# EXHIBIT D

GEORGE A. ZELCS*
 gzelcs@koreintillery.com
ROBERT E. LITAN*
 rlitan@koreintillery.com
RANDALL P. EWING*
 rewing@koreintillery.com
JONATHON D. BYRER*
 jbyrer@koreintillery.com
RYAN Z. CORTAZAR*
 rcortazar@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Ave., Suite 1950
Chicago, Illinois 60601
Tel.: (312) 641-9760 / Fax: (312) 641-9751

STEPHEN M. TILLERY*
 stillery@koreintillery.com
MICHAEL E. KLENOV (277028)
 mklenov@koreintillery.com
CAROL L. O'KEEFE*
 cokeefe@koreintillery.com
JAMIE BOYER*
 jboyer@koreintillery.com
KOREIN TILLERY LLC
505 North Seventh St., Suite 3600
St. Louis, Missouri 63101
Tel.: (314) 241-4844 / Fax: (314) 241-3525

DAVID BOIES*
 dboies@bsfllp.com
BOIES SCHILLER FLEXNER LLP
333 Main Street, Armonk, NY 10504
Tel.: (914) 749-8200 / Fax: (914) 749-8300

PHILIP C. KOROLOGOS*
 pkorologos@bsfllp.com
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2300 / Fax: (212) 446-2350

ABBY L. DENNIS*
 adennis@bsfllp.com
JESSE PANUCCIO*
 jpanuccio@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Tel.: (202) 895-7580 / Fax: (202) 237-6131

MARK C. MAO (236165)
 mmao@bsfllp.com
SEAN P. RODRIGUEZ (262437)
 srodriguez@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6820 / Fax: (415) 293-6899

SABRIA A. MCELROY*
 smcelroy@bsfllp.com
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel.: (954) 377 4216 / Fax: (954) 356-0022

*Pro Hac Vice application forthcoming*
*Attorneys for Plaintiffs Genius Media Group, Inc.,*
*The Nation Company, L.P., and The Progressive, Inc.*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| GENIUS MEDIA GROUP, INC., THE NATION COMPANY, L.P., and THE PROGRESSIVE, INC., individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　vs.<br><br>ALPHABET INC., GOOGLE LLC, and YOUTUBE, LLC,<br>　　　　　　　Defendants. | Case No.: 5:20-cv-09092<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PARTIES .............................................................................................................................. 3

JURISDICTION AND VENUE ........................................................................................... 5

FACTUAL ALLEGATIONS ............................................................................................... 5

I.      DIGITAL ADVERTISING ........................................................................................ 5

     A.    Search advertising ........................................................................................ 6

     B.    Display advertising ....................................................................................... 6

II.     THE OPEN DISPLAY ADVERTISING MARKETPLACE ....................................... 7

     A.    The relevant participants in the open display advertising marketplace ........ 7

     B.    How online display ads are selected and delivered ...................................... 8

     C.    Google dominates the open display programmatic advertising marketplace ................. 9

     D.    Google's significant power on both sides of the Ad Exchange and Ad Network markets is compounded by indirect network effects ............................. 10

III.    Google's unlawful conduct ....................................................................................... 11

     A.    Google excluded rival Ad Exchanges by using the publisher Ad Server to grant its Ad Exchange a first-in-line privilege and a last look in the sequential bidding process .................................................................................. 11

     B.    Google uses "Open Bidding" to tax its competitors in a classic "raising rivals' costs" strategy ................................................................................. 13

     C.    Google has combined its Ad Server and Ad Exchange products under Ad Manager, further excluding rivals and raising barriers to entry .................... 16

     D.    Google excludes rival Ad Networks under the guise of policing malicious code ........ 17

     E.    Google uses its Ad Server to impose rate structures that raise rivals' costs ................ 18

IV.    THE RELEVANT MARKETS ................................................................................. 19

V.     ANTITRUST IMPACT ............................................................................................ 21

VI.    ANTITRUST INJURY ............................................................................................. 22

CLASS ACTION COMPLAINT

VII.     GOOGLE CANNOT JUSTIFY ITS ILLEGAL CONDUCT ...................................23

VIII.    CLASS ALLEGATIONS ...............................................................................................24

IX.      CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS ...................................26

CLAIMS FOR RELIEF ...............................................................................................................27

COUNT I ...........................................................................................................................27

COUNT II ..........................................................................................................................27

COUNT III .........................................................................................................................28

REQUEST FOR RELIEF ............................................................................................................28

JURY TRIAL DEMAND .............................................................................................................29

CLASS ACTION COMPLAINT

Plaintiffs Genius Media Group, Inc., The Nation Company, L.P., and The Progressive, Inc., on behalf of themselves and all others similarly situated, bring this class action against Defendants Alphabet Inc. ("Alphabet"), Google LLC ("Google"), and YouTube, LLC ("YouTube") (collectively, "Defendants"), and allege, based on personal knowledge as to acts and events taking place in their presence, on the investigation of counsel, and on information and belief for all other allegations, as follows:

**INTRODUCTION**

1. This case is about the future of the online publishers who produce and publish the websites that have become the driving source of information throughout our society. These publishers, ranging from news organizations to bloggers, rely on online advertising revenue to fund their businesses. Their ability and incentive to create internet content is being threatened by Google—a titan of the internet—whose U.S. advertising-related revenues have exploded, approaching nearly $135 billion in 2019, while publisher revenues have plummeted.

2. The unlawful anticompetitive conduct at the heart of this case occurs in the display advertising marketplace, where publishers sell advertising space through real-time auctions. Through its campaign of anticompetitive conduct, Google has achieved and maintained a monopoly or near-monopoly in that marketplace by erecting a toll bridge between publishers and advertisers and charging an unlawfully high price for passage. Specifically, Google's Ad Server—the software or code that publishers use to make critical decisions about advertising content—imposes anticompetitive rules and conduct that artificially warp the channels through which publishers sell their ad placement inventory.

3. The Ad Server connects publishers to "Ad Exchanges," which are auction like platforms where advertisers bid to place advertisements on publishers' websites. "Ad Networks" are platforms that match advertisers and publishers, but which provide fewer features and target relatively smaller publishers.

4. Historically, Google's Ad Server conducted auctions for advertising space sequentially, accepting the first bid that exceeded publishers' minimum thresholds. But Google rigged the auctions by programming its Ad Server to make bids placed through its Ad Exchange marketplace artificially more likely to succeed, giving those bids both first-in-line privilege and the "last look" in each auction, which

CLASS ACTION COMPLAINT

artificially and anticompetitively distorted the outcomes. As Google's Ad Server awarded more winning bids to Google's Ad Exchange, that drove more advertisers to place bids using Google's Exchange, which in turn gave publishers stronger incentives to use that Exchange. And so the cycle continued—the increased use by advertisers and publishers of the Google Ad Exchange continued to incentivize further use by each. And this entire cycle was initiated by Google's use of its dominant Ad Server to give its Ad Exchange an advantage through a set of auction rules that were designed to exclude rival Ad Exchanges and thus to maintain and expand Google's dominance in the Ad Exchange market.

