# EXHIBIT F

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

John D. Radice (*pro hac vice* forthcoming)
April Lambert (*pro hac vice* forthcoming)
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
alambert@radicelawfirm.com

*Attorneys for Plaintiff*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| MARK J. ASTARITA, individually and behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| GOOGLE LLC and ALPHABET INC., | |
| Defendants. | |

CLASS ACTION COMPLAINT
CASE NO.

Plaintiff Mark J. Astarita, on behalf of himself and all others similarly situated, bring this first amended consolidated class action complaint for equitable relief and treble damages under the Sherman Antitrust Act, 15 U.S.C. § 2, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.

## I. NATURE OF THE ACTION

1. Over the past several years, Google leveraged its monopoly in online search and search advertising to acquire an illegal monopoly in brokering display advertising—the placement of advertisements on other companies' websites. Google gained this market dominance in part by acquiring rivals in the online advertising space, conditioning access to its search-results data and YouTube video advertising platform upon the purchase of its separate display advertising services, and making its intermediation systems incompatible with those of its competitors. Google's scheme to monopolize the market for brokering display advertising has vastly reduced competition in the purchase and placement of this advertising and resulted in economic harm to advertisers and publishers alike.

2. Forty-nine state attorneys general are currently conducting antitrust investigations of Google's conduct in digital advertising markets. Ten states, led by Texas, filed a civil antitrust action against Google on December 16, 2020 based on the conduct and violations described in this complaint. The United States Department of Justice and eleven state attorneys general also filed a civil antitrust action against Google on October 20, 2020 for unlawfully maintaining monopolies in the markets for online search and search advertising.

3. Because of its pervasive monopoly conduct, Google now controls the "ad tech stack" comprising the intermediary services between advertisers, which pay to place digital advertisements, and publishers paid to publish those ads on their websites. Companies that wish to place or publish online advertisements have little choice but to pay Google for its advertising services, including instantaneous auctions, and Google's exclusion of competition in this intermediation market has enabled it to favor its own advertising platforms. Google's extraction of monopoly rents through fees charged to both advertisers and publishers has resulted in higher prices paid by advertisers, higher consumer prices, and lower payments to publishers of online display advertisements.

4. Like the other class members, Plaintiff dealt directly with Google in its capacity as

1

CLASS ACTION COMPLAINT
CASE NO.

display advertising broker, having published online display advertisements using Google's services, and having been paid by Google for running those ads. Plaintiff, like the other class members, suffered economic losses as a result of Google's monopolization and seeks appropriate equitable relief and damages through this action.

## II.     JURISDICTION AND VENUE

5.      This Court has original jurisdiction over Plaintiff's federal antitrust claim under the Clayton Act, 15 U.S.C. § 15. The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendants, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

6.      Venue is proper in this District under 28 U.S.C. § 1391. Google's principal place of business is in this District, and it regularly conducts business here. A substantial part of the events giving rise to Plaintiff's causes of action occurred in or emanated from this District.

7.      Assignment to the San Jose Division is appropriate under Local Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in Santa Clara County. In addition, this case arises out of the same operative facts as a related action pending in this division, *In re Google Digital Advertising Antitrust Litigation*, No. 5:20-cv-03556-BLF.

## III.    PARTIES

### A.     Plaintiff

8.      Plaintiff Mark J. Astarita is a citizen and resident of Florida and an attorney who owns and operates the website seclaw.com.

9.      During each year from 2016 to 2020, Google brokered the placements of display advertisements that appeared on this website, and Google directly paid Plaintiff for making this advertising space available.

10.     Plaintiff sustained antitrust injury by being paid sub-competitive prices by Google in exchange for making space on his website available to publish display advertisements that Google brokered. These anticompetitive underpayments directly and proximately resulted from Google's

2

CLASS ACTION COMPLAINT
CASE NO.

monopolization of the relevant market, defined in Part VI below.

**B.    Defendants**

11.    Defendant Google LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Mountain View, California.  Google LLC is a technology company that provides internet-related services and products, including online advertising technologies and a search engine.

12.    Defendant Alphabet Inc. is a corporation organized under the laws of Delaware with its principal place of business in Mountain View, California.  Google LLC is a wholly-owned subsidiary of Alphabet.

13.    Google LLC and Alphabet Inc. are collectively referred to herein as "Google."

**IV.    FACTUAL ALLEGATIONS**

**A.    Overview of Digital Advertising**

14.    Businesses have long relied on advertising to promote their products, generate brand awareness, and increase sales.  Before the internet age, advertising campaigns were planned and managed by media buyers.  If a media buyer needed to help a toy manufacturer reach parents of children, she might place an ad in *Parents Magazine*, or in the family section of the local newspaper.

15.    Digital advertising today works differently.  The internet allows businesses to target potential customers with greater precision.  Digital advertising is the promotion of products and services via the internet through search engines, websites, social media, and other platforms that can be accessed online.  It is automated and data-driven, involving data scientists, mathematicians, and computer programmers who, behind the scenes, use advanced statistical tools to optimize advertising campaigns, micro-targeting users and constantly tweaking algorithms.

16.    Digital advertising is now the fastest growing segment of the advertising business in the United States.  More than half of all advertising money in the United States is now spent on digital advertising—approximately $129 billion in 2019.

17.    The two overarching markets in digital advertising are search advertising and display advertising.

3

CLASS ACTION COMPLAINT
CASE NO.

18. Search advertising is the placement of advertisements above or alongside the organic search results generated by a search engine, predominately Google Search. The advertisement targets those who are actually searching for a product or service; the advertisement appears when a consumer performs a search that has a connection to the product or service offered by company sponsoring the advertisement. The advertiser pays when the user clicks on the advertisement, based on a cost per click. For example, if a user searches for sandwich delivery, the search advertising results may look like this:

19. Search advertising is designed to reach customers who have already shown an interest in



purchasing a product or service and may be close to making a purchasing decision. If, for example, a person finds herself locked out of her house and searches for nearby locksmiths on Google Search, search advertising will place ads for local locksmith services above the organic search results.

20. Search advertising is limited, however, to prospective customers who affirmatively search for the advertiser's product or service or for something similar, or who input a related term.

21. Display advertising, in contrast, is the advertising that appears next to content on websites. Unlike search advertising, which is generally limited to text, display advertising comes in many forms, including banners, images, and videos. For instance, an ad for Dove soap might appear as a banner or sidebar on the cooking website "myrecipes":

4

CLASS ACTION COMPLAINT
CASE NO.



Or as side bar ads, like this:



22.     With display advertising, the internet user need not perform a specific search for the particular product or service.  Instead, the key to effective display ads is placing them on websites likely to be viewed by the advertiser's target audience or by those most likely to purchase the advertised products or services.  A running shoe company, for example, would prefer to have its advertisements appear on sporting goods websites rather than websites selling car parts.  In that scenario, even users who have not searched for running shoes will see the running shoe company's advertisement if they visit a website that publishes it.

23.     Suppliers of display advertising are website operators and are known as publishers (*e.g.*, providers of online news sites and other content creators).  Publishers employ third-party tools to find advertisers willing to purchase advertising space available on their websites.

24.     In 2019, $69.9 billion was spent on digital display advertising in the United States; 85% of that display marketing was advertising, 90% of which was executed through "programmatic," or automated, real-time bidding.  In 2020, spending on display media is expected to reach $81.3 billion, a 14% year-over-year increase.

25.     Display advertising accounts for approximately half of the digital advertising market,

5

CLASS ACTION COMPLAINT
CASE NO.

and many web publishers rely on display advertising for a major source of their revenue.

26.     As discussed in further detail below, search advertising and display advertising serve different purposes, and advertisers do not regard them as substitutes for each other.  The Interactive Advertising Bureau—an advertising organization that develops industry standards and conducts research for the advertising industry—separates display and search for purposes of gathering and reporting annual revenues in these two advertising markets.

### B.     Google Dominates and Controls Digital Advertising Services Markets

27.     Google is the dominant supplier in the search advertising market and has moved rapidly to control all stages of the display advertising market, as well.  In 2019, Google's corporate parent Alphabet earned $135 billion, 84% of its total revenue, from search and display advertising.

28.     Google's revenue derived from display advertising comes from ads placed on Google's own properties (Google Maps, Gmail, etc.) and from acting as an intermediary in the sale of ad space on third-party websites to advertisers.

29.     One of Google's key sources of revenue derives from its activities as the broker between publishers and advertisers in programmatic display advertising.  When an ad is viewed on a third-party publisher's site, such as the *New York Times* website, Google pays the publisher a share of the amount the advertiser paid to Google.  The amount of revenue Google earns from display advertising is dependent on the number of ads it sells, the price of those ads, and Google's percentage margin or "cut" of the deal, also known as the "take rate."

30.     The "take rate" is the difference between what an advertiser pays for an ad and what portion of that payment the publisher of the ad receives for placing the ad on its website.  Google's take rate as an intermediary is typically 54-61%.  When ads are presented on Google products, such as Google Search or YouTube, Google keeps the entire price of the ad.

31.     Google has a strong economic incentive to increase the number of ads placed on its proprietary sites, to charge advertisers higher prices, and to pay as little as possible to publishers displaying ads placed through Google on their websites.

CLASS ACTION COMPLAINT
CASE NO.

1    **1.    Google's Search Advertising Practices and Market Share**

2    32.    As the owner of the dominant online search platform, Google is by far the largest

3    supplier of digital search advertising in the United States.  Over the last ten years, Google's share of the

4    digital search advertising supply has ranged between 89% and 93%.

5    33.    Google makes space on its search results pages available to advertisers through an

6    auction process that occurs each time a user runs a search.  Google starts the auction by first finding all

7    the ads with keywords matching the search.  It then excludes ads that are considered ineligible based on

8    certain criteria, such as country restrictions.  Google then only displays ads with a sufficiently high

9    "rank" based on a combination of factors, such as the advertiser's bid, the quality of the ad, user

10   location, and the device the user is using.  Because the auction process is repeated for every search

11   performed on Google Search, different auctions may lead to different advertisements being displayed.

12   34.    Although Google claims that it prices its search advertising through an auction, Google

13   controls (and frequently raises) the price of its search advertising by setting a high reserve price.  Doing

14   so enables Google to directly set the price of its search advertisements because an ad will not sell unless

15   its price meets or exceeds the reserve price, which thus operates as a floor.  A majority of the winning

16   bids for Google Search ads are at the reserve price.

17   **2.    Google's Dominance in the Ad Tech Stack and Display Advertising**

18   35.    Google is also a major supplier of programmatic display advertising and owns multiple

19   products that supply it.  Google captures well over 50% of the market across the ad tech stack—the set

20   of intermediary exchanges and platforms that advertisers and publishers use to buy, sell, and place

21   display ads ("intermediation" services).  Google runs the leading ad exchange, while also running buy-

22   side and sell-side intermediary platforms trading on this exchange.

23   36.    YouTube, owned by Google, alone accounts for about 10% of the entire supply of display

24   advertising.  Other major Google products, such as Google Maps and Google Play, also offer display

25   advertisements.

