# EXHIBIT E

## Discovery Steering Committee
## In re Google Digital Advertising Antitrust Litigation

November 1, 2023

**VIA ECF**
Hon. P. Kevin Castel
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

*In re Google Digital Advertising Antitrust Litigation*
*No. 1:21-md-03010 (PKC)*

Dear Judge Castel:

     On behalf of MDL Plaintiffs, the Discovery Steering Committee respectfully requests that the Court order the production of documents and the designation of custodians identified in the attached Proposed Order (**Exhibit 1** hereto), which cross-references Attachments A and B to Plaintiffs' letter filed October 20, 2023. (ECF 654.) The MDL Plaintiffs submit this letter brief to explain the bases for these discovery requests. Plaintiffs' Proposed Order would resolve all remaining search term and custodian disputes arising from Plaintiffs' First Set of Requests for Production. The parties have been unable to resolve this dispute without the Court's intervention. *See* Fed. R. Civ. P. 37(a)(1). A conference is set for 2 p.m. on November 2, 2023.

     The parties' inability to resolve this dispute on their own has been hampered by Google's position that resolution of the instant disputes should be the final round as to search terms and custodians. Google raised this as a "gating issue" saying that until it was resolved, Google was not willing to negotiate further on search terms and custodians to narrow the differences between the positions set forth in the parties' respective submissions to the Court on October 20, 2023. Plaintiffs sought to make further progress by asking Google to meet and confer on that specific issue.

     At that meet and confer yesterday, Plaintiffs noted that our position has long conformed to the Court's position in its Order of October 25, 2023 (ECF 656)—Plaintiffs have submitted a thorough first set of RFPs to cover Plaintiffs' common claims relating to anticompetitive conduct; nonetheless, subsequent developments in the course of discovery, including information in recent or future productions or depositions, may demonstrate that there are significant relevant documents that were not captured in prior rounds. Plaintiffs noted that we would abide by the Federal Rules of Civil Procedure in seeking any such further discovery, including with respect to proportionality and to avoid duplication of prior requests. Despite the Court's admonition in its September 26, 2023, Order (ECF 634) that Google "have appropriate individuals attend" the meet and confer sessions, Google was largely unwilling to respond to Plaintiffs' position other

The Honorable P. Kevin Castel
November 1, 2023
Page 2 of 12

than to say that it would propose some as yet unstated limits on additional discovery.[1] As a result, no narrowing of issues has occurred since the parties' submissions of October 20.

Since this Court's last discovery conference in April, Google and the Discovery Steering Committee have negotiated search terms and custodians for Plaintiffs' initial set of discovery requests. That process has necessarily involved substantial work by the DSC to narrow requests common to Plaintiffs but also those specific to individual plaintiffs. Rather than seeking to accommodate the demands of each and every Plaintiff, the DSC has sought to keep those individual requests as narrow as is reasonable given the specific claims by the individual plaintiffs. Indeed, from its original proposal, the DSC has agreed to drop over 80 search terms and nearly all of its proposed custodians, concluding this narrowing would not substantially prejudice any Plaintiff. The scope of the remaining dispute is narrow, but critical.

Google should now be compelled to run ten additional search terms pertaining to Plaintiffs and their pending causes of action and include 22 additional custodians: three identified by all Plaintiffs, four identified by Daily Mail, five identified by Gannett, and ten identified by Inform Inc. These search terms and custodians correspond to MDL Plaintiff-specific document requests and are not covered by the already agreed-upon search terms and custodians.

Google asserts it has agreed to run "over 200" search terms and designate 158 custodians. Yet, Plaintiffs requested fewer than half of those search terms and only *seven* of those custodians.[2] Google's "my way or the highway" approach has persisted even after its shocking failure to search the majority of its own document repositories, resulting in a massive, tardy recent production. Even setting aside those failures and its other delay tactics, Google cannot avoid its discovery obligations in the MDL by pointing to the productions it made in response to the Department of Justice in Virginia, much less in response to other investigations that addressed substantially more and different conduct than is at issue in this case. MDL Plaintiffs allege distinct claims that implicate distinct subject matter and different individuals at Google, and each of the remaining search term and custodian requests is framed to adduce relevant, proportional discovery related to MDL Plaintiffs' claims.

