IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

**GOOGLE LLC'S MOTION FOR DISMISSAL PURSUANT TO RULE 12(b)(6)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION AND STATEMENT OF ISSUES ................................................................ 1

BACKGROUND ...................................................................................................................... 1

    A.  Procedural History .................................................................................... 1

    B.  Plaintiffs' DTPA Claims ............................................................................ 3

    C.  State Antitrust Claims ................................................................................ 6

LEGAL STANDARDS ........................................................................................................... 7

ARGUMENT ............................................................................................................................ 8

I.  The Deceptive Trade Practice Act Claims Should Be Dismissed. ............................................ 9

    A.  Plaintiffs' RPO Allegations Do Not State DTPA Claims............................................ 10

    B.  Plaintiffs' DRS Allegations Do Not State A Claim. .................................................. 13

    C.  Plaintiffs' Bernanke Allegations Do Not State A Claim.............................................. 16

    D.  Plaintiffs' Header Bidding Allegations Do Not State A DTPA Claim and Relate Only To Conduct Outside the Plaintiff States. ..................................................................... 19

    E.  Plaintiffs' "Equal Footing" Claims Are Based on Mis-Quotations of Statements that Are Not Even Alleged to Be False. ........................................................................... 21

    F.  Plaintiffs Do Not Allege that Google Sold Any Personal Information. ..................... 23

    G.  Arkansas, Idaho, Indiana, and Utah's DTPA Claims Should Be Dismissed for Failing to Allege that Google's Statements Related to Consumer Transactions. ................. 25

II.  The State Antitrust Claims Should Be Dismissed to the Same Extent as the Federal Claims, and Arkansas' and Mississippi's Dismissed Entirely. ........................................................ 26

III.  Plaintiffs' Demands for Unauthorized Remedies Should be Dismissed. ............................ 28

    A.  Disgorgement Is Not Available for Any DTPA Claims. .......................................... 29

    B.  Mississippi Cannot Seek Restitution or Disgorgement.............................................. 30

    C.  Puerto Rico Does Not Authorize Recovery of Civil Penalties................................... 30

CONCLUSION........................................................................................................................ 30

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Aguadilla Paint Ctr., Inc. v. Standard Oil,*
    2011 TSPR 194, 183 P.R. Dec. 901, 932-33 (2011) ....................................................... 30

*AMG Cap. Mgmt., LLC v. FTC,*
    141 S. Ct. 1341, 1347 (2021) ......................................................................................... 29

*Ashcroft v. Iqbal,*
    556 U.S. 662, 678 (2009) ................................................................................................. 7

*Autohaus, Inc. v. Aguilar,*
    794 S.W.2d 459, 464 (Tex. App. 1990) ......................................................................... 21

*Bass v. Hendrix,*
    931 F. Supp. 523 (S.D. Tex. 1996) ................................................................................. 20

*Carroll v. Fort James Corp.,*
    470 F.3d 1171, 1174 (5th Cir. 2006) .............................................................................. 17

*Chalmers v. Toyota Motor Sales, USA, Inc.,*
    935 S.W.2d 258, 264 (Ark. 1996) .................................................................................. 20

*Cogan v. Triad Am. Energy,*
    944 F. Supp. 1325, 1336 (S.D. Tex. 1996) .................................................................... 20

*Deburro v. Apple,*
    2013 WL 5917665, at *5 n.5 (W.D. Tex. 2013) ............................................................ 20

*Elson v. Black,*
    56 F.4th 1002, 1008 (5th Cir. 2023) ................................................................................ 9

*Energy Enhancement Sys., LLC v. Dep't of Bus. & Indus.,*
    486 P.3d 14, 2021 WL 1687056, at *4 (Nev. App. 2021) .............................................. 18

*Franklin v. Apple Inc.,*
    569 F. Supp. 3d 465, 479 (E.D. Tex. 2021) .................................................................... 9

*FTC v. Mylan Lab'ys, Inc.,*
    99 F. Supp. 2d 1, 4-11 (D.D.C. 1999) ........................................................................... 29

*Galveston, LLC v. Morris Inv., LLC,*
    2020 WL 5798160, at *7 (S.D. Ind. Sept. 29, 2020) ..................................................... 25

*In re Crown Auto Dealerships, Inc.,*
    187 B.R. 1009, 1018 (Bankr. M.D. Fla. 1995) ............................................................... 18

*In re Enron Corp. Sec., Derivative & "ERISA"Litig.,*
    238 F. Supp. 3d 799, 815 (S.D. Tex. 2017) ................................................................... 11

*In re Generic Pharms. Pricing Antitrust Litig.,*
    605 F. Supp. 3d 672, 676-78 (E.D. Pa. 2022) ............................................................... 28

*In re Google Digital Advert. Antitrust Litig.*,
1:21-md-03010-PKC (S.D.N.Y) ................................................................ 2, 3, 7, 27

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
350 F. Supp. 2d 160, 183-84 (D. Me. 2004) .............................................. 26, 29

*Jones v. Alcoa, Inc.*,
339 F.3d 359, 366 (5th Cir. 2003) ................................................................... 10

*Lampkin v. UBS Fin. Servs., Inc.*,
925 F.3d 727 (5th Cir. 2019) ......................................................................... 11

*Landgraf v. USI Film Prod.*,
511 U.S. 244, 280 (1994) ............................................................................... 29

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
594 F.3d 383, 387 (5th Cir. 2010) ................................................................... 7

*Lovelace v. Software Spectrum Inc.*,
78 F.3d 1015, 1017 (5th Cir. 1996) ................................................................. 7

*Mass. Mut. Life Ins. Co. v. Loew*,
2018 WL 2085212, at *4 (W.D. Tex. Mar. 27, 2018) ................................... 11

*Millennium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen., State of Fla.*,
761 So. 2d 1256, 1262 (Fla. Dist. Ct. App. 2000) ........................................ 20

*Nevares v. M.L.S.*,
345 P.3d 719, 727 (Utah 2015) ..................................................................... 20

*Omni USA, Inc. v. Parker-Hannifin Corp.*,
798 F. Supp. 2d 831, 852 (S.D. Tex. 2011) ................................................... 21

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*,
622 F.3d 1307, 1324 (11th Cir. 2010) ........................................................... 29

*Patterson v. McMickle*,
191 S.W.3d 819, 827 (Tex. App. 2006) ......................................................... 17

*Rayford v. State*,
16 S.W.3d 203, 211 (Tex. App. 2000) ....................................................... 9, 18

*Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*,
861 F. Supp. 1351, 1362 (S.D. Tex. 1994) ................................................... 15

*Sivertson v. Citibank, N.A.*,
390 F. Supp. 3d 769, 792 (E.D. Tex. 2019) ................................................... 11

*Staal v. Scherping Enterprises, Inc.*,
466 F. Supp. 3d 1030, 1035 (D.N.D. 2020) .................................................. 15

*State ex rel. Fitch v. Yazaki N. Am., Inc.*,
294 So. 3d 1178, 1186 (Miss. 2020) ........................................................ 13, 28

*State of Texas, et al. v. Google LLC*,
4:20-cv-00957-SDJ (E.D. Tex.) ....................................................................... 2

*Stonebridge Collection, Inc. v. Carmichael,*
791 F.3d 811, 822 (8th Cir. 2015) ........................................................... 26

*Tovar v. El Paso Area Teachers Fed. Credit Union,*
2013 WL 12394444, at *1-2 (W.D. Tex. Aug. 15, 2013) ........................ 29

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,*
444 U.S. 11, 19 (1979) ............................................................................. 29

*Tuchman v. DSC Commc'ns Corp.,*
14 F.3d 1061, 1067 (5th Cir. 1994) ........................................................... 7

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
125 F.3d 899, 903 (5th Cir. 1997) ........................................................... 14

*Van Peterson Fine Jewelers v. ADT Sec. Servs., Inc.,*
2010 WL 11617965, at *2 (N.D. Tex. Feb. 16, 2010) .............................. 9

*Vercher v. Ford Motor Co.,*
527 So. 2d 995, 1000 (La. Ct. App. 1988) ............................................... 18

*Vivint, Inc. v. England,*
2013 WL 1842538, at *1-2 (D. Utah May 1, 2013) ................................. 26

