**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

## <u>DECLARATION OF ROBERT J. McCALLUM</u>

I, Robert J. McCallum, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am Of Counsel at Freshfields Bruckhaus Deringer US LLP, which represents Defendant Google LLC ("Google") in the above-captioned case.

2.      I am an attorney admitted to practice in the State of New York and in the United States District Courts for the Southern District of New York and the Eastern District of New York.  I have been admitted to appear *pro hac vice* in the above-captioned case.

3.      I respectfully submit this Declaration in support of Google's Motion to Dismiss Plaintiffs' Fourth Amended Complaint ("FAC"), dated January 16, 2024.

4.      Attached as Exhibit A to this Declaration is a true and correct copy of the March 5, 2015 Digiday news article titled "Google sweetens deal for publishers with dynamic price floors" referenced by Plaintiffs.  FAC ¶ 535.

5.      Attached as Exhibit B to this Declaration is a true and correct copy of a May 12, 2016 Google Blog Post titled "Smarter Optimizations to Support a Healthier Programmatic Market" referenced by Plaintiffs.  FAC ¶ 536.

6.      Attached as Exhibit C to this Declaration is a true and correct copy of a March 6, 2019 Google Blog Post titled "Simplifying programmatic: first price auctions for Google Ad Manager" referenced by Plaintiffs. FAC ¶ 587.

7.      Attached as Exhibit D to this Declaration is a true and correct copy of the September 2014 article titled "Yield Optimizations of Display Advertising with Ad Exchange" referenced by Plaintiffs.  FAC  ¶ 551.

8.      Attached as Exhibit E to this Declaration is a true and correct copy of a Google Privacy Policy from December 19, 2019 referenced by Plaintiffs.  FAC ¶¶ 573, 574, 579.

9.      Attached as Exhibit F to this Declaration is a true and correct copy of a Google Blog Post from April 2020 titled "Learn the basics - How Open Bidding Works" referenced by Plaintiffs. FAC ¶ 587.

10.      Attached as Exhibit G to this Declaration is a true and correct copy of a certified translation of *Aguadilla Paint Ctr., Inc. v. Standard Oil*, 2011 TSPR 194, 183 P.R. Dec. 901, 932-33 (2011).

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 16th day of January 2024, in New York, New York.

Robert J. McCallum

**EXHIBIT A**

5/6/23, 11:28 AM
Case 4:20-cv-00957-SDJ    Document 202-1    Filed 01/16/24    Page 5 of 122 PageID #:  3620
Google sweetens deal for publishers with dynamic price floors - Digiday



# DIGIDAY

SUBSCRIBE  |  LOGIN

MEDIA

# Google sweetens deal for publishers with dynamic price floors

March 5, 2015  •  4 min read  •  By Digiday





turtix/Shutterstock.com

Google is testing a new way for publishers to maximize their advertising revenue.

The feature — called a "dynamic price floor" by a publishing executive briefed on the plans — would automatically change the minimum sell price for ads sold through Google's DoubleClick Ad Exchange (AdX) based upon advertiser demand.

A price floor is the lowest price at which an ad can be sold for through an ad exchange (a marketplace in which advertisers and publishers buy and sell ad inventory in real time). Publishers set price floors to ensure their ad inventory fetches at least a certain amount of money in a real-time auction. If a publisher sets a price floor of $2, it will only accept advertiser bids of $2 or more.

Dynamic price floors, however, change in real time in order to reflect the bid history for a given piece of inventory and ensure that it is sold at a price that better reflects its market rate. For example, say a publisher routinely sells a given ad through an exchange at $5 CPM, but the ad has a price floor of $3. Now, say an advertiser that often buys that ad at $5 decides to bid the minimum of $3. With a regular price floor, the ad would be sold at $3. But a dynamic price floor would take an advertiser's bid history into consideration, pushing the minimum sell price up to $4 without the publisher having to change its settings.

In this sense, automating the price floor entry process helps publishers as it alleviates concerns that AdX will depreciate their ad inventory. Although not as widely prevalent now, publishers have long worried that ad exchanges — and programmatic ad buying, in general — would exert downward pressure on the price of their advertising.

But Google's dynamic price floor feature comes with a caveat, according to industry executives with knowledge of

## MOST READ

01   GAMING & ESPORTS

**Inside the breakdown of EA's revenue share deal for Apex Legends esports**


02   THE COMMERCE MEDIA ERA

**Commerce media grows more dominant by the year, forcing media agencies to keep pace with change**


03   AWARDS

**HARIBO, Twitch, Regeneron and WSJ's The Trust are among this year's Digiday Content Marketing Awards finalists**


Case 4:20-cv-00957-SDJ   Document 202-1   Filed 01/16/24   Page 7 of 122 PageID #:  3622

the feature: Certain settings within the feature will only be available to publishers that use Google's ad server and ad exchange together. And that raises issues of whether Google is bundling the two products together so as to further its dominance in the ad tech industry.

Google's dynamic price floor feature will have three priority settings — "low," "medium" and "high" — that will allow publishers to determine how aggressively they price their inventory, according to those with knowledge of the feature. The high setting would push the minimum sell price higher than the medium setting would have, for instance.

Google has told publishers that the high and medium settings would only be available to those that use its exchange and ad server in conjunction, the executives told Digiday.

"I would have grave concerns if the largest and arguably most important digital intermediary improperly used its market dominance to gain other deals," Jason Kint, CEO of digital publishing trade group Digital Content Next.

Google disputed that any parts of its product would be exclusive to publishers that use both its ad server and ad exchange.

"That description doesn't match anything in our current product suite or future roadmap. We have and are working on a number of publisher tools to help maximize revenues," spokeswoman Andrea Faville said in a statement. "For example, in DoubleClick for Publishers, we've had our underlying dynamic allocation feature since 2010, integrated with the DoubleClick Ad Exchange. Separately, we're experimenting with new ways to improve yield for our publishers on the DoubleClick Ad Exchange, but nothing new has launched."

According to the executives briefed by Google, the dynamic price floor feature would function similarly to Google's "enhanced dynamic allocation," an ad tech feature that caused Google competitors to complain in spring 2013

04   THE COMMERCE MEDIA ERA

**How live shopping is shaping the future of retail**



05   GAMING & ESPORTS

**Why five prominent gaming influencers are teaming up to build the top Fortnite Creative experience**



**TRENDING IN**

01   GAMING & ESPORTS

**Inside the breakdown of EA's revenue share deal for Apex Legends esports**



02   THE COMMERCE MEDIA ERA

**Commerce media grows more dominant by the year, forcing media agencies to keep pace with change**



03   AWARDS

**HARIBO, Twitch, Regeneron and WSJ's The Trust are**



Google sweetends deal for publishers on its dynamic price floors - Digiday

to the Federal Trade Commission that Google was abusing its market power.

With enhanced dynamic allocation, a publisher's ad server selects the highest bid for an ad, even if the publisher had previously sold that ad impression directly to an advertiser. But enhanced dynamic allocation only works with bids that come in through Google's ad exchange instead of selecting the highest bid from across a variety of ad exchanges and ad optimization technologies, according to a Google customer support page.

That Google was bundling its ad server, which was dominant in the industry, with its ad exchange was enough to elicit an FTC probe, according to a May 2013 Wall Street Journal report. The FTC raised similar questions again last year, but it's unclear if the two examinations were connected.

Using DFP and AdX together does offer the distinct advantage of simplifying the increasingly complex world of programmatic advertising.

"There are advantages to having them coupled, especially with programmatic," Kavata Mbondo, head of programmatic solutions at Time Inc., which used both AdX and DFP. ""It would be great to have an aggregator of the demand aggregators. That would be awesome. … But companies don't work like that."

*Image courtesy Getty Images*

  



https://digiday.com/?p=108581

---

Ⓓ

# Stories like this, in your inbox each morning

Business Email

Job Title

Google sweetends deal for publishers on...c floors — Digiday

SIGN UP

## DIGIDAY TOP STORIES

MEMBER EXCLUSIVE

### Digiday+ Research: Nielsen gets boost in NewFronts, upfront cycle — but Comscore wins as measurement provider

Digiday's survey found that Comscore and Nielsen will be the dominant measurement providers during this year's NewFronts and upfronts. More than half of publishers said they will accommodate Comscore this year, and nearly half said they will accommodate Nielsen.



NAVIGATING ECONOMIC INSTABILITY

### Gannett's Q1 earnings report boasts optimism, despite ad declines and stagnant subscriptions

Gannett's CEO Mike Reed is confident that tides will turn for the company as soon as Q2.



THE COMMERCE MEDIA ERA

### Despite agencies' investments in data tech, advertiser expectations still fall short

The most insightful customer data sits at the heart of commerce media — but that doesn't mean advertisers always get the insights they're looking for.



SPONSORED

### Acquisition, engagement and retention: Using marketing to take on streaming's top challenges

Sponsored by Wurl Streaming is having its moment in the spotlight. Last year, streaming surpassed cable viewing for the first time. Meanwhile, the number of adults accessing streaming video platforms has outpaced those with cable or satellite service. With audiences continuing to flock to Internet-enabled viewing, the opportunity for streamers and content publishers has never [...]



BUSINESS OF TV

### TikTok, Meta, Vevo announce new ad products and planning tools on NewFronts' final day

TikTok, Meta and Vevo announced new ad products and media planning tools, and Condé Nast highlighted its popular live events on the final day of the IAB NewFronts.



MEMBER EXCLUSIVE

**Media Briefing: Ad spending is slowing, but it's a return to 'normal'**

Publishers' ad revenue was still up on an average of 26% year over year in 2022, but outlook for 2023 more so resembles pre-pandemic realities.



---

## DIGIDAY+

Get access to tools and analysis to stay ahead of the trends transforming media and marketing

SUBSCRIBE

### NEWSLETTER

Get Digiday's top stories every morning in your email inbox.

Business email          SIGN UP

### CONNECT

Follow @Digiday for the latest news, insider access to events and more.

**EXHIBIT B**

Google Ad Manager                                                                          🔍

---

GOOGLE AD MANAGER

# Smarter optimizations to support a healthier programmatic market

May 12, 2016  ·  2 min read                                          Share

 **Jonathan Bellack**
Director, Product Management

---

Our goal has always been to help publishers and advertisers thrive and create sustainable businesses. For many years Google has used optimization and machine learning techniques to improve the performance of our ads products, and now we're happy to share that we've been extending those techniques to DoubleClick Ad Exchange customers. Today we are introducing Optimized Private Auctions and optimized pricing in the Open Auction to help our publisher partners grow their revenue and give programmatic buyers greater access to premium inventory.

## More control of Private Auctions

Private Auctions were developed to help publishers negotiate higher prices by creating special segments of inventory for preferred buyers. As deal volume has grown, we discovered an additional opportunity for publishers to make even more money with Private Auctions. On average, 5% of Private Auction impressions on our platform have an Open Auction buyer willing to pay more than the Private Auction deal price. If all of these bids from Open Auction buyers were able to win their auctions, publishers would see a significant lift to their programmatic revenue.

Optimized Private Auctions, now available to all publishers using DoubleClick Ad Exchange globally, give publishers the ability to allow high-value Open Auction bids to compete against Private Auctions. Full transparency is available to buyers, who can see in the DoubleClick Ad Exchange UI which of their Private Auctions are being optimized.

## Greater accuracy with optimized pricing in the Open Auction

In addition to helping publishers maximize revenue from Private Auctions, we've been experimenting with optimized pricing to help publishers set price floors in the Open Auction that more closely reflect the value of their inventory.

The Open Auction tends to have a large price gap between what a buyer bids and what they pay. We've observed more than a 50%[1] price gap between bid and closing prices in many cases. Publishers see this gap as a revenue opportunity and try to close the gap by applying manually-calculated price floors. This is difficult to do well and can lead to lost revenue, or to complex implementations such as offering the same query repeatedly at different price floors that can increase user latency and hurt advertiser performance. We think there's a better way.

Optimized pricing in the Open Auction uses historical data to automate the post-auction analysis and updating of floor prices that publishers already do, and takes it a step further. Not only does our technology use signals like ad unit and device, it also calculates audience-based floors, so publishers can fully benefit from building valuable audiences. And as we've always done, if there is a floor applied to an impression, whether publisher or algorithmically set, we share it with buyers in our bid requests.

In our experiments to date, we have applied optimized pricing to about 15% of transactions, creating over 5% lift in revenue for publishers using the Open Auction. As we expand our experiments with optimized pricing, we will monitor its performance to ensure advertisers continue to get great ROI.

## Increasing price transparency

While Optimized Private Auctions and optimized pricing in the Open Auction help publishers get more value for their inventory, they raise important questions. In our conversations, programmatic buyers and sellers have expressed a strong desire for greater transparency and openness in how advertising is valued and prices are set. As the programmatic ecosystem continues to grow, we look forward to partnering with buyers and sellers in an open discussion on price transparency in the industry.

1 Google internal data, desktop and mobile web impressions in North America

**POSTED IN:**

**EXHIBIT C**

**Google** Ad Manager

GOOGLE AD MANAGER

# Simplifying programmatic: first price auctions for Google Ad Manager

Mar 06, 2019 · 2 min read

 Share

 **Sam Cox**
Group Product Manager, Google Ad Manager

In the very early days of programmatic buying, publishers typically used only one auction to sell their ad inventory. Today the programmatic ecosystem has evolved into a much more complex marketplace where a single ad can pass through a mix of auctions, with different rules, before a winning bid price is selected and an ad is served. This complexity has made it difficult for advertisers and agencies to properly value programmatic inventory and it has driven our publishers and app developers to implement increasingly complicated ad monetization strategies, reducing transparency across the industry. Further, the increasing intricacy of programmatic has made it operationally very difficult, even for experts, to determine what's going well and what needs to be improved.

In order to help simplify programmatic for our partners, in the coming months we'll start to transition publisher inventory to a unified first price auction for Google Ad Manager. We expect the transition to be complete by the end of this year. By switching to a single first price auction, we can help reduce complexity and create a fair and transparent market for everyone.

Common auction scenario today



Unified first price auction



## What this means for our partners

With this change, every offer from programmatic buyers will compete in the same unified auction, alongside inventory which is directly negotiated with advertisers. An advertising buyer's bid will not be shared with another buyer before the auction or be able to set the price for another buyer. The buyer that wins the auction pays the price they bid. By simplifying our auction in Ad Manager, we can help make it easier for publishers and app developers to manage and get fair value for their inventory.

## Preparing for this change

Since the change from second to first price will require both buyers and sellers to make changes in their programmatic strategies, we'll give everyone time to prepare over the next few months before we start testing. During this time, publishers and app developers will need to rethink how they use price floors and technology partners will need to adjust how they bid for Google Ad Manager Inventory.

It's important to note that our move to a single unified first price auction only impacts display and video inventory sold via Ad Manager. This change will have no impact on auctions for ads on Google Search,

AdSense for Search, YouTube, and other Google properties, and advertisers using Google Ads or Display & Video 360 do not need to take any action.

We are excited to take this next step to simplify the programmatic ecosystem and help our partners grow. As we get closer to the start of our transition to a unified first price auction, we'll work with all our partners to help them get prepared. ■

**POSTED IN:**

Google Ad Manager

**EXHIBIT D**

# Yield Optimization of Display Advertising with Ad Exchange

Santiago Balseiro

Graduate School of Business, Columbia University, New York, NY 10027, srb2155@columbia.edu

Jon Feldman, Vahab Mirrokni, S. Muthukrishnan

Google Research, New York, NY 10011, jonfeld@google.com, mirrokni@google.com, muthu@google.com

September 2011

It is clear from the growing role of Ad Exchanges in the real-time sale of advertising slots that web publishers are considering a new alternative to their more traditional reservation-based ad contracts. To make this choice, the publisher must trade off, in real-time, the short-term revenue from an Ad Exchange with the long-term benefits of delivering good quality spots to the reservation ads.

In this paper, we formalize this combined optimization problem as a stochastic control problem and derive an efficient policy for online ad allocation in settings with general joint distribution over placement quality and exchange prices. We prove asymptotic optimality of this policy in terms of any arbitrary trade-off between quality of delivered reservation ads and revenue from the exchange, and provide a rigorous bound for its convergence rate to the optimal policy. We also give experimental results on data derived from real publisher inventory, showing that our policy can achieve any Pareto-optimal point on the quality vs. revenue curve.

## 1. Introduction

Internet Display Advertising refers generally to the graphical and video ads that are now ubiquitous on the web. These types of ads generated about 10 billion dollars in the US in 2010, and analysts see a clear rising trend (Internet Advertising Bureau 2011). Traditionally, an advertiser would buy display ad placements by negotiating deals directly with a publisher (the owner of the web page), and signing an agreement, called a guaranteed contract. These deals usually take the form of a specific number of ad impressions reserved over a particular time horizon (e.g., one million impressions over a month). A publisher can make many such deals with different advertisers, with potentially sophisticated relationships between the advertisers' targeting criteria. The publisher would then need to assign arriving impressions to the matching reservations so as to maximize the *placement quality* of the contracts. Typically, the probability that a user clicks on an ad (known as *click-trough rate*) is used as a metric of placement quality.

Guaranteed contracts can suffer in efficiency: since slots are booked in advance, both parties cannot react to instantaneous changes to traffic patterns or market conditions. However, this has changed in the last couple of years. Advertisers may now purchase ad placements through spot markets for the real-time sale of online ad slots, called Ad Exchanges. Prominent examples of exchanges are Yahoo's RightMedia, Microsoft's AdECN, Google's DoubleClick and OpenX. While exchanges differ in their implementations, in a generic Ad Exchange (AdX) (Muthukrishnan 2009), publishers post an ad slot with a reservation price, advertisers post bids, and an auction is run; this happens between the time

a user visits a page and the ad is displayed. Ad exchanges allow advertisers to bid in real time and pay only for valuable customers, instead of bulk buying impressions and targeting large audiences.

In presence of ad exchanges, publishers face the problem of maximizing the overall placement quality of the impressions assigned to the reservations together with the total revenue obtained with AdX, while complying with the contractual obligations. Note that these two objectives are potentially conflicting; in the short-term, the publisher might boost the revenue stream from AdX at the expense of assigning lower quality impressions to the advertisers. In the long term, however, it may be convenient for the publisher to prioritize her advertisers in view of attracting future contracts. So for a given piece of ad inventory, the publisher must quickly decide whether to send the inventory to AdX (and at what price), or to assign it to an advertiser with a reservation.

In this paper, we study the problem faced by the publisher, jointly optimizing over AdX and the reservations. We bring to bear techniques from revenue management and stochastic optimal control, perform a probabilistic modeling of the problem, and derive an efficient policy for making real-time ad allocation decisions. We prove that our policy is asymptotically optimal in terms of an arbitrary (i.e., publisher-defined) trade-off between quality delivered to reservation ads and revenue from the exchange. Our policy and analysis is quite general, and works for any joint distribution over placement quality and exchange prices, even allowing correlation between advertisers, or between quality and exchange prices. In particular, we provide a rigorous bound on the convergence rate of our policy to the optimal policy (Theorem 2). Typically ad allocation research compares to the optimal offline policy in hindsight; instead, we compare our policy with an optimal online policy, obtaining a bound on additive regret, as in online machine learning.

Since the optimal policy cannot be computed efficiently in most real-world problems, we derive a provably good policy which resembles a bid-price control but extended with a pricing function to take into account for AdX. Our policy assigns each guaranteed contract a bid-price (or dual variable), which may be interpreted as the opportunity cost of assigning one additional impression to the advertiser. When a user arrives, the pricing function quotes a reserve price to submit to the exchange that depends on the opportunity cost of assigning the impression to an advertiser. If AdX price does not exceed this reserve price, the impression is immediately assigned to the advertiser whose placement quality exceeds its opportunity cost by the largest amount. We also give experimental results on data derived from real publisher inventory, showing that our policy can achieve any Pareto-optimal point on the quality vs. revenue curve.

## 1.1.   Related Work and Contributions

Our works draws on three streams of literature, namely, that of Display Advertising, Revenue Management, and Online Allocation. Rather than attempting to exhaustively survey the literature on each area, we focus on the work more closely related to ours.

*Display Advertising.*   There has been recent work on display ad allocation with both contract-based advertisers and spot market advertisers. Ghosh et al. (2009) focus on "fair" representative bidding strategies in which the publisher bids on behalf of the contract-based advertisers competing with the spot market bidders. This line of work is mainly concerned with computing such fair representative

bidding strategies for contract-based advertisers. Chen (2011) considers the case when the publisher runs the exchange, and employing a mechanism design approach he characterizes, through dynamic programming, the optimal dynamic auction for the spot market. In this model both bids from the spot market and the total number of impressions are stochastic. We focus, instead, on combined yield optimization and present a model and an algorithm taking into account any trade-off between quality delivered to reservation ads and revenue from the spot market.

Yang et al. (2010) studied the problem faced by the publisher of allocating between the two markets using multi-objective programming. As in our work, they consider different objectives for the publisher, such as, minimizing the penalty of under-delivery, maximizing the revenue from the spot market and the representativeness of the allocation. However, they employ a deterministic model with no uncertainty in which future inventory and contracts are nodes in a bipartite graph. Alaei et al. (2009) proposed an utility model that accounts for two types of advertisers: one oriented towards campaigns and seeking to create brand equity, and the other oriented towards the spot market and seeking to transform impressions to sales. Here impressions are commodities which can be assigned interchangeably to any advertisers. In this setting they look for offline and online algorithms aiming to maximize the utility of their contracts of the allocation. Roels and Fridgeirsdottir (2009) studied the scheduling problem in display advertising in the case without the exchange. In this paper the publisher needs to decide, as new contracts arrive, whether to accept them or not, and then dynamically deliver arriving impressions to them. They take into account uncertainty both in supply and demand, provide a dynamic programming formulation, and propose a certainty-equivalent control.

*Revenue Management.* Another stream of relevant work is that of Revenue Management (RM). Even though RM is typically applied to airlines, car rentals, hotels and retailing (Talluri and van Ryzin 2004), our problem formulation and analysis is inspired by RM techniques. As in the prototypical RM problem, we look for a policy maximizing the *ex-ante* expected revenue, which can be obtained using dynamic programming (DP). Since the resulting DP is intractable, we aim for a deterministic version in which stochastic quantities are replaced by their expect values and quantities assumed to be continuous. These are common in the literature (Gallego and van Ryzin 1994, Liu and van Ryzin 2008), and provide policies with provably good performance. Indeed, we show that our policy is asymptotically optimal.

The Display Ad problem can be thought of as a parallel-flight Network RM problem (see, e.g., Talluri and van Ryzin (1998)) in which users' click probabilities are requests for itineraries, and advertisers are edges in the network. The are three differences, however, with the traditional Network RM problem. First, we aim to satisfy all contracts, or completely deplete all resources by the end of the horizon. Second, in the traditional problem requests are for only one itinerary (which can be accepted or rejected), while in our model each impression can be potentially assigned to any contract and the publisher needs to decide whom to assign the impression based on possibly correlated placement qualities. Finally, the publishers in display advertising may submit impressions to a spot market to increase their revenues.

4

| | **Network RM** | **Display Ads** |
|---|---|---|
| Resources | Legs (edges) | Contracts |
| Constraints | $\leq$ | $=$ |
| Objective | Fares | Placement Quality |
| Decision | Accept/Reject | Decide whom to assign to |
| Spot market | No | Yes |

**Table 1**    **Comparison of the Display Ad and Network Revenue Management problems.**

A popular method for controlling the sale of inventory in revenue management applications is the use of bid-price controls. These were originally introduced by Simpson (1989), and thoroughly analyzed by Talluri and van Ryzin (1998). In this setting, a bid-price control sets a threshold or bid price for each advertiser, which may be interpreted as the opportunity cost of assigning one additional impression to the advertiser. This approach is standard in the context of revenue maximization, e.g. the stochastic knapsack problem by Levi and Radovanovic (2010). From this perspective, our contribution is the inclusion of a spot market, the exchange, as an new sales channel. In this case, our policy is a suitable modification of a bid-price control that takes into account AdX by incorporating a pricing function. This pricing function quotes a reserve price to submit to the exchange that depends on the opportunity cost of assigning the impression to an advertiser.

*Online Allocation.* Our work is closely related to online ad allocation problems, including the *Display Ads Allocation (DA)* problem (Feldman et al. 2009, 2010, Agrawal et al. 2009, Vee et al. 2010), and the *AdWords (AW)* problem (Mehta et al. 2007, Devenur and Hayes 2009). In both of these problems, the publisher must assign online impressions to an inventory of ads, optimizing efficiency or revenue of the allocation while respecting pre-specified contracts.

In the DA problem, advertisers demand a maximum number of eligible impressions, and the publisher must allocate impressions that arrive online to them. Each impression has a potentially different value for every advertiser. The goal of the publisher is to assign each impression to one advertiser maximizing the value of all the assigned impressions. The adversarial online DA problem was considered in Feldman et al. (2009), which showed that the problem is inapproximable without exploiting *free disposal*; using this property (that advertisers are at worst indifferent to receiving more impressions than required by their contract), a simple greedy algorithm is $\frac{1}{2}$-competitive, which is optimal. When the demand of each advertiser is large, a $(1 - \frac{1}{e})$-competitive algorithm exists (Feldman et al. 2009), and it is tight. The stochastic model of the DA problem is more related to our problem. Following a training-based dual algorithm by Devenur and Hayes (2009), training-based $(1 - \epsilon)$-competitive algorithms have been developed for the DA problem and its generalization to various packing linear programs (Feldman et al. 2010, Vee et al. 2010, Agrawal et al. 2009).

In the AW problem, the publisher allocates impressions resulting from search queries. Here each advertiser has a budget on the total spend instead of a bound on the number of impressions. Other than training-based dual algorithms and primal-dual algorithms that get similar bounds as in the DA problem (Devenur and Hayes 2009), online adaptive optimization techniques have been applied

to online stochastic ad allocation (Tan and Srikant 2010). Such control-based adaptive algorithms achieve asymptotic optimality following an updating rule inspired by the primal-dual algorithms.

Our work differs from all the above in three main aspects: (i) We study both the parametric and non-parametric models, and compare their effectiveness in terms of the size of the sample sizes—both analytically for various distributions and experimentally on real data sets. (ii) Instead of using the framework of competitive analysis and comparing the solution with the optimum solution in hindsight, we compare the performance of our algorithm with the optimal online policy, and present a rate of convergence bound under this model. This is akin to regret bounds found in online Machine Learning; and (iii) None of the above work considers the simultaneous allocation of reservation ads and ads from AdX. In particular, these previous works do not consider the trade-off between the revenue from a spot market based on real-time bidding and the efficiency of reservation-based allocation.

It is tempting to simply reduce to online stochastic packing by considering the AdX as just another "advertiser." The problem with this is that it does not allow adjusting the reserve price, or allocating a reservation advertiser if the AdX rejects. In fact one can make such a reduction go through by considering online decisions on pairs of (reserve price, advertisers), and formalize the problem as an online allocation problem with general packing constraints. After a couple more steps, one can apply the techniques of Devenur and Hayes (2009), Feldman et al. (2010), Vee et al. (2010), Agrawal et al. (2009) to derive an online algorithm for the combined problem. However this approach discretizes the price space into multiples of $\delta$; thus (a) we lose $1 + \delta$ in the yield, (b) we increase the running time by a factor of $\frac{1}{\delta}$, and (c) for the the competitiveness proof to hold, we need more stringent conditions on the size of the weights. In addition, there is no clear way to apply the parametric technique. The method presented in this work not only avoids this dependence, it is a much more natural, extensible solution to the problem.

## 2.   Model

Consider a publisher displaying ads in a web page. The web page has a single slot for display ads, and each user is shown at most one impression per page. The publisher has signed contracts with a set $A$ of advertisers guaranteeing them a certain number of targeted impressions within a given time horizon. We denote by $\mathcal{A} = \{1, \ldots, A\}$ the set of advertisers.

Even though the number of users visiting a web page is uncertain, publishers usually have fairly good estimates of the total number of expected users that arrive in a given horizon. In this model we index time based on the arrival of each user, and assume that the total number of users is fixed and equal to $N$. We do allow users to have different characteristics (random number of users can be accommodated in our model by considering dummy arrivals). Indeed, depending on the user profile, the impression may be more or less attractive for different advertisers.

We assume that the $n$-th impression is endowed with a vector of placement qualities $Q_n = \{Q_{n,a}\}_{a \in \mathcal{A}}$, where $Q_{n,a}$ is the predicted quality advertiser $a$ would perceive if the impression is assigned to her. Qualities lie in some compact space $\Omega \subseteq \mathbb{R}^A$. A typical measure of placement quality is the estimated probability that the user click on each ad. In practice, such measure of quality is learned

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.



**Figure 1    Publisher's decision tree for a new impression.**

using, for example, logistic regression. Here we abstract from the learning problem and assume that qualities $\{Q_n\}_{n=1,\dots,N}$ are random and drawn independently from some joint c.d.f $G(\cdot)$. We do allow, however, for qualities to be jointly distributed across advertisers. This captures the fact that advertisers might have similar target criteria, and hence the qualities perceived might be correlated. We do not impose any further restrictions on the qualities, other than finite second moments. Notice that the publisher observes the realization of the placement quality before showing the ad.

The publisher has agreed to deliver exactly $C_a$ impressions to advertiser $a \in \mathcal{A}$; neither over-delivery nor under-delivery is allowed. We denote by $\rho = \{\rho_a\}_{a \in \mathcal{A}}$ with $\rho_a = \frac{C_a}{N}$, the capacity to impression ratio of each advertiser. Note that a necessary condition for the feasibility of the operation is that the number of arriving impressions suffices to satisfy the contracts, or $\sum_{a \in \mathcal{A}} \rho_a \leq 1$. An assumption of this general model is that any user can be potentially assigned to any advertiser. In practice each advertiser may be interested in a particular group of user types. It is important to note that this is not a limitation of our results, but rather a modeling choice; in §5 we show how to handle targeting criteria by setting $Q_{n,a} = -\tau_a$ for impressions not matching the targeting criteria of an advertiser. This can also be interpreted as forcing the publisher to pay a good will penalty $\tau_a$ to the advertisers each time an undesired impression is incorrectly assigned.

Arriving impressions may either be assigned to the advertisers, discarded or auctioned in the Ad Exchange (AdX) for profit. In a general AdX (Muthukrishnan 2009), the publisher contacts the exchange with a minimum price she is willing to take for the slot. Additionally, the publisher may submit some partial information of the user visiting the website. For simplicity, we first assume that no information about the user is revealed. However, in section 7.3 we relax this assumption. Internally the exchange contacts different ad networks, and in turn they return bids for the slot. The exchange determines the winning bid among those that exceed the reserve price via an auction, and returns a payment to the publisher. In this case we say that the impressions is *accepted*, and the publisher is contractually obligated to display the winning impression. In the case that no bid attains the reserve price, no payment is made and the impression is *rejected*. We present the formal model of the exchange in Section 2.2. The entire operation above is executed before the page is rendered in the user's screen. Thus, in the event that the impression is rejected by the exchange, the publisher may still be able to assign it to some advertiser. Figure 1 summarizes the decisions involved.

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.                                                                          7

For notational simplicity we extend the set of advertisers to $\mathcal{A}_0 = \{0\} \cup \mathcal{A}$ by including an outside option 0 that represents discarding an impression. We set the quality of the outside option identically to zero, i.e. $Q_{n,0} = 0$ for all impressions $n = 1, \ldots, N$. In the following, the terms discarding an impression or assigning it to advertiser 0 are used interchangeably. We set $\rho_0 = 1 - \sum_{a \in \mathcal{A}} \rho_a$ to be the fraction of impressions that are not assigned to any advertiser. To wit, a fraction of the $\rho_0$ impressions will be assigned to the winning impression of AdX, and the remainder effectively discarded.

## 2.1.  Objective

The publisher's problem is to maximize the overall placement quality of the impressions assigned to the advertisers together with the total revenue obtained with AdX, while complying with the contractual obligations. Note that the objectives are potentially conflicting; in the short-term, the publisher might boost the revenue stream from AdX at the expense of assigning lower quality impressions to the advertisers. In the long term, however, it may be convenient for the publisher to prioritize her advertisers, in view of attracting future contracts.

We attack the multi-objective problem by taking a weighted sum of both objectives. The publisher has at her disposal a parameter $\gamma$, which allows her to trade-off between these conflicting objectives. The aggregated objective is given by

$$\text{yield} = \text{revenue}(\text{AdX}) + \gamma \cdot \text{quality}(\text{advertisers}),$$

Hence, by choosing a suitable large $\gamma$ the advertisers may focus on assigning high quality impressions to the advertisers; while a small $\gamma$ would prioritize the revenue from AdX (the publisher may set different values of the parameter for each advertiser). Without loss of generality, we set $\gamma = 1$ for the remainder of this paper, except when noted otherwise.

