# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, ET AL. | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | CIVIL ACTION NO. 4:20-CV-00957- |
| VS. | § | SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| DEFENDANT. | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |
| | § | |

## THE PLAINTIFF STATES' FOURTH AMENDED RESPONSES & OBJECTIONS TO GOOGLE LLC's FIRST SET OF INTERROGATORIES

The Offices of the Attorney General for the states of Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, Puerto Rico, South Carolina, South Dakota, and Utah (collectively, the "Plaintiff States") hereby make the following amended response to Google LLC's First Set of Interrogatories (the "Interrogatories") under Federal Rule of Civil Procedure 33 ("Federal Rules") and any applicable local rules.

## PRELIMINARY STATEMENT

These responses and objections are based on information presently available to the Office of the Attorney General in each of the Plaintiff States and are made without prejudice to, and are not a waiver of, the Plaintiff States' rights to rely on other facts or documents at trial.

The Plaintiff States reserve the right to supplement, clarify, revise, or correct any or all of their responses and objections, and to assert additional objections or privileges, in subsequent supplemental response(s).

No response or objections should be construed as an admission or acknowledgment that an interrogatory calls for information that is relevant to the subject matter of this litigation or proportional to the needs of the case, or that any responsive documents or information would be authentic or admissible at any trial.

Nothing in these amended responses should be construed as an amendment to Plaintiff States' claims in the Fourth Amended Complaint or a withdrawal or abridgment of any remedies sought by Plaintiff States as stated in the Fourth Amended Complaint, unless expressly stated herein.

## GENERAL OBJECTIONS

The Attorneys General for the Plaintiff States object to the Interrogatories to the extent that they attempt to impose any obligation greater than those imposed or authorized by the Federal Rules of Civil Procedure, the Local Civil Rules of the District Court for the Eastern District of Texas, or any applicable Order of the Court.

The Plaintiff States object to the Interrogatories to the extent that they seek information that is not relevant to this litigation or proportional to the needs of the case.

The Plaintiff States object to the Interrogatories to the extent that they call for information protected by the attorney-client privilege, the deliberative process privilege, the common interest privilege, and/or the attorney work product doctrine.

The Plaintiff States object to the Interrogatories as overbroad and unduly burdensome to the extent that they seek testimony and information from the Plaintiff States that are not within their possession, custody, or control. The Attorneys General of the Plaintiff States are the entities that brought this action pursuant to their statutory authority to enforce state and federal antitrust and consumer protection laws. This action was not brought by any other public officials, state agencies, government entities, or divisions thereof, and such persons are not parties to this litigation.

The Plaintiff States object to Google's legal conclusion that the Interrogatories are "in Accordance with PTO No.5," and object to the Interrogatories as contrary to PTO No. 5. For example, the Interrogatories contain thirty-one (31) enumerated interrogatories; whereas, PTO No. 5 only allows for twenty-five (25). Additionally, the Plaintiff States object to the use of inappropriately compounded interrogatories that contain multiple distinct and separate subparts.

The Plaintiff States of Arkansas, Florida, Kentucky, Missouri, Montana, Nevada, Puerto Rico, and Utah object to these Interrogatories as not properly served on their respective state. In responding to these Interrogatories, the Plaintiff States of Arkansas, Florida, Kentucky, Missouri, Montana, Nevada, Puerto Rico, and Utah do not concede that they were properly served and reserve all rights due to a party that is not properly served under the Federal Rules or the Local Rules.

3

## OBJECTIONS TO INSTRUCTIONS

Plaintiff States object to the instructions included with Google's Requests for Production to the extent they direct Plaintiff States to interpret words or phrases in a way that is different from their ordinary meaning. Plaintiff States further object to the instructions as vague and ambiguous to the extent they direct Plaintiff States to construe words or phrases differently than they are written or contrary to the ordinary rules of grammar.

## OBJECTIONS TO DEFINITIONS

The Plaintiff States object to the definitions included with Google's Interrogatories to the extent that they differ from the meaning of words as they are commonly used, to the extent they differ from the meaning they have as used in industry practice, and to the extent that they differ from the way that they were defined by Plaintiff States in any Civil Investigative Demand related to this litigation or discovery request issued in this litigation. The Attorneys General of the Plaintiffs States will respond to the Interrogatories giving the terms used their ordinary meaning as commonly understood.

The Plaintiff States object to Google's definition of the term "You" or "Your" as misleading, factually incorrect, vague, overbroad, and unduly burdensome. The Plaintiff States further object to the definition to the extent it purports to enlarge, expand, or in any way alter the plain meaning and scope of the Federal Rules of Civil Procedure or seeks to compel Plaintiff States to provide information that is not within the possession, custody, or control of the Offices of the Attorney General of the respective Plaintiff States. Plaintiff States will construe this term to refer to the units, departments, or subdivisions within the Offices of the Attorney General of each respective Plaintiff State.

4

Plaintiff States specifically object to Google's definition of the term "Relevant Period" as overbroad, unduly burdensome, and disproportional to the needs of the case to the extent it seeks information that is not relevant to any party's claim or defense in this litigation. Plaintiff States will meet and confer with Google to identify a reasonable period for each Request for Production that is relevant to this litigation and proportional to the needs of the case.

## RESPONSES & OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify each and every one of Your state's agencies, entities, divisions, or departments that has used Display Advertising or Ad Tech Products during the Relevant Period.

> **Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits, and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims of this litigation. The Plaintiff States further object to this interrogatory to the extent it seeks information that is not within their possession, custody, or control and reiterate their objection to the definition of "You" stated above. The Plaintiff States are willing to meet and confer with Google to identify responsive information, if any, that is in their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Subject to and without waiving the foregoing objections, the Plaintiff States respond:
>
> - The State of Arkansas identifies the Arkansas Office of Attorney General Public Protection Division as the only division of the Arkansas Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.
>
> - The Plaintiff State of North Dakota specifically identifies the North Dakota Lottery ("ND Lottery") as the only division of the North Dakota Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.
>
> - The Plaintiff State of Indiana identifies the following links containing a searchable directory identifying staff of Indiana State Agencies, Departments, Boards, and Commissions:
>
>   (https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf)
>   (https://www.in.gov/apps/iot/find-a-person/)
>
>   Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Indiana Office of the Attorney General.
>
>   The Plaintiff State of Indiana specifically identifies the Unclaimed Property Division as the only division of the Indiana Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.
>
> - The Plaintiff Commonwealth of Kentucky identifies the following link containing an organizational chart of the executive branch of government in the Commonwealth: OC-Statewide.pdf (ky.gov). The Kentucky Office of the Attorney

6

General does not have any independent knowledge of whether any other state agency, entity, division, or department of the Commonwealth, including any contained on the organizational chart available at the link provided, has used Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies. The Commonwealth further states that the Kentucky Office of the Attorney General has used Ad Tech Products and Display Advertising.

- The Plaintiff State of Louisiana, by and through its Attorney General's Office identifies the following link containing a directory of all Louisiana State Agencies:

  https://www.louisiana.gov/government/agency-directory/#:~:text=Louisiana%27s%20Community%20and%20Technical%20College%20System%20Louisiana%20Division,Administration%20Program%20Louisiana%20Legislature%20Louisiana%20State%20University%20System

- The Louisiana Gaming Division and Public Protection Division have purchased display advertising on limited occasions in the past for specific campaigns directed at messaging regarding fair housing and gambling. The purchase of said limited display advertising was made with non-state funds and through an outside advertising agency that would have selected the strategy, products and providers.

- The Plaintiff States of Texas, Idaho, and Mississippi attach to these responses as Exhibit "A" a list of contact information for their respective state agencies, which are in a superior position to provide Google with the information it seeks. The Plaintiff States of Texas, Idaho, and Mississippi do not possess knowledge as to whether these entities use display advertising or ad tech products, and such information is not within thier possession, custody, or control.

- The Plaintiff State of Missouri, by and through its Attorney General's Office identifies the following link containing a full list of Missouri State Agencies, Departments, Boards, and Commissions:

  (https://www.mo.gov/search-results?mode=state_agencies).

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Missouri Office of the Attorney General. The foregoing link includes contact information for each Missouri Agency, Department, Board, and Commission. Each such Agency, Department, Board, and Commission would be in a superior position to provide Google with the information it seeks.

- The Plaintiff State of Utah, by and through its Attorney General's Office ("Utah AGO") does not have possession, custody, or control of responsive information for any state agency other than the Utah AGO. The Utah AGO identifies the following

link containing a full list of Utah State Agencies, Departments, Boards, and Commissions:

https://www.utah.gov/government/agencylist.html

- The Plaintiff State of Nevada, by and through the Office of the Nevada Attorney General ("Nevada AGO") has confirmed that the Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period. The Nevada AGO does not have possession, custody, or control of documents or information for other state agencies. However, public officers in Nevada have a duty to reasonably provide information in their possession that relates to an active antitrust investigation or enforcement action brought by the Nevada AGO. Considering that duty, relevant state agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The Nevada AGO has determined that the following state agencies have not received FRCP 45 subpoenas issued by Google but may have responsive information similar to that requested by Google in previous FRCP 45 subpoenas ("Additional Nevada Agencies"). These agencies are willing to voluntarily gather and produce that information, and the Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time:

  - The Division of Welfare and Supportive Services
  - The Division of Public and Behavioral Health
  - The Division of Aging and Disability Services
  - The Health and Human Services Director's Office
  - The Department of Tourism and Cultural Affairs
  - The Silver State Health Insurance Exchange
  - Nevada State Treasurer

- The Offices of the Attorneys General for the Plaintiff States of Texas, Alaska, Idaho, Florida, Mississippi, Missouri, Montana, Puerto Rico, South Carolina, South Dakota and Utah and the Utah Division of Consumer Protection have not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 2:** Identify all remedies You seek in this Action, in what capacity

(such as *parens patriae* or sovereign capacity) You seek each remedy, and the statutory or other

legal basis for each such remedy.

> **Response:** The Plaintiff States object to this interrogatory to the extent is seeks to force a legal conclusion. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it

seeks to compel Plaintiffs to marshal all of their evidence in advance of trial. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. The Plaintiff States reserve their rights to supplement responses to this interrogatory at a later date once they have designated experts and obtained sufficient discovery to make a complete response. Subject to and without waiving the foregoing objections, the Plaintiff States respond:

- The Plaintiff States reserve the right to pursue any allowable remedy under federal or state antitrust law that would restore competition to any market in which Google's conduct is alleged to have anticompetitive effects. The Plaintiff States currently believe that a combination of structural and behavioral remedies are necessary to restore competitive conditions to the affected markets.

- The Plaintiff States reserve the right to pursue any allowable remedy under their respective state laws for Google's deceptive conduct in order to compensate the injured citizens or persons of their state and to deter future deceptive conduct on the part of Google.

- The Plaintiff States each seek injunctive relief in their *parens patriae* capacity for harm to their general welfare and economies.

  The Plaintiff States each seek civil penalties in their sovereign and *parens patriae* capacity for harm to their general welfare and economies.

- Subject to the foregoing responses and objections and reservations of rights, Plaintiff States have the present intent to pursuing those remedies identified in Exhibit "B".

- For the avoidance of doubt, the Plaintiff States emphasize that the foregoing responses pertain only to the *remedies* sought under their state law authorities and do not purport to address or modify the *injuries* that the Plaintiff States allege in the Fourth Amended Complaint.


**INTERROGATORY NO. 3:** Identify all persons answering and supplying information in

response to these Interrogatories and all documents You relied on to answer these

Interrogatories.

**Response:** The Plaintiff States object to this interrogatory to the extent it seeks attorney-client or work product privileged information, or to the extent it seeks information not otherwise discoverable under court order. The Plaintiff States will supplement their responses to this interrogatory at a later date if they have responsive information. Subject to and without waiving the foregoing objections, the Plaintiff States respond:

- Plaintiff States that responded to Interrogatory No. 28 also identify those individuals as being potentially responsive to this Interrogatory No. 3.

- Staff attorneys for the respective Attorneys General of the Plaintiff States or outside counsel representing certain of the Attorneys General of the Plaintiff States were involved in preparing these responses.

- The Plaintiff State of Florida specifically responds that it consulted with the following employees of the Florida Attorney General's Office in formulating these responses: Douglas Smith and Cindy Rutledge (Information Technology); Sabrina Donovan and Darlene Faris (Administrative Services); Erica Lee (Public Records); and the Citizen Services department.

- The Plaintiff State of Idaho specifically responds that the Idaho Office of the Attorney General (IDOAG) consulted with Robyn Lockett, Division Chief of the Admin & Budget Division of the IDOAG, with respect to the response to Interrogatory No. 1.

- The Plaintiff State of North Dakota specifically responds that it consulted with Ryan Koppy, Sales and Marketing Manager at the ND Lottery, in formulating the responses to the interrogatories.

- Plaintiff State of Indiana responds that the same individuals identified in response to Interrogatory No. 28 supplied information used in responding to Google's Interrogatories and that it relied on documents it produced as INOAG-GOOG_000000041 to INOAG-GOOG_00004981.

- The Plaintiff Commonwealth of Kentucky responds that it consulted with the following individuals in formulating the responses to the interrogatories:
  - Krista Buckel, formerly Communications Director (former employee)
  - Stacy Woodrum, Executive Director, Office of Administrative Services
  - Michelle Lacy, Budget Specialist, Office of Administrative Services
  - Shellie May, Special Assistant, Office of Consumer Protection (formerly Communications Director)
  - Atley Smedley, Deputy Communications Director
  - Heather Wagers, Executive Director, Office of Trafficking and Abuse Prevention and Prosecution
  - Leah Halfacre, Account Director, Red7e, Phone: 502-585-3403 (Ext. 258). Email: leahh@red7e.com
  - Jim Hoyland, COO, Red7e, Phone: (502) 585-3403 (Ext. 234). Email: jimh@red7e.com

10

- State of Nevada specifically responds by identifying below the following individuals, other than counsel, who supplied information to inform its response to Interrogatory No. 1:

    o Following discussions with IT staff that actively maintain the Nevada AG website, IT Manager Rick Lacanilao confirmed that the Nevada AG has never purchased display advertising or paid for other advertising products during the Relevant Period.

    o The State of Nevada identified the Nevada State Treasurer as an "Additional Nevada Agency" that may have responsive information after reviewing information provided by its Chief of Staff, Kirsten Van Ry.

    o The State of Nevada  identified the Silver State Health Insurance Exchange as an "Additional Nevada Agency" that may have responsive information after reviewing information provided by Janel Davis, its Chief Operating Officer, and Julian Tallent at the ABBI agency.

    o The State of Nevada identified the Division of Welfare and Supportive Services is an "Additional Nevada Agency" that may have responsive information after reviewing information provided by Karissa Looper, Agency Manager for the Division's Child Care and Development Program.

    o The State of Nevada  identified the Nevada Department of Tourism and Cultural Affairs as an "Additional Nevada Agency" that may have responsive information after reviewing information provided by its Director, Brenda Scolari, and Chief Deputy Director, Mary Ellen Kawchak.

    o The State of Nevada  identified the Health and Human Services Director's Office as an "Additional Nevada Agency" that may have responsive information after reviewing information provided by Shannon Litz, Director of Programs.

    o The State of Nevada  identified the Division of Public and Behavioral Health as an "Additional Nevada Agency" that may have responsive information after information provided by Vickie Ives, Health Bureau Chief, and Andrea Rivers, Agency Manager.

    o The State of Nevada  identified the Division of Aging and Disability Services as an "Additional Nevada Agency" that may have responsive information after reviewing information provided by Tammy Sever, a Social Work Supervisor, and Jennifer Frischmann, Agency Manager.

- The Plaintiff State of Utah specifically responds that it consulted with its internal staff in formulating these responses.

11

**INTERROGATORY NO. 4:** Identify all injured persons or categories of persons on whose behalf You as *parens patriae* seek monetary relief (including, where applicable, restitution, disgorgement, civil penalties, civil fines, or damages) in this Action, and for each person or category of persons state the following:

    a. whether the person is a natural person or legal entity;

    b. how the person has used Display Advertising or Ad Tech Products, including whether the person is a Publisher, Advertiser, or consumer;

    c. the person's state of residence, organization, or incorporation;

    d. if applicable, the person's principal place of business;

    e. the nature of the person's injury; and

    f. the specific monetary relief You seek as a result of the person's injury.

**<u>Response</u>:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its likely benefits, and the requesting party's ability to obtain the information is similar to that of the responding party. Plaintiff States also object to this Request to the extent that it implies that the identification of specific persons is a necessary element of a *parens patriae* claim. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Finally, the Plaintiff States object to this interrogatory as containing discrete sub-parts such that it should constitute multiple interrogatories in considering the interrogatory limit imposed by the Court in this case. ECF No. 194 at 6 ("This limit on the number of interrogatories includes discrete sub-parts …."). Subject to and without waiving the foregoing objections, the Plaintiff States respond:

<u>Plaintiff States seeking civil penalties as *parens patriae* for antitrust injury to the general welfare and economies of their respective state:</u>

- The Plaintiff States of Alaska, Arkansas, Florida, Idaho, Kentucky, Louisiana, Mississippi, Montana, Nevada, North Dakota, Puerto Rico, South Carolina, South Dakota, Texas, and Utah seek to recover civil penalties as *parens patriae* for harm to the general welfare and economies of each state caused by injuries to publishers and advertisers that have been deprived of improved quality, increased transparency, further innovation and lower prices due to Googles anticompetitive conduct. These Plaintiff States also seek to recover civil penalties *parens patriae* for harm to the general welfare and economies of each state caused by injuries to persons within each Plaintiff State that have suffered from increased prices and lowered quality on the web caused by Google's anticompetitive conduct in the markets alleged.

<u>Plaintiff States seeking civil penalties as *parens patriae* for injury to the general welfare and economies of their respective states caused by Google's unfair or deceptive practices:</u>

- All Plaintiff States seek to recover civil penalties as *parens patriae* for harm to the general welfare and economies of each state caused by injuries to publishers and advertisers in each state that have been deceived by Google while using its Ad Tech Products. Publishers receiving decreased revenue and low-quality ads and advertisers being forced to overpay for impressions due to Google's deception harmed the general welfare and economies of the Plaintiff States. The Plaintiff States also seek to recover civil penalties *parens patriae* for harm to the general welfare and economies of each state caused by increased prices and lowered quality on the web caused due to Google's deceptive conduct in each state.

