IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| THE STATE OF TEXAS, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 4:20-cv-00957-SDJ |
| GOOGLE LLC, | |
| Defendant. | |

**PLAINTIFF STATES' RESPONSE IN OPPOSITION TO GOOGLE LLC'S MOTION TO DISMISS UNDER RULE 12(b)(6)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND RESPONSE TO STATEMENT OF ISSUES ...................................... 1

BACKGROUND ............................................................................................................... 1

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT .................................................................................................................... 7

    I.    State DTPA Enforcement Claims Differ from Ordinary DTPA Claims. ....................... 7

        A.    State DTPA Enforcement Claims Are Not Subject to Heightened Pleading. .......... 8

        B.    The States' Claims Are Timely. ....................................................................... 11

    II.    The States Have Plausibly Alleged Deceptive Trade Practices Act Claims. ................ 12

        A.    Reserve Price Optimization Violated the DTPA. ................................................ 12

            1.    The FAC pleads that RPO violates the States' DTPA statutes......................... 14

            2.    The RPO claims are timely................................................................................. 15

        B.    Dynamic Revenue Share Violates the DTPA........................................................ 16

        C.    Project Bernanke Violates the DTPA. .................................................................. 18

        D.    Google's Aggressive Takedown of Header Bidding Violates the DTPA. ............. 20

        E.    Google's Recent Representations of Equal Footing and Fair Treatment Violate the DTPA Because They Are Demonstrably False. ................................. 22

        F.    The Complaint Plausibly Alleges DTPA Claims Based On Google's Continued Practice of Selling Users' Personal Information for Use in Its Ad Exchange. .............................................................................................. 23

        G.    The Purported "Consumer Transactions" Requirement Does Not Bar DTPA Claims. ................................................................................................... 24

    III.    The States Have Adequately Alleged Their State Antitrust Claims. ............................ 26

    IV.    Plaintiff States' Remedies Cannot Be Dismissed. ....................................................... 28

CONCLUSION................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguadilla Paint Ctr., Inc. v. Esso Standard Oil,*
    183 P.R. Dec. 901 ....................................................................................................29, 30

*Apprentice Info. Sys., Inc. v. DataScout, LLC,*
    544 S.W.3d 536 (Ark. 2018)..................................................................................................25

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...............................................................................6, 7, 17, 18, 28

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................6, 17, 18

*Benchmark Elecs., Inc. v. J.M. Huber Corp.,*
    343 F.3d 719 (5th Cir. 2003) ...............................................................................................10

*Cardinal Indus., Inc. v. Schwartz,*
    483 N.E.2d 458 (Ind. Ct. App. 1985).................................................................................29

*Carroll v. Fort James Corp.,*
    470 F.3d 1171 (5th Cir. 2006) ............................................................................................19

*Chalmers v. Toyota Motor Sales USA, Inc.,*
    935 S.W.2d 258 (Ark. 1996)................................................................................................22

*Click v. Gen. Motors LLC,*
    No. 2:18-cv-455, 2020 WL 3118577 (S.D. Tex. Mar. 27, 2020) ...........................................21

*Cogan v. Triad Am. Energy,*
    944 F. Supp. 1323 (S.D. Tex. 1996) ....................................................................................21

*Comput. Assocs. Int'l, Inc. v. Altai, Inc.,*
    918 S.W.2d 453 (Tex. 1996)................................................................................................12

*Fed. Trade Comm'n v. Consumer Health Benefits Ass'n,*
    No. 10-cv-3551, 2012 WL 1890242 (E.D.N.Y. May 23, 2012)..............................................9

*Fed. Trade Comm'n v. Freecom Commc'ns, Inc.,*
    401 F.3d 1192 (10th Cir. 2005) ............................................................................................9

*Fed. Trade Comm'n v. Nudge, LLC,*
    430 F. Supp. 3d 1230 (D. Utah 2019)...........................................................................12, 28

*State ex rel. Fitch v. Yazaki N. Am., Inc.*,
    294 So. 3d 1178 (Miss. 2020) ................................................................27

*Foddrill v. McManus*,
    No. 13-cv-51, 2013 WL 6198228 (W.D. Tex. Nov. 26, 2013)................................11

*Gilmour v. Blue Cross & Blue Shield of Ala.*,
    No. 4:19-cv-160-SDJ, 2021 WL 1196272 (E.D. Tex. Mar. 30, 2021) ....................................8

*In re Google Digit. Advert. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022) ................................................................1

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ................................................................9

*Holzman v. State*,
    No. 13-cv-168, 2013 WL 398935 (Tex. App.—Corpus Christi-Edinburg
    Jan. 31, 2013)................................................................9

*Humble Nat'l Bank v. DCV, Inc.*,
    933 S.W.2d 224 (Tex. App.—Houston 1996) ................................................17

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
    920 F.3d 890 (5th Cir. 2019) ................................................................6

*Ingram v. Joseph*,
    No 3:06-cv-626, 2007 WL 9711659 (N.D. Tex. Apr. 3, 2007) ........................14, 17

*IUE-CWA Local 901 v. Spark Energy, LLC*,
    440 F. Supp. 3d 969 (N.D. Ind. 2020) ................................................24

*Johnson v. Daimler Trucks N. Am., LLC*,
    No. 20-cv-385, 2020 WL 6875265 (W.D. Tex. Aug. 11, 2020)..........................10

*United States ex rel. Johnson v. Shell Oil Co.*,
    183 F.R.D. 204 (E.D. Tex. 1998)................................................11

*Jones v. Varsity Brands, LLC*,
    618 F. Supp. 3d 725 (W.D. Tenn. 2022)................................................27

*Kitchell v. Aspen Expl., Inc.*,
    562 F. Supp. 2d 843 (E.D. Tex. 2007)................................................11, 12

*Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc.*,
    No. 20-014 64, 2021 WL 2912436 (D.P.R. July 9, 2021) ....................................30

*In re Life Partners Holdings, Inc.*,
    926 F.3d 103 (5th Cir. 2019) ................................................................10

iii

*Millennium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*,
   761 So. 2d 1256 (Fla. Dist. Ct. App. 2000) ...........................................................22

*Hood ex rel. Mississippi v. Bristol-Myers Squib Co.*,
   1:12-cv-179, 2013 WL 3280267 (N.D. Miss. June 27, 2013) .................................29

*Molano v. State*,
   No 13-cv-477, 2011 WL 3631968 (Tex. App.—Corpus Christi-Edinburg
   Aug. 18, 2011) ........................................................................................................11

*Navient Corp. v. State ex rel. Fitch*,
   313 So. 3d 1034 (Miss. 2021) .................................................................................16

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   350 F. Supp. 2d 160 (D. Me. 2004) ........................................................................26

*Pinder v. Duchesne Cnty. Sheriff*,
   478 P.3d 610 (Utah 2020) .......................................................................................11

*Prieto v. John Hancock Mut. Life Ins.*,
   132 F. Supp. 2d 506 (N.D. Tex. 2001) ...................................................................12

*Rayford v. State*,
   16 S.W.3d 203 (Tex. App.—Dallas 2000) .............................................................19

*RooR Int'l BV v. Smoke & Vapor*,
   No. 4:18-cv-711, 2019 WL 4267594 (E.D. Tex. Aug. 12, 2019) ...........................10

*Spradling v. Williams*,
   566 S.W.2d 561 (Tex. 1978) ...................................................................................15

*Standard Oil Co. of Ky. v. State*,
   65 So. 468 (Miss. 1914) ..........................................................................................27

*Hood ex rel. State v. BASF Corp.*,
   2006 WL 308378 (Miss. Ch. Ct. Jan. 17, 2006) ....................................................27

*State v. Classic Pool & Patio, Inc.*,
   777 N.E.2d 1162 (Ind. Ct. App. 2002) ...................................................................11

*State v. Durham*,
   860 S.W.2d 63 (Tex. 1993) .....................................................................................11

*Stevens v. Motorists Mut. Ins. Co.*,
   759 S.W.2d 819 (Ky. 1988) ....................................................................................23

*Streber v. Hunter*,
   221 F.3d 701 (5th Cir. 2000) .....................................................................................7

iv

*Thomas v. State*,
226 S.W.3d 697 (Tex. App.—Corpus Christi-Edinburg 2007) ............................................7

*Utah v. B & H Auto*,
701 F. Supp. 201 (D. Utah 1988) ....................................................................................25

*Vivint, Inc. v. England*,
No. 12-cv-979, 2013 WL 1842538 (D. Utah May 1, 2023) ...............................................25

*Williams v. NIBCO Inc.*,
No. 20-cv-48, 2021 WL 1069044 (W.D. Tex. Mar. 18, 2021) ............................................10

**Statutes**

10 P.S.L.R. § 259(c) ..........................................................................................................29

10 P.S.L.R. § 269 ..............................................................................................................30

Ark. Code Ann. § 4-75-301 ...............................................................................................27

Ark. Code Ann. § 4-75-302 ...............................................................................................27

Ark. Code Ann. § 4-88-101 *et seq.* ...................................................................................22

Arkansas Unfair Practices Act, Ark. Code Ann. § 4-99-101 *et seq.*...................................22

Idaho Code Ann. § 48-602(1) ............................................................................................26

Idaho Code Ann. § 48-602(7) ............................................................................................25

Miss. Code Ann. § 15-1-51 ................................................................................................11

Miss. Code Ann. § 75–24–3(c) ...........................................................................................9

Miss. Code Ann. § 75-24-5 .................................................................................................9

Miss. Code Ann. § 75-24-11 ..............................................................................................29

Nev. Rev. Stat. § 11.190(2)(d) ...........................................................................................11

