IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

**<u>GOOGLE LLC'S REPLY IN SUPPORT OF</u>**
**<u>MOTION FOR DISMISSAL PURSUANT TO RULE 12(b)(6)</u>**

**Table of Contents**

I. Introduction ............................................................................................................... 1

II. Response to Plaintiffs' Background Section........................................................... 1

III. The DTPA Claims Should Be Dismissed .............................................................. 1

   A. Rule 9(b) Applies ................................................................................................ 1

   B. Plaintiffs Fail to State DTPA Claims Under Rule 8 and Under Rule 9(b)............................ 2

      1. RPO ................................................................................................................ 2

      2. DRS ............................................................................................................... 4

      3. Bernanke ....................................................................................................... 5

      4. Header Bidding .............................................................................................. 6

      5. Equal Footing ................................................................................................ 7

      6. Sale of Personal Information ........................................................................ 8

   C. The Statutes Of Limitations and Consumer-Transaction Bar Apply ................................. 9

IV. The Court Should Dismiss Arkansas' and Mississippi's State Antitrust Claims........... 10

V. The Court Should Dismiss Remedies that the States Cannot Obtain ............................. 11

VI. Conclusion ............................................................................................................. 11

## Table of Authorities

**Cases**

*Beam v. Monsanto Co.*,
532 S.W.2d 175 (Ark. 1976) ........................................................................... 10

*Elson v. Black*,
56 F. 4th 1002 (5th Cir. 2023) ......................................................................... 2

*Gilmour v. Blue Cross & Blue Shield of Alabama*,
No. 4:19-CV-160-SDJ, 2021 WL 1196272 (E.D. Tex. Mar. 30, 2021) ........................... 2

*Humble Nat'l Bank v. DCV, Inc.*,
933 S.W.2d 224 (Tex. App. 1996) ..................................................................... 5

*Ideal Plumbing Co. v. Benco, Inc.*,
382 F. Supp. 1161 (W.D. Ark. 1974) ................................................................. 10

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004) ................................................................... 10

*IUE-CWA Loc. 901 v. Spark Energy, LLC*,
440 F. Supp. 3d 969 (N.D. Ind. 2020) ............................................................... 10

*Navient Corp. v. State ex rel. Fitch*,
313 So. 3d 1034 (Miss. 2021) ........................................................................... 9

*Prather v. Neva Paperbacks, Inc.*,
446 F.2d 338 (5th Cir. 1971) ........................................................................... 9

*Reed v. Receivable Recovery Servs., L.L.C.*,
702 F. App'x 239 (5th Cir. 2017) ..................................................................... 8

*S.E.C. v. Huffman*,
996 F.2d 800 (5th Cir. 1993) ........................................................................... 11

*Sidco Prod. Mktg., Inc. v. Gulf Oil Corp.*,
858 F.2d 1095 (5th Cir. 1988) ......................................................................... 4

*State ex rel. Fitch v. Yazaki N. Am., Inc.*,
294 So. 3d 1178 (Miss. 2020) ......................................................................... 10

**Statutes**

10 L.P.R.A. § 269 ........................................................................................... 11

Ark. Code Ann §§ 4-75-309, 4-75-310 ............................................................... 10

Ark. Code Ann. § 4-75-301 ............................................................................. 10

Tex. Bus. and Commerce Code § 2.106 ............................................................... 9

## I. Introduction

Plaintiffs' attempt to lower their pleading bar belies the weakness of their claims. Essentially, they contend that because they are attorneys general, they need not articulate anything more than a generalized dislike of Google's conduct.  They also insist that they do not need to specifically identify any deceptive acts, asserting instead that *ad hominem* attacks are enough.  As discussed below, even AGs need to allege material false statements or omissions.

Plaintiffs' inability to point to any actual, false, Google statements dooms their claims. Fundamentally, Plaintiffs cannot state claims that Google misled anyone without explaining what Google said and why it was misleading.  After years of discovery, their FAC, and now their opposition brief, fail to do so.   The DTPA claims should be dismissed.

