# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| THE STATE OF TEXAS, et al., § <br> § <br> Plaintiffs, § <br> v. § <br> § Civil Action No. 4:20-CV-957-SDJ <br> GOOGLE LLC, § <br> § <br> Defendant. § | |

**NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)**

Please take notice that Defendant Google LLC, by and through its undersigned counsel, pursuant to Fed. R. Civ. P. 30(b)(6), will take the deposition upon oral examination of Plaintiff the State of Alaska before an officer authorized to administer oaths at the offices of Yetter Coleman LLP, 811 Main Street, Suite 4100, Houston, Texas 77002, commencing at 9:00 AM on April 1, 2024, or as otherwise agreed upon between counsel, and continuing from day to day until completed. The examination shall be recorded by stenographic and/or by audiovisual means, pursuant to Fed. R. Civ. P. 30(b)(3), for use as discovery, as evidence at trial, or for any other purpose allowed by the Federal Rules of Civil Procedure and the Rules of this Court.

The State of Alaska is requested, pursuant to Rule 30(b)(6), to designate one or more of its present or former employees, officers, agents, or other duly authorized persons to testify on its behalf as to all matters known or available to the State of Alaska concerning the topics set forth in the Schedule B attached hereto.

|  |  |
|---|---|
| Dated: March 5, 2024 | Respectfully submitted, |

                                                           *R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Eric Mahr (pro hac vice)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
eric.mahr@freshfields.com

ATTORNEYS FOR DEFENDANT
GOOGLE LLC

**CERTIFICATE OF SERVICE**

    I certify that on this 5th day of March 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

                                                        *R. Paul Yetter*
                                                        R. Paul Yetter

## SCHEDULE A

## **DEFINITIONS**

1. To the extent the terms defined below are used in the Requests, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of this Subpoena.

2. The term **"Action"** refers to the lawsuit captioned *The State of Texas et al. v. Google LLC*, 4:20-cv-00957-SDJ, formerly consolidated in the multidistrict litigation, *In re: Google Digital Advertising Antitrust Litigation*, 21-md-3010 (S.D.N.Y.).

3. The term **"Ad Buying Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

4. The terms **"Ad Exchange"** or **"Supply-Side Platform"** or **"SSP"** shall mean a third-party or In-House product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place Bids in real-time auctions for Inventory offered for sale by or on behalf of two or more Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

5. The term **"Ad Network"** shall mean a third-party or In-House product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

-3-

6. The term **"Ad Selling Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad Networks, SSPs, Header Bidding, or Header Bidding Wrappers) through which a Publisher sold or can sell Inventory.

7. The terms **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution or other interface that facilitates or is involved in the Purchase or sale of Inventory, including but not limited to a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, Header Bidding Wrapper, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or services offered by social media outlets (including but not limited to, for example, Facebook.com and Twitter.com) and certain other Publishers that enable the purchase of Inventory on their Properties via their own In-House Ad Tech Products. This term does not include general-purpose software or systems on which an Ad Tech Product relies.

8. The term **"Ad Tech Provider"** shall mean a person, firm, association, or other entity selling, reselling, licensing, or otherwise providing at least one Ad Tech Product, whether or not for a fee or other compensation.

9. The term "**Advertiser**" shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property. For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

10. The term "**AdX**" shall mean Google's Ad Exchange that was marketed as DoubleClick Ad Exchange, inclusive of all prior and subsequent iterations of the product and all variants thereof, and including, for the avoidance of doubt, the Ad Exchange functionality of Google Ad Manager and Google Ad Manager 360.

11. The term "**Agency**" shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns. For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

12. The term "**Automated Bidding**" shall mean a Feature of an Ad Buying Tool which authorizes the Ad Buying Tool to choose how much to Bid for an Impression.

13. The term "**Bid**" shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

14. The terms "**Bidder**" or "**Buyer**" shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting a Bid to an Ad Exchange or Publisher Ad Server on behalf of an Advertiser, whether known at the time or to be subsequently determined. For the avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to another Ad Exchange or Publisher Ad Server.

15. The term "**Campaign**" shall mean one or more Display Advertisements that are targeted to particular types of Inventory, Users, or objectives.

16. The term "**communication**" shall mean the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

17. The term "**concerning**" shall mean relating to, referring to, describing, evidencing or constituting.

18. The term "**Connected Television**" shall mean devices or services that allow Users to watch television content served over the internet on a television screen, such as smart TVs (e.g., Samsung, TCL, Sony), media streaming devices (e.g., Roku Streaming Stick, Apple TV, Chromecast), or video game consoles (e.g., Xbox, PlayStation).

