# EXHIBIT A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 4:20-cv-00957-SDJ |
| vs. | § | |
| | § | |
| GOOGLE LLC, | § | |
| | § | **JURY TRIAL DEMANDED** |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF THE STATE OF TEXAS'S REQUESTS FOR PRODUCTION

In accordance with Federal Rules of Civil Procedure 26 and 34, and Eastern District of Texas Local Rule CV-26, Plaintiff The State of Texas hereby requests that Defendant serve a written response to this Set of Requests for Production and produce for inspection and copying the documents and other materials requested, as specified below. Documents produced by Defendant must adhere to the Definitions and Instructions set forth below, the conditions of Rule 34 of the Federal Rules of Civil Procedure, and Eastern District of Texas Local Rule CV-26. The documents and things to be produced are described as follows:

### Instructions

1.      These requests should be construed in the broadest possible manner.

2.      These requests are to be read and interpreted in accordance with the Federal Rules of Civil Procedure, the local rules of the Court in which this case is pending, and the Instructions and Definitions set forth herein.

3.      To the extent that Documents responsive to one of these requests has already been produced, identify any such Documents by BATES label.

1

4.     These requests are continuing in nature and the responses thereto should be updated regularly.

5.     Unless otherwise specified, the relevant time period for these requests is from January 1, 2010, to the present day.

6.     Pursuant to Rule 34(b)(1)(C), produce all Documents in their Native Form.  To the extent that a Document has otherwise been produced to Plaintiff in a different form, produce all native versions with a label corresponding to the first page, if any, of documents produced in another form.  For example, if a Document was produced with four images using BATES labels EXAMPLE_0000007-0000010, the native version would have the BATES label EXAMPLE_0000007. The native, if any, for the subsequent Document would be labeled EXAMPLE_0000011.

7.     Explain in detail the process used to identify and collect Documents responsive to each request for production. Your explanation should include *inter alia* the extent to which search terms were utilized, if at all, and a general description of the collection of documents to which the search terms were applied.

8.     If You contend that a request in this document encompasses another request in this document or a prior document, please identify the request or requests that are allegedly encompassed. However, produce all documents responsive to said request that are not otherwise encompassed by said other request. For example, if You contend that all documents responsive to RFP 25 are also responsive to RFP 30, state that this is Your response, produce and identify documents that are responsive to RFP 25, and also produce and identify documents that are responsive to RFP 30 that are not also responsive to RFP 25. This instruction does not modify Google's obligation to produce all responsive Documents to each request for production.

9.      If You contend that a request in this document is encompassed by a request in this document or a prior document, please identify any such other requests and further identify by BATES label the documents that You contend are only responsive to the allegedly encompassed request.  For example, if You contend that RFP 26 is encompassed by RFP 14, identify the documents that You contend are responsive to RFP 26. This instruction does not modify Google's obligation to produce all responsive documents to each request for production.

10.      Produce the Documents responsive to the numbered requests below that are in Your possession, custody, and/or control, including Documents in the possession of Your attorneys, accountants, consultants, or other agents.

11.      If all or any portion of any responsive document is withheld for any reason, including a claim of attorney-client privilege, trade secret, any other applicable privilege or immunity, or judicial order, please submit, within the time permitted for a response, a list of the documents withheld and state individually as to each document: (1) the source of the document; (2) the name, address, position, and organization of the author and recipient of the document; (3) the type, title, specific matter, length, and date of the document; and (4) the legal or factual basis for withholding the document, including, but not limited to, a general description of the redacted matter and an identification of the actual or anticipated litigation for a claim based on work product immunity.  There is no basis to withhold Your documents and information based on confidentiality or trade secret assertions alone, as such documents and information can be produced with appropriate confidentiality designations pursuant to the protective order entered in this litigation. If a document is nonetheless withheld on confidentiality or trade secret grounds alone, You must explain, and provide any documentation necessary to explain, why such documents cannot be produced with appropriate confidentiality designations pursuant to the protective order entered in

this litigation.  To the extent that any parent Documents and/or attachments to parent Documents are withheld on the basis of any privilege or confidentiality claim, such parent document and any attachments withheld should be separately identified on a log or list pursuant to this paragraph with information sufficient to identify familial relationships between the family of Documents. Any privilege log or list is to be produced in an Excel spreadsheet or other format capable of electronic sorting with Your response or as otherwise ordered by the Court.

12.     The use of the singular form of any word includes the plural and vice versa.

13.     The terms defined below and the individual requests for production and inspection are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

14.     All Documents are to be produced in full. If any part of a document is responsive to any request, the whole document is to be produced. Non-responsive portions of otherwise responsive Documents may not be redacted.

15.     Any alteration of a responsive document, including notes, underlining, stamps, drafts, revisions, modifications and other versions of a final document, is a separate document and is to be produced as a separate document.

16.     If you file a timely objection to any portion of a request, definition, or instruction, please produce Documents responsive to the remaining portion.

17.     Any purportedly privileged document containing non-privileged material must be produced, redacting only the portion purportedly privileged..

18.     Any responsive dynamic material (*e.g.*, a wiki or repository) should be produced in electronic format as a Clone of such material, including all comments, versions, commits, revision

history, and material from any associated information tracking systems, including feature requests, bug reports, issues, sprints, tasks, user stories, project management, and trouble tickets.

19.     These requests are continuing in nature and, to the extent that Your response may be enlarged, diminished, or otherwise modified by information acquired subsequent to the service of Your responses, You are required to promptly serve supplemental responses reflecting such changes.

### Definitions

As used herein:

1.     "**Ad Auction**" shall mean any auction to sell Ad Inventory.

2.     "**Ad Exchange**" shall mean a digital marketplace for Ad Inventory that Publishers and Advertisers connect to, by direct or indirect means, in order to buy or sell their online Ad Inventory, including, but not limited to, AdX, AppNexus, The Rubicon Project, OpenX, ONE by AOL, or Oath, and including all predecessors and successors.

3.     "**Ad Impression**" shall mean a specific advertising opportunity in a specific ad space on a Publisher's website that can be sold to an Advertiser.

