**FILED UNDER SEAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

**<u>DEFENDANT GOOGLE LLC'S RESPONSE BRIEF TO
PLAINTIFFS' OPENING BRIEF TO THE SPECIAL MASTER
FOR THE MARCH 21, 2024 HEARING</u>**

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

BACKGROUND..................................................................................................................... 1

ARGUMENT......................................................................................................................... 3

    I. GOOGLE PROVIDED A DEPONENT CONSISTENT WITH THE SPECIAL MASTER'S ORDER ON DASHBOARDS................................................................. 3

        A. Google's Deponent Addressed the Issues Identified by the Special Master.................. 3

        B. Plaintiffs' Questioning Went Far Beyond the Proper Scope of the Deposition.............. 5

        C. The Dashboards Cannot be Produced in a Secure Clean Source Code Room Under the Terms of the Governing Confidentiality Order...................................................... 6

        D. Proposed Next Steps..................................................................................... 7

    II. THE STATES' 30(b)(6) NOTICE.................................................................... 7

    III. THE STATES' REQUEST FOR SOURCE CODE............................................. 8

**FILED UNDER SEAL**

## BACKGROUND

Plaintiffs are not conducting discovery in compliance with the Local Rules or the Orders of this Court. Yet again, Plaintiffs are abusing the discovery process to bring manufactured disputes to the Special Master. *See* ECF No. 191 at 1.

The Order of the Special Master states that "[p]rior to submitting opening briefs, the parties must comply with Local Rule CV-7(h)'s meet-and-confer requirements." ECF No. 227. Local Rule CV-7(h) requires the parties to make "a sincere effort" to "present the merits of their respective positions," and mandates that "a request for court intervention is not appropriate until the participants have . . . concluded, in good faith, that the discussions have conclusively ended in an impasse." The "good faith" requirement demands "honesty in one's purpose to discuss meaningfully the dispute, freedom from intention to defraud or abuse the discovery process and faithfulness to one's obligation to secure information without court intervention." *Id*.

Plaintiffs have routinely ignored the Order of the Special Master and the Local Rules by rushing to court without first engaging in good faith meaningful discussion. As set forth below, Plaintiffs continue to manufacture impasse.

**Dashboards**. Plaintiffs seek a second dashboard deposition at Google's expense, and demand that Google pay all of the "fees and expenses" associated with the first deposition. Br. at 5. Google produced an 11-year veteran software engineer with extensive experience with dashboards, and Google proposed that his deposition be conducted remotely. Plaintiffs pressed for it to be held in person and then flew counsel from Chicago to New York to take the deposition, which lasted two hours. Plaintiffs' counsel told Google's counsel that the deposition did not need to occur in person but that *Plaintiffs* had insisted that it be taken in person. Two hours after the deposition, Plaintiffs told Google that they would be seeking fees and expenses for the deposition. This is not the first time that Plaintiffs have demanded an in-person meeting

for tactical reasons.[1] After failing to meet and confer as directed by the Special Master, Plaintiffs filed their opening Brief and then filed a corrective meet and confer notice. ECF No. 295.

**Depositions**. Plaintiffs assert that the parties are at an impasse with respect to Plaintiffs' 30(b)(6) deposition notice. Br. at 5-6. But the first meet and confer regarding Plaintiffs' juggernaut 107-topic Notice occurred on Friday last week. The parties made it through the first 20 topics, and Plaintiffs conceded that they would need to come back to Google with further clarification of what they were really seeking. On Tuesday, and without providing the promised additional detail, Plaintiffs declared an impasse. Br. at 6.

**Source code**. Plaintiffs assert that the parties are at an impasse regarding source code. But the Special Master, at the February 22 Conference, stated that the parties should "make as much progress by agreement" as possible, and only "come back to the Special Master . . . after [the parties] really worked hard in good faith on the source code." Hr'g Tr. at 96:25-97:3 (Feb. 22, 2024). Plaintiffs did nothing. But when Google followed up on March 5 offering *more code*, Plaintiffs responded three hours later that the parties were at an impasse. And Plaintiffs have repeatedly referenced a supposed "impasse agreement" between the parties that does not exist. *See* Br. at 6. Google respectfully submits that the appointment of the Special Master does not relieve Plaintiffs of the obligation to meet and confer in good faith.

