```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE EASTERN DISTRICT OF TEXAS
 2                              SHERMAN DIVISION

 3   THE STATE OF TEXAS, et al,        §
                                       §
 4                    Plaintiffs,      §
                                       §
 5        vs.                          §        Case No.:
                                       §        4:20-cv-00957-SDJ
 6   GOOGLE, LLC,                      §
                                       §
 7                    Defendant.       §

 8
                            MOTIONS TO DISMISS
 9                      TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE SEAN D. JORDAN
10                    UNITED STATES DISTRICT JUDGE

11                 Thursday, April 18, 2024; 1:37 p.m.
                              Plano, Texas
12

13   APPEARANCES OF COUNSEL:
     (Continued on page 2.)
14
     FOR THE PLAINTIFF STATES:
15
     Zeke DeRose, III
16   THE LANIER LAW FIRM, PC - Houston
     10940 W. Sam Houston Parkway N.
17   Suite 100
     Houston, Texas 77064
18
     Jonathan P. Wilkerson
19   THE LANIER LAW FIRM
     6810 Cypress Creek Parkway
20   Houston, Texas 77069

21

22        *********************************************

23                    GAYLE WEAR, RPR, CRR
                   Federal Official Court Reporter
24                      7940 Preston Road
                       Plano, Texas 75024
25              gayle_wear@txed.uscourts.gov
```

```
1    FOR THE PLAINTIFF STATES:
     (Continued from page 1.)
2
     Ashley C. Keller
3    Daniel Backman
     KELLER LENKNER LLC
4    150 N. Riverside Plaza, Suite 4270
     Chicago, Illinois 60606
5
     Geraldine W. Young
6    NORTON ROSE FULBRIGHT US LLP - Houston
     1301 McKinney, Suite 5100
7    Houston, Texas 77010-3095
8    John W. McBride
     NORTON ROSE FULBRIGHT
9    1045 W Fulton Market, Suite 1200
     Chicago, Illinois 60607
10
     James Lloyd
11   Trevor Young
     STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL
12   ANTITRUST DIVISION
     300 W. 15th Street
13   Austin, Texas 78701
14   FOR THE DEFENDANT:
15   R. Paul Yetter
     Mollie Bracewell
16   YETTER COLEMAN, LLP - Houston
     811 Main Street, Suite 4100
17   Houston, Texas 77002
18   Eric Mahr
     FRESHFIELDS BRUCKHAUS DERINGER US LLP
19   700 13th Street NW
     Washington, DC 20005
20
     Robert John McCallum
21   FRESHFIELDS BRUCKHAUS DERINGER US LLP
     601 Lexington Avenue
22   New York, New York 10022
23   Justina Kahn Sessions
     KEKER, VAN, NEST & PETERS LLP - San Francisco
24   633 Battery Street
     San Francisco, California 94111
25
```

```
1    ALSO PRESENT:

2         David T. Moran, Special Master
          JACKSON WALKER LLP - Dallas
3         2323 Ross Avenue, Suite 600
          Dallas, Texas 75201
4
          Roger P. Alford
5         UNIVERSITY OF NOTRE DAME
          3119 Eck Hall of Law
6         Notre Dame, Indiana 46556

7         Lauren Vaca
          Sara Salem
8

9                           *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   April 18, 2024                                    1:37 p.m.

 2                        ---o0o---

 3                   P R O C E E D I N G S

 4                        ---o0o---

 5        THE COURT:  Good afternoon.  You can be seated.

 6        MR. YETTER:  Good afternoon, Your Honor.

 7        THE COURT:  All right.  We're back this afternoon

 8   on cause number 4:20-cv-957, The State of Texas, et al versus

 9   Google, LLC.  And we're here on two dismissal motions this

10   afternoon.  We're here on two dismissal motions this

11   afternoon.  We have a 12(b)(1) motion, filed by Google, and a

12   12(b)(6) motion.  As I advised you all this morning, we're

13   going to take up the 12(b)(1) motion first.

14        I didn't mention it this morning but as with all

15   our hearings, we also have our audio-only feed going out so

16   the public is able to hear this hearing.

17        And so we've already had appearances from counsel

18   this morning, but why don't I get appearances for these

19   motions for who's going to argue for the plaintiffs and who's

20   going to argue for Google.

21        MR. KELLER:  Good afternoon, Your Honor.  Ashley

22   Keller.  I'll be arguing both motions for the plaintiffs.

23        THE COURT:  Thank you.  And for Google?

24        MR. MAHR:  Good afternoon, Your Honor.  Eric Mahr.

25   I'll be arguing the 12(b)(1), and my colleague, Ms. Sessions,
```

1    will be arguing the 12(b)(6).

2        THE COURT:  All right.  So since these are Google's

3    motions, Mr. Mahr, we're on the 12(b)(1), and you will be

4    able to provide your argument.

5        What I'm going to do is set about 20 minutes for

6    each side, generally.  But if we need more time for

7    questions, we'll just go forward as long as we need to.  But

8    at least for initial presentation, I want to give each side

9    20 minutes.  I'll have Ms. Sanford keep an eye on that for

10    me.

11        I will note that I've read all of the submissions

12    of the parties.  And so, Mr. Mahr, you can proceed at this

13    time.

14        MR. MAHR:  Thank you, Your Honor.  And I, just to

15    admit -- mention, in the beginning, that because I have a

16    deposition in this case in New York starting tomorrow

17    morning, I may be leaving before the end of the second

18    motion.  But I will be sure to stay here for the motion I'm

19    arguing.

20        THE COURT:  Understood.

21        MR. MAHR:  So we've been spending a lot of quality

22    time together today, maybe intense quality time, and I

23    thought in the spirit of peace, collegiality, and good

24    fellowship, I'd start my argument with what I think we agree

25    on.  Both sides agree that Plaintiff States are bound by

1    Article III standing requirements just as any other party.

2    And both sides agree to the States' ability to maintain this

3    case in federal court, it depends on their ability to

4    establish Article III standing with respect to their federal

5    antitrust claims.

6              Both sides have to agree that to establish Article

7    III standing, the States must show injury, an injury in fact,

8    that is fairly traceable to the conduct complained of and

9    redressable by favorable judicial decision.  And I don't

10   think either side contests that injury in fact, according to

11   the Supreme Court, means, quote, an invasion of the legally

12   protected interests which is concrete and particularized and

13   actual or imminent, not conjectural or hypothetical.

14             And finally, we agree that the States here are

15   asserting two types of injury in fact, a direct injury to

16   their sovereign interests, sovereign standing, and injury to

17   their claimed quasi-sovereign interests parens patriae.  So

18   that's something.  We agree on that much.

19             But we then part ways, and I'm going to focus on

20   three ways we part ways.  The first is not really a legal

21   issue per se, but we think it's a really important part of

22   the context for this motion.  And there was a lot of

23   discussion in the briefs about it, but we think it's

24   important to address, and I'll try to be brief, the States'

25   inability over the last six months to articulate the capacity

1    in which they're coming before this Court.  And I think that

2    failure is telling because we have OAGs from 17 states, we

3    have excellent, five or six, firms representing them outside;

4    they have had three years and five complaints and a year-long

5    investigation; and yet, still we're having shifting

6    representations about how they're -- in what capacity they're

7    appearing.  And I'm not talking about interrogatory answers,

8    about remedies.  I'm talking about statements in this Court.

9            You will recall, in November, I asked plaintiffs to

10   state for once and all in what capacity they were bringing

11   this action, and Mr. Lanier stood up and said, "parens

12   patriae.  All of the above"; Google knows this.  And then

13   just three weeks later, he told you that actually only 5 of

14   the 17 states were coming under parens patriae.  And he went

15   further than that and told you that "Mr. Mahr complains

16   because of the parens patriae issue and the way we have

17   narrowed and ferreted that down.  And we have.  We have been

18   very careful.  Now, Texas at this point has a policy in the

19   AG's office where they are not pursuing things," like this,

20   "under parens patriae," end quote.

21           And we asked plaintiffs for a copy of that policy,

22   and got none.  Apparently doesn't exist.  It didn't exist

23   because, weeks later, all of the States are back to parens

24   patriae.

25           So at the end of the day, you know, I think all

 1    that really matters is that in the complaint they allege

 2    sovereign standing and quasi-sovereign interests parens

 3    patriae.  So all of this switching back and forth, we'll

 4    stick with the complaint, but I think it really does show the

 5    extent to which this has been a moving target in this case.

 6    And I'll tell you a little later why we think that matters.

 7            I'm going to take the sovereign standing first, of

 8    the two.  And we all agree that sovereign standing is a

 9    direct interest to -- injury to sovereign interests which are

10    defined in *Snapp* as the state's interest in the creation of

11    enforcement of the legal code and the failure of another

12    sovereign to respect the state's sovereignty, such as might

13    arise concerning the main recognition of borders.

14            The state -- the Fifth Circuit recently made clear

15    in *Jefferson Parish* that that goes well beyond kind of a

16    violation of its code, this interest in the code, and it's

17    not just a violation of the law; it's an encumbrance on that

18    violation.  And I don't take the plaintiffs as suggesting

19    that they've been encumbered in enforcing their state code.

20    That's the first prong.  I also don't see them, as allegedly

21    Google has, encroached the riparian rights or threatened

22    their borders in any way.  We searched the complaint

23    diligently and found nothing.  So we, therefore, think

24    sovereign is out.

25            And I'm not sure, reading the brief, whether

1    they've even intended to assert a sovereign interest.  But I

2    think it's important in this case that the Court very

3    carefully pick apart the various bases for Article III injury

4    in the case and rule on each of them.  And we think that's

5    important because, for one thing, as I just said, previously

6    the States said that they were abandoning their parens

7    patriae claims, and now they're back.  And we don't know

8    whether that will change again in the future.

9           And I think that's another -- another important

10   aspect of this is we think the States have used their federal

11   antitrust claims in this case primarily, if not exclusively,

12   as a jurisdictional tool to choose the forum they wanted.

13   They've used it to open the door to this Court to this kind

14   of tangled array of DTPA claims, which all have slightly

15   different requirements in terms of scienter and in terms of

16   what kind of conduct is violative and not.

17          And it appears to us the goal now is to try to kind

18   of reinvent this antitrust case as a DTPA case and, as

19   Mr. Yetter spoke about earlier today, a concern that that's

20   going to result in this last-minute effort to extend the

21   discovery deadline that we've worked very diligently to meet,

22   to do all this DTPA discovery on what started out as

23   primarily an antitrust case.

24          And we've seen this use of the antitrust -- the

25   federal antitrust laws as a jurisdictional tool back when

1    Google filed its petition to the judicial panel on the

2    multi-district litigation.  Because, if you recall, in

3    response, when we filed that motion, the States threw their

4    damage claims under Section 4C of the Clayton Act overboard

5    because under the MDL statute as it was then, before it was

6    recently amended, the MDL statute expressly allowed damages

7    actions under 4C to be consolidated for trial, not just

8    centralized.  And they didn't want that.  They wanted to stay

9    in the jurisdiction they picked, so they threw their damages

10    claims over.

11         And we think, you know, that kind of speaks to the

12    idea that this quasi-state or sovereign interests that they

13    claim in recovering damages on behalf of citizen consumers is

14    a little bit of a specious claim, especially since they can

15    get all the relief they seek under their own state laws.

16         So all of this to say, as I move on to discuss

17    quasi-sovereign injury, the States' claim they need a federal

18    forum to seek solely injunctive relief that is equally

19    available under their own laws rings a little hollow to us.

20         So turning to quasi-sovereign interests.  First,

21    the test.  And just in the last year, as you know, the Fifth

22    Circuit has really paid a lot of attention to this particular

23    prong of Article III standing.  And first, in *Louisiana*

24    *Fisheries* the Fifth Circuit identified two related but

25    distinct quasi-sovereign interests that the state has in the

1   well-being of its populace.  First, a quasi-sovereign

2   interest in the health and well-being, both physical,

3   economic, of its residents in general; and second, a

4   quasi-sovereign interest in not being discriminatorily denied

5   its rightful status within the federal system.

6          Again, I think we could easily dismiss the second

7   one concerning the discriminatory denial of rightful status

8   within the federal system.  But I do think it's important to

9   walk through these sovereign points and that prong of the

10  individual points because we're really getting down to --

11  well, first of all, that emphasizes the importance of kind of

12  federalism concerns in parens patriae entreating the federal

13  court, number one.  But we're really getting down to one thin

14  reed left for them, and that is the question about whether

15  they have the sovereign -- quasi-sovereign interest

16  recognizable here in the health and well-being, both physical

17  and economic, of their residents in general.  And that's

18  where *Harrison* comes in.

19         *Harrison* focuses very much on just that prong.  And

20  the Fifth Circuit in *Harrison* makes very clear from the

21  beginning that consistent with the Supreme Court's decision

22  in *Snapp*, this issue of Article III standing needs to be

23  taken very seriously.  It explains that *Snapp*, and in *Snapp*,

24  the Supreme Court imposed two what the Fifth Circuit calls

25  hard and fast limits on parens patriae.  And I read this as

1  confirming that the irreducible minimum for Article III

2  standing is not a subject that's important for a kind of

3  superficial hand-waving analysis but, frankly, I think you

4  see in a lot of these district court cases out of the circuit

5  that have been cited where it's not given the kind of

6  attention and care that we see in the Fifth Circuit given it

7  in *Harrison* and what I'm calling the *Louisiana Fisheries*

8  case.

9          For example, just take the *Microsoft* case.  The

10  district court there took the view that the case had already

11  been tried.  It went up to the court of appeals, came back to

12  the district judge, and she took the view that the court of

13  appeals, having reviewed and ruled on the earlier opinion in

14  the case, must have by necessary implication considered its

15  subject matter jurisdiction and determined *sub silentio* that

16  it had jurisdiction.  And I think if there's a message from

17  *Harrison*, it's that Article III standing under parens patriae

18  is not to be addressed *sub silentio* or by implication, but it

19  imposes hard and fast limits that must be carefully

20  considered and enforced.

21          In fact, at page 759, the Fifth Circuit says,

22  quote, "For parens patriae suits, States must do more than

23  meet Article III's irreducible minimum.  They must assert a

24  quasi-sovereign interest apart from the interest of" private

25  parties -- of "particular private parties."  And I know the

```
1    Court is well familiar with these cases, but I do think it's
2    worth --
3              THE COURT:  Right.  Speaking of the case you were
4    just talking about, you were talking about New York v.
5    Microsoft; is that correct?  That's the one you --
6              MR. MAHR:  Yes.
7              THE COURT:  -- were just talking about that had
8    come back down.  So if I'm right, that's 209 F.Supp2d 132.
9    That's the one you're talking about?
10             MR. MAHR:  Yes, on --
11             THE COURT:  Yeah.  So it does seem to me that
12   judge said a little bit more than what you just referenced,
13   though, about parens patriae standing, did she not?
14             MR. MAHR:  She said a little bit more, but I think
15   in the end, what kind of -- and I think this is a kind of a
16   characteristic of each of these cases that there are a lot of
17   circumstances that come together that result in a particular
18   ruling, and none of those circumstances are clear.
19             THE COURT:  I'm going to come back to that case
20   with you --
21             MR. MAHR:  Okay.
22             THE COURT:  -- and some others.  So you can
23   continue.
24             MR. MAHR:  Okay.  So as I say, the kind of
25   analysis, and there might be a lot of kind of -- I read those
```

```
 1    cases -- and we'll talk about them individually, of course,
 2    if you want to -- but as a lot of common sense practicality,
 3    that the case has been tried, it's gone up, it's come back.
 4    The Court of Appeals looked at it.  Those guys are smart.
 5    They wouldn't look at it if it didn't have subject matter
 6    jurisdiction, implicit *sub silentio*.  And other courts do
 7    this all the time.  So we'll just let it go.  And that's,
 8    again, the kind of what I'll call hand-wavy, this happens all
 9    the time, that I think the plaintiffs are asking you to do
10    here.  And instead, I think the Fifth Circuit has said in
11    these last two cases, no, not with respect to injury in fact,
12    in particular, when quasi-sovereign interests are at stake.
13    So going back to the *Harrison* court.
14              And do you call it *Harrison* court or *Jefferson*
15    *Parish*?
16              THE COURT:  I'm happy to go with whichever, however
17    you want to refer to it.
18              MR. MAHR:  Okay.  I'll call it *Harrison* because
19    there's another *Jefferson Parish* antitrust case, and I don't
20    want to get them mixed up.
21              So in Harrison, the Fifth Circuit said to invoke
22    parens patriae, a state must show that this quasi-sovereign
23    interest is sufficiently concrete to create an actual
24    controversy between the state and the defendant.  And that
25    was the issue there.
```

1          The second prong is does it affect enough people.

2    And that was not as big of a point in the -- in the *Harrison*

3    case.  And I don't think it's big as a point, at least of our

4    focus, in this case either.  As in *Harrison*, we focus on this

5    first prong of what is a conjunctive set of hard and fast

6    limits.  And the Fifth Circuit tells us three things about

7    this quasi-sovereign interest in the well-being.

