***FILED UNDER SEAL***

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § § | |
| Plaintiffs, | § § | Civil Action No. 4:20-cv-00957-SDJ |
| v. | § § | Hon. Sean D. Jordan |
| GOOGLE LLC, | § § | |
| Defendant. | § § § § | Special Master: David T. Moran |

**PLAINTIFF STATES' RESPONSE TO GOOGLE'S
MOTION FOR A PROTECTIVE ORDER REGARDING DISCOVERY-ON-
DISCOVERY ISSUES AND IN-HOUSE COUNSEL DEPOSITION**

## TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................................................... 1

Background ..................................................................................................................................... 3

    I.    Google Chats Are Relevant Yet Google's Chat Production is Miniscule. ......................... 3

    II.    Google Broadly Labels Communications as Privileged .................................................... 5

Argument ........................................................................................................................................ 6

    I.    The Evidence Supports a "Reasonable Deduction" That Relevant Chats and Non-Privileged Documents May Exist or Did Exist But Have Been Destroyed ............................... 7

        A.    The Evidence Supports a "Reasonable Deduction" That Relevant Chats Were Destroyed ................................................................................................................... 7

        B.    The Evidence Supports a "Reasonable Deduction" That Google's Practice of Fake Privilege May Have Permeated This Case .................................................................. 9

        C.    What Is Good for the Goose Is Good for the Gander: Google Has Sought and Is Obtaining Similar Discovery From All of the States ............................................... 10

    II.    The States' "Discovery-on-Discovery" is Timely ........................................................... 10

    III.    The *Shelton* Standard Does Not Apply to Shield ████████, Google's Display Ads Product Counsel, from Deposition ................................................................................. 11

Conclusion .................................................................................................................................... 12

***FILED UNDER SEAL***

Plaintiff States ("States") submit this response to Google's Motion for a Protective Order regarding discovery-on-discovery issues and in-house counsel deposition (ECF No. 348).

## INTRODUCTION

Despite insisting to conduct discovery-on-discovery against each of the 17 States in this case (none of which are alleged to have spoliated evidence), Google wants to entirely block the States from conducting any further discovery on two highly relevant issues: (1) Google's preservation of Google Chats and (2) Google's broad invocation of the attorney-client privilege.

The States' discovery into these areas is well-founded. Last year, in the *Play* case, another federal court sanctioned Google for destroying Chats during the same relevant time period as here with a permissive inference in jury instructions. As that court rebuked, Google fell "**strikingly short**" on its duty to preserve Chats, displaying an "intentionality manifested **at every level within Google** to hide the ball with respect to Chat." *See, e.g.*, **Ex. 1**, *In re Google Play Store Antitrust Lit.*, 664 F. Supp. 3d 981, 992-93 (N.D. Cal. 2023) ("*Play*") (emphases added). "In effect, Google adopted a "**don't ask, don't tell**" policy regarding Chat preservation, at the expense of its preservation duties." *Id.* (emphasis added). The court was left with one conclusion: "Google **intended** to subvert the discovery process, and that Chat evidence was lost with the intent to prevent its use in litigation and with intent to deprive another party of the information's use in litigation." *Id*. (emphasis added). Because of those intentions, "relevant, substantive business communications were made on Chat that plaintiffs **will never see**." *Id*. (emphasis added). While this is not the *Play* case, Google Chats are unquestionably relevant here, and the States are entitled to conduct discovery into Google's relevant conduct as to this case.

The *Play* court also found Google to have abused the attorney-client privilege:

> All of this presents **the most serious and disturbing evidence I have ever seen in my decade on the bench** with respect to a party intentionally suppressing potentially

1

> relevant evidence in litigation. I have just **never seen anything this egregious**.
>
> And my concern, as every judge's concern would be, is motivated by the fact that this conduct is a **frontal assault on the fair administration of justice**. It undercuts due process and it calls into question the just resolution of legal disputes. It's antithetical to our system.
>
> In addition to that, it imposes completely untenable costs on scarce federal judicial resources having to deal with all of this. There is nothing I would rather do than not deal with this, **but you have forced me to do it because of this rampant and systemic culture of evidence suppression at Google**.

**Ex. 2** at 3228:19-3229:14 (emphasis added). Those same "disturbing" privilege practices may be present in this case and certainly present highly relevant issues that the States are entitled to investigate here. *See* E.D. Tex. Local Rule CV-26(d).

