# Exhibit 21

**Volume 5**

**Pages 789 - 1036**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE            )
ANTITRUST LITIGATION,              )
                                   )   **NO. 21-md-02981-JD**
_____    )
THIS DOCUMENT RELATES TO:          )
                                   )
EPIC GAMES, INC.,                  )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )   **NO. 3:20-cv-05671-JD**
                                   )
GOOGLE, LLC., et al.,              )
                                   )
            Defendants.            )
_____    )

San Francisco, California
Thursday, November 9, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Rhonda Aquilina, CSR 9956, RMR, CRR
Official United States Reporter

**APPEARANCES**:

For Plaintiff:

           CRAVATH, SWAINE & MOORE LLP
           825 Eighth Avenue
          New York, New York  10019
    BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
          **YONATAN EVEN, ATTORNEY AT LAW**
          **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
          **MICHAEL ZAKEN, ATTORNEY AT LAW**
          **ANDREW WIKTOR, ATTORNEY AT LAW**

           HUESTON HENNIGAN LLP
           523 W 6th Street, Suite 400
           Los Angeles, CA 90014
    BY:  **SOURABH MISHRA, ATTORNEY AT LAW**

For Defendants:

           MUNGER, TOLLES & OLSON LLP
           350 South Grand Avenue - 50th Floor
           Los Angeles, California  90071
    BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**

           MUNGER, TOLLES & OLSON LLP
           601 Massachusetts Avenue NW
           Suite 500 East
           Washington, DC  20001
    BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
          **LAUREN BELL, ATTORNEY AT LAW**
          **JUSTIN RAPHAEL, ATTORNEY AT LAW**

           MORGAN, LEWIS & BOCKIUS LLP
           One Market - Spear Street Tower
           San Francisco, California  94105
    BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**

For Spotify USA:

           SULLIVAN AND CROMWELL LLP
           125 Broad Street
           New York, NY 10004
    BY:  **SVERKER HOGBERG, ATTORNEY AT LAW**

```
 1              I N D E X

 2    Thursday, November 9, 2023 - Volume 5

 3    PLAINTIFFS' WITNESSES                      PAGE   VOL.

 4    KOCHIKAR, PURNIMA (RECALLED)
       (PREVIOUSLY SWORN)                         800    5
 5     Direct Examination resumed by Mr. Hueston  800    5
       Cross-Examination by Ms. Chiu              831    5
 6     Redirect Examination by Mr. Hueston        908    5
       ReCross-Examination by Ms. Chiu            954    5
 7
       GARBER, EMILY
 8      (SWORN)                                    955    5
       Direct Examination by Mr. Bornstein        956    5
 9     Cross-Examination by Ms. Chiu              974    5
       Redirect Examination by Mr. Bornstein      975    5
10
       LAM, MARGARET
11      (SWORN)                                    976    5
       Direct Examination by Ms. Moskowitz        977    5
12     Cross-Examination by Ms. Chiu             1027    5
       Redirect Examination by Ms. Moskowitz     1029    5
13
       PERRYMAN, PAUL
14     By Videotaped Deposition                  1033    5

15              E X H I B I T S

16    TRIAL EXHIBITS                  IDEN  EVID   VOL.

17     713                                  1033    5

18     1410                                  819    5

19     1478                                  811    5

20     1522                                  803    5

21     1524                                  858    5

22     1530                                  922    5

23     1545                                  825    5

24     1546                                  823    5

25
```

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1549 | | 822 | 5 |
| 2050 | | 1033 | 5 |
| 2051 | | 1033 | 5 |
| 2052 | | 1033 | 5 |
| 2054 | | 1033 | 5 |
| 5653 | | 873 | 5 |
| 5696 | | 840 | 5 |
| 5714 | | 850 | 5 |
| 5816 | | 877 | 5 |
| 5911 | | 901 | 5 |
| 5941, cover page, page 10 and page 11 only | | 907 | 5 |
| 6044 | | 902 | 5 |
| 6390 | | 843 | 5 |
| 6454 | | 1023 | 5 |
| 6462 | | 1007 | 5 |
| 6464 | | 993 | 5 |
| 6465 | | 1018 | 5 |
| 6479 | | 1021 | 5 |
| 6487 | | 960 | 5 |
| 6488 | | 969 | 5 |
| 8020 | | 1005 | 5 |
| 8021 | | 1014 | 5 |
| 8024 | | 985 | 5 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 8025 | | 829 | 5 |
| 8519 | | 952 | 5 |
| 8520 | | 910 | 5 |
| 8522 | | 950 | 5 |
| 8523 | | 920 | 5 |
| 8526 | | 947 | 5 |
| 10883 | | 889 | 5 |
| 10928 | | 885 | 5 |

