# Exhibit 25

HIGHLY CONFIDENTIAL

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF TEXAS
 3                      SHERMAN DIVISION
 4
 5   THE STATE OF TEXAS, ET AL,
 6            Plaintiffs,
 7   vs.                         CIVIL NO. 4:20-CV-957-SDJ
 8   GOOGLE LLC,
 9            Defendants.
10   _____/
11
12
13                    HIGHLY CONFIDENTIAL
14       VIDEOTAPED DEPOSITION of ▮▮▮▮▮▮▮▮▮, PhD
15                 Redwood City, California
16                      April 1, 2024
17                        9:23 a.m.
18
19
20
21
22   Job No. MDLG6622335
23   Stenographically reported by:
24   JENNY L. GRIFFIN, RMR, CSR, CRR, CCRR, CRC
25   CSR No. 3969
```

Page 2

```
 8      Videotaped deposition of ███████, PhD,
 9  taken on behalf of the Plaintiffs, at Freshfields
10  Bruckhaus Deringer, 855 Main Street, Redwood City,
11  California, on Monday, April 1, 2024, beginning at
12  9:23 a.m. and ending at 4:54 p.m., before
13  Jenny L. Griffin, a Certified Shorthand Reporter,
14  Registered Merit Reporter, Certified Realtime
15  Reporter, California Certified Realtime Reporter,
16  Certified Realtime Captioner.
```

Page 3

```
 1           A P P E A R A N C E S:
 3      NORTON ROSE FULBRIGHT US LLP
 4      Attorney for Plaintiff
 5      1301 McKinney, Suite 5100
 6      Houston, Texas 77010-3095
 7      713.651.3629
 8      BY:  ERIK JANITENS, ESQ.
 9           JIANG WU, ESQ.
10           MARC COLLIER, ESQ. (Via Zoom)
11      Erik.janitens@nortonfulbright.com
12      Jaing.wu@nortonfulbright.com
14      FRESHFIELDS BRUCKHAUS DERINGER
15      Attorney for Defendant and the Witness
16      855 Main Street
17      Redwood City, California 94063
18      650.461.8276
19      BY:  JUSTINA K. SESSIONS, ESQ.
20           MARA BOUNDY, ESQ. (In Person)
21           SARA SALEM, ESQ. (Via Zoom)
22           LAUREN VACA, ESQ. (Via Zoom)
23      Justina.sessions@freshfields.com
```

Page 4

```
 1       A P P E A R A N C E S: (Continued)
 3  ALSO PRESENT VIA ZOOM:
 5  Zeke DeRose III: Lenier Law Firm
 6  Alex Abston: Lenier Law Firm
 7  Melanie DeRose:  Lenier Law Firm
 8  Trevor Young: Texas Office of the Attorney General
 9  Blake Pescatore:  Axinn
10  Jonathan Jaffe: Retained Plaintiff Consultant
13  VIDEOGRAPHER:  Steve Patapoff, Golkow Litigation
```

Page 5

