**EXHIBIT 3**

**Transcript of Status Conference**

**March 21, 2024**

**(E.D. Tex.)**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3   THE STATE OF TEXAS, et al,          §
                                         §
 4                   Plaintiffs,         §
                                         §
 5        vs.                            §      Case No.:
                                         §      4:20-cv-00957-SDJ
 6   GOOGLE, LLC,                        §
                                         §
 7                   Defendant.          §

 8
                         STATUS CONFERENCE
 9        AND PLAINTIFF STATES' MOTION TO LIFT STAY
                    TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE SEAN D. JORDAN
               UNITED STATES DISTRICT JUDGE
11
             Thursday, March 21, 2024; 10:01 a.m.
12                        Plano, Texas

13
     APPEARANCES OF COUNSEL:
14   (Continued on page 2.)

15   FOR THE PLAINTIFF STATES:

16   W. Mark Lanier
     THE LANIER LAW FIRM
17   6810 FM 1960 West
     P. O. Box 691448
18   Houston, Texas 77269-1448

19   Jonathan P. Wilkerson
     THE LANIER LAW FIRM
20   6810 Cypress Creek Parkway
     Houston, Texas 77069

21

22        *********************************************

23                  GAYLE WEAR, RPR, CRR
                 Federal Official Court Reporter
24                    7940 Preston Road
                    Plano, Texas 75024
25             gayle_wear@txed.uscourts.gov
```

```
 1   FOR THE PLAINTIFF STATES:
     (Continued from page 1.)
 2
     Zeke DeRose, III
 3   THE LANIER LAW FIRM, PC - Houston
     10940 W. Sam Houston Parkway N.
 4   Suite 100
     Houston, Texas 77064
 5
     Ashley C. Keller
 6   KELLER LENKNER LLC
     150 N. Riverside Plaza, Suite 4270
 7   Chicago, Illinois 60606
 8   Marc Brian Collier
     FULBRIGHT & JAWORSKI
 9   600 Congress, Suite 2400
     Austin, Texas 78701
10
     Geraldine W. Young
11   NORTON ROSE FULBRIGHT US LLP - Houston
     1301 McKinney, Suite 5100
12   Houston, Texas 77010-3095
13   Peter Mifflin Hillegas
     NORTON ROSE FULBRIGHT US LLP - Austin
14   98 San Jacinto Boulevard, Suite 1100
     Austin, Texas 78701-4255
15
     James Lloyd
16   Trevor Young
     STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL
17   ANTITRUST DIVISION
     300 W. 15th Street
18   Austin, Texas 78701
19   FOR THE DEFENDANT:
20   R. Paul Yetter
     Mollie Bracewell
21   YETTER COLEMAN, LLP - Houston
     811 Main Street, Suite 4100
22   Houston, Texas 77002
23   Robert John McCallum
     FRESHFIELDS BRUCKHAUS DERINGER US LLP
24   601 Lexington Avenue
     New York, New York 10022
25
```

```
1   ALSO PRESENT:

2         David T. Moran, Special Master
          JACKSON WALKER LLP - Dallas
3         2323 Ross Avenue, Suite 600
          Dallas, Texas 75201
4
          Roger P. Alford
5         UNIVERSITY OF NOTRE DAME
          3119 Eck Hall of Law
6         Notre Dame, Indiana 46556

7                                *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   March 21, 2024                                    10:01 a.m.

 2                          ---o0o---

 3                 P R O C E E D I N G S

 4                          ---o0o---

 5        THE COURT:  Good morning.  Please be seated.

 6        So we're back on cause number 4:20-cv-957, the

 7   State of Texas, et al versus Google, LLC.  And we can go

 8   ahead and start with appearances of counsel and with the

 9   Plaintiff States first.

10        MR. LANIER:  Thank you, Your Honor.  Mark Lanier on

11   behalf of the plaintiffs here from the Lanier Law Firm.  We

12   didn't know if a fistfight might break out, so we brought a

13   slew just in case.

14        We have James Lloyd from the AG's office.  We have

15   Marc Collier here from Norton Rose Fulbright; Geraldine Young

16   from Norton Rose Fullbright; Jonathan Wilkerson from our

17   firm; Roger Alford from Notre Dame; Trevor Young from the

18   AG's office as well; Peter Hillegas from Norton Rose

19   Fulbright.  We have back Ashley Keller who has finished

20   his jaunts above.

21        And I'll warn the Court you have hearings set on

22   motions to dismiss coming up April 18th.  With the Court's

23   permission, it looks like I'm in trial in federal court in

24   Helena, Montana, but Mr. Keller will be here to handle those

25   arguments and do all of that.
```

1        And we have James Lloyd from the Lanier law firm as

2   well.  Thank you, Judge.

3        THE COURT:  All right.  Mr. Yetter, you appear to

4   be outnumbered.

5        MR. YETTER:  We are definitely outnumbered, Your

6   Honor.  It's good to be back.

7        On behalf of the defendant, Google, Paul Yetter and

8   my colleague, Mollie Bracewell, and our co-counsel from

9   Freshfields, Rob McCallum.

10        THE COURT:  All right.  And I will remind counsel

11   that we also have -- as we had in our previous hearings, we

12   have the audio feed only line for the public on this hearing.

13        And we are once again joined together for a status

14   conference.  And helpfully the parties have submitted a joint

15   status report in which you laid out topics that the parties

16   believe will be appropriate for a discussion today, and they

17   all make sense to me.  So the agenda I have basically tracks

18   your joint status report which has three topics, the first

19   being the States' motion to lift stay, which is the --

20   basically has been fully briefed at this time.

21        Number two, we have the status of coordination with

22   the MDL, and particularly the proposed coordination order.

23        And then, number three, we have the States'

24   interrogatory responses.

25        So I will just move forward in that order unless

1    the parties would prefer some other order.

2              Sound okay to you Mr. Lanier?

3              MR. LANIER:  Yes, sir.

4              THE COURT:  Mr. Yetter?

5              MR. YETTER:  Perfect, Your Honor.

6              THE COURT:  So on the States' motion to lift stay,

7    what the parties suggested is if the Court wishes to hear

8    anything on this issue, the parties are prepared to discuss

9    it.  I think some discussion of this motion may be helpful.

10              I have a couple of questions for both sides, and I

11   might as well start with the States.  And really,

12   Mr. Lanier -- or I don't know if it's going to be you or

13   Mr. Keller -- it might be helpful just to talk a little bit

14   about the types of discovery that you think you're looking

15   for.  Because, you know, and I'll hear this from

16   Mr. Yetter -- it was in their written filing, they make two

17   points about the discovery -- if we leave aside the notion of

18   an order that simply says no discovery is going to be

19   permitted, I see that Google is making two arguments

20   essentially beyond that.

21              The first is all you really need is the Agreement

22   itself, and you have that.  And the second argument that I

23   understand Google is making is, well, even to the extent you

24   might need something beyond that, you already have that

25   information, too, because the discovery that has already

1     occurred has provided a lot of information about this.

2                   So I would like to get the States' take on those

3     arguments.  I may come back to you on questions about the

4     first question, which is should there be no discovery for

5     reasons having to do with Judge Castel's prior order.

6                   MR. LANIER:  All good points, Your Honor, which we

7     are going to ask Mr. Collier to address, if it's okay with

8     the Court.

9                   THE COURT:  Right.  And, Mr. Collier, I know you're

10    aware of this, we get probably the best sound from the

11    podium, the big podium there, so if you can make your remarks

12    from there.

13                  MR. COLLIER:  Well, and, Your Honor, I was --

14    watched Mr. Lanier's Elmo use in prior hearings -- which as I

15    explain when I teach the associates at my firm, you know,

16    sometimes you've got to use the Elmo, and I get blank

17    stares -- so I thought today, to answer your two questions, I

18    might also use the Elmo.

19                  First, I would say, Your Honor, your first question

20    was, Why not just the Agreement itself?  You've got the

21    Agreement; you're done.  And that, Your Honor, gets answered

22    I think by what are our claims.  What are we looking for

23    particularly under the DTPA?  Because that's the easiest.

24    There's no dispute we have a live DTPA claim as to

25    misrepresentations.

