# Exhibit 7
In Support of
Non-Party Meta Platforms, Inc.'s
Motion for Protective Order

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Eastern District of Virginia  ▾

| | |
|---|---|
| United States et al. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No.  1:23-CV-00108 |
| Google LLC | ) |
| _Defendant_ | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                Meta Platforms, Inc.

_____

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Described in the attached Exhibit A.

| Place:  Axinn, Veltrop & Harkrider LLP | Date and Time: |
|---|---|
| 114 West 47th Street. New York, NY 10036 | 04/17/2023 5:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      03/31/2023

| CLERK OF COURT | | |
|---|---|---|
| | OR | _Bradley Justus_ |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Google LLC
_____, who issues or requests this subpoena, are:

Bradley Justus, 1901 L Street NW, Washington, DC 20036, bjustus@axinn.com, 202-469-3532

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:23-CV-00108

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit A

***United States, et al. v. Google LLC,*** No. 1:23-CV-00108 (E.D. Va.)
**EXHIBIT A TO SUBPOENA**

## INSTRUCTIONS

1.   In addition to the specific instructions set forth below, these Requests incorporate the instructions set forth in Federal Rule of Civil Procedure 45 ("Federal Rules"), the Local Rules of the U.S. District Court for the Eastern District of Virginia ("Local Rules"), and any orders concerning discovery in place at the time production is made, including any stipulation and order concerning electronically stored information ("ESI Order"). Subject to a valid claim of privilege, please produce the entire document if any part of that document is responsive.

2.   Please produce all requested documents in Your possession, custody, or control, or available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, agents, or other persons directly or indirectly employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or otherwise under Your control.

3.   Pursuant to Federal Rule 45(e)(1), documents must be produced either: (a) as they are kept in the usual course of business (in which case they must be produced in such fashion as to identify the department, branch, or office in whose possession the document was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific Request enumerated herein, with such specific Request identified.

4.   If any portion of any document is responsive to any Request, a legible version of the entire document must be produced, together with all non-identical copies, versions, and drafts of that document, including all attachments and enclosures.

1

5.   You must retain all of the original documents for inspection or copying throughout the pendency of this Action, any appeal(s), and any related proceedings.

6.   You must produce all documents and associated metadata according to the Federal Rules, Local Rules, and, when entered, the governing ESI Order for this Action. Provide instructions and all other materials necessary to use or interpret Your data compilations, such as a data dictionary, with Your production.

7.   Data and materials that are stored electronically or in machine-readable form should be produced in electronic form with sufficient information to allow counsel to readily access or read such data or materials.

8.   If you object to all or any portion of any of the below Requests, you must identify the objectionable Request or portion thereof, and the nature and basis of the objection. Notwithstanding any objection to any portion of any Request, you must produce all documents and information to which such objection does not apply.

9.   If any document responsive to a particular Request no longer exists for reasons other than Your document retention policy, describe the circumstances under which it was lost or destroyed, describe the information lost or destroyed, list the Request to which it was responsive, and list persons with knowledge of the document.

10. If you are unable to produce a document that is responsive to a Request, describe the document, state why it cannot be produced and, if applicable, state the whereabouts of such document when last in your possession, custody, or control.

11. If there are no documents or information responsive to all or any portion of any Request, so state in writing.

12. Other than redactions of privileged information, documents are to be produced in full. If any requested document cannot be produced in full, or if you withhold production of any document or portion of any document responsive to these Requests based upon any privilege, protection, or immunity, produce it to the extent possible and provide the privilege log information to be set forth in the governing ESI Order, once entered.

13. In construing the Requests herein:

    a.  Terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

    b.  The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the scope of any Request all information that might otherwise be construed to be outside its scope;

    c.  The use of the singular form of any word includes the plural and vice versa;

    d.  Words in the masculine, feminine, or neutral gender shall include each of the other genders;

    e.  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope;

    f.  The terms "all," "any," and "each" shall each be construed as encompassing any and all.

14. None of the Definitions or Requests set forth herein shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any

evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the Requests.

15. These Requests are continuing in nature. In the event that You become aware of responsive documents or information in addition to, or in any way inconsistent with, that which You previously have produced, prompt supplementation of Your responses is required.

16. Google specifically reserves the right to seek supplementary responses and the additional supplementary production of documents before trial.

17. Unless otherwise stated, the Requests call for the production of documents from the Relevant Period.

**<u>DEFINITIONS</u>**

1.  To the extent the terms defined below are used in the Requests, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of this Subpoena.

2.  The terms **"Accelerated Mobile Pages"** or **"AMP"** shall mean the open source framework developed by the AMP Open Source Project designed to optimize mobile web browsing and intended to help mobile web pages load faster.

3.  The term **"Action"** refers to the above-captioned litigation, *United States v. Google LLC*, 1:23-cv-00108-LMB-IDD.

4.  The term **"Ad Blocking Tool"** shall mean any browser extension or software that prevents ads from being displayed to Users through their web browser.

