# Exhibit 9
In Support of
Non-Party Meta Platforms, Inc.'s
Motion for Protective Order

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Texas

| THE STATE OF TEXAS, et al., | ) |
|---|---|
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:20-CV-00957-SDJ |
| GOOGLE LLC, | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: META PLATFORMS, INC.

*(Name of person to whom this subpoena is directed)*

☑ **Testimony:** YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters: As described in attached Exhibit A.

| Place: 555 California Street, Ste. #3300, San Francisco, CA 94104 | Date and Time: 04/15/2024 9:00 am |
|---|---|

The deposition will be recorded by this method: Videographer and Stenographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: As described in attached Exhibit A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 03/29/2024

CLERK OF COURT

OR

_____     /s/ W. Mark Lanier
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
The State of Texas, et al. _____, who issues or requests this subpoena, are:
W. Mark Lanier, 10940 W. Sam Houston Pkwy N., Ste. 100, Houston, TX 77064

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 4:20-CV-00957-SDJ

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

*State of Texas et al. v. Google LLC*, No. 4:20-cv-00957-SDJ (E.D. Tex.)

## EXHIBIT A TO SUBPOENA

## INSTRUCTIONS

1. Please produce the documents responsive to the numbered requests below that are in Your possession, custody, or control, including Documents in the possession of Your attorneys, accountants, consultants, or other agents.

2. You are instructed to produce the documents requested herein at least ten (10) days before the subpoenaed deposition at 555 California St., Suite #3300, San Francisco, CA 94104.

3. Pursuant to Federal Rule 45(e)(1), documents must be produced either: (a) as they are kept in the usual course of business (in which case they must be produced in such fashion as to identify the department, branch, or office in whose possession the document was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific request enumerated herein, with such specific request identified.

4. All documents are to be produced in full. If any portion of any document is responsive to any request, a legible version of the entire document must be produced, together with all non-identical copies, versions, and drafts of that document, including all attachments and enclosures.

5. You must retain all of the original documents for inspection or copying throughout the pendency of this Action, any appeal(s), and any related proceedings.

6. Data and materials that are stored electronically or in machine-readable form should be produced in electronic form with sufficient information to allow counsel to readily access or read such data or materials. None of the definitions or requests set forth herein shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the requests.

7. If you object to all or any portion of any of the below topics or requests, you must identify the objectionable topic or request or portion thereof, and the nature and basis of the objection. Notwithstanding any objection to any portion of any topic or request, you must produce all documents and information to which such objection does not apply.

8. If any document responsive to a particular request no longer exists for reasons other than Your document retention policy, describe the circumstances under which it was lost or destroyed, describe the information lost or destroyed, list the request to which it was responsive, and list persons with knowledge of the document.

9. If you are unable to produce a document that is responsive to a request, describe the document, state why it cannot be produced and, if applicable, state the whereabouts of such document when last in your possession, custody, or control.

10. If there are no documents or information responsive to all or any portion of any request, so state in writing.

11. Other than redactions of privileged information, documents are to be produced in full. If any requested document cannot be produced in full, or if you withhold production of any document or portion of any document responsive to these requests based upon any privilege, protection, or immunity, produce it to the extent possible and provide a privilege log.

12. Unless otherwise stated, the requests seek documents and data from January 1, 2013 to the present. Because these requests are ongoing, please promptly produce any document discovered or obtained after service of these requests.

13. If any document responsive to a request exists or existed but cannot be located, please state with particularity the efforts made to locate the document and the specific reason for its destruction or unavailability.

## DEFINITIONS

1. To the extent the terms defined below are used in the Requests, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of this Subpoena.

2. "Action" shall mean Case No. 4:20-cv-00957-SDJ and *In re: Google Digital Advertising Antitrust Litigation*, 1:21-md-03010-PKC.

3. "Ad Auction" shall mean any auction to sell Ad Inventory.

4. "Ad Impression" shall mean a specific advertising opportunity in a specific ad space on a Publisher's website that can be sold to an Advertiser.

