# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS,

      Plaintiff,

v.

MERRICK GARLAND, in his official
capacity as Attorney General, et al.,

      Defendants.

No. 5:23-CV-034-H

## MEMORANDUM OPINION AND ORDER

For over 235 years, Congress understood the Constitution's Quorum Clause to require a majority of members of the House or Senate to be physically present to constitute the necessary quorum to pass legislation. This rule prevents a minority of members from passing legislation that affects the entire nation. But despite the Constitution's text and centuries of consistent practice, the House in 2020 created a rule that permitted non-present members to be included in the quorum count and vote by proxy. Pursuant to that novel rule, the House passed a new law included within the Consolidated Appropriations Act of 2023, and that particular provision affects Texas. Like many constitutional challenges, Texas asserts that this provision is unenforceable against it because Congress violated the Constitution in passing the law. In response, the defendants claim, among other things, that this Court has no power to address the issue because it cannot look to extrinsic evidence to question whether a bill became law. But because the Court is interpreting and enforcing the Constitution—rather than second-guessing a vote count—the Court disagrees. The Court concludes that, by including members who were indisputably absent in the quorum count, the Act at issue passed in violation of the Constitution's Quorum Clause.

In reaching this conclusion, the Court's analysis begins with the case's procedural background and the Court's factual findings from trial.  Then, the Court considers whether it has the power to consider the merits of Texas's challenge to the Act.  Three justiciability concerns are implicated by this case: (1) standing; (2) the enrolled bill doctrine; and (3) the political question doctrine.  The Court will address each of these in turn.  Ultimately, the Court concludes that none of these doctrines bar Texas's claim and that one of Texas's challenges succeeds on the merits.

First, Texas has demonstrated that it has standing to challenge the Pregnant Workers Fairness Act (PWFA), a piece of permanent legislation included in the Consolidated Appropriations Act of 2023.  It has done so based on the costs of compliance, litigation, and administrative investigations created by the PWFA, as well as the waiver of Texas's sovereign immunity.  However, as to the 2023 appropriation to the Department of Homeland Security's Alternatives to Detention Case Management Pilot Program, Texas did not provide sufficient evidence to show that any injury from increased illegal immigration is traceable to the funding at issue or redressable by this Court.  Notably, it is unclear at this time whether any of the 2023 funds will go to a location in Texas.  Additionally, there is insufficient evidence that the mere existence of the Case Management Pilot Program, which has currently served less than 140 aliens in Texas, will increase the number of illegal aliens receiving emergency medical care in Texas hospitals or attending its schools—and therefore impose additional costs on Texas.  Texas provides no evidence of any of the enrollees in the Case Management Pilot Program or their impact on Texas's resources.

Second, neither the enrolled bill doctrine nor the political question doctrine prohibit the Court from resolving the central challenge of this case—whether Congress's novel proxy

– 2 –

rule that counted members who were not physically present at the time of the vote toward the quorum violates the Quorum Clause.  The enrolled bill doctrine has limited applicability where constitutional provisions are at issue.  It prevents courts from considering challenges that the particular text of an act did not pass Congress.  But if a dispute turns on a clear constitutional limitation on Congress's power that does not involve factual challenges to the legislative record, the mere act of enrollment cannot thwart the Court's ordinary power to resolve such constitutional challenges.  And to the extent that quorum-based challenges do implicate the enrolled bill doctrine, Supreme Court precedent makes clear that the Court must first resolve any challenge to the validity of the rule used by the House or Senate to determine the existence of a quorum before the doctrine applies.  As for the political question doctrine, Texas's challenge involves ordinary constitutional interpretation of a restriction on congressional power.  The Court need not engage in policymaking to resolve the merits.  Instead, it simply looks to the Constitution's text, original public meaning, and historical practice, as courts routinely do.

Having determined that this case is justiciable, the Court will then proceed to the merits.  Based on the Quorum Clause's text, original public meaning, and historical practice, the Court concludes that the Quorum Clause bars the creation of a quorum by including non-present members participating by proxy.  Supreme Court precedent has long held that the Quorum Clause requires presence, and the Clause's text distinguishes those absent members from the quorum and provides a mechanism for obtaining a physical quorum by compelling absent members to attend.  This power to compel attendance makes little sense divorced from physical presence.  This connection to physical presence is further evident through the contemporaneous discussions of the Clause at the Constitutional

Convention, which centered on the challenge of having a majority of members attend legislative sessions due, in part, to the distance they must travel.  Additionally, longstanding historical practice dating back to the first Congress establishes that only those members who were physically present could affirmatively count towards the quorum.  And contrary to the defendants' assertions otherwise, the practice of unanimous consent provides no support for the House's actions here—affirmatively counting absent members as part of the quorum. Unanimous consent relies on the ongoing presumption of a quorum after one is obtained, but the roll-call vote in this case reveals that less than a majority of votes were cast in person.  Thus, the House's previously applied proxy rule that permitted its members participating by proxy to count towards the quorum violated the Constitution.  And because the House only had a quorum due to this unconstitutional provision of its proxy rule, the House violated the Quorum Clause when it passed the Consolidated Appropriations Act of 2023.  Finally, the Court finds that Texas has carried its burden to show its entitlement to a permanent injunction of the Pregnant Workers Fairness Act.  In light of these conclusions, the Court enjoins the defendants from enforcing the Pregnant Workers Fairness Act against the State of Texas.

However, because Texas lacks standing to raise its challenge to the 2023 appropriation to the Case Management Pilot Program, the Court dismisses this claim and the defendants related to it: (1) Alejandro Mayorkas, in his official capacity as the Secretary of the Department of Homeland Security (DHS); (2) DHS; (3) Patrick J. Lechleitner, in his official capacity as the Acting Director of Immigration and Customs Enforcement; (4) Peter E. Mina, in his official capacity as the official exercising the authority of the Officer of Civil Rights and Civil Liberties of DHS; (5) the Office of Civil Rights and Civil Liberties;

(6) Deanne Criswell, in her official capacity as the Administrator of the Federal Emergency Management Agency (FEMA); (7) FEMA; and (8) Joseph R. Biden, Jr., in his official capacity as the President of the United States.

Before proceeding further, the Court notes the limited scope of this case, this opinion, and the relief granted. This case does not involve creating a count of the representatives' locations or second-guessing the House's own count and listing of its members. Instead, the Court takes as true the House's recitation of its proceedings and its designation of certain members as participating by proxy. Further, the Court makes no judgment on the wisdom of the House's proxy rule, only its constitutionality as it pertains to counting absent members as part of the quorum. Nor does the Court address whether some members may permissibly vote by proxy if the constitutionally required quorum is otherwise physically present at the time of the vote. Finally, although the Court finds that the passage of the Consolidated Appropriations Act violated the Constitution, Texas does not seek an injunction of—and the Court does not enjoin—the entire Act. Rather, the Court enjoins only the application of the Pregnant Workers Fairness Act against Texas. The relief granted here is limited to abating the injury that Texas has proven will occur.

## 1.     Background

Texas challenges the passage of the Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (the Act), on the basis that, at the time of the vote, the House of Representatives lacked a quorum as required by Article I, Section 5 of the Constitution. Texas seeks a declaratory judgment that the Act violates the Constitution's Quorum Clause and injunctive relief preventing the defendants from enforcing two portions of the Act—the Pregnant Workers Fairness Act, which is permanent legislation included in the Act, and a

$20 million appropriation to the Department of Homeland Security's Alternatives to Detention Case Management Pilot Program.  Dkt. No. 4 ¶¶ 58–70.

### A.   Procedural History

In its amended complaint (Dkt. No. 4), Texas names as defendants (1) Merrick Garland, in his official capacity as the United States Attorney General; (2) the Department of Justice; (3) Charlotte A. Burrows, in her official capacity as a member of the Equal Employment Opportunity Commission (EEOC); (4) Jocelyn Samuels, in her official capacity as a member of the EEOC; (5) Keith E. Sonderling, in his official capacity as a member of the EEOC; (6) Andrea R. Lucas, in her official capacity as a member of the EEOC; (7) Christopher W. Lage, in his official capacity as general counsel of the EEOC; (8) the EEOC; (9) Alejandro Mayorkas, in his official capacity as Secretary of the Department of Homeland Security (DHS); (10) DHS; (11) Tae D. Johnson, in his official capacity as the Acting Director of Immigration and Customs Enforcement; (12) U.S. Customs and Border Enforcement; (13) Peter E. Mina, in his official capacity as "the official exercising the authority of the Officer for Civil Rights and Civil Liberties of [DHS]"; (14) the Office of Civil Rights and Civil Liberties; (15) Deanne Criswell, in her official capacity as Administrator of the Federal Emergency Management Agency (FEMA); (16) FEMA; and (17) Joseph R. Biden, Jr., in his official capacity as the President of the United States.[1]  Dkt. No. 4 ¶¶ 2–15.  Tae D. Johnson is no longer the Acting Director of

---

[1] Texas's amended complaint contains typographical errors stating that Mayorkas and Criswell were sued in their individual capacities.  The parties subsequently noted on the record, *see* Dkt. No. 53 at 3, and confirmed at the pretrial conference that Texas is suing them in their official capacities and that neither party objects to the Court's resolution of this case with that understanding.  *See* Dkt. Nos. 104; 107 at 5.  In addition, the defendants advised that there is no federal agency named U.S. Customs and Border Enforcement.  Dkt. No. 52 at 25 n.11.  At the pretrial conference, Texas did not contest this claim and agreed to dismiss its claims as to this nonexistent entity.  Dkt. Nos. 104; 107 at 6.

Immigration and Customs Enforcement.  *See* Dkt. No. 109 at 7–8.  Pursuant to Federal Rule of Civil Procedure 25(d), his successor-in-office, Patrick J. Lechleitner, is automatically substituted as a defendant in this matter.  *Id.*

After appearing, the defendants filed a motion to transfer this case to the U.S. District Court for the District of Columbia or to the Austin Division of the U.S. District Court for the Western District of Texas.  Dkt. No. 9.  Texas opposed the motion, Dkt. No. 32, and the Court denied the motion, Dkt. No. 66.  In its order, the Court found that venue is proper in the Northern District of Texas and that the defendants did not show another venue to be more convenient.  *Id.* at 3–20.

### B.    Pending Motions

Pending before the Court are two motions: (1) Texas's motion for a preliminary injunction (Dkt. No. 37); and (2) the defendants' motion to dismiss (Dkt. No. 54).  These motions are fully briefed and ripe for resolution.

Texas requests that the Court enjoin the defendants from enforcing two portions of the Act.  Dkt. Nos. 38 at 13–18; 61 at 7–13.  While Texas initially requested an injunction as to entire Act, *see* Dkt. No. 37 at 1, it later clarified that it only seeks relief as to the Pregnant Workers Fairness Act and the appropriation for the Case Management Pilot Program, *see, e.g.*, Dkt. Nos. 93 at 2; 107 at 68–71.  In support of its position, Texas asserts that it has standing, that there is no barrier to justiciability, and that it has satisfied the legal requirements for injunctive relief.  *See generally id.*  The defendants counter that Texas lacks standing, that justiciability doctrines—specifically, the enrolled bill doctrine and political question doctrine—bar Texas's claim, that the President cannot be enjoined, and that Texas's claim fails on the merits, so its request should be denied.  Dkt. No. 52.  Specifically,

the defendants ask that the Court dismiss this case for lack of subject-matter jurisdiction, lack of venue,[2] and for failure to state a claim.  Dkt. No. 54.

Regarding the merits, Texas asserts that the Quorum Clause requires the physical presence of a majority of the House's membership in order for it to enact legislation.  Dkt. No. 38 at 33–41.  In contrast, the defendants contend that the Quorum Clause "defines only the minimum number of Members who must participate for either House to conduct business, while being silent on the manner of how Members may participate," and that the members who voted by proxy were participating and therefore count towards a quorum.  Dkt. No. 52 at 52–55.  The defendants further cite the historical practice of acting by unanimous consent and voice votes without a majority physically present on the floor of either house, along with the presumption of a quorum.  *Id.* at 62–63.  Additionally, the defendants rely on the Supreme Court's decision in a case concerning recess appointments, where it discussed the Senate's power to act even when the chamber was mostly empty.  *Id.* at 64–65.  Accordingly, the defendants assert that the House had the requisite quorum when the Act was passed.  *Id.* at 66.

### C.    Trial on the Merits

On October 20, 2023, the Court informed the parties that, pursuant to Federal Rule 65(a)(2), it would consolidate the hearing on the motions with a trial on the merits.  Dkt. No. 73.  Following multiple continuances, on January 22, 2024, the Court held a trial on the merits consolidated with the plaintiff's motion for preliminary injunction and the

---

[2] The defendants' motion regarding lack of venue simply incorporates its arguments from their motion to transfer.  *See* Dkt. No. 52 at 49.  The briefs for the pending motions were filed prior to the Court's denial of the motion to transfer.  This portion of the defendants' motion is denied for the reasons stated in the Court's prior ruling.  Dkt. No. 66.

defendants' motion to dismiss.  Dkt. Nos. 74; 75; 83; 91; 108.  Both sides presented various

exhibits and declarations, but neither offered any live witness testimony.[3]  Neither party

requested posttrial briefing.  Dkt. No. 108 at 172–75.  Pursuant to Federal Rule of Civil

Procedure 52, the Court now makes its findings of fact and conclusions of law.  *See* Fed. R.

Civ. P. 52(a)(1).

## 2.      Findings of Fact[4]

Following the trial on the merits, the Court finds that the following facts have been

established by a preponderance of the evidence.

### A.      In 2020, the House of Representatives adopted a novel proxy-voting resolution to permit non-present members to count toward a quorum.

Rule III of the Rules of the House of Representatives requires "[e]very Member [to]

be present within the Hall of the House during its sittings, unless excused or necessarily

prevented," and it prohibits another person or member from casting the vote or recording

the presence of a member.  H.R. Rule III, 118th Cong. (2023); H.R. Rule III, 117th Cong.

(2021); DX37 at 8.  "Notwithstanding rule III," on May 15, 2020, the House of

Representatives adopted a resolution to authorize members to vote and be counted as part

of the quorum by proxy.  H.R. Res. 965, 116th Cong. (2020).  This resolution allowed the

Speaker to "designate a period . . . during which a Member who is designated by another

Member as a proxy . . . may cast the vote of such other Member or record the presence of

---

[3] The Court offered the parties the opportunity to present witnesses.  *See* Dkt. No. 75.  The parties instead agreed to rely solely on declarations and exhibits and not to object to the admission of evidence without supporting witnesses.  Dkt. No. 109 at 5.

[4] The Court has carefully considered the trial arguments, the record, and the admitted evidence in preparing this memorandum.  In making these findings of fact, the Court applies the Fifth Circuit's standard of providing "a clear understanding of the basis for the decision."  *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998).  As appropriate, any finding of fact that should be more appropriately considered a conclusion of law shall be deemed as such and vice versa.

such other Member in the House." *Id.* § 1(a).  To designate another member as a proxy, the member was required to submit a signed letter to the clerk specifying the name of the proxy and provide "an exact instruction . . . with respect to such vote or quorum call." *Id.* §§ 2(a)(1), 3(c)(1).  Additionally, the resolution permitted "[a]ny Member whose vote [was] cast or whose presence [was] recorded by a designated proxy under this resolution" to "be counted for the purpose of establishing a quorum under the rules of the House." *Id.* § 3(b).

The House of Representatives for the 117th Congress continued to apply the proxy voting and quorum rule.  H.R. Res. 8 § 3(s), 117th Cong. (2021).  Pursuant to the House's regulations for the proxy rule, the proxy must have an exact instruction "from the Member voting by proxy on whether they intend to be recorded as present, and must follow such instruction in responding to the quorum call."  DX40 at 1.  Similarly, to cast a vote, "the Member serving as a proxy must have exact instruction . . . from the Member voting by proxy on whether they intend to vote yea, nay, or present on the specific text or matter at hand, and must follow such instruction exactly in casting the proxy vote."  *Id.* at 2.  These instructions must be in writing.  *Id.*  For any final vote on a bill or joint resolution when proxy participation was permitted under the resolution, "[t]he Majority Leader must provide Members with 24-hours' notice."  *Id.*  A member voting by proxy also must provide "[a]n affirmative statement that because of the public health emergency the Member is unable to physically attend proceedings in the House Chamber."  *Id.* at 1.

### B. When the House passed the Act, less than a majority of the House voted in person.

The Consolidated Appropriations Act of 2023 began as House Resolution 2617, which the House of Representatives first passed on September 28, 2021.  167 Cong. Rec. H5497–98 (daily ed. Sept. 28, 2021).  An amended version then passed the Senate by

unanimous consent on November 15, 2022, 168 Cong. Rec. S6704 (daily ed. Nov. 15, 2022), followed by additional amendments in both chambers that transformed the bill into an omnibus appropriations bill.  168 Cong. Rec. H9745–46, H9752, H9790–803 (daily ed. Dec. 14, 2022); 168 Cong. Rec. S7819–8530 (daily ed. Dec. 20, 2022); 168 Cong. Rec. S10062–10075, S10077 (daily ed. Dec. 22, 2022).  The bill then returned to the House for a final vote.  168 Cong. Rec. H10063 (daily ed. Dec. 23, 2022); DX21.

On December 23, 2022, the House met to consider the latest round of Senate amendments.  DX21 at 20–27; 168 Cong. Rec. H10521–28 (daily ed. Dec. 23, 2022).  The vote on the final passage of the Act was 225 yeas, 201 nays, 1 "present," and 4 not voting.  DX21 at 27–28; 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022).  Out of the 431 votes, 226 members had voted by proxy and therefore had certified that they were "unable to physically attend" the vote, while the remaining 205 votes were cast in person.  DX21 at 28; 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022); DX40 at 1.  The total number of voting members of the House of Representatives is 435, making 218 the requisite number of members that constitutes a quorum.[5]  *See* Act of August 8, 1911, Pub. L. No. 62-5, 37 Stat. 13–14 (1911); 2 U.S.C. § 2a(a).  As a result, because only 205 votes were cast in person, less than a majority of the House voted from the floor on the Act.

---

[5] The Court recognizes that there has been considerable debate in Congress as to the proper denominator for the Quorum Clause and that the House currently only considers members that are active, sworn, and living in its count of the "whole number of the House."  *See, e.g.*, H.R. Rule XX, cl. 5(d), 118th Cong. (2023); H.R. Rule XX, cl. 5(d), 117th Cong. (2021).  The Court does not address that dispute here.  For one, both parties reference a quorum based on the 435 voting members in their briefing and do not suggest that a different denominator should apply in this case.  *See* Dkt. Nos. 38 at 41; 63 at 15.  Moreover, this issue is inconsequential here.  Even if the proper whole number of the House were 431, the total number who voted on the Act, a majority would be 216, which is still greater than the number who voted in person.

**C.    The House determined that a quorum was present by including absent members who voted by proxy.**

Even though less than a majority was physically present at the time of the vote, no member objected that a quorum was lacking.  DX21 at 27–28; 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022).  Representative Chip Roy raised the issue, but the Speaker Pro Tempore informed him that there was no recourse.  DX21 at 28; 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).  Specifically, Representative Roy "reserv[ed] the right to object" and noted that the legislation moved "off the floor without a physical quorum present" due to the number of proxy votes.  DX21 at 28; 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).  He then made a parliamentary inquiry, asking the Speaker Pro Tempore "whether there is a physical quorum present as required under the Constitution and whether there is any recourse for any Member under [the House's] rules to challenge a ruling that there is a quorum."  DX21 at 28; 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).  The Speaker Pro Tempore responded that a quorum was present despite 226 votes cast by proxy because "Members casting their vote or recording their presence by proxy are counted for the purpose of establishing a quorum" pursuant to House Resolution 8.  DX21 at 28; 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).  Roy then asked if there was any "recourse to ask the Speaker to count the Members physically present here in the body," to which the Speaker Pro Tempore again asserted that a quorum was present.  DX21 at 28; 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).

**D.    The Act was signed and enrolled.**

After the Act passed the House, it was printed and signed by the presiding officers pro tempore of both Houses.  DX1; *see* 1 U.S.C. § 106.  At that point, it was an "enrolled bill."  1 U.S.C. § 106.  The Act was then sent to the President for his approval.  The White

– 12 –

House received the Act on December 28, 2022, and the President signed it into law the

following day.  DX1.  Subsequently, the Act was sent to the Office of the Federal Register of

the National Archives and Records Administration, where it was assigned a public law

number and published in the Statutes at Large.  *See id.*; *Public Laws*, Nat'l Archives (Jan. 26,

2023), https://www.archives.gov/federal-register/laws [https://perma.cc/3M36-LKUN];

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459.

### E.   The Act contains appropriations and permanent legislation, including the Pregnant Workers Fairness Act and $20 million for the Alternatives to Detention Case Management Pilot Program.

As an omnibus appropriations bill, the Act contains numerous provisions.  It

includes the twelve regular annual appropriations bills that generally fund the federal

government's operations.  DX15 at 2; *see* Consolidated Appropriations Act, 2023, Pub. L.

No. 117-328, Divs. A–L, 136 Stat. at 4459–5188.  In addition to these annual appropriations

bills, the Act contains supplemental appropriations and several pieces of permanent

legislation.  DX15 at 5; *see generally* Consolidated Appropriations Act, 2023, Pub. L. No.

117-328, 136 Stat. at 5189–6111.  Relevant here, it included legislation to provide

protections to pregnant workers and a third year of spending for DHS's Alternatives to

Detention Case Management Pilot Program.  Consolidated Appropriations Act, 2023, Pub.

L. No. 117-328, Divs. F, II, 136 Stat. at 4726, 6084–89.

Regarding the appropriations provisions, after the passage of legislation that provides

budget authority, such as the Act, the President must apportion the budget authority to each

relevant federal agency, which then allows the agencies to obligate the funds.  DX15 at 6.

This apportionment authority has been delegated to the Director for the Office of

Management and Budget (OMB) and was fully carried out by December 29, 2022.  *Id.*

**F.     In this case, Texas challenges the Act as violating the Constitution's Quorum Clause.**

Texas filed this case to challenge the passage of the Act.  Dkt. No. 4.  Texas asserts that the Act violated the Quorum Clause because the Clause requires members to be physically present in order to count towards the quorum, but the vote on the Act only had a quorum by including members who were physically absent at the time of the vote in the quorum count.  *See id.* ¶¶ 20, 56, 58–60, 62.  Specifically, Texas challenges two provisions of the Act that it argues directly affect the State.  *Id.* ¶ 24.  These provisions are the Pregnant Workers Fairness Act (PWFA), which is one of the permanent pieces of legislation in the Act, and a third year of funding for DHS's Alternatives to Detention Case Management Pilot Program (CMPP).  Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Divs. F, II, 136 Stat. at 4726, 6084–89.  Specifically, the Act directed that $20,000,000 be given to FEMA for the CMPP.  Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. F, 136 Stat. at 4726.  These funds remain available to FEMA until September 30, 2024.  *Id.*

**G.     The Pregnant Workers Fairness Act creates new legal rights and remedies for workers, regulates Texas as an employer, and waives its sovereign immunity.**

Codified at 42 U.S.C. §§ 2000gg to 2000gg-6, the PWFA is standalone legislation that adopts an accommodation regime similar to the Americans with Disabilities Act (ADA) for pregnant workers.  *Compare* 42 U.S.C. § 2000gg-1 *with* 42 U.S.C. §§ 12112(a), (b)(5), 12203.  Principally, the PWFA requires employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of

– 14 –

such covered entity." 42 U.S.C. § 2000gg-1(1).  Further, an employer cannot deny employment opportunities due to a covered employee's need for a reasonable accommodation or retaliate against an employee for requesting or using a reasonable accommodation. 42 U.S.C. §§ 2000gg-1(3), (5).  And an employer cannot "require a qualified employee to take leave, whether paid or unpaid, if another reasonable accommodation can be provided to the known limitation." 42 U.S.C. § 2000gg-1(4).  The PWFA adopts the ADA's definitions for "reasonable accommodation" and "undue hardship," as well as the ADA's "interactive process" for determining a proper accommodation. 42 U.S.C. § 2000gg(7).  It specifically provides that employers cannot "require a qualified employee . . . to accept an accommodation other than any reasonable accommodation arrived at through the interactive process." 42 U.S.C. § 2000gg-1(2).  The PWFA's requirements apply to any private employer with 15 or more employees and government employers, including Texas.  *See* 42 U.S.C. § 2000gg.

