# EXHIBIT A

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 21, 2024

Lyle W. Cayce
Clerk

No. 23-10802

Ken Paxton, *Attorney General, State of Texas*; David Schnitz; Tracy Martin; Floice Allen,

*Plaintiffs—Appellants,*

*versus*

Steven Dettelbach, *in his Official Capacity as Director, Bureau of Alcohol, Tobacco, Firearms and Explosives*; Merrick Garland, *U.S. Attorney General*,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:22-CV-143

Before Jones, Clement, and Wilson, *Circuit Judges.*

Edith Brown Clement, *Circuit Judge*:

Three individuals and the State of Texas sought to enjoin federal statutes that criminalize making silencers for personal use without paying a $200 excise tax, applying for permission from the federal government, and, if permission is granted, registering the silencer in a federal database and labeling the silencer with a serial number. The district court granted

summary judgment for the federal government, holding that the Plaintiffs lacked standing. We AFFIRM.

I.

Federal law regulates the making of firearms. *See* 26 U.S.C. §§ 5821–22. Since 1968, silencers (also known as suppressors) have been considered "firearms" subject to these regulations. 26 U.S.C. § 5845; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1214. A silencer is a device that attaches to the muzzle of a firearm and makes the firearm quieter when discharged. *See* 18 U.S.C. § 921(a)(25).

As applied to individuals wishing to make a silencer for personal, non-commercial use, federal law imposes the following requirements. First, the individual must pay a $200 excise tax, 26 U.S.C. § 5821, and file a written application for permission to make a silencer with the Bureau of Alcohol, Tobacco, Firearms and Explosives, 26 U.S.C. § 5822. Then, if the application is approved, the individual may make the silencer but must register it in the National Firearms Registration and Transfer Record and mark it with a serial number. 27 C.F.R. § 479.64; 26 U.S.C. §§ 5841–42. If the application is denied, the individual may not make a silencer, and the $200 tax payment is refunded. 27 C.F.R. § 479.64. Making a silencer in violation of these procedures is a crime punishable by a maximum fine of $10,000, imprisonment for up to ten years, or both. 26 U.S.C. § 5871.

In 2021, Texas enacted a law providing that "[a] firearm suppressor that is manufactured in [Texas] and remains in [Texas] is not subject to federal law or federal regulation." TEX. GOV'T CODE ANN. § 2.052(a). The law also requires that upon "written notification to the attorney general [of Texas] by a United States citizen who resides in [Texas] of the citizen's intent to manufacture a firearm suppressor . . . the attorney general [of Texas] shall seek a declaratory judgment from a federal district court in [Texas] that

[the Texas statute] is consistent with the United States Constitution." *Id.* § 2.054.

On February 23, 2022, David Schnitz, Tracy Martin, and Floice Allen (the "Individual Plaintiffs") provided such "written notification" to Texas Attorney General Ken Paxton of their intent to manufacture a firearm suppressor. The next day, Paxton and the Individual Plaintiffs (collectively, the "Plaintiffs") filed suit seeking (1) "a declaratory judgment that neither the Commerce Clause nor the Necessary and Proper Clause authorize federal regulation of the making of a firearm suppressor for personal use in Texas," and (2) injunctive relief against "federal law as applied to taxing and regulating firearm suppressors made in Texas for personal use in Texas because that law violates the Second Amendment." The Plaintiffs later dropped their request for a declaratory judgment, proceeding only on their claims for injunctive relief against the application, tax, registration, and serial-number requirements on Second-Amendment grounds.

The parties cross-moved for summary judgment. The federal government's motion argued that the Plaintiffs lacked standing, that the court lacked jurisdiction because of the Tax Anti-Injunction Act, and that the Plaintiffs' claims failed on the merits. The district court concluded that neither the Individual Plaintiffs nor Texas had standing to pursue their claims and therefore granted summary judgment in favor of the federal government on that basis.[1]

---

[1] The district court did not address the Tax Anti-Injunction Act or the merits of the Plaintiffs' Second-Amendment claims. Neither do we.

No. 23-10802

II.

We review the district court's standing determination *de novo*. *Chavez v. Plan Benefit Servs., Inc.*, 77 F.4th 370, 378 (5th Cir. 2023).

