# EXHIBIT A

2024 WL 3302068
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION

MDL Case No. 21-md-02981-JD
|
Member Case No. 20-cv-05671-JD
|
Filed 07/03/2024

ORDER RE GOOGLE'S RENEWED MOTION
FOR JUDGMENT AS MATTER OF LAW
OR FOR NEW TRIAL IN *EPIC* CASE

JAMES DONATO United States District Judge

**\*1** After 15 days of trial, a jury found in favor of plaintiff Epic Games Inc. on its antitrust claims against Google. *See* Dkt. No. 866.[1] Google had moved for judgment as a matter of law at an appropriate stage of the trial, which the Court denied. Dkt. Nos. 825, 831. Google renewed the motion post-verdict under Federal Rule of Civil Procedure 50(b), with a motion in the alternative for a new trial under Rule 59. Dkt. No. 925. The Court denied both motions. Dkt. No. 951. This order provides a detailed explanation for that decision.

BACKGROUND

The Court presented the background of this multidistrict antitrust litigation in other orders. *See, e.g.*, Dkt. Nos. 383, 588. In pertinent part, Epic is a well-known video game and software developer, and its apps include Fortnite, a popular online game. Fortnite can be played on a variety of consoles and devices, including smartphones running the Android mobile operating system.

Epic distributed a Fortnite Android app through the Google Play Store for a handful of months starting in April 2020, until Epic's relationship with Google broke down in August 2020. A particular sticking point was Epic's objection to Google's requirement that Epic use Google's billing system and pay Google a 30% fee on all in-app purchases made by Fortnite users. Epic wanted to use its own in-app payment solution and not pay Google a 30% cut, which Google refused to allow. Epic then deployed a "hotfix," which was in effect a covert app update that allowed Fortnite users to use Epic's payment system. Google responded by removing Fortnite from the Google Play Store.

On the day that Fortnite was removed from the Google Play Store, Epic filed this lawsuit against Google LLC and certain of its affiliates alleging that Google had engaged in anticompetitive conduct in violation of the antitrust laws in connection with the Google Play Store. Dkt. No. 1. As alleged in its second amended complaint (SAC), Epic presented claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq.; and the California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq. Dkt. No. 378. Epic sought injunctive relief only, and no monetary damages. *Id.* Google filed counterclaims against Epic, including for breach of the Google Play Developer Distribution Agreement (DDA). Dkt. No. 386.

Epic's lawsuit was consolidated into a multidistrict litigation action along with similar antitrust complaints filed by Google Play Store users and developers, and the attorneys general of many states. A substantial period of litigation ensued for all of the member cases, and several important issues were resolved in the pretrial stage. One was a determination that Google had willfully failed to preserve relevant, substantive business communications that were made by employees on the Google Chat system. This determination required an extensive inquiry by the Court that culminated in an evidentiary hearing featuring witness testimony and documents, and extensive findings of fact. *See* Dkt. No. 469. Testimony at trial adduced even more troubling evidence of improper assertions of the attorney-client privilege by Google's employees, including its CEO, to keep communications secret, and a widespread understanding within the company that discussions of sensitive topics should be done in a way that evaded preservation. *See, e.g.*, Trial Tr. at 964:21-23, 991:16-992:8, 1075:20-1076:12, 1321:17-24.[2] Another important pretrial determination was whether Google could evade a jury altogether by asking for a bench trial at the very last moment. The Court concluded, based on Google's own conduct, that it had consented to a jury trial. *See id.* at 6:13-7:16.

**\*2** In time, the other cases went into settlement proceedings. Epic's case was tried by a jury of nine citizens in November and December 2023. The parties put on forty-five witnesses,

including nine expert witnesses, over the course of fifteen days of testimony. More than three hundred documents were admitted into evidence. *See* Dkt. Nos. 622, 623, 624. The final jury instructions totaled fifty-five pages. Dkt. No. 850. The instructions were based on extensive discussions with, and submissions by, the parties. *See, e.g.*, Dkt. Nos. 487, 528, 554, 564, 847, 848, 849.

At the conclusion of deliberations, the jury returned a unanimous verdict in favor of Epic. Dkt. No. 866. For the monopolization claim under Section 2 of the Sherman Act, the jury found that Epic had proved two relevant product markets: a market for the distribution of Android apps, and for Android in-app billing services for digital goods and services transactions. The jury also found that Epic had proved for both of these markets that the geographic scope was worldwide excluding China. The jury further concluded that Epic had proved that Google willfully acquired or maintained monopoly power by engaging in anticompetitive conduct in each of the product markets, and that Epic had proved it was injured as a result of Google's violation of the antitrust laws. *Id.* at 1-4. For the unlawful restraint of trade claim under Section 1 of the Sherman Act and California state law, the jury found that Epic had proved that Google entered into one or more agreements that unreasonably restrained trade in the same two product markets as for the monopolization claim. The jury determined that the illegal agreements were Google's DDA agreements; agreements with alleged competitors or potential competitors under Project Hug and the Games Velocity Program; and agreements with original equipment manufacturers (OEMs) that sell mobile devices, including the MADA and RSA agreements. Epic was found to have proved antitrust injury from these violations. *Id.* at 5-6. For the tying claim under Section 1 of the Sherman Act and California law, the jury determined that Epic had proved that Google unlawfully tied the use of the Google Play Store to the use of Google Play Billing, and that Epic again had been injured by this conduct. *Id.* at 7.

Epic's UCL claim was not presented to the jury and was reserved for the Court's decision. Google's breach of contract counterclaim also was not presented to the jury pursuant to the parties' agreement, and the Court will decide Epic's illegality defense, with the parties' stipulated facts to be treated as proved. *See* Dkt. No. 850 at 1. Also reserved for the Court's decision is the issue of an injunctive remedy under the Sherman Act and Cartwright Act in light of the jury's verdict. The remedy proceedings are currently underway. *See* Dkt. No. 978.

Google has fired a barrage of objections and allegations of error in an effort to escape the judgment of the jury. This approach has been Google's modus operandi throughout the case, and often results in headline-style arguments that lack useful development. The 90 pages of objections that Google filed to Epic's proposed injunction in the remedy proceedings are the latest manifestation of this problem. *See* Dkt. No. 958. In the ensuing discussion, the Court addresses Google's attacks on the verdict even when Google's argument was little more than a passing comment or two.

As the Supreme Court has observed, the "[d]etermination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 216 (1947) (citation omitted). It is on this basis, and the trial record as a whole, that the Court concludes Google is not entitled to undo the jury's verdict under Rule 50(b) or Rule 59.

