# EXHIBIT 26
# FILED UNDER SEAL

**ANTITRUST COMPLIANCE POLICY**
National Association of Federally-Insured Credit Unions

*CONFIDENTIAL*
*June 2022*

Trade associations provide a lawful and important opportunity for competitors to meet and discuss items of legitimate concern to the industry, such as legislative initiatives, the promotion of best practices, and other areas of common industry interest.  At the same time, trade associations and their members must be acutely sensitive to antitrust issues because trade associations, by definition, are organizations of actual and/or potential competitors that provide opportunities for formal and informal discussions that could lead to conduct that violates the antitrust laws.  As such, trade associations are often closely watched by antitrust enforcement agencies as well as the plaintiffs' class action bar.

Communications relating to competitive conditions between members or even in the marketplace more generally can give rise to serious antitrust risks and penalties, since any such communication may be cited as evidence of a conspiracy to restrain trade.  Such communications have potential ramifications for the National Association of Federally-Insured Credit Unions (NAFCU) and its membership as well as employees of the NAFCU and member organizations.

<u>It is NAFCU's policy to comply fully with all federal and state antitrust laws</u>, which are intended to protect free and fair competition for the benefit of American consumers.  This Antitrust Compliance Policy is designed to assist NAFCU, its employees, and its members in avoiding violations of the antitrust laws and to prevent even the appearance of any violation.

This Antitrust Compliance Policy is not a comprehensive statement of the antitrust laws but provides an overview of the most common issues and most risky activities to avoid.  All NAFCU employees and members are responsible for reading and adhering to this Policy.

**WHAT ARE THE ANTITRUST LAWS?**

The antitrust laws of the United States and the various states prohibit agreements, combinations, and/or conspiracies "in restraint of trade."  Because NAFCU is an organization of actual and/or potential competitors, only some action by the association that unreasonably restrains trade needs to occur for there to be a potential antitrust violation.

More specifically, the antitrust laws prohibit competitors from engaging in actions that could artificially reduce competition in the marketplace.  Certain activities are deemed so pernicious and harmful that they are considered "per se" violations—meaning that courts deem these activities illegal with virtually no factual inquiry, including whether or not the activities have an actual harmful effect on competition.   These activities, <u>which must be strictly avoided</u>, include:

› Price fixing agreements (e.g., agreeing to fix rates and fees at certain explicit amounts, agreeing not to sell below certain rate or fee "floors" or purchase above certain "ceilings," agreeing not to discount below certain levels, and any other factors that directly or indirectly affect price).

- › Market allocation (e.g., allocating certain suppliers/vendors, goods or services, customers, or geographic areas among competitors or potential competitors).
- › Bid-rigging (e.g., comparing bids before submission, agreeing to refrain from bidding, knowingly submitting noncompetitive bids).
- › Group boycotts (e.g., agreeing with competitors to exclude suppliers/vendors from the market, agreeing with suppliers/vendors to exclude competitors from market).

In addition to the foregoing, federal and state regulators have announced their intentions to prioritize and have started bringing enforcement proceedings against employers engaged in "naked no-poaching or wage-fixing agreements" with other employers—i.e., agreements among employers competing for the same types of employees to limit or fix the terms of employment for existing employees or potential hires.  Terms of employment include wages, salaries, and benefits.

Illegal anticompetitive agreements need not be formalized in writing or with a handshake.  Many government antitrust enforcement actions involve informal or "gentlemen's" agreements. ("Well, we didn't actually reach an agreement.  It was more like an informal understanding.")  Unlawful agreements may be inferred from conduct; express language is not required to form a conspiracy in the eyes of the law.

**Example:** Trade association members gather for a meeting.  One member says: "I don't care what the rest of you do; fees are too low and I intend to raise mine tomorrow."  After the meeting, several association members raise their fees.

**Result:** They were found guilty of a price fixing agreement, despite the speaker's disclaimer ("I don't care what the rest of you do") and the absence of direct evidence of an agreement.

Other activities, such as standards development and many contractual arrangements between buyers and sellers, are generally evaluated under a "rule of reason," which requires balancing the potential pro-competitive and anticompetitive aspects of the activity.  Enforcers have recognized the potential for procompetitive benefits of such activities but <u>because these activities still carry legal risk, they should be approached with caution and legal guidance.</u>

**LEGISLATIVE INITIATIVES, LITIGATION, AND POLITICAL ACTIVITY**

Generally speaking, the antitrust laws regulate business activity, not political activity.  Thus, collective efforts to petition the government can be protected from liability by the First Amendment, which supersedes the antitrust laws.  Referred to as the "Noerr-Pennington doctrine" (after a pair of Supreme Court cases), this exception protects legitimate, joint legislative lobbying and accompanying publicity campaigns, litigation efforts, and joint advocacy in administrative proceedings with government agencies, even if the effect of the pursued government action is potentially anticompetitive.  Note, however, that the immunity offered by the Noerr-Pennington doctrine has its limits.  Immunity can be lost where, for example, parties engage in "sham" or baseless lawsuits or administrative filings for the purpose of harming competition.

