# PLAINTIFFS MOTION TO EXCLUDE OPINIONS OF ITAMAR SIMONSON (PREVIOUSLY FILED AS ECF 673)

**\*\* FILED UNDER SEAL \*\***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| The State of Texas, et al., | |
| Plaintiffs, | Case No. 4:20-cv-00957-SDJ |
| | Hon. Sean D. Jordan |
| v. | |
| Google LLC, | |
| | Special Master: David T. Moran |
| Defendants. | |

**PLAINTIFF STATES' MOTION TO EXCLUDE
OPINIONS OF ITAMAR SIMONSON**

** FILED UNDER SEAL **

## INTRODUCTION

Google's survey expert, Dr. Itamar Simonson, conducted three surveys to examine the views of "higher-spending" advertisers, "lower-spending" advertisers, and ad agencies about behaviors regarding digital advertising. Those surveys fail to adhere to accepted standards in the field of survey design for three reasons. First, they are based on an unrepresentative sample—Dr. Simonson improperly excluded wide swaths of potential respondents without ensuring that doing so would not infect his survey results. Second, Dr. Simonson deviated from the standard approach of conducting double-blind surveys. And third, the penultimate question in each of the three surveys turned on a vague and ambiguous term, which Dr. Simonson deliberately left to the respondents to interpret. The use of that term—"small but significant amount"—by design, caused respondents to interpret the survey question differently and will almost certainly confuse, not help, the jurors. These fundamental flaws undermine Dr. Simonson's methodology fatally and compel exclusion of his opinions under Rule 702.

## BACKGROUND

### A. Dr. Simonson Conducted Three Surveys Purporting to Represent the "Higher-Spending" Advertiser, "Lower-Spending" Advertiser, and Ad Agency Populations.

Google's counsel asked Dr. Simonson to "conduct surveys designed to examine how advertisers at companies and advertisers at ad agencies (collectively, 'advertisers') approach, manage, and evaluate digital advertising, and, in particular, display advertising and programmatic display advertising." Ex. A, July 30, 2024 Expert Report of Itamar Simonson, Ph.D. ("Simonson Rep."), ¶ 13. Advertiser Perceptions—a market research firm—facilitated the three internet surveys. *Id.* ¶ 30. The first was the "Higher-Spend Advertiser Survey," which "included advertisers and marketers based in the U.S. who work for companies that sell and advertise products or services (as opposed to ad agencies) and have spent over $500,000 on advertising in the past year." *Id.* ¶ 42. Second was the "Lower-Spend Advertiser Survey," which included U.S.-based advertisers

1

** FILED UNDER SEAL **

and marketers who spent less than $500,000 on advertising in the past year. *Id.* ¶ 116. Third was the "Ad Agency Survey," which "included individuals based in the U.S. who work for ad agencies and assist their clients with media strategy . . . who have used programmatic display advertising in the past year for their primary client and who were personally involved in assisting their primary client with decisions regarding their use of display advertising . . . ." *Id.* ¶ 165.

### B. At the Direction of Counsel, Dr. Simonson Excluded from His Surveys 580 Key Advertisers and Ad Agencies.

Advertiser Perceptions selected samples of respondents for the surveys from its "AdPROs panel," which "includes U.S.-based respondents who are brand marketers, agency executives, media specialists, digital publishers, and IT leaders directly involved in media and ad tech purchase decisions." *Id.* ¶ 31. The respondents in the AdPROs panel "control[] $165B+ of annual ad spend" and include "100% of the Ad Age Top 200 Advertisers." *Id.* ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ Google's counsel directed Dr. Simonson to have Advertiser Perceptions follow its "standard practices" and "generate an inbound sample that was representative of the U.S. advertiser population accounting for the vast majority of spending." Simonson Rep. ¶ 33.

Dr. Simonson then—directed by Google's counsel—had Advertiser Perceptions exclude key potential respondents from the sample. "At the direction of counsel, I asked AP to pre-screen respondents to ensure that they did not work for any companies that are parties to, were identified on initial disclosures in, or have received subpoenas in connection with *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.), . . . *In re Google Digital Advertising Antitrust Litigation*, No.

