IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

## GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ANTITRUST CLAIMS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................iii

STATEMENT OF ISSUES TO BE DECIDED .............................................................................. 6

LEGAL STANDARD ...................................................................................................................... 7

    A.  Summary Judgment under Federal Rule of Civil Procedure 56. ......................................... 7

    B.  Monopolization and Attempted Monopolization under Section 2 of the Sherman Act. ....... 8

    C.  Unlawful Tying Under Sections 1 And 2 Of The Sherman Act. ......................................... 10

ARGUMENT ..................................................................................................................................11

    I.   MOST OF THE CHALLENGED ACTS WERE LAWFUL REFUSALS TO DEAL WITH RIVALS. .................................................................................................................. 13

        A.  Dynamic Allocation And Enhanced Dynamic Allocation. ............................................17

        B.  Line Item Limits. ...........................................................................................................22

        C.  Redacted Data Transfer Files. .......................................................................................24

        D.  Unified Pricing Rules. ....................................................................................................26

        E.  Tying ..............................................................................................................................29

    II.  GOOGLE DID NOT TIE ADX TO DFP. ........................................................................ 30

        A.  Adx And DFP Are Not "Tied." ......................................................................................30

        B.  Google Has No Duty to Deal. .........................................................................................32

    III.  GOOGLE'S CONDUCT IS NOT EXCLUSIONARY. ....................................................34

        A.  Dynamic Allocation and Enhanced Dynamic Allocation. .............................................37

        B.  Dynamic Revenue Share. ...............................................................................................38

        C.  Project Bernanke. ...........................................................................................................40

    IV.  PLAINTIFFS CANNOT DEMONSTRATE COMPETITIVE HARM IN THE ALLEGED RELEVANT MARKETS. ................................................................................................. 42

        A.  Plaintiffs Offer No Evidence That Challenged Conduct Harmed Competition At All Or In Certain Alleged Relevant Markets. ...............................................................................43

i

.

B.  Plaintiffs Have Not Demonstrated Net Harm In The Alleged Market For Ad Exchanges. 45

V.  PLAINTIFFS CANNOT DEMONSTRATE A DANGEROUS PROBABILITY OF GOOGLE ACHIEVING MONOPOLY POWER IN THE ALLEGED MARKET FOR AD BUYING TOOLS FOR LARGE ADVERTISERS. .......................................................................... 48

VI.  PLAINTIFFS' STATE LAW ANTITRUST CLAIMS FAIL FOR THE SAME REASONS AS THEIR FEDERAL CLAIMS. ..................................................................... 50

VII. CERTAIN OF PLAINTIFF STATES' ANTITRUST CLAIMS FOR CIVIL PENALTIES ARE BARRED BY THE STATUTES OF LIMITATIONS. ............................................. 51

CONCLUSION .................................................................................................................. 54

## TABLE OF AUTHORITIES

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ..................... 29, 32, 34

*AliveCor, Inc. v. Apple, Inc.*, 2024 WL 591864 (N.D. Cal. Feb. 13, 2024)........................... 15, 22

*All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund*, 887 F.Supp. 2d 448 (E.D.N.Y. 2012)........................................................................................................................... 49, 50

*Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411 (E.D.N.C. 1986) ... 43

*Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486 (11th Cir. 1985) ........................... 11, 32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 7

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694 (5th Cir. 2005)...... 14, 28

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)........................... 15, 36

*Bayou Bottling, Inc. v. Dr Pepper Co.*, 725 F.2d 300 (5th Cir. 1984)......................................... 14

*Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033 (5th Cir. 1981)........................... 30

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578 (W.D. La. 2021) . 35

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)................. 3, 4, 10

*City of Groton v. Conn. Light & Power*, 662 F.2d 921 (2d Cir. 1981)........................................... 9

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984) ........................ 49

*Dreamstime.com, LLC v. Google, LLC*, 2019 WL 341579 (N.D. Cal. Jan. 28, 2019) *aff'd* 54 F.4th 1130 (9th Cir. 2022) ................................................................................................... 15, 42

*Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321 (5th Cir. 1974) ........................... 42

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F. App'x 186 (2d Cir. 2012)................. 10

*Facebook, Inc. v. Brandtotal Ltd.*, 2021 WL 2354751 (N.D. Cal. June 9, 2021)................... 24, 28

*Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673 F.2d 1045 (9th Cir. 1982)................... 50

*Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir. 2000)................................................... 28

*Grp. Dealer Servs., Inc. v. Sw. Bell Mobile Sys., Inc.*, 2001 WL 1910565 (W.D. Tex. Sept. 19, 2001).................................................................................................................................. 52

*Illinois Tool Works Inc. v. Indep. Ink, Inc*, 547 U.S. 28 (2006)........................................ 3, 11, 30

*In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015)................. 42

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 429 F. Supp. 2d 752 (E.D. La. 2005) ........................................................................................... 15, 26

*In re EpiPen Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) .............. 9

*In re Google Digit. Advert. Antitrust Litig.*, No. 1:21-md-3010-PKC (S.D.N.Y. 2021) ....... passim

*In re: Digit. Advert. Antitrust Litig.*, MDL No. 3010 (J.P.M.L 2021)........................................... 1

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) .................................. 3, 11, 30, 32

*Laitram Mach., Inc. v. Carnitech A/S*, 884 F. Supp. 1074 (E.D. La. 1999) ................................ 41

*Logic Process Corp. v. Bell & Howell Publications Systems Co.*, 162 F. Supp. 2d 533 (N.D. Tex. 2001)......................................................................................................................... 30, 32

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ......................................................... 36

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ...................... 7

*Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855 (W.D. Tenn. 2001) ........................................ 42

*Nat'l Bancard Corp. v. Visa, U.S.A., Inc.*, 112 F.R.D. 62 (S.D. Fla. 1986) ................................ 42

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ......................................... passim

*Ohio v. Am. Express*, 585 U.S. 529 (2018) ....................................................................... 6, 12, 46

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986)...................... 14

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ......................... 3, 14, 16, 23

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010).......................... 7

*Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 888 (5th Cir. 2016) .......... 9, 10, 35

iv

*Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680 (4th Cir. 1992) ......................... 34

*Shah v. VHS San Antonio Partners LLC*, 612 F. Supp. 3d 686 (W.D. Tex. 2020 ................. 10, 42

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ....................................................... 8, 49

*State of Colorado v. Google LLC*, No. 20-cv-3715 (APM) (D.D.C. Dec. 17, 2020) .................. 16

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999) ........................... passim

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 2001 WL
    8586 (E.D. La. 2001) *aff'd* 309 F.3d 836, 843 (5th Cir. 2002) ................................................. 35

*Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465 (5th Cir. 2000)....................................... 9, 10, 34

*United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233 (5th Cir. 1996).......... 11, 31, 32

*United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945)...................................... 9

*United States v. American Express Co.*, 838 F.3d 179 (2d Cir. 2016) ......................................... 46

*United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) .................................................... 12, 14

*United States v. Google LLC*, No. 20-cv-3010 (APM), 2024 WL 3647498 (D.D.C. 2024) . passim

*United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) .................................................. 3, 8

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ............. passim

## Statutes

Ark. Code Ann. §§ 4-75-201 to -320 ............................................................................................ 51

AS 45.50.588 ................................................................................................................................. 51

Fla. Stat. § 542.26 ......................................................................................................................... 51

Idaho Code § 48 115 ..................................................................................................................... 51

Ind. Code § 34–11–2–4 .................................................................................................................. 51

Mo. Rev. Stat. § 416.131.2 ............................................................................................................ 51

Mont. Code Ann. §§ 27-2-103; 27-2-211 ..................................................................................... 51

Nev. Rev. Stat. § 598A.220(1)....................................................................................................... 51

North Dakota Century Code (N.D.C.C.) § 51-08.1-10 ..................................................... 51

P.R. Laws Ann. tit. 10, § 268(c) ................................................................................... 51

S.C. Code § 39-5-150 .................................................................................................... 51

SDCL § 37-1-14.4 ......................................................................................................... 51

Tex. Bus. Com. Code § 15.25 ....................................................................................... 51

Utah Code § 76-10-3117(1) .......................................................................................... 51

**Treatises**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and

Their Application ¶ 1757a (5th ed. 2023) ................................................................ 32, 34, 49

## **INTRODUCTION**

Google's success in the highly competitive digital advertising marketplace has resulted from its foresight, innovation, and massive investments in research and development. The federal antitrust laws encourage such success; the Plaintiffs seek to condemn it. They ask this Court to compel Google to share with its competitors the products and innovations it built through years of investment and hard work; to force Google to design—or redesign—its ad tech products to better suit its rivals' needs and preferences; and to order Google to reverse product improvements that benefit Google's advertiser and publisher customers. They would have this Court turn Google into a public utility for its rivals, undermining the incentives—protected by the antitrust laws—that drive innovation in the United States and encouraging competitors to free ride off of Google's investment, innovation, and success.

To date, Plaintiffs have tried to avoid the weaknesses of their antitrust claims by serially amending their complaints; playing a shell game regarding in what capacity and on whose behalf they seek to sue; and relying on a Rule 12 pleading standard that requires even their most farfetched allegations be accepted as true. And yet, Plaintiffs' antitrust claims have slowly but steadily eroded. First, Plaintiffs jettisoned their federal antitrust damages claims in August 2021 in the hope of avoiding MDL transfer.[1] Then, Judge Castel rejected their marquee claim of a conspiracy between Google and Facebook, holding that their allegations, even taken as true, did not plausibly allege concerted action between Google and Facebook to restrict Facebook's use of header bidding, much less a per se violation of the antitrust laws.[2] Judge Castel also dismissed

---

[1] Pl. State of Texas Supp. Info. to Panel at 1, *In re: Digit. Advert. Antitrust Litig.*, MDL No. 3010 (J.P.M.L Aug. 4, 2021), ECF No. 109; *see also* Second Am. Compl. ¶ 481, *In re Google Digit. Advert. Antitrust Litig.*, No. 1:21-md-3010-PKC (S.D.N.Y. Oct. 22, 2021), ECF No. 152 (containing no request for damages for alleged violations of the federal antitrust laws). Plaintiffs later also made clear they were dropping their claims for damages for alleged violations of *state* antitrust law. Pl. States' Am. Advisory Regarding Relief Sought at 2, ECF No. 381.
[2] *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 370 (S.D.N.Y. 2022).

1

Plaintiffs' claims based on some of the conduct alleged in their Complaint, holding that Plaintiffs did not plausibly allege that such conduct was anticompetitive.[3] Next, when required to find expert support for their theories, their own hired experts were unable to offer opinions that some of the remaining conduct caused anticompetitive effects in *any* of Plaintiffs' alleged relevant markets.

Now, Plaintiffs must clear the more demanding standard of Rule 56 to proceed with what is left of their antitrust claims. This they cannot do. After a 15-month investigation, more than 18 months of discovery, the production of more than 6.3 million documents and 750 TB of data, and over 85 depositions in this litigation (in addition to the more than 120 depositions produced from related cases), Plaintiffs' remaining antitrust claims (Counts I, II, III, and V) have been revealed for what they are—a paper-thin attempt to get *state law tort* claims from 17 different states in front of a jury in federal court. In the nearly four years since Plaintiffs filed their initial complaint in December 2020, Plaintiffs' case has shape-shifted away from antitrust to state deceptive trade practices act claims, as featured in Plaintiffs' Fourth Amended Complaint. While the infirmities with those claims are addressed separately, *see* Google's Motion for Summary Judgment on Plaintiffs' DTPA Claims (filed concurrently), Plaintiffs' shift away from their original antitrust claims is not surprising, since when evaluated in the context of the undisputed factual record those claims fail to meet the test of established antitrust law.

Plaintiffs' antitrust claims center around Google's "ad tech" products—the software that connects publishers wanting to sell digital ad space with advertisers wanting to buy it, and real-time bidding, an innovation that Google and its competitors first introduced around 2009 that enabled publishers and advertisers to match and transact advertisements in real time. Plaintiffs

---

[3] *Id.* at 370, 381, 391, 393, 398 (dismissing Plaintiffs' claims concerning Google's Network Bidding Agreement with Facebook, refusal to share encrypted IDs, Reserve Price Optimization, Exchange Bidding, and Accelerated Mobile Pages).

challenge changes Google has made to its products over the past 15 years, changes that have benefited advertisers and publishers, and some of which are now obsolete given advances in the ever-evolving ad tech landscape.

Plaintiffs must clear several legal hurdles to establish that Google's conduct violates Section 2 of the Sherman Act, including proving that Google possesses monopoly power (or has a dangerous probability of achieving it) in a properly defined market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The Court need not decide that issue to enter summary judgment, however, because—put simply—the antitrust laws do not prohibit any of the conduct at issue here.

