# EXHIBIT 15

# REDACTED

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                    SHERMAN DIVISION
3
     THE STATE OF TEXAS, et   |
4    al.,                     |
                              |   Case No.
5      Plaintiffs,            |   4:20-cv-00957-SD
                              |
6    - against -              |
                              |
7    GOOGLE LLC,              |
                              |
8      Defendant.             |
9
     ******************************************************
10   HIGHLY CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION OF
11                     JOSHUA GANS
12                   OCTOBER 10, 2024
13   ******************************************************
14
          ORAL AND VIDEOTAPED DEPOSITION of JOSHUA GANS,
15   produced as a witness at the instance of the
     Defendant, and duly sworn, was taken in the
16   above-styled and numbered cause on October 10, 2024,
     from 9:00 a.m. to 7:35 p.m., before Mendy A.
17   Schneider, CSR, RPR, in and for the State of Texas,
     recorded by machine shorthand, at the offices of
18   NORTON ROSE FULBRIGHT, 1550 Lamar, Suite 2000,
     Houston, Texas, pursuant to the Federal Rules of Civil
19   Procedure and the provisions stated on the record or
     attached hereto; that the deposition shall be read and
20   signed.
21
22
23
24
25     Job No. CS6922874

HIGHLY CONFIDENTIAL

Page 58

1    profitability.

2        Q.   (BY MR. EWALT)  Where does it describe

3    profitability in Paragraph 159?

4        A.   I said it described the components of it,

5    the -- which is the amount of sales that would be lost

6    should publishers be considering changing their

7    business model to a subscription model.

8        Q.   Do you reach any conclusion as to whether it

9    would be profitable for publishers to change their

10   business model to a subscription model?

11       A.   I do.

12       Q.   Where?

13       A.   In the components that would be significantly

14   costly and so.

15       Q.   So you don't use the word "profit"?

16       A.   I don't use the word "profit."  I said I

17   looked at the components of profit.

18              MS. YOUNG:  And let him finish his

19   question before you answer.  You talked over each

20   other a little there.

21       Q.   (BY MR. EWALT)  All right, sir, let's talk

22   about ad exchanges.

23              Is the key function of an ad exchange to match

24   buyers and sellers of display advertising?

25              MS. YOUNG:  Objection; form.

HIGHLY CONFIDENTIAL

Page 59

1        A.    It is to do so using information and bids.

2        Q.    (BY MR. EWALT)  So you agree then that a key

3   function of an ad exchange is to match buyers and

4   sellers of display advertising?

5              MS. YOUNG:  Same objection.

6        A.    It is to find opportunities for matches and

7   to communicate those to the parties.

8        Q.    (BY MR. EWALT)  For each transaction on an ad

9   exchange, is there always exactly one buyer and one

10  seller?

11             MS. YOUNG:  Objection to form.

12       A.    If a transaction is completed?  You mean if a

13  match is found?

14       Q.    (BY MR. EWALT)  (Nodding head.)

15       A.    From the point of view of the ad exchange,

16  yes.

17       Q.    For each transaction on an ad exchange, do

18  the buyer and seller interact simultaneously?

19             MS. YOUNG:  Objection; form.

20       A.    The buyer and seller submit information to

21  the ad exchange.  And the ad exchange considers that

22  information together which from an economist point of

23  view would be simultaneous.

24       Q.    (BY MR. EWALT)  Are there indirect network

25  effects between publishers and advertisers in the

HIGHLY CONFIDENTIAL

Page 60

1    market for ad exchanges?

2        A.   Yes.

3        Q.   Are ad exchanges two-sided transaction

4    platforms?

5        A.   That is a word that you could use for them.

6        Q.   When you define a market for ad exchanges,

7    did you focus on how publishers would respond to a

8    SSNIP?

9                 MS. YOUNG:  Objection; form.

10       A.   I -- I focused on should the amount that the

11   ad exchange is charging publishes in terms of taking

12   revenue from advertisers if that increased what the

13   publisher's substitution options would be.

14       Q.   (BY MR. EWALT)  When you defined a market for

15   ad exchanges, did you consider advertisers' options in

16   response to a SSNIP?

17                 MS. YOUNG:  Objection; form.

18       A.   For advertisers, the consideration would

19   be -- would require substitution, would be things that

20   were -- were -- were part of the terms of trade that

21   were not necessarily the take rate of the ad exchange.

22       Q.   (BY MR. EWALT)  So did you not consider

23   advertiser responses to a SSNIP when you were defining

24   a market for ad exchanges?

25       A.   Well --

HIGHLY CONFIDENTIAL

Page 61

1              MS. YOUNG:  Objection; form.

2              You may answer.

3       A.   Well, in this particular case, the

4    substitution triggers for advertisers would be perhaps

5    what you would regard -- what we would regard as

6    nonprice.

7       Q.   (BY MR. EWALT)  Okay.  I'm just asking what

8    you did.

9       A.   Yeah.

10      Q.   Did you consider advertiser responses to a

11   SSNIP when you were defining a market for ad

12   exchanges?

13              MS. YOUNG:  Same objection.

14      A.   I can't recall whether I looked at that

15   particularly given the way that I -- it's in my mind

16   now, but we could have a look at the report to see.

17      Q.   (BY MR. EWALT)  Well, how do you -- let's

18   not -- let's step back and say -- let me -- let me go

19   back for one second.

20              You said that you could define ad exchanges --

21   you could consider ad exchanges to be a two-sided

22   transaction platform, right?

23      A.   Yes.

24      Q.   Do you consider ad exchanges to be a

25   two-sided transaction platform?

HIGHLY CONFIDENTIAL

Page 62

1              MS. YOUNG:  Objection; form.

2        A.    The ad exchange itself is performing the

3    function of matching given the information from

4    advertisers and publishers.

5        Q.    (BY MR. EWALT)  Okay.  So, yes or no, do you

6    consider ad exchanges to be two-sided transaction

7    platforms?

8              MS. YOUNG:  Objection; form.

9              Go ahead.

10       A.    The -- my reason for hesitation in sort of

11   doing that word -- well, let me -- let me put it this

12   way, and maybe this will be easier on us.

13             Can you define what you mean by

14   "two-sided transaction platform"?

15       Q.    (BY MR. EWALT)  So we've been talking about

16   it.  I understand it's a term of art in economics.

17       A.    It is?

18       Q.    It's -- do you disagree?  Do you think it --

19   a two-sided transaction platform is not an economic

20   term?

21       A.    I think "two-sided platform" is or --

22   "multi-sided platform" is a term of art in economics.

23             I think "multi-sided matching" is a term

24   of art in -- in economics.

25             I am concerned when you insert the word

HIGHLY CONFIDENTIAL

Page 63

1    "transaction" into it you are meaning something

2    different --

3         Q.   Okay.

4         A.   -- than those.

5         Q.   That's fair.

6              Are ad exchange -- strike that.

7              Do you consider ad exchanges to be

8    two-sided platforms?

9              MS. YOUNG:  Objection; form.

10        A.   I do.

11        Q.   (BY MR. EWALT)  Do you consider ad exchanges

12   to be two-sided platforms that match publishers and

13   advertisers?

14             MS. YOUNG:  Objection; form.

15        A.   That match publishers and advertisers based

16   on the information submitted to the platform.

17        Q.   (BY MR. EWALT)  Do you consider ad exchanges

18   to be two-sided platforms that match publishers and

19   advertisers based on information submitted to the

20   platform?

21             MS. YOUNG:  Objection; form.

22        A.   Yes.

23        Q.   (BY MR. EWALT)  Okay.  So why don't we just

24   take a moment here and you can review your report --

25   both reports and refresh your memory as to whether you

HIGHLY CONFIDENTIAL

Page 74

1    their advertisements shown to consumers who might buy

2    their products?

3         A.   Yes, for the majority of advertisers.

4         Q.   Can advertisers reach consumers using display

5    advertising on the open web?

