# EXHIBIT 18

Page 1

1

2  IN THE UNITED STATES DISTRICT COURT

3  FOR THE EASTERN DISTRICT OF TEXAS

4  SHERMAN DIVISION

5  Case No. 4:20-cv-00957-SD

6  ----------------------------------x

THE STATE OF TEXAS, et al.,

7

            Plaintiffs,

8

9

        - against -

10

11

GOOGLE LLC,

12

            Defendant.

13  ----------------------------------x

                October 8, 2024

14              9:09 a.m.

15

16      Videotaped Deposition of MATTHEW

17  WEINBERG, Ph.D., taken by Defendant,

18  pursuant to Notice, held at the offices of

19  Norton Rose Fulbright US LLP, 1301 Avenue

20  of the Americas, New York, New York, before

21  Todd DeSimone, a Registered Professional

22  Reporter and Notary Public of the State of

23  New York.

24

25      Job No. CS6918901

```
1                 WEINBERG, Ph.D.
2    statute, right?
3         A.      That's correct.
4         Q.      And are you aware, for example,
5    whether a court has ruled -- oh, also, are
6    you quantifying in your report in any way
7    the amount of harm caused to any ad buyer?
8    I mean a specific ad buyer.
9         A.      No, I am not in my report
10   quantifying the amount of harm caused to a
11   specific ad buyer, that's correct.
12        Q.      And are you quantifying in your
13   report the amount of harm caused to any
14   specific publisher?
15        A.      That is also correct -- I'm
16   sorry, you didn't make an assertion.  I am
17   not in my report quantifying the harm to
18   any specific publisher.
19        Q.      And do you know of your own
20   knowledge whether, for example, a court in
21   Mississippi has ruled that the Mississippi
22   statute does not permit the imposition of
23   penalties without proof of harm?
24              MR. RENARD:  Objection to the
25        form of the question.
```

                     WEINBERG, Ph.D.

1          clean spiral-bound copies and I can give

2          you those so you don't have to flip pages.

3          Would you prefer?

4                A.    I'm happy to use either.

5                Q.    Well, I have these.

6                A.    Ooh, yeah.

7                Q.    Let's proceed.  So paragraph 56

8          of your September report, do you see that?

9                A.    Yes, I do.

10               Q.    All right.  And I'm going to

11         read that into the record and then we are

12         going to start having some conversation

13         about this, all right?

14                     So paragraph 56, read along

15         with me, says "Using the Wiggins Report

16         Proposition, the Wiggins Report then

17         attempts to rebut the Andrien Report's

18         claim ('Deceptive Conduct Total Impact

19         Framework' or 'DTCI Framework') - which

20         relies on my Opening Report - that every

21         auction is affected by Google's Deceptive

22         Conduct ('Element A'), and (B) the impact

23         of that deception affects all revenue from

24         Google's display ad auctions ('Element

Page 100

1              WEINBERG, Ph.D.

2    B')."

3              Do you see that?

4       A.      Yes, I do.

5       Q.      Now, just to be clear, the

6    deceptive conduct total impact framework is

7    Mr. Andrien's framework; is that right?

8       A.      I would say that is the --

9    that's the framework he uses.  I don't know

10   whether he possesses or created that

11   framework, but that was the framework he

12   uses.

13      Q.      Okay.  But it's not your

14   framework?

15      A.      I don't know that I would call

16   it my framework or his framework.  It is a

17   framework.

18      Q.      Well, the framework appears,

19   according to paragraph 56, in the Andrien

20   report, right?

21      A.      Yes, that's correct.

22      Q.      And he claims you say -- it

23   says there that, (A), every auction is

24   affected by Google's deceptive conduct,

25   that's from your opening report, right?

Page 101

1          WEINBERG, Ph.D.

2     A.     Sorry, can you repeat the

3  question?  I'm going to parse it slowly.

4     Q.     I'm just reading from your

5  paragraph 56.  You say "Mr. Andrien relies

6  on my opening report."  Do you see that?

7     A.     Yes.

8     Q.     That, (A), so is the language

9  that comes after (A) your opinion or

10 Mr. Andrien's opinion?

11    A.     The language that comes after

12 (A), which says "every auction is affected

13 by Google's deceptive conduct," is my

14 opinion.

15    Q.     All right.  And what about the

16 language that comes after (B), is that your

17 opinion or Mr. Andrien's?

18         MR. RENARD:  I object to the

19    form.

