# EXHIBIT 1
# [FILED UNDER SEAL]

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE EASTERN DISTRICT OF TEXAS

4    SHERMAN DIVISION

5    Case No. 4:20-cv-00957-SD

6    -----------------------------------x

     THE STATE OF TEXAS, et al.,

7

             Plaintiffs,

8

9

         - against -

10

11

     GOOGLE LLC,

12

             Defendant.

13   -----------------------------------x

                 October 8, 2024

14               9:09 a.m.

15

16       Videotaped Deposition of MATTHEW

17   WEINBERG, Ph.D., taken by Defendant,

18   pursuant to Notice, held at the offices of

19   Norton Rose Fulbright US LLP, 1301 Avenue

20   of the Americas, New York, New York, before

21   Todd DeSimone, a Registered Professional

22   Reporter and Notary Public of the State of

23   New York.

24

25       Job No. CS6918901

Page 2

1
2  A P P E A R A N C E S :
3  THE LANIER LAW FIRM, PC
     10940 West Sam Houston Parkway North
4  Suite 100
     Houston, Texas 77064
5       Attorneys for Plaintiffs
     BY:  ALEXANDRA ABSTON, ESQ.
6       alex.abston@lanierlawfirm.com
         ZEKE DEROSE III, ESQ. (Via Zoom)
7       zeke.derose@lanierlawfirm.com
         MELONIE DEROSE, ESQ. (Via Zoom)
8       melonie.derose@lanierlawfirm.com
9
10
     NORTON ROSE FULBRIGHT US LLP
11  2200 Ross Avenue
     Suite 3600
12  Dallas, Texas 75201
        Attorneys for Plaintiff
13  BY:  JAMES S. RENARD  ESQ.
        james.renard@nortonrosefulbright.com
14
15       - and -
16
     NORTON ROSE FULBRIGHT US LLP
17  98 San Jacinto Boulevard
     Suite 1100
18  Austin, Texas 78701
     BY:  ETHAN GLENN, ESQ.
19       ethan.glenn@nortonrosefulbright.com
20
21
22
23
24
25

Page 3

1
2  A P P E A R A N C E S :  (Continued)
3  GIBBS & BRUNS LLP
     1100 Louisiana
4  Suite 5300
     Houston, Texas  77002
5       Attorneys for Defendant
     BY:  KATHY D. PATRICK, ESQ.
6       kpatrick@gibbsbruns.com
         MICHAEL DAVIS, ESQ.
7       mdavis@gibbsbruns.com
         ROBIN C. GIBBS, ESQ. (Via Zoom)
8       rgibbs@gibbsbruns.com
9
10
11  ALSO PRESENT:
12   LUKE WOODWARD, Texas OAG (Via Zoom)
13   TREVOR YOUNG, Texas OAG (Via Zoom)
14   JONATHAN JAFFE (Via Zoom)
15   ADAM VENTURINI, Videographer
16
17
18
19
20
21
22
23
24
25

Page 4

1          WEINBERG, Ph.D.
2          THE VIDEOGRAPHER: Good morning.
3   We are going on the record at 9:09 a.m.
4   eastern standard time on October 8th,
5   2024.
6          Please note the microphones are
7   sensitive and may pick up whispering
8   and private conversation.  Please mute
9   your phones at this time.  Audio and
10  video recording will continue to take
11  place unless all parties agree to go
12  off the record.
13         This is media unit one of the
14  video-recorded deposition of Matthew
15  Weinberg in the matter of the State of
16  Texas v. Google LLC, filed in the
17  United States District Court, Eastern
18  District of Texas, case number
19  4:20-CV-00957.  The location of the
20  deposition today is 1301 Sixth Avenue
21  in New York, New York 10019.
22         My name is Adam Venturini
23  representing Veritext and I am the
24  videographer.  The court reporter today
25  is Todd DeSimone from the firm

Page 5

1          WEINBERG, Ph.D.
2   Veritext.  I'm not authorized to
3   administer an oath, I'm not related to
4   any party in this action, nor am I
5   financially interested in the outcome.
6          Counsel and all present remote
7   will be noted on the stenographic
8   record.  Will the court reporter please
9   swear in the witness and then counsel
10  may proceed.
11              *  *  *
12   M A T T H E W   W E I N B E R G ,
13  Ph.D.,
14  called as a witness, having been first
15  duly sworn, was examined and testified
16  as follows:
17  EXAMINATION BY MS. PATRICK:
18      Q.    Good morning, Professor.
19      A.    Good morning.
20      Q.    Who is Paul Milgrom?
21      A.    Paul Milgrom is an economist.
22      Q.    Is a Nobel Prize winning
23  economist; is that right?
24      A.    Yes.
25      Q.    What did he win the Nobel Prize

2 (Pages 2 - 5)

1        WEINBERG, Ph.D.
2 for, sir?
3    A.    He won the Nobel Prize in
4 economics.
5    Q.    For what area of study in
6 economics, sir?
7    A.    I don't recall the exact
8 citation, but it would have been within
9 auction theory.
10    Q.    And what is auction theory,
11 sir?
12    A.    Auction theory is the study of
13 how to allocate goods such as items amongst
14 many -- sometimes many, sometimes one,
15 interested buyers.  There could be several
16 objectives, sometimes you might want to
17 make the buyers as happy as possible,
18 sometimes you might want to generate as
19 much revenue as possible, but auction
20 theory is the study of situations like
21 this.  Most of auction theory involves
22 transfer of money from the buyers to the
23 seller, but there is also a study of
24 auction theory where you may be restricted
25 in how many can be used.

1        WEINBERG, Ph.D.
2    Q.    Is Dr. Milgrom testifying as an
3 expert for a party in this case, sir?
4    A.    Yes.
5    Q.    For whom?
6    A.    For Google.
7    Q.    And is his testimony in the
8 same area, namely auction theory, for which
9 he won the Nobel Prize?
10        MR. RENARD:  Objection to form.
11    A.    I believe his testimony is
12 within auction theory.
13    Q.    And you are here to tell the
14 jury that the Nobel Prize winner is wrong
15 in the opinions he expresses in this case?
16        MR. RENARD:  Objection to form.
17    A.    One of the claims I will make
18 is that many of the claims in his report is
19 wrong, that's correct.
20    Q.    And you used the term "claims,"
21 sir, and I want to understand the sense in
22 which you are using it.  What do you mean
23 by a claim?
24    A.    I would say I'm using "claim"
25 maybe as a synonym for conclusion, which

1        WEINBERG, Ph.D.
2 means that in his report he tries to start
3 from some facts.  Based on those facts he
4 tries to apply auction theory to draw some
5 conclusions, and as it refers to my
6 previous answer, one of the things that I
7 claim is that many of those conclusions are
8 incorrect.
9    Q.    Okay.  So just to be clear, you
10 are going to tell the jury the Nobel Prize
11 winner is wrong?
12        MR. RENARD:  Objection to the
13    form.
14    A.    In this case, yes, I do believe
15 that the report written by the Nobel Prize
16 winner, Paul Milgrom, has incorrect claims
17 in it.
18    Q.    Are there parts of
19 Dr. Milgrom's report you believe are
20 correct?
21        MR. RENARD:  Objection to form.
22    A.    Sure, I can think of one
23 example.  There is a theorem in his report
24 that is the same theorem I include in my
25 own report, and that theorem is correct.

1        WEINBERG, Ph.D.
2    Q.    Which theorem is that?
3    A.    Without seeing his report, I
4 couldn't tell you what label it is in his.
5 I can tell you what it is in mine.
6        (Weinberg Exhibit 1 marked for
7    identification.)
8    Q.    Are you looking at what's been
9 marked as Exhibit 1?
10    A.    Yes, I am looking at what has
11 been marked as Exhibit 1.
12    Q.    And just for the jury, can you
13 identify Exhibit 1 as the opening report
14 you -- is that your expert report dated
15 June 7th, 2024?  If you look at the cover,
16 sir.
17    A.    Yes, that is correct.
18    Q.    And that's your signature on
19 the front of it?
20    A.    Yes, that is correct.
21    Q.    All right.  And so you were
22 going to tell me which theory that you
23 think Dr. Milgrom is deploying correctly.
24    A.    So in my report on page 127, it
25 looks like paragraph 226(a), I state "If

WEINBERG, Ph.D.
1
2 all advertisers responded optimally to
3 DRSv2, no advertiser would bid in the
4 dynamic region, and therefore DRSv2 would
5 be equivalent to no DRS." And Professor
6 Milgrom has a theorem in his own report
7 that states the exact same thing.
8    Q.    We are going to come back to
9 Professor Milgrom's report. I want to
10 continue on down the road for a moment.
11    Dr. Milgrom is an economist,
12 you are not; is that right?
13    A.    I do not have a Ph.D. in
14 economics.
15    Q.    And your undergraduate degree
16 is in math; is that right?
17    A.    Yes, that's correct.
18    Q.    And your Ph.D. is in computer
19 science; is that right?
20    A.    Yes, that's also correct.
21    Q.    So you have not received any
22 prizes in economics, as Dr. Milgrom has,
23 true?
24       MR. RENARD: Objection to form.
25    A.    I did receive a dissertation

WEINBERG, Ph.D.
1
2 award from the SIGecom, which is an
3 economics and computing research group, and
4 from the same -- the same research group I
5 have also received a best paper award, and
6 so that research group includes both
7 economics and computer science.
8    Q.    Other than that, though, you
9 are aware there are recognized prizes in
10 economics like the Nobel Prize, the Clark
11 Medal, and so on, you have not been awarded
12 any of those, true?
13       MR. RENARD: Objection to form.
14    A.    I have not won a Nobel Prize or
15 the Clark Prize.
16    Q.    And there is -- there is no
17 Nobel Prize for computer science; is that
18 right?
19    A.    That's correct, there is no
20 Nobel Prize in computer science.
21    Q.    There is something called the
22 A.M. Turing Award though, right, it is
23 understood in your field to be the
24 equivalent of it?
25    A.    It is the ACM Turing Award, and

WEINBERG, Ph.D.
1
2 there are definitely people who would call
3 that the Nobel Prize of computer science.
4    Q.    And you have not received the
5 Turing Award; is that true?
6    A.    That is correct, I have not
7 received the Turing Award.
8       (Weinberg Exhibit 2 marked for
9 identification.)
10    Q.    Now, let's look at your --
11 while we are on the topic of identifying
12 things, can you identify Exhibit 2 as your
13 rebuttal report dated September 9th, 2024?
14    A.    Yes, that is Exhibit 2.
15    Q.    And you agree that report has
16 errors in it; does it not?
17    A.    Yes, the version you handed me
18 does not have the errata that I submitted.
19    Q.    All right. An errata is a
20 fancy Latin word for error, right?
21    A.    I'm actually not sure exactly
22 what errata means.
23    Q.    Then why did you use the term
24 "errata sheet" when you filed one?
25    A.    I know that errata -- what I

WEINBERG, Ph.D.
1
2 meant to say was I do not know whether the
3 word "errata" is a Latin word that
4 literally means error. I know that errata
5 is a term used for submitting a list of
6 errors that are being fixed in a written
7 document.
8    Q.    And with regard to your
9 rebuttal report, you submitted a list of
10 errors that you found in your report,
11 right?
12    A.    Yes, I submitted an errata
13 sheet.
14    Q.    Have you reviewed Exhibit 1,
15 your opening report, sir, since you filed
16 it?
17    A.    Yes.
18    Q.    Did you note any errors in that
19 that you need to correct today?
20    A.    No, I do not.
21    Q.    So as we sit here, subject to
22 the errors you corrected in Exhibit 2, you
23 intend to stand by your rebuttal report; is
24 that right?
25    A.    That is also correct. Can I

4 (Pages 10 - 13)

Page 14

WEINBERG, Ph.D.

1    make a very slight modification to my
2    answer about the opening report?
3    Q.    Sure.
4    A.    In my rebuttal report it
5    will -- it will take me a second to find
6    the precise footnote, there were a few
7    footnotes, I will give you one example --
8    Q.    And you are in which report,
9    sir?
10   A.    I'm in the rebuttal report.
11   Q.    Okay.
12   A.    So there are a few footnotes in
13   my rebuttal report which are updating the
14   opening report.  So footnote 582 is one
15   example which says -- so footnote 582 is on
16   the sentence in paragraph 448 that says
17   "Second, RPO was concealed from buyers and
18   Google took numerous steps to avoid
19   detection," and footnote 582 notes "I have
20   previously noted that I do not consider
21   Google's 'disclosure' of RPO to
22   meaningfully disclose RPO.  My opinion
23   remains the same for the entire duration of
24   RPO."

Page 15

WEINBERG, Ph.D.

1            And there are several footnotes
2    like this through the section in which I
3    discuss RPO where I note that in my opening
4    report I refer to a disclosure of RPO, and
5    in my rebuttal report, after seeing more
6    documentation, I consider that to have been
7    not a transparent disclosure.  So I just
8    wanted to clarify that although that is
9    stated in my rebuttal report, that that is
10   the only example.
11   Q.    That is the only or is not the
12   only example where you have used your
13   rebuttal report to correct your primary
14   report?  I didn't understand your use of
15   the word "only."
16   A.    Sorry, I believe that is the
17   only example.
18   Q.    Just to press the point, you
19   said there are a few footnotes in my
20   rebuttal report which are updating the
21   opening report, and you say footnote 582 is
22   one example.
23   A.    Sure.
24   Q.    I just want to be sure I have

Page 16

WEINBERG, Ph.D.

1    gathered all the others, sir.
2    A.    Sure.  What I meant is this is
3    the -- they are all footnotes of the
4    same -- saying the same thing.
5    Q.    So it is all related to RPO?
6    A.    They are all related to RPO,
7    that is correct.
8    Q.    All right.  And who was it that
9    called those additional documents to your
10   attention that you reviewed that led you to
11   correct your prior report by means of
12   footnotes here?
13   A.    It was a combination of myself
14   searching through documents and tracing
15   through documents that were cited in the
16   Milgrom report and the Wiggins report.
17   Q.    Okay.  You did that work
18   yourself?
19   A.    Yes, I did that work myself.
20   Q.    And so we have what you now
21   consider to be an error in your observation
22   about reserve price optimization in your
23   opening report that you have corrected in
24   your view in your rebuttal?

Page 17

WEINBERG, Ph.D.

1    A.    I don't know that I would call
2    it an error.  So I will read you one
3    example.
4    Q.    Which document are you in, sir,
5    Exhibit 1?
6    A.    This is Exhibit 2.
7    Q.    Okay.  This is your rebuttal
8    report?
9    A.    This is my rebuttal report.
10   Q.    All right.  Tell me where you
11   are.  Page?
12   A.    I am on page 144, paragraph
13   476.
14   Q.    Okay.
15   A.    So it says "First, my opening
16   report stated both that:  (1) Google
17   concealed information that is material to
18   both publishers and advertisers during the
19   period RPO was concealed."  So that is in
20   my opening report.  I cited at paragraph
21   273 of my opening report.  And that
22   statement has no errors in it.
23          However, one might read that to
24   imply that there was a period where RPO was

5 (Pages 14 - 17)

Page 18

1          WEINBERG, Ph.D.
2  not concealed, and in my rebuttal report I
3  clarify in footnote 619 "Since issuing my
4  opening report, I have reviewed further
5  documents regarding the claims disclosure
6  of RPO by Google.  These documents led me
7  to believe that the disclosures by Google
8  regarding RPO were insufficient.  I now
9  consider RPO to be concealed for its entire
10  existence since Google's disclosures
11  withheld vital information regarding RPO."
12         So that is an example of what I
13  mean when I answered your earlier question.
14  I guess I was trying to be extra
15  forthcoming, but I do not consider, for
16  example, the sentence to be an error, you
17  know, but there is maybe an update as the
18  footnote 619 notes.
19     Q.    All right.  So have you now
20  told me everything that you need to correct
21  in Exhibits 1 and 2 in order for me to have
22  a complete set of your accurate opinions?
23     A.    Assuming that you have the
24  errata sheet, yes.
25     Q.    Okay.  So as you sit here

Page 19

1          WEINBERG, Ph.D.
2  today, you are satisfied that Exhibits 1, 2
3  and the errata sheet contain your full set
4  of opinions about which you intend to try
5  to testify at the trial?
6     A.    Yes, absolutely.
7         (Weinberg Exhibit 3 marked for
8  identification.)
9     Q.    Okay.  Let's talk about your
10  work history, sir.  Do you have Exhibit 3
11  before you?
12     A.    Yes, I do.
13     Q.    And is that -- there is another
14  Latin word there.  Can you pronounce it for
15  us, please?
16     A.    You are talking about my CV,
17  curriculum vitae?
18     Q.    Yes.
19     A.    Yes.
20     Q.    So CV, curriculum vitae, those
21  are Latin words again, right?
22     A.    I will, again, trust you that
23  they are Latin words.
24     Q.    You don't need to trust me
25  about that, sir.  You know it is Latin,

Page 20

1          WEINBERG, Ph.D.
2  don't you?
3         MR. RENARD:  Objection to form.
4     A.    I believe you that it is Latin.
5  I am hesitant to testify under oath that it
6  is Latin.
7     Q.    So you used a foreign word at
8  the top of that you didn't know what it
9  meant or where it came from?
10         MR. RENARD:  Objection to form.
11     A.    I know that the term
12  "curriculum vitae" is used I guess at least
13  among academics for their resumé and it
14  describes their work history, their
15  qualifications, and things like that.  So I
16  know how the term is used even without
17  knowing with 100 percent certainty that it
18  is Latin.
19     Q.    Did you ever take Latin in
20  school, sir?
21     A.    I did not.
22     Q.    All right.  So let's look at
23  your experience here.  Am I right that you
24  finished your undergraduate degree at
25  Cornell in math in 2010?

Page 21

1          WEINBERG, Ph.D.
2     A.    Yes, that is correct.
3     Q.    And you went straight from
4  there into your Ph.D. work at the
5  Massachusetts Institute of Technology in
6  Boston?
7         MR. RENARD:  Objection to form.
8     A.    Yes, after I finished my
9  undergraduate degree, after the summer, I
10  started my Ph.D. in the fall at the
11  Massachusetts Institute of Technology,
12  which is in Cambridge, which is a suburb
13  near Boston.
14     Q.    And you received your Ph.D. --
15  your Ph.D. thesis was something called
16  Algorithms for Strategic Agents; is that
17  right?
18     A.    Yes, that's correct.
19     Q.    What is an algorithm, sir?
20     A.    An algorithm I would describe
21  as a step-by-step process that is concrete
22  and well defined that will take some input
23  and produce an output.
24     Q.    Is an algorithm commonly used
25  as a way of describing how machines make

1        WEINBERG, Ph.D.
2 decisions?
3     A.    Some people might use it to
4 mean that.  I personally would not use that
5 definition.
6     Q.    How does computer science use
7 the term "algorithm" in connection with
8 computers?
9     A.    So the field of computer
10 science I think would use the term
11 "algorithms" as I have defined it.  If a
12 computer scientist wanted to explicitly
13 connect algorithms to computers, they might
14 describe it -- they might use it to mean
15 how code executes, and the reason they are
16 connected is that in order for a computer
17 to make decisions the computer would need
18 very concrete step-by-step instructions,
19 and so in order for a computer to do
20 anything it would need an algorithm to tell
21 it what to do.
22        The reason I made the
23 distinction is that algorithms are not
24 limited to code or machine decision-making.
25     Q.    But algorithms can be a species

1        WEINBERG, Ph.D.
2 of machine decision-making, right?
3     A.    Algorithms could be used for
4 machines to make decisions, yes.
5     Q.    In other words, the computer
6 has a series of steps in the algorithm it
7 follows to accomplish a given task?
8        MR. RENARD:  Objection to form.
9     A.    If a computer is using an
10 algorithm, then that computer would have a
11 series of steps it follows to complete a
12 given task.
13     Q.    And so that's what an algorithm
14 is, and is that the sense in which you have
15 used it when you talk about your field of
16 expertise as algorithmic mechanism design,
17 that is the design of algorithms for
18 machines?
19        MR. RENARD:  Objection to form.
20     A.    I think there were two parts to
21 that question.  For the first one, when I
22 used the phrase "algorithmic," I would say
23 that I am referring to the same definition
24 of algorithm that I used.  For the second
25 one, that is not how I would define

1        WEINBERG, Ph.D.
2 algorithmic mechanism design.
3     Q.    All right.  So your definition
4 of algorithm that you used is a
5 step-by-step process that is concrete and
6 well defined that will take some input and
7 produce an output; is that right?
8     A.    Yes.
9     Q.    Okay.  And algorithmic
10 mechanism design, if you want to look at
11 paragraph 4 of your opening report, what's
12 a mechanism, sir?
13        MR. RENARD:  Objection to the
14     form.
15        MS. PATRICK:  What's
16     objectionable about asking him what a
17     mechanism is?
18        MR. RENARD:  Because mechanism
19     as used generally or as used in that
20     phrase?  It is unclear and vague.
21     Q.    What is a mechanism, sir?
22        MR. RENARD:  Same objection.
23     A.    A mechanism as used in this
24 context, there are two kinds of definitions
25 that mean the same thing.  One would come

1        WEINBERG, Ph.D.
2 more from the computer science view, which
3 would say that a mechanism is like an
4 algorithm but with incentives involved, and
5 so the distinction would be an algorithm
6 people typically think of as having an
7 input that is given and then the algorithm
8 processes the input and then an output is
9 produced, whereas the distinction of a
10 mechanism to an algorithm is that the input
11 would not necessarily be given, but there
12 would be some agents with incentives that
13 are providing the input and those agents
14 may be incentivized not to give you the
15 correct input.  So that would be mechanism
16 as it differs from algorithm.
17        The economics view may
18 introduce mechanism as different from a
19 game.  So, for example, a game is thought
20 of as being given.  There is a set of
21 players.  Each player has a set of actions.
22 Based on the actions taken by all players,
23 each player gets some payoff and the game
24 is given, whereas a mechanism implies that
25 is there is a designer who is designing a

WEINBERG, Ph.D.

1 game for the players to play. And so those
2 definitions mean the same thing, but they
3 come from different perspectives, and so
4 that's how -- that's what mechanism means
5 in this context.
6    Q.    And so when you say your field
7 of expertise is algorithmic mechanism
8 design, are you talking about the design of
9 computerized algorithms that involve
10 incentives?
11    A.    It includes the study of
12 computerized algorithms that involve
13 incentives, but it is not restricted to the
14 computerized aspect.
15    Q.    Do you have any training in
16 psychology, sir?
17    A.    I believe I took one course in
18 undergrad.
19    Q.    Do you have any training in
20 behavioral economics?
21        MR. RENARD:  Objection to the
22    form.
23    A.    Some of my research concerns
24 behavioral economics.  I do not have a

WEINBERG, Ph.D.

1 degree in behavioral economics.
2    Q.    So what do you understand the
3 field of behavioral economics to be?
4        MR. RENARD:  Objection to the
5    form.
6    A.    So I would say there is one
7 view of game theory that tries to study
8 fully rational agents, and so this would
9 mean that when agents are given a game to
10 play they behave in a way that optimizes
11 their payoff, and so some examples of
12 solution concepts related to this would be
13 Nash equilibrium, best response, Bayes-Nash
14 equilibrium, things like this, and there is
15 a wide field of economics that has realized
16 that in practice agents often don't play
17 rationally, and the field of behavioral
18 economics, especially behavioral game
19 theory, studies how agents behave in
20 practice when faced with incentives.
21        So I would say the economics
22 refers to the incentives or the game theory
23 refers to the fact that there was a game
24 they are playing, and behavioral refers to

WEINBERG, Ph.D.

1 the fact that we are trying to study how
2 agents actually behave rather than assuming
3 that they are rational.
4    Q.    Does your analysis -- does the
5 analysis you have done here assume
6 publishers are rational?
7    A.    I think maybe a distinction
8 that's better to make is you can be
9 rational with respect to the information
10 you have and you can be rational with
11 respect to information you have and
12 rational with respect to the full
13 information and those behaviors would be
14 different.
15        So to tie that back to your
16 question, I would say that my analysis
17 is -- does not make assumption on
18 publishers being rational or not rational,
19 they both are consistent.
20    Q.    Okay.  So as to publishers, you
21 make no assumption that any particular
22 publisher is or is not rational, true?
23    A.    I believe that all of my
24 conclusions are consistent with any

WEINBERG, Ph.D.

1 assumption on publishers as far as their
2 rationality is concerned.
3    Q.    Is that a yes, you make no
4 assumption one way or the other that
5 publishers are rational?
6    A.    I believe that is correct, yes.
7    Q.    All right.  And how about ad
8 buyers, does your analysis make any
9 assumption one way or the other about
10 whether ad buyers are rational?
11    A.    My analysis assumes that
12 advertisers would rationally bid their true
13 value into a truthful auction.  So let me
14 elaborate on that.
15        An auction is a truthful, so
16 this second price auction would be an
17 example, if it is in every bidder's best
18 interest to bid their true value, and in
19 the case of a second price auction, this is
20 also a dominant strategy, and because it is
21 a dominant strategy to bid your true value,
22 a rational participant in a second price
23 auction who is informed that they are
24 playing a second price auction would bid

WEINBERG, Ph.D.

1
2 their true value.
3    Q.    That's your assumption?
4    A.    Sorry, to finish my --
5    Q.    Sorry, I didn't mean to
6 interrupt.
7    A.    -- previous answer, that is --
8 it follows my definition.  So to back up
9 again, in game theory, rational would refer
10 to a player that is acting in their best
11 interest given the information they have,
12 and given that definition it is a theorem,
13 I believe I even stated it in my -- the
14 Background section of my opening report.
15        So, for example, in paragraph
16 47 of my opening report I introduce the
17 definition of truthful and provide an
18 example illustrating that in paragraph 48,
19 and I share that to note that a bidder
20 bidding their true value in a second price
21 auction, that is rational behavior, and to
22 repeat, that follows from the definition of
23 rational where rational means acting in
24 your best interest, observing that it is a
25 dominant strategy to bid your true value in

WEINBERG, Ph.D.

1
2 a second price auction, which means that no
3 matter what anyone else is doing, you are
4 always best off by bidding your true value
5 and then concluding using mathematical
6 proofs that it is any rational player would
7 bid their true value in a second price
8 auction.
9        And tying it back to your
10 original question, in both my opening
11 report and my rebuttal report, I do assume
12 that advertisers who believe they are
13 playing a second price auction would
14 rationally bid their true value into that
15 second price auction.
16    Q.    So as to ad buyers, you have
17 made an assumption of rationality, true?
18    A.    For ad buyers some of my
19 conclusions assume that advertisers would
20 rationally bid their true value into a
21 second price auction in which it is a
22 dominant strategy to do so.
23    Q.    So, again, that's a yes?
24    A.    I am clarifying that that is
25 true of some of my opinions, and some of my

WEINBERG, Ph.D.

1
2 other opinions do not make this assumption.
3    Q.    So there are circumstances in
4 your opinions where you do not assume
5 buyers act rationally, true?
6    A.    There are circumstances in my
7 opinions that do not make any assumptions
8 on advertiser behavior.
9    Q.    Such as?
10    A.    For example, I am reading from
11 my rebuttal report, paragraph 446, on page
12 133, sorry, paragraph 446(d), I'm reading
13 it from my rebuttal report, but it is a
14 quote from my opening report, paragraph
15 281, which says "RPO would lead to a payoff
16 loss for advertisers since it leads to both
17 a decrease in impressions won and an
18 increase in the average price paid for
19 impressions won."
20        So this claim makes no
21 assumption on advertisers whatsoever.  It
22 would hold no matter how the advertisers
23 behave.
24    Q.    All right.  Now, it is possible
25 to design an experiment to determine

WEINBERG, Ph.D.

1
2 whether publishers in a given circumstance
3 are acting rationally; is it not?
4        MR. RENARD:  Objection to form.
5    A.    It is certainly possible to
6 design an experiment to study this.  I
7 don't know whether that experiment could
8 decisively conclude the publishers are
9 certainly rational, but certainly you could
10 design an experiment to study that.
11    Q.    So you could design an
12 experiment to study whether publishers were
13 rational, true?
14    A.    Yes, one could design an
15 experiment to study whether publishers are
16 rational.
17    Q.    And you could design an
18 experiment to study whether buyers are
19 rational, true?
20    A.    Yes, one could design an
21 experiment to study whether buyers are
22 rational.
23    Q.    And in your work in this report
24 you did not design or conduct any
25 experiment to test either, did you?

