# EXHIBIT 8
# [FILED UNDER SEAL]

CONFIDENTIAL

Page 1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                    SHERMAN DIVISION
3    THE STATE OF TEXAS, ET      §
     AL.,                        §
4                                §   CIVIL ACTION NO.
        PLAINTIFFS,              §   4:20-CV-00957-SDJ
5                                §
     V.                          §
6                                §
     GOOGLE LLC,                 §
7                                §
        DEFENDANT.               §
8
9                    **CONFIDENTIAL**
10
           ORAL AND VIDEOTAPED DEPOSITION OF
11               JEFFREY SCOTT ANDRIEN
                   NOVEMBER 1, 2024
12
13
14
       ORAL AND VIDEOTAPED DEPOSITION OF JEFFREY SCOTT
15   ANDRIEN, produced as a witness at the instance of
     the Defendant and duly sworn, was taken in the above
16   styled and numbered cause on Friday, November 1,
     2024, from 9:04 a.m. to 6:20 p.m., before TAMARA
17   CHAPMAN, CSR, RPR-CRR in and for the State of Texas,
     reported by computerized stenotype machine, at the
18   offices of Norton Rose Fulbright US LLP, 98 San
     Jacinto Boulevard, Austin, Texas, pursuant to the
19   Federal Rules of Civil Procedure and any provisions
     stated on the record herein.
20
21
22
23
24
25     Job No. CS 6918698

**Page 2**

```
 1            A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFFS:
       Marc B. Collier
 4     Nathan Damweber
       Ethan Glenn (via Zoom)
 5  NORTON ROSE FULBRIGHT US LLP
       98 San Jacinto Boulevard, Suite 1100
 6  Austin, Texas 78701
       512-474-5201
 7     marc.collier@nortonrosefulbright.com
       nathan.damweber@nortonrosefulbright.com
 8     ethan.glenn@nortonrosefulbright.com
 9     Nathan Baum (via Zoom)
    NORTON ROSE FULBRIGHT US LLP
10     2200 Ross Avenue, Suite 3600
       Dallas, Texas 75201
11     214-855-7487
       nathan.baum@nortonrosefulbright.com
12
       Jonathan Wilkerson
13     Ryan Ellis (via Zoom)
       Zeke DeRose (via Zoom)
14     Alex Abston (via Zoom)
    THE LANIER LAW FIRM
15     10940 W. Sam Houston Parkway N, Suite 100
    Houston, Texas 77064
16     713-659-5200
       jonathan.wilkerson@lanierlawfirm.com
17     ryan.ellis@lanierlawfirm.com
       zeke.derose@lanierlawfirm.com
18     alex.abston@lanierlawfirm.com
19     Luke Woodward (via Zoom)
       Brian Kelleher Richter (via Zoom)
20  OFFICE OF THE TEXAS ATTORNEY GENERAL
       300 W. 15th Street
21  Austin, Texas 78701
       512-463-2100
22     luke.woodward@oag.texas.gov
       brian.richter@oag.texas.gov
23
24
25
```

**Page 3**

```
 1            A P P E A R A N C E S
 2
    FOR THE DEFENDANT:
 3     Robin C. Gibbs
       Charles M. Rosson
 4  GIBBS & BRUNS LLP
       1100 Louisiana, Suite 5300
 5  Houston, Texas 77002
       713-650-8805
 6     rgibbs@gibbsbruns.com
       crosson@gibbsbruns.com
 7
 8  ALSO PRESENT:
       Peter Zierlein, Videographer
 9     Jonathan Jaffe, Its-Your-Internet
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2
                          PAGE
 3
 4  APPEARANCES.........................  2
 5   JEFFREY SCOTT ANDRIEN
 6  EXAMINATION
       BY MR. GIBBS......................  6
 7     BY MR. COLLIER....................  315
 8
    CORRECTION PAGE......................  318
 9  SIGNATURE PAGE.......................  319
    REPORTER'S CERTIFICATION.............  320
10
11
12            E X H I B I T S
13  NO.    DESCRIPTION            PAGE
    Exhibit 1   Expert Report of Jeffrey S.
13              Andrien, June 7, 2024
14              (No Bates - 128 pages)      7
    Exhibit 2   Expert Rebuttal Report of
15              Jeffrey S. Andrien
                September 9, 2024
16              (No Bates - 143 pages)      8
    Exhibit 3   Curriculum Vitae of Jeffrey
17              Scott Andrien
                (No Bates - 22 pages)       51
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1      THE VIDEOGRAPHER:  Here begins the
 2  deposition of Jeffrey Andrien.  Today's date is
 3  November 1st, 2024, and the time is 9:04 a.m.
 4      Will counsel please identify
 5  themselves for the record, after which the court
 6  reporter will swear in the witness.
 7      MR. COLLIER:  This is Marc Collier
 8  with Norton Rose Fulbright.  Here in the conference
 9  room with me is Nathan Damweber of our firm and
10  Jonathan Wilkerson of the Lanier Law Firm.
11      MR. GIBBS:  Robin Gibbs, Gibbs &
12  Bruns.  I'm here with Charles Rosson.  We're
13  representing the defendant Google, and we're ready
14  to go.
15      THE VIDEOGRAPHER:  Would the folks on
16  Zoom like to identify themselves.
17      MR. GLENN:  Ethan Glenn with Norton
18  Rose Fulbright for the states.
19      MR. ELLIS:  Ryan Ellis, Lanier Law
20  Firm, for the states.
21      MR. BAUM:  Nathan Baum from Norton
22  Rose Fulbright for the states.
23      MR. RICHTER:  Brian Richter, Texas
24  Attorney General.
25      MR. JAFFE:  Jonathan Jaffe, also
```

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1  present for plaintiffs.
2          MR. WOODWARD:  Luke Woodward with the
3  Texas Attorney General.
4          JEFFREY SCOTT ANDRIEN,
5  having been first duly sworn, testified as follows:
6          EXAMINATION
7  BY MR. GIBBS:
8      Q.   Would you state your full name for the
9  record, please, sir.
10     A.   Jeffrey Scott Andrien.
11     Q.   Mr. Andrien, my name is Robin Gibbs.  I'm
12  with the firm of Gibbs & Bruns in Houston, and we
13  represent the defendant, Google, in this case.
14          Do you understand that?
15     A.   I do.
16     Q.   You are here to take your deposition
17  today.  And I know you've given depositions on many
18  occasions previously.  Would that be true?
19     A.   Yes.
20     Q.   And you understand, therefore, the
21  purpose of the deposition.  Fair?
22     A.   I do.  That's fair.
23     Q.   Can we agree that if there are any of my
24  questions that are unclear to you for any reason,
25  that you will ask me to clarify the question before

Page 7

1  you give your answer?
2      A.   Yes.
3      Q.   We can have that agreement.  And we take
4  that agreement because we want to ensure that if you
5  give an answer, you will have understood the
6  question.  Fair enough?
7      A.   Fair enough.
8      Q.   All right.  You have been retained here
9  as an expert, as I understand it, in connection with
10  the calculation of civil penalties in this lawsuit
11  on behalf of the states, the plaintiffs.  True?
12     A.   That is true.
13          (Exhibit 1 was marked.)
14          MR. GIBBS:  Okay.  I'm going to have
15  you mark -- and/or recognize Exhibit No. 1 to your
16  deposition, which is your original report filed in
17  this case.
18     Q.   Can you confirm to us that this appears
19  to be a true and correct copy of your original
20  report?
21     A.   (Pause.)
22          It does.
23     Q.   Did you have an opportunity to review
24  your report before you appeared here to testify
25  today?

Page 8

1      A.   Yes, I have.
2      Q.   Have you noted any errors in your report
3  or do you want to make any changes in that original
4  report as you sit here?
5      A.   As I sit here, I don't -- I don't recall
6  any changes that I would like to make, as I sit
7  here.
8      Q.   All right.  Do you intend to stand by
9  your report and the conclusions in that report in
10  this case?
11     A.   I do.  I do think I found a typo
12  somewhere, as I was looking through it.
13     Q.   All right.  But nonsubstantive, I take
14  it.
15          (Discussion off the written record.)
16          (Exhibit 2 was marked.)
17     Q.   Mr. Andrien, I want to hand you Andrien
18  Exhibit 2 to your deposition and ask you if you can
19  identify that as your rebuttal report in this
20  matter?
21     A.   (Pause.)
22          This does appear to be my rebuttal
23  report.
24     Q.   And did you likewise have a chance to
25  review that report before you came to testify?

Page 9

1      A.   Yes.
2      Q.   Did you note any errors in the report?
3      A.   Nothing substantive.
4      Q.   Is it true that you do not intend to
5  offer in this case any opinions not -- not stated in
6  those two reports?
7      A.   As I sit here today, I intend to offer
8  the opinions in this report and -- and that's it.
9  As I sit here today.
10     Q.   And you've not changed any of your
11  opinions since issuing those reports.  Is that true?
12     A.   That's correct.
13     Q.   You're serving as an expert here for all
14  the states that are plaintiffs in this matter, and
15  that includes Puerto Rico.  Correct?
16     A.   Yes.
17     Q.   Can we have the understanding that when I
18  talk about "the states" or ask you a question about
19  the states, unless I designate Puerto Rico, that I'm
20  talking about the 16 states plus Puerto Rico that
21  are the plaintiffs in this case?
22     A.   Yes, we can, and hopefully that would
23  work both ways then.
24     Q.   Yes.
25     A.   Okay.

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1    Q.   Unless we want to specify something about
2    Puerto Rico when we refer to the plaintiffs or the
3    states, it's all 17 of them.  Fair enough?
4        A.   Fair enough.
5        Q.   Now, am I correct that you are not
6    offering any opinions regarding civil penalties in
7    this case?
8            MR. COLLIER:  Objection; form.
9        A.   I am offering the opinions that I have
10   listed in each one of these reports, without
11   exception.  And to the extent that they relate to
12   civil penalties, then -- then I have opinions
13   related to civil penalties.  To the extent they
14   don't, then -- then I don't.  But these are the
15   opinions that I'm offering.
16       Q.   Yes.  As specified expressly in the
17   reports?  Is that what you're telling me?
18       A.   Yes, my opinions are as specified in the
19   reports.
20       Q.   Okay.  And you're not offering opinions
21   on any topics other than civil penalties, as I
22   understand it.  Is that true?
23       A.   Again, I'm going to say that my opinions
24   are written -- expressly written in both of these
25   reports.  I'm going to testify to those opinions,

Page 11

1    and to the extent that they relate to something
2    other than civil penalties, then that's what I'm
3    going to testify to.
4        Q.   And you are -- you have limited, in
5    writing, in your reports, what you're opining on.
6            Is that true?
7        A.   Would you -- I don't understand your
8    question.  I'm sorry.
9        Q.   You are not offering opinions on
10   liability in this case.  True?
11       A.   That is true.  I am assuming liability in
12   this case.
13       Q.   And your analysis is predicated on the
14   assumption that Google is found liable for the
15   alleged misconduct in this case.  True?
16       A.   That's correct.
17       Q.   What misconduct, sir, do you intend to
18   include in your assignment there?
19           MR. COLLIER:  Objection; form.
20       A.   The misconduct that the plaintiff states
21   allege that Google has -- has engaged in.  So
22   every -- everything that the plaintiff states have
23   alleged Google has engaged in as the misconduct.
24       Q.   Does the misconduct include all claims by
25   all the states?

Page 12

1        A.   Yes.
2        Q.   Under both federal and state law?
3        A.   Whatever laws that they're -- they're
4    claiming -- invoking in their claims, those would be
5    the laws that are at issue.
6        Q.   Where do we find those listed, according
7    to your scope of work?
8        A.   (Pause.)
9            The fourth amendment -- amended
10   complaint.
11       Q.   Okay.  And so the conduct that you are
12   undertaking to evaluate is included in the fourth
13   amended complaint filed by the plaintiffs.  True?
14       A.   Yes.
15       Q.   And you are assuming, for purposes of
16   your calculation of civil penalties, that the
17   defendant has been found guilty of that misconduct.
18           Is that correct?
19       A.   Yes.
20       Q.   And who was it that directed that you
21   make that assumption for your penalties work?
22           MR. COLLIER:  I'm going to object on
23   the basis of the Court's order limiting expert
24   discovery, Paragraph 5.11.
25           To the extent that the assumption was

Page 13

1    communicated to you by counsel, I direct you not to
2    disclose any communications with counsel.  However,
3    you -- you can state the assumptions under which
4    your expert report is undertaken.
5        Q.   Do you refuse to answer the question:
6    Who directed you to assume that those were the
7    sources of misconduct that you were to evaluate?
8        A.   Based on the advice of counsel, and I
9    don't believe I can answer that.
10       Q.   How would you characterize the assumption
11   that you have been directed to a doc for purposes of
12   your work?
13       A.   I'm not sure I understand your question.
14       Q.   What is the nature of the misconduct that
15   you have assumed for purposes of your work?
16           MR. COLLIER:  Objection; form.
17       A.   I am assuming liability in this case, and
18   I am specifically -- liability related to the -- the
19   Deceptive Trade Practices Act portion of -- of -- of
20   the case.
21       Q.   All right.
22       A.   As a layperson, that's how I would
23   describe it, but I am -- I am assuming that Google
24   is found liable for the claims against them.
25       Q.   What -- would your opinions change if

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1  Google is found liable under some of the Deceptive
2  Trade Practices claims but not others?
3      A.  I would have to understand more about
4  your hypothetical.
5      Q.  There are certain types of misconduct
6  which are identified as mechanics or features of the
7  display advertising -- advertising exchange process.
8      Would that be generally true?
9          MR. COLLIER:  Objection; form.
10     A.  I'd have to go back and refresh my memory
11  from the complaint.
12     Q.  Well, how about from your recollection
13  and understanding of the work that you've done, do
14  you understand that your work is to determine
15  penalties, civil penalties arising allegedly out of
16  liability for misconduct as it relates to certain
17  features of the ad exchange -- advertising exchange
18  process?
19     A.  Yes.  Certain features and -- and -- and
20  programs that were -- that were run by Google.
21     Q.  We call that features or what other --
22  what other terminology, mechanics?
23     A.  I think of it as -- as program -- the --
24  just the -- the various conduct at issue as various
25  programs that they ran on their auctions.

Page 15

1      Q.  For example, the dynamic revenue share
2  feature or mechanic of the Google ad exchange, was
3  that part of the scope of what you did?
4      A.  Yes.
5      Q.  And a dynamic allocation feature or
6  mechanic?
7      A.  Is that the dynamic revenue share of the
8  DRS?
9      Q.  Yes.
10     A.  Yes.
11     Q.  And Bernanke?
12     A.  Yes.
13     Q.  Alchemist?
14     A.  That's a part of Bernanke, yes.
15     Q.  Reserve price optimization?
16     A.  Yes.  That's correct.
17     Q.  And you're assuming, for purposes of your
18  work and your calculation of these figures that are
19  appearing in, and opinions that appear in your
20  report, that Google is found liable for each of
21  those.  Correct?
22     A.  I've looked at it jointly and
23  independently.
24     Q.  Okay.  And have you -- what if Google is
25  found to have committed violations as to some but

Page 16

1  not all of those mechanics or features, does that
2  change the amount of your calculation of the
3  penalties here?
4          MR. COLLIER:  Objection; form.
5      A.  I believe I've given --
6          MR. COLLIER:  Excuse me.
7          THE WITNESS:  Oh, I'm sorry.
8          MR. COLLIER:  Just give me just a
9  minute to get my objection to form out so the court
10  reporter can -- I'm not going to stop you from
11  answering, but she can't take us both.
12         THE WITNESS:  Fair enough.
13     Q.  Could you answer the question, please,
14  sir?
15         THE WITNESS:  I wasn't sure if you
16  were finished with your --
17         MR. COLLIER:  I just -- objection;
18  form, is all I needed to say.
19         THE WITNESS:  Okay.
20     A.  Would you please repeat the question?
21     Q.  Yes.  If the -- if Google is found liable
22  for misconduct as to less than the mechanics or
23  features of the ad exchange that I have outlined,
24  does that change your opinion as to the amount of
25  any civil penalties?

Page 17

1      A.  I believe I've considered all those
2  possibilities and my report addresses each of the
3  possibilities.
4      Q.  Is the answer to my question, is there a
5  circumstance in your work where you have concluded
6  that a liability finding of less than all of those
7  five mechanics or features would change your -- your
8  conclusion as to the total penalties?
9      A.  I don't believe it would change the
10  conclusion of my penalties because I believe the
11  violation counts are -- are -- are large enough
12  under each individual one or in aggregate that
13  would -- that would cause -- cause Google to fall
14  within that penalty range that I have established.
15     Q.  So if the only thing that a trier of fact
16  find -- found liability for was misconduct as to
17  dynamic revenue sharing, your conclusion as to the
18  total penalties to be charged here would remain the
19  same?
20     A.  Yes.  As I explained, I think the -- the
21  violation counts are such that you get to the
22  portion of -- of what is a reasonable penalty that
23  falls within my range.  I mean, you get into the --
24  the reasonable penalty for those violation counts,
25  that would fall into my range.

5 (Pages 14 - 17)

Page 18

1    Q.  And you've opined on a range of anywhere
2 from approximately $7 billion on the low side to
3 near 22 billion on the high side. Would that be
4 true?
5    A.  I can give the exact numbers, but
6 generally, that's appropriate -- generally the
7 range.
8    Q.  Under the Andrien theory penalty
9 calculations, if, for example, only one of the
10 alleged misconduct is found to have been committed
11 by Google, the entire range remains identical. Is
12 that true?
13        MR. COLLIER: Objection; form.
14        Go ahead.
15    A.  Yes, I believe that, as I said
16 previously, the violation counts for each individual
17 one are sufficient enough that would push the
18 reasonable appropriate penalty into -- into the
19 range that I have calculated.
20    Q.  Uh-huh. And would the -- if -- if there
21 was only one violation of the five we're talking
22 about at this moment, is it your position that the
23 same range of per violation value would remain
24 constant?
25    A.  Not necessarily, no. As I've kind of --

Page 19

1 I -- I believe I've explained in my report, I looked
2 at the various violations, determined violation
3 counts, looked at appropriate per violation
4 penalties, and assessed in a -- a holistic manner
5 given the -- the -- the three factors that I was
6 asked to -- asked to consider in my -- in my work
7 and then based on that, came to what I believe was a
8 reasonable penalty range.
9        And so if you lower the count
10 sufficiently, you'd still have to have a penalty, I
11 believe, it falls into that range. So by
12 definition, that would mean you might have to
13 increase the per penalty -- the per violation
14 penalty.
15    Q.  You're going to stick with the total of 7
16 to $20 billion no matter how many violations are or
17 are not found. True?
18    A.  No, that's not --
19        MR. COLLIER: Objection; form.
20        THE WITNESS: Oh, sorry.
21        MR. COLLIER: Mr. Andrien, please.
22        Objection; form.
23        Proceed.
24    A.  No, that's not true.
25    Q.  Would your opinions change, sir, if

Page 20

1 Google is not found liable under -- under the
2 States' antitrust claims?
3    A.  No, my opinions would not change.
4    Q.  Okay. So if there's zero -- if there's a
5 finding of zero liability for the antitrust claims,
6 your range of recommended penalties remains 7 to
7 $22 billion. Is that fair?
8    A.  Well, in -- maybe we should be specific
9 when we're talking about the range I had. But
10 generally, that's fair, yes.
11    Q.  Okay. Do your opinions have anything to
12 do with the States' antitrust claims?
13    A.  I understand that there's antitrust
14 claims and I understand that the States allege that
15 the conduct at issue -- the deceptive conduct at
16 issue in this case has -- has resulted in --
17 market power for -- for Google in certain areas of
18 its AdTech stack. And -- and -- and -- but my -- my
19 penalty amount is based on the deceptive trade
20 practices conduct.
21    Q.  And are -- is your penalty limited to
22 Deceptive Trade Practices Act civil penalties
23 provision of that statute?
24        MR. COLLIER: Objection; form.
25    A.  The statute for each state that deals

Page 21

1 with that.
2    Q.  Yes.
3        It is. Put another way, is your -- do
4 your opinions -- are they based on the violation of
5 antitrust statutes in each of those states?
6    A.  They are not.
7    Q.  Okay. And they are not calculated under
8 the penalties provisions of each of those states'
9 antitrust laws. True?
10    A.  That is true.
11    Q.  Okay. That's a separate statute, you
12 would agree. Right?
13    A.  I'm not a lawyer, but that -- as I
14 understand it, that's a separate -- there would be
15 separate laws that would govern antitrust violations
16 than the ones that govern the deceptive trade
17 practices.
18    Q.  And they have, under the antitrust laws
19 of each of those states, distinct and separate
20 elements that are required to be proved in order to
21 establish liability, as you would understand it.
22 Right?
23    A.  Again, as a nonlawyer, as I understand
24 it, that would be -- that would be true.
25    Q.  And nobody, to your understanding, has

6 (Pages 18 - 21)

Page 22

1  sued and is seeking to recover under the antitrust
2  statutes actual damages, for example. Would that be
3  true?
4       MR. COLLIER: Objection; form.
5       A.  I am not aware of the plaintiffs seeking
6  damages under the antitrust statutes, but that's
7  outside the scope of what I've been asked to
8  consider.
9       Q.  Yes. And you certainly haven't made any
10  calculation to determine any actual harm or damages
11  under the statutes -- the states' antitrust
12  statutes. True?
13      A.  That is correct.
14      Q.  And you understand that some of those
15  states' antitrust statutes have trebling provisions
16  if they are proved. Right?
17      A.  I --
18      MR. COLLIER: Objection; form.
19      A.  I do understand that.
20      Q.  And have you seen any indication that any
21  of the States are seeking to recover treble any
22  actual damages in this case?
23      MR. COLLIER: Objection; form.
24      A.  I'm addressing penalties. I'm not
25  addressing damages so I haven't analyzed one way or

Page 23

1  another any damages related to this case. I'm --
2  I'm purely focused on penalties.
3       Q.  Have you seen, as part -- any part of
4  your work, any indication that the States are
5  seeking to recover either actual or trebled
6  antitrust damages in this case?
7       A.  As part of my work, I have not seen that,
8  but, again, that's not part of the scope of my work.
9       Q.  And you've not seen any calculation of
10  any penalties, civil penalties for violation of any
11  of those States' antitrust statutes. True?
12      A.  Would you repeat that question?
13      Q.  Yes. You've likewise not seen any
14  indication that anybody has calculated or is
15  requesting and/or is going to try in this case
16  penalties under the antitrust statutes of the
17  States. Right?
18      MR. COLLIER: Objection; form.
19      A.  Again, I'm not a lawyer, but I -- I have
20  not seen anything that I -- that I would believe
21  addresses that. But I'm not a lawyer.
22      Q.  And with respect to the -- as you sit
23  here today, based upon your assumption, do you have
24  any personal opinion as to whether Google is liable
25  for any of the deceptive trade practices that are at

Page 24

1  issue in this case?
2       MR. COLLIER: Objection; form.
3       A.  I have not provided any opinions in my
4  reports relative to whether or not Google is liable
5  for the deceptive trade practices claims against
6  them.
7       Q.  Okay. And you don't intend at trial to
8  express any opinion, yea or nay, on any of those
9  alleged violations. Fair?
10      MR. COLLIER: Objection; form.
11      A.  As I sit here today, I -- I intend to
12  offer the opinions that are in my report, without
13  exception, to those opinions and -- but that's, as I
14  sit here today, the limit of what I'm intending to
15  testify to.
16      Q.  And you do not intend to offer any
17  opinions as to the violation of either of the
18  antitrust statutes or antitrust laws we've
19  established that. Right?
20      A.  As I sit here today I intend to offer the
21  opinions that -- that are listed in my report to the
22  extent that any of them relate to, again, I'm not a
23  lawyer. To the extent that any of them relate to
24  antitrust or any other category. That's what I
25  intend to -- to opine on.

Page 25

1       Q.  So you -- let's say just be very
2  specific. I realize your report contains a lot of
3  references to opinions and the like. You'd agree
4  with that. Right?
5       A.  It's relative terms. I have my opinions
6  that are stated in my report and they're very
7  specifically outlined in each report.
8       Q.  Did your assignment, as you undertook it,
9  include expressing any opinions on liability for
10  violation of any of the state statute -- antitrust
11  statutes?
12      A.  I have assumed liability in my work. So
13  I have not undertaken work to establish liability.
14      Q.  And you do not intend to undertake to
15  testify as to opinions about violations of any of
16  the antitrust laws. True?
17      MR. COLLIER: Objection; form.
18      A.  Would you repeat the question?
19      Q.  You do not intend to undertake to express
20  any opinions on violations of any of the states'
21  antitrust laws. Correct?
22      MR. COLLIER: Objection; form.
23      A.  Again, I intend to provide the opinions
24  that are expressed in my report. And without
25  exception, I intend to testify to those opinions.

7 (Pages 22 - 25)

Page 26

1  To the extent that any of them relate to antitrust
2  in any way, shape, or form, I haven't -- then --
3  then those are the opinions I'm going to give.
4      But they don't relate to the antitrust,
5  then -- then the -- those are still the opinions I'm
6  going to give.
7      Q.  Can you identify a single antitrust
8  liability opinion that you intend to give?
9      A.  I don't believe I have, what I would
10  refer to as a nonlawyer, as a liability opinion in
11  this report. So that -- that's how I could
12  categorize it as a nonlawyer. To the extent that
13  you have a different definition as a lawyer of how
14  to categorize my opinion or anybody else does, these
15  are the opinions that I'm going to -- to provide
16  and -- and testify to at trial.
17      Q.  And you have not undertaken to determine
18  whether or not Google is liable for any violation of
19  any of the antitrust statutes. True?
20      A.  I have assumed liability in -- in my
21  work. So my work assumes that they are found liable
22  for that.
23      Q.  And the -- that tells us that you have
24  not done any work, therefore, to determine whether
25  or not a violation of the antitrust laws occurred

Page 27

1  here. True?
2      A.  I have done work to support the opinions
3  that I have in this case. I've listed the opinions
4  that I have in the front of my reports and -- and
5  I've -- intend to testify to those. And however
6  anybody wants to categorize it as a lawyer, that's
7  different maybe than I would as a -- as a nonlawyer.
8  These are the opinions that I intend to offer and
9  the work that I've done supports those opinions.
10      Q.  And it is not intended to support
11  opinions of liability based upon the antitrust laws.
12  True?
13          MR. COLLIER:  Objection; form.
14      A.  I have assumed liability. So I --
15  I've -- I've not needed in my work to -- to
16  purposely support liability because I have assumed
17  it --
18      Q.  Okay.
19      A.  -- therefore, but the opinions that I
20  have are supported with the work that I have done.
21  I intend to testify to the opinions that I have and
22  the work that I have done. And to the extent that
23  covers -- that somehow covers something under
24  antitrust liability -- antitrust liabilities then --
25  then so be it. I don't know how else to answer that

Page 28

1  question.
2      Q.  Well, you understand the difference
3  between offering opinions as to liability in this
4  case for violation of, for example, of the antitrust
5  laws. You have a concept of that in mind as an
6  expert, don't you?
7          MR. COLLIER:  Objection; form.
8      A.  I have an understanding as an expert
9  that -- that I am assuming liability and, therefore,
10  I am not required to establish liability.
11      Q.  And for that reason you've not undertaken
12  the kind of investigation that would be required to
13  offer an opinion as to whether or not a liability
14  event has occurred under the antitrust laws. Right?
15      A.  I have undertaken the type of work to
16  support the opinions that I have. And that's how
17  I'm using the -- the work that I've undertaken.
18      Q.  Are you offering any opinions about the
19  relevant market for antitrust purposes? Have you
20  been retained to do that?
21      A.  I have not been retained to provide
22  opinions on a relevant antitrust market, if -- if
23  I'm defining a relevant market as an economist.
24      Q.  Are you offering any opinions about
25  the -- about what kinds of advertising are

Page 29

1  substitutes for any other kind of advertising?
2      A.  Again, I'm just going to say I've been --
3  I'm offering the opinions that I've listed in the
4  front of my reports, done the work to support those
5  opinions, and -- and I'm going to offer those
6  opinions without accept -- acceptance. To the
7  extent that they address -- somehow address that
8  question, then they address it. If they don't
9  address that question, then they don't address it.
10      Q.  Do you understand whether social media
11  advertising is included in the antitrust aspects of
12  the case?
13          MR. COLLIER:  Objection; form.
14      A.  Would you repeat the question?
15      Q.  Yes. Do you understand whether social
16  media advertising, as you understand that concept,
17  is included in display advertising that's at issue
18  in this case?
19          MR. COLLIER:  Objection; form.
20      A.  I would have to go back and read the --
21  reread the complaint. I don't recall one way or
22  another as I sit here.
23      Q.  Well, as you sit here, do you understand
24  whether or not you included in the display
25  advertising products those that relate to or are

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1 found in social media advertising?
2     A.    Well, I do understand as I sit here, for
3 example, that auctions involving Facebook, which is
4 a social media account were -- were -- were relevant
5 that a -- that Facebook is -- would be part of the
6 AdTech stack at issue here.
7     Q.    Okay.  So Facebook.  What other -- what
8 of the other features that you have understood in
9 calculating these penalties make up the market
10 that's at issue here?
11        MR. COLLIER:  Objection; form.
12     A.    I'm -- I'm sorry.  I don't understand
13 your question --
14     Q.    Yes.
15     A.    -- could you repeat it?
16     Q.    You said you -- you used Facebook as an
17 example as of one of the features or one of the
18 aspects of technology has been involved in what
19 you're evaluating for purposes of your penalties.
20 What are some others?
21        MR. COLLIER:  Objection; form.
22     A.    Could you define what you mean by
23 "features"?
24     Q.    Yes.  Mechanics, products that make up
25 the stack, as I think you referred to it.

Page 31

1     A.    Okay.  So, for example, I understand
2 there's a auction platform called AdX that's at
3 issue in this case.  There is supply side platforms
4 that -- that the publishers would use.  There's
5 demand side platforms that advertisers would use.  I
6 understand that users when they go on to websites
7 create queries for these types of auctions that take
8 place.
9     Q.    Do you include mobile apps where
10 advertisements appear?
11        MR. COLLIER:  Objection; form.
12     A.    I do understand that mobile apps is part
13 of their -- that -- something called AdMob is one of
14 the, as you say, features of Google's AdTech stack
15 and that some of these conducts were targeted at
16 AdMob.
17     Q.    So that is part of or embraced within the
18 impacted features that are at issue and you have
19 quantified?
20     A.    Yes.
21        MR. COLLIER:  Objection; form.
22     Q.    The answer is yes?
23     A.    The answer is yes.
24     Q.    Okay.  Google has made certain
25 acquisitions of companies with respect to the

Page 32

1 display advertising segment of its business.  Is
2 that correct?
3     A.    That's correct.
4     Q.    And could you give us the names of the
5 companies that you had in mind when you included
6 that in your calculations?
7     A.    I don't understand -- when I included
8 what in my calculations?
9     Q.    The acquisition of certain businesses or
10 companies as part of building the display
11 advertising segment of Google's business?
12     A.    All right.  I -- I just want to be clear
13 that -- that the acquisitions themselves are not
14 part of -- of the quantification of penalties.
15 There's no penalty associated with the acquisition
16 that I've calculated.  I just wanted to be clear.
17 But I do understand that they've engaged in
18 acquisitions during the -- during -- during the
19 course of -- of Google's life.  And I've discussed
20 in my report various acquisitions related to display
21 advertising.
22     Q.    Are you -- do you suggest as part of your
23 opinion that any of those acquisitions -- and that
24 would be DoubleClick and the two subsequent
25 acquisitions in particular, would it not?

Page 33

1     A.    If I could just go find exactly the names
2 of them.  Double -- DoubleClick would be one.  I'd
3 have to go find where the -- the names of the others
4 because I don't recall as I sit here so.
5     Q.    There's the two others that were in 2008,
6 2011, 2012, sound about right?
7     A.    I -- I -- I don't recall the dates.
8 They're written in my reports.  So if you give me a
9 minute here, I will take a look and we can -- we can
10 discuss them more fulsomely.
11        (Pause.)
12        All right.  So I'm on Page 68 of my
13 initial report.  And the DoubleClick acquisition was
14 in 2008.  The Invite Media acquisition was in 2010.
15 And the AdMob acquisition was in 2011.
16     Q.    Have you formed any opinion as to whether
17 any of those acquisitions were unlawful?
18     A.    I've not -- I've not -- I've not -- I'm
19 not a lawyer, I have not addressed whether these are
20 unlawful acquisitions or not.
21     Q.    Were you told to assume?  Have you
22 assumed that they were unlawful?
23     A.    I have not assumed that they're unlawful.
24     Q.    Anticompetitive or otherwise improper?
25     A.    I have not assumed either of those.

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1    Q.   Have you offered any opinions about
2  whether any of the conduct at issue was
3  anticompetitive under state or federal antitrust
4  law?
5    A.   Again, I've offered the opinions that are
6  listed in the front of each one of my reports. I
7  intend to testify to those opinions without
8  exception. I have not -- I am not a lawyer. So to
9  the extent that any of them relate to antitrust laws
10  or they don't relate to antitrust laws, that's the
11  answer to that question.
12    Q.   Well, you don't intend to give the
13  opinion that they do or -- that they -- they
14  constitute anticompetitive activities, do you?
15    A.   I am giving the opinions that are listed
16  in my report, and I plan to testify to those
17  opinions without exception. And -- and I -- I'm not
18  categorizing, based on your definitions, whether
19  they -- they do that or not. I'm just telling you,
20  these are the opinions, the work that I've put forth
21  to support those opinions, and that's what I'm here
22  to testify to.
23    Q.   As you sit here, can you think of a
24  single opinion that you are offering wherein
25  independent of your assuming liability as to that

Page 35

1  conduct, you have concluded independently it's
2  illegal or unlawful?
3         MR. COLLIER:  Objection; form.
4    A.   As I sit here, I don't believe I have
5  concluded in any of my opinions that -- that conduct
6  is unlawful. I'm not a lawyer. That would be
7  outside my -- that would be outside the scope of my
8  work in this case.
9    Q.   And your expertise as a nonlawyer. Is
10  that what you're saying?
11    A.   It depends on what would need to be
12  quantified for the -- I'm not -- my expertise might
13  be relevant in -- in that type of analysis.
14    Q.   But since it wasn't part of your
15  responsibility and undertaking here, you haven't
16  done it and you're not giving any such opinion as to
17  unlawful or anticompetitive conduct. True?
18         MR. COLLIER:  Objection; form.
19    A.   I am giving the opinions that I listed in
20  my report. I plan to testify to those opinions
21  without exception.
22         To the extent that any of those opinions
23  address that issue, then -- then I'm going to
24  testify to those opinions.
25         To the extent they don't address that

Page 36

1  issue, that I'm not going to testify to those
2  opinions.
3    Q.   Okay. Well, I just want to be sure that
4  you're not intending to offer a single opinion, as
5  you sit here, that you can think of, that some
6  conduct is anticompetitive or otherwise unlawful, in
7  connection with your calculations and opinions on
8  these --
9    A.   Then the best --
10    Q.   -- civil penalties?
11    A.   -- the best thing I can say is then you
12  should look at my opinions and determine whether
13  they do that or not. Because these are my opinions.
14  This is what I intend to testify to.
15    Q.   Okay. Do you intend to offer a single
16  opinion that any conduct that is referenced in your
17  report is -- that you have independently determined,
18  that it is anticompetitive or unlawful or a
19  violation --
20         MR. COLLIER:  Objection; form.
21    Q.   -- other than what somebody has told you
22  to assume?
23         MR. COLLIER:  Objection; form.
24    A.   And so I've -- I have quantified
25  violation counts in my report. So I do intend to

Page 37

1  offer opinions on the number of violations. I'm
2  offer -- I intend to offer the opinions that are in
3  this report and that are in my other report, listed
4  at the front. I'm going to offer those opinions
5  without exception.
6         And to the extent they address your
7  question you just asked, then they do. To the
8  extent they don't address the question that you just
9  asked, then they don't.
10    Q.   As you sit here today, can you identify a
11  single opinion you intend to give or include in your
12  report that is based upon your own assessment and
13  determination of the anticompetitive or unlawfulness
14  of that conduct, other than what somebody has told
15  you to assume? Have you independently done that
16  with respect to any of your opinions?
17         MR. COLLIER:  Objection; form.
18    A.   Would you please repeat the question one
19  more time?
20    Q.   Yes, sir.
21         Other than what people have -- somebody
22  has directed you to assume with respect to
23  anticompetitive or unlawful conduct in support of
24  your opinions, other than what they've directed you
25  to assume, can you point to a single opinion you

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1   intend to give that is -- expresses the opinion that
2   you have independently determined liability and/or
3   violation of any statute?
4           MR. COLLIER: Objection; form.
5       A.   So I am assuming, for purposes of my
6   work, liability. I have put forth the opinions in
7   my report, in the front of each of those reports,
8   what my opinions are and what I intend to testify
9   to, and the rest of the report gives the basis for
10  those opinions.
11          To the extent they address what you just
12  asked, then they do. To the extent they don't
13  address what you just asked, then they don't.
14      Q.   And you -- are you able to sit here and
15  identify a single alleged anticompetitive conduct or
16  event that you have investigated independently, of
17  any assumption you've been directed to hold, that
18  that constitutes an unlawful act or a misconduct
19  that is supportive of liability?
20          MR. COLLIER: Objection; form.
21      A.   Again, I am not a lawyer. I am a
22  financial economist. I've -- I've put forth the
23  opinions that I have based on the work that I've
24  done.
25          And so to the extent that they -- they --

Page 39

1   these opinions address what you just asked, and they
2   do. To the extent they don't, then they don't.
3           These are my opinions. They are very
4   clearly written, they're -- they're supported
5   throughout the reports. That's what I plan to
6   testify to.
7       Q.   And -- and across the board you've
8   operated under the assumption that you are not to
9   independently investigate and conclude or form an
10  opinion as to the illegality or unlawfulness of any
11  alleged misconduct. Would that be true?
12      A.   In performing my work I have assumed
13  liability.
14      Q.   And does -- and as you understood it in
15  assuming liability, did that exclude your having any
16  obligation or responsibility to independently
17  determine whether some conduct at issue is unlawful
18  or illegal?
19          MR. COLLIER: Objection; form.
20      A.   I have not thought about whether or not
21  my opinions can be used in that way one way or
22  another. I have done my -- my opinions based on the
23  work that I was asked to perform, assuming
24  liability, and I've supported those opinions. I'm
25  here to testify about those opinions.

Page 40

1           To the extent that they meet the
2   categorization that you're implying, then they do.
3   To the extent they don't, then they don't.
4       Q.   Have you -- have you undertaken any
5   independent investigation as to whether or not any
6   of the five mechanics or ad exchange features that
7   we've talked about constitute, in fact,
8   misconduct --
9           MR. COLLIER: Objection; form.
10      Q.   -- independent of the assumption?
11          MR. COLLIER: Objection; form.
12      A.   Would you repeat the question?
13      Q.   Yes.
14          Have you conducted any independent
15  investigation to form an opinion as to whether or
16  not any of those five areas that we've talked about
17  the features, were unlawful or constituted
18  misconduct under the statutes?
19      A.   I have assumed for purposes of my work
20  that those features, as you refer to them, or
21  conduct as the various programs, that they were
22  unlawful.
23      Q.   Okay.
24      A.   I've assumed that for the purposes of my
25  work.

