# EXHIBIT 13
# [FILED UNDER SEAL]

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF TEXAS

3                        Sherman Division

4       - - - - - - - - - - - - - -+
                                    |
5       THE STATE OF TEXAS, et al, |
                                    |
6              Plaintiffs,          |    Case Number:
                                    |
7         vs.                       |    4:20-cv-00957-SDJ
                                    |
8       GOOGLE, LLC,                |
                                    |
9              Defendant.           |
                                    |
10      - - - - - - - - - - - - - -+

11

12

13                   Video Deposition of

14                 DAVID W. DERAMUS, Ph.D.

15                 Monday, October 28, 2024

16                        9:11 a.m.

17

18

19

20

21

22

23

24      Reported by:  Laurie Donovan, RPR, CRR, CLR

25        Job No. CS6918935

Page 2

```
 1
 2
 3
 4
 5
 6                    October 28, 2024
 7                    9:11 a.m.
 8
 9        Video deposition of David W. DeRamus, Ph.D.,
10   held in person, with the witness and most parties
11   participating in person, some participating via Zoom,
12   pursuant to the Rules of the United States District
13   Court for the Eastern District of Texas, Sherman
14   Division, subject to such stipulations as may be
15   recited herein or attached hereto, before Laurie
16   Donovan, a Registered Professional Reporter and notary
17   public of the District of Columbia, who officiated in
18   administering the oath to the witness.
19
20
21
22
23
24
25
```

Page 3

```
 1           A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF STATES:
 3        The Lanier Law Firm, PLLC
 4        10940 West Sam Houston Parkway North
 5        Suite 1000
 6        Houston, Texas 77064
 7        (713)659-5200
 8        By: Marc Collier, Esq.
 9           marc.collier@lanierlawfirm.com
10           Zeke DeRose, Esq.
11           zeke.derose@lanierlawfirm.com
12           Alex Abston, Esq. (remote)
13           alex.abston@lanierlawfirm.com
14   ON BEHALF OF DEFENDANT GOOGLE LLC:
15        Gibbs & Bruns LLP
16        1100 Louisiana, Suite 5300
17        Houston, Texas 77002
18        (713)650-8805
19        By: Michael R. Davis, Esq.
20           mdavis@gibbsbruns.com
21
22
23
24
25
```

Page 4

```
 1   (Appearances continued)
 2   ALSO ON BEHALF OF DEFENDANT GOOGLE LLC:
 3        Freshfields Bruckhaus Deringer US LLP
 4        700 13th Street, NW, 10th Floor
 5        Washington, D.C. 20005
 6        (202)777-4500
 7        By: Tyler Garrett, Esq.
 8           tyler.garrett@freshfields.com
 9   ALSO PRESENT:
10        Orson Braithwaite, videographer
11        Bryan Richter  (remote)
12        Daniella Torrealba (remote)
13        Luke Woodward (remote)
14        Jonathan Jaffe (remote)
15        Nathan Baum (remote)
16        Nathan Damweber (remote)
17        Trevor Young (remote)
18
19
20
21
22
23
24
25
```

Page 5

```
 1            EXAMINATION INDEX
 2                   PAGE
 3   EXAMINATION BY MR. DAVIS . . . . . . . . . .  8
 4   EXAMINATION BY MR. COLLIER  . . . . . . . . . 310
 5   FURTHER EXAM BY MR. DAVIS . . . . . . . . . . 323
 6
 7
 8
 9
10            E X H I B I T S
11   EXHIBIT    DESCRIPTION             PAGE
12   Exhibit 1  Description of apple cart story .  10
13   Exhibit 2  Article by Combe, et al, titled
14             "Cartels: The Probability of
15             Getting Caught in the
16             European Union" . . . . . . . . .  99
17   Exhibit 3  Backup for the ex post
18             calculation . . . . . . . . . . . 104
19   Exhibit 4  Backup for the ex ante
20             calculation . . . . . . . . . . . 104
21   Exhibit 5  PowerPoint presentation titled
22             "Beyond Bernanke," dated
23             August 17, 2015, Bates
24             GOOG-DOJ-28385887 . . . . . . . . 123
25
```

2 (Pages 2 - 5)

Page 6

1   (Exhibits continued)
2   EXHIBIT    DESCRIPTION    PAGE
3   Exhibit 6  PowerPoint presentation titled
4       "Beyond Bernanke," dated
5       October 21, 2013, Bates
6       GOOG-DOJ-12700489 . . . . . . . . 148
7   Exhibit 7  Email about the launch of Global
8       Bernanke, Bates GOOG-DOJ-
9       15637938 . . . . . . . . . . . . 152
10  Exhibit 8  Four-page document describing
11      Global Bernanke, Bates
12      GOOG-DOJ-14161943 . . . . . . . . 158
13  Exhibit 9  Printout from the Internet
14      Encyclopedia of Philosophy with
15      definition of fallacies . . . . . 241
16  Exhibit 10  Article by Reuters titled
17      "Google Close to Clinching
18      Groupon Deal . . . . . . . 263
19  Exhibit 11  Reproduction of Figure 1 graph
20      with added points . . . . . . . . 293
21  Exhibit 12  Another reproduction of the
22      Figure 1 graph with added points
23      and line . . . . . . . . . . . . 295
24
25

Page 7

1   -------------------------------------------------
2          P R O C E E D I N G S
3               9:11 a.m.
4   -------------------------------------------------
5       THE VIDEOGRAPHER:  Good morning.  We are
6   going on the record at 9:11 a.m. on October 28,
7   2024.  Please note that the microphones are
8   sensitive and may pick up whispering and private
9   conversations.
10      Please mute your phones at this time.  Audio
11  and video recording will continue to take place
12  unless all parties agree to go off the record.
13      This is media unit one of the deposition of
14  Dr. David DeRamus in the matter of State of
15  Texas, et al, versus Google, LLC, filed in the
16  United States District Court for the Eastern
17  District of Texas, case number 20-CV-00957.
18      My name is Orson Braithwaite, representing
19  Veritext Legal Solutions, and I'm the
20  videographer.  The court reporter is Laurie
21  Donovan from the firm Veritext Legal Solutions.
22      Counsel will now state that are experiences
23  and affiliations for the record.
24      MR. DAVIS:  Michael Davis, Gibbs & Bruns,
25  for Google.

Page 8

1       MR. GARRETT:  Tyler Garrett, Freshfields,
2   for Google.
3       MR. COLLIER:  I guess continuing in person,
4   in person is Marc Collier with Norton Rose
5   Fulbright and Zeke DeRose with the Lanier Law
6   Firm.
7       THE VIDEOGRAPHER:  Thank you.  Will the
8   court reporter please swear in the witness.
9                * * * * *
10  Whereupon,
11          DAVID W. DERAMUS, Ph.D.,
12      having been first duly sworn, testified
13      upon his oath as follows:
14      EXAMINATION BY COUNSEL FOR DEFENDANT GOOGLE
15  BY MR. DAVIS:
16      Q   Good morning, Dr. DeRamus.  What do you,
17  what do you want me to call you?
18      A   You can call me Dr. DeRamus, since we're on
19  the record.
20      Q   Will do, and are you all good to proceed
21  with your deposition?
22      A   Yes, I am.
23      Q   In your work in this case, one of the things
24  that you've done is to perform a number of
25  calculations that, in your view, derive an optimal

Page 9

1   penalty for this case from the perspective of
2   deterrence, right?
3       A   I would agree with everything you said,
4   except perhaps "optimal."  I provide a range of, of
5   estimates of appropriate deterrent penalties, so I
6   think it's -- ultimately it's my understanding that it
7   is a jury decision as to what the optimal penalty
8   should be, based on a broad range of considerations.
9       Q   Is the range that you provide in this case
10  something other than optimal?
11      A   No.  I would consider -- well, I think there
12  are additional factors in the economics and finance
13  literature that might point to factors that would
14  increase the numbers.  I would generally expect them,
15  though, to be within the range that I provided.
16      Q   And there are also factors that you would
17  expect the jury to use that could decrease the range
18  below the numbers that you suggest, true?
19      A   Certainly.  It's up to, up to the jury's
20  discretion, yes.
21      Q   Okay, and to calculate that penalty range in
22  this case, one of the things that you do is to use a
23  formula that divides Google's expected benefit from
24  the alleged unlawful conduct by the probability of
25  detection and enforcement expressed as a decimal,

1 right?

2    A    In shorthand, yes.

3    Q    I'd like -- I will tell you I'm someone who
4 always thinks that examples are helpful, because I
5 can't keep some of the concepts in my head, so I'd
6 like to talk through that formula using an example.

7         (Exhibit 1 was marked for
8         identification.)

9 BY MR. DAVIS:

10   Q    This is Exhibit 1 that we just marked.  I'll
11 read it into the record, but if you want to read it
12 for yourself, please don't hesitate.

13        It says, "Consider, for example, an apple
14 farmer who sells apples.  While bringing 100 apples to
15 a farmers' market to sell, two apples fall out of the
16 farmer's cart and get bruised.  The farmer then sells
17 all 100 apples at the market, each for one dollar.
18 The farmer knows that a bruised apple will sell for
19 only 50 cents and that 50 percent of his customers
20 check apples for bruises before buying them.  The
21 farmer sells all 100 apples without informing
22 customers that some were bruised."

23        "Assume that the law required the farmer,
24 before selling the apples, to tell his customers that
25 some apples may be bruised, and that any customer so

1 informed would check an apple before purchasing it and
2 discover if it was bruised."

3         The first question is a hard one.  Did I
4 read Exhibit 1 correctly?

5    A    I believe you did, yes.

6    Q    And if we want to calculate a deterrent
7 penalty using the formula you apply in this case, what
8 we're doing is attempting to incentivize the farmer to
9 provide the disclosure that the law requires, right?

10   A    Well, to provide the disclosure or not to
11 engage in the actionable conduct, so not to -- not to
12 engage in actionable conduct, so if there is a broader
13 deception, then I guess there are different ways of
14 looking at it; an obligation to make the disclosure or
15 engaging in deception.

16   Q    So I want to make sure we're on the same
17 page.

18        In this example, if you look at the second
19 paragraph of Exhibit 1, it says "assume that the law
20 requires required the farmer, before selling the
21 apples, to tell his customers that some apples may be
22 bruised."

23        Do you understand that that's what I'm
24 asking to you assume the law to say?

25   A    I do, yes.

1    Q    And so in this case, if we are wanting to
2 deter unlawful conduct, what we want to do is
3 incentivize that farmer, using a penalty, to make the
4 disclosure required by law or just to not sell those
5 apples, fair?

6         MR. COLLIER:  Objection; form.

7         THE WITNESS:  Either that or not to engage
8    in the deceptive act.  So I guess I'm -- not
9    being an attorney, I see this from an economic
10   perspective is you're trying to avoid deception,
11   and in order to avoid deception, there is a law
12   that requires disclosure; and absent a
13   disclosure, then the party has engaged in
14   deception.  So what is the penalty required to
15   prevent the deception?

16 BY MR. DAVIS:

17   Q    And preventing the deception -- again, in
18 this example with the farmer in Exhibit 1 -- means
19 providing a disclosure that some apples may be
20 bruised, right?

21   A    Or removing the two bruised apples and
22 replacing them with non-bruised apples, so there's
23 many ways in which the conduct could be -- the
24 sanctioned conduct could be avoided in the first
25 place.

1    Q    And again, I just want to make sure we're on
2 the same page before we jump into the questions.

3         In this example, selling bruised apples is
4 legal.  What's illegal is selling bruised apples
5 without telling customers that they may be bruised.

6         You with me?

7         MR. COLLIER:  Objection; form.

8         THE WITNESS:  I understand the way you're
9    describing it is there is a broader range of
10   deception, though, that occurs against all
11   customers if the farmer is not disclosing the
12   nature of the -- the fact that there are bruised
13   apples.

14        So it's not just that there are two bruised
15   apples that the farmer is selling; it's that the
16   farmer is failing to disclose to all customers
17   coming up to his cart that he has two -- that in
18   his basket of apples, there are two bruised
19   apples.

20        So a customer, any customer who comes up
21   does not know whether -- or they all think,
22   coming up to the apple cart to buy the apples,
23   that they're all buying completely unbruised
24   apples, because they know that there's a law in
25   place where they have reason to expect there are

4 (Pages 10 - 13)

Page 14

1    laws in place to protect the consumer.
2  BY MR. DAVIS:
3    Q  Understood, and so what we want to do is
4  incentivize this farmer to make that disclosure to
5  each customer, not just to ones who he thinks may be
6  buying bruised apples, right?
7    MR. COLLIER:  Objection; form.
8    THE WITNESS:  Well, again, I think you're
9  going broader into what is the intent of the
10  lawmaker -- or -- the lawmaker -- the legislature
11  that established that law.  I think the question
12  is whether the law was intended to prevent
13  deception or whether -- and so the, the
14  disclosure is a, simply a means of, of preventing
15  that deception.  The required disclosure, I
16  should have said.
17  BY MR. DAVIS:
18    Q  If you were asked as an economist to
19  calculate a penalty or range of penalties in
20  connection with the violation of law here described in
21  the example in Exhibit 1, the first step would be to
22  determine the gain that the farmer expected to obtain
23  from the unlawful act, true?
24    A  Well, there are two different ways I
25  described in my reports, that one is the gain to the

Page 15

1  wrongdoer or the other is the societal harm.  That
2  would be one way would be to focus on the gain, yes.
3    Q  And in your report, you don't calculate
4  societal harm, true?
5    A  I don't derive an explicit calculation of
6  it.  I do make an assessment of it, and there are
7  certain figures in my report that I point to that, in
8  my view, are indicative of the magnitude of societal
9  harm, and I conclude that directionally the magnitude
10  of harm -- I conclude that directionally, the
11  magnitude of societal harm is greater than the
12  benefits to Google.
13    Q  Is there a place in your report that I can
14  look to for a numerical figure of the harm that you
15  say was caused by the nondisclosure of Project
16  Bernanke?
17    A  If you hand me my report, I can point you to
18  the sections of my report where I discuss this.
19    Q  So I'm just asking whether you recall
20  putting a numerical figure on the harm to society that
21  you believe was caused by any of the alleged
22  wrongdoing in this case.
23    MR. COLLIER:  I'm going to object to form.
24    THE WITNESS:  As I generally recall, I --
25  referring to, I believe in section 4 of my

Page 16

1  report, different measures of Google's revenues,
2  and I describe those revenues as likely being
3  inflated even on a gross basis, the gross
4  bookings revenue, for example, as being inflated
5  as a result of the conduct at issue, so, and
6  those being a proxy for the harm, but I don't
7  come to a, a measure of the incremental societal
8  harm the way I come to a measure of the
9  incremental benefits to Google.
10  BY MR. DAVIS:
11    Q  And so using the formula that you use in
12  this case, which divides the wrongdoer's expected gain
13  divided by the probability of detection and
14  enforcement, how would you calculate the farmer's
15  expected gain from the wrongdoing in the example in
16  Deposition Exhibit 1?
17    MR. COLLIER:  Object to form.
18    THE WITNESS:  Well, I would say that the
19  question -- it begs the question about whether
20  anyone would have come up to the farmer's cart to
21  begin with, in which case the benefits to the
22  farmer would be his entire profits divided by the
23  probability of, of that being detected, one can
24  imagine that the probability of detection being
25  relatively low, and so I would expect a fairly,

Page 17

1  eventually, a fairly high multiple, especially on
2  ex ante basis, I should say.
3  BY MR. DAVIS:
4    Q  So I actually only want to talk about the
5  numerator first, the expected gain to the farmer, and
6  then we can talk about probability of detection
7  second, because it's hard for me to keep straight at
8  the same time.
9    Can you put a dollar figure on the
10  numerator, the farmer's expected benefit from failing
11  to disclose to his customers that some apples may be
12  bruised?
13    A  It doesn't say what the profit is per apple
14  that he's selling, but again, if, if a deception is
15  really viewed from the lens of all people who buy
16  apples from his cart with the expectation that they
17  are all good, there's no probability of, of getting a
18  bad apple.
19    So for a customer, there's a zero
20  probability in expectation because of the law, that
21  there are no bruised apples.  So therefore, everyone
22  who comes up is buying an apple based on that
23  deception.  So his deception has resulted in the
24  totality of the profits that he earned on that
25  particular day.

5 (Pages 14 - 17)

Page 18

1      Q    That would be the case if this example
2   included an additional fact; namely, that nobody would
3   buy apples if they thought it was a possibility that
4   one was bruised, right?
5          MR. COLLIER:  Objection; form.
6          THE WITNESS:  I think it would also depend
7      on the alternatives that other people had at the
8      time, is there another cart right next door, and
9      whether that other cart complied fully with the
10     law, and if people knew, hey, there's some
11     probability you're going to get some bruised
12     apples from this farmer, and there is zero
13     probability that you will get bruised apples from
14     the next farmer, then I would expect all 100 --
15     if there was only a total demand for 100 apples,
16     that the other farmer's cart would be sold out
17     and this farmer would not sell any.
18  BY MR. DAVIS:
19     Q    Are you taking into account the fact that
20  the example in Deposition Exhibit 1 says explicitly
21  that a bruised apple will still sell, but for 50 cents
22  rather than one dollar?
23     A    Yes.
24     Q    All of your answers thus far have taken that
25  fact into account?

Page 19

1          MR. COLLIER:  Objection; form.
2          THE WITNESS:  Yes.
3          MR. COLLIER:  Hold on.  Dr. DeRamus, we
4      talked over each other.  I'll just remind you:
5      Give me just a beat to make an objection before
6      you answer.
7          THE WITNESS:  Understood.
8   BY MR. DAVIS:
9      Q    In a world with no bruised apples and no
10  disclosure, this farmer would make $100 in revenue,
11  right?
12     A    Correct.  Well, I'm sorry.  Will make $100
13  in revenue?  Yes.
14     Q    And I think you, you were about to answer my
15  next question, which is when we're talking about
16  calculating a penalty using expected gain divided by
17  the probability of detection, we would need to figure
18  out the farmer's expected profit per apple, not just
19  his revenue, right?
20     A    That's correct.  If we're, if we're using
21  the gain as the measure of the deterrent penalty as
22  opposed to societal harm.
23     Q    Right, like you do in your report, right?
24     A    Well, as I -- again, I'll refer you back to
25  my previous answer.  I consider both the harm to

Page 20

1   society and the gain to Google, and I think it's
2   important to consider both factors, but I do calculate
3   the gain to Google as part of my derivation of the
4   deterrent penalty range in this case.
5      Q    Okay.  So we've agreed that the world with
6   no disclosure and no bruised apples, the farmer has
7   $100.
8          What about in the world with disclosure; how
9   many dollars would the farmer have?
10     A    Well, it would depend --
11         MR. COLLIER:  Objection; form.  Go ahead.
12         THE WITNESS:  It would depend on the way
13     that particular disclosure was made.  If the
14     disclosure was this farmer in a cart next to
15     another farmer, and the farmer said I have
16     randomly two apples within my cart that are
17     bruised.  I'm not going to tell you which one,
18     then I would expect the competitive equilibrium,
19     would be if there's a total demand in the market
20     for 100 apples, I would expect that the cart next
21     door would entirely sell out and this farmer
22     would not sell any, and therefore, in that
23     but-for world, the farmer would have zero
24     profits.
25         I think there's a different way in which, if

Page 21

1   the farmer were to say here is all 98, put all 98
2   apples that were not bruised in -- I'm sorry --
3   how many bruised apples does he have?  He's got
4   two apples, right.
5          So all 98 unbruised apples, he put those --
6   he puts those in one stack.  He segregates the
7   other two bruised apples -- sorry.  He separates
8   the two, the two bruised apples in a separate
9   pile, and then he puts a sign that says 50 cents
10  on those apples.  If that's your but-for world,
11  then he makes $99.
12  BY MR. DAVIS:
13     Q    If a farmer sells 100 apples, two of which
14  are bruised, and tells each customer that an apple may
15  be bruised, and as it says in Exhibit 1, a customer so
16  informed will check an apple for bruising before
17  purchasing it and discover the bruise if they get that
18  disclosure, isn't it true that this farmer should
19  expect $99 in revenue?
20     A    I would say again it depends on the broader
21  competitive constraints, so if you're saying this is
22  the only apple in the market -- sorry.  This is the
23  only -- this is a monopoly apple cart, and you have a
24  lot of very hungry people, then yes, your results
25  would obtain.

6 (Pages 18 - 21)

Page 22

1    I would say if there are all competitive
2  alternatives, however, that it is much easier for
3  others to simply go to the cart next door where there
4  are no bruised apples. So again, it depends, and then
5  in which case the farmer would still go home with
6  nothing.
7    Q   I'm not familiar with the phrase "your
8  results would obtain." Are you saying that if there's
9  only one apple cart available, that yes, this farmer
10  would expect $99 in revenue if he made the disclosures
11  required by law?
12    MR. COLLIER:  Objection; form.
13    THE WITNESS:  Yes, and if customers were so
14    inclined to undertake -- A, if he were the only
15    apple cart in the market, and B, if customers
16    were so inclined to do their own checking, and
17    were sufficiently hungry that they wanted to buy
18    those apples from him.
19  BY MR. DAVIS:
20    Q   Have you ever heard the phrase "fighting the
21  hypothetical"?
22    A   No, but that's an interesting concept, yes.
23  Thank you.
24    Q   You're smiling. How come?
25    A   Because I was assuming you were raising

Page 23

1  that, that I am just your -- I took it as your
2  implication that I was fighting the hypothetical.
3    Q   And in fairness, you are a little bit,
4  right?
5    MR. COLLIER:  Objection; form.
6    THE WITNESS:  In fairness, no. I think
7    there are serious issues in this case, and I
8    think there are significant issues in this case
9    related to the deceptive conduct at issue, and I
10    don't think your hypothetical is apposite to the
11    issues in this case.
12    And so in drawing a particular conclusion
13    and applying economic principles, you do need to
14    understand the specifics of this case and not
15    simply rely on really broad hypotheticals.
16  BY MR. DAVIS:
17    Q   Assuming one apple cart in the farmers'
18  market, this farmer would expect $99.50 in revenue if
19  he did not make the disclosures required by law, true?
20    A   I'm sorry. Say that one more time.
21    Q   Assuming one apple cart in the farmers'
22  market, this farmer would expect $99.50 in revenue if
23  he did not make the disclosures required by law, true?
24    A   I think you're saying he would have made
25  $100 if he sells -- if he doesn't make the disclosures

Page 24

1  required by law, customers don't know. All customers
2  buy the 100 apples and pay one dollar for them, so he
3  makes $100.
4    Q   Doesn't the example in front of you,
5  Deposition Exhibit 1, say that 50 percent of his
6  customers check apples for bruises before buying them?
7    A   Oh, indeed. Thank you.
8    So probabilistically, that would be correct,
9  if again assuming -- not to fight your hypothetical,
10  but assuming a certain sequence of events in terms of
11  what happens when that first customer finds that
12  apple, so the customer finds an apple, thinks they're
13  all -- finds the bruised apple and says -- tells
14  everybody else that, hey, these are a bunch of
15  bruised -- there are bruised apples in this, I would
16  expect everybody to go away and buy from the
17  competitor's cart.
18    Q   You know that in the question I just asked
19  you, I asked you to assume there was one apple cart,
20  right?
21    MR. COLLIER:  Objection; form.
22    THE WITNESS:  Well, if you would like me to
23    assume that, if you would like me to assume
24    there's only one apple cart in the market, that
25    this is a, this is a monopoly apple seller, I'm

Page 25

1    happy to assume that for the purposes of this
2    hypothetical.
3  BY MR. DAVIS:
4    Q   Are the penalties that you calculate in --
5  excuse me -- the range of penalties that you calculate
6  in your report in this case intended to address the
7  alleged antitrust conduct in this case, in addition to
8  the alleged violations of deceptive trade practice
9  statutes?
10    A   I believe I have a sentence in my report
11  that goes to that issue. I'm happy to read that to
12  you if you would like.
13    Q   I'm actually just asking what your take is.
14  Do you think that the penalties that you have
15  calculated in this case as a potential range are
16  intended to address only the violations alleged of
17  deceptive trade practice statutes or are they also
18  intended to address violations of antitrust law?
19    A   Well, again, this is one of those issues,
20  because it does go to the broader claims, I would be
21  much more comfortable in giving you a complete and
22  accurate answer to that if I have my report. I can
23  tell you in general terms, but I'm concerned that,
24  because it does go to the issue of one of the
25  underlying claims, that I would be much more

7 (Pages 22 - 25)

Page 26

1  comfortable assuring that my, my answer is complete
2  and accurate if I had my report in front of me.
3      Q    Without looking at your report, are you able
4  to tell me what violations of law you're meaning to
5  calculate penalties for?
6      A    The penalties are calculated under, my
7  understanding, the provisions of the various Deceptive
8  Trade Practices Act. That's the -- I generally refer
9  to the Texas DTPA Act or DTPA, but also under similar
10  state statutes as well.
11        I believe in my report I do reference the
12  antitrust claims. I'm aware of the antitrust claims
13  are there, but they are not -- my opinions are not
14  dependent on a finding of liability on the antitrust
15  issues.
16        In my mind, there are certain issues related
17  to the conduct that, as an economist, I can't ignore
18  or that they do factor into my consideration, they do
19  factor into my opinions.
20      Q    Am I understanding correctly that there are
21  antitrust considerations that factor into the range of
22  penalties that you calculate in this case?
23      A    Not explicitly, no.
24      Q    What about implicitly?
25      A    Well, there are ways in which I consider the

Page 27

1  conduct to have -- or based on my review of the expert
2  reports submitted by others who were opining on the
3  antitrust issues, such as Dr. Gans, that the conduct
4  at issue contributed to Google's ability to maintain,
5  to establish and maintain a monopoly position, that
6  the market structure is changed as a result of its
7  conduct over the entirety of the time period, and by
8  "its conduct," I mean the totality of the conduct, not
9  simply the deceptive conduct that I'm particularly
10  analyzing.
11        As such, I expect a gain to Google from its
12  conduct to be larger than what I have estimated, as my
13  estimates are derived based on Google's own studies of
14  the gains from implementing certain programs that
15  are -- have been alleged to be deceptive, and does not
16  sweep in the -- I don't attempt to calculate the
17  additional gains that Google would have been able to
18  make as a result of its reinforcement of its market
19  power in the market, or those longer term, so those
20  longer term benefits.
21        So in that regard, it informs my opinion,
22  that conduct informs my opinion, but it does not --
23  but the calculations themselves that I'm offering do
24  not depend on a finding of liability on the antitrust
25  claims.

Page 28

1      Q    Do you remember what my question was?
2      A    I do.
3      Q    What was it?
4      A    It was to what extent is the antitrust, the
5  antitrust claims incorporated into my estimates of the
6  penalties, or at least that's -- I'm paraphrasing.
7  That was my understanding.
8      Q    And the answer is not at all, right?
9          MR. COLLIER: Objection; form, asked and
10  answered.
11          THE WITNESS: I've been asked to give my
12  opinions in this matter about what is the
13  appropriate deterrent and penalty amounts, and it
14  does factor into those broader opinions, in terms
15  of what is a reasonable deterrent penalty amount.
16        It is not factored -- the antitrust claims
17  in the antitrust conduct specifically considered
18  in isolation from the, the deceptive conduct at
19  issue is not something I have explicitly
20  calculated. I have not explicitly calculated
21  those benefits and added them to my estimates in
22  terms of the specific numbers that are put forth
23  in my report.
24  BY MR. DAVIS:
25      Q    Does the allegation that Google possessed

Page 29

1  monopoly power in one or more markets affect the
2  penalties that you calculate in this case?
3      A    No, they do not -- they do not affect the
4  calculations that I have made. I have not made an
5  adjustment factor to those to account for that factor,
6  for example.
7      Q    Okay.
8        In determining the numerator of the formula
9  you use in this case, namely, the wrongdoer's expected
10  gain divided by the probability of detection and
11  enforcement, are we comparing a world with the
12  wrongdoing to a but-for world without the wrongdoing?
13      A    Effectively, yes. It's the, it's the world
14  with the, with the conduct and without the conduct,
15  correct? Well, but -- I'm sorry. Let me, let me
16  think for a minute. It's a -- I think this notion of
17  a but-for world is -- I have a description in my
18  report about -- a section in my report where I discuss
19  the different lens that might be applied here versus
20  in a standard damages type case, where that but-for
21  analysis is much more front and center.
22        But ultimately my calculations are all based
23  on the incremental benefits to Google of the -- of
24  three particular bidding strategies. I'm sorry.
25  Three particular modifications to its auction program,

8 (Pages 26 - 29)

Page 30

1  Bernanke, RPO and DRS.
2      I should also mention in all these answers,
3  I'm referring to the calculation in section 6 of my
4  report. In section 7 of my report, I have an entirely
5  different approach.
6      Q  I'm, I'm tracking that. When I have said --
7  and I don't mean to interrupt you. I just --
8      MR. COLLIER: I'm going to object. You
9  interrupted. I'd like him to finish his sentence
10 even if you're tracking.
11     Go ahead, Dr. DeRamus.
12     THE WITNESS: I have two separate
13 methodological approaches to estimating deterrent
14 penalties, one in section 6 and one in section 7.
15     My answers up to this point have been
16 largely directed at those calculations in section
17 6, as I was assuming that was where you were
18 focused, but to be clear, my opinions do
19 encompass the ranges that I derive also in
20 section 7.
21 BY MR. DAVIS:
22     Q  And just object to everything about section
23 7 as nonresponsive.
24     To be clear for the record, when I've been
25 asking about the formula, the wrongdoer's expected

Page 31

1  gain divided by probability of detection and
2  enforcement, that's section 6 of your report, right?
3      A  That's where I did the calculations, yes,
4  but I -- maybe just for completeness, I would say --
5  I'd back up to section 2 through 6, because section 2
6  is where I lay out the economic principles of it, and
7  I even in section -- I'm sorry. Section 3 and 4
8  are -- and 5 are all relevant to the buildup for the
9  calculations that are in section 6.
10     Q  I should have asked a better question, which
11 is that what we've been talking about so far, the
12 formula, expected gain to the wrongdoer divided by
13 probability of detection and enforcement, has nothing
14 to do with section 7 of your report, correct?
15     MR. COLLIER: Objection; form.
16     THE WITNESS: The calculations don't go into
17 section 7. They inform my opinion as to the
18 reasonableness of the results in section 7, but
19 they do not feed into that, if that's how I
20 understand you to be asking the question.
21 BY MR. DAVIS:
22     Q  Moving to the denominator, the probability
23 of detection and enforcement, as an economist, do you
24 estimate the actual probability of detection and
25 enforcement or the wrongdoer's expected or believed

Page 32

1  probability?
2      A  I would say it's more the actual
3  probability. I think there's a -- I'm not trying to
4  be a mind reader for what Google employees may have
5  had in their heads in terms of what their
6  probabilities were, but -- and it is data that I'm
7  drawing from research, other empirical studies that
8  have been done.
9      So it is more of an actual probability, but
10 again with some range, because -- or I should say it
11 is estimated as a range, because there is some degree
12 of uncertainty associated with the probability of
13 detection, enforcement and collection of a penalty
14 associated with the specific type of conduct at issue
15 here.
16     Q  Does the economic literature and research on
17 which you rely with respect to the probability of
18 detection and enforcement state that the probability
19 should be determined subjectively to the specific
20 wrongdoer or objectively?
21     A  I think one could read the literature to
22 suggest either perspective. I think generally it
23 would be objectively, because there are -- that --
24 the -- that literature is within a, probably a broader
25 public policy framework, to try and determine what is

Page 33

1  an optimal penalty framework to apply and how to deter
2  conduct, not just by one individual but by others
3  similarly situated.
4      So because the whole point of having
5  deterrence is not simply to deter that particular
6  individual, but to incentivize compliance with the law
7  by others as well. So to do that, I think you have to
8  have some notion of objective probability of
9  detection, enforcement and collection of a penalty as
10 opposed to something where it might vary so
11 substantially person by person.
12     Q  And just to make sure that I'm understanding
13 correctly, is it, is it your understanding that the
14 answer you just gave is consistent with the economic
15 literature you cite in your report on the
16 determination of optimal deterrent penalties?
17     A  I would say broadly, I know that there are
18 very specific factors. I would say wrongdoer-specific
19 factors that that literature does cite, without having
20 it all in front of me to refer to, it's a little hard
21 to remember which author says what about a particular
22 factor, but the -- you know, for example, there are
23 references to risk preferences. I think I cite to a
24 lot of that in my report, and a, a risk-averse
25 individual.

9 (Pages 30 - 33)

Page 34

1    So, for example, someone who had less
2  income, you might need less of a deterrent penalty
3  amount to deter that particular violation, because the
4  consequence to them would be more severe rather than a
5  very wealthy person.
6    So I guess the question is really whether
7  it's an assessment of individual characteristics of,
8  you know, risk tolerance or risk preference or
9  financial abilities versus that probability of
10  detection and enforcement.  That's the part that I
11  think is -- I would have to think further about
12  whether there was any discussion of that as being a
13  variable that would effectively be different for each
14  individual.  I just have a hard time thinking how you
15  would implement that as a practical matter.
16    Q   So assuming we have time, we're going to get
17  into some of the literature that you cite in your
18  report.  Globally, generally speaking, are you
19  intending to apply a methodology that you find in the
20  existing economic literature or one that you have come
21  up with for this case?
22    A   I'm applying a method that I consider to be
23  very well-grounded in the economic and finance
24  literature, yes.  There are -- yes, I would say
25  everything that I'm doing is applying well-established

Page 35

1  methods in economics and finance to the facts of this
2  case.
3    Q   Including your methodology for estimating
4  the wrongdoer's expected gain from the unlawful
5  conduct, right?
6    A   Correct.
7    Q   And including your methodology for
8  estimating the relevant probability of detection and
9  enforcement, right?
10    A   That's correct.
11    Q   And so when we look at those sources, your
12  methodology should be consistent with them, broadly
13  speaking, fair?
14    A   Well, my methodology should be consistent in
15  terms of -- when I say "my methodology," my
16  methodology is to identify sources of information that
17  give me information about the probability of
18  detection, enforcement and collection of penalties.
19    So there are times when I need to collect
20  all that information and make a judgment as to what
21  sources are more applicable to the facts of this case
22  than others, but if there are other sources on that
23  that provide different numbers, then I would take
24  those into consideration.  I think that's where you
25  were going.

Page 36

1    In terms of the theoretical literature, I
2  would still say it's the kind of broader framework.
3  There's no -- I don't see the economic literature as
4  being, I guess, a cookbook, the way you might find in
5  a manual for how to prepare generally accepted
6  accounting principle-based financial statements.  It's
7  not a cookbook approach.  It's a principle issue.
8    Q   Would you say it's less of a cookbook
9  approach as compared to the existing economic
10  literature on calculating ordinary compensatory
11  damages?
12    MR. COLLIER:  Objection; form.
13    THE WITNESS:  Well, again, this is where I
14  would refer you to my report in a very -- I
15  believe section 2, where I describe the various
16  different methods for determining monetary
17  penalties under different causes of action.
18    So I would agree that the -- deriving a
19  deterrent penalty amount does involve applying
20  different principles than standard -- what I
21  would typically apply in deriving compensatory
22  damages, in a different type of case with a
23  different cause of action.
24  BY MR. DAVIS:
25    Q   Is there more room for disagreement between

Page 37

1  two good faith economists when it comes to calculating
2  what they believe to be optimal civil penalties as
3  compared to compensatory damages?
4    A   I would say there is always room for good
5  faith disagreements between economists about, just
6  about any topic.  I think different economists bring
7  to the table different experience and a different
8  theoretical lens.
9    I would say I have seen many excellent
10  economists have very different opinions as to damages
11  calculations in other contexts, in issues that were
12  more compensatory in nature across the board, I would
13  say.
14    So I wouldn't say there's a broader or
15  lesser degree of room for disagreements here than in
16  other types of cases.
17    I think the fact that the application of
18  deterrent penalty concepts here are such that you will
19  likely get a broader range, and I have a fairly broad
20  range in my report that's derived by the use of these
21  different probabilities of detection, enforcement and
22  collection.
23    So there's some degree to which that range
24  will be bigger, because there are effectively
25  multipliers applied here that might not apply in other

10 (Pages 34 - 37)

Page 38

1  cases, but other cases, like antitrust cases where
2  there's automatic trebling, will provide similar room
3  for disagreements between economists.
4      Q   Turning back to our example in Exhibit 1
5  with the farmer, to determine the numerator in the
6  equation used in section 6 of your report, do we
7  compare the money in the farmer's pocket in the world
8  without the disclosure required by law to the money in
9  the farmer's pocket in the world, assuming he had made
10  the disclosure required by law?
11      MR. COLLIER:  Objection; form.
12      THE WITNESS:  In the -- not to beat a dead
13  horse on that example on a hypothetical, but I
14  would say -- I think I described it before, as my
15  perspective, was the, the issue is what is the
16  gain to the farmer from that -- the farmer
17  obtained from engaging in the deception, and in
18  that, in that -- from that perspective, the
19  entirety of the profits that he had in his, in
20  his pocket were the appropriate measure of the
21  numerator to use in that calculation.
22  BY MR. DAVIS:
23      Q   The issue is the, the gain that the farmer,
24  as with any wrongdoer, obtained from violating the
25  law, right?

Page 39

1      A   Correct, and I'm assuming that the law is
2  one that prevents a deceptive trade practice, as
3  described in your hypothetical.
4      Q   Where does that hypothetical say that?
5      A   Because it is -- well, I infer that because
6  you are talking about the requirement of disclosure of
7  information, and the failure to disclose would
8  therefore be deception as I understood it.
9      Q   So assuming that the only violation of law
10  is a failure to disclose, when we are calculating the
11  expected gain to the wrongdoer, we compare a world in
12  which the wrongdoer had made the disclosure to the
13  world in which he did not, true?
14      MR. COLLIER:  Objection; form.
15      THE WITNESS:  Well, is that true?  I can
16  accept that as the hypothetical, and that was the
17  hypothetical I was using in our prior -- in my
18  prior answer.  So I just didn't want to have to
19  kind of re-go over those same answers with you.
20  BY MR. DAVIS:
21      Q   Stepping away from Exhibit 1 and talking
22  about general principles, if the only violation of law
23  at issue is a failure to make a required disclosure,
24  and we are calculating the expected gain to the
25  wrongdoer from the violation of law, we compare a

Page 40

1  world in which the wrongdoer did make the disclosure
2  to a world in which the wrongdoer did not, true?
3      MR. COLLIER:  Objection; form.
4      THE WITNESS:  Well, I think it would depend
5  if disclosure is fundamentally intertwined with
6  the particular conduct at issue.  If the conduct
7  had even occurred absent disclosure, would -- I'm
8  sorry.  Would the conduct have even occurred with
9  the disclosure is one issue, and so to that
10  extent, there are certain types of conduct where
11  the failure to disclose is part and parcel of the
12  conduct itself.  It's not like it's simply a
13  by-product of the conduct, or it's not something
14  off to the side.
15  BY MR. DAVIS:
16      Q   Which would thus affect the money in the
17  wrongdoer's pocket in the world in which the
18  disclosure was made, right?
19      MR. COLLIER:  Objection; form.
20      (Discussion was held off the record.)
21      THE VIDEOGRAPHER:  We're going off the
22  record at 9:54 a.m.
23      (Whereupon, a short recess was taken.)
24      THE VIDEOGRAPHER:  The time is 9:56 a.m.
25  We're on the record.

Page 41

1  BY MR. DAVIS:
2      Q   So, Dr. DeRamus, if -- in a circumstance
3  where the only violation of law is a failure to make a
4  required disclosure, to determine the gain that the
5  wrongdoer expected to obtain from its unlawful
6  conduct, we compare a world in which the disclosure
7  was made to a world in which it was not made; isn't
8  that true?
9      A   Well, it just -- it depends on what that
10  but-for world would have actually looked like with the
11  disclosure.  There are certain types of conduct where
12  the conduct, the broader conduct never happens with
13  the disclosure.
14      So it is a difficult thing to parse that
15  out, and that's one of the reasons -- and maybe to
16  make your life a little bit easier, I could even point
17  you to a portion of my report where I describe why, in
18  certain circumstances, a, an incremental but-for
19  analysis might not be appropriate in certain cases.
20      I have an example of a mortgage lender who
21  doesn't do required underwriting, for example, and
22  there -- so I think that's probably very similar to
23  your hypothetical here, and where the enforcement and
24  enforcement agency might be concerned about the total
25  volume of loans issued by a mortgage underwriter that

11 (Pages 38 - 41)

Page 42

1  didn't engage in any of the required underwriting, and
2  not simply on the incremental mortgages that the
3  company would have -- or that the incremental
4  mortgages that the underwriter wrote, that it wouldn't
5  have written in the but-for world, and I have some
6  other -- again, I'm happy to go through that example
7  in my report, but I think that is ultimately where
8  there's a disagreement between you and me about how we
9  see the appropriate calculation of the incremental
10  benefits to be used in this calculation.
11      Q   I'm going to object to the entire answer as
12  nonresponsive, and just note for the record that the
13  answer was just shy of two minutes long.  I'm not --
14      MR. COLLIER:  I'll object to your commentary
15  after the word "nonresponsive."
16  BY MR. DAVIS:
17      Q   I'm not meaning to try to trick you into
18  suggesting that the two worlds would be similar or
19  materially different.  I'm not meaning to try to get
20  you to admit that in a world with the disclosure, the
21  conduct would still have happened.
22      The only question I have is:  In a world in
23  which the only violation of law is a failure to
24  disclose, isn't it true that when we calculate the
25  expected gain to the wrongdoer, what we do is compare

Page 43

1  the world with the disclosure to the world without the
2  disclosure?
3      A   Not necessarily, for all the reasons I said
4  before.
5      Q   The reasons that you said before included
6  things like, well, maybe the conduct doesn't happen at
7  all if you have to make a disclosure, right?
8      A   Well, I said that there are certain times in
9  which the disclosure or the failure to disclose is
10  intimately related with the specific conduct, and in
11  that instance in particular, you would want to look at
12  the total gain that the individual obtained as a
13  result of the failure to disclose.
14      THE REPORTER:  Did you say "would" or
15  "wouldn't"?  Wouldn't want to look or would want
16  to look?
17      THE WITNESS:  Would want to look at the
18  total gain.
19  BY MR. DAVIS:
20      Q   I think we are saying the same thing.
21      By definition, the gain from a failure to
22  disclose is the difference between the actual world
23  without the disclosure and a but-for world with the
24  disclosure; isn't that true?
25      MR. COLLIER:  Objection; form.

Page 44

1      THE WITNESS:  Well, I guess this is where we
2  keep going around and around is it -- does the
3  deception -- in my view, it is the world with and
4  without the deception.
5      I think there are -- as an economist, when I
6  think about marginal impacts, there's lots of
7  ways of calculating that margin.  So in this
8  particular context in your specific example, I
9  think the way I have done it in this case and the
10  methodological approach I've taken is the right
11  way to do it.
12      And in that case, I don't think the
13  appropriate way would be to simply say assume
14  that everything would have remained the same,
15  that the conduct -- that the deceptive conduct at
16  issue would have remained the same; i.e., in my
17  example of the mortgage lender, the mortgage
18  lender would not have been there in the market
19  doing the specific conduct if they had actually
20  done the underwriting, because they didn't have
21  the capabilities of actually doing the
22  underwriting.
23  BY MR. DAVIS:
24      Q   And Dr. DeRamus, again, I'm not trying to
25  get you to admit that the world would be largely

Page 45

1  similar with or without a disclosure.  What I am just
2  asking for is a definition of the term "gain from
3  nondisclosure."
4      So in a world where the only violation of
5  law is a failure to disclose, isn't it true that the
6  expected gain from the failure to disclose is the
7  expected difference between a world with the
8  disclosure and a world without it, including all of
9  the ramifications of making the disclosure?
10      MR. COLLIER:  I'm going to object to form,
11  and counsel, you're getting harassing.  This is
12  about the fifth time you've asked the same
13  question.
14      MR. DAVIS:  I haven't gotten an answer yet.
15      MR. COLLIER:  No, you don't like his answer.
16  With that said, Dr. DeRamus, you can answer
17  this again.
18      THE WITNESS:  I think you're asking me to go
19  beyond the testimony -- the opinions I've offered
20  in the report.  I think I provided a fairly clear
21  explanation of how I derive the numbers in my
22  report, and I think that is the appropriate way
23  to do the calculations in this particular case.
24  BY MR. DAVIS:
25      Q   So I'm going to ask a different question.

12 (Pages 42 - 45)

1  Am I understanding correctly that the
2  calculations in your report assume that there is a
3  difference between the gain from a failure to disclose
4  on the one hand, and on the other hand, the difference
5  between a world with the disclosure and a world
6  without it?
7      A   My calculations, as I describe in my report,
8  estimate the -- and again, this is all about section
9  6.  We haven't touched section 7.  In section 6 of my
10 report, those calculations are all about the gain to
11 Google, the expected gain and the actual gain in some
12 instances, depending on the scenario, of the deceptive
13 conduct that I understand to be at issue in this case.
14     I have not tried to parse that out any
15 further.  That's what I describe in my report.
16     Q   And in your report, specifically in section
17 6, you have assumed the deceptive conduct to be each
18 of Bernanke, RPO and DRS, right?
19     A   Those are the conducts that I use in
20 deriving the penalty amounts in that section, but I do
21 provide a broader discussion of the deceptive conduct
22 or allegedly deceptive conduct more broadly.
23     Q   And specifically you have assumed that those
24 programs, in their entirety, are deceptive, right?
25     A   I assume if the jury finds that the -- those

1  programs were deceptive, yes, that the programs were
2  deceptive, that those would be considered violations
3  of the DTPA and other relevant statutes.
4      Q   So you have assumed in your calculation that
5  the violation of the DTPA is something more than
6  simply the alleged failure to disclose those programs,
7  true?
8      MR. COLLIER:  Objection; form.
9      THE WITNESS:  That ultimately sounds like
10     it's a jury determination.  I consider it to be
11     a -- the question is whether there is a deceptive
12     act, whether, in implementing Bernanke, the way
13     they implemented Bernanke constitutes deception
14     under the statutes.  I don't know the full legal
15     requirements associated with that, but assuming
16     that the jury comes back and says, we, the jury,
17     find the following conduct to be a violation of
18     the DTPA and the associated other statutes.
19     If the jury finds that, that these are the
20     violations, there are counts associated with
21     those violations that Jeffrey Andrien and
22     Dr. Wiggins have done.  We can talk about those,
23     but those -- whatever counts there are, those are
24     the things that ultimately can be used to
25     determine the appropriate deterrent penalty

1  amount.
2  BY MR. DAVIS:
3      Q   If a jury were to determine that the only
4  DTPA violation in connection with Bernanke was a
5  failure to disclose it, you have not calculated the
6  gain that Google expected to obtain from failing to
7  disclose Bernanke, true?
8      A   Well, I think it would depend on what
9  further conclusion the jury were to draw from that,
10 from that finding, i.e., would Google have engaged
11 in -- if that's the lens that they were to use, would
12 Google have engaged in the conduct with full
13 disclosure.  It is my view and my review of the record
14 they probably would not have, but these are ultimately
15 issues for the jury and for other experts to testify
16 about.
17     Q   I think we now have agreement.  I just want
18 to get it clean.
19     If the court or jury determines that the
20 only violation of the DTPA in connection with Bernanke
21 were a failure to disclose it, and that Google would
22 have implemented Bernanke even if it were required to
23 publicly disclose that program, then your calculations
24 in section 6 cannot be used as penalties specifically
25 for the failure to disclose Bernanke, fair?

1      MR. COLLIER:  Objection; form.
2      THE WITNESS:  No, I would not say that.
3  BY MR. DAVIS:
4      Q   Okay.  So you would say that you have
5  calculated penalties that can be used for the failure
6  to disclose Bernanke, assuming that's the only
7  violation and assuming that it would have been
8  implemented even if there were a requirement of
9  disclosure?
10     A   I think the jury could use the information
11 that I provided and apply other factors to increase or
12 potentially decrease those numbers.
13     So, for example, there's a separate severity
14 factor at least under consideration under the DTPA,
15 and if it concluded that the severity of the conduct
16 were really limited by a disclosure issue that would
17 not have then had a substantial impact, then they
18 could always reduce or adjust my numbers down, but I
19 do think my numbers are -- provide a reasonable
20 starting point and provide the economic basis from
21 which the jury can start to figure out whether those
22 numbers should be adjusted up or down or not at all.
23     Q   Is it your opinion that Google would not
24 have implemented the Bernanke program if it were
25 required to disclose it?

13 (Pages 46 - 49)

Page 50

1    A   I think you're going beyond the opinions
2  I've offered in this case.  I would say the facts that
3  I see -- I have reviewed a substantial number of
4  documents and expert reports about the conduct at
5  issue, and I understand that Google took a lot of
6  efforts to conceal, or that's how -- my interpretation
7  of those documents is that it took efforts to conceal
8  the conduct, that the conduct itself involved specific
9  actions such as throttling things back and forth to
10 avoid detection.
11      All of that would inform my opinion,
12 generally, that I would not expect them to have
13 engaged in the, in the conduct absent a, absent the
14 deception.  The deception, in some sense, was inherent
15 to the conduct.  It simply wasn't an afterthought.  It
16 wasn't like a separate administrative compliance
17 factor that somebody said, oh, I forgot to do it.  It
18 was really part and parcel of the conduct.
19      So that's why I -- well, part of the reasons
20 why we've had this back and forth for the last hour is
21 I do see this is as somewhat inherent to the, to the
22 conduct at issue.
23    Q   Have you seen any deposition testimony or
24 documents indicating to you that Google would not have
25 implemented RPO if it believed it had to disclose RPO?

Page 51

1    A   Again, I would give you the same answer that
2  I just gave you.  There are -- I don't recall the
3  specific documents I reviewed regarding the throttling
4  and which programs were throttled and which ones were
5  not, but I do expect, particularly within the the,
6  broader competitive landscape, that it would have been
7  a lot less likely for Google to have implemented these
8  programs individually or in their entirety absent the
9  deception, or absent the alleged deception, I should
10 say.
11    Q   And, and the assumption or opinion that
12 Google would not have implemented these programs in a
13 world where it had to disclose them and did disclose
14 them is baked into your penalty calculations in
15 section 6, right?
16      MR. COLLIER:  Objection; form.
17      THE WITNESS:  I'm sorry.  Say that to me one
18 more time.
19 BY MR. DAVIS:
20    Q   The assumption or opinion that Google would
21 not have implemented these programs in a world in
22 which it had to disclose them and did disclose them is
23 baked into your penalty calculations in section 6,
24 right?
25      MR. COLLIER:  Objection; form.

Page 52

1      THE WITNESS:  Maybe I would -- I would need
2  to think about whether you would call them baked
3  into those calculations.  There are -- some of
4  those are an estimate of the benefits actually
5  received from the deceptive conduct.
6      So there's a basic question, how much money
7  did Google make from implementing RPO, DRS, and
8  Bernanke.  And so I have both an ex post and ex
9  ante framework on that.  So that is more of a
10 factual issue, how much did they make.  That's
11 my, my estimate of what they made.
12      I guess there's -- a different question
13 is -- and that's where this, this notion of a
14 but-for incrementalism is one where early on in
15 my report I describe how that's not the
16 appropriate perspective in this particular case.
17 BY MR. DAVIS:
18    Q   If the jury determines that Google would
19 have implemented Bernanke even if it was required to
20 be disclosed and they had to disclose it and, in fact,
21 did so, how did they use your report to determine what
22 an appropriate penalty for Bernanke is?
23      MR. COLLIER:  Objection; form.
24      THE WITNESS:  Well, remember deterrent
25 penalties have two purposes.  They have the

Page 53

1  purpose of deterring the wrongdoer from
2  committing the offense in the future, but they
3  also have the purpose of committing others from
4  engaging in similar conduct -- deterring others
5  from engaging in similar conduct.
6      So I think there is a way in which, trying
7  to parse that out to finely; i.e., trying to back
8  out certain dollars from my estimates and
9  reducing that number to more of an incrementalism
10 approach, I think that is a, an approach that
11 could underdeter others from engaging in similar
12 conduct in the future.
13      But again, those are going to be ultimately
14 jury considerations, and that's one of the
15 reasons.  There are other factors the jury can
16 consider.
17 BY MR. DAVIS:
18    Q   So I, I may have asked a poor question.  I
19 only want to be living in the world of the
20 calculations you're performing in section 6.
21      And if the jury wants to assess the gain
22 that Google reasonably expected to obtain from not
23 disclosing Bernanke, but believes that Google would
24 have implemented Bernanke anyway, even if they had to
25 disclose it, how do they use your report to figure out

14 (Pages 50 - 53)

Page 54

1   that expected gain?
2        MR. COLLIER:  Objection; form.
3        THE WITNESS:  I guess I would need to think
4   further on that, because ultimately, there's a
5   lot of testimony by other experts about how the
6   equilibrium prices were changed, about bidding
7   behavior by other parties, so I would need to
8   think about how that might factor into those
9   calculations.
10       I still consider it to be appropriately put
11  into the bucket of a severity factor, that the
12  conduct at issue, that the deception at issue is
13  of a lesser type, so that the deception is not
14  the conduct itself, but the -- or the full scope
15  of the conduct, that the deception is a tiny
16  sliver of that conduct.
17       So back to my example of the, in my report,
18  of the issuer of the, of the mortgages, for
19  example.  So it's the question of the incremental
20  mortgages that they -- that the mortgage
21  underwriter wrote, underwrote, that it wouldn't
22  have underwritten in the but-for world.  They may
23  decide to use that particular lens to then say
24  severity isn't really that -- of the conduct
25  isn't that bad, and therefore we will reduce it

Page 55

1   accordingly.
2        So I consider it more to fall into the
3   severity factor.  I still think it's -- that the
4   numbers I have would be relevant for the jury to
5   consider in that -- in, again, in section 6.
6   BY MR. DAVIS:
7        Q   With respect to some of the work that other
8   experts have performed about how equilibrium prices
9   might change or bidding behavior might change in a
10  world where Bernanke had been disclosed, have you
11  performed a calculation estimating or calculating the
12  gain that Google obtained strictly by failing to
13  disclose Bernanke as opposed to by implementing it in
14  its entirety?
15       MR. COLLIER:  Objection; form.
16       THE WITNESS:  If you're asking me if I have
17  done a bid shading analysis, for example, the way
18  Dr. Wiggins reports to do, no, I have not done a
19  bid shading analysis.  I reviewed the approach he
20  used, and I reviewed testimony on other -- by
21  other experts on that issue, but I have not done
22  my own independent calculations of bid shading,
23  for example.
24  BY MR. DAVIS:
25       Q   So you have not done your own independent

Page 56

1   calculations comparing a world with Bernanke but
2   disclosed to the actual world that the plaintiffs
3   allege with Bernanke but undisclosed; is that fair?
4        MR. COLLIER:  Objection; form.
5        THE WITNESS:  I'm sorry.  Could you repeat
6   it one more time.
7   BY MR. DAVIS:
8        Q   Yeah.
9        You have not done an independent calculation
10  comparing a world with Bernanke disclosed to the
11  actual world that the plaintiffs allege with Bernanke
12  but undisclosed; is that fair?
13       A   Well, again, I think I'm --
14       MR. COLLIER:  Objection; form.
15       Again, Dr. DeRamus, give just a moment for
16  me to get the objection to form out.  The court
17  reporter can only take one of us at a time.
18       Go ahead.
19       THE WITNESS:  I think I still refer you back
20  to my, my prior answer.  I have not done a -- I
21  have not estimated the bid shading type analysis,
22  or the, the -- or yes, I would just say I have
23  not done the type of bid shading analysis or
24  estimates that I think you're asking about.
25       I do think there are ways in which, given

Page 57

1   the particularly the interconnected and dynamic
2   nature of this market, that -- and the long-term
3   benefits that Google obtained from the conduct,
4   that -- I think that framework in particular is
5   helpful to assess whether that type of analysis
6   would meaningfully change my results, and I don't
7   think it would.
8        MR. COLLIER:  Counsel, we've been going over
9   an hour.  Just when you hit the end of your
10  section here.  I'm not trying to interrupt you.
11       MR. DAVIS:  No, you're good, and I think
12  we're about wrapped here.
13  BY MR. DAVIS:
14       Q   Is it your understanding that plaintiffs'
15  other experts have opined that the but-for world is
16  one in which Bernanke, RPO, and DRS did not occur?
17  And by "but-for world," I mean a hypothetical world in
18  which there was no deceptive conduct.
19       A   Well, if you could point me to which
20  specific experts you're talking about, that would be
21  helpful.  I think there is -- I mention Dr. Wiggins'
22  report, whose report I'm rebutting in this case.  I
23  understand his perspective.  I just don't recall
24  everybody -- all the different experts' perspective.
25       There are a number of experts that are

15 (Pages 54 - 57)

Page 58

1  evaluating the conduct and evaluating the extent to
2  which the conduct would have changed auction outcomes,
3  the extent to which that conduct was deceptive or
4  could be considered to be deceptive, as well as there
5  are other experts opining on antitrust issues.
6      Q   I'm meaning to ask whether any of
7  plaintiffs' experts, so one or more, in your view,
8  have opined that the but-for world without deceptive
9  conduct is one in which Google would not have
10  implemented Bernanke, RPO, and DRS.
11      MR. COLLIER: Objection; form.
12      THE WITNESS: I just don't recall that being
13  the scope of anybody else's testimony other than
14  perhaps Dr. Wiggins', where -- I'm sorry -- where
15  he was saying more that he's looking -- he's
16  trying to estimate the world with disclosure.
17  BY MR. DAVIS:
18      Q   And so sitting here right now, the only
19  expert testimony that you can think of on the but-for
20  world without deception is Dr. Wiggins', true?
21      MR. COLLIER: Objection; form.
22      THE WITNESS: I can say that he's the only
23  expert who I saw whose -- who seems to explicitly
24  articulate that that was the purpose of his
25  calculations, is to, in a sense -- I don't -- I

Page 59

1  can't recall if he calls it the but-for world. I
2  think there are other experts who have opined on
3  whether the conduct caused changes in the bidding
4  behavior of different parties, but I don't.
5      Again, I just -- I -- and others who have
6  described the impact of that conduct on the
7  broader ad tech ecosystem. The study -- I
8  believe Dr. Rubin describes the snowball effect
9  of that conduct, which, again, is considered in
10  its more -- in its entirety in this aggregate
11  sense as opposed to this but-for disclosure
12  sense.
13      So those are the ones I'm thinking of in
14  trying to respond to your question. So the only
15  one that I know who is explicitly positing a
16  particular but-for world -- again, so to speak.
17  I don't want to put words in Dr. Wiggins' mouth,
18  but is one where he does explicitly state that he
19  is trying to estimate a -- the incremental impact
20  on the revenues of Google from disclosing or
21  failing to disclose that particular -- the
22  existence of those programs; again, an approach
23  that I completely disagree with for all the
24  reasons described in my report.
25

Page 60

1  BY MR. DAVIS:
2      Q   Okay. I think we can wrap up with one more
3  question.
4      So just to make sure I understand, you do
5  disagree with the approach of trying to estimate the
6  incremental impact on Google's revenues from
7  disclosing versus failing to disclose Bernanke, RPO,
8  and DRS?
9      MR. COLLIER: Objection; form.
10  BY MR. DAVIS:
11      Q   Right?
12      A   I disagree with the approach that
13  Dr. Wiggins has done in his analysis, which I
14  understand to be an attempt to estimate the
15  incremental impact of disclosure. I don't think
16  that's the right conceptual framework.
17      I think that ignores the specifics of these
18  markets, the interconnected nature of these markets.
19  I think it ignores the long-term effects of, of these
20  conducts and the, the broader conduct that we're
21  talking about; i.e., it's not just about RPS and
22  DRO -- I'm sorry -- it's not just about RPO and DRS
23  and Bernanke, but it's about a broader course of
24  conduct.
25

Page 61

1      Q   Okay. I lied about one more question.
2      Are your penalties meaning to -- excuse me.
3      Are your calculations meaning to assess
4  penalties for conduct outside of RPO, DRS, and
5  Bernanke?
6      MR. COLLIER: Objection.
7      Again, just a second.
8      Objection; form.
9      Go ahead.
10      THE WITNESS: Again, with the kind of
11  running comment -- the running caveat that we've
12  all been talking about, section 6, in section 6
13  and 7, there is some interrelationship between 6
14  and 7 in my report, but in 6, my estimate of the
15  appropriate deterrent penalty amount or that
16  range of deterrent penalty amounts is all derived
17  based solely on DRS, RPO, and Bernanke.
18      Those are the data inputs that I used in
19  those calculations, but nonetheless, those also
20  inform my opinion that those calculations in some
21  sense slightly underestimate the benefits that
22  Google obtained, and therefore, the appropriate
23  deterrent penalty amount, if one were to apply
24  that framework with complete information about
25  the impact of all the different programs, and

16 (Pages 58 - 61)

Page 62

1    particularly being able to incorporate these
2    longer-term effects.
3        And there are certain calculations in that
4    section that don't even include longer-term
5    effects, like the backward-looking approach, the,
6    the ex post analysis that I describe in that
7    section.
8    BY MR. DAVIS:
9        Q    Are you able to answer in, in one sentence
10    or less -- and I don't -- I'm not trying to get you to
11    do that. I'm asking whether you are able to do it or
12    not.
13        Are you able to answer in one sentence or
14    less whether you -- your calculations in section 6 of
15    your report are trying to estimate, in the numerator,
16    the incremental impact on Google from failing to
17    disclose Bernanke, RPO, and DRS?
18        MR. COLLIER: I'll object to form.
19        Go ahead.
20        THE WITNESS: I'm sorry. I'm just trying to
21    figure out if I could answer it in one sentence.
22    So that was the pending question. I think it's a
23    more complicated answer that probably requires
24    more than one sentence.
25        MR. DAVIS: Okay. This is a good time for a

Page 63

1    break.
2        THE VIDEOGRAPHER: The time is 10:26 a.m.
3    This ends unit 1. We're off the record.
4        (Whereupon, a short recess was taken.)
5        THE VIDEOGRAPHER: The time is 10:42 a.m.
6    This begins unit number 2. We're on the record.
7    BY MR. DAVIS:
8        Q    Dr. DeRamus, you ready to proceed with your
9    deposition?
10        A    Yes, I am.
11        Q    Have you been retained as an expert witness
12    in trial or arbitration more or less than 75 times?
13        A    Sorry. You're throwing me with a specific
14    number. I would need to go and look in my CV. I
15    don't think -- well, I don't know. Me? I -- to be
16    honest, I don't know. I would have to go look at my
17    CV --
18        Q    I think that --
19        A    -- see what comes up.
20        Q    That will work.
21        And all of the times that you've been
22    retained as an expert witness in trial or arbitration,
23    were you paid to do so?
24        A    I believe so, yes.
25        Q    Have you ever before been retained to opine

Page 64

1    on the optimal amount -- strike that question, because
2    I know that you explained it to me before.
3        Can I start over?
4        A    Certainly.
5        Q    Have you ever before been retained to
6    calculate ranges of civil penalties?
7        MR. COLLIER: I'm going to object to form.
8        Counsel, so I don't have to object based on
9    a consulting expert privilege, are all of your
10    questions about testimony or trial, him being a
11    testifying expert?
12        MR. DAVIS: Consulting expert in this case?
13        MR. COLLIER: No. I really don't want to
14    interrupt your question, which is why I just want
15    to know, when you say "have you ever been
16    retained to calculate ranges of IBM penalties,"
17    if, say, IBM retains him as a consultant, he's
18    not going to be able to testify as to that.
19        MR. DAVIS: I think he can testify that it
20    happened. I won't ask any details about it,
21    yeah.
22        MR. COLLIER: That's fine.
23    BY MR. DAVIS:
24        Q    So same question: Have you ever been before
25    been retained to calculate ranges of civil penalties?

Page 65

1        A    I'm sorry. I'm just pausing, because I need
2    to think about consulting, whether I'm able to
3    disclose the fact whether or not I've been retained on
4    a consulting basis, and whether I should include that
5    in my calculation or not.
6        I could say I have been engaged in prior
7    proceedings where I submitted testimony in which my
8    calculations were used as inputs for penalties, but I
9    have not offered testimony, that I recall, that went
10    to civil penalties the way they, the way they -- my
11    understanding, the way they apply here.
12        Q    And, and what's distinct about what you're
13    doing in this case versus giving calculations that are
14    used as inputs for civil penalties?
15        MR. COLLIER: Objection; form.
16        THE WITNESS: Well, on my CV, I, I -- or on
17    my list of prior testimony, I describe that I
18    worked on behalf of the State of Texas in a
19    matter adverse to Meta, and I describe in my CV
20    the scope of my retention, or the scope of -- the
21    general scope of what I was asked to do in that
22    matter.
23        I was also retained to testify in a matter
24    involving an alleged violation of the Texas, I
25    believe it's called the Theft Act, many years

17 (Pages 62 - 65)

Page 66

1    ago, and -- actually, I believe there were --
2    yeah, I'm sorry, it was just one, one proceeding
3    in which those numbers may have been used. I
4    don't -- or as part of a penalty calculation, but
5    I was not deriving a, explicitly a, an amount in
6    the way I think you're asking the question here.
7    BY MR. DAVIS:
8        Q    Yeah, whereas in this case, you are deriving
9    a specific amount of civil penalties, right?
10       MR. COLLIER:  Objection; form.
11       THE WITNESS:  That's correct.  I'm deriving
12    specific amounts, and my prior answers, I was
13    referring to my testifying work.
14    BY MR. DAVIS:
15       Q    And just as one kind of counter example, in
16    the, in the Meta case, you calculated the number of
17    alleged violations but not the, the, the penalties
18    associated with those violations.
19       Is that generally right?
20       MR. COLLIER:  I'm going to object to form.
21    I will allow you to answer, Dr. DeRamus,
22    generally, but none of us are under a protective
23    order in that case, so I would caution you to
24    stay at very high-level.
25       THE WITNESS:  Yes, and because of the

Page 67

1    protective order in that case, I, I would -- I'd
2    probably point you to my previous answer, because
3    I was trying to maintain within -- I was trying
4    to stay within the bounds of the protective order
5    in that case, and in my CV, I believe I disclose
6    the extent to which my -- I worked on that, and
7    the nature of my work on that, that I think -- so
8    I think I answered that question in my previous
9    answer.  I just don't want to try it again and,
10    and somehow stray outside the scope of the
11    protective order.
12    BY MR. DAVIS:
13       Q    Your CV accurately portrays what you did in
14    the Facebook case, right?
15       A    That's correct.
16       Q    Did somebody else in the Facebook case
17    calculate or derive actual civil penalties?
18       MR. COLLIER:  I'll object based on the
19    protective order if you believe or if we need to
20    discuss whether or not your discussion of another
21    expert's testimony covered by that order is
22    something you can disclose.
23       MR. DAVIS:  Do you want to go off?
24       THE WITNESS:  I'm sorry --
25       MR. COLLIER:  I just need to know if he

Page 68

1    needs to have a discussion.
2        THE WITNESS:  I don't need to have a
3    discussion.  I just need to think for a minute.
4    Can you repeat the, the question, please.
5    BY MR. DAVIS:
6        Q    Yeah.
7        Did, did an expert other than you actually
8    derive a quantum of civil penalties in the, in the
9    Meta matter against the State of Texas?
10       MR. COLLIER:  Same objection and
11    instruction.
12       THE WITNESS:  I don't believe so, not in
13    terms of a testifying expert, but I don't, I
14    don't recall whether there may have been others
15    who were opining on that.
16    BY MR. DAVIS:
17       Q    Do you have any experience or education in
18    the -- in, in advertising?
19       A    It's a field -- well, I guess it depends how
20    you ask the question.
21       You mean the field of advertising as a
22    profession, to be an advertiser, or do you mean the
23    economics of advertising?
24       Q    Well, I guess we'll start with the first
25    one.

Page 69

1        Do you have any experience working in
2    advertising?
3        A    Not in the advertising sector, per se.  I
4    have worked on issues that dealt with advertising.
5        Q    And do you have any experience or education,
6    I'm adding or education to this question, in digital
7    advertising specifically?
8        A    I have some experience in digital
9    advertising based on some of my prior work, but not --
10    maybe -- unless you're asking the question from the
11    perspective of have I worked for an advertiser or for
12    a company selling ad tech, for example.  I have not
13    done that level of, of work.  I've, I've been working
14    as an economist my entire career.
15       Q    And in your work as an economist, do you
16    have any experience or education in auction theory?
17       A    Yes.
18       Q    And tell me about that.
19       A    Well, auction theory is probably fundamental
20    to the question of price formation, or at least in
21    certain markets, and it is something that I have
22    studied periodically and worked on at times more
23    intensively and other times less intensively.
24       I've worked extensively on electricity
25    markets, and many of those markets have auctions, and

18 (Pages 66 - 69)

Page 70

1 there have been several dispute proceedings about
2 those, some of those markets at least, and I testified
3 about the auction design in those markets and, and the
4 impact of alleged misconduct on market outcomes.
5    Q   When you decided to get a Ph.D. in
6 economics, what were you wanting to do professionally?
7    A   Well, I, I wanted to, to actually work in,
8 initially, in international development.  I had been
9 working in the Peace Corps for several years, and that
10 was my -- I would say my first love was the field of
11 international development, but as I continued my
12 course of study, I became interested in industrial
13 organization, which is the theory of price, how price
14 is formed, study of industries.  It's also the area
15 where probably law and economics starts to raise its
16 head, and it's also the area of antitrust.
17    Q   Did you ever think about becoming an
18 economics professor?
19    A   I thought about it, but it was not one -- I
20 would not say that was my aspiration.
21    Q   Did you ever try to become an economics
22 professor?
23    A   No.  Other than -- well, by "professor," I,
24 I assume you mean a full-time faculty member at a
25 college or university, so the answer is no.  I've --

Page 71

1 yes, I'll just leave it at that.
2    Q   In connection with this case, did you
3 interview or communicate with any digital advertisers?
4    A   No.
5    Q   And same question.
6       Did you interview or communicate with any
7 digital publishers?
8    A   No.
9    Q   And same question as to ad tech providers.
10   A   No.
11   Q   I know there are a little over a hundred
12 depositions referenced in the appendix to your report.
13      Does that mean that you had access to those
14 depositions or that you read them?
15   A   It means I had -- well, I had access to a
16 much broader set of documents.  I think I had access
17 to the entire Reveal database, which is where I
18 understand all of the Google production is, and so I
19 had access to a much broader range of documents, but I
20 would say, particularly in the materials considered, I
21 would say those are ones that I had access to that
22 might have some relevance to what I'm -- the opinions
23 I'm providing here, as opposed to that broader
24 universe of millions of pages of -- or other millions
25 of pages of documents in a broader production.

Page 72

1    Q   Other than the depositions cited in your
2 report, can you tell me any depositions you read?
3    A   ████████ is probably the one that I recall
4 most recently, ████.  I have read Mr. Pichai's
5 deposition, P-I-C-H-A-I, I believe, and actually, that
6 one I read prior to submitting my report, so I
7 probably should have put that on my list of materials
8 considered or relied upon.  I read Mr. Brin's
9 deposition, which came in after my report.  I reviewed
10 the depositions of several individuals, but I believe
11 those are cited in my report, the ones that are
12 describing certain documents that I rely upon in my,
13 in my calculations.  Those would be what I consider
14 the, the core depositions to my report.
15   Q   Do you remember when you were retained in
16 this case?
17   A   Yes.
18   Q   Was it August 1 of this year?
19   A   No.
20   Q   When was it?
21   A   August 14.
22   Q   And then you issued your report on
23 September 9, right?
24   A   Correct.
25   Q   Am I remembering correctly that that report

Page 73

1 was originally going to be due on September 1, and
2 then there was a sort of joint extension to
3 September 9?
4    A   I do recall there being discussions about an
5 extension.  I just don't recall the original date.
6    Q   Do you feel like --
7    A   I remember it was earlier than September the
8 9th.
9    Q   Do you usually have longer than that to
10 prepare an expert report?
11      MR. COLLIER:  Objection; form.
12      THE WITNESS:  In terms of frequency, yes,
13   most of the times I do have longer than
14   approximately three weeks to prepare an expert
15   report.
16 BY MR. DAVIS:
17   Q   Would you characterize the facts of this
18 case as complex?
19   A   I would say yes.  There are a lot of facts,
20 so in that sense, it is complex.  There's a lot of
21 different conduct.  The number of -- so there, there
22 are complexities associated with this industry and
23 this case, but there are similar complexities in a lot
24 of my other work as well, so I don't want to say that
25 my other work is necessarily simple, but I would say

19 (Pages 70 - 73)

Page 74

1  this has certain complexities to it, yes.
2      Q   With, with respect to -- well, I should --
3  can I start over?
4      A   Yes.
5      Q   By the way, that's a trick that lawyers do
6  so that then in the transcript I'll have a clean
7  question as opposed to looking like a moron for
8  stopping in the middle.
9          So can I start a new question?
10     A   You can.
11     Q   Your analysis in this case starts from the
12  assumption that the factfinder has found Google to
13  have violated the DTPA, right?
14     A   Correct.
15     Q   You are not yourself offering the opinion
16  that Google violated the DTPA, correct?
17     A   I am not offering what sounds like would be
18  a legal or -- the, the province of the jury.  I'm not
19  offering any kind of legal conclusions or legal
20  opinions, nor am offering -- nor am I trying to step
21  into the province of the jury.
22     Q   Are you offering the opinion that Google's
23  practices were actually deceptive?
24     A   Well, to the extent that "deceptive" is, is
25  a freighted term in this context, because the claims

Page 75

1  at issue, the legal claims go to the question of
2  deception, to be clear, I am not offering a, an
3  opinion about whether they are literal violations of
4  the statute.  That goes maybe to the -- consistent
5  with my prior answer.
6          I have reviewed the documents, and as I said
7  earlier this morning, there were certain aspects of
8  Google's conduct that I took into consideration in my
9  analysis, and I think there are ways in which that
10  does -- informs my opinion as to the likely deceptive
11  nature of that conduct, but I would -- ultimately,
12  the, the core conduct issues and the extent of whether
13  they were -- the conducts were deceptive, is a subject
14  of interest by the other experts, as a, as a, as a
15  matter of, of expert opinion.
16     Q   Are you offering any opinions regarding what
17  information, if any, is material to Google's ad tech
18  customers, namely, advertisers and publishers?
19         MR. COLLIER:  Object to form.
20         THE WITNESS:  Well, I would say there, there
21  are probably other experts that I would defer to
22  who have a greater -- who have studied that issue
23  probably in greater detail than I have.  I do
24  think as an economist, in, in understanding how
25  auction markets work and how these markets work,

Page 76

1  I do have some of my own views as to what
2  information I think would be material to other
3  participants, but ultimately, kind of the
4  ultimate determination of that is probably -- I
5  would probably direct -- or the ultimate opinions
6  on that, I would probably direct you toward the
7  other industry experts, but I don't want to, to
8  close off the fact that I have had extensive
9  experience with auctions.
10         I know how machine-learning technologies
11  work.  I have applied machine-learning type
12  algorithms in the past.  I have an understanding
13  of how changes in auction rules, the hidden
14  changes in auction rules can affect behavior of
15  bidders in auctions.  That's been part of my
16  prior work, so I have an independent
17  understanding of that, but ultimately, with
18  regard to the very specific conduct at issue here
19  and the specific nature of that, I think
20  there's -- there are other experts who have, who
21  have done a more, what I would call a deep dive
22  analysis of those issues.
23         I would say I, I know Dr. Wiggins makes
24  certain statements about what information is
25  material and, and how bidders may have changed

Page 77

1  their behavior with the additional information or
2  may not have changed their behavior.  I have
3  reviewed that, so I have an opinion on those
4  issues and on his testimony, but I would say
5  ultimately, maybe the bigger question of very --
6  or very specific questions about what exactly is
7  material and immaterial would be something I
8  would point you to other experts for.
9  BY MR. DAVIS:
10     Q   You know how in more what I think of as
11  ordinary cases, I'm not asking you to sign onto that
12  language, but that we often talk in terms of liability
13  experts and damages experts in different sorts of
14  cases than this?
15     A   I understand the distinction, yes.
16     Q   As applied to this case, are you more like a
17  damages expert than a liability expert?
18         MR. COLLIER:  Object to form.
19         THE WITNESS:  Well, I am ultimately -- well,
20  I guess trying to adopt your use of a simile, so
21  yes, I am.  I would say I'm more like a damages
22  expert in the sense that I am quantifying a
23  appropriate deterrent penalty amount.  I don't
24  think deterrent penalties are necessarily the
25  same thing as damages -- as -- I do not think

20 (Pages 74 - 77)

Page 78

1     that deterrent penalties are necessarily the same
2     as damages.
3         I do think, not only in my work here in
4     assessing an appropriate deterrent penalty
5     amount, but also in my other work where I am a
6     damages expert, I think it is appropriate for the
7     economist or the expert to understand the conduct
8     at issue and to factor in their understanding of
9     that conduct in deriving an appropriate monetary
10    penalty, whether it's a damage number or whether
11    it's a deterrent penalty.
12        So I've had -- I've spent a significant
13    amount of time reviewing the documents, the
14    industry, and other expert reports on the conduct
15    at issue to inform my opinion about an
16    appropriate deterrent penalty amount.
17    BY MR. DAVIS:
18        Q    And if you were explaining to a layperson
19    what your role is in this case, how would you explain
20    it?
21        A    I would point them to paragraph 1, I
22    believe, of my -- or maybe it's paragraph 2, where
23    I -- of my report, where I describe my assignment, and
24    I'm happy to do that if you would provide me my
25    report.

Page 79

1         Q    No, that's good.
2              From, from where do you derive your
3     understanding of what the plaintiffs allege to have
4     been unlawful conduct under the DTPA?
5         A    Well, I read the Fourth Amended Complaint.
6     I read the Dr. Weinberg's and Dr. Chandler's opening
7     reports.  I would say that's how I began my analysis,
8     and I reviewed some of the documents in this case.  I
9     have -- I'm sorry.
10             Are you, are you asking at the time I
11    started the engagement, or are you asking as of today?
12        Q    Maybe neither.  I'm meaning to ask -- and I
13    can do it in two questions.  I'll break it up.
14             To, to begin your penalty analysis, you have
15    to start with a determination of what was unlawful,
16    right?
17        MR. COLLIER:  Objection; form.
18        THE WITNESS:  I have to start with, with an
19    analysis of the conduct.  I have to understand
20    what conduct is at issue, but maybe I
21    misunderstood the question.
22             I, I did not determine something is
23    unlawful.  I'm assuming that the jury finds that
24    the defendant has engaged in unlawful conduct in
25    violation of the DTPA and related state statutes.

Page 80

1     BY MR. DAVIS:
2         Q    And you need to know what the conduct that
3     is unlawful is, right?
4         A    Correct.  I need to understand the nature of
5     the conduct in dispute and the claims made, the claims
6     brought by the plaintiff states, and, and the
7     broader -- and understanding that broader conduct,
8     which is one of the reasons I, I reviewed the expert
9     reports of the number of witnesses who describe that
10    conduct.
11        Q    In connection with your analysis in section
12    6 and section 7 of your report, what conduct are you
13    assuming the jury to have found unlawful?
14        MR. COLLIER:  Objection; form.
15        THE WITNESS:  In section 6, I'm assuming
16    that the jury has found the conduct related to
17    Bernanke, RPS -- I'm sorry -- Bernanke, RPO, and
18    DRS to be unlawful.  I, I think in my -- in our
19    prior discussion this morning, I described how I
20    did take into consideration some of the broader
21    course of conduct; i.e., there are some other
22    bidding strategies that the various experts have
23    discussed in addition to those three that may
24    have been deceptive as well.  That factors into
25    my opinion, although it does not necessarily

Page 81

1     factor into those calculations in section 6.
2              The -- section 3 of my report, I believe,
3     goes through the conduct and references the
4     specific bidding strategies or, or rather
5     programmatic changes that Google made.  So I
6     probably point you to those, because ultimately
7     in section 7, it really is more of a holistic
8     look at the -- that conduct, broader course of
9     conduct.
10    BY MR. DAVIS:
11        Q    So taking them one at a time, in connection
12    with section 6 of your report, do you start with the
13    assumption that the jury has found that the
14    implementation of Bernanke was unlawful?
15        A    I start with the conclusion that the jury
16    has found that Bernanke -- the implementation of
17    Bernanke involved deception.  So whether -- how you
18    parse it out any finer than that, I'm not quite sure.
19    I think we're back to our previous debate.
20        Q    And, and I'm not -- I'm trying to get away
21    from the debate and just make sure I know what you're
22    starting from.
23             Are you starting from the premise that every
24    dollar of profit to Google resulting from Bernanke
25    should be included in the penalty calculation?

21 (Pages 78 - 81)

1      MR. COLLIER:  Objection; form.
2      THE WITNESS:  I'm starting -- those
3  calculations in section 6 do start from the
4  premise that the incremental dollars and the
5  incremental profits from Bernanke should be part
6  of the deterrent penalty calculation from an
7  economic perspective.
8  BY MR. DAVIS:
9      Q    And so that would be comparing the world in
10  which Google did implement Bernanke to a world in
11  which, holding everything else constant, no Bernanke
12  ever happened, right?
13     A    Well, again, unfortunately, I think we are
14  back into our prior debate about the but-for world.  I
15  think the question is -- from a penalty calculation,
16  the question is -- or deterrent penalty calculation
17  perspective, the question is what was the benefit from
18  the deceptive conduct.
19         So this is the -- I can -- the, the
20  calculations are very clear.  It's what is the -- and
21  the source of those, the data inputs for those
22  calculations are very clear:  What are the incremental
23  revenues coming from the Bernanke program.
24     Q    Gotcha.
25         Is, is it your understanding that the

1  plaintiffs allege that the use of Bernanke was itself
2  unlawful?
3      A    MR. COLLIER:  Objection; form.
4      THE WITNESS:  It's my understanding that the
5  plaintiffs have alleged that the -- that Google
6  has engaged in deceptive conduct, and that is
7  the -- its implementation of Bernanke involved
8  deception.  I, I don't want to step in the, in
9  the, in the shoes of the plaintiffs on this case,
10  because they -- that's -- but I would say that's
11  I don't -- that's -- but I would say that's
12  generally my understanding.
13  BY MR. DAVIS:
14     Q    All right.  I think we've got it.
15         I have to do it for each one.
16         With respect to DRS in section 6 of your
17  report, are you beginning the calculation with every
18  dollar of profit that you believe Google expected to
19  derive as a result of DRS?
20     A    Yes.
21     Q    And with respect to RPO in section 6 of your
22  report, are you starting the calculation with every
23  dollar of profit that you believe Google expected to
24  derive as a result of RPO?
25     A    Yes, but -- I'm sorry.  I should probably

1  put a caveat on that, just because it is -- in terms
2  of the calculation that I did, that is a correct
3  interpretation of my calculations.
4         I think there is a, kind of a broader
5  framework that I am applying to understand the
6  long-term nature of Google's conduct or the long-term
7  effects and long-term benefits that Google's conduct
8  would have provided it, but in terms of the specific
9  calculations, that takes -- those calculations in
10  section 6 take the incremental profits or my estimate
11  of the expected incremental revenues and profits from
12  each of those three programs, and then calculates an
13  appropriate deterrent penalty amount based on those
14  numbers.
15     Q    As an economist, do you agree that there are
16  social welfare enhancing reasons that companies
17  sometimes do not disclose certain information?
18         MR. COLLIER:  Objection; form.
19         THE WITNESS:  In certain circumstances, I
20  would agree with that, yes.
21  BY MR. DAVIS:
22     Q    Would that include things like intellectual
23  property?
24     A    In a long, roundabout way, yes, I agree.
25     Q    Would that include things like source code

1  for tech companies?
2      A    Well, again, I -- when I said "a long,
3  roundabout way," I think there are social welfare
4  enhancing reasons why companies provide source code to
5  the public, so there are open-source code or open --
6  or those are often welfare enhancing, social welfare
7  enhancing actions, but I can also understand other
8  reasons why companies are allowed to keep intellectual
9  property, including source code, private and protected
10  under a copyright or trademark law -- or, or patent
11  law.
12     Q    And from an economist's perspective, at
13  least one of those reasons is to incentivize companies
14  to innovate, right?
15     A    That's correct.
16     Q    I don't usually do this, but I am going
17  to -- we are now going to talk about the probability
18  of detection and enforcement.
19         Do you think it's likely that the
20  probability of detection for RPO, DRS, and Bernanke
21  were identical as to each program?
22         MR. COLLIER:  Objection; form.
23         THE WITNESS:  Well, I think you need -- one,
24  I would make sure, just so the record is clear,
25  that in my report I often -- or I generally,

22 (Pages 82 - 85)

Page 86

1    hopefully, describe the probability that I'm
2    interested in as the probability of detection,
3    enforcement, and collection of a monetary penalty
4    collectively. That's ultimately the probability
5    that I'm considering to be most relevant for
6    determining a deterrent penalty amount, and I
7    describe the differences between those.
8        You can consider the probability of
9    detection alone, separately from the probability
10   of, of enforcement, separately from the
11   probability of, of collection, and I think
12   there's a multiplicative approach you need to do
13   to derive that sum total, but the perspective is
14   more from the -- ultimately from the enforcement
15   perspective, as opposed to just a generalized
16   detection.
17       So, for example, consumers might -- or users
18   of a product might be able to detect a particular
19   course of conduct that's very different from the
20   perspective that I'm applying here, which is the
21   detection of an actionable conduct under the
22   relevant statutes.
23   BY MR. DAVIS:
24       Q   Using that definition of the relevant
25   probability, do you think it's likely that it was

Page 87

1    identical for each of RPO, DRS, and Bernanke
2    respectively?
3        MR. COLLIER: Objection; form.
4        THE WITNESS: I think within -- to a
5    reasonable -- given the range of uncertainty
6    associated with that particular parameter, I
7    would say it's reasonable to apply the similar
8    probably of detection enforcement and collection
9    for the -- for those conducts.
10   BY MR. DAVIS:
11       Q   If a wrongdoer engages in three forms of
12   unlawful conduct rather than one, does that make it
13   more likely that the conduct will be detected?
14       A   I think it would depend on the specific
15   conduct. Some conduct, the more may be obfuscating
16   the signal of a single course of conduct, for example.
17   So if you are both a price fixer and a monopolist,
18   which is kind of hard to think about, but maybe
19   somebody has monopoly power and also --
20       Q   And is charitable.
21       A   -- engages in a price-fixing conspiracy with
22   a very small competitor, then you'd have to separate
23   out the degree to which that price increase resulted
24   from the monopoly power versus from the agreement.
25       So there -- I think there's lots of ways in

Page 88

1    which the combination of, of conduct might make
2    detection more difficult, and in certain circumstances
3    here, I think that is the -- I think there is -- there
4    are elements of that as well.
5        MR. COLLIER: Counsel, one second.
6        Dr. DeRamus, I see the court reporter
7    struggling at times, and now she's nodding, to
8    keep up with you. I would just ask -- at times
9    you're going very fast. Can you just slow the
10   cadence down just a hair.
11       THE WITNESS: I will, or I will try, and I
12   appreciate the reminder.
13   BY MR. DAVIS:
14       Q   If -- holding everything else equal, if a
15   wrongdoer engages in wrongful conduct for five years
16   rather than one year, doesn't it become more likely
17   over time that the wrongful conduct will be detected?
18       MR. COLLIER: Objection; form.
19       THE WITNESS: Potentially. It would depend
20   on the type of conduct, whether the conduct
21   effectively gets baked into expectations; i.e.,
22   the market signal that someone sees five years
23   after the conduct, that might become viewed as
24   the norm, as opposed to the moment in which the
25   conduct is initially -- that conduct initially

Page 89

1    starts, but I think -- so that's why I think it
2    depends.
3    BY MR. DAVIS:
4        Q   In estimating a range of probabilities in
5    this case, did you account for how long Google
6    expected each program to last?
7        A   I looked for information on that regard. I
8    did not see anything suggesting that they expected a
9    given program to be limited in time, and the -- I, I
10   also observed instances in which there were constant
11   improvements or, from Google's perspective,
12   improvements to the particular programs, the various
13   versions of the program and the expansion of those
14   programs over time, the application of it, to
15   different types of customers, and continued
16   investments associated with those programs.
17       So all of that led me to conclude that there
18   was nothing to indicate that they were limited in
19   time, and I think I describe that in my report, but
20   nonetheless, I provide different calculations showing
21   a limitation to a 20-year term in one of the
22   calculations to account for that potential.
23       Q   The calculation without limitation to a
24   20-year term starts with the assumption that the, the
25   programs would go on for more than 20 years, right?

23 (Pages 86 - 89)

Page 90

1    A  Correct, that the expectation at the time
2  was that there was a, a change in the business.  There
3  was an implementation of a program that was going to
4  generate cash flows, and based on standard financial
5  principles, I then derived the expectation, the, the
6  net present value of those future cash flows, which
7  effectively assumes that it goes on beyond -- that the
8  expectation that it would go on beyond 20 years.
9    Q  And did you adjust the probability of
10  detection to account for the fact that those
11  calculations assume that the deceptive conduct goes on
12  for more than 20 years?
13    A  I guess the short answer is I did not change
14  the probability factors.  I have a range of
15  probability factors that range from ten percent to
16  33 percent.  I think the -- that range could
17  reasonably be considered to encompass conduct that
18  occurs over a very long period of time.
19      For example, some of those are derived from
20  estimates of price-fixing conspiracies, other types of
21  corporate misconduct as opposed to -- that occurs over
22  time as opposed to a single act like a theft, for
23  example.
24      So I think the range that I provided can
25  encompass an alternative assessment of what the

Page 91

1  appropriate penalty -- the appropriate probability of
2  detection, enforcement, and collection is over a
3  broader time period.
4    Q  One thing you mentioned before is that the
5  detection of actionable conduct under the relevant
6  statutes is very different from a product's customers
7  detecting the conduct, that those are two different
8  probabilities.
9      Am I capturing that correctly?
10    A  As I think about it, I would say yes, I
11  consider, I consider those to be distinct questions,
12  yes.
13    Q  How come?
14    A  Because I am charged with responding to
15  Dr. Wiggins in terms of what is the appropriate
16  monetary penalty in this case and what's -- and what
17  is the framework that should, that should be applied
18  in that, in deriving that monetary penalty, and from
19  the deterrent perspective, that the appropriate
20  perspective is an enforcement perspective.
21      It is if I engage in actionable conduct,
22  what is the probability that I am caught by an
23  enforcer, and what is the probability that enforcer
24  actually brings a case against me, and what is the
25  probability that I have a judgment against me that

Page 92

1  forces me to pay a monetary fine, which may be very
2  different from a customer noticing there's something
3  wrong or even complaining to an enforcer about that
4  particular conduct.
5    Q  How come?
6      MR. COLLIER:  Objection; form.
7      THE WITNESS:  Because that is what goes to
8    the fundamental calculus of the wrongdoer in the
9    deterrent enforcement framework, that the
10    calculus is based on expected benefits versus
11    expected cost, and the cost to them of engaging
12    in the conduct is the, the penalty resulting from
13    that conduct.
14  BY MR. DAVIS:
15    Q  I meant to ask:  How, how come the
16  probability of enforcement and punishment is very
17  different than the probability that customers will
18  notice the deceptive conduct?
19    A  Well, as I describe in my report, there are
20  various factors, and I'm happy to, again, go to my
21  report if you like, but I describe various factors
22  that may cause there to be constraints on enforcement
23  budgets.  There are also -- in the literature, there
24  are broader considerations about enforcement costs,
25  that there is a societal cost to enforcement, that you

Page 93

1  can basically increase the probability of detection if
2  you devote all the society's resources to punishing
3  wrongdoers.
4      So there -- that's, to some extent, an
5  endogenous variable that depends on the amount of
6  resources that the -- that society decides to allocate
7  to that particular activity.
8    Q  Do you have a copy of your report?
9    A  Not with me.
10    Q  I'm going to give you this.  I'll let you
11  know it is the version pre-Friday's amendment, but I
12  don't have questions about those numbers, and if I do,
13  I will use the new version.  These are just fancier
14  and bound.
15      THE REPORTER:  Is that an exhibit?
16      MR. DAVIS:  No.  I promise.
17      MR. COLLIER:  Counsel, just so the, the
18    record is clear -- I have no objection to this,
19    by the way, and I've got a copy.
20      Just so the record is clear, we served a
21    corrected version.  It changed some numbers in
22    some worksheets, and you've provided him the
23    older version.  I don't think your questions are
24    going to change based on the corrected version.
25      Is that fair?

24 (Pages 90 - 93)

Page 94

1    MR. DAVIS:  Correct.
2    MR. COLLIER:  Okay.  Sorry.  Go ahead.
3  BY MR. DAVIS:
4    Q  If you look at paragraph 103, please.  It's
5  on page 54.
6    A  Could you give me a minute?  Should I -- I
7  found the place.  Would you -- if you want me to read
8  that paragraph now or after you ask me the question,
9  I'm happy to.
10    Q  I don't have a question about the whole
11  paragraph.
12    Is this the paragraph in your report from
13  which you derive the ten percent to 33 percent
14  probability of detection range?
15    A  I would say that entire section is where I
16  derive that.
17    Q  Are there any other numerical probabilities
18  outside of paragraph 103 in that section?
19    A  Well, I'm -- paragraph 104, 105, all the way
20  through 108, and then the various references in those
21  footnotes all inform my opinion as to the reasonable
22  range of numbers that I think is appropriate.
23    So, for example, I describe in paragraph 107
24  the use of a 33 percent probability of detection and
25  it's consistency with the trebling of damages under

Page 95

1  antitrust laws as being informative of my -- as, as
2  informing my opinion.
3    So I would still direct you to the entirety
4  of that section as being the basis for my opinion, not
5  simply the numbers alone that are in paragraph 103.
6    Q  Okay.  As far as studies of actual
7  probabilities of detection, I see one in paragraph
8  103, which is, as I understand it, the Bryant and
9  Eckart study, and then I see another one in footnote
10  191, which is the Combe, C-O-M-B-E, study.
11    Do you see both of those?
12    A  I see both of those, but I see there are
13  other ones as well.  I also, I, I also reference the
14  Polinsky and Shavell article in that same footnote,
15  for example.
16    Q  I just mean to ask whether you see those two
17  things.
18    A  Oh, yes.  So I'm sorry.  I do see the
19  reference to the Combe and the Bryant and Eckart
20  study.
21    Q  And is it your opinion that the probability
22  of detection, enforcement, and punishment for
23  price-fixing cartels is the best proxy for the
24  relevant probability in this case for which data is
25  available?

Page 96

1    A  Counsel, just for the -- to save time, I
2  don't want to read into the record the entirety of
3  that section, but I went through a fairly extensive
4  description of my reasoning, and so I would point you
5  to that as being the basis for my conclusion.  It's
6  not simply that I took one particular study and used
7  that as being the appropriate number to use, and it's
8  one of the reasons why I provide a range.  It's for
9  the reasons I describe in the -- in this particular
10  section.
11    Q  Other than the studies about price-fixing
12  cartels, can you give me an example of a comparable
13  crime or offense for which there is research on the
14  probability of detection?
15    A  Well, some of these other studies cited do
16  reference those other crimes.
17    Q  What are those crimes?
18    A  Again, give me, give me a minute to review
19  that section, because I believe I will -- well, first
20  just point you to footnote -- the last sentence of
21  103, where I talk about the detection of a
22  price-fixing cartel within a range being -- within the
23  range of ten to 33 percent, and now I'm quoting,
24  "which is consistent with those observed for certain
25  other crimes, such as burglary, automobile theft, and

Page 97

1  arson."  And I cite that simply by way of example.
2    Like, again, I'm happy to read through this
3  entire section and make sure I've identified all the
4  different places where I identify the source documents
5  and the conclusions I draw from those document.
6    Q  I'm not going to cheat you, and if you don't
7  testify to it, try to say that it's not -- if it's in
8  here, it's in here.  I promise.
9    Is it, is it your view that the probability
10  of detection for price-fixing cartels is a useful
11  proxy for estimating the probability of detection
12  relevant to this case?
13    A  I believe it is reasonable to use as one of
14  the data points in establishing a range of
15  probabilities.  I think that there are ways in which
16  that probability may actually overestimate the
17  probability of detection of a case -- of a -- of
18  conduct such as this.  So I think there's probably
19  less, a low -- there may be a lower probability of
20  detecting deception and the type, specific type of
21  conduct here, and I believe I describe the the,
22  impact, for example, of the leniency program in
23  price-fixing cartels, where there are, there are
24  mechanisms that incentivize basically one participant
25  and a price-fixing cartel to inform on its other

25 (Pages 94 - 97)

Page 98

1    members in return for leniency, and there's no
2    comparable program in place that I know of related to
3    the deceptive conduct at issue, and single conduct,
4    single-firm conduct I think is also different than
5    multi-firm conduct in terms of the probabilities of
6    detection.
7        Q    The Bryant and Eckart study estimates the
8    probability of detection for price-fixing cartels in a
9    given year to be between 13 percent and 17 percent,
10   right?
11       MR. COLLIER:  Objection; form.
12       THE WITNESS:  That is my recollection and
13   consistent with the sentence in my report, yes.
14   BY MR. DAVIS:
15       Q    So is that an annual probability?
16       A    As I sit here, I don't -- I do not recall.
17   I would need to look back at the study.
18       Q    If an annual probability -- actually, let me
19   strike that.
20       Can I start that question over?
21       A    You can.
22       Q    What you wrote in your report is that the
23   Bryant and Eckart study estimates the probability of
24   detection in a given year to be between 13 percent and
25   17 percent, right?

Page 99

1        A    That's what it says. I'm trying to
2    remember. I think there's different ways in which you
3    can interpret that. I think the -- I, I would just
4    need to review how they came up with that number.
5        Q    Understood.
6        We mentioned it earlier, but you also cite
7    the, the Combe study from price-fixing cases in the
8    EU, right?
9        A    That's correct.
10       MR. DAVIS:  And we'll mark this as Exhibit
11   2.
12       (Exhibit 2 was marked for
13       identification.)
14   BY MR. DAVIS:
15       Q    And Exhibit 2 is the Combe study cited in
16   footnote 191 of your report, right?
17       A    I believe so. Give me one minute. Yes.
18       Q    Can you look, just page 1, the, the second
19   paragraph.
20       And you see that the, the Combe article is
21   discussing the Bryant and Eckart piece, right?
22       A    That is correct.
23       Q    If you look at the last full sentence, it
24   says, "Their paper became the most quoted work on this
25   issue. Nevertheless, the results were often

Page 100

1    improperly quoted. In particular, in the literature
2    relevant to optimal finds, the authors often refer to
3    a value of 15 percent as average probability of
4    getting caught, as Bryant and Eckart estimated a
5    probability that falls between 13 percent and
6    17 percent, but this 15 percent rate is the annual
7    probability of getting caught."
8        Do you see that?
9        A    "The annual probability of getting
10   caught . . . for cartels which will eventually be
11   detected."
12       Q    Right.
13       A    Yes.
14       Q    If I have an annual probability of detection
15   of ten percent and my conduct goes on for two years,
16   what's the probability of detection across a two-year
17   period?
18       A    Assuming those are just for the ease of
19   math, I'll just say 20 percent.
20       Q    In fairness to you, it's probably
21   19 percent?
22       A    I know. That's why I was trying to do the
23   easy math, just for the record.
24       Q    Would it surprise you that a ten percent
25   probability over the course of 20 years stacked on top

Page 101

1    of each other annually becomes 88 percent?
2        A    Mathematically, that's correct. That, that
3    would not surprise me as the result of that, but I
4    thinks that is an incorrect application of the
5    probabilities to the facts of this case, i.e. -- or
6    even the price-fixing cases. I don't think that there
7    is an 88 percent chance of every cartel that's formed
8    of being detected on an ex ante basis at the moment of
9    inception.
10       Q    You're aware that Bryant and Eckart study
11   finds that the absence of detection in one year does
12   not materially affect the probability of detection the
13   next year, aren't you?
14       MR. COLLIER:  Objection; form.
15       THE WITNESS:  If you could point me to where
16   they say that.
17   BY MR. DAVIS:
18       Q    I'm just asking:  Are you aware of that?
19       A    I'm, I'm not -- I just don't recall them
20   specifically stating that. I -- it's not a surprising
21   assumption to me.
22       Q    Did you --
23       A    Could you give me a second to think about
24   it?
25       Again, it's -- if they said it, they said

26 (Pages 98 - 101)

Page 102

1  it. I'm not quibbling with what, what the article
2  does or does not say. I think I just need to think
3  about the way in which one might draw reasonable
4  inferences from that fact in applying and deriving an
5  ex ante probability of detection and enforcement and
6  collection of a penalty.
7      Q   Does your report make the mistake that this
8  Combe study is noting that a lot of people make?
9      MR. COLLIER: Objection; form.
10     THE WITNESS: Am I making a mistake? No, I
11  don't believe my report is making a mistake. I
12  think the -- I have described in my report the
13  full scope of information that I consider, and I,
14  I provide a range that I think is reasonable for
15  the jury to consider, and I certainly consider
16  33 percent to be at the upper end of what I would
17  consider a reasonable range. I have a lower
18  bound of ten percent, and I think I describe
19  elsewhere in the report where I consider
20  20 percent to be a reasonable median estimate.
21  I'm not relying entirely on this one study that
22  they are citing.
23  BY MR. DAVIS:
24     Q   Until we talked about it just now, you did
25  not understand that the Bryant and Eckart probability

Page 103

1  is per year, true?
2      A   Well --
3      MR. COLLIER: Objection; form.
4      THE WITNESS: In my analysis, I did consider
5  this question of probabilities associated with
6  multi-year conduct. I did consider the fact that
7  it is the conduct here. Ongoing conduct may be
8  different than one-time conduct, and I concluded
9  that the numbers I provided, the range I provided
10  were reasonable to apply with regard to ongoing
11  conduct.
12  BY MR. DAVIS:
13     Q   You do agree that what Professor Combe is
14  saying here is that folks have made the mistake of
15  citing Bryant and Eckart as a roughly 15 percent
16  probability of detection without accounting for the
17  fact that it's annual; isn't that true?
18     A   I will agree that they -- what the sentence
19  says. I would need to see further about the, the
20  actual content of the article, as well as I would need
21  to go back --
22     Q   Understood.
23     A   -- and review the, the original article.
24     MR. DAVIS: The next one we're going to mark
25  is Exhibit 3.

Page 104

1      (Exhibit 3 was marked for
2      identification.)
3  BY MR. DAVIS:
4      Q   And I'll tell you, Professor DeRamus, this
5  is from your new set of backups, so this has adjusted
6  numbers, not the -- well, you'll see.
7      A   Okay. Sorry. You said this is from my new
8  set of backup materials?
9      Q   Correct.
10     A   Okay.
11     Q   And then I'm also going to hand you what
12  we'll mark as Exhibit 4, which is another worksheet
13  from the new set.
14     A   Okay.
15     Q   I think these are the two that we're going
16  to talk about, but . . .
17     (Exhibit 4 was marked for
18     identification.)
19  BY MR. DAVIS:
20     Q   So it looks to me like Exhibit 3 is the
21  backup for the ex post calculation, and Exhibit 4 is
22  the backup for the ex ante calculation, and I won't
23  hold you to it if there's more backup elsewhere. I
24  just want to frame this.
25     A   Could you give me one minute? And the only

Page 105

1  reason I'm, I'm hesitating a little bit is because it
2  is the ex post calculation, but the ex post
3  calculations do not change from the original ones. It
4  was the ex ante --
5      Q   I don't know if these numbers actually
6  change. I just mean this is my new, my new Excel
7  spreadsheet.
8      A   Yes. I'm sorry. Maybe I was assuming too
9  much about your -- what, what your question was going
10  to be.
11     But yes, this shows the ex post calculation
12  in Exhibit 3. And just give me one second. And it
13  shows a further calculation of that amount with the
14  allocation to certain plaintiff states at the back,
15  and then Exhibit 4 is the 20-year term calculation.
16     Q   Gotcha.
17     And I mostly just want to make sure we're on
18  the same page about the starting numbers. I don't
19  understand some of the weeds and won't get into them,
20  because I'll sound foolish if I try.
21     For the, for the RPO penalty analysis, you
22  start from what you say to be Google's expectation of
23  ███████ in incremental revenue per year from RPO,
24  correct?
25     A   Correct.

27 (Pages 102 - 105)

Page 106

1    Q    And you apply Google's DVAA wide profit
2    margin to █████████████████████████, right?
4    A    I, again, I would direct you to the
5    explanation in my report.  It's the gross profit
6    margin.
7    Q    I'm not trying to trick you.  I promise.
8    A    I know, but I just want the, the -- I want
9    the record to be clear in terms of what measure of
10   profit, because it will make a difference.
11   Q    So it's basically accounting for revenue
12   shares as between Google and its customers, as opposed
13   to also accounting for operating costs and overhead,
14   fair?
15   A    It would account for the incremental profits
16   that Google likely earned as a result of the program,
17   which would not include fixed costs that might not --
18   that would not have increased as a result of the
19   conduct.
20   Q    The -- for RPO specifically, ███████████
21   █████ profit, that's the starting point, that's the
22   amount of additional profit that you say Google
23   expected to earn as compared to a world where it
24   didn't do RPO, right?
25   A    Yes, but give me one minute to find the

Page 107

1    █████████████████, because these are revenues.  Oh,
2    here.  There are just different data inputs for some
3    of the calculations, and I know I'm using DVAA gross
4    profit margin for RPO and DRS, and for Bernanke, I had
5    a -- I have two different versions, one using that
6    gross profit margin and one using the explicit
7    estimate from the AB testing the company had done,
8    but -- I'm sorry -- it looks like you were pointing to
9    a particular cell in my report.
10   Q    The bottom of Exhibit 4 reflects that
11   █████████████████████████████, right?
12   █████████████ █ ██████████████
13   █████████████████████████
14   █████.
16   Q    Okay.
17   A    The bottom -- yes.  I was looking at the
18   bottom right.  The bottom left, just so the record is
19   clear, █████████████████████████
20   ██ ██████.
21   Q    And that █████████████
22   incremental profit that you believe Google expected to
23   earn as a result of running RPO as compared to not
24   running RPO, right?
25   MR. COLLIER:  Objection; form.

Page 108

1    THE WITNESS:  Correct.  I would probably
2    change a little bit of your wording, but I think
3    yes, in general terms, I think you are right,
4    that it is an incremental profit that I believe
5    they would have reasonably expected to earn as of
6    the start of the -- that particular conduct.
7    BY MR. DAVIS:
8    Q    As a result of that conduct, right?
9    A    Correct, as a result of that conduct.
10   Q    You start with the same figures for DRS,
11   right, namely, █████████████████████████
13   A    That's correct, but just give me a second to
14   look at the spreadsheet.  Yes.
15   Q    Okay, and with respect to Bernanke,
16   recognizing that you've applied two different profit
17   margins to allow the jury a couple of different
18   options, you start in both cases with ██████████████
19   █████████████████, right?
20   A    In the ex ante approach, yes.
21   MR. COLLIER:  Objection.
22   Well, go ahead.
23   BY MR. DAVIS:
24   Q    Do you use a different number in the ex post
25   approach?

Page 109

1    A    I believe in the ex post approach, I -- give
2    me one minute.  I believe I cut that in half in the ex
3    post approach.
4    Q    For the year 2014?
5    A    Correct, Bernanke year 2014.
6    Q    So just so it's clean for the record, in the
7    ex ante approach, ██████████████████████████
8    incremental Bernanke revenue starting in 2014, right?
9    MR. COLLIER:  Objection; form.
10   THE WITNESS:  Correct.
11   BY MR. DAVIS:
12   Q    And in the ex post approach, you attribute
13   half that amount to 2014, right?
14   A    Correct.
15   Q    How come?
16   A    I felt the, the ex post approach, it was
17   just a more, a more conservative assumption to looking
18   at it on a retrospective basis to assume that there
19   may have been a ramp-up time period associated with
20   that program.
21   There was not a -- I'm piecing together
22   different documents and different studies that have
23   different numbers associated with them, so I felt that
24   was -- in terms of coming to a number of, of -- or an
25   ex post number that is not going to overestimate, the,

28 (Pages 106 - 109)

Page 110

1  the actual revenues and actual profits, I felt that
2  was a reasonable assumption to make.
3       The ex ante is a different framework,
4  because it really is from the framework of, as a --
5  again, I'll call -- I will say the wrongdoer, but I'm
6  putting it within the context of this deterrent
7  penalty approach.
8       From a wrongdoer's perspective, the question
9  is what is the -- what were their reasonable
10  expectations about the benefits that they were going
11  to obtain from their wrongdoing, and that, based on
12  the data available to me and some of the preliminary
13  studies that they had done and the more extensive
14  studies that they had done later on, I concluded
15  that -- because I'm assuming that Bernanke is
16  effectively one course of conduct, and even though
17  there are multiple Bernanke programs associated with
18  it, I assumed that it would be a reasonable approach
19  from the ex ante perspective to start with a
20  ████████ as the expectation of the annual revenue
21  or the incremental annual revenue that the company
22  could earn from that particular course of conduct, and
23  then apply that into the future.
24       Q  Bernanke did nowhere near ████████ of
25  incremental revenue in 2014, did it?

Page 111

1       MR. COLLIER:  Objection; form.
2       THE WITNESS:  I have not seen any documents
3  stating that, showing that as a factual matter.
4  BY MR. DAVIS:
5       Q  Have you seen any documents showing that the
6  actual incremental revenue from Bernanke in 2014 were
7  anywhere near ████████?
8       A  Well, the ████████ incremental
9  revenue -- make sure I'm quoting you back the right
10  number -- was derived from a -- I'm sorry.  Give me
11  one minute just to make sure it's -- I -- there's █
12  ██ ███.  I just want to make sure I'm citing the right
13  number.
14       Where is the revenue number?
15       MR. COLLIER:  Dr. DeRamus, so counsel has a
16  clear record, you're going between two
17  spreadsheets.  If you would just make clear if
18  you refer to Exhibit 3 versus Exhibit 4.
19       THE WITNESS:  Correct.
20       So Exhibit 3, you will see the ex post
21  assumptions for -- I'm sorry.  Give me a moment
22  to orient myself.
23  BY MR. DAVIS:
24       Q  I, I can help, if you like.  Just let me
25  know.

Page 112

1       A  Sure.
2       Q  Do you see the top of Exhibit 3, you have a
3  line item for Bernanke in that table at the top?
4       A  Yes, I do.
5       Q  Do you see a source date?
6       A  Yes.
7       Q  And it says August 17, 2015, right?
8       A  Correct.
9       Q  And that's where that ████████ revenue
10  figure comes from?
11       A  That's my recollection.  I'm trying to
12  remember if the, if the study was conducted on 8/17 or
13  whether it was a -- but I believe that's correct.
14  Yes, 2015.  I'm sorry.  Now I remember.
15       Q  Can you describe at a high level the degree
16  to which you understand the differences between what
17  was called "Bernanke," and then on the other hand,
18  "Global Bernanke."
19       A  I can point you to my report for a more
20  complete description, but it was -- there was a --
21  generally a more -- well, I probably prefer to point
22  to my report for that distinction.  It was an
23  expansion of the, of the scope of the program.
24       Q  Got it.
25       Assume for me that Global Bernanke was

Page 113

1  launched in 2015.
2       It wouldn't be appropriate to use expected
3  revenue from Global Bernanke in determining Google's
4  expected revenue in 2013 when it launched original
5  Bernanke, would it?
6       A  Well, that's why I use a different
7  perspective for my ex post versus my ex ante analysis.
8  So for the ex post analysis, we know that there was a
9  phased rollout of the program, that there was one
10  version followed by another version, followed by a
11  subsequent version, just like there was on DRS.  So in
12  the ex post analysis, I, I account for that.
13       In the ex ante analysis, this is really a,
14  kind of a longer term perspective, so what is the
15  available that they would have had -- information --
16  what is the information that would have been available
17  to Google to make that decision, what would have been
18  a reasonable expectation, and here, we are -- there
19  are different ways of implementing the calculations,
20  and I'm assuming a one-shot deal for Bernanke as
21  opposed to I could have layered on additional versions
22  and -- of, of Bernanke and calculated incremental
23  impact of the different versions of it, and here I
24  chose to simply use a single ████████ incremental
25  revenue assumption for the entirety of the program,

29 (Pages 110 - 113)

1    from the ex ante perspective.
2        Q    What does ex ante mean?
3        A    Oh, I'm sorry. It's the, the perspective
4    of -- at the initiation of the conduct, if I'm trying
5    to assess a deterrent penalty amount or to try and
6    assess what is the dollar magnitude of a penalty that
7    would be required to deter someone from doing that
8    conduct at the -- at that point in time.
9        Q    When did RPO start, according to your
10   Exhibit 4 at the top?
11       A    RPO started in March of 2015.
12       Q    And so if we want evidence of Google's ex
13   ante expectation, as you just explained it to me, we
14   should look for evidence on or before March 31, 2015,
15   correct?
16       MR. COLLIER:  Objection; form.
17       THE WITNESS:  Well, I think if you have -- I
18   would look at all the information that's
19   available, both the information that's available
20   at that date.  Unfortunately, we deal in a world
21   where we don't have perfect information.  I can't
22   recreate that was, what was in the minds of the
23   individual Google employees who were engaged in
24   this process.
25       So I would use -- I have used documents and

1        studies from around the time that these programs
2        were implemented, some of them are, by nature,
3        were done after the beginning of the
4        implementation where they are assessing the
5        effectiveness of those particular programs.
6    BY MR. DAVIS:
7        Q    Did you review the documents reflecting
8    experiments and expectations from on or before the
9    start date of RPO?
10       A    I've reviewed a number of different studies.
11   I just don't recall when all of those experiments were
12   conducted.  I do recall reading some, and reviewing
13   some experiments from Bernanke from the earlier time
14   period, from early in -- I believe it was 2013, and --
15   but I just don't recall for RPO specifically.
16       Q    If there were a document reflecting Google's
17   experiments or expectations from on or before
18   March 31, 2015 with respect to RPO, that would be
19   better evidence of Google's ex ante expectation with
20   respect to RPO, true?
21       MR. COLLIER:  Objection; form.
22       THE WITNESS:  It might or might not.  It
23   would depend on, again, the way you set up the,
24   the benefits model.
25       So if I were to separately estimate the the

1    benefits associated with a, each incremental
2    improvement of a particular program, then ideally
3    I would have ex ante estimates of each of those
4    incremental improvements, and then I could do the
5    net present value calculation of adding up these
6    incremental improvements on a step-by-step basis.
7        If I'm doing it effectively as a one-shot
8    deal to say what is the reasonable expectation of
9    the expected future benefits of the entirety of
10   the program in all of its iterations, then I'm
11   trying to rely on what I think is the most
12   reliable document for that, that calculation.
13       But I have seen other documents with other
14   numbers, and I think -- and they are informative
15   of my opinions, and I think you might be able to
16   combine them in different ways in different
17   iterations that would also be reasonable.
18       MR. COLLIER:  Counsel, I'm sorry.  We've got
19   lunch --
20       MR. DAVIS:  Almost done.
21       MR. COLLIER:  Well, I just wanted to tell
22   you lunch is here.  We've been going an hour,
23   but --
24       MR. DAVIS:  Yeah, yeah.
25       MR. COLLIER:  Well, I just wanted to tell

1    you lunch is here.  We've been going an hour, but
2    finish off your section.  I'm not trying to
3    interrupt.  I just wanted to --
4        MR. DAVIS:  You're cool.  I gotcha.  You're
5    from Texas.  I know you're not getting in the
6    way.  People are nice in Texas.
7        MR. COLLIER:  I would never get in the way
8    of lunch either.
9        MR. DAVIS:  That goes without saying.  Me
10   neither.
11       MR. COLLIER:  That's probably evident from
12   my waistline.  Go ahead.
13   BY MR. DAVIS:
14       Q    If we want to do an actual ex ante
15   calculation, we need to determine what Google expected
16   to derive from a given conduct before it decided to
17   implement that conduct, true?
18       A    We need to derive an estimate of the
19   expected value of that, of that conduct over the
20   entire course of that conduct, but using reasonable
21   proxies, given the data that we have.
22       And particularly here, the challenge -- the,
23   the calculation is -- requires more of a holistic
24   consideration of the, of the conduct, because it's not
25   simply one course of conduct.  It is a program that

Page 118

1  evolves, and there are other programs that are
2  implemented on top of those programs.
3      So there are greater complexities in this
4  case as opposed to an example of where it was simply a
5  thief thinking about what their expected course --
6  their expected benefits were of a particular robbery,
7  for example.
8      Q   But if we want to know the expected benefit
9  to Google from implementing Bernanke, when it made the
10 decision to do so, and when the plaintiffs allege that
11 Google made the decision not to disclose it, that was
12 in November of 2013, wasn't it?
13     A   Well, that was at inception of the
14 conduct --
15     Q   Yes.
16     A   -- but there was an ongoing course of
17 conduct that I considered in my analysis, that Global
18 Bernanke was a different iteration of that particular
19 conduct, of that particular conduct, expanded the
20 benefits associated with that conduct.
21         There was an application of it to other,
22 other products, so there is a need to consider the sum
23 total of that information, as well as the reliability
24 of the individual data points, because I think there
25 are some of those experiments that are done in

Page 119

1  different time periods that you would also need to
2  assess the, the -- those experiments as well.
3      Q   And so when you relied on an experiment, you
4  individually assessed the reliability of the
5  experiment, right?
6      MR. COLLIER:  Objection; form.
7      THE WITNESS:  I did for the purposes that
8  I'm using them, yes.
9  BY MR. DAVIS:
10     Q   How did you do that?
11     A   I looked to see whether there were
12 consistency between that particular experiment and
13 other experiments.  I looked for references by other
14 Google employees, the results of that, and whether, in
15 effect, there was a passing the news up the chain to
16 indicate that the experiment was providing reliable
17 results to inform decision-makers about the success of
18 the program.
19         I looked at, in some cases, the
20 qualifications of the individuals who performed a
21 particular experiment.  I looked at the, the data
22 output, which is contained in some of these -- or the
23 summary of the data output from these experiments, and
24 so I would say that the totality of information is
25 what I, what I did.  I didn't simply pull a number

Page 120

1  from an email.
2      Q   Did, did you compare -- backing up, it
3  wouldn't be appropriate or reliable to just pull a
4  number out of a random document, would it?
5      MR. COLLIER:  Objection; form.
6      THE WITNESS:  I would never simply pull a
7  number from a random document and use it in a way
8  that I did not think was appropriate.  I do think
9  that there are ways in which in a -- in trying to
10 ascertain and derive an estimate of penalties,
11 particularly in this case, deterrent penalties, I
12 think it is reasonable to consider all the data
13 points, including some of those data points that
14 will appear in various documents; in emails, for
15 example.  Those are relevant data points.  I
16 wouldn't throw them out.
17 BY MR. DAVIS:
18     Q   When did you decide to throw away certain
19 data points on Google's expected revenue from given
20 conduct?
21         (Reporter clarification.)
22 BY MR. DAVIS:
23     Q   I should ask:  I begged the case there,
24 didn't I?
25         Did you decide to throw away or disregard

Page 121

1  any data points that you encountered regarding
2  Google's expected benefits from a given program?
3      A   No, I did not.
4      Q   So you accounted for every single indication
5  of Google's expected revenue or profit from each of
6  Bernanke, DRS or RPO that you saw, right?
7      A   I considered all of them.  I considered all
8  of the data points that were available to me in my
9  analysis, yes.
10     Q   And disregarded none them as unreliable,
11 right?
12     A   I don't believe so.  Not as I sit here
13 today.  I can't recall when I would say this is a, for
14 lack of a better term, a garbage data point.
15     Q   And how do you get the set of documents that
16 you rely on for Google's ex ante expected revenue from
17 a given program?
18     MR. COLLIER:  Objection; form.
19     THE WITNESS:  I directed my staff to do a
20 search of the documents.  Some of these documents
21 have been previously cited in other expert
22 reports, and that I directed my staff to do a
23 comprehensive search of the data that we had
24 available to us to try and identify all such data
25 points.

31 (Pages 118 - 121)

Page 122

1  BY MR. DAVIS:
2      Q   Were any of them identified by the
3  plaintiffs' lawyers for you?
4          MR. COLLIER:  I'm going to object, and
5  counsel, you're violating the stipulation about
6  communications between counsel and the testifying
7  witness.
8          MR. DAVIS:  Literally Rule 26, facts given
9  to the expert.  You can look it up.
10         MR. COLLIER:  I object -- give me a moment.
11         MR. DAVIS:  Let's do this.  Let's break for
12 lunch.  Can we go off?
13         MR. COLLIER:  Yeah, we can go off.
14         MR. DAVIS:  Because I don't want to bicker
15 about it.  If you want --
16         MR. COLLIER:  I don't want to bicker about
17 it.
18         MR. DAVIS:  I don't want to -- I at least
19 don't want to bicker about it on the record.
20 Because I will occasionally say something dumb.
21         THE VIDEOGRAPHER:  The time is 12:02 p.m.
22 This ends unit 2.  We're off the record.
23         (Whereupon, a short recess was taken.)
24         THE VIDEOGRAPHER:  The time is 12:57 p.m.
25 This begins unit number 3.  We're on the record.

Page 123

1  BY MR. DAVIS:
2      Q   Dr. DeRamus, looking at Exhibit 3 at the
3  top, can you confirm for me that the document you cite
4  for Google's expected revenue from Bernanke ends in
5  the Bates number 28385887?
6      A   Correct.
7      Q   And the page reference is the page ending
8  895, right?
9      A   Correct.
10     Q   And that's the one you believe to reflect
11 ▮▮▮▮▮▮▮ a year of expected revenue to Google from
12 Bernanke, correct?
13     A   Correct.
14         (Exhibit 5 was marked for
15          identification.)
16 BY MR. DAVIS:
17     Q   I'm going to hand you what we've marked as
18 Exhibit 5.
19         The first question is very hard.  Is this
20 the document that you cite for ▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮ expectation?
22     A   That's the right Bates number.  Let me just
23 double-check the, the specific page.
24         Correct.
25     Q   And when you say "the specific page," is

Page 124

1  that the page ending 895 with a slide titled "Bernanke
2  Success"?
3      A   Correct.
4      Q   And then there's a, a screenshot from an
5  experiment in Rasta, R-A-S-T-A, right?
6      A   Correct.
7      Q   What, if anything, did you do to confirm
8  that the ▮▮▮▮▮▮▮▮▮▮ figure was a reasonable
9  expectation, reasonably accurate?
10     A   I considered the way in which the experiment
11 was run, the fact that this is an AB experiment, as it
12 were; i.e., it's being run on a population that
13 includes transactions where Bernanke is on versus
14 those where Bernanke is off.
15         I reviewed the output on the spreadsheet.  I
16 looked for other documents and compared these results
17 with other documents, other documents that I reviewed.
18 I reviewed some of the deposition testimony about this
19 document as well.  I believe it was about this
20 document.  It may have been about Rasta in general or
21 about other experiments.
22     Q   And is the ▮▮▮▮▮▮▮▮▮▮▮▮ from
23 Bernanke figure consistent with the other documents
24 you reviewed?
25     A   I believe it was generally, particularly in

Page 125

1  terms of the ultimate dollar profit that we're using.
2  So there's some inferences I needed to make in
3  comparing it with other documents, because some of the
4  other experiments were run at different time periods
5  and different versions of Bernanke, and they may have
6  had different results associated with it, but I did
7  take all that into conversation in relying upon this
8  particular document.
9      Q   When it says ▮▮▮▮▮▮▮▮ per-year revenue
10 for GDN," do you know what "GDN" is?
11     A   Yes.
12     Q   What is it?
13     A   The Google Display Network.
14     Q   And is that a synonym for Google, Inc. or a
15 division of Google -- excuse me -- Google, LLC?
16         Can I start the question again, please?
17     A   Yes.
18     Q   Is GDN, in your understanding, Google in its
19 entirety or a division of Google?
20     A   Neither.
21     Q   What is GDN?
22     A   It's a reference to a, what is effectively a
23 product offering.  There's different ways in which
24 it's described in different documents, but in effect,
25 it is the, I believe the ad -- an ad buying tool, but

32 (Pages 122 - 125)

Page 126

1  it reflects -- the Display Network is the broader
2  network into which those, uh, advertisers are being
3  sold impressions.
4      Q   As used on the, the slide we're looking at
5  and that you relied on, "GDN" is a synonym for what's
6  now called Google Ads, right?
7      A   I would say correct with an asterisk. I
8  would probably refer you to -- Dr. Chandler talked
9  about the GDN, and I just don't recall specifically in
10  terms of the -- there's been a number of different
11  acronyms over time, and it sounded -- in some of the
12  documents, the GDN might be a little bit more of an
13  elastic concept versus Google Ads --
14      THE REPORTER:  Slow down.  "Might be more of
15  an" --
16      THE WITNESS:  Elastic concept versus Google
17  Ads, which is a very specific product.
18      MR. COLLIER:  Sorry.  Slow down -- just your
19  hourly reminder, slow down for the court
20  reporter.
21  BY MR. DAVIS:
22      Q   Whatever "GDN" stands for in this slide,
23  that is the entity to which the ███████████
24  revenue expectation applies, right?
25      A   The product or the group of products is

Page 127

1  probably how I would describe it, yes.
2      Q   Okay, and so because you analyzed this
3  experiment and assured yourself of its reliability,
4  you know which divisions of Google that revenue was
5  accruing to, right?
6      A   Well, the short answer is I understand it's
7  part of their ad tech business, so it's rolling up
8  into their DVAA financials.  I just don't recall the
9  divisional structure of Google, or alphabetic at this
10  point.
11      Q   Bernanke affected the revenue of Google
12  tools or divisions other than GDN, too, right?
13      A   Correct.  It likely had an impact.  It
14  likely affected the broader range of Google's ad tech
15  ecosystem.
16      Q   So, for instance, one thing that Bernanke
17  caused to happen is that Google Ads advertisers had a
18  higher win rate on AdX, right?
19      A   Correct.
20      Q   The inverse of that is that non-Google Ads
21  advertisers had lower win rates, as a result of
22  Bernanke, on AdX, right?
23      A   By "non-Google advertisers," I assume you
24  mean advertisers using ad-buying tools that were not
25  Google's ad-buying tools, correct?

Page 128

1      Q   That were not Google Ads.
2      MR. COLLIER:  Objection; form.
3      THE WITNESS:  Well, to be clear, we're
4  talking about an ad tech product.  So Google
5  sells ad, an ad-buying tool, and so there are
6  other users of competing ad-buying tools, and
7  they are not winning the auctions -- or they are
8  winning fewer auctions as a result of the
9  implementation of Bernanke.
10  BY MR. DAVIS:
11      Q   In the relevant time period, did Google
12  offer one or more ad-buying tools?
13      A   It offered at least two, probably three if
14  you include -- well, I'll just say at least two.
15      Q   While Bernanke increased the win rate of
16  Google Ads advertisers on AdX, it also decreased the
17  win rate of non-Google advertisers on AdX, correct?
18      A   Maybe just to speed up the answer, I will --
19  well, it's just that "non-Google advertisers" is a bit
20  of a loaded term.  I would just say it decreases the
21  win rate of other advertisers using non-Google ad tech
22  products.
23      Q   And that would result in an offset,
24  offsetting loss of revenue to Google, right?
25      MR. COLLIER:  Objection; form.

Page 129

1      THE WITNESS:  Well, the immediate impact is
2  going to -- if they're using other competing ad
3  tech products, it's going to be a decline in
4  revenue for sellers of other ad tech products,
5  but it would reduce a -- I'd have to think
6  through the implications of the revenues on
7  the -- on AdX itself.
8  BY MR. DAVIS:
9      Q   If without Bernanke, an impression is won by
10  a third-party authorized buyer on AdX, but with
11  Bernanke, it is won by a Google Ads advertiser.  There
12  is both a positive revenue impact to Google from the
13  Google Ads advertiser, and a negative revenue impact
14  from losing the revenue share at the AdX level from
15  that authorized buyer; isn't that true?
16      A   Correct.  That's my understanding also of
17  the data that's produced in this document.
18      Q   Have you actually looked at the data that's
19  in the screenshot?
20      A   I have, yes.
21      Q   What does it say Google's overall profit
22  increase as a result of Bernanke was?
23      A   So the -- there's a "Total" line at the very
24  top, and it shows the profit increase of, as I, as I
25  interpret as I sit here today, ███████████ for the

Page 130

1  increase in Google profit.
2      Q    And it's post rev share payout increased by
3  how much?
4      A    Well, in percentage terms -- actually, I'm
5  sorry. I need my reading glasses. I believe it's
6  ███████.
7      Q    You're correct.
8      A    Thank you.
9      Q    That's less than ███████, isn't it?
10     A    Well, it's on a different base. I mean the
11  percentage is different, but the, but the, the dollars
12  are, are -- is calculating based on a different set of
13  dollars.
14     Q    The percentage is less than half of the
15  percentage associated with the ████████████
16  revenue figure that you use in your calculations,
17  true?
18         MR. COLLIER: Objection; form.
19         THE WITNESS: True, but I don't think those
20     percentages are comparable.
21  BY MR. DAVIS:
22     Q    Why do you not think that?
23     A    Because they're calculated as a percentage
24  of a different number. You'll see, on that row 3,
25  those percentages, ████████████ is calculated as

Page 131

1  a difference between the ███████ -- I'm sorry.
2  Again, I don't -- I need my reading glasses, but it's
3  calculated based on that smaller number, whereas up
4  above, line 1 or the first block, is a percentage of
5  ███████, and now I'm looking at the revenue
6  number.
7      Q    Right. The ███████ revenue is the
8  revenue only looking at AdWords buyers on AdX, right?
9      A    Correct.
10     Q    There were more buyers than just AdWords
11  buyers on AdX, weren't there?
12     A    That's correct.
13     Q    And so when you take a count of the effect
14  of Bernanke on all buyers, not just AdWords buyers,
15  the revenue impact is actually ███████, true?
16     A    As a percentage, yes.
17     Q    But you used ███████, right?
18     A    Well --
19         MR. COLLIER: Objection; form.
20         THE WITNESS: -- I cite to the ███████,
21     and that is the, the statistic that is cited in
22     this document, the headline statistic on the
23     document, that's what I've -- I believe I've seen
24     that, that statement elsewhere, but ultimately
25     the question is? What is a reasonable estimate

Page 132

1  of the incremental revenues or profits associated
2  with -- and long-term revenues or profits
3  associated with this program.
4  BY MR. DAVIS:
5      Q    To whom?
6      A    To Google.
7      Q    And Google is more than just GDN, fair?
8      A    That's correct.
9      Q    And here we see that the revenue to GDN is
10  ███████ increased, whereas the revenue to Google is
11  ███████ increased, true?
12     A    Correct, but it's on a different base. The
13  revenue base -- the GDN revenue base is different from
14  the, the aggregate revenue base. You'll see the
15  percentages down below.
16     Q    Yeah, and if you want to walk through it,
17  right, as a result of Bernanke, according to this
18  experiment, which also reflects ███████ increased
19  revenue on AdWords buyers, there's also ███████
20  ███████ revenue on ███████, right?
21     A    Correct, and I interpret that as actually a
22  fairly positive thing from the, from the company's
23  perspective. They want to reduce the share of
24  transactions on AdX won by non-Google ad tech tool
25  buyers.

Page 133

1      There's plenty of documents that have even
2  so much as a frowny face associated with the
3  non-Google ad tech buyers winning auctions on AdX. So
4  that is -- and as I understand it from the documents,
5  they consider that a, a positive --
6         THE REPORTER: Just a minute. I'm sorry.
7         THE WITNESS: It's not a --
8         THE REPORTER: "As I consider it from the
9     documents," or "as I see from the documents" --
10         THE WITNESS: Google sees the reduction in
11     the revenues from the non-Google ad tech or
12     non-GDN buyers, they see that as a positive
13     development, not a negative development.
14  BY MR. DAVIS:
15     Q    Dollar for dollar?
16         MR. COLLIER: Objection; form.
17         THE WITNESS: Strategically, I believe they
18     consider it a substantial long-term benefit to
19     reduce the number of wins of non-Google ad-buying
20     tool users on the AdX auction.
21      There is a preference, a strong preference
22     by the company to have Google's own customers of
23     its ad-buying tools win those auctions. We see
24     that in strategy after strategy, program after
25     program, and there is -- that is considered a

34 (Pages 130 - 133)

Page 134

1    success of the program if it can reduce that
2    number that is in the red highlighted row in that
3    table.
4    BY MR. DAVIS:
5        Q   What are "█████████"?
6        A   I would probably need to review the full
7    context of the document to tell you with certainty. I
8    expect it's mobile device buyers, but I -- or it may
9    refer to AdMob, but at this point I guess I'm, I'm
10   guessing, so I would need to look at the specific
11   document.
12       Q   Did Google enjoy the fact that Bernanke
13   caused a ███████ revenue decrease for ████
14   buyers on AdX, in your opinion?
15       MR. COLLIER:  Objection; form.
16       THE WITNESS:  As I sit here today, I don't
17   think it would have considered those to be a
18   benefit.  Again, you do need to put that
19   percentage in the context of the, the dollars in
20   that column, or in that row, rather.  That is a
21   much smaller dollar amount than in the other
22   ones.
23       But in any event, in considering the success
24   of the program and whether to continue with the
25   program or push the program further, I interpret

Page 135

1    that document as indicating that there was
2    ███████████ revenue, and that's the bottom
3    line statistic, summary statistic that was used
4    in informing the company's decision-making.
5    BY MR. DAVIS:
6        Q   Are you talking about the title, or I guess
7    the bullet at the top of the slide?
8        A   Correct.
9        Q   Which literally says "████████████
10   ██████ revenue for GDN)"?
11       A   Correct.
12       Q   Which is different than Google, right?
13       MR. COLLIER:  Objection; form.
14       THE WITNESS:  Correct.
15   BY MR. DAVIS:
16       Q   Do you agree with me that this document
17   actually reflects that the overall incremental revenue
18   increase to Google resulting from Bernanke was
19   ███████ when expressed as a percentage?
20       MR. COLLIER:  Objection; form.
21       THE WITNESS:  Well, ██████ as a
22   reflection of a higher -- as a, as a function of
23   a higher number, so it's not -- you asked the
24   question in terms of what was the impact on the
25   aggregate revenue.  For that, I would look to

Page 136

1    that top row that has the, has aggregate numbers
2    on there, but I also understand that Google
3    considered the loss of revenue from the
4    non-Google parties -- I'm sorry.  Let me try that
5    again.
6        From the -- those who otherwise would have
7    won on the AdX auction, but who are using
8    non-Google ad-buying tools, they considered that
9    decrease to be a positive.  It's not a, it's not
10   a, a netting problem from their perspective.
11   It's not like, oh, we only need to focus on the
12   net.  We need to focus -- we are happy that it's
13   having this impact.  I'm sorry.  Here I'm
14   paraphrasing, but they see that as a positive
15   thing as it drives additional long-term revenue
16   to Google, that, over time, those people who are
17   losing those auctions who are using non-Google ad
18   tech products, those customers are then likely
19   switching, increasingly, toward GDN or other
20   Google products as a way of ensuring they
21   actually can clear in the auction.
22   BY MR. DAVIS:
23       Q   Sitting here right now, under oath, and with
24   all seriously respect, you can acknowledge that you're
25   coming up with that explanation for using the

Page 137

1    ██████ figure on the fly, right?
2        MR. COLLIER:  Objection; form.
3        THE WITNESS:  No.  Under oath, I considered
4    every number in this page.  I considered how it
5    was used.  I considered this, particularly
6    this -- the structure of this industry and the
7    notion that Google has in strategy after
8    strategy, where they are working to exclude -- to
9    lower the win rate of the non-Google ad tech
10   buying tool customers.
11       Their objective is to drive more and more
12   transactions to individuals who use Google tools,
13   and that, over the long term, is a, is a snowball
14   effect, I believe Dr. Rudin describes it as.
15       And I also have -- I've looked at the
16   alternative of using the aggregate number, and I
17   could reduce -- the aggregate number of that
18   first line, I've looked at the impact it has on
19   my numbers, and I don't think it would have a --
20   it, it would have some, would cause some
21   reduction of some numbers in certain scenarios,
22   but at the end of the day, I would still say that
23   it doesn't change my overall opinion about the
24   appropriate range of deterrent penalties that
25   I've calculated.

35 (Pages 134 - 137)

BY MR. DAVIS:

1 Q How do you get to ███████, given that
2 that was not actually the net benefit to Google?
3 MR. COLLIER: Objection; form.
4 BY MR. DAVIS:
5 Q By which I mean: Where is the calculation
6 by which you are increasing the benefit to Google to
7 account for what I assume to be the competitive
8 benefit of driving traffic to Google buying tools?
9 A So earlier on, you asked about my
10 calculations in section 6, and in section 6 I have a
11 fairly straightforward calculation that takes the
12 ███████ of revenue, and then I apply a certain
13 profit margin.
14 That lower profit margin I think understates
15 the, the profit from those -- from that particular
16 strategy. I know that, because even looking at the
17 document, the incremental profit that was being earned
18 was higher than that. That's why I have a different
19 sensitivity. I build it up in my section --
20 THE REPORTER: Slow down. "So I have a" --
21 THE WITNESS: Different sensitivity.
22 THE REPORTER: "I build it up" --
23 THE WITNESS: I build it up using first the
24 DVA margin, and then using the actual margins as

1 reflected in this document.
2 That all tells me that from a, particularly
3 the ex ante approach, that I am using the numbers
4 in an economically reasonable way, and I think
5 earlier I talked about how periodically I step
6 out of that framework to try and understand the
7 conduct in its totality and try to assess whether
8 this result is leading to an overestimate or an
9 underestimate of the benefits, and net/net, I
10 think I have underestimated total benefits to
11 Google from engaging in the course of conduct at
12 issue.
13 BY MR. DAVIS:
14 Q If we want to measure the incremental
15 benefit to Google from Bernanke, the number is not
16 ███████ in revenue, is it?
17 A I think that provides a reasonable starting
18 point for assessing the expected long-term benefits,
19 based on the data we have, and as I say in my report,
20 there are different sources of date, and that's one of
21 the reasons I use different sources of date, and I
22 combine them in different ways to come up with an
23 aggregate dollar amount.
24 So I do think there are certainly
25 alternative ways you can use alternative inputs and

1 come up with different numbers, but I think the way I
2 have implemented it in my report is a reasonable way.
3 Q You will agree with me, won't you, that the
4 slide we're looking at in Exhibit 5 does not indicate
5 that the incremental revenue to Google as a result of
6 Bernanke was ███████ per year, won't you?
7 MR. COLLIER: Objection; form.
8 THE WITNESS: I agree that is not what that
9 slide says. It talks about Google Display
10 Network.
11 BY MR. DAVIS:
12 Q And in your report, you do state that that
13 slide says that the incremental revenue from Bernanke
14 was ███████, right?
15 MR. COLLIER: Objection; form.
16 BY MR. DAVIS:
17 Q Just what you say.
18 A I would need to revenue specifically to my
19 report, but as we sit here today, I would say that it
20 is -- the document itself, literally looking at the
21 words of the document, the headline says "████████
22 ████████████████████████████████████
23 revenue for GDN."
24 In my calculations, I believe that is a
25 reasonable estimate to apply for the expected

1 long-term benefits to Google for that particular
2 program, and in part because of the other assumptions
3 I am applying to that ███████; namely, that the
4 profits are measured based on incremental -- I'm
5 sorry. I'm measuring incremental profits, not
6 incremental revenues, and I'm using this DVAA average.
7 And for the -- for my first calculation,
8 instead of the full -- instead of the margin that
9 appears on this document and frankly in other
10 documents, other studies that indicated even a higher
11 incremental profit percentage resulting from the
12 incremental revenues.
13 At the end of the day, that's what I'm most
14 focused on is, the incremental profits, not the
15 incremental revenue.
16 Q This document that we've been looking at
17 also reflects the incremental profits, doesn't it?
18 A Yes, it does. I'm sorry. I was giving the
19 court reporter time to catch up with us.
20 It reflects the incremental profit that I
21 use in certain calculations, but in other
22 calculations, I don't use those incremental profit
23 numbers. I use a lower profit percentage.
24 Q Based off of the revenue number that you get
25 from this slide?

36 (Pages 138 - 141)

Page 142

1    A   Correct.  I do apply the -- that lower
2    percentage to the same revenue number.
3    Q   The ███████?
4    A   That's correct.
5    Q   Will you look at paragraph 115 of your
6    report, please.
7        Can you read the last sentence of paragraph
8    115 out loud for the record.
9    A   Correct.  Oh, I'm sorry.
10       "Meanwhile, the Google internal estimate
11   (before the start of this litigation) is that in a
12   single year, the incremental profit that Google earned
13   as a result of the Bernanke program alone is
14   ██████████."
15   Q   Is that sentence true?
16   A   I, I believe it to be -- in big picture, it
17   reflects what is on the document.  I would say if you
18   want to say a net, incremental net profit, net of the
19   loss in that given year, then you would subtract out
20   the negative in that particular row that you
21   identified, so that the net incremental profit would
22   be less than that, but I would need to go through and
23   do the calculations.
24   Q   And the net incremental profit is what
25   should be relevant to the expected gain from the

Page 143

1    perspective of the wrongdoer, correct?
2        MR. COLLIER:  Objection; form.
3        THE WITNESS:  The purpose of the exercise
4    that I'm doing is to analyze the long-term
5    incremental profits to Google of the conduct, and
6    this conduct in particular has long-term effects,
7    a lot of feedback loops.  There's a lot of --
8    it's not simply about a small company in a very
9    large market where that kind of incrementalism is
10   easier to deal with.
11       Here, I think the approach that I've done --
12   and I verified that ██████████ as a
13   starting point is a reasonable approach, and
14   considering other assumptions that I use in my
15   calculations, I believe that's a, a reasonable
16   basis for that calculation.
17       I've also looked at other ways of doing that
18   calculation.  I don't think those are -- those
19   other ways would necessarily change my overall
20   opinion about what is a reasonable range of
21   deterrent penalty amounts to apply in this case.
22       This is really just the first step.  This is
23   just the Bernanke, and then I'm talking through
24   these additional additions to those programs.
25

Page 144

1    BY MR. DAVIS:
2    Q   Bernanke makes up ██████████ the
3    civil penalties that you calculate at any point in
4    your range, right?
5    A   That's correct.  That's what I'm --
6    approximately.
7    Q   Could you look at paragraph 16 of your
8    report, please.
9    A   Paragraph 16?
10   Q   Yes.  In the middle of paragraph 16, do you
11   see a sentence that starts "for example"?
12   A   Give me a minute.
13       I see that, yes.
14   Q   It says, "For example, in 2015, Google
15   employees estimated that Project Bernanke allowed the
16   company to earn ██████████ incremental revenues
17   on an annualized basis."
18       Did I read that correctly?
19   A   You did.
20   Q   That's referring to the slide in Exhibit 5
21   that we've been looking at, right?
22   A   That's correct.
23   Q   And that sentence is wrong, right?
24   A   Well --
25       MR. COLLIER:  Objection; form.

Page 145

1        THE WITNESS:  -- I'm -- I am paraphrasing
2    the document.  If I wanted to put quotes around
3    it, I could, and I could say that it's
4    █ ██████ per year revenue for GDN.
5        I consider that to be an important data
6    point and the headline that the company was using
7    in drawing the conclusions about the success of
8    this company.  They didn't say, hey, let's talk
9    about Bernanke success, great news, the end
10   result is Bernanke is only responsible for
11   ██████ of total revenue.
12       They said ██████, and I consider that
13   to be a relevant data point.
14   BY MR. DAVIS:
15   Q   Who wrote this presentation, Exhibit 5?
16   Like what group at Google wrote it?
17   A   I don't recall specifically.  I recall
18   reading the deposition transcript about -- I believe
19   it was about the specific presentation, but I, as I
20   sit here today, I don't -- I know it says it's -- it
21   has ██████ on the front of it.  The experiment is
22   run by the Rasta program, which I did a fair amount of
23   research to understand the Rasta research.
24   Q   What's ██████
25       I can ask a better question.  Is ██████ a

37 (Pages 142 - 145)

Page 146

1  buy-side group at Google?
2      A   I would need to go back and look through the
3  documents.  I wouldn't want to hazard a guess.
4      Q   Would it make sense that a buy-side group
5  was focused on buy-side revenue changes?
6      A   Generally, yes, but I also wouldn't expect
7  employees to be touting a program that had negative
8  results for the entire company as a whole.  They
9  clearly thought -- or I'm sorry.  Based on the
10 documents alone, from me as an economist, I interpret
11 those as reflecting a benefit to the company of that
12 amount.
13     Q   Just to be clear, this experiment isn't
14 reflecting a negative result to the company as a
15 whole, right?
16     A   Correct.
17     Q   It's reflecting that a fraction of the
18 marginal revenue to GDN is the marginal revenue to
19 Google as a whole from Bernanke, right?
20         MR. COLLIER:  Objection; form.
21         THE WITNESS:  I'm sorry.  Could you repeat
22 that last part?
23 BY MR. DAVIS:
24     Q   This experiment that you relied on in your
25 report reflects that the marginal revenue to GDN

Page 147

1  resulting from Bernanke is higher than the marginal
2  revenue that inures to the benefit of the whole
3  company, with the entire company considered at once,
4  true?
5      A   Correct, in the kind of short time frame or
6  in a shorter time frame, but again, I think I also
7  referred you to a number of other documents that
8  considered, over the long term, there was a net
9  positive every time there is a reduction in
10 third-party buyers who are winning on AdX, that there
11 is a -- appears to be an objective to increase the win
12 rate at the expense -- the win rate of Google ad tech
13 user buyers and to reduce the win rate of competing
14 buyers, and that is a longer term objective that has
15 longer term benefits for the company.
16     Q   And where is that longer term benefit
17 calculated in your report, if anywhere?
18     A   I don't explicitly calculate that, and
19 that's one of the reasons why I consider my numbers
20 to, if anything, be on the more cautious side, because
21 they don't fully account for all of the longer term
22 benefits.  It is the problem associated with a product
23 that has -- or with integrated products that have
24 these snowball effects.
25         MR. DAVIS:  I'll show you what we'll mark as

Page 148

1  Exhibit 6.
2         (Exhibit 6 was marked for
3          identification.)
4  BY MR. DAVIS:
5      Q   From looking at your backup, specifically
6  Exhibit 3, it indicates that Bernanke started in
7  November of 2013; is that right?
8      A   Yes.  That's my understanding, yes.
9      Q   So this would be a presentation about
10 Bernanke from a little bit less than a month prior to
11 its launch, correct?
12     A   That's correct.
13     Q   Do you recall what this document says about
14 the profits that Google expected to gain as a result
15 of implementing Bernanke?
16     A   Well, I recall what it says about the
17 experiment results, and so that's on paragraph -- I'm
18 sorry -- on the page ending in 93, where it shows an
19 increase in Google profit of ███████ a year.
20     Q   And do you see here that in this estimate,
21 it's accounting for a loss in spend from ███████?
22     A   Correct.
23     Q   And so specifically, again, in this
24 experiment, it shows a ███████ a year increase in
25 total spend from AdWords buyers and a ███████ a

Page 149

1  year decrease from ███████, right?
2         MR. COLLIER:  Counsel, can I just get a page
3  reference?  I don't know where you're reading
4  from.
5         MR. DAVIS:  The one he said, 493.
6         MR. COLLIER:  Thank you.
7         THE WITNESS:  You read those correctly, yes.
8  BY MR. DAVIS:
9      Q   And one of those, specifically the loss on
10 the ███████, was projected to offset some of the
11 gain from AdWords buyers, right?
12         MR. COLLIER:  Objection; form.
13         THE WITNESS:  Well, over the immediate time
14 period, yes.  Back to my earlier answer, though,
15 I would say over the longer term, the -- any
16 reduction from the non-Google ad tech buying tool
17 users, any reduction in that is a net positive
18 for Google over the long term, because they can
19 recapture that revenue, call it in time period 2,
20 right?
21         Time period 2, these third parties are then
22 unhappy, because they're not winning the same
23 auction, so then they could say, hey, it's better
24 for us to start using the Google ad tech tools.
25 That's the subject of this interconnected and

38 (Pages 146 - 149)

Page 150

1  the, kind of the long-term nature of the benefits
2  in these product markets.
3      I would also say that that's -- if you give
4  me one second, because that was only one of the
5  pages with results. There's also another page --
6  BY MR. DAVIS:
7      Q   We're going to do the other one, too.
8      A   Okay.
9      Q   So this that we've been looking at projects
10 a ▇▇▇▇▇▇ a year incremental benefit resulting
11 from Bernanke to Google writ large, correct?
12     A   That's what the slide says, yes. That's the
13 inference that I take from the slide.
14     Q   And this is based on an experiment across
15 ▇▇▇▇▇▇ of queries, correct?
16     A   It says a "▇▇▇▇▇ experiment," so yes,
17 I expect that to be ▇▇▇▇▇ of queries over one
18 week, and it would have been prior to November 2013,
19 so right before the launch.
20     Q   And then the next page, ending 494, has an
21 experiment with a larger dataset of ▇▇▇▇▇▇,
22 right?
23     A   That's correct.
24     Q   And that experiment in the month or so prior
25 to the launch of Bernanke indicated that the

Page 151

1  incremental benefit to Google of the program as a
2  whole was ▇▇▇▇▇▇ per year, right?
3      MR. COLLIER: Objection; form.
4      THE WITNESS: So that is what the slide
5  says, yes. There's some -- there's an asterisk
6  in the slide. I would say you would need to
7  consider the slide in its totality, but yes, the
8  overall conclusion from that slide is an
9  incremental ▇▇▇▇▇▇ year of benefits obtained
10 from that particular experiment.
11 BY MR. DAVIS:
12     Q   And is this one of the experiments that you
13 reviewed and incorporated into your analysis?
14     A   I did review it and I considered it.
15 Ultimately I concluded the way I implemented the
16 analysis to be reasonable, looking at it over the
17 entirety of the time period.
18     Q   Using the ▇▇▇▇▇▇ figure to GDN,
19 starting in August of 2015?
20     MR. COLLIER: Objection; form.
21     THE WITNESS: Correct, and applying a
22 3 percent -- in some of those scenarios, I'm
23 applying a 3 percent growth rate, which is, in my
24 view, very, very low, or a five -- and the other
25 scenario is a five percent growth rate, so I

Page 152

1  think you need to consider it within the context
2  of all the assumptions in the analysis.
3  BY MR. DAVIS:
4      Q   Did Google's display ad revenue increase
5  from 2014 to 2015 or decrease?
6      A   ▇▇▇▇▇▇.
7      Q   From 2014 to 2015?
8      A   You know, I say that very quickly. Let
9  me --
10     Q   That's okay.
11     A   Let me look in my, my -- the, the -- I
12 recall seeing ▇▇▇▇▇▇▇▇▇▇
13 but I need to make sure I have the right -- I'm
14 looking at the right revenue table.
15     MR. DAVIS: I'll show you what we'll mark as
16 Exhibit 7.
17     (Exhibit 7 was marked for
18     identification.)
19 BY MR. DAVIS:
20     Q   Do you see Exhibit 7 is a May 2015 email?
21     A   That's correct.
22     Q   And it's about the launch of Global
23 Bernanke, right?
24     A   That's correct.
25     Q   And we see -- well, is this document

Page 153

1  consistent with your use of a ▇▇▇▇▇▇ in
2  incremental revenue figure?
3      A   Give me a minute.
4      I guess I would need to have a little bit
5  more context about the document. It's unclear whether
6  they're referring to ▇▇▇▇▇▇ as a result of Global
7  Bernanke as compared to what I'll call plain vanilla
8  Bernanke. So that's where I don't -- I'm not quite
9  sure how to interpret that particular document, but it
10 is -- certainly it's a document that states that
11 they're expecting significant additional revenue, and
12 they are focusing on GDN as the measure of success.
13     There's a different number down below where
14 it says "Google revenue," using ▇▇▇▇▇▇ as well,
15 so they always seem to be calling out both numbers,
16 both the GDN and the Google revenue number.
17     Q   Because the numbers are necessarily
18 different, right?
19     MR. COLLIER: Objection; form.
20     THE WITNESS: The numbers will be different
21 over the short term. This question is about what
22 is the appropriate estimate to use for the longer
23 term.
24 BY MR. DAVIS:
25     Q   And you have not done any calculation to

39 (Pages 150 - 153)

Page 154

1  indicate that they are equal over the long term, have
2  you?
3      A   I have not done an explicit calculation, but
4  I think the -- particularly my use of this
5  three percent growth rate or the five percent growth
6  rate are exceedingly conservative relative to the
7  actual growth rates experienced by Google in this
8  business.
9      Q   In the -- or excuse me.  In the calculation
10 for Bernanke you used that starts with a ███████
11 per year incremental revenue expectation, what minimum
12 publisher revenue share -- excuse me.  What minimum
13 per-publisher GDN revenue share is being assumed in
14 that analysis?
15     A   I'm sorry.  Which presentation are you
16 talking about?
17     Q   Whatever you used to come up with $450
18 million per year.
19     A   Give me a moment.  Let me review that
20 particular --
21     Q   Sure.
22     A   -- presentation, because I know there was a
23 change in how Global Bernanke was implemented in --
24 and in the revenue shares, the way the revenue shares
25 were calculated.

Page 155

1          I don't see when they are -- where they are
2  calling out the minimum revenue share per publisher.
3  I don't think there -- I didn't think there was one.
4  I thought on a global basis, they were aggregating,
5  but I would need to go back and look at my, my other
6  parts of my report that talk about that.
7          I believe there's like even discussion on,
8  for example, the page ending 96, where it talks about
9  "GDN deliberately loses money on billions of queries
10 per day, primarily to subsidize publishers and drive
11 down margin ███████████," and then there's an
12 arrow to 15 percent.
13         So I think now you're getting more into the
14 way the algorithm worked and the specific constraints,
15 and I just don't recall, as I sit here today, what
16 that was for the publisher side.
17     Q   The specific constraints have enormous
18 revenue impacts, don't they?
19         MR. COLLIER:  Objection; form.
20         THE WITNESS:  The specific constraints and
21     any changes to the programs are going to have
22     significant revenue impacts, given the magnitude
23     of commerce flowing through these auctions, yes.
24 BY MR. DAVIS:
25     Q   What did you do to determine that your

Page 156

1  ███████ a year starting point was consistent with
2  the constraints actually applied in Global Bernanke as
3  launched?
4      A   I compared the rev- -- the profit numbers
5  from that spreadsheet or the implied profit numbers
6  and the profit numbers that I'm using, with other
7  estimates of incremental profit, and I concluded that
8  they were reasonable for the purposes that I'm using.
9          I did not further adjust or tweak those
10 numbers to try and recreate an alternative number
11 based on alternative parameters for, for Bernanke.  I
12 used that as the -- as what I consider to be a
13 reasonable proxy for a long-term annual benefit that
14 was expected to continue as a result of the expected
15 Bernanke programs in all of its flavors.
16     Q   What do you think the error rate in that
17 proxy is?
18         MR. COLLIER:  Objection; form.
19         THE WITNESS:  Well, there are error bounds
20     associated with the, each of these estimates in
21     the -- that are being provided by Google in each
22     of these experiments, the Rasta, at least for
23     some of them.  That doesn't -- like the ones you
24     just pointed me to that are just providing the,
25     the aggregate number, those don't have error

Page 157

1  bounds, but the ones in the actual experiments do
2  have error bounds associated with them.
3  BY MR. DAVIS:
4      Q   But your ███████ isn't based on an
5  experiment, is it?
6          MR. COLLIER:  Objection; form.
7          THE WITNESS:  It very much is based on an
8  experiment, shown in -- it's based on the results
9  obtained in that very first document we began
10 reading, and that has error bounds associated
11 with the parameters used to derive that number.
12 BY MR. DAVIS:
13     Q   To the extent you're using ███████ to
14 attribute the expected incremental gain to Google writ
15 large, that figure is not based on an experiment,
16 true?
17         MR. COLLIER:  Objection; form.
18         THE WITNESS:  The ███████ is a number
19     that comes from a specific experiment.  I did not
20     make the ███████ up.
21         It was an estimate that Google made, based
22     on GDN, and I concluded it was appropriate to use
23     in my calculations in the way that I've done,
24     principally not only because of the way in which
25     the experiment is made, but also based on my

40 (Pages 154 - 157)

Page 158

1  understanding of the long-term benefits to Google
2  of driving more revenue to itself and driving
3  revenue away from competitors; and also my review
4  of the profit numbers that I'm using, and the
5  other parameters that I'm using to derive the
6  penalty amount.
7      Ultimately the question is:  Taken in their
8  totality, are my parameter estimates I'm using
9  across the board to derive the aggregate penalty
10 amount, are those parameter estimates reasonable
11 in terms of the overall result and reliable in
12 terms of the overall result, and I think that
13 they are.
14     (Exhibit 8 was marked for
15 identification.)
16 BY MR. DAVIS:
17     Q   I'm going to object as non-responsive and
18 move to strike everything after "made, based on GDN."
19     And I've now shown you what's been marked as
20 Exhibit 8.  This is another document put out by █████
21 here on July 26, 2015, right?
22     A   That is what the title says, or right below
23 the title.  Give me a moment to review it.
24     Q   We can go off the record then, if you're
25 going to read the whole thing.

Page 159

1      MR. COLLIER:  Well, no.  We're not going to
2  take his break time to read this.  If you put the
3  document in front of him --
4      MR. DAVIS:  I don't --
5      MR. COLLIER:  You want to go off the record,
6  go off the record.
7      MR. DAVIS:  Okay.  We'll go off.
8      THE VIDEOGRAPHER:  The time is 1:49 p.m.
9  We're off the record.
10     (Whereupon, a short recess was taken.)
11     THE VIDEOGRAPHER:  The time is 2:02 p.m.
12 This begins unit number four.  We're on the
13 record.
14 BY MR. DAVIS:
15     Q   Dr. DeRamus, I'll tell you that what we've
16 marked as Exhibit 8 is on your list of materials
17 considered, but I know you consider a lot.
18     Is this something you recognize offhand?
19     MR. COLLIER:  Dr. DeRamus, take the time you
20 need to answer that question.
21     THE WITNESS:  I don't recognize it offhand,
22 without further reviewing it in detail.
23 BY MR. DAVIS:
24     Q   In the one, two, three, four -- fifth
25 paragraph, so under some of the numbers, it says, "The

Page 160

1  network margin of 15 percent is a business constraint.
2  With purely this constraint, the total revenue impact
3  would have been █████, but we have the other
4  constraints for the following reasons."
5      Do you see that?
6      A   I see that, but I'm sorry.  This is where I
7  need to spend more time to read the first part of
8  that, at least, to understand the context with which
9  those are being raised.
10     Q   Okay.
11     (Witness peruses document.)
12     THE WITNESS:  I'm sorry.  I've read through
13 the paragraph you asked me to read, but let me
14 just track something real quick.
15     (Witness peruses document further.)
16     THE WITNESS:  Okay.  I've read through that
17 paragraph.  I haven't finished reviewing the rest
18 of the document.
19 BY MR. DAVIS:
20     Q   Okay, but you do see that without further
21 constraints, the estimated revenue impact was
22 █████, right?
23     A   It says, "With purely this constraint, the
24 total revenue impact would have been █████, but
25 we have the other constraints for the following

Page 161

1  reasons," and I assume when it's talking about the
2  other constraints, it's referring to the additional
3  two above; i.e., the fact that it says "individual
4  publisher margin greater than or equal to five
5  percent," and then it has an explanation of that in
6  the following paragraph.  The following -- the other
7  constraint is then described -- appears to be
8  described in the next paragraph, which I have not had
9  time to read yet.
10     Q   In your analysis, did you account for the
11 actual constraints that were used upon the launch of
12 Global Bernanke in 2015 with respect to individual
13 per-publisher GDN margins or the publisher payout over
14 current publisher payout constraint?
15     MR. COLLIER:  Objection; form.
16     THE WITNESS:  I believe I've described the
17 calculations that I do in section 6 of my report,
18 and those are based on all the inputs that are
19 specified in my report and the ones we actually
20 went through earlier on in some of the backup
21 materials.
22     Those are based on the documents and
23 whatever the experiments and constraints that
24 were imposed on those particular experiments.  I
25 did not try to -- or I was not able to rerun

41 (Pages 158 - 161)

Page 162

1 those experiments using alternative parameter
2 adjustments to these programs.
3 BY MR. DAVIS:
4    Q   If the version of Global Bernanke that was
5 actually launched differs in material respects from
6 the version that was experimented on and which forms
7 the basis of your analysis, should the penalty
8 calculation account for that difference?
9    A   Well, I think it's always important to
10 consider all the available information, and if I were
11 to review it and determine that additional data inputs
12 are more reliable, I would certainly run the
13 calculations based on those data inputs.
14     I would say that it does -- the moment I
15 start to run those sensitivities, I would then also
16 need to think about the implications for all the other
17 parameter estimates I'm using; for example, something
18 even as obvious as the three percent annual growth
19 rate, which is a very low growth rate associated with
20 the revenues.
21    Q   So if your starting number got lower, you
22 would increase the growth rate you're using?
23     MR. COLLIER:  Objection; form.
24     THE WITNESS:  No.  What I'm saying is if you
25 start to change your parameters and you're doing

Page 163

1 a sensitivity analysis, it's important to make
2 sure that you look at the results holistically to
3 make sure that the aggregate amount is a
4 reasonable estimate of the -- a deterrent
5 penalty amount, and that requires a broader
6 perspective of all --
7     THE REPORTER:  That requires --
8     THE WITNESS:  A broader perspective on all
9 of the parameters that are being used that are
10 driving the model.
11 BY MR. DAVIS:
12    Q   Isn't that backwards?  Aren't you supposed
13 to start with the calculation and then get a result,
14 rather than check the result to make sure that it's
15 high enough?
16     MR. COLLIER:  Objection; form.
17     THE WITNESS:  The question ultimately is, is
18 a fundamental input is the growth rate.
19 Three percent is a phenomenally low growth rate,
20 even at the time of the -- at this -- at the time
21 that the projects were being implemented, the
22 forecast, the market forecast for the growth of
23 this business were so much higher than that
24 growth rate.
25     I used a very low growth rate on that

Page 164

1 purposely to make sure that if there were any
2 other estimates, any other parameters that I'm
3 using that may be overestimating, here is a way
4 to effectively down-weight the impact of any of
5 those changes.
6     So yes, if I were to consider -- if I were
7 to review holistically and had new information in
8 front of me and new data points, points that I
9 considered to be helpful in -- or a more reliable
10 data point, I would consider the use of that data
11 point, but I would also consider whether, in
12 imposing additional conservative assumption on
13 top of conservative assumption, that I'm
14 ultimately deriving an aggregate deterrent
15 penalty amount that is too low.
16 BY MR. DAVIS:
17    Q   And so if your ████████ per year
18 starting figure for Bernanke should be more like
19 ████████, would you increase the growth rate that
20 you are applying in that penalty calculation?
21    A   Not necessarily.  I would have to consider
22 how long, over what time period that lower parameter
23 was being put, whether to then revisit the entire
24 model structure and do separate adjustments for
25 separate cash flows, based on different versions or

Page 165

1 different iterations or different implementations of
2 the programs.
3     So that's what I meant in terms of you need
4 to consider the entirety of the model holistically,
5 but I would -- if there is a number that says
6 ████████ is the better number to use in certain
7 portions of my calculations, I would certainly use
8 that number.  I just might make other changes at the
9 same time.
10    Q   To offset the correction?
11     MR. COLLIER:  Objection; form.
12     THE WITNESS:  Not to offset the correction,
13 but to try and capture a more granular view of
14 how to estimate the ex ante benefits, given that
15 we have complex conduct, changes in strategies
16 implemented over a long time period.
17     It's not a single -- it's not like we're
18 dealing with kind of a single pinpoint act.
19 We're talking about algorithms that were
20 continuously experimented upon, refined, and
21 evaluated to determine whether they are having
22 the intended effect.
23 BY MR. DAVIS:
24    Q   Are you -- and I'm going as to warn you.
25 I'm switching gears a little bit.  We're like

42 (Pages 162 - 165)

Page 166

1 pivoting, so I don't want to catch you offguard.
2     Can I start a question?
3     A   You may.
4     Q   Are you yourself offering the opinion that
5 Google would not have implemented Bernanke if they
6 could only implement it after disclosing it?
7     MR. COLLIER:  Objection; form.
8     THE WITNESS:  I think that goes beyond the
9     four corners of my report.  I'm estimating the --
10     I'm ultimately dealing with issues of deterrent
11     penalty amounts as opposed to some of the more
12     detailed issues about the conduct.
13     Based on my review of the documents, I
14     consider the alleged deception to be an inherent
15     feature of the strategies that they were
16     undertaking, "they" meaning Google.  So I have
17     not -- well, I have not parsed it out beyond
18     that, based on our earlier discussion.
19 BY MR. DAVIS:
20     Q   So just to make sure -- and all I'm meaning
21 to do is determine what we need to talk to you about
22 versus talk to other experts or fact witnesses about.
23 That's all.
24     Are you offering the opinion in this case
25 that the alleged deception in connection with Bernanke

Page 167

1 was an inherent feature of the program such that if it
2 were disclosed, Google would not have done it?
3     A   I would agree to the first part, but I
4 don't -- I do not go so far as the second point or the
5 second part of your clause; i.e., I consider it to be
6 an inherent part of these programs.
7     There was throttling, there were concerns
8 about revelation of information, there is a desire to
9 change market outcomes, and to change market outcomes,
10 even under the theories of Dr. Wiggins and Dr. Milgrom
11 that there is a -- you would need to have that
12 information not available to the market.
13     So I do see that as inte- --- that there is
14 an interrelationship between what I'll call, for lack
15 of a better word, deception or the broader deception
16 and the, literally the algorithms themselves.
17     Now, the other part of your question was
18 would they have done it anyway, and I would leave it
19 to others to opine on that.
20     Q   Gotcha.
21     I should have asked this before, but
22 sometimes I don't do like the obvious lawyer things.
23     Are all of the opinions that you've reached
24 in this case and intend to offer at trial contained in
25 your expert report dated September 9 of this year as

Page 168

1 amended on Friday?
2     A   As I stand here today, yes.  I'm sorry.  As
3 I sit here today, yes.
4     Q   As an economist, if implementing Bernanke
5 would have been profitable even if it were disclosed,
6 you recognize that Google would still have had an
7 incentive to implement it, right?
8     MR. COLLIER:  Objection; form.
9     THE WITNESS:  I think the -- ultimately a
10     company has an incentive to engage in profit
11     maximizing or ultimately shareholder value
12     maximizing conduct.  I think the question is
13     whether the conduct would have had the level of
14     expected benefits, and at a certain point that's
15     a cost/benefit decision that the company would
16     then make.
17     I've never seen an evaluation of the conduct
18     with and without disclosure at the inception of
19     it, and so -- and there are probably also broader
20     considerations that I -- I interpreted some of
21     those documents to suggest that Google was
22     concerned about negative reactions by either
23     advertisers or publishers if they were aware of
24     these specific strategies.
25

Page 169

1 BY MR. DAVIS:
2     Q   In that last piece you said about documents
3 indicating concern if Google made people aware; is
4 that about Bernanke only or about each of Bernanke,
5 DRS and RPO?
6     A   Now you're testing my memory.  I don't
7 recall the specific documents.  I just remember it
8 being not an occasional document, but there were a
9 number of different documents that expressed concerns.
10 ██████████████████████████████████████████,
11 and I just don't recall which specific strategy that
12 those related to.
13     Q   Have you yourself reviewed the May 2016 blog
14 post that Google wrote about RPO?
15     A   The May 2016 blog post?
16     Q   Mm-hmm.
17     A   As I sit here today, I don't recall.
18     Q   Have you yourself reviewed the Help Center
19 update did DRS from mid-2016?
20     A   Again, in terms of going back to the
21 original document and reviewing it, I don't believe I
22 have.
23     I have reviewed certain statements by -- I
24 believe it is Dr. Wiggins and maybe even some of the
25 other Google experts who reference some of the

43 (Pages 166 - 169)

Page 170

1  asserted disclosures.  I did not go back and pull
2  those documents to parse out the scope of those
3  disclosures.
4      Q   If Google had two options, one of which was
5  not to implement Bernanke and the other of which was
6  to implement Bernanke only after disclosing it,
7  assuming that option 2 was profitable compared to
8  option 1, you would expect Google to have taken that
9  course; true?
10      MR. COLLIER:  Objection; form.
11      THE WITNESS:  I think it would depend on
12  what the assessment would have been about the
13  long-term benefits.  I also think it would --
14  i.e., it's not simply one that would say, oh, we
15  can still run this auction and get higher
16  numbers.
17      I think there are longer term questions
18  about whether you would have customers opting out
19  of using Google products if they considered
20  Google using something other than a true
21  second-price auction, for example.
22      So I think there are longer term
23  considerations that would have to go into that,
24  that factor, and I think it also depends on what
25  you consider to be disclosure.  The question is:

Page 171

1  Are they completely disclosing everything that
2  would have been required for users to really
3  understand how these auctions were being run, as
4  opposed to a general softball disclosure that may
5  have only been understandable by a few customers?
6      So I think a lot of it depends on, in your
7  hypothetical, on what the content of those
8  disclosures were or what the content of those
9  disclosures was, and the assessment of those
10  longer term ramifications, including the
11  ramifications for its competitive position.
12  BY MR. DAVIS:
13      Q   Does your ex post penalty analysis in
14  section 6 of your report assume that Bernanke was not
15  bidder-truthful for the entirety of its existence?
16      MR. COLLIER:  Objection; form.
17      THE WITNESS:  The ex post analysis assumes
18  that the -- well, mathematically, it takes half
19  of the first year profits in from the, from the
20  forecast, and then the full year profits
21  thereafter, ██████████████ we talked
22  about.
23      And so it's a numerical exercise, so what
24  does that mean in terms of -- it's really easy.
25  It's an expectation that I have that that

Page 172

1  provides a reasonable estimate of the actual
2  benefits, because that's I think the best
3  document I have to, to use for that calculation.
4  BY MR. DAVIS:
5      Q   If Google began implementing a minimum
6  bid-to-win pricing rule in May of 2016 when bidders
7  were affected by Bernanke, does that change your
8  penalty analysis in any way?
9      MR. COLLIER:  Objection; form.
10      THE WITNESS:  If I have other documents that
11  provide better estimates of the actual benefits
12  that Google obtained from the conduct, I would
13  use those documents.
14      Right now, the document that I consider to
15  be most reliable for the Bernanke program was
16  that one that had the ████████ annual revenue
17  benefit, again, applied with a profit margin is
18  probably the better thing to focus on, because
19  that ultimately is what drives those penalty
20  amounts.
21  BY MR. DAVIS:
22      Q   I guess what I'm meaning to ask is:  Is it
23  your understanding that the plaintiffs claim that
24  Bernanke was deceptive because it removed bidder
25  truthfulness from the auction process?

Page 173

1      MR. COLLIER:  Objection; form.
2      THE WITNESS:  My analysis is predicated on
3  the assumption that the jury were to find that
4  Bernanke was deceptive, and so if the jury were
5  to find that the deception only occurred over a
6  smaller range of time period, like a smaller
7  number of years, then in the ex post analysis,
8  there would be a way that the jury -- I or the
9  jury could use to adjust those numbers
10  accordingly.
11      I still think the ex ante approach doesn't
12  have that same issue.  The ex ante is really an
13  expectation as opposed to an actual result.
14  BY MR. DAVIS:
15      Q   So the ex ante approach doesn't give a
16  wrongdoer any incentive to stop acting in a deceptive
17  manner, does it?
18      MR. COLLIER:  Objection; form.
19      THE WITNESS:  The, the big incentive would
20  be not to get caught, so if you engage in
21  something for a very short time period, then you
22  should exit and take your money home.
23      So it's like walking away from a poker
24  table, so knowing when you're ahead and then
25  walking away, and you leave with your ill-gotten

44 (Pages 170 - 173)

Page 174

1    gains without having been detected and without
2    any penalty being assessed. So I think that
3    always -- for anybody who is engaged in repeat
4    conduct, I think that incentive is always there.
5    BY MR. DAVIS:
6       Q   So I'm just meaning to ask: Does the, does
7    the penalty you calculate in the ex ante approach
8    change if Google stopped acting in a deceptive manner
9    a year after starting to act in a deceptive manner, or
10   does it stay exactly the same?
11      A   On the -- I, I think it would be up to a
12   jury determination about whether the deception was,
13   was planned over the entire -- was expected to
14   continue; i.e., is there a generalized course of
15   conduct that we observe over many different programs?
16   Do we see it evolving over time? Are there
17   cost/benefit analyses that are constantly being used
18   to assess whether to extend or modify a particular
19   program?
20          If that were the case, I think from a pure
21   economic theory approach, I think you would still use
22   the expected value for the deterrent penalty amount,
23   but I also think that the jury could ultimately
24   determine that the severity of the conduct -- i.e.,
25   its impact -- was less because of the cessation, the

Page 175

1    voluntary cessation, kind of like the way in the, in
2    the price-fixing scenario we talked earlier about,
3    that one of the reasons there is leniency for the
4    first to effectively rat out their, their
5    coconspirators, the carrot is that they won't be hit
6    with penalties the same way that their coconspirators
7    are.
8           So I think there are other ways in which the
9    jury could adjust that number to account for that
10   shorter time period.
11      Q   Can you go to paragraph 125 of your report,
12   please, and my only question is about the 13.7 percent
13   figure, and I think it's a simple one.
14      A   Sorry. Paragraph 125?
15      Q   I thought so.
16      A   Yes, I am there.
17      Q   Is the 13.7 percent the only methodology you
18   have used to allocate the total deterrent penalties
19   you calculate to the plaintiff states specifically?
20      A   In this section of my report, yes, that is
21   the only way in which I do that, the mathematical
22   calculation. I provide a lot of discussion about why
23   I do not think that that would result in a deterrent
24   penalty amount, why I think that would underdeter the
25   conduct at issue, and I also describe the ways in

Page 176

1    which I think the 13.7 percent is an underestimate of
2    the actual commerce related to the plaintiff states.
3           But with all those caveats in mind,
4    literally that is the only place in the company
5    workpapers where I apply 13.7 percent times a number
6    to show the impact of that.
7       Q   Assuming that the court or the jury says we
8    have to allocate to the plaintiff states as opposed to
9    expected gain from the world. The only methodology
10   that you have suggested to them is to take
11   13.7 percent of the worldwide figure, true?
12          MR. COLLIER: Objection; form.
13          THE WITNESS: Well, I would say that there
14   are additional ways where the jury considered
15   that there was a need to apply a higher deterrent
16   penalty amount. In other words, if -- it's one
17   of the whole purpose of having my second section
18   is I have -- I'm sorry -- section 7 is I provide
19   an entirely different method for determining the
20   appropriate deterrent penalty amount.
21          I don't believe any allocation is necessary
22   in that particular context. It's really simply
23   what is the penalty required to cause a change in
24   the conduct of Google, if not derivative of
25   numbers that are specific to the plaintiffs -- to

Page 177

1    the world or the plaintiff states.
2           But there -- the 13.7 percent is the only
3    calculation that I performed in my report that
4    shows how that allocation would be done. I just
5    don't think you would necessarily draw a
6    conclusion that that is a, the necessary or a
7    sufficient, I should say, deterrent amount.
8    BY MR. DAVIS:
9       Q   The ranges of penalties in section 6, other
10   than those to which you apply the 13.7 percent figure,
11   are based off of Google's worldwide expected gains
12   from the three programs at issue, right?
13      A   That is my understanding, yes.
14      Q   So they're not just U.S. gains; it's the
15   entire world, right?
16      A   That's correct.
17      Q   In your view, if Idaho were the only
18   plaintiff in this case, the only government entity
19   bringing an enforcement action, you would say the
20   civil penalty payable to Idaho should be identical to
21   the civil penalties paid to the 17 plaintiffs in this
22   case, right?
23      A   I would say that the deterrent penalty
24   amount still needs to be an amount sufficient to deter
25   Google and other similarly situated companies from

45 (Pages 174 - 177)

Page 178

1  engaging in that conduct in the past. I -- give me
2  one second.
3        I think to some extent there are other
4  sections of my report that may come into play if it
5  were literally an Idaho-only factor. So, for example,
6  there's a consideration about whether, in fact, that
7  would be overdeterrence, so if both Idaho filed, and a
8  year later, Texas also filed, then I would consider --
9  I would not consider it appropriate to effectively
10 double my numbers and say each of Idaho and Texas
11 should separately recover the entirety of -- or assess
12 the entirety of those amounts.
13       In all cases, I would still say that it is
14 capped by the legal requirements of the statutes, so
15 there is a dollars-per-violation cap. So in no event
16 would the amount that Idaho recovers would that be in
17 excess of the dollars per violation, so at some point
18 those numbers would begin to bind on the deterrent
19 penalty amounts.
20    Q  Does the fact that there are two class
21 action lawsuits against Google brought by private
22 classes affect what the optimal deterrent penalty is
23 in this case?
24    A  As I sit here today, I don't -- it's not
25 factored into my opinions, but I would have to look at

Page 179

1  those to study those in more detail.
2     Q  I guess what I'm asking is: Should it be?
3     A  From my perspective, in general terms, I
4  don't think so. The principle of deterrence is an
5  issue associated with the specific statutes at issue
6  here.
7        They do not appear -- or they have not
8  appeared in my experience in other cases where a
9  private litigant sues for loss profits, for example,
10 or other harms, unless, to the extent that they are
11 suing for treble damages under the antitrust
12 statutes, they may be bringing different causes of
13 action, but ultimately it would depend.
14       That's why I said it would -- I would need
15 to review in detail what the specific claims were
16 brought by those plaintiffs; i.e., were they
17 violations of the, the same, the exact same statutes
18 and claiming somehow relief, using the same statutory
19 formula.
20    Q  When a private actor is doing the
21 cost/benefit analysis of whether to engage in unlawful
22 conduct, its expected total fine from that would
23 account not only for penalties in government
24 enforcement actions but also exposure in private
25 litigation, true?

Page 180

1        MR. COLLIER: Objection; form.
2        THE WITNESS: If it's for the identical
3     conduct, I would say yes.
4        I'm sorry. I should have said from this
5     deterrent perspective, this cost/benefit analysis
6     perspective, yes.
7  BY MR. DAVIS:
8     Q  You would agree that the total harm to
9  society from unlawful conduct is one of the basic
10 considerations that matters for calculating an optimal
11 penalty from the perspective of deterrence, wouldn't
12 you?
13    A  Well, I think as I describe in my report --
14 and I'm happy to walk you through the sections. I
15 think there are two different lenses you can use.
16       One is the, the harm to society, and the
17 other one is the benefit to the wrongdoer. It really
18 depends on the particular economic literature you're
19 drawing upon and whether the objective is to
20 absolutely deter the conduct or whether to effectively
21 establish a price for the conduct.
22    Q  The economic literature would also dictate
23 that one take the benefits to society from unlawful
24 conduct into account, true?
25       MR. COLLIER: Objection; form.

Page 181

1        THE WITNESS: I think in looking at the
2     social welfare side, I think there may be a --
3     literature that might describe that. That's not
4     one that I've particularly focused on, but I
5     believe that taken to its logical extreme, if
6     you're looking at social welfare and you have
7     particular conduct, then under that, the kind of
8     Gary Becker framework, I think you would look at
9     that as part of your analysis.
10       I think the deterrent literature is much
11    more focused on trying to say this is conduct
12    that we do not like, how do we prevent it from
13    occurring, so what is the dollar amount that we
14    need to establish in order to prevent it from
15    occurring in the future.
16 BY MR. DAVIS:
17    Q  Understood. Scholars like Becker, Polinsky,
18 Shavell, Buccirossi, all of those folks would consider
19 the benefits to society in determining an optimal
20 penalty, true?
21       MR. COLLIER: Objection; form.
22       THE WITNESS: Well, to some extent, I think
23    you're getting into the issue of overdeterrence,
24    and that's one of the reasons why I have my
25    entire section on overdeterrence in terms of

46 (Pages 178 - 181)

Page 182

1    looking at the impact on the plaintiff -- I'm
2    sorry -- the impact on the defendant, but I
3    would, I would say that in general I'd probably
4    simply point you to my last answer, that the
5    Becker approach, which is really about an
6    internalization of a cost approach as opposed to
7    an absolute deterrence approach, would look at,
8    all-in, society, net harms, net benefits
9    compared -- I'm sorry -- overall societal net
10   harms compared to the gains to the wrongdoer.
11   BY MR. DAVIS:
12       Q   The socially optimal penalty has to account
13   for the fact that there's such a thing as an efficient
14   violation, doesn't it?
15       A   Well, this is where I think you're moving
16   back into the earlier literature of Becker.
17       So Becker does have that concept of an
18   efficient violation, and that's why I said there's a
19   different perspective in terms of the, what I'll call
20   the "pure deterrence literature" that says if the
21   question before the court is what's the size of the
22   penalty to make sure this party and other people do
23   not engage in this conduct, because we do not consider
24   things like deception to be a positive thing for
25   society, because we think it undermines broader public

Page 183

1    policy goals or undermines faith in markets or
2    something else.
3        That's a different perspective than the
4    Becker type perspective which is about an efficient
5    level of deterrence, and even there -- which is one
6    that says you can pay to deceive.  So what's the right
7    fine to pay?  It's a price for deception.  It would be
8    the Becker type approach to it.
9        Keep in mind that there's these additional
10   factors that are present in that literature that also
11   say you also need to adjust for society's preferences
12   for the amount of resources it wants to spend on
13   enforcement, and that there's a max-- these maximum,
14   maximal penalty concepts that start to come to play
15   even under that literature.
16       So it's not a, not a single variable change
17   when you move from one of those literatures to the
18   other literature.
19       Q   Will you go to page 14 of your report and
20   look at note 34.
21       In note 34 you write, "The socially optimal
22   penalty makes the offender internalize all the costs
23   and benefits of the violation, thus leading the
24   offender to commit only 'efficient violations.'"
25       Did I read that part correctly?

Page 184

1        A   You do, or you did, rather.
2        Q   And those are violations for which the total
3    benefits exceed the total costs, right?
4        A   Correct, and I keep reading the rest of the
5    sentence just to be comprehensive.
6        Q   I just want to make sure.  The language in
7    note 34 on page 14, that is your opinion, right?
8        A   No.  These are -- the opinion -- I'm
9    describing the framework that's used in what I call
10   the "internalization literature."  So this is the
11   original Gary Becker literature.  Like I said, it's
12   the, the perspective of economists who, who use the
13   lens of there being effectively a price for
14   everything.
15       Q   Understood.
16       A   That there is a socially optimal way to
17   determine violations, and I also reference the other
18   literature that talks about the, what I would call the
19   "pure deterrence perspective" which would focus on the
20   penalties, the gains to the offender in trying to
21   prevent them from doing that in the future.  What's
22   the dollar amount that will prevent them from doing
23   it, because we don't want them to, somebody to lie,
24   cheat or steal.
25       Q   Do you know one way or the other whether

Page 185

1    Bernanke, DRS and RPO either collectively or
2    individually were net beneficial to society?
3        A   My view, based on my review of the available
4    documents and my understanding of the particular
5    conduct, is I would consider them to be a net
6    negative.
7        Q   How come?
8        A   For one, taking into account Google's market
9    position, the extent to which those policies were --
10   occurred at the same time as its enable -- as it
11   expanded its control over the broader ad tech markets,
12   plural, that I consider those to be long-term negative
13   effects.
14       Again, this is maybe going into the -- I'm
15   not opining on antitrust issues, but I'm talking about
16   the portions of my report where I describe my concerns
17   about the long-term -- the impact of these conducts on
18   the long-term competitive structure, the fact that
19   these conducts were directed towards earning not only
20   incremental revenue from -- for Google, but also
21   moving it away from competitors.
22       Q   Setting aside competitive issues, antitrust
23   issues, market power, and just looking at the effect
24   on publishers and advertisers' bottom lines, do you
25   have any opinion one way or the other as to whether

47 (Pages 182 - 185)

Page 186

1　Bernanke was net harmful or net beneficial?
2　　　MR. COLLIER: Objection; form.
3　　　THE WITNESS: Again, I would point you to
4　the words in my report. I think I said in my
5　report that I considered that the social harm was
6　likely greater than the benefits to Google. So
7　net/net, I would expect Bernanke and the other
8　programs to be net negative from a societal
9　perspective.
10　BY MR. DAVIS:
11　　Q　And in order to determine that something is
12　net negative, you have to account for both the benefit
13　to society and the harm to society, true?
14　　A　Generally, if you are actually going to do
15　the calculation, then it would be helpful to have all
16　that data points to do the evaluation.
17　　　I think in this case, understanding the
18　dynamics of this particular -- of these markets, their
19　interrelationship, Google's exceptionally high market
20　share in a number of these different markets, the exit
21　of competitors during the relevant time period, a
22　whole range of factors, the -- also the high,
23　relatively high take rate for Google overall
24　associated with this, these markets, considered
25　holistically.

Page 187

1　　　And the concerns that I understand were
2　expressed either by Google or maybe by other writers
3　about this, or maybe even other experts, regarding
4　these -- the impact of these specific strategies in
5　reducing competitive pressures, those would have led
6　to a -- or would have contributed to Google
7　maintaining its margins and expanding its margins and
8　expanding its revenues in these markets.
9　　Q　RPO led to increased publisher revenue,
10　right, by definition?
11　　A　It led to -- well, it led -- that's why I
12　need to go back and look at it, because it was, it was
13　applied to certain market participants and not others.
14　I see that to some extent as a raising rivals' cost
15　type strategy, if you put it in the context of, of
16　more of an antitrust framework. Again, I'm not here
17　to testify on antitrust framework and antitrust
18　issues, but simply it's one of the reasons why I think
19　of that as a net negative, because it's causing your
20　other advertisers who are not part of the GDN to pay
21　higher reserve prices.
22　　Q　How many dollars of benefit to publishers
23　did RPO cost?
24　　A　I would have to go -- I would probably
25　direct you either to Dr. Weinberg's -- I believe

Page 188

1　Dr. Weinberg talks about whether each of the
2　strategies, whether RPO or the other one was a net
3　positive or net negative from either the advertiser
4　side or the publisher side.
5　　Q　How many dollars of revenue to publishers
6　were attributed to Bernanke causing impressions that
7　would otherwise not have cleared to instead clear?
8　　　MR. COLLIER: Objection; form.
9　　　THE WITNESS: Sorry. Say it one more time.
10　BY MR. DAVIS:
11　　Q　How many -- I'll ask a better question.
12　　　To what extent -- by how many dollars did
13　Bernanke increase revenues paid to publishers?
14　　A　I don't recall as I sit here.
15　　Q　And when publishers obtain more revenue,
16　that's good for the internet, right?
17　　　MR. COLLIER: Objection; form.
18　　　THE WITNESS: Well, I think there are
19　tradeoffs, and again social welfare calculations
20　are always a little tricky here when you've got
21　costs being -- the increased revenues to the
22　publishers means there is increasing prices being
23　paid by advertisers, and whether those increasing
24　prices being paid by advertisers in turn are
25　passed through to consumers in terms of higher

Page 189

1　prices.
2　　　So I think there is a broader analysis you
3　would need to do, but again, on a net basis --
4　and again I just would point you back to my
5　report where I talked about this, that I consider
6　that, taken in its totality, that the conduct at
7　issue, the social welfare cost was likely to be
8　higher than the actual benefits to Google, but I
9　don't have the data to do that calculation.
10　BY MR. DAVIS:
11　　Q　And so you can't tell me a dollar value of
12　the harm caused by Bernanke to persons other than
13　Google, true?
14　　　MR. COLLIER: Objection; form.
15　　　THE WITNESS: I have not tried to quantify
16　that. I would say there are documents that
17　describe the impact on some -- of some of these
18　programs on some of the parties, and even then
19　there's a question about whether you should even
20　aggregate across the winners and losers, because
21　there would be winners and losers even within a
22　particular group, whether it's advertisers or
23　publishers.
24　BY MR. DAVIS:
25　　Q　Same question for DRS: Do you at any point

48 (Pages 186 - 189)

Page 190

1 calculate the social harm caused to persons other than
2 Google by DRS?
3     A   Again, I'd just give you the same answer I
4 just gave you for RPO.
5     Q   And same answer -- well, sorry.  The
6 original answer was for Bernanke.
7     A   Oh, I'm sorry.  The same answer would apply
8 for all three programs.  I looked at the documents and
9 particularly where Google describes the impact on
10 different groups; i.e., advertisers or publishers.
11     I reviewed Dr. Weinberg's analysis of the
12 directionality of the different programs, and like I
13 said, one of the other things I couldn't derive from
14 the available documents would be to ascertain it at a
15 more granular level of data that would be necessary in
16 order to actually do the calculation.
17     Q   What is "marginal deterrence," in economic
18 parlance?
19     A   Well, marginal -- the meaning of marginal is
20 really at the margin.  It's what is the incremental
21 impact of a particular action or fine or whatever it
22 is that would deter someone from going the next step,
23 as it were.  So you can think of it in a number of
24 different contexts.  It would depend on the context.
25     Q   And marginal deterrence is a recognized

Page 191

1 concept in the economic literature on optimal
2 deterrent fines, right?
3     A   I believe so.  I believe -- yes.  I would
4 say yes.  I would need to look back through the
5 specific articles that talk about marginal deterrence.
6 Some of the -- a lot of it depends on the particular
7 author.
8     Q   Is there sort of like a -- I don't know --
9 canonical reference point for economic analysis of
10 optimal finds?  I'll tell you in my view, it's
11 probably the Shavell/Polinsky article, but I don't
12 know that.
13     Is there one that I should look at as being
14 sort of a North Star?
15     MR. COLLIER:  Objection; form.
16     THE WITNESS:  And ultimately you are --
17 unfortunately, in economics, it's not like
18 there's a Supreme Court ruling that says -- a
19 Supreme Court of economists that says this is how
20 everybody should do it.  Different economists
21 bring a different lens associated with how to do
22 it.
23     I do think the Shavell and -- is it
24 Polinsky -- article was the -- or Shavell has a
25 text as well.  So the number -- both Shavell and

Page 192

1 Polinsky have written extensively about this.  So
2 they have studied the issue from their
3 perspective.  Others have as well.
4     I think the -- hang on one minute.  There
5 was another one in there that I found,
6 particularly helpful, is the Wouter Wils,
7 W-I-L-S, "Optimal Antitrust Fines, Theory and
8 Practice," which was more from what I consider
9 the straight deterrence perspective, to give the
10 contrast between that literature that talks about
11 socially efficient violations of law versus
12 deterrent perspectives.
13 BY MR. DAVIS:
14     Q   And who, who is Wils?  Who is that?
15     A   I would need to go back and review what his
16 CV was.  I just remember I read his article, and I
17 found it to be a very well-written summary of the
18 available literature.
19     Q   But you hadn't heard of him before that,
20 right?
21     MR. COLLIER:  Objection; form.
22     THE WITNESS:  I had not, no.
23 BY MR. DAVIS:
24     Q   Whereas somebody like Steve Shavell,
25 naturally you had heard of, correct?

Page 193

1     A   I had heard of Steve Shavell before this,
2 yes, but I would say this whole notion of this tension
3 between kind of the Becker perspective of social
4 efficiency and everything having a price is a, an
5 issue of kind some tension within the economics
6 profession more generally.  I think it applies not
7 just to conditions of deterrence, but it also applies
8 to antitrust; i.e., should we allow antitrust
9 violations as long as the violator pays for the amount
10 of its wrongdoing, which is not -- well, in any case,
11 I'll just say that that is -- there's always been this
12 broader tension between those economists that have
13 that view of everything has a price versus others that
14 have a broader perspective on the appropriate scope of
15 economic analysis.
16     Q   Isn't it true that under the, the principle
17 of marginal deterrence, it is important that the
18 sanction for a more harmful act exceed the sanction
19 for a less harmful act?
20     MR. COLLIER:  Objection; form.
21     THE WITNESS:  In general, yes, you would
22 expect that the greater the harm, the greater the
23 penalty should be applied.
24 BY MR. DAVIS:
25     Q   And also under marginal deterrence, as

49 (Pages 190 - 193)

Page 194

1  reflected in the economic literature, isn't it
2  important that the total sanction increase with the
3  activity level that is wrongful?
4       MR. COLLIER:  Objection; form.
5       THE WITNESS:  I would think in general, but
6  I think in specifics is where there, at the
7  limit, it makes -- that that blanket statement
8  may break down.  I think there's an expectation
9  in, in that story.  If I were to make that
10  statement, I think the caveat would always be up
11  to some level at which you are -- particularly in
12  a per-violation framework where the amount of the
13  penalty becomes excessive.
14  BY MR. DAVIS:
15     Q   And isn't it true that economists
16  considering marginal deterrence have determined that
17  when violations are serial in sequence over time, it
18  is better to underdeter on the per-violation level and
19  assure that the aggregate fine increases with each
20  violation than to not?
21       MR. COLLIER:  Objection; form.
22       THE WITNESS:  I would need to review any
23  articles that made that assertion, particularly
24  when you talk about underdeterring.
25

Page 195

1  BY MR. DAVIS:
2     Q   Maybe I'll do an example.
3        Well, no, that's okay.  I can shortcut this.
4        The works that you have cited, the economic
5  literature that you have cited in your report is
6  literature that you consider to be authoritative in
7  your field, true?
8     A   I considered all to be reliable.  I think
9  the question is really how much weight to put on one
10  author versus another.
11     Q   That's going to save time.
12        The concept of overdeterrence is widely
13  recognized in the economic literature, right?
14     A   Correct.
15     Q   One part of the concept of overdeterrence is
16  that society does not want to deter conduct that is
17  net welfare-enhancing, right?
18     A   I think that would be -- might be one way to
19  frame it.  I -- maybe I think of it differently, but
20  that might be one way to frame it.
21     Q   So another way to frame or another aspect of
22  the concept of overdeterrence is that we don't want to
23  chill lawful behavior by overly sanctioning unlawful
24  behavior, right?
25     A   That would be one consideration.  There are

Page 196

1  other considerations as well, but yes, that would be
2  one consideration.
3     Q   And another feature of -- actually, strike
4  that.
5        Another aspect of the concept of
6  overdeterrence is we do not want to drive
7  welfare-maximizing businesses out of business, right?
8     A   I think I have a discussion of this in my
9  report that I'd point you to for a more complete
10  explanation.  I probably wouldn't call it
11  "welfare-maximizing," because I think that depends on
12  whose welfare you're talking about, but I do think
13  that there -- I, I describe how you don't necessarily
14  want to drive a wrongdoer out of business if they are
15  providing broader societal benefits.
16        There may be others that you might want to
17  drive out of business, even if the welfare -- they're
18  maximizing their own welfare, but they're doing so at
19  the expense of society.
20     Q   If the net present value of a display ads
21  business is $2 billion, but there's a ten percent
22  chance that you'll incur a $25 billion fine in
23  connection with that business, it would be
24  economically irrational to enter that business, true?
25       MR. COLLIER:  Objection; form.

Page 197

1       THE WITNESS:  Well, you're saying simply by
2  virtue of participating in an industry that there
3  is a ten percent chance you're going to get hit
4  with a mammoth fine associated with it, I think
5  there are ways in which I could imagine that
6  still being a profit-maximizing decision to make
7  because of bankruptcy protection, because there's
8  a chance you don't -- so there is an asymmetry in
9  terms of the outcomes given, because of the
10  bankruptcy laws, you might get away with it.
11       But the bottom line is I understand your --
12  the hypothetical, and I can see how a probability
13  of a negative outcome can change the decision by
14  someone to invest -- to make any particular
15  investment.
16       MR. DAVIS:  Can we take a break?
17       MR. COLLIER:  Sure.
18       THE VIDEOGRAPHER:  The time is 2:55 p.m.
19  This ends unit 4.  We're off the record.
20       (Whereupon, a short recess was taken.)
21       THE VIDEOGRAPHER:  The time is 3:14 p.m.
22  This begins unit number 5.  We're on the record.
23  BY MR. DAVIS:
24     Q   Dr. DeRamus, you ready to continue with your
25  deposition?

50 (Pages 194 - 197)

Page 198

1    A   Yes, I am.
2    Q   One of the concepts discussed in your report
3 is what's commonly called "the principal-agent
4 problem," right?
5    A   Correct.
6    Q   And that's a problem that arises -- and in
7 other contexts, too, but predominantly in
8 corporations, correct?
9    A   I would say in corporations, but it is a
10 general, general economic problem, yes.
11   Q   In the context of large publicly traded
12 corporations, the principal-agent problem as it's been
13 studied arises from the separation of ownership and
14 effective control, right?
15   A   In effect, yes.
16   Q   And that's because a corporation that's
17 large and publicly traded is owned by many dispersed
18 shareholders, but controlled by a group of executives
19 and directors, right?
20   A   Correct, and I think it's also about the
21 owners versus managers distinction, but yes.
22   Q   And the result of the principal-agent
23 problem in corporations, as I understand it, is that
24 the board and executives of a corporation may behave
25 in ways that benefit them at the expense of

Page 199

1 shareholders; is that right?
2    MR. COLLIER:  Objection; form.
3    THE WITNESS:  Well, it's including managers.
4 I would say it's up and down the line.  It's not
5 necessarily just an issue about a board of
6 directors.  It's also about a -- because
7 oftentimes you will have large shareholders
8 sitting on the board of directors, but it's
9 really more about management versus owners when
10 you have a separation between the two.
11 BY MR. DAVIS:
12   Q   Got it, and is, is the cause of the issue
13 with the principal-agent problem in corporations that
14 shareholders don't have oversight over the day-to-day
15 activities of the firm?
16   MR. COLLIER:  Objection; form.
17   THE WITNESS:  It's not so much they don't
18 have oversight.  It's just that there is a
19 different set of incentives between shareholders
20 and managers, that the managers who are engaged
21 in conduct, in certain conduct may do things that
22 benefit them in the near term that are ultimately
23 at the expense of shareholders over the long
24 time.
25   But it can, it can also arise -- it doesn't

Page 200

1 have to be this shareholder versus management,
2 but that's the context within which I think it's
3 appropriate to analyze this case.
4 BY MR. DAVIS:
5    Q   Got it.
6    Does it have to do with the typical
7 shareholder in a public corporation not being
8 materially affected by movements in the stock price
9 unless those movements are substantial?
10   A   I have a pretty long section on that in my
11 report, so I would probably refer you to that, but I
12 say, I would say in general it's because the agents
13 can do -- the managers can do certain things that
14 benefit them in their compensation that are ultimately
15 not detectable by shareholders or insufficiently --
16 where they have the -- there's just insufficient
17 incentives on the part of the shareholders to the
18 effectively clamp down on managers and cause them to
19 do something differently.
20   Q   And the, the bridge, so to speak, between
21 the concept of the principal-agent problem on the one
22 hand and then section 7 of your report on the other is
23 the idea that a penalty needs to be large enough to
24 cause shareholders to take action, right?
25   A   That is the theoretical framework that I

Page 201

1 applied to this.  I wouldn't say it necessarily has to
2 be that, since one could still arrive at the same
3 conclusion without the principal-agent framework, but
4 I consider that to be, as an economist, a building
5 block to motivate the subsequent economic analysis
6 that I do with the actual share price data.
7    Q   And is the, is the idea, in sort of
8 layperson terms.  That a big enough stock drop will
9 cause shareholders to exercise their voting power in
10 such a way that achieves some combination of
11 monitoring and deterrence that prevents violations
12 like the ones at issue?
13   MR. COLLIER:  Objection; form.
14   THE WITNESS:  I would say in general, yes,
15 but again, I wouldn't say that's the only way.
16 BY MR. DAVIS:
17   Q   Is the way that shareholders in a public
18 corporation take action through casting shareholder
19 votes?
20   A   Generally, yes.
21   Q   What, what do you know, sitting here right
22 now, about the voting rights associated with Google's
23 publicly traded shares?
24   A   I would say at a high level I understand
25 there are three class of shares.  There's voting

51 (Pages 198 - 201)

Page 202

1  shares, publicly traded voting shares, publicly traded
2  nonvoting shares.  I believe those are the A and C
3  class stock, and then there's -- I think the B class
4  stock are the ones that are held by the founders,
5  Sergey Brin and I believe Larry Page.  I don't know
6  if --
7      THE REPORTER:  Who is it?  Sergey --
8      THE WITNESS:  Brin, B-R-I-N, and Larry Page.
9      MR. COLLIER:  That's my reminder every hour.
10  You've got to slow down just a little bit to let
11  her catch up.
12  BY MR. DAVIS:
13     Q   And to this day, Mr. Brin and Mr. Page have
14  more than 50 percent of the voting power in Google,
15  right?
16     A   I don't recall the exact amount.  I, I
17  recall reading from Mr. Brin's deposition, I don't
18  think he remembered either, but if -- it is a factual
19  issue, so I would say -- it's my understanding they
20  exert a, a lot of voting power over the stock, or they
21  could exert substantial voting power based on their
22  shareholdings and the, and the preferences that those
23  shareholdings have, given the fact that there's a big
24  chunk of nonvoting public stock.
25     Q   Would it surprise you to learn that Mr. Page

Page 203

1  and Mr. Brin together have a combined 51.7 percent of
2  the Google shareholder voting power?
3      A   That would not surprise me, no.
4      Q   So when you talk about a fine large enough
5  to incentivize shareholders to action, are you talking
6  about a fine large enough to incentivize Mr. Page and
7  Mr. Brin specifically?
8      A   Well, I consider it more from a big picture
9  perspective, shareholders collectively.  I think there
10  are -- from Mr. Brin's perspective, I'm not sure what
11  kind of fine would cause him to actually change his
12  conduct.  He did not seem to pay a lot of attention to
13  the value of his shares in his deposition, but I
14  consider it more of a generalized concept that as a
15  publicly traded company, the company has an obligation
16  to its shareholders more broadly.
17      And so I really consider that from that
18  lens, from -- what is the fine necessary to cause
19  shareholders to collectively -- whether it's Mr. Brin
20  and Mr. Page or whether it's the other shareholders --
21  to effectuate a change in management, or at least to
22  align the incentives, because to some extent I think a
23  fine large enough may have self-aligning factors;
24  i.e., you might be able to impose a very large
25  penalty, and managers and the CEO, for example, don't

Page 204

1  have to be told to change their conduct.
2      The award by the court may be sufficient at
3  that point to cause them to change that conduct, given
4  the impact that that penalty has had or could have on
5  the stock price of the company.
6      Q   But that has nothing to do with the
7  principal-agent problem, does it?
8      MR. COLLIER:  Objection; form.
9      THE WITNESS:  Ultimately it does, yes.
10  BY MR. DAVIS:
11     Q   Are you testifying that the principal-agent
12  problem is relevant to the penalty analysis,
13  notwithstanding the fact that without the
14  participation of Mr. Page or Mr. Brin, no shareholder
15  can cause any action at Google?
16     A   Well, I think there are fiduciary
17  responsibilities that the, the board has, right, to
18  all the shareholders, so when the board makes a
19  decision, it requires it to be in the interest of its
20  shareholders more broadly.
21     Q   And that's true always, right?  It has
22  nothing to do with stock drops or the degree of stock
23  drops, does it?
24     A   That's correct.  That is true always.  That
25  is my understanding, I should say.

Page 205

1      Q   Your idea about causing a large enough stock
2  drop has to do with incentivizing shareholder action,
3  as you testified a few minutes ago, right?
4      A   I would say in general, yes.  I don't think
5  you have to necessarily look at it through that lens,
6  but as an economist, I find that to be a more
7  theoretically cohesive way of looking at the issue.
8      Q   And that's certainly what your report says,
9  right?
10     MR. COLLIER:  Objection; form.
11     THE WITNESS:  In broad brush strokes, yes.
12  BY MR. DAVIS:
13     Q   When you wrote your report, did you know
14  that Mr. Brin and Mr. Page, combined, had more than
15  50 percent of the Google voting power?
16     A   I didn't know that they had more than
17  51 percent.  I just knew that they were very large
18  shareholders, and I think in that principal-agent
19  section in my report, I talked about the, the issue
20  associated with principal-agent problems in public
21  companies and, and the role of large shareholders in
22  that, in assessing that conduct.
23     Q   So Mr. Brin and Mr. Page are not just large
24  shareholders, right?  They're controlling
25  shareholders?

52 (Pages 202 - 205)

Page 206

1    MR. COLLIER:  Objection; form.
2    THE WITNESS:  Based on your representation,
3  yes.
4  BY MR. DAVIS:
5    Q   And they are also involved in the management
6  of the company, right?
7    A   They are involved to some extent in the
8  management of the company.
9    Q   It makes this sort of an odd fit for the
10  typical application of the principal-agent problem;
11  isn't that fair?
12    A   No.  Actually, I think it's very
13  appropriate.  I still think the fact that you've
14  got -- at least Mr. Brin stated he doesn't really pay
15  that much attention to his stock price.  I'm not quite
16  sure what is, what is it that would motivate his
17  change in conduct.
18    I just -- even Dr. Skinner suggests that a
19  penalty is going to have a negative impact on the
20  stock price, and I would consider it to be appropriate
21  and, in fact, necessary to have an impact on the stock
22  price to really effectuate change.
23    Q   But not because of the principal-agent
24  problem, right?  Just because, in general, large costs
25  incentivize more change, right?

Page 207

1    MR. COLLIER:  Objection; form.
2    THE WITNESS:  Well, ultimately, as an
3  economist, I view it from that principal-agent
4  perspective, that there are actions that the
5  managers do, the people lower down the totem pole
6  from Mr. Brin and Mr. Page.  Those are the
7  individuals developing these strategies and
8  implementing strategies to the benefit of
9  shareholders collectively, to maximize
10  profits/shareholder value/their individual
11  bonuses.
12    And those are -- there's an -- in a publicly
13  traded company, you need to account for the
14  differences in incentives between those
15  individuals.
16  BY MR. DAVIS:
17    Q   How is that any different than in a
18  privately owned company?
19    A   In a privately owned company, there's not
20  the separation between ownership and control -- or I'm
21  sorry -- ownership and management, and a privately
22  held company, assume it's a small Mom and Pop cleaner,
23  and the owner is a -- owns the cleaning business and
24  runs the cleaning business, and that individual has a
25  strong incentive to make sure that customers are happy

Page 208

1  every day, because they are effectively the residual
2  claimant.  After they pay all of their costs and their
3  employees, they get all the marbles.
4    Q   And that's assuming the absence of a
5  principal-agent problem, right?
6    MR. COLLIER:  Objection; form.
7    THE WITNESS:  Correct.  There would still be
8  a deterrent issue if the -- if there -- if the --
9  the dry cleaner might still have an incentive to
10  otherwise engage in actionable conduct, but it
11  doesn't raise the same kind of principal-agent
12  problem, since the owner then would internalize
13  those costs.
14  BY MR. DAVIS:
15    Q   And in our case with respect to Google, the
16  founders are both the -- never mind.
17    Can I ask a new question?
18    A   Yes.
19    Q   Does the fact that Mr. Brin and Mr. Page own
20  51 percent of the voting power in Google in any way
21  affect the application of the principal-agent problem
22  in the context of your penalty analysis?
23    MR. COLLIER:  Objection; form.
24    THE WITNESS:  Not in a meaningful way.  It's
25  a, it's a data point, the same way that if I had

Page 209

1  a company that was 51 percent owned by one
2  institutional shareholder, it's still a data
3  point, and I address that in the up-front section
4  of my report, but at the end of the day, it does
5  not change my conclusion that an alternative way
6  to determine an appropriate penalty amount is
7  what is the size of the penalty that would result
8  in an adverse -- a detectable change in the
9  company stock price.
10    I think particularly in this situation, the
11  company, as large and as profitable as Google, it
12  does lend itself to that particular lens as
13  opposed to other companies where you might not
14  have the same set of facts in which it might be
15  less of an issue.
16  BY MR. DAVIS:
17    Q   And why, why this focus on the stock price
18  as opposed to the balance sheet?
19    MR. COLLIER:  Objection; form.
20    THE WITNESS:  I think it's largely an issue
21  of incentives.
22    So the, the stock price, the move -- the
23  barometer of the stock price, probably in a
24  fast-growing company like, like Google, where
25  there are naturally going to be an incentive for

53 (Pages 206 - 209)

Page 210

1  shareholders to otherwise be perfectly happy with
2  management, that is increasing that stock price
3  as fast as it has grown, to basically get out of
4  the way of -- out of managers, because those
5  managers have made them wealthy.
6      So when, all of a sudden, the -- and there
7  is a chance in which management engages in
8  actionable conduct, and yet they don't get
9  detected, right?  And then the profits continue
10  to pour in, and the stock price continues to go
11  up, in which case, if the -- either there's not
12  detection or there's an insufficient penalty
13  amount, there's no incentive by shareholders to
14  rein in the conduct of management.
15      So that's why the share price is that
16  barometer that tells them, wait a second, there's
17  something off-trend here.  There's an event.
18  This is -- this conduct is negatively impacting
19  the value, my ownership stake in this company.
20  BY MR. DAVIS:
21      Q    Other than your expert report, are you aware
22  of any economic literature that suggests that public
23  corporations should have their fines calculated
24  differently than other sorts of entities?
25      A    Well, the literature describes the, the need

Page 211

1  to consider adjusting the appropriate deterrent
2  penalty amount for things like risk preferences, risk
3  tolerance, the wealth of a particular entity, so in
4  that respect I consider it to be correlated with a
5  public company which tend to be larger, have greater
6  resources than, for example, a privately held company.
7      Q    I'm asking just about public versus private.
8  Are you aware of anything written down, other than
9  your expert report, that suggests that there is a way
10  to calculate optimal deterrent penalties for public
11  corporations that cannot be used for private
12  corporations?
13      MR. COLLIER:  Objection; form.
14      THE WITNESS:  I'm sorry.  Say that one more
15  time.
16  BY MR. DAVIS:
17      Q    Are you aware of anything written down,
18  other than your expert report in this case, that
19  suggests that there is a particular way to calculate
20  optimal deterrent fines for public corporations as
21  opposed to other sorts of entities?
22      A    I think that's the part where I'm struggling
23  a little bit, because I do think there's lots of
24  literature about publicly traded companies.  They have
25  a value.  We can measure that value.  There's a lot of

Page 212

1  information that we can use, from changes in that
2  value over time, to run experiments on what has
3  changed valuations of those businesses.
4      We don't have similar data for privately
5  held companies.  You could do that analysis to look at
6  changes in the value of a privately held company, but
7  you wouldn't be able to do it with the same level of
8  precision as with public companies.
9      But I have not seen anything in the
10  literature that directly says, for example, a larger
11  penalty should be applied to a public company as
12  compared to a private company, because of a
13  principal-agent problem, nor do I think -- nor have I
14  applied effectively a premium to the penalties,
15  deterrent penalties I've calculated, simply because
16  they are a public company -- simply because Google is
17  a public company.
18      Q    And similarly, are you aware of anything
19  written down, other than your expert report, that
20  suggest reference to a company's stock price in
21  calculating an optimal deterrent penalty?
22      MR. COLLIER:  Objection; form.
23      THE WITNESS:  Well, there's a lot of
24  literature on doing event analyses based on
25  company stock prices.  I have not seen anything

Page 213

1  in the literature that talks about deriving a
2  specific penalty amount based on the company's
3  stock price.
4      I would say it is -- there are references to
5  the aggregate wealth of the, the offender; that
6  the aggregate wealth is an indication that
7  wealthier companies or individuals, a deterrent
8  penalty may need to be higher than other
9  companies, but not in the way that I have applied
10  it here.
11  BY MR. DAVIS:
12      Q    Are you aware of anything written down,
13  other than your expert report in this case, that uses
14  a stock market event study in connection with
15  calculating an optimal deterrent penalty?
16      A    Well, I would say in securities cases, there
17  are lots of cases in which you look at -- do event
18  studies in order to determine the amount of some kind
19  of monetary sanction.  I haven't seen it in the
20  context of a statute that was one that called for a
21  deterrent penalty number.
22      Q    And securities litigation is literally about
23  the stock market, isn't it?
24      A    Well, it's about conduct that led --
25  correct, that would have been reflected in a company's

54 (Pages 210 - 213)

1 stock price.
2   Q   Which is distinct from the facts at issue in
3 this case, fair?
4   A   Correct, only insofar -- I would say the
5 conduct at issue here helped to support the company
6 stock price, because it generated a substantial amount
7 of profits.
8   Q   And in a securities fraud case, the harm to
9 be redressed is itself movement, or the lack thereof,
10 in an issuer's stock price, true?
11   A   At issue is the conduct that led to the
12 increase in the company's stock price, yes.
13   Q   So it makes sense to do event studies in
14 that context, doesn't it?
15   A   Give me a second.  I think there's plenty of
16 context in which economists and financial analysts use
17 event studies in all sorts of contexts, regardless of
18 whether it's a securities -- a 10(b)(5) type case.
19     THE REPORTER:  A securities what five?
20     THE WITNESS:  A securities case or
21 irrespective of whether it's a 10(b)(5) case.
22     THE REPORTER:  10(b)(5) case.  Okay.
23     THE WITNESS:  So I'm sorry.  Could you give
24 me one second?
25

1 BY MR. DAVIS:
2   Q   Yes.  I'll also tell you I'm good to move on
3 to the next piece, and we can do it to where, if you
4 have a take over the course of the day, you're welcome
5 to give it to me, rather than waiting, now.  Is that
6 good?
7   A   That's good.  If I could just amend my prior
8 answer, just to say that I've used event studies in a
9 wide range of contexts, including outside of
10 securities cases.
11   Q   Got it.
12     Can you go to paragraph 129 of your report,
13 please.  And I don't have detailed questions.  I'm
14 just framing where we're at in your analysis.
15   A   I'm sorry.  Paragraph 129?
16   Q   Yes.  It's pages 71 and 72.
17   A   Yes.
18   Q   And it includes a list of fines and
19 settlements.
20   A   Yes.
21   Q   And those are a list of regulatory actions
22 against Google resulting in fines or settlements,
23 right?
24   A   I would say regulatory or enforcement
25 actions, and here you're referring to paragraph 129,

1 correct?
2   Q   Yeah, and then the next couple, I think,
3 too.
4     Did you do anything to assess or investigate
5 the similarity of the conduct at issue in those
6 matters as compared to this matter?
7   A   I would say I, I looked at it generally, but
8 the focus of my analysis was not necessarily on the --
9 I wasn't using it as a comparable, for example.
10     I was -- so I saw Dr. Wiggins' criticism of
11 some of these, and particularly his criticism of
12 Jeffrey Andrien's use of some of these, and I, I
13 disagreed with some of Wiggins' criticism in that
14 regard, in terms of his statement that these are too
15 far removed or unrelated to the conduct at issue, but
16 the purpose I'm using it for here in my analysis is
17 different.
18   Q   Are you aware of any significant fines or
19 settlements having to do with Google's digital display
20 ad technology?
21   A   Digital display ad technology?  I don't
22 believe so.
23   Q   Are you aware of any significant fines or
24 settlements that had to do with the lack of
25 disclosure?

1   A   Well, there's some that I think were
2 brought, brought under various deceptive conduct or
3 unfair competition type statutes.  I believe Jeffrey
4 Andrien addresses those in his rebuttal report.
5     So I'm aware that there are others that --
6 other types of conduct that involved alleged
7 deception, such as I think one was geo-tracking.  That
8 was one, for example, but again I didn't do that type
9 of review that, that Andrien did.
10   Q   How would additional monitoring or changed
11 incentives in connection with any of these past fines
12 have caused Google not to engage in the violations
13 associated, in your view, with Bernanke, DRS or RPO?
14   A   Well, I think that's the -- the point of my
15 analysis is that notwithstanding the imposition of
16 significant fines in the past, Google, Google's stock
17 price didn't change as a result.
18     That's the main thing, that Google's stock
19 price didn't change as a result of those, and
20 therefore in this case, I would not expect a change in
21 Google's conduct, absent the imposition of a fine
22 sufficiently large as to cause that price change.
23   Q   I'm going to try another example, because
24 I'm having trouble putting it in a question.
25     If this year I get fined for illegal sports

55 (Pages 214 - 217)

Page 218

1  betting, and then next year I get fined for speeding
2  in my car, would it be reasonable to surmise that I
3  did not respond correctly to my incentives from the
4  fine for sports betting, because I committed some
5  distinct violation the following year?
6      MR. COLLIER: Objection; form.
7      THE WITNESS: It might be reasonable to draw
8  that inference for a jury to say that, that here
9  is an individual who -- well, but again, I
10  shouldn't say what is reasonable for a jury to
11  include.
12     I would say from an -- it may indicate to
13  me, as an economist, that there is a certain
14  amount of risk-taking behavior, and that a prior
15  fine of a certain amount wasn't enough for
16  someone to focus on engaging only in lawful
17  conduct.
18     So I think it can have some relevance. I
19  think it all depends on how far you want to take
20  that particular data point.
21 BY MR. DAVIS:
22     Q   The degree to which the sanctioned conduct
23  is similar matters with respect to its relevance in
24  predicting an optimal fine in a given instance, right?
25     MR. COLLIER: Objection; form.

Page 219

1      THE WITNESS: I think it depends on how you
2  use it. Here, I'm using it from a different
3  perspective; namely, is a fine of a sufficient
4  magnitude as to cause a decline in the company's
5  stock price.
6      And I think one of the, one of the reasons
7  why early on in that section I described the
8  example of Apple, where it continued to engage in
9  a violation up to the statutory maximum in a
10  particular geographic area; namely, the
11  Netherlands, and I -- as an economist, I take the
12  inference that says that the maximum fines that
13  it was going to be subject to were not
14  sufficiently large to cause it, from a
15  cost/benefit perspective, to change its conduct.
16 BY MR. DAVIS:
17     Q   Is it your opinion that a fine should be
18  calculated to be high enough to deter the wrongdoer
19  from engaging in any future wrongdoing or only
20  wrongdoing of the sort for which they're being fined?
21     MR. COLLIER: Objection; form.
22     THE WITNESS: I don't think it's of any
23  wrongdoing. I think it is -- I think that's one
24  of the reasons why you need to go through the
25  whole analysis I do in the first part of my

Page 220

1  report to really understand the specific
2  wrongdoing at issue, to understand whether this
3  is a reasonable framework to apply.
4  BY MR. DAVIS:
5      Q   And what analysis, if any, did you do of
6  Google's responses to any of the privacy-related fines
7  that you list?
8      A   Well, those went into the econometric
9  analysis to determine whether the stock price moved in
10  response to those fines.
11     Q   My question -- and it may have been a bad
12  one, but I'm meaning to ask whether you did any
13  investigation or analysis as to whether Google
14  increased its monitoring, supervision or prevention
15  practices following those privacy-related fines?
16     A   I understand now.
17     I did not look to see what they had done
18  with regard to those -- response to those
19  privacy-related fines.
20     Q   Same question as to the competition-related
21  fine: Did you do any analysis or investigation into
22  whether those fines were sufficient to cause Google to
23  take any increased measures with respect to monitoring
24  or supervision?
25     A   I guess the short answer is no, but the

Page 221

1  longer answer is I do understand that there are
2  ongoing antitrust cases outstanding, including penalty
3  phases in -- that are still pending in the search
4  case, for example.
5      So there are a number of ongoing cases
6  associated with that conduct. It's not like the
7  anticompetitive at issue. It's simply a single
8  behavioral, a single behavioral type conduct.
9      Q   Sure. Did you do any investigation of
10  Google's response, if any, to the accusations of
11  anticompetitive conduct when those enforcement actions
12  were begun?
13     A   Other than my understanding that Google has,
14  has litigated -- has asserted that those claims are
15  not valid and has asserted its own defenses against
16  those claims. Nothing other than that.
17     Q   Isn't it true that you have assumed that if
18  Google's stock price didn't move a meaningful amount,
19  that Google did not respond to any fines in an
20  adequate manner?
21     MR. COLLIER: Objection; form.
22     THE WITNESS: No.
23 BY MR. DAVIS:
24     Q   What data do you have to indicate that a
25  fine leading to what you view to be an insignificant

56 (Pages 218 - 221)

Page 222

1  stock drop was one in which Google didn't respond with
2  adequate increased monitoring or supervision?
3     A   The question is what is the penalty that
4  should be -- to be -- that should be imposed in order
5  to prevent Google or to disincentivize Google from --
6  or others similarly situated parties from engaging in
7  similar conduct in the future, and you don't throw out
8  that ex ante approach, that probabilistic approach
9  that you -- that I look at in section 6.
10     And in my opinion, it has to -- the size of
11  the penalty, given the scope of the conduct and the
12  type of conduct and severity of the conduct, should be
13  sufficient enough to cause that -- some kind of stock
14  price reaction.
15     So that's why it is a different method.
16  It's a different approach than my approach in section
17  6, but I consider it ultimately a question of a
18  signaling issue.  It provides the signal to
19  shareholders and to the company that, in the future,
20  management should not engage in this or similar types
21  of conduct.
22     Q   And I just want to be clear, because I
23  understand that opinion, but your opinion that a
24  penalty needs to be large enough to have a material
25  stock price impact has nothing to do with Google's

Page 223

1  past fines or settlements in other cases, because you
2  didn't investigate Google's responses to those fines
3  or settlements, true?
4     A   Sounds like --
5     MR. COLLIER:  Objection.  Sorry.  Objection;
6  form.  Go ahead.
7     THE WITNESS:  It just sounds like you're
8  asking a different question than I was trying to
9  answer.
10  BY MR. DAVIS:
11     Q   Okay.
12     A   So the question I'm trying to answer is what
13  is the appropriate penalty in this case that should be
14  applied, using economic principles of deterrence,
15  to -- in order to address the conduct at issue.
16     And given the magnitude of Google, and given
17  the large number of other prior violations, I consider
18  those to be relevant data points with which to assess
19  how big should that number be.  There are lots of ways
20  -- we can do a different hypothetical, right, or just
21  assume that the jury were to only impose a fine of a
22  billion dollars.
23     I do not think -- based on my review of the
24  data, I don't think a billion dollars will have a
25  single effect on the future incentives of any Google

Page 224

1  manager, independently of any other action they might
2  take, to change their conduct.  They -- will the
3  conduct, in my view, will there still remain
4  incentives to Google and to its shareholders for this
5  or similar conduct, either by Google or by other
6  similarly situated companies, to engage in that
7  conduct in the future?
8     Q   I just want to be clear.  Your opinion is
9  that a billion dollar fine on Google would not have a
10  single effect on the future incentives of any Google
11  manager, independently of any other action -- well,
12  let me go back.
13     Is it your opinion that a fine of $1 billion
14  would not have an effect on any Google manager?
15     MR. COLLIER:  Objection; form.
16     THE WITNESS:  It would not have a sufficient
17  deterrent effect to remove the incentives to
18  engage in conduct of this type.
19  BY MR. DAVIS:
20     Q   Because, in your view, it wouldn't move the
21  stock price enough, right?
22     A   Well, again, within the -- I cannot --
23  setting aside my prior analysis based on my
24  understanding of the benefits, the expected benefits
25  relative -- and the lack of any impact on the stock

Page 225

1  price, I would have seen -- I would see that, on an
2  MPV basis, if I were a shareholder, having all that
3  information, all the information available to me
4  today, I would say terrific, good job.  We engaged in
5  this conduct, that even though we have a billion
6  dollar penalty assessed against the company, it didn't
7  affect the value of my shareholdings in any
8  significant degree.  It allowed us to earn substantial
9  profits over this time period and to continue to earn
10  profits into the future.
11     That, to me, is an outcome that I don't
12  think is consistent with economic principles.
13     Q   And I am only asking about section 7 right
14  now, not section 6.
15     Your analysis in section 7 starts with the
16  premise that any fine that does not move the stock
17  price enough does not affect the incentives of
18  Google's executives and employees; isn't that true?
19     MR. COLLIER:  Objection; form.
20     THE WITNESS:  Well, within the context of
21  this conduct in this case.  That's why I think I
22  hope I said -- or I will clarify my prior answer.
23     In the context of this case, I do not think
24  that a fine of less than a billion dollars or
25  even a billion dollars would change the

57 (Pages 222 - 225)

Page 226

1  incentives of Google management writ large from
2  engaging in this conduct in the future, or to --
3  nor would it change the incentives of another
4  similarly situated company, given the entire
5  analysis that I've done in the prior sections of
6  my report.
7      Now, there may be other conduct that an
8  employee, an individual employee may be
9  disincentivized from undertaking.  That doesn't
10  require a billion dollar penalty.  I agree with
11  that statement.
12  BY MR. DAVIS:
13      Q   So without your section 6 analysis, in which
14  you conclude that the conduct at issue resulted in
15  ███████████ to Google, your
16  section 7 analysis doesn't make any sense, fair?
17      MR. COLLIER:  Objection; form.
18      THE WITNESS:  No, I wouldn't say it doesn't
19  make any sense.  I would say it is informed by
20  the documents that I saw and used in section 6.
21  It doesn't necessarily have to be derived on the
22  back of the calculations that I did in section 6,
23  but it's one of the reasons why I start in
24  actually 3 -- 3, 4, 5, and 6 -- to understand the
25  type of conduct, the likely impact of that

Page 227

1  conduct, the scope of commerce affected or
2  potentially affected, and, and then to analyze
3  the documents that -- I tried to estimate the
4  benefit or, in fact, do estimate the benefit to
5  Google from engaging in that kind of -- that
6  conduct.  That's not information that I throw out
7  simply because I go to the analysis in section 7.
8      I would say that informs my view that this
9  is the kind of conduct that an analysis in
10  section 7 provides a meaningful data point that
11  one could use to derive a deterrent penalty
12  amount.
13  BY MR. DAVIS:
14      Q   Without first determining that the conduct
15  at issue resulted in ████████████
16  ██  █████  to Google, you would not advocate for the
17  methodology in section 7 of your report, true?
18      MR. COLLIER:  Objection; form.
19      THE WITNESS:  I would not propose using the
20  methodology in section 7 if a Google employee got
21  a speeding ticket.
22      So I consider section 7 to be appropriate
23  and the numbers that I derive in section 7 to be
24  appropriate, based on a totality of my analysis
25  of the conduct at issue in this case.

Page 228

1  BY MR. DAVIS:
2      Q   But the numbers in section 7 are in no way
3  derived by reference to the benefits to Google
4  resulting from the conduct at issue or the harm to
5  others in connection with the conduct at issue,
6  correct?
7      A   Those are not data inputs into it, but they
8  are certainly factors that I consider in considering
9  it to be a reasonable approach.
10      Q   How much harm does a piece of misconduct
11  have to cause for your analysis in section 7 to be an
12  appropriate response?
13      A   I don't know the exact number as I sit here
14  today, but I would say certainly I consider it to be a
15  reasonable approach in this case, and the numbers to
16  be on the very low end of the numbers that are derived
17  in section 6.
18      Q   If conduct causes $100 million of harm, can
19  we use your section 7 analysis to calculate an optimal
20  deterrent fine?
21      MR. COLLIER:  Objection; form.
22      THE WITNESS:  I think it would depend on the
23  size of the company, the type of company at
24  issue.  If you're talking about Google as opposed
25  to a different company, I would, I would think --

Page 229

1  I would probably use that factor to probably
2  reduce the range of the deterrent penalty
3  amounts.
4      If I had an independent estimate of
5  $100 billion, then I would say that's the better
6  estimate and leave it at that, without -- here, I
7  have two different ways of doing it, and I
8  provide those as alternative ways and frameworks
9  for the, for the jury to consider, but if there's
10  a real disparity between the two, and if you get
11  a much lesser number, using -- and I have good
12  estimates of the benefits to Google, and it was
13  $100 million, then I would probably look at --
14  and I had a good estimate of the probability of
15  detection and enforcement, then that may be the
16  better way to go.
17  BY MR. DAVIS:
18      Q   So the section 7 analysis is the way to go
19  only if you get a number similar to what you already
20  got in section 6?
21      A   Not similar.  It informs my opinion.  It
22  says I know the order of magnitude of the, of the
23  benefits that Google expected to obtain at the time,
24  and so there's just -- there are two ways to go down
25  that road, either forecast the expected future

58 (Pages 226 - 229)

Page 230

1  benefits and identify the probabilities of detection
2  and enforcement, or alternatively, go straight to the
3  magnitude of a penalty that would require an
4  adjustment -- that would cause a sufficient change in
5  the stock price to, to cause a change in behavior -- a
6  change in incentives on a going-forward basis.
7      Q   And when defining a sufficient change in the
8  stock price, you do that without reference to the
9  benefits resulting from or harm caused by the conduct
10 at issue, true?
11     MR. COLLIER:  Objection; form.
12     THE WITNESS:  Well, as I said before, I
13 don't use my analysis in section 6 as an input
14 into my calculations in section 7, but my overall
15 assessment of the reasonableness of the section 7
16 results is informed by the analysis and the
17 documents that I look at in section 6 and in the
18 other sections as well.
19 BY MR. DAVIS:
20     Q   Would you call that circular reasoning?
21     MR. COLLIER:  Objection; form.
22     THE WITNESS:  No.  I think in many ways,
23 economists or any, anyone tasked with identifying
24 or estimating monetary remedies, I think it's
25 appropriate to look at a wide range of data using

Page 231

1  different assumptions and different
2  methodologies, and asking whether a particular
3  result is reasonable.  I think to some extent,
4  it's a sanity check.
5  BY MR. DAVIS:
6      Q   If for some reason you weren't allowed to
7  prevent -- to present the analysis in section 6, would
8  you present the analysis in section 7 as a standalone
9  assessment of optimal deterrent penalties?
10     A   I, I consider section 7, on a standalone
11 basis, to be a reliable approach.  I would also point
12 to the broader set of factors that I considered in the
13 previous sections of my report; i.e., I wouldn't at
14 this point -- I'm trying to figure out if your
15 question is assume complete ignorance about the facts
16 of the case, and now if you don't -- if I did not know
17 anything about the conduct of the case, would I offer
18 section 7 as a standalone piece.
19     No, I wouldn't.  I would always offer it
20 within the context of my understanding of the facts of
21 the case, the documents, and the empirical analyses
22 that the company itself did.
23     Q   If Google's conduct caused $500 million of
24 harm to society, would you stand by the results of
25 your section 7 analysis?

Page 232

1      MR. COLLIER:  Objection; form.
2      THE WITNESS:  Well, $500 million, it depends
3  on how you do the calculation, but let's call
4  that $500 million in MPV as of the date of the
5  jury trial or the date of collection -- expected
6  date of collection.  Then multiply that and
7  assume that the jury found that a probability of
8  ten percent was reasonable, then you're up in the
9  five billion dollar range for an aggregate
10 deterrent penalty amount.
11     And I would probably say at that point, it
12 was likely sufficient, if I had sufficient
13 confidence in -- that the $500 billion -- the
14 $500 million that I started with was all-
15 encompassing; i.e., if I knew with certainty that
16 that had all the benefits, financial benefits
17 that Google had.
18     Here, I think the issue that I am -- that I
19 have tried to ascertain is how to make that
20 assessment of optimal or appropriate deterrent
21 range of deterrent penalties, given the breadth
22 of Google's conduct, given the specific nature of
23 this -- of these interrelated products, and the
24 long-term benefits Google likely obtained from
25 that conduct.

Page 233

1  BY MR. DAVIS:
2      Q   Okay.  Try it this way.
3      Dr. Wiggins calculates ▮▮▮▮▮▮▮▮ in
4  benefit to Google, resulting from the alleged conduct
5  at issue.  Assuming he's right -- I'm not asking you
6  to sign off on him being right.  Assuming he's right,
7  would you stand by your analysis in section 7 and say
8  that we should impose a 20 something billion dollar
9  fine on Google?
10     MR. COLLIER:  Objection; form.
11     THE WITNESS:  I'm having a really hard time
12 accepting the hypothetical that he's right.  So
13 maybe if I could phrase it a different way, and I
14 would say if I had calculated benefits of
15 $45 million to Google from the conduct, I would
16 not -- I would conclude that the $5 billion --
17 that the analysis in section 7 was likely too
18 high, and that I would suggest -- I may still use
19 that to try and figure out what lesser amount
20 might be necessary, but I don't think that the --
21 the range would not -- I would not be proposing a
22 $9 billion -- or I'm sorry -- minimum of a
23 $12 billion penalty in section 7 if I only
24 concluded that at the end of the day, there was a
25 $45 or a $44 million benefit to Google.

59 (Pages 230 - 233)

Page 234

1  BY MR. DAVIS:
2      Q   I take it you believe that Google's stock
3  trades in an efficient market; yes?
4          MR. COLLIER:  Objection; form.
5          THE WITNESS:  With some caveats, yes.
6      Reasonably efficient.  There's a question about
7      weak versus strong form efficiency, but yes, I
8      would say -- put that aside, but I would say yes.
9  BY MR. DAVIS:
10     Q   You would agree that Google's stock trades
11 in the market in which at least all public information
12 is incorporated into the stock price, right?
13     A   Yes, that's my general view of how financial
14 market work.
15     Q   And it's incorporated quickly and
16 completely; yes?
17         MR. COLLIER:  Objection; form.
18         THE WITNESS:  Yes, relatively quickly.  It
19     depends, but yes.
20 BY MR. DAVIS:
21     Q   The assumptions you're making in your
22 analysis in section 7 is that it's incorporated
23 completely at least within ten days, right?
24     A   Correct.
25     Q   Okay, and actually event studies like the

Page 235

1  one you perform in section 7 are actually what were
2  used to prove the validity of the efficient capital
3  markets hypothesis, right?
4      A   I think they have been used in that context
5  in the past, but I would need to go back and look at
6  the literature before I sign on to it too much, simply
7  because I think there is a vigorous debate about
8  efficient market hypothesis.
9      Q   Okay, but you're assuming that the market is
10 efficient?
11     A   As I said, I think it's -- I consider it to
12 be reasonably efficient.  We don't to debate strong
13 versus weak form efficiency, but yes, it is efficient
14 in the sense that I am analyzing the extent to which
15 information, public information is reflected in the
16 price of Google stock and particularly in the change
17 in the price of Google stock relative to the market
18 indices, and I do that analysis over a relatively
19 short time period.
20     Q   And based on that framework, if Google
21 announces tomorrow previously unforeseeable
22 information that it had miscalculated its total cash
23 on hand, and inflated that amount by $1 billion in its
24 securities filings, we can actually calculate roughly
25 what we expect the amount of Google's stock drop to

Page 236

1  be, right?
2      A   I think it would depend on how the market
3  were to react to that information, whether it was
4  simply a reflection of a one-time drop versus a, a
5  reflection of ongoing conduct or some kind of
6  underlying issue, but I think -- as an economist, I
7  think that the, the value of the company would be less
8  if they woke up and they said we don't have a billion
9  dollars that we thought we had, but the question is
10 whether -- there's a different question, which is
11 whether that is a large enough penalty to actually be
12 detected by the market.  I'm sorry.  Not a penalty.
13 Whether that's a large enough change to cause a
14 detectable change in the stock price.
15     Q   I'm just meaning that if tomorrow, the world
16 learns information about Google that makes Google
17 worth $1 billion more, we can calculate how much we
18 would expect Google's stock to increase by; yes?
19     A   We can calculate how much we would expect it
20 to increase.  The question is whether it's detectable.
21 Yes, you can calculate it.
22     Q   Okay, and similarly, if Google receives a
23 $20 billion fine tomorrow that was previously
24 unforeseen, but 100 percent enforceable, we can
25 calculate how much Google's stock is going to drop,

Page 237

1  can't we?
2      A   We can calculate our expectation of how much
3  the value of the company should drop.  There's a
4  different question about how much the stock actually
5  will drop, because that is going to depend on
6  shareholder expectations about whether that has
7  long-lasting effects and whether it's going to change
8  the growth of that company's future cash flows.
9      Q   It could drop even more than the value of
10 20 billion dollars spread across Google's publicly
11 traded shares, right?
12     A   It could drop more, it could drop -- or it
13 could drop less.
14     Q   Under what circumstances would it drop less?
15     A   Well, if the -- it's one of the things that
16 I've seen in the data, is that you don't detect the
17 change in stock price.  You have a lot of simultaneous
18 release of information coming out every day that's
19 affecting the price of Google's stock.
20         So the same day that they announce a
21 $20 billion fine, if Google comes out with the
22 greatest thing in AI, then the news about the greatest
23 thing in AI will likely swamp the $20 billion change.
24         That's why I said I agreed with you in terms
25 of as an economist, from a fundamental value

60 (Pages 234 - 237)

Page 238

1  perspective, I think the value of the future cash
2  flows has dropped by $20 billion, but the stock price
3  will reflect other information that is going on at the
4  same time.
5      Q   Well, if there's a day with $80 billion
6  worth of good news for Google and a $20 billion fine,
7  you would expect its market cap to decrease by
8  $60 billion; yes?
9      A   If that were calculated by investors in the
10  same way, I think the better way to say it is, I
11  expect, as an economist, the value of the company to
12  only increase by $60 billion.  There's a different
13  question as to how investors react to that
14  information.
15      Q   Okay.  You're not saying that investors have
16  not reacted to fines of less than $1 billion, are you?
17      A   That's correct, and I think I say that
18  explicitly in my report.
19      Q   Because what you do in your report is
20  determine that any movement less than two standard
21  deviations away from the mean is not a substantial
22  move, right?
23      A   I conclude that it was not likely to be
24  sufficiently significant for stockholders or
25  shareholders to effectively notice the impact of that

Page 239

1  event in a way that could cause them to change their
2  conduct or just to cause them to put pressure on
3  Google management to change its conduct.
4      Q   Without knowing anything about this case, if
5  I asked you to determine how big a fine would need to
6  be to move Google's stock down by two standard
7  deviations, would you be able to do it?
8          MR. COLLIER:  Objection; form.
9          THE WITNESS:  Well, I think that's what I've
10  provided in my report.
11          (Reporter clarification.)
12          THE VIDEOGRAPHER:  The time is 4:07 p.m.
13  We're off the record.
14          (Whereupon, a short recess was taken.)
15          THE VIDEOGRAPHER:  The time is 4:22 p.m.
16  This begins unit number six.  We on the record.
17  BY MR. DAVIS:
18      Q   Continuing where we just left off,
19  Dr. DeRamus, am I understanding correctly that your
20  event study methodology in section 7 looks for events
21  that caused at least a two-standard-deviation price
22  move after accounting for the fluctuation in the S&P
23  500?
24      A   Yes.
25      Q   And of the 65 events that you considered,

Page 240

1  you found only one fine-related event that resulted in
2  a move of that amount or more, right?
3      A   Effectively, yes.  It's a combination of
4  several -- it's an announcement date and three
5  separate fines that I aggregate, but in broad brush
6  strokes, you are correct.
7      Q   Can you look at paragraph 135 of your
8  report, and specifically the continuation that goes
9  onto Page 72.
10      A   Give me a minute.
11      Q   And I'm only wanting to remind you about
12  what you've got down for the standard deviation in
13  2008.
14      A   Correct.
15      Q   And so in this paragraph, you note that you
16  calculated a standard deviation for Google stock in
17  2008 of 3.5 percent, right?
18      A   Correct.
19      Q   And continuing on in that paragraph, onto
20  Page 73, you calculated that one standard deviation in
21  that time period equates to a $5 billion move in
22  Google's market cap, right?
23      A   That's correct.
24      Q   Given that you were looking for a
25  two-standard-deviation stock drop, and the standard

Page 241

1  deviation is roughly $5 billion, is it any surprise
2  that the only one you found was the one associated
3  with a $9.5 billion fine?
4      A   No.  It's not a surprise to me that I found
5  the results that I did, but given the large value of
6  the company, given the things that changed the
7  company's stock price on a daily basis, it would need
8  to be a substantial amount.
9      Q   For instance, if, instead of a $9.5 billion
10  fine, it had been a $4.75 billion fine, you would
11  expect to see a one standard deviation move rather
12  than a two, right?
13      A   Approximately, yes.
14          MR. DAVIS:  I'm going to hand you another
15  exhibit.  We'll mark it as Exhibit 9.
16          (Exhibit 9 was marked for
17          identification.)
18  BY MR. DAVIS:
19      Q   Do you have a document, Exhibit 9, in front
20  of you with a banner at the top that says "Internet
21  Encyclopedia of Philosophy"?
22      A   I do.
23      Q   Are you by any chance familiar with that
24  source?
25      A   I am not.

61 (Pages 238 - 241)

Page 242

1    Q   Okay.  Are you familiar with the term
2   "fallacy"?
3    A   Yes, I am.
4    Q   Do you agree that a fallacy is a kind of
5   error in reasoning?
6    A   Yes.
7    Q   Do you agree that fallacious reasoning
8   should not be persuasive?
9    A   Yes.
10    Q   There's a definition here of circular
11   reasoning, and it reads, "The fallacy of circular
12   reasoning occurs when the reasoner begins with what he
13   or she is trying to end up with."
14        Did I read that correctly?
15    A   I, I -- you did read that correctly, yes.
16    Q   Do you agree with that definition of
17   "circular reasoning"?
18        I can see how that could lead to circular
19   reasoning.  I'm not sure I would express it the same
20   way, but this is what this particular source -- how
21   this particular source describes it.
22    Q   Is it, in your view, fallacious reasoning to
23   begin with what you are trying to end up with?
24        MR. COLLIER:  Objection; form.
25        THE WITNESS:  I'm trying to understand even

Page 243

1   the, that concept of beginning with what I'm
2   trying to end up with.
3        I can see having a prior expectation and
4   needing to look at data to identify that is, in
5   fact, the case.  I would have a prior
6   expectation.  Look at my data.  I can test my
7   hypothesis using the data, and that then can tell
8   me whether my hypothesis is reasonably supported
9   by the data or not.
10        So just because I have that prior
11   expectation of the results being one way and the
12   results confirming my prior expectations does not
13   mean that it is a circular argument or circular
14   reasoning or fallacious in any way.
15   BY MR. DAVIS:
16    Q   The next definition is of "begging the
17   question," and it's defined as "a form of circular
18   reasoning in which a conclusion is derived from
19   premises that presuppose the conclusion."
20        Do you agree with that definition of
21   "begging the question"?
22    A   Give me one second.
23        I, I understand the general description
24   here, I guess.  I use the word "begging the question"
25   in a slightly different context as opposed to an

Page 244

1   example of a type of fallacy.
2        So typically you would say I observe X.
3   That begs the question of whether Y causes X.  So
4   that's how I've seen it in the past.  I've never come
5   across it specifically in this context of an example
6   of a reasoning fallacy.
7    Q   Okay.  Do you agree that it would be
8   fallacious reasoning to arrive at a conclusion derived
9   from premises that presuppose the conclusion?
10    A   I agree with the example that they, that
11   they provide here as an example of reasoning that does
12   not appear to me to be logical, but I, I would say if
13   I have basically an empirical basis to expect a
14   particular outcome, I don't know that with certainty.
15   I then look to the data to then test that hypothesis.
16   I consider that to be perfectly appropriate reasoning.
17    Q   The example is a colorful one from the
18   Bullfighters Association, right?
19    A   That's correct.
20    Q   And it says -- the example it gives is "but
21   women shouldn't fight bulls, because a bullfighter is
22   and should be a man."
23        That is indeed circular reasoning, right?
24    A   Well, it's defining what a bullfighter is.
25   It says a bullfighter is a man, and therefore it's

Page 245

1   just -- it offers that statement, categorical
2   statement, "a bullfighter is and should be a man," to
3   say that women shouldn't fight bulls, so it's assuming
4   the conclusion.
5    Q   Got it, and that's fallacious reasoning,
6   right?
7    A   I think assuming the conclusion is
8   fallacious reasoning, yes.
9    Q   And if I were to say the optimal penalty in
10   this case is one that will produce two standard
11   deviations in stock price drop because a penalty
12   producing two standard deviations in stock price drop
13   is the optimal penalty, that would be assuming the
14   conclusion, right?
15        MR. COLLIER:  Objection; form.
16        THE WITNESS:  With logical puzzles, I always
17   need a moment to kind of parse them through.
18   BY MR. DAVIS:
19    Q   Take your time.
20    A   I would probably say I would not conclude
21   that there is a need for a deterrent penalty amount
22   always -- that an appropriate deterrent penalty amount
23   should always be an amount that moves the company's
24   stock price.  Let me put it that way.
25

62 (Pages 242 - 245)

Page 246

1    Q   In this case you have determined that an
2  appropriate deterrent penalty amount is one that will
3  move Google's stock price by two standard deviation
4  net of the S&P 500, true?
5    A   I have assessed whether -- what is the
6  amount that would be necessary to cause a noticeable
7  change in Google's stock price, and --
8    Q   Hang on.
9    A   -- so I've tried to assess what is the
10  amount that would be noticeable by shareholders.  So
11  not every penalty that's assessed is sufficiently
12  large to be noticeable by shareholders, and that, in
13  turn, would cause shareholders to address what I
14  consider to be this underlying principal-agent
15  problem, but I do so within the context of the prior
16  analysis.  As I said before, I didn't just provide
17  section 7 in isolation and say here is the result.
18    Q   When you say "noticeable by shareholders,"
19  you mean an event that moves the stock price by at
20  least two standard deviations, right?
21    A   On an all-in basis, yes.
22    Q   Okay.
23      Are you aware of any research or literature
24  indicating that it requires a two-standard-deviation
25  stock price drop net of the prevailing market

Page 247

1  fluctuation to be noticeable to shareholders?
2    A   Well, I can see shareholders knowing about
3  a -- a public announcement comes out.  It says "Google
4  has been fined by a billion dollars," so shareholders
5  can notice that.  The question is whether there is a
6  change in incentive sufficient to deter the conduct at
7  issue in this case.
8    Q   Are you aware of any literature or research
9  indicating that it requires a two-standard-deviation
10  stock price drop, net of the fluctuating market that
11  prevails, to change the incentive of a corporation's
12  management?
13      MR. COLLIER:  Objection; form.
14      THE WITNESS:  I would say there is a lot of
15    literature that focuses on event studies, and
16    where looking at a statistically significant
17    result requires a change of more than two
18    standard deviations to obtain that, that result.
19      So whether there's other literature that
20    talks about the impact that might have on, on
21    shareholder incentives to change management
22    behavior, I'd have to think further on that.  I
23    just know that it is not -- that event study
24    analysis does this on a routine basis.
25

Page 248

1  BY MR. DAVIS:
2    Q   When they're trying to prove causation in
3  securities fraud cases, right?
4    A   As one example.
5      MR. COLLIER:  Hold on.  I didn't know you
6    had a new question.
7      Objection; form.  Go ahead.
8      THE WITNESS:  As one example, but it's not
9    the only way in which economists and financial
10    analysts use event studies.
11  BY MR. DAVIS:
12    Q   Please give me another example in which
13  economists use a minimum of two standard deviations in
14  fluctuation from the mean in connection with event
15  studies.
16    A   Anytime someone is trying to see did Event A
17  have a sufficient impact to cause a change in stock
18  prices, so whether it's a stock price manipulation or
19  whether it is a -- it may be an investigation about a
20  different type of conduct.  It might be a penalty
21  of -- or a fine for asbestos liabilities.  There's a
22  whole range of things one can think about.
23      So, for example, I think recently there was
24  a very large fine imposed on a company, and the stock
25  price went up, and so the question was why did that

Page 249

1  stock price go up as a result, and the inference is
2  that the investors had built-in expectations that the
3  fine was going to be larger, and so, yay, good news,
4  it's a smaller result.
5      So that gives you some sense of market
6  expectations of what the fine would be, based on the
7  information that was previously available.
8    Q   Two standard deviations is equal to the
9  95 percent confidence interval, right?
10    A   Correct, effectively, yes.
11    Q   Which is an interval relevant to causation;
12  yes?
13      MR. COLLIER:  Objection; form.
14      THE WITNESS:  Well, it's a standard level of
15    confidence that you use in statistical analysis
16    to figure out whether something is having a
17    causal impact, correct.
18  BY MR. DAVIS:
19    Q   It is not --
20    A   I wouldn't say -- I mean calling it a notion
21  of causal is maybe a little too strong, but it is a --
22  it is part of routine hypothesis testing.
23    Q   It is not part of routine testing for what
24  sorts of stock movement is necessary to incentivize
25  shareholders to take action, true?

63 (Pages 246 - 249)

1    MR. COLLIER: Objection; form.
2    THE WITNESS: I think it is reasonable to
3    use it in the way I've done, and I think what
4    I've done is consistent with the general approach
5    to event studies in the economics and finance
6    literature.
7  BY MR. DAVIS:
8    Q   Other than you in this case, can you tell me
9  a single other person who has used the two standard
10 deviation metric to do what you are doing in this
11 case?
12   A   I cannot point to a specific example in
13 which someone has done exactly what I've done in this
14 case. I can say, though, that, that event study
15 analysis is used routinely in assessing stock market
16 reactions to particular events.
17   Q   And in those cases you use the
18 two-standard-deviation metric to determine whether an
19 event, in fact, caused change in the stock price; yes?
20   MR. COLLIER: Objection; form.
21   THE WITNESS: Or that it was sufficiently
22   large to be detectable by the market. Otherwise,
23   it's just noise.
24 BY MR. DAVIS:
25   Q   You mean sufficiently large to be attributed

1  to a given hypothesized cause, don't you?
2    A   Effectively, yes.
3    Q   Okay, which is not how you are using the
4  two-standard-deviation metric in this case, true?
5    MR. COLLIER: Objection; form.
6    THE WITNESS: No. Maybe I misunderstood the
7    thread of your questioning, but I am using the
8    two-standard-deviation measure here to assess
9    whether announcement of a given penalty was
10   sufficiently large for the market to react
11   negatively to that particular news.
12 BY MR. DAVIS:
13   Q   Is it your belief that the market -- well,
14 I'll stop. I'll go back.
15   Can I start a new question?
16   A   Yes.
17   Q   If you want to determine what sort of fine
18 will have a two-standard-deviation impact on any
19 publicly traded company, you can calculate that right
20 now, can't you?
21   MR. COLLIER: Objection; form.
22   THE WITNESS: You can calculate for any
23   specific company, depending on its size, its
24   market capitalization, the standard deviations,
25   daily returns, and particularly if you can -- if

1  you have data to see how the stock price has
2  reacted in the past to those, to those fines, you
3  can see whether even a small fine may have
4  actually had a significant impact on the
5  company's stock price.
6    So, for example, a company with a relatively
7  small market capitalization and very thin
8  margins, a small penalty may be sufficient to
9  move the stock price outside of the random noise,
10 and particularly it it's a -- if you call it a
11 very low growth company, there's not a lot of
12 variation in its stock price on a day-to-day
13 basis.
14   So it will depend on the company that
15 both -- whether a given fine of a given size has
16 an effect sufficient to cause shareholders to
17 effectively sit up and notice in a measurable
18 way, it will depend on a lot of variables
19 associated with that particular company.
20 BY MR. DAVIS:
21   Q   How did you determine that it takes two
22 standard deviations of stock price drop net of the S&P
23 500 for shareholders to take notice?
24   MR. COLLIER: Objection; form.
25   THE WITNESS: Well, that's what I consider

1  to be a standard way of doing confidence interval
2  testing to establish a confidence interval, a
3  95 percent confidence interval, and to establish
4  whether the changes in the stock price at that
5  particular event were so large that they would
6  have been considered by the public as not simply
7  something reacting to noise.
8  BY MR. DAVIS:
9    Q   And this is a slight variation on a similar
10 question, so I hope you don't think I'm badgering you,
11 but is there anything written down, in your view, that
12 actually says that for shareholders to sit up and take
13 action, there needs to be at least a
14 two-standard-deviation drop in the stock price?
15   A   No. I think I said before, there are
16 certain conduct that I could see shareholders knowing
17 about and taking action on that didn't require that.
18 In this case, I do think it is one that requires a
19 penalty of that magnitude, particularly given the rest
20 of the information that I've analyzed.
21   Q   If -- using the analysis that you perform in
22 section 7, if you were assessing penalties only for
23 RPO and not for DRS or Bernanke, your section 7
24 methodology would arrive at the same conclusion, true?
25   A   Well, the section 7 methodology is --

Page 254

1 there's no -- I have not tried to adjust that for a
2 conduct-by-conduct analysis. So it's not, it's not
3 derived from this conduct. It's derived from Google
4 stock price, the reaction of Google stock price to
5 prior penalties.
6     So it would require perhaps a comparison of
7 what the RPO-only benefits were from the prior, the
8 prior sections, and assessing the extent to which that
9 conduct was expected to provide long-term financial
10 benefits to Google; back to this issue of
11 proportionality, to determine whether a fine of that
12 magnitude would be commensurate -- in general,
13 commensurate with an RPO-only finding, for example.
14     Q    And how do you determine whether it's
15 proportional or commensurate?
16     A    Well, I just -- I went through the analysis
17 in my section 6. My section 6 provides a pretty broad
18 range of, of potential deterrent penalty amounts, and
19 those numbers are generally in excess of the amount
20 derived from the stock price analysis.
21     So it would be reasonable, if the jury were
22 to find a lesser range of conduct than is analyzed in
23 the first part of my analysis, to award in the
24 range of what I propose in the, in section 7, but
25 again that's ultimately a jury determination. From an

Page 255

1 economic perspective, I would consider that to be a
2 reasonable approach to take.
3     Q    Okay. So you would consider it reasonable
4 for the jury to assess penalties based on your section
5 7 analysis, whether they find all three of Bernanke,
6 RPO and DRS to have been unlawful, or just two of the
7 three; fair?
8     A    Maybe I'd phrase it slightly differently. I
9 would say as an economist, I think it would be
10 reasonable to apply the damages that I derive in
11 section 7, even if the jury were to determine the
12 range of actionable conduct or that the actual legal
13 violations were less than the conduct that I'm
14 evaluating in the -- in section 6.
15     Q    Okay. The analysis in section 7 is divorced
16 from the conduct at issue in this case, other than
17 with respect to your desire to make sure that the
18 section 7 result is proportional to the section 6
19 result; fair?
20     MR. COLLIER: Objection; form.
21     THE WITNESS: I wouldn't say divorced from.
22 I would say it is not -- I do not -- as I said
23 probably an hour ago, I don't use as inputs a
24 measure of the direct benefits to Google of the
25 conduct at issue in deriving the numbers in

Page 256

1 section 7.
2     Section 7 provides an alternative approach
3 for the jury to consider or disregard that I
4 still think, from an economic perspective,
5 provides an indication of the order of magnitude,
6 more than an order of magnitude, but a reasonable
7 range for the jury to award, if it determines
8 that the conduct is significant and as extensive
9 as described in the earlier sections of my
10 report.
11     If the jury were to conclude that severity
12 was significantly less than as I describe, then
13 the jury is always free to either disregard it or
14 to adjust it accordingly.
15 BY MR. DAVIS:
16     Q    How would I use the event study methodology
17 you use in section 7 to calculate an optimal deterrent
18 fine for some sort of wrongdoing causing only
19 $1 million in harm?
20     MR. COLLIER: Objection; form.
21     THE WITNESS: In that situation, I wouldn't
22 use it.
23 BY MR. DAVIS:
24     Q    So the section 7 analysis is only capable of
25 arriving at very large fines; true?

Page 257

1     A    It tells me what kind of -- or it tells me,
2 as an economist, what is the magnitude of a financial
3 penalty that would be sufficient to change fairly
4 substantial conduct of the company that is otherwise
5 highly profitable for the company, and that otherwise
6 contributes to the growth of the company's stock
7 price.
8     Q    And if I say the sentence "the optimal
9 penalty is $25 billion, because that is the minimum
10 penalty that will cause two standard deviations in
11 stock price drop," aren't I begging the question?
12     MR. COLLIER: Objection; form.
13     THE WITNESS: If the only thing you said was
14 you did no evaluation, you did no evaluation of
15 the, of the conduct, of the scope of conduct, of
16 the likely benefits, the likely economic impact
17 of that conduct, and you just said $25 billion is
18 the number, I would say you have not done
19 sufficient analysis to determine that that is, in
20 fact, an appropriate penalty amount to apply in
21 this particular case.
22 BY MR. DAVIS:
23     Q    And to be clear, if all I said was
24 $25 billion is the number because it will cause two
25 standard deviations of drop in Google stock price net

65 (Pages 254 - 257)

Page 258

1  of the S&P 500, same problem; yeah?
2        MR. COLLIER:  Objection; form.
3        THE WITNESS:  Well, again, I probably --
4  maybe I'm missing the thrust of your
5  clarification or follow-up question, but the
6  bottom line is I would not be offering an opinion
7  in this matter without knowing anything about the
8  conduct, about the scope of the conduct, the
9  volume of commerce affected, the number of
10  transactions, Google's market position, so on and
11  so forth.  I would not be offering an opinion,
12  just say here is an analysis of a stock price,
13  and therefore suggesting to the jury that that
14  would be an economically reasonable amount to
15  apply.
16        I wouldn't say that if a Google employee had
17  a speeding ticket and, and I did not know it was
18  a speeding ticket; all I knew was that someone at
19  Google did something; therefore, there's a
20  penalty at issue; I wouldn't say, oh, here is an
21  analysis and apply this number.
22  BY MR. DAVIS:
23    Q   Can you point me to where in your report you
24  explain why you think a two-standard-deviation
25  threshold is a reasonable threshold for determining

Page 259

1  whether a penalty is sufficient?
2        MR. COLLIER:  Objection; form.
3        THE WITNESS:  Give me a moment.
4        (Witness peruses document.)
5        THE WITNESS:  Okay.  So just to orient us
6  where I am with section 7, so section 7, all my
7  reports are response to Dr. Wiggins and
8  Dr. Skinner.  Dr. Wiggins and -- both Dr. Wiggins
9  and Dr. Skinner say all this information about
10  prior penalties is irrelevant.
11        I say in my section 7, no, no, no, it's
12  highly relevant, but in particular because of the
13  other principal-agent literature that I described
14  before.
15        So I go through and I examine that.  I do
16  this event study, and then in paragraph 137, and
17  I say that -- I don't know if you want me to read
18  that entire paragraph in, but it talks about the
19  fluctuations of just the stock returns, remaining
20  within -- mostly remaining within one standard
21  deviation of the average, and mostly contained
22  within two standard deviations.
23        And maybe the crux of it is this consistent
24  pattern indicates that the stock returns do not
25  experience additional significant volatility due

Page 260

1  to the penalties announced on the event days.
2        Therefore, the analysis indicates that these
3  prior penalties have had a minimal impact on
4  Google's stock performance, providing little
5  incentive for shareholders to actively engage in
6  monitoring and deterring corporate misconduct.
7  BY MR. DAVIS:
8    Q   And that result was foreordained, because
9  the only penalty that you consider that's $1 billion
10  or above is the $9.5 billion aggregate penalty from
11  the EU in 2017 to 2019, right?
12    A   It's not foreordained.  There are certain
13  results that may be expected once you get some of the
14  basic data, once you -- so going into it, I have no
15  idea, maybe the standard deviation of their stock
16  returns is very, very tight, in which case -- and
17  maybe in the imposition of a prior penalty of
18  $5 billion, maybe there was a significant impact on
19  the price in that given day.
20        I looked to the data, and the data tell me
21  no, it's not, and I, I -- one would have reason to
22  expect -- on an ex ante basis, one would have reason
23  to hypothesize that, given the size of Google's market
24  capitalization, one would need a relatively
25  substantial penalty to have such an effect, but you

Page 261

1  would still need to look at the data to test what is
2  that amount, and that's what I use.
3        That's why I ultimately determined that this
4  method would suggest that $12 billion on a current
5  dollar value as of 2025 would be a floor for a
6  deterrent penalty amount.
7    Q   And just for the record, the place in your
8  report where you explain why to use a
9  two-standard-deviation threshold is paragraph 137?
10  That's what you were just reading from?
11    A   That's the one I was first reading from.  I
12  would have to go back and see if there are other
13  places that I talk about that, but I, I say that also
14  in paragraph 139 and other places in the report.
15    Q   Is there any important explanation for why
16  two standard deviations is correct that is not in
17  paragraph 137?
18        MR. COLLIER:  Objection; form.
19        THE WITNESS:  Well, big picture, I'm looking
20  for an observable impact.  I'm looking for a
21  large enough penalty in expectation, in aggregate
22  that is enough to move the stock price in a way
23  that is statistically significant.
24  BY MR. DAVIS:
25    Q   There are -- in your section 7, there are

66 (Pages 258 - 261)

Page 262

1 two points where you notice other unusual fluctuations
2 in Google's stock price on event days, but determined
3 that they were not the result of fines, right?
4     A   Correct.
5     Q   And my understanding is that you did some
6 research to see whether there may be other more likely
7 causes on those dates, right?
8     A   That's correct.
9     Q   Did you do that same research for
10 November 30, 2010?
11         MR. COLLIER:  Objection; form.
12         THE WITNESS:  I did do some research about
13     that on the 2010 date, yes.
14 BY MR. DAVIS:
15     Q   Did you learn whether there were any
16 confounding circumstances with respect to Google's
17 stock price on November 30, 2010?
18     A   I did not.  I did not, or I don't recall
19 them being such.  I recall the references or
20 expectations that those -- that drop in stock price
21 was a result or a reflection of the investigation.
22     Q   Do you know whether that investigation was
23 announced already back in February of 2010?
24     A   As I sit here today, I do not know.
25     Q   Would that be relevant to your analysis?

Page 263

1     A   I would take that into consideration.  I
2 would want to know when it was first -- when that
3 information was first made public, and I would want to
4 factor that into my analysis.
5     Q   If Google announced its largest ever
6 acquisition on November 30, 2010, would that be a
7 confounding circumstance?
8     A   It would be a factor that I would want to
9 analyze further.
10     Q   And just for the record, November 30, 2010
11 is the event day that you associate with the nearly
12 four percent stock drop associated with the
13 announcement of the EU antitrust investigation, right?
14     A   That's correct.
15         MR. DAVIS:  I'll show what we'll mark as
16     Exhibit 10.
17         (Exhibit 10 was marked for
18             identification.)
19 BY MR. DAVIS:
20     Q   And just let me know when you've had a
21 chance to peruse Exhibit 10.
22         (Witness peruses document.)
23         THE WITNESS:  Okay.  I haven't read it in
24     its entirety, but give me one second.
25         (Witness peruses document further.)

Page 264

1         THE REPORTER:  Okay, thank you.
2 BY MR. DAVIS:
3     Q   Exhibit 10 is a Reuters article dated
4 November 30, 2010, right?
5     A   It is.
6     Q   And it's about Google being reportedly close
7 to closing on a deal to buy Groupon, right?
8     A   That's correct.
9     Q   Do you remember Groupon?
10     A   Yes, I do.
11     Q   Me, too.  I don't know what happened to
12 them, but it says that the information that had been
13 released was that Google was going to pay $6 billion
14 for Groupon, right?
15     A   Correct.
16     Q   And this information is coming out the same
17 day that you assessed a stock drop to the announcement
18 of the EU antitrust investigation, right?
19     A   That's what it appears to be, yes.
20     Q   And the third paragraph says "Google's
21 shares fell 4.5 percent, partly on concern it may
22 shell out too much for a business likely to face
23 increasing competition," right?
24     A   That's correct.
25     Q   Then there's an analyst quoted as saying

Page 265

1 "investors think that might be overpaying," right?
2     A   That's what that analyst says, yes.
3     Q   Fair to say that this is an event that you
4 should have addressed before ascribing the entire
5 stock drop to the EU announcement of an antitrust
6 investigation?
7         MR. COLLIER:  Objection; form.
8         THE WITNESS:  Well, I would say it may
9     indicate that I am underestimating the amount of
10     a penalty that would be necessary to cause a
11     price drop, that if -- a lot of it depends on how
12     much weight to put on this particular article and
13     this particular analyst statement, but if some
14     fraction of the share price decline was caused by
15     the penalty -- or the investigation, rather --
16     and an additional portion of the stock price
17     decline was attributable to fears of overpaying,
18     then that would suggest that a higher amount than
19     I've derived in my amount would be necessary to
20     cause that noticeable impact on Google's share
21     price.
22 BY MR. DAVIS:
23     Q   Except that the amount from the
24 investigation would make the stock drop too little to
25 hit the two-standard-deviation threshold, wouldn't it?

67 (Pages 262 - 265)

Page 266

1    A   That's right, which would suggest that there
2  has not been a penalty sufficiently large, even in
3  those aggregate three penalties that I use to derive
4  this section of my report, that would suggest that
5  that is a -- the amount should be greater than that,
6  not less than that.
7    Q   Go ahead.
8    A   Well, I'm sorry.  I lost my train of
9  thought.
10    Q   The only numerical foundation for your
11  results in section 7 is the stock drop from
12  November 30, 2010; true?
13    A   Well, it's the only one -- and again, it's
14  combined across both the announcement date and the
15  penalty dates, so the only way I get the significant
16  result is by combining announcement date and
17  actually -- sorry -- announcement date of the
18  investigations and then ultimately penalty dates
19  imposed later on.
20        And absent that, that would indicate that a
21  fine in excess of $9 billion nominal terms, an excess
22  of --
23    Q   Totally?
24    A   -- $12 billion would be necessary in order
25  to cause investors to -- or shareholders to have

Page 267

1  sufficient incentive to --
2    Q   Totally?
3    A   -- discipline managers for the type of
4  conduct here.
5    Q   And similarly, if we went through all the
6  other stock drops that didn't hit your
7  two-standard-deviation threshold and tried to account
8  for other causes compared to the fines, your results
9  might change on those days, too, right?
10        MR. COLLIER:  Objection; form.
11        THE WITNESS:  Well, if there are other
12    confounding factors associated with any days, I
13    would want to look at those confounding factors
14    in order to assess whether the impact was --
15    whether the stock changed on those dates were
16    associated with those confounding factors or with
17    the announced penalty dates.
18        I would say the, the -- ultimately, the
19    directionality of your criticism basically says
20    that my $9 billion or $12 million minimum amount
21    under this method is too low, which I still think
22    is a relevant data point for the jury to have in
23    terms of how big does a penalty need to be, given
24    Google's stock price size -- or sorry -- given
25    Google's market capitalization, in order to cause

Page 268

1    the shareholders to induce a significant change
2    in management conduct for conduct that is
3    otherwise highly profitable for the company and
4    for shareholders.
5  BY MR. DAVIS:
6    Q   So I want to be clear.  Assuming that the
7    article in Exhibit 10 is right, your results in
8    section 7 are wrong, right?
9        MR. COLLIER:  Objection; form.
10        THE WITNESS:  No.  I still think the -- the
11    results would be that the $12 billion present
12    value floor that I have, it would be a floor,
13    right?  It would be -- actually, even that would
14    indicate that the penalty amount should be
15    greater than $12 billion.  At $12 billion, an
16    expectation would have no meaningful impact or
17    sufficiently large impact on Google's stock price
18    to cause a change in Google's conduct in the
19    future -- to deter similar conduct by Google or
20    other parties in the future.
21  BY MR. DAVIS:
22    Q   And we would be left with no relevant
23    metric, according to you, for what sort of fine would
24    cause that kind of a stock drop, right?
25    A   Well, you, you would then have a floor.  A

Page 269

1  very confident level without a floor, you would say
2  definitely needs to be north of $12 billion.
3    Q   Isn't the more likely explanation that none
4  of your event days were the days on which fines or the
5  expectation of fines were baked into Google's stock
6  price?
7        MR. COLLIER:  Objection; form.
8        THE WITNESS:  No.  I think, as you pointed
9    out early on, that there is a significant daily
10    volatility associated with their stock price,
11    that the -- given the size of Google's market
12    capitalization, one would need a very substantial
13    penalty relative to the prior penalties that were
14    imposed in order to have a meaningful impact on
15    the stock price.
16  BY MR. DAVIS:
17    Q   With "meaningful" defined as a
18  two-standard-deviation move, right?
19    A   Correct.  As a -- well, I would say it maybe
20  a little bit more completely, but "meaningful" meaning
21  detectable from a statistical perspective, relative to
22  all of the other factors that affect the price of
23  Google on any given day.
24    Q   But you were able to detect the impact of a
25  fine way back from November 30, 2010, I thought.

68 (Pages 266 - 269)

1      MR. COLLIER: Objection; form.
2      THE WITNESS: I was only able to do so as a
3  result of combining the event days across all the
4  different time periods and, and comparing the
5  stock returns, those combined stock returns
6  relative to the standard deviation of, of
7  Google's stock returns, in order to then assess
8  is this a statistically significant factor, does
9  it cause a statistically significant change in
10  the price of Google's stock price, and that's why
11  I consider it a floor and not a cap.
12 BY MR. DAVIS:
13     Q   Gotcha.
14     A   Nor do I say $12 billion is the number, full
15  stop.
16     Q   Because that would be silly, right?
17     MR. COLLIER: Objection; form.
18     THE WITNESS: No, because I believe it to
19  provide an indication of the minimum fine,
20  penalty that needs to be applied in order to
21  cause a change in conduct related to otherwise
22  highly profitable conduct for Google.
23 BY MR. DAVIS:
24     Q   By which you mean sufficient to cause a
25  two-standard-deviation stock drop?

1      MR. COLLIER: Objection; form.
2      THE WITNESS: By which I mean sufficient to
3  cause shareholders to appreciate the magnitude of
4  that drop and realize that the conduct is not --
5  and to deter, disincentivize management in the
6  future from making that trade-off.
7  BY MR. DAVIS:
8      Q   And you have defined that point as a
9  two-standard-deviation stock drop; yes?
10     A   I have defined the detectable -- the point
11  at which it's detectable relative to all the other
12  factors, the noise that happens with stock prices.
13     Q   Holding everything else equal, if there's a
14  $2 billion fine imposed on Google tomorrow, we would
15  expect Google's market cap to go down $2 billion; yes?
16     MR. COLLIER: Objection; form.
17     THE WITNESS: As an economist, I expect the
18  value of the company to go down by $2 billion, as
19  the -- thinking of the value of the company as,
20  as the net present value of the future cash
21  flows.
22     So if you take those future cash flows,
23  deduct $2 billion, then you would expect the
24  value of the company to go down by that amount.
25  There's a separate question, and that's why it's

1  described in my report that I -- that would be my
2  expectation in terms of a -- as a valuation
3  practitioner, that's what I would expect.
4      The question is whether that is observable
5  by the market and sufficiently impactful as
6  compared to, for example, conduct that the
7  company -- the stockholders would consider, hey,
8  okay, we got tagged by this anticompetitive
9  conduct or deceptive conduct, and -- but we're
10  still ahead of the game, so yes, continue on.
11 BY MR. DAVIS:
12     Q   And so you can actually cause the section 7
13  methodology to come out however you want by defining
14  what a sufficient stock drop to cause shareholder
15  action is; true?
16     MR. COLLIER: Objection; form.
17     THE WITNESS: No.
18 BY MR. DAVIS:
19     Q   Well, if I believe that half of a standard
20  deviation stock drop is sufficient to cause this
21  shareholder monitoring you're talking about, and I
22  convince you of that, then section 7 comes out at
23  25 percent of the current value it comes out to; yes?
24     A   There's no statistical basis for that. It's
25  not, it's not observable by -- relative to the

1  noise --
2      Q   Right.
3      A   -- in the stock price.
4      Q   And there's no research whatsoever
5  indicating what degree of a stock drop causes
6  shareholders to take action, is there?
7      MR. COLLIER: Objection; form.
8      THE WITNESS: There's lots of research in
9  the application of event studies to stock prices,
10  where the standard measure is going to be whether
11  the event caused a statistically significant
12  change in the stock price, so something typically
13  defined, based on two standard deviations or
14  based on a 95 percent confidence interval,
15  however the econometrician set up their event
16  study model.
17 BY MR. DAVIS:
18     Q   Do you think that if Google comes out below
19  earnings expectations and drops by one percent, that
20  investors aren't obviously to attribute that drop to
21  the earnings announcement?
22     MR. COLLIER: Objection; form.
23     THE WITNESS: It would, it would depend on
24  the event, right? It -- if there was a
25  particular change on a particular day where it

69 (Pages 270 - 273)

Page 274

1    dropped, and the other issue is whether an
2    analyst simply ascribes it or whether, in fact,
3    that is outside of the bounds; i.e., that's what
4    somebody who does statistics, what they are
5    charged with is; is that event, in fact,
6    ascertainable with some degree of reliability to
7    that particular event, or is it simply a random
8    fluctuation?  Did the analyst get lucky; i.e., a
9    negative news comes out, there's a one percent
10   decline in that -- in the stock price.  It turns
11   out that the S&P 500 also declined by one percent on
12   that day, and then it's just that analyst's
13   statement about it, but it is not necessarily
14   something that is a statistically verifiable
15   test.
16   BY MR. DAVIS:
17        Q    Would it surprise you to learn that over the
18   last several months, analysts have determined that
19   investors have started to price in the result of the
20   Virginia trial into Google's stock price?
21        MR. COLLIER:  Objection; form.
22        THE WITNESS:  It would not surprise me that
23        there are expectations of the Virginia trial
24        being factored into the future stock price.  I
25        think -- yeah, I'll leave it at that.

Page 275

1    BY MR. DAVIS:
2        Q    And for us to ascribe -- let me start over.
3        For us to subscribe to your results in
4    section 7, we have to believe that investors in 2010
5    relatively accurately predicted the fines that would
6    be imposed as a result of an investigation that did
7    not result in fines until 2017, 2018 and 2019
8    respectively; yes?
9        MR. COLLIER:  Objection; form.
10       THE WITNESS:  That's why I combine the
11       returns on all those days, both the announcement
12       dates and on the fine dates.
13   BY MR. DAVIS:
14       Q    The returns on the other dates were
15   positive, right?
16       A    I would have to go back and look.  Some
17   positive -- I believe some were positive and some were
18   negative.  I just don't recall exactly which ones.
19       Q    Please go ahead and look.  I believe it is
20   paragraph 140, which indicates that Google stock
21   dropped by 3.9 percent on the November 30, 2010 date,
22   and that across all of the dates, the aggregate is
23   just negative 3.8 percent.
24       And so the other dates were a positive
25   influence on the November 2010 date; yes?

Page 276

1        MR. COLLIER:  Objection; form.
2        THE WITNESS:  On aggregate, but there would
3    have been some that may have been positive and
4    some that may have been negative.  I just don't
5    recall.
6        THE REPORTER:  Slow down.  "There would have
7    been some that would have been" --
8        THE WITNESS:  Positive.  There's some that
9    may have been positive, there's some that may
10   have been negative.  Here you're just -- I'm just
11   referring to the sum.
12   BY MR. DAVIS:
13       Q    As of November 2010, what was the largest
14   fine that the EU had ever imposed in a competition
15   matter?
16       A    I don't recall, but it was -- well, I'll
17   just say I don't recall.
18       Q    Can you --
19       A    I don't know.  As I sit here today, I don't
20   know.  It may be in some of these documents, in some
21   of the, some of the . . .
22       Q    Five point something million of the
23   $9.5 million aggregate comes from Android, right?
24       MR. COLLIER:  Objection; form.
25       THE WITNESS:  I believe you mean billion.

Page 277

1    BY MR. DAVIS:
2        Q    Oh.  Can I ask a new question?
3        A    Sure.
4        Q    Over five billion of the three fines that
5    total $9.5 billion was a fine in connection with
6    Google's Android product, correct?
7        A    Give me a second.  That generally is
8    consistent with my recollection, but let me -- if you
9    can point me to the specific paragraph where I talk
10   about that one, that might make things faster.
11       Q    Page 76, note 250.
12       A    Thank you.  Note 250 doesn't say how much is
13   for each of the fines.
14       THE REPORTER:  Note 50?
15       THE WITNESS:  Note 250.  I believe it's in
16       the earlier section of my report.  Here we go.
17       Page 69.  I'm at the top.
18       Correct.  $5.1 billion was the fine for
19       Google having found to have used the Android
20       mobile operating system to effectively funnel
21       users toward Google's search engine.
22   BY MR. DAVIS:
23       Q    And so that's the majority of the 9.5,
24   right?
25       A    Correct.

70 (Pages 274 - 277)

Page 278

1    Q   Were investors in 2010 able to foresee a
2  fine by the EU in connection with Android?
3    A   Well, that's where I -- I believe the short
4  answer is no.  So I would say that there are -- those
5  are reasons why I analyze the returns on each of the
6  five days, and I add all the returns across those five
7  days, the two announcement dates and the
8  investigations, and then the three, the three penalty
9  dates.
10    Q   If your analysis determines that a
11  fine-related event has never moved Google's stock
12  price more than two standard deviations, isn't that
13  consistent with the possibility that fines get baked
14  into stock price over periods longer than ten days?
15        MR. COLLIER:  Objection; form.
16        THE WITNESS:  If they were, then it would
17    suggest that it's not a strong enough signal to
18    cause a change in, in the conduct of the, of the
19    company.
20  BY MR. DAVIS:
21    Q   Or in the stock price of the company, right?
22    A   Well, in the stock price and the conduct,
23  that it would -- so let me put it a slightly different
24  way.
25        If I am a manager, and I can increase my

Page 279

1  bonus by a million dollars by engaging in conduct that
2  shareholders are never going to tag me with, because
3  the share price is so high, and it keeps rising so
4  much, or it's volatile for other reasons, then I, as a
5  manager, would have an incentive to engage in that
6  otherwise actionable conduct, particularly if the
7  manager is not otherwise subject to prosecution or
8  other kinds of liability.
9    Q   How does it affect your analysis, if at all,
10  that in between one and two billion of the
11  $9.5 billion fines has since been reversed?
12        MR. COLLIER:  Objection; form.
13        THE WITNESS:  In the grand scheme of things,
14    it doesn't really, because I'm looking at the
15    stock price change on those earlier dates, and
16    I'm aggregating across those dates to see, is
17    that information -- well, once that information
18    is out there in the market about the
19    investigation and the ultimate fines, is there
20    any indication that the magnitude -- particularly
21    the expected fines.  It could have been too low,
22    for example.
23        The EU could have come up and said, you
24    know, a thousand dollars per violation, and then
25    we could have observed an increase in the stock

Page 280

1  price at a later time period, so that would have
2  been additional information.
3        Here, I'm looking at what is the empirical
4    basis to ascertain whether a $9 billion fine in
5    nominal terms is sufficient to elicit this
6    shareholder reaction, and that's where I thought
7    the analysis that I did is sufficient to come to
8    that conclusion.
9        Now, I haven't looked at the stock price
10    reaction when the EU reversed that decision, so
11    it may be that the number I have is too small,
12    that maybe you do need a number bigger than
13    $9 billion in nominal terms or $12 billion in
14    present value terms.
15        I still could consider that to be a relevant
16    data point for the jury to consider in
17    assessing -- or I should say I consider it a
18    relevant data point from an economic perspective,
19    in assessing what is a reasonable amount of a
20    deterrent penalty amount, consistent with
21    economic principles and consistent with the
22    broader course of conduct described in my report
23    to be applied in this case.
24  BY MR. DAVIS:
25    Q   Don't investors make projections about

Page 281

1  likely outcomes of enforcement proceedings while those
2  proceedings are ongoing?
3    A   Yes, I would expect investors to make those
4  projections.
5    Q   Don't they make projections about likely
6  enforcement proceedings before those proceedings are
7  formally announced?
8        MR. COLLIER:  Objection; form.
9        THE WITNESS:  They may make that assessment,
10    yes.
11  BY MR. DAVIS:
12    Q   For instance, when President Biden won
13  the -- not for much longer -- most recent election,
14  didn't the expected vector of his antitrust policy
15  affect certain companies' stock prices?
16        MR. COLLIER:  Objection; form.
17        THE WITNESS:  I don't recall.  I recall
18    there being concerns about antitrust enforcement,
19    or I should say fairly significant antitrust
20    enforcement actions preceding the Biden
21    administration, but I don't recall whether there
22    was a change in stock market reactions, for
23    example, for companies then under investigation
24    or even not under investigation, because of a
25    concern about additional antitrust enforcement

71 (Pages 278 - 281)

Page 282

1    actions.
2    BY MR. DAVIS:
3        Q   What analysis have you done to determine
4    that the market, relatively accurately, prices in
5    eventual fine amounts on the date that enforcement
6    actions are formally announced?
7        A   That is the question I'm trying to answer.
8    Is there an announcement, and is the announcement of
9    an investigation associated with conduct or in
10   potential outcome that the markets consider to be so
11   large as to actually move the price, and that's also
12   the reason why, in the context of fines, I want to
13   look at both the announcement date and the actual fine
14   imposition date.
15       Q   I think my question was different.
16           What analysis have you done or research have
17   you read that indicates to you that the announcement
18   date of an enforcement action is a date on which the
19   market, relatively accurately, prices in the
20   expected -- excuse me -- the actual outcome of that
21   enforcement action?
22       MR. COLLIER:  Objection; form.
23       THE WITNESS:  I think that is the question
24   and one of the -- so let me put it differently.
25           I look at the announcement date, because the

Page 283

1    amount of the stock price reaction on the penalty
2    announcement date may not reflect information
3    that's already baked into the stock price.  So
4    let's assume that the market expects a $5 billion
5    fine for a violation -- for an investigation that
6    commences five years earlier, and already
7    effectively punishes the company's stock price on
8    the date of the announcement, and then when the
9    fine is actually announced at $5 billion, then
10   you observe no change in the price.
11           And in that regard, I am attributing the
12   the $5 billion -- if I observe a statistically
13   significant drop in the combined returns across
14   the two days, then I am concluding that the, the
15   fine effectively was, was noticeable.
16           So I am actually helping to show that there
17   are certain fines at a certain level that begin
18   to be impacted.  The alternative approach --
19   i.e., just focusing on the fine announcement
20   date -- might not incorporate that additional
21   information.
22   BY MR. DAVIS:
23       Q   So it's too late at this point in this case
24   to achieve the results that you are purporting to
25   achieve, right?

Page 284

1        MR. COLLIER:  Objection; form.
2        THE WITNESS:  No.  I don't understand that
3    statement.
4    BY MR. DAVIS:
5        Q   This case was long since announced, wasn't
6    it?
7        A   Yes.
8        Q   And if the market relatively accurately
9    prices in the effect of an enforcement action that
10   actually occurs, then it's already been priced into
11   Google's stock; yes?
12       MR. COLLIER:  Objection; form.
13       THE WITNESS:  Now I think it's you who are
14   engaging in circular reasoning.  That would imply
15   that you should never impose any fine on a
16   company, because the company has already been
17   punished because of the announcement of an
18   investigation or an action.
19   BY MR. DAVIS:
20       Q   I think so, if you're going to calculate
21   fines based on stock price, yeah.
22       MR. COLLIER:  Objection; form.
23       THE WITNESS:  I guess you and I just have
24   different perspective on the use of event studies
25   and the ways in which an event study in this case

Page 285

1    can inform my opinion as an economist as to what
2    a minimum deterrent penalty would need to be in
3    order to cause a significant change in otherwise
4    highly profitable conduct for Google, or for
5    other similarly situated companies.
6    BY MR. DAVIS:
7        Q   I think we're speaking the same language.
8    Your analysis would indicate that on the date that
9    this case was announced, on plus or minus a few days,
10   Google's stock price went down a lot, right?
11       A   I'm sorry.  In this analysis, I have --
12   there is an observation where Google's price did go
13   down as on a date where there was an investigation by
14   the EU -- so I'm sorry.  I didn't, I mean I didn't
15   track the rest of your question.
16       Q   I thought that you told me that you were
17   believing that it's reasonable to expect, based on
18   your analysis in section 7, that the market prices in
19   the ultimate outcome of an enforcement action in or
20   around the time that that action is announced.
21           Am I wrong?
22       A   I said that it may.  I'm trying to account
23   for the possibility that there's a big announcement of
24   a major investigation, and on that date, there's a big
25   change in the company's stock price, because investors

72 (Pages 282 - 285)

Page 286

1 are concerned about the impact of that event.
2       And then I look, and if there are time
3 periods where I can match up an announcement date and
4 then an actual penalty amount, then I can observe,
5 well, is there -- was there a corresponding -- was
6 there a further stock price drop when the price was --
7 when the fine was announced, in which case that would
8 tend to indicate that the initial market reaction --
9    Q   Gotcha.
10   A   -- underestimated that particular amount.
11      By the same token, if I observe a no stock
12 price change on the date that the fine is announced,
13 there still may have been an impact of that particular
14 investigation; i.e., that amount of the fine may have
15 been enough to cause investors to pay attention.
16      How do I know?  Let me look at these change
17 in stock price on the date it was announced.  That's
18 why I look at both data points in my analysis.
19   Q   Except for any data points that don't hit
20 the two-standard-deviation threshold, right?
21   A   Well, I look at --
22      MR. COLLIER:  Objection; form.
23      THE WITNESS:  I look at all of those, and
24   the only question is:  Are they sufficient when
25   you combine them together?  So when you combine

Page 287

1    them together, they are more likely to exceed
2    that two-standard-deviation threshold.
3 BY MR. DAVIS:
4    Q   When you picked two standard deviations as
5 the threshold, you knew what the results of that
6 analysis would be, right?
7    A   I did not, no.
8    Q   Had you known Google's market cap, would you
9 have known what the results of the analysis would be?
10   A   No.
11   Q   If I define a sufficient fine as one that
12 moves a stock price at least two standard deviations,
13 and I know the market cap of the issuer, I know what
14 fine I'm going to come up with, don't I?
15   A   No, you don't know the -- you have a good
16 reason to expect it's going to be substantial if the
17 company has significant volatility in its stock price
18 in particular.  So it's going to be some combination
19 of the market capitalization of the company and the
20 standard deviation the stock returns, which will
21 differ on a company-by-company basis, and it will
22 differ over time, and if you're at a good stopping
23 point --
24   Q   I'm almost there.
25   A   Okay.

Page 288

1    Q   When you calculate the relevant standard
2 deviations, are you using all days or only days that
3 you think of as a fine-related event?
4      MR. COLLIER:  Objection; form.
5      THE WITNESS:  I am using all days that are
6   related to that particular conduct, so either the
7   announcement or the fine.  I guess that's -- if I
8   understood your question correctly.
9 BY MR. DAVIS:
10   Q   So, for instance, when you say that the
11 standard deviation of Google's stock price in 2010 was
12 three and a half percent, how do you calculate that
13 number?
14   A   Well, it's the -- so there's two different
15 standard -- well, there's a couple different standard
16 deviations that I calculate.  One is setting up kind
17 of the big picture view of what's the standard
18 deviation in the earlier time period and the later
19 time period, and what is likely to be enough -- or
20 what is going -- how big is one or two standard
21 deviations in those different time periods.
22      And then there's the event study itself, and
23 there I describe the calculations of the standard
24 deviations with regard to the days around the event
25 date, so I look at the standard deviation plus or

Page 289

1 minus ten days, for example, in Figure 22, and that's
2 why you see the little dotted lines that describe two
3 standard deviations, one or two standard deviations
4 over the stock returns over the course of that 20-day
5 time period.
6    Q   The first standard deviation that you apply
7 before the second one, that's calculated normally,
8 right?
9    A   What do you mean "normally"?  It's
10 calculated over a broader time period, really trying
11 to understand what is the market capitalization of the
12 firm in these different time periods, what is the
13 stock price, how is the stock price moving on a daily
14 basis in these years, and now I would say that's the
15 big picture view.  I'm not using it to do a
16 statistical test.  It just gives me an order of
17 magnitude sense of things.
18      And then here, in the actual area where I'm
19 calculating whether the event is within two standard
20 deviations, I'm looking at the standard deviations
21 within this narrower time period, because the standard
22 deviation may change over time, and, in fact, does
23 change.  We see that in that earlier -- that first
24 statement that you pointed me to.  There's a different
25 standard deviation in the earlier years as opposed to

73 (Pages 286 - 289)

1  the later years.
2       MR. DAVIS:  Got it.  This is now a good time
3  for a break.
4       THE VIDEOGRAPHER:  The time is 5:30 p.m.
5  This end unit 6.  We're off the record.
6       (Whereupon, a short recess was taken.)
7       THE VIDEOGRAPHER:  The time is 5:53 p.m.
8  This begins unit number 7.  We're on the record.
9  BY MR. DAVIS:
10      Q   Dr. DeRamus, you ready to finish up here?
11      A   I am.
12      Q   Can you go to paragraph 33 of your report
13  which starts on 18.
14      A   I'm there.
15      Q   Does paragraph 33 introduce Figure 1?
16      A   Yes, it does.
17      Q   If you look at paragraph 33 itself, in the
18  fifth line, there's a sentence beginning with the word
19  "because."
20      Do you see that?
21      A   Yes.
22      Q   I'm going to read it just so we have it for
23  the record.
24      "Because both the harm and gain increase
25  with the number of violations, so should the required

1  total penalty necessary for deterrence.  However, at
2  some point the level of the penalty is sufficiently
3  high such that optimal deterrence has been achieved or
4  the risk of overdeterrence exceeds the benefit of
5  higher penalties.  At that point, the total penalty
6  amount no longer increases with the number of
7  violations, and the curve flattens."
8       Did I read that correctly?
9       A   You did.
10      Q   And you see you begin this paragraph 33, in
11  the second sentence, with a reference to using
12  Figure 1 to "summarize the implications of the
13  economic literature reviewed above," right?
14      A   Correct.  That's what I say.
15      Q   Can you tell me what economic literature
16  supports the views expressed in your paragraph 33 and
17  Figure 1?
18      A   Well, the first point is that at a certain
19  point -- or I should say at a certain level of
20  penalties, overdeterrence becomes a concern.  That is
21  a concern expressed in the literature, in the economic
22  literature.
23      The second is that, as a general concept,
24  the -- one would expect harm and gain to increase with
25  the number of violations.  So in some region, it would

1  be reasonable to increase the size of the penalty as
2  the number or the scope of the, the violations
3  increases, but that at a certain point, one has
4  reached the -- I refer to it as "optimal deterrent
5  amount" here, again more in reference to the
6  theoretical literature as opposed to what my specific
7  task is here, which is to provide a range of deterrent
8  penalties.
9       Q   Is overdeterrence only a concern at the
10  maximal penalty level, or is it always a concern?
11      MR. COLLIER:  Objection; form.
12      THE WITNESS:  I would consider it always to
13  be a concern.
14  BY MR. DAVIS:
15      Q   Including like first penalty for the first
16  violation; we don't want to overdeter with that
17  penalty, right?
18      A   Potentially, yes.
19      Q   Am I understanding Figure 1 correctly to
20  indicate that the line becomes flat when you reach the
21  wrongdoer's total wealth?
22      A   No.
23      Q   I'm going to -- I think this will make
24  everything easier -- mark as Exhibit 11 -- and I don't
25  want you to think I'm doing any tricks.  This is your

1  Figure 1.  I have put the letters on it.  Those are
2  not your letters.  I did that, because otherwise I
3  don't know what to call them.
4       If you've ever done cases with horizontal
5  oil and gas wells, I could use like heel and toe, but
6  it's inverted, so I can't.
7       A   Very good.
8       (Exhibit 11 was marked for
9       identification.)
10  BY MR. DAVIS:
11      Q   I forget that you're -- yeah, okay.  Just
12  for the record, that is your Figure 1 with the
13  exception of the A, B, C and D which I have inserted,
14  right?
15      A   That's correct.
16      Q   At around Point A, it appears to me that the
17  per penalty -- can I start that question over,
18  Dr. DeRamus?
19      A   Yes.
20      Q   And at around Point A, it appears to me that
21  per-violation penalty starts to increase; is that
22  right?
23      A   Well, as I've drawn it here, yes, but I
24  wouldn't impart any particular significance to that
25  rate of increase.

Page 294

1    Q   Is there any significance to the change in
2  slope at A, B or C?
3    A   No.  It's just how I drew, it's just how I
4  drew the graph.  You can think of it actually as a
5  linear relationship is probably the better way to
6  think about it, based on if there is a per-violation
7  approach.  This is just a compressed graph for the
8  scale.
9    Q   So am I understanding correctly that if we
10  were not constrained by scale, there would be a
11  straight line from the origin --
12    A   Yes.
13    Q   -- to Point D?
14    A   There would be if you were doing that based
15  on a maximal penalty amount where the deterrent
16  penalty was determined -- the appropriate amount was
17  determined to be based on that per-violation statutory
18  maximum.
19        So if you were to apply a different
20  framework, somebody may decide that a lesser amount at
21  some point were to apply, but at certain point, at a
22  certain point, the appropriate amount should increase,
23  so my primary focus is on the region from D forward,
24  and particularly what that implies in terms of the
25  order of operations from an economic perspective that

Page 295

1  one should follow in determining an appropriate
2  per-violation penalty amount in this case.
3        (Exhibit 12 was marked for
4          identification.)
5  BY MR. DAVIS:
6    Q   Understood.
7        I've now marked as Exhibit 12, the same
8  exhibit as 11, but with a line on it.  I apologize.  I
9  only have the one copy.
10        With the exception of the fact that I
11  struggled to draw a straight line rather than a wavy
12  line, if we weren't constrained by scale, is that how
13  you view the growth and eventual ceasing end growth of
14  per-violation penalties?
15    A   Correct in terms of -- maybe that actually
16  is a good representation, having both those lines on
17  there as the difference between what someone might
18  award for a lesser amount versus the statutory maximum
19  amount.
20        So that particular figure, the straight line
21  assumes that every violation should -- there should be
22  the maximum applied to every violation from the get-go
23  as opposed to an alternative way in which a jury might
24  consider less than, but at a certain point, a less
25  than maximal penalty per violation, but at a certain

Page 296

1  amount or a certain extensiveness of conduct, that it
2  might be appropriate to apply that maximal amount.
3    Q   And before I get to Point D, so when my
4  penalty is still increasing with the number of
5  violations, that achieves marginal deterrence, because
6  the penalty goes up each time I do another violation,
7  right?
8    A   I guess I was offering this up as an
9  illustration of a different point rather than marginal
10  deterrence.  I was really offering it up as an
11  explanation for how to determine an appropriate
12  penalty amount based on economic principles in this
13  matter, when you have a statutory provision that calls
14  for an up-to amount; i.e., a cap on the maximum.
15        So that just -- it's just the interplay
16  between the the, the way in which one needs to, from an
17  economic perspective, one needs to assess first the
18  deterrent penalty amount and then assess whether there
19  are constraints on the imposition of that deterrent
20  penalty amount based on the statutory penalties.
21    Q   Do your section 6 or section 7 account for
22  the principle of marginal deterrence?
23        MR. COLLIER:  Objection; form.
24        THE WITNESS:  I would need to think further
25  about that question marginal deterrence in terms

Page 297

1  of the approach -- the approach I have taken here
2  is to step back, consider the conduct in its
3  totality, and assess what appropriate deterrent
4  amounts are, and to estimate those based on what
5  I consider to be reasonable economic methods, and
6  then back into a per-violation amount.
7        And for all intents and purposes, as I
8  describe in my report, whether the number of
9  violations that the jury ultimately determines is
10  $579 billion or whatever the number was that
11  Dr. Wiggins provided, or many trillions of
12  violations, I don't see that there is a
13  substantive change in the appropriate amount of a
14  deterrent penalty.
15  BY MR. DAVIS:
16    Q   So as applied to this case, given the way
17  that Mr. Andrien counts violations as per auction, is
18  Point D on the x-axis somewhere above $500 billion?
19        MR. COLLIER:  Objection; form.
20        THE WITNESS:  I'm sorry.  Say that one more
21  time.  Somewhere above $500 billion?
22  BY MR. DAVIS:
23    Q   On the x-axis.
24    A   Oh, yes.  I'm sorry.  I consider the Point D
25  to be well less than $500 billion.

75 (Pages 294 - 297)

1    Q   So on the x-axis, Point D is closer to
2  $1 billion than $500 billion?
3        MR. COLLIER:  Objection; form.
4        THE WITNESS:  I don't have an exact number.
5  I'm using this for illustrative purposes of a
6  method and particularly going from statutory
7  penalties that are calculated on a per-violation
8  amount or rather that are subject to a cap, and
9  the economic concepts of deriving an appropriate
10 deterrent penalty amount.  I just -- and I
11 consider that the -- based on the differing
12 numbers that Dr. Wiggins and Jeffrey Andrien have
13 offered in this matter, that my opinions still
14 wouldn't change, even though I disagree with
15 certain of Dr. Wiggins' asserted corrections to
16 the Andrien numbers, for example.
17 BY MR. DAVIS:
18    Q   So I certainly don't want to hold you to an
19 exact number, but can you tell me whether, given your
20 theory, Point D on the x-axis is closer to zero or
21 $100 billion?
22    A   Again, you're -- I think you're trying to
23 impart a greater numerical precision to that
24 illustrative graph, which is -- it's more intended to
25 or is only intended to derive the -- or to provide

1  that conceptual framework.
2        And it's the continuation of what I also
3  talk about in my executive summary, in particular, a
4  paragraph where I describe a particular formula,
5  basically a constraint on the number of -- on the
6  per-penalty violation amount, and there's an order of
7  operations I describe in -- I believe it's paragraph
8  12.  It's a high-level conceptual graph of a
9  methodological approach as opposed to a representation
10 of how different numbers should be plotted on, on a
11 particular graph.
12    Q   I get it.  It's depicting your opinion that
13 at a certain number of violations, the per-violation
14 penalty no longer increases, because you've reached
15 the point where an additional dollar will result in
16 overdeterrence, right?
17    A   Effectively, yes.
18    Q   And how --
19    A   Or there's a different way to describe it
20 would be there is an optimal -- if you consider the
21 conduct and you consider, for example, the expected
22 benefits of the conduct or the amount of the signal
23 that needs to be established for shareholders to react
24 to that particular conduct, once you've established
25 that, is there a point at which you might need to

1  reduce that penalty because of constraints -- because
2  you're constrained by the statutory provisions.
3        So, for example, if I were to determine that
4  there were $200 billion of net present, net present
5  value benefits once you factored into the -- factored
6  the probability of detection and enforcement and
7  collection, but the only statute that the plaintiffs
8  could recover under was the Utah statute, and there
9  were only 5,000 violations, statutory violations that
10 the jury found in that state, then you would be
11 somewhere much lower down on that -- on the earlier
12 part of that figure relative to the other -- to the
13 flat portion that I determined initially.  It's a
14 constrained optimization function.
15    Q   And when you do calculate a per-violation
16 penalty in your report, you do it by dividing what you
17 believe to be the optimal deterrent aggregate penalty
18 by the number of violations; fair?
19    A   It's what I -- again, maybe it's the word
20 "optimal."  Again, I'm providing a range of, 6 penalty
21 amounts for the jury to consider and I think the
22 appropriate way to turn that into a per-violation
23 amount is to then divide that by the amount of
24 violations that the jury determines, and if for some
25 reason that the jury considers the number of

1  violations to be very, very low, then that might
2  constrain the per-violation amount, so that might
3  constrain the total violation amount based on the
4  concepts provided here in this graph.
5    Q   And it also means that if the jury
6  determines that only ten percent of the violations
7  that plaintiffs claim to be violations were, in fact,
8  violations, the aggregate penalty remains the same, in
9  your view?
10       MR. COLLIER:  Objection; form.
11       THE WITNESS:  Well, there are a couple --
12 this is a two-dimensional -- this figure right
13 here is a two-dimensional representation of what
14 is probably a more complex multidimensional
15 problem for the jury to figure out, and it's one
16 of the reasons why I provided alternative ways of
17 deriving penalty amounts.
18       So the jury, for example, could decide that
19 the -- if the jury -- if the conduct were
20 constrained -- were defined for a shorter time
21 period or were limited to Bernanke only, for
22 example, I have some numbers for a penalty range
23 for Bernanke, in which case they would then take
24 that line and then figure out the number of, of
25 statutory violations, and then divide that

76 (Pages 298 - 301)

1    number, and then make sure that that number is
2    less than the relevant statutory maximum in each
3    of the relevant states.
4         So that, that line across the stop, the
5    horizontal line is not necessarily a fixed line.
6    It can shift, depending on the the, the way the
7    ultimate finder of fact concludes is the exact
8    scope of the actionable conduct.
9    BY MR. DAVIS:
10        Q   New topic.  Is there any area in which you
11   disagree with Mr. Andrien's opening report in this
12   case?
13        A   As I sit here today, not that I can think
14   of.  He has different calculations than I do.  I
15   approach it through my own lens and my own approach,
16   but I don't -- the scope of my charge was to respond
17   to Dr. Wiggins and Dr. Skinner, and I think I'm pretty
18   clear in my report where I take issue with Dr. Skinner
19   and Dr. Wiggins, and in some of those cases, there's
20   probably overlap in -- where I consider certain things
21   that Doctor -- that Jeffrey Andrien did in the Andrien
22   report to be reasonable.
23        Q   Sitting here right now, there's nothing in
24   Mr. Andrien's reports that you think is unreasonable,
25   is there?

1        A   As I sit here today, no.
2        Q   Apologies for returning to the topic of
3    event studies briefly.
4         On the date that a fine is imposed, the
5    stock price won't move if the market has accurately
6    predicted the imposition and amount of the fine
7    already; true?
8        A   I think so, but read that back slowly one
9    more time.
10       Q   Yeah, I don't know if I did it unnecessarily
11   confusingly.  That's what I get for writing questions
12   out.
13        On the date that a fine gets imposed, if the
14   market has accurately foreseen the imposition and
15   amount of that fine already, the stock price won't
16   move on the date that the fine is imposed, holding
17   everything else equal; true?
18       A   That would be my expectation, yes.
19       Q   And so if the market is relatively
20   efficient, it's no surprise that you don't see a
21   significant stock drop on the days fines are imposed,
22   is it?
23        MR. COLLIER:  Objection; form.
24        THE WITNESS:  Well, I think that calls for
25   maybe a deeper conversation about stock market

1    efficiency; i.e., would one expect investors
2    collectively to reasonably predict and accurately
3    predict the outcome of a very uncertain process.
4         So that's why I think both those dates are
5    ultimately relevant and why it's important to
6    take into consideration both the announcement
7    date and the actual penalty date.  There are
8    other kinds of event studies where the event is
9    single, a single event that doesn't require this
10   matching up with an announcement date, for
11   example.
12   BY MR. DAVIS:
13        Q   Gotcha.  I think I can do it simpler.
14        If, on a Tuesday, a fine is imposed, and the
15   issuer's stock price doesn't move, that is consistent
16   both with the fine having no impact on investors and
17   also with the possibility that the investors had
18   already priced in the imposition of that fine, right?
19       A   It could be either way, yes.
20       Q   Have you, in your work in this case,
21   investigated how Google compensates its executives and
22   managers?
23       A   Not in great detail.  I do -- I've observed
24   what Google says in its 10-Ks.  I understand that it
25   provides certain stock compensation and options that

1    are disclosed, so that's -- my expectation is that
2    there's some combination of cash and stock.
3        Q   Are you actually offering the opinion in
4    this case that Google does not align its managers'
5    incentives with those of its shareholders?
6         MR. COLLIER:  Objection; form.
7         THE WITNESS:  I think I describe this issue
8    in a paragraph in my report if I would turn to
9    that section where I discuss the principal-agent
10   problem, and give me one quick minute.  I think I
11   can find it for you really quickly.
12        So this is all in -- maybe I'll just start
13   your reference to paragraph 38 and forward, but I
14   give you an example in 39 that goes through that
15   in some detail, with an example, to say that
16   effectively there are attempts to align, to some
17   extent, the incentives of management and
18   shareholders with stock-based compensation, but
19   it is not sufficient to remove the incentive for
20   a manager in this case to engage in conduct that
21   might profit them as a result of that
22   short-term -- the bonus that they receive,
23   whether it's cash or stock.
24        Regardless of the form of compensation,
25   they're still net/net ahead by engaging in

77 (Pages 302 - 305)

Page 306

1    conduct that provides them a short-term benefit,
2    even if long-term detriment of shareholders.
3    BY MR. DAVIS:
4        Q   Are you offering the opinion on a
5    comparative basis that Google does a better or worse
6    job than the average corporation in attempting to
7    align its managers' incentives with those of its
8    shareholders?
9        A   I'm not offering any opinion about the
10   comparative effects of that for Google versus anybody
11   else.
12       Q   New topic.  Are you aware of any evidence
13   that any participants in the AdX auction would not
14   have participated had they been aware of the details
15   of RPO, DRS or Bernanke?
16       MR. COLLIER:  Objection; form.
17       THE WITNESS:  If you're asking if I've seen
18   a document from a participant that said we would
19   not participate, I have not seen such a document;
20   i.e. -- yeah, I guess I'm trying to figure out
21   the thrust of your argument.  I haven't seen a
22   specific document saying we would not
23   participate.
24       As an economist, however, I would expect
25   that had this information been fully disclosed,

Page 307

1    particularly at the inception, that that would
2    have changed significantly the incentives of, of
3    market participants whether to participate in the
4    auction and, if they were to participate in the
5    auction, what bids to submit.
6    BY MR. DAVIS:
7        Q   Have you done any analysis indicating to you
8    that one or more participants in the AdX auction, from
9    your perspective as an economist, would have had their
10   incentives change to such an extent that they would no
11   longer have participated in that auction going forward
12   if Bernanke, RPO and DRS were disclosed?
13       A   I'm sorry.  I'm trying to figure out whether
14   you're asking me an issue of fact; i.e., whether
15   there's a document that I've seen versus a matter of
16   my expectation as an economist.
17       Q   So you said as an economist you would expect
18   that if the information were disclosed, participants'
19   incentives would have changed, and I'm wondering if,
20   as an economist, you have done an analysis indicating
21   that anyone's incentives would have changed so much
22   that they would have stopped participating in the AdX
23   auction, like as opposed to changing their strategies
24   within the AdX auction.
25       MR. COLLIER:  Objection; form.

Page 308

1        THE WITNESS:  I would say maybe more
2    generally that had the information been fully
3    disclosed, there may have been -- or I would
4    expect, given the, the magnitude of the conduct,
5    I would expect that everybody knew perfectly and
6    was able to optimize those -- their bids to
7    account for that full and complete information,
8    and even there it's really hard to assess how
9    that would happen, because it's so -- a number of
10   very complicated algorithms, but I can see a
11   world in which there would have been users of
12   non-Google ad tech products that would have
13   continued to use those non-ad tech -- those
14   non-Google products in the -- and not
15   participated in, and not migrated to the use of
16   Google's ad-buying tools, for example.
17       I believe there were instances in which
18   there were direct deals that were affected by the
19   conduct, but again I'm -- there's a broad range
20   of behaviors that really Dr. Weinberg in
21   particular went through with each of the
22   conducts, and that informed my opinion that the
23   impact would likely be substantial, but then --
24   so there are others who have done a fairly
25   detailed analysis, and I would point you to

Page 309

1    Dr. Weinberg, but I have not reviewed a specific
2    document from a customer that said, for example,
3    hey, if we had known, we would not have done it,
4    but I have not -- that was not my charge.
5    BY MR. DAVIS:
6        Q   I think I can shortcut it.  Let me try this.
7        Is there an analysis disclosed in your
8    expert report indicating one way or the other whether
9    one or more participants in the AdX auction would have
10   stopped participating in that auction if any of DRS,
11   RPO or Bernanke had been disclosed to them?
12       A   Well, if by "analysis" you mean have I
13   quantified that, I have not quantified that.  I have
14   not estimated a -- well, hang on.  Let me think for a
15   minute.
16       Maybe I'll just say it that way.  The -- I
17   don't think -- I have not specifically quantified that
18   particular factor.  I have taken it into consideration
19   in a general way in considering the likely scope of
20   the impact, and particularly the fact that the conduct
21   increased the amount of, of auctions won by users of
22   Google's products.
23       So we talked about that earlier in -- and
24   there's empirical evidence in that regard, to that
25   regard, and I would expect that to result in a greater

78 (Pages 306 - 309)

1  migration of competitor -- of people using
2  competitors' products, I would expect them to then
3  migrate to using Google's products.
4       But other than my references to
5  Dr. Weinberg, my general discussion, and then the
6  documents responsible upon which I rely in doing my
7  calculations that are disclosed in my report, I have
8  not done any other independent analysis of that.
9       MR. DAVIS: I will pass the witness.
10       MR. COLLIER: Okay. Let me take a break,
11  see if I've got anything. If I do, it won't be
12  too terribly long.
13       THE VIDEOGRAPHER: The time is 6:23 p.m.
14  We're off the record.
15       (Whereupon, a short recess was taken.)
16       THE VIDEOGRAPHER: The time is 6:48 p.m.
17  We're on the record.
18       * * * * *
19       EXAMINATION BY COUNSEL FOR PLAINTIFFS
20  BY MR. COLLIER:
21   Q   Good evening, Dr. DeRamus.
22   A   Good evening.
23   Q   Dr. DeRamus, can you recall the questions
24  Google's counsel asked you today have been about your
25  opinions in your corrected rebuttal report?

1   A   Yes.
2   Q   Have -- is any of your testimony today
3  intended to change any of the opinions you expressed
4  in your rebuttal report?
5   A   No.
6   Q   Was any of your testimony today intended to
7  limit the opinions you've expressed in your rebuttal
8  report?
9   A   No.
10   Q   Do you believe you had sufficient facts and
11  data to reach the conclusions you reached in your
12  rebuttal report?
13   A   Yes, I do.
14   Q   Did anything about the questioning or the
15  exhibits put before you today cause you to change any
16  of the opinions that you've put in your rebuttal
17  report?
18   A   No.
19   Q   And you've discussed with Google's counsel
20  today various methodologies that you have in your
21  report, right?
22   A   That's right.
23   Q   Were the methodologies you used in your
24  expert report based on reliable and generally accepted
25  deterrence principles?

1   A   Yes, they were.
2   Q   Were the methodologies that you used in your
3  rebuttal report based on reliable and generally
4  accepted economic principles?
5   A   Yes, very much so.
6   Q   Can the methodologies in your report and
7  that you discussed today in your deposition be tested?
8   A   Yes, they can.
9   Q   Have the methodologies in your report been
10  the subject of peer review and publication?
11   A   Yes.
12   Q   Is deterrence a well-established subject in
13  the field of economics, or is it not part of that
14  field?
15   A   Yes, it is.
16   Q   I asked you an "either."
17   A   Oh, I'm sorry. So yes, it is a
18  well-established field in economics or it's a
19  well-established topic of study in the field of
20  economics. It's part of the broader discussion of
21  incentives. It's more about negative incentives
22  instead of positive incentives, which is the subject
23  of most economic research.
24   Q   That's the carrot versus the stick, right?
25   A   Yes.

1   Q   Both the carrot and the stick can be used to
2  motivate employees or entities, right?
3   A   Correct, and to, to provide a -- to motivate
4  a change in the course of conduct of an employee or a
5  company generally.
6   Q   Did you reliably apply the methodologies you
7  discussed with Google's counsel today to form your
8  opinions in this case?
9   A   I'm sorry. Could you repeat the question.
10   Q   Did you reliably apply the methodologies
11  you've discussed in your rebuttal report and with
12  Google's counsel today to form your opinions in this
13  case?
14   A   Yes, I did.
15   Q   Did you have sufficient facts and data to
16  reach the opinions that you've reached in this case
17  about the penalty ranges that could be necessary to
18  deter Google's conduct?
19   A   Yes.
20   Q   Dr. DeRamus, do you recall -- and it was
21  early in the day. You were asked a number of
22  questions about a hypothetical apple cart with bruised
23  apples.
24   A   I do recall those questions.
25   Q   Is the hypothetical apple cart analogous to

Page 314

1 the ad tech market and the conduct that you've
2 analyzed in this case?
3     A   Not by any stretch of the imagination, no.
4     Q   Is selling apples the same as ad auctions?
5     A   No, it's not. There are substantive --
6 well, the differences are just -- I could go on and
7 on, but there's so many differences associated with
8 the technology, the interrelationship between the
9 markets, the snowball effect, the detectability of the
10 conduct. It's a fairly long list.
11     Q   Have you ever bought apples?
12     A   I have.
13     Q   Do you feel like you're generally able to
14 detect a bruised apple?
15     A   I am indeed.
16     Q   How long does it take to you detect a
17 bruised apple?
18     A   I can usually -- if it's pointed the right
19 way, I can tell by looking at it.
20     Q   Is that your understanding of how hard it is
21 to detect Google's course of conduct or misconduct in
22 the auction space?
23     A   No. The ability to detect that course of
24 conduct would have been exceptionally difficult.
25     Q   Dr. DeRamus, do you recall a large series of

Page 315

1 questions where Google's counsel asked you to compare
2 a world where Google's Bernanke, DRS and RPO conduct
3 was disclosed versus undisclosed, basically?
4     A   I do recall those questions.
5     Q   And I recall you giving an answer that said
6 something about needing to further discuss disclosures
7 and the meaning of the word disclosures.
8         Well, let me just ask it this way: Would
9 you agree with me that for a disclosure to be
10 effective, it would need to be disclosed in advance of
11 the participant's conduct?
12     A   I agree with that statement, yes.
13     Q   A disclosure after the fact can't remedy
14 the, the conduct or the harm, can it?
15     MR. DAVIS: Objection; leading.
16 BY MR. COLLIER:
17     Q   Well, can it?
18     A   I don't believe so. The whole point of
19 disclosure is providing information to a market
20 participant before they choose to engage in that
21 particular course of conduct, and I would say
22 particularly here when it involves auctions, I would
23 say that disclosure in advance is particularly
24 important.
25     Q   And can just any disclosure do?

Page 316

1     A   No. I think disclosure does require a
2 complete and transparent disclosure of the rules of
3 the game, as it were, as applied in this case.
4     Q   Does disclosure, as you would use that term,
5 require allowing the participants to understand the
6 impact of the conduct?
7     A   Yes, it would.
8     Q   You spoke for a long time today about the
9 probability of detection.
10         Do you recall that?
11     A   I do.
12     Q   Do you provide the jury with sufficient
13 information and guidance on how to adjust or determine
14 the probability of detection in this case?
15     A   Yes.
16     Q   Can the jury actually determine, as a
17 factual matter, the probability of detection -- I'll
18 scratch that.
19         Does -- I'd ask you to look at paragraph 12
20 of your report.
21     A   Okay.
22     Q   Does paragraph 12 provide the jury with a
23 formula to determine the appropriate maximal -- the
24 appropriate -- sorry -- deterrence penalty in this
25 case?

Page 317

1     A   Yes. It provides them with a formula to
2 convert a deterrent penalty into an appropriate
3 per-violation penalty amount.
4     Q   And like all formulas, does that have
5 inputs, factual inputs?
6     A   Yes, it does.
7     Q   Is your formula sufficient for the jury to
8 determine the appropriate per-violation amount or
9 total deterrence amount, even if the input factors
10 differ from any of your assumptions in your report?
11     A   Yes. In combination with the other
12 information that I provide in my report, yes, it
13 provides -- that totality of information provides the
14 jury with sufficient ways to change the inputs into
15 those calculations to derive an alternative penalty
16 amount on a per-violation basis, or on an aggregate
17 basis as well.
18     Q   And I'd ask you to look at Exhibit 5. For
19 clarity, it looks like this.
20     A   Mr. Bernanke. Yes. All Mr. Bernanke.
21     Q   Exhibit 5, for the record, is
22 GOOG-DOJ-28385887, and I'm going to turn you to the
23 page counsel asked about, which ends in 895.
24     A   Yes.
25     Q   Do you recall a lot of discussion with

80 (Pages 314 - 317)

Page 318

1  Google's counsel about the sentence "███
2  ████," parens -- and that sign there; does that
3  mean "approximately"?
4      A  Yes, it does.
5      Q  "████████████ close
6  parens, "revenue for GDN."
7      A  Yes, I recall those questions.
8      Q  So for purposes of your calculations and
9  your formula, did you use Google's estimate of
10  ████, or did you use their estimate of
11  ████ a year out of this line?
12      A  I used ████ a year for the revenue
13  line, and I think I described how I have different
14  sensitivities of that calculation or of those
15  calculations that use different profit margins.
16      Q  Do you recall today Google's counsel
17  representing to you that individuals named Brin and
18  Page own approximately 51 percent of the voting
19  control of Google?
20      A  Yes.
21      Q  From an economic perspective, does that make
22  it reasonable to assess what the 51 percent
23  shareholders would need to take some action?
24      A  I'm sorry.  I don't quite understand the
25  question.

Page 319

1      Q  Let me ask it this way:  Did you read
2  Mr. Brin's deposition?
3      A  Yes, I did.
4      Q  Do you recall what Mr. Brin knew about AdX?
5      A  I recall he professed to know very little
6  about AdX.  He may even have not been sure what AdX
7  was.
8      Q  Did that surprise you?
9      A  It did surprise me.
10      Q  What does that tell you about the need for
11  deterrence in this case?
12      A  Well, it would tell me that the need -- that
13  there would be a need for a substantial penalty amount
14  to get Mr. Brin's attention, if, in fact, his
15  determination of a penalty was -- whether it met a
16  certain threshold level were enough for him to be
17  actually involved in the management of the business.
18          It certainly indicates to me that he was not
19  involved at all in the ad tech business, or at least
20  that's what I took from his deposition, and therefore,
21  a higher penalty amount would need to be applied, all
22  else equal.
23      Q  Now, with that said, did you increase your
24  deterrence penalty amounts in any way or in some way
25  based on Mr. Brin's not knowing what AdX is or the

Page 320

1  details of AdX?
2      A  No.  It did inform my opinion that
3  notwithstanding the unique ownership structure or
4  shareholding structure of the company, that did not
5  change my conclusion that the principal-agent
6  framework was the appropriate framework to apply, and
7  it further informed my opinion that the amounts of
8  deterrent penalties that I calculated were reasonable
9  and, in fact, likely necessary in order to deter such
10  conduct in the future.
11      Q  Okay.  Do you have an understanding as to
12  whether AdX is a part of the current Department of
13  Justice versus Google suit?  I believe counsel called
14  it the Virginia suit.
15      A  It is my understanding that it is a part of
16  that suit, yes, very much of a focus.
17      Q  Do you recall a lot of discussion with
18  Google's counsel about two standard deviations?
19      A  Yes.
20      Q  I'm asking to ask you just a few follow-ups
21  on that.
22          Am I -- does two standard deviations from
23  the mean correspond to a 95 percent confidence
24  interval?
25      A  Yes, it does.

Page 321

1      Q  Does two standard deviations from the mean
2  correspond to a five percent significance level?
3      A  Yes.
4      Q  Is it common for economists such as yourself
5  to use a 95 percent confidence interval?
6      A  Yes, it is.
7      Q  Is it common for economists such as yourself
8  to use a five percent significance level?
9      A  Yes, it is.
10      Q  Do you have an opinion on whether or not the
11  use of a 95 percent confidence interval or a five
12  percent significance level is common or uncommon in
13  economics literature?
14      A  I would say not only is it common, it's
15  standard practice.  It is what I expect to observe in
16  the vast majority of literature, of the, of the
17  economic literature.
18      Q  And last couple of questions.
19          At the very end of the day, you discussed
20  with Google's counsel the concept of overdeterrence,
21  right?
22      A  Yes.
23      Q  Is, is there a concept of underdeterrence?
24      A  Absolutely.  That's a big part of the entire
25  motivation for the need to divide the expected gains

81 (Pages 318 - 321)

Page 322

1 or the expected societal harm by the probability of
2 detection, because if you don't do that, then it will
3 also mean you will be in this underdeterrence world.
4    Q   Is underdeterrence only a concern at the
5 minimal penalty levels or in all penalty levels in
6 your range?
7    A   I can say that underdeterrence is just a
8 general concern that could apply across the board, so
9 regardless of where in the range one is, that one can
10 be concerned about the fact that the deterrent level
11 was not set sufficiently high, and so there still
12 might be -- if one has underestimated the amount of
13 benefits to Google and applied even a probability
14 multiplier to that underestimate, it still may result
15 in an underdeterrent amount.
16    Q   And for your expert report and the testimony
17 you're going to present to the jury, did you take into
18 account making sure that the proposed penalty ranges
19 you provided neither underdeterred nor overdeterred
20 Google or the wrongdoer?
21    A   Yes, I did take that into consideration.
22       MR. COLLIER:  Pass the witness.
23
24
25 //

Page 323

1            * * * * *
2     FURTHER EXAMINATION BY COUNSEL FOR GOOGLE
3 BY MR. DAVIS:
4    Q   Just a couple of quick ones.
5       You mentioned that your methodologies are
6 peer-reviewed.  Can you give me the best one or two
7 peer-reviewed citations for the methodology in section
8 7 of your report?
9    A   That is the use of an event study analysis.
10 An event study analysis has been peer-reviewed, has
11 been -- it is regularly used in the economic
12 literature and in the finance literature, and I
13 believe you even described -- you even referenced one
14 such study of that, of that methodology.
15    Q   I should have asked a better question.  Is
16 there a peer-reviewed study or paper using an event
17 study to calculate a deterrent penalty or a fine, to
18 your knowledge?
19    A   Not to determine a deterrent penalty or
20 fine.  The question is one of methodology.  The
21 methodology that I use in that section is
22 peer-reviewed and, and regularly used in a very broad
23 range of contexts, including the way -- or I would say
24 including in contexts that are analogous to what I've
25 done here.

Page 324

1    Q   Where in your report have you disclosed the
2 opinion that it would have been exceptionally
3 difficult for advertisers or publishers to detect one
4 or more of Bernanke, DRS or RPO?
5       MR. COLLIER:  Objection; form.
6       THE WITNESS:  I believe you and I discussed
7 that earlier on.  You were asking me about the
8 detection issue, and I believe that came up in a
9 prior discussion or a prior question that you
10 raised with me.
11 BY MR. DAVIS:
12    Q   So your attorney -- I should say the
13 plaintiffs' attorney -- was asking you whether it
14 would be similarly easy to detect Bernanke, DRS or RPO
15 as compared to a bruise on an apple, right?
16    A   Yes, on that one.
17    Q   You said it would be exceptionally difficult
18 for advertisers or publishers to detect RPO, DRS or
19 Bernanke, didn't you?
20    A   Yes, I did say that.
21    Q   That's not something that you have expertise
22 in, is it?
23       MR. COLLIER:  Objection; form.
24       THE WITNESS:  Well, it is in the sense that
25 I've reviewed -- I'm an economist by training.  I

Page 325

1 understand the way in which machine-learning
2 models work.  I understand enough of the specific
3 algorithms that were used and the specific
4 bidding strategies and the deviations of those
5 bidding -- of those bidding programs from the --
6 from a standard second price auction, for
7 example.
8       So I understand those, and I've worked on
9 those issues in other contexts, and that tells me
10 something about the exceptionally -- how
11 difficult it would be for a party to
12 understand and to measure exactly the formula
13 that Google was applying, even to the effect of
14 the throttling that Google was doing to attempt
15 to hide some of the different strategies.
16 There's lots of different ways that, in terms of
17 how I implemented those strategies, that would
18 have made it exceptionally difficult.
19 BY MR. DAVIS:
20    Q   And whether with respect to machine-learning
21 algorithms or otherwise, again where in your report is
22 any discussion of the technological difficulty or lack
23 thereof of detecting the allegedly deceptive conduct
24 at issue?
25       Go ahead and look if you need to.  I don't

82 (Pages 322 - 325)

Page 326

1  mean to preclude that.
2      MR. COLLIER:  Objection; form.
3      (Witness peruses document.)
4      THE WITNESS:  It's easier if I do this on a
5  running basis to show generally where I'm
6  describing the complex interdependencies within
7  the ad tech industry and among the various DVAA
8  products.  I talk about that in 55 and 56.
9  BY MR. DAVIS:
10     Q   Those are paragraphs?  I'm sorry.
11     A   I'm sorry.  Yes, in paragraphs 55 and 56, I
12 reference Dr. Weinberg's opening report about how the
13 conduct changed the auction procedures.  I -- and how
14 this affected -- would span many years, multiple years
15 in many different instances of deceptive conduct.
16     Give me a moment.
17     (Witness peruses document.)
18     THE WITNESS:  So I'd start on paragraph 97.
19 That's probably a little bit more detailed
20 discussion here.  This is rebutting Dr. Wiggins'
21 claim that he Google made no incremental profits
22 from the alleged deception.
23     His theory is effectively that everybody
24 learns instantaneously from the market and can
25 instantaneously adapt their conduct.  Therefore,

Page 327

1  there would have been no change in bidder
2  behavior in the but-for world.
3      I reference the academic literature
4  describing the difficulties in measuring
5  advertiser return on investment.  I reference
6  internal documents from Google that acknowledge
7  that advertisers find it difficult to understand
8  the drivers of returns.
9      And I, I also reviewed the documents, some
10 of the source studies that Mr. Wiggins -- that
11 Dr. Wiggins cites in his report.  There was one
12 particular study in particular about the speed
13 with which different advertisers or different
14 market participants react to changes in bidding
15 rules, and I drew very different conclusions from
16 that literature than those that, that Dr. Wiggins
17 drew.
18     So it's my -- it's in the scope -- it is in
19 the scope of what I was reviewing and rebutting
20 with regard to Dr. Wiggins and his assertion
21 regarding the lack of impact of the conduct at
22 issue, because he is asserted that it was easily
23 detectable by everybody and that everybody
24 adjusted it instantaneously.
25

Page 328

1  BY MR. DAVIS:
2      Q   Are you finished with your answer?
3      A   Yes.  Oh, I'm sorry.  I should add:  But it
4  was also within the context of your hypothetical of an
5  apple cart; that is to say it was part of the reason
6  why I think the apple cart analogy is simply
7  inapposite to this particular case.
8      Q   You're not offering any opinions on the
9  adequacy of Google's disclosures, if any, about
10 Bernanke, RPO or DRS, are you?
11     MR. COLLIER:  Objection; form.
12     THE WITNESS:  I think ultimately the factual
13 issue about whether those were sufficient in
14 order to provide enough information to the
15 client -- to the market about those rules is the
16 scope of other experts' testimony.  That is not
17 the central part of my testimony.
18     Ultimately, as I said early on in this
19 deposition, I do analyze the conduct, and I have
20 to understand the conduct at issue sufficiently
21 in order to assess whether Dr. Wiggins' claim,
22 for example, that there is no impact of the
23 conduct is a reasonable position to take, and
24 whether that is based on sound application of
25 economic principles and it also reflects the

Page 329

1  facts of this case.
2      And I concluded on that basis that -- in
3  responding those arguments, that those
4  disclosures were not -- whatever disclosures were
5  made were not sufficient.
6  BY MR. DAVIS:
7      Q   When you testified on cross that you haven't
8  actually read any of Google's disclosures about RPO or
9  DRS, that was true then and true now; yes?
10     MR. COLLIER:  Objection; form and outside
11 the scope, and counsel, you're out of time.  I'm
12 going to let him answer.  Go ahead.
13     THE WITNESS:  I correctly and truthfully
14 answered your question earlier about the extent
15 to which I reviewed those disclosure statements.
16     MR. DAVIS:  Pass him right back.
17     MR. COLLIER:  Okay, and by the way, I just
18 announced you're out of time.  If you've got a
19 question or two, I'm not cutting you off.
20     MR. DAVIS:  No.
21     MR. COLLIER:  Okay.
22     Dr. DeRamus, I'd like to thank you, the
23 court reporter, the videographer, and all counsel
24 for staying so late tonight.  I appreciate you
25 coming.

83 (Pages 326 - 329)

Page 330

1    At this point the plaintiff states will
2    reserve the remainder of their questions until
3    the time of trial, and thank you very much.
4        THE VIDEOGRAPHER:  The time is 7:15 p.m.
5    This concludes the deposition.
6        THE REPORTER:  Let me review the orders
7    here.  Mr. Davis, you want a copy of the
8    transcript?
9        MR. DAVIS:  Yes, please.  I think we have a
10   standing order where we like magically get them
11   the next day, but whatever is normal is fine, and
12   if you need extra time, just let me know, and I
13   will tell everyone to wait.  Like totally fair,
14   but yeah, whatever is normal is what we like.
15       MR. COLLIER:  And I think we needed a rough,
16   I think a rough is what we've ordered.
17       THE REPORTER:  And then as far as the
18   expedite?
19       MR. DEROSE:  Please.
20       MR. COLLIER:  There's your order.  I
21   wouldn't known what to say.
22       MR. DAVIS:  So I think we have a rough and
23   an expedite as a standing order.
24       MR. COLLIER:  I think we do, too.
25

Page 331

1        (Signature having not been waived, the
2        video deposition of DAVID W. DERAMUS,
3        Ph.D. was concluded at 7:15 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 332

1
2
3
4
5
6        ACKNOWLEDGEMENT OF WITNESS
7        I, David DeRamus, Ph.D., do hereby
8    acknowledge that I have read and examined the
9    foregoing testimony, and the same is a true,
10   correct and complete transcription of the
11   testimony given by me, and any corrections appear
12   on the attached Errata sheet signed by me.
13
14
15   _____ _____
16   (DATE)         (SIGNATURE)
17
18
19
20
21
22
23
24
25

Page 333

1        E R R A T A  S H E E T
2    IN RE:  State of Texas, et al, vs. Google LLC
3    RETURN BY:
4    PAGE   LINE        CORRECTION AND REASON
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____
25   (DATE)         (SIGNATURE)

84 (Pages 330 - 333)

Page 334

```
 1
 2
 3
 4
 5   CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 6       I, Laurie Donovan, Registered Professional
 7   Reporter, Certified Realtime Reporter, and notary
     public for the District of Columbia, the officer
     before whom the foregoing deposition was taken,
 8   do hereby certify that the foregoing transcript
     is a true and correct record of the testimony
 9   given; that said testimony was taken by me
     stenographically and thereafter reduced to
10   typewriting under my supervision; and that I am
     neither counsel for, related to, nor employed by
11   any of the parties to this case and have no
     interest, financial or otherwise, in its outcome.
12
13       IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my notarial seal this 29th day
     of October 2024.
14
15   My commission expires:  July 14, 2027
16
17
18   «%L2445_Signature%»
19   LAURIE DONOVAN
     NOTARY PUBLIC IN AND FOR
20   THE DISTRICT OF COLUMBIA
21
22
23
24
25
```

Page 335

```
 1   Zeke DeRose, Esq.
 2   zeke.derose@lanierlawfirm.com
 3       October 29, 2024
 4   RE: State Of Texas, Et Al. v. Google LLC
 5   10/28/2024, David W. DeRamus , PH.D. (#6918935)
 6   The above-referenced transcript is available for
 7   review.
 8       Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   (Erratas-CS@veritext.com).
16   Return completed errata within 30 days from
17   receipt of testimony.
18       If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22       Yours,
23       Veritext Legal Solutions
24
25
```