5.      Attempting to preserve some level of competition, publishers and other market participants turned to "header bidding"—a process that enabled simultaneous bidding among competing Ad Exchanges—as a more competitive means of engaging in the sale and distribution of open display advertising.

6.      Google reacted with a series of actions that ensured Google would retain and expand its control over the marketplace. Google began imposing Ad Server rules that pushed publishers to Google's own auction system and impeded the ability of header bidding to compete on the merits or function as intended. Through its Ad Server, Google also started levying an explicit surcharge on the bids submitted by non-Google Ad Exchanges. The surcharge can run as much as 10 to 15 percent of a bid, and it takes the form of a deduction from non-Google Ad Exchange bids as they are entered into the bidding process so that Google's Ad Exchange can win auctions even when its advertiser is not the highest bidder.

7.      But surcharging isn't enough for Google. It has also imposed uniform bidding floors that artificially prevent publishers from maximizing their revenues through competition. Google imposed these floors by modifying its Ad Server product to preclude publishers from establishing differentiated minimum bid floors for Ad Exchanges. When publishers tried to aim at a more even playing field—by allowing advertisers to submit lower bids through rival Ad Exchanges to encourage viable alternative Ad Exchanges--Google programmed its Ad Server to prevent it. This no-discounting provision makes it impossible for publishers to encourage competing Ad Exchanges and thereby prevents publishers from pursuing revenue-maximizing strategies.

8.      Google has further tilted the Ad Exchange market in its favor by combining its Ad Server and Ad Exchange products as a single product: Google Ad Manager. This fusion of two distinct products

serving distinct roles in related markets also favors Google's Ad Exchange by creating vendor lock-in to a single, anticompetitive, Google-controlled marketplace, entrenching its monopoly power in the Ad Server market, and excluding rival Ad Exchanges.

9.      Google also directed its anticompetitive conduct against the small- and medium-sized publishers that use Ad Networks, which act as intermediaries helping match those smaller publishers with advertisers through auction like processes.  Google modified its Ad Server to exclude bids submitted through rivals' Ad Networks when they competed with Google, thereby driving more business to Google's Ad Network.

10.      Google's conduct is not competition on the merits, but instead deliberately crafted anticompetitive conduct designed to monopolize or to attempt to monopolize the Ad Exchange and Ad Network markets, while unlawfully maintaining Google's monopoly in Ad Servers.

11.      Plaintiffs thus bring this class action, alleging violations of Section 2 of the Sherman Act and of California's competition laws, to obtain relief for themselves and the Class, and to ensure that competition, not Google's anticompetitive rules and practices, governs the online display of advertising through the Ad Server, Ad Exchange, and Ad Network markets.  Left unrestrained, Google will monopolize these and the other markets related to the display advertising marketplace, allowing Google's toll on publishers (and advertisers) to continue unabated.  Once Google is able to achieve that control, there will be no end to Google's ability to charge publishers monopoly prices, and Google will have obtained power once thought unimaginable—the power to decide which publishers live and which die.

## PARTIES

12.      Plaintiff Genius Media Group, Inc. is a Delaware corporation with its principal place of business at 92 Third Street, Brooklyn, New York 11231.  Established in 2009, Genius is a digital media company offering services such as the development and maintenance of a vast repository of annotated music lyrics, some of which are artist-supplied and many of which are transcribed and refined by a community of over two million Genius contributors.  Genius has approximately 25 million advertising impressions per day and has earned tens of millions of dollars in annual advertising revenue over the last four years.  Genius Media has used Google's Ad Server and Ad Exchange products to sell advertising

space on its website during the class period, received reduced revenues as a result of Google's misconduct, and suffered economic damage and antitrust injury as a direct result.

13.    Plaintiff The Nation Company, L.P., is a limited liability corporation organized in the state of New York, and having its principal place of business at 520 8th Avenue, 21st Floor, New York, New York 10018. The Nation used a Google Ad Server product and paid for and used a Google Ad Network product to sell advertising space on its website during the Class Period, received reduced revenues as a consequence of Google's misconduct, and suffered economic damage and antitrust injury as a direct result.

14.    Plaintiff The Progressive, Inc. is a non-profit organization organized in the state of Wisconsin, and having its principal place of business at 30 W. Mifflin Street, Suite 703, Madison, WI 53703. The Progressive used a Google Ad Server product and paid for and used a Google Ad Network product to sell advertising space on its website during the Class Period, received reduced revenues as a consequence of Google's misconduct, and suffered economic damage and antitrust injury as a direct result.

15.    Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Defendant Google is a wholly owned and controlled subsidiary of XXVI Holding Inc., which is a subsidiary of Defendant Alphabet. Since 2006, Google has wholly owned and controlled YouTube. Google is the alter ego and agent of Defendants Alphabet and YouTube, and the companies regularly combine and comingle their operations. For example, Google and YouTube share consumer data from their respective websites, google.com and youtube.com, in order to create new content and personalized advertisements on both sites.

16.    Defendant Alphabet Inc. is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Defendant Alphabet wholly owns and controls Defendants Google and YouTube. Defendant Alphabet is the alter ego of Defendants Google and YouTube. Google and YouTube direct all profit to, and report revenue through, Alphabet.

17.    Defendant YouTube, LLC, is a Delaware limited liability company with its principal place of business at 901 Cherry Avenue, San Bruno, California 94066. YouTube is a wholly owned and controlled subsidiary of Defendant Google. Defendant YouTube is the alter ego of Defendants Google and Alphabet. Google and YouTube combine both products for purposes of Google's AdWords

advertising program, which allows an advertiser to determine that if a person searches for a specific term on Google's search engine (*e.g.*, "financial advisor"), the advertiser can direct that the next time that consumer watches a video on YouTube that person will see an advertisement for financial advisory services. Google has recently begun testing integrating links to its search engine within YouTube's search results.

18. All three Defendants are engaged in substantial interstate commerce. Each Defendant deals with and earns revenue from publishers and advertisers throughout the United States.

## JURISDICTION AND VENUE

19. This action arises under Sections 2 and 15 of the Sherman Act, 15 U.S.C. §§ 2, 15 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

20. This Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 & 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

21. This Court has personal jurisdiction over Defendants. Google, Alphabet, and YouTube each maintain their headquarters in California.

22. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). All Defendants reside, transact business, are found, and have agents in this District.

23. Defendants' acts were within the flow of, were intended to have, and did, in fact, have a substantial effect on the interstate commerce of the United States.

## FACTUAL ALLEGATIONS

### I. DIGITAL ADVERTISING

24. The internet has revolutionized advertising and publishing. Due to the explosion of online commerce, the ability to target specific online consumers and audiences, whether through display or search ads, has powered the growth of online advertising. Online advertising is now the most rapidly growing segment of the advertising business in the United States, accounting for more than half of all advertising spending. In 2019, U.S. advertisers spent over $130 billion on online advertising.