7

CLASS ACTION COMPLAINT
CASE NO.

37.     Approximately 86% of online display advertising space in the United States is bought and sold in real time on electronic trading venues, referred to in the industry as "advertising exchanges" or programmatic real-time bidding.  Google owns and operates the dominant ad exchanges.

38.     The role of the ad exchange is critical in display advertising.  Exchange transactions are the means by which website publishers monetize the attention they earn from web users and advertisers can maximize the impact of their ad spend.  A competitive and transparent ad exchange is therefore essential to parties on both sides of the ad stack.

39.     Relying on intermediaries like Google that route buy and sell orders from advertisers and publishers, the structure of the ad market resembles the structure of electronically traded financial markets.  Just as individual investors trade on financial exchanges through an intermediary brokerage firm, so must publishers and advertisers go through a computerized intermediary to trade on advertising exchanges.  But in display advertising, a single company, Google, simultaneously functions as the key intermediary through which buyers (advertisers) and suppliers (publishers) of display advertising trade, and as a leading publisher of advertisements in its own right.

40.     On the buy-side, advertisers use specialized software made either for small or large advertisers.  Smaller advertisers, such as a local dry cleaner, typically use Google Ads, a self-serve online buying tool.  Google Ads will bid on and buy ad space, including available inventory trading on Google's exchange, in an automated fashion on the dry cleaner's behalf.  But in this process, Google can ultimately be the advertiser's counterparty instead of its neutral agent.

41.     When an internet user clicks to visit a web page, in the milliseconds that it takes for that page to load, real-time auctions are occurring in the background to determine which ads will display on the web page *that particular user* will see.  These auctions are run by supply-side platforms (SSPs), exchanges, and demand-side platforms (DSPs) in the ad tech stack.

42.     On the supply side of the exchange, suppliers—online publishers—of display advertising employ publisher ad servers (PAS) to accept, store, and manage ads; choose where and when ads appear; and track the effectiveness of ad campaigns.  Each specific ad placement is determined based on bids from advertisers and/or preexisting arrangements between publishers and advertisers.  Publishers

CLASS ACTION COMPLAINT
CASE NO.

rely on supply-side platforms (SSPs) to run auctions, interface directly with their demand-side equivalents, and optimize available inventory.

43. The demand side is comprised of advertisers and media agencies running advertising campaigns for businesses. Advertisers and media agencies rely on advertiser ad servers (AAS) to store ads, deliver them to publishers, and record transactions. Advertisers and media agencies also employ demand-side platforms (DSPs) to purchase digital advertising by bidding in auctions and to manage their bids.

44. The DSP connects to an ad exchange, which combines inventory from ad networks and SSPs with third-party data from a data management platform or data broker. When an ad space on a publisher's site becomes available, the ad exchange holds an auction in which the DSP bids on the impression submitted by the ad network or SSP.

45. Together, the publisher ad servers (PAS), supply-side platforms (SSP), advertiser ad servers (AAS), and demand-side platforms (DSP) comprise what is known as the "ad tech stack." By connecting publishers and advertisers, an ad tech provider functions as an intermediary broker. The U.K.'s Competition and Markets Authority (CMA) depicted this market as follows:



46. Until fairly recently, different firms provided the various services in the ad tech stack, and intermediaries did not own publishers or advertisers. Google lagged behind the pace of innovation and was not a key player in the development of online ad exchanges. Early players in virtual ad auctions recognized it was most efficient to interoperate with competitors and maintain a level playing field so that customers could mix and match products. During Senate testimony on September 15, 2020, digital marketing expert Adam Heimlich compared transacting in those earlier auctions to "owning a stall in a vast open air market"—transparency was at a level where market participants could

9

CLASS ACTION COMPLAINT
CASE NO.

easily compare features, quality, and price with those of other participants within reach, and could use ad stack services provided by a variety of providers. This is no longer the case. After a series of acquisitions, Google now dominates and controls the ad stack as a whole.

47. Before Google's entry, ad exchanges generally operated as disinterested brokers, similar to stock exchanges. Google saw the market efficiency of these early exchanges as a threat to its primary business of selling ads. It soon turned to a sustained mergers and acquisitions strategy to gain market dominance. Google's acquisitions gave it access to and made it a major player at every level of the display advertising service industry, and have enabled Google to exclude competition through a variety of anticompetitive policies and activities.

48. Since 2007, Google has made numerous key acquisitions in the interest of taking control of the entire ad tech stack. Through these acquisitions, Google absorbed competing firms to avoid competing with them with the purpose and effect of building and consolidating its monopoly.

49. In 2007, Google purchased the leading ad server, DoubleClick, which provided the basic technology for Google's current PAS. In 2009, Google acquired AdMob, the largest ad server for the then-nascent mobile application market, which has since grown exponentially. The technology from Invite Media, which Google acquired in 2010, was re-launched in 2012 as DoubleClick Bid Manager and eventually converted into Google's main DSP, Display & Video 360. In 2011, Google purchased AdMeld, one of the largest SSPs in the display advertising industry, which it integrated into AdX, Google's existing exchange. And in 2014, Google bought Adometry, an analytics and attribution provider it then integrated into Google Analytics. Together, these acquisitions reveal a business objective of occupying the entire ad stack and the connected analytics market through buying up the competition.

50. When Google purchased DoubleClick, the Federal Trade Commission accepted Google's representations that it would not leverage its control of publishers' primary ad server to distort competition in the electronic ad-trading market. Google promised to manage the conflicts of interest, including from enhanced access to user data, that would result from the acquisition. Google's general

counsel assured Congress that DoubleClick "data is owned by the customers, publishers and advertisers, and DoubleClick or Google cannot do anything with it."

51.     FTC Commissioner Pamela Jones Harbour dissented from the FTC's approval of the acquisition, warning in part that if Google and DoubleClick were permitted to merge without conditions, the new combination could merge Google and DoubleClick data to the detriment of consumer privacy and competition.  Commissioner Harbour stated that the merger could "profoundly alter the 21st century Internet-based economy—in ways we can imagine, and in ways we cannot."  She expressed concern about "the privacy interests of consumers" and wrote that she was "uncomfortable accepting the merging parties' nonbinding representations at face value."

52.     In approving Google's acquisition of DoubleClick, the FTC rejected prescient concerns about data and competition raised by Commissioner Harbour and public interest groups.  An April 14, 2007 news article in the *New York Times* noted that Google's DoubleClick division would have conflicts of interest with Google's exchange, but suggested publishers and advertisers might simply "jump ship" if Google leveraged the acquisition "to further its own ad network."

53.     When Google did leverage the DoubleClick acquisition to further its ad network, instead of turning to other ad tech providers, increasing numbers of publishers and advertisers concluded they had no choice but to rely on Google to broker display-ad placement.

54.     In 2009, Google restricted the ability of publishers and advertisers participating in its exchange to access their DoubleClick data, reserving an essential information advantage for its own trading divisions.

55.     In 2016, moreover, Google broke a key promise it made to the FTC to push through the DoubleClick acquisition: Google began merging DoubleClick web-browsing data with personal information collected through other Google services, combining information linked to a user's personal identity with their location on Google Maps, information from their Gmail records, and their Google search histories, along with user information obtained from other Google products.  With this step, Google eliminated the barrier between the data that Google gathered from cookies tracking users' online behavior and the personal information Google held from its users' accounts.  Its digital advertising

---

11

CLASS ACTION COMPLAINT
CASE NO.

monopolies enabled Google to make this momentous shift in data policy without risk of losing business to rivals more protective of consumer privacy.

56.     In approving Google's 2010 acquisition of AdMob, the leading mobile ad network at the time, the FTC acknowledged that "the combination of the two leading mobile advertising networks raised serious antitrust issues." Yet the FTC deemed those concerns "overshadowed by recent developments in the market," in particular a move by Apple to "launch its own, competing mobile ad network." The FTC approved Google's acquisition of AdMob based on the assumption that Apple would continue to build its presence in the mobile ad market. But that assumption was incorrect— Apple's product failed to gain traction and in 2016 Apple abandoned its attempt to develop a competing mobile ad network.

57.     By 2015, Google's acquisitions had given it monopoly power in the display advertising services market, and the early exchanges that had initially outperformed Google were selling at a discount price or had folded. The market shares of the DSPs that once led that market segment declined in parallel.

58.     Documents that Google produced to the House Subcommittee on Antitrust, Commercial, and Administrative Law show that Google acquired companies to absorb its competition and combine products along the ad stack instead of competing on the merits. An internal Google presentation from July 2006 included a slide titled "Build a Self-Reinforcing Online Ads Ecosystem," which noted in part that acquiring DoubleClick or Atlas could create "self-reinforcing benefits" for Google's integrated ad business. The slide asked, "[I]s there some framework we have to demonstrate the synergies/inter-relationships from owning all these pieces?"

59.     In an internal email from 2010, discussing Google's potential development of a demand-side platform for advertising agencies (a "bidder"), the executive in charge of Google's display business wrote: "The primary benefits on having a bidder are eliminating the disintermediation risk and substantially increasing display spend with Google from agencies (through the combined use of DFA – bidder – AdX). . . . We are looking at options to accelerate this (potentially through M&A for example)."

CLASS ACTION COMPLAINT
CASE NO.

60. DFA refers to Google's ad server; AdX was Google's exchange. The "disintermediation risk" that Google sought to eliminate resulted from the competitive, transparent conditions in the display advertising exchange market at the time, which diverted ad money away from Google. Thus, Google's plan was to *combine* products to increase its revenue from "display spend" and lock in bidders to its new and consolidated intermediation services.

61. Google's merge-to-monopolize strategy worked. On the supply side, Google now holds at least 90% of the PAS submarket through multiple products such as Google Ad Manager and Google DoubleClick for Publishers. Since taking the dominant position in the PAS submarket, Google began merging its supply-side intermediation products with its PAS offering. The composite product "Google Ad Manager" combined Google's PAS with its associated ad exchange. For the SSP and associated ad exchange submarket, Google holds a 50-60% share. On the demand side, Google also controls a substantial majority of the DSP submarket. Google has a 55% market share of the ad-exchange submarket, far more than the second-place company, AppNexus, which has a 11% share of that submarket. And Google's DSP holds a 50% share of the DSP submarket, with AOL a distant second at 12%. Google holds an 80-90% share of the AAS submarket as well.

62. Because of Google's market dominance, publishers and advertisers have little choice but to use Google's intermediation services. Nexstar Media Group, Inc., the nation's largest local news company, tested what would happen if it stopped using Google's technology to place ads on its websites. Over just a few days, the company's video-ad sales plummeted.

63. Google further consolidated its monopoly across the ad tech stack through a series of product mergers, whereby it bundled two distinct products together and rebranded the integrated entity as a single product. Google blurred the distinction between its ad server and exchange by reclassifying its ad-serving revenues in its shareholder reports and by merging the two into a single new product that it named Google Ad Manager. Google then merged its AAS with its DSP to create Display & Video 360. Each of these mergers increased switching costs for advertisers—and barriers to entry for competitors—for services that already carried high switching costs.