---

[1] Indeed, we note that Google's submissions to the Court on these issues frequently misstate the tenor or intent of Plaintiffs, a factor that may be driven in part by Ms. Sessions not having attended any meet and confers on search terms and custodians since March 2023.

[2] Google designated 116 custodians when it produced documents to the Department of Justice and the State of Texas during pre-complaint investigations. Many of the same group of custodians were designated for both the DOJ's search case against Google, filed in D.C. District Court and now being tried, and the DOJ's subsequent ad-tech case filed January 24, 2022, in the Eastern District of Virginia. MDL Plaintiffs had no role in identifying or negotiating any of those custodians. Moreover, Google rejected our repeated requests for the titles, roles or reporting lines of these individuals, or even an organizational chart, from which we could ascertain their relevance to our own cases and claims.

The Honorable P. Kevin Castel
November 1, 2023
Page 3 of 12

For the reasons explained in our October 20, 2023, letter (ECF 654) and as set forth in greater detail below, Plaintiffs respectfully ask that the Court compel Google to run the search terms in Attachment A of that letter and to include the custodians identified in Attachment B of that letter as part of the search protocol. The disputed search terms (Section II, below) and custodians (Section III, below) are appropriate to address (a) issues common to all Plaintiffs, and (b) narrowly tailored and non-duplicative areas of discovery pertinent to individual Plaintiff groups.

I.   **Legal Standard**

"Parties are entitled to discovery of documents in the possession, custody or control of other parties, so long as they are relevant to any party's claim or defense" and, "[a]lthough not unlimited, relevance for purposes of discovery is an extremely broad concept." *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon*, 2018 WL 2215510, at *6 (S.D.N.Y. May 15, 2018) (internal quotation marks and citations omitted). "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Id.* at *7 (citation omitted). Furthermore, "circumstances often mean that the burden of responding to discovery lies heavier on the party who has more information, and properly so." Fed. R. Civ. P. 26(b)(1) advisory committee's note (2015).

In an MDL, individual plaintiffs retain the right to seek the discovery necessary to litigate their specific cases. *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015) ("Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities."); *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 845 (6th Cir. 2020) ("[A] party's rights in one [MDL] case" cannot "be impinged to create efficiencies in the MDL generally.") Coordination in an MDL cannot "alter the substantive rights of the parties," *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3382071, at *8 (S.D.N.Y. Aug. 3, 2017) (citation omitted), including the right to secure discovery to prove a claim or defense. Thus, the JPML repeatedly has encouraged that "common" and "case-specific" discovery proceed simultaneously as part of the centralized pretrial proceedings. *See* Multidistrict Litigation Manual: Practice Before the Judicial Panel on Multidistrict Litigation (2023), Part II, § 112 (collecting cases).

II.  **Search Terms**

Google long has resisted responding to any of Plaintiffs' specific requests for production. Initially, Google proposed to simply "refresh" its document searches from the DOJ ad-tech investigation and the Texas OAG investigation to capture documents from October 2020 forward. Google maintained that this would be "sufficient for the needs of the case" and that "negotiating new search terms and custodians from scratch would be impractical in light of the May 30, 2023, deadline to substantially complete production of documents in response to" Plaintiffs' First Set of Requests for Production of Documents to Defendants.

Over the past several months, Plaintiffs have repeatedly narrowed and refined their search terms, withdrawing several dozen, and narrowing many others. In our October 20 letter,

The Honorable P. Kevin Castel
November 1, 2023
Page 4 of 12

Plaintiffs made a final narrowing proposal, identifying ten search strings required by Plaintiffs. Together, these strings yield about 642,000 hits—before any deduplication.[3] Given Google's previous production record in Virginia, we expect this review population would likely yield about 255,000 documents pre-review and a total production of about 80,000 documents.[4]

Here it is also important to recognize that Google's estimates of the number of documents that will be returned by the search terms currently at issue are significantly inflated in two respects. First, 50% of the documents Google has produced to date are near-duplicates of other produced documents (meaning they are at least 80% textually identical). This duplication means Google has produced and is likely to continue to produce substantially fewer truly unique documents, which also reduces the burden on Google from reviewing such documents prior to production. Second, nearly 20% of the documents produced by Google to date are emails whose content is wholly contained in a later-in-time email in the same email thread. Once the last-in-time email in such a thread is reviewed (which document review platforms allow), the lesser-included emails need not separately be reviewed prior to production.