*Williams v. WMX Techs. Inc.,*
112 F.3d 175, 177-78 (5th Cir. 1997) ........................................................ 7

*Winter v. Am. Inst. of Med. Scis. & Educ.,*
242 F. Supp. 3d 206, 226-27 (S.D.N.Y. 2017) ........................................ 11

**Statutes**

10 L.P.R.A. § 259(a),(i) ................................................................................. 30

73 Am. Jur. 2d Statutes § 243 ....................................................................... 20

Ark. Code Ann. §§ 4-75-201 to -320 ............................................................ 28

Idaho Code § 48-602(7) ................................................................................. 26

Ind. Code § 24-5-0.5-2(a) .............................................................................. 25

Ind. Code § 24-5-0.5-3(a) .............................................................................. 25

La. Stat. § 51:1402(10)(a); Mo. Stat. §407.010(7) ...................................... 19

Miss. Code. § 75-24-19(b) ............................................................................. 13

Miss. Code. Ann. 75-24-19 (1) ...................................................................... 30

Mont. Code §30-14-102(8)(a) ........................................................................ 19

S.C. Code § 39-5-10(b) .................................................................................. 19

Tex. Bus. & Com. Code § 17.45(6) ............................................................... 19

Tex. Bus. & Com. Code Ann. § 17.46(24) (West) ........................................ 18

Utah Code Ann. § 13-11-3(2)(a) ................................................................... 25

Utah Code Ann. § 13-11-4(1) ..................................................................... 25

**Other Authorities**

ABA Section of Antitrust Law, State Antitrust Practice and Statutes. 42-15, § 15.b. (5th ed. 2014) ............................................................................................. 30

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1296 (4th ed.) ... 8

## INTRODUCTION AND STATEMENT OF ISSUES

Plaintiffs' fifth attempt at state-law deceptive trade practices claims should be dismissed. In the two-and-a-half years since Plaintiffs filed their first complaint, they have strained to settle on the theories and remedies to pursue, and to this day cannot say precisely whom they represent. During this time, they have voluntarily amended and changed their DTPA allegations *four times*, all before any motion to dismiss.  The result is the current, sprawling fourth amended complaint in which Plaintiffs try to bootstrap what was originally a federal antitrust case into a common tort case of "deception."  Plaintiffs' problem is that none of the conduct they try to paint as deceptive was anything of the sort.  As a result, Plaintiffs have not and cannot plead any actionable misrepresentations with the particularity their fraud claims require.

The state-law antitrust claims should be significantly trimmed or dismissed altogether. Plaintiffs' state-law antitrust claims are copies of their federal antitrust claims.  As each Plaintiff State's antitrust law mirrors federal law or is narrower than federal antitrust law, the state antitrust claims should be dismissed to the same extent that Plaintiffs' federal antitrust claims were dismissed.  Arkansas' and Mississippi's antitrust laws do not encompass the types of claims at issue here at all and should be dismissed in their entirety.

The following issues are presented: (1) Should Plaintiffs' DTPA claims should be dismissed for failure to state a claim? (2) Should Plaintiffs' state-law antitrust claims should be dismissed to the same extent as their federal antitrust claims and some dismissed in their entirety? (3) Should Plaintiffs' demands for unauthorized remedies be dismissed?

## BACKGROUND

### A.  Procedural History

Plaintiffs' May 5, 2023 filing of the fourth amended complaint ("FAC") marked their fifth pleading against Google's ad tech business.  Plaintiffs' initial complaint was 116 pages long.

Although that complaint included state-law antitrust and deceptive trade practices claims, the initial complaint included no distinct allegations relating to any state-law claims.[1]  Instead, Plaintiffs completely relied on their federal antitrust allegations to support their state-law claims. Unprompted, Plaintiffs filed an amended complaint in March 2021.  Plaintiffs substantially changed their initial allegations, including by adding over 35 paragraphs to the state Deceptive Trade Practices Act ("DTPA") count—but still included no substantive DTPA allegations.[2] Google answered the Amended Complaint on April 6, 2021.

Plaintiffs then sought to "eliminate or clarify certain state-law claims" in August 2021 by filing a second amended complaint ("SAC").[3]  The SAC included significant changes to all of Plaintiffs' claims but, again, included no distinct substantive allegations regarding the DTPA claims.[4]  Google requested permission to move to dismiss the SAC, and in response Plaintiffs asked to amend yet again.[5]  Judge Castel directed that the third amended complaint ("TAC") be Plaintiffs' "strongest and best pleading."[6]  Plaintiffs filed their TAC in November 2021.  By this point, Google had produced over 2 million documents to Plaintiffs.

Judge Castel also directed that Google first move to dismiss Plaintiffs' federal antitrust claims and stayed Google's response to all state-law claims.[7]  In January 2022, Google filed that

---

[1] Compl., *State of Texas, et al. v. Google LLC*, 4:20-cv-00957-SDJ, ECF No. 1.

[2] Am. Compl., *State of Texas, et al. v. Google LLC*, 4:20-cv-00957-SDJ, (March 15, 21), ECF No. 77.

[3] Mot. to File Second Am. Compl., *State of Texas, et al. v. Google LLC*, 4:20-cv-00957-SDJ, (Aug. 5, 2021), ECF No. 136.

[4] Second Amended Complaint, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC, (Sept. 9, 2021), ECF No. 81.

[5] *See* Ltr. to Judge Castel, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC (Oct. 8, 2021), ECF No. 140.

[6] Order at 1, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC (Oct. 13, 2021), ECF No. 144.

[7] *See* Pre-Trial Order No. 1 ¶ 7, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC (Aug. 13, 2021), ECF No. 4.

motion, which Judge Castel granted in part, *see* Opinion & Order, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC (Sept. 9, 2022), ECF No. 308.

Google then sought leave to move to dismiss the TAC's state-law claims and strike unauthorized remedies for those claims.  In response, Plaintiffs sought leave to *further* amend "so they may put their best foot forward with respect to [their DTPA] claims."[8]  Plaintiffs filed their fifth version of the complaint—the FAC—on May 5, 2023.  The FAC now stands at over 230 pages—nearly twice the length of the initial complaint.  Google has since produced millions more documents, data, and source code, and Plaintiffs had the opportunity to participate in multiple Google and third-party depositions.  They have not sought to further amend based on any of this discovery.  Presumably, the fifth version includes all the factual allegations Plaintiffs could muster.

### B.  Plaintiffs' DTPA Claims

Plaintiffs' fifth effort at a complaint added a 72-paragraph "Deceptive Trade Practice Violations" section along with amended Claims and Prayer for Relief sections.  The DTPA section contains six subsections, each focused on a different category of alleged conduct.  Five of these six subsections repeat and reallege a subset of the antitrust conduct, recasting conduct they characterized elsewhere as "harmful to competition" as "deceptive."  The sixth category has little to do with antitrust and instead tries to insert purported privacy issues into a case where Plaintiffs otherwise complain that Google should share *more* data with third parties.  The categories are:

**1. RPO.**  Plaintiffs allege that, "at least during the period of 2015 - 2019," Google offered an auction optimization called "Reserve Price Optimization."  FAC ¶ 335.  Google offered RPO to website publishers to help them more easily and intelligently set price floors for their advertising slots.  RPO used historical data to help publishers set higher price floors for certain transactions

---

[8]  Ltr. to Judge Castel, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC (Nov. 3, 2022), ECF No. 362.

when doing so would increase their yield.  *See Id.* ¶ 335 (RPO "generated unique and custom per-buyer floors depending on what a buyer had bid in the past").  Although Plaintiffs assert that "Google never disclosed to advertisers that it was running this program," *id.* ¶ 534, two paragraphs later Plaintiffs concede that Google announced this optimization in a 2016 public blog post for its customers, *id.* ¶ 343.