Alternatively, the publisher might impose that the overall quality of the impressions assigned to the advertiser is greater than some threshold, and then maximize the total revenue obtained from AdX; this may have a more natural interpretation for some publishers, and would be simpler than having to set $\gamma$. We can model this simply by interpreting $\gamma$ as the Lagrange multiplier of the quality of service constraint, and our problem as the Lagrange relaxation of the constrained program. In §7.1 we analyze the implications of this formulation, and in §6.1 we study experimentally the impact of the choice of $\gamma$ on both objectives.

## 2.2.  AdX Model

The publisher submits an impression to AdX with the minimum price it is willing to take, denoted by $p \geq 0$. The impression is accepted if there is a bid of value $p$ or more. We denote by $B$ the winning bid random variable. In the following we assume that bids are independent of the quality of the impression, and identically distributed according to a c.d.f. $F(\cdot)$. Hence, the impression is accepted with probability $1 - F(p) = \bar{F}(p)$. In this first model, when the impression is accepted, the publisher is paid the minimum price $p$. In Sections 7.2 and 7.3 we drop this assumption and consider a more general second-price auction with side information.

Suppose the publisher has computed an *opportunity cost* $c$ for selling this inventory in the exchange; that is, the publisher stands to gain $c$ if the impression is given to a reservation advertiser. Given

opportunity cost $c \geq 0$ the publisher picks the price that maximizes its expected revenue. Hence, the publisher solves the optimization problem $R(c) = \max_{p \geq 0} \bar{F}(p)p + F(p)c$. Changing variables, we can define $r(s) = s\bar{F}^{-1}(s)$ to be the expected revenue under acceptance probability $s$, and rewrite this as

$$R(c) = \max_{s \in [0,1]} r(s) + (1 - s)c. \tag{1}$$

Also, let $s^*(c)$ be the least maximizer of (1), and $p^*(c) = \bar{F}^{-1}(s^*(c))$ be the price that verifies the maximum.

**Assumption 1** *The expected revenue under survival probability $s$ is continuous, concave, non-negative, bounded, and satisfies $\lim_{s \to 0} r(s) = 0$. We call a function $r(s)$ that satisfies all of the assumptions above a regular revenue function.*

These assumptions are common in RM literature (see, e.g., Gallego and van Ryzin (1994)). A sufficient condition for the concavity of the revenue is that $B$ has increasing generalized failure rates (Lariviere 2006). Regularity implies, among other things, the existence of a *null price* $p_\infty$ such that $\lim_{p \to p_\infty} \bar{F}(p)p = 0$. Additionally, it allows us to characterize the value function $R(c)$. In §7.2 we show that $r(s)$ remains regular in the presence of multiple bidders in the AdX by considering the joint density of the highest and second-highest bids. Thus, all our results hold in this case too.

**Proposition 1** *Suppose that $r(s)$ is regular revenue function. Then, $R(c)$ is non-decreasing, convex, continuous, and $R(c) \geq c$. Additionally, $R(c) - c$ is non-increasing, $s^*(c)$ is non-increasing, and $p^*(c)$ is non-decreasing.*

An important consequence of above is that the maximum revenue expected from submitting an impression to AdX is always greater than the opportunity cost. This should not be surprising, since the publisher can pick a price high enough to compensate for the revenue loss of not assigning the impression. Hence, assigning an impression directly to an advertiser (rather than first testing the exchange) is never the right decision, and so in Figure 1 the upper branch is never taken.

## 3. Problem Formulation

In this section we start by formulating an optimal control policy for yield maximization based on dynamic programming (DP), where the state of the system is represented by the number of impressions yet to arrive, and a vector of the number of impressions needed to comply with each advertiser's contract. Unfortunately, the state space of the DP has size $O(N^{A+1})$, and in most real-world problems the number of impressions in a single horizon can be in the order of millions. So the DP is not efficiently solvable. We give, instead, an approximation in which stochastic quantities are replaced by their expected values, and are assumed to be continuous. Such "deterministic approximation problems (DAP)" are popular in RM (see, e.g., Talluri and van Ryzin (1998)). In our setting, the approximation we make is to enforce contracts to be satisfied only in expectation. We formulate the problem based on this assumption and obtain an infinite-dimensional program. This DAP is solved by considering its dual problem, which turns out to be a more tractable finite-dimensional convex

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.
9

program. Finally, we wrap a full stochastic policy around it (one that always meets the contracts, not just in expectation).

## 3.1.  Dynamic Programming Formulation

Let $(m, X)$ be the state of the system, where we denote by $m$ the total number of impressions remaining to arrive, and by $X = \{x_a\}_{a \in \mathcal{A}}$ the number of impressions needed to comply with each advertiser's contract. Let the value function, denoted by $J_m(X)$, be defined as the optimal expected yield obtainable under state $(m, X)$. Using the fact that is optimal to first test the exchange, we obtain the following Bellman equation

$$
\begin{aligned}
J_m(X) &= \mathbb{E}_{Q_n} \left[ \max_{p \geq 0} \left\{ \bar{F}(p)(p + J_{m-1}(X)) + (1 - \bar{F}(p)) \max_{a \in \mathcal{A}_0} \{Q_{n,a} + J_{m-1}(X - \mathbf{1}_a)\} \right\} \right] \\
&= J_{m-1}(X) + \mathbb{E}_{Q_n} \left[ R \left( \max_{a \in \mathcal{A}_0} \{Q_{n,a} - \Delta_a J_{m-1}(X)\} \right) \right],
\end{aligned}
\tag{2}
$$

where we defined $\mathbf{1}_a$ as a vector with a one in entry $a$ and zero elsewhere, $\mathbf{1}_0 = 0$, and $\Delta_a J_m(X) = J_m(X) - J_m(x - \mathbf{1}_a)$ as the expected marginal yield of one extra impression for advertiser $a$. In (2) the objective accounts for the yield obtained from attempting to send the impression to AdX. In the yield has two terms that depend on whether the impression is accepted or not by AdX. In the latter case the maximum accounts for the decision of assigning the impression directly to the advertiser or discarding the impression (when $a = 0$). In (2) we used the fact that assigning an impression directly to an advertiser is never the right decision (except in boundary conditions, see below). The publisher, however, may choose to discard impressions with low quality after being rejected by AdX.

Our objective is to compute $J_N^* = J_N(C)$. Let $M$ be an upper-bound on the expected yield.[1] The boundary conditions are

$$
\begin{aligned}
J_m(x) &= -M, \qquad \forall X \text{ s.t. } x_a < 0 \text{ for some } a \in \mathcal{A}, \\
J_m(x) &= -M, \qquad \forall m < \sum_{a \in \mathcal{A}} x_a.
\end{aligned}
$$

Recall that when the contract with an advertiser is fulfilled, no extra yield is obtained from assigning to her more impressions. This is the case of the first boundary condition, which guarantees that advertisers whose contract is fulfilled are excluded from the assignment. In particular, when $X = 0$ all remaining impressions are sent to AdX with the yield maximum price $p^*(0)$ when $x = 0$. The second boundary condition guarantees that the contracts with the advertisers are always fulfilled. When $\sum_{a \in \mathcal{A}} x_a = m$ AdX must be bypassed, and impressions should be assigned directly to the advertisers. The optimal policy is described in Policy 1.

In the above policy, when the impression is submitted to AdX, the optimal price ponders an opportunity cost of $Q_{n,a_n^*} - \Delta_{a_n^*} J_{n-1}(X)$. This opportunity cost, when positive, is just the value of the impression adjusted by the loss of potential yield from assigning the impression right now. Note that the two boundary conditions are implicit in the optimal policy. This guarantees that the policy complies with the contracts. It is routine to check that the value function $J_n(X)$ is finite for

---

[1] One could set, e.g., $M \triangleq \max\{p_\infty, \bar{Q}\}$ where $\bar{Q}$ is an upper-bound on the placement quality

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

---

**Policy 1** Optimal dynamic programming policy.

    Observe state $(m, X)$ and the realization $Q_n$.

    Let $a_n^* = \arg\max_{a \in \mathcal{A}_0} \{Q_{n,a} - \Delta_a J_{n-1}(X)\}$.

    Submit to AdX with price $p^*\left(Q_{n,a_n^*} - \Delta_{a_n^*} J_{n-1}(X)\right)$.

    **if** impression rejected by AdX and $a_n^* \neq 0$ **then**

        Assign to advertiser $a_n^*$.

    **end if**

---

all feasible states and that Policy 1 is optimal for the dynamic program in (2). It is worth noting that in order to implement the optimal policy one needs to pre-compute the value function, which is intractable in most real instances.

### 3.2. Deterministic Approximation Problem (DAP)

We aim for an approximation in which (i) the policy is independent of the history but dependent on the realization of $Q_n$, (ii) capacity constraints are met in expectation, and (iii) controls are allowed to randomize. These approximations turn out to be reasonable when the number of impressions is large. When an impression arrives, the publisher controls the reserve price submitted to AdX, and the advertiser to whom the impression is assigned, if rejected by AdX. Alternatively, in this formulation we state the controls in terms of total probabilities, where each control is a function from the quality domain to $[0, 1]$. Let $\vec{s} = \{s_n(\cdot)\}_{n=1,\dots,N}$ and $\vec{i} = \{i_n(\cdot)\}_{n=1,\dots,N}$ be vectors of functions from $\Omega$ to $\mathbb{R}$, such that when the $n^{\text{th}}$ impression arrives with quality $Q$ the impression is accepted by AdX with probability $s_n(Q)$, and with probability $i_{n,a}(Q)$ it is assigned to advertiser $a$. The conditional probability of an impression being assigned to advertiser $a$ given that it has been rejected by AdX is given by $I_{n,a}(Q) = i_{n,a}(Q)/(1 - s_n(Q))$. When it is clear from the context, we simplify notation by eliminating the dependence on $Q$ from the controls.

A control is feasible for the DAP if (i) it satisfies the contractual constraint in expectation, (ii) the individual controls are non-negative, and (iii) for every realization of the qualities the probabilities sum up to at most one. We denote by $\mathcal{P}$ the set of controls that satisfy the latter two conditions. That is, $\mathcal{P} = \{(s, i) : \sum_{a \in \mathcal{A}} i_a + s \leq 1, s \geq 0, i \geq 0\}$. The objective of the DAP is to find a sequence of real-valued measurable functions that maximize the expected yield, or equivalently

$$J_N^D = \max_{(s_n, i_n) \in \mathcal{P}} \sum_{n=1}^{N} \mathbb{E}\left[r(s_n) + \sum_{a \in \mathcal{A}} i_{n,a} Q_{n,a}\right]$$

$$\text{s.t.} \sum_{n=1}^{N} \mathbb{E}\left[i_{n,a}\right] = N\rho_a, \qquad \forall a \in \mathcal{A}. \tag{3a}$$

The first term of the objective accounts for the revenue from AdX, while the second accounts for the quality perceived by the advertisers. Notice that in the DAP we wrote the total capacity as $N\rho_a$ instead of $C_a$ to allow the problem to be scaled.

Alas, the problem is still hard to solve since the number of functions is linear in $N$. However, exploiting the regularity of the revenue function, we can show that in the optimal solution to DAP,

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

11

we can drop the dependence on $n$ in the controls. This follows from the linearity of the constraints together with the concavity of the objective. We formalize this discussion in the following proposition.

**Proposition 2** *Suppose that the revenue function is regular. Then, there exists a time-homogenous optimal solution to the DAP, i.e. where $s_n(Q_n) = s(Q_n)$ for all $n = 1, \ldots, N$ and $i_n(Q_n) = i(Q_n)$ for all $n = 1, \ldots, N$.*

The previous proposition allows us scale the problem so that $N = 1$, and consider the maximum expected revenue of one impression, denoted by $J_1^D$. The total revenue for the whole time horizon is then $J_N^D = N J_1^D$. In order to compute the DAP's optimal solution, we consider its dual problem, which we informally derive next.

*Derivation of the Dual to DAP.* To find the dual, we introduce Lagrange multipliers $v = \{v_a\}_{a \in \mathcal{A}}$ for the capacity constraints (3a). The Lagrangian, denoted by $\mathcal{L}(s, i; v)$ is

$$\mathcal{L}(s, i; v) = \mathbb{E}\left[ r(s) + \sum_{a \in \mathcal{A}} i_a Q_a - \sum_{a \in \mathcal{A}} v_a (i_a - \rho_a) \right].$$

The dual function, denoted by $\psi(v)$, is the supremum of the Lagrangian over the set $\mathcal{P}$. Thus, we have that

$$\begin{aligned}
\psi(v) &= \sup_{(s,i) \in \mathcal{P}} \mathcal{L}(s, i; v) \\
&= \sup_{s \geq 0} \left\{ \mathbb{E}\left[ r(s) \right] + \sup_{i \geq 0, \sum_{a \in \mathcal{A}} i_a \leq 1-s} \mathbb{E}\left[ \sum_{a \in \mathcal{A}} i_a (Q_a - v_a) \right] \right\} + \sum_{a \in \mathcal{A}} v_a \rho_a \\
&= \sup_{s \geq 0} \mathbb{E}\left[ r(s) + (1-s) \max_{a \in \mathcal{A}_0} \{Q_a - v_a\} \right] + \sum_{a \in \mathcal{A}} v_a \rho_a \\
&= \mathbb{E} R\big( \max_{a \in \mathcal{A}_0} \{Q_a - v_a\} \big) + \sum_{a \in \mathcal{A}} v_a \rho_a
\end{aligned}$$

where the first equation follows from partitioning the optimization between the AdX acceptance and the assignment probability controls, the second from optimizing over the advertiser assignment controls $i$, and the last equation from solving the AdX variational problem. Note that $R$ is convex and non-decreasing and the maximum is convex w.r.t $v$, hence the composite function within the expectation is convex. Using the fact that expectation preserves convexity, we obtain that the objective $\psi(v)$ is convex in $v$.

Next, the dual problem is $\min_v \psi(v)$. When the revenue function is regular, the DAP's objective is concave and bounded from above. Moreover, the constraints of the primal problem are linear, and the feasible set $\mathcal{P}$ convex. Hence, by the Strong Duality Theorem (p.224 in Luenberger (1969)) the dual problem attains the primal objective value. So, we have that dual problem is given by the following convex stochastic problem

$$J_1^D = \min_v \left\{ \mathbb{E} R\big( \max_{a \in \mathcal{A}_0} \{Q_a - v_a\} \big) + \sum_{a \in \mathcal{A}} v_a \rho_a \right\}. \tag{4}$$

12

Balseiro et al.: *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

*Deterministic optimal control.* When the distribution $Q$ is known, the dual problem in (4) can be solved using a Subgradient Descent Method. It is worth noting that in many applications the distribution of $Q$ is unknown and should be learned as impressions arrive. We postpone the discussion of that problem until §6.2.

Once the optimal dual variables $v$ are known, the primal solution can be constructed from plugging the optimal Lagrange multipliers in $\mathcal{L}(s, i; v)$. Following the derivation of the dual, we obtain that the optimal survival probability is $s(Q) = s^*\left(\max_{a \in \mathcal{A}_0}\{Q_a - v_a\}\right)$. Hence, the impression has a value of $\max_{a \in \mathcal{A}_0}\{Q_a - v_a\}$ for the publisher, and she picks the reserve price that maximizes her revenue. From the optimization over the assignment controls, we see that an impression is assigned to an advertiser $a$ only if she maximizes the contract adjusted quality $Q_a - v_a$. Thus the dual variables $v_a$ act as the *bid-prices* of the guaranteed contracts. Additionally, the impression can be discarded only if the maximum is not verified by an advertiser (i.e. all contract adjusted qualities are non-positive).

Notice that optimizing the Lagrangian states that the impression should be assigned to an advertiser maximizing the contract adjusted quality, but does not specify how the impression should be assigned when –multiple– advertisers attain the maximum. In the case when the probability of a tie occurring is zero, the problem admits a simple solution: assign the impression to the unique maximizer of $Q_a - v_a$. We formalize this discussion in the the following theorem.

**Theorem 1** *Suppose that the revenue function is regular, and there is zero probability of a tie occurring, i.e. $\mathbb{P}\{Q_a - v_a = Q'_a - v'_a\} = 0$ for all distinct $a, a' \in \mathcal{A}_0$. Then, the optimal controls for the DAP are $s(Q) = s^*\left(\max_{a \in \mathcal{A}_0}\{Q_a - v_a\}\right)$, and $I_a(Q) = \mathbf{1}\{Q_a - v_a > Q_{a'} - v_{a'} \,\forall a' \in \mathcal{A}_0\}$, that is, the impression is assigned to the unique advertiser maximizing the contract adjusted quality. Furthermore, the optimal dual variables solve the equations*

$$\mathbb{E}\left[(1 - s^*(Q_a - v_a))I_a(Q)\right] = \rho_a, \qquad \forall a \in \mathcal{A}.$$

### 3.3. Our Stochastic Policy

The solution of the DAP suggests a policy for the stochastic control problem, but we must deal with two technical issues: (i) when more than one advertiser maximizes $Q_a - v_a$ we need to decide how to break the tie, and (ii) we are only guaranteed to meet the contracts in expectation, whereas we must meet them exactly. We defer the first issue until §3.4, where we give an algorithm for generalizing the controls $I_a(Q)$ to the case where ties are possible.

We propose a static bid-price control extended with a pricing function for AdX given by $p^*$. The policy, which we denote by $\mu^B$, is defined in Policy 2. In there we let $x_{n,a}$ be the total number of impressions left to assign to advertiser $a$ to comply with the contract, $m = N - n$ the total number of impressions remaining to arrive, and $v$ to be the optimal solution of (4).

Notice that impressions are only assigned to advertisers with contracts that have yet to be fulfilled. When all contracts are fulfilled, impressions are sent to AdX with the revenue maximizing price $p^*(0)$. Moreover, when the total number of impressions left is equal to the number of impressions necessary to fulfill the contracts, the price is set to $p_\infty$, and thus all incoming impressions are directly assigned to advertisers. Hence, the stochastic policy $\mu^B$ satisfies the contracts with probability 1.

---

**Policy 2** Static Bid-Price Policy with Pricing $\mu^B$.

Observe state $(m, X)$ and the realization $Q_n$.

Let $\mathcal{A}_n = \{a \in \mathcal{A} : x_{n,a} > 0\}$ be the set of ads yet to be satisfied.

Let $a_n^* = \arg\max_{a \in \mathcal{A}_n \cup \{0\}} \{Q_{n,a} - v_a\}$.

**if** $\sum_{a \in \mathcal{A}} x_{n,a} < m$ **then** let $p_n = p^*(Q_{n,a_n^*} - v_{a_n^*})$, **else** let $p_n = p_\infty$.

Submit to AdX with price $p_n$.

**if** impression rejected by AdX and $a_n^* \neq 0$ **then**

  Assign to advertiser $a_n^*$.

**end if**

---

The proposed stochastic policy shares some resemblance with the optimal dynamic programming policy. The intuition is that, when the number of impressions is large, the actual state of the system becomes irrelevant because $\Delta_a J_{m-1}(x)$ is approximately constant (for states in likely trajectories), and equal to $v_a$. In that case both policies are equivalent.

### 3.4.   Handling ties

Theorem 1 had an assumption that there would be no ties between advertisers verifying the maximum $Q_a - v_a$. In this section we show how to construct a primal optimal solution to the DAP and the corresponding stochastic policy in the general case (for example, when the distribution of placement quality is discrete or has atoms). Devenur and Hayes (2009) proposed introducing small random and independent perturbations to the qualities, or smoothing the dual problem to break ties. We provide an alternate method that directly attacks ties, and provides a randomized tie-breaking rule. Computing the parameters of the tie-breaking rule requires solving a flow problem on a graph of size $2^{|A|}$; thus in some settings it may not be possible. In section EC.3, we show that in practice ties do not occur frequently. However, for completeness we provide a full characterization of the problem.

For any non-empty subset $S \subseteq \mathcal{A}_0$, we define a *S-tie* as the event when the maximum is verified exactly by all the advertisers $a \in S$, and the impression is rejected by AdX. Note that the tie may be a singleton, in the case that exactly one advertiser verifies the maximum. Since the dual variables $v$ are known, the probability of such event can be written as

$$\mathbb{P}(S\text{-tie}) = \mathbb{E}\Big[\big(1 - s^*(\lambda(Q))\big)\mathbf{1}\big\{Q_a - v_a = \lambda(Q)\,\forall a \in S,\ Q_a - v_a < \lambda(Q)\,\forall a \notin S\big\}\Big],$$

where $\lambda(Q) = \max_{a \in \mathcal{A}_0}\{Q_a - v_a\}$. With some abuse of notation we define the $\emptyset$-*tie* as the event when the impression is accepted by AdX, that is, $\mathbb{P}(\emptyset\text{-tie}) = \mathbb{E}[s^*(\lambda(Q))]$. Note that the tie events induce a partition of the quality space, and we have that $\sum_{S \subseteq \mathcal{A}_0} \mathbb{P}(S\text{-tie}) = 1$.

We look for a random tie-breaking rule that assigns an arriving impression to advertiser $a \in S$ with conditional probability $I_a(S)$ given that a $S$-tie occurs. Hence, the routing probabilities depend on which advertisers tie, and not on the particular realization of the qualities (they are independent of $\lambda(Q)$). Therefore, under such policy the total probability, originating from $S$-ties, of an impression being assigned to advertiser $a$ is $y_a(S) = \mathbb{P}(S\text{-tie})I_a(S)$. We can interpret $y_a(S)$ as the normalized flow

14

Balseiro et al.: *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

of impression assigned to the advertiser originating from $S$-ties. We will show that, in terms of $y_a(S)$ as decision variables, finding the tie-breaking rule amounts to solving a transportation problem.

First, in order for the publisher to fulfill the contract with an advertiser $a \in \mathcal{A}$ the incoming flow of impressions over all possible ties sums up to $\rho_a$. The previous constraint can be written as

$$\sum_{S \subseteq \mathcal{A}_0 : a \in S} y_a(S) = \rho_a, \qquad \forall a \in \mathcal{A}. \tag{5}$$

Notice that we impose no constraints for $a = 0$ since any number of impressions can be discarded. Alternatively, we could set $\rho_0^{\text{eff}} = 1 - \mathbb{P}(\emptyset\text{-tie}) - \sum_{a \in \mathcal{A}} \rho_a$ because the impressions effectively discarded are those that are rejected by AdX and not assigned to an advertiser. Second, the outgoing flow of impressions originating from a particular tie should sum up to the actual probability of that tie occurring. Then, we have that

$$\sum_{a \in S} y_a(S) = \mathbb{P}(S\text{-tie}), \qquad \forall S \subseteq \mathcal{A}_0. \tag{6}$$

Third, we require that $y_a(S) \geq 0$ for all $S \subseteq \mathcal{A}_0$ and $a \in S$. Finally, in order to obtain the tie-breaking rule we need a non-negative flow satisfying constraints (5) and (6). Once a such solution is found, the optimal controls can be computed as

$$I_a(Q) = \begin{cases} y_a(S)/\mathbb{P}(S\text{-tie}) & \text{if } a \in S, \text{ and } Q \text{ is an } S\text{-tie,} \\ 0 & \text{otherwise,} \end{cases}$$

with the pricing function as before.

It is not hard to see that the previous problem can be stated as a feasible flow problem in a bipartite graph. We briefly describe how to construct such graph next. On the left-hand side of the graph we include one node for each non-empty subset $S \subseteq \mathcal{A}_0$, and in the right-hand side we add one node for each advertiser $a \in \mathcal{A}_0$. In the following we refer to nodes in the left-hand side as *subset nodes*, and to those in the right-hand side as *advertiser nodes*. The supply for subset nodes is $\mathbb{P}(S\text{-tie})$, while the demand for advertiser nodes is $\rho_a$. Arcs in the graph represent the membership relation, i.e., the subset node $S$ and advertiser node $a$ are connected if and only if $a \in S$. Moreover, arc capacities are set to infinity. In Figure 2 the resulting bipartite graph is shown.

An important question is whether the flow problem admits a feasible solution. The next result proves that the answer is affirmative when the dual variables $v$ are optimal for the dual problem (4). The proof proceeds by casting the feasible flow problem as a maximum flow problem, and then exploiting the optimality conditions of $v$ to lower bound every cut in the bipartite graph.

**Proposition 3** *Suppose that $v \in \mathbb{R}^A$ is an optimal solution for the dual problem* (4). *Then, there exists a non-negative flow satisfying constraints* (5) *and* (6).

We conclude this section by showing that the solution constructed is optimal for the primal problem. Notice that the solution is feasible because it satisfies constraints (5) and (6). In order to prove optimality it suffices to show that it attains the dual objective value, or that it satisfies the complementary slackness conditions. The latter follows trivially.



**Figure 2** **Bipartite flow problem solved to obtain the tie-breaking rule. On the left-hand side of the graph we include one node for each non-empty subset $S \subseteq \mathcal{A}_0$ (subset nodes), and in the right-hand side we add one node for each advertiser $a \in \mathcal{A}_0$ (advertiser nodes). The supply for subset nodes is $\mathbb{P}(S\text{-tie})$, while the demand for advertiser nodes is $\rho_a$. Arcs in the graph represent the membership relation, i.e., the subset node $S$ and advertiser node $a$ are connected if and only if $a \in S$. Arc capacities are set to infinity.**

Once the optimal controls are calculated, we construct our stochastic policy as follows. We let $\mathcal{A}_n^* = \arg\max_{a \in \mathcal{A}_n \cup \{0\}} \{Q_{n,a} - v_a\}$, be the set of advertisers that attain the maximum. Now, if the impression is rejected by AdX and $\mathcal{A}_n^* \neq \{0\}$, we assign it to advertiser $a$ in $\mathcal{A}_n^*$ with probability $I_a(Q_n) / \sum_{a' \in \mathcal{A}_n^*} I_{a'}(Q_n)$. Notice that impressions are only assigned to advertisers with contracts that have yet to be fulfilled. Additionally, as the contracts of some advertisers are fulfilled, these are excluded of the assignment, and the routing probabilities $I_a(\cdot)$ of the remaining advertisers are scaled-up and normalized.

## 4. Asymptotic Analysis

In this section we show that the heuristic policy constructed from the DAP is asymptotically optimal for the stochastic problem when the number of impressions and capacity are scaled up proportionally. We proceed in the following way. First, we formulate the problem as a stochastic control problem (SCP). Though not practical, this abstract and equivalent formulation is useful from a theoretical point of view. Second, we show that the optimal objective value of the DAP provides an upper bound on the objective value of the SCP. Finally, we show that the upper bound is asymptotically tight.

*Stochastic Control Problem.* A stochastic control policy maps states of the system to control actions (prices and target advertiser), and is adapted to the history up to the decision epoch. We restrict our attention to policies that always submit the impression to AdX, which were argued to be optimal. Recall that given the reserve price, the publisher knows the actual probability that the impression is accepted by AdX. As before, we recast the problem in terms of the survival probability control. Hence, the publisher picks the probability that the impression is accepted. Conversely, given a survival probability the reserve price can be easily computed using $\bar{F}^{-1}(\cdot)$. We denote by $s_n^\mu(Q) \in [0, 1]$ the target survival probability under policy $\mu$ at time $n$ when an impression with quality $Q$ arrives. Similarly, we let $I_{n,a}^\mu(Q) \in \{0, 1\}$ indicate whether the $n^{\text{th}}$ impressions is assigned to advertiser $a$ or not when policy $\mu$ is used. In particular, $I_{n,a}^\mu(Q) = 1$ indicates that the impression should be assigned to the advertiser if rejected by AdX.

16

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

We let the binary random variable $X_n(s_n^\mu)$ indicate whether the $n^{\text{th}}$ impression is accepted by AdX or not when policy $\mu$ is used. Specifically, $X_n(s_n^\mu) = 1$ indicates that the impression is accepted by AdX, and when $X_n(s_n^\mu) = 0$ the impression is rejected by AdX. Notice that, conditioning on the quality of the impression and the history, $X_n(s_n^\mu)$ is a Bernoulli random variable with success probability $s_n^\mu$.

We denote by $\mathcal{M}$ the set of admissible policies, i.e. policies that are non-anticipating, adapting and feasible. A feasible policy should satisfy the contractual obligations with each advertiser, or equivalently $\sum_{n=1}^N [1 - X_n(s_n^\mu)] I_{n,a}^\mu = C_a$ in an almost sure sense. Additionally, the target advertiser controls should satisfy that $\sum_{a \in \mathcal{A}} I_{n,a}^\mu \le 1$, since the impression should be assigned to at most one advertiser. Finally, the equivalent stochastic optimal control problem is

$$J_N^* = \max_{\mu \in \mathcal{M}} \mathbb{E}\left[ \sum_{n=1}^N r(s_n^\mu) + (1 - s_n^\mu) \sum_{a \in \mathcal{A}} I_{n,a}^\mu Q_{n,a} \right], \tag{7}$$

where $J_N^*$ denotes the optimal expected revenue over the set of admissible policies $\mathcal{M}$. The objective follows from conditioning on the quality of the impression and the history. By the Principle of Optimality it is the case that the dynamic program described in section 3.1 provides an optimal solution to the SCP (Bertsekas 2000) and $J_N(C) = J_N^*$.

*Analysis.* Following a similar analysis to Gallego and van Ryzin (1994), Talluri and van Ryzin (1998), Liu and van Ryzin (2008), we first show that the optimal objective value of the DAP provides an upper bound to the objective value SCP, and then prove that this bound is tight. For the first result, we proceed by taking the optimal stochastic control policy, and construct a feasible solution for the DAP by taking expectations over the history. Later, we exploit the concavity of the objective and apply Jensen's inequality to show that this new solution attains a greater revenue in the DAP.

**Proposition 4** *The optimal objective value of the DAP provides an upper bound on the objective value of the optimal policy, i.e.* $J_N^* \le J_N^D$.

Now we complete the analysis by lower bounding the yield of the stochastic policy in terms of the DAP objective. In proving that bound, we look at $N^*$, the first time that any advertisers contract is fulfilled or the point is reached where all arriving impressions need to be assigned to the advertisers. We refer to the time after $N^*$ as the *left-over regime*. The first key observation in the proof is that before time $N^*$, the controls of the stochastic policy behave exactly as the optimal deterministic controls. The second key observation is that the expected number of impressions in the left-over regime is $O(\sqrt{N})$, and the left-over regime has a small impact on the objective.

**Theorem 2** *Let* $J_N^B$ *be the expected yield under the stochastic policy* $\mu^B$. *Then,*

$$\frac{J_N^B}{J_N^*} \ge \frac{J_N^B}{J_N^D} \ge 1 - \frac{1}{\sqrt{N}} K(\rho),$$

*where* $K(\rho) = \sqrt{\frac{A}{A+1} \sum_{a \in \mathcal{A}_0} \frac{1 - \rho_a}{\rho_a}}$.

*Proof.* The first bound follows from Proposition 4. We now prove the second bound.

Let $S_{n,a}^{\mu} = \sum_{i=1}^{n} (1 - X_i(s_i^{\mu}(Q_i))) I_{i,a}^{\mu}(Q_i)$ be the total number of impressions assigned to advertiser $a$ by time $n$ when following the stochastic policy $\mu^B$. Additionally, we denote by $S_n^{\mu} = \{S_{n,a}^{\mu}\}_{a \in \mathcal{A}}$ the random vector of impressions assigned to advertisers. Then, $x_{n,a} = C_a - S_{n,a}^{\mu}$ is the total number of impressions left to assign to advertiser $a$ to fulfill the contract, and $m = N - n$ is the total number of impressions remaining to arrive.

To simplify the proof, we let $C_0 = N - \sum_{a \in \mathcal{A}} C_a$ be the total number of impressions that are not assigned to any advertiser (accepted by AdX and discarded), and we refer to $S_{n,0}^{\mu} = n - \sum_{a \in \mathcal{A}} S_{n,a}$ as total number of impressions not assigned to any advertiser by time $n$ when following the stochastic policy $\mu^B$. Because $C_0$ is the total number of impressions we can dispense of, when the point is reached that $S_{n,0} = C_0$, then all remaining impressions need to be assigned to the advertisers.

Let the random time $N^* = \inf \left\{ 1 \leq n \leq N : x_{n,a} = 0 \text{ for some } a \in \mathcal{A} \text{ or } \sum_{a \in \mathcal{A}} x_{n,a} = m \right\}$ be the first time that any advertiser's contract is fulfilled or the point is reached where all arriving impressions need to be assigned to the advertisers. Clearly, $N^*$ is a stopping time with respect to the stochastic process $\{S_n^{\mu}\}_{n=1,\dots,N}$.