<u>Plaintiff States seeking damages as *parens patriae* for antitrust injury to the general welfare and economies of their respective state:</u>

- The Plaintiff States of Louisiana, Puerto Rico, and South Dakota seek to recover damages as *parens patriae* on behalf of advertisers and publishers to rectify the financial loss of paying higher prices or receiving a lower payout than they would have absent Google's anticompetitive conduct.

- The Arkansas Office of the Attorney General seeks to recover under its *parens patriae* authority as set forth in Ark. Code Ann. § 4-75-212. The State of Arkansas seeks to recover on behalf of natural persons located in the State of Arkansas that have paid higher prices for goods and services as the result of Google's anticompetitive conduct toward advertisers that increased the cost of advertising and thereby the cost of goods and services purchased.

<u>Plaintiff States seeking damages as *parens patriae* for injury to the general welfare and economies of their respective states caused by Google's unfair or deceptive practices:</u>

- The Plaintiff States of Louisiana, Puerto Rico, and South Dakota seek to recover damages as *parens patriae* on behalf of advertisers that have been deceived by Google into paying more for impressions than they would have absent Google's deception. These Plaintiff States also seek to recover damages as *parens patriae* for publishers that have suffered financial loss in the form of decreased payouts for their inventory due to Google's deception.

Plaintiff States seeking disgorgement as *parens patriae* for antitrust injury to the general welfare and economies of their respective state:

- The Plaintiff States of Missouri and South Dakota seek disgorgement as *parens patriae* on behalf of publishers and advertisers in their respective states to recover the illegal financial gains that Google has amassed from these market participants through its anticompetitive conduct.

Plaintiff States seeking disgorgement as *parens patriae* for injury to the general welfare and economies of their respective states caused by Google's unfair or deceptive practices:

- The Plaintiff States of Alaska, Arkansas, Indiana, Missouri, and North Dakota, seek disgorgement as *parens patriae* on behalf of publishers and advertisers to recover the illegal financial gains that Google has amassed from these market participants through its deceptive conduct.

Plaintiff States seeking restitution as *parens patriae* for antitrust injury to the general welfare and economies of their respective state:

- The Plaintiff States of Arkansas and South Dakota seek restitution as *parens patriae* on behalf of advertisers and publishers to make them whole and restore the financial losses of increased prices or reduced payout because of Google's anticompetitive conduct.

Plaintiff States seeking restitution as *parens patriae* for injury to the general welfare and economies of their respective states caused by Google's unfair or deceptive practices:

- The Plaintiff States of Louisiana, and Missouri seek restitution as *parens patriae* on behalf of advertisers and publishers to make them whole and restore the financial losses suffered due to Google's deception.

**INTERROGATORY NO. 5:** Identify and quantify all harm to the general welfare and the economy of Your state for which You seek monetary relief (including, where applicable,

14

restitution, disgorgement, civil penalties, civil fines, or damages) in this Action, and specify the particular relief You seek for each such harm.

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its likely benefits. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial or to the extent that it seeks to compel a legal conclusion. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Subject to and without waiving the foregoing objections, the Plaintiff States respond as follows:

- Google's unlawful conduct has inflicted harm to businesses and individuals in the Plaintiff States, to the respective economies of the Plaintiff States, and to the general welfare of the Plaintiff States. Those harms result from the significant number of advertising transactions conducted daily by Google. Google earns around $712 million dollars per day from a business model grounded in digital display advertising and supported by its unlawful conduct.

- Google's conduct caused harm to web publishers and digital advertisers who conduct business in each of the Plaintiff States. These companies are part of an important industry in each state's economy.

- Web publishing and monetization are essential to each Plaintiff States' citizens in terms of providing rich content on the internet without erecting paywalls or otherwise charging users to subscribe to content.

- Digital advertising is important to a multitude of large and small businesses that operate in each of the Plaintiff States. Google's conduct has caused, and continues to cause, harm to small and large businesses in the Plaintiff States, with follow-on effects to consumers (i.e., Plaintiff States' citizens). The impacts to the Plaintiff States by the following conduct of Google are broad and manifest.

Harm Arising from Google's Unlawful Tying:

- Beginning in 2009 and continuing through the present day, the general welfare of the Plaintiff States and the economies of the Plaintiff States were harmed though Google's illegal coercion of web publishers into licensing its ad server in each of the Plaintiff States.

- In order to access a unique pool of small advertiser inventory that was unavailable on other exchanges, due to Google making that inventory exclusive to Google's ad exchange and refusing to interoperate with web publishers' in-house ad servers or third-party ad servers, web publishers were forced to use Google's ad server.

- Web publishers located in the Plaintiff States were thus deprived of the opportunity to connect to Google's captive pool of small advertiser demand using an ad server that was not owned by Google.

- Google's ad server operated in self-serving and deceptive ways to advantage its own ad exchange over rivals and insulate Google's ad exchange from competing on take rates with other ad exchanges.

- Advertisers located in the Plaintiff States were also harmed because they were left without viable alternatives to Google's ad tech products. For example, Google's prohibition against small advertisers submitting live bids on rival ad exchanges deprived rival exchanges of sources of demand, stifling competition. Those advertisers, and the Plaintiff States' economies, were denied innovative, alternative exchange platforms, while those businesses had to pay Google supracompetitive prices.

- If there were more alternatives in the ad serving market that could access small advertising demand, Google would not be able to exclude rival ad servers and ad exchanges from competing with Google on equal footing.

- With more competition in the ad serving and ad exchange markets, Google would be forced to lower its take rate and take less from each advertising transaction. Web publishers in each of the Plaintiff States would use that additional revenue to create more content, improve the quality of that content, reduce or eliminate paywalls to that content, and internet users would gain increased access to valuable ad supported content.

- If small advertiser demand were available on more ad exchanges, advertisers located in each of the Plaintiff States would have access to web publisher inventory that is not available on Google's ad exchange. This would allow advertisers to get access to the best inventory possible at the lowest cost available. Advertisers, in turn, could provide better quality advertising content and offer the general public of the Plaintiff States lower-priced goods and services due to reduced advertising costs.

Dynamic Allocation:

- Beginning in 2010 and continuing through 2019, Dynamic Allocation harmed the general welfare of the Plaintiff States and the economies of the Plaintiff States.

16

- Absent Dynamic Allocation, a web publisher's impression would have transacted on rival ad exchanges more often and on terms more favorable to web publishers.

- Dynamic Allocation also ensured that more web publisher impressions would be available on Google's ad exchange at the expense of rival exchanges.

- Google's AdX was able to charge web publishers in the Plaintiff States supracompetitive prices in the ad exchange market due to the ability of AdX to win an impression based on a live bid while suppressing live bids from rival exchanges.

- As a result, web publishers in the Plaintiff States received less yield for their ad inventory and advertisers were deprived of the ability to transact ad impressions through a lower cost exchange.

Enhanced Dynamic Allocation ("EDA"):

- Google automatically enrolled web publishers that used its ad server into EDA, which inhibited rival exchanges from transacting high-revenue impressions offered by web publishers in each of the Plaintiff States.

- As a result of EDA, web publishers in the Plaintiff States received less yield due to rival exchanges with lower take rates being excluded from transacting high-revenue inventory and received lower quality ads from AdX.

- Additionally, EDA advertisers would benefit from cost savings absent Google's conduct by paying less to purchase ad inventory on rival ad exchanges.

Dynamic Revenue Sharing ("DRS"):

- Beginning in 2014, the general welfare of the Plaintiff States and the economies of the Plaintiff States were harmed though Google's operation of dynamic revenue sharing.

- The DRS program allowed Google to adjust the take rate of Google's ad exchange to clear the publisher's pre-set price floor, ensuring that AdX would transact the impression that otherwise would have been won by a rival ad exchange.

17

- DRS was then subsequently modified (without notifying publishers) to increase the take rate of Google's ad exchange on subsequent transactions to make up for the previous decreased take rate.

- Web publishers in the Plaintiff States lost out on higher yields as a result of DRS because they did not get the benefit of Google's discounted take rate since Google increased its take rate on subsequent transactions.

- DRS operated to increase the number of transactions awarded to AdX while depriving rival exchanges of impressions they otherwise would have won.

- In competing on take rate only on an impression-by-impression basis, only to recoup its revenue on subsequent transactions, Google insulated its ad exchange from price competition with rival exchanges.

- Web publishers in the Plaintiff States would have benefitted from increased price competition among ad exchange take rates and would have used that additional yield to create more content, improve the quality of that content, impose lower paywalls or eliminate paywalls for internet users.

- Advertisers in each of the Plaintiff States were harmed because DRS operated to ensure that more ad inventory transacted through Google's ad exchange rather than lower cost alternatives. If advertisers in each of the Plaintiff States were able to submit more competitive bids on AdX due to increased price competition, they could provide better quality advertising content and offer the general public of the Plaintiff States lower-priced goods and services.

Reserve Price Optimization:

- Beginning in 2015 and continuing to the present day, Google's operation of RPO harmed the general welfare of the Plaintiff States and the economies of the Plaintiff States by deceptively increasing the amount paid by advertisers on Google's ad exchange. RPO used Google's data asymmetries to automate increases to floors set by publishers. Importantly, RPO did not decrease any floors set by publishers. It only served to increase floors and force advertisers to pay more. Publishers were automatically enrolled in Google's RPO program without their knowledge or consent and RPO was not disclosed to advertisers.

- Google misled advertisers into believing that its ad exchange was a second price auction between 2015 and 2019. Despite these misrepresentations, RPO increased price floors set by publishers to eliminate any advantage that an advertiser would

receive from bidding into a second price auction. Without RPO or with full disclosure of RPO's existence and workings, advertisers would have bid less for publisher inventory in which RPO set the price floor.

- RPO caused advertisers in each of the Plaintiff States to overbid for publisher inventory on which RPO was operational. These deceptive overcharges to advertisers in each of the Plaintiff States resulted in lost ad spend which, in turn, increased the prices of goods and services sold to consumers. Had advertisers known they were bidding into an auction that was utilizing RPO, they would have bid less or engaged in bid shading strategies to avoid overbidding for ad impressions. Advertisers that pay less for web publisher impressions could provide better quality advertising content and offer the general public of the Plaintiff States lower-priced goods and services.

Bernanke:

- Bernanke overcharged advertisers for web publisher impressions and suppressed revenues for web publishers from 2013 and is conduct that continues to harm the general welfare of the Plaintiff States and the economies of the Plaintiff States though the present day.

- The operation of Bernanke manipulated display advertising auctions to the detriment of both web publishers and advertisers located the Plaintiff States.

- "Project Bernanke" underpaid a web publisher after a transaction cleared on AdX, with Google secretly retaining a portion of the winning bidder's payment.  Google added this secretly retained payment into a pool that was used to increase Google Ads wins on its own ad exchange at the expense of rival exchange.

- Project Bernanke also overcharged advertisers on certain transactions where Google Ads placed the two highest bids into the AdX auction. Once Google dropped the lower bid, the advertiser with the highest bid was still forced to pay the price of the second highest bid that Google dropped.

- Although Google used funds collected from overcharging advertisers and underpaying publishers to increase subsequent bids causing some advertisers to win impressions they otherwise would have lost, Bernanke did not operate to always make publishers whole. In fact through Project Bell, Google ensured that publishers who did not enable Dynamic Allocation or otherwise preference Google's ad exchange consistently had bids suppressed for their ad inventory. Further, Google did not ensure that advertisers who were overcharged on one transaction were made whole on a subsequent transaction. Even when advertisers were made whole

financially, Bernanke still resulted in advertisers winning more low quality ad impressions than they otherwise would have bid for in a competitive market.

- If Bernanke did not exist Publishers would get paid their fair share causing them create more content, improve the quality of that content, and lower paywalls to consumers in each of the Plaintiff States to improve access to valuable content.

- If Bernanke did not exist advertisers would not get overcharged on impressions purchased through Google Ads on AdX in which Google had the top two bids. Without such overcharges, advertisers would spend less on advertising or spend advertising dollars more efficiently providing better quality advertising content and lower-priced goods and services the general public in each of the Plaintiff States.

Header Bidding Suppression:

- Beginning in 2015, Google engaged in a campaign to thwart web publisher adoption of header bidding that introduced competition into the exchange market. Google harmed the general welfare of the Plaintiff States and the economies of the Plaintiff States. Google continues efforts to undermine header bidding as an alternative to their platform to the present day.

- Google thwarted publisher's ability to realize significant increases in revenue through the advent of header bidding, which gave publishers the ability to receive live, competitive bids from multiple exchanges. Header bidding resulted in significant price competition on ad exchange take rates, but through Dynamic Allocation, Enhanced Dynamic Allocation, DRS, and Bernanke, Google was able to insulate itself from price competition.

- Google took further steps to suppress header bidding and limit the ability of publishers to realize the benefits of header bidding.

  - Google misrepresented to publishers that header bidding would be harmful to them. This led web publishers in each of the Plaintiff States to forego header bidding to their detriment. Publishers that did not use header bidding suffered from decreased yield from their ad inventory causing them to erect or raise paywalls on internet users or lower the quality of content on their webpage. Advertisers in each of the Plaintiff States were also deprived of transacting the same web publisher inventory through lower cost exchanges leading to higher priced goods and services for citizens in each of the Plaintiff States.

  - Google capped the number of line items a publisher could set for bids received from header bidding exchanges. This limited the effectiveness and

20

precision of header bidding resulting in lost revenue for publishers. Google denied publisher requests that Google increase the number of line items they could set in DFP because the caps were a "tool" to fight header bidding. The cap on publisher line items also directed transactions away from header bidding and towards Exchange Bidding, while depriving rival exchanges of publisher inventory necessary to compete against Google's monopoly. The limit on publishers' line items has driven down publishers' yields and made bids from header bidding exchanges less competitive. The decreased yield from publisher ad inventory causing them to erect or raise paywalls on internet users, increase ad saturation, or lower the quality of content on their webpage.

- o Google, beginning in 2018, undermined publisher's ability to compare the relative success of header bidding with the performance of exchange bidding by redacting from its auction records key data fields. In so doing, Google's publisher clients were denied the ability to measure the performance of different exchanges and foreclosed the price competition brought about by header bidding as a result. Google's anticompetitive conduct caused publishers in the Plaintiff States to pay more advertising and denied participation in market innovations. The decreased yield from publisher ad inventory causing them to erect or raise paywalls on internet users or lower the quality of content on their webpage. Advertisers in each of the Plaintiff States were also deprived of transacting the same web publisher inventory through lower cost exchanges leading to higher priced goods and services for citizens in each of the Plaintiff States.

- o In 2018, concerned about the threat posed by header bidding, Google entered into a Network Bidding Agreement ("NBA") with Facebook. To prevent Facebook from significantly investing in header bidding for its Facebook Audience Network and developing its own header bidding solution, Google agreed to provide preferential Open Bidding auction terms to Facebook in exchange for spend and pricing commitments from Facebook. The intended consequence of the NBA was to direct Facebook's clients to transact on Google's product at the expense of header bidding exchanges. Google's conduct suppressed the advent of header bidding, decreasing publisher's yields led publishers to erect or raise paywalls on internet users or lower the quality of content on their webpage.

Uniform Pricing Rules ("UPR"):

- Beginning in 2019, Google imposed Uniform Pricing Rules as part of its transition from a second price auction to a first price auction. UPR harmed the general welfare of the Plaintiff States and the economies of the Plaintiff States. UPR continues to

operate to deprive web publishers of making competitive decisions to the present day.

- Google intentionally designed UPR to unilaterally override publisher choice on setting auction floors for their own inventory to undermine publishers that wanted to conduct more transactions for higher quality impressions through header bidding exchanges and fewer transactions through Google's ad exchange that often returned lower quality impressions.

- UPR harmed web publishers who wanted preference higher quality demand and to deter low quality ads from Google.  Web publishers subject to UPR lost out on the ability to optimize their price floors to account of the higher fees that Google charged, and the lower quality of ads transacting through Google's AdX exchange.

- Google knew that publishers set higher price floors for Google's AdX exchange in an effort to improve the quality of ads for their impressions and also improve their yield by using exchanges who charge lower prices.

- Web publishers used price floors to protect their content and preserve web traffic to their website. Maintaining or increasing web traffic gave publishers more impressions to sell enabling web publishers to create more content, improve the quality of that content, and lower paywalls to consumers in each of the Plaintiff States.

- Advertisers were also harmed by UPR. By paying less for publisher impressions, advertisers could provide better quality advertising content and offer the general public of the Plaintiff States lower-priced goods and services.

Each form of anticompetitive and deceptive conduct discussed above caused harm to businesses in each Plaintiff State—small, medium, and large—that rely on display advertising. Google's conduct has resulted in higher prices and lower quality products for participants in the ad tech markets and foreclosed competition that would bring about non-Google product alternatives.  In turn, the Plaintiff States' economies in general have not realized the benefits of competition and instead suffered from stifled innovation and investment in the display advertising space.

Furthermore, and as discussed above, Google's unlawful conduct also exacts harm on consumers (*i.e.*, citizens) in the Plaintiff States and negatively affected the general welfare. The use of the internet in the United States, and in the Plaintiff States, is pervasive and almost universally adopted. That means that anyone who uses the internet (i.e., consumers in the Plaintiff States) interacts with display advertising. Consumers benefit from competition in the form of choice and innovation. The cost savings realized by advertisers and publishers could be passed on to consumers, such as lowering subscription fees and removing paywalls. At the same time, small and large businesses would need to spend less on advertising to generate business. Those savings would benefit consumers

because businesses could, in turn, lower the price of their goods and services.  Increased commerce drives economic growth in the Plaintiff States and improves the general welfare. Google's anticompetitive and deceptive conduct inhibits that progress, growth, and welfare promotion.

**INTERROGATORY NO. 6:** Identify all injunctive or structural relief You seek in this Action, including a description of:

a. the specific relief sought;

b. the applicable relevant market;

c. the assets or Ad Tech Product(s) You expect to be impacted;

d. the proposed duration of the relief; and

e. how each type of relief sought would "restore competitive conditions in the relevant

markets" as alleged in Paragraph 683(c)-(d) of the Third Amended Complaint.

<u>**Response:**</u> The Plaintiff States object to this interrogatory to the extent it seeks to compel a legal conclusion. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel the Plaintiff States to marshal all of their evidence in advance of trial. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Finally, the Plaintiff States object to this interrogatory as containing discrete sub-parts such that it should constitute multiple interrogatories in considering the interrogatory limit imposed by the Court in this case.  ECF No. 194 at 6 ("This limit on the number of interrogatories includes discrete sub-parts …."). Subject to and without waiving the foregoing objections, the Plaintiff States respond:

- Plaintiff States are pursuing all potential remedies that will resolve the anticompetitive effects of Google's conduct. Specifically, Plaintiff States are seeking behavioral remedies to address ongoing anticompetitive conduct, including but not limited to enjoining Google from the following continuing conduct:

  - Plaintiff States seek to enjoin Google from the use of Bernanke (and any subsequent, relevant versions) in its auctions and to force Google to fully disclose how Bernanke worked to publisher and advertisers who were affected by its operation.