Nev. Rev. Stat. § 11.220 ....................................................................................................11

Tex. Bus. & Com. Code § 17.43 ..........................................................................................7

Tex. Bus. & Com. Code § 17.44 ........................................................................................23

Tex. Bus. & Com. Code § 17.45(2) ....................................................................................23

Tex. Bus. & Com. Code § 17.45(6) ...............................................................................21, 23

Tex. Bus. & Com. Code § 17.46(a) ..................................................................................7, 17

Tex. Bus. & Com. Code  § 17.46(b)(24) .................................................................................17

Tex. Bus. & Com. Code § 17.46(c)(1).....................................................................................9

Tex. Bus. & Com. Code § 17.47(a) ......................................................................................7, 9

Tex. Bus. & Com. Code § 17.47(d) .........................................................................................8

Tex. Bus. & Com. Code § 17.50(a)(1)......................................................................................9

Utah Code Ann. § 13-2-6(4) ..................................................................................................22

Utah Code Ann. § 13-11-3(6) ................................................................................................25

Utah Code Ann. § 13-11-3(2)(a)............................................................................................23

## Other Authorities

Einer Elhauge, *Disgorgement As an Antitrust Remedy*, 76 Antitrust L.J. 79 (2009)....................28

Fed. R. Civ. P. 8(a)(2) ............................................................................................................28

Fed. R. Civ. P. 8(a)(3) ............................................................................................................28

Fed. R. Civ. P. 9(b) ..................................................................................................................8

Fed. R. Civ. P. Rule 54(c)......................................................................................................28

Idaho Admin. Code r. 04.02.01.020.13..................................................................................26

Jeff Horwits & Keach Hagey, *Google's Secret 'Project Bernanke' Revealed in Texas Antitrust Case*, Wall Street Journal (Apr. 11, 2021) https://www.wsj.com/articles/googles-secret-project-bernanke-revealed-in-texas-antitrust-case-11618097760 ..................................................................20

Miss. Const. art. IV, § 104 .....................................................................................................11

## INTRODUCTION AND RESPONSE TO STATEMENT OF ISSUES

Google has a stranglehold on the adtech market, with a dominant position in servicing the buy-side (advertisers), the sell-side (publishers), and the exchange connecting them.  It attained this position in substantial part through anticompetitive conduct—allegations that already survived a motion to dismiss.  But it also attained this position through deceptive and unfair trade practices. It initially set up sealed second-price ad auctions that market participants trusted.  Then, without telling anyone, Google changed the auction rules to boost its profits and reinforce its dominant position.  This is not a "common tort case" by those Google deceived. Dkt. 224 at 1.  Rather, it is a public enforcement action by Plaintiff States seeking to deter misconduct and guarantee the free and fair functioning of the markets in their economies that Google's conduct has impaired.  The well-pleaded facts show that Google violated each State's deceptive or unfair trade practices act.[1]

This response answers the issues presented as follows: (1) The pleading alleges facts that establish each element of a DTPA claim.  (2) The state-law antitrust claims should survive to the same extent that federal claims did and should not be narrowed further.  (3) Only claims, not remedies, can be dismissed under Rule 12, and each remedy demanded is legally available.

## BACKGROUND

The pleading in this case has three parts.  First, the federal antitrust claims, which Judge Castel ruled on last year, allowing many to proceed.  MDL Dkt. 308; *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022).  The court rejected some claims for antitrust purposes but suggested that the facts may plausibly allege deception. *E.g.*, MDL Dkt. 308 at 59-61 (describing how Reserve Price Optimization misled publishers and advertisers).  Second, are the state antitrust claims.  These largely parallel the federal claims, and the parties have agreed that

---

[1] Different states use different abbreviations, often variations on DTPA or UDAP.  Both parties use "DTPA," to refer to all the state consumer protection laws alleged in the complaint.

Judge Castel's reasoning applies to them.  Third, are the state Deceptive Trade Practices Act ("DTPA") claims.  Judge Castel did not rule on these claims, and they are the focus of this motion.

The Fourth Amended Complaint ("FAC") alleges multiple sets of facts that, accepted as true, plausibly establish DTPA claims.  *See* MDL Dkt. 541 (FAC).  The DTPA claims, like the antitrust claims, are based on Google's anticompetitive conduct directed at participants in Google's ad exchange.  Though antitrust claims and DTPA claims coexist, the focus is different.  Antitrust law focuses on anticompetitive effects and antitrust injury, while public DTPA enforcement actions focus on unfair, deceptive, or misleading acts, with no need to show particular injuries or effects.

Though Google deceived its customers in myriad ways, there is a common starting place for its deceit: before 2013, Google used a sealed second-price auction system through which advertisers would buy ads from publishers on Google's exchange, called AdX.  "Google widely advertised that its auctions in AdX were sealed second-price auctions."  FAC ¶ 550; *see also* ¶¶ 300, 313, 332-34, 346, 529, 531.  Google employees were proud of this model: "AdX is a second price auction with minimum CPMs set by the publisher. This is the most efficient auction model, resulting in the most stable, long-term equilibrium price." FAC ¶ 550.  Under many auction designs, buyers have an incentive to bid strategically.  In the standard open, first-price model, bidders try to bid the *least* they can and still win. FAC ¶ 299  But under a sealed second-price auction, every bidder has an incentive to place a bid according to his actual willingness to pay, aligning optimal strategy (incentives) with efficiency (the price signal).  FAC ¶¶ 530-31 ("Google's second-price auction 'incentivizes buyers to bid the most they're willing to pay for a given piece of inventory and it minimizes the need to 'game' the system.'").  Without disclosing that it no longer operated using a sealed second-price model, Google changed the rules to enhance its profits.

In 2015, Google launched a program called **Reserve Price Optimization ("RPO")**. FAC ¶ 532.  Before RPO, publishers could have a floor on bids, guaranteeing that the sale price would

not be below that amount (if a sale occurred). FAC ¶ 529.  Under that system, if multiple bids were above the floor, the winner paid the second-highest bid, but if only one bid was above the floor, the winner would pay the floor instead. "[W]ithout disclosing it to advertisers," Google unilaterally changed the floor price.  FAC ¶ 532.  Under RPO, the floor was *different* for each bidder. FAC ¶ 532-33.  Specifically, Google used its vast data troves on each bidder to accurately forecast an "optimized" floor for each bidder.  *Id.*  Now, the so-called second-price auction frequently required the winning bidder to pay the amount calculated by Google as that bidder's own "floor," rather than the actual floor set by the publisher or second-highest bid.  Internally, Google acknowledged that this shift "undermine[d] the whole idea of second price auctions," FAC ¶ 537. Bidders using the same strategy with RPO as they did previously would unwittingly overpay, FAC ¶ 532, which explains why Google resorted to deception when implementing the strategy.

Another deviation from a second-price auction mechanism started after 2015 when Google launched a program called **Dynamic Revenue Share** ("**DRS**"). FAC ¶ 541.  Until then, AdX—like other exchanges—charged a set fee. FAC ¶ 95  If the fee was too high, bids channeled through AdX would be less competitive on price, and so win auctions less often. FAC ¶ 319. If the fee was too low, Google would miss out on profits in scenarios when a certain bid was clearly the highest. Google hatched a secret solution: a dynamic fee.  It began charging *less* when a lower fee was necessary to win a still-profitable (but lower margin) impression.  But it charged *more* when it could do so and still win.  AdX would "alter its exchange fee [] to manipulate the net bid amount, clear the publisher's floor, and transact the impression," resulting in more transactions on AdX. FAC ¶ 541.  Google never disclosed DRS to publishers or advertisers (who would have changed their strategy had they known). FAC ¶ 326. By the fall of 2015, all publishers were opted into DRS without their knowledge.  FAC ¶ 543.  In 2016, Google attempted to cover its tracks by vaguely announcing that it was launching a "revenue share-based optimization" that increased publishers'

yield and began urging publishers to keep it turned on. *Id.* While Google eventually told publishers that it sometimes *discounted* its fees to get the sale, it omitted that it "viewed the lowered exchange fees as a debt that needed to be recollected from publishers by increasing [Google's] exchange fee above 20 percent on subsequent impressions." FAC ¶ 544.  Internally, Google acknowledged its deception: "DRS . . . makes the auction untruthful."  FAC ¶ 545.

In 2013, Google launched yet another secret change to its auction model: **Project Bernanke**.  Bernanke took advantage of situations in which Google knew it was bidding against itself.  When Google controlled the second and third highest bids, it could drop the second-highest bid.  The top bid would still win, but the bidder would now only owe the publisher the price of the *third* highest bid. FAC ¶ 553.  Amazingly, Google charged the winning bidder (the advertiser) *as if* the second-highest bid had *not* been withdrawn by Google, while paying the publisher the third-bid rate. FAC ¶ 554. The difference between the second-and third-highest bids went into a pool to subsidize—"stimulate," in the jargon of former Fed Chairman Bernanke—the Google Ads business, in a self-reinforcing, opaque cycle of market dominance on every side of the adtech market.  *Id.*  Google "deceived advertisers into paying the difference between the third and second highest bid directly into Google's pool," while publishers were tricked into accepting payment based on the third-highest (rather than the second-highest) bid. *Id.* Once more, Google never disclosed Bernanke to what would have been understandably irate publishers and advertisers—it came out in this litigation.  FAC ¶ 559.  As Judge Castel ruled, Google "misled display-ad auction participants about how Google organized auctions and distributed the proceeds of winning bids" by implementing Project Bernanke. MDL Dkt. 308 at 50. Judge Castel agreed that the complaint "describe[d] misleading statements and the underpayment of publishers[.]" *Id.* at 53.