## II. Response to Plaintiffs' Background Section

Plaintiffs misrepresent Judge Castel's order.  As one example, Plaintiffs state: "*As Judge Castel ruled*, Google 'misled display-ad auction participants about how Google organized auctions and distributed the proceeds of winning bids' by implementing Project Bernanke." Opp. at 4 (emphasis added).  The actual text of the opinion is much different than Plaintiffs would have this Court believe: "*The Complaint describes* a Google program called Project Bernanke that *it asserts* misled display-ad auction participants about how Google organized auctions and distributed the proceeds of winning bids." MDL ECF No. 308 at 50 (emphasis added).  Google has compiled the relevant actual text of the order in Appendix E.

## III. The DTPA Claims Should Be Dismissed

### A. Rule 9(b) Applies

Plaintiffs' contention that they need not plead their claims with particularity is incorrect. The Fifth Circuit has specifically *rejected* the argument that Plaintiffs make here.  In *Elson v.*

1

*Black*, the plaintiff argued that Rule 9(b) did not apply to its New York-law claims because those claims did not require "proof of the same essential elements (such as reliance) as common-law fraud." 56 F. 4th 1002, 1008 (5th Cir. 2023).  The court disagreed and held that Rule 9(b) applied because the plaintiffs' claims relied entirely on "'untrue and/or misleading' statements, representations, and omissions."  *Id.* at 1009.  The same is true of Plaintiffs' claims here.

Plaintiffs next argue that the 9(b) standard should be relaxed. Opp. at 8.  But they cite no case in which this standard has been applied outside of the False Claims Act context.  It also would not help them.  Even under a relaxed standard, plaintiffs must make *some* allegations that satisfy 9(b).  As this Court observed, "courts' relaxation of Rule 9(b) pertains to the volume of cases that must be alleged with particularity and not to the degree of particularity alleged." *Gilmour v. Blue Cross & Blue Shield of Alabama*, No. 4:19-CV-160-SDJ, 2021 WL 1196272, at *8 (E.D. Tex. Mar. 30, 2021) (holding that plaintiffs failed even under the more relaxed standard because "even Plaintiffs' most specific allegations of misrepresentation" did not satisfy 9(b)).[1] Here, even Plaintiffs' most specific allegations are not sufficiently particular.

### B. Plaintiffs Fail to State DTPA Claims Under Rule 8 and Under Rule 9(b)

#### 1. RPO

Plaintiffs criticize Google for "pretend[ing] the entire claim is based on three statements." Opp. at 14.  But they never point to any other statement, besides the three that Google addressed, for their RPO claim.  Instead, they attempt to recast their claim as one of a failure to disclose, rather than one of affirmative misstatements.  *Id.*  The claim fails in either incarnation.

There is no failure to disclose because Google's blog post contains all the key points about RPO that Plaintiffs contend advertisers would need to know.  The post is not misleading

---

[1] This Court also applied Rule 9(b) to a claim that did not require reliance and damages. *Id.* at *9.

for the same reasons.  Plaintiffs complain that RPO implemented unique floors for each buyer based on what [the] buyer had bid in the past."  Opp. at 13 (internal quotation marks omitted). They argue that using historical bid information makes an auction into a first-price, not a second-price, auction.  *Id.*  But the blog post discloses these key points.  It notes that "the [ ] Auction tends to have a large price gap between what a buyer bids and what they pay," *i.e.*, between the first- and second-highest bids or between the highest bid and the floor.  ECF No. 224, McCallum Decl Ex. B.  It notes that "Publishers see this gap as a revenue opportunity and try to close the gap by applying manually-calculated price floors."  *Id.*  Google then goes on to explain that Optimized Pricing (or RPO) "*uses historical data* to automate the post-auction analysis and updating of floor prices that publishers already do, and takes it a step further."  *Id.*  (emphasis added).  Plaintiffs contend that the use of historical data meant that Google was not running a true second-price auction, but Google did not mislead anyone in that respect because Google disclosed that RPO used historical data.