19. The terms "**Demand-Side Platform**" or "**DSP**" shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an Impression-by-Impression basis. For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

20. The term "**Direct Transaction**" shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Tech Intermediary), including for the avoidance of doubt an agreement to set such price through an auction conducted by the Publisher itself or an affiliate thereof.

21. The terms "**Display Advertisement**" or "**Display Advertising**" shall mean Online Advertising other than Search Advertising, and shall include Native, banner, in-app or Video advertising, whether social or non-social.

22. The term "**document**" shall be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Federal Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

23. The term "**documents sufficient to show**" means documents sufficient to provide a true and correct disclosure of the factual matter requested.

24. The terms "**DoubleClick for Publishers**" or "**DFP**" shall mean Google's Publisher Ad Server that was marketed as DoubleClick for Publishers, inclusive of all prior and subsequent iterations of the product and all variants thereof (e.g. Small Business, Enterprise editions, etc.), and including for the avoidance of doubt the ad server functionality of Google Ad Manager and Google Ad Manager 360.

25. The term "**Environment**" shall mean the electronic environment in which an Impression is served, meaning in a desktop web browser, in a mobile web browser, in a mobile app (other than a mobile web browser), or via Connected Television.

26. The term "**Feature**" shall mean any design, feature, limitation, policy, mechanism, innovation, improvement, optimization, or strategy related to how Ad Tech Products buy, sell, price, bid, or auction Inventory, how Ad Tech Products improve ad quality or Match Quality, how Ad Tech Products measure, or report on the effectiveness of Display Advertising, or how Ad Tech Products integrate or interoperate with other Ad Tech Products, whether owned or operated by the same entity or different entities.

27. The term "**Fees**" shall mean any money retained by a provider of Ad Tech Products, including via Take Rates, for services related to the purchase of Display Advertisements.

28. The term "**Floor Price**" shall mean the limitation on how low an Advertiser or Ad Buying Tool can bid for Inventory while still being eligible to win the Impression.

29. The term "**Format**" shall mean the general makeup or layout of an ad. Different types of Display Advertising Formats include Native Advertising, Instream Video Advertising, Outstream Video Advertising, and Static Advertising.

30. The term "**Google**" shall mean Google LLC, any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

31. The term "**Google Ads**" shall mean Google's Ad Buying Tool described on https://ads.google.com/home/, inclusive of all prior iterations or naming conventions, including AdWords.

32. The terms "**Google Ad Manager**" or "**GAM**" shall mean the product introduced by Google on June 27, 2018, which brought together DFP and AdX into a unified programmatic platform.

33. The term "**Guaranteed Transaction**" shall mean a transaction where a specified amount of inventory is purchased.

34. The term "**Header Bidding**" shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

35. The term "**Header Bidding Provider**" shall mean a person, firm, association, or other entity that provides Header Bidding Wrapper services to Publishers.

36. The term "**Header Bidding Wrapper**" shall mean a Header Bidding management system.

37. The term "**identify**," when referring to a person, shall mean to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment.

38. The term "**identify**," when referring to documents, shall mean to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

39. The terms "**impact**" and "**effect**" shall include both qualitative and quantitative, direct and indirect meanings of those terms.

40. The term "**Impression**" shall mean the service of a single Display Advertisement to a single User.

41. The term "**In-House Ad Tech Product**" shall mean an Ad Tech Product created for a Publisher's, Advertiser's, or Agency's internal use.

42. The term "**including**" shall mean including but not limited to.

43. The term "**Indirect Transaction**" shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction Transaction or Private Auction Transaction conducted by an Ad Exchange or a purchase of Inventory by an Ad Network for resale to one or more Advertisers.

44. The term "**Instream Video Advertising**" shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

45. The term "**Inventory**" shall mean space offered by Publishers for the sale or placement of Display Advertising.

46. The term **"Investigation"** means any formal or informal inquiry or investigation into Google's Ad Tech Products or Display Advertising business by Your State's Office of the Attorney General or the Texas Office of the Attorney General.

47. The term "**Match Quality**" shall mean the effectiveness of matching customer information parameters to a website event.