4.     "**Ad Inventory**" shall mean the range of potential Ad Impressions a Publisher has available to sell on its webpages when Users load the webpages.

5.     "**Ad Network**" shall mean a third-party or in-house product or service (other than an Ad Exchange) through which two or more Advertisers purchased or can purchase inventory offered for sale by two or more Publishers.

6.     "**Ad Request**" shall mean an electronic message sent from a Publisher's web page to a Publisher Ad Server, requesting the Publisher Ad Server prepare Bid Requests soliciting advertising content from SSPs, Ad Exchanges, or Ad Networks for insertion or incorporation into a web page. An Ad Request may be directed to a portion or the entirety of a web page.

7.     "**Ad Tech Product(s)**" shall mean any and all systems, platforms, and software, including predecessors and successors, used in the process of identifying, selecting, transmitting, and/or rendering Digital Advertising on a desktop or mobile device, as well as all systems and software, including predecessors and successors, that implement and/or effectuate an Ad Auction, including receiving, processing, and transmitting Bid Requests, Bid Responses, or related messages. The term includes Publisher Ad Servers, Advertiser Ad Servers, SSPs, DSPs, Demand-

6

Side Products, Ad Exchanges, and Ad Networks, and specifically includes Your products: Your Publisher Ad Server (formerly called "DoubleClick for Publishers" or "DFP"); Your Ad Exchange (formerly called "DoubleClick Ad Exchange" or "AdX"), Google Ads (formerly called "Google AdWords" or "AdWords"), Display & Video 360 ("DV360"), DoubleClick Bid Manager ("DBM") (also known as "Google Bid Manager"), Campaign Manager, DoubleClick Campaign Manager ("DCM"), Google Display Network ("GDN"), Google Ad Manager ("GAM"), DoubleClick for Publishers ("DFP"), Google AdSense (also known as "AdSense for Content" and "AFC"), DoubleClick for Advertisers ("DFA"), Google Analytics, Google AdMob, Search Ads 360 ("SA360"), Google Search Network, Bernanke, Reserve Price Optimization, Dynamic Revenue Share, and any other product, program, or service, however named, that You provide, have provided, or will provide for the sale or intermediation of Digital Advertising, including all predecessors and successors of such Ad Tech Products.

8.      "**AdTech Auction Mechanics**" shall mean any and all systems and software that implement, effectuate, or modify any Ad Auction rules, preferences, designs, or features; this term includes Open Bidding (also known as "Exchange Bidding," "Jedi," "Jedi+," "Jedi++," or "Demand Syndication"), Open Auction, Dynamic Allocation, Enhanced Dynamic Allocation, Optimized Competition, Real-Time Bidding, OpenRTB, Unified Pricing Rules, First Look, Last Look, Reserve Price Optimization, Dynamic Revenue Share (also known as "Average Revenue Share"), Bernanke, Project Poirot, Project Elmo, or Minimum Bid to Win.

9.      "**Advertiser**" shall mean any person or entity who buys, bids, or otherwise attempts to buy Ad Inventory on a third-party webpage or mobile application to serve ads to Users who visit a third-party webpage or mobile application, including their agents, brokers, employees, representatives, officers, directors, and assigns.

10.    "**Advertiser Ad Server**" shall mean those tools used by Advertisers to manage their ad campaigns by directing how Advertisers store and deliver advertisements and tracking where ads are served, such as Your DoubleClick Campaign Manager (now known as Campaign Manager).

11.    "**Algorithm**" shall mean any process, set of rules, source code, or white paper describing or concerning the operation of Your Ad Tech Products or search engine.

12.    "**AMP Page**" shall mean a webpage designed and served as an accelerated mobile page, as described on the domain https://amp.dev/.

13.    "**Analysis**" shall mean any analyses, evaluations, or interpretations of Your Metrics, financial performance, expenses, or revenues. It also includes any analyses, evaluations, or interpretations of the Metrics, financial performance, expenses, or revenues of third parties, such as Advertisers, Competitors, and Publishers.

14.    "**API**" shall mean application programming interface.

15.    "**Attribution Model**" shall mean the rule or rules that determine how a purchase is credited or attributed to an ad.

16.    "**Authorized Buyer**" shall mean a buyer participating in Your Authorized Buyers program. See https://support.google.com/authorizedbuyers/answer/6138000?hl=en.1.

17.    "**Behavioral Data**" shall mean all types of data collected regarding user preferences, statuses, and behaviors, regardless of whether acquired directly from the user ("**First-Party Data**") or indirectly ("**Second-Party Data**" or "**Third-Party Data**").  Behavioral Data includes, but is not limited to, demographic information, device identification, browser identification, location information, browsing history, and session length.

18.     "**Bernanke**" shall mean the program You initially launched in or about 2013 that adjusted bids from Google Ads, and means and includes any iteration or extension of Project Bernanke, including Dynamic Revshare, Bell, First Call, Passback, and Global Bernanke, Alchemist, Hidden Alchemist, and any predecessors or successors thereto.

19.     "**Bid Request**" shall mean an electronic message containing (directly or indirectly) information about the context of a piece of Ad Inventory (page content, URL, etc.) and the User (*e.g.*, cookie data) that can be used to solicit bids to purchase an Ad Impression, irrespective of whether the message or its contents has been modified for transmission to an Advertiser.

20.     "**Bid Response**" shall mean an electronic message generated in response to a Bid Request containing (directly or indirectly) a bid price and various pieces of information concerning proposed advertising content to fill an Ad Impression identified in the corresponding Bid Request.

21.     "**Communication(s)**" means any form of oral or written interchange or attempted interchange, formal or informal, at any place or under any circumstances whatsoever whereby information of any nature is transmitted or transferred, including but not limited to any note, memorandum, letter, correspondence or other document, electronic mail message, telephone call, and/or conversation, discussion, meeting and/or other record thereof, or a single person seeing or hearing any information by any means.

22.     "**Competitor(s)**" shall mean any entity that offers any products or services that competes or has competed with Your Ad Tech Products or Ad Tech Services.

23.     "**Core Algorithm Update**" includes "core updates" as described by You at https://developers.google.com/search/updates/core-updates, and all other algorithmic changes and updates You employ to implement Your Core Algorithm Updates.