---

[1] In May 2023, Plaintiffs demanded that Google participate in several all-day in-person meet-and-confers to address Plaintiffs' 301 Requests for Production. Google agreed to participate but proposed remote meetings because the relevant counsel were based on the east and west coasts. Plaintiffs threatened a motion if Google did not agree to meet in person. To spare Court resources, Google agreed and flew its counsel from California to New York for the in-person meeting demanded by Plaintiffs. Ten minutes before the "in person" meeting began, Plaintiffs circulated a Zoom invitation so that their own counsel could participate remotely.

**FILED UNDER SEAL**

**ARGUMENT**

**I. GOOGLE PROVIDED A DEPONENT CONSISTENT WITH THE SPECIAL MASTER'S ORDER ON DASHBOARDS.**

The Special Master ordered that Google produce a witness with "personal knowledge of Google's dashboards for Display Ads for a deposition." ECF No. 265 at 5. The Special Master stated that he "appreciates the parties' agreement to deposition" and expressed "confiden[ce] that the parties will cooperate as to all aspects of the deposition." *Id*. The deposition was intended to form the foundation for a meet and confer within three days of the deposition regarding the scope of any production "by Google in a secure source code room." *Id*.

Google proposed that the dashboard deposition be conducted remotely. Plaintiffs pressed for it to be held in person and flew to New York to take the deposition. After the deposition concluded, Plaintiffs demanded another deposition at Google's expense. *See supra* at 2.

Google complied with the Special Master's Order, and there is no basis for Plaintiffs' demands or for additional deposition time. Google produced a Staff Software Engineer—employed by Google for 11 years—to testify. Ex. A 7:3-9. As a member of the Reporting Unit of the Display Ads business, Google's deponent testified that he had personal knowledge of creating and using dashboards related to display ads, and that he indeed had a "very good understanding" about those dashboards. *Id*. at 6:22-7:2.

**A. Google's Deponent Addressed the Issues Identified by the Special Master.**

Dashboards are not a source of information separate from the underlying data; the underlying "data sources are more reliable than dashboards themselves." *Id*. at 85:23-86:2.[2] Google's deponent testified that there are likely hundreds of thousands of dashboards at Google that could reflect aspects of Google's Display Ads business, as dashboards are frequently created

---

[2] The governing ESI Order reflects Google's long-held position that "[d]ynamic fields of databases, dashboards, or log files" need not be preserved or produced. ECF No. 183 at 5 n.3

3

by individual employees on an ad hoc basis; some have become popular at times within particular teams and sub-teams.[3]

There is no central repository or commonly accepted set of dashboards that are used across the whole of the Display Ads business and so the best way to determine which dashboards are used (or were used at a particular time) by any of the many teams within Display Ads is to ask those teams directly. *Id*. at 86:23-87:1, 88:3-7. Google's deponent identified various particular teams within Display Ads that use dashboards and provided points of contact.[4]

Google's deponent testified to the topics identified by the Special Master.

**Lumina**. The Special Master stated that "[t]o the extent there is an analogue or equivalent to the Lumina dashboard—that is, the current 'most comprehensive' Display Ads dashboard—the Special Master expects the parties' discussions to principally focus on such dashboard(s)." ECF No. 265 at 6-7 n.4. Google's deponent testified that he had personally used Lumina as part of his work but that it was no longer actively maintained. Ex. A 12:23-25, 57:17. He identified examples of Lumina content in documents shown to him. *Id*. at 56:20-58:24. Google's deponent identified the Google employee responsible for creating Lumina, but added that he himself would have comparable knowledge of Lumina. *Id*. at 57:2-58:8.