8          First, it has to be articulated apart from the

9    interests of particular private parties.  Second, the Court

10   explains at 773, present in *Snapp* but missing here is an

11   injury that emanates outside the state's authority.  It's

12   something the state can't get to on its known, so it needs to

13   be resorting to the federal court.  And third, relatedly, the

14   Court talks about how, quote, "The vindication of Puerto

15   Rico's interest in protecting its citizens against

16   discrimination from a state could only occur in federal

17   court, and no such federalism concern was present in

18   *Harrison*."  And it identified that as an important factor.

19         And I'll take those in reverse order and apply them

20   to this case.  Obviously, you don't have a federalism concern

21   here that could only be addressed in this federal court.

22   Google's alleged conduct, if it violates the federal law, it

23   violates the state laws that are based on that federal law.

24   And so no state claims if there's any material difference,

25   and no state claims that it could not obtain the same

1    injunctive relief in its home state court that it can -- it

2    seeks under the federal antitrust laws.

3            There might be an exception with Arkansas that

4    Ms. Sessions will talk about.  But by and large, that answers

5    the next factor, too, that there's no injury here that

6    emanates outside of the state's existing state sovereign

7    authority.  It already has the ability to do everything it

8    needs to do with respect to this alleged conduct under its

9    own laws -- each state does.  So they don't, therefore,

10   require any access to the federal courts like in -- like

11   *Harrison* explains was important in *Snapp*, is it important in

12   general in this area.

13           So I think those two failings are enough alone

14   under *Harrison* and *Snapp* to close off the quasi-sovereign

15   parens route to standing in this case, but the remaining

16   factor further underscores and supports that result.  As we

17   read the complaint, the States' attempt to assert the

18   injuries of three different sets of private parties as the

19   bases for their own injury in fact.  Two groups, they're

20   almost the same -- at least how we treat them -- publishers

21   and advertisers, and that's what you see across the

22   complaint, even in the brief.  Every mention of harm --

23   nearly every mention of harm says publishers and advertisers;

24   publishers paid more, advertisers paid more.  And then the

25   third group is this amorphous group of citizen consumers of

1    goods and services in each of the 17 states.

2         And I think it's a little bit of a three-bear

3    situation where one's too hot and the other's too cold.

4    Publishers and advertisers, that seems paradigmatically

5    private interests that don't become state interests just

6    because the state jumps in.  The publisher/advertiser

7    interests are purely commercial, and they're being vigorously

8    pursued in the Southern District of New York by very

9    competent class counsel, and individual cases.  They don't

10   need the States' help in those cases.  And, in fact, having

11   those claims addressed here -- publisher and advertiser harm

12   addressed here while it's also being addressed in the

13   Southern District of New York, if anything, creates a risk of

14   conflicts and inefficiencies.

15        So that brings us to too-cold, citizens of --

16   citizen consumers of goods and services.  Without limitation,

17   this means anyone who bought anything in Texas or Alaska or

18   Arkansas, or any of the other states, is part of this citizen

19   consumers of goods and services.  This is the antithesis of

20   the kind of concrete and particularized injury in fact

21   required.  It's hypothetical, abstract.  And it's completely

22   contingent on the competitive contentions existing in each of

23   the 17 states for each of the goods and services that these

24   citizen consumers buy.  They just kind of assume that there's

25   been a pass on of whatever overcharge they alleged took place

at the digital advertising level, and that's been passed on

to someone who buys a toaster in Puerto Rico.  And you can't

make that supposition without looking at the market for

toasters and see whether toaster producers and toaster

sellers even have the ability to pass on costs.

Pass on doesn't happen automatically.  You have to

have some level of ability to pass on those costs.  And you

have to do that for literally every single product or goods

and services purchased by anybody in these 17 states in order

to determine any kind of concrete injury.  And that, to me,

is just so hypothetical, theoretical, and abstract that it

can't substitute for the kind of concrete and particularized

answer -- harm that's required in *Harrison*.

So in the end, the States are claiming to have

suffered this concrete and particularized injury to a

quasi-sovereign interest, and that gives them an interest in

having a completely redundant claim for injunctive relief in

federal court, and they're then using that federal claim to

open the door to a raft of 17 different DTPA claims.

And now, as we look at the -- both the rulings in

the two Fifth Circuit cases, and in *Snapp* before that, we

don't think that's what *Harrison* envisioned or the Fifth

Circuit envisioned at all.  Again, the Fifth Circuit very

carefully laid out the requirements for parens injury in two

different cases just in the last year.  And in those cases,

1    the Court stressed hard and fast limits, required the States

2    to show more than Article III irreducible minimum and, in

3    particular, interests that implicate federalism concerns

4    resulting from harm that goes beyond what the States can

5    address themselves.  And that's why we think it's

6    inappropriate in this case.

7              THE COURT:  Thank you, Mr. Mahr.  I'm going to want

8    to visit with you a bit about some of these cases before we

9    hear from your friend on the other side, Mr. Keller.

10             So let's start with *Harrison*.  I think you have

11   aptly focused on a lot of very important parts of the

12   opinion, including standards that the Fifth Circuit laid

13   down.  In that case, as you know, we have a school board, and

14   you have the state coming in and saying the school board is

15   essentially not following state law.  And I think another

16   passage in that opinion that is telling about what was going

17   on in that case is what Judge Willett winds up with in Roman

18   IV where he says Louisiana essentially seeks to bring an

19   enforcement action in federal court against a subordinate

20   largely for violating state law.

21             And he says this is the same as the cases, the

22   Sixth and Seventh Circuit cases, that are discussed in the

23   opinion in both of which cases -- the Sixth Circuit one is

24   the *Saginaw* case -- similar claims failed.  And he then says,

25   "The federal courts do not sit to resolve injury or disputes

1    among state officials over the bounds of their authority

2    under state law," quoting another court.  And he says, "Why,

3    because it's not the role of the federal courts to govern the

4    states; that Louisiana stands fully capable and ready to

5    enforce its laws."

6          And so I think part of what he's saying is going on

7    there is you have a school board that's got a policy for,

8    what was it, roughly 50,000 students in the entire State of

9    Louisiana.  And so it seems to me that the state in that case

10   didn't have a very good case, certainly under parens patriae,

11   for something that a policy or a problem that was going to

12   affect a substantial part of the population; it was one

13   school board.  And the conclusion was that the state had not

14   met requirements for parens patriae standing.

15         As you know -- we will talk about the *Fisheries*

16   case.  The *Fisheries* case is at a different stage than this

17   case; it was at the summary judgment stage.  And as you will

18   recall, the parens patriae finding in that case turned

19   virtually entirely on the fact that Louisiana had failed to

20   come forward with evidence showing that the shrimp-fishing

21   industry in Louisiana had suffered any harm.  That was

22   basically the bottom line of that part of the parens patriae

23   part of the opinion.  As you know, in that case the state was

24   trying to assert some other grounds for standing.

25         So I think both of those cases are important and I

```
 1    do think they're important in setting parameters for this
 2    Court's analysis.  And I agree with you that the Fifth
 3    Circuit is certainly articulating that, as you put it, we
 4    don't want to be doing a hand-waving analysis of these
 5    issues.  But I do want to ask you about three cases, one of
 6    which you touched on, that I think I'd like to hear what you
 7    have to say about them.
 8              The first one is the New York v. Facebook case.
 9    I'm just going to say D.D.C. for this; it's obviously Federal
10    Court District of Columbia.  This is a case where you have a
11    coalition of 46 States suing Facebook for antitrust
12    violations under the Sherman Act.  And as you know, in that
13    case the Court found that parens patriae standing was
14    present.
15              And I'm going to just quote to you from part of the
16    opinion.  At page 23, the Court says that "Plaintiffs have
17    properly pleaded sufficient injury to the quasi-sovereign
18    interests in the economic well-being of their states.  Their
19    Complaint alleges that Facebook has prevented, through
20    anticompetitive means, the emergence of viable competitors to
21    its monopoly and Personal Social Networking Services.  As a
22    result, millions of Plaintiffs' citizens have experienced
23    'reductions in the quality and variety of privacy options and
24    content available to them in the market,' which is to say
25    that, on the States' theory, millions have experienced a rise
```

1    in the effective price of using Facebook."  It also then goes

2    on to talk about effects on small and medium businesses.

3           The Court then says, and it says, "Although these

4    allegations are a shade vague, the Court finds them enough to

5    at least satisfy the pleading requirements for *parens patriae*

6    standing in the context of asserted antitrust violations."

7           And if you'll bear with me, I'm going to go through

8    each of these cases and then have you comment because I think

9    there's at least some similarities among them, and I would

10   rather you hear all of them and then comment.

11          MR. MAHR:  Appreciate that.

12          THE COURT:  The second one is one you alluded to,

13   again out of the DDC, the District of Columbia federal court,

14   the *New York v. Microsoft* case.  This is a case that, as you

15   know, has got a rather complicated procedural history.  You

16   have 19 states.  You get a judgment that goes up to the D.C.

17   Circuit, it comes back down.  And you have I believe it's

18   nine litigating States that haven't settled, and you have

19   *Microsoft* challenging their standing under *parens patriae*.

20          And this is the one where I think you talked about

21   the district court maybe not saying that much, but I will

22   note that there is -- you know, there's a few pages of

23   analysis from, you know, about four to five pages total I

24   think, and the Court does note a couple of things that I

25   think bear on some of the points you were making, one of

which is that in that case *Microsoft* I think at two levels

was pointing to the fact that there is a problem when you

have a number of states alleging the same kind of injury;

it's like this isn't sufficiently specific to that state.

And the Court at two levels rejects that argument.  It

rejects it at the Article III level, at footnote 22, noting

that "For Article III purposes, the breadth of the injury

among the several states is not relevant as limitations on

the claims for broadly felt injuries are not constitutionally

based."

        The Court also rejects that argument, I'm going to

call it sort of the prudential standing level, and says the

following:  "While certainly a state alleging injury must

establish that its own citizens have suffered some injury,

none of the cases cited by *Microsoft* hold that *parens patriae*

standing should be denied where the injury is felt by the

citizens of other states."  It then cites a number of cases.

        "Indeed, such a requirement is undermined by the

Supreme Court's acknowledgment in *Hawaii v. Standard Oil*

that, quote, 'the United States government, the governments

of each state, and any individual threatened with injury by

an antitrust violation, may all sue for injunctive relief

against violations of the antitrust laws, and they may

theoretically do so simultaneously against the same persons

for the same violations.'"  And, of course, that is quoting

1    directly from the United States Supreme Court.

2              It goes on and provides -- it says, "Moreover, if

3    the Court agreed with Microsoft's reading of the law, a

4    state's right to bring suit as *parens patriae* under the

5    Clayton Act would be nullified where the harm sweeps broadly

6    across the states.  In such a situation, the individual

7    states would have to rely solely upon the federal government

8    to bring suit to cease the harm.  This result runs contrary

9    to the well-established principle that suits by a state

10   *parens patriae* have long been recognized.  There is no

11   apparent reason why those suits should be excluded from the

12   purview of the Antitrust Act."  So this is all from that

13   opinion.

14             And then on the next page, the court walks through

15   why it believes there was sufficient, if you will, injury

16   that was brought out in the case.  And the conclusion is, "At

17   a minimum, this is a case where the direct impact of the

18   alleged wrong is felt by a substantial majority, though less

19   than of all the state's citizens, so that the suit can be

20   said to be for the benefit of the public."  I'm not giving

21   you the whole paragraph; that's partially because there are

22   several opinions preceding this that talk about the Microsoft

23   products, et cetera, et cetera, that are involved.  I know

24   you're well familiar with that.  And so that's another case

25   that I think I would like to hear you address.  But I am

1    going to put a finer point on this in a moment in terms of

2    this case compared to the cases I'm talking to you about.

3           The other case -- and these I think are all cases

4    probably cited by both parties.  I know they're cited by the

5    States.  The other one is the *In Re Electronic Books*

6    antitrust litigation out of the Southern District of New

7    York.  And again this is a case where you have a coalition of

8    states suing for federal antitrust violations.  This is one

9    that includes Apple, and I think Apple is the only remaining

10   defendant.  And Apple, I think rather late in the game after

11   getting an adverse decision, came back and said, Wait a

12   minute, there's no standing; they don't have *parens patriae*

13   standing.

14          As you know, the Southern District of New York

15   disagreed.  And in that case, it had to do with I believe

16   some price fixing on books, and the Court's ultimate

17   conclusion was that there was a sufficient injury to the

18   residents, the citizens of the state, who were subject to

19   basically the effects of this price fixing, to support *parens*

20   *patriae* standing.  Again this is, you know, we have -- in

21   each of these, we have groups of states.

22          I will be asking Mr. Keller about this, because the

23   point you made that it seems to me gets to the heart of this

24   of the *parens patriae* issue is your point about the primary

25   entities affected, based on the conduct that's been alleged

1    against Google, are publishers, advertisers, others in this

2    industry, but the Plaintiff States have alleged, as you've

3    noted, that the harm goes beyond that to the consumers.  And

4    so the question becomes are those allegations sufficient to

5    get them to *parens patriae* standing.  And what I mean by that

6    is are they sufficient to articulate a harm to enough of the

7    populace and that is not, if you will, too speculative --

8    we're at the motion to dismiss stage -- to support *parens*

9    *patriae* standing in this case.

10              And I will note that in the current amended

11   complaint you have, amongst the other portions of it,

12   paragraphs 502 to 525 go through in detail the

13   anticompetitive effects, and they don't just talk about

14   publishers, advertisers, et cetera.  They do have paragraphs

15   and sections that talk about the, if you will, the injury

16   that then resulted to consumers.

17              And so I'm not going to read you chapter and verse

18   of those -- I have a feeling we may hear some of that from

19   Mr. Keller, we may not -- but to me the question, the

20   important question here, is whether or not those allegations

21   of harm going through to consumers are sufficient.  It's not

22   the only question here.  But I would like to hear your

23   reaction to those three cases.

24              MR. MAHR:  That's a pretty straightforward, easy

25   one.  I think I'll try to take them all together.  And if you

1   want me to break them apart, I can, but -- and you'll know

2   this one.  The number one is those are out-of-circuit cases

3   decided before *Harrison*.  And I don't mean ignore them.  I

4   mean, I don't think they would be cited the same way in those

5   courts if those courts were bound by *Harrison*.  Judge

6   Boasberg, fantastic judge in the D.D.C., thoughtful judge,

7   was applying a 1976 case called *Kleppe*, which is kind of the

8   standard case in the DDC.  That's not the law in the Fifth

9   Circuit.  And these plaintiffs have fought mightily to change

10  the law in order to come back down here, and they should be

11  bound by the law that they've come to.

12          Secondly, very odd procedural postures in those

13  cases.  As you said, two were post trial.  One at the relief

14  stage, Apple; and one post appeal with Microsoft.  And I dare

15  say that judges can -- district court judges are often

16  practical as well as right on the law.  And I think, you

17  know, the idea that after these massive cases have been going

18  on, when all parties are in the federal court -- not in this

19  very unusual situation here where we have the same case,

20  because of the procedural transfers, same case pending in

21  three different districts -- here, Southern District of New

22  York, and Eastern District of Virginia.  In those cases,

23  everybody's in the same court.  And a lot of cases previously

24  said the states have an interest in enforcing the laws, too.