There can be no question that both Google Chats and privilege practices are relevant and subject to discovery in this case, and Google cannot simply block unfavorable discovery. Specifically, the States seek Chat discovery to determine the extent that Google has destroyed relevant Chats in this matter. It is undisputed that Google employees use Chats interchangeably with email to communicate about substantive AdTech business. Indeed, Google witnesses have testified that they can send over 100 Chats per day and use Chats as frequently, if not more, than email. But remarkably, of the approximately 6 million documents Google has produced in this case, *it has only produced 13,588 Chats*. That stands in stark contrast with Google's production of *3.8 million* emails. Given that enormous production discrepancy, testimony by Google employees that Chats are as important as email and used just as often, and Google's documented history of spoliation—spoliation that occurred under the same preservation policies Google used in this matter, over the same relevant time period—the States' discovery is permissible.

With respect to discovery into Google's privilege practices, the States seek to depose Google's in-house product counsel, ▮▮▮▮▮▮▮▮—who "leads Google's Display Media Legal

team, which advises product teams on all aspects of display advertising"[1]—about her use of "fake privilege" with respect to relevant display advertising documents in this case. "Fake privilege" is ███'s own language, referencing Google's sweeping practice of labeling and improperly shielding communications that do not actually seek legal advice as privileged. Her testimony is not privileged or protected, as she testified in open court about this same subject. Her deposition is necessary here because, after the States alerted Google to serious deficiencies in its privilege logs, Google re-reviewed them and has provided **170,475 revisions** to its initial 486,429 privilege log entries, produced approximately 31,804 documents that were previously withheld, and re-produced approximately 6,685 others where Google de-designated privilege. Of those 38,489 documents, 822 included Ms. ███—**but, crucially, she still appears in large numbers of privilege log entries as to withheld relevant documents**. Given ███'s knowledge and established use of fake privilege, her testimony is necessary to understand the scope of Google's practices and whether Google is still improperly withholding non-privileged documents.

## BACKGROUND

I.   **Google Chats Are Relevant Yet Google's Chat Production is Miniscule.**

A pervasive practice at Google that directly impacts this case arises from Google employees—including witnesses and custodians in this case—using Chats interchangeably with email for substantive Google business communications.[2] For instance, ███████, Google's Managing Director of Global Product and Sales Strategy, recently testified that he sends hundreds of Chats every day.[3] These Chats bear on matters relevant to AdTech; in one, ███ told another employee that he wanted to ask a Google product and engineering executive, "do we punish

---

[1] https://www.pli.edu/faculty/███████████.
[2] *See, e.g.* **Ex. 1** at 986; **Ex. 3** (███████) at 80:3, 99:21; See **Ex. 4** (█████) at 243:19-245:14, 256:14-23; **Ex. 25** (███) at 33:1-18.
[3] **Ex. 4** at 258:23-25.

3

businesses and consumers" and just "[t]ake our ball and just F-ing go home" in response to antitrust actions against Google.[4] But despite ▮'s consistent use of Chats, Google produced only 320 Chats for him, compared with 78,146 emails and other communications.[5]

▮'s Chat experience and production discrepancy reflects that of other employees too.[6] Another employee, ▮, testified that she uses Chats daily to communicate about AdTech products with the sales, engineering, and product management teams, that Chats are more conducive for quick discussions and are not replicated in emails, and that she sometimes sends more Chats than emails.[7]

Yet Google's Chat production is lacking. The Chats Google *has* produced establish that employees use Chats to discuss highly relevant topics, including, among other things: (1) impression counting and auction results in 2023[8]; (2) AdTech product launches in 2022[9]; (3) UPR and header bidding in 2021[10]; (4) transparency and consent from publishers and advertisers in 2020[11]; (5) CPM in 2018[12]; and (6) bid prices in 2017[13].