**GARBER - DIRECT / BORNSTEIN**

 1   **A.**   Yes.

 2   **Q.**   Would it be a concern to you if 12 percent of Android users

 3   switched to Apple?

 4   **A.**   Yes.

 5   **Q.**   Is that a significant amount?

 6   **A.**   Yes.

 7           **MS. CHIU:**  Nothing further, Your Honor.

 8           **THE COURT:**  Okay.  You may step down.  Be careful on

 9   the way down.

10           And who do we have next?

11          **MR. BORNSTEIN:**  Your Honor, Epic calls Emily Garber to

12   the stand.

13          **THE CLERK:**  Please stand and raise your right hand.

14                         EMILY GARBER,

15   called as a witness for the PLAINTIFFS, having been duly sworn,

16   testified as follows:

17          **THE WITNESS:**  Yes, I so affirm.

18          **THE CLERK:**  Please be seated.

19           Please state your name for the Court and spell your

20    last name.

21          **THE WITNESS:**  My name is Emily Garber, spelled

22   G-A-R-B-E-R.

23          **THE CLERK:**  Thank you.

24          **MR. BORNSTEIN:**  May I proceed, Your Honor?  Thank you.

25   \\\

1        <u>**DIRECT EXAMINATION**</u>

2    **BY MR. BORNSTEIN:**

3    **Q.**   Ms. Garber, good afternoon.

4    **A.**   Good afternoon.

5    **Q.**   You are a lawyer; am I right?

6    **A.**   Yes, that's right.

7    **Q.**   And you are a lawyer who works at Google?

8    **A.**   Yes.

9    **Q.**   You're a Google employee?

10   **A.**   Yes.

11   **Q.**   And you've been at Google for a little over 9 years now; is

12   that correct?

13   **A.**   Yes, that's right.

14   **Q.**   And your responsibilities include managing something called

15   the Ads Policy Product Counsel Team; is that right?

16   **A.**   Yes, that's right.

17   **Q.**   And as an attorney you are generally familiar with the

18   concept of attorney-client privilege; am I right about that?

19   **A.**   I'm generally familiar, yes.

20   **Q.**   All right.  So attorney-client privilege is a legal concept

21   that protects confidential communications that clients have with

22   their lawyers about requesting legal advice and receiving legal

23   advice; is that fair?

24   **A.**   I think that's generally correct.

25   **Q.**   And when a communication is privileged, it is protected from

1  being disclosed to the other side in a lawsuit like this one,

2  right?

3  **A.**   In some circumstances.

4  **Q.**   In almost all circumstances, right, a privileged

5  communication is supposed to be kept secret within the company

6  and not disclosed in litigation, right?

7  **A.**   I don't think that's always true, but sometimes.

8  **Q.**   Okay.  I'm not asking about sometimes.  My question,

9  Ms. Garber:  It's almost always the case that privileged

10 communications are supposed to be kept secret and not disclosed

11 to the other side in litigation; fair?

12 **A.**   No, that's not my understanding.

13 **Q.**   It's your understanding that these documents are just freely

14 shared in litigation?

15 **A.**   In some circumstances they're shared.

16 **Q.**   Okay.  Just so the record is clear, your view as a lawyer is

17 that privileged communications are not typically withheld in

18 litigation; is that your testimony under oath?

19 **A.**   No, I didn't say typically.  I think it depends on the

20 circumstances.

21 **Q.**   Okay.  So would you please answer the question, Ms. Garber?

22         Typically, privileged communications are withheld from

23 sharing with the other side in litigation, correct?