```
 1              C O N T E N T S
 2                                          PAGE
 3  ███████, Phd
 4  PROCEEDINGS                              12
 5  EXAMINATION BY MR. JANITENS              13
 6  STENOGRAPHER'S CERTIFICATE              169
 7  SIGNATURE                               170
 8  DEPOSITION ERRATA SHEET                 171
 9              ---oOo---
10              E X H I B I T S
11  ███████       DESCRIPTION               PAGE
13  Exhibit 11   LinkedIn Information for    20
14              ███████ - 2 pages
16  Exhibit 12   gTrade Analysis Project     52
17              Document -
18              GOOG-AT-MDL-001391402 through
19              -1406
21  Exhibit 13   Promo Packet -              75
22              GOOG-AP-MDL-002468549 through
23              -8560
```

Page 30

1  Q. What other teams would you interact with?
2  A. Other teams inside ads, in display ads
3  or -- ads, basically.
4  Q. Okay. So within display ads, what were the
5  names of some of those teams that you would interact
6  with?
7  A. I don't remember. That was, yeah, eight,
8  nine years ago. So --
9  Q. And as a member of gTrade, would you say
10 you were on the buy-side or the sell-side?
11 A. If I remember correctly the terms, we were
12 in the buy-side.
13 Q. And so as a buy-side team member, would you
14 assist with sell-side teams?
15     MS. SESSIONS: Object to the form.
16     You can answer.
17     THE WITNESS: Yeah. I don't necessarily --
18 I wouldn't say "assist" the teams. I interacted
19 with them.
20 BY MR. JANITENS:
21 Q. How would you interact with those teams?
22 A. We had meetings every once in a while.
23 Q. And during those meetings, what would be
24 discussed?
25 A. It was about if there will be -- it was

Page 31

1  about telling if there's a new project coming up or
2  if there's something interesting that might
3  affect -- for planning purposes, mainly.
4  Q. What do you mean by "planning purposes"?
5  A. If you are launching a project, that might
6  change some numbers on the other side. So they are
7  informed so they know because we changed something.
8  Q. Okay. So if you were changing something on
9  the buy-side, it could impact some numbers on the
10 sell-side and then affect the sell-side team?
11 A. Sometimes that could happen, yes.
12 Q. When you mentioned launch, what exactly do
13 you mean by "launch"?
14 A. Launch was when a project goes live. It
15 works fully on the -- because it's launched to work
16 fully.
17 Q. Okay. So a launch would be fully -- like
18 operating on live data?
19 A. Yes.
20 Q. Just back real quickly. So you said you
21 work remotely maybe one or two times a day -- sorry.
22 Scratch that.
23     When you work remotely, you mentioned that
24 that was maybe once or twice a week?
25 A. Currently, yes.

Page 32

1  Q. Okay. And when you're working remotely, do
2  you have access to Google's network?
3  A. Network? I don't have access to Google's
4  Wi-Fi, but I have access to Google's tools to do my
5  job.
6  Q. Okay. Are there any restrictions to what
7  tools you can access?
8     MS. SESSIONS: Object to the form.
9     You can answer.
10    THE WITNESS: I'm not aware if there's any
11 restrictions.
12 BY MR. JANITENS:
13 Q. Now, since you're on the robotics team now,
14 are you -- strike that.
15    When you're working remotely, do you have
16 access to dashboards?
17 A. I think depending on the dashboard. Some
18 dashboards, I have access.
19    Actually, I'm not aware of -- yes. I have
20 access to dashboards.
21 Q. So initially you said it may be depending
22 on the dashboard?
23 A. No. I tried to think if there's any
24 dashboard I cannot access from home. I couldn't
25 find any. So --

Page 33

1  Q. So back -- jumping back to when you were on
2  gTrade from 2014 to 2017, how would you typically
3  communicate with other googlers?
4  A. Email and face-to-face.
5  Q. And in addition to email and face-to-face,
6  would you use any other means to communicate with
7  coworkers?
8  A. We use Chat.
9  Q. So is that just Google Chats, or are there
10 different names internally for these Chats?
11 A. I think at the time it was called Hangouts
12 or Chat, yeah. They changed the name. So --
13 Q. So when you talked to them when you were on
14 the gTrade team, it was called Chats?
15 A. I cannot remember that.
16 Q. And currently, on the robotics team, still
17 use Chats as well?
18 A. Yes.
19 Q. And what is the name for Chats now?
20 A. I think it's called just Google Chats.
21 Q. A little while ago we talked about
22 preserving documents.
23    Did you preserve any Chats in relation to
24 this case?
25 A. I did not do anything to preserve or not to

Page 34

1 preserve Chats.
2  Q. With Chats, are they typically -- strike
3 that.
4     With internal Google Chats, are there
5 policies to delete the Chats after a certain amount
6 of time?
7     MS. SESSIONS: Object to the form.
8     You can answer.
9     THE WITNESS: There are settings, I think.
10 There's a default setting. I don't know.
11 BY MR. JANITENS:
12  Q. Do you know what the default setting is?
13  A. No. I don't know.
14  Q. Now, back to while you were on gTrade
15 communication, did you communicate with customers as
16 part of your job?
17  A. No.
18  Q. Did anyone on the gTrade team communicate
19 with customers?
20  A. I don't know.
21  Q. And as a member of the gTrade team, would
22 you ever communicate with publishers or advertisers?
23  A. No.
24  Q. And while you were on the gTrade team,
25 would you communicate with the public?

Page 35

1  A. Communicate with the public? Any -- any
2 public? Any person, you mean?
3  Q. Would you communicate with any -- via any