```
 1                 And just to refresh Your Honor, you know, we pled

 2       the DTPA claim.  Above paragraph 586, for example, we said

 3       what the representations are.  And this is, of course, the

 4       context against which the discovery would occur.  They told

 5       everyone, advertisers, publishers, there will be an equal

 6       playing field; this will be fair and transparent.  And we,

 7       you know, we talk about the Section 2 claims, but under the

 8       DTPA that's just a flat misrepresentation.

 9                 And then, Your Honor, I will skip ahead to why

10       isn't the Agreement enough, your first question.  And, you

11       know, I don't like to spend a lot of time with lawyers

12       characterizing with what's pled and what our claims are; I

13       like to go right to it.

14                 So, for example, in paragraph 433 of our Fourth

15       Amended Complaint we plead, after talking about the NBA

16       agreement, which we have just the sole Agreement, indeed,

17       since signing the Agreement, Google and Facebook have been

18       working closely in an ongoing manner to help Facebook

19       recognize users in auctions and bid and win more often.

20                 And then we go -- and I can walk through as many

21       paragraphs as the Court wants, and I probably will in

22       response to your second question -- we explain what some of

23       the post Agreement conduct is.  And as Mr. Keller argued in

24       the hearing in the previous motion to dismiss, rarely are any

25       sophisticated Fortune 50 companies going to put in the
```

1    agreement the illegal, or anticompetitive, or the

2    misrepresentation acts.  But we've smoked some of them out.

3    And what they deal with, Your Honor -- so this, let me -- I

4    want to answer the questions the way you've asked them.

5              Why isn't the Agreement enough?  Because both for

6    our Section 2 claim and for our DTPA misrepresentation claim,

7    we have to show how that Agreement was implemented that made

8    this not a fair and equal exchange and made it not

9    transparent.  And so I can go further on the first, but

10   that's --

11             THE COURT:  No.  I think that's fine for the

12   moment.

13             MR. COLLIER:  All right.  And then back to the

14   complaint, looking at -- oh, you're going to try to make me

15   use the zoom button, but we walk through --

16             (Mr. Lanier stands to assist Mr. Collier.)

17             MR. COLLIER:  Now I get to tell everyone Mark

18   Lanier is my IT help.  There we go.

19             Mr. Lanier, you're not going to be on standby for

20   me?  I mean, he's going to leave me afloat?

21             THE COURT:  He's a man of many talents.

22             MR. COLLIER:  He wants to teach a man to fish, not

23   just give him a plate of fish, clearly.

24             So what sort of things, in response to your second

25   question, Your Honor, do we need in discovery?  What post

1    Agreement stuff do we need?  Well, we explained in our

2    complaint in very much detail -- almost like interrogatory

3    answers as opposed to a complaint -- there are some special

4    secret advantages in the auctions that the Agreement and the

5    post Agreement conduct give.

6            Now, we can't tell all of this from the Agreement

7    itself, but we do know that Facebook gets some information

8    and speed advantages.  We've talked about like, for the

9    record, I'm looking at paragraphs 590 to 592 of the Fourth

10   Amended Complaint, and we walk through some of those.  And I

11   can go through as many pages as the Court would like.

12           But, in essence, Facebook gets an advantage, and

13   match rates.  There's nothing transparent or equal playing

14   field about that.  And we need to know what that is, and we

15   need to investigate, was Facebook -- because we've got a good

16   faith to believe it -- given an advantage of match rates --

17   match rates being the advertise, you know, buy and sell

18   side -- helping Facebook recognize users more easily.

19           Facebook was given certain information that other

20   bidders were not given, other sellers were not given.  And

21   then, you know, we go on and on.  But basically that's the

22   sort of pathological detail that's not in a contract, it's in

23   the implementation of the contract that makes it an unequal

24   and nontransparent playing field.

25           THE COURT:  All right.  Mr. Collier, I think that's

1    it for right now.  I think I'll hear from Mr. Yetter first on

2    that topic of I think Google's belief that you all have all

3    the additional information you would need anyway.  And I

4    would like to hear his points on that first, and then I can

5    come back to you if you would like to respond.

6              So Mr. Yetter, let me start out at the outset with

7    you on this issue, and let's go ahead and start with these

8    existing DTPA claims.  We can talk about the Section 2 claim

9    as well.  But obviously Google acknowledges that these DTPA

10   claims are live at the moment.  We have a motion to dismiss

11   pending on them, but at the moment they are live claims and

12   they're claims made that invoke a number of different

13   states', I'm going to call them, consumer protection

14   statutes.

15             So let me get your argument, first of all, on why

16   you think just the Agreement itself should be sufficient with

17   regard to these DTPA claims, if I understood you correctly in

18   your written filing.

19             MR. YETTER:  Yes, Your Honor.  So I think the two

20   questions that you asked are very related, but let me just

21   start with the Agreement itself.  As we put in our papers,

22   Your Honor, this is not the first time this issue of the

23   Network Bidding Agreement has come up with Facebook, it came

24   up in a thoroughly vetted hearing before Judge Castel.  And

25   what the plaintiffs, what the States, told Judge Castel is

1    that the plaintiffs were, quote, "relying mostly on the four

2    corners of the written document," namely the Network Bidding

3    Agreement, as opposed to the wink -- the winks and the nods

4    that we were talking about previously.

5            So what the plaintiffs told Judge Castel, when this

6    issue was live for Judge Castel, to look at their complaint

7    and decide whether there is a Section 1 claim or not, they

8    told Judge Castel that they were relying mostly on the four

9    corners of the written document.  But I believe your two

10   questions are very much related because that hearing wasn't

11   just on the four corners of the document.  As you raised,

12   Your Honor, and we put in our papers, there was lots of

13   discovery.  And I would like to pause just briefly on that.

14           In the investigation that Texas did of Google, or

15   that first two million documents, a substantial number of

16   those documents were Facebook-related Network Bidding

17   Agreement-related documents.  We have looked back at the

18   search terms that we used, search terms like "FB" for

19   Facebook, and "FAN" for Facebook Audience Network, the name

20   "Facebook" -- it wasn't Meta at the time, it was Facebook --

21   "Jedi Blue," which is kind of the project name for the

22   contract, and another search term.  And that generated over

23   500,000 documents that were part of that very initial 2020

24   group of documents.

25           So at this hearing before Judge Castel, Your Honor,

1    not only did the States tell Judge Castel that they're

2    relying mostly on the four corners of the written document,

3    but they had 500,000 documents about the Facebook Agreement

4    on which they had written a complaint, amended the complaint,

5    and I believe amended it again by the time that Judge Castel

6    made that ruling.

7            So our position today is the plaintiffs are coming

8    back to this Court to undo, to essentially reverse, a stay,

9    an order by the MDL judge, Judge Castel.  And they don't have

10   a low burden.  That is -- that is something that you have to

11   provide to this Court very ample cause.  Under Rule 26, this

12   Court -- Rule 26(b)(2)(C) says that a district court must,

13   it's a mandatory, limit discovery when the discovery sought

14   was something that the plaintiffs had ample opportunity to

15   obtain.

16           So in the MDL, Judge Castel was doing exactly what

17   a MDL judge does.  He was streamlining the case.  He was

18   looking at nonviable claims.  And on a multi-amended

19   complaint, on 500,000 documents produced -- not a small

20   amount of discovery, lots of discovery -- he decided that

21   that the Network Bidding Agreement was -- presented no viable

22   basis for a claim.

23           Today, the plaintiffs have to come to this Court

24   and say, We didn't get enough discovery, but they haven't

25   told the Court what exactly it is, in their motion to

1    essentially reverse Judge Castel's motion to stay, what

2    exactly they're looking for.  They've got all the documents.

3    They're not saying, We're missing this group of documents.

4    They're not saying, We need this testimony to understand the

5    documents.  They didn't tell that to Judge Castel when he was

6    there looking at their complaint.  They didn't ask for

7    reconsideration of his ruling because they needed more

8    discovery.

9           And so, Your Honor, kind of in a nutshell, what we

10   see the plaintiffs doing today is very similar to what they

11   did with Judge Castel's order on the ESI order, on the

12   coordination order, and now with the stay on the Network

13   Bidding Agreement, is they're basically trying to undo

14   decisions that the MDL made, which was his job, that they

15   don't like.  But they're not giving this Court the grounds

16   under Rule 26 to find good cause to get -- to reverse the

17   motion.

18          So we believe that not only have they said, the

19   States said, that the Agreement is what they're relying

20   mostly on, but they had lots of discovery, and they're not

21   giving this Court really any idea of the discovery that they

22   say is missing.

23          THE COURT:  All right.  Well, here's how I look at

24   approaching this for both sides.  I think the first question

25   is -- for this Court is should the Court allow any discovery

1    whatsoever with regard to the Network Bidding Agreement.  And

2    the reason I had the States file a motion is because we have

3    a prior order from the MDL.

4         The second question then, to me, is if the States

5    should otherwise have discovery, is the fact that they -- or

6    does the fact that they have the Network Bidding Agreement

7    mean they don't need anything more whatsoever?

8         And then if we're past that, then I think we're

9    into what I consider to be the proportional discovery part of

10   Rule 26(b).  And I don't think that's for me or today or even

11   ruling on this motion.  I think the motion is really about

12   those first two parts, and really about the first part.

13        So I do note that the ruling from Judge Castel has

14   a lot to do with the fact that he was front-loading the

15   consideration of the federal claims, and he really was

16   putting the State claims on hold, which makes total sense.

17   He then had a ruling with regard to the federal claims, and

18   particularly Count Four of the Third Amended Complaint, which

19   had to do with this Agreement in the context of the Section 1

20   claim under the Sherman Act that had been made by the

21   States -- and we can talk about Section 2 in a moment -- but

22   clearly under Section 1.

23        As we sit here today and with the case back here,

24   we have these DTPA claims.  And I think Google acknowledges

25   that there is relevance -- well, that the NBA agreement is

1    relevant to those claims assuming the claims survive.  And so

2    I'm not sure that there is an argument from Google that the

3    Court should nonetheless stop at the fact that there was a

4    stay in place before the MDL court, but now we have the

5    States' claims well in play.  And so it seems to me that

6    there's not that initial breakwater, if you will, of like,

7    well, we shouldn't even consider discovery about this

8    Agreement.

9         But maybe I'm missing something.  I don't think

10   that's Google's argument, but I think the argument maybe goes

11   more to the second point about, well, they already have the

12   NBA agreement; that's the only thing they should have.  But

13   let me know if I'm missing something.

14        MR. YETTER:  Your Honor, I think it's a little bit

15   more than that.  Yes, they already have the NBA agreement.

16   Yes, their complaint says that they -- it characterizes its

17   relevance as the unlawful agreement, which we're going to

18   read from the four corners of the Agreement -- yes, the State

19   represented that to Judge Castel.  But they had more than

20   that, Your Honor.

21        And that's, I believe, that's probably one of the

22   reasons why Judge Castel at that time, once he made that

23   ruling, the DTPA claims of the States existed at that time

24   back in 2022.  It wasn't like they're new to this case now on

25   remand in 2023 and 2024.  And Judge Castel ordered that stay