4

5.   The term **"Ad Buying Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

6.   The terms **"Ad Exchange"** or **"Supply-Side Platform"** or **"SSP"** shall mean a third-party or In-House product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place Bids in real-time auctions for Inventory offered for sale by or on behalf of two or more Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

7.   The term **"Ad Network"** shall mean a third-party or In-House product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

8.   The term **"Ad Selling Tool"** shall mean any third-party or In-House software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad Networks, SSPs, Header Bidding, or Header Bidding Wrappers) through which a Publisher sold or can sell Inventory.

9.   The term "**Ad Spam**" shall mean Display Advertisements of poor quality (e.g., ads that are popups or have flashing or other unpleasant audiovisual aspects) or objectionable content (e.g., ads that are sexually suggestive, related to illicit activities, etc.).

10. The terms **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution or other interface that facilitates or is involved in the Purchase or

sale of Inventory, including but not limited to a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, Header Bidding Wrapper, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or services offered by other social media outlets (including but not limited to, for example, Twitter.com) and certain other Publishers that enable the purchase of Inventory on their Properties via their own In-House Ad Tech Products.  This term does not include general-purpose software or systems on which an Ad Tech Product relies.   For avoidance of doubt, the phrase includes, but is not limited to, Facebook Audience Network, Ads Manager, and the discontinued Facebook Exchange, Atlas, and LiveRail.

11. The term **"Ad Tech Provider"** shall mean a person, firm, association, or other entity selling, reselling, licensing, or otherwise providing at least one Ad Tech Product, whether or not for a fee or other compensation.

12. The term **"Advertiser"** shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property.  For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

13. The term **"Agency"** shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns. For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

14. The term **"Amazon"** shall mean Amazon.com, Inc., any of its current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

15. The term **"Attributed Clicks"** shall mean the number of Clicks determined or estimated by an Advertiser, DSP, Ad Network, Ad Exchange, or other person or entity, in the ordinary course of its business, to have resulted from the display of one or more given Impressions to Users.

16. The term **"Attributed Conversions"** shall mean the number of instances in which an Advertiser (or a person or entity acting on behalf of such Advertiser) identifies a specific User action that it has defined as valuable to its business, such as an Online purchase or phone call, and determines or estimates that action to have resulted, in whole or in part, from the display of one or more Impressions to such User.

17. The term **"Attributed Sales"** shall mean the total amount of sales of products or services that an Advertiser determines or estimates resulted, in whole or in part, from the display of one or more Impressions to Users.

18. The term **"Bid"** shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

19. The terms **"Bidder"** or **"Buyer"** shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting a Bid to an Ad Exchange or Publisher Ad Server on behalf of an Advertiser, whether known at the time or to be subsequently determined. For the avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to another Ad Exchange or Publisher Ad Server.

20. The term **"Brand Protection"** shall mean measures taken by Ad Tech Products to avoid or limit the display of advertisements next to objectionable content or other ads, including without limitation displaying ads next to those of a competitor, next to sexually suggestive content, or next to content related to illicit drugs.

21. The term **"Campaign"** shall mean one or more Display Advertisements that are targeted to particular types of Inventory, Users, or objectives.

22. The term **"Click"** shall mean an instance of a User clicking on a Display Advertisement, thereby causing the rendering of the associated landing page, but excluding instances in which the click was deemed fraudulent, inadvertent, spam, a bot, or otherwise non-genuine.

23. The term **"Client-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running at least in part within the User's web browser.

24. The term **"communication"** shall mean the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

25. The term **"concerning"** shall mean relating to, referring to, describing, evidencing or constituting.

26. The term **"Connected Television"** shall mean devices or services that allow Users to watch television content served over the internet on a television screen, such as smart TVs (e.g., Samsung, TCL, Sony), media streaming devices (e.g., Roku Streaming Stick, Apple TV, Chromecast), or video game consoles (e.g.,  Xbox, PlayStation).

27. The term "**Cost Type**" shall refer to the basis on which an Advertiser pays for Display Advertising, such as, but not limited to, cost-per-thousand Impressions ("CPM"), cost-per-Click ("CPC"), or cost-per-action ("CPA").

28. The terms "**Demand-Side Platform**" or "**DSP**" shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an Impression-by-Impression basis.  For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

29. The term "**Device Type**" shall mean the electronic device by which the Impression was served, including mobile devices, desktop or laptop computers, tablets, and Connected Televisions.

30. The term "**Direct Transaction**" shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Tech Intermediary), including for the avoidance of doubt an agreement to set such price through an auction.

31. The terms "**Display Advertisement**" or "**Display Advertising**" shall mean Online Advertising other than Search Advertising, and shall include Native, banner, in-app or Video advertising, whether social or non-social.

32. The term "**document**" shall be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Federal Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

33. The term **"documents sufficient to show"** means documents sufficient to provide a true and correct disclosure of the factual matter requested.

34. The term "**Domain Spoofing**" shall mean a practice in which Inventory is misrepresented as being from a different web domain than it actually is.