5. "Ad Inventory" shall mean the range of potential Ad Impressions a Publisher has available to sell on its webpages when Users load the webpages.

6. "Ad Tech Auction Mechanic(s)" shall mean any and all systems and software that implement, effectuate, or modify any Ad Auction rules, preferences, designs, or features.

7. "Ad Tech Products" shall mean any and all systems, platforms, and software, including predecessors and successors, used in the process of identifying, selecting, transmitting, and/or rendering Digital Advertising on a desktop or mobile device, as well as all systems and software, including predecessors and successors, that implement and/or effectuate an Ad Auction, including all predecessors and successors of such Ad Tech Products.

8. "Advertiser" shall mean anyone who buys, bids, or otherwise attempts to buy Ad Inventory on a third-party webpage or mobile application to serve ads to Users who visit a third-party webpage or mobile application.

9. "Algorithm" shall mean any process, set of rules, source code, or white paper describing or concerning the operation of Your network, website(s), Ad Tech Products, or Ad Tech Mechanics.

10. "Analysis" shall mean any analyses, evaluations, or interpretations of Your Metrics, financial performance, expenses, or revenues. It also includes any analyses, evaluations, or interpretations

of the Metrics, financial performance, expenses, or revenues of third parties, such as Advertisers, Competitors, and Publishers.

11. The term "Communication" or "communication" shall include, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer, or exchange of information of any nature whatsoever, by or to whomever, whether oral or written or whether face-to-face, by telephone, mail, email, electronic mail, personal delivery, or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interviews, consultations, agreements, contracts, understandings, meeting of the minds, licenses, settlements, deals, and assignments.

12. The term "all communications" shall mean any and all communications that might reasonably be located through a search of all locations likely to contain such communications.

13. "Competitors" shall mean any entity that offers any products or services that competes or has competed with You.

14. The term "Date" shall mean the exact day, month, and year, if ascertainable, and if the exact day, month, and year are not ascertainable, then the best approximation thereof.

15. The term "Document" or "document" shall be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in F.R.C.P. 34(a)(1)(A). As used herein, the term "document" means all written, printed, recorded, reproduced, stored, or computer-generated words, data, or information, including any writing or recording of any type or description, whether made by mechanical, electronic, or manual (*e.g.*, by hand) means, and whether or not produced or created by Plaintiff, Defendants, or a third-party, including, without limitation, all letters, email, electronic mail, communications, correspondence, telegrams, tickets, coupons, certificates, reports, financial statements, memoranda, records, minutes, notices and notes of meetings, telephone, and personal conversations and conferences, interoffice, microfilm, microfiche, tape recordings, videotapes, photographs, bulletins, studies, plans, analyses, notices, computer records, runs, programs, software, books, pamphlets, illustrations, lists, forecasts, brochures, periodicals, charts, graphs, indices, bills, statements, files, agreements, contracts, subcontracts, understandings, meeting of the minds, licenses, settlements, deals, assignments, completed and incomplete forms, schedules, work sheets, data compilations, policies, training manuals, operator's manuals, user manuals, calendars, diaries, test results, reports and notebooks, opinions or reports of consultants, and any other written, printed, typed, recorded, or graphic matter, of any nature, however produced or reproduced, including drafts, amendments, revisions, modifications, copies, duplicates, and reproductions thereto, all code base(s) necessary to access and read the foregoing, and all handwritten notes or notations thereon in whatever form; provided that the term "documents" includes "communications" (as defined above), to the extent they are written, printed, recorded, reproduced, stored, or computer-generated words, data, or information. For the avoidance of doubt, the term "document" also includes communications, as well as all words, data, or information that is recorded, stored, or otherwise recorded in a computer or other storage, disk, device, or media (whether hosted locally or remotely) and can be printed on paper or tape, including web pages, web sites, social media applications, and drafts of documents stored in a computer application (*e.g.*, applications for word processing, document management, spreadsheet creation and management, computer assisted drafting, etc.).

16. The term "all documents" shall mean any and all documents that might reasonably be located through a search of all locations likely to contain such documents.