The PWFA aims to address gaps in existing legislation regarding protections for pregnant workers.  *See generally* DX33.  Specifically, under the ADA and Rehabilitation Act, pregnancy alone does not qualify as a disability requiring accommodations.  *E.g.*, *Appel v. Inspire Pharms., Inc.*, 712 F. Supp. 2d 538, 548 (N.D. Tex. 2010); *Issa v. Tex. Dep't of Crim. Just.*, No. 1:22-CV-1107, 2023 WL 4923971, at *10 (W.D. Tex. Aug. 1, 2023), *report and recommendation adopted by* 2023 WL 5352319 (Aug. 18, 2023); *Tomiwa v. PharMEDium Servs., LLC*, No. 4:16-CV-3229, 2018 WL 1898458, at *5 (S.D. Tex. Apr. 20, 2018).  Typically, courts find that "pregnancy and related medical conditions" constitute a physical impairment such that a worker would be covered by the ADA only under "unusual circumstances," such as significant complications.  *E.g.*, *Tomiwa*, 2018 WL 1898458, at *5;

*Issa*, 2023 WL 4923971, at *10.  The PWFA lacks this limitation by specifically providing that any known limitation of pregnancy, childbirth, or related medical condition—in other words, any "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions that the employee or employee's representative has communicated to the employer"—can itself require a reasonable accommodation "whether or not such condition meets the definition of disability specified in section 3 of the [ADA]."  42 U.S.C. §§ 2000gg(4), 2000gg-1.  Further, the PWFA specifies that an employee is "qualified" even if she is unable to perform an essential function of the job temporarily.  42 U.S.C. § 2000gg(6).

As an enforcement mechanism, the PWFA adopts the powers, remedies, and procedures of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-4 et seq., and it waives a State's sovereign immunity.  42 U.S.C. §§ 2000gg-2, 2000gg-4.  Accordingly, an employee aggrieved by the denial of a reasonable accommodation may file a charge with the EEOC against her employer.  42 U.S.C. §§ 2000e-5(b), 2000gg-2, 2000gg-4.  The EEOC will then investigate the charges and seek a conciliation agreement.  42 U.S.C. §§ 2000e-5(b), (f).  If no agreement is reached, the EEOC will either bring a civil action against an employer or decline and issue a notice to the employee of her right to sue.  42 U.S.C. § 2000e-5(f).  In the case of a government employer, once conciliation fails, the EEOC refers the case to the Attorney General who can bring suit or issue a right-to-sue notice to the employee.  *Id.*  Besides individual charges, the Attorney General is authorized to bring a civil action against an employer based on "a pattern or practice of resistance" to the PWFA.  42 U.S.C. §§ 2000e-6, 2000gg-2.  The PWFA also provides the EEOC with rulemaking authority.  42 U.S.C. § 2000gg-3.

Accordingly, the PWFA regulates Texas as an employer by imposing new obligations and liability on the State.  Texas must now provide its employees with "reasonable accommodations to the known limitations relate to [their] pregnancy, childbirth, or related medical conditions . . . unless [it] can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 2000gg-1(1).  Moreover, to the extent Texas previously voluntarily provided accommodations, *see* Dkt. No. 4 ¶ 28, the PWFA limits what accommodations can be imposed because Texas cannot require an employee to take leave if another accommodation could be provided.  42 U.S.C. § 2000gg-1(4).  Likewise, it cannot force an employee to accept an accommodation if it was not "arrived at through the [ADA's] interactive process."  42 U.S.C. §§ 2000gg-1(2).  And if an employee is not satisfied with Texas's response to her accommodation request, she can file a charge with the EEOC, subjecting Texas to both the administrative agency's investigative process and any resulting litigation.  42 U.S.C. §§ 2000e-5(b), (f), 2000gg-2, -4.

As a result of these new obligations, Texas and its agencies must devote time and expenses to understanding these legal requirements, developing new policies and training, providing accommodations, and responding to EEOC charges and resulting litigation.  PX1 at 2–3.  For one agency, the Texas Office of the Attorney General (OAG), this regulatory burden will cost it in the first year approximately (1) $574.76 to research the PWFA's requirements; (2) $637.58 to review and update policies; (3) $236.63 to review and update training;[6] (4) $539.13 to review, assess, and process accommodation requests; and

---

[6] Henry De La Garza's declaration, the source of this cost information, states at one point that this cost to review and update training will be $263.63.  PX1 at 3.  This appears to be erroneous based on his attached exhibit and his combined cost estimates.  *See id.* at 3, 6.  Accordingly, the Court finds that the cost of reviewing and updating training is $236.63.

(5) $4,685.92 to answer charges of discrimination.  *Id.* at 3, 6.  The OAG will incur around $6,674.01 throughout the first year of the PWFA and around $5,225.05 annually thereafter. *Id.* at 3–4.  Similarly, the EEOC itself projects that state and local governments collectively will spend $360,000 in one-time administrative costs from "rule familiarization, posting new equal employment opportunity posters, and updating EEO policies and handbooks."  *See* Regulations to Implement the Pregnant Workers Fairness Act, 88 Fed. Reg. 54714, 54760– 61 (proposed Aug. 11, 2023).

### H. The Alternatives to Detention Case Management Pilot Program provides funding for selected nonprofits and local governments to help connect participating illegal aliens to government services.

In addition to the PWFA, Texas challenges the $20,000,000 appropriation for a third year of funding for DHS's Alternatives to Detention Case Management Pilot Program (CMPP).  There are several Alternatives to Detention (ATD) programs: the Intensive Supervision Appearance Program, the Young Adult Case Management Program, and the CMPP.  *See* PX6; *Alternatives to Detention*, ICE (July 6, 2023), https://www.ice.gov/ features/atd [https://perma.cc/8SWL-CZ23]; DX7 at 2.  The ATD programs apply to aliens on ICE's non-detained docket and aim to "ensure compliance with release conditions and provide important case management services" for these aliens.  PX6 at 1; *Alternatives to Detention*, *supra*; DX7 at 1–2.  These programs allow aliens to remain in local communities during immigration proceedings.  PX6 at 2; *Alternatives to Detention*, *supra*; DX7 at 1.

Over 350,000 aliens have participated in an ATD program.  PX6 at 2; *Alternatives to Detention*, *supra*.  To be eligible for ATD, an alien must be 18 years of age or older, released from DHS custody, and "generally in removal proceedings or subject to a final order of removal."  PX6 at 2; *Alternatives to Detention*, *supra*.  Whether an alien is detained or instead

placed on the non-detained docket depends on ICE's exercise of its authority under the

Immigration and Nationality Act and applicable regulations.  DX7 at 2; *see, e.g.*, 8 U.S.C.

§§ 1182(d)(5), 1225(b)(1)(B)(iii)(IV), 1226; 8 C.F.R. §§ 212.5(b), 236.1(c).  The CMPP does

not itself cause the release of any alien and "plays no role in ICE [Enforcement and

Removal Operations'] decision to release an individual from its custody."  DX7 at 2.  While

in custody, an alien is ineligible for the CMPP, but any alien enrolled in an ATD program is

eligible to be included in the CMPP unless he affirmatively opts out.  *Id.*; PX8 at 4.  Aliens

may voluntarily enroll in the CMPP if eligible.  PX8 at 4.  Any alien who enrolls in the

CMPP is removed from the other ATD program.  *Id.*  CMPP participants "remain under

ICE supervisions and [are] required to adhere to ICE check-in requirements and all other

ATD requirements, except for technology monitoring."  *Id.*; *see also* PX6 at 3.  Accordingly,

unlike under the Intensive Supervision Appearance Program, CMPP participants are not

subject to telephonic or GPS monitoring or SmartLINK, a phone application that permits

ICE to monitor a participant's location.  *See* PX6 at 3–4.

Texas's challenge to the 2023 appropriation comes after two prior appropriations,

which were not challenged.  The CMPP was first created as part of the 2021 Consolidated

Appropriations Act.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div.

F, 134 Stat. 1182, 1449.  The 2021 Act appropriated $5,000,000 to FEMA for the CMPP to

"be awarded to nonprofit organizations and local governments . . . for the purposes of

providing case management services . . . to each individual enrolled into the [ATD]

program in the geographic areas served by the pilot program."  *Id.*  Congress then

appropriated an additional $15,000,000 for the CMPP in the 2022 Consolidated

Appropriations Act and the $20,000,000 appropriation in the 2023 Act currently at issue

before the Court.  *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. F,

136 Stat. 49, 312; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. F, 136

Stat. at 4726.

The CMPP is administered by the CMPP National Board, not ICE itself.  *See* PX7;

DX7 at 2; DX11.  The National Board is comprised of three nonprofits organizations—

Church World Services, Catholic Charities USA, and the Center for Migration Studies of

New York—along with DHS's Officer for Civil Rights and Civil Liberties, who chairs the

Board.  PX7 at 1; DX11 at 2.  The National Board selects nonprofits and/or local

governments to receive funding to carry out the CMPP in certain geographic areas.  *Id.*

These organizations, known as the subrecipients, then provide the CMPP services.  *Id.*;

PX7; PX8 at 2–4.

The case-management services provided by the CMPP subrecipients include "mental

health services; human trafficking screenings; legal orientation; cultural orientation;

connections to social services; and, for individuals departing the U.S., assistance with pre-

departure planning and/or referral to reintegration services."  PX8 at 2.  Connections to

social services include helping aliens obtain legal counsel, "housing assistance, childcare,

transportation, school enrollment, health care, translation/interpretation services, job

training, flexible funds assistance, and language classes."  *Id.*  The National Board aims to

have each subrecipient "serve a minimum of 2,800 individuals with a goal of serving 5,000

or more."  *Id.* at 3.  Subrecipients must report their performance on various indicators,

including (1) the number of aliens enrolled; (2) the number offered case-management

services; (3) the number of aliens who received and declined services; (4) the number of

participants provided or referred for legal services; (5) the number of participants connected

to social services, such as school enrollment and health care; and (6) the number of aliens provided flexible fund assistance. *Id.* at 6. Moreover, subrecipients are scored on various legal program performance metrics, which consider, among others, the number of CMPP participants who obtain legal counsel through the CMPP and the breakdown and percentage of immigration relief granted to participants. *Id.* at 6–7.

### I.     CMPP funding is distributed through grant awards to nonprofits and local governments.

CMPP funding from the appropriations acts follows a multistep process before it is ultimately received by a subrecipient. The initial provision of the budget authority is apportioned by the President to FEMA. *See* DX15 at 6; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, 134 Stat. at 1449; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. F, 136 Stat. at 312; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. F, 136 Stat. at 4726. Once apportioned, FEMA must administer the funds to the CMPP National Board. DX8 at 3; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, 134 Stat. at 1449. To do so, FEMA partners with DHS's Office for Civil Rights and Civil Liberties to develop a notice of funding opportunity for which the National Board then applies. DX8 at 3; *see also* DX4 at 3; DX9. Once the notice of funding is published, the National Board has 30 days to apply. DX11 at 2. The National Board is the only eligible recipient of FEMA's notice. *Id.*; DX8 at 3.

After the National Board receives the funds, it then issues a solicitation for subrecipients to apply. DX11 at 2; *see also* PX8; DX12. Applicants provide a project proposal to the National Board that explains the organization's plan to deliver CMPP services, its goals, and the geographic region where it will operate. PX8 at 2, 10–12. The National Board evaluates the applications based on various factors, including: (1) the

"quality and feasibility of the program idea"; (2) the organization's "capacity and record on previous grants"; (3) "program planning and ability to achieve objectives"; (4) budget; (5) the organization's "monitoring and evaluation plan"; and (6) the program's "accountability to affected populations, gender equity, and sustainability." *Id.* at 14–15 (cleaned up).  Each of the four members of the National Board has one vote in selecting subrecipients, and decisions are made by a majority vote.  DX11 at 3.  The number of subrecipients selected depends on the appropriation at issue.  *See* PX8; DX12.  For the 2021 funds, two subrecipients were selected: BakerRipley in Houston, Texas, and International Rescue Committee in New York, New York.  DX11 at 3; DX13; DX14.  For the 2022 funds, the National Board selected four subrecipients: BakerRipley in Houston, Texas; Los Angeles County Office of Immigrant Affairs in Los Angeles, California; Lutheran Immigration and Refugee Service in Baltimore, Maryland; and Lutheran Social Services of the National Capital Area in Washington, DC.  *National Board Announces Subgrantee Selection for Case Management Pilot Program*, Church World Services (Dec. 19, 2023) [hereinafter *2022 CMPP Subrecipient Announcement*].[7]

This funding process is lengthy, and the subrecipient typically does not receive the funds for more than a year after the initial appropriation to FEMA.  For the 2021 funds, FEMA issued the notice of funding on June 28, 2022, and it awarded the funds to the National Board on August 31, 2022.  DX8 at 3.  The National Board selected the subrecipients on November 30, 2022.  DX11 at 3.  Then, for the 2022 funds, FEMA released the funding opportunity on April 26, 2023, with a deadline of May 26, 2023, for the

---

[7] Available at: https://cwsglobal.org/press-releases/national-board-announces-subgrantee-selection-for-case-management-pilot-program [https://perma.cc/Q9PQ-A92R].

National Board to apply.  DX8 at 3.  The subrecipients for the 2022 funds were selected on December 19, 2023.  *2022 CMPP Subrecipient Announcement*, *supra*.  As for the 2023 funds, FEMA has not yet awarded the funds to the National Board, and no subrecipients have been selected.  DX4 at 3.

Once the subrecipients are selected, they must then receive the contact information of potential participants from ICE and the Office of Civil Rights and Civil Liberties so they can reach out to eligible aliens for potential enrollment in the CMPP.  *See* DX7 at 2; DX11 at 4.  Specifically, ICE gives the Office of Civil Rights and Civil Liberties a list of potential participants.  DX7 at 2.  Some aliens on that list are then randomly selected as potential participants to provide to the subrecipients "[b]ecause there are many more potentially eligible participants than spots available in CMPP."  *See* PX8 at 4–5.  At that point, the subrecipients can contact possible participants.  DX11 at 4.  For the 2021 funds, eligible aliens were first contacted by a subrecipient in April 2023.  *Id.*

### J.     Nonprofit BakerRipley received a CMPP grant from the 2021 and 2022 funding to provide CMPP services in Houston, Texas.

For the two years of CMPP funds that have been awarded, BakerRipley, a nonprofit organization, has been selected as a subrecipient to provide CMPP services in Houston, Texas.  DX11 at 3; *2022 CMPP Subrecipient Announcement*, *supra*.  Since April 2023, BakerRipley has been contacting eligible aliens to enroll them in the CMPP and providing them with the requisite legal and cultural orientation and referrals to social services in Houston.  *See* PX8; DX4 at 2; DX11 at 4; DX12.  Despite the large appropriation involved, as of October 31, 2023, only 138 aliens had enrolled in the CMPP in Texas.  DX4 at 2.  Of those 138 enrollees, "[a]t least two CMPP participants have left Texas either moving to another state or returning to their country of citizenship."  DX4 at 2.  In order for the

CMPP participants to receive services from BakerRipley, they must remain in Houston.  *Id.*
Thus, by the end of the October 2023, BakerRipley was providing CMPP services to only
136 or fewer aliens.  *Id.*

### K. An increased number of illegal aliens in Texas that use its social services leads to increased State costs.

Texas incurs costs from increased illegal immigration into the State in three areas:
health care, education, and law enforcement.  *See* PX2; PX3; PX4; PX11 at 12–23.  For
health care, the Texas Health and Human Services Commission provides "three principal
categories of services and benefits to undocumented immigrants in Texas: (i) Texas
Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas
Children's Health Insurance Program (CHIP) Perinatal Coverage."  PX4 at 2.  Federal law
requires all States to provide Emergency Medicaid coverage to aliens, which is jointly
funded by the federal government and the States.  *See id.*; 8 U.S.C. § 1611(b)(1)(A).  As a
result, when qualifying aliens obtain health care services in Texas covered by Emergency
Medicaid, Texas is legally obligated to bear part of the cost of those services.  *See* PX4 at 2; 8
U.S.C. § 1611(b)(1)(A).  Providing Emergency Medicaid coverage to illegal aliens has cost
Texas $116 million in 2019; $88.3 million in 2020; $95.6 million in 2021; and $72.2 million
in 2022.  PX4 at 3–4.  Similarly, to provide CHIP Perinatal Coverage to such aliens, Texas
has spent $11.1 million in 2019; $16.9 million in 2020; $25.8 million in 2021; and $30.9
million in 2022.  *Id.* at 4–5.  These costs vary annually because they are "affected by both
the volume and cost of services provided and annual changes in the percentage of
expenditures matched by the federal government."  *Id.* at 5.  As a result, if there are more
aliens in the State, Texas faces a substantial risk that it will incur greater costs related to
these health care expenditures.

Regarding public education, Texas's education costs rise with an increase in alien children.  *See* PX2.  All States are required to provide free public education to undocumented children.  *Plyler v. Doe*, 457 U.S. 202, 230 (1982).  The Texas Education Agency estimates that "the average funding entitlement from state and local sources for fiscal year 2023 will be $9,564 per student in attendance for an entire school year."  PX2 at 1.  To provide additional bilingual education, which Texas does for most alien children, Texas must spend $11,781 to educate each student.  *Id.*  Texas has historically encountered a sizeable number of such alien children in its schools: from October 2021 to September 2022, 19,071 alien children were released to sponsors in Texas.  *Id.* at 2.  Texas spent $224.67 million to educate those newly arriving children for one year.  *Id.* at 2–3.  Such costs from these children continue so long as they are enrolled in Texas schools.  In sum, any additional alien child enrolled in and attending Texas public schools increases Texas's educational expenditures.  *See id.* at 3.

Finally, when aliens commit crimes, Texas incurs costs from incarcerating them.  For each day that an inmate is incarcerated, the Texas Department of Criminal Justice (TDCJ) spends $77.49 systemwide on that inmate.  PX3 at 2.  For fiscal year 2022, the TDCJ held 6,914 undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law for a total of 2,019,635 days of incarceration for these aliens.  *Id.* at 1–2.  Based on the number of aliens and the number of days each was held, TDCJ spent $156,501,516 incarcerating these aliens.  *Id.* at 2.  And reimbursement of these costs from the federal government is minimal.  For fiscal year 2021, TDCJ spent $153,786,422 in incarceration costs for criminal aliens but received only $14,883,040 in federal reimbursement.  *Id.* at 2–3.  And for those criminal aliens released on

parole or mandatory supervision, Texas incurs costs of approximately $4.69 a day. *Id.* at 3. Accordingly, "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." *Id.*

> **L.** **The solicitation process for the Act's $20 million appropriation has not begun, and it is uncertain whether the funds will go to an entity in Texas.**

For the 2023 funds at issue here, the funding process has not yet begun. DX4 at 3. The Office for Civil Rights and Civil Liberties has started drafting the notice of funding for which the National Board will apply, but it anticipates that the notice will not be published until March 1, 2024. *Id.* Moreover, each year of funding operates independently: grants do not renew automatically, so subrecipients must apply again each year. *Id.* at 2–3. And the National Board has "no obligation to provide future funding from the 2022 or 2023 Appropriations Acts to past recipients" or to other organizations from the states of the past recipients. *Id.* Accordingly, if a subrecipient reapplies, its receipt of funds from one year of CMPP funding does not guarantee that it will receive another grant. *Id.* For example, the organization in New York that initially received funding from the 2021 Appropriations Act did not receive a new grant from the 2022 funds. *See* DX11 at 3; *2022 CMPP Subrecipient Announcement*, *supra*. As a result, it is uncertain which organizations will receive the 2023 funds and where those funds will be used to provide CMPP services.

## 3. Legal Standards

### A. Permanent Injunction

Pursuant to Federal Rule of Civil Procedure 65(a)(2), "[b]efore or after the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Fed. R. Civ. P. 65(a)(2). Accordingly, if the district court "conclude[s] that this is a case wherein no material fact issues remain and there is indeed

nothing left to be tried, [it] should not hesitate to afford [the prevailing party] final relief." *Eli Lilly & Co., Inc. v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1107 (5th Cir. 1972). To protect the rights of the litigants, a court must provide "clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their cases." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (alteration in original) (quotation omitted).

Here, the Court notified the parties that it would consolidate the preliminary injunction hearing with a trial on the merits in light of the lack of material fact issues in the case. Dkt. No. 73. The Court granted the parties multiple continuances to allow them to gather evidence and prepare for trial. Dkt. Nos. 75; 91. In light of the consolidation of the hearing with a trial on the merits, the Court will assess Texas's request for injunctive relief under the permanent, rather than preliminary, injunction standard.

To obtain a permanent injunction, a plaintiff must demonstrate: (1) that it succeeded on the merits; (2) that it will suffer irreparable injury if an injunction is not granted; (3) that a balance of the hardships between the plaintiff and the defendant favors equitable relief; and (4) that an injunction will not harm the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). This standard is essentially the same as the one for a preliminary injunction except a plaintiff must show actual success on the merits, rather than just a likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). The Court takes each question in turn, but in the final analysis, "[l]ikelihood of success and irreparable injury to the movant are the most significant factors." *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir.

2021).  Where, as here, the federal government is the opposing party, the third and fourth

factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

###   B.      Motions to Dismiss

Also before the Court is the defendants' motion to dismiss based on Federal Rules of

Civil Procedure 12(b)(1), (3), and (6).  Dkt. No. 54.  In considering Rule 12(b) motions, a

court must "take the well-pled factual allegations of the complaint as true and view them in

the light most favorable to the plaintiff."  *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir.

2008).  The motion should only be granted if the Court determines that the plaintiff cannot

prove a plausible set of facts that would establish subject-matter jurisdiction or has failed to

state a plausible claim of relief.  *Id.*; *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009).

In appropriate circumstances, courts will consolidate a motion for a preliminary injunction

with a trial on the merits when there are pending motions to dismiss, even motions brought

under Rule 12(b)(1).  *E.g.*, *Woodlands Pride, Inc. v. Paxton*, No. H-23-2847, 2023 WL

6226113, at *1, *8 & n.75 (S.D. Tex. Sept. 26, 2023); Order at 1–3, *Woodlands Pride, Inc.*,

2023 WL 6226113 (S.D. Tex. Oct. 3, 2023) (No. H-23-2847), ECF No. 98.  Here, the

central issues in the case are purely legal challenges.  While evidence was submitted and

evidentiary fights occurred, there are few contested factual issues.  In light of this reality and

the intertwined nature of the defendants' motion to dismiss and Texas's motion for a

preliminary injunction, the Court determined that consolidation was appropriate.

Typically, "a court ruling on a 12(b)(6) motion may rely on the complaint, its proper

attachments, documents incorporated into the complaint by reference, and matters of which

the court may take judicial notice."  *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue

Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (internal citations and quotations

omitted) (quoting *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011)).  "However, under
Rule 12(b)(1), the [C]ourt may find a plausible set of facts by considering any of the
following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts
evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the
[C]ourt's resolution of disputed facts."  *Lane*, 529 F.3d at 557 (quotation omitted).  Thus,
unlike a standard 12(b)(6) motion, where the evidence outside of the complaint that a court
may consider is heavily limited, precedent permits the Court to consider the "record"
generally when resolving a 12(b)(1) motion.  *Williamson v. Tucker*, 645 F.2d 404, 413 (5th
Cir. 1981); *see also Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016).

Despite this common practice of courts considering the whole record in resolving a
12(b)(1) challenge, the defendants argued at trial that the Court should not consider Texas's
declarations in determining whether it has standing.  The Court disagrees and finds that it
can properly consider all evidence admitted at the trial in resolving the 12(b)(1) motion.  *See
Williamson*, 645 F.2d at 413.  Beyond considering the then-existing record, courts will
occasionally hold hearings and accept testimony and evidence in considering a 12(b)(1)
motion.  *See Mikkilineni v. Creative Prop. Mgmt. Co.*, 58 F.3d 636, 1995 WL 371938, at *2 (5th
Cir. 1995).  Moreover, if a 12(b)(1) motion "raises factual issues, the plaintiff should have an
opportunity to develop and argue the facts in a manner that is adequate in the context of the
disputed issues and evidence."  *Williamson*, 645 F.2d at 414.   Unless there is "an incurable
defect in the complaint," courts permit plaintiffs to introduce further evidence to support
jurisdiction.  *Id.*  Thus, the Court can consider properly admitted declarations and other
evidence in determining whether Texas has standing, both for purposes of the defendants'
12(b)(1) challenge and the trial.