III.

We begin with the Individual Plaintiffs. To have Article III standing, the Individual Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). On appeal, as before the district court, the parties primarily contest whether the Individual Plaintiffs demonstrated an injury in fact.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Where, as here, a plaintiff raises a pre-enforcement challenge to a federal statute, the injury-in-fact requirement is satisfied where the plaintiff shows a serious "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also, e.g.*, *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (requiring a "serious intention to engage in conduct proscribed by law").[2]

---

[2] The Individual Plaintiffs have not raised—and have therefore forfeited—other potential bases for standing beyond pre-enforcement standing vis-à-vis the criminal penalties imposed by the federal regulatory scheme at issue. *See Ctr. for Biological Diversity*

The Individual Plaintiffs claim that they have established injury in fact through their signed, unsworn declarations, each of which stated, in relevant part:

> I intend to personally manufacture a firearm suppressor for my own non-commercial, personal use. The firearm suppressor will be manufactured in my home from basic materials without the inclusion of any part imported from another state other than a generic and insignificant part, such as a spring, screw, nut, or pin.

For two reasons, we find that these declarations are insufficient to "establish a serious intention to engage in conduct proscribed by law." *Zimmerman*, 881 F.3d at 389.

## A.

First, the declarations do not state any intention to engage in conduct *proscribed by law*. Rather, the declarations state only that the Individual Plaintiffs "intend to personally manufacture a firearm suppressor for [their] own non-commercial, personal use." But, as the federal government points out, the statutes at issue do not prohibit the Individual Plaintiffs from making a firearm suppressor. Rather, they only prohibit making a firearm suppressor *without complying with the applicable procedures and requirements*, *i.e.*, applying for approval, paying the requisite tax, registering the suppressor, and labeling it with a serial number. *See* 26 U.S.C. § 5871. This is a distinction with an important difference because it differentiates this case from those in which the statutory scheme at issue is a blanket prohibition.

---

*v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.").

Take, for example, *National Rifle Association of America, Inc. v. McCraw*, a case concerning a pre-enforcement challenge to a Texas criminal statute prohibiting individuals under the age of 21 from carrying handguns in public. 719 F.3d 338, 342 (5th Cir. 2013). The district court had found that the plaintiff's declared intent to "carry a handgun outside of the home" was insufficient to establish standing, in part because the criminal provision at issue allowed an individual to carry a handgun in public if the individual had a concealed-carry license, and the plaintiff had not specifically alleged any "desire to carry a handgun . . . without a license." *Jennings v. McCraw*, No. 5:10-cv-141-C, 2012 WL 12898407, at *2–3 (N.D. Tex. Jan. 19, 2012). We reversed, explaining that because Texas's licensing program prohibited granting concealed-carry licenses to individuals under 21, "[t]he criminal provision forb[ade] [the plaintiff] from carrying a handgun altogether." *McCraw*, 719 F.3d at 345. For this reason, the intent to carry a handgun outside of the home generally was sufficient to bring the plaintiff's intended conduct within the ambit of the criminal prohibition.

Here, the opposite is true. The Individual Plaintiffs have only stated an intent "to personally manufacture a firearm suppressor" but say nothing about whether they intend to personally manufacture a firearm suppressor *without applying for government approval*, and they make no claim that they are statutorily ineligible for such approval. So, they have failed to show that their intended conduct is within the scope of what 26 U.S.C. § 5871 prohibits and therefore lack standing to bring their pre-enforcement challenge.

In this sense, the Individual Plaintiffs' declared intent is more akin to that which was deemed insufficient in *Zimmerman*. In that case, an Austin City Councilmember challenged a campaign-finance law that placed an aggregate limit on the amount of monetary contributions that could be accepted from persons outside of the Austin area. *Zimmerman*, 881 F.3d at 382. The plaintiff had submitted a declaration stating that, absent the

challenged law, he would have solicited funds from individuals outside of the Austin area. *Id.* at 389. But, as we pointed out, the law at issue did "not preclude *solicitations*; it preclude[d] only *accepting* aggregate contributions over the relevant limit." *Id.* (cleaned up) (emphases added). So, "[s]tating [a] desire to *solicit* funds . . . d[id] not establish an intent to accept funds above the proscribed limit," and the plaintiff therefore lacked standing. *Id.* Here, the challenged statute does not preclude making a silencer; it precludes only making a silencer without submitting to various government-imposed requirements. So, stating a blanket desire to make a silencer does not establish an "intention to engage in conduct proscribed by law." *Id.* at 389.