### LEGAL STANDARDS

**\*3** Under Rule 50(b), a party that has previously made a motion for judgment as a matter of law during a jury trial, as Google did, may "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Judgment as a matter of law is appropriate when "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002) (citation omitted); *see also Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir. 2009) ("JMOL is ... appropriate when the jury could have relied only on speculation to reach its verdict."). The "district court must uphold the jury's award if there was any 'legally sufficient basis' to support it." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014) (citation omitted); *see also Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017) ("A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible.") (citation omitted). In making this determination, the Court is to "consider[ ] all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party," and

it "may not make any credibility determinations or reweigh the evidence." *Experience Hendrix*, 762 F.3d at 842. Put more plainly, the Court must "draw all inferences in favor of the verdict." *Id.* at 845.

Rule 59 permits the Court to grant a new trial on all or some of the issues, and to any party, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although for a Rule 59 motion, the Court is "not required to view the trial evidence in the light most favorable to the verdict," *Experience Hendrix*, 762 F.3d at 842, the Court "may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). Our circuit has stated that "[a] trial court may grant a new trial only if the verdict is against the clear weight of the evidence." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) (citing *Silver Sage*, 251 F.3d at 818-19).

Google presented its JMOL and new trial arguments in a single, interwoven fashion. *See* Dkt. No. 925. The Court will follow suit, while being mindful of the different standards that govern each rule.

## DISCUSSION

### I. ANDROID-ONLY RELEVANT MARKETS

For the monopolization claim, the jury found that Epic had proved the existence of two relevant product markets: (1) an "Android app distribution market," and (2) a market for "Android in-app billing services for digital goods and services transactions." Dkt. No. 866 at 3 (Question No. 2). The jury found the same two relevant product markets for Epic's unlawful restraint of trade claim. *See id.* at 6 (Question No. 8). Google proposes two reasons why, in its view, Epic should not have been permitted to argue for these relevant markets that were "limited to Android devices." Dkt. No. 925 at 1-7.

#### A. Issue Preclusion

To start, Google says that it is entitled to judgment as a matter of law on all claims submitted to the jury because of the preclusive effect of *Epic Games, Inc. v. Apple Inc.* ("*Apple I*"), 559 F. Supp. 3d 898 (N.D. Cal. 2021), and *Epic Games Inc. v. Apple Inc.* ("*Apple II*"), 67 F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 682 (2024). *Apple II* affirmed in part and reversed in part *Apple I*. Google says that the *Apple I* court found a "market for mobile game transactions in which both Google and Apple competed," which was a market definition the circuit affirmed. Dkt. No. 925 at 2-3. Consequently, in Google's view, Epic had "already litigated and lost" the issue of "competition between Apple's App Store and Google Play." *Id.* Because Epic did not propose at trial a market that included Apple, Google contends that Epic failed to prove a valid relevant market at all, which necessarily doomed all of its antitrust claims. *Id.* at 4.

This is not the first time Google has tried to make this point. It is in effect a re-do of the same argument that the Court rejected in prior proceedings because Google had failed to establish the elements of preclusion. Dkt. No. 700 at 2. Nothing has happened since to change the Court's conclusion.

**\*4** "Issue preclusion, which bars the relitigation of issues actually adjudicated in previous litigation, applies where four conditions are met: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021) (cleaned up).

The market definition issues that were litigated in *Apple I* and *Apple II* were plainly not the same as the issues litigated here. In the case against Apple, Epic "proposed two single-brand markets: the aftermarkets for iOS app distribution and iOS in-app payment solutions, derived from a foremarket for smartphone operating systems." *Apple II*, 67 F.4th at 970 (emphasis omitted). The district court rejected Epic's proposed single-brand markets mainly because there was a "failure of proof." *Id.* Epic "presented no evidence regarding whether consumers unknowingly lock themselves into Apple's app-distribution and IAP restrictions when they buy iOS devices." *Id.* On appeal, the circuit court determined that the district court "did not clearly err in rejecting Epic's proposed relevant markets"; "[i]n particular, Epic failed to produce any evidence showing -- as our precedent requires -- that consumers are generally unaware of Apple's app-distribution and IAP restrictions when they purchase iOS devices." *Id.* at 973.

Epic took a very different approach to the markets in this case. It did not, for obvious reasons in a case that did not include Apple, advocate for "aftermarkets for iOS app distribution and iOS in-app payment solutions, derived from a foremarket for" iOS devices. *Id.* at 970 (emphasis omitted). Nor did it argue for aftermarkets for Android app distribution and

Android in-app payment solutions, derived from a foremarket for Android devices. It took a wholly different approach for the antitrust claims against Google, and offered wholly different evidence about relevant markets than that offered in the case against Apple. The holdings in *Apple I* and *Apple II* about Epic's proposed foremarket/aftermarkets for Apple products, and Epic's deficient evidentiary support for those markets, have no preclusive effect here.

Consequently, Epic was perfectly free at trial to argue for Android-only relevant markets, just as Google was free to argue for a different result. Each side took maximum advantage of this freedom to hotly dispute the definition of the product markets for Epic's antitrust claims. The jury was presented with evidence sponsored by each side, including witness testimony, documents, and expert witness opinions, on the question of the relevant product markets. Google took every opportunity to tell the jury that Google and Apple compete, and so should be considered to be in the same relevant market. If there was one theme Google pressed relentlessly to the jury, it was this one. Epic presented substantial evidence showing that the Android-only product markets made factual and economic sense for this case. For example, Epic's economics expert, Professor Douglas Bernheim, testified that the fact that Apple and Android compete in the market for smartphones does not mean that they are in the same market for app distribution. Trial Tr. at 2423:23-2424:1. The jury also heard from Dr. Bernheim that, based on a SSNIP test and other widely accepted analytical tools, his conclusion was that the Apple App Store does not compete in the same relevant market as the Google Play Store. *Id.* at 2424:17-2427:16, 2462:2-16.

**\*5** In the end, the jury did precisely what it was called upon to do by resolving the hotly disputed evidence to define the product markets as stated in the verdict. The possibility that the jury might have come out differently is no basis for judgment as a matter of law in Google's favor. *See White, 312 F.3d at 1010*. Google also has not demonstrated that the product market verdicts were clearly contrary to the weight of the evidence.

### B. Aftermarket Theory

Despite the plain record of what happened at trial, Google says that Epic was actually proposing a " 'single-brand aftermarket' theory of market definition" that it failed to prove. Dkt. No. 925 at 5. This is a rather odd argument because Epic never presented or even mentioned a "single-brand aftermarket" in this case, and Google's suggestion to the contrary is utterly bereft of any evidence.