**WHAT ARE THE CONSEQUENCES OF VIOLATING THE ANTITRUST LAWS?**

<u>The consequences of violating the antitrust laws are severe.</u>  Federal and state antitrust laws are enforced both criminally and civilly.  A criminal conviction can carry stiff fines for the association and its offending members and employees—up to $100 million for an offending corporation and up to $1 million for each individual—as well as jail time for individuals who participated in the violation (up to 10 years per offense).  A criminal conviction can also result in a court order dissolving the association or seriously curtailing its activities.  The antitrust laws can be enforced against associations, association members, and the association's employees by both government agencies and private parties, including competitors and consumers.  A plaintiff who successfully establishes an antitrust violation in court is automatically awarded treble damages (triple the amount of actual damages sustained) plus attorneys' fees and costs to bring the case.

Defendants in a civil antitrust action are jointly and severally liable for damages, meaning that each defendant is liable for up to the full amount of proven damages.  As the principal federal antitrust law is a criminal conspiracy statute, a credit union representative attending a meeting at which competitors engage in illegal discussions may be held criminally responsible, even if he or she says nothing at the meeting.  The representative's attendance at the meeting may be sufficient to imply acquiescence in the discussion, making him or her liable to as great a penalty as those who actively participated in the illegal agreement.

**WHAT SHOULD I DO TO AVOID VIOLATING THE ANTITRUST LAWS?**

**Please adhere to the following guidelines:**

› **DON'T** discuss or agree upon: (i) credit terms including rates or fees that you will pay suppliers/vendors or charge members; or (ii) any price-related terms such as discounts, rebates, costs, margins, or terms of sale; or (iii) terms of employment, including wages, salaries, and benefits, for existing employees or potential hires with other association members.

› **DON'T** discuss or agree to divide up suppliers/vendors, customers, markets, goods or services, or territories with other members.

› **DON'T** coordinate or agree upon fields of membership with other association members.

› **DON'T** discuss or agree upon upcoming bids, quotes, requests for proposal, or negotiations with other members.

› **DON'T** discuss or agree with other members: (i) not to deal with certain suppliers/vendors, customers, or other industry players; or (ii) regarding the terms of dealing with any such third parties, including whether you will or will not accept specific terms of dealing with such third parties.

› **DON'T** try to prevent a supplier/vendor from doing business with a competitor.

› **DON'T** discuss or exchange competitively sensitive information with competitors, such as credit union terms, rates, fees, prices, bids, costs, or other business practices unless the exchange is made pursuant to a well-considered plan that has been approved by legal counsel.

- **DON'T** discuss or agree with other members to adopt standards for the purpose of excluding certain competitors from the market.

- <mark>**DON'T** say or commit to writing anything that you would not be comfortable repeating or explaining to a government investigator, judge, or jury. Many antitrust investigations and lawsuits have their roots in poorly written communications</mark> (especially emails, text messages, or online chats).

- **DO** start every NAFCU meeting with a statement regarding the importance of antitrust compliance and the need for each person attending NAFCU meetings to have read and understood this Antitrust Compliance Policy.

- **DO** insist that detailed NAFCU meeting agendas are circulated in advance of the meetings, and accurate minutes are kept that reflect the discussions and actions taken at the meeting.

- **DO** follow this Policy in both formal NAFCU meetings as well as any other NAFCU sponsored event. Avoid non-NAFCU sponsored ancillary or "extracurricular" meetings with competitors/members before or after NAFCU sponsored meetings.

- **DO** voice your objection to any discussion relating to a prohibited subject. If any member seeks to raise a prohibited subject with you, inform the member immediately and forcefully that you will not discuss the subject. End the conversation if the member persists. If a prohibited subject is raised at a NAFCU meeting, voice your objection to the discussion and leave the meeting if the discussion continues. Ask that your departure be noted in the record of the meeting.

- **DO** speak with legal counsel (for your institution or NAFCU) immediately if in doubt regarding whether a particular discussion or activity is appropriate. It is much easier to take preventive action than to try to undo a wrong decision.

**If you have any questions relating to the National Association of Federally-Insured Credit Union's Antitrust Compliance Policy, including its meaning or any concerns regarding potential non-compliance, contact:**

| | |
|---|---|
| **Ann Petros** | **Jana I. Seidl, Esq.** |
| Vice President of Regulatory Affairs | Outside legal counsel to the National |
| National Association of Federally-Insured Credit Unions | Association of Federally-Insured Credit Unions |
| | Baker Botts, LLP |
| 3138 10th Street North | 700 K Street, N.W. |
| Arlington, VA 22201 | Washington, D.C. 20001 |
| Office: (703) 842-2225 | Office: (202) 639-7855 |
| apetros@nafcu.org | Cell: (202) 412-4807 |
| | jana.seidl@bakerbotts.com |