** FILED UNDER SEAL **

1:21-md-03010 (S.D.N.Y.), and/or *Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.)." *Id.* ¶ 34. Dr. Simonson ultimately placed ***580 companies*** on the "No Contact List," and excluded anyone who worked for them from the surveys. *Id.* ¶ 34, App'x I (No Contact List).

By excluding those potential respondents, Google ensured the survey missed the most prolific users of ad tech tools. Indeed, the No Contact List ████████████████████████



████████████████████████████████████████████████████████

████████████████████████████████████████ According to Advertiser Perceptions, the Big Six "are responsible for roughly 30% of total US ad spending today."[1] The exclusion of the Big Six is staggering on its own. But Dr. Simonson did not stop there; he also excluded ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████ Some notable missing advertisers are American Express, Best Buy, Coca-Cola, CVS, General Motors, Meta, Netflix, Nike, Target, and Walmart. Simonson Rep., App'x I. These represent some the most important advertisers in the market; ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

Dr. Simonson defends his decision to exclude these key potential respondents with a single speculative sentence: "To the extent [No Contact List companies] are, on average, more sophisticated advertisers, then my results would likely be conservative on key topics such as multi-homing . . . and substitution across advertising types in response to cost increases, which likely requires greater experience and expertise." Simonson Rep. ¶ 34.

---

[1] *See Changing Agency Dynamics: How Shifts in Ad Spending and the Role of AI in Media Buying and Planning Are Changing the Agency-Marketer* Relationship, Advertiser Perceptions (Aug. 7, 2024), https://www.advertiserperceptions.com/changing-agency-dynamics-how-shifts-in-ad-spending-and-the-role-of-ai-in-media-buying-and-planning-are-changing-the-agency-marketer-relationship/.

** FILED UNDER SEAL **

**C. At the Direction of Counsel, Dr. Simonson Revealed That Google Sponsored the Surveys for Antitrust Litigation Purposes, Allowing Respondents To Opt-Out.**

The pre-survey exclusion of the companies from the No Contact List was not the end of the efforts to narrow the survey populations. At the end of the surveys, respondents were told that the surveys were conducted "on behalf of Google in connection with pending lawsuits in which the plaintiffs allege that Google engaged in anticompetitive conduct related to digital advertising." *Id.* ¶ 80. Respondents were then allowed to opt out of the survey. *Id.* ("If you do not want to participate in this survey, please click 'Exclude my responses' below."). 16 percent (94/603) of respondents in the Higher-Spend Advertiser Survey, 24 percent (95/402) of respondents in the Lower-Spend Advertiser Survey, and 15 percent (71/463) of respondents in the Ad Agency Survey opted out. Simonson Rep. Exs. 2, 38, 69. Dr. Simonson's decision to allow respondents to opt out *after* disclosing the sponsor and purpose of the surveys is ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████

**D. Inconsistent with Standard Practices, Dr. Simonson's Surveys Asked Diversion Questions Using Ambiguous Terminology.**

The surveys' "Main Questionnaire" sections focused on four categories of questions: (1) Use of Ad Agencies, (2) Budget Allocation and Substitution, (3) Use of Ad Buying Tools for Programmatic Display (Multihoming), and (4) Measuring Performance. *See* Simonson Rep., App'x F, App'x G, App'x H. The first question in the "Budget Allocation and Substitution" section

** FILED UNDER SEAL **

asked respondents to estimate their budget allocation across ten types of digital advertising: Search, Programmatic Display, Direct Deals Display, Email, Digital Audio, Social, App/In-app, Digital Video, Connected TV, eCommerce Platforms, and Other. *See id.*, App'x F.1-12, App'x G. 1-12, App'x H.1-11. The surveys then asked a diversion question:

> **Q5.** Please read carefully. Now suppose that, based on your analysis, the cost of **programmatic display advertising** has **recently increased by a small but significant amount, and will remain elevated for the foreseeable future**. Assume further that, based on similar analyses for other digital advertising types, the **costs of other digital advertising types** have **not** changed and are not expected to change.
>
> So if the cost of programmatic display advertising increases (while the cost of other advertising types remains the same), <u>will you or won't you divert some of your advertising spending for the coming year to other types of digital advertising</u>?