Specifically, Plaintiffs' antitrust claims are squarely at odds with three fundamental principles of Section 2 law: (1) competitors generally have no duty to deal with each other, *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004), (2) a failure to deal with a competitor does not equate to unlawful tying absent coercion, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12-14 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006), and (3) the antitrust laws protect competition, not competitors, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993).

First, Plaintiffs cry foul because Google's innovations benefited Google (and its customers), and did not make it easier for Google's competitors to compete. Plaintiffs go so far as to suggest that Google should have innovated *for* its competitors and its decision not to do so was anticompetitive. But such claims are squarely at odds with the well-settled principle that under antitrust law "firms have 'no duty to deal' with a rival." *United States v. Google LLC*, No. 20-cv-3010 (APM), 2024 WL 3647498, at *129 (D.D.C. Aug. 5, 2024) [hereinafter "*Search*"]; *see also Trinko*, 540 U.S. at 408, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)

(Roberts, C.J.) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."). And it is equally settled that, should a firm choose voluntarily to deal with its competitors, it need not do so on terms that favor those competitors. *linkLine*, 555 U.S. at 450.

Second, Plaintiffs claim that Google was obligated to allow its ad server competitors to have unfettered and "equal" access to Google's advertiser customers, going so far as to seek "interoperability" as a remedy. This is squarely at odds with *Trinko* and its progeny. What is more, Plaintiffs claim that Google's failure to provide the access Google's *competitors* seek amounts to an illegal tie. But a "duty to deal" cannot form the basis for a tying claim. Critically, the undisputed record demonstrates that Google does not coerce publishers to use its ad server to access its advertisers. Publishers using competing ad servers can and do have access to Google's advertisers, and Google's publishers can and do use rival ad exchanges. Indeed, it is undisputed that the vast majority of publishers using Google's ad server do <u>not</u> use Google's ad exchange.

Third, Plaintiffs complain that Google's innovations "steered" transactions of display ads to Google's ad tech, claiming that such behavior is anticompetitive. Of course, developing an "infrastructure that renders [Google] uniquely suited to serve [its] customers," *Trinko*, 540 U.S. at 407, is not anticompetitive, even if it negatively affects competitors. The antitrust laws are designed to protect "*competition*, not *competitors*." *Brooke Grp. Ltd.*, 509 U.S. at 224. Thus, conduct undertaken for a legitimate business purpose is not "exclusionary" within the meaning of Section 2. *See generally Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999).

Applying these principles to Plaintiffs' remaining antitrust claims (Counts I, II, III, and V) and the underlying conduct at issue, Google is entitled to summary judgment for numerous, independent reasons.

- <u>First</u>, Plaintiffs' monopolization and attempted monopolization claims (Counts I and II) as to the alleged markets for ad exchanges and ad buying tools for large advertisers fail, in part, and Plaintiffs' tying claim (Count III) fails in its entirety, because they are based on the incorrect premise that Google has a duty to deal with its rivals. *See* Section I.

- <u>Second</u>, Plaintiffs' tying claim (Count III) fails because Google does not force publishers to use Google's ad server in order to access buyers transacting through Google's Ad Exchange, and a duty to deal claim cannot form the basis for a tying claim. *See* Section II.

- <u>Third</u>, Plaintiffs' monopolization and attempted monopolization claims (Counts I and II) for the alleged market for ad exchanges fail in part, and fails in its entirety for the alleged market for ad buying tools for small advertisers, because there is no genuine dispute that there were legitimate business justifications for much of Google's conduct. *See* Section III.

- <u>Fourth</u>, Plaintiffs' monopolization and attempted monopolization claims (Counts I and II) fail, in part, because Plaintiffs concede that certain alleged conduct did not have *any* anticompetitive effect in any of Plaintiffs' alleged relevant markets. *See* Section IV.A.

- <u>Fifth</u>, Plaintiffs' monopolization and attempted monopolization claims (Counts I and II) for the alleged market for ad exchanges fails because, having conceded that Google's ad exchange is a two-sided platform, Plaintiffs must (but did not) offer evidence of the net impact of the challenged conduct on both advertisers and publishers. *See* Section IV.B.

- <u>Sixth</u>, Plaintiffs' attempted monopolization claim (Count II) as to the alleged market for ad buying tools for large advertisers fails because Plaintiffs cannot demonstrate that there is a dangerous probability that Google will achieve monopoly power. *See* Section V.

- <u>Seventh</u>, Plaintiffs' state antitrust claims (Count V) fail for the same reasons their federal antitrust claims fail. *See* Section VI.

- <u>Finally</u>, certain Plaintiff States' antitrust claims for civil penalties are barred by the applicable statutes of limitations. *See* Section VII.

In sum, Plaintiffs' scattershot challenge to a host of innovations by Google over the past 15 years runs afoul of numerous, well-established Supreme Court precedents aimed at preserving the incentive for competitors to innovate, which indisputably (and as demonstrated by the undisputed record in this litigation) promotes economic and consumer welfare..

Google respectfully submits that summary judgment should be granted in its favor.[4]

---

[4] For ease of reference, Google provides herewith a matrix of the conduct challenged by Plaintiffs and the summary judgment arguments applicable to that conduct for each alleged relevant market. *See* Appendix 1.

## **STATEMENT OF ISSUES TO BE DECIDED**

1. Whether Google is entitled to summary judgment, in part, on Counts I and II (Monopolization and Attempted Monopolization in Violation of Section II of the Sherman Act, 15 U.S.C. § 2) on the ground that Google has no "duty to deal" with its competitors with respect to Dynamic Allocation, Enhanced Dynamic Allocation, Line Item Limits, Redacted Data Transfer Files, and Unified Pricing Rules;

2. Whether Google is entitled to summary judgment on Count III (Unlawful Tying in Violation of Sections I and II of the Sherman Act, 15 U.S.C. §§ 1, 2) on the grounds that Google does not coerce customers to use DFP to gain access to AdX (so the products are not "tied") and a "duty to deal" cannot form the basis for a tying claim;

3. Whether Google is entitled to summary judgment on Counts I and II on the ground that there were legitimate business justifications for Dynamic Allocation, Enhanced Dynamic Allocation, Dynamic Revenue Share, and Project Bernanke;

4. Whether Google is entitled to summary judgment on Counts I and II on the ground that Plaintiffs cannot demonstrate competitive harm in the alleged relevant markets[5] with respect to certain alleged conduct;

5. Whether Google is entitled to summary judgment on Counts I and II with respect to the alleged market for ad exchanges on the ground that Plaintiffs cannot prove "net harm" in that alleged market;

---

[5] Google maintains that there is a single two-sided market, consistent with the United States Supreme Court decision in *Ohio v. Am. Express*, 585 U.S. 529 (2018) [hereinafter "*AmEx*"]. Solely for purposes of this Motion, Google assumes Plaintiffs' alleged markets because it is not necessary for Google to contest Plaintiffs' market definition to prevail on this Motion. Google reserves all rights to challenge Plaintiffs' market definitions in future motions and/or at trial.

6. Whether Google is entitled to summary judgment on Count II with respect to the alleged market for ad buying tools for large advertisers on the ground that Plaintiffs cannot demonstrate a dangerous probability of Google achieving monopoly power in that alleged market;

7. Whether Google is entitled to summary judgment on Count V (Supplemental State Law Antitrust Claims) for the same reasons as Plaintiffs' federal claims;

8. Whether certain States' claims for civil penalties are barred by the statutes of limitations.

## LEGAL STANDARD

### A. Summary Judgment under Federal Rule of Civil Procedure 56.

A federal "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a "dispute about a material fact is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conversely, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). The Fifth Circuit has held that "[w]e no longer maintain that summary judgment is especially disfavored in categories of cases"; thus, any "suggest[ion] that summary judgment should be shunned when complex antitrust claims are involved" is without merit. *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 521 (5th Cir. 1999). Instead, "[s]ummary judgment is of particular importance in the area of antitrust law, because it helps to avoid wasteful trials and prevent lengthy litigation that may have a chilling effect on pro-competitive market forces." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (brackets and quotation marks omitted); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010) ("The entry of

summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which may have a chilling effect on competitive market forces.").

### B. Monopolization and Attempted Monopolization under Section 2 of the Sherman Act.

Plaintiffs claim that Google has unlawfully monopolized or attempted to monopolize each of the alleged markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. *See* Fourth Am. Compl. ¶¶ 598-606, *In re Google Digit. Advert. Antitrust Litig.*, No. 1:21-md-3010-PKC (S.D.N.Y. May 5, 2023), ECF No. 541 [hereinafter "FAC"]. To prove that Google has monopolized the alleged markets for publisher ad servers, ad exchanges, and ad buying tools for small advertisers, FAC ¶¶ 598-601 (Count I), Plaintiffs must prove "(1) the possession of monopoly power in [each] relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). And to prove that Google attempted to monopolize the alleged markets for ad exchanges and ad buying tools for large and small advertisers, FAC ¶¶ 602-606 (Count II), Plaintiffs "must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

It is well-established that "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). The requirement of anticompetitive conduct for both monopolization and attempted monopolization claims is no throwaway, technical element. Justice Scalia explained in *Trinko* that the "mere possession of monopoly power … is not only not unlawful; it is an important element of the free-market system." *Id.*. The prospect of such

8

competitive success "is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." *Id*. The anticompetitive conduct requirement, therefore, helps "safeguard the incentive to innovate" by ensuring that the possession of monopoly power alone will not be found unlawful. *Id*. Judge Learned Hand put it another way: "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir. 1945).

Thus, to establish their claims, Plaintiffs must come forward with evidence sufficient to demonstrate that the conduct complained of is "exclusionary" as opposed to "competition on the merits." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000). The Fifth Circuit has explained that "[t]he key factor … whether challenged conduct is or is not competition on the merits is the proffered business justification for the act. If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." *Stearns*, 170 F.3d at 522. Thus, "[c]ompetition, even the maintenance of monopoly, through superior business acumen is allowed under Section 2." *Id.* at 527.

Where, as here, Plaintiffs purport to challenge a course of conduct, courts evaluate whether different types of conduct are individually exclusionary. *See, e.g.*, *In re EpiPen Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) ("For the sake of accuracy, precision, and analytical clarity, we must evaluate Mylan's allegedly exclusionary conduct separately."); *Retractable Techs., Inc. v. Becton Dickinson & Co*., 842 F.3d 888, 891-92 (5th Cir. 2016) (analyzing each "type[]" of conduct "separately" "in light of settled principles of antitrust law" and later citing *City of Groton v. Conn. Light & Power*, 662 F.2d 921, 928 (2d Cir. 1981) for the rule that "alleged instances of misconduct, none of which is anticompetitive, cannot be cumulatively anticompetitive"); *accord Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F.

App'x 186, 191 (2d Cir. 2012) ("Because these alleged instances of misconduct are not independently anti-competitive, we conclude that they are not cumulatively anti-competitive either.").

Finally, to sustain their monopolization claims, Plaintiffs have the burden of proving that the alleged anticompetitive conduct had the effect of harming competition, and not just competitors. *Taylor Publ'g Co.*, 216 F.3d at 483 (affirming judgment as a matter of law for defendant because plaintiff "failed to introduce sufficient evidence to prove that [the alleged anticompetitive acts] … harm[ed] the market as a whole"); *Shah v. VHS San Antonio Partners LLC*, 612 F. Supp. 3d 686, 696 (W.D. Tex. 2020) (granting summary judgment for defendant on Section 1 and Section 2 claims because plaintiff failed to "produce evidence of harm to the relevant market—that is, harm to competition"). This is because the antitrust laws "do not create a federal law of unfair competition." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993). They were designed to protect "*competition*, not *competitors*," and thus "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Id.* at 224-25; *see also Retractable Techs., Inc.*, 842 F.3d at 892-93.

### C. Unlawful Tying Under Sections 1 And 2 Of The Sherman Act.

Plaintiffs also contend that Google engaged in unlawful tying in violation of Sections 1 and 2 of the Sherman Act. FAC ¶¶ 607-613 (Count III). For tying claims under the *per se* rule, Plaintiffs bear the burden to demonstrate each of the following: "(1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce." *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2

(5th Cir. 1996). Force is the central focus of a tying claim. The Supreme Court has explained that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of the tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (emphasis added), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28 (2006). If a tying claim does not fall within the *per se* framework, it is analyzed under the rule of reason, *id.* at 29, which "requires a showing of all five elements including actual anti-competitive effect," *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1503 (11th Cir. 1985).

## ARGUMENT

Subject to and without waiver of the arguments set forth in Google's pending Rule 12(b)(1) motion,[6] Google is entitled to summary judgment on all of Plaintiffs' remaining antitrust claims (Counts I, II, III, and V) as a matter of law and based on the undisputed factual record in this case.