6         A.   They can.

7         Q.   Can advertisers reach consumers using

8    advertiser -- advertising on social media websites

9    like Instagram and TikTok?

10        A.   They can.

11        Q.   Can advertisers reach consumers using

12   advertising on retail websites like Amazon and

13   Walmart?

14        A.   Depending on whether their products are

15   available in those platforms, yes.

16        Q.   Can advertisers reach consumers using

17   advertising in mobile apps?

18        A.   It is possible.

19        Q.   Can Advertisers reach consumers through

20   Direct Deals with publishers?

21             MS. YOUNG:  Objection; form.

22        A.   If they strike a direct deal with the right

23   sort of publisher, yes.

24        Q.   (BY MR. EWALT)  Can advertisers reach

25   consumers using advertising in streaming services or

HIGHLY CONFIDENTIAL

Page 99

1      Q.    (BY MR. EWALT)  Does Google Ads have unique

2   product features as compared to other ad-buying tools

3   for small advertisers?

4      A.   Yes.

5              MS. YOUNG:   Objection; form.

6              Go ahead.

7      A.   Yes.

8      Q.    (BY MR. EWALT)  Do these unique features make

9   Google Ads a relatively high quality ad-buying tool

10   for small advertisers?

11              MS. YOUNG:   Objection; form.

12      A.    Those features mean that compared to other

13   ad-buying tools for small advertisers there are

14   distinctive features whereby advertisers can derive

15   value from Google relative to those others.

16      Q.    (BY MR. EWALT)  In your reports, have you

17   expressed the opinion that Google has monopoly power

18   in the market for ad-buying tools for large

19   advertisers?

20      A.   I have not.

21      Q.   In your reports, have you expressed the

22   opinion that Google has a dangerous probability of

23   achieving monopoly power in the market for ad-buying

24   tools for large advertisers?

25      A.   I have not.

HIGHLY CONFIDENTIAL

Page 145

1          MS. YOUNG:  Objection; form.

2

11          Q.   (BY MR. EWALT)  All right.  Let's turn to your

12     rebuttal report, Page 9.

13          A.   Yes.

14          Q.   Does Table 1 provide a summary of your

15     opinions in this case?

16          A.   Yes.

17          Q.   Does the column titled "Relevant Market"

18     describe each of the markets that you've defined to be

19     relevant markets in this case?

20          A.   Yes.

21          Q.   Does the column titled "Conduct Affecting the

22     Relevant Market" describe the only conduct that you're

23     opining affected each of the relevant markets that

24     you've defined?

25               MS. YOUNG:  Objection; form.

HIGHLY CONFIDENTIAL

Page 146

1        A.    Yes.

2        Q.    (BY MR. EWALT)  In either of your reports did

3    you express an opinion about whether any conduct,

4    other than the alleged tying, affected the publisher

5    ad server market?

6        A.    The -- sorry, can you repeat that question

7    again.

8        Q.    In either of your reports did you express an

9    opinion about whether any conduct, other than the

10   alleged tying, affected the publisher ad server

11   market?

12              MS. YOUNG:  Objection; form.

13       A.    Some of the conduct did affect those, but the

14   market for -- that was relevant for competitive harm

15   was only with tying that it was affecting

16   competitive -- impacting on competition in that

17   market.

18       Q.    (BY MR. EWALT)  I see.

19             In either of your reports did you express an

20   opinion about whether any conduct, other than the

21   alleged tying, harmed competition in the publisher ad

22   server market?

23                  MS. YOUNG:  Objection; form.

24       A.    I did not.

25       Q.    (BY MR. EWALT)  In either of your reports did

HIGHLY CONFIDENTIAL

Page 147

1    you express -- did you express an opinion about

2    whether any conduct, other than Bernanke and Global

3    Bernanke harmed competition in the market for

4    ad-buying tools for small advertisers?

5         A.    I did not.

6                   MS. YOUNG:   Objection; form.

7                   THE WITNESS:   Oh, sorry.

8                   MS. YOUNG:   Go ahead.

9         A.    I did not.

10        Q.    (BY MR. EWALT)   In either of your reports did

11   you express an opinion about whether any conduct,

12   other than UPR, harmed competition in the market for

13   ad-buying tools for large advertisers?

14                  MS. YOUNG:   Objection; form.

15        A.    I don't believe I did.

16        Q.    (BY MR. EWALT)   In either of your reports did

17   you express an opinion about whether any conduct

18   affected -- strike that.

19                  In either of your reports did you -- did --

20   strike it again.

21                  In either of your reports did you express an

22   opinion about whether competition in the ad exchange

23   market was harmed by conduct, other than UPR, Dynamic

24   Allocation, Enhanced Dynamic Allocation, line item

25   limitations, data field redactions, Bernanke, Global

HIGHLY CONFIDENTIAL

Page 148

1    Bernanke, and DRS?

2        A.    I don't --

3                MS. YOUNG:    Objection; form.

4        A.    I didn't.

5        Q.    (BY MR. EWALT)    In either of your reports did

6    you express an opinion that RPO harmed competition in

7    any market?

8                MS. YOUNG:    Objection; form.

9        A.    I did not.

10       Q.    (BY MR. EWALT)    In either of your reports did

11   you express an opinion that exchange bidding harmed

12   competition in any market?

13               MS. YOUNG:    Firm.

14       A.    That exchange bidding itself, I did not.

15       Q.    (BY MR. EWALT)    In either of your reports did

16   you express an opinion that Open Bidding harmed

17   competition in any market?

18               MS. YOUNG:    Objection; form.

19       A.    Open Bidding itself, I did not.

20       Q.    (BY MR. EWALT)    In either of your reports did

21   you express an opinion that the network bidding

22   agreement between Google and Facebook harmed

23   competition in any market?

24       A.    I did not.

25       Q.    In either of your reports did you express an

HIGHLY CONFIDENTIAL

Page 149

1    opinion that Project Poirot harmed competition in any

2    market?

3                    MS. YOUNG:   Objection; form.

4        A.   I did not express an opinion.

5        Q.   (BY MR. EWALT)  In either of your reports did

6    you express your opinion in your report that

7    Project Elmo harmed competition in any market?

8                    MS. YOUNG:   Objection; form.

9        A.   Project Elmo.   Right.   I did not.

10       Q.   (BY MR. EWALT)  In either of your reports did

11   you express an opinion that Project Bell harmed

12   competition in any market?

13                   MS. YOUNG:   Objection; form.

14       A.   I'm forgetting whether Project Bell was also

15   a name for something else, so I can't recall.

16       Q.   (BY MR. EWALT)  Okay.   In either of your

17   reports did you express an opinion that Privacy

18   Sandbox harmed competition in any market?

19       A.   I did not separately evaluate Privacy

20   Sandbox.

21       Q.   Do you see that the middle column of Table 1

22   in your rebuttal report is titled "Google's Estimated

23   Market Share Across the Relevant Time Period"?

24       A.   Yes.

25       Q.   Why do you have "NA" in the row for large

HIGHLY CONFIDENTIAL

Page 150

1    advertiser buying tools market, in that column?

2       A.    Because I didn't attempt to calculation of

3    its market share or try to estimate it through other

4    means.

5       Q.

22          MS. YOUNG:  Objection; form.

23       A.

HIGHLY CONFIDENTIAL

Page 152

1    didn't -- I -- I -- I didn't listen to your question.

2    I -- I led Google's market share and I didn't think

3    about the dates when I answered your question.

4        Q.   Okay.  Well, but even putting aside whether

5    it was, you know, Google or DoubleClick that owned the

6    exchange --

7        A.   Yes.

8        Q.   -- you're aware that in 2007, that exchange

9    was nascent, it had no market share in 2007?