20    A.     The language that comes after

21 Element B is not an opinion contained in my

22 reports because I do not -- it's not part

23 of my assignment.  I do not quantify.

24    Q.     Okay.  So you have no opinion

25 and have expressed none that the impact of

Page 102

1                    WEINBERG, Ph.D.

2        deception affected all revenue from

3        Google's display ad auctions, true?

4             A.     I have opinions that might form

5        a basis for that, but that is not my own

6        stated opinion.

7             Q.     You understand Mr. Andrien is

8        relying for opinions of yours to make that

9        determination?

10                   MR. RENARD:    Objection to form.

11            A.     I understand that Mr. Andrien

12       is relying on my report, and I understand

13       that Element B is one of his

14       determinations, and I understand that

15       opinions in my report could be used as a

16       basis to conclude Element B.

17            Q.     But Element B is not your own

18       conclusion?

19            A.     That is correct.    Element B is

20       not my own conclusion.

21            Q.     And you have not, and do not

22       expect to, quantify the extent to which

23       deception affected any or all of Google's

24       revenues, true?

25            A.     I do not intend to express an

```
 1          WEINBERG, Ph.D.
 2  joined Google's ecosystem if every --
 3  unless -- I'm sorry, if every detail of RPO
 4  were not made public.  I will again add as
 5  context that the concept that bidders tend
 6  to join simple auction environments is a
 7  concept that is stated in the Milgrom
 8  report, and that is not a controversial
 9  opinion.
10      Q.      Controversial or not, you
11  agree, you have not identified a single ad
12  buyer that would not have joined Google's
13  ad tech ecosystem if every detail of
14  reserve price optimization had been public?
15      A.      I will again repeat the
16  context, is that my opinion is that bidders
17  in general tend to join simple ecosystems.
18  That opinion is stated in the Milgrom
19  report.  That being said, I have not
20  identified a particular advertiser that I
21  know would not have joined Google's
22  ecosystem if RPO had been fully and
23  accurately disclosed.
24      Q.      And the same question about
25  dynamic revenue sharing, have you
```

Page 120

1            WEINBERG, Ph.D.

2    identified any single ad buyer that would

3    not have joined Google's ecosystem if

4    dynamic revenue sharing had been disclosed

5    in every detail?

6        A.     I will repeat the same context,

7    which is that it is generally accepted, as

8    stated in the Milgrom report, that bidders

9    tend to prefer ecosystems that are simple.

10   I will go ahead and read the quote this

11   time.  The Milgrom report states "Google

12   recognized the advantages of bidder

13   truthful auctions, explaining them as

14   follows:  It is faster, less costly, and

15   more fair to the less sophisticated

16   advertisers to structure the auction in

17   favor of true value.  The lower transaction

18   costs associated with bidding in a bidder

19   truthful auction encourage advertisers to

20   participate on Google's platform, which

21   increases thickness, tending to improve the

22   efficiency of its allocations and increase

23   the prices paid to publishers."

24            That is the methodology by

25   which I draw my conclusions, but I will

Page 121

1                    WEINBERG, Ph.D.

2   again state that I do not know of a

3   particular advertiser that I am confident

4   only joined Google's ecosystem because they

5   believed it to be bidder truthful.

6        Q.    And the same questions about

7   Bernanke, context about what bidders in

8   general might do, you cannot tell the jury

9   as you sit here today that you are aware of

10  a single bidder that would not have joined

11  Google's ad tech ecosystem if every detail

12  of Bernanke had been disclosed, true?

13       A.    That is again true, and I will

14  again repeat the same context, which is

15  from the Milgrom report states "Google

16  recognized the advantages of bidder

17  truthful auctions, explaining them as

18  follows:  It is faster, less costly and

19  more fair to the less sophisticated

20  advertisers to structure the auction in

21  favor of true value.  The lower transaction

22  costs associated with bidding in a bidder

23  truthful auction encourage advertisers to

24  participate on Google's platform."