9 (Pages 30 - 33)

Page 34

```
 1          WEINBERG, Ph.D.
 2     A.    No, I did not design
 3  experiments to test these.
 4     Q.    And so you have not, as you sit
 5  here, tested or demonstrated the validity
 6  of these assumptions, have you?
 7          MR. RENARD:  Objection to form.
 8     A.    No, that is incorrect.
 9     Q.    You did not design an
10  experiment.  What is the basis, then, for
11  the assumption you make -- by the way, what
12  is an assumption?
13     A.    So I would distinguish an
14  assumption from a conclusion, and
15  assumption is a starting point for an
16  argument that follows, and a conclusion is
17  what follows from the assumption.
18     Q.    Assumption is a starting point
19  for an argument, is that what you said?
20     A.    I believe that's what I said.
21     Q.    And assumptions can be
22  inaccurate; is that right?
23     A.    Yes, an assumption could be
24  accurate or inaccurate.
25     Q.    You are familiar with the adage
```

Page 35

```
 1          WEINBERG, Ph.D.
 2  when you assume you make an ass of you and
 3  me?
 4     A.    Yes, I am familiar with that.
 5     Q.    And so you made these
 6  assumptions and you did not design an
 7  experiment to test their validity, true?
 8          MR. RENARD:  Objection to form.
 9     A.    I did not design any
10  experiments, and as I said, some claims did
11  make -- some claims did make assumptions
12  because some assumptions are necessary in
13  order to draw conclusions.
14     Q.    You have to assume certain
15  facts in order to draw the conclusions you
16  have drawn, right?
17          MR. RENARD:  Objection to form.
18     A.    Yes, every conclusion requires
19  a starting point, which would be an
20  assumption.
21     Q.    Well, it could be an assumption
22  or it could be a demonstrated fact, right?
23          MR. RENARD:  Objection to form.
24     A.    Sorry, I didn't mean to draw a
25  distinction between assumption and
```

Page 36

```
 1          WEINBERG, Ph.D.
 2  demonstrated fact.  I was primarily drawing
 3  a distinction between assumption and
 4  conclusion.  A conclusion could follow from
 5  a demonstrated fact as well.
 6     Q.    So an assumption can be
 7  different from a fact known to be true,
 8  right?
 9     A.    An assumption would be
10  different from a fact known to be true.
11  The role they play in a logical argument is
12  the same.
13     Q.    And when you talk about the
14  role in a logical argument, I ran across
15  something when I noted your use of the word
16  "claim," Professor, a form of reasoning
17  called CER.  Are you familiar with that?
18          MR. RENARD:  I object to
19     everything up to the question, move to
20     strike.
21     A.    I don't recall what the acronym
22  CER stands for.  I don't know if I'm
23  familiar with it.
24     Q.    Claim evidence reasoning?
25     A.    I don't believe I have heard
```

Page 37

```
 1          WEINBERG, Ph.D.
 2  that phrase before.
 3     Q.    Okay.  But at least as you used
 4  the term "claim," a claim is a statement
 5  that is subject to dispute and
 6  demonstration; is that fair?
 7     A.    Yes, I think every claim should
 8  be subject to dispute.
 9     Q.    And you would agree further
10  that a claim is only valid if it is
11  demonstrated to be true on the evidence?
12          MR. RENARD:  Objection to form.
13     A.    I don't know exactly what valid
14  means, but, you know, a claim can be true
15  or false, and a false claim, it is hard for
16  me to imagine a definition of valid for
17  which a false claim would be valid.
18     Q.    Okay.  But a claim is
19  demonstrated to be true would you agree
20  only if it is supported by evidence?
21          MR. RENARD:  Objection to form.
22     A.    I would say if you take a broad
23  view of evidence to include mathematical
24  justification, I would say yes, every claim
25  in order to be deemed true should have a
```

10 (Pages 34 - 37)

Page 38

1      WEINBERG, Ph.D.
2  justification.
3      Q.    Are you finished?
4      A.    Yes, sorry.
5      Q.    Every claim to be true should
6  have a justification either in evidence or
7  math; is that what you mean?  I just want
8  to be sure I had your complete answer.
9      A.    I was including within
10  evidence, the reason I gave a nuanced
11  answer is because some mathematical claims
12  are claims about math and there is not an
13  evidence element, there is only a logic
14  element.  There is not a physical evidence
15  element, there is only a logic element.
16  And so some claims can be proven true using
17  only logic, and so I wanted to include
18  those claims in the set of claims that
19  could be proven true.
20      Q.    So would you agree with the
21  statement, then, that math is not a matter
22  of opinion, it is just a fact?
23      A.    No.  There are elements of math
24  that are just facts, but how math is
25  applied to real-world situations is a

Page 39

1      WEINBERG, Ph.D.
2  matter of opinion.
3      Q.    So let me ask you about another
4  adage.  The sum of the parts is greater
5  than the whole, is that a statement that is
6  mathematically true?
7      MR. RENARD:  Objection to form.
8      A.    In order for that statement to
9  be mathematically true, it would require a
10  precise definition of parts and whole.  So
11  as stated, I would not say that claim is
12  mathematically true.
13      Q.    Okay.  So, for example, if I
14  say I have the number 4 and I add to it the
15  number 2, the result of that is?
16      MR. RENARD:  Objection to form.
17      A.    If that's a question for me,
18  the answer is 6.
19      Q.    And you can arrive at the
20  result, 6, by adding 1 plus 2 plus 3, 4
21  plus 2, 5 plus 1, but in each case those
22  parts do not equate to more than 6, right?
23      A.    Yes, all of those additions are
24  correct.
25      Q.    And so that would be an example

Page 40

1      WEINBERG, Ph.D.
2  of how the statement the sum of the parts
3  is greater than the whole is not true as a
4  statement of math, right?
5      A.    Yes.  Again, just to be super
6  clear, when you made that statement, you
7  took parts to mean numbers and you took
8  whole to mean the sum of those numbers.  So
9  I just want to emphasize that you needed a
10  concrete definition to make it a
11  mathematical statement.  But yes, what you
12  said is correct.
13      Q.    All right.  So let's talk some
14  more about your experience, sir.
15      By the way, I didn't tell you,
16  but anytime you need a break, you let me
17  know.  Okay?
18      A.    Sure.
19      Q.    If we look at your list of
20  publications -- well, let's talk about your
21  work experience first.  You have only ever
22  been an academic; is that right?
23      MR. RENARD:  Objection to form.
24      A.    No, that is not correct.
25      Q.    Okay.  When have you worked in

Page 41

1      WEINBERG, Ph.D.
2  the private sector?
3      A.    So for several summers, one
4  example is the summer of 2009, another is
5  the summer of 2010, another is the summer
6  of 2011, and another is the summer of 2013.
7      Q.    You are looking at the last
8  page of your resumé, sir?
9      A.    Yes, that is correct.
10      Q.    Okay.  So you had summer
11  internships while you were in college
12  through 2010; is that right?
13      A.    I had summer internships while
14  I was in college through 2009.  In 2010 I
15  had already graduated.
16      Q.    All right.  And so you had
17  another summer internship the summer of
18  2010 before you went to MIT?
19      A.    Yes, that's correct.
20      Q.    And the Institute for Defense
21  Analysis is a think tank; is that right?
22      A.    I do not believe they would
23  consider themselves a think tank.
24      Q.    What would they consider
25  themselves to be?

11 (Pages 38 - 41)

Page 42

WEINBERG, Ph.D.
1
2       MR. RENARD:  Objection to form.
3    A.    They are a contractor for the
4 Department of Defense.
5    Q.    So you had some internships
6 with defense contractors from 2008 to 2011;
7 is that right?
8    A.    2009 to 2011.
9    Q.    Okay.
10    A.    Yes.
11    Q.    And then from and after that,
12 all of your work has been in academic
13 research; is that right?
14    A.    No, that is not correct.
15    Q.    Okay.
16    A.    I also mentioned the summer of
17 2013, so that is at Microsoft, and actually
18 recently in the summer of 2022 I was at
19 Andreessen Horowitz for the summer.
20    Q.    Okay.  So summer of 2013 you
21 were a research intern, a summer job, with
22 Microsoft?
23    A.    Yes, that's correct.
24    Q.    Microsoft is a competitor of
25 Google's; is that right?

Page 43

WEINBERG, Ph.D.
1
2       MR. RENARD:  Objection to form.
3    A.    I don't know whether they are a
4 competitor of Google's or not.
5    Q.    And in the summer of 2022 you
6 worked at, what did you say, Andreessen
7 Horowitz?
8    A.    Andreessen Horowitz, that's
9 correct.
10    Q.    What are they?
11    A.    Andreessen Horowitz is a
12 venture capital firm.
13    Q.    They invest in tech companies?
14    A.    I believe they invest in tech
15 companies, but I don't know their entire
16 portfolio.
17    Q.    And in any of those internships
18 that you had for the summers, did you work
19 with ad publishers?
20    A.    I don't know whether any of the
21 companies I worked for are also publishers.
22    Q.    You are not here telling the
23 jury that you have worked in ad publishing,
24 are you?
25       MR. RENARD:  Objection to form.

Page 44

WEINBERG, Ph.D.
1
2    A.    No.  I have definitely not
3 worked in ad publishing.  The way the
4 question was asked was publishers.  I
5 believe that many companies are publishers,
6 and I may not have known whether they were
7 publishers or not when I was working with
8 them.
9    Q.    But we are here talking about
10 how ad publishers, among other things, sell
11 space on their websites for ads, right?
12       MR. RENARD:  Objection to form.
13    A.    That is one of the things we
14 are talking about, yes.
15    Q.    And in that sense you have
16 never worked in ad publishing, you have
17 never had to prepare a marketing campaign,
18 sell ad space on a website, you have not
19 done any of that?
20    A.    That is correct.
21    Q.    Same question about ad buyers,
22 you have never worked as an ad buyer, have
23 you?
24    A.    I have never worked on ad
25 buying.  I'm, again, making just the same

Page 45

WEINBERG, Ph.D.
1
2 clarification, I don't know whether any
3 companies I have worked for also buy ad
4 space, but I have never worked on ad
5 buying, which I think was the intent of the
6 question.
7    Q.    So you have never had to advise
8 or decide how to go about buying an ad on
9 an ad exchange?
10    A.    That is correct.
11    Q.    And you have never used any ad
12 buying tools; is that right?
13    A.    That's correct.
14    Q.    And you have written no
15 peer-reviewed or published scholarship
16 about ad publishers, have you?
17    A.    I have written several
18 peer-reviewed papers on auction --
19    Q.    Show me which ones on your
20 resumé.
21       MR. RENARD:  Were you finished
22 with your answer, Professor Weinberg?
23 If you weren't, please continue.
24    A.    Yes, I was just going to
25 clarify that those papers are on auction

12 (Pages 42 - 45)

1           WEINBERG, Ph.D.
2   theory as it applies to ad auctions, and
3   the seller in those would be publishers.
4       Q.    Which papers, please?
5       A.    Sure.  So Settling the
6   Competition Complexity of Additive Buyers
7   of --
8       Q.    Which date is that, sir?
9       A.    That is 2024.  I'm on page --
10  the first page of my publications in my CV.
11  Sorry, the pages aren't labeled, but it is
12  the third from the front page.  So it is
13  labeled as DRWX 24 on my CV.
14      Q.    Okay.
15      A.    And just to finish saying the
16  title, this was Settling the Competition
17  Complexity of Additive Buyers of
18  Independent Items.  The next one is on the
19  following page labeled CWWZ 23, Selling to
20  Multiple No-Regret Buyers.  Another example
21  is on the following page labeled PSW 22, On
22  Infinite Separations Between Simple and
23  Optimal Mechanisms.  Right below that is
24  CCFPW 22, Optimal Item Pricing in
25  Combinatorial Auctions.

1           WEINBERG, Ph.D.
2           Below that is EFW 22, Credible,
3   Strategyproof, Optimal, and Bounded
4   Expected-Round Single-Item Auctions for All
5   Distributions.  Below that is EW 21, On
6   Symmetries in Multi-Dimensional Mechanism
7   Design.  Below that, sorry, on the next
8   page, is FW 20, Credible, Truthful and
9   Two-Round (Optimal) Auctions via
10  Cryptographic Commitments.  Below that is
11  DGSSW 20, Optimal Mechanism Design for
12  Single-Minded Agents.  Below that is CW 20,
13  On the (in)-approximability of Bayesian
14  Revenue Maximization for a Combinatorial
15  Buyer.
16          MR. RENARD:  Professor, in
17      reading those article names, if you
18      will go slow enough that Todd, our
19      court reporter, gets it down, because
20      sometimes people speed up when they
21      read.
22          THE WITNESS:  Sure.
23      A.    On the next page is KMSSW 19,
24  Approximation Schemes for a Buyer with
25  Independent Items via Symmetries.  Below

1           WEINBERG, Ph.D.
2   that is PSW 19, Smoothed Analysis of
3   Multi-Item Auctions with Correlated Values.
4   Next on the same page is BW 19, Optimal
5   (and Benchmark-Optimal) Competition
6   Complexity for Additive Buyers over
7   Independent Items.  On the same page it is
8   labeled GW 18 and GW 21, The Sample
9   Complexity of up-to Epsilon
10  Multi-Dimensional Revenue Maximization.
11          On the same page is BMSW 18,
12  Selling to a No-Regret Buyer.  On the same
13  page is SSW 18, The Menu Complexity of
14  "one-and-a-half-dimensional' Mechanism
15  Design.  Below that is DW 17, The Optimal
16  Mechanism for Selling to a Budget
17  Constrained Buyer: The General Case.  Below
18  that is EFFTW 17b and EFFTW 21, A Simple
19  and Approximately Optimal Mechanism for a
20  Buyer with Complements.  Below that is
21  EFFTW 17a, The Competition Complexity of
22  Auctions: A Bulow-Klemperer Result for
23  Multi-Dimensional Bidders.
24          On the next page is CDW 16 and
25  CDW 21, A Duality Based Unified Approach to

1           WEINBERG, Ph.D.
2   Bayesian Mechanism Design.  On the same
3   page is RW 15 and RW 18, Simple Mechanisms
4   for a Subadditive Buyer and Applications to
5   Revenue Monotonicity.  Below that is DDW
6   15, DDW 18, Revenue Maximization and
7   Ex-Post Budget Constraints.
8           On the next page is BILW 14,
9   BILW 20, A Simple and Approximately Optimal
10  Mechanism for an Additive Buyer.  The same
11  page is CDW 13b, Understanding Incentives:
12  Mechanism Design Becomes Algorithm Design.
13  Below that, CDW 13a, Reducing Revenue to
14  Welfare Maximization:  Approximation
15  Algorithms and Other Generalizations.
16  Below that, ADMW 13, Optimal and Efficient
17  Parametric Auctions.
18          On the next page, CDW 12b,
19  Optimal Multi-Dimensional Mechanism Design:
20  Reducing Revenue to Welfare Maximization.
21  Below that, DW 12, Symmetries and Optimal
22  Multi-Dimensional Mechanism Design.  Below
23  that, An Algorithmic Characterization of
24  Multi-Dimensional Mechanisms.  And then the
25  last one is the BCKW 10, BCKW 15, Pricing

13 (Pages 46 - 49)

Page 50

WEINBERG, Ph.D.
1    WEINBERG, Ph.D.
2  Randomized Allocations.
3         And just to wrap up, I will
4  repeat that these papers all concern
5  auction theory from the perspective of a
6  seller, and the theory in these papers
7  would apply to ad auctions, and the seller
8  in these papers would be the publisher.
9         MR. RENARD:  Ms. Patrick, we
10     have been going --
11        MS. PATRICK:  Let me just
12     finish this topic.
13        MR. RENARD:  Whenever you are
14     at a convenient breaking point.
15     Q.   Professor, I want to go back
16  and ask you my question, because my
17  question was not whether you had written
18  about auction theory, my question was
19  whether you have peer-reviewed or published
20  scholarship related specifically to
21  consideration of the behavior of ad buyers?
22        MR. RENARD:  Objection to form.
23     A.   I think the question --
24     Q.   I'm sorry, I will just read
25  you -- let me strike that.

Page 51

1    WEINBERG, Ph.D.
2         My question to you was you have
3  written no peer-reviewed or published
4  scholarship about ad publishers, have you?
5  Do any of these papers specifically mention
6  ad publishers, sir?
7     A.   So all of the papers I listed
8  consider auctions from the perspective of a
9  revenue-maximizing seller, which would be
10  relevant to ad auctions where the publisher
11  is the seller.  The papers do not use the
12  term "publisher" in them.
13     Q.   So none of these papers
14  considers a specific example of an ad
15  publisher, true?
16     A.   The papers use ad auctions as a
17  motivating example.  They do not use the
18  term "publisher."
19     Q.   And which specific papers use
20  ad auctions as motivating examples?
21     A.   I do not recall exactly which
22  papers use ad auctions as a motivating
23  example.  All of those papers could use ad
24  auctions as a motivating example because
25  they all apply to ad auctions.

Page 52

1    WEINBERG, Ph.D.
2     Q.   I understand your assertion
3  they apply, sir.  My question is different.
4  Do you understand my question?
5     A.   I believe I understood your
6  question.
7     Q.   And my question was which
8  specific papers use ad auctions as
9  motivating examples, and your answer is you
10  can't tell me any, right?
11     A.   My answer is I don't recall
12  without seeing the text of each paper which
13  ones it is that explicitly state it as a
14  motivating example, that's correct.
15     Q.   And do any of them consider ad
16  buyers specifically?
17        MR. RENARD:  Objection to form.
18     A.   So all of them apply to ad
19  buyers by the same reasoning that the
20  theory applies to ad auctions where the
21  buyers would be the ad buyers.  Again, I
22  don't believe the papers use the phrase "ad
23  buyer" in them.
24     Q.   So to be clear, none of the
25  papers that you just listed describes or

Page 53

1    WEINBERG, Ph.D.
2  discusses ad buyers specifically, true?
3     A.   Many of them would use ad
4  auctions as a motivating example and may
5  discuss ad buyers.  If it is helpful, I'm
6  comfortable saying that they do not make a
7  special point of discussing ad buyers as
8  different than other forms of buyers, if
9  that's what you are looking for.
10     Q.   And can you confirm that in
11  each of the cases and papers that you just
12  cited, you are not the principal author of
13  any of them?
14        MR. RENARD:  Objection to form.
15     A.   In mathematical fields, you
16  will notice all of the authors are ordered
17  alphabetically.  There may be only one or
18  two exceptions, and my last name starts
19  with a W, and I believe there was only one
20  example of a paper where my co-author had a
21  later last name.  But the first versus last
22  is not a meaningful distinction in math.
23     Q.   But can you at least answer for
24  my purposes, are you the principal author
25  of all of these papers?

14 (Pages 50 - 53)

WEINBERG, Ph.D.
2    A.    Sure.  For many of them I am
3  the principal author.  For all of them I am
4  a heavily involved author.  I will just
5  give you some examples.
6        For example, BILW 14, BILW 20,
7  I would say I was the principal author.
8  For CDW 13b, CDW 13a, ADMW 13, CDW 12b, I
9  would say I was a co-principal author with
10  the co-author Yang Cai or Pablo Azar on
11  ADMW.  On DW 12 I would say I was the
12  principal author.  On DW 15 I was the
13  principal author.  On DDW 15, DDW 18 I was
14  the principal author.  On RW 15, RW 18 I
15  was a co-principal author with Aviad
16  Rubinstein.  I don't know if there are any
17  examples where I would say I was not a
18  co-principal author.
19    Q.    Okay.
20    A.    Maybe for DRWX 24 I would say
21  that the two students, Emily and Eric, were
22  the co-principal authors.  And for CWWZ 23
23  I would say the students, Linda Cai, Evan
24  Wildenhain and Shirley Zhang were the
25  co-principal authors.  Maybe if it is

WEINBERG, Ph.D.
2  helpful I can summarize.  I tend to be a
3  co-principal author on papers I work on.
4    Q.    Okay, fair enough.
5        MS. PATRICK:  Your counsel has
6    asked for a break, so why don't we take
7    ten minutes and we will come right
8    back.
9        THE VIDEOGRAPHER:  Off the
10    record, 10:25 a.m.
11        (Recess taken.)
12        THE VIDEOGRAPHER:  Back on the
13    record, 10:38 a.m. eastern standard
14    time.
15  BY MS. PATRICK:
16    Q.    Did you have an opportunity to
17  talk with counsel during your break, sir?
18    A.    Yes.
19    Q.    Did they suggest anything in
20  your testimony that we did in the first
21  hour that you needed to change or correct?
22        MR. RENARD:  I will object to
23    that question and instruct you not to
24    answer.
25    Q.    Did you discuss the subject of

WEINBERG, Ph.D.
2  your testimony on the break, sir?
3        MR. RENARD:  You can answer
4    that yes or no.
5    A.    Yes.
6    Q.    And having had that
7  conversation, is there anything that we
8  discussed in the first hour that you feel
9  like you need to correct?
10    A.    No.
11    Q.    All right.  Let's move on.  We
12  were talking about your work in the private
13  sector.  Has any private company paid you
14  to design an auction for them?
15    A.    No company has paid me to
16  design an auction specifically for them.
17    Q.    And just to tie it out, what
18  subjects of your testimony did you discuss
19  with counsel during the break?
20        MR. RENARD:  I will object to
21    that and instruct you not to answer.
22    Q.    You used an "ly" word, which is
23  an adverb.  You said "No company has paid
24  me to design an auction specifically for
25  them."  Has any company paid you to design

WEINBERG, Ph.D.
2  an auction for them?
3    A.    I added the qualifier because
4  while I was Andreessen Horowitz I was paid,
5  and while I was there I was designing
6  auctions.  So I tried to answer the spirit
7  of your question, which is to say I did not
8  write source code.
9    Q.    So fair to say you have not
10  ever been paid to write source code for an
11  auction?
12    A.    I have never been paid to write
13  source code for an auction, correct.
14    Q.    And while you worked on the
15  design of auctions while working at the
16  venture capital firm over the summer, did
17  any of those auctions pertain to potential
18  auctions of display ads?
19    A.    In the same way that my
20  research publications, design auctions,
21  that are applicable to display ads, the
22  work I did there could be applied to
23  display ads.  I think for the spirit of
24  your question, I did not design auctions at
25  the level of detail that were then

Page 58

WEINBERG, Ph.D.

1          WEINBERG, Ph.D.
2 launched.
3     Q.    All right.  Well, I want to be
4 quite specific.  We are here in this case
5 about Google's Ad Exchange, right, you
6 understand that?
7          MR. RENARD:  Objection to form.
8     Q.    In part at least.
9     A.    In part we are here because of
10 Google's Ad Exchange, yes.
11     Q.    And auctions of various types
12 that Google conducted for ads?
13     A.    That is correct, another one of
14 the reasons we are here is because of
15 auctions of various types that Google
16 conducted for ads.
17     Q.    And in the spirit of that
18 question, none of the work you did at
19 Andreessen Horowitz or anywhere else was
20 specifically oriented to designing auctions
21 for the purchase or sale of display ads of
22 any kind, true?
23     A.    Yes.  Maybe I can phrase it as
24 the auctions I designed were not more
25 applicable to ad auctions than other

Page 59

1          WEINBERG, Ph.D.
2 auction domains.
3     Q.    And you weren't specifically
4 asked to work for client X to design a
5 display ad auction, true?
6     A.    Yes, that is true.
7     Q.    Do you hold any patents for
8 auction design?
9     A.    No.
10     Q.    Do you hold any patents at all?
11     A.    No.
12     Q.    Have you ever testified in
13 court before, sir?
14     A.    No.
15     Q.    And so fair to say, then, that
16 you have never been received as an expert
17 by any court in the field of economics?
18     A.    I have not been received prior
19 to this case as an expert in economics,
20 that's correct.
21     Q.    Well, you haven't been received
22 by the Court yet, right, you understand
23 that?
24     A.    Sorry, it is my first time, so
25 I don't know the right language.

Page 60

1          WEINBERG, Ph.D.
2     Q.    You are here to offer opinions
3 as an expert, but you understand the Court
4 is going to decide whether you are
5 qualified to provide them or not, right?
6     A.    Yes, I do understand that.  I
7 just didn't know the appropriate language
8 for the process.
9     Q.    All right.  So now that I have
10 explained that to you, you have never been
11 qualified or permitted to testify in court
12 as an expert on any topic of any kind,
13 true?
14     A.    I have never been permitted to
15 testify by any court on any topic, that is
16 true.
17          (Weinberg Exhibit 4 marked for
18 identification.)
19     Q.    Let's talk a little bit more
20 about your analysis.  Would you look,
21 please, could you identify Exhibit 4 as
22 your errata sheet?
23     A.    Yes, Exhibit 4, yes, Exhibit 4
24 is my errata sheet.
25     Q.    Okay.  And we will talk about

Page 61

1          WEINBERG, Ph.D.
2 that a little bit later.  But I did want to
3 ask you about the materials you reviewed.
4          Could you pull out Exhibit 1 --
5 well, actually, let's look at Exhibit 2
6 because it is more current, which would be
7 your rebuttal report, and could you please
8 look at Exhibit B to that report, or
9 Appendix B.  Are you there?
10     A.    Yes, sorry.
11     Q.    All right.  So Appendix B at
12 the top has a heading that says Materials
13 Relied Upon and Materials Considered.  Do
14 you see that?
15     A.    Yes.
16     Q.    And so you first list materials
17 relied upon, and then in the next section
18 starting at page 2 you list materials
19 considered.  Do you see that?
20     A.    Yes.
21     Q.    What does the word "considered"
22 mean to you, sir?
23     A.    As the word "considered" is
24 used here, it means that I had access to
25 all of this information and that the

Page 62

1        WEINBERG, Ph.D.
2  opinions presented have considered all of
3  the relevant information contained in them.
4      Q.    So I brought a dictionary with
5  me, and you don't have to take my word for
6  it, I will show it to you if you want, you
7  cited the Merriam-Webster Dictionary in
8  some of your footnotes. Do you remember
9  that?
10     A.    Yes, that is correct.
11     Q.    All right. And do you know how
12 Merriam-Webster defines "considered"?
13     A.    No, I do not.
14     Q.    I just want to see if you agree
15 with it or not. If you will look at
16 page -- this is the Merriam-Webster
17 Dictionary. Look at page 265. If I have
18 done it right, you will find it
19 highlighted. If I haven't, you won't.
20 "Considered," got it?
21     A.    Yes, I have read the
22 definition.
23     Q.    All right. And the definition
24 from Merriam-Webster of "considered" is "to
25 observe or think about carefully," right?

Page 63

1        WEINBERG, Ph.D.
2      A.    That is one of the definitions
3  that you have highlighted.
4      Q.    Is that a definition that you
5  accept?
6          MR. RENARD: Objection to form.
7      A.    The definition that I think is
8  best suited for how I used it here would
9  actually be B, which is "to take into
10 account."
11     Q.    Now, in your list of materials
12 considered, when I asked you what that
13 meant originally you said you had access to
14 this information and that the opinions
15 presented have considered all of the
16 relevant information contained in them.
17 Now, take into account, are you following
18 with me so far?
19     A.    Yes.
20     Q.    So in your list of materials
21 considered I counted 138 depositions that
22 you listed in United States against Google,
23 I'm sorry, a total of 138 depositions; is
24 that right? I think you need to look at
25 page 2 of your materials considered, sir.

Page 64

1        WEINBERG, Ph.D.
2      Let's start again. Directing
3  your attention to page 2 under Materials
4  Considered, you have said depositions and
5  transcripts and exhibits. Do you see that?
6      A.    Yes.
7      Q.    And you have listed a total of
8  84 depositions in the State of Texas
9  against Google. Do you see that?
10     A.    Yes.
11     Q.    And you have listed another 54,
12 if I have done my math right in my head,
13 depositions in the United States against
14 Google case. Do you see that?
15     A.    Yes.
16     Q.    Did you read each of those
17 depositions, sir?
18     A.    As stated in the report, I
19 considered all of those depositions.
20     Q.    That was not my question. Did
21 you read them?
22     A.    I read -- I read the ones with
23 information that was relevant.
24     Q.    Who told you which depositions
25 to read that had relevant information?

Page 65

1        WEINBERG, Ph.D.
2          MR. RENARD: Objection to the
3  form of the question.
4      A.    I decided which ones to read.
5  In some cases that was because I recognized
6  the names from other documents that I had
7  seen, and in other cases it was because I
8  just read a lot of depositions.
9      Q.    Okay. So you read some
10 depositions; is that right?
11     A.    Yes.
12     Q.    How did you consider the
13 depositions you did not read?
14     A.    So I'm aware that many of
15 the -- there are many topics in the case
16 and my assignment concerns auction theory,
17 and so for the depositions that did not
18 contain auction theory, I considered them
19 without reading them front to back.
20     Q.    Without reading them at all,
21 right?
22     A.    Sure, that seems fair, without
23 reading them at all.
24     Q.    So how many depositions did you
25 actually read, sir, and which ones?

17 (Pages 62 - 65)

Page 66

1      WEINBERG, Ph.D.
2    A.   I don't remember the exact
3  number off the top of my head.  I would
4  ballpark -- I would ballpark maybe 15 to
5  25.
6    Q.   Can you tell me who, which
7  witnesses?
8    A.   I can tell you some of them
9  that I remember most clearly.  ████████
10  Nirmal Jayaram, both volumes, ██████████
11  ██████  Nitish Korula, all four volumes,
12  ██████████, deposition and exhibits of
13  ██████▌████████████████████████████
14  There are -- there are definitely others,
15  but I don't recall exactly which of these.
16    Q.   So of the, if I count
17  correctly, you said you estimated 15 to 25,
18  but you only identified seven; is that
19  right?
20    A.   Assuming you counted correctly,
21  that sounds right.
22    Q.   Okay.  And of those, the only
23  one that is a potential ad buyer is ██████
24  is that right?
25    A.   I'm going off memory here, but

Page 67

1      WEINBERG, Ph.D.
2  I believe the reason I read ████████
3  ██████ is because it was cited in the
4  Wiggins report as being part of an ad
5  buyer.
6         Maybe let me say what I'm
7  trying to convey is that several of the
8  depositions I read are because they were
9  cited in the Milgrom or Wiggins report as
10  being of ad buyers.  I think that's why I
11  remember the name ██████████████
12    Q.   Okay.  So first you think
13  ████████████ is an ad buyer?
14      MR. RENARD:  Objection to form.
15    A.   What I'm saying is I recognize
16  the name ████████████.  I believe the
17  reason I recognize that name is because her
18  deposition was cited in either the Milgrom,
19  Wiggins or Baye reports as making a claim
20  from the ad buyer's perspective.
21    Q.   All right.  Now, if you read
22  depositions only in response to the
23  Milgrom, Wiggins or Baye reports, is it
24  fair to say that you did not read any
25  depositions before you prepared your first

Page 68

1      WEINBERG, Ph.D.
2  report, Exhibit 1?
3      MR. RENARD:  Objection to the
4    form of the question.
5    A.   The assumption in the question
6  is not correct.  One of the reasons I read
7  depositions was in response to Milgrom,
8  Wiggins and Baye, another reason is because
9  I chose to read them, and some of this I
10  did before the opening report.
11    Q.   Which depositions did you read
12  before the opening report, sir?
13    A.   That I do not recall.  To
14  clarify, what I mean is I don't recall from
15  the depositions which was before, which was
16  after.
17    Q.   And other than ████████████
18  ██████ do you have a memory of reading a
19  deposition by a single ad buyer?
20      MR. RENARD:  Objection to the
21    form of the question.
22    A.   ████████████ and I don't remember
23  why I remember this, but I think I even
24  remember that the name was ████████████.
25    Q.   He is from ████████

Page 69

1      WEINBERG, Ph.D.
2    A.   Again, going from memory --
3  actually, I probably even have a quote from
4  him in my report.  Yes, in footnote 87 I
5  write "Expert Report of S. Wiggins,
6  paragraph 50 ██████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████  And then I say
16  more.
17    Q.   Okay.  So back to my question.
18  Other than ████████████ and ████████
19  of ████ those are the only two people
20  whose depositions you recall being ad
21  buyers?
22      MR. RENARD:  Objection to form.
23    Q.   That you read.
24    A.   Those are the only two I can
25  definitively state are certainly ad buyers

18 (Pages 66 - 69)

Page 70

WEINBERG, Ph.D.
1
2 that I read off the top of my head. I
3 don't recall if there are other -- other ad
4 buyers who I read.
5    Q.    If ▓▓▓▓▓▓▓ is a former
6 Google employee, then there would only be
7 one, right?
8    A.    If I misremembered and
9 ▓▓▓▓▓▓ was not speaking from the
10 perspective of ad buyers, then Nike is the
11 only example I gave, that's correct.
12    Q.    My question, sir, to be
13 precise, was whether you had read the
14 depositions of any ad buyers, actual
15 buyers.
16        MR. RENARD:  Objection to the
17    form of the question.
18    Q.    And what I hear you saying is
19 the only ad buyer deposition you read was
20 of Nike; is that true?
21    A.    That is not true.  What I'm
22 saying is that ▓▓▓ is the only one that I
23 can confidently state is an ad buyer among
24 those that I read.
25    Q.    Do you think you read other ad

Page 71

WEINBERG, Ph.D.
1
2 buyer depositions, sir, or are you just
3 guessing?
4        MR. RENARD:  Objection to the
5    form.
6    A.    I think I read other
7 depositions of other ad buyers.
8    Q.    All right.  So what I'm going
9 to do is I'm going to leave a blank in your
10 deposition here and I would like you to
11 list in your errata sheet the specific
12 depositions of ad buyers that you read
13 before you prepared either your opening
14 report or your rebuttal report.  Okay?
15        MR. RENARD:  Before you answer
16    that question, we will take that under
17    advisement, but we are making no
18    commitments right now to fill in blanks
19    in a deposition.
20    Q.    Do you understand what I'm
21 going to do?  You can decide whether you
22 are going to be complete in your answer or
23 not.  Okay?
24        MR. RENARD:  I object to the
25    argument there.  We will take it under

Page 72

WEINBERG, Ph.D.
1
2 advisement.
3    Q.    All right.  And of the
4 depositions on your list there, sir, how
5 many were of publishers?
6    A.    I don't recall.
7    Q.    Do you recall reading any
8 depositions of publishers?
9    A.    I don't recall.
10    Q.    Don't recall means -- I don't
11 recall has two meanings in my mind, so let
12 me press you.  I don't recall means I don't
13 recall whether I did or I didn't, or no, I
14 don't remember doing that.  What are you
15 saying?
16        MR. RENARD:  I object to the
17    form of the question.
18    A.    I'm saying the former, I don't
19 recall whether I did or did not read
20 depositions of publishers.
21    Q.    So as you sit here today, you
22 cannot tell me that you read a deposition
23 of any publisher, true?
24        MR. RENARD:  Objection to the
25    form.