Page 41

1           I've -- based on the work that I've done,
2   I've reached the opinions that I've reached,
3   supported those opinions.
4           To the extent that those opinions address
5   the question you just asked, then they do. To the
6   extent that they don't address that question, then
7   they don't.
8       Q.   Do you include -- or intend to include
9   within that answer -- do you intend that you are
10  going to function here as a second opinion on -- on
11  misconduct and the unlawfulness of any of those ad
12  features?
13          MR. COLLIER: Objection; form.
14      A.   I make -- I make no assumption one way or
15  another. I am assuming that I'm going to testify to
16  the opinions that I have in these reports, without
17  exception. And I'm going to testify to the support
18  and the basis for those opinions.
19      Q.   You conducted no independent
20  investigation directed at whether or not those
21  mechanics or features violate the antitrust
22  statutes. True?
23          MR. COLLIER: Objection; form.
24      A.   I've directed -- I've done the
25  independent work necessary to support the opinions

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1  that I have in my report. To the extent that those
2  opinions address your categorization, then I have
3  done that work. To the extent that they don't, then
4  I have not.
5      Q. So are you -- are you suggesting to the
6  Court or the fact finder that you have conducted an
7  independent investigation of any of the misconduct
8  and/or unlawful conduct at issue in this case and
9  formed an independent opinion as to whether it was
10  or was not illegal?
11      MR. COLLIER: Objection; form.
12      A. I'm suggesting to the Court that my
13  opinions that I intend to offer and provide in this
14  case, which are listed in the front of both of my
15  reports, that I've done the independent work to
16  support those opinions. That's all I'm suggesting
17  to the Court.
18      Q. And those opinions are limited to
19  quantifying, as I understand it, the civil penalties
20  under the DTPA. True?
21      A. Those opinions are -- are based on the
22  assignment that I was given to -- to determine what
23  appropriate penalties would be, analyzing three very
24  specific factors that I was asked to analyze.
25      Q. What were those three factors that you

Page 43

1  were advised to opine on?
2      A. So I have those listed in my report. I'm
3  just going to read those so I don't -- I prefer to
4  read them the way I have them in my report, than to
5  try to summarize them. So if you just give me a
6  moment, I'll get to those.
7      (Pause.)
8      Q. Let me help you out.
9      A. It is --
10      Q. Page 3.
11      A. Yeah, it's on Page 40 here. What
12  I've been -- you're on Page 3?
13      Q. You indicate at Page 3, in the center of
14  the first paragraph, 7, quote, I address the amount
15  necessary to deter future misconduct. No. 1.
16      Right?
17      A. Yes.
18      Q. No. 2, the history of past violations.
19  Right?
20      A. Yes.
21      Q. And 3, the ability of the offending party
22  to pay a penalty. Right?
23      A. That's correct.
24      Q. Okay. Those are the three factors that
25  you indicate that you were directed to consider.

Page 44

1      Right?
2      A. That's the lens in which I was asked to
3  view my quantification of appropriate penalty.
4      Q. Okay. Who asked -- how did you decide to
5  pick those three factors to consider and base your
6  calculation of penalties on?
7      MR. COLLIER: Objection.
8      5.11 of the Court's order prohibits
9  you from disclosing any communications with counsel.
10      If you can answer that question
11  without disclosing communications with counsel,
12  you're free to do so.
13      A. That was my direct assignment.
14      Q. That was your direct assignment in this
15  case, limited to that, right, specified?
16      A. That was my assignment in this case.
17      Q. Okay. And you refuse to answer and tell
18  us who directed you to adopt that -- that lens
19  through which you were to calculate these penalties?
20      MR. COLLIER: Mr. Gibbs, now your
21  violations of the Court's order are becoming
22  intentional. I have instructed him not to disclose
23  communications with counsel and I have allowed him
24  to answer if he can answer without.
25      So I will instruct again,

Page 45

1  Mr. Andrien, if you can answer that question without
2  disclosing communications with counsel, please do
3  so. If you cannot, please indicate.
4      A. I don't believe I can answer that
5  question.
6      Q. Okay. Did you -- did you conduct any
7  investigation -- okay. Do you intend, therefore,
8  not to answer the question?
9      A. Based on advice -- or guidance from --
10  from Mr. Collier, I don't believe I can -- I can
11  answer that question without violating the
12  stipulation.
13      Q. In the -- in preceding then on those
14  three factors, did you agree as an independent
15  expert or purported independent expert that those
16  were the proper three factors to consider under the
17  DTPA statutes?
18      MR. COLLIER: Objection; form.
19      A. I have looked at various statutes. I
20  believe these are generally factors that -- that a
21  trier of fact would consider and -- and I've been
22  asked to consider those. So as a nonlawyer, that's
23  what I've been asked to do. I've reviewed whether
24  that's a reasonable assignment. I believe it is a
25  reasonable assignment based on my review of the

12 (Pages 42 - 45)

Page 46

1  statutes and -- and I did that work.
2      Q.   Okay.  So those are the three that you
3  were directed to use and you said you had the right,
4  obviously, to say, I don't think those are the --
5  the correct ones.  That would be something, as an
6  independent expert, you would reserve to yourself.
7  Correct?
8      A.   Well, again, I'm not a lawyer and legally
9  interpreting what is and what is not.  That's --
10  that's beyond my scope as a -- as a financial
11  expert.  I -- I've reviewed the statutes as a
12  financial expert and believe these were reasonable
13  factors to consider from a financial economic
14  perspective.  And, therefore, I went forth and
15  conducted my analysis as such.
16      Q.   Okay.  But did you -- did you agree,
17  then, to focus on those three elements in arriving
18  at your numbers?
19      A.   I did focus on those three elements in --
20  in -- arriving at my number.  Those -- those
21  three elements were a part of my analysis.
22      Q.   And are you, sir -- do you hold yourself
23  out as an expert on online auction mechanics?
24      A.   That's -- that's for a court to decide,
25  whether I have expertise beyond what a average juror

Page 47

1  would have in that area.
2      Q.   My question is, do you hold yourself out
3  as an online auction mechanics expert?
4          MR. COLLIER:  Objection to form.
5      A.   I understood your question and I was
6  trying to give a -- what I believe was the
7  appropriate answer to that question, is whether or
8  not, as you're asking and I understand it, I'm an
9  expert is up to a judge to decide.  That's a legal
10  determination.
11          I understand that it's possible I might
12  have experience, training or skill in the area that
13  would be above the typical juror.
14      Q.   Before this -- you undertook this
15  calculation, the responsibility for the civil
16  penalties under the DTPA, had you ever heard of ^
17  Ad Ex before, the advertising exchange at Google?
18      A.   I -- I believe I have.  I --
19      Q.   Had you ever done any work with -- with
20  respect to evaluating the Ad Ex -- Exchange or its
21  features before?
22      A.   I'm trying to think through that
23  question.  I have worked as kind of a lead marketing
24  partner in -- in my firm, my prior firm, and I'm
25  trying to think of any of the work I did in that.

Page 48

1      Q.   Have you ever been -- have you --
2          MR. COLLIER:  I don't believe -- I'm
3  sorry.  I don't believe he was done, Mr. Gibbs.
4      A.   I believe I have -- I believe I have done
5  work in that capacity that would involve different
6  aspects of -- of that.
7      Q.   Have you ever been retained to provide
8  opinions regarding -- regarding to the ad --
9  advertising technology business?
10      A.   I -- I don't believe I've worked on -- on
11  case work that involves the advertising technology
12  industry --
13      Q.   Have you ever --
14      A.   -- prior this case.
15      Q.   Excuse me.  Have you ever taught a class
16  on advertising technology?
17      A.   I haven't taught a class entitled
18  "advertising technology" but I've taught -- for 12
19  years, I taught a master's in marketing program.
20  And part of my work as a -- in that -- in that class
21  that I taught for 12 years was -- was to talk about
22  various marketing advertising campaigns, how they
23  work, how to assess whether they're going to be
24  profitable or not.
25      Q.   Have you ever done any work evaluating

Page 49

1  penalties or damages in a -- an advertising
2  exchange, online advertising exchange market?
3      A.   Before this case, I have not done any
4  quantification of damages or penalties in the online
5  advertising exchange market.
6      Q.   Do you have any degrees in economics?
7      A.   I have an undergraduate degree in
8  economics.
9      Q.   Okay.  Do you have any higher degrees, a
10  Ph.D.?  Are you a doctor in economics?
11      A.   I'm not a doctor in economics, but I do
12  have a master's in business administration with a
13  concentration in finance, which is a subset of
14  economics.
15      Q.   Yes.  But you have no degrees in
16  economics beyond a bachelor's where you presumably
17  majored in economics?
18          MR. COLLIER:  Objection; form.
19      A.   I majored in economics as an undergrad
20  and I have a master's in business administration
21  with a concentration in financial economics.
22      Q.   Have you ever held yourself out as an
23  economist in the private sector?
24          MR. COLLIER:  Objection; form.
25      A.   I work as an economic consultant for an

13 (Pages 46 - 49)

Page 50

1  economic consulting firm for the last almost 30
2  years, 25, 30 years. So I've held myself out as
3  someone who works in the economics field and applies
4  my -- my -- my education, training, and experience
5  in that field of economics.
6       Q.  Do you have any expertise in evaluating
7  appropriate penalties when enforcement authorities
8  seek them?
9         MR. COLLIER:  Objection; form.
10      A.  I've been involved in that before.
11      Q.  In what capacity?
12      A.  As an expert.
13      Q.  In what kind of a matter?
14         MR. COLLIER:  Mr. Andrien, I don't
15  know what your answer is going to be. If this was a
16  consulting engagement, I'd ask you not to disclose
17  anything proprietary to the consulting engagement.
18  And if it's a testifying engagement, don't disclose
19  anything that would be in violation of whatever
20  protective order may govern you in that matter.
21  With that said, you can answer.
22         THE WITNESS:  Thank you.
23      A.  So, for example, if you look at my -- my
24  CV, I think the last --
25      Q.  Let's mark your CV, if we may.

Page 51

1         As a prelude to that, am I given to
2  understand you have recently changed your
3  employment?
4      A.  I've -- I've switched firms, yes.
5         (Exhibit 3 was marked.)
6      Q.  Okay. Let's look at -- would you
7  identify Andrien Exhibit 3 to your deposition?  Is
8  that your current CV?
9      A.  This is my most recent CV, yes.
10      Q.  And you now work for Resolution Economics
11  in Austin. Right?
12      A.  Yes.
13      Q.  And what is the nature of that business?
14      A.  Economic consulting.
15      Q.  Does that include being retained to
16  testify in litigation?
17      A.  It does.
18      Q.  Okay. And is that a consistent sequel,
19  if you will, to the work that you did before that in
20  your prior employment?
21      A.  Yes. Since -- for the last 25 years or
22  more, I've been working as an economic consultant --
23      Q.  And --
24      A.  -- and -- and part of my work as an
25  economic consultant has been to be engaged as a --

Page 52

1  as a testifying expert.
2      Q.  And what -- what portion of your work
3  over the past five years, let's say, has consisted
4  of testifying in litigation as a consultant?
5      A.  I've never done the math to determine
6  what portion that would be.
7      Q.  Give us your best estimate.  You've lived
8  through it.  Give us your best estimate?
9      A.  I'd be speculating as to a number.  I can
10  say the majority of that work --
11      Q.  Okay?
12      A.  -- would be in that area.
13      Q.  So the majority of your work, would that
14  be true over the past ten years?
15      A.  It really depends on the year.  So I've
16  never -- as I said, I've never done that work.  I
17  do -- I -- I have a lot of different functions in my
18  capacity at various jobs and so testifying as a
19  witness, I would say actually I -- I don't believe
20  it's the majority if I think about all the other
21  obligations I have.  And the things that I do, I
22  actually think it would be on the lower end of my
23  overall work.
24      Q.  Well, you originally said a moment ago
25  you thought it was the majority of your work.

Page 53

1  Right?
2      A.  I think it was the majority of my
3  billable work.
4      Q.  Okay?
5      A.  But I do a lot of work that's
6  nonbillable.  I do -- I teach, for example.
7  There's -- there's lots of things that I do in my
8  capacity at the firm and as -- as a member of the
9  faculty at University of Texas that -- that is
10  outside the scope of -- of litigation consulting.
11      Q.  Okay.  Back to the point.  Your --
12  your -- the majority of your paid work has been to
13  testify -- prepare for and to testify -- testify and
14  give opinions in litigation.  Fair?
15      A.  No, because I get -- as I said, I get
16  paid to be a -- a part of the faculty of UT and
17  teach courses.  I get paid as a consultant to do
18  many things outside of work in litigation, to do
19  engagements that are nonlitigation, to -- to manage
20  and support the firm.  There's lots of work I get
21  paid to do.  So my paid work, the -- the way you
22  phrased your question, I would say that litigation
23  work is a -- is a minority of my paid work.
24      Q.  Okay.  So your position now is it's a
25  minority of your paid work is in litigation-related

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1    work?
2        A.    That's been -- that's what I've been
3    trying to say this whole time.  I have -- I'm not
4    trying to be inconsistent with my answers at all.
5        The majority of the work that I get paid
6    for from my employers, I would say, is
7    nonlitigation-related.
8        Q.    Now, sir, are you a tenured or --
9    you've -- you've talked about the fact that you're
10   a -- you've taught some lectures at the University
11   of Texas.  Is that fair?
12       MR. COLLIER:  Objection; form.
13       A.    I'm -- I'm on the faculty of the finance
14   department at the University of Texas.
15       Q.    Are you a tenured, or on tenure track,
16   member of any university facility -- or faculty?
17       A.    No, I'm a lecturer because I have a
18   full-time job as a consultant.
19       Q.    Okay.  Your full-time job is a
20   consultant.  You are an -- what's called an adjunct
21   professor or you teach occasional courses.  True?
22       A.    I routinely teach courses in finance at
23   the McCombs School of Business at the University of
24   Texas.
25       Q.    Okay.

Page 55

1        A.    And I've been doing that for several
2    years now.
3        Q.    That's outside, as you say, of your full
4    time employment as a consultant as you've described
5    it.  Right?
6        A.    That's correct.
7        Q.    Are you an academic researcher?
8        A.    I do not perform -- well, I have
9    performed research and published in academic
10   journals before so --
11       And I've written a academic -- a chapter
12   in an academic text took.
13       Q.    Have you ever published work in a
14   peer-reviewed journal or other research publication?
15       A.    Yes.
16       Q.    And what -- what type of economic
17   activity have you published?
18       A.    So if we go to my publications.  I'll
19   point you to -- so I wrote a chapter in a marketing
20   textbook, the chapter that I wrote is called The
21   Brand Imperative:  Protecting Your Most Valuable
22   Asset, and that was in a book called The Future of
23   Branding.
24       Q.    Anything else?
25       A.    Yes.  I wrote an article in Asian

Page 56

1    Management Insights called Protecting an Asian
2    Treasure and that is an academic publication that
3    comes out of the Singapore Management University.
4        Q.    Any other peer-reviewed publications?
5        A.    You know, depending on how you defined
6    peer-reviewed.  All of -- all of my publications are
7    reviewed -- reviewed by my peers or other
8    professionals before they've been -- before they've
9    been published.
10       Q.    You understand the difference between
11   peer-reviewed and non peer-reviewed publications?
12       A.    If you have a definition you'd like to
13   provide to me to answer that question, I will.  But
14   peer-reviewed can mean different things to different
15   people.  There's academic journals have a
16   peer-review process and I've talked about the --
17   the -- the publication I've done there.  But I
18   also -- these other publications have been reviewed
19   by professional peers in the industry.  And so I
20   consider them in that aspect, peer-reviewed.
21       Q.    Okay.  How about the first group.  There
22   are publications which only submit or publish
23   peer-reviewed work --
24       A.    Okay.
25       Q.    -- articles.  Right?

Page 57

1        How many -- how many such publications
2    have you published in that are restricted to
3    peer-reviewed work or articles?
4        MR. COLLIER:  Objection; form.
5        A.    At least the two that I just mentioned
6    and I believe some of the -- the work that I've
7    published for various bar associations would then
8    have to be peer-reviewed before they would be
9    accepted into those.
10       Q.    The two that you have described are the
11   two that come to mind.  Is that right?
12       MR. COLLIER:  Objection; form.
13       A.    Those two, plus, by your definition, the
14   others that I don't believe would've been allowed
15   unless they were reviewed as well.
16       Q.    Have you ever been hire --
17       MR. COLLIER:  Mr. Gibbs, we've been
18   going more than an hour, just when you reach a
19   convenient stopping point, please.
20       MR. GIBBS:  You bet.
21       Q.    Have you ever been hired to analyze DTPA
22   violations against any computer product developers?
23       A.    And just so I understand how we're
24   defining "computer product developers," Google would
25   fall into that category from your definition?

15 (Pages 54 - 57)

Page 58

1    Q.   They would, yes.
2    A.   I have been.
3    Q.   And what -- what case or what connection?
4    A.   Let me look at my CV.  The very last
5  testifying entry on my CV is the State of Texas
6  et al. versus Google, Inc.
7    Q.   Okay.  Other than that occasion, have you
8  been hired in any other matter to express any
9  opinions?
10   A.   On -- well, I've -- that was a very
11 open-ended question on other matters I've -- every
12 matter I'm --
13   Q.   Such opinions.  I'm talking about
14 opinions violations, DTPA violations against
15 computer product developers?
16   A.   I think that last case would be the only
17 one that fits that description as you've -- as
18 you've laid out.
19   Q.   Have you ever been retained to express
20 opinions regarding DTPA violations of other kinds?
21       MR. COLLIER:  Objection; form.
22   A.   I don't recall these cases involve -- my
23 other cases involving specifically deceptive trade
24 practices.  But I may have, I just don't recall as I
25 sit here.

Page 59

1    Q.   Okay.  In any event, none come to mind
2  out of the work assignments that you've described
3  that you've undertaken in your career.  Correct?
4    A.   I've undertaken a lot of cases in my
5  career and -- and I don't recall specifically the --
6  the various causes of action under each of those
7  cases.  So it's hard for me to answer that question.
8  But none come to mind as I sit here right now.
9    Q.   Have you --
10       MR. GIBBS:  Let's -- let's take a
11 break.
12       MR. COLLIER:  Okay.
13       THE VIDEOGRAPHER:  Going off the
14 record.  The time is 10:10.
15       (Break.)
16       THE VIDEOGRAPHER:  Back on the
17 record.  The time is 10:29.
18   Q.   Mr. Andrien, have you ever been hired to
19 express an opinion about DTPA state civil penalties
20 before this case?
21   A.   Yes.
22   Q.   In what case?
23   A.   The state of Texas et al. v. Google, Inc.
24   Q.   Okay.  Other than that case?
25   A.   As I answered before, I've been involved

Page 60

1  in a lot of cases over the course of my career.
2  I -- as I sit here today, I don't recall any of the
3  others being associated with DTPA penalties.  But
4  that's based on my recollection as I sit here today.
5    Q.   All right.  How about have you ever been
6  called on in a case to express opinions about civil
7  penalties for multiple states -- under multiple
8  states' DTPA statutes in one case?
9    A.   Again, as I sit here today, I don't
10 recall a case that meets those characteristics.  But
11 that's based on my recollection as I sit here today.
12   Q.   And have you ever had your opinions
13 stricken or disqualified by a court when you were
14 designated as a potential expert witness?
15   A.   I've never had it done for any
16 reliability issues.  There was a case that I was on,
17 an antitrust case, that was a per se antitrust case
18 where I was asked to do a -- a rule of reason
19 analysis.  And that was -- that -- the judge
20 determined that was not allowed in but not -- never
21 said I did anything wrong in my analysis.
22   Q.   You were disqualified as not having
23 appropriate expertise, the court ruled in that case.
24 True?
25       MR. COLLIER:  Objection; form.

Page 61

1    A.   That is not true.
2    Q.   He did not -- your opinions were not
3  received or accepted by the court, they were
4  excluded on the antitrust issue.  True?
5    A.   Those opinions were excluded, but not --
6  there is no finding that I wasn't qualified or
7  finding that I did anything wrong in the case.  What
8  happened is it was a per se case.  The judge made
9  it clear he wasn't going to allow a -- rule of
10 reason analysis.  So when the Daubert motion came,
11 the other side made arguments.  The side that I was
12 working for didn't defend those arguments.  And the
13 judge ruled because they weren't defended, they
14 couldn't allow me to testify.
15   Q.   The party that was adverse to you in that
16 antitrust case in which you were tendered as a
17 potential expert witness was the Department of
18 Justice.  Right?
19   A.   It was the United States, I believe.
20 It was -- I -- I belive it was under the Department
21 of Justice.
22   Q.   And in that case, that antitrust case,
23 the Department of Justice challenged on multiple
24 grounds your qualifications as to serve as an expert
25 on any antitrust issues.  Right?

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1    A.   The Department of Justice challenged
2  those, as I get challenged on virtually every case
3  I'm on.  The judge never ruled that those challenges
4  were -- were right.  The judge just ruled saying
5  these weren't defended and so I'm not going to allow
6  them to testify.  And the reason it wasn't defended
7  is because the judge made it clear to counsel that
8  he wasn't going to allow a rule of reason report in
9  a per se antitrust case.
10    Q.   The Department of Justice challenged you
11  on multiple grounds including number one, that you
12  were not a economist they said.  Right?
13         MR. COLLIER:  Objection; form.
14    A.   That was one of their claims which again
15  I believe is demonstrably false.
16    Q.   The Department of Justice said you had no
17  scientific, technical, or other specialized
18  knowledge that would help the jury in that case.
19  Right?
20    A.   Yeah, that was their claim.  As I said
21  people make claims in every case I'm on like that.
22    Q.   The Department of --
23    A.   May I finish?
24    Q.   You sure may.
25    A.   They make claims in every case I'm on

Page 63

1  like that.  I believe those claims were demonstrably
2  false.  The judge never ruled that those claims were
3  correct.
4    Q.   The -- the Justice Department also
5  objected to you on the grounds that you had no
6  peer-reviewed methodology supporting your proffered
7  opinions there.  True?
8    A.   I don't recall specifically whether that
9  was part of the claim.  But I -- I remember the case
10  and I did have a peer-reviewed methodology.  So
11  because they claimed it doesn't make it true.
12    Q.   And they also objected to you on the
13  grounds that your methodology was never tested in
14  any outside litigation that under -- under --
15  underscored your opinions there.  Right?
16    A.   I --
17         MR. COLLIER:  Objection; form.
18    A.   I would have to go back and read the --
19  the -- the motion by the -- the plaintiffs in that
20  case.  But, again, I am confident the judge did not
21  rule that those -- those allegations were true.  And
22  I'm confident that they are not true.
23    Q.   And they also -- the Department of
24  Justice also objected that your performed --
25  performed methodology for litigation was for that

Page 64

1  litigation only and, therefore, not peer-reviewed.
2  True?
3         MR. COLLIER:  Objection; form.
4    A.   Again, I don't recall the -- the -- the
5  specific claims that the DOJ alleged in that case.
6  Like every case I'm on, the other side alleges
7  reasons why they don't believe a judge should --
8  virtually every case -- should allow my testimony.
9  And the judge did not agree or -- or confirm any of
10  those allegations --
11    Q.   Have you --
12    A.   -- in this case.
13    Q.   -- prepared -- or strike that.
14         Have you prepared and been published in
15  any peer-reviewed article a description of how to
16  calculate civil penalties in a DTPA case?
17    A.   I have not written a -- an article on how
18  to calculate civil penalties on a DTPA case.
19    Q.   How about civil penalties under the state
20  antitrust statutes or federal antitrust statutes?
21    A.   I don't believe any of the articles I've
22  written have addressed how to quantify penalties
23  under the state antitrust or federal antitrust laws.
24    Q.   You are relying on other experts in your
25  opinions, as your opinions relate to the sums you

Page 65

1  say should be awarded as civil penalties.  True?
2         MR. COLLIER:  Objection; form.
3    A.   Would you, please, repeat the question?
4    Q.   You rely upon other third-party expert
5  witnesses in issuing your opinions regarding the
6  amount of civil penalties that you recommend here?
7         MR. COLLIER:  Objection; form.
8    A.   That is correct.  I reference other
9  experts that are involved in this case.
10    Q.   That's Messrs. Weinberg, Chandler, and
11  Gans?
12    A.   I believe I've also referenced Dr. Ruden
13  in my case -- in my report.  So it would be
14  Drs. Weinberg, Gans, Chandler, and Ruden, I believe
15  are the...
16    Q.   And who -- who selected -- or why did you
17  select those specific witnesses to rely upon in
18  forming your opinions about the amount of civil
19  penalties to recommend?
20    A.   It was my understanding that those
21  doctors were addressing various issues in this case,
22  and the issues that they were addressing were --
23  provided pertinent information for me to consider in
24  the work that I was addressing.
25    Q.   Did you assume their opinions were

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1 correct for the purpose of your own analysis?
2    A.  I have assumed that their opinions are
3 correct.
4    Q.  Why did you assume that?
5        MR. COLLIER:  Objection; form.
6    A.  Because they were experts hired in this
7 case who have done work and analyses based on their
8 expertise that I did not perform in this case.  And
9 like almost every case I'm on, it's useful and
10 helpful to rely upon the expertise of others when
11 necessary.
12    Q.  You anticipated my next question.  You
13 just indicated they -- they did an analysis that you
14 were not called upon to do.  Right?
15        MR. COLLIER:  Objection; form.
16    A.  I -- I -- from my understanding of -- of
17 their reports, I believe they were addressing issues
18 different to the issues that I was addressing.
19    Q.  Okay.  Did you perform any analysis
20 yourself to determine whether those experts and
21 their reports you relied upon were worthy of
22 reliance?
23        MR. COLLIER:  Objection; form.
24    A.  I understood how I was relying on them.
25 I understood the base -- I've read the reports, so I

Page 67

1 did an analysis and read the reports to understand
2 how they concluded what they concluded.
3        And based on my research in this case, my
4 understanding of the record in this case, my
5 education, training, and experience, and upon
6 reading those reports, I felt that it was
7 appropriate for me to rely upon them.
8    Q.  Okay.  Even though you didn't conduct any
9 independent analysis of the investigations or
10 analysis they did in their respective reports.
11 True?
12        MR. COLLIER:  Objection; form.
13    A.  I don't agree with that characterization.
14 I just told you that I've read their reports.  And
15 when I read the reports, that is an analysis and a
16 review that I bring my education, training, and
17 experience to bear when I look at those opinions and
18 determine whether or not they seem well-supported,
19 they're based on logical -- you know, logical
20 workflows, et cetera.
21    Q.  Did you consider relying on any of
22 Google's experts in arriving at your numbers that
23 you were going to recommend as civil penalties?
24        MR. COLLIER:  Objection; form.
25    A.  Well, I've looked at certain reports that

Page 68

1 Google experts have put forth, specifically
2 Drs. Wiggins and Skinner.  And when they presented
3 information that I thought was something I should
4 consider, I did.  When they -- but I looked and
5 analyzed whether I agreed with what they were saying
6 or disagreed with what they were saying.
7    Q.  So you performed -- you -- you made
8 judgments in calculating your numbers about which
9 side's experts were correct or incorrect on
10 liability?
11        MR. COLLIER:  Objection; form.
12    A.  I've told you in my work I've assumed
13 liability in this case.  So I didn't have to apply
14 that type of judgment in assuming liability.
15    Q.  And for that reason you didn't do that?
16    A.  I didn't do what?
17    Q.  You didn't do any independent evaluation.
18 Right, sir?
19        MR. COLLIER:  Objection; form.
20    A.  I didn't do any independent evaluation of
21 what?
22    Q.  Of the merits of the underlying facts and
23 support -- that supported -- that supported
24 Weinberg, Chandler, or Gans, for example?
25        MR. COLLIER:  Objection; form.

Page 69

1    Q.  You didn't conduct your own independent
2 evaluation of their antitrust liability conclusions?
3    A.  And, again, I disagree with that
4 characterization.  I told you I've read the reports,
5 I brought my training, education, and experience, to
6 -- to bear when I read those reports.
7        I -- I've also reviewed a plethora of
8 documents in this case.  And so I have an
9 understanding based on all the information I've seen
10 in this case, and I did determine -- or looked to
11 see if anything that I was relying upon was
12 inconsistent with what I've seen in this case.
13        So I do believe that's an independent
14 analysis.
15    Q.  How many depositions were taken in this
16 case?
17    A.  I have not counted the number of
18 depositions.
19    Q.  How many depositions have you read that
20 were taken in this case?
21    A.  I have not counted that either.
22    Q.  Well, haven't you listed the things that
23 you relied upon in arriving at your opinions in this
24 case?
25    A.  I've listed what I've relied upon, yes.

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1     Q.    And how many depositions have you relied
2  upon in this case?
3     A.    (Pause.)
4         There's six that I've relied upon.
5     Q.    Which -- where does that appear in
6  your -- in your report?
7     A.    On my initial report it is Appendix B,
8  the materials relied upon list.
9     Q.    And how many depositions did you indicate
10  there?
11     A.    Two depositions, and the one, two --
12  three declarations.
13     Q.    Okay.  I asked depositions.  You
14  listed -- you disclosed two depositions that you
15  relied upon in total in arriving at your original
16  report.  True?
17     A.    In my initial report, yes.  In my --
18     Q.    That was my --
19     A.    -- in my
20     Q.    -- (unintelligible).
21     A.    -- rebuttal report there is four
22  additional depositions.
23     Q.    Okay.  Well, I'm -- I'm now looking at
24  the -- the basis upon which you arrived at your
25  initial report.

Page 71

1         How did you pick those two depositions?
2     A.    These are the ones that were relied upon.
3  So it's not necessarily the -- the list of
4  depositions that were reviewed -- the -- the list of
5  depositions that were relied upon.
6         And I determined that these two
7  depositions addressed issues that I was addressing
8  in my report, and I relied upon them because of
9  that.
10     Q.    And what were those -- what were those
11  issues that you relied upon in the two depositions
12  that you cited?
13     A.    I would have to go -- well, let me take a
14  look and I'll...
15     Q.    Can you recall, as you sit here, how you
16  picked those two to rely upon?
17     A.    I believe I just -- I tried to address
18  how I got to why I relied upon them.  I chose them
19  because they addressed issues that I relied upon
20  in -- in coming to my conclusions and -- and as the
21  basis for my conclusions.
22         So that's how they were chosen.  They
23  said things that were relevant to my analysis.
24     Q.    Would you look with me at Page 3 of your
25  original report.  Paragraph 8 you indicate there

Page 72

1  that your:  Analysis, evaluation, and opinions
2  discussed in this report are based on certain
3  assumptions, including the assumption that Google is
4  found liable for the alleged misconduct.  No
5  opinions on liability are expressed herein.
6         Do you see that?
7     A.    I do.
8     Q.    And do you -- is that an accurate
9  representation to the Court?
10     A.    I believe that is an accurate
11  representation to the Court.
12     Q.    And do you intend to limit your testimony
13  in this case consistent with that representation to
14  the Court?
15         MR. COLLIER:  Objection; form.
16     A.    I intend to limit the testimony to the
17  opinions that I have listed in my report and --
18  without exception --
19     Q.    And --
20     A.    -- and that support -- that -- that
21  underlies those opinions.
22     Q.    -- and therefore you intend to honor your
23  representation that you are expressing no opinions
24  on liability in this report.  Right?
25     A.    I was not addressing liability in my

Page 73

1  report.  To the extent that my opinions that I have
2  addressed can be used in that way, it's -- it's not
3  for me to determine.  I am here to opine and --
4  and -- and support and testify on the opinions that
5  I have expressed in both of these reports, and --
6  and that's what I intend to do.
7     Q.    On Note 4 at the bottom of that page you
8  represent to the Court that:  The plaintiff states
9  have also brought antitrust claims against Google in
10  this matter.
11     A.    Yes.
12     Q.    Do you see that?
13         You go on to say "however, my opinions
14  are limited to those claims related to deceptive
15  trade practices," that statute.  Right?
16     A.    That's what it says, yes.
17     Q.    Okay.  And do you intend to be bound by
18  that representation of the Court?
19         MR. COLLIER:  Objection; form.
20     A.    As I said, I intend to opine on the --
21  to -- to testify in the opinions that I've listed in
22  my report without exception --
23     Q.    And --
24     A.    -- and to the support that I provide for
25  those opinions.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    Q.  -- and do you intend to honor the
2  representation that your opinions in this report are
3  limited to those claims related to deceptive trade
4  practices only?
5         MR. COLLIER:  Objection; form.
6    A.   My opinions on how I derived them were
7  based on the deceptive trade practices.  If they may
8  be used in ways other than that.  That is not for me
9  to decide.  I'm here to testify on the opinions that
10  I've put forth without exception.
11        And to the extent they address or can
12  address things that -- that meet the characteristics
13  that you say, then they can.  And to the extent they
14  can't, then they can't.
15        But I'm here to testify to the opinions
16  that I've put forth in my report.
17    Q.   You -- you indicate that you rely upon
18  source material cited in your report.  Right, sir?
19    A.   Are you -- are you pointing to a
20  specific --
21    Q.   No.  You -- you rely upon source material
22  in this report in support of your opinions.  Right?
23    A.   I -- I rely upon --
24        MR. COLLIER:  Objection; form.
25        THE WITNESS:  I'm sorry.

Page 75

1    A.   I rely upon documents -- I rely upon all
2  the materials that are listed in Appendix B of the
3  first report and Appendix 2 of my rebuttal report.
4    Q.   Let's look at Page 6 of your report.
5    A.   Okay.
6    Q.   Now, you told us a moment ago that one of
7  your three factors that you were relying upon was
8  deterrence.  Do you recall that?
9    A.   I think --
10        MR. COLLIER:  Objection; form.
11    A.   -- specifically what we agreed to was I
12  addressed the amount necessary to deter future
13  misconduct.
14    Q.   Yes, sir.
15        And then back to Page 6, you say at
16  Paragraph F there:  To deter Google from continuing
17  its misconduct, the penalty must eliminate Google's
18  financial incentive to engage in the misconduct.
19        Right, sir?
20    A.   I do say that.
21    Q.   "At minimum, this would involve
22  penalizing Google for the total incremental
23  benefits, including the future benefits, from the
24  alleged misconduct."
25        Right?

Page 76

1    A.   I do.
2    Q.   And then you list under that the conduct
3  that your -- that underlies your opinions with
4  respect to the amount of penalties you're
5  recommending.  Right?
6         MR. COLLIER:  Objection; form.
7    A.   Can you point me to what you're -- to
8  what you're speaking about?
9    Q.   Yes.  The small I:  The alleged
10  misconduct provides Google with direct and indirect
11  financial benefits.
12        Right, sir?
13    A.   Yes.
14    Q.   And secondly, you indicate:  I'm unable
15  to determine Google's total incremental benefits
16  from the misconduct because Google has not produced
17  information sufficient to determine even the direct
18  benefits from the alleged misconduct.
19        Right, sir?  That's what you say.  Right?
20    A.   It says:  And then much less the indirect
21  benefits from the alleged misconduct.
22    Q.   Right.
23        And then you say:  Additionally, the
24  benefits from both the alleged deceptive trade
25  practices misconduct and the separate antitrust

Page 77

1  conduct alleged in this case play a role within an
2  overall scheme to dominate the display advertising
3  industry.
4         You see that?
5    A.   I do.
6    Q.   So you're indicating here that the judge
7  or fact-finder should consider in assessing
8  penalties both the alleged deceptive trade practices
9  misconduct and the separate antitrust conduct
10  alleged in the case.  Right?
11        MR. COLLIER:  Objection; form.
12    A.   I'm -- I am -- what I'm saying here is
13  based on this -- the alleged deceptive trade
14  practices misconduct, when -- when you -- when you
15  couple that with the -- the separate antitrust
16  conduct alleged in this case, it -- they play a role
17  in Google's overall scheme to dominate the display
18  advertising market.  I'm putting this into context,
19  that -- that Google is clearly working to dominate
20  the overall display market and that's borne out from
21  the -- the -- the work that I've done in this case.
22        Whether or not they're -- they're found
23  liable for antitrust conduct or not is -- is not
24  dispositive of my conclusion that they are working
25  to dominate that market.

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1    Q.   So you've arrived at an independent
2   conclusion that both antitrust and DTPA misconduct
3   is to be considered in connection with your opinions
4   of the amount of civil penalties?
5        MR. COLLIER:  Objection; form.
6        A.   I don't believe that's what it says.  I
7   believe you're -- you're misinterpreting that.
8        Q.   Okay.  So you don't intend, by saying the
9   benefits from both the alleged deceptive trade
10  practices misconduct and separate antitrust conduct
11  both play a role in the overall -- in an overall
12  scheme to dominate.  That's not to be considered in
13  support of your total recommended deceptive trade
14  practices penalties?
15       A.   As I --
16       MR. COLLIER:  Objection -- again,
17  just one moment before you answer.
18       THE WITNESS:  Okay.
19       MR. COLLIER:  Objection; form.
20       You may answer.
21       A.   Excuse me.  Just -- would you please
22  repeat the question?
23       Q.   Yes, sir.
24       You make the statement that both the
25  alleged deceptive trade practices misconduct and the

Page 79

1   separate antitrust conduct alleged in this case play
2   a role within an overall scheme to dominate the
3   display advertising industry.  Have I read that
4   correctly?
5        A.   You have read that correctly, yes.
6        Q.   Okay.  So you're suggesting that the
7   Court or fact-finder, that both of those areas of
8   misconduct should be considered as part of an
9   overall scheme by Google to dominate the display
10  advertising industry.  Right?
11       A.   So I -- I don't agree with that last
12  characterization.  What I'm -- what I'm saying in
13  this report and what I'm saying in that particular
14  spot is I'm assuming liability.  I understand that
15  the alleged deceptive misconduct in this case, that
16  the -- the plaintiffs are also alleging that that
17  has reached -- that -- that has provided Google with
18  monopoly power in certain aspects of this market.
19  That's part of their claim.
20       But in terms of the penalties that I'm
21  addressing, the penalties I'm addressing are
22  associated with the DTPA and are independent of the
23  antitrust claims.  This is talking about that this
24  conduct is leading to other conduct that is alleged
25  in this case.  But there's an overall scheme if you

Page 80

1   consider how these things are working in the
2   snowball effect that this conduct has on Google's
3   overall business.  It -- it demonstrates and leads
4   to the conclusion that they are -- they are -- have
5   a scheme to dominate this display advertising
6   industry and that's what I'm getting at.
7        Q.   You've not conducted any independent
8   study to determine whether under the penalties that
9   may be available to a party for violation of the
10  state antitrust statutes are -- are met on this
11  record.  True?
12       A.   I didn't understand your question --
13       Q.   You have not conducted any --
14       A.   I feel like when I'm talking, I didn't
15  get to finish what I was saying before you started
16  your question.  I'm just trying to just -- just
17  trying to get my -- my answer or -- or question out.
18       Q.   Well, finish the question, then.
19       A.   I -- I -- I believe we just talked over
20  one another at the end and I'm just trying to --
21  just trying to avoid that just so we can be clear
22  and help the court reporter.
23       Q.   The -- my question is simply this.  With
24  respect to the -- your assertion in your report at
25  Page 6 that the alleged deceptive trade practices,

Page 81

1   misconduct, and the separate antitrust conduct
2   alleged in this case play a role within an overall
3   scheme to dominate the display advertising industry.
4   Okay.  You have that before you.  Right?
5        A.   I do.
6        MR. COLLIER:  Objection; form.
7        A.   I do.
8        Q.   Now, my question is, you've not, as we've
9   established, conducted any analysis that's reflected
10  in your report of the -- of the antitrust conduct
11  under the antitrust penalty provisions.  True?
12       MR. COLLIER:  Objection; form.
13       A.   I -- I don't understand your question and
14  how to answer your question.
15       What I've done -- and then maybe that's
16  the best way I can answer your question is to tell
17  you what I've done.  What I've done is to determine
18  a penalty associated with the deceptive trade
19  practices violations that Google engaged in within
20  the lens of the three factors I was asked to
21  consider.  I understand the jury might consider
22  other factors.
23       But based on that, I have an
24  understanding of Google's -- of the States; excuse
25  me -- claim that Google has a -- has monopolistic

21 (Pages 78 - 81)

Page 82

1  power in this market as a result of the misconduct.
2  I understand that. I've looked at that. I
3  understand what Dr. Gans has said about that.
4       My -- my penalty doesn't rely on Google
5  being found liable for those claims because I'm
6  addressing the DTPA claims, not the antitrust claims
7  specifically. To the extent that my work and my
8  opinions are -- somehow relate to that, then they
9  do. To the extent they don't, they don't.
10       But that this is -- this in section -- on
11  Page 6 the section F2, what I'm saying here is that
12  when -- when you -- when I've reviewed Google's
13  conduct and I've looked at all the -- the -- the
14  information that was available to me in this case,
15  Google's conduct is clearly shown that they have an
16  intention and -- and a desire to dominate this
17  market and they have improved their -- enhanced
18  their position through this deceptive conduct.
19  And -- and if -- if it's reached an anticompetitive
20  level as -- as Dr. Gans said, that's even more
21  demonstrative of their enhanced power and their --
22  their enhanced position.
23       But whether they've reached that level or
24  not is not part of my calculation, part of my
25  penalty assessment.