25. Before the internet, companies wanting to advertise did so largely through print, the radio, and television. Advertising then was sent to all consumers, regardless of their traits or interests. As a

result, significant advertising dollars were wasted each year. The internet has changed all that, through two basic types of advertising—display ads and search ads—which are increasingly finely targeted to specific consumers who are more likely both to click on the ads and to ultimately buy the advertised products or services.

### A. Search advertising

26. Search advertising comprises ads linked to a word or phrase (*e.g.*, "Goldendoodles" or "water sprinklers") that are triggered to display when a consumer types that word or phrase into a search engine.

27. Advertisers value paid search ads because they are served to a consumer only after the consumer has made a query correlated with products or services related to the ad.  On Google's search engine platform, search ads typically appear at the top of the first page of results from a keyword search. Google hosts search advertising on other platforms as well—notably Google Play, Google Maps, and third party applications.

28. Google has been dominant in the online search advertising market for roughly 17 years. Collectively, Google's products account for approximately 73% of the search advertising market.

### B. Display advertising

29. Unlike search advertising, which is triggered when a consumer expresses an interest in the product through a search inquiry, display advertising is designed to induce that interest by displaying ads on webpages likely to be frequented by potential customers.  Since display ads are shown to specific consumers as they view a web page on their computer or mobile device, it is critical for the successful deployment of marketing spend for advertisers to have information about each prospect.  All else being equal, the more advertisers know about consumers' characteristics (*e.g.,* geography, age, gender, income) and preferences (*e.g.,* cars, food, clothes), the more advertisers will be willing to pay for ad space offered by publishers.  Detailed data on consumer demographics, characteristics, interests, and tastes enables advertisers to target their display ads to narrow, carefully chosen audiences who are most likely to purchase their product or service.

CLASS ACTION COMPLAINT

**II.     THE OPEN DISPLAY ADVERTISING MARKETPLACE**

30.     Publishers who wish to sell display advertising space on their webpages and advertisers who wish to place display ads on those pages are matched together, in the blink of an eye, in what is known as the "open display advertising marketplace."

31.     The act of displaying an advertisement to a consumer on a webpage is known as an "impression."  The value of an impression depends upon both the characteristics of the consumer who is viewing the ad and the value of the real estate where it is embedded—that is, the content of the publisher's webpage and the ad's location on that page.  Thus, the value of a publisher's impression may be increased whenever an advertiser has additional information about the consumer.  The publishers who can deliver the most desirable impressions in terms of both quality of the webpage and data on the consumer are able to charge more for the advertising space on their websites.

32.     Advertising space in the open display advertising marketplace may be sold on the basis of impressions, clicks, or actions.  Cost per impression means that advertisers pay the publisher for the number of times their ads are displayed as different consumers load the relevant webpage.  Cost per click means the advertiser pays the publisher each time a consumer clicks on their ad.  Cost per action means the advertiser pays the publisher if an action, such as a product purchase or a registration for a service, results from a consumer's exposure to the advertising.

33.     Advertisers that want to display their ads and publishers wishing to provide space for the ads each have a familiar problem:  finding each other.  Advertisers need to determine which sites and consumers to target, and the prices they are willing to pay to access consumers with various characteristics.  Publishers need to determine which ads they are willing to host on their site, and how much they want to charge.  A number of products and services within the industry enable publishers and advertisers to accomplish these goals, most often through automation.  The use of automated, algorithmic-driven computer software programs in the buying and selling of media is known as "programmatic" advertising.  Approximately two-thirds of all online advertising dollars are spent via programmatic marketing.

**A.     The relevant participants in the open display advertising marketplace**

34.     Publishers use software, called an Ad Server, to make their impressions available for sale.  The Ad Server is a key component of the publisher's website—it affects the revenue, layout, and content

of the website.  The publisher's Ad Server identifies the consumer, collects and distributes to potential advertisers information about both the webpage and the consumer, requests bids from those advertisers, selects an advertisement to display to the consumer from the competing advertisers' bids it receives, and ultimately serves the winning advertisement, displaying it to the consumer as the webpage loads.

35.    Ad Exchanges are platforms where publisher Ad Servers offer their inventory of impressions for sale and advertisers place bids on the impressions they wish to purchase.  Ad Exchanges then match advertisers with publishers programmatically using virtually instantaneous auctions known as "real-time bidding."  Ad Exchanges commonly cater to larger publishers, requiring that publishers have a minimum threshold of page views per month in order to offer their impressions up for auction on the Exchange.

36.    Smaller publishers with fewer page views than the Ad Exchange thresholds may use an Ad Network to sell their inventory of impressions.  An Ad Network is an aggregator that collects ad inventory from publishers and sells it to advertisers.  Like Ad Exchanges, Ad Networks compete against one another on the basis of price for publisher inventory.

37.    When possible, the publisher's Ad Server will offer the same impression on multiple Ad Exchanges or Ad Networks in order to reach the broadest group of potential advertisers, thereby increasing publisher revenues.

**B.    How online display ads are selected and delivered**

38.    Ads are chosen and shown to consumers via a sequence of events, all completed in a second or less.  In order for an ad to be displayed to a consumer visiting a webpage, the publisher's Ad Server, the consumer's browser, or a combination of the two, reach out to Ad Exchanges to request bids on the ad placement from interested advertisers.  These requests often contain information about the content the consumer is accessing, the consumer who is intending to visit the publisher's website, and the size and prominence of the ad space available on the web page.  After the interested advertisers place their bids, each Ad Exchange selects a winning bid from among those bids to submit to the publisher Ad Server.

39.    At that point, the publisher's Ad Server will essentially run an auction involving the participating Ad Exchanges.  Once the auction is concluded and the winning advertiser is selected, the Ad

Server delivers a final ad request to the consumer's browser, which contains a link for the ad to be displayed as part of the publisher's web page as it loads on the consumer's computer or mobile device.

**C.** **Google dominates the open display programmatic advertising marketplace**

40. Google is the dominant competitor at each segment of the open display programmatic advertising marketplace.

41. Google's dominance of the publisher Ad Server market began in 2007, when Google purchased DoubleClick for Publishers, which controlled over 50% of the market. At the time of the acquisition, industry participants, including publishers, raised concerns that Google could use DoubleClick's market power in Ad Servers and its wealth of consumer tracking data to reduce competition throughout the online advertising marketplace. The Federal Trade Commission, which conducted a competition assessment of the merger, observed the potential for future "unlawful tying or other anticompetitive conduct." The FTC nevertheless permitted the merger to continue, over the dissent of a Commissioner who warned of the "troubling" likely effect that the merger would have on "the evolution of the entire online advertising market—especially in light of existing network effects, and the tremendous additional network effects the transaction will generate." Another Commissioner, while concurring in the decision to close the investigation, noted "serious vertical competition issues raised by Google's proposed acquisition of DoubleClick."

42. The warnings were validated, as Google has achieved monopoly power in Ad Servers, with an estimated market share of 70-90%. Google has benefitted from its market power in Ad Servers to become the dominant display Ad Exchange, with a market share in the neighborhood of 50%. The few rivals to Google's Ad Exchange—such as Rubicon and OpenX—have market shares in the teens or single digits, and Google's current market share outstrips the combined shares of the next six competitors. Google's control over the Ad Server makes it a gatekeeper for publishers' revenues and puts Google in charge of publishers' critical advertising and content decisions.