**C. Google Used Its Market Power to Acquire and Maintain a Monopoly for Display Advertising Services**

**1. Google Leveraged Its Dominance in Search and Search Advertising and Its Control of User Data to Gain a Monopoly in Brokering Display Advertising**

64.     Google operates the default internet search platform in the United States.  More than 90% of all internet searches are conducted through Google Search.  Further, Google's web browser, Google Chrome, occupies about half of the U.S. browser market.

65.     Google has long monetized its monopoly in search by selling search advertising—digital ads responsive to user searches.  The data that Google has acquired from search and Google Chrome users allowed Google to leverage its monopoly in the digital search market into the related but separate market of display advertising.

66.     General online search services in the United States constitutes a distinct antitrust market. Search services allow consumers to find responsive information on the internet by entering keyword queries into search engines such as Google.  These general search services are unique because they offer consumers access to an extremely large and diverse volume of information from many sources across the internet.

67.     There are no reasonable substitutes for general online search services.  Other search tools, platforms, and information sources are not reasonably interchangeable with general online search services because they do not provide access to a wide range of information from one search inquiry. Few consumers would find alternative sources a suitable substitute for general search services.

68.     Google has monopoly power in the United States general online search services market. Google dominates this market with an approximately 90% market share.  And nearly 95% of all search queries on mobile devices are performed using Google's search engine.

69.     There are significant barriers to entering the market for general online search services, including large capital investment, highly complex technology, access to effective distribution, and adequate scale.

70.     Google's anticompetitive conduct has effectively eliminated rivals' ability to compete in the general search services market.  Google used exclusionary agreements, tying arrangements, and

14

CLASS ACTION COMPLAINT
CASE NO.

payoffs to barricade its general search monopoly such that competitors are denied vital distribution, scale, and product recognition—preventing them from realistically challenging Google in this market. As one example, Google ensured that its search engine would be the preset default general search engine on hugely popular devices like Apple's iPhone and the devices running on Google's Android operating system.

71.     Online search advertising in the United States also constitutes a distinct antitrust market. Search advertising enables advertisers to target their ads in real time in response to search queries.

72.     Other forms of advertising are not reasonably interchangeable with online search advertising.  The capability of search advertising to respond to consumers' inquiries at the moment they are looking for information to make a potential purchase makes these ads highly valuable to advertisers and distinguishes them from other types of advertising that cannot be targeted in this way, whether online or offline.  Display advertising is no substitute for search advertising, including because display advertising is not responsive to a consumer's specific inquiry and is further removed from the point of purchase.  Few advertisers would find alternative sources a suitable substitute for search advertising.

73.     Google has monopoly power in the United States online search advertising market. Google holds more than a 70% share of that market.

74.     Barriers to entry in the search advertising market, among other factors, protect Google's monopoly in that market.  Most critically, search advertising requires a search engine with sufficient scale to make the advertising profitable.  Hence the same entry barriers that fortify Google's general search services monopoly also protect Google's search advertising monopoly.

75.     Google's monopolies in search and search advertising—and the data they generate about individual users—give Google an enormous advantage over online advertisers and publishers owing to the sheer volume of information Google acquires about consumers through its integrated panoply of products and services.  This data include browsing histories from Google Search and Google's Chrome web browser, and location data from Google Maps, Waze, and Google's Android operating system embedded in hundreds of millions of smartphones.  As Google's former CEO Eric Schmidt boasted,

CLASS ACTION COMPLAINT
CASE NO.

"We know where you are. We know where you've been. We can more or less know what you've been thinking about."

76.     Online advertising is more effective when it is targeted, displaying products or services a user is more likely to want. Accordingly, user data—including gender, age, location, and browsing history—influence not just the types of ads a user will see, but also the prices advertisers are willing to pay. "The exact same ad, on the same website, at the same time, could be worth vastly different amounts to two different buyers depending on how much they know about the consumer being targeted," explained Ari Paparo, a former Google executive who founded the advertising company Beeswax. "User data is everything."

77.     The prices that any company is able to fetch for ads that it displays online depend on two crucial factors: the ability to identify *who* is loading the page or mobile application, and the ability to connect that user's identity with more information about them.

78.     The targeting of display ads begins the moment a user clicks to visit a web page. Typically, the user's IP address and location, along with the URL of the web page, are swiped from the user's browser without their explicit knowledge. This data then informs the instantaneous ad auctions that occur in the split second before the web page appears to the user. The goal is to build and deploy as specific a portrait about the user as possible, primarily by linking their device with their identity. Web cookies, tags, and "fingerprinting" of mobile devices are common tools for doing so.

79.     If a publisher or company that sells online ads can know what a user is viewing on *other* sites, the publisher can target the user based on that information when the user returns to the publisher's site. Because of its dominance, including in search, Google can track users' visits to at least 70% of the top one million sites on the internet. Google has tags (including as a third party) tracking user behavior on over 80% of popular websites.

80.     Due to Google's monopoly in search and its unrivalled ability to gather, aggregate, and analyze user data, which it does not share, no potential competitor to Google can offer an advertising product that comes close to the individualized targeting that Google can offer. Without access to search data, potential rivals are effectively excluded from competing in digital advertising.

CLASS ACTION COMPLAINT
CASE NO.

81.     To illustrate Google's vast advantage over any other publisher in accessing and monetizing data, consider two hypothetical online publishers, CNBC and the *New York Times*.  Suppose, for example, that a user named Mary visits CNBC's website in the mornings, where she reads about financial markets, and visits the *New York Times* in the evenings to read the book review section.  CNBC knows that Mary follows financial markets and might monetize her view at a $30 CPM (cost per thousand impressions).  The *Times* knows that Mary likes to read books and might only monetize her at a $10 CPM.  If the *Times* can somehow find out that Mary is reading CNBC in the mornings, then when Mary visits the *Times* book review section in the evening, the *Times* can target her as someone who follows the markets and monetize her at $30, too.

82.     Since the two are competitors in the supply side of the display advertising market, CNBC would not want to share with the *Times* what Mary reads on cnbc.com.  If CNBC is selling ads to its audience of financial readers at a $30 CPM, and the *Times* can access CNBC's readers and their reading patterns, then the *Times* could undercut CNBC and sell ads targeted to CNBC financial readers for, say, $25 instead of $30.

83.     Google uses its ability to track users across the web to extract such a large advantage in display advertising markets that rivals are effectively excluded.  Google tracks users through its analytics and ad-serving products, which it combined and rebranded as the Google Marketing Platform.  While publishers like CNBC and the *Times* would never share with each other user information that gave each a competitive advantage, they have no choice but to share user tracking information with Google, which acts as both their ad broker and supply-side competitor.

84.     Google's exclusive access to its proprietary data from Chrome and Android further widens its substantial advantage over other publishers.  Google relies on this data, which is generally unavailable to competing bidders, when bidding on its own ad exchanges to win contracts to display ads.  Potential rivals for display advertising contracts cannot compete to win business without access to this data.

85.     Furthermore, while digital ads trade on several auction markets, Google ensures that its own display advertising inventory can only be purchased through its proprietary auctions.  Thus, the

---

17

CLASS ACTION COMPLAINT
CASE NO.

most effective, data-driven inventory stays within Google's control and potential competitors are excluded.

86.     Having consolidated key portions of the ad tech stack for display advertising, Google now readily brokers transactions on both sides of this market, and can steer advertisers to its *own* display supply platforms like YouTube.  As the U.K.'s CMA concluded in a report issued on July 1, 2020, "Google's strong position at each level of the intermediation value chain creates clear conflicts of interest, as it has the ability and incentive to exploit its position on both sides of a transaction to favour its own sources of supply and demand."

## 2.     Google Harms Purchasers and Sellers of Online Advertising by Coercing the Purchase of Display Advertising Through Tying Arrangements

87.     With about nine out of ten internet searches using Google's search engine, Google is the dominant source for search advertising.  As a result, companies seeking to promote their products or services online have little or no choice but to purchase search advertising space from Google.  Google has taken advantage of this dominance in the search advertising market to drive out competition in the separate market for display advertising services, tying its display advertising services to its search advertising services to extend its monopoly power.

88.     Because search advertising targets users who have already shown some interest in the product or service from their search, few online advertising campaigns bypass online search as a platform for marketing.  Search advertising accounts for at least part of the ad spend of nearly every advertiser engaged in online advertising.

89.     When a Google Ads account is established for use in placing search advertisements, Google Ads is set as the default account for placing both search *and* display advertisements.  Google also blocks advertisers from using third-party DSPs to purchase Google Search inventory, which is sold primarily through Google AdWords.  And, to further disadvantage rivals, Google restricts access to data relating to web searches performed on Google Search.

90.     When consumers run Google searches, Google collects and retains data related to the searches.  For example, Google Ads (a DSP) relies on algorithms that match keywords selected by

CLASS ACTION COMPLAINT
CASE NO.

1    advertisers to user search terms to determine which search ads pop up after which searches.

2        91.    DSPs and advertisers use this data to craft more effective advertising campaigns.

3    Google, however, withholds this data from rival DSPs and advertisers using rival service providers.  As

4    a result, an advertiser running both search and display ads cannot track the performance of its search ads

5    unless it relies only on Google to place its display ads.

6        92.    The effect of this policy is that, to access the search data over which Google has

7    monopoly control and which is vital to effective online advertising, an advertiser is coerced into using

8    Google's products in the separate market for display advertising services.

9        93.    Advertisers that open a Google Ads account are required to buy Google search

10   advertising.  Thus, Google Ads does not merely steer advertisers to Google search advertising but

11   conditions their ability to bid for publisher display space upon their purchase and use of Google search

12   advertising.

13       94.    Google's restrictive practices coerce any advertiser whose marketing pairs online search

14   advertising with online display advertising to rely only on Google's intermediation services to place its

15   display advertisements.

16       95.    Exacerbating this tying conduct, Google pressures many advertisers to use only one

17   Google buy-side intermediary to purchase ad space.  This pressure results from Google's decision to

18   scramble user IDs across multiple bidding tools instead of assigning and disclosing a single user ID to a

19   particular advertiser.  Because Google obscures DoubleClick IDs for all parties other than Google,

20   advertisers that use more than one buying tool at a time risk inadvertently bidding against themselves in

21   exchange transactions, driving up the price they would pay.

22       96.    Google's Ads Data Hub (ADH) allows advertisers to view data from ad campaigns,

23   including which users their search advertising campaigns reached, and to combine that data with internal

24   or third-party data to set or adjust display advertising strategy.  Nevertheless, the ability to use Google's

25   ADH data comes with a built-in restriction: the data can only be sent to another Google service and

26   cannot otherwise be exported.

27       97.    In 2018, Google stopped allowing advertisers to access the encrypted user IDs from ad

28

---

19

CLASS ACTION COMPLAINT
CASE NO.

campaign reports. Advertisers need this information to hire non-Google ad campaign measurement firms. Advertisers that stay within Google's "walled garden" and use its ADH product can still access these IDs.