Plaintiffs require *at least* the documents responsive to the narrow search strings discussed below, as no other search strings accepted by Google are sufficiently targeted at identifying important components of the Plaintiffs' various allegations.

    A.    **Search Terms Covering Plaintiffs' Names**

The majority of the document "hits" that remain in dispute with the ten remaining search terms are attributable to four search terms (Nos. 94, 107, 191, and 200) that seek documents concerning its business dealings with individual Plaintiffs and class representatives or their affiliates.[5]

- **Daily Mail**: String No. 94 includes the term "Daily Mail" and a select number of other corporate identities of Plaintiffs Associated Newspapers, Limited, and Mail Media, Inc. This search term hits on ▇▇▇▇ documents pre-deduplication.

- **Gannett**: String No. 200 includes "Gannett" and other terms targeted at identifying references to the corporate entity that publishes popular publications such as USA Today. "USA Today" and other specific publisher names are not included in the

---

[3] For the avoidance of doubt, these strings are those numbered 29, 60, 80, 94, 107, 165, 177, 179, 191, and 200, which were provided to chambers as Attachment A to the October 20 letter.

[4] When Google failed to run the agreed search terms over all ingestion sites, it identified 16.1 million documents. *See* EDVA ECF 478 at 1. Of those, only about 6.4 million were deemed to be non-duplicates subject to review. *Id.* Of that set, about 2 million were produced. *See* EDVA ECF 492 at 1.

[5] Of the approximately 640,000 pre-deduplication hits, approximately 430,000 of those hits come from those four requests.

- search string to dispel the risk of bringing in news alerts or articles. This search string hits on ▆▆▆▆ documents before deduplication.

- **Inform**: <u>String No. 191</u> includes "Inform"—with proximity limiters to ensure that only documents related to the subject matter of this case are captured by the search—as well as News Distribution Network and "NDN." This search string hits on ▆▆▆▆ documents before deduplication.

- **Publisher Plaintiffs**: <u>String No. 107</u> is carefully limited to return only references to the Publisher Class Plaintiffs. This search term hits on ▆▆▆▆ documents pre-deduplication.

As demonstrated by documents already produced, Google often discusses the effects of its experiments on specific publishers or advertisers. For example, when Daily Mail's revenue suffered harm from Google's implementation of optimization, Google took back Daily Mail's complaints and discussed internally how to respond. *See* GOOG-AT-MDL-B-001637599.[6] When Daily Mail sought an exemption to Google's line-item policy that harmed header bidding, Google staff discussed Daily Mail by name. One staff member candidly stated: ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆" GOOG-DOJ-13942574. Google did not share this explanation with Daily Mail. And when Gannett approved Google's experimentation with EDAv3, Google discussed the results of its experiments internally, mentioning Gannett by name. GOOG-AT-MDL-012330763.

Including a plaintiff's name in a search protocol is a reasonable approach to identifying internal documents that may shed light on the defendant's treatment of the plaintiff. *See Hudson v. AIH Receivable Mgmt. Servs.*, 2011 WL 1402224, at *3-4 (D. Kan. Apr. 13, 2011) (ordering "an ESI search of active, as well as archived . . . calendar entries . . . which identify Plaintiff by name" and "ESI email data that names Plaintiff" in response to requests for "a list of diary, notes, and calendar-type documents that 'mention' Plaintiff" and "written complaints made to Defendant concerning Plaintiff's job performance); *Kleppinger v. Texas Dep't of Transp.*, 2012 WL 12893654, at *4 (S.D. Tex. Aug. 23, 2012) (ordering the governmental defendant to search the email accounts of several individual defendants "using the search term 'Kleppinger' without limitation" as well as a "global" search for the name in conjunction with other limiting terms).