**2. DRS.**  Next Plaintiffs complain about a feature called Dynamic Revenue Share, allegedly launched in 2013 or 2014 and publicly announced in "summer of 2016."  *Id.* ¶¶ 318, 541, 543.  DRS was designed to increase the number of auctions that resulted in a match; it allowed Google to raise or lower its revenue share for a transaction to improve the chances that a publisher received a bid that would clear the price floor.  *Id.* ¶ 318.  If the highest bid net of revenue share would not clear the publisher's floor, then Google could reduce its fee so that a bid would clear the floor.  *Id.* ¶ 320.  Plaintiffs allege that Google subsequently expanded DRS to allow AdX to increase the revenue share "when one buyer bid significantly above the floor."  *Id.* ¶ 332.  Plaintiffs concede that in "the summer of 2016," Google told customers about the program.  *Id.* ¶ 543.  While they allege that "publishers were led to believe" various things about DRS, Plaintiffs do not identify any specific, allegedly false statements by Google.  *Id.*

**3. Bernanke.**  Bernanke was also an optimization (this time on the bidding side) designed to increase overall output by increasing the number of auctions in which a bid cleared the publisher's floor.  Bernanke involved a subset of bids into the AdX auction, specifically those from Google Ads.  *Id.* ¶¶ 303, 306.  Under Bernanke, Google Ads sometimes subsidized advertisers' bids so that they might clear a floor or win an auction.  *Id.* ¶ 310.  That subsidy came from a "pool" accrued when Google Ads made the two highest bids in the AdX auction.  *Id.*

While Plaintiffs launch a screed against Bernanke, their DTPA-related allegations are limited.  They allege that because of Bernanke, as of 2014, Google was not running a true "second-price auction." *Id.* ¶ 319.  They claim deception because, (i) five years before Bernanke launched, a Google executive said in an interview that AdX was a second-price auction and (ii) Google employees co-authored a paper modeling "a generic ad exchange (AdX)" that "runs a sealed bid second-price auction" in the paper's experiment.  *Id.* ¶ 300.

**4. Header bidding.**  According to Plaintiffs, header bidding was an alternative technology that allowed publishers "to solicit live, competitive bids from multiple ad exchanges" before the ad server solicited bids.  *Id.* ¶ 564.  The FAC's only specific alleged misrepresentation is an alleged thirdhand statement: according to the FAC, "a major New York publisher" told someone at OpenX that Google had told "this publisher to remove OpenX from header bidding" or risk a "strain on its servers." *Id.* ¶ 385.  While the FAC alleges that someone at Google thought the alleged communications were "a bad look," *id.* ¶ ¶ 385, 569, the FAC never alleges that the alleged thirdhand statement was, in fact, false.  In a single conclusory paragraph, Plaintiffs also allege that Google made unidentified "widespread misrepresentations" to unidentified publishers regarding header bidding and that "some publishers"—again unidentified—moved away from header bidding at some unidentified time "to their detriment." *Id.* ¶ 570.

**5. Auction participants on equal footing**.  Next, Plaintiffs try to spin a claim from a March 2019 Google statement that "[b]y switching to a single first price auction, we can help reduce complexity and create a fair and transparent market for everyone" and "all participants in the unified auction, including Ad Exchange . . . compete equally for each impression on a net basis." *Id.* ¶ 587.  Plaintiffs characterize this statement as "a promise of a transparent market." *Id.* ¶ 588.  They use this claim as a repository for a laundry list of complaints about Google's product

5

designs, including insisting that Google should share more detailed and granular data with third parties.  *See id.* ¶¶ 595, 596.  None of these designs undermines the veracity of Google's statement about the goals of switching to a single first price auction.

**6. Sale of "personal information."**  In an about-face from their complaint that Google does not share enough data with third parties, Plaintiffs next complain that Google shares too much.  They argue that Google violated a commitment not to sell users' personal information, yet they do so without any factual allegation that Google sold any personal information to anyone.  FAC ¶¶ 572, 574, 578.  Plaintiffs point to the ad server sending a bid request as the supposed "sale."  *Id.* ¶ 582.  But they never allege facts showing that a bid request contains "personal information."  *Id.* ¶ 579.  Indeed, the Privacy Policy on which they rely distinguishes between "personal information" and the anonymized information in a bid request.  Moreover, the same Privacy Policy tells users that Google may share anonymized information collected from devices with advertising partners.  Nor do Plaintiffs allege any facts suggesting that a bid request is a "sale" by Google.

### C.  State Antitrust Claims

Plaintiffs' state-law antitrust claims have always been carbon copies of their federal antitrust claims, and remain as such in the FAC.  After Judge Castel granted in part Google's motion to dismiss Plaintiffs' federal-law antitrust claims, he directed the parties to agree on a stipulation describing how that ruling applied to the state antitrust claims.  After some wrangling and disagreement between the parties, the court entered two stipulations, including one providing that Judge Castel's ruling on the federal antitrust claims "is also determinative of any state antitrust claim based on that same conduct" and that "any state-law antitrust claim is deemed dismissed to

the extent that it is based on conduct alleged to serve as a basis for a federal antitrust claim that the Opinion and Order dismissed."[9]

## **LEGAL STANDARDS**

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). These allegations must show "more than the mere possibility" that a defendant has acted unlawfully. *Id.* at 679. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678. Nor should the Court accept "as true conclusory allegations or unwarranted deductions of fact." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). On a 12(b)(6) motion, the Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

Claims that sound in fraud must also meet the higher pleading standard of Federal Rule of Civil Procedure 9(b).[10] At a minimum, this requires a plaintiff to specify in the complaint the allegedly deceptive statement, who made it, when and where it was made, and why it was deceptive. *Williams v. WMX Techs. Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997). Specificity in pleading is essential to the ability to focus discovery, and to a defendant's ability to prepare its defense:

> [F]raud and mistake embrace such a wide variety of potential conduct that a defendant needs a substantial amount of particularized information about the plaintiff's claim in order to enable him to understand it and effectively prepare a responsive pleading and an overall defense of the actions. That need for particularity is especially persuasive, of course, when

---

[9] Order at 2, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC (Dec. 14, 2022), ECF No. 417.

[10] A claim that fails Rule 9(b) may be dismissed under Rule 12(b)(6). *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

the defendant is a business entity that engages in a high volume of transactions and might have difficulty in identifying the one that is being challenged.[11]

Particularity is especially important in a case like this one, where Plaintiffs launch broad and vague attacks on more than ten years of a business.

## ARGUMENT

Plaintiffs' FAC makes no effort to link the conduct it alleges to any specific claim, any harm to specific parties or even specific states or state residents, nor does it specify which remedies each Plaintiff is seeking with respect to any particular conduct. As a result, Google is left to comb through the FAC to deduce what exactly Plaintiffs believe it did wrong and to discern any asserted legal basis for any claims based on that conduct. In an effort to assist the Court in making sense of this chaos, Google organizes this motion as follows: *First*, Google explains why Plaintiffs' allegations do not state DTPA claims, proceeding through the six categories of conduct that Plaintiffs list in the FAC. *Second*, Google addresses the state antitrust claims. *Third*, Google addresses Plaintiffs' blunderbuss demands for remedies. As many of the remedies arguments pertain equally to DTPA and antitrust claims (and because Plaintiffs do not associate remedies with specific conduct), Google addresses those issues remedy-by-remedy and state-by-state.

Plaintiffs' lack of specificity makes it impossible for Google to raise other possible defenses at this time. For example, Plaintiffs steadfastly refuse to identify any specific in-state alleged victim on whose behalf they seek to recover. As a result, Google is unable to assert defenses that might apply to any well-pleaded claim, including that (i) certain advertisers whom Plaintiffs purport to represent may have agreed to arbitrate their claims; and (ii) certain publishers and advertisers agreed that California or New York law would govern claims relating to their use

---

[11] 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1296 (4th ed.).

of Google's ad tech products.  Google reserves the right to pursue these and any other applicable defenses at an appropriate time.

## I.  The Deceptive Trade Practice Act Claims Should Be Dismissed.

Each of the DTPA claims should be dismissed for several reasons.  In all instances, Plaintiffs fail to plead one or more of the essential elements of a DTPA claim under Rule 8.  As relevant here, each State's DTPA requires, at a very minimum, that Plaintiffs plead facts demonstrating that a challenged statement was false or misleading, or that Google made a material omission of fact that deceived a consumer into transacting with it.  *See, e.g.*, *Van Peterson Fine Jewelers v. ADT Sec. Servs., Inc.*, 2010 WL 11617965, at *2 (N.D. Tex. Feb. 16, 2010) ("In the absence of evidence that a defendant's statements were false, a DTPA action for misrepresentations cannot survive."); *Rayford v. State*, 16 S.W.3d 203, 211 (Tex. App. 2000) (holding that Texas "did not meet its burden as a matter of law" where it "presented no evidence that the failure to disclose [certain] information induced a consumer into a transaction she would not have entered had she known this information").  The FAC does not include facts that would show any of Google's challenged statements were false.  The "omission" claims fail for similar reasons, *e.g.*, failure to plead that the alleged misrepresentation or omission induced a consumer to transact with Google.