In the following, let $R_n^{\mu}$ be the revenue from time $n$ under policy $\mu^B$. Similarly, we denote by $R_n$ the revenue from time $n$ when the deterministic control are used in an alternate system with no capacity constraints. Because the deterministic controls are time-homogeneous, and the underlying random variables are i.i.d., then the random variables $\{R_n\}_{n=1,\dots,N}$ are i.i.d. too. Moreover, it is the case that $\mathbb{E}R_n = J_1^D$. Notice that when $n < N^*$, the controls of stochastic policy $\mu^B$ behave exactly as the optimal deterministic controls. Thus, $R_n = R_n^{\mu}$ for $n < N^*$. Using this fact together with the fact that $N^*$ is a stopping time we get that

$$J_N^B = \mathbb{E}\left[\sum_{n=1}^{N} R_n^{\mu}\right] = \mathbb{E}\left[\sum_{n=1}^{N^*} R_n + \sum_{n=N^*+1}^{N} R_n^{\mu}\right] \geq \mathbb{E}\left[\sum_{n=1}^{N^*} R_n\right] = \mathbb{E}N^* J_1^D, \qquad (8)$$

where the inequality follows from the non-negativity of the revenues, and the last equality from Wald's equation. Then, we conclude that $J_N^B / J_N^D \geq \mathbb{E}N^* / N$.

Next, we turn to the problem of lower bounding $\mathbb{E}N^*$. Before proceeding we make some definitions. We define by $S_{n,a}$ the number of impressions assigned to advertiser $a$ by time $n$ when following the deterministic controls in the alternate system with no capacity constraints. As for the revenues, it is the case that $S_{n,a} = S_{n,a}^{\mu}$ for $n < N^*$. We define $S_{n,0}$ in a similar fashion.

Let $N_a = \inf \{n \geq 1 : S_{n,a} = C_a\}$ be the time when the contract of advertiser $a \in \mathcal{A}$ is fulfilled, and $N_0 = \inf \{n \geq 1 : S_{n,0} = C_0\}$ be the point in time where all arriving impressions need to be assigned to the advertisers. Even though these stopping times are defined with respect to the stochastic process that follows the deterministic controls, it is the case that $N^* = \min_{a \in \mathcal{A}_0} \{N_a\}$. In the remainder of the proof we study the mean and variance of each stopping time, and then conclude with a bound for $\mathbb{E}N^*$ based on those central moments.

For the case of $a \in \mathcal{A}$, the summands of $S_{n,a}$ are independent Bernoulli random variables with success probability $\rho_a$. The success probability follows from (3a). Hence, $N_a$ is a negative binomial random variable with $C_a$ successes and success probability $\rho_a$. The mean and variance are given by

18

Balseiro et al.: *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

$\mathbb{E}N_a = N$, and $\mathrm{Var}[N_a] = N\frac{1-\rho_a}{\rho_a}$, where we used that $\rho_a = C_a/N$. Similarly, for the case of $a = 0$, now the summands of $S_{n,0}$ are Bernoulli random variables with success probability $\rho_0$. Hence, $N_0$ is a negative binomial random variable with $C_0$ successes and success probability $\rho_0$.

Finally, using the lower bound on the mean of the minimum of a number of random variables of Aven (1985) we get that

$$\mathbb{E}N^* = \mathbb{E}\min_{a \in \mathcal{A}_0}\{N_a\} \geq \min_{a \in \mathcal{A}_0}\mathbb{E}N_a - \sqrt{\frac{A}{A+1}\sum_{a \in \mathcal{A}_0}\mathrm{Var}[N_a]}$$

$$= N - \sqrt{\frac{A}{A+1}}\sqrt{\sum_{a \in \mathcal{A}_0}N\frac{1-\rho_a}{\rho_a}} = N - \sqrt{N}K(\rho). \tag{9}$$

The result follows from combining (8) and (9). □

In terms of yield loss, our previous bound can be written as $J_N^* - J_N^B \leq \sqrt{N}K(\rho)J_1^D$, achieving an $O(\sqrt{N})$ loss w.r.t the optimal online policy. In particular, we may fix the capacity to impression ratio of each advertiser, and consider a sequence of problems in which capacity and impressions are scaled up proportionally according to $\rho$. Then, the yield under policy $\mu^B$ converges to the yield of the optimal online policy as $N$ goes to infinity.

A key observation in proving the last theorem was that the number of impressions in the left-over regime is $O(\sqrt{N})$. In fact, using a Chernoff bound, we may show that the probability that the number of impressions in the left-over regime exceeds a fraction of the total impressions decays exponentially fast.

**Corollary 1** *The probability that the number of impressions in the left-over regime exceeds a fraction $\epsilon > 0$ of the total impressions decays exponentially fast, as given by*

$$\mathbb{P}\{N - N^* \geq \epsilon N\} \leq \sum_{a \in \mathcal{A}_0}\exp(-2\epsilon^2\rho_a N).$$

*Proof.* We prove the complement, that is, the probability that $N^* \geq (1-\epsilon)N$ converges exponentially fast to one. Notice that $N^* \geq (1-\epsilon)N$ if and only if by time $(1-\epsilon)N$ the contract of each advertiser is not yet fulfilled ($S_{(1-\epsilon)N,a} < C_a$), and the point where all impressions need to be assigned to advertisers has not been reached ($S_{(1-\epsilon)N,0} < C_0$). Combining De Morgan's law and Boole's inequality we get that

$$\mathbb{P}\{N^* \geq (1-\epsilon)N\} = \mathbb{P}\{S_{(1-\epsilon)N,a} < C_a \,\forall a \in \mathcal{A}_0\} \geq 1 - \sum_{a \in \mathcal{A}_0}\mathbb{P}\{S_{(1-\epsilon)N,a} \geq C_a\}.$$

Recall that $S_{(1-\epsilon)N,0}$ is the sum of $(1-\epsilon)N$ independent Bernoulli random variables with success probability $\rho_a$. Hence, we conclude by applying Chernoff's bound to the each summand to obtain $\mathbb{P}\{S_{(1-\epsilon)N,a} \geq C_a\} \leq \exp(-2\epsilon^2\rho_a N)$. □

The policy described in 3.3 is static in the sense that it does not react to changes in supply: the dual variables $v$ are computed at the beginning and remain fixed throughout the horizon. To address this issue, in practice, one would periodically resolve the deterministic approximation (4). Recently, Jasin and Kumar (2010) showed that carefully chosen periodic resolving schemes together

with probabilistic allocation controls can achieve bounded yield loss w.r.t. the optimal online policy. It is worth noting that those results do not directly apply to our setting: they consider a network RM problem with discrete choice, while our model deals with jointly distributed (and possibly continuous) placement qualities and AdX. Nevertheless, by periodically resolving the DAP one should be able to obtain similar performance guarantees for the yield loss of the control.

## 5.   Data Model and Estimation

We have thus far assumed that any user could be potentially assigned to any advertiser. In practice, however, advertisers have specific targeting criteria. For instance, a guaranteed contract may demand for females with certain age range living in New York, while other contract may demand for males in California. In this section we give a parametric model based on our observation of real data, which takes into consideration that advertisers demand for particular *user types* in their contracts.

Instead of grouping user types according to their attributes, we aggregate user types that match the criteria of the same subset of advertisers. This has the advantage of reducing the space of types to a function of the number of advertisers (which is typically small in practice) rather then the number of possible types (which is potentially large). Hence, a user type is characterized by the subset of advertisers $T \subseteq \mathcal{A}$ that are interested in it. In the following, we let $\mathcal{T}$ be the support of the type distribution, and $\pi(T)$ the probability of an arriving impression being of type $T$. As before we assume that, across different impressions, types are independent and identically distributed. Given a particular type $T$, the predicted quality perceived by the advertisers within the type is modeled by the non-negative random vector $Q(T) = \{Q_a(T)\}_{a \in T}$.

Even if the total number of impressions suffices to satisfy the contracts, i.e. $\sum_{a \in \mathcal{A}} \rho_a \leq 1$, the inventory may not be enough to satisfy the contracts targeting criteria. Our algorithm guarantees that the total number of impressions $C_a$ is always respected, yet some advertisers may be assigned impressions outside of their criteria. If an impression of type $T$ happens to be assigned to an advertiser $a \notin T$, the publishers pays a nonnegative goodwill penalty $\tau_a$. These penalties allow the publisher to prioritize certain reservations, specially when the contracts are not feasible. Thus, the ex-ante distribution of quality is given by the mixture of the types distribution with mixing probabilities $\pi(T)$. Notice that all our previous results hold if we apply the same analysis to the mixture distribution.

### 5.1.   Estimation

Although the number of types may be exponential in $A$, in practice we observe that a linear number of them suffice to characterize 98% of the inventory. We observe that the predicted quality perceived by the advertisers within a type is approximately log-normal. This can be seen in Figure 3, where the empirical distribution of log-quality is graphically represented for a type with two advertisers (data is log-transformed). The histograms on the diagonal show the marginal log-quality of each advertiser, which approximately resemble a normal curve. On the off-diagonals, scatter plots show the correlation between advertisers, which is strongly positive. In some sense this is expected, since many advertisers have similar targeting criteria.

20

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.



**Figure 3**   Graphical representation of the empirical distribution of log-quality for a type with two advertisers (data is log-transformed).

Given a particular type $T$, we assume that quality follows a multivariate log-normal with mean vector $\mu_T$ and covariance matrix $\Sigma_T$ for the advertisers in the type, and takes a value of $-\tau_a$ for advertisers not in the type. The total distribution of quality is given by the mixture of these types distribution with mixing probabilities $\pi(T)$. Thus, we have that

$$Q \sim \begin{cases} \ln \mathcal{N}(\mu_T, \Sigma_T), & \text{for } a \in T, \\ -\tau_a, & \text{for } a \notin T, \end{cases} \quad \text{w.p. } \pi(T).$$

To perform the estimation we analyzed data from four different publishers for a consecutive period of seven days. First, the capacities of the reservations were used to compute the ratios $\rho$. Second, logs were analyzed to estimate the types' frequencies, and the parameters of the underlying log-normal distributions (using maximum likelihood estimation).

Bidding data from the same period of time was used to estimate the primitives of the AdX. With multiple bidders, AdX runs a sealed bid second-price auction. In this first approach to the problem, we assume that bids are independent of the quality of the impressions. We analyze the first and second highest bids for the inventory submitted to AdX. We denote by $\{(B_1^m, B_2^m)\}_{m=1,\ldots,M}$ the sampled highest and second highest bids from the exchange. Sample data is used to compute the two primitives of our model: (i) the complement of the quantile of the highest bid $p(s)$, and (ii) the revenue function of $r(s)$. Both functions are estimated on a uniform grid $\{s_j\}_1^{100}$ of survival probabilities in the $[0, 1]$ range.

First, for each point in the grid $j$, the price $p_j = p(s_j)$ is estimated as the $(1 - s_j)$-th population quantile of the highest bid. Then, using sampled bids, we estimate the revenue function w.r.t. to prices at the grid points as

$$r(p_j) = \frac{1}{M} \sum_{m=1}^{M} \mathbf{1}\{B_1^m \geq p_j\} \max\{B_2^m, p_j\} \tag{10}$$

Finally, the revenue function is obtained by composing (10) and $p(s)$. AdX data is available only for the first two publishers.

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.



(a) User type-advertiser graph.



(b) Estimated survival probability and revenue function for AdX.

| Type | Ads | $\pi(T)$ | $\mu_T$ | $\Sigma_T$ |
|------|-----|----------|---------|------------|
| $T_1$ | $\{1,2,3\}$ | 0.2 | $\left(\begin{smallmatrix} 7.8155 \\ 7.8155 \\ 7.8155 \end{smallmatrix}\right)$ | $\left(\begin{smallmatrix} 0.3 & 0.1 & 0.1 \\ 0.1 & 0.3 & 0.1 \\ 0.1 & 0.1 & 0.3 \end{smallmatrix}\right)$ |
| $T_2$ | $\{1,2\}$ | 0.3 | $\left(\begin{smallmatrix} 6.6755 \\ 7.0655 \end{smallmatrix}\right)$ | $\left(\begin{smallmatrix} 0.3180 & 0.1649 \\ 0.1649 & 0.3602 \end{smallmatrix}\right)$ |
| $T_3$ | $\{2,3\}$ | 0.1 | $\left(\begin{smallmatrix} 6.6355 \\ 7.8055 \end{smallmatrix}\right)$ | $\left(\begin{smallmatrix} 0.4347 & 0.2357 \\ 0.2357 & 0.4367 \end{smallmatrix}\right)$ |
| $T_4$ | $\{1,3\}$ | 0.4 | $\left(\begin{smallmatrix} 7.2155 \\ 6.9155 \end{smallmatrix}\right)$ | $\left(\begin{smallmatrix} 0.23 & 0.05 \\ 0.05 & 0.40 \end{smallmatrix}\right)$ |

(c) Parameters of the distribution of log-quality.

**Figure 4**  **Description of Instance 1.**

Figure 4a describes Instance 1, a publisher with 4 types and 3 advertisers. The estimated survival probability and revenue function for the publisher is shown in Figure 4b. The parameters for the remaining publishers are available at the webpage of the first author.

## 6. Experimental Results

Two experiments were conducted to study our algorithm. First we study the impact of introducing an AdX on the publisher's yield. Second, we compare the previously known primal-dual approach to ad allocation that is non-parametric to our approach here which is parametric.

### 6.1. Impact of AdX

This first experiment explores the potential benefits of introducing an AdX, and how the publisher can take advantage of it. We study the impact of the trade-off parameter $\gamma$ on both objectives, that is, the quality of the impressions assigned to the advertisers, and the revenue from AdX. The limiting choices of $\gamma = 0$, and $\gamma = \infty$ are of particular interest. The first choice represents the case where the publisher disregards the quality of the impressions assigned to the advertisers, and strives to maximize the revenue extracted from AdX. Here the publisher strategically picks the reserve price so that just enough impressions are rejected to satisfy the contracts. In the second choice, the publishers prioritizes the quality of the impressions assigned, and submits the remanent inventory to AdX. We use this case as the baseline to which we compare our method.

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

22



(a) Ratios to baseline     (b) Pareto Frontier

**Figure 5**   Figure 5a plots the quality and revenue relative to the case $\gamma = \infty$, as a function of $\gamma$. Figure 5b plots, in a quality vs. revenue graph, the objective values of the optimal solutions for the different choices of $\gamma$, together with the Pareto frontier. Both plots are for Instance 2, given in §6.

### Instance 1

| $\gamma$ | 0 | 0.001 | 0.01 | 0.05 | 0.075 | 0.1 |
|---|---|---|---|---|---|---|
| Yield | 110.94 | 112.78 | 128.81 | 202.46 | 249.11 | 296.95 |
| Quality | 1107.32 | 1779.07 | 1801.00 | 1864.95 | 1891.19 | 1913.78 |
| Revenue | 110.94 | 111.00 | 110.80 | 109.21 | 107.27 | 105.57 |

| $\gamma$ | 0.25 | 0.5 | 0.75 | 1 | 10 | $\infty$ |
|---|---|---|---|---|---|---|
| Yield | 590.54 | 1098.43 | 1608.80 | 2122.99 | 20764.82 | $\infty$ |
| Quality | 1998.31 | 2044.89 | 2055.72 | 2061.33 | 2072.22 | 2075.52 |
| Revenue | 90.97 | 75.98 | 67.00 | 61.66 | 42.61 | 38.48 |

### Instance 2

| $\gamma$ | 0 | 0.001 | 0.01 | 0.05 | 0.075 | 0.1 |
|---|---|---|---|---|---|---|
| Yield | 428.73 | 429.02 | 434.22 | 459.57 | 477.39 | 495.66 |
| Quality | 483.02 | 545.27 | 573.23 | 676.34 | 720.31 | 752.35 |
| Revenue | 428.73 | 428.47 | 428.49 | 425.75 | 423.37 | 420.42 |

| $\gamma$ | 0.25 | 0.5 | 0.75 | 1 | 10 | $\infty$ |
|---|---|---|---|---|---|---|
| Yield | 617.04 | 834.39 | 1056.05 | 1279.88 | 9425.63 | $\infty$ |
| Quality | 843.47 | 880.69 | 891.49 | 896.89 | 906.46 | 907.05 |
| Revenue | 406.17 | 394.05 | 387.43 | 382.99 | 360.99 | 356.11 |

**Table 2**   Expected yield, advertisers' quality and revenue from **AdX** for two instances, and different choices of $\gamma$.

The experiment was conducted as follows. First, we set up a grid on the trade-off parameter $\gamma$. Then, we solve the publisher's problem as given in (4). The resulting policies are evaluated using a fluid limit (see EC.4). Table 2 reports the expected quality and revenue for different choices of $\gamma$. Figure 5a plots the quality, and revenue relative to the baseline case; as a function of $\gamma$. In Figure 5b we plot, in a quality vs. revenue graph, the objective values of the optimal solutions for the different choices of $\gamma$, together with the Pareto frontier.

*Discussion.* Results confirm that, as we increase the trade-off parameter $\gamma$, the quality of the impressions assigned to the advertisers increases, while the revenue from AdX subsides. Interestingly, starting from the baseline case that disregards AdX ($\gamma = \infty$), we observe that the revenue from AdX can be substantially increased by sacrificing a small fraction of the overall quality of the impressions assigned. For instance, by exploiting strategically the AdX, the publisher can increase AdX's revenue by 8% by giving up only 1% quality. Conversely, starting from the case that disregards the advertiser's quality ($\gamma = 0$), the publisher can raise the quality in a large amount at the expense of a small decrease in AdX's revenue.

Alternatively, the previous analysis can be understood in terms of the Pareto frontier. Results show that the Pareto frontier is highly concave, relatively horizontally flat around $\gamma = \infty$, and vertically flat around $\gamma = 0$. This explains the huge marginal improvements at the extremes. There are several advantages to the quality vs. revenue representation. First, the Pareto frontier allows for quick grasp of the nature of the operation. When the publisher's current operation is sub-optimal, its performance point should lie in the interior of the frontier. In this case, the Pareto frontier allows the publisher to measure its efficiency, and quantify the potential benefits an optimal policy may introduce. Second, when the choice of the trade-off parameter is not clear, the publisher may impose a lower bound on the overall quality of the impressions, and instead maximize the total revenue from AdX. The efficient frontier provides the maximum attainable revenue, and the proper $\gamma$ to achieve the quality constraint.

## 6.2.  Comparison with the Primal-Dual Approach

In this second experiment we study the performance the our algorithm, and contrast it with a Primal-Dual (PD) method. This experiment is discussed in detail in §EC.1, but we give the full experiments and discussion here for the benefit of the reader. Since no existing PD method is known yet for the AdX problem, we consider instead the case with no AdX. The Primal-Dual approach (Devenur and Hayes 2009), uses a sample from data to estimate the dual variables and uses it in a bid-price control policy. In contrast, our algorithm, as stated, assumes the parameters of the quality distribution are known, and uses that to estimate the dual variables. So we do not need to use a sample. Of course in practice, the parameters need to be learned, and so we would need to use a sample of the data in order to learn them; but in many settings (including online advertising) it is reasonable to assume that we at least know the *form* of the distribution (e.g., normal, exponential, Zipf), albeit not the specific parameters (mean, variance, covariance, etc.). The techniques in Devenur and Hayes (2009) are powerful *because* they don't need to assume anything about the distribution, but it is important to ask what can be gained from knowing the *form* of the distribution, which is what we do in the remainder of this section.

In order to objectively assess the performance of our algorithm we adopt the user type model described in §5 as a generative model. The generative model is used to generate sample data on which both our algorithm and a PD method are tested. The advantages of adopting a generative model are twofold. First, it allows us to compute the truly optimal policy $\mu^{\text{OPT}}$. Second, the true performance of any policy can be evaluated efficiently using a fluid limit (see Section EC.4).

24

Balseiro et al.: *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.



(a) Average Yield

(b) Std. Dev. of Yield

**Figure 6**    **Average (a) and standard deviation (b) of yield as a function of training set sample size; results are shown for the parametric method (EST) based on our policy $\mu$ and the primal-dual method (PD) as in Devenur and Hayes (2009). Both policies converge to the optimal yield, but EST converges faster, and with less variance.**

The computational experiment is conducted as follows. First, a *training* data set of $M$ impressions is generated. We denote the sampled quality vectors by $\{q_m\}_{m=1}^M$. Then, we estimate the parameters of the model on the training set as follows. For each type we estimate the type probabilities $\hat{\pi}_T$; and mean $\hat{\mu}_T$, and covariance matrix $\hat{\Sigma}_T$ of the logarithm of the qualities. Next, the dual problem (4) is solved on the estimated parametric model using a Gradient Descent Method as described in §EC.3. Note that, since no AdX is considered, the maximum expected revenue function $R(\cdot)$ is the identity. Using the optimal solution $v^{\text{EST}}$ we construct a policy, which be refer as $\mu^{\text{EST}}$.

Simultaneously, we employ the PD method on the training data. The PD method amounts to solving a sample average approximation of problem (4), which results in the following linear program

$$\min_{v,\lambda} \frac{1}{M} \sum_{m=1}^M \lambda_m + \sum_{a \in \mathcal{A}} \rho_a v_a \tag{11}$$
$$\text{s.t. } \lambda_m + v_a \geq q_{m,a}, \qquad \forall m, a$$
$$\lambda_m \geq 0 \qquad \forall m.$$

The linear program is solved using CPLEX 12. Again, using the dual optimal solution $v^{\text{PD}}$ we construct a policy $\mu^{\text{PD}}$.

Afterwards, we assess the performance of both policies using a fluid limit. These steps are replicated on 50 different training sets. Table 3 reports the average results over the training sets for different sizes of training sets, and instances. Plots of the results for a given instance are shown in Figure 6.

*Discussion.* Results show that for both algorithms, as the size of the training set increases, the optimality gap decreases at a rate of $O(M^{\frac{1}{2}})$. However, the parametric method performs uniformly better that the non-parametric PD method. Additionally, the variability across different training sets diminishes as the size of the training set increases. Indeed, we observe that the standard deviation over training sets converges to zero for both methods, but the convergence is faster for the parametric

### Instance 1 (A = 3, T = 4, OPT = 2075.09)

| Training | EST | | PD | |
|---|---|---|---|---|
| Set Size | mean | std.dev. | mean. | std.dev |
| 100 | 2004.16 (3.42%) | 33.978 | 1990.32 (4.08%) | 37.552 |
| 1000 | 2053.41 (1.04%) | 10.008 | 2047.92 (1.31%) | 12.365 |
| 2500 | 2065.12 (0.48%) | 4.956 | 2062.76 (0.59%) | 5.838 |
| 5000 | 2068.44 (0.32%) | 3.681 | 2066.99 (0.39%) | 4.224 |

### Instance 2 (A = 6, T = 10, OPT = 907.44)

| Training | EST | | PD | |
|---|---|---|---|---|
| Set Size | mean | std.dev. | mean. | std.dev |
| 1000 | 889.58 (1.97%) | 8.861 | 882.77 (2.72%) | 12.829 |
| 2500 | 894.43 (1.43%) | 7.485 | 887.64 (2.18%) | 10.418 |
| 5000 | 898.59 (0.98%) | 5.231 | 892.51 (1.65%) | 7.625 |
| 10000 | 901.13 (0.70%) | 3.588 | 897.42 (1.10%) | 4.692 |
| 25000 | 904.69 (0.30%) | 1.712 | 901.97 (0.60%) | 2.720 |
| 50000 | 905.03 (0.27%) | 1.267 | 903.44 (0.44%) | 1.567 |

### Instance 3 (A = 17, T = 15, OPT = 894.82)

| Training | EST | | PD | |
|---|---|---|---|---|
| Set Size | mean | std.dev. | mean. | std.dev |
| 2500 | 859.83 (3.91%) | 9.937 | 849.44 (5.07%) | 14.615 |
| 5000 | 868.61 (2.93%) | 5.870 | 861.06 (3.77%) | 7.954 |
| 10000 | 877.59 (1.92%) | 5.226 | 873.46 (2.39%) | 6.577 |
| 25000 | 884.04 (1.20%) | 2.585 | 881.13 (1.53%) | 3.747 |
| 50000 | 887.34 (0.84%) | 1.926 | 885.11 (1.08%) | 2.728 |

### Instance 4 (A = 14, T = 10, OPT = 928.76)

| Training | EST | | PD | |
|---|---|---|---|---|
| Set Size | mean | std.dev. | mean. | std.dev |
| 2500 | 892.55 (3.90%) | 12.886 | 888.88 (4.29%) | 13.427 |
| 5000 | 903.04 (2.77%) | 8.537 | 901.79 (2.90%) | 10.277 |
| 10000 | 911.25 (1.88%) | 6.951 | 909.96 (2.02%) | 6.935 |
| 25000 | 917.30 (1.23%) | 3.353 | 915.81 (1.39%) | 3.705 |
| 50000 | 921.36 (0.80%) | 2.668 | 920.11 (0.93%) | 2.716 |

**Table 3**   **Experimental results comparing the performance of our parametric method (EST) with the non-parametric primal-dual method (PD). No AdX present in this experiment.**

one. In some sense this is expected, since the true data model follows exactly the distributional assumptions. However, the PD method is expected to be more robust to model misspecification.

Another experiment, though results are not reported, was conducted to test the strength of the parametric method on real data. We observed that, when the training set is small (around thousands), the parametric method performs better than the non-parametric one. However, as the sample size increases the non-parametric method outperforms the other. The rationale for this behavior is that, when data is scarce, the parametric method can exploit the distributional assumptions to reconstruct

Case 4:20-cv-00957-SDJ    Document 202-1    Filed 01/16/24    Page 44 of 122 PageID #:  3659

26

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

a fair representation of the data. However when the training set is larger, the fit of our model to real data is not perfect, and the non-parametric method can withstand deviations more robustly.

## 7. Extensions

In this section we consider a number of extensions of the model and policy from the previous section.

### 7.1. Target Quality Constraints

In section 2.1 we discussed an alternate formulation in which the publisher imposes a minimum overall quality for the impressions assigned to the advertisers. This might be more natural for some publishers; they might feel more comfortable specifying target quality constraint than picking a Lagrange multiplier to weight the impact of quality in the objective. Additionally, in some settings the advertisers themselves might demand that certain level of quality is guaranteed.

In the following, we impose that the average quality of the impressions assigned to advertiser $a$ is larger or equal than a threshold value $\ell_a$. Now, the publisher would strive to maximize the revenue from AdX, while complying with the target quality constraints, and the contractual obligations. The one-impression DAP would be similar, except that the objective only accounts for AdX's revenue, and the inclusion of the constraints

$$\mathbb{E}\left[i_a(Q)Q_a\right] \geq \ell_a, \qquad \forall a \in \mathcal{A}. \tag{12}$$

We attack the problem, as done before, by considering its dual. Let $\gamma_a \geq 0$ be the Lagrange multiplier associated to (12). As a side note, problem (3) can be interpreted as the Lagrange relaxation of our new problem w.r.t. the target quality constraints, and the dual variables $\gamma$ as the shadow price of the target quality constraints. The new constraints preserve the convexity of the program, and strong duality still holds. Following the same steps, we obtain the new dual problem

$$\min_{\gamma \geq 0, v} \left\{ \mathbb{E}R\left(\max_{a \in \mathcal{A}_0}\{\gamma_a Q_a - v_a\}\right) + \sum_{a \in \mathcal{A}} v_a \rho_a - \gamma_a \ell_a \right\},$$

which still is a convex minimization problem. The publisher might now jointly optimize over $v$, and $\gamma$ to construct a provably good policy. Additionally, in a similar fashion to Proposition 6, we may compute the directional derivative of the objective w.r.t. the dual variables $\gamma$.

Regarding the performance the bid-price control $\mu^B$, Theorem 2 still holds, and the policy asymptotically attains the optimal revenue from AdX, while complying with the delivery targets. However, we still need to argue about the expected average quality assigned to the advertisers. Unfortunately, for those advertisers whose constraint (12) is binding, our algorithm might not attain the desired quality target. Nevertheless, from our asymptotic analysis we may show that the expected average quality is lower bounded by

$$\mathbb{E}\left[\frac{1}{N}\sum_{n=1}^{N}\left[1 - s_n^\mu(Q_n)\right]I_{n,a}^\mu(Q_n)Q_{n,a}\right] \geq \frac{\mathbb{E}N^*}{N}\mathbb{E}\left[i_a^*(Q)Q_a\right] \geq \left(1 - \frac{1}{\sqrt{N}}K(\rho)\right)\ell_a.$$

Hence, for advertisers with binding constraint (12), albeit not feasible, the expected average quality becomes arbitrary close to the threshold value as the number of impressions in the horizon increases.

On the other hand, for the remaining advertisers whose target quality constraint is not binding, the expected average quality will surpass the threshold for suitably large $N$.

## 7.2.  AdX with Multiple Bidders

Here we generalize our results to the case where multiple buyers participate in the Ad Exchange. We model AdX as an auction with $K$ risk neutral buyers. The publisher believes that individual valuations are drawn independently from the same distribution with c.d.f $F(\cdot)$, density $f(\cdot)$, and support $[p_0, p_\infty]$. Moreover, we assume that the distribution of the values have increasing failure rates, are absolutely continuous and strictly monotonic. The publisher must choose the reservation price $p$ that maximizes her expected revenue given that her value for the impression is $c \geq 0$. As before, we denote by $R(c)$ the optimal expected revenue of the publisher.

Myerson (1981) argued that under our assumptions the optimal mechanism is a Vickrey or second-price sealed-bid auction. Moreover, it is known that in such auctions bidding the true valuation is a dominant strategy for the buyers, and that the optimal reservation price $p^*(c)$ is independent of the number of buyers (Laffont and Maskin 1980).

Let $B_{1:K}$ and $B_{2:K}$ be the order statistics which denote the highest and the second highest bid respectively. Given a reserve price $p$, the item is sold if $B_{1:K} \geq p$, i.e., there is some bid higher than the reserve price. The winning buyer pays the second highest bid, or alternatively $\max\{B_{2:K}, p\}$, since the seller should receive at least the reserve price $p$. Therefore, the publisher's maximization problem is

$$R(c) = \max_{p \geq 0} \mathbb{E}\left[\mathbf{1}\{B_{1:K} \geq p\} \max\{B_{2:K}, p\} + \mathbf{1}\{B_{1:K} < p\}c\right].$$

Notice that the setup of Section 2.2 can be consider as a particular case of a second-price auction in which we have only one bidder and $B_{2:K} = 0$.

Recall that, instead of reserve prices, we casted our problem in terms of survival or winning probabilities. Then, letting $s$ be the probability than the impression is sold, we have that $s = \mathbb{P}\{B_{1:K} \geq p\} = 1 - F^K(p)$ since valuations are i.i.d. Conversely, the reserve price as a function of the survival probability is given by $p(s) = \bar{F}^{-1}(1 - (1 - s)^{1/K})$, which is well-defined due to the strict monotonicity of the c.d.f. In terms of survival probabilities, the problem is now

$$R(c) = \max_{0 \leq s \leq 1} r(s) + (1 - s)c,$$

where we defined the revenue function as $r(s) = r(p(s))$, and $r(p) = \mathbb{E}\left[\mathbf{1}\{B_{1:K} \geq p\} \max\{B_{2:K}, p\}\right]$.

The next proposition shows that the revenue function is regular, and as a consequence all previous results hold for the case with multiple bidders.

**Proposition 5** *Under the previous assumption, the revenue function $r(s)$ is regular. Moreover, the optimal reserve price $p^*(c)$ solves*

$$\frac{\bar{F}(p)}{f(p)} = p - c,$$

28

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

when $c \in [p_0 - 1/f(p_0), p_\infty]$. When the opportunity cost is higher than the null price ($c > p_\infty$), the publisher bypasses the exchange ($p^*(c) = p_\infty$). Finally, when the opportunity cost is low enough ($c < p_0 - 1/f(p_0)$), the impression is kept by the highest bidder ($p^*(c) = p_0$).

*Proof.*   The joint distribution of $B_{1:K}$ and $B_{2:K}$ has a density function (Laffont and Maskin 1980)

$$f(b_1, b_2) = \begin{cases} K(K-1)F(b_2)^{K-2}f(b_1)f(b_2) & \text{if } b_1 \geq b_2 \\ 0 & \text{otherwise} \end{cases}.$$

Then, we have that

$$\begin{aligned} r(p) &= \mathbb{E}\left[\mathbf{1}\{B_{2:K} \geq p\}B_{2:K} + p\mathbf{1}\{B_{1:K} \geq p, B_{2:K} < p\}\right] \\ &= \int_p^\infty \int_p^{b_1} b_2 f(b_1, b_2) \, \mathrm{d}b_2 \, \mathrm{d}b_1 + p \int_p^\infty \int_0^p f(b_1, b_2) \, \mathrm{d}b_2 \, \mathrm{d}b_1 \\ &= K(K-1)\int_p^\infty b_2 F(b_2)^{K-2}f(b_2)(1 - F(b_2)) \, \mathrm{d}b_2 + KpF(p)^{K-1}(1 - F(p)) \end{aligned}$$

Continuity of $r(s)$ follows because the p.d.f. is continuous, and $p(s)$ is continuous (if F not strictly monotone, the inverse may have jumps). Additionally, we may bound the revenue by

$$r(p) \leq \mathbb{E}\left[\mathbf{1}\{B_{1:K} \geq p\}B_{1:K}\right] \leq K\mathbb{E}\left[\mathbf{1}\{B \geq p\}B\right] \leq K\mathbb{E}B < \infty,$$

the first inequality follows because $B_{1:K}$ is the maximum, the second because any order statistic is upper bounded by the sum of the bids, and the fourth because bids are integrable. Moreover, integrability of $B$ implies that $\lim_{p\to\infty} r(p) = 0$.