  - Plaintiff States seek to enjoin Google from enforcing Unified Pricing Rules by giving web publishers the ability to turn off this feature.

23

- o Plaintiff States seek to enjoin Google from engaging in conduct that undermines publishers' adoption of or use of procompetitive header bidding technology.

- o Plaintiff States seek to enjoin the enforcement of the Network Bidding Agreement between Google and Facebook and rescind its terms.

- o Plaintiff States seek to enjoin Google from limiting Google Ads demand from bidding across multiple exchanges.

- o Plaintiff States seek to enjoin Google from refusing to integrate third-party or web publishers' in-house ad servers into its ad exchange.

- o Plaintiff States seek to enjoin Google from limiting optionality for publishers in its use of Enhanced Dynamic Allocation by giving them a choice to enable or disable the feature.

- o Plaintiff States seek to enjoin Google from deprecating support for third-party cookies in its Chrome browser and from forcing web publishers, advertisers, ad exchanges, and demand side platforms to participate in its anticompetitive Privacy Sandbox initiative.

- The historical operation and combined effects of the continuing conduct addressed above and other historically anticompetitive conduct such as Dynamic Allocation and Dynamic Revenue Sharing has significantly contributed to an unlawful acquisition of monopoly power that behavioral remedies cannot fully address. To the extent that the above behavioral remedies do not restore harm to competition caused by Google's conduct, the Plaintiff States also seek structural relief including potential divestiture of one or more of Google's Ad Tech Products including but not limited to:

    (a) a divestiture of DFP to restore competition in the ad serving and ad exchange markets;

    (b) a divestiture of AdX to restore competition to the ad exchange and buying tools markets;

    (c) a divestiture of Google Ads to retore competition to the small ad buying tools and ad exchange markets; and/or

    (d) a divestiture of DV360 to restore competition to the ad exchange market and prevent monopolization in the market for large ad buying tools.

24

**INTERROGATORY NO. 7:** Identify the "data and information unlawfully taken from consumers by means of deceptive trade practices" for which You seek disgorgement in Paragraph 683(g) of the Third Amended Complaint, and describe how such disgorgement is to be effected and implemented.

> **Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel the Plaintiff States to marshal all of their evidence in advance of trial. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Subject to and without waiving the foregoing objections, the Plaintiff States respond:
>
> - The Plaintiff States incorporate by reference paragraphs 572-583 of the Fourth Amended Complaint in response to this interrogatory.
>
> - The Fourth Amended Complaint refers to data collected from users of Google products and data that Google requires publishers and advertisers to give Google about users collected from their visit to and participation on a publisher's webpage as being unlawfully and deceptively taken from internet users by Google.

**INTERROGATORY NO. 8:** Identify with particularity each and every act, practice, or statement by Google that You allege to have been unfair or deceptive. As part of your response, identify all documents on which you relied on to respond to this Interrogatory.

> **Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel the Plaintiff States to marshal all of their evidence in advance of trial. Plaintiff States also object on the basis that this is a contention interrogatory that need not be answered until the conclusion of fact

discovery. Subject to and without waiving the foregoing objections, the Plaintiff States respond:

- The Plaintiff States hereby incorporate by reference herein paragraphs 526-597 and 647-758 of the Fourth Amended Complaint in response to this interrogatory.  More specifically, Google's acts, practices, and statements that the Plaintiff States believe or have reason to believe have been unfair, deceptive, false, and/or misleading, and/or which have the capacity or tendency to deceive, or are likely to deceive, include but are not limited to the following:

- Google's deceptive, false, and/or misleading acts, misrepresentations, omissions, and failure to disclose material information surrounding the use and implementation of Project Bernanke to manipulate advertiser bids without their knowledge.  *See, e.g.*, GOOG-NE-03626245; GOOG-NE-03898431; GOOG-AT-MDL-004334894; GOOG-NE-11267438; GOOG-DOJ-14152910; GOOG-NE-03898431; GOOG-DOJ-14254525; GOOG-NE-13549441; GOOG-DOJ-14157039; GOOG-DOJ-15104543; GOOG-NE-10569088; GOOG-NE-03580452; GOOG-NE-03892302; GOOG-AT-MDL-007173084; GOOG-DOJ-15435620; GOOG-NE-10929507; GOOG-NE-13468541.

- Google's deceptive, false, and/or misleading acts, misrepresentations, omissions, and failure to disclose material information surrounding the use and implementation of Reserve Price Optimization and other dynamic flooring practices.  *See, e.g.*, GOOG-NE-13340735; GOOG-DOJ-14368344; GOOG-DOJ-14008433; GOOG-NE-06842715; GOOG-DOJ-15511015; GOOG-AT-MDL-003141298; GOOG-AT-MDL-003164150; GOOG-AT-MDL-003164158; GOOG-AT-MDL-003164162; GOOG-AT-MDL-003164171; GOOG-DOJ-14147817; GOOG-DOJ-29803801; GOOG-AT-MDL-004242638; GOOG-NE-13229114; GOOG-TEX-00831373; GOOG-NE-05308050; GOOG-NE-12466643; GOOG-DOJ-15435620; GOOG-AT-MDL-001890174.

- Google's deceptive, false, and/or misleading acts, misrepresentations, omissions, and failure to disclose material information surrounding the use and implementation of Dynamic Revenue Sharing.  *See, e.g.*, GOOG-NE-04934281; GOOG-NE-06842133; GOOG-NE-09485306; GOOG-TEX-00777528; GOOG-DOJ-15422521; GOOG-DOJ-14735882; GOOG-NE-04934281; GOOG-DOJ-14156440; GOOG-NE-06842715; GOOG-NE-09485306; GOOG-AT-MDL-001004706; GOOG-NE-09485306; GOOG-DOJ-14368344; GOOG-DOJ-AT-02423615; GOOG-NE-13226622; GOOG-NE-12737317; GOOG-DOJ-14162332.

- Google's deceptive, false, and/or misleading acts, misrepresentations, omissions, and failure to disclose material information regarding publisher's use and implementation of header bidding.  *See, e.g.*, GOOG-TEX-00036586; GOOG-TEX-00971726; GOOG-TEX-00097138; GOOG-NE-12741112; GOOG-TEX-00036144; GOOG-DOJ-14323586; GOOG-AT-MDL-003168327; GOOG-NE-13414309; GOOG-NE-11797459.

26

- Google's deceptive, false, and/or misleading acts, misrepresentations, omissions,, and failure to disclose material information regarding its collection of user data, auction data, and ad log data, and how such data was used to optimize its buying tools.  *See*, *e.g.*, GOOG-NE-06910389; GOOG-NE-12794242; GOOG-DOJ-AT-02644082;    GOOG-DOJ-15611285;    GOOG-DOJ-15621058;    GOOG-DOJ-15789359; GOOG-DOJ-15089206.

- Google's deceptive, false, and/or misleading acts, misrepresentations, omissions, and failure to disclose material information relating to the operations of Google's ad serving and auction mechanics; and Google's deceptive acts, misrepresentations, and failure to disclose material information relating to all bidders competing on equal footing within Google's ad exchange.  *See*, *e.g.*, GOOG-NE-02345371; GOOG-DOJ-14032377; GOOG-DOJ-15241839; GOOG-TEX-01022605; GOOG-AT-MDL-004071049;  GOOG-NE-07954222;  GOOG-TEX-00633233;  GOOG-DOJ-AT-01807679;      GOOG-NE-06879032;      GOOG-AT-MDL-003570297; GOOG-NE-07289269.

Discovery and the Plaintiff States' investigation remains ongoing, and accordingly, the Plaintiff States reserve the right to further supplement their objections and responses to this interrogatory.

**INTERROGATORY NO. 9:** Identify all persons other than Google with whom You communicated concerning an Investigation or this Action. In Your response:

a. provide the date of each communication, the participants in the communication (including each participant's employer or affiliation), the method of the communication, and the subject matter discussed; and

b. identify any documents disclosed by You or the person during each communication.

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party as it is duplicative of information included as part of the State Plaintiffs' Rule 26 disclosures, information equally available to all parties in documents already produced in this case, and/or otherwise not relevant to the facts or claims in this litigation. The Plaintiff States also object to this interrogatory to the extent it seeks attorney-client or work product privileged information, information subject to the common interest and joint prosecution privileges, or to the extent it seeks information not otherwise discoverable under court order. Finally, the Plaintiff States object to this interrogatory as containing discrete sub-

parts such that it should constitute multiple interrogatories in considering the interrogatory limit imposed by the Court in this case.  ECF No. 194 at 6 ("This limit on the number of interrogatories includes discrete sub-parts ...."). Subject to and without waiving the foregoing objections, the State Plaintiffs respond:

- *See* Appendix A of Plaintiff States' forthcoming First Amended Initial Disclosures which will list each third party contacted during the investigation by the Plaintiff States.

- *See also*, pursuant to Federal Rule of Civil Procedure 33(d)(1), prior document productions of third-party communications made by Plaintiff State of Texas.

**INTERROGATORY NO. 10:** Identify all persons other than Google who have provided

You with information that You intend to rely on to support Your claims asserted in this

Action, and provide a brief description of the information received from each such person.

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party as it is duplicative of information included as part of the Plaintiff States Rule 26 disclosures. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including the productions and review of documents from third parties, and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial. The Plaintiff States also object to this interrogatory to the extent it seeks attorney-client or work product privileged information, information subject to the common interest and joint prosecution privileges, or to the extent it seeks information not otherwise discoverable under court order. Plaintiff States also object on the basis that this is a contention interrogatory that need not be answered until the conclusion of fact discovery. Subject to and without waiving any of the foregoing objections, the Plaintiff States respond:

- *See* Appendix A of Plaintiff States forthcoming First Amended Initial Disclosures which lists each third party contacted during the investigation by the Plaintiff States.

- The following companies produced documents to Plaintiff States during the investigation: Adobe, Amazon, Amobee, AT&T, Comcast, Criteo, Daily Mail, Discovery, Duck Duck Go, Facebook, Fox, Hearst, Index Exchange, MediaMath, Microsoft, New York Times, News Corp., OpenX, Oracle, Pubmatic, Rubicon (now Magnite), SpringServe, The Trade Desk, Verizon, WPP.

- The Plaintiff States intend to rely on documents and information produced by other plaintiffs who have filed suit against Google and by third parties that have produced

documents to the parties since the Plaintiff States' investigation—whose identities are all known to Google.

**INTERROGATORY NO. 11:** Identify any communications with or from Google upon which You rely for any of Your claims, including the dates of such communications, the relevant individuals from You and Google who participated in such communications, the subject matter of such communications, and all documents related thereto.

> **Response:** The Plaintiff States object to this interrogatory as vague and ambiguous, overly burdensome, and disproportional to the needs of the case as the requesting party's ability to obtain the information is similar or superior to that of the responding party. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents (including large volumes of Google communications) not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial. Plaintiff States also object on the basis that this is a contention interrogatory that need not be answered until the conclusion of fact discovery. Subject to and without waiving the foregoing objections, the Plaintiff States will meet and confer with Google to identify responsive information.

**INTERROGATORY NO. 12:** Identify all contracts that You allege coerced customers into using DFP with AdX, as set forth in Paragraphs 245-252 of the Third Amended Complaint. For each contract, identify the specific provisions You contend are coercive in nature.

> **Response:** The Plaintiff States object to this interrogatory as misstating their claims, which allege, among other allegations, that Google's decision and actions to no longer offer AdX-only contracts was coercive. Subject to and without waiving the foregoing objection, the Plaintiff States respond:
>
> - Google's Interrogatory mischaracterizes Plaintiff States' allegations and the state of discovery by assuming that Google has produced a substantial number of actual agreements between publishers and DFP.
>
> - Plaintiff States allege that Google's policy, practices, and actions of restricting the ability of publishers to trade through AdX unless they use Google's ad server and allowing only those which licensed Google's ad server to receive live, competitive bids from AdX, constituted coercion.

- The alleged conduct at issue was described in MDL Judge Castel's Order on Google's Motion to Dismiss (which Google has access to) as Google renegotiating agreements with publishers and "requiring publishers to sign a combined contract that included both Google's DFP ad server and Google's AdX exchange." Castel MTD Order at 18.

- The Fourth Amended Complaint at Paragraphs 245-252 also alleges that Google required publishers to either sign a combined contract licensing DFP and AdX, or risk losing access to live competitive bids from AdX. (*See also* GOOG-TEX-00059386).

- Plaintiff States assert that Google's decision and actions to no longer offer AdX-only contracts was coercive. (*See* GOOG-TEX-00059678).

- This ultimatum from Google coerced publishers into adopting DFP to access AdX demand. This allegation is substantiated by documentation of Google's plans to stop offering AdX as a stand-alone product to publishers. (*See* GOOG-TEX-00058737.)

- Examples of the combined DFP and AdX contracts that Google coerced, as described above, publishers into entering, include but are not limited to:

  - GOOG-TEX-0074509;  GOOG-TEX-00976755;  GOOG-TEX-00978421; GOOG-TEX-00980662; GOOG-TEX-00975725; GOOG-TEX-00976389; GOOG-TEX-00981687; GOOG-TEX-00976342; COM-00392228; COM-00247113.

- Further, Plaintiff States have requested, and Google is obligated to produce but has not yet produced, all contracts that relate to Plaintiffs' tying claims pursuant to: Requests for Production Nos. 66 and 272 of Plaintiffs' First Request for Production of Documents to Defendants served on Google on January 27, 2023 while this case was still consolidated in the MDL; and Plaintiff State of Texas's Second Requests for Production served on Google on February 9, 2024. These additional and responsive contracts, not yet produced by Google, also relate to Plaintiff States' tying claims and coercion allegations against Google.

**INTERROGATORY NO. 13:** Identify the "one large publisher" and all other "publishers"

referenced in Paragraph 247 of the Third Amended Complaint.

**Response:** The Plaintiff States object to this interrogatory as overly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party. Subject to and without

waiving the foregoing objections, the Plaintiff States will meet and confer with Google to identify responsive information, if any, within their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Subject to and without waiving the foregoing objections:

- The Plaintiff States identify NewsCorp as the "one large publisher."

**INTERROGATORY NO. 14:** Identify the earliest date on which You believe Google possessed monopoly power in each of the markets that You allege to be relevant to Your claims, and describe how You believe Google obtained monopoly power in each of those markets.

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party. The Plaintiff States also object to this interrogatory to the extent that it seeks to compel a legal conclusion. Further, Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Plaintiff States also object on the basis that this is a contention interrogatory that need not be answered until the conclusion of fact discovery. Subject to and without waiving the foregoing objections, the Plaintiff States respond:

- The Plaintiff States believe Google possessed monopoly power in the ad serving market as early as 2008 upon the acquisition of DoubleClick.

- The Plaintiff States believe Google possessed monopoly power in the ad exchange market as early as 2009.

- The Plaintiff States believe Google possessed monopoly power in the market for buying tools for small advertisers as early as 2009.

- The Plaintiff States believe that Google acquired monopoly power in the market for buying tools for large advertisers as early as 2018.

**INTERROGATORY NO. 15:** Separately for each agency, department, entity, or division of Your state (including the office of the Attorney General) that has used Ad Tech Products or Display Advertising, identify each Ad Tech Product used during the Relevant Time Period, whether from Google or any other Ad Tech Provider. In Your response, provide:

a. the type of Ad Tech Product used;

b. the amount of fees or Take Rate by month for each Ad Tech Product used;

c. the dates during which each Ad Tech Product was used;

d. all reasons for using and/or switching from one Ad Tech Product to another; and

e. if applicable, all reasons for ceasing use of an Ad Tech Product.

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims in this litigation.The Plaintiff States also object to this interrogatory because it seeks information that is not within the possession, custody, or control of their respective Offices of the Attorney General and reiterate their objection to the definition of "You" stated above. The Plaintiff States are willing to meet and confer with Google to identify responsive information, if any, within their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Finally, the Plaintiff States object to this interrogatory as containing discrete sub-parts such that it should constitute multiple interrogatories in considering the interrogatory limit imposed by the Court in this case.  ECF No. 194 at 6 ("This limit on the number of interrogatories includes discrete sub-parts …."). Subject to and without waiving the foregoing objections:

- The Arkansas Office of Attorney General Public Protection Division has used Google AdWords services from November 1, 2013 to present. The Take Rate is not applicable, as this service was not purchased with the goal of monetary gain. Ad Tech products were used to notify the public of laws concerning tobacco purchases in the State of Arkansas and to deter sales of contraband tobacco products. At no time did the Public Protection Division cease the use of or switch Ad Tech products.

- The Plaintiff State of North Dakota specifically identifies the North Dakota Lottery ("ND Lottery") as the only division of the North Dakota Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.