Apart from manipulating its own auctions, Google also engaged in deception to take down **Header Bidding**, a "technical workaround that publishers could use to help circumvent Google's

anticompetitive ad serving programs." FAC ¶ 564. By 2016, approximately 70% of publishers were—with great success—using Header Bidding to route their inventory to multiple exchanges and avoid Google's ad exchange. FAC ¶ 565. Indeed, publishers received 80% higher prices for impressions sold through Header Bidding than through AdX. *Id.*  Because "Google did not want header bidding to circumvent its pipeline," it began developing strategies to combat it and "deceived publishers into foregoing [its] adoption . . .  by falsely representing that it would negatively affect publishers' yield." FAC ¶ 563. Google told one publisher that it would put a "strain on" servers and decrease inventory yield. FAC ¶ 568. Internally, Google noted that this representation was a "bad look" and that it (and other misrepresentations like it) would make it difficult "to convince [companies] to trust" Google. FAC ¶ 569. Relying on Google's coordinated campaign, publishers "moved away from header bidding to their detriment." FAC ¶ 570.

Most recently, Google misleadingly told all participants on its ad exchange that they competed on **equal footing** with other participants. Beginning as early as 2019, Google represented that it was creating "a fair and transparent market for everyone," in which "[a]ll participants . . . including Ad Exchange and third-party exchanges, compete equally for each impression." FAC  ¶ 587. But Google "tilt[s] the playing field in favor of certain auction participants and against others." FAC ¶ 589. Through Project Bernanke, Google subsidizes bids (using the "pooled" money) from advertisers who use Google Ads to "help them win impressions they would have otherwise lost to advertisers bidding through non-Google buying tools." FAC ¶ 589. Google also "gives Facebook several special, secret advantages in publishers' auctions," such as by providing Facebook information about impressions and faster bidding than other auction participants.  FAC ¶¶ 590-91. And while Google claimed that it removed "Last Look," a practice that gave Google an unfair advantage, it actually maintained its advantage under a "secret bid optimization scheme called 'Smart Bidding.'" FAC ¶ 593. Finally, Google altered its Unified

Pricing Rules, to "downgrade[] the data it shared with publishers" and "prevent publishers from linking bids originating from Google Ads to bids from rivals using header bidding," which impairs their ability to "track[] competition amongst ad exchanges to make informed decisions." FAC ¶¶ 595-96. All of this conduct renders Google's "equal footing" promises false and misleading.

Along with deceiving publishers and advertisers, Google also misled its users about its use in its ad exchange of their **personal information**. Since at least January 2010, Google has repeatedly promised users that it does not sell their personal information. FAC ¶ 572. One of Google's "Privacy and Security Principles" is: "Never sell our users' personal information to anyone." *Id.* And Google's privacy policy represents that "Google does not sell your personal information." FAC ¶ 573.  But Google does sell its users' personal information. "It takes [a] user's personal information [and] displays it to advertisers, who in turn pay Google money for access to that user." FAC ¶ 578. As relevant to the States' claims, when a user visits a Google partner's website or app, Google sends a bid request—"convey[ing] information that Google has collected about the particular user to whom the advertisement will be displayed—to potential advertisers." FAC ¶ 582. Google is compensated "for every bid from a Google buying tool that wins an impression." FAC ¶ 583. Many companies participate in Google's ad auctions not to win the bid, but "solely to siphon off the data." FAC ¶ 584. Despite its many representations to the contrary, Google sells its users' personal information through its ad exchange.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court "must accept all well-pleaded facts as true, and . . . view them in the light most favorable to the plaintiff." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (citation

omitted).  The mere presence of "conclusory statements [is] insufficient to support dismissal under Rule 12(b)(6) . . . when the movant disregards relevant portions of the operative pleading." *Id.* After all, legal conclusions can support the "framework" of a well-pleaded complaint so long as backed up by factual content. *Iqbal*, 556 U.S. at 679.

## ARGUMENT

### I.   State DTPA Enforcement Claims Differ from Ordinary DTPA Claims.

Google fundamentally mischaracterizes state DTPA enforcement actions, which infects its argument in multiple respects.  Taking Texas law as an example, the consumer protection division "may bring an action in the name of the state" whenever it "has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter."  Tex. Bus. & Com. Code § 17.47(a).  The unlawful acts are similarly broad: "False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division."  *Id.* § 17.46(a).  Under the DTPA, "an act is false, misleading, or deceptive if it has the capacity to deceive an ignorant, unthinking, or credulous person."  *Streber v. Hunter*, 221 F.3d 701, 728 (5th Cir. 2000).  Without identifying any specific victims, the state may seek injunctive relief, "a civil penalty to be paid to the state," or restitution of "money or property."  *Id.* § 17.47(a) (injunctive relief), (b) (civil penalty), (d) (restitution); *see Thomas v. State*, 226 S.W.3d 697, 707 (Tex. App.— Corpus Christi-Edinburg 2007) (holding that subsection (d) authorizes restitution "without any requirement . . . [to] specify 'identifiable persons,'" and requiring defendant to send funds to the consumer protection division, to be distributed "within [its] sole discretion").  DTPA remedies "are not exclusive," but "in addition to any other procedures or remedies." Tex. Bus. & Com. Code § 17.43.  Other DTPAs have the same core features, since they are based on a uniform law. Google

may call these remedies "blunderbuss," Dkt. 224 at 8, but its objection is to the will of the legislatures of each state, not any defect in the pleading.

A public DTPA enforcement action does *not* require reliance, injury, damages, identification of *specific* victims, or even false statements (as opposed to deceptive acts). That fully explains why the FAC does not lay out "harm to specific parties" or "identify any specific in-state alleged victim on whose behalf they seek to recover," Dkt. 224 at 8—the States can prevail at the pleading stage without that.[2]

### A.  State DTPA Enforcement Claims Are Not Subject to Heightened Pleading.

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake," but can allege "conditions of a person's mind . . . generally."  Fed. R. Civ. P. 9(b). DTPA claims are not fraud claims, but Google nonetheless argues that the claims "sound in fraud" because they are "predicated on the allegation that Google made false or misleading statements or failed to make a material disclosure." Dkt. 224 at 9.  But Google is simply wrong that Rule 9(b) applies every time a plaintiff pleads a "false or misleading statement."  Whether Rule 9(b) applies is a question of federal procedure, on which Fifth Circuit law controls.  In general, where elements of traditional fraud are absent, courts do not apply Rule 9(b).

This Court has explained that "Rule 9(b)'s heightened pleading requirement for fraud should be relaxed in the context of government-enforcement actions, where reliance is immaterial." *Gilmour v. Blue Cross & Blue Shield of Ala.*, No. 4:19-cv-160-SDJ, 2021 WL 1196272, at *8 (E.D. Tex. Mar. 30, 2021).  That conclusion is well-grounded in Fifth Circuit case law, which ties Rule 9(b) to reliance and damages: "Given the elements of reliance and damages, pleading common law fraud with particularity demands the specifics of the false representation—

---

[2] States are *permitted* to seek "judgments" "to compensate identifiable persons for actual damages," which would involve identifying persons and proving their actual damages. Tex. Bus. & Com. Code § 17.47(d).  They are not *required* to do so.

without the precise contents of the misrepresentation the plaintiff cannot show he relied on the misrepresentation to his detriment.  In other words, common law fraud's elements of reliance and damages are intertwined with the misrepresentation and heighten the need for attention to the misrepresentation itself."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188-89 (5th Cir. 2009).

Given the Fifth Circuit's focus on reliance and damages, the elements matter.  Under Mississippi law, for example, reliance is not required.  Miss. Code Ann. § 75-24-5.  Under Texas law, an *individual* alleging a "false, misleading, or deceptive act or practice," must show "damages" and that the practice was "relied on by a consumer to the consumer's detriment," Tex. Bus. & Com. Code § 17.50(a)(1), but "it is not necessary for the State to allege" injury or reliance in a public enforcement action, *Holzman v. State*, No. 13-cv-168, 2013 WL 398935, at *3 (Tex. App.—Corpus Christi-Edinburg Jan. 31, 2013); Tex. Bus. & Com. Code § 17.47(a).  Because state DTPAs do not require enforcement actions to allege reliance, a heightened pleading standard does not apply.

Federal courts' treatment of claims brought under Section 5 of the Federal Trade Commission Act ("FTC Act") reinforce this conclusion. The State DTPAs are modeled after Section 5 of the FTC Act (for example, the Texas DTPA instructs courts to follow "the interpretations given by the Federal Trade Commission and the federal courts," Tex. Bus. & Com. Code § 17.46(c)(1)); *accord e.g.*, Miss. Code Ann. § 75–24–3(c). Rule 9(b) generally does not apply to FTC actions. *See Fed. Trade Comm'n v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005) ("A § 5 claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b) . . . . Unlike the elements of common law fraud, the FTC need not prove scienter, reliance, or injury . . . . The FTC's action against Haroldsen was not a private or common law fraud action designed to remedy a singular harm, but a government action

brought to deter deceptive acts and practices aimed at the public"); *Fed. Trade Comm'n v. Consumer Health Benefits Ass'n*, No. 10-cv-3551, 2012 WL 1890242, at *6-7 (E.D.N.Y. May 23, 2012) ("Rule 9(b) Does Not Apply to the FTC's Claims").  The individual DTPA case law Google cites does not contradict this point.