Plaintiffs identify no statements that RPO made false.  Instead, Plaintiffs repeat the mischaracterizations in their complaint, without acknowledging the actual content of the statements.  For example, they repeat their assertion that it is "easy to read" an article as Google denying the existence of RPO.  Opp. at 15.  It's "easy" only if one does not read the article.  The article describes in detail Google's testing of dynamic price floors, and suggests that Google in fact told publishers about it: "Google is testing a new way for publishers to maximize their advertising revenue. The feature . . . would automatically change the minimum sell price for ads sold through Google's DoubleClick Ad Exchange (AdX) based upon advertiser demand."  ECF No. 224, McCallum Decl. Ex. A.  The article goes on to describe a "caveat," that "[c]ertain settings within the feature will only be available to publishers that use Google's ad server and ad

exchange together." *Id.*  The "denial" that Plaintiffs characterize as a misrepresentation is obviously related to the exclusivity point and is not a denial of RPO.  In fact, the article says "Google disputed that any parts of its product would be exclusive to publishers that use both its ad server and ad Exchange."  It does not say that Google denied RPO.  *Id.*

### 2. DRS

Google noted that Plaintiffs did not identify a single specific allegedly false or misleading statement with respect to DRS.  Br. at 13.  In response, Plaintiffs again attempt to recast their DRS allegation as one of a failure to disclose.  That recharacterization does not save their claim.

Plaintiffs have not stated a failure-to-disclose claim with respect to DRS because they have not identified what Google omitted, nor why that disclosure would have made a difference, *i.e.*, that any omission was material.  *See Sidco Prod. Mktg., Inc. v. Gulf Oil Corp.*, 858 F.2d 1095, 1100 (5th Cir. 1988) (DTPA omission claim "requires intentional omission of a material fact by a Seller for the purpose of duping the consumer"); *see also* Br. at 17.  Plaintiffs acknowledge that Google announced a "revenue share based optimization" in the summer of 2016.  Opp. at 17.  They claim that Google never disclosed that it might raise its revenue share but, in fact, Google said "[a]s part of our ongoing efforts to provide smarter optimizations and maximize revenue, we may *increase or decrease* revenue share per query."  McCallum Decl. Ex. A (emphasis added).  Plaintiffs also fail to allege how some other unspecified disclosure would have made a difference.  They do not allege that any business would have declined to use Google's ad server, ad exchange, or bidding tools if Google had described DRS differently.

Plaintiffs' misrepresentation-based theory also fails.  Google's statement it was launching "a revenue share-based optimization" was not false.  Instead, Plaintiffs assert that Google made an unspecified representation that DRS would increase publishers' yield.  *See* FAC ¶ 543.  This

statement, even if actually pleaded, would be neither actionable nor false.  Plaintiffs claim that "false general representations" are actionable, citing *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 231 (Tex. App. 1996).  But that case stated that a "general statement" must be examined "in the context of its particular fact situation."  *Id.*  Since Plaintiffs provide no fact situation for the statement (and in fact do not provide the statement itself), *Humble National Bank* is of no help to them.  Plaintiffs also repeat their argument that "Google wasn't decreasing its revenue overall" with DRS, but do not address the reality that publishers could still have higher yield even if Google wasn't decreasing its revenue.

### 3. Bernanke

Plaintiffs do not meet Google's arguments that they (i) failed to plead that any specific statements about Google running a second-price auction were false; and (ii) did not allege that any consumer would not have transacted with Google if Bernanke had been disclosed.

First, Plaintiffs repeat their argument that Google was not running a "true" second-price auction.  Opp. at 18-20.  This generalized grievance does not state a DTPA claim because Plaintiffs do not point to a single actual statement about Google's auction that Bernanke made false.  Indeed, Plaintiffs seem to acknowledge that Bernanke did not render any *specific* representations false.  They do not respond to Google's arguments regarding the 2010 statement and 2014 research paper, which are the only specific statements they identify in the FAC.  *See* Br. at 16-17.  Instead, Plaintiffs fall back on hand-waving like "Google frequently extolled the virtues of its second-price auction," and Bernanke "caused AdX's auction mechanism to depart from a sealed second price-auction."  Opp. at 19 & n.8.  As with RPO, Plaintiffs do not explain what exactly Google said and how it was false because of Bernanke.  That dooms the claim.