48. The term "**Meta**" shall mean Meta Platforms, Inc., including Facebook, Inc., any current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

49. The term "**Native Advertising**" shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

50. The terms "**Online Advertisement**" or "**Online Advertising**" shall mean advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

51. The term "**Open Auction Transaction**" shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to bid on the relevant Ad Exchange are or were eligible to submit Bids.

52. The term "**Other Direct Transaction**" shall mean a Direct Transaction other than a Programmatic Guaranteed Transaction, Preferred Deal Transaction, or Publisher-Automated Transaction.

53. The term "**Other Indirect Transaction**" shall mean an Indirect Transaction other than an Open Auction Transaction or a Private Auction Transaction.

54. The term "**Outstream Video Advertising**" shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

55. The term "**Paid Advertising**" shall mean an advertising model whereby Advertisers pay Publishers to display their ads on a Property.

-10-

56. The term "**person**" shall mean any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

57. The term "**Plaintiff State**" shall mean each of the States of Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, South Dakota, Utah, and the Commonwealths of Kentucky and Puerto Rico, and any other state or territory of the United States that later joins this Action as a Plaintiff.

58. The term "**Preferred Deal Transaction**" shall mean a Programmatic Direct Transaction where the Inventory is not guaranteed. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Preferred Deal Transaction.

59. The term "**Private Auction Transaction**" shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

60. The term "**Programmatic Direct Transaction**" shall mean a Direct Transaction (other than a Publisher-Automated Transaction) that is or was negotiated, transacted, or finalized through an Ad Tech Product, provided that, for the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Direct Transaction if such transaction was not otherwise negotiated through such Publisher Ad Server.

61. The term "**Programmatic Guaranteed Transaction**" shall mean a Programmatic Direct Transaction where the Inventory is guaranteed. For the avoidance of doubt, the mere fact

that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Guaranteed Transaction.

62. The term "**Programmatic Transaction**" shall mean a Display Advertising transaction, other than a Publisher-Automated Transaction, that is or was negotiated, transacted, or finalized through Ad Tech Products.

63. The term "**Property**" shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

64. The term "**Publisher**" shall mean a person or entity operating a Property. For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

65. The term "**Publisher Ad Server**" shall mean a third-party or In-House product, service, or system that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory. For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third-party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third party on behalf of or under contract with the Publisher. For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of this Subpoena.

66. The term "**Publisher-Automated Transaction**" shall mean a Direct Transaction that is or was negotiated, transacted, or finalized through one or more automated services, whether or not auction-based, that is controlled by the Publisher or an affiliate thereof (other than an Ad Network, Ad Exchange, or SSP). This would include, for example, the Publisher's self-service

website for Advertisers to create Campaigns or place advertisements, such as that described at https://facebook.com/business/ads. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server (including one operated by the Publisher) shall not be sufficient to render such transaction a Publisher-Automated Transaction.

67. The term "**Publisher Partner**" shall mean a person, firm, association, or other entity that sells Display Advertising on behalf of Publishers, other than Publisher Ad Servers, Ad Exchanges, and Ad Networks.

68. The term "**Purchase**," when used in connection with Inventory or Impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

69. The term "**Query**" shall mean a request to provide, or Bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid request," or otherwise. A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

70. The term "**reflecting**" shall mean illustrating or describing.

71. The term "**Relevant Period**" shall mean January 1, 2013 to present.

72. The term "**Search Advertising**" shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

73. The term "**Static Advertising**" shall mean Online Advertising consisting solely of static (i.e., non-moving or -changing) text, images, or graphics.

74. The term "**Take Rate**" shall mean the proportion of total revenue generated from Purchased Inventory that an Ad Tech Provider collects as part of its fee arrangement in connection with the Purchased Inventory.

75. The term "**User**" shall mean an end user visiting or using a Property, or a proxy for that end user (including, but not limited to, cookie identifiers or mobile ad identifiers).

76. The terms "**You**" or "**Your**" refer to the State of Alaska and its agencies, agents, contractors, departments, divisions, employees, representatives, and vendors.

## SCHEDULE B

## **TOPICS**

1. Your retention, preservation, collection, review, and production of documents and data related to the Investigation and this Action, including in response to Google's discovery requests in this Action.

2. The authenticity of all documents and data You produced in response to Google's discovery requests in this Action.

3. Your document preservation related to the Investigation and this Action, including any relevant document retention policies and whether and when You implemented a litigation hold.