24.     "**Cost-Per-Click**" or "**CPC**" shall mean that method of payment by which Advertisers pay a certain amount of money each time a User clicks on ad space filled by that Advertiser.

25.     "**Cost-Per-Mille**" or "**CPM**" shall mean that method of payment by which Advertisers pay, or Publishers receive, a certain amount of money for every thousand Ad Impressions that occur in a given ad space.

26.     "**Daily Mail**" shall mean Associated Newspapers Ltd., Mail Media, Inc., and all persons or entities acting or that have acted on their behalf, including divisions, subsidiaries, holding companies, parents, successors, predecessors, and any other related entity as well as their officers, directors, trustees, present and former employees, agents, affiliates, joint ventures, partners, assigns, or any other representatives or other persons under their control.

27.     "**Demand-Side Products**" shall mean Your Ad Tech Products that facilitate the purchase of Ad Inventory, including AdWords, Google Ads, DoubleClick for Advertisers, Google Display Network, DoubleClick Campaign Manager, Google Campaign Manager, DoubleClick Bid Manager, DV360, Google Analytics, Analytics 360, and Google Audience Center.

28.     "**Direct Action Plaintiff**" shall mean any Plaintiff (not including Daily Mail as defined) in any matter that is now or becomes a part of *In re Google Digital Advertising Antitrust Litigation*, 1:21-md-03010 (PKC) (S.D.N.Y.), that is proceeding in its or their individual capacity, and all persons or entities acting or that have acted on its or their behalf, including divisions, subsidiaries, holding companies, parents, successors, predecessors, and any other related entity as well as their officers, directors, trustees, present and former employees, agents, affiliates, joint ventures, partners, assigns, or any other representatives or other persons under their control.

29. "**Direct Sales**" shall mean Ad Inventory that is sold by a Publisher without the use of open programmatic auctions, but including programmatic guaranteed line items managed by the Publisher, directly to Advertisers.

30. "**Digital Advertising**" shall mean advertising inventory filled by way of the internet, as opposed to out-of-home, broadcast television, or print, including video Digital Advertising, display (desktop and mobile) Digital Advertising, search Digital Advertising, in-app Digital Advertising, native Digital Advertising, rich media Digital Advertising and any other advertising categorized as Digital Advertising by You in Your ordinary course of business.

31. "**Display Advertising Market**" shall mean that portion of the online advertising market that displays visual-based advertisements on the website of a Publisher.

32. "**Document(s)**" shall mean the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of any written, printed, typed, recorded, computerized, electronic, taped, graphic, or other matter, in whatever form, whether final or draft, including but not limited to all materials and things that constitute "writings," "recordings," or "photographs" within the meaning of Rule 1001 of the Federal Rules of Evidence or "documents" within the meaning of Rule 34 of the Federal Rules of Civil Procedure. The term "Document(s)" includes without limitation any kind of written, typewritten, printed, recorded, computer produced or graphic material, however produced or reproduced, including, but not limited to, memoranda, letters, notes, graphs, charts, newspapers, magazines, journals, diaries, commentaries, checks, money orders, wire transfers, notebooks, calendars, analyses, projections, summaries and/or records of meetings, conferences, negotiations or investigations, or any notes taken at or with respect to any meetings, conferences, negotiations or investigations, trade publications, books, photographs and any other data compilations from which

information can be obtained or translated into reasonably useable form.  "Document" as used herein also includes the form of any medium in which information is stored, including, but not limited to, documents or information in electronic form, including documents stored in or on a computer, back-up tape or other electronic storage medium, other electronic device or electronic mailboxes.  The term "Document" as used herein shall also include all computer files, including information stored in or accessible through computers, portable computers, handheld devices, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off the premises of Your place of business, and includes electronic mail messages ("e-mail"), wikis, slack messages, text messages, social media messages, and other electronic Documents in Your possession, custody, or control.  The term "Document" as used herein also includes any Communication(s), which means any form of oral or written interchange or attempted interchange, formal or informal, at any place or under any circumstances whatsoever whereby information of any nature is transmitted or transferred, including but not limited to any note, memorandum, letter, correspondence or other document, electronic mail message, telephone call, and/or conversation, discussion, meeting and/or other record thereof, or a single person seeing or hearing any information by any means.

33.    "**DoubleClick for Publishers**" or "**DFP**" shall mean Your Ad Server used to manage Publisher Ad Inventory before it was renamed along with AdX as Google Ad Manager, including any successor or predecessor product bearing the same or similar functionality.

34.    "**Dynamic Allocation**" shall mean that feature of DFP introduced in 2014 that changed the procedure for how a winning bid was selected on DFP.

35.    "**Dynamic Revenue Share**" and "**DRS**" shall mean the program You launched in or about 2014 that dynamically or otherwise adjusted Your exchange fee after soliciting bids in an

Ad Auction, and includes any iteration or version thereof, including Dynamic sell-side revenue share, DRSv.1, DRSv.2 and any predecessors or successors thereto.

36. "**Enhanced Dynamic Allocation**" or "**EDA**" shall mean that feature of DFP that allowed AdX to use Dynamic Allocation on Premium Inventory and Direct Sales of Publishers.

37. Unless otherwise stated, the Requests seek Documents from January 1, 2010 to the present (the "**Relevant Time Period**").

38. "**First Look**" shall mean the feature of Google Ad Manager described on https://support.google.com/admanager/topic/9242064 (*see also* https://support.google.com/authorizedbuyers/answer/6142666#first-look), including any equivalent features in other Google AdTech Products.

39. "**Floor Pricing**" shall mean any system, procedure, or rules used to implement, determine, or define the floor price in an Ad Auction (first-price and/or second-price), including, but not limited to, the Unified Floor Pricing Rule described on  https://support.google.com/admanager/answer/9298008.

40. "**Google Ad Manager**" or "**GAM**" shall mean the product You refer to as Google Ad Manager, which includes Your Ad Server previously known as DFP and Your Ad Exchange previously known as AdX, as well as any successor or predecessor product bearing the same or similar functionality.