**Display Ads dashboards**. The Special Master expressed an interest in "dashboards at a high level that would reflect the performance of display ads . . . that Google would have used for monitoring trends and just the operation of how display ads work." Hr'g Tr. at 56:13-19 (Feb. 22, 2024) Google's deponent identified ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Ex. A at 21:5-14. This dashboard closely aligns with the information that the Special Master identified at the hearing, and Google

---

[3] Ex. A 13:6-9, 35:4-10, 66:2-4, 85:7-11, 86:8-22, 89:19-22.
[4] *Id.* at 10:16-19, 10:24 -11:4, 15:11-13, 19:19-20, 40:8-16, 41:13-14, 54:10-19, 57:2-14.

has produced underlying data from this dashboard to Plaintiffs.

**Finance dashboards**.  The Special Master expressed an interest in "internal reporting and analysis of how . . . display ads are performing, from a financial perspective." Hr'g Tr. 55:10-16 (Feb. 22, 2024).  Google's deponent also identified certain dashboards and tools that were commonly used by the finance team.  Ex. A 15:15-25, 19:6-7.

### B. Plaintiffs' Questioning Went Far Beyond the Proper Scope of the Deposition.

Plaintiffs' questioning was engineered to generate the dispute they are now litigating. Rather than providing a foundation for further discussions, Plaintiffs quizzed the deponent in the hopes of finding questions he could not answer.  Among other things, Plaintiffs asked:

- Whether the deponent had investigated the principal fact patterns underlying Plaintiffs' DTPA claims in their Fourth Amended Complaint.  *Id.* at 61:18-65.3;

- Whether the deponent was familiar with a list of 97 "go" links selected by Plaintiffs' counsel that Plaintiffs did not supply to Google in advance of the deposition.  *Id.* at 73:2-21;

- Whether the deponent was "aware of any errors" in a 32 page slide deck that he did not author or receive.  *Id.* at 43:12-13; and

- Whether the deponent had "any reason to doubt" whether certain facts about "Experiment 42" were true, without any context as to "Experiment 42" other than a reference to the phrase "Experiment 42" itself.  *Id.* at 43:25-44:16.

After filing their Brief, Plaintiffs told Google that, in their view, a properly prepared witness should have undertaken their own independent analysis of the patterns of conduct alleged in the Fourth Amended Complaint, as well as investigation of the various teams within Display Advertising with a particular focus on the "gTrade Team."  But none of those issues are evident on the face of the Special Master's Order, and Plaintiffs did not communicate any of these expectations to Google in advance of the deposition.[5]

---

[5] The meet and confer that took place after the deposition (and after the filing of their Brief) was short:  Plaintiffs took the position that "it seems that the parties are pretty far apart."

**FILED UNDER SEAL**

### C. The Dashboards Cannot be Produced in a Secure Clean Source Code Room Under the Terms of the Governing Confidentiality Order.

Plaintiffs' examination of Google's deponent entirely overlooked the extent to which dashboards can, in fact, "be made available and produced by Google in a secure source code room." ECF No. 265 at 6; *see also* ECF No. 182 at App'x B ¶ D (10) (outlining the procedure for making such information available "without Internet access or network access to other computers" on a "secured computer"). It was only when Google questioned the deponent that it became clear it would not be feasible for Google to make dashboards available in the kind of "secure source code room" contemplated by the governing Confidentiality Order. Ex. A 90:11-91:15. That is because it is not possible to view Google's dashboards without access to the broader Google network and proprietary architecture, and because it is not possible to view all dashboards without appropriate permission to access the underlying data sources that serve as the inputs to those dashboards. *Id*. And although Plaintiffs, in their Brief, acknowledge that permissions are an issue, they omit the fact that nobody within Google would have permission to access all of the data that Plaintiffs now seek. *Id*. at 94:24-25.

Though Plaintiffs failed to ask, Google's deponent also testified that if the underlying data existed outside of Google's systems—as it does here because Google has produced 200 terabytes of data in response to Plaintiffs' RFPs[6]—that a dashboard to view slices of this data can be easily created with standard and widely-available tools. *Id*. at 92:16-25. In other words, if Plaintiffs want to view a particular subset of the data Google has provided, they may already do so.

---

[6] This includes custom transaction-level datasets that do not exist in the ordinary course of business. Developing the bespoke pipelines to produce these datasets required work from more than 20 Google engineers over the course of nearly six months.