25  And I think that judges can be practical when everything

1    could be resolved at one time after trial, after appeals

2    courts.  And I just think that's something we have to

3    consider in those decisions.

4        I also -- I agree with you there's a number of

5    pages, in particular the *Facebook*, Judge Boasberg paid

6    attention to the issue.  Although, I think she pays a little

7    bit more attention to the number of people affected than the

8    nature of the injury in fact, which is where *Harrison* really

9    drills down; what is the nature of that injury in fact, in

10   that interest -- that quasi-sovereign interest.  Because the

11   rest of these cases just kind of say general interest in

12   protecting competition, that's enough and there are enough

13   people.

14       And I do think in *Microsoft*, though, she spent a

15   few pages on it at the end, the idea that the court of

16   appeals had already looked at this weighed heavily, as I read

17   her decision.  But you mentioned --

18       THE COURT:  Can I ask you a question?  I want to

19   ask you a question because you're talking about Fifth Circuit

20   precedent.  And I don't know that I'm reading the two Fifth

21   Circuit cases to be articulating any kind of new or different

22   standard, and I don't know -- I don't think you're saying

23   that, but I think they are applying Supreme Court decisions

24   like *Snapp* and that have been out there for a while, but

25   they're applying them to those particular circumstances.

1          So part of what I'm coming back to is I don't know

2     that those Fifth Circuit cases are breaking new ground so

3     much as they're saying we're going to rigorously apply the

4     standards that are here to the facts in our case.  And the

5     facts in the *Jefferson Parish* case I think are pretty clearly

6     not going to come close to meeting *parens patriae* standing

7     based on the circumstances there.

8          And then, you know, the *Fisheries* case is

9     interesting to me in one sense because, you know, there's

10    some discussion in that case about the motion to dismiss

11    stage, and this is being, you know, poured out at the summary

12    judgment stage.  And the notion there, which is interesting

13    to me, is it appears that there is implied acceptance from

14    the Fifth Circuit potentially that if the state had come

15    forward with evidence of harm to the shrimping industry in

16    Louisiana, they might have gotten to *parens patriae*.  I'm

17    saying that's not clear.  But the opinion basically says you

18    had your chance.  You put on no evidence of the shrimping

19    industry -- I mean, I can see the argument being is that

20    really -- is that significant enough to get you to *parens

21    patriae* standing, but it looks like the Fifth Circuit might

22    have said yes, if they had put on that kind of evidence.

23          And what I'm coming to is this case, in terms of

24    the factual background, the technology, what's at issue,

25    looks a lot more like the three cases I'm talking to you

1    about than it does the factual background of the two Fifth

2    Circuit cases.  Do you see my point?

3          MR. MAHR:  I do.  So to the general point you

4    mentioned first, I agree with you there's no new law here.

5    There is -- as I think courts of appeals do from time to time

6    say, there's been a drift since *Snapp.*  It's been 40 years.

7    And I think they actually go back and have a truer

8    application of *Snapp* than I think you see in these other

9    antitrust cases where they're saying it always works this

10   way; the states always sue; private parties come in.  We have

11   it all in one place.  Let's not rock the boat, let's keep

12   rocking with it.  People always say the magic words and we

13   let it go forward and solve the problem.

14         I think the Fifth Circuit is saying they could

15   resolve the *Harrison* case just on the final paragraph, Roman

16   IV, that you mentioned.  This is purely interstate.  Why do

17   we have to go back and say this is more than the irreducible

18   minimum, this is concrete and particularized, and this is

19   hard and fast limits.  And things have drifted and we need to

20   tighten it up.  That's how I read the two decisions.

21         And in *Fisheries*, I agree with you, that I read it

22   as if they had shown that there was harm emanating outside --

23   in the form of federal government regulation outside of

24   Louisiana affecting interests inside Louisiana.  Well, that's

25   exactly consistent with all that they're talking about when

1    they were explaining that these are federalist concerns, and

2    here is a force outside.  You can't go to a Louisiana court

3    and say, "Hey, the federal government is telling me to put on

4    this turtle catcher on the front of my trawler.  Can you stop

5    them to do it?"  The Louisiana state court can't do it.

6    You've got to be in federal court there.  As opposed to

7    *Harrison* where you've got all you need in federal court -- in

8    state court for the government of Louisiana to handle, to

9    deal -- the OAG of Louisiana to deal with the school

10   districts of Louisiana.

11          I would also say though about Louisiana's injury --

12   I mean, about the general harm, I think 52,000 students is

13   not an insignificant amount.  And they haven't put a number

14   on the amount of advertisers here.  But at least there, they

15   had two examples of it really happened to these two, and

16   there are 52,000 others that it could happen to.  We have

17   nothing in the complaint that it really happened to anybody.

18   This person bought a toaster, and it cost them a micro cent

19   more because of some -- there's nothing because you can't

20   measure that.

21          THE COURT:  Right.  But I also didn't see any

22   concern that, you know, my goodness, we're going to have

23   school districts all over Louisiana doing something similar

24   to this.  And, certainly, there had been time to see if that

25   would have developed.  I mean, I hear your point, but I think

1  that part of what the Fifth Circuit was saying in that

2  opinion is this is one school district.  It has to do with

3  these two kids.  But basically that's why in Roman IV he's

4  saying you're dealing with one school district that you're

5  saying is not following state law, and that does not sound

6  like the kind of issue that you need to come and bring to

7  federal court.

8          And, you know, in both of these cases, obviously we

9  don't know hypothetically what changed facts might have done

10 to those decisions.  But, you know, it does seem to me that

11 one of the things we have to reckon with in this case is the

12 subject matter that the Court's dealing with here looks

13 different than the subject matter in those cases.  And those

14 other technology cases, again subject matter wise, look more

15 similar to this case.

16         I hear your point about the Courts -- the way that

17 the Court applied precedent and the way that the Court

18 applied *parens patriae* doctrine in those cases may not have

19 been sufficiently rigorous.  But my point is when we're

20 looking at context of courts that have looked at at least

21 analogous, somewhat analogous, factual background, those

22 cases I think are meaningful as well.

23         MR. MAHR:  Certainly meaningful.  And I get it

24 completely that we've got the kind of cases that are

25 factually more similar outside of the circuit in other

1    district courts, just district court decisions, versus I

2    think very meaningful direction from the Fifth Circuit but

3    not on facts that are exactly the same.  But I would say,

4    even as you described it, you said in *Harrison* it's not the

5    kind of case that seemed like it needed to be in federal

6    court.  And that's kind of our point here, that a case where

7    the only thing they're seeking in federal court is an

8    injunction that they could equally get in any other state

9    courts doesn't seem like the kind of case that needs to be in

10   federal court.

11           THE COURT:  Well, neither of them were antitrust

12   cases either.  I mean, maybe -- the *Fisheries* case does have

13   to do with the federal government.  And, by the way, we have

14   footnote 5 that talks about a serious problem under *Mellon*

15   that they could have had, you know, but the Fifth Circuit

16   didn't even look at that.  But the *Harrison* case is certainly

17   not an antitrust case.  And does that not make a difference?

18           MR. MAHR:  The fact that -- I think it makes a

19   difference on the facts, but I don't think that means that

20   the explanation of the law and the importance of the federal

21   interests and the -- what they pointed out, going back to

22   *Snapp*, which again I think these Fifth Circuit cases are more

23   a reconfirmation of *Snapp* and we're going back to the

24   beginning rather than making new law.

25           THE COURT:  Speaking of the beginning, let me just

1    come back to the *Hawaii* case that's cited by the Court in

2    *Microsoft* and that language that says, you know, you can be

3    the United States Government, it can be the government of

4    each state, it can be all of the above, can sue for

5    injunctive relief for antitrust violations, and they can do

6    it simultaneously against the same parties.  And I'll note

7    that *Hawaii* is, you know, this is our citizens are going to

8    pay some more for petroleum products or something like that;

9    right?  I mean, it's *Standard Oil*, and it looks like they're

10   going to pay some more for petroleum products.  I don't know

11   that some of your same arguments couldn't have been made in

12   that case.  And, you know, we have the Supreme Court

13   endorsing, you know, a *parens patriae* cause of action.

14             MR. MAHR:  And I do understand that, and I think

15   it's obviously true that all of those people can sue

16   together, but we still need an injury in fact analysis.  They

17   can't do that without an injury in fact, and that's what we

18   examined under the facts of this case.

19             And that's my final point about those three cases

20   you mentioned, is I do think there's an aspect of this where

21   the injury to the citizen consumers in those cases was far

22   more direct, far more concrete and particularized.  If

23   ebooks -- so understand our -- lots of people buy ebooks and

24   that harms our citizenry.  They directly bought ebooks from

25   the -- from the defendants.  And same with generic medicines.

1    And there was also even a recognition in the Eastern District

2    of Pennsylvania case on generics, about the importance of

3    medication to the citizens.  Social networking sites -- the

4    same thing -- they're getting them from Facebook, not from

5    others.

6         And that's not to say -- and I think there might be

7    some misunderstanding that *Illinois Brick* bars this, but it

8    talks -- speaks to the, is this a concrete and particularized

9    injury.  And we think when you get to the point where anybody

10   who bought anything in the entire state could have had a

11   milli- -- a micro cent, or a very small percentage, of their

12   price increased, maybe if the seller of that good was able to

13   increase, pass on, the advertising costs for the virtual

14   advertiser, maybe not, I think is another difference.  And

15   there's that big jump from the harm of direct purchasers, but

16   it's absolutely concrete stepping into the shoes of people

17   who are already represented versus it is completely diffuse

18   citizen customers, citizen consumers.

19        THE COURT:  No, I don't disagree with that.  I

20   think that's -- as I mentioned earlier, I think that's the

21   issue here is that you have -- in these other cases you have

22   the direct purchasers or the consumers, if you will, who are

23   being directly impacted, whether it's through Facebook's

24   social networking or, for that matter, *Hawaii*, the purchase

25   of those products, or Microsoft products in the *Microsoft*

1    case, that these are the direct purchasers.  So that's why I

2    was referring to earlier that here you have an additional

3    step, right, that --

4         MR. MAHR:  I think more than an additional step.

5    They're not any longer purchasers of advertising.  It's just

6    everyone who might have been affected, like a purchaser of a

7    bottle of water is a purchaser of petroleum.  I mean, maybe

8    you can still say that's somewhere down in the chain of

9    indirect purchasers, but I think it even goes beyond that and

10   it just becomes completely remote and speculative and no

11   longer suitable for injury in fact.

12        THE COURT:  All right.  Thank you, Mr. Mahr.  We'll

13   hear from Mr. Keller.

14        You can proceed.

15        MR. KELLER:  Good afternoon, Your Honor.  May it

16   please the Court.  Ashley Keller on behalf of the Plaintiff

17   States.

18        You're being asked through Google's 12(b)(1) motion

19   to find that you don't have a case or controversy in front of

20   you under Article III of the Constitution.  But this is the

21   quintessential case or controversy that has been adjudicated

22   by federal courts on the merits for the over 100 years that

23   federal antitrust laws first entered the statutes at large.

24        There are lots of different ways to see that you

25   have Article III jurisdiction, but I'll start with admittedly

1    the one that has the most precedent and I think is the

2    easiest, which is *parens patriae*.

3            *Snapp Brothers* is the leading Supreme Court

4    precedent on this score and it says quite clearly, and you

5    heard from my friend on the other side -- there's no

6    disagreement on this -- that States can proceed *parens*

7    *patriae* to assert an injury to a quasi-sovereign interest

8    where the physical or economic health of their citizens is at

9    stake.

10            Now, the prototypical example of the harm to the

11    physical health of a state's citizens would be a pollution

12    case.  If Google were polluting a river, there's really no

13    dispute that the states could bring a suit as *parens patriae*

14    in federal court and allege quasi-sovereign injury in fact.

15    That would be true, even though boaters and fishermen and

16    baiters would be directly harmed by the pollution that Google

17    was committing in the river, because the downstream

18    consequences of that pollution, literally and figuratively,

19    would affect a large number of citizens and it would be

20    diffuse.  And that would be true even if the States could

21    regulate under their own state laws; right?

22            The States wouldn't be limited to bringing claims

23    under the Clean Water Act or claims under CERCLA.  They could

24    bring their own state public nuisance cause of actions or any

25    positive statutory law that the legislatures of the states

1    have enacted to protect the health of the citizens from a

2    physical perspective.

3            THE COURT:  Mr. Keller, though, in the example

4    you're giving, and obviously we know that there's cases out

5    there that have the similar kinds of facts that date back,

6    but in that type of case you have a lot of people, probably

7    citizens, who are being directly impacted.

8            MR. KELLER:  Absolutely, Your Honor.  That's a good

9    segue to our argument, respectfully, that this is the

10   prototypical example of harm to the economic health of a

11   state's citizens where the states should be allowed to

12   proceed *parens patriae*, which is why there is an unbroken

13   line of authority from the beginning of the antitrust laws to

14   today where federal courts have adjudicated these sorts of

15   disputes, and not one, not one, authority from the federal

16   system that goes their way and says states cannot bring these

17   sorts of claims under the antitrust laws.

18           And if you accept the well-pleaded facts in the

19   complaint as true -- and Your Honor stole my thunder, you

20   went to the very paragraphs where we allege this -- Google

21   has a stranglehold on multi-trillion dollar markets for

22   online advertising.  And, yes, just like boaters and

23   fishermen in my pollution example, advertisers and publishers

24   are directly impacted by this, and they're suing to vindicate

25   their economic rights.

1          But it is truly the case that every nanosecond of

2     the day, if you accept our plausible allegations as true,

3     there are consumers, flesh-and-blood people, in these states

4     who are seeing the wrong advertisements for the wrong

5     products for the wrong price.  Now, they can dispute all of

6     that at a legal procedural posture, as Your Honor has pointed

7     out, but we're at the pleading phase, and standing still

8     accepts under Article III the procedural posture of this

9     case.  This is 12(b)(1), not a Rule 56 motion, and so --

10    please.  Excuse me.

11          THE COURT:  Yes.  I don't want to interrupt your

12    train of thought too much.  But two quick questions that were

13    raised by your -- by what you were just saying.  You know,

14    the first is assume with me for a moment that this was just

15    harm to advertisers and publishers -- if we assume there

16    wasn't any harm beyond that, the only harm we could point to

17    was them.  Would there be a problem for the state coming in

18    *parens patriae* in that circumstance on behalf of just

19    advertisers and publishers?

20          MR. KELLER:  I think that would be a harder case,

21    but I still think the States could be here under a *parens

22    patriae* theory, and the reason is there are a lot of

23    advertisers and publishers.  And yes, there's an action in

24    the MDL, and there's Rule 23 and the possibility of obtaining

25    relief for a class.  But Rule 23 is really tough, as Your

1    Honor knows, and they are going to appropriately -- I

2    understand why they would do this -- fight quite vigorously

3    to say that a class shouldn't be certified.  And so a

4    mom-and-pop advertiser or a mom-and-pop publisher that isn't

5    *The Daily Mail*, that doesn't have the resources to hire

6    Kellogg, Hansen, and all of the great lawyers you're seeing

7    in New York, the States have a right to try to vindicate

8    their interests as well.  And the diffuse downstream

9    consequences of Google's anticompetitive misbehavior I think

10   are best indicated by a sovereign in this interest.

11          And so while I do agree that that would make the

12   case more difficult, I don't think it would strip the Court

13   of adjudicatory authority under Article III of the

14   Constitution.  And again, Your Honor has pointed to this,

15   it's not just the consumers, the flesh-and-blood people,

16   although that's a very significant population, and I would

17   say anybody who's got a cell phone or an internet connection

18   would be governed by the anticompetitive conduct we're

19   talking about here.  So essentially, every flesh-and-blood

20   person, man, woman, and child in these states, but it also

21   would be competitors.

22          We document this, too, in the paragraphs that Your

23   Honor highlighted.  Competitors who were previously competing

24   in the marketplace but had to exit, or competitors who are

25   now operating in a very different fashion as a result of

1    Google's anticompetitive misbehavior, so all of that -- or

2    not the publishers and the advertisers who are directly

3    attempting in the MDL to vindicate their rights -- who they

4    are entitled to rely on us as sovereigns to vindicate their

5    rights for them.