Despite employees' widespread use of Chats to discuss relevant issues to this case, Google's sparse Chat production was only recently revealed. Google's initial document productions did not distinguish Chats from emails or other documents and lacked metadata that would enable the States to easily identify Chats. The States did not know the exact number of Chats Google had produced until March 1, 2024, when Google confirmed it had only produced

---

[4] *Id*. at 290:9-291:10.
[5] **Appx. A** (histogram showing Chat production for Mr. ▮ compared to other documents).
[6] **Appx. B** (histogram showing Chat production for ▮, another AdTech deponent).
[7] **Ex. 5** (Excerpt from Dep. of ▮) at 60:18-62:2 63:10-65:13, 97:16-98:19, 99:10-14.
[8] **Ex. 6** (GOOG-AT-MDL-013266652).
[9] **Ex. 7** (GOOG-AT-MDL017709737).
[10] **Ex. 8** (GOOG-AT-MDL-00907226; GOOG-AT-MDL-009286790).
[11] **Ex. 9** (GOOG-AT-MDL-018285349).
[12] **Ex. 10** (GOOG-AT-MDL-B-004444043).
[13] **Ex. 11** (GOOG-AT-MDL-B-004444006).

13,588 Chats.[14] As of April 10, 2024, Chats make up just **0.26%** of Google's production.[15] And of the Chats Google has produced, 28.4% *are from 2024*.[16] Juxtapose that with the rest of Google's production, which peaks in 2018 and 2019.[17]

## II.   Google Broadly Labels Communications as Privileged

▮▮▮▮▮, Google's in-house product counsel who advises the AdTech business on legal and non-legal matters,[18] appears in thousands of privilege log entries, including entries asserting that Ms. ▮▮▮▮ provided legal advice about AdTech product development[19] and compliance with competition laws.[20] Ms. ▮▮▮▮ is also included in many communications labeled as "privileged" that do not actually concern legal advice.[21] Ms. ▮▮▮▮ has previously referred to these types of communications as "fake privilege."[22] Notably, Ms. ▮▮▮▮ is not litigation counsel or counsel of record in this case.

Instead, Ms. ▮▮▮▮ is intimately familiar with Google's use of "fake privilege." In the *Play* trial, Ms. ▮▮▮▮ testified about her "fake privilege" Chats with another Google lawyer, ▮▮▮▮▮▮▮: "So all I have is an email thread where they looped me in for fake privilege…."[23]; "Yeah like the fake privilege!"[24] In *Play*, Ms. ▮▮▮▮ explained that "fake

---

[14] **Ex. 12** (email from Google's counsel with attached spreadsheet of all produced Chats).
[15] **Appx. C** (histogram of Google's total document production).
[16] **Appx. D** (histogram showing year of origin for Google's produced Google Chats).
[17] **Appx. E** (histogram showing year of origin for all of Google's produced documents)
[18] **Ex. 13** (GOOG-AT-MDL-B-000683892); **Ex. 14** (GOOG-AT-MDL-016948375); **Ex. 15** (GOOG-AT-MDL-012349411)
[19] **Appx. F** (GGPL-AT-0006449; GGPL-AT-000611450; GGPL-AT-000658736; GGPL-AT-000706632; GGPL-AT-000741924) (this is non-exhaustive list of many similar entries).
[20] **Appx. F** (GGPL-AT-000731702; GGPL-AT-000716614; GGPL-AT-000634949; GGPL-AT-000602668; GGPL-AT-000601219) (this is not an exhaustive list of many similar entries).
[21] In the *Search* litigation, Judge Mehta ordered Google to review all "silent attorney" emails—those where legal counsel was included on an email but never responded. **Ex. 16** at 67:12-21; *see also* **Ex. 17** (GOOG-DOJ-32554988); **Ex. 18** (GOOG-DOJ-32554843); **Ex. 19** (GOOG-NE-10508355).
[22] **Ex. 20** (GOOG-PLAY5-000500332); **Ex. 21** at 964:25-966:8
[23] **Ex. 20**.
[24] **Ex. 22**.

***FILED UNDER SEAL***

privilege" referred to a lawyer being copied on a communication where someone misapprehended the way the privilege works.[25]

In this matter, after the States received Google's initial 26 volumes of privilege logs (with 486,429 privilege log entries) and identified serious deficiencies, Google agreed to re-review its privilege logs. As of today, Google's re-review has yielded ***170,475 revisions in 28 "revision" volumes***. Google has also produced approximately 31,804 documents it previously withheld and re-produced approximately 6,685 others that Google de-designated. Of those 38,489 documents, 822 included ▬▬▬▬, and she remains on large numbers of still-withheld documents.