24 **A.**   In United States litigation normally.

25         **THE COURT:**  I need you to get a little closer to that

1   microphone, please.

2           **THE WITNESS:**  Sorry.

3           **THE COURT:**  Or you can pull it towards you.

4           All right.  Go ahead.

5   **BY MR. BORNSTEIN:**

6   **Q.**   I'm sorry, could you repeat the answer to the question?

7   **A.**   I think typically in typical United States litigation.

8   **Q.**   Fair.  Thank you.

9           Now, will you agree with me that a document doesn't

10   become privileged just because one of the recipients is a

11   lawyer, yes?

12   **A.**   Yes, I agree.

13   **Q.**   As a lawyer you can be part of communications that are not

14   privileged, correct?

15   **A.**   Yes, that's true.

16   **Q.**   And just labeling a document "privileged" also doesn't make

17   the document actually privileged, correct?

18   **A.**   Yes, I agree.

19   **Q.**   Right.  Like if you have a pint of vanilla ice cream and you

20   put a label on it that says "chocolate," it doesn't actually make

21   the ice cream vanilla; fair?

22   **A.**   I think that's true.

23   **Q.**   Right.  The label is just wrong; correct?

24   **A.**   I think that's right.

25   **Q.**   All right.  So privilege depends on the content of the

1    document rather than the label that somebody puts on it, right?

2    **A.**    It does depend on more than the label.

3    **Q.**    Right.  It depends on the content, correct, as well as the

4    fact that a lawyer is involved?

5    **A.**    And the circumstances of the generation, yeah.

6    **Q.**    Very good.  Now, you, at Google, you have a colleague named

7    Tristan Ostrowski; is that right?

8    **A.**    Yes, that's right.

9    **Q.**    And Mr. Ostrowski is also a lawyer?

10   **A.**    Yes, that's right.

11   **Q.**    And his responsibilities include supporting the Google Play

12   Store business; is that right?

13   **A.**    Yes, that's right.

14   **Q.**    And you and Mr. Ostrowski have, during your time at Google,

15   regularly communicated with one another as part of your job,

16   right?

17   **A.**    Yes, that's true.

18   **Q.**    Okay.  Now, you should have a binder in front of you there,

19   and I would like you, please, to turn to Exhibit 6487 in the

20   binder.  There should be a tab that helps you find it.

21   **A.**    Okay.  I think I have it.

22   **Q.**    Great.  And this is a Google Chat communication that you had

23   with Mr. Ostrowski in January of 2021; is that correct?

24   **A.**    Yes, that looks right.

25         **MR. BORNSTEIN:**  Your Honor, I move the admission of

 1   Exhibit 6487, please.

 2           **MS. CHIU:**  Your Honor, we don't have objections.  We

 3   just have -- I just wanted to confirm we have an agreement only

 4   certain portions of this document will be shown to the jury.

 5           **MR. BORNSTEIN:**  Correct.

 6           **MS. CHIU:**  No objections.

 7           **THE COURT:**  You know which portions?

 8           **MR. BORNSTEIN:**  We have discussed in advance, Your

 9   Honor.  Yes, we have.

10           **THE COURT:**  Admitted on that basis.  Go ahead.

11                           (Trial Exhibit 6487 received in

12                            evidence.)

13   **BY MR. BORNSTEIN:**

14   **Q.**    Thank you.  Now, Ms. Garber, we have this chat to look at

15   because either you or Mr. Ostrowski had your history set to "on"

16   while this conversation was happening, right?

17   **A.**    That's correct, for this chat, yes.

18   **Q.**    Right.  Or at least the portions of the chat that we have,

19   right?

20   **A.**    Yes.

21   **Q.**    Okay.  And we've heard a lot of discussion about chat in the

22   courtroom, so I'm going to spare people, but just one or two

23   questions.

24           Google Chat is a communication method where you can

25    have substantive business communications with your colleagues,

GARBER - DIRECT / BORNSTEIN

1   correct?

2   **A.**   Yes, you could have any type of communications.

3   **Q.**   Right.  And you, in fact, do have substantive business

4   communications with your colleagues over Google Chat, right?