4 public-facing means?
5  A. No.
6  Q. Now, while you were on the gTrade team
7 communicating with other coworkers via the Chats,
8 would you discuss about any auction projects that
9 you were working on?
10     MS. SESSIONS: Object to the form.
11     You can answer.
12     THE WITNESS: Usually, no.
13 BY MR. JANITENS:
14  Q. What do you mean by "Usually, no"?
15  A. We -- we usually use Chat to meet to
16 discuss the projects.
17  Q. Okay. So you mainly just used Chats to set
18 up meetings to discuss?
19  A. Yes.
20  Q. Okay. Now, are there -- strike that.
21     When you were using Chats, talking with
22 coworkers about certain auction projects, would you
23 discuss anything that would not have been otherwise
24 captured in an email?
25     MS. SESSIONS: Object to the form.

Page 36

1     You may answer.
2     THE WITNESS: No.
3 BY MR. JANITENS:
4  Q. And while using Chats while you were on the
5 gTrade team, would you communicate with the sales
6 team at all?
7  A. The sales team? No. Well, I cannot
8 remember. I don't remember.
9  Q. And while you were on the gTrade team,
10 would you discuss any projects with the sales team?
11  A. Not as far as I remember.
12  Q. Okay. Just switching gears a little bit
13 here since we're going to be kind of talking about
14 Google's Ad Auctions and publishers and advertisers.
15     At a high level, how would you describe
16 Google's Ad Exchange?
17     MS. SESSIONS: Object to the form.
18     You may answer if you can.
19     THE WITNESS: I'm not sure about the full
20 technical details of the Ad Exchange.
21 BY MR. JANITENS:
22  Q. Would you agree that Google's Ad Exchange
23 is an ad auction?
24     MS. SESSIONS: Object to the form.
25     THE WITNESS: I'm not sure.

Page 37

1 BY MR. JANITENS:
2  Q. So do you have a general understanding of
3 how Google's Ad Exchange operates?
4  A. By "general understanding," I only know at
5 a very high level what that does.
6  Q. Okay. Can you explain at a high level what
7 Google Ad Exchange does?
8  A. If I remember correctly, they get ad
9 requests and they get some requests on the places
10 for ads, and then they pick one to place.
11  Q. Okay. So who gets the request?
12  A. I'm not sure.
13  Q. Would you agree that, let's say, a
14 publisher that has a website with an ad space on
15 their website, would they sell this space to
16 advertisers?
17  A. I'm not sure how they would sell. There
18 might be probably many ways.
19  Q. Okay. Can you give an example of the --
20 one of the many ways?
21  A. Taking -- speaking in the high level, one
22 could just sell the website space to some advertiser
23 directly, or if -- from my understanding, they can
24 use some services to get ads there.
25  Q. Okay. What are an example of some of the

Page 166

1 should be transparent?
2  A. I don't have an opinion of the rules of
3 auctions. It depends on the business. It depends
4 on the context as well.
5  Q. Participants should be allowed to have
6 control over their own bidding strategy; right?
7  A. I'm not sure where that statement comes
8 from. I don't think I have an opinion on that
9 participant strategy.
10  Q. Do you have an opinion whether Google
11 should favor any one participant over another during
12 an auction?
13  A. No, I don't have any opinion on that.
14  Q. While you were on gTrade team, is there
15 anything you would have done differently?
16  A. Not as far as I can remember.
17  Q. And do you think that the advertisers and
18 the publishers should have been informed about
19 changes that you made to ad auctions?
20  A. I don't have an opinion if they should be
21 informed or not.
22  Q. The profit impact that you discuss in your
23 promo packet, is it safe to say that it went to
24 Google?
25  A. First, I don't know which impact. There's

Page 167

1 multiple impacts. And I don't really know if it --
2 in the end -- if it mattered to Google or how it
3 impacted with the rest of the projects; so -- or
4 teams. So -- I'm not sure how it was distributed in
5 the end.
6  Q. If Google's profit improves, does that
7 improve your finances?
8  A. I don't know if there's a direct relation
9 to that.
10  Q. Do you own stock in Google?
11  A. 
12  
13  Q. 
14  
15  A. 
16  
17  Q. 
18  
19  
20  A. 
21  
22  
23  
24  Q. 
25  

Page 168

1  
2  A. 
3  MR. JANITENS: Okay. I'll go ahead and
4 pass the witness.
5  MS. SESSIONS: Thank you.
6  We have no questions for the witness at
7 this time.
8  We would like to mark the transcript highly
9 confidential, and we would like to read and sign.
10  We can go off the record.
11  THE VIDEOGRAPHER: Going off the record.
12  The time is 4:54.
13  (Time: 4:54 p.m.)

Page 169

1  ---oOo---
2
3  I, JENNY L. GRIFFIN, hereby certify:
4  That I am a certified shorthand reporter in and
5 for the County of Alameda, State of California;
6  Prior to being examined, ▓▓▓▓▓▓, PhD, the
7 witness named in the foregoing deposition, was by me
8 duly sworn to testify to the truth, the whole truth,
9 and nothing but the truth; that said deposition was
10 taken pursuant to notice at the time and place
11 therein set forth, and was taken down by me in
12 stenotype and thereafter transcribed by means of
13 computer-aided transcription, and that said
14 deposition is a true record of the testimony given by
15 the witness.
16  I further certify that I am neither counsel for
17 nor related in any way to any party to said action,
18 nor otherwise interested in the outcome thereof.
19  In witness whereof, I have hereunto subscribed
20 my name April 3, 2024.
21
22
23
24  JENNY L. GRIFFIN, CSR #3969
25  Certified Shorthand Reporter

43 (Pages 166 - 169)