1    on all discovery of the NBA.  It wasn't just because they had

2    the Agreement itself, but they had $500,000 -- excuse me,

3    500,000 documents of lots of discovery, and some of it is

4    decided in their own complaint.

5         And so the combination of they had the Agreement,

6    which they say it pivotal, which they say is key, but they've

7    had lots of opportunity to take discovery.  And under Rule

8    26(b)(2)(C), they had, quote, ample opportunity to obtain

9    that discovery.  Judge Castel issued that stay.  The

10   Plaintiff States never went back to him and said, We have

11   DTPA claims that we need more discovery on the Network

12   Bidding Agreement.

13        And it's only now, Your Honor, when you first --

14   when this first -- case first came back in November, you told

15   both sides, Tell me what discovery needs to be done because I

16   need to set a schedule for this case.  And in December, both

17   sides gave you their views of what discovery needed to be

18   done.  And Your Honor might recall that the States said

19   nothing about the Network Bidding Agreement; that didn't come

20   up until 2024.  And then you said -- when it did finally come

21   up, you said, Well, you're going to have to file a motion on

22   that.  And it wasn't until earlier this month in March.

23        But, Your Honor, I think that speaks volumes about

24   what these plaintiffs, as we see --

25        THE COURT:  Mr. Yetter, let me just stop you just

1    for a moment.

2              MR. YETTER:  Sure.

3              THE COURT:  But my understanding is Judge Castel

4    didn't, at least in his order, didn't specify this is a

5    26(b)(2)(C) order.

6              MR. YETTER:  No, he didn't.

7              THE COURT:  And so it sounds to me like, like the

8    argument you're making might be something that Google might

9    be raising with this Court of you should do a motion for --

10   some sort of a motion for protection under 26(b)(2)(C).  I

11   don't -- in other words, the first step for me is looking at

12   what Judge Castel did.  I don't see a 26(b)(2)(C) order.

13             What I see is a judge who I think had kept things

14   paused while he considered some substantive issues having to

15   do with a motion to dismiss.  And I hear your point about,

16   well, the States had also gotten all this discovery.  But

17   what I don't have in front of me from Judge Castel is any, if

18   you will, additional analysis or order saying, And, by the

19   way, this should also be stayed under Rule 26(b)(2)(C), which

20   is a different reason --

21             MR. YETTER:  It is, Your Honor.

22             THE COURT:  -- that you might stay discovery.  I

23   don't have that in front of me.  So as far as I'm concerned,

24   the reason that I understand he made the stay is no longer

25   present in this sense.  These, the state law claims, are

1    live, we're working through them.  It is a separate question

2    to me, then, whether or not there ought to be some protection

3    or limitation of that discovery.

4         And I hear the arguments you're making.  You're

5    making arguments about proportionality.  You're making

6    arguments about ample time and wasn't completed.  You may

7    have a number of arguments.  But you understand I'm going to

8    the antecedent question.  The antecedent question is:  Is

9    there some order from the MDL or some other reason why this

10   Court should say -- should not even get to those parameters

11   of Rule 26(b)?  I don't see that there is.

12        And so I'll let you continue in a moment, but let

13   me move on to what I think is then the second question, which

14   is:  Well, what about the NBA agreement, the Network Bidding

15   Agreement, itself?  Why would they need -- why would the

16   States need anything more than that?  I've heard from

17   Mr. Collier.  But I will say something that struck me is, I

18   don't know if Google sees these statutes as some sort of

19   strict liability or something like that, but these, at least

20   from my review at this point, these are statutes from the

21   various states that have various scienter requirements.  Even

22   the Texas statute, which generally does not include scienter

23   requirement -- and as you know, there is no pervasive

24   scienter requirements, but there is -- there are scienter

25   requirements baked into certain parts of the Texas DTPA, and

1    some of those have been invoked in this case, which I'm sure

2    you're aware of.  So I'm thinking of 17.46(b)(24), amongst

3    other provisions.  (B)(24) strikes me because it's got --

4    it's, you know, failing to disclose information concerning

5    goods or services which was known at the time.  If such

6    failure to disclose was intended to induce a consumer into a

7    transaction the consumer would not have entered had the

8    information been disclosed.  That's one of a few that has

9    sort of a scienter requirement baked in with.  I'm not going

10   to go through it.

11          The other states have -- I'm just using these as

12   examples, by the way.  I mean, we've got other state

13   statutes, for example, that have -- that have been invoked

14   that have particular provisions that would pertain to willful

15   conduct, for example, so -- and I'm looking at like South

16   Carolina; Florida seems to have something like that.

17          What I'm basically saying is these DTPA statutes,

18   in various portions of them, seem to have scienter

19   requirements.  So I could see -- I guess I would see more

20   power in the argument you're making about you don't need

21   anything more than the Agreement itself if this was some sort

22   of strict liability type situation or -- or perhaps the

23   question, under Section 1, is the Agreement in and of itself

24   unlawful.

25          But it seems to me that the DTPA claims and the way

1   that these statutes work bring in, to some extent and in

2   certain aspects, some scienter issues.  And I come back to,

3   in that regard, the fact that under Rule 26(b), the -- you

4   know, the bar is relatively low generally speaking on

5   discovery.  I mean, it's not as low as it used to be.  And

6   this comes to your arguments.

7          But, you know, the relevant language, as you know,

8   is that parties can obtain discovery regarding any

9   non-privileged matter that is relevant to any parties' claim

10  or defense -- and this is where it's changed, right -- and

11  proportional to the needs of the case considering the

12  importance of the issues at stake in the action, the amount

13  in controversy, the parties' relative access to relevant

14  information, the parties' resources, the importance of the

15  discovery in resolving the issues, and whether the burden or

16  expense of the proposed discovery outweighs its likely

17  benefit.

18         So we all know that this rule used to be much more

19  wide open than it is now.  And what I think are some of the

20  arguments Google really wants to press have to do with that

21  latter part of the rule rather than the early part of the

22  rule, which is just saying as a general matter, you get to

23  look into non-privileged things that are relevant.

24         Now, particularly looking at these -- I'm using the

25  scienter as an example, and given that the bar is pretty low,

1    I think if we're just speaking generally, there's going to be

2    some relevant information, it seems to me.  Then I'm

3    getting -- and then I find myself getting to part three here,

4    to me, which is the arguments that I saw in your filings and

5    that you're articulating today that really have to do with

6    getting into the weeds or getting pretty granular on, okay,

7    if they're going to get any discovery, or if there's -- if

8    we're going even look at the States getting anything more,

9    then we need to look at the entirety of Rule 26(b).  And

10   you've mentioned some of the other, you know, protections

11   that are in the rule where discovery is unreasonably

12   cumulative, where a party had ample opportunity to obtain the

13   information.

14          So those are points that we're all familiar with

15   because we see them in motions for protection or we see them

16   in those types of issues.  That to me is a distinct question

17   from again the first question in front of me, which is is the

18   stay lifted as to any discovery on the NBA does not mean

19   you're -- you know, the door is wide open, let's get into

20   reams of discovery on this.

21          So if you see where I'm coming from, Mr. Yetter,

22   it's this motion raises the question whether this Court's

23   going to say King's X, no discovery whatsoever on this, we're

24   done, based on Judge Castel's prior order or for some other

25   reason.

 1          And my review of these materials, my review of the

 2    parties' pleadings and controlling law, is that even if we're

 3    just talking about the DTPA claims, I think there's some

 4    opening there.

 5          And we can talk about Section 2.  I don't know if

 6    you have more you want to say on this, because I do want to

 7    ask but the Section 2 argument that you've made as well.

 8          MR. YETTER:  All right.  I do have one last point,

 9    Your Honor, because I hear where you're going.  But if this

10    were a situation where they, the States, were sending us the

11    Network Bidding Agreement discovery on a clean slate and

12    there was no stay in place, I would -- we would agree with

13    the Court that the only thing you need to look at is the

14    relevance and, you know, and do they already have enough and

15    that sort of thing.  But this is not in that context.

16          What the States are asking the Court to do is

17    essentially to lift an order of the MDL judge.  And that's

18    why we think, Your Honor, that that third step that you've

19    been talking about, which is the cumulative, duplicative,

20    ample opportunity to obtain, under 26 (b)(2)(C), that we

21    believe that's part of the decision for this Court.  And I

22    know that that would get -- the Court has said that would get

23    into the granular of what exactly are they asking for, but

24    that's what we believe the States should have presented to

25    the Court -- this is what we need, this is what we don't

 1    have -- and they haven't done that, Your Honor.

 2              So we think their burden is much more than just

 3    normal discovery, is there relevance to this discovery.

 4    Their burden is to convince the Court that to lift a motion

 5    to stay that was put in place by the MDL judge.  And it's

 6    more than just proving relevance.

 7              Their last brief, their reply brief,

 8    hung essentially their whole position on, well, it's clearly

 9    relevant.  And, you know, Your Honor, you're right, it was at

10    one time relevant we believe because we gave them

11    investigative materials and discovery about it early on.

12              At this point, they have to show the Court that --

13    more than that.  It's not just relevance.  It's that we don't

14    have it, and we couldn't have gotten it, and there is a good

15    reason for us to get it.

16              If discovery in this case is a book, the States are

17    acting like we're in the middle of the book.  We think we're

18    in the last couple of chapters.  And that's why that issue of

19    burden and the opportunity -- prior opportunity to obtain it,

20    we think is relevant today to this Court's decision on this

21    motion.

22              THE COURT:  All right, Mr. Yetter.  Well, I may --

23    I don't know that I agree with you on how to read Judge

24    Castel's order and what the Court is looking at here because

25    his order was just a complete stay of discovery and it was

1    not, as far as I can tell, a stay that was premised on

2    Because you've gotten everything you need, because there's no

3    more that you would need to get; it was a pause based on

4    other reasons that I think are no longer present.  And

5    precisely because it's not a stay that said, well, you can't

6    get any more of these types of documents or this type of

7    information because of 26(b), because it's not that type of

8    order, it's just a wholesale block.  I think what this Court

9    would be doing is saying, We're not doing a wholesale block.

10   It still leaves the question, if it's raised by the parties,

11   about what exactly type of discovery would be allowable on

12   this.  So I think I see his order a little bit differently.

13          Let me ask you, because we've talked about the DTPA

14   claims, you know, the States' position is, you know, this is

15   also relevant on the Sherman Act Section 2 claim, and the

16   parties have a dispute about this.  And I would like to get

17   your comments on that, because I may be missing this, but

18   I've gone through Judge Castel's September 2022 order very

19   carefully more than once, and it's a very thorough, it's very

20   thoughtful, opinion, and I just don't see that he dismissed

21   the Section 2 claims.  And the States asserted them in the

22   Third Amended Complaint.  We've checked that.  I can give you

23   the paragraphs, but I'm sure you know them by heart.

24          But I will say that Judge Castel was very I think

25   thorough and careful about how he discussed the claims.  So,