35. The term **"Environment"** shall mean the electronic environment in which an Impression is served, meaning in a desktop web browser, in a mobile web browser, in a mobile app (other than a mobile web browser), or via Connected Television.

36. The term **"Express Fees"** shall mean Fees that are explicitly charged to a customer by an Ad Tech Provider, as opposed to merely being retained as a revenue share or retained profit.  For example, a DSP fee calculated as a percentage of an Advertiser's gross spend, and charged to the Advertiser in addition to such gross spend, would be an Express Fee, but a profit or buyside margin earned by a DSP as the difference between what it charges the Advertiser (e.g. on a cost-per-click basis) and what it pays to Ad Selling Tools or Publishers to purchase such Impressions would not be an Express Fee.  Similarly, a CPM fee charged by a Publisher Ad Server (e.g. *x* cents per thousand impressions served) would be an Express Fee, whereas the revenue share retained by an Ad Exchange (e.g. if the Ad Exchange remits 80% of gross revenue to the Publisher and retains a 20% revenue share) would not be an Express Fee.

37. The term **"Feature"** shall mean any design, feature, limitation, policy, mechanism, innovation, improvement, optimization, or strategy related to how Ad Tech Products buy, sell, price, bid, or auction Inventory, how Ad Tech Products improve ad quality or Match Quality, how Ad Tech Products measure, or report on the effectiveness of Display Advertising, or how Ad Tech Products integrate or interoperate with other Ad Tech Products, whether owned or operated by the same entity or different entities.

10

38. The term "**Fees**" shall mean any money retained by a provider of Ad Tech Products, including via Take Rates, for services related to the purchase of Display Advertisements.

39. The term **"Floor Price"** shall mean the limitation on how low an Advertiser or Ad Buying Tool can bid for Inventory while still being eligible to win the Impression.

40. The term **"Format"** shall mean the general makeup or layout of an ad. Different types of Display Advertising Formats include Native Advertising, Instream Video Advertising, Outstream Video Advertising, Mobile Publishing Formats, and Static Advertising. For the avoidance of doubt

41. The term **"Google"** shall mean Google LLC, any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

42. The term **"Gross Revenue"** shall mean revenue received from, or on behalf of, the Advertiser Purchasing the Inventory, before the deduction of any and all related fees and/or revenue share.

43. The term **"Guaranteed Transaction"** shall mean a transaction where a specified amount of inventory is purchased.

44. The term **"Header Bidding"** shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

45. The term **"Header Bidding Provider"** shall mean a person, firm, association, or other entity that provides Header Bidding Wrapper services to Publishers.

11

46. The term **"Header Bidding Wrapper"** shall mean a Header Bidding management system.

47. The term **"identify,"** when referring to a person, shall mean to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

48. The term **"identify,"** when referring to documents, shall mean to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

49. The terms **"impact"** and **"effect"** shall include both qualitative and quantitative, direct and indirect meanings of those terms.

50. The term **"Impression"** shall mean the service of a single Display Advertisement to a single User.

51. The term **"In-House Ad Tech Product"** shall mean an Ad Tech Product created for a Publisher's, Advertiser's, or Agency's internal use.

52. The term **"including"** shall mean including but not limited to.

53. The term **"Indirect Transaction"** shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction Transaction or Private Auction Transaction conducted by an Ad Exchange or a purchase of Inventory by an Ad Network for resale to one or more Advertisers.

54. The term "**Instream Video Advertising**" shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

55. The term **"Inventory"** shall mean space offered by Publishers for the sale or placement of Display Advertising.

56. The term **"Line Item"** shall mean the Feature of a Publisher Ad Server that contains parameters for how a given Display Advertisement is intended to be served on a Publisher's Property, along with pricing and other delivery details.

57. The term "**Match quality**" shall mean the effectiveness of matching customer information parameters to a website event.

58. The term **"Mobile Publishing Formats"** shall mean the various methods by which Publishers make their Properties or content available or more accessible on mobile devices, including Accelerated Mobile Pages, Facebook Instant Articles, and Apple News.

59. The term **"Native Advertising"** shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

60. The term **"Net Revenue"** shall mean revenue received from, or on behalf of, the Advertiser purchasing the Impressions, excluding any and all fees paid to Ad Tech Providers for the transaction.

61. The terms **"Online Advertisement"** or **"Online Advertising"** shall mean advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

62. The term **"Open Auction Transaction"** shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to bid on the relevant Ad Exchange are or were eligible to submit Bids.

63. The term "**Other Direct Transaction**" shall mean a Direct Transaction other than a Programmatic Guaranteed Transaction, Preferred Deal Transaction, or Publisher-Automated Transaction.

64. The term "**Other Indirect Transaction**" shall mean an Indirect Transaction other than an Open Auction Transaction or a Private Auction Transaction.

65. The term "**Outstream Video Advertising**" shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

66. The term **"Paid Advertising"** shall mean an advertising model whereby Advertisers pay Publishers to display their ads on a Property.