17. "Includes" shall mean "includes, but not limited to"; and "including" shall mean "including without limitation."

18. "Metric" shall mean any measures of quantitative assessment that may be used for analyzing, evaluating, or interpreting Your business, budgets, financial performance, revenues, or Projections, including revenue split, total advertising revenue, take rate, transaction fees, total ad impressions, number of impressions, and/or daily active users. Metric also includes any measures of quantitative assessment that may be used for analyzing, evaluating, or interpreting the business, budgets, financial performance, revenues, or Projections relating to third parties (*e.g.*, Advertisers, Competitors, and Publishers), including the following: average advertiser yield, monthly active users (MAU), revenue split, total advertising revenue, take rate, transaction fees, total ad impressions, number of impressions, and/or daily active users.

19. "Network Bidding Agreement" or "NBA" shall refer to the agreement entered into by Google LLC and Google Ireland Limited and Facebook, Inc. and Facebook Ireland Limited effective September 28, 2018.

20. "Network Bidding Pilot Program" shall have the meaning ascribed to it in the Network Bidding Agreement.

21. "Projections" shall mean any forecasts or evaluations of Your or a third parties' (*e.g.*, Advertisers, Competitors, Publishers) future or predicted Metrics, financial performance, expenses, or revenues.

22. "Publisher" shall mean anyone who serves content on the internet that is monetized by selling Ad Inventory to Advertisers.

23. The "States" shall mean Plaintiffs the State of Texas, State of Arkansas, State of Idaho, State of Indiana, Commonwealth of Kentucky, State of Mississippi, State of Missouri, State of North Dakota, State of South Dakota, State of Utah, State of Alaska, State of Florida, State of Nevada, Commonwealth of Puerto Rico, State of Montana, State of Louisiana, and State of South Carolina.

24. "Third-Party Publisher" refers to any publisher other than Google or You.

25. "Third-Party Advertiser" refers to any advertiser other than Google or You.

26. "Third-Party Exchange" refers to any Ad Exchange other than those operated by Google.

27. "User" shall mean the person who is viewing a web page and to whom an Ad Impression may be displayed through use of Your Ad Tech Products and/or Ad Tech Services.

28. The term "Facebook Audience Network" refers to the Facebook Audience Network and to the Meta Audience Network described by you at https://www.facebook.com/audiencenetwork/. Thus, where either of these terms is used, it shall be construed conjunctively or disjunctively as necessary to bring within its scope either of these terms that might otherwise be construed to be outside its scope.

29. "Google" shall mean Defendant Google LLC, ("Defendant") and its past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

30. The terms "You," "Your," "Facebook," "Meta," and "Meta/Facebook" shall refer to Meta Platforms, Inc. and its past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. For the avoidance of doubt, these terms shall be construed to include, without limitation, Facebook, Inc., the name by which Meta Platforms, Inc. was known before rebranding in October 2021, and TheFacebook, Inc., Facebook Ireland Limited, and Meta Platforms, Inc. Thus, where any of these terms is used, it shall be construed conjunctively or disjunctively as necessary to bring within the scope of the term each of these other entities that might otherwise be construed to be outside of its scope.

31. The terms "and" and "or" and "and/or" shall be construed conjunctively or disjunctively as necessary to bring within the scope of the deposition topics all information that might otherwise be construed to be outside of its scope.

32. The terms "any" or "all" shall mean any and all and encompasses "any," "all," and "any and all."

33. The terms "each" and "any" shall mean each and every, and should be understood to encompass "all"; "or" should be understood to include and encompass "and"; and "and" should be understood to include and encompass "or."

34. The term "identify," when used with reference to:

    a. an individual, shall mean to state the individual's full name, present or last known employer, present or last known job title or business description, present or last known residence addresses and telephone number, and present or last known business addresses and telephone number;

    b. a Person that is not an individual, shall mean to state the full name and address of the Person and the names and positions of the individual or individuals connected with such Person who have knowledge of the information requested;

    c. a document, shall mean to state the type of document (letter, memorandum, etc.), its date, author(s) or originator(s), addressee(s), all individuals who received or reviewed copies of the document, the identity of Persons known or presumed by you to have present possession, custody or control thereof, and a brief description of the subject matter and present location;

    d. an event, or in connection with events, shall mean to describe the event, the date of the event, the location of the event and the individual and organizational entities participating in the event.