Further, the general limitation on considering evidence outside of the complaint and attachments for other Rule 12(b) motions exists to protect the plaintiff from having its case dismissed prior to a fair opportunity to gather evidence to support its claims and to combat whatever contrary proof a defendant seeks to offer.  The Court sees no justification for allowing the defendants in this circumstance to use this common shield instead as a sword against the plaintiff.  For one, where a plaintiff offers further evidence showing that it can cure defects in the complaint's allegations, courts typically offer leave to amend to supplement those allegations.  Accordingly, even if the declarations could not be considered, the proper course of action would be to allow leave to amend so that Texas could add the statements from the declarations to an amended complaint or to attach them.  At that point, the parties could then reargue this matter only to end up at the same place as they are now.  There is no justification for such delays and waste of the parties' and the Court's resources, particularly when the defendants had ample opportunity to contest the declarations.  The defendants knew of the declarations' contents for nearly three months before trial, and the Court ordered Texas to make the declarants available for the defendants to depose should the defendants wish to question the declarants directly on their statements.  Dkt. Nos. 75; 91.  The defendants decided to forego that opportunity.  *See* Dkt. No. 97.  Thus, requiring the parties to jump through additional procedural hoops would only delay—not alter—the result of this case.  Instead the Court will consider the full record in resolving the defendants' 12(b)(1) challenge, as courts routinely do.[8]

---

[8] In any event, even if the Court were to limit itself to the amended complaint for purposes of the defendants' motion to dismiss, it would still find that Texas has standing to challenge the PWFA. As further discussed *infra*, the PWFA imposes new legal obligations on Texas that it alleges

4.      **Texas has standing to challenge the PWFA and therefore the Act's passage.**

In order for a case to be justiciable, the plaintiff must have standing to challenge the conduct at issue.  Texas argues that it has standing to challenge the Act based on two provisions: the PWFA and the CMPP.  The Court concludes that Texas has established standing to sue regarding the PWFA but not the CMPP.  The PWFA creates a new regulatory burden for Texas and opens it up to administrative and judicial proceedings by the EEOC, the Attorney General, and third-party employees.  While the Court cannot enjoin those third-party employees from bringing PWFA claims against Texas, an injunction prohibiting the EEOC and Attorney General from taking any enforcement action against Texas would eliminate many compliance costs and would impact the administrative-exhaustion process, thereby significantly lessening the harm to Texas.  As for the CMPP, Texas has shown only a speculative possibility that any injury from increased immigration-related expenses is traceable to the challenged funds because, at this stage, it is unclear where the funding will go.  Accordingly, Texas has not shown that it has standing as to the CMPP.

A.      **Legal Standard**

The power of the federal judiciary extends only to "[c]ases" and "[c]ontroversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016); U.S. Const. art. III, § 2.  "One element of the case-or-controversy requirement is that [a plaintiff], based on [its] complaint, must establish that [it has] standing to sue."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

---

"subject it to the costs, hassles, and attendant risks of administrative proceedings, investigations, and lawsuits, by both private individuals and the federal government, should either an individual or the federal government feel that the State should indulge unreasonable demands."  Dkt. No. 4 ¶ 28.  The Court's analysis regarding Texas's injury from accommodations, charges, and litigation costs applies with equal force to this allegation, particularly at the lower standard necessary to find standing at the 12(b)(1) stage.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The "irreducible constitutional minimum of standing contains three elements."
*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "The plaintiff must have (1) suffered an
injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and
(3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338
(quoting *Lujan*, 504 U.S. at 560–61).  "The plaintiff, as the party invoking federal
jurisdiction, bears the burden of establishing these elements."  *Id.*  Additionally, "standing is
not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they
press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413,
431 (2021).  Further, "when considering whether a plaintiff has Article III standing, a
federal court must assume *arguendo* the merits of his or her legal claim."  *N. Cypress Med. Ctr.
Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (quoting *Cole v. Gen.
Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007)); *FEC v. Cruz*, 596 U.S. 289, 298 (2022) ("For
standing purposes, we accept as valid the merits of [plaintiffs'] legal claims. . . .").

The first prong of the standing inquiry is injury.  "To establish injury in fact, a
plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is
'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"
*Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  A concrete injury is one that must
"actually exist"—it must be "'real,' and not 'abstract.'"  *Id.* at 340.  Meanwhile, the
particularity aspect requires that the plaintiff be affected in a "personal and individual way."
*Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  Additionally, "under Article III, an injury in
law is not an injury in fact.  Only those plaintiffs who have been *concretely harmed* by a
defendant's statutory violation may sue that private defendant over that violation in federal
court." *TransUnion*, 594 U.S. at 427 (emphasis in original).  So a plaintiff who is merely

seeking to ensure that a defendant complies with the law does not have "grounds for Article III standing" absent some "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American Courts." *Id*. at 427–28.

The second prong is traceability. This requires Texas to show that the challenged government action caused its Article III injury. *Allen v. Wright*, 468 U.S. 737, 757 (1984). While there must be "a causal connection between the plaintiff's injury and the defendant's challenged conduct, [traceability] doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Inclusive Cmtys. Proj., Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). An injury is not fairly traceable if it is "the result of the independent action of some third party not before the court." *Id*. (quoting *Bennett*, 520 U.S. at 167). But a plaintiff can satisfy traceability by showing that the challenged action "produce[s] a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Id*. (quoting *Bennett*, 520 U.S. at 169). In addition, courts find that the injury is traceable to the challenged act when standing "does not rest on mere speculation about the decisions of third parties" but instead "on the predictable effect of [g]overnment action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

The third prong to demonstrate standing is redressability. Redressability requires a plaintiff to show that that a favorable decision "is *likely*, as opposed to merely *speculative*," to redress its injury. *Inclusive Cmtys. Proj.*, 946 F.3d at 655 (emphasis in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). A plaintiff demonstrates redressability if "the desired relief would lessen" the injury—a "complete[] cure" is unnecessary. *Id*. However, "[r]elief that does not remedy the injury

– 33 –

suffered cannot bootstrap a plaintiff into federal court." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

**B.    Texas has standing to challenge the PWFA.**

Texas asserts that the PWFA imposes new legal obligations on employers such as Texas.  As a result of these obligations, Texas incurs costs from researching the new law to ensure compliance, updating its policies and trainings, providing accommodations, and responding to EEOC charges and lawsuits.  In support of its argument, Texas has provided the sworn declaration of Henry De La Garza, the Human Resources Director for the Texas Office of the Attorney General (OAG).  PX1.  De La Garza oversees "employment [and] compensation, benefits, recruiting, leave, training [and] development, accommodations, charges of discrimination, and human resources policies" for the Texas OAG.  *Id.* at 1.  He states that the PWFA requires multiple acts of his office.  Specifically, the PWFA requires him and other members of his office to:

> (1) engage in legal research to understand and prepare for the [PWFA]'s new requirements; (2) review and update OAG's policies as needed to comply with the [PWFA]'s new requirements; (3) review and update any OAG training regarding the new requirements as needed to comply with the [PWFA]'s new requirements; (4) review, assess, and otherwise process any requested pregnancy accommodations under the [PWFA]'s new requirements; and (5) answer, respond, litigate, or otherwise defend against charges of discrimination filed with the [EEOC], investigations by the EEOC, lawsuits by the [DOJ], and private actions by allegedly aggrieved individuals.

*Id.* at 2–3.  Altogether, Texas asserts that these five tasks each inflict a financial injury on the State, and it contends that private PWFA enforcement actions harm it because it would be immune from such suits in the absence of the PWFA.

Given the credible evidence adduced by Texas at trial, Texas has standing to challenge the PWFA.  As a preliminary matter, Texas itself is directly regulated by the

PWFA, and in such circumstances, "there is ordinarily little question that the action . . . has caused [it] injury, and that a judgment preventing . . . the action will redress it." *Lujan*, 504 U.S. at 561–62.  Due to the direct regulation of its employment practices by the PWFA, Texas is injured by the costs of compliance, litigation, and administrative investigations created by the PWFA, as well as the waiver of its sovereign immunity.  The PWFA imposes new legal obligations on Texas and creates avenues for suit that were previously unavailable.  Due to the PWFA, Texas incurs costs from updating its training and policies, providing accommodations, and responding to PWFA charges, investigations, and lawsuits. Moreover, Texas's statements that it already provides reasonable accommodations does not alleviate the heightened regulatory burden of PWFA charges, investigations, and lawsuits because it is the worker—not Texas—who would bring the claim believing that she was owed some reasonable accommodation that was not provided.  These injuries are directly inflicted by the PWFA, and the Court can redress this harm by enjoining the defendants from enforcing the statute.

### i.    Injury-in-Fact

Texas's asserted injuries from the PWFA fall into two groups: (1) initial administrative costs that it faces immediately from the promulgation of the PWFA, such as updating its employment policies and anti-discrimination trainings; and (2) recurring costs from providing pregnant workers with accommodations and responding to charges of discrimination and resulting litigation.  The Court addresses whether each type of injury demonstrates an injury-in-fact for purposes of standing in turn, and the Court finds that both injuries establish standing.

### a.    Initial Administrative Costs

Texas's claimed injuries from legal-research costs, updating policies, and amending trainings all result from initial administrative costs from the PWFA.  These costs constitute an injury-in-fact to Texas as the State has shown it will suffer a pocketbook injury from the PWFA's implementation.

De La Garza's declaration provides that OAG expects to incur $1,475.97 in order to complete these tasks.  PX1 at 3.  Specifically, he notes that OAG

> will spend roughly (1) $574.76 to have the Human Resources ("HR") Director, HR Deputy Director, and a law clerk engage in adequate legal research of the [PWFA]'s new requirements; (2) $637.58 to have the HR Director, HR Deputy Director, Director of Employee Development, and Administrative Operations Manager review and update OAG's policies in order to comply with the [PWFA]'s new requirements; [and] (3) $[236.63] to have the HR Director, Director of Employee Development, and Senior Training Coordinator review and update any OAG training as needed to comply with the [PWFA]'s new requirements.

*Id.*[9]  His statements are corroborated by the EEOC's own Initial Regulatory Impact Analysis detailed in its Notice of Proposed Rulemaking on the PWFA, which detailed the expected one-time and annual costs to employers in order to comply with the PWFA.  *See* Regulations to Implement the Pregnant Workers Fairness Act, 88 Fed. Reg. 54714, 54749–64 (proposed Aug. 11, 2023).  The EEOC estimated that state and local governments collectively will spend $360,000 in one-time administrative costs from "rule familiarization, posting new equal employment opportunity posters, and updating EEO policies and handbooks."  *Id.* at 54760–61.  While the EEOC's estimates are not Texas-specific, they

---

[9] As previously noted, *see* note 6 *supra*, De La Garza provided a cost estimate of $263.63 in this portion of his declaration, which does not match his total expected costs and his attached exhibit. *See* PX1 at 3, 6.  Accordingly, for consistency with the Court's finding of fact that this cost is $236.63, the Court corrects the apparent typographical error here.

demonstrate that these tasks must be completed and that state employers like Texas face financial costs from the PWFA.  *See id.*

These "pocketbook injur[ies are] a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. ----, 141 S. Ct. 1761, 1779 (2021).  "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017).  Further, completing these tasks requires Texas "to divert time and resources away from [its] regular [business]," which also constitutes a concrete injury. *Book People, Inc. v. Wong*, No. 23-50668, --- F.4th ----, 2024 WL 175946, at *7 (5th Cir. Jan. 17, 2024) (second alteration in original) (quoting *All. For Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 235 (5th Cir.), *cert. granted*, No. 23-235, 2023 WL 8605746 (U.S. Dec. 13, 2023), *and cert. granted sub nom. Danco Lab'ys, L.L.C. v. All. Hippocratic Med.*, No. 23-236, 2023 WL 8605744 (U.S. Dec. 13, 2023), *and cert. denied*, No. 23-395, 2023 WL 8605749 (U.S. Dec. 13, 2023)).  Accordingly, Texas's evidence of the financial costs from these administrative measures stemming from the PWFA demonstrates an injury-in-fact.

### b.    Accommodations, Charges, and Litigation

Texas also argues that the PWFA injures it by requiring it to provide accommodations, respond to PWFA charges filed with the EEOC, and deal with the costs associated with EEOC investigations and litigation.  In addition to these financial harms and regulatory burdens, Texas asserts that it is harmed because the PWFA waives its sovereign immunity.  The Court finds that Texas has proven that these injuries also constitute injuries-in-fact for purposes of standing.

Under the "ordinary rule," a party that is the "object[] of the [r]egulation[] may challenge it." *Contender Farms, L.L.P. v. U.S. Dep't of Agriculture*, 779 F.3d 258, 266 (5th Cir.

2015).  Because Texas is a covered employer, the PWFA directly regulates Texas by requiring it to make reasonable accommodations for pregnant workers when it previously had no legal obligation to do so.  42 U.S.C. §§ 2000gg, 2000gg-1; *see also* PX1.  This "amounts to an increased regulatory burden," which "typically satisfies the injury in fact requirement."  *Contender Farms, L.L.P.*, 779 F.3d at 266.  Moreover, if Texas fails to provide what an employee believes to be a reasonable accommodation, Texas faces investigations by the EEOC and referrals to the Attorney General for enforcement proceedings.  As a result, the Texas OAG estimates that it will incur annual costs of "$539.13 to have the HR Director and Administrative Operations [M]anager review, assess, and otherwise process any pregnancy accommodations requests under the [PWFA's] new requirements" and "$4,685.92 to have the HR Director, HR Deputy Director, law clerk, and Administrative Operations Manager . . . answer any charges of discrimination filed with the EEOC."  PX1 at 3.  This "regulatory burden on Texas to comply with the [PWFA] to avoid enforcement actions" provides standing.  *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).

Nevertheless, the defendants assert that Texas's financial injury is too hypothetical to provide standing, especially because Texas states that it already "accommodates the reasonable needs of its pregnant employees as a matter of course."  Dkt. No. 52 at 36–37 (quoting Dkt. No. 4 ¶ 28).  But "a plaintiff who wishes to challenge the constitutionality of a law" need not "confess that [it] will in fact violate that law."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014).  As Texas notes, the PWFA "subject[s] it to the costs, hassles, and attendant risks of administrative proceedings, investigations, and lawsuits, by both private individuals and the federal government, should either an individual or the federal government" believe that Texas should have made an ungranted accommodation.

Dkt. No. 4 ¶ 28; *accord.* PX1 at 1–3; 42 U.S.C. §§ 2000e-5, 2000gg-2; 29 C.F.R. §§ 1601.15–17, 1601.23–25, 1601.28–29.  And while Texas had discretion to offer those accommodations it believed to be reasonable before the PWFA, it now must address accommodation requests through the ADA's required interactive process with the looming threat of investigations and litigation if its employee believes a denied request was reasonable.  *See* PX1 at 1–3; 42 U.S.C. §§ 2000e-5, 2000gg-1, -2.  Accordingly, Texas's mere belief that it already offers reasonable accommodations does not eliminate the PWFA's increased regulatory burden under these circumstances.

The Fifth Circuit has found standing in a similar situation where the ultimate impact of the regulation required additional efforts and costs from the plaintiffs even though they did not claim that their prior activity violated the regulation.  *Contender Farms L.L.P.,* 779 F.3d at 267–68.  There, the regulation at issue prohibited soring horses, and the defendants asserted that the plaintiffs were not injured because "the [r]egulation targets only those horse owners who sore horses," not those like the plaintiffs "who purportedly do not."  *Id.* at 266.  The Fifth Circuit disagreed, noting that soring "yields a large number of 'false positives'" because "[i]n many cases, inspectors, veterinarians, and other professionals will disagree as to whether a horse is actually a sore."  *Id.* at 266, 268.  Thus, even if the plaintiffs did not sore horses, they could face prosecution and "must take additional measures to avoid even the appearance of soring."  *Id.* at 266.  Likewise, here, while the PWFA ultimately targets employers that do not provide reasonable accommodations, Texas still faces the threat of administrative and judicial proceedings and liabilities if third parties or the defendants disagree with its assessment of what accommodations are reasonable.

Employers and employees often disagree on what constitutes a reasonable accommodation, and Texas's opinion that it provides reasonable accommodations is not sufficient in itself to avoid administrative proceedings and lawsuits.  *See, e.g.*, *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009); *Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 F. App'x 772, 775–76 (5th Cir. 2020).  Even though Texas already provides what it considers to be reasonable accommodations for its pregnant workers, some employees and the defendants will likely think that additional measures are necessary at times.  Given an avenue to seek administrative and judicial recourse, those workers will pursue the PWFA's remedies, just as many plaintiffs have done through Title VII and the ADA.  There are numerous examples of suits against Texas on the basis that it failed to provide a reasonable accommodation, including by pregnant employees.  *See, e.g.*, *Issa*, 2023 WL 4923971, at *1–2, 6; *Dugger v. Stephen F. Austin Univ.*, 232 F. Supp. 3d 938, 942–44, 956–58 (E.D. Tex. 2017).[10]  The PWFA opens the door to even more litigation and the attendant costs by expanding those entitled to accommodations under federal law.

In addition, the significant time and litigation expenses that Texas faces from the abrogation of its sovereign immunity also constitutes an injury for standing.  The State is ordinarily immune from suits by its citizens or citizens of another state pursuant to the Constitution's "structural understanding that States entered the Union with their sovereign immunity intact" and the Eleventh Amendment.  *Va. Off. for Prot. & Advoc. v. Stewart*, 563

---

[10] *See also, e.g.*, *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215–16 (5th Cir. 2015); *Ituah ex rel. McKay v. Austin State Hosp.*, No. 22-50305, 2023 WL 3222848, *2 (5th Cir. May 3, 2023); *Hodges v. Univ. of Tex. at Arlington*, No. 4:23-CV-7, 2023 WL 4759228, *1 (N.D. Tex. July 26, 2023); *Sweeney v. Tex. State Univ.*, No. 1:14-CV-910, 2016 WL 4368380, at *3–4 (W.D. Tex. Aug. 15, 2016); *Amsel v. Tex. Water Dev. Bd.*, No. A-09-CA-389, 2010 WL 11519190, at *14–16 (W.D. Tex. Nov. 22, 2010), *report and recommendation adopted by* 2011 WL 13185793 (Feb. 15, 2011).

U.S. 247, 253 (2011).  This immunity "is the privilege of [Texas] to not be sued without its

consent," *id.*, and it "serves to avoid 'the indignity of subjecting [Texas] to the coercive

process of judicial tribunals at the instance of private parties.'"  *Seminole Tribe of Fla. v.*

*Florida*, 517 U.S. 44, 58 (1996) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,

506 U.S. 139, 146 (1993)).  This "fundamental constitutional protection" of Texas is

imperiled by the PWFA because individuals can hale Texas into federal court to answer

allegations that it violated the Act's protections.  *See id.*; 42 U.S.C. §§ 2000e-5, 2000gg-2.

While no PWFA charges had been filed against Texas by the end of October 2023, *see* DX5

at 3–4, this new avenue for workers to seek redress will assuredly result in litigation against

Texas in the near future.  As discussed, the PWFA encourages aggrieved workers to file

charges and litigate their claims, and the history of past employment-discrimination statutes

makes clear that employees will bring such claims, including Texas's employees.

Texas's fear that the PWFA will result in new investigations and litigation is hardly

speculative or improbable based on this history.  Moreover, the obvious purpose of the

PWFA is to create a new federal forum for pregnant employees who believe they were

denied reasonable accommodations by permitting them to file charges with the EEOC.

Although mere allegations of a possible future injury are insufficient, it is not a hypothetical

that one of Texas's employees will bring a charge but an inevitability.  *Cf. Clapper v. Amnesty*

*Int'l USA*, 568 U.S. 398, 409–14 (2013) (finding an injury to be too speculative where the

plaintiffs lacked evidence that the government would ever obtain their communications

under the challenged statute because they lacked proof of the government's targeting

practices).  To minimize this threat, Texas must provide additional accommodations that it

would otherwise have no obligation to offer.  And Texas has demonstrated that its Attorney

General's office alone will incur around $5,000 in annual costs from the PWFA's accommodation requirements and grievance scheme.  PX1 at 3.

Accordingly, Texas will suffer an injury-in-fact from the PWFA due to its costs from offering additional accommodations and responding to charges and litigation.

### ii.    Traceability

Next, the Court finds that Texas's injuries are fairly traceable to the PWFA.  Its injury from these initial administrative costs directly results from the new requirements of the PWFA to provide reasonable accommodations and the rights of pregnant workers that necessitate these updates in policies and trainings.  *See* PX1; 42 U.S.C. § 2000gg-1.  Likewise, its obligation to provide reasonable accommodations and respond to discrimination charges and lawsuits also arises from the PWFA, its adoption of Title VII's remedial scheme, and its waiver of Texas's sovereign immunity.  42 U.S.C. §§ 2000e-5, 2000gg-1, 2000gg-2(a), 2000gg-4.  In addition, the burdens of complying with the EEOC or Attorney General's inquiries or subsequent litigation are directly inflicted by those defendants' authorities under the PFWA.

Despite the clear link between the PWFA's requirements and Texas's injuries, the defendants assert that these injuries are not caused by the PWFA but instead by independent third-party workers who will seek accommodations and bring EEOC charges.  The defendants' arguments here effectively amount to requiring the PWFA to be the "very last step in the chain of causation," which courts have consistently rejected.  *See Bennett*, 520 U.S. at 169; *Inclusive Cmtys. Proj., Inc.*, 946 F.3d at 655.  Certainly, traceability and redressability can be difficult to prove when a plaintiff's injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and

legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.)); *Warth v. Seldin*, 422 U.S. 490, 504–08 (1975).   However, these concerns over the actions of third parties typically arise when the plaintiff is not the object of the challenged regulation. *See Lujan*, 504 U.S. at 562; *Warth*, 422 U.S. at 504–08; *ASARCO, Inc.*, 490 U.S. at 615 (opinion of Kennedy, J.); *Inclusive Cmtys. Proj., Inc.*, 946 F.3d at 655.   The PWFA itself imposes the obligation on Texas to comply with any requests from the third parties and to answer to charges and litigation.   In the absence of the PWFA, Texas would not need to change its policies, provide the covered accommodations, or face EEOC charges, and there would be no PWFA cause of action.   Accordingly, Texas's injuries are traceable to the PWFA itself because it has a determinative effect on the actions of the third parties by giving them a right to seek such relief and necessitates Texas's response. *See Bennett*, 520 U.S. at 169.

Moreover, the Court can, and does, reasonably predict that the PWFA will cause third parties to make choices that will result in Texas's injuries by giving them new rights and remedies. *See Dep't of Com.*, 139 S. Ct. at 2566.   As the Court has discussed, the clear result of the PWFA's existence and the EEOC accepting and investigating charges of discrimination is that pregnant workers will seek accommodations and file charges if they believe their rights were violated.   Employees "have historically responded" to statutes like the PWFA by seeking accommodations, bringing charges, and filing lawsuits, so Texas's "theory of standing thus does not rest on mere speculation about the decisions of third parties" but "the predictable effect of [g]overnment action on the decisions of third parties." *See id.*   Accordingly, the Court finds that covered pregnant employees will seek

accommodations and will bring PWFA claims against Texas and its agencies.  As a result, the only relevant third-party choice necessary to create Texas's accommodation- and litigation-based injuries will occur.  Traceability is therefore satisfied.

### iii.   Redressability

Texas's sought relief would also reduce its injuries.  While the Court cannot enjoin nonparties such as pregnant workers seeking to bring PWFA charges, "a favorable ruling could potentially lessen [Texas's] injury" enough to establish redressability.  *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (quoting *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012)).  The Fifth Circuit has found standing in a similar case involving both private and public enforcement when the plaintiff sought an injunction against the government actor charged with enforcement even though a favorable result would not preclude private parties from seeking relief.  *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *6 (5th Cir. July 25, 2023).  Likewise, here, although third parties not before the Court could still seek enforcement of the PWFA against Texas despite any remedy here, Texas can obtain relief from enforcement by the defendants.  The EEOC and Attorney General investigate charges filed under the PWFA, and the Attorney General has the power to bring a lawsuit against Texas if he believes a violation occurred.  42 U.S.C. §§ 2000e-5(b), (f)(1), 2000gg-2(a)(1).  But if they are enjoined from enforcing the PWFA, the burdens from those investigations and lawsuits would be lessened, if not eliminated.  This reduction in "the total amount of risk and liability" that Texas faces under the PWFA is sufficient for redressability.  *Consumer Data Indus. Ass'n*, 2023 WL 4744918, at *6.

As for Texas's injury to its sovereign immunity, the PWFA adopts Title VII's remedial structure and therefore requires administrative exhaustion before someone could

file a claim in court.  42 U.S.C. §§ 2000e-5, 2000gg-2; *see Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 337 (5th Cir. 2021).  To properly exhaust, a worker must file a charge with the EEOC, wait for the EEOC to investigate, the Attorney General to decline to bring a lawsuit, and then receive a notice of her right to sue.  42 U.S.C. § 2000e-5; *Ernst*, 1 F.4th at 337.  If the EEOC and Attorney General are enjoined, they would be unable to receive the charges or issue the notices such that the worker could not administratively exhaust.  Texas could seek to dismiss on the basis of a failure to exhaust if a worker were nevertheless to file suit in federal court, similar to its ability to assert sovereign immunity to such a suit prior to the PWFA's existence.  *See Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002).  Even if courts ultimately adopted an equitable exception to exhaustion because of an injunction against the EEOC, the EEOC's refusal of the charge might deter some people who would otherwise be inclined to sue Texas under the PWFA, thereby alleviating some of its injury.  Regardless, the EEOC's ability to investigate the charge would be prohibited if Texas prevailed, so the attendant costs of such investigation would be redressed.  Moreover, this lowered risk will also allow Texas to maintain its existing policies and training or, at least, reduce the number of changes it would otherwise need to make.