## B.

Second, the declarations lack the necessary detail to establish that the Individual Plaintiffs' professed intent to make a silencer is sufficiently "serious" to render their feared injury "imminent" rather than merely speculative or hypothetical. As the Supreme Court explained in *Lujan*, at the summary-judgment stage, declarants' profession of "'some day' intentions [to engage in certain conduct]—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury" required for standing. 504 U.S. at 564. To determine whether the Individual Plaintiffs' professed intent to make silencers is sufficiently serious, it is helpful to look specifically at cases concerning pre-enforcement Second-Amendment claims.

Again *McCraw*—and its companion case, *National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 188 (5th Cir. 2012) (hereinafter, "*BATFE*"), challenging a federal law prohibiting the sale of handguns to individuals under the age of 21—are instructive. In both cases, the same individual plaintiff—Andrew Payne—submitted a detailed declaration describing his passion for the safe handling

of firearms and explaining how and when he would engage in the proscribed conduct if the challenged laws did not exist. With respect to the federal law prohibiting the sale of handguns to individuals under 21, Payne explained, "I identified a handgun that I wanted to purchase—a new Taurus .357 magnum that was selling for just under $500" at a local firearms dealer—and he declared, under penalty of perjury, that "[i]f [the retailer] could legally sell me this handgun, I would buy it (or one very similar to it) from that store now." Decl. of Andrew Payne at 3, *BATFE*, 700 F.3d 185 (No. 11-10959), ECF No. 25 at 56. Similarly, in the case challenging the state law prohibiting him from carrying a handgun in public, Payne's declaration was unequivocal: "If Texas law did not prohibit me from doing so, I would carry a handgun outside of the home"—specifically, his "father's handgun when patronizing [a local] Wal-Mart" in an area of town where Payne felt unsafe. Decl. of Andrew Payne at 2, *McCraw*, 719 F.3d 338 (No. 12-10091), ECF No. 17 at 59. We therefore had no hesitation holding that Payne had a serious intention to engage in the conduct that he claimed would expose him to criminal liability. *BATFE*, 700 F.3d at 191–92; *McCraw*, 719 F.3d at 345.

Out-of-circuit case law is in accord. In *Antonyuk v. Chiumento*, the Second Circuit found that a plaintiff had established a serious intention to violate a criminal law banning the carriage of firearms in "sensitive locations," including public zoos, based on the plaintiff's "aver[ments] in his declaration that he and his wife frequently visit the [local] Zoo . . . so that [they] can see the otters and wolves, . . . that they would visit the zoo . . . at least once[] within the next 90 days" and that "he intend[s] to carry [his] firearm when [they] visit." 89 F.4th 271, 333, 352 (2d Cir. 2023) (internal quotation marks omitted). Similarly, in *Montana Shooting Sports Association v. Holder*, the Ninth Circuit found that an individual had a serious intention to violate federal laws criminalizing the manufacturing of firearms and ammunition without a government-issued license where the plaintiff had

"not merely alleged a vague desire to manufacture and sell unlicensed firearms if he [won his] lawsuit, but ha[d] made specific allegations substantiating [that] claim," including that he "ha[d] a background in running his own shooting range equipment manufacturing business, ha[d] identified . . . the component parts of the [firearm he wanted to make], ha[d] design plans for the firearm ready to load into manufacturing equipment, and ha[d] identified hundreds of customers who ha[d] ordered the [firearm] at his asking price." 727 F.3d 975, 978–80 (9th Cir. 2013).[3]