To start, there was no "single brand" in play here. As the parties stipulated in the final jury instructions, Android is a mobile operating system; it is not a brand. *See* Dkt. No. 850 at ECF p. 16 (Instruction No. 12 (Stipulations of Fact)) ¶ 15. The undisputed evidence showed at trial that Android devices are manufactured by many companies, including Google, Samsung, Motorola, OnePlus, Xiaomi, and other OEMs. This is in sharp contrast to iOS devices, which are manufactured by Apple alone. *See Apple II, 67 F.4th at 966*. Epic expressly argued for a single-brand aftermarket in the Apple case for iOS devices, and the circuit stated that, "in some instances one brand of a product can constitute a separate market." *Id. at 976* (cleaned up). That observation, and the discussion that followed it, are not relevant here because Epic never proposed or argued for a market consisting of only "one brand of a product" with respect to Google. *Id.*

Google says that it doesn't matter that there are multiple brands of Android devices because "Google generates significant revenue from Android devices." Dkt. No. 945 at 2. Even taking that as true for discussion purposes, it hardly explains why many different and competing OEM brands should be treated as a single brand. Google certainly did not present any evidence, or case law or other authority, in support of that proposition. There simply is no evidentiary or legal reason to treat Epic as though it had pursued a foremarket/aftermarket theory that it did not propose, or to penalize it for not proving that theory at trial.

This case also differs from the Apple case in that the Apple App Store is the only app store for iOS devices, which is not true for Android devices. Substantial evidence was presented at trial that multiple Android app stores can be, and on occasion have been, available to consumers. Google's efforts to suppress rival app stores was another key theme at trial. To that end, an internal Google document asked the "existential question": "How do we continue to keep Play as the preeminent distribution platform for Android?" Trial Tr. at 920:24-921:14. Other documents referred to a "market" consisting of Android app developers only, *see id.* at 922:13-923:18, and spoke of "store rivals" that were Android app stores. *Id.* at 952:3-13. Google's CEO, Sundar Pichai, testified that each Android OEM "had the potential to have an app store" which "would compete with Google Play." *Id.* at 1343:1-5.

Overall, the evidence at trial demonstrated that the markets for Android app distribution and in-app payment systems are different from the markets for Apple/iOS app distribution and in-app payment systems that were at issue in *Apple II*. Epic did not pursue a "single-brand aftermarket" here.

## II. JURY INSTRUCTIONS RE RULE OF REASON

**\*6** Google requests a new trial because of alleged legal errors in the jury instructions relating to the Rule of Reason. Dkt. No. 925 at 7-11. Its arguments are not well taken.

### A. Step One

On Step 1 of the Rule of Reason, Google says the jury was impermissibly allowed to "conclude that individually lawful acts are unlawful in the aggregate." Dkt. No. 925 at 10.

The record demonstrates otherwise. Before trial, the Court granted summary judgment for Google on " 'plaintiffs' claims that Google unlawfully prohibits the distribution of other app stores on Google Play.' " Dkt. No. 700 at 1 (quoting Dkt. No. 483 at 6). Because governing case law makes clear that Google had no duty to deal, the Court stated that plaintiffs could reference § 4.5 of the Developer Distribution Agreement by way of background and context only, but they could not "argue or suggest that § 4.5 is unlawful either on its own *or in combination with other alleged practices.*" *Id.* (emphasis added) (citing *Verizon Communications, Inc. v. Trinko*, 540 U.S. 398 (2004)).

The same guidance was stated in the jury instructions. The jury was instructed that "[i]t is not unlawful for Google to prohibit the distribution of other app stores through the Google Play Store, and you should not infer or conclude that doing so is unlawful in any way." Dkt. No. 850 at ECF p. 33 (Instruction No. 24). For the anticompetitive conduct required for Epic's Section 2 claim, the jury was instructed that, "[i]n determining whether Google's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether *the conduct* is consistent with competition on the merits, whether *the conduct* provides benefits to consumers, and whether *the conduct* would make business sense apart from any effect it has on excluding competition or harming competitors." *Id.* at ECF p. 30 (Instruction No. 23) (emphases added). Nothing in the instructions invited the jury to consider Google's alleged conduct in the aggregate, or gave them permission to consider whether independently legitimate conduct may have combined to create an anticompetitive effect.

The verdict form underscored this by directing the jury to consider each type of conduct separately. For Epic's Section 1 claim, the jury was called upon to answer separately for three types of agreements -- (1) DDA agreements; (2) agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program; and (3) agreements with OEMs that sell mobile devices (including MADA and RSA agreements) -- whether each type of agreement was an "unreasonable restraint(s) of trade." Dkt. No. 866 at 5 (Question No. 7).

As the record established, and contrary to Google's argument, the jury was in fact "guided ... to consider each category of conduct individually." Dkt. No. 925 at 10.

### B. Step Two

Google says that on Step 2 of the Rule of Reason analysis, "[t]he jury should have been instructed to consider cross-market justifications," *i.e.*, procompetitive benefits not limited to the relevant product markets at issue. Dkt. No. 925 at 7-8. But in *Apple II*, our circuit expressly took up the issue of the "cognizability of cross-market rationales." 67 F.4th at 989. There, Epic had argued that, "even if Apple's security and privacy restrictions are procompetitive, they increase competition in a *different market* than the district court defined and in which Epic showed step-one anticompetitive effects, and thus are not legally cognizable at step two." *Id.* (emphasis in original).

**\*7** Our circuit noted that the "Supreme Court's precedent on this issue is not clear," even though on occasion it "has considered cross-market rationales in Rule of Reason and monopolization cases." *Id.* The circuit "decline[d] to decide this issue here." *Id.* The circuit also determined that Apple's procompetitive justifications related to the relevant market. *Id.* at 990.

Consequently, there was no legal mandate to expressly require the jury to consider cross-market justifications, such as "Google's competition with Apple in smartphones," Dkt. No. 925 at 9, as Google urges. Contrary to Google's argument, this is not at all a situation where the circuit has not yet "stated 'explicitly' a legal point that 'was implicit in [its] past decisions.' " Dkt. No. 945 at 4 (citing *Dang v. Cross*, 422 F.3d 800, 807-08 (9th Cir. 2005)). It also bears repeating that Google spared no opportunity at trial to tell the jury of its views about competition with Apple.

### C. Step Three

Google makes another argument contrary to circuit law for Step 3 of the Rule of Reason analysis by stating that the Court improperly invited the jury to balance competitive effects. Dkt. No. 925 at 11. But as Google acknowledges, *Apple II* expressly "held that Ninth Circuit precedent requires balancing." *Id.*; *see Apple II*, 67 F.4th at 994 ("where a plaintiff's case comes up short at step three, the district court must proceed to step four and balance the restriction's anticompetitive harms against its procompetitive benefits."). There was no error in the Court's balancing instruction to the jury.

## III. SUFFICIENCY OF EVIDENCE SUPPORTING JURY VERDICT

Google's primary claim for judgment as a matter of law or a new trial is that the verdict is "unsupported by legally sufficient evidence." Dkt. No. 925 at 11-27. True to form, Google objects to just about everything adduced at trial that impugned Google's conduct. The Court has undertaken the laborious task of reviewing the record in light of Google's many complaints, as the ensuing discussion details. Some prefatory observations are in order. The true crux of Google's argument isn't that the verdict was not based on substantial evidence, but rather that the jury didn't see the evidence in the way Google wanted. This is not a situation where the verdict was based on speculation or where the evidence would allow only one conclusion that is contrary to what the jury decided.