Simonson Rep. ¶ 65 (emphases in original). Those who responded "Yes, I will divert some of my advertising spending for the coming year to other types of digital advertising" were then asked where they would "divert [their] advertising spending for the coming year as a result of the **increase in the cost of programmatic display advertising**[.]" *Id.* (emphasis in original). ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ The respondents were then prompted to use a sliding scale to show the extent to which they "would divert (that is, increase) advertising spending for the coming year to **each type of digital advertising** that [they] just indicated." Simonson Rep. ¶ 66 (emphasis in original).

The surveys did *not define* "small but significant amount." Instead, the term "was designed to leave it to the respondents to consider their reaction, if any, if (what they consider to be) 'a small but significant' increase in the cost of programmatic display advertising occurred." Simonson Rep. ¶ 17, n.5. ████████████████████████████████████████████████

████████████████████████████████████ ████████████████████████

████████████████████████████████████████████████████████████████

**\*\* FILED UNDER SEAL \*\***

███████████████████████████████████████████████████████

██ Dr. Simonson does not explain why he used specific metrics in his preliminary interviews, only to switch to the ambiguous "small but significant amount" term for the main surveys. Simonson Rep. ¶ 17, n.5.

### E. Dr. Simonson Conducted Flawed Preliminary Interviews and Pre-Tests.

Before designing the survey questionnaires, Dr. Simonson conducted fourteen "preliminary interviews" to "inform the development of the survey questions." Simonson Rep. ¶¶ 22-24. Dr. Simonson used a "think-aloud" protocol to help "capture[] respondents' understanding and interpretation of the questions in real time," which he then used to develop the survey questions. *Id.* ¶ 24. Dr. Simonson deviated from generally accepted standards in the preliminary interviews. At the *beginning* of each interview, interviewees were told that Google sponsored the interview for "pending antitrust lawsuits in which the plaintiffs allege that Google engaged in anticompetitive conduct related to digital advertising." Simonson Rep., App'x D.D-2. ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

After Dr. Simonson developed the questionnaires, he arranged to conduct twelve "pre-tests" of the questionnaires: five of the Higher-Spend Advertiser questionnaire, three of the Lower-Spend Advertiser questionnaire, and four of the Ad Agency questionnaire. Simonson Rep. ¶ 28, n.23. During the pre-tests, respondents reviewed and answered the survey questions, and then a moderator asked scripted debriefing questions. *See id.*, App'x E.E-2. The moderators were instructed to follow a strict script that posed yes/no questions about whether the respondents understood the questions and responses. *Id.* Based on the pretest moderator instructions (*id.*), ██

** FILED UNDER SEAL **

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

### LEGAL STANDARD

Trial courts act as "gatekeepers" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). "[P]rior to admitting expert testimony, '[d]istrict courts must be assured that the proffered witness is qualified to testify by virtue of his "knowledge, skill, experience, training, or education."'" *Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 705 (E.D. Tex. 2006) (second alteration in original) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). This gatekeeping ensures that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Under *Daubert*, the party offering the expert's testimony has the burden of showing that (1) the expert is qualified, (2) the testimony is relevant to an issue in the case, and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590-91. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). Because the *Daubert* Framework is "a flexible one," *Daubert*, 509 U.S. at 594, the decision to exclude expert testimony is left to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405-06 (5th Cir. 2000).

"As with other expert evidence, surveys are subject to *Daubert* scrutiny." *Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-cv-227, 2021 WL 1691136, at *3 (E.D. Tex. Apr. 29, 2021). "Evaluating the validity of surveys under *Daubert* involves two criteria: (1) 'the adequacy of the [survey]

** FILED UNDER SEAL **

universe,' and (2) 'the format of the questioning." *Id.* at *3 (citing *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 506-07 (5th Cir. 1980))*; Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004). While "minor methodological flaws" go to weight, "[i]n some cases . . . serious flaws in a survey will make any reliance on that survey unreasonable." *Scott Fetzer*, 381 F.3d at 488 (citing *Bank of Tex. v. Commerce Sw., Inc.*, 741 F.2d 785, 789 (5th Cir. 1984)); *see also In re Motor Fuel Temperature Sales Pracs. Litig.*, MDL No. 18400, 2012 WL 13050523, at *6 (D. Kan. Feb. 29, 2012) (exclusion follows where flaws are "so substantial as to render the survey conclusions untrustworthy").