First, as to the vast majority of the challenged conduct, Plaintiffs' claims are entirely dependent on the idea that Google had a "duty to deal" with its competitors, which the Supreme Court, in *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), among many other cases, has squarely rejected. *See* Section I. Google's right "'freely to exercise [its] own independent discretion as to parties with whom [it] will deal'" and its concomitant right to refuse to deal with its competitors are bedrock principles of U.S. antitrust law. *Trinko*, 540 U.S. at 407-

---

[6] Google's Mot. for Dismissal Pursuant to Rule 12(b)(1) (Jan. 16, 2024), ECF No. 200. As set forth in that Motion, the States do not have Article III standing—either sovereign or parens patriae—to bring their federal or state antitrust claims in this Court. Now that discovery has closed, it is clear that Plaintiffs have no evidence of (1) any injury to a sovereign interest (i.e. interference with their enforcement of the law), or (2) injury to a quasi-sovereign interest because there is no evidence of widespread effects on the Plaintiff States' populations as a whole (as distinguished from injuries to discrete groups of private parties, such as publishers or advertisers).

10 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). <u>Second</u>, Google is entitled to summary judgment on Count III (tying) because Plaintiffs cannot demonstrate that DFP and AdX were or are "tied" or that customers were or are in any way forced to use DFP to obtain access to AdX. *See* Section II. <u>Third</u>, based on the undisputed factual record, Google has legitimate business justifications for much of the alleged conduct, and thus Plaintiffs cannot demonstrate that the conduct was exclusionary, an essential element of their claims for both monopolization and attempted monopolization (Counts I and II). *See* Section III. <u>Fourth</u>, Plaintiffs' state law antitrust claims (Count V), which mirror their federal claims, fail for the same reasons. *See* Section VI.

In addition, Plaintiffs' failures of proof on several essential elements of their claims provide additional, independent bases for summary judgment in Google's favor. Specifically:

- Google is entitled to summary judgment, in part, on Plaintiffs' monopolization and attempted monopolization claims under Counts I and II as to the alleged markets for ad exchanges, ad servers, ad buying tools for small advertisers, and ad buying tools for large advertisers to the extent they are based on conduct for which Plaintiffs offer *no* evidence of harm to competition. *See* Section IV.A.

- Google is entitled to summary judgment as to Plaintiffs' monopolization and attempted monopolization claims under Counts I and II as to the alleged market for ad exchanges on the ground that Plaintiffs have failed to demonstrate the "net harm" required for two-sided platform markets under the Supreme Court's decision in *Ohio v. American Express*, 585 U.S. 529 (2018). *See* Section IV.B.

- Google is entitled to summary judgment on Plaintiffs' attempted monopolization claim under Count II as to the alleged market for ad buying tools for large advertisers on the

ground that Plaintiffs have failed to demonstrate a dangerous probability of Google achieving monopoly power in that alleged market. *See* Section V.

- Finally, Google is entitled to summary judgment on certain States' claims for civil penalties based on conduct that occurred more than four years ago. *See* Section VII.

## I.    MOST OF THE CHALLENGED ACTS WERE LAWFUL REFUSALS TO DEAL WITH RIVALS.

For the majority of the challenged conduct, Plaintiffs' claims rely on the erroneous premise that Google has some "duty to deal" with its rivals or a duty to make it easier for those rivals to compete, principally by giving rivals "equal" or "comparable" access to Google's products. But claims based on such notions of "enforced sharing" are squarely foreclosed by the Supreme Court's decision in *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). A firm is not required to share its technology, innovations, or other competitive advantages with its rivals, and declining to do so does not run afoul of the antitrust laws.

And while Google contests Plaintiffs' baseless allegations that it is a monopolist, the law has long been clear that: "Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.). As Justice Scalia explained in *Trinko*:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.

540 U.S. at 407-08. Further, such "[e]nforced sharing" would require "courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Id*. at 408.

Thus, holds *Trinko*, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal,'" *id.* (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)), and the Sherman Act imposes no duty on a firm to extend a helping hand to its rivals, *see Bayou Bottling, Inc. v. Dr Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) (affirming summary judgment because refusing to deal with a competitor is "not barred by the antitrust laws," but reflects "competitive acts"); *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375-76 (7th Cir. 1986) (Posner, J.) ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors" and thus no duty "to extend a helping hand to new entrants … [or] help [rivals] … survive or expand.").

Further, should a firm choose voluntarily to deal with its competitors, it has no obligation to do so on terms that favor those competitors: "*Trinko* thus makes clear that if a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) (Roberts, C.J.); *ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694, 698 (5th Cir. 2005) (affirming dismissal of § 2 claim alleging that the defendant "refused to connect [the plaintiff] on favorable enough terms").

Applying the principles of *Trinko* and its progeny, courts consistently have refused to require companies to provide their competitors with access to their innovations. *See Novell*, 731 F.3d at 1070-79 (holding that Microsoft's refusal to grant access to its Windows operating system to competitor software developers constituted a lawful refusal to deal); *see also Search*, 2024 WL 3647498, at *129-31 (holding Google was not obligated to grant feature parity with its search engine advertising management tool because to do so would conflict with "the settled principle

that firms have 'no duty to deal' with a rival"); *AliveCor, Inc. v. Apple, Inc.*, 2024 WL 591864, at *14-15 (N.D. Cal. Feb. 13, 2024) (granting summary judgment because defendant was "under no antitrust obligation to make its improvements … compatible with [rival's] app"). Courts also have rejected the notion that a firm must share any information advantages with rivals. *See In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 429 F. Supp. 2d 752, 758-59 (E.D. La. 2005) (finding that standardized testing company's decision not to release its testing booklets and answer sheets to its customers (test takers) or competitors does not amount to anticompetitive conduct under Section 2). Nor is there anything unlawful about a firm using the information it possesses to its competitive advantage. *See Dreamstime.com, LLC v. Google, LLC*, 2019 WL 341579, at *8 (N.D. Cal. Jan. 28, 2019) (explaining that, "[a]lthough the data collection likely gives [defendant] an advantage … over its rivals, a monopolist utilizing its competitive advantage does not equate to anticompetitive conduct"), *aff'd*, 54 F.4th 1130, 1141-42 (9th Cir. 2022).[7]

Google's ad tech stack is an end-to-end platform with integrated tools that benefit ad buyers and sellers, including by providing improved stability, efficiencies, simplicity, security, and performance. SMF ¶¶ 27, 28.[8] Google is under no obligation to share with competitors access to its platform as a whole or to any particular technology within its platform. Nor is Google required

---

[7] A "limited exception" to *Trinko*'s general rule, grounded in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), has been recognized where "[t]he unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409. This narrow exception, which is "at or near the outer boundary of § 2 liability," *id.* at 409, does not apply here. Plaintiffs do not allege that Google terminated any profitable prior course of dealing with its rivals. As such, unlike the circumstances in *Aspen Skiing*, this case is not about terminating a pre-existing course of dealing, but rather whether and under what terms Google must deal with competitors in the first place.

[8] All references to "SMF" refer to Google's Statement of Undisputed Material Facts in Support of its Motions for Summary Judgment on Plaintiffs' Antitrust and DTPA Claims (filed concurrently).

to provide its rivals with open access to its customers on either the publisher or advertiser side of its ad tech platform. Other industry participants with integrated platforms, such as Meta and Amazon, operate walled gardens, meaning their publisher "inventory is 'not accessible to everyone.'" Ex. 3 at ¶ 161;[9] *see also* SMF ¶ 24. To the extent Google decides to deal with rivals at all, it may do so on its own terms and certainly should not be punished for being more open than its walled garden rivals. *See linkLine*, 555 U.S. at 450-51 (explaining that a firm generally "has no obligation to deal under terms and conditions favorable to its competitors").

Recently, on facts analogous to those here, the U.S. District Court for the District of Columbia held that Google had no duty to deal with a competitor relating to services available on Google's search engine advertising management tool, SA360. *Search*, 2024 WL 3647498, at *129. Plaintiffs in that case—which include seven of the Plaintiffs here: Alaska, Idaho, Nevada, North Dakota, Puerto Rico, South Dakota, and Utah[10]—claimed that Google had "prioritized and advantaged its own ad platform, Google Ads, over Microsoft's ad platform on SA360" by "slow-roll[ing] the development and launch of various features for Microsoft Ads that Google has fully integrated into SA360 for Google Ads." *Id.* Specifically, the state plaintiffs complained that Google had not "integrat[ed] auction time bidding (ATB), a feature that permits advertisers to change their bid strategies in real time during auctions," for Microsoft Ads despite the fact that ATB was available to Google Ads. *Id.* Judge Mehta concluded that the plaintiffs' theory "falters at the threshold because it conflicts with the settled principle that firms have 'no duty to deal' with

---

[9] All references to "Ex." refer to exhibits described in and appended to the Declaration of Robert McCallum in Support of Google's Motions for Summary Judgment.

[10] *See* Compl., *State of Colorado v. Google LLC*, No. 20-cv-3715 (APM) (D.D.C. Dec. 17, 2020), ECF No. 3. The other ten Plaintiffs in this case (including the State of Texas) are plaintiffs in the parallel proceeding brought by the United States that was consolidated before Judge Mehta. *See* Am. Compl., *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. Jan. 15, 2021), ECF No. 94.

a rival." *Id.* Holding that the plaintiffs' claim raised the "concerns that animate the no-duty-to-deal principle," Judge Mehta pointed out that the plaintiffs' claim "requires grappling with a host of questions that the court is ill-equipped to handle, such as: (1) by when, from a technical standpoint, could Google have integrated ATB into Microsoft Ads?; (2) how much advertiser interest in ATB does there need to be for Google to act on Microsoft's request [for integration]?; and (3) was it improper for Google to commit resources to prioritizing other projects … over integrating ATB for Microsoft Ads?" *Id.* at *131 (citations omitted).

Plaintiffs ask this Court to grapple with precisely these sorts of questions—an invitation this Court should reject. Accordingly, under *Trinko* and its progeny, including *Search*, Plaintiffs' "enforced sharing" claims "falter at the threshold," and Google is entitled to summary judgment to the extent Plaintiffs' claims are based on Dynamic Allocation, Enhanced Dynamic Allocation, Line Item Limits, Redacted Data Transfer Files, Unified Pricing Rules, or Tying.

### A.  Dynamic Allocation And Enhanced Dynamic Allocation.

Like so much of their case, Plaintiffs' claims relating to Dynamic Allocation ("DA") and Enhanced Dynamic Allocation ("EDA") have morphed as they have abandoned many of the baseless allegations in their Complaint.[11] Plaintiffs no longer argue (as they did in their Complaint, *see, e.g.*, FAC ¶¶ 270-296, that DA and EDA are anticompetitive in and of themselves. Ex. 15 at 210:25-211:4 (Plaintiffs' expert admitting he did not evaluate "the existence or not" of DA; *id.* at 211:10-15 (Plaintiffs' expert admitting he did not evaluate "the existence or not" of EDA). The factual record developed in discovery makes clear that those allegations were baseless from the start. Instead, Plaintiffs now challenge what they refer to as Google's "configuration choice," Ex.

---

[11] Judge Castel held that Plaintiffs lack Article III standing to seek injunctive or equitable relief for Dynamic Allocation because the Complaint did not identify continuing adverse effects that are attributable to Dynamic Allocation. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 402-03 (S.D.N.Y. 2022).

11, ¶ 350, or "implementation" of DA and EDA. *id.*, ¶ 351. *See also* Ex. 15 152:16-21 ("the conduct that I have at issue is … [is the] Google-specific implementation of it"). In plain English, Plaintiffs now claim that Google should have developed or altered DA and EDA in a manner that facilitated the ability of its competitors to submit real-time bids into Google's ad tech platform. This pivot reveals Plaintiffs' claims for what they are: an attempt to impose on Google a duty to deal that does not exist under the law.

Google's publisher ad server (DFP), ad exchange (AdX), and Dynamic Allocation features comprise complex technology that has interacted with the technological tools offered by its competitors in different ways depending on the state of the constantly evolving ad tech industry at different points in that evolution. *See generally* SMF ¶¶ 48-58, 65, 67-68, 75, 80, 88-89, 91, 93-96, 99-101. But regardless of the particular interaction or the specific time period considered, Plaintiffs' claims concerning DA and EDA are rooted in the mistaken premise that Google had a "duty to deal" with its competitors on terms that those competitors found advantageous.

As is relevant here, Dynamic Allocation was a product innovation that DoubleClick introduced in 2007, before Google acquired DoubleClick, SMF ¶¶ 30, 88, and before the rise of real-time bidding and header bidding, SMF ¶¶ 51, 54, 56. DoubleClick designed Dynamic Allocation to address, in part, the inherent inefficiencies that existed in "the waterfall," a static, sequential method of allocating impressions among demand sources in the early days of display advertising. SMF ¶¶ 48-50, 90. In the simplest terms, DA provided a way for publishers to determine whether there were buyers bidding in real time through AdX who might be willing to pay a higher price for a particular ad impression than the publisher expected to receive from other demand sources. SMF ¶ 93, 94. If no AdX buyer bid higher than the auction reserve price, the ad impression would be filled (if at all) by another demand source, and DA (and later EDA) would

have no impact on the sale. SMF ¶ 96. In 2014, Google launched Enhanced Dynamic Allocation, which expanded on DA by allowing AdX (and other exchanges) to transact impressions that otherwise would have been allocated to direct deals if doing so would generate more revenue for the publisher, while still fulfilling the publisher's direct deals. SMF ¶¶ 99-102.