10       A.   Yes, that's correct.

11       Q.   ████████████████████████████████████████

    ███████████████████████████████████████████████████

    ███████████████████████████████████████

    █████████████████████████████████

15       A.   So let's be very clear because this is a

16   summary table.  When we talk about the conducts of

17   Dynamic Allocation and Enhanced Dynamic Allocation,

18   I'm talking -- the conduct that I have at issue is not

19   that there was Dynamic Allocation or Enhanced Dynamic

20   Allocation but Google-specific implementation of it

21   which did not occur until Google had an ad exchange.

22       Q.   (BY MR. EWALT)  Okay.  And so you understand

23   that Google had an ad exchange in 2008?

24            MS. YOUNG:  Objection; form.

25       A.   Google had acquired DoubleClick and then had

HIGHLY CONFIDENTIAL

Page 162

1      A.    That's exactly why I --

2      Q.    Opening report, Paragraph 414.

3      A.    Thank you.

4            Paragraph 414.  Sorry.

5      Q.    Yes.

6            Second sentence.

7      A.    Yes.

8            "Google conditioned the use of AdX (the

9      tying product) with the sale of DFP -- of its DFP ad

10     server (the tied product ). "

11     Q.    So in your tying analysis, did you consider

12     AdX to be the tying product and DFP to be the tied

13     product?

14     A.    I did.

15     Q.    Do AdX Direct Tags enable third-party ad

16     servers to call AdX to serve an ad?

17            MS. YOUNG:  Objection; form.

18     A.    I believe that's what they used to be able to

19     do when they were used.

20     Q.    (BY MR. EWALT)  Do AdX Direct Tags allow a

21     publisher to request ads from AdX in real time even if

22     the publisher does not use DFP?

23            MS. YOUNG:  Objection; form.

24     Q.    (BY MR. EWALT)  And I can -- you can take a

25     look at Paragraph 429 of your opening report if that's

HIGHLY CONFIDENTIAL

Page 163

1    helpful.

2         A.    Okay.

3         Q.    And then I'll ask it again.  Let me know when

4    you're ready.

5         A.    Thank you very much.

6                    Yes.  Yes, it could.

7         Q.    Let me just ask it so we have a clear record

8    here.

9         A.    Uh-huh.

10        Q.    Do AdX Direct Tags allow a publisher to

11   request ads from AdX in real time even if the

12   publisher does not use DFP?

13                MS. YOUNG:   Objection; form.

14        A.    Yes.

15        Q.    (BY MR. EWALT)  Do AdX Direct Tags allow a

16   publisher to receive tags from AdX even if a publisher

17   does not use DFP?

18        A.    I believe they do.

19        Q.    All right.  Could you please turn to Page 157

20   of your report.

21                You see Figure 12 there?

22        A.    Yes.

23        Q.    And the red dots refer to AdX direct tag,

24   right?

25        A.    Yes.

HIGHLY CONFIDENTIAL

Page 164

1        Q.   Have AdX direct tags been in use since at

2    least 2014?

3        A.   They have been in use at the data set we --

4    they were listed as being in use in the data set we

5    evaluated.

6        Q.   And in use in that data set since at least

7    2014?

8        A.   That is correct.

9        Q.   Can a publisher still use AdX direct tags

10   today?

11            MS. YOUNG:   Objection; form.

12        A.   As I understand it, these were legacy things

13   that -- so they may still exist, some publishers that

14   could use them.

15        Q.   (BY MR. EWALT)  Is it your understanding that

16   AdX sends real-time bids into DFP?

17        A.   That is my understanding.

18        Q.   What is the basis of that understanding?

19        A.   Oh, sorry.  AdX sends real-time bids into --

20   AdX is the -- as the DFP allows publishers to offer

21   inventory that is -- can receive real-time bids.

22        Q.   Let me -- let me ask that question again.   If

23   you don't understand the question, let me know.

24        A.   Okay.

25        Q.   Is it your understanding that AdX sends

HIGHLY CONFIDENTIAL

Page 166

```
 1      forced to sign a DFP/AdX contract.  Was the only way
 2      they could do so.  And that gave -- made it a
 3      contractual tie.
 4          Q.   All right.  So if I understand this right,
 5      it's your opinion that Google implemented the alleged
 6      tie of DFP to AdX through technical limitations
 7      beginning in 2019 [verbatim] and contractual
 8      provisions beginning in 2016?
 9               MS. YOUNG:  Objection; form.
10          A.   That is correct.
11               MS. YOUNG:  And think I you meant 2009.
12      I think you said 2019.
13               MR. EWALT:  Thank you very much.
14               MS. YOUNG:  Just for the purpose of the
15      record, yeah.
16               MR. EWALT:  I'll fix it.
17          Q.   (BY MR. EWALT)  Is it your opinion that Google
18      implemented the alleged tie of DFP to AdX through
19      technical limitations beginning in 2009 and
20      contractual provisions beginning in 2016?
21          A.   Okay.  Yes, that is my opinion.  It's my
22      understanding.
23          Q.   What technical limitations are you referring
24      to?
25          A.   Okay.  So if we go to -- technical
```

HIGHLY CONFIDENTIAL

Page 167

1    limitations I refer to.

2        Q.    I'll suggest a paragraph.  You tell me if

3    this is the right one.

4        A.    424.

5        Q.    I was going to go 435.

6        A.    Oh, okay.

7        Q.    But you tell me if it's that -- if that's not

8    right.

9        A.    Yes.  Yes, that's one of the technical

10    limitations.

11        Q.    Okay.  And were there other technical

12    limitations, other than the one that you refer to in

13    Paragraph 435, through which Google implemented the

14    tie?

15        A.    I think not necessarily 2009, but there were

16    other things that emerged that I described earlier

17    regarding how they implemented their GPT tags and

18    other tags that had limitations on them as well.

19        Q.    But is it -- is it fair to say that there was

20    not a tie until this technology that you're talking

21    about -- technical limitation, rather, that you're

22    talking about in 2009?

23        A.    Yeah.  That was --

24                    MS. YOUNG:  Objection; form.

25                    Go ahead.

HIGHLY CONFIDENTIAL

Page 168

1      A.    That was the critical decision point because

2   at that point Google had the evidence that I -- that

3   I -- that I -- I list there the ability to offer

4   third-party ad servers access to real-time bidding.

5      Q.    (BY MR. EWALT)  And that technology, that

6   technical limitation, is called third-party Dynamic

7   Allocation; is that right?

8      A.    Yes.  Well, that's -- that wasn't a technical

9   limitation.  That was a technical -- that was a -- a

10  technically feasible thing.

11     Q.    And it was a limitation because --

12     A.    They --

13           (Speaking simultaneously.)

14     Q.    (BY MR. EWALT)  -- it could do more?

15     A.    No, because they didn't actually offer it.

16     Q.    ███████████████████████████████████████

    ██████████████████████████████

    ██    ████

    ██  ████████████████████████████████████████████

    ████████████████████████████

21     A.    ████████████████████████████████████████

    ████████████████████

23     Q.    ███████████████████████████████████████

    ██████████████████████████████████████████████

    ██████████████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 169

1 ███████████████████

██ ████████████████

██ ██ ████████████████████

██ ████████████████████████████

██ ██████████████████████████

██ ███████████

7        Q.    (BY MR. EWALT)  Do you think --

8        A.    It took them some time to get the full force

9   of it in.

10       Q.    When did the full force occur?

11       A.    I would say that I would -- if I had to give

12  a date, I would mark that as 2016.

13       Q.    Do you think that Google should have offered

14  third-party Dynamic Allocation to allow competing

15  publisher ad servers to receive real-time bids from

16  AdX?

17             MS. YOUNG:  Objection; form.

18       A.    My opinion is that had Google not had market

19  power through AdX and had not been vertically

20  integrated, that they -- and their ads of a product

21  would have offered third-party Dynamic Allocation.