25                    And that is the methodology

Page 122

1              WEINBERG, Ph.D.
2      from which I draw my conclusions, although
3      as you asked, I do not know a particular
4      advertiser that I know for certain only
5      joined -- only used GDN because of Google's
6      deception.
7          Q.      All right.  And, similarly, you
8      made an assumption that what you called
9      default participants predominate in the
10     ecosystem; is that right?
11             MR. RENARD:  Objection to the
12         form of the question.
13         A.      I don't know that I would -- I
14     wouldn't phrase it that way.
15         Q.      All right.  Look at your errata
16     sheet, sir.  Did you change one of your
17     observations about errata -- about default
18     participants in your errata sheet?
19         A.      Sorry, can you rephrase the
20     question?
21         Q.      Uh-huh.  Did you change one of
22     your observations in your errata sheet
23     related to default participants
24     predominating?
25         A.      What I changed was in paragraph

Page 143

1       WEINBERG, Ph.D.

2       Q.      Nor are you arguing that it is

3  deceptive conduct for Google to keep its

4  source code proprietary?

5              MR. RENARD:    Same objection.

6       A.      I also do not intend to argue

7  that the decision to keep source code

8  confidential is itself a deceptive act.

9       Q.      You also said, sir, that every

10  ad tech auction should be considered

11  deceptive during the period you considered,

12  right?

13      A.      Let me just read an exact quote

14  to remove confusion.    On page 43, section

15  header G, I say "Google's Deceptive Display

16  Advertising RTB Ecosystem Could Influence

17  Any Auction."

18      Q.      I'm sorry, where are you again?

19      A.      Sorry, the rebuttal report,

20  page 43, section header G.    "Google's

21  Deceptive Display Advertising RTB Ecosystem

22  Could Influence Any Auction."

23      Q.      Now, that use of "could" is of

24  interest to me because you did not prove

25  that any particular transaction was

Page 144

1                    WEINBERG, Ph.D.

2    influenced by deceptive conduct as you

3    describe it, true?

4                    MR. RENARD:   I object to the

5         question, form.

6         A.     Let me read a slightly

7    different quote --

8         Q.     Can you answer my question

9    first?

10        A.     Sure, I will answer the

11   question and follow it with a different

12   quote.

13                That is correct that I do not

14   find a particular transaction and assert

15   that this particular transaction had its

16   price increased by RPO when the advertiser

17   did not know or this particular transaction

18   had cleared in a dynamic region above the

19   advertiser's bid, or this particular

20   transaction was won by someone who would

21   not have been in Google's ecosystem but for

22   their deception.  However, I do claim, this

23   is now section header B on page 21, where I

24   say "Google's Deceptive Conducts Impact the

25   Entirety of Google's Display Advertising

1                    WEINBERG, Ph.D.

2    RTB Ecosystem."

3              So while the particular section

4    header G had a "could," there was no

5    "could" in the section header B.

6        Q.    Right.  So I want to

7    distinguish, because what you say is it

8    impacted the entire ecosystem, true?

9        A.    Yes, that's correct, I say that

10   it impacted the entire ecosystem.

11       Q.    But you do not say, and you

12   have not demonstrated, that any particular

13   transaction was affected by reserve price

14   optimization, what you call RPO, true?

15              MR. RENARD:  Objection to form.

16       A.    I do not find any particular

17   impression that I know was impacted by the

18   deceptive elements of RPO, that is correct.

19       Q.    And, similarly, you do not find

20   any particular transaction that was

21   affected by what you call the deceptive

22   elements of dynamic revenue sharing, true?

23       A.    That is also correct, I do not

24   find particular impressions on which I know

25   they cleared in the dynamic region and

Page 146

1                  WEINBERG, Ph.D.

2    would not have cleared but for Google's

3    deception.

4         Q.      And when you are using the

5    phrase "Google's deception," just to be

6    clear, you are calling dynamic revenue

7    sharing deceptive, true?

8         A.      Yes, I'm calling dynamic

9    revenue sharing deceptive.

10        Q.      And, similarly, you do not find

11   any particular transaction that was

12   affected by what you call the deceptive

13   elements of Bernanke, true?

14                MR. RENARD:   Objection to form.

15        A.      I do not know any particular

16   impressions on which I know that a bidder

17   took suboptimal behavior due to the

18   deception surrounding Bernanke, that is

19   correct.

20        Q.      Okay.  Now, do you know the

21   identity of the advertisers bidding in the

22   AdX auctions?

23                MR. RENARD:   Objection to form.

24        A.      I know some advertisers that

25   bid.  I do not know the identity of

Page 161

1              WEINBERG, Ph.D.

2     you say it was inappropriate?

3         A.      An.

4         Q.      An?

5         A.      a-n.

6         Q.      Okay.  So simpler, you don't

7     have any difficulty with saying for

8     purposes of this discussion min CPM floor

9     is the reserve price that the publisher

10    sets for their ad space?