Page 73

WEINBERG, Ph.D.
1
2    A.    As I sit here today, I can say,
3 for example, I'm confident I read the
4 deposition of Disney.  I believe that part
5 of their deposition was from the
6 perspective of a publisher.  But I don't
7 recall whether it was from the publisher
8 perspective or exchange perspective.  And
9 as I'm trying to remember from others on
10 this list, yeah, I cannot confidently state
11 I certainly read a deposition of a
12 publisher, but I believe that I did.
13    Q.    Okay.  And the one that is
14 possible is Disney; is that right?
15    A.    To clarify, one that I
16 certainly read and is possibly from a
17 publisher perspective is Disney.
18    Q.    Right.  And so what you mean by
19 that is you know you read the Disney
20 deposition, but Disney also runs an ad
21 exchange, right?  Is that what you mean?
22    A.    What I mean by that is I
23 remember why I was interested in the Disney
24 deposition, and I do not recall whether
25 that was from the publisher or exchange

19 (Pages 70 - 73)

Page 74

WEINBERG, Ph.D.

1          WEINBERG, Ph.D.
2  perspective.  I am not stating that Disney
3  ran an exchange.
4      Q.    How would Disney be from the
5  exchange perspective in your mind?
6          MR. RENARD:  Objection to form.
7      A.    So in paragraph 449(a) of my
8  rebuttal report, I will read the beginning
9  part of that paragraph.  It says

[text redacted]

This similarity is
20  superficial (which would not be surprising,
21  as it would be quite challenging for one
22  program to be similar to both EDA and RPO)
23  and satisfies neither of the two elements."
24          So what I remember is reading
25  the Disney deposition carefully to

Page 75

1          WEINBERG, Ph.D.
2  understand

[text redacted]

16      Q.    All right.  And so am I hearing
17  you correctly that you did not read the
18  Disney deposition until Dr. Milgrom cited
19  it?
20      A.    Yes, that is correct.
21      Q.    Okay.  So in preparing your
22  initial report, then, we can be relatively
23  confident that you did not read any
24  publisher deposition before you prepared
25  your first report, Exhibit 1?

Page 76

1          WEINBERG, Ph.D.
2          MR. RENARD:  Objection to form.
3      A.    I am not confident of that, no.
4      Q.    But you can't tell me today as
5  you sit here that you read any publisher
6  deposition before you prepared Exhibit 1,
7  right?
8      A.    I cannot tell you a specific
9  deposition that I am confident is a
10  publisher and that I am confident I read
11  before producing my opening report.
12      Q.    And in your opening report, if
13  we look at it, it has the same list of
14  materials considered, doesn't it, when it
15  comes to depositions?
16      A.    From a quick look it appears to
17  be the same list.  It has the same number
18  and it has the same number in each category
19  and it passes a quick spot check.
20      Q.    All right.  So at least as it
21  pertains to your opening report, when you
22  said you considered, among others, the
23  deposition of Disney, you had not in fact
24  read the deposition of Disney before your
25  opening report, true?

Page 77

1          WEINBERG, Ph.D.
2      A.    Yes, and I can clarify the
3  reason for that, is that the content of the
4  Disney report was used to support an
5  opinion of the rebuttal report.
6      Q.    My question, sir, was your
7  opening report says you had considered the
8  deposition of Disney but you had not in
9  fact read it at that time, true?
10      A.    Yes, that is correct, and I'm,
11  again, clarifying that it was considered
12  still.
13      Q.    You knew it existed?
14      A.    Yes, I did know it existed.
15      Q.    But in terms of observing and
16  thinking about it carefully, the dictionary
17  definition we used earlier, or taking it
18  into account, your preferred definition,
19  you had not actually read the Disney
20  deposition even though you listed it as
21  considered before you prepared your first
22  report, true?
23          MR. RENARD:  Objection to form.
24      A.    So I will again note that for
25  the dictionary definition that I said was

20 (Pages 74 - 77)

Page 78

1        WEINBERG, Ph.D.
2 most relevant in this context was taken
3 into account, that the report was taken
4 into account for the report.
5    Q.    The fact that there was a
6 deposition of Disney was taken into
7 account, but you did not review or consider
8 its contents, true?
9    A.    I did not review the contents.
10 The opinions in my report are taken in
11 consideration of those contents.
12    Q.    Mr. Weinberg, I'm having some
13 trouble here.  How do you consider
14 something that you haven't read?  Is this
15 like Carnac the Magnificent, that you hold
16 it up and you hold it up to your head and
17 say I have considered it?
18        MR. RENARD:  I object to the
19    form of the question.
20    Q.    You understand my point?
21        MR. RENARD:  I object to the
22    statement to the witness.  Do you have
23    a question?
24        MS. PATRICK:  That is my
25    question.

Page 79

1        WEINBERG, Ph.D.
2        MR. RENARD:  With all the
3    preface?
4        MS. PATRICK:  Yes.
5        MR. RENARD:  I object to all
6    that, move to strike it.
7    A.    The opinions in the report are
8 in consideration of the information that is
9 in what I have cited in the materials
10 considered list.  I would stand by that
11 statement.
12    Q.    All right.  But the information
13 in the list is only the fact that Disney
14 gave a deposition, right?
15    A.    The information you would get
16 from reading the materials considered list
17 is only the fact that Disney gave a
18 deposition.
19    Q.    And in preparing your report,
20 you did not in any way in your opening
21 report take into account the testimony of
22 the Disney witness because you had not read
23 that testimony, true?
24    A.    No, I wouldn't say that.
25    Q.    So you took into account the

Page 80

1        WEINBERG, Ph.D.
2 fact that Disney had been deposed but not
3 what Disney's witness said because you had
4 not read it, true?
5    A.    What I'm saying is that the
6 opinions that are in the opening report
7 have taken into account the contents, and
8 the opinions -- the opinions are not
9 impacted -- the opinions do not need to be
10 impacted or changed in any way due to
11 contents in the material considered list.
12    Q.    How do you take into account
13 the content of a deposition if you don't
14 read it, sir?
15    A.    So when forming an opinion,
16 there is some information I need and there
17 is some information that may not be
18 relevant to the opinions I'm forming, and
19 so it is possible to have an opinion that
20 has considered information that would not
21 influence that opinion.
22    Q.    You just said your opinions are
23 not impacted and do not need to be impacted
24 or changed in any way due to contents in
25 the material considered list, right?

Page 81

1        WEINBERG, Ph.D.
2        MR. RENARD:  Objection to the
3    form of the question.
4    A.    Could you repeat the quote one
5 more time?
6    Q.    Yeah.  I will read it exactly.
7 I can show it to you if you would like.  Do
8 you want to look at it?
9    A.    Maybe that's safer.
10    Q.    Okay.
11    A.    Would you like me to just
12 reread the answer?
13    Q.    You can.
14    A.    Or could you remind me what the
15 question is?
16    Q.    My question was, is it the
17 case, then, that your opinions are not
18 changed or affected by the content of any
19 testimony?
20        MR. RENARD:  Objection to the
21    form.
22    A.    The opinions in the opening
23 report are not changed by the content of
24 the Disney testimony, that's correct.
25    Q.    And the opinions in the opening

21 (Pages 78 - 81)

Page 82

1    WEINBERG, Ph.D.
2  report would not change or be changed by
3  the content of the testimony of any ad
4  publisher, would they?
5        MR. RENARD:  Objection to the
6    form.
7    A.    I mean, the opinions would not
8  change because I was thorough in forming
9  them and cited all of the evidence
10  necessary to confirm that everything is
11  correct.  Short of someone saying that the
12  stuff I looked at was fraudulent and false
13  I don't know how the opinions would change.
14    Q.    Well, let's be quite precise,
15  sir.  You formed your opinions, you say, in
16  consideration of the materials on the list,
17  but we have established that your opening
18  report would not be changed by the content
19  of any ad buyer's testimony, true?
20        MR. RENARD:  Objection to the
21    form of the question.
22    A.    Sorry, could you just repeat
23  one more time?
24    Q.    Does it matter to your report
25  at all, Professor Weinberg, what any ad

Page 83

1    WEINBERG, Ph.D.
2  buyer testified to?
3    A.    Ad buyer testimony could have
4  strengthened my opinions maybe.  Ad buyer
5  testimony could have been one source of
6  information if you were unable to get that
7  information from another source.  Those are
8  two ways I can think of.  But I was able to
9  get the information I needed from the
10  sources I directly cited and relied upon.
11    Q.    So it could have been the case
12  that an ad buyer's testimony might affect
13  your report, but as you sit here you cannot
14  tell the jury that the testimony of any ad
15  buyer actually impacted your report in any
16  way, true?
17        MR. RENARD:  Objection to form.
18    A.    Could you rephrase -- sorry, I
19  don't need you to rephrase, could you just
20  repeat the question?
21    Q.    It could have been the case
22  that an ad buyer's testimony might affect
23  your report, but as you sit here you cannot
24  tell the jury that the testimony of any ad
25  buyer actually impacted your report in any

Page 84

1    WEINBERG, Ph.D.
2  way, true?
3        MR. RENARD:  Same objection.
4    A.    I would slightly rephrase it
5  as -- I would rephrase it as the testimony
6  of an ad buyer could have been additional
7  evidence to support the opinions that I
8  already have evidence for, and the actual
9  question that at the same time testimony of
10  ad buyers did not impact my opinions
11  because I already had sufficient evidence
12  without ad buyer testimony.
13    Q.    So the testimony of ad buyers
14  could have supported your opinions, but
15  that's only if the ad buyer agreed with
16  you, right?
17        MR. RENARD:  Objection to the
18    form of the question.
19    A.    I don't know that an ad buyer
20  would agree or disagree with a conclusion
21  of auction theory.  What I meant was for
22  the evidence from which I draw conclusions,
23  that evidence could be -- that that
24  evidence was supported from the sources
25  that I directly cited and some of that

Page 85

1    WEINBERG, Ph.D.
2  evidence could have been additionally drawn
3  from ad buyer testimony.
4    Q.    Okay.  But my point is you
5  cannot tell the jury as you sit here today
6  that the testimony of any ad buyer actually
7  impacted your report in any way?
8    A.    With the same caveat, the
9  testimony of ad buyers could have been
10  additional evidence to opinions that are
11  already supported by existing evidence, but
12  because I got that evidence from other
13  sources the testimony of ad buyers did not
14  directly influence my opinions.
15    Q.    So to state it directly, the
16  testimony of ad buyers did not directly
17  influence any of the opinions in your
18  report, true?
19    A.    I am repeating the caveats
20  because I think the caveat is important,
21  that there are instances where I had
22  sufficient evidence for my opinions and
23  testimony from ad buyers could have been
24  additional sources of evidence.  Because I
25  already had sufficient evidence from other

WEINBERG, Ph.D.

1        WEINBERG, Ph.D.
2   sources, the testimony of ad buyers did not
3   directly impact my conclusions in the
4   opening report.
5       Q.   Sir, I understand you believe
6   you had sufficient evidence.  The jury is
7   going to have to decide whether they agree
8   with you.  Do you understand that?
9           MR. RENARD:  Objection to the
10      form of the question.
11      A.   Yes, I understand that the jury
12  will ultimately decide whether they trust
13  my opinions or not.
14      Q.   And if the jury believes it is
15  important to consider what ad buyers
16  actually said, you can't tell them that in
17  preparing your report you did that?
18          MR. RENARD:  Objection to the
19      form of the question.
20      A.   If the jury were to ask me
21  that, I would repeat the same caveats,
22  which is that there are instances where ad
23  buyer testimony could have provided
24  additional evidence to support conclusions
25  I drew in my opening report, and I would

1        WEINBERG, Ph.D.
2   ask them -- or I would explain to them why
3   the evidence that I already had I
4   considered to be sufficient, and then I
5   would honestly answer the question that
6   because of that the direct testimony of ad
7   buyers did not directly influence opinions
8   in my opening report.
9       Q.   And in fact as you sit here
10  today you can't remember whether you read
11  any testimony of any ad buyers before you
12  did your opening report, true?
13          MR. RENARD:  Objection to form.
14      A.   Yes, I do not recall
15  definitively whether I read testimony of ad
16  buyers before submitting my opening report.
17      Q.   And true or false, you don't
18  remember definitively whether you read the
19  deposition of any publisher before you
20  prepared your opening report?
21      A.   That is also correct, I do not
22  recall definitively whether I read the
23  deposition of a publisher before preparing
24  the opening report.
25      Q.   It is not listed in your

1        WEINBERG, Ph.D.
2   report, but just to confirm, you also never
3   interviewed any individual ad buyer, did
4   you?
5       A.   No, I did not.
6       Q.   And you never interviewed any
7   individual ad seller, did you?
8       A.   No, I did not.
9       Q.   And you have never spoken to
10  any Google employee, have you?
11      A.   I have not spoken directly to a
12  Google employee in any matter related to
13  this case.
14      Q.   All right.  And how about
15  employees of other ad exchanges, have you
16  talked to any of them or interviewed any of
17  them?
18      A.   Again, I have not talked to any
19  of them directly related to this case.
20      Q.   And you don't list any
21  interviews of witnesses as materials you
22  considered or relied on, so it's fair to
23  say I'm not going to hear you testify about
24  that at the trial, right?
25          MR. RENARD:  Objection to the

1        WEINBERG, Ph.D.
2       form of the question.
3       Q.   In your materials considered,
4   sir, I don't see that you conducted any
5   personal interviews with any witness; is
6   that true?
7       A.   Yes, that is correct, I did not
8   conduct any personal interviews with any
9   witnesses.
10      Q.   And so you don't expect to tell
11  me at the trial about somebody you talked
12  to that you didn't mention in your report,
13  true?
14          MR. RENARD:  Objection to the
15      form of the question.
16      A.   Yes, I do not expect to testify
17  at trial by telling you about an interview
18  that is not listed in either of these
19  reports.
20      Q.   In the materials considered,
21  you understand here that the states are
22  suing Google under various deceptive trade
23  practices statutes, do you know that?
24      A.   Yes.
25      Q.   And you also know they are

23 (Pages 86 - 89)

Page 90

1        WEINBERG, Ph.D.
2  suing Google under various antitrust
3  statutes?
4        A.    Yes.
5        Q.    Did you read or inform yourself
6  of the requirements of those statutes in
7  connection with preparing your report here?
8        A.    Not in detail, since I'm not
9  providing a legal opinion.
10        Q.    My question was not whether you
11  did that in detail.  My question was did
12  you inform yourself of the requirements of
13  those statutes or read them in connection
14  with preparing your report?
15        A.    I did not read the statutes as
16  standalone -- I did not do standalone
17  reading of the statutes, no.
18        Q.    So you are opining here without
19  knowing as to any particular statute what
20  actually constitutes a violation of the
21  statute, true?
22        MR. RENARD:  Objection to the
23     form of the question.
24        A.    So just to be clear, none of my
25  opinions are alleging a violation of any

Page 91

1        WEINBERG, Ph.D.
2  statute.  It is my understanding that other
3  experts may be using claims in my report as
4  the basis to allege violations.
5        Q.    Which other experts?
6        MR. RENARD:  Objection to the
7     form.
8        A.    So I am aware that Mr. Andrien
9  uses claims in my report as a basis to
10  allege violations of the DTPA.
11        Q.    Have you spoken with
12  Mr. Andrien?
13        A.    Yes.
14        Q.    How many times?
15        A.    Once.
16        Q.    When?
17        A.    I don't recall the exact date.
18  Maybe a month ago.
19        Q.    What did he tell you?
20        MR. RENARD:  I'm going to
21     object to that under the Court's order
22     regarding experts, and I will instruct
23     you not to answer the question.
24        Q.    All right.  So you are not
25  yourself alleging a violation of any

Page 92

1        WEINBERG, Ph.D.
2  statute, right?
3        A.    That's correct.
4        Q.    And are you aware, for example,
5  whether a court has ruled -- oh, also, are
6  you quantifying in your report in any way
7  the amount of harm caused to any ad buyer?
8  I mean a specific ad buyer.
9        A.    No, I am not in my report
10  quantifying the amount of harm caused to a
11  specific ad buyer, that's correct.
12        Q.    And are you quantifying in your
13  report the amount of harm caused to any
14  specific publisher?
15        A.    That is also correct -- I'm
16  sorry, you didn't make an assertion.  I am
17  not in my report quantifying the harm to
18  any specific publisher.
19        Q.    And do you know of your own
20  knowledge whether, for example, a court in
21  Mississippi has ruled that the Mississippi
22  statute does not permit the imposition of
23  penalties without proof of harm?
24        MR. RENARD:  Objection to the
25     form of the question.

Page 93

1        WEINBERG, Ph.D.
2        A.    I am not familiar with the
3  Mississippi statute as it pertains to DTPA.
4        Q.    Or whether any statute requires
5  proof of harm to establish a violation?
6        MR. RENARD:  Objection to the
7     form.
8        A.    Yes, I think that's fair, I'm
9  not -- I'm generally not particularly
10  familiar with the statutes since my
11  understanding is my opinions are used by
12  Mr. Andrien as a basis to allege
13  violations, but I myself am not dealing
14  with that.
15        Q.    So just to be perfectly
16  precise, you have not determined how many,
17  if any, violations of a particular consumer
18  protection or DTPA statute occurred in any
19  state, right?
20        A.    That is correct.  I will just
21  repeat the same caveat, which is that my
22  understanding is that my opinions are used
23  as a basis for someone who is doing that.
24  But that is correct, that I myself am not
25  doing that.

24 (Pages 90 - 93)

Page 94

WEINBERG, Ph.D.

1  WEINBERG, Ph.D.
2    Q.    And, sir, I'm not asking you
3  what Mr. Andrien is doing.  He is going to
4  account for himself when he is deposed. I'm
5  asking you specifically have you determined
6  how many violations of a deceptive trade
7  practices act occurred in any particular
8  state?
9        MR. RENARD:  I object to the
10    form of the question.
11    A.    No, my report does not attempt
12  to count a number of violations.
13    Q.    And the number of violations
14  that might have occurred, therefore, is not
15  in your view a relevant issue for you?
16        MR. RENARD:  Objection to the
17    form of the question.
18    A.    Maybe if it is helpful, I can
19  repeat my assignment and then answer your
20  question.
21        So this is stated on page 7 of
22  my opening report, in paragraph 1, I will
23  just read the whole thing.  "I have been
24  engaged by the counsel for the Office of
25  Texas Attorney General, on behalf of all

Page 95

1  WEINBERG, Ph.D.
2  Plaintiff States in the case, to analyze
3  several changes made to the auctions for
4  online displayed ads under the conducts
5  undertaken by Google."
6        In particular, I have been
7  asked to opine on "How the conducts
8  undertaken by Google (including Dynamic
9  Allocation, Dynamic Revenue Sharing,
10  Project Bernanke, Unified Pricing Rules and
11  Reserve Price Optimization) change the
12  auction procedure from an auction theory
13  perspective, and how the resulting changes
14  to auction procedures impact outcomes (such
15  as revenue, fill rate, price, payoff, win
16  rate) for various actors in the auctions
17  for online display ads (including
18  publishers, advertisers, exchanges, ad
19  buying tools.)"
20        And so as a result it is not
21  relevant to that assignment to directly
22  engage with statutes on deception.
23        MS. PATRICK:  Objection,
24    nonresponsive.
25    Q.    My question, sir, was the

Page 96

1  WEINBERG, Ph.D.
2  number of violations that might have
3  occurred, therefore, is not in your view a
4  relevant issue for you and your report, I
5  take it the answer to my question is not
6  relevant?
7    A.    Sorry, I had forgotten the
8  question.  I will just say yes, and maybe I
9  will quickly summarize that it is because
10  my assignment was to understand how the
11  conducts changed the auction procedure from
12  an auction theory perspective and how the
13  resulting changes impact outcomes.
14    Q.    So we're not going to hear you
15  at trial testify to a number of violations
16  or that this or that action of Google
17  violated the statutes, are we?
18        MR. RENARD:  Objection to the
19    form of the question.
20    A.    I have no intention of
21  testifying at trial about a number of
22  violations that have occurred, nor making
23  claims that involve legal reasoning about
24  the statutes, that's correct.
25    Q.    Or about whether any particular

Page 97

1  WEINBERG, Ph.D.
2  action of Google violated any statute?
3        MR. RENARD:  Objection to the
4    form of the question.
5    A.    So I will again repeat the
6  caveat that my understanding is that my
7  opinions may be used as a basis for other
8  claims, but I myself will not be directly
9  making those claims.
10    Q.    Thank you.  All right, so let's
11  talk -- we have been going about an hour.
12  Do you want a break or do you want to keep
13  going?
14        MR. RENARD:  If this is a good
15    stopping point for you, it has been a
16    little over an hour.
17        MS. PATRICK:  Sure.  I'm happy
18    to stop whenever.
19        THE WITNESS:  Let's do that
20    then.
21        MS. PATRICK:  So we will come
22    back -- what time do you normally eat
23    lunch sir?
24        THE VIDEOGRAPHER:  Let me just
25    take us off before we get into this.

25 (Pages 94 - 97)

Page 98

1          WEINBERG, Ph.D.
2      Off the record 11:42 a.m.
3          (Recess taken.)
4          THE VIDEOGRAPHER:  We are back
5      on the record, 11:56 a.m.
6  BY MS. PATRICK:
7      Q.    Professor, did you have a
8  chance to talk with your counsel on the
9  break?
10     A.    Yes.
11     Q.    Did you discuss your testimony?
12     A.    Yes.
13     Q.    Is there anything you feel like
14  you need -- did they ask you or suggest
15  that you should correct anything in the
16  last hour that we discussed?
17     A.    No.
18     Q.    What specifically did you
19  discuss about your testimony during the
20  break?
21         MR. RENARD:  I will object to
22      that and instruct you not to answer.
23     Q.    Let's look at your September
24  report, your rebuttal report, paragraph 56.
25  You know, Professor, if you want, I have

Page 99

1          WEINBERG, Ph.D.
2  clean spiral-bound copies and I can give
3  you those so you don't have to flip pages.
4  Would you prefer?
5      A.    I'm happy to use either.
6      Q.    Well, I have these.
7      A.    Ooh, yeah.
8      Q.    Let's proceed.  So paragraph 56
9  of your September report, do you see that?
10     A.    Yes, I do.
11     Q.    All right.  And I'm going to
12  read that into the record and then we are
13  going to start having some conversation
14  about this, all right?
15         So paragraph 56, read along
16  with me, says "Using the Wiggins Report
17  Proposition, the Wiggins Report then
18  attempts to rebut the Andrien Report's
19  claim ('Deceptive Conduct Total Impact
20  Framework' or 'DTCI Framework') - which
21  relies on my Opening Report - that every
22  auction is affected by Google's Deceptive
23  Conduct ('Element A'), and (B) the impact
24  of that deception affects all revenue from
25  Google's display ad auctions ('Element

Page 100

1          WEINBERG, Ph.D.
2  B')."
3          Do you see that?
4      A.    Yes, I do.
5      Q.    Now, just to be clear, the
6  deceptive conduct total impact framework is
7  Mr. Andrien's framework; is that right?
8      A.    I would say that is the --
9  that's the framework he uses.  I don't know
10  whether he possesses or created that
11  framework, but that was the framework he
12  uses.
13     Q.    Okay.  But it's not your
14  framework?
15     A.    I don't know that I would call
16  it my framework or his framework.  It is a
17  framework.
18     Q.    Well, the framework appears,
19  according to paragraph 56, in the Andrien
20  report, right?
21     A.    Yes, that's correct.
22     Q.    And he claims you say -- it
23  says there that, (A), every auction is
24  affected by Google's deceptive conduct,
25  that's from your opening report, right?

Page 101

1          WEINBERG, Ph.D.
2      A.    Sorry, can you repeat the
3  question?  I'm going to parse it slowly.
4      Q.    I'm just reading from your
5  paragraph 56.  You say "Mr. Andrien relies
6  on my opening report."  Do you see that?
7      A.    Yes.
8      Q.    That, (A), so is the language
9  that comes after (A) your opinion or
10  Mr. Andrien's opinion?
11     A.    The language that comes after
12  (A), which says "every auction is affected
13  by Google's deceptive conduct," is my
14  opinion.
15     Q.    All right.  And what about the
16  language that comes after (B), is that your
17  opinion or Mr. Andrien's?
18         MR. RENARD:  I object to the
19      form.
20     A.    The language that comes after
21  Element B is not an opinion contained in my
22  reports because I do not -- it's not part
23  of my assignment.  I do not quantify.
24     Q.    Okay.  So you have no opinion
25  and have expressed none that the impact of

26 (Pages 98 - 101)

Page 102

WEINBERG, Ph.D.

1          WEINBERG, Ph.D.
2 deception affected all revenue from
3 Google's display ad auctions, true?
4     A.    I have opinions that might form
5 a basis for that, but that is not my own
6 stated opinion.
7     Q.    You understand Mr. Andrien is
8 relying for opinions of yours to make that
9 determination?
10         MR. RENARD:  Objection to form.
11    A.    I understand that Mr. Andrien
12 is relying on my report, and I understand
13 that Element B is one of his
14 determinations, and I understand that
15 opinions in my report could be used as a
16 basis to conclude Element B.
17    Q.    But Element B is not your own
18 conclusion?
19    A.    That is correct.  Element B is
20 not my own conclusion.
21    Q.    And you have not, and do not
22 expect to, quantify the extent to which
23 deception affected any or all of Google's
24 revenues, true?
25    A.    I do not intend to express an

Page 103

1          WEINBERG, Ph.D.
2 opinion quantifying the damages related to
3 deceptive conduct, that's correct.
4     Q.    Or the amount of revenue that
5 was affected by deceptive conduct, right?
6     A.    That is correct, yes.
7     Q.    Now, Mr. Andrien, I checked
8 during the break, your interview with
9 Mr. Andrien, by the way, Mr. Andrien is a
10 Mr., right, he is not a professor or
11 doctor?
12    A.    I believe that is correct.
13    Q.    And according to Mr. Andrien's
14 report, your interview with him, which was
15 the only time you have spoken to him, you
16 have told me, right?
17    A.    That is correct, yes.
18    Q.    And he says your interview with
19 him occurred on September 8th, 2024.  I can
20 show it to you if you would like.
21    A.    That's okay.
22         MR. RENARD:  I don't think
23    there was a pending question yet.
24    Q.    Does that conform to your
25 memory?

Page 104

1          WEINBERG, Ph.D.
2     A.    Yes, I believe I said about a
3 month ago, and that date sounds correct.
4     Q.    And let's just confirm it.  I'm
5 not going to mark this as an exhibit, but
6 just to confirm it, this is the expert
7 rebuttal report of Mr. Andrien.  Do you see
8 that?
9     A.    Yes.
10    Q.    Dated September 9th, 2024.  Do
11 you see that?
12    A.    Yes.
13    Q.    And in that report at his
14 Appendix 2, page 3 of 3, he indicates the
15 date of his interview with me as September
16 8th, 2024.  Do you see that?
17    A.    Yes, I see that.
18    Q.    And have you read Mr. Andrien's
19 rebuttal report, sir?
20    A.    No, I have not read his
21 rebuttal report.
22    Q.    Are you aware that he cites
23 your rebuttal report in his rebuttal
24 report?
25    A.    That doesn't surprise me.

Page 105

1          WEINBERG, Ph.D.
2     Q.    Your rebuttal report is also
3 dated September 9th; is that right?
4     A.    That is correct, my rebuttal
5 report is dated September 9th.
6     Q.    So how in a report prepared by
7 Mr. Andrien dated September 9th did he
8 consider or cite your rebuttal report also
9 dated September 9th?
10         MR. RENARD:  Objection to the
11    form.
12    A.    I don't know or have an opinion
13 on how Mr. Andrien formed his report.
14    Q.    Did you give him a draft of
15 your rebuttal report before September 9th?
16    A.    I don't know what he had access
17 to before September 9th.
18    Q.    But you certainly did not give
19 him a draft of your rebuttal report, did
20 you, directly?
21    A.    I did not directly give him a
22 draft of my rebuttal report, that is
23 correct.
24    Q.    And just to tie this out, if
25 you will just -- I will just look at a

27 (Pages 102 - 105)

Page 106

WEINBERG, Ph.D.
1
2 random page.  Page 64 is a number of
3 footnotes.  You see there they cite the
4 Weinberg rebuttal report dated September
5 9th, 2024?  Do you see that?
6     A.    I see that these footnotes cite
7 the Weinberg rebuttal report, and my
8 rebuttal report is dated September 9th,
9 2024.  September 9th is not written in
10 these footnotes themselves.
11     Q.    But so we have the chronology
12 clear, you had not spoken directly to
13 Mr. Weinberg until September 8th, true?
14         MR. RENARD:  You mean
15     Mr. Andrien?
16         MS. PATRICK:  I'm sorry, thank
17     you.
18     Q.    You had not spoken directly to
19 Mr. Andrien until September 8th of 2024; is
20 that right?
21     A.    Yes, I had not spoken to
22 Mr. Andrien before September 8th.
23     Q.    And you had not yourself
24 provided him a draft of your rebuttal
25 report before you spoke to him on September

Page 107

WEINBERG, Ph.D.
1
2 8th?
3     A.    I'm not sure what he had access
4 to.  I did not directly send him a draft of
5 my rebuttal report before September 8th.
6     Q.    Were you asked to provide a
7 copy of your draft rebuttal report to
8 Mr. Andrien so he could review it?
9         MR. RENARD:  That inquires into
10     matters that are nondiscoverable under
11     the Court's order regarding experts,
12     and consequently, Professor, I will
13     instruct you not to answer the
14     question.
15     Q.    Can you explain how Mr. Andrien
16 was able to draft and cite in his rebuttal
17 report extensive citations to your rebuttal
18 report on the same day your rebuttal report
19 was prepared?
20         MR. RENARD:  Objection to the
21     form.
22     A.    I don't know how Mr. Andrien
23 formed his report.
24     Q.    And you can't account for how
25 he is able to cite your rebuttal report

Page 108

WEINBERG, Ph.D.
1
2 there?
3         MR. RENARD:  Same objection.
4     A.    I was not involved in the
5 process of drafting his report, so I have
6 no way of knowing how he drafted his
7 report.
8     Q.    Now, one of the things I noted
9 in your report is that you draw a
10 distinction between what you call default
11 participants and what you call
12 sophisticated participants.  Are you
13 familiar with that?
14     A.    I would actually say I draw a
15 distinction between default and
16 sophisticated and fully informed.
17     Q.    So three distinctions?
18     A.    No, there are two terms; one is
19 default, the other is sophisticated and
20 fully informed.  Sophisticated is also a
21 term I defined.
22     Q.    Okay.  And so before you
23 testified in this case or prepared your
24 report in this case had you ever seen in
25 any published scholarship the term

Page 109

WEINBERG, Ph.D.
1
2 "deceptive conduct total impact framework"?
3     A.    I doubt it.
4     Q.    Why do you doubt it?
5     A.    I'm saying basically no, but I
6 don't remember everything that I have seen
7 in every academic work I have read.
8     Q.    Okay.  So basically no, you
9 have never seen that framework published in
10 any peer-reviewed scholarship that you can
11 recall?
12     A.    It is maybe worth clarifying
13 that I tend to read peer-reviewed
14 scholarship and auction theory for
15 algorithm design or mechanism design, and
16 deceptive conduct total impact framework
17 would be used to analyze within those
18 perspectives deceptive conduct.  I would
19 just say maybe it is not -- it is not a
20 common topic to write about in auction
21 theory.
22     Q.    Okay.  So deceptive conduct
23 total impact framework is not a common
24 topic to write about in auction theory?
25     A.    Maybe let me take a step back

28 (Pages 106 - 109)

1          WEINBERG, Ph.D.
2  and say that mathematical modeling is a
3  very common topic to write about in auction
4  theory. Deceptive conduct total impact
5  framework is an application of mathematical
6  modeling which is very common to the
7  particular case at hand, which is Texas v.
8  Google, and because there is no academic
9  research on the particulars of Texas v.
10  Google, this particular framework would not
11  have appeared in peer-reviewed publication.
12      Q.   Okay. So let's see if I can
13  break that down. Mathematic modeling is a
14  common technique to test propositions,
15  true?
16          MR. RENARD: Objection to form.
17      A.   That's not how I would phrase
18  it.
19      Q.   Okay. So if I understand what
20  you are saying, number one, you cannot tell
21  the jury that you're aware of any scholarly
22  publications in your field that have
23  established that -- or that have evaluated
24  the deceptive conduct total impact
25  framework, true?