Page 83

1       Q. If they are found liable, do you --
2  you've offered, as further support for the numbers
3  that you have cited, the antitrust conduct. Right?
4       MR. COLLIER: Objection; form.
5       A. If they are found liable for the
6  antitrust conduct, then that just shows how much
7  this -- I mean, that -- that just shows the snowball
8  effect from this deceptive conduct has reached
9  just a -- an unarguable level that this is -- this
10  has been -- extraordinarily valuable to Google.
11       I look at it -- that is supportive that
12  happens. That is just support to the level that
13  just makes this very easy and understandable to --
14  to -- to conclude what I've concluded. Without
15  that, I believe there's support and information in
16  the record that shows that either way, there's been
17  a snowball effect that has enhanced their position
18  that have caused others in the -- in the market harm
19  and Google has benefitted from that, not just in
20  their AdTech stack, but throughout their
21  organization.
22       Q. So if the -- if the fact-finder finds
23  that Google committed the antitrust conduct, that
24  supports, by your description, the range of 7 to
25  $20 billion in penalties? Reinforces it. Let's put

Page 84

1  it that way. Right?
2       A. While -- while -- while I agree that
3  would absolutely reinforce, it doesn't need to --
4  to for my support and my range to be appropriate. I
5  don't -- I don't rely upon it solely. It's just --
6  it is just a factor that if that happens, then
7  it's --
8       Q. Clear as a bell?
9       A. -- clear as a bell. And I think it's
10  clear as a bell, anyway, from what I've said. So I
11  think it's -- what -- what I have -- what I've
12  reached -- the conclusions that I've reached I
13  believe are clear as a bell. They're reliable.
14  They are based on the -- on the information that I
15  reviewed and the analysis that I've performed and
16  I -- I -- I think it's clear as a bell -- as a bell
17  anyways (sic) that there's been this snowball effect
18  from their misconduct, their deceptive misconduct.
19       Q. And if someone -- if the jury or a court
20  determines that there is no antitrust misconduct
21  liability violations, you're not going to come off
22  your 7 to $20 billion numbers a dime. True?
23       MR. COLLIER: Objection; form.
24       A. I believe my seven -- let's just get the
25  exact numbers here so we can then --

Page 85

1  (Pause.)
2       I think it's 7.2 -- 7.27 and 21.81.
3       Q. Okay. So you -- if they are found
4  liable, then that makes it clear a bell to you
5  that that was misconduct that would support your --
6  your -- 7 to -- 7-plus to 22 approximately range of
7  penalties. Right?
8       A. I think either way it's clear as a bell
9  that it's important whether they're found liable or
10  not. If they're found liable, I think that's
11  just --
12       Q. Laniappe?
13       A. It's just additional support.
14       Q. Okay. So you didn't need it but you
15  wanted to put it in there because it would serve to
16  increase the justification for your -- your numbers.
17  Right?
18       MR. COLLIER: Objection; form.
19       A. I don't believe it -- it increases it.
20  I'm just saying that this is part of the case and
21  I'm assuming liability. If that's true.
22       Q. But they only get those penalties if they
23  find a DTPA violation. Right, sir?
24       MR. COLLIER: Objection; form.
25       Q. According to your testimony?

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    A.    My testimony is based on the -- my scope
2  of work in this case, I've determined an appropriate
3  penalty for Google for the violations of the
4  deceptive conduct that it's engaged in relative to
5  the different programs that it -- that it -- that
6  were addressed -- we're addressing.  If they're
7  found guilty for any or all of those misconducts, I
8  believe the appropriate penalty falls within the
9  range that I've calculated regardless of whether or
10  not they are found additionally guilty of antitrust
11  violations.
12    Q.    And so without the antitrust liability
13  finding, you don't come off your 7 to 22 billion.
14  Right?
15    A.    That's correct.
16    Q.    And if -- if you have one -- only one
17  DTPA finding of misconduct, you still stay with your
18  7 to 22 billion.  Right?
19        MR. COLLIER:  Objection; form.
20    A.    Yeah, the 7.27 to 21.81.
21        But, yeah, because of the number of
22  violation counts.  And I can kind of explain this
23  graphically and I -- I think I did that in my -- my
24  rebuttal report.  Because the violation counts are
25  so massive in this case, and the benefits to Google

Page 87

1  are really large in this case.  Yes, you would --
2  you would get to my range of appropriate penalties
3  with the number of violation counts of either one or
4  all of the misconduct.
5    Q.    Okay.  Even if one of the -- if you only
6  had a finding that one of those alleged DTPA
7  violations occurred and it occurred during a limited
8  period of time, your -- you stick with and you won't
9  come off of your 7 to $22 billion number.  Right?
10        MR. COLLIER:  Objection; form.
11    A.    Let -- let me maybe just be as clear as I
12  can on this.  All of the numbers that anybody has
13  put forth in terms of violation counts in this case,
14  what I think are the appropriate numbers, I put in
15  my reports.  I think they're appropriate for -- for
16  every independent conduct as well as the total
17  conduct.  I've calculated for -- for all of it.
18        I've looked at Dr. Wiggins' report.  I've
19  looked at his independent calculations and his --
20  his aggregate quantification.  Any range in there
21  I -- I believe we -- the penalty reaches the point
22  where we're going to be within my range.
23        Now, if there is a lower -- if it's found
24  that there's just five independent -- like just five
25  violations ████████████████████,

Page 88

1  ██████████████████████████, I have the math
2  in my report to be able to -- for the jury to be
3  able to answer what the appropriate penalty is.
4        █████████████████████████
5  ████████████████████████████████████████
6  ████████████████████████████████████████
7  █████████████████.
8    Q.    So you've anticipated another question.
9  Let's assume that you keep cutting -- the fact
10  finder keeps cutting in half the number of
11  violations, okay, assume that.
12    A.    Okay.
13        MR. COLLIER:  Objection; form.
14    Q.    And you keep halving it.  That is
15  H-A-L-V-I-N-G, halving it.  And you wind up getting
16  down to ████████████████.  Now at that point in
17  time are you coming off your 7 to $20 billion
18  figure?
19    A.    Yes.  But is that -- at that point I have
20  the math in my report to be able to calculate what
21  the appropriate penalty would be.
22    Q.    Yeah, where is that math?  What is that
23  math?
24    A.    Sure.  Let me -- let me show you.
25        So if we go to Figure 2 of my rebuttal

Page 89

1  report.
2    Q.    You got a page on that?
3    A.    It's Page 16.
4    Q.    All right?
5    A.    So if we look at this -- and -- and I
6  think the scaling of this picture is such that it
7  actually curves this line when I -- I view this
8  line -- this curved portion is actually a straight
9  line from zero to that point.  And so you can think
10  of this as a straight line from here to here, and
11  that would go up.  So if -- if for every violation
12  Google committed, they would receive the maximum
13  penalties.  They would go a straight line from 0 all
14  the way up to, as I calculated, ████████████████
15  based on the number of violation counts.  The slope
16  of that line indicates where this point, this --
17  this kind of point where it gets you into my
18  violation range occurs, that slope happens at
19  roughly I think it's ██████████████████.
20        So if you get ███████████████████,
21  we're in the -- the range of my damages.  If you're
22  below that, then you would quantify what the
23  appropriate penalty would be based on the slope of
24  that line.  Which I've given because of the -- the
25  00 to ████████████ divided by the number of

23 (Pages 86 - 89)

Page 90

1   violation counts that I have. So that's easy,
2   simple math that the jury could apply to get to
3   whatever violation count they come up with, what the
4   appropriate penalty is.
5         But where -- where we are on this part of
6   violation counts are so far out, they're so large,
7   that we're -- there's not anyone in this case that
8   has put forth kind of a violation count that would
9   get us off of my range of where an appropriate
10  penalty would be that would serve as an effective
11  deterrent to Google.
12      Q.   Your Figure 2 is in your rebuttal report,
13  isn't it?
14      A.   It is, yes.
15      Q.   Your Figure 2 and that explanation
16  appears nowhere in your original report, does it?
17      A.   Well, I have similar explanation in my --
18  maybe not as detailed, but I do -- I do address this
19  in my initial report and this is trying to clarify
20  it further.
21      Q.   You don't include in your initial report
22  any suggestion that you can calculate or that your
23  break point for your numbers appear -- ███
24  ███   ███████████
25         MR. COLLIER: Objection; form.

Page 91

1       A.   I -- I disagree. I've -- I've given the
2   ████████████ number. And so the slope of
3   that line is easily calculable given that number and
4   the number of violations.
5         So it is there, I talk about that number,
6   I talk about what it represents, and I talk about
7   what the appropriate range is given Google's --
8   given the -- the lens that I was asked to look for.
9   And so I believe all the information is there. It
10  seemed that Dr. Wiggins was mischaracterizing what I
11  was doing, so I tried to explain it more fulsomely
12  in my rebuttal report which I believe I have.
13      Q.   No. 1, the two figures that you put in
14  your reply after Wiggins attacked you at Pages 15
15  and 16 in your rebuttal report, appear nowhere in
16  your original report. True?
17         MR. COLLIER: Objection; form.
18      A.   I do not -- that is true, I do not
19  include those figures. These are -- these are
20  figures that I've added to my rebuttal to -- to
21  further describe and -- and demonstrate what I've
22  done and -- and why I'm right.
23      Q.   Did you put the ████████████████
24  ███  ██████ in your rebuttal report?
25      A.   I -- I didn't put that in there but the

Page 92

1   math is -- is there to do it very simply. And we
2   are -- we are so far beyond that point that I -- I
3   don't think it was necessary for me to calculate
4   specifically. But -- but that's about where it
5   would fall. And I've given the information to do
6   that math. I'm telling you it's a straight line.
7   And I'm telling you any point, any violation count
8   that -- that the jury comes to, they're going to be
9   able to use my work to help determine what an
10  appropriate penalty should be. And -- and if it's
11  over -- ███████████████████████████████
12  ████████████, I believe we are squarely
13  within my range.
14      Q.   And what you've just described is a
15  situation where you say under your theory of
16  calculating civil penalties, because the -- the
17  number of violations are so big that there are not
18  going to be a violation limitation that is going to
19  be sufficient to change your range of penalties
20  below the 7 to 22 billion range. Right?
21         MR. COLLIER: Objection; form.
22      A.   I have not seen any -- any evidence in
23  this case from either party that would suggest that
24  the violation counts are sufficiently low where we
25  would be outside of -- of my violation count. That

Page 93

1   would still serve as an effective deterrent that
2   would meet its goal as -- as penalizing Google
3   for -- for the misconduct at issue in this case.
4       Q.   Is that another way of saying that under
5   your theory -- your theory is a nonlinear theory of
6   calculation on this record of these penalties?
7          MR. COLLIER: Objection; form.
8       A.   My theory, non -- nonlinear, the math is,
9   I believe, actually -- it's nonlinear and that for
10  every violation you don't just -- just multiply
11  times the -- the per violation penalties that I've
12  given. Because as you do that, you're going to get
13  into a situation where you're not serving as an
14  appropriate deterrent which I believe is described
15  in my initial report. And so it's nonlinear in that
16  sense.
17      Q.   It's nonlinear. And you mean by
18  nonlinear that if you reduce the number of
19  violations, you're not going to reduce the total 7
20  to $20 billion because you've decided that amount or
21  that range is necessary to deter Google. Right?
22         MR. COLLIER: Objection; form.
23      A.   I've determined based on my analysis,
24  based on all of the documents that I've looked at,
25  all the financials I've looked at, my education,

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1  training, and experience, when I've analyzed the
2  factors that I was asked to analyze to come up with
3  a penalty that Google should pay for violating and
4  deceiving its -- the constituents within the -- the
5  AdTech Stack, that if you -- if you think about the
6  benefits to Google, the size of the benefits to
7  Google, the snowball effect that all of these
8  violations have had on Google's operations, and how
9  it's helped Google become the massive company it is
10  today that you would have to -- you would have to
11  punish Google or apply a penalty that would be large
12  enough to -- to deter them from future violations
13  you would have to get into my range. ▓▓▓▓▓▓
14  ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15  ▓▓ ▓▓▓▓▓▓▓▓▓
16     Q.  And the range you're talking about is
17  your, Jeffrey Andrien -- Andrien's range.  Right?
18  You selected the 7 to $20 billion figure as adequate
19  in your opinion to deter and required to deter
20  Google.  Right?
21     MR. COLLIER:  Objection; form.
22     A.  The range that I've quantified is based
23  on my analysis, education, training, and experience
24  consistent with the -- the -- my assignment in this
25  case.

Page 95

1     And -- and so that's a range that I've
2  quantified based on all the work that I've done.
3  And based on understanding one of the lenses is
4  Google needs to be punished for the sheer number of
5  violations they have.
6     Another lens is I've looked at the --
7  what the statute allows for a punishment on a per
8  violation basis.  I've looked at their financials
9  to -- to understand their -- their -- and -- and --
10  and how all their business works to understand the
11  benefits that they receive from this, in a
12  general -- generally.
13     And I looked at the history of other
14  violations.  And, yes, it brings me to this range.
15  But I think that is an appropriate, carefully
16  analyzed range that is -- that is derived from
17  methodological, reliable, analytical work.
18     Q.  You pitched the range, and you decided --
19  you have decided that it is that range in this case
20  that has to be adhered to.  Right, sir?
21     MR. COLLIER:  Objection; form.
22     A.  I have determined that range based -- as
23  a financial penalties witness in this case, that's
24  the range that I've determined would be appropriate
25  to -- to penalize Google, to serve as an effective

Page 96

1  deterrent, given the factors that I have analyzed.
2     And I do understand that there's other
3  factors that a jury might need to consider that I
4  haven't considered.  But based on the factors that
5  I've considered, I believe that's the appropriate
6  range.
7     Q.  You have not -- in your -- well, strike
8  that.
9     You've told us what -- that the
10  descriptor of nonlinear is how you characterize the
11  fact that the number of violations cannot change in
12  this case sufficiently to change the total 7 to
13  $20 billion penalty range, in your opinion.  Right?
14     MR. COLLIER:  Objection; form.
15     A.  That's not exactly what I said.  So
16  I want to be clear what I said.
17     I have not seen any evidence in this case
18  that would suggest or give any plausible basis for
19  assuming the violation count would be so low, ▓▓▓
20  ▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓, as to get to a different
21  conclusion.
22     Is it possible the jury decides it is?
23  Perhaps.  I haven't seen any indication or evidence
24  in the record that would lead them there.  If they
25  do decide that, I have provided information that

Page 97

1  would help them quantify that.
2     Q.  You also, in your -- and, by the way,
3  does the term "nonlinear" appear anywhere in your
4  opening report or that explanation, as nonlinear?
5     MR. COLLIER:  Objection; form.
6     A.  I -- I don't know if I used that term.
7  Again, I think I've described this whole situation
8  generally in my opening report, and the purpose of
9  my rebuttal report is to -- is to further detail it.
10  To make sure everybody understands what I've done
11  and what I've relied upon.
12     Q.  Specifically my question to you is you
13  nowhere included the term nonlinear or the
14  explanation that this was a nonlinear theory that
15  you were propounding in your original report, did
16  you, sir?
17     MR. COLLIER:  Objection; form.
18     A.  If you want me to go read my report to
19  see if the term "nonlinear" is in here, I can do
20  that.  I don't -- I don't recall one way or another
21  if that term is in a 90-page report or an
22  80-some-odd-page report.
23     I do believe the basis on how I
24  calculated this number, in this range, is -- is
25  detailed in this, that would lead one to conclude

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1    it's nonlinear. If I didn't use those terms, I've
2    certainly -- I've certainly clarified and -- and
3    further detailed and described the methodology in
4    my -- in my rebuttal report.
5        Q.   You also, in your rebuttal report,
6    characterize your theory of how to calculate
7    penalties as a holistic approach or theory.
8        Do you recall that?
9        A.   By holistic, I mean given the factors
10   that I've been asked to consider. An analysis of
11   all those factors -- those three factors goes into
12   the conclusions that I've reached.
13       Q.   The word "holistic" does not appear in
14   your original report, to your recollection, does it?
15           MR. COLLIER: Objection; form.
16       A.   Well, I think it's very clear in my
17   original report that these are the factors that I'm
18   considering to get to those conclusions. And so --
19   to reach the conclusions I've reached.
20           In this report I'm saying you can't take
21   away -- I think Dr. Wiggins, in his report, was
22   mischaracterizing what I've done. And so I was
23   trying to clarify that that's not an appropriate
24   characterization of what I've done. I've considered
25   all of these three factors. And you have to

Page 99

1    consider my analysis holistically based on those
2    three factors.
3        But it's very clearly described in my
4    report, in my initial report, that those are the
5    factors that I'm addressing.
6        So to -- for Dr. Wiggins to -- to
7    mischaracterize my work as something other than what
8    I described in my opening report, I don't think was
9    appropriate, and I wanted to make it clear in my
10   rebuttal report that that's not the right way to
11   look at it.
12       Q.   You don't dispute the fact, as you sit
13   here, that the first time you used those two
14   descriptions, that is, that my report or my theory
15   is -- is based upon a holistic report or a holistic
16   theory appear for the first time in your rebuttal.
17   True?
18       A.   I -- I don't know. Let me -- I -- I can
19   read my report to see if I can find those words in
20   there. I think it was very clear that it is,
21   whether those words are stated or not. But they may
22   or may not be stated. I...
23       Q.   All right. In some aspects of your
24   report you indicate that you assume certain facts.
25   We've covered that. Right?

Page 100

1        MR. COLLIER: Objection; form.
2        A.   Do you want to point me to...
3        Q.   Well, just, you know that you've assumed
4    a number of facts based upon, you've told us, some
5    of these other experts in the case. Right?
6        A.   I had assumed liability --
7        Q.   And you've assumed --
8        (Simultaneous speaking.)
9        Q.   -- or you cite other experts as support
10   for a fact that you are assuming. Right?
11       A.   I have cited other experts and -- and
12   have -- have based some of my conclusions based on
13   the work of other experts.
14       Q.   And when you assume -- tell us the -- the
15   definition of "assume" for purposes of your report?
16           When you're referring to assuming certain
17   facts or the opinions of other witnesses, what are
18   you saying?
19           MR. COLLIER: Objection; form.
20       A.   You're asking me to define the word
21   "assume"?
22       Q.   Yes?
23       A.   I am -- I am -- I am taking it as a fact
24   that Google is found liable for the conduct claimed
25   against it in this case, for example.

Page 101

1        Q.   Okay. That -- is that the working
2    definition that -- that you had in mind when you
3    assumed facts for purposes of your analysis and your
4    conclusions?
5        A.   That I'm assuming that the information
6    that I relied upon is true.
7        Q.   Okay. That somebody else has given you
8    and you've assumed it's true. It's taken and
9    granted as true?
10       A.   It is taken and granted as true. But I
11   have reviewed that work. I have looked at it
12   through the lens of my training, education,
13   experience to see if there's things that -- to
14   determine whether it's reasonable for me to rely
15   upon it.
16           And I believe based on that review, that
17   I've relied on -- the work that I've relied on is --
18   is reliable.
19       Q.   You also, in your report, sometimes refer
20   to what you're -- what you're dealing with respect
21   to the facts as something that you understand.
22           Do you recall using that terminology in
23   your reports?
24       A.   I do.
25       Q.   Okay. Sometimes you say "I assumed" X or

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1  Y, which you've told us you mean "I took it for
2  granted as true." Right?
3      A.    Assuming as I've taken it as this is
4  reliable. This is reliable information to use.
5      Q.    Now, in terms of reliability, had you
6  ever worked with Weinberg or -- or Chandler and
7  relied upon their information before, or their
8  findings?
9      A.    I have not been in a case, that I'm aware
10 of, in which I've relied on their findings in other
11 matters.
12     Q.    The only time that you can recall is this
13 one. Right?
14     A.    Yes.
15     Q.    And, now, what -- when you say "I
16 understand," as you do many times in your reports,
17 what do you mean to -- to convey by the different
18 terminology "I understand X or Y as a fact"?
19     A.    I'm letting the reader know how I am
20 interpreting something that I'm talking about or
21 why -- where -- that I -- I understand that this is
22 the right way to think about something.
23     Q.    Okay. That you -- you've come to believe
24 or infer something to be true. You have done that?
25          MR. COLLIER: Objection; form.

Page 103

1          Go ahead.
2      A.    I'm just describing what I understand
3  about certain information.
4      Q.    Yeah, what you've come to believe to be
5  true about certain information. Right?
6      A.    What I understand to -- about that
7  information.
8      Q.    Now, you understand it's important, in
9  forming an opinion about the value that you're
10 recommending as civil penalties, that you be clear
11 in indicating to the reader the basis for those
12 opinions. Would you agree with that?
13     A.    I believe it's important to -- to
14 articulate the bases and support that I have that
15 are the underpinnings of my conclusions.
16     Q.    And not to mislead the reader or listener
17 to your opinions into believing that you have
18 independently investigated and arrived at a
19 conclusion, as opposed to you have been told to
20 assume certain facts, that distinction, you can see,
21 would be important. Right, sir?
22          MR. COLLIER: Objection; form.
23     A.    Would you please repeat that question?
24     Q.    Yes?
25          Do you recognize that there -- it is

Page 104

1  important, in conveying to the reader or listener of
2  your opinions about these -- these penalties, to
3  know what facts you are simply assuming, given facts
4  as correct, as opposed to things that you have
5  obtained an independent understanding of?
6          Do you think that that's an important
7  distinction?
8          MR. COLLIER: Objection; form.
9      A.    I think it is important to provide the
10 reader with an under -- with the information
11 necessary to understand how I've reached the
12 conclusions that I've reached.
13     Q.    Look with me, if you would, at page --
14 Paragraph 90, for example, of your rebuttal report.
15          Do you have that? Do you have that
16 before you?
17     A.    (Pause.)
18          I do.
19     Q.    Now, sir, you do recall and recognize
20 that you, as we've established, have indicated in a
21 number of instances what you have been told to
22 assume to be a fact. Do you recall that you've done
23 that?
24          MR. COLLIER: Objection; form.
25     A.    I have, I believe, made it clear when I'm

Page 105

1  relying upon an assumption, what assumption I'm
2  relying upon in my report.
3      Q.    Okay. And you also use the separate and
4  distinct terms "I understood" or "understand" many
5  times with respect to other facts or information.
6  Right?
7      A.    I have also --
8          MR. COLLIER: Objection --
9          THE WITNESS: Excuse me. Sorry.
10         MR. COLLIER: Objection; form.
11         Go ahead.
12     A.    I have also used the term "understand."
13 You're claiming that there's a major distinction
14 between those. There might be in certain
15 circumstances. There might not be. I'm trying to
16 give the reader the basis for -- for -- for the
17 reader to understand what I've done, how I've done
18 it, and what I've relied upon.
19     Q.    At page -- or at Paragraph 90 of your
20 rebuttal as an example, you have a header there,
21 small A. Do you see that?
22     A.    Yes.
23     Q.    There, you say: Google deceived and
24 misled auction participant's into believing that Ad
25 Ex ran a second price auction?

27 (Pages 102 - 105)

CONFIDENTIAL

1      Stated as a declarative fact.  Right?
2      A.   Yes.
3      Q.   And then below that -- and you don't give
4  attribution to why or how you arrived at any such
5  understanding or opinion there, do you?
6      A.   I disagree with that.
7      Q.   You don't state it right there in that
8  header.  It's stated as a declarative fact, isn't
9  it?
10     A.   The headers are -- are a preview to the
11 reader of what's to follow and so the header tells
12 the reader, hey, this is -- this is a conclusion and
13 then the -- the -- the basis for that conclusion
14 follows.  So I have given the reader an
15 understanding and the information that I relied upon
16 to -- to reach that conclusion.
17     Q.   You use the term under -- "I understand"
18 in excess of 85 times in your opening report alone,
19 don't you, sir?
20          MR. COLLIER:  Objection; form.
21     A.   I have not counted the number of times
22 that I've used that term, sir, so I can't answer
23 that question.
24     Q.   Well, you wouldn't dispute that, I take
25 it?

1          MR. COLLIER:  Objection; form.
2      A.   I have no way to agree or disagree with
3  it because I haven't -- I haven't done the math to
4  determine what it is.
5      Q.   And dropping down to Paragraph 91, you
6  say:  I understand, however, that during the
7  relevant period, Google falsely, misleadingly, and
8  deceptively misrepresented the entire Ad Ex auction
9  model, for example, stating that Ad Exchange uses a
10 second-price auction model.
11          Right, sir?
12     A.   I do.
13          MR. COLLIER:  Objection; form.
14     Q.   And you go on to say:  When, in fact, it
15 did not.
16          Right, sir?
17     A.   I don't know if my first answer was
18 recorded or not because you asked the second
19 question before I could -- I got to it.
20     Q.   Okay.
21     Q.   So what was the first question?
22     Q.   Your first -- the first point is you
23 indicate there that you understand that during the
24 relevant period, Google falsely, misleadingly, and
25 deceptively misrepresented the entire AdX auction

1  model, for example, stating that Ad Exchange uses a
2  second-price auction model.
3          Going on to say:  When, in fact, it did
4  not.  Or by stating that all participants were on
5  equal footing in AdX auctions when, in fact, they
6  were not, et cetera.
7          Do you see that?
8      A.   I do see that.
9      Q.   Okay.  And you have categorized that as
10 your understanding.  Right?
11     A.   That is based upon -- and I just -- I --
12 I reference the documents that provide that
13 understanding.  So it -- it shows the documents in
14 which Google represents that it is a second-price
15 auction model.  And then I've -- I've showed other
16 various times in my reports how those second-price
17 auctions have been manipulated so they're not true
18 second-price auctions.  So -- so I think the -- the
19 fact that they were not is detailed specifically
20 throughout my reports.
21          And on the second one, I've -- I've
22 demonstrated where Google has -- has made statements
23 that shows that the participant's are -- that --
24 where they claim the participants are on equal
25 footing.

1          And then I've described throughout my --
2  my opening report or -- or in various places in my
3  opening report about the advantages that were
4  provided to Facebook and, therefore, they were not
5  on equal footing.
6          And so my understanding comes from the --
7  from my review of the documents and -- and the
8  information that I've received.  And I'm telling
9  the -- the reader, and this is why I believe this.
10 This is why I understand this to be true, that it's
11 because of Google's own documents and all the other
12 information that I've talked about in other areas of
13 my report.
14     Q.   And in some instances, did you rely upon
15 references to pleadings of the plaintiffs as facts
16 upon which you relied in arriving at your
17 conclusions?
18     A.   There's times when I -- I'm demonstrating
19 what I -- when I'm assuming liability, the pleading
20 is going to demonstrate what I'm assuming in terms
21 of liability.
22     Q.   Well, you go on to cite the complaints of
23 the Department of Justice on antitrust matters when
24 you're describing some of the facts that you relied
25 upon in this case.  Right?

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1    A.  You'd have to refer me to the specific
2  portion of the report.
3    Q.  Do you recall having done that?
4        MR. COLLIER:  Objection; form.
5    A.  Well, I recall citing the Department of
6  Justice complaint.  I -- I don't want to
7  characterize my cite necessarily the way you just
8  did.  So I want to see where exactly it is in my
9  report.
10    Q.  Now, before we come to that point, one of
11  the cites that you --
12    A.  Do you want me to answer that question
13  now or do you want --
14    Q.  I'm going to ask you some other questions
15  before I come back to that.
16    A.  Okay.
17    Q.  Okay?
18        You've -- you've indicated that
19  Weinberg -- that you've relied upon Weinberg here in
20  his -- his report.  Did you see a copy of a draft of
21  his report before you issued your report, your
22  original report?
23    A.  The report, I understand, that I received
24  from Dr. Weinberg was his final report --
25    Q.  When did you get that?

Page 111

1    A.  -- and so I relied upon --
2    Q.  Sorry.  Forgive me.
3    A.  So I relied upon his final report.
4    Q.  Okay.  His final report was issued on
5  what date?
6    A.  I assume it was issued probably the same
7  date and time mine was issued.  I don't know exactly
8  when his was issued, but I -- I saw the final report
9  prior to issuing my report.
10    Q.  Well, weren't they issued the same date?
11    A.  They may have been issued the same day,
12  but that doesn't mean it wasn't finalized before it
13  was issued.
14    Q.  Well, that was my question.  Did you have
15  a copy of his final report before the date that it
16  was issued?
17        MR. COLLIER:  Objection; form.
18    A.  My understanding, that the report that I
19  have that I relied upon was Dr. Weinberg's final
20  report.
21    Q.  When did you get a copy of that report?
22    A.  I don't recall a specific date, but
23  certainly within enough time to rely upon it in --
24  in preparing my report.
25    Q.  Well, let's talk about that.  You had a

Page 112

1  copy of his report before you issued your report.
2  Your report was dated, what, September the 9th?
3  Your original report was earlier.  Right, sir?
4    A.  My original report was June 7th.
5    Q.  Okay.
6    A.  My -- my September 9th report was,
7  obviously, September 9th --
8    Q.  Yeah.
9    A.  -- 2024.
10    Q.  And his final report was September
11  the 9th, is it not?
12    A.  I believe he has one report that was
13  September -- I -- I don't know the issue date, but
14  he has a rebuttal report that he issued in this
15  case.  And he also has a -- I believe he had an
16  affirmative report that he issued in this case.
17    Q.  And you had a copy of his first report
18  before it was physically issued or filed?
19        MR. COLLIER:  Objection; form.
20    A.  I had a -- what I understand to be a
21  final copy of his report before I issued my report.
22  That's -- that's as much information as I -- I have
23  about that as I can tell you.
24    Q.  How long before you issued your report, a
25  day --

Page 113

1    A.  I don't --
2    Q.  -- two days?
3    A.  Sorry.  I -- I don't recall the specific
4  time frame as I sit here.  But certainly enough time
5  to -- to utilize the information in that report the
6  way I did.
7    Q.  Did you contact Mr. Weinberg or Chandler,
8  for that matter, or Gans at any point in time before
9  you received a draft of Weinberg's report?
10    A.  I believe I had a conversation with
11  Drs. Gans and Chandler prior to the issuance of my
12  report, but there is nothing from those
13  conversations that I relied upon in issuing my first
14  report.
15    Q.  Did you -- when you read any of their
16  draft -- did -- you had a draft -- copy of a
17  draft --
18        MR. COLLIER:  I'm going to object.
19  Now, Counsel, you're clearly violating 5.1 of the
20  Court's order asking about drafts.  I let him -- I
21  want to be clear for the record.  I let him answer
22  questions because he testified he had the final
23  version of Dr. Weinberg's report and I let you ask
24  all the questions about the final version.  But I'm
25  not going to allow you to violate the Court's order

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1  and ask about drafts.
2      MR. GIBBS:  Well, I'm not going to
3  violate the Court's order.
4      Q.   The -- my question to you is, did you
5  call Weinberg at any time before he issued either
6  his first or second reports?  And --
7      MR. COLLIER:  You can -- you can
8  answer that yes or no.
9      A.   I had a conversation with Dr. Weinberg
10 prior to the issuance of my second report.  As I
11 said, I don't know when he issued his reports.
12     Q.   Did -- did -- when did that single --
13 when did that single contact occur?
14     A.   That phone conversation?  I think it's --
15 the date is listed in my information relied upon.
16     Q.   September the 8th?
17     A.   I have to -- I don't know as I sit here
18 so I'm going to look that up because I don't --
19     Q.   All right.  If your report reflects
20 September the 8th, that's what it would have been?
21     A.   Well, I think I can say exactly when it
22 is because it's in my -- it's in my report.  So --
23 interviews.  It was September 8th, 2024.
24     Q.   In arriving at any of -- of your original
25 or rebuttal report, did you ever reach out and

Page 115

1  contact any of the individuals you relied upon and
2  ask them any questions about any of their
3  conclusions?
4      MR. COLLIER:  And I'm going to object
5  based on Paragraph 5.11(b) which specifically
6  prohibits this question, the content of
7  communications between testifying experts.
8      MR. GIBBS:  Well, I'm not getting
9  into the specifics of it.
10     Q.   Did you have any questions that caused
11 you when you had read over Weinberg's or any of the
12 other experts' reports that you reviewed, did you
13 have a -- a single question for any of them about
14 any of the matters?  That --
15     MR. COLLIER:  And I'm going to object
16 to that as calling for content, what was the content
17 of the communications.
18     So I'm going to instruct you not to
19 answer.
20     Q.   Okay.  Did you call them for any purpose
21 relating to your report at any point in time?
22     MR. COLLIER:  Mr. Andrien, you can
23 answer the question which I think already you have
24 on September 8th, factually, which if any of the
25 testifying experts in this case did you call?  You

Page 116

1  can answer that question.
2      THE WITNESS:  Thank you.
3      A.   So as I've mentioned, I've had a
4  conversation with Dr. Gans, I've had a conversation
5  with Dr. Chandler.  Both of those conversations took
6  place prior to the issuance of my original report.
7      Subsequent to the issuing of my original
8  report, I had a conversation with Dr. DeRamus and a
9  conversation with Dr. Weinberg.
10     Q.   You indicated then -- and I think that
11 your conversation with Weinberg took place on the
12 8th of September.  Is that right?
13     A.   That's correct.
14     Q.   And you called that an interview in your
15 footnotes when you refer to that.  Do you not?
16     A.   I do.
17     Q.   Now was that an interview or a
18 conversation, not a interview?
19     MR. COLLIER:  Objection; form.
20     A.   I believe they can be both.  My -- my --
21 the way I reference conversations with others in all
22 of my expert reports is as an interview.  Because
23 what I am doing in my work is conducting data
24 gathering and information gathering for my work.
25 And so that conversation, and any conversation I

Page 117

1  have in any of my reports with -- with someone is --
2  I refer to as an interview.  That's how I refer to
3  those conversations.
4      Q.   How long was this one conversation with
5  Weinberg?
6      A.   I don't recall the length of time as I
7  sit here, I -- I --
8      Q.   If the record reflects it was five
9  minutes, would you quarrel with that?
10     MR. COLLIER:  Objection; form.
11     A.   I don't recall the length of time that
12 that conversation happened as -- as I sit here right
13 now, I don't recall.
14     Q.   And you interviewed him for five minutes?
15     MR. COLLIER:  Objection; form.
16     A.   As I said, I don't know the length of
17 time of that call and I had a conversation with
18 Dr. Weinberg on September 8th.  I don't recall the
19 length of time.
20     Q.   Yeah, well, in that singular October 8th
21 contact, if he says it's five minutes, do you
22 quarrel with that?
23     MR. COLLIER:  Objection; form.
24     A.   I -- I -- I can't agree or disagree with
25 it because I don't know, as I sit here, how long

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1  that conversation was.
2      Q.  But anyway, that's what you call an
3  interview of Weinberg in your report?
4          MR. COLLIER:  Objection; form.
5      A.  That is what I'm referring to in -- in my
6  Appendix 2 on my rebuttal report as an interview.
7  But all conversations that I have with others, I --
8  I list as interviews.
9      Q.  All right.  Let's look at --
10         MR. COLLIER:  Counsel, if you're
11  shifting gears, it's been far more than an hour,
12  but --
13         MR. GIBBS:  Oh, okay.
14         MR. COLLIER:  But if you're not, I
15  don't want -- I'm not trying to preclude you.
16         MR. GIBBS:  I'm shifting gears.
17         THE VIDEOGRAPHER:  Going off the
18  record.  The time is 11:46.
19             (Break.)
20         THE VIDEOGRAPHER:  We're back on the
21  record.  The time is 12:03.
22      Q.  Mr. Andrien, look at your opening report
23  at Paragraph 108, would you.  Do you have that
24  before you?
25      A.  I'm just about there.  I'm there.