43. Google is also the dominant display Ad Network, through its AdSense network, with a market share of over 50%.

44. Today, Google stands as the dominant provider of tools to publishers at all levels of the open display programmatic advertising marketplace, with market power at each stage of that marketplace.

GOOGLE'S ROLE IN THE SIMPLIFIED ADVERTISING MARKETPLACE

**GOOGLE SHARE ESTIMATE**

70-90%    45-55%

**D.      Google's significant power on both sides of the Ad Exchange and Ad Network markets is compounded by indirect network effects**

45.      Ad Exchanges and Ad Networks are subject to indirect network effects.  This means that as the number of consumers on one side of the platform increases, the platform becomes more valuable to consumers on the other side of the platform.

46.      Thus, as the number of advertisers using Google's Ad Exchange has grown, giving rise to more potential bidders on impressions, more publishers are encouraged to use Google's Ad Exchange.  Similarly, as the number of publishers offering impressions on Google's Ad Exchange has grown, increasing the inventory of impressions available on that Exchange, more advertisers are encouraged to

use Google's Ad Exchange.  Each additional advertiser increases the value of Google's Ad Exchange to all publishers using it.  Likewise, each additional publisher increases the value of Google's Ad Exchange to all advertisers using it.  These same indirect network effects are present in the Ad Network market as well.

**III.   Google's unlawful conduct**

47.     Google has dominant power in the open display programmatic advertising marketplace at the Ad Server level, which determines the winner of any competitive bidding process.  Google has abused its monopoly power in Ad Servers, and its concomitant control over the bid selection process, to engage in a number of anticompetitive acts, including:

      a.  excluding rival Ad Exchanges through the imposition of rules designed to ensure Google's Ad Exchange wins more bids, including the combined practices of first-in-line privilege and last look in the waterfall process;

      b.  taxing rival Ad Exchanges through Google's Open Bidding process;

      c.  excluding rivals and raising barriers to entry by combining two separate products that serve distinct functions, the Ad Server and Ad Exchange;

      d.  excluding rival Ad Networks from competing for impressions; and

      e.  using its Ad Server to impose rate structures that raise rival Ad Exchanges' costs through prohibiting publishers from offering better prices through other Exchanges.

**A.      Google excluded rival Ad Exchanges by using the publisher Ad Server to grant its Ad Exchange a first-in-line privilege and a last look in the sequential bidding process**

48.     Historically, Ad Servers conducted auctions for ad impressions supplied by publishers through a sequential, or "waterfall," process.  The Ad Server first checked whether the space was subject to a direct long-term contract between the publisher and advertiser.  If not, the Ad Server routed the impression to a series of Ad Exchanges for auction.  If the first auction produced a bid above the publisher's minimum floor price, the bid would be accepted.  If, however, the first Ad Exchange failed to generate a bid above the publisher's reservation price, the Ad Server would pass the impression on to a second Ad Exchange, and so on, until a winning bid from an Ad Exchange cleared the publisher's minimum floor price level.

CLASS ACTION COMPLAINT

49.     This waterfall method excluded rival Ad Exchanges and deprived publishers of the opportunity to reach the entire universe of Ad Exchanges. If an Ad Exchange with an early place in the waterfall sequence produced a bid above the publisher's minimum acceptable price, that early bid would win the impression—even if an Ad Exchange later in the waterfall sequence had elicited a substantially higher bid. The publisher Ad Server determined the order in which publisher impressions were sent to the various Ad Exchanges, setting their sequential ranking in the waterfall. This waterfall option approach disadvantaged publishers to Google's benefit, particularly as compared to what would occur in a simultaneous auction.



**WATERFALL AUCTION          VS          SIMULTANEOUS AUCTION**

Under the Waterfall Auction model, the highest potential bid of $3.50 is never considered because an earlier (albeit lower) bid matches the floor set by the publisher. The winning bid is $3.00. In contrast, in the Simultaneous Auction, the highest bid of $3.50 wins the auction, garnering higher returns for the publisher.

50.     The publisher Ad Server determined the order in which publisher impressions were sent to the various Ad Exchanges, setting their sequential ranking in the waterfall. Google's Ad Server sent the vast majority of publisher impressions to Google's Ad Exchange first. From the perspective of advertisers, this meant that Google's Ad Exchange provided a significant advantage because the advertiser was assured that its bid would be accepted so long as it was above the publisher's minimum acceptable price. This first-in-line privilege, granted by the Google Ad Server, effectively drove advertisers to use Google's Ad

Exchange because advertisers knew that if they submitted the same bid on Google's Ad Exchange and on a competing Exchange, the bid on Google's Ad Exchange was more likely to win due to Google Ad Exchange's priority in the waterfall. Thus, Google used its Ad Server monopoly power to expand its Ad Exchange dominance. In turn, Google's enhanced Ad Exchange dominance reinforced its Ad Server dominance through network effects and feedback loop dynamics.

51. Google introduced "last look" to its Ad Server in 2014. Rather than running a real-time auction among a variety of Ad Exchanges or Ad Networks, Google's Ad Server assigned each provider an estimated bid generated from historical data. The Ad Server would then submit the highest estimated bid to the Google Ad Exchange, which could win the auction by bidding one cent higher. This reduced publisher revenue because Google's Ad Exchange only had to beat the estimated bids of other providers, even if those providers would have bid far higher had they been given the opportunity. Google's last look also tended to foreclose competition in the Ad Exchange market because Google's Ad Server did not allow rival Ad Exchanges to bid in real time on an impression until Google's Ad Exchange had already passed on the opportunity. Like the first-in-line privilege, this last look option increased the number of winning bids originating from Google's Ad Exchange, driving even more advertisers to use the Exchange, and further reinforcing Google's power in both Ad Servers and Ad Exchange through indirect network effects.

52. In sum, Google's first-in-line privilege combined with its last look served to further exclude rival Ad Exchanges by causing advertisers to gravitate to Google's Ad Exchange, which was more likely to win the auctions rigged by its Ad Server. This exclusion harmed competition in the Ad Exchange market, to the detriment of Plaintiffs and other class members, who were compelled to accept lower prices for their ad space than they would have received without Google's anticompetitive conduct.

**B. Google uses "Open Bidding" to tax its competitors in a classic "raising rivals' costs" strategy**

53. Publishers recognized that the sequential bidding process of the waterfall method did not produce bids as high as those generated by simultaneous bidding among competing Ad Exchanges. Publishers responded to their predicament—Google's manipulation of the waterfall method to favor its own Ad Exchange and discriminate against rivals—by widely adopting "header bidding" in 2015. Header

bidding refers to a bidding process enabled by "header codes" that publishers were able to place on their websites, allowing them to notify multiple Ad Exchanges simultaneously of the availability of an impression.