98.     Google's restrictive policies have made it virtually impossible for an online marketer to operate independently from the Google ad stack, particularly given Google's dominance in the DSP, ad server, site analytics, and other submarket segments.

99.     Likewise, on the supply side, Google restricts publishers' ability to access the bid data required to compare the performance of Google's exchange with rival exchanges. And Google does not reveal to other market participants its own fees and commissions on transactions. As discussed further below, this lack of transparency that Google has unilaterally imposed across the ad stack undermines the ability of both advertisers and publishers to make the informed decisions necessary to drive competition.

100.    Google similarly uses its dominance in the video-ad publishing market segment to coerce advertisers to use Google's display advertising services.

101.    Google-owned YouTube is Google's most valuable display property. YouTube is by far the most visited website in the United States, drawing more than three times the traffic of Twitter and Facebook, respectively. Nearly every business that advertises with online videos buys advertising space on YouTube, and about half of all video ads not appearing on Facebook and Amazon appear on YouTube.

102.    Video has become increasingly important to online advertising campaigns because of its compelling nature and the exponential increase in user traffic that it generates. In 2019, 81% of businesses used video as a marketing tool—up from 63% in 2018. By 2022, online videos will account for more than 82% of all consumer internet traffic—15 times higher than the corresponding percentage in 2017.

103.    After Google purchased YouTube, it initially made YouTube's inventory of display advertising available to any advertising service provider. But in 2015, Google took YouTube off the digital ad exchanges, restricting its ad inventory to being purchased *only through Google's* brokering channels and bidding tools.

CLASS ACTION COMPLAINT
CASE NO.

104.    Consequently, advertisers can no longer purchase YouTube inventory using a third-party DSP.  If an advertiser wants to purchase any of the valuable advertising space on YouTube, it must use Google's advertising services and cannot use any of Google's rivals' advertising services.

105.    One erstwhile competitor described Google's requirement that Google services be used to place ads on YouTube as "the beginning of the end," noting that "Google used its monopoly on YouTube to put its hand on the scale" unfairly.  Sen. Amy Klobuchar (D-MN) observed that this change "of course had a crippling effect on Google's rivals" and "not only forces YouTube's ad inventory into Google DSP, it also had the effect of driving non-YouTube ad volume to Google and away from the rival DSPs."

106.    In 2018, Google also began restricting third-party ad servers from tracking viewing activity on YouTube, leaving Google-owned Display & Video 360 as the only product available to collect and analyze YouTube advertising data.  This action effectively tied YouTube to Google Ads and Display & Video 360, preventing advertisers from using competitors' products to serve *or* analyze ads on YouTube.

107.    Google's leveraging of its position in forums like YouTube in which it is the dominant ad publisher restrains competition with an enhanced effect because advertisers almost always use a single DSP for a given advertising campaign.  Advertisers use a single DSP for a campaign largely because doing so allows them to manage frequency caps (limits on the number of times the same user is shown an ad) during the campaign and facilitates audience management and reporting.  Thus, if an advertiser wished to advertise on YouTube, Google Search, *and* other publisher websites, the advertiser would bear significant costs and inefficiencies from using a different advertising service provider to broker distribution of the ad campaign into each forum.

108.    Even if an advertiser preferred to use multiple DSPs, Google does not permit it to use third-party DSPs to purchase Google Search inventory (sold primarily through Google AdWords) or Google's YouTube inventory.  Because Google Search and YouTube, in addition to digital display, are essential to many online ad campaigns, Google is able to capitalize on its "must-have" inventory to tether advertisers to its DSP.  And because advertisers typically use one DSP per ad campaign, a display

CLASS ACTION COMPLAINT
CASE NO.

1    advertiser that wants any of its ads to appear on Google Search or YouTube must use Google's DSP for
2    the entire ad campaign.  In short, Google enlisted its dominance in search and search advertising to
3    pursue and secure a monopoly in display advertising.

4         109.    Google has also combined ad tech stack products that were once technically separate but
5    interdependent, reinforcing that they were effectively tied within the relevant market all along.  For
6    instance, using Google's ad server, formerly called DoubleClick for Publishers, was for many years the
7    only way to obtain full access to Google's AdX exchange.  That access was critical for publishers
8    because AdX connected to AdWords, and the ability to access AdWords greatly expanded publishers'
9    access to advertisers because of Google's dominance in search.  As the *Wall Street Journal* reported,
10   "[f]or many years, Google's AdX was the only ad exchange that had access to" Google's AdWords
11   platform and its many advertisers.  Thus, for example, when News Corp considered switching from
12   Google to a different company to facilitate its ad-serving business, it reportedly "felt it would jeopardize
13   the 40% to 60% of advertising demand it gets from Google's ad marketplaces . . . ."  According to the
14   *Journal*, Google in 2018 merged DoubleClick for Publishers and AdX "into a single product called
15   Google Ad Manager, making it plain to the industry that they are indeed linked . . . ."

16        110.    Advertisers have suffered harm by paying higher prices due to Google's display
17   advertising monopoly.  During the class period, increases in the prices paid by advertisers to place
18   online display ads have outpaced the rate of inflation as a result of Google's ability to charge supra-
19   competitive prices free from any realistic competitive threat.

20        111.    The investigation conducted by the House Subcommittee on Antitrust, Commercial, and
21   Administrative Law revealed that many companies pay Google most of their online ad expenditures.
22   For example, one major company paid well over half of its total ad spend to Google each year from
23   2016 to 2019, with the second top provider receiving less than 15%.

24        112.    A 2018 study by eMarketer, which focused on programmatically purchased ads across
25   the open internet, found that programmatic ad prices have risen meaningfully across all major display
26   categories: desktop, mobile, mobile app, and video.  In 2018, the average digital advertisement sold for
27   12% more than it did in 2016, an increase approximately five times the prevailing rate of inflation.

28

---

22

CLASS ACTION COMPLAINT
CASE NO.

These price increases resulted in substantial part from Google's consolidation of the intermediation services market and Google's price increases for those services, and were largely borne by advertisers who paid Google for those services to broker the placement of their display ads.

113.   *Bloomberg* also reported that as of 2019, Google had increased the price of search ads by about 5% annually, a rate more than three times greater than the 1.6% inflation rate during the same time period.

114.   Google's power in the relevant market enabled it to raise the prices of its brokering services to supra-competitive levels.  The higher prices have increased Google's profits, but advertisers now receive less for each dollar they spend, with trading costs now accounting for half the cost of every trade on average.

115.   A substantial portion of Google's trading fees are monopoly rents.  Competitive market conditions would serve to reduce these fees.

116.   Advertisers have seen progressively lower returns on their digital advertising investments as Google built and reinforced its monopoly in the relevant market.  And publishers have lost ad revenue because Google's entrenched monopoly has enabled it to take a comparatively larger cut of advertisers' payments for the placement of ads.

117.   The higher prices have greatly benefited Google.  Google has consistently reaped profits at margins greater than 20%—almost three times more than the average profit margin for an American business.  Financial analysts predict that Google is well positioned to maintain its dominance in digital advertising, noting that "Alphabet has established unusually deep competitive moats around its business."

118.   Google's reserve-price practices also have caused advertisers to pay higher prices.  In its online ad auctions, Google sets a reserve or floor price, which corresponds to a minimum bid that is needed to win a particular ad placement.  If none of the bids exceeds this reserve price, the winning bidder *must* pay the reserve price—a price that, by definition, is higher than the price that would have won the placement in an auction in which Google had not set a floor price.  In fact, the majority of winning bids by advertisers are at the reserve price.  The lack of competition from other ad auctions has

1    allowed Google to impose these supra-competitive floor prices.  At the same time, Google denies

2    advertisers access to data they would need to accurately measure the success of their advertising

3    campaigns and negotiate for lower prices.

4         119.    Market participants such as advertisers and newspapers also lack visibility into the fees

5    charged along the supply chain, which limits their ability to make optimal choices about how to buy or

6    to sell advertising inventory.  A market participant observed in congressional testimony that "Google

7    could make the process 'more transparent,' but given Google's financial stake in maintaining secrecy,

8    'there is no incentive to do so.'"

9         120.    The foreclosure of competition in digital advertising markets resulting from Google's

10   monopoly has harmed the public at large.  When advertisers pay supra-competitive fees to brokers like

11   Google for placing ads, they pass on a portion of those costs to their customers by marking up the prices

12   of their goods and services.  And when publishers receive anticompetitive underpayments for running

13   ads, they are often forced to cut costs, including through layoffs, and hence cannot produce content of

14   the same quality or variety.  Finally, by eliminating competition, Google's display advertising monopoly

15   also has reduced the incentive to innovate in these markets and thereby deprived the public of the benefit

16   of improvements in advertising services and delivery.

17       D.    **Google Created and Has Maintained Its Monopoly in Display Advertising Services
18             by Restricting the Ability of Rivals to Compete on Equal Footing**

19        121.    Google has engaged in a host of anticompetitive practices, including the leveraging of its

20   monopoly in search and search advertising and the multiple tying arrangements discussed above, to

21   disadvantage its rivals and cement its dominance in the display advertising services market.

22        122.    Another key monopolistic practice that Google employs is denying interoperability—that

23   is, Google denies the ability of its own advertising service systems to interface with the systems of rival

24   advertising service providers, where those systems once were compatible.

25        123.    Google's set of anticompetitive acts described in this complaint, including its monopoly

26   leveraging, tying, exploitation of user data, and foreclosure of technological compatibility, were part of a

27   unified, long-term strategy to exclude competition in the relevant market.  While each component of that

28

                                              24
                                  CLASS ACTION COMPLAINT
                                        CASE NO.

strategy, by itself, may not have sufficed to allow Google to monopolize the relevant market, their combined effect was to roll back competition, giving Google untrammeled power across the ad tech stack connecting advertisers and publishers of display advertising.

124.    Although Google has publicly claimed that publishers can "mix and match technology partners," that claim is false in several important respects.  Google changed its practices to deny interoperability with its rivals to squelch competition that would otherwise occur within Google's SSP system.  When accepting bids from advertising services, Google's SSP operates more efficiently with Google's own advertising service.  Although Google's SSP can accept bids from non-Google advertising services, Google's SSP is inefficient by design at processing those bids, and they are therefore disadvantaged as compared to bids submitted by Google's own advertising service.  As the U.K.'s CMA explained in its July 1, 2020 report, if a publisher "uses a non-Google ad server, AdX would not participate in a real-time auction with other SSPs, but would compete with an 'expected' price, which determines the order in which SSPs are sent an ad request" and "is inefficient for the publisher."

125.    Google, in short, runs an auction that includes its own bids, which are prioritized by the auction system that Google designed in such a way that non-Google-based bids cannot effectively compete.  Imagine if this were a live, in-person auction: Google would be the auctioneer as well as a bidder; and it would have designed the process so that the other bidders could not hear the live bids, but instead would need to submit in advance bids based on guesses about what the other bids were going to be.  Exacerbating these conflicts, Google is also a seller of a portion of the inventory up for bid.