Courts also recognize that plaintiffs need documents responsive to search terms consisting of the plaintiffs' names when their claims put the defendant's state of mind at issue. *See Helmert v. Butterball*, 2010 WL 2179180, at *4 (E.D. Ark. May 27, 2010) (compelling

---

[6] Consistent with the Court's Order requesting a hard-copy filing (ECF 656), Plaintiffs have not filed supporting materials for this letter motion on the public docket, and have redacted any information protected by the Confidentiality Order (ECF 297, 611) in this MDL. If the Court would like to review any of the supporting documentation, Plaintiffs will provide any cited document, from either this letter motion or in the attached exhibits, in hard copy upon request.

The Honorable P. Kevin Castel
November 1, 2023
Page 6 of 12

inclusion of search terms and phrases corresponding to 17 plaintiff names in an FLSA case in which the defendant's "'good faith' compliance with, and non-'willful' violation" of the statute was at issue). Identifying documents corresponding to a set of plaintiffs including Daily Mail, Gannett, and Inform—to whom Google made misleading representations—is an expedient way to identify internal documents discussing those representations.

Google's only stated objection to the inclusion of these strings has been that they are likely to turn up news alerts, subscription newsletters, or other mass mailings from the individual Plaintiffs. But these search terms are not likely to return irrelevant documents run over the relevant custodians. String No. 200, for example, includes the names of Gannett's corporate divisions whose representatives communicated with Google and used Google's ad-tech products; it does *not* include the name of any specific publication. Moreover, Plaintiffs have asked Google to identify communications of the "mass mailing" type so the parties can determine how to filter them out pre-review. Google has not done so.

### B. Search Terms Covering Conduct Alleged

The six remaining search terms yield relatively few hits and are narrowly tailored to common issues in the MDL.

**Network Effects**: String No. 29 focuses on "network effects"—the phenomenon whereby increasing numbers of people using a certain electronic platform disproportionately increases its value—in combination with the names of specific Google products central to Plaintiffs' allegations of anticompetitive conduct. Network effects appear in several Plaintiffs' complaints as one of the underlying reasons for Google's accelerating acquisition of monopoly power across ad-tech markets, and the term speaks to Google's defense that consumers choose its products because they are better, as well as the barriers to entry created by Google's dominant position in the relevant markets. The string currently hits on ▮▮▮ new documents before deduplication

**Search Ranking**: Search ranking is an issue unique to the MDL; it is not part of DOJ's ad-tech suit against Google. String No. 60 is limited to terms relating to search ranking and optimization within 20 words of several of Google's ad-tech products and features. Documents produced in the Search case reflect that Google links its Search function to its ad-tech products. *See* GOOG-ADTCH-01202928 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. But so far, Google has agreed to only one of Plaintiffs' search terms relating to the search ranking allegations, and only one other search string from the Texas OAG is plausibly related to this subject. With Plaintiffs willing to forgo their remaining search strings, Search String No. 60 is the last remaining search term from Plaintiffs pertaining to this topic.

String No. 60 is also the most expedient way to identify documents responsive to these allegations. Neither the Texas OAG string nor Plaintiffs' Search String No. 57 is likely to return a proportionate set of documents responsive to the search engine ranking issue. The *only* agreed-upon search string that includes "search engine" is limited to accelerated mobile pages ("AMP"), so it would not hit on documents that pertain to any Google product other than AMP. And

The Honorable P. Kevin Castel
November 1, 2023
Page 7 of 12

Search String No. 57 is limited to documents identifying two variations of "core algorithm update" along with specific ad-tech products; should Google have referred to its search ranking algorithm using terms other than algorithm— —these documents would not be captured by the already agreed terms. *See* GOOG-DOJ-09304877. All of Google's remaining ad-tech product strings are framed to return documents relevant to *other* dimensions of the case. Accordingly, because Search String No. 60 currently hits on ▮ new documents before deduplication, any incremental burden on Google in reviewing more documents is vastly outweighed by Plaintiffs' need for documents responsive to this MDL-specific issue.