The claims also fail for lack of particularity under Rule 9(b).  Each of the DTPA claims is predicated on the allegation that Google made false or misleading statements or failed to make a material disclosure.  They therefore sound in fraud and are subject to Rule 9(b).  *See Elson v. Black*, 56 F.4th 1002, 1008 (5th Cir. 2023) ("Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not.") (internal citation omitted)); *see, e.g.*, *Franklin v. Apple Inc.*, 569 F. Supp. 3d 465, 479 (E.D. Tex. 2021) (applying 9(b) to

misrepresentation and failure-to-disclose-based Texas DTPA claims).  Appendix A provides state-by-state authority for the Rule 9(b) standard.

Many claims are also time-barred.  "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff[s'] pleadings that the action is barred."  *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).  Here, many Plaintiffs' claims are barred on their face because they are based on very old statements.  Indeed, some of the alleged statements or omissions are from *2010—ten years* before the first complaint in this case was filed.  The age of these claims further undermines any suggestion that Google's statements or omissions were ever harmful, let alone harmful at the time they were made.  Appendix B provides the relevant limitations period for each Plaintiff State's DTPA and how it applies to each specific claim.

Finally, some States' DTPA claims are barred in their entirety. Several Plaintiffs' DTPAs apply only to "consumer transactions," and Plaintiffs do not allege any misrepresentations or failure to disclose in connection with consumer (as opposed to commercial) transactions.  Other States fail to plead specific prerequisites to their claims.

### A.  Plaintiffs' RPO Allegations Do Not State DTPA Claims.

Plaintiffs allege that, in connection with RPO, "Google failed to disclose material facts to advertisers about the nature of its display ad auctions and made misrepresentations to advertisers." FAC ¶ 528.  Plaintiffs fail to allege facts showing that any of the identified statements was false. Also, each allegedly deceptive statement was made more than four years before the initial complaint was filed, making eleven States' DTPA claims time-barred.

***Plaintiffs fail to allege that the challenged statements were false when made, or any material omission with respect to RPO.***  Plaintiffs *first* point to a 2010 statement, to the effect that Google was running a second-price auction.  FAC ¶ 531.  Google did not launch RPO until 5 years later, in 2015, *id.* ¶¶ 532, 534.  That subsequent change cannot plausibly render the 2010 statement

false when it was made.  *See Mass. Mut. Life Ins. Co. v. Loew*, 2018 WL 2085212, at *4 (W.D. Tex. Mar. 27, 2018) (dismissing DTPA claim, noting Plaintiff did not allege false statements at time made); *see also Winter v. Am. Inst. of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 226-27 (S.D.N.Y. 2017) (dismissing fraud claim where alleged statement was "true at the time," despite later changes).

*Next*, Plaintiffs point to a 2015 news article about Google's plans to launch RPO.  *Id.* ¶ 535. Plaintiffs assert that a Google spokesperson denied plans to launch dynamic price floors.  *Id.* Reading the article reveals that she did no such thing.  Where a document integral to the complaint contradicts an allegation in the complaint, the document controls.  *See Sivertson v. Citibank, N.A.*, 390 F. Supp. 3d 769, 792 (E.D. Tex. 2019); *see also In re Enron Corp. Sec., Derivative & "ERISA"Litig.*, 238 F. Supp. 3d 799, 815 (S.D. Tex. 2017)*, aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019).

Examining the actual article on which Plaintiffs rely shows that Plaintiffs' characterization is incorrect.  Contrary to the FAC's gloss, the article itself clearly shows that the spokesperson was not denying plans to launch dynamic price floors, but was responding to a different inquiry— whether "parts of its product would be exclusive to publishers that use both its ad server and ad exchange," *see* McCallum Decl., Ex. A.  Plaintiffs never allege that this particular part of the statement was false and their claim therefore fails.

*Third*, Plaintiffs allege that Google "misled advertisers" about RPO in a May 12, 2016 blog post.  FAC ¶ 536.  Tellingly, Plaintiffs did not attach the entire post, choosing instead to mischaracterize it.  Although Plaintiffs assert that Google "never disclosed to advertisers that it was running [RPO]," *id.* ¶ 534, the public blog post shows the opposite is true.  In fact, half of the post is an announcement regarding RPO.  *See* McCallum Decl., Ex. B.

11

Plaintiffs then resort to nitpicking the blog post.  They complain that it did not say that RPO was allegedly "launched" "over one year earlier."  FAC ¶ 536.  But Plaintiffs never explain or allege facts showing why such a disclosure would be material or why its omission would render the blog post misleading.  Moreover, the blog post states "we've been experimenting with optimized pricing to help publishers set price floors in the Open Auction that more closely reflect the value of their inventory," and "in our experiments to date, we have applied optimized pricing to about 15% of transactions," making clear that RPO was running before May 2016.  McCallum Decl., Ex. B.  Next Plaintiffs complain that Google stated it would monitor RPO's performance and that optimized pricing would "give programmatic buyers greater access to premium inventory."  FAC ¶ 536.  Plaintiffs do not allege that these statements were false.  Plaintiffs never plead that Google did not monitor RPO's performance or that RPO did not provide buyers greater access to premium inventory.  To the contrary, Plaintiffs allege that Google helped buyers gain access to high-value impressions.  *See id.* ¶ 154.  They also concede that "RPO appeared to increase yield" and fail to allege any facts showing that this was not in fact true.  *Id.* ¶ 344.

**RPO claims are time-barred.**  The statements that Plaintiffs challenge occurred in 2010, 2015, and 2016, and according to Plaintiffs, Google disclosed RPO on May 16, 2016.  As all the RPO-related allegations date from more than four years before the initial complaint, Indiana, Louisiana, Montana, Nevada, Puerto Rico, South Carolina, Utah, Florida, Idaho, North Dakota, South Dakota, and Texas's RPO claims are time-barred.  Missouri, Kentucky, and Arkansas' claims based on 2010 and 2015 statements are time-barred, and Alaska's claim based on 2010 statements is time-barred.  *See* Appx. B.  Plaintiffs plead no facts to support tolling.

Mississippi's RPO claims are barred for a related reason.  To state a claim for injunctive relief under the Mississippi DTPA, the Attorney General must allege "facts that support a

reasonable inference of present or future illegal conduct that needs to be enjoined." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1186 (Miss. 2020) (affirming dismissal of AG's DTPA claim where alleged conspiracy had ended). The FAC does not allege that any RPO-related alleged misrepresentations are ongoing or likely to recur. Thus, Mississippi has no viable claim for injunctive relief. And, if the Mississippi AG cannot state a claim for injunctive relief, he cannot bring claims for any other relief under the Mississippi DTPA. *See id.* at 1184 ("If there is no action for injunctive relief under 75-24-9, there is no action to recover civil penalties under Section 75-24-19."); *see also* Miss. Code. § 75-24-19(b) (authorizing the AG to seek civil penalties only in "an action brought under" the Mississippi DTPA's injunctive-relief subsection).

### B.  Plaintiffs' DRS Allegations Do Not State A Claim.

Plaintiffs do not identify any specific alleged misrepresentation or deceptive statement with respect to DRS. Their claim that "Google deceived publishers into adopting DRS," is pled with no particularity whatsoever. Plaintiffs also fail to allege facts suggesting that even a generalized statement that DRS improved yield would have been false. Finally, ten States' DRS claims are time-barred since Google announced DRS in 2016.

***Plaintiffs make no particularized allegations regarding DRS.***  Plaintiffs vaguely allege that Google made misrepresentations concerning DRS, yet never identify a specific statement, speaker or setting. They only state that, at some time (they don't say when), someone at Google (they don't say who) said something (they don't say what) suggesting that DRS would increase publisher revenue:

- "Google deceived publishers into adopting DRS by telling them that it would increase revenue . . . ." FAC ¶ 540.