Next, we turn to the concavity of $r(s)$. Differentiating w.r.t to $p$ we get

$$\frac{dr}{dp} = KF(p)^{K-1}(\bar{F}(p) - pf(p)).$$

Then, using the fact that $\frac{ds}{dp} = -KF(p)^{1-k}/f(p)$ we get from the composition rule that

$$\frac{dr}{ds} = \frac{dr}{dp}\bigg|_{p(s)} \frac{dp}{ds} = p(s) - \frac{1}{h(p(s))},$$

where $h(p) = f(p)/\bar{F}(p)$ is the hazard rate of the bidder's valuation. Because $p(s)$ is non-increasing in $s$ and the $h(p)$ is non-decreasing in $p$, we conclude that $\frac{dr}{ds}$ is non-increasing. Thus, the revenue function is concave.

Finally, notice that the that derivative of the objective w.r.t to $s$ is

$$p(s) - \frac{1}{h(p(s))} - c, \tag{13}$$

which is non-increasing. When $c > p_\infty$ we have that (13) is negative, so $s^*(c) = 0$ and $p^*(c) = p_\infty$. Similarly, when $c < p_0 - 1/h(p_0)$ we that (13) is positive, so $s^*(c) = 1$ and $p^*(c) = p_0$.   $\square$

## 7.3. AdX with User Information

In most systems, the publisher shares some user information with the exchange. In turn, the exchange may partially disclose the user information to their advertisers. The advertisers may react to this information, and bid strategically (Muthukrishnan 2009). In this section we extend our model to the case when the bids from AdX are correlated with the quality of the impression (a surrogate for user information). For simplicity we consider the case of one bidder. Nevertheless, our analysis can be easily extended to the general case.

Let $\bar{F}(p|Q) = \mathbb{P}\{B \geq p \,|\, Q\}$ be the conditional probability that the bid from AdX is greater than $p$ given that the impression quality vector is $Q$. Additionally, we define the *conditional revenue function* as $r(s|Q) = s\bar{F}^{-1}(s|Q)$. The publisher can exploit the correlation between user information and bids to update his prior on AdX bids. Conditioning on the impression quality, we obtain that the maximum expected revenue under opportunity cost $c$, denoted by $R(c|Q)$, is now

$$R(c|Q) = \max_{0 \leq s \leq 1} r(s|Q) + (1-s)c. \tag{14}$$

In order to apply the results from the previous sections we require that the conditional revenue function $r(\cdot|Q)$ is regular for all qualities $Q$ almost surely.

The rest of the analysis follows in a straightforward way by conditioning on the impression quality. The dual problem (4) now reads

$$\min_v \left\{ \mathbb{E}R\left(\max_{a \in \mathcal{A}_0}\{Q_a - v_a\} \,|\, Q\right) + \sum_{a \in \mathcal{A}} v_a \rho_a \right\},$$

where we replaced the maximum expected revenue by $R(\cdot|Q)$. It is worth noting that now the optimal reserve price to be submitted to AdX depends both on the maximum contract adjusted quality, and the actual realization of the quality vector.

## 8. Conclusion

Ad Exchanges are an emerging market for the real-time sale of online ad slots on the Internet. Despite the popularity of this emerging market, many publishers are currently not jointly optimizing their inventory over AdX and their traditional reservations. Instead they first aim to fulfill their reservations and then submit their remnant inventory to the exchange. In this work, we show that there are considerable advantages for the publishers from jointly optimization over both channels. Publishers may increase their revenue streams without giving away the quality of service of their reservations contracts, which still represents a significant portion of their advertising yield. Our approach helps publishers determine when and how to access AdX to complement their contract sales of impressions. In particular, we model the publishers problem as a stochastic control program and derive an asymptotically optimal policy with a simple structure: a bid-price control extended with a pricing function for the exchange. We also hope our insights here will help understand ad allocation problems more deeply.

Internet advertising, and in particular AdX, is likely to prove to be a fertile area of research. There are several promising directions of research stemming from this work. One intuitive approach

Case 4:20-cv-00957-SDJ   Document 202-1   Filed 01/16/24   Page 48 of 122 PageID #:  3663

30

**Balseiro et al.:** *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

to improve the performance of a control, which is appealing for its simplicity, consist on resolving the deterministic approximation periodically throughout the horizon. In a follow-up work we intend to show that one can indeed improve on the static control and obtain sharper bounds by resolving the DAP. Another problem that needs further study is that of learning in the case of unknown distributions, which is of great importance given the fast-paced and changing nature of the Internet. There exists independent research on online algorithms for capacity allocation and online pricing for repeated auctions, but none on the joint optimization problem. Finally, as more publishers reach out for AdX, advertisers will have the opportunity to buy their inventory from either market. The existence of two competing channels, the exchange as a spot market and the reservations as future market, introduces several interesting research questions. For example, how should publishers price their contracts and allocate their inventory, and how should advertisers hedge their campaign between these two markets. We hope that this work pave the way for further research on this important topic.

## Acknowledgments

We thank Omar Besbes, Ciamac Moallemi, Daryl Pregibon, Ana Radovanovic, Nemo Semret, and Nicolás Stier for helpful discussions.

## Appendix A:   Proofs of Statements

*Proof of Proposition 1.*   First, observe that for all $c$ the objective function of (1) is concave and continuous in $s$, and the feasible set is compact. Hence, by Weierstrass Theorem the set of optimal solutions is non-empty and compact. Thus, both $R(c)$ and $s^*(c)$ are well-defined.

Second, $R(c) \geq c$ follows from letting $s = 0$. To see that $R(c)$ is non-increasing, let $c < c'$, and $s^*$ be the optimal solution under cost $c$. Then, $R(c) = r(s^*) + (1 - s^*)c \leq r(s^*) + (1 - s^*)c' \leq R(c')$ where the first inequality follows because $s^* \leq 1$, and the second because no solution is better than the optimal. To see that $R(c) - c$ is non-increasing, let $c' < c$, and $s^*$ be the optimal solution under cost $c$. Then, by a similar argument we get that $R(c') - c' \geq r(s^*) - s^*c' \geq r(s^*) - s^*c = R(c) - c$. Convexity follows in a similar way (this is a standard result).

Third, observe that the objective function of (1) is jointly continuous in $s$ and $c$. Thus, by the Maximum Theorem $R(c)$ is continuous in $c$, and $s^*(c)$ is upper-hemicontinuous.

Finally, because $r(s) + (1 - s)c$ has decreasing differences in $(s, c)$ and the feasible set is a lattice, by Topkis's Theorem $s^*(c)$ is non-increasing in $c$. The result for $p^*(c)$ follows from the fact that $\bar{F}^{-1}(s)$ is non-increasing in $s$.   □

*Proof of Theorem 1.*   The optimality conditions of $v$ for problem (4) imply that the directional derivative of $\psi(v)$ along any direction is greater or equal to zero. In particular for each advertiser $a \in \mathcal{A}$ it should be the case that $\nabla_{\mathbf{1}_a} \psi(v) \geq 0$, and $\nabla_{-\mathbf{1}_a} \psi(v) \geq 0$. Applying proposition 6 to both directions, together with the fact that there is zero probability of a tie occurring, we get that

$$\mathbb{E}\left[(1 - s^*(Q_a - v_a))\,\mathbf{1}\{Q_a - v_a > Q_{a'} - v_{a'}\,\forall a' \in \mathcal{A}_0\}\right] = \rho_a,$$

and the result follows.   □

*Proof of Proposition 2.*   Let $\vec{s} = \{s_n(\cdot)\}_{n=1,\ldots,N}$ and $\vec{\imath} = \{i_n(\cdot)\}_{n=1,\ldots,N}$ be any feasible vectors of controls. Let $\bar{s}$ be the mean of the controls (in terms of prices $\bar{p}$ would be the generalized $\bar{F}$-mean), which is defined point-wise $\bar{s} = \frac{1}{N}\sum_{n=1}^N s_n$. Similarly, let $\bar{\imath}$ be such that $\bar{\imath}_a = \frac{1}{N}\sum_{n=1}^N i_{n,a}$ point-wise for all $a \in \mathcal{A}$. We will show

that solution in which $(\bar{s}, \bar{\imath})$ are used for all impressions is a feasible control with greater or equal revenue than the original one.

First, for the feasibility of $(\bar{s}, \bar{\imath})$ observe that for each advertiser $a \in \mathcal{A}$

$$C_a = \mathbb{E}_Q \left[ \sum_{n=1}^{N} i_{n,a} \right] = N \mathbb{E}_Q \left[ \bar{\imath}_a \right],$$

where the first equation follows from the feasibility of $(\vec{p}, \vec{\imath})$ and the linearity of expectation, and the second from substituting $\bar{\imath}_a$ pointwise for $Q$. Clearly, from the convexity of $\mathcal{P}$ it follows that $(\bar{s}, \bar{\imath}) \in \mathcal{P}$.

Second, we denote by $J^D(\vec{s}, \vec{\imath})$ and $J^D(\bar{s}, \bar{\imath})$ the objective value of the solutions $(\vec{s}, \vec{\imath})$ and $(\bar{s}, \bar{\imath})$ respectively. We have that

$$J^D(\vec{s}, \vec{\imath}) = \mathbb{E} \left[ \sum_{n=1}^{N} r(s_n) + \sum_{a \in \mathcal{A}} Q_a \sum_{n=1}^{N} i_{n,a} \right] \leq \mathbb{E} \left[ Nr \left( \frac{1}{N} \sum_{n=1}^{N} s_n \right) + \sum_{a \in \mathcal{A}} Q_a \sum_{n=1}^{N} i_{n,a} \right]$$

$$= N\mathbb{E} \left[ r(\bar{s}) + \sum_{a \in \mathcal{A}} Q_a \bar{\imath}_a \right] = J^D(\bar{s}, \bar{\imath}),$$

where the inequality follows from the concavity of the revenue function, and the second equality from substituting $\bar{s}$ and $\bar{\imath}$ pointwise for all $Q$.   $\square$

Given a subset of the quality space $D \subseteq \Omega$, we define the measure $\mathbb{P}_R(D)$ as the probability that the quality vector belongs to that subset and the impression is rejected by the Ad Exchange when the optimal survival probability is used. More formally,

$$\mathbb{P}_R(D) = \mathbb{E} \left[ \left( 1 - s^* \left( \max_{a \in \mathcal{A}_0} \{Q_a - v_a\} \right) \right) \mathbf{1}\{Q \in D\} \right].$$

Notice that the latter is not a probability measure since $\mathbb{P}_R(\Omega) \leq 1$. Proposition 6 characterizes the directional derivative of the objective function of the dual along some directions that, as we will show later, are of particular interest. Results are given in terms of the measure $\mathbb{P}_R$.

**Proposition 6** *Given a subset $\alpha \in \mathcal{A}$, the directional derivative of the objective function of the dual w.r.t. directions $\mathbf{1}_\alpha$ and $-\mathbf{1}_\alpha$ are respectively*

$$\nabla_{\mathbf{1}_\alpha} \psi(v) = -\mathbb{P}_R \left\{ \max_{a \in \alpha} \{Q_a - v_a\} > \max_{a \in \mathcal{A}_0 \setminus \alpha} \{Q_a - v_a\} \right\} + \sum_{a \in \alpha} \rho_a,$$

$$\nabla_{-\mathbf{1}_\alpha} \psi(v) = \mathbb{P}_R \left\{ \max_{a \in \alpha} \{Q_a - v_a\} \geq \max_{a \in \mathcal{A}_0 \setminus \alpha} \{Q_a - v_a\} \right\} - \sum_{a \in \alpha} \rho_a.$$

*Proof of Proposition 6.* We consider first the direction $\mathbf{1}_\alpha$. Notice that the random function $R\left(\max_{a \in \mathcal{A}_0}\{Q_a - v_a\}\right)$ is convex, and thus directionally differentiable. We first show that $\psi(v)$ is finite. From Assumption 1 we have that the revenue function is bounded by $r(s) \leq M$, and thus $R(c) \leq M + \max(c, 0) \leq M + |c|$. Therefore, using the triangle inequality we obtain that

$$\phi(v) \leq M + \mathbb{E}|\max_{a \in \mathcal{A}_0} \{Q_a - v_a\}| \leq M + \sum_{a \in \mathcal{A}} \mathbb{E}|Q_a| + |v_a| < \infty$$

We can now apply Theorem 7.46 in Shapiro et al. (2009) and obtain that $\psi(v)$ is directionally differentiable at $v$ and that one can exchange expectation and directional derivative. Putting all together we get that

$$\nabla_{\mathbf{1}_\alpha} \psi(v) = \mathbb{E} \left[ \nabla_{\mathbf{1}_\alpha} R \left( \max_{a \in \mathcal{A}_0} \{Q_a - v_a\} \right) \right] + \sum_{a \in \alpha} \rho_a$$

$$= \mathbb{E} \left[ R' \left( \max_{a \in \mathcal{A}_0} \{Q_a - v_a\} \right) \nabla_{\mathbf{1}_\alpha} \left\{ \max_{a \in \mathcal{A}_0} \{Q_a - v_a\} \right\} \right] + \sum_{a \in \alpha} \rho_a,$$

where the second equation follows from the chain rule. We conclude by the fact that $R'(c) = 1 - s^*(c)$ and $\nabla_{\mathbf{1}_\alpha}\{\max_{a\in\mathcal{A}_0}\{Q_a - v_a\}\} = -\mathbf{1}\{\max_{a\in\alpha}\{Q_a - v_a\} > \max_{a\in\mathcal{A}_0\setminus\alpha}\{Q_a - v_a\}\}$. A similar result follows for the opposite direction $-\mathbf{1}_\alpha$ from the fact that $\nabla_{-\mathbf{1}_\alpha}\{\max_{a\in\mathcal{A}_0}\{Q_a - v_a\}\} = \mathbf{1}\{\max_{a\in\alpha}\{Q_a - v_a\} \geq \max_{a\in\mathcal{A}_0\setminus\alpha}\{Q_a - v_a\}\}$.   $\square$

*Proof of Proposition 3.*   The proof proceeds by contradiction, that is, we assume that there is no feasible flow. First, we cast the feasible flow problem as a maximum flow problem. Feasibility would imply the existence of a flow with value $1 - \mathbb{P}(\emptyset\text{-tie})$. But since we assume that no such feasible flow exists, by the max-flow min-cut theorem there should exists a cut with value strictly less than $1 - \mathbb{P}(\emptyset\text{-tie})$. The contradiction arises because the optimality conditions of $v$ for the dual problem (4) imply that the every cut is lower bounded by $1 - \mathbb{P}(\emptyset\text{-tie})$.

In order to write the feasible flow problem as a maximum flow problem, we first add a source $s$ and a sink $t$. Second, we add one arc from $s$ to each node associated to a non-empty subset $S \subseteq \mathcal{A}_0$ (left-hand side nodes) with capacity $\mathbb{P}(S\text{-tie})$. Third, we add one arc from each advertiser $a \in \mathcal{A}_0$ (right-hand side nodes) to $t$ with capacity $\rho_a$. Lastly, we set the capacity of arcs from $S$ to $a \in S$ to infinity.

Now, since no feasible flow exists, by the max-flow min-cut theorem there should be a cut with value strictly less than $1 - \mathbb{P}(\emptyset\text{-tie})$. Let $\alpha \subseteq \mathcal{A}_0$ be the advertiser nodes (right-hand) belonging to the $t$ side of a *minimum* cut. Figure 7 shows the minimum cut. Next we argue that subset nodes in the $s$ side verify that $S \cap \alpha = \emptyset$, while those in the $t$ side verify that $S \cap \alpha \neq \emptyset$. First, because the cut has minimum value, there is no arc from a subset node to an advertiser node crossing the cut (those arcs have infinity capacity). Equivalently, within the $s$ side of the cut, all subsets nodes $S \subseteq \mathcal{A}_0$ should verify that $S \cap \alpha = \emptyset$. Second, observe that any subset node with $S \cap \alpha = \emptyset$ in the $t$ side of the cut could be moved to the $s$ side of the cut without increasing the value of the cut. Hence, with no loss of generality we can assume that all subset nodes in the $t$ side of the cut verify that $S \cap \alpha \neq \emptyset$.

As a consequence, the only arcs crossing the cut are those from the source to the subsets $S \cap \alpha \neq \emptyset$, and those from advertisers $\mathcal{A}_0 \setminus \alpha$ to the sink. The value of this cut is

$$\sum_{S\subseteq\mathcal{A}_0 : S\cap\alpha\neq\emptyset} \mathbb{P}(S\text{-tie}) + \sum_{a\in\mathcal{A}_0\setminus\alpha} \rho_a.$$

Because the value is strictly less than $1 - \mathbb{P}(\emptyset\text{-tie})$ we get that

$$\sum_{S\subseteq\mathcal{A}_0 : S\cap\alpha\neq\emptyset} \mathbb{P}(S\text{-tie}) < \sum_{a\in\alpha} \rho_a, \tag{15}$$

where we used that $\sum_{a\in\mathcal{A}}\rho_a + \rho_0^{\text{eff}} = 1 - \mathbb{P}(\emptyset\text{-tie})$.

Next, we look at the optimality conditions of $v$ for the dual problem (4). We distinguish between the case that $0 \notin \alpha$ and $0 \in \alpha$. First suppose that $0 \notin \alpha$, and consider the direction $-\mathbf{1}_\alpha$ that has a $-1$ if $a \in \alpha$ and 0 elsewhere. According to proposition 6 the directional derivative of the objective at $v$ is

$$\nabla_{-\mathbf{1}_\alpha}\psi(v) = \mathbb{P}_R\left\{\max_{a\in\alpha}\{Q_a - v_a\} \geq \max_{a\in\mathcal{A}_0\setminus\alpha}\{Q_a - v_a\}\right\} - \sum_{a\in\alpha}\rho_a$$

$$= \sum_{S\subseteq\mathcal{A}_0 : S\cap\alpha\neq\emptyset}\mathbb{P}(S\text{-tie}) - \sum_{a\in\alpha}\rho_a,$$

where we have written the event that the maximum is verified non-exclusively by some advertiser $a \in \alpha$ as all $S$-ties in which some advertiser $a \in \alpha$ is involved. The optimality of $v$ implies that the directional derivative along that direction is greater or equal to zero, contradicting equation (15).

When $0 \in \alpha$ we consider the direction $\mathbf{1}_{\mathcal{A}\setminus\alpha}$ that has a 1 if $a \notin \alpha$ and 0 elsewhere. The direction derivative is now

$$\nabla_{\mathbf{1}_{\mathcal{A}\setminus\alpha}}\psi(v) = -\mathbb{P}_R\left\{\max_{a\in\mathcal{A}\setminus\alpha}\{Q_a - v_a\} > \max_{a\in\alpha\cup\{0\}}\{Q_a - v_a\}\right\} + \sum_{a\in\mathcal{A}\setminus\alpha}\rho_a,$$

$$= -\sum_{S\subseteq\mathcal{A}_0 : S\subseteq\mathcal{A}\setminus\alpha}\mathbb{P}(S\text{-tie}) + \sum_{a\in\mathcal{A}\setminus\alpha}\rho_a = \sum_{S\subseteq\mathcal{A}_0 : S\cap\alpha\neq\emptyset}\mathbb{P}(S\text{-tie}) - \sum_{a\in\alpha}\rho_a,$$



**Figure 7** **The flow problem in the bipartite graph with a minimum cut. A source $s$ connected to the subset nodes and a sink $t$ connected to the advertisers nodes was included. $\alpha \subseteq \mathcal{A}_0$ is the subset of advertiser nodes (right-hand) belonging to the $t$ side. Note that no there is no arc from a subset node to an advertiser node crossing the cut.**

where in the second equation we have written the event that the maximum is verified exclusively by some advertiser $a \in \alpha$ as all $S$-ties in which only advertisers in $\alpha$ are involved. Again, the optimality of $v$ implies that the directional derivative along that direction is greater or equal to zero, contradicting equation (15).  □

*Proof of Proposition 4.* Let $\mu^*$ be the optimal policy for the stochastic control problem. Let $\hat{s} = \{\hat{s}_n(\cdot)\}_{n=1,\dots,N}$ and $\hat{\imath} = \{\hat{\imath}_n(\cdot)\}_{n=1,\dots,N}$ be deterministic vectors of controls defined as

$$\hat{s}_n(Q) = \mathbb{E}_{\mathcal{F}_n}\left[s_n^{\mu^*}(Q) \mid Q\right] \qquad \forall Q \text{ pointwise,}$$

$$\hat{\imath}_{n,a}(Q) = \mathbb{E}_{\mathcal{F}_n}\left[(1 - s_n^{\mu^*}(Q))I_{n,a}^{\mu^*}(Q) \mid Q\right] \qquad \forall Q \text{ pointwise, } a \in \mathcal{A},$$

where the expectation is taken over the history of the system until $n$, which is denoted by $\mathcal{F}_n$, and conditional on a particular realization of $Q$. The resulting controls are independent of the history, and dependent only on the realization of $Q$ and the impression number $n$. Thus, they fulfills the first approximation and they are valid deterministic vectors of controls. We will show that $(\hat{s}, \hat{\imath})$ is feasible for the DAP, and that its objective value (in the DAP) dominates the optimal objective value of the SCP. Then, we may conclude that $J_N^* \leq J_N^D(\hat{s}, \hat{\imath}) \leq J_N^D$, because no feasible solution is better than the optimal.

First, for the contract fulfillment constraint we have that for each advertiser $a \in \mathcal{A}$

$$C_a = \mathbb{E}\left[\sum_{n=1}^N (1 - X_n(s_n^{\mu^*}(Q_n)))I_{n,a}^{\mu^*}(Q_n)\right]$$

$$= \sum_{n=1}^N \mathbb{E}\left[\mathbb{E}_{\mathcal{F}_n}\left[(1 - s_n^{\mu^*}(Q_n))I_{n,a}^{\mu^*}(Q_n) \mid Q_n\right]\right] = \sum_{n=1}^N \mathbb{E}\left[\hat{\imath}_{n,a}(Q)\right],$$

where the first equality follows from taking expectations to the almost sure contract fulfillment constraint of $\mu^*$, the second from the tower rule, and the third from substituting $\hat{s}$ and $\hat{\imath}$ pointwise for all $Q$ and the fact that impressions are i.i.d. Non-negativity of the controls follows trivially. Additionally, is it not hard to show that $\sum_{a \in \mathcal{A}} \hat{\imath}_{n,a}(\cdot) + s_n(\cdot) \leq 1$ for all $n$. Thus, $(\hat{s}, \hat{\imath})$ is a feasible deterministic control.

Second, the objective value of the optimal stochastic control is bounded by

$$J_N^* = \mathbb{E}\left[\sum_{n=1}^N \mathbb{E}_{\mathcal{F}_n}\left[r\left(s_n^{\mu^*}(Q_n)\right) \mid Q_n\right] + \sum_{a \in \mathcal{A}} Q_{n,a}\mathbb{E}_{\mathcal{F}_n}\left[(1 - s_n^{\mu^*}(Q_n))I_{n,a}^{\mu^*}(Q_n) \mid Q_n\right]\right]$$

$$\leq \mathbb{E}\left[\sum_{n=1}^N r\left(\hat{s}_n(Q_n)\right) + \sum_{a \in \mathcal{A}} Q_{n,a}\hat{\imath}_{n,a}(Q)\right] = J_N^D(\hat{s}, \hat{\imath}),$$

34

Balseiro et al.: *Yield Optimization with Ad Exchange*
Article submitted to ; manuscript no.

where the first equality follows from the tower rule and because $Q_n$ is measurable w.r.t. the conditional expectation, and the inequality from applying Jensen's inequality to the concave revenue function.  □

*Proof of Proposition 7.*   Because $B = 0$, then it is not hard to show that $\bar{F}^{-1}(s) = 0$, and that the revenue function is $r(s) = 0$. Hence, the revenue function is regular and satisfies Assumption 1. Moreover, the optimal survival probability is $s^*(c) = 0$, and $R(c) = c$. The result follows from substituting these functions in Theorem 1.  □

# References

Agrawal, S., Z. Wang, Y. Ye. 2009. A dynamic near-optimal algorithm for online linear programming. Working paper posted at http://www.stanford.edu/ yyye/.

Alaei, Saeed, Esteban Arcaute, Samir Khuller, Wenjing Ma, Azarakhsh Malekian, John Tomlin. 2009. Online allocation of display advertisements subject to advanced sales contracts. *Proceedings of the Third International Workshop on Data Mining and Audience Intelligence for Advertising*. ADKDD '09, ACM, 69–77.

Aven, Terje. 1985. Upper (lower) bounds on the mean of the maximum (minimum) of a number of random variables. *Journal of Applied Probability* **22**(3) 723–728.

Bertsekas, Dimitri P. 2000. *Dynamic Programming and Optimal Control*. 2nd ed. Athena Scientific.

Billingsley, Patrick. 1968. *Convergence of Probability Measures*. John Wiley & Sons Inc.

Casella, George, Roger L Berger. 2002. *Statistical Inference; 2nd ed.*. Duxbury advanced series, Wadsworth, New Delhi.

Chen, Ying-Yu. 2011. Optimal dynamic auctions for display advertising. Working paper.

Devenur, Nikhil R., Thomas P. Hayes. 2009. The adwords problem: online keyword matching with budgeted bidders under random permutations. *Proceedings of the 10th ACM conference on Electronic commerce*. EC '09, ACM, 71–78.

Feldman, Jon, Monika Henzinger, Nitish Korula, Vahab S. Mirrokni, Cliff Stein. 2010. Online stochastic packing applied to display ad allocation. *Proceedings of the 18th annual European conference on Algorithms: Part I*. ESA'10, Springer-Verlag, 182–194.

Feldman, Jon, Nitish Korula, Vahab Mirrokni, S. Muthukrishnan, Martin Pál. 2009. Online ad assignment with free disposal. *Proceedings of the 5th International Workshop on Internet and Network Economics*. WINE '09, Springer-Verlag, 374–385.

Gallego, Guillermo, Garrett van Ryzin. 1994. Optimal dynamic pricing of inventories with stochastic demand over finite horizons. *Management Science* **40**(8) 999–1020.

Ghosh, Arpita, Preston McAfee, Kishore Papineni, Sergei Vassilvitskii. 2009. Bidding for representative allocations for display advertising. *WINE*. 208–219.

Internet Advertising Bureau. 2011. Internet advertising revenue report, 2010 full year results. Tech. rep., PricewaterhouseCoopers.

Jasin, Stefanus, Sunil. Kumar. 2010. A re-solving heuristic with bounded revenue loss for network revenue management with customer choice. Working paper posted at http://www.stanford.edu/ skumar/.

Laffont, Jean-Jacques, Eric Maskin. 1980. Optimal reservation price in the vickrey auction. *Economics Letters* **6**(4) 309 – 313.

Lariviere, Martin A. 2006. A note on probability distributions with increasing generalized failure rates. *Oper. Res.* **54** 602–604.

Levi, Retsef, Ana Radovanovic. 2010. Provably near-optimal lp-based policies for revenue management in systems with reusable resources. *Operations Research* **58**(2) 503–507.

Liu, Qian, Garrett van Ryzin. 2008. On the choice-based linear programming model for network revenue management. *Manufacturing Service Operations Management* **10**(2) 288–310.

Luenberger, David G. 1969. *Optimization by Vector Space Methods*. 1st ed. John Wiley & Sons, Inc., New York, NY, USA.

Mehta, Aranyak, Amin Saberi, Umesh Vazirani, Vijay Vazirani. 2007. Adwords and generalized online matching. *J. ACM* **54** 22:1–22:19.

Muthukrishnan, S. 2009. Ad exchanges: Research issues. *Internet and Network Economics, Lecture Notes in Computer Science*. 1–12.

Myerson, R. 1981. Optimal auction design. *Mathematics of Operations Research* **6**(1) 58–73.

Roels, Guillaume, Kristin Fridgeirsdottir. 2009. Dynamic revenue management for online display advertising. *Journal of Revenue and Pricing Management* **8** 452–466.

Shapiro, A., D. Dentcheva, A. Ruszczynski. 2009. *Lectures on Stochastic Programming: Modeling and Theory.*. MOS-SIAM Series on Optimization 9, Society for Industrial and Applied Mathematics (SIAM).

Shapiro, Alexander. 1991. Asymptotic analysis of stochastic programs. *Annals of Operations Research* **30** 169–186.

Simpson, R.W. 1989. Using network flow techniques to find shadow prices for market demands and seat. Flight Transportation Laboratory Memorandum M89-1.

Talluri, Kalyan, Garrett van Ryzin. 1998. An analysis of bid-price controls for network revenue management. *Management Science* **44**(11) 1577–1593.

Talluri, Kalyan T., Garrett J. van Ryzin. 2004. *The Theory and Practice of Revenue Management*. International Series in Operations Research & Management Science, Vol. 68, Springer.

Tan, Bo, R. Srikant. 2010. Online advertisement, optimization and stochastic networks. *CoRR* **abs/1009.0870**.

Vee, Erik, Sergei Vassilvitskii, Jayavel Shanmugasundaram. 2010. Optimal online assignment with forecasts. *Proceedings of the 11th ACM conference on Electronic commerce*. EC '10, ACM, 109–118.

Yang, Jian, Erik Vee, Sergei Vassilvitskii, John Tomlin, Jayavel Shanmugasundaram, Tasos Anastasakos, Oliver Kennedy. 2010. Inventory allocation for online graphical display advertising. Yahoo Technical Report.

This page is intentionally blank. Proper e-companion title page, with INFORMS branding and exact metadata of the main paper, will be produced by the INFORMS office when the issue is being assembled.

# Appendix EC.1:   Comparison to the Primal-Dual Method

Consider the allocation problem faced by a publisher in display advertising in which arriving impressions need to be assigned to advertisers, and there is no option of sending to an exchange. This problem is a particular case of our model where the winning bid random variable is identically zero, i.e. $B = 0$. The following proposition shows that the optimal controls admit simple analytical expressions.

**Proposition 7** *Suppose that ties have zero probability. Then, in the case without AdX the optimal controls are* $I_a(Q) = \mathbf{1}\{Q_a - v_a \geq Q_{a'} - v_{a'} \,\forall a' \in \mathcal{A}_0\}$ *where* $v = \{v_a\}_{a \in \mathcal{A}_0}$ *satisfies* $v_0 = 0$ *and*

$$\mathbb{P}\{Q_a - v_a \geq Q_{a'} - v_{a'} \,\forall a' \in \mathcal{A}_0\} = \rho_a \qquad \forall a \in \mathcal{A}.$$

The resulting decision rule $\arg\max_a\{Q_a - v_a\}$ is identical to the rule studied in previous work (e.g., Devenur and Hayes (2009)), where $v_a$ is an optimal dual variable resulting from solving an assignment problem on a sample of the data, where the distribution is unknown. Roughly speaking, in Devenur and Hayes (2009) (and similarly in other work Feldman et al. (2010), Vee et al. (2010), Agrawal et al. (2009)), it is shown that as long as the sample is of size $\approx \epsilon n$, the overall assignment will be $\approx \epsilon$ close to the optimal offline solution.

In our model, the parameters of the quality distribution are known, so we do not need to use a sample. Of course in practice, the parameters need to be learned, and so we would need to use a sample of the data in order to learn them; but in many settings (including online advertising) it is reasonable to assume that we at least know the *form* of the distribution (e.g., normal, exponential, Zipf), albeit not the specific parameters (mean, variance, covariance, etc.). The techniques in Devenur and Hayes (2009) are powerful *because* they don't need to assume anything about the distribution, but it is important to ask what can be gained from knowing the *form* of the distribution, which is what we do in the remainder of this section, both analytically and experimentally.