The Plaintiff State of North Dakota restates its objection to Relevant Time Period, if it is meant to be "Relevant Period." The "Relevant Period," as defined, is overbroad, unduly burdensome, and disproportional to the needs of the case. The State of North Dakota will provide responses to this Interrogatory to the extent that the State of North Dakota has the information in its possession, custody, or control.

a. *the type of Ad Tech Product used:* The ND Lottery has used Google Display, DV360 (Adswerve), YouTube (Pre-roll), Meta (Facebook and Instagram), Forum Communications (Programmatic Pre-Rolls and Programmatic Display), Midco (OTT/CTV), Hulu (OTT/CTV), Outstream Video, Extreme Reach, Teads, Dynadmic, Pandora, Google Campaign Manager, and Simpli.Fi.

b. *the amount of fees or Take Rate by month for each Ad Tech Product used:* The ND Lottery does not have any information regarding fees or Take Rate for Ad Tech Products used.

c. *the dates during which each Ad Tech Product was used:* The ND Lottery's use of Ad Tech Products identified in a., above, depends on each advertising buy, campaign, and budget. The use of Ad Tech Products is reflected in each media buy. The ND Lottery used Google Display and YouTube Pre-Roll until March 2022, and began using DV360 in December of 2022. The ND Lottery used Teads In-read video from 2016 to 2019 and switched to Outstream Video in November 2019. The ND Lottery tried Dynadmic video and Extreme Reach for a short time from 8/6/2017 to 9/2/2017.

d. *all reasons for using and/or switching from one Ad Tech Product to another:* While using YouTube Pre Roll and Google Display, ND Lottery had persistent issues with Google flagging its ads as unapproved online gambling. ND Lottery stopped using YouTube Pre Roll and Google Display in March 2022, as neither ad tech product would run its advertising campaign. ND Lottery was informed by its advertising agency that Google rejected the advertising campaign because of a sentence in the ND Lottery's website global footer, which references the contact information for Responsible Gaming Help. Google specifically had issues with the language: "If gambling is no longer fun call 2-1-1, contact GamblerND in North Dakota or Gamblers Anonymous." Google would only approve ND Lottery's advertising campaign if it agreed to remove this section of the Responsible Gaming Help language. Per the ND Lottery's Administrative Rules 10-16-01-02, Advertising, Subsection b, the ND Lottery provides retailers with Problem Gambling Helpline Telephone Number. Since the Responsible Gaming Help language is provided to retailers, the ND Lottery is legally required to provide it to the public as a public service. ND Lottery could not make

33

the change requested by Google, and ND Lottery had to switch the online advertising budget it would have used on Google Display/YouTube over to Facebook. In or around December of 2022, ND Lottery tried DV360, negotiated ad/website language that would allow it to advertise using DV360, and subsequently switched some of its advertising budget to DV360. In June 2023, the ND Lottery's advertising agency, Kranzler Kingsley Communications Ltd d/b/a KK Bold ("KK Bold"), was bought out by another advertising agency, Odney, Inc, dba Odney Advertising ("Odney").  Odney took over the marketing and advertising services contract July 1, 2023.  Odney uses Google Campaign Manager and Simpli.Fi as their ad tech product.

      *e. if applicable, all reasons for ceasing use of an Ad Tech Product:* See response to d.

- The Plaintiff State of Indiana identifies the following links containing a searchable directory identifying staff of Indiana State Agencies, Departments, Boards, and Commissions:

  ([https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf](https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf))
  ([https://www.in.gov/apps/iot/find-a-person/](https://www.in.gov/apps/iot/find-a-person/))

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Indiana Office of the Attorney General.

  The Plaintiff State of Indiana specifically identifies the Indiana Office of Attorney General Unclaimed Property Division ("UPD") as the only division of the Indiana Office of Attorney General that has used display advertising or ad tech products during the Relevant Period. The Indiana Office of Attorney General works through an outside vendor to purchase advertising services, including display advertising, for UPD.

  The Indiana Office of Attorney General UPD has provided some general targeting criteria to its vendor The Prosper Group for some campaigns for Display Advertising as defined. Specifically, it has directed internal information on potential owners to its vendor in connection with social advertising campaigns. Additionally, UPD it has provided geographic targeting goals to its vendor in connection with specific video campaigns. However, the communication of any specific targeting criteria to Ad Tech Providers is managed through its vendor. The specific Properties where Display Advertisements have been placed is not information within the possession, custody, or control of the Indiana Office of Attorney General.

  The Plaintiff State of Indiana restates its objection to "the Relevant Time Period," if it is meant to be "Relevant Period." The "Relevant Period," as defined, is

overbroad, unduly burdensome, and disproportional to the needs of the case. The State of Indiana will provide responses to this Interrogatory to the extent that the State of Indiana has the information in its possession, custody, or control.

The Plaintiff State of Indiana will produce documents related to its use of Display Advertising through advertising contracts with outside vendors.

> *a. the type of Ad Tech Product used:* The Indiana Office of Attorney General does not select individual Ad Tech Products. It uses an outside vendor, The Prosper Group, PO Box 488, Greenwood, IN 46142, to purchase advertising services, including Display Advertising, for UPD. Previously, the Indiana Office of Attorney General used a different vendor, The Basement, 1075 Broad Ripple Avenue, Ste 381, Indianapolis, IN 46220, to purchase advertising services, including Display Advertising, for UPD.

> *b. the amount of fees or Take Rate by month for each Ad Tech Product used:* The Indiana Office of Attorney General does not track fees or Take Rates by Ad Tech Product used.

> *c. the dates during which each Ad Tech Product was used:* The Indiana Office of Attorney General does not direct or track the use of individual Ad Tech Products. The Indiana Office of Attorney General has allocated some of its UPD advertising budget through The Prosper Group to display advertising in different campaigns since at least May, 2021.

> *d. all reasons for using and/or switching from one Ad Tech Product to another:* The Indiana Office of Attorney General does not select individual Ad Tech Products. Any Display Advertising purchased for any UPD advertising campaign was arranged through its outside vendor.
>
> As part of UPD's reliance on its outside vendor, the vendor has on one or more occasions recommend shifting spend between different advertising mediums and given notice of proposed changes to UPD. UPD does not independently formulate a strategy as to individual Ad Tech Products but relies on its vendor's expertise to formulate a strategy and select individual Ad Tech Products.

> *e. if applicable, all reasons for ceasing use of an Ad Tech Product:* The Indiana Office of Attorney General does not select individual Ad Tech Products. Any Display Advertising purchased for any UPD advertising campaign was arranged through its outside vendor.

- The Plaintiff Commonwealth of Kentucky identifies the following link containing an organizational chart of the executive branch of government in the Commonwealth: OC-Statewide.pdf (ky.gov). The Kentucky Office of the Attorney

General does not have any independent knowledge of whether any other state agency, entity, division, or department of the Commonwealth, including any contained on the organizational chart available at the link provided, has used Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies.

The Office further states that the Kentucky Office of the Attorney General has used Ad Tech Products and Display Advertising. The Office has retained an outside firm, Red7e, for advertising, marketing, and digital media services in connection with various ad campaigns. The ad campaigns managed by Red7e used various forms of Display Advertising, including but not limited to advertisements on Facebook, Instagram, and streaming devices. Please see the Red7e documentation the Commonwealth is producing in response to Google's First Set of Requests for Production for additional details. The Office has also used LinkedIn for job postings. Please see the LinkedIn invoices the Commonwealth is producing in response to Google's First Set of Requests for Production for additional details. As to the specific subparts of Interrogatory No. 15, responses are provided below:

   a. *the type of Ad Tech Product used:* LinkedIn; Facebook; Instagram. Please see the Red7e documentation the Kentucky Office of the Attorney General is producing in response to Google's First Set of Requests for Production for additional details regarding the type of AdTech Product used.

   b. *the amount of fees or Take Rate by month for each Ad Tech Product used:* The Kentucky Office of the Attorney General has information regarding the fees it paid for LinkedIn and the fees it paid to Red7e. Please see the Red7e and LinkedIn documentation the Office is producing in response to Google's First Set of Requests for Production for additional details. The Office does not have information on the Take Rate for each Ad Tech Product used.

   c. *the dates during which each Ad Tech Product was used:* The Kentucky Office of the Attorney General used LinkedIn in April of 2020, September of 2021, and July of 2022. The Office has worked with Red7e in 2021, 2022, and 2023. At the time of service of these responses, the Office continues to work with Red7e. Please see the Red7e and LinkedIn documentation the Commonwealth is producing in response to Google's First Set of Requests for Production for full details regarding the dates during which each Ad Tech Product was used.

   d. *all reasons for using and/or switching from one Ad Tech Product to another:* The Kentucky Office of the Attorney General does not have information on the reasons for using and/or switching from one Ad Tech Product to another, other than what appears in the Red7e documentation the Office is producing in response to Google's First Set of Requests for

36

Production. The documents generally show that the reasons for using and/or switching from one AdTech Product to another was based on the needs of the particular advertising campaign. Those needs were informed by, but not limited to, budget and audience reach.

e. *if applicable, all reasons for ceasing use of an Ad Tech Product:* The Kentucky Office of the Attorney General does not have information on the reasons for ceasing use of an Ad Tech Product other than what appears in the document production the Office has previously made to Google in response to Google's First Set of Requests for Production.

- The Louisiana Gaming Division and Public Protection Division have purchased display advertising on limited occasions in the past for specific campaigns directed at messaging regarding fair housing and gambling. The purchase of said limited display advertising was made with non-state funds and through an outside advertising agency that would have selected the strategy, products, and providers. In addition, the Plaintiff State of Louisiana, by and through its Attorney General's Office identifies the following link containing a directory of all Louisiana State Agencies:

  https://www.louisiana.gov/government/agency-directory/#:~:text=Louisiana%27s%20Community%20and%20Technical%20College%20System%20Louisiana%20Division,Administration%20Program%20Louisiana%20Legislature%20Louisiana%20State%20University%20System

- The Plaintiff States of Texas, Idaho, and Mississippi attach to these responses as Exhibit "A" a list of contact information for their respective state agencies, which are in a superior position to provide Google with the information it seeks. The Plaintiff States of Texas, Idaho, and Mississippi do not possess knowledge as to whether these entities use display advertising or ad tech products, and such information is not within their possession, custody, or control.

- The Plaintiff State of Missouri, by and through its Attorney General's Office identifies the following link containing a full list of Missouri State Agencies, Departments, Boards, and Commissions:

  (https://www.mo.gov/search-results?mode=state_agencies).

Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Missouri Office of the Attorney General. The foregoing link includes contact information for each Missouri Agency, Department, Board, and Commission. Each such Agency, Department, Board, and Commission would be in a superior position to provide Google with the information it seeks.

37

- The Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period, and does not have possession, custody or control of documents or information for other state agencies. However, as stated in the Response to Interrogatory No. 1, public officers for Additional Nevada Agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The documents these Additional Nevada Agencies are willing to voluntarily produce would include information that is responsive to the requests in Interrogatory No. 15, and the Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time.

- The Offices of the Attorneys General for the Plaintiff States of Texas, Idaho, Florida, Mississippi, Missouri, Montana, Puerto Rico, South Carolina, South Dakota, and Utah have not purchased display advertising or used ad tech products during the Relevant Period. Additionally, the Utah Division of Consumer Protection has not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 16:** Separately for each agency, department, entity, or division of Your state (including the office of the Attorney General) that has used Ad Tech Products or Display Advertising, identify each account associated with each Ad Tech Product used and provide:

a. the dates during which each account was in use;

b. all entities associated with each account;

c. all account IDs, including Google Customer IDs (CIDs), associated with each account;

d. the individuals and entities, including external advertising agencies, who had responsibility for and access to each account and the contact information for each; and

e. the settings for each account over time, including bidding methodologies for Display Advertisements (e.g., manual or automated bidding), bidding strategy, attribution and User tracking, any changes made from the default settings including enabling or disabling certain Features, any limits or thresholds set for Bid amounts, the associated time period in which these changes were made, and reasons for doing so.

38

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims in this litigation. The Plaintiff States also object to this interrogatory because it seeks information that is not within the possession, custody, or control of their respective Offices of the Attorney General and reiterate their objection to the definition of "You" stated above. The Plaintiff States are willing to meet and confer with Google to identify responsive information, if any, within their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Finally, the Plaintiff States object to this interrogatory as containing discrete sub-parts such that it should constitute multiple interrogatories in considering the interrogatory limit imposed by the Court in this case.  ECF No. 194 at 6 ("This limit on the number of interrogatories includes discrete sub-parts …."). Subject to and without waiving the foregoing objections:

- The Arkansas Office of Attorney General operates a single account for Ad Tech Services.

    a) November 1, 2023—Present

    b) Arkansas Office of Attorney General, Public Protection Division

    c) Account Number 862-941-6906; Google Customer ID 0596-6592-3895-7671

    d) Two individuals:
    1. Charles Saunders, Assistant Attorney General, Arkansas Office of Attorney General, 323 Center St., Little Rock, AR 72201
    2. Bryant Stanfield, Logistics Director, Arkansas Office of Attorney General, 323 Center St., Little Rock, AR 72201

    e) Because this is a Google account, Google should be in possession of most of the information sought in this section. All information sought in this section that would not be in the possession of Google is included in the State of Arkansas' response to Interrogatory No. 18.

- The ND Lottery does not have possession, custody, or control over this information. The ND Lottery's Ad Tech product accounts have been handled by a third party, namely Kranzler Kingsley Communications Ltd d/b/a KK Bold ("KK Bold"), 505 East Main Avenue Suite 250, Bismarck, ND, 58501, telephone (701) 255-3067, during the Relevant Time Period until June 30, 2023.  Since July 1, 2023, Odney, Inc. has been the vendor of contract for marketing and advertising services.  Odney, Inc.'s contact information is 117 West Front Avenue, Bismarck, ND, 58504, telephone (701) 222-8721.

- The Plaintiff State of Indiana identifies the following links containing a searchable directory identifying staff of Indiana State Agencies, Departments, Boards, and Commissions:

  (https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf)
  (https://www.in.gov/apps/iot/find-a-person/)

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Indiana Office of the Attorney General.

  The Plaintiff State of Indiana specifically identifies the Unclaimed Property Division as the only division of the Indiana Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.

  The Indiana Office of Attorney General does not directly purchase individual Ad Tech Products and does not have any information on any individual Ad Tech "account" used for such purpose. Any Display Advertising purchased for any UPD advertising campaign was arranged through its outside vendor. Specifically, UPD maintains a Google Analytics account for purposes of tracking website traffic on indianaunclaimed.gov but does not purchase Display Advertising through that account. UPD understands that Display Advertising purchases for UPD are made by its outside vendor through a Google Analytics account for which it lacks access. Additionally, UPD maintains an account for facebook.com which, among other things, allows ads to be purchased for UPD through its outside vendor. However, UPD does not arrange the purchase of ads on behalf of the account and relies on its vendor to purchase Display Advertising.

- The Plaintiff Commonwealth of Kentucky identifies the following link containing an organizational chart of the executive branch of government in the Commonwealth: OC-Statewide.pdf (ky.gov). The Kentucky Office of the Attorney General does not have any independent knowledge of whether any other state agency, entity, division, or department of the Commonwealth, including any contained on the organizational chart available at the link provided, has used Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies.

  The Kentucky Office of the Attorney General states that it does not have information on subparts (a) through (e) of Interrogatory No 16. The Office's "accounts" associated with each Ad Tech Product have been handled by a third party—Red7e—located at 637 W Main Street Louisville, Kentucky 40202. The Plaintiff Commonwealth of Kentucky interpreted Interrogatory No. 16, when it asked to "identify each account associated with each Ad Tech Product" to be requesting information on the account name or number tied to a specific Ad Tech Product and not asking for any internal, administrative numbers used by the Kentucky Office of the Attorney General to track or process payments to Red7e for

its services. To the extent Google is requesting information on the former, that information, if it exists, will be best addressed by Red7e, as that agency has handled the Office's use of Display Advertising and Ad Tech Products. If as part of Interrogatory No. 16 Google is requesting all internal, administrative reference numbers the Kentucky Office of the Attorney General has used to track payment and processing of Red7e invoices, then the Commonwealth refers Google to those specific documents within its production in response to Google's First Set of Requests for Production.

- The Plaintiff State of Louisiana, by and through its Attorney General's Office identifies the following link containing a directory of all Louisiana State Agencies:

  https://www.louisiana.gov/government/agency-directory/#:~:text=Louisiana%27s%20Community%20and%20Technical%20College%20System%20Louisiana%20Division,Administration%20Program%20Louisiana%20Legislature%20Louisiana%20State%20University%20System

  The Louisiana Gaming Division and Public Protection Division have purchased display advertising on limited occasions in the past for specific campaigns directed at messaging regarding fair housing and gambling. The purchase of said limited display advertising was made with non-state funds and through an outside advertising agency that would have selected the strategy, products, and providers.

- The Plaintiff States of Texas, Idaho, and Mississippi attach to these responses as Exhibit "A" a list of contact information for their respective state agencies, which are in a superior position to provide Google with the information it seeks. The Plaintiff States of Texas, Idaho, and Mississippi do not possess knowledge as to whether these entities use display advertising or ad tech products, and such information is not within their possession, custody, or control.

- The Plaintiff State of Missouri, by and through its Attorney General's Office identifies the following link containing a full list of Missouri State Agencies, Departments, Boards, and Commissions:

  (https://www.mo.gov/search-results?mode=state_agencies).

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Missouri Office of the Attorney General. The foregoing link includes contact information for each Missouri Agency, Department, Board, and Commission. Each such Agency, Department, Board, and Commission would be in a superior position to provide Google with the information it seeks.

- The Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period, and does not have possession, custody or control of documents or information for other state agencies. However, as stated in the

41

Response to Interrogatory No. 1, public officers for Additional Nevada Agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The documents these Additional Nevada Agencies are willing to voluntarily produce would include information that is responsive to the requests in Interrogatory No. 16, and the Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time.

- The Offices of the Attorneys General for the Plaintiff States of Texas, Idaho, Florida, Mississippi, Missouri, Montana, Puerto Rico, South Carolina, South Dakota, and Utah have not purchased display advertising or used ad tech products during the Relevant Period. Additionally, the Utah Division of Consumer Protection has not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 17:** Separately for each agency, department, entity, or division of Your state (including the office of the Attorney General) that has used Ad Tech Products or Display Advertising, identify the monthly return on investment or return on advertising spend as a result of using each Ad Tech Product, including Google as well as non-Google Products. In Your answer, describe how each agency, department, entity, or division determines return on investment or return on advertising spend.

**Response:** The Plaintiff States object to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims in this litigation. The Plaintiff States also object to this interrogatory because it seeks information that is not within the possession, custody, or control of their respective Offices of the Attorney General and reiterate their objection to the definition of "You" stated above. The Plaintiff States are willing to meet and confer with Google to identify responsive information, if any, within their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Subject to and without waiving the foregoing objections:

- The State of Arkansas states that this interrogatory is inapplicable to the State of Arkansas, as its use of Ad Tech Products and Display Advertising were not intended to create a return on investment, but solely to operate as a notice to the public.

- The ND Lottery does not track return on investment or return on advertising spend. The ND Lottery has received some analytics relating to its online advertisement

from KK Bold, however, not regarding return on investment or return on advertising spend.

- The Plaintiff State of Indiana identifies the following links containing a searchable directory identifying staff of Indiana State Agencies, Departments, Boards, and Commissions:

  (https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf)
  (https://www.in.gov/apps/iot/find-a-person/)

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Indiana Office of the Attorney General.

  The Plaintiff State of Indiana specifically identifies the Unclaimed Property Division as the only division of the Indiana Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.

  The Indiana Office of Attorney General does not track return on investment or return on advertising spend by Ad Tech Product used. The Indiana Office of Attorney General has only purchased display advertising in furtherance of UPD's noncommercial mission which includes informing owners of the existence of unclaimed property held by UPD.