Even for individual DTPA claims, courts mostly apply Rule 9(b) when a complaint pleads both fraud and a non-fraud claim based on the same facts.  Fifth Circuit precedent teaches that if a complaint pleads fraud *and* another claim based "on different sets of underlying facts," Rule 9(b) applies only to the fraud claim, but if both claims are "'based on the same set of alleged facts,'" Rule 9(b) applies to both.  *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 123 (5th Cir. 2019) (quoting *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003)).  Following that principle, district courts have reasoned that the "crucial factor is whether 'the DTPA claims are based on the same facts as the underlying fraud claims.'"  *Williams v. NIBCO Inc.*, No. 20-cv-48, 2021 WL 1069044, at *12 (W.D. Tex. Mar. 18, 2021) (quoting *Johnson v. Daimler Trucks N. Am., LLC*, No. 20-cv-385, 2020 WL 6875265, at *2 (W.D. Tex. Aug. 11, 2020).  In *Williams*, for example, the court declined to apply Rule 9(b) "[b]ecause Plaintiffs [did] not assert an independent fraud claim." *Id.*; *see also RooR Int'l BV v. Smoke & Vapor*, No. 4:18-cv-711, 2019 WL 4267594, at *2 (E.D. Tex. Aug. 12, 2019), *rep't and rec. adopted*, 2019 WL 4257014 (E.D. Tex. Sept. 8, 2019) (Rule 9(b) did not apply because allegations were not "intertwined[] with those of a fraud claim.").  Here, as in *Williams* and *RooR*, the States allege no independent fraud claims, and so Rule 9(b) should not apply.

Even if the Court applied Rule 9(b) to certain allegations about misrepresentations, it should apply Rule 8 to allegations of unfairness, unconscionability, willfulness, or other elements.[3]

---

[3] For example, Rule 9(b) does not apply to Utah's "unconscionable . . . practices" claim. FAC ¶ 756.

10

Even for misrepresentations, "it has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied." *United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206 (E.D. Tex. 1998).  The breadth and complexity of the conduct here justifies less stringent application of Rule 9(b), if it applies.

## B. The States' Claims Are Timely.

Judge Castel held that the States' *federal* antitrust claims are timely on a Rule 12 standard, MDL Dkt. 308 at 80-87, and the same is true of the state claims.  Google again conflates the limitations on *private* claims with those on public enforcement actions: the statute of limitations does not apply to Texas, Mississippi, and Louisiana, meaning all their claims are timely.[4]  Google also misstates the statute of limitations for Nevada, which is four years, since the claims were brought before October 31, 2021.[5]  *See also* Appendix A (listing limitations periods for each state).

*Second*, a host of doctrines raise fact issues that preclude adjudicating timeliness on a Rule 12 motion, including the discovery rule,[6] the continuing violation doctrine,[7] equitable tolling, and fraudulent concealment.  *See* Appendix A.  Under the discovery rule, a cause of action accrues when "the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Kitchell v. Aspen Expl., Inc.*, 562 F. Supp. 2d 843, 848 (E.D. Tex. 2007) (cleaned up). Even under a strict application of that doctrine, the discovery rule applies when "the

---

[4] *E.g.*, *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993) (Texas "is not subject to the defenses of limitations, laches, or estoppel."); *Molano v. State*, No 13-cv-477, 2011 WL 3631968, at *4 (Tex. App.—Corpus Christi-Edinburg Aug. 18, 2011) (applying this rule to the DTPA); Miss. Const. art. IV, § 104 ("Statutes of limitation in civil causes shall not run against the state, or any subdivision or municipal corporation thereof."); Miss. Code. Ann. § 15-1-51 (same).

[5] *See* Nev. Rev. Stat. §§ 11.220 (antitrust), 11.190(2)(d) (consumer protection).

[6] *E.g.*, *Pinder v. Duchesne Cnty. Sheriff*, 478 P.3d 610, 619 (Utah 2020); *see also* Appendix A.

[7] "[T]he continuing violation doctrine provides that where the last act alleged is part of an ongoing pattern . . . and occurs within the filing period, allegations concerning earlier acts are not time-barred." *Foddrill v. McManus*, No. 13-cv-51, 2013 WL 6198228, at *1 (W.D. Tex. Nov. 26, 2013); *see also, e.g.*, *State v. Classic Pool & Patio, Inc.*, 777 N.E.2d 1162, 1166 (Ind. Ct. App. 2002) ("[T]he statute of limitations is triggered by the date of each occurrence.").

nature of the injury is unlikely to be discovered even through due diligence." *Id.* at 849 (citing *Prieto v. John Hancock Mut. Life Ins.,* 132 F. Supp. 2d 506, 513 (N.D. Tex. 2001) and *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)).  Here, the pleadings allege that Google's misconduct resulted in injury that was unlikely to be discovered based on Google's actions. Google argues that no such principles were pleaded, but Judge Castel found that "[t]he Complaint describes conduct on the part of Google that lacked transparency, occurred out of the public eye, and had effects that were not immediately obvious or well understood." MDL Dkt. 308 at 84.  Its behavior was "opaque, and accompanied by misrepresentations about its intent and effects." *Id.* at 85.  "These allegations describe a purported scheme that enrolled publishers without their advance consent, which was misrepresented to publishers as a way to increase yield but internally understood by Google as a way to transact highest-value inventory on AdX." *Id.* at 86. "[I]nternal Google materials [] would not have been known to customers or rivals at the time." *Id.* at 87.  Adjudicating these issues would require delving into fact-specific arguments to dismiss— at most—violations within a certain range of time, but not other times.  That is not proper on a Rule 12 motion. *See Fed. Trade Comm'n v. Nudge, LLC*, 430 F. Supp. 3d 1230, 1245 (D. Utah 2019) (declining to dismiss parts of Utah's claims on limitations grounds).

## II. The States Have Plausibly Alleged Deceptive Trade Practices Act Claims.

### A. Reserve Price Optimization Violated the DTPA.

In an auction, the buyers' bidding strategy depends on the auction design.  Consider two auction systems.  First, a standard second-price auction: the highest bid wins, but the winner only pays the second-highest bid price.  Second, the second-price-plus-one auction: the highest bid wins, but the winner pays the second-highest bid price, plus $1.  If the auctioneer announced that the system was changing to a second-price-plus-one auction, buyers would realize that they should bid a bit less.  Most likely, everyone would bid exactly $1 less, and the results would be the same—

a bit more confusing, but harmless.  But what if the auctioneer switched from a second-price auction to a second-price-plus-one auction *without any announcement*?  Buyers would not change their bids.  They would simply pay $1 extra, and likely would infer that other people were entering higher bids.  The buyers would do this because they were unfairly deceived by an undisclosed change in the auction mechanism.  RPO was like that, except instead of $1 extra every time, the amounts varied, making it even harder to detect and more unfair.

Auctions often have a floor—the lowest amount the seller would accept.  Before RPO, publishers set the floor.  FAC ¶ 302.  Then, advertisers bid.  The highest bid, if above the floor, won, paying the amount of the *second*-highest bid *unless* the second bid was *below* the floor, in which case the winner would pay the floor.  Enter RPO.  "RPO overrode publishers' AdX exchange floors."  FAC ¶ 335.  Instead of *one* floor for the entire auction, RPO silently implemented "a unique and custom floor" for *each buyer*, "based on what each buyer had bid in the past."  FAC ¶ 336.  Now, the winner's "optimized" floor would frequently be higher than the second bid, raising the price the advertiser pays.  If buyers knew, they would change their bidding strategy.  Google employees recognized that RPO, if disclosed, would "transform the system into a 1st price auction where the bidder has a strong incentive to bid LESS than he's willing to pay."  FAC ¶ 347.  But buyers did not change their strategy, because Google did not disclose that the system had changed.  Instead, Google "lead publishers and advertisers to believe that AdX operated a second-price auction."  FAC ¶ 346.  This was so successful that "industry articles covering Google's conduct in the exchange market continued to report that Google operated a second-price auction" right up "until 2019."  *Id.*  "RPO netted Google an additional $250 million of annual recurring revenue."  FAC ¶ 349.  A "senior Google employee" explained that RPO was part of "charging non-transparently."  FAC ¶ 351.  The pleading alleges that "Google launched" RPO "*without disclosing it to advertisers*."  FAC ¶ 532 (emphasis added).  These allegations state a DTPA claim.

Judge Castel rejected *antitrust* claims based on RPO but acknowledged that the complaint alleged deceptive conduct.  According to Judge Castel, the "allegations describe a practice that misled Google's publisher clients."  MDL Dkt. 308 at 59.  "Accepted as true, the Complaint's allegations describe how Google exploited advertisers' understanding that Google was running a sealed, second-price auction by using advertisers' bids against them in order to manipulate publishers' price floors . . . ."  *Id.* at 60.  "The Complaint describes RPO as a project that secretly manipulated the price floors set by publishers, resulting in unwitting overpayments by advertisers . . . . Accepting the truth of the Complaint's allegations, RPO describes a secretive process that misled publishers and advertisers and increased publishers' price floors."  *Id.* at 61.

1.   *The FAC pleads that RPO violates the States' DTPA statutes.*

Ignoring these well-pleaded facts, Google pretends the entire claim is based on three statements, then contends those statements were true. Dkt. 224 at 10.  The first statement—that a second-price auction "incentivizes buyers to bid the most they're willing to pay for a given piece of inventory and it minimizes the need to 'game' the system," FAC ¶ 531—is an example of "extoll[ing] the virtues of its sealed second-price auction."  FAC ¶ 531.  The statement helps establish that Google persuaded the public that it used a sealed second-price auction.  The problem is the subsequent *change* in the system without disclosure, which *made the statement no longer true*.  "[S]ilence or failure to disclose can amount to a violation of" the DTPA. *Ingram v. Joseph*, No 3:06-cv-626, 2007 WL 9711659, at *7 (N.D. Tex. Apr. 3, 2007).  That happened here: "advertisers were deceived as to several critical features of Google's auctions," which "resulted in the advertiser[s] paying significantly higher prices than the true second price." FAC ¶ 533.