Second, Plaintiffs avoid Google's argument on the omission claim.  Google pointed out

that Plaintiffs failed to allege that any consumer would not have transacted with Google if (unidentified) specific information about Bernanke had been disclosed.  *See* Br. at 17-18.  In response, Plaintiffs point to their allegation that advertisers paid based on the second-highest price but publishers received the third-highest price, and their conclusion that this was "deceptive."  Opp at 19-20.  These allegations are inapposite; none bears on whether advertisers or publishers would have bought a different product (or not bought at all) had Bernanke been disclosed.  It is implausible to simply assume that publishers would have neither used AdX nor accepted bids from Google Ads because Plaintiffs allege that both were "must haves" for publishers. And Bernanke made advertisers pay less.  Plaintiffs did not respond to this point.

### 4. Header Bidding

Plaintiffs do not–and could not–seriously contend that Google's desire to compete with header bidding products itself violates a DTPA.  There is nothing unfair or deceptive about a company trying to get customers to use its product over competitors' products.  Thus, any DTPA claim relating to header bidding must be predicated on some specific statement or action that Plaintiffs claim to be deceptive.  Plaintiffs allude to an agreement with Facebook and a single statement in New York.  Neither makes a DTPA claim.

Plaintiffs cannot revise their complaint to make out a new DTPA claim with respect to the Facebook agreement.  The FAC section concerning the header-bidding DTPA allegations does not mention the Facebook agreement at all.  *See* FAC ¶¶ 563-71.  The States' antitrust claims with respect to the Facebook agreement have been dismissed, MDL ECF No. 308 at 34, and the FAC does not even attempt to relate the Facebook agreement to the elements of a DTPA claim.

Plaintiffs' argument with respect to the alleged 2017 statement to a New York publisher

also fails.  First, Plaintiffs do not even attempt to explain how they pleaded facts showing that the statement is false.  Second, Plaintiffs do not connect the statement to their states.  Plaintiffs argue in their brief that the one alleged statement to one publisher somehow tricked multiple publishers into turning off header bidding.  *See* Opp. at 21.  But that is not what the FAC says. In fact, the FAC never alleges that even the specific New York publisher who heard the statement turned off header bidding.  *See* FAC ¶¶ 568-70.  It certainly does not say that any *other* publisher heard this statement or did anything in response.  *Id.*  The FAC identifies no in-state publishers, no in-state ad exchanges, nor anyone else.  Plaintiffs' argument appears to be that website viewers were somehow affected, *see* Opp. at 21, but the FAC does not allege a connection between this one New York statement about ad exchanges and viewers of any generic website.

### 5. Equal Footing

Plaintiffs' Opposition confirms that their equal-footing claim is predicated on two alleged misstatements.  *See* Opp. at 22.  But they refuse to acknowledge the actual statements or to explain how Google's product designs make these statements false.

Plaintiffs try to change their story on the first statement.  The FAC takes issue with the statement "[b]y switching to a single first price auction, we can help reduce complexity and create a fair and transparent market for everyone."  FAC ¶ 587.  Google explained in its opening brief that the statement is neither actionable nor false.  Br. at 21.  Plaintiffs now purport to take issue with a different part of the blog post, which says that "every offer from programmatic buyers will compete in the same unified auction" and "an advertising buyer's bid will not be shared with another buyer before the auction or be able to set the price for another buyer."  *See* Opp. at 22.  But the FAC does not quote or identify this part of the statement.  *See* FAC ¶ 587.

Plaintiffs cannot amend their complaint via an opposition brief.  Moreover, Plaintiffs do not explain how or why any part of this statement is untrue.  There are no allegations that any of the Facebook agreement, Smart Bidding, or a change in data transfer files changed the unified nature of the auction nor allowed buyers access to one another's bids.