4. Your responses to Google's Interrogatories.

5. Your responses to Google's Requests for Admission.

6. The allegations in the Fourth Amended Complaint ("FAC"), including (a) the factual basis for the allegations, and (b) the date on, or the time period during which, you allege that Google engaged in the conduct described in the FAC.

7. The factual basis for the antitrust markets You allege, including the market share calculations You allege with respect to those markets.

8. The factual basis for the relevant antitrust markets that You allege, including Your contention that there is no reasonable substitute, with respect to: (a) publisher ad servers for web display inventory as set forth in paragraphs 93 to 127 of the FAC, (b) exchanges for web display inventory as set forth in paragraphs 128 to 160 of the FAC, (c) ad buying tools for small advertisers as set forth in paragraphs 163 to 195 of the FAC, (d) ad buying tools for large advertisers as set forth in paragraphs 196 to 214 of the FAC; (e) mediation tools for in-app inventory as set forth in paragraphs 216 to 231 of the FAC, (f) in-app display ad networks as set forth in paragraphs 232 to 243 of the FAC.

9. The market share calculations You allege, and any factual basis for them, with respect to: (a) publisher ad servers for web display inventory as set forth in paragraphs 93 to 127 of the FAC, (b) exchanges for web display inventory as set forth in paragraphs 128 to 160 of the FAC, (c) ad buying tools for small advertisers as set forth in paragraphs 163 to 195 of the FAC, (d) ad buying tools for large advertisers as set forth in paragraphs 196 to 214 of the FAC; (e) mediation tools for in-app inventory as set forth in paragraphs 216 to 231 of the FAC, (f) in-app display ad networks as set forth in paragraphs 232 to 243 of the FAC.

10. Any Investigation or proposed Investigation of Google in which You have participated, including, without limitation, Your reasons, motives, rationale, and factual basis for any Investigation or proposed Investigation of Google.

11. Whether You are seeking relief on behalf of Your state for its own benefit, as *parens patriae*, on behalf of any other person or entity, or on behalf of any combination of these, and on what basis, including the specific claims applicable to each class or classes of persons on whose behalf You are seeking relief.

12. The injuries alleged and the relief and remedies You are seeking in this Litigation, including when and how You discovered You were harmed, when or how You came to believe You had a claim against Google, and the factual and legal bases supporting Your claims for (a) monetary relief, (b) injunctive relief (including structural relief), (c) restitution, (d) disgorgement, (e) the imposition of civil fines and penalties, and (f) any other type of relief or remedy that You are seeking in this Litigation.

13. Communications between You and any third party concerning this Action, including the circumstances surrounding such communications, the identity of the third party individuals or entities involved, the content of the communications, and the dates of the communications.

14. Non-privileged communications between Your Office of Attorney General and Your state agencies, divisions, or departments regarding Display Advertising, Ad Tech Products, Google, this Action, or the Investigation.

15. Communications between You and any third party referenced in the FAC, including in paragraphs 247, 344, 345, 385, 528, 534, 536, 540, 543, 546, 547, 560, 561, 563, 568, 570, 584, 594, and 596 of the FAC, and the allegations therein, including the circumstances surrounding such communications, the identity of the third party individuals or entities involved, the content of the communications, and the date of the communications.

16. How Google's conduct has "adversely affected and substantially affected" and "continues to adversely affect and substantially affect" Your state's economy and general welfare, including the proportion and magnitude of Your state economy and population affected by Google's alleged conduct and the identities of any entities or persons You claim are so affected.

17. The factual basis for Your allegations that Google has created barriers to entry.

18. The factual basis for Your limitation of the alleged relevant product markets to "web display advertising."

19. All specific factual bases for Your deceptive trade practice claims.

20. The material facts about the nature and mechanics of its ad auctions You contend Google omitted or misrepresented in communications to advertisers, the particular omissions or misrepresentations to advertisers You contend Google made, the manner You contend Google made such representations, any basis for contending Google intended such representations or omissions to mislead advertisers, any basis for contending that advertisers relied on such representations or omissions, and the factual basis for Your contention that but for these alleged omissions or misrepresentations that advertisers would not have used Google Ad Tech products or services.

21. The material facts about the nature and mechanics of its ad auctions You contend Google omitted or misrepresented in communications to publishers, the particular omissions or misrepresentations to publishers You contend Google made, the manner You contend Google made such representations, any basis for contending Google intended such representations or omissions to mislead advertisers, any basis for contending that publishers relied on such representations or omissions, and the factual basis for Your contention that but for these alleged omissions or misrepresentations that publishers would not have used Google Ad Tech products or services.