41. "**Google Ad Exchange**" or "**AdX**" shall mean Your Ad Exchange before it was renamed Google Ad Manager, as well as the current Ad Exchange functionality of Google Ad Manager, including any successor or predecessor product bearing the same or similar functionality.

42. "**Google Group**" shall have the meaning of the term as used on the webpage https://support.google.com/a/answer/33329, including email distribution lists, collaborative

inboxes, and Q&A forums. The term "Google Group" shall include any computer account that can be assigned or has been assigned access rights for a computer resource, has been assigned an email address, and/or can serve as a proxy or an alias for a collection of one or more other computer accounts.

43.     "**Header Bidding**" shall mean that form of Ad Auction where Ad Exchanges and/or SSPs are invited to submit bids for an Ad Impression before an Ad Request is sent to the Publisher Ad Server.

44.     "**Identify**" means, with respect to a Document, to give, to the extent known, the type of Document, the general subject matter, the date of the Document, as well as the author, addressees, and recipients of the Document.

45.     "**Identify**" means, with respect to a Person, to give, to the extent known, the Person's full name, title, and, when referring to a natural Person, additionally, the present or last known place of employment. Once a Person has been first identified in accordance with this definition, only the name of that Person need be listed in response to subsequent discovery requesting the identity of that Person.

46.     "**Includes**" shall mean "includes, but not limited to"; and "including" shall mean "including without limitation."

47.     "**Metric**" shall mean any measures of quantitative assessment that may be used for analyzing, evaluating, or interpreting Your business, Your budgets, Your financial performance, Your revenues, or Your Projections, including the following: cost per mille (CPM), revenue per mille (RPM), cost per click (CPC) cost per impression, average advertiser yield, monthly active users (MAU), revenue split, total advertising revenue, take rate, transaction fees, total ad impressions, number of impressions, and/or daily active users (DAU). Metric also includes any

measures of quantitative assessment that may be used for analyzing, evaluating, or interpreting the business, budgets, financial performance, revenues, or Projections relating to third parties (*e.g.*, Advertisers, Competitors, and Publishers), including the following: cost per mille (CPM), revenue per mille (RPM), cost per click (CPC) cost per impression, average advertiser yield, monthly active users (MAU), revenue split, total advertising revenue, take rate, transaction fees, total ad impressions, number of impressions, and/or daily active users (DAU).

48.     "**Open Bidding**" or "**Exchange Bidding**" shall mean that feature of DFP which enables Publishers using DFP to connect to demand from third-party Ad Exchanges to AdX over a server-to-server connection, allowing multiple Ad Exchanges to submit bids simultaneously. This definition also includes any successor or predecessor AdTech Auction Mechanics bearing the same or similar functionality, e.g., any and all iterations of the pre-release projects You refer or have referred to as Jedi (e.g., Jedi+, Jedi++) or Demand Syndication.

49.     "**Optimized Competition**" shall mean the feature of Google Ad Manager described on https://support.google.com/admanager/answer/7422526, including any equivalent or similar functionality in other Google AdTech Products.

50.     "**Person**" is defined as set forth in Tex. Bus. & Com. Code § 15.03(3), and includes any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

51.     "**Privacy and Security Principles**" shall mean the six principles that guide Your products, processes, and people in keeping Your users' data private, safe, and secure, as described on https://safety.google/principles/, including any prior versions or iterations of such principles.

52.     "**Privacy Policy**" shall mean the Google Privacy Policy found at https://policies.google.com/privacy, including any prior versions or iterations of such policy.

53.     "**Projections**" shall mean any forecasts or evaluations of Your or a third parties' (*e.g.*, Advertisers, Competitors, Publishers) future or predicted Metrics, financial performance, expenses, or revenues.

54.     "**Publisher**" shall mean any person or entity who serves content on the internet that is monetized by selling Ad Inventory to Advertisers, and includes a Publisher's agents, brokers, employees, representatives, officers, directors, and assigns.

55.     "**Publisher Ad Servers**" shall mean those tools used by Publishers to determine how Ad Inventory is filled, including, but not limited to,  DFP, Google Ad Manager, OpenX, FreeWheel, or AdZerk, or any predecessors or successors bearing the same or similar functionality.

56.     "**Real-Time Bidding**" or "**RTB**" shall mean that process by which Advertisers submit bids for Ad Impressions in real-time Ad Auctions.

57.     "**Relating to,**" "**related to,**" and "**concerning**" shall mean in whole or in part constituting, containing, concerning, embodying, reflecting, discussing, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to.

58.     "**RPM**" or "**Revenue Per Mille**" shall mean "the estimated earnings you'd accrue for every 1000 impressions you receive."

https://support.google.com/adsense/answer/190515?hl=en

59.     "**Reserve Price Optimization**" and "**RPO**" shall mean the program You implemented in or about 2015 that adjusted AdX exchange floors and generated custom floors based on historical bidding information, and includes any version, iteration, predecessor, or successor thereof.

60.     "**Supply Side Platforms**" or "**SSP**" shall mean those entities that organize demand for Ad Inventory and connect Publishers to Ad Exchanges to sell Ad Inventory, including those

that allow Publishers to connect to DSPs, such as AdX, AppNexus, Xandr, PubMatic, Rubicon Project, OpenX, One by AOL, and Oath, or any predecessors or successors bearing the same or similar functionality.

61.     "**User**" shall mean the person who is viewing a web page and to whom an Ad Impression may be displayed through use of Your Ad Tech Products and/or Ad Tech Services.

62.     "**You,**" "**Your,**" "**Alphabet,**" or "**Google**" shall mean Defendants Google LLC, Alphabet Inc., and YouTube, LLC ("Defendants") and their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

63.     The connectives "**and**" and "**or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses and documents that might otherwise be construed to be outside its scope.

64.     The terms "**all**," "**any**," "**each**," and "**every**," shall each be construed as both "each" and "every" to bring within the scope of the request all responses which might otherwise be construed to be outside its scope.