### D. Proposed Next Steps.

Google cannot make live dashboards available for inspection under the terms of the governing Confidentiality Order because that Order provides that any information be made available "in a secured, locked room without Internet access or network access to other computers" on a "secured computer." ECF No. 265 at 6; *see also* ECF No. 182 at App'x B ¶ D (10). But Google remains willing to meet and confer regarding alternative methods of obtaining discovery of dashboard information that are consistent with the protections and procedures specified by the Confidentiality Order. The Special Master should direct Plaintiffs to participate in that meet and confer process.

The Special Master should deny Plaintiffs' various other requests for relief because they have not yet engaged in good faith meaningful discussions with Google as required. "Local Rule CV-7(h) requires the meaningful engagement of opposing counsel before opposed motions are filed." It is not, as Plaintiffs seem to think, "'a perfunctory obligation.'" *Encore Wire Corp. v. Copperweld Bimetallics, LLC*, 2023 WL 123506 (E.D. Tex. Jan. 6, 2023) (Jordan, J.) (denying motion because party filed before the scheduled meet and confer in a violation of Local Rule CV-7(h)) (quoting *Morrison v. Walker*, 2014 WL 11512240, at *2 (E.D. Tex. Dec. 2, 2014)).

## II. THE STATES' 30(b)(6) NOTICE.

Plaintiffs assert that the parties are at an impasse with respect to Plaintiffs' 30(b)(6) deposition notice. Br. at 5-6. But the first meet and confer regarding Plaintiffs' juggernaut 107 topic Notice occurred on Friday. The parties made it through the first 20 topics—which Plaintiffs had identified as their priorities—but have yet to discuss the remaining 87 topics. At the first meet and confer last week, Plaintiffs were not prepared to discuss, clarify, or narrow their own poorly drafted "priority" topics and conceded that they would need to come back to Google with further details of what they were really seeking through their "priority" topics.

**FILED UNDER SEAL**

On Tuesday, and without providing the additional detail of the information they seek through their 30(b)(6) deposition notice, Plaintiffs emailed Google to say that "[w]e have declared an impasse for a pretty simple reason – there is one." Then they filed this Brief improperly asking for relief from the Special Master even though the parties are in the midst of discussing what the Plaintiffs are even asking for. *See TRPX Res. LLC v. Hill*, 2023 WL 5321087, at *1 (E.D. Tex. July 25, 2023) (denying motion where party only e-mailed opposing counsel and did not engage in a personal conference to discuss basis of opposition). Plaintiffs also demanded written objections rather than further live meet and confers. At Plaintiffs' request, Google will be providing detailed responses and objections and making an offer to resolve Plaintiffs' "priority" topics. There is currently no ripe dispute.

**III.   THE STATES' REQUEST FOR SOURCE CODE.**

Google made source code available to Plaintiffs in July 2023. On January 16, 2024, Plaintiffs raised, for the first time, specific issues with the scope of code available. On February 16, 2023, Google offered to make available (1) one additional source code snapshot on a date of Plaintiffs' choosing, and (2) certain source code files and directories. ECF No. 246-12 at 1. Google asked Plaintiffs to confirm "[their] preferred date for the snapshot." *Id*. at 2. And Google informed Plaintiffs that it would "collect and make available the files and directories at the time of each source code snapshot already made available to Plaintiffs and at the time of the additional source code snapshot of Plaintiffs' choosing." *Id*.

Plaintiffs did not respond to Google's offer before the February 22 Conference. At the Conference, the Special Master stated that "Google is open for further conversation and further access to the source code" and "encourage[d] the States to engage on that." Hr'g Tr. at 96:20-23 (Feb. 22, 2024). The Special Master further stated that the parties should "make as much progress by agreement" as possible, and only "come back to the Special Master . . . after [the

8

parties] really worked hard in good faith on the source code." *Id*. at 96:25-97:3.

Plaintiffs did not engage. Having heard nothing of substance from Plaintiffs, on March 5, 2024, Google confirmed that it would make available additional directories to supplement its February 16 offer. Ex. D. And Google reminded Plaintiffs that the ball was in their court to "select the date of the additional source code snapshot that we offered on February 16." *Id*.