6            And as I noted before, there is not a single

7    solitary case that's controlling that goes their way in the

8    antitrust context, but I would say to Your Honor there is one

9    decision that I can point you to in the federal system that

10   looks like a primer of Google's argument.  This is the

11   *Georgia v. Pennsylvania Railroad* Supreme Court case.  But

12   it's not the majority opinion, it's Chief Justice Stone's

13   dissent that I would commend to you.  It looks exactly like

14   the argument that Google is making here, saying we shouldn't

15   take this case; *Georgia* doesn't have standing to proceed

16   *parens patriae*.

17           I have immense respect for Chief Justice Stone, but

18   as our current chief justice said just last term in the

19   *Students For Fair Admissions* case, you don't typically look

20   to a dissenting opinion to figure out what the law of the

21   United States is; you're bound by what the majority says.

22           And what the majority said in *Georgia* was we're

23   taking this case.  And we're not just taking this case, we're

24   taking it on our original jurisdiction docket, which is

25   actually a separate point that I would make to Your Honor.

1    You heard from my friend on the other side that we should go

2    bring these cases in state court; we don't need to be in

3    federal court.  I think he's actually unwittingly

4    demonstrated a different way that you could find Article III

5    jurisdiction here.

6              As Your Honor is keenly aware, Article III

7    specifies the sorts of cases or controversies that federal

8    courts are allowed to adjudicate, and sometimes those cases

9    or controversies turn on the source of law, right, claims

10   arising under the Constitution or laws of the United States,

11   claims in admiralty.  Sometimes those cases or controversies

12   are determined not by the source of law, but by the identity

13   of the parties.  Think of a diversity case.  It doesn't

14   matter that those claims are all under state law.  Federal

15   courts adjudicate those all the time when $75,000 is in

16   controversy.

17             Well, one head of Article III jurisdiction, going

18   all the way back to 1789, are controversies between a state

19   and citizens of a different state.  Google is not from any of

20   the 17 sovereign states that are in front of Your Honor.  And

21   so what they are inviting us to do is file a controversy

22   between 17 sovereigns and Google, a citizen of a different

23   state.  That's something that originally under Article III

24   was something that federal courts had cognizance of.  It's

25   actually something that's on a controversial Supreme Court

1    opinion that you are probably aware of, it's *Chisholm v.*
2    *Georgia*.   It's one of the few opinions that resulted in a
3    constitutional amendment.
4            *Chisholm* wasn't from Georgia.   He sued Georgia in
5    federal court.   The Supreme Court took it as an original
6    matter and said Article III implicitly is waiving Georgia's
7    sovereign immunity, so we have to adjudicate this case on a
8    debt.   Congress then proposed, and the states ratified, the
9    Eleventh Amendment saying, no, no, no, no.   When the state is
10   a defendant, we're not going to let federal courts hear those
11   cases.   They're out of federal court because of sovereign
12   immunity, unless Georgia or the other states choose to waive
13   it.   But where the state is a plaintiff, Article III remains
14   intact.
15           So state versus citizen of a different state is
16   exactly the sort of controversy that can be heard in federal
17   court, and not just any federal court -- the Supreme Court of
18   the United States' original jurisdiction.   Now, what the
19   Supreme Court has told us since then is we don't like hearing
20   cases as an original matter like this.   We're far better
21   equipped to be an appellate court.   So if you have another
22   way to get into federal court, in the district court, go do
23   that, and maybe we'll hear it later on appeal.   That's the
24   *General Motors* case, for example.   And they've repeated this
25   time after time.   There was controversy about whether they

1  really have discretion to decline these cases as an original

2  matter, going back to *Marbury v. Madison*, but that's what

3  they said, and we're bound by what the Supreme Court has

4  said.  We've done exactly what the Supreme Court asked here.

5  Instead of going into the Supreme Court under the

6  original jurisdiction docket, state versus citizen of

7  different state, we've used the arising -- of jurisdiction,

8  brought antitrust claims that are obviously claims that arise

9  under the laws of the United States, directly in front of

10  Your Honor.  That's a different available Article III ground

11  of jurisdiction.  But the fact that it's possible for us to

12  bring a state versus citizen of different state claim

13  directly in the Supreme Court of course means that there's a

14  case or controversy here that you have authority to

15  adjudicate.

16  THE COURT:  But do you still need to fit into one

17  of the -- well, the cases discussed has four different

18  potential heads for jurisdiction, but here we have two, we

19  have the sovereign standing and quasi-sovereign standing.

20  The States are not asserting, for example, proprietary

21  standing argument.

22  And so I definitely understand all of your points

23  about going back to basically the roots of Article III and

24  the fact that we have states versus citizens of another

25  state, but we still have to fit it into one of those,

1    quasi-sovereign or sovereign standing.

2            MR. KELLER:  Absolutely, Your Honor.  There has to

3    be injury in fact.  We've --

4            THE COURT:  Right.

5            MR. KELLER:  -- talked about *parens patriae* and

6    injury to a quasi-sovereign interest.  I think the Article

7    III head of jurisdiction that they're inviting us to

8    entertain speaks to sovereign interest.  I will concede for

9    the Court there's a lot less precedent that's on point there.

10   We don't have something squarely on point for sovereign

11   standing.  I don't think they have anything on point for

12   sovereign standing.  So the safer course is *parens patriae*.

13           THE COURT:  And let me ask you, on *parens patriae*,

14   because I'm going to get to sovereign standing with you, you

15   had mentioned that, you know, you haven't really seen a case

16   that supports their theory.  You said really you just would

17   be looking at the dissent in the *Georgia* case.  But what

18   about -- this is a case cited by the other side from 2017,

19   Ninth Circuit -- the *Missouri v. Harris* case?  That's a case

20   where the Ninth Circuit rejects *parens patriae* standing, and,

21   you know, it's from 2017.

22           And I would like to get your thoughts on that case

23   because that's a case where -- I'm sure you're well familiar

24   with the facts, but basically you had California had passed

25   legislation about what kinds of eggs could be sold in

1    California and how you needed to treat, you know, the

2    livestock involved in that.  And I think to assist in the

3    enforcement of that regulation in California, they also had

4    put into effect regulations saying any eggs coming from

5    anywhere else, if they're not coming from manufacturing

6    facilities that abide by our law, they're not going to be

7    able to be sold here.  And so you had the egg farmers from a

8    number of states that filed suit.

9            And that's a case where the Ninth Circuit wound up

10   saying there wasn't *parens patriae* standing, and the

11   discussion, as you know, had to do with, well, the state is

12   really just here for these particular groups, meaning the

13   farmers, and the state really couldn't articulate -- or the

14   states couldn't articulate a sufficient *parens patriae*

15   interest going to a substantial part of the population.

16           So I would like to get your comments on that.

17   That's obviously a case that goes the other way from the

18   arguments that are being made by the States here.

19           MR. KELLER:  Yeah, absolutely.  I think it was also

20   Nebraska, which was a top ten egg-producing state.  Correct

21   me if I'm wrong, Your Honor, but I think that was a

22   pre-enforcement challenge, so you didn't see the market

23   impact yet on the price of eggs.  So I think that's a

24   relevant distinction.

25           I will also say, my point stands, that's obviously

 1    not an antitrust case.  I'm not trying to say that Article

 2    III standing creates special solicitude for antitrust cases,

 3    but the types of harm that you see in antitrust cases I think

 4    are uniquely situated to support *parens patriae* standing.

 5    And it's exactly the sort of thing that we have been talking

 6    about here.  If you have a monopolist, the impact that that

 7    is going to create in a diffuse way to a large population is

 8    easier to intuit than when you're talking about something

 9    like a pre-enforcement challenge to, you know, how chickens

10    are going to be raised and whether or not those eggs can be

11    sold on California grocery shelves.  But it is a case that

12    goes the other way.  I think the facts are distinguishable.

13            THE COURT:  Well, to -- and exactly the point

14    you're making about I think the assertions being too

15    speculative.  So in that case, part of the problem for the

16    states was that they were trying to predict what was going to

17    happen to the price of eggs.  And they had -- they wound up

18    making two completely inconsistent arguments, under one of

19    which the price of eggs would go up in those states, under

20    another of which the price would go down, because if they did

21    not meet the California law, then they were going to have a

22    lot more eggs for that particular state, and the price would

23    go down, which would benefit consumers.

24            This goes to your point which is that the Court was

25    saying that's just too speculative.  The States have

1  basically outed themselves.  This potential harm is so

2  ambiguous and speculative, it can't possibly support this to

3  potential injury to a substantial portion of the public.

4  That brings me to the argument that your friend Mr. Mahr was

5  making, which is his argument is it doesn't look exactly the

6  same, obviously, but that here, when you're talking about the

7  consumers -- and I appreciate the fact that you're bringing

8  up maybe other entities directly affected which are the

9  would-be competitors -- but if the consumers are sort of

10  maybe a step removed, I think Mr. Mahr's point is it's too

11  speculative what the States are asserting in terms of harm.

12  And I would like to get your comments on that.

13         MR. KELLER:  Yeah.  So it's not even too

14  speculative to ignore the constitutional context for

15  consumers in states that have *Illinois Brick* repeal statutes

16  to get economic recoveries for themselves.  And there's

17  nothing in the antitrust laws that sort of impact the Article

18  III analysis.  So *Illinois Brick*, as we point out in our

19  papers, maybe there was or wasn't confusion on this, that's a

20  pure question of statutory interpretation.

21         Many states, including some that are in front of

22  front of Your Honor, have *Illinois Brick* repeal statutes, so

23  well past the pleading phase could actually recover monetary

24  damages on behalf of consumers in states that choose not to

25  follow *Illinois Brick*, and so I think that's proof positive.

1    But for constitutional injury purposes, we've done more than

2    we need to, certainly, on the pleading.

3              THE COURT:  All right.  You can continue.

4              MR. KELLER:  I think that I've exhausted my

5    prepared remarks, Your Honor.  I'm happy to talk about

6    sovereign standing some more, if you would like.  I've

7    admitted that there is a dearth of case law on that, so

8    *parens patriae* I think is the easier ground.  But --

9              THE COURT:  Let's talk about sovereign standing

10   because this comes back to the point that was made by

11   Mr. Mahr, meaning he focused a little more on *parens patriae*,

12   but the *Harrison* case, you know, lays out very clearly the

13   test for sovereign standing.  And it seems problematic for

14   the States under that test because the only part of the test

15   that it seems like the States could meet could be something

16   about being able to enforce their own laws.  And I don't know

17   that I see that here.  In other words, I look at the test in

18   *Harrison*, which is very clear, and I match that up with

19   what's at issue in this case, and it looks like it's

20   problematic for the States.

21              And so my question to you is in light of the

22   standards that are clearly sovereign in *Harrison*, how do you

23   get -- how do the States fit into that here to get the

24   sovereign standing?

25              MR. KELLER:  I'll give you my best shot at it, Your

```
 1    Honor.  So Massachusetts v. EPA from the Supreme Court,

 2    leaning heavily on Justice Kennedy's concurring opinion from

 3    Lujan, says that "Congress has allowed to depart from the

 4    common law default for injury in fact.  It can create

 5    injuries that wouldn't have been previously recognized."  And

 6    I think the default is certainly that when there's a

 7    violation of federal law, it's for the federal sovereign, an

 8    Article II executive branch officer, to go enforce that

 9    violation.  But the antitrust laws are unique in that

10    Congress expressly desired for the states to play a crucial

11    role in the enforcement of the antitrust laws and to address

12    violations of the antitrust laws.  And this case is a good

13    illustration as to why.

14            The States here are the ones who led the

15    investigation.  They filed the complaint.  They largely

16    survived a motion to dismiss.  And then the United States

17    jumped in and said, yeah, this is a really good piece of work

18    that you've done.  We're going to copy you and go to

19    Virginia.  And I am casting no aspersions.  We're thrilled

20    that the United States has come along for the ride and has

21    recognized the harm that Google is causing to markets, but

22    the States did the leg work for that at Congress's

23    invitation.

24            And so where you have Congress under Massachusetts

25    v. EPA inviting the states to enforce federal law, and you
```

1    have precedent going all the way back to *Testa v. Katt* saying

2    that a violation of federal law is a violation of state law

3    because federal law under the supremacy clause is the law of

4    the state, I think in that unique confluence of situations,

5    plus Congress saying exclusive federal jurisdiction, we can't

6    file our federal antitrust claims in state court, they can

7    only be filed in an Article III tribunal, I think all of that

8    suggests that the States do have a sovereign injury.

9           THE COURT:  All right.  Thank you, Mr. Keller.

10          MR. KELLER:  Thank you, Your Honor.

11          THE COURT:  Mr. Mahr?

12          MR. MAHR:  Just a few comments, Your Honor.

13   Certainly, if they want to bring a diversity case before the

14   Supreme Court, they can do that.

15          And I'm focused on this case and the idea that if

16   there is no on-point precedent, it's because this is such a

17   unique situation.  And they've got something else that was

18   remarked upon by the *Harrison* court, I think it was, that

19   that says something about the whether they said an interest

20   or not.  And this is a unique case in that it's a federal

21   claim being used to get into federal court to bring these 17

22   state DTPA claims on, seeking only redundant injunctive

23   relief -- nothing else under the federal antitrust laws --

24   when there are private cases in the Southern District of New

25   York, many of them seeking the exact same relief on behalf of

1    those same private parties who are not by and large citizens,

2    they're businesses, just as the rivals that they allege have

3    been excluded or weakened are not citizens as much as

4    companies, as opposed to the consumers that they -- the

5    consumer citizens that they claim this kind of indirect harm

6    takes a toll on.

7            And where there's, as my friend mentioned, a

8    federal case seeking the same injunctive relief again, in

9    three different courts -- in three different courts -- and

10   that's a pretty unique situation, so it brings into more

11   focus can a state by itself bring this redundant federal

12   claim that's being litigated in two other courts on the same

13   facts, can it bring it as solely a claim for injunctive

14   relief and then pull all of the state DTPA claims into it.

15   And as I said, I don't think that's the kind of federal

16   injury in fact that the Congress envisioned -- that was

17   envisioned, the Constitution envisioned, under Article III.

18           THE COURT:  Well, Mr. Mahr, I mean, you may need to

19   correct my memory.  Was this the first case filed, and did it

20   proceed in that advertiser or publisher suits, or had some of

21   those been filed?  But this was filed in December 2020, and

22   I'm not sure if other suits had been filed yet.

23           MR. MAHR:  Eight months before.  There were cases

24   filed in the Northern District of California.  In fact, Judge

25   Freeman had ruled already on a motion to dismiss before this

1   case was filed.  And so, I mean, again everybody can bring a

2   case when they want, but there's copycats out there, after

3   copycats, after copycats.  But they have no claim to being

4   the first one.  And certainly now, under the federal laws,

5   they have no claim to be even the primary enforcer here.  So

6   we really think it's the tail wagging the dog.

7            And finally, I think, you know, when you -- there

8   was a lot of this is the prototypical type and antitrust is a

9   prototypical harm.  I don't think it is in this case.  I

10  think you could have that argument maybe.  And again I think

11  those other cases wouldn't have been decided the same in the

12  Fifth Circuit.  But you can have that argument when the

13  citizen consumers that you're protecting in this indirect

14  harm that emanates from the primary violation are direct

15  purchasers of a product because you can identify them, and it

16  is concrete, particularized.  That doesn't disappear when you

17  look to the indirect part, concrete and particularized.

18           And this is -- even the words "hypothetical,"

19  "contingent," "ambiguous," and "speculative," I'm not just

20  throwing them out.  There is ambiguous harm.  Not every

21  person who bought a service for a good in all of these 17

22  states is going to be able to show or -- that it was even

23  affected by an alleged price increase in digital advertising.

24  It depends on so many -- they are not even indirect

25  purchasers.  There are so many steps down, that is really

1    contingent, and speculative, and hypothetical.  And

2    unlike pollution, pollution operates on humans pretty much

3    the same way for all humans, but alleged overcharges in the

4    digital advertising market don't affect every single good and

5    service in 17 states in the same way.