## ARGUMENT

Under Rule 26(b)(1), parties have the right to discover any relevant information, including "discovery-on-discovery." Information is relevant if, among other things, it (1) "is likely to have an influence on or affect the outcome of a claim or defense"; (2) "deserves to be considered in the preparation, evaluation, or trial of a claim or defense"; or (3) "is information that reasonable and competent counsel would consider reasonably necessary to prepare, evaluate, or try a claim or defense." Local Rule CV-26(d). Relevancy is "broadly construed, and a request for discovery should be considered relevant if there is *any* possibility that the information sought may be relevant to the claim or defense of any party." *Houser v. LaSalle Mgmt. Co. LLC*, 2019 WL 13212319, at *1 (E.D. Tex. Dec. 4, 2019) (Schroeder, J.) (cleaned up, emphasis added).

To seek "discovery-on-discovery" based on a deficiency in the responding party's production, a party need only "make a showing, including through the documents that have been produced, that allows the Court to make *a reasonable deduction* that other documents may exist or did exist and have been destroyed . . . ." *U. S. v. Planned Parenthood Fed'n of Am., Inc.*, 2022

---

[25] **Ex. 21** at 966:2-8.

***FILED UNDER SEAL***

WL 19021566, at *2 (N.D. Tex. Sept. 20, 2022) (emphasis added, quotation omitted). Here, there is substantial evidence that relevant Chats exist but have not been produced, or did exist but have now been destroyed, and that Google has misused the attorney-client privilege. In light of that evidence, the States's sought discovery requests is proper and should be permitted.[26]

I. **The Evidence Supports a "Reasonable Deduction" That Relevant Chats and Non-Privileged Documents May Exist or Did Exist But Have Been Destroyed**

   A. <u>The Evidence Supports a "Reasonable Deduction" That Relevant Chats Were Destroyed</u>

The States have shown that the facts of *this* case support a "reasonable deduction" that relevant information exists or did exist and has been destroyed. Google employees have testified that Chats are interchangeable with emails for substantive communications and that they send dozens or hundreds of Chats per day. Yet Google's production of Chats is miniscule, especially compared to its production of emails and other documents for those employees. In addition to that production discrepancy in this case is the *Play* court's explicit finding that Google "failed to preserve Chat evidence with the intent of preventing its use in this litigation and with the intent of depriving [plaintiff] of the use of that evidence," during the same relevant time period, and that the dearth of produced Chats supports a "reasonable deduction" that Chats existed but were destroyed. **Ex. 2** at 3226:24-3227:4; *see also* **Ex. 23** at 18.

---

[26] The cases on which Google relies that limited the scope of discovery are inapposite. In *VeroBlue*, the court actually compelled production of information concerning defendants' retention practice after finding reason to believe defendants were "withholding relevant evidence, or relevant evidence has been destroyed[.]" 2021 WL 5176839, at *29. *See also Grey v. Dallas Indep. Sch. Dist.*, 265 F. App'x 342, 348 (5th Cir. 2008) (affirming denial of motion to compel because plaintiff waited to file the motion until the discovery deadline); *Carroll v. Variety Children's Hosp.*, No. 4:07-MC-033, 2007 WL 2446553, at *2 (E.D. Tex. Aug. 23, 2007) (Bush, M.J.) (quashing a subpoena to a third party who had already produced documents and been deposed in a "materially similar" dispute between the same parties, therefore the discovery sought was cumulative and duplicative); *Wade v. Westinghouse Lighting Corp.*, No. 1:11-CV-483, 2013 WL 12136608, at *5 (E.D. Tex. June 4, 2013) (Giblin, M.J.) (granting protective order where plaintiff sought to depose two Chinese nationals where plaintiff already had deposed the employees' supervisor who had most knowledge); *Alvarado v. State Farm Lloyds*, No. 7:14-CV-166, 2015 WL 12941979, at *4 (S.D. Tex. Jan. 29, 2015) (granting protective order where plaintiff sought a 30(b)(6) deposition going beyond the crux of plaintiff's complaint that an insurer had undervalued a loss).