5   **A.**   Yes.

6   **Q.**   That said, Google Chat is a forum where people tend to be

7   more candid and informal in their communications, correct?

8   **A.**   I would say informal, but not necessarily more candid.

9   **Q.**   Well, you say things in chat that you may not feel

10  comfortable putting in an email, correct?

11  **A.**   No, that's not really my understanding.

12  **Q.**   All right.  Well, let's take a look at this chat then,

13  Ms. Garber.

14          Can we have that published, please?  I want to look at

15   page 12.  Thank you.

16          And I want to just clear out one administrative thing

17   first.  Do you see, we have on the screen there's a chat from

18   you that ends with something that has a bunch of funny

19   characters in it, an ampersand, a hatch sign, a 39, and a

20   semicolon; do you see that?

21  **A.**   Yes.

22  **Q.**   Okay.  Do you understand that's just kind of supposed to be

23  an apostrophe, and what you were saying there is "Let's get

24  Jonathan to dial in?"

25  **A.**   Yes, I think that's right.

1   Q.   Okay.  It comes up this way all through the document, and I
2   want to be sure we're reading it and understanding it the same
3   way, so I appreciate that.
4             So let's take a look, if we can, at the next chat
5      down, which is also from you that says, "Ads team is freaking
6      out about some Play VP escalation."
7             Do you see that?
8   A.   Yes.
9   Q.   Okay.  And the ads team refers to your area of the business,
10  correct?
11  A.   Yes, that's right.
12  Q.   And "Play" refers to the Google Play Store, right?
13  A.   Yes, I think so.
14  Q.   And Play VP means someone who has a vice-president title
15  within the Play organization, correct?
16  A.   Yes, I think that's right.
17  Q.   And you were writing this to Mr. Ostrowski because he had
18  responsibilities in connection with the Play Store, and you
19  wanted to connect with him on this issue, correct?
20  A.   Yes, that's right.
21  Q.   And this idea of escalation that you referenced, that means
22  that somebody was bringing some issue or disagreement or
23  discussion further up the chain for discussion, correct?
24  A.   Yes, that's right.
25  Q.   And you ask Mr. Ostrowski if he wants to discuss this issue

**GARBER - DIRECT / BORNSTEIN**

1  with you, right?

2  **A.**   Yes.

3  **Q.**   And so if we can go a little further down in the chat,

4  Mr. Ostrowski responds and he says, "Oh, yeah, I can discuss.

5  What is it?"  He asks you, right?

6  **A.**   Right.  Yes.

7  **Q.**   And you say in response, even further down:  "I haven't been

8  fully looped in either," right?

9  **A.**   Right.  Yes.

10  **Q.**   Okay.  So at this point in time you were not really terribly

11  aware of what the issue was that you had raised with

12  Mr. Ostrowski to discuss, correct?

13  **A.**   Yeah, I was somewhat aware, but I think not fully aware.

14  **Q.**   Okay.  So let's go to the next page, and on the next page of

15  the document you say to Mr. Ostrowski, "so far as I can read it."

16  And then you proceed to explain what the issue was, right?

17  **A.**   Yes.

18  **Q.**   Okay.  And you say, "so far as I can read it," because you

19  were working off of an email that you had been sent without any

20  other context about this issue, correct?

21  **A.**   I, I don't remember fully, but I don't think I had much

22  other context, if any.

23  **Q.**   Okay.  And you go on to describe the issue.  And in the next

24  chat you say that you understood that it related to prohibiting

25  ads leading to non-Play downloads with a couple of exclamation

 1  points.

 2          Do you see that?

 3  **A.**   Yes.

 4  **Q.**   All right.  But then it seems that Play and Ads, as you put

 5  it, settled for some reasonable intermediate policy, right?

 6  **A.**   That's right.

 7  **Q.**   And I want to drop down then to the bottom or near the

 8  bottom of this page where you say despite that settlement, so to

 9  speak, apparently Play was escalating again because they were mad

10  about some things, correct?

11  **A.**   Yes, that looks right.