```
1    you know, at page -- I mean, you all know the cite, it is now

2    in the Fed Supp., it's at 627 F.Supp.3d 346.  But like at

3    page 366 of that order he describes the four claims asserted

4    in the Third Amended Complaint.  He carefully distinguishes

5    for claims of violations of Section 1 versus Section 2.  And

6    he describes Count Four, which concerns the Network Bidding

7    Agreement as asserting only Section 1 claims.

8            And I will note that he's careful also to note

9    where the States assert claims that are violations of both

10   Section 1 and Section 2.  So, for example, were they both at

11   play in a particular count?  Count Three is an example of

12   that.  His discussion of Count Three talks about how this is

13   an assertion of violation of both Sections 1 and 2.

14           And I will say that in his entire discussion of

15   Count Four, which is at pages 370 to 377, a very thorough

16   discussion, it's focused, as far as I can tell, entirely on

17   restraint of trade analysis under Section 1.  I just don't

18   see in his order anywhere where he is saying the Section 2

19   claim is gone, also.

20           And so I wanted to get your, you know, thoughts on

21   that, because if I'm missing something, you can let me know,

22   but it seems to me that he did not dismiss that claim.  And

23   so then the question becomes, is there some reason that's

24   otherwise not in front of the Court.  It's back in the Fourth

25   Amended Complaint.
```

```
 1          But I've read your written filing on it, and that
 2   prompted me to go back through again Judge Castel's order.
 3   And I'm not seeing it.
 4          MR. YETTER:  Your Honor, we -- I don't think you're
 5   reading this incorrect in terms of Judge Castel's focus.
 6   However, the Section 2 claim, much like the DTPA claims that
 7   the States are making, is based on this concept of an
 8   unlawful agreement.  So what they haven't done for the Court
 9   is explain how -- if that Agreement's not unlawful, how does
10   it fit within a monopolization -- a Section 2 claim, a
11   monopolization claim.  And that's what they haven't given the
12   Court any explanation about.
13          It's not like you just get to talk about anything.
14   How does a lawful Agreement, a lawful Network Bidding
15   Agreement, fit within and have relevance to their
16   monopolization claim.  And that's what the States have not
17   explained to the Court.
18          I will also say that -- and I'm sure the Court
19   knows this, but Judge Castel had this same issue come before
20   him with the private plaintiffs in the MDL, and he dismissed
21   their monopolization claim based on the Network Bidding
22   Agreement.  And so I think he believed that if that
23   Agreement -- or he concluded that Agreement was not lawful --
24   was not unlawful, that it has no place even in their
25   monopolization claim, the DTPA claims are no longer in the
```

```
 1    MDL because the private plaintiffs don't have those.  But the

 2    same principle we believe applies here.