67. The term "**Payment Type**" shall refer to the basis on which a Publisher receives payment for the sale of Display Advertising, such as, but not limited to, cost-per-thousand Impressions ("CPM"), cost-per-Click ("CPC"), or cost-per-action ("CPA").

68. The term **"person"** shall have the meaning provided in Local Rule 26.3, namely, any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

69. The terms **"Plaintiff"** and **"Defendant"** as well as a party's full or abbreviated name or a pronoun referring to a party shall mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the Action.

70. The term **"Preferred Deal Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is not guaranteed.  For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Preferred Deal Transaction.

71. The term **"Private Auction Transaction"** shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

72. The term "**Programmatic Direct Transaction**" shall mean a Direct Transaction (other than a Publisher-Automated Transaction) that is or was negotiated, transacted, or finalized through an Ad Tech Product, underlined provided that, for the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Direct Transaction if such transaction was not otherwise negotiated through such Publisher Ad Server.

73. The term **"Programmatic Guaranteed Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is guaranteed.  For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Guaranteed Transaction.

74. The term **"Programmatic Transaction"** shall mean a Display Advertising transaction, other than a Publisher-Automated Transaction, that is or was negotiated, transacted, or finalized through Ad Tech Products.

15

75. The term **"Property"** shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

76. The term **"Publisher"** shall mean a person or entity operating a Property.  For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it shall mean a third-party or In-House product, service, or system that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory.has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

77. The term **"Publisher Ad Server"**  For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third-party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third party on behalf of or under contract with the Publisher.  For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of this Subpoena.

78. The term **"Publisher-Automated Transaction"** shall mean a Direct Transaction that is or was negotiated, transacted, or finalized through one or more automated services, whether or not auction-based, that is controlled by the Publisher or an affiliate thereof (other than an Ad Network, Ad Exchange, or SSP).  This would include, for example, the Publisher's self-service website for Advertisers to create Campaigns or place advertisements, such as that described at https://facebook.com/business/ads.  For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server (including one operated by

the Publisher) shall not be sufficient to render such transaction a Publisher-Automated Transaction.

79. The term **"Publisher Partner"** shall mean a person, firm, association, or other entity that sells Display Advertising on behalf of Publishers, other than Publisher Ad Servers, Ad Exchanges, and Ad Networks.

80. The term **"Purchase,"** when used in connection with Inventory or Impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

81. The term **"Query"** shall mean a request to provide, or Bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid request," or otherwise.  A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

82. The term **"reflecting"** shall mean illustrating or describing.

83. The term **"Relevant Period"** shall mean January 1, 2013 to present.

84. The term **"Search Advertising"** shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

85. The terms **"Self-Competition"** or **"Bid Duplication"** shall mean a situation in which Bids from the same Campaign, same Advertiser, or same Ad Buying Tool compete against each other in the same auction or same chain of auctions.

86. The term **"Server-Side Header Bidding"** shall mean an implementation of Header Bidding in which the Queries are sent, and responsive Bids are evaluated, by code running on a server (even if such server code is invoked from a call from the User's web browser).

87. The term **"Static Advertising"** shall mean Online Advertising consisting solely of static (i.e., non-moving or -changing) text, images, or graphics.

88. The term **"Take Rate"** shall mean the proportion of total revenue generated from Purchased Inventory that an Ad Tech Provider collects as part of its fee arrangement in connection with the Purchased Inventory.

89. The term **"Third-Party Cookie"** shall mean a browser cookie created and stored by a domain other than the domain to which the User navigated.

90. The term **"Transaction Type"** shall mean Programmatic Guaranteed Transaction, Preferred Deal Transaction, Publisher-Automated Transaction, Other Direct Transaction, Open Auction Transaction, Private Auction Transaction, or Other Indirect Transaction.

91. The term **"User"** shall mean an end user visiting or using a Property, or a proxy for that end user (including, but not limited to, cookie identifiers or mobile ad identifiers).

92. The term **"Winning Bid"** shall mean the Bid in an auction that ultimately succeeded in Purchasing the relevant Inventory.

93. The terms **"You"** or **"Your"** refer to Meta Platforms, Inc., including Facebook, Inc., any current or former parents, subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

## REQUESTS FOR DOCUMENTS

1.   Documents and data sufficient to show for all Display Advertising shown on Your Properties in the Relevant Period, the (i) total Bids received, (ii) total Impressions, (iii) total Clicks generated, and (iv) total Gross Revenue earned – all aggregated (at a monthly level for each month since January 1, 2013) separately for each unique combination of parameters (a)-(g) below:

      a.   The Property on which the Impressions were displayed;

      b.   The Advertiser for the Impressions;

      c.   The Ad Buying Tool used to purchase the Impressions;

      d.   The Cost Type that was specified for sale of the Impressions;

      e.   The Format of the Impressions; and

      f.   The Environment in which the Impressions were displayed.