35. The term "Person" shall mean any individual (i.e., natural person), entity, firm, association, partnership, corporation, group, organization, unincorporated association, joint venture, sole proprietorships, or any organization of the same.

36. The terms "relating to," "related to," "relate to" or "regarding" shall mean identifying, showing, dealing with, embodying, pertaining, concerning, regarding, involving, indicating, constituting, commenting upon, summarizing, analyzing, interpreting, detailing, outlining, defining, comprising, reflecting, discussing, disclosing, evidencing, mentioning, referring to, consisting of, responding to, or having any logical or factual connection whatever with the subject matter in question.

37. Any reference to Ad Tech Products or Ad Tech Auction Mechanics, individually or collectively, also shall include any successor or predecessor Ad Tech Products or Ad Tech Auction Mechanics having the same or similar functionality.

## DEPOSITION TOPICS

1. The Network Bidding Agreement[1] and all drafts thereof, including but not limited to the origination, development, negotiation, drafting, execution, and terms of the NBA, as well as the expected and actual operation and effects thereof.

2. The identity and roles of the person(s) involved in the origination, development, negotiation, execution, and operation of the NBA.

3. Your participation in the Network Bidding Pilot Program.

4. The identity and roles of the person(s) who originated and/or developed the Network Bidding Pilot Program.

5. Internal and external communications regarding the NBA, including Your communications with Google or Amazon concerning the Network Bidding Pilot Program, the NBA or negotiations regarding the NBA, or any similar agreement with Amazon.

6. Your decision to enter into the Network Bidding Agreement and Your reasons therefor.

7. Any advantages, including information and speed advantages, in publishers' and developers' auctions that Google offered or promised You in relation to the NBA, or that was contemplated by or provided to You in relation to the NBA.

8. Any speed advantages or timing delays offered or provided to You by Google with respect to advertising auctions, including contracts or negotiations discussing such advantages or delays, the extent and duration of such advantages or delays, the purpose, expected, and actual effects of such advantages or delays, and any related internal or external communications.

9. The effect of different auction timeouts in the Final Clearinghouse Auction on auction outcomes or any other Metric, including any analyses, evaluations, or studies conducted by or for You related thereto.

10. Any exceptions to or accommodations and variation of auction timeouts You requested from Google in any way related to the NBA, including whether and to what extent Google approved or rejected any such requests.

11. Whether and to what extent Google informed You of the content and/or source of impressions, including without limitation whether such impressions were spam or targeted to bots, in relation to the NBA, and whether and to what extent such information was exclusive to You, as opposed to other networks, and whether you received any discounts related to impressions.

12. Match rate commitments related to or referenced in the NBA, including the intended and actual effects of the NBA on match rates and whether and to what extent match rates improved as a result of the NBA.

---

[1] All capitalized terms in the Topics in this section shall have the definition specified in the Network Bidding Agreement ("NBA") entered into by Google LLC and Google Ireland Limited and Facebook, Inc. and Facebook Ireland Limited effective September 28, 2018.

13. The restrictions You required on Google's access to Your data, including Your Bid Response Data, in relation to the NBA, as well as Your decision and reasons for requiring such restrictions, any communications or negotiations related to such restrictions, and any purported, expected, or actual advantages You received in auctions as a result of such restrictions.

14. Your knowledge of Google's efforts to manipulate auctions, how Google used data to advantage itself, changing bid responses, adjusting price floors, price reserves, and other pricing parameters, reverse engineering bidding logic, and any other efforts by Google to manipulate auctions or benefit from auctions.

15. Whether and to what extent the NBA was intended to aid You or the Facebook Audience Network in winning more auctions, including any related communications, analyses, evaluations, or studies conducted by or for You related thereto.