In light of the record and the foregoing analysis, Texas has proven by a preponderance of the evidence that it has standing to challenge the PWFA.

### C.     Texas lacks standing to challenge the CMPP funding.

Texas also asserts that it is injured by a provision of the Act that "allocates $20 million to a case-management pilot program for the Department of Homeland Security's 'Alternatives to Detention Program.'"  Dkt. No. 4 ¶ 31.  It claims that this appropriation encourages illegal immigration into Texas and connects these aliens to its social services,

thereby imposing additional health care, education, and law enforcement costs on the State. Dkt. No. 38 at 21–24; *see generally* PX2; PX3; PX4; PX11.  Texas has provided sworn statements from three officials detailing these immigration-related costs to the State.  PX2; PX3; PX4.

While Fifth Circuit precedent has repeatedly established that these costs from increased immigration into the State constitute an injury-in-fact, Texas has not demonstrated that these injuries are traceable to the CMPP funding at issue in this case. While the Court recognizes the evidence establishing the significant burden that illegal immigration imposes on Texas generally, Texas has provided no evidence that the 2023 CMPP funds will increase immigration.  At this stage, the 2023 funds have not been distributed to any particular organization, so there is no evidence that the funds will go to any organization within Texas.  Moreover, even if traceability were satisfied, Texas's requested relief would not remedy its injury because there is no evidence that enjoining the 2023 CMPP funds would alleviate illegal immigration and its costs to Texas.  The currently funded program, which has not been challenged, has only 136 participants in Texas, yet illegal immigration and its costs to Texas have been—and remain—substantial. Accordingly, Texas lacks standing to challenge the CMPP funding.

i.     **Injury-in-Fact**

Texas cites increased health care, education, and law enforcement costs as injuries-in-fact created by the CMPP.  PX2; PX3; PX4; PX11.  To be sure, these cited expenses are routinely affirmed as injuries-in-fact by the Fifth Circuit when Texas has raised challenges to governmental action regarding immigration.  *See, e.g.*, *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023); *Texas v. United States (DACA)*, 50 F.4th 498, 517–18 (5th Cir. 2022); *State*

*v. Biden (MPP I)*, 10 F.4th 538, 546–47 (5th Cir. 2021). And the record also demonstrates that at least some CMPP enrollees are located and remain in Texas. DX4 at 2. Putting aside for the moment the particular question of how the CMPP funds from the Act would increase the number of aliens in Texas, *see* Section 4.C.ii., *infra*, the Court concludes that Texas has shown a cognizable injury-in-fact.

Beginning with health care, the Texas Health and Human Services Commission provides "three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage." PX4 at 2. All States are required by federal law to provide Emergency Medicaid coverage to aliens, which is jointly funded by the federal government and the States. *See id.*; 8 U.S.C. § 1611(b)(1)(A). As a result, Texas is legally obligated to bear part of the cost of Emergency Medicaid for qualifying aliens. Texas estimates that Emergency Medicaid coverage to illegal aliens has cost it tens of millions of dollars annually since 2019. PX4 at 3–4. Similarly, to provide CHIP Perinatal Coverage to such aliens, Texas has spent $11.1 million in 2019; $16.9 million in 2020; $25.8 million in 2021; and $30.9 million in 2022. *Id.* at 4–5. These costs vary annually because they are "affected by both the volume and cost of services provided and annual changes in the percentage of expenditures matched by the federal government." *Id.* at 5. As a result, if there are more aliens in the State, Texas faces a substantial risk that it will incur greater costs related to these health care expenditures.

Next, Texas has established that it must increase expenditures for public education with an increase in alien children. All States are required to provide free public education to undocumented children. *Plyler*, 457 U.S. at 230. The Texas Education Agency estimates

– 47 –

that "the average funding entitlement from state and local sources for fiscal year 2023 will be $9,564 per student in attendance for an entire school year." PX2 at 1. For those students that qualify for additional bilingual education, which applies to most alien children, Texas must spend approximately $11,781 to educate each student. *Id.* Texas has historically faced a sizeable number of such alien children in its schools. For example, from October 2021 to September 2022, 19,071 alien children were released to sponsors in Texas, resulting in $224.67 million in educational expenses. *Id.* at 2–3. Such costs from these children would continue so long as they are enrolled in Texas schools. In sum, any additional alien child enrolled in and attending Texas public schools increases Texas's educational expenditures. *Id.* at 3.

Finally, Texas also incurs law-enforcement related costs from aliens. The Texas Department of Criminal Justice (TDCJ) spends $77.49 systemwide for each day an inmate is incarcerated. PX3 at 2. For fiscal year 2022, the TDCJ held 6,914 undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law. *Id.* at 1–2. Based on the number of aliens and the days each was held, TDCJ spent $156,501,516 to incarcerate these aliens. *Id.* at 2. While the federal government reimburses some of this cost, such compensation is minimal. *See id.* at 2–3. For example, in fiscal year 2021, TDCJ spent $153,786,422 in incarceration costs for such criminal aliens but was reimbursed only $14,883,040. *Id.* at 3. Accordingly, "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." *Id.*

These foregoing costs satisfy the injury-in-fact requirement. As previously stated, financial injuries are quintessential injuries-in-fact for standing purposes. *Collins*, 141 S. Ct.

at 1779.  More specifically, courts in the Fifth Circuit routinely find these exact types of

financial harms to constitute injuries-in-fact.  *E.g.*, *Gen. Land Off.*, 71 F.4th at 272; *Texas*

*(DACA)*, 50 F.4th at 517–18; *State (MPP I)*, 10 F.4th at 546–47; *Texas v. United States (100-Day*

*Pause)*, 524 F. Supp. 3d 598, 620–21 (S.D. Tex. 2021).  These financial injuries are concrete

and particularized to Texas, and given that Texas currently provides and must continue to

provide health care and public education to aliens and plans to continue incarcerating

criminal aliens, these injuries are certain to occur in the future.  PX2; PX3; PX4; *see also*

*Texas (100-Day Pause)*, 524 F. Supp. 3d at 620–21.

> ### ii.  Traceability

But the required analysis does not end there.  Texas must also prove that its injuries-

in-fact are fairly traceable to the CMPP funding at issue in this case.  To do so, Texas must

demonstrate that the CMPP would increase the number of aliens in Texas and that some of

those aliens would be incarcerated by TDCJ, would attend Texas public schools, or would

use the health care services offered to such aliens.  *See Texas (100-Day Pause)*, 524 F. Supp. 3d

at 622.

While Texas may be able to show some injury connected to past CMPP funds, it has

failed to prove by a preponderance of the evidence that the 2023 funds at issue will result in

any injury to the State.  Importantly, at this point, it is undisputed that no organization has

been awarded the 2023 funds, and there is no guarantee that the money will go to an entity

in Texas.  And Texas's response that the recipient of the funds is irrelevant is unavailing

because it has not provided the Court with evidence suggesting that the CMPP will increase

immigration into Texas if there were no CMPP site in Texas funded by the 2023 funds.

a.      Past CMPP Funding

As detailed earlier, the CMPP is part of ICE's Alternatives to Detention programs.
PX5.  The Alternatives to Detention programs permit "eligible non-detained noncitizens to
remain in their communities pending the outcome of their immigration cases."  DX7 at 1.
The CMPP applies only to those who are on ICE's non-detained dockets and "plays no role
in ICE [Enforcement and Removal Operations]'s decision to release an individual from its
custody."  *Id.* at 2.  Accordingly, the CMPP itself does not result in the release of persons
from ICE's custody and does not dictate the federal government's arrest or prosecution
policies, which are instead impacted by other laws and regulations not at issue in this case.
*See id.*  Instead, the CMPP is one of ICE's programs for persons after Enforcement and
Removal Operations decides not to detain the individual based on other laws, regulations,
and policies.  *Id.*; PX6.  Unlike the other Alternatives to Detention programs, the CMPP is
overseen by the CMPP National Board and the subrecipients—not ICE itself.  DX7 at 2;
PX7 at 1.  And, notably, CMPP enrollees are not subjected to the technology-monitoring
requirements of the other Alternatives to Detention programs.  *See* PX8 at 4.  An alien
enrolled in Alternatives to Detention may voluntarily enroll in the CMPP if in a geographic
location served by a CMPP subrecipient.  *Id.*; *see* DX4 at 2.  Once enrolled, there is no
requirement for the alien to remain in the geographic region, but to receive services "he or
she must reside in the geographic location served by the relevant nonprofit subrecipient."
DX4 at 2.

The Consolidated Appropriations Act of 2021 and 2022 each provided two tranches
of CMPP funding.  These past funds have gone through the full application process and for
both, BakerRipley, a Houston organization, has been a subrecipient of the funds.  *See* DX13;

*2022 CMPP Subrecipient Announcement*, *supra*.  With these funds, the subrecipients must

provide case-management services in their geographic locations, "including but not limited

to: mental health services; human and sex trafficking screening; legal orientation programs;

cultural orientation programs; [and] connections to social services."  DX9 at 3.  Such

connections to social services include helping aliens access health care and schooling.  *Id.* at

3–4.  In fact, the CMPP National Board specifically considers an organization's ability to

connect aliens to "health screening and medical services" and "school enrollment" in its

selection process, and a subrecipient's performance is judged in part on its success in

facilitating such connections.  *Id.* at 17–18.  Accordingly, some of these past funds have

gone to BakerRipley in Houston with the aim that it will help those enrolled in the CMPP

access health care and education services in Houston.

The CMPP aims "to serve a minimum of 2,800 individual with a goal of serving

5,000 or more."  PX8 at 3.  To recruit aliens to enroll in the CMPP, in April 2023,

BakerRipley was provided contact information for a randomized group of individuals

enrolled in Alternatives to Detention.  PX8 at 5; DX11 at 3–4.  As of October 31, 2023, only

138 aliens had enrolled in the CMPP in Texas, however "[a]t least two CMPP participants

have left Texas, either moving to another state or returning to their country of citizenship."

DX4 at 2.  Based on this information, the past CMPP funding has resulted in some aliens

enrolling into the CMPP in Texas and therefore being connected to Texas's social services

such as health care and education.

Texas has not provided specific evidence of any person who will attend its schools or

use its medical services who would not have in the absence of the CMPP.  But this is not

necessarily fatal.  *See Texas v. Biden (MPP II)*, 20 F.4th 928, 971 (5th Cir. 2021), *rev'd on other*

*grounds*, 597 U.S. 785 (2022).  For large-scale policies, a state plaintiff may rely on "large-scale statistics and figures, rather than highly specific individualized documents" and therefore can show standing even if there is some possibility that any given person would inflict such costs even without the challenged action.  *Id.*  For example, the Fifth Circuit rejected the federal government's argument that Texas lacked standing based on its driver's license fee injury where it had not shown that it had issued a license to someone who became eligible for a license due to the challenged action.  *Id.*  Instead, the Fifth Circuit stated that the "big-picture evidence" that the challenged action "increas[ed] the number of [paroled aliens] and the fact that many of those parolees will apply for Texas licenses" made it "impossible to imagine" that the challenged action would not cost Texas money.  *Id.*

But these large-scale policies typically involve at least tens of thousands of migrants. *See, e.g.*, *id.* at 948.   For example, the Migrant Protection Protocols involved over 68,000 aliens, *id.*, DACA covered around 1,500,000 aliens and DAPA applied to approximately 4,300,000 aliens, *Texas (DACA)*, 50 F.4th at 508–09.  Given the evidence before the Court that only 138 persons had enrolled in the CMPP in Texas by the end of October after six months of BakerRipley's recruiting, DX4 at 2; DX11 at 4, the Court questions whether the CMPP can be classified as a similar large-scale policy and, as a result, whether the lack of specific evidence is fatal in this case.[11]  Nevertheless, for the reasons that follow, the Court need not resolve this issue.

### b.    The 2023 Funds

Even if the foregoing were sufficient to show Texas's financial injuries from increased immigration are traceable to past CMPP funds, Texas has not demonstrated that

---

[11] Moreover, at least two of those 138 enrollees had already left Texas by that time.  DX4 at 2.

its injuries are fairly traceable to the only funds at issue here—the 2023 funds.  There is no guarantee that the 2023 funds will go to BakerRipley or any other organization in Texas. Additionally, there is no evidence before the Court explaining how the CMPP's existence will increase the number of aliens in Texas and those using its services in the absence of a subrecipient helping connect people to such services.

Supreme Court precedent establishes that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of [that] statute's operation or enforcement," not just an injury from the operation of *some* statute.  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *Clapper*, 568 U.S. at 410.  As a result, to show standing, a plaintiff cannot point to other provisions that operate independent of the challenged one.  *California v. Texas*, 593 U.S. ----, 141 S. Ct. 2104, 2119– 20 (2021).  Accordingly, no matter the effect of the past years of CMPP funding, Texas cannot show that it has standing solely by pointing to those expenditures because they are not before the Court, and no remedy here could possibly stop that harm.  *See id.*  So, to the extent that Texas's injuries are connected to the CMPP funding due to the actions of a subrecipient in the State encouraging aliens to use its services, it must demonstrate that the 2023 funds will be awarded to a Texas entity.  It has not done so at this point in time.

At this point, there is no evidence to show that the funds will actually go to Texas such that the Houston program will continue to be funded by the CMPP appropriation at issue or that some other location in Texas would be chosen.  CMPP funds go through a two-stage award process before any subrecipient receives them.  As detailed earlier, the grant process takes many stages and years to complete.  *See* Section 2.I, *supra*; DX8 at 2–4; DX11 at 3–4.  For the 2023 funds, FEMA has not yet awarded the funds to the National

Board, and no subrecipients have been selected.  DX4 at 3.  Based on the timeline for the

past awards to subrecipients, the funds are unlikely to be awarded to a subrecipient until

November or December 2024.  Moreover, "[t]he National Board's subgrant awards to

subrecipients do not automatically renew." *Id.* at 2.  Instead, an organization must apply

again each time there is a funding opportunity and must be selected again by the National

Board. *Id.* at 2–3.  There is no guarantee that the National Board will select an existing

CMPP provider for future subgrants as "[t]here is no obligation to provide future funding

from the . . . 2023 Appropriations Act to past recipients." *Id.*  And the fact that a Texas

nonprofit received funds from past appropriations acts "does not mean that nonprofit

organizations in [Texas] will necessarily receive subgrants in the future."  DX11 at 4.

Accordingly, although BakerRipley received funds from both the 2021 and 2022 Acts, it

may not receive any of the 2023 funds.

This is not a mere empty possibility.  The other subrecipient from 2021, a New York

organization, did not receive funding from the 2022 Act, and no other New York

organization was awarded funding.  DX11 at 3; *2022 CMPP Subrecipient Announcement*,

*supra*.  As a result, the Court cannot conclude based on the record before it that it is more

likely than not that the 2023 funds will go to BakerRipley or another Texas organization.

In response to this reality, Texas argues that what actually happens with the funding

is irrelevant because "the [CMPP] lowers the opportunity cost of illegally immigrating to the

United States . . . even for those who ultimately do not receive the benefit of the program."

Dkt. No. 38 at 23.  In essence, Texas contends that the CMPP funding injures the State by

the message it sends—"that the federal government's priorities have shifted from deterring

such immigration to facilitating a transition into living in the United States." *Id.*  Aliens

need not actually participate in a CMPP program to see that the continued funding of these Alternatives to Detention programs indicates that the federal government is more focused on helping them integrate into local communities than deterrence, detention, and removal. Once in those communities, the various states will face the health care, education, and law-enforcement costs demonstrated by Texas.  Moreover, Texas argues that these messages encourage illegal immigration into Texas right now.

Certainly, access to governmental social services and integration into the community rather than detention may encourage immigration.  *See generally* 8 U.S.C. § 1601(2) (noting that the "availability of public benefits" can "constitute an incentive for immigration"). Knowing that the existing program will continue, people may then illegally enter Texas because of its position along the border and because of their knowledge that it is the site of one of the current pilot programs for the CMPP.  Moreover, those currently present in Houston who may consider leaving the United States or going to another state may decide to stay in Texas because of the program created by the previous funding and a belief that the additional appropriation means that this assistance to finding services will continue.  Even if the money ultimately goes elsewhere, the broader message might incentivize immigration into Texas and its attendant costs.

But Texas has provided no evidence at trial of this impact tied to the CMPP.  Texas has presented the Court with nothing but speculation that the CMPP's existence could create this signaling effect, which is insufficient to establish standing.  At the point where the message of a statute is creating an injury, it is difficult to see how a single year of CMPP funding is fairly traceable to that injury rather the decisions of third parties based on a litany of other immigration policy decisions made by the federal government that encourage illegal

immigration but are not before the Court.  The Court certainly cannot make such an inference based on the limited record here.  There are numerous programs and policies, including previous years of CMPP funding, that provide the messaging that might create this injury.  And while the existence of other programs that also encourage illegal immigration does not mean that the CMPP cannot cause Texas's injury, Texas lacks evidence demonstrating that the funding for the CMPP itself leads to greater illegal immigration into Texas and use of its services.

The Court emphasizes that the problem here is not that many circumstances, policies, and programs can influence an alien's decision to immigrate to and remain in Texas, but that Texas has not proven that the funding at issue here actually plays any causal role in that decision.  Unlike the other immigration programs that Texas has challenged over the years, this one lacks a tangible tie to increased immigration or the resulting costs. For example, in the DAPA case, Texas had evidence that the legal status itself would lead to aliens in Texas being eligible for driver's licenses, which Texas would have to subsidize. *Texas v. United States* (*DAPA*), 809 F.3d 134, 155 (5th Cir. 2015).  In the border-wall case, Texas showed that the physical barrier was effective at deterring immigration.  *Gen. Land Off.*, 71 F.4th at 272–73.  In its challenge to DACA, Texas presented evidence that 22% of DACA recipients stated they would likely leave if DACA ended.  *Texas (DACA)*, 50 F.4th at 519.  In the detention case, there was evidence demonstrating that people would be released and stay in Texas.  *E.g.*, *Texas (MPP II)*, 20 F.4th at 966–67.  And in the 100-day pause-on-removals case, Texas showed that about 16,000 aliens would not be removed from Texas cities if removals were paused.  *Texas* (*100-Day Pause*), 524 F. Supp. 3d at 622–23.

Here, Texas has not provided this Court with any evidence comparable to those cases. Texas did not present evidence of any alien indicating that the CMPP has played any role in the decision to come to or remain in Texas. Nor has it shown that the CMPP has facilitated an alien's access to Texas's social services or that any alien would consider leaving if additional CMPP funding ceased. It has not provided any witnesses or affidavits stating that persons currently enrolled in the CMPP plan to stay in Texas due to the 2023 funds.

Instead, the Court only has evidence of those already in the Alternatives to Detention program in Texas, PX13, information on costs from illegal immigration writ large, PX2; PX3; PX4; PX11, and the 138 aliens who enrolled in the CMPP in Texas under earlier funding, DX4 at 4. None of this proves by a preponderance of the evidence that the 2023 funds will exacerbate Texas's cited expenses. *Cf. Texas (DACA)*, 50 F.4th at 519. The CMPP does not release people from ICE custody. It does not provide relief from removal or deem individuals to be lawfully present. At most, it exempts persons in the program from the technology monitoring of other Alternatives to Detention programs and helps connect them to various social services. But to receive services under the CMPP, a person must already and continue to reside in the geographic location served by the CMPP. DX4 at 2. Accordingly, to the extent that the CMPP plays any role in an alien's decision to enter or remain in the United States, the benefits of the CMPP's funds are tied to the location served by those funds. And, as explained, there is no guarantee that any 2023 funding will go to Texas.

Consequently, in the absence of evidence of how the 2023 funds will cause more aliens to enter or remain in Texas, Texas has not shown how any increased costs are fairly traceable to the challenged appropriation.

### iii.   Redressability

Even if Texas had evidence demonstrating that the CMPP funds impact the number of aliens enrolling in its public schools or obtaining emergency health care by signaling the federal government's immigration priorities, Texas has not shown how an injunction of the CMPP funds would remedy its harm.

To reiterate, Texas claims that what actually happens with the 2023 funds is irrelevant because the existence of the program and federal funding aimed at helping aliens connect to social services in their communities makes clear that the federal government prioritizes community integration over deterrence and removal. *See* Dkt. No. 38 at 23.  And to those aliens considering immigrating or those currently present who might otherwise leave, this message may make them more willing to enter or to remain because this message indicates that they are more likely to obtain their goal of living in the United States long-term.

Assuming arguendo that there was evidence of this effect, it is unclear how the Court could cure the claimed harm caused by this message.  After all, the remedies sought here are an injunction of the CMPP funds and a declaratory judgment.  Neither can change the federal government's immigration priorities.  Nor can these remedies signal to aliens that they are likely to be deported or detained if they unlawfully enter or remain in Texas.  At most, the Court could prevent the distribution of one year of the CMPP funds based on the alleged constitutional deficiency in the passage of the Act.  But if, as Texas claims, the

actual receipt of the funds is irrelevant to its harm, then enjoining the federal government from providing the funds to a nonprofit or local government would not alleviate Texas's harm.  Under these circumstances, Texas has not shown by a preponderance of the evidence how the Court can remedy any harm from the 2023 CMPP funds if it were to succeed on the merits of its claim.

As a result, the Court concludes that Texas has failed to carry its burden to show an injury-in-fact that is fairly traceable to the CMPP funds that could be remedied by a favorable verdict.  Texas therefore lacks standing to challenge the appropriation of the 2023 CMPP funds.  Nevertheless, Texas has standing to challenge another provision of the Act— the PWFA—so the Court proceeds to the remaining justiciability arguments to determine whether it can reach the merits of Texas's claim.

In light of the Court's finding that Texas lacks standing to challenge the CMPP, the Court dismisses those defendants whom Texas has sued based solely on the CMPP funds.  Accordingly, (1) Alejandro Mayorkas, in his official capacity as the Secretary of DHS; (2) DHS; (3) Patrick Lechleitner, in his official capacity as the Acting Director of ICE; (4) Peter E. Mina, in his official capacity as the official exercising the authority of the Officer of Civil Rights and Civil Liberties of DHS; (5) the Office of Civil Rights and Civil Liberties; (6) Deanne Criswell, in her official capacity as the Administrator of FEMA; (7) FEMA; and (8) Joseph R. Biden, Jr., in his official capacity as the President of the United States are all dismissed as parties to this litigation.[12]

---

[12] As a result, the defendants' other grounds for dismissing Texas's claims against President Biden are moot, *see* Dkt. No. 52 at 49–50, and the Court need not address them.

5.      **The enrolled bill doctrine does not preclude Texas's claim.**

Under the enrolled bill doctrine, after a bill is signed by the leaders of the House and Senate, signed by the President, and filed by the Secretary of State, the bill is considered enrolled and conclusively proven to have been passed by Congress.  *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672 (1892).  Courts therefore may not consult legislative journals to resolve questions of whether the law in question is the same one that passed either house of Congress and that the President signed.  *Id.* at 668–73.  The defendants assert that this doctrine forecloses Texas's Quorum Clause challenge because the Court should "refrain from looking at extrinsic evidence to impeach the validity of an enrolled bill, deferring to the House's implementation of its own rules."  Dkt. No. 52 at 44.  Texas counters that the enrolled bill doctrine is inapplicable to its challenge—a legal dispute about a potential violation of a binding constitutional requirement.  Dkt. No. 38 at 28–30.

Given the unique circumstances of this case, the Court concludes that the enrolled bill doctrine does not preclude it from reaching the merits.  While somewhat opaque, Supreme Court precedent on the scope of the enrolled bill doctrine establishes two key points that together instruct that this case is justiciable.  First, the doctrine shields from judicial inquiry non-constitutional and fact-intensive disputes over Congress's passage of a bill.  Thus, when a party challenges whether each house of Congress passed a bill with identical text, the enrolled bill doctrine dictates that a court must treat the enrolled bill as indisputable evidence that the enrolled text was adopted by both houses.  Otherwise, courts would be dragged into extensive fights comparing the text presented to each chamber and the President to the one officially enrolled.  However, when the dispute turns on a clear constitutional limitation on Congress's power that does not devolve into battles over

conflicting legislative records, the mere act of enrollment cannot thwart a court's ordinary power to resolve constitutional challenges.

Second, to the extent that quorum-based challenges can implicate the principles of the enrolled bill doctrine, the Court must first resolve any challenge to the constitutionality of the procedural rule at issue that was used by the House or Senate to determine the existence of a quorum.  In contrast, if a party merely challenges the quorum based on a claim of miscounting, a court should apply the enrolled bill doctrine to bar such factual second-guessing.