The detailed allegations and declarations that were sufficient for standing in *BATFE*, *McCraw*, *Antonyuk*, and *Montana Shooting* stand in stark contrast to those submitted in this case. For example, in *Montana Shooting*, the plaintiff presented design plans for the firearm he intended to make and identified each of the parts necessary to complete the manufacturing process. And in *BATFE*, the plaintiff identified the specific handgun that he intended to purchase. Here, the Individual Plaintiffs have provided no information concerning the specific type of silencer that they allegedly intend to make or what parts they will use to make it. Moreover, and perhaps most importantly, each of the plaintiffs in *BATFE*, *McCraw*, *Antonyuk*, and *Montana Shooting* expressed an unequivocal intent to engage in the proscribed conduct *immediately* if the challenged restrictions did not exist, whereas here, the Individual Plaintiffs have expressed only a vague intention to make a silencer at some indeterminate point in the future. The Individual Plaintiffs' professed "some day intentions" to make a silencer, without any concrete

---

[3] *Montana Shooting* went to the Ninth Circuit at the motion-to-dismiss stage, 727 F.3d at 979, so the court needed only look at the allegations in the complaint to evaluate standing. More—namely, "affidavit or other evidence"—is required here. *Lujan*, 504 U.S. at 561.

details concerning the type of silencer they will make or even *when* they will make it, is insufficient to establish injury in fact. *See Lujan*, 504 U.S. at 564.[4]

To be sure, there are limits to the degree of specificity a plaintiff can be expected to provide in a declaration. And, as the Second Circuit recognized, courts must be "mindful that a plaintiff may fall between stools: allege future conduct too imminent and the claim will become moot, but allege a generic or distant intention and the injury will be insufficiently specific." *Antonyuk*, 89 F.4th at 371. But the bottom line is that "it is simply not all that hard" to write a declaration with enough detail to establish a serious intention to engage in a course of conduct. *See id.* The Individual Plaintiffs have fallen well short of that mark here.

IV.

Next, we address Texas's two asserted bases for standing: its "quasi-sovereign interests in its citizens' health and well-being," and "its sovereign interest in the power to create and enforce a legal code." Neither is valid.

A.

Texas claims that it "has standing to vindicate its quasi-sovereign interests in its citizens' health and well-being" because "[t]he unconstitutional regulation of firearm suppressors adversely affects Texans' health and well-being by delaying (by 60 or 55 days when the application is

---

[4] To be clear, our holding does not require the Individual Plaintiffs to commit a crime to have standing. To the contrary, it is well established that "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (emphasis removed). The Individual Plaintiffs would face no risk of criminal liability by identifying the materials they plan to use to make a silencer in a declaration, and they need not collect those parts if it would be illegal to possess them without a permit.

approved) or prohibiting (when the application is not approved) Texans' ability to use firearm suppressors for the purpose of home defense." We hold that Texas has not established a valid quasi-sovereign interest because it has not shown that the challenged statutes implicate the State's *own* interests in addition to and "apart from the interests of particular private parties." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

*Snapp* itself is illustrative of what a state must show to satisfy this requirement. There, Puerto Rico, as part of its participation in a federal jobs program, had recruited over two thousand Puerto Rican farmworkers to be sent to harvest apples for private growers on the east coast. *Id.* at 597. But when the workers arrived, the growers refused to employ them on the basis that Puerto Rican farmhands were inferior and unproductive. *Id.* The Supreme Court found that Puerto Rico had *parens patriae* standing on an economic-wellbeing basis because the conduct at issue concerned efforts to stigmatize the *entire* Puerto Rican labor force and therefore implicated the economic interests of Puerto Rico itself beyond the interests of the specific individuals who lost job opportunities. *Id.* at 609–10.

Contrast Puerto Rico's showing in *Snapp* with that of Louisiana in *Harrison v. Jefferson Parish School Board*, 78 F.4th 765 (5th Cir. 2023). There, Louisiana claimed *parens patriae* standing to challenge a local school board's disciplinary policy based on its "quasi-sovereign interest in preventing its political subdivisions [*i.e.*, the school board] from violating the constitutional rights of 52,000 public schoolchildren." *Id.* at 772. As we explained, this was not a valid quasi-sovereign interest because Louisiana was not claiming "injury to its citizens health or economic well-being *in a way that also implicates its own interests*"; rather, "Louisiana's asserted interest [was] wholly derivative of the interests of [the individual] students," who were perfectly capable of suing the school board themselves. *Id.* at 773 (emphasis added); *see also Pennsylvania v. Kleppe*, 533 F.2d 668, 675 (D.C. Cir. 1976)

(finding lack of quasi-sovereign interest in light of "the presence . . . of a more appropriate party or parties capable of bringing the suit").