Another problem is that Google ignores in practice the standards for granting JMOL or a new trial. For Rule 50, as discussed, all reasonable inferences are made in favor of the verdict and Epic, as the nonmoving party. *See Experience Hendrix*, 762 F.3d at 842, 845. This is so irrespective of whether the evidence might have supported a different result. *See Pavao*, 307 F.3d at 918 ("A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion."). Google subverts this by asking in effect that all inferences be drawn for its benefit. For Rule 59, where the review is free of inferences for either side, the jury verdict will stand unless it is "against the clear weight of the evidence." *Silver Sage*, 251 F.3d at 819. Google slights this by insisting that a new trial is warranted simply because some evidence was disputed and the jury might have decided differently.

### A. Relevant Market

#### 1. Limitation to Android In-App Payments

**\*8** The jury found a market consisting of "Android in-app billing services for digital goods and services transactions." Dkt. No. 866 at 3, 6 (Question Nos. 2, 8). Google says that "[t]he evidence does not support the jury's decision to exclude out-of-app payment systems from the relevant product market," highlighting websites in particular as a "reasonable substitute" that should have been included in the relevant market. Dkt. No. 925 at 11-12.

Not so. Epic's economics expert, Dr. Steven Tadelis, testified that the relevant product market was properly limited to "any product that could do what Google Play Billing does," *i.e.*, "any payment solution provider for digital content on Androids." Trial Tr. at 2553:1-4. He further testified that "web purchases are not a viable substitute for in-app purchases" because of "friction" -- whereas in-app purchases can be completed in two to three steps by the user, web store purchases required at least eight steps. *Id.* at 2554:4-2556:15. This increased friction was likely to lead to increased dropoff along the process, where users do not complete the purchase. *Id.* at 2556:19-2557:10. Google executive Purnima Kochikar was taken through the 18 steps a user would have had to go through "to have the Amazon App Store show up on the Home Page of their Android device." *Id.* at 746:3-752:8. Kochikar called the sideloading experience "abysmal," *id.* at 753:22-755:5, and agreed that "the number of steps makes for a bad user experience," and "where there's friction, people [often] fall out and don't complete purchases." *Id.* at 762:20-763:2. Witness Eric Chu testified that YouTube engineers worked to "reduce the number of clicks," asking themselves, "[f]rom the moment the user wants to buy something[,] what can we do to reduce [the] number of clicks and make it easier for them to purchase something[?]" *Id.* at 1441:2-1442:11; Dkt. No. 915-1 at ECF p. 85. The "[r]eason for that is obvious that the more friction there is[,] the more likely we lose users along the buy flow." *Id.*

The jury was instructed, without objection by Google, that "[i]n determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view." Dkt. No. 850 at ECF p. 22 (Instruction No. 18). This means "they must be, as a matter of practical fact and the actual behavior of consumers (meaning users and developers), substantially or reasonably

interchangeable to fill the same consumer needs or purposes. Two products are within a single market if one item could suit buyers' needs substantially as well as the other." *Id.* The jury reasonably relied on the testimony summarized above, and similar evidence at trial, to conclude that from the developers' and users' points of view, out-of-app payment systems were not reasonable substitutes for in-app payment systems.

Google's citation to *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001), is misdirected. Google cites it for the proposition that consumers' personal preferences are not relevant. But *Tanaka* involved a highly unique personal preference -- literally the preference of just plaintiff Tanaka, a "star high school soccer player" who wanted to "remain in the Los Angeles area" so she could "be close to her family." 252 F.3d at 1061, 1063. Tanaka challenged an intercollegiate athletic association rule that discouraged intra-conference transfers, and although the association was national in scope, she alleged that the "relevant geographic market is Los Angeles and the relevant product market is the 'UCLA women's soccer program,' " based purely on her personal desires. *Id.* at 1063. The circuit concluded that Tanaka's personal preference to be near her family could not be a proper basis for defining the " 'area of effective competition' for student-athletes competing for positions in women's intercollegiate soccer programs." *Id.*

**\*9** The facts here could not be more different. This is not a case of one person trying to define a purely personal market. Substantial evidence was presented at trial to the effect that an out-of-app payment solution would not meet a developer's or user's needs as well as an in-app payment solution. The evidence showed that this was not a matter of mere preference or taste, but a product of design and function. Out-of-app payment solutions are a cumbersome mechanism for sales, and so are not likely to be viewed by developers or users as reasonable substitutes for in-app payment systems. The jury's finding of an Android in-app payment solutions product market was not against the great weight of the evidence.

### 2. Geographic Scope

Substantial evidence supported the jury's finding that the relevant geographic market was "worldwide excluding China." Dkt. No. 866 at 3, 6 (Question Nos. 2, 8). The jury was instructed that the "relevant geographic market is the area in which Google faces competition from other firms that compete in the relevant product markets and to which customers can reasonably turn for purchases." Dkt. No. 850 at ECF p. 23 (Instruction No. 19). The jury was further instructed that "[w]hen analyzing the relevant geographic market, you should consider whether changes in prices or product quality in one geographic area have substantial effects on price or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market." *Id.* Contrary to Google's argument, there is no absolute "legal test" of " 'consumer substitution.' " Dkt. No. 945 at 6.

Epic's economics expert, Dr. Douglas Bernheim, testified that the appropriate geographic boundary for the relevant market was "global, excluding China." Trial Tr. at 2445:16-24. This was because "competitive conditions" in different countries "are largely similar," and Google's challenged conduct in this case was "global, excluding China." *Id.* at 2446:1-11. It was appropriate to carve out China because China was "very dissimilar" in that Google Android, Google Play, and Google's challenged conduct, were "not in China." *Id.* at 2446:18-23. Dr. Tadelis agreed with Dr. Bernheim's analysis, and also concluded that the geographic market was "global excluding China." *Id.* at 2560:10-16.

Other witnesses at trial also testified to these facts. For example, Google witness James Kolotouros testified that Google Play is not permitted in China and is not preinstalled on smartphones distributed there. *See id.* at 1070:7-17. On the flip side, "every Android smartphone outside of China comes preinstalled with Google Play." *Id.* at 1070:18-21. Kolotouros also testified that Google faced competition from companies such as Samsung, Xiaomi, Oplus, and Vivo, which "had the potential to have app stores that competed with Google Play in markets outside of China." *Id.* at 1079:16-1080:24; *see also id.* at 1207:13-1210:11 (Google witness Jamie Rosenberg's testimony re internal Google document discussing Amazon App Store's growing popularity in Japan, and Google's concern that Amazon might "scal[e] up and go[ ] global," becoming a more global threat to Google Play). Similarly, for in-app payment solutions, there was trial testimony that Google Play Billing is "not offered in China," and Google faces competition from companies such as PayPal, Square, and Braintree outside of the United States. *Id.* at 2586:21-2588:25. The jury's geographic market findings were supported by adequate evidence and were not against the great weight of the evidence.