"An expert's survey meets *Daubert's* reliability standards if [among other things], the expert . . . properly defines the 'universe' of respondents" and "selects a representative sample of that universe." *Navarro v. Proctor & Gamble Co.*, 501 F. Supp. 3d 482, 497-98 (S.D. Ohio 2020). "Identification of a survey population must be followed by selection of a sample that accurately represents that population." Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* ("*FJC Ref. Man.*") at 380 (3d ed. 2011).[2] And the survey population must "adequately represent the opinions which are relevant to the litigation." *Scott Fetzer*, 381 F.3d at 487. "[A] sample that accurately represents the target population must be selected, and procedures must be taken to reduce the likelihood of a biased sample." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003); *Manual for Complex Litigation* § 11.493 (4th ed. 2004).

An underinclusive sample population can render a survey unreliable. "If [a survey's] coverage is underinclusive, the survey's value depends on the proportion of the target population

---

[2] "In determining whether a survey was conducted in accordance with 'accepted survey principles,' most courts look to the Federal Judicial Center's Reference Manual on Scientific Evidence . . . ." *Johnson v. Big Lots Stores, Inc.*, No. 04-cv-03201, 2008 WL 1930681, at *4 (E.D. La. Apr. 29, 2008). The FJC Reference Manual is "intended to assist judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information." *FJC Ref. Man.* at 362.

**\*\* FILED UNDER SEAL \*\***

that has been excluded from the sampling frame and the extent to which the excluded population is likely to respond differently from the included population." *FJC Ref. Man.* at 378. A "suspiciously underinclusive" sample population "severely limits the probative value of the survey's results." *Scott Fetzer*, 381 F.3d at 487-88. Thus, "[a] survey should be excluded when the sample is clearly not representative of the universe it is intended to reflect." *Mini Melts, Inc. v. Reckitt Benckiser, Inc.*, No. 4:07-cv-271, 2009 WL 10677599, at \*6 (E.D. Tex. Feb 26, 2009) (citation omitted).

## ARGUMENT

The methodology underlying Dr. Simonson's opinions is flawed in three respects. *First*, the surveys' sample populations are unrepresentative and biased. Dr. Simonson—at the direction of Google's counsel—excluded the six largest ad agencies and hundreds of other prolific users of Google's ad tech tools. These exclusions make his sample population underinclusive. Because all three surveys pull from an underinclusive and biased population sample, they are unreliable and should be excluded. *Second,* inconsistent with standard practices, the surveys were not blind. Dr. Simonson—again, at the direction of Google's counsel—allowed respondents to opt out of the survey *after* being told that Google sponsored the survey in connection with litigation. Fifteen to twenty-four percent of respondents did opt out. Dr. Simonson did not collect or analyze the opt-out respondents' data, so he cannot reliably confirm that their exclusion did not alter the survey results. *Third,* Dr. Simonson's diversion question—the question about substitution behavior— turned on a vague and ambiguous term (a "small but significant amount"), deliberately leaving it to the respondents to speculate about its meaning. The responses are therefore unreliable.

## I.    The Surveys Are Unreliable Because Their Sample Populations Are Biased And Unrepresentative.

Dr. Simonson's surveys are not representative of the populations they purport to study. First, Dr. Simonson improperly excluded many of the largest and most important advertisers and

** FILED UNDER SEAL **

ad agencies in the market. Second, respondents opted out of the surveys *after* learning that Google sponsored the surveys in connection with ongoing antitrust litigation. The surveys' samples are consequently "suspiciously underinclusive." *Scott Fetzer*, 381 F.3d at 487-88.