Plaintiffs' claims as to DA and EDA are two-fold. First, Plaintiffs complain about Google's "implementation of DA after the acquisition of DoubleClick." Ex. 3, ¶ 548. Specifically, Plaintiffs complain that AdX "was afforded a right of first refusal," meaning "that AdX was offered the opportunity to submit a live bid on each impression" before the impression was offered to other exchanges. *Id.* But the factual record in this case contains no evidence that Google changed the way that DA functioned after it acquired DoubleClick. Nor is there evidence that Google changed the way that DA functioned after Google implemented real-time bidding in 2009. Plaintiffs' claim thus amounts to a criticism that Google was obliged to, and did not, affirmatively offer a way to extend DA to competing ad exchanges after it acquired DoubleClick or with the advent of real-time bidding.

Second, Plaintiffs complain that, with the advent of header bidding, Google was obliged to, but did not, alter DA or EDA or develop new technology to accommodate these changes in the ad tech industry in ways that its competitors would have liked. *Id.*, ¶ 548; *see also* Ex. 11, ¶¶ 350-351. Specifically, Plaintiffs complain that "DA afforded AdX a 'last look' advantage that other intermediaries did not receive." Ex. 3, ¶ 548. But it is undisputed that this so-called "advantage" was not the result of anything Google affirmatively did, but merely the way that AdX and its competitors' ad tech tools, including header bidding, "interacted with one another," Ex. 15 at 197:23, as the ad tech landscape evolved. SMF ¶ 107; *see generally* Ex. 15 at 195:18-198:4 (agreeing that Google did not "modify Dynamic Allocation once publishers started to experiment

with Header Bidding," that "Last Look" was not "a product feature that Google designed," and stating that "Last Look" "wouldn't have been an issue if there had been no Header Bidding").

Plaintiffs nevertheless assert that Google's conduct was anticompetitive because it was—*according to Plaintiffs*—"technically feasible" for Google to provide DA and EDA to other ad exchanges, but Google "delayed" and "did not provide it." Ex. 11, ¶ 351. Thus, whether called an "implementation" or "configuration choice," "First Look," or "Last Look," Plaintiffs' objection is the same—Google was obliged to, and did not, affirmatively take action to facilitate competitors' use of DA and EDA, by enabling other ad exchanges to submit real-time bids for inventory sold by publishers using Google's ad server, DFP.

The law is clear, however, that Google is under no obligation to make its innovations compatible with its competitors' products. *See Novell*, 731 F.3d at 1069, 1078 (finding no antitrust violation where Microsoft made a design choice not to extend the interoperability of a software interface in part to give Microsoft's product a "real advantage" over rivals). Indeed, Plaintiffs' claim closely mirrors the unsuccessful claim in *Search* and would require the Court to "grapple" with the very same questions Judge Mehta held a court "is ill-equipped to handle," including "by when, from a technical standpoint, could Google have integrated" real-time bidding from all ad exchanges for its DFP publisher customers. *Search*,  2024 WL 3647498 at *131.

Plaintiffs' proposed imposition upon Google of a duty to extend its Dynamic Allocation and Enhanced Dynamic Allocation features to rival exchanges vividly demonstrates why the Supreme Court has consistently rejected such a duty to deal. These challenges are made all the more daunting by Plaintiffs' extraordinary delay in bringing this litigation. The Court would be forced to determine how a duty to deal should have been implemented from as early as 2008, when Google acquired DoubleClick and Dynamic Allocation, SMF ¶ 30, to at least 2018, when Google

first launched Open Bidding for general availability, SMF ¶¶ 65-67, a period of extraordinary change and innovation in the display advertising industry. And over the course of this timeframe and the evolving ad tech industry, the Court would have to grapple with the following kinds of questions:

- The factual record is devoid of evidence that any rival exchange requested permission to participate in DA or EDA, so was Google required to seek out competing exchanges to offer these features to them? What would their responses have been at the time?

- How should Google have determined to which of its many exchange competitors it was obligated to extend DA and EDA—all competing exchanges or just some?

- How should Google have determined which of its competitors qualified as an "exchange" to which some duty to deal was owed, *i.e.*, how would the Court define the universe of competitors to whom Google should have extended its DA and EDA product features?

- To how many Google exchange competitors would Google have been required to extend DA and EDA? Would five or ten be sufficient to address any alleged anticompetitive harm, or would Google have to make its DA and EDA features available to any and all competitors on a continuing basis?

- What kind of vetting would Google be permitted to perform before providing DA and EDA access to its competitors? Would it be permitted to ensure that those competitors had sufficient security and spam protections in place before allowing them to bid on inventory from Google's publisher customers, or would it be required to extend DA and EDA to any company claiming to be an exchange competitor without any inquiry into its security and spam record?

- Who would have been responsible for developing the technology to make DA and EDA accessible to Google's rivals—Google or each rival exchange? Who would have been responsible for paying for the development of that technology and the engineering time spent setting up the compelled access?

- How much effort would Google have been required to put into developing technology for its rivals, and how would the Court weigh Google's decision to forgo investing in technology to assist its rivals in favor of investing in the development of optimizations to increase revenue for its publisher customers and ROI for its advertiser customers?

- Would Google have been allowed to charge its rivals for providing them with the benefits of DA and EDA? How much would Google be permitted to charge for DA and EDA? Under what circumstances would Google be permitted to increase the prices for access to DA and EDA?

- If Google developed the technology to offer a version of DA or EDA to its rivals, would it have an obligation to maintain that technology in the face of new innovations because its rivals preferred DA or EDA?

● What obligations would Google have to maintain or improve DA or EDA for its competitors at the expense of other priorities?

These are just a few of the many questions that the Court would have to answer if it were to buy into Plaintiffs' proposed imposition upon Google of a duty to make DA and EDA (and related optimizations) available to its rivals. Such questions are what led the Supreme Court to recognize that such "[e]nfored sharing also requires antitrust courts to act as central planners, identifying the proper price, quality, and other terms of dealing—a role for which they are illsuited." *Trinko*, 540 U.S. at 408; *see also Search*, 2024 WL 3647498 at *130-131; *AliveCor, Inc.*, 2024 WL 591864, at *14-15. Even more troubling, the imposition of such a duty to deal would undermine the incentives both for Google to innovate going forward—as it would have to share the fruits of its innovations with its competitors—and for Google's exchange rivals to innovate, as free-riding off Google's innovation would be much more attractive to them. *Trinko*, 540 U.S. at 407-08.

### B.  Line Item Limits.

Plaintiffs claim that Google's decision to enforce its preexisting line item limits in its ad server, DFP, violates the antitrust laws. FAC ¶¶ 389-394. Line items are entries that a publisher inputs into an ad server to "specify all of the details relevant to showing an ad to website visitors, including the space available for the ad and the details about what kind of ad campaign could be shown." Ex. 3, ¶ 638; *see also* SMF ¶ 184. Line items are the mechanism through which rival exchanges compete with Google. SMF ¶ 185. When a publisher uses a large number of line items, they can slow or crash the ad server infrastructure. SMF ¶ 186. Google therefore introduced a limit of 61,000 "active" line items in 2013 to ensure the performance of Google's ad server. SMF ¶ 187, 189. The limits preclude any one publisher from using an excessive number of "active" line items and thereby negatively affecting the performance of Google's ad server for other publishers. SMF ¶ 188.

With the advent of header bidding, Google began to see an increase in excessive numbers of active line items, many times more than the system was designed to support. SMF ¶¶ 190, 191. When publishers exceeded the line item limit, Google had to absorb the infrastructure costs associated with doing so. SMF ¶ 192, 193. ████████████████████████████████████ ████████████████████████████ SMF ¶ 192.

In 2018, Google announced that, beginning on January 31, 2019, it would start to enforce the preexisting limits for publishers who were close to or over the limit. SMF ¶ 194. At the time of that announcement, only ██ publishers were over the line item limit. SMF ¶ 195. Google tried to accommodate publisher requests for exceptions to the line item limit. SMF ¶ 196. Google did not charge publishers for the increased infrastructure costs of doing so. SMF ¶¶ 192-193, 196. Google subsequently launched Header Bidding Manager in 2021, which provided publishers with tools to manage and optimize their header bidding setups, including by setting up header bidding without having to create large numbers of line items. SMF ¶ 197.

Plaintiffs surmise that Google "impos[ed] restrictions on 'line items' to limit the use of Header Bidding by publishers," Ex. 3, ¶ 634, and "made it more difficult to use Header Bidding," Ex. 15 at 253:2-8. But even accepting that as true for purposes of summary judgment, the question remains whether Google should have facilitated header bidding (by permitting limitless line items despite the impact on its ad server and associated costs) or should have done so differently (by permitting limitless line items *instead* of developing Header Bidding Manager). Of course, Google had no obligation to facilitate the business of its competitors at all. *See Trinko*, 540 U.S. 407-09. And, if it chooses to, it may do so on its own terms. *See linkLine*, 555 U.S. at 450-51 (explaining that a firm generally "has no obligation to deal under terms and conditions favorable to its competitors"); *Facebook, Inc. v. Brandtotal Ltd.*, 2021 WL 2354751, at *16 (N.D. Cal. June 9,

2021) (dismissing claim premised on Facebook's "block[ing]" competitors from its platform because "Facebook generally has a right to set rules for accessing [its platform]" and "its refusal to authorize the access [competitor] seeks is a refusal to deal"). Indeed, Plaintiffs' proposed imposition of a duty on Google to help its rivals gain access to Google's customers by giving every publisher as many line items as they desire improperly invites the Court to grapple with "thorny" questions about technical feasibility and feature development. *Search*, 2024 WL 3647498, at *131. For example, the Court would have to decide:

- How many line items should Google have permitted? Limitless? Or was there a number sufficient to address the alleged anticompetitive conduct?

- Who would be responsible for determining that number: the Court? Google's competitors?

- Who will monitor and determine the appropriate number of line items going forward, as the industry changes?

- Who will be responsible for managing the infrastructure necessary for the additional line items? Google or the rival exchanges using header bidding?

- Who will be responsible for paying for the additional infrastructure costs? Google, publishers, or rival exchanges?

The inappropriateness of these questions for judicial resolution is one of the many reasons *Trinko* rejects the notion of any duty to deal with or to accommodate competitors in the ways proposed by Plaintiffs.

### C. Redacted Data Transfer Files.

Plaintiffs assert that it was anticompetitive for Google not to provide certain information to its premium publisher customers. FAC ¶¶ 387-388. As a feature of GAM, Google provides its premium publishers with the option to subscribe to various Data Transfer files—including a Bid Data Transfer ("BDT") file—that contains event-level data of all the ads served to their websites. SMF ¶ 208. BDT files contain information about the bids that the publisher received on its inventory. SMF ¶ 209. It is undisputed that, prior to 2019, Google allowed Authorized Buyers and

Open Bidding Buyers to opt-out of including their bids in BDT files. SMF ¶ 210. It is also undisputed that "many bidders chose to opt-out" so the "BDT files did not provide publishers with information about the complete set of bids for their inventory." Ex. 22, ¶ 11; *see also* SMF ¶¶ 210, 211. As part of its migration to a Unified First Price Auction ("UFPA") in 2019, and in response to publishers seeking more complete information about the performance of the first price auction, Google improved the BDT files so that they would contain information about bids submitted by *all* Authorized Buyers and Open Bidding Buyers. SMF ¶ 213.

In order to provide publishers with bids submitted by all Authorized Buyers and Open Bidding Buyers, it is undisputed that Google balanced several considerations, including the need to abide by contractual limitations on what data could be disclosed. SMF ¶¶ 214, 215. Google also was concerned with protecting the privacy of internet users; for example, if the BDT files could be joined with impression files, user lists could be created and then disseminated or sold downstream to data management providers or "DMPs." SMF ¶¶ 214, 216. To address these concerns, Google removed and/or redacted some fields from the BDT files that "could have been used to probabilistically join BDT files with other Data Transfer report files." Ex. 22, ¶ 13; SMF ¶ 217.

Plaintiffs challenge Google's decision to make these changes to the BDT files because they "*might have*" caused a "reduction in the use of Header Bidding" (or "*might not have*") and "*could have* reduced [publishers'] ability to use Header Bidding effectively." Ex. 15 at 263:21-264:13 (emphasis added). In lodging this speculation (which is all Plaintiffs can muster despite extensive discovery), Plaintiffs fail to acknowledge that *before* Google offered the Redacted Data Transfer Files, it did not provide a complete set of bid information because most bidders opted out of doing so. SMF ¶ 211. In fact, it is undisputed that as of ███████████████████████

███████████████████████████████████████████████████████████

██████████████████████████ Ex. 22, ¶ 11; *see also* SMF ¶ 211. Yet Plaintiffs do not claim

that these files were anticompetitive. In essence, Plaintiffs challenge Google's decision to modify

the BDT files that it offered its publisher customers because they claim (without evidence) that the

modifications "might have" interfered with publisher's ability to use header bidding.