22       Q.    (BY MR. EWALT)  And is it your opinion that it

23  was anticompetitive for Google not to build technology

24  that would have allowed competing publisher ad servers

25  to receive real-time bids from AdX?

HIGHLY CONFIDENTIAL

Page 174

1      Q.    And I'm trying to understand what you mean by

2      "tied contractually."

3      A.    It meant that if you wanted to access AdX

4      demands, you have to use DFP.

5      Q.    Okay.  So I just want to confirm that it is,

6      in fact, your opinion that Google's contracts required

7      publishers to use DFP in order to obtain access to AdX

8      demand?

9              MS. YOUNG:  Objection; form.

10     A.    My understanding of -- of those contracts --

11     and I will caveat that it is my understanding because

12     I am not a lawyer -- was that that's what they

13     would -- would do.

14             MS. YOUNG:  So we've been going over an

15     hour, so it's just for court reporter's purposes and

16     everyone else's that we break at a good time.

17             MR. EWALT:  Okay.

18     Q.    (BY MR. EWALT)  And I believe you said that

19     Google implemented this contractual tie in June 2016?

20     A.    Yes.

21     Q.    And so there was no contractual tie before

22     June 2016; is that correct?

23             MS. YOUNG:  Objection; form.

24     A.    That is my -- well, that -- that's -- that's

25     my understanding of what a contractual tie was of that

HIGHLY CONFIDENTIAL

Page 175

1    date.

2        Q.    (BY MR. EWALT)    Is it your opinion that the

3    contractual tie is contained in the unified DFP AdX

4    contract?

5                    MS. YOUNG:    Objection; form.

6        A.    I believe that that's where it is.

7        Q.    (BY MR. EWALT)    Have you ever reviewed a

8    unified DFP AdX contract?

9        A.    I have looked at it.    And had a normal

10   reaction to the contract.

11       Q.    You don't cite a unified DFP AdX contract in

12   your reports, do you?

13                   MS. YOUNG:    Objection; form.

14       A.    No, I cite other things describing these

15   things.

16       Q.    (BY MR. EWALT)    But it's your testimony that

17   you have, in fact, reviewed such a contract?

18       A.    I believe at some time that I did, but I

19   remember I -- I don't remember it as something I felt

20   I could pass.

21       Q.    Is it fair to say you didn't rely on the

22   terms of the unified DFP AdX contract in forming the

23   opinions in your reports?

24                   MS. YOUNG:    Objection; form.

25       A.    I relied on the descriptions of these things

HIGHLY CONFIDENTIAL

Page 176

1      as listed in the footnotes here.

2          Q.    (BY MR. EWALT)   But you did not rely on the

3      contracts themselves in reaching your opinions about

4      the contractual tie.

5              Is that fair?

6                  MS. YOUNG:   Objection; form.

7          A.    I didn't feel it was -- I -- it was not my

8      role to provide a legal analysis of those, which is

9      what you're asking for there.

10         Q.    (BY MR. EWALT)   Could you please turn to

11     Paragraph 297 of your rebuttal report.

12         A.    Yes.

13         Q.    And that paragraph describes a communication

14     from Google to publishers in connection with the move

15     to the unified contract; is that right?

16                  MS. YOUNG:   Objection; form.

17         A.    Can you repeat the question?

18         Q.    (BY MR. EWALT)   Does Paragraph 297 of your

19     rebuttal report describe the communication from Google

20     to publishers about the transition to the unified DFP

21     AdX contract?

22         A.    Yes.

23         Q.    I want to direct your attention to the second

24     sentence there -- third sentence, reads:   "The message

25     states to continue using AdX, our partners now need to

HIGHLY CONFIDENTIAL

Page 177

1    sign a new contract that includes terms for both AdX

2    and DFP.  This contract will give you access to DFP

3    features, but there is no obligation to use them."

4                    Do you see that?

5        A.    Yes.

6        Q.    And so you understand that when it was

7    rolling out the unified DFP AdX contract, Google told

8    publishers that they would have no obligation to use

9    DFP; is that right?

10                   MS. YOUNG:  Objection; form.

11       A.    I -- I acknowledge that's what it says in my

12   report.

13       Q.    (BY MR. EWALT)  And did you have -- how does

14   the fact that Google told publishers that there was no

15   obligation to use DFP inform your analysis of whether

16   the unified DFP AdX contract actually required

17   publishers to use DFP?

18                   MS. YOUNG:  Objection; form.

19       A.    Well, it did require them to sign that -- I

20   don't -- I'm not sure the distinction you're trying

21   to -- to make.

22                   MS. YOUNG:  Mr. Ewalt, is this --

23                   MR. EWALT:  This is a good time for a

24   break.  Yeah.  Go off the record.

25                   THE VIDEOGRAPHER:  Now the end of

HIGHLY CONFIDENTIAL

Page 182

1    A.   The specific requirement of UPR that

2    restricted that ability did not simplify things for

3    publishers.

4         Q.   (BY MR. EWALT)  Does UPR have any effect on a

5    publisher that chooses not to use DFP?

6              MS. YOUNG:  Objection; form.

7         A.   As I understand it, UPR was implemented

8    through DFP, So not directly for other people.

9         Q.   (BY MR. EWALT)  Does UPR require that the

10   same price floors apply to AdX and other exchanges?

11        A.   Well, there were some restrictions on how you

12   could differentiate your price floors between

13   exchanges, as I understood it.

14        Q.   Does UPR prevent publishers from setting

15   price floors in Google Ad Manager at advantaged AdX

16   over other ad exchanges?

17             MS. YOUNG:  Objection; form.

18        A.   I don't think that they did.  I -- I -- I

19   believe that the -- I can't recall exactly, but I

20   thought there might be -- I -- I recall an asymmetry

21   with how those price floors -- the UPR rules applied.

22        Q.   (BY MR. EWALT)  Should Google be required to

23   allow its customers to use Google Ad Manager in a way

24   that disadvantages AdX?

25             MS. YOUNG:  Objection; form.

HIGHLY CONFIDENTIAL

Page 193

1    implementation of Dynamic Allocation harmed market --

2    harmed the market for ad exchanges, but not other, I

3    did not express opinions with respect to other

4    markets.

5        Q.    Was Dynamic Allocation a feature that

6    DoubleClick launched in 2007?

7        A.    All right.   You're testing --

8        Q.    All right.

9        A.    -- me on--

10       Q.    Opening report --

11            (Speaking simultaneously.)

12       A.    But I'm sure you have --

13       Q.    (BY MR. EWALT)   Opening report Paragraph 552.

14       A.    Thank you.

15            Yes, I agree that in 2007 they had

16    launched a feature they had called Dynamic Allocation.

17       Q.    And so Dynamic Allocation was launched before

18    Google acquired DoubleClick?

19       A.    Well, the feature that they called it was,

20    yes.

21       Q.    When Dynamic Allocation was launched, were ad

22    networks the primary way that advertisers purchased

23    display advertising?

24            MS. YOUNG:  Objection; form.

25       A.    The ad networks was one of them that was

HIGHLY CONFIDENTIAL

Page 194

1    still Direct Deals as well.

2        Q.   (BY MR. EWALT)  Did ad networks bid in real

3    time?

4        A.   My understanding was that ad networks could

5    not do bid by in real time.

6        Q.   Did ad networks purchase display inventory

7    through sequential process known as the Waterfall?

8        A.   Yes.

9        Q.   Did the Waterfall lead to publishers missing

10   out on more valuable ad inventory allocation?

11                MS. YOUNG:  Objection; form.

12       A.   I think that's a reasonable conclusion.

13       Q.   (BY MR. EWALT)  Was Dynamic Allocation an

14   improvement over the Waterfall?

15       A.   Enabling real-time bidding of that kind was,

16   I believe, a potential improvement over the Waterfall.

17       Q.   Did Dynamic Allocation help publishers make

18   more money than they could make under the Waterfall?