11              MR. RENARD:  Objection to form.

12        A.      I don't object to using that

13    term.  I do want to note that I have seen

14    it used in a different context, and so it

15    may be -- it may be a confusing term to use

16    in hindsight.

17        Q.      Okay.  But when we talk about

18    reserve price optimization, the reserve

19    price that is being optimized in that

20    conduct is the min CPM floor, right?

21        A.      The min CPM floor set by the

22    publisher, yes.

23        Q.      Is what is optimized in reserve

24    price optimization?

25        A.      Again, at a simple level, yes.

Page 202

1                    WEINBERG, Ph.D.

2          A.        Okay.  Can I ask --

3          Q.        Because I go step by step,

4    that's why.

5          A.        Got it, okay.  I guess I was

6    trying to ask whether I can put away

7    Exhibit 5.  It sounds like you are saying

8    no, not yet.

9          Q.        I wouldn't.

10         A.        Okay.

11         Q.        All right.  So let's talk first

12   about that sentence, "In some cases the

13   auction may close at a price lower than the

14   reserve price applied due to auction

15   optimizations."

16                   Do you see that?

17         A.        Yes, I agree with that.

18         Q.        So it says that the auction

19   optimization can affect the closing price,

20   right?

21         A.        I agree that it is saying the

22   auction optimization can affect the closing

23   price.

24         Q.        But it also says that "Sellers

25   will receive, subject to the terms

Page 203

1              WEINBERG, Ph.D.

2    governing their use of the Ad Exchange, no

3    less than the min CPM applied to the

4    auction."

5              Do you see that?

6    A.         Yes, I see that too.

7    Q.         So how, other than by adjusting

8    Google's fee for the transaction, would

9    that be possible?

10             MR. RENARD:   Objection to form.

11   A.         In the event that the auction

12   closes at a price lower than the reserve

13   price applied and sellers are paid at least

14   their min CPM, I agree that can only happen

15   by adjusting Google's revenue share.

16   Q.         Right.  And in fact it says

17   "Sellers are paid the Ad Exchange closing

18   price net of Google's revenue share but

19   will receive no less than the min CPM

20   applied to the auction," right?

21   A.         Yes, I agree that's what it

22   says.

23   Q.         So Google is saying there it is

24   in some cases cutting its revenue share in

25   order to make the auction work, right?

Page 230

                     WEINBERG, Ph.D.

1       within my assignment to determine how many

2       advertisers believed that statement.

3          Q.      Right.  And in fact, as you sit

4       here today, you have not determined whether

5       any ad buyer believed that their -- I'm

6       sorry, I lost my train of thought.

7                  You said "One thing it could

8       mean to be deceived by this document is to

9       believe the sentence 'Regardless of whether

10      any adjustments are made, the winning buyer

11      will never be charged more than the bid it

12      submits.'  That's an example of a way an

13      advertiser could be deceived by this

14      document, but it is not within my

15      assignment to determine how many

16      advertisers believed that statement," and

17      therefore you cannot say as you sit here

18      today that even one advertiser was deceived

19      by that statement, true?

20               MR. RENARD:  Objection to form.

21          A.      It is not within my assignment

22      to determine how many advertisers,

23      including whether that number was one,

24      more, or zero, believe that statement.

Page 231

1             WEINBERG, Ph.D.

2        Q.        Right.   And as you sit here

3    today you cannot say that even one was

4    deceived, true?

5             MR. RENARD:   Objection to form.

6        A.        It was not within my

7    assignment -- it was not within my

8    assignment to determine whether any

9    advertisers believed the statement, and as

10   a result it is also not within my

11   assignment to determine whether even one

12   believed that statement.

13       Q.        And, similarly, not within your

14   assignment to believe -- to determine

15   whether even one buyer or even one seller

16   was deceived by the statement about

17   offsets?

18       A.        I think this is getting back

19   into nuance about whether a statement in

20   isolation that withholds material

21   information is deceiving in isolation.  So,

22   for example, the sentence "A buyer that has

23   received discounts on its bids may face

24   higher reserve prices in subsequent

25   transactions to offset such discounts," I

Page 241

1                    WEINBERG, Ph.D.

2    and which publishers were deceived by

3    different conducts of Google.  In

4    particular, it was not part of my

5    assignment to determine whether any, even

6    one advertiser or publisher, were deceived

7    by this document.

8        Q.      And therefore you have not

9    determined that even one advertiser or

10   publisher was deceived by this document or

11   by DRS, right?