1          WEINBERG, Ph.D.
2      A.   I will give the same
3  clarification, which is that I am aware of
4  many publications and auction theory,
5  including several of my own, that use
6  mathematical modeling to take evidence of a
7  particular situation, mathematically model
8  it, to form a concrete mathematical model,
9  and then do analysis within that model.
10          The part that I have not seen
11  in prior academic work is that methodology
12  applied to the particular case of Texas v.
13  Google, and the deceptive conduct total
14  impact framework is the result of applying
15  that kind of methodology to Texas v.
16  Google.
17      Q.   So this is, in that sense, an
18  unprecedented use of it, true?
19          MR. RENARD: Objection to form.
20      Q.   You have never seen it before?
21          MR. RENARD: Objection to form.
22      A.   Again, prior to this case I
23  have not seen mathematical modeling applied
24  to Texas v. Google.
25      Q.   And have you seen mathematical

1          WEINBERG, Ph.D.
2  modeling applied to deceptive conduct?
3      A.   Broadly, yes.
4      Q.   And in specific to the purchase
5  or sale of online ads, have you seen it
6  applied?
7      A.   I have seen it applied to -- I
8  have seen it applied in circumstances that
9  would apply to ad auctions. I have not
10  seen it applied to cases that are specific
11  to ad auctions but not other situations.
12      Q.   All right. Now, one of the
13  things that you say here is that every
14  auction is affected by Google's deceptive
15  conduct; is that right?
16      A.   That is correct.
17      Q.   But you have -- you have
18  performed no sampling or quantitative study
19  to show how many transactions were affected
20  by, for example, reserve price
21  optimization; is that true?
22          MR. RENARD: Objection to form.
23      A.   So maybe I will first -- I will
24  first note context and then answer the
25  letter of your question.

1          WEINBERG, Ph.D.
2          In my report on page 43,
3  Section G, starting in paragraph 138, I
4  write that "There are two manners by which
5  the Deceptive Conduct affecting Google's
6  Display Advertising RTB Ecosystem could
7  influence any auction." I will summarize
8  the two arguments there. The first one is
9  that participants are attracted to systems
10  that are simple, and so when Google
11  deceptively describes AdX as a second price
12  auction or GDN as a tool that optimizes on
13  behalf of its advertisers, this would cause
14  bidders to use those tools when they might
15  not have if they knew how complex they were
16  or that those descriptions were inaccurate.
17  And then once they are in the system, the
18  only reason they are bidding on impressions
19  in the first place is because of Google's
20  deception.
21          The second is that when a
22  participant may have realized that Google's
23  text descriptions are not accurate, but
24  they are unable to figure out the actual
25  auction format, they may behave in

29 (Pages 110 - 113)

Page 114

WEINBERG, Ph.D.
1       WEINBERG, Ph.D.
2   unpredictable ways, and there is indeed
3   evidence that I have cited in my report in
4   paragraphs 142 and 143 and 144 that
5   describe that this indeed occurred.  And so
6   what that means is that RPO could be active
7   on one impression but impact behavior on
8   another.
9       So I give that as context to
10  say that there is -- there are arguments in
11  my report that support the conclusion that
12  Google's deceptive conduct impacted every
13  auction.  And then for the letter, in terms
14  of do I do quantitative analysis to count
15  the number that were impacted by RPO, no, I
16  do not do that in my report.
17      MS. PATRICK:  Objection,
18  nonresponsive.
19      Q.   We can agree there is truth in
20  the world about this statement:  You did or
21  you did not do quantitative sampling to
22  demonstrate the number of transactions that
23  were specifically affected by reserve price
24  optimization?
25      MR. RENARD:  I'm sorry, wasn't

Page 115

1       WEINBERG, Ph.D.
2   that the last sentence of his answer?
3       MS. PATRICK:  I want a clear
4   answer to my question and I'm entitled
5   to it.
6       MR. RENARD:  Then I object.
7       Q.   I really don't -- I don't think
8   this is that hard.  True or false, you did
9   not do quantitative sampling to demonstrate
10  the number of transactions that were
11  specifically affected by reserve price
12  optimization?
13      MR. RENARD:  I'm going to
14  object to the statement, "I don't think
15  this is that hard," and move to strike
16  it.  If you understand the question, go
17  ahead and answer it.
18      Q.   Do you need the question again,
19  sir?
20      A.   No.  So maybe I will summarize
21  what I said previously, which is just in my
22  report, I give arguments for why Google's
23  deceptive conduct impacted every auction.
24  Maybe I won't repeat those arguments, and I
25  will say true, I did not use the particular

Page 116

1       WEINBERG, Ph.D.
2   method of quantitative sampling to quantify
3   the number that were impacted by RPO, for
4   example.
5       Q.   Also true, you did no
6   quantitative sampling to show how many
7   transactions were affected by dynamic
8   revenue sharing?
9       A.   I will summarize that in my
10  report I use a different method which are
11  the two arguments, I will just repeat
12  quickly those two arguments, which is that
13  participants would not even be in Google's
14  ecosystem but for Google's deception, and
15  that conduct that directly affects one
16  auction could impact behavior in another
17  auction.  These are the methodologies by
18  which I conclude that DRS impacted every
19  auction and it is correct that I do not use
20  quantitative sampling to draw that
21  conclusion, I use a different methodology.
22      Q.   So you did not use quantitative
23  sampling to draw any conclusions about
24  dynamic revenue sharing, true?
25      A.   That is correct, I did not use

Page 117

1       WEINBERG, Ph.D.
2   quantitative sampling to draw conclusions
3   about dynamic revenue sharing.
4       Q.   You also did not use
5   quantitative sampling to draw conclusions
6   about Bernanke, true?
7       A.   That is also correct, I did not
8   use quantitative sampling to draw
9   conclusions about Bernanke.
10      Q.   And you did no study to show
11  how many specific transactions were
12  transactions in which dynamic revenue
13  sharing occurred, true?
14      A.   If by dynamic revenue sharing
15  occurred, you mean the transaction would
16  not have cleared but for dynamic revenue
17  sharing, then I did not do quantitative
18  analysis to determine how many
19  transactions -- on how many transactions it
20  is the case that the transaction cleared
21  only because of dynamic revenue sharing.
22      Q.   All right.  And, similarly, did
23  you do any study to quantify how many
24  transactions used reserve price
25  optimization?

30 (Pages 114 - 117)

Page 118

WEINBERG, Ph.D.

1  A.  If by used reserve price
2  optimization you mean the reserve price was
3  increased due to reserve price
4  optimization, no, I did not do any
5  quantitative analysis to determine how many
6  impressions used reserve price
7  optimization.
8  Q.  And, similarly, did you do any
9  study to quantify how many transactions
10 were ones in which the Bernanke algorithm
11 was used?
12 A.  My understanding is that the
13 Bernanke algorithm was always used from the
14 moment it was developed, but I did not do
15 quantitative analysis to confirm that or
16 count the number of transactions that
17 occurred since Bernanke was developed.
18 Q.  And can you identify a single
19 ad buyer that would not have joined
20 Google's ad tech ecosystem if every detail
21 of reserve price optimization had been
22 public?
23 A.  I cannot cite a specific
24 advertiser that I know would not have

1       WEINBERG, Ph.D.
2    A.    If by used reserve price
3  optimization you mean the reserve price was
4  increased due to reserve price
5  optimization, no, I did not do any
6  quantitative analysis to determine how many
7  impressions used reserve price
8  optimization.
9    Q.    And, similarly, did you do any
10 study to quantify how many transactions
11 were ones in which the Bernanke algorithm
12 was used?
13   A.    My understanding is that the
14 Bernanke algorithm was always used from the
15 moment it was developed, but I did not do
16 quantitative analysis to confirm that or
17 count the number of transactions that
18 occurred since Bernanke was developed.
19   Q.    And can you identify a single
20 ad buyer that would not have joined
21 Google's ad tech ecosystem if every detail
22 of reserve price optimization had been
23 public?
24   A.    I cannot cite a specific
25 advertiser that I know would not have

Page 119

1       WEINBERG, Ph.D.
2  joined Google's ecosystem if every --
3  unless -- I'm sorry, if every detail of RPO
4  were not made public.  I will again add as
5  context that the concept that bidders tend
6  to join simple auction environments is a
7  concept that is stated in the Milgrom
8  report, and that is not a controversial
9  opinion.
10   Q.    Controversial or not, you
11 agree, you have not identified a single ad
12 buyer that would not have joined Google's
13 ad tech ecosystem if every detail of
14 reserve price optimization had been public?
15   A.    I will again repeat the
16 context, is that my opinion is that bidders
17 in general tend to join simple ecosystems.
18 That opinion is stated in the Milgrom
19 report.  That being said, I have not
20 identified a particular advertiser that I
21 know would not have joined Google's
22 ecosystem if RPO had been fully and
23 accurately disclosed.
24   Q.    And the same question about
25 dynamic revenue sharing, have you

Page 120

1       WEINBERG, Ph.D.
2  identified any single ad buyer that would
3  not have joined Google's ecosystem if
4  dynamic revenue sharing had been disclosed
5  in every detail?
6    A.    I will repeat the same context,
7  which is that it is generally accepted, as
8  stated in the Milgrom report, that bidders
9  tend to prefer ecosystems that are simple.
10 I will go ahead and read the quote this
11 time.  The Milgrom report states "Google
12 recognized the advantages of bidder
13 truthful auctions, explaining them as
14 follows:  It is faster, less costly, and
15 more fair to the less sophisticated
16 advertisers to structure the auction in
17 favor of true value.  The lower transaction
18 costs associated with bidding in a bidder
19 truthful auction encourage advertisers to
20 participate on Google's platform, which
21 increases thickness, tending to improve the
22 efficiency of its allocations and increase
23 the prices paid to publishers."
24       That is the methodology by
25 which I draw my conclusions, but I will

Page 121

1       WEINBERG, Ph.D.
2  again state that I do not know of a
3  particular advertiser that I am confident
4  only joined Google's ecosystem because they
5  believed it to be bidder truthful.
6    Q.    And the same questions about
7  Bernanke, context about what bidders in
8  general might do, you cannot tell the jury
9  as you sit here today that you are aware of
10 a single bidder that would not have joined
11 Google's ad tech ecosystem if every detail
12 of Bernanke had been disclosed, true?
13   A.    That is again true, and I will
14 again repeat the same context, which is
15 from the Milgrom report states "Google
16 recognized the advantages of bidder
17 truthful auctions, explaining them as
18 follows:  It is faster, less costly and
19 more fair to the less sophisticated
20 advertisers to structure the auction in
21 favor of true value.  The lower transaction
22 costs associated with bidding in a bidder
23 truthful auction encourage advertisers to
24 participate on Google's platform."
25       And that is the methodology

31 (Pages 118 - 121)

Page 122

WEINBERG, Ph.D.

1
2 from which I draw my conclusions, although
3 as you asked, I do not know a particular
4 advertiser that I know for certain only
5 joined -- only used GDN because of Google's
6 deception.
7     Q.    All right.  And, similarly, you
8 made an assumption that what you called
9 default participants predominate in the
10 ecosystem; is that right?
11         MR. RENARD:  Objection to the
12     form of the question.
13     A.    I don't know that I would -- I
14 wouldn't phrase it that way.
15     Q.    All right.  Look at your errata
16 sheet, sir.  Did you change one of your
17 observations about errata -- about default
18 participants in your errata sheet?
19     A.    Sorry, can you rephrase the
20 question?
21     Q.    Uh-huh.  Did you change one of
22 your observations in your errata sheet
23 related to default participants
24 predominating?
25     A.    What I changed was in paragraph

Page 123

WEINBERG, Ph.D.

1
2 44 --
3     Q.    Of your rebuttal report, sir?
4     A.    Of the rebuttal report.  I will
5 go ahead and read the errata.  At the end
6 of the sentence it initially said "Default
7 Participants and Sophisticated Participants
8 (i.e. collectively, all participants)."
9 And it should say "predominantly Default
10 participants, acknowledging some are not."
11         I'm going to quickly read
12 from --
13     Q.    Paragraph 114?
14     A.    No, paragraph 153.  So in
15 paragraph 153 I write "My Opening Report
16 further discusses that the impact of
17 Google's Deceptive Conduct is predominantly
18 determined by its impact on Default
19 Participants while acknowledging that
20 Sophisticated Participants, who may be
21 Fully or Well Informed about some conduct,
22 also exist in the Google's Display
23 Advertising RTB Ecosystem.  Herein, as
24 defined above, I refer to this framework as
25 the Weinberg Framework."

Page 124

WEINBERG, Ph.D.

1
2         I share that to note that the
3 definition in 153 immediately precedes my
4 analysis and was always the intended
5 definition.  There was a drafting error
6 that caused the restating of that
7 definition in paragraph 44 to not be as I
8 had intended.
9     Q.    All right.  So let's be clear,
10 then, about what I was asking you.  In
11 paragraph 153, which you just called to my
12 attention, you said sophisticated
13 participants exist in the system who may be
14 fully or well informed about some conduct,
15 true?
16     A.    Yes, that is correct.
17     Q.    And there are also what you
18 call default participants.  Do you see
19 that?
20     A.    Yes, that's correct.
21     Q.    And those participants are the
22 participants you presume rely on Google's
23 disclosures, right?
24         MR. RENARD:  Objection to form.
25     A.    Yes, that's correct.

Page 125

WEINBERG, Ph.D.

1
2     Q.    All right.  And as you sit here
3 today you have not quantified how many
4 participants in the Google ecosystem are
5 sophisticated participants; is that true?
6     A.    That is correct.
7     Q.    And you also have not
8 quantified how many participants in the
9 Google ecosystem are default participants,
10 true?
11     A.    That is also correct.
12     Q.    And as it pertains to
13 sophisticated participants, do you know how
14 many publishers met your definition of a
15 sophisticated publisher?
16     A.    No, I do not know exactly how
17 many publishers met my definition of a
18 sophisticated publisher.
19     Q.    And, similarly, you do not know
20 how many advertisers met your definition of
21 a sophisticated advertiser?
22     A.    That is also correct, I do not
23 know how many advertisers exactly met the
24 definition of sophisticated advertiser.
25     Q.    Or how many participants in the

32 (Pages 122 - 125)

1        WEINBERG, Ph.D.
2 ecosystem met the definition of default
3 participants?
4      A.    That is also correct, I do not
5 know exactly how many participants in the
6 ecosystem were default participants.
7      Q.    And therefore do not know which
8 transactions, if any, were conducted by
9 sophisticated publishers as opposed to
10 default publishers?
11      A.    I myself do not know which
12 transactions were conducted by
13 sophisticated or default publishers.
14      Q.    But you acknowledge in your
15 report, do you not, that sophisticated
16 publishers may not have been affected by
17 Google's representations and disclosures,
18 true?
19        MR. RENARD:  Objection to form.
20      A.    I don't believe I stated that
21 sophisticated publishers may not have been
22 affected.
23      Q.    We will come back to that in
24 your report.  If I can direct your
25 attention to page 13 of your September

1        WEINBERG, Ph.D.
2 rebuttal report, paragraph 34, you define a
3 term, "deceptive conduct."  Do you see
4 that?
5      A.    Yes, I see that.
6      Q.    And in it, it has got several
7 lines of information.  Does the term
8 "deceptive" have an ordinary meaning in
9 plain English?
10        MR. RENARD:  Objection to form.
11      A.    There must be a dictionary
12 definition of deceptive, yes.
13      Q.    Well, let's look at it.  Here
14 is your dictionary again.
15      A.    Thank you.
16      Q.    You see there it says "tending
17 or having the power to deceive"?
18      A.    Yes.
19      Q.    Is that your definition of
20 deceptive?
21        MR. RENARD:  Objection to form.
22      A.    The definition of deceptive
23 that I use is the one in my report given in
24 paragraph 34 that you referenced.
25      Q.    So you are not using the term

1        WEINBERG, Ph.D.
2 "deceptive" in its ordinary meaning?
3        MR. RENARD:  Objection to form.
4      A.    The definition I use is
5 consistent with the dictionary definition,
6 but in the interest of precision, I use the
7 term "deceptive conduct" as I have defined
8 it precisely in the definitions.
9      Q.    So your term "deceptive
10 conduct" is not drawn from any particular
11 statute or how the statute defines
12 deceptive conduct; is that right?
13        MR. RENARD:  Objection to form.
14      A.    I do not intend for it to be
15 similar or dissimilar to any particular
16 statute.  I don't know whether it happens
17 to be similar or dissimilar to statutes.
18      Q.    You also use the word
19 "transparent."  Do you see that?  Paragraph
20 30.
21      A.    Yes.
22      Q.    And there you actually use the
23 dictionary definition, right?  You cite the
24 Merriam-Webster Dictionary, the one you
25 have in front of you?  Well, you cited the

1        WEINBERG, Ph.D.
2 online one, but it is the same dictionary.
3      A.    Yes.
4      Q.    Okay.  And there you said
5 "Transparent is free from pretense or
6 deceit, easily detected or seen through,
7 readily understood, characterized by
8 visibility or accessibility of
9 information," right?
10      A.    Yes, that is correct.
11      Q.    And then you use that term
12 "transparent" to define another term called
13 "transparent disclosure."  Do you see that?
14      A.    Yes, that's correct.
15      Q.    That's in paragraph 31.  And
16 there you say "A transparent disclosure, as
17 used herein, refers to disclosures that are
18 likely to or reasonably believed would
19 contribute to, assist, or allow a
20 participant to behave more optimally
21 because the disclosure reveals information
22 that is truthful, equally accessible, and
23 informative."
24        That's what you wrote, right?
25      A.    Yes, that is correct.

33 (Pages 126 - 129)

WEINBERG, Ph.D.
1
2    Q.    And you use the term
3    "participant" there.  What kind of
4    participants, a sophisticated participant
5    or a default participant?
6          MR. RENARD:  Objection to form.
7    A.    This would apply equally to any
8    participant.
9    Q.    Now, your definition of a
10   transparent disclosure posits that it would
11   allow a participant to behave more
12   optimally.  Is that in your definition
13   there?
14   A.    Yes, that is correct.
15   Q.    But that does not mean a
16   participant will actually behave more
17   optimally in the face of a disclosure, does
18   it?
19   A.    No, it does not.  That is
20   correct.
21   Q.    For example, I can make a
22   transparent disclosure in a contract I have
23   with someone, but if that person doesn't
24   read the contract, they are not behaving
25   optimally, right?

WEINBERG, Ph.D.
1
2          MR. RENARD:  Objection to form.
3    A.    Yes, it is possible to have a
4    transparent disclosure and to still have
5    suboptimal behavior, that is correct.
6    Q.    And you understand that if a
7    disclosure is transparent and accurate, the
8    fact that someone's behavior is suboptimal
9    is not a violation of any law?
10         MR. RENARD:  Objection to form.
11   Q.    Do you understand that?
12         MR. RENARD:  Same objection.
13   A.    I don't have an opinion on what
14   violates or doesn't violate the relevant
15   statutes here.
16   Q.    Okay.  Let's come at it this
17   way:  A disclosure can be transparent and
18   accurate, and the fact that someone's
19   behavior and response is suboptimal does
20   not mean the disclosure is deceptive in
21   your view, does it?
22   A.    It could be useful evidence --
23   evidence of suboptimal behavior -- evidence
24   of suboptimal behavior could be used as
25   evidence to argue that a disclosure was not

WEINBERG, Ph.D.
1
2    transparent, but I agree that that alone
3    does not imply a disclosure is definitely
4    not transparent.
5    Q.    For example, go back to my
6    contract example where I have a contract
7    that says these are the rights I have,
8    these are the rights you have, and you
9    don't read it, and let's further posit that
10   I define accurately in that contract what
11   my rights are.  Are you with me?
12   A.    Yes.
13   Q.    In that circumstance, the fact
14   that you did not read the contract does not
15   mean the contract was deceptive, true?
16         MR. RENARD:  Objection to form.
17   A.    I agree that if one tried to
18   claim that a contract was deceptive because
19   someone who didn't read it behaved
20   suboptimally, that would be a flawed
21   argument, I agree with that.
22   Q.    And, similarly, you would agree
23   that if a contract discloses what is
24   material about the transaction, it is also
25   not deceptive?

WEINBERG, Ph.D.
1
2          MR. RENARD:  Objection to the
3    form of the question.
4    A.    A contract could be transparent
5    if it discloses everything that all parties
6    consider to be material, while
7    acknowledging that parties may disagree
8    about what is considered material.
9    Q.    But in that circumstance, using
10   your phrase, a contract could be
11   transparent if it discloses everything that
12   all parties consider to be material, a
13   contract like that would not be deceptive,
14   would it?
15         MR. RENARD:  Objection to form.
16   A.    So I will just go through the
17   definition I have in paragraph 34.  I will
18   note that a contract could be part of a
19   larger conduct, but when looking at that
20   contract in isolation the contract you
21   described as disclosing all material
22   information with no misrepresentations
23   would not misrepresent material
24   information, it would not be incomplete, it
25   could be untimely, but let's assume that

34 (Pages 130 - 133)

Page 134

WEINBERG, Ph.D.
1           WEINBERG, Ph.D.
2  the contract was presented in a timely
3  manner, it does not conceal material
4  information, and there was no nondisclosure
5  of material information, and so then the
6  rest of the definition is not relevant.
7  And so that contract in itself would not
8  meet the definition of deceptive conduct.
9       Q.    Okay.  Now, your definition of
10  transparent allows that it would --
11  includes that it would allow a participant
12  to behave more optimally, but are you
13  saying that conduct qualifies as deceptive
14  even if a disclosure has informed the world
15  about the material aspects of the conduct
16  but not in a way that helps participants to
17  optimize their behavior?
18           MR. RENARD:  I object to the
19       form.
20       Q.    Let me tell you -- let me tell
21  you my dilemma and maybe it will help,
22  okay?  You acknowledge that we live in a
23  world where people do not always behave
24  optimally even in the face of complete
25  information, right?

Page 135

1           WEINBERG, Ph.D.
2       A.    Yes, I agree we live in a world
3  where people sometimes behave suboptimally
4  even in the face of complete information.
5       Q.    And in that circumstance, the
6  person providing the accurate information
7  has done what they can do?
8           MR. RENARD:  Objection to form.
9       A.    I feel like that's asking for a
10  moral judgment that would be very context
11  specific on the manner in which the
12  information were provided.
13       Q.    Well, I'm asking about your
14  opinion about deceptive conduct, okay?
15           MR. RENARD:  Well, I object to
16       the form of that statement.
17       Q.    Well, if a person provides
18  accurate information -- strike that.
19           If a person provides accurate
20  and complete information to somebody with
21  whom it is engaging in a transaction, is
22  that deceptive conduct?
23           MR. RENARD:  Objection to the
24       form.
25       Q.    In your parlance.

Page 136

1           WEINBERG, Ph.D.
2       A.    If a party provides accurate,
3  complete, timely information in a manner
4  that they believe to be understandable by
5  the recipient, then that act alone would
6  not be deceptive.
7           Sorry, if I can add, that
8  action does not necessarily excuse other
9  deceptive actions related to similar
10  conduct, but that action alone would not be
11  deceptive.
12       Q.    So, for example, you know that
13  at some point reserve price optimization
14  was disclosed by Google, right?
15       A.    We discussed this morning that
16  in my rebuttal report, after seeing more
17  information, I do not consider the
18  disclosure of RPO to be meaningful.
19       Q.    Okay.  So we will talk about
20  that a little bit more in a moment.  But
21  let's ask now another question about
22  transparency.
23           Is transparency always
24  economically efficient?
25           MR. RENARD:  Objection to form.

Page 137

1           WEINBERG, Ph.D.
2       A.    I think that is a very
3  overarching question that would be hard to
4  give a yes or no to without knowing exactly
5  what does transparency mean exactly, what
6  does economic efficiency mean, and in what
7  kinds of settings you have in mind.
8       Q.    All right.  So, for example,
9  you can agree that it is economically
10  efficient for Coke, Coca-Cola, to
11  manufacture Coke, right?
12           MR. RENARD:  Objection.
13       Q.    That's their product.
14           MR. RENARD:  Objection to form.
15       Q.    Let me rephrase the question.
16           You know that Coca-Cola
17  manufactures Coke, right?
18       A.    Yes, I do know that, assuming
19  the name of the company is correct and
20  everything, yes, I believe Coca-Cola is the
21  company that manufactures Coke.
22       Q.    And you know there is a formula
23  for Coke, right, how you make it?
24       A.    I know that there is a list of
25  ingredients.  I assume that they have a

35 (Pages 134 - 137)

Page 138

WEINBERG, Ph.D.
1
2 process by which they make Coke, yes.
3      Q.    Like Kentucky Fried Chicken has
4 17 herbs and spices, right?
5      A.    I don't actually know much
6 about Kentucky Fried Chicken, but I will
7 believe you that that's accurate.
8      Q.    Okay.  And Coca-Cola, to your
9 knowledge, considers its formula for
10 manufacturing Coke to be proprietary
11 information, right?
12          MR. RENARD:  Objection to the
13     form.
14     A.    I don't actually know what
15 Coca-Cola considers to be proprietary
16 information, but I am familiar with the
17 concept of proprietary information.
18     Q.    It would not surprise you that
19 Coca-Cola considers the recipe for Coke to
20 be proprietary, would it?
21     A.    That would not surprise me, no.
22     Q.    And you know about Costco,
23 right?
24          MR. RENARD:  Objection to form.
25     A.    I know of Costco, yes.

Page 139

WEINBERG, Ph.D.
1
2      Q.    And you know they have a
3 Kirkland brand, right?
4      A.    I did not know about the
5 relationship between Costco and Kirkland.
6      Q.    They have a store brand you
7 assume?
8          MR. RENARD:  Objection to form.
9      A.    I'm sorry, I don't understand
10 the question.
11     Q.    Do you know -- have you ever,
12 maybe you haven't, bought store brand
13 things at the grocery store?
14     A.    Yes, I have bought store brand
15 things at the grocery store.
16     Q.    And when I was growing up, we
17 couldn't afford Coke, so we had off-brand
18 cola.  Do you know what I mean?
19     A.    Yes.
20     Q.    We had something that was
21 supposed to taste like Coke, right, but it
22 didn't, because they didn't have the exact
23 recipe, right?
24     A.    Yes, I had the same experience
25 in my childhood.

Page 140

WEINBERG, Ph.D.
1
2      Q.    And so the store selling that
3 off-brand stuff might very well like to
4 have the formula for Coca-Cola so their
5 off-brand cola tasted better, right?
6          MR. RENARD:  Objection to form.
7      A.    I understand why an
8 off-brand -- an off-brand producer may
9 benefit from understanding proprietary
10 information of a brand name producer, yes.
11     Q.    And yet you would not sit here
12 and say that Coca-Cola had the obligation
13 to tell the grocery store in El Paso, Texas
14 how to manufacture their off-brand cola?
15          MR. RENARD:  Objection to the
16     form.
17     A.    I'm not an expert in -- I don't
18 even know what the right branch of law is,
19 maybe intellectual property, I don't know
20 what Coca-Cola's legal obligations would be
21 in that circumstance.
22     Q.    But you would expect, having
23 drunk off-brand cola in your own life, that
24 somehow Coca-Cola was able to keep that
25 proprietary and not have to share it with

Page 141

WEINBERG, Ph.D.
1
2 your local grocery store, true?
3          MR. RENARD:  Same objection.
4      A.    I actually didn't mind the
5 taste of the off-brand cola.  But I
6 understand the point of the question.  I'm
7 familiar with the concept of proprietary
8 information.
9      Q.    And so therefore you understand
10 that secrecy about things like formulas is
11 important to the economy?
12          MR. RENARD:  Objection to the
13     form of the question.
14     A.    I would say I understand that
15 there is a reason why intellectual -- I
16 hope I'm using the right term -- why
17 intellectual property law exists, and I
18 understand why companies are legally
19 permitted to keep some things confidential.
20     Q.    And, similarly, you are aware,
21 having worked, for example, at Andreessen
22 Horowitz, that technology companies
23 consider their source code to be highly
24 proprietary, right?
25          MR. RENARD:  Objection to form.

36 (Pages 138 - 141)

Page 142

1          WEINBERG, Ph.D.
2     A.    I don't want to make a
3 representation about a particular tech
4 company or tech companies generally, but it
5 makes sense to me that a tech company would
6 consider its source code proprietary.
7     Q.    And what is source code, sir?
8     A.    Source code is the underlying
9 code that verbatim executes whatever the
10 product is.
11    Q.    It is the -- it is the
12 algorithms that tell the product how to
13 operate?
14    A.    I would make a slight
15 distinction that the source code implements
16 the algorithms that are intended.
17    Q.    Okay.  And you're not here
18 advocating that Google has to make its
19 source code for its advertising products
20 openly available to its competitors, are
21 you?
22          MR. RENARD:  Objection to form.
23    A.    No, I am not here to argue that
24 Google should make all of its code open
25 source.