Page 119

1      Q.  All right.  There you indicate that
2  quote: I understand that several statutes allow for
3  trebling damages to establish deterrence of future
4  misconduct?
5          Do you see that reference there?
6      A.  I do.
7      Q.  And you're referring there to other
8  federal statutes as examples of deterrence-based
9  penalties and the like?
10     A.  I am referring to specifically a -- a
11  federal statute there.
12     Q.  And you -- you point out there that the
13  Clayton act among others which is an
14  antitrust-related statute.  Right?
15     A.  That's -- that's one I address, yes.
16     Q.  Yeah.  And you say you're looking there
17  for support for your notion of what constitutes
18  deterrence in statutory-related penalties.  Would
19  that be fair?
20     A.  Would you repeat the way you said that?
21  Would you --
22     Q.  Yes?
23     A.  -- say that again?  I want to make sure I
24  agree with that or disagree.
25     Q.  You're citing potential considerations of

Page 120

1  federal statutes and other statutes as support for
2  the notion of deterring future violations of these
3  statutes.  Right?
4      A.  I think what I'm doing in -- in
5  Paragraph 8 is saying exactly what it says.  But I
6  understand several statutes allow for trebling
7  damages to establish deterrence of future
8  misconduct.  And I'm giving examples as I understand
9  those examples that do that.
10     Q.  Right.  And because here you're talking
11  about the concept of deterrence which is one of the
12  three factors that you focused on in support of your
13  penalties.  Right?
14     A.  I -- this -- I am addressing the amount
15  necessary to deter future violations in section F of
16  that report which Paragraph 108 falls under.
17     Q.  And with respect to the antitrust
18  statutes, there are some 17 antitrust statutes by
19  the states in our case here.  Right?
20     A.  I -- I don't know the number of antitrust
21  statutes in this case.  I've never counted that up.
22     Q.  Okay.  Well, in any event, you -- you're
23  familiar with the Clayton Act apparently because you
24  used it here to make the point.  True?
25     A.  I am --

Page 121

1          MR. COLLIER:  Objection; form.
2      A.  I am familiar with the Clayton Act.
3      Q.  And you cited there to the reader you
4  say: It is recognized that the purposes of trebling
5  damages is twofold.  Do you see that?
6      A.  Would you tell me where you are?
7      Q.  I'm sorry.  Footnote 83.
8      A.  Okay.  Thank you.  Sorry.
9      Q.  Do you see that?
10     A.  That is -- that's a quote.
11     Q.  Quote that you included here.  Is my
12  point, right?
13     A.  It is a quote that I included.
14     Q.  And you say that the two purposes or
15  two -- twofold purposes of trebling under these
16  statutes is to compensate plaintiffs for their
17  injury, past injury.  Right?
18     A.  Again, this is a quote.  It's not that
19  I'm saying it.  I'm -- I'm quoting that someone
20  else has said it.
21     Q.  Yes, sir.  You selected it to make the
22  points presumably that it includes -- that you
23  included here.  Right?  Regarding deterrence?
24     A.  I think this -- this does support my
25  understanding that I talk about in Paragraph 108.

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1    Q.   And the state statutes are modelled as
2  you understand it after the federal statutes, these
3  antitrust statutes.  Right?
4    A.   Again, I'm not a lawyer.  I've -- I've
5  never studied why -- how the state statutes are
6  modelled.  It wouldn't surprise me if that were the
7  case, but it's outside the scope of my work in this
8  case.
9    Q.   Well, did you look at any of the state
10  antitrust statutes as part of your work to
11  familiarize yourself with them?
12         MR. COLLIER:  Objection; form.
13    A.   I -- I may have seen some of the state
14  antitrust factors.  I don't recall as I sit here.
15  I -- as I've mentioned in my report and sitting here
16  today, I was focused on the deceptive conduct at
17  issue in this case.  Not the anti -- anticompetitive
18  conduct.
19    Q.   Well, the point you made here was that
20  in -- under the federal antitrust laws, the
21  deterrence or the purpose behind treble damages
22  which is the statutory additional amount as you
23  would understand it that can be awarded if liability
24  is established.  Right?
25    A.   I --

Page 123

1         MR. COLLIER:  Objection; form.
2    A.   I understand that from an economic
3  perspective, damages can be trebled in certain
4  circumstances for the purposes -- for at least the
5  purposes that I've cited here in Footnote 283.
6    Q.   Okay.  And the -- as you understand it
7  under these antitrust statutes, they are designed to
8  both compensate the plaintiffs for their injury and
9  to deter future violations.  Right, the trebling?
10    A.   That's what it says.
11    Q.   Okay.  And basically the -- the state
12  statutes mirror that as you understand it.  Right?
13         MR. COLLIER:  Objection; form.
14    A.   I, again, I haven't studied the state
15  statutes with -- in looking at that to determine if
16  they mirror it or not as you say.
17    Q.   Okay.
18    A.   So I don't have an opinion on that one
19  way or another.
20    Q.   So in arriving at your conclusions here,
21  you cite the federal trebling purposes.  Right?
22    A.   I cite the federal act, the Clayton Act
23  and the RICO Act as an example that from an economic
24  perspective, this concept of trebling has been
25  applied by various statutes to account for this

Page 124

1  issue of deterrence.
2    Q.   What about the state statutes on the
3  issue of deterrence and the purpose of penalties
4  under the state statutes, including the antitrust
5  statutes.  Did you go and look to see what the state
6  statutes said about the purpose of trebling?
7         MR. COLLIER:  Objection; form.
8    A.   I have looked at the state statutes in
9  this case.  For purposes of the economic point I was
10  making, I didn't need to go beyond what I -- what
11  I've referenced.  It's just an example that I was
12  saying -- or -- or demonstrating that deterrence --
13  courts have -- have looked at this issue of
14  deterrence before, and this is one way that -- that
15  courts under certain statutes have considered it.
16    Q.   And with respect to the states' claims
17  under these state laws, did you go and at least look
18  to see what the trebling features were under those
19  statutes?
20         MR. COLLIER:  Objection; form.
21    A.   I have looked at the state statutes
22  related to the deceptive conduct in this case, as I
23  understand them, and I've laid those out in my
24  report, what those -- that I understand them to be.
25         And I understand that deterrence is one

Page 125

1  of the things that one would consider in looking at
2  the penalty.  And because I was asked to look at
3  deterrence, I wanted to look as an economist, as a
4  financial economist.  I'd want to look at that,
5  understand if there's any basis for me understanding
6  how courts might look at this, as well as
7  understanding it from an -- from an economic,
8  theoretical perspective, and understanding the
9  financial perspective, and then applying the facts
10  and circumstances in this case to -- to my overall
11  understanding to ensure that the range that I come
12  up with meets the -- the -- the factor that I was
13  asked to consider, which is what -- what penalty
14  would serve as a a -- let me just -- amount necessary
15  to deter future violations.
16    Q.   Okay.  Well, the federal statute that you
17  cited here has twofold purposes behind the statutory
18  penalties, doesn't it?
19         MR. COLLIER:  Objection; form.
20    Q.   Past injury compensation is one.  Right?
21    A.   That is one, yes.
22    Q.   And the other one is deterring future
23  violations of the antitrust laws.  Right?
24    A.   That's correct.
25    Q.   Okay.  And my question was did you look

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1  at the state's antitrust statutes and their trebling
2  features to see what the purposes of those were
3  according to the states?
4       A.  I may or may not have looked at those
5  antitrust statutes.  As I -- as I sit here, I don't
6  recall specifically those antitrust state statutes.
7  But it wasn't necessary for me to review them for
8  purposes of my analysis in this case.
9       What I am doing here is assessing
10  penalties on the alleged deceptive conduct in this
11  case, and I am trying to ascertain what penalty
12  would be an appropriate amount to punish Google for
13  those violations and deter Google from -- and others
14  from future violations.
15       Q.  Were you interested in what the states
16  were saying about the other group of statues, the
17  antitrust statutes, state antitrust statutes, under
18  which your clients were suing in this case?
19            MR. COLLIER:  Objection; form.
20       A.  Would you repeat the question?
21       Q.  Were you interested in deterring --
22  evaluating how to define deterrence in these state's
23  laws?  Did you look at their state antitrust laws
24  and see if they dealt with deterrence and indicated
25  the purposes behind deterrence in -- in those

Page 127

1  states?
2            MR. COLLIER:  Objection; form.
3       A.  As I sit here, I don't recall looking at
4  those state antitrust statutes for that purpose, nor
5  was that necessary to do for -- for my work in this
6  case.
7       My work in this case was related to the
8  deceptive conduct, and I looked at the statutes and
9  some case law around the notion that -- that this --
10  that deterrence is an important consideration.  And
11  then I applied economically appropriate
12  methodologies and financial methodologies to -- to
13  determine what would serve as an appropriate
14  deterrence in this case.
15            MR. GIBBS:  Objection; nonresponsive.
16       Q.  Simple question.  Did you or did you not
17  look at the states' statement under the antitrust
18  laws of those states to see what they had to say
19  about deterrence and the purpose of their trebling
20  features?
21            MR. COLLIER:  Objection; form.
22       Q.  You either did or you didn't.
23       A.  I know --
24            MR. COLLIER:  Objection; form, asked
25  and answered.

Page 128

1       A.  Yeah.  I know what you're asking.  I'm
2  going to give a complete answer again, like I just
3  did.
4       And my answer is that, well, as I sit
5  here right now I don't recall looking at the state
6  antitrust statutes for that purpose.  However, that
7  was not required or necessary to reach the
8  conclusions I've reached because what I was trying
9  to do in this case, and what I've done in this case
10  is to determine what an appropriate penalty would be
11  for -- to punish Google for the actions that it's --
12  the -- the deceptive actions that it's accused of
13  taking in this case and -- and determine what --
14  what penalty would be -- would reasonably deter
15  Google and others from future misconduct.
16            MR. GIBBS:  Objection; nonresponsive.
17       Q.  It's just very simple.
18       Did you -- I'm not asking you why you
19  didn't do it or what else you might have done.
20       Did you look at those statutes, the
21  states' statutes, as it bears on the deterrent
22  factor in their treble damage statutory penalties,
23  yes or no?
24            MR. COLLIER:  Objection; form.
25       A.  And I'm going to give the same answer I

Page 129

1  gave last time, and the time before that, and -- and
2  every time you ask me this question because it's
3  important for me, I think, under oath to give a
4  complete answer and put it into context, so I'm
5  going to do that every time.  I'm happy to state the
6  answer again.
7       Q.  No, I'll accept it.  I'll accept that
8  you're going to state the same thing and I'll
9  interpose the same objection.
10            MR. GIBBS:  Nonresponsive.
11       A.  Okay.
12       Q.  I'm just asking you whether you did
13  something or you didn't, not why you did.  That
14  could clarify for purposes of my future questions.
15  I'll bear that in mind.
16       I may be just asking you a simple
17  question.  Did you do something or did you not, not
18  why you didn't do it, or why you were justified in
19  not doing it.  Maybe that clarification will help.
20       Do you think it might?
21            MR. COLLIER:  Objection; form.
22       A.  I am going to answer the questions as I
23  think they need to be answered with a complete
24  context around them, such that my answers cannot be
25  misconstrued.  I'm going to be very clear and give

33 (Pages 126 - 129)

Page 130

1  full answers. I'm under oath and I think it's
2  important for me to do so.
3       Q.   Did you, sir, take into account as a
4  factor, compensating plaintiffs for their injury
5  in -- in this case?
6            MR. COLLIER: Objection; form.
7       Q.   Was that one of the factors?
8       A.   I understood that there is parties that
9  are harmed as a result of the conduct that -- the
10  misconduct at issue in this case.
11      But because I was provided the lens of
12  looking at deterrence, the -- the penalty amount
13  that I derived is a penalty that -- that is for the
14  violations, it is punishing Google for the
15  misconduct, as well as -- as deterring Google and
16  others from future misconduct.
17      Q.   Deterring -- deterring future conduct is
18  the lens through which you were making that
19  determination. True?
20           MR. COLLIER: Objection; form.
21      A.   It is -- one of the lenses was the amount
22  necessary to deter future violations.
23      Q.   Okay. Don't see in those three factors
24  that you utilized in your calculations compensation
25  for past injury. That was not in there, was it?

Page 131

1            MR. COLLIER: Objection; form.
2       A.   Well, I've talked throughout my report,
3  the opening report, of how I understand harm has
4  occurred to participants in those various auctions
5  as a result of Google's misconduct. So I do
6  understand that harm has occurred.
7            And I do understand, and I explained in
8  my rebuttal report, that economic theory on
9  deterrence considers the overall impact to society.
10  However -- and I also state this in my rebuttal
11  report -- when we -- when we -- when we flip the
12  lens to focus on deterrence, now we go from the harm
13  to society and look at the -- the -- the benefit to
14  the offender, in this case Google.
15           And so while I understand there's harm
16  and Google needs to be punished for that, which is
17  part -- I understand that's why we have these
18  statutes and penalty amounts in the statutes. So I
19  did consider that, I considered the -- the -- the
20  size of the per violation penalties associated with
21  those statutes, I understand that they have a -- a
22  -- a penalty -- a punishment component to it.
23           But the lens that I had to apply was
24  deterrence, so that moves from societal harm to
25  Google's benefits.

Page 132

1       Q.   Who told you to pick those and focus
2  those -- on those three factors that constitute the
3  lens of your conclusions, as you described it?
4            MR. COLLIER: Mr. Andrien, I give you
5  the same instruction before pursuant to the Court's
6  September 13th, 2023, order. If giving that answer
7  would require you to disclose communications with
8  counsel, I instruct you not to do so. However, if
9  you can answer that question without disclosing
10  communications with counsel, you're free to do so.
11           THE WITNESS: Thank you.
12      A.   I don't believe I'm able to answer that
13  question without violating the stipulation that
14  Mr. Collier just referenced.
15      Q.   All right. And you refuse to answer on
16  that basis?
17           MR. COLLIER: Objection; form.
18           There's no refusal.
19      A.   I -- I've been advised by counsel that my
20  answering that would violate the stipulation, and --
21  and, therefore, I'm not going to answer that for
22  that reason.
23      Q.   Did you independently determine that
24  those were the three factor lens through which you
25  should conduct your civil penalties evaluation in

Page 133

1  this case?
2       A.   That was my assignment, to evaluate
3  penalties and to consider those factors in doing so.
4       Q.   Okay. My question is in picking those
5  three factors for your lens of your opinions, did
6  you independently decide those were the three proper
7  ones to apply?
8            MR. COLLIER: Objection; form.
9            Same instruction.
10      A.   I -- I -- I can just tell you what my
11  assignment was, and -- and I executed my assignment.
12  I determined independently that I was -- I was --
13      Q.   Doing what you were told?
14      A.   -- able to do that assignment, that I --
15  that falls within kind of the area of -- of -- of
16  training, education, experience that I have.
17      Q.   Okay.
18      A.   And so I -- I conducted my assignment.
19      Q.   Did you independently attempt to conclude
20  on your own behalf that those were the three best or
21  appropriate factors to take into account in -- in
22  doing your report?
23           MR. COLLIER: I would give you the
24  same instruction. I don't know your answer.
25      A.   I'm going to say the same answer as I

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1    gave last time. This was my assignment I was asked
2    to perform. I determined independently if I thought
3    I could add value to that assignment. I believe I
4    can. I believe I have. And I've performed that
5    assignment.
6        Q.   Okay. So you concluded independently
7    that you couldn't add value, that is, change or add
8    to those factors that were the primary focus of your
9    opinions. True?
10       A.   Would you please repeat that question?
11       Q.   Yes. Yes.
12           You did not independently conclude that
13   you should add a different factor or factors than
14   the three that you have described as the lens?
15           MR. COLLIER: Objection; form.
16       A.   I was asked to perform a certain analysis
17   that was my assignment, and I performed my
18   assignment.
19       Q.   All right, sir. Did you look at the
20   factors that are to be considered under the DTPAs of
21   each of the 17 states, claimants?
22       A.   I believe I have, yes.
23       Q.   Did you look at them to determine whether
24   they should, any of them should be included in your
25   lens, the three factors that you have identified?

Page 135

1            MR. COLLIER: Objection; form.
2        A.   I -- I have been given an assignment in
3    this case. I performed the assignment that I was --
4    I was asked to perform and that's the work that I
5    performed. I -- I did analyze the different
6    statutes under which my -- my assignment fall and to
7    ensure that I felt it was reasonable to do this
8    assignment, which I did.
9        Q.   How many -- excuse me.
10       A.   And I do.
11       Q.   How many factors does the Texas DTPA
12   indicate should be taken into account?
13       A.   I have those listed in my report. Let me
14   just go find it for you and you can answer that
15   question specifically rather than go by
16   recollection.
17           As I have listed on Page 40 and 41 of my
18   report --
19       Q.   Opening?
20       A.   My opening report, yes.
21           I understand that the Texas DTPA provides
22   the following list of factors for the trier of fact,
23   shall consider in determining the level of a
24   penalty. I list those six, as I understand them to
25   be. I sourced the Texas Deceptive Trade Practices

Page 136

1    Act and where I got that understanding from and I
2    acknowledge throughout my report that I've been
3    asked to address -- that my assignment is to address
4    three of them and the jury might be asked to
5    consider other factors in coming to their ultimate
6    conclusion.
7        Q.   Okay. So how many of the three factors
8    are listed under the Texas statute?
9            MR. GIBBS: Objection; form.
10       A.   Would you repeat the question, please?
11       Q.   Yes, sir.
12           Under the Texas DTPA, where -- where are
13   the factors -- three factors that you undertook to
14   examine?
15       A.   I've been asked to examine No. 2, the
16   history of previous violations; No. 3, the amount
17   necessary to deter future violations; and No. 4, the
18   economic effect on the person against whom the
19   penalty is to be assessed.
20       Q.   You did not select the seriousness of the
21   violation, including the nature of circumstances,
22   extent, and gravity of any prohibited act or
23   practice. Right?
24       A.   That factor is outside the scope of my
25   assignment.

Page 137

1        Q.   And you also ignored the factor of
2    knowledge of the illegality or of the active
3    practice. Right?
4        A.   That factor was outside my assignment and
5    outside the scope of the work that I -- that I've
6    been assigned to perform in this matter.
7        Q.   How about the Alaska statute, what
8    factors does the Alaska statute ask you to consider
9    or require that you consider?
10       A.   Do we have a list of the -- the statutes
11   here? I can -- I can -- I don't recall from memory,
12   but I can look at this Page 31 of my report.
13           "The Alaska Unfair Trade Practices and
14   Consumer Protection Act declare unfair or deceptive
15   acts or practices in the conduct of a trade or
16   commerce unlawful. The State of Alaska alleges that
17   Google has violated the AUTPCPA specifically by
18   engaging in other conduct creating a likelihood of
19   confusion or a misunderstanding and that misleads,
20   deceives or damages a buyer or competitor in
21   connection with the sale or advertisement of goods
22   and services and using or employing deception fraud,
23   false pretense, false promise, misrepresentation or
24   knowingly concealing, suppressing or omitting
25   material fact with the intent that others rely upon

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1   the concealment, suppression or omission in
2   connection with the sale or advertisement of goods
3   or services, whether or not a person has, in fact,
4   been misled, deceived, or damaged and allows for
5   civil penalties between 1,000 and 2,500.
6          And I have to see if there's a footnote
7   anywhere in my report that would -- I have cited
8   it -- my report doesn't specifically call it out, at
9   least in that section. I would have to go through
10  and read the -- statute from the -- from the
11  footnote that I put to answer that question --
12      Q. Okay?
13      A. -- because I don't have it memorized.
14         MR. GIBBS: Objection; nonresponsive.
15      Q. My question was unlike your -- you
16  recounted the six factors under the Texas statute in
17  your report. True?
18      A. You've asked me what the six were. I've
19  listed them in my report.
20      Q. And I asked you if you looked at the --
21  the parallel factors to be considered under the
22  Alaska statute and you read me the whole thing where
23  you generally describe the statute, but you didn't
24  list any of the factors there, did you?
25         MR. COLLIER: Objection; form.

Page 139

1      A. Not there, but I do have a place in my
2   report where I -- I believe I have demonstrated that
3   I understand the other states have similar-type
4   factors, either through their statutes or -- or case
5   law. And so I -- I did reference the Alaska
6   statute. I know I've looked at it. And if you want
7   to put it in front of me, I'm happy to refresh my
8   recollection of that question.
9      Q. I'm talking about your report. Your
10  report doesn't include and list any of the factors
11  under the Alaska or the rest of these states'
12  statutes that are to be considered under each of
13  those statutes, does it?
14         MR. COLLIER: Objection; form.
15      A. That's not true. For example --
16      Q. Do you --
17      A. Let me answer the question.
18         For example, under South Carolina, South
19  Carolina provides guidance on the factors to
20  consider and I list those and -- but I also -- let
21  me just -- can you just give me a minute here.
22         (Pause.)
23         I believe it's in my rebuttal report. I
24  think in my opening report, if you look at the
25  footnotes, I have -- I've described for many states

Page 140

1   my understanding of -- of either the factors or --
2   or the basis for understanding that these are
3   relevant factors for those states.
4      Q. My question, sir, is how did you decide
5   there are -- there are many more than three factors,
6   will you agree with that, among the 16 states
7   differing DTPA statutes? You agree with that?
8         MR. COLLIER: Objection; form.
9      A. I would agree that certain states have
10  more than three factors to consider.
11      Q. Well, Texas alone has more than three and
12  you selected three and did not select the other
13  three because that was outside your assignment you
14  told us. Right?
15      A. My assignment was to analyze the penalty
16  to Google, appropriate penalty to Google for -- as
17  punishment for -- for the misconduct at issue, the
18  deceptive conduct at issue, and to determine what an
19  appropriate penalty would be, given those three
20  factors as a -- as an additional lens.
21      Q. How did you decide that you shouldn't
22  consider or add to those three factors many of the
23  other factors that differing states require the
24  fact-finder to consider?
25         MR. COLLIER: Objection; form.

Page 141

1      A. Any factors that I did not address were
2   outside the scope of my assignment in this case.
3      Q. Okay. So you're not expressing an
4   opinion on whether those are the right or correct
5   factors, I take it? They're just part of your
6   assignment?
7         MR. COLLIER: Objection; form.
8      A. I think I've addressed in my report that
9   based on my review of the statutes in the different
10  states and -- and what I've reviewed, that I think
11  these are appropriate factors to consider in this
12  case and that there may be potential others that the
13  jury is asked to consider.
14         But -- but given that I've been asked
15  to -- to -- my assignment is -- is to address
16  penalties given these three factors, that's what
17  I've done. I believe it's appropriate. I believe
18  I've given basis in my report for why it's
19  appropriate and -- and so I performed -- performed
20  that work.
21      Q. There are no -- there's no state-by-state
22  review in here of the penalties and why you would --
23  elected to exclude from your three the other
24  penalties to the extent they existed in each state,
25  is there?

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1     MR. COLLIER: Objection; form.
2     A.   I -- I don't understand that question. I
3  do have a chart in my report that does list the --
4  the maximum statutory penalties or the penalty range
5  for each one of the states so --
6     Q.   Not asking that question?
7     A.   Well, that's how I understood it. I'm
8  sorry.
9     Q.   I'm asking the factors, not the -- not --
10  I'm not asking you now about caps. Okay? That's a
11  separate question. I'm talking now about the
12  factors that are to be considered under the statutes
13  like the degree of culpability and good or bad
14  faith, for example?
15     A.   Okay. Would you please repeat your
16  question --
17     Q.   Yes. My question was --
18     A.   -- because I misunderstood it, I believe,
19  sir.
20     Q.   Did you go state by state through and say
21  while Texas has six factors, I picked these three
22  and here's why those three are the right ones and
23  the other three can be ignored for my purposes? Did
24  you do that?
25     MR. COLLIER: Objection; form.

Page 143

1     A.   As you've asked the question, I -- I -- I
2  was asked and assigned to analyze those three
3  factors. I looked through the statutes and my
4  understanding, based on those statutes and based on
5  what I've reviewed, that for all those states, these
6  are reasonable factors to consider. I've been asked
7  to consider them as my assignment. I considered
8  them and came to my conclusions based -- based on
9  the work that I performed.
10     Q.   And you would agree that if somebody had
11  assigned you to look at and to form the opinion
12  under three others or three from various other
13  states total, that would have been what you would
14  have done?
15     A.   I -- I can't answer that --
16     MR. COLLIER: Objection; form.
17     A.   I can't answer that question because
18  that's not what I was asked to do.
19     Q.   Okay?
20     A.   I don't know what I would have done had I
21  been asked to do something else.
22     Q.   So you didn't -- you didn't independently
23  say, I'll do these three, but I shouldn't or I have
24  an opinion different from these three, did you?
25     MR. COLLIER: Objection; form.

Page 144

1     A.   I believe I -- I -- I've been trying to
2  answer this question. I've been -- I've been -- my
3  assignment was to look at these three. I've
4  reviewed the statutes to determine if that's a
5  reasonable assignment. I believe it was a
6  reasonable assignment. I believe I have
7  information, skill, experience, training
8  capabilities that is going to assist the trier of
9  fact in analyzing those three factors. And I -- I
10  made it very clear in my report that I understand
11  the jury might be asked to consider other factors as
12  well, but this would serve as a useful, important,
13  reliable information for the jury to consider
14  relevant -- relative to those three factors.
15     MR. GIBBS: Objection; nonresponsive.
16     Q.   Now, sir, you're a part-time teacher,
17  right -- lecturer?
18     MR. COLLIER: Objection; form.
19     A.   I am a faculty member at the McCombs
20  School of Business at the University of Texas, their
21  finance department and in that capacity I annually
22  and even most semesters teach graduate-level courses
23  in finance.
24     Q.   Have you ever taught techniques for
25  assessing civil penalties under a deceptive trade

Page 145

1  practices act?
2     A.   I believe --
3     MR. COLLIER: Objection; form.
4     A.   I believe I've taught the -- the
5  quantitative methodologies and the financial
6  theories that would underline -- underlie
7  calculating penalties. So I believe I have taught
8  relevant information and routinely teach relevant
9  information that would be important to apply in
10  determining penalties including DTPA penalties.
11     Q.   Have you ever taught a course that was
12  designated as a course to determine how to calculate
13  civil penalties under a statute, the DTPA statue of
14  any state?
15     MR. COLLIER: Objection; form.
16     A.   I have not had a course entitled how to
17  calculate DTPA penalties under a certain state. As
18  I said I have -- I do and have routinely taught the
19  financial tools and theories that one would need
20  to -- to apply in calculating a penalty.
21     Q.   Your violation count, I want to ask you
22  about that. Your violation count is dependent on a
23  assumption provided to you by somebody else. Would
24  that be true?
25     MR. COLLIER: Objection; form.

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1      A.   My violation count is based on my
2   understanding of what constitutes a violation.  And
3   my understanding of what constitutes a violation,
4   for that understanding I've relied on Dr. Weinberg.
5      Q.   Okay.  And Dr. Weinberg, what is his
6   specialty, if you know, what does he hold himself
7   out as an expert on?
8      A.   I'd have to go back and review his -- I'd
9   have to go back and review his -- his report and CV
10  to see if that's mentioned.  But I -- I understand
11  he's an -- an economist who understands auctions and
12  understands -- understands the -- the information he
13  needed to -- he used to reach his conclusions.
14     Q.   Did you -- have you read his deposition
15  in this case?
16     A.   I have not read his deposition in this
17  case.
18     Q.   Any portion of it?
19     A.   I have not read his deposition in this
20  case.
21     Q.   Has anybody read it to you or summarized
22  it for you?
23     A.   Not that I recall as I sit here.
24     Q.   Is there any doubt in your mind about
25  that?

Page 147

1          MR. COLLIER:  Objection; form.
2      A.   I've -- I've answered the question as
3   best I can.  As I -- as I sit here right now, I do
4   not believe that's occurred.  I don't recall it at
5   all and -- and I know that I haven't read it myself.
6   That's the best I can answer that question.
7      Q.   The -- professor Weinberg characterized
8   himself as an auction theorist.  Do you have an
9   understanding of what an auction theorist is?
10         MR. COLLIER:  Objection; form.
11     A.   I have an understanding of -- of the --
12  kind of the study of auctions from -- from an
13  economist's standpoint.  I understand what they do
14  and -- and I understand kind of the area of
15  economics within which auction -- auction theory
16  falls into it.
17     Q.   What is "auction empirical analysis," as
18  you understand it?
19     A.   As I would understand that it is looking
20  at auction data and then analyzing auction data.
21     Q.   Actual real world data?
22     A.   I don't --
23         MR. COLLIER:  Objection; form.
24     A.   Empirical analysis would lead me to --
25  would lead me to believe that it is real world data.

Page 148

1      Q.   Okay?
2      A.   It's empirical.
3      Q.   In other words, go on the theoretical
4   side that would be perhaps the design of aspects or
5   in this case mechanics or functional parts of an --
6   of a auction.  Would that be the kind of things that
7   would be included in the theoretical?
8          MR. COLLIER:  Objection; form.
9      A.   I think you would be best served
10  asking -- asking Dr. Weinberg about that because
11  he's the auction theorist.  My understanding is that
12  auction economists were involved in auctions even
13  theoretical economists.  And I know this because
14  my -- my father-in-law is a -- is an auction
15  economist.  He does a tremendous amount of empirical
16  research in thinking about auction theory.  So I
17  don't think just because one is a theoretical
18  auction expert means that they don't have
19  experience, and skill, and talent in analyzing
20  empirical data.
21     Q.   Did professor Weinberg conduct any
22  empirical auction analysis of the -- any of the
23  auctions at issue in this case, to your knowledge?
24         MR. COLLIER:  Objection; form.
25     A.   I think that's a question best asked to

Page 149

1   Dr. Weinberg.  I have not -- I have not looked into
2   that one way or another so I have no basis for
3   answering that.
4      Q.   Okay.  Nothing that he provided to you in
5   his report indicated one way or the other whether he
6   engaged in any form of actual real world empirical
7   analysis of the matters that he opined on?
8      A.   Well, as I said earlier I have read his
9   report.  I don't recall, as I sit here, I don't
10  recall whether empirical analysis was part of his
11  work.  He may have, he may not have.  You need to
12  talk to him about that.  I don't recall as I sit
13  here.
14     Q.   Okay.  Certainly you didn't have the
15  benefit of any empirical analysis regarding these
16  auctions that you received by way of Weinberg's
17  report.  Correct?
18         MR. COLLIER:  Objection; form.
19     Q.   That you know of?
20     A.   I think that's a -- well, if you want to
21  ask that -- I read his report and I don't recall as
22  I sit here right now whether or not there was a
23  empirical component to that report.  It was a long
24  report.  There's -- I just can't recall as I sit
25  here, so I can't answer that question one way or

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1    another.
2        Q.    What you can tell us is as you sit here
3    you can't recall a single empirical piece of
4    information that was imparted to you by your review
5    of that report?
6            MR. COLLIER:   Objection; form.
7        A.    I don't believe that's what I said.   You
8    said a -- a single empirical piece of information.
9    That is such a broad term.   Now you've changed what
10   we were talking about to something completely
11   different.   So I feel like it's --
12       Q.    Let me clarify it for you.
13       A.    Okay.
14       Q.    As you sit here, can you recall any
15   report in Weinberg's report of his having conducted
16   any empirical analysis of any of these auctions?
17           MR. COLLIER:   Objection; form.
18       A.    I'm trying to recall one way or another
19   as I sit here.   And I know he's looked at
20   information in this case.   So I don't recall how
21   that -- I just don't recall his report specifically
22   enough as I sit here.
23       Q.    Okay.   So you don't recall any such
24   information as you sit here?
25           MR. COLLIER:   Objection; form.

Page 151

1        A.    Yeah, I don't recall as I sit here
2    whether or not that exists in his report.   I read
3    his report.   You'd have to ask him what he relied
4    upon and what he employed in his work.
5            MR. GIBBS:   Objection; nonresponsive.
6        Q.    I think you've answered the question in
7    the front part.
8            Okay.   Paragraph 98, you say there
9    that --
10           THE WITNESS:   Maybe this is a good
11   time for lunch break.
12           MR. GIBBS:   Oh, yeah.   That's fine.
13           THE WITNESS:   Since we're moving to
14   another --
15           MR. GIBBS:   Fine with me.
16           THE WITNESS:   Are you guys fine with
17   that?
18           MR. COLLIER:   Fine with me.
19           THE VIDEOGRAPHER:   Going off the
20   record.   The time is    12:46    .
21           (Break.)
22           THE VIDEOGRAPHER:   Back on the
23   record.   The time is 1:28.
24       Q.    Mr. Andrien, we were talking about
25   Paragraph 98 of your original report.   Do you still

Page 152

1    have that before you?
2        A.    I do, yes.
3        Q.    All right.   Your violation count in -- in
4    your evaluation here of the -- in your evaluation of
5    the penalties, do you assume in your violation count
6    that the -- that there's an assumption that has been
7    provided to you?
8            MR. COLLIER:   Objection; form.
9        A.    I have -- when it comes to the violation
10   count and determining the violation count I've --
11   I've assumed that Google's misconduct indirectly
12   affects -- affected all open auctions within the
13   assumed period associated with each misconduct.
14       Q.    Okay.   And so you've been directed to
15   assume that all open auctions were indirectly
16   affected is your terminology.   Right?
17       A.    I --
18           MR. COLLIER:   Objection; form.
19       A.    I've been asked to assume based on
20   Dr. Weinberg's report that all auctions during the
21   period in which these misconducts occurred were
22   affected by the claimed misconduct.
23       Q.    Okay.   And did you --
24       A.    Whether -- whether they were directly
25   targeted by the misconduct or not.

Page 153

1        Q.    Okay.   Did you adhere to that directed
2    assumption that Google's misconduct affected all
3    open auctions within the assumed periods?
4            MR. COLLIER:   Objection; form.
5        A.    I -- I assumed that Google's misconduct
6    whether directly targeted -- whether the auctions
7    were directly targeted or not affected all of the
8    open auctions within the assumed period associated
9    with each misconduct.
10       Q.    Okay.   And so did you, in fact, assume
11   that all open auctions were indirectly affected as
12   you were directed?
13       A.    I've assumed that Google's misconduct
14   indirectly affected all open auctions within the
15   assumed period associated with each misconduct.
16       Q.    Okay.   Can you -- do you know which or
17   how many open auctions were actually affected?
18           MR. COLLIER:   Objection; form.
19       A.    I -- I just told you that I've assumed
20   that all of the open auctions within the assumed
21   period associated with each misconduct were
22   affected.   I have calculated -- I -- I do have
23   calculations of -- of those and have put those
24   calculations into my report.
25       Q.    All right.   Are you able to testify that

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1 each and every auction transaction from 2013 to 2023
2 was a violation of a state Deceptive Trade Practice
3 Act?
4         MR. COLLIER: Objection; form.
5     A.   I am able to testify based on the
6 assumption that I've been asked to make that
7 Google's misconduct indirectly affected all open
8 auctions within the assumed period associated with
9 each misconduct. Based on that, I am able to
10 provide a number of auctions that have been affected
11 that are -- that are deemed violations.
12     Q.   Have you personally undertaken to
13 determine that each and every auction transaction in
14 that ten-year period constituted a violation of a
15 state DTPA?
16         MR. COLLIER: Objection; form.
17     A.   Would you repeat the question, please?
18         MR. GIBBS: Would you read it back,
19 please?
20         (The requested material was read.)
21         MR. COLLIER: Same objection.
22     A.   What I'm going to say is I've been -- I
23 have assumed that Google's misconduct indirectly
24 affected all open auctions within the assumed period
25 associated with each misconduct, and -- there's

Page 155

1 different temporal periods for each one of those
2 misconducts.
3         And so I -- I -- I've written in my
4 report my -- my -- my basis for -- for the temporal
5 components of each one of those misconducts, and
6 within that I've calculated the number of auctions
7 that have taken place within those periods.
8     Q.   My question is have you gone out and
9 personally investigated to determine that each and
10 every auction transaction in that ten-year period
11 constituted a violation? Have you done that or have
12 you not done that?
13         MR. COLLIER: Objection; form.
14     A.   I have assumed that the misconduct
15 indirectly affected all of the auctions within the
16 assumed period associated with its misconduct.
17     Q.   Okay. You solely assumed that. You've
18 not gone out and actually investigated to determine
19 if auctions on a particular date in that period was,
20 in fact --
21     A.   I understand Dr. --
22     Q.   -- a violation?
23     A.   I'm sorry. I thought you were finished.
24         MR. COLLIER: And I did, too, so give
25 me just a moment.

Page 156

1         Objection; form.
2         Now you can answer.
3     A.   Now I forget what the question was.
4     Q.   Yes. The question is simply this: I
5 understand you assumed that each and every one was
6 affected. That's your testimony. Right?
7     A.   I'm just going to read the same sentence
8 again.
9         "I've assumed that Google's misconduct
10 indirectly affected all open auctions within the
11 assumed period associated with each misconduct."
12         That's my assumption.
13     Q.   Okay. My next question is have you gone
14 out and investigated and determined personally that
15 any particular auction transaction was a violation
16 of a DTPA?
17         MR. COLLIER: Objection; form.
18     Q.   Have you done that?
19         MR. COLLIER: Objection; form.
20     A.   I have assumed that those were based on
21 Dr. Weinberg, who I understand has made that
22 determination. So I have assumed -- assumed that
23 those open auctions are -- are indirectly affected
24 within the assumed period associated with each
25 misconduct.

Page 157

1     Q.   I understand you've assumed that based
2 upon what you say Weinberg tells you in his report.
3         Right?
4     A.   Dr. Weinberg has, as I understand it,
5 determined that all open auctions have been
6 affected. That's his work and his determination.
7         I rely upon that work in -- in my
8 assumption that all of those auctions have been
9 affected.
10     Q.   Putting that assumption aside --
11 different question -- have you personally, Jeffrey
12 Andrien, gone and investigated to determine whether
13 any individual transaction, auction transaction,
14 was, in fact, a violation of a DTPA? You
15 personally.
16         MR. COLLIER: Objection; form.
17     A.   Yeah, I -- I -- I have performed the work
18 that I talked about in this case, and I don't want
19 to characterize it that it does or doesn't.
20 Independently look at that as the work stands for
21 itself and what I've done. I'm assuming for
22 purposes of my -- my analysis, based on Dr. Weinberg
23 and -- and his work, that all those open auctions
24 have been effective.
25     Q.   Other than assuming what somebody else

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1  has told you about them, have you specifically
2  picked a -- any single or group of auction events
3  and investigated whether they constituted a
4  violation?  Have you done that work?
5      A.  I've done the work to understand the --
6  the states' claims and what they claim to be a --
7  a -- the misconduct at issue.  I understand how
8  those different conducts are at play within the --
9  the auctions.
10      And so I do have independent work that
11  I've performed to understand why auctions would be
12  considered violations.  And I've been asked to
13  assume that every auction, every open auction has
14  been indirectly affected within the assumed period
15  associated with each misconduct.
16      Q.  Can you -- can you identify, as you sit
17  here, a single transaction that you have gone out
18  and investigated and determined, independently of
19  what you've been asked to assume, that it was a
20  violation of any of the DTPAs?  Have you done that?
21      A.  Well, I've looked at the auction database
22  that was -- that was produced in this case by
23  Google.  And I understand, based on the information
24  I reviewed in this case, that ███████████████

Page 159

3
10      I do understand generally how the
11  auctions work.  I do understand generally how these
12  programs work.  And I do understand that generally
13  these auctions -- and I've done the independent work
14  to -- to understand that auctions would be impacted
15  by these -- by these misconducts.  So I have done
16  independent work to determine that auctions would be
17  affected.
18      I have asked to assume that -- that
19  Google's misconduct indirectly affected all open
20  auctions within the assumed period associated with
21  this misconduct.
22      Q.  Can you identify a single transaction,
23  auction transaction on a day, or five of them, that
24  you claim you have confirmed were a violation of the
25  DTPAs?