54.     Header bidding enhanced competition between Ad Exchanges and led to substantial increases in winning prices for impressions, by as much as 25-50%. This increase in impression prices for publishers under header bidding is evidence of the harm publishers suffered by virtue of Google's use of its monopoly power in Ad Serving to reduce competition in the Ad Exchange market.

55.     But here, too, Google was unwilling to compete head-to-head with rival Ad Exchanges. Google used its Ad Server to interfere with the mechanism its header bidding competitors used to handle simultaneous bids, making its Ad Exchange bid available in Google's Ad Server only *after* the header bidding auction was complete. Google thus granted itself an anticompetitive advantage over its competitors—one not based on the merits and enabled solely by the gatekeeper role Google took for itself.



Header Bidding took the form of a simultaneous auction, which required Exchanges to compete head to head, and eliminated Google's ability to win impressions with bids lower than those offered by competing Exchanges, as its first-in-line preference had enabled it to do.

Google refused to participate in header bidding, choosing instead to essentially reimplement its last look option in this context, bidding against the winner of the header bidding auction in the Ad Server.

CLASS ACTION COMPLAINT

56.     In April 2018, Google launched its direct competitor with header bidding, a system conducted by its dominant Ad Server under the name "Exchange Bidding with Dynamic Allocation." Google later euphemistically re-named "Open Bidding."  Google used its Ad Server to effectively force Exchange Bidding on publishers by interfering with the JavaScript code that rival Ad Exchanges used to place advertisements through header bidding.

57.     Google also used its monopoly in Ad Servers to impose an explicit 5-15% surcharge or tax on any ads from a non-Google Ad Exchange.  Google also chose to structure and use this surcharge to maximize its anticompetitive impact: it is imposed as part of the bidding process, as opposed to after-the-fact, which has the effect of suppressing the amount that advertisers from competing Exchanges are shown to be bidding for an impression.  This structure has two consequences.  First, bids as input from Google's Ad Exchange can win auctions even if those bids are lower than those of the rival Ad Exchange absent the surcharge; in this way, the surcharge *both* drives more wins towards Google's Ad Exchange *and* suppresses the revenues publishers earn from winning bids.  Second, even when a rival Ad Exchange wins an auction in spite of the surcharge, the publisher will receive less money for that impression than it otherwise would have received absent the surcharge.  Had the Ad Server imposed the surcharge on winning bids from rival Ad Exchanges after-the-fact, Google would have had to pay more to win the ad, resulting in more money for publishers and more wins by competing Ad Exchanges.

58.     For example, assume the surcharge is 10% and minimum bid increments are $0.05.

- **Scenario 1: Surcharge is imposed as part of the bid in the auction:** If Ad Exchange A has a winning bid of $1.00, it is entered into the Ad Server Open Bidding auction as $0.90, and Google's Ad Exchange must bid at least $0.95 to win the auction. If Google's Ad Exchange wins, the publisher receives $0.95; if Ad Exchange A wins, the publisher receives $0.90.

- **Scenario 2: Surcharge is imposed after the auction:** If Ad Exchange A again has a winning bid of $1.00, Google's Ad Exchange must now bid at least $1.05 to win.  If Google wins, the publisher receives $1.05; if Ad Exchange A wins, the publisher receives $0.90.

59.     While publishers receive the same amount if a rival Ad Exchange wins under either scenario, publishers receive significantly lower amounts when Google wins if the surcharge is imposed as part of the bidding process.  Moreover, structuring the surcharge as part of the bid necessarily results in more winning bids by the Google Ad Exchange, and again adds to Google's power in the Ad Exchange market literally at publishers' expense.  Google's surcharge on rivals reduces competition in the Ad Exchange market, to the detriment of publishers.  Ironically, Google imposes this tax through business rules imposed by the Ad Server—the very software product that purports to serve the interests of Google's publisher clients.

## C.    Google has combined its Ad Server and Ad Exchange products under Ad Manager, further excluding rivals and raising barriers to entry

60.     Google further responded to competition from header bidding by locking critical Ad Exchange functionality into its Ad Server and ultimately marketing and selling both products under a single product name, Google Ad Manager.  Google's combination of the two products into one further funnels publishers into Google's Ad Exchange.  The market's network effects then create a feedback loop: those additional publishers make Google's Ad Exchange even more irresistible to advertisers, which in turn entices more publishers to install Google's Ad Server.  The more transactions that Google's Ad Server sends to its Ad Exchange, the more surcharges Google is able to impose on its Ad Exchange rivals, thereby continuing to build its share and dominance in the Ad Exchange market.  The bolting of these two products together as one substantially forecloses rival Ad Exchanges by subjecting them to ever more surcharging by Google.

61.     Moreover, in order to reach a significant portion of Google's large stable of advertisers, publishers have no realistic alternative but to place their impressions on the Google Ad Exchange.  In order to do so, publishers are now compelled to use the Google Ad Server under the Ad Manager umbrella.  The new Ad Manager serves as the latest nail in the coffin for any competing Ad Server, or for any potential entrant into the Ad Server market, further maintaining Google's existing monopoly in Ad Servers.

62.     Having compelled the use of both the Ad Server and Ad Exchange by customers that want only one or the other, Google has maintained, strengthened, and expanded its dominance in *both* markets,

CLASS ACTION COMPLAINT

thereby further enabling much of Google's other anticompetitive conduct, such as surcharging rivals and misusing the Ad Server to steal auction wins from its Ad Exchange competitors.

63. Forcing Google's Ad Exchange customers to use Google's Ad Server, and vice versa, raises additional barriers to entry in a two-sided market that already posed a monumentally high bar given Google's massive stable of advertisers. Google's conduct has both the goal and effect of gaining control over the entire range of products, squelching innovation, and locking publishers and advertisers into a Google-controlled network—all of which allows Google to extract more revenue from publishers and advertisers alike.

64. Microsoft used similar anticompetitive strategies in the 1990s. For example, Microsoft correctly recognized that the web browser could displace the operating system as the most important computer interface. The web browser is an application that sits on top of a "stack" or layers of software, with the operating system at its foundation. Microsoft used its Windows operating system monopoly to force consumers to install, load, and use Internet Explorer instead of a rival web browser. By so doing, Microsoft was both expanding its monopoly "upward" in the stack—from the operating system into web browsers—and maintaining its operating system monopoly by making the web browser dependent on Windows. Similarly, Google seeks to maintain and expand control throughout the entire advertising technology stack (including the Ad Server and Ad Exchange/Ad Network markets) by forcing its Ad Server and Ad Exchange or Ad Network products together. Google, like Microsoft before it, is thereby squelching innovation and locking its users into a Google-controlled system from top to bottom.

65. Google cannot avoid the consequences of its monopoly by arguing that its wrongful conduct—forcing Ad Server customers to use Ad Exchange and vice-versa—has in fact resulted in making Ad Manager a "single integrated product" rather than two distinct products tied together. The fact remains that the Ad Server, which selects and serves ads, and the Ad Exchange, which holds auctions, perform fundamentally different functions.