126.    Google also imposed new restrictions on publishers' ability to set differential price floors, preventing them from calibrating different pricing for different SSPs or DSPs.  This change had its intended result of driving more brokering business to Google on the sell side because publishers could no longer set higher floor prices for Google than for other sources of demand.

127.    Moreover, Google's asymmetric approach to sharing websites' DoubleClick user IDs has distorted competition among buying tools seeking to purchase ad space from Google's exchange—*i.e.*, the limited number of buying tools that still compete with Display & Video 360 and Google Ads.

CLASS ACTION COMPLAINT
CASE NO.

Google's exchange shares users' DoubleClick IDs with Google-owned buying tools. But, when sending bid requests to *non*-Google intermediaries, Google's exchange shares a different ID value that is obscured from view.

128. Google's scrambling of IDs in this manner has directly interfered with competition. An advertiser that uses Google's DoubleClick ad server now has a much harder time using a non-Google buying tool because the two tools operate on different user IDs.

129. Still another example of Google's exclusionary conduct involves technology called header bidding, a system designed by Google's competitors on the sell side to compete with Google's display advertising exchange. Google responded to header bidding not by accepting the free and open competition it otherwise would have fostered, but by preventing its systems from working with the javascript code that publishers usually placed on their websites to enable header bidding. The result of this lack of compatibility was that the publisher would first notify non-Google exchanges and the winning bid would be sent to Google as if it were a pre-existing contract price. Thus, instead of submitting a blind bid to the publisher for how much the publisher would be paid to place an ad on its website, Google would separately receive the bids submitted by *other* service providers and then submit its *own* bid, knowing the minimum price it would need to outbid its rivals. This rigging gave Google a significant advantage over its rival brokers because, unlike Google, they would need to submit aggressive bids to ensure their bid was the most attractive—and even then Google could outbid them to win display advertising business.

130. Google's rivals lacked Google's market dominance and therefore could not make their systems incompatible with header bidding as Google did. Had they done so, a publisher simply would not have received bids from them. Even after Google permitted non-Google service providers to integrate with Google's "Open Bidding" system—its exclusionary response to header bidding— Google charged the winning bidder 5-10% of the winning bid, driving up the costs to Google's rivals of merely attempting to compete with Google. This structure also gives Google a systematic advantage in bidding to place ads because it does not charge itself these fees.

131. Similarly, when Google launched its Accelerated Mobile Pages, or "AMP," it made the

26

CLASS ACTION COMPLAINT
CASE NO.

pages incompatible with header bidding, coercing publishers to use Google's Open Bidding system. And to further repel competition created by header bidding, Google began conditioning premium treatment on Google Search (*i.e.*, being featured at the top of search results) upon publishers migrating to AMP and forgoing the use of header bidding.

132.    As Mr. Heimlich, the digital marketing expert, described in his Senate testimony, "Google became the only display company not hobbled by the exclusions and restrictions it'd placed on everyone else.  The power to interoperate among buy-side, sell-side and measurement software went from being a feature of the exchange ecosystem to a capability exclusive to Google."  That exclusive capability fortified Google's power to exclude rivals and allowed it to further boost its share of the display advertising services market, unfettered by any meaningful competition.

**E.    Google Maintains Its Display Advertising Monopoly with Harmful Anticompetitive Conduct**

133.    Google maintains a culture of secrecy around its advertising services, a culture made possible by its market power.  When acting as an intermediary, Google conceals from publishers and advertisers the price actually paid to Google for an ad placement.  Even so, the consensus among knowledgeable publishers and advertisers is that Google's "ad tech tax" is high, particularly in comparison to fees charged in non-programmatic ad markets.

134.    Google is competing with other sellers of display advertising, yet because it is also acting as the broker for these sales, Google has unique information which it denies to the buyers and other sellers to protect its monopoly.  Google refuses to disclose even basic information, including the fees it charges for each transaction, to other participants in the ad tech stack, causing market-distorting inefficiencies that solidify its grip on display advertising.

135.    Google redacts its take rate from trading or auction records on both the buy-side and the sell-side.  Service providers in competitive markets, by contrast, generally must furnish their customers detailed accounts of the services they are providing to justify the prices they charge.  Studies have shown that about 15% of display advertising transaction costs are unaccounted for: these are Google's monopoly rents.

136.    In surveys conducted by the Association of National Advertisers estimating take rates,

participants reported it was impossible or very difficult to obtain transaction-level pricing data related to Google's brokering services.  This lack of transparency makes it harder for publishers to negotiate with advertisers, and for potential competitors to compete with Google.

137.    Google also removes time-stamp information on bids, which publishers previously had used to optimize their pricing.  Moreover, Google conceals information about the performance of the digital ads it brokers, such as how many impressions are shown to actual users, as opposed to bots.  Google's multiple failures of transparency reinforce its power in the display-ad market and prevent advertisers from knowing if they are wasting some of their spend.

138.    Google's lack of transparency is strong evidence of its monopoly power.  If Google were subjected to competition in the relevant market, it could not conceal from advertisers and publishers information that Google collects related to their transactions for the placement of display ads.  In a competitive market, Google would risk losing business to more transparent rivals, as both advertisers and publishers have an interest in learning, assessing, and modulating their advertising efforts in response to information related to those transactions.

139.    Google's lack of transparency is not limited to withholding of information.  When advertisers use the Google Ads tool to bid on ad space belonging to third-party publishers from Google's exchange, Google does not disclose to them the price at which the ad space actually cleared.  Google can thus arbitrage advertisers' bids across two Google-controlled marketplaces—a fact that may go unnoticed by small-business and other advertisers due to the sheer complexity of Google's terms, including in its various "Help" documents.  Read as a whole, the terms appear to permit Google to process bids that advertisers submit via Google's buying tool for smaller advertisers (known as Google Ads) through two different Google marketplaces (auctions).  In other words, Google Ads hosts a first auction, and then Google Ads acts as the "buyer" in Google's exchange, so that Google simultaneously acts on the buy-side and the sell-side.  Google implicitly confirmed this practice to Australia's competition authority.

140.    Google has claimed implausibly that the conflicts of interest now present in its digital advertising business should lead to market efficiencies rather than distortions, asserting that "the

28

CLASS ACTION COMPLAINT<br>CASE NO.

combination of Google's search business and its vertical ad tech integration should give it incentives to balance the interests of all ecosystem participants." But market data tell a different story. Google's public filings show that the differential in allocation of advertising revenues between Google and non-Google properties has consistently increased. In 2007, the share going to Google properties increased to 64%, in 2008 to 68%, eventually to 71% (2011), then 75% (2014), 77% (2015), 80% (2016), 81% (2017), and 82% (2018). This percentage increased again in 2019, with just 16% of the $134 billion that advertisers spent through Google going to the more than 2 million *non*-Google properties that sell their ad space through Google's exchange and buying tools. These widening percentages well demonstrate the market distortions now favoring Google, and they correspond to—and resulted from—Google's steady acquisition of monopoly power in the ad tech stack.

141. As discussed above, Google has ready access to enormous amounts of consumer data, yet it has also acted to prevent competitors from obtaining similar information. In January 2020, for instance, Google announced that it would "phase out" the third-party cookies in its Chrome browser that help advertisers target consumers based on demographics, past browsing history, and other information. As a result, competing exchanges and buying tools soon will no longer be able to use cookies to assign user IDs for the purpose of buying and selling ads. Without access to third-party cookies, it will be much harder for advertisers and competing service providers to bid rationally on ads. Yet that is not so for Google, which will continue to have other sources for gleaning robust data on consumers. Google Chrome has begun tracking users' web activity directly at the browser level, obviating Google's need to rely on cookies for identity information.

142. In 2016, Google launched AMP for the stated purpose of loading web pages faster on mobile devices. AMP is a framework that websites can use to create fast-loading mobile web pages. By limiting the types of programming codes that can be used on a page, AMP pages load faster than they otherwise would. When a user clicks on an AMP link from Google Search, instead of being routed to the page on the third-party site's server, the user sees a cached version stored on Google's own servers via its Content Delivery Network.

143. Google encourages publishers to use AMP web pages and lists them first in a search.

CLASS ACTION COMPLAINT
CASE NO.

But, because the pages are *Google* pages, publishers are unable to gather data about their own users as they normally would. For example, in the below image, the left side shows a *Newsweek* article on its own server. The right side shows the same article, but on a Google-hosted page the user would see after clicking on the AMP-loaded link via Google Search:



*Left: Normal article; Right: AMP article loaded from Google Search*

144. Google's strategy to host more and more content on its own servers demonstrates that Google views content providers themselves as long-term competitors for the capture of ad dollars. More than half of the desktop searches on Google keep users on Google properties rather than prompting clicks to the rest of the web. For mobile searches, 70% of Google searches keep users on Google properties. The percent of Google's revenue from advertising dollars spent on its own properties increased from 64% in 2007 to 85% in 2020.

145. The report issued on October 6, 2020 by the House Subcommittee on Antitrust, Commercial, and Administrative Law notes that, "in the context of Google's placement of news on accelerated mobile pages (AMP) . . . publishers raised concerns that 'Google effectively gave news publishers little choice but to adopt it,' requiring the creation of parallel websites 'that are hosted, stored and served from Google's servers rather than their own.'"

30

CLASS ACTION COMPLAINT
CASE NO.

146.     A recent study by the News Media Alliance found that in 2018, Google gained over $4 billion in revenue from crawling and scraping news content, and running associated display ads, without paying the publishers for that use.  Google was able to take these steps because of its monopoly power over display advertising.

147.     Considered as a whole, Google's activity in the ad tech stack reflects a long-term strategy to monopolize display advertising.  Through acquiring rivals, leveraging its monopoly in search, tying display advertising to search advertising, denying the interoperability of its products with others, exploiting conflicts of interest, and withholding information from other market participants, Google has effectively created a "walled garden" for display advertising.  Google sells its own display advertising inventory even as it brokers a large majority of all display advertising sales, inhibits potential rivals from competing by denying them information and equal footing in the intermediation process it controls, and has acquired any company that threatens its display advertising services monopoly.  Google profits illegally from its walled garden by plucking the fruit every step of the way.

### F.     Government Investigations and Actions Regarding Google's Monopolistic Activities

148.     In July 2019, the United States Department of Justice announced that it had opened an investigation into whether Google is committing illegal monopolistic acts.  The DOJ stated that its probe would focus on whether and how Google and other leading online platforms "have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers."

149.     DOJ's ensuing civil action—joined by eleven state attorneys general and filed on October 20, 2020 in the United States District Court for the District of Columbia—focuses on Google's monopoly conduct in the markets for online search, search advertising, and search text advertising.  The complaint of these governmental enforcers alleges that Google acted unlawfully to preserve these monopolies after having "created continuous and self-reinforcing monopolies in multiple markets."