**Dynamic Allocation and Direct Sales**: String No. 80 is limited to a set of tightly defined terms corresponding to direct ad sales within 20 words of terms corresponding to dynamic allocation and enhanced dynamic allocation. Direct ad sales were highly lucrative for many publishers. Thus, this is a significant issue for publishers that sold ads directly, and it is not sufficiently covered by other search strings. The string currently hits on ▮ new documents before deduplication.

**Google's auction experiments**: String No. 165 focuses on Google's "RASTA" database, in combination with the names of Google products that are central to Plaintiffs' allegations of anticompetitive conduct and terms related to the auctions at issue. Product names and auction-related terms are included to limit documents returned to those most likely to be relevant to Plaintiffs' claims. Among other materials, RASTA contains documents and data reflecting the results of Google's "experiments" with various ad-tech products and their financial and other consequences. Although Google has disclosed the name of the RASTA database in prior public filings, Google has designated documents concerning it as "Highly Confidential." Thus, for purposes of this public filing, Plaintiffs state simply that other discovery materials strongly indicate that documents in this database are likely to be highly relevant to Plaintiffs' claims. The string currently hits on ▮ new documents before deduplication.

**Throttling of Advertisers and Publishers**: String Nos. 177 and 179 target Google's malicious activity towards buyers and sellers of advertising. Seeking to uncover documents confirming Google's anticompetitive intent, String No. 177 is limited to references to forms of "throttling" or "disabling" within five words of forms of "advertiser," "buyer," "publisher," or "seller." String No. 179 targets terms indicating Google's strategies for forecasting user traffic (and corresponding ad dollars) to particular websites, in close proximity to terms pertaining to advertisers, customers, and publisher traffic. These strings seek documents that relate to manipulation of advertising sales in favor of Google products. The strings currently hit on ▮ documents and ▮ documents, respectively, before deduplication.

Even in the aggregate, the inclusion of these search strings is not burdensome. In total, they represent fewer than 212,000 "new hits" before any deduplication. This Court should compel Google to run each of the above-identified search strings and produce relevant, non-privileged documents in response.

The Honorable P. Kevin Castel
November 1, 2023
Page 8 of 12

III. **Custodians**

Google touts that it has agreed to provide documents from some 158 custodians. But Google has agreed to only *seven* custodians requested by the MDL Plaintiffs. The Court should order Google to designate the custodians identified below.

    A. **"Common" Custodians**

In addition to the seven custodians Google has agreed to for the MDL Plaintiffs, the DSC has identified three additional Google custodians who possess documents relevant to all Plaintiffs' claims: ███████████, ██████████, and ████████████. Google has already agreed to add the three custodians but will add them only in the context of their being part of an overall cap for all Plaintiffs of additional custodians. The inclusion of three custodians identified by MDL Plaintiff, whose relevancy Google has conceded, is reasonable and proportionate.

    B. **Daily Mail and Gannett Custodians**

Daily Mail and Gannett have identified, in **Exhibit 2** (Daily Mail) and **Exhibit 3** (Gannett), attached hereto a narrow set of additional custodians who possess unique documents relevant to their respective claims.[7]

These individuals are proper custodians. They are "likely to have non-cumulative relevant documents," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2023 WL 2871090, at *9 (S.D.N.Y. Apr. 10, 2023), because they were Daily Mail's and Gannett's primary points of contact at Google during the relevant times: Daily Mail and Gannett negotiated their ad serving, exchange, and other contracts with them; raised their complaints to them; and corresponded with them regarding Google's products. *See Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 2020 WL 7383940, at *6-7 (S.D.N.Y. Dec. 16, 2020) (ordering custodian who "took an active role in internal discussions assessing the contract between" the parties); *Fam. Wireless #1, LLC v. Auto. Techs., Inc.*, 2016 WL 2930887, at *3 (D. Conn. May 19, 2016) (ordering custodian who was "in direct, regular contact with the [plaintiffs], and her communications . . . involved . . . one of the two main issues in this case"). In short, these individuals are the Google employees who served as the intermediary between the Google technical team and the Plaintiffs, discussing Daily Mail's and Gannett's specific facts. That alone makes them proper document custodians with respect to these Plaintiffs' causes of action.