- Google "told publishers that [DRS] increased publisher's yield" *Id.* ¶ 543.

- "DRS deceived and harmed publishers by convincing them that [it] actually increased publisher revenue when Google took a haircut on its take rate." *Id.* ¶ 546.

Plaintiffs also assert that Google misled publishers into thinking that DRS would only operate by

lowering Google's exchange fee, but again fail to allege any specific Google statements:

- Publishers were "led to believe that DRS would only lower Google's fee…but [DRS] was subsequently updated to also increase" it. *Id.* ¶¶ 543-44.

- "Google deceived publishers into using DRS under the false pretense that it would only lower Google's exchange fee and net publishers more revenue." *Id.* ¶ 547.

None of these allegations identify the requisite "who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). Nor do conclusory statements like "[p]ublishers were led to believe that . . ." suffice to state a claim even under Rule 8. Without any allegations of who said what and when, plaintiffs have failed to plead that Google said anything or that it was false. Nor can Google or the Court assess whether Plaintiffs' claims are timely, as the unspecified and unattributed statements have no date.

***Statements that DRS would increase revenue or yield would not be false.*** Taking Plaintiffs' allegation that Google told (unidentified) publishers that DRS would increase revenue or yield at face value, FAC ¶¶ 540, 543, Plaintiffs' DTPA claims would still fail because Plaintiffs do not plausibly allege that such statements would have been false or otherwise actionable.

Plaintiffs insist that DRS "plainly did not increase publisher yield" but plead no facts showing why this is the case. *Id.* ¶ 327. "Conclusory allegations and unwarranted deductions of fact are not admitted as true." *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974). Plaintiffs do not support this conclusory deduction with any facts. Indeed, Plaintiffs concede that when Google lowered its revenue share that might allow a bid to clear a publisher's floor when it otherwise would not have, thereby allowing the publisher to receive payment for an impression—increasing both yield and revenue. *Id.* ¶ 541; *see also id.* ¶ 320. Plaintiffs insist that DRS nonetheless did not increase yield or revenue because Google subsequently increased its revenue share in auctions where one bidder bid significantly above the

floor.  *Id.* ¶ 544.  But Plaintiffs do not connect these dots; they fail to explain why DRS would necessarily have resulted in overall lower revenue for publishers given the increase in matches that it facilitated.[12]   Similarly, Plaintiffs' allegation that "Google knew DRS made its auction untruthful" does not support an inference that DRS did not increase publisher yield.  *Id.* ¶ 545.  Whether or not the auction was "truthful"[13] has nothing to do with whether DRS would increase publishers' yield.

Broad, generic marketing statements to the effect of "our product will increase your revenue" are not actionable.  For example, in North Dakota, "[g]eneral expressions of opinion by a seller, commendatory of the thing he is selling, are not actionable even though not entirely true."  *Staal v. Scherping Enterprises, Inc.*, 466 F. Supp. 3d 1030, 1035 (D.N.D. 2020).  In Texas, "[w]hether a statement constitutes merely an expression of opinion or 'puffing,' or an actionable misrepresentation depends on several factors, including the specificity of the statement and the comparative levels of the buyer's and seller's knowledge concerning the subject matter of the transaction."  *Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1362 (S.D. Tex. 1994).  Here Plaintiffs allege no specific statements whatsoever, do not allege any actual person to whom statements were made, and provide no basis to suggest that any statements were anything more than an opinion that DRS would likely improve yield.  This failure dooms their claims.

***Statute of Limitations.***  Google told publishers it was launching a revenue-share-based optimization in 2016.  Indiana, Louisiana, Montana, Nevada, Puerto Rico, South Carolina, Utah,

---

[12] In other words, Plaintiffs do not explain why "***Google*** recouping its losses" necessarily meant that ***publishers*** lost money.  Google could break even while publishers did better.

[13] "Truthful" is an auction term of art.  In general, a truthful auction is one in which a bidder's optimal strategy is to bid their true value, rather than something less than their true value.  For example, first-price auctions (a common auction format) are not considered "truthful."

Florida, Idaho, North Dakota, South Dakota, and Texas's DRS claims are more than four years old and therefore time-barred.  *See* Appx. B.  Again, Plaintiffs plead no facts that would entitle them to tolling.  Mississippi's DRS claims must also be dismissed because Mississippi alleges no ongoing or likely future misrepresentations.  *See above* at 12.

### C.  Plaintiffs' Bernanke Allegations Do Not State A Claim.

Plaintiffs have two DTPA complaints about Bernanke: they claim that (i) certain statements about Google running a second-price auction were deceptive, and (ii) the "failure to disclose Bernanke" was itself deceptive.  FAC ¶ 560.  Neither is properly pleaded.

***Plaintiffs fail to plead that the challenged statements were false.***  Plaintiffs again hearken back to Scott Spencer's 2010 statement that "AdX is a second price auction with minimum CPMs set by the publisher" and "this is the most efficient auction model."  FAC ¶ 550.  Google's alleged launch of Bernanke three years later does not make these 2010 statements false or deceptive.  *See above* at 4.

Next, Plaintiffs attempt to set up a statement in a 2014 research paper as false.  FAC ¶ 551.  The research paper was written by four people, three of whom worked at Google.  It was published in a third-party research journal.  Even assuming that statements in the article could be attributed to Google, the claim falls flat.  There is simply no representation in the paper about any Google product, let alone a misrepresentation about Google's ad exchange.  Google is mentioned but twice in the paper: once as some authors' employer, and once along with Yahoo, Microsoft, and OpenX as "prominent exchanges."  The statement that Plaintiffs focus on did not describe Google's—or any other exchange's— auction; it was about the generic ad exchange that the authors modeled in the paper:

> While exchanges differ in their implementations, ***in a generic Ad Exchange (AdX)*** (Muthukrishnan 2009), publishers post an ad slot with a reservation price, advertisers post bids, and an auction is run . . .

> Bidding data from the same period of time was used to estimate the primitives of the AdX. With multiple bidders, AdX runs a sealed bid second-price auction.

McCallum Decl., Ex. D at 1, 20 (emphasis added).  Since the statement upon which Plaintiffs rely was not a representation regarding *Google's* ad exchange, Bernanke cannot make it false.

**_Plaintiffs fail to plead all elements of a "material omission" claim._**  Plaintiffs also argue that the "failure to disclose Bernanke [was] deceptive."  FAC ¶ 560.  This version of a Bernanke claim fails for lack of particularity and because Plaintiffs do not plead that any advertiser would not have used Google Ads if they had known about Bernanke.

Plaintiffs fail to plead their omission claim with the specificity required under 9(b).  "In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading."  *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) (internal citations omitted).  Plaintiffs have made no effort whatsoever to explain what about Bernanke should have been disclosed, when, to whom, or why.

Nor do Plaintiffs allege that Google intentionally refrained from disclosing Bernake to induce customers to transact or that any customer would not have transacted had Bernanke been disclosed.  "Mere nondisclosure of material information is not enough to establish an actionable DTPA claim."  *Patterson v. McMickle*, 191 S.W.3d 819, 827 (Tex. App. 2006).  Rather, under the Texas DTPA, a failure-to-disclose claim requires "(1) the defendant knew information regarding the goods or services, (2) the information was not disclosed, (3) there was an intent to induce the consumer to enter into the transaction through the failure to disclose, and (4) the consumer would

not have entered into the transaction had the information been disclosed." *Id.*; *see also* Tex. Bus. & Com. Code Ann. § 17.46(24) (West).[14]

Plaintiffs fail to allege that Google withheld information about Bernanke in order to deceive customers.  They also fail to allege that any customer would have acted differently if Bernanke were disclosed.  *See Rayford*, 16 S.W.3d at 211 (Texas "did not meet its burden as a matter of law" where it "presented no evidence that the failure to disclose this information induced a consumer into a transaction she would not have entered had she known this information.").  Plaintiffs argue that "publishers were deceived into accepting decreased payments," FAC ¶ 560, but this is not an allegation that publishers would not have transacted with Google had they known that Bernanke affected the bids Google Ads submitted to AdX.  Further, given Plaintiffs' insistence that Google Ads "was and remains a 'must have' source of demand for most publishers," *id.* ¶ 248, any such allegation would not be plausible.  Indeed, Plaintiffs' antitrust claims are premised on the idea that publishers had *no choice* but to work with Google Ads and AdX.  Plaintiffs also claim that "advertisers were also deceived about the price that they were paying" *id.* ¶ 561, but again, that is not an allegation that advertisers would have stopped using Google Ads had they known about Bernanke.