More formally, suppose the distribution of quality is not known with certainty, but we have at our disposal a sample of $M$ quality vectors $\{q_m\}_{m=1}^M$ that may be used to pin-down the distribution. Additionally, it is known that the qualities are drawn independently from a population with continuous density $g(x|\theta)$, where $\theta$ is an unknown parameter to be estimated. Let $G(x|\theta)$ be the c.d.f. which we assume to be strictly monotonic. For simplicity, we deal with the case of one advertiser with capacity to impression ratio of $\rho$. From Proposition 7 the optimal DAP control is the $(1-\rho)$-quantile of $Q$, that is, $v = \bar{G}^{-1}(\rho|\theta)$. We compare the asymptotic efficiency of a parametric and a non-parametric estimation of the model.

*Parametric estimation method.* Let $\hat{\theta}_M^{\mathrm{mle}}$ be the maximum likelihood estimator (MLE) of the unknown parameter $\theta$. That is, $\hat{\theta}_M^{\mathrm{mle}}$ is an optimal solution of the program $\max_\theta \sum_{m=1}^M \log g(q_m|\theta)$. Once we have our estimator, we plug-in the estimated distribution in the dual problem, and solve for the optimal dual variable $\hat{v}_M^{\mathrm{mle}}$. Again, from Proposition 7 we have that the optimal dual variable, given our maximum likelihood estimation, is given by $\hat{v}_M^{\mathrm{mle}} = \bar{G}^{-1}(\rho|\hat{\theta}_M^{\mathrm{mle}})$.

In turn, by the invariance property of the MLE, it is the case that $\hat{v}_M^{\mathrm{mle}}$ is the maximum likelihood estimator of the true optimally dual variable $v$ (see, e.g., Casella and Berger (2002)). As a

consequence, under some regularity conditions, we have that our new estimator is consistent, asymptotically efficient, and asymptotically normal

$$\sqrt{M}(\hat{v}_M^{\text{mle}} - v) \Rightarrow \mathcal{N}(0, u(\theta)),$$

where the $u(\theta)$ is the Cramér-Rao lower bound on the variance of any unbiased estimator. The Cramér-Rao lower bound is $u(\theta) = \left(\frac{\partial \bar{G}^{-1}}{\partial \theta}(\rho|\theta)\right)^2 I(\theta)^{-1}$, where $I(\theta) = \mathbb{E}\left[\left(\frac{\partial}{\partial \theta} \ln g(Q|\theta)\right)^2\right]$ is the Fisher information of parameter $\theta$.

*Non-parametric estimation method.* Considering the Sample Average Approximation (SAA) of the dual problem (4) we can obtain a non-parametric estimator of the truly optimal dual variable (see Chapter 5 from Shapiro et al. (2009) for a review of the topic). In a SAA the expected value of the stochastic program is approximated by the sample average function over the observations $\{q_m\}_{m=1}^M$. In our case, we have that

$$\hat{v}_M = \arg\min_v \frac{1}{M} \sum_{m=1}^M \max\{q_m - v, 0\} + \rho v.$$

Equivalently, the previous problem can be stated as a linear program, and in this case one obtains the training-based Primal-Dual method as described in Devenur and Hayes (2009). It can be shown that, under some conditions, the non-parametric estimator $\hat{v}_M$ is consistent and asymptotically normal (Shapiro et al. 2009). As we shall see, this estimator is not necessarily efficient. It is not hard to prove that the sample $(1-\rho)$-quantile is an optimal solution to the SAA problem. Hence, from the asymptotic distribution of the $(1-\rho)$-quantile we have that

$$\sqrt{m}(\hat{v}_M - v) \Rightarrow \mathcal{N}(0, u'(\theta)),$$

where the variance is $u'(\theta) = \frac{\rho(1-\rho)}{g(v|\theta)^2}$.

*Analysis.* Both the parametric and the non-parametric estimators converge, as the number of samples increases, to the true optimal solution. However, the non-parametric estimator is not as efficient as the parametric counterpart. Indeed, this is expected since the maximum likelihood estimator is known to be asymptotically efficient. We measure the *relative efficiency* as the ratio of asymptotic variance of the non-parametric estimator to parametric one, i.e. $\varepsilon(\theta) = \frac{u'(\theta)}{u(\theta)}$.

Until now, our analysis has been in terms of the optimal dual solution. The rationale is that the closer the dual variable is to the true value $v$, the better the performance of the policy should be. Next, we quantify analytically how does a deviation from the optimal solution impacts the performance of the policy. To assess the performance of the policy we look at the fluid limit as described in Section EC.4. The next proposition shows that the relative efficiency in terms of the performance is exactly equal to $\varepsilon(\theta)$. Hence, there is no loss in looking at the relative efficiency of the estimators instead.

**Proposition 8** *The relative efficiency of the non-parametric estimator is*

$$\varepsilon(\theta) = \rho(1-\rho)I(\theta)\left(\frac{\partial \bar{G}}{\partial \theta}(v|\theta)\right)^{-2} \geq 1, \quad \text{(EC.1)}$$

*which is exactly equal to the relative efficiency in terms of the policies' performance.*

*Proof of Proposition 8.*   For (EC.1), we use that $\frac{\partial \bar{G}^{-1}}{\partial \theta}(\rho|\theta) = \frac{\partial \bar{G}}{\partial \theta}(v|\theta)/g(v|\theta)$, which follows from the implicit function theorem. In view of Cramér-Rao lower bound, we have that $\varepsilon(\theta) \geq 1$.

Next, we look at the average yield of the policy as the number of impressions grows to infinity when a bid price of $u$ is employed, denoted by $\bar{J}(u)$. The limiting performance is given by

$$\bar{J}(u) = \begin{cases} \rho \mathbb{E}_\theta[Q|Q \geq u], & \text{if } u < v, \\ \mathbb{E}_\theta[Q] - (1-\rho)\mathbb{E}_\theta[Q|Q \leq u], & \text{if } u \geq v. \end{cases}$$

Under our assumptions, the performance function is continuous $u$. One would be tempted to apply the Delta Method to derive the asymptotic distribution of the performance. Unfortunately, $\bar{J}(\cdot)$ is not differentiable at $v$. However, it is the case that the performance function is semi-differentiable at $v$ with finite right-derivative $\bar{J}'_+(v) \geq 0$ and left-derivative $\bar{J}'_-(v) \leq 0$. Thus, we can apply an extension of the Delta Method for directionally differentiable functions proved by Shapiro (1991), and obtain

$$\sqrt{m}(\bar{J}(\hat{v}_M) - \bar{J}(v)) \Rightarrow d\bar{J}\Big(v; \mathcal{N}(0, u'(\theta))\Big),$$
$$\sqrt{m}(\bar{J}(\hat{v}_M^{\mathrm{mle}}) - \bar{J}(v)) \Rightarrow d\bar{J}\Big(v; \mathcal{N}(0, u(\theta))\Big),$$

where $d\bar{J}(v;\xi)$ is the Gâteaux derivative of $\bar{J}$ at the point $v$ along the direction $\xi$, which is given by $d\bar{J}(v;\xi) = \bar{J}'_+(v)\xi$ when $\xi \geq 0$, and $d\bar{J}(v;\xi) = \bar{J}'_-(v)\xi$ when $\xi < 0$. Note that the asymptotic variance of the performances are $u'(\theta) \cdot K$, and $u(\theta) \cdot K$ respectively, where the performance scale factor is given by $K = \frac{1}{2}(\bar{J}'_+(v)^2 + \bar{J}'_-(v)^2) - \frac{1}{2\pi}(\bar{J}'_+(v) - \bar{J}'_-(v))^2$. Thus, the relative efficiency of the performance is identical to $\varepsilon(\theta)$.   $\square$

*Examples.*   To fix ideas we consider two simple examples. First, suppose that $Q \sim \exp(\theta)$. The maximum likelihood estimator is given by $\hat{\theta}_M^{\mathrm{mle}} = \left(\frac{1}{M}\sum_{m=1}^{M} q_m\right)^{-1}$, and the Fisher information is $I(\theta) = \theta^{-2}$. The optimal dual variable is $v = -\theta^{-1}\ln\rho$. Hence, the relative efficiency is $\varepsilon(\theta) = (1-\rho)/(\rho\ln^2\rho)$. In this case, the relative efficiency is lower bounded by $\varepsilon(\theta) \geq 1.544$. The lower bound is tight, and attained at $\rho \approx 0.2032$. The relative efficiency as a function of the capacity to impression ratio is plotted in Figure EC.1. As shown in the figure, the relative efficiency may be arbitrarily bad as the capacity to impression ratio gets close to zero or one.

For the next example we assume that qualities are normal with known variance $\sigma^2$ and unknown mean, that is, $Q \sim \mathcal{N}(\theta, \sigma^2)$. The maximum likelihood estimator is the sample mean, $\hat{\theta}_M^{\mathrm{mle}} = \frac{1}{M}\sum_{m=M}^{m} q_m$, and the Fisher Information is $I(\theta) = \sigma^{-2}$. In this case the relative efficiency is given by $\varepsilon(\theta) = 2\pi\rho(1-\rho)\exp\left(\Phi^{-1}(1-\rho)^2\right)$, with $\Phi^{-1}$ being the inverse of the standard normal c.d.f. Here the relative efficiency is lower bounded by $\varepsilon(\theta) \geq \pi/2$, with the minimum attained at $\rho = 1/2$. Interestingly, the relative efficiency is invariant under monotonic transformations of any random variable. Hence, the previous result holds too for the log-normal distribution.

*Experiments.*   The previous analysis was in terms of a single advertiser; in Section 6.2 we show experimentally that the advantage of parametric estimation extends to multiple advertisers as well.

## Appendix EC.2:   Incorrect Assignments in the User Type Model

In Section 5 we introduced a user-type model with good-will penalties to accommodate the fact that advertisers have specific targeting criteria. If the contracts are feasible, that is, there is enough



**Figure EC.1** **Relative efficiency as a function of the capacity to impression ratio $\rho$ for the exponential distribution, and the normal distribution with known variance.**

inventory to satisfy the targeting criteria; one would expect our policy to assign only impressions within the criteria. In this section we formalize the concept of a feasible operation, and give sufficient conditions under which the stochastic control policy does not assign any impressions outside of the targeting criteria.

It is straightforward to state the problem of determining whether contracts can be satisfied or not, as a feasible flow problem on a bipartite graph. The problem can be formulated on an graph with one node for each user type $T$ with a supply of $\pi(T)$, on the left side; and one node for each advertisers $a \in \mathcal{A}_0$ with a demand $\rho_a$, on the right side. Then, we say that the operation is *feasible* if the user type-advertiser graph admits a feasible flow.

The feasibility of the operation, albeit necessary, does not suffice to guarantee that no impressions outside the targeting criteria are assigned to the advertisers. When advertisers compete for the same type, and one of them obtains a potentially unbounded reward for that type; it may be optimal to allow the latter advertiser to cannibalize the user type, and force the others advertisers to take types outside of their criteria. This may occur, surprisingly, for all conceivable penalties. However, if qualities are bounded, and penalties are set high enough, then the optimal policy would not recommend the assignment of impressions outside the targeting criteria. Even in this case some impressions may be incorrectly assigned in the left-over regime, but the probability of this event decays exponentially fast. We formalize this discussion in the following proposition.

**Proposition 9** *Suppose that the user type-advertiser graph admits a feasible flow, and that qualities and bids from AdX are bounded by $\frac{1}{A} \min_a \tau_a$. Then, the stochastic control policy does not assign any impressions outside of the targeting criteria, except perhaps for the left-over regime.*

*Proof Sketch of Proposition 9.* For simplicity we consider the case without AdX. Let $i$ be an optimal solution to the DAP, and suppose that some advertisers are assigned some types outside of



**Figure EC.2**    **Example with two user types, and two advertisers.**

their targeting criteria. We will construct another solution with greater or equal yield in which no incorrect assignments are made.

An optimal solution to the DAP is a vector of functions $i_{T,a} : \Omega_T \to [0,1]$ for $a \in \mathcal{A}_0$ and $T \in \mathcal{T}$ such that

$$\sum_{T \in \mathcal{T}} \mathbb{E} i_{T,a}(Q) = \rho_a, \quad \forall a \in \mathcal{A}_0,$$

$$\sum_{a \in \mathcal{A}_0} i_{T,a}(Q) = \pi(T), \quad \text{(a.s.)} \ \forall T \in \mathcal{T},$$

We refer to each of the functions in a solution as components.

Next, we construct a feasible solution $i^0$ to the DAP from a feasible flow of the user type-advertiser graph. Take the difference $\Delta i = i^0 - i$, which is a circulation in the user type-advertiser graph. The circulation $\Delta$ may have components of mixed signs. Because $i^0$ has no incorrect assignments, if advertiser $a$ is assigned a type $T \not\ni a$ not in her criteria, then the circulation verifies that $\Delta i_{T,a}(Q) = -i_{T,a}(Q)$. Hence, the components with incorrect assignments are negative.

Let $a$ be an advertiser that is assigned a type $T \not\ni a$ not in her criteria, that is, $\mathbb{E}[i_{T,a}(Q)] > 0$. We may find an augmenting cycle $w$ containing the incorrect assignment, such that if we push some flow along this cycle, we construct another solution $i + w$ with fewer incorrect assignments. The cycle $w$ has at most $A + 1$ positive components, and at most $A + 1$ negative components. The cost associated to the negative components is at most $A \frac{1}{A} \min_{a'} \tau_{a'} - \tau_a \le 0$. All positive components arcs have a cost of at least zero, and the total cost of this cycle is positive. Thus, the new solution $i + w$ has greater or equal yield. Moreover, $\mathbb{E}[(i+w)_{T,a}(Q)] < \mathbb{E}[i_{T,a}(Q)]$, and no new incorrect assignments are introduced. Repeating this procedure, we may construct a solution with no incorrect assignments.    □

Note that since the left-over regime is vanishingly small in proportion to the length of the horizon (Cor. 1) this implies that the number of unassigned impressions is small. Thus in practice, a publisher may set $C_a' = C_a + \epsilon$, discard any impressions assigned by the policy outside the targeting criteria, and ensure that contracts are filled properly.

Next, we prove by example that the requirement that qualities are bounded is necessary for the previous result to hold. Consider a publisher who contracts with two advertisers, and agrees to deliver one half of the arriving impressions to each one of them. Additionally, there are two impression types, denoted by $T_1$ and $T_2$, each occurring 50% of the time. The first advertiser only cares about the first type. She obtains a reward of zero for $T_1$, and the advertisers pays a positive penalty $\tau$ each time a $T_2$

impression is assigned to her. The second advertisers admits both types, but only obtains a positive reward $Q \sim \exp(1)$ for the first type. The setup is shown in Figure EC.2.

A feasible policy could assign all $T_1$ impressions to the first advertiser, and $T_2$ impressions to the second advertiser. However, such policy is not optimal. Notice that both advertisers compete for the $T_1$ impressions, and the first advertiser could extract a potentially high quality from them. It is not hard to see that the optimal dual variables are $v_1 = -\tau$, and $v_2 = 0$; and the optimal objective value is $\frac{1}{2}\mathbb{E}[Q - \tau]^+ = \frac{1}{2}e^{-\tau}$. Hence, it is optimal to assign those $T_1$ impressions with quality greater than $\tau$ to the second advertiser. Thus, no matter the value of the penalty, a fraction $e^{-\tau}$ of the total impression assigned to the first advertiser are undesired.

## Appendix EC.3:   Computation

In this section we describe show to compute the optimal policy for our data model. The main problem resides in the computation of the dual objective in (4) and its gradient given a vector of dual variables.

*Objective.* The first term of the objective can be written as

$$\mathbb{E}R\left(\max_{a \in \mathcal{A}_0}\{Q_a - v_a\}\right) = \sum_{\forall T} \pi(T)\mathbb{E}\left[R\left(\max_{a \in \mathcal{A}_0}\{Q_a - v_a\}\right) \mid T\right]$$

$$= \sum_{\forall T} \pi(T) \sum_{a \in T \cup T^c} \mathbb{E}\left[R\left(Q_a - v_a\right)\mathbf{1}\{Q_a - v_a \geq Q_{a'} - v_{a'} \,\forall a' \neq a\} \mid T\right]$$

$$= \sum_{\forall T} \pi(T)\left(I_{T,0}(v) + \sum_{a \in T} I_{T,a}(v)\right)$$

where the first equation follows by conditioning on the type, and the second because the events are a partition of the sample space. Next, we show to compute the expectations $I_{T,a}(v)$.

Let $M_T(v) = \max_{a \in \mathcal{A}_0 \setminus T}\{-\tau_a - v_a\}$ be the maximum contract adjusted quality of the advertisers (including the outside option) that are not in the type, and $\alpha_T(v)$ the set of advertisers that verify the maximum. Then, we have that

$$I_{T,0}(v) = R\left(M_T(v)\right)\mathbb{P}\{Q_a - v_a \leq M_T(v) \,\forall a' \in T\}$$

$$= R\left(M_T(v)\right)G_T(M_T(v) + v_T),$$

where $G_T(\cdot)$ is the c.d.f. of $Q_T$, and $v_T$ is the vector of dual variables for the advertisers in the type.

For $a \in T$, we compute the expectation by conditioning on the continuous random variable $Q_a$. Further, suppose that we partition the mean vector and covariance matrix in a corresponding manner. That is, $\mu_T = \binom{\mu_a}{\mu_{-a}}$, and $\Sigma_T = \left(\begin{smallmatrix}\Sigma_{a,a} & \Sigma_{a,-a} \\ \Sigma_{-a,a} & \Sigma_{-a,-a}\end{smallmatrix}\right)$. For instance, $\mu_{-a}$ gives the means for the variables in $T \setminus \{a\}$, and $\Sigma_{-a,-a}$ gives variances and covariances for the same variables. The matrix $\Sigma_{-a,a}$ gives covariances between variables in $T \setminus \{a\}$ and set $a$ (as does matrix $\Sigma_{a,-a}$). Because the marginal distribution of a multivariate normal is an univariate normal, we have that $Q_a \sim \ln\mathcal{N}(\mu_a, \Sigma_{a,a})$. We denote by $g_{T,a}(\cdot)$ the p.d.f. of $Q_a$. Similarly, let $Q_{-a}$ be the vector of qualities for advertisers in $T \setminus \{a\}$. Conditioning on $Q_a = q_a$, the distribution of $Q_{-a}$ is log-normal with mean vector $\mu_{-a} - \Sigma_{-a,a}(q_a - \mu_a)/(\Sigma_{a,a})$, and covariance matrix $\Sigma_{-a,-a} - (\Sigma_{-a,a}\Sigma_{a,-a})/(\Sigma_{a,a})$. We denote its c.d.f. by $G_{T,-a}(\cdot)$. Putting all together, we have that

$$I_{T,a}(v) = \mathbb{E}\left[R\left(Q_a - v_a\right)\mathbb{P}\{Q_{a'} - v_{a'} \leq Q_a - v_a \,\forall a' \neq a \mid Q_a\} \mid T\right]$$

$$= \int_{v_a + M_T(v)}^{\infty} R(q_a - v_a) G_{T,-a}(q_a - v_a + v_{-a}) g_{T,a}(q_a) \ \mathrm{d}q_a,$$

where $v_{-a}$ is the vector of dual variables for advertisers in $T \setminus \{a\}$.

*Gradient.* The forward derivative of the dual objective can be written as

$$\nabla_a \psi(v) = -\mathbb{P}_R \left\{ Q_a - v_a > \max_{a \in \mathcal{A}_0 \setminus a} \{Q_{a'} - v_a'\} \right\} + \rho_a$$

$$= -\sum_{\forall T} \pi(T) \mathbb{E} \left[ (1 - s^*(Q_a - v_a)) \mathbf{1} \left\{ Q_a - v_a > \max_{a \in \mathcal{A}_0 \setminus a} \{Q_{a'} - v_a'\} \right\} \mid T \right] + \rho_a$$

$$= -\sum_{T: a \in T} \pi(T) P_{T,a}(v) - \sum_{\substack{T: a \notin T \\ a \in \alpha_T(v), |\alpha_T(v)| = 1}} \pi(T) P_{T,a}(v) + \rho_a,$$

where the contributing types for the forward derivative are those where $a$ is in, and those where $a$ is not in but verifies exclusively the maximum of the types not in ($M_T(v)$). If two or more advertisers verify the maximum $M_T(v)$, then increasing $v_a$ does not have an impact of the type's contribution to the objective. When $a \notin T$, the expectation is given by

$$P_{T,a}(v) = \left(1 - s^*(M_T(v))\right) G_T(M_T(v) + v_T).$$

Similarly to the objective, when $a \in T$ we have that

$$P_{T,a}(v) = \int_{v_a + M_T(v)}^{\infty} \left(1 - s^*(q_a - v_a)\right) G_{T,-a}(q_a - v_a + v_{-a}) g_{T,a}(q_a) \ \mathrm{d}q_a.$$

The backward derivative is computed in a similar fashion. The only exception is that, when $a \notin T$, and $a$ verifies the maximum $M_T(v)$, the advertiser always contributes to the derivative regardless of the number of advertisers that attain the maximum. Hence,

$$\nabla_{-a} \psi(v) = \sum_{T: a \in T} \pi(T) P_{T,a}(v) + \sum_{\substack{T: a \notin T \\ a \in \alpha_T(v)}} \pi(T) P_{T,a}(v) - \rho_a.$$

*Optimization.* We solve the dual problem (4) using a Gradient Descent Method. At each step the objective and its objective are computed as described previously. Notice that, when multiple advertisers verify a tie, the objective is not differentiable. In this case a descent direction is constructed using the forward and backward derivatives (if possible).

*Ties.* For the following, we assume that the instance is not *degenerate*, that is, the variances within the types are positive, and no two advertisers are perfectly correlated. Then, within each type, non-trivial ties can only occur between the advertisers that are not in the type (we refer to the non-trivial ties as those in which multiple advertisers attain the same contract adjusted quality). Moreover, there can be at most one tie within each type, and this happens when the maximum $M_T(v)$ is verified by many advertisers, that is $|\alpha_T(v)| > 1$. With some abuse of notation, the probability of such a tie is given by $\pi(T) P_{T,\alpha_T(v)}$ and it should be split among the advertisers $\alpha_T(v)$. Note that the number of non-trivial ties is $O(T)$, and the tie-breaking rule can be computed efficiently by solving a feasible flow problem.

## Appendix EC.4:    Fluid Limit

Exploiting our generative model we can construct a fluid model, and obtain the limiting performance of an arbitrary bid-price policy as the number of impressions grows to infinity. We first describe the fluid equations governing the dynamics of the fluid model, then we construct a solution to such system, and then prove that the stochastic algorithm satisfies the fluid equation in the limit. For simplicity, we focus our analysis on the case with no AdX, and no ties; though, a similar analysis applies to the more general case.

In the following we analyze the performance of the stochastic control policy when implementing some (sub-optimal) bid-prices $v$. Let $\omega$ be a sample path, $J_n(\omega)$ be the cumulative yield collected up to impression $n$, and $S_{n,a}(\omega)$ the number of impressions assigned to advertiser $a$ up to time $n$. We extended the previous definitions for an arbitrary time, by taking their linear interpolations, so that they are continuous. The previous functions are random elements on $\mathbb{C}[0, \infty)$. We shall construct the fluid limit by scaling capacity and time proportionally to infinity, and considering a continuous flow of impressions arriving during an horizon of length 1. More formally, we define $\bar{S}_a(t) = \lim_{N \to \infty} N^{-1} S_{tN,a}(\omega)$, which can be interpreted as the fraction of impressions assigned to advertiser $a$ by time $t$. Similarly, we define $\bar{J}(t) = \lim_{N \to \infty} N^{-1} J_{tN}(\omega)$ as the cumulative yield up to time $t$. We are interested in computing $\bar{J}(1)$, the total limiting yield of the algorithm under bid-prices $v$.

When capacity is scaled, each advertiser has a capacity of $\rho_a$, and the fluid model should satisfy the following differential equations

$$J'(t) = \sum_{a \in \mathcal{A}(t)} \mathbb{E}\Big[Q_a \mathbf{1}\big\{a = \arg\max_{a' \in \mathcal{A}(t)}\{Q_{a'} - v_{a'}\}\big\}\Big], \tag{EC.2a}$$

$$S_a'(t) = \mathbb{P}\Big\{a = \arg\max_{a' \in \mathcal{A}(t)}\{Q_{a'} - v_{a'}\}\Big\}, \quad \forall a \in \mathcal{A}_0 \tag{EC.2b}$$

$$\mathcal{A}(t) = \big\{a \in \mathcal{A}_0 : \bar{S}_a(t) < \rho_a\big\}, \tag{EC.2c}$$

with the initial conditions $S_a(0) = 0$, and $J(0) = 0$. In (EC.2c), $\mathcal{A}(t)$ is the set of advertisers that are yet to be fulfilled (including advertiser 0, which is fulfilled when the time comes all impressions should be assigned directly to the advertisers), and (EC.2b) determines the rate at which impressions are assigned to each advertiser. When one advertiser is fulfilled and the fraction of impressions $\bar{S}_a'(t)$ reaches its capacity $\rho_a$, it is excluded from $\mathcal{A}(t)$, and its rate is driven to zero. Finally, (EC.2a) determines the rate at which yield is generated.

It is not hard to see that the solution to the fluid equations (EC.2) is piecewise linear, and continuous. We construct a solution as follows. Let an *epoch*, denoted by $t^k$, be the time in which the contract of any advertiser is fulfilled (including advertiser 0). The horizon $[0, 1]$ is partitioned in consecutive *pieces*, each culminating with an epoch. The $k^{\text{th}}$ piece spans the interval $[t^k, t^{k+1})$, and has a length of $\Delta^k = t^{k+1} - t^k$. Since one advertiser is fulfilled at each epoch, there are at most $A + 1$ pieces.

Let $\mathcal{A}^k$ be set of advertisers yet to be satisfied at the beginning of stage $k$ as given by (EC.2c), $r_a^k$ be the service rate for advertiser $a$ during stage $k$ as given by (EC.2b), and $y^k$ be the yield rate during stage $k$ as given by (EC.2a). The length of a stage is determined by the advertiser that is first

fulfilled. Once determined, the solution is constructed recursively as follows

$$\Delta^k = \min_{a \in \mathcal{A}^k} \left\{ \frac{\rho_a - S_a(t_k)}{r_a^k} \right\}, \tag{EC.3a}$$

$$t^{k+1} = \Delta^k + t^k,$$

$$S_a(t^{k+1}) = S_a(t^k) + r_a^k \Delta^k,$$

$$J(t^{k+1}) = J(t^k) + y^k \Delta^k,$$

$$\mathcal{A}^{k+1} = \mathcal{A}^k \setminus a^k,$$

where $a^k$ is the advertiser that verifies the minimum in (EC.3a), and initially $t^0 = 0$, and $\mathcal{A}^0 = \mathcal{A}_0$. The functions $S_a$ and $J$ are obtained as the linear interpolation of the values at the endpoints of the interval. Fortunately, the rates can be easily obtained by evaluating the dual objective and its gradient. Let $\psi^k(v)$ be the objective in (4) when restricting to the set of advertisers $\mathcal{A}^k$. Then, we have that $r^k = \rho - \nabla \psi^k(v)$, and $y^k = \psi^k(v) - v \cdot \nabla \psi^k(v)$.

We conclude by showing that functions obtained are actually the fluid limit of the stochastic process induced by the algorithm.

**Proposition 10** *The fluid limits $\bar{S}_a(t)$, and $\bar{J}(t)$ are a solution to the fluid equations* (EC.2).

*Proof.* Consider the sequence of random elements $\bar{S}_{N,a}(t,\omega) = N^{-1} S_{tN,a}(\omega)$, and $\bar{J}_N(t,\omega) = N^{-1} J_{tN}(\omega)$. We would like to show that the previous sequences are tight. By Theorem 8.3 in Billingsley (1968), a sequence of random elements $\{X_N\}$ in $\mathbb{C}[0,\infty)$ is tight iff (i) $\{X_N(0)\}$ is tight, and (ii) for all $\epsilon > 0$ and $\eta > 0$, there is a $\delta > 0$ and an integer $N_0$ such that $\mathbb{P}\{\sup_{t \le t' \le t+\delta} |X_N(t') - X_N(t)| \ge \epsilon\} \le \eta$ for $N \ge N_0$.

The first condition is trivially satisfied for both sequences. Disregarding integrality issues, which are not important in the analysis, and using the fact that the processes are non-decreasing, we have that

$$\sup_{t \le t' \le t+\delta} |\bar{S}_{N,a}(t') - \bar{S}_{N,a}(t)| \le \frac{1}{N} \left( S_{(t+\delta)N,a} - S_{tN,a} \right) \le \delta.$$

Thus, by picking $\delta < \epsilon$ the second condition is satisfied for the number of impressions assigned. For the yield processes, employing Markov's inequality, and the bound $\mathbb{E} R_n^2 \le A^2 \max_a \{\mathbb{E} Q_a^2\}$ for the yield in any single period, we obtain

$$\frac{1}{\delta} \mathbb{P} \left\{ J_{(t+\delta)N} - J_{tN} \ge N\epsilon \right\} \le \frac{1}{\delta N^2 \epsilon^2} \mathbb{E} \left[ \sum_{n=tN}^{(t+\delta)N} R_n \right]^2 \le \delta \frac{A^2 \max_a \{\mathbb{E} Q_a^2\}}{\epsilon^2},$$

which can be bounded from above by $\eta$ by picking a small enough $\delta$, and $N > 1/\delta$.

Next, we show that the fluid limit converges to the solution of the equation (EC.2b). Before proceeding we state some definitions. Let the stopping time $n_N^k = \inf\{n : S_{n,a} \ge C_a$ for some $a \in \mathcal{A}_N^{k-1}\}$ be the time in which the contract of the $k^{\text{th}}$ advertisers is fulfilled. In our previous terminology, $n_N^k$ is the $k^{\text{th}}$ epoch and the beginning of the $k^{\text{th}}$ piece. Similarly, we let $\mathcal{A}_N^k = \{a \in \mathcal{A}_0 : S_{n_N^k,a} < C_a\}$ to be the set of advertisers that are active during the $k^{\text{th}}$ piece. The initial values are given by $n_N^0 = 1$ and $\mathcal{A}_N^0 = \mathcal{A}_0$.

We intend to show that $N^{-1}n_N^k \to t^k$, $\mathcal{A}_N^k \to \mathcal{A}^k$, and $N^{-1}S_{n_N^k,a} \to S_a(t^k)$ as $N \to \infty$ in an almost sure sense. We proceed by induction in $k$. The base case follows trivially. Suppose that our claim holds for $k$, we intend to show that it holds for $k+1$. By the definition of the $(k+1)^{\text{th}}$ epoch, it should be the case that $S_{n_N^{k+1}-1,a} < C_a$ for all $a \in \mathcal{A}_N^k$ and $S_{n_N^{k+1},a} \geq C_a$ for exactly one advertiser $a \in \mathcal{A}_N^k$. Notice that the number of impressions assigned to ad $a$ up to the stopping time can be written as

$$\frac{S_{n_N^{k+1},a}}{N} = \frac{S_{n_N^k,a}}{N} + \frac{n_N^{k+1} - n_N^k}{N} \frac{\sum_{n=n_N^k+1}^{n_N^{k+1}} I_{n,a}}{n_N^{k+1} - n_N^k}, \tag{EC.4}$$

where the summands on the right-hand size are i.i.d. bernoulli random variables with success probability $\mathbb{P}\left\{a = \arg\max_{a' \in \mathcal{A}_N^k}\{Q_{a'} - v_{a'}\}\right\}$. From the induction hypothesis, together with the Triangular Strong Law of Large Numbers, we get that (EC.4) goes to $S_a(t^k) + (\lim N^{-1}n_N^{k+1} - t^k)r_a^k$ since the success probability converges to $r_a^k$. It is not hard to see that the same limit holds for $N^{-1}S_{n_N^{k+1}-1,a}$. Thus, we have that for all advertisers yet to be satisfied it should be the case that $S_a(t^k) + (\lim N^{-1}n_N^{k+1} - t^k)r_a^k \leq \rho_a$, and for at least one advertiser $S_a(t^k) + (\lim N^{-1}n_N^{k+1} - t^k)r_a^k \geq \rho_a$. Combining this expressions we get that in the limit the stopping time should satisfy

$$\lim \frac{n_N^{k+1}}{N} = t^k + \min_{a \in \mathcal{A}^k}\left\{\frac{\rho_a - S_a(t_k)}{r_a^k}\right\} = t^{k+1}.$$

In turn this implies that $N^{-1}S_{n_N^{k+1},a} \to S_a(t^{k+1})$ and $\mathcal{A}_N^{k+1} \to \mathcal{A}^{k+1}$, thus concluding the inductive step.

**EXHIBIT E**

**GOOGLE PRIVACY POLICY**

When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control.

This Privacy Policy is meant to help you understand what information we collect, why we collect it, and how you can update, manage, export, and delete your information.