- The Plaintiff Commonwealth of Kentucky identifies the following link containing an organizational chart of the executive branch of government in the Commonwealth: OC-Statewide.pdf (ky.gov). The Kentucky Office of the Attorney General does not have any independent knowledge of whether any other state agency, entity, division, or department of the Commonwealth, including any contained on the organizational chart available at the link provided, has used Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies.

  The Kentucky Office of the Attorney General refers to the information contained in the Red7e documentation the Office is producing in response to Google's First Set of Requests for Production, including the document entitled "Digital/Internet Advertising Recap." The Kentucky Office of the Attorney General further states that it does not track return on investment or return on advertising spend beyond the analytics it has received Red7e. The Kentucky Office of the Attorney General has used Display Advertising or Ad Tech Products to raise awareness on the subjects of the ad campaigns for which it has used Red7e.

- The Plaintiff State of Louisiana, by and through its Attorney General's Office identifies the following link containing a directory of all Louisiana State Agencies:

43

https://www.louisiana.gov/government/agency-directory/#:~:text=Louisiana%27s%20Community%20and%20Technical%20College%20System%20Louisiana%20Division,Administration%20Program%20Louisiana%20Legislature%20Louisiana%20State%20University%20System

The Louisiana Gaming Division and Public Protection Division have purchased display advertising on limited occasions in the past for specific campaigns directed at messaging regarding fair housing and gambling. The purchase of said limited display advertising was made with non-state funds and through an outside advertising agency that would have selected the strategy, products and providers. The State of Louisiana states that this interrogatory is inapplicable, as its limited use of Ad Tech Products and Display Advertising were not intended to create a return on investment, but solely to operate as a notice to the public on the limited topics of the campaigns.

- The Plaintiff States of Texas, Idaho, and Mississippi attach to these responses as Exhibit "A" a list of contact information for their respective state agencies, which are in a superior position to provide Google with the information it seeks. The Plaintiff States of Texas, Idaho, and Mississippi do not possess knowledge as to whether these entities use display advertising or ad tech products, and such information is not within their possession, custody, or control.

- The Plaintiff State of Missouri, by and through its Attorney General's Office identifies the following link containing a full list of Missouri State Agencies, Departments, Boards, and Commissions:

    (https://www.mo.gov/search-results?mode=state_agencies).

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Missouri Office of the Attorney General. The foregoing link includes contact information for each Missouri Agency, Department, Board, and Commission. Each such Agency, Department, Board, and Commission would be in a superior position to provide Google with the information it seeks.

- The Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period, and does not have possession, custody or control of documents or information for other state agencies. However, as stated in the Response to Interrogatory No. 1, public officers for Additional Nevada Agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The documents these Additional Nevada Agencies are willing to voluntarily produce would include information that is responsive to the requests in Interrogatory No. 17, and the Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time.

- The Offices of the Attorneys General for the Plaintiff States of Texas, Idaho, Florida, Mississippi, Missouri, Puerto Rico, South Carolina, South Dakota, and Utah have not purchased display advertising or used ad tech products during the Relevant Period. Additionally, the Utah Division of Consumer Protection has not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 18:** Separately for each agency, department, entity, or division of Your state (including the office of the Attorney General) that has used Ad Tech Products or Display Advertising, identify all factors that have influenced Display Advertising strategy, selection of Ad Tech Providers, and selection of Ad Tech Products.

<u>**Response:**</u> The Plaintiff States object to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims in this litigation. The Plaintiff States also object to this interrogatory because it seeks information that is not within the possession, custody, or control of their respective Offices of the Attorney General and reiterate their objection to the definition of the word "You" stated above. The Plaintiff States are willing to meet and confer with Google to identify responsive information, if any, within their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Subject to and without waiving the foregoing objections:

- The State of Arkansas states that the factor that influenced its display advertising strategy were the State of Arkansas' goal to notify persons located in Arkansas of laws governing tobacco purchases within the State of Arkansas and to deter the sale of contraband tobacco products. The selection of Google AdWords was made because Google is the most used search engine and the most used online advertising platform for searches.

- The ND Lottery has relied on recommendations and decisions from its advertising agency regarding Display Advertising strategy and selection of Ad Tech Providers and Products. The ND Lottery provides a budget to its advertising agency and relies on the advertising agency to make recommendations on how and where to advertise based on the budget and the nature and goal of the advertising campaign. ND Lottery does not tell its advertising agency what Ad Tech Providers and Ad Tech Products to use.  ND Lottery hires an advertising agency to rely on their expertise.

- The Plaintiff State of Indiana identifies the following links containing a searchable directory identifying staff of Indiana State Agencies, Departments, Boards, and Commissions:

  (https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf)
  (https://www.in.gov/apps/iot/find-a-person/)

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Indiana Office of the Attorney General.

  The Plaintiff State of Indiana specifically identifies the Unclaimed Property Division as the only division of the Indiana Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.

  The Indiana Office of Attorney General UPD has relied on input and decisions from its outside vendor for decisions relating to Display Advertising strategy and selection of individual Ad Tech Providers and Ad Tech Products. The Indiana Office of Attorney General has provided campaign budgets to its vendor and relied on the vendor to make recommendations on how and where to advertise based on the budget and the nature and goal of the advertising campaign.

  As part of UPD's reliance on its outside vendor, the vendor has on one or more occasions recommend shifting spend between different advertising mediums and given notice of proposed changes to UPD. UPD does not independently formulate a strategy as to individual Ad Tech Providers or Ad Tech Products but relies on its vendor's expertise to formulate a strategy and select individual Ad Tech Providers and Ad Tech Products.

- The Plaintiff Commonwealth of Kentucky identifies the following link containing an organizational chart of the executive branch of government in the Commonwealth: OC-Statewide.pdf (ky.gov). The Kentucky Office of the Attorney General does not have any independent knowledge of whether any other state agency, entity, division, or department of the Commonwealth, including any contained on the organizational chart available at the link provided, has used Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies.

  The Kentucky Office of the Attorney General states that it relies on input from Red7e regarding advertising, marketing, and digital media services, including its input on selecting any Ad Tech Providers and Ad Tech Products. In addition, the Office states that what Ad Tech Providers or Ad Tech Products are used is also a function of the details of each ad campaign, including the budget of the campaign and the intended audience of the campaign.. Please see the Red7e documentation the Commonwealth is producing in response to Google's First Set of Requests for Production for additional information on the details of each ad campaign. The

documents the Commonwealth has produced in response to Google's First Set of Requests for Production generally show that the "factors that have influenced Display Advertising strategy, selection of Ad Tech Providers, and selection of Ad Tech Products" are based on the needs or requirements of the particular advertising campaign in question, and the needs and requirements of those campaigns were informed by, but not limited to, the budget for the campaign and the intended audience of the campaign.

- The Louisiana Gaming Division and Public Protection Division have purchased display advertising on limited occasions in the past for specific campaigns directed at messaging regarding fair housing and gambling.  The  purchase of said limited display advertising was made with non-state funds and through an outside advertising agency that would have selected the strategy, products and providers. In addition, the Plaintiff State of Louisiana, by and through its Attorney General's Office identifies the following link containing a directory of all Louisiana State Agencies:

  https://www.louisiana.gov/government/agency-directory/#:~:text=Louisiana%27s%20Community%20and%20Technical%20College%20System%20Louisiana%20Division,Administration%20Program%20Louisiana%20Legislature%20Louisiana%20State%20University%20System

- The Plaintiff States of Texas, Idaho, and Mississippi attach to these responses as Exhibit "A" a list of contact information for their respective state agencies, which are in a superior position to provide Google with the information it seeks. The Plaintiff States of Texas, Idaho, and Mississippi do not possess knowledge as to whether these entities use display advertising or ad tech products, and such information is not within their possession, custody, or control.

- The Plaintiff State of Missouri, by and through its Attorney General's Office identifies the following link containing a full list of Missouri State Agencies, Departments, Boards, and Commissions:

  (https://www.mo.gov/search-results?mode=state_agencies).

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Missouri Office of the Attorney General. The foregoing link includes contact information for each Missouri Agency, Department, Board, and Commission. Each such Agency, Department, Board, and Commission would be in a superior position to provide Google with the information it seeks.

- The Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period, and does not have possession, custody or control of

documents or information for other state agencies. However, as stated in the Response to Interrogatory No. 1, public officers for Additional Nevada Agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The documents these Additional Nevada Agencies are willing to voluntarily produce would include information that is responsive to the requests in Interrogatory No. 18, and the Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time.

- The Offices of the Attorneys General for the Plaintiff States of Texas, Idaho, Florida, Mississippi, Missouri, Montana, Puerto Rico, South Carolina, South Dakota, and Utah have not purchased display advertising or used ad tech products during the Relevant Period. Additionally, the Utah Division of Consumer Protection has not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 19:** Separately for each agency, department, entity, or division of Your state (including the office of the Attorney General) that has used Ad Tech Products or Display Advertising, describe the impact of Header Bidding on Digital Advertising strategy or the cost effectiveness of Digital Advertising.

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims in this litigation. The Plaintiff States also object to this interrogatory because it seeks information that is not within the possession, custody, or control of their respective Offices of the Attorney General and reiterate their objection to the definition of "You" stated above. The Plaintiff States are willing to meet and confer with Google to identify responsive information, if any, within their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Subject to and without waiving the foregoing objections:

- The State of Arkansas states that the only effect that Header Bidding on Digital advertising has had on the State of Arkansas Office of Attorney General's digital advertising strategy was that the account operator placed a bid limit of $500 on the account. Automatic bidding is enabled on the account.

  The North Dakota Lottery does not have any information regarding Header Bidding, its impact on the Digital Advertising strategy or the cost effectiveness of the ND Lottery's Digital Advertising.

- The Plaintiff State of Indiana identifies the following links containing a searchable directory identifying staff of Indiana State Agencies, Departments, Boards, and Commissions:

  (https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf)
  (https://www.in.gov/apps/iot/find-a-person/)

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Indiana Office of the Attorney General.

  The Plaintiff State of Indiana specifically identifies the Unclaimed Property Division as the only division of the Indiana Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.

  The Indiana Office of Attorney General does not have any information regarding Header Bidding, its impact on its Digital Advertising strategy or the cost effectiveness of UPD's Digital Advertising.

- The Plaintiff Commonwealth of Kentucky identifies the following link containing an organizational chart of the executive branch of government in the Commonwealth: OC-Statewide.pdf (ky.gov). The Kentucky Office of the Attorney General does not have any independent knowledge of whether any other state agency, entity, division, or department of the Commonwealth, including any contained on the organizational chart available at the link provided, has used Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies.

  The Kentucky Office of the Attorney General states that it does not have any information regarding the impact of Header Bidding on Digital Advertising strategy or the cost effectiveness of Digital Advertising.

- The Louisiana Gaming Division and Public Protection Division have purchased display advertising on limited occasions in the past for specific campaigns directed at messaging regarding fair housing and gambling. The  purchase of said limited display advertising was made with non-state funds and through an outside advertising agency that would have selected the strategy including that regarding Header Bidding and its impact on the Digital Advertising strategy,  products and providers.  In addition, the Plaintiff State of Louisiana, by and through its Attorney General's Office identifies the following link containing a directory of all Louisiana State Agencies:

  https://www.louisiana.gov/government/agency-directory/#:~:text=Louisiana%27s%20Community%20and%20Technical%20College%20System%20Louisiana%20Division,Administration%20Program%20Louisiana%20Legislature%20Louisiana%20State%20University%20System

- The Plaintiff States of Texas, Idaho, and Mississippi attach to these responses as Exhibit "A" a list of contact information for their respective state agencies, which are in a superior position to provide Google with the information it seeks. The Plaintiff States of Texas, Idaho, and Mississippi do not possess knowledge as to whether these entities use display advertising or ad tech products, and such information is not within their possession, custody, or control.

- The Plaintiff State of Missouri, by and through its Attorney General's Office identifies the following link containing a full list of Missouri State Agencies, Departments, Boards, and Commissions:

   (https://www.mo.gov/search-results?mode=state_agencies).

   Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Missouri Office of the Attorney General. The foregoing link includes contact information for each Missouri Agency, Department, Board, and Commission. Each such Agency, Department, Board, and Commission would be in a superior position to provide Google with the information it seeks.

- The Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period, and does not have possession, custody or control of documents or information for other state agencies. However, as stated in the Response to Interrogatory No. 1, public officers for Additional Nevada Agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The documents these Additional Nevada Agencies are willing to voluntarily produce would include information that is responsive to the requests in Interrogatory No. 19, and the Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time.

- The Offices of the Attorneys General for the Plaintiff States of Texas, Idaho, Florida, Mississippi, Missouri, Montana, Puerto Rico, South Carolina, South Dakota, and Utah have not purchased display advertising or used ad tech products during the Relevant Period. Additionally, the Utah Division of Consumer Protection has not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 20:** Separately for each agency, department, entity, or division of

Your state (including the office of the Attorney General) that has used Ad Tech Products or

Display Advertising, describe the Properties on which Display Advertisements have been

50

placed, including any restrictions on the placement of Display Advertisements and any applicable criteria, settings, or parameters, or any instructions given to Agencies or Ad Tech Providers regarding the placement of Display Advertisements.

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims in this litigation. The Plaintiff States also object to this interrogatory because it seeks information that is not within the possession, custody, or control of their respective Offices of the Attorney General and reiterate their objection to the definition of "You" stated above. The Plaintiff States are willing to meet and confer with Google to identify responsive information, if any, within their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Subject to and without waiving the foregoing objections:

- The State of Arkansas states that the account has restricted advertisements to searches geolocated within the State of Arkansas. The AdWords account has parameters of associated search keywords. The Search Keyword report is attached to this supplemental response. Because this is a Google account, Google should be in possession of the information sought in this interrogatory.

- The ND Lottery only advertises in locations where the targeted audience is 18+ years old and North Dakota residents. In certain instances, North Dakota Lottery may seek to focus its advertising on bigger cities in the state. The ND Lottery seeks to advertise on sites where its audience is likely to have a history in gaming. The specific Properties where Display Advertisements have been placed is not information within the possession, custody, or control of ND Lottery.

- The Plaintiff State of Indiana identifies the following links containing a searchable directory identifying staff of Indiana State Agencies, Departments, Boards, and Commissions:

  (https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf)
  (https://www.in.gov/apps/iot/find-a-person/)

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Indiana Office of the Attorney General.

  The Plaintiff State of Indiana specifically identifies the Unclaimed Property Division as the only division of the Indiana Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.

The Indiana Office of Attorney General UPD has provided some general targeting criteria to its vendor The Prosper Group for some campaigns for Display Advertising as defined. Specifically, it has directed internal information on potential owners to its vendor in connection with social advertising campaigns. Additionally, UPD it has provided geographic targeting goals to its vendor in connection with specific video campaigns. However, the communication of any specific targeting criteria to Ad Tech Providers is managed through its vendor. The specific Properties where Display Advertisements have been placed is not information within the possession, custody, or control of the Indiana Office of Attorney General.

- The Plaintiff Commonwealth of Kentucky identifies the following link containing an organizational chart of the executive branch of government in the Commonwealth: OC-Statewide.pdf (ky.gov). The Kentucky Office of the Attorney General does not have any independent knowledge of whether any other state agency, entity, division, or department of the Commonwealth, including any contained on the organizational chart available at the link provided, has used Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies.

  The Kentucky Office of the Attorney General refers to the Red7e documentation the Office is producing in response to Google's First Set of Requests for Production, including the document entitled "Digital/Internet Advertising Recap." As for any restrictions on the placement of Display Advertisements and any applicable criteria, settings, or parameters, or any instructions given regarding the placement of Display Advertisements, the Office does not have information other than what appears in the Red7e documentation the Commonwealth is producing in response to Google's First Set of Requests for Production. Please see those documents for details. Please also see the documents the Kentucky Office of Attorney General produced to Google in response to the First Set of Requests for Production. Those documents show that the Office has provided general audience targeting criteria to its vendor, Red7e, for some ad campaigns for the Office.

- The Plaintiff State of Louisiana, by and through its Attorney General's Office identifies the following link containing a directory of all Louisiana State Agencies:

  https://www.louisiana.gov/government/agency-directory/#:~:text=Louisiana%27s%20Community%20and%20Technical%20College%20System%20Louisiana%20Division,Administration%20Program%20Louisiana%20Legislature%20Louisiana%20State%20University%20System

  The Louisiana Gaming Division and Public Protection Division have purchased display advertising on limited occasions in the past for specific campaigns directed at messaging regarding fair housing and gambling. The purchase of said limited display advertising was made with non-state funds and through an outside advertising agency that would have selected the strategy, products, and providers.

- The Plaintiff States of Texas, Idaho, and Mississippi attach to these responses as Exhibit "A" a list of contact information for their respective state agencies, which are in a superior position to provide Google with the information it seeks. The Plaintiff States of Texas, Idaho, and Mississippi do not possess knowledge as to whether these entities use display advertising or ad tech products, and such information is not within their possession, custody, or control.

- The Plaintiff State of Missouri, by and through its Attorney General's Office identifies the following link containing a full list of Missouri State Agencies, Departments, Boards, and Commissions:

  (https://www.mo.gov/search-results?mode=state_agencies).

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Missouri Office of the Attorney General. The foregoing link includes contact information for each Missouri Agency, Department, Board, and Commission. Each such Agency, Department, Board, and Commission would be in a superior position to provide Google with the information it seeks.

- The Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period, and does not have possession, custody or control of documents or information for other state agencies. However, as stated in the Response to Interrogatory No. 1, public officers for Additional Nevada Agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The documents these Additional Nevada Agencies are willing to voluntarily produce would include information that is responsive to the requests in Interrogatory No. 20, and the Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time.

- The Offices of the Attorneys General for the Plaintiff States of Texas, Idaho, Florida, Mississippi, Missouri, Montana, Puerto Rico, South Carolina, South Dakota, and Utah have not purchased display advertising or used ad tech products during the Relevant Period. Additionally, the Utah Division of Consumer Protection has not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 21:** Separately for each agency, department, entity, or division of Your state (including the office of the Attorney General) that has used Ad Tech Products or Display Advertising, identify by date and description any studies or analyses concerning return

on investment for Display Advertising, including analyses comparing the performance, value, or effectiveness of Google Ad Tech Products to other Ad Tech Products.

**Response:** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims in this litigation. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Further, the Plaintiff States object to this interrogatory because it seeks information that is not within the possession, custody, or control of their respective Offices of the Attorney General and reiterate their objection to the definition of "You" stated above. The Plaintiff States are willing to meet and confer with Google to identify responsive information, if any, within their possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden. Subject to and without waiving the foregoing objections:

- The State of Arkansas states that this interrogatory is inapplicable to the State of Arkansas, as its use of Ad Tech Products and Display Advertising were not intended to create a return on investment, but solely to operate as a notice to the public.