When news of Google's manipulation of auction floors began leaking, Google still did not disclose RPO.  The FAC alleges that "after the [Digiday] article ran, Google spokesperson Andrea Faville issued the following statement in response: 'That description doesn't match anything in

our current product suite or future roadmap.'  This statement was false as Google had already launched RPO . . . ."  FAC ¶ 535.  The "statement" Google "issued" was a public relations response given multiple times to multiple people, not a quotation from a particular story.  Google disputes the complaint, contending that it was "responding to a different inquiry," Dkt. 224 at 11, but even if that were true the denial would be highly misleading, since it would mean Google's statement responding to the leak actually did not address the leak *at all*, but instead (confusingly) addressed a different topic.  The specific document Google reproduced is not central to the complaint and does not even contradict it.  Drawing all inferences in Plaintiffs' favor, it is easy to read the statement—even in the context Google provides—as about RPO, especially when one examines the legal standard: a representation is misleading when it can deceive "the ignorant, the unthinking, and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions." *Spradling v. Williams*, 566 S.W.2d 561, 563 (Tex. 1978).

Third, the FAC alleges that Google's May 12, 2016 blog post "misled advertisers about RPO," FAC ¶ 536, but Google denies the allegation because "half of the post is an announcement regarding RPO." Dkt. 224 at 11.  The Court can read the post for itself.  It is generally "regarding" reserve prices, but comes nowhere near explaining how RPO works, and how it is different from a second-price auction.  Google also quotes the complaint saying that "optimized pricing would 'give programmatic buyers greater access to premium inventory,'" and perplexingly claims that "Plaintiffs do not allege that these statements were false."  Dkt. 224 at 12 (quoting FAC ¶ 536).  In fact, the next three words of the FAC after the portion Google quoted are: "This was false . . . ."

*2.  The RPO claims are timely.*

No RPO claims are time-barred.  "Between 2010 and September 2019, Google led publishers and advertisers to believe that AdX was a second-price auction."  FAC ¶ 332.  But it was not, because of RPO.  The limitations period runs from the *discovery* of Google's conduct in

2019, not the earlier statements.  Leaving the discovery rule aside, every transaction constitutes a violation "in the conduct of any trade," and each triggers a new limitations period, meaning even on Google's theory some violations are timely.  The continuing violations doctrine also applies. Google's timeliness challenges are fact-specific and cannot be decided at the Rule 12 stage.

Rather than attack timeliness, Google contends that Mississippi case law bars suit for completed conduct, Dkt. 224 at 12-13, but that is not true.  Google relies upon an extreme case where the "defendants were convicted of federal crimes, suffered criminal sanctions, and were forced to pay hundreds of millions of dollars in fines, which further reduced the likelihood that it would repeat its past conduct."  *Navient Corp. v. State ex rel. Fitch*, 313 So. 3d 1034, 1042 (Miss. 2021).  Where the defendant "has suffered no consequences, and it remains active"—like Google—there is "infinitely more potential to reenter the business."  *Id.*  Here, the FAC even alleges that "RPO continues in some form . . . under the codename 'Bulbasaur.'"  FAC ¶ 348.

## B.  Dynamic Revenue Share Violates the DTPA.

Google makes much of its money from exchange fees, which are a percentage of each ad sale that goes to AdX.  Sometime after 2013, Google made its revenue share "dynamic."  Where *reducing* the fee could net an extra sale, Google did so.  Where the bid was high enough that *increasing* the fee would not lose the sale, Google did that.  Google could profitably shift its fees dynamically because it "had access to rivals' net bids as a result of running publishers' ad server, a market in which Google had a monopoly."  FAC ¶ 321.  When not arguing a motion to dismiss, Google itself acknowledged that a problem with "DRS is that it makes the auction untruthful." FAC ¶ 324.  "Google concealed DRS from both publishers and advertisers."  FAC ¶ 326.  Judge Castel held that the pleading plausibly alleged that DRS was "anticompetitive conduct that permitted AdX to win bids based on price manipulations by Google" which "had the effect of advancing or maintaining Google's monopoly in the ad-exchange market."  MDL Dkt. 308 at 57.

Again, Google reduces the claim to individual *statements*, then argues that the statements are insufficient.  But the claim is based on the way the auction rules changed.  The transactions, in light of the undisclosed auction mechanics, are "misleading or deceptive acts or practices," Tex. Bus. & Com. Code § 17.46(a), or at minimum involve a failure "to disclose information concerning . . . services which was known at the time of the transaction . . . [and] intended to induce the consumer into a transaction." *Id.* § 17.46(b)(24).  Google is essentially arguing that if it changes its code—and therefore how the auctions work, who gets paid and how much—but does not make any new statements, that is categorically outside the protection of the DTPA.  That is absurd.  In 2014, Google began opting publishers into DRS *without telling* the publishers that it was doing so. FAC ¶ 543. "By the fall of 2015, Google had opted all publishers into DRS, still without disclosing the program." FAC ¶ 326. These omissions are actionable. *See Ingram*, 2007 WL 9711659, at *7.

Later, Google made affirmative misrepresentations. Google's summer 2016 announcement to publishers "that it was launching a 'revenue share-based optimization' that increased publishers' yield" was a misrepresentation. FAC ¶ 543.  "Google deceived publishers into adopting DRS by telling them that it would increase revenue when in fact it only benefitted Google and even caused a decrease to publisher revenue overall." FAC ¶ 540.  The misrepresentation is somewhat general, but "the DTPA prohibits false general representations as well as more specific representations." *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 231 (Tex. App.–Houston 1996). Google argues that these allegations are insufficient because the States "do not plausibly allege that" Google's statements that DRS would increase revenue or yield "would have been false or otherwise actionable." Dkt. 224 at 14.  But the FAC alleges that DRS "only benefited Google and even caused a decrease to publisher revenue overall."  FAC ¶ 540.  Google suggests this allegation is a *conclusion*, but the leading Supreme Court cases define "conclusory" allegations as "merely *legal conclusions* resting on the prior allegations." *Twombly*, 550 U.S. at 564 (emphasis added).  *Iqbal*

was even clearer. *See* 556 U.S. at 678 (describing *Twombly*'s holding: "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"); *id.* (courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Twombly*, 550 U.S. at 555)); *id.* at 679 ("begin by identifying . . . conclusions" because "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by fact[s]").  That revenue "decreased" is clearly not a legal conclusion, and not a recital of an element of any cause of action—rather, it is a well-pleaded fact, albeit a big-picture fact.

"DRS deceived and harmed publishers by convincing them that DRS actually increased publisher revenue when Google took a haircut on its take rate. In reality, Google wasn't decreasing its revenue overall, because it was recouping any losses on subsequent transactions without telling publishers." FAC ¶ 546.  Google argues that DRS harmed no one, but the pleading alleges it did, and harm is not a DTPA element.  Maintaining an auction with unfair, undisclosed rules is enough.

Google argues that any statute of limitations runs from 2016 because it "told publishers it was launching a revenue-share-based optimization in 2016," Dkt. 224 at 15-16, but the 2016 statements were continued misrepresentations, FAC ¶ 543, and Google "subsequently" "increase[d] AdX's fee to above 20 percent," FAC ¶ 544 without telling publishers.  "[A] separate violation occurred as to the publisher each time DRS was used," FAC ¶ 548, which extended "through at least 2019," FAC ¶ 546.  Taking all inferences in Plaintiffs' favor, the claim is timely.

## C.  Project Bernanke Violates the DTPA.

As with every other claim, Google pretends that Bernanke is based on only two statements (the 2010 Spencer statement and a research paper in 2014), then argues against each.  The basic claim is quite straightforward: Google was representing AdX as a sealed second-price auction—

as the FAC alleges repeatedly[8]—and by implementing Project Bernanke, Google caused AdX's auction mechanism to depart from a sealed second-price auction.  FAC ¶ 552.  Google "charged the winning bidder/advertiser as if the second-highest bid had remained in the auction and had been the winning bid," but actually dropped that bid "without disclosing" that fact "to publishers or advertisers."  FAC ¶ 552-53.  "So, advertisers would clear an auction at the second highest price but Google only paid the publisher the lower third price (minus Google's take rate). Incredibly, Google actually retained the difference between the second-place bid (that was dropped) and the third-place bid." FAC ¶ 554.  That change, for its own benefit, without explanation, is a misleading or deceptive practice and actionable under the DTPA.[9]

Google also argues that the States "fail to allege that Google withheld any information about Bernanke in order to deceive customers" or that "any customer would have acted differently if Bernanke were disclosed." Dkt. 224 at 17-18 (citing *Rayford v. State*, 16 S.W.3d 203, 211 (Tex. App.—Dallas 2000)). But the Complaint specifically alleges that "advertisers would clear an auction at the second highest price but Google only paid the publisher the lower third price" and Google "actually retained the difference between the second-place bid . . . and the third-place bid." FAC ¶ 554. Google "deceived advertisers into paying the difference" by not disclosing its intent to retain the difference. *Id.* Google also deceived *publishers* into taking payment based on the

---

[8] *E.g.*, FAC ¶¶ 550 ("Google widely advertised that its auctions in AdX were sealed second-price auctions."  Scott Spencer, for example, said "AdX is a second price auction with minimum CPMs set by the publisher. This is the most efficient auction model, resulting in the most stable, long-term equilibrium price."); ¶ 531 ("Google itself frequently extolled the virtues of its second-price auction."); ¶ 300 ("Between 2010 and September 2019, Google led publishers to believe that AdX was a second-price auction."); ¶ 313 ("Google falsely told publishers that its AdX exchange ran a transparent second-price auction that 'is the most efficient auction model, resulting in the most stable, long-term equilibrium price.'").