Plaintiffs isolate one phrase from the second statement.  But when considering whether a statement would be false, deceptive or misleading, "the court must consider the statement in the context of the entire communication."  *Reed v. Receivable Recovery Servs.*, L.L.C., 702 F. App'x 239, 240-41 (5th Cir. 2017) (Fair Debt Collection Practices Act claim).  Read more fully than Plaintiffs quote it, Google's statement that "all participants in the unified auction, including Ad Exchanges, and third-party exchanges, compete equally for each impression on a net basis.  Each exchange runs its own auction independently and then submits their bid into the unified auction" is a description of how bids are compared in the unified auction.  It is not, as Plaintiffs suggest, a general representation that the auction comports with any conceivable notion of "fairness" or "equal[ity]."  Opp. at 22.  The purportedly "unequal" treatment that Plaintiffs point to does not make Google's statement false because none of it has anything to do with whether bids in the unified auction "compete equally for each impression on a net basis."

### 6. Sale of Personal Information

Plaintiffs' claim that a consumer would be misled by Google's Privacy Policy depends on a consumer (i) not reading the entire Policy; and (ii) engaging in a tortured and unreasonable interpretation of one phrase.  Opp. at 23-24.  Plaintiffs acknowledge that Google tells users that certain "information that is recorded about users so that it no longer reflects or references an individually-identifiable user" may be shared with advertising partners.  Plaintiffs do not contend that a bid request reflects or references individually identifiable users.  Instead, Plaintiffs argue

that, read out of context, such information might fall within the definition of "personal information" even though it is not actually linked to any individually identifiable user.

Plaintiffs' tortured reading is also irrational.  Plaintiffs claim that a consumer would understand the phrase "or other data that can be reasonably linked to [your name, email address, or billing information] by Google, such as information we associate with your Google account" to encompass data that has nothing to do with a Google account.  Plaintiffs plead no facts suggesting that Google in fact links any bid-request-type information to a Google account or that Google provides any information that is linked to identity or account information to anyone else.

Nor do Plaintiffs plead that sending a bid request is a "sale."  "A 'sale' consists in the passing of title from the seller to the buyer for a price."  Tex. Bus. and Commerce Code § 2.106.  Plaintiffs do not allege that Google is compensated for sending the bid request, but rather, when its product wins the right to transact an impression.  FAC ¶ 583.  Plaintiffs argue that their DTPAs should be liberally construed, but the question here is not the theoretical scope of state DTPAs but whether Google's statement is plausibly alleged to be false.  It is not.

### C. The Statutes of Limitations and Consumer-Transaction Bar Apply

All states other than Texas, Mississippi, and Louisiana concede that the statutes of limitations apply to their DTPA claims.[2]  They have the burden to plead facts (not just identify potential fact issues) showing entitlement to tolling, and they have pleaded none.  *See Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338, 340 (5th Cir. 1971).  Many cited doctrines would not apply, even if they were properly pleaded.  *See* App'x. F.

The States who limit their DTPAs to "consumer transactions" attempt to escape that

---

[2] Mississippi has no viable claim. Where, as here, the Attorney General alleges no facts suggesting that the alleged unfair practice will continue or be repeated, he has no claim for injunctive relief and, therefore, no claim at all.  *See Navient Corp. v. State ex rel. Fitch*, 313 So. 3d 1034, 1042 (Miss. 2021); *see also* Br. at 12-13.

requirement by arguing that corporations can be "people."  That observation does not assist Plaintiffs where the applicable laws cover only transactions "for purposes that are primarily personal, familial, charitable, agricultural, or household."[3]  Br. at 25.  Business transactions clearly fall outside the scope of the Indiana, Utah, and Arkansas DTPAs.  Idaho misconstrues *In re New Motor Vehicles*.  In that case, the court dismissed the ICPA claims because the plaintiffs "do not allege that CADA and NADA provided services to or on behalf of consumers."  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 184 (D. Me. 2004).