22. The factual basis for Your contention that Google made misrepresentations or omissions to publishers to trick them into turning off header bidding, the particular misrepresentations or omissions to publishers that you contend Google made, the date and (where applicable) content of any such misrepresentations or omissions, including the number of violations You contend are associated with this practice.

23. The factual basis for Your contention that Google misrepresented that all auction participants are on equal footing, the particular misrepresentations or omissions to auction participants that you contend Google made, the date and (where applicable) content of those misrepresentations or omissions, including the number of violations You contend are associated with this practice.

24. The factual basis for Your contention that Google misrepresented to users that Google would not sell its users' personal information, including the particular misrepresentations to users that you contend Google made and the date and content of those misrepresentations.

25. The factual basis for Your contention that Google's conduct described in Your response to Google's Interrogatory No. 8 was "unfair, deceptive, false, and/or misleading, and/or which have the capacity or tendency to deceive, or are likely to deceive."

26. The number and nature of any consumer complaints You received relating to Ad Tech Products and services, including Google's Ad Tech Products.

27. The number and nature of any consumer complaints You received relating to Display Advertising, including Google's Display Advertising.

28. The process in Your jurisdiction for filing a consumer complaint related to a deceptive trade practice, and the relevant retention policies for such complaints.

29. Your process for reviewing or investigating consumer complaints related to deceptive trade practices, and the relevant retention policies for: (a) complaints reviewed and/or investigated pursuant to such process(es) and (b) the review and/or investigative files.

30. The structure and operation of Your offices or agencies responsible for consumer complaints related to Your deceptive trade practice laws.

31. Your policies and practices for taking enforcement actions regarding allegedly deceptive trade practices, including factors or information You consider in deciding whether to bring a deceptive trade practice claim.

32. Your use of Ad Tech Products or Ad Tech Providers, including whether You use intermediaries such as advertising Agencies to facilitate Ad Tech purchases.

33. Your advertising budget, including where and how You spend Your advertising budget, how much You spend on Display Advertising, how you evaluate the effectiveness of Your spending on Display Advertising, how and why you adjust spending on Display Advertising as a whole or in particular types of Display Advertising and who is responsible for making the decisions relating thereto.

34. Your actual or considered switching from one Ad Tech Product to another Ad Tech Product, including Your reasons for switching, the costs of switching, and the actual or potential impact of switching on Your return on advertising spend and who is responsible for making the decisions relating thereto.

35. The effectiveness of Your Campaigns, including the tracking, measurement, and assessment of Your Display Advertising purchases the effectiveness of those Campaigns, and how You calculate or assess return on advertising spend, return on investment, or other Campaign objectives.

36. How You consider and decide what form of Display Advertising to purchase, including the role of Advertising Agencies in such decisions. This includes the process by which You determine the objectives for a Campaign, and how You consider and decide what form of Display Advertising to purchase in light of the objectives for a Campaign, including how and why You shift, substitute, and/or reallocate Your spending on Display Advertising among (a) open web Display Advertising and social media advertising; (b) open web Display Advertising and in-app Display Advertising; (c) open web Display Advertising in formats other than instream video and instream video Display Advertising; and (d) Indirect Transactions and Direct Transactions.

37. How You consider and decide which Ad Tech Products or Ad Tech Providers to use, including Your consideration, evaluation, or comparison of Ad Tech Products or Ad Tech Providers and their Features, effectiveness, and pricing, and the role of Advertising Agencies in such decisions.

38. Your contracts or agreements with each Agency You use, have used, or have considered using for purchasing Display Advertising or Ad Tech Products, including documents reflecting the services each Agency provides and how each Agency is compensated for its services.

39. Fees paid by You for Ad Tech Products, including to whom those Fees were paid, whether You contend You overpaid for any Ad Tech Products and any amounts You contend You overpaid for any Ad Tech Products.

40. Your payments for Display Advertising, including whether You contend You overpaid for Display Advertising and any amounts You contend You were overcharged for Display Advertising.

41. Your understanding, and the basis for Your understanding, of Bidding auction mechanics and any other factors that influence Your Bidding strategies (such as whether the auction is first- or second-priced, expected Floor Price, manual or automated Bid optimization

strategies, and available post-auction report information) and the effect of Your Bidding strategies on Your return on investment or return on advertising spend.