65.     The definitions set forth above shall apply to all requests. Capitalized terms not defined herein shall have the definitions set forth in the most recent complaints (and any subsequently filed complaints or amended complaints) in *In re: Google Digital Advertising Antitrust Litigation*, 1:21-md-03010-PKC, ECF Nos. 195 (States Complaint), 399 (Advertiser Class Complaint), 400 (Daily Mail Complaint), 401 (Direct Action Newspapers Complaint) and 408 (Publisher Class Complaint).

66.     Any reference to Your Ad Tech Products or Your Ad Tech Auction Mechanics, individually or collectively, also shall include any successor or predecessor Ad Tech Products or Ad Tech Auction Mechanics having the same or similar functionality.

### Requests for Production

1. All Documents and Communications relating to the development of, adoption of, enforcement of, or compliance with Your Privacy and Security Principle to "never sell our users' personal information to anyone."

2. All Documents and Communications relating to Your understanding or interpretation of the terms "sell" and "personal information" as used in Your Privacy and Security Principle to "never sell our users' personal information to anyone."

3. All Documents and Communications relating to the development of, adoption of, enforcement of, or compliance with Your statement on the "How our business works" portion of Your website that "We don't sell your personal information to anyone."

4. All Documents and Communications relating to Your understanding or interpretation of the terms "sell" and "personal information" as used on the "How our business works" portion of Your website.

5. All Documents and Communications relating to the development of, adoption of, enforcement of, or compliance with Your statement on the "How our business works" portion of Your website that "Advertisers do not pay us for personal information."

6. All Documents and Communications relating to Your understanding or interpretation of the term "Advertisers do not pay us for personal information" as used on the "How our business works" portion of Your website.

7. All Documents and Communications relating to any commitment or representation You have made to never sell the personal information or personal data of Your Users.

8. All Documents and Communications related to any complaints or concerns you have received from Your Users in Texas related to the use, sale, or sharing of a User's personal information or personal data without their consent.

9. All Documents and Communications related to the methods by which You have obtained consent to use or share the personal information or personal data of Your Users in Texas.

10. Documents sufficient to show the number of Users in Texas, on a monthly basis from January 1, 2010 to the present, from whom You have obtained consent to share a User's personal information or personal data.

11. All Documents and Communications related to any changes, amendments, revisions, and updates to Your Privacy Policy or any portion thereof, Your Privacy and Security Principles or any portion thereof, and the "How our business works" page on Your website.

12. All Documents and Communications, including but not limited to usability studies, controlled experiments, user surveys, or any other research, analyses, or testing, related to how Users respond to, interact with, understand, perceive, or interpret Your Privacy Policy or any portion thereof, Your Privacy and Security Principles or any portion thereof, and the "How our

business works" page on Your website. This request includes any such studies, research, analyses, experiments, or tests related to any version of Your Privacy Policy, Your Privacy and Security Principles, and the "How our business works" page of Your website, as well as any proposed changes, revisions, amendments, and updates to Your Privacy Policy, Your Privacy and Security Principles, and the "How our business works" page of Your website, or any portions thereof.

13. All Documents and Communications, including but not limited to usability studies, controlled experiments, user surveys, or any other research, analyses, or testing, related to what Users understand or perceive related to the data and personal information You collect from Users.

14. All Documents and Communications, including but not limited to usability studies, controlled experiments, user surveys, or any other research, analyses, or testing, related to what Users understand or perceive related to how You use, share, sell, monetize, or transfer data and personal information You collect from or about Users.

15. Documents Identifying every affiliate, trusted business, Advertiser, Publisher, or any other entities or persons with which You shared a User's personal information or personal data for external processing, including without limitation all agreements You have entered into with any such any affiliates, trusted businesses, Advertisers, Publishers, or any other entities or persons or persons with which You shared a User's personal information for external processing.

16. All Documents and Communications relating in any way to Your sharing of a User's personal information or personal data with any affiliates, trusted businesses, Advertisers, Publishers, or any other entities or persons with which You shared a User's personal information for external processing.

17. All Documents and Communications related to any instance in which You shared a User's personal information or personal data with a third party to protect against harm to the rights, property, or safety of Google.

18. Documents Identifying all mergers, acquisitions, or sales of assets in which You have shared Users' personal information or personal data.

19. All Documents, including without limitation user studies, planning documents, white papers, market analyses, competitive analysis, retrospectives, strategic plans, or other decision-making or analytical Documents related to Your use of Users' personal information or personal data for advertising purposes.

20. For each month from January 1, 2010 to the present, Documents Identifying the number of persons in Texas who visited each of the following websites, including any prior or subsequent versions thereof:

    a.  https://www.google.com/search/howsearchworks/mission/

    b.  https://about.google/intl/en_US/how-our-business-works/

    c.  https://safety.google/principles/

    d.  https://policies.google.com/privacy

    e.  https://safety.google/privacy/ads-and-data/

    f.  https://safety.google/privacy/data/

    g.  https://howwemakemoney.withgoogle.com/

    h.  https://support.google.com/admanager/answer/7128958?hl=en

21. All logs or reports from January 1, 2010 to the present, including Google Analytics and other web analytics logs and reports, related to or Identifying persons in Texas who visited each of the following websites, including any prior or subsequent versions thereof:

    a.  https://www.google.com/search/howsearchworks/mission/

    b.  https://about.google/intl/en_US/how-our-business-works/

    c.  https://safety.google/principles/

    d.  https://policies.google.com/privacy

    e.  https://safety.google/privacy/ads-and-data/

    f.  https://safety.google/privacy/data/

    g.  https://howwemakemoney.withgoogle.com/

    h.  https://support.google.com/admanager/answer/7128958?hl=en

22. All Documents and Communications relating to any study, experiment, analysis, or simulation Google conducted or is aware of which relates to the value of individuals' personal information or personal data, whether such study, experiment, analysis, or simulation relates to a single piece of an individual's personal information (e.g. the value of an individual's social security number or the value of an individual's location), or a dataset that includes multiple pieces of an individual's personal information (e.g. a database containing an individual's social security number, email address, and location). This request includes but is not limited to any study, experiment, analysis, or simulation Google conducted, received, or became aware of in connection with any litigation or other legal proceeding.