Just a little over three hours later, Plaintiffs declared an impasse and told Google that they would raise these issues with the Special Master. Ex. E. *See Bowie v. Martin Transp., Inc.*, 2015 WL 12832561, at *1 (E.D. Tex. Apr. 23, 2015) (Gilstrap, J.) (denying motion where parties did not confer until after motion was filed but made "belated progress").

Google has made clear that it is not obliged to provide source code on a piecemeal basis at Plaintiffs' whim. The Court has ordered that Google need only make source code available on a single secured computer without Internet access or network access to others computers. *See* ECF No. 182, App'x B at ¶ D (10). To make its source code available for inspection, Google must identify and collect the relevant code, download the code from their internal system, upload the code onto the source code laptop, and transport the source code laptop by hand to a secure room. Google will promptly do that once the remaining issues, described below, are resolved.

**Bernanke Initial Implementation**. Six weeks ago, Google agreed to make an additional snapshot of code available on a date of Plaintiffs' choosing. When chased by Google, Plaintiffs complained about having to guess the date and demanded a stipulation that "no unproduced versions of source code contain any differences material to the claims at issue in this case." Ex. B. Google then suggested a date which Plaintiffs have since agreed to. Plaintiffs now seek "any implementations of Bernanke that contain material differences from the produced versions." If

9

**FILED UNDER SEAL**

Plaintiffs have specific concerns after reviewing the code, Google agrees to meet and confer.[7]

**Files in the "public" subfolder.** Google has confirmed that most of the files from Plaintiffs' request are available in the public domain. Ex. B. Google is investigating whether it is able to make available the few remaining non-public files and will promptly notify Plaintiffs once it has confirmation. Ex. C

**"Log" files allegedly relevant to Bernanke.** Google has reviewed Plaintiffs' requests for these additional files and directories and has determined in good faith that the code and source code files it has already produced or agreed to provide addresses Plaintiffs' requests. Ex. C. Google remains available to meet and confer.

**Bernanake SSTable experiment files and Cassandra software**. Google continues to believe that Bernanke experiment files—which are stored in SSTables and are not source code—are not relevant to this dispute. Google has nevertheless tested the viewing software requested by Plaintiffs but it did not work because of file format compatibility issues. Ex. C. Google has offered to meet and confer with Plaintiffs on Tuesday, March 19, 2024, on alternative methods of making available the SSTable files for Plaintiffs' review, in an effort to work together to resolve this issue before the Conference before the Special Master scheduled for March 21, 2024. Ex. C.

**Bell**. Google has consistently maintained that Plaintiffs already have access to the source code for Project Bell, including code to "execute Project Bell." Plaintiffs' assertion that Google has done so "without evidence," Br. at 9, is wrong. *See* Ex. C. Plaintiffs' confusion stems from the fact that the hypothesized version of Bell that Plaintiffs are searching for does not exist (and never has). Google has directed Plaintiffs to the code implementing Bell. *Id.*

---

[7] We do not address Plaintiffs' remaining contentions regarding preclusion because, ordinarily, neither side can rely on material that is not produced in fact discovery absent good cause shown.

**FILED UNDER SEAL**

Dated: March 15, 2024

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com

Eric Mahr (*pro hac vice*)
FRESHFIELDS BRUCKHAUS DERINGER LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
(202) 777-4545
eric.mahr@freshfields.com

ATTORNEYS FOR GOOGLE LLC

**FILED UNDER SEAL**

**CERTIFICATE OF SERVICE AND SEALING**

I certify that, on March 15, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).  I also certify that, on March 15, 2024, a motion to seal the foregoing document and its exhibits was filed separately and before the filing of this document under seal, per Local Rule CV-5(a)(7)(B).  This sealed filing will be promptly served by email with a secure link on counsel of record for all parties in this case, and will be publicly filed in redacted form per Local Rule CV-5(a)(7)(E).

*/s/ R. Paul Yetter*
R. Paul Yetter