6                    THE COURT:  It's interesting.  I'm going to have a

7    followup for Mr. Keller, but I would like you to respond just

8    in terms of another fact or aspect of this case that is

9    unique is -- just focusing on the digital advertising and,

10   you know, leaving aside the mobile apps and everything, just

11   digital advertising, the prevalence of exposure to that for

12   all of us on a daily basis, whether it's, you know, on our

13   phones or on our computers online, and being exposed to

14   digital advertising.  The ubiquity of that in our lives, do

15   you think -- how do you think that factors in, if at all, in

16   the notion that does that make this comparable in certain

17   ways to alleged conduct that is just going to affect a lot of

18   citizens of the state, whether you want to say it's pollution

19   in the waterway or something like that?

20                   Because I think that's what your colleagues on the

21   other side -- I'll hear from Mr. Keller -- but when we talk

22   about consumers, I'm going to leave aside the other, you

23   know, the entities including the would-be competitors, but it

24   seems like the argument is this is all -- you know, this is

25   part of the fabric of people's lives and most citizens' lives

```
 1    that they may see every day, that's what I take it to be,

 2    because digital advertising is so prevalent.  And that

 3    therefore, they go from there to say, so if you have these

 4    issues that are arising from the conduct of the defendant and

 5    that's naturally going to impact these consumers in some of

 6    the ways that they've talked about, which is, you know -- at

 7    a high level, as you've noted, you know, we're talking about

 8    people who are, in my mind, one level removed.  I know you

 9    think they may be more than one level removed.  But I would

10    like to get your comment on that.  And I'm going to ask

11    Mr. Keller the same thing.

12          MR. MAHR:  Sure.  And I think this runs into

13    another issue that we haven't addressed in this court a lot

14    yet but will, and that's market definition, because it is not

15    all digital display advertising that their case is about.

16    It's a very narrow sliver.  In fact, we argue that it's a

17    gerrymandered sliver of just on open web advertisements that

18    are just placed on websites through this ad tech stack.

19          And I think the facts will show, and they don't

20    plead otherwise, that they're excluding from that mobile in

21    app.  So my guess is you see more ads on your mobile device

22    and on apps than you do on your desktop open web advertising.

23    So they cut out search ads because they think they're not

24    subject to -- they cut out video, they cut out mobile app,

25    mobile in app, and all these other kinds.  So the ubiquity of
```

1    digital display advertising doesn't correspond with the

2    ubiquity of this narrow slice of it that they're talking

3    about here.

4            THE COURT:  All right.  Thank you, Mr. Mahr.

5            So Mr. Keller, I do want to hear from you on just a

6    very practical level this notion of how consumers are being

7    affected and, you know, your theory on that.  You've heard

8    Mr. Mahr saying that given the plaintiffs' claims, it may be

9    much more narrow than what's suggested in the pleading.

10           MR. KELLER:  Yeah.  Well, the pleading governs, for

11   purposes of the 12(b)(1), we'll stick, of course, with the

12   markets that we've proposed in the pleading.  I'm not trying

13   to run away from that.  But if a consumer goes to

14   dailymail.com and is consuming the information from that

15   source, they're receiving advertisements.  And that's how the

16   publisher makes money.  The advertiser is hoping to make

17   money by selling a product or a service to that consumer.

18           And we're alleging that because of Google's

19   monopolistic practices, they're not necessarily seeing the

20   right ad, or they're paying too much for the product.  And,

21   yeah, paying a couple of pennies too much for a toaster,

22   aggregated across all of the citizens of the 17 states who

23   are in front of you, that's real injury that the antitrust

24   laws allow us to address.

25           And let's remember as well we're seeking equitable

1    relief.  We don't have to necessarily prove the exact

2    quantification of harm that the consumers experienced in

3    dollar terms.  We're going to do what we have to do to make

4    sure that fair competition is restored to these marketplaces,

5    and injunctions will allow us to do that when we've proved

6    our case.

7              THE COURT:  All right.  Thank you, Mr. Keller.

8              MR. KELLER:  Thank you, Your Honor.

9              THE COURT:  Mr. Mahr, you didn't have anything

10   else, did you?

11             MR. MAHR:  No, Your Honor.  Thank you.

12             THE COURT:  All right.  So we'll take about a

13   ten-minute break, and then we'll come back and hear argument

14   on the 12(b)(6) motion.

15             THE COURT SECURITY OFFICER:  All rise.

16             (Recess taken.)

17             THE COURT:  Please be seated.

18             All right.  We're back on cause number 4:20-cv-957,

19   The State of Texas, et al versus Google.  And we have heard

20   argument on the 12(b)(1) motion pending, and now we're going

21   to move to the 12(b)(6) motion submitted by Google.

22             And I believe -- is it Ms. Sessions?

23             MS. SESSIONS:  Yes, Your Honor.

24             THE COURT:  All right.  Why don't you come to the

25   podium.  And as with the 12(b)(1) motion, I'm going to give

 1    each side about 20 minutes and allow for some questioning.

 2            So you can proceed when you're ready, Ms. Sessions.

 3            MS. SESSIONS:  Thank you, Your Honor.  Good

 4    afternoon.  Justina Sessions from Freshfields Bruckhaus

 5    Deringer on behalf of Google.

 6            There are a number of issues in our 12(b)(6)

 7    motion, but I'm going to focus my argument today on the

 8    motion to dismiss the DTPA claims, which I think are sort of

 9    the main event for this motion to dismiss.

10            The state antitrust claims that we've moved to

11    dismiss are I think are pretty well covered in the briefing.

12    And as for the remedies, in their latest advisory, plaintiffs

13    committed that they are dropping all but one of the remedies

14    that was at issue in our motion to dismiss.  The only one

15    that's still at issue is Puerto Rico's claim for civil

16    damages.  So as I said, with those issues kind of out of the

17    way, I'll focus on the DTPA claims, but I'm, of course, happy

18    to answer any of Your Honor's questions about any of the

19    other grounds for dismissal.

20            The DTPA claims started out in this case as they

21    often start in antitrust cases, which are kind of state law

22    add-ons to the main event of the antitrust claims.  In the

23    first two iterations of the complaint, the plaintiffs didn't

24    include any distinct DTPA factual allegations, although they

25    included DTPA claims.  Now, on their fifth complaint,

plaintiffs have added some DTPA specific sections, but those allegations are largely a recycling of the same conduct that underlies the antitrust claims, just crammed into a different legal framework.

The problem for the plaintiffs is that their antitrust claims just don't fit into a DTPA mold; they don't involve consumers or traditional consumer transactions; they involve business transactions in a highly specialized, highly technical context, often with very sophisticated customers such as large publishers or advertising agencies that optimize bidding for a living.

Against this background, it's not particularly surprising that plaintiffs have had to stretch to find a tort hook for this conduct. The fundamental problem with the DTPA claims is that while they might not like the conduct underlying their antitrust claims, there simply isn't an actionable misrepresentation or omission associated with that conduct.

Whether on a Rule 9 standard, a relaxed Rule 9 standard, or the Rule 8 standard, to state a claim, a DTPA claim, the plaintiffs must at a minimum identify the act that they contend is false or deceptive, and plead facts showing why or how that act was, in fact, false or deceptive. And each of the plaintiffs' DTPA claims fails on those two elements.

1          With respect to the actual statements of Google's

2     that they allege in the complaint, there are no facts pleaded

3     to support inference that those actual statements were false

4     or misleading.  And with respect to the omissions, the things

5     that they claim that we did not disclose, plaintiffs'

6     complaint doesn't establish any duty or any circumstance that

7     would make the nondisclosure deceptive; in other words, they

8     don't allege that there was anything that needed to be

9     corrected by the disclosures that they would like to have

10    happened.  Instead, and not focusing on the specific

11    statements, plaintiffs fall back to a gloss or interpretation

12    of unidentified statements that they attribute to Google, or

13    things like Google led publishers to believe something, or

14    extolled the virtues of its auction.

15          This lack of specificity is quite telling in a case

16    that started with a 2019 pre-suit investigation and where

17    that investigation involved dozens of pre-suit interviews

18    with industry participants, only one of whom seems to have

19    identified a single specific alleged misrepresentation that

20    made its way into the complaint.  And since that time, it's

21    involved the production of millions of documents.  So where

22    the plaintiffs haven't identified a particular statement that

23    Google made, it's safe to assume that they don't have one in

24    mind.

25          I haven't thought of a better way to structure the

1    rest of this argument other than to just march through each

2    of the kind of categories of conduct and in the DTPA claims.

3    So with the Court's indulgence, I'll run through that.

4        THE COURT:  One question before you do that.  You,

5    at the outset, talked about whether we're looking at Rule 9

6    or just under Rule 8.  But could you talk about the standard

7    here and the standard you believe needs to be applied?

8        MS. SESSIONS:  Yes, Your Honor.  We do believe that

9    Rule 9 is the appropriate standard here because the claims do

10   sound in fraud.  There are allegations.  The allegations are

11   that Google made misrepresentations or made omissions that

12   were misleading, or that it was misleading not to make those

13   disclosures.  So because those claims all do sound in fraud,

14   they are subject to the Rule 9 standard.

15       THE COURT:  So basically across the board here,

16   Rule 9.  And I know I'm sure I'll hear from Mr. Keller.  My

17   general understanding is that while antitrust allegations may

18   otherwise not be subject to Rule 9 when they're premised on

19   fraud, a lot of courts have then applied Rule 9.

20       MS. SESSIONS:  So, certainly, yes.  When the

21   allegations are premised on something like fraud or a

22   misrepresentation, the courts in the Fifth Circuit in

23   particular apply Rule 9 regardless of the underlying law.

24   And so when we're talking about the DTPA claims in

25   particular, a Rule 9 pleading standards applies there.

1          We're -- just to be clear, we're not arguing that a

2     Rule 9 standard applies to the state antitrust claims.

3          THE COURT:  And what about the relaxed standard

4     issue?  Do you have a thought on that and whether that

5     applies here?  The cases that I think I've seen has always

6     been False Claims Act cases where that's applied, but, you

7     know, it's government enforcement, and this is a government

8     enforcement action.  And we know the Fifth Circuit has also

9     talked about Rule 9 being applied in context-specific manner.

10         MS. SESSIONS:  Yes, and that's right.  And I think

11    the Fifth Circuit has directed that Rule 9 always needs to be

12    applied in a context-specific manner.

13         I agree with Your Honor that the vast majority of

14    the relaxed Rule 9 cases arise in the False Claims Act

15    context, but I recognize that Your Honor did say in the

16    *Gilmore* case that relaxed Rule 9 may apply in other

17    government-enforcement contexts as well.

18         I don't think that whether a strict or a relaxed

19    Rule 9 standard actually makes a difference in this case, and

20    that's because the relaxed Rule 9 standard, general -- it

21    doesn't excuse the plaintiff from still pleading what was

22    said and how or why what was said was misleading or a

23    material omission.  Relaxed Rule 9 tends to come into play

24    when -- again, in the False Claims Act context when a

25    plaintiff may be excused from specifying the exact amount of

  1    every false claim that was submitted, or the precise date on

  2    which every one of those claims was submitted.

  3            And here, the failing is much more fundamental than

  4    that.  And so I don't think that relaxed Rule 9 excuses the

  5    plaintiffs from still pleading the basic what was said and

  6    why it was false or misleading, which is the basis of our

  7    motion to dismiss.  So I guess I would say you can apply the

  8    relaxed Rule 9 standard and still dismiss these cases --

  9    dismiss the DTPA claims under the relaxed Rule 9 standard.

 10            THE COURT:  All right.  I think you were going to

 11    walk through, I suppose, the various claims here.

 12            MS. SESSIONS:  I was.  Starting with the what I'll

 13    call the auction optimizations, so those are the DTPA claims

 14    that relate to reserve price optimization, dynamic revenue

 15    share, and project Bernanke.  So on each of those

 16    optimizations, plaintiffs have an omission argument that

 17    Google should have disclosed these optimizations because the

 18    optimizations meant that in their view Google was not running

 19    a second price auction.

 20            I'll note that the complaint doesn't provide any

 21    reason other than expectations about the auction format that

 22    Google had any duty to disclose these optimizations, or

 23    nothing else that needed to be corrected with respect to

 24    these optimizations.  And I'll get back to this in a minute.

 25    But the omission theory as to dynamic revenue share and

1    reserve price optimization really doesn't work because

2    documents integral to the complaint demonstrate that Google

3    did, in fact, disclose those optimizations.

4           But more fundamentally for all three of them, as I

5    said, the plaintiffs don't establish any duty to correct some

6    statement by revealing those optimizations.  They don't

7    describe any contemporaneous representation about the nature

8    of Google's auction that would need to be corrected.  So, in

9    other words, they don't say at the time dynamic revenue share

10   came out, Google told everybody that its auction worked in

11   some way that is inconsistent with dynamic revenue share.

12          What they do is they rely on a statement from many,

13   many years earlier, from 2010, that describes Google's

14   auction as a second price auction.  And so without

15   contemporaneous statements that might be misleading, if not,

16   you know, corrected by a disclosure of any of these

17   optimizations, that omission-based DTPA claim fails.

18          And I'll note that the precise details of whatever

19   the representation about the auction format is really matters

20   in this context because, for instance, if the state -- if

21   Google makes a statement that said AdX -- the ad exchange is

22   a second price auction where the winning bidder pays the

23   higher of the second bid or the reserve price, which is how

24   the plaintiffs describe a second price auction at paragraph

25   529 of their complaint, none of dynamic revenue share,

```
1    reserve price optimization, or Bernanke makes that statement
2    false.  Under any of those optimizations, as plaintiffs have
3    described them, the auction is still one where the winning
4    bidder pays the higher of the second bid or the reserve
5    price.  So without understanding the details of the specific
6    representation that is allegedly made false by a lack of
7    disclosure, we can't assess whether there was any material
8    lack of disclosure at all because the precise details really
9    matter.
10         So that leaves us with misrepresentation theories
11   with respect to reserve price optimization and dynamic
12   revenue share.  And for both of those optimizations,
13   plaintiffs concede that there was some disclosure of those
14   optimizations, and the complaint selectively quotes from
15   those disclosures.  But when you read the full actual
16   disclosures that Google made, the key points that plaintiffs
17   seem to have a problem with are contained in those
18   disclosures.
19         So, for example, reserve price optimization,
20   plaintiffs claim that reserve price optimization was a
21   problem because it used historical data to help publishers
22   set their floors, their price floors.  Well, that disclosure
23   that Google made says that reserve price optimization uses
24   historical data.  So there was no misrepresentation as to the
25   presence or absence of the use of historical data.
```

 1          And it's a similar story with dynamic revenue

 2    share.  Dynamic revenue share, plaintiffs say while Google

 3    misled customers because not only could Google decrease its

 4    revenue share with dynamic revenue share, but it might also

 5    increase its revenue share on some transactions.  But again,

 6    the disclosure that Google made of that optimization says, We

 7    may increase or decrease our revenue share.  So again, that

 8    key point was disclosed.  And so on the points that plaintiff

 9    identifies, you know, misleading or deceptive about those

10    optimizations, those were contained in the disclosures that

11    were made.

12          THE COURT:  Well, some of them were a situation

13    where there was some information that was delivered, but the

14    plaintiffs complained because there wasn't enough information

15    disclosed, if you will.  And you can tell me if I have

16    something wrong.  I just want to use as an example the

17    Bernanke One.  And you talked about, you know, the bidder is

18    going to pay the same price.

19          As I understand the complaint, it's the bidder

20    might pay the same price, but the publisher, you know, is

21    getting that third highest, and then I think Google was

22    putting that difference in a pool or something like that.

23          So as I understood it, the plaintiffs are saying,

24    well, you didn't reveal that part about the publisher getting

25    that third highest rate.  And so -- and perhaps on dynamic

1    revenue share they might say, well, you didn't say enough

2    about what you were actually going to do in terms of

3    changing, you know, the revenue share.  So I would like to

4    get your response to that, because I'm sure I'll hear from

5    Mr. Keller on these points.

6        MS. SESSIONS:  Yes.  And thank you, Your Honor.

7    And I'll take the easier one of those two questions first

8    on -- which was your question on dynamic revenue share.  I

9    think this is true for dynamic revenue share and for reserve

10   price optimization.