In similar circumstances, courts have allowed discovery-on-discovery. In *Planned Parenthood*, the court found the discrepancy in defendants' production volumes sufficient to support a reasonable deduction where one defendant had produced 1,292 documents (and only 857 emails) over a twelve-year period but the other produced approximately 75,000 documents. 2022 WL 19021566, at *3. And in *Sinclair Wyoming Refining Company v. A&B Builders, Ltd.*, the court allowed discovery into a refining company's document retention practices where the party seeking discovery presented evidence about potential spoliation. 2017 WL 10309306, at *1, 6-7 (D. Wyo. Oct. 31, 2017). Moreover, the court even allowed discovery into the company's document retention policies in a separate litigation where the underlying incidents—and the potential spoliation—occurred around the same time. *Id.* at *6-7.

Here, Google has produced only 1 chat document for every 282 emails produced, despite substantial evidence and express testimony that Google employees use Chats ***as much or more*** than emails. Either relevant Chats are being withheld or have been destroyed. The States are entitled to the answer, which they cannot obtain without further discovery.

Additionally, the States' discovery requests are not governed by the MDL. Unlike the Eastern District of Texas, the Southern District of New York's Local Rules limit the scope of permissible interrogatories. S.D.N.Y. Local Civil Rule 33.3.; *see also* **Ex. 24** at 2 n.1. The MDL interrogatories also sought broad information about any data source touching on AdTech. *Id.* at 2-3. In contrast, here, the States have limited their requests to Chats and privilege, areas where there is specific evidence that Chats may exist but have not been produced or may have been destroyed.

Finally, *when* Google told Texas about its retention policies does not matter; the issue is whether Google employees actually *followed* those policies. The States' evidence indicates they did not; the *Play* court found that, despite preservation instructions concerning Chats—the same

8

instructions Google gave employees for Chats in this matter—Google's employees were "unable or unwilling" to follow them. **Ex. 23** at ¶ 33. That was a serious problem because Google "left employees largely on their own to determine what [Chats] might be relevant[.]" *Id.* at ¶ 35. If the employee did not take action to preserve a Chat, it was destroyed. That problem has continued here; when asked whether he preserved any Chats for this matter, ▮▮▮▮, a Google Staff Research Scientist, testified: "*I did not do anything to preserve or not to preserve Chats.*"[27]

    B. <u>The Evidence Supports a "Reasonable Deduction" That Google's Practice of Fake Privilege May Have Permeated This Case</u>

The States have also shown that the facts of *this* case support a "reasonable deduction" that Google abused attorney-client privilege through "fake privilege" and related practices. After the States alerted Google to substantial deficiencies in its privilege logs, including tens of thousands of entries where no attorney was identified as a sender or recipient, Google agreed to re-review its logs. In doing so, it provided 170,475 revisions to the original 486,429 entries. Google also produced over 31,000 documents it had previously withheld, and re-produced 6,685 documents where Google de-designated privilege. **But, crucially, large volumes of documents remain even on Google's revised logs, including entries and withheld documents involving display ads product counsel ▮▮▮▮▮▮▮▮.** That is particularly troubling to the States, because in the *Play* case, Ms. ▮▮▮▮ testified about Google's invocation of "fake privilege," which the judge said was the "most serious and disturbing" evidence issue he had ever seen on the bench and was a "frontal assault on the fair administration of justice." **Ex. 2** at 3228:19-20, 3228:25-3229:1. The *Play* court found Ms. ▮▮▮▮'s efforts to explain away the practice not credible and unpersuasive. *Id.* at 3227:14-16. Given Google's revision of hundreds of thousands of privilege log entries, production

---

[27] **Ex. 25** (▮▮▮▮) at 33:23-34:1.

of over 31,000 documents previously withheld, **continued withholding of documents involving Ms. ▮▮▮▮**, and history of abusing privilege, the States have legitimate grounds for questioning Ms. ▮▮▮▮—Google's display advertising product counsel who has already testified about fake privilege—to vet the scope of Google's fake privilege practice.

### C. What Is Good for the Goose Is Good for the Gander: Google Has Sought and Is Obtaining Similar Discovery From All of the States

Further undermining Google's efforts to block relevant discovery against itself, Google has sought and has obtained, and is obtaining, similar discovery-on-discovery from the States. Yet, unlike with respect to Google, there is no indication of any spoliation or improper withholding by the States. Recognizing the breadth of relevance and permissible discovery in this District, the States have nonetheless cooperated with Google to provide information and testimony on Google's discovery-on-discovery. Specifically, in Google's 30(b)(6) deposition notice to the State of Texas, the first three topics concern document retention and preservation. Google cannot be allowed to shield itself from discovery into its own document retention and preservation practices while seeking the same discovery from the States.[28]