12  **Q.**   And, again, you say "apparently" because you still -- you

13  didn't know a tremendous amount about what was going on, and you

14  had just received this one email about it, right?

15  **A.**   Yes, I think that's right.

16  **Q.**   And you had not, at this point in time, been consulted for

17  legal advice on this question, correct?

18  **A.**   I can't remember whether or not that's true.

19  **Q.**   Okay.  Well, let's see if I can refresh you by continuing to

20  go down the document a bit.

21          The way that you described at the time the way you had

22   been informed about this is that you had been looped in for

23   "fake privilege," correct?

24  **A.**   Yes, I see I wrote that.

25  **Q.**   Okay.  And what you understood at the time or your belief at

1  the time was that someone had included you on the email because

2  that person knew you were a lawyer, and they believed that

3  including you would make it more likely that the email would be

4  considered privileged, correct?

5  **A.**  I, I think they had a misapprehension about the rules of

6  privilege.

7  **Q.**  Understood.  But your understanding was that this individual

8  who had copied you had a misapprehension about the rules, but

9  copied you for the reasons that I just stated, correct?

10  **A.**  I wasn't sure what the intentions of the person adding me

11  was.

12  **Q.**  Okay.  But you understood that this was a document in which

13  you were copied not for a request for legal advice, but in order

14  to try to establish what you referred to as fake privilege,

15  correct?

16  **A.**  I, I originally wasn't clear on what the request for legal

17  advice was in that email, although when I looked at it more

18  closely I saw there was a --

19       **THE COURT:**  Okay.  Ms. Garber, that's not the

20  question.

21       **THE WITNESS:**  Oh, sorry.  Maybe I misunderstood the

22  question.

23       **THE COURT:**  The question is -- ask it again.

24       Please listen carefully and answer the question that's

25   posed.

GARBER - DIRECT / BORNSTEIN

| | |
|---|---|
| 1 | **BY MR. BORNSTEIN:** |
| 2 | **Q.**   You believed at the time that you had been copied on this |
| 3 | communication because somebody had a misapprehension about the |
| 4 | way privilege worked, correct? |
| 5 | **A.**   Yes, that was my initial understanding. |
| 6 | **Q.**   And you referred to that situation, to your colleague |
| 7 | Mr. Ostrowski, as an instance of fake privilege, correct? |
| 8 | **A.**   Yes, I did. |
| 9 | **Q.**   And at this point in time you were not even aware of the |
| 10 | meeting that had happened that led to the issue that was |
| 11 | discussed in this email, right? |
| 12 | **A.**   I don't remember what I was previously aware of. |
| 13 | **Q.**   Well, you say just at the bottom, "So seems like there was a |
| 14 | VP meeting yesterday," question mark, right? |
| 15 | **A.**   Yes. |
| 16 | **Q.**   So you were, again, you were intuiting that from this email |
| 17 | that you had just been looped in on for fake privilege, correct? |
| 18 | **A.**   I don't recall where I learned about the VP meeting. |
| 19 | **Q.**   All right.  Well, Mr. Ostrowski, let's focus on his response |
| 20 | to your email. |
| 21 |         He doesn't say gosh, what do you mean by "fake |
| 22 |   privilege," correct? |
| 23 | **A.**   I don't see him saying that. |
| 24 | **Q.**   And he doesn't express any confusion whatsoever about what |
| 25 | you meant, right? |

**GARBER - DIRECT / BORNSTEIN**

1  **A.**   No, I don't see anywhere where he expresses confusion.

2  **Q.**   Right.  And you didn't feel the need to explain to him what

3  you meant, right?  You don't say that anywhere, correct?

4  **A.**   No, that seems correct.

5  **Q.**   Right.  Because you understood that Mr. Ostrowski, in the

6  Play store business, knew full well what fake privilege was,

7  correct?

8  **A.**   I don't think that was my meaning.

9  **Q.**   Well, it was a perfectly well understood concept what fake

10  privilege was, so well understood that you were able to use the

11  term without any explanation to your colleague, and he had no

12  question in response to you about what it meant; fair?

13  **A.**   No, I don't think that's a fair interpretation.