 3              It's not a Section 2 -- relevant to Section 2

 4    because it's not unlawful, it is a valid agreement, according

 5    to Judge Castel's prior order, we don't think it's relevant

 6    to the DTPA claims as well.  But the plaintiffs don't explain

 7    how it is relevant to their Section 2 claim, Your Honor.

 8              THE COURT:  All right.  And I'll hear from the

 9    plaintiffs on that.  Is there something more you want to say

10    at the moment on this topic?

11              MR. YETTER:  Your Honor, I think you've been very

12    patient and given me time to say plenty.  So if I have

13    something, I will flag you, but I'll wait until after counsel

14    speaks.

15              THE COURT:  All right.  Let me let Mr. Collier

16    respond on those issues.

17              And maybe you can speak to both topics.  You can

18    respond regarding my discussion with Mr. Yetter on the DTPA

19    issue, and I have a feeling you'll have something to say on

20    the Section 2 issue.

21              MR. COLLIER:  Very little to say, Your Honor,

22    because your analysis is correct.  The issue before the Court

23    today is simply, Is the courthouse door fully and forever

24    barred to us taking evidence as to what Google and Facebook

25    did under the NBA agreement?  That's what we did, Your Honor.
```

1   We moved to lift the stay.  We didn't move to take a certain

2   deposition.  We didn't move to take even the Facebook

3   deposition.  Now, that's coming, of course.  And when it

4   comes, we have a process in place for that, which is --

5   Mr. Moran is sitting right here -- I assure you five minutes

6   after we issue, you know, corporate representative

7   depositions to figure out how this Agreement was implemented,

8   which we don't have.

9           And if you listen carefully, Mr. Yetter never at

10  any point said, They have everything.  What he said was,

11  They've got lots, like just hundreds of thousands of pages,

12  which the Court has addressed before.  You don't just get to

13  point to the haystack and go, Hopefully, it's in there, and

14  tell me it's not.  We don't have anything since 2022 because

15  of the stay.  So we know right now there's things we don't

16  have without even getting into the details.

17          So the issue before the Court is should the stay be

18  lifted.  And we have -- now that we've gone through this

19  hearing, it's clear we have DTPA claims that everyone

20  admits -- and I've walked through covering not just the

21  Agreement, but the post Agreement conduct.  And so we are

22  seeking a lift of the stay for relevant information.

23          And Your Honor is exactly correct.  If they want to

24  make proportionality and burden objections, well, they could

25  have already done so.  We didn't withhold bringing this issue

1    before the Court as has been portrayed.  We served DTPA

2    discovery on November 10th, 2023, as soon as we came back

3    here.  And Google didn't answer it, they said, because it's

4    stayed.

5           And then we come to the Court hearings in December

6    and January and we say, Hey, this is an issue.  And the Court

7    said correctly, Well, you're going to need to file a motion.

8    So we filed a motion immediately.

9           And here we are just simply wanting the courthouse

10   doors open, with 38, 40 days of discovery left.  We've had

11   the clock run out on us for months, and months, and months

12   saying, Okay, this is relevant and material discovery.  Once

13   the discovery -- well, first of all, we've already served

14   some discovery.

15          So if you talk about burdens, why aren't they here

16   saying, Judge, this is what they served on me and here's my

17   evidence as to why it's burdensome.  They don't even

18   acknowledge we've served the written discovery.

19          But once we serve the discovery, I'm sure Mr. Moran

20   will have first shot to:  Does it meet proportionality?

21   Because we've only got a certain amount of time, Judge.  We

22   just want to know what happened.  The Agreement says that

23   various money will flow back and forth.  Of course, it

24   doesn't say how much.  We need information on that.  What

25   money has changed hands?

1            So I think the Court has it right on what's limited

2    before the Court is, can we open these doors.  And I could

3    say a lot about their characterizations of when we're arguing

4    a section -- well, I'll go ahead and say it -- you've asked

5    me to comment a little bit about Section 1 versus Section 2.

6            Mr. Keller, Your Honor, they keep saying when we

7    were arguing a Section 1 motion to dismiss, said mostly it's

8    on the Agreement.  Well, that's the nature of a Section 1

9    claim.  Is there a contractual, you know, kind of almost per

10   se -- you know, I'm a shade tree and I trust lawyers, and I'm

11   really nervous when Professor Alford and others are here to

12   grade my papers.  But essentially, is there something about

13   the four corners of that Agreement that violates Section 1?

14   So, of course, Mr. Keller, Well, mostly we're going to rely

15   on the four corners, Judge.

16            But that's not our Section 2 claim.  That's not our

17   DTPA claim, which takes into account the monopolistic conduct

18   or the conduct that was misrepresented as being equal, or, as

19   Your Honor points out, the conduct that they kept secret.

20            And they kept Project Jedi secret, even when it

21   came out, Your Honor, motion after motion to keep that under

22   seal.  And when it finally broke, it's in 500 papers across

23   the country, this secret deal.  That's the essence of the

24   DTPA claim, of failure to disclose and lying.

25            So --