An example of a sufficient response to this request is attached as Exhibit B. Data and documents produced in response to this Request shall be limited to the United States.  For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

2.    For each Ad Buying Tool that You operate or have operated at any point since January 1, 2013, data sufficient to show, for each month since such date, for all Display Advertising transactions involving such Ad Buying Tool in which resulting Impressions were shown to Users believed to be located in the United States (or where the Users' locations were ambiguous or unknown), the monthly (i) total Impressions purchased; (ii) total Attributed Clicks (or Clicks, if Attributed Clicks are not known) for such Impressions; (iii)

total Attributed Conversions for such Impressions; (iv) total Attributed Sales for such Impressions; (v) total Gross Revenue that You received from Advertisers for such Impressions (or Clicks thereon); (vi) total Buyer Payments that You made for such Impressions; (vii) total Express Fees that You collected on such Impressions; and (viii) total Fees that You collected on such Impressions  – all aggregated at a monthly level, separately for each unique combination of the following parameters:

     a.   Ad Buying Tool that You operate or have operated at any point since January 1, 2013;

     b.   Advertiser and Ad Agency (if used) that Purchased the Impressions through such Ad Buying Tool;

     c.   Ad Exchange, Header Bidding Wrapper, or other Ad Selling Tool from which You received the Query that led to the Purchase of such Impressions (or otherwise through which the Impressions were purchased);

     d.   Publisher Ad Server that served the Impressions (if known);

     e.   Transaction Type through which the Impressions were purchased;

     f.   Publisher of the Inventory on which the Impressions were displayed;

     g.   Environment in which the Impressions were displayed;

     h.   Format of the Impressions;

     i.   Cost Type that was specified for purchasing the Impressions; and

     j.   whether the Impressions were displayed on social media.

An example of a sufficient response to this request is attached as Exhibit C.

    3.   All Documents analyzing the competition You face or have faced with respect to Your Ad Tech Products, including Documents analyzing the features and effectiveness of

other Ad Tech Products or Ad Tech Providers (including actual or potential In-House Ad Tech Products), market size and shares, competitor entry and expansion, pricing, network effects, and Your competition with Google.

4. For each Ad Buying Tool that You operate or have operated at any point since January 1, 2013, data sufficient to show, for each month since such date, for all Display Advertising transactions involving such Ad Buying Tool in which resulting Impressions were shown to Users believed to be located in the United States (or where the Users' locations were ambiguous or unknown), and for each Ad Exchange from which You received a query, (i) total Queries You received; (ii) total responses submitted; and (iii) total Impressions You won. An example of a sufficient response to this request is attached as Exhibit D.

5. Documents and data sufficient to show, for all Display Advertising shown on Your Properties, including, but not limited to, Your owned and operated Properties Facebook, Instagram, and Messenger, in the Relevant Period, the (i) total Queries sent, (ii) total Bids received, (iii) total Impressions, (iv) total Clicks generated, (v) total Buyer Payments received, (vi) total Express Fees paid, (vii) total Fees paid, and (viii) total Net Revenue earned – all aggregated (at a monthly level for each month since January 1, 2013), separately for each unique combination of (1) the Header Bidding Wrapper which won the Impression, (2) the Ad Selling Tool used to transact the Impression, (3) the Format of the Impression, and (4) the Environment in which the Impression was displayed, and separately for each of the following types of Impressions (a)-(e) below:

      a. Impressions for which Server-Side Header Bidding was used (i.e., the Query was sent to one or more Server-Side Header Bidding providers) but did not win the Impression;

    b.   Impressions for which Server-Side Header Bidding was the Winning Bid;

    c.   Impressions for which Client-Side Header Bidding was used (i.e., the Query was sent to one or more Client-Side Header Bidding providers) but did not win the Impression;

    d.   Impressions for which Client-Side Header Bidding was the Winning Bid; and

    e.   Impressions for which Header Bidding was not used.

An example of a sufficient response to this request is attached as Exhibit E. Data and documents produced in response to this Request shall be limited to information pertaining to transactions taking place in the United States. For any data and documents which You are unable to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

6.   All Documents analyzing Your strategy concerning Display Advertising, including all Documents analyzing Your strategy concerning Brand Protection; maintaining ad quality, including avoiding Ad Spam; ensuring privacy protection; and addressing adoption of Ad Blocking Tools by Users.

7.   Documents sufficient to show Your Ad Tech Products and their Features.

8.   Documents reflecting Your consideration, evaluation, or use of any actual or potential In-House Ad Tech Products You have developed, purchased, or considered developing or purchasing, including (a) any comparison of Your In-House Ad Tech Products with third-party Ad Tech Products or Ad Tech Providers, and their features, effectiveness, and pricing; (b) Your rationale for developing, or purchasing, or considering developing or purchasing such In-House Ad Tech Products instead of sourcing them from third parties; and

(c) the time, costs, and resources required to develop or purchase such In-House Ad Tech Products and/or to move to In-House Ad Tech Products from third-party Ad Tech Products.

9. Documents sufficient to show Your research and development spending on Your Ad Tech Products for each year beginning January 1, 2013, including, if applicable, how such research and development spending is allocated among Your Ad Tech Products.