16. The design or methodology considered for or employed by the Network Bidding Pilot Program, including any analyses, evaluations, or studies conducted by or for You related thereto.

17. The scope, performance, status, or third-party participation in the Network Bidding Pilot Program, including any analyses, evaluations, or studies conducted by or for You related thereto.

18. The nature and scope of (a) Facebook Data, (b) Bid Response Data, (c) End User Interaction Data, (d) Google Data, (e) Google Platform Data, (f) Google Program-Related Information; (g) Google Proprietary Data, (h) Google User Data, and (i) Publisher-Specific Data (as those terms are defined in the NBA), including any analyses, evaluations, or studies conducted by or for You related thereto.

19. Your efforts to identify users in publishers' and developers' auctions.

20. The expected or realized effects of the NBA on the performance and/or outcomes of Final Clearinghouse Auctions or on any auction Metric, including any analysis, evaluation, or study conducted by or for You related thereto.

21. The expected or realized effect of the NBA on third-party bidders in Final Clearinghouse Auctions or on any Metric used to track, monitor, or evaluate third-party auction activity, including any analysis, evaluation, or study conducted by or for You related thereto.

22. The expected or realized effect of the NBA on You, Google, or any Ad Tech competitors, including any analysis, evaluation, or study conducted by or for You related thereto.

23. Your Algorithms to facilitate or implement the NBA and any changes or overrides thereto.

24. The extent to which the NBA was or was not disclosed to any third party and any effort by You or Google to prevent third parties from learning of its existence.

25. The expected or realized competitive effect of the Network Bidding Pilot Program or the NBA in the Publisher Ad Server, Ad Exchange, Ad Network, Ad Buying Tools for Large Advertisers, or Ad Buying Tools for Small Advertisers markets.

26. The parameters applied to Final Clearinghouse Auctions, including any comparison of variations in such auction parameters and any analyses, evaluations, or studies conducted by or for You related thereto.

27. Any complaints submitted to You by bidders in the Final Clearinghouse Auction regarding the procedures or outcome of any auction.

28. The Ad Tech data and information that Google makes available to You and the mechanisms and tools that Google uses to make such data available:

29. Your use of Open Bidding, including the minimum spend commitment that would deter You from using Header Bidding in a significant way, and any analyses, evaluations, or studies conducted by or for You related thereto, as well as any concerns You had or expressed (internally or externally) regarding Facebook potentially partnering with Amazon to use Header Bidding.

30. Header Bidding, including, but not limited to:

    a. The monthly share of impressions and revenue transacted by You through Google's AdX, as well as the monthly share of impressions and revenue transacted by You for any other Publisher Ad Server, Ad Exchange, Ad Network, or through Header Bidding;

    b. The Facebook Audience Network, Meta Audience Network, and/or Your use of Header Bidding;

    c. Any changes You made to Your Ad Tech Products in connection with or that had an effect on Header Bidding, including line item caps, any data redactions, or data sharing;

    d. Any features limiting the visibility of publishers into Header Bidding performance/insights;

    e. Your internal operations groups, employee groups, investigative teams, or task forces which have studied or examined (or are studying or examining) the effects of Header Bidding on any aspect of Your business, including the establishment, operation of, and conclusions drawn by such groups/teams/task forces;

    f. Header Bidding's impact on winning prices paid by Advertisers and/or received by Publishers for impressions and take rates charged by ad exchanges;

    g. Latency studies performed by You, at Your request, or otherwise in Your possession with respect to Header Bidding;

    h. Your responses to Header Bidding, including all Documents concerning Your policy and practice of implementing Open Bidding

    i. Any analysis of the flow of queries running through Header Bidding as compared to Open Bidding;

    j. Contracts between You and any third-party Ad Exchange, SSP, or Publisher that contains any provision that requires such entity to make Ad Inventory available through Open Bidding;

    k. Your communications with any third party encouraging, requiring, demanding, suggesting or otherwise promoting Header Bidding over Open Bidding, or vice versa.

    l. Efforts undertaken, policies implemented, or buying strategies implemented by You to avoid interacting with Header Bidding auctions;

    m. The impact that Your decision to end support for Header Bidding would have or has had on the adoption of Header Bidding;

    n. The impact of Header Bidding on Your Metrics, Publisher's and/or Advertisers Metrics, and Your competitors' Metrics.