Here, Texas's claim rests on the purely legal contention that the House violated the Constitution when it passed the Act because it only had a quorum due to its rule permitting physically non-present members voting by proxy to count towards the quorum.  This particular challenge falls outside of the enrolled bill doctrine's scope, and it is the Court's obligation to resolve the constitutional challenge presented.[13]

### A.      Enrolling a bill does not ordinarily preclude constitutional challenges.

Supreme Court precedent provides that "[w]here, as here, a constitutional provision is implicated" in a plaintiff's challenge to a congressional act, the enrolled bill doctrine "does not apply." *United States v. Munoz-Flores*, 495 U.S. 385, 391 n.4 (1990) (emphasis omitted).  The doctrine "concerns 'the nature of the evidence the Court [may] consider in

---

[13] In a separate challenge to the proxy voting rule at issue here, the D.C. Circuit found the case to be precluded by the Speech and Debate Clause.  *McCarthy v. Pelosi*, 5 F.4th 34, 37, 41 (D.C. Cir. 2021).  In that case, the House Minority Leader sued various officers of the House on the basis that the proxy rule was unconstitutional.  *Id.* at 38.  The Speech and Debate Clause precluded that case on the basis that the defendants were immune from a challenge to the promulgation of a rule since it was a core legislative act.  *Id.* at 38–39.  Because none of the defendants here are members of the legislature covered by the Speech and Debate Clause, it is inapplicable to the present challenge.  *See id.* at 38.  The defendants do not dispute that legislative immunity does not apply here.  *See generally* Dkt. Nos. 52; 63.

determining whether a bill had actually passed Congress,'" and it establishes that "a law consists of the 'enrolled bill,' signed in open session by the Speaker of the House of Representatives and the President of the Senate." *U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 n.7 (1993) (first quoting *Munoz-Flores*, 495 U.S. at 391 n.4; and then quoting *Marshall Field*, 143 U.S. at 672). As a result, because most constitutional challenges do not question what the proper text of the law is and whether a bill has actually passed Congress, the enrolled bill doctrine is inapplicable. While this exception for constitutional claims is not absolute because some challenges involve judicial inquiry into the law's text or actual passage, Texas's claim is not such an inquiry.

The case where the Supreme Court adopted the enrolled bill doctrine as a principle of federal law, *Marshall Field & Co. v. Clark*, demonstrates the type of claim with which the doctrine is primarily concerned. In *Marshall Field*, the plaintiffs challenged a tariff act on the basis that a section of the bill as passed had been omitted from the enrolled bill. 143 U.S. at 668–69. Essentially, they claimed that the congressional record revealed that each house had voted on a version of the bill that included a section that was missing from the version of the bill that was signed by the presiding officers of the two houses and the President. *Id.* Their case relied on comparing the text of the bill as published in the congressional journals with the text in the Statutes at Large. *See id.* at 668–70. The Supreme Court rejected their challenge and held that the act of enrollment "authenticat[es]" a bill as one "that has passed Congress" and cannot be impeached by investigating congressional records. *Id.* at 672.

In adopting this rule, the Supreme Court noted its concern that resorting to congressional journals would "mak[e] the validity of [c]ongressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate

officers charged with the duty of keeping them." *Id.* at 673.  Moreover, the Constitution

does not require Congress to include the full text of the bills in the journals even though it

does expressly require certain votes to be entered on the record.  *Id.* at 667, 671.  In light of

this distinction, the Supreme Court left unanswered "[t]o what extent the validity of

legislative action may be affected by the failure to have those matters entered on the

journal." *Id.* at 671.  Likewise, while *Marshall Field* relied extensively on state court

decisions applying the enrolled bill doctrine, *id.* at 673–77, it distinguished state court cases

that involved "constitutional or statutory provisions of a peculiar character, which,

expressly[] or by necessary implication, required or authorized the court to go behind the

enrolled act" to determine whether it was duly enacted, *id.* at 678.

Ultimately, *Marshall Field* rejected an attempt to look for inconsistencies in the

congressional record and the enrolled bill to question what the proper text of the law was

and whether all requisite bodies had agreed to the same text.  *Id.* at 672, 679–80.  Instead,

because the act of enrollment involved officers of both houses and the President agreeing

that the text was the proper law, courts must accept that pronouncement as definitive proof

of what language was passed.  *Id.*

Since *Marshall Field*, the Supreme Court has twice reiterated that the enrolled bill

doctrine is a principle of evidence concerned with disputes over whether a bill has indeed

passed Congress and that it has limited applicability in constitutional challenges.  First, in

*Munoz-Flores*, the Supreme Court rejected an argument that a court must accept that an

enrolled bill designated as "House Joint Resolution" or "H.J. Res." originated in the House

for purposes of an Origination Clause challenge.  495 U.S. at 391 n.4; *see id.* at 408–09

(Scalia, J., concurring in judgment); U.S. Const. art. I, § 7, cl. 1.  While Justice Scalia in a

solo concurrence in judgment argued that *Marshall Field* dictated that a court should treat the "H.J. Res." designation as definitive proof of its origin, *id.* at 408–09, the majority concluded that a court could "independently consider[]" a bill's origin because the challenge does not involve a question of "whether a bill had actually passed Congress," *id.* at 391 & n.4 (majority op.).  Further, the majority remarked that "[w]here, as here, a constitutional provision *is* implicated, *Field* does not apply."  *Id.* (emphasis in original).  Second, in *U.S. National Bank of Oregon*, the Supreme Court again found the enrolled bill doctrine to be "irrelevant" where "there is no doubt in the[] case[] that the [challenged act] as printed in the Statutes at Large is identical to the enrolled bill."  508 U.S. at 455 n.7.  Given that the present challenge does not involve a factual dispute as to whether the text of the bill at issue passed Congress and implicates a constitutional provision, these cases indicate that the enrolled bill doctrine is inapplicable here.

Although *Munoz-Flores* rejects the idea that the enrolled bill doctrine would foreclose a constitutional challenge such as Texas's, *see* 495 U.S. at 391 n.4, the defendants argue that the relevant language cannot be read as broadly as it may seem.  Dkt. No. 52 at 47.  They rely principally on two post-*Munoz-Flores* cases from the D.C. and Second Circuits, *see id.* at 47–48, where those courts held that *Munoz-Flores* does not "overturn or modify the enrolled bill rule of *Marshall Field*."  *Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1352–54 (D.C. Cir. 2007); *OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197, 206–07 (2d Cir. 2007).  But those cases involved challenges nearly identical to the one at issue in *Marshall Field*, unlike the present case, and do not support construing *Munoz-Flores* as creating a one-off enrolled bill doctrine exception for Origination Clause cases.

More specifically, *Public Citizen* and *OneSimpleLoan* arose from challenges to the Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109–171, 120 Stat. 4 (2006). *OneSimpleLoan*, 496 F.3d at 198–99; *Pub. Citizen*, 486 F.3d at 1343.  The plaintiffs argued that the DRA was unconstitutional pursuant to the Constitution's Bicameralism and Presentment Clause "because the bill passed by the House of Representatives was not identical to the bill passed earlier by the Senate and presented later to the President" as shown by differences in the bill transmitted from the Senate to the House and the enrolled bill.  *OneSimpleLoan*, 496 F.3d at 199; *Pub. Citizen*, 486 F.3d at 1343; *see also* U.S. Const. art. I, § 7, cls. 2–3.  At their core, these arguments are the same inconsistent-text challenge at issue in *Marshall Field*.  Nevertheless, citing *Munoz-Flores*, the plaintiffs argued that their claims were not barred because the Bicameralism and Presentment Clause requires that the same text be approved by both the Senate and the House and signed by the President. *OneSimpleLoan*, 496 F.3d at 206–07; *Pub. Citizen*, 486 F.3d at 1343–44; *see Clinton v. City of New York*, 524 U.S. 417, 448 (1998).  Unable to distinguish the DRA challenges from the one in *Marshall Field*, the courts construed both as bicameralism and presentment challenges and rejected the plaintiffs' claims that *Munoz-Flores* had overruled *Marshall Field*'s prohibition of challenges that the enrolled bill was not the one passed by each house of Congress. *OneSimpleLoan*, 496 F.3d at 204–06; *Pub. Citizen*, 486 F.3d at 1350–51.  These cases therefore do not reject *Munoz-Flores*'s exception as mere dicta but instead construed it as overbroad.  Neither case persuades the Court that Texas's constitutional challenge is foreclosed.

The Court recognizes that in some cases, although a claim is constitutional in nature, its resolution requires inquiry into what the proper text of a law is and whether a bill has

actually passed Congress.  Those questions are foreclosed by a bill's enrollment.  Thus, even though the claims in *Public Citizen* and *OneSimpleLoan* implicated the Bicameralism and Presentment Clause, the enrolled bill doctrine applied.  However, most constitutional challenges, including the one brought here by Texas, do not raise these concerns and are therefore beyond the enrolled bill doctrine's scope.

Other courts and scholars have recognized this distinction as valid.  For example, the district court in *Public Citizen* noted that *Munoz-Flores* determined "that *Marshall Field* does not apply when the Constitution itself sets with particularity a procedure to be followed in preparing a bill for passage," except for the "ultimate act of bicameral passage" that was at issue in *Marshall Field*.  *Pub. Citizen v. Clerk, U.S. Dist. Ct. for D.C.*, 451 F. Supp. 2d 109, 123 (D.D.C. 2006), *aff'd*, 486 F.3d 1342 (D.C. Cir. 2007).  Likewise, scholars have read *Munoz-Flores* as restricting the enrolled bill doctrine to bicameralism and presentment.  Matthew D. Adler & Michael C. Dorf, *Constitutional Existence Conditions and Judicial Review*, 89 Va. L. Rev. 1105, 1181 (2003); Ittai Bar-Siman-Tov, *Legislative Supremacy in the United States?: Rethinking the "Enrolled Bill" Doctrine*, 97 Geo. L.J. 323, 351–52 (2009); Vikram Amar, *Why the "Political Question Doctrine" Shouldn't Necessarily Prevent Courts from Asking Whether a Spending Bill Actually Passed Congress Part Two in a Series*, FindLaw (Apr. 13, 2006);[14] *see also* Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. Chi. L. Rev. 361, 426 n.209 (2004); Victoria F. Nourse, *The Constitution and Legislative History*, 17 U. Pa. J. Const. L. 313, 336 (2014).

---

[14] Available at: https://supreme.findlaw.com/legal-commentary/why-the-political-question-doctrine-shouldnt-necessarily-prevent-courts-from-asking-whether-a-spending-bill-actually-passed-congress.html [https://perma.cc/Q7DV-9U8Q].

In this case, Texas's claim implicates a constitutional provision and does not contest whether the Act contains the text adopted by Congress.  As a result, resolving this challenge does not require the Court to undertake the type of comparisons between legislative records and the Statutes at Large prohibited by *Marshall Field*.  Nor must the Court otherwise question whether Congress passed the bill.  Instead, Texas asks the Court to resolve a traditional constitutional challenge—whether the House had the power to pass the Act. This Quorum Clause challenge is similar to other constitutional challenges of congressional acts, such as First Amendment or Commerce Clause challenges, which are not prohibited simply because the leaders of the two houses of Congress and the President signed the bill. These signatures foreclose debate over what language was presented to and agreed upon by Congress and the President but provide no definitive proof that Congress had the power to pass the legislation.  Accordingly, Texas's Quorum Clause challenge falls outside the traditional scope of the enrolled bill doctrine.

> **B.    In the context of quorums, the Court must resolve a constitutional challenge to the validity of the congressional rule providing a quorum before applying the principles of the enrolled bill doctrine.**

Beyond the general principle exempting constitutional challenges from the enrolled bill doctrine, the doctrine also does not—in the context of quorum-based challenges specifically—preclude a court from determining whether the rule that provided the House with a quorum was valid.  The principles of the enrolled bill doctrine can preclude fact-intensive quorum-based challenges that involve second-guessing the number of members counted and recorded by either house of Congress.  But when the case involves determining whether the rule used to reach those numbers is constitutional, a court must resolve that issue even though the bill is enrolled and the House states that it had a quorum.  As a result,

the constitutional challenge here to the House's rule that permitted it to include non-present members participating by proxy as part of the quorum can be considered despite the House's declaration that it had a quorum.

Supreme Court precedent makes this clear.  In *NLRB v. Noel Canning*, the Court explained that if the congressional record or the journal of either house "indicates that a quorum was present, *under a valid [House or] Senate rule*, at the time [it] passed a bill, [a court] will not consider an argument that a quorum was not, in fact, present."  573 U.S. 513, 551 (2014) (emphasis added).  Courts assume that the congressional journals "speak the truth" of the proceedings and do not engage in evidentiary disputes over whether those records were properly kept.  *Id.* at 551–52 (quoting *United States v. Ballin*, 144 U.S. 1, 4 (1892)).  Nevertheless, the record of a quorum must have been determined "under a valid [House or] Senate rule" in order for this absolute deference to apply.  *Id.* at 551.  The rule must be valid because Congress "may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained."  *Ballin*, 144 U.S. at 5.

One such constitutional restraint is the Quorum Clause, which requires "the presence of a majority" in order for either house to transact business.  *Id.* at 6.  Accordingly, a court may consider whether the rule adopted by the House or Senate seeks only "to prescribe a method for ascertaining the presence of a majority" or instead seeks to evade the majority-presence requirement through a method "inhibit[ed]" by the Constitution.  *See id.*  If the rule at issue merely adopts a process to determine that a majority is present, the rule is likely

valid and the House's recognition that it had a quorum and could transact business resolves any quorum dispute. *Id.* at 6, 9.

The Supreme Court followed this method in *Ballin*, where the respondents challenged an enrolled bill on the basis that it had been passed by the House without the requisite quorum. *Id.* at 4–6, 9. The House Journal noted that only 138 members—less than a quorum—had voted on the bill. *Id.* at 4; H. Journal, 51st Cong., 1st Sess. 549–50 (1890); 21 Cong. Rec. 4026 (1890). But the record also noted the names of 74 members who were present and not voting, which, together with the voting members, constituted a quorum. H. Journal, 51st Cong., 1st Sess. 549–50 (1890); 21 Cong. Rec. 4026 (1890). Pursuant to a House rule adopted earlier that year, any member "in the hall of the house who d[id] not vote" counted as part of the quorum, and the clerk was directed to report the names of such members in the House's journal. *Ballin*, 144 U.S. at 5; *see* H. Journal, 51st Cong., 1st Sess. 549–50 (1890). To resolve this quorum question, the Supreme Court looked to the journal and noted that the quorum was found "in direct compliance with this rule." *Ballin*, 144 U.S. at 5. Therefore, the question presented was "the validity of this rule"—more specifically, whether the House had the power to adopt this rule. *Id.* The Supreme Court explained that the House's rule did not violate the Constitution because "all that [the] rule attempts to do is to prescribe a method for ascertaining the presence of a majority." *Id.* at 6. The Supreme Court further clarified that the Constitution only required a member's presence, not his "disposition or assent or action," to count in the quorum. *Id.* at 5–6. Accordingly, the bill lawfully passed the House because "a majority of its members were present when the bill passed," and "the presence of that quorum was determined in accordance with a valid rule" adopted by the House. *Id.* at 9.

As in *Ballin*, the question before the Court in this case is whether the House's rule that created a quorum is valid.  Here, too, the congressional record includes the vote total, the names of those voting on the Act, and the names of those who were included as part of the quorum based on the challenged House proxy rule.  *Compare* H. Journal, 51st Cong., 1st Sess. 549–50 (1890), *and* 21 Cong. Rec. 4026 (1890), *with* 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022).  Resolving Texas's quorum challenge involves only a narrow inquiry into the validity of the rule and the House's own recorded count of its members based on its rule.  The Court is not asked to question the numbers of the count or to look to affidavits or other evidence besides the House's records as to the existence of quorum.  Instead, the Court need only look to the same sources that the Supreme Court used in *Ballin* to resolve the Quorum Clause challenge.[15]  Just as the Supreme Court determined the validity of the House's rule that mandated including certain members in the quorum count, this Court may resolve Texas's challenge to the House's quorum rule even though the Act has been enrolled and the House previously decided it had a quorum.

Despite *Ballin*'s clear resolution of a challenge to the House's quorum rule, the defendants assert that the Court should nevertheless follow the approach of other courts that have rejected Quorum Clause challenges based on the enrolled bill doctrine.  Dkt. No. 52 at 45–46.  These cases involved a series of challenges by pro se criminal defendants to the passage of Public Law 80-772, which adopted 18 U.S.C. § 3231, the statute giving federal

---

[15] The defendants assert that "the sole evidence the Court potentially could consider" is the record of "the yeas and the nays" to resolve any quorum dispute.  Dkt. No. 52 at 47.  But as the Court has explained, had the Supreme Court in *Ballin* considered only the yeas and nays, no quorum would have been found.  *See* H. Journal, 51st Cong., 1st Sess. 549–50 (1890); 21 Cong. Rec. 4026 (1890).  Instead, this Court, as the *Ballin* Court did, may consider the yeas and nays along with the recorded names noted as counting as part of the quorum pursuant to the challenged rule.

courts jurisdiction over federal crimes.  *See, e.g.*, Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 826 (codified as 18 U.S.C. § 3231); *United States v. Farmer*, 583 F.3d 131, 151–52 (2d Cir. 2009); *United States v. Small*, 487 F. App'x 302, 303 (7th Cir. 2012); *United States v. Gonzalez-Arenas*, 496 F. App'x 866, 867 (10th Cir. 2012); *United States v. Levy*, 849 F. Supp. 2d 1353, 1354–56 (S.D. Fla. 2012).  In those cases, the defendants argued that the House had lacked a quorum when it voted on the bill, and the courts concluded that the enrolled bill doctrine precluded a Quorum Clause challenge.  *See Farmer*, 583 F.3d at 151–52; *Small*, 487 F. App'x at 303; *Gonzalez-Arenas*, 496 F. App'x at 867; *Levy*, 849 F. Supp. 2d at 1354–56.

Despite the defendants' assertion otherwise, those cases are inapplicable to the present case and are otherwise unpersuasive.  None of the cases cited by the defendants—or similar ones found by this Court—address *Munoz-Flores*'s instruction about *Marshall Field*'s limited application to constitutional challenges.  *See Farmer*, 583 F.3d at 151–52; *Small*, 487 F. App'x at 303; *Gonzalez-Arenas*, 496 F. App'x at 867; *Levy*, 849 F. Supp. 2d at 1355.[16] Similarly, none of them discuss *Noel Canning*'s statement that the journal's record of a quorum must have been determined by a valid congressional rule or *Ballin*'s inquiry into the validity of the rule—and for good reason.  None of those cases involved an actual challenge to the House's use of a particular rule to determine whether a quorum exists.  In fact, the

---

[16] *See also, e.g.*, *United States v. Davis*, Crim. No. 3:11-834-CMC, 2013 WL 12204904, at *1 (D.S.C. May 7, 2013); *Bodley v. Crabb*, No. 15cv98 MV/LAM, 2015 WL 12781709, at *2 (D.N.M. Mar. 19, 2015); *United States v. Hornback*, Crim. Action No. 3:10-13 & Civ. Action No. 3:13-7296, 2014 WL 2768872, at *16 (E.D. Ky. June 18, 2014); *Colby v. United States*, Nos. 2:15-cr-182 & 2:18-cv-429, 2019 WL 1783052, at *3 (D. Me. Apr. 23, 2019); *United States v. Anzaldi*, No. 11 CR 820, 2013 WL 393326, at *2 (N.D. Ill. Jan. 31, 2013); *Turner v. United States*, Crim. No. 09-180-WS-C & Civ. No. 11-327-WS-C, 2011 WL 5595939, at *1–5 (S.D. Ala. Sept. 8, 2011), *report and recommendation adopted by* 2011 WL 5597283 (Nov. 17, 2011).

vote challenged by those criminal defendants lacked a recorded vote count because the congressional records note only that the bill passed.  *See* H. Journal, 80th Cong., 1st Sess. 343–44 (1947); 93 Cong. Rec. 5048–49 (1947).  And earlier on the same day when the House voted on the challenged bill, a quorum call had been ordered where "297 Members had answered to their names, a quorum."  H. Journal, 80th Cong., 1st Sess. 341 (1947). Accordingly, those criminal defendants asked the courts to question the existence of a quorum—in the absence of any recorded vote or quorum count—based on reasons unrelated to a challenge to the rule used to find a quorum.  That type of quorum challenge presents markedly different concerns of judicial competence and inquiry into Congress's proceedings than this case.  And even if those cases were indistinguishable, none of them bind this Court.[17]

Here, the Court has the House's record of its vote, noting those voting in person and by proxy, and the central question to resolve is whether the Constitution permits the House to form a quorum by counting non-present members.  Texas does not ask this Court to second-guess the House's count or to attempt to determine whether a quorum existed in the absence of any contemporaneous record from the House itself.  Instead Texas asks this Court to resolve the same type of question that the Supreme Court answered in *Ballin*— whether the rule used by the House to determine that a quorum was present at the time this bill passed is valid.  The requisite inquiry is therefore narrow.  If the House determined that it had a quorum and its rule is valid, the quorum challenge ends.  But, if the rule is

---

[17] No party cites any Fifth Circuit authority regarding the enrolled bill doctrine, and this Court was able to locate only one Fifth Circuit case discussing it.  But that case cited *Marshall Field* solely to support the proposition that an Origination Clause challenge was nonjusticiable, a holding later rejected by *Munoz-Flores*.  *Tex. Ass'n of Concerned Taxpayers, Inc. v. United States*, 772 F.2d 163, 167 (5th Cir. 1985), *abrogated by Munoz-Flores*, 495 U.S. 385.

unconstitutional because those whom the House recorded as participating by proxy cannot count towards the quorum, then the Court need only look to the House's records, which show that less than a majority participated in the vote in person.  Either way, this case centers around a legal challenge to the House's rule where Texas does not contest the accuracy of the House's records.

And these types of claims are exceedingly rare.  Neither party points to a case involving a challenge to the House's or Senate's quorum rules besides *Ballin* itself—a case brought over 130 years ago.  And the proxy-voting rule at issue is likewise unique—never before and never since has the House permitted proxies to constitute a quorum.  Moreover, even for other bills passed through roll-call votes during the brief period when this proxy rule was in effect, the extensive number of members voting by proxy on the Act was atypical.[18]  Accordingly, the defendants' concerns about a deluge of future quorum litigation are overstated.  To the extent that the House or Senate adopts another novel quorum rule that raises constitutional concerns, a future plaintiff harmed by some act passed where a quorum was found under that rule may be able to challenge that act and quorum rule.  But permitting Texas's claim here does not sanction a challenge based on an alleged miscount by Congress or even the omission of a recorded count.  Here, the Court only recognizes that a challenge to the constitutionality of a rule used to find a quorum may be brought when a

---

[18] *See, e.g.*, 166 Cong. Rec. H2665 (daily ed. June 29, 2020) (431 votes with 34 votes by proxy); 166 Cong. Rec. H3038–39 (daily ed. July 1, 2020) (431 votes with 30 votes by proxy); 166 Cong. Rec. H3877–78 (daily ed. July 27, 2020) (368 votes in favor with 37 votes by proxy); 166 Cong. Rec. H7313–15 (daily ed. Dec. 21, 2020) (over 400 votes with 98 members voting by proxy); 167 Cong. Rec. H1783 (daily ed. Apr. 14, 2021) (over 400 votes with 32 votes by proxy); 167 Cong. Rec. H3051–52 (daily ed. June 23, 2021) (430 votes with 24 votes by proxy); 167 Cong. Rec. H4351–52 (daily ed. Aug. 23, 2021) (431 votes with 92 votes by proxy); 168 Cong. Rec. H5076 (daily ed. May 17, 2022) (428 votes with 59 proxy votes); 168 Cong. Rec. H8269–70 (daily ed. Sept. 29, 2022) (432 votes with 59 votes by proxy).

court can ultimately resolve the quorum question based on the uncontested congressional records.

In sum, Texas's Quorum Clause claim is not precluded by the enrolled bill doctrine. "Where, as here, a constitutional provision is implicated," the enrolled bill doctrine generally "does not apply." *Munoz-Flores*, 495 U.S. at 391 n.4 (emphasis omitted). And, as the Supreme Court reaffirmed in *Noel Canning*, the House's quorum count receives preclusive effect only if that determination was made "under a valid [House] rule." 573 U.S. at 551 (citing *Ballin*, 144 U.S. at 9). Accordingly, so long as no other justiciability doctrine bars this case, this Court can, and must, resolve Texas's challenge to the proxy rule before adopting the House's finding that it had a quorum.

### 6.     This case does not present a nonjusticiable political question.

The political question doctrine asks whether a case is nonjusticiable based on separation of powers concerns and a lack of judicial competency to resolve the question. *Baker v. Carr*, 369 U.S. 186, 210 (1962). The defendants assert that a Quorum Clause challenge is nonjusticiable based on this doctrine. Dkt. No. 52 at 48–49. They contend that the Constitution commits the determination of whether a quorum is present to the House and should not be second-guessed by the judiciary. *Id.* at 48. And they argue that the potential upheaval of undoing an omnibus appropriations bill is so substantial that this case is a "paradigmatic" example for why adherence to the House's decision is necessary. *Id.* Texas counters that the Quorum Clause is a limitation on the House's power, not a grant of discretionary authority, and that this case requires ordinary constitutional interpretation, not policymaking. Dkt. No. 38 at 24–28.