Applying these principles here, it is plain that Texas's asserted quasi-sovereign interest is wholly derivative of the personal Second-Amendment interests of its citizens and therefore not a valid quasi-sovereign interest at all. *See Harrison*, 78 F.4th at 773. As the district court succinctly put it: "Texas may not merely litigate as a volunteer the personal claims of its citizens. And it is hard to think of a more personal interest than one's ability to better hear a home intruder in the middle of the night and fend them off with the aid of a home-made silencer."[5]

## B.

Texas claims that it "also has standing to vindicate its sovereign interest in the power to create and enforce a legal code." True, such a sovereign interest exists. *See Snapp*, 458 U.S. at 601. But it is not implicated here.

Specifically, Texas asserts that the challenged federal statutes interfere with its ability to enforce Section 2.052 of the Texas Government Code, which provides that "[a] firearm suppressor that is manufactured in [Texas] and remains in [Texas] is not subject to federal law or federal

---

[5] Because Texas has failed to establish an injury to its quasi-sovereign interests and "[p]rinciples of judicial restraint dictate that if resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented," *Manning v. Upjohn Co.*, 862 F.2d 545, 547 (5th Cir. 1989), we do not address Texas's argument that it would have standing to bring a claim based on an injury to its quasi-sovereign interests against the federal government despite the so-called *Mellon* bar, which prohibits states from bringing *parens patriae* suits against the federal government. *See Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923) (explaining that when it comes to a state's citizens' "relations with the federal government," "it is the United States, and not the state, which represents them as parens patriae").

regulation." Tex. Gov't Code Ann. § 2.052(a). But as we have previously explained, "[a] state has standing based on a conflict between federal and state law if the state statute at issue regulates behavior or provides for the administration of a state program, *but not if it simply purports to immunize state citizens from federal law*." *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 836 (5th Cir. 2023) (quoting *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015)) (emphasis added). Section 2.052 falls squarely into the latter category.

The black-letter rule set forth in *Texas v. Nuclear Regulatory Commission* and *Texas v. United States* is derived from the Fourth Circuit's decision in *Virginia ex rel. Cuccinelli v. Sebelius*—a case with facts remarkably similar to this one. *See Texas v. United States*, 787 F.3d at 749 (quoting *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011)). In *Cuccinelli*, the Commonwealth of Virginia filed suit challenging the "individual mandate" provision of the Affordable Care Act. 656 F.3d at 266. As its basis for standing, Virginia argued that it had a sovereign interest in creating and enforcing its legal code, namely the Virginia Health Care Freedom Act ("VHCFA"), which provided, in relevant part, that "no resident of this Commonwealth . . . shall be required to obtain or maintain a policy of individual insurance coverage." *Id.* at 267–68. As the Fourth Circuit rightly explained: "the VHCFA regulates nothing and provides for the administration of no state program. Instead, it simply purports to immunize Virginia citizens from federal law. In doing so, the VHCFA reflects no exercise of 'sovereign power,' for Virginia lacks the sovereign authority to nullify federal law." *Id.* at 270. Rather, what Virginia was really trying to do was "escape [the *Mellon*] bar merely by codifying its objection to the federal statute in question." *Id.* The Fourth Circuit refused to permit such an end-around, which would have improperly "convert[ed] the federal judiciary into a 'forum' for the vindication of a state's 'generalized grievances about the

No. 23-10802

conduct of government.'" *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)).

Like Virginia, Texas cannot avoid the *Mellon* bar by legislative fiat. Section 2.052 merely purports to immunize Texas citizens making silencers in Texas from federal firearms law. It therefore reflects no exercise of Texas's sovereign power and provides no standing for Texas to challenge the federal laws with which Section 2.052 conflicts. *See Nuclear Regul. Comm'n*, 78 F.4th at 836.

## V.

For these reasons, we AFFIRM the judgment of the district court that the Plaintiffs lack standing.