### B. Anticompetitive Effect of Google's Conduct

For Epic's monopolization claim, the jury was instructed that "[a]nticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF p. 30 (Instruction No. 23). For Epic's restraint of trade claim, the jury was instructed that "[a] harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality." *Id.* at ECF p. 37 (Instruction No. 28). The jury was further instructed to consider the following factors: "(1) the effect of the challenged restraint on prices, output, product quality, and service; (2) the purpose and nature of the challenged restraint; (3) the nature and structure of the relevant market; (4) the number of competitors in the relevant market and the level of competition among them, both before and after the challenged restraint was imposed; and (5) whether Google possesses market power." *Id.*

**\*10** After considering the evidence in light of these instructions, the jury found that Google "willfully acquired or maintained monopoly power by engaging in anticompetitive conduct." Dkt. No. 866 at 3 (Question No. 3). The jury also found each of these agreements to have been unreasonable restraints of trade (and so impliedly to have had anticompetitive effects): (1) "DDA agreements"; (2) "Agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program"; and (3) "Agreements with OEMs that sell mobile devices (including MADA and RSA agreements)." *Id.* at 5 (Question No. 7).

Each of these findings was supported by substantial evidence, and was not against the great weight of the evidence. There was substantial evidence at trial that Google had engaged in conduct, "other than competition on the merits, that ha[d] the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF p. 30 (Instruction No. 23). It bears mention that Google does not contest that Epic presented sufficient evidence on Google's market power or the barriers to entry that existed in both of the relevant markets found by the jury. *See* Dkt. No. 932 at 15, n.11; *compare with* Dkt. No. 945.

The jury heard a great deal of testimony about Google's agreements with existing or potential competitors in connection with Project Hug.[3] Activision Blizzard King (ABK) was a developer that signed a Project Hug deal. The developer of mobile games such as Candy Crush and Call of Duty, ABK "had the highest estimated spend by users of all of the Project Hug developers." Trial Tr. at 445:5-13. ABK had been "quite vocal [in] complaining about Google Play's 30 percent fee," and Google witness Koh testified that it had been communicated to Google that ABK was considering the option of starting its own Android app store. *Id.* at 445:14-22, 463:5-8. Google estimated that it faced a risk of losing $243 million per year if ABK were to pull its content from the Google Play Store. *Id.* at 463:24-464:9. Google internally discussed this risk, as well as the possible "contagion risk" if ABK were to launch its own store and "attract[ ] more content from other developers." *Id.* at 463:5-464:24.[4] Google then offered ABK a Project Hug deal for $360 million. *Id.* at 465:3-466:8. Google witness Kochikar testified about Google's concern that ABK might launch its own Android app store, and Google's hope that a Project Hug deal would prevent that. *See id.* at 804:7-807:12. Riot Games was another developer that was offered and took a Project Hug deal. An internal Google document stated, "A year ago, we pulled all the stops, promised them $10 million co-marketing for before they signed GVP, for example, to get Riot Games to stop their in-house app store effort." *Id.* at 811:6-812:12.

In exchange for significant payments from Google, developers who signed a Project Hug agreement "could not launch [an app] either first or exclusively on any competing Android distribution platform." Trial Tr. at 442:23-443:2. Developers who agreed to Project Hug also could not "launch a materially different version of the game that it had on Google Play on a competing Android app distribution platform." *Id.* at 444:10-15. Epic's expert, Dr. Bernheim, testified to the anticompetitive effects of these provisions. In his view, these provisions "prevent[ed] any significant differentiation," disincentivized developers from creating valuable content, and would also have discouraged Project Hug developers from entering the app store market themselves. *Id.* at 2403:7-2410:7.

**\*11** There was also substantial evidence of the anticompetitive effects of Google's agreements with OEMs, specifically the Mobile Application Distribution Agreement (MADA) and Revenue Share Agreements (RSA). The MADA is an agreement that Google enters into with Android OEMs. Pursuant to the MADA, OEMs must place Google Play on the default home screen of their Android devices. Trial Tr. at 1351:14-21. Virtually all OEMs that manufacture Android smartphones have entered

into a MADA, and so Google Play is preinstalled on the default home screen of nearly all Android smartphones. *Id.* at 1351:22-1352:8. Google's CEO, Sundar Pichai, acknowledged that "[t]ypically," placement on the default home screen tends to lead to more usage of an app. *Id.* at 1352:9-12. Preinstallation of Google Play on the default home screen is a precondition for an OEM to have access to other key Google GMS apps and Android APIs without which many Android applications cannot function. *Id.* at 1355:1-1356:4. Restrictions like these made it difficult for competitors like Amazon to obtain "premium placement" for apps such as its own app store, Dkt. No. 915-1 at ECF p. 107, and so it was difficult for alternative app stores to get off the ground.

The terms of the Google Revenue Share Agreements with OEMs were even more aggressive. The RSA 3.0 agreements are the third iteration of that contract, and they offer OEMs the opportunity to enroll their devices in three different tiers. Trial Tr. at 1053:1-9. For the "premier tier," which offers the highest revenue share, an OEM "may not install any app store on their device other than Google Play." *Id.* at 1053:7-24. Epic's expert, Dr. Bernheim, testified that this kind of profit-sharing with a competitor disincentivizes competition, and so is anticompetitive. *Id.* at 3189:22-3190:14.

There was additional trial testimony to the same effect. Google witness Kolotouros testified that, with the exception of Samsung, most of Google's major Android OEM partners executed RSA 3.0 agreements. *Id.* at 1092:4-6. OnePlus was one such OEM, and outside of China and India, OnePlus enrolled the vast majority of its devices in the premier tier. *Id.* at 1094:3-17. Although OnePlus wanted to enter into a partnership with Epic Games whereby the Epic Games Store app would be preloaded onto OnePlus devices, Google declined to grant a waiver to the premier tier restrictions. After that, OnePlus decided to "take Google's revenue share payments and keep nearly all of its devices outside of India in the premier tier instead of preinstalling the Epic Game Store app." *Id.* at 1094:18-25, 1098:24-1099:13.

The jury heard more evidence from which it could reasonably conclude that the RSA 3.0 agreements were anticompetitive. This included an internal Google document in which Google employees discussed how "Google cannot stop OEMs from preloading the Amazon App Store due to anticompetitive concerns on the MADA 2.0 only," but "[w]e can do this through revenue share deals." Trial Tr. at 1074:8-17. The employees agreed that having "stricter placement restrictions through revenue share" was something that would "help stem the tide of emerging app stores." *Id.* at 1074:22-1075:19. In the course of this discussion, another Google executive inquired about why Google "doesn't put everything in the MADA" and asked, "Is it anticompetitive concerns or something more than that?" Witness Kolotouros responded, "This might be better discussed in person as opposed to writing." *Id.* at 1075:20-1076:12. This and much other evidence supported a verdict against Google on the "purpose and nature of the challenged restraint," namely the RSA 3.0 agreements.