The Court should be skeptical of Dr. Simonson's ███████████████████████████████ ████████████████████████████████████████ "[s]pecial precautions are required to reduce the likelihood of biased samples." *FJC Ref. Man.* at 382-83; ██████████████ ████████ Second, ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ Despite these concerns, ███████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ This omission is critical—the jury cannot be asked to rely on surveys designed to identify the relevant market when the expert did not show that the populations actually represent the markets the surveys purport to represent.

**A. Dr. Simonson Improperly Excluded 580 Key Respondents from the Surveys.**

Dr. Simonson's exclusion of some of the largest and highest-spending advertisers and ad agencies—at the direction of Google's counsel—renders his samples unrepresentative. By excluding those potential respondents, Dr. Simonson failed to adhere to the standard that "[i]dentification of a survey population must be followed by selection of a sample that accurately represents that population." *FJC Ref. Man.* at 380. His findings are therefore unreliable.

In *Scott Fetzer*, a vacuum company's expert conducted a survey to show "consumer confusion" in a trademark infringement case. 381 F.3d at 487. The expert used the company's

** FILED UNDER SEAL **

customer lists to construct a survey population of local residents who owned the company's vacuum cleaner. *Id.* The survey population therefore "sa[id] nothing about the ad's effect on the class of potential consumers of new Kirby vacuum cleaners," which included a "large proportion" of consumers who had not yet purchased a vacuum. *Id.* at 488. And the court noted that the population was "suspiciously underinclusive" even for the narrower class of potential purchasers of *repairs* for the vacuum cleaners—"presumably include[ing] a high proportion of Kirby vacuum cleaner owners"—because "at least some" of them would not be on the customer lists. *Id.* Recognizing that a survey's sample population "must adequately represent the opinions which are relevant to the litigation," the Fifth Circuit affirmed the district court's finding that the survey population was underinclusive and thus the survey was unreliable. *Id.* (quoting *Amstar Corp. v Domino's Pizza*, 615 F.2d 252, 264 (5th Cir. 1980)); *see also FTC v. Fleetcor Techs., Inc.*, No. 1:19-cv-5727, 2022 WL 3350066 (N.D. Ga. Aug. 9, 2022) (excluding expert survey because its "deeply unrepresentative sample" excluded customers for much of the relevant period); *Hi Ltd. P'ship v. WingHouse of Fla., Inc.*, No. 6:03-cv-00116, 2004 U.S. Dist. LEXIS 30687 at *25-26 (M.D. Fla. Oct. 5, 2004) (survey was underinclusive and thus unreliable because it excluded women, who were roughly one third of the competing restaurant's clientele).

Here, too, Dr. Simonson's sample populations are "suspiciously underinclusive" and do not reflect the relevant populations. ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████.[3] Excluding that "large proportion" of potential respondents biased

---

[3] *See Changing Agency Dynamics: How Shifts in Ad Spending and the Role of AI in Media Buying and Planning Are Changing the Agency-Marketer Relationship*, *supra* note 1.

**\*\* FILED UNDER SEAL \*\***

the survey results and shows that the surveys do not reliably represent the broader populations they supposedly studied. When a survey's coverage is underinclusive, its "value depends on the proportion of the target population that has been excluded from the sampling frame and the extent to which the excluded population is likely to respond differently from the included population." *FJC Ref. Man.* at 378. ███████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████ But Dr. Simonson conducted *no* analysis on the extent to which the excluded advertisers and ad agencies were likely to respond differently from the included population. Instead, he merely speculates that his "results would likely be conservative on key topics." Simonson Rep. ¶ 34. Because Dr. Simonson excluded a large and critical proportion of the potential population, Google cannot meet its burden of showing the sample is reliable.

### B. Dr. Simonson Improperly Allowed Respondents To Opt Out After Revealing That Google Sponsored the Survey for Its Antitrust Litigation.