Again, Plaintiffs' claim overlooks the fact that the antitrust laws do not require Google to

provide information to its customers to make it easier for Google's rivals to compete. *See In re*

*Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 429 F. Supp.

2d 752, 758-59 (E.D. La. 2005) (rejecting argument that testing company's "failure to make its

test booklets and answer sheets available to its competitors and to [its customers] amounts to

exclusionary conduct in the market for teacher certification testing"). And as with the other

conduct Plaintiffs challenge, their claim would force the Court to grapple with questions Judge

Mehta indicated it is ill-equipped to handle, such as:

- What information should Google provide in its BDT files to address the alleged anticompetitive conduct?

- By what standard will the sufficiency of that information be judged?

- If Google is required to provide certain data, who is responsible for protecting the interests of the individuals whose information is contained in the files? In the absence of protections, would individuals be given the opportunity to opt-out even though that would make the files less valuable?

**D. Unified Pricing Rules.**

Publishers use pricing rules to set the reserve (or "floor") prices that apply in auctions

occurring on ad exchanges. SMF ¶ 198. Google implemented Unified Pricing Rules[12] ("UPR") in

2019 in connection with the transition to a Unified First Price Auction. SMF ¶ 199. It is undisputed

that, prior to implementing UPR, DFP publishers had to separately configure reserve prices for

---

[12] Also referred to as "Uniform Pricing Rules."

Open Bidding partners and other indirect sources of demand—a complicated and time-consuming task. SMF ¶ 201. Due to these complex configurations, advertisers bidding through a variety of buying tools into a variety of exchanges could face different reserve prices for the same impression, leading to the possibility of self-competition, as well as situations in which the highest bid would not necessarily win the auction. SMF ¶ 202.

The undisputed record reflects that UPR simplified the process of setting price floors for publishers and the bidding process for advertisers. SMF ¶¶ 203-205. With UPR, publishers set a single price floor within the GAM interface that applies uniformly across all exchanges and buyers in Google's Unified First Price Auction. SMF ¶ 204. With UPR, buyers face the same reserve prices in Google's Unified First Price Auction when bidding across different buying channels. SMF ¶ 206. Plaintiffs complain, however, that UPR "restrict[ed] publishers who use its ad server tool (GAM) from being able to set different floor prices for different exchanges or bidder demand sources," which "require[d] equal treatment of AdX and non-Google sell-side platforms," Ex. 11, ¶ 332 in Google's UFPA. According to Plaintiffs, this "equal treatment" allegedly "gave AdX an advantage over rivals." Ex. 3, ¶ 490. Specifically, Plaintiffs contend that UPR "dramatically lowered price floors on AdX," *id.*, ¶ 491, thus allowing AdX "to transact more impressions at the expense of third-party tools," *id.*, ¶ 544.

There is no dispute that UPR prevented publishers from disadvantaging Google by using pricing rules in Google Ad Manager to set a higher floor price for AdX than for other exchanges participating in Google's UFPA. The problem with Plaintiffs' claim is that, as a matter of law, Google is entitled to design its Unified First Price Auction on its own two-sided platform however it likes. Specifically, Google is entitled to design its auction to include only a single floor price for all exchanges. Plaintiffs' argument seems to be that publishers could no longer *disadvantage* AdX

by imposing a higher reserve price on certain buyers and not others in Google's UFPA. But because it is perfectly lawful for a company to advantage its own products over those of its competitors, *see, e.g.*, *Novell*, 731 F.3d at 1068-69, 1078, it cannot be unlawful for a company to prevent its own product from being disadvantaged in its own auction simply because that would have facilitated the business of its competitors. In fact, Google had no antitrust duty to allow third-party exchanges into its unified auction at all. *See Trinko*, 540 U.S. at 407, 410 ("deni[al of] interconnection services to rivals" was lawful); *Facebook, Inc*., 2021 WL 2354751 at *16. And Supreme Court precedent makes clear that if Google decides to provide access to its rivals, it is under no obligation to deal with rival exchanges "under terms and conditions that the *rivals* find commercially advantageous." *linkLine*, 555 U.S. at 450 (emphasis added); *see also ASAP Paging*, 137 F. App'x at 698 ("refus[al] to connect on favorable enough terms" is a lawful refusal to deal). This includes having no obligation to provide publishers with ways to disadvantage Google demand sources on Google's own two-sided platform.

Importantly, UPR concerns only the design and operation of Google's auction, and does not restrict customers' ability to use competing products. UPR does not prevent publishers from using competing ad servers or exchanges instead of Google. And UPR has no effect on publishers using competing ad servers, only those who use DFP. SMF ¶ 207.

Plaintiffs also contend that "Google could have provided UPR functionality to make it easier for publishers to set unified pricing floors without actually imposing that as a requirement," but chose not to do so. Ex. 11, ¶ 334 (emphasis removed). But, as a matter of law, Google had no obligation to design UPR to make it easier for rival ad exchanges to compete with AdX. *See Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 400-01 (7th Cir. 2000) ("[T]he antitrust laws do not impose that kind of affirmative duty, even on monopolists."). Once again, Plaintiffs' position

would thrust the Court into the role of "'central planner' that endeavors to identify the proper 'terms of dealing.'" *Search*, 2024 WL 3647498, at *131 (quoting *Trinko*, 540 U.S. at 408). This would force the Court to answer questions such as:

- Under what circumstances are differential price floors acceptable? And who will determine what those circumstances are?

- Would Google be required to permit differential price floors even if they made it so complicated for advertisers to transact on Google's platform that they chose to leave the platform?

- If Google is required to allow publishers using GAM to set different price floors in a way that disadvantages AdX in favor of other exchanges, is there a threshold at which that "disadvantage" is no longer appropriate? What is that threshold? What standard will be used to determine it?

- Are publishers permitted to use court-imposed differentiated price floors to advantage Google? Can Google incentivize them to do so?

In effect, Plaintiffs ask the Court to take over the design of Google's Unified First Price Auction and to design the pricing rules of that auction to allow publishers to impose higher reserve prices on Google than on competing buyers on Google's own platform. Nothing in the antitrust laws permits—much less compels—such a result.

### E.  Tying

As discussed *infra*, Section II.A., Plaintiffs' claim that Google tied its ad server, DFP, with its ad exchange, AdX, fails as a matter of law because Plaintiffs cannot demonstrate that Google coerced its customers to use DFP. But as also discussed *infra*, Section II.B., Plaintiffs' tying claim fails because it is based on the flawed premise that Google has a duty to deal with its rivals. *See, e.g., Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016) (rejecting that "a refusal to deal with competitors may form the basis of a tying claim").

*         *         *

Because the foregoing Plaintiffs' claims all rest on lawful refusals to deal, they cannot support a monopolization or attempted monopolization claim. Accordingly, Google is entitled to summary judgment on:

- Counts I and II to the extent Plaintiffs' claims are based on Dynamic Allocation, Enhanced Dynamic Allocation, Line Item Limits, Redacted Data Transfer Files, and UPR, FAC ¶¶ 598-606; and

- Count II (Attempted Monopolization in Violation of Section II of the Sherman Act, 15 U.S.C. § 2) with respect to the alleged market for ad buying tools for large advertisers, which is based solely on UPR as discussed *infra*, Section IV.A. FAC ¶¶ 602-606.

## II.   GOOGLE DID NOT TIE ADX TO DFP.

Google is entitled to summary judgment on Plaintiffs' tying claim (Count III) because the undisputed record shows that Google does not require publishers to use DFP in order to access AdX. Further, Plaintiffs' requested relief for the alleged "tie" reveals that their tying claim is, like so many of their other claims, an improper duty to deal claim barred by *Trinko*.

### A.  Adx And DFP Are Not "Tied."

Plaintiffs allege that Google "tied" DFP and AdX "through technical limitations [and] contractual provisions." Ex. 15 at 166:17-22. But where, as here, "the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 n.17 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28 (2006). That is, because Plaintiffs failed to come forward with sufficient evidence on summary judgment to raise a genuine issue of material fact as to whether Google "actually coerces or forces the customer to buy [DFP] in order to obtain [AdX]," Google is entitled to summary judgment. *Logic Process Corp. v. Bell & Howell Publications Systems Co.*, 162 F. Supp. 2d 533, 540 (N.D. Tex. 2001) (citing *Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir. 1981) ("We have held

that actual coercion is an indispensable element of a tie-in charge.")); *see also United Farmers,* 28 F.3d at 235 n.2.

First, Plaintiffs contend that Google implemented technical limitations that "restrict[ed] the ability of publishers using rival ad servers to trade through AdX." FAC ¶ 19. But the undisputed record establishes that publishers are "free to take either [AdX or DFP] by itself." *United Farmers,* 28 F.3d at 235 n.2.; SMF ¶¶ 173-178, 181. As Plaintiffs acknowledge—publishers can and do use AdX without DFP. Ex. 13 at 278:5-11 ("Q. Can a publisher choose to use AdX without using DFP? A. Yes, it is possible for a publisher to use AdX without using Google Ad Manager. Q. Can a publisher choose to use DFP without using AdX? A. Yes."); Ex. 4, ¶ 127 ("Currently, AdX tags are still in use, and it is still possible for publishers to use AdX with a third-party ad server."); *see also* SMF ¶¶ 173-176. Specifically, and as Plaintiffs acknowledge, publishers using third-party ad servers reach Google advertisers using the "AdX Direct" tag, which "enable[s] AdX to be called by third-party ad servers to serve an ad." Ex. 3, ¶ 429; *see also* Ex. 11, ¶ 293 ("The publishers that access AdX from outside of DFP are publishers using AdX Direct."); SMF ¶ 175.[13] It is also undisputed that DFP publishers can and do use other ad exchanges to the exclusion of AdX. SMF ¶¶ 177, 178. In fact, of the approximately ███████ publisher networks on GAM using Google's publisher ad server, only approximately ██████ networks have AdX enabled. SMF ¶ 178.

---

[13] Plaintiffs will likely complain that AdX Direct is a red herring because it is not the same as "real-time AdX demand" or "competitive live bids." But Plaintiffs, themselves, allege that AdX— not real-time bids from AdX—is the "tying product." Ex. 3 ¶ 414 ("Google tied its AdX ad exchange with its DFP ad server."), *id.* at ¶ 445 ("For purposes of the contractual tie, AdX is the tying product"); *see* Ex. 15 at 162:11-14 (admitting that he "consider[ed] AdX to be the tying product and DFP to be the tied product"); Ex. 7, ¶¶ 80, 471. Plaintiffs have not alleged or established a tying product market for real-time bids (or "real-time demand," or "competitive live bids"), nor Google's market power in any such market. And even if Plaintiffs were now to contend that real-time bids (or "real-time demand," or "competitive live bids") is a tying product, such a claim would be contradicted by the factual record. Google does not provide real-time AdX bids to any ad server, including its own. SMF ¶ 38. Plaintiffs cannot manufacture a tie (and certainly not harm to competition) out of a product that Google does not provide to anyone, even itself.

Second, Plaintiffs claim that Google's decision to offer unified DFP/AdX contracts beginning in 2016 effectuated a "tie." Ex. 3, ¶ 446. But Plaintiffs cannot point to any contractual provision requiring publishers to serve ads through DFP to access AdX demand (or requiring publishers to use AdX to be eligible for DFP). *See, e.g.,* Ex. 15 at 174:18-176:9 (Plaintiffs' expert admitting he did not rely on the contract in forming his opinions). That is because no such provision exists. SMF ¶ 182; *see also* Ex. 15 at 176:18-177:21 (acknowledging that Google informed publishers that "the contract will give you access to DFP features, but there is no obligation to use them."). Put simply, the contracts do not force publishers to use both DFP and AdX. Indeed, AdX Direct has been available to and used by publishers both before and after Google instituted this alleged contractual tie in 2016. SMF ¶ 181.