19                MS. YOUNG:  Objection; form.

20       A.   I believe that they did help some publishers

21   make more money than they could under the Waterfall.

22       Q.   (BY MR. EWALT)  When Dynamic Allocation

23   launched, were ad exchanges competing against each

24   other in real time?

25       A.   No, they were not.

HIGHLY CONFIDENTIAL

Page 195

1     Q.   When did ad exchanges start competing against

2     each other in real time?

3         A.   I'm not sure that they ever did.

4         Q.   Okay.  So is it your understanding that ad

5     exchanges do not compete against in each other in real

6     time today?

7         A.   I -- sorry.  Let me correct.

8              I thought you said "ad networks."

9         Q.   Oh.

10        A.   Could you repeat that question again?

11        Q.   I might have misspoken.  I'll --

12        A.   No, I just -- no, that's what I heard so...

13        Q.   Okay.  When did ad exchanges start competing

14    against each other in real time?

15        A.   I don't know the precise timing of entry of

16    all of the ad exchanges, so I don't have a date for

17    you for that.

18        Q.   Does early 2010 sound about right?

19        A.   That does sound about right.

20        Q.   Did Google modify Dynamic Allocation once ad

21    exchanges started competing against each other in real

22    time?

23              MS. YOUNG:  Objection; form.

24        A.   I cannot recall at the moment.

25        Q.   (BY MR. EWALT)  Is it your view that it -- it

HIGHLY CONFIDENTIAL

Page 196

1    was anticompetitive for Google to have not modified

2    Dynamic Allocation so that bids from rival non-AdX

3    exchanges could compete in real time against AdX?

4              MS. YOUNG:   Objection; form.

5         A.   That wasn't my opinion.

6         Q.   (BY MR. EWALT)   Did Header Bidding allow

7    participating ad exchanges to compete against each

8    other in real time?

9         A.   Header Bidding enabled -- enabled publishers

10   to solicit real-time bids from multiple exchangers, so

11   enabled that competition.

12        Q.   Did publisher start to experiment with Header

13   Bidding around 2014?

14        A.   Yes.

15             MS. YOUNG:   Objection; form.

16             Go ahead.

17        A.   Yes.

18        Q.   (BY MR. EWALT)   Did Google modify Dynamic

19   Allocation once publishers started to experiment with

20   Header Bidding?

21        A.   Not initially, no.

22        Q.   What is your understanding of the term "Last

23   Look"?

24        A.   My understanding of the term "Last Look" is

25   that after DFP has received bids from Header Bidding,

HIGHLY CONFIDENTIAL

Page 197

1    that prior to soliciting those bids, or in this case

2    offers of inventory and floors to -- to AdX, they are

3    able to decide their own bid by for AdX.

4        Q.    Did Last Look emerge from the interaction

5    between Dynamic Allocation and Header Bidding?

6        A.    Last Look emerged primarily from -- from

7    Dynamic Allocation, but it was a thing that was made

8    apparent competitively through Header Bidding.

9        Q.    Was Last Look a product feature that Google

10   designed?

11                   MS. YOUNG:   Objection; form.

12       A.    No, Last Look was a -- a -- a constraint that

13   arose out of the way Dynamic Allocation was set up and

14   Google's choices with regard to which exchange got the

15   Last Look.

16       Q.    (BY MR. EWALT)   And it was also a consequence

17   of the way that publishers chose to use Header

18   Bidding, correct?

19                   MS. YOUNG:   Objection; form.

20       A.    Publishers only had only a certain set of

21   choices they could engage in because of being forced

22   to -- to utilize an approach such as Header Bidding.

23   And so those things interacted with one another.

24       Q.    (BY MR. EWALT)   If there had been no Header

25   Bidding, could there have been a Last Look?

HIGHLY CONFIDENTIAL

Page 198

1              MS. YOUNG:   Objection; form.

2         A.    I think in terms of the competitive

3    consequences of Last Look, it wouldn't have been an

4    issue if there had been no Header Bidding.

5         Q.   (BY MR. EWALT)  After publishers started

6    experimenting with Header Bidding, was it

7    anticompetitive for Google not to modify bids --

8    excuse me, let me start over.

9              After publishers started experimenting with

10   Header Bidding, was it anticompetitive for Google not

11   to modify DFP so that bids from rival exchanges could

12   compete in real time against AdX bids?

13             MS. YOUNG:   Objection; form.

14        A.   My analysis was that had ad server market

15   been a competitive market and Google not been

16   integrated into an exchange, that in that scenario, in

17   setting who it was that received -- which exchange

18   received the Last Look, Google would not have

19   necessarily selected its own exchange and may have

20   indeed allowed publishers to selected that exchange.

21        Q.   (BY MR. EWALT)  So is that a way of saying

22   your -- in your counterfactual world Google was not

23   vertically integrated and did not have monopoly power?

24        A.    That's correct.

25        Q.    Why did you pick that as your counterfactual

HIGHLY CONFIDENTIAL

Page 205

1    originated.

2        Q.    (BY MR. EWALT)    Okay.    And is that answer the

3    same with respect to all of the conduct that you

4    evaluated in your reports?

5        A.    Yes.

6                MS. YOUNG:    Objection; form.

7        A.    Oh.    Yes.

8        Q.    (BY MR. EWALT)    Okay.    In either of your

9    reports did you express an opinion about the overall

10   net effect of UPR considering all the effects on both

11   advertisers and publishers?

12               MS. YOUNG:    Objection; form.

13       A.    No, I only engaged in an analysis of whether

14   it was anticompetitive with respect to the -- the

15   methodology -- the method I've already outlined.

16       Q.    (BY MR. EWALT)    In either of your reports did

17   you express an opinion about the overall net effect of

18   Dynamic Allocation considering all of the effects on

19   both advertisers and publishers?

20               MS. YOUNG:    Objection; form.

21       A.    No.    I didn't analyze a world with or without

22   Dynamic Allocation.    Just a world with or without

23   Google's particular implementation of Dynamic

24   Allocation.

25       Q.    (BY MR. EWALT)    In either of your reports did

HIGHLY CONFIDENTIAL

Page 206

1    you express an opinion about the overall net effect of

2    Enhanced Dynamic Allocation considering all the

3    effects on both advertisers and publishers?

4              MS. YOUNG:  Objection; form.

5         A.   No, I only considered the effects of Google's

6    implementation of Enhanced Dynamic Allocation compared

7    to a counterfactual where it didn't implement it in

8    that way.

9         Q.   (BY MR. EWALT)  In either of your reports did

10   you express an opinion about the overall net effect of

11   line item capping considering all the effects on both

12   advertisers and publishers?

13             MS. YOUNG:  Objection; form.

14        A.   As before, I considered the impact of line

15   item capping in a world with or without Google having

16   market power in -- in -- in publisher ad servers.

17        Q.   (BY MR. EWALT)  So is it fair to say that you

18   did not express an opinion in your reports about the

19   overall net effect of line item capping considering

20   all the effects on both advertisers and publishers?

21             MS. YOUNG:  Objection; form.

22        A.   My analysis only concerned the impact on the

23   competition in ad exchangers as a result of Google's

24   line item capping, which itself has effects on both

25   advertisers and publishers.

HIGHLY CONFIDENTIAL

Page 210

1    Dynamic Allocation, Google had to make a decision as
2    to who received -- which exchange received First Look
3    or Last Look in the process of implementing that.
4             Its decision was that its own exchange
5    would receive the Last Look advantage.  And that was
6    the particular implementation that I analyzed as to
7    whether -- had Google had a competitive ad server
8    market or faced a competitive ad server market,
9    whether they would have made such a decision.
10        Q.   (BY MR. EWALT)  Was there any implementation
11   of Dynamic Allocation other than the implementation
12   that Google did?
13        A.   Conceptually, of course.
14        Q.   In the real world, because you're evaluating
15   the effects of the actual conduct, right?
16        A.   Yeah.  They had market power.  They had
17   monopoly power.  I'm -- I don't think anyone's
18   surprised that they would do that in their own
19   interest and not believe that there is any other way.
20             However, if you imagine a counterfactual
21   world in which they were just running ad servers in
22   competition with other ad servers, different things
23   would have happened.
24        Q.   So are you disputing -- let me strike that.
25             Am I understanding you correctly that

HIGHLY CONFIDENTIAL

Page 211

1    you did not evaluate Dynamic Allocation generally?