12               MR. RENARD:  Objection to form.

13       A.      Because it was not part of my

14   assignment to determine, I did not

15   determine whether even one advertiser or

16   publisher believed the false statements in

17   this document, nor whether they were able

18   to understand more than I as an auction

19   theorist was capable of understanding.

20               MS. PATRICK:  Objection,

21       nonresponsive.

22       Q.      Let me ask you the question a

23   slightly different way.

24               You have not determined whether

25   even one advertiser or publisher was

Page 242

                    WEINBERG, Ph.D.

1

2       deceived by this document about dynamic

3       revenue sharing, true?

4            A.      If you could help me understand

5       how I'm not answering the question.

6            Q.      I'm asking you whether you know

7       a particular ad buyer or ad seller that you

8       can name for me so the jury knows there is

9       one who was actually deceived by this

10      document.   That's my question.

11                  MR. RENARD:   Objection to the

12           form.

13           A.      I will repeat my answer.   If

14      you tell me which part of the answer is not

15      clear, I will try again.

16           Q.      Can you name one, sir?

17           A.      I would like to finish my

18      answer to your previous question.

19                  This document does not contain

20      sufficient information for me as an auction

21      theorist to understand the concept of debt,

22      and therefore I, as an auction theorist,

23      would be deceived by Google's conduct with

24      respect to DRS.   Therefore, I believe that

25      any advertiser that does not employ -- I

Page 243

1          WEINBERG, Ph.D.

2    would expect advertisers or publishers with

3    less expertise in auction theory than me to

4    be deceived.

5          If you could let me know which

6    part of that doesn't answer your question,

7    I can try to change it.

8        Q.    Yes.    Can you identify any

9    specific ad buyer who was in fact deceived

10    by the true statements in this document,

11    Weinberg Exhibit 8?

12          MR. RENARD:    Objection to form.

13        A.    Maybe I can say it was not part

14    of my assignment to identify specific

15    advertisers or publishers who were

16    deceived, therefore I cannot identify a

17    particular advertiser or publisher who I am

18    certain has less auction theory expertise

19    or ability to understand this document than

20    I do.

21        Q.    And therefore you cannot tell

22    the jury that you are -- that you can

23    identify even one who actually was deceived

24    by name?

25        A.    Because it was not part of my

1               WEINBERG, Ph.D.

2    had an overbidding aspect which is that the

3    winning bid was increased.  And just to be

4    super clear, let me clarify that I mean

5    competition in the auction theory sense, as

6    in competing for this particular

7    impression, and not in any other way.

8        Q.      Okay.   And what was the

9    threshold payment rule as it pertained to

10   Bernanke?

11       A.      So I don't remember exactly

12   when, but I believe the Milgrom report

13   claims that Global Bernanke switched from a

14   first price payment rule to a threshold

15   payment rule.  I don't remember the precise

16   date he claims.  But to be clear, I do not

17   object to whatever date he claims.  I would

18   take that at face value.  And a threshold

19   payment rule refers to the fact that a

20   bidder is paying their minimum bid to win,

21   whereas a first price payment rule refers

22   to the fact that a bidder is paying their

23   bid in the auction.

24       Q.      Okay.  And when did Bernanke

25   start?

Page 263

                    WEINBERG, Ph.D.

1
during a period when AdX was running a

2
second price variant and Bernanke was using

3
a threshold payment rule.

4

5          Q.      Okay.  And, similarly, if I can

6   direct your attention to paragraph 98 --

7          A.      Of rebuttal?

8          Q.      Uh-huh.  You say that "Project

9   Bernanke or Global Bernanke or Buy-Side DRS

10  would have caused Google Display Network

11  advertisers to report" -- I'm sorry, let me

12  try again, rephrase.

13              In paragraph 98 you say that

14  "With a first price payment rule Buy-Side

15  DRS, Bernanke and Global Bernanke would

16  have caused Google Display Network

17  advertisers to report their true values to

18  the network when they would have been

19  better off bid shading," right?

20              MR. RENARD:  Objection to form.

21         A.      I just want to note it is a

22  slight misquote, but I consider the way you

23  read it to be an accurate representation of

24  the letter of the text.

25         Q.      Okay.  And does it follow that

Page 264

1                    WEINBERG, Ph.D.

2      when Bernanke was using a threshold payment

3      rule advertisers would not have been better

4      off bid shading because bidding truthfully

5      was optimal?