Page 143

1          WEINBERG, Ph.D.
2     Q.    Nor are you arguing that it is
3 deceptive conduct for Google to keep its
4 source code proprietary?
5          MR. RENARD:  Same objection.
6     A.    I also do not intend to argue
7 that the decision to keep source code
8 confidential is itself a deceptive act.
9     Q.    You also said, sir, that every
10 ad tech auction should be considered
11 deceptive during the period you considered,
12 right?
13    A.    Let me just read an exact quote
14 to remove confusion.  On page 43, section
15 header G, I say "Google's Deceptive Display
16 Advertising RTB Ecosystem Could Influence
17 Any Auction."
18    Q.    I'm sorry, where are you again?
19    A.    Sorry, the rebuttal report,
20 page 43, section header G.  "Google's
21 Deceptive Display Advertising RTB Ecosystem
22 Could Influence Any Auction."
23    Q.    Now, that use of "could" is of
24 interest to me because you did not prove
25 that any particular transaction was

Page 144

1          WEINBERG, Ph.D.
2 influenced by deceptive conduct as you
3 describe it, true?
4          MR. RENARD:  I object to the
5     question, form.
6     A.    Let me read a slightly
7 different quote --
8     Q.    Can you answer my question
9 first?
10    A.    Sure, I will answer the
11 question and follow it with a different
12 quote.
13          That is correct that I do not
14 find a particular transaction and assert
15 that this particular transaction had its
16 price increased by RPO when the advertiser
17 did not know or this particular transaction
18 had cleared in a dynamic region above the
19 advertiser's bid, or this particular
20 transaction was won by someone who would
21 not have been in Google's ecosystem but for
22 their deception.  However, I do claim, this
23 is now section header B on page 21, where I
24 say "Google's Deceptive Conducts Impact the
25 Entirety of Google's Display Advertising

Page 145

1          WEINBERG, Ph.D.
2 RTB Ecosystem."
3          So while the particular section
4 header G had a "could," there was no
5 "could" in the section header B.
6     Q.    Right.  So I want to
7 distinguish, because what you say is it
8 impacted the entire ecosystem, true?
9     A.    Yes, that's correct, I say that
10 it impacted the entire ecosystem.
11    Q.    But you do not say, and you
12 have not demonstrated, that any particular
13 transaction was affected by reserve price
14 optimization, what you call RPO, true?
15          MR. RENARD:  Objection to form.
16    A.    I do not find any particular
17 impression that I know was impacted by the
18 deceptive elements of RPO, that is correct.
19    Q.    And, similarly, you do not find
20 any particular transaction that was
21 affected by what you call the deceptive
22 elements of dynamic revenue sharing, true?
23    A.    That is also correct, I do not
24 find particular impressions on which I know
25 they cleared in the dynamic region and

37 (Pages 142 - 145)

Page 146

```
 1        WEINBERG, Ph.D.
 2  would not have cleared but for Google's
 3  deception.
 4      Q.    And when you are using the
 5  phrase "Google's deception," just to be
 6  clear, you are calling dynamic revenue
 7  sharing deceptive, true?
 8      A.    Yes, I'm calling dynamic
 9  revenue sharing deceptive.
10      Q.    And, similarly, you do not find
11  any particular transaction that was
12  affected by what you call the deceptive
13  elements of Bernanke, true?
14        MR. RENARD:  Objection to form.
15      A.    I do not know any particular
16  impressions on which I know that a bidder
17  took suboptimal behavior due to the
18  deception surrounding Bernanke, that is
19  correct.
20      Q.    Okay.  Now, do you know the
21  identity of the advertisers bidding in the
22  AdX auctions?
23        MR. RENARD:  Objection to form.
24      A.    I know some advertisers that
25  bid.  I do not know the identity of
```

Page 147

```
 1        WEINBERG, Ph.D.
 2  particular advertisers currently bidding or
 3  on particular auctions.
 4      Q.    Did you consider whether Google
 5  was an advertiser bidding in those auctions
 6  for its own products?
 7        MR. RENARD:  Objection to form.
 8      A.    Assuming that by Google --
 9  sorry, Google appeared twice in that.  So
10  assuming that the buyer bidding refers to a
11  Google product such as GDN or DV360 and the
12  auction into which they are bidding is AdX,
13  which is also Google, yes, for some of my
14  opinions it is relevant that Google
15  controls both the ad buying tool and the
16  exchange and the ultimate seller, which is
17  DFP.
18      Q.    Okay.  So I think you missed my
19  question, so let me try again, and let me
20  add to it, see if it helps.
21        You know that Google
22  manufactures Pixel phones, right?
23      A.    I know that Google manufactures
24  phones.  I did not know they were called
25  Pixel, but I believe you.
```

Page 148

```
 1        WEINBERG, Ph.D.
 2      Q.    You know that Google owns
 3  Fitbit?
 4      A.    I believe you that Google owns
 5  Fitbit.
 6      Q.    And YouTube?
 7      A.    That one I knew, that Google
 8  owns YouTube.
 9      Q.    And did you consider whether
10  for its own products Alphabet, the parent
11  company, or Google, the operating company,
12  were bidding for ads for their products
13  like the Pixel phone or Fitbit or YouTube?
14      A.    Thank you for the
15  clarification.  I do not believe any of my
16  opinions explicitly consider the case where
17  the ultimate advertiser, such as Fitbit,
18  was also Google.
19      Q.    Is it your opinion that ad
20  purchases by Fitbit, a company owned by
21  Google, were affected by deceptive conduct?
22        MR. RENARD:  Objection to form.
23      A.    Could you repeat the question
24  so I could hit every word exactly?
25      Q.    Is it your opinion that ad
```

Page 149

```
 1        WEINBERG, Ph.D.
 2  purchases by Fitbit, a company owned by
 3  Google, were affected by deceptive conduct?
 4      A.    Yes.
 5      Q.    Okay.  Why?
 6      A.    The publisher could be affected
 7  by the deception.
 8      Q.    Could be, but you didn't
 9  determine that they were, true?
10        MR. RENARD:  Objection to the
11  form of the question.
12      A.    I interpreted the initial
13  question as asking whether the fact that
14  Fitbit is the advertiser that ultimately
15  won the impression necessarily implies that
16  the auction was not impacted by deception,
17  deceptive conduct, and I am saying that
18  that is incorrect, it is not the case that
19  just because Fitbit, which is owned by
20  Google, ultimately won the impression,
21  therefore the impression is not impacted by
22  deceptive conduct.
23      Q.    What about if the impression is
24  a display ad on YouTube?
25        MR. RENARD:  Objection to the
```

38 (Pages 146 - 149)

Page 150

WEINBERG, Ph.D.
1
2    form.
3        A.    The answer is still no.  There
4    could be other bidders who were impacted by
5    the deceptive conduct.
6        Q.    But that's your speculation,
7    because you haven't examined any particular
8    transactions, true?
9        MR. RENARD:  Objection to the
10    form of the question.
11        A.    I interpreted the most recent
12    question as asking is it the case that just
13    because the advertiser is Fitbit and the
14    publisher is YouTube, which are both owned
15    by Google, therefore that impression could
16    not be impacted by deceptive conduct, and
17    that is false.
18        Q.    All right.  And it is false
19    because somebody might have lost the
20    impression on YouTube?
21        A.    Yes.
22        Q.    That's the only circumstance in
23    which it could be false, right?
24        A.    No.
25        Q.    How else could it be false?

Page 151

WEINBERG, Ph.D.
1
2        A.    There are other non-Google
3    exchanges in addition to non-Google
4    advertisers and non-Google ad buying.
5        MR. RENARD:  Counsel, whenever
6    you get a chance on lunch.  I don't
7    want to interrupt your flow, but if you
8    are at a convenient breaking point.
9        Q.    Let me ask you one more
10    question or just a couple more to line this
11    out.
12        So in your scenario of
13    deception, you are not just encompassing ad
14    buyers and sellers, you are encompassing
15    competing exchanges who don't get the
16    transaction?  Because I didn't see that in
17    your report.  That's a little bit of a
18    surprise to me.
19        MR. RENARD:  Objection to the
20    statement.  Do you have the question in
21    mind?
22        A.    Let me maybe try to answer that
23    with an example for why I said that.
24        Q.    Before you give me an example,
25    Professor, I really do want to find out,

Page 152

WEINBERG, Ph.D.
1
2    because if I have missed something in your
3    report, I need to know it.  We have talked
4    a lot about ad buyers and ad sellers, true?
5        MR. RENARD:  Professor Weinberg
6    was in the middle of a response.  Now
7    it may be a response --
8        MS. PATRICK:  It was not
9    responsive.
10        MR. RENARD:  You may find that
11    to be true, Counsel, and I'm not
12    arguing with you, but what I don't want
13    to happen here is an interruption of a
14    witness when he is in the middle of an
15    answer, what he believes is responsive
16    to your question.
17        MS. PATRICK:  I don't want to
18    engage in argument of counsel.  But a
19    lot of this has been deflecting from
20    the questions that I have actually
21    asked, and so I'm trying, in the
22    interest of time, to actually just get
23    an answer to my questions, and I think
24    I'm entitled to it.
25        MR. RENARD:  I don't appreciate

Page 153

WEINBERG, Ph.D.
1
2    the argument or the innuendo or
3    accusation against the witness.  But
4    what I would prefer is that if
5    Professor Weinberg is in the middle of
6    providing what he believes is
7    responsive, that you allow him the
8    courtesy of completing that, and then
9    if you have an objection to that, you
10    are free to make that and to rephrase
11    or reword or ask that the question be
12    responded to if you don't think it is
13    responsive.
14        A.    I interpreted the question to
15    be asking or at least interested in why did
16    you say that there are non-Google exchanges
17    involved, why would that matter.  The
18    reason I said that is because some of
19    Google's conduct, such as the last look
20    advantage, dynamic allocation, enhanced
21    dynamic allocation, have deceptive elements
22    to them, and those involve other exchanges,
23    and so advertisers and publishers can still
24    be impacted if they transact through a
25    non-Google exchange.

39 (Pages 150 - 153)

Page 154

1         WEINBERG, Ph.D.
2    Q.    The focus of your report is on
3  the effect of what you call deceptive
4  conduct on auction participants in the
5  Google ecosystem, true?
6    A.    Yes, that's correct.
7    Q.    Okay.  And we will come to it
8  after lunch, but you acknowledge that there
9  are other ad exchanges out there that
10  compete with Google, right?
11    A.    There are other ad exchanges
12  out there.  I don't want to assert that
13  they compete or don't compete with Google,
14  but I know that there are other exchanges
15  out there.
16    Q.    Right.  Because you have done
17  no analysis of who the competitors are in
18  this market, true?
19         MR. RENARD:  Objection to form.
20    A.    I would say that's not true.
21  Sorry, let me go back.  Without knowing
22  exactly what you mean by competitors, I
23  don't know how to answer that question.  In
24  terms of other exchanges, I have done some
25  analysis of some properties of other

Page 155

1         WEINBERG, Ph.D.
2  exchanges.
3    Q.    Tell me the exchanges that you
4  are aware of.
5    A.    There is at least OpenX and
6  Rubicon.  I believe that Sovrn is also an
7  exchange.  ████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████  ██████████████████████There
14  may be others that I'm aware of but I don't
15  know that I could list them off the top of
16  my head.
17         MS. PATRICK:  Okay.  We can
18  take our lunch break.
19         THE VIDEOGRAPHER:  We are off
20  the record, 1:18 p.m.
21         (Luncheon recess:  1:18 p.m.)
22
23
24
25

Page 156

1         WEINBERG, Ph.D.
2    A F T E R N O O N   S E S S I O N
3         2:00 p.m.
4  M A T T H E W   W E I N B E R G, Ph.D.,
5  resumed.
6         THE VIDEOGRAPHER:  We are back
7  on the record, 2:00 p.m.
8  CONTINUED EXAMINATION
9  BY MS. PATRICK:
10    Q.    Did you have a chance to talk
11  to your counsel at the lunch break,
12  Professor?
13    A.    Yes.
14    Q.    Did you discuss your testimony?
15    A.    Yes.
16    Q.    Did they suggest anything that
17  you testified to that needed to be
18  corrected in the last hour that we covered
19  or in the morning session?
20    A.    I do not have anything that I
21  need to correct from the morning session or
22  the last hour.
23    Q.    Okay.  A couple of cleanup
24  questions.  Can you tell the jury how long
25  was your meeting with Mr. Andrien?

Page 157

1         WEINBERG, Ph.D.
2    A.    I don't recall exactly how
3  long, but it was very brief, maybe five
4  minutes.
5    Q.    So the only -- when Mr. Andrien
6  says he had an interview with you, it was a
7  five-minute conversation?
8    A.    I don't know exactly what he is
9  saying, but I had a five-minute
10  conversation with him.
11    Q.    Okay.  Have you spoken to
12  Dr. Doremus?
13    A.    I don't believe so.
14    Q.    And other than that five-minute
15  conversation with Mr. Andrien, you never
16  talked to him otherwise?
17    A.    No, I don't believe so.
18    Q.    Okay.  All right.  Let's talk
19  now about the specific conduct that you
20  have discussed in your report.  I want to
21  start with reserve price optimization.  Are
22  you with me?
23    A.    Yes.
24    Q.    In simple terms, do you agree
25  that reserve price optimization changed the

WEINBERG, Ph.D.
1
2  minimum cost per mille floor that
3  publishers established for their ad space?
4      A.   In simple terms, I would agree
5  with that.
6      Q.   And so that we're
7  communicating, part of what Google was
8  doing through reserve price optimization
9  was it was, in effect, saying to publishers
10 you are selling your space too cheaply, you
11 need to price it higher?
12      MR. RENARD:  Objection to form.
13     A.   I don't want to offer an
14 opinion on what Google was trying to
15 convey.  From a technical perspective, RPO
16 increased the CPM floors that publishers
17 had set.
18     Q.   Because they were previously
19 too low compared to what the market was
20 willing to bear?
21      MR. RENARD:  Objection to form.
22     A.   I, again, don't want to opine
23 too much on Google's motivation, but that
24 is a reasonable inference to draw, that
25 Google considered them too low and

1      WEINBERG, Ph.D.
2  therefore RPO raised them.
3      Q.   And it's a benefit to
4  publishers if they avoid selling their
5  space too cheaply, right?
6      MR. RENARD:  Objection to form.
7      A.   It is a benefit to publishers
8  to sell their space at a higher price than
9  to sell the same space at a lower price, I
10 agree with that.
11     Q.   Now, the minimum CPM, what is
12 that?
13     A.   CPM stands for cost per mille,
14 or mille, I'm not positive how to pronounce
15 it.
16     Q.   Cost per thousand?
17     A.   Again, I'm not fluent in my --
18 actually, I have no idea if that is Latin.
19 I would assume it means thousand or
20 million.
21     Q.   Well, do you know whether the
22 units in which reserve prices were
23 expressed on AdX was in cost per thousands
24 or cost per millions?
25     A.   I know it was in cost per

1      WEINBERG, Ph.D.
2  mille, and, like I said, I'm not sure
3  whether that is thousands or millions.
4      Q.   So you don't even know what
5  units are represented by that measurement?
6      A.   No, I know that the units
7  represented are impressions.
8      Q.   But you don't know how many of
9  them are in that label, right?
10     A.   I don't know exactly how many
11 mille refers to.
12     Q.   Okay.  Now, but we can agree
13 that the minimum cost per mille is what
14 would otherwise be called the reserve
15 price?
16      MR. RENARD:  Objection to form.
17     A.   I believe I have seen min CPM
18 used in a couple of different contexts.  It
19 seems to me an appropriate use to equate
20 reserve price with min CPM floor set by the
21 publisher.
22     Q.   I just want to be sure I heard
23 you correctly.  Did you say it seems to me
24 an appropriate use to equate reserve price
25 with min CPM floor by the publisher or did

1      WEINBERG, Ph.D.
2  you say it was inappropriate?
3      A.   An.
4      Q.   An?
5      A.   a-n.
6      Q.   Okay.  So simpler, you don't
7  have any difficulty with saying for
8  purposes of this discussion min CPM floor
9  is the reserve price that the publisher
10 sets for their ad space?
11      MR. RENARD:  Objection to form.
12     A.   I don't object to using that
13 term.  I do want to note that I have seen
14 it used in a different context, and so it
15 may be -- it may be a confusing term to use
16 in hindsight.
17     Q.   Okay.  But when we talk about
18 reserve price optimization, the reserve
19 price that is being optimized in that
20 conduct is the min CPM floor, right?
21     A.   The min CPM floor set by the
22 publisher, yes.
23     Q.   Is what is optimized in reserve
24 price optimization?
25     A.   Again, at a simple level, yes.

WEINBERG, Ph.D.

1
2    Q.    Okay.  Now, in paragraph 273 of
3  your original report, you said that there
4  was a period during which RPO was
5  concealed.  Do you see that?
6    A.    Yes.
7    Q.    And you went on to say "It is
8  also my opinion that even after RPO was
9  revealed, publishers might set suboptimal
10  reserves on any impression for which RPO is
11  a possibility."
12        Do you see that?
13    A.    Yes.
14    Q.    And so at least in your initial
15  report you contemplated a period when RPO
16  was concealed and a period after which it
17  had been revealed, right?
18    A.    That is a correct assessment of
19  my opening report.  And for context I will
20  just note that in my rebuttal report I no
21  longer take that opinion.
22    Q.    Right.  And, Professor
23  Weinberg, it will help if you let me ask my
24  questions and not anticipate the next,
25  okay?  So my next question was to direct

WEINBERG, Ph.D.

1
2  you to paragraph 122 of your rebuttal
3  report.
4    A.    I can quickly clarify, I wasn't
5  trying to anticipate your question, I was
6  trying to add context to a question I had
7  given in case you weren't going there.
8    Q.    Your counsel can ask you all
9  the context questions he wants.  I would
10  like to try to keep you focused on my
11  questions, all right?
12        And so to pick up on my point,
13  beginning at Section E, you revise your
14  opinion about whether RPO was disclosed to
15  state the view in paragraph 127 that the
16  disclosure was insufficient.  Do you see
17  that?
18    A.    Yes, I see in paragraph 127
19  where I state that Google's purported
20  disclosure of RPO was insufficient.
21        (Weinberg Exhibit 5 marked for
22  identification.)
23    Q.    So let me ask you first to look
24  at Weinberg Exhibit 5.  Now, I think you
25  told me this morning that one of the things

WEINBERG, Ph.D.

1
2  you did between your original report and
3  your rebuttal was you went back and looked
4  at some additional documents, is that
5  right, to assess the disclosure of RPO?
6    A.    Yes, that's correct.
7    Q.    So then let's look at your list
8  of documents from your rebuttal report,
9  which is Exhibit 2, and I want to direct
10  your attention to Appendix B.
11        So in Materials Relied On, if
12  you will look there at the first page of
13  that, you've got it right there, yup, and I
14  will just direct your attention, items 68
15  and 69 are documents numbered
16  GOOG-AT-MDL-C-35251 and 35252.  Do you see
17  that?
18    A.    Yes, and both of those have
19  four zeros preceding.
20    Q.    Yes.  But this document that I
21  have just handed you, which is Exhibit --
22  Weinberg Exhibit 5 is Google exhibit, the
23  same prefix, 35250.  Do you see that?
24    A.    Yes, I see that.
25    Q.    So this document, Exhibit 5, is

WEINBERG, Ph.D.

1
2  not a document that is listed as one that
3  you either relied on or considered, is it?
4    A.    The text looks very similar to
5  something I had seen and certainly cited.
6  I agree that the Bates number is not in the
7  list of materials relied upon, but the text
8  looks very familiar.
9    Q.    All right.  So this text looks
10  familiar but you can't say for certain that
11  you actually considered or relied on this
12  document; is that fair?
13    A.    So I certainly cite a sentence
14  that is included in this document.  I will
15  quickly repeat that sentence.  It is in my
16  report, page 33, paragraph 5.  I say
17  "Regardless of whether any adjustments are
18  made, the winning buyer will never be
19  charged more than the bid it submits."  And
20  that same sentence appears in the document
21  you handed me.  So it is possible that this
22  is a copy of a document I relied on.  It is
23  also possible that it has overlapping
24  information, but I agree that the Bates
25  number on this document is not in my

Page 166

1          WEINBERG, Ph.D.
2   materials relied upon.
3      Q.   So you can't tell us
4   definitively that you actually considered
5   this document, it is possible you did, you
6   just don't know; is that fair?
7      A.   I'm saying I have definitely
8   considered at least some contents of this
9   document.  From the looks of it, it looks
10  like content I remember seeing, but because
11  the Bates number does not match and I do
12  not have the document associated with all
13  the Bates that I do cite, I do not know
14  whether this is exactly the same document
15  or a similar one.
16     Q.   Okay.  So let's go through this
17  document, and I just want to ask you a
18  couple of questions about it.
19          In the first bullet point
20  there, so this is the Ad Exchange Auction
21  Model and how it selects ads that will
22  appear on your pages and it determines how
23  much you will earn from those ads, that's
24  the beginning preface of this, right?
25          MR. RENARD:  Objection to the

Page 167

1          WEINBERG, Ph.D.
2      form.
3      A.   The title of the document is Ad
4   Exchange Auction Model, and the first
5   sentence before the bullets does say
6   "DoubleClick Ad Exchange uses the following
7   auction model in the open auction and
8   private auction," and then proceeds to the
9   bullets.
10     Q.   It also says "The ad auction is
11  designed to ensure that you are earning the
12  most possible revenue for your ad space,"
13  right?
14     A.   It does also say the ad auction
15  is designed to ensure you are earning the
16  most possible revenue for your ad space, I
17  agree.
18     Q.   So this is a document directed
19  to publishers that sell ad space, right?
20          MR. RENARD:  Objection to form.
21     A.   I would assume so based on the
22  sentence you just read.
23     Q.   But it is -- you have seen
24  documents like this and you know they are
25  public blog posts by Google, right?

Page 168

1          WEINBERG, Ph.D.
2          MR. RENARD:  Objection to form.
3      A.   Again, I have seen a document
4   with overlapping content to this, perhaps
5   the same document.  That other document was
6   a public post that I believe the Milgrom
7   report cited as a disclosure of some sort.
8      Q.   Okay.  And so while it talks
9   about the Ad Exchange auction being
10  designed to ensure publishers earn the most
11  revenue for their ad space, it also talks
12  about how buyers' bids are treated, right?
13     A.   Yes.  For example, it has the
14  claim the winning buyer will never be
15  charged more than the bid it submits.
16     Q.   Right.  It also says that
17  "DoubleClick Ad Exchange determines the
18  winning bidder based on the highest net bid
19  submitted."
20          Do you see that?
21     A.   Yes, I see that too.
22     Q.   And it goes on to say that
23  "Such net bid reflects any adjustments Ad
24  Exchange may, at its discretion, have made
25  to the bid submitted by the buyer for the

Page 169

1          WEINBERG, Ph.D.
2   purpose of optimizing the auction."
3          Do you see that?
4      A.   Yes, I see that sentence too.
5      Q.   So that says to buyers we will
6   change your bid to optimize the auction,
7   right?
8          MR. RENARD:  Objection to form.
9      A.   I think it says to buyers
10  exactly what it states.
11     Q.   One of which is we may adjust
12  your bid to optimize the auction, true?
13     A.   Yes, that is implied by this
14  sentence.
15     Q.   And it then continues and says
16  "Regardless of whether any such adjustments
17  are made, the winning buyer will never be
18  charged more than the bid it submits,"
19  right?
20     A.   I agree that that sentence is
21  written and I discuss that particular
22  sentence significantly in both my reports.
23     Q.   Okay.  And then going down to
24  the third sub-bullet that starts "The
25  Google DoubleClick Ad Exchange may run."

43 (Pages 166 - 169)

Page 170

1          WEINBERG, Ph.D.
2   Do you see that?
3      A.   Yes, I do.
4      Q.   So the first sentence there
5   says "The Google DoubleClick Ad Exchange
6   may run limited experiments designed to
7   optimize the auction."
8          Have I read that correctly?
9      A.   Yes, you have read that
10  sentence correctly.
11     Q.   So both publishers and ad
12  buyers are told in that sentence that the
13  Ad Exchange may run experiments designed to
14  optimize the auction.  Do you see that?
15         MR. RENARD:  Objection to form.
16     A.   Assuming this is a
17  public-facing document, then I agree that
18  publishers and advertisers would have
19  access to this document, and I also agree
20  that this document says that Google
21  DoubleClick Ad Exchange may run limited
22  experiments designed to optimize the
23  auction.
24     Q.   Okay.  And it continues by
25  describing what some of those experiments,

Page 171

1          WEINBERG, Ph.D.
2   quote, "may include."  Do you see that?
3      A.   Yes, that's the next sentence.
4      Q.   And the experiments that may be
5   included are, quote, "modifying the
6   standard auction model or mechanics (e.g.,
7   a tiered rather than a second price
8   auction)."
9          Do you see that?
10     A.   Yes, I see that.
11     Q.   So one of the things that this
12  experiment may be is a deviation from a
13  second price auction, true?
14     A.   Yes, I agree that this
15  language, by using the phrase "rather"
16  suggests that a tiered auction is not a
17  second price auction.
18     Q.   Right.  And that in those
19  experiments Google may not actually run a
20  second price auction, right?
21     A.   I agree that that is a
22  reasonable interpretation of this sentence.
23     Q.   The next thing Google says it
24  may experiment in doing is simulating ad
25  calls and auctions.  Do you see that?

Page 172

1          WEINBERG, Ph.D.
2      A.   Yes, I see that too.
3      Q.   The third thing it says is the
4   experiment may include, quote, "modifying
5   the min CPM set by the publisher for an
6   impression or otherwise adjusting the
7   publisher settings."
8          Do you see that?
9      A.   Yes, I see that too.
10     Q.   And there we are talking about
11  modifying and adjusting the reserve price
12  set by the publisher for the impression,
13  right?
14         MR. RENARD:  Objection to form.
15     A.   Yes, in the sentence modifying
16  "The min CPM set by the publisher for an
17  impression or otherwise adjusting publisher
18  settings," in that sentence min CPM would
19  refer to the reserve.
20     Q.   Okay.  And all of that was
21  disclosed by this document, if we're
22  correct that it is a publicly-facing blog
23  post, right?
24         MR. RENARD:  Objection to the
25     form.

Page 173

1          WEINBERG, Ph.D.
2      A.   I agree that all of that
3   content is in this document, and I agree
4   that if this was a public-facing document
5   then participants would have been able to
6   access it if they knew where to access it.
7      Q.   And do you know when this
8   document was first published?
9          MR. RENARD:  Objection to form.
10     A.   This document does not have a
11  date on it, so I do not know when it was
12  first published.
13     Q.   But do you agree that if people
14  knew that reserve prices could be changed
15  by experiments and that Google could change
16  the bids submitted by a buyer and they used
17  the Ad Exchange anyway, they accepted those
18  risks?
19         MR. RENARD:  Objection to form.
20     A.   That sounds like a legal
21  conclusion that I don't have an opinion on.
22     Q.   Okay.  Well, without regard to
23  accepting those risks, you talked about
24  what people's expectations of the auction
25  were, right, and how bids operate, that's

44 (Pages 170 - 173)

1        WEINBERG, Ph.D.
2 throughout your report?
3        MR. RENARD:  Objection to the
4 form.
5        A.    Yes, I do talk about the
6 expectations of participants for the
7 auction that they are participating in.
8        Q.    And if participants entered the
9 auction knowing that the bids submitted by
10 a buyer could be changed at Google's
11 discretion, then they were not deceived
12 about that, true?
13        MR. RENARD:  Objection to form.
14        A.    I need to unpack that a bit.
15 So if a participant is informed of the
16 sentence "Ad Exchange may, at its
17 discretion, adjust the bids," so if a
18 participant is aware of that, I guess then
19 they are not deceived about that particular
20 fact.
21        However, the mere fact that an
22 Ad Exchange is adjusting bids is not
23 necessarily the material information, and
24 so, for example, in my report, I go into
25 extensive detail about the manner in which

1        WEINBERG, Ph.D.
2 bids are adjusted or prices are charged or
3 min CPMs are changed, and the precise
4 manner in which that is done is very
5 material.  So a participant could be
6 informed or not deceived about some
7 high-level concept while still being
8 deceived about the material details of that
9 concept.
10        Q.    Okay.  To echo your phrase,
11 let's unpack that a bit.
12        So, first, we can agree that if
13 a participant is informed of the sentence
14 that "Ad Exchange may, at its discretion,
15 adjust the bids" and is aware of that, then
16 they are not deceived about that particular
17 fact; we agree about that, true?
18        A.    Yes, we agree that if a
19 participant is aware of a fact then they
20 are not deceived about that fact, and we
21 applied that to the fact AdX may at its
22 discretion adjust bids.
23        Q.    Right.  And at its discretion
24 means what, however it wants, right?
25        MR. RENARD:  Objection to the

1        WEINBERG, Ph.D.
2 form.
3        A.    At its discretion is maybe
4 subject to interpretation of surrounding
5 context.  Personally I would not interpret
6 this document, the phrase "at its
7 discretion," to imply literally however
8 Google wants.
9        For example, Google is stating
10 earlier in the document the ad auction is
11 designed to ensure that you are earning the
12 most possible revenue for your ad space.
13 So at its discretion in a way that is
14 completely counter to that would not be a
15 reasonable interpretation.
16        Q.    From a buyer's perspective,
17 though, it says the net bid may reflect any
18 adjustments Ad Exchange may, at its
19 discretion, make to the bid the buyer
20 submits, right?
21        A.    I agree that that is what the
22 sentence says.
23        Q.    And "at its discretion" does
24 not contemplate any confining parameter,
25 does it?