Page 160

1      A.  I think I just answered that question.
2  I'd repeat my same answer.  I've done the work in
3  this case --
4      Q.  Your answer was nonresponsive, I'll tell
5  you that.  Go ahead?
6          MR. COLLIER:  He wasn't done
7  speaking.
8      Q.  Go ahead?
9      A.  Thank you.
10      I've done the work, independent work in
11  this case to understand and to look for whether or
12  not you could identify whether these programs were
13  run on any individual auction. ██████████████
14  ██████████████████████████
15  ████████████████████████████████
16  ██████████████████████
17  ████████████████████████████████
18  ██████████████████████
19  ████████████████████████████
20  ████████████████  I then
21  looked independently into understanding how the
22  auctions work, how those programs work,
23  understanding how those programs would -- would
24  manipulate those auctions, and therefore I have an
25  understanding that those are violations

Page 161

1  independently.
2          ████████████████████████
3      So I understand to the
4  extent that that conduct occurred, it's going to
5  affect auctions.  I've done that independent work.
6  I've looked to Dr. Weinberg to -- to -- to rely on
7  his opinion that -- that Google's misconduct
8  indirectly affected all open auctions within the
9  assumed period associated with each misconduct.
10          MR. GIBBS:  Objection; nonresponsive.
11      Q.  Your -- your answer is ██████████
12  ████████████████████████████
13  ████████████████████████████
14  ████████████████████████
15      Right?
16
17      A.  I -- I --
18          MR. COLLIER:  Objection; form.
19      A.  -- I think that's a mischaracterization
20  of what I said. ████████████████████
21  ██████████████████████████████
22  ████████████  I didn't say whether
23  or not they were affected individually.
24      I ████████████████████

41 (Pages 158 - 161)

CONFIDENTIAL



Page 162

3  manipulated -- manipulation -- the -- the type of
4  manipulation that was -- was performed by these
5  misconducts.  And so I know auctions were
6  manipulated and therefore violations.
7      And I also understand generally how
8  auctions work and how -- and how there's feedback
9  loops, because this is a repeated game for many of
10  the participants.  And I understand that those
11  feedback loops would be -- would be -- would be --
12  the information wouldn't -- would have been
13  manipulated based -- the -- the feedback loops that
14  they would get would be manipulation -- manipulated,
15  and that would affect other auctions.
16      So I understand that and I've done the
17  work to understand that independently.  And,
18  therefore, I do have a basis for understanding that
19  these auctions would be considered a violation.  And
20  I have relied on Dr. Weinberg to -- to, in his
21  conclusion and opinion that Google's misconduct
22  indirectly affected all open auctions within the
23  assumed period associated with each misconduct.
24      MR. GIBBS:  Objection; nonresponsive.
25  Q.

Page 163

3  Is that your testimony?
4      MR. COLLIER:  Objection; form.
5  A.

16  Q.

        Right?
19      MR. COLLIER:  Objection; form.
20
21  As I've told -- as I've said in my report, my
22  opinion is based on the assumption that Google's
23  misconduct indirectly affected all open auctions
24  within the assumed period associated with each
25  misconduct.

Page 164

1      MR. GIBBS:  Objection; nonresponsive.
2  Q.  Did -- was that information available to
3  anyone else in connection with the -- the -- their
4  evaluations, to your knowledge?
5      MR. COLLIER:  Objection; form.
6  A.  Which information?

9  A.

11  Q.  Okay.

        But I understand that they were running
19  these -- these programs throughout the time periods
20  that I have -- I have put forth in each one of my --
21  each one -- related to each one of the conducts.
22      MR. GIBBS:  Objection; nonresponsive.
23  Q.  And so that is the reason that your
24  report does not have that level of detail, that is,

Page 165

3      MR. COLLIER:  Objection; form.

8  Q.  Therefore, you did not --
9      MR. COLLIER:  I don't -- counsel, I
10  don't think he was done.
11      Were you done, Mr. Andrien?
12      THE WITNESS:  I was -- I was still in
13  the middle of my -- my answer, but...
14  A.  So what I -- what I was saying was that

19      Now, there's information that is
20  available to understand how the auctions work, how
21  the programs that manipulate the auctions work, how
22  they manipulate the auctions, to understand that
23  information flows back to the participants of the
24  auction, to understand that this -- these auctions
25  are repeated gain and that participants engage in

42 (Pages 162 - 165)

Page 166

1  these auctions multiple times over and over again.
2      And so with that understanding, one is
3  able to conclude that these would have impacts
4  throughout this auction environment and -- and --
5  and I've done the work to understand that, but I'm
6  relying upon Dr. Weinberg's conclusion and -- and --
7  and opinion that -- that Google's misconduct
8  indirectly affected all open auctions with the
9  assumed period -- within the assumed period
10  associated with each misconduct.
11     Q.  And you have not been able to -- for the
12  reasons you've just expressed, ████████████████
13  █████████████████████████████████████
14  ██████████████████████████  True?
16         MR. COLLIER:  Objection; form.
17     A.  I disagree with that characterization. █
18  ██████████████████████████████████████
19  ████████████████████████████████████
20  ███████████████████████████████
21  But I can determine, based on Dr. Weinberg's work
22  and based on my understanding, that the auctions --
23  that auctions were impacted.
24     Q.  Do you know whether each and every one of
25  the auctions was deceptive?  Have you done any

Page 167

1  personal investigation about any specific auction to
2  determine whether it was deceptive or not?
3     A.  I would say I've done a lot of work in
4  this case to understand whether or not those would
5  be deceptive based on my understanding of the
6  auctions, the participants, the programs that were
7  run, the feedback loops that would happen.  I
8  generally have a -- I believe I have a strong
9  understanding of all that.  So I've done all that
10  independent work.  I've looked at Dr. Weinberg's
11  report.  I understand what he has concluded based on
12  his work and that -- that -- that is consistent with
13  my understanding of how -- my independent work and
14  how this works.  And based on his work as an auction
15  theorist or an auction expert, I have relied upon
16  his work which is consistent with my own independent
17  work.  I've relied upon him to reach the
18  conclusion or -- or -- or to assume that Google's
19  misconduct indirectly affected all open auctions
20  within the assumed period associated with each
21  misconduct.
22         MR. GIBBS:  Objection; nonresponsive.
23     Q.  Have you gone and talked to a single
24  seller or buyer in any of these auctions to
25  determine what their understanding of the mechanics

Page 168

1  involved in the auction were?  Have you done that?
2     A.  I have not specifically spoken to an
3  advertiser or a publisher that has -- that has
4  engaged in -- in the auctions at issue in this case.
5  I have not gone in -- and talked to any advertiser
6  or publisher, but that was not necessary to do to
7  reach the conclusions that I've reached and --
8  and -- and understand how these auctions work.
9  There's enough information in the record for me to
10  glean that information.
11         MR. GIBBS:  Objection; nonresponsive.
12     Q.  So the answer to my question is you can't
13  point to a single publisher or advertiser, by name
14  or by the date of a particular auction, that was
15  deceived according to your personal investigation
16  that produced that name.  True?
17         MR. COLLIER:  Objection; form.
18     A.  I don't believe that's true the way you
19  phrased that question, though.
20     Q.  Have you gone out and talked to a single
21  publisher or advertiser and asked them about a
22  single election -- or auction that they've been
23  involved in and whether they were deceived by any of
24  these facts?
25         MR. COLLIER:  Objection; form.

Page 169

1     A.  I have not spoken to a particular
2  advertiser or publisher and asked them that.  But
3  I've looked through the record in this case.  I've
4  read deposition testimony in this case.  I've --
5  I've understood how the auctions work and the
6  programs work and I understand -- well -- or -- or
7  statements Google has made about the auctions and --
8  and so based on all that work, I can conclude that
9  there has been advertisers and publishers deceived.
10  I don't have to call them up and ask them.  I can do
11  it based on the record that was produced.
12         MR. GIBBS:  Objection; nonresponsive.
13     Q.  Somebody else will determine the
14  significance of this.
15         My question is just, simply, can you name
16  a single advertiser or a single publisher that was
17  deceived in a particular transaction auction on a
18  particular date and auction from your own work or
19  investigation?  Can you identify that person or
20  company?
21         MR. COLLIER:  Objection; form.
22     A.  As I sit here right now, I don't have the
23  information in front of me to identify a particular
24  name and a particular auction.  I have looked at a
25  database of auctions.  So I understand that █████

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

████████████████████
████████████████████
████████████████████
████ And as I said before, I
5  understand the technologies. Like, I understand
6  the -- kind of the environment, the auctions, the
7  way the -- the participants engage within the
8  auctions. I understand the misconduct that's
9  alleged, and, therefore, I have an understanding
10  that the auctions have been deceptive and -- and the
11  participants have been deceived.
12      Q.  But you can't give us a single name of a
13  publisher or an advertiser who have -- will come in
14  and that you've identified by name or company and
15  say, I've been deceived, can you?
16      MR. COLLIER:  Objection; form.
17      A.  I have -- I have not read a deposition or
18  anything from an advertiser or publisher that I
19  recall as I sit here that -- that says that that
20  individual advertiser or publisher has been
21  deceived.  However, I do understand that each
22  advertiser and publisher who's engaged with this
23  auction technology has been deceived.  I understand
24  why and I understand the -- the -- manipulations
25  that have occurred based on these programs and why

Page 171

1  they would be deceptive and how they are deceptive.
2  And, therefore, I can conclude that they've been
3  deceived without having to name them individually.
4      Q.  And that's the reason you haven't gone to
5  talk to a single one of the publishers or
6  advertisers personally, have you?
7      MR. COLLIER:  Objection; form.
8      A.  As I previously testified to, I have not
9  gone to talk to them.  I did not need to talk to
10  them to reach the conclusions that I've reached
11  and -- and do the work that I've done in this case.
12  It wasn't -- it would not have -- have altered or --
13  or changed my opinions.
14      Q.  You were indicating in your report that
15  you were directed to assume Google's alleged
16  misconduct indirectly affected all the open
17  auctions.  Do I understand that correctly?
18      A.  You do.  And I say below, just to put a
19  finer point on it, and I said:  I've been asked to
20  assume based on Dr. Weinberg's report that all
21  auctions during the period in which RPO DRS
22  Version 1, DRS Version 2 and Bernanke misconducts
23  were active were affected by the claimed misconduct,
24  whether they were directly targeted by the
25  misconduct or not.

Page 172

1      And so, therefore, that's how I get the
2  "indirectly."  Whether they were directly targeted
3  or not, they were all at least indirectly affected.
4      Q.  What do you mean by "indirectly
5  affected"?
6      A.  What I mean by that is, for example, if
7  the -- if Bernanke didn't run on a specific auction,
8  it doesn't -- that -- that auction can still be
9  indirectly affected because of Bernanke during the
10  period that Bernanke ran.
11      Q.  Why?
12      A.  I -- I'm trying to describe this.  I'll
13  try again.
14      Understanding the auction mechanisms and
15  these programs to manipulate auctions, understanding
16  the feedback loops from these auctions, it goes back
17  to the advertisers and -- and -- and the --
18  publishers.  I understand that's going to impact
19  their future behavior and, therefore, the -- the --
20  the auctions that -- the manipulations that happen
21  on one auction would impact -- would impact the
22  participants in auctions that don't even run that --
23  that program at the time because of -- because of
24  all the -- the -- the feedback loops I've just
25  discussed.

Page 173

1      Q.  Does the -- does your assumption that all
2  the auctions were affected, does that mean that the
3  auction participants were worse off because of the
4  mechanic or feature that's at issue?
5      MR. COLLIER:  Objection; form.
6      A.  I understand that there is harm done to
7  the participants and I've discussed that harm in my
8  report.  I don't believe it necessarily means that
9  each participant was harmed every time, but they --
10  they are harmed in the sense that they are -- they
11  are developing their auction strategies based on
12  information that they're receiving from tainted
13  auctions that's not accurate.
14      Q.  Are -- are you aware or are you saying
15  that every one of them was worse off financially as
16  a result of any of these mechanics?
17      A.  I'm -- I'm not saying that everyone was
18  worse off financially because of these mechanics.
19      Q.  Okay.  There are -- from that perspective
20  in terms of financially, there are people or
21  businesses included within the total violations or
22  transactions you've counted, there are people,
23  therefore, that have not been rendered worse off.
24  Would you agree with that?
25      MR. COLLIER:  Objection; form.

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1    Q.   From a financial perspective?
2         MR. COLLIER:  Objection; form.
3    A.   I -- I don't have the -- the -- the
4    insight to reach that conclusion that you just put
5    forth.  I do know that there are situations where --
6    where, for example, it's kind of robbing Peter to
7    pay Paul where -- where you are taking surplus from
8    one participant and providing it to another
9    participant.  And, therefore, in that situation, one
10   might be benefit, and one might be harmed.
11        But the -- as I said before, the -- the
12   manipulations affect how people engage --
13   participants engage with the technology.  And so
14   from that standpoint, the whole ecosystem is
15   affected.
16   Q.   Has anyone to your knowledge determined
17   whether any ad seller or publisher was financially
18   worse off because of reserve price optimization?
19        MR. COLLIER:  Objection; form.
20   A.   Would you please repeat the question?
21   Q.   Yes, sir.  Let's start with you.  Have
22   you personally determined whether a single ad seller
23   or a single publisher was worse off financially
24   because RPO made sure they did not sell their ad
25   space too cheaply?

Page 175

1         MR. COLLIER:  Objection; form.
2    A.   As I understand the way RPO was -- was
3    employed, that the reserve price would be
4    manipulated and by doing so that would cause a
5    financial benefit to Google.  They would, for
6    example, I talk about this in -- in -- I have a
7    chart in my report.  Let me see if I can find it.
8         It's Figure 3 for reserve price
9    optimization.  And so you can see if the reserve
10   price is manipulated to that would have been below
11   the second bid to place above the second bid, then
12   by definition the -- the advertiser surplus is being
13   destroyed here and therefore they are harmed
14   financially.
15   Q.   Have you gone out or anyone else to your
16   knowledge gone out and identified a single publisher
17   or advertiser that has financially suffered injury
18   from reserve price optimization?
19        MR. COLLIER:  Objection.
20   Q.   A single one?
21        MR. COLLIER:  Objection; form.
22   A.   Would you please repeat the question?
23   Q.   Can you identify, have you identified by
24   name, a single publisher or a single advertiser that
25   has been financially injured or harmed by RPO?

Page 176

1         MR. COLLIER:  Objection; form.
2    Q.   In a transaction?
3    A.   I have not identified a particular name
4    of a advertiser that's been harmed.  But I do
5    understand how reserve price optimization has been
6    employed.  And I do understand the mechanism by
7    which that -- that by definition harms advertisers.
8    It is -- it is taking surplus from advertisers
9    and -- and -- and it's increasing that surplus by
10   definition.
11   Q.   Same question about dynamic revenue
12   sharing.  Can you, sir, point to a single publisher
13   or advertiser that has been financially harmed in
14   a -- in any single or group of transactions in
15   auctions by DRS?
16   A.   And I will give the same answer.  While I
17   understand -- while I have not identified any
18   individual named publisher or advertiser -- excuse
19   me -- that's been -- that's been affected.  I
20   have -- I have an understanding of how the program
21   works.  And as I've listed in the report, an
22   understanding of how those programs would -- would
23   negatively or could negatively impact publishers
24   and -- publishers and -- and advertisers.
25   Q.   You understood as you just said how they

Page 177

1    could be impacted, is that the word you just used,
2    could?
3    A.   I --
4         MR. COLLIER:  Objection; form.
5    A.   I did use that word.  But I also have
6    talked extensively about how that manipulating
7    auctions affects participant's information.  And
8    their -- their information they get from
9    participating in auctions is now tainted and -- and
10   skewed.  It's not truthful information.  And that's
11   going to impact their future interactions with
12   the -- with future auctions.
13   Q.   Have you, in fact, determined that, in
14   fact, a single publisher or advertiser was, not
15   could be, was in fact harmed financially by any of
16   these alleged misrepresentations or mechanics?
17        MR. COLLIER:  Objection; form.
18   A.   Could you repeat the question please?
19   Q.   Have you, in fact, determined not whether
20   somebody could have been affected, as you've
21   indicated in your report, have you gone out and
22   determined and identified a single advertiser or
23   publisher that was, in fact, injured or harmed
24   financially by any of these mechanics?
25        MR. COLLIER:  Objection; form.

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1    A.   I'm going to give the same answer that
2  while I have not identified by name a single
3  publisher or advertiser that was financially harmed,
4  I do understand how the programs were implemented
5  and understand how that implementation would cause
6  harm to publishers and advertisers who are
7  participating in this -- in -- in -- in this market.
8    Q.   You have no names that you can give us.
9  True?
10       MR. COLLIER:  Objection; form.
11    A.   I have not identified a name because it
12  wasn't necessary to do that for the work that I'm
13  performing.  It's not -- the name of one of these
14  isn't relevant to my determining what an appropriate
15  penalty is.
16       MR. GIBBS:  Objection; nonresponsive.
17    Q.   What is -- what is your understanding of
18  a truthful auction?  Do you have an understanding of
19  that concept?
20    A.   I do.  It's -- my understanding is
21  detailed or discussed in -- in Paragraph 40 and 41.
22    Q.   Is an auction truthful if the bidders
23  optimally bid their true values rather than shading
24  their bids?
25       MR. COLLIER:  Objection; form.

Page 179

1    A.   Is an auction truthful?
2    Q.   Yes.
3    A.   Not if it's being manipulated, it's not
4  truthful.
5    Q.   Putting aside the manipulation question.
6  If bidders have bid their true values, is that a --
7  a truthful auction?
8       MR. COLLIER:  Objection; form.
9    A.   That's a hypothetical.  I don't know how
10  to answer without more information.  It could be a
11  true -- a truthful auction.  It could be a
12  manipulated auction.
13    Q.   Okay.
14    A.   It would be -- there's -- there's --
15  there's not enough information for me to answer that
16  question.
17    Q.   Is a -- an auction where the winning
18  bidder is charged a threshold price a truthful
19  auction?
20    A.   I'd give the same answer.  There's just
21  not enough information for me to answer that
22  question.
23    Q.   What's a threshold price?
24    A.   A threshold would be a -- a floor amount,
25  like a -- it has to be at least this price, at least

Page 180

1  a certain price.
2    Q.   Do you know of a concept involved in
3  this -- in these auctions called the "threshold
4  price payment rule"?
5    A.   I'd have to go back and refresh my
6  memory.  As I sit here, I don't recall exactly what
7  that is, but it sounds familiar to me.  I would just
8  have to refresh my recollection.
9    Q.   Okay.  In May of 2016, Google Ads
10  transitioned advertisers using auto bidding that is
11  cost per sale to a threshold price payment rule.
12       Do you agree with that statement?
13    A.   Would you repeat the question, please?
14    Q.   Yes, sir.  In May of 2016, Google Ads
15  transitioned advertisers using auto bidding, that is
16  cost per sale, to a threshold price payment rule.
17  Are you aware of that fact?
18    A.   That sounds familiar.  I don't recall the
19  dates as I sit here or the specifics.  I'd have to,
20  again, refresh my memory on that.
21    Q.   I'm not holding you to the date, but if
22  it's in May of 2016, were you familiar with that
23  fact?
24    A.   As I said, I would have to go back and
25  refresh my recollection.

Page 181

1    Q.   You can't answer that question as you sit
2  here?
3    A.   There's a -- a tremendous amount of
4  information that I've received in this case.  I'm --
5  not -- I understand it's not supposed to be a memory
6  test.  As I sit here I don't under -- I don't recall
7  specifically the details.  I would like to refresh
8  my memory.  If you want to put a document in front
9  of me to -- to refresh my recollection, I'd be happy
10  to look at it.
11    Q.   Did you -- did the implementation of
12  the -- a threshold price payment rule by Google, did
13  you take that into account in arriving at your --
14  your -- the civil -- civil penalties -- penalties in
15  this case?
16    A.   I've taken into account as I've detailed
17  in my report, when these manipulative conducts have
18  occurred, when they stopped.  And so I've looked at
19  that.
20       Now, as I said, you'd have to refresh my
21  recollection about that specific issue that you're
22  talking about.  And I'm -- and I'm happy to look at
23  something.  But I've -- I've been very specific
24  of -- of why I picked the -- the temporal component
25  of my analysis that I have for each one of the

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1  different conducts and -- and all the work that I've
2  done to assess penalties, appropriate penalties
3  associated with each one of those conducts.
4      Q.   Well, putting --
5      A.   I'm happy to take a look at it, but if
6  you want to refresh my recollection --
7      Q.   Just tell us how does your theory take
8  into account, if it does, threshold price payments?
9  How did you account for that when you were arriving
10  at your 7 to $20 billion range of penalties?
11          MR. COLLIER:  Objection; form.
12      A.   And if you -- as I said -- as I sit here
13  I need to have my memory refreshed about that
14  specific conduct.  And if I -- that specific change
15  as you call it.  It would like to look at it and
16  understand it better than I can recall as I sit here
17  right now.  But what I have done is I've looked at
18  the conducts -- the alleged misconducts at issue in
19  this case.  I've looked at the time period for which
20  those conducts ran and I think I've been very
21  conservative in my selection of those time periods.
22  And I've assessed the number of auctions that have
23  occurred within those time periods.  And I've
24  quantified a penalty based on those assessments.
25          So I can't tell without getting my memory

Page 183

1  refreshed how that fits into -- into what I've done
2  or -- if it's relevant to what I've done without
3  having my memory refreshed on it.
4      Q.   Can you tell us anything about how the
5  introduction of threshold price payment impacted
6  your 7 to $20 billion figures at -- in any way?  Do
7  you have any idea as you sit here?
8          MR. COLLIER:  Objection; form.
9      A.   I'm -- I'm going to have the same answer
10  that I've had this whole time.  And that is I can
11  tell you exactly what I've done, how I've done it,
12  how I've picked the time components of what I've
13  done, why I've reached the conclusions I've reached.
14  And if you want to refresh my memory about this
15  threshold change, I can review it and -- and answer
16  your question.  But as I sit here, I don't have
17  the -- the recall of that specific program
18  to -- to answer your question.
19      Q.   Okay.  So as you sit here, you can't
20  recall any way in which you have taken into account
21  in arriving at your 7 to $20 billion numbers of the
22  impact of threshold price payment?
23      A.   I --
24          MR. COLLIER:  Objection; form.
25          Go ahead.

Page 184

1      A.   I'm going to give the same answer I've
2  given every single time you've asked ask this
3  question.  I have described exactly what I've done
4  in my work to get to the -- the time components for
5  the auctions, how I've quantified the auctions
6  within those time components, and how I've reached
7  my conclusions based on the number of auctions and
8  the rest of the analysis I've done.
9          If you want to refresh my recollection
10  of -- of this threshold change that you're
11  discussing, I will tell you how that impacts, if it
12  impacts, or if it's irrelevant to what I have done.
13  But as I sit here right now, I don't recall the
14  details sufficient enough to answer that question.
15      Q.   Okay.  Do you recall anything about
16  threshold price, payment, that concept, as it
17  applies in this context?
18      A.   I -- that -- that sounds like something
19  I've seen before.  I'd want to have my -- my memory
20  refreshed on it.
21      Q.   Okay.  May seen it.  It sounds like
22  something you may have seen.  Right?
23      A.   As I said, it sounds like something I've
24  seen before.  I would like to have my memory
25  refreshed.  If you want to show me a document and

Page 185

1  refresh my memory, I'm happy to talk about it in
2  more detail.
3      Q.   Did the --
4          THE WITNESS:  Is this a good time for
5  a restroom break?
6          MR. GIBBS:  Sure.
7          THE VIDEOGRAPHER:  Going off the
8  record.  The time is 2:12.
9          (Break.)
10          THE VIDEOGRAPHER:  Back on the
11  record.  The time is 2:27.
12  ████ ████████████████████████
13  █████████████████████████████
14  █████████████████████████
15
16      A.   You're -- you're wrong on that.
17      Q.   Okay?
18
19  ████████████████████████████████
20  ███████████████████████████████████
21      Q.   That's what I thought at first, but I
22  talked myself out of that.  ██████████
23          And then that's the -- the low or minimum
24  part of your per violation penalty value.  Right?
25      A.   Given the violation counts that I have in

47 (Pages 182 - 185)

CONFIDENTIAL



Page 186

1 my report, that would be the low end of the -- of
2 the -- of the penalty range, per violation penalty
3 range.
4     Q.   And the high -- high or maximum under
5 your analysis, ███████████████████████
6 ███████████████████. Right?
7     A.   That's right, given the number of
8 violation counts that I've quantified in my opening
9 report.
10     Q.   ████████████████████
11 ████████████████████████████████████
12 ████████████████████████████████████
13 ████████████████
14     A.   Sure.  Let me explain how I got there.
15         So when I performed my work in this case,
16 I looked at the -- the statutes and understood
17 the -- the penalty ranges for the states at issue
18 in this case, the plaintiff states.  And when I
19 determined the number of violations, the first thing
20 I did is say, okay, well, what would this mean if --
21 ████████████████████████████████████
22 ████████████████████████████████████
23 ████████████████  Then I realized, well,
24 that's -- that's a -- that's a big number.  I don't
25 think that would be an appropriate penalty.

Page 187

1 ████████████████████████████████
2 ████████████████████████████████████
3 ████████████████  I came to the same
4 conclusion, ████████████.
5         Given just the incredible number of
6 violations here, we're -- we're -- we're talking
7 about such huge scope and scale.  So I said, well,
8 what is a penalty -- ████████████████████
9 ████████████████████████████
10         And I said, well -- well, that gets to,
11 like ████████████.  And I still believe that's --
12 that's too high.  So I -- I -- I looked at different
13 violation amounts, and then determined what you get
14 from those amounts, and then kind of viewed the
15 results from that work holistically within the --
16 the factors that I was asked to consider.
17         And -- and based on all of that work and
18 analysis, that's how I get to my range.  And so it's
19 a range that I determined through my work, analysis,
20 education, training, experience, looking at the
21 record produced in this case, doing independent
22 research.  And all of that work is how I determined
23 that given the violation counts that I've
24 quantified, that would be an appropriate per
25 violation penalty range to assess in this matter,

Page 188

1 based on the factors that I've addressed.
2     Q.   So in order -- in answer to the question
3 who came up with the range per violation, that was
4 Jeffrey Andrien.  Right?
5     A.   I came up with that range based on the
6 work that I performed and just described.
7     Q.   How did you conclude that ████████
8 ████████████████████████████████████
9 ████████████████████████████████████
10 ████████████████████████████████?
11     A.   Sure.  So as I said, I -- I kind of
12 explained how I analyzed the different results.  And
13 then when I looked at the various analyses that I've
14 undertaken to try to understand Google's benefit
15 from engaging in this activity, I've applied a
16 number of what I would call conservative assumptions
17 to -- to -- to conclude -- to reach the conclusions
18 that I've concluded.
19         So, for example, I looked at the
20 historical benefits that Google has derived or tried
21 to look at the incremental benefits that Google
22 derived from this misconduct, that the information
23 required to do that type of calculation was not
24 retained by Google and not provided in this case for
25 me to be able to do that type of incremental

Page 189

1 analysis.
2         So I looked at various results from
3 Google, financial results in different aspects of
4 their business.  I looked at the display advertising
5 portion of their business, which is where this
6 AdTech stack resides.  I looked at the components
7 that Google said in its interrogatory, I related to
8 its -- it's AdTech stack.
9         And I looked at the -- the results from
10 Google P&L related to those aspects of its business.
11 I looked at its overall business.  I looked -- I
12 analyzed those into the -- by looking at kind of a
13 portion of those to the 17 point of states.
14         I understood and did work to understand
15 how this -- this conduct is -- would not only create
16 direct benefits, but there would be a snowball
17 effect that would create indirect benefits
18 throughout Google's not just advertising stack,
19 AdTech stack, but throughout its entire
20 organization.
21         And so based on all of that analysis, I
22 feel -- and thinking about the future benefits to
23 Google, the snowball effect, the profitability of
24 Google, how important this part of the business is
25 to its overall success, looking at its success in

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1  this portion of the business, analyzing that on a --
2  or allocating that to a per state level, I've
3  concluded, based on that, that Google's benefit from
4  doing this is -- is -- is well above $7 billion.
5  And, therefore, I █████████████████
6  and determined that this is a reasonable lower end
7  range based on kind of deterrence theory, based on
8  my analysis, education, training, and experience.
9  And I concluded the same for the upper end.
10      Now, I don't think the data is sufficient
11  to -- to get so precise and granular that you can
12  pick within that range what is the appropriate
13  ████████████████████  but I believe
14  this is a reasonable, appropriate, reliable range,
15  given all of the information I've -- I've -- I've
16  received and all the analysis that I've done.
17     Q.   And so you concluded -- you personally
18  picked as the maximum penalty $21.81 billion?
19          Right?
20     A.   21.81 billion.  That's correct.
21     Q.   And then on the high side that was your
22  maximum.  Right?
23     A.   That's -- I said this is an appropriate
24  range.  I've also said that I believe the jury,
25  considering other facts, might find that there's a

Page 191

1  basis for going higher than that range.
2          But I -- and I've even tested whether
3  Google could pay a penalty higher than that range.
4  But based on my work, I thought that was a
5  reasonable, appropriate range, given the factors
6  that I've considered, based on the analysis and work
7  I've done.
8     Q.   And the low -- the minimum that you have
9  concluded is appropriate against Google is
10  7.2 million -- billion?
11     A.   I believe the exact number there was
12  7. -- let me just give it to you so we're --
13          (Pause.)
14          7.27.
15     Q.   Okay.  So that was the minimum that you
16  concluded was the appropriate deterrent penalty --
17  deterrence-based penalty, I should say.  Right?
18          MR. COLLIER:  Objection; form.
19     A.   Well, I believe my -- my work is -- has
20  multiple components here.  There's a -- there's a
21  penalty component to it, a punishment component to
22  it, but one that has to also deter Google and other
23  future violators from engaging in -- in misconduct.
24          And it's got to be one that Google, I
25  think, can -- I had to analyze the impact of -- of

Page 192

1  such a penalty on Google and its ability to pay, and
2  also consider other past violations and settlements
3  and other...
4     Q.   And the period of time that you're
5  calculating penalties for is ten years.  Right?
6     A.   Well, it varies for each misconduct.  So
7  I have in my report -- if we want to go -- let's
8  just go to the right page here.
9          If you look at Page 76 of my -- I believe
10  this is my initial report -- initial report, you
11  will see that I've -- the -- the -- the period of
12  time for each one of the misconducts.  So it varies
13  by misconduct.
14     Q.   But the inclusive -- total inclusive
15  period is ten years.  True?
16     A.   The total inclusive period starts
17  November 2020 -- November 20th, 2000 --
18  November 11th, excuse me, 2013, through the present,
19  at the time I issued these reports.
20     Q.   So '23?
21     A.   I issued it in '24.
22     Q.   '24.  Okay?
23     A.   I believe, yeah.
24     Q.   So through the end of '23?
25     A.   Through -- through the present, based on

Page 193

1  the information that I had available to me.
2     Q.   Okay.  A little over ten years?
3     A.   Yes.
4     Q.   Okay.
5          Now, would I find in your, the Jeffrey
6  Andrien's, view of double, say, all of Google's
7  AdTech-related profits, would that be unreasonably
8  low as a penalty, in your opinion?
9     A.   Double of -- you'd have to tell me what
10  that amount is.  Double of all of Google's AdTech
11  profits?
12     Q.   Yeah.
13     A.   You'd have to tell me what that amount is
14  and I can -- I can let you know.
15     Q.   All right.  Well, let me ask you, have
16  you calculated or attempted to calculate the profits
17  generated by the advertising technology division of
18  Google over that period of time?
19     A.   I've looked at various different
20  profitability.  So let me -- let me go find exactly
21  when he talked numbers here.
22          So if you look at -- some of these
23  calculations might be in my work papers and not
24  specifically in the report.
25     Q.   Do you have a Table 1 in your original

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1    report?
2        A.    What page is that?  I'm sure I have a
3    Table 1.  I just don't know what page.
4        Q.    Well, let's look at your rebuttal report.
5    It's Updated Table 1.  Yeah, it's toward the very
6    end of your rebuttal.  It's the appendix after your
7    materials that you relied upon.  Okay?
8        A.    The Updated Opening Report, Table 1, yes.
9        Q.    You have that before you.  And there, you
10   have the total display advertising operating profit
11   you've calculated for the ten-year period for the
12   Google display advertising division.  Do you see
13   that?
14       A.    That is not what this is, just so we're
15   clear.
16       Q.    Well, that's what it says it is at the
17   top?
18            MR. COLLIER:  Objection; form.
19       A.    What it says at the top is it's Google
20   display advertising revenue and profit for the
21   plaintiff states --
22       Q.    Okay?
23       A.    -- for the 17 states.  I want to make it
24   clear that it's not their total.
25       Q.    Right?

Page 195

1        A.    And -- and so that's a very big
2    distinction and I just want to clarify that.
3        Q.    Okay.  So -- but this is based upon --
4    this -- this is advertising revenue and profits
5    generated by the AdX division, if you will, of the
6    company that is the subject of this lawsuit.  Right?
7        A.    This is a -- a portion of the -- of the
8    display advertising revenue and profit that Google
9    has generated in that division.
10       Q.    Right.  And you've taken a portion of
11   those profits from that division and allocated them
12   to the states.  Right?  Over that period?
13       A.    I have done that over that period, but I
14   also, I believe, calculated -- to do that
15   calculation, I also calculated the total that
16   they've -- they've made in the U.S. and I believe
17   even internationally or globally.
18       Q.    Okay.
19       A.    I've done those calculations.
20            So this is -- this table just takes that
21   allocation down to the 17 plaintiff states.
22       Q.    Okay.  And so what you've calculated over
23   that ten-year period is that the total display
24   advertising revenue Google -- Google got that is
25   allocable to the 17 states ████████

Page 196

1    ████████████████████
2        A.    This would be the -- direct revenue
3    that's applicable that they've earned in this line
4    of business that's -- that's allocable to the 17
5    states based on my methodology.
6        Q.    Okay.  And you've also calculated that
7    Google's display advertising profit allocable to the
8    states during that same ten years is ████████
9    Right?
10       A.    That's the -- the amount that I've
11   allocated based on my methodology to the -- the 17
12   plaintiff states during this period of time from
13   their -- directly from their display advertising
14   revenue.  I don't want to confuse that with the
15   total benefit that Google has derived from the
16   misconduct at issue here.
17       Q.    So in penalizing, in your view, and
18   deterring future acts by Google, you felt it was
19   appropriate, I think you indicated, to have a
20   penalty assessed between 7.2 billion and 22 billion
21   or slightly less.  Right?
22       A.    I believe my penalty range is appropriate
23   that I've calculated and it also -- as I've
24   explained throughout my report, you have to consider
25   not just the direct benefits from the misconduct or

Page 197

1    the -- even just the historical direct benefits from
2    the misconduct.  You have to think of the fact that
3    Google has enhanced its market position in -- in
4    this -- in this -- in this -- with -- within the
5    AdTech business based on this misconduct.  The
6    misconduct has a snowball effect for Google in
7    that -- that -- that -- that builds upon itself and
8    makes -- has made them enhance their -- their
9    position in this market and it is -- and that market
10   and their position and enhanced position in this
11   market has had spillover effects on the rest of its
12   business.  And this will continue well into the
13   future.
14            So you have to consider all of the direct
15   and indirect benefits, all of the historical and
16   future benefits.  And -- and based on all the work
17   that I've done, I think that those would be well in
18   excess of $7 billion so I think I was quite
19   conservative at looking at the 7 billion as the
20   lower end.
21            And then if you look at the rest of my
22   analysis, I think there's a very strong basis for
23   concluding that the high range would be at least
24   what I calculated, the 21, almost 22 billion.
25            MR. GIBBS:  Objection; nonresponsive.

50 (Pages 194 - 197)



Page 198

1    Q.    Your $22 billion recommended penalty is
2    ████████████████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████    True?
5    A.    That is not true.
6    Q.    Allocable to the states.  That's true,
7    isn't it?
8    A.    Well --
9         MR. COLLIER:  Objection; form.
10   A.    And, again, I think it's very important
11   to put that into context.  So the context behind
12   that, that's -- that's -- that's critical to
13   understanding the penalty is to understand that this
14   would be the -- ████████████████████████████
     ████████████████████████████████████████
     ██████████████████████████████████
17        Now, the conduct at issue occurred in the
18   display advertising portion of their business, but
19   it will have benefits to Google that go well into
20   the future.  So the revenue they make in the future
21   is all going to be enhanced by this conduct.  The
22   revenue that they make in other areas of their
23   business and their profits that they make in other
24   areas of business is going to be enhanced by this.
25   And -- and there's information in the record that

Page 199

1    suggests that this portion of their business was
2    critical to Google's success as an overall
3    organization and its ability to become the fourth
4    largest company in the world.
5         So you have to put all of that into
6    perspective when you're analyzing the benefits that
7    Google received from the misconduct.  This is just
8    one -- one slice that helps to put this into
9    perspective.  And so I do believe that my penalty is
10   conservative and appropriate given the totality of
11   the information.  And this is one -- one piece of
12   that totality and it needs to be understood in
13   context.
14        MR. GIBBS:  Objection; nonresponsive.
15   Q.    The question is very simple.  Your
16   $22 billion recommended penalty is, in terms of the
17   dollar amount, ████████████████████████████
     ████████████████████████████████████████
20   ████████████████████████    True?
     MR. COLLIER:  Objection; form.
21   A.    Well, incorporating my previous answer,
22   ████████████████████████████████████████
     ████████████████████, and you have to consider the
24   context when looking at the -- the penalty. ████

Page 200

1    ████████████████████████████████████████
     ████████████
3         So I think it's very important to
4    understand the context.  I've explained what that
5    context is, that this revenue is just a small
6    component of the benefit that Google has -- is going
7    to have achieved as a result of its misconduct.
8    They are going to achieve benefits that -- that --
9    that filter through the entire organization so not
10   just this division.  So you have to look at their
11   success as a corporation historically throughout the
12   organization, not just this division, which I've
13   done.  You have to look at Google's future success,
14   where they are in the market now, how they've grown
15   as a company, and how important this portion of the
16   business has been to that growth.  And -- and you
17   have to understand how they're poised to -- to
18   benefit from the misconduct going forward.
19        So it -- it -- you have to look at it
20   within the context of all of that to make -- and
21   understand the penalty range and -- and understand
22   why it is conservative and appropriate.
23        MR. GIBBS:  Objection; nonresponsive.
24   Q.    ████████████████████████████████
     ████████████████████████████████

Page 201

1    ████████████████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████
4         MR. COLLIER:  Objection; form.
5    A.    Well, A, I disagree with that.
6         And, B, I'm going to give a complete
7    answer as I have done the last two times because I
8    think it's important.  I'm under oath.  I want -- I
9    don't want to -- to have an answer out of context so
10   I'm going to put this into context as I have twice
11   already and will continue to do every time you ask
12   me, that this has to be considered in context.
13        Now -- now, the -- my -- my penalty range
14   ████████████████  and -- and this number has to
15   be put into context with -- with the -- the benefit
16   that Google has -- has achieved from the misconducts
17   at issue in this case that permeate its entire
18   organization and the future benefits.  So when
19   you're looking at this, ████████████████████
     ████████████████████████████████████████
22   that Google is going to benefit well beyond this
23   area of the business and well beyond the historical
24   viewpoint that this represents.  So I think it's --
25        MR. GIBBS:  Objection; nonresponsive.