**D.    Google excludes rival Ad Networks under the guise of policing malicious code**

66. Ad Networks act as intermediaries, helping to match advertisers with small and medium-sized publishers whose page views are not high enough to allow them to offer their advertising inventory directly on the more sophisticated Ad Exchange marketplaces. By offering its Ad Server product for free

to publishers that use its Ad Network and have fewer than 90 million monthly page views, Google has generated power in the Ad Network market with an estimated market share of at least 50%. Google's Ad Server allows publishers to solicit guaranteed prices from multiple Ad Networks for the same impressions, although a publisher may choose to use only Google's Ad Network.

67. Under the guise of controlling problematic code, Google's Ad Server excluded rival Ad Networks from competing for impressions, thereby driving more business to the Google Ad Network and diminishing publisher revenues. Google's Ad Server informed the publisher and the rival Ad Network that there was a problem with the rival Ad Network's code. The Ad Server removed the rival Ad Network's code, which effectively precluded the rival from competing for the publisher's impressions. The rival Ad Network was then forced to resubmit the same code to the publisher's Ad Server, which required extensive work and hours of labor by staff at both the rival Ad Network and the publisher, and jeopardized the rival Ad Network's business relationship with the affected publisher. Moreover, while this work was in process, the rival Ad Network was not permitted to compete for that publisher's impressions in the Google Ad Server.

68. This recurring practice, instituted by the Google Ad Server, injured rival Ad Networks by imposing unnecessary additional costs on publishers seeking to use the rival Ad Networks in conjunction with their Google Ad Server. Publishers were injured because the rivals impacted included Ad Networks that paid more for the same inventory than Google's Ad Network was willing to offer. Through its anticompetitive conduct, Google has used its monopoly power in Ad Servers to monopolize or attempt to monopolize the Ad Network market, and as with Ad Exchange, the impacts of these acts are exacerbated by indirect network effects.

**E.** **Google uses its Ad Server to impose rate structures that raise rivals' costs**

69. Separate and in addition to the surcharge on rival Ad Exchanges discussed above, Google uses its Ad Server to raise its rivals' costs. Through Google Ad Manager, Google imposes a rate structure that lowers publishers' revenues if an advertisement is placed using a rival Ad Network or Ad Exchange under certain circumstances.

70. For instance, Google's Ad Server may impose an "Audience" fee that is as much as 100% higher when advertisements are placed through a non-Google Ad Network or Ad Exchange (*e.g.*, a 5-cent

fee for a certain number of Google-placed advertisements, but a 10-cent fee for the same number of competitor-placed advertisements). Google deploys other fee structures that achieve a similar economic effect by "including" a certain number of Google-placed advertisements at certain price tiers, while "excluding" non-Google-placed advertisements so that publishers incur additional fees when they do business with a competitor.

71.     Google's course of conduct is designed to force publishers to deal exclusively with Google and punish those who do not. Google's conduct has the purpose and effect of making it uneconomical to use a rival Ad Exchange, thereby coercing publishers to exclusively use Google's Ad Server and Ad Exchange. Put differently, Google punishes customers who choose not to deal exclusively with Google.

72.     Google's surcharges and discriminatory rate structures make it uneconomical for publishers to substitute a rival Ad Server, Ad Exchange, or Ad Network. Because Google's surcharges and rate structures cannot be supported by legitimate business justifications, they serve no purpose but to keep publishers locked in to Google's advertising products by penalizing customers who attempt to substitute a rival product.

73.     Google's Ad Manager conduct serves the same end because, by compelling publishers who need access to Google's dominant Ad Exchange or Ad Network to use Google's Ad Server, Google punishes publishers who attempt to use rivals' products by increasing the cost of doing so.

74.     Together, Google's conduct adds up to a scheme to force publishers to deal exclusively with Google and to prevent publishers from defecting.

**IV.     THE RELEVANT MARKETS**

75.     Google has achieved market or monopoly power in each of the relevant product markets.

76.     This case involves the markets for three products: Ad Servers, Ad Exchanges, and Ad Networks.

77.     Publisher Ad Servers are the means and "decision engine" for determining which advertisements to display. They impose and administer the rules for offering advertising impressions for sale, and selecting which ad to display.

78.     Ad Exchanges, by contrast, match two different categories of customers (advertisers and publishers). They provide a service like a clearinghouse or auction house, that is distinct from the Ad

Server product, which connects publishers to the Ad Exchanges and Ad Networks and makes decisions regarding ad placement and acceptance.

79.     Ad Networks are less sophisticated than Ad Exchanges and are a separate product market. Rather than providing all the targeting and bidding features of Ad Exchanges, Ad Network placements are made based on a pool of advertising inventory.  Ad Networks have existed much longer than Ad Exchanges, and are inadequate for sophisticated or large-scale publishers.

80.     All of the foregoing markets are part of what the industry calls "display advertising"—as opposed to video advertising or search advertising, which use different technologies and are not substitutable with the display advertising seen across the internet.

81.     Display advertising comprises two channels: owned-and-operated platforms and the open display advertising marketplace.  The owned-and-operated channel consists of social media platforms like Facebook and e-commerce giant Amazon, which are each vertically integrated in that they sell their own advertising inventory directly to advertisers through propriety, integrated interfaces referred to in the industry as "walled gardens".  Google, however, operates not just in such an isolated space but instead has created advertising tools and advertising exchange services for both third party publishers and advertisers in the open display advertising marketplace.  Owned-and-operated platforms and the open display advertising marketplace are not reasonable substitutes for each other and are not viewed as such by advertisers or publishers.

82.     There is one further distinction within the open display advertising marketplace: the market for ads that are negotiated directly between publishers and advertisers, and the open display programmatic advertising market, in which ads are placed automatically through Ad Exchanges and Ad Networks.  The two segments are not reasonable substitutes for each other and are not viewed as such by advertisers or publishers.  That is because both sides of the market initially try to arrange direct placements, which provide both security and maximum revenue.  Once these opportunities are exhausted, parties on both sides of the market turn to programmatic advertising, arranged by auctions on Ad Exchanges and Ad Networks, which collectively account for approximately two-thirds of all open display advertising.

83.     In the open display programmatic advertising marketplace, Google has monopoly power in the publisher Ad Server market, where it has a market share in the range of 70–90%; the Ad Exchange

1 market, where it controls approximately 50% of the market; and the Ad Network market, where it controls

2 approximately 50% of the market.

3       84.    The relevant geographic market is the United States.

4       85.    Google also has monopolies in adjacent markets—such as the market for advertiser buying

5 products. Because many advertisers single-home, meaning they use only a single advertiser buying

6 product to access the open display advertising marketplace, Google's advertiser buying products have

7 become the sole access point to the market for a substantial portion of all advertisers. Google also has a

8 monopoly or substantial market power in search advertising, web browsers, and phone operating systems.