150.     As a result of Google's monopoly conduct, the enforcers allege, consumers are "forced to accept Google's policies, privacy practices, and use of personal data; and new companies with innovative business models cannot emerge from Google's long shadow."

31

CLASS ACTION COMPLAINT
CASE NO.

151.    The governmental enforcers further note that Google's conduct and internal messaging demonstrate its executives' awareness that Google has used its monopoly power to restrain competition: "Google employees were instructed to avoid using terms such as 'bundle,' 'tie,' 'crush,' 'kill,' 'hurt,' or 'block' competition, and to avoid observing that Google has 'market power' in any market."

152.    The governmental enforcers seek, among other relief, "structural relief as needed to cure any anticompetitive harm" and an injunction forbidding Google's anticompetitive practices: "Absent a court order, Google will continue executing its anticompetitive strategy, crippling the competitive process, reducing consumer choice, and stifling innovation."

153.    The attorneys general of every state except Alabama are separately investigating Google for monopolization.  In September 2019, the attorneys general of 48 states, and of the District of Columbia and Puerto Rico, led by Texas Attorney General Ken Paxton, disclosed that they had opened an investigation into whether Google is violating the antitrust laws.  In announcing the investigation, Mr. Paxton referred to "evidence that Google's business practices may have undermined consumer choice, stifled innovation, violated users' privacy, and put Google in control of the flow and dissemination of online information."

154.    On July 9, 2020, news media reported that the California Attorney General's Office had opened its own independent antitrust investigation of Google.

155.    On July 29, 2020, the House Subcommittee on Antitrust, Commercial, and Administrative Law of the House Judiciary Committee held hearings on the subject of "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google." Google CEO Sundar Pichai appeared for questioning by members of Congress, including regarding whether Google has abused its position as the default web gateway with its dominant search engine. The Subcommittee Chair, Rep. David N. Cicilline (D-RI), noted the "harmful economic effects" of the market dominance of Google and the other companies under scrutiny for monopoly conduct: "They discourage entrepreneurship, destroy jobs, hike costs, and degrade quality."

156.    On October 6, 2020, the House Subcommittee issued a report entitled "Investigation of Competition in Digital Markets."  The report finds that, "[w]ith a sizeable share in the ad exchange

---

32

CLASS ACTION COMPLAINT
CASE NO.

market, ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on behalf of publishers and advertisers, while also trading for itself—a set of conflicting interests that market participants say enable Google to favor itself and create significant information asymmetries from which Google benefits."

157.    The House report recognizes that Google's series of acquisitions in the relevant market "enabled it to gain a controlling position across an entire supply chain or ecosystem. Google's acquisitions of DoubleClick, AdMeld, and AdMob . . . let Google achieve a commanding position across the digital ad tech market."

158.    On September 15, 2020, the Subcommittee on Antitrust, Competition Policy, and Consumer Rights of the Senate Judiciary Committee held a hearing on the subject of "Stacking the Tech: Has Google Harmed Competition in Online Advertising?" Questioning Google's witness, Sen. Josh Hawley (R-MO) took note of its "enormous advantage in this ad stack that you control every single layer of." Google controls "the entire ad stack from top to bottom," he further explained.

> And you're using your position in search and YouTube in order to give yourselves a dominant position in the ad stack, and not just on the demand side . . . but also on the supply side. . . . I think the concern is, is that you control YouTube and search, which are the dominant platforms; you control massive amounts of consumer data that you have harvested from your other consumer-facing platforms—Gmail, Google Maps, G-Suite, etcetera. You then use those advantages in the ad stack at every single layer, every layer of which you exercise dominance in.

Senator Hawley concluded: "This looks like monopoly upon monopoly, in a classic case of tying."

159.    Senator Klobuchar added that "Google may be taking between 30 and 70 percent of every advertising dollar spent by advertisers using its services, depriving publishers of that revenue." She also stated that, "[w]ith the benefit of hindsight, it seems obvious that [Google's] acquisitions were undertaken by the company in order to add to its market share and without explanation . . . other than for Google to establish and maintain the monopoly power it currently has."

160.    Sen. Richard Blumenthal (D-CT) stated that Google has committed "quite simply a stunning abuse of market power." Senator Blumenthal termed Google's position in regard to its digital advertising monopoly "indefensible," noting that

33

CLASS ACTION COMPLAINT
CASE NO.

in no other market does the same party represent the seller, the buyer, make the rules and conduct the auction. . . . Given that Google operates the exchange and it competes with publishers on that exchange, that is a classic risk of insider trading. If you compare it as Google has to the stock market, Google would have been prosecuted long ago for insider trading.

161. On December 16, 2020, the State of Texas, joined by nine other states, filed a civil antitrust action against Google for the conduct alleged herein. *See Texas, et al. v. Google LLC*, No. 4:20-cv-00957-SDJ (E.D. Tex. filed Dec. 16, 2020). Like Plaintiff in this action, the state plaintiffs in the *State of Texas* action claim that Google illegally acquired and maintained a monopoly in online display advertising services, alleging "Google uses its powerful position on every side of the online display markets to unlawfully exclude competition." And like Plaintiffs here, the state plaintiffs assert causes of action against Google for violations of Section 2 of the Sherman Act, as well as the antitrust and unfair competition laws of their respective states, seeking a range of civil remedies and penalties to restore competition.

162. Google has already met with significant regulatory action in Europe. The European Commission fined Google $2.7 billion in 2017 for rigging search results to favor its own online shopping portal and $1.7 billion in 2019 for dictating to other websites how they can display search results from Google's competitors.

163. In December 2019, France's competition authority fined Google $166 million following a lengthy investigation into Google's online advertising practices. France sanctioned Google for adopting "opaque and difficult to understand" rules for its ad platform and for applying them in an "unfair and random manner." According to *TechCrunch*, the French governing body also found that "another element of Google ad rules could lead sites to favor a content policy aligned with its own ad-funded services—thereby pushing online publishers to adopt an economic model that deeds and benefits its own." The French governing body summarized its bases for fining Google as follows:

[T]he French Competition Authority considers that the Google Ads operating rules imposed by Google on advertisers are established and applied under non-objective, non-transparent and discriminatory conditions. The opacity and lack of objectivity of these rules make it very difficult for advertisers to apply them, while Google has all the discretion to modify its interpretation of the rules in a way that is difficult to predict, and decide accordingly whether the sites comply

34

CLASS ACTION COMPLAINT
CASE NO.

with them or not. This allows Google to apply them in a discriminatory or inconsistent manner. This leads to damage both for advertisers and for search engine users.

164. On July 1, 2020, the U.K.'s Competition and Markets Authority released a 437-page report entitled "Online Platforms and Digital Advertising: Market Study Final Report." The CMA found that Google has dominant market share positions at each level within the ad tech ecosystem, with particularly high shares of at least 80% in both the publisher ad server and advertising markets. The CMA further found that Google "has been able to leverage the market power from its owned-and-operated advertising inventory into the open display market and within the ad tech stack, making it harder for third-party intermediaries to compete," and that "greater competition and transparency would put downward pressure on" fees borne by advertisers and publishers. Additionally, the CMA found that Google has deployed its dominant market positions by engaging in "self-preferencing behaviour," such as precluding publishers using Google Ad Manager from setting different floor prices for different buyers, a policy shift that substantially increased "Google demand's win rate."

165. In response to Google's attempts to justify its lack of transparency and other practices by invoking data privacy laws, the CMA observed that "Google itself" has proposed technologies "to allow targeted advertising without user profiling," and that Google has an obvious incentive to interpret data protection laws in a self-serving way to "entrench[] its own competitive advantage, including by denying third parties access to data that is necessary for targeting, attribution, verification and fee or price assessment" while preserving its own right to use that data within its "walled garden."

## V.   INTERSTATE TRADE AND COMMERCE

166. Google's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

167. At all material times, Google participated in the marketing, promotion, distribution, and sale of publication and advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

168. Google's conduct also had substantial intrastate effects in that, among other things, Google's publication and advertising services for display advertisements were sold in each state,

35

CLASS ACTION COMPLAINT
CASE NO.

including California. At least thousands of individuals in each state, including California, were impacted by Google's anticompetitive conduct. As alleged below, absent Google's unlawful conduct, Plaintiff and class members within each state would have paid less or received more money for digital advertising services.

## VI.    RELEVANT MARKET

169.    Google's anticompetitive conduct has restrained competition in the market for online display advertising services, encompassing the overall system or process that connects online display advertisers and publishers (including Google). This market, colloquially known as the "ad tech stack" or "ad stack," comprises various segments and is the relevant market that Google monopolized for purposes of this action.

170.    The relevant geographic market is the United States. Market participants recognize this in the ordinary course of business. For example, Google offers display advertisers the ability to target and deliver ads based on the location of publishers or consumers in the United States. Google also separately tracks display advertising revenue for the United States.

171.    Google is the dominant provider of online search and search advertising in the United States—over 90% of internet searches are performed on Google's search engine—and used its dominant position in those markets to restrain trade in the separate market for display advertising services.

172.    The display advertising services market comprises advertising services and platforms, and publishing services and platforms. Google has monopolized each of the relevant submarkets of the overall market for display advertising services, including the subsidiary markets for publisher ad servers, supply-side platforms, demand-side platforms, and advertiser ad servers. Google's conduct had the intent and effect of suppressing competition in the display advertising services market as well as in each of its component submarkets, and converting those submarkets into a single intermediation market under its control.

173.    Google controls well over 90% of the PAS submarket and more than half of the SSP and associated ad exchange submarket. Likewise, on the demand side, Google controls 80-90% of the AAS

36

CLASS ACTION COMPLAINT
CASE NO.

1    submarket and at least 60% of the DSP submarket.

2    174.    Google has wielded its market power to integrate each submarket of the ad stack into a

3    single set of bundled services, with the intent and effect of preventing and discouraging competitors

4    (other display advertising services providers), publishers, and advertisers from relying on advertising

5    service providers on a product-by-product basis.  Google's anticompetitive conduct has foreclosed

6    competition, eliminating the ability of each segment of the display advertising services process, and the

7    process as a whole, to function as a free and independent market.  As a result of Google's conduct

8    detailed in this complaint, Google has succeeded in combining the various subcomponents of the

9    intermediation market for display advertising into one market—and a large and continually increasing

10   majority of advertisers and publishers recognize and submit to this economic reality by paying only

11   Google for display advertising brokering services.

12   175.    Digital display advertising on the open web is a "market" under antitrust law even

13   though advertisers may engage in other forms of digital advertising as well.  Online display advertising

14   is at base a matching problem.  On one side are publishers who produce content, and earn revenue by

15   displaying ads to users.  On the other side are advertisers who are interested in displaying ads to

16   particular users (*e.g.*, based on demographics or market segments).  The online user population is

17   fragmented across hundreds of thousands of publishers, preventing advertisers from reaching desired

18   customers without assistance from an intermediary.  Likewise, given the vast number of advertisers

19   interested in displaying their ads, most publishers would find it very difficult to maintain the

20   corresponding business relationships.