The above-named custodians are also uniquely positioned to have documents bearing on specific allegations in Daily Mail's and Gannett's complaints. For example:

- Daily Mail and Gannett allege that Google made misrepresentations so they would enable anticompetitive Google services they no longer can turn off (*e.g.*, Enhanced

---

[7] Consistent with this Court's October 25 Order (ECF 656), these Exhibits and Exhibit 4, pertaining to Inform, are being submitted in hard copy but will not be filed publicly via ECF.

> Dynamic Allocation). *See* Case No. 1:21-cv-03446-PKC, ECF 66 at ¶¶ 128-29; Case No. 1:23-cv-03446-PKC, ECF 1 at ¶¶ 152-53. Several of the above custodians made representations to Daily Mail and Gannett regarding Google's services, including EDA. *See, e.g.*, DM_GOOG_0032418; DM_GOOG_0044139.

- Daily Mail and Gannett allege that Google enforces an unlawful tie through contractual terms, *see* Case No. 1:21-cv-03446-PKC, ECF 66 at ¶¶ 99-101; Case No. 1:23-cv-03446-PKC, ECF 1 at ¶¶ 120-22, and that those contracts secure Daily Mail's and Gannett's rights to important datasets that Google unlawfully has disabled, *see* Case No. 1:21-cv-03446-PKC, ECF 66 at ¶¶ 108-113; Case No. 1:23-cv-03446-PKC, ECF 1 at ¶¶ 129-35. Many of the above custodians were the key negotiators during the relevant contract negotiations. *See, e.g.*, GOOG-DOJ-09922643; GOOG-AT-MDL-006853152.

There is no indication that documents from these proposed custodians will materially duplicate documents already in Google's production. For example, for Daily Mail, Google has produced only 39 emails sent by ▮▮▮▮ and 84 emails sent by ▮▮▮▮—on any topic. Similarly, there are only 28 emails involving Gannett that include ▮▮▮▮ in the email chain, and only 82 emails involving Gannett that include ▮▮▮▮ in the email chain. Other custodians have higher email volumes—*e.g.*, 465 emails including ▮▮▮▮ discussing Gannett—but those volumes include duplicates and lesser-included email threads. Moreover, even taken at face value, those production volumes do not indicate that all relevant emails exist in the record. Critically, unless these custodians are included, Daily Mail and Gannett have no way of discovering the relevant things said *internally* within Google by the specific people interacting with Daily Mail and Gannett on a regular basis about the matters alleged in their complaints.

**C.    Inform**

Plaintiff Inform Inc. has likewise identified in **Exhibit 4**, attached hereto, a tailored set of additional custodians who possess documents relevant to Inform's claims. Inform's Initial Disclosures included a list of 61 Google and YouTube employees who had direct contact with Inform (formerly News Distribution Network, Inc. or "NDN") concerning the substance of the allegations in the Second Amended Complaint. In a letter dated August 8, 2023, to which Google did not respond, counsel for Inform noted "[w]e are entitled to documents from our list of custodians" and specifically requested documents from 18 custodians identified by Inform as well as from the one lone custodian identified by Google in its (deficient) Initial Disclosures to Inform.

Like Gannett and Daily Mail, Plaintiff Inform had at least four to five primary points of contact on the publishing side. Additionally, however, Plaintiff Inform also had Google contacts on the advertising side, as well as technical account managers and engineers who assisted Inform with the technical aspects of Inform's video players and the integration of Google DFP's software development kit with Inform's proprietary ad-tech video players. Further, these Google employees themselves met with Inform to gather information about the company and its clients

The Honorable P. Kevin Castel
November 1, 2023
Page 10 of 12

as a competitor of YouTube and Google's DV360 and/or discussed internal Inform business, seeking to generate more revenue for Google.