---

[14] *See also Vercher v. Ford Motor Co.*, 527 So. 2d 995, 1000 (La. Ct. App. 1988) ("This amounted to a misrepresentation or a failure to disclose a material fact which, had it been known, might have caused the buyer to take a different position with respect to the sale."); *In re Crown Auto Dealerships, Inc.*, 187 B.R. 1009, 1018 (Bankr. M.D. Fla. 1995) (holding that claimants failed to establish deception by omission where they did "not even contend that the prior thefts materially affected their use of the automobiles or that Crown misled them as to the condition of the cars or their potential enjoyment of the cars"); *Energy Enhancement Sys., LLC v. Dep't of Bus. & Indus.*, 486 P.3d 14, 2021 WL 1687056, at *4 (Nev. App. 2021) ("[A] representation, false or otherwise, ordinarily requires some sort of inducement and/or reliance on the part of the person to whom the representation was made[.]").

***Statute of Limitations.***  The 2010 and 2014 statements occurred more than six years before the initial complaint was filed, so every Plaintiff's Bernanke DTPA claim is time-barred.  *See* Appx. B.  Plaintiffs also do not plead facts that would establish tolling or fraudulent concealment.

### D.  Plaintiffs' Header Bidding Allegations Do Not State A DTPA Claim and Relate Only To Conduct Outside the Plaintiff States.

Plaintiffs next argue that Google made misrepresentations regarding header bidding.  But the only specific statement that Plaintiffs identify in this section is not false or misleading. Moreover, that statement was allegedly made in New York to a New York website operator/publisher.  Several Plaintiffs cannot bring DTPA claims for conduct that occurred outside their states and had no pleaded effect on any consumer in their states.

Plaintiffs assert that, in October 2017, a "major New York publisher" told someone at OpenX (a competing ad server) that Google told the publisher to remove OpenX from header bidding to avoid a strain on its servers.  FAC ¶ 568.  Plaintiffs fail to plead that such a statement would have been false.  They plead no facts suggesting that OpenX was not, in fact, a strain on the publisher's server.  They cite to an internal communication stating that the recommendation was "a bad look" for Google, *id.* ¶ 569, but that isolated opinion does not support an inference that Google's statement was false nor that the speaker knew it to be false.

Plaintiffs' claim fails for a second reason: they allege no connection between any Plaintiff State and the single alleged statement, allegedly made in New York to a New York company.

Five States—Texas, Louisiana, Missouri, South Carolina, and Montana—bind their DTPA statutes to "trade or commerce directly or indirectly affecting the people of this state" or "of the state."[15]  Courts interpreting this language have held that the statutes do not reach conduct when

---

[15] Tex. Bus. & Com. Code § 17.45(6); La. Stat. § 51:1402(10)(a); Mo. Stat. §407.010(7); S.C. Code § 39-5-10(b); Mont. Code §30-14-102(8)(a).

"every operative fact occurred outside of the state." *Cogan v. Triad Am. Energy*, 944 F. Supp. 1325, 1336 (S.D. Tex. 1996); *see Bass v. Hendrix*, 931 F. Supp. 523 (S.D. Tex. 1996) (Texas DTPA did not apply to misrepresentations that "took place in New York or Connecticut and were not directed toward a Texas resident"); *Deburro v. Apple*, 2013 WL 5917665, at *5 n.5 (W.D. Tex. 2013) (similar); *see also* 73 Am. Jur. 2d Statutes § 243 ("[T]he general rule is that no state or nation can by its laws directly affect, bind …persons beyond its territorial jurisdiction.").   In another three states—Arkansas, Florida, and Utah—courts have established or presume that state statutes are limited to in-state conduct.[16]   Plaintiffs make no non-conclusory allegations that an alleged statement to a New York website about removing OpenX from that website's header-bidding setup had any effect on *anyone*, let alone an effect on people in their states.   Texas, Louisiana, Missouri, South Carolina, Montana, Arkansas, Florida, and Utah's header bidding DTPA claims must be dismissed for this reason as well.

**Statute of Limitations.**   The alleged October 2017 statement occurred more than three years before the initial complaint was filed.   Indiana, Louisiana, Montana, Texas, Nevada, South Carolina, and Utah's header-bidding DTPA claims are therefore time-barred.   *See* Appx. B.

Mississippi's header bidding DTPA claim must also be dismissed because Mississippi alleges no ongoing or likely future misrepresentations.   *See* above at 12.

---

[16] *Chalmers v. Toyota Motor Sales, USA, Inc*., 935 S.W.2d 258, 264 (Ark. 1996) ("As a general rule, statutes have no effect except within the state's own territorial limit."); *Millennium Communic's & Fulfillment, Inc. v. Office of Att'y Gen., Dep't of Legal Affs., State of Fla*., 761 So. 2d 1256, 1262 (Fla. Dist. Ct. App. 2000) (FDUTPA "seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation."); *Nevares v. M.L.S.*, 345 P.3d 719, 727 (Utah 2015) ("[U]nless a statute gives a clear indication of an extraterritorial application, it has none.").

**E.  Plaintiffs' "Equal Footing" Claims Are Based on Mis-Quotations of Statements that Are Not Even Alleged to Be False.**

Next Plaintiffs argue that Google made false promises about equality among auction participants.  Again, Plaintiffs mis-quote and mischaracterize the two statements upon which they hang their claim, yet fail to allege any facts suggesting that Google's actual statements were false.

*First*, Plaintiffs take issue with a March 2019 blog post.  They pluck out one phrase from that post as a supposedly misleading representation of a "fair and transparent market."  FAC ¶ 587.  In fact, what Google said is:

> In order to help simplify programmatic for our partners, in the coming months we'll start to transition publisher inventory to a unified first price auction for Google Ad Manager. We expect the transition to be complete by the end of this year. By switching to a single first price auction, we can help reduce complexity and create a fair and transparent market for everyone.

McCallum Decl. Ex. C.  This statement is not actionable.  As an initial matter, the statement that "switching to a single first price auction" "can help . . . create a fair and transparent market" is an opinion, not a falsifiable representation that could support a DTPA claim.  *See, e.g.*, *Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F. Supp. 2d 831, 852 (S.D. Tex. 2011) (statement that defendant could manufacture seals that met or exceeded competitors' quality not actionable); *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 464 (Tex. App. 1990) (statements that a car was "the best engineered car in the world" and "probably" would not need servicing were not actionable).  Nor do Plaintiffs plead facts showing this statement is false.   Indeed, none of the gripes Plaintiffs list in this section (*i.e.*, Bernanke, the partnership with Facebook, Smart Bidding, or "downgrad[ing] data shared with publishers") has anything to do with whether "switching to a single first price auction … can help reduce complexity and create a fair and transparent market for everyone."  Plaintiffs do not connect any of this challenged conduct to implementing a first-price auction.

*Second,* Plaintiffs challenge a statement on Google's website about how the Open Bidding product works.  FAC ¶ 587.  Again, the FAC selectively, and misleadingly, quotes the statement in an attempt to make it into a falsifiable representation.  In fact, Google said:

> The real-time bids (RTB) from yield partners compete as part of dynamic allocation in a unified auction. The best Ad Manager line item rate, expected Mediation yields and exchange bids are compared at the same time and the top bid wins the auction. Ad Exchange and Open Bidding yield partners bid once for each impression.

> All participants in the unified auction, including Ad Exchange and third-party exchanges, compete equally for each impression on a net basis. Each exchange runs its own auction independently and then submits their bid into the unified auction.