Effective December 19, 2019 | Archived versions | Download PDF

We build a range of services that help millions of people daily to explore and interact with the world in new ways. Our services include:

- Google apps, sites, and devices, like Search, YouTube, and Google Home

- Platforms like the Chrome browser and Android operating system

- Products that are integrated into third-party apps and sites, like ads and embedded Google Maps

You can use our services in a variety of ways to manage your privacy. For example, you can sign up for a Google Account if you want to create and manage content like emails and photos, or see more relevant search results. And you can use many Google services when you're signed out or without creating an account at all, like searching on Google or watching YouTube videos. You can also choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used.

To help explain things as clearly as possible, we've added examples, explanatory videos, and definitions for key terms. And if you have any questions about this Privacy Policy, you can contact us.

**INFORMATION GOOGLE COLLECTS**

We want you to understand the types of information we collect as you use our services

We collect information to provide better services to all our users — from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like. The information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls.

When you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This helps us do things like maintain your language preferences across browsing sessions.

When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information.

## Things you create or provide to us

When you create a Google Account, you provide us with personal information that includes your name and a password. You can also choose to add a phone number or payment information to your account. Even if you aren't signed in to a Google Account, you might choose to provide us with information — like an email address to receive updates about our services.

We also collect the content you create, upload, or receive from others when using our services. This includes things like email you write and receive, photos and videos you save, docs and spreadsheets you create, and comments you make on YouTube videos.

## Information we collect as you use our services

### Your apps, browsers & devices

We collect information about the apps, browsers, and devices you use to access Google services, which helps us provide features like automatic product updates and dimming your screen if your battery runs low.

The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

We collect this information when a Google service on your device contacts our servers — for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services. This information includes things like your device type, carrier name, crash reports, and which apps you've installed.

## Your activity

We collect information about your activity in our services, which we use to do things like recommend a YouTube video you might like. The activity information we collect may include:

- Terms you search for

- Videos you watch

- Views and interactions with content and ads

- Voice and audio information when you use audio features

- Purchase activity

- People with whom you communicate or share content

- Activity on third-party sites and apps that use our services

- Chrome browsing history you've synced with your Google Account

If you use our services to make and receive calls or send and receive messages, we may collect telephony log information like your phone number, calling-party number, receiving-

party number, forwarding numbers, time and date of calls and messages, duration of calls, routing information, and types of calls.

You can visit your Google Account to find and manage activity information that's saved in your account.

Go to Google Account

## Your location information

We collect information about your location when you use our services, which helps us offer features like driving directions for your weekend getaway or showtimes for movies playing near you.

Your location can be determined with varying degrees of accuracy by:

- GPS

- IP address

- Sensor data from your device

- Information about things near your device, such as Wi-Fi access points, cell towers, and Bluetooth-enabled devices

The types of location data we collect depend in part on your device and account settings. For example, you can turn your Android device's location on or off using the device's settings app. You can also turn on Location History if you want to create a private map of where you go with your signed-in devices.

In some circumstances, Google also collects information about you from publicly accessible sources. For example, if your name appears in your local newspaper, Google's Search engine may index that article and display it to other people if they search for your name. We may also collect information about you from trusted partners, including marketing partners who provide us with information about potential customers of our business services, and security partners who provide us with information to protect

against abuse. We also receive information from advertisers to provide advertising and research services on their behalf.

We use various technologies to collect and store information, including cookies, pixel tags, local storage, such as browser web storage or application data caches, databases, and server logs.

WHY GOOGLE COLLECTS DATA

We use data to build better services

We use the information we collect from all our services for the following purposes:

## Provide our services

We use your information to deliver our services, like processing the terms you search for in order to return results or helping you share content by suggesting recipients from your contacts.

## Maintain & improve our services

We also use your information to ensure our services are working as intended, such as tracking outages or troubleshooting issues that you report to us. And we use your information to make improvements to our services — for example, understanding which search terms are most frequently misspelled helps us improve spell-check features used across our services.

## Develop new services

We use the information we collect in existing services to help us develop new ones. For example, understanding how people organized their photos in Picasa, Google's first photos app, helped us design and launch Google Photos.

## Provide personalized services, including content and ads

We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results. For example, Security Checkup provides security tips adapted to how you use Google products. And Google Play uses information like apps you've already installed and videos you've watched on YouTube to suggest new apps you might like.

Depending on your settings, we may also show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

- We don't show you personalized ads based on sensitive categories, such as race, religion, sexual orientation, or health.

- We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

Go to Ad Settings

## Measure performance

We use data for analytics and measurement to understand how our services are used. For example, we analyze data about your visits to our sites to do things like optimize product design. And we also use data about the ads you interact with to help advertisers understand the performance of their ad campaigns. We use a variety of tools to do this, including Google Analytics. When you visit sites that use Google Analytics, Google and a Google Analytics customer may link information about your activity from that site with activity from other sites that use our ad services.

## Communicate with you

We use information we collect, like your email address, to interact with you directly. For example, we may send you a notification if we detect suspicious activity, like an attempt to sign in to your Google Account from an unusual location. Or we may let you know

about upcoming changes or improvements to our services. And if you contact Google, we'll keep a record of your request in order to help solve any issues you might be facing.

## Protect Google, our users, and the public

We use information to help improve the safety and reliability of our services. This includes detecting, preventing, and responding to fraud, abuse, security risks, and technical issues that could harm Google, our users, or the public.

---

We use different technologies to process your information for these purposes. We use automated systems that analyze your content to provide you with things like customized search results, personalized ads, or other features tailored to how you use our services. And we analyze your content to help us detect abuse such as spam, malware, and illegal content. We also use algorithms to recognize patterns in data. For example, Google Translate helps people communicate across languages by detecting common language patterns in phrases you ask it to translate.

We may combine the information we collect among our services and across your devices for the purposes described above. For example, if you watch videos of guitar players on YouTube, you might see an ad for guitar lessons on a site that uses our ad products. Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.

If other users already have your email address or other information that identifies you, we may show them your publicly visible Google Account information, such as your name and photo. This helps people identify an email coming from you, for example.

We'll ask for your consent before using your information for a purpose that isn't covered in this Privacy Policy.

YOUR PRIVACY CONTROLS

You have choices regarding the information we collect and how it's used

This section describes key controls for managing your privacy across our services. You can also visit the Privacy Checkup, which provides an opportunity to review and adjust important privacy settings. In addition to these tools, we also offer specific privacy settings in our products — you can learn more in our Product Privacy Guide.

Go to Privacy Checkup

# Managing, reviewing, and updating your information

When you're signed in, you can always review and update information by visiting the services you use. For example, Photos and Drive are both designed to help you manage specific types of content you've saved with Google.

We also built a place for you to review and control information saved in your Google Account. Your Google Account includes:

## Privacy controls

### Activity Controls

Decide what types of activity you'd like saved in your account. For example, you can turn on Location History if you want traffic predictions for your daily commute, or you can save your YouTube Watch History to get better video suggestions.

Go to Activity Controls

### Ad settings

Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads. You can modify your interests, choose whether

your personal information is used to make ads more relevant to you, and turn on or off certain advertising services.

Go to Ad Settings

## About you

Control what others see about you across Google services.

Go to About You

## Shared endorsements

Choose whether your name and photo appear next to your activity, like reviews and recommendations, that appear in ads.

Go to Shared Endorsements

## Information you share

If you're a G Suite user, control whom you share information with through your account on Google+.

Go to Information You Share

## Ways to review & update your information

### My Activity

My Activity allows you to review and control data that's created when you use Google services, like searches you've done or your visits to Google Play. You can browse by date and by topic, and delete part or all of your activity.

Go to My Activity

## Google Dashboard

Google Dashboard allows you to manage information associated with specific products.

Go to Dashboard

## Your personal information

Manage your contact information, such as your name, email, and phone number.

Go to Personal Info

When you're signed out, you can manage information associated with your browser or device, including:

- Signed-out search personalization: Choose whether your search activity is used to offer you more relevant results and recommendations.

- YouTube settings: Pause and delete your YouTube Search History and your YouTube Watch History.

- Ad Settings: Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads.

# Exporting, removing & deleting your information

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

Export your data

You can also request to remove content from specific Google services based on applicable law.

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

Delete your information

And finally, Inactive Account Manager allows you to give someone else access to parts of your Google Account in case you're unexpectedly unable to use your account.

---

There are other ways to control the information Google collects whether or not you're signed in to a Google Account, including:

- Browser settings: For example, you can configure your browser to indicate when Google has set a cookie in your browser. You can also configure your browser to block all cookies from a specific domain or all domains. But remember that our services rely on cookies to function properly, for things like remembering your language preferences.

- Device-level settings: Your device may have controls that determine what information we collect. For example, you can modify location settings on your Android device.

SHARING YOUR INFORMATION

# When you share your information

Many of our services let you share information with other people, and you have control over how you share. For example, you can share videos on YouTube publicly or you can decide to keep your videos private. Remember, when you share information publicly, your content may become accessible through search engines, including Google Search.

When you're signed in and interact with some Google services, like leaving comments on a YouTube video or reviewing an app in Play, your name and photo appear next to your activity. We may also display this information in ads depending on your Shared endorsements setting.

# When Google shares your information

We do not share your personal information with companies, organizations, or individuals outside of Google except in the following cases:

## With your consent

We'll share personal information outside of Google when we have your consent. For example, if you use Google Home to make a reservation through a booking service, we'll get your permission before sharing your name or phone number with the restaurant. We'll ask for your explicit consent to share any sensitive personal information.

## With domain administrators

If you're a student or work for an organization that uses Google services (like G Suite), your domain administrator and resellers who manage your account will have access to your Google Account. They may be able to:

- Access and retain information stored in your account, like your email

- View statistics regarding your account, like how many apps you install

- Change your account password

- Suspend or terminate your account access

- Receive your account information in order to satisfy applicable law, regulation, legal process, or enforceable governmental request

- Restrict your ability to delete or edit your information or your privacy settings

## For external processing

We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. For example, we use service providers to help us with customer support.

## For legal reasons

We will share personal information outside of Google if we have a good-faith belief that access, use, preservation, or disclosure of the information is reasonably necessary to:

- Meet any applicable law, regulation, legal process, or enforceable governmental request. We share information about the number and type of requests we receive from governments in our Transparency Report.

- Enforce applicable Terms of Service, including investigation of potential violations.

- Detect, prevent, or otherwise address fraud, security, or technical issues.

- Protect against harm to the rights, property or safety of Google, our users, or the public as required or permitted by law.

We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

If Google is involved in a merger, acquisition, or sale of assets, we'll continue to ensure the confidentiality of your personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

KEEPING YOUR INFORMATION SECURE

We build security into our services to protect your information

All Google products are built with strong security features that continuously protect your information. The insights we gain from maintaining our services help us detect and automatically block security threats from ever reaching you. And if we do detect something risky that we think you should know about, we'll notify you and help guide you through steps to stay better protected.

We work hard to protect you and Google from unauthorized access, alteration, disclosure, or destruction of information we hold, including:

- We use encryption to keep your data private while in transit

- We offer a range of security features, like Safe Browsing, Security Checkup, and 2 Step Verification to help you protect your account

- We review our information collection, storage, and processing practices, including physical security measures, to prevent unauthorized access to our systems

- We restrict access to personal information to Google employees, contractors, and agents who need that information in order to process it. Anyone with this access is subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

EXPORTING & DELETING YOUR INFORMATION

You can export a copy of your information or delete it from your Google Account at any time

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

Export your data

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

Delete your information

RETAINING YOUR INFORMATION

We retain the data we collect for different periods of time depending on what it is, how we use it, and how you configure your settings:

- Some data you can delete whenever you like, such as the content you create or upload. You can also delete activity information saved in your account, or choose to have it deleted automatically after a set period of time.

- Other data is deleted or anonymized automatically after a set period of time, such as advertising data in server logs.

- We keep some data until you delete your Google Account, such as information about how often you use our services.

- And some data we retain for longer periods of time when necessary for legitimate business or legal purposes, such as security, fraud and abuse prevention, or financial record-keeping.

When you delete data, we follow a deletion process to make sure that your data is safely and completely removed from our servers or retained only in anonymized form. We try to ensure that our services protect information from accidental or malicious deletion. Because of this, there may be delays between when you delete something and when copies are deleted from our active and backup systems.

You can read more about Google's data retention periods, including how long it takes us to delete your information.

### COMPLIANCE & COOPERATION WITH REGULATORS

We regularly review this Privacy Policy and make sure that we process your information in ways that comply with it.

# Data transfers

We maintain servers around the world and your information may be processed on servers located outside of the country where you live. Data protection laws vary among countries, with some providing more protection than others. Regardless of where your information is processed, we apply the same protections described in this policy. We also comply with certain legal frameworks relating to the transfer of data, such as the EU-US and Swiss-US Privacy Shield Frameworks.

When we receive formal written complaints, we respond by contacting the person who made the complaint. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of your data that we cannot resolve with you directly.

# California requirements

If the California Consumer Privacy Act (CCPA) applies to your information, we provide these disclosures and the tools described in this policy so you can exercise your rights to receive information about our data practices, as well as to request access to and deletion of your information. These tools allow you to review, update and delete your information, as well as export and download a copy of it. You can also read more about Google's data retention periods, and the process we follow to delete your information.

Google does not sell your personal information. We only share your information as described in this policy. Google processes your information for the purposes described in this policy, which include "business purposes" under the CCPA. These purposes include:

- **Protecting against security threats, abuse, and illegal activity.** Google uses and may disclose information to detect, prevent and respond to security incidents, and for protecting against other malicious, deceptive, fraudulent, or illegal activity. For example, to protect our services, Google may receive or disclose information about IP addresses that malicious actors have compromised.

- **Auditing and measurement.** Google uses information for analytics and measurement to understand how our services are used, as well as to fulfill obligations to our partners like publishers, advertisers, developers, or rights holders. We may disclose non-personally identifiable information publicly and with these partners, including for auditing purposes.

- **Maintaining our services.** Google uses information to ensure our services are working as intended, such as tracking outages or troubleshooting bugs and other issues that you report to us.

- **Research and development.** Google uses information to improve our services and to develop new products, features and technologies that benefit our users and the public. For example, we use publicly available information to help train Google's language models and build features like Google Translate.

- **Use of service providers.** Google shares information with service providers to perform services on our behalf, in compliance with our Privacy Policy and other appropriate confidentiality and security measures. For example, we may rely on service providers to help provide customer support.

- **Advertising.** Google processes information, including online identifiers and information about your interactions with advertisements, to provide advertising. This keeps many of our services freely available for users. You can control what information we use to show you ads by visiting your ad settings.

Google also uses information to satisfy applicable laws or regulations, and discloses information in response to legal process or enforceable government requests, including to law enforcement. We provide information about the number and type of requests we receive from governments in our Transparency Report.

If you have additional questions or requests related to your rights under the CCPA, you can contact Google.

ABOUT THIS POLICY

# When this policy applies

This Privacy Policy applies to all of the services offered by Google LLC and its affiliates, including YouTube, Android, and services offered on third-party sites, such as advertising services. This Privacy Policy doesn't apply to services that have separate privacy policies that do not incorporate this Privacy Policy.

This Privacy Policy doesn't apply to:

- The information practices of other companies and organizations that advertise our services

- Services offered by other companies or individuals, including products or sites that may include Google services, be displayed to you in search results, or be linked from our services

# Changes to this policy

We change this Privacy Policy from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We always indicate the date the last changes were published and we offer access to archived versions for your review. If changes are significant, we'll provide a more prominent notice (including, for certain services, email notification of Privacy Policy changes).

RELATED PRIVACY PRACTICES

# Specific Google services

The following privacy notices provide additional information about some Google services:

- Chrome & the Chrome Operating System

- Play Books

- Payments

- Fiber

- Google Fi

- G Suite for Education

- YouTube Kids

- Google Accounts Managed with Family Link, for Children under 13 (or applicable age in your country)

- Voice and Audio Collection from Children's Features on the Google Assistant

# Other useful resources

The following links highlight useful resources for you to learn more about our practices and privacy settings.

- Your Google Account is home to many of the settings you can use to manage your account

- Privacy Checkup guides you through key privacy settings for your Google Account

- Google's safety center helps you learn more about our built-in security, privacy controls, and tools to help set digital ground rules for your family online

- Privacy & Terms provides more context regarding this Privacy Policy and our Terms of Service

- Technologies includes more information about:

  - How Google uses cookies

  - Technologies used for Advertising

  - How Google uses pattern recognition to recognize things like faces in photos

  - How Google uses information from sites or apps that use our services

## ads you'll find most useful

For example, if you watch videos about baking on YouTube, you may see more ads that relate to baking as you browse the web. We also may use your IP address to determine your approximate location, so that we can serve you ads for a nearby pizza delivery service if you search for "pizza." Learn more about Google ads and why you may see particular ads.

## the people who matter most to you online

For example, when you type an address in the To, Cc, or Bcc field of an email you're composing, Gmail will suggest addresses based on the people you contact most frequently.

## phone number

If you add your phone number to your account, it can be used for different purposes across Google services, depending on your settings. For example, your phone number can be used to help you access your account if you forget your password, help people find and connect with you, and make the ads you see more relevant to you. Learn more

## payment information

For example, if you add a credit card or other payment method to your Google Account, you can use it to buy things across our services, like apps in the Play Store. We may also ask for other information, like a business tax ID, to help process your payment. In some cases, we may also need to verify your identity and may ask you for information to do this.

We may also use payment information to verify that you meet age requirements, if, for example, you enter an incorrect birthday indicating you're not old enough to have a Google Account. Learn more

### devices

For example, we can use information from your devices to help you decide which device you'd like to use to install an app or view a movie you buy from Google Play. We also use this information to help protect your account.

### Android device with Google apps

Android devices with Google apps include devices sold by Google or one of our partners and include phones, cameras, vehicles, wearables, and televisions. These devices use Google Play Services and other pre-installed apps that include services like Gmail, Maps, your phone's camera and phone dialer, text-to-speech conversion, keyboard input, and security features.

### Views and interactions with content and ads

For example, we collect information about views and interactions with ads so we can provide aggregated reports to advertisers, like telling them whether we served their ad on a page and whether the ad was likely seen by a viewer. We may also measure other interactions, such as how you move your mouse over an ad or if you interact with the page on which the ad appears.

### synced with your Google Account

Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account. Learn more

### services to make and receive calls or send and receive messages

Examples of these services include:

- Google Hangouts, for making domestic and international calls

- Google Voice, for making calls, sending text messages, and managing voicemail

- Google Fi, for a phone plan

## Sensor data from your device

Your device may have sensors that can be used to better understand your location and movement. For example, an accelerometer can be used to determine your speed and a gyroscope to figure out your direction of travel.

## Information about things near your device

If you use Google's Location services on Android, we can improve the performance of apps that rely on your location, like Google Maps. If you use Google's Location services, your device sends information to Google about its location, sensors (like accelerometer), and nearby cell towers and Wi-Fi access points (like MAC address and signal strength). All these things help to determine your location. You can use your device settings to enable Google Location services. Learn more

## publicly accessible sources

For example, we may collect information that's publicly available online or from other public sources to help train Google's language models and build features like Google Translate.

## protect against abuse

For example, information about security threats can help us notify you if we think your account has been compromised (at which point we can help you take steps to protect your account).

## advertising and research services on their behalf

For example, advertisers may upload data from their loyalty-card programs so that they can better understand the performance of their ad campaigns. We only provide aggregated reports to advertisers that don't reveal information about individual people.

## deliver our services

Examples of how we use your information to deliver our services include:

- We use the IP address assigned to your device to send you the data you requested, such as loading a YouTube video

- We use unique identifiers stored in cookies on your device to help us authenticate you as the person who should have access to your Google Account

- Photos and videos you upload to Google Photos are used to help you create albums, animations, and other creations that you can share. Learn more

- A flight confirmation email you receive may be used to create a "check-in" button that appears in your Gmail

- When you purchase services or physical goods from us, you may provide us information like your shipping address or delivery instructions. We use this information for things like processing, fulfilling, and delivering your order, and to provide support in connection with the product or service you purchase.

## ensure our services are working as intended

For example, we continuously monitor our systems to look for problems. And if we find something wrong with a specific feature, reviewing activity information collected before the problem started allows us to fix things more quickly.

## make improvements

For example, we use cookies to analyze how people interact with our services. And that analysis can help us build better products. For example, it may help us discover that it's

taking people too long to complete a certain task or that they have trouble finishing steps at all. We can then redesign that feature and improve the product for everyone.

## customized search results

For example, when you're signed in to your Google Account and have the Web & App Activity control enabled, you can get more relevant search results that are based on your previous searches and activity from other Google services. You can learn more here. You may also get customized search results even when you're signed out. If you don't want this level of search customization, you can search and browse privately or turn off signed-out search personalization.

## personalized ads

You may also see personalized ads based on information from the advertiser. If you shopped on an advertiser's website, for example, they can use that visit information to show you ads. Learn more

## sensitive categories

When showing you personalized ads, we use topics that we think might be of interest to you based on your activity. For example, you may see ads for things like "Cooking and Recipes" or "Air Travel." We don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we require the same from advertisers that use our services.

## may link information

Google Analytics relies on first-party cookies, which means the cookies are set by the Google Analytics customer. Using our systems, data generated through Google Analytics can be linked by the Google Analytics customer and by Google to third-party cookies that are related to visits to other websites. For example, an advertiser may want to use its Google Analytics data to create more relevant ads, or to further analyze its traffic. Learn more

## safety and reliability

Some examples of how we use your information to help keep our services safe and reliable include:

- Collecting and analyzing IP addresses and cookie data to protect against automated abuse. This abuse takes many forms, such as sending spam to Gmail users, stealing money from advertisers by fraudulently clicking on ads, or censoring content by launching a Distributed Denial of Service (DDoS) attack.

- The "last account activity" feature in Gmail can help you find out if and when someone accessed your email without your knowledge. This feature shows you information about recent activity in Gmail, such as the IP addresses that accessed your mail, the associated location, and the date and time of access. Learn more

## detect abuse

When we detect spam, malware, illegal content, and other forms of abuse on our systems in violation of our policies, we may disable your account or take other appropriate action. In certain circumstances, we may also report the violation to appropriate authorities.

## combine the information we collect

Some examples of how we combine the information we collect include:

- When you're signed in to your Google Account and search on Google, you can see search results from the public web, along with relevant information from the content you have in other Google products, like Gmail or Google Calendar. This can include things like the status of your upcoming flights, restaurant, and hotel reservations, or your photos. Learn more

- If you have communicated with someone via Gmail and want to add them to a Google Doc or an event in Google Calendar, Google makes it easy to do so by autocompleting their email address when you start to type in their name. This feature makes it easier to share things with people you know. Learn more

- The Google app can use data that you have stored in other Google products to show you personalized content, depending on your settings. For example, if you have searches stored in your Web & App Activity, the Google app can show you news articles and other information about your interests, like sports scores, based your activity. Learn more

- If you link your Google Account to your Google Home, you can manage your information and get things done through the Google Assistant. For example, you can add events to your Google Calendar or get your schedule for the day, ask for status updates on your upcoming flight, or send information like driving directions to your phone. Learn more

## your activity on other sites and apps

This activity might come from your use of Google services, like from syncing your account with Chrome or your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics), or it might embed other content (such as videos from YouTube). These services may share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.

Learn more about how Google uses data when you use our partners' sites or apps.

## partner with Google

There are over 2 million non-Google websites and apps that partner with Google to show ads. Learn more

## specific Google services

For example, you can delete your blog from Blogger or a Google Site you own from Google Sites. You can also delete reviews you've left on apps, games, and other content

in the Play Store.

## rely on cookies to function properly

For example, we use a cookie called 'lbcs' that makes it possible for you to open many Google Docs in one browser. Blocking this cookie would prevent Google Docs from working as expected. Learn more

## legal process, or enforceable governmental request

Like other technology and communications companies, Google regularly receives requests from governments and courts around the world to disclose user data. Respect for the privacy and security of data you store with Google underpins our approach to complying with these legal requests. Our legal team reviews each and every request, regardless of type, and we frequently push back when a request appears to be overly broad or doesn't follow the correct process. Learn more in our Transparency Report.

## show trends

When lots of people start searching for something, it can provide useful information about particular trends at that time. Google Trends samples Google web searches to estimate the popularity of searches over a certain period of time and shares those results publicly in aggregated terms. Learn more

## specific partners

For example, we allow YouTube creators and advertisers to work with measurement companies to learn about the audience of their YouTube videos or ads, using cookies or similar technologies. Another example is merchants on our shopping pages, who use cookies to understand how many different people see their product listings. Learn more about these partners and how they use your information.

## servers around the world

For example, we operate data centers located around the world to help keep our products continuously available for users.

## third parties

For example, we process your information to report use statistics to rights holders about how their content was used in our services. We may also process your information if people search for your name and we display search results for sites containing publicly available information about you.

## appropriate safeguards

For example, we may anonymize data, or encrypt data to ensure it can't be linked to other information about you. Learn more

## ensure and improve

For example, we analyze how people interact with advertising to improve the performance of our ads.

## Customizing our services

For example, we may display a Google Doodle on the Search homepage to celebrate an event specific to your country.

## Affiliates

An affiliate is an entity that belongs to the Google group of companies, including the following companies that provide consumer services in the EU: Google Ireland Limited, Google Commerce Ltd, Google Payment Corp, and Google Dialer Inc. Learn more about the companies providing business services in the EU.

## Algorithm

A process or set of rules followed by a computer in performing problem-solving operations.

## Application data cache

An application data cache is a data repository on a device. It can, for example, enable a web application to run without an internet connection and improve the performance of the application by enabling faster loading of content.

## Browser web storage

Browser web storage enables websites to store data in a browser on a device. When used in "local storage" mode, it enables data to be stored across sessions. This makes data retrievable even after a browser has been closed and reopened. One technology that facilitates web storage is HTML 5.

## Cookies and similar technologies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

## Device

A device is a computer that can be used to access Google services. For example, desktop computers, tablets, smart speakers, and smartphones are all considered

devices.

## Non-personally identifiable information

This is information that is recorded about users so that it no longer reflects or references an individually-identifiable user.

## IP address

Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. These numbers are usually assigned in geographic blocks. An IP address can often be used to identify the location from which a device is connecting to the Internet.

## Pixel tag

A pixel tag is a type of technology placed on a website or within the body of an email for the purpose of tracking certain activity, such as views of a website or when an email is opened. Pixel tags are often used in combination with cookies.

## Personal information

This is information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.

## Sensitive personal information

This is a particular category of personal information relating to topics such as confidential medical facts, racial or ethnic origins, political or religious beliefs, or sexuality.

## Server logs

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser.