- The ND Lottery does not track return on investment for Display Advertising and does not have any studies or analysis concerning return on investment or the performance or effectiveness of Ad Tech Products. The ND Lottery has received some analytics relating to its online advertisement from KK Bold, however, not relating to return on investment for Display Advertising.

- The Plaintiff State of Indiana identifies the following links containing a searchable directory identifying staff of Indiana State Agencies, Departments, Boards, and Commissions:

  (https://www.in.gov/apps/iot/find-a-person/phonebook/PhoneBook.pdf)
  (https://www.in.gov/apps/iot/find-a-person/)

  Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Indiana Office of the Attorney General.

  The Plaintiff State of Indiana specifically identifies the Unclaimed Property Division as the only division of the Indiana Office of Attorney General that has used display advertising or ad tech products during the Relevant Period.

The Indiana Office of Attorney General does not track return on investment for Display Advertising. The Indiana Office of Attorney General has only purchased Display Advertising in connection with UPD's noncommercial mission which includes informing owners of the existence of unclaimed property held by UPD. The Indiana Office of Attorney General is producing documents reflecting ad performance prepared by its vendor The Prosper Group. Other than the very limited information available to UPD by way of Google's Ad Transparency Center or the Meta Transparency Center, UPD's knowledge of the results of advertising campaigns is limited to what is reported by its vendor, and it has not conducted any independent comparative analysis.

- The Plaintiff Commonwealth of Kentucky identifies the following link containing an organizational chart of the executive branch of government in the Commonwealth: OC-Statewide.pdf (ky.gov). The Kentucky Office of the Attorney General does not have any independent knowledge of whether any other state agency, entity, division, or department of the Commonwealth, including any contained on the organizational chart available at the link provided, has used Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies.

  The Kentucky Office of the Attorney General refers to the Red7e documentation the Commonwealth is producing in response to Google's First Set of Requests for Production, including, but not limited to the document entitled "Digital/Internet Advertising Recap." See also the document entitled "Missing Children Phase 2 Digital Media End of Campaign Report October 23, 2023 – November 6, 2023," which is to be included in a forthcoming document production. The Kentucky Office of the Attorney General further states that it does not track return on investment or return on advertising spend beyond the analytics it has received from Red7e. The Kentucky Office of the Attorney General has used Display Advertising or Ad Tech Products to raise awareness on the subjects of the ad campaigns for which it has used Red7e.

- The Plaintiff State of Louisiana, by and through its Attorney General's Office identifies the following link containing a directory of all Louisiana State Agencies:

  https://www.louisiana.gov/government/agency-directory/#:~:text=Louisiana%27s%20Community%20and%20Technical%20Coll ege%20System%20Louisiana%20Division,Administration%20Program%20Louis iana%20Legislature%20Louisiana%20State%20University%20System

  The Louisiana Gaming Division and Public Protection Division have purchased display advertising on limited occasions in the past for specific campaigns directed at messaging regarding fair housing and gambling. The purchase of said limited display advertising was made with non-state funds and through an outside advertising agency that would have selected the strategy, products, and providers. The State of Louisiana states that this interrogatory is inapplicable, as its limited

use of Ad Tech Products and Display Advertising were not intended to create a return on investment, but solely to operate as a notice to the public on the limited topics of the campaigns.

- The Plaintiff States of Texas, Idaho, and Mississippi attach to these responses as <u>Exhibit "A"</u> a list of contact information for their respective state agencies, which are in a superior position to provide Google with the information it seeks. The Plaintiff States of Texas, Idaho, and Mississippi do not possess knowledge as to whether these entities use display advertising or ad tech products, and such information is not within their possession, custody, or control.

- The Plaintiff State of Missouri, by and through its Attorney General's Office identifies the following link containing a full list of Missouri State Agencies, Departments, Boards, and Commissions:

    (https://www.mo.gov/search-results?mode=state_agencies).

    Information regarding their use of display advertising or display ad products is not within the possession, custody or control of the Missouri Office of the Attorney General. The foregoing link includes contact information for each Missouri Agency, Department, Board, and Commission. Each such Agency, Department, Board, and Commission would be in a superior position to provide Google with the information it seeks.

- The Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period, and does not have possession, custody or control of documents or information for other state agencies. However, as stated in the Response to Interrogatory No. 1, public officers for Additional Nevada Agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The documents these Additional Nevada Agencies are willing to voluntarily produce would include information that is responsive to the requests in Interrogatory No. 21, and the Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time.

- The Offices of the Attorneys General for the Plaintiff States of Texas, Idaho, Florida, Mississippi, Missouri, Montana, Puerto Rico, South Carolina, South Dakota, and Utah have not purchased display advertising or used ad tech products during the Relevant Period. Additionally, the Utah Division of Consumer Protection has not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 22:** Identify all facts and documents supporting Your allegations concerning the alleged 2020 Facebook boycott described in Paragraph 175 of the Third Amended Complaint.

**Response:** The Plaintiff States objects to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case. Plaintiff States also object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel Plaintiffs to marshal all of their evidence in advance of trial. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Plaintiff States also object on the basis that this is a contention interrogatory that need not be answered until the conclusion of fact discovery. Subject to and without waiving the foregoing objections, the Plaintiff States respond:

- These allegations were based on publicly available information. The Plaintiff States will supplement their response to this interrogatory at a later date if they obtain additional information that is not readily available in the public domain.

  - npr.org//07/01/885853634/big-brands-abandon-facebook-threatening-to-derail-a-70b-advertising-juggernaut
  - cnn.com/2020/06/19/tech/north-face-facebook-ads/index.html
  - https://www.cnet.com/tech/mobile/civil-rights-groups-slam-facebook-call-for-ad-boycott-north-face-rei/
  - https://www.cnbc.com/2020/06/22/patagonia-joins-growing-list-of-companies-boycotting-facebook-ads.html
  - https://www.theverge.com/2020/6/25/21303717/verison-facebook-adl-ad-boycott-instagram-north-face-rei-ben-and-jerrys
  - https://www.bbc.com/news/business-53204072
  - https://www.reuters.com/article/facebook-ads-boycott-unilever-idUSL1N2E3170/
  - https://www.reuters.com/article/facebook-ads-boycott-unilever-idUSL1N2E3170/
  - https://www.cnn.com/2020/06/28/business/facebook-ad-boycott-list/index.html
  - https://www.cbc.ca/news/business/facebook-ad-boycott-canada-1.5631054
  - https://www.bbc.com/news/technology-53235302
  - cbc.ca/news/business/facebook-canada-big-banks-advertising-boycott-1.5634395

- https://www.cnbc.com/2020/06/27/diageo-will-pause-ad-spend-on-major-social-media-platforms.html

**INTERROGATORY NO. 23:** For the following alleged conduct, describe the facts and identify the documents that support Your assertion that each is a continuing violation such that the statute of limitations is tolled and/or equitable tolling applies:

    a. tying DFP to AdX, as described in Paragraphs 245-52 of the Third Amended Complaint;

    b. Encryption of User IDs, as described in Paragraphs 254-66 of the Third Amended Complaint;

    c. Dynamic Allocation, as described in Paragraphs 267-81 of the Third Amended Complaint;

    d. Enhanced Dynamic Allocation, as described in Paragraphs 282-96 of the Third Amended Complaint;

    e. Bernanke, as described in Paragraphs 297-317 of the Third Amended Complaint;

    f. Dynamic Revenue Share, as described in Paragraphs 318-30 of the Third Amended Complaint;

    g. Reserve Price Optimization, as described in Paragraphs 331-51 of the Third Amended Complaint;

    h. implementing a cap on active Line Items in DFP as described in Paragraphs 389-94 of the Third Amended Complaint; and

    i. Accelerated Mobile Pages, as described in Paragraphs 406-12 of the Third Amended Complaint.

**Response:** The Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial. The Plaintiff States object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Plaintiff States also object on the basis that this is a contention interrogatory that need not be answered until the conclusion of fact discovery. Finally, the Plaintiff States object to this interrogatory as containing discrete sub-parts such that it

should constitute multiple interrogatories in considering the interrogatory limit imposed by the Court in this case.  ECF No. 194 at 6 ("This limit on the number of interrogatories includes discrete sub-parts …."). Subject to and without waiving the foregoing objections, the Plaintiff States responds:

- The Plaintiff States have sufficiently described the conduct at issue in their Fourth Amended Complaint and identify the following documents as supporting the allegations in the paragraphs identified:

    a. <u>Tying DFP to AdX</u>: GOOG-TEX-00145163,  GOOG-NE-08112779, GOOG-TEX-00089237, GOOG-NE-05243813, GOOG-NE-06732710, GOOG-NE-03467508, GOOG-NE-04440670;

    b. <u>Encryption of User IDs</u>: GOOG-NE-09026329, GOOG-TEX-00873254;

    c. <u>Dynamic Allocation</u>: GOOG-TEX-00775968, GOOG-NE-05241137, GOOG-TEX-00036284,     GOOG-NE-04384116,     FBTEX_00277367, FBTEX_00048775, GOOG-NE-01728417, GOOG-TEX-00473222, GOOG-NE-01431592;

    d. <u>Enhanced Dynamic Allocation</u>:  GOOG-TEX-00001229,  GOOG-NE-09776369, GOOG-NE-03900351, GOOG-NE-09026329;

    e. <u>Bernanke</u>:     GOOG-NE-05279363,     GOOG-NE-06841582,     GOOG-NE-10929493;   GOOG-NE-10569088,    GOOG-NE-03898431,    GOOG-NE-13083558,   GOOG-TEX-00828547,    GOOG-NE-13468541,    GOOG-NE-03227701,    GOOG-NE-06592460,    GOOG-NE-03898431,    GOOG-NE-03892302,    GOOG-NE-06592460,    GOOG-TEX-01154251,    GOOG-NE-11753797,    GOOG-NE-11926612,    GOOG-NE-13468541,    GOOG-NE-06839089, GOOG-NE-13624783;

    f. <u>Dynamic Revenue Share</u>:  GOOG-NE-04934281,  GOOG-NE-09485542, GOOG-NE-04294619, GOOG-NE-06842715, GOOG-NE-04934281, GOOG-TEX-00777528, GOOG-NE-09485306;

    g. <u>Reserve Price Optimization</u>:  GOOG-NE-04933892,  GOOG-NE-13204729, GOOG-TEX-00326649,     GOOG-NE-13201773,     GOOG-NE-04933892, GOOG-TEX-01149719,     GOOG-NE-13231832,     GOOG-NE-10951885, GOOG-TEX-00780272,     GOOG-NE-13389693,     GOOG-NE-13204729, GOOG-NE-10985210, GOOG-NE-06591119, GOOG-NE-10544618, GOOG-NE-09485306, GOOG-NE-13415537, GOOG-TEX-00374779, GOOG-NE-11794129,   GOOG-TEX-0071969,   GOOG-NE-13340735,   GOOG-TEX-00797340, GOOG-NE-06842715, GOOG-TEX-00106310;

    h. <u>Line Item Caps</u>: GOOG-TEX-00090969, GOOG-TEX-00090961;

i. <u>Accelerated Mobile Pages</u>: GOOG-NE-09724514, GOOG-TEX-00004021, GOOG-TEX-00326424, GOOG-TEX-00831373, GOOG-TEX-00134732, GOOG-NE-11201630, GOOG-TEX-00123034, GOOG-NE-12720941, GOOG-NE-03246461, GOOG-NE-08412355, GOOG-NE-03246461, GOOG-NE-12570719.

**INTERROGATORY NO. 24:** For each of Your state's agencies, entities, divisions, or departments identified in response to Interrogatory No. 1, state whether You have possession, custody, and/or control over documents concerning the use of Display Advertising or Ad Tech products by that agency, entity, division, or department. If so, include in Your answer the locations, custodians, and general description of such documents. If not, identify all person(s) with possession, custody, and/or control of such documents.

**<u>Response:</u>** The Plaintiff States object to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits. The Plaintiff States also object to this interrogatory to the extent is seeks to compel a legal conclusion. Subject to and without waiving the foregoing objections, the Plaintiff State respond:

- Plaintiff States' respective Offices of the Attorney General do not have possession, custody, or control over documents or personnel from any state agency, entity, division, or department identified in Interrogatory No. 1 with the exception of North Dakota Lottery, which is a division of the North Dakota Office of Attorney General.

- The State of Arkansas objects that, because this is a Google account, Google should be in possession of documents associated with the account. To the extent that there are documents not within the possession of Google, the State of Arkansas Office of Attorney General has possession, custody, and control over documents concerning the use of display advertising or ad tech products only relating to the aforementioned Google AdWords account No. 862-941-6906, which is maintained by the Arkansas Office of Attorney General Public Protection Division. Such documents are maintained within the Google AdWords account, are not stored external to that account, and are maintained by Charles Saunders, Assistant Attorney General. Documents relating to payments made to Google in maintaining the Google AdWords account are maintained by the State of Arkansas Office of Attorney General's Fiscal Division.

- The Commonwealth of Kentucky objects to this interrogatory as unduly burdensome and disproportional to the needs of the case as it places an undue

burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party or otherwise not relevant to the facts or claims in this litigation. Indeed, Google can issue and has issued subpoenas in this case to agencies of the Commonwealth. The Commonwealth also objects to this interrogatory to the extent it seeks information that is not within the possession, custody, or control of the Kentucky Office of the Attorney General and reiterates its objection to the definition of "You" stated above. The Commonwealth is willing to meet and confer with Google to identify responsive information, if any, within its possession, custody, or control, that is not more easily obtained from third parties or that can be provided without causing undue burden.

Subject to and without waiving the foregoing objections, the Kentucky Office of the Attorney General states that the persons with possession, custody, and/or control of such documents are those agencies, entities, divisions, or departments. For a list of all executive branch agencies, entities, divisions, or departments of the Commonwealth, please see the organization chart at this link: OC-Statewide.pdf (ky.gov). The Office remains willing to meet and confer with Google to facilitate discovery with state agencies.

**INTERROGATORY NO. 25:** State whether You have possession, custody, and/or control over documents concerning the use of Display Advertising or Ad Tech Products by each of the following agencies, entities, divisions, and departments of Your state. If so, include in Your answer the locations, custodians, and general descriptions of such documents. If not, identify all persons with possession, custody, and/or control of such documents:

<u>Agencies, Entities, Divisions, & Departments Listed for Each State</u>

TX:  North Texas Tollway Authority; The Texas Department of Information Resources (DIR); Texas Office of the Governor, Economic Development & Tourism; Texas A&M University;  Texas Department of Transportation; The University of Texas.

AR:  Arkansas Department of Parks, Heritage and Tourism; Southern Arkansas University; University of Arkansas.

FL:  Florida Department Of Corrections; Florida Department of Economic Opportunity; Florida Department Of Environmental Protection; Florida Department Of State; Florida Department Of Transportation; Florida Fish & Wildlife Conservation Commission; Florida Institute of Food & Agricultural Sciences; University Of Florida.

ID:     College of Western Idaho; Idaho Transportation Department; University of Idaho.

IN:     Indiana Municipal Power Agency; Indiana University.

KY:     Eastern Kentucky University; Kentucky Community & Technical College System; Kentucky Tourism, Arts, and Heritage Cabinet.

LA:     Louisiana State University; Louisiana Office of Tourism.

MS:     Mississippi State University; Mississippi Development Authority.

MO:     Missouri Division of Tourism; University of Missouri.

MT:     Montana Office of Tourism; The University of Montana.

NV:     College of Southern Nevada; Nevada Department of Motor Vehicles; University of Nevada.

ND:     North Dakota Department of Health; University of North Dakota.

PR:     Departamento de Educación de Puerto Rico; Puerto Rico Tourism Company; Universidad de Puerto Rico.

SC:     South Carolina Department of Parks, Recreation, and Tourism; University of South Carolina

SD:     South Dakota Department of Human Services; South Dakota State University; University of South Dakota.

UT:     Southern Utah University and the Utah Office of Tourism.

**Response:** The Plaintiff States object to these interrogatories to the extent they seek to compel a legal conclusion. Plaintiff States also object to the extent that these interrogatories are duplicative of Rule 45 subpoenas that have already been sent to the entities listed and thus requesting the same information from the Plaintiff States is unduly burdensome and disproportional to the needs of the case. Finally, the Plaintiff States object to this interrogatory as containing discrete sub-parts such that it should constitute multiple interrogatories in considering the interrogatory limit imposed by the Court in this case. ECF No. 194 at 6 ("This limit on the number of interrogatories includes discrete sub-parts …."). Subject to and without waiving the foregoing objection, Plaintiff States respond that they do not have possession, custody, or control over any documents or personnel that belong to the institutions listed in these interrogatories for their respective state, and do not

know who within those organizations would have possession, custody, or control of this information.

- The Office of the Attorney General of Kentucky remains willing to meet and confer with Google to facilitate discovery with state agencies of the Commonwealth, including those identified in this Interrogatory.

**INTERROGATORY NO. 26:** For each category of monetary relief (including where applicable restitution, disgorgement, civil penalties, civil fines, or damages) that You seek in this Action, provide a computation of the amount of each category of monetary relief sought for each count.

> **Response:** The Plaintiff States objects to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google, and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial. The Plaintiff States objects on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Subject to and without waiving the foregoing objection, Plaintiff States respond:

> Civil Penalties for consumer claims:[1]

>> Reserve Price Optimization ("RPO"): The use of RPO was a violation each time it operated to cause an advertiser to pay more for an impression than they otherwise would have in the absence of RPO. Based on the allegations set forth in Paragraphs 527 – 538 of the Fourth Amended Complaint, the total number of violations equals the total number of impressions that RPO affected from when publishers were opted into RPO until it was announced in 2016. During this period, advertisers were deceived into bidding into what they believed was a second price auction while RPO ensured they did not receive the benefits of a second price auction, and/or paid more for impressions than they otherwise would have without RPO. The total number of violations is expected to be approximately 20% of all impressions transacted between the date RPO was launched and the date it was disclosed to advertisers, subject to any additional data to be discovered or produced.

>> Bernanke:  As alleged in Paragraphs 297 - 317 and 549 – 562 of the Fourth Amended Complaint, the use of Bernanke and its iterations was a violation each time it was used to overcharge advertisers or underpay publishers. The total number of violations against advertisers equals the number of impressions that Bernanke lowered the second highest bid from Google Ads while charging an advertiser

---

[1] All Plaintiff States seek civil penalties for violations of their state law consumer protection statutes.

based off the full amount of that bid. This caused advertisers to pay into a pool for Google that was used to win more on Google's platform. The total violations against web publishers equals the number of impressions in which Bernanke paid publishers based off a decreased bid amount after Bernanke dropped or lowered the second highest bid from Google Ads. In sum, two violations occurred for each transaction that Bernanke operated to drop or lower a bid from Google Ads.