[9] Google again argues here that Rule 9(b) applies, but cites a common-law fraud case, not a DTPA case—much less a public enforcement action.  *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006). Rule 9(b) does not apply here, or is at minimum relaxed.  Even if it did apply, the FAC lays out the facts clearly enough for Google to understand the claims and defend itself.

third-highest price rather than the second. *Id.* These changes raised Google AdX's revenue by $230 million in the first year alone while "dramatically decreas[ing] publisher revenue." FAC ¶ 558.

Google nonsensically argues any statute of limitations for this claim runs from 2010— *before* Bernanke began.  It alternatively argues for 2014, but the discovery rule and other doctrines render all claims timely because Bernanke was not widely known until the complaint in this lawsuit was unsealed,[10] and not discovered by Plaintiff States until the pre-suit investigation.

### D.  Google's Aggressive Takedown of Header Bidding Violates the DTPA.

Header bidding was a significant threat to Google's dominant position, and it acted swiftly to "'kill' header bidding."  FAC ¶ 413.  As a "Google executive advised colleagues internally," Google needed to be "very careful here what we say to publishers" because "negatively impacting header bidding is a Google desired outcome."  FAC ¶ 373.  Google advised a publisher to remove OpenX (Google's competitor) from header bidding because, according to Google, failure to do so would "put a 'strain on its servers' and decrease the publisher's inventory yield." FAC ¶ 568.  But those were not the real reasons Google wanted the publisher to remove OpenX from header bidding. Recognizing "header bidding posed a major threat to [its] dominance in ad servers and ad exchanges," Google "sought to eliminate header bidding through several different tactics," including "flat out lying to publishers to peel them away from header bidding." FAC ¶¶ 566-67. To eliminate header bidding's threat to Google's dominance, "Google engaged in widespread misrepresentations to publishers to trick them into turning off header bidding." FAC ¶ 570. Influenced by Google, some publishers "moved away from header bidding."  *Id.*

---

[10] *See* FAC ¶ 559 ("Google never disclosed Bernanke, Global Bernanke or Bell to publishers or advertisers."); *see also* Jeff Horwits & Keach Hagey, *Google's Secret 'Project Bernanke' Revealed in Texas Antitrust Case*, Wall Street Journal (Apr. 11, 2021) https://www.wsj.com/articles/googles-secret-project-bernanke-revealed-in-texas-antitrust-case-11618097760.

"[O]ne of Google's strategies for killing header bidding was to induce Facebook, Amazon, and other industry participants to end their support for the new technology."  FAC ¶ 418.  Google offered Facebook substantial concessions to get it on board with exchange bidding (rather than header bidding)—including a 5% fee instead of the typical 10%.  FAC ¶ 428.  Google gave Facebook "longer timeouts" which helped Facebook "win[] more auctions."  FAC ¶ 429.  It received "direct billing and contractual relationships with publishers," "more information" that Facebook "does not have to pay for," and "protections against Google using [Facebook's] data."  FAC ¶¶ 430-34.  Google "kept these special advantages for Facebook secret" and "continues to actively misrepresent the terms on which it conducts publishers' auctions."  FAC ¶ 435.

Focusing exclusively on one interaction that took place in New York, Google contends that Texas, Louisiana, Missouri, South Carolina, and Montana's DTPA claims based on Header Bidding fail because "they allege no connection between any Plaintiff State and the single alleged statement, allegedly made in New York to a New York company." Dkt. 224 at 19. The claim is easily supported by other pleaded facts.  But even focusing solely on the New York interaction, the argument fails. Google's 2017 false statement to a publisher "trick[ed] [publishers] into turning off header bidding" and forced them to go back to using Google's ad exchange. FAC ¶¶ 568-70. While the specific statement may not have occurred in Texas, Louisiana, Missouri, South Carolina, or Montana, it resulted in the publisher turning off header bidding and doubling-down on Google's ad exchange *everywhere*, including those five states. The Texas case Google cites holds that the DTPA does not reach conduct when "every operative fact occurred outside of the state." Dkt. 224 at 19-20 (citing *Cogan v. Triad Am. Energy*, 944 F. Supp. 1323, 1336 (S.D. Tex. 1996)). Here, the principal fact—that the publisher discontinued its use of header bidding in favor of Google's ad exchange—occurred everywhere the publisher posted ads, which affects every state "indirectly," which is all the statute requires. Tex. Bus. & Com. Code § 17.45(6); *see also Click v. Gen. Motors*

*LLC*, No. 2:18-cv-455, 2020 WL 3118577, at *9 (S.D. Tex. Mar. 27, 2020) (The DTPA "does not provide that its application will be limited to acts or practices occurring in Texas.").

Google also argues against Arkansas, Florida, and Utah, but fails because these claims are not extraterritorial.  Ads were seen, and auctions conducted, in each state.  Because the FAC plausibly pleads that effects were felt within each state, the claims are not extraterritorial.[11]

### E. Google's Recent Representations of Equal Footing and Fair Treatment Violate the DTPA Because They Are Demonstrably False.

Google admitted that "Last Look," a method to allow front-running, "is inherently unfair." FAC ¶ 377.  It promised to end that program in 2019, stating: "every offer from programmatic buyers will compete in the same unified auction, alongside inventory which is directly negotiated with advertisers. An advertising buyer's bid will not be shared with another buyer before the auction or be able to set the price for another buyer."  FAC ¶ 379.  Later, it claimed to be creating "a fair and transparent market for everyone," *id.*, and that "all participants in the unified auction, including Ad Exchanges, and third-party exchanges, compete equally for each impression."  FAC ¶ 587.  These statements are not mere opinion, and they are false or misleading.

As described above and in the complaint, Facebook does not "compete equally"—it has profound advantages, granted by Google in exchange for Facebook's assistance in undermining header bidding. *E.g.*, FAC ¶¶ 418-435, 590-92. Google and Facebook have a complex agreement on identifying end users, guaranteeing bids when the end user is identified, and guaranteeing that

---

[11] The Arkansas case Google cites, *Chalmers v. Toyota Motor Sales USA, Inc.*, 935 S.W.2d 258, 264 (Ark. 1996), addresses the extraterritoriality of Arkansas's Unfair Practices Act (Ark. Code Ann. § 4-99-101 *et seq.*), not the DTPA (Ark. Code Ann. § 4-88-101 *et seq.*). The Florida case holds only that the FDUTPA allows the Florida attorney general to bring DTPA claims on behalf of both in-state and foreign *residents*. *Millennium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*, 761 So. 2d 1256, 1262 (Fla. Dist. Ct. App. 2000).  The Utah case has nothing to do with consumer protection, and the UCSPA applies where a violation is "partly within the state" or involves an in-state "internet connection by a resident."  Utah Code Ann. § 13-2-6(4).

Facebook will win a certain minimum number of auctions.  FAC ¶ 438.  And Google does not compete equally—it employs DRS and Bernanke, ties its products, and gets far more information than others.  *E.g.*, FAC ¶¶ 589-96.  The market is not fair and transparent.

**F. The Complaint Plausibly Alleges DTPA Claims Based On Google's Continued Practice of Selling Users' Personal Information for Use in Its Ad Exchange.**

Google opens boldly, saying "Plaintiffs do not allege that Google sold any user's personal information," Dkt. 224 at 23, but this is false: "[d]espite its many representations that it will never sell its users' personal information, Google does just that. It takes users' personal information, displays it to advertisers, who in turn pay Google money for access to that user," FAC ¶ 578. The FAC describes this process in detail.  When a user visits a Google partners' website or app, Google sends a bid request—consisting of users' personal information—to potential advertisers, and that Google is then compensated "[f]or every bid from a Google buying tool that wins an impression." FAC ¶¶ 582-83. Citing no law, Google argues that this sale process is not a sale, but a "multi-link chain of events where Google might eventually be compensated if a Google advertising customer wins an auction." Dkt. 224 at 25.  That a sale is complicated or multi-level does not make it something other than a sale, especially under the broad definitions of the DTPA.[12]  And Google outright ignores the allegation that advertisers often purchase impressions or ad services "solely to siphon off the data" included in the bid request. *See* FAC ¶ 584.

Google's claim that the bid requests do not contain personal information similarly fails. Dkt. 224 at 24. Google defines personal information as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, *or other data*

---

[12] *E.g.*, Tex. Bus. & Com. Code § 17.45(2), (6); *Id.* § 17.44 (Texas DTPA is to be "liberally construed"); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988) (Kentucky Consumer Protection Act should be construed to provide the "broadest possible protection"); *see also* Utah Code Ann. § 13-11-3(2)(a) (defining a "consumer transaction" to include any "transfer or disposition of goods, services, or other property, both tangible and intangible").

*that can be reasonably linked to such information by Google*, such as information we associate with your Google account." FAC ¶ 579. Rather than confronting its *own* definition of "personal information," Google argues around it by claiming Google "specifically differentiates between 'unique identifiers tied to the browser, application, or device you're using' (*i.e.*, the information that 'could' be in a bid request) and 'personal information.'" Dkt. 224 at 24. But, according to Google's privacy policy, *see* Dkt. 224-1, Ex. E, Google associates these "unique identifiers" with individual accounts that include names, email addresses, geolocation, and other information.