### IV. The Court Should Dismiss Arkansas' and Mississippi's State Antitrust Claims

The parties agree that Plaintiffs' state-law antitrust claims should be dismissed to the same extent that corresponding federal claims were dismissed.  Arkansas' and Mississippi's claims should be dismissed in their entirety.  Arkansas' antitrust law was modeled on the federal Robinson Patman Act, not the Sherman Act.  *See Ideal Plumbing Co. v. Benco, Inc.*, 382 F. Supp. 1161, 1168 (W.D. Ark. 1974), aff'd, 529 F.2d 972 (8th Cir. 1976); *Beam v. Monsanto Co.*, 532 S.W.2d 175, 182 (Ark. 1976).  The AUPTA defines "monopoly" as a firm that accomplishes or seeks to accomplish "any one of the purposes or objects mentioned in this subchapter."  Ark. Code Ann. § 4-75-301.  The subchapter outlaws price fixing and below-cost pricing, not the type of conduct that Arkansas alleges here.  *See* Ark. Code Ann §§ 4-75-309, 4-75-310.

Mississippi Antitrust Act claims require at least some "transactions lying wholly within the state." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1189 (Miss. 2020) (quotation omitted).  Mississippi does not identify *any* wholly intrastate transactions.

---

[3] Plaintiffs' suggestion of corporate "personal use," Opp. at 24-25, is unavailing because there is no allegation that any corporation used Google products for non-business purposes. *See IUE-CWA Loc. 901 v. Spark Energy, LLC*, 440 F. Supp. 3d 969, 976 (N.D. Ind. 2020) (corporation used natural gas "like any consumer would").

### V. The Court Should Dismiss Remedies that the States Cannot Obtain

While courts are not required to dismiss demands for unauthorized remedies under Rule 12, they can and often do.  *See* Br. at 28-29.  Doing so here will significantly streamline discovery, among other benefits.

Plaintiffs argue that they can obtain disgorgement because disgorgement is a form of "monetary equitable relief."  But their statutes specifically provide for certain types of equitable and monetary relief, *not* disgorgement.  Mississippi's argument is one example.  It cites a provision that provides for orders to "restore to any person . . . monies . . . which may have been acquired."  *Restoring* money to persons is not the same thing as ordering disgorgement.  *S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) ("Disgorgement wrests ill-gotten gains from the hands of a wrongdoer . . . Disgorgement does not aim to compensate the victims of the wrongful acts, as restitution does.").  The Court should not allow Plaintiffs to invent a new remedy where others are specifically and statutorily listed.

Finally, Puerto Rico cannot seek civil penalties.  Puerto Rico references "the remedies authorized by Section 269," but that section does not provide for civil penalties.  10 L.P.R.A. § 269.  Puerto Rico also argues that private parties may seek *damages* under Article 1802 of the Civil Code, Opp. at 30, but that is irrelevant to Puerto Rico's ability to seek civil penalties.

### VI. Conclusion

For the reasons provided above and in Google's opening brief, the Court should dismiss with prejudice Plaintiffs' DTPA claims in their entirety, dismiss the state-law antitrust claims in accordance with Judge Castel's order, dismiss Mississippi and Arkansas' state antitrust claims, and dismiss claims for unauthorized remedies.  Revised Appendix D provides an updated summary of the reasons to dismiss each claim.

Dated: March 6, 2024                    Respectfully submitted,

                                        */s/ R. Paul Yetter*
                                        R. Paul Yetter
                                        State Bar No. 22154200
                                        YETTER COLEMAN LLP
                                        811 Main Street, Suite 4100
                                        Houston, Texas 77002
                                        (713) 632-8000
                                        pyetter@yettercoleman.com

                                        Eric Mahr (*pro hac vice*)
                                        FRESHFIELDS BRUCKHAUS DERINGER LLP
                                        700 13th Street NW, 10th Floor
                                        Washington, D.C. 20005
                                        (202) 777-4545
                                        eric.mahr@freshfields.com

                                        ATTORNEYS FOR GOOGLE LLC

**CERTIFICATE OF SERVICE**

I certify that on March 6, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ R. Paul Yetter*
R. Paul Yetter