23. All Documents and Communications relating to any study, experiment, analysis, or simulation Google conducted or is aware of which relates to the value of Your Users' personal information or any subset thereof.

24. All Documents and Communications related to the July 31, 2020, letter from members of the United States Senate and House of Representatives to the then-Chairman of the Federal Trade Commission, Joseph Simons, related to entities participating in Real-Time Bidding Ad

Auctions for the sole purpose of obtaining sensitive information about the potential recipient of the ad.

See https://www.wyden.senate.gov/imo/media/doc/073120%20Wyden%20Cassidy%20Led%20FTC%20Investigation%20letter.pdf).

25. All Documents, including without limitation all Communications, studies, investigations, or audits related to complaints or allegations that persons or entities participate in Real-Time Bidding Ad Auctions for the sole or primary purpose of obtaining information about the potential recipient of the ad.

26. All Documents and Communications related to steps You have taken to prevent or discourage persons or entities from participating in Real-Time Bidding Ad Auctions for the sole or primary purpose of obtaining information about the potential recipient of the ad.

27. All Documents which You have provided to any regulator, legislative body, or governmental entity (either foreign or domestic) related to allegations or complaints that persons or entities participate in Real-Time Bidding Ad Auctions for the sole or primary purpose of obtaining information about the potential recipient of the ad.

28. All Documents Identifying what personal information, if any, participants in Your Real-Time Bidding Ad Auctions receive about the potential recipient of an ad.

29. All Documents and Communications exchanged between You and any Publisher, Advertiser, or other third party related to or describing the benefits of waterfalling.

30. All Documents and Communications exchanged between You and any Publisher, Advertiser, or other third party related to how any AdTech Product affects Publishers' revenues or yields, including without limitation all such Documents and Communications related to whether and how any AdTech Product maximizes Publishers' revenues or yields.

31. All Documents, including but not limited to planning documents, Communications, white papers, market analyses, competitive analysis, retrospectives, strategic plans, or other decision-making or analytical Documents related to or describing how running a spread between exchanges maximizes publisher revenue or yield.

32. All Documents, including but not limited to planning documents, Communications, white papers, market analyses, competitive analysis, retrospectives, strategic plans, or other decision-making or analytical Documents related to or describing how or why You route Advertisers' bids through consecutive second price auctions between the Google Display Network and AdX.

33. All Documents and Communications related to statements, claims, or representations You made to any Publisher concerning Your duty, ability, or intent to increase or maximize the Publisher's revenues or yields.

34. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Your AdTech Products on Publisher revenues or yields.

35. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact that competition between Ad Exchanges has on Publishers, including but not limited to, any impact on Publisher revenues or yields.

36. All Documents and Communications related to statements, claims, or representations You made to any Advertiser Concerning Your duty, ability, or intent to decrease or minimize the Advertiser's costs.

37. All Documents, including but not limited to planning documents, Communications, white papers, market analyses, competitive analysis, retrospectives, strategic plans, or other decision-making or analytical Documents related to transparency of pricing in Your Ad Auctions.

38. All Documents, including but not limited to planning documents, Communications, white papers, market analyses, competitive analysis, retrospectives, strategic plans, or other decision-making or analytical Documents related to Your take rate in Your Ad Auctions.

39. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the percent or amount of Your take rate in Your Ad Auctions.

40. All Documents and Communications related to the disclosure of Your take rate in Your Ad Auctions.

41. All Documents and Communications related to statements, claims, or representations You made to any Publisher concerning revenue share, fees, or other costs related to transactions on Your exchanges.

42. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the percent of advertising revenue paid by Advertisers that Publishers receive when selling inventory through Your exchange or network.

43. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the percent or breakdown of the revenue You receive at each stage in any Ad Auction run by any of Your AdTech Products (i.e. on the sell side, the buy side, and the exchange).

44. All Documents and Communications related to any complaints made or concerns expressed by any Publisher, Advertiser, or other third party concerning the fairness of transparency of, or bias in, Your Ad Auctions.

45. All Documents and Communications exchanged between You and any Publisher, Advertiser, or other third party related to statements, claims, or representations You made Concerning the fairness or transparency of, or bias in, Your Ad Auctions, including any statements, claims, or

representations that all bidders in Your Ad Auctions compete on equal footing or that all bidders are treated equally.

46. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the number or percent of Ad Auctions transacted through Google Ad Exchange instead of a competing Ad Exchange because of each of the following programs:

    a.  RPO

    b.  DRS

    c.  Bernanke

    d.  Elmo

    e.  Poirot

47. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Header Bidding on Publishers, including but not limited to, any impact on Publisher revenues or yields.

48. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Header Bidding on any Ad Exchange.

49. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Header Bidding on website latency or strain on servers.

50. All Documents and Communications exchanged between You and any Publisher, Advertiser, or other third party related to or describing the disadvantages of Header Bidding, including but not limited all Documents and Communications related to or describing the impact of Header Bidding on website latency or strain on servers.

51. All Documents, including but not limited to reports, sufficient to show  the number of instances that Exchange Bidding returned a higher bid than the winning bid for the ad selected.

52. All Documents and Communications related to the disclosure of Reserve Price Optimization to any Publisher, Advertiser, or other third party, including but not limited to All Documents and Communications related to Your decision to launch Reserve Price Optimization without disclosing the program to Advertisers or Publishers.

53. Documents sufficient to Identify all Advertisers and Publishers who were opted into Reserve Price Optimization when it was initially launched or implemented.

54. Documents sufficient to show the number of transactions on AdX on a monthly basis from January 1, 2013 to the present, on which Reserve Price Optimization affected, altered, changed, manipulated, or overrode a Publishers' set exchange floor or floor price.

55. All Documents and Communications, including but not limited to all contracts and agreements, exchanged between You and any Publisher reflecting or concerning Publishers' floor settings and floor prices, including but not limited to Documents and Communications in which a Publisher provided instructions related to floor settings or floor prices.

56. Documents sufficient to Identify all Publishers whose contractually set exchange floors were affected, altered, changed, manipulated, or overridden as a result of Reserve Price Optimization from January 1, 2013 through the present.