11       They may say there was something more that we

12   should have disclosed, but they don't identify what that

13   something more should have been.  The something more, all

14   right, the reasons that they identify in the complaint were

15   disclosed in those disclosures.  So the example of raising or

16   lowering the revenue share.  So I suspect that they may come

17   up with a lot of other things that they maybe now would like

18   to have had disclosed about RPO or DRS, but those aren't --

19   are not identified in the complaint as reasons that those

20   should have been disclosed.

21       Now, the harder of your questions, which is

22   Bernanke.  And I acknowledge that I think their theory is

23   that on the publisher side, that the publishers did not know,

24   as they allege, there was a different price being given to

25   them.  The time to dispute their factual allegations about

1    Bernanke will come down the road because I don't think their

2    description is correct.  But taking it on its terms, they

3    still don't allege why that lack of disclosure would have

4    been material to anybody.

5            And so on the Bernanke omission claim in

6    particular, there is a striking lack of any allegation that

7    anybody would have done anything differently had Bernanke

8    been disclosed, or had that aspect of Bernanke been disclosed

9    to anyone.  And, in fact, it's somewhat the -- any allegation

10   of materiality would really be at odds with the premise of

11   their antitrust claims, which is that nobody had any choice

12   but to use these products in the first place.  And so if

13   nobody had any choice but to use these products and were

14   using them despite them not wanting to, or not liking how

15   they worked, it's hard to see how any additional disclosure

16   would have been material to anybody's decision whether or not

17   to use the product.  And materiality is required in

18   particular for an omission claim.  A part of a DTPA omission

19   claim is -- it has to be an omission that would have induced

20   a consumer, you know, to buy the product or use the product

21   when they otherwise would not have.

22           THE COURT:  All right.  You can continue.

23           MS. SESSIONS:  Thank you, Your Honor.

24           The next -- I won't belabor the point.  There's

25   another allegation on reserve price optimization about an

1    article that came out in 2015, but in the interests of time,

2    I think I'll move on to the next category of conduct.

3            THE COURT:  Right.  Because I think the argument

4    you've made would apply to the, you know, the reserve price

5    optimization issue, similar to what you said about the

6    dynamic revenue share.  Is that fair to say?

7            MS. SESSIONS:  Exactly.  Yes, Your Honor.

8            THE COURT:  All right.

9            MS. SESSIONS:  So the next category of conduct

10    relates to header bidding and Google's response to header

11    bidding.  And I think there are two kind of theories again

12    that the plaintiffs have here.  First, in that opposition

13    brief, they alluded to the Google-Facebook Network Bidding

14    Agreement as relating to their DTPA claims on header bidding.

15    This is not alleged in the header bidding factual section of

16    their DTPA claims, so we didn't think that that was a basis

17    on which they were bringing the header bidding DTPA claim.

18    But even if it were, plaintiffs don't allege or explain why

19    entering into a lawful agreement with a customer could be a

20    misrepresentation or a deceptive omission on the header

21    bidding front.  The agreement also comes in when we talk

22    about their equal footing claim, and I'll address that in a

23    moment.

24            But the second argument on header bidding involves

25    a statement that a New York publisher told to one of Google's

1    competitors.  And that New York publisher said to one of

2    Google's competitors that apparently Google said to that New

3    York publisher the header bidding would be a strain on their

4    servers.  Even sort of taking these layers of hearsay at face

5    value, plaintiffs don't plead any facts from which one can

6    infer that the statement that Google allegedly made was

7    false, which is "header bidding would be a strain on your

8    servers."  So without an allegation, a header bidding was

9    not, in fact, a strain on this publisher's servers, they

10   really have no DTPA claim based on header bidding.

11        They try to stretch that one specific statement

12   into some other unidentified misrepresentations; other

13   publishers were led to believe the same thing; or Google

14   repeated this.  I would say it still doesn't make it false.

15   They still haven't alleged any facts that would make the

16   statement false, and it's also wildly unspecific.  And, you

17   know, you can't infer that a statement was false without

18   actually having someone tell you what that statement was.

19        So next -- second to the last, we get to the equal

20   footing claim, and these are both -- this is based on two

21   alleged misrepresentations.  And as with the other specific

22   statements, it's really crucial to examine what Google

23   actually said and what plaintiffs are taking issue with.

24        So there are two statements that plaintiffs look to

25   in the equal footing section.  One is about the switch in

1    2019 from a second price auction to a first price auction,

2    and the statement is, "By switching to a single first price

3    auction, we can help reduce complexity and create a fair and

4    transparent market for everyone."

5           Well, plaintiffs don't dispute that Google did

6    switch to a first price auction.  So that part of the

7    statement is true.  They seem to take issue with the

8    statement because they don't believe that Google's auction

9    comported with their notions of fairness or transparency.

10   But their opinions about sort of fairness and transparency in

11   the abstract don't make that particular statement actionable.

12          First of all, they utterly fail to explain how the

13   statement "we can help reduce complexity and create a fair

14   and transparent market for everyone" is material at all, or

15   how it could be false, because it's not a particular

16   represent -- it's not a representation that any particular

17   auction comports with any particular mechanics or is run in

18   any particular way.  It's really a general statement.

19          THE COURT:  I think you made the argument in your

20   brief, too, that this, you know, at what point are you

21   running into more of an opinion versus something that's being

22   stated as a fact.

23          MS. SESSIONS:  Absolutely.

24          THE COURT:  I think I saw that in your briefing.

25          MS. SESSIONS:  Yes.  Yes, that's right.  And

```
 1    statements of opinion or, sometimes as the courts say,
 2    puffery is not actionable because it's really not
 3    falsifiable, it's a statement of opinion.
 4              And so "we can help reduce complexity and create a
 5    fair and transparent market" is --
 6              THE COURT:  But did they have another piece of that
 7    that had to do with everyone is competing on the same --
 8    something like that?
 9              MS. SESSIONS:  Yes, Your Honor, they do.  The next
10    statement that they take issue with is -- and it was
11    selectively quoted in the complaint, but a more -- and we've
12    reproduced the entire statement for Your Honor in the
13    exhibits to the brief.  But a more complete version of the
14    statement is "All participants in the unified auction,
15    including ad exchanges and third-party exchanges, compete
16    equally for each impression on a net basis."
17              And the part of the statement that was left out in
18    the complaint is "on a net basis."  And so plaintiffs wanted
19    to say, well, this is a representation that everybody in the
20    auction is on equal footing in every, you know, sort of
21    conceivable way.  But that's not -- the statement said -- the
22    statement is about how the bids are compared in an auction,
23    and they're compared on a net basis.  And none of the things
24    that the plaintiffs complain about in the equal footing
25    section makes that specific statement false or misleading.
```

```
 1              They don't -- there's no optimization that means
 2    that the bids are not being compared on a net basis in the
 3    auction.  They have some other problems, and they say
 4    Facebook had special advantages in the auction; they had a
 5    longer time out; or Google had more information than some
 6    other folks.  But that doesn't make the statement "that
 7    everybody is competing equally for each impression on a net
 8    basis" false.
 9              THE COURT:  And that part of that sentence that
10    you've been talking about, "on a net basis," what is -- and
11    I'm asking you to be redundant, but what does that part mean,
12    "on a net basis," in the context of that sentence?
13              MS. SESSIONS:  So we talked earlier a little bit
14    about dynamic revenue share.
15              THE COURT:  Right.
16              MS. SESSIONS:  And so in the auction there can be a
17    revenue share that is taken out of the -- in many cases, the
18    advertiser's bid.  And so what this is referring to is the
19    bids being compared on a net basis after the revenue share is
20    subtracted from that.  So everybody runs their own -- there's
21    more of the statement that actually says every -- all the
22    exchanges are going to run their own auctions; they're going
23    to kind of do whatever it that is they do; they're going to
24    submit their bids into the unified auction; and then the bids
25    in the unified auction are compared on a net basis.
```

```
 1            THE COURT:  All right.  Thank you.

 2            MS. SESSIONS:  So the last bucket of allegations is

 3   the personal -- the sale of personal information claim.  And

 4   on this one, the plaintiffs are alleging that Google's

 5   privacy policy is deceptive or misleading.

 6            So Google says in its privacy policy that it does

 7   not sell user's personal information.  In that same privacy

 8   policy Google also says that "Information that is recorded

 9   about users so that it no longer reflects or references an

10   individually identifiable user may be shared with advertising

11   partners."  And that's a long sentence but, right, Google

12   says we don't share your personal information.  Google also

13   tells users that there is information that doesn't

14   individually identify a particular user, but, and that sort

15   of information may be shared with advertising partners.

16            Despite this disclosure in the privacy policy,

17   plaintiffs claim that the policy is misleading -- the

18   statement "we don't sell your personal information" is

19   misleading -- because in the course of digital advertising,

20   Google sends a bid request to bidders and that bid request is

21   somehow a sale of personal information because the bid

22   request contains information in it.  And they allege that the

23   bid request contains things like device IDs, user IDs,

24   cookie, and browser information, demographic data, and

25   geolocation information.
```

1          So they don't allege that the bid request has a

2     person's name in it or personally identifying information,

3     but they're saying, well, these things that could be in

4     the -- in the bid request, well, they could be linked up by

5     Google with some other personal information; therefore, it's

6     personal information; therefore, it's misleading.

7          THE COURT:  Is it -- and I want to -- I'm going to

8     try to break this down for a layperson of where Google is at

9     on this.  And here's what I think I understand, because I

10    think part of this is to the extent that data is being shared

11    for an advertiser to be able to do a targeted ad, that the --

12    as I understand it, the data that Google is providing is here

13    is a person that there's data that would show this kind of ad

14    might be, you know, appropriate for this person.  But what

15    you're not sharing is anything about the person's name, or

16    where they live, or anything else like that, but it is

17    specific to that particular user of the data -- the data is

18    so that the advertiser may figure out an ad to send them.

19    And, I don't know, do I have that right or wrong?

20         MS. SESSIONS:  So I think without making a

21    representation about what is in any particular bid request

22    that Google might send, because that's not at issue right

23    here, right, what they say is in this bid request are things

24    like a device ID, which could identify a particular -- a

25    device, like it's associated with a device; or a user ID,

```
 1    which is a bunch of numbers that could correspond to a user,
 2    but it doesn't identify a specific user; and then cookie and
 3    browser information; demographic data; geolocation
 4    information, that all could be associated with, you know, a
 5    person who is viewing or associated with the -- these sort of
 6    impression that the viewing --
 7              THE COURT:  Right.
 8              MS. SESSIONS:  -- of that page, but it doesn't --
 9    they're not saying that the person's name or their address,
10    or anything, that individually identifies that where they
11    could say, oh, Ms. Sessions is viewing this advertising
12    request -- they're not saying that that -- they don't allege
13    that that's in the bid request.
14              THE COURT:  Right.  But the cookie and browser
15    information would be information about that individual, I
16    suppose, where -- what they were viewing on the internet;
17    right?
18              MS. SESSIONS:  It would be -- it could be
19    information about what that device had been doing on the
20    internet.
21              THE COURT:  Right.
22              MS. SESSIONS:  Yes.  But it's not -- it doesn't tie
23    to an individually identifiable -- it doesn't allow the
24    recipient to individually identify any user, which is the
25    real distinction here because in the privacy policy Google
```

1    says, right, information that's recorded about users so that

2    it no longer reflects or references an individually

3    identifiable user might be shared as a part of advertising.

4            So in light of the entirety of the privacy policy,

5    it can't be misleading to say, Oh, well, Google does send

6    some of this anonymized information, as they allege, in the

7    bid request.  And the second portion of that is that they

8    also don't allege that the bid request is a sale.  They --

9    for their theory to work, the bid request would also have to

10   be a sale of the information that is in there.  And the

11   bid -- Google doesn't receive, right, a price from anybody

12   for sending the bid request.  It simply isn't a sale.  They

13   say, well, Google, down the road, might make money if one of

14   Google's advertisers gets that bid request and sends the

15   winning bid, and, you know, Google makes money off of that

16   transaction.  But that's not the same as the bid request

17   itself being a sale.

18           So I'm glad to take any questions that Your Honor

19   has.  That was my run-through on the DTPA claims, but I'll --

20   I'm happy to sit down, also.

21           THE COURT:  Well, I think this is not -- this has

22   to do with the tolling issue, the statute of limitations

23   issue.  It's really, I think at least at the moment, the only

24   other thing I was going to ask you about --

25           MS. SESSIONS:  Certainly.

1          THE COURT:  -- is the parties have obviously

2   disagreements about this.  And I would like to get your

3   understanding of whether or why some sort of tolling or like

4   provision might not apply here writ large.  And I would like

5   to get just Google's position on that, because the States

6   obviously have noted that they believe a number of different

7   doctrines would apply to these statutes of limitation.  So

8   maybe you can --

9          MS. SESSIONS:  Certainly.  And I'll try to keep it

10  kind of big picture for as applicable generally to the States

11  where the statute of limitations applies.

12          The first thing is there are no pleaded facts that

13  would support application of the tolling doctrines.  And so

14  in particular, in instances of a misrepresentation -- of an

15  alleged misrepresentation where the statement was actually

16  out there and made, and folks were presumably aware of it,

17  there has to be pleaded some facts that would support

18  application of a tolling doctrine to toll the statute of

19  limitations beyond the date of the alleged misrepresentation.

20          Now, some -- there's been some invocation of

21  doctrines like continuing violation.  And again, in a case of

22  a misrepresentation, a misrepresent -- there is a distinction

23  between the act itself and then sort of continuing effects of

24  that act, which is different than repeating the act over, and

25  over, and over again, which wouldn't necessarily be a

1    continuing violation, but would be a new violation every time

2    an alleged misstatement was made.  But in the case of a

3    single alleged misstatement, that's not a continuing

4    violation, even though there might be continuing effects from

5    that alleged misrepresentation.

6           The only other point I'll make on tolling kind of

7    writ large is usually tolling doctrines come into play when

8    the -- when either the injury is very difficult to -- where

9    the injury is difficult to detect or doesn't become apparent

10   until much later, or the violation itself is quite difficult

11   to detect.

12          In this case, we're not dealing with consumer

13   claims or with private claims where the plaintiffs have to

14   prove that they suffered any injury.  And we're also not

15   dealing with plaintiffs that don't have the power of

16   investigation.  And so on the tolling doctrines, I would say,

17   you know, the State Plaintiffs' zeal to tell you that they

18   don't have to prove reliance for injury, or any of the other

19   elements of perhaps a private DTPA claim, really means that

20   tolling also should not apply because the violation occurred

21   and was sort of complete, for their purposes, at the time of

22   the alleged misrepresentation.  And again, they have

23   investigatory powers at their disposal, and haven't pleaded

24   any reason that, in the exercise of diligence, that they

25   couldn't have discovered these claims earlier.

1          I'll note, right, continuing violations, discovery

2    rule, a lot of those tolling doctrines have to be applied on

3    a state-by-state basis -- and you have been provided

4    appendices sort of detailing those -- so not every state

5    could benefit even from, for instance, the discovery rule,

6    but I had to keep it a little bit bigger picture.

7          THE COURT:  All right.  Thank you, Ms. Sessions.

8          I'll hear from Mr. Keller.

9          MR. KELLER:  Good afternoon again, Your Honor.  May

10   it please the Court.  Ashley Keller for the Plaintiff States.

11         I'll make two prefatory comments, one legal, one

12   thematic, and then I will also march through each of the DTPA

13   theories, unless you want to repurpose me into other

14   secondary or tertiary issues.

15         So the first prefatory remark is the legal one on

16   Rule 9.  I think I agree with my friend from the other side

17   that this is largely not controlling.  You saw some of the

18   precedent that says you can apply a relaxed Rule 9 where

19   sovereigns are in play.  A lot of these DTPA statutes don't

20   have fraud or mistake as a necessary element; they prohibit

21   only unfair or unconscionable practices.