## II. The States' "Discovery-on-Discovery" is Timely

Google's argument that the States should have sought this discovery earlier is a non-starter. The States sought discovery into Google's Chat preservation and privilege practices and fake privilege practices as soon as it was clear Google's productions were deficient. Google did not confirm what Chats it had produced to the States until March 1, 2024. Nor did it begin producing

---

[28] *See* ECF No. 339 at 6 ("The Special Master is persuaded that Google cannot on the one hand offer its own witnesses only in a particular sequence while insisting that the States reconfigure their deposition schedule-particularly as to the State of Texas-to Google's liking."); *Heffernan v. City of Paterson, NJ*, 578 U.S. 266, 272 (2016) (Breyer, J.) ("After all, in the law, **what is sauce for the goose is normally sauce for the gander**.") (emphasis added); *Ex parte Tokio Marine & Fire Ins. Co.*, 322 F.2d 113, 116 (5th Cir. 1963) ("What is sauce…for the goose is the same for the gander."); *Allergan, Inc. v. Teva Pharms. USA*, 2017 WL 373462, at *3 (E.D. Tex. Jan. 26, 2017) ("[T]he venerable legal principle that 'what is sauce for the goose is sauce for the gander' applies here.").

***FILED UNDER SEAL***

revised privilege logs or de-designation productions until March 1, 2024. Once the discrepancies were clear, the States propounded targeted discovery on those issues, which Google promptly avoided. The States also deposed Google's fact witnesses—during depositions that began just in the last month—specifically about Chats, asking questions those witnesses either could not answer or answered in a way that led to a reasonable deduction that Chats were missing and/or destroyed. This evidence rises to the level of showing that there were relevant documents that Google had destroyed or was withholding, and shows that other means of discovery are insufficient to investigate it. *Planned Parenthood*, 2022 WL 19021566, at *2.

Google's argument that it disclosed its retention policies to the States years ago, and thus has a get-out-of-jail-free card from its preservation obligations, is similarly a non-issue. The issue has never been what the policy was, but that Google's employees did not follow the policy. Further, Google's obligation to preserve documents arose before it ever had any discussions with the States about preservation, and extended to *all* relevant information, whether Chats, other "ephemeral messaging," or email.[29]

### III. The *Shelton* Standard Does Not Apply to Shield ▬▬▬▬, Google's Display Ads Product Counsel, from Deposition

Google cannot find any shelter under *Shelton* either. ▬▬▬▬ is not Google's trial counsel nor is ▬▬▬ involved in trial strategy. Sister courts have allowed similar depositions. For instance, in *Nguyen v. Excel Corporation*, the Fifth Circuit approved a district court ordering the depositions of defense counsel. 197 F.3d 200, 208-209 (5th Cir. 1999) (citing *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986)). The States do not seek Ms. ▬▬▬'s deposition to discover Google's trial strategy. Rather, they seek testimony about Google's "fake

---

[29] Office of Public Affairs, U.S. Dep't of Justice (Jan. 26, 2024), https://www.justice.gov/opa/pr/justice-department-and-ftc-update-guidance-reinforces-parties-preservation-obligations.

privilege" practice—a non-privileged subject—of including attorneys on communications that do not seek legal advice and labeling them as privileged. After all, Ms. ▓▓▓▓ testified in open court before about this same issue. Because Ms. ▓▓▓▓ is not trial counsel or involved with trial strategy, *Shelton* does not apply. *E.g.*, *Moser as Trustee of Tango Transport, LLC v. Navistar Int'l Corp.*, 2019 WL 763487, at *1-2 (E.D. Tex. Feb. 20, 2019) (Mazzant, J.); *DataTreasury Corp. v. Wells Fargo & Co.*, 2009 WL 10742267, at *2 (E.D. Tex. June 23, 2009) (finding *Shelton* did not apply where attorney was not trial counsel and where questioning would not expose litigation strategy).[30]

In any event, were the Court to apply *Shelton*, its criteria have been met.[31] First, the States have no other means to obtain Ms. ▓▓▓▓'s testimony about what *she herself* has referred to as "fake privilege." Google's argument that Ms. ▓▓▓▓'s testimony is unnecessary because she testified in open court does not save it here, as it has not stipulated to admit ▓▓▓▓'s testimony in *Play*, admit Ms. ▓▓▓▓'s chats with ▓▓▓▓ into evidence, or otherwise admit to its use of fake privilege. The information sought is also relevant and crucial to the preparation of the case. Given the vast revisions to Google's privilege logs and the amount of relevant documents it is still withholding, the States have reasonable grounds to explore the full reach of Google's practice.[32]

## CONCLUSION

For the foregoing reasons, Google's Motion (ECF No. 348) should be denied.