14  **Q.**   Okay.  There are --

15        **THE COURT:**  Ms. Garber, why did you say "fake

16  privilege" in that chat?

17        **THE WITNESS:**  Well, I certainly regret the wording

18  that I used.  I was using --

19        **THE COURT:**  You sure -- okay.  Why did you say -- when

20  you wrote this, why did you say "fake privilege?"

21        **THE WITNESS:**  I meant that I believed privilege had

22  been incorrectly applied by the clients.  What I meant was a

23  mistaken use of privilege.

24        **THE COURT:**  You used the word "fake" rather than

25  "mistaken?"

1          **THE WITNESS:**  Yes, due to the casual nature of the

2    conversation.

3          **THE COURT:**  Go ahead.

4    **BY MR. BORNSTEIN:**

5    **Q.**    So we can agree chats are indeed more casual conversations,

6    correct?

7    **A.**    In many cases they can be.

8    **Q.**    But this phenomenon of fake privilege that we've been

9    looking at, this was not a one-time event, correct?

10   **A.**    I'm not sure what you mean by that.

11   **Q.**    I mean, you used the words "fake privilege" to describe this

12   situation in other instances, not just in this one chat; am I

13   right?

14   **A.**    I've used those words in other contexts.  I don't know if

15   I was describing the same thing.

16   **Q.**    Sure.  Well, why don't we take a look at Exhibit 6488.

17   That, too, is in your binder.

18   **A.**    Okay.

19   **Q.**    Great.  And this, too, is a chat between you and

20   Mr. Ostrowski, correct?  Same person?

21   **A.**    Yes, that's right.

22   **Q.**    And this chat is dated March 17, 2022, right?

23   **A.**    Yes.

24   **Q.**    So that's a little over a year after the chat that we were

25   just looking at, correct?

1  **A.**  Yes.

2      **MR. BORNSTEIN:**  Your Honor, I'd move the admission of

3  Exhibit 6488, please.

4      **MS. CHIU:**  No objections, pending --

5      **THE COURT:**  Admitted.

6                  (Trial Exhibit 6488 received in

7                  evidence.)

8  **BY MR. BORNSTEIN:**

9  **Q.**  Now, in this chat, you and Mr. Ostrowski are joking around;

10  is that correct?  I'm going to ask you -- sorry.  Let me ask you

11  to look at page 48 of the chat.  And we can put that on the

12  screen, please.

13      And if it helps you for context, you can maybe start

14  reading at 47, but I'm going to ask you about page 48,

15  Ms. Garber.  And my question is just you and Mr. Ostrowski are

16  kind of joking around and being friendly with one another here?

17  **A.**  Yes, I think that's right.

18  **Q.**  Okay.  And you're joking about things like the early morning

19  meetings and the kind of work-from-home situation during the

20  pandemic; is that right?

21  **A.**  Yes, I see us joking about morning meetings.

22  **Q.**  And if we go up a little bit, the second chat in the -- on

23  this page, you say, "I feel like everyone just in 9 hours of

24  meetings a day straight."  Yes?

25  **A.**  Yes.

1 **Q.** I know the feeling. This was a complaint about your

2 workload; fair?

3 **A.** Yes.

4 **Q.** A good-natured complaint, I acknowledge, but a complaint

5 about your workload?

6 **A.** Yes, a complaint about the amount of meetings we had.

7 **Q.** Yes, like I said, I sympathize.

8 A little further down you say, "At least ARRIS,

9 A-R-R-I-S, going to take a lot of work off our plate."

10 Do you see that?

11 **A.** Yes.

12 **Q.** And ARRIS is a group within Google's legal department,

13 correct?

14 **A.** I think it sits outside the legal department, but it's a

15 team of lawyers.

16 **Q.** Okay. And they have responsibilities for certain types of

17 things that are within their purview, correct?

18 **A.** Yes, that's right.

19 **Q.** And you make a joke a little further down. You say,

20 "They'll do all the counseling, and we'll be on the beach playing

21 bocce," right?

22 **A.** Yes.

23 **Q.** And Mr. Ostrowski, he understands that this is a joke. He

24 responds to you a little further down: "Oh, yeah, they'll do all

25 the hard parts."