```
 1              THE COURT:  Mr. Collier, is there something you
 2    want to say about Mr. Yetter's argument that the States have
 3    not explained how the NBA is relevant if it's not, if you
 4    will, unlawful under Section 1?
 5              MR. COLLIER:  Well, if it's -- there is no --
 6    Mr. Alford -- Professor Alford is staring at me, so I'm
 7    feeling a little heat right now.
 8              Otherwise lawful contracts can be a part -- you
 9    know, the only unlawful was, is it per se unlawful under
10    Section 1 on a motion to dismiss?  Not, is it part of the
11    scheme to acquire or maintain a monopoly under Section 2?
12    That can happen all the time.  Otherwise, not per se in the
13    legal contracts between two actors in a marketplace that
14    don't violate Section 1 are part of the relevant conduct in
15    Section 2.
16              THE COURT:  All right, Mr. Collier.  Anything else
17    you wanted to say on this issue?
18              MR. COLLIER:  On this issue, what I will say, Your
19    Honor, is the path forward I believe -- because I don't want
20    to just leave the Court hanging -- we've served discovery in
21    November.  I will pledge to the Court we'll serve our
22    30(b)(6) notice on this of what we want from Google by next
23    Friday.  We'll serve our third-party subpoena to Facebook.
24    Which, by the way -- they say we've got all the stuff --
25    we've never got a Facebook document, not one.  We've never
```

1    heard what Facebook had to say about their part of the deal,

2    or what Google told them, when it goes to Your Honor's

3    scienter point.  There's nothing in that stack of 500,000

4    documents, that haystack, that has anything to do with what

5    Facebook is going to say Google knew and attempted to

6    accomplish.

7           So there's a path forward on this.  We lift the

8    stay -- or hopefully, Your Honor.  We're going to send out

9    proportionate discovery.  We don't have lots of time, Your

10   Honor.  If nothing else, if not just our kind of code of

11   ethics and following the rules, we just don't have a lot of

12   time.

13          We're going to send out that discovery.  We've

14   already got some out that they should answer and they should

15   be ordered to answer, so we can start to frame this dispute.

16   We'll serve our two 30(b)(6) notices of deposition, or one to

17   the nonparty, one to them.  And then either Your Honor, if

18   you want it, or Special Master Moran, if there's any

19   proportionality, we'll deal with it in the appropriate course

20   when we have the actual requests.

21          THE COURT:  All right.  Thank you, Mr. Collier.

22          Mr. Yetter, I'll give you another opportunity to

23   speak.  Mr. Collier addressed some of the items we were

24   talking about.

25          MR. YETTER:  Thank you, Your Honor.  Just briefly,

1    two points.

2         I still didn't hear how a lawful agreement fits

3    within their monopolization Section 2 claim.  I'm not sure

4    how it does, other than counsel simply saying lots of stuff

5    does.  Nor do I see how a lawful agreement fits within their

6    DTPA claim.

7         But setting that aside, the other point that

8    counsel made was they sent us discovery in November about the

9    Network Bidding Agreement.  I don't believe that's accurate.

10   They did send us a ton of discovery, over a hundred requests

11   for production, about their DTPA claims.  I don't believe

12   that the Network Bidding Agreement was part of that.

13        They told -- they told this Court that it's just

14   that DTPA discovery is just going to be a little bit more,

15   we'll need a few more custodians and you'll use the same

16   search terms.  That's not where they are today.  We're having

17   a lot more custodians and we're having new search terms.

18        But fundamentally, Your Honor, we believe that what

19   this Network Bidding Agreement discovery that the States say

20   they will send, is basically starting a whole new phase of

21   the DTPA or Section 2 discovery afresh.  We haven't even seen

22   it yet.

23        So we're talking about, as counsel said, six weeks

24   left before the discovery cutoff, and we still haven't even

25   seen this discovery that -- on the Network Bidding Agreement.

1        So those are my only comments, Your Honor.

2        THE COURT:  All right.  Thank you, Mr. Yetter.

3        Mr. Collier, if you have something you want to say,

4   you can.

5        MR. COLLIER:  Yes.  I will be brief.  I promise,

6   Your Honor.

7        Mr. Yetter admits that our November discovery was

8   on our DTPA claims.  And laptop on an Elmo -- I may need my

9   technical support guru -- but our discovery was on the AdTech

10  Auction Mechanics, Your Honor.  And we wanted to know

11  everything, but in particular we wanted to know about the

12  open bidding including Jedi, Jedi+ and Jedi++.  We asked for

13  this, Your Honor, and we were just sent away.  And we asked

14  for this in November as soon as we got back to this Court,

15  because the Texas DTPA claims for Texas and, of course, the

16  other states, you know, the analogous, are critical to us.

17        THE COURT:  All right.  Thank you, Mr. Collier.

18        So the second issue I have -- I'm going to move to

19  the second issue unless there is anything else counsel need

20  to say on this.  I see you shaking your heads in the

21  negative, so we'll move to the second topic, which is the

22  coordination order concerning the MDL.

23        So I'm going to just briefly go through our history

24  on this.  As counsel are aware, on February 26, this Court

25  entered an order regarding coordination of discovery.  That

1    order was issued after substantial input from the parties, as

2    well as the special master.  But, of course, that order

3    provided that it would not go into effect unless and until it

4    was entered both by this Court and by the MDL Court.  So

5    baked into the order was the notion that this is not going to

6    happen unless we have both Courts signing off on it.

7           On March 14, 2024, this was presented, my

8    understanding, to Judge Castel.  He entered an order on that

9    date, and it confirmed that the coordination order would not

10   be entered in the MDL matter.  The order works through -- I

11   mean, it's not a long order, but I think it expresses what it

12   needs to about the reasons why Judge Castel did not think

13   that would be prudent for the MDL matter.

14          And so I welcome comments from the parties about,

15   you know, moving forward in this case, what you think about

16   opportunities for coordination or what you think about the

17   effect of the coordination order not being in place.

18          I am -- I'm aware -- by the way, I have read the

19   transcript of your comments to the special master about this.

20   So I know at that time you were all digesting this and you've

21   had more time to think about it.

22          So maybe I can start with Mr. Lanier --

23          MR. LANIER:  Yes.

24          THE COURT:  -- and any comments you want to make

25   about what this means going forward in discovery.

```
 1            MR. LANIER:  Thank you, Your Honor.

 2            A coordination order exists for the benefit of the

 3    Court, obviously, but it mainly exists for the benefit of the

 4    parties.  It's just an easier way to cut the diamond.  I look

 5    at this, and I would think that even if the judge never

 6    entered an order, the parties on their own would figure out a

 7    way to coordinate to mutual benefit.

 8            So, for example, we have depositions that we set.

 9    It seems logical that Google might not wish to produce the

10    same witness twice, in our case and in the MDL.  And so

11    Google would say, Hey, can we coordinate and figure out some

12    way to do this once?

13            By the same token, we want documents and things

14    that are produced in other discovery.  We can go and ape the

15    discovery requests in the other case and just put it down and

16    mimic it, or we can just say, Give us the discovery that was

17    relevant in the other case that's relevant similarly in ours.

18    Either way, it's just adding extra steps to get to an end

19    result that we're entitled to.

20            I view, at this point in my career, discovery not

21    as a game, or but rather means to an end.  And the goal is

22    not to obfuscate, to hide, and to make things arduous and

23    difficult.  The goal is to figure out as expeditiously and

24    efficiently as possible how to get the relevant information

25    to the other side so that we can go about the truth process,
```

1    which is our American judicial system.

2            I will add to the record, to have an opportunity to

3    use the Elmo, an email that we have received from Michael

4    Wolin, as of March 20th.  And the email was to Z, and Michael

5    Wolin is one of the trial attorneys for the DOJ in the

6    antitrust matter.

7            He writes, for the record, "Zeke, we understand

8    from the March 14th joint status report filed by the

9    Texas-led state plaintiffs and Google that the parties plan

10   to discuss the status of the coordination order in the

11   Eastern District of Texas case during the March 21 conference

12   before Special Master David Moran."

13           Well, actually, it's in front of El Jefe himself.

14           "The United States believes that the coordination

15   order previously signed by Judge Jordan, Docket 266, should

16   be rendered effective notwithstanding Judge Castel's order in

17   SDNY, declining to order further coordination.  Several

18   provisions, in particular paragraphs 3.f., 6.b., and 6.c.,

19   are vital to creating a level playing field between Google,

20   on" the one hand -- or "on one hand," excuse me, "and the

21   Texas and Virginia plaintiffs, on the other hand.  Those

22   provisions as applied to the Virginia plaintiffs, should not

23   be dependent on an action by Judge Castel and are consistent

24   with the provisions already ordered by the Court in the

25   Virginia case in our coordination order.

```
 1              "Regards, Michael Wolin."

 2              You know, the parties are seeking to find some way

 3     to make this efficient and effective.  And part of me just

 4     wants to say, Fine.  If Google doesn't want to enter into a

 5     good coordination order that works with both sides, we don't

 6     need a coordination order, we'll take depositions twice.

 7     We'll just file discovery requests and say, Give us all the

 8     discovery you gave to the other folks.

 9              We can go that route.  We can do that.  The problem

10     might come with our discovery cutoff.  What if there's a

11     third party, say AT&T, that produces discovery to Google in

12     the MDL case three weeks after our discovery cutoff?  If

13     there's no coordination order, we don't have a chance to get

14     that in our case within the discovery cutoff.

15              So absent a discovery -- a coordination order, what

16     are we left with?  Oh, we'll file a motion in front of you

17     and say, We know we're past discovery, but this has been

18     produced in the other case and it's relevant to ours, and we

19     would like it anyway.  And so again it's just more steps that

20     takes away from the judicial economy and the lawyer economy

21     on trying to get to the end.