10. Documents reflecting Your analyses of Advertiser satisfaction and/or retention (i.e., churn), including Your wins and losses of Advertiser accounts, spending or sales; Advertisers' response to changes in Your Fees or the cost-effectiveness of their Display Advertising while using Your Ad Tech Products; actual or perceived differences between Advertisers that use Your Ad Tech Products and Advertisers that use Your competitors' Ad Tech Products; and Advertisers' compliments and complaints regarding Your Ad Tech Products.

11. Documents analyzing competition You face or have faced with respect to selling Inventory on Your Properties, including Documents analyzing market size and shares, competitor entry and expansion, pricing, network effects, and Your competition with Google.

12. Documents reflecting how You promote or market Your Properties to Advertisers, including how you promote any of their benefits or advantages related to:

    a. access to Inventory;

    b. return on investment;

    c. enhancement of the User experience;

    d. Brand Protection;

    e. fraudulent inventory, including Domain Spoofing;

    f. ability to switch between ad Formats; and

g.  proprietary ad Formats.

13. All Documents analyzing how revenues, costs, profits, return on investment, return on advertiser spend, or any other commercial objectives are impacted by Your or other Advertisers' decisions to buy Display Advertising (i) in different Formats and Environments; (ii) through Direct and Indirect Transactions; (iii) with different Transaction Types; (iv) on social media and non-social media Properties; (v) using Agencies and not using Agencies; (v) from or through different Ad Exchanges, SSPs, Publisher Ad Servers, or Publishers, and (vi) through multiple or a combination of different Ad Buying Tools.

14. Documents sufficient to show how and why You shift Display Advertising spend across Ad Tech Providers (including actual or potential providers of In-House Ad Tech Products).

15. Documents sufficient to show why and how often You shift Display Advertising spend among Formats, between Direct and Indirect Transactions, among Environments, among  social media and non-social media Properties, and between Inventory Purchases using Agencies  and not using Agencies.

16. All documents reflecting Your consideration, evaluation, or comparison of Ad Tech Products or Ad Tech Providers (including actual or potential In-House Ad Tech Products), and their Features, effectiveness, and pricing.

17. Documents reflecting the costs and benefits associated with Your actual or considered switching, in whole or in part, from Paid Advertising to monetizing Your Properties including, but not limited to, Your owned and operated Properties Facebook, Instagram, and Messenger, through subscription fees, in-app purchases, downloads, or other forms of sales of content.

18. Documents reflecting  (i) the types of User data You collect in operating your Ad Tech Products; and (ii) the methods and processes You employ to use the User data You collect to form user profiles and audience lists.

19. All Documents analyzing the effect on Your Display Advertising strategy or the revenue resulting from Your Display Advertising from the availability or use of User identifiers or proxy identifiers (e.g. Apple Identifier for Advertisers (IDFA), Android AdID, Third-Party Cookies, logged-in account, etc.) or other User tracking mechanisms (whether or not used in connection with Your Properties).

20. Documents sufficient to show how demand sources are ranked or compared with one another in Your Ad Tech Products' process of choosing an ad to serve in response to a Query, and how an ad is selected to serve as a result of such rankings or comparisons, including any changes over time.

21. All Documents analyzing Your strategies and decisions concerning integration or interoperability (or any strategies or decisions by You to terminate, reduce or refrain from integration or interoperability) between Your Ad Tech Products and any Header Bidding offering or technology (such as those available from Amazon, PreBid, or other sources), including the impacts of such offering or technology on revenue, latency, Bid Duplication or Self-Competition, privacy concerns, billing issues, ad quality or ad spam, and fraudulent inventory.

22. All Requests for Proposal (RFPs), Requests for Quotation (RFQ), or similar documents that You have sent to Ad Tech Providers and responses to those RFPs or RFQs received from Ad Tech Providers.

23. All Documents regarding Your planned or actual entry into, exit from, or enlargement or retrenchment of the provision of any Ad Tech Products, including, but not limited to, any decision by You to limit any Inventory, Formats, or Environments available on Meta Audience Network/Facebook Audience Network  and  any decisions by You to shut down Facebook Exchange, Atlas, and LiveRail.

24. All documents concerning any formal or informal governmental investigation or litigation concerning Google's Display Advertising or Google's Ad Tech Products, including all documents concerning the multi-district litigation captioned *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (S.D.N.Y.), all communications involving You and any governmental agency, all documents that You provided to any governmental agency, and all documents You produced in the above-referenced litigation.