31. The expected and realized benefits, advantages, and compensation You received or are receiving from Google as a result of the NBA, including information, monetary compensation, speed advantages, advantages related to Google's Ad Tech Auction Mechanics or Google's Ad Tech Products, user information, publisher information, advertiser information, "kickbacks," and any other compensation.

32. The competitive landscape in the Publisher Ad Server, Ad Exchange, Ad Network, Ad Buying Tools for Large Advertisers, or Ad Buying Tools for Small Advertisers markets, including what competitors are considered, product offerings (e.g. SWOT analysis), pricing, and fees.

33. All Documents and Communications You produce in response to this subpoena.

## DOCUMENT REQUESTS[2]

You are directed to produce documents related to each of the categories listed below.

1. Documents sufficient to identify all Persons, both internal and external to Facebook, involved in the discussions and/or negotiations that culminated in the NBA.

2. All Documents analyzed, described, evaluated, or studied by the persons involved in the discussions and/or negotiations that culminated in the NBA as part of their work related to those discussions and/or negotiations.

3. All internal Documents and Communications, as well as all Communications between You and Google, relating to the NBA, including all Documents and Communications related to the origination, development, negotiation, drafting, execution, and terms of the NBA, the expected and actual operation and effects of the NBA, and the partnership or relationship between You and Google that resulted or was expected to result from the NBA.

4. All Documents and Communications analyzing, describing, evaluating, or studying the scope, performance, and/or status of the partnership or relationship between Google and Facebook that resulted or was expected to result from the NBA.

5. All drafts and redlines of the NBA.

6. All Documents and Communications related to Your decision to enter into the NBA and Your reasons therefor.

7. All Documents and Communications relating to any benefits or advantages in auctions, including information and speed advantages, that Google offered or promised You in relation to the NBA, or that was contemplated by or provided to You in relation to the NBA.

8. All Documents analyzing, describing, evaluating, or studying the design or methodology considered for or employed by the Network Bidding Pilot Program.

9. All Documents analyzing, describing, evaluating, or studying the scope, performance, status, or third-party participation in the Network Bidding Pilot Program.

10. All Documents analyzing, describing, evaluating, or studying the nature and scope of (a) Facebook Data, (b) Bid Response Data, (c) End User Interaction Data, (d) Google Data, (e) Google Platform Data, (f) Google Program-Related Information, (g) Google Proprietary Data, (h) Google User Data, and (i) Publisher-Specific Data (as those terms are defined in the NBA).

11. All Documents and Communications regarding the restrictions You required on Google's access to Your data, including Your Bid Response Data, in relation to the NBA.

---

[2] All capitalized terms in the Requests in this section shall have the definition specified in the Network Bidding Agreement entered into by Google LLC and Google Ireland Limited and Facebook, Inc. and Facebook Ireland Limited effective September 28, 2018.

12. All Documents and Communications between You and Google concerning or relating to Header Bidding.

13. All Documents and Communications related to Your decision to suggest, implement, enforce, require, promote, encourage, reward, and/or condone the use of Header Bidding prior to the effective date of the NBA.

14. All Documents and Communications related to Your decision to discourage, prevent, preclude, punish, bar, and/or condemn the use of Header Bidding after the effective date of the NBA.

15. All Documents analyzing, describing, evaluating, or studying the expected or realized effects of the NBA on Facebook, the Facebook Audience Network, or the Meta Audience Network.

16. All Documents analyzing, describing, evaluating, or studying the expected or realized effects of the NBA on the performance and/or outcomes of Final Clearinghouse Auctions or on any auction Metric.

17. All Documents analyzing, describing, evaluating, or studying the expected or realized effects of the NBA on third-party bidders in Final Clearinghouse Auctions or on any Metric used to track, monitor, or evaluate third-party auction activity.