The Supreme Court has provided several considerations for determining whether a case involves a nonjusticiable political question:

> (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department";
>
> (2) "a lack of judicially discoverable and manageable standards for resolving" the issue;
>
> (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion";
>
> (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government";
>
> (5) "an unusual need for unquestioning adherence to a political decision already made"; and
>
> (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Baker*, 369 U.S. at 217.  "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence."  *Id.*  In analyzing these six attributes, a plurality of the Supreme Court has noted that "[t]hese tests are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality op.).

Here, Texas's challenge to the Quorum Clause does not present a nonjusticiable political question.  Rather than giving the House judicially unreviewable power, the Quorum Clause restricts the House's power, including its authority to make rules governing its proceedings.  In addition, Texas only asks the Court to interpret the Constitution and apply it to settled facts.  The question here is not whether proxy voting is good policy but rather whether the constitutional requirement that a majority be present to conduct business prohibits constituting a quorum via proxy.  This issue of interpretation, and then of applying that interpretation to presented facts, is judicial, not political.  Finally, while there are

– 75 –

prudential concerns inherent in opening the courthouse doors to a challenge that the House conducted business without a majority, all challenges to the constitutionality of congressional action carry similar risks.  Courts routinely interpret the Constitution and determine whether a bill conformed to its requirements.  The Court can do the same here.

### A.     The Quorum Clause is not a textually demonstrable constitutional commitment of power to the House.

"The dominant consideration in any political question inquiry is whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) (quotation omitted).  To decide whether there is a textual commitment to a coordinate branch, a court "must first determine what power the Constitution confers upon" the other branch "before [it] can determine to what extent, if any, the exercise of that power is subject to judicial review." *Powell v. McCormack*, 395 U.S. 486, 519 (1969).  If the text at issue "gives the House judicially unreviewable power," then the political question doctrine bars judicial review. *Id.* at 520.

For a textual commitment to exist, there must be some power or authority granted by the text at issue.  *See id.* at 519–20; *Nixon v. United States*, 506 U.S. 224, 229 (1993).  For example, the Supreme Court has held that the constitutional clause that states "[t]he Senate shall have the sole Power to try all Impeachments" is a textually demonstrable constitutional commitment of impeachment trials to the Senate because "[t]he commonsense meaning of the word 'sole' is that the Senate alone shall have the authority to determine whether an individual should be acquitted or convicted." *Nixon*, 506 U.S. at 299, 230–31 (quoting U.S. Const. art. I, § 3, cl. 6).  Beyond the text, the Supreme Court found further proof of this judicially unreviewable power based on the Framers' discussions over

the impeachment power and the rejection of the judiciary's role in impeachment. *Id.* at

233–36.  In contrast, the Supreme Court rejected the argument that "Each House shall be

the Judge of the Qualifications of its own Members" provided the House with unreviewable

power to exclude members-elect. *Powell*, 395 U.S. at 520–22, 547–48 (quoting U.S. Const.

art. I, § 5, cl. 1).  It instead held that the clause was "at most a 'textually demonstrable

commitment' to Congress to judge only the qualifications expressly set forth in the

Constitution," not to create any additional qualifications. *Id.*  Accordingly, when the House

had excluded a member-elect despite him satisfying the requirements set forth in the

Constitution, the Supreme Court determined that the case did not present a political

question. *Id.* at 489, 547–48.

Applying these principles here, the Court concludes that the Quorum Clause itself is

not a textual commitment of power in the context of this case because it does not grant

unreviewable power to the House to decide what constitutes a quorum.  Unlike the

constitutional text committing impeachment-trial power to the Senate, nothing in the

Quorum Clause denotes that the House or Senate has the power to define a quorum.  To the

contrary, the text specifies that "a Quorum" is "a Majority" of the House and that a quorum

is necessary for the House "to do Business."  U.S. Const. art. I, § 5, cl. 1.  By defining a

quorum and requiring its existence for the House to conduct business, the Clause restricts

the House's power by limiting the circumstances under which it can legislate, rather than

conferring unreviewable authority.

The debates over the Quorum Clause at the Constitutional Convention further

demonstrate that its original public meaning served as a limit on Congress's power. *See*

James Madison, *Notes of Debates in the Federal Convention of 1787*, at 425, 428–31 (W.W.

Norton & Co. 1987) (1840); *Powell*, 395 U.S. at 532–47 (discussing the Constitutional Convention debates and other historical practice in determining whether the provision at issue was a textually demonstrable commitment to Congress); *Nixon*, 506 U.S. at 233–36 (same). Some delegates argued that the Clause should be left out or otherwise limited to give Congress the power to set its quorum number. *See* Madison, *supra*, at 428–31. But this position was rejected based on other delegates' concerns that Congress could not be trusted with the power to set its own quorum requirement or that it would not be representative of the country as a whole in the absence of a majority requirement. *See id.* For the Framers, the Quorum Clause ensured that the branch of government most representative of the people acted only with a majority of its members. *See id.* The Framers feared that, in the absence of the Quorum Clause, the nation could be governed by a small subset, particularly by those members from states closest to the capital. *See id.*

At the trial in this case, the defendants conceded that the Quorum Clause is a restriction on Congress, though they nevertheless argued that it, in combination with the Rulemaking Clause, is a textually demonstrable commitment. Dkt. No. 109 at 90–91. But the Quorum Clause's function as a limit on Congress's power to act also explains why the Rulemaking Clause—"Each House may determine the Rules of its Proceedings"—cannot show a possible constitutional commitment of the quorum question to the House. *See* U.S. Const. art. I, § 5, cl. 2. The Rulemaking Clause generally is a "broad delegation of authority to the [House] to determine how and when to conduct its business." *Noel Canning*, 573 U.S. at 550. To be sure, the House's exercise of its rulemaking power is "absolute and beyond the challenge of any other body or tribunal." *Ballin*, 144 U.S. at 5. However, the House "may not by its rules ignore constitutional restraints." *Id.* That is, "the Rulemaking Clause

gives Congress no license to adopt unconstitutional rules" and "provides no cover for the House to unconstitutionally interpret or apply its rules." *Barker v. Conroy*, 921 F.3d 1118, 1126 (D.C. Cir. 2019).  Thus, where "an identifiable textual limit on the authority which is committed to the [House]" exists, the fact that a House rule is at issue and authorized the action is insufficient to make the controversy nonjusticiable.  *Nixon*, 506 U.S. at 238; *see also Ballin*, 144 U.S. at 5; *Noel Canning*, 573 U.S. at 551.

The defendants assert that the Rulemaking Clause permits the House to effectively adopt any rule to determine the existence of a quorum because the Constitution does not prescribe a specific method for doing so.  Dkt. No. 52 at 48–49.  They rely principally on the Supreme Court's statements in *Ballin* that the Constitution "requires . . . the presence of a majority" but "prescribe[s] no method of making this determination, and it is therefore within the competency of the [H]ouse to prescribe any method which shall be reasonably certain to ascertain the fact."  144 U.S. at 6.  But the defendants' argument is undermined by the very authority on which they rely.  *Ballin* itself determined whether the House's rule was valid rather than simply saying that the Constitution provides no limits.  *See id.* at 4–6.  And its analysis of the scope of the House's power does not suggest that the House may adopt a rule to declare that a majority is present in the absence of an actual majority.  Instead *Ballin* provides specific examples of different ways that a member could be identified as present, such as by "answer[ing] to roll-call" or "announc[ing] from the desk . . . the names of those who are present."  *Id.* at 6.  The House can choose such methods because they are "reasonably certain" to determine whether a majority is present, and none are "inhibit[ed]" by the Constitution.  *See id.*

None of these examples involve counting non-present members as present, determining that a minority of members constitutes a majority, or providing certain circumstances in which a member might not count towards the whole number out of which a quorum is to be determined. Such actions could defeat the Quorum Clause's requirements of the presence of a majority in order for the House to do business. But, as the defendants admitted at trial, their position is that even though the Quorum Clause restricts Congress's power, such actions—even the most extreme circumstances of a quorum-majority violation—are unreviewable so long as Congress acts under its rulemaking authority. Dkt. No. 109 at 87–89, 91. They provide no authority for this position, and it defies logic, common sense, and binding precedent.[19] Regardless of the exact scope of the House's rulemaking authority, it is clear that the House "may not by its rules ignore constitutional restraints." *Ballin*, 144 U.S. at 5. In short, we know that a house's rule may be subject to judicial review to test its constitutionality because the Supreme Court did that very thing in *Ballin*.

---

[19] The defendants seem to argue that this is a necessary result because Congress must be empowered to enact rules to evade the Quorum Clause's restrictions in the event of a national disaster, such as an attack that kills or incapacitates the majority of Congress. *See* Dkt. Nos. 52 at 47; 109 at 152. But the possibility that the Quorum Clause could paralyze the legislative branch if such an attack occurred is not an unforeseen problem. In fact, members of the Senate have recognized this issue and have advocated for considering constitutional amendments to ensure that Congress could conduct legislative business in the case of a catastrophic attack. *E.g.*, 100 Cong. Rec. 7658–69 (1954) (discussing and voting on a constitutional amendment); *Ensuring the Continuity of the United States Government: The Congress: Hearing Before the S. Comm. on the Judiciary*, 108th Cong. 2, 29–30 (2003) (calling for a constitutional amendment because "[u]nder the Constitution's requirement of a majority for a quorum, terrorists could shut Congress down by killing or incapacitating a sufficient number of Representatives or Senators"). Again, this case does not involve this type of national disaster, and the Court does not resolve whether the House and Senate's current rules addressing such situations are constitutional. Nevertheless, it is clear that at least some members of Congress understand that the Quorum Clause limits their rulemaking power, even as it pertains to such national emergencies.

Accordingly, the defendants' argument that the Quorum or Rulemaking Clauses provide Congress with a textually demonstrable commitment of power not subject to judicial review is unavailing. The Quorum Clause specifically limits the House's and Senate's power to conduct business to times when a majority is present. This is a necessary prerequisite for Congress to pass legislation, and the Founders specifically denied Congress the authority to set its own quorum requirements. While the House has some power to prescribe a method to determine the presence of the majority, this power is not unreviewable because the House cannot adopt a rule that would completely eliminate the requirement that a majority be present. If the opposite were true, as the defendants suggest, the House could create the presence of a majority even in circumstances where less than a majority of the members are present. In this case, Texas claims the House's proxy rule violates the Quorum Clause's requirements. This type of challenge to the House's rule is generally justiciable notwithstanding the House's broad rulemaking power. *Id.*; *Barker*, 921 F.3d at 1126.

**B.   The challenge here has judicially manageable standards.**

Even if there is no textually demonstrable constitutional commitment of power to another branch of government, a case presents a nonjusticiable political question "when a claim suffers from 'a lack of judicially discoverable and manageable standards for resolving it.'" *Lane*, 529 F.3d at 560 (quoting *Baker*, 369 U.S. at 217). "[J]udicial action must be governed by *standard*, by *rule*," and any "law pronounced by the courts must be principled, rational, and based upon reasoned distinctions." *Vieth*, 541 U.S. at 278 (plurality op.) (emphasis in original). In essence, this *Baker* factor is concerned with whether the claim requires a court to engage in policymaking rather than a judicial inquiry "resolvable

according to *legal* principles." *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2494, 2500–01
(2019) (emphasis in original); *Spectrum Stores, Inc.*, 632 F.3d at 949.

Courts have found nonjusticiable political questions where there are "no legal
standards to limit and direct [a court's] decision[]." *Rucho*, 139 S. Ct. at 2507.  For example,
the Supreme Court held that political gerrymandering is a political question because
determining whether a district was drawn unfairly to favor a political party was subject to
numerous competing standards of fairness.  *Id.* at 2499–500.  Further, choosing among
those standards "pose[d] basic questions that are political, not legal" and lacked any "legal
standards discernible in the Constitution for making such judgments." *Id.* at 2500.
Likewise, the Fifth Circuit has found that claims disputing land ownership by foreign
sovereigns lacked judicially manageable standards because "no law exists binding these
sovereigns and allocating rights and liabilities." *Occidental of Umm al Qaywayn, Inc. v. A
Certain Cargo of Petroleum Laden Aboard the Tanker Dauntless Colocotronis*, 577 F.2d 1196,
1204–05 (5th Cir. 1978).

In contrast, where a court may resolve the dispute using ordinary tools of legal
interpretation, courts typically find judicially manageable standards.  *Zivotofsky ex rel.
Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012); *Kuwait Pearls Catering Co., WLL v. Kellogg
Brown & Root Servs., Inc.*, 853 F.3d 173, 182–84 (5th Cir. 2017).  In *Zivotofsky*, the Supreme
Court found judicially manageable standards to resolve the plaintiff's challenge to the
Secretary of State's refusal to list Israel as his place of birth on his passport despite a
congressional statute permitting such designation for individuals like the plaintiff who were
born in Jerusalem.  566 U.S. at 191, 201.  The Supreme Court rejected the Secretary's claim
that the case was nonjusticiable because the central issue in the case was the

constitutionality of the statute, and resolving that question involved ordinary statutory and constitutional interpretation.  *Id.* at 197–201.  And in *Japan Whaling Association v. American Cetacean Society*, the Supreme Court found judicially manageable standards to resolve whether the Secretary of Commerce needed to certify that Japan was violating the International Whaling Commission's sperm-whale quota.  478 U.S. 221, 223, 229–30 (1986).  Even though the case involved foreign relations, an area often found to present political questions, the Supreme Court determined that the case was justiciable because it involved "a purely legal question of statutory interpretation."  *Id.* at 230.  As "one of the Judiciary's characteristic roles is to interpret statutes," the Supreme Court stated that a court "cannot shirk this responsibility merely because [its] decision may have significant political overtones."  *Id.*

Similarly here, Texas's Quorum Clause challenge presents "discernible and manageable standards for deciding whether there has been a violation."  *Rucho*, 139 S. Ct. at 2501.  Resolving Texas's claim rests solely on standard constitutional interpretation that courts routinely undertake.  The Court is not tasked with determining whether proxy participation is good or bad policy.  Instead, the Court is asked to resolve whether a member participating by proxy can count towards the House's quorum under the meaning of the Quorum Clause.  The Court can determine whether the Quorum Clause permits this process based on the text of the Constitution, its original public meaning, and its historical application.  The parties' own arguments as to the merits of this case, which are based on the text and history of the Quorum Clause, further demonstrate that this case turns on traditional legal standards.  *See* Dkt. Nos. 38 at 33–42; 52 at 50–71; 61 at 18–21; 63 at 12–15. And, importantly, the Court is not asked to inquire into the accuracy of the House's method

of counting.  Both parties accept the House's record as the definitive evidence of how the members participated in the vote in question—whether in person or by proxy—and, once the constitutional question is resolved, the Court can easily apply that record in determining as a mathematical matter whether the House had a constitutional quorum.

In short, Texas's "claim demands careful examination of the textual, structural, and historical evidence put forward by the parties," which "is what courts do." *Zivotofsky*, 566 U.S. at 201.  Because the arguments used to resolve Texas's Quorum Clause challenge "sound in familiar principles of constitutional interpretation," that "is enough to establish that this case does not 'turn on standards that defy judicial application.'" *Id.* (quoting *Baker*, 369 U.S. at 211).

### C.  Prudential considerations do not compel the Court to find the case nonjusticiable.

The remaining four *Baker* factors are all prudential considerations.  *Spectrum Stores, Inc.*, 632 F.3d at 953.  While this case relates to the internal function of the legislative branch, the Court's resolution of the dispute is ultimately a legal determination of whether the House exceeded its constitutional authority by counting physically non-present members as part of the quorum.  Ultimately, this case does not present greater concerns of judicial interference in the political branches than those that are apparent in every constitutional challenge.  Courts routinely engage in constitutional interpretation to resolve claims that a coordinate branch violated the Constitution when it took some action, and a court "cannot shirk this responsibility merely because [its] decision may have significant political overtones."  *See Japan Whaling Ass'n*, 478 U.S. at 230; *INS v. Chadha*, 462 U.S. 919, 942–43 (1983).  Accordingly, the Court also finds that these prudential considerations do not render this case a nonjusticiable political question.

Of the prudential factors, the defendants emphasize the need to adhere to the House's decision-making, citing concerns of finality and the potential upheaval that permitting a challenge to the passage of an appropriations bill may create.  Dkt. No. 52 at 48–49.  As the defendants note, "upending the $3 trillion omnibus appropriations law months after it passed" creates significant "challenges and complications for the entire federal government."  *Id.* at 48.

Setting aside for now the fact that Texas's remaining challenge focuses solely on one discrete aspect of the Act, courts have often decided cases with major ramifications despite arguments that the cases involved political questions.  *Baker* itself permitted a challenge to a state's apportionment of legislative representation among its counties.  369 U.S. at 187–95. Moreover, in *Chadha*, the Supreme Court found that legislative-veto provisions were unconstitutional, even though "Congress ha[d] included the veto in literally hundreds of statutes, dating back to the 1930s."  462 U.S. at 959; *id.* at 959–60 (Powell, J., concurring in judgment).  In *Zivotofsky*, the Supreme Court permitted the plaintiff's claim even though his victory would have required the Executive Branch to list Israel as the birthplace for Americans who were born in Jerusalem and so desired, despite the foreign-policy implications of such a designation.  566 U.S. at 194–201.  In *Powell*, the Supreme Court resolved a dispute over whether the Constitution required a member-elect to the House of Representatives to be seated despite the House's decision to exclude him based on corruption.  395 U.S. at 489–93, 550.  And *Munoz-Flores* found Origination Clause challenges to be justiciable even though such claims directly affect bills that raise revenue for the federal government.  495 U.S. at 390–97.  Certainly a decision that the Consolidated Appropriations Act was passed in violation of the Constitution would be significant, but

that "cannot justify [this Court] avoiding [its] constitutional responsibility." *Id.* at 391
(quoting *Powell*, 395 U.S. at 549).

In any event, the particular inquiry here is narrow, and deciding the merits of Texas's
claim does not indicate that a Quorum Clause challenge could be brought against any act of
Congress. Texas's claim involves a specific challenge to a particular House quorum rule as
applied to one portion of an act with a known vote count. A case where a court was asked
to investigate whether a quorum existed without such records or where a plaintiff directly
challenged the accuracy of the House's records would involve an intrusion into the
proceedings of another branch. Such claims may lack judicially manageable standards,
implicate the House's power to conduct the count, and express a disrespect for a coordinate
branch of government that may make them nonjusticiable. But here, the Court is merely
asked to interpret the Constitution and apply that interpretation to an agreed set of facts,
albeit in the context of an omnibus appropriations bill. Further, the Court's resolution of
this case in favor of Texas would not prevent the House from permitting its members to
participate by proxy. Rather, it would solely state that the House must have a majority of its
members present without reliance on proxies to conduct business and that non-present
members cannot count towards the quorum.

Moreover, even if other plaintiffs tried to challenge other bills based on a purely legal
challenge that they too were passed pursuant to unconstitutional quorum rules, other
justiciability doctrines would likely limit the number of such claims. A plaintiff would still
need to show a concrete and particularized injury-in-fact caused by the act and redressable
by a favorable result, which cannot be satisfied by a general claim that the defendant
violated the Constitution. *See Spokeo*, 578 U.S. at 338–39. Additionally, the taxpayer-

standing doctrine would prevent a suit based on a claimed interest "in seeing that Treasury funds are spent in accordance with the Constitution." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007).  If future plaintiffs can overcome these barriers to suit, then their claims may also be cognizable.  However, the history of Quorum Clause litigation suggests that these types of claims will be so rare that finding this case justiciable will not imperil the judiciary with endless quorum fights.

*     *     *

In sum, this case does not present a nonjusticiable political question.  The Quorum Clause ensures that the most representative branch of the federal government conducts business only with a majority of its members present, thereby protecting the essential character of the legislative branch.  This function was so important to the Framers that they included it as a constitutional prerequisite for congressional action, rather than leaving it to Congress's ordinary power to establish its own rules for its proceedings.  These constitutionally mandated procedural requirements are fundamental to the Framers' vision of our government, no less so than the Commerce Clause or the First Amendment.  Just as courts routinely resolve whether a law violated Congress's constitutional authority under those clauses using traditional methods of judicial interpretation, this Court can determine whether the House exceeded its constitutional authority through its proxy rule.  After all, "[t]o survive this Court's scrutiny, the 'law' must comply with all relevant constitutional limits." *Munoz-Flores*, 495 U.S. at 397.  This Court has a constitutional obligation to "decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky*, 566 U.S. at 194 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).  Texas's claim does not involve the House's exercise of judicially unreviewable authority and can be resolved using

ordinary judicial standards.  In addition, it presents no more prudential concerns than those present any time a court determines the constitutionality of another branch's actions.  It therefore lacks the essential characteristics of a political question and is justiciable.

**7.    Texas has succeeded on the merits.**

Having found that Texas's Quorum Clause claim is justiciable, the Court proceeds to the merits.  Based on the alleged constitutional violation, Texas seeks a permanent injunction of the PWFA and a declaratory judgment that the Act was passed in violation of the Constitution.  Dkt. No. 4 ¶¶ 58–70.  In response, the defendants argue that the Constitution does not forbid the House from counting proxies to constitute a quorum.  Dkt. No. 54; *see also* Dkt. No. 52 at 16–17.

Given the Constitution's text, original public meaning, and historical practice, the Court concludes that the House cannot count members voting by proxy to constitute a constitutionally compliant quorum.  The House's adoption of a rule that counted absent members in the quorum and its passage of the Act without a physically present quorum, as detailed in Sections 2.A–2.C, therefore violated the Quorum Clause.  The Quorum Clause is not a majority-participation requirement, but a majority-presence requirement.  *See Ballin*, 144 U.S. at 6.  The Constitution's text, as well as evidence from the Founding Era, demonstrates that the Clause requires the physical presence of a majority and that a member could not form part of the quorum if he was elsewhere.  With the exception of the proxy-voting rule at issue here, Congress has consistently applied this understanding of the Quorum Clause throughout our nation's history.  Affirmatively treating an absent member as a member of the quorum is an aberration adopted only by the 116th and 117th Congresses, and the rule exceeded the Constitution's limitations.

The defendants' counterarguments are ultimately unpersuasive.  Their reading of the Quorum Clause transforms the ability to compel attendance into mere surplusage and makes little sense in the context of how that provision was added to the drafts of the Constitution.  And while Congress's extensive use of unanimous consent can lead to votes occurring without the physical presence of a majority actually present on the House or Senate floor, it does so based on the presumption of the presence of a quorum.  Here, in contrast, the recorded vote itself demonstrates that there was no quorum without counting those members not present.  Under ordinary congressional practice, if a quorum fails to vote on legislation, any presumption of a quorum is extinguished.  Unlike a unanimous-consent vote, the vote on the Act reveals that a majority of the House was not physically present, thereby removing any presumption of a quorum.  Accordingly, even if *Noel Canning* is read to approve of the unanimous-consent process even without the physical presence of a quorum, this case does not fall within that scope.

The Section proceeds as follows.  First, the Court analyzes the Quorum Clause's text and original public meaning.  Second, it discusses Congress's historical practice regarding quorums with a specific focus on unanimous consent.  Third, it concludes that Texas has demonstrated that the Act's passage violated the Quorum Clause.

### A.      The Quorum Clause at the Founding

The Court must "'interpret the Constitution in light of its text, structure, and original understanding'—as informed by history and tradition."  *Abbott v. Biden*, 70 F.4th 817, 827 (5th Cir. 2023) (quoting *Noel Canning*, 573 U.S. at 573 (Scalia, J., concurring in judgment)).  This "analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means."  *Dobbs v. Jackson Women's*

*Health Org.*, 142 S. Ct. 2228, 2244–45 (2022) (first quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189 (1824); and then quoting 1 J. Story, *Commentaries on the Constitution of the United States* § 399, at 383 (1833)).  The central aim is to determine "the original public meaning of the Constitution's text."  *Abbott*, 70 F.4th at 829 (quoting *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 452–53 (5th Cir. 2022), *cert. granted in part*, No. 22-555, 2023 WL 6319650 (U.S. Sept. 29, 2023)).

After considering the text, courts look to history, starting with the period around the provision's ratification—here, the Founding Era.  *See id.* at 835.  This involves looking to "background concerns that informed the [Quorum] Clause[]" and debates over the Clause. *See id.* at 835, 839.  The actions of the "Founding-era Congress" can also inform the proper understanding of the Constitution.  *See id.* at 841–42; *Myers v. United States*, 272 U.S. 52, 174–75 (1926); *see also Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2029–31 (2020).   In addition, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide [the Court's] interpretation of an ambiguous constitutional provision."  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2137 (2022) (quoting *Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring in judgment)).  "But to the extent later history contradicts what the text says, the text controls."  *Id.*  So "post-ratification adoption or acceptance" of practices "that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."  *Id.* (emphasis in original) (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).  After all, "[t]hat an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date."  *Powell*, 395 U.S. at 546–47.