There was additional evidence at trial that Google worked to suppress competition by actively impeding users from "sideloading" competing app stores through increased "friction" and "scare screens." "Sideloading" referred to a direct installation process whereby a user "find[s] an app via a mechanism that is not billing itself purely as an app store." Trial Tr. at 2128:4-6. "Friction" meant "the screens, the dialogues, the warnings that an operating system is going to put up and show to users and sort of force the user to click through or interact with before the user can actually accomplish the intended task." *Id.* at 2113:21-25. Google's CEO, Sundar Pichai, acknowledged that "the more friction there is, the less likely the user completes that flow," *id.* at 1361:11-13, and there was evidence that Google viewed friction as a means of impeding users from sideloading third-party app stores. For example, a Google internal document titled, "Amazon competitor deep dive," noted that "Amazon [was] emerging as a major challenge to Play in gaming globally." Dkt. No. 886-50 (Trial Ex. 682) at ECF pp. 1-2. Another slide was titled, "Amazon strongly promoting its 15%+ discount on IAPs available via Play, but for now switching hurdle too high for most users." *Id.* at ECF p. 11. Under the heading, "Significant hurdle to switching to Amazon apk," the Google document stated, "Process is quite complex, involves 14 steps (but motivated users will follow walkthroughs like this on YT)." *Id.*

*12 For the DDA agreements, Google says that "Epic failed to prove, and no reasonable jury could have found, that the anti-steering restrictions in the DDA were anticompetitive because they merely prevent developers who choose to use valuable Google services and intellectual property in the Play store from depriving Google of compensation for that value." Dkt. No. 925 at 22. But this objection ignores the trial evidence about the anticompetitive nature of these anti-steering restrictions and the DDA in general. For example, there was testimony that Paddle, a company that offers to

developers in-app payment solutions, was prevented from more effectively entering the in-app payment services market because "Google Play's terms of services for developers [*i.e.*, the DDA] expressly prohibit the usage of a third-party payment method." Trial Tr. at 653:3-11.

This and similar trial evidence demonstrate that the jury's findings on Google's anticompetitive conduct were well supported. There was sufficient evidence for the jury to agree with Dr. Bernheim that Google "impairs competition without preventing it entirely," Trial Tr. at 3181:1-3185:12, thereby satisfying the requirement that Google's conduct "frustrat[ed] the efforts of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF p. 30 (Instruction No. 23). Because the evidence discussed above is adequate to support the jury's verdict, the Court declines to address Google's other arguments on the anticompetitive effect element of Epic's antitrust claims.

### C. Tying

Substantial evidence supported the jury's finding in favor of Epic on its tying claim, namely that "Google unlawfully tied the use of the Google Play Store to the use of Google Play Billing." Dkt. No. 866 at 7 (Question No. 10).

The jury heard evidence that the Google Play Store and Google Play Billing are separate products. It was not necessary for Epic to prove that there was separate demand for Google Play Billing as a standalone product; rather, it was enough for Epic to prove that there was demand for in-app billing services separate from the demand for app distribution services. *See Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984) (a "tying arrangement cannot exist unless two separate product markets have been linked"; "in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services"). Epic presented substantial evidence on this element. Epic witness Steven Allison testified, for example, that in the case of the Epic Game Store, developers can use Epic Direct Pay, which is Epic's in-app payment solution, or "they can bring their own if they've set their game up to do so." Trial Tr. at 227:5-12. Down Dog's CEO, Benjamin Simon, testified that he would prefer Stripe or PayPal over Google Play Billing, and if he "had the ability at Down Dog to use PayPal or Stripe on [Down Dog's] Android app," he would do so. *Id.* at 303:2-10.

There was substantial evidence that Google coerced its customer -- here, developers -- to buy the tied product (Google Play Billing) in order to obtain the tying product (Google Play Store). Numerous witnesses testified that developers whose apps are on the Google Play Store are required through the DDA to use only Google Play Billing to sell any digital content that is to be used inside of the app. *See, e.g.*, Trial Tr. at 887:7-13, 889:9-21, 1185:18-21.

The jury had an ample evidentiary basis for rejecting Google's business justification defense as pretextual, and finding that Epic had successfully proven the existence of less restrictive alternatives. The trial testimony established, for example, that developers who sold digital content for use outside of the app were exempted from the requirement to use Google Play Billing, which weakened Google's business justification argument. *See* Trial Tr. at 1185:22-25. Similarly, developers who sold physical goods were also exempted. *See* Dkt. No. 886-94 (Trial Ex. 1436); *see also* Trial Tr. at 936:3-9.

\*13 Epic also adduced evidence that the Google Play Store was so profitable that Google did not need to tax developers a 30% fee through Google Play Billing to be fully compensated for its IP and other costs for the Google Play Store. For example, the jury saw an internal Google document showing that some developers paid "more than a hundred million dollars per year more than the value that they have obtained from Google"; and for the 100 most negative developers (whose payments to Google exceeded the estimated value they received from Google), Google internally estimated that on average, they "receiv[ed] a value equivalent to 19 percent," but "still were required to pay Google a 30 percent revenue share." Trial Tr. at 608:6-611:22. Based on Google Play's revenue numbers, this worked out to $1.43 billion per year that the top 100 most negative developers were overpaying to Google. *See id.* at 612:3-613:11. There was additional evidence at trial that Google was concerned about public criticism calling out "Google's 30 percent fee on in-app purchases made on apps distributed through Google Play" as "highway robbery." *Id.* at 417:17-418:24; *see also, e.g., id.* at 708:18-21 (internal Google document stating that "the team estimates that if you compare the value of nonSearch-driven discovery versus revenue share paid, Tinder is now deriving only 10 percent of the revenue share value versus the 30 percent share they pay."). Overall, the jury had more than enough evidence at the balancing step to conclude that any benefit from Google's tie was outweighed by its competitive harms.

It was not improper for the jury to consider the DDA as an unreasonable restraint of trade and to additionally consider

Epic's tying claim. The tying claim focused on Google's coercive tie of Google Play Billing to the Google Play Store, while Epic's challenge to the DDA also encompassed the DDA's anti-steering provisions. Multiple legal claims may be based on the same underlying conduct, and Google has not presented any authority to the contrary.

### D. Substantially Less Restrictive Alternatives

Google challenges the jury's implicit finding in favor of Epic on Step 3 of the Rule of Reason, and says that no reasonable jury could find that Epic satisfied its burden to identify substantially less restrictive alternatives that would be virtually as effective in serving Google's objectives without significantly increased cost. Dkt. No. 925 at 24-27.