The pre-survey exclusion of potential respondents was not the end of Dr. Simonson's improper whittling of the sample populations. The opt-out question that Google requested further excluded respondents who *were* in the sample but chose not to submit their responses after learning Google sponsored the survey in connection with antitrust litigation. All told, 16% of respondents in the Higher-Spend Advertiser Survey, 24% of respondents in the Lower-Spend Advertiser Survey, and 15% of respondents in the Ad Agency Survey chose to opt out. Simonson Rep. Exs. 2, 38, 69. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ Because the opt-out rendered the survey population underinclusive, its "value depends on . . . the extent to which the excluded population is likely to respond differently from the included population." *FJC Ref. Man.* at 378.

**\*\* FILED UNDER SEAL \*\***



Dr. Simonson speculates that "there is no reason to expect [the respondents] who chose . . . to not be included in the final sample to be different . . . from the other respondents." Simonson Rep. ¶ 81. ███████████████████████

████████████████████████████████████████████████

███████████████████████████████ Dr. Simonson failed to retain or analyze data from the opt-out respondents, and so lacks any basis to opine that the opt-out respondents were similar to the remainder. As Dr. Simonson acknowledged, this inquiry into bias is the ████████ and on that question his opinion is mere guesswork.

## II.    The Surveys Were Not Double Blind.

The opt-out question undermined the reliability of the surveys in another way: it made the surveys unblinded. "To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose." *FJC Ref. Man.* at 410-11. When the survey sponsorship is disclosed, court should consider: "(1) whether the sponsor has views and expectations that are apparent and (2) whether awareness is confined to the interviewers or involves the respondents." *Id.* at 411.

The opt-out question is at odds with the principle of double blindness, further undermining the reliability of the surveys. ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**\*\* FILED UNDER SEAL \*\***

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ Google cannot meet its burden to

show that the surveys were reliable without data from the out-out respondents, and so the surveys

should be excluded.

## III.    The Surveys' Use Of Leading Diversion Questions With Vague Terminology Renders Them Unreliable and Irrelevant.

The surveys' diversion question, which asks about substitutability in response to a "small

but significant" increase to the cost of programmatic display advertising, is so vague that it is

unreliable. "When unclear questions are included in a survey, they may threaten the validity of the

survey by systematically distorting responses if respondents are misled in a particular direction, or

by inflating random error if respondents guess because they do not understand the question. If the

crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey."

*FJC Ref. Man.* at 388. ███████████████████████████████████

████████████████████████████

The diversion question is vague because it, by design, leaves it to the respondent to decide

for himself what a "small but significant amount" is. Simonson Rep. ¶ 17, n.5. Dr. Simonson

adopted this approach █████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████. Courts find that similarly ambiguous

**\*\* FILED UNDER SEAL \*\***

language renders survey results unreliable and inadmissible. *See, e.g.*, *In re Motor Fuel Temp. Sales Pracs. Litig.*, No. 07-1840, 2012 WL 13050523, at \*6-7 (D. Kan. Feb. 29, 2012).

In this case, the inclusion of such ambiguous language is especially problematic. In antitrust cases like this one, the "hypothetical-monopolist test" ("HMT") is used to evaluate the relevant market. *See FTC v. Tapestry, Inc.*, No. 1:24-cv-03109, 2024 WL 4647809, at \*8 (S.D.N.Y. Nov. 1, 2024). "Implementing the HMT requires imagining that a hypothetical monopolist has imposed a **small but significant** non-transitory **price increase** in price ('SSNIP') within the proposed market." *Id.* (emphasis added) (quotations omitted). "The usual practice is to define the SSNIP as a five-percent increase in price." *Id.* Dr. Simonson's question about a "small but significant" price increase almost exactly mirrors the SSNIP language. Jurors will likely assume that the respondents understood Dr. Simonson's survey question to be asking about the SSNIP test (a five-percent price increase), when, in fact, respondents could have interpreted the term "small but significant amount" to be *any* amount. This invites (practically ensures) an unreasonable and impermissible amount of juror confusion.



Because the diversion question is fatally vague and ambiguous, the court should, at a minimum, exclude the survey responses to that question and the resulting analysis.

<u>**CONCLUSION**</u>

For these reasons, the Court should exclude Dr. Simonson's expert opinions.