Because the undisputed record reflects that publishers are "free to take either product by itself" and thus "there is no tying problem," Google is entitled to summary judgment. *Jefferson Parish*, 466 U.S. at 12 n.17.[14]

### B.  Google Has No Duty to Deal.

Plaintiffs' "tying" claim also fails because a duty to deal cannot form the basis for a tying claim. But that is exactly the foundation on which Plaintiffs' tying claim sits—that Google was

---

[14] This is true regardless of whether Count III is analyzed under the per se rule or rule of reason. *See Logic Process Corp.*, 162 F. Supp. 2d at 540. If a tying claim does not fall within the *per se* framework, it is analyzed under the rule of reason, *see Jefferson Par. Hosp. Dist. No. 2*, 466 U.S. at 29, which "requires a showing of all five elements including actual anti-competitive effect," *Amey, Inc.*, 758 F.2d at 1503. Thus, the failure to demonstrate that two products are tied together or that customers were coerced to buy both dooms Plaintiffs' claim under either standard. *See United Farmers Agents Ass'n*, 89 F.3d at 235 n.2. Of course, because the alleged "tie" is a unilateral act, Section 1 is inappropriate in the first instance. *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1757a (5th ed. 2023) (explaining that because "no tying agreement is needed" to implement such a "technological tie," it is a "unilateral act [which] does not satisfy Sherman § 1"); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178-79 (9th Cir. 2016) (holding that making the tied product an "economic imperative," and blocking third-party providers through "pricing decisions[ ] and removal of technical data" does not fit the "tying construct").

obliged to and did not implement a feature enabling "third-party ad servers to solicit bids in real-time from AdX." Ex. 3, ¶ 435; *see also* Ex. 15 at 167:19-169:6 (agreeing that "a technical limitation that effectuated a tie … was Google's decision in 2009 not to offer third-party Dynamic Allocation" and stating that "if they had offered that, there wouldn't be a tie").

Plaintiffs' proposed remedy for the alleged tie makes this explicitly clear. Plaintiffs seek to impose on Google "[a] rule requiring non-discriminatory interoperability," Ex. 5, ¶¶ 221, 226, including a rule that "would require AdX to allow access from third-party ad servers and allow third-party ad servers to receive real-time bids from AdX." Ex. 5, ¶ 229. Plaintiffs' *tying* claim thus raises the "concerns that animate the no-duty-to-deal principle." *Search*, 2024 WL 3647498, at *131. It would require the Court to "grappl[e] with a host of questions that the court is ill-equipped to handle," *id.*, such as:

- To which third party publisher ad servers would Google be obligated to send real-time AdX bids to—all competing ad servers or just some? Would five be sufficient to address any alleged anticompetitive harm, or would Google have to make real-time AdX bids available to any and all ad servers on a continuing basis?

- What kind of vetting would Google be permitted to perform before providing real-time AdX bids to other ad servers? Would it be permitted to ensure that the competitor had sufficient security and spam protections in place before allowing it to send inventory to AdX to be bid on by demand sources Google itself operated (e.g. Google Ads) or with whom it has entered into agreements to use AdX?

- Who will be responsible for developing the technology to make real-time AdX bids available to rival publisher ad servers? Who would be responsible for ensuring that AdX and the third-party ad server maintained an efficient and functional integration?

- Would AdX be required to submit real-time bids any time it was called by the rival ad server, or would AdX retain discretion as to certain categories of impressions it would not submit bids for?

In other words, Plaintiffs' "tying" claim seeks to force Google to deal with its competitors in the way Plaintiffs deem appropriate. *See, e.g.*, Ex. 3, ¶ 435 (faulting Google for "electi[ng] not to bring [third-party integration] technology to market."); Ex. 5, ¶ 237 (criticizing Google for not offering "a *wide-ranging enough* interoperability solution" (emphasis added)); Ex. 11, ¶ 282

(faulting Google for not "creat[ing] [third-party integration] functionality within DFP"). But for all the same reasons discussed in detail *supra* Section I, Google is under no legal obligation to share real-time bids from AdX—the "source of [its] advantage"—with rival ad servers. *Trinko*, 540 U.S. at 407-08; *see also Search*, 2024 WL 3647498, at *129 (rejecting argument that it was anticompetitive for Google not to "integrate auction time bidding" for Microsoft Ads like it had for Google Ads, because "[t]he Sherman Act imposes no liability … for refus[ing] to grant feature parity" to a rival).

Google is entitled to summary judgment on Plaintiffs' tying claim (Count III) because, as a matter of law, an alleged refusal to deal cannot support a tying claim. *See, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016) (rejecting that "a refusal to deal with competitors may form the basis of a tying claim"); *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 686 (4th Cir. 1992) (holding that defendant's decision to "selectively license[] [its product] is not evidence of an illegal tying agreement."); Areeda & Hovenkamp, ¶ 1700j1 ("A challenged arrangement is not a tie-in unless the alleged foreclosure can be eliminated by instructing the defendant to disaggregate what it sells to its customers … rather than by an order to sell something … to would-be rivals.").

## III.    GOOGLE'S CONDUCT IS NOT EXCLUSIONARY.

In light of the undisputed record, Plaintiffs cannot demonstrate, as they must, that much of the conduct they challenge is "exclusionary."

In the Fifth Circuit, conduct is exclusionary *only* "[i]f the conduct has *no* rational business purpose other than its adverse effects on competitors." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999) (emphasis added); *see also Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000) ("To determine whether conduct is exclusionary, [courts] look to the proffered business justification for the act."); *Retractable Techs., Inc. v. Becton Dickinson*

*& Co.*, 842 F.3d 883, 892 (5th Cir. 2016); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.) ("Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect."). In other words, "[i]n the Fifth Circuit, proving anticompetitive conduct also '[g]enerally' requires 'some sign that the monopolist engaged in behavior that—examined without reference to its competitors—is economically irrational.'" *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 597 (W.D. La. 2021) (second alteration in original) (quoting *Stearns*, 170 F.3d at 523). This is true notwithstanding the impact of the conduct on competitors. As the Court in *Stearns* noted, "winning a competition on the merits does not change the fact that it is a competition on the merits." 170 F.3d at 524 n.4 (dismissing Stearns' reference to "FMC documents which indicate that FMC was aware that a certain specification would prevent Stearns from bidding, and was pleased by this fact"); *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 2001 WL 8586, at *11 (E.D. La. Jan. 3, 2001) (finding that exclusive contracts, while "certainly … not helpful to [a competitor] … constituted an exercise of justified business activities"), *aff'd*, 309 F.3d 836, 843 (5th Cir. 2002).

Thus, even if—as Plaintiffs claim—Google's conduct was designed to increase Google's profits, that alone is not enough to demonstrate that Google's conduct was anticompetitive. Indeed, a competitor's decision to do something to maximize its own profits is, in and of itself, a rational and legitimate business purpose. *See Stearns*, 170 F.3d at 524 (firm's "business justification … is obvious" when "it [is] trying to sell its product" because it "produce[s] real, not merely relative, gains for the company"). For profit maximization to rise to the level of exclusionary conduct, it would have to maximize profitability solely because the conduct had the effect of eliminating competition (and thus enabling, for example, increased prices at a later time). *See, e.g.*, *Retractable Techs.*, 842 F.3d at 892 (highlighting conduct that "'sacrifice[d] short-run benefits and consumer

goodwill in exchange for a perceived long-run impact'" on a competitor as "an example of conduct taken without a rational business purpose" (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985)).

For example, in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), the Supreme Court held that a newspaper violated Section 2 by forcing advertisers to boycott the newspaper's only real rival for local advertising, a new radio station. The newspaper "refused to accept local advertisements … from any Lorain County advertiser who advertised or who [it] believed to be about to advertise" with the radio station. *Id.* at 148. The Court held that because the newspaper was attempting to attain a "monopoly over the mass dissemination of all news and advertising," *id.* at 153, solely by "destroy[ing] and eliminat[ing]" the radio station, *id.* at 150, its conduct was exclusionary under Section 2. Moreover, the Court found that the newspaper could not offer any justification for its conduct other than a desire to eliminate competition. *Id.* at 154 n.8.

The challenged conduct in this case bears no resemblance to that condemned in *Lorain Journal*. Plaintiffs have not even alleged, much less come forward with evidence to show, that Google took any action to prevent its customers from dealing with any of its scores of rivals. Instead, the record evidence shows that both publishers and advertisers "multi-home," meaning that publishers use multiple ad exchanges on the sell-side, and advertisers use multiple buying tools on the buy-side. SMF ¶¶ 17, 21. Furthermore, Google actually enables its rivals to participate in its Uniform First Price Auction and, through Google Ad Manager, facilitates relationships between its publisher customers and rival exchanges to allow them to participate in the UFPA. SMF ¶ 68, 80. And while Google has legitimate business justifications for all of the challenged conduct, there is no genuine issue of material fact that the features discussed below, in addition to benefiting Google's bottom line, were based on additional, legitimate business justifications and

are therefore not exclusionary.

### A. Dynamic Allocation and Enhanced Dynamic Allocation.

As discussed *supra* at 18-19, Dynamic Allocation and Enhanced Dynamic Allocation provided a way for publishers to determine in real-time whether a buyer bidding through AdX was willing to pay more for a particular ad impression than the publisher could receive from other exchanges or third-party buyers. Plaintiffs do not dispute that DA and EDA benefited publishers. Ex. 15 at 194:17-21 ("Q. Did Dynamic Allocation help publishers make more money than they could make under the Waterfall? [...] A. I believe that they [sic] did help some publishers make more money than they could under the Waterfall."); Ex. 6, ¶ 141 ("As Enhanced Dynamic Allocation runs live auctions for every impression, it will likely create a revenue increase for the publishers in the short run."). The undisputed record reflects that DA and EDA increased publisher revenue by over ███ and ███, respectively. SMF ¶¶ 98, 104. Google's desire to provide its publisher customers with these significant benefits was a legitimate business justification for DA and EDA, regardless of what effect Plaintiffs claim those programs had on Google's competitors. But, beneficial as it was for Google and its publisher customers, Google had no obligation to enable other ad exchanges to submit real-time bids for inventory sold by publishers using Google's ad server, DFP.

As an independent basis for summary judgment, it was entirely legitimate and rational for Google to choose not to open its proprietary display advertising platform to its rivals so that those rivals could bid against Google for ad inventory from Google's publisher customers. Indeed, Google was justifiably concerned about providing its competitors with direct access to Google's base of publisher customers via Open Bidding. *See* Ex. 19 at ¶ 41. Google nevertheless invested significantly in Open Bidding after finding that the product provided value to publishers using

Google's ad server, DFP. SMF ¶ 74.

### B. Dynamic Revenue Share.

Dynamic Revenue Sharing ("DRS") was a Google auction optimization introduced in 2015, which the undisputed record reflects increased the number of successful transactions between publishers and advertisers.[15] SMF ¶¶ 141, 159, 162-164. DRS allowed Google to reduce its revenue share—that is to say, lower its price—when doing so would allow a buyer's net bid to clear the price floor. SMF ¶¶ 144-145. Prior to DRS, Google charged publishers a fixed revenue share—typically 20% of the total bid—for transacting through AdX. SMF ¶ 39. Within the AdX auction, bids were evaluated on a net basis—that is, after Google's revenue share was deducted from the buyer's gross bid. SMF ¶ 40. Even if the AdX winning bidder was willing to pay more than the reserve price, transactions would not occur if the winning bidder's "net bid"—the bid minus AdX's revenue share—fell below the publisher's reserve price. Google termed bids that met this criteria as being in the "dynamic region." SMF ¶ 143.

The undisputed record reflects that Google introduced DRS to help transactions clear when the winning bid was in the dynamic region. SMF ¶ 142. When first introduced (DRS v1), DRS enabled Google to reduce AdX's revenue share when the winning bid for an impression fell in the dynamic region, in order to cause the transaction to clear on AdX. SMF ¶ 145. In the second iteration of DRS (DRS v.2), AdX could both reduce its revenue share when a winning bid was in the dynamic region and increase its revenue share on subsequent impressions where the winning bid was well in excess of the floor price. SMF ¶ 148. In doing so, Google kept its average revenue share closer to 20% (or the publisher's contractually agreed revenue share) without ever exceeding

---

[15] Judge Castel held that Plaintiffs lack Article III standing to seek injunctive or equitable relief for DRS because the Complaint did not identify continuing adverse effects that are attributable to DRS. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 403-04 (S.D.N.Y. 2022).

that contractually agreed share. SMF ¶¶ 149, 150. It is also undisputed that publishers could choose whether or not to implement DRS v.2, i.e., it was in a publisher's control. SMF ¶¶ 155, 158. Finally, in the third version of DRS—referred to as Truthful DRS or tDRS—Google determined whether to reduce its revenue share based on historical bidding data and made that determination prior to receiving live bids from buyers. SMF ¶ 157. Google deprecated DRS in September 2019 with its move to a Unified First Price Auction. SMF ¶ 165.

The undisputed factual record makes clear that DRS delivered benefits to Google's publisher and advertiser customers. In more than half of the auctions where DRS applied, the publisher's impression would have gone unsold but for DRS because no other net bid from *any* demand source exceeded the publisher's floor price. SMF ¶ 159. Plaintiffs also concede that DRS increased output, and that such "[o]utput increases are welfare enhancing," Ex. 15 at 237:14-23. Furthermore, Plaintiffs do not dispute that DRS increased publisher revenue. SMF ¶¶ 162-164. Indeed, by increasing match rates, it is undisputed that all versions of DRS increased publisher revenues and benefitted advertisers by enabling efficient transactions to occur. SMF ¶¶ *Id.*. These customer benefits—which made Google's products more attractive—constitute a valid business justification for DRS. Plaintiffs even concede that Google's decision to implement DRS was "likely procompetitive" at least in the first instance. Ex. 11, ¶ 405; Ex. 15 at 234:4-14 (DRS v1 "could be regarded as – as procompetitive or welfare enhancing").