2                   MS. YOUNG:   Objection; form.

3        A.    The existence or not of Dynamic Allocation

4    was not a conduct that I evaluated.

5        Q.    (BY MR. EWALT)  Did you --

6                   MS. YOUNG:  Are you finished answering

7    your question?

8                   THE WITNESS:  Yes.

9                   MS. YOUNG:  Okay.

10       Q.    (BY MR. EWALT)  Did you evaluate the existence

11   of Enhanced Dynamic Allocation?

12       A.    The existence of Dynamic -- of Enhanced

13   Dynamic Allocation or not, or the enhanced part of

14   Dynamic Allocation versus Dynamic Allocation, was not

15   a conduct that I evaluated.

16       Q.    Did you evaluate the existence of UPR?

17       A.    I evaluated the existence of UPR in a world

18   where UPR was not imposed.  That is, as it was prior

19   to the imposing of UPR.

20       Q.    So your answer for UPR was a little bit

21   different than the answer for Enhanced Dynamic

22   Allocation and Dynamic Allocation.

23       A.    It's no different.  If you look in my report,

24   both of them, I'm very clear on the conducts that I am

25   evaluating and looking at.

HIGHLY CONFIDENTIAL

Page 219

1      A.   Yes.

2      Q.   ██████████████████████

  ████████████████████████████████

  ██████████████████████

  ████████████████████████████

  ████  ██████████████████████

  ████  ██████████████████████████

  ████████████████████████████████

  ████████████████

  ██████████████████████

  ████  ████████████████████████████

  ████████████████████

13     Q.   (BY MR. EWALT)  Did Google develop Bernanke so

14  that Google Ads could clear more impressions on AdX,

15  specifically those impressions that Google Ads would

16  have lost due to high publisher floor prices?

17             MS. YOUNG:   Objection; form.

18     A.   Yes, that's what it said it was trying to do.

19     Q.   (BY MR. EWALT)  Did Google develop Bernanke to

20  improve the match rate on AdX?

21     A.   It was trying to improve and increase the

22  number of transactions going through AdX as compared

23  to elsewhere.

24     Q.   Did Google develop Bernanke to help sell

25  impressions that otherwise would not have been sold

HIGHLY CONFIDENTIAL

Page 220

1    due to high publisher floor prices?

2                  MS. YOUNG:   Objection; form.

3       A.    It developed Bernanke to sell impressions

4    that otherwise would have not been sold due to high

5    publisher floor prices on AdX.

6       Q.    (BY MR. EWALT)  Would you please turn to

7    Paragraph 740 to 743 of your opening report.

8       A.   Yes.

9       Q.   And in those paragraphs you describe three

10   scenarios where Bernanke could impact AdX auctions?

11      A.   Yes.

12      Q.   The first scenario is when Google Ads submits

13   the highest and second highest bids into the AdX

14   auction, right?

15      A.   Yes.

16      Q.   In that first scenario, does Bernanke have

17   any effect on rival ad-buying tools?

18      A.   No.

19      Q.   Second scenario is when no buyer submits a

20   bid above the AdX floor price without Bernanke, but

21   Bernanke allows Google Ads to bid above the floor

22   price and win the impression.

23                 Is that fair?

24      A.   Yes.

25      Q.   In the second scenario, does Bernanke have

HIGHLY CONFIDENTIAL

```
                                                   Page 221

 1    any effect on rival ad-buying tools?

 2         A.   No.

 3         Q.   In the second scenario, does Bernanke allow

 4    transactions to clear that otherwise would not have

 5    cleared?

 6         A.   Yes.

 7         Q.   In the second scenario, does Bernanke expand

 8    the output of transactions?

 9                   MS. YOUNG:   Objection; form.

10                   Go ahead.

11         A.   Yes.

12         Q.   (BY MR. EWALT)  Do publishers and advertisers

13    benefit from Bernanke expanding output in the second

14    scenario?

15                   MS. YOUNG:   Objection; form.

16         A.   Well, Google is lowering its price so that

17    they potentially benefit.

18         Q.   (BY MR. EWALT)  The third scenario is when a

19    rival buying tool would have won the impression

20    without Bernanke but Bernanke allows Google Ads to win

21    instead; is that right?

22         A.   That's right.

23         Q.   And this third scenario is the only one where

24    Bernanke could harm rival buying tools.

25                   Is that fair?
```

HIGHLY CONFIDENTIAL

Page 224

1    to be called AdWords, by $230 million per year?

2        A.    I want to state for the record, since you've

3    been confused by this before, that when we're talking

4    about Bernanke with respect to the circulation, we're

5    talking about Bernanke Version 1.

6            We are not talking about Bernanke as its

7    whole implementation.

8        Q.    Fair.  Okay.

9            And so can we agree that we'll just call

10   it Bernanke Version 1?  We can refer to that as

11   Bernanke and then we can refer to Global Bernanke

12   separately.

13       A.    Well, it's not Global Bernanke.  It's

14   Bernanke Version 2, and then Global Bernanke was

15   another thing entirely.

16       Q.    And so --

17       A.    There was another -- it was another --

18       Q.    Iteration?

19       A.    Sorry.  Yeah.

20       Q.    Okay.  So let me ask the question again.

21            Does this simulation show that Bernanke

22   Version 1 would increase advertiser spend from Google

23   Ads by $230 million per year?

24            MS. YOUNG:  Objection; form.

25       A.    Yes.

HIGHLY CONFIDENTIAL

Page 225

1       Q.    (BY MR. EWALT)   Does this simulation show that

2    Bernanke Version 1 would decrease advertiser spend

3    from rival buying tools by $75 million per year?

4       A.    Yes.

5       Q.    Is that $75 million decrease what you were

6    describing in the third scenario we just talked about?

7       A.    Yes, I believe so.

8       Q.    And was the net effect of the $230 million

9    increase for Google Ads and the $75 million decrease

10   for rival buying tools a $155 million increase in

11   advertiser spend?

12      A.    Yes.

13      Q.    If Google Ads could increase -- strike that.

14             If Google Ads' spend could increase by

15   $230 million and rival ad-buying tools lost only

16   $75 million, where did the other $155 million in ad

17   spending come from?

18             MS. YOUNG:   Objection; form.

19      A.    Well, isn't -- pardon me for my ability to

20   arithmetic at this part of the afternoon.

21             But isn't 155 million equal to 230 minus

22   75?

23      Q.    (BY MR. EWALT)   I believe you're correct about

24   that.

25      A.    Yeah.

HIGHLY CONFIDENTIAL

Page 226

1      Q.     So did -- is the $155 million increase in ad

2   spend an increase in output?

3                    MS. YOUNG:   Objection; form.

4      A.     It's an -- it's an increase in surplus.

5      Q.     (BY MR. EWALT)   In -- in advertiser surplus?

6      A.     Well, economic surplus.

7      Q.     All right.   And --

8      A.     I could draw you a picture.

9      Q.     Okay.   So it's an increase in economic

10   surplus.

11                    And do advertisers receive some of that

12   surplus?

13     A.     Yes.

14     Q.     Do you publishers receive some of that

15   surplus?

16     A.     Yes.

17     Q.     So is fair to say that Bernanke Version 1

18   benefitted both advertisers and publishers?

19                    MS. YOUNG:   Objection; form.

20     A.     That would be a fair statement.

21     Q.     (BY MR. EWALT)   All right.   Could you please

22   turn now to Paragraph 750 of your opening report.