6                    MR. RENARD:    Objection to form.

7           A.        As I stated in my opening

8      report and is also commonly known within

9      auction theory, in an auction that uses

10     threshold payments, advertisers are not

11     better off bid shading.

12          Q.        They are better off bidding

13     truthfully?

14          A.        Just to repeat the previous

15     context for that question, in an auction

16     with threshold payments, advertisers are

17     best off bidding truthfully, that's

18     correct.

19          Q.        Okay.  And so that means, then,

20     that in periods without the first price

21     payment rule where instead threshold

22     payment was the norm, Bernanke and its

23     later manifestations did not injure

24     advertisers because they were presenting

25     truthful bids, right?

Page 270

1                    WEINBERG, Ph.D.

2     sorry, I misspoke.

3                    MR. RENARD:  Same objection.

4          A.       It wasn't part of my assignment

5     to determine which advertisers were

6     sophisticated or not sophisticated, and as

7     a result I don't, excuse me, I don't know

8     what particular advertisers knew or did not

9     know about Project Bernanke.  What I know

10    is that Google did not disclose it and that

11    I find it deceptive.

12         Q.       All right.  And what you do

13    agree is that during periods where Project

14    Global Bernanke used threshold payments,

15    both sophisticated and default advertisers

16    would best respond by bidding truthfully

17    because the auction was actually truthful,

18    right?

19                    MR. RENARD:  Objection to form.

20         Q.       I read your footnote correctly;

21    did I not?

22         A.       There is a slight nuance.

23    There are parts of the footnotes you read

24    correctly, which is that when Global

25    Bernanke used threshold payments, it is in

Page 271

1            WEINBERG, Ph.D.

2    GDN advertisers' best interest to bid their

3    true value, so that is correct.   The

4    question went a small step further and said

5    the auction was truthful, and I would

6    disagree with that because the auction was

7    not truthful for non-GDN bidders because of

8    RPO and DRS.

9        Q.        Okay.  So let me just read your

10   footnote exactly.

11       A.        Can I ask, is this 349?

12       Q.        No, it is 348.

13       A.        348, sorry.

14       Q.        Last sentence in 348 says

15   "During periods where Project Global

16   Bernanke," and I think you must have meant

17   Project Bernanke and Global Bernanke, do

18   you think you meant both?

19       A.        I believe the switch from

20   Bernanke to Global happened before Milgrom

21   claims the switch from first to threshold

22   occurred, so I don't believe there is a

23   period where non-Global Bernanke used

24   threshold periods -- payments.  But if

25   there were such a period, then it would

Page 272

```
 1                WEINBERG, Ph.D.
 2   apply.
 3        Q.    Okay.  So just to be clear, in
 4   any period where a Bernanke project used
 5   threshold payments, both sophisticated and
 6   default advertisers would best respond by
 7   bidding truthfully because the auction is
 8   actually truthful, right?
 9        A.    Yes, that is what I wrote.  It
10   looks like I would nitpick against my own
11   writing.  I think there was an implied "for
12   GDN bidders" at the end of that
13   parenthetical.  That would have been what I
14   assert if I explicitly wrote if I'm being
15   extra critical.
16        Q.    And Alchemist used a threshold
17   pricing, not a first price payment rule,
18   right?
19        A.    I forgot the question, but I
20   think I remember enough --
21        Q.    Well, let me ask it again.
22   Alchemist used a first, sorry, Alchemist
23   used a threshold pricing, not a first price
24   payment rule, right?
25        A.    Yes, that is correct.
```

Page 273

1          WEINBERG, Ph.D.

2     Q.      And so the same would be true,

3   that is in a circumstance where Alchemist

4   was operative as to advertisers, they were

5   best responding by bidding truthfully

6   because that auction was actually truthful?

7     A.      Basically, yes.  I'm just going

8   to add some qualifiers, which is that

9   during periods where Alchemist was active

10  and using a threshold payment rule, which I

11  believe to be all of the periods that

12  Alchemist was active, GDN bidders would

13  have best responded by bidding their true

14  value into the Alchemist.

15     Q.      And in those circumstances that

16  we have described where Project Global

17  Bernanke is using threshold payments or

18  where Alchemist is using threshold

19  payments, there is no deceit operating on

20  bidders as to the amount of their bid

21  because they are incentivized to bid

22  truthfully, right?

23          MR. RENARD:  Objection to form.

24     A.      I, again, don't believe I have

25  an opinion on that.  That is a technical