1        WEINBERG, Ph.D.
2        MR. RENARD:  Objection to form.
3        A.    I would still say that, like
4 with most text, the surrounding context is
5 useful for understanding exactly how
6 someone would interpret it.
7        Q.    And here the surrounding
8 context says "Regardless of whether any
9 such adjustments are made, the winning
10 buyer will never be charged more than the
11 bid it submits."
12        Do you see that?
13        MR. RENARD:  Objection to form.
14        A.    I agree that the next sentence
15 is "Regardless of whether such adjustments
16 are made, the winning buyer will never be
17 charged more than the bid it submits."
18        Q.    But at minimum we can agree
19 that this sentence discloses to anybody
20 that read it that Google was adjusting bids
21 at its discretion, true?
22        MR. RENARD:  Objection to form.
23        A.    I agree that the sentence "Such
24 net bid reflects any adjustments Ad
25 Exchange may, at its discretion, have made

45 (Pages 174 - 177)

Page 178

```
 1          WEINBERG, Ph.D.
 2  to the bid submitted by the buyer for the
 3  purpose of optimizing the auction" conveys
 4  the information to someone who reads it and
 5  understands it that AdX is adjusting bids
 6  at its discretion.
 7      Q.    And also conveys the
 8  information that AdX is also in these
 9  experiments adjusting the reserve prices,
10  true?
11          MR. RENARD:  Objection to the
12  form.
13      A.    This particular sentence does
14  not imply adjustments to the reserve.  Just
15  because the document is several paragraphs,
16  could you point me to the sentence you have
17  in mind?
18      Q.    Yes, look at the third
19  sub-bullet.  "These experiments may
20  include," skipping ahead, "modifying the
21  min CPM set by the publisher for an
22  impression or otherwise adjusting publisher
23  settings," that's a reference to the
24  reserve price, right?
25      A.    Yes.
```

Page 179

```
 1          WEINBERG, Ph.D.
 2      Q.    And therefore that disclosure
 3  conveys information that AdX is also in
 4  these experiments adjusting publisher
 5  reserve prices, true?
 6          MR. RENARD:  Objection to form.
 7      A.    Someone who read the sentence
 8  "AdX may run limited experiments designed
 9  to optimize the auction.  These experiments
10  may include modifying the min CPM," would
11  be aware that there are limited auctions on
12  which AdX is modifying the min CPM.
13      Q.    Okay.  And therefore that
14  disclosure is not deceptive as to those
15  experiments, true?
16          MR. RENARD:  Objection to form.
17      A.    This particular document is
18  deceptive.  In particular, I discuss this
19  at length in my report, the sentence
20  "Regardless of whether any such adjustments
21  are made, the winning buyer will never be
22  charged more than the bid it submits."
23  That sentence is false for DRSv2, I stated
24  that in my opening report, and I do not
25  believe any Google experts contested that
```

Page 180

```
 1          WEINBERG, Ph.D.
 2  claim, and I repeated it in my rebuttal
 3  report.  So this document would be
 4  deceptive for that reason.
 5      Q.    You just switched to dynamic
 6  revenue sharing 2.  I'm asking you about
 7  reserve price optimization.  So someone who
 8  reads the "AdX may run limited experiments
 9  designed to optimize the auction.  These
10  experiments may include modifying the min
11  CPM" would be aware that there are limited
12  auctions on which AdX is modifying the min
13  CPM, that's true, right?
14          MR. RENARD:  Objection to form.
15      A.    Sorry, that was a long
16  question.  Can you repeat it?
17      Q.    You just testified earlier in
18  response to my question, I asked you
19  "Therefore, that disclosure conveys
20  information that AdX is also in these
21  experiments adjusting publisher reserve
22  prices, true?"
23          And your answer was "Someone
24  who read the sentence 'AdX may run limited
25  experiments designed to optimize the
```

Page 181

```
 1          WEINBERG, Ph.D.
 2  auction.  These experiments may include
 3  modifying the min CPM' would be aware that
 4  there are limited auctions on which AdX is
 5  modifying the min CPM."
 6          That was your testimony, right?
 7      A.    Yes, that sounds accurate.
 8      Q.    Okay.  And as to publishers,
 9  therefore, that statement was in no way
10  deceptive, true?  Because anybody who read
11  that was aware that there were experiments
12  where the min CPM floor was being changed.
13          MR. RENARD:  Objection to the
14  form.
15      A.    I would agree that this
16  sentence is not a deceptive sentence.
17  However, if this is the only disclosure
18  that is made with respect to RPO, I would
19  consider that deceptive because there was
20  much more material information related to
21  RPO.
22          But for your specific question,
23  this particular sentence in isolation, I do
24  not -- I do not see a false statement in
25  this sentence.  Maybe it is -- by
```

46 (Pages 178 - 181)

WEINBERG, Ph.D.

1           WEINBERG, Ph.D.
2  suggesting that it is limited experiments
3  whereas RPO was more widespread could be
4  misleading.
5       Q.   All right.  So at least at the
6  point where they are conducting experiments
7  and they disclose that one aspect of those
8  experiments is to change bids, that's not
9  deceptive, right?
10          MR. RENARD:  Objection to the
11     form.
12     A.   I think there was a broader
13  view on deception that's missing here.  For
14  these sentences in isolation, for example,
15  "AdX may run limited experiments designed
16  to optimize the auction.  These experiments
17  may include modifying the min CPM," if AdX
18  is indeed only running limited experiments,
19  I agree that that sentence in isolation is
20  not a deceptive sentence.
21     Q.   Okay.
22     A.   I still want to clarify, that
23  does not mean all of RPO is not deceptive
24  or no other communications are deceptive.
25  But this sentence in isolation, viewed as

1           WEINBERG, Ph.D.
2  just a sentence, has not false information
3  in it.
4       Q.   Right.  And, similarly, the
5  sentence viewed as a sentence, "Such net
6  bids reflects any adjustments AdX may make
7  at its discretion to bids submitted by the
8  buyer for purposes of optimizing the
9  auction" is likewise not false information
10  and in isolation is not a deceptive
11  sentence either, true?
12     A.   I have to add the same caveats,
13  which is if all of Google's adjustments
14  were indeed for the purpose of optimizing
15  the auction, then the sentence in isolation
16  would not be a deceptive sentence.  But
17  taking a big-picture view on deception, if
18  this is the only sentence that Google said
19  to describe its deceptive conduct, it omits
20  significant material information.
21     Q.   Okay.  But we do know that at
22  least in this document, two things are
23  disclosed, we are adjusting buyers' bids
24  and we are adjusting publishers' floors,
25  reserve prices, right?

1           WEINBERG, Ph.D.
2       A.   I agree that this document
3  states that buyers' bids are being
4  adjusted.  As far as adjusting publishers'
5  floors, it does add a qualifier, "run
6  limited experiments," which suggests that
7  they are only experiments and not
8  widespread.
9       Q.   But as to the experiments where
10  that is running, that's also disclosed,
11  right?
12          MR. RENARD:  Objection, form.
13     A.   I agree that the information in
14  here is accurately describing limited
15  experiments that modify the publishers' set
16  reserve.  Whether or not that amounts to a
17  transparent disclosure, there is a lot --
18  there is a lot more context.
19          But as far as -- as far as the
20  accuracy of the sentence, I agree that if
21  Google is running limited experiments that
22  modify the publisher reserve, this sentence
23  is accurately describing that that happens.
24     Q.   And thus not deceptive?
25          MR. RENARD:  Objection to form.

1           WEINBERG, Ph.D.
2       A.   Again, in isolation, this
3  sentence would not be deceptive.  I, again,
4  say that if this is the only sentence
5  Google is sharing about RPO, that that is
6  not sufficient to convey the material
7  information.
8       Q.   Okay.  So let's look at some
9  other things that Google said.  Let me show
10  you Exhibit 6.
11          (Weinberg Exhibit 6 marked for
12  identification.)
13     Q.   I will ask you the same
14  question, sir, let's start with your
15  rebuttal report, Exhibit B, and let me know
16  whether this document appears on your list
17  of materials relied on, please.
18          Sir, you are kind of reading
19  ahead.  Can I get you to answer my question
20  first?
21     A.   I can answer that the Bates
22  number of this document is not in the
23  materials relied upon list.
24     Q.   Okay.
25     A.   The reason I'm reading it is

47 (Pages 182 - 185)

WEINBERG, Ph.D.

2 because it, again, looks very familiar and
3 looks similar to a document that I did
4 cite, so I'm trying to read it to fully
5 answer your question as to whether I cited
6 it.
7    Q.    Okay.  So we'll go step by
8 step.  I promise you I will get there, and
9 if I don't, you can prompt me and say I
10 didn't ask you this and I will ask you,
11 okay?
12        So at least as we look at your
13 list of materials considered and relied on,
14 this document marked as Exhibit 6 is not
15 listed there, true?
16    A.    I agree that the Bates number
17 of this document does not appear in the
18 materials considered list.  However, I do
19 want to note that I have not yet finished
20 looking at it to determine whether it is
21 identical to a document I considered under
22 a different Bates.
23    Q.    Okay.  So let's start on the
24 first page, and I will give you all the
25 time to look at it, but let me just kind of

WEINBERG, Ph.D.

2 direct your attention.  The date on the
3 front of this document is May 12th, 2016.
4 Do you see that?
5    A.    Yes, I see that.
6    Q.    Okay.
7    A.    Sorry, that was the end of my
8 answer.
9    Q.    Because I saw you rummaging in
10 your document I thought you needed to do
11 something.  Are you ready to go?
12    A.    Sorry, I'm ready to go.
13    Q.    So if we turn to the second
14 page, there is a heading there that says
15 Greater Accuracy with Optimized Pricing in
16 the Open Auction.  Do you see that?
17    A.    Yes, I see that at the bottom
18 of page 2.
19    Q.    Okay.  And this is in a
20 document that bears the date May 12th,
21 2016, the title of which is Smarter
22 Optimizations to Support a Healthier
23 Programmatic Market, right?
24    A.    Yes, I agree that this document
25 is dated May 12th, 2016.  I agree that the

WEINBERG, Ph.D.

2 title is Smarter Optimizations to Support a
3 Healthier Programmatic Market.
4    Q.    And one of the headings is
5 Greater Accuracy with Optimized Pricing in
6 the Open Auction.  Do you see that?
7    A.    I agree that one of the
8 headings is Greater Accuracy with Optimized
9 Pricing in the Open Auction.
10    Q.    Okay.  So let's look at the
11 first page -- first paragraph at the top of
12 page 3.  So in May of 2016 Google says "In
13 addition to helping publishers maximize
14 revenue from private auctions, we have been
15 experimenting with optimized pricing to
16 help publishers set price floors in the
17 Open Auction that more closely reflect the
18 value of their inventory."
19        Do you see that?
20    A.    Yes, I see that that is the
21 first paragraph at the top of page 3.
22    Q.    So Google is saying there we
23 have been experimenting with how to
24 optimize pricing, right?
25    A.    Yes, I agree.

WEINBERG, Ph.D.

2    Q.    And in the next paragraph it
3 explains that they have observed more than
4 a 50 percent price gap between bid and
5 closing prices in many cases, right?
6    A.    I agree that is stated in the
7 second sentence of the second paragraph.
8    Q.    And "Publishers see this gap,"
9 it says, "as a revenue opportunity and try
10 to close the gap by applying manually
11 calculated price floors."
12        Do you see that?
13    A.    I see that sentence too, yes.
14    Q.    And Google says "This is
15 difficult to do well and can lead to lost
16 revenue or to complex implementation such
17 as offering the same query repeatedly at
18 different price floors that can increase
19 user latency and hurt advertiser's
20 performance.  We think there is a better
21 way."
22        Have I read that correctly?
23    A.    Yes, you have read that
24 correctly.
25    Q.    And you agreed with me earlier

1         WEINBERG, Ph.D.
2 that it is not in publisher's interest to
3 sell their ad space for less than what
4 would have cleared the market at a higher
5 price, right?
6         MR. RENARD:  Objection to form.
7     A.    To repeat what I said, I agree
8 that it is better for a publisher to sell
9 their impression at a high price than to
10 sell that same impression at a lower price.
11     Q.    Okay.  And so then Google says
12 "Optimized pricing in the Open Auction uses
13 historical data to automate the
14 post-auction analysis and updating of floor
15 prices that publishers already do."
16         Do you see that?
17     A.    Yes, I agree.
18     Q.    And you agree that publishers
19 did do that, right?
20         MR. RENARD:  Objection to the
21     form.
22     Q.    Or maybe you don't know.  Do
23 you know what publishers did to value their
24 inventory, sir?
25     A.    I agree that this document is

1         WEINBERG, Ph.D.
2 asserting that publishers already update
3 floor prices.  I agree that that's what
4 this document is asserting.
5     Q.    But you don't know whether
6 publishers do that or not, do you?
7     A.    I know that prior to RPO, if a
8 publisher wanted to update their price
9 floors, they would do so manually.  That is
10 also stated earlier in this document.  I
11 don't know that publishers chose to update
12 them manually.  I just know that if they
13 updated it, they did it manually.
14     Q.    Okay.  And so Google is saying
15 our optimized pricing, quote, "takes it a
16 step further."
17         Do you see that?
18     A.    Yes, I see that.
19     Q.    It goes on to say "Not only
20 does our technology use signals like ad
21 unit and device, it also calculates
22 audience-based floors so publishers can
23 fully benefit from building valuable
24 audiences."
25         Do you see that?

1         WEINBERG, Ph.D.
2     A.    Yes, I see that too.
3     Q.    What is an audience-based
4 floor?
5         MR. RENARD:  Objection to form.
6     A.    I would need more information
7 to know what that means.
8     Q.    Okay.  It goes on to say "and
9 as we have always done, if there is a floor
10 applied to an impression, whether publisher
11 or algorithmically set, we share it with
12 buyers in our bid request."
13         Do you see that?
14     A.    Yes, I see that too.
15     Q.    So when AdX was putting an
16 impression or a display space out for bid,
17 it did so with a disclosure of what the
18 floor price demanded was, right?
19         MR. RENARD:  Objection to form.
20     A.    I agree that the sentence is
21 stating that whenever AdX ran an auction,
22 AdX would disclose the price floor for that
23 auction.
24     Q.    And then it says "In our
25 experiments to date we have applied

1         WEINBERG, Ph.D.
2 optimized pricing to about 15 percent of
3 transactions, creating over 5 percent lift
4 in revenue for publishers using the Open
5 Auction."
6         Do you see that?
7     A.    Yes, I see that too.
8     Q.    So they disclosed the exact
9 number of transactions that the experiments
10 had been applied in as of May 2016, right?
11         MR. RENARD:  Objection to form.
12     A.    I agree that if Google applied
13 optimized pricing to 15 percent of
14 transactions and created over 5 percent
15 lift in revenue for publishers, that this
16 sentence is stating it publicly.
17     Q.    Right.  And you did not go back
18 when you saw some version of this document
19 and look at the actual transactions to see
20 whether Google was accurate in saying that
21 at this point, as of May of 2016, it had
22 applied optimized pricing only in about 15
23 percent of transactions?
24     A.    That's correct.  I'm not
25 contesting the accuracy of this claim, I'm

49 (Pages 190 - 193)

Page 194

1        WEINBERG, Ph.D.
2  just trying to be precise with the
3  questions.
4      Q.    So you're not here telling the
5  jury that as of the date of this
6  disclosure, Google was not telling the
7  truth about the fact that it had applied
8  optimized pricing to about 15 percent of
9  transactions?
10     A.    That is correct, I am not
11 contesting the claim we have applied
12 optimized pricing to about 15 percent of
13 transactions, which was made on May 12th.
14     Q.    And Google says in the next
15 sentence "As we expand our experiments with
16 optimized pricing, we will monitor its
17 performance to ensure advertisers continue
18 to get great ROI."
19        Do you see that?
20     A.    Yes, I see that too.
21     Q.    And so as any reader of this
22 blog post or article from Google would know
23 both that Google had been applying
24 optimized pricing to 15 percent of
25 transactions and that it continued -- it

Page 195

1        WEINBERG, Ph.D.
2  intended to expand those experiments.  Do
3  you see that?
4        MR. RENARD:  Objection to the
5     form of the question.
6      Q.    I will break it down.  Any
7  reader who bothered to read this could have
8  seen that in May of 2016 Google was
9  disclosing that it had applied optimized
10 pricing to 15 percent of transactions,
11 right?
12        MR. RENARD:  Objection to form.
13     A.    I agree that if someone were to
14 have read and understood the first sentence
15 of the last paragraph they would have
16 concluded that Google applied optimized
17 pricing to about 15 percent of
18 transactions.
19     Q.    And if they read the first
20 paragraph at the top of that page they
21 would have understood that optimized
22 pricing was used to help publishers set
23 their price floors, right?
24        MR. RENARD:  Objection to form.
25     A.    I agree that someone who read

Page 196

1        WEINBERG, Ph.D.
2  and understood this disclosure from the
3  first paragraph could have concluded that
4  optimized pricing helped publishers set
5  price floors.
6      Q.    And, finally, you agree that
7  anybody who read this disclosure would have
8  been informed that Google intended to
9  expand its experiments with optimized
10 pricing, right?
11        MR. RENARD:  Objection to form.
12     A.    Yes, I also agree that someone
13 who read and understood this document,
14 including the last paragraph on page 3,
15 would have understood that Google intends
16 to expand its experiments with optimized
17 pricing.
18     Q.    All right.  Now, let's look at
19 another document.  This is one that is on
20 your list, 35251.  Do you see that?
21     A.    While you are doing that, can
22 I -- you noted before that if I determine
23 that this was a document I had likely seen
24 before, I should let you know.  It seems to
25 be -- it seems to be cited in footnote 422

Page 197

1        WEINBERG, Ph.D.
2  on page 152 of my opening report.  The
3  reason I believe that is because the date
4  matches and because the author matches.
5      Q.    Okay.
6      A.    But I do not have the web page
7  in front of me to confirm for sure.
8      Q.    Okay.
9        (Weinberg Exhibit 7 marked for
10 identification.)
11     Q.    Now, this document you did see,
12 right?
13     A.    Yes, it looks like this one
14 is -- the Bates number is in my Appendix B.
15     Q.    So I'm going to represent to
16 you and ask you to accept my representation
17 that the metadata on this document, 35251,
18 shows that it was published in 2015, okay?
19     A.    Okay.
20     Q.    Can you accept that?  All
21 right, so we are going forward in time.
22 Now, this is another one of these
23 explanations of the Ad Exchange model.  Do
24 you see that?
25     A.    I see that it is titled Ad

50 (Pages 194 - 197)

1          WEINBERG, Ph.D.
2  Exchange Auction Model, and I see that the
3  text that follows is similar to Exhibit 5,
4  yes.
5          MR. RENARD:  Can I just ask you
6      when you said we are going forward in
7      time, just what you meant?
8          MS. PATRICK:  It is backward,
9      it is 2015, isn't it?
10         MR. RENARD:  Well, in relation
11     to what?
12         MS. PATRICK:  So the first
13     document --
14         MR. RENARD:  I don't remember
15     us talking about metadata on 5 is the
16     reason I'm --
17         MS. PATRICK:  We didn't.  But
18     if you need it, it is 2014.
19         MR. RENARD:  Okay.  I just want
20     to make sure I understood the context.
21         MS. PATRICK:  So just so you
22     have it, 5 is 2014, 6 is May 2016, 7 is
23     in 2015.  Right, Michael?
24         MR. DAVIS:  Yes.
25         MR. RENARD:  Thank you.  And

1          WEINBERG, Ph.D.
2      obviously we're not in a position right
3      now to confirm, but if that's your
4      representation, then Dr. Weinberg will
5      follow it.
6      Q.    All right.  So directing your
7  attention to the first bullet point, do you
8  see that?
9      A.    Yes.
10     Q.    And this is a document that you
11 listed as one that you actually saw, do you
12 remember that, 3251 -- 35251?
13     A.    Yes.  If you want me to say
14 where in my report, I would need some time,
15 but I agree that it is in the materials
16 relied upon, and that also helps explain
17 why I recognized Exhibit 5.
18     Q.    But the text of the two
19 documents is different, you see that,
20 right?  I'm not asking you to do a
21 line-by-line presentation, but one of them
22 is longer, right?
23     A.    Yes, Exhibit 7 is longer, so
24 there must be some change.
25     Q.    All right.  So Exhibit 7, which

1          WEINBERG, Ph.D.
2  I will represent to you is from 2015, has
3  the same sentence in it, "The net bid
4  reflects any adjustments Ad Exchange may,
5  at its discretion, have made to the bids
6  submitted by the buyer."
7          Do you see that?
8      A.    Yes.
9      Q.    And it has the same sentence
10 "Regardless of whether any adjustments are
11 made, the winning buyer will never be
12 charged more than the bid it submits."
13         Do you see that?
14     A.    Yes, I see that too.
15     Q.    All right.  So now I want to
16 direct your attention to the second bullet,
17 which says "The Ad Exchange auction closing
18 price is determined as the greater of the
19 second highest net bid in the Ad Exchange
20 auction or the reserve price applied to
21 that impression."
22         Do you see that?
23     A.    Yes, I see that too.
24     Q.    And that's new language, right?
25     A.    I don't think that sentence is

1          WEINBERG, Ph.D.
2  new.
3      Q.    The next sentence is new
4  though, right, "In some cases"?
5      A.    Yes, the next sentence is new.
6      Q.    So let's talk about the new
7  sentence.  The new sentence says "In some
8  cases the auction may close at a price
9  lower than the reserve price applied due to
10 auction optimizations."
11         Do you see that?
12     A.    Yes, I see that.
13     Q.    And it continues and says
14 "Sellers are paid the Ad Exchange closing
15 price net of Google's revenue share but
16 will receive, subject to the terms
17 governing their use of the Ad Exchange, no
18 less than the min CPM applied to the
19 auction."
20         Do you see that?
21     A.    Yes.  Can I also quickly ask,
22 are you representing that that sentence is
23 the only difference between Exhibit 5 and
24 7?
25     Q.    I did not say that.

51 (Pages 198 - 201)

WEINBERG, Ph.D.

1
2   A.   Okay.  Can I ask --
3   Q.   Because I go step by step,
4  that's why.
5   A.   Got it, okay.  I guess I was
6  trying to ask whether I can put away
7  Exhibit 5.  It sounds like you are saying
8  no, not yet.
9   Q.   I wouldn't.
10   A.   Okay.
11   Q.   All right.  So let's talk first
12  about that sentence, "In some cases the
13  auction may close at a price lower than the
14  reserve price applied due to auction
15  optimizations."
16        Do you see that?
17   A.   Yes, I agree with that.
18   Q.   So it says that the auction
19  optimization can affect the closing price,
20  right?
21   A.   I agree that it is saying the
22  auction optimization can affect the closing
23  price.
24   Q.   But it also says that "Sellers
25  will receive, subject to the terms

WEINBERG, Ph.D.

1
2  governing their use of the Ad Exchange, no
3  less than the min CPM applied to the
4  auction."
5        Do you see that?
6   A.   Yes, I see that too.
7   Q.   So how, other than by adjusting
8  Google's fee for the transaction, would
9  that be possible?
10        MR. RENARD:  Objection to form.
11   A.   In the event that the auction
12  closes at a price lower than the reserve
13  price applied and sellers are paid at least
14  their min CPM, I agree that can only happen
15  by adjusting Google's revenue share.
16   Q.   Right.  And in fact it says
17  "Sellers are paid the Ad Exchange closing
18  price net of Google's revenue share but
19  will receive no less than the min CPM
20  applied to the auction," right?
21   A.   Yes, I agree that's what it
22  says.
23   Q.   So Google is saying there it is
24  in some cases cutting its revenue share in
25  order to make the auction work, right?

WEINBERG, Ph.D.

1
2        MR. RENARD:  Objection to form.
3   A.   I agree that it is possible to
4  conclude from the information there, after
5  the logic I applied, that on such auctions
6  Google must have lowered its revenue share,
7  yes.
8   Q.   And that's there in the black
9  and white, right?
10        MR. RENARD:  Objection to form.
11   A.   I agree that this sentence in
12  black text on white page describes that
13  Google may lower its revenue share.
14        I can maybe add some quick
15  context that I know in my rebuttal report I
16  claim that one of these sentences is
17  deceptive, and I can clarify that I'm not
18  saying it is deceptive because Google did
19  not disclose that it might adjust its
20  revenue share, that I claimed it is
21  deceptive for the reason in my report.
22   Q.   Okay.  So just to be clear,
23  this blog post is disclosing that, A,
24  Google may change the bid submitted by the
25  buyer for purpose of optimizing the

WEINBERG, Ph.D.

1
2  auction, right?
3        MR. RENARD:  Objection to the
4  form.
5   A.   I agree that those words are
6  contained in this document, yes.
7   Q.   Okay.  And it is also
8  disclosing that the auction may close at a
9  price lower than the reserve price due to
10  auction optimizations, but that the seller
11  will not receive less than its floor price
12  because Google is netting some part of its
13  revenue share to make that happen, right?
14        MR. RENARD:  Objection to form.
15   A.   Again, I agree that that
16  information is contained in this document.
17   Q.   Okay.  So if both of those are
18  disclosed, what part of what you call DRS
19  version 1 is not disclosed in this
20  document?
21   A.   So it does not disclose that
22  when a buyer wins with a bid below the
23  price floor that they will pay their bid.
24  That is not disclosed anywhere in this
25  document and there is no way to plausibly

52 (Pages 202 - 205)

Page 206

1    WEINBERG, Ph.D.
2  conclude that just from the information in
3  this document.
4    Q.   It's your contention that the
5  sentence "Regardless of whether any
6  adjustments are made, the winning buyer
7  will never be charged more than the bid it
8  submits" does not disclose that the bidder
9  may have to pay the bid it submits?
10   A.   It is my opinion that this
11 sentence does not disclose that the bidder
12 will certainly pay the bid it submits.
13   Q.   All right.  But it certainly
14 does disclose that the winning buyer will
15 never be charged more than the bid it
16 submits, right?
17   A.   I agree that this sentence
18 states that the winning buyer will never be
19 charged more than the bid it submits.
20   Q.   Right.  And in any auction a
21 buyer understands that when they submit a
22 bid they are bound to perform it if it is
23 accepted, right?
24       MR. RENARD:  Objection to form.
25   A.   I disagree with that.

Page 207

1    WEINBERG, Ph.D.
2    Q.   Okay.  So a buyer can submit a
3  bid not intending to have to honor it, is
4  that your contention?
5        MR. RENARD:  Objection to form.
6    A.   No, that's not how I understood
7  your question.
8    Q.   So we can agree if I submit a
9  bid in this auction of $10 for 1,000
10 impressions, it is no surprise to me if I
11 am called on to pay that bid?
12       MR. RENARD:  Objection to form.
13   A.   I would need more information
14 to answer that question.  There is missing
15 information about the auction format.
16 There is missing information about the bids
17 of other bidders.  There is missing
18 information about the reserve price.
19   Q.   But what is disclosed here is
20 that whatever my $10 bid was that I
21 submitted, AdX has discretion to change it
22 and I will never be charged more than the
23 bid I submitted, right?
24   A.   I agree that is what this
25 document is stating.

Page 208

1    WEINBERG, Ph.D.
2        MR. RENARD:  Counsel, we have
3  been going about an hour and 10, so
4  whenever you get to a convenient breaking
5  point.
6    Q.   And you would agree that in a
7  second price auction, the winning bidder
8  pays the higher of the second highest bid
9  or the reserve, right?
10   A.   Yes, in a second price auction
11 that is clean and unmodified, the winning
12 bidder would pay the highest of the second
13 highest bid in the reserve.
14   Q.   And if an auction clears at a
15 bid below the reserve, then the reserve was
16 necessarily higher than the second highest
17 bid in that scenario, right?
18   A.   If the auction clears below the
19 reserve, it's not a second price auction
20 then.
21   Q.   And in that circumstance the
22 seller -- let me read you the question
23 again.  In an auction that is a second
24 price auction, there will be a reserve set
25 by the seller, right, and then there will

Page 209

1    WEINBERG, Ph.D.
2  be bids by bidders, true?
3    A.   In a second price auction with
4  reserve, there is a -- what you said is
5  correct for a second price auction with
6  reserve, yes.
7    Q.   Thank you.  And in a
8  circumstance where the auction clears at a
9  bid below the reserve, that means the
10 reserve was, A, necessarily higher than any
11 bid, right?
12       MR. RENARD:  Objection to form.
13   A.   Let me -- there is an incorrect
14 assumption in the question.  A second price
15 auction with a reserve of 10 cannot clear
16 below a value of 10.
17   Q.   I gotcha.  But if dynamic
18 revenue sharing is operating where Google
19 is cutting its fee to make up the
20 difference, right, in that scenario my
21 statement would be correct, right?
22       MR. RENARD:  Objection to form.
23   A.   In the scenario where Google is
24 running dynamic revenue sharing, which, to
25 be clear, is not a second price auction,

53 (Pages 206 - 209)

Page 210

1        WEINBERG, Ph.D.
2 and -- maybe let me rephrase it in a
3 helpful way.
4        Forget about second price
5 auction. In DRS, if an auction under DRS
6 clears at a price below the reserve, then
7 yes, the reserve is higher than the
8 winning bid, that is correct.
9     Q.    And in that circumstance the
10 seller still receives their reserve price,
11 true?
12    A.    So that is false under TDRS.
13 It could be false under DRSv2. It is true
14 under DRSv1.
15    Q.    So at least as of 2015 what
16 Google is saying is in a circumstance under
17 DRS version 1, dynamic revenue sharing
18 version 1, if the auction clears below the
19 reserve price, Google will make up the
20 difference out of its revenue share and the
21 seller will receive its floor price, right?
22        MR. RENARD: Objection to form.
23    A.    This document is describing
24 that when an auction clears below the
25 reserve price that the publisher will be

Page 211

1        WEINBERG, Ph.D.
2 paid at least the min CPM, and this
3 document is also representing that the
4 bidder will not pay more than their bid,
5 and you asked me to confirm that those two
6 things together mean that Google is
7 adjusting its revenue share, so those are
8 all true.
9     Q.    Okay. So all of that about DRS
10 version 1 is disclosed in this document,
11 Exhibit 7, right?
12        MR. RENARD: Objection to form.
13    A.    Those three things are true.
14 But backtracking, you asked me what do I
15 consider to not be disclosed, and what I
16 said was not disclosed is that when the
17 impression clears below the reserve, the
18 winning bidder always pays their bid
19 exactly. That is not disclosed in this
20 document and that is one of the reasons why
21 I found Google's conduct with respect to
22 DRSv1 deceptive, because if advertisers
23 were aware that below the reserve they are
24 always charged their bid, then advertisers
25 would have bid shaded in that region.

Page 212

1        WEINBERG, Ph.D.
2     Q.    But advertisers at least know
3 that Google is adjusting the prices of bids
4 to optimize the auction as of the date of
5 this post, right?
6        MR. RENARD: Objection to form.
7     A.    I don't know what advertisers
8 know, but this post contains information
9 that says AdX is optimizing bids.
10    Q.    Right. Changing them, right?
11    A.    Adjusting, yes, that's what it
12 says.
13    Q.    Adjusting is changing, right?
14    A.    Yes, sorry, I was just looking
15 for the precise phrase to make sure.
16        MS. PATRICK: All right, we can
17    take a break and we will go on to the
18    next document.
19        THE VIDEOGRAPHER: Off the
20    record 3:15 p.m.
21        (Recess taken.)
22        THE VIDEOGRAPHER: We are back
23    on the record 3:33 p.m.
24 BY MS. PATRICK:
25    Q.    Professor Weinberg, did you

Page 213

1        WEINBERG, Ph.D.
2 have a chance to talk with your counsel
3 during the break?
4     A.    Yes, I did.
5     Q.    And did you discuss your
6 testimony with them, sir?
7     A.    Yes, I did.
8     Q.    And what suggestions, if any,
9 did they make for changes you might make to
10 your testimony?
11        MR. RENARD: I'll object to
12    that as worded and instruct you not to
13    answer. But if in response to
14    Ms. Patrick's questions you have
15    anything to add or change, feel free to
16    do so.
17    A.    I do not have anything to add
18 or change.
19    Q.    So you stand by your testimony
20 up to now?
21    A.    Yes, I stand by the testimony
22 up to now.
23    Q.    All right. Weinberg Exhibit 8.
24        (Weinberg Exhibit 8 marked for
25 identification.)