51 (Pages 198 - 201)

CONFIDENTIAL



Page 202

1    MR. COLLIER: Well, I don't think he
2    was done.
3    A.    Very important to keep --
4        MR. GIBBS: It's hard to tell.
5        MR. COLLIER: Counsel, I'm going to
6    object to the side colloquy.
7        THE WITNESS: It's going to -- I'm
8    sorry.
9        MR. COLLIER: Please -- please
10   continue. If you need to see the transcript for
11   where you were in the answer, we can do that or you
12   can continue.
13   A.    I was just going to say that I think
14   it's -- it's not appropriate to answer that question
15   without the context. So I'm going to continue to
16   put the context in.
17   Q.    And I'm going to object to your -- what
18   you call context as nonresponsive.
19        Now, sir, you have also indicated you
20   calculated here ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████. Right, sir?
24   A.    ███████████████████████████████████
████████████████████████████████████

Page 203

1    ███████████████████████████████████████████
████████████████████████████████████
3    Q.    All right, sir.
4    A.    -- from the time period in 2013 to 2023.
5    Q.    So your upper maximum recommended penalty
6    of $22 billion ████████████████████████████████
███████████████████████████████████████████████
9    A.    Again, I'm going to answer the way I have
10   at every -- every time you've asked me these types
11   of questions. It's very important to put this into
12   context.
13        The display advertising profit is just a
14   small look at the overall benefit that Google has --
15   has made from this misconduct and will make in the
16   future from this misconduct. It's limited to just
17   the -- the area of this business in which the AdTech
18   stack resides. It doesn't consider the -- the
19   snowball effect that this conduct has had on
20   Google's business. It doesn't -- ████████████████
███████████████████████████████████████████████
██████████████████████████████████
23        And so the benefit based on my -- to
24   Google based on my analysis ███████████████████████
██████████████. And if you look at the rest of

Page 204

1    my analysis and you look at what it takes to deter,
2    it would have to be a multiple of the overall
3    benefit or greater than the overall benefit and,
4    therefore, if you put in -- this into perspective
5    with the rest of my analysis, I -- I think it's very
6    reasonable and easy to conclude that this is a
7    conservative range that I've put forth and -- and a
8    correct conservative range.
9    Q.    Putting aside --
10        MR. GIBBS: Nonresponsive objection.
11   Q.    Putting aside your response there, the --
12   the maximum amount of your $20-billion-plus penalty
13   ████████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████?
17        MR. COLLIER: Objection; form.
18        You can answer.
19   A.    And -- and I'm going to answer the same
20   way. ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████████

Page 205

1    ██████████████████████████. And as I've
2    explained before, it is reasonable for them to
3    differ because the benefit to Google goes well
4    beyond this amount. It goes well beyond it because
5    the benefit from this conduct has a snowball effect
6    on -- on their business. And it's going to create
7    huge opportunities and advantages for Google moving
8    forward it's enhanced their position in the
9    marketplace, it has had benefits throughout their
10   organization both historically and will continue to
11   have benefits to Google into the future.
12        And when we look at the overall benefit
13   amount to Google, given those concepts and how
14   important this -- this portion of the business has
15   been to Google's overall success, I mean, that's the
16   appropriate lens to look at my analysis. And when
17   you do that, the only conclusion you could reach in
18   my opinion is that -- that range is conservative,
19   appropriate, and -- and reliable.
20        MR. GIBBS: Objection; nonresponsive.
21   Q.    Let's take your limitation. ██████████████
████████████████████████████████████████████████
██████████████. True?
25        MR. COLLIER: Objection; form.

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1    A.   I'm going to keep giving the same answer,
2  sir.
3    Q.   Okay.  You will not -- you will refuse to
4  answer the question whether or not --
5        MR. COLLIER:  No no, no, no, Mr. Gibbs
6  you cut him off again it's been about the tenth
7  time.  Now, when he says I'm going to give you my
8  same answer and you say you will not, you are in
9  violation of the code of conduct in the eastern
10  district.  So you either withdraw your question or
11  you let him fully answer it.  Your call.
12    Q.   Answer the question, please, sir.
13        MR. COLLIER:  Do you remember the
14  question, sir?
15        THE WITNESS:  Would you please read
16  it back to me?
17    Q.   I'll restate the question.
18    A.   Okay.
19  ████████████████████████████████
   ████ ████████████████████████████████
   ████ ████████████████████████████████
   ████ ██████████████████████    True or false?
24        MR. COLLIER:  Objection; form.
25        You may answer.

Page 207

1    A.   Okay.  And I'm going to say while it
2  sounds like your math is not correct, I haven't done
3  that math.  But if you're going to do it, you have
4  to understand it in the -- context of what this
5  represents and what my penalty represents.  And I'm
6  going to go through that very specifically again.
7  That this just represents a portion of the -- of the
8  a small portion of the benefit that Google has
9  derived from its misconduct in this case.  And
10  when -- when we're thinking about a penalty that
11  serves as not only an appropriate penalty for the
12  violation but one that -- that is sufficient enough
13  to deter Google and other -- and others from -- from
14  committing future violations, one has to understand
15  the overall benefit that Google has earned or -- or
16  put that into context.  And the overall benefit is
17  much, much greater than this because this conduct
18  has a snowball effect and it -- it is such that
19  Google has enhanced its position in the AdTech
20  arena.  It's going to earn benefits -- significant
21  benefits for Google into the future, so as long as
22  Google exists as a company.  Which when we do
23  valuations in businesses, we assume is into
24  perpetuity.  So it's going to add benefits to Google
25  for as long as Google is around and -- and -- and we

Page 208

1  have to consider those benefits.
2        And so we have to put this into
3  perspective.  And it's not just going to have
4  benefits within the display advertising portion of
5  their business.  It's going to -- it has and will
6  continue to benefit Google in other areas of their
7  business.  And so you have to put that lens on -- on
8  this analysis when you're looking at the penalty
9  range.  So this -- this -- looking at this number
10  and comparing it to the range.  A, I think it's just
11  an inappropriate math to do because it's not -- it
12  doesn't consider all those other facts.  But, B, I
13  think it's really important to keep it -- if you do
14  it, to keep it in the proper context.
15        MR. GIBBS:  Objection; nonresponsive.
16  ████████████████████████████████
   ████ ████████████████████████████████
18  ████████████████████████████    I
19  think from a mathematical perspective, that's --
20  that's directionally right.  I don't -- I haven't
21  done the math.  ████████████████████████
   ████ ████████████████████████████████
   ████ ████████████████████████████████
   ████ ████████████████████████████████
25  it's important and appropriate to put it in the

Page 209

1  correct context.
2        And so I think if you're going to make
3  that comparison and -- and -- and put out what the
4  number is, it's important to do it in context and
5  I've given that context over and over again.  And
6  I'm gonna do it another time to say that this is
7  just a small portion of the benefits that Google has
8  made from its misconduct.  You have to consider the
9  future benefits, the benefits throughout its entire
10  organization, the snowball effect that this conduct
11  has on Google, and if you're looking for a penalty
12  range that deters Google from future violations, you
13  have to consider all of those benefits.  And this is
14  just one slice of that benefit that I've calculated.
15  So it's not appropriate to make the comparison that
16  you're making.
17        MR. GIBBS:  Objection; nonresponsive.
18    Q.   Is it your opinion that 100 percent of
19  these profits that you've calculated from the
20  advertising -- display advertising division were
21  produced by Google's alleged misconduct under the
22  DTPA?
23        MR. COLLIER:  Objection; form.
24    A.   That is not my opinion.  Because as I've
25  stated in my report, ████████████████

53 (Pages 206 - 209)



**Page 210**

1 ████████████████████████

2 ████████████████

3 ██████████████

4 ████████████████████████

5 ████████████████████████

6 ████████████████████

7 ████████████████████████████

8 ███████████████████████

9 █████

13 ██████████████ So I have to look at the

15 benefit to Google based on various financial

16 information that's available to me. This is one

17 aspect of that.

18     Q.   ██████████████████████

    ███████████████████████████

    ███████████████████ Right?

22     A.   And I -- as I understand these -- I have

23 calculated these numbers. I understand that this

24 relates to the portion of -- of Google's business

25 that the AdTech stack and -- and those components.

**Page 211**

1 And I understand based on my work in this case and

2 others that I have relied upon, that that ecosystem

3 has been deceptive as a result of this conduct. And

4 therefore I think it's appropriate to look at these

5 numbers and -- and understand them but understand

6 them in context to -- to my assignment in this case.

7     MR. GIBBS: Objection; nonresponsive.

8     Q.   Can you tell us what percentage in your

9 opinion of these profits, if it's less than

10 100 percent, were attributable to the misconduct

11 under the DTPA? Can you tell us?

12     MR. COLLIER: Objection; form.

13     A.   ██████████████████

    ██████████████████████████████

    ████████████████ And therefore I have to use other

17 information, other financial information to

18 understand it. ████████████████████

    ████████████████████████████████

    ██████████████████████████████.

23     Q.   Using your --

24     A.   Hang on. I'm not done. I'm sorry.

25     And -- and so I think this is a good

**Page 212**

1 proxy for the -- ████████████████

2 ████████████████ -- which was deceptive

3 by -- by nature because of the conduct. And

4 therefore I think this is a good proxy to consider

5 in relation to all the other information I've

6 considered to -- to help understand how Google is

7 benefitting and -- and the scope and scale of the

8 benefits from the -- this misconduct --

9     MR. GIBBS: Objection; nonresponsive.

10     A.   -- and -- and hold on. I'm almost done. And

11 so when you put that into perspective with the rest

12 of the information I've considered, I think you --

13 you will -- one should conclude that my range is

14 appropriate, reasonable, reliable.

15     MR. GIBBS: Objection; nonresponsive.

16     Q.   ████████████████████████

    ██████████████████████████

    █████████████████████████████

20     MR. COLLIER: Objection; form.

21     A.   I'm going to answer the same way I just

22 answered. I think it's the question you just asked.

23 So I'm just going to answer the same way.

24     And that is because ████████████████

    █████████████████████████

**Page 213**

1 ███████████████████████████

2 █████████████████████████ I

3 couldn't do an analysis to calculate that

4 incremental benefit. So I had to look at other

5 financial information to determine the benefit that

6 Google or the scope and scale of the benefit to

7 Google. And so I have. And -- and so when I looked

8 at Google's financial statements and profit-and-loss

9 statements, I have tried to isolate the behavior --

10 or -- or the -- the profitability to the portion of

11 the business where the behavior occurs.

12     And it's my understanding based on my

13 review and analysis of this work, as well as on the

14 testimony from other experts in this case, that in

15 this area of the business and the profit that I've

16 calculated here relate to the portion of the

17 business that has been -- that has been -- that this

18 has been earned as a result of that -- that

19 deceptive conduct. That -- that whole area of the

20 business has been deceptive. That ecosystem is

21 deceptive.

22     But you have to take that into context of

23 all the other analysis I've done, the -- the

24 assignment I've been asked to do, and put it into

25 the appropriate context. And if you do I think it's

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1  very clear that my range is appropriate, reliable,
2  and conservative.
3          MR. GIBBS:  Objection; nonresponsive.
4      Q.  Is it your opinion that but for the
5  challenged conduct █████████████████████████
6  ██ ████████████████████████████████████████
7  ██ ███████████████████████████
8          MR. COLLIER:  Objection; form.
9      A.  That is not my -- that is not my opinion.
10 That's not what I put in my report.  What I'm saying
11 is when I'm looking at the -- trying to isolate the
12 incremental benefit that Google has made from its
13 misconduct in this case, I looked to certain data
14 and information.  █████████████████████████
15 ██ ████████████████████████████████████████
16 ██              And so now I have to look
17 at other information to -- to put the -- put the
18 benefits from this conduct into perspective.  And --
19 and so I've looked at their -- their financials.
20 I've looked at where in their financials this area
21 of the business relates.  I've tried to limit in
22 that -- within that area of business to the areas
23 that contain this misconduct.
24         And then I -- I've looked through my own
25 work and work of others to determine that this area

Page 215

1  of the business where the conduct has occurred has
2  been -- is a deceptive area of Google's business
3  because of that conduct.
4          So all the -- the profits they've earned
5  into this business have been earned during this time
6  involved that deception.  And -- and I know that the
7  deception has provided benefits to Google well
8  beyond this area of their business.  I know that --
9  the -- the area allocated -- the profits allocated
10 to the states have provided -- the conduct allocated
11 to the states has provided benefits well beyond the
12 states, well beyond display advertising, well beyond
13 historical look into the future.
14         And one must consider all of those
15 different aspects when -- when calculating an
16 appropriate penalty that's going to serve as an
17 appropriate penalty, plus deter Google and others
18 from future violations.
19         MR. GIBBS:  Objection; nonresponsive.
20     Q.  So as between 100 percent and zero
21 percent, tell us, if you can, what percent of
22 profits are not attributable, if any, in your
23 opinion, to the misconduct?
24     A.  Yeah, so --
25         MR. COLLIER:  Objection; form.

Page 216

1          THE WITNESS:  I'm sorry.
2          MR. COLLIER:  Go ahead.
3      A.  Yeah.  So --
4          (Discussion off the written record.)
5      A.  I'm going to have the same answer to that
6  question as the previous questions.
7          And that is █████████████████████████
8  ███████████████████████████████████████████████
9  ███████████████████████████████████████████████
10 ███████████████████████████████████████████
11 ███████████████████████████████████████████████
12 ███████████████████████████████████████████████
13 ███████████████████████████████████████████████
14 ███████████████████████████████████████████████
15 ██.
15         So I am not able to determine the
16 incremental benefit, and therefore I have to look at
17 other information and try to understand what might
18 be a good proxy for that benefit.
19         And so this is one of the looks I've
20 taken, where I've tried to take Google's financials,
21 I try to look at where this part of the business is.
22 Then I try to limit even those financials to just
23 the -- the part of the business that engaged in this
24 conduct during the time.
25         I understand that that whole part of the

Page 217

1  business and that ecosystem is deceptive by nature
2  because of the conduct.  So I think this represents
3  a good proxy for the benefits that Google derives
4  historically, the direct benefits, from this
5  misconduct.
6          But one has to understand that the
7  benefits extend well beyond this -- this narrow look
8  at Google's financials.  It -- it extends into --
9  there's a snowball effect from this misconduct that
10 has created an enhanced market position for Google,
11 not just in the AdTech stack, but throughout its
12 organization.  And it will have benefits well into
13 the future, and -- and all of those benefits have to
14 be considered.
15         And when one considers all those, I think
16 you put it into the light of my range, and my range
17 is reliable, it's -- it's conservative, and it's
18 appropriate.
19         MR. GIBBS:  Objection; nonresponsive.
20     Q.  Under your methodology I think you've
21 indicated that if you took the maximum penalty under
22 the state statutes, DTPA statutes for Google's
23 alleged misconduct and multiplied them times the
24 number of transactions as you have calculated under
25 your methodology, that that maximum dollar penalty

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

1    that you would assess Google would be ██████
2    ██ ████████████ . Right?
3         A.   That was a long question and that --
4    there's something I wanted to clarify.
5         Would you please restate that?
6    Q.   Yes, sir.
7         Under your methodology the maximum
8    penalty for Google's alleged misconduct, if you use
9    the maximums under the state law, it would be ████
10   ██ ████████████ . True?
11        A.   What I wanted to clarify is that one of
12   the statutes, I believe, doesn't have a maximum
13   penalty.  It's unlimited.  I think it's Utah, if I
14   remember correctly.  It doesn't have a maximum.
15        And so I have assumed that the maximum
16   for Utah was $1,000, which -- which I believe is --
17   is on the lower end of the maximums for the other
18   states.
19        So based on that assumption about Utah,
20   I've quantified -- if you take my -- my violation
21   count and multiplied it times the -- the -- the
22   maximum of each state's, based on the allocation
23   methodology that I used, you would have ██████████
24   ██ ████████████ .
25        Q.   Have you ever calculated or read a

Page 219

1    calculation of a civil penalty which included a
2    potential maximum penalty calculation totaling
3    ████████ .
4         A.   I think the scope and scale of this case
5    is at a level that is probably unprecedented in
6    history, if you think about the number of violations
7    ████████ .  I -- I -- I can't -- I
8    don't know of another case, as I sit here, that
9    would come close to the scope and scale of this one,
10   in terms of the number of violations, and I was
11   showing the relationship.
12        As we said, the slope of that line that
13   we discussed earlier in my testimony today.  And so
14   I'm showing that, look, if we -- if the juror was
15   going to apply the maximum, that's what the number
16   would be.  And that number is such a large number
17   that it would be -- Google wouldn't exist anymore as
18   a company.
19        It's just not even -- I think it's just
20   so far out and so high that I knew the penalty
21   couldn't be the maximum.  So that's when I said --
22   all right.  I started to look at, well, what if it's
23   ████████████████████████
24   ██ ████████████████████████
25   ██ ████████████████████████ I

Page 220

1    looked at different -- ████████████████████
2    ██ ████████████████████████
3    ██ ████████████████████
4         I looked at -- I looked at different
5    ranges to -- to see where would we get to a level of
6    penalty, given my other areas of -- of focus that I
7    was asked to consider, that would -- that would meet
8    that obligation in a kind of holistic look at those
9    factors.
10        MR. GIBBS:  Objection; nonresponsive.
11   Q.   My question was in your experience have
12   either you or any other expert ever included a -- as
13   part of their methodology a potential maximum
14   penalty calculation of ████████████████
15        A.   I can't answer what other experts have
16   done and what they've concluded.  This is the -- for
17   me, I have not looked at anything to this scale and
18   scope that would get to that size, but this scale
19   and scope gets to that size.
20        And so in my work I had to determine what
21   that was, because that's an important part of my
22   analysis.  And the slope of the line from zero
23   violations to zero dollars to ████████████████
24   ██ ████████████████████████ , that
25   slope is an important slope in -- in my work because

Page 221

1    that's what enables the juror to -- if they go below
2    the violation count that would get off a straight
3    line that we talked about in Figure 2 of my rebuttal
4    report, that would -- that would be what would
5    enable them to calculate, you know, a different
6    total penalty, given the total violations.
7         MR. GIBBS:  Objection; nonresponsive.
8    Q.   Have you yourself ever included in any
9    methodology regarding calculation of penalties or
10   have you read any other expert's methodology in
11   which they have included an upper maximum penalty of
12   ████████ ?
13        MR. COLLIER:  I'm going to object;
14   form.  And to the extent he's asking about reading
15   any other expert's methodology, to the extent other
16   experts have testified in cases where you're
17   governed by another judge's protective order, I
18   encourage you not to violate that protective order.
19        THE WITNESS:  Okay.
20        MR. COLLIER:  That said, I believe
21   you can answer the question, but I wanted to remind
22   you he's now asking about testimony under other
23   cases in other protective orders.
24        A.   Okay.  As I -- as I sit here, I -- I
25   don't know what all experts have done in all their

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

1  cases.  The cases that I've been involved in, I
2  don't believe any of them have reached the scope and
3  scale that this one has that would -- that would --
4  if one was calculating the number of violations
5  times the maximum benefit would get to the
6  ███████████████████████████████████
7          But this case has the scope and scale
8  that is so far beyond anything I've ever seen that
9  the number of violations are ████████████████ .
10         When you -- when you think about what the
11 maximum possible penalty would be, given the
12 statutes, that's the number you get to.  So it's not
13 one that I'm putting forth as an opinion.  That's
14 just a fact.
15         If you take the number of violations and
16 multiply it times the total penalty -- the maximum
17 penalty for the allowable under the statutes, that's
18 the number you get.
19         And so I think that's an important number
20 to keep in perspective and -- and it's important to
21 my work in this case, but it's not the number that
22 I'm suggesting is an appropriate penalty.
23         MR. GIBBS:  Objection; nonresponsive.
24    Q.   Have you defined the term "deterrence"
25 that applies to your objective here in setting the

Page 223

1  penalty in this case?
2     A.   I believe I discussed that in my rebuttal
3  report.  So let me pull that up.
4     Q.   Well, can you tell us, as you sit here,
5  how you understand "deterrence" as you used it here
6  in your factor?
7     A.   I prefer to refer exactly to my report
8  because I define it specifically in my report.  And
9  I want to make sure I'm -- I'm under oath.  I want
10 to give the right answer, so I want to -- I want to
11 read it from my report.  So if you just give me a
12 minute, I will tell you where that is and we can
13 take it from there.
14         (Pause.)
15    Q.   We're going to have to start going off
16 the record if you're going to do this, sir.
17         MR. COLLIER:  You can go off the
18 record any time you want.  You're not going to give
19 him homework off the record.
20         MR. GIBBS:  Well, he can do whatever
21 he wants.
22         MR. COLLIER:  It's fine.  Go off the
23 record if you want.
24         THE WITNESS:  Are we going off the
25 record?

Page 224

1          MR. COLLIER:  It's up to Mr. Gibbs.
2  He's threatened it, so go ahead and do it if you
3  want.
4          MR. GIBBS:  Well, look, we're --
5          THE WITNESS:  I'll go to the restroom
6  again.
7          MR. COLLIER:  Well, I don't -- do you
8  need to go to the restroom?
9          THE WITNESS:  No.
10         MR. COLLIER:  Okay.  Mr. Gibbs, do
11 you want to go off the record or do you want him to
12 answer your question?
13         MR. GIBBS:  Just put it on the
14 record.  She can calculate how long he is taking to
15 tie his answer to the -- to the -- text of the
16 report.
17         MR. COLLIER:  She can do that, you
18 can do that.
19    Q.   The question on the table, sir, is how do
20 you define deterrence in your evaluation of these
21 penalties?  Can you answer that question?
22    A.   I understand the question and I'm -- just
23 wanted to look at my report and -- and read it to
24 you such that we can -- we can then use the words in
25 the report.  I will tell you, if you want, generally

Page 225

1  I -- I mentioned in my report how -- if you're going
2  to deter an offender from engaging in misconduct,
3  that misconduct at a minimum cannot be beneficial --
4  cannot be profitable.  And so you'd have to have a
5  fine that's large enough for it to not be
6  profitable.  And you would also have to consider
7  then if it's not going to be profitable, that it has
8  to be more than their -- than their -- more than
9  just disgorging that profit because you have to take
10 into consideration the probability that the conduct
11 would be detected, litigated, and taken to a
12 judgment.  And so I've talked about that in my
13 report.  I'm trying to find exactly where so --
14 so --
15    Q.   Under your understanding and intent with
16 respect to deterrence, is the objective to
17 completely deter a repeating of that conduct in the
18 future?
19         MR. COLLIER:  Objection; form.
20    A.   My understanding is that if you're going
21 to deter future conduct, you don't want to make that
22 conduct beneficial and I've cited other -- other --
23 I've -- I've cited information in my opening and
24 my -- and my rebuttal report that supports that
25 understanding, that -- that position.

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1    And so if the -- if the conduct is
2  beneficial to the offender, then there's going to be
3  an economic incentive to continue to engage in the
4  misconduct even if they've been penalized in it
5  because the penalty -- if the penalty doesn't
6  sufficiently -- sufficiently penalize them and make
7  it not beneficial. So the penalty has to make it
8  not beneficial for it to serve as a -- as a
9  deterrent. Otherwise, the rational economic actor
10 would continue to engage in the penalty as long as
11 it's beneficial.
12    Q.   Under your understanding and -- and
13 definition, do you -- is the goal to eliminate any
14 benefit to the offender?
15         MR. COLLIER: Objection; form.
16    A.   Under my understanding, if you're going
17 to deter behavior, you cannot allow the behavior to
18 be profitable to the offender because that wouldn't
19 deter. Corporations are economic animals. They
20 pursue and finance, today we call it net present
21 value positive projects. They're going to pursue
22 projects that add value to the firm. If it -- if it
23 adds value in the firm to engage in misconduct,
24 they're going to pursue that, because that's their
25 job is to add value to the firm.

Page 227

1    If -- if you're going to penalize and
2  dissuade a firm and -- and deter that conduct, it --
3  it can't be profitable for them to engage in because
4  if it is, then there's an incentive to continue to
5  do it. You haven't effectively deterred the
6  behavior.
7    Q.   To effectively deter the behavior, in
8  your opinion, you have to eliminate any benefit?
9         MR. COLLIER: Objection; form.
10    Q.   To the offender.
11    A.   I believe economic theory says that you
12 would have to do more than that. And I believe
13 that's -- and, again, I have an area in my opening
14 report so I can point you to it. Just give me a
15 moment and I'll point you to it.
16    There's so much volume in these reports,
17 it's hard for me to remember exactly where it is.
18         MR. GIBBS: While you're looking for
19 that, let's go off the record.
20         MR. COLLIER: Okay.
21         THE VIDEOGRAPHER: Going off the
22 record. The time is 3:28.
23         (Break.)
24         THE VIDEOGRAPHER: Back on the
25 record. The time is 3:46.                0

Page 228

1    Q.   Mr. Andrien, one of the things you
2  purport to do in your methodology is to allocate
3  revenue and profit to individual states. Am I
4  correct in that?
5    A.   I do make allocations to individual
6  states, yes.
7    Q.   Why are you -- why are you doing that as
8  part of your civil penalty recommendation here?
9         MR. COLLIER: Objection; form.
10    A.   I am looking at Google's financials in a
11 variety of different ways, and I think all of which
12 are instrumental and -- and instructive and
13 informative into reaching my ultimate conclusion.
14    Q.   Well, what does the allocation of revenue
15 and profit to Texas versus Florida have to do with
16 your calculation of the penalty? How do they
17 relate?
18    A.   Well, for example, when I looked at
19 the -- the █████████████████████
20 ██ ████████, it was based on the maximum penalty of each
21 state so it was important to allocate violations to
22 each state to be able to do that calculation.
23    Q.   Did you actually calculate a penalty
24 amount for each of the 17 states?
25    A.   While I have not calculated a penalty

Page 229

1  amount for each of the 17 states individually, I
2  have provided the basis for a juror to do that. I
3  provided them the information and the -- I think
4  the -- to do that is -- is simple math based on --
5  on what I've done.
6    Q.   So did you lay out in your report an
7  explanation for how you -- your methodology of
8  calculating or allocating revenue and profit to the
9  states, how that relates to or is a measure for
10 determining each states' separate penalty?
11         MR. COLLIER: Objection; form.
12    A.   Would you please restate that question?
13 I -- I got confused as you were saying it.
14         MR. GIBBS: Read that question,
15 please.
16         (The requested material was read.)
17         MR. COLLIER: And I had an objection;
18 form.
19         Go ahead.
20    A.   So in my report, the allocation of
21 revenue and profit and -- to the various states is
22 to help me understand how -- how I can look at
23 global financials and see what they look like for
24 the 17 plaintiff states. It is not to -- it is not
25 to assign a penalty per individual state based on

58 (Pages 226 - 229)

Page 230

1  the allocation of profits.
2        But I've provided a -- a basis and
3  under- -- and an understanding that my penalty range
4  is -- is calculated based on all the different
5  analyses I've done and that penalty range is
6  instructive to states because we can look at the
7  number of violations per state.  And given the
8  number of violations -- and, quite frankly, ███
█████ ██████████████████████████████████████████
9
10  ██  ██  -- you're going to end up in my penalty range.
11        So I believe I've given the juror the --
12  the capability of looking at my work, my penalty
13  range, and applying it.  So if one -- if only one
14  out of the 17 plaintiff states -- I don't know the
15  correct term for saying this.  Google is found
16  liable for violating the statutes in one out of the
17  17 states and the other -- the other 16 they're not
18  found liable for, I've provided the -- the -- the
19  foundation basis and analyses for which a juror
20  could look at my work and -- and determine if the
21  violation counts are sufficient to be within my
22  range, then my range would apply.  If it's below
23  that -- which I don't see how it could be below
24  that.  But if it's below that, I've given them
25  the -- the basis for calculating the -- the profit

Page 231

1  per state based on the number of violation -- I mean
2  the penalty per state based on the number of
3  violations.
4     Q.  So have you calculated, as we sit here,
5  and included in your report a separate proposed
6  penalty for each of the states?
7        MR. COLLIER:  Objection; form.
8     A.  Based on my calculation of the -- the --
9  the number of violations in each state, there was no
10  need to calculate a separate number because in each
11  state, the violations would be sufficiently numerous
12  where -- where either independently or in an
13  aggregate, you would get to my -- you would get to
14  my range as I've described on -- on -- as we
15  discussed Figure 2 in my rebuttal report, how that
16  works.
17     Q.  So the answer is you have not calculated
18  a separate penalty amount that you're recommending
19  for each and every one of the states?
20        MR. COLLIER:  Object --
21     Q.  That's true, isn't it?
22        MR. COLLIER:  Objection; form.
23     A.  I don't believe that's true.  What I've
24  done is I've calculated the violation count for each
25  state.  I've shown that each state has sufficient

Page 232

1  violations to be within my range.  So to -- to that
2  extent, I have calculated a specific number because
3  my range is in play on either any individual state
4  or any two states or any permutation and combination
5  of states are found liable for violating their
6  statutes, then we're going to have a violation count
7  sufficient to end up in my penalty range.  And so
8  based on that, I believe I have calculated an
9  appropriate number to assist the jurors.
10        Moreover, if the juror ends up with a
11  violation count ███████████████████████████
████████████, I've given them the -- the -- the
12
13  information to be able to quantify exactly what that
14  penalty should be if we get below that.  But I
15  haven't seen any basis for any state, individually
16  or in aggregate or any permutation or combination of
17  states, that would get a violation count that low.
18        So I believe I have calculated the
19  number.  If -- if they come up with something
20  different, I've given them the basis for doing their
21  own calculation.
22     Q.  You calculated one range, 7.2 billion up
23  to 22 billion, that you're recommending, not 17
24  different ranges.  True?
25        MR. COLLIER:  Objection; form.

Page 233

1     A.  I have calculated a range that serves as
2  an appropriate penalty as well as an appropriate
3  deterrent to Google and others to deter Google and
4  others from future misconduct and -- and to -- to
5  meet those -- to achieve those qualifications,
6  and -- and then also one that Google can afford to
7  pay, one that wasn't going to bankrupt Google.  And
8  given those three qualifications, I've come up with
9  a range and it turns out that given the number of
10  violations, that that range is applicable, whether
11  it's one state, two states, 13, 17, any permutation
12  combination.  So I have quantified the range for
13  each individual.  They just all fall into the same
14  range.
15     Q.  So one-size-fits-all under your theory in
16  terms of the range that would be allocable to any of
17  the states.  Would that be correct?
18        MR. COLLIER:  Objection; form.
19     A.  I would not use that language.  What --
20  what I would say is that the number of violations --
21  the scope and scale of the number of violations in
22  this case are so large that you're in the -- ███
███████████████████████████████████████████████
23
████████████████████████████████████████████
24
██████████████  And I've looked at each by state and
25

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1  by -- by conduct ███████
█  ████████████████████████
█  ████████████

4        And given that -- given the scope and
5  scale of this, if you're going to penalized Google
6  for the misconduct to punish them for it and provide
7  a -- a penalty amount that would deter Google from
8  future misconduct and one that they can pay, you're
9  going to end up in this range and it's going to be
10  based upon the number of violations.
11        So it's not a one-size-fits-all that I
12  just willy-nilly apply.  It is an appropriate range
13  that meets the criteria that I've been asked to
14  consider and the violation counts are so large that
15  any way you slice it, that you end up in that range.
16      Q.   What if Florida has a -- it turns out has
17  a ███████████████████████████████████.  How do
██  each of them -- how much -- how much of a -- of a
19  ████████
20  penalty have you calculated should go to each of
21  those individual states?
22      A.   So if they have in aggregate gone over as
23  you said ████████████████████,
24  the penalty range has to be within -- within
25  my -- excuse me -- within my range.  Because you are

Page 235

1  over -- you are on the part of the curve, the
2  flattened part of the curve that we discussed in my
3  rebuttal report from Figure 2, this part.  And so --
4  so we can look and see which portion of that is
5  going to apply to each state.  But the aggregate is
6  going to be within my range.  I've given the -- I've
7  given the -- the slope of the curve.  We know the
8  maximum penalty for each state.  It would be easy to
9  quantify what would be appropriate given numbers
10  that are below or numbers that are above.  So it's
11  just math at that point.
12      Q.   Well, supposing one of the states just
13  pulled out of this case and then and went and tried
14  to prove up its own under your theory, to prove up
15  its own number of violations.  Are you with me?
16      A.   I am.
17      Q.   And the jury finds in that case they only
18  get -- ███████████████████████
██  ███████████████.  How much money under your
20  methodology goes to them under --
21      A.   Yeah.
22      Q.   -- your penalty theory?
23      A.   As I was --
24        MR. COLLIER:  Hold on.  One second.
25        THE WITNESS:  Oh, I'm sorry.

Page 236

1        MR. COLLIER:  Objection; form.
2        Now you can answer.
3      A.   Yeah, as I've said you would look at this
4  straight line and the slope of that straight line
5  which I have given the information to calculate, and
6  you would just go this is the number of violations,
7  let's go up and see where it lands on this line, and
8  that will give us the total penalty amount.  It's
9  simple math at that point.  And so I have not
10  specifically calculated every single permutation
11  combination of violations and -- and penalties.  But
12  I've given the -- the information to be able to do
13  that.
14      Q.   You -- there is no statement in there
15  explaining how it is that each individual state gets
16  X-number of dollars under your methodology.  Would
17  you agree?
18        MR. COLLIER:  Objection; form.
19      A.   I -- I believe that I've sufficiently
20  described my methodology, how I've gotten to my
21  conclusion, the basis for them.  I'm here explaining
22  it to you today and so I am -- I am telling you,
23  now, that the -- the slope of that line is going to
24  be able to help one determine what the appropriate
25  penalty amount is if the counts are sufficiently low

Page 237

1  to get outside of my range.  But for the counts
2  to sufficiently -- there's no basis I've seen in the
3  record or from any other expert in this case that
4  would suggest we're even close in terms of violation
5  counts to get outside of my range.  So there's no --
6  there's no reasonable -- there's -- there's no
7  reason that I felt was worthy enough for me to do
8  individual calculations.  But the -- the ability to
9  do that math is there.
10      Q.   So there's no -- there's no way in the
11  way you have calculated the 22 billion maximum
12  penalty, is there some way that the -- the State of
13  Florida or Nevada can come in and say, well, we
14  don't get the full 22 billion, we get X.  How does
15  that work?
16        MR. COLLIER:  Objection; form.
17      A.   I don't understand the question as you've
18  asked it.  Would you please either rephrase it or
19  repeat it and see if I can --
20      Q.   Each one of the --
21      A.   -- understand it.
22      Q.   Excuse me.  Each one of these states is
23  suing under their own separate DTPA statute.  Right?
24      A.   That's my understanding.  I'm not a
25  lawyer, but I understand they each have -- each have

60 (Pages 234 - 237)

Page 238

1  individual statutes that are -- that are applicable
2  to those states, but they're -- they're -- they're
3  coordinating under one lawsuit.
4      Q.  And -- and one of -- and each of those
5  statutes as you understand it has multiple different
6  factors that sometimes overlap, many times don't
7  overlap with other states that are to be taken into
8  account in assessing that individual state's
9  penalties.  Right?
10     A.  I --
11         MR. COLLIER:  Objection; form.
12     A.  I have analyzed the factors that I have
13  been asked to consider which as an economist I
14  believe would be important to all of the states.  So
15  the factors that I've been asked to consider and
16  the -- the ranges that I have provided, the range
17  that I have provided I think is relevant to all of
18  the states.  And I think those factors that I
19  consider is relevant.
20         But as I've said that if -- if the jury
21  is asked to consider other factors, they might,
22  under their own purview, adjust the range or numbers
23  that I've come up with.
24     Q.  Well, they -- for example, you haven't
25  provided on an individual basis an analysis of some

Page 239

1  of the prime factors under other states that don't
2  fall within the three that you picked.  True?
3         MR. COLLIER:  Objection; form.
4      A.  I've -- I've analyzed under the scope of
5  work that I've been -- I've been assigned to
6  analyze, the three factors that I've analyzed, and
7  the appropriate penalty to Google -- to punish
8  Google for the alleged misconduct in this case,
9  based on those factors or considering those factors.
10  And that's -- that's -- I think those factors are
11  appropriate to consider for all states, as I've
12  said, and given the economic -- I can give the
13  economic rationale why it's appropriate.  And
14  therefore that's the work I've done.  And I think
15  that's instructive to the jury, it's helpful to the
16  jury, it's beneficial to them to have that baseline
17  to be able to apply to their analysis.  And if they
18  need to adjust it because they need to consider
19  other factors, that's within their purview to do.
20  I'm not telling them how to do that or what to do
21  about other factors.  I am -- I am telling them how
22  to interpret the information to assess the factors
23  that I've been asked to consider.
24     Q.  Right.  And so if somebody decided, well,
25  nice to hear about those three factors, but I'm in

Page 240

1  Nevada and I've got five other factors, and I -- I
2  think those deserve consideration, I think I ought
3  to base those -- my share or my penalties on those.
4  You have not provided under that circumstance an
5  analysis with money attached to it for that state,
6  have you?
7         MR. COLLIER:  Objection; form.
8      A.  I disagree with that conclusion.  I
9  provided them analysis for that state given the
10  factors that I've considered.  Now, if they want to
11  add different factors, that's within their purview
12  as the juror.  They might be asked to do that.  I
13  don't know.  I've been asked to consider -- the ones
14  that I've asked to consider and I provide
15  information to the jury that's applicable to each
16  state that they can use to help them come to a
17  conclusion on penalties.  Specifically as it relates
18  to those factors and as a baseline for whether or
19  not there should be an adjustment based on other
20  factors.
21     Q.  And based upon any of those other factors
22  other than the three that you have selected, if the
23  State of Nevada wanted to calculate based upon the
24  other factors there, they just have to start over
25  and make their own assessment.  Right, sir?