9 Google's power in these adjacent markets bears on Google's market power in the relevant markets and

10 their barriers to entry. These adjacent markets allow Google to lock customers into, and keep them

11 dependent on, its ecosystem, but they are not the markets in which the challenged conduct occurred. For

12 instance, Google has used its search and mobile dominance to strong-arm publishers into a scheme called

13 "AMP", whereby Google takes publisher content and hosts it on Google's own systems—thus ensuring

14 that consumers never leave Google's websites even when viewing the non-Google content. This allows

15 Google to independently collect and retain information concerning the publishers' consumers, allowing

16 Google to benefit from and control advertising associated with content created by others.

17 **V.    ANTITRUST IMPACT**

18       86.    Google's conduct has substantially impaired competition in the Ad Exchange and Ad

19 Network markets, which Google has a dangerous probability of monopolizing by virtue of its intentional

20 and unlawful conduct.

21       87.    Google's taxes on rivals have contributed to the consolidation of the Ad Exchange market

22 fostering Google's maintenance and expansion of its power in that market. When Google entered that

23 market in 2009, it was highly competitive, and has previously been populated by at least eight vigorous

24 competitors.

25       88.    Since then, in part as a direct result of Google's anticompetitive conduct, several Ad

26 Exchanges have left the Ad Exchange business, including adBrite, Yahoo, and the ASDAQ exchange.

27 Among the remaining major competitors, Rubicon has consistently lost money and been barely profitable.

28 Rubicon has attempted to remain alive in the Ad Exchange business by sharply cutting its fees to

percentages in the low teens or lower, a strategy which the company itself admitted may not succeed. The financial condition of OpenX, another competing privately owned Ad Exchange, is not publicly reported and therefore unknown, although it was reported to have laid off approximately 20 percent of its staff at the end of 2018, and added more layoffs earlier this year.

89. In the Ad Network market, Google's use of its Ad Server product to block the bids of competing Ad Networks has driven more market share to Google's own Ad Network. By anticompetitively driving additional usage of its Ad Network, Google has unlawfully maintained its monopoly or enhanced the probability of it gaining monopoly power in the Ad Network market by impeding its rivals' ability to compete on the merits, including through the use of strategies raising rivals' costs.

90. Moreover, by anticompetitively driving additional usage of its Ad Exchange and Ad Network, and bolting its Ad Exchange and Ad Publisher into a single product, Google has unlawfully maintained its monopoly in Ad Servers, and unlawfully maintained its monopoly or enhanced the probability of it gaining monopoly power in the Ad Exchange market, to the detriment of Plaintiffs and class members.

91. Google's challenged conduct is completely lacking in any procompetitive justification. Moreover, the harm to competition—particularly by publishers but also by advertisers—in the Ad Exchange, Ad Network, and Ad Server markets from Google's unlawful conduct more than offsets any pro-competitive benefits or justifications Google may offer.

## VI. ANTITRUST INJURY

92. Plaintiffs and class members have suffered antitrust injury as a direct result of Google's unlawful conduct.

93. By impairing competition among advertisers on rival Ad Exchanges, Google has artificially suppressed prices for and revenues earned by publishers for their ad space. In addition, Google's unlawful conduct has enabled it to charge supra-competitive prices for its Ad Exchange and Ad Network services, both to publishers and advertisers, and supra-competitive prices, either directly or indirectly, to publishers for its Ad Server product.

94.     The Ad Exchange and Ad Network markets are platforms or two-sided markets that serve two types of customers (publishers and advertisers) by matching them to create a transaction.  As such, the fee level for purposes of antitrust harm, and as an indicator of monopoly or market power, may be calculated as the net or total cost of the transaction across both sides of the market—that is the sum of fees paid by publishers and fees paid by advertisers.  Google is able to extract monopoly rents.

95.     But this case is not just about the publishers and advertisers that make up the two sides of an Ad Exchange or Ad Network transaction.  The ultimate consumers—the readers and viewers of publishers' content—are also harmed by Google's misconduct.  Consumers are deprived of quality.  This includes quality of presentation and display (due to Google's conduct in the Ad Server market) and of the match between consumer and advertiser (due to Google's conduct in the Ad Exchange and Ad Network markets).

96.     Total damages from Google's unlawful conduct suffered by class members during the class period amount, at the very least, to hundreds of millions of dollars.

## VII.    GOOGLE CANNOT JUSTIFY ITS ILLEGAL CONDUCT

97.     Google cannot justify its restraints of trade and monopolizing conduct.

98.     Google cannot supportably claim efficiency justifications for its conduct because Google's conduct creates numerous inefficiencies.

99.     Nor is there any valid argument that monopoly is somehow desirable in the relevant markets.  Even in markets with network effects, antitrust law does not recognize a defense to anticompetitive conduct based on size.  Moreover, as confirmed by relevant empirical and economic literature, competition between platforms results in better quality, better matches, and lower net prices.  Competition on the merits—in both the Ad Exchange and Ad Network markets—will produce better outcomes for consumers than monopoly because competing Ad Exchanges and Ad Networks will be incentivized to lower their take rates, increasing revenue to publishers enabling them to generate additional, higher-quality content as well as allow new or existing publishers to more readily enter the online world.

100.    Nor can Google claim any of the abstract justifications often used when firms "vertically integrate."  Google's integration in fact reflects a strategy through which Google raises barriers to entry

CLASS ACTION COMPLAINT

and prevents new competitors or ways of doing business from breaking into the online advertising marketplace.

## VIII.   CLASS ALLEGATIONS

101.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes (the "Classes"):

•         Class 1 – All persons that received revenue from Google for displaying advertisements using Google's Ad Exchange services from four years prior to the date of this Complaint's filing through the present (the Class Period).

•         Class 2 – All persons that received revenue from Google for displaying advertisements using Google's Ad Network services from four years prior to the date of this Complaint's filing through the present (the Class Period).

Specifically excluded from the Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, and any person acting on their behalf.

Also excluded from the Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

102.    The Classes are readily ascertainable and the records for them should exist, including, specifically, Defendants' own records and transaction data.

103.    Due to the nature of the trade and commerce involved, there are thousands of geographically dispersed members in the Classes, the exact number and their identities being known to Defendants.

104.    Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and members of the Classes sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein.  The damages and injuries of each member of the Classes were directly caused by Defendants' wrongful conduct.

CLASS ACTION COMPLAINT

105.    There are questions of law and fact common to the members of the Classes, including, but not limited to, the following:

- whether Google has monopoly power in the Ad Server, Ad Exchange, and Ad Networks markets;

- whether Google has imposed implicit and explicit taxes on rival Ad Exchanges;

- whether the imposition of such taxes constitutes monopolization, monopoly maintenance, and/or attempt to monopolize the Ad Exchange market;

- whether Google's tie of its publisher Ad Server and Ad Exchange products furthers Google's monopolization, monopoly maintenance, and/or attempt to monopolize the Ad Exchange market;

- whether Google has blocked rival Ad Networks from competing for publisher inventory;

- whether Google's conduct with respect to rival Ad Networks constitutes monopolization, monopoly maintenance, and an attempt to monopolize the Ad Network market;

- whether Google's conduct has harmed Plaintiffs and class members by reducing their revenues from the sale of their ad inventory;

- whether Google's conduct has harmed Plaintiffs and class members by causing them to pay supra-competitive prices for Google's Ad Exchange, Ad Network, and Ad Server services;

- whether Google's conduct has harmed or at least not benefited advertisers; and

- the appropriate Class-wide measures of damages.