21   176.    Display advertising brokering services have no reasonable substitute for purposes of

22   marketing goods or services in today's economy.  While it is theoretically possible for an advertiser to

23   connect directly with a publisher to negotiate the placement of advertisements onto the publisher's

24   supply of advertising space, for the vast majority of advertisers doing so is impractical and very rare.

25   At least 90% of all online display advertising space in the United States is bought and sold on ad

26   exchanges in the electronic real-time bidding market.

27   177.    Nearly all advertisers lack the resources and access to be able to negotiate directly with

28

---

37

CLASS ACTION COMPLAINT
CASE NO.

particular publishers to place their display advertisements, and even advertisers with the ability to do so prefer not to limit their placement of display advertisements to discrete websites. Publishers and advertisers thus generally rely on third-party display advertising services to facilitate the placement of online display advertisements.

178. In the rare instances where select advertisers can purchase "directly from the publisher" they can do so via manual media buying, programmatic direct buying, or a private, invite-only marketplace (PMP). Manual media buying is antiquated and now seldomly if ever done. Programmatic direct and private auctions are the only current ways to purchase advertising directly from publishers. Programmatic direct buying is done under extremely limited circumstances of either specific invite from the publisher to participate in a private auction, or directly, without an auction, at ultra-premium prices most advertisers cannot afford. Ads sold through programmatic direct are typically tied to premium publishers (*e.g.*, *Forbes*) that reserve a limited percentage of their inventory for which they can demand a premium price from well-capitalized advertisers, which receive guaranteed ad space in return. Similarly with PMP, the participants are large enterprise advertisers and marketers, and only a handful of large advertisers (*e.g.*, Nike, Barclays) are invited to bid on a publisher's inventory. PMP is typically offered by publishers with premium, expensive inventory, such as major media sites like *Forbes*, the *Wall Street Journal*, or the *New York Times*.

179. For small- and medium-sized advertisers, it is essentially impossible to access such exclusive inventory directly—not only are they not invited by the publisher, but even if they were, they could not pay the high prices set by the publisher. Together, private invite-only auctions and direct purchase are so exclusive that they account for a very low percentage of the display advertising market, and they are no substitute for real-time bidding on the open web.

180. In fact, Google often is involved in these limited invite-only and premium ad-buying processes where they occur. Google offers these options for transacting in Display & Video 360 (reserved for enterprise advertising customers), and DoubleClick Ad Exchange offers services to facilitate invite-only exchanges. As such, despite these processes' "private" label, Google's participation is frequently still required to complete the underlying transactions.

CLASS ACTION COMPLAINT
CASE NO.

181.     Online display advertising is not substitutable with traditional forms of advertising, such a print, television, radio, or billboard advertisements.  None of those platforms rely on individual targeting based on individual user data and profiles—the entire driver of programmatic or automated display advertising.  Recent pricing and bid data from various exchanges illustrate the point.  For example, a 2018 Google study reported that the prices for ad space trading on Google's exchange drop by half or more when advertisers cannot identify users associated with the ad space for sale.  Relatedly, according to Index Exchange, the number of bids for ad space on Mozilla Firefox pages declined by 38% after that internet browser started blocking cookies.  In short, unless they can know the identity of the users being targeted, advertisers often avoid ad auctions altogether.

182.     Regardless of whether certain traditional forms of advertising may be reasonably interchangeable for each other, digital advertising is not.  Digital advertising is different in kind from traditional forms of advertising, including because it reaches targeted customers individually and because digital advertisements can be continuously updated and improved based on data showing how consumers are responding.

183.     With the broad category of digital advertising, display advertising is not reasonably interchangeable with search advertising.  These two forms of digital advertising perform different roles, serve different purposes in marketing campaigns, and are treated by advertisers and marketing firms as distinct.  Search is intent-based advertising that seeks to induce consumers who have already shown an interest in buying a product or service to make a purchase.  Display, in contrast, is suitable for raising awareness about a product, service, or brand and reaching new audiences that may not yet have shown an interest.  Because of this basic difference in how the two forms of advertising function in relation to potential customers, they are not reasonable substitutes for each other.

184.     During the class period, display advertising also performed a unique function in advertisers' re-marketing campaigns.  When a user visited a website selling goods or services, or clicked on a certain online advertisement, a "cookie" (or small file) capturing that user's action would be stored on their browser.  Then, as the user continued to browse the web, the cookie enabled the placement of display advertisements on other websites from the company whose website the user had

39

CLASS ACTION COMPLAINT
CASE NO.

visited or on whose advertisement the user had clicked. Numerous class members relied on display advertising brokered by Google to carry out such re-marketing aiming to increase user "conversion" into paying clients or customers. These campaigns also resulted in the placement of display advertisements to users who carried a similar "cookie" profile as users who visited the advertiser's website and/or clicked on its advertisement. Search advertising cannot accomplish this re-marketing given that the purpose of this strategy is to target a discrete set of users with display advertising.

185.    The government enforcers note in their complaint that display advertising, in contrast to search advertising, does "not enable advertisers to target customers based on specific queries and are generally aimed at consumers who are further from the point of purchase." The enforcers' complaint also quotes the statement of Google's Chief Economist that "[o]ne way to think about the difference between search and display/brand advertising is to say that 'search ads help satisfy demand' while 'brand advertising helps to create demand,'" and "[d]isplay and search advertising are complementary tools, not competing ones." Thus, given that search and display advertising, by Google's own admission, do not compete for the same business, they occupy distinct antitrust markets.

186.    Additionally, the market for display advertising services is separate and distinct from the market for advertisement inventory—*i.e.*, the spaces on websites that publishers make available for advertisers to purchase. At least thousands of companies act as publishers with display advertisement inventory, but in general, these companies do not offer the services that facilitate placement of advertisements into the supply of display advertising space. Only a few companies—Google chief among them—now provide display advertising services.

187.    There are high barriers to entry for the display advertising market and its component submarkets. Entering any of these markets requires a substantial investment to develop and implement the technology necessary to compete. Consequently, "advertisers and publishers alike have few options when deciding how to buy and sell online ad space," concludes the 2020 House Subcommittee report on competition in digital markets.

188.    Google's overall conduct, including leveraging its internet search platform dominance and denying interoperability in several respects, as described above, has made it exponentially more

CLASS ACTION COMPLAINT
CASE NO.

1  difficult for would-be market participants to effectively enter these markets and compete with Google.

2  Google has used its market dominance to ensure that market entry by would-be competitors is

3  infeasible.  And Google's conduct, moreover, has made it impractical for existing market participants

4  to compete—which has resulted in large numbers of companies exiting the relevant market.

5         189.    Programmatic display advertising—the subject of this action—serves a different purpose

6  and is not reasonably interchangeable with social-media display advertising.  Google's automated

7  display advertising services *connect* independent entities—advertisers and publishers.  In other words,

8  advertisers use display advertising services to access a *range* of publication options and thereby reach a

9  broader group of users.  Publishers, in turn, use display advertising services to access many potential

10  advertisers.  Google operates in an open-ended market in which it facilitates the transactions between

11  these advertisers and publishers.

12         190.    By contrast, companies like Facebook, Twitter, and Snapchat primarily host social

13  media content, while Amazon primarily operates an online market for goods.  These web businesses are

14  suppliers of their own ad inventory and have close-ended, in-house display advertising systems that

15  they use to publish advertisements on their own sites.  Those services are not available to other

16  publishers, and advertisements that appear on these close-ended websites only reach visitors to *those*

17  websites.  To advertise across the open web—rather than, for example, on Facebook or Amazon

18  specifically—an advertiser must engage with the ad tech stack that Google dominates.

19         191.    As the House Subcommittee report explains:

20       Within display advertising there are two separate "ad tech" markets . . . first-
21  party and third-party.  "First-party" platforms refer to companies such as
Facebook, Twitter, and Snap which sell ad space on their own platforms
22  directly to advertisers. . . . Third-party display ad tech platforms are run by
intermediary vendors and facilitate the transaction between third-party
23  advertisers, such as the local dry cleaner or a Fortune 500 company, and
24  third-party publishers, such as *The Washington Post* or a blog.

25         192.    The close-ended advertising services offered by Facebook, Amazon, Twitter, and

26  Snapchat (among other web businesses) are not, therefore, reasonable substitutes for the open-ended

27  system Google offers and do not compete for the same business.  "Programmatic" CPM ads are thus

28

41

CLASS ACTION COMPLAINT
CASE NO.

distinguished from "social media" CPM ads among participants in the digital advertising industry.

## VII.  ANTITRUST IMPACT

193.    Google's conduct set forth herein had the purpose and effect of excluding competition in the relevant market.  Absent Google's conduct, each segment of the display advertising market would have been significantly more competitive and class members would have financially benefited from that increased competition.

194.    Google's monopoly conduct has caused ongoing and durable harm to competition in the display advertising market.  Google's monopoly power has enabled it to raise its prices above the competitive level to advertisers and, in turn, pay lower than competitive prices to publishers.  Google has extracted monopoly rents in the form of fees it does not fairly disclose to other market participants.

195.    A competitive market would have benefited both the advertisers and the publishers that use display advertising services.  Firms that provide display advertising services make money in a variety of ways, including by retaining the difference between (1) what an advertiser pays the provider to place ads, and (2) the portion of that payment that the provider remits to a publisher for placing the ads on its website.  In a competitive market, advertisers would have paid less to have their ads placed, and publishers would have received more for placing the ads on their websites.

196.    With Google stifling competition and extracting monopoly rents as the dominant intermediary, both advertisers and publishers lost money.  The antitrust economist Fiona Scott Morton noted that,

> [i]f advertisers had more choices in the but-for world about where and through whom to place their ads, they would not continue to give their business to Google in the face of an overcharge. Google would have to choose between losing advertisers' business to rivals whose auctions were fair, or adopting an auction design that generated competitive (lower) prices for advertisers.

197.    In sum, the marked decrease in competition that has resulted from Google's conduct has caused economic injury to Plaintiff and class members because publishers have been paid less than they otherwise would have been paid, and advertisers have paid more than they otherwise would have paid.

CLASS ACTION COMPLAINT
CASE NO.

## VIII. TOLLING OF THE STATUTE OF LIMITATIONS

### A. The Statutes of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover His Claims

198. Plaintiff and class members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

199. As described herein, Plaintiff and class members suffered antitrust injury in the form of economic losses as a result of Google's wrongful exercise of monopoly power in the relevant market. Other than dealing directly with Google when using its digital advertising services, Plaintiff had no direct contact or interaction with Google and no means from which Plaintiff could have discovered these injuries and the other bases for his causes of action set forth in this complaint.

200. Throughout the class period, and continuing thereafter, there was no information in the public domain sufficient to put Plaintiff on notice that Google had wrongfully acquired a display advertising monopoly or was using its monopoly power to pay sub-competitive prices to publishers of such advertising and to charge advertisers supra-competitive prices for display advertising.

201. It was reasonable for Plaintiff and class members not to suspect that Google was engaging in any unlawful and injurious anticompetitive behavior.