Notably, as respects Inform's most important custodians, Google has indicated that missing from the production are documents from the requested custodian *and* their direct supervisor – arguably insulating all communications that Google has with Inform (formerly NDN) from discovery. The custodians above made representations to Plaintiff Inform regarding issues concerning dynamic allocation and enhanced dynamic allocation, technical issues regarding pacing and delivery or non-delivery of video ads, blocking of ads by the Chrome browser, representations concerning why DFP and AdX were not functioning properly, and identification of problems with DFP and AdX and "bugs" in their systems. Moreover, documents produced demonstrate that when there were technical issues they were escalated to separate "escalation management" and policy teams – often using varying id numbers and not publishers names – to determine what was happening in real time and how to respond to the publisher or product customer. Many of these custodians sought and had access to Inform's proprietary ad technology, data and customer lists.

In an attempt to narrow the number of requested custodians, Plaintiff Inform does not include all of its primary points of contact.[8] Rather the custodians requested are a markedly pared-down set, and Inform respectfully reserves the right to seek additional specific custodians and their Inform-related documents as appropriate and proportionate to the needs of the case, as for example if developments in the course of discovery demonstrate that there are custodians who are making the internal decisions concerning Inform and/or significant and relevant documents that were not captured and produced.

### D. <u>Plaintiffs' Custodian Requests are Proportional</u>

Plaintiffs' custodian requests are proportional to the needs of the case. Indeed, Google has never argued that producing documents from these specific custodians would be unduly burdensome. Google's primary argument is, instead, that because it has already designated 158 custodians, Plaintiffs should get no more. But Google unilaterally designated 119 of those custodians during pre-complaint discovery with DOJ—and it has refused to agree to custodians regarding Gannett's, Daily Mail's, and Inform's cases without imposing arbitrary caps irrespective of the parties' justifications or need. The sheer number of custodians Google used (for DOJ, much less MDL Plaintiffs) is not dispositive, especially when there are meaningful differences between the allegations of DOJ and MDL Plaintiffs. *See In re LIBOR*, 2023 WL 2871090, at *9 (ordering 20 custodians in addition to 500 prior custodians).

Google has also suggested to Plaintiffs that other employees in the supervisory chain—no matter how removed—are appropriate substitutes for requested custodians who are direct

---

[8] Plaintiff Inform had several Google account managers, several technical account managers, and several ad engineering points of contact over time. In order to narrow the number of custodians, they are not all prioritized here. This accounts for the 18 custodians that Plaintiff Inform requested in its August 8, 2023, letter to Google.

contacts with Plaintiffs. They are not. *See Capitol Recs., Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 50 (S.D.N.Y. 2009) (ordering "lower level" employees as custodians even when defendant had designated "more senior" employees). Indeed, Google has even identified its CEO, Sundar Pichai, as one such supervisory custodian; it simply implausible to believe that he played any role in discussions about Daily Mail's, Gannett's or Inform's contract negotiations, or that he was privy to discussions among account managers, technical account managers, or engineers about representations made to these three Plaintiffs. *Cf. Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *3 (S.D.N.Y. May 18, 2017) (rejecting senior employee as custodian because "it is equally plausible to assume that because of his senior position, he would have less information about specific transactions than employees lower in the hierarchy").

The duplicity and unreasonableness of Google's position is belied by its own objectionably broad discovery demands of Plaintiffs. Google demands expansive defensive discovery particular to individual Plaintiffs' cases while rejecting discovery requests it perceives to be "plaintiff-specific." Google has served Daily Mail with 73 RFPs and 42 search terms returning over 7 million hits. For Gannett and Inform, Google has served 98 and 93 RFPs, respectively. Additionally, while Google objects to and refuses to run certain searches (*e.g.*, a search for the term "HB," commonly used to reference header bidding), Google itself has listed "HB" and other rejected search terms for Plaintiffs to run on their own documents. Further, Google's discovery requests are facially overbroad and improper.[9] Google cannot reasonably demand that Daily Mail and Gannett potentially review and produce millions of (largely irrelevant) documents, while simultaneously objecting to the custodians who were these Plaintiffs' primary points of contact at Google. Likewise, given that Inform is both a customer *and* an online video advertising *competitor* of Google, Inform's proposal of 10 custodians is reasonable and proportionate to the needs of the case.