McCallum Dec. Ex. F.  Plaintiffs' allegations about Bernanke, Smart Bidding, and a change in data transfer files do not make Google's explanation of Open Bidding deceptive.  First, Bernanke does not render this explanation deceptive because Bernanke impacts how Google Ads bids into AdX, not how AdX competes in the Open Bidding auction.  *See* FAC ¶ 589.  Second, Smart Bidding does not render this statement deceptive; Smart Bidding is a bidding product that Google offers to its bidding-tool customers.  *Id.* ¶ 593.  Like Bernanke, Smart Bidding has nothing to do with the manner in which AdX and other exchanges are compared in the Open Bidding auction.  Third, the alleged change in data transfer files does not render this statement deceptive.  The data transfer files are "data [Google] shared with publishers," *id.* ¶ 595, and have nothing to do with how bids in the Open Bidding auction (which come from demand sources, not publishers) are compared.  Finally, regarding Facebook, none of the alleged "advantages" that Plaintiffs claim that Facebook Audience Network obtained meant that exchanges were not "compet[ing] equally for each impression on a net basis."  For example, Plaintiffs do not allege that FAN's bids were treated on an other-than-net basis or that FAN's bids might win even if not the highest net bid.

Additionally, Mississippi's "equal footing" DTPA claim must also be dismissed because Mississippi alleges no ongoing or likely future misrepresentations.  *See* above at 12.

**F.   Plaintiffs Do Not Allege that Google Sold Any Personal Information.**

Last, Plaintiffs take aim at Google's statement in its Privacy Policy that it does not sell users' personal information.  FAC ¶ 573.  This claim has almost nothing to do with competition in advertising technology and everything to do with Plaintiffs' general desire to bring any claim they can think of against Google.  In any event, this tacked-on claim also fails because Plaintiffs have not pleaded any instance in which Google violated its promises.  Simply put, Plaintiffs do not allege that Google sold any user's personal information.

As part of its Privacy Policy (which includes the representation on which Plaintiffs rely), Google makes detailed disclosures regarding the types of information it does and does not collect from users, as well as how that information is used.  Google also discloses the categories of partners and circumstances under which Google may share some of that information.  McCallum Dec. Ex. E.  Among other things, Google specifically tells users–in the same privacy policy that Plaintiffs point to–that "We may share <u>non-personally identifiable information</u> publicly and with our partners—like publishers, advertisers, developers, or rights holders."  *Id.*  Non-personally identifying information is defined as "information that is recorded about users so that it no longer reflects or references an individually-identifiable user."  *Id.*

The only action that Plaintiffs point to in their FAC is when an advertising bid request is sent to potential advertisers.  FAC ¶ 582.  According to Plaintiffs, the bid request "***can*** include device IDs, user IDs, cookie and browser information, unique demographic data, and geolocation information."  *Id.*  In order for bid requests to render Google's promises false, those bid requests would have to contain "personal information" and be "sales" by Google.  Plaintiffs have not and cannot plead either.

***Plaintiffs have not pleaded that bid requests contain a user's personal information.***
Google's statements that it does not "sell your personal information" cannot be misleading with

respect to bid requests.  Google tells users that it may share bid-request-type information with advertising partners and bid-request-type information is not "personal information."

Simply reading Google's policy eviscerates Plaintiffs' claims.  Plaintiffs' theory hinges on "device IDs, user IDs, cookie and browser information, unique demographic data, and geolocation information" being "personal information."   The problem with this theory is that Google specifically differentiates between "unique identifiers tied to the browser, application, or device you're using" (*i.e.*, the information that "could" be in a bid request) and "personal information." McCallum Dec. Ex. E.  In contrast to "unique identifiers," "personal information" is "information that you provide to us which personally identifies you, such as your name, email address, or billing information."  *Id.*  Google tells users that "information that is recorded about users so that it no longer reflects or references an individually-identifiable user" may be shared with advertising partners.  *Id.*  Given these disclosures, no user could be misled into thinking that Google would never transmit anonymized identifiers tied to the browser, application, or device.

Nor do Plaintiffs plead facts showing that the information that "could" be in a bid request is otherwise "personal information."  Plaintiffs rely on the Privacy Policy to define the term, but offer a completely tortured reading.  *See* FAC ¶ 579.  The Privacy Policy defines "personal information" in the context of describing information collected when a user is "signed in." McCallum Decl. Ex. E.  Specifically: "When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information."  *Id.*  "Personal information" is defined as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account."  *Id.*  Plaintiffs do not allege that a bid request contains names, email addresses, or billing

information or any other information that personally identifies anyone.  Instead, they claim without support that "Google can reasonably associate most of the information it collects about users with their Google Account or information that identifies the user."  *Id.* ¶ 580.  This is a bare conclusion that need not be credited on a 12(b)(6) motion, and says nothing about whether any information in a bid request is so linked.

***Plaintiffs Have Not Alleged that a Bid Request Is a "Sale" by Google.***  Plaintiffs do not allege that any advertiser pays Google (or provides anything else to Google) in exchange for a bid request.  Instead, Plaintiffs assert a multi-link chain of events where Google might eventually be compensated if a Google advertising customer wins an auction.  *See id.* ¶ 583 ("For every bid from a Google buying tool that wins an impression, Google is compensated.").  But the "sale" in Plaintiffs' scenario is a publisher selling an ad impression to a bidder, or a sale of Google Ads services to an advertiser.  Neither of these is a bid request.  Plaintiffs never (and could not) allege that Google sells a bid request to anyone.

### G.  Arkansas, Idaho, Indiana, and Utah's DTPA Claims Should Be Dismissed for Failing to Allege that Google's Statements Related to Consumer Transactions.

The Indiana and Utah DTPAs cover deception only when made "in connection with a consumer transaction."  *See* Ind. Code § 24-5-0.5-3(a); Utah Code Ann. § 13-11-4(1).  Consumer transactions are limited to those that are primarily personal, household, or similar - not commercial. Ind. Code § 24-5-0.5-2(a) (defining "consumer transaction" as being "for purposes that are primarily personal, familial, charitable, agricultural, or household"); *Galveston, LLC v. Morris Inv., LLC*, 2020 WL 5798160, at *7 (S.D. Ind. Sept. 29, 2020) (dismissing Indiana DTPA claims where the purchases were not "consumer transactions" ); Utah Code Ann. § 13-11-4(1); Utah Code Ann. § 13-11-3(2)(a) (defining "consumer transaction" as being for "primarily personal, family,

or household purposes"); *Vivint, Inc. v. England*, 2013 WL 1842538, at *1-2 (D. Utah May 1, 2013) (dismissing Utah DTPA claims based on commercial transactions).

Similarly, courts interpreting the Arkansas and Idaho DTPAs have held that deception is not actionable unless directed at consumers. *See Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015) (holding that an Arkansas DTPA cause of action requires "a deceptive *consumer-oriented* act or practice which is misleading in a material respect" and upholding dismissal of Arkansas DTPA claim where plaintiff did not show a consumer-oriented act or practice); *see* Idaho Code § 48-602(7) (defining "services" as "work, labor or any other act or practice provided or performed by a seller to or *on behalf of a consumer*") (emphasis added); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 183-84 (D. Me. 2004) (granting defendants' motion to dismiss Idaho consumer protection claims because plaintiffs did not "allege that [defendants] provided services to or on behalf of consumers").

Plaintiffs' allegations relate to transactions with publishers and advertisers, and not to consumer transactions. Arkansas, Idaho, Indiana, and Utah therefore fail to state claims under their DTPAs, and those claims should be dismissed.

## II. The State Antitrust Claims Should Be Dismissed to the Same Extent as the Federal Claims, and Arkansas' and Mississippi's Dismissed Entirely.

The Court should dismiss each of Plaintiffs' state antitrust claims that are predicated on the same conduct and legal theories as their previously dismissed federal antitrust claims, for two reasons. *First*, Plaintiffs agreed to this result. *Moreover,* on the merits, each Plaintiff's antitrust law mirrors the relevant federal law (except Arkansas), so the logic of Judge Castel's ruling extends equally to all state antitrust claims. Arkansas' claims should be dismissed completely because the Arkansas antitrust laws are narrower than the federal antitrust laws and do not

26

encompass any of the antitrust theories in the FAC.  Mississippi's claims should be dismissed because Mississippi alleges no wholly intrastate conduct.