A typical log entry for a search for "cars" looks like this:

```
123.45.67.89 - 25/Mar/2003 10:15:32 -
http://www.google.com/search?q=cars -
Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. Depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.

- `25/Mar/2003 10:15:32` is the date and time of the query.

- `http://www.google.com/search?q=cars` is the requested URL, including the search query.

- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.

- `740674ce2123a969` is the unique cookie ID assigned to this particular computer the first time it visited Google. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've visited Google, then it will be the unique cookie ID assigned to their device the next time they visit Google from that particular device).

## Unique identifiers

A unique identifier is a string of characters that can be used to uniquely identify a browser, app, or device. Different identifiers vary in how permanent they are, whether they can be reset by users, and how they can be accessed.

Unique identifiers can be used for various purposes, including security and fraud detection, syncing services such as your email inbox, remembering your preferences, and providing personalized advertising. For example, unique identifiers stored in cookies help sites display content in your browser in your preferred language. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. Learn more about how Google uses cookies.

On other platforms besides browsers, unique identifiers are used to recognize a specific device or app on that device. For example, a unique identifier such as the Advertising ID is used to provide relevant advertising on Android devices, and can be managed in your device's settings. Unique identifiers may also be incorporated into a device by its manufacturer (sometimes called a universally unique ID or UUID), such as the IMEI-number of a mobile phone. For example, a device's unique identifier can be used to customize our service to your device or analyze device issues related to our services.

**EXHIBIT F**

1/16/24, 1:01 PM    Case 4:20-cv-00957-SDJ    Document 202-1    How Open Bidding works - Google Ad Manager Help    Filed 01/16/24    Page 99 of 122 PageID #:  3714

The Wayback Machine - https://web.archive.org/web/20200429174344/https://support.google.com/a...

# Learn the basics

# How Open Bidding works

Learn the life cycle of an Open Bidding request



Next: Getting started with Open Bidding

*Only available in Google Ad Manager 360.*

Each Open Bidding interaction between a publisher and their exchange partners is handled by Ad Manager in what is called a "server-to-server" integration. This article describes the life cycle of an ad request targeted by an Open Bidding yield group.

- The Open Bidding process
- Auction dynamics
- Payments

## The Open Bidding process

### 1. An ad request is triggered and information is passed to the Ad Manager ad server

Requests are sent to Ad Manager using Google Publisher Tags, the Google Mobile Ads SDK, or the IMA SDK. Along with each request, information about the user, device and targeting is passed to Ad Manager. Learn more

Support for native inventory for yield groups is not yet available. However, if Ad Exchange wins the bid, native inventory can be served within a fixed size.

### 2. Ad Manager runs a unified auction to determine the best yield

The steps below are completed synchronously on the server-side as part of the ad selection process.

*2a. Ad Manager selects the best trafficked line item to compete in the unified auction*

Using targeting and delivery pacing information, Ad Manager catalogs all eligible line items booked in the Ad Manager ad server and selects the best line item to compete via dynamic allocation in the unified auction.

*2b. Ad Manager sends a bid request to targeted yield partners*

Ad Manager uses yield groups to identify the list of exchanges to compete in the unified auction. Yield groups contain targeting similar to line items and include a combination of Ad Exchange, third-party

exchanges and/or Mediation ad networks. For each Open Bidding yield partner assigned to an eligible yield group, Ad Manager sends a bid request to collect their highest bids.

> Requests marked as child-directed in compliance with the Children's Online Privacy Protection Act (COPPA) are not sent to Open Bidding yield partners.

---

What happens if multiple yield groups are eligible for the same request?

---

What happens if requested ad sizes don't match the yield group targeting?

---

What information is sent to buyers with each Open Bidding request?

---

How do Ad Exchange or AdSense line items and yield groups compete?

---

*2c. Targeted yield partners run their own auction and returns their most competitive bid to Ad Manager*

Yield partners utilize their own Open Bidding integration to receive the bid request from Ad Manager, run an auction according to the information provided in the request, and return their most competitive bid to Ad Manager.

*2d. Ad Manager hosts a unified auction and selects a winner*

Ad Manager hosts a unified auction, comparing yield partner bids, the Ad Exchange bid and other direct line items via dynamic allocation to ensure that each impression maximizes yield.

## 3. A creative or Mediation list is returned to the publisher

After dynamic allocation and all Open Bidding auctions have completed and a winner is selected, the Ad Manager ad server returns the winning asset to the publisher for display.

- If an Ad Manager line item wins the unified auction, the Ad Manager creative is returned to the publisher.

- If an exchange bidder or an Ad Exchange buyer wins the Ad Manager unified auction, the buyer's creative is returned to the publisher.

- If a Mediation yield partner wins the Ad Manager unified auction, a Mediation list, or "chain," is returned to the publisher that includes Mediation yield partners with a CPM higher than the highest Ad Exchange or Open Bidding yield partner bid. The publisher's mobile app will then call each partner in the list in order for a creative to display. Learn more about Mediation for mobile apps

> If the default CPM for a Mediation yield partner is defined as higher than the highest bid from an Open Bidding yield partner, the Mediation yield partner will have a first look to fill the impression with no guarantee they will return a bid at the default CPM price. Ensure that your default CPM values for Mediation yield partners is set realistically to optimize competition.

# Auction dynamics

The real-time bids (RTB) from yield partners compete as part of dynamic allocation in a unified auction. The best Ad Manager line item rate, expected Mediation yields and exchange bids are compared at the same time and the top bid wins the auction. Ad Exchange and yield partners bid once for each impression.

All participants in the unified auction, including Ad Exchange and third-party exchanges, compete equally for each impression on a net basis. Each exchange runs its own auction independently and then submits its bid into the unified auction. Ad Manager sends the reserve price for the unified auction to all eligible Ad Exchange buyers and Open Bidding participants (including third-party exchanges or networks). The reserve price is at least the maximum of the temporary CPM calculated by Ad Manager for the best eligible guaranteed line item or the floor price configured by the publisher (as may be adjusted, at the publisher's option, by various Ad Manager optimizations). The reserve price is not set by either the value CPMs of remnant line items that are competing for the impression or any bids received from any Ad Exchange buyers or Open Bidders for the impression. No auction participant receives any information about any other party's bids prior to completion of the auction.

### Example

There are three buyers. Ad Exchange Buyer 1 bids $3.00, Ad Exchange Buyer 2 bids $1.00, and a third-party exchange bids $2.00 on an impression. The winner of the unified auction would be Ad Exchange Buyer 1, as $3.00 is the highest bid submitted.

The highest net bid (which takes into account Ad Manager's revenue share) wins. The channel through which a bid is received (for example, whether through Google Ads or Display & Video 360, a third-party Authorized Buyer, Open Bidding yield partner, or a remnant line item) does not otherwise affect the determination of the winning bidder. Learn more about unified pricing rules and the auction rules.

---

**Was this helpful?**

| Yes | No |

**EXHIBIT G**



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Aguadilla Paint Center v Esso**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Jacqueline Yorke

Sworn to before me this
January 11, 2024

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

Stamp, Notary Public

183 D.P.R. 901, 2011 WL 6759549 (P.R.), 2011 TSPR 194

AGUADILLA PAINT CENTER, INC., CB GASOLINE SERVICE

GROUP and MICADA DE PUERTO RICO, INC., appellees,

v.

ESSO STANDARD OIL COMPANY (PUERTO RICO), petitioner.

In the Supreme Court of Puerto Rico.
*Number:* CC-2010-1135

**Synopsis**

*CERTIORARI* PETITION to request the review of a RESOLUTION of *Guillermo Arbona Lago, José L. Miranda de Hostos* and *Mildred G. Pabón Charneco*, Judges of the Court of Appeals, which concluded that after a considered analysis of the appeal submitted and the documents contained in the file, the Esso Standard Oil Company had not placed it in a position to grant the requested remedy and that the appealed opinion did not merit its intervention at this procedural stage. *The Resolution issued by the Court of Appeals is revoked and, consequently, the cause of action based on Art. 4A of the Gasoline Producers, Refiners and Distributors-Wholesalers Control Act, 23 L.P.R.A. sec. 1104a, as amended, is dismissed, before the Court of First Instance, due to lack of jurisdiction.*

*Salvador Antonetti Stutts, Carlos A. Valldejuly Sastre, Carlos J. Sagardía Abreu, Pedro A. Delgado Hernández* and *Carla Framil Ferrén, of O'Neill & Borges*, attorneys for the petitioning party; *José A. Ramos Díaz*, attorney for the appellee party; *Irene S. Soroeta Kodesh*, solicitor general, *Amir Cristina Nieves Villegas*, assistant solicitor general *Leticia Casalduc Rabell*, deputy solicitor general, and *José G. Díaz Tejera*, Assistant Secretary of the Antitrust Affairs Office of the Department of Justice, *amici curiae.*

THE ASSOCIATE JUDGE MR. KOLTHOFF CARABALLO issued the opinion of the Court.

On this occasion, the dispute in question is relatively simple: does a private person, a gasoline retailer, have active standing to file a cause of action before the Court of First Instance against a distributor-wholesaler of that product for alleged violations of the provisions related to the duty of operational separation established in Art. 4A of the Gasoline Producers, Refiners and Distributors-Wholesalers Control Act? [1] When addressing this question, we interpreted for the first time jointly two statutes that regulate competition in the gasoline market, namely: the Gasoline Producers, Refiners and Distributors-Wholesalers Control Act, Act No. 3 of March 21, 1978, as amended, 23 L.P.R.A. (Leyes de Puerto Rico Anotadas [*Laws of Puerto Rico Annotated*]) sec. 1101 *et seq.* (Gasoline Act), and the Antitrust **\*909** and Restriction of Trade Act, Act No. 77 of June 25, 1964, as amended, 10 L.P.R.A sec. 257 *et seq.* (Antitrust Act).

1     28 L.P.R.A. sec. 1104a.

# I

The petitioner Esso Standard Oil Company (the petitioner or Esso) is a corporation dedicated to the import, distribution and sale of gasoline in bulk, that is, a distributor-wholesaler. [2] For its part, the appellees Aguadilla Paint Center, Inc., and CB Gasoline Service Group, Inc. (the appellees) are retailers, [3] that is, retail sellers of gasoline, in this case gasoline imported, distributed and sold by the petitioner Esso (brand retailers).

2     See Art. 1(f) of the Gasoline Producers, Refiners and Distributors-Wholesalers Control Act (Gasoline Act), 23 L.P.R.A. sec. 1101(f).

3     See Art. 1(g) of the Gasoline Act, *supra*, 23 L.P.R.A. sec. 1101(g).

In August 2004, the appellees filed a claim before the trial court in which they charged the petitioner Esso, inter alia, with incurring in the practice of operational association, in contravention of Art. 4A of the Gasoline Act, *supra*, and Art. 7 of the Antitrust Act. [4] In addition, they requested compensation for damages and losses, according to Art. 1802 of the Civil Code, 31 L.P.R.A. sec. 5141.

4    10 L.P.R.A. sec. 263.

After multiple procedural incidents, [5] on March 12, 2010, Esso requested the dismissal of the claim **\*910** under Rule 10.2 of Civil Procedure. [6] In its motion, Esso basically argued that the cause of action of the appellees, based on the obligation of "operational separation" established in Art. 4A of the Gasoline Act, *supra*, should be dismissed because Art. 8 of the Gasoline Act, 23 L.P.R.A. sec. 1108, establishes that a violation of Art. 4A "shall constitute an unfair or deceptive practice or act and shall be subject to the provisions of sections 257 et seq." of the Antitrust Act, *supra*.

5    On October 1, 2004, Esso first requested the dismissal of the claim, based on the fact that Art. 4 of the Gasoline Act displaced the application of Art. 7 of the Antitrust and Restriction of Trade Act (Antitrust Act) (case DAC2005-0343). However, the Court of First Instance denied the request for dismissal, and therefore Esso appealed to the Court of Appeals (case KLCE2005-00564). The Court of Appeals denied the issuance of the order by Resolution of May 26, 2005. Esso then appealed to this Court by *certiorari*, which we denied on November 10, 2005. Such a determination became enforceable and final, thus continuing the proceedings before the Court of First Instance.

6    32 L.P.R.A. Ap. III.

The trial court declared Esso's application for dismissal "inadmissible" by concluding "that a private entity such as the plaintiff may file an action under Article 7 of the [Gasoline Act, 23 L.P.R.A. Sec. 1107] on competition in the gasoline market, before the Court of First Instance." [7] Dissatisfied, Esso appealed to the Court of Appeals through a *certiorari appeal*. This venue concluded that, after a considered analysis of the appeal submitted and the documents contained in the file, Esso had not placed it in a position to grant the requested remedy and that the appealed opinion did not merit its intervention in that procedural stage.

7    Appendix to the Petition for *certiorari*, p. 179.

In view of this ruling, Esso appeared before this venue by means of an appeal of *certiorari* outlining the following points of error:

The Court of Appeals erred by not issuing the requested order and not recognizing that Art. 12(a) of the Antitrust Act excludes private claims for alleged operational association under Art. 4A of the Gasoline Act.

The Court of Appeals erred by not issuing the requested order and not ordering the dismissal of the claim under Art. 4A of the Gasoline Act, since the plaintiffs do not have active standing to initiate it and, therefore, the Court of First Instance lacks jurisdiction over the matter to address it. **\*911**

The Court of Appeals erred in determining that Esso did not place it in "conditions of being able to grant the requested remedy," since the criteria for the issuance of the order contained in Rule 40 of the Rules of the Court of Appeals are met. Request for *certiorari*, p. 8.

Once the *certiorari* was issued, we stopped the proceedings and ordered the parties to submit their corresponding arguments. [8] With the benefit of the position of all parties, we now proceed to rule.

8    We also ordered the Solicitor General of Puerto Rico to appear and express her position on the dispute, as *amicus curiae*; the Solicitor General did so.

## II

### A. *Gasoline Producers, Refiners and Distributors-Wholesalers Control Act*

**[1]**   As it arises from its Statement of Reasons, the approval of the Gasoline Producers, Refiners and Distributors-Wholesalers

Aguadilla Paint Center v. Esso, 183 D.P.R. 901 (2011)

2011 TSPR 194

Control Act, Act No. 3 of March 21, 1978, as amended, 23 L.P.R.A. sec. 1101 *et seq.*, had the intention, among others, to combat the problem "that arises from the fact that the control of energy product supplies and, especially, of gasoline and other petroleum and natural gas fuels, continue to be concentrated in hands of a few who dominate all aspects of production, refining and marketing of these products." [9] In response to this the legislator sought to eliminate the competitive advantages existing in the gasoline or special engine fuels market, as well as to have oversight of that process and to establish measures for the fulfillment of the purposes pursued by said statute. In **\*912** accordance with this purpose, the legislator classified infractions and set penalties for the violators of the statute.

9      See Statement of Reasons for the Gasoline Act, 1978 Puerto Rico Laws 16-17.

Thus, the Legislative Assembly determined that, in the absence of competitive uniformity, it was necessary to institute careful safeguards that prevented the actions of oil companies and distributors of energy products aimed at monopolizing the points of public distribution of gasoline. [10] In addition, the Gasoline Act seeks to protect the retail fuel sales industry from any discriminatory practices that seek to eliminate the individual gasoline retailer from market competition, as well as from those discriminatory practices and control over the price structure aimed at favoring certain retailers to the detriment of others and the consumer. [11]

10      Statement of Reasons for the Gasoline Act, *supra.*

11      Id.

**[2]**   On the other hand, just a few months after the passage of the Gasoline Act, the Legislature approved, as *an addendum* to the latter, Act No. 73 of June 23, 1978, as amended, 23 L.P.R.A. sec. 1131 *et seq.* (Act No. 73), addressing the "Regulation and Control of the Gasoline Industry." With the passage of Act No. 73, "the gasoline industry in all its facets was declared as being in the public interest." [12] In doing so, it was recognized that the gasoline industry is a fundamental element for the security and well-being of the People of Puerto Rico. This is because the availability of that product was at that time—and obviously continues to be so today— critical for the normal functioning of our economy and the continued development of the country's daily activities. [13] **\*913**

12      23 L.P.R.A. sec. 1131.

13      See Statement of Reasons for the Gasoline Industry Regulation and Control Act, Act No. 73 of June 23, 1978, as amended, 23 L.P.R.A. sec. 1131 *et seq.* (Act No. 73).

In harmony with the Gasoline Act, the purpose of Act No. 73 is to effectively regulate certain aspects of the gasoline industry and thus ensure that the interests of the People of Puerto Rico are adequately protected from harmful activities that take place at any of the different operational levels of that industry. [14] In so acting, the legislator indicated that the Government is responsible for ensuring that there is a stable situation within all activities that affect the general well-being of the public, as well as to ensure the good order of the community and the protection of the best interests of the economic and government system. [15]

14      Id.

15      Id.

To fulfill its purposes, Act No. 73 established certain obligations and prohibitions detailed in its Art. 3. [16] Among them, and as an example, it was prohibited that in the relationships between distributors-wholesalers and retailers, that there be simultaneously lease and lease-back agreements, when said relationship has the effect or purpose of canceling the obligation of payment between the parties or of unreasonably restricting the right to free contracting or to the disposal of the property. [17] In addition, Act No. 73 established the obligation for any distributor-wholesaler to present at the Antitrust Affairs Office (O.A.M., Oficina de Asuntos

Monopolísticos) [18] a legible copy of any contract establishing a commercial relationship with a retailer, within ten days after its execution, as well as any subsequent amendment or modification thereof. **914**

16      23 L.P.R.A. sec. 1131.

17      23 L.P.R.A. sec. 1133(a).

18      As we will detail below, the Antitrust Affairs Office (O.A.M.) is an entity attached to the Department of Justice, with powers for the administration of legislation on monopolistic practices, as well as for the oversight thereof.

Collectively, and to ensure the fulfillment of its objectives and purposes, Act No. 73 empowered various government agencies and imposed on them the responsibility to perform various functions. These agencies include the Department of Commerce, [19] the Public Service Commission, the Planning Board, the Regulations and Permit Administration, and *the Department of Consumer Affairs* (D.A.Co., *Departamento de Asuntos del Consumidor*). [20]

19      Currently, Department of Economic Development and Commerce.

20      23 L.P.R.A. sec. 1133(c)–(h).

Finally, it is necessary to consider what Art. 5 of Act No. 73 establishes in relation to the Antitrust Act, *supra*:

*Sec. 1134. Enforcement of the Antitrust Act*

Nothing herein provided or promulgated by regulation or otherwise, pursuant to the provisions of Sections 1131 to 1135 of this title, shall be construed as excepting or conferring immunity as to the applicability of the provisions of Sections 257 to 274 of Title 10. [21]

21      23 L.P.R.A. sec. 1134.

**[3]**   In summary, it is evident that from its inception, both the Gasoline Act and its *addendum*, Act No. 73, provided not only for the protection of the retail fuel sales industry of any discriminatory practice to the detriment of the best interests of the people of Puerto Rico, but they expressly recognized the impact of the Antitrust Act in such a process. Thus, both laws provided for the actions of the Puerto Rico Department of Justice, through its O.A.M., to be cardinal in compliance with its oversight provisions. In addition, the legislator arranged for other government agencies, such as the D.A.Co, to also participate.

**[4]** In keeping with all of the foregoing, Art. 2(a) of the Gasoline Act, *supra*, 23 L.P.R.A. sec. 1102(a), establishes that **915**

... no producer, refiner or distributor-wholesaler will acquire or establish, open, operate or recover to operate any gasoline retail service station to be operated with personnel of their own company or subsidiary company, agent, commission agent, or under contract with any individual or legal entity, operating or administering said retail service station by means of a paid agreement or arrangement with said producer, refiner or distributor-wholesaler. The gas sales service station may only be operated by a retailer.

**[5]** Likewise, Art. 4 of the Gasoline Act, *supra*, 23 L.P.R.A. sec. 1104, establishes that

any oil producer or refiner or distributor-wholesaler of petroleum products that supplies gasoline and/or special fuels to service stations for the retail sale of such products shall be obliged to uniformly provide to all retailers of the sale of gasoline and/or special fuels to whom it supplies, any discount, deduction, decrease or reduction in prices granted directly or indirectly. [22]

22 In turn, Art. 5 of the Gasoline Act, *supra*, 23 L.P.R.A. sec. 1105, provides that any oil producer or refiner or distributor-wholesaler of petroleum products that supplies gasoline or special fuels to retailers, must uniformly apply to all retail sellers to whom it supplies, the rental of equipment and signage, when they are provided directly or indirectly to said retailers by that producer, refiner or distributor-wholesaler. Meanwhile, Art. 6 of the Gasoline Act, *supra*, 23 L.P.R.A. sec. 1106, orders the uniform distribution of fuel in periods of shortage or decrease in the supply or availability of gasoline or special fuels. Art. 7 of the aforementioned law, 23 L.P.R.A. sec. 1107, prohibits a retail seller of fuel, knowingly, from requesting or inducing the concession, or reduction in prices or in the rental of equipment and signage, in violation of Arts. 4 and 5 of the Gasoline Act, 23 L.P.R.A. sec. 1107.

**[6]** Having stated the above, directly related to the dispute at hand, we analyze Art. 4A of the Gasoline Act, *supra*, which provides the following:

*Sec. 1104a* . Operational Separation

No refiner, oil producer or distributor-wholesaler may, by agreement, arrangement, contract, corporate operational scheme, with any retailer and/or individual or legal entity, or in any other way directly operate a **\*916** gasoline retail service station in a way that prevents its complete operational separation. No refiner, oil producer or distributor-wholesaler may, by agreement, arrangement, contract, operating [sic] corporate scheme, with any retailer and/or individual or legal entity, or in any other way directly impose, require, fix or limit the profit margin and/or retail price of gasoline and/or special fuels at the retail service station.

**[7]** Art. 4A of the Gasoline Act, *supra*, is the result of an amendment made to this statute by Act No. 157-1996 (Act No. 157) and another amendment to the article itself - which adds the second sentence - by the approval of Act No. 74-2005. The article establishes the "operational separation" or, what is the same, prohibits the so-called "operational association" of gasoline wholesalers with stations for retail sale. Act No. 157 also amended the Gasoline Act to establish that "operational separation" is the cessation by a refiner, oil producer, or distributor-wholesaler "of directly participating in the operation or commercial exchange activities of the retail sale of gasoline and special fuels at retail service stations." [23]

23 23 L.P.R.A. sec. 1101(j).

**[8]** On the other hand, and cardinal to the dispute at hand, we must also consider Art. 8 of the Gasoline Act, which provides the following:

*Sec. 1108*. Violation of fair competition

Any violation of Sections 1102, 1102a, 1104, *1104a*, 1105 and 1105a of this title *shall constitute an unfair [or] deceptive act or practice* and shall be subject to the provisions of *Sections 257 et seq. of Title 10.* (Emphasis added.) [24]

24 23 L.P.R.A. sec. 1108.

**[9]** Art. 8 of the Gasoline Act, *supra*, is intended for two intimately linked purposes. First, to institute **\*917** as an "unfair or deceptive practice or act" any violation of Arts. 2, 2A, 4, *4A*, 5 and 5A of the Gasoline Act. Second, to *establish that any violation of the aforementioned articles will be subject to the provisions of the Antitrust Act.* Complementing this provision, Art. 10 of the Gasoline Act provides that "[t]he fulfillment of the purposes and provisions of sections 1101 to 1110 of [the Gasoline Act] shall be the responsibility of the Secretary of Justice, through the Antitrust Affairs Office of said Department." [25]

25 23 L.P.R.A. sec. 1110.

In its original version, Art. 8 of the Gasoline Act, *supra*, provided as follows:

> Any violation of Arts. 4, 5, 6 and 7 shall constitute an unfair or deceptive act or practice and shall be subject to the provisions of Article 3 of Act No. 77 of June 25, 1964. [26]

26    Art. 8 of Act No. 3 of March 25, 1978.

Note that this article originally referred to violations of Art. 4 of the Gasoline Act, *supra*, which establishes the obligation of any oil producer or refiner or distributor-wholesaler of petroleum products to provide uniformity for any discount, deduction, decrease or reduction in retail prices; violations of Art. 5, which establishes the obligation of any oil producer or refiner or distributor-wholesaler of petroleum products to provide uniformity in the rental of equipment and signage to retailers, and violations of Art. 6, which establishes the obligation of any oil producer or refiner or distributor-wholesaler of petroleum products to institute indiscriminate proration and uniform distribution among all retailers to whom gasoline is supplied for sale, during times of shortages, or decrease in the supply or availability of gasoline or special fuels. On the other hand, Art. 8 in its original version also referred to violations of Art. 7, **\*918** which establishes a prohibition on the retailer to request or induce the concession or reduction in prices in the rental of equipment and signage. As can be seen, each provision to which Art. 8 in its original version referred—Arts. 4 to 7—contained *a prohibition* whose violation constituted "an unfair or deceptive practice or act."

However, since its original wording, Art. 8 of the Gasoline Act, *supra*, has undergone two amendments. The first of them through the approval of Act No. 157-1996 (Act No. 157), which in its Statement of Reasons indicated the following (referring to Act No. 3 of 1978, Gasoline Act):

> In 1978, the Legislative Assembly passed legislation *aimed at protecting gasoline retailers from potential predatory practices by wholesale gasoline distribution companies.* One of those laws, Act No. 3 ...provided that *no wholesale company could directly operate gasoline stations*, subject to certain exceptions. *The responsibility for monitoring compliance with this law was assigned to the Secretary of Justice through its Antitrust Affairs Office.* (Emphasis added) [27]

27    See Statement of Reasons of Act No. 157-1996 (Act No. 157), 1996 Puerto Rico Laws 683.

As can be seen, in the Statement of Reasons of Act No. 157, the Legislative Assembly mentioned the Gasoline Act among those laws whose intention is to "protect gasoline retailers from possible *predatory practices by wholesale gasoline distribution companies*." (Emphasis added.) [28] In addition, it noted that the Gasoline Act "provided that no wholesale company could directly operate gasoline stations, subject to certain exceptions." [29] In such a way that Act No. 157, in its Statement of Reasons, recognized as a predatory practice, that is, harmful to retailers and prohibited by the Gasoline Act, that in which the **\*919** wholesaler directly operated a gasoline station. It also pointed out that the oversight of that prohibition was a matter that the *Antitrust Affairs Office* would be responsible for.

28    Id.

29    Id.

On the other hand, in its last paragraph, the Statement of Reasons of Act No. 157 also indicates as its purpose to amend the Gasoline Act so that the complete separation between retail sales operations and those of wholesalers and gasoline refiners is established. The aforementioned text provides as follows:

This measure aims to close the exception gaps that, because they were opened in 1978, have limited the achievement of public objectives in this industry. *Specifically, the complete separation between retail sales operations and those of wholesalers and gasoline refiners is established, with a deadline for the necessary separations to be carried out until it is achieved.* (Emphasis added.) [30]

30      Id.

As part of the amendments made to the Gasoline Act aimed at establishing that "complete separation between operations" of retailers and wholesalers, Act No. 157 created the aforementioned Art. 4A, which prohibits any act that prevents the so-called "operational separation." The definition of "operational separation," which Act No. 157 itself also established as one of the amendments to the Gasoline Act, *supra*, states that it "occurs when a... wholesale distributor ceases to participate directly in the operation or commercial exchange activities of the retail sale of gasoline... at retail service stations." [31]

31      23 L.P.R.A. sec. 1101(j).

However, the amendment to Art. 8 of the Gasoline Act, *supra*, produced by Act No. 157, changed the majority of the articles which referred to the version of the original article. The version of Art. 8 after the amendment of Act No. 157 became as follows: **\*920**

Any violation of Articles 1, 2, 3, 4 and 5 shall constitute an unfair or deceptive act or practice and shall be subject to the provisions of Article 3 of Act No. 77 of June 25, 1964, as amended... 1996 Puerto Rico Laws 686.

In analyzing the above text we have to conclude that the aforementioned amendment to Art. 8 that was introduced by Act No. 157 produced illogical changes in some cases and inconsequential changes in others. By this we mean the following. Firstly, it makes no sense that a law whose Statement of Reasons indicates that its purpose is to amend the Gasoline Act to establish a complete separation between retail and wholesale sales operations, thus avoiding "possible predatory [monopolistic] practices by wholesale gasoline distribution companies"; which creates Art. 4A of "operational separation" for those purposes, and which acknowledges that the oversight for such compliance rests on the *expertise* of the O.A.M., should not include Art. 4A as part of the amendment to the aforementioned Art. 8 of the Gasoline Act, *supra*.

On the other hand, the amendment to Art. 8 of the Gasoline Act, *supra*, which introduced Act No. 157 also included, as "unfair or deceptive practice or act," any violation of Art. 1 of the Gasoline Act, *supra*, 23 L.P.R.A. sec. 1101. However, Art. 1 of the Gasoline Act, *supra*, only established at that time—and currently establishes—a series of definitions of terms, none of which constitutes a prohibition *per se*. Therefore, no one could commit a violation of Art. 1 of the Gasoline Act, *supra*, since such an article did not prohibit and does not prohibit anything.

Finally, the same thing happened with Art. 3 of the Gasoline Act, *supra*, 23 L.P.R.A. sec. 1103. Such an article established at that time —and this remains the same currently— the creation of the "Inter-agency Committee on the Gasoline Industry." As was the case with Art. 1 ("Definitions"), Art. 3 did not constitute any prohibition, so the inclusion **\*921** of that article in the enumeration established by the amendment of Act No. 157 to Art. 8 of the Gasoline Act, *supra*, was totally inconsequential.

As such, the question that is applicable is what the final wording and approval of Art. 8 of the Gasoline Act, *supra*, was due to, after the amendment made by Act No. 157. Although the legislative history does not give us much to go on in this regard, we do

find that the first version of amendment to this article (which was presented in the Bill of the House of Representatives) indicated that "any violation of Articles 2, 4, *4A*, 5, *5A*, 6, *6A*, and 7, would constitute an unfair or deceptive practice or act." (Emphasis in the original and added.) [32]

32    See Bill 2288 of January 30, 1996, 7th Ordinary Session, 12 Legislative Assembly, p. 7.

On the other hand, when codifying the version of the second and last amendments made to this article through Act No. 74-2005, the following codifying note is indicated in its history:

> The amending law of 1996 appears to have referred to Arts. 1, 2, 3, 4 and 5 of the law itself instead of the articles amended or added thereto, namely: Arts. 1, 2, 4A, 5A and 8, i.e., sec. 1101, 1102, 1104a, 1105a and 1108 of this title. *However, because it is similar to the content of the sections originally referred to in the 1978 law, it could be the case that the 1996 law attempted to refer to Arts. 4, 4A, 5 and 5A of the law, sec. 1104, 1104a, 1105 and 1105a of this title.* (Emphasis added.) 23 L.P.R.A. sec. 1108 n.

In considering all of the above, we are sure that the version of Art. 8 of the Gasoline Act, *supra*, which arose as a result of the amendment made by Act No. 157 was the product of a likely typographical error, which did not reflect the intention or will of the legislator. As the codification note of the history of this article suggests, we understand that the intent of Act No. 157 was to include Arts. 4, 4A, 5 and 5A in version **\*922** of Art. 8 of the Gasoline Act, *supra*, and its exclusion responds to a mere administrative error (*clerical error*).

[10]    We determined the foregoing, considering the legal hermeneutical standard that we reiterated in *Passalacqua v. Mun. of San Juan*, 116 D.P.R. 618, 623 (1985), where we indicated the following:

> In *Roig Commercial Bank v. Buscaglia, Tes.*, 74 D.P.R. 986, 998 (1953), this Court determined that if a word, phrase or provision has been approved by mistake or error, *especially if it is contrary to the rest of the law or would limit its effectiveness, it can be eliminated. We understand that under the same circumstances a phrase or words can be added, so that legislative intent can be fulfilled.* (Emphasis added.)

So, being consistent with what our guideline has been in terms of legal interpretation when confronting situations in a law such as the case in question, we determined that the legislator intended that Art. 4A was to be part of those listed in Art. 8 of the Gasoline Act, *supra*, since the approval of Act No. 157; this must be interpreted in this way.

[11]    To finalize the analysis of the articles of the Gasoline Act that are necessary to consider for the resolution of the case in question, we must refer to Art. 7 of the aforementioned law, 23 L.P.R.A. sec. 1107. This article provides the following:

*Sec. 1107. Obligation of the retailer*

No individual or legal entity *operating a retail service station* may knowingly request or induce the concession, or reduction in prices or the rental of equipment and signage, in violation of sections 1104 and 1105 of this title. (Emphasis added.)

As it clearly arises from its text—including from the title—this article is intended *only* for the retail seller of fuel, prohibiting it from knowingly inducing or requesting a **\*923** producer or distributor-wholesaler (among others) to grant or reduce prices or the rental of equipment and signage, in violation of Arts. 4 and 5 of the Gasoline Act, *supra*. In other words, the object of prohibition is that *retailer* who intends to request or induce a producer or distributor to provide different prices on gasoline or special fuels,

other than those provided to other retailers, in violation of Art. 4 of the Gasoline Act, *supra.* Likewise, the article is intended only for the *retailer* who requests or induces the producer or distributor-wholesaler (among others) to provide it with a different rental cost for equipment and signage than that provided to other retailers, in violation of Art. 5 of the Gasoline Act, *supra.*

B. *Antitrust Act*

**[12]**   Antitrust laws, as well as those that seek to establish fair competition and that establish restrictions on trade, constitute statutes that require extreme care both in their legislation and in their legal interpretation. The objective that inspires this type of statute is based on pressing interests and, as such, indispensable for the economy of the jurisdiction in which they are applied.

Thus, in *Colón Cabrera v. Caribbean Petroleum*, [33] we expressed in relation to our Antitrust Act that, "considering that it is a matter that affects the foundation of our democratic society, we understand that the purposes underlying said legislation are of the highest hierarchy and constitute an urgent interest of the State."

33      170 D.P.R. 582, 595 (2007).

The main purpose of this type of statute lies in the fundamental economic principle that provides for the preservation of freedom of competition and the hindrance of **\*924** any practice that harms the development of the different markets. Therefore, such statutes aim to eradicate abusive, unfair and monopolistic acts that tend to limit commercial activity, thus favoring free and open competition in the markets. [34]

34      J. von Kalinowski, *Antitrust Laws and Trade Regulation*, Sec. 1.02, Second ed. (2004).

**[13]**   In Puerto Rico, the Antitrust Act was drafted based on two federal statutes: the Sherman [35] Act and the Clayton Act. [36] In fact, this is also the pattern in most states of the Union that also have statutes that in some manner regulate competition, monopolies, and trade restrictions, and that contain provisions comparable to those of federal antitrust laws.

35      15 U.S.C.A. seq. 1 *et seq.*

36      15 U.S.C.A. seq. 12 *et seq.*; *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, 149 D.P.R. 691, 706–707 (1999).

Our Antitrust Act was enacted "to ensure for the Public in general, and small merchants in particular, the benefits of free competition." [37] As we pointed out in *Colón Cabrera v. Caribbean Petroleum*, supra, p. 594, the purpose of the Antitrust Act is to

37      *G.G. & Supp. Corp. v. S. & F. Systs., Inc.*, 153 D.P.R. 861, 869 (2001).

... avoid "collusion between businesses to dominate the market, [the] hoarding of raw materials, improper increases in prices resulting from a monopolistic position, discriminatory practices in customer relations [and the] extreme concentration of economic activity and wealth in some large consortia of companies." (Square brackets in original.)

However, with regard to the dispute in question, it is necessary to consider, in particular, Articles 3(a) and 12(a) of the Antitrust Act. **\*925**