Dynamic Revenue Sharing ("DRS"): The use of DRS was a violation each time it increased its take rate above 20% on any transaction for an ad impression. As alleged in Paragraphs 318 – 330 and 539 – 548 of the Fourth Amended Complaint, Google deceived publishers into opting into DRSv2 by promising increased yield then surreptitiously implemented DRSv2. Publishers were led to believe that DRS would only lower Google's revenue share, but DRSv2 served to increase Google's revenue share on certain impressions. A violation occurred for each transaction in which DRS increased Google's revenue share causing web publishers to receive less yield for their inventory under DRSv2 than they would have received under DRSv1.

Header Bidding: As alleged in Paragraphs 563 – 571 of the Fourth Amended Complaint, Google misrepresented to publishers that header bidding would be harmful to them and result in increased latency. This led to publishers to forego header bidding to their detriment, so a violation occurred each time a publisher did not use header bidding and received a reduced yield for their inventory based off Google's misrepresentations.

Equal Footing: As alleged in Paragraphs 586 – 587 of the Fourth Amended Complaint, Google falsely represented that all participants in the unified auction compete equally for each impression. After this statement Google still changed the outcome of auctions with the use of Bernanke and some bidders such as Facebook held an advantage over other bidders. Each time an advertiser bid into AdX where Facebook was also a bidder after entering the NBA with Google, a violation occurred. Further, each time a bidder submitted a bid into the unified auction that they would not have submitted if they were informed on Bernanke, a violation occurred.

Sale of Personal Data: As alleged in Paragraphs 572 – 585 of the Fourth Amended Complaint, Google falsely represented that it does not sell users' personal information. Google leverages the personal information of millions of people for profit in its online advertising business. With respect to each auction involving DFP or AdX, each disclosure of user's information within each auction is a separate violation.

Civil Penalties for antitrust claims:[2]

Tying:  Google Ads maintains exclusive access to hundreds of thousands of small advertisers seeking to purchase publisher inventory. Google leveraged that exclusive demand to coerce publishers to adopt and license its ad server product. Google denies publishers direct access to its AdX product and does not allow third-party ad servers to access AdX.  This conduct began in 2009 and continues today, in violation of state and federal antitrust law.

Dynamic Allocation:  Using its monopoly power in the market for ad servers, Google blocked publishers from receiving a live bid from rival exchanges more than one exchange at a time through Dynamic Allocation. Dynamic Allocation reduced publishers yield and provided little to no procompetitive benefit to publishers. This anticompetitive conduct occurred between 2010 and 2019, in violation of state and federal antitrust law.

Dynamic Revenue Sharing:  The use of DRS was a violation each time it operated to alter Google's revenue share on an impression.  Google altered its revenue share to ensure it could transact an impression after receiving and reviewing bids. This advantage harmed competition amongst exchanges, particularly competition on exchange fees.  Google's conduct occurred between 2014 and 2019, in violation of state and federal antitrust laws.

Bernanke:  Using its market power in the markets for small ad buying tools and in ad exchanges, Google acted to change the outcome of auctions after they occurred. Google dropped the second-highest bid from the AdX auction when the two highest bids were above the floor and submitted from Google Ads advertisers. Project Bernanke overcharged advertisers because Google did not pass through the benefit derived from dropping the second-highest bid. Bernanke caused further harm to advertisers, because their (inflated) bids were routed to less relevant publisher inventory to help AdX beat out rival exchanges. Google's variations on Project Bernanke hurt publishers also. By pooling funds away from publishers to manipulate and inflate the bids of advertisers using Google Ads, Bernanke caused publishers to be underpaid. Project Bernanke manipulated auctions, ensuring that Google Ads would beat out any rivals who might outbid Google and win the auction in AdX. This conduct began in 2013 and continues today, in violation of state and federal antitrust laws. A violation occurs each time Bernanke affects the outcome of an auction.

Enhanced Dynamic Allocation:  As alleged in paragraphs 282-296 of the Complaint, Google deployed a new decisioning logic called Enhanced Dynamic Allocation ("EDA") into its DFP ad server that gave its AdX exchange exclusive

---

[2] The Plaintiff States Alaska, Arkansas, Florida, Idaho, Kentucky, Louisiana, Mississippi, Montana, Nevada, North Dakota, Puerto Rick, South Carolina, South Dakota, Texas, and Utah seek civil penalties for violations of their state antitrust statutes. Subject to how the Court determines what constitutes a violation, Kentucky reserves the right to seek a per day penalty as set out in KRS 367.990(8).

access to premium publisher inventory. EDA excluded rival ad buying tools and ad exchanges from accessing and winning this valuable inventory. As alleged in paragraphs 366-374 of the Complaint, when Google did allow (beginning in 2016) its DFP product to allow non-Google exchanges to submit live, competitive bids for impressions (so-called "Exchange Bidding"), EDA excluded rival exchanges from accessing this premium inventory because Google charged publishers a 5% tax on any impression sold on non-Google exchange.  This conduct began in 2014 and is ongoing.  The operation of EDA both before and after the advent of Exchange Bidding was and is a violation of state and federal antitrust laws.

Header Bidding Line-Item Caps: As alleged in paragraphs 389-394, Google used its monopoly power in the ad server market to cap the number of "line items" a publisher can set to match a bid received from a header bidding exchange. This harmed competition in the exchange market and hampered publishers' ability to adopt header bidding to increase yield. A separate violation occurred as to each publisher that was denied a line-item increase for header bidding use.

Header Bidding Data Redactions: As alleged in paragraphs 387-388, Google redacted key fields that previously allowed publishers the ability to evaluate the performance of header bidding exchanges. Google's redaction of auction data impaired publisher participation in header bidding. A separate violation occurred as to each publisher that was affected by the data redactions.

Poirot: Google used Poirot to funnel more spend towards AdX, suppress header bidding, and deprive rival exchanges from access to publisher inventory. A separate violation occurred each time Poirot operated in an auction.

FAN Agreement: Google entered an unlawful agreement with Facebook in 2018 where Facebook agreed to substantially curtail its use of header bidding in return for Google giving Facebook an advantage in display ad auctions. A violation occurred when Google entered into its agreement with Facebook and any time it was subsequently amended.

Unified Pricing Rules:  Google exerts its market power in the ad serving market to suppress competition in the ad exchange market via Unified Pricing Rules ("UPR"). As alleged in paragraphs 451-469, Google knew that publishers set higher price floors for AdX and Google's ad buying tools to improve inventory yield, improve ad quality, and increase competition.  In response, Google forced publishers to set equal floors across all exchanges, thereby depriving publishers of the opportunity to favor demand from rival exchanges.  This conduct began in 2019 and is ongoing, in violation of state and federal antitrust laws.

Damages for consumer claims:[3]

Reserve Price Optimization ("RPO"): Advertisers suffered economic damages each time RPO increased the reserve price of an impression, and a higher price was extracted from them unwittingly. Damages for RPO should be calculated as the average amount of money extracted from advertisers by RPO multiplied by the number of impressions it operated on from the time it launched until the time it was announced in 2016.

Bernanke: Advertisers and publishers suffered economic damages each time Bernanke operated to boost the high bid from Google Ads and lower the second highest bid from Google Ads in an auction. Publishers were deceived into accepting a decreased payout for an impression while advertisers overpaid for the same impression. The damage to publishers should be calculated as the difference between the payout with Bernanke and what the payout would have been absent Bernanke multiplied by the number of impressions affected by Bernanke. Advertiser damages should be calculated as the difference between the price paid for an impression affected by Bernanke and what the price would have been for the same impression absent Bernanke multiplied by the number of impressions affected by Bernanke.

Dynamic Revenue Sharing ("DRS"): Google's representations surrounding DRS induced publishers into believing that DRS would improve revenue, but publishers ultimately suffered economic damages when DRSv2 was implemented by Google. The damages to publishers should be calculated as the average negative impact to revenue suffered by publishers that relied on Google's misrepresentations during the time that DRSv2 was adjusting take rates on impressions.

Header Bidding: Publishers were deceived by Google into foregoing the adoption of header bidding to their detriment. The damages to publishers stemming from Google's suppression of header bidding should be calculated as the lost potential revenue that a publisher could have expected had they implemented header bidding multiplied by the number of publishers that relied on Google's representations when forgoing the adoption of header bidding.

Equal Footing: Google falsely represented that all participants in the unified auction compete equally for each impression. After this statement, Google still changed the outcome of auctions with the use of Bernanke and some bidders such as Facebook held an advantage over other bidders. Advertisers that were disadvantaged by the unified auction were damaged each time they were competing for an impression with Facebook and when their bids were affected by Bernanke.

---

[3]  The Plaintiff States of, Louisiana, Puerto Rico, and South Dakota seek damages for violations of their state law consumer protection statutes.

Sale of Personal Data: Google falsely represented that it does not sell users' personal information, but Google leverages the personal information of millions of people for profit in its online advertising business. With respect to each auction involving DFP or AdX, each disclosure of user's information within each auction damaged users' who relied on Google's representations that it would never sell user data.

Damages for Antitrust Claims:[4]

Tying: The damages to publishers that were forced to license DFP to access AdX demand should be calculated as the average opportunity cost of publishers who were coerced into using DFP instead of another ad serving mechanism times the total number of publishers who were coerced.

Dynamic Allocation: Dynamic Allocation reduced publisher's yield by shielding AdX from real-time competition and permitting AdX to transact impressions at depressed prices. But for Dynamic Allocation, publishers would have transacted impression on rival exchanges at a higher price and on more favorable terms than AdX. This resulted in damages to publishers equal to the difference between the average publisher payout from impressions transacted through Dynamic Allocation and what the expected publisher payout would be absent Dynamic Allocation.

Dynamic Revenue Sharing: Dynamic Revenue Sharing had the effect of excluding rival exchanges from transacting impressions and stifling competition on exchange fees. Because DRSv2 ensured that Google could win impressions without giving up its supracompetitive exchange fee, publishers were deprived of the benefit of transacting impressions through rival exchanges at a lower fee. Publishers also suffered a quality harm, as DRS allowed Google to adjust its exchange fee to serve low quality ads tied to bids that would not win an impression but for DRS. Finally, some publishers suffered economic damages when they were opted into both RPO and DRS where the publisher set reserve price represented the opportunity cost of transacting the impression on a rival exchange.

Bernanke: Bernanke allowed Google to pool funds to increase advertiser bids and win impressions it otherwise would not have won. Advertisers suffered economic damages equal to the total amount that was paid into Google's pool of funds. Further, the Bell variation harmed publishers that did not grant AdX the opportunity to bid before rival exchanges by dropping bids and pooling funds from their impressions to inflate bids for publishers that granted AdX preferential treatment. For publishers that did not give AdX preferential treatment, this resulted in economic damages equal to the average decrease in publisher payout multiplied by the number of impressions affected by Bell.

---

[4] The Plaintiff States of Louisiana, Puerto Rico, and South Dakota seek damages for violations of their state antitrust statutes.

Enhanced Dynamic Allocation ("EDA"): Google used EDA to channel publishers' most valuable inventory to AdX, starving rival exchanges of scale and liquidity. Google automatically enrolled publishers into EDA and indicated it would increase publisher yield, but it only served to allow Google to cherry pick high value impressions and exclude rival exchanges. This resulted in economic damages from publishers being deprived of the opportunity to transact their high value impressions on rival exchanges at a lower fee.

Header Bidding Line-Item Caps: Google limited the number of line items available to publishers for use on header bidding. This harmed competition in the exchange market and hampered publishers' ability to adopt header bidding to increase yield. Publishers suffered economic damages equal to the average lost revenue that could have been gained from header bidding had no line-item cap been imposed.

Header Bidding Data Redactions: Google's redaction of auction data prevented publishers from assessing the performance of their participation in header bidding and ultimately impaired publisher participation in header bidding. This resulted in damages to publishers equal to the average potential revenue that publishers would have gained had they been able to properly monitor and fully adopt header bidding.

Poirot: Google used Poirot to funnel more spend towards AdX, suppress header bidding, and deprive rival exchanges from access to publisher inventory. This resulted in economic and quality harm to publishers as they were deprived from the opportunity to fully embrace header bidding and transact impressions on rival exchanges with more favorable terms.

FAN Agreement: Google entered an unlawful agreement with Facebook in 2018 where Facebook agreed to substantially curtail its use of header bidding in return for Google giving Facebook an advantage in display ad auctions. This suppressed the use of header bidding and damaged publishers that adopted it.

Unified Pricing Rules: Google adopted and enforced Unified Pricing Rules to foreclose competition from rival exchanges and channel transactions through AdX. Google's anticompetitive enforcement of Unified Pricing Rules had a direct negative impact on publisher revenues. Damages to publishers equals the total decrease in yield that publishers suffered upon the enactment and enforcement of Unified Pricing Rules.

69

<u>Disgorgement for Consumer Claims:</u>[5]

<u>Reserve Price Optimization ("RPO")</u>: While Google is in the best position to calculate the total illegal revenue extracted from advertisers through RPO, Plaintiff States expect that Google received at least $250 million by deceiving advertisers with RPO between the time it was launched and its announcement in 2016. (*See* GOOG-NE-06842715).

<u>Bernanke</u>: While Google is in the best position to calculate the total illegal revenue earned with Bernanke, Plaintiff States expect that Bernanke and the Bell iteration bring in at least an additional $140 million in revenue each year. (*See* GOOG-NE-03898431).

<u>Dynamic Revenue Sharing ("DRS")</u>: While Google is in the best position to calculate the total illegal revenue gained from its use of DRS, Plaintiff States expect that publishers' reliance on Google's misrepresentations concerning DRS brought in at least an additional $105 million in annual revenue each year that it was in use. (*See* GOOG-TEX-0777528).

<u>Header Bidding</u>: While Google is in the best position to calculate the total illegal revenue gained through its suppression of header bidding, Plaintiff States expect that publishers' reliance on Google's misrepresentations in foregoing header bidding resulted in at least tens of millions in additional revenue for Google.

<u>Equal Footing</u>: While Google is in the best position to calculate the amount of illegal revenue it gained by misrepresenting that participants are on equal footing in its auctions, Plaintiff States expect that auction participants' reliance on Google's misrepresentations of equal footing resulted in at least tens of millions in additional revenue for Google.

<u>Sale of Personal Data</u>: While Google is in the best position to calculate its illegal revenue gains from misrepresenting that it would not sell user data, Plaintiff States expect that Google's misrepresentations about its sale of user data brought in at least tens of millions in additional revenue for Google.

<u>Disgorgement for Antitrust Claims:</u>[6]

<u>Tying</u>: While Google is in the best position to calculate the revenue gained by tying DFP to AdX, Plaintiff States expect that the illegal combination of AdX and DFP by Google resulted in at least tens of millions in additional revenue for Google.

---

[5] The Plaintiff States of Alaska, Arkansas, Indiana and North Dakota seek disgorgement for violations of their state law consumer protection statutes.

[6] The Plaintiff States of Missouri and South Dakota seek disgorgement for violations of their state antitrust statutes.

Dynamic Allocation: While Google is in the best position to calculate its illegal revenue gains through the anticompetitive use of Dynamic Allocation, Plaintiff States expects that Google gained at least tens of millions in illegal revenue by using Dynamic Allocation to deprive rival exchanges from transacting impressions.

Dynamic Revenue Sharing ("DRS"): While Google is in the best position to calculate its illegal revenue gains from using DRS to harm competition amongst exchanges, Plaintiff States expect that DRS brought in at least an additional $105 in annual revenue each year it was in use. (*See* GOOG-TEX-0777528).

Bernanke: While Google is in the best position to calculate its illegal revenue gains from using Bernanke and the Bell iteration to suppress header bidding and harm competition, Plaintiff States expect that Bernanke and the Bell Iteration bring in at least an additional $140 million each year. (*See* GOOG-NE-03898431).

Enhanced Dynamic Allocation ("EDA"): While Google is in the best position to calculate its revenue gains stemming from its anticompetitive use of EDA to cherry pick high value impressions, Plaintiff States expect that Enhanced Dynamic Allocation brought in at least tens of millions in additional revenue for Google.

Header Bidding Line-Item Caps: While Google is in the best position to calculate its illegal revenue gains brought in by limiting publisher line-item caps to suppress competition from header bidding, Plaintiff States expect that this brought in at least tens of millions in additional revenue for Google.

Header Bidding Data Redaction: While Google is in the best position to calculate its illegal revenue gains brought in by redacting data to prevent publishers from monitoring header bidding performance, Plaintiff States expect that this brought in at least tens of millions in additional revenue for Google.

Poirot: While Google is in the best position to calculate its illegal revenue gains from using Poirot to funnel ad spend into AdX and away from rival exchanges, Plaintiff States expect that Poirot brought in at least tens of millions in additional revenue for Google.

FAN Agreement: While Google is in the best position to calculate the illegal revenue brought in through its NBA agreement with Facebook, Plaintiff States expect that the NBA agreement resulted in at least tens of millions in additional revenue for Google.

Unified Pricing Rules: While Google is in the best position to calculate the illegal revenue gain from enacting and enforcing its anticompetitive Unified Pricing Rules, Plaintiff States expect that implementing Unified Pricing Rules in AdX resulted in at least tens of millions in additional revenue for Google.

<u>Restitution for Consumer Claims</u>:[7]

<u>Reserve Price Optimization ("RPO")</u>: Google is in the best position to calculate the total amount extracted from advertisers through its RPO program.  The Plaintiff States expect that advertisers are owed at least $250 million in restitution from being deceived by RPO from the time it was launched until it was announced in 2016. (*See* GOOG-NE-06842715).

<u>Bernanke</u>: Under Project Bernanke (and its variations), for each impression transaction, publishers were underpaid and advertisers were overcharged.  Google is in the best position to calculate the total amounts underpaid to its publisher clients and overcharged to is advertiser clients. Plaintiff States expect that publishers and advertisers are owed at least $140 million in restitution for each year that Bernanke and the Bell iteration have been in operation. (*See* GOOG-NE-03898431).