Google argues that "'information that is recorded about users so that it no longer reflects or references an individually-identifiable user' may be shared with advertising partners." Dkt. 224 at 24. But that definition conflicts with another in Google's privacy policy, which contemplates that the data Google associates with its users *is* "personal information" regardless of whether it "no longer reflects or references an individually-identifiable user." *Id.* Any reasonable Google user reading Google's privacy policy would understand it to mean that the "non-personally identifiable information" that Google may share with its advertising partners does *not* include any "information . . . which personally identifies you . . . *or other data that can be reasonably linked to such information by Google*." FAC ¶ 579. Despite claiming otherwise, Google brokers billions of advertisements that "target individual users based almost entirely on personal information about the user . . . collected by Google and its advertising partners." FAC ¶ 578.

**G.  The Purported "Consumer Transactions" Requirement Does Not Bar DTPA Claims.**

Google argues that Indiana's, Utah's, Arkansas's, and Idaho's DTPA claims should be dismissed because the FAC "fail[ed] to allege that Google's statements related to consumer transactions." Dkt. 224 at 25. Because a corporation is "considered a 'person' under the [Indiana Deceptive Consumer Sales Act]," that corporation "can make purchases of items and services that are primarily for that corporation's personal use." *IUE-CWA Local 901 v. Spark Energy, LLC*, 440

F. Supp. 3d 969, 976 (N.D. Ind. 2020) ("It stands to reason that if Plaintiff, a corporation, is considered a 'person' under the Act, it can make purchases of items and services that are primarily for that corporation's personal use.").  The Utah's Consumer Sales Practices Act ("UCSPA"), defines "person" as "an individual, corporation, government . . . or any other legal entity." Utah Code Ann. § 13-11-3(6); *see Utah v. B & H Auto*, 701 F. Supp. 201, 204 (D. Utah 1988).  Google cites *Vivint, Inc. v. England*, No. 12-cv-979, 2013 WL 1842538, at *1-2 (D. Utah May 1, 2023), but that case involved a plaintiff who had a contract with a distributor.  The distributor also sold products for a "competing company," and solicited the plaintiff's customers. *Id.* at *1.  Interference with contract—not any actual transactions—were the core of the claim. *Id.* at 2. There were no relevant transactions between them at issue—just a contract.  Here there are vast numbers of transactions at issue.

Despite no such limitation in Arkansas's and Idaho's DTPAs, Google argues that "courts interpreting the Arkansas and Idaho DTPAs have held that deception is not actionable unless directed at consumers." Dkt. 224 at 26. Arkansas's purported "consumer transaction" requirement turns on whether the action is brought on behalf of a consumer (a proper DTPA plaintiff) or a *competitor* (not a proper DTPA plaintiff). In *Apprentice Information Systems, Inc. v. DataScout, LLC*, 544 S.W.3d 536, 539-40 (Ark. 2018), the plaintiff was not a "consumer" under the ADTPA because it was a competitor "in the market of selling counties' public data." There, because the plaintiff "sued over its thwarted business model, not a specific harm to consumers," the court declined to extend the ADTPA. *Id.* at 540. Here, Arkansas has asserted its DTPA claims not on behalf of Google's competitors, but to protect consumers of Google's AdX products and services.

Finally, with respect to Idaho's purported "consumer transactions" requirement, Google relies on the Idaho Consumer Protection Act's ("ICPA") definition of "services." Dkt. 224 at 26 (citing Idaho Code § 48-602(7)). But Google ignores that the ICPA's definition of "consumer"

includes business entities. Rules implementing the ICPA define "consumer" as a "*person* who purchases . . . or is solicited to purchase . . . or otherwise gives consideration for any goods or services." Idaho Admin. Code (IDAPA) Rule 04.02.01.020.13 (emphasis added). And "person" includes "business entities, and any other legal entity." Idaho Code Ann. § 48-602(1). Google cites *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 350 F. Supp. 2d 160 (D. Me. 2004), where plaintiffs were car buyers who sued car companies and two national dealer associations. *Id.* at 167. Their ICPA claims against the dealer associations failed because the associations "provided services to automobile dealers," not the plaintiffs. *Id.* at 184. The ICPA claims were *not* dismissed because automobile dealers could not ever be "consumers" under the ICPA. Here, Idaho's claims are grounded in Google's deceitful and misleading conduct toward ad buyers and users.

### III. The States Have Adequately Alleged Their State Antitrust Claims.

Plaintiff States respectfully disagree with Judge Castel's rulings dismissing certain antitrust claims, and reserve the right to challenge those rulings on appeal.  However, Plaintiff States do not plan to relitigate the issues decided in Judge Castel's order, and agree with Google that there is no reason to distinguish between the federal claims and the parallel state-law claims.[13]

That said, Google's motion mentions the dismissal of "claims for injunctive relief because the alleged conduct stopped in 2019 and therefore there was nothing to enjoin."  Dkt. 224 at 28 n.20.  The stipulations cover claims, not remedies, and there is no reason to construe federal and state *remedies* to be parallel, since they plainly are not.  For example, states are seeking civil penalties under state antitrust law, but there is no comparable remedy under federal law.  Available

---

[13] Certain claims were dismissed only in part.  For example, though Judge Castel dismissed certain claims based on DRS, he also held that "[t]he Complaint plausibly alleges that that Google's Dynamic Revenue Sharing harmed competition in the ad-exchange market."  MDL Dkt. 308 at 57. The state-law claims should survive in part too, where applicable.

injunctive relief may also differ, though to the extent they are the same (for example, a structural remedy), Plaintiff States agree that the same reasoning should be applied.

> Google claims Arkansas law does not cover monopolization, but it does:
>> A monopoly . . . is declared to be unlawful and against publish policy, and any and all persons, firms, corporations, or associations of persons engaged therein shall be deemed and adjudged to be guilty of a conspiracy to defraud and shall be subject to the penalties prescribed in this subchapter.

Ark. Code Ann. § 4-75-302; *see also id.* § 4-75-301 (defining "monopoly"); FAC ¶ 623.

Second, Google argues that all of Mississippi's state antitrust claims should be dismissed because Mississippi did not allege "intra-Mississippi conduct or transactions." Dkt. 224 at 28. Again, Google relies only on *State ex rel. Fitch v. Yazaki North America, Inc.*, 294 So. 3d 1178 (Miss. 2020). But *Yazaki* specifically acknowledged that "[t]he alleged conduct does not have to be *exclusively* intrastate to be actionable under the MAA." *Id.* at 1189. Rather, the conduct may be "partly intrastate." *Id.* (citing *Standard Oil Co. of Ky. v. State*, 65 So. 468, 471 (Miss. 1914)). For Mississippi, "the 'intrastate effects' requirement is met at the pleading stage by a plaintiff's allegations . . . claiming that the anticompetitive conduct cause supracompetitive price effects in the relevant jurisdiction[]." *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 763 (W.D. Tenn. 2022) (citing cases).  Here, the States allege that billions of transactions—whereby "consumer goods company[ies] e-commerce entit[ies], and small businesses . . . purchase display ads through" Google's exchange—occur on Google's advertising apparatus every day. FAC ¶¶ 3, 13, 46, 48, 303. Google uses its monopoly in the ad exchange market to ensure that "nearly all of today's online publishers" depend on Google to act "as their middleman to sell their online display ad space in ad exchanges." FAC ¶ 4.  That is sufficient.  *See Hood ex rel. State v. BASF Corp.*, 2006 WL 308378, at *5-6 (Miss. Ch. Ct. Jan. 17, 2006).  It is not only plausible, but inevitable, that millions of transactions occurred in Mississippi.

**IV. Plaintiff States' Remedies Cannot Be Dismissed.**

Rule 12 does not apply to remedies.  Rule 8(a)(2) requires "a short and plain *statement* of the *claim* showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  Rule 12(b)(6) is parallel to and enforces 8(a)(2).  If no relief—at all—is available, the claim fails, but neither Rule 8(a)(2) nor 12(b)(6) says anything about striking forms of relief.  Rule 8(a)(3) requires only: "a demand for the relief sought, which may include relief in the alternative or different types of relief."  There is no Rule 12 motion for failure to state a remedy. For good reason: Rule 54(c) provides that a default judgment must match what is "demanded in the pleadings," but "[e]very other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  Fed. R. Civ. P. 54(c). If courts give any appropriate relief at the *end* of the case, surely motions to dismiss remedies on the pleadings are improper. *See Nudge*, 430 F. Supp. 3d at 1245 (declining to dismiss "disgorgement" remedy).  Google's arguments illustrate the perils of allowing such motions.

Consider disgorgement.  The "Antitrust Modernization Commission concluded that the ability of antitrust agencies to secure disgorgement as a remedy was so well-established that there was no need to clarify it." Einer Elhauge, *Disgorgement As an Antitrust Remedy*, 76 Antitrust L.J. 79, 80-81 (2009) (citing cases and discussing the history). Nonetheless, citing no antitrust cases, Google asks this Court to hold that disgorgement is categorically unavailable in *eight* states under antitrust law.  Next, Google asks the Court to hold that disgorgement is categorically unavailable under the state DTPAs of *seventeen* jurisdictions.  The only authority it cites are federal cases holding that certain federal statutes that provide for injunctive relief do not allow monetary relief. Those cases (on the wrong body of law) are far afield, since the DTPAs *do* provide for monetary

equitable relief, including disgorgement.  The liberal construction required by state DTPAs and expansive enforcement powers of the state also factor in.  Candidly, there is insufficient briefing from either side to determine whether disgorgement is legally available in every state.  As movant, Google failed to carry its burden to point to applicable law, so the motion should be denied.[14]

For Mississippi, Google omits Mississippi Code § 75-24-11, which authorizes "such additional orders or judgments, including restitution, as may be necessary to restore to any person in interest any monies or property, real or personal, which may have been acquired by means of any practice prohibited by this chapter."  *See also Hood ex rel. Mississippi v. Bristol-Myers Squib Co.*, 1:12-cv-179, 2013 WL 3280267, at 3 (N.D. Miss. June 27, 2013) (seeking disgorgement).