57. Documents sufficient to show the number of transactions on AdX on a monthly basis from January 1, 2013 to the present, in which an Advertiser paid more for an ad/impression than they otherwise would have if Reserve Price Optimization had not been operational or in effect.

58. Documents sufficient to identify all Advertisers who, from January 1, 2013 to the present, paid more for an ad/impression than they otherwise would have if Reserve Price Optimization had not been operational or in effect.

59. All Communications with any Publisher, Advertiser, or third party, and/or public statements about Reserve Price Optimization; all Documents, including drafts, providing "talking points" or other instructions to Your employees regarding such Communications; all complaints or feedback from any Publisher, Advertiser, or other third party regarding Your use of Reserve Price Optimization or its consequences; Your internal discussions of any such complaints; and any responses You have made to such complaints, regardless of whether or not the party providing feedback knew of the program's existence. To the extent that Reserve Price Optimization was not disclosed to customers, produce Documents relating to any efforts to prevent customers from learning of these practices and/or concerns about Your lack of transparency regarding Reserve Price Optimization.

60. All Documents and Communications exchanged between You and any Publisher, Advertiser, or other third party related to or describing the benefits of Reserve Price Optimization, including but not limited to all Communications with any Advertisers related to the amount and type of inventory that would be available on AdX a result of Reserve Price Optimization.

61. All Documents and Communications, including but not limited to training materials, related to explaining the benefits of Reserve Price Optimization to Publishers, Advertisers, or other third parties, including but not limited to Documents and Communications related to statements, claims, or representations that could or could not be made to any Publisher, Advertiser, or other third party concerning Reserve Price Optimization.

62. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Reserve Price Optimization on Publishers, including but not limited to, any impact on Publisher revenues or yields.

63. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Reserve Price Optimization on Advertisers, including but not limited to, any impact on prices paid by Advertisers for an ad/impression or Advertisers' return on investment.

64. All Documents and Communications relating to the effects of Reserve Price Optimization on Ad Auctions, Ad Exchanges, exchange floors, exchange floor settings, Floor Pricing, and floor prices.

65. All Documents and Communications relating to Your use of Advertisers' historical bidding information and the effects of such use on Ad Auctions, Ad Exchanges, exchange floors, exchange floor settings, Floor Pricing, and floor prices.

66. All Documents and Communications related to Your access to and use of Publisher Ad Server user IDs to view historical bidding information, including but not limited to all disclosures you made to any Publisher, Advertiser, or other third party regarding Your access to and use of Publisher Ad Server user IDs.

67. All Documents and Communications relating to the effects of Your use of historical bidding information on second prices in AdX.

68. All Documents and Communications related to any complaints or concerns You received from any Publisher, Advertiser, or other third party related to Your changes to or manipulation of a Publisher's set price floor.

69. Documents sufficient to Identify all Publishers and Advertisers who were opted into Dynamic Revenue Share when it was initially implemented or launched.

70. All Documents and Communications related to the disclosure of any version of Dynamic Revenue Share to any Publisher, Advertiser, or other third party, including but not limited to All Documents and Communications related to Your decision to opt Publishers into the first version of Dynamic Revenue Share without disclosing to Publishers their enrollment therein.

71. All Communications with any Publisher, Advertiser, or other third party, and/or public statements about Dynamic Revenue Share; all Documents, including drafts, providing "talking points" or other instructions to Your employees regarding such Communications or statements; all complaints or feedback from any Publisher, Advertiser, or other third party regarding Your use of Dynamic Revenue Share or its consequences; Your internal discussions of any such complaints; and any responses You have made to such complaints, regardless of whether or not the party providing feedback knew of the program's existence. To the extent that Dynamic Revenue Share was not disclosed to customers, produce Documents relating to any efforts to prevent customers from learning of these practices and/or concerns about Your lack of transparency regarding Dynamic Revenue Share.

72. All Documents and Communications exchanged between You and any Publisher, Advertiser, or other third party related to whether opting out of any version of Dynamic Revenue Share would also opt Publishers out of another version of Dynamic Revenue Share.

73. All Documents and Communications exchanged between You and any Publisher, Advertiser, or other third party related to or describing the benefits of any version of Dynamic Revenue Share, including but not limited to all Documents and Communications comparing any versions of Dynamic Revenue Share.

74. All Documents and Communications, including but not limited to training materials, related to explaining the benefits of any version of Dynamic Revenue Share to Publishers, Advertisers, or other third party, including but not limited to Documents and Communications related to statements, claims, or representations that could or could not be made to any Publisher or Advertiser concerning any version of Dynamic Revenue Share.

75. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Dynamic Revenue Share on Publishers, including but not limited to, any impact on Your exchange fees and Publisher revenues or yields.

76. All Documents and Communications relating to the effects of Dynamic Revenue Share on Ad Auctions, Ad Exchanges, exchange floors, exchange floor settings, Floor Pricing, and floor prices.

77. Documents sufficient to show the number of transactions and impressions transacted on AdX on a monthly basis from January 1, 2012 to the present in which the implementation or operation of Dynamic Revenue Share resulted in exchange fees for publisher inventory that were higher than they otherwise would have been had Dynamic Revenue Share not been implemented or in operation.

78. Documents sufficient to Identify every Publisher transacting on AdX from January 1, 2012 to the present that paid or otherwise incurred exchange fees that were higher than they otherwise would have been had Dynamic Revenue Share not been implemented or in operation.

79. All Documents and Communications related to the disclosure of any version of Bernanke to any Publisher, Advertiser, or other third party, including but not limited to All Documents and Communications related to Your decision whether or not to disclose any version of Bernanke to Publishers or Advertisers.

80. All Communications with any Publisher, Advertiser, or other third party, and/or public statements about any version of Bernanke; all Documents, including drafts, providing "talking points" or other instructions to Your employees regarding such Communications; all complaints or feedback from any Publisher, Advertiser, or other third party regarding Your use of any version of Bernanke or its consequences; Your internal discussions of any such complaints; and any responses You have made to such complaints, regardless of whether or not the party providing feedback knew of the program's existence. To the extent that Bernanke was not disclosed to customers, produce Documents relating to any efforts to prevent customers from learning of these practices and/or concerns about Your lack of transparency regarding Bernanke.