22         But the real teeth behind Rule 9 is typically on

23   the reliance prong.  And you just heard my friend on the

24   other side concede under cases like *Holzman*, and there are

25   many others, when sovereigns are bringing these DTPA

1    enforcement actions, they don't have to prove reliance.  And

2    if we don't have to prove reliance, of course, we don't have

3    to plead reliance.  So there's no necessary Rule 9, Tell me

4    the specific consumer transaction where this consumer was

5    conceived into doing something; we don't have to establish

6    that.

7         Another thing that you typically see in these DTPA

8    cases, and I think you brought this up at a previous status

9    conference, is some of them have scienter as an element.  I

10   would point to Texas's subsection (b)(24) as an omission

11   example of where Google's intent becomes relevant where Rule

12   9 is expressed on its terms.  Intent is something that we can

13   plead generally; and generally, under *Ashcroft v. Iqbal*,

14   means complying with Rule 8.  So Rule 9 is essentially

15   cross-referencing the regular pleading standard where you

16   draw all these other inferences in our favor, and we just

17   have to have a short and plain statement of the claim showing

18   that the pleader is entitled to relief on that element of

19   scienter.  So I actually don't think that the Rule 9

20   discussion is all that controlling despite both sides

21   admittedly spilling some ink on it in our papers.

22        Let me make the prefatory thematic point that I

23   think is going to undergird a lot of what we talked about

24   here for the DTPA theories that the States allege, and that

25   is I hope the common sense intuition that the rules of an

1    auction matter a lot to the auction participants.  And the

2    reason for that is well studied in the economic literature

3    that there are lots of different ways to run an auction.

4    There is no necessary right way or wrong way, but those

5    different rules impact strategic behavior because, let's face

6    it, the sellers and the buyers want different things.

7            The buyers want to buy the item at the auction

8    block for the lowest possible price.  The sellers want to

9    sell their items for the highest possible price.  And if they

10   know the rules of the road, if they know what Christie's and

11   Sotheby's are going to do when they're selling their items,

12   they're going to modify their behavior strategically to

13   achieve their own objectives.

14           If you secretly change the rules or tell

15   half-truths about the rules of the auctions that you're

16   running, that's going to be unfair, that's going to be

17   deceptive; that's going to be exactly the sort of omissions

18   that are the heartland of the transactions that these DTPA

19   statutes are designed to police.  And so with that thematic

20   point in view, let's talk -- Oh, I'm sorry.  Go ahead.

21           THE COURT:  Let me ask you a question about that,

22   because it's a point your friend on the other side made which

23   was that if part of the theory is these people really didn't

24   have a choice but to participate in these auctions, I think

25   the argument was it wouldn't have mattered if they knew or

1    not.

2            MR. KELLER:  Yeah.  Two responses to that, Your

3    Honor.  First, we have attempted monopolization claims.  And

4    so obviously, with respect to those, Google didn't have a

5    monopoly yet, and the consumers -- I'm defining "consumers"

6    the way these statutes do, of course, which includes business

7    entities like advertisers and publishers, so they potentially

8    could have changed their behavior.

9            The second point I would make with respect to that

10   is Google obviously disputes that they had a monopoly.  And

11   we're allowed to plead things in the alternative.  I think

12   we're going to win, but to the extent we don't ultimately

13   prevail on our monopolization claims, that's not dispositive

14   to whether they were engaged in deceptive behavior.

15           And I think our third point is, legally it's not

16   relevant under most of these statutes whether the consumers

17   would have ultimately changed their behavior.  If Google

18   intended to deceive them in order to induce the transaction,

19   that's enough irrespective of whether they would have

20   ultimately been able to go to a different product or service

21   because of Google's monopoly power.

22           And the final point I would make is change can

23   sometimes be in the eye of the beholder.  But even if Google

24   had a monopoly, it is quite possible that publishers and

25   advertisers still would have had to transact with Google, but

1    they would have changed their behavior.  They might have bid

2    in a different way and deployed different strategies as they

3    were doing prior to the rollout of some of these things.

4            So for all of those reasons, certainly on a

5    12(b)(6), construing all of the allegations and plausible

6    inferences in our favor, I don't think my friend on the other

7    side's point carries the day.

8            Let me talk about reserve price optimization and

9    how that deceived advertisers in particular.  A rule of an

10   auction that's really important for auction participants to

11   know is whether there's going to be a reserve price.  This is

12   a completely common feature in auctions.  It's a price below

13   which the item can't transact.  If Your Honor were a

14   collector of beautiful artwork and you were selling a

15   Rembrandt at Sotheby's, you would be allowed to tell

16   Sotheby's, "No less than $10 million.  You can start the

17   bidding anywhere you want, but the hammer cannot fall on this

18   auction item for less than $10 million."  And the people who

19   are bidding know that that's the rules of the auction house.

20   The seller has the right to set a reserve price below which

21   the item cannot transact.

22           What Google did is it used its treasure trove of

23   data that it had because of its monopolies on advertisers to

24   change the publisher's reserve price so that the publishers

25   could receive more for that item at the auction block.

```
 1              Now, a year after Google did this, they disclosed
 2    on a blog post, "We look at historical data in order to set
 3    the reserve price."  And what this illustrates I think, Your
 4    Honor, is that oftentimes deceptive parties are trafficking
 5    in half-truths.  Yes, they did disclose that they were using
 6    historical data to set a reserve price.  What they didn't
 7    disclose, as the complaint states -- you can look at
 8    paragraphs 532 and 537 for this -- is they were using
 9    historical data to set a unique reserve price for each
10    advertiser.  So the minimum price for you as a bidder is $10
11    million.  But we know you like Rembrandt a lot.  You're going
12    to pay more.  Your minimum price is $15 million.  And up and
13    down the line.
14              That is a unique form of price discrimination that
15    completely eviscerates the concept of a reserve price.  It's
16    not a reserve price anymore, it's multiple different
17    reservation prices that Google is setting for these
18    advertisers.  That is obviously deceptive.  That is obviously
19    something that Google intended to omit from telling the
20    advertisers to induce these transactions, and Google admitted
21    it internally.  In those paragraphs that I just referenced,
22    Google says, "This blows up the concept of a second price
23    auction."  But they weren't willing to tell that to the
24    actual auction participants.
25              Let's look at dynamic revenue share where I think
```

1    the story is the same.  Here's a rule that's really important

2    to participants in an auction.  What is the auctioneer's

3    commission?  How much do they charge?  Does Sotheby's get 10

4    percent, 20 percent, or 30 percent when they sell the

5    Rembrandt?  People need to know that because obviously the

6    middleman's take is not going into the seller's pocket and is

7    something that the buyer ultimately is going to have to pay

8    in a competitive auction.

9              What dynamic revenue share did is it involved

10   Google again utilizing its monopolistic power to be able to

11   see all of the bids that were coming in from rival exchanges

12   to dynamically adjust its commission.  Sometimes they would

13   lower their commission to let's say 10 percent instead of 20

14   percent in order to win that transaction.  And sometimes,

15   when they knew they could get away with it, they raised it to

16   30 percent.  This was deceptive in two different ways.  The

17   first one is more intuitive.  If you're the publisher selling

18   your inventory through Google's exchange, you obviously don't

19   mind paying 10 percent instead of 20 percent, but you

20   definitely care about paying 30 percent.  Google can say it

21   all came out in the wash.  But for the publisher who had to

22   pay 30 percent instead of 10 percent, the fact that a

23   different publisher paid 10 percent and on average it worked

24   out to 20 percent, is no consolation to that publisher; they

25   paid a higher commission in order to transact.

1          But the other way that this was deceptive --

2     because again Google says, "We disclosed this; we said that

3     we might dynamically adjust our commission" -- what they

4     didn't disclose is they were adjusting their commission not

5     based on historical data.  Then let's say based on our

6     algorithm, we think for this auction we've got to lower it to

7     10, and for this auction we've can to raise it to 30 and get

8     away with it.  They were peeking at all the rival bids from

9     the other exchanges, from the competitors who were trying to

10    efficiently compete with Google and submit the best bids for

11    auction inventory.  And only after seeing what the other

12    competitors were doing did Google change its commission

13    knowing that that was going to ensure that they won the

14    transaction that their auction exchange would be the one that

15    transacted.

16          That's deceptive actually to both sides of the

17    transaction, advertisers and publishers, and the reason is it

18    creates a false impression about the efficiency of Google's

19    products.  If everybody thinks, look, Google's just the one

20    winning all of these auctions because they've got the best

21    service, they've got the best technology, they're adjusting

22    their commission based on their superior technological

23    prowess, that's one thing.

24          If Google's using its monopoly over publisher and

25    advertising servers and saying, "We know that we didn't

1    actually produce the best bids for this auction item, so

2    let's lower our commission," the rival exchange doesn't know

3    that Google is doing that; the publishers and advertisers

4    don't know that Google is doing that, that's the deception

5    that Google was creating through dynamic revenue share.

6              I think Project Bernanke is actually the easiest

7    one.  You know, the technology here is complicated,

8    obviously, but the concept behind Project Bernanke is very

9    easy to see as deceptive under state law.  You essentially

10   have Google going all the way back to 2010 saying that

11   they're running a sealed second price auction.  And everybody

12   knows what that means.  That means that the second highest

13   bid is the one that's going to win the auction.  The bidder

14   is going to pay that second price and, less Google's

15   commission, it's going to go to the publisher.

16             And what Google decided to do unilaterally without

17   telling anybody this, "We're going to charge the second price

18   to the advertiser and we're going to give the publisher the

19   third price, and we're going to put the difference in some

20   pool that we're going to use to juice the bids of people that

21   are using our advertising products to help advertisers bid on

22   exchanges."

23             Google's not allowed to create a secret slush fund

24   and essentially say the rules of the auction are completely

25   different than all of the auction participants previously

1    thought, and advertisers are going to pay one price, and

2    publishers are going to get a lower price.  That's obviously

3    deceptive.  It's obviously an omission that was intended to

4    induce these transactions.  And there's a reason Google never

5    told anybody about it.  It's because they knew that both

6    publishers and advertisers would be up in arms if they found

7    out about Project Bernanke.

8         Let's talk about equal footing.  Another thing

9    that's really important to auction participants is that we're

10   all going to be competing on a level playing field.  Sellers

11   and buyers are going to be able to bid on an exchange.  We're

12   going to understand how the price inputs are going to work.

13   And again, there are different ways that we can all be on

14   equal footing.

15        If you want to go back to a game show that I used

16   to watch as a kid, *Let's Make a Deal*, if Monty Hall says, "Do

17   you want to bid behind" -- "Do you want to bid on what's

18   behind door number one?" and it might be the Rembrandt we

19   were talking about, or it might be a chicken, and you'll find

20   out after you bid, people would be willing to bid on that.

21   There's a chance it's a Rembrandt, so they're going to put in

22   a significant bid recognizing that there's a chance that it's

23   a chicken, and they're going to be pretty disappointed when

24   the door opens.

25        It's a very different thing if Facebook has special

1    information advantages and knows that it's a Rembrandt behind

2    door number one, or has longer to bid.  And Google is feeding

3    them this information, as the complaint documents, for the

4    specific purpose for helping them in their efforts to control

5    the markets that they have a monopoly in, and to destroy

6    header bidding.

7            And so if you're participating in an auction where

8    Google says, "Everybody's on the same footing," and you've

9    got this behemoth -- a Fortune 100, a Fortune 10 -- company

10   that's getting special information advantages, it's no longer

11   true to say people are competing on equal footing.  And to my

12   mind, the notion that that's just puffery, that's like a car

13   salesman saying, you know, this is a really shiny new car and

14   people will be impressed by it, that's just a false

15   statement.  It's not true that everybody's competing on an

16   equal footing.  It's not gloss.  It's not an opinion.  It's

17   something that every auction participant, again, would be up

18   in arms about.

19           THE COURT:  Well, let me ask you, because your

20   colleague on the other side made the point of the portion of

21   the statement that talks about being on a net basis.  And I

22   would like to get your comment on that.

23           MR. KELLER:  I certainly don't see how the net

24   basis gloss does anything to undermine how anybody else would

25   read that statement.  Certainly, again taking the

1    well-pleaded factual allegations as true and drawing

2    inferences in our favor, I don't think anybody would say, Oh

3    well, they qualified it by "on a net basis," so that must

4    mean it's possible someone else like Facebook has special

5    information about whether it's a Rembrandt or a chicken.  I

6    don't think that basis can carry that load.

7          So when I saw them saying we didn't completely

8    quote the statement, I was concerned.  But when they threw

9    the rest in, I sort of shrugged my shoulders and said I don't

10    see why that undermines any of the DTPA theories that we have

11    here, that the basic thrust of the theory is they were

12    secretly giving information and advantages to one of the

13    largest participants in these auctions while inducing

14    everybody else to keep participating, and saying it was equal

15    footing.  "Net basis" I don't think does very much to that,

16    certainly on the face of the complaint.

17          Let's talk about user ID and privacy policy, which

18    is a little bit of a fog relative to the auction rules, but

19    obviously the consumers who are using Google are the ultimate

20    recipients of these auctions.

21          We all agree on the privacy policy and what the

22    privacy policy says and how it defines personal information.

23    What the complaint alleges -- you can look at paragraphs 572

24    through 573, 578, 582, and 584, is, yeah, Google anonymized

25    the information, and so it didn't just publish a user's email

1    address, which is defined as personal information, but then

2    it gave the advertisers the decoder ring.  And so it

3    anonymized it, but then it knew that everybody participating

4    in its auctions was able to de-anonymize it and figure out

5    exactly not just your user history and which websites you had

6    gone to, which is obviously useful information for an

7    advertiser, but who you are in particular.

8          They can fight those well-pleaded factual

9    allegations at a later posture, they can say that's not

10   actually what we did, but that's what we plead.  And so based

11   on what we've pled, they've clearly violated their own

12   privacy policy and in a deceptive way, in a way where

13   consumers -- you know, the jury that will ultimately be

14   impaneled to hear this, they're perfectly capable of reading

15   the privacy policy.  It's supposed to adhere to people like

16   them.  They're going to be able to look at it and say, "Yeah,

17   that was deceptive.  I didn't realize that you were

18   actually putting out information into these auctions where

19   the advertisers could figure out exactly who we are."

20         With respect to header bidding, Your Honor, this

21   was obviously something that was a focus of the antitrust

22   allegations.  We respect Judge Castel's decision, even the

23   portions we disagree with.  We're not fighting it for

24   purposes of the DTPA claims.  You know, it's admittedly not

25   as clear-cut as the others.  But I still think that there was

1    deception when they are essentially telling parties not to

2    use header bidding because it's going to strain the load of

3    your servers, as opposed to the real and true reason, which

4    is, "This is a competitive threat and we're going to do

5    everything in our power to squelch it."

6         THE COURT:  Is it accurate to say that the only

7    statement to that effect mentioned is the one to the

8    individual in New York; is that correct?  It is just that one

9    incident?

10        MR. KELLER:  Paragraph 568 is the one that contains

11   that statement.  Obviously, the complaint was written at a

12   different time compared to all of the fact discovery that

13   we've received.  And so that statement, this is the one area,

14   again I'm being honest with the Court, where I think a

15   relaxed Rule 9(b) might be more relevant.  With respect to

16   all of the other things that we have just talked about, I

17   actually don't think it controls, but this is one area where

18   it might be something that's pertinent.

19        I've run through the different theories.  I do want

20   to talk about the statute of limitations because you asked my

21   friend on the other side about that.  Let's deal with the

22   easy part.  It would be unconstitutional to apply the statute

23   of limitations against Mississippi.  And there's clear

24   dispositive case law saying the same thing, but not

25   constitutional, but the statute of limitations doesn't apply

1    to the sovereigns if you're Texas or Louisiana.  So that's

2    off the board.

3               THE COURT:  I think that's not disputed as to those

4    states; is that right?

5               MS. SESSIONS:  That's correct, Your Honor.

6               THE COURT:  All right.  I think those states,

7    that's not disputed and it just doesn't apply to them.

8               MR. KELLER:  Just wanted to make sure that I got it

9    in.

10              With respect to the other states, I think there is

11   a respectful disagreement between our sides as to who bears

12   the burden to plead what.  Rule 8 is very clear, the statute

13   of limitation is an affirmative defense.  That means the

14   burden of persuasion and production should be on the other

15   side.  We have to plead ourselves out of court, effectively,

16   in order for us to lose on the pleadings for a 12(b)(6).