---

[30] The cases Google cites are easily distinguished since both sought depositions of counsel involved with trial strategy. *See Ring Plus, Inc. v. Cingular Wireless, LLC*, 2008 WL 11348478, at *3-4 (E.D. Tex. Feb. 13, 2008) (Folsom, J.) (applying *Shelton* where party sought deposition of counsel regarding prosecution of patent); *Nat'l W. Life Ins. Co. v. W. Nat'l Life Ins. Co.*, 2010 WL 5174366, at *2-3 (W.D. Tex. Dec. 13, 2010) (applying *Shelton* where party sought deposition of outside legal counsel involved with trial preparation).

[31] *U.S. v. Philip Morris Inc.*, 209 F.R.D. 13, 17 (D.D.C. 2002) ("[T]he three Shelton criteria apply to limit deposition questions of attorneys in only two instances: (1) when trial and/or litigation counsel are being deposed, and (2) when such questioning would expose litigation strategy in the pending case.").

[32] Additionally, the MDL court, presiding over the separate MDL case, again should not limit the States here. The privilege challenges the MDL court rejected involved more descriptive entries than here. The entries challenged in the MDL identified the specific attorneys and investigations involved. **Ex. 26** at 6-7. MDL Judge Castel, however, ruled that entries like those the States have alleged as deficient here, which did not identify lawyers and described general legal advice concerning pricing guidance, were deficient and discoverable. *Id.* at 5-6.

12

***FILED UNDER SEAL***

Respectfully submitted,

| | |
|---|---|
| */s/ W. Mark Lanier* | */s/ Ashley Keller* |
| W. Mark Lanier | Ashley Keller |
| Mark.Lanier@LanierLawFirm.com | ack@kellerpostman.com |
| Alex J. Brown | 150 N. Riverside Plaza, Suite 4100 |
| Alex.Brown@LanierLawFirm.com | Chicago, Illinois 60606 |
| Zeke DeRose III | (312) 741-5220 |
| Zeke.DeRose@LanierLawFirm.com | |
| Jonathan P. Wilkerson | Zina Bash |
| Jonathan.Wilkerson@LanierLawFirm.com | zina.bash@kellerpostman.com |
| 10940 W. Sam Houston Pkwy N | 111 Congress Avenue, Suite 500 |
| Suite 100 | Austin, TX 78701 |
| Houston, TX 77064 | (512) 690-0990 |
| (713) 659-5200 | |
| **THE LANIER LAW FIRM, PLLC** | Noah S. Heinz |
| | noah.heinz@kellerpostman.com |
| | 1101 Connecticut, N.W., 11th Floor |
| | Washington, DC 20005 |
| | (202) 918-1123 |
| | **KELLER POSTMAN LLC** |

*Counsel for Texas, Idaho, Louisiana (The Lanier Law Firm only), Mississippi, North Dakota, Indiana, South Carolina, and South Dakota*

*Submitted on behalf of all Plaintiff States*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

***FILED UNDER SEAL***

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General

*/s/ Trevor E. D. Young*
Brent Webster, First Assistant Attorney General of Texas
Brent.Webster@oag.texas.gov
James R. Lloyd, Deputy Attorney General for Civil Litigation
James.Lloyd@oag.texas.gov
Trevor Young, Deputy Chief, Antitrust Division
Trevor.Young@oag.texas.gov

**STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

***FILED UNDER SEAL***

## CERTIFICATE OF SERVICE AND SEALING

I certify that, on April 15, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

I also certify that, on April 15, 2024, a motion to seal the foregoing document and its exhibits was filed separately and before the filing of this document under seal, per Local Rule CV-5(a)(7)(B).  This sealed filing will be promptly served by email with a secure link on the Special Master and counsel of record for all parties in this case, and will be publicly filed in redacted form, per Local Rule CV-5(a)(7)(E).

*/s/ Geraldine Young*
Geraldine Young