GARBER - DIRECT / BORNSTEIN

```
 1              Right?
 2   A.    Right.
 3   Q.    Right.  So meaning the hard parts of the job or the work
 4   that they were going to relieve you of doing, this ARRIS group,
 5   right?
 6   A.    Yes, I think that was the substance of the joke.
 7   Q.    Right.  And then you respond:  "Yeah, like the fake
 8   privilege."  Correct?
 9   A.    That's right.
10   Q.    And this was sarcasm, yes?
11   A.    Yes.
12   Q.    Okay.  But you understood that the ARRIS team was not
13   actually taking over the hard parts of your job, right?
14   A.    Sorry.  I'm not totally sure I understand the question.
15   Q.    Sure.  I'll back up a little bit.
16          You and Mr. Ostrowski did not think very highly of the
17    ARRIS team; is that fair?
18   A.    I don't know if we had a general opinion.
19   Q.    Okay.  Well, Mr. Ostrowski says to you, right under the
20   "fake privilege" chat, he says, "definitely not poorly duplicate
21   work and take credit after auditing and indicting."
22          Do you see that?
23   A.    Yes.
24   Q.    Okay.  That's an unflattering comment he's making about the
25   ARRIS team; is that fair?
```

1  **A.**   I think that's fair.

2  **Q.**   Okay.  And you respond:  "Ha ha, oh my God, that whole thing

3  insane."  Right?

4  **A.**   It looks like I said that in response to something that's

5  been redacted.

6  **Q.**   Yes, indeed, I agree, something has been redacted.

7         But you say "Ha ha, oh my God, that whole thing

8  insane."  Correct?

9  **A.**   Yes.

10  **Q.**   All right.  So you were at least expressing support or

11  sympathy for Mr. Ostrowski's view about the ARRIS team, correct?

12  **A.**   I'm not sure if my statement was in response because I'm

13  not sure what's missing.

14  **Q.**   All right.  Well, let me back up then.

15         Am I right that you did not hold the view that ARRIS

16  was going to be taking over the hard parts of your job?

17  **A.**   Not fully.

18  **Q.**   Okay.  And you did not consider the "fake privilege"

19  communications to be a terribly challenging part of your job

20  either; am I right?

21  **A.**   No, that wasn't part of our job at all.

22  **Q.**   Indeed.  You were copied on these communications not because

23  your legal advice was being requested, but just because you were

24  a lawyer, correct?

25  **A.**   I'm not sure which communications you're referring to.

1   **Q.**  All right.  Well, again, Mr. Ostrowski didn't respond to

2   your second "fake privilege" communication that we have, at least

3   because history is on, again, by asking you any questions about

4   what you meant, correct?

5   **A.**  Not that I see.

6   **Q.**  Right.  Because Mr. Ostrowski, who worked in the Play Store

7   Business, was fully aware of the concept at Google of copying

8   lawyers for fake privilege, correct?

9   **A.**  No, I think it was because that was a sarcastic statement

10  in response to external litigation.

11       **THE COURT:**  That's not an answer.  Listen to the

12  question and answer it.

13       **THE WITNESS:**  Okay.  Sorry.  Will you ask it again?

14       **THE COURT:**  Take the question exactly the same way

15  again.  Put your full attention on it, please, Ms. Garber.

16       **THE WITNESS:**  Okay.

17  **BY MR. BORNSTEIN:**

18  **Q.**  Ms. Garber, Mr. Ostrowski, who worked in the Play Store

19  Business was fully aware of the concept at Google of copying

20  lawyers for fake privilege, correct?

21  **A.**  No, that's not my understanding.

22  **Q.**  Your understanding is this was a joke, correct?

23  **A.**  Yes.

24  **Q.**  Because fake privilege is funny?

25  **A.**  No.

1  **Q.**  Do you know the phrase or the -- I'll do a little

2  Shakespeare if I can:  Many a true word has been spoken in jest?

3  **A.**  I'm not familiar with that quotation.

4  **Q.**  I'll take it out of Shakespeare.  In every joke there's a

5  kernel of truth, right, Ms. Garber?