22              But we think that you had a well-reasoned order.

23     We understand Judge Castel has not entered that order.  And

24     Mr. Keller and I have appeared in front of him on numerous

25     occasions, and he is a strong jurist, and we have no fuss
```

 1   with his legal acumen and all.  And I can't presume to say

 2   why he has said what he has said for his plaintiffs.

 3          But for your court and for your plaintiffs, it

 4   still makes sense to us to have the coordination order in

 5   place.  But if not, it just means that it's not as efficient,

 6   and we'll go after it anyway.

 7          THE COURT:  All right.  Thank you, Mr. Lanier.

 8          Mr. Yetter?  Oh, okay.  It's going to be

 9   Mr. McCallum.

10          MR. MCCALLUM:  Good morning, Your Honor.  Good to

11   see you again.

12          THE COURT:  Good morning.  Good to see you.

13          MR. MCCALLUM:  I think as Your Honor put it, the

14   coordination order was the product of a lot of input from

15   both sides and also with some input from the special master.

16   There was a negotiation.  There was a lot of back and forth.

17   From Google's perspective, there were benefits and

18   responsibilities to both sides as a part and parcel of

19   signing onto a coordination agreement.  And Google was -- in

20   that context of that negotiation, Google was prepared to sign

21   up to a number of responsibilities and to make a number of

22   concessions in exchange for one key benefit.  And the key

23   benefit to Google, in the context of the coordination order,

24   was protection for Google's witnesses in terms of

25   coordination of depositions.  That was the key thing that

1    Google was signing up to, and we were prepared to make some

2    concessions to get that.

3          So now we're in the position that Judge Castel has,

4    of course, we all know, declined to enter the order in the

5    MDL.  And so the effect of that, from a practical

6    perspective, for Google is that we have lost that protection,

7    the one thing that we were bargaining for in the context of

8    the coordination order.

9          So it's our position that sitting here today, we

10   don't think we should be bound by the concessions that we

11   were prepared to make in exchange for that protection because

12   the result of entering a coordination order in its current

13   form without the protection to Google would simply be a

14   one-sided order in favor of plaintiffs, with no protections

15   to Google.

16         And it was precisely for that reason that I think

17   Your Honor alluded to this in your opening remarks, that we

18   insist as part of the terms of the coordination order, that

19   it would not go into effect unless it was entered in both

20   courts, but for that very reason.

21         So Google finds itself in the position where we

22   have to abide by the orders of Judge Castel and, of course,

23   the orders of Your Honor in this Court.  And Google will, of

24   course, abide by both sets of orders.  But that puts us in a

25   situation where Judge Castel has ruled the coordination

1    between this case and the MDL is not appropriate, and so we

2    have to honor that order and we will abide by that order.

3    He's said that discovery is winding down.  And I think you

4    alluded to some of the reasons behind that relatively short

5    order, that he said, in effect, that now is not the time to

6    begin cross-noticing depositions in Texas.

7            So the situation here today is we don't think it's

8    appropriate to enter the coordination order as it was

9    negotiated on the assumption that it would be entered in the

10   MDL.  However, we made it very, very clear to the plaintiffs

11   that we're happy to meet and confer with them in good faith

12   to work through some of the issues that we see arising from

13   that, particularly with respect to the email that was shown

14   to the Court from the Department of Justice.

15           We've actually had productive discussions over the

16   last two days where Google has made it very clear to

17   plaintiffs that as regards Virginia, we intend to do

18   everything that we can to sort of continue the effectuation

19   of the existing coordination order that was entered in

20   Virginia and the MDL.  And we have made it very clear to

21   plaintiffs that we are prepared to make Google -- continue to

22   make Google's documents and data available and to otherwise

23   coordinate with respect to that existing coordination order.

24   But the situation we find ourselves in with respect the MDL

25   is somewhat more complicated.

```
 1              THE COURT:  Right.  Well, certainly as to your
 2    point that no one is bound by the coordination order, I
 3    agree, and I assume everybody in the room agrees, that the
 4    order is very clear, it's not effective -- and that means no
 5    one's bound by any provision in it -- unless and until both
 6    Courts have entered it.  So as you've noted, both sides are
 7    not bound by anything in that order.
 8              However, as you've noted and as Mr. Lanier has
 9    noted, it certainly and obviously makes sense for the parties
10    to do whatever they can to work together to make the process
11    of depositions, I think particularly as you've noted, but
12    also other discovery, as efficient as possible.
13              And so I don't think there's anything about the
14    fact that the order is not going to be in place here in the
15    MDL that prevents the parties from coordinating on the
16    scheduling of depositions, you know, for this case and the
17    MDL case.  I'm sure the parties can work together to try to
18    do that and make it efficient.
19              And beyond that, Mr. Lanier talked about some
20    things you could do that might allow the parties to
21    coordinate as much possible between these actions.  But the
22    way I see it going forward is it's going to be up to the
23    parties in the first instance to work together and find ways
24    to be as efficient as possible and hopefully, per the email
25    that Mr. Lanier showed, as much as possible under the kinds
```

1    of agreements you made in the coordination agreement, even

2    though no one's bound by that.  And there may be aspects of

3    that that the parties are, you know, not going to agree on,

4    now that that order is off the table, but the spirit of that

5    order had everything to do with the parties' commitment to

6    save resources and to move forward efficiently.

7         So again, I see this as, in the first instance, the

8    parties trying to work together.  Beyond that, you know, the

9    Court will be ready to intervene as necessary.  We have the

10   special master who can help on discovery issues that arise.

11   But I think that -- I think it's fair to say my hope is the

12   same as yours, that you'll be able to work together as best

13   as possible going forward.

14        MR. MCCALLUM:  And we will do that, Your Honor.

15        And just to be clear, it remains very much in

16   Google's interest, as you can imagine, to coordinate on

17   deposition scheduling, and we will work in good faith to do

18   that.  Our point is simply that the agreement as it was

19   drafted contains concessions that we do not think should

20   necessarily remain in place.

21        THE COURT:  Right.  And the underlying principle

22   that I probably don't need to say, but I will say it, is both

23   sides are going to get the discovery they need in this case.

24   They're going to get it.  And if it means people are deposed

25   twice, then that's what's going to happen.

1          MR. MCCALLUM:   Understood, Your Honor.

2          THE COURT:  All right.  I think we can move to the

3     last issue, unless the parties have anything else they want

4     to talk about on item two.

5          So I think moving on to the third topic, we have

6     the States' interrogatory responses.  I don't know if that's

7     you, Mr. McCallum, or you, Mr. Yetter.  This was when you

8     filed your status report, a bit of a moving target, I think,

9     but something that you identified that we would need to

10    discuss.  So Mr. Yetter, you can proceed.

11         MR. YETTER:  Yes.  Thank you, Your Honor.  "Moving

12    target" is the perfect description, and the target is now, as

13    the Court is well aware, the States have gone from

14    representing all of the above consumers, competitors, users,

15    advertisers, and publishers, to dropping -- that was in

16    prior -- that was last Fall, to dropping -- eleven of the

17    States dropping their parens positions, and Texas saying that

18    it has as a policy against proceeding in parens patriae.

19         And then in February, everybody reverting back, all

20    17 States now say they are acting in both in parens and some

21    in sovereign.

22         And now, in March, Your Honor, they've dropped all

23    of their -- they, 16 of the 17 plaintiffs, have dropped all

24    of their damages claims, restitution claims, and disgorgement

25    claims.  Only Puerto Rico has maintained those claims.  That

1    is the state, not -- maybe, perhaps, not coincidentally, that

2    has produced no documents to us, no retention policies,

3    almost basically nothing.

4           And we raise it, Your Honor, because we weren't --

5    we are still digesting the impact of that claim.  Now all 17

6    States saying they are still seeking civil penalties, all as

7    in their parens capacity, some in their sovereign capacity,

8    for both DTPA and injunctive -- excuse me, for DTPA claims

9    and injunctive relief for both antitrust and DTPA claims.

10   Puerto Rico is the outlier in terms of seeking damages.

11          But we are still digesting how that affects

12   standing of these claims -- these States who under -- as the

13   Court knows, under some of the DTPA claims, there's no

14   requirement to prove reliance or damages.  And so without

15   injury, under *TransUnion*, there may be an issue of standing.

16   We're still digesting that.  And it certainly does impact

17   discovery.

18          So we wanted to raise it, make sure the Court was

19   aware that even now, just a few weeks before the end of fact

20   discovery, the States have taken what we see as a pretty

21   significant change in position.  And we're obviously going to

22   deal with it and figure out where it goes, but we just wanted

23   to make sure that we brought it up to the Court.

24          THE COURT:  Mr. Yetter, just one quick question.

25          MR. YETTER:  Sure.