# Exhibit B

EXHIBIT B
ILLUSTRATIVE EXAMPLES OF DATA DEEMED SUFFICIENT TO RESPOND TO REQUEST NO. 1 IN EXHIBIT A TO THE SUBPOENA

| Month | (a) Property | (b) Advertiser | (c) Ad Buying Tool | (d) Format | (e) Environment | (f) Cost Type | (i) Total Bids Received | (ii) Total Impressions | (iii) Total Clicks Generated | (iv) Total Gross Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan-21 | Facebook | Nike | Facebook Ads Manager | Native | Mobile Web | CPM | 645,000 | 495,000 | NULL | $1,000 |
| Jan-21 | Instagram | The Home Depot | Facebook Ads Manager | Native | Desktop Web | CPM | 880,000 | 650,000 | NULL | $700 |
| Jan-21 | Facebook | Target | Facebook Ads Manager | Outstream Video | Mobile App | CPC | 750,000 | 700,000 | 500 | $900 |
| Jan-21 | Facebook | Hasbro | Facebook Ads Manager | Outstream Video | Mobile App | CPC | 550000 | 510,000 | 1,440 | $770 |
| Jan-21 | Instagram | Mars Inc. | Facebook Ads Manager | Outstream Video | Mobile App | CPA | 910000 | 820,000 | 1,200 | $1,300 |
| Feb-21 | Facebook | Ford | Facebook Ads Manager | Static Advertising | Desktop Web | CPM | 722,000 | 600,000 | NULL | $1,250 |
| Feb-21 | Instagram | Delta | Facebook Ads Manager | Outstream Video | Mobile App | CPC | 245,000 | 220,000 | 900 | $700 |
| Feb-21 | Facebook | The Home Depot | Facebook Ads Manager | Static Advertising | Mobile App | CPM | 1,100,000 | 850,000 | NULL | $1,500 |
| Feb-21 | Facebook | Target | Facebook Ads Manager | Native | Mobile App | CPM | 285000 | 233,000 | NULL | $180 |
| Feb-21 | Instagram | The Home Depot | Facebook Ads Manager | Native | Desktop Web | CPM | 622000 | 561,000 | NULL | $200 |

# Exhibit C

EXHIBIT C

ILLUSTRATIVE EXAMPLES OF DATA DEEMED SUFFICIENT TO RESPOND TO REQUEST NO. 2 IN EXHIBIT A TO THE SUBPOENA

| Month | (a) Ad Buying Tool that You Operate | (b) Advertiser Name | (b) Ad Agency Name | (c) Ad Exchange, Header Bidding Wrapper, or other Ad Selling Tool | (d) Publisher Ad Server Name | (e) Transaction Type | (f) Publisher Name | (g) Environment | (h) Format | (i) Cost Type | (j) Whether Impression Displayed on Social Media | (i) Total Impressions | (ii) Total Attributed Clicks | (iii) Total Attributed Conversions | (iv) Total Attributed Sales | (v) Total Gross Revenue from Advertiser | (vi) Total Buyer Payments | (vii) Total Express Fees Collected | (viii) Total Fees Collected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-21 | Criteo | Nike | W+K | AdX | Google Ad Manager | Programmatic Guaranteed | Disney | CTV | Instream Video | CPM | 0 | 495,000 | NULL | NULL | NULL | $1,020 | $850 | NULL | $170 |
| Jan-21 | Criteo | The Home Depot | NULL | Index Exchange | NULL | Private Auction | News Corp | Desktop Web | Static | CPC | 0 | 100,000 | 1,000 | NULL | NULL | $800 | $625 | NULL | $175 |
| Jan-21 | Criteo | Ford | BBDO | AdMob | NULL | Open Auction | Snapchat | Mobile App | Native | CPM | 1 | 1,000,000 | NULL | NULL | NULL | $1,600 | $1,250 | NULL | $350 |
| Jan-21 | Criteo | NBC Universal | NULL | Pubmatic | Google Ad Manager | Open Auction | WSJ | Mobile Web | Static | CPC | 0 | 1,500,000 | 1,100 | NULL | $2,200 | $3,300 | $2,900 | NULL | $400 |
| Jan-21 | Criteo | Spotify | NULL | OpenX | NULL | Private Auction | NY Times | Mobile App | Native | CPA | 0 | 575,000 | 1,500 | 120 | NULL | $1,100 | $850 | $180 | $70 |
| Feb-21 | Criteo | Nike | W+K | Open Bidding | Google Ad Manager | Open Auction | News Corp | Desktop Web | Outstream Video | CPM | 0 | 1,100,000 | NULL | NULL | NULL | $800 | $650 | NULL | $150 |
| Feb-21 | Criteo | The Home Depot | NULL | Xandr | NULL | Open Auction | USA Today | Desktop Web | Static | CPC | 0 | 500,000 | 1,100 | NULL | NULL | $880 | $670 | NULL | $210 |
| Feb-21 | Criteo | Ford | BBDO | AdMob | NULL | Private Auction | NY Times | Mobile App | Outstream Video | CPM | 0 | 1,330,000 | NULL | NULL | NULL | $3,500 | $3,000 | NULL | $500 |
| Feb-21 | Criteo | NBC Universal | NULL | PreBid | NULL | Other Indirect | Conde Nast | Mobile Web | Instream Video | CPM | 0 | 800,000 | NULL | NULL | NULL | $2,600 | $2,200 | NULL | $400 |
| Feb-21 | Criteo | Spotify | NULL | AdX | Google Ad Manager | Programmatic Guaranteed | Disney | CTV | Static | CPM | 0 | 650,000 | NULL | NULL | NULL | $1,200 | $950 | NULL | $250 |