18. All Documents analyzing, describing, evaluating, or studying the expected or realized effect of the NBA on third-party publishers.

19. All Documents analyzing, describing, evaluating, or studying the expected or realized effect of the NBA on Ad Tech competitors or any Metric used as a measure of competition.

20. All Documents analyzing, describing, evaluating, or studying the expected or realized effects of the NBA on Your revenues or any other Metric.

21. All Documents concerning any change of Your Algorithms and/or manual overrides of Your Algorithms to facilitate or implement the NBA.

22. All Documents and Communications related to the expected and realized benefits, advantages, or compensation You received or are receiving from Google as a result of the NBA, including information, monetary compensation, speed advantages, advantages related to Google's Ad Tech Auction Mechanics or Google's Ad Tech Products, user information, publisher information, advertiser information, "kickbacks," and any other benefits, advantages, or compensation.

23. All Documents analyzing, describing, evaluating, or studying the effect of different auction timeouts in the Final Clearinghouse Auction on auction outcomes or any other Metric.

24. All Documents and Communications concerning the extent to which the NBA was or was not disclosed to any third party or reflecting any effort by You or Google to prevent third parties from learning of its existence.

25. All Documents and Communications between You and Google related to any exceptions, accommodations, or variations of auction timeouts that You requested from Google in relation to the NBA, as well as Google's responses to any such requests.

26. All Documents and Communications between You and Google in the relation to the NBA concerning which impressions are likely targeted to spam and whether and to what extent such information was exclusive to You, as opposed to other networks.

27. All Documents and Communications between You and Google in relation to the NBA concerning match rate commitments, including all Documents and Communications concerning the intended and actual effects of the NBA on match rates and whether and to what extent match rates improved as a result of the NBA.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| THE STATE OF TEXAS, et al.,<br><br>　　　Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>　　　Defendant. | Civil Action No. 4:20-cv-00957-SDJ |

## NOTICE OF SUBPOENA

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT, pursuant to Rules 34(c) and 45 of the Federal Rules of Civil Procedure, The State of Texas ("Texas"), by its counsel, serves the attached subpoena to produce documents and to testify at a deposition directed to Meta Platforms, Inc. The deposition will occur on Monday, April 15th, 2024 at 9:00 AM PDT. The deposition shall occur at 555 California St., Suite #3300, San Francisco, CA 94104 in the manner and within the time prescribed by the Federal Rules and the Local Rules, and in accordance with the further Definitions set forth in the attached subpoena. The deposition will be taken before an individual authorized by law to administer oaths and will be recorded by a stenographer and/or by videotape, for use as discovery, as evidence at trial, or for any other purpose allowed by the Federal Rules of Civil Procedure and the Rules of this Court.

PLEASE TAKE FURTHER NOTICE that the deponent shall appear and produce documents pursuant to a subpoena attached hereto. You are further instructed to produce the documents requested herein at least ten (10) days before the subpoenaed deposition at 555 California St., Suite #3300, San Francisco, CA 94104 in the manner and within the time prescribed by the Federal Rules and the Local

4/1/2024

Rules, and in accordance with the further Instructions and Definitions set forth in the attached subpoena.

| | |
|---|---|
| DATED: March 29, 2024 | Respectfully submitted,<br>*/s/ W. Mark Lanier*<br>**THE LANIER LAW FIRM, P.C.**<br>10940 W. Sam Houston Pkwy N.<br>Suite 100<br>Houston, TX 77064<br>Telephone: (713) 659-5200<br>Facsimile: (713) 659-2204<br>Email: mark.lanier@lanierlawfirm.com<br>Email: alex.brown@lanierlawfirm.com<br>Email: zeke.derose@lanierlawfirm.com<br>Email: Jonathan.wilkerson@lanierlawfirm.com<br><br>*Counsel for Texas,*<br>*Submitted on behalf of all Plaintiff States.* |

## CERTIFICATE OF SERVICE

I certify that on this 29th day of March 2024, this document was served upon counsel for Defendant via email.

*/s/ W. Mark Lanier*
W. Mark Lanier

1