> i.      **The Text**

The first clause of Article I, Section 5 establishes the requirement of a quorum:

> Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

U.S. Const. art. I, § 5, cl. 1.

The first relevant portion of the Clause, "a Majority of each shall constitute a Quorum to do Business," establishes the number of members necessary to form a quorum. *Id.*; *Ballin*, 144 U.S. at 5–6.  Contemporary dictionaries at the Founding defined "quorum" as "such a number of any officers as is sufficient to do business."  2 Samuel Johnson, *A Dictionary of English Language* (6th ed. 1785).[20]  It was therefore understood that this Clause established a majority as the necessary number of members for either house of Congress to do business.  On its own, one might be able to consider this provision providing solely a number with no real indication of whether this number needed to be physically present.

However, the majority requirement is followed by noting the power of "a smaller Number" to obtain a quorum by "compel[ling] the Attendance of absent Members."  U.S. Const. art I, § 5, cl. 1.  Texas argues, and the Court agrees, that this provision would serve no purpose if the Quorum Clause lacked a physical-presence requirement.  Dkt. No. 38 at

---

[20] *See also* 2 John Ash, *The New and Complete Dictionary of the English Language* (2d ed. 1795) ("a number of commissioners sufficient to do business; one or more commissioners without which the rest cannot proceed to business"); James Barclay, *A Complete and Universal English Dictionary* (1792) ("one in a commission without whom the rest cannot act"); 2 Thomas Sheridan, *A Complete Dictionary of the English Language* (3d ed. 1790) ("such a number of any officers as is sufficient to do business"); 2 Timothy Cunningham, *A New and Complete Law Dictionary* (2d ed. 1771) ("one[] without whom the rest of the justices in some cases cannot proceed"); 2 Noah Webster, *An American Dictionary of the English Language* (1828) ("such a number of officers or members as is competent by law or constitution to transact business").

33–35.  Like its common use today, "absent" often had a physical component to it.  In addition to "[n]ot present," Noah Webster noted that it meant "not in company" or "at such a distance as to prevent communication," and James Barclay's dictionary defined it as "at a distance from, out of the sight and hearing of a person."  1 Noah Webster, *An American Dictionary of the English Language* (1828); James Barclay, *A Complete and Universal English Dictionary* (1792).  It would belie logic for the Constitution to give the House the ability "[t]o force" or "oblige" members who are "[n]ot present" to attend—right after noting the number necessary to do business—if physical presence were unnecessary for a member to count as part of the quorum.  *See* 1 Johnson, *supra* (defining "absent" and "compel").[21]

Similarly, the meaning of "attendance" or "attend" at the time of the Founding carried a physical-presence connotation.  The most common definition of "attendance" was "[t]he act of waiting on another" or "[s]ervice."  *E.g.*, *id.*; 1 John Ash, *The New and Complete Dictionary of the English Language* (2d ed. 1795); 1 Thomas Sheridan, *A Complete Dictionary of the English Language* (3d ed. 1790).  To serve or wait on another, one typically would need to be in the same place as the person served.  Further, definitions of "attend" include: (1) "[t]o be present with, upon a summons," 1 Johnson, *supra*; 1 Sheridan, *supra*; (2) "to accompany," 1 Ash, *supra*; Barclay, *supra*; and (3) "[t]o be present for some duty" or "in business," 1 Webster, *supra*.  One typically accompanies another by being physically with them and is present upon a summons or for some duty by appearing in person.

Relying on alternative definitions of "absent" as meaning "inattentive" and "attendance" as "giving attention or regard," the defendants assert this language simply permits members "to require inattentive members to yield their attention to or partake in the

---

[21] *See also* 1 Ash, *supra*; 1 Sheridan, *supra*.

legislative matters at hand."  Dkt. No. 52 at 55 (internal quotation marks omitted); *see, e.g.*, 1 Johnson, *supra*; 1 Ash, *supra*.  But at least one dictionary from the Founding Era notes that "inattentive" is only a "figurative[]" use of the word "absent," and such a figurative usage would seem odd given its place in the Constitution.  Barclay, *supra*.  Moreover, if the Clause permitted members to participate by proxy, it is unclear why it would direct them to "yield their attention" to the legislative matters at hand, since proxy participation permits a member to focus on another matter while someone else conducts the legislative business on the absent member's behalf.

In addition, the Supreme Court has previously held that the House's "capacity to transact business" is "created by the mere presence of a majority, and does not depend upon the disposition or assent or action of any single member or fraction of the majority present." *Ballin*, 144 U.S. at 5–6.  If no affirmative act or particular disposition of a member is necessary to count towards the quorum, it would be odd for the Framers to place a provision requiring a member's attention or participation in the latter half of the Quorum Clause.  Instead, the most natural reading based on this provision's placement in the Constitution is that it allows a minority of members to force members who are not present at the House's meeting to physically appear so that a quorum may be reached and business can be conducted.

### ii.    The Constitutional Convention

This reading is corroborated by the drafting history and discussion of the Quorum Clause at the Constitutional Convention.[22]  As one of the few procedural rules included in the Constitution, the Quorum Clause represented an important safeguard against rule of the country by a few representatives of the states closest to the nation's capital.  *See* Madison, *supra*, at 428–31.  The debate over the proper number to require for a quorum centered around concerns about the difficulties for a majority of members to be physically present.  *Id.* at 429.  While the use of proxies was not an unfamiliar concept to the Framers, the delegates chose to ensure the presence of a majority by giving the non-quorum the ability to compel the attendance of absent members.  U.S. Const. art. I, § 5, cl. 1.

The Quorum Clause originated in the work of the Committee of Detail.  William Ewald, *The Committee of Detail*, 28 Const. Comment. 197, 226 (2012).  The delegates had not debated a quorum requirement prior to the Committee's work, but quorum requirements were commonplace in the thirteen states.  John Bryan Williams, *How to Survive a Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress*, 48 Wm. & Mary L. Rev. 1025, 1037, 1038 n.36 (2006).  A version of the Quorum Clause first appeared in Edmund Randolph's draft, Document IV of Farrand's Records of the Federal Convention of 1787.  2 Max Farrand, *The Records of the Federal Convention of 1787*, at 137, 140 (1911); *see* Ewald, *supra*, at 226.  This initial version read: "A majority shall be a quorum for business; but a smaller number may be authorized by the house to call for and

---

[22] The Court refers to these texts not as a search for the subjective intent of the Framers but instead as evidence of the public understanding of the text at the time of its adoption, which is "a critical tool of constitutional interpretation."  *See District of Columbia v. Heller*, 554 U.S. 570, 605 (2008); Antonin Scalia, *A Matter of Interpretation* 38 (Amy Gutmann ed., 1997).

punish nonattending members, and to adjourn for any time not exceeding one week."  2

Farrand, *supra*, at 140.  The next draft, handwritten by James Wilson, also contained a

quorum provision, though it omitted the provision about "call[ing] for and punish[ing]

nonattending members": "In each House (*of the Legislature*) a Majority *of the Members* shall

constitute a Quorum to do Business; but a smaller Number may adjourn from Day to Day."

2 Farrand, *supra*, at 155; *see* Ewald, *supra*, at 248–50.  The final drafts from the Committee of

Detail maintained a nearly identical clause: "In each House a Majority of the Members

shall constitute a Quorum to do Business; but a smaller Number may adjourn from Day to

Day."  2 Farrand, *supra*, at 165, 180.

The delegates to the Constitutional Convention discussed the Quorum Clause on

August 10, 1787.  DX30; Madison, *supra*, at 425, 428–31.  Nathaniel Gorham argued that a

majority quorum requirement was too high.  Madison, *supra*, at 428–29.  Gorham worried

that requiring a majority would lead to great delays in business and would become

increasingly inconvenient as the number of members grew.  *Id.*  John Mercer also disagreed

with the proposed clause and contended that Congress should decide the requisite quorum

itself.  *Id.* at 429.  His central concern was that "[s]o great a number will put it in the power

of a few by seceding at a critical moment to introduce convulsions, and endanger the

Government," as had occurred in some of the states.  *Id.*; *see also* Williams, *supra*, at 1039 &

n.42, 1044.

To address these concerns, Gouverneur Morris recommended "fix[ing] the quorum

at 33 members in the [House of Representatives and] 14 in the Senate," which was a

majority of the present number of members but would mitigate the concerns of future

difficulties from a larger quorum number.  Madison, *supra*, at 429–30.  Rufus King offered

an amended version of this proposal that made 33 and 14 the respective minimum quorums and allowed the two houses to choose a higher quorum number through legislation.  *Id.* at 430.  Elbridge Gerry recommended capping the House's quorum at 50.  *Id.*

In support of the majority requirement, George Mason argued that "it would be dangerous to the distant parts [of the country] to allow a small number of members of the two Houses to make laws."  *Id.* at 429.  After all, "[t]he Central States could always take care to be on the [s]pot" and could wear down the other members "and outstay[] them" in order to carry out legislation.  *Id.*  Mason acknowledged the problems that could "spring from the secession of a small number," but he worried that "[i]f the Legislature should be able to reduce the number at all, it might reduce it as low as it pleased [and] the U[nited] States might be governed by a Juncto [sic]."  *Id.*  In fact, Mason thought that a majority might be too low for a quorum.  *Id.*  Oliver Ellsworth and James Wilson also thought that the Quorum Clause was a necessary protection and would provide "confidence to the people that no law or burden could be imposed on them, by a few men."  *Id.* at 430.  Ellsworth asserted that the concerns of "secessions may be guarded [against] by giving to each House an authority to require the attendance of absent members."  *Id.*  Daniel Carroll also voiced his support for the majority requirement, noting that the legislature could not be trusted to require a sufficient number of members if not compelled by the Constitution.  *Id.*

Based on this debate, Randolph and Madison moved to add the following language to the end of the Clause: "and may be [authorized] to compel the attendance of absent members in such manner [and] under such penalties as each House may provide."  *Id.* at 431.  All present delegations agreed to this addition except Pennsylvania, which was divided.  *Id.*  With this addition, the relevant portion of the Clause was unchanged by the

edits in the Committee of Style, resulting in the final version of the Quorum Clause.[23]  *See* 2

Farrand, *supra*, at 567, 592; U.S. Const. art. I, § 5.

This history reinforces the conclusion that the Quorum Clause's original public

meaning required physical presence.  The delegates' concern about the inconvenience and

difficulty of obtaining a quorum based on travel from the states far from the capital makes

little sense if the representatives were not required to appear in order to participate and be

counted.  In addition, they worried about providing power to a few members to "secede"

from the legislature and deprive it of its power.  This fear could only materialize if

physically leaving had some impact on whether a quorum existed.  To mitigate these

concerns, the Framers adopted a provision giving members the power to compel attendance.

Based on this context, the second portion of the clause was not about requiring inattentive

members to focus on legislative business.  Instead, it ensured that members could force

those from the distant states or those who would otherwise seek to leave to come to the

House and Senate so that legislative business could be conducted.

While the defendants argue that "proxy participation resolves some of the Framers'

concerns about minority rule," Dkt. No. 52 at 69, it is notable that the Constitution's

solution was providing the power to compel attendance rather than adopting the use of

proxies.  And proxy participation was known to the Framers.  In fact, Benjamin Franklin

had proposed the use of proxies for the Articles of Confederation.  Benjamin Franklin,

Proposed Articles of Confederation [on or before 21 July 1775], *in* 22 *The Papers of Benjamin*

*Franklin* 120–25 (William B. Willcox ed., 1982).  And Hamilton's proposed approach to the

---

[23] Between the drafts from the Committee of Style, the provision regarding each house's power to
judge the elections, returns, and qualifications of members was moved from a separate section to
the first portion of Section 5 of Article I.  *See* 2 Farrand, *supra*, at 567, 592.

Constitution would have allowed representatives to vote by proxy while prohibiting a

"[r]epresentative present [to] be proxy for more than one who is absent."  3 Farrand, *supra*,

at 620.  But when considering the difficulties of representatives from distant states having to

travel to and remain in the capital for a quorum, the Framers instead decided to allow

members to ensure physical presence by compelling the attendance of those absent.

### B.    Historical Practice

In addition to the original public meaning of the text, courts "look[] to 'settled and

established practice' to interpret the Constitution."  *Moore v. Harper*, 143 S. Ct. 2065, 2086

(2023) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).  Here, the longstanding

historical practice of Congress reflects the understanding that the Quorum Clause counted

only those physically present.  Until the resolutions used to adopt the proxy rule at issue

here, no house of Congress had ever attempted to affirmatively count a non-present member

as part of the quorum.  While both houses have used unanimous consent and the

presumption that a quorum is present in order to pass legislation and conduct business even

without a physically present majority on the floor, these practices do not actually consider

absent members to be present and part of the quorum.  In addition, these practices do not

apply to roll-call votes when the actual vote demonstrates the absence of a quorum, as was

the case here.  Instead, under longstanding practices, if a quorum fails to vote on a measure,

any presumption of a quorum is defeated.  Accordingly, the House's attempt to evade the

roll-call vote's revelation that a majority of members were not present and instead had voted

by proxy cannot be justified by historical practice.

###### i.     The First Congress

Just as the Framers' discussions demonstrate an understanding that the Quorum Clause required physical attendance, the practice of the first Congress indicates that those selected to represent the states shared this view.  1 Annals of Cong. 15–16, 95–96 (1789) (Joseph Gales ed., 1834); *see also* Williams, *supra*, at 1051–53; Howard M. Wasserman, *The Trouble with Shadow Government*, 52 Emory L.J. 281, 301–02 (2003).  March 4, 1789, was selected as the first meeting date for the new Congress.  1 Annals of Cong. 95 (1789) (Joseph Gales ed., 1834).  But on that day, a quorum was not present in either the House or the Senate, so both chambers adjourned.  *Id.* at 15, 95.  For each day that the House or Senate met before each chamber obtained a quorum, the Annals list the members who "appeared and took their seats."  *Id.* at 15–16, 95–96.  The House finally obtained a quorum on April 1, 1789.  *Id.* at 96; H.R. Journal, 1st Cong., 1st Sess. 3–6 (1789).  The Senate obtained a quorum five days later once twelve senators were "assembled" and "present."[24]  S. Journal, 1st Cong., 1st Sess. 7 (1789).

In an effort to obtain a quorum, the first Senate exercised its power to request attendance—twice issuing a circular to absent members.  1 Annals of Cong. 15–16 (1789) (Joseph Gales ed., 1834); Wasserman, *supra*, at 302.  On March 11, the Senate wrote "to the absent members, requesting their immediate attendance."  1 Annals of Cong. 15 (1789) (Joseph Gales ed., 1834).  And on March 18, the present members "agreed that another circular should be written to eight of the nearest absent members, particularly desiring their attendance, in order to form a quorum."  *Id.* at 15–16.  The first letter noted that it was "of

---

[24] At the time, only eleven states had ratified the Constitution, making twelve senators a majority of the Senate.  *See* Wasserman, *supra*, at 302.

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 101 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 100 of 120   PageID 1770
16976

the utmost importance that a quorum sufficient to proceed to business be assembled" so the "absent members" were requested "to attend as soon as possible."  S. Journal, 1st Cong., 1st Sess. 5–6 (1789).  The second one told the absent senators that their "presence [was] indispensably necessary" and that the present members "therefore again earnestly request[ed] [their] immediate attendance."  *Id.* at 6.

Thus, the members of the first Congress believed that the Quorum Clause required each house to have the physical presence of a majority before it could take any action.  Both chambers waited nearly a month for enough members to arrive, and the Senate specified in its letter that the "presence" of a majority of members was "indispensably necessary."  *Id.* Moreover, the first Congress maintained this understanding throughout its term, with each session's business delayed until enough members "appeared" and attended the proceedings. *See* 1 Annals of Cong. 931, 1039–40 (1790) (Joseph Gales ed., 1834); 2 Annals of Cong. 1787 (1790).  This constitutional understanding of the first Congress "should be regarded" with "great[] weight in the interpretation" of the Constitution, especially if the construction is maintained by following legislatures.  *Myers*, 272 U.S. at 174–75; *see also Mazars USA, LLP*, 140 S. Ct. at 2029–31; *id.* at 2040 (Thomas, J., dissenting).

### ii.    Subsequent Practice

The first Congress was not an outlier in its position that the Quorum Clause compelled the physical presence of a majority in order to conduct business.  For example, the first proceedings of the fifth Congress's second session were delayed by several days in both the House and the Senate because a majority of the members had not "assembled in their Chamber."  7 Annals of Cong. 469–70, 625–26 (1797).  Even after the House formed its initial quorum, on November 20, 1797, it could not conduct business "for some time"

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 102 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 101 of 120   PageID 1771
16970

that day until a majority arrived. *Id.* at 627.  At the third session, the House again was

"fourteen short of a quorum" because after "the names of all the members were called,"

only forty were present.  9 Annals of Cong. 2417–18 (1798).  And in the second session of

the eighth Congress, the House initially had a quorum because a majority of members

"appeared and took their seats," but a week later, "[n]o quorum [was] present," so the

members adjourned that day.  14 Annals of Cong. 677–78, 685 (1804).

Beyond this general counting of the members present, discussions in Congress also

provide insight into their views on a physical-presence requirement in the Quorum Clause.

The House of Representatives of the eighth Congress indicated that they viewed the

Quorum Clause as considering only those physically present.  13 Annals of Cong. 648, 656–

58 (1803).  William Bankhead, the Speaker of the House of Representatives for the seventy-

fifth Congress, noted, "[n]o business of any character can be transacted" where less than a

majority of members were present during a count of the members.  81 Cong. Rec. 2793

(1937).  And Sam Rayburn, the then-Speaker, remarked before a quorum count in 1950 that

"[t]he Chair cannot count any [m]embers that he cannot see."  96 Cong. Rec. 1811 (1950);

*see also* 41 Cong. Rec. 3572 (1907) (stating that the Chair counted the members who were

"visible").

In 1862, the Senate debated the Quorum Clause at length after confronting the

problem that a substantial number of its ordinary membership would not attend its

sessions—those senators who would have represented the seceded states.  Cong. Globe,

37th Cong., 2d Sess. 3189–94 (1862); *see also* Williams, *supra*, at 1059–61.  Senator John

Sherman remarked that the Quorum Clause created two classes of senators—"present" and

"absent"—and, under his "plain reading of the Constitution," "[i]f some of them are absent,

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 103 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 102 of 120   PageID 1772
16980

those who are present can compel the attendance of the absentees, and as soon as there is a majority of those elected present, they can go on and transact the business of the body." Cong. Globe, 37th Cong., 2d Sess. 3190 (1862).  Sherman noted that if enough senators were sick or simply absent, the Senate could not operate.  *Id.*  Senator John Carlile agreed that the Quorum Clause required a majority and "conferred upon those present" the power "to send for the Senators [who] are absent."  *Id.*  In discussing the quorum formed on that day, the senators considered those "in [their] seat[s]" and omitted a senator who "ha[d] gone" after being present the prior day.  *Id.* at 3192.  Senator Lafayette Foster also remarked that a quorum must be present and that they could lose a quorum if "members go away."  *Id.*  Foster further warned his fellow senators of the need to comply with the Quorum Clause because if they failed to suspend business and passed a bill even one short of a quorum, "the bill which [they] passed would not be a law" and instead would be a "nullit[y]."  *Id.* at 3193.

Nevertheless, the Court recognizes that the House has passed legislation in the absence of a physical quorum.  During the 1918 flu epidemic, the House repeatedly failed to obtain a quorum as few members attended legislative sessions.  *Whereas: Stories from the People's House—Sick Days*, U.S. House of Representatives, Hist., Art & Archives (Dec. 17, 2018) [hereinafter *Sick Days*].[25]  On October 14, 1918, the House met to consider a Senate resolution to allow the Public Health Service to mobilize civilian doctors as an emergency response to locations with severe flu outbreaks.  *Id.*  But at the roll call, only 178 members were present, less than a quorum, so the Speaker ruled against consideration of the bill, and

---

[25] Available at: https://history.house.gov/Blog/2018/December/12-14-Flu [https://perma.cc/7L3U-49KY].

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 104 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 103 of 120   PageID 1773
16980

the House adjourned.  *Id.*; 56 Cong. Rec. 11264 (1918).  The following day, the House again considered the bill, this time with less than 50 members in attendance.  *Sick Days*, *supra*. Leaders of both parties reached an agreement to pass the bill by unanimous consent.  *Id.* Given the lack of a physical quorum, "two [m]embers initially balked at the plan and demanded a quorum call" but were convinced by other members to withdraw their requests. *Id.*  The bill ultimately passed without objection.  *Id.*  But because a quorum was lacking, the House adjourned "[i]mmediately afterward."  *Id.*; *see* 56 Cong. Rec. 11288–89 (1918).

This occurrence does not support an argument that the Quorum Clause does not require physical presence.  Quite the opposite, the House was aware it lacked a quorum at the time, with members urging those who considered raising points of no quorum to withdraw their points because they knew a quorum call would reveal the obvious—the House lacked the physical presence of a quorum and therefore could not proceed to business.  And the members sought to pass the bill by unanimous consent because a roll-call vote would reveal the absence of a quorum.  The House's decision to proceed in knowing violation of a constitutional requirement does not alter the proper interpretation of that Clause—"[p]ast practice does not, by itself, create power."  *See Medellín v. Texas*, 552 U.S. 491, 532 (2008) (alteration in original) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)).  Instead, it may merely represent action beyond constitutional authority.  But given the House's own acknowledgement at the time and the history previously discussed, the historical practice of the House—even when acting without a quorum—demonstrates an understanding that members must be physically present in order to count towards the quorum.

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 105 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 104 of 120   PageID 1774
16980

### iii.   Unanimous Consent

While the Constitution's text, history, and tradition teach that participation by proxy cannot satisfy the Quorum Clause's requirement, the Court recognizes the practice of unanimous consent.  If Congress can conduct business without a majority physically present through unanimous consent, then why can't it conduct business through proxy voting?  The answer stems from the material differences between the two practices and the procedural safeguards in place.

The practice of unanimous consent is widespread in Congress and is used to pass legislation despite the lack of a physical quorum on the floor.  *See* Dkt. No. 52 at 62–65; *see also* DX26 at 38–40.  It does so based on each house's presumption that a quorum is always present.  Dkt. No. 52 at 62–65.  The defendants assert that unanimous consent, along with the Supreme Court's discussion of the practice in *Noel Canning*, requires the Court to find that the Quorum Clause does not have a physical-presence requirement.  *Id.*  But even if unanimous consent and the presumptive presence of a quorum are valid, the practice does not change the result here.  Principally, the presumption of a quorum for unanimous consent ends when a vote reveals that a quorum is not in fact present.  Unanimous-consent votes would never have this effect—because either (1) no one objects and the vote proceeds, or (2) someone objects and unanimous consent fails.  The vote in this case, however, was a roll-call vote, and the record reveals that less than a majority of votes were cast in person.  168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022).  Accordingly, the vote itself in this case demonstrated that the House lacked a physical quorum, which would destroy the presumption of a quorum.

The practice of unanimous-consent agreements "suspend[s] the order of business temporarily" to "permit[] some action that is not in dispute and to which no [m]ember has any objection."  DX38 at 2; Charles W. Johnson et al., *House Practice: A Guide to the Rules, Precedents, and Procedures of the House* Ch. 54 § 1 (2017).  If a member objects, any unanimous-consent agreement ends.  DX38 at 2; Johnson et al., *supra*, at Ch. 54 § 1. Unanimous-consent agreements date back to the 1830s in the House, and the Senate has conducted business by unanimous consent since 1789.  DX38 at 2; Johnson et al., *supra*, at Ch. 54 § 1; DX39; U.S. Senate, *The First Unanimous Consent Agreement*, https://www.senate.gov/about/powers-procedures/rules-procedures/first-unanimous-consent-agreement.htm [https://perma.cc/6Z5Y-5HVY].

In both chambers, unanimous consent can permit measures to be passed in the absence of a physical quorum due to a presumption of a quorum.  *See* DX28 at 9; 5 Lewis Deschler, *Deschler's Precedents of the United States House of Representatives* Ch. 20 § 1 (1994); William McKay & Charles W. Johnson, *Parliament and Congress: Representation and Scrutiny in the Twenty-First Century* 85 (2010); DX32 at 4; Floyd M. Riddick & Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices* 1038 (1992).  Effectively, once a quorum is obtained through a majority's physical presence at the beginning of each Congress, the House presumes that a quorum is always present "unless disclosed by a vote or questioned by a point of no quorum."  DX28 at 9, 16; 5 Deschler, *supra*, at Ch. 20 §§ 1, 2.1; McKay & Johnson, *supra*, at 85–86.  The Senate similarly presumes that a quorum is always present "unless the question to the contrary is raised, or the absence of a quorum is officially shown otherwise, or until a point of no quorum is made."  DX32 at 7–8; Riddick & Frumin, *supra*, at 1041–42.  This presumption "permits many measures to be passed by unanimous consent,

voice votes, or other non-recorded votes when in fact fewer than a majority of [m]embers of either [h]ouse are present, since the [r]ecord does not disclose the absence of a quorum which would reverse this presumption." McKay & Johnson, *supra*, at 85.