Google overlooks the fact that the jury might simply have rejected Google's proffered justifications. The jury had ample evidence to do so. There was evidence at trial, for example, to support Epic's theory that the exclusionary provisions in the MADA and RSA agreements were put into those agreements for anti-competitive reasons, rather than any legitimate business reasons. *See, e.g.*, Trial Tr. at 2920:19-2921:7 (Google witness Gennai testifying that RSA 3.0 premier tier was developed "to respond to increasing app store competition from OEMs and large platforms like Epic"); *id.* at 1078:3-1079:19 (changes to RSA proposed "to protect Google from key strategic risks," including risks of revenue loss due to "Chinese OEMs and Samsung ... actively investing in creating own app and services ecosystems"); *id.* at 1073:6-1076:12 (internal Google document stating that "Google cannot stop OEMs from preloading the Amazon App Store due to anticompetitive concerns on the MADA 2.0 only," but could "prevent OEMs from preloading competitive app stores" through "revenue share deals").

For the sideloading warnings, there was evidence at trial that the increased friction built in by Google were not related to Google's assessment of the security risk posed by the material the user was trying to sideload. Google CEO Pichai agreed that "[s]ome websites, such as those from reputable developers, actually present very low security risks," and yet "Google's unknown sources flow does not distinguish between those trusted developers and every other website." Trial Tr. at 1365:2-8; *see also id.* at 1693:11-1695:21 (sideloading / "unknown source" install flows of 14 or 17 steps applied equally to apps from companies such as Microsoft or Adobe, which are known to Google). Epic's mobile security expert, Dr. James Mickens, testified that any legitimate benefit of increased security protections for users could have been accomplished through less restrictive means such as fewer screens, or a notarization process that differentiated among the types of security risks presented by different apps or companies. *See id.* at 2149:2-7, 2151:6-8, 2152:4-6, 2157:2-24. His overall opinion, which the jury could reasonably have credited and believed, was that the friction Google imposes is unwarranted and disproportionate, and that Google could reduce the amount of friction while preserving the status quo on security.

**\*14** For the parity provisions in Project Hug and the anti-steering provisions in the DDA, as discussed above in Section III.B. *supra*, sufficient trial evidence supported a conclusion by the jury that those were motivated by anticompetitive reasons, rather than legitimate business ones.

## IV. EVIDENTIARY RULINGS AND ADVERSE INFERENCE INSTRUCTION

Google says that three evidentiary rulings entitle it to a new trial. Dkt. No. 925 at 27-29. The record demonstrates otherwise.

### A. Google Employees' Use of Attorney-Client Privilege

To start, Google says the Court "permitted Epic to question witnesses about markings related to attorney-client privilege on produced documents." Dkt. No. 925 at 27. Google also claims, quite brazenly and wrongly in light of its willful conduct to hide material evidence, that it had not "improperly withheld any document on the basis of privilege" and so "Epic's questioning of Google witnesses regarding privilege markings on documents gave the jury the incorrect impression that Google had improperly asserted the attorney-client privilege." *Id.*

Google's remarks are ill made. After the Court's findings of fact against Google for willfully failing to preserve Google Chat evidence, *see* Dkt. No. 469, more evidence emerged at trial of a frankly astonishing abuse of the attorney-client privilege designation to suppress discovery. CEO Pichai testified that there were occasions when he "marked e-mails privileged, not because [he was] seeking legal advice but just to indicate that they were confidential," as he put it. Trial Tr. at 1321:17-24. He knew this was a misuse of the privilege. *Id.* at 1323:5-17. Emily Garber, a Google in-house attorney, testified that there was a practice at Google of "loop[ing] in" a lawyer based on a "misapprehension about the rules of privilege," and that Google employees "believed that including [an in-house lawyer] would make it more

likely that the email would be considered privileged." *Id.* at 964:21-966:5. Garber called this "fake privilege," a practice that she appears to have found amusing rather than something a lawyer should have put an immediate and full stop to. *Id.* at 964:21-23; Dkt. No. 887-86 (Trial Ex. 6487) at EXHIBIT pp. 012-013.

On this record, there was no error in the Court's evidentiary ruling that Epic could "present fake privilege" and make arguments to the jury about it. *Id.* at 785:5-6. The Court was crystal clear that Epic could not "do anything else with privilege," and it commended the parties for not saying "anything about" documents that had been "branded privileged" even though it should not have been subject to an assertion of privilege. *Id.* at 785:8-12.

### B. Preclusion of Outcome of *Epic v. Apple*

Google repackages the prior preclusion argument as an ostensible evidentiary objection to say: "the Google Play store's primary competitor is free to use the same basic service fee model explains why it is important for Google to use that same model. The Court erred by preventing Google from introducing evidence that Apple was unlikely to change its existing model in light of the outcome of *Epic v. Apple* -- a market fact that supports Google's procompetitive justifications for that model and the alleged tie." Dkt. No. 925 at 28.

The point fares no better as an evidentiary objection than it did in the prior version. *See* Section I.A., *supra.* In addition, for the same reason that there was no error in the jury's decision to exclude Apple from the relevant product markets it found, these outside facts about Apple are not nearly as relevant and important as Google urges.

### C. Adverse Inference Instruction

*15 Google's comments on the permissive inference instruction are even more poorly taken that those about the attorney-client privilege. The Court determined after an evidentiary hearing held before trial that Google had willfully failed to preserve relevant Google Chat communications, and allowed employees at all levels to hide material evidence. Dkt. No. 469. The evidence presented at trial added more fuel to this fire. As discussed, Google in-house attorney Garber testified about the company practice of asserting a fake privilege to shield documents and communications from discovery. Other witnesses also amplified the seriousness and pervasiveness of Google's preservation abuses. For example,

Google employee Margaret Lam, who worked on RSA issues, said in a Chat message that she didn't have a specific document because "competition legal might not want us to have a doc like that at all :)." Trial Tr. at 991:16-992:8 (smiley face emoji in original). She was a party to other Chats where, in a discussion about MADA, she asked to turn history off because of "legal sensitivity"; she requested to turn history off in a different conversation about RSAs, so there would be no "trail of us talking about waivers, etc." Dkt. No. 887-83 (Trial Ex. 6464), Dkt. No. 888-23 (Trial Ex. 8020). Witness Lam also testified that the decision of which Chats to preserve had been left in her hands, but she had "no idea" what was or was not relevant. Trial Tr. at 1012:6-1014:9.

Overall, there was an abundance of pretrial and trial evidence demonstrating "an ingrained systemic culture of suppression of relevant evidence within Google." *Id.* at 1044:15-17. The Court had advised the parties before trial that an appropriate sanction might include a permissive inference instruction to the jury. Dkt. No. 700 at 3-4. After the additional evidence of malfeasance emerged during trial, the Court raised the question of whether a mandatory adverse inference instruction would be more fitting. Trial Tr. at 1044:4-22. Even then, despite the mountain of evidence against Google, the Court held an evidentiary hearing on the question outside of the presence of the jury.

The results of this hearing were disappointing. Google's chief legal officer, Kent Walker, was the main witness. Despite the seriousness of these issues, and the likelihood that they could affect other litigation matters where Google is a party, Walker showed little awareness of the problems and had not investigated them in any way. Trial Tr. at 1834:18-1835:17. Much of his testimony was in direct opposition to the facts established at the prior Google Chat hearing. *See, e.g., id.* at 1829:16-1830:3. Overall, Walker did nothing to assuage the Court's concerns.

In these circumstances, the salient question was not whether an adverse inference instruction should be given at all, but whether the inference should be permissive or mandatory. The Court would have been well within its discretion to order a mandatory inference, given the volume of evidence of Google's misconduct. Even so, the Court took the conservative approach of permitting the jury to make an adverse inference rather than requiring it to. The parties had a fair and balanced opportunity during trial to present evidence and arguments about Google Chat preservation and Google's conduct, and both sides took full advantage of that. The

jury was free to make or decline an inference as it saw fit. To further ensure fairness, the Court instructed Epic that it could not make arguments about Google's conduct predating August 2020. *See* Trial Tr. at 3237:4-8. If Epic opened that door, Google would have been permitted to respond, *see id.*, but Epic followed that instruction in its closing argument. *See id.* at 3352:3-3386:14, 3430:19-3435:7.

In light of this record, Google's complaints about the inference instruction are wholly misdirected. It has not provided anything close to a good reason to conclude otherwise.

**V. ADVISORY JURY**

Google says, rather disingenuously, that the Court has not clarified "whether it was going to treat the jury's verdict as binding or advisory," and requests that the Court treat the verdict as advisory. Dkt. No. 925 at 29. It argues further that it "did not consent to a jury trial," and even if it did, it withdrew that consent. *Id.* at 29-30.

Google again ignores that it already made these arguments to the Court prior to the start of trial, and lost, for good reason. The Court expressly denied Google's request to "abandon a jury trial" on the eve of trial. Trial Tr. at 6:13-7:16. Google is in effect seeking reconsideration of that ruling, for no good reason.

*16 To summarize the prior proceedings on this issue, under Federal Rule of Civil Procedure 39(c)(2), "[i]n an action not triable of right by a jury, the court, on motion or on its own: ... (2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right, unless the action is against the United States and a federal statute provides for a nonjury trial." Google consented to a jury trial of Epic's antitrust claims against it. A party's consent under Rule 39(c)(2) can be express or implied. *See, e.g.*, *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989); *Thompson v. Parkes*, 963 F.2d 885, 889 (6th Cir. 1992) (en banc); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 795-96 (9th Cir. 1999); *Broadnax v. City of New Haven*, 415 F.3d 265, 271-72 (2d Cir. 2005); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000).

Google gave unambiguous express and implied consent to a jury trial. The express consent can be found in documents such as the parties' Joint Submission re Trial Proposal, which stated, for "Issues Triable to a Jury": "The parties agree that all claims by all Plaintiffs are triable to a jury, with the exception of the claims brought under California's Unfair Competition Law, ..., and claims that the States have brought under the laws of 38 states other than California." Dkt. No. 505 at 3. The record also shows that the Court and the parties contemplated a jury trial for Epic's antitrust claims for years, without objection by Google and with its active participation in the filing and discussion of jury instructions, proposed voir dire, and motions in limine.

Google's filing on November 1, 2023, one day before jury selection and two court days before the start of trial, was the first time it said it was "withdraw[ing] that consent." *See* Dkt. No. 730 at 7. That was far too late. *See Bereda*, 865 F.2d at 55 ("Rule 39(c) does not permit the district court to withdraw its prior consent to the litigants' request for a nonadvisory jury."); *Thompson*, 963 F.2d at 889 ("Even if the court was correct that no jury trial right existed in this case, F.R.Civ.Pro. 39(c) permits both sides to stipulate to a jury trial. To be sure, a district court does not have to go along with the stipulation, but once that occurs, it does not have unbridled discretion to change its mind."); *see also AMF Tuboscope, Inc. v. Cunningham*, 352 F.2d 150, 155 (10th Cir. 1965) (where parties had stipulated to a jury trial that was set to begin on March 1, abuse of discretion for district court to vacate the jury trial on February 28 and re-set the case for a bench trial, based on court's conclusion that the parties were not entitled to a jury trial as of right).

Allowing Google to withdraw its consent two court days before trial would have caused immense prejudice to Epic, which had been awaiting its day before a factfinder since filing its case years prior, and which had spent many months preparing for a jury trial. A jury trial was proper, and the jury's verdict is properly treated as binding.

**CONCLUSION**

Google's motion did not present good grounds for judgment as a matter of law or for a new trial.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 3302068

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION, Slip Copy (2024)
2024 WL 3302068

## Footnotes

1   All docket number references are to the ECF docket for *In re Google Play Store Antitrust Litigation*, Case No. 21-md-02981-JD.

2   "Trial Tr." references are to the trial transcript, which consists of 17 volumes with 3,442 total pages that are consecutively numbered. The transcript can be found at Dkt. No. 834 (Vol. 1; pages 1-116); Dkt. No. 835 (Vol. 2; pages 117-322); Dkt. No. 836 (Vol. 3; pages 323-578); Dkt. No. 837 (Vol. 4; pages 579-788); Dkt. No. 838 (Vol. 5; pages 789-1036); Dkt. No. 839 (Vol. 6; pages 1037-1302); Dkt. No. 840 (Vol. 7; pages 1303-1539); Dkt. No. 841 (Vol. 8; pages 1540-1785); Dkt. No. 842 (Vol. 9; pages 1786-1866); Dkt. No. 843 (Vol. 10; pages 1867-2103); Dkt. No. 844 (Vol. 11; pages 2104-2291); Dkt. No. 845 (Vol. 12; pages 2292-2518); Dkt. No. 846 (Vol. 13; pages 2519-2763); Dkt. No. 847 (Vol. 14; pages 2764-2854); Dkt. No. 848 (Vol. 15; pages 2855-3065); Dkt. No. 849 (Vol. 16; pages 3066-3293); and Dkt. No. 867 (Vol. 17; pages 3294-3442).

3   The Games Velocity Program was a continuation of Project Hug. *See* Trial Tr. at 491:13-14; *id.* at 410:13-15 (Google witness Lawrence Koh affirming that "Project Hug was later renamed the Games Velocity Program").

4   Witness Koh testified that the "contagion risk" had to do with Google's concern that "once top developers took their gaming content off of Google Play, that other developers would potentially follow suit." Trial Tr. at 422:14-16.

End of Document                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                                      14