** FILED UNDER SEAL **

DATED: November 18, 2024                    Respectfully submitted,

/s/ W. Mark Lanier                          /s/ Ashley Keller
W. Mark Lanier                              Ashley Keller
Mark.Lanier@LanierLawFirm.com               ack@kellerpostman.com
Alex J. Brown                               Kiran N. Bhat
Alex.Brown@LanierLawFirm.com                kiran.bhat@kellerpostman.com
Zeke DeRose III                             2333 Ponce De Leon Boulevard
Zeke.Derose@LanierLawFirm.com               Suite R-240
Jonathan P. Wilkerson                       Coral Gables, Florida 33134
Jonathan.Wilkerson@LanierLawFirm.com        (833) 633-0118
10940 W. Sam Houston Pkwy N.
Suite 100                                   Zina Bash (Bar No. 24067505)
Houston, TX 77064                           zina.bash@kellerpostman.com
(713) 659-5200                              111 Congress Avenue, Suite 500
                                            Austin, TX 78701
                                            (512) 690-0990

**THE LANIER LAW FIRM, PLLC**               /s/ Noah S. Heinz
                                            Noah S. Heinz
                                            noah.heinz@kellerpostman.com
                                            1101 Connecticut Ave., N.W., Suite 1100
                                            Washington, DC 20036
                                            (202) 918-1123
                                            **KELLER POSTMAN LLC**

*Counsel for Texas, Idaho, Louisiana (The Lanier
Law Firm only), Indiana, Mississippi, North
Dakota, South Carolina, and South Dakota*

*Submitted on behalf of all Plaintiff States*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

*/s/ Trevor E. D. Young*
Brent Webster, First Assistant Attorney General of Texas
Brent.Webster@oag.texas.gov
James R. Lloyd, Deputy Attorney General for Civil Litigation
James.Lloyd@oag.texas.gov
Trevor Young, Deputy Chief, Antitrust Division
Trevor.Young@oag.texas.gov

**STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

** FILED UNDER SEAL **

FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
ATTORNEY GENERAL


By: /s/ Jeff Pickett
Jeff Pickett
Senior Assistant Attorney General, Special Litigation Section
jeff.pickett@alaska.gov

*Attorney for Plaintiff State of Alaska*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF ARKANSAS:

TIM GRIFFIN
ATTORNEY GENERAL

By: _____
AMANDA J. WENTZ
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Attorney for Plaintiff State of Arkansas*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF FLORIDA:

ASHLEY MOODY, Attorney General

<u>/s/ Lee Istrail</u>
LEE ISTRAIL, Assistant Attorney General
FL Bar No. 119216

LIZABETH A. BRADY, Director, Antitrust Division
R. SCOTT PALMER, Special Counsel and Chief of Complex Enforcement
ANDREW BUTLER, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General


Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF IDAHO:

RAÚL R. LABRADOR
Attorney General

*/s/ John K. Olson*
John K. Olson, Deputy Attorney General

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone:   (208)   334-2424
john.olson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

Matthew Michaloski
Deputy Attorney General
Indiana Atty. No. 35313-49
Indiana Government Center South – 5th Fl. 302
W. Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: matthew.michaloski@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

RUSSELL COLEMAN
Attorney General

*/s/ Philip R. Heleringer*
Christian J. Lewis, Commissioner of the Office of Consumer Protection
christian.lewis@ky.gov
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
philip.heleringer@ky.gov
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
jonathan.farmer@ky.gov
Office of the Attorney General
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300

*Attorneys for Plaintiff Commonwealth of Kentucky*

** FILED UNDER SEAL **

FOR PLAINTIFF STATE OF LOUISIANA:

By: */s/ Patrick Voelker*
Liz Murrill, Attorney General
Michael Dupree, Assistant Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
(225) 326-6400
voelkerp@ag.louisiana.gov

*s/ James R. Dugan, II*
James R. Dugan, II (*pro hac vice*)
TerriAnne Benedetto (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:   (504) 648-0180
FX:   (504) 649-0181
EM:   jdugan@dugan-lawfirm.com
        tbenedetto@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:   (504) 833-5600
FX:   (504) 833-8080
EM:   jmw@chehardy.com

*Attorneys for Plaintiff State of Louisiana*

** FILED UNDER SEAL **

FOR PLAINTIFF STATE OF MISSISSIPPI:

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:     */s/ Garrett S. Mascagni*
        Garrett S. Mascagni
        Special Assistant Attorney General
        Consumer Protection Division
        Mississippi Attorney General's Office
        Post Office Box 220
        Jackson, Mississippi 39205
        Telephone: 601-359-4223
        Fax: 601-359-4231
        Garrett.Mascagni@ago.ms.gov

        *Attorney for Plaintiff State of Mississippi*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF MISSOURI:

ANDREW BAILEY
Attorney General

*/s/ Michael Schwalbert*
Michael.Schwalbert@ago.mo.gov
Missouri Attorney General's
Office
815 Olive St.
Suite 200
St. Louis, MO 63101
Tel: 314-340-7888

*Attorneys for Plaintiff State of Missouri*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Montana Attorney General


*/s/ Anna Schneider*
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894 Anna.Schneider@mt.gov


*/s/ Charles J. Cooper*
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves
hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

*Attorneys for Plaintiff State of Montana*

** FILED UNDER SEAL **

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate


*/s/ Michelle C. Badorine*
Michelle C. Badorine, Senior Deputy
Attorney General
MNewman@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100

*Attorneys for Plaintiff State of Nevada*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF NORTH DAKOTA:

> **STATE OF NORTH DAKOTA**
> Drew H. Wrigley
> Attorney General

By:    */s/ Elin S. Alm*
       Elin S. Alm, ND ID 05924
       Assistant Attorneys General
       Consumer Protection & Antitrust Division
       Office of Attorney General of North Dakota
       1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
       (701) 328-5570
       (701) 328-5568 (fax)
       ealm@nd.gov

       *Attorneys for Plaintiff State of North Dakota*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

*/s/ Domingo Emanuelli-Hernández*
Domingo Emanuelli-
Hernández Attorney General
Thaizza Rodríguez Pagán
Assistant Attorney
General PR Bar No.
17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201, 1204
trodriguez@justicia.pr.gov

Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

*Attorneys for Plaintiff Commonwealth of Puerto Rico*

** FILED UNDER SEAL **

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

ALAN WILSON
Attorney General


/s/ *Mary Frances Jowers*
Mary Frances Jowers
Assistant Deputy Attorney General
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-5855
Email: mjowers@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC
880 Johnnie Dodds Blvd, Suite 1
Mount Pleasant, SC 29464
Phone: 843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
Phone: (504) 648-0180
Email: jdugan@dugan-lawfirm.com


*Attorneys for Plaintiff State of South Carolina*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

MARTY JACKLEY
Attorney General


*/s/ Jonathan Van Patten*
Jonathan Van Patten
Assistant Attorney General
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: 605-773-3215
jonathan.vanpatten@state.sd.us

*Attorney for Plaintiff State of South Dakota*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF UTAH:

Sean D. Reyes
Utah Attorney General

*/s/ Marie W.L. Martin*
Marie W.L. Martin
Assistant Attorney General
160 East 300 South, 5th Floor
P.O. Box 140874
Salt Lake City, UT 84114-0872
mwmartin@agutah.gov
Telephone: (801) 538-9600

*Attorneys for Plaintiff State of Utah and*
*as counsel for the Utah Division of Consumer Protection*

**\*\* FILED UNDER SEAL \*\***

## CERTIFICATE OF SERVICE

I certify that on November 18, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ Noah S. Heinz*

## CERTIFICATE OF MOTION TO SEAL

I certify that contemporaneously with the filing of this Motion, Plaintiff States filed a motion to seal both this document and the attached exhibits.

*/s/ Noah S. Heinz*

## CERTIFICATE OF CONFERENCE

I certify that counsel has complied with the meet and confer requirement in Local Rule CV-7(h). Counsel for Plaintiff States met and conferred by telephone in good faith with counsel for Google on November 15, 2024. Google indicated that it opposes the motion.

*/s/ Noah S. Heinz*