Notwithstanding these clear benefits, Plaintiffs point to the fact that under certain versions of DRS Google sometimes increased its revenue share. Ex. 11, ¶ 405. But it is undisputed that such increases were employed only to offset Google's revenue share reductions on other transactions, SMF ¶ 149, which allowed DRS to be more sustainable over time. Ex. 19, ¶¶ 48-49; *see also* SMF ¶ 149. The undisputed record reflects that publishers were not paid less than their reserve price,

and buyers were never charged more than their maximum bid. SMF ¶ 160. Moreover, publishers were informed of the existence of the versions of DRS that involved offsetting revenue share increases, SMF ¶ 151, and were given the opportunity to opt-out, SMF ¶¶ 154-155. Consequently, DRS—in all three versions—was a procompetitive feature that increased output and publisher revenue. It was thus rational and justified for Google to innovate on behalf of, and implement these changes for the benefit of, its customers.

### C.  Project Bernanke.

It is undisputed that Project Bernanke, a Google Ads bid optimization program, was designed to—and, in fact, did—help Google Ads' advertiser customers "win more" impressions. SMF ¶¶ 110-111. Under Project Bernanke, Google Ads increased its bids in AdX auctions on behalf of Google Ads advertisers by decreasing its margin when, based on Google Ads' own historical data, SMF ¶ 119, Google Ads predicted other bids would be high (and thus the Google Ads advertiser would otherwise lose the auction), SMF ¶¶ 112-115. Google Ads then would increase its margin on other impressions such that the two margin adjustments balanced out and Google Ads did not increase its overall fee. SMF ¶ 115. There is no dispute that this helped Google Ads advertisers win more auctions, and therefore created more opportunities for advertisers to get their advertisements in front of users. SMF ¶¶ 122-127. Importantly, Google Ads did so without changing the price the advertiser would be charged for the impression and without increasing Google Ads' overall revenue share. SMF ¶¶ 115-118.

It is also undisputed that Project Bernanke expanded output by helping Google Ads advertisers buy impressions that, without Project Bernanke, would not have been sold at all due to high publisher floor prices. SMF ¶ 122. Prior to Project Bernanke, almost ███ of AdX queries were going unmatched due to high publisher floor prices. SMF ¶ 123. ████████████████████



SMF ¶ 124.

And, in fact, the record reflects that Project Bernanke did increase the win rate for Google Ads advertisers by ███, and benefitted publishers through a ███ revenue increase. SMF ¶ 125. As Plaintiffs admit, after considering impacts on Google Ads and other buying tools, Project Bernanke increased advertiser spending by █████████ per year, generating "economic surplus" that benefited both advertisers and publishers. Ex. 15 at 226:1-6; *see also* Ex. 15 at 224:21-226:20; SMF ¶ 126. By helping advertisers win more impressions, Project Bernanke increased advertiser click and conversion volume. SMF ¶ 127. And Plaintiffs' experts agree that this, in turn, also helped Google's publisher customers by increasing match rates and publisher revenue by ███ █████ per year. SMF ¶ 125. It was entirely legitimate for Google to build features like Project Bernanke that delivered these significant benefits to its customers. Indeed, one important aspect of competition is for Google—and other firms—to develop innovative ways to meet their customers' needs.

\*    \*    \*

Because "[l]iability turns on business justification," *Laitram Mach., Inc. v. Carnitech A/S*, 884 F. Supp. 1074, 1082 (E.D. La. 1999), and Plaintiffs are unable to raise a genuine issue of material fact as to Google's undisputed business justifications for the conduct addressed above, Google is entitled to summary judgment on Counts I and II to the extent Plaintiffs' claims are based on DA, EDA, DRS, or Project Bernanke.

## IV.    PLAINTIFFS CANNOT DEMONSTRATE COMPETITIVE HARM IN THE ALLEGED RELEVANT MARKETS.

Google is entitled to summary judgment on Counts I and II to the extent Plaintiffs have failed to adduce evidence of anticompetitive effects stemming from certain challenged conduct.

Under Section 2 of the Sherman Act, Plaintiffs have the burden of providing sufficient evidence that the alleged anticompetitive conduct had the effect of harming competition, and not just competitors. *See Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974) (affirming summary judgment where plaintiff failed to "come forth with a showing of any specific facts supporting" anticompetitive effects); *see also Shah v. VHS San Antonio Partners LLC*, 612 F. Supp. 3d 686, 696 (W.D. Tex. 2020) (granting summary judgment where plaintiff failed to "produce evidence of harm to the relevant market—that is, harm to competition, not just harm to himself"). This requires Plaintiffs to prove that the allegedly anticompetitive conduct had not only "the requisite anticompetitive effect," but also that its allegedly anticompetitive effect is in the market that is allegedly monopolized. *See, e.g.*, *Dreamstime.com v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022) (affirming district court's dismissal of monopolization claim where plaintiff failed to allege harm to competition in the allegedly monopolized market); *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 456 (S.D.N.Y. 2015) (dismissing monopolization claim where plaintiffs failed to allege anticompetitive effects in the market in which defendants allegedly exercised monopoly power).

Generally speaking, expert testimony on anticompetitive effects is "indispensable, or, at least, important to the determination of the issues in any complex antitrust action." *Nat'l Bancard Corp. v. Visa, U.S.A., Inc.*, 112 F.R.D. 62, 68 (S.D. Fla. 1986); *see also Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855, 862 n.3 (W.D. Tenn. 2001) (noting that "generally speaking, expert proof is required to prove antitrust claims"); *Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640

F. Supp. 1411, 1434 (E.D.N.C. 1986) ("To prove an effect on competition … a plaintiff must put on expert economic testimony as to … whether the defendant's conduct had any competitive effect within that market."). Here, Plaintiffs' expert on anticompetitive effects has expressly disavowed that he has any opinions on whether certain conduct resulted in any anticompetitive effects. Because Plaintiffs have not offered any evidence, much less expert opinion testimony, that certain conduct caused competitive harm in the alleged markets, Google is entitled to summary judgment as to claims based on those acts.[16]

### A. Plaintiffs Offer No Evidence That Challenged Conduct Harmed Competition At All Or In Certain Alleged Relevant Markets.

Plaintiffs' sprawling 230-page Complaint alleges the existence of four distinct relevant markets and more than a dozen different types of allegedly anticompetitive conduct. FAC ¶¶ 244-501. Plaintiffs' claims as to certain conduct were previously dismissed by Judge Castel in the MDL. And now, having concluded fact and expert discovery, Plaintiffs concede (as they must) that (1) not all conduct that survived Google's Motion to Dismiss caused anticompetitive effects (the "no-longer-challenged conduct,") and (2) not all conduct that survived Google's Motion to Dismiss caused anticompetitive effects in all of Plaintiffs' alleged relevant markets. Google is entitled to summary judgment on those claims that rest on conduct Plaintiffs now concede had no anticompetitive effect. Likewise, to the extent Plaintiffs now claim that some conduct impacted only certain alleged markets, Google is entitled to summary judgment with respect to the impact of that conduct on all other alleged markets.

---

[16] In support of their attempted monopolization claims (Count II), Plaintiffs have the burden of producing evidence of each alleged act's "potential effect" of harm to competition. *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 481-82 (5th Cir. 2000). Because Plaintiffs and their experts have failed to do even that for the certain alleged conduct, summary judgment on Count II is appropriate with respect to those alleged acts.

No Longer Challenged Conduct: Plaintiffs' expert on anticompetitive effects, Joshua Gans, conceded that he offers **no** opinion as to the competitive harm in **any** alleged relevant market arising out of three types of conduct alleged in Plaintiffs' Complaint that survived Google's Motion to Dismiss.[17] FAC ¶¶ 311, 395-405. Specifically, Professor Gans is not offering **any** opinions that the following conduct had anticompetitive effects in **any** alleged relevant market: Project Poirot, Project Elmo, or Project Bell. Ex. 15 at 148:25-149:15; *see also* SMF ¶¶ 235-37. Because Plaintiffs have failed to offer evidence that this conduct had anticompetitive effects in any alleged market, Google is entitled to summary judgment on Counts I and II to the extent Plaintiffs' claims are based on this conduct.

Conduct Impacting Alleged Relevant Markets: Professor Gans further concedes that, as to the remaining conduct, he is offering opinions that only certain conduct impacted certain alleged relevant markets. As set forth in his rebuttal report, Plaintiffs are claiming that the conduct in the column labeled, "Conduct Affecting the Relevant Market," is at issue only as to those alleged markets identified in the Relevant Market column:

---

[17] Judge Castel previously dismissed Plaintiffs' claims based on the Network Bidding Agreement with Facebook, refusal to share unencrypted User IDs, Open/Exchange Bidding, Reserve Price Optimization, and AMP. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 370, 381, 391, 393, 398 (S.D.N.Y. 2022). He also held that Plaintiffs' claim as to Privacy Sandbox was not ripe for adjudication. *Id.* at 399.

**Table 1**
**Summary of Opinions**

| Relevant Market | Google's Estimated Market Share across the Relevant Time Period | Conduct Affecting the Relevant Market |
|---|---|---|
| Ad server market: the market for publisher ad servers used for the sale of open web display advertising inventory, in the Untied States | Over 80% | Tying |
| Ad exchange market: the market for ad exchanges for transacting indirect open web display advertising, in the United States | Over 50% | UPR<br>DA and EDA<br>Line item limitations<br>Data field redactions<br>Bernanke, Project Bernanke, Global Bernanke<br>DRS |
| Small advertiser buying tools market: the market for ad buying tools for small advertisers for open web display advertising space, in the United States | Over 60% | Bernanke, Global Bernanke |
| Large advertiser buying tools market: the market for ad buying tools for large advertisers, in the United States | N/A | UPR |

Ex. 11, Table 1; *see also* Ex. 15 at 145:14–146:1; 146:18-147:15, 147:21-148:4 (Plaintiffs' expert confirming he did not express opinions about certain alleged conduct in certain markets). Because Plaintiffs are not offering evidence that all of the remaining conduct had anticompetitive effects in all of the alleged relevant markets, Google is entitled to summary judgment on Counts I and II for each alleged relevant market to the extent Plaintiffs' claims are based on conduct other than that specified in the table above.[18]

### B. Plaintiffs Have Not Demonstrated Net Harm In The Alleged Market For Ad Exchanges.

It is undisputed that the key function of an ad exchange is to match buyers and sellers of display advertising. SMF ¶ 22; Ex. 15 at 58:21-59:1 (agreeing that a "key function in an ad

---

[18] The conduct and alleged markets implicated by this argument are the ones that are shaded in gray in Appendix 1.

exchange" is "to match buyers and sellers of display advertising" by "using information and bids"). It is also undisputed that, as such, ad exchanges are two-sided platforms. SMF 22; Ex. 15 at 60:3-5 (agreeing that ad exchanges are "two-sided transaction platforms"); *id. at* 61:20-62:4 (stating that an "ad exchange itself is performing the function of matching given the information from advertisers and publishers"); *id. at* 63:17-22 (agreeing that ad exchanges are "two -sided platforms that match publishers and advertisers based on information submitted to the platform"). With respect to such platforms, the Supreme Court has held that "competition cannot be accurately assessed by looking at only one side of the platform." *AmEx*, 585 U.S. 529, 546 (2018). Rather, to demonstrate anticompetitive effects in the two-sided market for ad exchanges, Plaintiffs must prove that the challenged conduct "made all [AdX] consumers on both sides of the platform—*i.e.*, both [publishers and advertisers]—worse off overall." *United States v. American Express Co.*, 838 F.3d 179, 205 (2d Cir. 2016); *aff'd sub nom AmEx*, 585 U.S. 529 (2018). Because Plaintiffs have failed to assess, much less demonstrate, the net impact of the challenged conduct on both advertisers and publishers, Google is entitled to summary judgment on Plaintiffs' claims of monopolization and attempted monopolization (Counts I and II) of the alleged market for ad exchanges.

In *AmEx*, the Supreme Court was asked to decide whether plaintiffs—the United States and several states (including Texas)—had carried their burden of proving that American Express's antisteering provision had an anticompetitive effect. The antisteering provision "prohibit[ed] merchants from discouraging customers from using their Amex card after they have already entered the store and are about to buy something, thereby avoiding Amex's fee." 585 U.S. at 534. Plaintiffs prevailed at trial, with the District Court concluding that the provisions were anticompetitive because they resulted in higher merchant fees. *Id.* at 540. The Second Circuit

reversed, and the Supreme Court affirmed. The Court held that "[b]y providing … services to cardholders and merchants, credit-card companies bring these parties together, and therefore operate what economists call a 'two-sided platform' … [which] offers different products or services to two different groups who both depend on the platform to intermediate between them.'" *Id.* at 534. The Court then held that "[e]valuating both sides of a two-sided transaction platform is necessary to accurately assess competition." *Id.* at 546. As a result, typical direct evidence of anticompetitive effects—such as increased prices, lower output, or reduced quality, *see id.* at 542—is not sufficient unless those effects are proved to hold true in view of the "market as a whole." *Id.* at 544, 547 (explaining that "[p]rice increases on one side of the platform … do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services"). Because plaintiffs "stake[d] their entire case on proving that Amex's agreements increase merchant fees," without considering the effect of the agreements on the cardholders and any resulting "net harm," they "wrongly focused on only one side of the two-sided credit card market" instead of the "market as a whole." *Id.* at 547.

Plaintiffs make the same mistake here. None of their experts offered opinions in their reports on "net harm" with respect to any of the conduct allegedly impacting the alleged ad exchange market. Indeed, Plaintiffs' expert on anticompetitive effects concedes he made no effort to do so, or, alternatively, that the challenged conduct actually made publishers and advertisers *better off* overall:

- Professor Gans testified that he did not offer an opinion about the "net effects" of the following conduct on advertisers and publishers:  DA/EDA, Ex. 15 at  205:16-206:8 (agreeing he did not "express an opinion about the overall net effect of Dynamic Allocation considering all of the effects on both advertisers and publishers"); DRS, *id.* at 237:24-238:5

47

(agreeing he did not "express an opinion about the overall net effect of DRS considering all the effects on both advertisers and publishers"), UPR, *id.* at 205:8-15 (agreeing he did not "express an opinion about the overall net effect of UPR considering all the effects on both advertisers and publishers"); Line Item Limits, *id.* at 254:9-20 (stating that he focused his opinions on "the publisher facing markets" and did not "directly consider" the impacts on advertisers from line item caps), and Redacted BDT files, *id.* at 264:14-265:12 (stating that it was "not necessary" to evaluate the effects of redacted BDT files on advertisers).

- With respect to Project Bernanke, Professor Gans testified that, contrary to making advertisers and publishers "worse off overall," *Amex*, 838 F. 3d at 205, Project Bernanke "benefitted both advertisers and publishers," *id.* at 226:17-20, and had the "effect of increasing the revenue of publishers [and] potentially advertisers as well," *id.* at 232:3-14.

Having failed to offer evidence of "net harm" in the alleged market for ad exchanges, Plaintiffs cannot meet their burden of proving an essential element of their monopolization and attempted monopolization claims, and Google is entitled to summary judgment on Counts I and II as to the ad exchange market.

## V.    PLAINTIFFS CANNOT DEMONSTRATE A DANGEROUS PROBABILITY OF GOOGLE ACHIEVING MONOPOLY POWER IN THE ALLEGED MARKET FOR AD BUYING TOOLS FOR LARGE ADVERTISERS.

Google is entitled to summary judgment on Count II as to the alleged market for ad buying tools for large advertisers because Plaintiffs have not offered any credible evidence or expert opinions that Google has a dangerous probability of achieving monopoly power in that alleged market.[19]

---

[19] The Fourth Amended Complaint did not advance a monopolization claim in the alleged market for ad buying tools for large advertisers, *see* FAC ¶¶ 598-601, but only alleged that Google *attempted* to monopolize this purported market, *see* FAC ¶ 603.

Determining whether a "dangerous probability" exists requires "inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 448 (1993). While "no particular percentage of market share is dispositive ... market share is critical to evaluate when determining the key issue of whether there is a probability of success in achieving monopoly power." *All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund*, 887 F.Supp. 2d 448, 458 (E.D.N.Y. 2012); *see also Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) ("a defendant must have some legally significant share of the market before he approaches the level of dangerous probability of success condemned by the attempt provision of section two"). As noted by Areeda and Turner, "the clear thrust of the classic rule is the presumption that attempt does not occur in the absence of a rather significant market share, generally measured as of the time the conduct occurred or perhaps when it was commenced." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 807a. (5th ed. 2023).

Here, Plaintiffs have no evidence and offer no expert opinions as to whether or not Google has a dangerous probability of achieving monopoly power in the alleged market for ad-buying tools for large advertisers. Their expert on monopoly power and anticompetitive effects, Professor Gans, offers no opinion on whether or not there is a dangerous probability that Google might achieve monopoly power in this alleged market. Ex. 15 at 99:21-25 ("Q. In your reports, have you expressed the opinion that Google has a dangerous probability of achieving monopoly power in the market for ad-buying tools for large advertisers? A. I have not."). In fact, Plaintiffs have not offered *any* evidence of Google's market share in the market for ad buying tools for large advertisers; their expert "didn't attempt to calculat[e it]" or "try to estimate it through other means." Ex. 15 at 149:21-150:4 ("Q. Do you see that the middle column of Table 1 in your rebuttal

report is titled 'Google's Estimated Market Share Across the Relevant Time Period'? A. Yes. Q. Why do you have 'NA' in the row for large advertiser buying tools market, in that column? A. Because I didn't attempt to calculation [sic] of its market share or try to estimate it through other means.").

In the absence of any evidence showing that Google is dangerously close to achieving monopoly power in the alleged market for ad buying tools for large advertisers, Google is entitled to summary judgment on Count II with respect to that market. *See, e.g.*, *All Star Carts and Vehicles*, 887 F. Supp. 2d at 458 (granting summary judgment for defendant where "Plaintiffs' only evidence of market share lies [sic] the lay testimony of Kussmaul and Amato, and Defendants' internal, and informal, company documents"); *see also Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673 F.2d 1045, 1059 (9th Cir. 1982) (affirming judgment in favor of defendant on monopolization claim because "[w]ithout the benefit of expert testimony or other credible evidence to support an inference of market power … any such inference would be sheer speculation.").

## VI.    PLAINTIFFS' STATE LAW ANTITRUST CLAIMS FAIL FOR THE SAME REASONS AS THEIR FEDERAL CLAIMS.

Google is entitled to summary judgment on Plaintiffs' state law antitrust claims to the same extent as Plaintiffs' federal antitrust claims. Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas), *see* Appendix 2, and their state antitrust claims are predicated on the same conduct and legal theories as their federal antitrust claims, *see* FAC ¶¶ 617-672 (Count V, Supplemental State Law Antitrust Claims). Thus, summary judgment should also be granted on the state antitrust claims: (1) as to challenged acts that were lawful refusals to deal with rivals; (2) as to challenged acts that do not constitute tying; (3) as to challenged acts that are not exclusionary because they were based on legitimate business justifications; (4) based on insufficient evidence

of anticompetitive effects; and (5) for alleged monopolization in the alleged market for ad buying tools for large advertisers.

Google should also prevail on any antitrust claims based on Arkansas antitrust laws because those laws are narrower than the federal antitrust laws and do not encompass any of the antitrust theories in the FAC. The Arkansas statutes cited in the FAC prohibit only (i) locality discrimination, (ii) secret payments, rebates, or discounts, (iii) price-fixing, and (iv) below-cost pricing with anticompetitive intent. FAC ¶ 623; *see also* Ark. Code Ann. §§ 4-75-201 to -320. No such conduct is pleaded in Plaintiffs' Fourth Amended Complaint. *See generally* FAC.

## VII.   CERTAIN OF PLAINTIFF STATES' ANTITRUST CLAIMS FOR CIVIL PENALTIES ARE BARRED BY THE STATUTES OF LIMITATIONS.

Google is entitled to summary judgment on certain States' antitrust claims for civil penalties based on conduct that occurred outside the statutorily imposed limitations periods. Specifically, ten of the seventeen states filed suit claiming civil penalties outside their four-year statutorily prescribed limitations periods: Alaska, Florida, Idaho, Missouri, Nevada, North Dakota, Puerto Rico, South Dakota, Texas, and Utah.[20] And three more states filed suit claiming civil penalties where the statutorily prescribed limitation periods are shorter than four years: Indiana,[21] Montana,[22] and South Carolina.[23]

The relevant accrual standard, which Google accepts solely for purposes of this Motion, is that Plaintiffs knew or should have known about the conduct at issue at the time it was disclosed to Google's advertisers and publishers. *See generally Grp. Dealer Servs., Inc. v. Sw. Bell Mobile*

---

[20] AS 45.50.588; Fla. Stat. § 542.26; Idaho Code § 48 115; Mo. Rev. Stat. § 416.131.2; Nev. Rev. Stat. § 598A.220(1); North Dakota Century Code (N.D.C.C.) § 51-08.1-10; P.R. Laws Ann. tit. 10, § 268(c); SDCL § 37-1-14.4; Tex. Bus. Com. Code § 15.25; Utah Code § 76-10-3117(1).
[21] Ind. Code § 34–11–2–4 (2 years).
[22] Mont. Code Ann. §§ 27-2-103; 27-2-211 (2 years).
[23] S.C. Code § 39-5-150 (3 years).

*Sys., Inc.*, 2001 WL 1910565, at *14 (W.D. Tex. Sept. 19, 2001) (discussing that "[a] cause of action accrues when facts come into existence that give a claimant the right to seek a remedy in the courts"). As explained below, under this standard, it cannot reasonably be disputed that the States knew or should have known about the conduct at issue well before, and in one case more than a decade before, Plaintiffs filed their original complaint on December 16, 2020.

Dynamic Allocation: Google publicized the Dynamic Allocation feature as early as 2009, when it re-launched AdX. SMF ¶ 92. Plaintiffs' experts also admit that Plaintiffs knew about Dynamic Allocation in, and prior to, 2014 when they opine that "[p]ublishers [and] other industry participants … saw Header Bidding as a response to [...] DA." Ex. 3, ¶ 584; Ex. 5, Pathak Report at ¶ 142 ("Header Bidding was an industry response to Google only giving Dynamic Allocation to itself."); *id.*, ¶ 139 ("Header Bidding addressed publisher concerns around Dynamic Allocation and enabled publishers to increase yields by facilitating real-time price competition between exchanges.").

Enhanced Dynamic Allocation: Google publicly announced Enhanced Dynamic Allocation on March 3, 2014 through its Help Center, stating that its "ad servers now optimize the distribution of Ad Exchange and AdSense impressions throughout goal-based line item delivery, without compromising reservation goals." SMF ¶ 99.

Dynamic Revenue Share: On June 13, 2016, Google notified advertisers and publishers via a public Help Center release that "[a]s part of [its] ongoing efforts to provide smarter optimizations and maximize revenue, [Google] may increase or decrease revenue share per query." SMF ¶ 154. It also notified users via a notification bar in the AdX user interface displayed as of June 14, 2016. SMF ¶ 155.

<u>Alleged DFP / AdX Tie</u>:  Plaintiffs claim that Google began to integrate DFP and AdX as early as 2014 and that by "June 2016, Google made the Unified DFP/AdX Contract … the default and prevented the creation of new AdX-only contracts." Ex. 3, ¶ 446.  On September 19, 2016, Google publicly announced in a Help Center release that "[u]sers with access to both Ad Exchange and DoubleClick for Publishers can now enjoy access to Ad Exchange product features in the DoubleClick for Publishers interface. This streamlines the user workflow and reduces the need to access separate products." SMF ¶ 180.

Because there is no dispute that this conduct was well-publicized, and thus Plaintiffs knew or should have known about it more than four years before filing suit, Google is entitled to summary judgment on the following States' claims for civil penalties based on such conduct: Alaska, Florida, Idaho, Indiana, Missouri, Montana, Nevada, North Dakota, Puerto Rico, South Carolina, South Dakota, Texas, and Utah.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in Google's favor on all antitrust counts of the Plaintiffs' Fourth Amended Complaint. Google respectfully requests oral argument on its Motion for Summary Judgment on Plaintiffs' Antitrust Claims.

Dated: November 18, 2024                    Respectfully submitted,

*/s/ Eric Mahr*
Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Constance Forkner (*pro hac vice*)
FRESHFIELDS US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4545
Email: eric.mahr@freshfields.com

Kathy D. Patrick
State Bar No. 15581400
KPatrick@gibbsbruns.com
Gibbs & Bruns LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel.: (713) 650-8805
Fax: (713) 750-0903

Daniel S. Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
55 Second Street
San Francisco, CA 94105
(415) 490-1486
dbitton@axinn.com

*Attorneys for Google LLC*

### CERTIFICATE OF SERVICE

I certify that on November 18, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

/s/ *Eric Mahr*

### CERTIFICATE OF MOTION TO SEAL

I certify that contemporaneously with the filing of this Motion, Defendant is filing a motion to seal both this document and documents attached as exhibits hereto.

/s/ *Eric Mahr*