23                    (Marked Gans Exhibit No. 10.)

24     Q.     (BY MR. EWALT)   Okay.   I'm handing you what's

25   been marked as Exhibit 10.   This is a presentation

HIGHLY CONFIDENTIAL

                                               Page 230

1            Are you aware that prior to Bernanke there was
2     a program called buy-side DRS?
3        A.   Yes.  I see.  Right.
4        Q.   And is buy-side DRS the program that only
5     reduced the margin but did not have a debt account?
6        A.   Right at the moment I have -- I would have to
7     review my report again to remember which version was
8     under which name, which is what I am struggling with
9     right here.
10       Q.   Okay.  So is it possible that Bernanke
11    Version 1 also had a debt account?
12       A.   I would have -- I would -- I would need some
13    time to refresh my memory regarding the exhibits and
14    my report to --
15       Q.   Okay.
16       A.   -- to confirm with certainty.
17       Q.   Okay.  Well, let's turn back to Exhibit 10,
18    Page 167.
19       A.   Yes.
20       Q.   Did Bernanke increase match queries by
21    8.3 percent?
22              MS. YOUNG:   Objection; form.
23       A.   Did Bernanke increase matched queries by
24    19.6 percent, you said?
25       Q.   (BY MR. EWALT)  Did Bernanke increase matched

HIGHLY CONFIDENTIAL

Page 231

1    queries by 8.3 percent?

2         A.    What am I supposed to be looking at?

3         Q.    Ah, yes.  In the box, dotted line box on the

4    left side of the page.  Just inside the top of that.

5         A.    Yes.

6         Q.    So the question is:  Did Bernanke increase --

7         A.    Oh, I see.

8         Q.    -- matched queries by 8.3 percent?

9         A.    I see.  It does say that data, yes.

10        Q.    And then looking above the box on the left

11   side, did Bernanke increase advertiser spending by

12   $150 million per year?

13        A.    Relative to the case without the Bernanke

14   version in this, yes.

15        Q.    And that increase in advertiser spending was

16   due to Bernanke allowing more matches between

17   publishers and advertisers increasing output, correct?

18        A.    What you're asking me is about -- potentially

19   about a counterfactual, which was not the

20   counterfactual I analyzed.  It's with and without

21   Bernanke as in these experiments.

22               But with that caveat, yes.

23        Q.    And if you look on the right side in that

24   oval at the top, I'll ask you, does Exhibit 10 show

25   that Bernanke increased publisher revenue by

HIGHLY CONFIDENTIAL

Page 232

1    $84 million per year?

2        A.    Yes.

3        Q.    So according to your Exhibit 10, did Bernanke

4    benefit both advertisers and publishers?

5              MS. YOUNG:  Objection; form.

6        A.    Well, Bernanke wasn't a conduct I evaluated,

7    as I already mentioned.

8              But in a world with and out -- with and

9    without Bernanke as in those experiments, one effect

10   of it was a short-run effect of increasing the revenue

11   of publishers.

12       Q.    (BY MR. EWALT)  And advertisers?

13             MS. YOUNG:  Objection; form.

14       A.    Potentially of advertisers as well.

15             MR. EWALT:  Let's go off the record.

16             THE VIDEOGRAPHER:  This is now the end

17   of Video 5 of Joshua Gans.  We're off the record.  The

18   time is 4:59.

19             (Break from 4:59 p.m. to 5:18 p.m.)

20             THE VIDEOGRAPHER:  Now back on the

21   record.  Video 6 of Joshua Gans.  The time is

22   approximately 5:18.

23       Q.    (BY MR. EWALT) Professor Gans, during the

24   break, did you discuss the substance of this case with

25   counsel?

HIGHLY CONFIDENTIAL

Page 234

1      procedure as procompetitive."

2                        Do you see that?

3          A.   Yes.

4          Q.   Was DRS Version 1 procompetitive?

5          A.   In a sense that it --

6                        MS. YOUNG:  Objection; form.

7                        Sorry.  Go ahead and answer.

8          A.   In a sense that it involved Google reducing

9      its take rate only, it -- it -- it could be regarded

10     as -- as procompetitive or welfare enhancing.

11         Q.   (BY MR. EWALT)  Is there any sense in which

12     DRS Version 1 was not welfare enhancing?

13         A.   I do not -- I did not find any sense that it

14     wasn't.

15         Q.   Would you please turn to Paragraph 809 of

16     your opening report.

17                        The first sentence of that paragraph

18     reads --

19                        MS. YOUNG:  Can you give me one second?

20     I'm going to -- it's taking me a little while to flip

21     to it.

22                        Sorry.  Go ahead.

23         Q.   (BY MR. EWALT)  First sentence of

24     Paragraph 809 of your opening report reads:  "The

25     combined effects of Last Look in DRS v2 led to revenue

HIGHLY CONFIDENTIAL

Page 236

1      Q.    Does Footnote 1030 cite to Exhibit 11?

2      A.    Yes.

3      Q.    And in particular you cite Page 467 of

4   Exhibit 11; is that correct?

5      A.    Yes.

6      Q.    And please turn to Page 467.

7      A.    Okay.

8      Q.    And that page states that DRS consistently

9   makes publishers more money.

10              Do you see that?

11     A.    I see that it says that.

12     Q.    And according to Exhibit 11, does DRS

13   Version 2 consistently make publishers more money?

14     A.    As compared to no DRS.

15     Q.    Would you please turn to Page 469 in

16   Exhibit 11?

17     A.    Yes.

18     Q.    You see the top of that page defines

19   publisher revenue as the some of AdX revenue and

20   third-party network revenue?

21     A.    Yes.

22     Q.    And you understand that third-party network

23   revenue refers to rival ad exchanges and ad networks

24   that would compete against AdX through remnant items.

25     A.    Yes.

HIGHLY CONFIDENTIAL

```
                                                    Page 237

 1                 MS. YOUNG:  Objection; form.

 2                 Sorry.  Go ahead.

 3         Q.   (BY MR. EWALT)  At the bottom of Page 469,

 4    Exhibit 11 reads:  "Overall impact of DRS plus

 5    2.80 percent publisher revenue increase."

 6              Do you see that?

 7         A.   Yes.

 8         Q.   According to Exhibit 11, does DRS v2 increase

 9    publisher revenue by ███ percent even taking into

10    account impacts on rival ad exchanges and ad networks?

11                 MS. YOUNG:  Objection; form.

12         A.   According to this document, it does relative

13    to no DRS.

14         Q.   (BY MR. EWALT)  Did DRS v2 increase output in

15    the ad exchange market by ███ percent?

16                 MS. YOUNG:  Objection; form.

17         A.   According to this document, in the short run,

18    DRS Version 2 compared to DRS, this document argues

19    that it increased output.

20         Q.   (BY MR. EWALT)  And is an output increase

21    procompetitive?

22                 MS. YOUNG:  Objection; form.

23         A.   Output increases are welfare enhancing.

24         Q.   (BY MR. EWALT)  In either of your reports, did

25    you express an opinion about the overall net effect of
```

HIGHLY CONFIDENTIAL

Page 238

1    DRS considering all the effects on both advertisers
2    and publishers?
3                    MS. YOUNG:   Objection; form.
4         A.   No, I didn't, because the conduct I evaluated
5    was not that.
6         Q.   (BY MR. EWALT)  All right.  Let's talk about
7    line item capping.
8         A.   Saving the best until last.
9                    Okay.  Let's go.
10        Q.   Have you seen evidence that publishers using
11   large numbers of active line items impose costs on
12   Google?
13                   MS. YOUNG:  Objection; form.
14        A.   I've seen -- I recall claims made by
15   Professor Baye to that effect.
16                   (Marked Gans Exhibit No. 12.)
17        Q.   (BY MR. EWALT)  I'm handing you what's been
18   marked as Exhibit 12.  It's a document titled
19   "PRD/Strat Review:  Network Health."  First page bears
20   Bates No. GOOG-DOJ-06875572.
21                   Do you see that?
22        A.   I do.
23        Q.   Would you please turn to Paragraph 370 of
24   your rebuttal report?
25        A.   Of the rebuttal report.

HIGHLY CONFIDENTIAL

Page 249

1    reasonable impact on system stability) at the end of

2    the day was forcing them to change their business

3    strategy kicking out HBs, head of bidding."

4              Quoting a statement from discussion with

5    The Washington Post.

6              "I note that even if there were such

7    costs, Google, given its monopoly power and

8    integration, would not have an incentive to make the

9    optimal trade off.  Professor Milgrom, as he

10   consistently does throughout his analysis, fails to

11   consider Google's broad multimarket incentives in

12   making these decisions."

13             And then we quoted the last two ones

14   before.

15             So you'll see there that captures what

16   I've already just described to you.

17        Q.   You're aware that Google granted exceptions

18   to the line item cap to some publishers?

19        A.   Yes.

20        Q.   And did Google charge those publishers

21   additional fees when they granted the exceptions to

22   the line item cap?

23        A.   No.

24        Q.   Was it anticompetitive for Google not to

25   charge more for exemptions from line item limits?

HIGHLY CONFIDENTIAL

Page 253

1    publishers.

2        Q.    (BY MR. EWALT)  Do you have any reason to

3    believe that any publisher was prevented from using

4    Header Bidding because of the line item caps?

5                    MS. YOUNG:    Objection; form.

6        A.    I don't believe the line item caps was a full

7    prevention of using Header Bidding.    It just made it

8    more difficult to use Header Bidding.

9        Q.    (BY MR. EWALT)  Would you please turn to

10    Paragraph 657 of your opening report.

11        A.    Yes.

12        Q.    And there you talk about Header Bidding

13    Manager.

14                    Is that fair?

15        A.    Seems that way.

16        Q.    Did Google rule out Header Bidding Manager in

17    2021?

18        A.    Yes.    Started enrolling publishers into it in

19    20211 is what I know.

20        Q.    And is Header Bidding Manager a tool that

21    allows publishers to set up Header Bidding without

22    having to set up large numbers of line items?

23        A.    I believe that's what it does.

24        Q.    Does the availability of Header Bidding

25    Manager reduce the effects on Header Bidding that you

HIGHLY CONFIDENTIAL

Page 254

```
 1    found were caused by line item caps?
 2                   MS. YOUNG:  Objection; form.
 3         A.    Would you ask that question again?
 4         Q.    (BY MR. EWALT)  Does the availability of
 5    Header Bidding Manager reduce the effects on Header
 6    Bidding that you found were caused by line item caps?
 7                   MS. YOUNG:  Same objection.
 8         A.    It -- it may do so for some publishers.
 9         Q.    (BY MR. EWALT)  In either of your reports, did
10    you express an opinion about the overall net effect of
11    line item caps considering the effects on both
12    advertisers and publishers?
13                   MS. YOUNG:  Objection; form.
14         A.    Line item caps were a restriction on -- on
15    publishers, and so my analysis was focused on the
16    impact on competitive conditions that faced those --
17    that -- that were in the publisher facing markets.
18         Q.    (BY MR. EWALT)  And did you consider impacts
19    on advertisers from line item capping?
20         A.    I didn't directly consider that.
21         Q.    Let's talk about data redactions.
22                   Would you please turn to Paragraph 688
23    of your opening report?
24         A.    Yes.
25         Q.    The first sentence reads:  "This section
```

HIGHLY CONFIDENTIAL

Page 260

1    Exhibit 14?

2        A.    Oh, you've given me two.

3        Q.    Oh.

4        A.    Paragraph 11.  I'm sorry.  I'm looking at

5    page.

6              Yes.

7        Q.    Okay.  And the second sentence there says:

8    "Prior to September 2019, Google allowed buyers to opt

9    out of including information about their bids in BDT

10   files."

11             You see that?

12       A.    Yes.

13       Q.    Do you have any reason to doubt that prior to

14   September 2019 Google allowed buyers to opt out of

15   including information about their bids in BDT files?

16       A.    No.

17             MS. YOUNG:  Objection; form.

18       A.    No.

19       Q.    (BY MR. EWALT)  Are you aware that buyer

20   opt-outs limited the amount of bid data that was

21   available to publishers?

22       A.    I would expect that they would.

23       Q.    Are you aware that when Google made the data

24   redactions discussed in your reports they also removed

25   the ability of buyers to opt out of having their bid

HIGHLY CONFIDENTIAL

Page 263

1    receive BDT files.

2                    Do you see that?

3        A.    Yes.

4        Q.    ███████████████████████████

     ████████████████████████████████████

     ██████████████

     ██████████████████████████████████

     ███   ████

9                    MS. YOUNG:  Go ahead.

10       A.    No.

11       Q.    (BY MR. EWALT)  Do you have any reason to

12   believe that any publisher was prevented or dissuaded

13   from using Header Bidding because of the data transfer

14   files?

15                    MS. YOUNG:  Objection; form.

16       A.    My analysis was in terms of how effective

17   they could -- effectively they could use Header

18   Bidding in order to create further exchange

19   competition, not necessarily whether they would

20   curtail the use of Header Bidding or not.

21       Q.    (BY MR. EWALT)  Is it fair to say you did not

22   analyze whether any publisher curtailed its use of

23   Header Bidding because of the data transfer files?

24                    MS. YOUNG:  Objection; form.

25       A.    I was not able to -- I did not -- sorry.

HIGHLY CONFIDENTIAL

Page 264

1              My analysis was on the impact of the

2    data redaction conduct on the ability of Header

3    Bidding to impact on ad exchange composition.

4              The manifestation of which might have

5    been a reduction in the use of Header Bidding or it

6    might not have.

7        Q.   (BY MR. EWALT)   Is it your opinion that the

8    redaction of the data files could have affected

9    competition in the ad exchange market even if it had

10   no impact on publisher usage of Header Bidding?

11             MS. YOUNG:   Objection; form.

12       A.   Yes, because it could have reduced their

13   ability to use Header Bidding effectively.

14       Q.   (BY MR. EWALT)   In either of your reports did

15   you express an opinion about the overall net effect of

16   the data redactions considering the effects on both

17   advertisers and publishers?

18             MS. YOUNG:   Objection; form.

19       A.   It was not necessary given the conduct was on

20   the publisher market.

21       Q.   (BY MR. EWALT)   So is fair to say that you did

22   not evaluate the effects of the data redactions on

23   advertisers?

24       A.   My focus was on, as I said before, whether

25   Google would have engaged in this conduct had they had

HIGHLY CONFIDENTIAL

Page 265

1    a competitive ad server market.  And my conclusion was

2    that they would not have.

3        Q.    Did you evaluate the effect of data

4    redactions on advertisers?

5        A.    I wasn't --

6                MS. YOUNG:   Objection; form.

7                Go ahead.

8                THE WITNESS:   Sorry.

9        A.    I wasn't calculating the incidents of damage

10   of the anticompetitive conduct, just the presence of

11   it and the harm -- the existence of harm to

12   competition.

13               MR. EWALT:  We can go off the record.

14               THE VIDEOGRAPHER:  This is now the end

15   of Video 6 of Joshua Gans.  We're off the record.  The

16   time is approximately 6:08.

17               (Break from 6:08 p.m. to 7:01 p.m.)

18               THE VIDEOGRAPHER:  Now on the record of

19   Video 7 of Joshua Gans.  The time is approximately

20   7:01.

21       Q.   (BY MR. EWALT)  Professor Gans, during the

22   break did you discuss the substance of this case with

23   counsel?

24               MS. YOUNG:  Same instruction as earlier

25   today.  Pursuant to the expert stipulation entered by