54 (Pages 210 - 213)

Page 214

1    WEINBERG, Ph.D.
2    Q.    This is another document that
3 is on your list of documents that you
4 relied on. So I think we can say with a
5 fair degree of confidence that you have
6 seen and read this document. Take a moment
7 and confirm it for me.
8        (Witness perusing document.)
9    Q.    Have you read it, sir?
10    A.    Yes, I just finished.
11    Q.    And you can confirm that this
12 is a document that you have read, correct?
13    A.    I am just quickly confirming
14 that the Bates matches exactly. Yes, it is
15 exactly this document.
16    Q.    All right. And in several
17 places in your report you have described
18 dynamic revenue sharing as, quote,
19 "exceptionally misleading"; is that right?
20 Look at your opening report, paragraph 128.
21    A.    Sorry, did you say paragraph
22 128?
23    Q.    I did, but I might be wrong.
24 Maybe it is page. But let me check. Yes,
25 it is page 128, I apologize, Professor.

Page 215

1    WEINBERG, Ph.D.
2    A.    That's okay.
3    Q.    So look at page 128, heading G.
4    A.    Yes, I agree heading G says
5 Some Aspects of DRS are Exceptionally
6 Misleading.
7    Q.    And one of the aspects, what
8 you go on to say is "Much of my analysis
9 below concerns the concept of debt to
10 mislead both advertisers and publishers
11 regarding how much they are paying or paid
12 out."
13        Have I read that sentence
14 correctly?
15    A.    Yes, you have read that
16 sentence correctly.
17    Q.    And so it is your position as
18 you sit here today that the concept of debt
19 was misleading to both ad buyers and
20 publisher ad sellers as it was affected by
21 DRS, true?
22    A.    Can I repeat it? I just want
23 to get the question precise.
24    Q.    Yeah, it was a bad question.
25        My point is as it pertains to

Page 216

1    WEINBERG, Ph.D.
2 dynamic revenue sharing, DRS, your position
3 that it is misleading to advertisers and
4 publishers concerns in significant part the
5 concept of the debt created to Google by
6 virtue of the operation of dynamic revenue
7 sharing, right?
8    A.    I agree that one significant
9 aspect that contributes to my opinion that
10 DRS is deceptive is the mechanism of debt.
11    Q.    And it is deceptive in your
12 view to both ad buyers and ad sellers,
13 publishers?
14    A.    Yes, the concept of debt in my
15 opinion is deceptive both towards
16 advertisers and towards publishers.
17    Q.    And that's because the concept
18 of debt in your view was not disclosed to
19 either of them, right?
20        MR. RENARD: Objection to form.
21    A.    That is one element of why I
22 consider it to be deceptive.
23    Q.    Namely that the concept of debt
24 was not disclosed?
25    A.    Yes, that the concept of the

Page 217

1    WEINBERG, Ph.D.
2 debt was not transparently disclosed forms
3 one element of why I consider it to be a
4 deceptive conduct.
5    Q.    All right. So you added a
6 modifier there, "not transparently
7 disclosed." You will agree that the
8 existence of debt was disclosed, true?
9        MR. RENARD: Objection to the
10    statement preceding the question.
11    A.    No, I would disagree with that
12 statement.
13    Q.    All right. Well, let's examine
14 that.
15    A.    Can I clarify quickly? The
16 reason I chose to say "transparently
17 disclosed" is because I have a precise
18 definition for that in my report.
19 "Disclosed" is a vaguer term, and I would
20 still say no for disclosed, but I would
21 prefer to stick to a concrete term with a
22 concrete definition.
23    Q.    I understand that might be your
24 preference, sir, but I've got to live in
25 the law, where I live, and so I'm not aware

55 (Pages 214 - 217)

Page 218

WEINBERG, Ph.D.
1 of any statute that uses the word
2 "transparent," and so I'm going to ask
3 about what is disclosed, okay?
4        So with that preface, is it
5 your position that the concept of debt as
6 it pertained to DRS was not disclosed?
7        MR. RENARD: I'll object to the
8    preface.
9    A.    That is my opinion. I will
10 elaborate that this document does not
11 disclose the concept of debt, and I do
12 not -- I recall this document I believe
13 being cited in the Milgrom report as
14 evidence for the concept of debt being
15 disclosed. Without having the Milgrom
16 report in front of me, it is possible I'm
17 misremembering. But I do not recall seeing
18 any evidence in any of Google's experts'
19 reports or any other documents that would
20 lead me to believe that the concept of debt
21 was disclosed.
22    Q.    All right. Let's examine that.
23 Directing your attention to Exhibit 8,
24 which you have before you, sir, I will --

Page 219

WEINBERG, Ph.D.
1 this is another one of those disclosures
2 about the Ad Exchange auction model. So
3 the metadata would tell us that this is
4 June of 2016. I will ask you to accept my
5 representation about that. All right? Are
6 you with me?
7    A.    I will accept your
8 representation.
9    Q.    All right. And I want to go
10 down to, so we see in the first bullet
11 point the same disclosure of the fact that
12 "Ad Exchange may, at its discretion, make
13 adjustments to bids."
14        Do you see that?
15    A.    Yes, I agree.
16    Q.    And you see the same disclosure
17 that "Regardless of whether any adjustments
18 are made, the winning buyer will never be
19 charged more than the bid it submits."
20        Do you see that?
21    A.    I see that sentence, and I
22 would like to note that this sentence is
23 false for DRSv2, and I have stated that in
24 both my opening and my rebuttal reports.

Page 220

WEINBERG, Ph.D.
1    Q.    And as it pertains to that,
2 Professor, you remind me, I need to ask
3 this question, how many transactions have
4 you determined were executed because of the
5 effect of DRS version 1, dynamic revenue
6 sharing version 1?
7        MR. RENARD: Objection to form.
8    A.    It was not my assignment to
9 determine quantitatively how many
10 transactions cleared as a result of DRSv1.
11    Q.    All right. So the answer to my
12 question is you have not determined by any
13 method how many or whether any transactions
14 were cleared as a result of dynamic revenue
15 sharing version 1, true?
16    A.    Someone who wished to determine
17 how many transactions cleared because of
18 dynamic revenue sharing version 1 could use
19 my opinions as a basis, but I do not myself
20 do any calculations of that form.
21    Q.    And the same question as to
22 dynamic revenue sharing version 2, again,
23 you cannot tell the jury of your own
24 knowledge how many transactions were

Page 221

WEINBERG, Ph.D.
1 actually executed because of dynamic
2 revenue sharing version 2, true?
3    A.    So that was also not part of my
4 assignment. Someone who wished to
5 determine how many transactions cleared
6 because of dynamic revenue sharing V2 could
7 use opinions in my report as a basis, but I
8 do not myself calculate the number of
9 transactions.
10    Q.    And are you aware, sir, of
11 whether anyone on behalf of the states has
12 determined how many transactions were
13 actually executed because of dynamic
14 revenue sharing version 1?
15        MR. RENARD: Objection to form.
16    A.    I don't recall whether any
17 other experts on behalf of the plaintiff
18 states are doing that calculation.
19    Q.    All right. And same question
20 as to dynamic revenue sharing version 2,
21 DRS2.
22        MR. RENARD: Objection as to
23    form.
24    A.    I also don't recall whether any

56 (Pages 218 - 221)

WEINBERG, Ph.D.

1 experts on behalf of the plaintiff states
2 are calculating the number of transactions
3 that would not have cleared but for DRSv2.
4     Q.    And other than your five-minute
5 conversation with Mr. Andrien, have you
6 spoken directly with any of the other
7 experts for the plaintiff states?
8     A.    No, I have not.
9     Q.    Okay.  So let's go back to
10 Exhibit 8.  Let's look at the third bullet
11 point.  "To optimize the auction, Google
12 may choose to close an auction at a price
13 lower than the reserve price that would
14 otherwise have been applied.  In such cases
15 the winning buyer may pay a price below the
16 reserve and therefore receive a discount on
17 its bid.
18     Q.    Do you see that?
19     A.    Yes, I see that.
20     Q.    And the next sentence says "A
21 buyer that has received discounts on its
22 bid(s) may face higher reserve prices in
23 subsequent transactions to offset such
24 discounts."
25

WEINBERG, Ph.D.

1     Do you see that?
2     A.    Yes, I see that sentence too.
3     Q.    What does the word "offset"
4 mean?
5     MR. RENARD:  Objection to form.
6     A.    If you would let me use the
7 dictionary, I will give you a dictionary
8 definition.
9     Q.    Well, I happen to have one.
10     (Weinberg Exhibit 9 marked for
11 identification.)
12     Q.    Here is Exhibit 9.  When you
13 use Google to ask for the definition of
14 "offset," it gives you the Oxford Languages
15 Dictionary, do you see that, Exhibit 9?
16     A.    As I see that, as long as we
17 have Merriam-Webster, may I also look in
18 Merriam-Webster?
19     Q.    Of course.  It is right there.
20 Help yourself.  What do Merriam-Webster
21 say?
22     A.    I will read the entire one.  It
23 says "A.  to place over, against something,
24 balance.  B.  to serve as a counterbalance

WEINBERG, Ph.D.

1 for, compensate, to form an offset in, to
2 become marked by offset."
3     Q.    All right.  And the Oxford
4 Language Dictionary says an offset is "a
5 consideration or amount that diminishes or
6 balances the effect of a contrary one."
7     Do you see that?
8     A.    Yes, I see that.
9     Q.    And, similarly, the next
10 definition, which is the verb, "counteract
11 something by having an opposing force or an
12 effect.  The deficit has been more than
13 offset by capital inflows."
14     Do you see that?
15     A.    Yes, you said that correctly.
16     Q.    And so using all of those
17 definitions, counterbalance, to place over,
18 against, or to diminish or balance the
19 effect of a contrary one, at minimum, that
20 language is disclosing, you would agree,
21 that the discount is being offset by higher
22 prices elsewhere, right?
23     MR. RENARD:  Objection to form.
24     A.    This sentence contains the
25

WEINBERG, Ph.D.

1 information for someone who reads and
2 understands it that states the lower price
3 you received on this one is causing you to
4 pay a higher price later, for someone who
5 reads and understands it.
6     Q.    Right.  And, similarly, we see
7 the same thing in the disclosure for
8 sellers in the next bullet point, right?
9     MR. RENARD:  Objection to form.
10     A.    In the subsequent bullet point,
11 for someone who read and understood this,
12 they could conclude that they would face a
13 lower revenue share in subsequent
14 transactions to make up for the higher
15 revenue share of a previous one.
16     Q.    And you don't know how many ad
17 buyers or ad sellers read this disclosure,
18 do you?
19     MR. RENARD:  Objection to form.
20     A.    I do not know how many ad
21 buyers or ad sellers read this document.
22     Q.    Nor do you understand, nor do
23 you have any basis to determine, what, for
24 example, a sophisticated purchaser might
25

57 (Pages 222 - 225)

Page 226

1          WEINBERG, Ph.D.
2 have understood from that language, right?
3          MR. RENARD: Objection to form.
4     A.    Sorry, could you repeat the
5 question?
6     Q.    Sure.  You are not a
7 mind-reader, are you, sir?
8     A.    No, I'm not a mind-reader.
9     Q.    Right.  And so as it pertains
10 to what you have called a sophisticated
11 purchaser, you can't tell the jury from
12 your own knowledge how a sophisticated
13 purchaser might have received, read, or
14 understood this disclosure, true?
15     A.    I do not have a basis by which
16 I would assert that a sophisticated buyer
17 or seller would or would not get certain
18 information from this document.
19     Q.    So when you are talking about
20 conduct being deceptive, you are not able
21 to testify that this disclosure would be
22 deceptive to any particular ad buyer or ad
23 seller, true?
24          MR. RENARD: Objection to form.
25     A.    I think my previous answer may

Page 227

1          WEINBERG, Ph.D.
2 have been a bit too vague.  What I meant to
3 say was for the information that we have
4 just discussed, I could conclude from
5 reading this document, for that information
6 I don't have a basis by which to say a
7 particular sophisticated participant could
8 have reached the same conclusions.  I do
9 have a basis by which to say this document
10 does not contain sufficient information for
11 me, an auction theory expert, to conclude
12 the concept of debt, and therefore I
13 consider that a sufficient basis to
14 conclude that even a sophisticated player
15 would also not be able to deduce the
16 concept of debt from this document.
17     Q.    All right.  But what you can
18 deduce in plain English, and you don't have
19 to be a sophisticated auction theorist to
20 do that, is if you get a bid -- if you get
21 a discount on bid number one, you may face
22 higher reserve prices in subsequent
23 transactions to make up for it, right?
24          MR. RENARD: Objection to form.
25     A.    For someone who has read and

Page 228

1          WEINBERG, Ph.D.
2 understood this document, the document does
3 state that a buyer that has received
4 discounts on its bids may face higher
5 reserve prices in subsequent transactions.
6     Q.    To make up for those discounts?
7     A.    To offset such discounts, yes.
8     Q.    And, similarly, for sellers,
9 their revenue share might be reduced to
10 offset prior earnings in excess of the
11 contracted revenue share, right?
12          MR. RENARD: Objection to form.
13     A.    For a seller who read and
14 understood this document, the document
15 states that the revenue share may be
16 reduced to offset the prior earnings, yes.
17     Q.    And just to tie it out,
18 Professor, you cannot testify of your own
19 knowledge or opinion how many sellers would
20 have, could have, or did read and
21 understand this document?
22          MR. RENARD: Objection to form.
23     A.    It is not within my assignment
24 to determine how many sellers read and
25 understood this document, and I am indeed

Page 229

1          WEINBERG, Ph.D.
2 unable to do that.
3     Q.    All right.  And it is also not
4 within your assignment to determine how
5 many buyers read and understood this
6 document and therefore you are not able to
7 do that either, right?
8     A.    Yes, that is correct.
9     Q.    And therefore not able to say
10 whether particular ad buyers or sellers
11 were or were not deceived by this document,
12 true?
13          MR. RENARD: Objection to form.
14     A.    I will answer the question
15 followed by a clarification.  That is
16 correct that it is not within my assignment
17 to determine how many advertisers were
18 deceived by this document.  One thing it
19 could mean to be deceived by this document
20 is to believe the sentence "Regardless of
21 whether any adjustments are made, the
22 winning buyer will never be charged more
23 than the bid it submits."  That would be
24 one example of a way an advertiser could be
25 deceived by this document, and it is not

Page 230

WEINBERG, Ph.D.

1          WEINBERG, Ph.D.
2 within my assignment to determine how many
3 advertisers believed that statement.
4     Q.   Right.  And in fact, as you sit
5 here today, you have not determined whether
6 any ad buyer believed that their -- I'm
7 sorry, I lost my train of thought.
8          You said "One thing it could
9 mean to be deceived by this document is to
10 believe the sentence 'Regardless of whether
11 any adjustments are made, the winning buyer
12 will never be charged more than the bid it
13 submits.'  That's an example of a way an
14 advertiser could be deceived by this
15 document, but it is not within my
16 assignment to determine how many
17 advertisers believed that statement," and
18 therefore you cannot say as you sit here
19 today that even one advertiser was deceived
20 by that statement, true?
21     MR. RENARD:  Objection to form.
22     A.   It is not within my assignment
23 to determine how many advertisers,
24 including whether that number was one,
25 more, or zero, believe that statement.

Page 231

1          WEINBERG, Ph.D.
2     Q.   Right.  And as you sit here
3 today you cannot say that even one was
4 deceived, true?
5          MR. RENARD:  Objection to form.
6     A.   It was not within my
7 assignment -- it was not within my
8 assignment to determine whether any
9 advertisers believed the statement, and as
10 a result it is also not within my
11 assignment to determine whether even one
12 believed that statement.
13     Q.   And, similarly, not within your
14 assignment to believe -- to determine
15 whether even one buyer or even one seller
16 was deceived by the statement about
17 offsets?
18     A.   I think this is getting back
19 into nuance about whether a statement in
20 isolation that withholds material
21 information is deceiving in isolation.  So,
22 for example, the sentence "A buyer that has
23 received discounts on its bids may face
24 higher reserve prices in subsequent
25 transactions to offset such discounts," I

Page 232

1          WEINBERG, Ph.D.
2 am not aware that that is a false
3 statement, and so in isolation it is hard
4 for me to call that sentence deceiving.
5          However, to the best of my
6 knowledge, this is the only sentence that I
7 have seen in any document, including those
8 cited in the Milgrom, Baye and Wiggins
9 report that attempts to describe the
10 concept of debt to advertisers.
11          So for an advertiser who only
12 sees this sentence, I would say that
13 advertiser is deceived about DRSv2.  My
14 basis for making that claim is I as an
15 expert auction theorist would not deduce
16 the concept of debt just from this
17 sentence.
18     Q.   Right.  But as we sit here,
19 Doctor, you have not determined whether any
20 any advertiser or publisher only saw this
21 one document, true?
22     A.   I do not know what documents
23 advertisers or publishers see.  What I do
24 know is in my opening report I clearly
25 stated that Google would have needed to

Page 233

1          WEINBERG, Ph.D.
2 disclose a somewhat precise description of
3 the debt concept in order to transparently
4 disclose it, and this is I believe the most
5 relevant document, the Milgrom report,
6 cited in response, and so I therefore have
7 reason to believe that there is no better
8 document that Google is aware of that an
9 advertiser or publisher could have seen.
10          MS. PATRICK:  Objection,
11 nonresponsive.
12     Q.   I'm going to ask you my
13 question again.  It was actually simpler.
14          As we sit here, you have not
15 determined whether any advertiser or
16 publisher only saw this one document, true?
17     A.   The sentence is true, it is not
18 within my assignment to determine whether
19 advertisers or publishers have seen more
20 than this document.  I would still like to
21 add the context that the basis for my
22 opinions regarding deception are that
23 significantly more information would be
24 needed than this document not to be
25 deceived about DRSv2.  In my opening report

59 (Pages 230 - 233)

Page 234

1    WEINBERG, Ph.D.
2 I clearly stated this, and in the Milgrom
3 rebuttal report, this seems to be the most
4 informative document that could be found
5 within Google in response.
6    MS. PATRICK:  I object as
7 nonresponsive to everything after the
8 first sentence of your answer, sir.
9    Q.    And then my last question is
10 and therefore you cannot identify for the
11 jury even one buyer who was deceived by the
12 statement "A buyer that has received
13 discounts on its bids may face higher
14 reserve prices in subsequent transactions
15 to offset such discounts"?
16    MR. RENARD:  Objection to form.
17    A.    I think there is an implication
18 in that statement that I find the sentence
19 "A buyer that has received discounts on its
20 bids may face higher reserve prices in
21 subsequent transactions to offset such
22 discounts" deceiving in isolation, that
23 indication was false.  I find that sentence
24 insufficient and to withhold material
25 information.

Page 235

1    WEINBERG, Ph.D.
2    Q.    Okay.  But that sentence is,
3 you have agreed, literally true, right, as
4 you understand how DRS version 2 operated?
5 You just told me it is not a false
6 statement.
7    A.    Yes, I am not contesting
8 whether that statement is true or false as
9 it relates to DRSv2.  I understand that
10 statement to be true.
11    Q.    Okay.  So you understand that
12 statement to be true, and you are not here
13 telling this jury that you can identify
14 even one buyer that was deceived by that
15 true statement, right?
16    A.    I will answer the question and
17 provide context again.  A true statement in
18 isolation, I don't see how a true statement
19 in isolation could be deceptive, and
20 therefore I don't see how I would find
21 evidence that a buyer was deceived by a
22 true statement in isolation absent any
23 other context.
24    What I am asserting, sorry,
25 what I am opining is that this sentence is

Page 236

1    WEINBERG, Ph.D.
2 insufficient to disclose the material
3 information for the concept of debt, and
4 therefore I, as an expert auction theorist,
5 could not conclude the concept of debt just
6 from this sentence, and therefore I do not
7 expect someone else to be able to conclude
8 so.
9    MS. PATRICK:  I object as
10 nonresponsive to everything after "What
11 I am asserting."
12    Q.    Same question, you understand
13 the statement to be true that a "seller's
14 revenue share may then be reduced to offset
15 the prior earnings in excess of the
16 contracted revenue share, but the seller
17 will always receive at least its contracted
18 revenue share across all its ad
19 transactions in a given month," true?
20    A.    The "In subsequent transactions
21 the seller's revenue share may then be
22 reduced to offset the prior earnings in
23 excess of the contracted revenue share,"
24 that is true with respect to my
25 understanding of DRSv2 and TDRS.  For the

Page 237

1    WEINBERG, Ph.D.
2 second half of the sentence, I believe that
3 is true for DRSv2 and that is a nuanced
4 question for TDRS that I don't recall
5 whether I addressed in my report.
6    Q.    But at least as to the
7 statements that you believe are true, you
8 understand that a seller, sorry, at least
9 as to the portions of the statement that
10 you acknowledge are true, namely that in
11 subsequent transactions the seller's
12 revenue share may then be reduced to offset
13 the prior earnings in excess of the
14 contracted revenue share, you are not able
15 to identify a single seller that was
16 deceived by that true statement, right?
17    A.    So for a true statement in
18 isolation, I don't know how someone would
19 be deceived by a true statement in
20 isolation with no further context.  It is
21 my opinion that this sentence is
22 insufficient and withholds material
23 information about DRSv2 and TDRS and that I
24 as an auction theorist would not be able to
25 conclude material information about the

60 (Pages 234 - 237)

WEINBERG, Ph.D.
1
2  concept of debt from just this text.
3        MS. PATRICK:  I object as
4  nonresponsive.
5    Q.    You keep saying that I as an
6  auction theorist would not be able to
7  discern debt from the use of the term
8  "offset."  But you are neither an
9  advertiser nor a publisher ad seller, true?
10        MR. RENARD:  Objection to form.
11    A.    I am neither an advertiser nor
12  a publisher for part one or for part two.
13  For part one, to clarify, what I am stating
14  is that the sentences, or this document in
15  its entirety, is insufficient for me to
16  conclude the concept of debt as I now know
17  it from the documents I have reviewed for
18  this case.
19    Q.    Right.  But you have no way of
20  knowing what an ad buyer or seller
21  experienced in the industry would have
22  understood from that disclosure, right?
23        MR. RENARD:  Objection to form.
24    Q.    Because you have never been an
25  ad buyer or an ad seller?

1        WEINBERG, Ph.D.
2        MR. RENARD:  Same objection.
3    A.    I do not know whether the word
4  "offset" means something special to
5  advertisers and publishers that it doesn't
6  mean to me, because I am not an advertiser
7  or a publisher.
8    Q.    And you certainly would agree
9  that if you see a term in a disclosure that
10  you don't understand, it would be useful to
11  inquire as to what it means, right?
12        MR. RENARD:  Objection to form.
13    A.    If I were to read a document
14  and I thought that document were relevant
15  to my business, I personally would try to
16  understand that.
17    Q.    And we've seen that if you had
18  used Google to Google "offset," the
19  definition as set out in Exhibit 9 makes
20  reference to offsetting a debt, right,
21  counterbalancing a financial obligation?
22        MR. RENARD:  Objection to form.
23    A.    Sorry, maybe I can --
24    Q.    Exhibit 9 is right there, sir.
25  That's what I've asked you about.

1        WEINBERG, Ph.D.
2    A.    Yeah, I'm happy to clarify that
3  I don't think the use of the word "offset"
4  is misleading.  I agree that "offset"
5  implies counteracting or opposing or
6  counterbalancing.
7        What I am stating is that debt
8  is a very precise mechanism and I needed to
9  understand the actual pseudocode used to
10  describe the concept of debt.  That took me
11  several hours to understand exactly what
12  was going on.  And just knowing that there
13  was a counteracting or opposing force is
14  not sufficient for me to draw those
15  conclusions.
16    Q.    For you as an auction theorist
17  to draw those conclusions, right?
18    A.    Yes, I am an auction theorist.
19    Q.    So just to wrap this up, you
20  can't point to any individual ad buyer or
21  ad seller who was deceived by those true
22  statements, right?
23        MR. RENARD:  Objection to form.
24    A.    It was not part of my
25  assignment to understand which advertisers

1        WEINBERG, Ph.D.
2  and which publishers were deceived by
3  different conducts of Google.  In
4  particular, it was not part of my
5  assignment to determine whether any, even
6  one advertiser or publisher, were deceived
7  by this document.
8    Q.    And therefore you have not
9  determined that even one advertiser or
10  publisher was deceived by this document or
11  by DRS, right?
12        MR. RENARD:  Objection to form.
13    A.    Because it was not part of my
14  assignment to determine, I did not
15  determine whether even one advertiser or
16  publisher believed the false statements in
17  this document, nor whether they were able
18  to understand more than I as an auction
19  theorist was capable of understanding.
20        MS. PATRICK:  Objection,
21  nonresponsive.
22    Q.    Let me ask you the question a
23  slightly different way.
24        You have not determined whether
25  even one advertiser or publisher was

61 (Pages 238 - 241)

Page 242

WEINBERG, Ph.D.

1     WEINBERG, Ph.D.
2  deceived by this document about dynamic
3  revenue sharing, true?
4      A.    If you could help me understand
5  how I'm not answering the question.
6      Q.    I'm asking you whether you know
7  a particular ad buyer or ad seller that you
8  can name for me so the jury knows there is
9  one who was actually deceived by this
10  document.  That's my question.
11          MR. RENARD:  Objection to the
12  form.
13      A.    I will repeat my answer.  If
14  you tell me which part of the answer is not
15  clear, I will try again.
16      Q.    Can you name one, sir?
17      A.    I would like to finish my
18  answer to your previous question.
19          This document does not contain
20  sufficient information for me as an auction
21  theorist to understand the concept of debt,
22  and therefore I, as an auction theorist,
23  would be deceived by Google's conduct with
24  respect to DRS.  Therefore, I believe that
25  any advertiser that does not employ -- I

Page 243

1     WEINBERG, Ph.D.
2  would expect advertisers or publishers with
3  less expertise in auction theory than me to
4  be deceived.
5          If you could let me know which
6  part of that doesn't answer your question,
7  I can try to change it.
8      Q.    Yes.  Can you identify any
9  specific ad buyer who was in fact deceived
10  by the true statements in this document,
11  Weinberg Exhibit 8?
12          MR. RENARD:  Objection to form.
13      A.    Maybe I can say it was not part
14  of my assignment to identify specific
15  advertisers or publishers who were
16  deceived, therefore I cannot identify a
17  particular advertiser or publisher who I am
18  certain has less auction theory expertise
19  or ability to understand this document than
20  I do.
21      Q.    And therefore you cannot tell
22  the jury that you are -- that you can
23  identify even one who actually was deceived
24  by name?
25      A.    Because it was not part of my

Page 244

1     WEINBERG, Ph.D.
2  assignment, I cannot identify by name any
3  publisher or advertiser that I am confident
4  did not understand this document better
5  than I do.
6      Q.    Or was deceived by it?
7      A.    Noting that they would need to
8  understand the document better than I do in
9  order to not be deceived by it.
10      Q.    So the answer to my question is
11  you cannot tell the jury any individual ad
12  buyer or publisher who was deceived by this
13  document, true?
14      A.    I believe I am answering your
15  question with the appropriate amount of
16  nuance.  Because it was not part of my
17  assignment, I cannot identify a single
18  advertiser or publisher who did not
19  understand this document better than I do,
20  and therefore was not deceived.
21          I think, what I said is true,
22  but I think if that does not answer your
23  question I can try again.
24      Q.    There is truth in the world and
25  there are ad buyers in the system, right?

Page 245

1     WEINBERG, Ph.D.
2          MR. RENARD:  Objection to the
3  question.
4      A.    I agree that there is truth in
5  the world and that there are ad buyers in
6  the ad buying ecosystem.
7      Q.    And we can agree that it is
8  part of the truth here that you did not
9  identify any specific ad buyer who was in
10  fact deceived by anything Google did, true?
11          MR. RENARD:  Objection to form.
12      A.    How about this:  Because it was
13  not part of my assignment, I cannot
14  identify even a single advertiser or
15  publisher who was deceived by this
16  document, noting that any advertiser or
17  publisher who does not understand this
18  document better than I do would have been
19  deceived by this document.
20      Q.    That's your opinion?
21      A.    Yes, that is my opinion.
22      Q.    But you don't actually know
23  what the standards and practices or
24  understandings of the advertising industry
25  are, right?

62 (Pages 242 - 245)

Page 246

1    WEINBERG, Ph.D.
2        MR. RENARD:  Objection to the
3    form.
4    A.    Sorry, can you just repeat the
5    question?
6    Q.    Sure.  You don't know what ad
7    buyers and ad sellers understand from their
8    common parlance in their industry from the
9    term "offset," do you?
10        MR. RENARD:  Objection to form.
11   A.    That is correct.  I do not know
12   what ad buyers or publishers would
13   understand the term "offset" to mean.
14   Q.    And you can agree that if they
15   don't understand the term "offset" they
16   should ask a question, right?
17       MR. RENARD:  Objection to form.
18   A.    It is not part of my assignment
19   to determine what an advertiser or
20   publisher should do.
21   Q.    Or what they in fact
22   understood, right?
23       MR. RENARD:  Objection to the
24   form.
25   A.    It was also not part of my

Page 247

1    WEINBERG, Ph.D.
2    assignment to understand what an advertiser
3    or publisher in fact understood.
4    Q.    All right.  Let's look at our
5    next document.
6        (Weinberg Exhibit 10 marked for
7    identification.)
8    Q.    This is Weinberg Exhibit 10,
9    sir.  Does this document look familiar to
10   you?
11       (Witness perusing document.)
12   Q.    Professor, in the interest of
13   time, I'm just asking you at the moment if
14   this document looks familiar to you.  I'm
15   not asking you about something specific
16   yet.
17   A.    The document is a lot of pages.
18   I'm comfortable saying that the first page
19   does not look familiar, but there are ten
20   pages and it is possible that a later page
21   will look familiar.  I was trying to be
22   thorough with your question.
23   Q.    Okay.  Well, I will represent
24   to you, but I could be wrong, let me just
25   look here, I don't think you have seen this

Page 248

1    WEINBERG, Ph.D.
2    document.  So if I look at your rebuttal
3    report, Materials Relied Upon, sir, the
4    documents numbered GOOG-AT-MDL-C, none of
5    these are listed there, none of these pages
6    are listed there.
7    A.    I understand that, but there
8    were two documents earlier today that had a
9    Bates number that was not included where I
10   believe I had seen them.  If you are
11   comfortable with my answer that the first
12   page doesn't look similar, then leaving it
13   at that --
14   Q.    So it is possible this is a
15   document you have not seen before?
16   A.    It is possible this is a
17   document I have not seen before, yes.
18   Q.    So let me pace you through this
19   document in the interest of time.  If you
20   will get to the first page.  So this is an
21   archive of releases for publishers and Ad
22   Exchange sellers.  It is a web archive of
23   what has been put out to the public, okay?
24   And it starts at Q4 2016.  Do you see that?
25       MR. RENARD:  Objection to the

Page 249

1    WEINBERG, Ph.D.
2    preface to the question.
3    Q.    I understand.  I'm just
4    orienting you.  You see the fourth quarter
5    2016, sir?
6    A.    Yes, I see that it says Q4 2016
7    on the first page.
8    Q.    So if you will go to the Bates
9    page that ends in 74, you will see Q3 2016?
10   A.    On the Bates page that ends in
11   74 I see that it ends Q3 2016.
12   Q.    All right.  And if you go to
13   the page that ends in 78, you will see Q2
14   2016.  Do you see that?
15   A.    Yes, I see on the page that
16   ends in 78 it says Q2 2016.
17   Q.    All right.  And then if you
18   turn to the next page that ends in 79 you
19   see there June 13th Change History Update.
20   Do you see that?
21   A.    Yes, on the page ending in 79,
22   I see at the top it says June 13th Change
23   History Update.
24   Q.    And in the second -- in the
25   second headline there under Ad Exchange,

63 (Pages 246 - 249)

WEINBERG, Ph.D.

1      WEINBERG, Ph.D.
2  there are -- there is a bullet, two bullet
3  points, right?
4      A.   Yes, I see that there are two
5  bullet points.
6      Q.   And the second bullet point
7  says "As part of our ongoing effort to
8  provide smarter optimizations and maximize
9  revenue, we may increase or decrease
10 revenue share per query."
11      Do you see that?
12      A.   Yes, I see that.
13      Q.   So that is Google saying we may
14 change our fee in order to provide smarter
15 optimizations and maximize revenue, right?
16      MR. RENARD:  Objection to the
17      form of the question.
18      A.   Taking at face value that this
19 is a Google written document, I agree that
20 the authors of this document are stating in
21 the document that they are increasing and
22 decreasing revenue share per query.
23      Q.   Increasing and decreasing
24 Google's fees in order to provide smarter
25 optimizations and maximize revenue, right?

1      WEINBERG, Ph.D.
2      MR. RENARD:  Objection to form.
3      A.   This document is describing
4  increasing or decreasing revenue share per
5  query for the purpose of smarter
6  optimizations and maximizing revenue.  I
7  will take at face value that it is authored
8  by Google, and therefore the revenue share
9  are Google's fees.
10      Q.   And then it goes on to say "If
11 you would prefer to apply your contracted
12 revenue share on every query, use the new
13 Ad Exchange user interface admin control to
14 exclude all sites you monetize through your
15 account from revenue share based
16 optimizations."
17      Do you see that?
18      A.   Yes, I see that.
19      Q.   So people could opt out of that
20 revenue share optimization if they wanted
21 to at least as of June 13th, 2016, right?
22      MR. RENARD:  Objection to form.
23      A.   I need to unpack that a bit.
24 There are two types of participants that
25 are -- may want to opt out of DRS.  One is

1      WEINBERG, Ph.D.
2  the advertisers, one is the publishers.
3  This describes an opt-out for publishers.
4  And while I have not cited this document
5  directly, I am confident that my rebuttal
6  report acknowledges that publishers could
7  opt out of DRSv2.  I believe my opening
8  report also acknowledges this.  And in my
9  rebuttal report I note on page 37, 119-5,
10 so this is at the top of page 37, I wrote
11 "Google did allow publishers to opt out of
12 DRSv2," and I don't know actually if this
13 is the same document I cited or maybe I
14 cited a different announcement or an
15 internal e-mail.  I don't recall exactly
16 what I cited, but there was something cited
17 in 136, so I am aware of that.  But I
18 follow "but given that publishers were
19 misled to believe they would always be paid
20 at least their price floor under DRSv2,
21 publishers could not make a fully-informed
22 decision on whether to opt out of DRSv2."
23      Sorry, one more sentence.
24 "Google's imperfect opt-out does not remedy
25 that deceptive conduct."  And I would say

1      WEINBERG, Ph.D.
2  there was an implied to publishers.
3      Q.   Putting aside for the moment
4  your observation about what you considered
5  to be a fully-informed decision, we can
6  agree that as of June of 2016 it was
7  disclosed to both publishers and ad buyers
8  that Google was increasing or decreasing
9  revenue share per query to provide smarter
10 optimizations and maximize revenue, right?
11      MR. RENARD:  Objection to form.
12      A.   This statement, which, again, I
13 don't know who read this statement or how
14 well they understood it, this statement
15 definitely says that Google may increase or
16 decrease revenue share per query for the
17 aim of optimizing revenue and smarter
18 optimizations.
19      Q.   Okay.  And this statement also
20 says that publishers can opt out of that
21 revenue sharing function and optimization
22 if they want to, right?
23      A.   This document states that, and
24 I will note that my rebuttal report and my
25 opening report acknowledge that, and I have

64 (Pages 250 - 253)

Page 254

WEINBERG, Ph.D.
1          WEINBERG, Ph.D.
2   cited in my rebuttal report how my
3   deceptive -- my analysis of deceptive
4   conduct takes that into consideration.
5     Q.    But the fact that people could
6   opt out is disclosed, right, and true?
7          MR. RENARD: Objection to form.
8     A.    Again, to unpack, advertisers
9   could not opt out, so when you say people,
10  I want to refine that to publishers, this
11  document is stating that publishers can opt
12  out. My rebuttal report acknowledges that
13  and it does not impact any of my opinions.
14  I do not have an opinion on whether
15  advertisers/publishers were aware of this
16  document, whether they read and understood
17  it, how well Google advertised it, or
18  whatever else is necessary for it to
19  constitute a, quote, "disclosure."
20    Q.    Or if even one person was
21  deceived by it, right?
22         MR. RENARD: I object to form.
23    A.    When you say "it," could you
24  clarify what you mean?
25    Q.    By this document.

Page 255

1          WEINBERG, Ph.D.
2     A.    If it is helpful to clarify,
3   this is -- okay, this is a long document,
4   but providing an opt-out as this document
5   does, I don't consider it deceptive for
6   Google to offer the opportunity to opt out
7   in isolation. What I consider deceptive is
8   not providing sufficient information to
9   make an informed decision on opting out.
10         For your question, in terms of
11  being deceived by this document, that is
12  correct that it is not within my assignment
13  to determine whether an advertiser or
14  publisher were deceived by this document.
15  I add the remaining context to note that my
16  report does not claim that providing an
17  opt-out is deceptive in the first place.
18         MS. PATRICK: Okay. I don't
19  know how long we have been going, but
20  let's stop for a minute.
21         MR. RENARD: It has been about
22  an hour.
23         MS. PATRICK: Okay, take
24  another break.
25         THE VIDEOGRAPHER: Off the

Page 256

1          WEINBERG, Ph.D.
2   record 4:33 p.m.
3         (Recess taken.)
4         THE VIDEOGRAPHER: We are back
5   on the record 4:51 p.m.
6   BY MS. PATRICK:
7     Q.    All right, Professor, I now
8   want to ask you about Bernanke. What was
9   Bernanke?
10    A.    Bernanke was a conduct that GDN
11  engaged in.
12    Q.    GDN is what?
13    A.    GDN I believe stands for Google
14  Display Network. This was one of Google's
15  ad buying tools. And there are multiple
16  variants of Project Bernanke. I will
17  describe properties that they all shared,
18  and afterwards I'm happy to clarify further
19  details.
20         So when AdX was running let me
21  call it a claim second price auction, or a
22  second price auction, ignoring the other
23  deceptive conduct like RPO and DRS, GDN was
24  submitting, prior to Bernanke, its two
25  highest bids, and what this has the effect

Page 257

1          WEINBERG, Ph.D.
2   of is submitting your two highest bids to
3   AdX is functionally just passing on the
4   relevant bids. And there are two aspects
5   to Bernanke that are relevant that I refer
6   to in my report, I call one of them the
7   collusion aspect, one of them the
8   overbidding aspect, and what Bernanke did
9   was it lowered the second highest bid
10  submitted and raised the highest bid
11  submitted, and in particular
20  had the impact of potentially lowering the
21  price that GDN would pay when it wins,
22  because, for example, GDN's own second
23  highest bid could become the clearing
24  price, so lowering this would lower the
25  clearing price. This is what I referred to

65 (Pages 254 - 257)

Page 258

WEINBERG, Ph.D.
1
2 as the collusive element. And increasing
3 the highest bid would cause GDN to win more
4 often, and that is what I referred to as
5 the overbidding aspect.
6        So that was true when AdX was
7 using a second, let me call it a second
8 price variant, because of the other
9 deceptive conduct. When AdX switched to a
10 first price variant the Alchemist or first
11 price Bernanke has the same overbidding and
12 collusive elements but the precise
13 implementation differs.
14        So in order to implement the
15 collusion aspect, the Bernanke bids were
16 optimized only against outside advertisers
17 rather than against the entire advertising
18 pool, including other GDN bidders, and the
19 overbidding aspect is that the bids were
20 optimized for a larger true value instead
21 of the actual true value.
22        So maybe to summarize I would
23 say that Bernanke had a collusive aspect
24 throughout all variants, which is that
25 competition within GDN was lowered, and it

Page 259

WEINBERG, Ph.D.
1
2 had an overbidding aspect which is that the
3 winning bid was increased. And just to be
4 super clear, let me clarify that I mean
5 competition in the auction theory sense, as
6 in competing for this particular
7 impression, and not in any other way.
8    Q.    Okay. And what was the
9 threshold payment rule as it pertained to
10 Bernanke?
11    A.    So I don't remember exactly
12 when, but I believe the Milgrom report
13 claims that Global Bernanke switched from a
14 first price payment rule to a threshold
15 payment rule. I don't remember the precise
16 date he claims. But to be clear, I do not
17 object to whatever date he claims. I would
18 take that at face value. And a threshold
19 payment rule refers to the fact that a
20 bidder is paying their minimum bid to win,
21 whereas a first price payment rule refers
22 to the fact that a bidder is paying their
23 bid in the auction.
24    Q.    Okay. And when did Bernanke
25 start?

Page 260

WEINBERG, Ph.D.
1
2    A.    It looks like Project Bernanke
3 launched in 2013, although I want to note
4 that a predecessor called Buy-Side DRS
5 seems to have launched earlier, and some of
6 my claims about Project Bernanke that I
7 have explicitly stated in my rebuttal
8 report also apply to Buy-Side DRS. Just to
9 be super clear, what I mean is in my
10 rebuttal report I have explicitly stated
11 that some claims also apply to Buy-Side
12 DRS.
13    Q.    And when did you learn about
14 the switch from a first price payment rule
15 to a threshold payment rule?
16    A.    I don't recall.
17    Q.    Did you learn it between the
18 time you published your first report and
19 the time you have published your rebuttal
20 report?
21    A.    I also don't recall.
22    Q.    Do you think you learned about
23 it from Professor Milgrom?
24    A.    I don't -- I don't recall where
25 I learned it from.

Page 261

WEINBERG, Ph.D.
1
2    Q.    Can you say definitively that
3 you knew about threshold pricing before you
4 read Professor Milgrom's report?
5    A.    I can't definitively say that.
6 Yeah, that's the end of my answer.
7    Q.    Okay. So it is possible at
8 least that you first learned of threshold
9 pricing from Professor Milgrom's report,
10 right?
11    A.    That is possible, yes.
12    Q.    And it is fair to say that the
13 information about the threshold payment
14 rule changed some of your opinions in your
15 initial report about Global Bernanke and
16 Alchemist?
17    A.    No, I don't think that's
18 accurate. Do you have a specific --
19    Q.    Yeah, we will go through it
20 piece by piece.
21        In paragraph 19 of your
22 rebuttal report, Exhibit 2, you say --
23    A.    Sorry, paragraph 19?
24    Q.    Yes.
25    A.    Not page?

66 (Pages 258 - 261)

WEINBERG, Ph.D.

1
2    Q.    Page 10, paragraph 19.  You say
3  "Project Bernanke did not benefit Google
4  Display Network advertisers during the
5  periods when it used a first price payment
6  rule."
7          Do you see that?
8    A.    Yes.
9    Q.    Stated affirmatively, would you
10  agree that that means that Bernanke did
11  benefit advertisers when the system used a
12  threshold payment rule?
13          MR. RENARD:  Objection to form.
14    A.    I don't have an opinion on
15  that, and that would take me some time to
16  think through a new opinion that's
17  technical in nature.
18    Q.    All right.  So at least as you
19  sit here today you have not excluded the
20  possibility that Bernanke was beneficial to
21  advertisers during periods when it used a
22  threshold payment rule?
23    A.    That is correct.  My report
24  does not exclude the possibility that
25  Bernanke was beneficial to advertisers

WEINBERG, Ph.D.

1
2  during a period when AdX was running a
3  second price variant and Bernanke was using
4  a threshold payment rule.
5    Q.    Okay.  And, similarly, if I can
6  direct your attention to paragraph 98 --
7    A.    Of rebuttal?
8    Q.    Uh-huh.  You say that "Project
9  Bernanke or Global Bernanke or Buy-Side DRS
10  would have caused Google Display Network
11  advertisers to report" -- I'm sorry, let me
12  try again, rephrase.
13          In paragraph 98 you say that
14  "With a first price payment rule Buy-Side
15  DRS, Bernanke and Global Bernanke would
16  have caused Google Display Network
17  advertisers to report their true values to
18  the network when they would have been
19  better off bid shading," right?
20          MR. RENARD:  Objection to form.
21    A.    I just want to note it is a
22  slight misquote, but I consider it the way you
23  read it to be an accurate representation of
24  the letter of the text.
25    Q.    Okay.  And does it follow that

WEINBERG, Ph.D.

1
2  when Bernanke was using a threshold payment
3  rule advertisers would not have been better
4  off bid shading because bidding truthfully
5  was optimal?
6          MR. RENARD:  Objection to form.
7    A.    As I stated in my opening
8  report and is also commonly known within
9  auction theory, in an auction that uses
10  threshold payments, advertisers are not
11  better off bid shading.
12    Q.    They are better off bidding
13  truthfully?
14    A.    Just to repeat the previous
15  context for that question, in an auction
16  with threshold payments, advertisers are
17  best off bidding truthfully, that's
18  correct.
19    Q.    Okay.  And so that means, then,
20  that in periods without the first price
21  payment rule where instead threshold
22  payment was the norm, Bernanke and its
23  later manifestations did not injure
24  advertisers because they were presenting
25  truthful bids, right?

WEINBERG, Ph.D.

1
2          MR. RENARD:  Objection to form.
3    Q.    Let me rephrase it.
4          That means, then, that in
5  periods without the first price payment
6  rule and where instead the threshold
7  payment rule was the norm, advertisers
8  submitting truthful bids were not injured
9  or deceived by Bernanke?
10          MR. RENARD:  Same objection.
11    A.    That is not an opinion I have.
12  I can share that for the opinions of mine
13  where I explicitly add a parenthetical or
14  footnote or other clarification of "with
15  first price payment rule," those opinions
16  as stated only apply to the variants with
17  first price payment rule, and those
18  conclusions, I am not claiming them with
19  threshold payments.
20    Q.    Okay.  And so if I look at page
21  83 of your report at footnote 39 -- 39? --
22  no, 349, sorry, you are talking there at --
23  I'm sorry, footnote 348 and then 349.  You
24  first say during periods when Bernanke and
25  Global Bernanke used a first price payment

67 (Pages 262 - 265)

WEINBERG, Ph.D.

1
2  option the assumption you make, or the
3  assumption made by Professor Milgrom holds
4  only for sophisticated advertisers and not
5  for default advertisers. Do you see that?
6     A.   Yes, I see that footnote.
7     Q.   Explain, please.
8     A.   Without having the Milgrom
9  report, I believe I can answer your
10 question, but I will do so to the best of
11 my ability given the text that's here.
12    Q.   That's fine.
13    A.   So when I write
14 "Specifically" -- sorry, just to confirm,
15 you asked me just footnote 348?
16    Q.   Correct.
17    A.   So when I write "Specifically,
18 when the report invokes the 'revelation
19 principle' in its proof, the report
20 implicitly assumes that bidders are best
21 responding in Bayes-Nash equilibrium,"
22 what that means is there is an economic
23 concept called Bayes-Nash equilibrium and
24 what that refers to is in a game where
25 there are multiple participants, each of

WEINBERG, Ph.D.

1
2  those participants have some private
3  information that is drawn from a
4  distribution. Each of those bidders can
5  form a belief about what the other bidders
6  are doing knowing that their private
7  information is drawn from whatever
8  distribution it is drawn from, and a bidder
9  could be best responding to what they
10 believe the other bidders are doing in
11 expectation over the bidders drawing their
12 information from these distributions.
13       So what a Bayes-Nash
14 equilibrium is is when all bidders are
15 simultaneously forming accurate beliefs
16 about what the others are doing, forming
17 accurate beliefs about what their private
18 information is drawn from, and best
19 responding to those beliefs.
20       I assume, because I wrote the
21 report invokes the revelation principle,
22 this means that Milgrom's proof of theorem
23 1 uses the revelation principle, and what
24 the revelation principle means is that for
25 every Bayes-Nash equilibrium in a domain

WEINBERG, Ph.D.

1
2  where the participants' information is
3  drawn independently, there is a direct
4  implementation of that Bayes-Nash
5  equilibrium with an incentive compatible
6  auction.
7       So what the rest of footnote
8  348 is saying is that during periods where
9  Project Bernanke and Global Bernanke use a
10 first price payment rule, default
11 advertisers would not participate in
12 Bayes-Nash equilibrium because default
13 advertisers would bid their true value,
14 which is not best responding, because they
15 would more optimally shade their bids. But
16 for a sophisticated and fully-informed
17 advertisers, this is exactly what that
18 definition means, that they would somehow
19 find a way to be in Bayes-Nash equilibrium
20 no matter whether Bernanke was disclosed or
21 not.
22    Q.   Okay. And so potentially in
23 that universe sophisticated advertisers,
24 even in a first price payment rule, might
25 not be deceived by Bernanke or Global

WEINBERG, Ph.D.

1
2  Bernanke, right?
3     A.   I, again, don't know that --
4  sorry, I don't know that I have an opinion
5  on, and it wasn't in my assignment to
6  determine whether publishers or advertisers
7  were deceived, but it is my opinion that
8  Google's conduct surrounding Project
9  Bernanke and Global Bernanke during periods
10 where it used the first price payment rule
11 was deceptive for this particular reason.
12    Q.   Was deceptive for default
13 advertisers, right, but not necessarily for
14 sophisticated advertisers?
15       MR. RENARD: Objection to form.
16    A.   No, I think Bernanke and Global
17 Bernanke and Buy-Side DRS using a first
18 price payment rule are just deceptive.
19    Q.   Okay. But you have not tested
20 that by reading, for example, the
21 depositions of any sophisticated investors
22 to know what they might have known or
23 considered about it, right?
24       MR. RENARD: Objection to form.
25    Q.   Sophisticated advertisers, I'm

Page 270

1         WEINBERG, Ph.D.
2 sorry, I misspoke.
3         MR. RENARD:  Same objection.
4     A.    It wasn't part of my assignment
5 to determine which advertisers were
6 sophisticated or not sophisticated, and as
7 a result I don't, excuse me, I don't know
8 what particular advertisers knew or did not
9 know about Project Bernanke.  What I know
10 is that Google did not disclose it and that
11 I find it deceptive.
12    Q.    All right.  And what you do
13 agree is that during periods where Project
14 Global Bernanke used threshold payments,
15 both sophisticated and default advertisers
16 would best respond by bidding truthfully
17 because the auction was actually truthful,
18 right?
19        MR. RENARD:  Objection to form.
20    Q.    I read your footnote correctly;
21 did I not?
22    A.    There is a slight nuance.
23 There are parts of the footnotes you read
24 correctly, which is that when Global
25 Bernanke used threshold payments, it is in

Page 271

1         WEINBERG, Ph.D.
2 GDN advertisers' best interest to bid their
3 true value, so that is correct.  The
4 question went a small step further and said
5 the auction was truthful, and I would
6 disagree with that because the auction was
7 not truthful for non-GDN bidders because of
8 RPO and DRS.
9     Q.    Okay.  So let me just read your
10 footnote exactly.
11    A.    Can I ask, is this 349?
12    Q.    No, it is 348.
13    A.    348, sorry.
14    Q.    Last sentence in 348 says
15 "During periods where Project Global
16 Bernanke," and I think you must have meant
17 Project Bernanke and Global Bernanke, do
18 you think you meant both?
19    A.    I believe the switch from
20 Bernanke to Global happened before Milgrom
21 claims the switch from first to threshold
22 occurred, so I don't believe there is a
23 period where non-Global Bernanke used
24 threshold periods -- payments.  But if
25 there were such a period, then it would

Page 272

1         WEINBERG, Ph.D.
2 apply.
3     Q.    Okay.  So just to be clear, in
4 any period where a Bernanke project used
5 threshold payments, both sophisticated and
6 default advertisers would best respond by
7 bidding truthfully because the auction is
8 actually truthful, right?
9     A.    Yes, that is what I wrote.  It
10 looks like I would nitpick against my own
11 writing.  I think there was an implied "for
12 GDN bidders" at the end of that
13 parenthetical.  That would have been what I
14 assert if I explicitly wrote if I'm being
15 extra critical.
16    Q.    And Alchemist used a threshold
17 pricing, not a first price payment rule,
18 right?
19    A.    I forgot the question, but I
20 think I remember enough --
21    Q.    Well, let me ask it again.
22 Alchemist used a first, sorry, Alchemist
23 used a threshold pricing, not a first price
24 payment rule, right?
25    A.    Yes, that is correct.

Page 273

1         WEINBERG, Ph.D.
2     Q.    And so the same would be true,
3 that is in a circumstance where Alchemist
4 was operative as to advertisers, they were
5 best responding by bidding truthfully
6 because that auction was actually truthful?
7     A.    Basically, yes.  I'm just going
8 to add some qualifiers, which is that
9 during periods where Alchemist was active
10 and using a threshold payment rule, which I
11 believe to be all of the periods that
12 Alchemist was active, GDN bidders would
13 have best responded by bidding their true
14 value into the Alchemist.
15    Q.    And in those circumstances that
16 we have described where Project Global
17 Bernanke is using threshold payments or
18 where Alchemist is using threshold
19 payments, there is no deceit operating on
20 bidders as to the amount of their bid
21 because they are incentivized to bid
22 truthfully, right?
23        MR. RENARD:  Objection to form.
24    A.    I, again, don't believe I have
25 an opinion on that.  That is a technical

69 (Pages 270 - 273)

Page 274

1        WEINBERG, Ph.D.
2  claim, claiming that there is no deceit is
3  a strong technical claim that would take me
4  a lot of time to think through.
5        What I can say is that for my
6  claims that explicitly discuss first price
7  payment rule, not threshold payment,
8  something like that, I intend for those
9  conclusions to not apply without that
10 assumption.
11   Q.   Right.  So therefore to state
12 it affirmatively, you have not expressed an
13 opinion that the threshold payment rule,
14 when it operated in Global Bernanke or in
15 Alchemist, was deceptive to any Google
16 Display Network advertiser, right?
17   A.   Can you repeat the question one
18 more time?  I'm ready to answer.
19   Q.   So therefore to state it
20 affirmatively, you have not expressed an
21 opinion that the threshold payment rule,
22 when it operated in Global Bernanke or in
23 Alchemist, was deceptive to any Google
24 Display Network advertiser, true?
25   A.   That is correct.  I'm going to

Page 275

1        WEINBERG, Ph.D.
2  repeat it just to be absolutely clear.  I
3  have not expressed an opinion that Bernanke
4  or Global Bernanke during periods where it
5  used threshold payment rules was deceptive
6  towards GDN advertisers.
7    Q.   Okay.  I'm going to change
8  topics now, sir.  I want to talk to you
9  about what you call the Google display
10 advertising RTB ecosystem.  So I'm going to
11 direct your attention to Exhibit 2, your
12 rebuttal report, at paragraph 28.  And you
13 refer there to include in that definition,
14 Google's display advertising and platforms,
15 and I want to ask you whether the opinions
16 you have expressed here in this report
17 address AdSense in any way?
18   A.   There are a lot of different
19 products, and I would need your help with a
20 reminder of what exactly is AdSense to
21 answer that.
22   Q.   If you don't remember it, I'm
23 going to assume it was not significant
24 enough in your opinion to stick in your
25 mind.  How is that?

Page 276

1        WEINBERG, Ph.D.
2        MR. RENARD:  Objection to the
3    statement and the question at the end.
4    Q.   Let me rephrase it.  I don't
5  need the colloquy.
6        As you sit here today, there is
7  nothing in your mind that sticks out about
8  a product called AdSense?
9    A.   I don't know if I got the name
10 right.  Is Ad Sense what GDN used to bid on
11 non-AdX exchanges?
12   Q.   I can't answer your question.
13   A.   Okay.  Then maybe let me state
14 the following:  Some of the conclusions I
15 draw are conclusions about auctions and ad
16 buying pools and publishers.  It is
17 possible that those conclusions would apply
18 to AdSense, but I have not -- I certainly
19 have not singled out AdSense for any
20 conclusions, and the term AdSense sounds
21 like something I have read before, but I
22 did not -- I'm comfortable saying I did not
23 do any study specific to AdSense.
24   Q.   How about something called
25 AdMob?

Page 277

1        WEINBERG, Ph.D.
2        MR. RENARD:  Objection to the
3    form.
4    A.   So for AdMob I, again, want to
5  say that for my conclusions that discuss
6  auctions, they could apply to AdMob but I
7  am not offering any opinions specialized to
8  AdMob.
9    Q.   What about DV360?
10       MR. RENARD:  Objection to form.
11   A.   DV360, I definitely know what
12 it is.  DV360 is an ad buying tool of
13 Google's that I believe was marketed
14 primarily for large publishers, whereas GDN
15 was marketed primarily towards small
16 publishers.
17       So, for example, if you look on
18 page 5, section header G, I'm going to read
19 the corrected version.  This was one of the
20 places the errata touched.  I think it will
21 be obvious to you what the errata is when
22 you read it.  But I say "GDN and DV360's
23 exemptions from DRS demonstrates
24 preferential treatment."  So that is an
25 example where I specifically mentioned

70 (Pages 274 - 277)

Page 278

1    WEINBERG, Ph.D.
2 DV360.
3    Q.   Okay.  But have you expressed
4 any opinion that DV360 was deceptive in
5 fact to any individual ad buyer or ad
6 seller?
7    MR. RENARD:  Objection to form.
8    A.   No, I don't believe I have
9 expressed any opinions that DV360 as a
10 product was deceptive towards advertisers.
11    Q.   Or ad sellers?
12    A.   Let me add some nuance to the
13 previous one.  I do think -- sorry, I do
14 opine and believe that GDN and DV360's
15 exemptions from DRS demonstrate
16 preferential treatment.  Because those were
17 not disclosed, I consider that to be
18 deceptive.  However, I would say that is
19 DRS being deceptive.  So to clarify my
20 previous answer, I was not attributing the
21 product DV360 as being deceptive.
22    So to repeat, while noting that
23 some of my conclusions regarding deception
24 involve DV360, I do not offer an opinion
25 that DV360 as a product was deceptive

Page 279

1    WEINBERG, Ph.D.
2 towards advertisers or publishers.
3    MS. PATRICK:  Okay.  Let me
4 just take a quick break.  I think I
5 might be done, sir.
6    THE VIDEOGRAPHER:  Off the
7 record, 5:30 p.m.
8    (Recess taken.)
9    THE VIDEOGRAPHER:  Back on the
10 record 5:31 p.m.
11 BY MS. PATRICK:
12    Q.   Professor, before I conclude,
13 is there anything over the course of the
14 day that you think you need to change or
15 correct in your answers?
16    A.   No.
17    MS. PATRICK:  Thank you very
18 much for your time.  I appreciate it
19 very much.
20    MR. RENARD:  I have just one
21 small thing that will not make you miss
22 your car or your flight.
23 EXAMINATION BY MR. RENARD:
24    Q.   Professor, you mentioned
25 several times during the course of your

Page 280

1    WEINBERG, Ph.D.
2 deposition you referred to claims in
3 reference to certain statements in your
4 report.  Do you recall that?
5    A.   Yes.
6    Q.   Can you tell us whether or not
7 by claims you meant opinions?
8    A.   Yes, I use those terms
9 synonymously.
10    MR. RENARD:  That's all I have.
11 Thank you, sir.
12    THE VIDEOGRAPHER:  With that,
13 we are off the record and concluded for
14 the day, 5:32 p.m. eastern standard
15 time.
16
17    [TIME NOTED:  5:32 p.m.]
18
   _____
19    MATTHEW WEINBERG, Ph.D.
20
   _____
21 Subscribed and sworn to
   before me this _____
22 day of _____, 2024.
23 _____
    Notary Public
24
25

Page 281

1
2    I N D E X
3
   WITNESS    EXAMINATION BY        PAGE
4
   WEINBERG    PATRICK             5
5    RENARD      279
6
   E X H I B I T S
7
   WEINBERG    DESCRIPTION          PAGE
8 Exhibit 1  Expert Report of         9
            Matthew Weinberg
9 Exhibit 2  Rebuttal Report of      12
            Matthew Weinberg
10 Exhibit 3  Curriculum Vitae        19
   Exhibit 4  Errata to September 9,  60
11             2024 Rebuttal Report
            of Matthew Weinberg
12 Exhibit 5  GOOG-AT-MDL-C-000035250  163
   Exhibit 6  GOOG-AT-MDL-C-000086317- 185
13             000086320
   Exhibit 7  GOOG-AT-MDL-C-000035251  197
14 Exhibit 8  GOOG-AT-MDL-C-000035252  213
   Exhibit 9  Google definition of    223
15             "offset"
   Exhibit 10 GOOG-AT-MDL-C-000015769- 247
16             000015788
17 DIRECTIONS NOT TO ANSWER
18 Page    Line
   55     22
19 56     20
   91     20
20 98     21
   107     9
21 213     11
22
   REQUESTS
23
   Page    Line
24 71      8
25

71 (Pages 278 - 281)

Page 282

```
1
2
3                        CERTIFICATION
4        I, TODD DeSIMONE, a Notary Public for
5   and within the State of New York, do hereby
6   certify:
7        That the witness whose testimony as
8   herein set forth, was duly sworn by me; and
9   that the within transcript is a true record
10  of the testimony given by said witness.
11       I further certify that I am not related
12  to any of the parties to this action by
13  blood or marriage; and that I am in no way
14  interested in the outcome of this matter.
15       IN WITNESS WHEREOF, I have hereunto set
16  my hand this 8th day of October, 2024.
17
18
19
20            *       *       *
21
                   TODD DESIMONE
```



Page 283

```
1
2
3                        ERRATA SHEET
4   CASE NAME: TEXAS v. GOOGLE
    DATE OF DEPOSITION: 10/8/24
5   WITNESS NAME: MATTHEW WEINBERG, PH.D.
6
    PAGE/LINE(S)/   CHANGE        REASON
7
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21           MATTHEW WEINBERG, PH.D.
22  SUBSCRIBED AND SWORN TO
23  BEFORE ME THIS_____DAY
    OF_____, 2024.
24  _____
    NOTARY PUBLIC
25  MY COMMISSION EXPIRES
```