Page 241

1         MR. COLLIER:  Objection; form.
2      A.  I -- I -- I want to make sure I
3  understand your question properly.  If you're
4  suggesting that my factors wouldn't be relevant to a
5  state, I don't see a basis for that from an economic
6  perspective.  I think they're relevant to all the
7  states.  I think I've given rationale why in my
8  report.
9         But if you're tell me that the states
10  aren't going to consider the factors that I've
11  addressed and they're irrelevant to those states,
12  then they would consider other factors.  And if
13  they're not going to consider the factors that I've
14  considered, they would at least have a baseline for
15  what an appropriate penalty is given those factors.
16  And they could use that as a baseline for the
17  factors that they are considering.
18         So I still think it could be relevant
19  information.  But if you're telling me they've been
20  instructed to ignore that information, then I don't
21  know how to answer that question because --
22     Q.  I didn't suggest --
23     A.  -- it doesn't make sense.
24     Q.  -- anybody was instructing them one way
25  or another.  I said, suppose that they wanted to

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1  consider under their own state's factors how much of
2  a penalty to assess or that they were entitled to.
3  You don't -- you don't tell them how to assess those
4  under their state's separate penalties, do you?
5      A.  I am --
6          MR. COLLIER:  Object -- okay.
7  Objection; form.
8          Go ahead.
9      A.  I'm not following that question.  What
10  I -- what I think I've testified to and what I'll
11  say again is I think the fact -- first of all, I
12  think quantifying a penalty and making sure Google
13  is punished for its misconduct is an important thing
14  to do.  And in considering what that penalty should
15  be, considering the factors that I've considered, I
16  think there are important economic factors that --
17  that should apply to each of the states involved in
18  this case from an economic perspective.  I think
19  I've given the -- the trier of fact the ability
20  to -- to think about those for each and every state
21  independent of the others.  And if they want to
22  apply other factors to that, that's within their
23  purview.  And they have a basis now by which they
24  can apply those other factors.
25          So I think what I've done is informative,

Page 243

1  instructive, it's reliable, it is important to the
2  juror and it -- it relies on -- on analysis, on
3  training, experience, education, methodologies that
4  the average juror wouldn't be able to -- to get to
5  on their own.  So I do think it's important to have
6  that information available to them.
7      Q.  Does your allocation among the states as
8  part of your 7-plus billion to $22 billion range,
9  does it tell us how many DTPA violations in your
10  opinion occurred in each state?
11      A.  I can allocate to each state based on the
12  allocation.  And -- give me -- give me one second
13  here and I'll --
14          I have a -- a total number that's
15  allocable to the states.  And so I've done that math
16  and I believe it's in my work papers that I provided
17  in this case.  So you absolutely can look and see
18  the number of violations per state per -- per
19  temporal component for each of the -- each of the
20  different conducts.
21      Q.  You've got a total figure for those
22  states of how many DTPA violations occurred in each
23  state?
24      A.  I have -- would have to go look at the
25  work papers to answer that.  But the -- the -- the

Page 244

1  allocation to the states, so I've had to allocate
2  the total number of -- of auctions at issue to the
3  states.  And so I've used an allocation methodology
4  to do that.  I've described the methodology.  I've
5  labeled the percentages for each state.  And so if I
6  haven't totaled each state in this report, it's
7  simple math to do based on the allocation
8  percentages and the number of -- for each state and
9  the number of violations that I've counted in
10  aggregate.  So I -- I -- I believe that might exist
11  in my work papers.  If it doesn't the math is -- is
12  absolutely readily available to somebody.  And it's
13  just multiplying A times B at that point.
14      Q.  How many -- do you have an opinion or
15  offer an opinion as to how many DTPA violations
16  occurred in Texas?
17          MR. COLLIER:  Objection; form.
18      A.  I believe I've just answered that in my
19  work paper.  I have provided information to multiply
20  the A times the B that it would take to identify
21  Texas specifically.
22          So -- and I say in my report that I have
23  the flexibility -- my methodology has the
24  flexibility to look at any permutation and
25  combination of -- of states, of -- of -- of conduct

Page 245

1  that's at issue of contemp- -- of the time periods
2  at issue for any one of these.
3          So it's all there in simple math if -- if
4  something needs to be changed from -- from what I've
5  calculated.  It's all in the work papers.  It's all
6  described in the report.  It's very simple to
7  calculate that, if it's not already calculated in
8  the work papers, which I don't recall as I sit here.
9      Q.  Do you have data showing Google's display
10  advertising profit and loss within the United
11  States?
12      A.  I believe that's been calculated, again,
13  in the work papers because I used the total numbers.
14  ███████████████████████████████████████████████
15  ███████████████████████████████████████████
16      Q.  Okay.  So you estimated the total profit
17  and loss to Google's display advertising division
18  within the United States?
19  ████████████████████████████████████████████
20  █████████████████████████████████████████████████
21  ████████████████████████████████████████████████
22  ██████████████████████████████████████████████
23  ██████████████████████████████████████████████
24  ███████████████████████████████████████
25          And I did that based on a -- a -- an

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

1 allocation of Google's profitability between
2 globally and the United States that it does report
3 in its financials. And I used that method of
4 allocating the display advertising to the United
5 States, and then I describe in my report exactly how
6 I -- I take that answer and allocate to the
7 different states.
8    Q.   So did you begin with the global revenue
9 and profit P&Ls for Google?
10   A.   Well, I don't recall what I began with in
11 my -- in my analysis, but I've looked at Google's
12 financial statements which report global information
13 and report U.S. information, I believe.
14   Q.   Okay.
15   A.   I've looked at their P&Ls, which the P&Ls
16 that I've had I believe were on a global basis.
17   Q.   Does the -- did you use the global P&L
18 breakdown of their P&L -- global P&Ls for Google to
19 estimate the profit and loss in the United States?
20   A.   For their display advertising I used the
21 global information and estimated based on an
22 allocation methodology that I've explained was from
23 their financial statements, which does have
24 reporting information both domestically and -- and
25 globally.

Page 247

1       So I was able to use the relationship
2 between their -- their -- their financial statements
3 between domestic and global profit and apply that to
4 the P&L, the global P&L, to get the domestic.
5       Because the information available to me
6 that Google does -- either not retain or provide did
7 not give me P&Ls by the -- at the U.S. level. So I
8 needed to -- to -- and their financials that are at
9 the U.S. level don't have the sufficient detail that
10 those P&Ls did have for me to be able to determine
11 what the display advertising profitability and
12 revenues were.
13      So I needed to use a combination of the
14 financial information provided to me to reach
15 that -- that determination, that calculation.
16   Q.   Is the ratio between profit and loss the
17 same globally for Google as it is in the United
18 States?
19   A.   That question does not make sense to me.
20   Q.   The profit and loss that is reported in
21 their global financials, you have that information.
22      Right?
23   A.   Yes.
24   Q.   Did you use that information and
25 extrapolate from that in your methodology the profit

Page 248

1 and loss figures or ratios between the two for the
2 United States only, separated out?
3    A.   Maybe I wasn't clear though. So, I mean,
4 let me -- let me state this again in a way that
5 hopefully is more clear.
6       The -- the financial statements that
7 Google has -- has -- has put out into the world,
8 their annual financial statements, has financial
9 data on profitability for both globally and
10 domestically.
11      And so I can look at a specific ratio
12 between Google's U.S. results and their global
13 results. And I can understand what that ratio is.
14 It's -- it's -- it's reported, so it's not -- it's
15 not estimated, it's not -- it's not any sort of
16 guess of what that is. It is this is what they
17 report.
18 ████████████████████████████████
19 ████████████████████████████████████
20 ████████████████████████████████████████
21 ████████████████████████████████
22      And so I had to look at the global and --
23 and I had to figure out what is an appropriate way
24 to understand what that is in the United States and
25 therefore in the 17 states.

Page 249

1       And so what I did is I looked at those
2 global results. I applied that ratio between U.S.
3 and global results and their overall financials to
4 this, these P&Ls, to get an estimate of what the --
5 what the -- the U.S. P&Ls would -- would -- results
6 would be. And from that I have allocated to the 17
7 states.
8    Q.   The -- did you then estimate the display
9 advertising revenue and profit associated with the
10 plaintiff states?
11      MR. COLLIER:  Objection; form.
12   A.   I believe I've said that. Once I looked
13 at the global P&Ls and winnowed those to the area
14 that -- that I was focused in on, the display
15 advertising, then I -- I applied the ratio to get to
16 the U.S. results, and then I did a further
17 allocation of that information to get to the U.S. --
18 I mean, excuse me, to get to the individual --
19   Q.   States.
20   A.   -- states.
21   Q.   All right. And then did you multiply
22 that share by the population of the -- of the
23 states?
24   A.   I did not.
25   Q.   Did you undertake to determine the share

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

1  of the internet subscription rates in the states to
2  the population of the states?
3      A.  No.  That's not an analysis I've done.
4  What I've -- what I've done to -- for the allocation
5  to the individual states is I looked at the number
6  of internet users in those states in relation to the
7  number of internet users in the United States.
8          And so that's the -- the ratio that I
9  applied to get to the individual states.  And I
10 believe that's an appropriate, reasonable ratio to
11 use for doing this type of allocation.
12     Q.  Let me see if I understand.
13         In each year you took the share of each
14 state's households that have an internet
15 subscription.  That was part of what you did.
16 Right?
17     A.  I looked, as I said, the number of
18 internet subscribers in each state versus the number
19 of internet subscribers in the United States as a
20 whole.
21     Q.  Okay.  Did you multiply that -- that
22 internet subscription, that number by the share of
23 the -- of that share by the population of the state
24 in order to estimate the number of persons in each
25 state that have an internet subscription?

Page 251

1      A.  I don't understand your question.  I --
2  I -- I explain exactly what I've done very clearly
3  in my report, and I thought I explained it again.  I
4  don't understand the question you just asked me.
5      Q.  Let's look at 93.
6          MR. GIBBS:  Paragraph.
7          MR. COLLIER:  Paragraph, sorry.
8      Q.  Paragraph 93 of your opening report.  Do
9  you have that before you?
10     A.  I do.
11     Q.  You say:  To estimate the share of
12 Google's overall display advertising revenue and
13 profit described above that is attributable to the
14 plaintiff states, you take two additional steps.
15         Do you follow me?
16     A.  I -- I see what you're saying, yes.
17     Q.  "First, I estimate Google's U.S. display
18 advertising revenues and profits."
19         Right?
20     A.  Yes.
21     Q.  "By multiplying Google's annual display
22 advertising revenues and profits from Google's P&Ls,
23 as described above, by the percent of its overall
24 revenues attributable to the United States in each
25 respective year as reflected in Google/Alphabet SEC

Page 252

1  filings."
2          Right?
3      A.  Yes.  That's the step I just described to
4  you earlier, that I looked at the financial
5  statements that had Google and U.S. data.  I used
6  the ratio between Google's performance globally and
7  performance in the U.S., and I looked at that each
8  year as the basis for -- for figuring out what --
9  what -- how to turn the global P&L that didn't have
10 that breakdown into what portion of that's
11 attributable to the -- the U.S.
12     Q.  The next step you said was:  To estimate
13 display advertising revenue and profit associated
14 with the plaintiff states.
15         Right?
16     A.  That's the next --
17         MR. COLLIER:  Objection; form.
18         Go ahead.
19     A.  That's what I do next.  I estimate that.
20     Q.  And then you note that:  The U.S. Census
21 Bureau collects an assortment of data about the
22 people and economy of the United States, including
23 data on internet use, which it has collected as a
24 part of the American Community Survey (ACS) since
25 2013.

Page 253

1          Right?
2      A.  Yes.
3      Q.  And then you say, over in the next page:
4  In each year you took the -- take the share of each
5  state's households that have an internet
6  subscription as provided by the ACS and multiply
7  that share by the population of the state in order
8  to estimate the number of persons in each state that
9  have an internet subscription in each year 2013
10 through 2022.  Right, sir?
11     A.  Yes, that's correct.
12     Q.  And then you perform the same operation
13 for the United States overall in each year for that
14 ten years.  Right?
15     A.  Yes.
16     Q.  And the U.S. Senate -- U.S. Census Bureau
17 has not yet released '23, so you assumed 2023
18 figures are the same as 2022.  Right?
19     A.  That is correct again.
20     Q.  And then finally you use this ratio:
21 Each state's persons with internet subscriptions
22 versus all Americans with internet subscriptions and
23 apply it to Google's U.S. display advertising
24 revenue and profit in each year as described above
25 to estimate Google's display advertising revenue and

64 (Pages 250 - 253)

Page 254

1  associated with each state for the years 2013
2  through 2023.
3      Right?
4      A.  That's correct.
5      Q.  Okay.  Do you agree that not all internet
6  access involves display ads?
7          MR. COLLIER:  Objection; form.
8      A.  Do I agree that not all internet access
9  involves display ads?  In general, I would agree
10 that -- that -- that every internet interaction does
11 not necessarily result in a display ad, in general.
12     But I also believe this is a -- I have
13 not been able to identify, nor has anybody else in
14 this case been able to identify a more appropriate
15 allocation method than this.  I think this is a
16 highly appropriate, reliable, useful measure.  And
17 it's -- the reason I have to do this is because
18 Google does not keep the information on the number
19 of users in each state, the number of -- of its
20 financials by each state.  So I have to find an
21 allocation methodology to be able to do that.  And I
22 think this is a reliable, good one.
23     I've seen no -- no other method that I
24 think is better in this case and -- and so I -- I
25 really stand behind this as the correct one to think

Page 255

1  about.
2          MR. GIBBS:  Object; nonresponsive.
3      Q.  Internet subscriptions can involve
4  something that doesn't involve any access to a
5  display ad at all.  Would you agree?
6          MR. COLLIER:  Objection; form.
7      A.  Yeah.  What -- what I'm going to say is,
8  again, I -- I am not stating that every -- every
9  internet interaction results in a display ad.
10 That's not the analysis that I've done.  That's not
11 an assumption that I've made.
12     What I'm stating is that I'm trying to
13 understand how to allocate Google's success and its
14 profit across different states in the U.S.  A
15 reasonable appropriate way to do it is to look at
16 the internet users within the internet user
17 population within those states and compare it to the
18 internet user population overall.  That's an
19 appropriate, reasonable, reliable method to use.
20     Q.  An internet user in a particular
21 household may not engage in any display ads
22 observations whatsoever.  True?
23          MR. COLLIER:  Objection; form.
24     A.  If you're thinking about individually,
25 it's possible that a -- a -- I think it's probably

Page 256

1  unlikely, but would it be possible that -- that one
2  doesn't?  Perhaps.  But, again, that impossibility
3  exists throughout internet users in the U.S. and
4  within each state.  So I believe that -- that --
5  that my -- my -- my methodology considers that
6  and -- and is adjusted for that because it exists
7  both locally and globally or -- or throughout the
8  entire U.S.
9      Q.  Some people --
10     A.  And so I just think that is as fine a
11 detail as -- as -- as we can get to as a method for
12 allocation.  I think it's appropriate and reliable.
13     Q.  Well, it was a method you selected.
14 Right?
15          MR. COLLIER:  Objection; form.
16     A.  I did utilize this.  I think it's
17 appropriate and I think it's -- and I haven't seen
18 anything that anybody suggested that would -- that
19 would provide a better allocation methodology than
20 this.
21     Q.  For --
22     A.  This is --
23     Q.  Excuse me.
24     A.  This is absolutely the -- the best
25 methodology I believe and I'm aware of to use in

Page 257

1  this case.
2          MR. GIBBS:  Objection; nonresponsive.
3      Q.  For example, sir, a Netflix subscription
4  doesn't involve display ads, does it?
5      A.  I would have to think whether or not a
6  Netflix subscription could provide a display ad.  I
7  think there's video ads.
8      Q.  Some people just use their Netflix
9  subscription for their subscription -- internet
10 subscription to watch Netflix, for example.  Right?
11     A.  People use their internet subscriptions
12 for all sorts of things.
13     Q.  That's right.
14     A.  And what I -- what I believe I testified
15 to a moment ago and I'll say again is the likelihood
16 of that happening to internet users in the United
17 States, there's a likelihood of that and there's a
18 likelihood in each state.  So when I'm using each
19 states' internet users versus the United States
20 internet users, that is considered in using that
21 ratio and I think that makes it an applicable
22 appropriate ratio to use.
23     Q.  There's a statement about the number of
24 households that have internet subscriptions in a
25 state.  Tell us anything quantifiable about No. 1,

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

1  how many ad buyers there are in a state.
2        MR. COLLIER:  Objection; form.
3     A.  So tell us how many ad buyers are in a
4  state?
5     Q.  Yes, sir.
6     A.  I think this is a useful tool in
7  understanding internet commerce in states relative
8  to internet commerce in the United States.  And
9  that's -- that's the important relationship that I'm
10  trying to -- that I think should be used to
11  allocate.  So I think that's what needs to be
12  considered.  That's what I've considered and that's
13  important.
14        So to the extent internet commerce
15  includes -- what did you -- what -- what was the
16  advertiser what?
17     Q.  Ad buyers.
18     A.  Advertiser buyers.  I think there's a --
19  that are included in the auctions that are generated
20  by users, I think this -- and we have to remember
21  that auctions are generated by users, that -- that
22  the user population is an appropriate basis for
23  making the -- the allocations that I've made --
24     Q.  Well, for --
25     A.  -- it's just -- it's just --

Page 259

1        MR. GIBBS:  Objection; nonresponsive.
2     A.  -- quite clear.
3     Q.  For -- for, say, a thousand -- a thousand
4  subscribers or subscriptions in the state of Texas,
5  how many ad buyers does that indicate there are?
6        MR. COLLIER:  Objection; form.
7     A.  Well, I haven't analyzed that.  It's not
8  important to analyze it and it mis- -- it -- it's
9  irrelevant to my analysis and what my analysis is
10  doing is saying Google is making -- is making its
11  money off of the activity of users and the users are
12  located throughout the United States and they have
13  to be internet users and so I've -- I've looked at
14  the ratio between internet users in each state
15  versus the United States and used that as a basis
16  for allocation of Google's profitability and
17  their -- their revenues, et cetera.  And that is a
18  highly appropriate, reliable, reasonable method.
19     Q.  For every thousand subscribers in a
20  state, how many ad buyers and/or ad sellers by group
21  does that measure and indicate?
22        MR. COLLIER:  Objection; form.
23     A.  Would you repeat the question, please?
24     Q.  Yes, sir.
25        For every thousand subscriptions in a

Page 260

1  state, how many ad buyers does that confirm are in
2  the state or ad sellers, either one?
3        MR. COLLIER:  Objection; form.
4     A.  That would indicate the number of users
5  that are in the state.  That question is kind of a
6  non-sequitur to me because it does not relate in --
7  in the way it needs to to the work that I'm doing.
8        And so what I'm doing is trying to
9  understand Google -- how to allocate Google's share
10  of United States revenue and profits to the 17
11  states.  They -- they earn that based on user --
12  based on user activity and -- and, therefore, I
13  think looking at users -- the number of users in
14  each state versus the number of users in the U.S. is
15  the appropriate way to do it.  There's no other good
16  way that I've seen or -- or know about to do that
17  work.
18        MR. GIBBS:  Objection; nonresponsive.
19     Q.  Didn't answer how many ad buyers and ad
20  sellers for every thousand subscribers, internet
21  subscribers in a state?
22        MR. COLLIER:  Objection; form, asked
23  and answered.
24     Q.  What's the answer to that question?
25        MR. COLLIER:  Objection; form, asked

Page 261

1  and answered.
2     A.  I think I've answered that question that
3  it's -- that question is a non-sequitur.  It doesn't
4  make sense to me because it's irrelevant to my
5  analysis, to the rationale behind my analysis.  So
6  it doesn't make any sense to me and -- and it's --
7  it's not an analysis that I've performed because
8  it's not one that was necessary to perform because
9  it would be irrelevant to the work that I was doing.
10        MR. GIBBS:  Objection; nonresponsive.
11     Q.  Does the number of households with
12  internet service or subscriptions tell you how many
13  display ads were sold in a state by all of the ad
14  sellers?
15        MR. COLLIER:  Objection; form.
16     A.  Would you repeat the question, please?
17     Q.  Yes, sir.
18        Does the number of households with
19  internet service subscriptions tell you how many
20  display ads were sold in a state by all the ad
21  sellers in that state?
22        MR. COLLIER:  Objection; form.
23     A.  I don't believe where the ad sellers are
24  located is -- is necessarily a relevant portion of
25  that question again because the users in the states

66 (Pages 258 - 261)

CONFIDENTIAL

1    are the ones that get on the internet and create the
2    auction.  And so if they're in the state and create
3    the auction, it's important to understand that --
4    where they're located --
5        Q.   Internet --
6        A.   -- and so -- hang on a second.
7             And so -- so the user base, understanding
8    the -- the user base in each state compared to the
9    user base in the United States is the relevant
10   metric to think about when applying Google's --
11   when -- when allocating Google's financials to the
12   individual states.
13       Q.   So in shorthand, whether you think it's
14   relevant or not, my question is, for every thousand
15   internet service subscribers in a state, how many
16   display ads were sold in a state by all the ad
17   sellers in that state?
18       A.   And I'm going to give the same answer,
19   that that question is a non-sequitur.  I don't
20   understand it.  It's not relevant to my analysis.
21   It is -- it -- it conflates different issues so it's
22   hard for -- like, it doesn't make sense to me.
23            MR. GIBBS:  Okay.  Nonresponsive.
24       Q.   You have no answer as to how -- based
25   upon internet subscribers in a state, how many ads

1    are sold in a state by all of the ad sellers.  True?
2            MR. COLLIER:  Objection; form.
3        A.   How many ads are sold by all of the ad
4    sellers.
5        Q.   In the state.
6        A.   All the ads are sold by the ad sellers.
7        Q.   How many -- all right.  How many display
8    ads were sold in a state based upon the number of
9    subscribers?  What's the number?
10           MR. COLLIER:  Objection; form.
11       A.   I -- the -- I have not performed the
12   analysis to determine the number of -- of ads that
13   are sold per subscriber.  What I'm saying is that
14   the users generate the auction and, therefore, if
15   I'm looking at the way to allocate financial
16   information or auction information in this case,
17   looking at the user base in each state relative to
18   the United States is the appropriate way to do it.
19   It's -- it's the only way that -- that I've seen
20   that makes sense on how to do it.
21           MR. GIBBS:  Objection; nonresponsive.
22       Q.   Does the subscription -- the number of
23   subscriptions in a state identify how many ads were
24   sold in a -- in that state by using -- or using
25   Google's AdTech platform or its tools?

1            MR. COLLIER:  Objection; form.
2        A.   Again, I -- I -- I lost the question as
3    you were reading it.
4        Q.   Let me repeat it, then.
5        A.   If you could slow down because I was
6    having trouble following -- following you.
7        Q.   Certainly.
8             Does the number of internet subscriptions
9    in a state identify how many ads were sold in that
10   state using Google's AdTech platform or its tools?
11       A.   I think it provides a ratio -- a reliable
12   ratio between the number -- between that state and
13   the numbers sold in the United States based on the
14   number of users.  So I think it provides the
15   reliable ratio and that's what I was using was the
16   ratio for my allocation.  So I think it provides me
17   the information to -- to utilize that ratio and
18   so -- so I did.
19       Q.   What is the ratio?
20       A.   The ratio is the number of internet users
21   in each state to the number of internet users in the
22   United States.
23       Q.   I don't understand how the -- the number
24   of -- of internet subscribers in a state versus
25   internet subscribers in the country that tells you

1    how many Google Ads were sold in a state.  Explain
2    that to me.
3        A.   Because I'm -- what I'm saying is it's
4    not -- the -- the number it's the relationship
5    that's important.  So the -- the relationship is how
6    many were sold in that state versus how many were
7    sold in the United States.  And the way you
8    understand that relationship is to look at the user
9    base and that's what I've done.
10       Q.   Have you made some calculation by state
11   by any of the 17 states as to how many Google Ads,
12   based upon your internet subscription theory, were
13   sold in each of the years?
14           MR. COLLIER:  Objection; form.
15       A.   I've made a determination that the
16   relationship between the user base in those states
17   and the user base in the United States would be
18   relevant to -- to the ratio between the states and
19   the United States of Google's profitability of
20   their -- of their -- of the revenues that they earn
21   in the U.S. That's a reliable, reasonable
22   methodology.  So -- and I believe that incorporates
23   your question.
24       Q.   I'm asking specifically about AdTech
25   platform users and people that subscribe and then

67 (Pages 262 - 265)

Page 266

1  use the AdTech platform or it's tools?
2          MR. COLLIER: Objection; form.
3      Q.  What does the -- what does the
4  subscription rate tell you about how many people
5  within that state in a -- in a year or a period of
6  time actually use the -- the Google AdTech platform?
7      A.  I think --
8          MR. COLLIER: Objection; form.
9      A.  I'm just going to keep answering the same
10  way. I think this provides me a reliable ratio
11  between the numbers of -- of internet users in
12  the -- the states versus the U.S. The internet
13  users are the ones that create the auctions by which
14  Google makes money. And so allocating the -- the --
15  their success in internet commerce -- Google's
16  success in internet commerce, I think this is the
17  most appropriate, reliable means by which to -- to
18  use as an allocation methodology. Which I wouldn't
19  need to do if Google provided or kept that
20  information for me. I had to -- I had to come up
21  with a method of making those allocations because
22  the -- the -- the data wasn't available for me not
23  to have to use an allocation method.
24      Q.  Do you know whether Google maintains
25  records which track based upon subscription rates or

Page 267

1  subscription holders in states, the number of Google
2  Ads --
3          MR. COLLIER: Objection; form.
4      Q.  -- are used?
5      A.  I believe I requested them there for the
6  plaintiffs or requested information from Google that
7  says: Do you have the data that we need available
8  by -- by state.
9          And that data is not available. So
10  Google does not -- either does not retain it, does
11  not track it, or -- or doesn't have it. But either
12  way that information wasn't available to me, I
13  couldn't use it. So I had to make an allocation.
14  And when looking at different allocation
15  methodologies, this one was clearly the -- the best,
16  most reliable methodology that I'm aware of. And --
17  and I haven't been made aware of a better one by any
18  other expert in this case or -- or I've given any
19  rationale why another one would be more appropriate.
20          MR. GIBBS: Objection; nonresponsive.
21      Q.  Does the number of internet subscription
22  in a state tell you where the ad buyers or ad
23  sellers were when they bought and sold ads using
24  Google's AdTech?
25          MR. COLLIER: Objection; form.

Page 268

1      A.  Does the number of internet --
2      Q.  Subscriptions?
3      A.  -- subscriptions.
4      Q.  In a state tell you where the ad buyers
5  or the ad sellers were when they bought and sold ads
6  using Google's AdTech?
7          MR. COLLIER: Objection; form.
8      A.  I don't believe you can ascertain that
9  information from the number of users. But I don't
10  believe that information is relevant to making
11  the -- the allocations that I've made. In fact, I
12  think it would be the wrong information to use for
13  allocation of Google's revenues and profits.
14  They've earned their revenues and profits from
15  internet commerce. And looking at internet
16  commerce, it's reasonable to allocate internet
17  commerce to Google's success and internet commerce
18  to different states based on the -- the user base.
19      Q.  Which you've indicated Google doesn't
20  track these -- these -- the identities or numbers of
21  ad purchasers or sellers based upon subscription
22  rates. Right?
23          MR. COLLIER: Objection; form.
24      Q.  You've told us that I think. Right?
25      A.  Google has not provided any information

Page 269

1  related to being able to allocate its profitability
2  or revenues to the various states. They -- they've
3  given us no basis by which to do that.
4          So I've used the methodology that is
5  described in my report which I believe is reasonable
6  and reliable and appropriate.
7      Q.  To your knowledge, does any AdTech
8  company, whether it's Google or its competitors,
9  track the number of ads -- ad transactions in -- by
10  state based upon internet subscriptions by state, to
11  your knowledge?
12          MR. COLLIER: Objection; form.
13      A.  I only have access to the information
14  that was available to me in this case and
15  independent research. And -- and based on my
16  independent research and the information available
17  to -- to me in this case. What I can tell you is
18  that Google doesn't keep that information.
19      Q.  Does anybody else?
20      A.  I -- it was not part of the scope of my
21  work to look to see what -- if anybody else does. I
22  looked to see if I could find information on -- on
23  reasonable methods of allocating and there was
24  nothing available to me that I believe is better
25  than the method I used. And if --

68 (Pages 266 - 269)

Page 270

1    Q.  And nothing --
2       (Simultaneous speaking.)
3    Q.  -- there was a methodology that's better,
4  I'd like to see it, I will consider it, and if it's
5  worth applying, I'll apply it.  I would be -- be
6  happy to do so.
7      MR. GIBBS:  Objection; nonresponsive.
8    Q.  Your independent research over and above
9  what you were assigned to look at, did not turn up
10  any indication that anybody in the AdTech industry
11  tracks ad displays based upon internet subscriptions
12  by state.  True?
13      MR. COLLIER:  Objection; form.
14    A.  I have not uncovered in my independent
15  analysis an indication of how other ad platforms
16  track -- what was the advertise -- did you say ad --
17  could you --
18    Q.  Advertising -- advertising displays, what
19  we're here on, auctions?
20    A.  But I do understand that auctions are a
21  result of the -- the user base, internet user base
22  accessing websites.  And that's going to create an
23  individual auction based on that access.  And so if
24  you're looking -- and Google is going to make money
25  off that auction.  So if you're looking at -- at the

Page 271

1  states by which Google makes its money, looking at
2  the user base is a wholly appropriate way to do it.
3  Because that's what creates the auction that -- that
4  Google is -- from which Google is generating money.
5  So I think that's a really reliable, appropriate
6  method and -- and that's why I've used it.
7      MR. GIBBS:  Objection; nonresponsive.
8    Q.  Is it true that this so-called reliable
9  and only method to your knowledge has only been
10  employed in this context by yourself, Mr. Andrien?
11    A.  I don't -- I don't believe that to be --
12  I -- I don't believe that's probably the case.  I
13  think this method is a method that's reliable.
14  It's -- it's -- it's informative and if you
15  understand that Google is making its money through
16  internet commerce, it's making its money through
17  auctions that happen when an internet user gets onto
18  a website, and this is an absolutely appropriate way
19  to go about figuring out what portion would be
20  allocated -- allocable to each state.
21      MR. GIBBS:  Objection; nonresponsive.
22    Q.  Can you identify as you sit here a single
23  other expert or industry publication that tracks the
24  things I've asked you about here, ad sellers, ad
25  buyers, or the number of display events based upon

Page 272

1  some ratio based in turn upon subscription rates in
2  the states?
3    A.  I've --
4      MR. COLLIER:  I'm sorry.  Were you
5  done?
6      MR. GIBBS:  Yes.
7      MR. COLLIER:  Mr. Andrien, I -- I
8  instruct you not to disclose any information that
9  may be covered by a protected order.  I believe you
10  can answer that question yes or no without violating
11  any protective orders.  And I will allow you to do
12  that.
13    A.  Yes, I have.
14    Q.  As part of your analysis here, is it your
15  testimony that somebody has tracked and does track
16  the number of ad buyers and ad sellers by state
17  based upon the internet subscriptions in that state?
18    A.  I -- I apologize.  Maybe I can be
19  clearer.  And I want to be careful here, but I have
20  seen -- I don't know how to answer this question.
21      MR. COLLIER:  Do -- do you need to
22  consult with me not to -- not to violate a
23  protective order?
24      THE WITNESS:  I -- I -- I would like
25  to if that's allowed.

Page 273

1      MR. COLLIER:  Okay.
2      Mr. Gibbs, it's up to you.  There
3  is a -- I'll consult with him, I'll not.  I have an
4  idea what this answer is and which is why I
5  understand you're treading into information covered
6  by another court's protective order.  But if you
7  want me to consult with him and see if I can craft
8  you an answer that doesn't make you violate the
9  protective order or the witness, I'm happy to do so.
10      MR. GIBBS:  Well, since I'm at a
11  disadvantage, I don't know what the information is
12  you're talking about, certainly you have a right to
13  consult with the client.
14      MR. COLLIER:  Okay.
15      MR. GIBBS:  I'm going to -- I'm going
16  to dignify it with a yes or no that I agree with it.
17  But I can't -- I can't do that.
18      MR. COLLIER:  I have a good-faith
19  basis to believe that the answer is covered by
20  another court's protective order.  And I think we're
21  coming up on time on a break.  I'll use break time
22  to consult with him.  I'm not trying to take your
23  on-the-record time.  But I do need to consult with
24  my client and figure out how to fashion an answer to
25  your question that doesn't put you, me, or

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

1  Mr. Andrien in trouble.
2       MR. GIBBS:  Fair enough.  Let's take
3  a break.
4       MR. COLLIER:  Okay.  I wasn't trying
5  to make you take a break now.  I just -- I will do
6  it on a break.
7       THE WITNESS:  It's a good time for
8  me.
9       MR. COLLIER:  Okay.
10       THE VIDEOGRAPHER:  Going off the
11  record.  The time is 4:48 p.m.
12            (Break.)
13       THE VIDEOGRAPHER:  We're back on the
14  record.  The time is 5:05.
15       MR. COLLIER:  Mr. Gibbs, I consulted
16  with -- with my client, Mr. Andrien, and he's going
17  to give a statement as best he can that answers your
18  question what he believes keeps him compliant with
19  the protective order.
20       And I'll let him give that and we'll
21  see where it goes.
22       MR. GIBBS:  All right.
23    A.  So I am aware of an expert who has
24  utilized the ratio between internet users in states
25  versus internet users in the United States as a

Page 275

1  means by which to allocate financial -- a company's
2  financial results to -- from the U.S. to individual
3  states.
4    Q.  Is that the only such -- is that the only
5  such tracking use that you're aware of using either
6  the subscription rate of a state as a tracking
7  device?
8    A.  I don't understand your question.  What
9  do you mean by "tracking"?  So...
10    Q.  As a way of measuring.
11    A.  Would you repeat the question --
12    Q.  Yes.
13    A.  -- that way, please.
14    Q.  Other than the -- the situation you have
15  just described, are you aware of any other instance
16  in which someone has tracked advertising technology,
17  transactions, auction events, in states and measured
18  it by the number of internet subscriptions within a
19  state?
20    A.  My answer is I'm aware of an expert who
21  has done what I just testified to.  I'm -- that --
22  that is the extent of my knowledge on how other
23  experts have approached maybe a similar issue that I
24  was approaching here.
25    Q.  Okay.  Just to clarify then, are you

Page 276

1  aware of any public sources in which any industry
2  participant or analyst tracks or identifies the
3  number of ad sellers or ad buyers in a state based
4  upon the number of internet subscriptions in that
5  state?
6    A.  As I sit here right now, I can't recall a
7  publication that comes to mind that tracks the
8  number of ad buyers or the number of ad sellers by
9  the ratio between internet users in a state to
10  internet users in a -- in the United States.
11       As I sit here, I don't -- I don't recall
12  seeing anything that would do that, that I can
13  recall.
14    Q.  What is --
15    A.  I do -- oh, I was just going to say I've
16  seen ratios used to allocate financials routinely,
17  and I teach that routinely.  And based on my review
18  of the record in this case, my review of the data
19  available in my independent research, I believe this
20  was an appropriate, reliable method for allocating
21  the -- the financial information I've allocated to
22  the individual states.
23    Q.  Have you done any analysis to demonstrate
24  the validity of your suggestion that household
25  internet subscriptions are a reasonable way to

Page 277

1  measure the number of display ads that were bought
2  and sold in a given state?
3       MR. COLLIER:  Objection; form.
4    A.  I -- I've -- I've worked on this case,
5  I've reviewed a plethora of documents in this case,
6  I've done a lot of my own research in this case.
7  And based on the work that I've done in this case,
8  I've concluded that utilizing the ratio between
9  internet users in -- in individual states versus
10  internet users in the United States is an
11  appropriate, reliable, reasonable allocation
12  methodology to allocate Google's financial
13  information to the individual states in this case.
14    Q.  What -- what is the relationship between
15  the number of subscribers, internet subscribers in
16  Florida to the number of ad sellers or ad buyers in
17  Florida?
18       MR. COLLIER:  Objection; form.
19    A.  Again, that -- that question, I think,
20  conflates a couple issues here.
21       The number of internet users in Florida,
22  as it relates to the number of internet users in the
23  United States is the metric to -- that's appropriate
24  to calculate what portion of Google's overall U.S.
25  financial results are allocable to Florida.

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

1    Because U.S. earns its -- its overall
2    U.S. financial results from internet commerce. And
3    internet commerce occurs from internet users. And
4    therefore it's the appropriate methodology. And I
5    don't -- the -- the relationship between internet
6    users and the -- I don't even -- advertising -- what
7    did you...
8        Q.    Ad buyers and sellers?
9        A.    Ad buyers and sellers isn't the relevant
10   ratio to consider because the users are what's
11   creating the auctions, and the auctions are what is
12   providing Google the -- the financial success.
13       And so understanding what opportunities
14   Google is getting financially from each state is --
15   is -- under the -- we're thinking about allocating
16   its financials to each state. Well, what
17   opportunities are generated in each state is the --
18   is the appropriate way to look at it. So that's
19   what I've done.
20       Q.    Does the number of subscriptions,
21   internet subscriptions in a state tell you how many
22   ad auctions were conducted within that state in a
23   given period of time?
24           MR. COLLIER: Objection; form.
25       A.    I think the ratio between the number of

Page 279

1    internet users in each state and the number of
2    internet users in the United States gives a -- a
3    relevant ratio between the -- the number of ad
4    auctions that would be developed, because the users
5    are -- are creating the ad auctions.
6        Q.    Have you done that analysis?
7            MR. COLLIER: Objection; form.
8        A.    I've done the analysis and determined the
9    ratio between internet users in the United States
10   and internet users in -- in the individual states.
11   I've done that analysis. I understand, based on my
12   work in this case, my education, training, and
13   experience, that -- that the -- the auctions are
14   generated by users going on to different websites.
15   And so I think the ratio -- I would expect the ratio
16   to be -- to be a reliable ratio for that purpose.
17       Q.    What about -- what if a -- what if an
18   internet subscriber in Texas -- well, let's ask a
19   different question.
20       If there is a transaction between a
21   resident company in New Hampshire as a seller, and a
22   buyer in Maine, and Google is in California, do you
23   count that transaction in your total transaction
24   count?
25           MR. COLLIER: Objection; form.

Page 280

1        A.    I don't understand. Would you repeat
2    that, please?
3        Q.    In effect there is an auction that takes
4    place between two nonplaintiff state citizens or
5    residents. Do you have that in mind?
6        A.    There's an auction that takes place.
7    Does that include all of the participants, i.e., the
8    people who were participants in the auction that
9    didn't win the auction?
10       Because as I understand, auctions have a
11   variety of participants, not just the winner and
12   the -- not just the -- the -- the winning advertiser
13   and the seller.
14       Q.    Well, let's take one that there is two
15   participants, a New Hampshire seller and a -- and a
16   Maine buyer, and Google is in California. Right?
17           MR. COLLIER: Objection; form.
18       A.    Google -- the -- the headquarters of
19   Google?
20       Q.    Yes.
21       A.    I understand the headquarters of Google
22   are in California.
23       Q.    Okay. And they -- they consummate a
24   buy/sell or auction between those two buyers and --
25   and sellers. Right?

Page 281

1            MR. COLLIER: Objection; form.
2        Q.    Got that?
3        A.    I understand what you're saying thus far.
4        Q.    Okay. Did you count that auction in your
5    violation total count?
6        A.    Are you -- are you talking -- is there a
7    user that created the auction that's in one of
8    the -- the states?
9        Q.    No. I'm just asking you now, the
10   participants are out-of-state and Google is
11   out-of-state. Did you -- did you count that in your
12   total violations under the plaintiff states'
13   statutes?
14       A.    I believe my allocation method would --
15   would -- would be a sufficient basis where it would
16   allocate approp- -- reasonably accurately to each
17   state, reliably accurate to the appropriate states.
18



            And so based on that, it's fully appropriate

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

1  to look at the internet users in states versus
2  overall as an allocation methodology.
3          And by using that allocation methodology,
4  it should do a -- and I believe it is the
5  appropriate methodology to -- to use to parse out
6  ones that are affiliated auctions that would involve
7  users from those states.  So that is an appropriate
8  methodology.
9          Using that methodology, one would -- one
10 would expect that that auction -- if it doesn't have
11 a user or any participant in the United States -- in
12 one of those states wouldn't be counted as part of
13 the -- the allocation.
14         But because that specific information is
15 not available in each and every auction that was
16 provided in Google's dataset, we have to use an
17 allocation methodology.
18         And so that methodology that I used is --
19 is one that I think would appropriately separate the
20 one -- the auction that you -- you've described from
21 auctions that -- that occur with -- with a user
22 party in one of the relevant states.
23         And so while I can't specifically look at
24 each auction and calculate that, and I have to use
25 an allocation methodology, and by definition that's

Page 283

1  going to be an estimate.  It's going to be a proxy.
2  This is a reliable, useful, relevant proxy.
3      Q.  Why did you say that you recognize it
4  would be appropriate to exclude any such
5  transaction, that is, a transaction between
6  noncitizen -- plaintiff citizens in this case from
7  your analysis?
8          MR. COLLIER:  Objection -- objection;
9  form.
10     A.  I'm trying to allocate the portion of
11 auctions that Google is involved in that involved
12 U.S. users.  And so I look at the dataset of
13 auctions that they've provided to us, and I'm trying
14 to allocate the portion of those auctions that would
15 be relevant to the 17 states, that would be --
16 involved the 17 states.
17         I have to find a methodology that -- that
18 would work as a reasonable, reliable allocation
19 method.  And I believe that user base versus the
20 overall internet user base -- the internet user base
21 from each state, relative to the overall internet
22 user base in the United States is the appropriate
23 methodology.
24     Q.  Do you agree that -- that a
25 Nevada -- strike that.

Page 284

1          Do you agree that a -- that ad buyers and
2  sellers under the New Hampshire DTPA should not be
3  able to come into court and recover for auctions
4  that allegedly were burdened with misrepresentation
5  or deception outside of their state?
6          Do you follow what I'm asking?
7          MR. COLLIER:  Objection; form.
8      A.  Well, I -- I -- I understand that all of
9  the auctions that I've looked at from the dataset
10 have been burdened with deception.  And, therefore,
11 there's not a question of -- of whether the auctions
12 have been burdened with -- with deception.
13         Now -- and now it's just allocating the
14 proportion of those auctions that would have -- that
15 would relate to each individual state at issue here.
16 And that's because the information to do that, on an
17 auction-by-auction basis, isn't available to me. ■
18 ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
19 ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
20 ■■■■■■■■■■■■■■■■
21         I haven't received it.  I have to use an
22 allocation methodology and so the methodology I used
23 is -- is appropriate.  It is -- it is reliable.  If
24 there's another one that I'm asked to use, I'm happy
25 to look at it and -- and use it.  I don't know of

Page 285

1  one that's more reliable or appropriate than I've --
2  than this one.  I don't believe that it would
3  have -- using another methodology would -- would
4  likely have a -- an impact on my overall conclusion.
5  But I'm happy to do it if there's -- if there's an
6  additional one.
7      Q.  Did -- do you understand that Google ever
8  tracked, based upon internet subscriptions, the
9  location or identity of the ad buyers and sellers
10 that were participants in its auctions?
11         MR. COLLIER:  Objection; form.
12     A.  I think we've gone around on this a few
13 times.  My -- my understanding is that Google has
14 not provided or maintained data that enables me to
15 determine, of the auctions that they've listed,
16 which ones involve users in -- in the 17 plaintiff
17 states.  So they haven't kept that data and I think
18 that's responsive to the question you just asked
19 and, therefore, I had to use an allocation
20 methodology.
21     Q.  Are you suggesting, when you say they
22 haven't kept it, that they had it at some point in
23 time and did use that methodology that you've used
24 to track ad buyers' and ad sellers' locations but
25 now don't have that information anymore, or are you

72 (Pages 282 - 285)

Page 286

1  saying they just did not keep or track things at any
2  time to your knowledge in that fashion?
3  　　　MR. COLLIER:  Objection; form.
4  　　　Go ahead.
5  　　A.  I don't have an opinion whether they had
6  the information and didn't retain it or they didn't
7  track the information, but I believe the information
8  would be generally available through IP addresses
9  and things of that nature to be able to track
10  where -- where the participants are located.  But
11  whether they tracked it or didn't retain it, I
12  don't -- I don't have any insight to that.  I just
13  know they didn't produce it in this case.
14  ██  ███████████████████████
████████████████████████████████
██  ████████████████████████████████████
██  ███████████████████████████
18  　　　MR. COLLIER:  Objection; form.
19  ██  ████████████████████████████████
██  ████████████████████████████████████
██  █████████████████████████████
██  █████████████████████████████████
██  █████████████████████████████████
██  ██████████████████████████
██  ██████████████████████████████████

Page 287

██  ████████████████████████
2  　　　I've used and described my methodology
3  for -- based on data available to me, the -- the
4  advertisers and where they're located using the best
5  data available to me.  And I've described that
6  methodology in my report.
7  ██  ██████████████████████████████
██  ██████████████████████████████████
██  ████████████████████████████████████
██  ████████████████████  So the publishers, the
12  advertisers, the users, there's not more granular
13  information than the country.  So to try to -- to
14  try to figure out the state requires allocation
15  methodology.
16  　　　MR. GIBBS:  Objection; nonresponsive.
17  　　Q.  Did you undertake any alternative
18  analysis to identify the state location or identity
19  of ad sellers or buyers other than through your
20  internet methodology?
21  　　　MR. COLLIER:  Objection; form.
22  　　A.  Of course, I looked at the dataset.  I
23  looked to see if I could parse that information from
24  the dataset.  I analyzed the dataset to determine
25  whether or not that data were -- those data were

Page 288

1  available in the dataset.  They weren't.  We -- and
2  I made a -- a request saying I would like to see
3  data by state if it -- if it's available.  I was
4  told it wasn't.
5  　　　So I've -- I've done analysis to try to
6  determine if there's a better way.  I've looked
7  at -- I've asked for information, if it exists, to
8  do it a different way.  And given that there was no
9  better information, it was up to me to -- to figure
10  out a -- a allocation methodology that was
11  appropriate.  And based on my review of the
12  documents, the record produced in this matter, my
13  independent research, my training, education, and
14  experience, I determined that this was the best
15  method available to me.
16  　　　And as I said, if there's a better one,
17  the jury thinks there's a better one or there's
18  another one that I should consider, I'm happy to
19  consider it.  I know, for example, Dr. Wiggins
20  suggests an alternative.  I disagree with his
21  alternative.  I don't think it's appropriate.  I
22  explain why.  But even using his methodology, we
23  still get the violation counts that are so far out
24  to -- that are so many, that we're going to end up
25  in my -- whether we use his count or my count, in --

Page 289

1  in my -- in my penalty range.
2  　　　So I think this is appropriate.  I think
3  it's reasonable.  I'm happy to consider other
4  methods.  I'd be -- be very surprised if the other
5  methods would affect the violation counts such that
6  we would not be -- that they would be low enough
7  where we would not be in my penalty range.
8  　　　MR. GIBBS:  Objection; nonresponsive.
9  　　Q.  On average, sir, do internet users in
10  Texas and Nevada spend the same amount of time on
11  the internet based upon your investigation?
12  　　　MR. COLLIER:  Objection; form.
13  　　A.  I do not have information about the
14  amount of time on the internet between individual
15  users.  I think the methodology that I have used
16  accounts that users -- there's going to be people in
17  Texas and people in Florida that use the internet a
18  lot, that don't use the internet a lot.  It's going
19  to be related to the number of -- I think it's going
20  to be proportional in general to the number of
21  users.  But I think the -- this is an appropriate
22  apportionment that considers those factors that
23  you're bringing up.
24  　　Q.  Did you do any -- did you make any
25  investigation to see whether people in Texas or in

73 (Pages 286 - 289)

CONFIDENTIAL

1  Nevada spend the same amount of time on average on
2  the internet, yes or no?
3        MR. COLLIER: Objection; form.
4     A.  As I said, I've looked at lots of
5  information in this case, done independent research.
6  I've found no information that allowed -- that --
7  that provide me information to do that type of
8  calculation. General understanding of -- of -- of
9  the user bases would be such that I think those
10  ratios would be similar --
11     Q.  But you haven't done --
12     A.  -- (unintelligible) appropriate methods.
13     Q.  You -- I understand why you say you
14  didn't do it. My question simply was you didn't do
15  any -- any analysis that answered that question?
16     A.  I did an analysis that looked into that
17  question, but that question, I believe, is -- is
18  answered by the ratio itself and I think that's a
19  reliable method.
20     Q.  How about your analysis with respect to
21  state-by-state demographics? For example, did you
22  determine whether a particular state has younger or
23  more older -- more old subscribers and consider any
24  difference in their participation in auctions --
25     A.  What I've done is --

1     Q.  -- or display ads?
2     A.  What I've done is determine the internet
3  user base numbers in those states versus -- in each
4  individual state that's at issue here versus the
5  entire United States.
6        I believe the ratios are -- are -- are
7  reliable, reasonable ratios to use, and -- and as
8  such, that's what I've used as a basis for internet
9  commerce. If there's -- if someone presents another
10  alternative that they think I should think about,
11  I'm happy to -- to look at it.
12     Q.  Okay. If somebody else came up with
13  that, you'd look at it. Right?
14     A.  If there's -- if someone suggests there's
15  a better method, I would like to see it. I
16  believe -- I believe my method is the correct one.
17  I'm not aware of a better one, but I'm happy to
18  consider one if there's a better one.
19     Q.  What is the relationship, sir, between
20  Google's display advertising revenue and profits and
21  home internet subscriptions?
22        MR. COLLIER: Objection; form.
23     A.  Google, is, as I've said a number of
24  times, is a internet commerce company and makes its
25  money off of internet commerce and, therefore, the

1  relationship between internet subscribers and
2  their -- and their financial results I think is
3  an -- an appropriate relationship.
4     Q.  Was Google charging and making money off
5  of home internet subscriptions?
6     A.  Google is charging and making money in a
7  variety of different ways. In general, it's through
8  internet commerce and when -- and in auctions, they
9  make money when auctions happen and auctions are a
10  result of internet users going onto websites in
11  which a publisher has space for an ad. And,
12  therefore, internet users would be creating the
13  auctions and, therefore, the ratio of internet users
14  in the states versus the United States is a
15  reasonable, rational, reliable ratio to use for
16  allocating Google's profits.
17     Q.  Was -- how much was Google charging
18  for -- and how much revenue did it generate for home
19  internet subscriptions?
20        MR. COLLIER: Objection; form.
21     A.  I -- I believe I'm going to give the same
22  question. Google is an internet commerce company
23  and makes its money off of internet commerce.
24  And -- and, therefore, internet users are creating
25  the opportunities for Google to make money and,

1  therefore, internet users is the appropriate kind of
2  allocation method to allocate to the states. So
3  Google makes its money off of those users and --
4  and -- because of the activity of those users and,
5  therefore, the -- the ratio of users in those
6  states, the United States is an appropriate ratio.
7     Q.  In the AdTech industry, how much money --
8  or as a percentage of their revenues or profit, how
9  much money does Google make charging, if they do,
10  for home internet subscriptions under your
11  investigation?
12     A.  Google makes the vast majority of its
13  money and -- and I think virtually all of its
14  profits ultimately as a result of selling ads. They
15  sell ads to the people who use the internet. Or
16  they sell ads as a result of people using the
17  internet. And, therefore, Google makes its money as
18  a result of the people who use the internet and,
19  therefore, I'm trying to allocate the money it makes
20  in individual states. It is reasonable, rational,
21  reliable to use the number of internet users in
22  those states compared to the United States as a
23  ratio for allocating their -- their financial
24  results.
25     Q.  If you totaled the number of internet

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

1   users in the state, can you determine from that the
2   number of DTPA violations that occurred in that
3   state?
4           MR. COLLIER:  Objection; form.
5       A.  Well, I think, as I've mentioned, I've
6   looked at the number of -- of auctions that involve
7   U.S. users.  That's the dataset that Google
8   provided.  I understand that all the open auctions
9   that resulted in matched queries from that dataset
10  are -- are -- are deceptive based on the misconduct
11  at issue in this case and I've utilized an
12  appropriate allocation methodology to determine
13  which of those -- how many of those violations
14  occurred in the various states.  So -- so that's
15  what I've done and I think it's appropriate.
16      Q.  I wanted look at your, paragraph the
17  original opening paragraph, at 110.  Do you have
18  that?
19      A.  Yes.
20      Q.  You state there as your header on that
21  portion of your opinion that:  Google derives direct
22  and indirect benefits from the alleged misconduct.
23          Right, sir?
24      A.  That is correct.
25      Q.  That's a declare -- one of those

Page 295

1   declarative statements by you.  Right, sir?
2           MR. COLLIER:  Objection; form.
3       A.  It is a -- a header that provides the
4   reader a road map as to which to follow.  And so
5   that is a conclusion and the -- and the basis and
6   information that supports that conclusion follows
7   that header from Paragraphs 110 through
8   Paragraphs 115.
9       Q.  Now, you did have some documentation
10  produced by Google indicating what its expectations
11  were in terms of profit, lift or increases, expected
12  or hoped for from various of these mechanics.  Did
13  you not?
14      A.  There was various Google documents that
15  indicated a calculation of different, what I would
16  call, direct benefits that Google was trying to
17  calculate.  I think there is deposition testimony
18  that I reference that -- that put that into context
19  as well by one of the Google software engineers.
20  I'm trying to recall his name.  I can look at my
21  attachment too.  One second.  It's in my other
22  report.  That generally says that that information
23  is not going to provide me the information that
24  I'm -- that I was looking for.  It's not going to
25  provide me even the -- the -- the amount of

Page 296

1   historical and direct benefits that Google has made
2   from this conduct.
3           But that's just one -- one small area of
4   the overall benefits.  And, again, you have to
5   remember that this conduct creates a snowball effect
6   for Google in that it feeds upon itself and
7   creates -- creates advantages and enhanced position
8   in Google in the marketplace for -- for AdTech, and
9   it also creates future benefits for Google in the
10  market for AdTech.  That is an important component
11  to Google's overall success.  So this has had
12  benefits to Google throughout its organization.
13  During the time that this has occurred Google has
14  become the fourth largest company in the -- in the
15  world by market capitalization.  And they're going
16  to make money as a result of this and derive
17  benefits as a result of this conduct for the rest of
18  its existence.
19          MR. GIBBS:  Objection; nonresponsive.
20      Q.  Let's look at Paragraph 110.  You say:
21  Google directly benefits from its misconduct.  Every
22  time an auction clears on AdX that would not have
23  cleared but for the misconduct.
24          Do you see that?
25          MR. COLLIER:  Objection; form.

Page 297

1       A.  Yeah.  I said Google directly benefits
2   from its misconduct every time an option clears on
3   AdX that would not have cleared but for the
4   misconduct.
5       Q.  Comma.
6       A.  Or if the clearing price would have been
7   absent the misconduct.
8       Q.  Right.  And you footnote that.  Right?
9       A.  Yes.
10      Q.  So you footnote that direct benefit that
11  you are characterizing that Google obtained from the
12  misconduct.  Right?
13      A.  I -- I can read the footnote.  It says:
14  There are documents in the record that provide
15  estimates of the direct monetary impact related to
16  Google's misconduct.  When asked to provide Google's
17  revenue and profits attributable to such -- to such
18  Google auction mechanic, Google has stated that they
19  would need to attempt to create this data through a
20  manual process.
21          And I say:  See the declaration of
22  ██████████████  in support of defendant Google
23  LLC's responses to plaintiffs' third set of
24  interrogatories May 24th, 2024.  Google has not
25  undertaken this process.  Thus, I find these limited

75 (Pages 294 - 297)

CONFIDENTIAL



Page 298

1 documents unreliable and insufficient to support an
2 analysis of the direct benefits of the misconduct to
3 Google. Further, as I described herein, Google's
4 benefit from the misconduct is not limited to the
5 direct monetary benefit of each misconduct.
6          MR. GIBBS: Objection; nonresponsive.
7     Q. Dropping down in that same footnote, you
8 see the bottom paragraph beginning "Prelaunch
9 Estimates of DRS"?
10    A. Yes.
11    Q. And DRS, of course, is one of the
12 mechanics that the plaintiffs are complaining about
13 here. Right?
14    A. Yes.
15    Q. And indeed, you cite here to documents,
16 internal real-time documents, at Google which made
17 estimates before they launched it of the order of
18 magnitude of the impact that they hoped to achieve
19 from that particular product or mechanic. Right?
20    A. If I recall there was different
21 estimates.

Page 299

1
2
    And so there's a variety of different
6 estimates and -- and a variety of different
7 documents. None of which consider or try to
8 quantify the -- impact -- the snowball impact
9 that I've been describing throughout today and the
10 benefits that Google is going to derive as a result
11 of that or the future benefits or -- or even
12 according to their own testimony, can accurately
13 quantify the -- the -- the actual benefits.
14          So when I was attempting to quantify
15 the -- the incremental benefits to Google from this
16 action, I looked to the record. These documents
17 were not sufficient to do that.
                      And -- and as a -- as such that
22 type of analysis isn't -- not able to do it. Those
23 documents do not serve as a reliable estimate of --
24 of the benefits that Google has -- has earned from
25 this misconduct or even the direct benefits that

Page 300

1 Google has earned from this misconduct.
2          MR. GIBBS: Objection; nonresponsive.
3     Q. Continuing on at the end of that
4 footnote, you -- you note there that:
10    Q. Yes, sir.
11    A. And I said the document in which that was
12 projected.
13    Q. So the internal projection real-time
14 document which you indicate is unreliable,
17    A. Well, if I can address what you just
18 said. I said it's unreliable for the quantification
19 of the actual benefit to Google from this
20 misconduct. And it's not that I'm saying it's
21 unreliable, Google's -- I am saying that.
                                          t I was trying to
25 accomplish which was an incremental benefit analysis

Page 301

1 from the misconduct. This is not an incremental
2 benefit analysis.
3     Q. No, sir, what it is,
8          MR. COLLIER: Objection.
9
10    A. And that --
11          MR. COLLIER: Sorry. Give me just a
12 moment. I apologize. I thought you were done.
13          Objection; form.
14          Go ahead Mr. Andrien.
15    A. That doc -- those --
                                          are not taking into
18 account, as I said, the overall benefit, the
19 snowball effect, the future benefit. This is --
20 this is a -- a -- a -- is a very limited analysis and --
21 and that limitations are supported by other
22 testimony in the record. And so this cannot be used
23 reliably to do the incremental analysis to analyze
24 the benefit from this conduct to Google throughout
25 its operation. It just doesn't -- it -- it can't be

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

1  used for that purpose.
2        MR. GIBBS:  Objection; nonresponsive.
3     Q.   Certainly you have declared it unreliable
4  and chose not to use it in determining the direct
5  benefit or incremental benefit.  True?
6        MR. COLLIER:  Objection; form.
7     A.   I have reached that conclusion.  But I've
8  also reached that based on the -- the testimony of
9  Google personnel who have said the same thing.
10    Q.   Well, they said that you couldn't --
11 strike that.
12       If you're just looking at the expected
13 direct benefit, █████████████████████████
14 ████ █████████████████████████████████
15 ████ ████████████  Right?
17    A.   This document was a very limited
18 review -- it was a limited estimate of the benefits
19 to Google -- that -- and is not enough to determine
20 the incremental benefits, period.  It's not just me
21 saying that.  It's Google's people saying that.  It
22 is insufficient.  It doesn't take into account how
23 the interactions between these conducts play.  How
24 these conducts create an advantage in the
25 marketplace for Google.  How that advantage in the

Page 303

1  marketplace is going to have some snowball effects
2  throughout the AdTech stack in the rest of Google's
3  operations.  It doesn't account for how important
4  this part of the technology was to Google, the rest
5  of Google's business.  It doesn't account for future
6  benefits to Google.
7        So all the future benefits beyond as a
8  result of all these snowball effects, it is a very
9  limited document.  It is not sufficient to do any
10 sort of incremental analysis of the benefits to
11 Google from this misconduct.  And Google's people
12 confirm that conclusion.  It's not just me saying
13 it.
14       MR. GIBBS:  Objection; nonresponsive.
15    Q.   At the time those documents were
16 generated internally, they didn't know whether any
17 ███████████████████████████████████
18 ████ ███████████  True?
20       MR. COLLIER:  Objection; form.
21    A.   I'd -- I'd have to go back and look at
22 the documents to see what Google knew at the time.
23 But what they've known and what happened as a result
24 of the -- what they projected or knew or -- or
25 expected is different than what I've been tasked

Page 304

1  to -- to determine.  I've been tasked to determine
2  the incremental benefits to Google from the
3  misconduct.  And that estimate is not sufficient for
4  me to calculate the incremental benefit to Google.
5  And the information required to do that calculation
6  was not available to me because Google didn't either
7  retain or keep or track the necessary information
8  for me to do that.  And therefore I could not do
9  that.
10    Q.   Who --
11       THE WITNESS:  If it's okay, I just
12 have to take a quick bio break.  Just a second.
13       MR. GIBBS:  Sure.
14       THE VIDEOGRAPHER:  Going off the
15 record.  The time is 5:50.              0
16       (Break.)
17       THE VIDEOGRAPHER:  Back on the
18 record.  The time is 6:02.
19    Q.   Mr. Andrien, I want to talk now about
20 your third factor in your lens we've been discussing
21 here in calculating your penalties, and that's
22 previous violations.  Okay?
23       That is one of the three that you have
24 listed in your report, is it not?
25    A.   That is -- that is one of the factors

Page 305

1  that I've been asked to consider.
2     Q.   And you included there what you
3  characterize as a number of fines and settlements
4  related to various alleged misconduct by Google.
5        Right?
6     A.   That is correct.
7  █ ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████
   ████ ████████████████████
   ████ ██████████████████████████████████
   ████ ██████████████████
   ████ ████████████████████████████████
   ████ ██████████████████████████████
   ████ ████████████████
   ████ ██████████████████████████████████
   ████ ████████████████████████████████
25    Q.   Did you personally review the site -- the

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

1  circumstances, allegations, and/or terms of the
2  resolution of each of those cases before you relied
3  upon them?
4          MR. COLLIER:  Objection; form.
5      A.  I've considered the fines.  I -- I looked
6  to see what they were related to, and the amounts,
7  and the settlement.  There are certain -- I have
8  certain understandings about some of those, so I --
9  I have looked at the information that was -- that
10  I -- that I've outlined in my -- in my -- in my
11  attachment here that -- it's the information I
12  relied upon, and that'll -- that'll show you the
13  information that I've relied upon --
14      Q.  Did you --
15      A.  -- related to this issue.
16      Q.  -- did you rely upon any fines,
17  penalties, settlements from the European Union and
18  Google's business transactions there?
19      A.  There was certain of those antitrust
20  violations that related to claims brought from --
21  from -- that were brought outside of the United
22  States.
23      Q.  Did you -- are you an expert in the due
24  process and/or processes and procedures of
25  governments' litigation outside the United States?

Page 307

1      A.  I have worked on a number of cases
2  involving litigations outside the United States
3  during my career.  I would imagine I have more
4  experience than the average juror with litigations
5  that have occurred outside of the United States, but
6  other -- I think the question of whether one is an
7  expert or not is a legal determination.  That would
8  be up to a judge to determine.
9      Q.  Well, you don't hold yourself out as an
10  expert in the processes of litigation, for example,
11  conducted by the European Union in its litigation
12  against foreign nationals, are you?
13      A.  I would just say the same thing.  I have
14  experience in litigation that has happened outside
15  the United States.  I have probably more
16  understanding and experience than the average juror.
17  And whether or not that -- that is -- whether or not
18  I'm an expert in that area is -- is up to a judge to
19  determine, not me.
20          That has a legal -- I think that's a
21  legal determination.  So I hold myself up as a
22  person who has knowledge, skill, experience in -- in
23  various different categories.
24      Q.  You don't hold yourself out as having
25  legal expertise in that -- and market yourself, if

Page 308

1  you will, based upon that, do you?
2      A.  I -- I don't market myself as a lawyer,
3  if that's what you're asking.  I market myself as a
4  financial economist who has experience in the legal
5  environment, both inside and outside of the United
6  States.
7      Q.  Do you -- did you take into account
8  any -- any legal action against Google by Russia in
9  your evaluations?
10  ███ ███████████████████
11  ███████████████████████, I think there's
12  one that was -- if I recall -- I don't have it in
13  front of me as I sit here -- was $7.8 million
14  associated with Russia.
15      Q.  You don't know what -- have you made any
16  study of the due process protections and/or legal
17  process, fairness of litigation against American
18  companies, for example, in Russia?  Has that been
19  part of your experience?
20      A.  Well, I am familiar with different
21  international arbitrations and litigations that have
22  happened in Russia.  So I have some familiarity with
23  that, but -- I guess I'll just leave it there.
24      Q.  Yeah.  Do you think that it is an
25  appropriate -- it is an appropriate measure of your

Page 309

1  deterrence analysis to -- to take into account
2  judgments taken by Russia against a company like
3  Google?
4      A.  I think it can be.  As an economist I'm
5  going to want to look at all the data I can, and
6  available to me, and interpret that data, and -- and
7  determine its relevance to my analysis.
8          So I've looked at the data.  I think
9  I've -- I've analyzed the data in aggregate.  And --
10  and as I've said, I've looked at various -- I've
11  broken it down, and I've, in general, come to some
12  general conclusions based on the -- on the data that
13  I've reviewed, and -- and so that's the -- that's
14  the work that I've undertaken.
15      Q.  Are you aware that in the last couple of
16  days that Russia has taken a judgment against Google
17  for decimillions of dollars, that is a number and 35
18  zeros behind it?  Are you aware of that as you sit
19  here?
20      A.  I have heard about that.  I have not --
21  other than hearing about it, I have not studied it
22  or anything like that.  It's not part of my
23  analysis, and so it bears no relevance to what I've
24  done in this case.
25      Q.  It's laughable, in your opinion, but

78 (Pages 306 - 309)

CONFIDENTIAL

Page 310

1  understandable that the Russians would take some
2  kind of legal action against an American company
3  like that, isn't it?
4        MR. COLLIER:  Objection; form.
5     A.   I don't have an opinion on whether it's
6  understandable or not.  I do believe that a
7  penalty -- or -- or that large is -- I believe it's
8  larger than the wealth of the entire world.
9        So in that sense, it doesn't make any
10  economic sense to me.
11    Q.   ████████████████████████████████
12  ████████████████████████████████████████?
13        MR. COLLIER:  Objection; form.
14    A.   ████████████████████████████████
15  ████████████████████████████████████████
16  ████████████████████████████████
17  ████████████████████████████████████████
18  ████████████████████████████████████████
19  ████████████████████████████████
20  ████████████████████████████████████
21  ████████████████████████████.
23    Q.   The -- the EU took a major judgment
24  against Google back in 2019.  Right?
25        MR. COLLIER:  Objection; form.

Page 311

1     A.   You'd have to refresh my recollection on
2  dates and the judgment amounts, as I sit here.
3     Q.   Hundreds of millions of dollars.  Do you
4  recall that?
5     A.   I recall looking at a variety of
6  different judgments and settlements that Google
7  entered into from 2011 to -- through 2023.  And I
8  recall a number of them being related to the
9  European Union, but I'd have to go back and look
10  individually again and have my recollection
11  refreshed as to the date and the exact amount.
12        I've thought about these more in -- in
13  categories of the type of violation and the total
14  amounts, not the individual amounts.
15    Q.   Were you aware that the 2019 judgment,
16  for example, against Google has been reversed and
17  that fine has been eliminated?
18    A.   You'd have to show me and refresh my
19  recollection so I could -- I could look.  And I
20  would have to go back and review it based -- in
21  relation to the ████████████████████
23    Q.   So my question is did you take into
24  account, in your review and use of these past
25  violations, that indeed a number of these kinds of

Page 312

1  cases are either brought by or taken by somebody
2  like the Russian government or on the other hand are
3  later reversed, as in the case of the EU?
4        MR. COLLIER:  Object.
5     Q.   Were those taken into consideration by
6  you?
7     A.   I think whether or not the reverse would
8  not have any bearing or -- or -- or -- or weighting
9  to -- to my opinion in this case.  Because my
10  opinion looks at these and says, all right, I
11  understand that Google has entered into fines and
12  settlements for various conduct, much of which
13  relates to this case.
14        And whether it's been reversed or not,
15  those amounts that were levied against it have not
16  caused Google to sufficiently alter its behavior to
17  avoid the -- the allegations and conducts that --
18  that the -- that the plaintiffs in this case are --
19  are -- alleged that are ongoing still.
20    Q.   We've established that your sole task and
21  your sole opinions are confined in this case to the
22  quantum or amount of civil penalties that you are
23  recommending under the DTPA statutes.  True?
24        MR. COLLIER:  Objection; form.
25     A.   I've analyzed and been asked to

Page 313

1  consider -- my assignment in this case was to
2  determine appropriate penalties that should be
3  applied -- levied against Google, to punish Google
4  for the alleged misconduct in this case, and -- and
5  consider that penalty in relation to three
6  additional factors, which -- the three factors that
7  I've addressed in this report.  And that's the work
8  that I've undertaken.
9        Now, the opinions that I've offered are
10  those opinions -- I've provided the support for
11  those opinions.  I am -- I am expecting to testify
12  to those opinions, without -- without exception.
13  And to the extent that those opinions enter into the
14  category that you just described, that I'm going to
15  them as such.  To the extent they don't, then I'm
16  going to testify to them as such still.
17    Q.   What type --
18        MR. GIBBS:  Objection; nonresponsive.
19    Q.   -- what type of violations, in your
20  opinion, and as you have calculated your penalties
21  here, are you recommending be considered as
22  supportive of your opinions?
23        And by that I mean what kinds of legal
24  violations are fair game?
25        MR. COLLIER:  Objection; form.

79 (Pages 310 - 313)

CONFIDENTIAL

Page 314

1    A.   That's -- I don't understand the
2  question.
3    Q.   I'll repeat --
4    A.   It's a broad question.
5    Q.   -- I'll rephrase the question.
6    A.   Thank you.
7    Q.   If -- if somebody at Google violated
8  ERISA over and didn't pay the employees,
9  or was accused of not paying the employees, or there
10  was some claim against management for not paying the
11  employees under the ERISA statutes for, say,
12  interest on pensions, is that fair game under the
13  DTPA analysis of their -- of the penalties provision
14  of the DTPAs?
15       Is that includable, in your view, in
16  assessing penalties?
17       MR. COLLIER:  Objection; form.
18    A.   I -- I don't know what you mean by "fair
19  game."
20    Q.   Includable.
21    A.   If I may -- as an economist, if I'm
22  looking at past violations, I would want to look at
23  all of the past violations that exist that I can
24  find.  I'd want to understand them.  I'd want to
25  understand if ultimately the -- the -- the

Page 315

1  violations have resulted in Google -- effectively
2  deterring Google's bad conduct.  In this case,
3  Google has continued to engage in misconduct,
4  continues to engage in now.  ███████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████  And as I
9  understand it, the deceptive misconduct in this case
10  has risen -- has -- has -- has put Google in the
11  position where it's also facing anticompetitive
12  conduct.  So those are related in that way.
13       MR. GIBBS:  I'll pass the witness.
14       EXAMINATION
15  BY MR. COLLIER:
16    Q.   Mr. Andrien, is it fair to say Google's
17  counsel has asked you approximately seven hours'
18  worth of questions regarding your opinions in your
19  June 7th opening report and your September 9th
20  rebuttal report?
21    A.   Yes, that's fair.
22    Q.   Well, is any of the testimony you've
23  given today intended to change the opinions you've
24  expressed in your opening report?
25    A.   No, sir.

Page 316

1    Q.   Is any of the testimony today intended to
2  somehow limit the opinions expressed in your opening
3  report?
4    A.   No, sir.
5    Q.   Was any of your testimony intended to
6  change the opinions expressed in your rebuttal
7  report?
8    A.   No, sir.
9    Q.   Is any of the testimony you gave today
10  intended to limit the opinions expressed in your
11  rebuttal report?
12    A.   No, sir.
13    Q.   After sitting through all of these
14  questions and exhibits presented by Google's
15  counsel, do you have an opinion on whether or not
16  you have sufficient facts and data to reach the
17  opinions you've reached within the two reports in
18  this case?
19    A.   Yes, I do have sufficient facts and data
20  to reach the opinions that I've reached in this
21  case.
22       MR. COLLIER:  Pass the witness.
23       MR. GIBBS:  We need to designate the
24  transcript as confidential.
25       MR. COLLIER:  So -- so -- so noted.

Page 317

1       Thank you, sir.
2       MR. GIBBS:  And let the record
3  reflect I have left you -- given back five minutes.
4       MR. COLLIER:  Let the record reflect
5  we gave out cookies.
6       MR. GIBBS:  Fair trade.
7       MR. COLLIER:  All right.
8       THE VIDEOGRAPHER:  This ends the
9  deposition of Jeffrey Andrien.  Going off the
10  record.  The time is 6:20.
11       (Deposition concluded at 6:20 p.m.)
12       MR. COLLIER:  Read and sign.
13
14
15
16
17
18
19
20
21
22
23
24
25

80 (Pages 314 - 317)

CONFIDENTIAL

Page 318

```
 1          CORRECTION PAGE
 2   WITNESS NAME: JEFFREY SCOTT ANDRIEN
 3   DATE: 11/01/2024
 4   PAGE  LINE  CHANGE      REASON
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Job No. CS6918698
```

Page 319

```
 1          SIGNATURE PAGE
 2
 3   I, JEFFREY SCOTT ANDRIEN, have read the foregoing
     deposition and hereby affix my signature that same
     is true and correct, except as noted on the
 4   correction page.
 5
 6
     _____
     JEFFREY SCOTT ANDRIEN
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   Job No. CS6918698
25
```

Page 320

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2               SHERMAN DIVISION
 3
 4   THE STATE OF TEXAS, ET  §
     AL.,                    §
                             § CIVIL ACTION NO.
 5   PLAINTIFFS,             § 4:20-CV-00957-SDJ
                             §
 6   V.                      §
                             §
 7   GOOGLE LLC,             §
                             §
 8   DEFENDANT.              §
 9
10          REPORTER'S CERTIFICATION
            DEPOSITION OF JEFFREY SCOTT ANDRIEN
            TAKEN NOVEMBER 1, 2024
11
12        I, TAMARA CHAPMAN, Certified Shorthand Reporter in
13   and for the State of Texas, hereby certify to the
14   following:
15        That the witness, JEFFREY SCOTT ANDRIEN, was duly
16   sworn by the officer and that the transcript of the
17   oral deposition is a true record of the testimony
18   given by the witness;
19        That the original deposition was delivered to
20   ROBIN C. GIBBS;
21        That a copy of this certificate was served on all
22   parties and/or the witness shown herein on
23
24        I further certify that pursuant to FRCP No.
25   30(f)(i) that the signature of the deponent:
```

Page 321

```
 1        X   was requested by the deponent or a party
 2   before the completion of the deposition and that the
 3   signature is to be returned within 30 days from date
 4   of receipt of the transcript. If returned, the
 5   attached Changes and Signature Page contains any
 6   changes and the reasons therefor;
 7        ____ was not requested by the deponent or a party
 8   before the completion of the deposition.
 9        I further certify that I am neither counsel for,
10   related to, nor employed by any of the parties in
11   the action in which this proceeding was taken, and
12   further that I am not financially or otherwise
13   interested in the outcome of the action.
14        Certified to by me this 4th day of November, 2024.
15
16
17
18
19
20          Tamara Chapman, CSR, RPR-CRR
            CSR NO. 7248; Expiration Date: 12-31-24
            Veritext Legal Solutions
            Firm Registration No. 571
21          300 Throckmorton Street, Suite 1600
            Fort Worth, Texas  76102
22          800-336-4000
23
24
25
```

81 (Pages 318 - 321)

Veritext Legal Solutions

973-410-4098

800-567-8658

CONFIDENTIAL

Page 322

1  Marc B. Collier

2  marc.collier@nortonrosefulbright.com

3         November 5, 2024

4  RE:   State Of Texas Et Al  v. Google LLC

5    11/1/2024, Jeffrey Scott Andrien (#6918698)

6     The above-referenced transcript is available for

7  review.

8     Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  erratas-cs@veritext.com.

16   Return completed errata within 30 days from

17  receipt of testimony.

18   If the witness fails to do so within the time

19  allotted, the transcript may be used as if signed.

20

21

22         Yours,

23         Veritext Legal Solutions

24

25

82 (Page 322)

CONFIDENTIAL

## ERRATA SHEET FOR THE TRANSCRIPT OF JEFFREY ANDRIEN

Case Name: *The State of Texas, et. al. v. Google LLC*, 4:20-cv-00957-SDJ

Date of Deposition:   November 1, 2024

Deponent:   Jeffrey Andrien

| Page | Line | Original Language | Corrections | Reason for Correction |
|---|---|---|---|---|
| 9 | 8 | "the opinions in this report" | "the opinions in these reports" | Correction |
| 26 | 4-6 | "But they don't relate to the antitrust, then -- then the -- those are still the opinions I'm going to give." | "But if my opinions don't relate to antitrust, they are still the ones I am going to give and testify to." | Clarity |
| 29 | 6 | "opinions without accept - - acceptance" | "opinions without exception" | Transcription Error |
| 30 | 5-6 | "that Facebook is - - would be part of the AdTech stack at issue here." | "that Facebook would be involved in auctions at issue here." | Correction |
| 35 | 20 | "my report" | "my reports" | Correction |
| 36 | 25 | "in my report" | "in my reports" | Correction |
| 38 | 7 | "my report" | "my reports" | Correction |
| 38 | 9 | "of the report" | "of the reports" | Correction |
| 39 | 22 | "my opinions based" | "my opinions are based" | Correction |
| 52 | 21 | "And the things that I do" | "And of the things that I do" | Correction |
| 56 | 15 | "academic journals have" | "academic journals that have" | Correction |
| 56 | 17 | "publication" | "publications" | Transcription Error |
| 63 | 10-11 | "So because they claimed it" | "So just because they claimed it" | Correction |
| 65 | 12 | "Dr. Ruden" | "Dr. Rudin" | Transcription Error |
| 65 | 14 | "Ruden" | "Rudin" | Transcription Error |
| 70 | 21 | "there is four" | "there are four" | Correction |
| 80 | 1 | "are working in the snowball" | "are working and the snowball" | Transcription Error |

**CONFIDENTIAL**

| Page | Line | Original Language | Corrections | Reason for Correction |
|------|------|-------------------|-------------|----------------------|
| 89 | 21 | "damages" | "penalties" | Correction |
| 95 | 7 | "statute allows" | "statutes allow" | Correction |
| 116 | 7-8 | "issuing of my original report" | "issuing of my rebuttal report" | Correction |
| 157 | 24 | "effective" | "affected" | Transcription Error |
| 159 | 18 | "I have asked to assume" | "I have been asked to assume" | Correction |
| 176 | 9 | "increasing" | "Decreasing" | Correction |
| 189 | 7 | "I related to" | "that relate to" | Correction |
| 189 | 12-13 | "I looked -- I analyzed those into the -- by looking at kind of a portion of those to the 17 point of states." | "I analyzed those and apportioned them to the 17 states." | Correction |
| 212 | 25 | "produced" | "produce" | Correction |
| 248 | 19 | "DBAA" | "DVAA" | Transcription Error |
| 292 | 22 | "question" | "answer" | Correction |
| 297 | 2 | "option" | "auction" | Transcription Error |
| 297 | 6-7 | "Or if the clearing price would have been absent the misconduct." | "Or if the clearing price was higher than it would have been absent the misconduct." | Transcription Error |
| 300 | 9 | "In a" | "And a" | Transcription Error |
| 308 | 10 | "funds" | "fines" | Transcription Error |
| 310 | 18 | "violation accounts" | "violation counts" | Transcription Error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefore.

Signature:

Date: November 13, 2024

**CONFIDENTIAL**