106.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes, and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Classes.

107.    Questions of law or fact that are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

108.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Classes would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying

adjudications of the questions of law and fact common to the Classes. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of Class members to seek redress for the violations of law alleged herein.

## IX.    CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

109.    California's substantive laws apply to every member of the Classes, regardless of where in the United States the Class member resides. Defendants' Terms of Service explicitly state that California law will govern all disputes arising out of or relating to the terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. By choosing California law for the resolution of disputes covered by its Terms of Service, Google concedes that it is appropriate for this Court to apply California law to the instant dispute.

110.    Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, *see* U.S. CONST. amend. XIV, § 1, and the Full Faith and Credit Clause, *see* U.S. CONST. art. IV, § 1, of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, with the claims asserted by the Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair. Defendants' decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible. The application of California laws to the Classes is also appropriate under California's choice of law rules because California has significant contacts with the claims of Plaintiffs and the proposed Classes, and California has the greatest interest in applying its laws here.

CLASS ACTION COMPLAINT

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation of § 2 of the Sherman Act, 15 U.S.C. § 2**

**(Monopolization and Monopoly Maintenance)**

111.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

112.    The relevant markets defined above are valid antitrust markets.

113.    Google has monopolized the Ad Server, Ad Network, and Ad Exchange markets.

114.    Google possesses monopoly power in the Ad Server, Ad Network, and Ad Exchange markets.  Google willfully seeks to maintain its monopoly power through anticompetitive conduct.

115.    There are no procompetitive benefits or justifications that offset the competitive harm of Google's unlawful conduct.

116.    As a result of Google's unlawful conduct, Plaintiffs have suffered, and continue to suffer, monetary harm in an amount to be proved at trial.

**COUNT II**

**Violation of § 2 of the Sherman Act, 15 U.S.C. § 2**

**(Attempted Monopolization)**

117.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

118.    The relevant markets defined above are valid antitrust markets.

119.    To the extent that Google contends it does not have a monopoly in any of the Ad Network, Ad Exchange, or Ad Server markets, Plaintiffs assert in the alternative that Google has intentionally and unlawfully attempted to monopolize the Ad Network, Ad Exchange, and/or Ad Server markets through anticompetitive conduct, including, *inter alia*, its implicit and explicit taxes on rival Ad Exchanges and its blocking of bids from rival Ad Networks; its interference with and manipulation of auctions and header bidding; and by combining and effectively forcing users to use both its Ad Server, one the one hand, and its Ad Network and/or Ad Exchange, on the other.

CLASS ACTION COMPLAINT

120.    Google has acted with the specific intent to monopolize the Ad Network, Ad Exchange markets, and/or Ad Server markets.

121.    Google has a dangerous probability of monopolizing the Ad Network, Ad Exchange, and/or Ad Server markets, including by excluding competitors, undermining quality, squelching innovation, and raising the total price of services.

122.    There is no legitimate business justification for Google's conduct.

123.    As a result of Google's unlawful conduct, Plaintiffs have suffered, and continue to suffer, monetary harm in an amount to be proved at trial.

## COUNT III

## Violation of California's Unfair Competition Law

## (Cal. Bus. & Prof. Code § 17000 *et seq.*)

124.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

125.    Google's conduct constitutes deceptive, fraudulent, unlawful and/or unfair business acts and practices.

126.    Google's conduct threatens an incipient violation of the antitrust laws alleged herein, and it violates the policy and spirit of those laws because the effects of the conduct are comparable to or the same as a violation of the law, and it otherwise significantly threatens and harms competition.

127.    Additionally, Google's conduct on balance harms consumers and competition, offends established public policy, is substantially injurious to consumers, and is neither outweighed by countervailing benefits nor avoidable by consumers.

128.    Plaintiffs have been deprived of money or property as a result of Google's unfair business practices alleged herein through numerous mechanisms, including but not limited to Google's depriving publishers of advertising revenue by taking fees and charges from publisher.

## **REQUEST FOR RELIEF**

129.    WHEREFORE, Plaintiffs and the Class members request the Court to enter judgment in their favor against Defendants, awarding all such relief as the Court deems appropriate and just.

130.    Plaintiffs request the following relief:

1        A.     That the Court determine that this action may be maintained as a class action under

2 Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this

3 action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

4        B.     That the Court enter an order declaring that Defendants' actions, as alleged

5 herein, violate the law;

6        C.     That the Court award Plaintiffs and Class members damages, treble damages,

7 punitive damages, and/or restitution in an amount to be determined at trial;

8        D.     That the Court order Defendants to fully divest their publisher Ad Server line of

9 business, and refrain from operating within the market for publisher Ad Server products;

10        E.     That the Court permanently enjoin Defendants, their affiliates, successors,

11 transferees, assignees, and other officers, directors, agents, and employees thereof from continuing,

12 maintaining, or renewing the conduct alleged herein, and from adopting or following any practice, plan,

13 program, or device having a similar purpose or effect;

14        F.     That the Court award Plaintiffs pre- and post-judgment interest;

15        G.     That the Court award Plaintiffs their costs of suit, including reasonable attorneys'

16 fees and expenses; and

17        H.     That the Court award any and all such other relief as the Court may deem proper.

18 **JURY TRIAL DEMAND**

19       131.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

20 trial of all issues so triable.

21      Dated: December 16, 2020       */s/ Mark C. Mao*

22                     George A. Zelcs (*pro hac vice* forthcoming)
                        Robert E. Litan (*pro hac vice* forthcoming)

23                     Randall P. Ewing (*pro hac vice* forthcoming)
                        Jonathon D. Byrer (*pro hac vice* forthcoming)

24                     Ryan A. Cortazar (*pro hac vice* forthcoming)
                        KOREIN TILLERY LLC

25                     205 North Michigan Avenue, Suite 1950
                        Chicago, IL 60601

26                     Tel.: (312) 641-9750 / Fax: (312) 641-9751

27

28                     Stephen M. Tillery (*pro hac vice* forthcoming)

Michael E. Klenov (277028)
Carol L. O'Keefe (*pro hac vice* forthcoming)
Jamie Boyer (*pro hac vice* forthcoming)
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844 / Fax: (314) 241-3525

David Boies (*pro hac vice* forthcoming)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200 / Fax: (914) 749-8300

Philip C. Korologos
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2300 / Fax: (212) 446-2350

Abby L. Dennis
Jesse Panuccio
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Tel.: (202) 895-7580 / Fax: (202) 237-6131

Mark C. Mao (236165)
Sean P. Rodriguez (262437)
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6820 / Fax: (415) 293-6899

Sabria A. McElroy (*pro hac vice* forthcoming)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel.: (954) 377 4216 / Fax: (954) 356-0022

*Attorneys for Plaintiffs Genius Media Group, Inc.,*
*The Nation Company, L.P., and The Progressive,*
*Inc.*