202. While certain of Google's anticompetitive acts occurred before the applicable limitations periods, not until recently, with the announcement of governmental investigations into Google's monopolization of the market for intermediation services in the online display advertising market, could Plaintiff have discovered his antitrust injuries and causes of action set forth in this complaint. At the time it occurred, no reasonable class member had any basis to discern the anticompetitive nature of Google's conduct described in this complaint that occurred before the applicable limitations periods.

203. Plaintiff alleges a continuing course of unlawful conduct by Google, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm to Plaintiff and class members within the applicable statutes of limitations.

204. For these reasons, the statutes of limitations applicable to Plaintiff's and class members'

CLASS ACTION COMPLAINT
CASE NO.

claims have been tolled with respect to the claims asserted herein.

**B.     Google's Fraudulent Concealment Tolled the Statute of Limitations**

205.    Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiff's claims.  Plaintiff had no knowledge of Google's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place Plaintiff on inquiry notice of his injuries or the other bases for his causes of action, during the class period and continuing thereafter.  No information in the public domain or otherwise available to Plaintiff during the class period suggested that Google had wrongfully acquired a digital advertising monopoly or was using its monopoly power to pay sub-competitive prices to publishers of such advertising and to charge advertisers supra-competitive prices for display advertising.

206.    Google concealed its illicit and harmful conduct, both by failing to disclose its wrongful acquisition and maintenance of a digital advertising monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct.  Google has (repeatedly) publicly denied allegations by American and foreign regulators that it has abused its power in digital advertising markets.  These affirmative statements, and Google's nondisclosure that it had acted to forestall competition, served to fraudulently conceal Google's unlawful monopoly in brokering online display advertising.

207.    When the French Competition Authority fined Google $167 million in late 2019, Google publicly defended its advertising policies in a statement issued on December 20, 2019, as purportedly needed to "protect[ people] from exploitative and abusive ads."  In fact, as discussed above, Google adopted those policies to protect its monopoly power by heading off competition.  Similarly, in response to news reports in 2019 that federal and state officials had opened antitrust investigations into Google's advertising business, a Google vice-president for product management, Sissie Hsiao, released a public statement on September 11, 2019 asserting that "[c]ompetition is flourishing, and publishers and marketers have enormous choice" when that was false.

208.    In addition to its affirmative fraud and nondisclosure, Google's anticompetitive conduct also was inherently self-concealing because revealing the true facts concerning Google's monopolistic

CLASS ACTION COMPLAINT
CASE NO.

behavior would have prompted governmental enforcement activity and/or class action litigation. Digital advertising is subject to antitrust regulation, so it was reasonable for Plaintiff and class members not to suspect that digital advertising services were being sold in a noncompetitive market. A reasonable person under the circumstances would not have had occasion to suspect Google was brokering display advertising at supra-competitive prices (for advertisers) and sub-competitive prices (for publishers) at any time during the class period.

209. Because Google's antitrust violations were self-concealing and affirmatively concealed by Google, Plaintiff and class members had no knowledge of Google's antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Google of having wrongfully acquired and maintained monopoly power during the class period.

210. Therefore, by operation of Google's fraudulent concealment, the statutes of limitations applicable to Plaintiff's and class members' claims were tolled throughout the class period.

## IX. CLASS ACTION ALLEGATIONS

211. Plaintiff brings this action on behalf of himself and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as the representative of the following class:

> All persons and entities in the United States that, from January 1, 2016 to the present, used Google's display advertising services to (1) place an ad on a website operated by another entity (advertisers) or (2) place an ad from a third party on their own website (publishers).

Excluded from the proposed class are: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

212. The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).

213. The members of the class are so numerous that joinder is impracticable. The class includes at least hundreds of thousands of members that are widely dispersed throughout the country.

214. Plaintiff's claims are typical of the claims of all class members. Plaintiff's claims arise

out of a common course of conduct that gives rise to the claims of all other class members. Plaintiff and all class members were and will continue to be damaged in the same manner by the same wrongful conduct, namely Google's unfair business practices and monopolization of the market for display advertising services.

215.     Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff's interests are coincident with, and not antagonistic to, those of the class.

216.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with antitrust litigation.

217.     Numerous questions of law or fact common to the class arise from Google's course of conduct to exclude competition in the relevant market, including:

        a.     Whether Google holds monopoly power in the relevant market;

        b.     Whether Google unlawfully acquired and maintained monopoly power in the relevant market;

        c.     Whether Google engaged in unfair business practices that reduced competition in the relevant market;

        d.     The form and content of injunctive relief to restore competition; and

        e.     The amount of damages owed the class as a result of Google's illegal activity.

218.     Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Google acted on grounds generally applicable to the class as a whole. For the same reason, class certification for purposes of adjudicating Plaintiff's claims for injunctive and declaratory relief is appropriate.

219.     This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

220.     The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Google.

221.    Plaintiff reserves the right to seek class certification with respect to common issues, including issues related to Google's duties or conduct.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE SHERMAN ANTITRUST ACT
### 15 U.S.C. § 2

222.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

223.    The market for programmatic display advertising services in the United States is a relevant antitrust market, and Google has monopoly power in that market.

224.    Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the overall scheme and conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

225.    Google's actions were carried out willfully and with the specific intent to acquire and maintain monopoly power in the relevant market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

226.    Google's exclusionary conduct has foreclosed a substantial share of the market for programmatic display advertising services.

227.    As a direct and proximate cause of Google's conduct, Plaintiff and members of the class have suffered antitrust injury in the form of economic losses.  Those losses constitute antitrust injury, as they are an injury of the type the antitrust laws were intended to prevent and that flows from what makes Google's monopolistic acts unlawful.  But for Google's unlawful exclusionary conduct, competition would have prevailed in the relevant market and Plaintiff and class members would not have sustained these losses.  Google's conduct also deprived Plaintiff and class members of improved quality and innovation in the relevant market.

228.    There is no legitimate pro-competitive justification for Google's anticompetitive conduct,

47

1    and even if there were, less restrictive alternatives to achieve it would exist.

2    229.    Plaintiff and members of the class are entitled to equitable relief as appropriate to halt

3    Google's monopoly conduct and restore competition in the relevant market.  Members of the class are

4    regular users of display advertising services and will continue to purchase such services and suffer

5    further injury if Google's monopoly is not ended.  The primary purpose of such injunctive relief will be

6    to benefit the public from the lower prices and greater innovation that will prevail in competitive digital

7    advertising markets in the absence of Google's monopoly.

8    230.    Plaintiff and members of the class are entitled to damages, including treble damages,

9    sustained as a result of Google's monopolistic acts and practices.

### SECOND CAUSE OF ACTION
### VIOLATIONS OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)

231.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

232.    Google's conduct is unlawful in violation of the UCL because it violates the Sherman

Antitrust Act, 15 U.S.C. § 2.

233.    Google has engaged in unfair business practices through the overall scheme and conduct

alleged herein, which has restrained competition.  Google's conduct is unfair, in violation of the UCL,

because it violates California's clearly established public policy forbidding monopolistic acts.  Google

wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the

conduct alleged herein, including by leveraging its monopoly power in the online search and other

markets to coerce the purchase and use of its display advertising services (an unlawful tying

arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting

competing firms' access to information, and rigging auctions that it controlled to its own advantage.

234.    Google's practices also are unfair in violation of the UCL because they offend public

policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and

caused substantial harm, including from Google's supra-competitive prices that advertisers paid and

Google's anticompetitive underpayments to publishers, that outweighs by a wide margin any possible

utility from the practices.

CLASS ACTION COMPLAINT
CASE NO.

235.    Google's unlawful and unfair business practices actually and proximately caused Plaintiff and class members to lose money or property.

236.    Plaintiff and class members lack an adequate remedy at law to redress certain conduct of Google that violates the unfair prong of the UCL.  Through the practices described herein, Google suppressed competition in its incipiency, violated well-established antitrust policies, and significantly harmed and threatened competition in the relevant market.

237.    Accordingly, on behalf of the class, Plaintiff seeks injunctive relief, restitution, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.  The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the class defined herein, respectfully request that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the class, appoint Plaintiff as the named representative of the class, and appoint the undersigned Plaintiff's counsel as class counsel;

B.    Enter judgment against Google and in favor of Plaintiff and the class;

C.    Enter injunctive relief to restore competition in the relevant market and its constituent submarkets;

D.    Award damages, including treble damages, and/or restitution to the class in an amount to be determined at trial, plus interest in accordance with law;

E.    Award Plaintiff and the class their costs of suit, including reasonable attorneys' fees, as provided by law; and

CLASS ACTION COMPLAINT
CASE NO.

F.    Award such further and additional relief as is necessary to redress the harm caused by Google's unlawful conduct and as the Court may deem just and proper under the circumstances.

## XII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: January 4, 2021                    Respectfully submitted,


                                          By:    /s/ *Dena C. Sharp*

                                          Dena C. Sharp (State Bar No. 245869)
                                          Jordan Elias (State Bar No. 228731)
                                          Adam E. Polk (State Bar No. 273000)
                                          Scott M. Grzenczyk (State Bar No. 279309)
                                          **GIRARD SHARP LLP**
                                          601 California Street, Suite 1400
                                          San Francisco, CA 94108
                                          Tel: (415) 981-4800
                                          Fax: (415) 981-4846
                                          dsharp@girardsharp.com
                                          jelias@girardsharp.com
                                          apolk@girardsharp.com
                                          scottg@girardsharp.com

                                          John D. Radice (*pro hac vice* forthcoming)
                                          April Lambert (*pro hac vice* forthcoming)
                                          **RADICE LAW FIRM, PC**
                                          475 Wall Street
                                          Princeton, NJ 08540
                                          Tel: (646) 245-8502
                                          Fax: (609) 385-0745
                                          jradice@radicelawfirm.com
                                          alambert@radicelawfirm.com

                                          Scott L. Silver (*pro hac vice* forthcoming)
                                          **SILVER LAW GROUP**
                                          11780 W. Sample Road
                                          Coral Springs, FL 33065
                                          Tel: (954) 755-4799

50

CLASS ACTION COMPLAINT
CASE NO.

ssilver@silverlaw.com

*Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

MARK J. ASTARITA

**(b)** County of Residence of First Listed Plaintiff   Palm Beach County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Girard Sharp LLP
601 California St., Ste. 1400, San Francisco, CA 94108 Tel: (415) 981-4800

## DEFENDANTS

GOOGLE LLC and ALPHABET INC.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | ☒ 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 862 Black Lung (923) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation–Transfer  ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 2
Brief description of cause:
Violation of Sherman Act, 15 U.S.C. § 2 and California law

## VII. REQUESTED IN COMPLAINT:

✓ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE Beth Labson Freeman   DOCKET NUMBER 5:20-cv-03556

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*   ☐ SAN FRANCISCO/OAKLAND   ☒ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

DATE   01/04/2021   SIGNATURE OF ATTORNEY OF RECORD   /s/ Dena C. Sharp