### IV. <u>Additional Discovery</u>

During the meet and confers Google asserted the position that following the resolution of discovery related to Plaintiffs' First Set of Requests for Production of Documents, Plaintiffs would not be entitled to any more document discovery. ECF 653 at 3. In light of the Court's October 25 Order (ECF 656), Google has since backed away from that extreme position, but other than vague references to "discovery gating" issues, Google has refused to articulate a firm position on future discovery (or even to propose one to Plaintiffs). In contrast, Plaintiffs have told Google that they view any future discovery to be governed by this Court's prior orders and

---

[9] Overbroad requests for production served on Gannett are representative of those served on other Plaintiffs, including class representatives. *See, e.g.*, RFP No. 71 ("Without regard to any time period, all documents and communications known to You that weigh against or tend to refute any of Your allegations in the Complaint."); RFP No. 94 ("All documents and communications relating to management decisions alleged to have had an impact on Your ad revenue or financial position, including without limitation documents and communications relating to management decisions that were raised by (a) labor unions whose members include Your employees or (b) Your employees.").

The Honorable P. Kevin Castel
November 1, 2023
Page 12 of 12

the federal rules, which allow for targeted discovery of non-duplicative issues not covered by prior requests. *See, e.g.*, ECF 311 (PTO No. 3); ECF 656. Given the June 2024 fact discovery deadline, the Court should reject any efforts by Google to further limit discovery beyond the protections already provided by the Court in its pre-trial orders or the Federal Rules.

* * *

In sum, MDL Plaintiffs have reasonably narrowed their search term and custodian requests after diligently seeking compromise with Google. Plaintiffs' bottom-line requests, reflected in their proposed order submitted herewith referencing Attachments A and B to Plaintiffs' October 20, 2023, letter, reflect a targeted set of relevant search terms, together with custodians critically important to various Plaintiffs. Accordingly, the Court should order Google to produce documents responsive to the identified search strings and designate the requested individuals as custodians for document discovery.

Respectfully submitted,

| */s/ Jordan Elias* | */s/ Philip Korologos* |
|---|---|
| Jordan Elias | Philip Korologos |
| Girard Sharp LLP | Boies Schiller Flexner LLP |

| */s/ Zeke DeRose* | */s/ Noah Heinz* | */s/ Serina Vash* |
|---|---|---|
| Zeke DeRose | Noah Heinz | Serina Vash |
| The Lanier Law Firm, PC | Keller Postman LLC | Herman Jones LLP |

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

IN RE: GOOGLE DIGITAL ADVERTISING        21-md-3010 (PKC)
ANTITRUST LITIGATION

                                                                                     [PROPOSED] ORDER

-------------------------------------------------------------x

CASTEL, Senior District Judge

        Having considered the parties' written submissions (ECF Nos.    ) and the arguments made during November 2, 2023 hearing concerning search terms and custodians, the Court orders as follows:

        1.    Plaintiffs' request for (a) three common custodians; (b) four custodians specific to plaintiff Daily Mail; (c) five custodians specific to plaintiff Gannett; and (d) ten custodians specific to plaintiff Inform is GRANTED. Those custodians are identified in Attachment B to Plaintiffs' October 20 submission (ECF No. 564).

        2.    Plaintiffs' request that Google run an additional 10 search terms set forth in Attachment A to Plaintiffs' October 20 submission (ECF No. 564) is GRANTED.

        3.    For the 19 custodians specific to plaintiffs Daily Mail, Gannett, and Inform, Google may forgo running the 47 search terms identified by those plaintiffs.

        4.    Future requests for production shall be made consistent with the Court's prior orders, which remain in full force and effect, and the Federal Rules of Civil Procedure. *See* ECF Nos. 311, 647, 656.

        SO ORDERED.

                                                                             P. Kevin Castel
                                                           United States District Judge

Dated: New York, New York
       November    , 2023