Plaintiffs agreed that Judge Castel's ruling on the federal antitrust claims "is also determinative of any state antitrust claim based on that same conduct."[17]  They further agreed that "any state-law antitrust claim is deemed dismissed to the extent that it is based on conduct alleged to serve as a basis for a federal antitrust claim that the Opinion and Order dismissed."  They later agreed that certain specific claims in the Third Amended Complaint were either "deemed dismissed" or that "such claim[ ] is deemed to have failed to allege that such conduct is anticompetitive."[18]  Plaintiffs then amended their complaint a fourth time but did not change their federal or state antitrust allegations.  And they have continued to state that they "possess no present intentions of pursuing . . . claims that the Court determined were not adequately pled as being anticompetitive in the TAC."[19]  Thus, Plaintiffs' prior agreements with respect to the Third Amended Complaint should apply with equal force to the identical claims in the FAC.

On the merits, Judge Castel's dismissal of certain federal antitrust claims should also dispose of the parallel state claims.  The state antitrust laws in 16 of 17 plaintiff states are to be construed in harmony with federal antitrust law.  *See* Appendix. C.  The 17th state is Arkansas, discussed below.  Thus, conduct that is not plausibly anticompetitive under federal law is also not plausibly anticompetitive under these states' antitrust laws.

The stipulations and Judge Castel's ruling cover the following claims in the FAC, each of which should be dismissed pursuant to the stipulations and the reasoning in Judge Castel's Order.

- Encrypted User IDs [Op. at 381-83].  FAC ¶¶ 254-266.

---

[17] Order at 2, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC (Dec. 14, 2022), ECF No. 417.
[18] *Id.* at 2-4.
[19] Ltr. to Judge Castel, *In re Google Digital Advert. Antitrust Litig.*, 1:21-md-03010-PKC (Feb. 24, 2023), ECF No. 475.

- Reserve Price Optimization [Op. at 391-93].  FAC ¶¶ 331-351.
- Exchange Bidding [Op. at 393-95].  FAC ¶¶ 366-384.
- Accelerated Mobile Pages [Op. at 398-99].  FAC ¶¶ 406-412.
- Privacy Sandbox [Op. at 399-400].  FAC ¶¶ 473-481 .
- Dynamic Allocation ** [Op. at 384-85, 402-03].  FAC ¶¶ 267-281.
- Dynamic Revenue Share **[20] [Op. at 389-91, 402-03].  FAC ¶¶ 318-330.
- Facebook Network Bidding Agreement [Op. at 370-77].  FAC ¶¶ 413-450.

Arkansas' state-law antitrust claims should be dismissed in their entirety because Arkansas' antitrust laws do not prohibit alleged monopolization (except based on below-cost pricing, which is not alleged here).  The Arkansas statutes cited in the FAC prohibit only (i) locality discrimination, (ii) secret payments, rebates, or discounts, (iii) price-fixing, and (iv) below-cost pricing with anticompetitive intent.  *Id.* ¶ 623; *see also* Ark. Code Ann. §§ 4-75-201 to -320.  Arkansas pleads no such conduct in the FAC.   Therefore, Arkansas' state antitrust claims should be dismissed in their entirety.

Mississippi's state antitrust claims must also be dismissed.  A Mississippi Antitrust Act claim requires, among other things, non-conclusory allegations of intrastate transactions.  *See State ex rel. Fitch v. Yazaki North Amer.*, 294 So. 3d 1178, 1187-90 (Miss. 2020) (affirming dismissal of AG's complaint that failed to allege "any wholly intrastate transactions").  The FAC describes no intra-Mississippi conduct or transactions, and so the Mississippi antitrust claims must be dismissed.

### III.  Plaintiffs' Demands for Unauthorized Remedies Should be Dismissed.

Plaintiffs ask for a raft of remedies that their state laws do not authorize.  Each unauthorized demand should be dismissed.  Federal courts regularly consider and dismiss unauthorized state-law remedy demands on 12(b)(6) motions.  *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 676-78 (E.D. Pa. 2022); *Tovar v. El Paso Area Teachers Fed. Credit*

---

[20] ** Judge Castel dismissed the federal DA and DRS claims for injunctive relief because the alleged conduct stopped in 2019 and therefore there was nothing to enjoin.  All States' claims for injunctive relief based on DA and DRS should be dismissed for the same reasons.

*Union*, 2013 WL 12394444, at *1-2 (W.D. Tex. Aug. 15, 2013); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 169-214 (D. Me. 2004); *FTC v. Mylan Lab'ys, Inc.*, 99 F. Supp. 2d 1, 4-11 (D.D.C. 1999).

### A.   Disgorgement Is Not Available for Any DTPA Claims.

All Plaintiffs seek disgorgement for alleged DTPA violations, *see* FAC ¶ 759(f) and (g), and eight Plaintiffs seek disgorgement for their state antitrust claims.[21]  Plaintiffs cannot obtain disgorgement as a matter of law because the underlying laws do not provide for it.

While each State DTPA lists certain remedies available (*e.g.*, injunction or damages), none specifically provides a disgorgement remedy.  "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."  *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979).  A State DTPA's authorization of injunctive relief does not extend to disgorgement.  *See AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1347 (2021) ("An 'injunction' is not the same as an award of equitable monetary relief."); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1324 (11th Cir. 2010) ("Injunctive relief constitutes a distinct type of equitable relief; it is not an umbrella term that encompasses restitution or disgorgement.").  Similarly, the antitrust laws of the eight states that seek disgorgement authorize other specific equitable relief—but not disgorgement.[22]   All claims for disgorgement must, therefore, be dismissed.

---

[21] Alaska, FAC ¶¶ 621, 761(a); Arkansas, FAC ¶¶ 624; Idaho, FAC ¶ 631; Kentucky, FAC ¶ 639(a); Mississippi, FAC ¶ 648; Missouri, *see* Pls.' Third Am. Resps. & Objs. to Google's Interrogs. No. 4; Nevada, FAC ¶ 655; and Utah, FAC ¶ 673.

[22] Nevada and Indiana recently amended their laws to authorize disgorgement but those amendments should not apply retroactively to this case.  *Landgraf v. USI Film Prod.*, 511 U.S. 244, 280 (1994).

### B.  Mississippi Cannot Seek Restitution or Disgorgement.

Mississippi demands restitution and disgorgement.  *See* FAC ¶ 648, *see also* Section A, *above*.  But Mississippi law does not allow the AG to seek restitution or disgorgement on antitrust or deceptive trade practices claims.  *See* Miss. Code. Ann. 75-24-19 (1)(authorizing the AG to seek a civil penalty in addition to an injunction).

### C.  Puerto Rico Does Not Authorize Recovery of Civil Penalties.

Puerto Rico cannot obtain civil penalties under its antitrust law or DTPA.  Puerto Rico's antitrust law simply "does not provide for civil penalty actions."  *See* ABA Section of Antitrust Law, State Antitrust Practice and Statutes. 42-15, § 15.b. (5th ed. 2014).  Puerto Rico's DTPA does not empower the AG to pursue civil penalties in federal court.  10 L.P.R.A. § 259(a),(i); *Aguadilla Paint Ctr., Inc. v. Standard Oil*, 2011 TSPR 194, 183 P.R. Dec. 901, 932-33 (2011) (Department of Consumer Affairs has "exclusive primary jurisdiction" to award non-injunctive remedies).[23]

### CONCLUSION

For the reasons provided above, the Court should dismiss Plaintiffs' DTPA claims in their entirety, dismiss the state-law antitrust claims in accordance with Judge Castel's order on the federal antitrust claims, and dismiss claims for unauthorized remedies.  Appendix D provides a summary of the reasons to dismiss each claim, state-by-state.  The dismissal should be with prejudice, as Plaintiffs have amended their complaint four times already.  Given the voluminous discovery to which Plaintiffs already have access, their representations that they engaged in a pre-suit investigation, and the four prior amendments to their complaints, the Court can assume that if Plaintiffs had any more specific facts they would have alleged them.

---

[23] Google provides the Court a certified translated version as Ex. G to the McCallum Decl.

Dated: January 16, 2024

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Eric Mahr (*pro hac vice*)
FRESHFIELDS BRUCKHAUS DERINGER LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
(202) 777-4545
eric.mahr@freshfields.com

ATTORNEYS FOR DEFENDANT
GOOGLE LLC

## CERTIFICATE OF SERVICE

I certify that on January 16, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ R. Paul Yetter*
R. Paul Yetter

31