## C. *Art. 3(a) of the Antitrust Act*

**[14]**   Where relevant, Art. 3(a) of the Antitrust Act [38] provides that "unfair methods of competition, as well as *unfair or deceptive practices or acts* in business or trade" shall be illegal. (Emphasis added.) Likewise, subsection (c) of this article establishes the following:

38      10 L.P.R.A. sec. 259(a).

(c) Without prejudice to the power to use the means authorized by sec. 269 of this title [*injunctions*], the Antitrust Affairs Office may file [sic] and process administrative complaints with the Department of Consumer Affairs to avoid, prevent and stop violations of subsection (a) of this section or the regulations approved in accordance with subsection (b) thereof. [39]

39      10 L.P.R.A. sec. 259(c).

Unlike other provisions of the Antitrust Act, Art. 3 was based on Sec. 5(a)(1) of the law created by the Federal Trade Commission (15 U.S.C.A. sec. 45), which, like Art. 3(a), declares unfair methods of competition and unfair or deceptive acts or practices affecting trade to be illegal. [40]

40      Session Diary of the Senate of Puerto Rico of May 22, 1964, page 1706.

**[15–16]** On the other hand, subsection (c) of Art. 3 of the Antitrust Act, 10 L.P.R.A. sec. 259(c) expressly empowers the Antitrust Affairs Office of the Department of Justice to act as an oversight body before the D.A.Co. regarding any violation by "unfair methods of competition, as well as unfair or deceptive practices or acts in business or trade." The Antitrust Affairs Office was created through Art. 16 of the aforementioned statute to implement the purpose that inspires it. [41] The O.A.M. is an entity attached to the Department ***926** of Justice, with powers for the administration of legislation on monopolistic practices, as well as for the oversight thereof. In addition, it has the power to enact regulations and proscribe actions that constitute unfair methods of competition and unfair or deceptive practices or acts in business or trade. [42] In short, the O.A.M. is an entity created with a delegation of broad powers that allows the State to have the precise investigative instruments to fulfill the oversight purpose of the Antitrust Act. [43] There is no doubt that, according to Art. 3 of the Antitrust Act, *supra*, the O.A.M. is the government body with the ministerial duty to supervise and ensure compliance with that law.

41      Art. 16(a) of the Antitrust Act, 23 L.P.R.A. sec. 272(a).

42      10 L.P.R.A. sec. 259(b).

43      *Colón Cabrera v. Caribbean Petroleum*, supra, p. 594.


**[17]**   However, note that Art. 3 of the Antitrust Act, *supra, does not* confer adjudicative powers on the O.A.M. That is, the O.A.M. is not made responsible for adjudicating the dispute, but rather for investigating and presenting the cause of action. Subsection (c) of Art. 3 of the Antitrust Act, *supra*, provides not only that it is before D.A.Co that the O.A.M. may file and process complaints seeking to avoid, prevent and stop violations of subsection (a) of the article itself, but that the rest of the article establishes an entire procedural and appeal scheme that must be followed before that agency and of which we will mention some details.


Thus, subsection (c) of Art. 3 of the Antitrust Act, *supra*, establishes that once the defendant has been notified of the complaint against it, the D.A.Co. must hold a hearing and resolve the dispute between the parties, granting the most appropriate remedy as soon as possible. [44] Meanwhile, subsection (d) establishes that the O.A.M. will have a term of thirty days to appeal for review ***927** the decision of the D.A.Co. to the Court of First Instance, if the result goes against it. [45] For its part, subsection (e) establishes how such an appeal for review will be formalized before the Court of First Instance, of which the defendant and the D.A.Co. must be notified, which will have a term of fifteen days to request an intervention. [46]

44      23 L.P.R.A. sec. 259(c).

45      23 L.P.R.A. sec. 259(d).

46      23 L.P.R.A. sec. 259(e).

Subsection (g) states that the Court of First Instance will review the decision of the D.A.Co. based on the administrative record that was submitted to the agency and only with respect to the conclusions of law. *In addition, the D.A.Co's factual determinations "will be conclusive to the court if supported by substantial evidence."* [47]

47      23 L.P.R.A. sec. 259(g).

It is evident that by the direct reference to that agency, by the very detailed procedure established before it, and considering the nature of the causes of action that the antitrust disputes involve —especially in the face of allegations of unfair or deceptive practices or acts— the legislator decided that it was the D.A.Co. that had the exclusive primary jurisdiction to process and

adjudicate any complaint filed by the O.A.M.

**[18]**   The exclusive primary jurisdiction of the D.A.Co. in this matter is further confirmed by the Internal Law of the Department of Consumer Affairs itself, Act No. 5 of April 23, 1973, as amended, [48] which in its Art. 6(x) includes among the powers and faculties that the Secretary of Consumer Affairs will exercise the "adjudication of the complaints that the Antitrust Affairs Office of the Department of Justice files [sic] and processes under the provisions of sec. 259 [Art. 3] of **\*928** Title 10." [49] As we see, in harmony with Art. 3(c) of the Antitrust Act, subsection (x) of Art. 6 of the Internal Law of the D.A.Co. confers jurisdiction on that agency to adjudicate the complaints presented to it by the O.A.M. under Art. 3 of the Antitrust Act.

48      3 L.P.R.A. sec. 341e(x).

49      Id.

**[19]**   In conclusion, it is the Department of Justice, through the O.A.M., to which, according to the legislative mandate, is responsible for directly overseeing the violations of the Antitrust Act, specifically with regard to the violations of the provisions of unfair trade practices, including any unfair or deceptive practice or act. In addition, we conclude that, in accordance with Art. 3 of the Antitrust Act, *supra*, the D.A.Co. has the exclusive primary jurisdiction in any antitrust cause of action undertaken by the O.A.M., whose cause of action is based on any unfair or deceptive practice or act.

### D. *Art. 12(a) of the Antitrust Act*

**[20–21]**   As we have already established, a violation of the prohibition of operational association established in Art. 4A of the Gasoline Act, *supra*, constitutes an "unfair or deceptive practice or act," an action that would be subject to the provisions of our Antitrust Act, in accordance with Art. 8 of the Gasoline Act, *supra*. Therefore, in view of the allegation of a violation of the provision that requires such "operational separation," refer to those articles of the Antitrust Act that concern "unfair or deceptive practices or acts" in trade, to resolve any questions on this matter. We have already analyzed Art. 3 of the Antitrust Act, *supra*, so it now remains to discuss Art. 12 of the aforementioned statute, specifically subsection (a), which provides: **\*929**

*Sec. 268. Suits by injured persons*

(a) Anyone who is injured in their business or property by another person, due to acts, or attempted acts, prohibited or declared illegal by the provisions of this chapter, *except for those of seq. 259* and 261 of this title, may sue for such acts before the Court of First Instance and shall be entitled to recover three (3) times the amount of the damages and losses caused, plus the costs of the proceeding and a reasonable amount for attorney's fees. (Emphasis added.) [50]

50      10 L.P.R.A. sec. 268(a).

Art. 12(a) of the Antitrust Act, *supra*, establishes the so-called "treble damages remedy" for any person who suffers damages as a result of antitrust acts. The legal action to recover such damages must be initiated within four years, counted from the origin of the cause of action. [51] However, it *is clearly deduced from the text of this subsection (a) of Art. 12 of the Antitrust Act*, supra, *that, without any distinction, it exempts from its jurisdictional scope any cause of action that is intended or has to be initiated under sec. 259 of the Antitrust Act itself; that is, any cause of action for unfair or deceptive practices or acts.*

51      10 L.P.R.A. sec. 268(c).

### III

In the present case, we do not have any doubts regarding the fact that a private person, whether and individual or legal entity, lacks active standing to file a cause of action against a distributor-wholesaler for alleged violation of Art. 4A of the Gasoline Act, *supra*. This clearly arises from each statute concerned. As follows.

Art. 8 of the Gasoline Act, *supra*, establishes as a "unfair [or] deceptive practice or act" any violation of Art. 4A of the

aforementioned law and states that such violation **930** "will be subject to the provisions of sec. 257 et seq. of Title 10," that is, to section 257 "and the following" of the Antitrust Act.

For its part, Art. 3(a) of the Antitrust Act (10 L.P.R.A. sec. 259(a)) declares as illegal "unfair or deceptive practices or acts," which is precisely the conduct described and referred to the scope of that law by Art. 8 of the Gasoline Act, *supra*. Note, then, that there is clear identification or concordance in the language used in both provisions. So, by the clear language of both statutes—Gasoline Act and Antitrust Act—, it is evident that the legislator provided, through Art. 8 of the Gasoline Act, *supra*, that any violation of Art. 4A of that law was to be included, covered or under the jurisdictional scope of Art. 3 of the Antitrust Act, *supra*.

[22]   Once we determine that the conduct prohibited by Art. 4A of the Gasoline Act, *supra*, is under the jurisdictional scope of Art. 3 of the Antitrust Act (10 L.R.P.A. sec. 259), we face Art. 12(a) of the Antitrust Act, *supra*, which, in turn, expressly exempts from its jurisdictional scope any action that is filed under the aforementioned section 259. Therefore, any private person who suffers damages due to actions prohibited by the Antitrust Act has a treble damages remedy under Art. 12(a) of the Antitrust Act, *supra*, *except when their cause of action is based on Art. 3 of the Antitrust Act (10 L.P.R.A. sec. 259).* [52] This being the case, obviously, *any cause of action under Art. 4A of the Gasoline Act*, supra, is *excluded from the possibility of the remedy **931** of treble damage provided by Art. 12(a) of the Antitrust Act,* supra.

52      Art. 12(a) also includes within that exception the provisions of 10 L.P.R.A. sec. 261.

[23]   In this context, Esso argues that the court of instance erred by not dismissing, under Rule 10.2 of Civil Procedure, the claim of the appellees based on Art. 4A of the Gasoline Act. [53] And it is correct. Rule 10.2 of Civil Procedure of 1979 (32 L.P.R.A. Ap. V) establishes privileged defenses that, as such, can be presented at any time in the proceeding. [54] That is, such defenses are not lost if they are not put forth in the response to the claim or earlier. Among those privileged defenses, Rule 10.2 includes the lack of jurisdiction over the subject matter. [55]

53      See pleading of the petitioning party, p. 15.

54      R. Hernández Colón, *Legal Practice of Puerto Rico: civil procedural law*, 4th ed., San Juan, Ed. Lexisnexis, 2007, Sec. 2601, p. 234.

55      The new Rule 10.8(c) of Civil Procedure, 32 L.P.R.A. Ap. V, points out that "whenever it arises, at the direction of the parties or otherwise, that the court lacks jurisdiction over the matter, it will dismiss the lawsuit."

[24]   Recently, in *Gonzalez v. Mayagüez Resort & Casino*, 176 D.P.R. 848, 855 (2009), we reiterated our guideline in the sense that the absence of jurisdiction on the matter:

(1) is not capable of being remedied; (2) the parties may not voluntarily confer it on a court of law nor may the court give it to them; (3) entails the nullity of the opinions issued; (4) imposes on the courts the unavoidable duty to sound out their own jurisdiction; (5) imposes on the appellate courts the duty to examine the jurisdiction of the venue from which the appeal comes, and (6) may occur at any stage of the procedure, at the request of the parties or by the court ex officio.

[25]   On the other hand, a plaintiff party has active standing if it meets the following requirements: "(1) it has suffered clear and palpable damage; (2) the aforementioned damage is real, immediate and precise, and not abstract or hypothetical; (3) **932** there is a connection between the damage caused and the cause of action exercised, and (4) *the cause of action arises under the protection of the Constitution or of a law."* (Emphasis added.) [56] Therefore, considering that, as we have established, a private person cannot file a cause of action for alleged violation of Art. 4A of the Gasoline Act, *supra*, the appellees lack a cause of

action that arises under the protection of a law. Thus, the court of instance certainly lacked jurisdiction over the matter to address such cause of action and should have dismissed it, in accordance with Rule 10.2 of Civil Procedure of 1979, *supra.*

56    *Col. Peritos Elec. v. A.E.E.,* 150 D.P.R. 327, 331 (2000). See also *Hernandez Torres v. Governor,* 129 D.P.R. 824, 835 (1992).

**[26]**   On the other hand, we recently established in *SLG Semidey Vázquez v. ASIFAL,* 177 D.P.R. 657, 676 (2009), that "if [a] statute confers jurisdiction on the administrative body, it is an (exclusive) statutory jurisdiction." [57] In that case, we also established the following:

57    See also Mr. Fernandez, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme [Administrative Law and Uniform Administrative Procedure Law],* 2nd ed. rev., Bogotá, Ed. Forum, 2001, Sec. 8.3, p. 437 esc. 1.

The concept *of statutory or exclusive jurisdiction* relates to concurrent primary jurisdiction but is different in scope and nature. In exclusive jurisdiction, these are situations in which the doctrine of *concurrent primary jurisdiction* does not apply because the law itself clarifies that the latter does not exist. That is, the statute itself establishes an exclusive jurisdiction. In such cases we are facing a legislative mandate. Hence, when a statute expressly confers jurisdiction on an administrative body on certain types of matters, the courts will not have the authority to determine the case in the first instance. Of course, the exclusive primary jurisdiction does not preclude further judicial review of the body's decision. (Quotes omitted and emphasis in the original.) [58]

58    *SLG Semidey Vázquez v. ASIFAL,* 177 D.P.R. 657, 677 (2009).

**[27]**   In observing the express, broad and detailed manner in which the legislator explained himself, we determine **\*933** that, with the exception of the remedies authorized by sec. 269 (*injunctions*), Art. 3 of the Antitrust Act, *supra,* confers exclusive primary jurisdiction on the D.A.Co. in the elucidation of any violation of subsection (a) of the article itself, that is, the use of unfair methods of competition and unfair or deceptive practices or acts in business or trade.

With regard to the determination of the court of instance in the sense that "a private entity such as the plaintiff may file a cause of action under Article 7 of the Gasoline Control Act," from what we have already explained, we determine that it is clearly erroneous. Art. 7 of the Gasoline Act, *supra,* provides for a cause of action against the retailers and not in favor of them. On the other hand, in addition to the fact that the interpretation of such statute by the primary court was not correct, the truth is that the appellees never claimed a cause of action under Art. 7 of the Gasoline Act,

rather under Art. 7 of the Antitrust Act, *supra.* [59]

59    See the claim filed by the appellees. Appendix of the *Cteriorari Petition,* pp. 79–84.

**[28]**   However, in relation to the fact that the cause of action of the appellees can be compensated as a simple or ordinary remedy for damages and losses under Art. 1802 of the Civil Code, 31 L.P.R.A. sec. 5141, we do not find anything in the law that prevents it; on the contrary. As the Solicitor General points out in her special appearance, the following arises from the discussion outlined in the legislative history in relation to the house reports that originated the Antitrust Act:

With regard to the actions of individuals, for treble damage, these are not authorized with respect to the acts prohibited by Article 3, *without this being used to affect the right to file an ordinary action for damages and losses, if it was appropriate* **\*934** in *accordance with the Civil Code or other principles of law.* (Emphasis added.) [60]

60      Diary of the sessions of the House of Representatives, May 22, 1964, p. 1708.

As we can see, the legislator's expressions were clear. The Legislative Assembly did not intend that a cause of action such as that in the case in question could be barred from being compensated as a simple or ordinary remedy for damages and losses under Art. 1802 of the Civil Code, *supra.* The opposite is true.

Finally, at the end of their arguments the appellees state that the cause of action in this litigation includes events occurring from 2000 to 2005, a period of time in which Art. 8 of the Gasoline Act, *supra*, had not been amended to include Art. 4A . Therefore, the appellees conclude that as such an amendment occurred after the filing of their cause of action, this—the 2005 amendment—would have a retroactive effect in violation of Art. 3 of our Civil Code. [61] They are incorrect.

61      Art. 3 of the Civil Code establishes the following:

   "The laws will have no retroactive effect, if they do not provide otherwise. Under no circumstances may the retroactive effect of a law prejudice the rights acquired under previous legislation." 31 L.P.R.A. sec. 3.


First, we have already determined, based on the analysis of the amended article and the legislative history of Act No. 157, *supra*, that the intention of the Legislative Assembly was that Art. 4A of the Gasoline Act, *supra*, was to be included under the jurisdictional scope of Art. 8 of the law itself, from the amendment of 1996. This is how we interpret it.

But, in addition, if we accept the proposal of the appellees in the sense that Art. 8 of the Gasoline Act, *supra*, did not include in its jurisdictional scope Art. 4A for the year in which they filed their cause of action, we would still have to resolve that the 2005 amendment would not constitute an amendment with a retroactive effect. By this we mean the following. **\*935**

The inclusion of Art. 4A of the Gasoline Act, *supra*, to the jurisdictional scope of Art. 8 of the Gasoline Act, *supra*, by amendment of 2005, constituted a change in the jurisdictional aspect of this article. That is, since the 2005 amendment, all causes of action under Art. 4A of the Gasoline Act, *supra*, fall under the jurisdictional scope of Art. 3 of the Antitrust Act, *supra* (10 L.P.R.A. sec. 259). As such, the 2005 amendment, in effect, resulted in the fact that private causes of action could no longer be exercised under this article and that it is the D.A.Co. that was granted exclusive primary jurisdiction.

Since 1905, this Court resolved, interpreting Art. 3 of the Civil Code, *supra*, that

   ... it is a principle of Spanish law, that *the statutes that regulate jurisdiction and procedure are in the public interest, and begin to govern retroactively,* [or] rather, that they are not considered retroactive in this sense, when they are included under the restrictions of this article. (Emphasis added.) [62]

62      *American Railroad Co. of P.R. v. Hernandez,* 8 D.P.R. 516, 520 (1905).

Also in *Texas Co. v. Sancho Bonet, Tes.*, 52 D.P.R. 658, 667(1938), we note that

   ...as stated in 59 Corpus Juris 1173, summarizing the jurisprudence, "... The general rule that the statutes shall only be interpreted prospectively and not retrospectively or retroactively, *ordinarily is not applicable to statutes affecting the remedy or procedure, or, in other words, that general rule is subject to an exception when it is a statute relating to the remedy or procedure.*" (Emphasis added.)

Thus, considering that the amendment produced by Act No. 74-2005 to Art. 8 of the Gasoline Act, *supra*, clearly had an effect on the processes and jurisdiction of the court of instance in causes of action under Art. 4A of the Gasoline Act, *supra*, such **\*936** amendment is retroactive in the context that Art. 3 of the Civil Code, *supra*, prohibits it. [63]

63      *J.R.T. v. A.E.E.*, 133 D.P.R. 1, 13, (1993). See also: *Texas Co. v. Sancho Bonet, Tes.*, 52 D.P.R. 658, 667 (1938); R.E. Bernier and J.A. Cuevas Segarra, *Aprobación e intepetación de las leyes en Puerto Rico [Approval and interpretation of the laws in Puerto Rico]*, 2nd ed., San Juan, Pubs. J.T.S., 1987, Vol. I, Chap. 63.

## IV

Due to all of the above, *the Resolution issued by the Court of Appeals is revoked and, consequently, the cause of action based on Art. 4A of the Gasoline Act*, supra, *before the Court of First Instance, is dismissed, due to lack of jurisdiction.*

*A judgment in this sense will be issued.*

The Presiding Judge Mr. Hernández Denton issued a dissenting opinion, which was joined by the Associate Judge Ms. Rodríguez Rodríguez.

## --O--

Dissenting opinion issued by the Presiding Judge Mr. Hernández Denton, which was joined by the Associate Judge Ms. Rodríguez Rodríguez.

Given that neither the Gasoline Producers, Refiners and Distributors-Wholesalers Control Act, Act No. 3 of March 21, 1978, as amended, 23 L.P.R.A. sec. 1101 *et seq.* (Gasoline Act), nor the Antitrust and Restriction of Trade Act, Act No. 77 of June 25, 1964, as amended, 10 L.P.R.A. sec. 257 *et seq.* (Antitrust Act), prevent a market participant from filing an action for damages for violations of the prohibitions of the aforementioned laws, we dissent from the course followed by a majority of this Court. In essence, we cannot **\*937** agree because the outcome of the Court's Opinion is contrary to the purposes of the antitrust statutes in dispute.

## I

The plaintiffs, Aguadilla Paint Center, Inc., CB Gasoline Service Group, and Micada de Puerto Rico, Inc. are retailers or retail sellers of gasoline imported, distributed, and sold by Esso Standard Oil (Esso), in other words, they are brand retailers. In 2004, the retailers filed a claim against Esso in which they charged it with incurring in the unlawful practice of operational association and discrimination of prices and discounts, in contravention of Art. 4A of the Gasoline Act, 23 L.P.R.A. sec. 1104a, and Art. 7 of the Antitrust Act, 10 L.P.R.A. sec. 263. Likewise, they requested compensation under Art. 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. sec. 5141. Specifically, the plaintiffs allege that Esso controls the operation of gasoline stations in violation of Art. 4A, because it establishes the cost of the gasoline, the amount of gasoline sold, the frequency with which the gasoline is purchased, the delivery thereof, the method of payment, the suggested sale price and the rental of the service stations. On the other hand, the cause of action for violation of Art. 7 of the Antitrust Act is based on the fact that, allegedly, Esso maintains a price discrimination system in relation to equally situated buyers.

For its part, Esso requested the dismissal alleging, in essence, that these two causes of action can only be filed by the Department of Justice. Therefore, the plaintiffs lacked active standing.

The Court of First Instance ruled that the motion for dismissal was "inadmissible" and the intermediate appeal venue maintained that opinion by not issuing the requested order, because it was not in a position to intervene in that procedural stage. **\*938** Dissatisfied, Esso approached this court. For their part, the plaintiffs, whose arguments were excluded from the Opinion of the Court, argue that they are aware that there are a series of remedies in the aforementioned statutes that have been entrusted to the Department of Justice. Specifically, they argue that the preliminary and permanent *injunctions* recognized in such laws to paralyze prohibited actions are the exclusive competence of the Secretary of Justice and that is who has active standing to seek them. However, the plaintiffs do not seek to interfere with those remedies. Their only request is to be allowed to demonstrate that Esso caused them damages by violating the precepts of both laws by incurring in operational association practices and price discrimination. Even though they originally requested it in their claim, the plaintiffs argue before us that they do not claim the treble damages remedy, recognized in the antitrust statutes of the United States and Puerto Rico. Again, they only want to be allowed to demonstrate how, by engaging in the practices prohibited by the aforementioned statutes, damage was caused to them that, in some cases, resulted in the bankruptcy of family businesses.

## II

### A. *Antitrust statutes*

The Gasoline Act aims to combat the control of energy product supplies and eliminate the competitive advantages existing in the gasoline market. Therefore, our Legislative Assembly sought competitive uniformity and implemented prohibitions on discriminatory and price control practices. A few months later, Act No. 73 of June 23, 1978 (23 L.P.R.A. sec. 1131 *et seq.*) (Law 73) was approved, for the purpose of declaring the gasoline industry—in all its facets—as having the status of being in the *public interest.* **\*939**

In turn, Law 73, *supra*, implemented a series of prohibitions on lease and sublease agreements, and other types of association between wholesalers and retailers. In addition, it established that wholesalers are required to submit to the Department of Justice's Antitrust Affairs Office (O.A.M.) a copy of all their contracts with retailers. Likewise, Law 73 provided that it recognized the existence of the Antitrust Act and that nothing in the former would contravene the latter. That is, the Legislative Assembly was aware of the Antitrust Act and its operation.

In harmony with the above, Art. 4A of the Gasoline Act, 23 L.P.R.A. sec. 1104a, provides that

> no... distributor-wholesaler may, by agreement... directly operate a gasoline retail service station in a manner that prevents its complete operational separation. No... distributor-wholesaler may, by agreement ... directly impose, require, fix or limit the profit margin and/or retail price of gasoline... at the retail service station.

Likewise, Art. 8 of the Gasoline Act, 23 L.P.R.A. sec. 1108, provides that "any violation of sec. 1102, 1102a, 1104, *1104a*, 1105 and 1105a, of this title shall constitute an unfair or deceptive practice or act and shall be subject to the provisions of sec. 257 *et seq.*, of Title 10." (Emphasis added.) The latter on sec. 257 et seq. of Title 10 refers to the Antitrust Act.

On the other hand, the Antitrust Affairs Office of the Department of Justice has a series of remedies and powers to monitor compliance with the Antitrust Act. It should be noted that all sections of that law referred to by the Opinion of this Court provide that the O.A.M. "may" perform certain acts. **\*940**

On the other hand, Art. 7 of the Antitrust Act provides, where relevant, that:

> (a) It shall be illegal for any person, directly or indirectly, to discriminate in price between different buyers of commercial things of the same grade and quality, when those things are sold for use, consumption or resale in Puerto Rico, and where the effect of such discrimination may be to substantially reduce competition or tend to create a monopoly on any line of commerce in Puerto Rico or affect, destroy or prevent competition with any person who has granted or knowingly received the benefit of such discrimination, or any customer of one of these. 10 L.P.R.A. sec. 263.

Finally, Art. 12 of the Antitrust Act provides:

> (a) Any person who is injured in their business or property by another person, due to acts, or attempted acts, prohibited or declared illegal by the provisions of this chapter, except for those of *Sections 259* and 261 of this title, may sue because of such acts before the Court of First Instance and shall be entitled to

recover three (3) times the amount of the damages and losses experienced, plus the costs of the proceeding and a reasonable amount for attorney's fees. (Emphasis added.) 10 L.P.R.A. sec. 268.

As this last article excludes the actions under 10 L.P.R.A. sec. 259, today this Venue concludes that not just any person may file that action, rather the O.A.M. will be the only body entitled in accordance with that provision of the Antitrust Act. Therefore, it orders the dismissal of the causes of action under the Gasoline Act and the Antitrust Act, although it allows the case to continue with regard to the allegations of damages according to Art. 1802 of the Civil Code, *supra*.

As we will see later, that analysis is contrary to what is expressed in *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 D.P.R. 497 (1994). There, we established the origin and encompassing purposes of Art. 2 of the Antitrust Act, **\*941** 10 L.P.R.A. sec. 258. It seeks to avoid any act, contract or conspiracy to unreasonably restrain business or trade in Puerto Rico. To this end, our Legislative Assembly adopted the same text as Sec. 1 of the *Sherman Act*, 15 U.S.C.A. sec. 1. See: *Pressure Vessels*, supra; *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 4 (1958).

In addition, we established that both the text of our article and federal doctrine agree that there are three requirements that must be established to demonstrate a violation of this provision: (1) there must be a contract, combination or conspiracy between two or more entities, (2) which unreasonably restricts business or trade (3) in Puerto Rico. *Pressure Vessels P.R. v. Empire Gas P.R.*, supra, p. 509. Finally, in the aforementioned case, we resolved that a plaintiff may bring evidence to demonstrate the unreasonable nature of certain contracts based on their substantially adverse effect on free competition, this as a vehicle to prove that, "as a result of the violation of the law, the plaintiff has suffered damage." Id., p. 520.

### B. *Grant of regulatory power*

On June 23, 1978, the Legislative Assembly passed two laws that concern us in relation to the current dispute. The first is Act No. 72, which had the purpose of adding to Art. 3 of the Antitrust Act, *supra*, a provision "in order to authorize the Antitrust Affairs Office to file and process complaints for violations of this article in the Department of Consumer Affairs," "to authorize said Department to resolve said complaints and impose the penalties provided herein" and "to establish the procedural process for the judicial review of said complaints." See Act No. 72 of June 23, 1978 (1978 Puerto Rico Laws 256–257). In addition, that law clearly establishes that what was desired was "to provide an *additional forum to* **\*942** *the existing ones* where unfair acts or methods in business and trade can be reviewed." (Emphasis added.) Id., page 257.

In turn, the second approved law, Act No. 73, was established with the purpose of "authorizing the Departments of Justice, Trade and Consumer Affairs, the Planning Board, the Administration of Regulations and Permits, and the Public Service Commission to adopt and implement the regulations necessary to put into effect the purposes and objectives of this law." 1978 Laws of Puerto Rico 259. The Statement of Reasons of this law provides that "government intervention in its exercise of the State's Reasoning Power is necessary to avoid dislocation in the integrity, functionality and competition that must prevail in the gasoline market in Puerto Rico, an industry vital to the best interests of the citizens and the economic dynamics of the country." Id., page 260. Later, that same law prescribes in Art. 5 that "nothing herein provided or enacted by regulation or otherwise, in accordance with the provisions of this law, shall be interpreted as creating an exemption or conferring immunity as to the applicability of the provisions of Act No. 77 of June 25, 1964, as amended." Id., page 264.

This being the case, the Legislative Assembly wanted to add an administrative remedy with the purpose of adding tools to the antitrust fight. Nonetheless, nothing herein provided on the administrative powers and procedure was intended to eliminate the remedies recognized by the Antitrust Act, as well provided for in Art. 5 of Act No. 73, *supra*.

That legislative action is entirely consistent with the 1970 amendment to the Antitrust Act. By means of Act No. 67 of May 30, 1970, an amendment was made to Art. 3 of the Antitrust Act, *supra*, which provides that "without [text cut-off] **\*943** authorized in Article 13 [which deals with the remedy of *injunction*], the Antitrust Affairs Office, by means of rules and regulations enacted ... may proscribe specific acts or practices..." (Scholiums omitted.) Act No. 67 of May 30, 1970 (1970 Puerto Rico Laws 185).

Therefore, Art. 3 of the Antitrust Act, *supra*, as amended, simply recognizes the administrative power to regulate unlawful practices and provides a venue before the Department of Consumer Affairs to examine violations of the statutes discussed herein.

### III

On the basis of the foregoing, we disagree with the result of the majority opinion. We consider that nothing in the statutes we have discussed prevents the plaintiffs' active standing and that, despite the fact that, according to Art. 12 of the Antitrust Act, *supra*, Art. 3 is excluded, the plaintiffs' action in no way contravenes the legislative delegation of power to regulate, which is granted in that Art. 3. In summary, the claimants should be allowed to prove a case of damages for violations of the specific provisions of the statutes discussed herein. As follows.

The Gasoline Act was adopted following the passage of the Antitrust Act. Likewise, the former expresses that the Legislative Assembly was aware of the provisions of the latter, at the time of approving it. The Gasoline Act states in its Art. 8 that any violation of several of its articles, including Art. 4A, "shall constitute an unfair [or] deceptive practice or act and shall be subject to the provisions of sec. 257 *et seq.* of Title 10." 23 L.P.R.A. sec. 1108.

When we examine sec. 257 et seq. of Title 10, that is, the Antitrust Act, we find that the Civil Code of Puerto Rico, *supra*, asks us: what ale [text cut-off] Art. **944** 12 recognizes a cause of action to "any person who is harmed in their businesses or properties by another person, by reason of acts, or attempted acts, prohibited or declared illegal by the provisions of this chapter, except those of sections 259 and 261..." 10 L.P.R.A. sec. 268.

In harmony with the legislative purposes of our statutes and the federal statutes on which local legislation is based, *that cause of action is entirely independent of the legislative power to regulate that was conferred on the administrative agencies by Art. 3 of the Antitrust Act*, supra.

This is important because, according to the Court's Opinion, the practices that violate Art. 8 of the Gasoline Act, *supra*, would only be subject to action in accordance with the aforementioned Art. 3 of the Antitrust Act, which provides that "[t]he unfair methods of competition, as well as unfair or deceptive practices or acts in business or trade, are hereby declared illegal." 10 L.P.R.A. sec. 259. That is, because Art. 8 of the Gasoline Act declares "unfair and deceptive acts" to be prohibited in said law and that, as Art. 3 of the Antitrust Act is the one that prohibits "unfair and deceptive acts," and this, in turn, is excluded from Art. 12 of the Antitrust Act that recognizes the treble damages action, then the plaintiffs do not have that cause of action available for violations of the Gasoline Act.

That textual interpretation—which the petitioner proposes and which this Court fully adopts—is entirely contrary to the purposes of both laws. In addition, the items claimed by the plaintiffs should not be construed as the only items of those laws that allow an action for damages. While that interpretation made by the Opinion of this Court allows the plaintiffs to continue with their cause of action in damages in accordance with Art. 1802 of the Code **945** [text cut-off] ‐gations could be filed by the plaintiffs to demonstrate that it was the prohibited practices of the defendant that caused the damages they seek to indemnify, if the causes of action under the Antitrust Act and the Gasoline Act have been dismissed?

We believe that a different interpretation could have been reached. Even more so in light of the fact that the Court's own Opinion recognizes the direct origin of our antitrust statutes from their federal analogs.

In the United States, private antitrust actions play a critical role in the antitrust regime. *Antitrust Laws and Trade Regulation*, Chap. 160, Sec. 160.01, page 160-2 (Mathew Reader). "*In enacting the antitrust laws, the US Congress was convinced that 'private antitrust litigation is one of the surest weapons for effective antitrust enforcement' and that private suits are an important element of the Nation's antitrust enforcement' scheme .... The Supreme Court has labeled 'the private action as a vital means of enforcing the antitrust policy of the United States' and as an 'important weapon of antitrust enforcement.*' " (Emphasis added and scholiums omitted.) Id.

Therefore, our interpretation is that the alleged unlawful action of the respondents could be prohibited by the Antitrust Act and the plaintiffs thus could prove it in accordance with our opinion in *Pressure Vessels P.R. v. Empire Gas P.R.*, supra, which

Aguadilla Paint Center v. Esso, 183 D.P.R. 901 (2011)

2011 TSPR 194

essentially allows a market participant to claim damages for a prohibited act under the antitrust statute.

In fact, under federal law, the treble damages remedy is available in Sec. 4 of the *Clayton Act*. The text of that section is extremely simple and simply recognizes a cause of action to any person affected by any act prohibited by an antitrust law. 15 U.S.C.A. sec. 15. To obtain that remedy, the plaintiff only has to prove that the damage was caused by an [text cut-off] acCivil [sic] of Puerto Rico, *supra*, we can ask ourselves: what allegation  [text cut-off] **\*946** antimonopoly. *Antitrust Laws and Trade Regulation* Chap. 160, Sec. 161.02, p. 161-9 (Mathew Bender) ("Thus, in antitrust cases, it is not sufficient simply to demonstrate an injury, even injury directly caused 'by the defendant. The injury will not be considered antitrust injury unless it was caused by reason of a violation of the antitrust laws' "). This demonstrates that Congress wanted to allow market participants to file a damage action for the mere fact of another person having performed an antitrust practice.

Therefore, we would have concluded that the claim filed by the appellants could continue. With its decision, this Court puts on hold an important element of the antitrust fight, in particular regarding the fuel distribution business in Puerto Rico. It is sufficient to look back over decades to remember the undesirable practices we experienced in the Country during the oil crisis of the 1970s. Today, turning our back on the public policy of the United States, the base on which we formulate our statutes related to this matter, this Court binds the hands and closes the doors of justice to those who claim to have suffered damages that will now be more difficult to demonstrate.

From the federal regulations described above, it is evident that, since the beginning of the last century, legislation provided that competitors would play a central role in the fight against the illicit control of markets, by submitting actions to recover the damage caused by monopolistic actions. We do not see why Puerto Rican gasoline market participants cannot do the same, when our legislation is also intended to empower those affected with standing to claim remedies for unfair practices.

## IV

As an epilogue, this Court's decision is issued **\*947** at a time when the Antitrust Affairs Office' ability to advance the legislative purposes is in question. From the information published by the Department of Justice regarding its budget for the current fiscal year, it arises that, since 2009, the Office has lost almost forty percent of its staff, it currently has only four attorneys, and, during the same period, it has had fifteen percent of its budget cut. See Department of Justice, *Approved Budget for 2012*, available at: http:// www.pr.gov/presupuesto/aprobado—2012/justicia.htm.

In sum, we would have allowed the litigation to continue on its merits rather than settle it summarily, without allowing the plaintiff to establish its case. The dismissal of private actions against the illicit control of markets in our jurisdiction is contrary to both the intent and spirit of the Antitrust Act and the Gasoline Act, and deprives gasoline retailers of a very important instrument to vindicate their rights in response to unfair wholesaler practices.

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.