<u>Dynamic Revenue Sharing ("DRS")</u>: Google is in the best position to calculate the amount extracted from its publisher clients from its use of DRS. State Plaintiffs expect that publishers are owed at least $105 million in restitution for each year they were deceived by Google's representations concerning DRS. (*See* GOOG-TEX-0777528)

<u>Header Bidding</u>: Google is in the best position to calculate the total amount extracted from its publisher clients through its suppression of header bidding. State Plaintiffs expect that publishers are owed tens of millions of dollars in restitution stemming from their reliance on Google's misrepresentations in foregoing header bidding.

<u>Equal Footing</u>: Google is in the best position to calculate the amount of money extracted from auction participants by its misrepresentations concerning equal footing in its auctions. Plaintiff States expect that auction participants' reliance on Google's misrepresentations of equal footing resulted in them being owed at least tens of millions of dollars in restitution.

<u>Sale of Personal Data</u>: Google is in the best position to know whose individual data was sold, the amount of money made by each sale, and to whom that money must be repaid. While Google is in the best position to calculate its illegal revenue gains from misrepresenting that it would not sell user data, Plaintiff States expect that Google's misrepresentations about its sale of user data resulted in users being owed at least tens of millions of dollars in restitution.

---

[7] The Plaintiff States of, Louisiana, and Missouri seek restitution for violations of their state law consumer protection statutes.

Restitution for Antitrust Claims:[8]

Tying: While Google is in the best position to calculate the amount of money extracted from publishers by tying DFP to AdX, Plaintiff States expect that the illegal combination of AdX and DFP by Google resulted in at least tens of millions of dollars in restitution being owed to publishers.

Dynamic Allocation: While Google is in the best position to calculate the amount of money derived through its use of dynamic allocation, Plaintiff States expects that auction participants are owed tens of millions of dollars in restitution from Google using Dynamic Allocation.

Dynamic Revenue Sharing ("DRS"): Google is in the best position to calculate the amount extracted from its publisher clients from its use of DRS. State Plaintiffs expect that publishers are owed at least $105 million in restitution for each year DRS was in operation. (See GOOG-TEX-0777528)

Bernanke: Google is in the best position to calculate the total amounts underpaid to its publisher clients and overcharged to is advertiser clients. Plaintiff States expect that publishers and advertisers are owed at least $140 million in restitution for each year that Bernanke and the Bell iteration have been in operation. (*See* GOOG-NE-03898431).

Enhanced Dynamic Allocation ("EDA"): While Google is in the best position to calculate the amount of money extracted by its anticompetitive use of EDA to cherry pick high value impressions and charge advertisers and publishers supracompetitive prices, Plaintiff States expect that Enhanced Dynamic Allocation resulted in at least tens of millions of dollars in restitution being owed to auction participants.

Header Bidding Line-Item Caps: While Google is in the best position to calculate the number of times it transacted an impression after limiting publisher line-item caps, Plaintiff States expect that this resulted in at least tens of millions of dollars in restitution being owed to publishers.

Header Bidding Data Redaction:  While Google is in the best position to calculate the number of times it redacted data to prevent publishers from monitoring header bidding performance, Plaintiff States expect that this resulted to at least tens of millions of dollars in restitution being owed to publishers.

Poirot: While Google is in the best position to calculate the number of times it used Poirot to funnel ad spend into AdX and away from rival exchanges, and any supracompetitive fees charged to advertisers and publishers, Plaintiff States expect

---

[8] The State Plaintiffs of Arkansas and South Dakota seek restitution for violation of their state antitrust statutes.

that Poirot resulted in tens of millions of dollars in restitution being owed to publishers.

FAN Agreement: While Google is in the best position to calculate the illegal revenue brought in through its NBA agreement with Facebook, Plaintiff States expect that the NBA agreement amounted to tens of millions of dollars in restitution being owed to auction participants.

Unified Pricing Rules: While Google is in the best position to calculate the number of times it caused publishers to set unified floors in auctions and the resulting underpayments to publishers, Plaintiff States expect that the amount is at least tens of millions of dollars in restitution being owed to publishers.

**INTERROGATORY NO. 27:** Identify all persons with relevant knowledge concerning Your claims in this Action.

**Response:** The Plaintiff States objects to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case as it places an undue burden on the responding party as it is duplicative of information included as part of the Plaintiff States' Rule 26 disclosures or otherwise not relevant to the facts or claims in this litigation. Further, the Plaintiff States objects to this interrogatory to the extent that it seeks information that is attorney-client or work product privileged. Further, the Plaintiff States object to the extent that they do not have possession, custody, or control over other state agencies' documents or personnel. Subject to and without waiving the foregoing objections, Plaintiff States respond:

- *See* Appendix A of Plaintiff States forthcoming First Amended Initial Disclosures which lists each third party contacted during the investigation by the Plaintiff States.

**INTERROGATORY NO. 28:** Identify all persons with relevant knowledge concerning the use of Display Advertising or Ad Tech Products by each of Your state's agencies, entities, divisions, or departments, including the office of the Attorney General.

**Response:** The Plaintiff States object to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits and the requesting party's ability to obtain the information is similar or superior to that of the responding party. Further, the Plaintiff States object on the basis that they do not have possession, custody, or control over other state agencies' documents or personnel. Subject to and without waiving the foregoing objections:

74

- Plaintiff State of Arkansas identifies the following persons with relevant knowledge concerning the use of Display Advertising or Ad Tech Products:

    - Charles Saunders, Assistant Attorney General
    - Sid Rosenbaum, Chief Fiscal Officer
    - Ann Frazier, Deputy Chief Fiscal Officer
    - Bryant Stanfield, Logistics Director

- Plaintiff State of North Dakota identifies the following persons with relevant knowledge concerning the use of Display Advertising or Ad Tech Products:

    - Ryan Koppy, Sales and Marketing Manager – ND Lottery
    - Lance Gaebe, Director – ND Lottery

- Plaintiff State of Indiana identifies the following persons with relevant knowledge concerning the Indiana Office of Attorney General's use of Display Advertising or Ad Tech Products:

    - Jamie Weber, Chief of Staff
    - Amy T. Hendrix, Director of Unclaimed Property Division

- The Commonwealth of Kentucky states that Jim Hoyland with Red7e has knowledge concerning the use of Display Advertising by the Office of the Attorney General. Phone: (502) 585-3403 (Ext. 234). Fax: (502) 582-2043. Email: jimh@red7e.com. The Kentucky Office of the Attorney General is unaware of who within any other state agency, entity, division, or department of the Commonwealth has knowledge of those entities' use, if any, of Display Advertising or Ad Tech Products, but the Office remains willing to meet and confer with Google to facilitate discovery with state agencies. Plaintiff Commonwealth of Kentucky further identifies the following persons with relevant knowledge concerning the Kentucky Office of the Attorney General's use of Display Advertising or Ad Tech Products:
    - Elizabeth Kuhn, formerly Communications Director (former employee)
    - Krista Buckel, formerly Communications Director (former employee)
    - Stacy Woodrum, Executive Director, Office of Administrative Services
    - Michelle Lacy, Budget Specialist, Office of Administrative Services
    - Shellie May, Special Assistant, Office of Consumer Protection (formerly Communications Director)
    - Atley Smedley, Deputy Communications Director
    - Heather Wagers, Executive Director, Office of Trafficking and Abuse Prevention and Prosecution
    - Hanna Ray, Digital Account Director, Red7e, Phone: (502)585-3403 (Ext. 227). Email: hannahr@red7e.com
    - Leah Halfacre, Account Director, Red7e, Phone: 502-585-3403 (Ext. 258). Email: leahh@red7e.com.

- The Nevada AGO has not purchased display advertising or used ad tech products during the Relevant Period, and does not have possession, custody or control of documents or information for other state agencies. However, as stated in the Response to Interrogatory No. 1, public officers for Additional Nevada Agencies are willing to voluntarily produce relevant documents or information without the formal issuance by Google of a FRCP 45 subpoena. The Nevada AGO is willing to facilitate the voluntary production from these Additional Nevada Agencies within a reasonable period of time.

- Plaintiff State of Louisiana identifies the following persons with relevant knowledge concerning the Louisiana Attorney General's use of Display Advertising or Ad Tech Products: Christine Rozas, Section Chief, Fair Housing Section; Suzanne Bourgeois, Program Manager for Problem Gambling Resource Services.

- The Offices of the Attorneys General for the Plaintiff States of Texas, Idaho, Florida, Mississippi, Missouri, Montana, Puerto Rico, South Carolina, South Dakota, and Utah have not purchased display advertising or used ad tech products during the Relevant Period. Additionally, the Utah Division of Consumer Protection has not purchased display advertising or used ad tech products during the Relevant Period.

**INTERROGATORY NO. 29:** With respect to each harm or injury for which You seek relief in this Action in Your sovereign capacity, identify each person with knowledge of that harm or injury.

> **Response:** The Plaintiff States object to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits, the requesting party's ability to obtain the information is similar or superior to that of the responding party, and it is duplicative of information included as part of the State Plaintiffs' Rule 26 disclosures. The Plaintiff States objects to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order.

**INTERROGATORY NO. 30:** With respect to each harm or injury for which You seek relief in this Action as *parens patriae*, identify each person with knowledge of that harm or injury.

> **Response:** The Plaintiff States object to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits, the requesting party's ability to

obtain the information is similar or superior to that of the responding party, and it is duplicative of information included as part of the State Plaintiffs' Rule 26 disclosures. Plaintiff States also object to this Request to the extent that it implies that the identification of specific persons is a necessary element of a *parens patriae* claim. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial or to the extent that it seeks to compel a legal conclusion. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Subject to and without waving the foregoing objections, Plaintiff States respond:

- Web publishers and advertisers located in each of the Plaintiff States suffered harm as a result of Google's anticompetitive and deceptive conduct. Harm to those businesses significantly harmed the digital advertising industry and web publishing industries in each of the Plaintiff States.

  - Harm to web publishers in each of the Plaintiff States as a result of Google's anticompetitive and deceptive conduct also harmed internet users in each of the Plaintiff States in the form of imposed paywalls, increased paywalls, ad saturation, and lower quality content on the internet.

  - Harm to digital advertisers in each of the Plaintiff States as a result of Google's anticompetitive and deceptive conduct also harmed consumers of goods and services that paid higher prices as the result of inefficient ad spend in each of the Plaintiff States.

**INTERROGATORY NO. 31:** With respect to each harm or injury to the general welfare and the economy of Your state for which You seek relief in this Action, identify each person with knowledge of that harm or injury.

**Response:** The Plaintiff States object to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case as it places an undue burden on the responding party that outweighs its expected benefits, the requesting party's ability to obtain the information is similar or superior to that of the responding party, and it is duplicative of information included as part of the State Plaintiffs' Rule 26 disclosures. Further, the Plaintiff States object to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents not timely collected and only recently or not yet produced by Google and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial or to the extent that it seeks to compel a legal conclusion. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will

be made within the time prescribed by the Court's Scheduling Order. Subject to and without waving the foregoing objections, Plaintiff States respond:

- Web publishers and advertisers located in each of the Plaintiff States suffered harm as a result of Google's anticompetitive and deceptive conduct. Harm to those businesses significantly harmed the digital advertising industry and web publishing industries in each of the Plaintiff States.

  - o Harm to web publishers in each of the Plaintiff States as a result of Google's anticompetitive and deceptive conduct also harmed internet users in each of the Plaintiff States in the form of imposed paywalls, increased paywalls, ad saturation, and lower quality content on the internet.

  - o Harm to digital advertisers in each of the Plaintiff States as a result of Google's anticompetitive and deceptive conduct also harmed consumers of goods and services that paid higher prices as the result of inefficient ad spend in each of the Plaintiff States.

Dated: February 14, 2024

                                          Respectfully submitted,

*/s/ Ashley Keller*
Ashley Keller
Admitted Pro Hac Vice
ack@kellerpostman.com
Noah Heinz
Noah.Heinz@kellerpostman.com
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
(312) 741-5220
Zina Bash
zina.bash@kellerpostman.com
111 Congress Avenue, Suite 500
Austin, TX 78701
(501) 690-0990
**KELLER POSTMAN LLC**

*/s/ Mark Lanier*
W. Mark Lanier (*lead counsel*)
Texas Bar No. 11934600
Mark.Lanier@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.DeRose@LanierLawFirm.com
10940 W. Sam Houston Parkway N. Suite 100
Houston, Texas 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
**THE LANIER LAW FIRM, P.C.**

*Attorneys for Plaintiff States of Texas, Idaho, Indiana, Louisiana (The Lanier Law Firm only), Mississippi, North Dakota, South Carolina, and South Dakota*

FOR PLAINTIFF STATE OF TEXAS:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Texas.


KEN PAXTON
Attorney General


*/s/ Trevor E. D. Young*
Brent Webster, First Assistant Attorney
General of Texas
Brent.Webster@oag.texas.gov
Grant Dorfman, Deputy First Assistant
Attorney General
Grant.Dorfman@oag.texas.gov
James R. Lloyd, Deputy Attorney General
for Civil Litigation
James.Lloyd@oag.texas.gov
Trevor Young, Deputy Chief, Antitrust
Division
Trevor.Young@oag.texas.gov


OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF ALASKA

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Alaska.

TREG TAYLOR
ATTORNEY GENERAL


By: /s/ Jeff Pickett
Jeff Pickett
Senior Assistant Attorney General, Special Litigation Section
jeff.pickett@alaska.gov


*Attorney for the plaintiff state of Alaska*

FOR PLAINTIFF STATE OF ARKANSAS:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Arkansas.

TIM GRIFFIN
ATTORNEY GENERAL


By: _____
AMANDA J. WENTZ
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Attorney for Plaintiff State of Arkansas*

FOR PLAINTIFF STATE OF FLORIDA:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Florida.

ASHLEY MOODY, Attorney General

*/s/ Lee Istrail*
Lee Istrail, Assistant Attorney General, Antitrust Division
FL Bar No. 119216

LIZABETH A. BRADY, Director, Antitrust Division
ANDREW BUTLER, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General


Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com

Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

FOR PLAINTIFF STATE OF IDAHO:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Idaho.

RAÚL R. LABRADOR
Attorney General

*/s/ John K. Olson*
John K. Olson, Deputy Attorney General

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone:   (208)   334-2424
john.olson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Indiana.

_____
Matthew Michaloski
Deputy Attorney General
Indiana Atty. No. 35313-49
Indiana Government Center South – 5th Fl. 302
W. Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: matthew.michaloski@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Kentucky.


DANIEL CAMERON
Attorney General

*/s/ Philip R. Heleringer*
Christian J. Lewis, Commissioner of the Office of Consumer Protection
christian.lewis@ky.gov
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
philip.heleringer@ky.gov
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
jonathan.farmer@ky.gov
Sarah A. Telle, Assistant Attorney General
sarah.telle@ky.gov
Office of the Attorney General
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300


*Attorneys for Commonwealth of Kentucky*

FOR PLAINTIFF STATE OF LOUISIANA:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Louisiana.

By: /s/ Patrick Voelker
Liz Murrill, Attorney General
Michael Dupree, Assistant Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
(225) 326-6400
voelkerp@ag.louisiana.gov

Counsel for State of Louisiana

*s/ James R. Dugan, II*
James R. Dugan, II (*pro hac vice*)
TerriAnne Benedetto (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:   (504) 648-0180
FX:   (504) 649-0181
EM:   jdugan@dugan-lawfirm.com
         tbenedetto@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:   (504) 833-5600
FX:   (504) 833-8080
EM:   jmw@chehardy.com

*Attorneys for the State of Louisiana*

FOR PLAINTIFF STATE OF MISSISSIPPI:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Mississippi.

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:      */s/ Hart Martin*
         Hart Martin
         Consumer Protection Division
         Mississippi Attorney General's Office
         Post Office Box 220
         Jackson, Mississippi 39205
         Telephone: 601-359-4223
         Fax: 601-359-4231
         Hart.martin@ago.ms.gov

         *Attorney for Plaintiff State of Mississippi*

FOR PLAINTIFF STATE OF MISSOURI:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Missouri.

ANDREW BAILEY
Attorney General

*/s/ Michael Schwalbert*
Michael.Schwalbert@ago.mo.gov
Missouri Attorney General's Office
815 Olive St.
Suite 200
St. Louis, MO 63101
Tel: 314-340-7888

*Attorneys for Plaintiff State of Missouri*

FOR PLAINTIFF STATE OF MONTANA:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Montana.

AUSTIN KNUDSEN
Montana Attorney General


/s/ Anna Schneider
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894 Anna.Schneider@mt.gov


/s/ Charles J. Cooper
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves
hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

*Attorneys for Plaintiff State of Montana*

FOR PLAINTIFF STATE OF NEVADA:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of Nevada.

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate


/s/ Michelle C. Badorine
Michelle C. Badorine, Senior Deputy
Attorney General
MNewman@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701 Tel:
(775) 684-1100

Attorneys for Plaintiff State of Nevada

FOR PLAINTIFF STATE OF NORTH DAKOTA:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of North Dakota.

> **STATE OF NORTH DAKOTA**
> Drew H. Wrigley
> Attorney General


By: */s/ Elin S. Alm*
   Parrell D. Grossman, ND ID 04684
   Elin S. Alm, ND ID 05924
   Assistant Attorneys General
   Consumer Protection & Antitrust Division
   Office of Attorney General of North Dakota
   1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
   (701) 328-5570
   (701) 328-5568 (fax)
   pgrossman@nd.gov
   ealm@nd.gov

   *Attorneys for Plaintiff State of North Dakota*

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

*/s/ Domingo Emanuelli-Hernández*
Domingo Emanuelli-Hernández
Attorney General
Thaizza Rodríguez Pagán
Assistant Attorney General
PR Bar No. 17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192 Tel:
(787) 721-2900, ext. 1201, 1204
trodriguez@justicia.pr.gov

Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

*Attorneys for Plaintiff Commonwealth of Puerto Rico*

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of South Carolina.

ALAN WILSON
Attorney General


*/s/ Mary Frances Jowers*
Mary Frances Jowers
Assistant Deputy Attorney General
Rebecca M. Hartner (S.C. Bar No. 101302) Assistant
Attorney General
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-3996
Email: mfjowers@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC
880 Johnnie Dodds Blvd, Suite 1
Mount Pleasant, SC 29464 Phone:
843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*) The
Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130 Phone:
(504) 648-0180
Email: jdugan@dugan-lawfirm.com


*Attorneys for Plaintiff State of South Carolina*

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge as it applies to the State of South Dakota.

MARTY JACKLEY
Attorney General


*/s/ Jonathan Van Patten*
Jonathan Van Patten
Assistant Attorney General
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: 605-773-3215
jonathan.vanpatten@state.sd.us

*Attorney for Plaintiff State of South Dakota*