Last, Google argues that Puerto Rico cannot seek "civil penalties in federal court," because the Department of Consumer Affairs "has 'exclusive primary jurisdiction' to award non-injunctive remedies." Dkt. 224 at 30 (citing *Aguadilla Paint Ctr., Inc. v. Esso Standard Oil*, 183 P.R. Dec. 901, 932-33, 2011 TSPR 194 (Dec. 15, 2011)). But *Aguadilla* says that, because the Department of Consumer Affairs can *determine* the existence of an infringement, courts lack jurisdiction over "private person[s] who suffer damages" under Section 259.  Ex. A at 929, 183 D.P.R. at 930.[15] *Aguadilla* says nothing about the jurisdiction over public enforcement actions. And while Section 259(c) sets out an administrative process for presenting DTPA claims to the Department of

---

[14] On retroactivity, Google fails to note that new *remedies* (like disgorgement) do apply retroactively. *E.g.*, *Cardinal Indus., Inc. v. Schwartz*, 483 N.E.2d 458, 460 (Ind. Ct. App. 1985).
[15] The translation submitted by Google differs somewhat. Google's translation says: "Art. 3 of the Antitrust Act, *supra*, confers primary jurisdiction on the D.A.Co. in the elucidation of any violation . . ." Dkt. 224-1 at 93. The correct translation is: "Art. 3 of the Antitrust Act, supra, confers primary jurisdiction on the D.A.Co. in the determination of any violation . . ." Ex. A. The relevant portion in Spanish is: "con excepción de los remedios autorizados por la sec. 269 (injunctions), el Art. 3 de la Ley de Monopolios, supra, le confiere jurisdicción primaria exclusiva a D.A.Co. en la dilucidación de cualquier violación al inciso (a) del propio artículo, esto es, la utilización de métodos injustos de competencia y prácticas o actos injustos o engañosos en los negocios o el comercio." *Aguadilla Paint*, 183 D.P.R. at 932-33.

Consumer Affairs, it preserves "the power to resort to the remedies authorized by Section 269," 10 P.S.L.R. § 259(c), which vests courts "with jurisdiction to prevent, prohibit, enjoin and punish violations of this chapter," *Id.* § 269. Moreover, the *Aguadilla* court expressly held that DTPA actions for damages may be brought under Article 1802 of the Puerto Rico Civil Code. *Id.* at 933. Puerto Rico district courts have applied *Aguadilla*, allowing for DTPA damages under Article 1802. *See Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc.*, No. 20-014 64, 2021 WL 2912436, at *7 (D.P.R. July 9, 2021).

## CONCLUSION

Plaintiff States respectfully request that the Court deny Google's motion.

DATED: February 21, 2024

Respectfully submitted,

/s/ W. Mark Lanier

/s/ Ashley Keller

W. Mark Lanier
Alex J. Brown
Zeke DeRose III
**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
Email: mark.lanier@lanierlawfirm.com
Email: alex.brown@lanierlawfirm.com
Email: zeke.derose@lanierlawfirm.com

Ashley Keller (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502
Email: ack@kellerpostman.com

Zina Bash (Bar No. 24067505)
111 Congress Avenue
Suite 500
Austin, TX 78701
Email: zina.bash@kellerpostman.com

Noah S. Heinz (*pro hac vice*)
1101 Connecticut Ave., N.W.
11th Floor
Washington, DC 20036
Email: noah.heinz@kellerpostman.com

*Counsel for Texas, Idaho, Indiana, Louisiana (The Lanier Law Firm Only), Mississippi, North Dakota, South Carolina, and South Dakota.*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General


*/s/ Trevor E. D. Young*
Brent Webster, First Assistant Attorney
General of Texas
Brent.Webster@oag.texas.gov
James R. Lloyd, Deputy Attorney General
for Civil Litigation
James.Lloyd@oag.texas.gov
Trevor E. D. Young, Deputy Chief,
Antitrust Division
Trevor.Young@oag.texas.gov


**OFFICE OF THE ATTORNEY GENERAL OF
TEXAS**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
ATTORNEY GENERAL


By: /s/ Jeff Pickett
Jeff Pickett
Senior Assistant Attorney General, Special Litigation Section
jeff.pickett@alaska.gov

*Attorney for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF ARKANSAS:

TIM GRIFFIN
ATTORNEY GENERAL


By: _____
AMANDA J. WENTZ
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Attorney for Plaintiff State of Arkansas*

34

FOR PLAINTIFF STATE OF FLORIDA:

ASHLEY MOODY, Attorney General

*/s/ Lee Istrail*
Lee Istrail, Assistant Attorney General, Antitrust Division
FL Bar No. 119216

LIZABETH A. BRADY, Director, Antitrust Division
ANDREW BUTLER, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General


Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com

Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

FOR PLAINTIFF STATE OF IDAHO:

RAÚL R. LABRADOR
Attorney General

*/s/ John K. Olson*
John K. Olson, Deputy Attorney General

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone:   (208)   334-2424
john.olson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

Matthew Michaloski
Deputy Attorney General
Indiana Atty. No. 35313-49
Indiana Government Center South – 5th Fl. 302
W. Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: matthew.michaloski@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

RUSSELL COLEMAN
Attorney General

*/s/ Philip R. Heleringer*
Christian J. Lewis, Commissioner of the Office of Consumer Protection
christian.lewis@ky.gov
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
philip.heleringer@ky.gov
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
jonathan.farmer@ky.gov
Office of the Attorney General
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300

*Attorneys for Plaintiff Commonwealth of Kentucky*

FOR PLAINTIFF STATE OF LOUISIANA:

By: */s/ Patrick Voelker*
Liz Murrill, Attorney General
Michael Dupree, Assistant Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
(225) 326-6400
voelkerp@ag.louisiana.gov

*s/ James R. Dugan, II*
James R. Dugan, II (*pro hac vice*)
TerriAnne Benedetto (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:   (504) 648-0180
FX:   (504) 649-0181
EM:   jdugan@dugan-lawfirm.com
        tbenedetto@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:   (504) 833-5600
FX:   (504) 833-8080
EM:   jmw@chehardy.com

*Attorneys for Plaintiff State of Louisiana*

FOR PLAINTIFF STATE OF MISSISSIPPI:

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:      */s/ Hart Martin*
         Hart Martin
         Consumer Protection Division
         Mississippi Attorney General's Office
         Post Office Box 220
         Jackson, Mississippi 39205
         Telephone: 601-359-4223
         Fax: 601-359-4231
         Hart.martin@ago.ms.gov

         *Attorney for Plaintiff State of Mississippi*

FOR PLAINTIFF STATE OF MISSOURI:

ANDREW BAILEY
Attorney General

*/s/ Michael Schwalbert*
Michael.Schwalbert@ago.mo.gov
Missouri Attorney General's
Office
815 Olive St.
Suite 200
St. Louis, MO 63101
Tel: 314-340-7888

*Attorneys for Plaintiff State of Missouri*

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Montana Attorney General


*/s/ Anna Schneider*
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894 Anna.Schneider@mt.gov


*/s/ Charles J. Cooper*
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves
hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

*Attorneys for Plaintiff State of Montana*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate


/s/ Michelle C. Badorine
Michelle C. Badorine, Senior Deputy
Attorney General
MNewman@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100

*Attorneys for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NORTH DAKOTA:

       **STATE OF NORTH DAKOTA**
       Drew H. Wrigley
       Attorney General


By:     */s/ Elin S. Alm*
       Elin S. Alm, ND ID 05924
       Assistant Attorneys General
       Consumer Protection & Antitrust Division
       Office of Attorney General of North Dakota
       1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
       (701) 328-5570
       (701) 328-5568 (fax)
       ealm@nd.gov

       *Attorneys for Plaintiff State of North Dakota*

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

*/s/ Domingo Emanuelli-Hernández*
Domingo Emanuelli-
Hernández Attorney General
Thaizza Rodríguez Pagán
Assistant Attorney
General PR Bar No.
17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201, 1204
trodriguez@justicia.pr.gov

Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

*Attorneys for Plaintiff Commonwealth of Puerto Rico*

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

ALAN WILSON
Attorney General


/s/ *Rebecca M. Hartner*
Rebecca M. Hartner (S.C. Bar No. 101302)
Assistant Attorney General
Rebecca M. Hartner
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Mary Frances Joers
Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-5855
Email: rhartner@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC
880 Johnnie Dodds Blvd, Suite 1
Mount Pleasant, SC 29464
Phone: 843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
Phone: (504) 648-0180
Email: jdugan@dugan-lawfirm.com


*Attorneys for Plaintiff State of South Carolina*

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

MARTY JACKLEY
Attorney General


*/s/ Jonathan Van Patten*
Jonathan Van Patten
Assistant Attorney General
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: 605-773-3215
jonathan.vanpatten@state.sd.us

*Attorney for Plaintiff State of South Dakota*

FOR PLAINTIFF STATE OF UTAH:

Sean D. Reyes
Utah Attorney General

*/s/ Marie W.L. Martin*
Marie W.L. Martin
Assistant Attorney General
160 East 300 South, 5th Floor
P.O. Box 140874
Salt Lake City, UT 84114-0872
mwmartin@agutah.gov
Telephone: (801) 538-9600

*Attorneys for Plaintiff State of Utah and as counsel for the Utah Division of Consumer Protection*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 21, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ W. Mark Lanier*
W. Mark Lanier