81. All Documents and Communications exchanged between You and any Publisher, Advertiser, or other third party related to or describing the benefits of any version of Bernanke.

82. All Documents and Communications, including but not limited to training materials, related to explaining the benefits of any version of Bernanke to Publishers, Advertisers, or other third parties, including but not limited to Documents and Communications related to statements,

claims, or representations that could or could not be made to any Publisher or Advertiser concerning Bernanke.

83. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of any version of Bernanke on Publishers, including but not limited to, any impact on Publisher revenues or yields.

84. If You contend that You discontinued Your use or implementation of any version of Bernanke, documents sufficient to show the date on which You discontinued such use or implementation.

85. All Documents and Communications related to Bernanke's effects on second bids on non-competitive queries.

86. All Documents and Communications related to the accumulation or retention of profit under Bernanke into "pools" and the use and effects of such "pools" on future bids, including but not limited to Documents and Communications related to the disclosure of such "pools" to Publishers and Advertisers.

87. All Documents and Communications related to Bernanke's effects on Google Ads buyers' win rates, including but not limited to Documents sufficient to show whether Google Ads buyers won more transactions on average than non-Google Ads buyers under Bernanke.

88. Documents sufficient to show the number of transactions on AdX where Bernanke, or any version thereof, was operational or in effect and a Publisher was paid based off the third highest bid when Google Ads submitted the top two bids in AdX.

89. Documents sufficient to Identify all Publishers that were paid based off the third highest bid when Google Ads submitted the top two bids in AdX while Bernanke was operational or in effect.

90. Documents sufficient to show the number of transactions on AdX in which Bernanke operated to retain a portion of the second price when Google Ads submitted the top two bids in AdX.

91. Documents sufficient to show, on a monthly basis from January 1, 2012 to the present, the amount or portion of the second price You retained under Bernanke when Google Ads submitted the top two bids in AdX.

92. All Documents and Communications related to statements, claims, or representations You made to any Publisher or Advertiser concerning Elmo.

93. All Documents and Communications exchanged between You and any Publisher, Publisher Ad Server, Advertiser, Advertiser Ad Server, DSP, Ad Exchange, or SSP, related to or describing the benefits of Elmo.

94. All Documents and Communications, including but not limited to training materials, related to explaining the benefits of Elmo to Publishers or Advertisers or related to statements, claims, or representations that could or could not be made to any Publisher or Advertiser concerning Elmo.

95. All Documents and Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Elmo on Publishers, including but not limited to, any impact on Publisher revenues or yields.

96. All Documents and Communications related to statements, claims, or representations You made to any Publisher or Advertiser concerning Poirot.

97. All Documents and Communications between You and any Publisher, Publisher Ad Server, Advertiser, Advertiser Ad Server, DSP, Ad Exchange, or SSP, related to or describing the benefits of Poirot.

98. All Documents and Communications, including but not limited to training materials, related to explaining the benefits of Poirot to Publishers or Advertisers, or related to statements, claims, or representations that could or could not be made to any Publisher or Advertiser Concerning Poirot.

99. All Documents an Communications related to any experiment, analysis, or simulation You conducted or are aware of which relates to the impact of Poirot on Publishers, including but not limited to, any impact on Publisher revenues or yields.

100.   All Documents and Communications from January 1, 2019 to the present relating to statements, claims, or representations You made to any Publisher relating to whether You manipulated search traffic results to punish Publishers who set higher floor prices for Your Ad Auctions.

101.   All Documents and Communications from January 1, 2019 to the present relating to statements, claims, or representations You made to any Publisher relating to whether You manipulated search traffic results to punish publishers who did not engage in Exchange Bidding.

Respectfully Submitted,

**November 10, 2023**

FOR PLAINTIFF STATE OF TEXAS:


*/s/ W. Mark Lanier*
W. Mark Lanier (*lead counsel*)                   Ashley Keller
Mark.Lanier@LanierLawFirm.com          ack@kellerpostman.com
Alex J. Brown                                                    KELLER POSTMAN LLC
Alex.Brown@LanierLawFirm.com           150 N. Riverside Plaza, Suite 4100
Zeke DeRose III                                             Chicago, Illinois 60606
Zeke.DeRose@LanierLawFirm.com        (312) 741-5220
**THE LANIER FIRM, P.C.**
10940 W. Sam Houston Parkway N., Suite 100    Zina Bash
Houston, Texas 77064                                   Zina.bash@kellerpostman.com
Telephone: (713) 659-5200                          111 Congress Avenue, Suite 500
Facsimile: (713) 659-2204                            (512) 690-0990
                                                                      KELLER POSTMAN LLC

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General

*/s/ Trevor E. D. Young*
Brent Webster, First Assistant Attorney
General of Texas
Brent.Webster@oag.texas.gov
Grant Dorfman, Deputy First Assistant
Attorney General
Grant.Dorfman@oag.texas.gov
James R. Lloyd, Deputy Attorney General
for Civil Litigation
Trevor Young, Deputy Chief, Antitrust
Division
Trevor.Young@oag.texas.gov

**STATE OF TEXAS, OFFICE OF THE
ATTORNEY GENERAL**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of November, 2023, a true and correct copy of the foregoing was served on the following counsel of record by Certified Mail, Return Receipt Requested, and via email delivery:

R. Paul Yetter
Bryce Callahan
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
pyetter@yettercoleman.com
bcallahan@yettercoleman.com

John D. Harkrider
Axinn Veltrop & Harkrider, LLP
114 West 47th Street
New York, NY  10036
jharkrider@axinn.com

Daniel S. Bitton
Axinn Veltrop & Harkrider, LLP
560 Mission St.
San Francisco, CA 94105
dbitton@axinn.com

Eric Mahr
Julie S. Elmer
Freshfields Bruckhaus Deringer LLP
700 13th Street NW, 10th Floor
Washington, DC  20005
Eric.mahr@freshfields.com
julie.elmer@freshfields.com

*/s/ Zeke DeRose III*
Zeke DeRose III