17              But beyond that, I think you heard my friend on the

18   other said say, well, the statements are all out there, and

19   we're sophisticated parties, and so we could have figured

20   this out.  Yeah, we are sophisticated parties.  We're the

21   sovereign States.  And the ultimate parties that were

22   deceived here are largely businesses, not flesh-and-blood

23   people.  But not every business is a behemoth business that

24   has the flexibility, the financial wherewithal, and the

25   sophistication to go figure this stuff out.  But even if you

 1    are a sophisticated party, Google wasn't telling the whole

 2    truth.  That's the nature of these allegations.  They're of

 3    course entitled to dispute that.  But accepting the complaint

 4    as true, it was really hard to figure out that Google was

 5    deceiving folks.

 6           So even with a high level of sophistication, I

 7    don't see why things like the discovery rule and the

 8    continuing violation doctrines in the states that recognize

 9    those theories wouldn't apply, again recognizing we're here

10    on the pleadings.  Summary judgment is a different kettle of

11    fish.  You know, disputed facts can then be put into the

12    record after the close of discovery, which Your Honor knows

13    is coming right up.  But for purposes of just a pleading

14    document, I think we're healthily past the line to say we

15    can't rule on this as a dispositive matter here today.

16           THE COURT:  All right.  Thank you, Mr. Keller.  I

17    think you hit on the questions as you went along that I had

18    for you.

19           MR. KELLER:  Thank you, Your Honor.

20           THE COURT:  All right.

21           Ms. Sessions, rebuttal?

22           MS. SESSIONS:  Thank you, Your Honor.  I'll respond

23    first on the Rule 9 point, and then run through the -- a

24    couple of the conduct arguments.

25           So on the Rule 9 point, I think we still -- I agree

1    that strict Rule 9 or relaxed Rule 9 probably doesn't make a

2    significant difference, but it is our position that Rule 9

3    does apply here.  And Rule 9 applies notwithstanding the fact

4    that the plaintiffs don't need to plead reliance in this

5    case.  *Elson v. Black*, which is a 2023 Fifth Circuit case,

6    applies Rule 9 to allegations of untrue or misleading

7    statements, representations, and omissions, not

8    notwithstanding the fact that that underlying -- the New York

9    law that was at issue in that case did not require reliance.

10   So I think the law is clear in the Fifth Circuit that Rule 9

11   applies to averments of fraud whether or not they are part of

12   a traditional fraud claim that would also require reliance.

13           And then on relaxed Rule 9, if some relaxed

14   standard applies, it may allow again for some flexibility as

15   to the when and perhaps the where and sometimes the who of

16   the allegedly deceptive or misleading acts, but not the

17   specific what and not the how; that's still required, even

18   under a relaxed Rule 9 standard.

19           On to the sort of DTPA merits issues.  I heard a

20   lot about Google's secretly changing the rules and that

21   mattering to publishers or to advertisers.  That highlights

22   the fundamental problem with their pleading, which is they

23   don't establish kind of a predicate baseline.  What were the

24   rule -- they say it would be important, you know, to auction

25   participants to sort of know this or that.  But what -- they

1    don't say what we were telling auction participants about the

2    rules of the auction at the time that these statements were

3    made.  So while they say it would be -- it would sort of be

4    important, they don't put -- they don't ground that in any

5    representations of Google or any statements about how our

6    auction was being run at the time.

7              And then very briefly on some of the specific

8    conduct allegations.  I heard a number of things that I don't

9    think are present in the complaint, and I just wanted to

10   highlight those for Your Honor.  So on RPO, I heard that now

11   the problem is that the price was unique for each advertiser,

12   not that we used historical information because that was

13   disclosed.  And I don't see the allegation that the fact that

14   the price was unique for each advertiser -- I don't see an

15   allegation that was material, that that would have been

16   material, or that advertisers would have changed their

17   bidding behavior had they known that, that particular fact.

18             DRS, dynamic revenue share.  I heard that Google

19   should have disclosed what my colleague described as the

20   peeking at the bids.  That's not what the complaint says in

21   paragraphs 543 to 547.

22             And then again personal information.  I heard about

23   Google giving the decoder ring to advertisers so that they

24   could I guess decode the information in the bid request.

25   Again, I don't see -- I don't see that allegation in that

1    portion of the complaint in paragraphs 582 to 585.

2            And so I would just encourage Your Honor to, when

3    you're thinking about these issues, look carefully at the

4    complaint because we can only respond to the allegations of

5    misrepresentations and omissions that are actually pleaded in

6    the complaint, and can't sit up here and play Whac-a-Mole

7    with allegations that haven't been made or weren't clearly

8    made.  And that's part of the reason why a Rule 9 is the

9    standard that applies when we're being accused of fraud or

10   misrepresentation.

11           THE COURT:  I want to make sure that I understand

12   the argument I think you were just making about, I guess, the

13   way it sounds like you're framing it is sort of what is the

14   baseline expectation that somebody has.  So, you know,

15   whether it's the reserve price optimization or dynamic

16   revenue sharing, your point would be there is nothing in the

17   complaint to show that the people participating or entities

18   participating had a different understanding or had some

19   particular understanding of the way that the auction was

20   going to go that did not include that information.  Is that

21   your point?

22           MS. SESSIONS:  Basically, Your Honor, yes.  Without

23   some identification of the representations that Google was

24   making to folks at the time about how the auction worked, how

25   can you say that the failure to include this or that detail

1    was misleading?  Because they haven't established the absence

2    of this or that detail was a part of anybody's baseline

3    understanding of how the auction worked.

4            THE COURT:  All right.  I have a feeling Mr. Keller

5    is going to want to say more.  You know, let me -- in that

6    context, though, a lot of this talk is about the reserve

7    price and what expectations would be about the setting of the

8    reserve price.  How do you respond to the notion of, well,

9    people are just going to expect that, you know, that the

10   reserve price is just going to be set, it's not going to

11   move?

12           MS. SESSIONS:  I -- well, I don't think that's

13   pleaded, and I think that that's inconsistent with the facts.

14   So the complaint does acknowledge that prior to Google's

15   reserve price optimization, that publishers were setting

16   reserve prices.  And so it is not as if Google invented the

17   idea of a reserve price and introduced it into the auction

18   with reserved price optimization.  This was a better way, a

19   better tool, for publishers to set their reserve prices.  But

20   this was going on prior to Google's reserve price

21   optimization.

22           And, in fact, one of the documents that the

23   plaintiffs cite, which they characterize as a discussion of

24   this undermining the idea of first price auctions, is, in

25   fact, a discussion of publishers on their own setting

1    increasingly higher reserve prices on transactions, which is

2    a practice that was called "soft flooring" where publishers

3    were kind of trying to fish for a better -- you know, fish

4    for the best price that they could.

5           So all of that is not -- you know, it's in a

6    document that's integral to the complaint, but my point here

7    is that the complaint doesn't say that this introduction of

8    reserve prices was some new and shocking thing and, in fact,

9    acknowledges that publishers were setting reserve prices in

10   auctions prior to Google's introduction of reserve price

11   optimization.

12           THE COURT:  All right.

13           MS. SESSIONS:  Thank you, Your Honor.

14           THE COURT:  Thank you, Ms. Sessions.

15           Mr. Keller, I don't know if you want to respond.  I

16   had one thing I wanted to touch base with you on here, and I

17   say touch base on that Rule 9(b) application.  And I think I

18   meant to visit with you on this before.  There is a very

19   recent Fifth Circuit case, literally March 21st, *Kumar v.*

20   *Panera Bread Company*, and it's just one where the Fifth

21   Circuit, in the specific context of the Texas DTPA, it's just

22   saying in federal court a complaint alleging violations of

23   the DTPA is subject to the requirements of Federal Rule 9(b),

24   which requires fraud be pleaded with particularity.  That

25   decision also notes, however, that Rule 9(b)'s ultimate

1    meaning is context specific, which we've said.  And also

2    says, "Likewise, we are mindful that Rule 9(b) does not

3    supplant Rule 8(a)'s notice pleading, which requires only

4    enough facts to state a claim on relief that is plausible on

5    its face."

6            So it's an articulate -- it's citing to some prior

7    Fifth Circuit cases that I'm sure both sides have seen, but

8    it's basically saying Rule 9(b) is generally going to apply

9    to these cases, meaning pleading with particularity, but with

10   the caveats that I think both sides have recognized.

11           MR. KELLER:  Yeah.  On that case in particular, I

12   hate being at the lectern saying I haven't seen that case.

13   As you noted, it was recent.  But I think I agree with all of

14   the things you articulated.  And of course, even if I didn't,

15   I would be bound to agree by it with what the Fifth Circuit

16   has told you to do.

17           None of that I think is inconsistent with what

18   we've been sort of discussing, and the fact that it's

19   possible there can be a relaxed Rule 9(b) in a certain

20   context like sovereign enforcement.  But for the most part, I

21   don't think the relaxation does very much.  I think we get

22   there just on the points of disagreement that you've heard

23   from both sides.  We're pointing to the specific things that

24   we think were deceptive, and they're essentially responding,

25   well, they weren't because people knew about it, or it

1    wouldn't have been material, or it wouldn't have changed

2    behavior.  So it's not like they don't know the theory of

3    what counts as deceptive or an omission that we say is

4    actionable.  It's just they don't think that it actually

5    rises to the statutory standards.

6              THE COURT:  Right.  I think both sides are pretty

7    much on the same page on these standards.  And we have,

8    obviously, recent precedent from the Fifth Circuit that's

9    confirming I think these principles.  But I assume you may

10   want to comment on what you just heard from your friend on

11   the other side.

12             MR. KELLER:  Yeah.  When I first started hearing my

13   friend on the other side, I thought she might have been

14   saying that, for example, we don't plead in the complaint

15   that there is a unique reserve price set for each advertiser.

16   There clearly was.  You can look at paragraph 532 to 533 for

17   that.  I think what it became clearer to me that my friend on

18   the other side was arguing was, "Yeah, but that wouldn't have

19   been deceptive."  Again, taking the pleading standard as we

20   find it and drawing all inferences in our favor, the

21   complaint pleads that starting in 2010, Google said that it

22   was running a reserve second price auction.

23             The idea that advertisers wouldn't have wanted to

24   know that there wasn't just going to be just one reserve

25   price, but individual reserve prices set for each one of

1    them, I think that beggars belief.  But certainly, on a

2    12(b)(6), it's not something that you can accept from

3    Google's perspective.  You have to draw the inference in our

4    favor.  But the whole concept of a reserve price is there's a

5    single one.  Once you start setting reserve prices for each

6    bidder who walks into the auction house, that's a completely

7    different kettle of fish.

8              THE COURT:  Is it fair to say from the States'

9    perspective that, you know, if it is put out there this is a

10   second price auction that's running, that that carries a

11   group of expectations with it, and that's your point?  And

12   then if things are different than what those I think that the

13   States would say are standard expectations of how that's

14   going to run, where there are divergences from that, that's

15   what you're saying people would have wanted to know.

16             MR. KELLER:  That's absolutely what I'm saying,

17   Your Honor.  And they actually try and turn this positive

18   point for us into one that's positive for them.  And I don't

19   blame them for trying the jujitsu, but they say, "Oh, well,

20   2010, that was so long ago, people knew that we had moved on

21   from that."  If you go to Sotheby's and Christie's to buy and

22   sell items, and you've been going there for years or decades

23   and they haven't changed their auction rules, your

24   expectation is those are the rules of the auction.  They

25   can't just secretly change it and say, "Well, it's been a

1    couple of years.  We reserve the right to optimize things to

2    take money out of your pocket and put it in ours."  That's

3    not how any reasonable consumer, defined again the way "a

4    consumer" is defined in these statutes, would be behaving.

5              THE COURT:  All right.  Thank you, Mr. Keller.

6              Ms. Sessions, let me -- I don't know if you have to

7    go all the way back up to the podium.  But, well, the

8    discussion I just had with Mr. Keller, I want to make sure

9    from Google's perspective, is it factually accurate to say

10   that what was being made clear from the get-go was this is a

11   second price auction until you changed it to a first price

12   auction; that that was -- that Google's acknowledging this

13   was what was put out there to the participants as your part

14   of a second price auction.

15             MS. SESSIONS:  So, Your Honor, right, there aren't

16   statements beyond 2010 that have been pleaded.  However, I

17   would not dispute that Google was running a second price

18   auction until 2019 when it changed to a first price auction.

19   And none of reserve price optimization, or dynamic revenue

20   share, or Bernanke changed the fact that Google was still

21   running a second price auction.  My point is it's the details

22   beyond that that are being haggled over at the moment.

23             And so the representation that the auction is

24   second price in the way that they described it as where the

25   bidder pays either the second -- the next price or the

1    reserve price, isn't undermined by the existence of any of

2    these optimizations.  And that's my point about the

3    subsequent details really, really matter.

4         THE COURT:  And is there anything you want to say

5    about Mr. Keller's point that that term "second price

6    auction" in this context is going to carry these expectations

7    such that those changes that were made -- whether it's

8    dynamic revenue allocation, whether it's reserve price

9    optimization -- are things that the participants would very

10   much want to know because they wouldn't have expected it to

11   be part of that auction?  That's the point of Mr. Keller.

12        MS. SESSIONS:  Yes.  And I would just respond that

13   there are no facts pleaded in the complaint that would

14   establish anybody's expectations on those points, you know,

15   beyond 2010 or beyond the disclosures that Google made about

16   its auctions.

17        THE COURT:  All right.  Thank you, Ms. Sessions.

18        I think we've covered certainly all the questions

19   that I had.  I appreciate counsel, Mr. Mahr, has departed,

20   but I appreciate all of the argument from the parties.  It's

21   been very helpful on both motions.  Needless to say, we will

22   be working on these and trying to get decisions as timely as

23   we can.

24        Anything further, Mr. Keller, from the States

25   today?  And the reason I raise that is if -- and it may be

1    Mr. DeRose, but what I mentioned earlier before you all

2    visited the special master was if there's anything that you

3    think we need to take up discovery wise today, you know,

4    while we're here, I'm willing to do it.  But it seems like

5    maybe there's not.

6            Maybe I'm turning to you, Mr. DeRose.  Anything

7    else from the States today?

8            MR. DEROSE:  I do not think that there is anything

9    else from the States.  Ms. Sessions and Mr. McBride were

10   discussing the Korula deposition and the topics.  Our

11   understanding is the Korula deposition will go forward

12   tomorrow, and there will be another date next week.  But

13   there are some specifics around the topics and things of that

14   sort.  Is that correct?

15           MS. SESSIONS:  Yeah.  I think we had a productive

16   conversation.  And the deposition is going to go forward

17   tomorrow.  And then we're also looking for Mr. Korula's

18   availability to sit for some additional time.

19           MR. DEROSE:  I think we're good, Your Honor.

20           THE COURT:  All right.  So nothing further from the

21   States.

22           So Mr. Yetter, Ms. Sessions, anything further from

23   Google?

24           MR. YETTER:  Nothing, Your Honor.  Thank you for

25   all the time and patience for today, and your staff.

1          THE COURT:  It's been an entire day of Texas versus

2    Google.

3          All right.  Again, thank you for your arguments,

4    counsel, they're appreciated.

5          And we will stand in recess.  Thank you.

6          THE COURT SECURITY OFFICER:  All rise.

7                    *    *    *    *    *

8

9          CERTIFICATE OF OFFICIAL REPORTER

10

11          I, Gayle Wear, Federal Official Court Reporter, in

12    and for the United States District Court for the Eastern

13    District of Texas, do hereby certify that pursuant to Section

14    753, Title 28 United States Code, that the foregoing is a

15    true and correct transcript of the stenographically reported

16    proceedings held in the above-entitled matter and that the

17    transcript page format is in conformance with the regulations

18    of the Judicial Conference of the United States.

19

20               Dated 20th day of April 2024.

21

22

23          /s/ Gayle Wear
            GAYLE WEAR, RPR, CRR
24          FEDERAL OFFICIAL COURT REPORTER

25