6  **A.**  I don't think I have an opinion on that.

7        **MR. BORNSTEIN:**  I'll pass the witness, Your Honor.

8        **THE COURT:**  What did you mean by "fake privilege" on

9  page 48 of this exhibit?

10        **THE WITNESS:**  It was a reference to external

11  allegations that had recently been -- become public in other

12  litigation where the litigants in that case had accused Google

13  of improperly using privilege, and it was a sarcastic reference

14  to that allegation which I disagreed with.

15        **THE COURT:**  Pass the witness.

16        <u>**CROSS-EXAMINATION**</u>

17  BY MS. CHIU:

18  **Q.**  Ms. Garber, are you assigned to provide legal counsel

19  regarding the Google Play Store?

20  **A.**  No, I'm not.

21  **Q.**  And Ms. Garber, have you provided any legal advice regarding

22  Epic Games?

23  **A.**  Not that I recall.

24  **Q.**  Have you ever worked on any issues relating to Fortnite?

25  **A.**  Not that I recall.

1  **Q.** And have you been involved in providing legal advice to

2  anyone at Google regarding this litigation between Google and

3  Epic?

4  **A.** No, I haven't.

5  **Q.** Ms. Garber, were you deposed in this litigation?

6  **A.** No, I wasn't.

7  **Q.** Now, the Court just asked you about that second chat that we

8  just looked at. Could you just explain what you meant when you

9  used "fake privilege" in that second chat?

10 **A.** Yes, it was a reference to litigation that had recently

11 become public at the time in which the other party claimed that

12 Google had been improperly using the concept of attorney-client

13 privilege, and I had recently become familiar with those

14 allegations and I strongly disagreed with them. And so I was

15 using the concept here in a sarcastic way to indicate my

16 disagreement with how external parties would portray the work

17 that our team was doing.

18      **MS. CHIU:** Thank you, Ms. Garber. I have nothing

19 further.

20                    **REDIRECT EXAMINATION**

21 BY MR. BORNSTEIN:

22 **Q.** Ms. Garber, a few very, very brief questions.

23      First of all, the litigation you were referring to

24  that you have now testified prompted your comment in

25  Exhibit 6488, that didn't prompt your "fake privilege" reference

1  in 6487, the prior exhibit, did it, Ms. Garber?

2  **A.**   No, I don't think so.

3  **Q.**   Okay.  And you were asked a few questions about whether you

4  have Play Store responsibilities just now, right?

5  **A.**   Yes.

6  **Q.**   But we agree that Mr. Ostrowski, your correspondent on these

7  "fake privilege" communications, did have responsibilities for

8  supporting the Play Store Business, correct?

9  **A.**   He does counsel Play, yes.

10  **Q.**   Right.  And he is, in fact, all over documents that were

11  exchanged by senior Play Store executives who are going to

12  testify in this case or have already testified in this case,

13  right?

14  **A.**   I don't have any awareness of that.

15  **Q.**   Okay.  Well, we will share that with the jury soon.  Thank

16  you, Ms. Garber.

17        **THE COURT:**  Okay.  You may step down.  Careful on the

18  way down.

19           Who do we have next?

20        **MS. MOSKOWITZ:**  Your Honor, Epic calls Margaret Lam to

21  the stand, please.

22        **THE COURT:**  Okay.

23        **THE CLERK:**  Please stand and raise your right hand.

24                     MARGARET LAM,

25  called as a witness for the PLAINTIFFS, having been duly sworn,

CERTIFICATE OF REPORTER


    I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF

CALIFORNIA, 450 GOLDEN GATE AVENUE, 16TH FLOOR, SAN

FRANCISCO, CA 94102, DO HEREBY CERTIFY:


    THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE,

IS A CORRECT TRANSCRIPT OF MY SHORTHAND NOTES OF THE

RECORD

    OF THE PROCEEDINGS HEREINBEFORE ENTITLED, AND REDUCED TO

TYPEWRITING BY COMPUTER TO THE BEST OF MY ABILITY.


 November 9, 2023


_____

Rhonda L. Aquilina, RMR, CRR, CSR 9956