```
 1          THE COURT:  Is any of that you think going to be
 2  something you're going to raise in regard to the motion to
 3  dismiss beyond what's already been raised?
 4          MR. YETTER:  That is a very good question, Your
 5  Honor.  And we are -- this is a somewhat unusual situation,
 6  and the issues are perhaps nuanced on this issue of seeking
 7  federal standing for state claims in which you do not have to
 8  prove damages or reliance; in other words, injury.  And
 9  TransUnion says for private plaintiffs, if you don't have
10  injury, you don't have federal standing to seek civil fines.
11          But we're looking at that, Your Honor.  And if we
12  do intend to bring it up, we will raise it promptly with the
13  Court and ask for permission to supplement our briefing.
14          THE COURT:  Understood.  All right.  Thank you,
15  Mr. Yetter.
16          Mr. Lanier?
17          MR. LANIER:  I don't think I have a lot to add to
18  that, Your Honor.  I'm glad we weren't chided for dropping
19  claims.  I think that makes it a little bit easier.  Numerous
20  plaintiffs have been chided for dropping claims.  But we have
21  dropped, as Mr. Yetter reflected.
22          We have the process -- you had asked us in the last
23  hearing to go through a process to make sure that everyone's
24  aware of how the various states are working together to try
25  and address discovery needs.  And we filed that with the
```

1    Court.  We gave a copy to Google.  We've never heard anything

2    back from Google on that.  I think, to some degree, your

3    instructions to do that have helped us probably clarify some

4    of this.  And so some of the credit for this actually

5    probably flows to the Court.

6             But I can tell you that you've got 17 governmental

7    entities that are working fast and furious.  While the State

8    of Texas is in the lead, and the State of Texas has plenty of

9    people power to move the machine, some of the other states do

10   not have such dedicated large-budget AG offices, and so it's

11   still a difficult process fully.  And, yes, a bit of a moving

12   target for all of us, but one where we are keeping that

13   target as live and fully up to date as we can as we go along.

14   We'll continue to do so.

15            And if Google's got a complaint, we've got a

16   wonderful process in place right now with Special Master

17   David Moran.  And I have no doubt, just as he had told us --

18   we told him on March 7th that we would amend our answers, and

19   then we did March 15th, within the timeline he gave us.

20   He -- we've probably made more progress in the last month

21   working through this stuff with him than we have in the prior

22   ten months at least, because he's very hands on.  And that's

23   a process that will be in place for this as well should it

24   look like our target needs to move some more.  Thank you.

25            THE COURT:  All right.  Thank you, Mr. Lanier.

```
 1              Mr. Yetter, any followup on this issue?  I mean,
 2    I'll note that it does certainly appear to me that, from my
 3    review of the filings before the Court and the proceedings
 4    before the special master, that a lot of progress has been
 5    made on discovery issues.  That's not to say there aren't
 6    things I can see that you're still working on.  I've read the
 7    most recent status reports, coming in yesterday and today.
 8    So I know there's issues you're working on, but it seems to
 9    me you've made a lot of progress.
10              So Mr. Yetter, you wanted to follow up?
11              MR. YETTER:  Two brief comments, Your Honor.
12    Counsel is right that the Court's direction that the
13    plaintiffs identify a little bit more specifically who
14    represents whom has helped.  It doesn't mean that we're
15    communicating perfectly on all things, but that is the nature
16    of complicated, complex litigation like this.
17              And, secondly, we are appreciative that the Court
18    asked Special Master Moran to give up his entire private law
19    practice so that he could be the special master in this case,
20    because it has -- I don't know how he has kept up any of his
21    law practice, but it is -- and I don't want to break the
22    suspense for our hearing with the special master, but there
23    are a few issues that we need a little bit of guidance from
24    him on.  But, otherwise, we very much appreciate his service
25    and the Court's guidance on all this.
```

```
 1              THE COURT:  All right.  Thank you, Mr. Yetter.

 2              Mr. Lanier, one other thought I had and would like

 3      to get your comment on is whether or not it makes sense at

 4      some point for perhaps the States to file some sort of

 5      advisory on where we are currently with regard to what's

 6      being claimed by each state or what, you know, claims are

 7      being -- are continuing to be pursued and what capacity.

 8              I know you have the answers.  You've been going

 9      through the discovery part of that.  And I will say that the

10      filing you referenced before, that really had to do with

11      making sure there wasn't any confusion about the authority

12      the State and the States' counsel have.  And I know,

13      Mr. Lanier, your firm and Mr. Keller's firm represent more

14      than -- or are involved with more than one state, and the

15      State of Texas has a coordinating role.  But I thought that

16      the filing you made was very thorough.  My sense is, and hope

17      was, that there wouldn't be confusion anymore about that.

18              So I only raise this issue with you because we have

19      had a lot of discussion, and Mr. Yetter's mentioned today and

20      so have you, about, you know, where the states are in terms

21      of claims being pursued and in what capacity -- or I should

22      say damages or remedies.  Let's talk about in terms of

23      remedies being pursued.

24              MR. LANIER:  Judge, what you're asking for is a

25      document of clarity.
```

```
 1              THE COURT:  Yes.

 2              MR. LANIER:  And I think clarity is incredibly

 3    useful to me, too.  I'd love to see that document.  So I'm

 4    going to go out on a limb and tell my team that at your

 5    encouragement, we will produce such a document.  And I don't

 6    know how quickly we can do it.  And recognize that we do

 7    represent a good number of these entities, but, for example

 8    the -- Mr. Yetter had mentioned about Puerto Rico not

 9    producing any document retention policies.  You know,

10    Hausfeld represents Puerto Rico; we do not.  And Hausfeld has

11    told Google, Puerto Rico doesn't have a document retention

12    policy to produce.  And so, you know, we're having to juggle

13    he said/she said within the confines of this.

14              And I think if you were to tell us to put together

15    such a document, that it would enable us to not only do it

16    for ourselves and those we represent, but it would also put a

17    wonderful opportunity on the shoulders of those we do not

18    represent to also help and assist in that regard.  So that

19    would be great.

20              THE COURT:  And, Mr. Lanier, you did talk about

21    time frames.  So if the Court -- because my initial thought

22    was it was something you might all just want to sua sponte

23    file, but I can also -- based on your comments, we can also

24    enter an order.  And in terms of a time frame, you can let me

25    know.  Do you think two weeks?  Do you think longer than that
```

1   would be needed?

2         MR. LANIER:  I think at least -- my people over

3   here are telling me two, but I've got people on the phone and

4   people not here.  If I could have three, and we'll get it

5   done before our next conference.

6         THE COURT:  All right.  So we're looking at more

7   like 21 days, and the Court will plan to get some order out

8   on that.

9         So we've covered, counsel, all the topics that we

10  had for our status conference.  And I know you have another

11  one immediately after this one.

12        Is there any other issue we need to discuss today,

13  Mr. Lanier?

14        MR. LANIER:  Not from plaintiff, Your Honor.

15        MR. YETTER:  No, not for Google, Your Honor.  Thank

16  you.

17        THE COURT:  All right.  And I will add the

18  additional reminder that was brought up at the beginning of

19  the hearing, which is that our next status conference will be

20  a full day for us because we have the conference in the

21  morning, and then at least at the moment we have arguments

22  scheduled for the afternoon on the pending dismissal motions,

23  subject to any -- if there is a need for some sort of

24  supplement or additional briefing, which I'm not suggesting

25  that needs to happen, but it sounds like that's a

1   possibility.  But for the moment, we're ready to go next

2   month on both.

3           And I appreciate your discussion and arguments

4   today.  They are very helpful for the Court.  And we have

5   orders that we'll be planning to get out on the pending stay

6   motion and then on the other issue we discussed

7   regarding remedies sought by the States.

8           All right.  We'll stand in recess.  Thank you,

9   counsel.

10                  (Adjourned at 11:16 a.m.)

11                  *    *    *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4              I, Gayle Wear, Federal Official Court Reporter, in

5      and for the United States District Court for the Eastern

6      District of Texas, do hereby certify that pursuant to Section

7      753, Title 28 United States Code, that the foregoing is a

8      true and correct transcript of the stenographically reported

9      proceedings held in the above-entitled matter and that the

10     transcript page format is in conformance with the regulations

11     of the Judicial Conference of the United States.

12

13                     Dated 24th day of March 2024.

14

15

16                     /s/ Gayle Wear
                       GAYLE WEAR, RPR, CRR
17                     FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25