# Exhibit D

EXHIBIT D

ILLUSTRATIVE EXAMPLES OF DATA DEEMED SUFFICIENT TO RESPOND TO REQUEST NO. 4 IN EXHIBIT A TO THE SUBPOENA

| Month | Ad Buying Tool that You Operate | Ad Exchange from which You Received a Query | (i) Total Queries You Received | (ii) Total Responses Submitted | (iii) Total Impressions You Won |
|-------|-------|-------|-------|-------|-------|
| Jan-21 | Criteo | Index Exchange | 113,468,524 | 111,654,789 | 212,435 |
| Jan-21 | Criteo | AdX | 625,699,647 | 614,237,564 | 443,854 |
| Jan-21 | Criteo | Magnite | 281,409,505 | 271,234,888 | 345,165 |
| Jan-21 | Criteo | Xandr | 732,698,815 | 722,543,791 | 494,134 |
| Jan-21 | Criteo | Pubmatic | 985,554,285 | 944,256,780 | 645,014 |
| Feb-21 | Criteo | Index Exchange | 812,681,786 | 797,563,740 | 597,067 |
| Feb-21 | Criteo | AdX | 565,431,658 | 542,000,000 | 408,063 |
| Feb-21 | Criteo | Magnite | 716,224,472 | 710,675,088 | 480,345 |
| Feb-21 | Criteo | Xandr | 416,356,289 | 398,137,507 | 355,136 |
| Feb-21 | Criteo | Pubmatic | 446,995,633 | 410,368,471 | 340,255 |

# Exhibit E

EXHIBIT E

ILLUSTRATIVE EXAMPLES OF DATA DEEMED SUFFICIENT TO RESPOND TO REQUEST NO. 5 IN EXHIBIT A TO THE SUBPOENA

| Month | (a) Server-Side Header Bidding Used but Did Not Win | (b) Server-Side Header Bidding bid was Winning Bid | (c) Client-Side Header Bidding Used but Did Not Win | (d) Client-Side Header Bidding bid was Winning Bid | (e) Header Bidding Not Used | (1) Header Bidding Wrapper that Won the Bid | (2) Ad Selling Tool | (3) Format | (4) Environment | (i) Total Queries | (ii) Total Bids | (iii) Total Impressions | (iv) Total Clicks | (v) Total Buyer Payments | (vi) Total Express Fees Paid | (vii) Total Fees Paid | (viii) Total Net Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-21 | 0 | 0 | 0 | 1 | 0 | Prebid | Google Ad Manager | Static | Desktop Web | 1,600,000 | 1,550,000 | $495,000 | $100 | $1,200 | NULL | $300 | $900 |
| Jan-21 | 0 | 0 | 0 | 1 | 0 | Prebid | Google Ad Manager | Instream Video | Desktop Web | 750,000 | 748,000 | $600,000 | NULL | $1,600 | NULL | $280 | $1,320 |
| Jan-21 | 0 | 1 | 0 | 0 | 0 | TAM | Google Ad Manager | Static | Desktop Web | 1,400,000 | 1,360,000 | $350,000 | $800 | $3,600 | $150 | $350 | $3,100 |
| Jan-21 | 0 | 1 | 0 | 0 | 0 | TAM | Google Ad Manager | Static | Mobile Web | 2,000,000 | 1,850,000 | 750,000 | NULL | $2,200 | NULL | $250 | $1,950 |
| Jan-21 | 0 | 1 | 0 | 0 | 0 | TAM | Google Ad Manager | Static | CTV | 950,000 | 945,000 | 265,000 | NULL | $1,200 | NULL | $350 | $850 |
| Jan-21 | 0 | 0 | 0 | 0 | 1 | NULL | AdX | Instream Video | Mobile App | 2,400,000 | 2,395,000 | 850,000 | 1,600 | $2,600 | NULL | $280 | $2,320 |
| Jan-21 | 0 | 0 | 0 | 0 | 1 | NULL | Index Exchange | Instream Video | Mobile App | 1,200,000 | 1,180,000 | 290,000 | NULL | $1,100 | NULL | $280 | $820 |
| Jan-21 | 0 | 0 | 0 | 0 | 1 | NULL | Index Exchange | Instream Video | Mobile Web | 650,000 | 648,000 | 400,000 | 950 | $1,300 | $80 | $280 | $940 |
| Jan-21 | 0 | 0 | 0 | 0 | 1 | NULL | Index Exchange | Static | Desktop Web | 775,000 | 770,000 | 520,000 | NULL | $1,150 | NULL | $220 | $930 |
| Jan-21 | 0 | 0 | 1 | 0 | 0 | NULL | Google Ad Manager | Static | Desktop Web | 100,000 | 98,000 | 12,000 | NULL | $130 | NULL | $35 | $95 |