As the defendants note, the Supreme Court discussed the Senate's use of unanimous consent and the presumption of a quorum's presence in *Noel Canning* without casting constitutional doubt on the practice. *See Noel Canning*, 573 U.S. at 549–56. *Noel Canning* involved the Recess Appointments Clause, which permits the President to fill vacancies that happen during the Senate's recess without having to go through the ordinary advice-and-consent process. *Id.* at 518–19; U.S. Const. art. II, § 2, cl. 3. Of relevance here, the case concerned whether the President could appoint officers under this clause during an intra-session break where the Senate conducted pro forma sessions every Tuesday and Friday. *Noel Canning*, 573 U.S. at 519–21. The Supreme Court held that intra-session adjournments qualified as recesses under the clause, but that any recess had to last at least ten days to trigger the clause. *Id.* at 538. Based on that decision, the Supreme Court then determined whether the pro forma sessions terminated the "recess." *Id.* at 549–50. It held that these pro forma sessions "count as sessions, not as periods of recess" because, "for purposes of the Recess Appointments Clause, the Senate is in session when it says it is, provided that, under its own rules, it retains the capacity to transact Senate business." *Id.* at 550. In *Noel Canning*, the Senate could conduct business under its rules because it could have "pass[ed] a unanimous consent agreement" under its presumption of a quorum even though "the Senate Chamber was, according to C-SPAN coverage, almost empty." *Id.* at 552–54. But the Supreme Court reaffirmed that "deference to the Senate cannot be absolute," and if the

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 108 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 107 of 120   PageID 1777
16986

Senate lacked "the capacity to act, under its own rules, it is not in session even if it so
declares." *Id.* at 552 (emphasis omitted).

Even if *Noel Canning* confirms the constitutionality of unanimous consent under the
Quorum Clause, it provides little support for concluding that the Quorum Clause does not
mandate physical presence and that the proxy rule is permissible.  Unanimous consent and
the roll-call vote at issue in this case operate distinctly in relation to the presumption of a
quorum under the House's own rules and precedents.  Under unanimous consent, no
counting of votes occurs, so any lack of a physical quorum is not revealed by the vote.  *See*
McKay & Johnson, *supra*, at 85.  Instead, it ends if someone objects or if someone raises the
lack of a quorum.  But for a roll-call vote, the vote itself can demonstrate that a quorum was
not physically present.  Under the House's rules, "[w]hen a quorum fails to vote on a
question, a quorum is not present."  H.R. Rule XX, cl. 6(a), 117th Cong. (2021).  Even if no
member of the House objects, "failure of a quorum to vote on a roll call cannot be ignored."
DX28 at 9; 5 Deschler, *supra*, at Ch. 20 § 1; *see also* DX36 at 37; 4 Asher C. Hinds, *Hinds'
Precedents of the House of Representatives of the United States* § 2963 (1907).

And once a vote reveals that a quorum is lacking, the House and Senate must either
obtain a quorum or adjourn—they cannot ignore the demonstrated absence by unanimous
consent.  5 Deschler, *supra*, at Ch. 20 §§ 10.4, 10.5, 10.6; DX31 at 13; 6 Clarence Cannon,
*Cannon's Precedents of the House of Representatives of the United States*, Ch. 208 § 660 (1935);
DX36 at 33–34; 4 Hinds, *supra*, §§ 2951–53; DX32 at 13; Riddick & Frumin, *supra*, at 1047.
As then-Speaker Pro Tempore Clarkson N. Potter explained, when "[t]he vote upon the
passage of th[e] bill by yeas and nays has disclosed the fact that there is not a quorum in the
House[,] [t]he House thereby becomes constitutionally disqualified to do further business,

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 109 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 108 of 120   PageID 1778
16980

except . . . to adjourn, or to order a call of the House." Cong. Globe, 42d Cong., 2d Sess.
3857 (1872); *see also* 4 Hinds, *supra*, § 2951. Accordingly, under those circumstances, the
House could not proceed with a unanimous-consent vote "on the assumption that a quorum
is present." Cong. Globe, 42d Cong., 2d Sess. 3856–57 (1872).

As a result, even if the House or Senate can presume that a quorum exists to conduct
business under procedures that would not demonstrate the lack of a quorum, affirmatively
counting an absent member as present even though a roll-call vote shows the lack of a
quorum is an entirely different matter. As discussed, the presumption of a quorum only
loosely applies to a roll-call vote because the revelation that a quorum failed to vote kills any
such presumption. H.R. Rule XX, cl. 6(a); 5 Deschler, *supra*, at Ch. 20 § 1; McKay &
Johnson, *supra*, at 85–86. The quorum-related discussion surrounding the vote on the Act
here reflects the distinct nature of roll-call votes. The response to Representative Roy's
inquiry about whether a quorum was physically present was not that the quorum was
presumed or physically present, but that the absent members voting by proxy counted
towards the quorum. 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022). This exchange
further exemplifies the unique nature of this rule. Had the House attempted to pass the Act
by unanimous consent in the absence of a physical quorum, a member ordinarily could have
objected to the lack of a quorum and required a majority to appear. But with this rule, even
if the physical absence of a majority were shown, the House still deemed itself to have a
quorum, and no member could prevent legislative action based on that absence.

Thus, even if *Noel Canning*, which did not directly address the Quorum Clause,
approved of unanimous consent, it does not support acting when the lack of a quorum is
revealed. In fact, *Noel Canning* noted that, had a point of no quorum been raised and a

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 110 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 109 of 120   PageID 1779
16980

"quorum was missing, the Senators in attendance could have directed the Sergeant at Arms to bring in the missing Senators"—not that the Senate could legislate without them. 573 U.S. at 554. In sum, even though unanimous consent is prevalent, the historical practice provides further support for a physical-presence requirement.

### C.   Texas has proven that the House's passage of the Act violated the Quorum Clause.

In light of the foregoing, the Quorum Clause prohibits the use of the proxy rule in order to obtain a quorum.[26] When a majority of members are revealed to be absent, the Quorum Clause gives the House two options: adjourn or compel the attendance of absent members. It does not allow the House to adopt a mechanism to deem those absent members present and part of the quorum. Accordingly, because the record of the vote on the Act demonstrates that only a minority of members cast votes in person, with the remainder voting while absent and through proxies, Texas has proven that the Act was passed in violation of the Quorum Clause.

Texas's claim is straightforward. Less than a majority of the members of the House voted in person on the Act, and as a result, the House lacked a quorum to do business. 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022); DX21 at 27–28. The total number of

---

[26] The parties cite two further arguments in favor of their positions. *See* Dkt. Nos. 38 at 37–38; 52 at 57–58, 67–68; 63 at 12–13. Texas asserts that other constitutional provisions that directly discuss presence in connection with congressional action further support a physical-presence requirement. The defendants cite quorum provisions for federal courts that do not require physical presence.

Ultimately, the Court finds these other constitutional provisions and other quorum contexts are at best ambiguous as to whether the Quorum Clause requires physical presence. These provisions use other language that varies or is absent from the Quorum Clause or address different concerns from those motivating the Clause. And the examples of virtual attendance at least implicate some sort of presence, whereas the proxy rule here counted members who were not "present" in any ordinary sense of the word. Regardless, the text, original public meaning, and historical practice of the Quorum Clause clearly point towards a physical-presence requirement. Nothing in these additional arguments persuades the Court that an alternative interpretation is correct.

voting members of the House of Representatives is 435, making 218 the requisite number of members that must be physically present to constitute a quorum.  *See* Act of August 8, 1911, Pub. L. No. 62-5, 37 Stat. 13–14 (1911); 2 U.S.C. § 2a(a).  A total of 431 votes were cast on the Act, and 226 of the votes were cast by proxy. 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022); DX21 at 27–28.  Only 205 votes, less than a quorum, were cast in person.  168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022); DX21 at 27–28.  And when Representative Roy inquired into whether a physical quorum was present, the response was that the House counted those absent members participating by proxy as part of the quorum. *See* 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022); DX21 at 28.  Treating absent members as present via proxy in order to create a non-present majority violates the Quorum Clause.  Yet that is what the House did through its proxy rule when passing the Act.  The House lacked the constitutionally required quorum but sought to evade the Constitution's limits by counting absent members as present in order to conduct business.  The Quorum Clause prohibits Congress from doing so.  Accordingly, Texas has carried its burden of proof that the House violated the Quorum Clause when it passed the Act.

**8.    Texas will suffer irreparable injury absent an injunction.**

To obtain a permanent injunction, Texas must demonstrate: (1) that it succeeded on the merits; (2) that it will suffer irreparable injury if an injunction is not granted; (3) that a balance of the hardships between the plaintiff and the defendant favors equitable relief; and (4) that an injunction will not harm the public interest.  *Valentine*, 993 F.3d at 280; *see also eBay Inc.*, 547 U.S. at 391.  Although the Court has found that Texas succeeded on the merits of its claim, the remaining injunction factors must still be considered before Texas can obtain a permanent injunction.  Texas has also carried its burden as to these factors and

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 112 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 111 of 120   PageID 1781
16980

is therefore entitled to a permanent injunction of the defendants' enforcement of the PWFA against it.  It is irreparably harmed by the PWFA because it faces irrecoverable compliance costs and the waiver of its sovereign immunity.  As for the balance of the hardships and the public interest, the strong public interest in favor of preventing unlawful and unconstitutional government action—along with the narrow scope of the injunctive remedy needed to prevent harm to Texas—support a permanent injunction.

The irreparable injury prong requires Texas to show that it is likely to suffer "harm for which there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).  This risk of harm must be more than speculative: "there must be more than an unfounded fear on the part of the applicant."  *Id.* (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.3d 992, 997 (5th Cir. 1985)).  Once a movant shows that more than a de minimis harm is likely, the focus turns to irreparability. *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). While financial injuries generally do not qualify, if those costs cannot be recovered, the harm is irreparable.  *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  And when the defendants are federal agencies, such costs are almost always unrecoverable due to sovereign immunity. *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142.  Accordingly, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."  *EPA*, 829 F.3d at 433 (emphasis in original) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)); *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022).

Texas contends that the Act inflicts an irreparable injury by forcing it to comply with the PWFA's requirements and opening it up to administrative and judicial proceedings. *See* PX1; Dkt. No. 38 at 42–43. In addition, Texas notes the harm to its sovereign immunity. Dkt. No. 38 at 42–43. According to Texas, these harms are irreparable because it cannot compel the federal government to reimburse it, and the damage to its sovereign immunity occurs the moment it must defend a lawsuit. *Id.* The defendants counter that Texas has not shown more than a mere speculation that it will suffer harm. Dkt. No. 52 at 73–74. Further, they argue that Texas's cited litigation costs are not irreparable harm and that Texas has a legal remedy—raising this Quorum Clause defense if sued. *Id.*

As discussed in the standing section, *see* Section 4.B, *supra*, Texas has demonstrated a nonspeculative claim that it will be forced to update its policies and trainings, process accommodation requests, and respond to charges of discrimination brought under the PWFA. Consequently, the main issue is whether this harm is irreparable. The Court finds that it is. While the defendants are correct that "the expense and disruption" of having to defend against a proceeding is generally not irreparable harm, *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980), here, there is more than mere litigation costs. Texas must comply with the PWFA's requirements. This imposes new regulatory burdens on Texas even if Texas already provides what it believes to be reasonable accommodations for pregnant workers. Texas's OAG will incur around $6,674.01 throughout the first year of the PWFA and around $5,225.05 annually thereafter if the PWFA is not enjoined. PX1 at 3–4. Those compliance costs are irreparable because Texas cannot recoup these costs from the defendants. *EPA*, 829 F.3d at 433–34.

In addition, because the PWFA waives Texas's sovereign immunity, the costs related to PWFA lawsuits are not simply litigation costs but the fact of having to face litigation at all.  Under such circumstances, merely having to respond in court is an irreparable harm to Texas.  Having to relitigate the Quorum Clause issue in each new lawsuit is an insufficient legal remedy when Texas should not have to answer to these lawsuits in the first place.  Between the additional regulatory costs of complying with the PWFA and the harm of having its sovereign immunity waived, Texas has shown an irreparable injury caused by the PWFA.

**9.      The balance of the equities and the public interest favor a permanent injunction.**

In determining whether to grant an injunction, the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  On the other side, courts consider the public interest in favor of preventing unlawful and unconstitutional government action.  *See Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1143; *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997).

Texas contends that the federal government will not be harmed by an injunction because it will spare the defendants the "administrative, legal, financial, or other costs associated with enforcing the Act" and that any interest that the defendants have in enforcing the Act is "illegitimate" because it is unconstitutional.  Dkt. No. 38 at 43 (quoting *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021)).  Additionally, Texas asserts that the financial harms from complying with the PWFA will fall on it and its citizens, *id.*; *see* PX1, and that leaving the Act in force disserves the public interest in maintaining constitutional safeguards and limits on federal power, Dkt. No. 61 at 22.

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 115 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 114 of 120   PageID 1784
16902

The defendants counter that the public and the federal government would be greatly harmed by any injunction because it would cause "uncertainty regarding other portions of the omnibus legislation" and "would harm pregnant workers who otherwise will be entitled to reasonable accommodations for limitations relating to pregnancy, childbirth, or related medical conditions." Dkt. No. 52 at 75. They further note the expansive scope of the Act and the concerns if the Court were to enjoin the Act in its entirety. *Id.* at 76–77.

The Court finds that the balance of the equities and the public interest favor granting Texas a permanent injunction of the PWFA against it. Although the particular provisions of the legislation may benefit the public, "[t]he public interest is also served by maintaining our constitutional structure." *BST Holdings, L.L.C.*, 17 F.4th at 618. In fact, "the public interest of the nation is always served by the cessation of a program that was created in violation of law and whose existence violates the law." *Texas (DACA)*, 50 F.4th at 530 (quotation omitted). Texas has a strong interest in not incurring regulatory costs and in maintaining its sovereign immunity. As for the defendants' interest in enforcing the PWFA, there is little valuable interest in enforcing statutes promulgated in violation of the Constitution. *BST Holdings, L.L.C.*, 17 F.4th at 618.

Certainly, the Act itself presents a unique case given its contents: extensive funding for the federal government's operations and several pieces of permanent legislation. But there is no too-big-to-be-unconstitutional exception for congressional action. A harmed party cannot be prohibited from obtaining relief from unconstitutional legislation simply because Congress included enough important provisions in the legislation. It is well-established that Congress cannot simply ignore the Constitution's limits "in pursuit of

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 116 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 115 of 120   PageID 1785
16990

desirable ends." *See Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1143 (quoting *Ala. Ass'n of*

*Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021)).

If a request for an injunction of the entire Act were before the Court, these concerns

about the public's interest in the continued funding for the federal government, albeit

through an unconstitutionally passed act, would weigh much heavier than they do here.

However, Texas only requests that the Court enjoin the specifically challenged portions of

the Act as to it—not the Act as a whole.   Dkt. Nos. 93 at 2; 107 at 68–71.   And even if

Texas were seeking such an injunction, any remedy provided to Texas must "be limited to

the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v.*

*Casey*, 518 U.S. 343, 357 (1996); *see also DHS v. New York*, 140 S. Ct. 599, 600 (2020)

(Gorsuch, J., concurring in the grant of stay).   The Court need not enjoin the entire Act to

remedy Texas's harm.   Therefore, the consequences of such an injunction are not at issue

here, and the relevant public interest pertains to the PWFA's application to employees of

Texas.   An injunction of the PWFA alone will prevent the cited irreparable harm, leaving in

effect the other provisions of the 2023 Consolidated Appropriations Act.   As a result, many

of the defendants' cited harms to themselves and the public are inapplicable, and those that

remain are outweighed by the strong interest in preventing unconstitutional government

action, *see BST Holdings, L.L.C.*, 17 F.4th at 618; *Wages & White Lion Invs., L.L.C.*, 16 F.4th at

1143.

Accordingly, after considering the evidence presented by the parties, the Court finds

that Texas is entitled to a permanent injunction of the PWFA's enforcement against it.

Case 4:20-cv-00957-SDJ   Document 527-6   Filed 06/14/24   Page 117 of 121 PageID #:
Case 5:23-cv-00034-H   Document 110   Filed 02/27/24   Page 116 of 120   PageID 1786
16904

10.     **Scope of Relief**

Having determined that Texas has carried its burden and is entitled to a permanent

injunction of the PWFA's enforcement against it, the Court must determine the proper

scope of such relief.  Specifically, at trial, the defendants argued that any injunction related

to the PWFA should not prohibit the defendants from accepting PWFA charges, serving

notices to Texas of such charges, and issuing right-to-sue notices to claimants.  Dkt. No. 109

at 76–78, 164–65, 171.  As the Court previously explained, as part of the PWFA's

administrative-exhaustion process, a covered employee must file a charge and receive a

notice of her right to sue in order for her claim to fully accrue.  *See* 42 U.S.C. §§ 2000e-5,

2000gg-2; *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 337 (5th Cir. 2021).  Consequently,

barriers to the administrative-exhaustion process could complicate an employee's ability to

bring a PWFA claim.  Thus, the defendants cite a case from the District of North Dakota as

an example of such a limited injunction and argue that this restriction is necessary so that

the Court does not interfere with the rights of employees who are not parties to this

litigation.  *Id.* at 164–65, 171; *Religious Sisters of Mercy v. Cochran*, Nos. 3:16-cv-386 & 3:16-

cv-432, 2021 WL 1574628, at *2 (D.N.D. Feb. 19, 2021).[27]

Here, the proper remedy includes enjoining the defendants from accepting PWFA

charges and issuing right-to-sue notices to PWFA claimants.  Texas has demonstrated that

the PWFA as a whole was enacted unconstitutionally and seeks an injunction of the

enforcement of the PWFA by the defendants.  Therefore, the enforcement powers that the

---

[27] During trial, the defendants requested an opportunity to provide additional briefing on this point if
the Court considered enjoining the EEOC from issuing right-to-sue notices.  Dkt. No. 109 at 173.
After careful consideration of the arguments at trial and review of the cited authorities, the Court
finds additional briefing unnecessary.

PWFA purports to give the defendants are themselves unconstitutional.  This includes the acceptance of charges and issuance of right-to-sue notices.  The defendants' exercise of these powers against Texas would violate the Constitution and contribute to the harms the Court has previously discussed.

This situation is unlike *Religious Sisters of Mercy*, where the plaintiffs challenged only the EEOC's interpretation of Title VII as violating their rights under the Religious Freedom Restoration Act, not the constitutionality of Title VII as a whole.  *See* 2021 WL 1574628, at *1.  In such circumstances, the EEOC's general power to accept charges and issue notices was not implicated.  But here, the constitutionality of the defendants' authority under the PWFA has been challenged, and Texas has prevailed in its claim.  Moreover, the plaintiffs in *Religious Sisters* agreed to the limitation.  *See* Plaintiffs' Unopposed Motion for Entry of Final Judgment and for Extension of Time to File for Fees and Costs and Proposed Final Judgment, *Religious Sisters of Mercy*, 2021 WL 1574628 (No. 3:16-cv-386), ECF Nos. 132, 132–1.  In contrast, here, Texas has made clear that its harms from the PWFA include any litigation brought by an employee under the PWFA, such that its injury is remedied in part by restricting the defendants' ability to take steps that are generally necessary for those employees to have PWFA claims.  *See* Dkt. Nos. 4 ¶¶ 25–29, 63–65, 70; 38 at 14–16, 42–43.

Further, the Court disagrees that such an injunction improperly enjoins the rights of non-present third parties.  While foreclosing the administrative process may preclude an individual's ability to properly administratively exhaust, it does not prevent the employee from filing her own PWFA lawsuit against Texas.  If she chooses to file despite the injunction against the defendants, she may argue that her failure to administratively exhaust should be excused due to impossibility based on this injunction.  Courts have on occasion

granted equitable exceptions to exhaustion in the Title VII context.  *See, e.g.*, *Stapper v. Tex. Dep't of Hum. Res.*, 470 F. Supp. 242, 244–45 (W.D. Tex. 1979); *Jackson v. Chick & Seafood, Inc.*, No. 3:22-CV-1687-N, 2023 WL 2799736, at *2 (N.D. Tex. Apr. 4, 2023); *Hiller v. Oklahoma ex rel. Used Motor Vehicle & Parts Comm'n*, 327 F.3d 1247, 1251–52 (10th Cir. 2003); *Fouche v. Jekyll Island-State Park Auth.*, 713 F.2d 1518, 1526 & n.11 (11th Cir. 1983).  Thus, an employee would not be precluded from bringing her own suit and may be able to reach the merits of her claims.[28]  The mere possibility that an injunction foreclosing the administrative process may deter a non-party from filing a PWFA claim does not mean that she is prohibited from doing so.  By the same token, the Court's conclusion that the PWFA was enacted in violation of the Constitution may itself impact an individual's decision whether to bring a PWFA claim even if no injunction were granted.  For example, a potential PWFA plaintiff may decline to bring a claim, believing that another court may agree that enforcement of the PWFA violates the Constitution's Quorum Clause.  But she is not barred from bringing her claim because the Court's conclusion—like an injunction of the defendants—does not actually determine her rights.

Nevertheless, to facilitate a third-party employee's ability to show that she attempted to administratively exhaust her claim, the Court's injunction will make clear that the defendants may, upon receipt of a PWFA claim against the State of Texas, send a written notice to the claimant stating that they received her charge but cannot accept it, investigate it, or issue a right-to-sue notice based on this Order.

As for Texas's additional request for a declaratory judgment that the PWFA was enacted in violation of the Constitution, the Court declines to exercise its discretion to grant

---

[28] The defendants themselves acknowledged this at trial.  Dkt. No. 109 at 78.

such relief.  "Ample precedent establishes that [a court] should not exercise [its] discretion

to extend declaratory relief when a challenged law or policy no longer affects the plaintiff."

*EEOC*, 933 F.3d at 451.  Because the Court enjoins the PWFA's enforcement against Texas,

a declaratory judgment against the defendants would be redundant and provide no further

relief to it.  *Id.* at 451 n.38.

## 11.   Conclusion

In sum, the Court concludes that this case is justiciable and that the House of

Representatives' passage of the Consolidated Appropriations Act of 2023 violated the

Quorum Clause.  Because Texas has carried its burden to show its entitlement to a

permanent injunction of the PWFA but not as to the CMPP, the Court grants in part and

denies in part Texas's request for an injunction (Dkt. No. 37) and grants in part and denies

in part the defendants' motion to dismiss (Dkt. No. 54).

The Court orders that the Attorney General, the United States Department of

Justice, the Equal Employment Opportunity Commission, Charlotte A. Burrows, Jocelyn

Samuels, Keith E. Sonderling, Andrea R. Lucas, Christopher W. Lage, their divisions,

bureaus, agents, officers, commissioners, employees, and anyone acting in concert or

participation with them, including their successors in office, are permanently enjoined from

enforcing the Pregnant Workers Fairness Act, 42 U.S.C. §§ 2000gg et seq., including

accepting any charges or issuing any right-to-sue letters in relation to charges brought under

the Pregnant Workers Fairness Act, or any implementing regulations thereto, against the

State of Texas and its divisions and agencies.  This Order does not prohibit the Attorney

General, the United States Department of Justice, the Equal Employment Opportunity

Commission, Charlotte A. Burrows, Jocelyn Samuels, Keith E. Sonderling, Andrea R.

Lucas, Christopher W. Lage, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from sending a written notice upon receipt of a PWFA claim against the State of Texas and its divisions and agencies to the claimant stating that, due to this Order, they are unable to accept the charge, investigate it, or issue a right-to-sue letter.

The Court dismisses without prejudice for lack of standing Texas's claims against (1) Alejandro Mayorkas, in his official capacity as the Secretary of the Department of Homeland Security (DHS); (2) DHS; (3) Patrick J. Lechleitner, in his official capacity as the Acting Director of Immigration and Customs Enforcement; (4) Peter E. Mina, in his official capacity as the official exercising the authority of the Officer for Civil Rights and Civil Liberties of DHS; (5) the Office of Civil Rights and Civil Liberties; (6) Deanne Criswell, in her official capacity as the Administrator of the Federal Emergency Management Agency (FEMA); (7) FEMA; and (8) Joseph R. Biden, Jr., in his official capacity as the President of the United States.

All other relief not specified here is denied.

The Court stays the effect of this Order for seven days from the date of entry to allow the defendants to seek relief, if any, at the appellate level.

So ordered on February 27, 2024.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE