# EXHIBIT 28
# [FILED UNDER SEAL]

CONFIDENTIAL

Page 1

1           IN THE UNITED STATES DISTRICT COURT

            FOR THE EASTERN DISTRICT OF TEXAS

2                   SHERMAN DIVISION

3     THE STATE OF TEXAS,        )

      et al.,                    ) CASE NO.

4                                ) 4:20-cv-00957-SD

            Plaintiffs,          )

5                                )

            vs.                  )

6                                )

      GOOGLE LLC,                )

7                                )

            Defendant.           )

8     _____)

9

10              Taken at 100 Madison Street

                   Missoula, Montana

11          Thursday, October 24, 2024 - 8:15 a.m.

12

13              *** CONFIDENTIAL ***

14              VIDEOTAPED DEPOSITION

15                     OF

16           DR. JOHN CHANDLER, Ph.D.

17

18

19

20

21

22

23     Reported by Emily K. Niles, RMR, CRC, CRR, NV CCR #782;

24

25     Job No. CS6918917

Page 2

```
 1       A P P E A R A N C E S:
 2   ZEKE DeROSE, ESQ.
     ALEX ABSTON, ESQ. (appearing via Zoom)
 3   MELONIE DeROSE, ESQ. (appearing via Zoom)
     THE LANIER LAW FIRM
 4   10940 West Sam Houston Parkway North
     Suite 100
 5   Houston, Texas 77064
     713.659.5200
 6   alex.abston@lanierlawfirm.com
        appearing on behalf of the Plaintiffs.
 7   and
     JAMES S. RENARD, ESQ.
 8   DEWEY GONSOULIN, ESQ.
     ABRAHAM CHANG, ESQ. (appearing via Zoom)
 9   NORTON ROSE FULBRIGHT
     2200 Ross Avenue
10   Suite 3600
     Dallas, Texas 75201
11   214.855.8000
     james.renard@nortonrosefulbright.com
12      appearing on behalf of the Plaintiffs.
13
     TREVOR YOUNG, ESQ. (appearing via Zoom)
14   DIAMANTE SMITH, ESQ. (appearing via Zoom)
     JONATHAN JAFFE, ESQ. (appearing via Zoom)
15   BRIAN RICHTER, ESQ. (appearing via Zoom)
     STATE OF TEXAS ATTORNEY GENERAL'S OFFICE
16   300 West 15th Street
     Austin, Texas 78701
17   512.474.5201
     trevor.young@oag.texas.gov
18      appearing on behalf of the State of Texas.
19
     CHARLES M. ROSSON, ESQ.
20   GIBBS & BRUNS LLP
     1100 Louisiana
21   Suite 5300
     Houston, Texas 77002
22   713.650.8805
     crosson@gibbsbruns.com
23      appearing on behalf of the Defendants.
24
25   ALSO APPEARING:  IRELYN WHITE, Videographer
```

Page 3

```
 1           I N D E X
 2   WITNESS:  DR. JOHN CHANDLER, Ph.D.
 3   EXAMINATION                      PAGE
 4   BY MR. ROSSON                      7
     BY MR. RENARD                    278
 5   BY MR. ROSSON                    290
 6
 7
 8
 9
         INSTRUCTED NOT TO ANSWER
10
     PAGE    LINE
11
         137      6
12
         137     17
13
         138      6
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           E X H I B I T S
 2   NUMBER                          PAGE
 3   Exhibit 1   June 7, 2024, Expert Report of      8
                 Dr. John Chandler, Ph.D.
 4
     Exhibit 2   September 9, 2024, Expert Rebuttal  112
 5               Report of Dr. John Chandler, Ph.D.
 6   Exhibit 3   Ad Exchange Auction Model; Bates    185
                 Stamped GOOG-AT-MDL-C-000035250
 7
     Exhibit 4   Smarter Optimizations to Support    211
 8               a Healthier Programmatic Market;
                 GOOG-AT-MDL-C-000086317 - 320
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1           THURSDAY, OCTOBER 24, 2024
 2           THE VIDEOGRAPHER:  Good morning.  We are going
 3   on the record at 9:15 a.m., October 24th, 2024.
 4       Please note that this deposition will be
 5   conducted both in-person and virtually.  Quality of this
 6   recording depends on the quality of camera, Internet
 7   connection of participants.  What is seen from the
 8   witness and heard on the screen is what will be
 9   recorded.  Audio and video recording will continue to
10   take place unless all parties agree to go off the
11   record.
12       This is Media 1 of the recorded deposition of
13   John Chandler, taken by counsel Plaintiff in the matter
14   of State of Texas, et al., versus Google LLC, Case
15   No. 4:20-CV-00957-SDJ.
16       The location of this deposition is DoubleTree
17   by Hilton Missoula in Missoula, Montana, with attendance
18   over Zoom.
19       My name is Irelyn White representing Veritext.
20   I am the videographer.  The court reporter is
21   Emily Niles from the firm Veritext.
22       I am not authorized to administer an oath.  I
23   am not related to any party in this action, nor am I
24   financially interested in the outcome.  If there are any
25   objections to proceeding, please state them at the time
```

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1  of your appearance.
2      Counsel and all present, including remotely,
3  will now state their appearances and affiliations for
4  the record, beginning with the noticing attorney.
5      MR. ROSSON:  Charles Rosson, Gibbs & Bruns for
6  the Defendant.
7      MR. RENARD:  Jim Renard and Dewey Gonsoulin
8  with Norton Rose Fulbright for the Plaintiffs and for
9  the witness.
10     And also for the record, the deposition is
11 being taken at the instance of the Defendant, Google.
12     THE VIDEOGRAPHER:  Okay.  Sorry.
13     MR. RENARD:  No problem.
14     There will also be -- not in attendance yet
15 but will be here is Mr. Zeke DeRose of The Lanier Law
16 Firm, also representing the Plaintiffs and the witness.
17     THE REPORTER:  Do people online want to state
18 who they are?
19     MR. RENARD:  I don't think it's necessary.
20     THE VIDEOGRAPHER:  All right.
21     Will the court reporter please swear in the
22 witness and then Counsel will proceed.
23 Thereupon,
24         JOHN CHANDLER,
25 a witness of lawful age, having been first duly sworn to

Page 7

1  tell the truth, the whole truth, and nothing but the
2  truth, testified upon his oath as follows:
3         EXAMINATION
4  BY MR. ROSSON:
5    Q.  Good morning.
6    A.  Good morning.
7    Q.  Do you understand you're under oath?
8    A.  I do.
9    Q.  Your opinions for this case are stated in your
10 expert reports; is that right?
11   A.  That's correct.
12   Q.  You have two expert reports; is that correct?
13   A.  Yes, I have two expert reports in this case.
14   Q.  The first one is your opening report and then
15 you also have a rebuttal, right?
16   A.  Yes, that's correct.
17   Q.  Okay.
18     Are you offering any opinions that are not
19 stated in your expert reports?
20   A.  I am not.
21   Q.  Have any of your opinions changed since you
22 issued your reports?
23   A.  They have not.
24   Q.  Have you identified any errors in your expert
25 reports?

Page 8

1    A.  I have identified a couple errors as I was
2  reviewing my reports, which I can tell you.
3    Q.  Yes, please do.
4    A.  At my opening report, at the end of
5  Paragraph 206, I would like to strike the last sentence,
6  which was placed there in error.  Par -- or Footnote 45
7  is duplicated in the report.
8      And there's some typos, one of which is in my
9  Rebuttal Report.  I have an erroneous paragraph mark.  I
10 think it is Paragraph 115 into 116.
11   Q.  The first of those you said was your opening
12 report, Paragraph 206; is that right?
13   A.  Yes, that's correct.
14   Q.  And you referred to the last sentence?
15   A.  Yes, the one that gives the market share of
16 DV360.
17   Q.  To make this easier, I'm going to mark your
18 report so that you can have a copy.
19 EXHIBITS:
20     (Deposition Exhibit Number 1
21     marked for identification.)
22     MR. RENARD:  Thank you.
23 BY MR. ROSSON:
24   Q.  If you could look at Paragraph 206, please.
25     THE REPORTER:  What number is that?

Page 9

1      MR. ROSSON:  That's Chandler Exhibit 1.
2      THE WITNESS:  I'm there.
3  BY MR. ROSSON:
4    Q.  And the last sentence, if I'm getting it right
5  is, "Currently Google's advertiser ad buying tool,
6  DV360, which is what DoubleClick for Advertisers became,
7  ███████████████████████████████████████
8      Is that right?
9    A.  Yes, that's correct.
10   Q.  And that is no longer your opinion?
11     MR. RENARD:  Objection to form.
12     THE WITNESS:  I would like to remove that
13 sentence and the accompanying footnote.
14 BY MR. ROSSON:
15   Q.  Okay.
16     Do you have the opinion that currently
17 Google's advertiser -- ad buying tool DV360, which is
18 what DoubleClick for Advertisers became, has a
19 ██████████████
20   A.  I do not.
21   Q.  Okay.
22     Can you tell me why that is not your opinion?
23     MR. RENARD:  Objection to form.
24     THE WITNESS:  I was unable to substantiate
25 that number, the number giving the market share, other

CONFIDENTIAL

Page 10

1  than estimates from deposition testimony, and so I would
2  like to remove it since I do not have an external
3  foundation for it.
4  BY MR. ROSSON:
5      Q.  All right.
6          Do you have an opinion on DV360's market
7  share?
8      A.  I have opinions relating to DV360's place in
9  the display advertising marketplace but not a specific
10 market share number.
11     Q.  Got it.  To make sure I understand, you're not
12 offering an opinion that's a quantum, a percentage of
13 DV360's market share; is that right?
14     A.  That's correct.
15     Q.  Okay.
16         Now, I want to make sure I understand your --
17 the other corrections you mentioned.  You mentioned a
18 Footnote 45; is that right?
19     A.  That's correct.  And --
20     Q.  And was that in your opening report or your
21 rebuttal?
22     A.  In the opening report on Page 32.
23     Q.  I see.  It's a double footnote; is that right?
24     A.  That's correct.
25     Q.  Okay.

Page 11

1          Any other non-typographical changes to your
2  opinions?
3      A.  I don't believe so.
4      Q.  Okay.  Thank you.
5          You're serving as an expert for the plaintiffs
6  in this lawsuit; is that correct?
7      A.  That's correct.
8      Q.  And can we agree that when we talk about the
9  plaintiffs in the lawsuit, we can call them "the
10 states"?
11     A.  Yes.
12     Q.  Okay.  And Puerto Rico is not a state, but for
13 simplicity, can we agree that when we refer to the
14 states, we're also referring today to Puerto Rico?
15     A.  Yes, and Kentucky I believe is a commonwealth,
16 but "states" is fine.
17     Q.  Got it.  "The states" will be the plaintiffs,
18 fair?
19     A.  That's fair.
20     Q.  All right.
21         Are you relying on any assumptions provided to
22 you by anyone?
23     A.  I am not relying on any assumptions provided
24 to me by anyone.
25     Q.  Are you relying on any instructions provided

Page 12

1  to you by counsel?
2      A.  The only instructions I've received from
3  counsel relate to my assignment.
4      Q.  And what about instructions from anyone other
5  than counsel?
6      A.  There are no instructions from anyone other
7  than counsel.
8      Q.  All right.  So the only part of your opinions
9  that are dependent on an instruction from counsel would
10 be that you received the assignment; is that right?
11     A.  That's correct.
12     Q.  All right.
13         Are you an economist?
14     A.  I am not.
15     Q.  Are you an expert in ethics?
16     A.  I am an expert in ethics as it relates to
17 marketing because of my marketing expertise, and there
18 are certainly ethical concepts within data science and
19 statistics that I consider myself an expert in.
20     Q.  Have you ever taught a course on business
21 ethics?
22     A.  No.
23     Q.  Published any papers that concern ethics?
24         MR. RENARD:  Objection to form.
25         THE WITNESS:  I have not published any

Page 13

1  academic papers that concerned ethics.
2  BY MR. ROSSON:
3      Q.  What about other papers?
4      A.  I have published white papers that touch on
5  ethical concepts.
6      Q.  When you say "touch on ethical concepts," what
7  do you mean?
8      A.  I mean concepts such as marketplace
9  participation by advertisers and publishers.
10     Q.  Have you ever taken an ethics course?
11     A.  I have not.
12     Q.  You work for a private company, Data Insights,
13 in addition to being a professor; is that right?
14     A.  That's correct.  In addition to being a
15 professor at the University of Montana, I have a data
16 science consulting company that I founded.
17     Q.  Do people hire you for ethics advice?
18         MR. RENARD:  Objection to form.
19         THE WITNESS:  Not specifically for ethics
20 advice.
21 BY MR. ROSSON:
22     Q.  Have people ever hired you for ethics advice?
23         MR. RENARD:  Same objection.
24         THE WITNESS:  My clients have asked for my
25 ethical opinions as part of my consulting work.

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

BY MR. ROSSON:

Q. Would you say you have specialized skills in the field of business ethics?

A. As it relates to digital marketing and marketing generally, I would say yes.

Q. Are you a survey expert?

A. Yes.

Q. Are you an expert on what is fair?

MR. RENARD: Objection to form.

THE WITNESS: In certain fields, such as digital marketing, I consider myself an expert on what is fair.

BY MR. ROSSON:

Q. Would you say you have specialized knowledge about what is fair in digital marketing?

A. Yes.

Q. Are you an expert in transparency?

A. Again, as it relates to digital marketing, yes.

Q. And same questions. Have you ever taught a university course on fairness?

MR. RENARD: Objection to form.

THE WITNESS: I have taught university courses that deal with fairness as it relates to research.

Page 15

BY MR. ROSSON:

Q. What do you mean by that?

A. As part of qualitative and quantitative research on human subjects, we undergo institutional review board process and fairness and transparency as part of that process.

Q. I see.

Are you talking about research where the subjects of the research would be human beings?

A. Yes, that's correct.

Q. Okay. What about other than that?

MR. RENARD: Objection to form.

THE WITNESS: Some of my classes deal with interactions between different business entities, and those classes again touch on issues of fairness and transparency in the business dealings between firms.

BY MR. ROSSON:

Q. And when you're discussing fairness and transparency with your students, where do you draw your own knowledge so that you can teach them?

A. Typically from entities like the American Marketing Association which publishes a code of ethics.

Q. Did you rely on the American Marketing Association code of ethics in offering your opinions in this case?

Page 16

A. I did not.

Q. What about other industry sources of what is ethical and fair? Did you rely on any industry sources of what is ethical and fair in offering your opinions in this case?

A. In terms of articles and like the popular press, I don't believe I am relying on those for my estimates of what is ethical and fair. There are places where I am relying on deposition testimony by industry participants.

Q. So setting aside deposition testimony in this case and popular press, are you relying on any other written material for your opinion as to what is fair or transparent?

A. I don't believe so, but I would be happy to refer to my report.

Q. That's fair.

Are you an expert in online auction mechanics?

A. Yes.

Q. Are you an expert in online auction design?

A. Can you tell me what you mean by "design" here?

Q. Yes. I mean expertise in the creation of an online auction system.

A. Yes.

Page 17

Q. Have you ever been engaged to help set auction rules?

MR. RENARD: Objection to form.

THE WITNESS: I have advised on the creation of auction rules as part of my work at Microsoft.

BY MR. ROSSON:

Q. And in that instance, were you advising the exchange owner?

A. Yes, the firm that ran the exchange.

Q. Okay. Who was that firm?

A. At the time it was called AppNexus.

Q. So you have advised AppNexus in the past; is that correct?

A. As part of AppNexus's relationship with Microsoft, I provided advice to AppNexus.

Q. Okay.

Can you just give me a thumbnail of the subject matter you were advising on?

MR. RENARD: Objection to form.

THE WITNESS: I would say the subject matter I was advising on was related to what we internally called the matching problem determining winning bids in an option environment.

BY MR. ROSSON:

Q. As part of that work, were you providing

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1 advice about what would be fair?
2     A.  As part of that work, I was providing advice
3 about disclosure of auction rules.
4     Q.  Okay.  And providing -- when you were
5 providing advice of disclosure of auction rules, were
6 you offering advice about what would be fair to disclose
7 versus what would not be fair to disclose?
8     A.  Yes, I think that's a fair characterization of
9 the type of advice.
10     Q.  Excuse me.
11         Are you an expert in algorithm design?
12     A.  Yes.
13     Q.  Are you an expert in data analysis?
14     A.  Yes.
15     Q.  Are you an expert in forestry?
16     A.  I collaborate with members of the Forestry
17 college here on campus, Forestry and Conservation.  So I
18 have expertise in that area, but I would say in a legal
19 sense of helping a finder of fact gather information
20 about the social science aspects of forestry and
21 conservation, then yes.
22     Q.  Are there any other fields that you consider
23 yourself an expert in that I have not mentioned?
24     A.  I consider myself an expert in statistics.  I
25 consider myself an expert in marketing and digital

Page 19

1 marketing.
2         And nothing else pops to mind.
3     Q.  All right.
4         I'm going to ask you about your prior work
5 experience a little bit.  You're going to have to help
6 me with the words so I don't mispronounce it.
7         Am I pronouncing aQuantive correctly?
8     A.  That was perfect.
9     Q.  Thank you.
10         You were with aQuantive from 1999 to 2007; is
11 that right?
12     A.  That's correct.
13     Q.  And you were a data scientist there; is that
14 correct?
15     A.  My titles varied, but I think "data scientist"
16 would describe all the work I did there.
17     Q.  Did you ever have a client-facing role?
18     A.  Yes, almost all of my roles were partially
19 client facing.
20     Q.  And were clients of aQuantive advertisers?
21     A.  Initially the clients of aQuantive were
22 agencies and advertisers.  We then developed a line of
23 business where the clients were publishers.
24     Q.  So aQuantive was providing services to both
25 agencies and advertisers and publishers; is that right?

Page 20

1     A.  We formed a division that provided services
2 for publishers.  AQuantive had several divisions during
3 the time I worked there.
4     Q.  Okay.
5         And when aQuantive formed its division to
6 advise publishers, did its work in advising agencies and
7 advertisers continue or did it cease?
8     A.  The work advising agencies and advertisers
9 continued.
10     Q.  So aQuantive was advising agencies and
11 advertisers and publishers at the same time; is that
12 right?
13     A.  Yes, that's correct.
14     Q.  Okay.
15         What proportion of your career has been spent
16 working with advertisers as compared to publishers?
17         MR. RENARD:  Objection to form.
18         THE WITNESS:  For the portion of my career
19 related to marketing, I would say that roughly
20 50 percent of the time has been spent on the agency and
21 advertiser side.  Roughly 20 percent of the time has
22 been spent on the publisher, or sell side, and the
23 remaining 30 percent was working on technologies that
24 may have spanned multiple entities or might not fit that
25 description.

Page 21

1 BY MR. ROSSON:
2     Q.  Just to orient you, I'm looking at Paragraph 6
3 of your opening report.  You describe how you were the
4 first analyst to work on DrivePM and had shared
5 responsibility for developing algorithms generating tens
6 of millions of dollars in profit; is that right?
7     A.  That's correct.
8     Q.  And would you describe this algorithm as an ad
9 buying tool?
10     A.  The work at DrivePM, I would describe as an
11 advertising network primarily and in the modern
12 marketing taxonomy would be the forbearer of a supply
13 side platform or SSP.
14     Q.  Was DrivePM trading on its own account, or was
15 it offering software to its clients?
16         MR. RENARD:  Objection to form.
17         THE WITNESS:  DrivePM acquired inventory in
18 several different ways.  Some through revenue sharing
19 agreements, some through more direct arbitrage type
20 arrangements where we would purchase inventory.
21 BY MR. ROSSON:
22     Q.  How did the algorithms that you mention in
23 Paragraph 6 of your opening report generate profit?
24     A.  The business of DrivePM was a business of
25 aligning inventory that was available for sale with

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1  entities who were interested in buying that inventory,
2  and I worked on optimization algorithms to facilitate
3  those matches and created profit by taking a technology
4  fee on the transactions that were executed.
5      Q.  So when transactions were executed, DrivePM
6  would take a technology fee.  Do I have that right?
7      A.  Yes, similar to an ad serving fee.
8      Q.  Do you agree that in the marketing world data
9  is a valuable asset?
10      A.  Yes, I do agree with that.
11      Q.  Do you agree that algorithms are a valuable
12  asset?
13      A.  Yes, I think it is somewhat difficult to speak
14  about these things in complete generality, but in broad
15  strokes, algorithms are valuable.
16      Q.  Is it true in your experience that companies
17  don't tend to give away their data or algorithms to the
18  public?
19      MR. RENARD:  Objection to form.
20      THE WITNESS:  I think that is a question that
21  probably deserves specific analysis for a given
22  scenario.  When we talk about giving away algorithms or
23  data to the public, what I am thinking about is
24  releasing consumer information back to consumers or
25  developed intellectual property to other software

Page 23

1  developers, and I think that -- I can think of many
2  examples where that happens.
3  BY MR. ROSSON:
4      Q.  Is it true in your experience that companies
5  don't tend to give away data or algorithms for free?
6      A.  I think it really varies.  One example I might
7  offer is ChatGPT is very famous right now.  The "T" in
8  ChatGPT stands for "transformer," which was a technology
9  or algorithm that was developed within Google and
10  released for free.
11      Q.  What about in the marketing world?
12      MR. RENARD:  Objection to form.
13      THE WITNESS:  I'm not exactly sure what you
14  mean by release a marketing algorithm for free.
15  BY MR. ROSSON:
16      Q.  Let me do an example.
17      Did you ever share the DrivePM algorithms with
18  your competitors?
19      A.  We did not share the internal workings of
20  DrivePM with competitors.
21      Q.  Did you ever share the DrivePM algorithms with
22  other bidders?
23      A.  I'm not sure what you mean by "other bidders"
24  in this context.
25      Q.  Well, correct me if I'm wrong, I understood

Page 24

1  DrivePM to be an algorithm that helps match inventory
2  with bidders; is that right?
3      A.  I would maybe restate it to say match
4  publisher inventory with advertisers who wanted to buy
5  that.  It was not an auction in the same sense that an
6  entity like AppNexus or AdX was.
7      Q.  Did you ever share the DrivePM source code
8  with bidders who desired to acquire publisher inventory?
9      A.  We did --
10      MR. RENARD:  Objection to form.
11      THE WITNESS:  We did not share the source
12  code; we shared the parameters that we used to perform
13  the optimization with both advertisers and publishers in
14  an effort to encourage them to include information in
15  our system that would allow us to match -- or if the
16  publisher's inventory or place more ads on behalf of the
17  advertiser.
18  BY MR. ROSSON:
19      Q.  Who did you share the source code with?
20      MR. RENARD:  Objection to form.
21      THE WITNESS:  The source code remained
22  internal, a trade secret.
23  BY MR. ROSSON:
24      Q.  Would you say that DrivePM source code gave it
25  a competitive advantage?

Page 25

1      MR. RENARD:  Objection to form.
2      THE WITNESS:  I think the source code of
3  DrivePM was part of our competitive advantage.
4  BY MR. ROSSON:
5      Q.  And was DrivePM engaging in arbitrage?
6      A.  DrivePM was engaging in arbitrage on the sell
7  side, where we were purchasing inventory from some
8  publishers and then reselling that inventory.
9      Q.  So publishers would sell inventory to DrivePM
10  which would then sell that inventory to other parties;
11  is that right?
12      A.  Yes, some of our inventory came in that way.
13      Q.  Do you ever remembering -- remember asking
14  yourself if that practice of DrivePM was ethical?
15      MR. RENARD:  Objection to form.
16      THE WITNESS:  Yes.
17  BY MR. ROSSON:
18      Q.  Did you conclude that it was ethical?
19      A.  Yes, I concluded that our participation in the
20  advertising ecosystem via DrivePM was ethical.
21      Q.  How did you make that decision?
22      A.  I evaluated the extent to which we were being
23  fair with the companies we were working with and whether
24  or not we were unfairly disadvantaging certain
25  participants over others.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1    Q.  Which participants?
2        MR. RENARD:  Objection to form.
3        THE WITNESS:  Well, I was evaluating whether
4    or not we were unfairly advantaging any particular
5    advertisers over others and also any publishers over
6    others.  And this was a topic at aQuantive that was very
7    sensitive for us because we also owned an advertising
8    agency called Avenue A, then called Avenue A/Razorfish,
9    then called Razorfish.  That gave us in the marketplace
10   a potential line of attack by our competitors that we
11   were unfairly treating our internal agency over external
12   agencies.  So we were, both at Atlas and at DrivePM,
13   extremely sensitive to appearance of impropriety or
14   unfair dealing.
15   BY MR. ROSSON:
16       Q.  DrivePM's source code gave it an advantage
17   over its competitors, right?
18       MR. RENARD:  Objection.  Form.
19       THE WITNESS:  I think so.  I think that our
20   source code gave us an advantage over other ad networks.
21   BY MR. ROSSON:
22       Q.  And that put DrivePM in an unequal position
23   with other ad networks, right?
24       MR. RENARD:  Objection to form.
25       THE WITNESS:  I'm not sure what you mean by

Page 27

1    "unequal" here.
2    BY MR. ROSSON:
3        Q.  I mean an advantage that DrivePM had developed
4    source code that it believed worked better.
5        MR. RENARD:  Same objection.
6        THE WITNESS:  In the sense that we felt like
7    we were doing a better job matching advertisers and
8    publishers, that gave us a competitive advantage
9    relative to other advertising networks.
10   BY MR. ROSSON:
11       Q.  Did you consider the ethics of having a
12   competitive advantage over other ad networks through
13   DrivePM making a better product?
14       MR. RENARD:  Objection to form.
15       THE WITNESS:  No.  I think we considered that
16   aspect of the business competition in the marketplace.
17   BY MR. ROSSON:
18       Q.  And to put the question bluntly, do you
19   believe that competition in the marketplace is
20   unethical?
21       MR. RENARD:  Objection to form.
22       THE WITNESS:  I do not believe that
23   competition in the marketplace is unethical.
24   BY MR. ROSSON:
25       Q.  Your work at aQuantive predated -- well, let

Page 28

1    me retract that and just orient you.
2        I'm still on Paragraph 6 of your opening
3    report, and I'm looking at a sentence that says, "The
4    creation of DrivePM presaged the programmatic display
5    revolution," and then it continues.
6        Do you see that sentence?
7    A.  I do.
8    Q.  Is it true that all of your work at aQuantive
9    predated the era of programmatic advertising?
10   A.  My work at aQuantive predated the era of
11   programmatic advertising when we were required by
12   Microsoft.  I was working on programmatic.
13   Q.  All right.  So your aQuantive time was prior
14   to the programmatic era and your Microsoft time was
15   during the programmatic era; is that right?
16   A.  My Microsoft time was at the beginning of the
17   programmatic error -- era.
18   Q.  Okay.
19   A.  Apologies.
20   Q.  Am I otherwise correct on the division?
21   A.  Yes.  AQuantive was acquired before large-
22   scale programmatic.  We worked with Right Media,
23   R-i-g-h-t, that was doing some programmatic work, but at
24   aQuantive we were not engaged in programmatic other than
25   analyzing those sort of early days of programmatic.

Page 29

1    Q.  Thank you.
2        While you were at aQuantive, was DoubleClick
3    aQuantive's primary competitor?
4    A.  Yes.  There was -- there were one or two other
5    competitors in the market:  ValueClick, a company called
6    BlueKai, B-l-u-e-K-a-i.  But DoubleClick was our primary
7    competitor.
8    Q.  And aQuantive was acquired by Microsoft; is
9    that correct?
10   A.  That's correct.
11   Q.  Microsoft lost a lot of money on that
12   transaction; is that right?
13   A.  Yes.  Those kinds of accounting evaluations
14   happened well above my level, but I know that Microsoft
15   wrote down a substantial portion of its aQuantive
16   acquisition.
17   Q.  $6.2 billion; is that right?
18       MR. RENARD:  Objection to form.
19       THE WITNESS:  $6.2 billion was the price of
20   the acquisition.  Then the agency portion of the
21   business was sold to Publicis, and so my impression was
22   that the write-down was for the Atlas portion of the
23   acquisition and was less than 6 billion, but I could be
24   wrong.
25

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1  BY MR. ROSSON:
2     Q.  All right.  Your answer may have corrected me
3  on this, but I'm just going to have to ask you again to
4  make sure I understand.
5           Did Microsoft shut down aQuantive?
6     A.  Not exactly.
7     Q.  Can you ex- -- correct me on how Microsoft
8  ingested aQuantive?
9     A.  "Ingested" is the perfect word.
10          After the acquisition, Microsoft sold the
11  agency division, which I believe at the time was called
12  Avenue A/Razorfish.  Then DrivePM was absorbed into
13  essentially MSN, and the Atlas assets were folded into
14  Microsoft's advertiser and publisher solutions group.
15    Q.  Thank you.
16          So now moving to the Microsoft era for when
17  you worked there.  Was that 2007 to 2011?
18    A.  Yes, I believe that my -- the end of my time
19  at Microsoft was maybe March of 2012.
20    Q.  Did you have a client-facing role at
21  Microsoft?
22    A.  Yes, although less client facing than at
23  aQuantive.
24    Q.  What do you mean by that?
25    A.  Much of my work at Microsoft was focused more

Page 31

1  on internal tools and algorithms, and so I met with
2  agencies and advertisers, met with publishers, met with
3  exchanges, and so those were all client facing.  I
4  believe that Microsoft considered all of them clients.
5           And then in my final role at Microsoft which
6  was research director at Microsoft TV, I interacted with
7  clients directly quite a bit.
8     Q.  Did you work with source code while you were
9  at Microsoft?
10    A.  Yes.
11    Q.  Did you share it with Microsoft's competitors?
12    A.  No.
13    Q.  Did you share it with Microsoft's customers?
14    MR. RENARD:  Dr. Chandler, one thing I would
15  just caution you, to the extent that any of these
16  questions with respect to your involvement at -- within
17  firms within the industry, implicate matters of
18  contractual confidentiality or obligations that you
19  might have with respect to the nondisclosure of
20  information, that you point that out to counsel and then
21  we'll take it from there.
22    THE WITNESS:  Understood.
23          I think I can say that, that we did not share
24  source code with our customers; we did share information
25  about source code.

Page 32

1  BY MR. ROSSON:
2     Q.  Why didn't you share the source code?
3     MR. RENARD:  Objection to form.
4     THE WITNESS:  That was Microsoft's policy.
5  BY MR. ROSSON:
6     Q.  Did you have an ethical issue with the policy?
7     MR. RENARD:  Objection to form.
8     THE WITNESS:  I did not have an ethical
9  objection to Microsoft's decision to not release its
10  source code to customers or competitors.
11  BY MR. ROSSON:
12    Q.  Have you ever worked directly for an online ad
13  exchange?
14    A.  I've never been employed by an online ad
15  exchange.
16    Q.  Have you ever had a role where you were
17  responsible for helping an online ad exchange run its
18  business?
19    A.  As I mentioned --
20    MR. RENARD:  Objection to form.
21    THE WITNESS:  As I mentioned earlier, as part
22  of the work at Microsoft, I provided advice to AppNexus
23  and Ad Exchange.
24  BY MR. ROSSON:
25    Q.  We talked about how aQuantive was providing

Page 33

1  services to advertisers and publishers.  Do you remember
2  that?
3     A.  Yes.
4     Q.  Do you believe that was a conflict of interest
5  for aQuantive?
6     A.  I believe that it created potential conflicts
7  of interest, and so we were extremely careful to
8  separate those parts of the business and attempted to
9  ensure that work done on the advertiser side of the
10  business was not informed by work done on the publisher
11  side of the business and vice versa.
12    Q.  Do you believe that aQuantive had an actual as
13  opposed to potential conflict of interest?
14    MR. RENARD:  Objection to form.
15    THE WITNESS:  I believe that we did a good job
16  separating those lines of business.
17  BY MR. ROSSON:
18    Q.  Do you believe separating the lines of
19  business was sufficient such that aQuantive did not have
20  a conflict of interest?
21    MR. RENARD:  Objection to form.
22    THE WITNESS:  I believe that to be true.
23  BY MR. ROSSON:
24    Q.  Okay.
25          Do you believe that aQuantive had an inherent

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 conflict of interest by providing services to publishers
2 and advertisers at the same time?
3     MR. RENARD: Same objection.
4     THE WITNESS: I would say that there was an
5 inherent potential for conflict of interest that we
6 worked hard to avoid.
7 BY MR. ROSSON:
8     Q. Are you distinguishing between an inherent
9 conflict of interest and an inherent potential for
10 conflict of interest?
11     MR. RENARD: Same objection.
12     THE WITNESS: Yes.
13 BY MR. ROSSON:
14     Q. Can you explain the distinction to me, please.
15     A. I think our relationships on the buy and sell
16 side created an inherent potential conflict of interest
17 which we took measures to prevent becoming a realized
18 conflict of interest.
19     Q. You agree there's a difference between the
20 potential conflict of interest and a realized conflict
21 of interest?
22     MR. RENARD: Objection to form.
23     THE WITNESS: Yes.
24 BY MR. ROSSON:
25     Q. And you believe that aQuantive did not have a

Page 35

1 realized conflict of interest by providing services to
2 both advertisers and publishers; is that correct?
3     A. I think based on the measures we took to
4 ensure separation and the nature of our business where
5 the way in which our publisher side of the business was
6 organized, I think, prevented a realized conflict of
7 interest.
8     Q. You worked for a company called Data Insights;
9 is that right?
10     A. Yes. Data Insights is my consulting business.
11     Q. Are you the founder?
12     A. Yes.
13     Q. And is your title managing director?
14     A. I think "managing partner" might be what I put
15 on my resumé, but...
16     Q. And what are your responsibilities for
17 Data Insights?
18     MR. RENARD: Objection to form.
19 BY MR. ROSSON:
20     Q. Let me clarify that.
21     What are your job responsibilities at
22 Data Insights?
23     A. They are the full range of jobs that you might
24 expect for someone at a small consulting business. I do
25 everything from payroll and accounting, to negotiating

Page 36

1 client agreements, to carrying out our consulting work.
2     Q. How many employees does Data Insights have?
3     A. We have four people who are full-time with us,
4 and I would say around 15 people who are part-time.
5     Q. Do you consider Data Insights a major player
6 in the online advertising industry?
7     A. I do not.
8     Q. Does Data Insights have publisher clients?
9     A. We have had publisher clients in the past.
10     Q. Does Data Insights currently have publisher
11 clients?
12     A. No, I do not believe we do.
13     Q. When was the last time Data Insights had a
14 publisher client?
15     A. Right before the pandemic.
16     Q. And I expect Data Insights has advertiser
17 clients; is that correct?
18     A. That's correct.
19     Q. Okay.
20     Can you give me a breakdown, an estimate of
21 the percentage of work Data Insights does on the
22 publisher side versus the advertiser side?
23     MR. RENARD: Objection to form.
24     THE WITNESS: I would say, again, probably
25 about half is on the advertiser or agency or buy side,

Page 37

1 about 30 to 35 percent would be technology companies in
2 the space that operate in a variety of ways. Some are
3 purely on the buy side, some are on the sell side, and
4 then the remainder would be publishers for our marketing
5 business.
6 BY MR. ROSSON:
7     Q. About how many hours a week do you work for
8 Data Insights? And I'll back up.
9     To be transparent, I'm trying to get a
10 breakdown between your professor hat and your private
11 sector hat.
12     So here's my question: About what percentage
13 of your time in a week is spent working for
14 Data Insights?
15     A. My teaching and academic responsibilities vary
16 quite a bit throughout the year. If we look at it on an
17 annual basis, I spend about 1,000 hours a year on my
18 academic responsibilities and more like 1,800 hours a
19 year on my Data Insights responsibilities.
20     Q. Has that breakdown been true since 2015?
21     A. In broad terms.
22     Q. You charge your Data Insights clients $750 an
23 hour; is that right?
24     A. That is my expert witness rate. That is not
25 the rate I charge for other projects.

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1    Q. So your expert rate in this case is different
2 from your private sector rate?
3    A. Yes. If I was developing algorithms or doing
4 data analysis, I charge a different rate.
5    Q. What is that rate?
6    A. It varies by client, but typically it's around
7 $350 an hour.
8    Q. Has a company ever engaged Data Insights to
9 design an auction for them?
10    MR. RENARD: Objection to form.
11    THE WITNESS: We have never been engaged
12 purely to design an auction; we have been engaged to
13 advise companies that were running auctions or
14 participating in auctions.
15 BY MR. ROSSON:
16    Q. In terms of building an online ad exchange
17 from the ground up, has a company ever reached out and
18 asked Data Insights to help with that?
19    A. No.
20    Q. In any of your jobs, did you have a
21 responsibility for mergers and acquisitions?
22    A. In my jobs I had responsibilities, shared
23 responsibilities that dealt with mergers and
24 acquisitions. So some of our clients are small startups
25 who may be interested in being acquired. And so I have

Page 39

1 worked on mergers and acquisitions from the being-
2 acquired side. I have also worked with large companies
3 who were interested in acquiring or merging with other
4 companies.
5    Q. In that part of your work, the mergers and
6 acquisitions, is any part of that work making a
7 determination on whether a merger or acquisition would
8 be fair?
9    A. I have occasionally weighed in on things like
10 regulatory concerns, but I don't recall specifically
11 weighing in on fairness as a standalone question.
12    Q. And here for this question by "fairness," I
13 mean your personal sense of ethics. Have you ever been
14 asked to give your ethical opinion on whether a merger
15 is ethical or not?
16    MR. RENARD: Objection to form.
17    THE WITNESS: As part of my work at
18 Data Insights, I don't believe I have.
19 BY MR. ROSSON:
20    Q. Okay.
21    You mentioned regulatory considerations; is
22 that right?
23    A. Yes.
24    Q. Okay.
25    Is there an area of federal or state

Page 40

1 regulation that you'd consider yourself an expert in?
2    A. No.
3    Q. Okay.
4    Have you ever been called on to advise on
5 whether a merger was allowable under the antitrust laws?
6    A. No.
7    Q. Under any competition law?
8    MR. RENARD: Objection to form.
9    THE WITNESS: Certainly I was not the person
10 making the decision. I have offered an opinion on that
11 in a -- as a consultant.
12 BY MR. ROSSON:
13    Q. On whether a merger or acquisition was
14 permitted by competition laws?
15    A. I would reframe it slightly to say whether or
16 not market participants would view an acquisition as
17 anticompetitive. But, again, I'm speaking from the
18 perspective of a digital marketing expert, not an
19 economist and not someone who is a legal expert.
20    Q. Have you ever been called on to decide whether
21 a merger would make a company dominant in an industry?
22    A. I have not.
23    Q. In any of your jobs or any of your job
24 experience, have you ever seen the government demand
25 that a company help its competitors?

Page 41

1    MR. RENARD: Objection to form.
2    THE WITNESS: Can you say that again for me?
3 BY MR. ROSSON:
4    Q. Drawing on all your job experience, do you
5 remember a time when a government entity came in and
6 demanded that a company help its competitors?
7    MR. RENARD: Same objection.
8    THE WITNESS: And when you say -- I mean, are
9 these things that I have like observed or things I have
10 participated in as an employee or consulted?
11 BY MR. ROSSON:
12    Q. First, let's go with observed.
13    A. Certainly I have, living in Seattle in the
14 late '90s, seen the antitrust decisions against
15 Microsoft. I observed the decoupling of operating
16 systems and browsers in a way that I think would help a
17 company like Firefox or Google with the Chrome browser.
18 So that kind of thing.
19    Q. All right.
20    And then, first of all, do any other examples
21 come to mind?
22    A. Recently the Epic Games lawsuit against Apple.
23    Q. Any other examples?
24    A. As I sit here right now, those are the only
25 two that come to mind.

11 (Pages 38 - 41)

CONFIDENTIAL

1     Q.   And so for the examples that you provided,
2  were you personally involved in any of those actions?
3     A.   No.
4     Q.   All right.
5         You are a clinical professor at the
6  University of Montana; is that right?
7     A.   That's correct.
8     Q.   Can you explain to me what the clinical part
9  of "clinical professor" means?
10     A.   Yes.  Clinical professors are professors who
11  have academic responsibilities but also have business
12  experience or business ties.  The term I think came from
13  medical schools where practicing doctors would also be
14  professors.
15     Q.   Are you on the tenure track?
16     A.   No.  Clinical professors at the
17  University of Montana are not tenurable.
18     Q.   So you do not have tenure; is that right?
19     A.   That is correct.  I do not have tenure.
20     Q.   Okay.
21         Are the opinions -- excuse me.  Mind if I
22  start over?
23     A.   [Gesture.]
24     Q.   Are all of the opinions in your report within
25  an academic field that you publish in?

1         MR. RENARD:  Objection to form.
2         THE WITNESS:  No.  I think that most of the
3  opinions in my reports are in fields where I have
4  industry experience rather than publication experience.
5  There are exceptions.  For instance, I have published in
6  areas related to surveys, and my rebuttal report has
7  opinions about surveys.
8  BY MR. ROSSON:
9     Q.   So your opinions are summarized in -- your
10  opening opinions are summarized in Paragraph 23 of your
11  opening report.
12         Do you mind taking a look at that?
13     A.   I am there.
14     Q.   Okay.
15         For these opening opinions, are there any
16  opinions you're offering where you've published in that
17  academic field?
18     A.   No.
19     Q.   Do you live in Montana?
20     A.   Part of the year.
21     Q.   And part of the year you live in Minnesota?
22     A.   That's correct.
23     Q.   Do you teach in person at the
24  University of Montana?
25     A.   In the fall semester I teach in person, and in

1  the spring semester I teach online.
2     Q.   Got it.
3         Has a court ever declined to receive your
4  testimony?
5     A.   No.
6     Q.   Have you ever been struck as an expert?
7     A.   No.
8     Q.   Have you ever offered opinions in court about
9  online auctions?
10         MR. RENARD:  Objection to form.
11         THE WITNESS:  Outside of this matter, no.
12  BY MR. ROSSON:
13     Q.   Have you ever offered opinions in court about
14  online auction mechanics?
15         MR. RENARD:  Same objection.
16         THE WITNESS:  Again, outside of this, no.
17  BY MR. ROSSON:
18     Q.   Have you ever offered opinions in court about
19  fairness and transparency?
20         MR. RENARD:  Same objection.
21         THE WITNESS:  I have offered opinions about
22  fairness.  And transparency, I guess, to amend my
23  answer.
24  BY MR. ROSSON:
25     Q.   Is that the Juul litigation?

1     A.   Yes.
2     Q.   Okay.  What about other than the Juul
3  litigation?
4     A.   In --
5         MR. RENARD:  Objection to form.
6         THE WITNESS:  Other than the Juul litigation,
7  I have offered opinions in the trial against the --
8  where the defendants were USC's Rossier School of
9  Education where I talked about fairness and
10  transparency.
11  BY MR. ROSSON:
12     Q.   Okay.  Have you ever offered opinions in court
13  about substitutability?
14         MR. RENARD:  Objection to form.
15         THE WITNESS:  No.
16  BY MR. ROSSON:
17     Q.   Have you ever offered opinions in court about
18  whether a company dominates a market?
19         MR. RENARD:  Same objection.
20         THE WITNESS:  My Juul opinions touched on
21  Juul's market share, and so in that sense, yes, but that
22  is the only sense I can think of.
23  BY MR. ROSSON:
24     Q.   Have you ever offered opinions in court about
25  advertiser expectations?

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1    MR. RENARD: Same objection.
2    THE WITNESS: The USC and Juul cases touch on
3 those cases, but I might need to ask questions to
4 understand with certainty.
5 BY MR. ROSSON:
6    Q. We may come back to that, but for now, have
7 you ever offered opinions in court about what publishers
8 expect?
9    MR. RENARD: Same objection.
10    THE WITNESS: Other than this matter, no.
11 BY MR. ROSSON:
12    Q. Okay.
13    Before you were hired on this case, have
14 you -- excuse me.
15    Before you were hired on this case, had you
16 ever heard of the Google auction mechanics you discuss
17 in your opinions?
18    MR. RENARD: Objection to form.
19    THE WITNESS: When you say "Google auction
20 mechanics," are you talking about what I call Google's
21 conducts or are you talking about the auction dynamics
22 such as first price, second price?
23 BY MR. ROSSON:
24    Q. I'll go one by one to make it easier.
25    Before you were hired in this case, had you

Page 47

1 ever heard of reserve price optimization?
2    A. No.
3    Q. Before you were hired in this case, had you
4 ever heard of Dynamic Revenue Sharing?
5    A. No.
6    Q. Before you were hired in this case, had you
7 ever heard of Bernanke?
8    A. Not the Google program Bernanke.
9    Q. Before you were hired in this case, had you
10 ever heard of first look?
11    A. Yes, I had heard about first look as an
12 auction dynamic.
13    Q. And when you'd heard about first look, was
14 that -- well, why don't I just open it up.
15    Tell me when you first heard about first look.
16    A. My recollection is somewhat vague, but I would
17 say 2008 or 2009 I heard of first look as it relates to
18 digital advertising auctions.
19    MR. RENARD: Mr. Rosson, I don't want to
20 interrupt your flow. Whenever you're at a convenient
21 breaking point, we've gone over an hour.
22    MR. ROSSON: Sure.
23    MR. RENARD: We'll just take a break.
24    MR. ROSSON: Two minutes.
25    MR. RENARD: Sure.

Page 48

1 BY MR. ROSSON:
2    Q. In this 2008-2009 period when you first heard
3 of first look, was that in connection with something
4 Google was doing?
5    A. No. It was in abstract terms.
6    Q. I see.
7    And what about last look? When did you first
8 hear of last look?
9    A. About the same time.
10    Q. Okay.
11    And when you heard about first and last look,
12 was it in relation to something a specific company was
13 doing?
14    A. It was related to the waterfall auction
15 process where publishers, networks, or exchanged would
16 enter what we called line items at different places in
17 the waterfall, and so we referred to the first position
18 as "first look" and the last position as "last look." I
19 can't recall right now if it was in relation to specific
20 companies or if we were talking about it in terms of
21 general auction dynamics.
22    Q. Were you aware in 2008 or 2009 of whether
23 auctions were using a first or last look feature?
24    A. Again, in the waterfall auction setup, we were
25 aware of it, and we knew that any waterfall would have

Page 49

1 either a single participant or a set of participants
2 operating in the first tier of that waterfall and then
3 in the final tier.
4    Q. And for that answer you mean in the industry
5 as a whole, not specifically to a Google auction; is
6 that right?
7    A. That's correct. I am not speaking
8 specifically of a Google auction.
9    Q. Okay.
10    Would you like to take a break?
11    A. Yeah, I think that would be great.
12    MR. ROSSON: Great. Let's go off the record.
13    THE VIDEOGRAPHER: This is the end of Media 1.
14 We are going off the record at 10:16 a.m.
15    (RECESS TAKEN)
16    THE VIDEOGRAPHER: We are back on the record
17 with Media 2 at 10:32 a.m.
18 BY MR. ROSSON:
19    Q. Dr. Chandler, is there any testimony that
20 you've given so far that you would like to change or
21 correct?
22    A. No.
23    Q. For these next questions, I want to set aside
24 any work you did on this case, communications with
25 lawyers and so on. Don't want to know about those. Are

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1  you with me?
2      A.  Yes.
3      Q.  Okay.
4      So before you were engaged on this case, in
5  your private sector and academic life, had you ever
6  reviewed Google's disclosures about its auction
7  features?
8      MR. RENARD:  Objection to form.
9      THE WITNESS:  I have a vague recollection of
10  visiting like the AdX help pages and Google Ad pages as
11  part of my client work, but I did not visit them with an
12  eye toward auction dynamic disclosures.
13  BY MR. ROSSON:
14      Q.  Okay.
15      Do you remember when you visited those Google
16  help pages?
17      A.  I would guess that it was maybe 2015 or 2016.
18  I'm thinking of a particular client who was advertising
19  via AdX.  And so I think I might have looked at those
20  pages as part of my research, but I can't recall the
21  contents of the pages at that time.
22      Q.  Okay.  And what about after that -- and
23  correct me if I get the years wrong -- 2015-2016 time
24  period, do you remember reviewing those disclosures
25  again before you were engaged?

Page 51

1      A.  I don't believe so.
2      Q.  Okay.
3      Before you were engaged on this case, did you
4  know whether Google ran experiments on auction traffic?
5      A.  No.
6      Q.  Before you were engaged on this case, do you
7  know whether Google ran optimizations on auction
8  traffic?
9      A.  No.
10      Q.  Before you were engaged on this case, did you
11  know whether Google could adjust bids in its discretion?
12      A.  No.
13      MR. RENARD:  Objection to form.
14      THE WITNESS:  No.  If I'm correctly
15  understanding what you mean by "in its discretion," I
16  think the answer is no.
17  BY MR. ROSSON:
18      Q.  Okay.
19      Before you were hired in this case, did you
20  know whether one way or the other Google could adjust
21  bids at all?
22      MR. RENARD:  Objection to form.
23      THE WITNESS:  I knew that via DV360, Google
24  provided tools that allowed bid adjustment, but did not
25  know anything beyond that.

Page 52

1  BY MR. ROSSON:
2      Q.  Okay.
3      From the period of 2016 up to when you were
4  hired on this case, do you remember reviewing any Google
5  disclosures about its auction mechanics?
6      A.  No.
7      Q.  Have you ever recommended that a client use
8  any of Google's auction tools?
9      A.  Yes.
10      Q.  Do you have clients who use Google auction
11  tools?
12      A.  Yes.
13      Q.  Has that been the case from 2015 through the
14  present?
15      A.  There may be short periods of time where that
16  was not the case, but I believe that it even predates
17  2015.
18      THE REPORTER:  2015?
19      THE WITNESS:  2015.
20      THE REPORTER:  Thank you.
21      THE WITNESS:  And also, the advertiser tool
22  that I'm saying is "DV360."  I'm just from the south, so
23  they sound the same.
24  BY MR. ROSSON:
25      Q.  Forgive me if I just asked this.  Do you have

Page 53

1  clients who do not use Google tools?
2      A.  Currently I believe all of my clients use
3  Google tools.  I have had clients that do not use Google
4  tools.
5      Q.  Is one of your jobs at Data Insights to advise
6  clients about Google tools?
7      MR. RENARD:  Objection to form.
8      THE WITNESS:  I would not consider that one of
9  my primary jobs.  I am occasionally asked about tool
10  recommendations, but I am -- that is not the primary
11  type of consulting I provide.
12  BY MR. ROSSON:
13      Q.  Do you have clients at Data Insights who use
14  AdX?
15      A.  I have clients that participate in AdX
16  auctions.
17      Q.  And is part of your role at Data Insights to
18  advise clients about AdX?
19      MR. RENARD:  Objection to form.
20      THE WITNESS:  My work at Data Insights
21  typically involves analyzing data for clients and some
22  of that data has run through AdX.  So in that sense,
23  yes.
24  BY MR. ROSSON:
25      Q.  Help me understand what work you're performing

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1  with client data when you receive it. I don't need
2  specifics about an individual client.
3      MR. RENARD: Objection to form.
4      THE WITNESS: The work is highly varied. I
5  would say a large fraction of it is related to measuring
6  marketing effectiveness and making recommendations on
7  optimizations and things like that.
8  BY MR. ROSSON:
9      Q.  As part of that work, do you advise clients
10 about how auction mechanics work?
11     A.  I have done that in the past. I don't have
12 any clients now where I'm currently advising them on how
13 auction mechanics work.
14     Q.  Is that a core part of Data Insights'
15 business?
16     MR. RENARD: Objection to form.
17     THE WITNESS: It's hard for me to know what
18 "core part" means in this sense. Certainly there have
19 been clients where my advice on auction participation
20 was an important part of the engagement to the client.
21 BY MR. ROSSON:
22     Q.  Let me do an example.
23     Is -- to take reserve price optimization as an
24 example, is that the type of auction mechanic that you
25 would advise a client about?

Page 55

1      MR. RENARD: Objection to form.
2      THE WITNESS: If I had been advising a client
3  during the time period when reserve price optimization
4  came out and I knew about reserve price optimization,
5  then, yes, that would be the sort of thing that I would
6  advise a client on.
7  BY MR. ROSSON:
8      Q.  And is the work that you perform for clients,
9  does that involve looking into the rules of online
10 auctions?
11     MR. RENARD: Objection. Form.
12     THE WITNESS: I think knowledge of the auction
13 rules is part of the work, but I wouldn't necessarily
14 classify it as looking into the rules of online
15 auctions.
16 BY MR. ROSSON:
17     Q.  So would a typical client ever ask you the
18 question: What are the rules of this online auction?
19 Any online auction in particular.
20     MR. RENARD: Objection. Form.
21     THE WITNESS: They might ask something like
22 that or: How does this auction work?
23 BY MR. ROSSON:
24     Q.  And so part of your responsibility would be to
25 tell clients how auctions work. Is that fair?

Page 56

1      A.  Yes, or describe online auction dynamics.
2      Q.  Okay.
3      Would you agree that the -- one of the
4  functions of Data Insights is to try to help clients
5  maximize their profits?
6      A.  I would say that our job at Data Insights is
7  to help clients achieve their business goals, and most
8  businesses are interested in maximizing their profits.
9  So in that sense, yes.
10     Q.  You want to help companies spend their
11 advertising money efficiently; is that right?
12     MR. RENARD: Objection to form.
13     THE WITNESS: In broad strokes that is one
14 thing that we help clients with.
15 BY MR. ROSSON:
16     Q.  So at Data Insights, all things equal, you
17 would rather Google charge less for its products, right?
18     A.  I'm not sure how that follows.
19     Q.  Do any of your clients -- well, when your
20 clients transact on AdX, you understand there's a take
21 rate; is that right?
22     A.  Yes.
23     Q.  So all things equal, for your clients you'd
24 rather that take rate be higher rather than lower; is
25 that right?

Page 57

1      MR. RENARD: Objection to form.
2      THE WITNESS: I've never been asked to advise
3  on that sort of thing, nor can I think of an example
4  where I recommend a certain auction environment over
5  another based on take rate. Usually I was concerned
6  with the performance of the marketing.
7  BY MR. ROSSON:
8      Q.  Okay.
9      You can't remember a time that you've ever
10 recommended one auction over another on the basis of
11 auction take rates; is that correct?
12     MR. RENARD: Objection to form.
13     THE WITNESS: Perhaps I should say solely on
14 the basis of auction take rates.
15 BY MR. ROSSON:
16     Q.  Are auction take rates a consideration when
17 you recommend different auction platforms to clients?
18     A.  If I'm working with clients on the buy side,
19 then part of my work often involves calculations of
20 return on investment or return on ad spend, and take
21 rate is part of measuring that return.
22     Q.  Would your clients rather pay a lower take
23 rate than a higher take rate?
24     MR. RENARD: Objection to form.
25     THE WITNESS: I think all else being equal, my

15 (Pages 54 - 57)

CONFIDENTIAL

1  clients who are operating in an auction environment
2  would prefer to pay a lower take rate.
3  BY MR. ROSSON:
4      Q.  And all things equal, your clients would
5  rather have greater access to Google's data rather than
6  less access.  Is that fair?
7      A.  Yes, particularly as the data relates to the
8  measurement of marketing performance.
9      Q.  All things equal, you would rather your
10  clients have more control over Google's ecosystem.  Is
11  that fair?
12      MR. RENARD:  Objection to form.
13      THE WITNESS:  I think I would phrase it
14  slightly differently in that my advertising clients
15  would prefer greater control over their data and their
16  ability to measure the performance of their marketing.
17  If we say "control over Google's ecosystem," that does
18  not seem accurate to me.
19  BY MR. ROSSON:
20      Q.  Let's discuss your methodology next.  I'm
21  shifting gears.  Do you understand?
22      A.  Yes.
23      Q.  In preparing your opinions in this case, what
24  was your methodology?
25      A.  In preparing my opinions in the opening

1  report, I applied a standard data science methodology
2  that goes by the name CRISP-DM, C-R-I-S-P hyphen D-M.
3      Q.  Is CRISP-DM mentioned in your opening report?
4      A.  No.  The features of CRISP-DM are mentioned in
5  the report, but I do not call out the methodology by
6  name.
7      Q.  Give me a thumbnail sketch of CRISP-DM.
8      A.  CRISP-DM is a data science methodology that
9  has seven steps and is a standard methodology in data
10  science and data mining.  It was, I think, originally
11  conceived in the late '90s but published in '99 and
12  2000.  And I'm happy to walk through the steps of it,
13  but it's something that I use professionally and it's
14  also something that I teach in my classes.
15      Q.  Is the CRISP -- excuse me.
16      Can the CRISP-DM methodology be used to make a
17  scientific determination about what is fair?
18      A.  I think yes.
19      Q.  Can the CRISP-DM methodology be used to make a
20  scientific determination about what is transparent?
21      A.  Yes.
22      Q.  Other than your work on this case, are you
23  aware of any peer-reviewed research where the CRISP-DM
24  methodology has been used to determine what is fair?
25      A.  I have read academic articles talking about

1  fairness in business practices, but I can't recall if
2  they applied the CRISP-DM methodology.
3      Q.  Other than you in this case, are you aware of
4  anyone ever using the CRISP-DM methodology to make a
5  determination of what is fair?
6      MR. RENARD:  Objection to form.
7      THE WITNESS:  I am not aware of when the
8  CRISP-DM methodology has been applied to the questions
9  of fairness specifically.
10  BY MR. ROSSON:
11      Q.  Or whether it's ever been applied to questions
12  of fairness, correct?
13      A.  Yes, that's correct.
14      Q.  Are you aware of whether the CRISP-DM
15  methodology has ever been applied to a question of
16  whether something is transparent?
17      A.  Other than my application here, I'm not sure
18  if it has been applied to transparency.
19      Q.  And this is by no means to limit your answer.
20  Can you give me four or five sentences about what the
21  CRISP-DM methodology is?
22      A.  Yes.  The CRISP-DM methodology has seven
23  steps.  It begins with business understanding, then
24  proceeds to data understanding.  And those two are
25  depicted as a cycle.  So data understanding informs

1  business understanding and vice versa.
2      From there you move to data preparation, which
3  is the process by which you transform raw data into data
4  that can be used for modeling.  From data preparation we
5  move to modeling, model evaluation, and then deployment.
6  And at the modeling step, sometimes we return to the
7  business understanding and data understanding cycle.
8      Q.  What was your dataset in reaching your
9  opinions?
10      A.  My dataset in reaching my opinions were the
11  materials in this case, the documents produced, the
12  deposition testimony, peer-reviewed literature,
13  information from popular press and trade press, and I
14  outline those sources in my opening report.
15      Q.  Did you say that CRISP-PM -- excuse me.
16      Did you say that CRISP-DM involves a modeling
17  step?
18      A.  Yes.
19      Q.  Did you do modeling for this case?
20      A.  Yes.  In this case the modeling step was the
21  synthesis of the data in the report.  So framing my
22  report via this methodology, the deployment of the model
23  would be the release of the report, and the model would
24  be the opinions in my reports that synthesize the data.
25      Q.  Are you aware of CRISP-DM being used as a

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1   methodology on a nonquantitative dataset?
2       A.  Yes.
3       Q.  Are you offering opinions on the expectations
4   of publishers and advertisers?
5           MR. RENARD:  Objection to form.
6           THE WITNESS:  Yes, I offer opinions on what
7   advertisers and publishers expect in the marketplace.
8   BY MR. ROSSON:
9       Q.  Are you offering opinions on what every
10  publisher expects?
11          MR. RENARD:  Objection to form.
12          THE WITNESS:  I'm offering opinions on general
13  industry practices and what publishers generally would
14  expect.  There are certainly exceptions.
15  BY MR. ROSSON:
16      Q.  What do you mean "there are certainly
17  exceptions"?
18      A.  The ecosystem of digital marketing has so many
19  participants that I would not be comfortable speaking
20  for all publishers without exception.
21      Q.  Is that also true for advertisers?
22      A.  Yes, my opinions about advertisers are what
23  the industry generally accepts and not a blanket
24  statement on every single advertiser.
25      Q.  Do all ad buyers agree on what is fair?

Page 63

1       A.  I think buyers of advertising agree on
2   fairness generally but, again, a blanket statement that
3   covers the entire industry I think is likely to be
4   contradicted in some cases.
5       Q.  It's not possible to make a blanket statement
6   that covers the entire online ad industry about what is
7   fair.  Do you agree?
8           MR. RENARD:  Objection to form.
9           THE WITNESS:  I think we can make a statement
10  about what the industry believes is fair that is true in
11  almost all cases, but I would not say in all cases.
12  BY MR. ROSSON:
13      Q.  What's the confidence interval there?
14          MR. RENARD:  Objection to form.
15          THE WITNESS:  In order to talk about a
16  confidence interval, we need to talk about the dataset
17  we're working with.  In this matter, I have looked at
18  testimony from many advertisers, or ad buyers, and I
19  have reviewed documents from advertisers communicating
20  with Google, and I would estimate that maybe one in a
21  hundred would disagree with my conception of fairness
22  based on my review of the data in this case.
23  BY MR. ROSSON:
24      Q.  What's the basis for that estimation?
25      A.  I'm thinking through the testimony that I've

Page 64

1   reviewed and trying to estimate the number of advertiser
2   perspectives I have seen and trying to think about
3   places where I have seen advertisers disagree about what
4   is fair.
5       Q.  Is the testimony you reviewed a representative
6   sample of all advertisers?
7           MR. RENARD:  Objection to form.
8           THE WITNESS:  I believe in the context of this
9   case it is.
10  BY MR. ROSSON:
11      Q.  Do you know how that dataset of advertisers
12  who gave testimony was constructed?
13      A.  In certain cases I do.  So the documents that
14  I reviewed that were internal to Google, I believe that
15  is a sample of advertisers working with Google,
16  particularly those who are the most engaged because they
17  made an effort to reach out to their Google
18  representatives.
19          In terms of the advertisers who provided
20  third-party depositions, I do not know how that sample
21  was drawn.
22      Q.  Do you know whether the sample of advertisers
23  who provided testimony is a random sample?
24          MR. RENARD:  Objection to form.
25          THE WITNESS:  I do not know if it is a random

Page 65

1   sample.
2   BY MR. ROSSON:
3       Q.  Do you know if it's a representative sample?
4       A.  I believe it to be representative based on my
5   experience in the industry and looking at the list of
6   companies who provided testimony and reading that
7   testimony.  So I think that as a statistician, I would
8   consider it a random sample -- or I'm sorry, a
9   representative sample.  I misspoke.
10      Q.  A representative sample of what overall
11  population?
12      A.  Of advertisers engaged in programmatic
13  advertising at scale.
14      Q.  And do you believe that the number of
15  advertisers who provided testimony is sufficient to form
16  a representative population?
17          MR. RENARD:  Objection to form.
18          THE WITNESS:  I think with my industry
19  experience and familiarity with the advertising
20  landscape, my work dating back to the time at aQuantive,
21  my work at Microsoft, and my work at Data Insights, and
22  applying the testimony that I have reviewed, I can say
23  that that sum total, my experience plus the testimony,
24  represents a representative sample of large advertisers.
25

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1  BY MR. ROSSON:
2      Q.  Of large advertisers?
3      A.  That's correct.  I said "of large
4  advertisers."
5          There is less testimony of small advertisers,
6  and so my conclusions on small advertisers is driven
7  more by my experience working via Data Insights' clients
8  with many small advertisers.
9      Q.  And to go back to the confidence interval, is
10  it your opinion that the data you reviewed to reach your
11  opinions gave you a confidence interval of .01?
12      A.  Yes, I would say a confidence interval or
13  perhaps if we're talking in just a raw number, I would
14  say a probability of error or a p-value of less than
15  .01.
16      Q.  Did you apply any form of Bayesian reasoning
17  to the analysis?
18          MR. RENARD:  Objection to form.
19          THE WITNESS:  I applied Bayesian statistics in
20  a sense that I think would accord with the general
21  principles of Bayesian analysis using data to update
22  prior beliefs to arrive at parameter estimates.
23  BY MR. ROSSON:
24      Q.  Are you familiar with SPSS?
25      A.  Yes.

Page 67

1      Q.  Did you use SPSS?
2      A.  No.
3      Q.  Did you use PSPP?
4      A.  PSPP?  I'm not sure what PSPP is.
5      Q.  It's the open source of --
6      A.  Oh, okay.  Sorry.
7          I did not use that.  I used -- in some places
8  I used the statistical computing language R, just the
9  letter R, and I also used the programming language
10  Python.
11      Q.  Okay.
12          And does your opening report or rebuttal
13  report disclose any analysis you've done in R or Python?
14      A.  The analysis that I'm relying on in R in my
15  rebuttal report is disclosed.
16          I produced the R code to make the charts and
17  the data analysis I did there.
18          The Python work was part of my work product
19  and text mining to understand the large datasets that I
20  was working with.
21      Q.  Okay.  We'll come back to that.
22          How many ad buyers and sellers transacted on
23  AdX between 2013 and 2023?
24          MR. RENARD:  Objection to form.
25          THE WITNESS:  I do not know that number off

Page 68

1  the top of my head.
2  BY MR. ROSSON:
3      Q.  Do you have an estimate?
4      A.  For ad buyers I would estimate ███
5  ████████████████████████████████████████
6  █████████.
7          And in terms of sellers, I would expect it to
8  be ████████████████████████████████████.
9      Q.  ████████████████████████████████████?
10          MR. RENARD:  Objection to form.
11          THE WITNESS:  Yes, I would say something maybe
12  ████████████.
13  BY MR. ROSSON:
14      Q.  And what percentage of ad buyers and sellers
15  did you personally communicate with between 2013 and
16  2023?
17      A.  In terms of ad buyers, I may not be sure on
18  what we mean by "personally communicate with."  If we
19  include -- well, I guess I would ask:  Are we including
20  working with their data or are we talking to them in
21  person?
22      Q.  Talking to them in person, by Zoom, by text
23  message, by e-mail, any form of interpersonal
24  communication.
25      A.  Okay.  And we're excluding reading testimony?

Page 69

1      Q.  You may include reading testimony.
2          MR. RENARD:  Objection to form.
3          THE WITNESS:  I would say that from 2013 to
4  2023, I personally communicated with -- between 200 and
5  300 ad buyers.  And, again, probably an order of
6  magnitude smaller for ad sellers.  And I should mention
7  that I am excluding from this estimate situations where
8  I gave a talk to a group of ad buyers or sellers, in
9  which case the numbers would be much higher.
10  BY MR. ROSSON:
11      Q.  That's fair.
12          If I'm trying to get a sense of how many ad
13  buyers communicated to you their expectations about
14  online advertising from 2013 to 2023, would you estimate
15  that number is 200 and 300 ad buyers?
16          MR. RENARD:  Objection to form.
17          THE WITNESS:  If we are talking personal
18  com- -- direct communication not through intermediaries,
19  I would say that that is a good estimate.  If we include
20  intermediaries, for instance, where I had a client who
21  provided technology to ad buyers, and so therefore I was
22  aware of the ad buyer's preferences via that
23  intermediary, then the numbers are much higher.
24  BY MR. ROSSON:
25      Q.  Can you give me an estimate including the

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1  intermediaries?
2      MR. RENARD:  Objection to form.
3      THE WITNESS:  I'm thinking.
4      I think that including intermediaries, the
5  number of ad buyers that I have worked with would be --
6  a rough estimate would be around 10,000 and 20,000.
7  BY MR. ROSSON:
8      Q.  And of those 10- to 20,000 ad buyers, for how
9  many would you be confident that you could convey their
10  expectations about the online advertising industry?
11      MR. RENARD:  Objection to form.
12      THE WITNESS:  My sense is a substantial
13  fraction because I worked with companies that provided
14  the gateway to digital marketing for these ad buyers,
15  and so I am learning about the ad buyers' preferences
16  and expectations and informing them about the
17  marketplace via those intermediaries.
18  BY MR. ROSSON:
19      Q.  Has an ad buyer or seller authorized you to
20  speak for it in offering your opinions in this case?
21      MR. RENARD:  Objection to form.
22      THE WITNESS:  I'm not sure what we mean by
23  "authorize" here.
24  BY MR. ROSSON:
25      Q.  In offering your opinions in this case, is

Page 71

1  there any ad buyer or seller who said yes, you can speak
2  on my behalf?
3      MR. RENARD:  Same objection.
4      THE WITNESS:  No.  I have not disclosed my
5  participation in this case to these ad buyers.
6  BY MR. ROSSON:
7      Q.  So the ad buyers -- well, okay, that's fine.
8      In offering your opinions in this case, are
9  you speaking on behalf of any of your clients from
10  Data Insights?
11      MR. RENARD:  Objection to the form of the
12  question.
13      THE WITNESS:  I don't see myself as speaking
14  on their behalf; I see myself as synthesizing their
15  experience in an effort to interpret the facts and data
16  made -- provided to me as part of this case.
17  BY MR. ROSSON:
18      Q.  Have you reached out to any ad buyer or seller
19  that you've spoken with to ask them if you've correctly
20  represented their position?
21      A.  No, and I believe that would violate the
22  protective order I've signed.
23      Q.  So you believe you cannot do that; is that
24  right?
25      A.  Correct.

Page 72

1      Q.  Okay.
2      This may sound similar.  It's a little
3  different.
4      As part of your assignments in this case, did
5  you perform any surveys of ad buyers or sellers?
6      A.  No, as part of my work in this case I did not
7  perform any surveys of ad buyers or sellers.
8      Q.  Did you conduct any interviews of ad buyers or
9  sellers?
10      A.  I did not personally conduct any interviews of
11  ad buyers or sellers, but I have read testimony that was
12  solicited from them.
13      Q.  Do you have an -- I want to go on what you've
14  read, not communications with counsel.
15      Do you have an understanding of whether the
16  states in this case are saying that Google violated
17  state deceptive trade practice laws?
18      A.  I know that there are deceptive trade practice
19  law claims in this case, but I don't know much beyond
20  that.
21      Q.  Are you offering an opinion on whether Google
22  violated any deceptive trade practice laws?
23      A.  I'm not a legal expert.  I'm offering opinions
24  on Google's conducts relative to what I consider
25  generally accepted practices in the industry.  So I

Page 73

1  think the answer is no.
2      Q.  Are you offering any opinions on whether
3  Google violated antitrust laws?
4      A.  No.
5      Q.  Did you consider AdX or any other online
6  exchange transactional data in forming your opinions?
7      MR. RENARD:  Objection to form.
8      THE WITNESS:  I believe that the data I
9  analyzed as part of my rebuttal report includes some AdX
10  data, but that is the extent to which I analyzed AdX
11  data in preparing my reports.
12  BY MR. ROSSON:
13      Q.  So for your opening report, you did not
14  analyze AdX data; is that correct?
15      A.  I did not analyze numerical AdX data beyond
16  numerical data that was included in materials I
17  reviewed, but I certainly reviewed a great deal of AdX
18  data in the form of things like emails and deposition
19  testimony.
20      Q.  Are you relying on any numerical AdX data in
21  offering your opinions?
22      MR. RENARD:  Objection to form.
23      THE WITNESS:  I believe that I offer some
24  numerical estimates, but, again, they are numbers drawn
25  from text-based documents, not analysis of numerical

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1  data per se.
2  BY MR. ROSSON:
3      Q.  Do you know who the parties are to the
4  transactions at issue in this case?
5      MR. RENARD:  Objection to form.
6      THE WITNESS:  There are a variety of
7  advertising transactions that happen as a part of this
8  case, and so I'm aware of the parties that use the
9  Google technologies that are at issue in this case.
10 BY MR. ROSSON:
11     Q.  Are you aware of all of them?
12     A.  I doubt that I am aware of all of the
13 individual users of Google Ads, GAM, DV360 and AdX.
14     Q.  Is that something you sought to understand as
15 part of your assignment?
16     MR. RENARD:  Objection to form.
17     THE WITNESS:  I sought to understand those
18 entities in aggregate but not actively as individuals.
19 BY MR. ROSSON:
20     Q.  How many of the parties to the transactions at
21 issue in this case read Google's help page?
22     MR. RENARD:  Objection to form.
23     THE WITNESS:  I do not have access to that
24 information.
25

Page 75

1  BY MR. ROSSON:
2      Q.  How many of the parties to the transactions at
3  issue in this case read Google's blog posts?
4      MR. RENARD:  Objection to form.
5      THE WITNESS:  Could you clarify for me what we
6  mean by "parties at issue"?
7  BY MR. ROSSON:
8      Q.  Yes.  Am I right that in AdX, publishers and
9  advertisers enter into transactions with each other?
10     MR. RENARD:  Objection.  Form.
11     THE WITNESS:  Sometimes via intermediaries,
12 but yes.
13 BY MR. ROSSON:
14     Q.  Okay.
15         I'm talking about companies that utilized AdX
16 from 2013 to 2023.  Are you with me?
17     A.  Yes.
18     Q.  Okay.  How many of those companies read any
19 statement made by Google about its auctions?
20     A.  I have reviewed evidence of individual
21 companies, sometimes reviewing statements by Google,
22 sometimes not.  For instance, a particular part of the
23 help page.  But I don't have a comprehensive
24 understanding of that, nor do I think I have access to
25 the data that would tell it to me.

Page 76

1      Q.  Can you give me a percentage of parties, of
2  companies transacting on AdX from 2013 to 2023, that
3  reviewed any of Google's auction communications on its
4  blog or on its Help page?
5      A.  No, I cannot.
6      Q.  How many of the companies who transacted on
7  AdX from 2013 to 2023 know what reserve price
8  optimization is?
9      MR. RENARD:  Objection to form.
10     THE WITNESS:  I do not know.
11 BY MR. ROSSON:
12     Q.  Same answer for DRS?
13     MR. RENARD:  Objection to form.
14     THE WITNESS:  Yes, I also do not know the
15 fraction of companies who transacted on AdX from 2013 to
16 2023 who know what DRS is or understand how it works.
17 BY MR. ROSSON:
18     Q.  And you mentioned acronym soup this morning.
19 I'm the first guilty party.  Do we agree that DRS stands
20 for Dynamic Revenue Sharing?
21     A.  We do agree on that, and I'm guessing we will
22 get to this later, but there were a few different
23 flavors of that.
24     Q.  Yes.
25         How many of the parties -- sorry, strike that.

Page 77

1          How many of the companies that transacted on
2  AdX from 2013 to 2023 know what Bernanke is?
3      MR. RENARD:  Objection to form.
4      THE WITNESS:  I do not know the answer to
5  that.
6  BY MR. ROSSON:
7      Q.  Okay.
8          How many of the parties who transacted on AdX
9  from 2013 to 2023 have an opinion about Bernanke?
10     MR. RENARD:  Objection to form.
11     THE WITNESS:  I think that is a number that it
12 may be possible to estimate based on the way in which
13 the industry greeted the news of Bernanke when the
14 information was released publicly, but I do not know the
15 fraction that had had an opinion about Bernanke, and I
16 believe the information about Bernanke came out in 2021.
17 So it does -- or 2022.  So it does overlap slightly with
18 our time period.
19 BY MR. ROSSON:
20     Q.  Okay.  How many of the companies that
21 transacted on AdX from 2013 to 2023 found any
22 representation or omission by Google to be material?
23     MR. RENARD:  Objection to form.
24     THE WITNESS:  I've reviewed testimony of
25 companies that I believe would meet the definition of

20 (Pages 74 - 77)

CONFIDENTIAL



Page 78

1  "material." I'm not awa- -- I do not know the precise
2  legal definition of that,
3
4
5
6
7
8
9
10  BY MR. ROSSON:
11  Q. You estimated that 2013 to 2023 on AdX, we're
12  ?
13  A. I thought I said something more like
14  .
15  Q. Okay.
16
17  A. That is my attempt to give an estimate.
18  Q. Okay.
19  Can you off- -- sorry. Are you offering an
20  opinion about what percentage of those
21  advertisers found any representation or omission by
22  Google to be material?
23  MR. RENARD: Objection to form.
24  THE WITNESS: The phrasing "representation or
25  omission by Google to be material" sounds like it has

Page 79

1  specific legal language that I do not know the
2  definition of.
3  Speaking from the perspective of a data
4  scientist, I can say that a large fraction of companies
5  may have had material impacts to their advertising
6  performance that was driven by these conducts, but I
7  don't know the extent to which they found them to be
8  material.
9  BY MR. ROSSON:
10  Q. Do you have an opinion on how many of the
11  companies that transacted on AdX from 2013 to 2023
12  suffered an economic loss?
13  MR. RENARD: Objection to form.
14  THE WITNESS: I'm not offering a specific
15  opinion on that fraction. I think there were some
16  conducts such as RPO that had an impact on a large
17  number of entities in the case of RPO on the buy side,
18  but I am not offering an opinion on the specific
19  fraction.
20  BY MR. ROSSON:
21  Q. Okay.
22  Is it fair to say you can't tell me how many
23  companies transacted on AdX and suffered an economic
24  loss because of any particular auction feature or
25  optimization from 2013 to 2023?

Page 80

1  MR. RENARD: Objection. Form.
2  THE WITNESS: Yes, it's fair to say that I
3  can't tell you the number of companies that suffered an
4  economic loss for any particular auction feature during
5  this time period.
6  BY MR. ROSSON:
7  Q. Can you identify an ad buyer that would not
8  have joined Google's AdTech ecosystem if every detail of
9  reserve price optimization had been public?
10  MR. RENARD: Objection to form.
11  THE WITNESS: I can't identify an advertiser
12  who would not have transacted on Google's AdTech
13  ecosystem. I am aware of advertisers who would have
14  modified their behavior if they had known about some of
15  these conducts.
16  BY MR. ROSSON:
17  Q. So I'm going to make a list. It's a list of
18  every ad buyer who would not have joined Google's AdTech
19  ecosystem if every detail of reserve price optimization
20  had been public. Are you with me?
21  A. Okay.
22  Q. What's the first company on that list?
23  MR. RENARD: Objection to the form and the
24  prelude to the ultimate question. Move to strike.
25  THE WITNESS: In my previous answer I said I

Page 81

1  cannot identify an advertiser who would not have
2  transacted.
3  BY MR. ROSSON:
4  Q. Okay. Thank you.
5  Can you identify an ad buyer who would have
6  decided not to transact on AdX if every detail of each
7  of Google's auction mechanics and optimizations had been
8  disclosed?
9  MR. RENARD: Objection to form.
10  THE WITNESS: Again, I cannot identify an ad
11  buyer who would have decided to completely not transact.
12  I can identify entities that would have changed their
13  behavior had they known about all of the details.
14  BY MR. ROSSON:
15  Q. Did you review auction data for any particular
16  impression on AdX?
17  MR. RENARD: Objection to form.
18  THE WITNESS: No.
19  BY MR. ROSSON:
20  Q. Can you identify on a transactional level any
21  transaction that was affected by Bernanke?
22  MR. RENARD: Objection to form.
23  THE WITNESS: I cannot identify any
24  transaction on that individual transactional level.
25

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  BY MR. ROSSON:
2      Q.  Is that also true for reserve price
3  optimization?
4      A.  Yes, that is also true for reserve price
5  optimization.
6      Q.  Is that also true for Dynamic Revenue Sharing?
7      A.  Yes.
8      Q.  Is that also true for first and last look?
9      A.  Yes.  I did not review individual transactions
10  as part of my work in this case.
11      Q.  All right.
12      In offering your opinions, have you analyzed
13  how many transactions from 2013 to 2023 cleared because
14  of Dynamic Revenue Sharing?
15      MR. RENARD:  Objection.  Form.
16      THE WITNESS:  No, I have not identified that
17  as part of my work in this case.
18  BY MR. ROSSON:
19      Q.  Okay.
20      Have you, in offering your opinions, analyzed
21  whether ad buyers as a whole earned an economic profit
22  or sustained an economic loss because of any Google
23  auction mechanic?
24      MR. RENARD:  Objection.  Form.
25      THE WITNESS:  No, I have not analyzed that.

Page 83

1  BY MR. ROSSON:
2      Q.  Also true for ad sellers?
3      MR. RENARD:  Same objection.
4      THE WITNESS:  I have not estimated if any ad
5  sellers earned an economic profit or sustained an
6  economic loss.
7  BY MR. ROSSON:
8      Q.  All right.  To help orient you, I'm looking at
9  Paragraph 18, Subparagraph 5 of your opening report.
10      Are you there?
11      A.  I am.
12      Q.  Could you read that to yourself, please?  You
13  can read it silently.  I just want to make sure you get
14  a chance to read it and then let me know when you're
15  ready.
16      A.  Okay.
17      Q.  That assignment was provided to you, right?
18      A.  I'm sorry, I read the wrong section.  I was in
19  Paragraph 23.
20      Q.  Oh, that's all right.  It's Paragraph 18,
21  Subsection 5.  It begins, "Whether, colon."
22      A.  That was entirely my fault.
23      Q.  No worries.
24      A.  Yes, this was part of my assignment.
25      Q.  All right.  And the assignment was provided to

Page 84

1  you rather than created by you; am I correct?
2      A.  That's correct.
3      Q.  All right.
4      The assignment doesn't come with definitions
5  of any terms, does it?
6      A.  No.  I received the assignment as it is.
7      Q.  All right.
8      What is a manipulation in the context of
9  Paragraph 18, Subparagraph 5 of your opening report?
10      A.  The way I interpret "manipulation" in this
11  context where it says the manipulation of auctions,
12  auction rules, or auction mechanics I define as
13  behaviors that departed from generally accepted
14  understandings of how auctions functioned.
15      Q.  Where did you get that definition of
16  "manipulation"?
17      A.  It is my personal definition that I'm basing
18  on my industry experience.
19      Q.  And your assignment in Paragraph 18,
20  Subparagraph 5 doesn't come with a statute or a law,
21  right?
22      A.  That's correct.
23      Q.  It also doesn't come with an explanation of
24  the law, right?
25      A.  Yes.  I'm not sure what law we are speaking

Page 85

1  about specifically, but I do not see any legal
2  definitions there.
3      Q.  So I'm asking if in offering your opinion any
4  legal definitions were provided to you to rely on or
5  make an assumption on the basis of?
6      A.  No.
7      Q.  Okay.
8      Have you ever performed an assignment like the
9  assignment in opening report Paragraph 18,
10  Subparagraph 5?
11      MR. RENARD:  Objection to form.
12      THE WITNESS:  I think it would depend on our
13  definition of "like" or being similar to, but I think
14  the answer may be yes.
15  BY MR. ROSSON:
16      Q.  And if you could explain that, please.
17      A.  As we discussed earlier, some of my previous
18  expert work has touched on questions of disclosure and
19  fairness in advertising, and I would say those are
20  somewhat akin to this assignment.
21      Q.  Have you ever been given an assignment before
22  to determine whether a company has a conflict of
23  interest?
24      A.  No.
25      Q.  Have you ever been given an assignment before

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1  to determine whether a company's actions have negatively
2  impacted the transparency and overall fairness of an
3  auction?
4      A.  No.  I have been given assignments related to
5  fairness and transparency of advertising but not
6  advertising auction specifically.
7      Q.  I'm going to make some statements and see if
8  you agree or disagree with them.  Do you understand?
9      A.  I do.
10     Q.  Okay.
11         The contemporary display advertising ecosystem
12 is a dynamic technologically-driven and highly
13 profitable market.
14         Do you agree?
15         MR. RENARD:  Objection to the form.
16         THE WITNESS:  Yes, I believe I wrote that.
17 BY MR. ROSSON:
18     Q.  Yes.  I don't -- I'll be transparent here.
19 Sometimes I paraphrase from your report.  So if you're
20 unclear, just ask me where in your report and I'll show
21 you.
22         Do you understand?
23     A.  Yes.
24     Q.  All right.
25         Marketing technology changes very quickly.

Page 87

1         Do you agree?
2      A.  Yes.  I think that might depend on the
3  context, but compared to other industries I've worked
4  in, I think marketing technology changes rapidly.
5      Q.  Marketers are continually fine-tuning and
6  optimizing their data and strategies.
7         Do you agree?
8      A.  Yes.  Again, I think there may be nuances
9  related to context, but overall I agree.
10     Q.  Third-party providers like Google Ad Manager,
11 Kevel, and Amazon Ad Server offer robust features that
12 include targeting, ad delivery, and reporting
13 capabilities which are essential for effective ad
14 management and optimization.
15         Do you agree?
16     A.  I generally agree.  The second item in your
17 list is Kevel, K-e-v-e-l.  And Kevel, rather than
18 providing the same types of tools as Google Ad Manager
19 and Amazon Ad Server, provides a series of APIs.  And so
20 there are potentially nuances there, but I generally
21 agree.
22     Q.  All right.
23         The evolution of auctions in digital
24 advertising is a tale of increasing sophistication and
25 technological advancement reflecting the industry's

Page 88

1  response to the need for more efficient and effective ad
2  buying processes.
3         Do you agree?
4         MR. RENARD:  Objection to form.
5         THE WITNESS:  Could you point me to where this
6  is --
7  BY MR. ROSSON:
8      Q.  Opening report, Paragraph 105.
9         Wait a minute.  Sorry.  102.  And I'm asking
10 whether you agree with the first sentence of
11 Paragraph 102 of your report?
12     A.  Yes, in the context of programmatic
13 advertising, I do agree with this.
14     Q.  Okay.
15         Do you agree that realtime bidding was an
16 upgrade over the waterfall process?
17     A.  Yes.
18     Q.  And now I'm -- just to orient you, I'm at
19 Paragraph 104 on the same page.
20         Do you agree that the shift to realtime
21 bidding ensured that inventory could be sold at its
22 maximum potential value in a fair and efficient manner?
23         MR. RENARD:  Objection.  Form.
24         THE WITNESS:  I think in the context of my
25 report, that depends on the implementation of the

Page 89

1  realtime bidding algorithm.
2  BY MR. ROSSON:
3      Q.  So you mean that the answer to my question is
4  dependent on the structure of the realtime bidding
5  process?
6      A.  Yes.
7      Q.  Okay.
8         MR. RENARD:  Mr. Rosson, we have been going a
9  little bit more than an hour.  Whenever you get a
10 convenient breaking point, perhaps we could take a
11 break.
12         MR. ROSSON:  Now is perfect.
13         THE VIDEOGRAPHER:  Okay.  This is the end of
14 Media 2.  We are going off the record at 11:30 a.m.
15         (RECESS TAKEN)
16         THE VIDEOGRAPHER:  This is the start of
17 Media 3.  We are back on the record at 11:50 a.m.
18 BY MR. ROSSON:
19     Q.  Good morning, Dr. Chandler.
20     A.  Good morning.
21     Q.  Is there any testimony that you've given today
22 that you would like to change or correct?
23     A.  No.
24     Q.  All right.
25         Could you look at Opinion 1 in your opening

23 (Pages 86 - 89)

Page 90

1    report, please?  It's Opening Paragraph 23 and then
2    Subparagraph 1.
3        A.  I have read it.
4        Q.  All right.
5            Would this Opinion 1 hold true if it read
6    "open web display advertising" instead of "display
7    advertising"?
8        A.  Yes.
9        Q.  Before your involvement in this lawsuit, had
10   you ever heard the term "open web display advertising"?
11       A.  Yes.
12       Q.  And I mean specifically those four words
13   together in order, open web display advertising?
14       A.  Yes.
15       Q.  Have you ever heard the term "open web display
16   advertising" used outside of litigation context?
17       A.  Yes.
18       Q.  Okay.
19           How commonly is that term, "open web display
20   advertising" used in the digital marketing industry in
21   your experience?
22       A.  In my experience, it is more common for
23   members of the industry to refer to what we are calling
24   "open web display advertising" as display advertising
25   and then discuss nonopen web display advertising in

Page 91

1    other terminology.
2        Q.  You used the term "Walled Gardens" in your
3    opinion.
4            Do you remember that?
5        A.  Yes.
6        Q.  I'm looking at Paragraph 31 of your opening
7    report.  Subparagraph 8, which is on Page 15.
8            Do you see that there?
9        A.  I do.
10       Q.  So as you use the term "Walled Garden," is it
11   a closed ecosystem where the platform owner controls the
12   ad inventory and data?
13       A.  Yes.
14       Q.  And so you would call Google, Facebook, and
15   Amazon walled gardens; is that right?
16       A.  It depends on the aspect of those businesses,
17   but I list those companies as examples of companies that
18   are selling advertising within walled gardens.
19       Q.  And could you explain for me what you mean
20   by -- I think you said it depends on the context?
21       A.  Aspect.
22       A.  Aspect.
23       A.  Yes.  So Google sells open web display
24   advertising, or facilitates that sale via their tools.
25   But Google also operates a walled garden, for instance,

Page 92

1    Google's search advertising is a walled garden.
2            Facebook is almost entirely a walled garden.
3    Amazon is almost entirely a walled garden, although
4    Amazon's DSP tool allows open web display advertising in
5    some cases, but most of Amazon's advertising revenue is
6    walled garden.
7        Q.  Facebook and Amazon are not entirely walled
8    gardens in your opinion; is that right?
9        A.  Certain aspects of their advertising business
10   would allow open web display advertising.  I'm
11   specifically thinking of Amazon's new beta product that
12   allows advertising off of Amazon owned and operated
13   properties.
14       Q.  And so Facebook and Amazon have a presence on
15   the web that you would not categorize as a walled
16   garden; is that correct?
17           MR. RENARD:  Objection.  Form.
18           THE WITNESS:  I think I would restate that
19   slightly to say that Amazon currently and Facebook in
20   the past have aspects of their advertising business that
21   would not be a walled garden even though the vast
22   majority of their advertising revenue takes place within
23   a walled garden.
24   BY MR. ROSSON:
25       Q.  Do you know the percentage breakdown for

Page 93

1    Facebook and Amazon in terms of how much of their
2    revenue comes from walled gardens versus how much does
3    not?
4        A.  I don't know the number exactly, but I would
5    estimate that roughly 99 percent of their revenue comes
6    from walled gardens.
7        Q.  And if we're thinking of the digital marketing
8    world, what is on the other side of the walled gardens?
9            MR. RENARD:  Objection to form.
10           THE WITNESS:  That's quite a broad question.
11           If we're thinking about digital marketing
12   outside of walled gardens, then we have many other forms
13   of digital marketing, including advertising on the open
14   web across devices.
15   BY MR. ROSSON:
16       Q.  So tell me if I'm correct on this, and from
17   your perspective:  If advertising is occurring on the
18   open web, it is not occurring in a walled garden?
19           MR. RENARD:  Objection to form.
20           THE WITNESS:  There are some gray areas
21   outside of -- let me restate that.
22           If we are talking about digital marketing
23   outside of walled gardens, there is some advertising
24   that is a gray area that may not be considered open web,
25   but generally speaking, if we're talking about display

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1  advertising, then we're talking open web outside of
2  walled gardens.
3  BY MR. ROSSON:
4      Q.  Is there ever an instance of display
5  advertising where you would look at it and have
6  difficulty determining whether it's inside a walled
7  garden or on the open web?
8      MR. RENARD:  Objection.  Form.
9      THE WITNESS:  The only example I can think of
10 is related to advertising on mobile apps.  So some
11 advertising on mobile devices is via browsers.  That, I
12 would consider open web.  Some advertising on mobile
13 devices is within apps that are written to exist only on
14 those mobile devices using technologies like
15 Objective-C.
16     There is a category of apps called progressive
17 web apps where publishers are using a technology to put
18 a sort of skin around a browser, and I think that is
19 something of a gray area in terms of whether or not it's
20 open and it partially depends on the implementation in
21 the specific case.
22 BY MR. ROSSON:
23     Q.  The gray area you described, it's gray as
24 between what and what?
25     A.  Between being open web advertising and being

Page 95

1  inside a walled garden.
2      Q.  Display advertising occurs in walled gardens,
3  right?
4      MR. RENARD:  Objection.  Form.
5      THE WITNESS:  I believe that almost any kind
6  of advertising can take place within a walled garden,
7  and that includes display.
8  BY MR. ROSSON:
9      Q.  And a display ad in a walled garden can look
10 just like a display ad on the open web, right?
11     MR. RENARD:  Objection.  Form.
12     THE WITNESS:  It depends on what we mean by
13 "look like."  If we are talking about a consumer, they
14 can look very similar.  If we were talking about a
15 technologist who understands the underpinnings, then
16 regardless of sort of surface similarity, they look
17 quite different.
18 BY MR. ROSSON:
19     Q.  If I were to show you a printout of a display
20 ad with no other context, would you be able to tell me
21 whether I pulled it from a walled garden or the open
22 Internet?
23     MR. RENARD:  Objection.  Form.
24     THE WITNESS:  It would probably depend on the
25 display ad.

Page 96

1  BY MR. ROSSON:
2      Q.  Is there any instance where you would not be
3  able to tell me whether the display ad came from a
4  walled garden or the open web?
5      MR. RENARD:  Same objection.
6      THE WITNESS:  If I am only seeing the
7  advertisement and not the surrounding context and not
8  knowing how the ad was delivered or to whom, then, yes,
9  there are times where I cannot tell the difference.
10 BY MR. ROSSON:
11     Q.  You understand that in some instances a
12 consumer looking only at a display ad would not be able
13 to determine whether it came from a walled garden or the
14 open Internet, right?
15     MR. RENARD:  Objection.  Form.
16     THE WITNESS:  Yes.  I mean, you said "in some
17 instances," and I think that there are consumers who may
18 be entirely ignorant of all of these AdTech discussions
19 we're having.
20 BY MR. ROSSON:
21     Q.  I'm looking at, just to help you, opening
22 report Paragraph 44.  Let me know when you're there.
23     A.  I am there.
24     Q.  Well, no, I'm not there.  Sorry.  Just give me
25 a minute.

Page 97

1      All right.  And you're at opening report
2  Paragraph 44?
3      A.  Yes.
4      Q.  Okay.
5      Is it your opinion that one thing display ads
6  can be used for is retargeting or remarketing to
7  consumers who have already seen or interacted with
8  previous ads?
9      A.  Yes.  Typically retargeting or remarketing is
10 done based on interactions with advertisers' websites,
11 but it can also be based on interactions with previous
12 ads.
13     Q.  Display ads can be used for retargeting or
14 remarketing, right?
15     A.  Yes, that's correct.
16     Q.  And you have a marketing funnel in your
17 report.  Do you remember that?
18     A.  Yes.
19     Q.  And the processes of retargeting or
20 remarketing would be down in the bottom of your funnel;
21 is that right?
22     A.  Yes, I would say that it would be primarily at
23 the penultimate step of the funnel.
24     Q.  Retargeted display ads are typically focused
25 on taking a consumer from the desire phase to the action

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1 phase within your funnel framework; is that right?
2     A.  That's right.  Generally speaking, the purpose
3 of retargeted or remarketed ads is converting someone at
4 the bottom of the funnel.
5     Q.  And retargeting using display ads occurs on
6 the open web; is that right?
7     A.  Retargeting using display ads can take place
8 either on the open web or within walled gardens.
9     Q.  That was my next question.  Retargeting using
10 display ads can also occur in walled gardens; is that
11 right?
12     A.  That's correct.
13     Q.  Okay.
14     A.  Remarketing can take place within walled
15 gardens and also on the open web.
16     Q.  Okay.
17         Let's do an example of retargeted display ads,
18 and I'm looking at the Paragraph 44 in your opening
19 report.
20         If I put a pair of pants in my shopping cart
21 on a website of a sophisticated marketer, I might see
22 massages of those same pants when I visit other
23 websites; is that right?
24     A.  That's correct.
25     Q.  And that's a process that can be accomplished

Page 99

1 with retargeting display ads?
2     A.  Yes.
3     Q.  Is that trying to take me to the desire part
4 of the funnel, to the action part of the funnel?
5     A.  Yes, in the context of this example putting
6 the pants in your shopping cart would represent the
7 desire phase and the action that the marketer would be
8 interested in is you completing the purchase.
9     Q.  Can display ads reach users based on
10 demographics, interests, or browsing behavior?
11     A.  Yes.
12     Q.  And video ads can also reach users based on
13 demographics, interests, or browsing behavior; is that
14 right?
15     A.  Yes, if we're speaking in generalities here,
16 there are video providers, whether we're talking about
17 something like Connected TV or in-stream video that can
18 use the same types of targeting dimensions such as
19 demographics, interests, and potentially browsing
20 behavior, although that is less common.
21     Q.  Can in-app ads reach users based on
22 demographics, interests, or browsing behavior?
23     A.  Yes, although it does become, again, less
24 common, and if we are talking about in-app ads, then
25 most marketers use other targeting criteria.

Page 100

1     Q.  Like what?
2     A.  For instance, location.  So in-app advertising
3 provides much more granular location information than is
4 typically available for, say, open web display, and so
5 you will see many marketers using fine grain geographic
6 information to do targeting in-app.
7     Q.  Is it common for in-app advertisers to use
8 demographics or interests to target display ads?
9         MR. RENARD:  Objection.  Form.
10        THE WITNESS:  It is common for them to use
11 demographics.  It is less common for them to use
12 interests other than the contextual interest of the app.
13 So if you are in a recipe app, that is the dominant
14 interest segment for the targeting.
15 BY MR. ROSSON:
16     Q.  So if I'm on a sports app, for example, the
17 app is going to use the fact that I'm utilizing the app
18 to become aware that I'm interested in sports; is that
19 right?
20     A.  I would say it slightly differently.
21 Advertisers purchasing advertisements within that app
22 would be taking advantage of the fact that they would be
23 advertising to people who had shown interest in sports.
24     Q.  So advertisers purchasing display ad space on
25 apps are utilizing the user's interest as they can

Page 101

1 ascertain it from what kind of app the user is on?
2         MR. RENARD:  Objection.
3 BY MR. ROSSON:
4     Q.  Is that right?
5         MR. RENARD:  Objection to the form of the
6 question.
7         THE WITNESS:  I differentiate between in-app
8 advertising and display advertising, and your question
9 said advertisers purchasing display ad space on apps.  I
10 would reframe that to say advertisers purchasing in-app
11 advertising are utilizing the user's interest.
12 BY MR. ROSSON:
13     Q.  In-app advertising can include display ads,
14 right?
15        MR. RENARD:  Objection.  Form.
16        THE WITNESS:  The industry does not generally
17 conflate those two channels.
18 BY MR. ROSSON:
19     Q.  What is a display ad?
20     A.  A display ad is a banner rich media
21 rectangular ad served on a webpage either on a laptop or
22 desktop or a mobile device, and typically advertisers
23 also split out tablet as a separate device.
24     Q.  Can a banner rectangular rich media ad be
25 served within an app?

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1    A.  The form factor of the ad can be served within
2    apps, whether they are the apps that are coded custom
3    for the platform or those progressive web apps.  The
4    definition of the channel requires, what I call in my
5    report, this who, what, and where, and the audience, the
6    creative, and the context.  And so we're talking about
7    the what, the creative.  And so that creative can be
8    served into an app.
9    Q.  Apps can include rectangular ads; is that
10   true?
11   A.  Yes.
12   Q.  And those rectangular ads can include a
13   message from a marketer, correct?
14   A.  Yes, it might be true definitionally that a
15   message from a marketer is required to make it an ad.
16   Q.  If I were to screenshot a rectangular ad from
17   an app and compare it to an open web display ad, are you
18   confident you would be able to tell me which one came
19   from the app?
20       MR. RENARD:  Objection to form.
21       THE WITNESS:  Generally speaking, yes.
22       There would be cases where I would not be able
23   to tell them apart.  But that strikes me a little bit
24   like saying, if you showed me a count of impressions
25   from in-app ads and open web display, would I be able to

Page 103

1    tell which count came from which channel without the
2    column header.  And the information that marketers are
3    using takes into account the audience to whom the ad is
4    delivered and also the context within which it's
5    delivered.  So I think it's a mistake to focus on just
6    the similarity of the creative.
7    BY MR. ROSSON:
8    Q.  Is the answer to my question "yes"?
9    A.  I began my answer with "generally speaking,
10   yes."
11   Q.  Okay.
12       Let's look at Paragraph 67 of your opening
13   report.
14       Are you there?
15   A.  I am.
16   Q.  And you write in the second sentence of that
17   paragraph, "Because social media advertising relies
18   extensively on social network transmission, and high
19   levels of consumer engagement, it is a form of
20   advertising that I distinguish from display advertising
21   on the open Internet."
22       Do you see that?
23   A.  I do.
24   Q.  Social media can show display ads, can't it?
25       MR. RENARD:  Objection.  Form.

Page 104

1        THE WITNESS:  The generally accepted
2    definition of social media advertising on the Internet
3    is distinct from display advertising.  So if what you're
4    asking is can the creative be similar, rarely but
5    possibly.  Social media advertising has its own
6    techniques, its own specializations, and its own
7    creative formats, and so social media advertising is not
8    display advertising.
9    BY MR. ROSSON:
10   Q.  Are you familiar with a company formerly
11   called Twitter now called X?
12   A.  I am.
13   Q.  Have you been to Twitter or X's website
14   before?
15   A.  Yes.
16   Q.  Is -- as you categorize it, is -- well, let me
17   step back.
18       You're aware that Twitter changed its name to
19   X?
20   A.  I am aware of that.
21   Q.  If I say "Twitter," will you understand I'm
22   referring to X?
23   A.  I understand that, and that would be my
24   preference.
25   Q.  All right.  We can agree to call X "Twitter"

Page 105

1    for today?
2    A.  Yes.
3    Q.  Okay.
4        Is Twitter a form of social media?
5    A.  Yes.
6    Q.  Is it a walled garden?
7    A.  Part of Twitter are walled gardens.
8        I would need to think about the extent to
9    which there's any advertising on Twitter that is not a
10   walled garden.
11   Q.  Have you ever seen a Twitter post linked in a
12   news article?
13   A.  Yes.
14   Q.  And from that news article, you can click the
15   Twitter link and go to Twitter's website, right?
16   A.  That's correct.
17   Q.  And that would allow you to see the Tweet,
18   correct?
19   A.  That's correct.
20   Q.  And you don't have to have a Twitter account
21   to do that, do you?
22   A.  No.  If you are reading a news article and
23   they include an embedded Twitter post in that article
24   and you click on it, generally speaking, particularly
25   pre-2022, you could view that post without having a

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1  Twitter account.  It has changed somewhat recently.
2      Q.  And you could view that Twitter post without
3  logging into Twitter; is that right?
4      A.  That is correct.  The -- an advertiser though
5  who was showing an ad would be participating with
6  Twitter as a walled garden, but not the end user, or
7  consumer of the ad.
8      Q.  So in my example, the advertiser is inside a
9  walled garden, but the viewer of the ad is not; is that
10  correct?
11      MR. RENARD:  Objection.  Form.
12      THE WITNESS:  It's not that the advertiser is
13  inside the walled garden; it's that if the advertiser
14  wants an ad to show up for the person who clicks on the
15  Twitter post, that advertiser would need to transact
16  with Twitter, which is a walled garden and generally
17  does not allow open web display-type advertisement --
18  advertisements to run or the customary tracking that
19  goes with that.
20  BY MR. ROSSON:
21      Q.  All right.  And I'm going to return to my
22  example where we have been to a website reading a news
23  article, we saw a Twitter link and we clicked on the
24  link.  Are you with me?
25      A.  I am.

Page 107

1      Q.  In order to see that Tweet, you wouldn't have
2  to like that Tweet, correct?
3      MR. RENARD:  Objection.  Form.
4      THE WITNESS:  That's correct.  Under the
5  scenario where you arrive at Twitter and get to see the
6  Twitter post, you do not have to like the Tweet itself.
7  BY MR. ROSSON:
8      Q.  You can just look at the Tweet on Twitter's
9  website, correct?
10      A.  Yes, a consumer or Internet surfer can just
11  look at the Tweet.
12      Q.  And when that Internet surfer just looks at
13  the Tweet, they might see a rectangular ad displayed at
14  the top or bottom of Twitter's website; is that true?
15      MR. RENARD:  Objection.  Form.
16      THE WITNESS:  That is not the most common type
17  of advertising on Twitter, and Twitter has changed its
18  ad formats over time.  So I think it would depend on
19  when this action was taking place.
20  BY MR. ROSSON:
21      Q.  Is there ever a time between 2013 and 2023
22  where an individual could click a news link, go to
23  Twitter's website, and see a rectangular ad at the top
24  or bottom of the page or along the side?
25      MR. RENARD:  Objection.  Form.

Page 108

1      THE WITNESS:  Yes, I believe there have been
2  times where that was possible.
3  BY MR. ROSSON:
4      Q.  Consumers can view rectangular ads displayed
5  on social media websites without social interaction with
6  anyone else on the website, true?
7      MR. RENARD:  Objection.  Form.
8      THE WITNESS:  It is true that consumers of the
9  advertisement can sometimes view ads on social media
10  websites without participating in the social network.
11  The thing that makes Twitter a walled garden is the way
12  in which advertisers interact with Twitter.
13  BY MR. ROSSON:
14      Q.  Do you know what Reddit is?
15      A.  Yes.
16      Q.  Is that a social media site?
17      A.  Generally speaking, Reddit is classified as a
18  social media site.
19      Q.  And it has banner ads, doesn't it?
20      A.  Yes, Reddit for most of its history has had
21  banner ads on its site.
22      Q.  Up through the present, right?
23      A.  Yes.  When I said "for most of its history," I
24  was excluding some earlier times.
25      Q.  Times before 2013?

Page 109

1      A.  I don't know with precision when Reddit
2  changed its advertising formats.
3      Q.  Have you heard the term, in connection with
4  Reddit, "lurker"?
5      A.  Yes.
6      Q.  Do you know what a lurker is?
7      A.  My understanding of the term "lurker" on
8  Reddit is someone who visits Reddit but does not post or
9  interact with posts.
10      Q.  Let's use that understanding.  You agree that
11  a lurker can be served a banner ad on Reddit even though
12  they don't post or interact with posts on Reddit, true?
13      MR. RENARD:  Objection.  Form.
14      THE WITNESS:  Yes, I agree that someone who's
15  a lurker on Reddit can see a banner ad regardless of
16  their participation on the site.
17  BY MR. ROSSON:
18      Q.  And that banner ad may look the same as a
19  banner ad they saw when they were visiting a different
20  website on the open web; is that true?
21      MR. RENARD:  Objection.  Form.
22      THE WITNESS:  I believe that that is true,
23  that you could show an ad on the open web that looks the
24  same as an ad on Reddit.  The ad formats are sometimes
25  different on Reddit.

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1    BY MR. ROSSON:
2        Q.  You would say that in-app advertising is a
3    different channel than open web display advertising; is
4    that right?
5        A.  Yes.
6        Q.  That term "channel" is a term you use in your
7    expert reports, correct?
8        A.  That's correct.
9        Q.  Okay.
10       I'll use that term "channel" as you use it in
11   your reports.  Will you correct me if you aren't
12   understanding any of the questions I'm asking?
13       A.  Yes.
14       Q.  Okay.
15       You agree that in-app ads can be delivered in
16   a manner similar to display; is that true?
17       A.  No.
18       Q.  Okay.
19       Let's look at your report, Paragraph 75.
20       A.  [Witness complies.]
21       Q.  Tell me why you disagree with the statement
22   that in-app ads can be delivered in a manner similar to
23   display.
24       A.  Without the context of the paragraph, I was
25   disagreeing because the technology to deliver that ad

Page 111

1    and to receive information about that ad is different.
2        Q.  Okay.
3        A.  In this context, I was describing it from the
4    advertising messaging perspective and so I mean sort of
5    similar in that sense.
6        Q.  Do you agree with me that in-app
7    advertising -- well, I'm sorry.  Strike that.
8        Is it true from your perspective that "In-app
9    advertising represents an evolution in the digital
10   marketing landscape, harnessing the pervasive use of
11   mobile applications to deliver tailored advertisements
12   to users in a manner similar to display"?
13       A.  Yes.  In the context of how advertisers use
14   marketing channels, I agree with that statement.
15       Q.  In Paragraph 76 of your report, towards the
16   bottom of that paragraph, you discuss some of the
17   information that advertisers can use to deliver
18   personalized ads.
19       Do you see that?
20       A.  I do.
21       Q.  And one of those types of information is
22   demographics, correct?
23       A.  Yes.
24       Q.  Is demographic information also available to
25   open web display advertisers, as you use the term?

Page 112

1        MR. RENARD:  Objection to form.
2        THE WITNESS:  "Demographic data" is a very
3    broad term.  It can mean something as broad as an adult
4    or it can mean something extremely detailed.  And so the
5    specificity of that demographic data can be different,
6    but generally speaking, demographic data can be used to
7    target on both platforms -- or channels, I'm sorry.
8    EXHIBITS:
9        (Deposition Exhibit Number 2
10       marked for identification.)
11   BY MR. ROSSON:
12       Q.  I'm going to hand you Exhibit 2 in case you
13   need to refer to it.
14       Is Chandler Exhibit 2 your "Expert Rebuttal
15   Report" in this case?
16       A.  Yes.
17       Q.  All right.
18       And to orient you, right now I'm looking at
19   the Rebuttal Paragraph 4.
20       Strike that, because my citation is not
21   correct.  So let me just ask you generally.
22       Are you offering opinions on whether open web
23   display advertising is used -- that term is
24   substitutable for other forms of advertising?
25       MR. RENARD:  Objection to form.

Page 113

1        THE WITNESS:  Yes, I am offering opinions that
2    open web display advertising is not substitutable for
3    advertising on other channels but is complementary.
4    BY MR. ROSSON:
5        Q.  And you use a dictionary to define the term
6    "complementary"; is that right?
7        A.  I offer a dictionary definition of
8    "complementary" in a footnote.  I also have an
9    understanding of complementary marketing based on my
10   industry experience.
11       Q.  Okay.  And did you rely on your dictionary
12   definition of "complementary" in offering your rebuttal
13   opinions?
14       A.  Relied on both the dictionary definition and
15   my industry understanding of how marketing channels work
16   together as part of a marketing plan.
17       Q.  And where did you get the definition of
18   "substitutability"?
19       A.  My definition of "substitutability" came from
20   my understanding of the term, which is that something
21   could be entirely replaced by something else with
22   essentially no change in function.
23       Q.  So your definition of a substitute is
24   something that can be entirely replaced with something
25   else with no change in function; is that correct?

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    A.  My definition of "substitute" might depend on
2    the context in which we were discussing it, but if I was
3    offering a broad definition, that would be my answer.
4        Q.  What definition of "substitute" did you use in
5    the context of your substitutable opinion in this case?
6        MR. RENARD:  Objection to form.
7        THE WITNESS:  I'm just going to pull up my
8    substitutability opinion.
9        So I'm looking at Paragraph 52 of my rebuttal
10   report.  "The Ghose Report makes inaccurate arguments
11   about the substitutability and interchangeability of
12   marketing channels that are distinct from display
13   advertising" -- "or display marketing on the open web,
14   including social media, video, in-app, retail, and CTV
15   marketing."
16       So in this case I am using my understanding of
17   Dr. Ghose's definition of "substitutability."
18   BY MR. ROSSON:
19       Q.  So your opinions use Dr. Ghose's definition of
20   substitutability?
21       MR. RENARD:  Objection to the form.
22       THE WITNESS:  This opinion about
23   substitutability is a rebuttal to Dr. Ghose.
24   BY MR. ROSSON:
25       Q.  Do you have a non-rebuttal opinion on

Page 115

1    substitutability?
2        MR. RENARD:  Objection to form.
3        THE WITNESS:  I offer in my opening report
4    opinions about the complementarity of different
5    marketing channels, and therefore I'm offering opinions
6    about the lack of substitutability.
7    BY MR. ROSSON:
8        Q.  And so for your opening report, what is your
9    definition of "substitutability"?
10       MR. RENARD:  Objection to form.
11       THE WITNESS:  I'm trying to recall if I used
12   the term "substitutability" in my opening report.  I
13   think off the top of my head I talk about the channels
14   being complementary and not interchangeable or
15   exchangeable with each other, and so the definition I'm
16   using I think is the one that I gave you earlier, could
17   you entirely remove one marketing channel, replace it
18   with another with no changes in function.
19   BY MR. ROSSON:
20       Q.  Let's go to Rebuttal Paragraph 52, Note --
21   Footnote 54.  Let me know when you see that.
22       A.  I'm there.
23       Q.  You use the Oxford Learner's Dictionary; is
24   that right?
25       A.  That is correct.

Page 116

1        Q.  How did you select that dictionary?
2        A.  I don't recall.  I believe I Googled
3    "complementary" definition.
4        Q.  Do you know whether the Oxford Learner's
5    Dictionary is designed for people who are learning
6    English as a second language?
7        A.  I do not know.
8        Q.  Let's go to Rebuttal Paragraph 55.
9        A.  Okay.
10       Q.  I'll come back to this later.  So scratch that
11   question.
12       Do you know whether "substitutability" means
13   something in particular under the antitrust laws?
14       A.  I know that it has a specific antitrust
15   definition, but I do not know that definition.
16       Q.  Did you apply the antitrust definition in
17   offering your opinions on substitutability?
18       MR. RENARD:  Objection to form.
19       THE WITNESS:  I did not specifically apply the
20   antitrust definition.  I'm talking about
21   substitutability from a marketing perspective.  Could
22   marketers take out one marketing channel and replace it
23   with another, and there's a similar understanding on the
24   sell side.
25

Page 117

1    BY MR. ROSSON:
2        Q.  You could not have applied the antitrust
3    definition of substitutability in offering your opinions
4    because you do not know what it is.  Is that fair?
5        A.  Yes, that's correct, I do not know the
6    antitrust definition of "substitutability."
7        Q.  Do you know how to define a relevant product
8    market under the antitrust laws?
9        MR. RENARD:  Objection.  Form.
10       THE WITNESS:  No, I do not know how to define
11   that.
12   BY MR. ROSSON:
13       Q.  Are you offering an opinion on the relevant
14   product market of open web display advertising?
15       MR. RENARD:  Objection to form.
16       THE WITNESS:  I'm not offering an opinion on
17   the relevant product market.  I understand that my
18   opinions in this case inform opinions of other experts
19   who are, but I am not offering an opinion on that.
20   BY MR. ROSSON:
21       Q.  Have you ever heard of the SSNIP test?
22       A.  Is that S-N-I-P?
23       Q.  S-S-N-I-P.
24       A.  I don't believe I have.
25       Q.  Did you do any analysis in offering your

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1  opinions involving small but significant non-transitory
2  increases in price?
3      MR. RENARD: Objection to form.
4      THE WITNESS: The language of SSNIP appears in
5  the Simonson report, and so I did offer rebuttal
6  opinions related to the suitability of Dr. Simonson's
7  survey to estimate those.
8  BY MR. ROSSON:
9      Q. Did you yourself perform a SSNIP test?
10     A. No, I did not perform a SSNIP test.
11     Q. In offering your opinions, did you perform any
12  analysis on cross elasticity of demand?
13     MR. RENARD: Objection to form.
14     THE WITNESS: I did not.
15  BY MR. ROSSON:
16     Q. If part of your assignment were to perform an
17  analysis on cross elasticity of demand between open web
18  display advertising and any other product, would you
19  know to do that?
20     MR. RENARD: Objection to form.
21     THE WITNESS: I would not know how to do it
22  without probably a great deal of study.
23  BY MR. ROSSON:
24     Q. So I'm going to give you a hypothetical.
25  Imagine that the cost of open web display advertising

Page 119

1  increases. Are you with me?
2      A. Yes. I think I will be asking for more
3  specifics on this hypothetical.
4      Q. Understood.
5          Holding all things equal, would you expect
6  that an increase in price of open web display
7  advertising would cause a decrease in demand for other
8  channels?
9      MR. RENARD: Objection to form.
10     THE WITNESS: I do think that would depend on
11  the specific circumstances.
12  BY MR. ROSSON:
13     Q. Can you give me an example where an increase
14  in price of open web display advertising would cause a
15  decrease in demand for other channels?
16     MR. RENARD: Objection to form.
17     THE WITNESS: I'm just going to say this back
18  to you to make sure I understand. So we're talking
19  about open web display advertising prices going up and
20  that resulting in a decrease in demand for other
21  channels?
22  BY MR. ROSSON:
23     Q. Correct.
24     A. If we are holding all else equal and so that
25  price increase is not accompanied by things like

Page 120

1  increasing quality, increasing performance or anything
2  like that, I do not see why open web display
3  advertising, increasing price -- well, actually, sorry.
4  I guess now that I'm thinking through it, yes, I can
5  imagine a circumstance.
6          So I'm imagining an advertiser for whom
7  Display is a high-performing channel and a central part
8  of their marketing strategy and the price increases and
9  they have a fixed marketing budget and they don't want
10  to change their Display spin for some business reasons.
11  Then I could imagine them taking money from some other
12  channel, if I'm understanding correctly.
13     Q. Can you think of any other examples?
14     MR. RENARD: Objection. Form.
15     THE WITNESS: I mean, I think that was a
16  family of examples since I mentioned other business
17  reasons. So I think that all of my examples would fall
18  under that umbrella as I sit here right now trying to
19  think through this.
20  BY MR. ROSSON:
21     Q. Holding all things equal, would you expect
22  advertisers to respond to an increase in the price of
23  open web display ads by placing fewer video ads?
24     MR. RENARD: Objection. Form.
25     THE WITNESS: I think that it's very hard for

Page 121

1  me to answer that question in the total abstract. The
2  advertisers that I work with typically allocate those
3  budgets separately, and so I don't think I have an
4  expectation around what the advertiser would do with
5  changes in price to display vis-à-vis their video
6  channels.
7  BY MR. ROSSON:
8      Q. In your view, are hot dogs and hamburgers
9  substitutes?
10     MR. RENARD: Objection. Form.
11     THE WITNESS: No. My partner loves plain hot
12  dogs in a way that I cannot get my head around and I
13  love hamburgers in a way that she seems not able to
14  understand.
15  BY MR. ROSSON:
16     Q. Okay. So let's hang on that for a moment. So
17  based on your answer, why is it your view that hot dogs
18  and hamburgers are not substitutes?
19     MR. RENARD: Objection. Form.
20     THE WITNESS: Let me just begin by saying I'm
21  not an economist and I'm not trying to offer opinions on
22  whether or not these two foods constitute some sort of
23  market. I don't think they're substitutable because I
24  think they provide different forms of gustatory
25  pleasure. And so the reason you would say hot dogs and

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1  hamburgers are not substitutes is because they taste
2  different. Is that fair?
3      MR. RENARD: Objection. Form.
4      THE WITNESS: Not just taste. I think
5  esthetics enter into it. I think -- I think the amount
6  of calories typically in a hotdog versus a hamburger are
7  different. I like the number of accouterments you can
8  add to a hamburger. I like those better than the ones
9  you can add to a hotdog.
10 BY MR. ROSSON:
11     Q.  Can you think of any two products that are
12 substitutes?
13     MR. RENARD: Objection. Form.
14     THE WITNESS: Yes.
15 BY MR. ROSSON:
16     Q.  Can you give me an example?
17     A.  I think that PC laptops are generally
18 substitutable if we are conditioning on similar monitor
19 size, hard drive capacity, and CPU power.
20     Q.  Why?
21     MR. RENARD: Objection to the form.
22     THE WITNESS: Because the way that I use my
23 laptop would be essentially unchanged if I switched from
24 an Acer laptop to a similarly provisioned Lenovo laptop.
25

Page 123

1  BY MR. ROSSON:
2      Q.  As you use the term, can products that have
3  differences be substitutes?
4      MR. RENARD: Objection to form.
5      THE WITNESS: Yes. I mean, I think that those
6  laptops have differences. Similarly, maybe articles of
7  clothing clearly seem substitutable to me. A button-
8  down shirt in a lot of ways is a button-down shirt and
9  there's differences in price and quality, but from my
10 perspective, largely substitutable.
11     Q.  Does your definition of "substitutability"
12 account for price or quality?
13     MR. RENARD: Objection. Form.
14     THE WITNESS: Yes. If we're talking about
15 advertising, then price is an important consideration
16 for marketers. The quality relates to the quality of
17 the audience that can be reached, the quality of the
18 creative that can be shown, and the quality of the
19 context. And so I think price and quality are
20 components of substitutability in that sense.
21     MR. RENARD: Mr. Rosson, we -- whenever you're
22 at a convenient breaking point, I think we're close to
23 having lunch ready.
24     MR. ROSSON: Now is fine.
25     MR. RENARD: Now?

Page 124

1      MR. ROSSON: Yeah, that's fine.
2      MR. RENARD: Okay.
3      THE VIDEOGRAPHER: Okay.
4      This is the end of Media 3. We are going off
5  the record at 12:42 p.m.
6      (LUNCH RECESS)
7      THE VIDEOGRAPHER: This is the start of
8  Media File 4. We are back on the record at 1:24 p.m.
9  BY MR. ROSSON:
10     Q.  Dr. Chandler, are you ready to proceed?
11     A.  I am.
12     Q.  Any testimony from today that you'd like to
13 change or correct?
14     A.  No.
15     Q.  Do you agree that advertisers can track the
16 performance of the money they spend on digital
17 advertisements?
18     A.  I think it depends on the context.
19     Q.  Tell me what you mean by, "it depends on the
20 context."
21     A.  Well, I think it depends on the definition
22 we're using of "track" and the definition we're using of
23 "performance." For instance, one common measure of
24 performance in open web display advertising is the
25 conversion rate, the number of conversions divided by

Page 125

1  the number of impressions. In search advertising, the
2  number of impressions is not known. So that would be an
3  example where an advertiser could not track the
4  performance of digital advertising.
5      Q.  I'm looking at your opening report,
6  Paragraph 91.
7      The first sentence says, "Advertisers make
8  tradeoffs among these aspects to find pieces of
9  marketing that provide a positive return on investment
10 or return on ad spend."
11     Do you see that?
12     A.  I do.
13     Q.  And when you write "these aspects," what are
14 you referring to?
15     A.  In this subsection, I'm talking about pricing.
16 And so the previous paragraphs talk about the costs of
17 "video advertising." Then -- that's Paragraph 88.
18     Paragraph 89 talks about "display advertising
19 costs." And then there's a discussion of
20 "industry-specific variations" in price.
21     And so what I mean by "these aspects" is the
22 price aspects of the different channels. So that is one
23 component of the ROI or ROAS calculation.
24     Q.  Marketers "make tradeoffs among the price of
25 digital advertising channels to find pieces of marketing

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1  that provide a positive return on investment or return
2  on ad spend."
3        Do I have that right?
4     A.  Yes.
5        MR. RENARD:  Objection to form.
6        THE WITNESS:  Sorry.
7        Yes, that's what Paragraph 91 begins with.
8  BY MR. ROSSON:
9     Q.  Have you ever helped an advertiser compare the
10  bang for their buck they're getting across different
11  advertising channels?
12        MR. RENARD:  Objection.  Form.
13        THE WITNESS:  Yes, I've done a great deal of
14  work on that, both as a consultant, then also while at
15  Microsoft and at aQuantive, and as part of my
16  dissertation research.
17  BY MR. ROSSON:
18     Q.  So at Data Insights -- I know we talked about
19  this this morning.  I just have a few more questions
20  about it.  Are you with me?
21     A.  Yes.
22     Q.  Okay.
23        Is one service you provide looking at
24  advertisers' spend to help them understand where their
25  money's being best used?

Page 127

1     A.  I would say it's the combination of spend and
2  performance to assess the efficacy of their marketing.
3     Q.  So you're measuring advertiser spend and
4  advertiser performance to understand how effective their
5  marketing is; is that right?
6     A.  Yes, in sort of broad terms, that's what I'm
7  doing.
8     Q.  And does that work that you perform have
9  anything to do with the auction mechanics on the
10  exchanges that your clients are trading in?
11        MR. RENARD:  Objection to form.
12        THE WITNESS:  Potentially.
13  BY MR. ROSSON:
14     Q.  How so?
15     A.  The auction mechanics partially define both
16  the performance and the cost of the marketing.  And so
17  the auction mechanics can influence the two principal
18  pieces of marketing performance.
19     Q.  So are auction mechanics something that you
20  need to be up to date on to advise your clients about
21  their marketing plans?
22        MR. RENARD:  Objection.  Form.
23        THE WITNESS:  Generally speaking.  Also, I'm
24  typically analyzing data coming out of the auctions.
25  And so many times my analysis is downstream from the

Page 128

1  mechanics themselves, and I can potentially see the
2  influence of those mechanics as part of the data.
3  BY MR. ROSSON:
4     Q.  Are you more often giving your clients
5  qualitative or quantitative advice?
6        MR. RENARD:  Objection.  Form.
7        THE WITNESS:  I would say it's a blend of the
8  two.
9  BY MR. ROSSON:
10     Q.  And when you're giving them qualitative
11  advice, without regard to a specific client, can you
12  give me a general idea of what you mean by providing
13  qualitative advice?
14     A.  Yes.  I mean, I think that can encompass a
15  very wide array of things from the way in which they've
16  set up their marketing and data science teams, the way
17  in which they've structured their data collection, and
18  the way in which they use that data both internally
19  within the organization and as it relates to my work.
20        Also, I help them with things like which
21  marketing channels may align with their goals, the
22  measurement of those goals and advice on, for instance,
23  brand recall and favorability, and how we might message
24  most effectively to influence those, and then all the
25  way to things like the way in which the client presents

Page 129

1  their marketing within the organization and externally
2  outside the organization to do what we would call
3  thought leadership.
4     Q.  And does the advice you provide
5  including [verbatim] making a recommendation of whether
6  that client should use AdX versus some other exchange?
7     A.  Sometimes.
8     Q.  Sometimes an advertiser will spend its
9  marketing budget differently based on your
10  recommendation, correct?
11     A.  Yes.
12     Q.  They might put more money into one channel and
13  less money in a different channel, right?
14     A.  Typically when it comes to channel allocation
15  decisions, I am providing models and tools for the
16  marketer to use as an input into their decision-making
17  process regarding budget allocation.
18     Q.  And ultimately in a budget allocation process,
19  an advertiser might decide to put more advertising
20  dollars into one channel versus another; is that right?
21     A.  Yes, typically marketers have variability in
22  their budget allocation across channels.
23     Q.  So they might choose to do more in display ads
24  or -- and fewer in social media, for example?  Is that
25  what you're talking about?

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1    MR. RENARD: Objection. Form.
2    THE WITNESS: Yes. Generally speaking, my
3  clients will use the insights generated by my models to
4  determine their return on investment and return on ad
5  spend both within and across channels, and use that to
6  inform budget allocation decisions, which are also
7  driven partially by other business considerations.
8  BY MR. ROSSON:
9    Q. In your opinions you discuss how what you
10  referred to as different channels typically have
11  different price points; is that right?
12    A. That's right. Generally speaking, there is
13  price variability both within and between marketing
14  channels.
15    Q. And so when you analyze whether open web
16  display advertising is substitutable for any other
17  channel, what steps did you take to control for
18  differences in price among the channels?
19    MR. RENARD: Objection to form.
20    THE WITNESS: When you say, did I take, are
21  you describing in my report, or are you talking
22  generally more in my consulting?
23  BY MR. ROSSON:
24    Q. In your report.
25    A. Can you repeat that question for me?

Page 131

1    Q. Sure.
2    Did you perform any analysis to determine
3  whether quality differences among channels are explained
4  by their difference in price?
5    MR. RENARD: Objection to form.
6    THE WITNESS: I am a little bit confused. I'm
7  not sure what it would mean for price to explain the
8  quality difference. So would that mean that
9  Connected TV costs more and there -- yeah, I think that
10  inverts the cause and effect relationship between price
11  and quality.
12  BY MR. ROSSON:
13    Q. Imagine two products where one is twice as
14  expensive and has twice the quality of the first one.
15  Are you with me?
16    A. Yes. Could we make it more concrete and talk
17  about a specific product or...?
18    Q. We might get there.
19    A. Okay.
20    Q. Holding all things equal, you would agree with
21  me that the difference in price between those two
22  products would not lead you to conclude that they're not
23  substitutes, right?
24    MR. RENARD: Objection to form.
25    THE WITNESS: I'm going to try to state this

Page 132

1  in a positive way and just let me know if I've
2  misunderstood the negatives in that.
3    For instance, Connected TV tends to be about
4  twice as expensive as premium social media placements.
5  If I was analyzing an advertiser's data and saw that at
6  twice the cost, Connected TV was driving twice the
7  return, then the cost per action would be the same, and
8  cost per action would not be a reason to differentiate
9  between the channels.
10    Am I answering your question?
11  BY MR. ROSSON:
12    Q. Yes. Thank you.
13    And so in opining that open web display
14  advertising is not a substitute for other media
15  channels, did you perform a cost per action analysis to
16  normalize the price of the various channels?
17    MR. RENARD: Objection. Form.
18    THE WITNESS: The only place, as far as I
19  know, where I speak specifically to substitutability is
20  in my rebuttal report, and there I am synthesizing my
21  industry experience when I make statements about
22  substitutability and how in my experience working with
23  hundreds of advertisers, how I see them treat those
24  channels, among other aspects that I elucidate in that
25  report.

Page 133

1  BY MR. ROSSON:
2    Q. Did you perform a quantitative analysis to
3  normalize price differences among channels in offering
4  any opinions about substitutability?
5    MR. RENARD: Same objection.
6    THE WITNESS: The only opinions I'm offering
7  specifically about substitutability are in that rebuttal
8  report, and the only quantitative analysis I did in that
9  report is not related to price.
10  BY MR. ROSSON:
11    Q. For any of your analysis, did you do a t-test?
12    MR. RENARD: Objection to form.
13    THE WITNESS: I did not have a situation where
14  I needed to compare the means of two different groups,
15  and so I did not do a t-test.
16  BY MR. ROSSON:
17    Q. You know what a t-test is, correct?
18    A. I do know what a t-test is.
19    Q. Did you Z-score any data that was provided to
20  you?
21    MR. RENARD: Same objection.
22    THE WITNESS: No. The -- I did not perform a
23  null hypothesis test of any flavor as part of my reports
24  because that was not needed to form my opinions.
25

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1  BY MR. ROSSON:
2      Q.  Did you apply any statistical tests that would
3  typically be taught in a --
4          THE REPORTER:  I'm sorry.  Can you repeat
5  that?  I didn't hear you.
6          MR. ROSSON:  Yes.
7  BY MR. ROSSON:
8      Q.  In offering your opinions, did you utilize any
9  statistical tests that would be taught in graduate-level
10  statistical courses?
11      A.  The sense in which I applied a statistical
12  test in graduate statistical courses would, I think,
13  only be my text mining, which I did as part of my data
14  synthesis as I was trying to prepare the materials in
15  this case for my reports.  But that was not a
16  statistical test where I would do something like
17  estimate parameters, estimate those standard errors, and
18  then use those standard errors to do a statistical test
19  on whether or not the parameters could be zero, for
20  instance.
21          THE REPORTER:  Could be what?  Sorry.
22          THE WITNESS:  Could be zero.
23          THE REPORTER:  Thank you.
24  BY MR. ROSSON:
25      Q.  For your opening report, would you be able to

Page 135

1  offer all of your opinions if you had no background in
2  statistics?
3          MR. RENARD:  Objection to form.
4          THE WITNESS:  I don't believe so.
5  BY MR. ROSSON:
6      Q.  Which ones would you be unable to offer?
7          MR. RENARD:  Objection to form.
8          THE WITNESS:  It is very hard for me to
9  separate my data science background from my marketing
10  background since I have principally interacted with
11  marketing and digital marketing through the lens of data
12  science, and so the industry experience that I am
13  bringing to bear to form these opinions is part and
14  parcel with my data science background.  And so I think
15  someone without statistical training would not be in my
16  position to offer these opinions.
17  BY MR. ROSSON:
18      Q.  By virtue of the consideration that they
19  wouldn't have your industry experience?
20      A.  They wouldn't have my particular industry
21  experience.  One thing that I really like about being a
22  data scientist in marketing is the opportunity to work,
23  you know, not with one advertiser at a time, but maybe
24  with dozens of advertisers at the same time via their
25  data.  And so I think my experience is related to my

Page 136

1  statistical training.
2      Q.  Can we agree that setting aside the text
3  mining, you didn't use any of your statistical training
4  to perform a data analysis in offering your opinions?
5          MR. RENARD:  Objection to form.
6          THE WITNESS:  Again, I would probably state it
7  differently and say that my data science training gives
8  me my industry experience which is what I'm using to
9  synthesize this information.  And so in that sense, I am
10  using the statistical training as part of my opinions.
11  BY MR. ROSSON:
12      Q.  Let me ask an open-ended question.  Can you
13  show me which opinions that you're offering in this case
14  in your opening report rely on statistical analysis?
15          MR. RENARD:  Objection to form.
16          THE WITNESS:  If we are using statistical
17  analysis in the sense of part of my statistical
18  training, then I think nearly all of my opinions in my
19  opening report derive from that statistical training.
20  BY MR. ROSSON:
21      Q.  Okay.  I'm going to move on to a different
22  topic.
23          Did you speak with Professor Gans about ad
24  buying tools?
25      A.  I had a conversation with Professor Gans --

Page 137

1          MR. RENARD:  Dr. Chandler, I just -- that's a
2  yes or no.
3          THE WITNESS:  Oh.
4          MR. RENARD:  In fact, let me, to that
5  question, object to it on the basis of the stipulation
6  and order regarding experts and instruct you not to
7  answer the question.
8  BY MR. ROSSON:
9      Q.  On that basis, are you not going to answer the
10  question?
11      A.  Yes.
12      Q.  Did you tell Professor Gans that, quote,
13  industry participants consider ad buying tools for small
14  advertisers to be a distinct product in a separate
15  market from an industry perspective?
16          MR. RENARD:  Same objection.  Same
17  instruction.
18          THE WITNESS:  And I will also not be answering
19  on the advice of counsel.
20  BY MR. ROSSON:
21      Q.  Okay.
22          Are you aware of whether Professor Gans
23  expressly relies on a conversation that he had with you
24  and discloses it in his expert report?
25      A.  I'm aware that Professor Gans relies on a

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1  conversation with me.
2      Q.  Okay.  Could you please tell me about the
3  conversation he's relying on.
4          MR. RENARD:  That's off limits under the order
5  regarding experts.
6          And I'll instruct you not to answer the
7  question.
8          You can ask Dr. Gans that.
9          MR. ROSSON:  Okay.
10         MR. RENARD:  Which I think you're allowed to
11  do under the stipulation and order regarding experts.
12         MR. ROSSON:  Okay.  I'm going to ask one more
13  question just to draw the line and then I'll move on.
14         MR. RENARD:  Sure.
15  BY MR. ROSSON:
16     Q.  Where were you when you had a conversation
17  with Mr. Gans about ad buying tools?
18     A.  I was in my home office in Minneapolis.
19         MR. ROSSON:  And, Counsel, so that I don't
20  just run down this again and again, is the line you're
21  drawing that in this deposition I'm not entitled to
22  learn the content of that communication?
23         MR. RENARD:  Yes, and I think specifically
24  under the order regarding experts, conversations that
25  Dr. Chandler had with consultants, other experts,

Page 139

1  lawyers are off limits.  The only exception being to the
2  extent an expert relies upon another expert, you can ask
3  the expert who is relying on the other expert about that
4  communication.
5          MR. ROSSON:  I see.  So you're saying I can
6  ask Professor Gans --
7          MR. RENARD:  Yes.
8          MR. ROSSON:  -- about the conversation?
9          MR. RENARD:  Yes.
10         MR. ROSSON:  All right.
11  BY MR. ROSSON:
12     Q.  Let's look at Page 50 of your opening report.
13         MR. ROSSON:  And just for the record, I think
14  this is clear, I'm not agreeing with that
15  interpretation.
16         MR. RENARD:  I understand.
17         MR. ROSSON:  But I'm just going to move on.
18         MR. RENARD:  I understand.
19  BY MR. ROSSON:
20     Q.  Okay.  Mr. Chandler, do you understand that
21  now I'm not asking you about any conversations with
22  another expert; I'm going to ask you about what's in
23  your report?  Do you understand?
24     A.  I do understand.
25     Q.  Okay.

Page 140

1          On Page 50, do you see a heading titled "The
2  Bifurcation of Tools for Large Advertisers and Small
3  Advertisers"?
4      A.  I do see that.
5      Q.  Okay.
6          Other than Google Ads, what are other tools --
7  what are other ad buying tools for small advertisers?
8      A.  Facebook Ads, Amazon Ads.  Those are the
9  primary ones for small advertisers in addition to
10  Google Ads.
11     Q.  Okay.  And are Facebook Ads and Amazon Ads in
12  your view tools for small advertisers to buy open web
13  display ad space?
14     A.  No.
15     Q.  So the only open web display ad small
16  advertiser tool that you can name is Google Ads; is that
17  correct?
18         MR. RENARD:  Objection.  Form.
19         THE WITNESS:  The only open web display tool
20  for small advertisers that I can think of is Google Ads.
21  BY MR. ROSSON:
22     Q.  Other than Google Ads, can you give me
23  examples of ad buying tools that offer robust targeting
24  options and analytics?
25     A.  Yes.

Page 141

1          MR. RENARD:  Objection.  Form.
2          THE WITNESS:  And just to clarify, we're now
3  talking about advertisers of all sizes?
4  BY MR. ROSSON:
5      Q.  Let me direct you to your report.  So I'm
6  looking at opening report Paragraph 177.
7          Do you see that?
8      A.  I do.
9      Q.  And mid-way down the paragraph, it reads,
10  "Google Ads offers features like Smart Campaigns, which
11  simplify the ad creation process and provide robust
12  targeting options and analytics."
13         Do you see that?
14     A.  I do.
15     Q.  Okay.
16         Can you give me examples of what you would
17  consider small advertisers ad buying tools that offer
18  robust targeting options and analytics?
19     A.  Yes.  It would be the same list as before,
20  Google Ads, Facebook Ads Manager, and Amazon Ads.
21     Q.  And for open web display ads specifically,
22  your list would be Google Ads only; is that correct?
23     A.  That's correct.
24     Q.  Okay.
25         And then let's expand this now.  Can you give

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1  me a list of tools for small advertisers that do not
2  offer robust targeting options in analytics?
3      A.  You know, there are some small players in
4  certain categories.  Taboola is primarily native ads, I
5  believe, and I think the targeting and reporting
6  capabilities are much more limited, particularly for
7  small advertisers.
8          There is a tool called AppLovin,
9  A-p-p-L-o-v-i-n, that provides in-app capabilities.
10 And, again, for small advertisers, I don't believe it
11 provides the same level of reporting in analytics.
12         Those are the two that I can think of.
13     Q.  Now I'm going to broaden to any advertiser.
14 Can you give me examples of ad buying tools that offer
15 robust targeting options in analytics?
16     A.  DV360, Criteo, The Trade Desk.
17         Those other tools that I mentioned, Taboola,
18 and that's T-a-b-o-o-l-a, I believe, and AppLovin offer
19 tools for large advertisers as well.
20     Q.  And is it your opinion that DV3 --
21     A.  Excuse me.  Could I -- just thought of one
22 more.
23     Q.  Oh, I'm sorry.  Yeah.  I'm sorry, I didn't
24 know --
25     A.  I was still thinking.

Page 143

1          Yahoo has a DSP, formerly Verizon.  Over the
2  time period that we're discussing, 2013 to 2023, there
3  was a company called MediaMath that provided tools for
4  large advertisers, but I believe they went bankrupt in
5  2022 or 2023.
6          And that's all I can come up with right now.
7  Thank you.
8      Q.  And so is it your position that DV360,█████
9  █████████ are not available to small advertisers?
10     MR. RENARD:  Objection to form.
11     THE WITNESS:  It's my experience in the
12 industry that small advertisers don't have the expertise
13 or time to use those tools.  And so when I have seen
14 small advertisers placing advertisements through those
15 tools, it has been via intermediaries.
16         So for instance, I have a consulting client
17 that specializes in programmatic display.  Some of their
18 customers are small businesses, but the actual
19 management of the campaigns is taking care of Via and
20 this company functioning like an advertising agency
21 ████████████████████.
22 BY MR. ROSSON:
23     Q.  Is Google Ads customizable?
24     MR. RENARD:  Objection to form.
25     THE WITNESS:  I'm not sure what we mean by

Page 144

1  "customizable" here.
2  BY MR. ROSSON:
3      Q.  I'll come back to that.
4          I'm looking at Paragraph 182 of your opening
5  report.  Would you look at that, please.
6      A.  I'm there.
7      Q.  Okay.
8          Do you see your Footnote 76?
9      A.  I do.
10     Q.  And you see it tied to the body text that
11 says, "███████████████████████████████
12 ██
13     A.  I see that.
14     Q.  Okay.
15 ██████████████████████████████
16 ███████████████████
17 ██████████
18     Q.  Okay.
19         And your citation there is to an expert report
20 from the Eastern District of Virginia case; is that
21 right?
22     A.  That's correct.  In that section of Dr. Lee's
23 report, Dr. Lee analyzed customer data from Google and
24 produced a chart that showed the number of customers who
25 used each tool exclusively and then the two together.

Page 145

1      Q.  And are you relying on Dr. Lee's analysis?
2      MR. RENARD:  Objection to form.
3          THE WITNESS:  I have carried out that analysis
4  independently to verify his conclusions.  I believe I'm
5  using the correct pronoun.  So I am citing to Dr. Lee's
6  chart, but I have independently verified the information
7  in that chart.
8  BY MR. ROSSON:
9      Q.  Where can I find your analysis?
10     MR. RENARD:  Objection to form.
11     THE WITNESS:  I did this as part of my
12 preparation for this deposition.
13 BY MR. ROSSON:
14     Q.  Had you performed such analysis at the time
15 you issued your opening report?
16     A.  I had not.
17     Q.  Okay.
18         Other than Dr. Lee's expert report and the
19 work you performed yourself that you just described, is
20 there anything else in your experience or research to
21 indicate to you how common it is for an advertiser to
22 use DV360 and Google Ads?
23     A.  Yes.
24     Q.  And what is that?
25     A.  I've worked with a number of large advertisers

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1  who use both tools. And in the bulleted list in
2  Paragraph 182, I describe some of the reasons why in my
3  experience large advertisers tend to use both.
4      Q. Did your experience allow you to conclude that
5  ████████████████████████████████████████████████
6  ████████████████████████████
7      A. The information that I'm citing to you here is
8  consistent with my experience. The specific numerical
9  ████████████████████████████████████████████████████
10 █████████████████████████████. But that
11 number seems about right to me based on the advertisers
12 that I've worked with.
13     Q. Without Dr. Lee's analysis, would you be able
14 to ██████████████████████████████████████████████
15 ███████████████
16     MR. RENARD: Objection. Form.
17     THE WITNESS: I think without the information
18 provided to Dr. Lee, my opinion might be modified
19 somewhat to say something like a significant proportion
20 of large advertisers use both or something a little less
21 specific.
22 BY MR. ROSSON:
23     Q. If Google Ads raised its prices or decreased
24 its quality, do you agree that advertisers using both
25 DV360 and Google Ads would shift SSPIN to DV360?

Page 147

1      MR. RENARD: Objection to form.
2      THE WITNESS: No, I would probably not agree
3  with that.
4  BY MR. ROSSON:
5      Q. Do you have an opinion one way or the other
6  whether demand for DV360 or Google Ads changes when the
7  quality or price of one of them changes?
8      MR. RENARD: Objection. Form.
9      THE WITNESS: No, I'm not offering an opinion
10 on that.
11 BY MR. ROSSON:
12     Q. Okay.
13     Is it true that advertisers use other ad
14 buying tools in addition to Google Ads? DV360?
15     MR. RENARD: Objection. Form.
16     THE WITNESS: Some advertisers use additional
17 buying tools.
18 BY MR. ROSSON:
19     Q. What's the proportion of users of DV360 and
20 Google Ads that also use an additional tool?
21     MR. RENARD: Same objection.
22     THE WITNESS: I think it depends on the size
23 of the advertiser. I think for the very largest
24 advertisers probably the best I can say right now is
25 it's not uncommon. For advertisers that I would

Page 148

1  consider large but they are not behemoths, I would say
2  it is uncommon and for small advertisers, they're not
3  using DV360 so I think it doesn't apply.
4  BY MR. ROSSON:
5      Q. What's the basis for those estimates?
6      A. That's based on my experience.
7      Q. Do you believe that your clients at
8  Data Insights are a representative sample of the ad
9  buyer and ad seller population at large?
10     MR. RENARD: Objection. Form.
11     THE WITNESS: I think it would depend on
12 specifically what we're trying to measure, but if we're
13 talking about the overall advertising market, I would
14 say my sample is more representative of the large
15 advertisers, but I have a large sample size at both
16 large and small.
17 BY MR. ROSSON:
18     Q. When you delineate between large and small
19 advertisers, can you give me an idea of how you're
20 defining those two categories?
21     A. Yes. I think about this in terms of in the
22 context of this case the needs that those advertisers
23 have. As I mention in the report, small advertisers
24 tend to have someone managing their marketing who maybe
25 it's not their full-time job or maybe there's only one

Page 149

1  person who's handling all marketing and so those
2  advertisers need a very streamlined process to transact
3  in the advertising marketplace.
4      Generally speaking, those advertisers tend to
5  have smaller budgets, but I have worked with advertisers
6  I would consider small that had quite large budgets;
7  they just spent a ton in one channel or something.
8      Large advertisers tend to have large budgets
9  and large teams and need a great deal of what I might
10 call enterprise class functionality, managing multiple
11 log-ins, multiple channels, many creatives making
12 omni-channel marketing decisions across those channels
13 and operating at a much higher level of sophistication
14 and taking advantage of much more sophisticated
15 targeting options, and so that's how I come to this
16 definition of large and small.
17     Q. In Paragraph 182 of your opening report, the
18 first bullet point, the beginning reads, "Access to
19 search: the overwhelming reason for large, sophisticated
20 advertisers who use DV360 to also use Google Ads is to
21 participate in Google's search marketing."
22     Do you see that?
23     A. I do.
24     Q. And you have no citation there, correct?
25     A. That is correct.

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1   Q.  What's the basis for the assertion?
2   A.  The basis is my experience working with these
3   large advertisers.  Google makes a tool for large
4   advertisers to use search called SA360.  But in my
5   experience, most marketers find the interface for Google
6   Ads to buy search more robust and efficient, and so for
7   these large advertisers it is worth it to have members
8   of their team who specialize in Google Ads to perform
9   large-scale search campaigns.
10   Q.  Are you relying on anything other than your
11   industry experience?
12      MR. RENARD:  Objection.  Form.
13      THE WITNESS:  As it relates to this bullet
14   point, no, I'm relying on my industry experience.
15   BY MR. ROSSON:
16   Q.  Other than you, can you tell me of someone in
17   the AdTech space that believes ad buying tools for small
18   advertisers are a distinct product in a separate market
19   compared to advertising tools for large advertisers?
20   A.  I would suspect that most advertisers would
21   identify DV360 and Google Ads as distinct products.  And
22   the extent to which they exist in a separate market
23   might be a question for an economist, but if you asked
24   an advertiser do these products do different things, I
25   think they would say yes.

Page 151

1   Q.  You said "I would suspect" at the beginning of
2   your answer.  Do you remember that?
3   A.  I do.
4   Q.  Do you know anyone else who claims that ad
5   buying tools for small advertisers are a distinct
6   product and separate market from advertising tools for
7   large advertisers?
8   A.  Yes.
9   Q.  Okay.  Don't reveal anything from counsel;
10   don't reveal communications with experts.  Can you tell
11   me who that is?
12   A.  I can think of several conversations I've had
13   with clients where they have described Google and DV360
14   as separate products.  Partially when I have asked them,
15   "Could we streamline our tech stack by working with only
16   one of Google's advertiser tools," and they have
17   explained the unique features of the two different
18   tools.
19   Q.  So now I want to turn to your own history of
20   publication, anything you've published to the market
21   academically or as a professional.
22      Do you understand?
23   A.  Okay.  So we're talking peer-reviewed
24   literature and also white papers?
25   Q.  Exactly.  Or --

Page 152

1   A.  Would this also include white papers internal
2   to companies or only public facing?
3   Q.  Public facing and, you know, blog posts,
4   insights, thought leadership papers, et cetera.
5      Are you with me?
6   A.  Yes.
7   Q.  Okay.
8      Before this case, had you ever written
9   something to the effect that ad buying tools for small
10   advertisers are a distinct product in a separate market
11   from advertising tools for large advertisers?
12   A.  I have not written anything publicly that
13   would fit that description.
14   Q.  Okay.  Are you aware of anyone else writing
15   something publicly that would fit that description?
16   A.  I have vague recollections of some trade press
17   articles talking about the different product features.
18   It might have been ClickZ writing about the difference
19   between DV360 and Google Ads, or Digiday, but I can't
20   recall with precision right now.
21   Q.  Those industry publications wouldn't be
22   analyzing whether tools are distinct to the product
23   market, would they?
24      MR. RENARD:  Objection to form.
25      THE WITNESS:  I think that those publications

Page 153

1   would be talking about the benefits and audiences of
2   those two different products and distinguishing between
3   the use and the types of customers that the products
4   have, and I'm not sure if that fits the definition of
5   "product market."
6   BY MR. ROSSON:
7   Q.  Okay.  Other than the ClickZ article and the
8   other one you mentioned, does anything come to mind in
9   terms of public materials that would indicate small
10   advertiser tools and large advertiser tools are two
11   different markets?
12      MR. RENARD:  Objection to form.
13      THE WITNESS:  In my rebuttal report, I cite a
14   paper by Hal Singer, and I can't remember the other
15   author's name.  It's either H-o-h-n or K-o-h-n, I think,
16   that talks about the difference between -- my
17   recollection is it talks about the difference between
18   large ad buying tools like DV360, and the version of
19   Google Ads that was primarily just Search and AdSense,
20   and distinguishes between those, and I believe
21   distinguishes between them as product markets.  That's
22   the only other thing that comes to mind right now.
23   BY MR. ROSSON:
24   Q.  I'm going to shift gears and ask you some
25   questions about conflicts of interest, okay?

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1    A.  Okay.
2    Q.  Are you aware of any deceptive trade practice
3  statutes that use the term "conflict of interest"?
4        MR. RENARD:  Objection.  Form.
5        THE WITNESS:  I am not a lawyer and I don't
6  believe I can tell you anything directly about deceptive
7  trade practice statutes, including whether or not they
8  include the term "conflict of interest."
9  BY MR. ROSSON:
10    Q.  Okay.  You don't know whether deceptive trade
11  practice statutes include the term "conflict of
12  interest"?
13    A.  I do not.
14    Q.  Do you agree that since -- excuse me.
15        Do you agree that since at least 2013, it's
16  been widely known that Google operates AdX?
17    A.  Yes.
18    Q.  Are you aware of Google trying to keep that a
19  secret?
20    A.  No, I'm not.
21    Q.  Do you agree that since at least 2013, it's
22  been widely known that Google provides services to ad
23  buyers?
24    A.  I agree with that.
25    Q.  Are you aware of Google trying to keep that a

Page 155

1  secret?
2    A.  I am not aware of Google trying to keep that a
3  secret.
4    Q.  Do you agree that since at least 2013, it's
5  been widely known that Google provides services to ad
6  sellers?
7    A.  I am aware of that.
8    Q.  Are you aware of Google trying to keep that a
9  secret?
10    A.  No.  I think, as my report makes clear, it is
11  the interoperability between these and the way in which
12  Google leveraged that was kept a secret.
13    Q.  The fact that Google operates AdX and provides
14  services to ad buyers and sellers has been known to the
15  market since at least 2013, right?
16        MR. RENARD:  Objection to form.
17        THE WITNESS:  Yes.
18  BY MR. ROSSON:
19    Q.  What part of Google's alleged conflict of
20  interest would you say was not known to the market?
21        MR. RENARD:  Objection to form.
22        THE WITNESS:  I think the way in which
23  operating these multiple lines of businesses allowed
24  Google to engage in practices that were not known to the
25  industry.  And had they been known, people in the

Page 156

1  industry would have changed their behavior.  I think
2  that constitutes a conflict of interest, and as we were
3  discussing earlier, taking advantage of that conflict of
4  interest.
5  BY MR. ROSSON:
6    Q.  I'm looking at Paragraph 374 of your opening
7  report.  Let me know when you're there.
8    A.  I'm there.
9    Q.  The second sentence reads -- pardon me.  The
10  third sentence reads, "Conflicts arise when the party
11  with control of material information or functionality
12  discriminates among participants, violating expectations
13  of fairness and impartiality."
14        Do you see that?
15    A.  I do.
16    Q.  Where did this definition of a "conflict of
17  interest" come from?
18        MR. RENARD:  Objection to form.
19        THE WITNESS:  I'm not sure if I'm offering
20  this sentence as a definition of conflict of interest.
21  BY MR. ROSSON:
22    Q.  All right.  Let me clarify then.
23        What is the basis for your position that,
24  "Conflicts arise when the party with control of material
25  information or functionality discriminates among

Page 157

1  participants, violating expectations of fairness and
2  impartiality"?
3    A.  The basis for my understanding of fairness and
4  impartiality comes primarily from my industry experience
5  and my participation in auctions in digital marketing
6  both from the buy side and the sell side, and the way in
7  which the practices carried out by those businesses
8  would change if they were aware of ways in which
9  Google's conduct restricts the flow of information or
10  discriminates among the participants in the auction.
11    Q.  When you write, "Conflicts arise when the
12  party with control of material information or
13  functionality discriminates among participants,
14  violating expectations of fairness and impartiality," is
15  that a statement that you consider true only as to
16  Google?
17    A.  In this case, I have information about
18  Google's conducts, and so I'm making this statement
19  primarily through that lens.  The general principle I
20  think is true regardless, but I don't have knowledge of
21  that kind of behavior in other cases.
22    Q.  If I want to test whether it's true, that
23  conflicts arise when the party with control of material
24  information or functionality discriminates among
25  participants, violating expectations of fairness and

40 (Pages 154 - 157)

Page 158

1  impartiality, can you point me to any peer-reviewed
2  literature that would help me?
3      MR. RENARD:  Objection to form.
4      THE WITNESS:  I don't believe off the top of
5  my head I can point you to peer-reviewed literature that
6  can help you.  Certainly there's ample deposition
7  testimony that speaks to this.
8  BY MR. ROSSON:
9      Q.  In what regard?
10      MR. RENARD:  Objection to form.
11      THE WITNESS:  In my rebuttal report, I cite a
12  number of depositions where market participants were
13  asked about expectations of fairness and transparency.
14  And so I believe that that testimony speaks to these
15  expectations and the ways in which, when compared to
16  Google's conducts, those expectations are violated.
17  BY MR. ROSSON:
18      Q.  But what about the inferential belief that if
19  expectations are violated, it's a conflict of interest?
20  How do you know that?
21      MR. RENARD:  Objection to form.
22      THE WITNESS:  I think that what I am trying to
23  capture with this sentence is that the conflict of
24  interest that Google has operating on the buy side and
25  on the sell side as the exchange led to these violations

Page 159

1  of expectations.
2  BY MR. ROSSON:
3      Q.  What is a conflict of interest?
4      MR. RENARD:  Objection to form.
5      THE WITNESS:  A conflict of interest in this
6  case -- or this situation is where a party like Google
7  has interests on one side of a transaction, for
8  instance, on the buy side, and on the other side of the
9  transaction, for instance, on the sell side.  And
10  throughout the documentation in this case, we see
11  instances of Google disadvantaging one set of customers
12  in preference for another set of customers.  And so that
13  is the conflict of interest I'm speaking about.
14  BY MR. ROSSON:
15      Q.  Am I correct that your definition of a
16  conflict of interest is when a company has interests on
17  one side of a transaction and on the other side?
18      MR. RENARD:  Objection.  Form.
19      THE WITNESS:  Yes, sitting here today offering
20  a lay definition of conflict of interest, that's how I
21  think of it.
22  BY MR. ROSSON:
23      Q.  Okay.
24      And so your opinions use the definition that a
25  conflict of interest is an interest on one side of the

Page 160

1  transaction and the other side; is that right?
2      A.  And where tho- --
3      MR. RENARD:  Objection to form.
4      THE WITNESS:  Oh, excuse me.
5      And where those are in conflict.  As I mention
6  in my report, in the previous section, generally
7  speaking, advertisers are trying to acquire the highest
8  quality audience at the lowest price to meet their
9  business goals.  And publishers are trying to monetize
10  their inventory for the highest price.  And so the
11  conflict arises when Google has the ability to decide
12  the extent to which each party gets their way versus the
13  parties negotiating directly over that.
14  BY MR. ROSSON:
15      Q.  Can you point me to any literature not about
16  whether a conflict has occurred, but on what a conflict
17  of interest is?
18      MR. RENARD:  Objection to form.
19      THE WITNESS:  I don't believe I cite any
20  documents giving a definition of a conflict of interest.
21  BY MR. ROSSON:
22      Q.  Do you know of any?
23      A.  Not off the top of my head.
24      Q.  Do you know of any documents that would help
25  the reader understand what a conflict of interest is?

Page 161

1      MR. RENARD:  Objection to form.
2      THE WITNESS:  The testimony in this case does
3  speak to conflict of interest.  So I'd perhaps point the
4  reader toward that.
5  BY MR. ROSSON:
6      Q.  Do you agree with me that in order to
7  determine whether a conflict of interest occurred, you
8  first have to know what a conflict of interest is?
9      MR. RENARD:  Objection to form.
10      THE WITNESS:  Yes, I think that having a
11  working definition of conflict of interest as I've just
12  given you is part of classifying a situation as
13  exhibiting a conflict of interest.
14  BY MR. ROSSON:
15      Q.  And you got the working definition of a
16  conflict of interest from the testimony in this case?
17      A.  I would point the reader to testimony in this
18  case for independent verification of conflict of
19  interest.  My definition of conflict of interest is
20  based on my working experience.
21      Q.  Your working experience supplied you with the
22  definition of a conflict of interest?
23      A.  I developed my definition of a conflict of
24  interest based on my work experience.
25      Q.  Do you know of a way we could scientifically

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1  test whether your definition of a conflict of interest
2  is correct?
3      MR. RENARD:  Objection to form.
4      THE WITNESS:  I could imagine a survey to
5  estimate whether or not my conflict of interest accords
6  with others in a given industry.
7  BY MR. ROSSON:
8      Q.  Is that work you undertook?
9      A.  I did not.  I am basing my description of
10  conflicts of interest on my experience.
11      Q.  Are conflicts of interest -- let me ask this
12  differently.
13      If I took ten advertisers at random and ten
14  publishers at random, do you think they would agree on a
15  definition of what a conflict of interest is?
16      MR. RENARD:  Objection to form.
17      THE WITNESS:  I think in a purely abstract
18  setting, I don't know.  I think if given a description
19  of a conduct, such as the conducts in this case, and if
20  you asked ten advertisers and ten publishers if, say,
21  Bernanke represents a conflict of interest, I think we
22  would find agreement.
23  BY MR. ROSSON:
24      Q.  Can you say that with a reasonable degree of
25  scientific certainty?

Page 163

1      A.  Yes.
2      Q.  And if we are to take the population of online
3  advertisers and online publishers as a whole, what
4  percentage of that population have you drawn your
5  experience from?
6      MR. RENARD:  Objection to form.
7      THE WITNESS:  We went through the numbers
8  earlier today.  My experience among large advertisers,
9  which maybe we could define by the top 100 advertising
10  budgets, then my sample in the sense of the number that
11  I have worked with is roughly 20 percent.  If we're
12  talking about small advertisers who, again, in my
13  experience I think are a little bit further from the
14  details of some of these conducts.  My sample of small
15  advertisers is much smaller.  I estimated the number of
16  small advertisers at 3 million, and I estimated that I
17  had worked with 15- to 20,000.
18  BY MR. ROSSON:
19      Q.  Do you agree that there are millions of
20  advertisers who transacted on AdX from 2013 to 2023 who
21  you've never spoken with?
22      MR. RENARD:  Objection to form.
23      THE WITNESS:  Yes.  It is my estimate that
24  millions of advertisers have used AdX, and I have not
25  spoken to millions of them.

Page 164

1      MR. RENARD:  Mr. Rosson, whenever you're at a
2  convenient break, I think we have been going about an
3  hour.
4      MR. ROSSON:  That's fine.  We can break now.
5      THE VIDEOGRAPHER:  This is the conclusion of
6  Media 4.  We are going off the record at 2:23 p.m.
7      (RECESS TAKEN)
8      THE VIDEOGRAPHER:  This is the start of
9  Media 5.  We are back on the record at 2:44 p.m.
10  BY MR. ROSSON:
11      Q.  Dr. Chandler, any testimony from today that
12  you would like to change or correct?
13      A.  No.
14      Q.  Could you look at Paragraph 377 of your
15  opening report, please.
16      A.  Okay.
17      Q.  The second sentence reads, "Conduct benefiting
18  Google's customers at the expense of competitors is
19  conflicted when fairness is expected."
20      Do you see that?
21      A.  I do.
22      Q.  Expected by whom?
23      A.  I would say expected in the market.  So this
24  paragraph is talking about advertisers.  And the
25  preferencing of, for instance, Google's DV360 customers

Page 165

1  within AdX versus customers that are bidding into AdX
2  from other ad buying tools, that would be a conflict of
3  the expected fairness.
4      Q.  According to whom?
5      A.  According to the industry.
6      Q.  As a whole?
7      A.  Yes.
8      Q.  Based on what?
9      A.  Based on my experience of working with many
10  advertisers who used DV360 and advertisers who used
11  other tools like Criteo and The Trade Desk.
12      Q.  Would you agree that when you reference your
13  industry experience, you're doing so anecdotally?
14      MR. RENARD:  Objection to form.
15      THE WITNESS:  No.
16  BY MR. ROSSON:
17      Q.  Did you make any effort to take surveys of
18  publishers or advertisers to determine what they
19  considered a conflict of interest?
20      MR. RENARD:  Objection.  Form.
21      THE WITNESS:  I have been working with
22  advertisers and publishers in these contexts for 25
23  years, and so I have gathered data that way, but I did
24  not take a survey as part of this work.
25

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

BY MR. ROSSON:

1    BY MR. ROSSON:
2       Q.  Did you take notes on the data you were
3    collecting from publishers and advertisers as you went
4    along through those 25 years?
5       A.  Certainly there were notes taken in the
6    engagements with the publishers and advertisers that
7    were part of the engagements with them.
8       Q.  Are you relying on those notes in offering
9    your opinions?
10      MR. RENARD:  Objection to form.
11      THE WITNESS:  No.
12   BY MR. ROSSON:
13      Q.  Are you relying on your memories?
14      A.  I'm relying on my experience.
15      Q.  Is that experience documented somewhere that I
16   can review it other than in your mind?
17      MR. RENARD:  Objection to form.
18      THE WITNESS:  My experience is described in my
19   reports.
20   BY MR. ROSSON:
21      Q.  From your experience described in your
22   reports, I won't be able to know which specific
23   advertisers or publishers you've spoken to, correct?
24      A.  I list some of the advertisers and publishers
25   I've worked with in the opening section.

Page 167

1       Q.  Do you list hundreds?
2       A.  No.
3       Q.  And is there a place I can go where I can
4    study and understand the interactions you've had with
5    all of your advertiser and publisher clients?
6       A.  The material that's available to study is the
7    material that I've cited in my reports.
8       THE REPORTER:  In your what?
9       THE WITNESS:  Reports.
10      THE REPORTER:  Thank you.
11   BY MR. ROSSON:
12      Q.  So you don't have, for example, a database of
13   the names of all the publishers and advertisers you've
14   interacted with and their preferences on
15   transparency, fairness, or conflicts of interest,
16   correct?
17      A.  I don't have a database like that, that I am
18   allowed to share.
19      Q.  You don't have one at all, right?
20      A.  I have data related to advertisers and
21   publishers I've worked with, but most of those specific
22   agreements are subject to NDAs for the client
23   engagement.
24      Q.  You don't have a database of all of your
25   clients and their views on fairness, transparency, and

Page 168

1    conflicts of interests anywhere, correct?
2       A.  If we're specifically talking about those
3    topics, I do not have that information stored in the
4    database.
5       Q.  The only place that information is stored is
6    in your mind, correct?
7       A.  In my reports, I am synthesizing information
8    from the case and interpreting that information, but the
9    places where I am relying on my experience, the
10   information about that experience, is in my reports.
11      Q.  Let's say I want to -- let's say that you tell
12   me about your experiences, and just assume for the sake
13   of argument, I'm not implying that this is true, but
14   assume I don't believe you.  How can I test whether what
15   you're saying is true?
16      MR. RENARD:  Objection to form.
17      THE WITNESS:  I think you could look for
18   information from other industry participants that
19   contradicts what I'm saying, and look for information
20   that supports it.  And based on my synthesis of the
21   materials in this case, the additional data supports the
22   opinions that I'm drawing.
23   BY MR. ROSSON:
24      Q.  Does Google have duties to its competitors?
25      MR. RENARD:  Objection to form.

Page 169

1       THE WITNESS:  I think it depends on the
2    context.
3    BY MR. ROSSON:
4       Q.  Let's go back to that sentence where you write
5    "Conduct benefiting Google's customers at the expense of
6    competitors is conflicted when fairness is expected."
7       Do you see that?
8       A.  Yes.
9       Q.  So you believe that conduct that benefits
10   Google's customers at the expense of its competitors is
11   conflicted if the market expects fairness, correct?
12      A.  In this sentence, when I say, "conduct
13   benefiting Google's customers at the expense of
14   competitors," I mean the competitors to Google's
15   customers.
16      Q.  Do you believe there's any context in which
17   Google has duties to its competitors?
18      MR. RENARD:  Objection to form.
19      THE WITNESS:  I think that there are places
20   where AdX operating as an exchange has duties to behave
21   fairly to Google's competitors on, for instance, the ad
22   buying tools side.
23   BY MR. ROSSON:
24      Q.  Do you believe that AdX has any duties to
25   exchanges that compete with it?

43 (Pages 166 - 169)

Page 170

1    MR. RENARD: Objection to form.
2    THE WITNESS: I think there are certain
3 business norms that AdX should adhere to when it is
4 interacting with other exchanges. But I think that AdX
5 should be free to compete with other exchanges. I think
6 the problems arise when we tie together multiple
7 software platforms, and particularly when we combine
8 them with Google's dominant position in the industry.
9 BY MR. ROSSON:
10   Q. What norms do you believe AdX should adhere to
11 when competing against other exchanges?
12   A. Fair dealing. For instance, AdX is in a
13 position where it could receive bids from other
14 exchanges and send back erroneous information to those
15 exchanges, and could essentially lie about the
16 advertising that was carried out. That is a
17 hypothetical example of a norm that I feel like AdX
18 should not be violating. And when I say "feel like,"
19 what I mean is I think the industry would agree that
20 that would not be acceptable.
21   Q. Do you believe that Google's AdX has a duty to
22 deal in good faith and fairly with other exchanges?
23   MR. RENARD: Objection to form.
24   THE WITNESS: Independent of Google's other
25 AdTech products, I do not think that AdX has a duty to

Page 171

1 deal in I think the sense you mean it. But I think that
2 when Google's AdX engages in advertising transactions
3 and another exchange is that party, then AdX should deal
4 honestly with those exchanges in carrying out the
5 transaction.
6 BY MR. ROSSON:
7    Q. What's the basis for that belief?
8    A. These are the norms in the industry. If we
9 have a contract where I will give you a certain amount
10 of money and you will show an ad, then there is an
11 expectation that if I give you that money, you will show
12 that ad. And so if that -- again, a hypothetical
13 example, but if we were in that situation and AdX was
14 not doing that with another exchange, that would violate
15 norms. The conflicts that I'm describing in this
16 section relate to the connection between AdX and other
17 tools, like DV360 or GAM.
18   Q. Is there a norm in the online advertising
19 industry that parties should adhere to their contracts?
20   A. Yes.
21   Q. Do you take any ethical exception to that
22 norm?
23   MR. RENARD: Objection to form.
24   THE WITNESS: If a contract is freely entered
25 into by both parties, then I can't think of an ethical

Page 172

1 exception.
2 BY MR. ROSSON:
3    Q. If parties enter into a commercial contract
4 freely, you agree that it's appropriate to hold the
5 parties to that contract, fair?
6    MR. RENARD: Objection to the form of the
7 question.
8    THE WITNESS: Again, I am not a lawyer; I am a
9 marketer and data scientist. But based on my
10 interpretation of the question you're asking, I think
11 that it is appropriate to hold parties to contracts they
12 enter into freely.
13 BY MR. ROSSON:
14   Q. You are here speaking today about what the
15 online advertising industry generally expects, right?
16   MR. RENARD: Objection to form.
17   THE WITNESS: That is one of the things that I
18 am talking about here today.
19 BY MR. ROSSON:
20   Q. And is it your position that the online
21 advertising industry generally expects that when
22 commercial parties enter into a written transaction,
23 that it's fair to hold them to their bargain?
24   MR. RENARD: Objection to form.
25   THE WITNESS: Yes. I think there are examples

Page 173

1 in this case where the generally accepted understanding
2 of the terms of the contract might be understood
3 differently between Google and other parties. And so I
4 think conflicts could arise from that. But contracts
5 being binding is one of the most central parts of our
6 rule of law as far as I understand.
7 BY MR. ROSSON:
8    Q. Contracts being binding is a very important
9 part of the online advertising industry, isn't it?
10   MR. RENARD: Objection to form.
11   THE WITNESS: Yes.
12 BY MR. ROSSON:
13   Q. Is it your opinion that in the AdTech
14 industry, that there are not alternatives to Google's
15 products?
16   A. It depends on which of Google's products we're
17 talking about.
18   Q. Which of Google's products would you say there
19 is no alternative in the industry for?
20   A. If we are saying --
21   MR. RENARD: Objection to the form of the
22 question.
23   THE WITNESS: If we are saying no alternative
24 in a strict, absolute sense, then all of Google's
25 products have alternatives. If we mean that slightly

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1 more broadly to say, no practical alternative, then I
2 think there is not a practical alternative to GAM or to
3 Google Ads depending on a company's business goals.
4 BY MR. ROSSON:
5    Q.  What about AdX?
6        MR. RENARD:  Objection to form.
7        THE WITNESS:  There are alternative exchanges
8 that advertisers can buy on for publishers.  It is very
9 hard to profitably run an online publishing business
10 without entering into a business relationship with AdX.
11 BY MR. ROSSON:
12    Q.  I'm going to talk about your Opinion 17 next.
13 I'm looking at the opening report Paragraph 23,
14 Subparagraph 17.
15    A.  Okay.
16    Q.  Do you know whether AdX runs a first-price
17 auction?
18    A.  In 2024, it is my understanding that AdX runs
19 a first-price auction.
20    Q.  Do you know when AdX went to a first-price
21 auction?
22    A.  I believe it was in 2019.
23    Q.  Okay.
24        Do you have an understanding of whether
25 Reserve Price Optimization was utilized after 2019?

Page 175

1    A.  I believe that Reserve Price Optimization was
2 discontinued when AdX moved to a first-price auction.
3    Q.  Okay.
4        Would you agree with me that an auction
5 mechanic or optimization cannot deceive anyone at the
6 point in which it's been discontinued and is no longer
7 utilized?
8        MR. RENARD:  Objection to form.
9        THE WITNESS:  No.
10 BY MR. ROSSON:
11    Q.  Why not?
12    A.  Speaking from the perspective of a marketing
13 data scientist, if I am analyzing data trying to derive
14 insights based on auction data, whether this is on the
15 publisher side setting price floors or on the advertiser
16 side determining optimal bidding strategies, if I am
17 operating in an environment where a conduct is applied
18 intermittently, whether that's on and off, or turning
19 off, there is a challenge in making optimal decision
20 logic even after a conduct has ceased.  And that is
21 because the analyses and algorithms developed during the
22 time the conduct was present become instantly out of
23 date.  If a conduct is ceased and announced, then that
24 lessens the extent to which the conduct is deceptive
25 after it's been discontinued.

Page 176

1    Q.  Can conduct you would find deceptive ever
2 cease being deceptive?
3    A.  Yes.
4    Q.  How?
5        MR. RENARD:  Objection to form.
6        THE WITNESS:  A conduct that I find deceptive
7 could cease being deceptive by being fully disclosed,
8 and after a sufficient period of time, allowing for
9 revised analyses to take place in the post-conduct
10 world, or if perhaps the party that ceased the conduct
11 provided data that allowed affected parties to arrive at
12 the moment of the conduct ceasing with new algorithms
13 ready to roll.
14 BY MR. ROSSON:
15    Q.  Where do you get the understanding that
16 conduct can be deceptive even after it entirely ceases?
17    A.  Based on my work analyzing auction data and
18 also the materials produced in this case.
19    Q.  What auction mechanics or optimizations
20 mentioned in your report continued after 2019?
21    A.  My understanding is enhanced dynamic
22 allocation has continued after 2019.  I am unsure
23 whether or not Dynamic Revenue Sharing continued at any
24 point past 2019.
25        I talk about in my report exchange bidding or

Page 177

1 open bidding being a conduct that harmed publishers and
2 that conduct has continued.  And I believe that may be
3 all.  Other than I guess I would say Privacy Sandbox,
4 which to the best of my knowledge has been mothballed.
5 But if that returns, it would be a post-2019 conduct.
6    Q.  Are you still offering an opinion about
7 Privacy Sandbox?
8        MR. RENARD:  Objection to form.
9        THE WITNESS:  I'm offering opinions about the
10 ideas contained in Privacy Sandbox.  Again, it is my
11 understanding that Google has decided not to release
12 Privacy Sandbox.  And so the opinions about the
13 potential conduct are still in force.  But if Privacy
14 Sandbox does not get released, then there's no harm from
15 Privacy Sandbox.
16 BY MR. ROSSON:
17    Q.  And do your Privacy Sandbox opinions depend on
18 the deprecation of third-party cookies?
19        MR. RENARD:  Objection to form.
20        THE WITNESS:  My Privacy Sandbox opinions are
21 related to the deprecation of third-party cookies.  I'm
22 not sure what you mean by "depend on the deprecation"
23 here.
24 BY MR. ROSSON:
25    Q.  If Google were to not deprecate third-party

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1  cookies, would you have the opinion that the Privacy
2  Sandbox is deceptive or unfair?
3        MR. RENARD:  Objection to form.
4        THE WITNESS:  If third-party cookies remained
5  a viable Internet advertising technology, then my
6  opinions about Privacy Sandbox being unfair and harmful
7  to the industry would be different.
8  BY MR. ROSSON:
9    Q.  How so?
10   A.  It would --
11       MR. RENARD:  Objection to form.
12       THE WITNESS:  It would depend on what
13  Privacy Sandbox looked like under that scenario.
14  BY MR. ROSSON:
15   Q.  So sitting here today, if we're to make the
16  assumption that Google does not deprecate third-party
17  cookies, do you have opinions you can share with me
18  about whether Privacy Sandbox is deceptive or unfair?
19       MR. RENARD:  Objection to form.
20       THE WITNESS:  Under this hypothetical, it is
21  my understanding that we are simultaneously supposing
22  Google does not deprecate third-party cookies, and there
23  is some program called Privacy Sandbox.  And it is
24  unclear to me what Privacy Sandbox looks like when that
25  first assumption is taken.

Page 179

1  BY MR. ROSSON:
2    Q.  That's fair.  Let me repeat it back.  Tell me
3  if I did it wrong.
4        If third-party cookies were not deprecated,
5  it's unclear to you what Privacy Sandbox would look
6  like; is that fair?
7    A.  Yes, that's fair.
8    Q.  And in that case, you don't have a present
9  opinion sitting here right now about the -- whether
10  Privacy Sandbox is fair or transparent or deceptive
11  under the assumption that third-party cookies are not
12  deprecated; is that right?
13       MR. RENARD:  Objection to form.
14       THE WITNESS:  Yes, I think that matches what I
15  was attempting to say.
16  BY MR. ROSSON:
17   Q.  Okay.  Thank you.
18       Imagine I am an ad buyer in 2021, and I go in
19  AdX to transact for an impression.  Are you with me?
20   A.  Yes.
21   Q.  Would you say that I have been deceived by
22  Reserve Price Optimization?
23       MR. RENARD:  Objection.  Form.
24       THE WITNESS:  I think a deception that you
25  suffered in 2021 would only be transmitted via your

Page 180

1  experience from when Reserve Price Optimization was
2  running.  And so if you had never interacted with AdX
3  before 2021, and if my memory is correct that Reserve
4  Price Optimization ceased, then I think under that
5  scenario, I don't believe that you would be deceived by
6  Reserve Price Optimization.
7  BY MR. ROSSON:
8    Q.  Do you know the proportion of ad buyers that
9  transacted on AdX between the time Reserve Price
10  Optimization was no longer used in 2023 that had not
11  transacted in AdX before Reserve Price Optimization was
12  no longer used?
13   A.  I do not know that proportion.
14   Q.  For your Opinion 17, are you relying on the
15  opinions of Dr. Matthew Weinberg?
16       MR. RENARD:  Objection to form.
17       THE WITNESS:  I am partially relying on the
18  opinions of Dr. Weinberg.
19  BY MR. ROSSON:
20   Q.  What do you mean by "partially"?
21   A.  I have had access to descriptions of these
22  conducts independently of what I've read in the Weinberg
23  report, and I am also relying on my experience working
24  in the industry during the time when these conducts were
25  extant.  And so the Weinberg report is one facet of my

Page 181

1  understanding of these conducts.
2    Q.  Are you able to offer all of your opinions
3  without relying on the opinions of Dr. Weinberg?
4        MR. RENARD:  Objection to form.
5        THE WITNESS:  That would require quite a bit
6  of time for me to assess.
7  BY MR. ROSSON:
8    Q.  Is it fair to say that sitting here right now,
9  you cannot tell me what opinions you would be able to
10  offer if you were not permitted to rely on Dr. Weinberg?
11   A.  I would be happy to go through the facets of
12  Opinion 17 and attempt to tease apart which ones I could
13  not offer in the absence of the Weinberg report, but I'm
14  not sure right now.
15   Q.  Let me do it this way.  Are you relying on
16  Dr. Weinberg partially or entirely for your Opinions 1
17  through 16?
18   A.  No, I don't believe so.
19   Q.  Why did you rely on Dr. Weinberg?
20   A.  I relied on Dr. Weinberg's report because I
21  think I lacked the time to fully describe all of these
22  conducts in my report.
23   Q.  You relied on Dr. Weinberg because you lacked
24  the time to fully describe all the conducts in your
25  report; is that correct?

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1    A.  Yes.  I think that the portions of the
2    Weinberg report that I rely on are descriptions of the
3    conducts, and I estimated that in order to recapitulate
4    Dr. Weinberg's analysis or what I understood his
5    analysis to be, I would not have the time before the
6    report deadline to do so, and I would not be able to
7    offer Opinion 17 without descriptions of these conducts.
8    And so that's why I rely on the sections of the Weinberg
9    report.
10   Q.  Other than relying on the Weinberg report for
11   descriptions of conduct, are you relying on the Weinberg
12   report for anything else?
13   A.  I have reviewed Dr. Weinberg's analyses of the
14   conducts, and in places I rely on his analysis as well
15   as his description.
16   Q.  If you had sufficient time, would you consider
17   yourself as having the expertise to perform the analysis
18   that Mr. Weinberg did as to the part you relied on?
19       MR. RENARD:  Objection to form.
20       THE WITNESS:  Generally speaking, yes.  In
21   terms of the analysis of the dynamics of the conducts
22   and the way in which they were implemented, I believe I
23   have the expertise to describe and analyze them in the
24   sense that I am relying on them in my report.
25

Page 183

1    BY MR. ROSSON:
2    Q.  Did you consider relying on any experts
3    offered by Google?
4    A.  No.
5    Q.  Why not?
6    A.  I was performing an independent analysis of
7    these conducts in this section.
8    Q.  But you did rely on an expert in this section,
9    right?
10   A.  In this section I relied on Dr. Weinberg's
11   report.  And in my rebuttal report, I rely on Google's
12   experts.
13   Q.  In your opening report, you know that -- well,
14   let me pause there.
15       In reviewing Dr. Weinberg's opinions that you
16   relied on, do you believe they're incorrect in any
17   regard?
18       MR. RENARD:  Objection.  Form.
19       THE WITNESS:  No.
20   BY MR. ROSSON:
21   Q.  Have you reviewed Dr. Weinberg's deposition?
22   A.  I don't believe so.
23   Q.  Are you relying on Dr. Weinberg's deposition?
24   A.  No.
25   Q.  For your Opinion 17, are you offering an

Page 184

1    opinion that applies to all publishers?
2        MR. RENARD:  Objection to form.
3        THE WITNESS:  I do not believe I am offering
4    an opinion on all publishers as part of Opinion 17.
5    BY MR. ROSSON:
6    Q.  Are you offering an opinion as to all
7    advertisers?
8        MR. RENARD:  Objection as to form.
9        THE WITNESS:  If by "all advertisers" and "all
10   publishers" what you mean is truly all across all tool
11   choices by all advertisers and publishers, then the
12   answer is, no, I'm not offering an opinion on all
13   advertisers.
14   BY MR. ROSSON:
15   Q.  And what if I limit it to advertisers or
16   publishers who transacted on AdX from 2013 to 2023, are
17   you offering an opinion as to all advertisers and
18   publishers?
19       MR. RENARD:  Objection as to form.
20       THE WITNESS:  There are portions of this
21   opinion that I think apply to all advertisers.  Some of
22   these conducts only affected advertisers who were using
23   DV360.
24       MR. ROSSON:  I'm going to hand you an exhibit
25   that I'll mark.

Page 185

1    EXHIBITS:
2        (Deposition Exhibit Number 3
3         marked for identification.)
4    BY MR. ROSSON:
5    Q.  I'm handing you what I've marked as
6    Chandler Exhibit 3.
7        Why don't you take a look at that and let me
8    know when you've had a chance to review it.
9    A.  Okay, I've read it.
10   Q.  All right.
11       Have you seen Chandler Exhibit 3 before?
12   A.  Yes.
13   Q.  Is it a document you relied on?
14   A.  I believe so, yes.
15   Q.  Do you see it's titled "Ad Exchange Auction
16   Model" at the top?
17   A.  Yes.
18   Q.  I want to go down to that first black bullet
19   point there.  It says, "DoubleClick Ad Exchange
20   determines the winning bidder based on the highest net
21   bid submitted."
22       Do you see that?
23   A.  I do.
24   Q.  Any reason to believe that statement was
25   untrue?

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1    MR. RENARD:  Objection to form.
2    THE WITNESS:  I believe that statement could
3  be misleading to the audience for this, but I think that
4  it is vague enough with its use of "based" to be not
5  factually inaccurate.
6  BY MR. ROSSON:
7    Q.  So you don't have a reason to believe that
8  sentence is factually inaccurate, do you?
9    A.  No.  I think that saying the winning bidder is
10  determined based on the highest net bid submitted, but
11  not the winning bidder is the one submitting the highest
12  next bid -- or net bid, I think that is vague enough
13  that it's not factually inaccurate.
14    Q.  The next sentence reads, "Such net bid
15  reflects any adjustments Ad Exchange may, at its
16  discretion, have made to the bid submitted by the buyer
17  for the purpose of optimizing the auction."
18    Do you see that?
19    A.  I do.
20    Q.  Any reason to believe that statement is not
21  factual?
22    MR. RENARD:  Objection to form.
23    THE WITNESS:  I have no reason to believe that
24  that statement is not factual.  I would not consider
25  this to be adequate disclosure of some of the conducts

Page 187

1  that we're talking about in this case.
2  BY MR. ROSSON:
3    Q.  Do you agree that in this sentence Google
4  disclosed that Ad Exchange may make adjustments to bids?
5    A.  I agree that this statement says that Google
6  may make adjustment to bids.  The disclosure of this
7  also depends on how it was promulgated.
8    Q.  Do you think it would be reasonable for anyone
9  to read this disclosure and conclude that Google would
10  not make adjustments to bids?
11    MR. RENARD:  Objection to form.
12    THE WITNESS:  I think that the typical
13  publisher reading this would not be able to infer the
14  conducts at issue in this case from this statement.  And
15  I think that many publishers would read this and not
16  understand the types of adjustments that were being
17  discussed.
18  BY MR. ROSSON:
19    Q.  So I'm asking you something different.
20    Do you agree with me that in this sentence,
21  Google disclosed that it may adjust bids?
22    MR. RENARD:  Objection to form of the question
23  and the preface to the question.
24    THE WITNESS:  I believe that this statement
25  says that Google makes adjustments to bids.  Whether or

Page 188

1  not this statement constitutes disclosure partially
2  depends on how publishers were made aware of the
3  existence of this statement.  And I think that this
4  statement obfuscates rather than clarifies the conducts
5  at issue in this case.
6  BY MR. ROSSON:
7    Q.  What I want to know is whether you think it
8  would be reasonable for any publisher or advertiser to
9  read the first bullet here and to come away with the
10  understanding that adjustments to bids will never be
11  made?
12    MR. RENARD:  Objection to the form of the
13  question.
14    THE WITNESS:  If we seclude the take rate as
15  an adjustment, then I think it could be reasonable for a
16  publisher to read this and think that no other
17  adjustments were being made.  I think that if we include
18  the take rate, so the move from gross to net bid, then I
19  think that a publisher would read this and conclude that
20  adjustments were being made, and they would expect that
21  to be the take rate being harvested.
22  BY MR. ROSSON:
23    Q.  Okay.  But I'm asking about the inverse,
24  whether you think it would be reasonable for any
25  publisher or advertiser to read Bullet 1 and to conclude

Page 189

1  that no adjustment of any kind will ever be made?
2    MR. RENARD:  Objection to the form of the
3  question.
4    THE WITNESS:  Again, I think that there would
5  be publishers who would read this and conclude that the
6  only adjustment that was being made was the imposition
7  of a take rate.
8  BY MR. ROSSON:
9    Q.  My question is whether you think it would be
10  reasonable for any publisher to conclude that no
11  adjustment of any kind, take rate or otherwise, would
12  ever be made, and that the way they knew that was
13  reading this first bullet point.
14    MR. RENARD:  Objection to form and the
15  assumption.
16    THE WITNESS:  Again, I think it would be
17  reasonable for a publisher to read this and conclude
18  that the adjustment that Google is talking about is the
19  imposition of a take rate, and to conclude that no other
20  adjustments were being made.  But if we include the take
21  rate, then I think all publishers would read this and
22  expect an adjustment to be made.
23  BY MR. ROSSON:
24    Q.  Now, the sentence reads, "Such net bid
25  reflects any adjustments Ad Exchange may, at its

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1  discretion, have made to the bid submitted by the buyer
2  for the purpose of optimizing the auction," right?
3      A.  Yes.
4      Q.  And is it your opinion that publishers would
5  read this and say, Well, I think what's being changed is
6  the take rate?
7      MR. RENARD:  Objection to form.
8      THE WITNESS:  Yes, I think that publishers
9  could read this and think the net bid reflects the take
10 rate being imposed on the bid submitted by the buyer.
11 BY MR. ROSSON:
12     Q.  Do you agree that Google disclosed that it may
13 adjust bids at its discretion?
14     MR. RENARD:  Objection to form.
15     THE WITNESS:  I would agree that this sentence
16 says that Google may adjust bids at its discretion, and
17 whether or not that constitutes disclosure depends not
18 only on what's in the sentence, but then also how that
19 information is shared.
20 BY MR. ROSSON:
21     Q.  What is your definition of "disclosure" as you
22 just used the term?
23     MR. RENARD:  Objection to form.
24     THE WITNESS:  I was attempting to use
25 disclosure in the same sense that you were using it in

Page 191

1  your question.  And I am taking "disclosure" to mean
2  giving the information to the publisher in a way that
3  the publisher could incorporate into their business
4  practices.
5  BY MR. ROSSON:
6      Q.  For these next questions, I'm going to use
7  "disclosure" as it's defined in the Merriam-Webster
8  Dictionary, okay?  "To make known or public, to expose
9  to view."
10     Do you understand?
11     A.  Yes.
12     Q.  Okay.
13     Do you agree with me that Google made known
14 that it may adjust bids at its discretion?
15     MR. RENARD:  Objection to the form of the
16 question and the preface to it.
17     THE WITNESS:  It's my understanding that this
18 document was created for a part of Google's website, and
19 so whether or not Google's adjustments that it was
20 making it its discretion was known depends on the extent
21 to which Google was calling attention to that site and
22 publishers were visiting it.
23 BY MR. ROSSON:
24     Q.  What duties in your mind did Google have to
25 call attention to its website and make sure that people

Page 192

1  visited its website?
2      MR. RENARD:  Objection to form.
3      THE WITNESS:  For conducts like the
4  manipulations we're discussing in this case, I think
5  Google went out of its way to not call attention to the
6  information that it was providing.
7      Reading the internal e-mail correspondence of
8  Google employees, reading the marginal comments on edits
9  of the Help Desk pages, I saw a commentary by Google
10 employees trying to thread a needle where they gave
11 enough information to cover their conducts without
12 calling undue attention to them.  And this includes
13 things like removing references to second-price
14 auctions, but not broadcasting that information or
15 attempting to ensure that their customers knew and
16 understood what they were saying, but merely put the
17 information somewhere on the Internet so that they felt
18 like they had created a statement they could point to
19 later.
20     MR. ROSSON:  I object as nonresponsive.
21 BY MR. ROSSON:
22     Q.  What duties did Google have, in your view, to
23 call attention to its own website?
24     MR. RENARD:  Objection to form.
25     THE WITNESS:  If Google was attempting to

Page 193

1  disclose auction manipulations, Google had a duty to
2  ensure that the affected parties were aware of the
3  changes.  And the mechanisms by which Google might call
4  attention to those changes could be varied.
5  BY MR. ROSSON:
6      Q.  So other than posting information on its own
7  website, what else in your view should Google have done
8  to inform the marketing community of Chandler Exhibit 3?
9      MR. RENARD:  Objection to form.
10     THE WITNESS:  I'm not offering opinions in
11 this case on what Google should have done necessarily.
12 Google has a wide variety of tools at its disposal to
13 promulgate information, and merely changing website
14 documentation is insufficient.
15 BY MR. ROSSON:
16     Q.  Publishers and advertisers are in the business
17 of putting information on the Internet, right?
18     MR. RENARD:  Objection to form.
19     THE WITNESS:  That is one of the things they
20 do, yes.
21 BY MR. ROSSON:
22     Q.  Would you agree that, generally speaking,
23 publishers and advertisers are Internet savvy?
24     A.  Yes, I would agree that, generally speaking,
25 entities that advertise on the Internet are Internet

49 (Pages 190 - 193)

Page 194

1  savvy. And entities that make their money by placing
2  ads on the Internet are certainly Internet savvy.
3      Q.  Would you agree with me that online publishers
4  and advertisers generally understand how to find
5  information on the Internet?
6          MR. RENARD:  Objection to form.
7          THE WITNESS:  I think it really depends on
8  that information.  I think the change to a website is
9  not something that the industry would reasonably
10  consider disclosure.  Google has at its -- I'm
11  forgetting the word.  I'm sorry.
12         Google has the option to issue press releases,
13  to send messages, to create pop-ups that appear when
14  someone logs into a tool, and those are ways to call
15  attention to changes.  A change to a website is not
16  something that even Internet-savvy people are likely to
17  notice unless they have somehow set up an alert every
18  time a website changes to be notified of it.
19  BY MR. ROSSON:
20     Q.  If Google issues a press release, where do you
21  imagine them putting it on the Internet?
22     A.  I imagine them sending it to journalists that
23  cover technology as they typically do.  I imagine them
24  putting it on the news portion of the product page, and
25  also making changes like this.

Page 195

1          MR. RENARD:  Mr. Rosson, whenever you get to a
2  convenient breaking point, it's been about an hour.
3          MR. ROSSON:  Yeah, we can break now.
4          MR. RENARD:  Thanks.
5          THE VIDEOGRAPHER:  This concludes the end of
6  Media 5.  We are going off the record at 3:37 p.m.
7          (RECESS TAKEN)
8          THE VIDEOGRAPHER:  This is the start of
9  Media 6.  We are back on the record at 4:00 p.m.
10  BY MR. ROSSON:
11     Q.  Dr. Chandler, any testimony from today that
12  you would like to change or correct?
13     A.  No.
14     Q.  We're looking at Chandler Exhibit 3.  Do you
15  still have that in front of you?
16     A.  I do.
17     Q.  In the first bullet point, do you see the
18  sentence that reads, "Regardless of whether any such
19  adjustments are made, the winning buyer will never be
20  charged more than the bid it submits"?
21     A.  Yes, I see that.
22     Q.  And that sentence is indicating that the
23  winning bidder will never be charged more than the bid
24  it submits, right?
25     A.  Yes.  That sentence is saying that regardless

Page 196

1  of the adjustments, the buyer will not be charged more
2  than the buyer's bid.
3      Q.  Any reason to believe that sentence was
4  factually untrue?
5          MR. RENARD:  Objection to form.
6          THE WITNESS:  I have no reason to believe that
7  statement was factually untrue for an individual bid.
8  There were conducts like RPO where a future bid by that
9  buyer would result in the buyer paying more than they
10  would have otherwise without the conduct, but on an
11  individual auction, that statement, I believe, is
12  accurate.
13  BY MR. ROSSON:
14     Q.  Are you aware of an instance where a bidder
15  bid X, but paid more than X?
16     A.  Not on an individual auction, no, I'm not
17  aware of that.
18     Q.  Are you aware of either in the aggregate or
19  individually a bidder bidding X and paying more than X?
20         MR. RENARD:  Objection to form.
21         THE WITNESS:  I am aware of a conduct like RPO
22  raising aggregate prices for a bidder over time.
23  BY MR. ROSSON:
24     Q.  Such that a bidder would end up paying a
25  greater amount than the bidder bid?

Page 197

1      A.  Such that the bidder ends up paying a greater
2  amount than the bidder would have otherwise.
3      Q.  What I'm asking about is whether you're aware
4  of a circumstance where a bidder paid an amount of money
5  greater than its bid.
6          MR. RENARD:  Objection to form.
7          THE WITNESS:  I am not aware of a circumstance
8  where the bidder is paying more than the bidder's bid;
9  I'm aware of circumstances where the bidder paid more
10  than the bidder would have expected to pay without the
11  conducts.
12  BY MR. ROSSON:
13     Q.  Go down to the last bullet point, if you
14  would.
15     A.  [Witness complies.]
16     Q.  It reads, "The Google DoubleClick Ad Exchange
17  may run limited experiments designed to optimize the
18  auction."
19         Do you see that?
20     A.  I do.
21     Q.  And that sentence is indicating that Google
22  may run experiments, right?
23     A.  That --
24         MR. RENARD:  Objection to form.
25         THE WITNESS:  That sentence is indicating that

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1  Google may run limited experiments.
2  BY MR. ROSSON:
3      Q.  Is there any reading of that bullet that you
4  can imagine where someone could reasonably conclude that
5  Google would not run any experiments?
6          MR. RENARD:  Objection to form.
7          THE WITNESS:  I think that if someone read
8  this sentence, then they would conclude that there was a
9  chance that Google would be running experiments on
10  auctions that they were participating in.
11  BY MR. ROSSON:
12      Q.  And the Chandler Exhibit 3, last bullet point,
13  also indicates what the experiments may include, right?
14      A.  Yes.
15      Q.  Did every ad buyer and seller who transacted
16  on AdX from 2013 to 2023 read Chandler Exhibit 3?
17          MR. RENARD:  Objection to form.
18          THE WITNESS:  I do not know how this
19  information was shared with advertisers and publishers.
20  BY MR. ROSSON:
21      Q.  So you don't know whether every ad buyer and
22  seller who transacted on AdX from 2013 to 2023 read the
23  information contained in Chandler Exhibit 3; is that
24  right?
25          MR. RENARD:  Same objection.

Page 199

1          THE WITNESS:  That's correct.  I don't know
2  how this information was shared.  And so I don't know if
3  every advertiser or every publisher read this
4  information.
5  BY MR. ROSSON:
6      Q.  How many advertisers or publishers relied on
7  the information contained in Chandler Exhibit 3?
8          MR. RENARD:  Objection.  Form.
9          THE WITNESS:  I don't know how many relied
10  upon it.  And now having reviewed the conducts at issue,
11  I don't think that Chandler Exhibit 3 could be relied
12  upon to appropriately account for the conducts that
13  we're discussing in this case.
14          MR. ROSSON:  Okay.  Object as nonresponsive to
15  everything after "it."
16  BY MR. ROSSON:
17      Q.  How many ad buyers or sellers from 2013 to
18  2023 found the information contained in Chandler
19  Exhibit 3 to be material to them?
20          MR. RENARD:  Objection.  Form.
21          THE WITNESS:  Based on my industry experience
22  and my time working with advertisers and publishers, I
23  would be surprised if any advertisers or publishers
24  found this material based on what I now know to be true
25  about the conducts underlying this text.

Page 200

1  BY MR. ROSSON:
2      Q.  For the information contained in Chandler
3  Exhibit 3, you would be surprised if any ad buyer or
4  seller relied on the information or found it material,
5  correct?
6          MR. RENARD:  Objection to form.
7          THE WITNESS:  I do not think Chandler
8  Exhibit 3 has information in it that advertisers or
9  publishers could use to appropriately handle the
10  conducts at issue in this case.
11  BY MR. ROSSON:
12      Q.  I'm asking a broader question.
13      A.  Can you repeat the question, please?
14      Q.  Is it your opinion that you would not expect
15  any advertiser or publisher to rely on or find material
16  the information in Chandler Exhibit 3?
17          MR. RENARD:  Objection to the form.
18          THE WITNESS:  What do you mean by "rely on" or
19  "find material"?
20  BY MR. ROSSON:
21      Q.  How did you use those terms from our prior
22  discussion a minute ago?
23          MR. RENARD:  Object to that question.  Form.
24          THE WITNESS:  I would use "rely on" or "find
25  material" to mean in this case that the information

Page 201

1  contained in Chandler Exhibit 3 would give advertisers
2  and publishers the information necessary to
3  appropriately adjust their advertising strategies based
4  on the conducts we're discussing in this case.  And
5  under that definition, I do not think it would be
6  possible for advertisers or publishers if they read this
7  to appropriately take action.
8  BY MR. ROSSON:
9      Q.  You said you have a definition of "rely on"
10  and "material" for this case.  Am I right about that?
11      A.  I'm not sure.
12          MR. RENARD:  Objection.  Form.
13          THE REPORTER:  I'm sorry, what was that?
14          MR. RENARD:  Objection to form.
15          THE WITNESS:  I'm not sure I'm following that
16  question.
17  BY MR. ROSSON:
18      Q.  How many -- let me ask it more broadly.
19          When I ask you any question about how many
20  advertisers or publishers did anything from 2013 to
21  2023, you're not going to be able to provide an answer
22  because you didn't review advertiser-by-advertiser or
23  publisher-by-publisher conduct; is that correct?
24          MR. RENARD:  Objection.  Form.
25          THE WITNESS:  No.

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

BY MR. ROSSON:

1    Q. Okay.

2      Tell me about your review of

3 advertiser-by-advertiser or publisher-by-publisher

4 conduct.

5      MR. RENARD: Objection to the form of the

6 question.

7      THE WITNESS: I did not carry out an

8 advertiser-by-advertiser review or

9 publisher-by-publisher review, other than reviewing

10 materials in this case. But you asked -- when you asked

11 questions about how many, and that question is

12 answerable regardless of whether or not an

13 advertiser-by-advertiser review or

14 publisher-by-publisher review was carried out.

15 BY MR. ROSSON:

16    Q. If you wanted to better understand whether a

17 specific advertiser or publisher found Chandler

18 Exhibit 3 to contain important information, information

19 that mattered to it, how would you do that?

20      MR. RENARD: Objection to form.

21      THE WITNESS: One way to do that would be to

22 read Chandler Exhibit 3, and compare it to my

23 understanding of the industry created over the last 25

24 years, and use that experience to determine how

---

Page 203

1 advertisers or publishers would interpret this

2 information, and compare that interpretation to the full

3 interpretation I have of these conducts based on

4 reviewing the ma -- classified material from this case,

5 and then estimating the extent to which an advertiser or

6 publisher could infer these conducts based on this

7 statement.

8 BY MR. ROSSON:

9    Q. Did you do that?

10    A. Yes.

11    Q. Now, I want to know: If whatever advertiser

12 won the 30,000th impression on September 20th, 2019,

13 relied on Chandler Exhibit 3, and said, This information

14 is important to me; I read it and it's important, will

15 your opinions in this case allow me to do that?

16      MR. RENARD: Objection to form.

17      THE WITNESS: My opinions in this case do not

18 give you information on specific auction impressions on

19 a specific day, but they do give you information on

20 generally what advertisers and publishers would

21 understand about these conducts based on the information

22 that was provided and the information that was not

23 provided.

24 BY MR. ROSSON:

25    Q. Is it true that an advertiser could simply not

---

Page 204

1 care what disclosures Google made about its online

2 auction?

3      MR. RENARD: Objection to form.

4      THE WITNESS: Advertisers have agency, and if

5 there was a disclosure that was accurate, full, and

6 timely, then that advertiser would have a choice about

7 the extent to which the advertiser wanted to incorporate

8 that disclosure in its strategies going forward.

9      In the absence of that full timely and

10 accurate disclosure, the advertiser does not have a

11 choice.

12 BY MR. ROSSON:

13    Q. An advertiser could make the choice simply

14 never to consider online auction rules and instead look

15 at their return on investment only, right?

16      MR. RENARD: Objection. Form.

17      THE WITNESS: It would depend on the

18 advertiser's situation.

19 BY MR. ROSSON:

20    Q. Right. So sometimes it could be true that an

21 advertiser cares only about ROI and cares nothing about

22 auction rules, right?

23      MR. RENARD: Same objection.

24      THE WITNESS: I have not worked with an

25 advertiser like that, nor have I reviewed testimony from

---

Page 205

1 an advertiser that fits that description, but it could

2 be true.

3 BY MR. ROSSON:

4    Q. You didn't do any analysis that would allow

5 you to conclude that there are no advertisers who are

6 driven solely by ROI and not by auction rule

7 disclosures, correct?

8      MR. RENARD: Objection. Form.

9      THE WITNESS: I analyzed the materials in this

10 case and applied my industry experience, and did not

11 discover these advertisers that you're describing here.

12 But it is impossible to say with certainty that such an

13 advertiser doesn't exist; it just does not match any of

14 the available evidence or my experience.

15 BY MR. ROSSON:

16    Q. Did you review the depositions of the states?

17    A. Yes.

18    Q. Did all of the states know that there's such a

19 thing as an online auction?

20      MR. RENARD: Objection to the form.

21      THE WITNESS: No.

22 BY MR. ROSSON:

23    Q. And those states were advertisers, right?

24      MR. RENARD: Objection to form.

25      THE WITNESS: The witnesses representing the

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1  states were representing the states as advertisers.
2  BY MR. ROSSON:
3      Q.  You agree with me that some advertisers don't
4  even know that -- excuse me.
5          You agree with me that some advertisers who
6  place online advertisements don't know that online
7  auctions exist at all, right?
8          MR. RENARD:  Objection.  Form.
9          THE WITNESS:  Yes.  There are participants in
10 the open web display auction ecosystem who either
11 because of lack of experience, lack of education, or
12 lack of need perhaps are unaware of the way in which
13 online auctions work.
14 BY MR. ROSSON:
15     Q.  Or of their existence, right?
16         MR. RENARD:  Objection.  Form.
17         THE WITNESS:  I'm not sure.
18 BY MR. ROSSON:
19     Q.  If I'm an online advertiser who doesn't know
20 that online auctions exist, do you expect it would be
21 important to my decision-making to know what the rules
22 of an online auction are?
23         MR. RENARD:  Objection.  Form.
24         THE WITNESS:  Under the initial part of that
25 question, if you do not know that online auctions exist,

Page 207

1  then knowing the auction rules I think would be
2  impossible.
3  BY MR. ROSSON:
4      Q.  And therefore, not important to my decision-
5  making, right?
6          MR. RENARD:  Same objection.
7          THE WITNESS:  Yes.  Under this hypothetical,
8  if you don't know that online auctions exist, then
9  auction rules are not taken into account in your
10 decision-making.  That does not mean that they are not
11 important to your decision-making, because they affect
12 things like your ROI.
13 BY MR. ROSSON:
14     Q.  If I'm an online advertiser who doesn't know
15 that online auctions exist at all, do you agree that
16 changes to online auction rules are not an important
17 data point for me?
18         MR. RENARD:  Objection.  Form.
19         THE WITNESS:  The vast majority of AdX spend
20 does not fit this description, but if there is an
21 advertiser who is spending on AdX, and they don't know
22 that online auctions exist at all, then the online
23 auction rules are an important data point to you only
24 insofar as they affect data points that you do care
25 about, such as ROI.

Page 208

1  BY MR. ROSSON:
2      Q.  If I'm an online advertiser who doesn't know
3  that an online auction exists -- well, I'll move on.
4          Now, forgive me if I asked you something
5  similar this morning.  Now that you have Chandler
6  Exhibit 3 in front of you, do you recall reviewing this
7  information in your practice at Data Insights prior to
8  your engagement for this case?
9      A.  I do not recall reviewing this information
10 prior to my engagement in this case.
11     Q.  But you were in a position where clients would
12 be asking you how AdX's auction rules worked; is that
13 right?
14     A.  I was in a position to advise clients on
15 participation in AdX online auctions.  The underlying
16 mechanics of those auctions were generally not well
17 understood in the industry compared to my understanding
18 now having looked at the classified materials.  So the
19 industry, my clients, and myself were under a
20 misapprehension about how AdX operated.
21     Q.  Would it be typical for clients to ask you
22 questions -- online advertising clients or publishers --
23 does Google run experiments?
24         MR. RENARD:  Objection to the form.
25         THE WITNESS:  I don't recall a client asking

Page 209

1  me that question.
2  BY MR. ROSSON:
3      Q.  Do you recall a client ever asking you:  Does
4  Google run optimizations?
5      A.  I do not recall that.  I recall clients asking
6  me questions like, Is AdX a second-price auction, during
7  the period of time where I believed it to be a
8  second-price auction when it was not a second-price
9  auction because of these conducts?  But I don't recall a
10 client asking me:  Does Google run optimizations?
11     Q.  When clients asked you, Does Google run a
12 second-price auction, would it be your practice to
13 search out information on Google's blog or Help page?
14         MR. RENARD:  Objection to form.
15         THE WITNESS:  I would typically gather that
16 information from several sources, Internet, research.
17 So that could include Google's blog or Help page,
18 analyzing the auction data itself, reading trade press
19 about the auction, and those sorts of ways.
20 BY MR. ROSSON:
21     Q.  But you don't remember being asked the
22 question, Does Google run a second-price auction, and
23 going to take a look at Chandler Exhibit 3, correct?
24     A.  That's right.  I don't remember being asked
25 the question about Google running a second-price auction

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1  and reading Chandler Exhibit 3, but I will say that even
2  reading Chandler Exhibit 3 in the absence of the other
3  materials that I've had access to would not be enough
4  information for me to determine with any sort of
5  precision what type of auction Google is running and
6  whether it was a truthful second-price auction, an
7  untruthful second-price auction, or a third-price
8  auction.
9       MR. ROSSON: Okay. Object as nonresponsive
10 beginning even if.
11 BY MR. ROSSON:
12      Q.  I want to clarify a term with you.
13          When you say "truthful" versus "non-truthful
14 auction," what distinction are you making?
15      A.  I'm using the language that Google used
16 internally about its auctions.
17      Q.  And what's your understanding of that?
18      A.  Can you clarify that question for me?
19      Q.  Sure.
20          What is your understanding of the difference
21 between a truthful auction and a non-truthful auction?
22      A.  In the context of a second-price auction, my
23 understanding of a truthful second-price auction is an
24 auction where the participant on the buy side submitting
25 the highest bid pays a price one cent over the second

Page 211

1  highest bid in the auction.
2          An untruthful second-price auction could have
3  a variety of meanings.
4       Q.  I don't want to ask you all the different
5  potential meanings. Do you mean that a non-truthful
6  second-price auction would be a second-price auction
7  that doesn't meet the criteria that you described for a
8  truthful second-price auction?
9       A.  Yes, while being represented as a second-price
10 auction.
11 EXHIBITS:
12      (Deposition Exhibit Number 4
13       marked for identification.)
14 BY MR. ROSSON:
15      Q.  I'm going to hand you Chandler Exhibit 4.
16          Have you seen this document before?
17      A.  I have a vague recollection of having seen
18 this document before, but I can't recall with precision.
19      Q.  Let me start by asking you in your private
20 practice, independent of this litigation and you serving
21 as an expert. Do you remember reading the Google blog
22 post that's Chandler Exhibit 4?
23      A.  Let me take a moment to --
24      Q.  Sure, go ahead.
25      A.  -- skim it.

Page 212

1          I think I did see this back in 2016 or 2017.
2       Q.  The title -- well, first of all, this is a
3  Google blog post, right?
4       MR. RENARD: Objection to form.
5       THE WITNESS: Yes, I believe it's part of the
6  Ad Manager blog.
7  BY MR. ROSSON:
8       Q.  Do you know what a blog is?
9       A.  Pardon?
10      Q.  Do you know what a blog is?
11      A.  Yes. It is a word that is short for weblog.
12      Q.  Okay. And do you see there's an HTTPS
13 indicator in the bottom left of the first page?
14      A.  Yes.
15      Q.  Do you see that part of that hyperlink reads,
16 "blog.google"?
17      A.  I do see that.
18      Q.  Okay.
19          The title here is, "Smarter optimizations to
20 support a healthier programmatic market."
21          Do you see that?
22      A.  Yes.
23      Q.  And if we go to the second page, second line
24 from the top, it reads, "For many years Google has used
25 optimization and machine learning techniques to improve

Page 213

1  the performance of our ad products."
2          Do you see that?
3       A.  I do.
4       Q.  And so ad buyers and sellers could tell that
5  Google was using optimizations and machine learning from
6  this blog post, right?
7       MR. RENARD: Objection to form.
8       THE WITNESS: I would say that language is so
9  vague as to be almost meaningless.
10 BY MR. ROSSON:
11      Q.  Do you agree it would be unreasonable for an
12 ad buyer or seller to conclude from the top of Page 2,
13 first full sentence, that Google was not using
14 optimizations or machine learning?
15      MR. RENARD: Objection to form.
16      THE WITNESS: I think an ad seller, as I
17 believe was the target audience for this blog post,
18 would not know what to conclude from this, but they
19 would read that Google has used optimizations and
20 machine learning techniques, which I think could mean
21 almost anything.
22 BY MR. ROSSON:
23      Q.  Whatever optimization and machine learning
24 techniques mean to a reader, Chandler Exhibit 4 tells
25 the reader that Google has been using them, right?

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1    MR. RENARD:  Same objection.
2        THE WITNESS:  Yes, that's what that line says.
3    BY MR. ROSSON:
4    Q.  Okay.
5        I'm going about halfway down, Page 2, there's
6    a sentence that says, "On average 5% of Private Auction
7    impressions on our platform have an Open Auction buyer
8    willing to pay more than the Private Auction deal
9    price."
10       Do you see that?
11   A.  I do see that.
12   Q.  Any reason to believe that statement is
13   factually untrue?
14       MR. RENARD:  Objection.  Form.
15       THE WITNESS:  No, I have no reason to doubt
16   the veracity of that statement.
17   BY MR. ROSSON:
18   Q.  Top of Page 3 reads, "In addition to helping
19   publishers maximize revenue from Private Auctions, we've
20   been experimenting with optimized pricing to help
21   publishers set price floors in the Open Auction that
22   more closely reflect the value of their inventory."
23       Do you see that?
24   A.  I do see that.
25   Q.  Do you agree that it would be unreasonable for

Page 215

1    an ad buyer or seller to read that sentence and conclude
2    that Google does not run experiments?
3        MR. RENARD:  Objection.  Form.
4        THE WITNESS:  I think a publisher reading this
5    would conclude that in the past Google had run
6    experiments.  They would not know the nature of those
7    experiments.
8    BY MR. ROSSON:
9    Q.  First full paragraph on Page 3 reads, "The
10   Open Auction tends to have a large price gap between
11   what a buyer bids and what they pay."
12       Do you see that?
13   A.  I do see that.
14   Q.  Any reason to believe that statement was
15   untrue as of the date of this blog post?
16   A.  I have no reason to think that that statement
17   is untrue.
18   Q.  Okay.
19       The next sentence says, "We've observed a more
20   than 50% price gap between bid and closing prices in
21   many cases."
22       Do you see that sentence?
23   A.  I do see that.
24   Q.  Any reason to believe that statement was
25   untrue as of the date of the blog post?

Page 216

1    A.  Only in that the numerical information in that
2    is somewhat vague, "more than 50%."  In many cases it's
3    hard to know with precision what they mean by this.  But
4    I would expect that it would be accurate.
5    Q.  The next sentence reads, "Publishers see this
6    gap as a revenue opportunity and try to close the gap by
7    applying manually-calculated price floors."
8        Do you see that?
9    A.  I do see that.
10   Q.  Any reason to believe that statement was
11   untrue?
12       MR. RENARD:  Objection to form.
13       THE WITNESS:  I am not sure to what extent
14   publishers were able to analyze the information that you
15   would need in order to come to this conclusion.  So I
16   don't know if what Google is saying here is that when
17   told the previous sentences, publishers thought that
18   that was a price gap and wanted to close the gap, or if
19   it means that publishers were doing that analysis.  And
20   I think that often publishers did not have the data to
21   do that analysis.
22   BY MR. ROSSON:
23   Q.  You know from experience that some publishers
24   spent thousands of hours manually calculating price
25   floors, correct?

Page 217

1    A.  Yes.
2    Q.  And they did that in order to determine the
3    economically efficient price floor, right?
4    A.  Yes, I would probably say that, as they did
5    that in an effort to maximize revenue.
6    Q.  Manually calculating price floors is a data
7    intensive process; is that right?
8    A.  Typically, yes.
9    Q.  You have, for example, modeled price floors
10   using millions of data points, right?
11   A.  Yes.
12   Q.  Second full paragraph on Page 3 -- well,
13   that's kind of subjective.
14       Go down to the third paragraph of Page 3, if
15   you would.  It reads, "Optimized pricing in the
16   Open Auction uses historical data to automate the
17   post-auction analysis and updating of floor prices that
18   publishers already do and take it a step further."
19       Do you see that?
20   A.  I'm sorry, where are we reading?
21   Q.  I'm on Page 3, and I'm looking at the third
22   paragraph.  It begins, "Optimized pricing".
23   A.  Okay.  The second complete paragraph?
24   Q.  Yes.
25   A.  Yes, I see that.

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

1    Q.  All right.
2        You would agree with me that it was disclosed
3    to ad buyers and sellers that, "Optimized pricing in the
4    Open Auction uses historical data to automate the
5    post-auction analysis and updating of floor prices,"
6    right?
7        MR. RENARD:  Objection to form.
8        THE WITNESS:  I would not agree that a blog
9    post on the Ad Manager page constitutes disclosure to
10   advertisers.
11   BY MR. ROSSON:
12       Q.  Let me use a different word.
13       All of the information in Chandler Exhibit 4
14   was made public, right?
15       A.  Yes, I believe that as of May 2016, this
16   information was public.
17       Q.  The last full paragraph on Page 3 reads, "In
18   our experiments to date, we've applied optimized pricing
19   to about 15% of transactions, creating over 5% lift in
20   revenue for publishers using the Open Auction."
21       Do you see that?
22       A.  I do see that.
23       Q.  Is this an example of Google publicly
24   disclosing an experiment?
25       MR. RENARD:  Objection to form.

Page 219

1        THE WITNESS:  I would say that this is an
2    example of Google disclosing some details of an
3    experiment to some publishers.
4    BY MR. ROSSON:
5        Q.  Is this an example of Google publicly
6    discussing an experiment?
7        MR. RENARD:  Objection to form.
8        THE WITNESS:  I would say this is an example
9    of Google publicly admitting that they were running an
10   experiment.
11   BY MR. ROSSON:
12       Q.  And any reader of Chandler Exhibit 4 could
13   read and understand that Google had run an experiment,
14   right?
15       MR. RENARD:  Objection to form.
16       THE WITNESS:  Someone who read this would know
17   that Google had run an experiment, although the details
18   of that experiment would still remain somewhat opaque.
19   BY MR. ROSSON:
20       Q.  Do you have any reason to doubt that the
21   factual statement that Google had "applied optimized
22   pricing to about 15% of transactions creating over 5% in
23   lift in revenue for publishers using the Open Auction"?
24       MR. RENARD:  Objection to form.
25       THE WITNESS:  I don't have a reason to doubt

Page 220

1    the specific numbers quoted in this sentence.
2    BY MR. ROSSON:
3        Q.  You don't know how many ad buyers or ad
4    sellers who transacted on AdX from 2016 to 2023 read
5    this blog post, right?
6        A.  No.  I don't know how many ad sellers read it.
7    It was not disclosed in a place where ad buyers were
8    likely to read it.  And so, I would suspect that however
9    many sellers read it, the number of buyers would be much
10   fewer.
11       Q.  You don't know if a thousand companies or a
12   million companies read this blog post, right?
13       MR. RENARD:  Objection to form.
14       THE WITNESS:  To the best of my knowledge,
15   there are not a million users of Google Ad Manager.  And
16   so I think I can say to a reasonable degree of
17   scientific certainty that it was not a million companies
18   who read this blog post.
19   BY MR. ROSSON:
20       Q.  You don't know if it was 1,000 or 10,000
21   companies, right?
22       A.  That's correct.
23       Q.  1,000 or 100,000, right?
24       MR. RENARD:  Objection to the form.
25       THE WITNESS:  Again, I think it is quite

Page 221

1    unlikely that 100,000 companies read this blog post.
2    BY MR. ROSSON:
3        Q.  You don't know if it was 1,000 companies or
4    25,000 companies, right?
5        MR. RENARD:  Same objection.
6        THE WITNESS:  I do not know the number of
7    companies who read this blog post.  And I do know that
8    the information in this blog post, while it was
9    providing what I think many publishers would consider to
10   be good news, it's providing what many advertisers would
11   consider to be bad news, and it was posted in a place
12   where it was unlikely to be seen by buyers.
13       MR. ROSSON:  Object as nonresponsive after, I
14   don't know.
15   BY MR. ROSSON:
16       Q.  Are you able to give me the names of the
17   companies that read this blog post?
18       A.  I'm not.
19       Q.  What about one of them?
20       A.  I think pursuant to NDA agreements I have, I
21   can't give you the name of one, but I am aware of a
22   company that read this blog post.
23       Q.  All right.  I'm not going to put you on the
24   spot and ask you the name of that company.
25       Are you aware of more than five companies that

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

1 read this blog post?
2    A.  I am not.
3    Q.  Okay.  You can set that aside.
4      Just to tell you where I am in your materials,
5 I'm at Rebuttal Paragraph 81.
6    A.  Amazingly, I turned directly to it.
7      MR. RENARD:  Excuse me.
8 BY MR. ROSSON:
9    Q.  Let me know when you're ready.
10    A.  Oh, sorry.  I'm there.
11    Q.  Okay.
12      Do you agree that it's common practice for
13 advertisers to conduct online auction experiments?
14    A.  Yes.  I think that for advertisers who are
15 larger, it is somewhat common for them to conduct online
16 auction experiments.  Not all have an experimentation
17 practice, but I've worked with a number who do.
18    Q.  Do you agree that it's common for publishers
19 to conduct online auction experiments?
20    A.  Yes.
21    Q.  So, for example, online advertisers commonly
22 run experiments to test the effectiveness of their
23 marketing, right?
24    A.  Yes.  I would say that many of those
25 experiments I would not consider online auction

Page 223

1 experiments, but it is common for advertisers to run
2 experiments to test the effectiveness of their
3 marketing.
4    Q.  And publishers commonly run tests to assess
5 the impact of site changes on revenue or ad views?
6      THE REPORTER:  I'm sorry, can you repeat that
7 question?  I did not get that.
8      MR. ROSSON:  Yes.
9 BY MR. ROSSON:
10    Q.  Publishers commonly run tests to assess the
11 impact of site changes on revenue or ad views; is that
12 true?
13      MR. RENARD:  Objection to form.
14      THE WITNESS:  Yes, in particular, publishers
15 commonly run tests to assess the impact of site changes
16 on revenue.
17 BY MR. ROSSON:
18    Q.  Publishers and advertisers don't issue a
19 public notice indicating they're going to run an
20 experiment, do they?
21      MR. RENARD:  Objection to form.
22      THE WITNESS:  No.  As I elucidate in my
23 report, typically when advertisers and publishers are
24 running experiments, the advertisers and publishers bear
25 the cost of that experiment.  And so they do not

Page 224

1 disclose those experiments, nor are other parties
2 typically harmed in those experiments.
3 BY MR. ROSSON:
4    Q.  We can agree that the norm for publishers and
5 advertisers when they run experiments is not to disclose
6 them to others, right?
7      MR. RENARD:  Objection to form.
8      THE WITNESS:  I think we can agree that the
9 norm for publishers and advertisers when they run
10 experiments is not to disclose them because they are not
11 causing harm to other participants in the advertising
12 ecosystem.
13 BY MR. ROSSON:
14    Q.  Have you ever seen an online advertiser issue
15 a press release that it's running an experiment?
16    A.  I have certainly seen advertisers disclose
17 results from their experiments and talk about those
18 experiments and what they've learned from those
19 experiments.  I can't recall if it has been in the form
20 of a press release specifically.
21    Q.  Do you recall in your career having seen
22 millions of press releases disclosing advertiser and
23 publisher experiments?
24      MR. RENARD:  Objection to form.
25      THE WITNESS:  No, I do not recall seeing

Page 225

1 millions of press releases.
2 BY MR. ROSSON:
3    Q.  All right.
4      Look at your Footnote 108, please.  It's on
5 Page 37 of your rebuttal.
6    A.  Okay, I've re-read it.
7    Q.  Okay.  And it cites the Harvard Business
8 Review as its first source, right?
9    A.  Yes.
10    Q.  And the quotation you indicated is, "Firms
11 that do experiment tend to run more than one experiment
12 in a year, averaging 15 experiments per firm in
13 E-commerce and close to 50 in the travel sector."
14      Do you see that?
15    A.  I do see that.
16    Q.  Any reason to believe those numbers are not
17 correct?
18    A.  No, I have no reason to doubt those numbers.
19    Q.  Okay.
20      And how many advertisers would you expect are
21 transacting on AdX in a given day?
22      MR. RENARD:  Objection.  Form.
23      THE WITNESS:  ▬▬▬▬▬▬ ▬▬▬▬▬▬▬
24 ▬▬▬▬.
25

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1  BY MR. ROSSON:
2      Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  if each advertiser runs 15 experiments a year, how many
4  total experiments is that?
5      A.  I think that is a misapplication of my
6  understanding of this article, because this article is
7  talking about large advertisers, and that number is --
8  the number of large advertisers transacting on AdX in
9  any given day is much smaller than the total number of
10  advertisers.
11      Q.  Give me your estimate in a given year of the
12  number of large advertisers transacting on AdX.
13      MR. RENARD:  Objection.  Form.
14      THE WITNESS:  ▮▮▮▮▮▮▮▮▮▮▮▮.
15  BY MR. ROSSON:
16      Q.  Okay.  So if each one is running 15
17  experiments, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by publishers or
18  advertisers a year on AdX, right?
19      A.  Not all of the experiments run by large
20  advertisers are run on AdX.
21      Q.  What would be a reasonable estimate for large
22  advertisers of how many of their experiments are run on
23  AdX?
24      MR. RENARD:  Objection to form.
25      THE WITNESS:  Using the estimates from this

Page 227

1  article of 15 experiments per firm, I would expect zero
2  or one of those experiments would be on AdX.
3  BY MR. ROSSON:
4      Q.  And why is that your expectation?
5      A.  I do extensive work with advertising
6  experimentation online, and the fraction of experiments
7  that I have seen advertisers run on AdX is below
8  1/15th.
9      Q.  You do agree that both online advertisers and
10  online publishers do experiment on AdX, correct?
11      A.  I agree that online advertisers experiment on
12  AdX.  And I agree that online publishers experiment with
13  their ad inventory, and some of that ad inventory runs
14  through AdX.
15      Q.  Okay.
16      I'm looking at Rebuttal Paragraph 82.  You
17  say, "When marketing companies conduct experiments, they
18  typically absorb the costs of those experiments rather
19  than transferring them to their customers."
20      Do you see that?
21      A.  I do see that.
22      Q.  That's not always true, is it?
23      A.  No.  I use the word "typically" there
24  intentionally.
25      Q.  Because marketing companies don't always

Page 228

1  absorb the cost of their experiments themselves, right?
2      A.  The vast majority of marketing companies that
3  conduct experiments run those experiments in such a way
4  that those companies are paying the cost of that
5  experiment and they are not transferring that cost to
6  their customers.
7      Q.  If an advertiser wins an impression because of
8  an experiment it's running, does the advertiser issue a
9  credit to the next highest bidder?
10      MR. RENARD:  Objection to form.
11      THE WITNESS:  No, I don't think the advertiser
12  typically knows the identity of the next highest bidder.
13  BY MR. ROSSON:
14      Q.  So if an advertiser runs an experiment to,
15  say, increase the amount it's willing to pay for an
16  impression, it might win more impressions, right?
17      A.  Yes.  It would win more impressions and it
18  would pay for those impressions.
19      Q.  By virtue of the fact that that advertiser
20  would win more impressions, there would be less
21  impressions available for all other advertisers, right?
22      MR. RENARD:  Objection.  Form.
23      THE WITNESS:  Yes.
24  BY MR. ROSSON:
25      Q.  Would that advertiser who won more impressions

Page 229

1  issue a credit to any other advertiser in the industry?
2      MR. RENARD:  Same objection as before.
3      THE WITNESS:  I may be confused on the
4  foundation for this question, but I don't understand
5  what credit would be offered.  The advertiser in
6  question would be winning more impressions, would be
7  paying for those impressions, and to whom would that
8  advertiser owe a credit?
9  BY MR. ROSSON:
10      Q.  Let me see if I can be a little more clear.
11      When you say that advertisers bear the cost of
12  their experiments, you mean they pay for the impressions
13  they win, right?
14      A.  I'm speaking more broadly about typical
15  practices in digital marketing.  So when I talk about
16  advertisers running experiments, I'm talking about
17  online auction experiments as you have been talking
18  about, but also things like creative experiments where
19  they test multiple creatives or experiments where they
20  do geographic or temporal experimental designs to
21  estimate the efficacy of those marketing channels.
22      Q.  And when an advertiser runs an online auction
23  experiment, that online auction experiment can change
24  other bidder behavior; is that correct?
25      MR. RENARD:  Objection.  Form.

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1     THE WITNESS:  Generally speaking, the pool of
2  impressions transacted on AdX in any given day is so
3  vast that I cannot think of a case where an advertiser
4  would run an experiment and have sufficient scale to
5  affect the bidding decisions of other advertisers in the
6  same auction.
7  BY MR. ROSSON:
8     Q.  When an online advertiser changes its behavior
9  by engaging in an experiment, is it typical for that
10  online advertiser to inform other participants in an
11  auction that it has changed its behavior?
12     MR. RENARD:  Objection to form.
13     THE WITNESS:  That online advertiser does not
14  know who else is participating in that auction.
15  Moreover, that experiment is not causing harm to the
16  other participants in that auction in the same way as
17  the experiments we're talking about here and that I'm
18  talking about in this section of my rebuttal report.
19  BY MR. ROSSON:
20     Q.  I'm actually only asking about online
21  advertiser conduct so that I can better understand
22  advertiser experiments.  Are you with me?
23     A.  I think so.
24     Q.  Okay.
25     There would be no way for an online advertiser

Page 231

1  to communicate to other bidders in an impression auction
2  that it had chosen to change its behavior due to an
3  experiment.
4     Do I have that right?
5     MR. RENARD:  Objection.  Form.
6     THE WITNESS:  Yes.
7  BY MR. ROSSON:
8     Q.  Okay.
9     Likewise, if an online advertiser engages in
10  an experiment that lowers the efficacy of its marketing
11  campaign and thereby that online advertiser gains fewer
12  impressions, or has lower quality impressions, that's
13  going to be my hypothetical.  I'm going to stop and ask
14  if that hypothetical makes sense to you so far.
15     MR. RENARD:  Objection.  Form.
16     THE WITNESS:  Let me repeat it back to you and
17  see if I understand.
18     You're saying an online advertiser is engaging
19  in an experiment and that is diminishing the efficacy of
20  its marketing campaign so that it either wins fewer
21  impressions or the impressions it wins are of lower
22  quality, lower performance?
23  BY MR. ROSSON:
24     Q.  Yes.
25     A.  Okay.

Page 232

1     Q.  In that scenario, if an ad doesn't reach a
2  consumer as a result, does the online advertiser
3  compensate that consumer?
4     MR. RENARD:  Objection to form.
5     THE WITNESS:  So you're asking if an online
6  advertiser by virtue of running an experiment wins fewer
7  impressions and thereby exposes fewer consumers to its
8  advertising, does it compensate those consumers for
9  having not seen its advertising?
10  BY MR. ROSSON:
11     Q.  Yes.
12     A.  No, advertisers do not do that.
13     Q.  Okay.
14     Can you look at Rebuttal Paragraph 83, please.
15     A.  Okay.
16     Q.  You cite the NIH Guidelines for Ethical
17  Research.
18     Do you see that?
19     A.  Yes.
20     Q.  Is that the source you relied on for the
21  statement, "Informed consent is a central tenet of
22  experimentation"?
23     A.  Yes.
24     Q.  And you cite no other support for that
25  statement, correct?

Page 233

1     A.  No, but I have a great deal of experience with
2  experimentation, experimentation on human subjects, and
3  online advertising experiment and -- experiments, and so
4  I'm familiar with this notion of informed consent from
5  other contexts as well.
6     Q.  The NIH is the National Institute of Health,
7  correct?
8     A.  That's correct.
9     Q.  It's a resource for medical consents, right?
10     A.  The NIH operates in many different fields, but
11  it is the National Institute of Health and it is
12  offering research guidelines typically for people who
13  are doing research into health-related matters.
14     Q.  NIH's remit is the health of humans, right?
15     A.  Yes.
16     Q.  Are you saying there's a connection between
17  standards governing human medical experimentation and
18  Ad Exchange experimentation?
19     A.  I am saying that when an experiment has the
20  possibility of causing material harm, that the ethical
21  best practices are to have informed consent.  So that
22  consent needs to be free and prior to the experiment in
23  addition to providing sufficient information so that the
24  subject can determine whether or not to be the subject
25  of that experiment.

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1    Q.   When you say "material harm," what do you mean
2    by "material"?
3    A.   In this case, I'm specifically thinking about
4    some of the experiments that Google ran where they
5    caused significant changes to publisher revenue or
6    advertiser performance.
7    Q.   You agree there are differences between human
8    medical experimentation and online advertising
9    experimentation, right?
10   A.   Yes, I agree with that.
11   Q.   Okay.
12       Online ad experimentation cannot result in
13   death, right?
14   A.   That is correct.
15   Q.   It can't make people very sick?
16   A.   It can make businesses sick, but not people.
17   Q.   You aren't claiming that the conduct at issue
18   in this case harmed anyone's health, are you?
19   A.   I'm not offering any opinions about the health
20   impacts of Google's experimentation on people; I am
21   offering opinions on the health of businesses.
22   Q.   Do you believe the NIH bioethics standard
23   governs Google's conduct?
24   A.   I am not opining that it governs Google's
25   conduct; I am offering it as one potential source of

Page 235

1    ethical conduct that Google had the option to follow.
2    Q.   It's, in fact, the only source for ethical
3    conduct that you disclose in your opinions, right?
4        MR. RENARD:  Objection to form.
5        THE WITNESS:  I think there are many places
6    within this report where I touch on what makes
7    experiments and advertising experiments ethical or not,
8    but I am offering this footnote as explanation and basis
9    for the term "informed consent" here in my statement
10   that it is a central tenet of experimentation generally.
11   BY MR. ROSSON:
12   Q.   In terms of third-party standards for whether
13   conduct is ethical or not, are your opinions disclosing
14   any source other than the National Institute of Health?
15       MR. RENARD:  Objection.  Form.
16       THE WITNESS:  I think that third-party
17   depositions touch on ethical experimentation and
18   fairness and transparency in experimentation.  So I
19   would say that, yes, I am disclosing other sources.
20   BY MR. ROSSON:
21   Q.   Anything other than third-party depositions
22   and the National Institute of Health?
23       MR. RENARD:  Objection to form.
24       THE WITNESS:  A number of the academic
25   articles that I cite in this rebuttal report touch on

Page 236

1    experimentation and I think inform our understanding of
2    ethical online advertising experimentation.
3    BY MR. ROSSON:
4    Q.   Can you point me to an example of a
5    third-party source in any of your opinions that
6    discusses the ethics of experimentation other than the
7    National Institute of Health?
8    A.   I think the academic articles that I'm
9    thinking of right now describe ethical experiments, but
10   are not laying out a guideline of ethics for online
11   experiments.  They are talking about the same sort of
12   framework that I'm describing where the entities that
13   benefit from the experiment bear the cost of the
14   experiment.
15   Q.   Do those articles use the term "ethics" at
16   all?
17       MR. RENARD:  Objection to form.
18       THE WITNESS:  Off the top of my head, I don't
19   know.
20   BY MR. ROSSON:
21   Q.   You can't remember any source you cited that
22   refers directly to ethics other than third-party
23   depositions and the National Institute of Health,
24   agreed?
25   A.   As I sit here right now, I cannot recall if

Page 237

1    any other sources mention ethics by name.
2    Q.   Okay.
3        MR. ROSSON:  We have been going for a while.
4    You guys want to take a break?
5        MR. RENARD:  Sure.
6        THE VIDEOGRAPHER:  This concludes Media 6.  We
7    are going off the record at 5:04 p.m.
8        (RECESS TAKEN)
9        THE VIDEOGRAPHER:  This is the start of
10   Media 7.  We are back on the record at 5:26 p.m.
11   BY MR. ROSSON:
12   Q.   Dr. Chandler, any testimony from today that
13   you'd like to change or correct?
14   A.   No.
15   Q.   Could you look at Paragraph 356 of your
16   opening report?  Let me know when you've had a chance to
17   read that paragraph.
18   A.   I've read it.
19   Q.   Is it your criticism that Bernanke helped
20   advertisers at the expense of -- sorry.
21       Is your criticism that Bernanke helped GDN
22   advertisers at the expense of non-GDN advertisers?
23   A.   Yes.  I would expand that a little bit to say
24   that my criticism is that Bernanke and Global Bernanke
25   privileged GDN advertisers participating in AdX over

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

1 non-GDN advertisers participating in AdX.
2    Q.  And how were GDN advertisers hurt?
3    A.  GDN advertisers were harmed by the inability
4 to understand the auction dynamics and perform analyses
5 that would inform future bidding strategies.
6    Q.  You agree with me that not all advertisers
7 perform analyses to inform future bidding strategies,
8 right?
9    A.  Yes, I would agree that some advertisers
10 perform these analyses and some advertisers do not.
11    Q.  Okay.
12        On Paragraph 357, one below, you write, "Other
13 exchanges were harmed because AdX completed manipulated
14 auctions that would not have been completed otherwise;
15 and therefore, would not have been available to other
16 exchanges."
17        Do you see that?
18    A.  I do.
19    Q.  I want to make sure I understand what you
20 mean.  Do you mean that Bernanke caused AdX to win
21 auctions that therefore its competitors could not win?
22    A.  I'm saying that Bernanke allowed AdX to win
23 auctions in situations where competitors might have won
24 those auctions.
25    Q.  And in your opinion, was that -- is that

Page 239

1 wrong?
2    A.  In my opinion, Bernanke departed from
3 generally accepted auction dynamics in the industry in
4 ways that were potentially deceptive to other exchanges.
5    Q.  If Bernanke were fully disclosed in every
6 detail, do you believe all advertisers would object to
7 it?
8        MR. RENARD:  Objection to form.
9        THE WITNESS:  I think that a large number of
10 advertisers would object to it, but I'm not opining that
11 all advertisers would object to it.
12 BY MR. ROSSON:
13    Q.  What percentage would object to it?
14        MR. RENARD:  Same objection.
15        THE WITNESS:  Based on my review of the
16 materials in this case and my experience in the
17 industry, and the advertisers that I've worked with, I
18 would expect 90 percent or more of large advertisers to
19 object it and a smaller fraction of small advertisers.
20 BY MR. ROSSON:
21    Q.  What fraction for small advertisers?
22    A.  I don't think I can give a precise estimate of
23 that fraction.
24    Q.  If I want to derive that 90 percent figure for
25 large advertisers, how do I calculate it?

Page 240

1    A.  I would calculate it by looking at a fraction
2 of large advertisers who engage in detailed analyses of
3 the auction data resulting from their participation in
4 online auctions.
5    Q.  In that group of 90 percent of large
6 advertisers under discussion, is it your position that
7 all of them had an economic loss because of Bernanke?
8        MR. RENARD:  Objection to form.
9        THE WITNESS:  I'm not offering an opinion on
10 economic loss; I'm offering an opinion here on the ways
11 in which Bernanke was not disclosed and the potential
12 harms that that caused to participants in the auction.
13 But I am offering that opinion from the perspective of a
14 marketing expert.  And the harms I'm talking about are
15 primarily related to the ways in which it would harm
16 their marketing activities.
17 BY MR. ROSSON:
18    Q.  If large advertisers had an economic gain from
19 Bernanke, would you expect them to object to it?
20        MR. RENARD:  Objection to form.
21        THE WITNESS:  I think it depends.
22 BY MR. ROSSON:
23    Q.  On what?
24    A.  On --
25        MR. RENARD:  Same objection.

Page 241

1        THE WITNESS:  I think the potential objections
2 that large advertisers would have could be related to
3 the economic impact.  It could also be related to the
4 way in which information was manipulated, and the way in
5 which the models and insights, the advertisers were
6 trying to glean from the auction data they were seeing
7 would be impacted.
8 BY MR. ROSSON:
9    Q.  Has Bernanke been disclosed today?
10        MR. RENARD:  Objection to form.
11        THE WITNESS:  Yes.  As of this lawsuit,
12 Bernanke has been generally disclosed in the industry.
13 BY MR. ROSSON:
14    Q.  Did that cause a dec- -- I'm sorry, were you
15 finished?
16    A.  I was finished.
17    Q.  Did that cause a decline in AdX auction
18 traffic?
19    A.  I don't know the impact of that disclosure on
20 AdX auction traffic.  But even if advertisers were
21 harmed, it is possible that we would not see a change in
22 AdX auction traffic because AdX represents a significant
23 market share of online exchanges and provides access to
24 inventory that advertisers cannot access in other ways.
25    Q.  The answer to the question of whether the

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1 disclosure of Bernanke caused a decrease in AdX auction
2 traffic is that you don't know, right?
3      MR. RENARD:  Objection to form.
4      THE WITNESS:  That's correct.  But I was also
5 offering that regardless of the direction of AdX auction
6 traffic, advertisers could be harmed.
7 BY MR. ROSSON:
8      Q.  Do you know of an advertiser that decided not
9 to advertise on AdX because of Bernanke?
10      A.  I do not know of an advertiser who decided not
11 to advertise on AdX because of Bernanke.
12      Q.  What about a publisher?
13      MR. RENARD:  Objection to form.
14      THE WITNESS:  I do not know of a publisher who
15 stopped participating with AdX because of Bernanke.
16 BY MR. ROSSON:
17      Q.  Are you offering opinions about Elmo?
18      A.  I consider Elmo to be a deceptive practice,
19 and so I have mentioned Elmo in my Opinion 17, if I
20 recall.
21      Q.  What is Elmo?
22      A.  Elmo was a conduct by Google used to -- where
23 Google used data from DV360 to identify -- I believe it
24 was to identify exchanges that were not running a true
25 second-price auction.  Although, I might be confusing it

Page 243

1 with Poirot, which is P-o-i-r-o-t.
2      Q.  Other than mentioning Poirot and Elmo and Bell
3 in your Opinion 17, do you discuss them at all in your
4 report?
5      A.  I can't recall if I do.  I flipped through the
6 remaining portion of my Section 10 and did not see it on
7 a quick pass.
8      Q.  If a reader did not know what Elmo, Poirot,
9 and Bell were, could they read your opinions and learn
10 that information?
11      MR. RENARD:  Objection to form.
12      THE WITNESS:  I think they would have to read
13 the materials I'm relying upon, which would be the
14 Weinberg description and analysis of the conducts.
15 BY MR. ROSSON:
16      Q.  Okay.  So it's your position that
17 Dr. Weinberg, the portions you're relying on, he
18 discusses Poirot, Elmo, or Bell?
19      A.  That is my recollection is that Weinberg
20 discusses these conducts.
21      Q.  Okay.  And is there a portion of your opinions
22 anywhere in the opening or rebuttal that discusses
23 Poirot, Elmo, or Bell?
24      A.  My recollection is that Bell was a code name
25 for aspects of Project Bernanke.  So in that sense I

Page 244

1 discuss Bell, if that recollection is correct.  I do not
2 recall where Poirot and Elmo are discussed, if at all,
3 in my reports.
4      Q.  Are you maintaining your opinion as to whether
5 Poirot, Bell, and Elmo are deceptive?
6      A.  I am maintaining my opinion that Poirot and
7 Elmo represent conducts that I outline in my report,
8 particularly the equal access and functionality aspect.
9      Q.  Are you offering an opinion that publishers or
10 advertisers were deceived?
11      A.  What is the context for your question?
12      Q.  Both of your reports.
13      A.  Yes, I am offering an opinion that publishers
14 and advertisers did not have the necessary information
15 they needed to carry out their business, and that
16 information was held by Google as part of the materials
17 that I've reviewed in this case and they were not
18 disclosed.
19      Q.  And that that caused publishers and
20 advertisers to be deceived?
21      A.  It caused the potential for harm and it
22 prevented advertisers and publishers from being able to
23 participate in the market as efficiently as they could
24 have otherwise.
25      Q.  Are you offering an opinion that publishers or

Page 245

1 advertisers were actually harmed?
2      MR. RENARD:  Objection to form.
3      THE WITNESS:  I'm offering opinions about the
4 harms related to information, but I'm not offering
5 opinions about economic harm.
6 BY MR. ROSSON:
7      Q.  Could you look at Paragraph 233 of your
8 opening report, please.  And specifically the last
9 sentence.
10      A.  Yes, I've read it.
11      Q.  That last sentence reads, "If the DoubleClick
12 acquisition had not been approved, this present lawsuit
13 would not be necessary."
14      Do you see that?
15      A.  I do see that.
16      Q.  Is that your position?
17      A.  Yes.
18      Q.  What do you mean by that?
19      A.  What I mean by that is Google's acquisition of
20 DoubleClick set into motion a process that resulted in
21 this lawsuit.
22      Q.  Do you know whether Google's DoubleClick
23 acquisition was reviewed by regulators?
24      A.  Yes.
25      Q.  Okay.

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

1    You cite a dissent in your opinions. Do you
2    remember that?
3        A. Yes.
4        Q. Okay. Was the person dissenting in the
5    majority or the minority?
6        A. The person dissenting was in the minority.
7        Q. Okay.
8        Do you take issue with any regulatory action
9    in approving the DoubleClick acquisition?
10       MR. RENARD: Objection to form.
11       THE WITNESS: I am not a regulator. I am not
12   an economist. Sitting here as an industry practitioner,
13   as I state in this paragraph, I view this present
14   lawsuit as the chickens coming home to roost from the
15   decision to approve the DoubleClick acquisition in 2007.
16   BY MR. ROSSON:
17       Q. By that do you mean the DoubleClick
18   acquisition should not have been approved?
19       MR. RENARD: Objection to form.
20       THE WITNESS: I'm not offering an opinion on
21   that, but I am connecting the dots between the approval
22   of that acquisition and the present lawsuit.
23   BY MR. ROSSON:
24       Q. What does it mean in your opinion for a
25   company to be dominant in a market?

Page 247

1        A. I think it means that it is very hard for
2    market participants to avoid using a company's products
3    or services in that market.
4        Q. Is there a market share that you have in mind
5    in determining whether a company's dominant?
6        MR. RENARD: Objection. Form.
7        THE WITNESS: No. When I talk about Google's
8    dominant position, I'm talking about both its market
9    share and then other things like unique sources of
10   inventory.
11   BY MR. ROSSON:
12       Q. Are you offering any opinions about market
13   share quantitatively?
14       A. I have opinions in my report about market
15   share of some of Google's products. They are supported
16   by pieces of evidence, typically third-party testimony.
17   So I'm reporting that information such as in
18   Paragraph 234 and Paragraph 236, where I quote industry
19   participants estimating market share, but that is the
20   extent to which I am offering quantitative market share
21   estimates.
22       Q. You have not done an independent market share
23   analysis, correct?
24       A. Other than in the sense that I have
25   synthesized this information and added it to my report,

Page 248

1    I have not done any further analysis.
2        Q. Could you look at your rebuttal report,
3    Paragraph 97, please.
4        Oh, I'm sorry, one more question on that.
5        When you say that a company is "dominant," are
6    you saying that that violates the antitrust laws?
7        MR. RENARD: Objection to form.
8        THE WITNESS: I'm not offering an opinion on
9    antitrust laws.
10   BY MR. ROSSON:
11       Q. Okay.
12       Rebuttal Paragraph 97, please. Let me know
13   when you've had a chance to read that.
14       A. I've re-read it.
15       Q. Okay.
16       Do you see where you write, "Google's user
17   data has no equal in the digital marketing world,
18   combining data from Search, Gmail, Maps, YouTube,
19   Android, and other advertising products"?
20       A. I would just amend that slightly to say "and
21   their advertising products," but yes.
22       Q. Apologies. Correct.
23       Did you do any quantitative analysis of how
24   much data Google has?
25       A. I have worked extensively with Google data,

Page 249

1    and from that industry work have a sense for the scale
2    and scope and quality of Google's data, and so that I
3    would consider analysis of Google's data.
4        Q. Have you disclosed in your opinions how much
5    data Google has?
6        MR. RENARD: Objection to form.
7        THE WITNESS: I list the data sources and
8    describe the quality and in both reports talk about the
9    importance of data, but I am not quantifying the amount
10   of data that Google has.
11   BY MR. ROSSON:
12       Q. Do you have an opinion on whether search data
13   is used in online advertising products?
14       MR. RENARD: Objection to form.
15       THE WITNESS: I believe that some of the
16   opinions in my opening report mention the power of being
17   able to target on search data. And so I think those
18   opinions talk about the use of search data in online
19   advertising.
20   BY MR. ROSSON:
21       Q. Do you have a position on whether Google Ad
22   Manager utilizes search data?
23       A. I do not have a position on that.
24       Q. Do you know one way or the other?
25       A. I do not know if Google Ad Manager uses online

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

1  search data.
2      Q.  Same question for AdX.
3      MR. RENARD:  Objection to form.
4      THE WITNESS:  I believe that search data is
5  used as part of Google's estimates of the quality of
6  impressions on AdX.  So I think the answer is, yes, I
7  think search data is used within AdX.
8  BY MR. ROSSON:
9      Q.  What is the basis for that belief?
10     A.  My prior understanding of targeting options
11  available via AdX.
12     Q.  In your professional work?
13     A.  Yes.
14     Q.  When you write that, "Google's user data has
15  no equal in the digital marketing world, combining data
16  from Search, Gmail, Maps, YouTube, Android," are you
17  indicating that data from all of those categories,
18  Search, Gmail, Maps, YouTube, Android, is utilized by
19  Google in its online advertising tech stack?
20     MR. RENARD:  Objection to form.
21     THE WITNESS:  Certainly all of those sources
22  of data are used by Google in its various online
23  advertising products.
24  BY MR. ROSSON:
25     Q.  Is it your position that all of these

Page 251

1  categories of data are used for open web display
2  advertising?
3      A.  I am not offering an opinion on whether all of
4  those forms are being used for open web display.
5      Q.  Okay.
6          Just to make sure I didn't misask the
7  question, do you have an opinion on whether any of those
8  categories -- Search, Gmail, Maps, YouTube, Android --
9  are used for online display advertising?
10     A.  For open web display advertising, I have
11  experience using data from Search, Gmail, Maps.  Direct
12  professional experience.  YouTube data is typically used
13  as part of video advertising, and I do not have direct
14  experience with using it for open web display.  And data
15  from Android devices is used as part of mobile open web
16  display.
17     Q.  Explain what you mean that Gmail data is used
18  in open web display advertising.
19     A.  I'm just going to pause for a second.
20  Something is happening on the monitor here.
21     MR. ROSSON:  You guys want to go off the
22  record?
23     MR. GONSOULIN:  Yeah.
24     THE WITNESS:  It's fixed now.
25     MR. ROSSON:  Okay.

Page 252

1      THE WITNESS:  Can you repeat that last
2  question?
3  BY MR. ROSSON:
4      Q.  Yes.
5          What is the basis for your statement that
6  Gmail data is used for open web display advertising?
7      A.  I have worked on advertising campaigns where
8  Gmail data was used for targeting variables.
9      Q.  What do you mean "targeting variables"?
10     A.  Gmail data flowed into the creation of
11  variables that could be used for targeting open web
12  display advertising.
13     Q.  Could you explain that one more level of
14  detail?
15     A.  Yes.
16          Data from Gmail that includes information
17  about how consumers have interacted with ads that Google
18  has placed within Gmail inboxes can be used for
19  targeting variables on open web display.
20     Q.  Give me an example of a targeting variable.
21     A.  Interest in sports.
22     Q.  I'm going to shift gears on you a little bit.
23          Is it your opinion that cookie matching is
24  unethical?
25     MR. RENARD:  Objection to form.

Page 253

1      THE WITNESS:  Can you give me the context for
2  that question?
3  BY MR. ROSSON:
4      Q.  I'm looking at opening report Paragraph 279.
5      A.  In the context that I discuss cookie matching
6  in Paragraph 279, and describe the way in which actions
7  are tracked online, I do not think that cookie matching
8  is unethical.
9      Q.  What about the placement of cookies in a
10  browser?
11     MR. RENARD:  Objection to form.
12     THE WITNESS:  I do not consider that
13  unethical.
14  BY MR. ROSSON:
15     Q.  Shifting gears again.
16          Have you ever published a peer-reviewed
17  article that included a survey?
18     A.  Yes.
19     Q.  Can you tell me what it is?
20     A.  Yes.  I'll refer to my CV.
21     Q.  While you're doing that, is it the forestry?
22     A.  It is the one on invasive weeds.
23     Q.  Okay.
24     A.  So the two articles:  "Effective Weed
25  Management, Collective Action, and Land Ownership Change

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

1  in Western Montana," used in an extensive survey.  "The
2  Wilderness Politics in the American West" used the same
3  survey data.  And the "Making Time, Words, Narratives
4  and Clocks in Elementary Mathematics" used something
5  that I think math education researchers would consider a
6  survey instrument.
7      Q.  Did you design those survey instruments?
8      A.  I was part of a team designing them.
9      Q.  Have you ever published a peer-reviewed
10  article relating to online marketing that utilized the
11  survey?
12      A.  No.  My online peer-reviewed articles have not
13  used surveys to study online marketing.
14      Q.  Have you ever taught an undergraduate or
15  graduate course on how to scientifically conduct a
16  survey?
17      A.  I've taught classes that cover scientific
18  survey design and analysis as part of the course
19  material, but I have not taught a standalone course on
20  survey design and analysis.
21      Q.  Do you agree that surveys are commonly used as
22  tools in online advertising?
23      MR. RENARD:  Objection to form.
24      THE WITNESS:  Yes, I have used surveys in
25  online advertising a great deal.

Page 255

1  BY MR. ROSSON:
2      Q.  And you agree that surveys can be powerful
3  tools, correct?
4      MR. RENARD:  Objection to form.
5      THE WITNESS:  I think it really depends on the
6  survey, but important information can be gleaned from
7  surveys.
8  BY MR. ROSSON:
9      Q.  If I went around and talked to people in the
10  industry and told you generally what I heard, would you
11  view that as a source of data just as good as a
12  scientific survey?
13      MR. RENARD:  Objection to form.
14      THE WITNESS:  I think it would depend on both
15  aspects of the methods you used talking to people in the
16  industry and the surveying question.
17  BY MR. ROSSON:
18      Q.  What if I just used like my general memory of
19  things I heard in the industry?
20      MR. RENARD:  Objection to form.
21      THE WITNESS:  Again, I think it would depend
22  on the survey you were comparing it to.
23  BY MR. ROSSON:
24      Q.  Okay.
25      As a statistician, if I gave you my memories

Page 256

1  of things I learn in the industry, would you consider
2  that a robust dataset?
3      MR. RENARD:  Objection to form.
4      THE WITNESS:  It does depend on the context.
5  BY MR. ROSSON:
6      Q.  Okay.  Would you agree that that dataset would
7  be subject to the limitations of my own memory?
8      A.  I think if you were relying exclusively on
9  your memory and no additional artifacts created along
10  the way, no information you had recorded during the
11  time, then, yes, your memory would be the limiter.  When
12  I talk about my experience, I'm including those other
13  things as well.
14      Q.  Well, other than your resumé and the accounts
15  of your memories in your opening and rebuttal report, we
16  don't have an independent source of your memories, do
17  we?
18      MR. RENARD:  Objection to form.
19      THE WITNESS:  What do you mean by
20  "independent" here?
21  BY MR. ROSSON:
22      Q.  There's no record of peer-reviewed literature
23  that we can look back to that would contain your
24  memories about the online advertising space, correct?
25      MR. RENARD:  Objection to the form of the

Page 257

1  question.
2      THE WITNESS:  We have documents such as my
3  dissertation and we have other peer-reviewed literature
4  that I'm offering as support for my opinions.
5  BY MR. ROSSON:
6      Q.  Remind me what your dissertation was in.
7      A.  The title of my dissertation was "Measuring
8  Conversions in Online Advertising," and it was in
9  statistics.
10      Q.  And remind me what statistical analysis you
11  applied to the dataset there.
12      A.  In that case I was working with a large
13  dataset of cookie level records.  And the statistical
14  analysis I applied particularly to model conversions was
15  a Cox proportional hazard model with time varying
16  covariants.
17      Q.  Do you believe that dissertation supports your
18  opinions in this case?
19      A.  Some of my opinions are supported by that
20  dissertation, yes.
21      Q.  How so?
22      A.  Part of the dissertation analysis was
23  estimating the relative impact and efficacy of different
24  marketing channels across a variety of advertisers.  And
25  my opinions partially relate to marketing channels,

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

1 marketing efficacy, the use of data in marketing, and
2 all of those opinions are supported --
3          THE REPORTER:  All of those what?  Sorry.
4          THE WITNESS:  I'm sorry.
5          All of those opinions are supported by my
6 dissertation.
7 BY MR. ROSSON:
8     Q.  Did your dissertation concern what is fair or
9 transparent?
10    A.  No.
11    Q.  Has any of your peer-reviewed work discussed
12 what is fair or transparent?
13          MR. RENARD:  Objection.  Form.
14          THE WITNESS:  Most of my peer-reviewed work
15 had an IRB approval process, and so required fairness
16 and transparency to do the research.
17 BY MR. ROSSON:
18    Q.  Right.  So, for example, your research
19 underwent a process to check on whether you doctored
20 data, for example, right?
21    A.  Yes, and also to ensure that the research was
22 fair and ethical where it was studying humans.
23    Q.  Those standards are applied to the research
24 you performed, correct?
25    A.  Those standards are part of the research

Page 259

1 process.
2     Q.  I'm asking whether you published any research
3 answering the question of what is fair and what is
4 transparent.
5          MR. RENARD:  Objection.  Form.
6          THE WITNESS:  I don't have any peer-reviewed
7 research on what is fair or what is transparent.  My
8 opinions related to fairness and transparency are based
9 on my industry experience.
10 BY MR. ROSSON:
11    Q.  Let's look next at your opening report,
12 Paragraph 18.
13    A.  I've turned to that page.
14    Q.  And now I'm going to direct you to
15 Subparagraph 5.
16          Apologies.  I'm going to direct you to
17 specifically Footnote 9 within Subject -- within
18 Subparagraph 5.
19          Do you see that footnote?
20    A.  I do see that.
21    Q.  Were you asked to determine what a fair and
22 transparent online auction would look like?
23          MR. RENARD:  Objection to form.
24          THE WITNESS:  I don't believe I was
25 specifically asked to say what a fair and transparent

Page 260

1 auction would look like.  I was asked to opine on the
2 extent to which Google's conducts negatively impacted
3 the fairness and transparency.
4          And in order to make it clear how I was
5 interpreting that assignment, I added Footnote 9.
6 BY MR. ROSSON:
7     Q.  Do you know of any online auction that meets
8 all of your criteria in Footnote 9?
9     A.  In 2024, I do not have detailed knowledge of
10 the underpinnings of current online auctions, but I have
11 knowledge of auctions that have met these criteria in
12 the past.
13    Q.  Which ones?
14          MR. RENARD:  Objection to form.
15          THE WITNESS:  At the time that we were at
16 Microsoft working with AppNexus, the AppNexus auction
17 met these criteria.
18 BY MR. ROSSON:
19    Q.  Any other ones?
20    A.  That is the only auction environment where I
21 have had a similar level of access to the underlying
22 information as I've had in this case.
23    Q.  Okay.
24          So if we're going to create a set of online
25 auctions that you know to meet the criteria of your

Page 261

1 Footnote 9, it would be AppNexus when you worked at
2 Microsoft; is that correct?
3          MR. RENARD:  Objection to the form of the
4 question.
5          THE WITNESS:  Verifying this definition of
6 fairness requires a level of access to the auction
7 environment that to the best of my knowledge no current
8 auction participants give out publicly.  And so, yes,
9 the only two auctions that I know of to a level of
10 detail where I can assess their fairness are the
11 AppNexus advertising auction when I worked at Microsoft,
12 and the AdX auction over the time period that we're
13 discussing for these conducts.
14 BY MR. ROSSON:
15    Q.  So sitting here today in 2024, you can't name
16 an auction that's presently running that meets the
17 criteria in your Footnote 9; is that correct?
18          MR. RENARD:  Objection to form.
19          THE WITNESS:  Yes, because of a lack of
20 information about the inner workings of those auctions,
21 I do not know if auctions run by entities such as OpenX
22 or Index Exchange meet these criteria.
23 BY MR. ROSSON:
24    Q.  You don't know if there are several auctions
25 that meet your Footnote 9 criteria or none at all,

66 (Pages 258 - 261)

Page 262

1  right?
2      MR. RENARD: Objection to form.
3      THE WITNESS: I do not know which auctions
4  meet this criteria.
5  BY MR. ROSSON:
6      Q. Footnote 9 is a statement of your personal
7  belief, correct?
8      A. Footnote --
9      MR. RENARD: Objection to form.
10     THE WITNESS: Footnote 9 is an opinion based
11  on my industry experience about what would constitute a
12  fair online auction.
13  BY MR. ROSSON:
14     Q. And after the first comma in Footnote 9, you
15  write, "I believe," correct?
16     A. Yes.
17     Q. And what follows "I believe" is your belief,
18  correct?
19     MR. RENARD: Objection. Form.
20     THE WITNESS: What follows "I believe" is my
21  opinion.
22  BY MR. ROSSON:
23     Q. Not your belief?
24     A. And also --
25     MR. RENARD: Objection to form of the

Page 263

1  question.
2      THE WITNESS: It is both my opinion and my
3  belief.
4  BY MR. ROSSON:
5      Q. Beliefs are not objective facts, correct?
6      MR. RENARD: Objection to the form of the
7  question.
8      THE WITNESS: One can use the expression "I
9  believe" to talk about an objective fact. I believe
10  that gravity is real. Saying "I believe it" does not
11  make it not an objective fact.
12  BY MR. ROSSON:
13     Q. We get to pick our beliefs, right?
14     MR. RENARD: Objection to the form of the
15  question.
16     THE WITNESS: I am not picking a belief in
17  what constitutes a fair and transparent auction; I am
18  attempting to describe a fair and transparent auction
19  based on my industry experience.
20  BY MR. ROSSON:
21     Q. We get to pick our beliefs, right?
22     MR. RENARD: Objection to the form of the
23  question.
24     THE WITNESS: No.
25

Page 264

1  BY MR. ROSSON:
2      Q. Do you believe people can believe different
3  things?
4      MR. RENARD: Objection to the form of the
5  question.
6      THE WITNESS: Yes, I believe that people can
7  believe different things.
8  BY MR. ROSSON:
9      Q. In the framework of your Footnote 9, where you
10  write, "I believe a fair and transparent online
11  auction," and then continuing, within that framework, do
12  parties have the freedom to contract?
13     A. Yes.
14     Q. Do you agree generally that people have
15  different ideas about what's fair?
16     MR. RENARD: Objection to the form of the
17  question.
18     THE WITNESS: In the context of my reports, I
19  am describing fairness as it is generally accepted
20  within the online advertising industry.
21  BY MR. ROSSON:
22     Q. I asked you last time about the
23  American Marketing Association.
24     Do you remember that?
25     A. I can't recall what you mean by "last time."

Page 265

1      Q. I'm sorry. Let me just ask you and we'll take
2  it from there.
3      Are you aware of organizations or associations
4  that companies in the digital marketing space look to as
5  authoritative?
6      A. Yes.
7      Q. Can you tell me what they are?
8      A. There are several bodies that I cite in
9  various sections of my two reports, including the
10  Advertising Research Foundation, the
11  Internet Advertising Bureau, the 4A's, and the American
12  Marketing Association.
13     Q. Okay. And to take them one by one, does the
14  Advertising Research Foundation publish literature on
15  fairness and transparency?
16     A. The Advertising Research Foundation publishes
17  guidelines governing online advertising. And some of
18  those include information about fairness and
19  transparency.
20     Q. Did you derive your Footnote 9 from materials
21  you reviewed from the Advertising Research Foundation,
22  the Internet Advertising Bureau, or the 4A's?
23     A. I'm basing Footnote 9 on my industry
24  experience, not on information from those organizations.
25     Q. If I want to corroborate your Footnote 9 by

67 (Pages 262 - 265)

CONFIDENTIAL

Page 266

1 looking to one of these trade associations, can I do
2 that?
3     MR. RENARD: Objection to form.
4     THE WITNESS: Yes. The American Marketing
5 Association standards of ethical conduct inform
6 Footnote 9.
7 BY MR. ROSSON:
8     Q. Are you relying on the American Marketing
9 Association's standards of ethical conduct in offering
10 your opinions?
11     A. No. The opinion in Footnote 9 is based on my
12 industry experience.
13     Q. Will I be able to look at the materials
14 published by -- within the AMA standards of ethical
15 conduct and find information about how to build a fair
16 and transparent online auction?
17     MR. RENARD: Objection to form.
18     THE WITNESS: You will find the principles
19 undergirding a fair and transparent online auction, but
20 I don't believe you will find a guideline to building an
21 auction.
22 BY MR. ROSSON:
23     Q. Are you aware of the standards that you employ
24 in Footnote 9 of your opening report having been used by
25 anyone in any other context?

Page 267

1     A. Again, the only other auction that I have the
2 detailed knowledge of the inner workings of was the
3 AppNexus auction and it conformed to these guidelines.
4     Q. What I mean is, if I want to find an
5 authoritative source to help me build a fair and
6 transparent online auction, are you aware of any other
7 material, aside from your opening report, that is going
8 to lay out the criteria that you did in your Footnote 9?
9     MR. RENARD: Objection to form.
10     THE WITNESS: I think in order to find an
11 authoritative source that would lay out the criteria for
12 a fair and transparent online auction, you would need to
13 ask one or more additional industry experts.
14 BY MR. ROSSON:
15     Q. Are you aware of any industry experts who
16 adopt your Footnote 9 as the standard for a fair and
17 transparent online auction?
18     MR. RENARD: Objection to form.
19     THE WITNESS: Participants in the industry
20 would recognize my definition as the description of a
21 fair and transparent online auction.
22 BY MR. ROSSON:
23     Q. Are you aware of any industry experts who have
24 utilized your criteria for determining whether an
25 auction is fair and transparent?

Page 268

1     MR. RENARD: Same objection.
2     THE WITNESS: I am not aware of an industry
3 participant who is using my criteria exactly as it is,
4 but my criteria describe a fair and transparent online
5 auction that would be recognizable to industry
6 participants on both the buy and sell side.
7 BY MR. ROSSON:
8     Q. Do you believe that if we were to -- I'm not
9 saying we're going to do this. This is a hypothetical,
10 okay? Are you with me so far?
11     A. So far I'm with you.
12     Q. Okay.
13     If we were to make your Footnote 9 in your
14 opening report public, do you believe all industry
15 participants would agree with all of its criteria?
16     A. I believe the vast majority of industry
17 participants would agree with its criteria.
18     Q. And when you say "vast majority," can you be
19 more specific? Give me a percentage.
20     A. I think if you asked industry participants, Do
21 you consider the following standards to define a fair
22 and transparent online auction, and listed my criteria,
23 north of 90 percent would agree that it accords with
24 their understanding of a fair and transparent online
25 auction.

Page 269

1     Q. Do you know of the industry getting together
2 to publish a statement about what it believes is fair
3 and transparent?
4     MR. RENARD: Objection to the form.
5     THE WITNESS: I do not know specifically of an
6 industry gathering to discuss fairness and transparency
7 in online auctions in this sense.
8 BY MR. ROSSON:
9     Q. As you use the term "fair," are you using that
10 term objectively or subjectively?
11     MR. RENARD: Objection to form.
12     THE WITNESS: I'm using that term as an
13 objective measure of equal dealing across participants
14 on a given side of an auction.
15 BY MR. ROSSON:
16     Q. What about transparency; are you using that
17 objectively or subjectively?
18     A. Again, objectively. Transparency in this
19 sense means disclosure of the auction rules and that is
20 an objective measure.
21     Q. Imagine you and I set up an online auction
22 exchange. Are you with me?
23     A. I am.
24     Q. If we set up an exchange, are we obligated to
25 disclose all of the auction rules to all participants?

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

1         MR. RENARD:  Objection to form.
2         THE WITNESS:  What do you mean by "obligated"
3    in this sense?
4    BY MR. ROSSON:
5         Q.  Is it a requirement?
6         MR. RENARD:  Objection.  Form.
7         THE WITNESS:  Again, I think the -- my
8    question for clarification is a requirement by whom?  A
9    requirement to adhere to these standards or a
10   requirement by an external party?
11   BY MR. ROSSON:
12        Q.  First let's start with a requirement by an
13   external party.
14        MR. RENARD:  Objection to the form of the
15   statement.
16        THE WITNESS:  I am not aware of an external
17   party that would require us under this hypothetical of
18   you and I getting together and setting up an online
19   auction environment, a party that would require us to
20   adhere to these standards.
21   BY MR. ROSSON:
22        Q.  Are you aware of a third party requiring a
23   company to adhere to any of the standards that you've
24   mentioned in your opinions?
25        MR. RENARD:  Objection.  Form.

Page 271

1         THE WITNESS:  I am not aware of a third party
2    requiring any particular set of standards for an online
3    auction.  I think that if you and I were to set up an
4    online auction environment and we adhered to these
5    standards, then we would be able to use those to attract
6    advertisers and publishers to our auction environment.
7    And if we did not adhere to those standards, we would
8    have a much harder time of doing that.
9    BY MR. ROSSON:
10        Q.  Online exchanges can compete on the basis of
11   transparency, right?
12        A.  Online exchanges compete on a variety of
13   bases, and transparency can be one of those.
14        Q.  So an online auction could seek to become more
15   transparent to secure a competitive advantage over other
16   auctions, right?
17        MR. RENARD:  Objection to form.
18        THE WITNESS:  There are many criteria that
19   advertisers and publishers use to decide whether or not
20   to use an online auction and transparency could be one
21   of those, and an online auction could seek to compete on
22   the basis of that transparency.
23   BY MR. ROSSON:
24        Q.  At the online auction level, transparency is a
25   form of competition, right?

Page 272

1         MR. RENARD:  Objection to form.
2         THE WITNESS:  Transparency on its own or in
3    isolation does not define the competition between online
4    auctions and exchanges, but it is an aspect of
5    competition.
6    BY MR. ROSSON:
7         Q.  Do you recall setting out some wish lists in
8    your opening report?
9         A.  Yes.
10        Q.  All right.  I want to turn to those and
11   discuss them with you.
12        A.  Page 86 of the opening report?
13        Q.  Correct.
14            You have a wish list for the buy side, the
15   sell side, and the exchange; is that right?
16        A.  That's correct.
17        Q.  And are these the desires of -- on the buy
18   side, are these the desires of all buyers?
19        MR. RENARD:  Objection to form.
20        THE WITNESS:  In this section I am attempting
21   to lay out hypothetical information that the buy side,
22   the sell side, and the exchange would wish to have or
23   wish to be able to act upon, taking into account the
24   totality of the participants.
25            So I am not representing that all buyers would

Page 273

1    want all of these pieces of information, but generally
2    speaking, they would be advantageous to people on the
3    buy side, for the buy side wish list.
4    BY MR. ROSSON:
5         Q.  Look at Paragraph 337, please, where you
6    write, "Another unethical practice would be prioritizing
7    certain bids over others based on undisclosed criteria."
8            Do you see that?
9         A.  I do see that.
10        Q.  What does "unethical" mean in that sense?
11        A.  What I mean is that if an exchange or auction
12   was putting its thumb on the scale in a set of online
13   auctions and prioritizing certain bids over others based
14   on mechanisms that were not disclosed, then that would
15   be unfair to some auction participants.
16        Q.  Is whether an action is ethical or unethical a
17   subjective question?
18        MR. RENARD:  Objection to form.
19        THE WITNESS:  There are generally accepted
20   standards of ethics within marketing in terms of fair
21   dealing, and so I think in that sense it is objective.
22   BY MR. ROSSON:
23        Q.  Where can I find these general standards of
24   fair dealing for marketing practice?
25        MR. RENARD:  Objection to form.

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

1    THE WITNESS:  Again, places like the AMA
2    standards of ethics.
3    BY MR. ROSSON:
4    Q.  And do those -- let's take the AMA standards
5    of ethics.  Is that cited in your reports, by the way?
6    A.  It is not.  I did not need to cite that in
7    order to form these opinions, as this particular opinion
8    in Paragraph 337 is based on my industry experience.
9    Q.  You didn't rely on the AMA standard of ethics?
10   Did I say that correctly?  AMA.
11   A.  [No response.]
12   Q.  Okay.  Apologies.  Let me start over.
13       You didn't rely on the AMA standards of ethics
14   for any of your opinions, right?
15   A.  That's correct.  Those ethical standards are
16   not part of my reliance list.
17   Q.  Okay.
18       On the exchange wish list, are there other
19   practices aside from Paragraph 337 that are unethical in
20   your opinion?
21   A.  As I say in Paragraph 340, "In sum, if
22   exchanges were willing to be unethical, they can
23   manipulate the auction process through practices like
24   last-look bidding, dynamic take rate adjustments, bid
25   prioritization, altering auction mechanics, and

Page 275

1    withholding market data.  These manipulations would
2    undermine the transparency and fairness of the auction
3    process, disadvantaging both advertisers and
4    publishers."
5    Q.  Has Data Insights ever had an exchange as a
6    client?
7    A.  Not as a direct client, no.
8    Q.  Has an exchange, online ad exchange, ever paid
9    Data Insights in exchange for services?
10   A.  Not directly.
11   Q.  Every practice you list on the exchange wish
12   list is one that you find to be unethical, right?
13   A.  Yes.  On the buy side and sell side, I'm
14   describing information that those entities would like to
15   have in order to operate in an exchange more
16   effectively.
17       For the exchanges, I am describing
18   manipulations generally to the auction process that
19   undermine the fairness and transparency of the auctions
20   on that exchange.
21   Q.  So you believe that if ad buyers and sellers
22   had their way, they would want to do ethical things,
23   right?
24       MR. RENARD:  Objection to form.
25       THE WITNESS:  In my experience in the

Page 276

1    industry, buyers and sellers tend to act ethically.
2    BY MR. ROSSON:
3    Q.  And in your opinion, if exchanges had their
4    way, they would want to do unethical things; is that
5    right?
6        MR. RENARD:  Objection to form.
7        THE WITNESS:  That's not what I'm opining
8    here; I am describing ways in which exchanges could take
9    advantage of their position in the market to act
10   unethically.
11   BY MR. ROSSON:
12   Q.  You call it their wish list, right?
13   A.  I do call it the wish list.
14   Q.  Things they wish for?
15       MR. RENARD:  Objection to form.
16       THE WITNESS:  I am not offering an opinion on
17   the extent to which exchanges desire to behave in this
18   way.  I'm attempting to describe those behaviors here.
19   BY MR. ROSSON:
20   Q.  What does the word "wish" mean?
21       MR. RENARD:  Objection to form.
22       THE WITNESS:  I acknowledge that the word
23   "wish" implies a desire.  I am trying to explain that
24   other than in the use of "wish" in the header here, I am
25   attempting to describe behaviors that exchanges have

Page 277

1    available to them as part of their position in the
2    marketplace.
3    BY MR. ROSSON:
4    Q.  Are you offering any opinions on Google's
5    subjective intent?
6        MR. RENARD:  Objection to form.
7        THE WITNESS:  There are places where I cite to
8    Google employees discussing their desired outcomes from
9    experiments and behaviors that they engage in.  And so
10   in that sense, I think I am perhaps offering opinions on
11   their subjective intent.
12   BY MR. ROSSON:
13   Q.  What about the subjective intent of Google,
14   the Defendant?
15       MR. RENARD:  Objection to form.
16       THE WITNESS:  I'm not offering an opinion on
17   the subjective intent of Google the company.
18       MR. ROSSON:  So I think we're a little over an
19   hour.  Do you guys want to take a quick break?
20       MR. RENARD:  Sure.
21       THE VIDEOGRAPHER:  Okay.  That concludes
22   Media 7.  We are going off the record at 6:28 p.m.
23       (RECESS TAKEN)
24       THE VIDEOGRAPHER:  This is the start of
25   Media 8.  We are going back on the record at 6:49 p.m.

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

1  BY MR. ROSSON:
2      Q.  Dr. Chandler, any testimony you want to
3  correct or change?
4      A.  No.
5      Q.  Can a publisher choose to use AdX without
6  using DFP?
7      A.  Yes, it is possible for a publisher to use AdX
8  without using Google Ad Manager.
9      Q.  Can a publisher choose to use DFP without
10  using AdX?
11      A.  Yes.
12          MR. ROSSON:  I pass the witness.
13              EXAMINATION
14  BY MR. RENARD:
15      Q.  Dr. Chandler, I have a few questions and
16  matters of clarification.
17          Do you recall the questions that Mr. Rosson
18  asked you today regarding your opinions in your June 7
19  opening report, which is Exhibit No. 1?
20      A.  Yes.
21      Q.  Was any of your testimony today, other than
22  the errata matters that Mr. Rosson covered with you at
23  the beginning, was any of your testimony today intended
24  to change the opinions expressed in your opening report?
25      A.  No.

Page 279

1      Q.  Was any of your testimony today intended to
2  limit the opinions expressed in your opening report,
3  Exhibit 1?
4      A.  No.
5      Q.  Similar questions with respect to your
6  rebuttal report.
7          Do you recall the questions that Mr. Rosson
8  asked regarding your opinions set forth in your
9  September 9 rebuttal, which is Exhibit No. 2?
10      A.  Yes.
11      Q.  Was any of your testimony today intended to
12  change the opinions expressed in that rebuttal report?
13      A.  No.
14      Q.  Was any of your testimony today intended to
15  limit the opinions expressed in Exhibit 2, the rebuttal
16  report?
17      A.  No.
18      Q.  Can you tell us whether or not you had
19  sufficient facts and data to reach your opinions that
20  are set forth and expressed in your two reports in this
21  case?
22      A.  Yes, I had sufficient facts and data to reach
23  my opinions for both my reports.
24      Q.  Do you recall being asked today about the
25  methodology that you used in forming your opinions on

Page 280

1  the Ad Tech industry as set forth in your opening
2  report?
3      A.  Yes.
4      Q.  Can you tell us whether or not that
5  methodology that you utilized was based on reliable and
6  generally accepted data analytics principles?
7      A.  Yes.
8      Q.  And was it?
9      A.  It was indeed.
10      Q.  Can that methodology be tested?
11      A.  Yes.
12      Q.  Has the methodology that you utilized and
13  described in your deposition today been the subject of
14  peer review and publication?
15      A.  It has.
16          MR. ROSSON:  Objection.  Form.
17  BY MR. RENARD:
18      Q.  Is that methodology generally accepted in the
19  field of data analytics to the Ad Tech industry?
20          MR. ROSSON:  Objection.  Form.
21          THE WITNESS:  Yes.
22  BY MR. RENARD:
23      Q.  Did you reliably apply that methodology to
24  form your opinions about the Ad Tech industry in this
25  case?

Page 281

1      A.  Yes.
2      Q.  Did you have sufficient facts and data to
3  reach the opinions you did in this case about the
4  Ad Tech industry?
5      A.  Yes.
6      Q.  And similarly, did you have and do you have
7  sufficient facts and data to reach the opinions
8  expressed within your two reports in this case?
9      A.  Yes.
10      Q.  Are you offering any new opinions beyond those
11  set forth in Exhibit 1 and Exhibit 2, which are your
12  opening report and your rebuttal report, respectively?
13  Are you offering any new opinions in addition to those
14  set forth in those reports here today?
15      A.  I am not offering any new opinions beyond
16  those in Exhibit 1 and Exhibit 2.
17      Q.  Do you remember when you were asked whether
18  the advertising industry generally expects that when
19  commercial parties enter into written transaction, that
20  it's fair to hold them to their bargain?
21      A.  Yes.
22      Q.  Can you tell us whether or not in providing
23  the answer that you provided, you were envisioning
24  contracts among parties with vastly different bargaining
25  power?

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

1     MR. ROSSON: Objection. Form.
2     THE WITNESS: I was not envisioning contracts
3  between parties with vastly different bargaining power.
4  BY MR. RENARD:
5     Q. In your experience representing and advising
6  advertisers and publishers and other players in the Ad
7  Tech industry, did you develop a sense of whether Google
8  has unequal bargaining power in negotiations regarding
9  the Ad Tech industry?
10    MR. ROSSON: Objection. Form.
11    THE WITNESS: Yes, I developed an -- a sense,
12 and I believe that Google does have unequal bargaining
13 power in negotiations in the Ad Tech industry.
14 BY MR. RENARD:
15    Q. Unequal in what direction?
16    A. Google has vastly more power than the parties
17 it's negotiating with.
18    Q. Dr. Chandler, just because some of Google's
19 conducts discussed in your report may have ceased, does
20 that mean in your opinion that those conducts no longer
21 have adverse effects or can cause harm?
22    A. No. Conducts that have ceased can still have
23 adverse effects and can still cause harm.
24    Q. Do you recall your testimony with respect to
25 your reliance on Dr. Weinberg's opening report?

Page 283

1     A. I do.
2     Q. By the way, have you read Dr. Weinberg's
3  rebuttal report?
4     A. I have.
5     Q. Can you tell us whether or not one of the
6  reasons that you partially relied on Dr. Weinberg's
7  report was that it contained an accurate and detailed
8  description of Google's conducts?
9     MR. ROSSON: Objection. Form.
10    THE WITNESS: Yes. One of the reasons I
11 relied partially on Dr. Weinberg's report is because it
12 contained an accurate and detailed description of
13 Google's conducts.
14 BY MR. RENARD:
15    Q. Can you tell us whether or not beyond your
16 reliance on Dr. Weinberg, partial reliance, whether you
17 also have an independent understanding of Google's
18 conducts?
19    A. I do have an independent understanding of
20 Google's conducts.
21    Q. And since the time of your opening report, did
22 you further study and develop an even deeper
23 understanding of those conducts?
24    A. I did.
25    Q. Dr. Chandler, do you remember when you were

Page 284

1  asked whether you were offering opinion on whether
2  Google violated any deceptive trade practices of law,
3  and your answer being no?
4     A. I do remember that.
5     Q. Are you saying that your opinions have no
6  application or relevance with respect to the Plaintiff's
7  deceptive trade practices claims in this case?
8     MR. ROSSON: Objection. Form.
9     THE WITNESS: I am not saying that.
10 BY MR. RENARD:
11    Q. Let me ask you a similar question with respect
12 to the questions that Mr. Rosson asked you, whether your
13 opinions -- whether you have any opinions on whether
14 Google violated the antitrust laws. And I believe your
15 answer was no, correct?
16    A. That's correct.
17    Q. Are you saying that your opinions do not have
18 any application or relevance to the Plaintiff's
19 antitrust claims against Google in this case?
20    A. That is not what I'm saying.
21    Q. If you'll pull out Exhibit 3, Chandler
22 Exhibit 3. I have just a couple questions about that.
23    Do you remember being shown Exhibit 3 and
24 asked a series of questions about it?
25    A. Yes.

Page 285

1     Q. Do you know if that document was ever posted
2  publicly? And by that, I mean shared with auction
3  participants generally.
4     A. I do not know.
5     Q. And do you know the date of that document, if
6  in fact it was ever posted publicly?
7     A. I do not know the date.
8     Q. Do you know the form of the medium in which
9  that document was posted publicly, if it was at all?
10    A. I do not know.
11    Q. Does the statement in Exhibit 3 that "Google
12 may run limited experiments" constitute, in your
13 opinion, an accurate, full, effective, and timely
14 disclosure?
15    A. It does not.
16    Q. Would that -- those statements constitute a
17 factually accurate and full, effective, and timely
18 disclosure of Bernanke or any of the versions thereof?
19    MR. ROSSON: Objection. Form.
20    THE WITNESS: No.
21 BY MR. RENARD:
22    Q. Would it, in your opinion, constitute a full,
23 effective, accurate, and timely disclosure of Dynamic
24 Revenue Sharing, DRS?
25    A. No.

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

1    Q.  Would it, in your opinion, constitute a
2  factually accurate, full, effective, and timely
3  disclosure of Reserve Price Optimization, RPO?
4    A.  No.
5    Q.  You testified -- and let's take a look, sir,
6  then, at Chandler Exhibit 4.
7       Do you recall being asked a series of
8  questions about it?
9    A.  Yes.
10    Q.  You testified, did you not, that you had no
11  reason to doubt the veracity of certain statements in
12  Exhibit 4?
13    A.  I did testify to that.
14    Q.  Let me ask you:  Based upon your analysis of
15  certain Google internal communications, has Google
16  previously made untrue statements --
17    A.  Yes.
18    Q.  -- in its public-facing communications?
19       MR. ROSSON:  Objection.  Form.
20       THE WITNESS:  Yes.
21  BY MR. RENARD:
22    Q.  Do you remember when Mr. Rosson asked you
23  about experiments that advertisers and publishers run?
24    A.  Yes.
25    Q.  Is it your opinion that the experiments run by

Page 287

1  advertisers and publishers that are discussed in your
2  report are the same type of experiments that Google was
3  running as you describe in your reports?
4    A.  No, it is not my opinion that the experiments
5  run by advertisers and publishers are the same type of
6  experiments that Google runs.
7    Q.  Let me now move away from type to scale.
8       Is it your opinion that Google was running the
9  same scale of experiments as those experiments to which
10  you refer that are conducted or have been conducted by
11  advertisers and publishers in the Ad Tech industry?
12    A.  No.  The scale of Google's experiments was
13  vastly larger.
14    Q.  Do you remember the question from Mr. Rosson
15  asking whether advertiser experiments changed auctions?
16    A.  Yes.
17    Q.  And your testimony was, was it not, that no
18  advertiser had the scale to do so; is that correct?
19    A.  That is correct.
20    Q.  Let me ask you:  Did Google have the scale
21  necessary to affect the outcome of auctions?
22    A.  Google did have the scale necessary to run
23  experiments that would affect the outcome of auctions.
24    Q.  Do you remember when you were asked if
25  Bernanke has been disclosed today?

Page 288

1    A.  Yes.
2    Q.  Do you recall your testimony was that as of
3  this lawsuit, Bernanke has been generally disclosed to
4  the industry?
5    A.  Yes.
6    Q.  What did you mean by "generally"?
7    A.  I meant that the industry was aware of the
8  general concept of Bernanke.  And I did not mean that
9  the industry was aware of the specifics of Bernanke that
10  I have learned about from my review of confidential
11  documents.
12    Q.  Do you remember when you were asked if any
13  publishers or advertisers had decided not to advertise
14  on AdX because of Bernanke?
15    A.  Yes.
16    Q.  In your experience within the industry, do you
17  believe that there are viable alternatives to AdX such
18  that an advertiser or publisher could stop using AdX
19  altogether?
20       MR. ROSSON:  Objection.  Form.
21       THE WITNESS:  No.
22  BY MR. RENARD:
23    Q.  Do you remember being asked about Footnote 9
24  of your report?
25    A.  Yes.

Page 289

1    Q.  Does Footnote 9, and the definition that you
2  provide, represent your expert opinion in this matter?
3    A.  Yes, it does.
4    Q.  If you would turn, sir, to Exhibit 1, which is
5  your opening statement.  I'm sorry, opening report.
6    A.  [Witness complies.]
7    Q.  And if we can go to Page -- we'll start at
8  Page 86.  Let me know when you're there.
9    A.  I'm there.
10    Q.  And do you recall being -- or providing
11  testimony about what your purpose was in setting forth
12  "The Buy Side Wish List," which is Section G,
13  Subsection 1 on Page 86, and Section G.2, "The Sell Side
14  Wish List," which is on Page 87?
15    A.  Yes.
16    Q.  I'd like to turn to the third subsection,
17  which is on Page 88.
18       Do you recall testifying about what the
19  purpose of that section was?
20    A.  Yes.
21    Q.  I'd like to direct your attention,
22  Dr. Chandler, to Paragraph 332.  Would you read into the
23  record your second sentence of that paragraph?
24    A.  "This subsection explores the types of
25  information that exchanges could exploit with access to

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

1 data that exchanges typically do not have or if the
2 exchanges were willing to manipulate their auctions."
3     Q.  Does that sentence fairly capture the purpose
4 and intent of Subsection 3 of Section G, which is on
5 Pages 88 and 89 of your opening report?
6     A.  It does.
7         MR. RENARD:  No further questions.
8             EXAMINATION
9 BY MR. ROSSON:
10    Q.  Dr. Chandler, did I hear you correctly that
11 the opinions you're offering in this case are entirely
12 contained in your opening and rebuttal report?
13    A.  Yes.
14    Q.  Do your opening and rebuttal reports mention a
15 disparity of bargaining power at all?
16    A.  They do not specifically mention disparity of
17 bargaining power.
18    Q.  ███████████████████████████████
19 ██
20        MR. RENARD:  Objection.  I believe that's
21 outside the scope of my examination.
22        Objection to the form.
23        THE WITNESS:  ████████████████████
24 ██  ███████████
25

Page 291

1 BY MR. ROSSON:
2     Q.  ████████████████████████████████
3 
4     A.  As it relates to open web display, I think
5 ██████████████████████████████
6 ██
7     Q.  ████████████████████████████
8 ██
9         MR. RENARD:  Objection to form.
10        THE WITNESS:  ███████
11 BY MR. ROSSON:
12    Q.  ████████████████████████████
13 ██
14    A.  As it relates to open web display, yes.
15    Q.  If I want to learn more about how you
16 determine whether there's a disparity of bargaining
17 power between two companies, can I look in your report
18 and find any analysis about that?
19    A.  I don't believe my report contains information
20 about disparity of bargaining power specifically.
21    MR. ROSSON:  I pass the witness.
22    MR. RENARD:  No further questions.
23    MR. ROSSON:  We'll designate the transcript
24 confidential.
25    MR. RENARD:  Also, before we go off the

Page 292

1 record, we will want the opportunity to review the
2 transcript and sign, if necessary.
3         Thank you all.
4         THE VIDEOGRAPHER:  Okay.
5         We are off the record at 7:06 p.m.  This
6 concludes today's testimony given by John Chandler.  The
7 total number of media used was eight and will be
8 retained by Veritext.
9         (Signature was reserved.)
10        (Thereupon, the deposition
11        concluded at 7:06 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 293

1         CERTIFICATE OF REPORTER
2 STATE OF MONTANA    )
                      :
3 COUNTY OF GALLATIN  )
4     I, Emily K. Niles, Registered Merit Reporter,
5 do hereby certify:  That I reported the deposition of
6 DR. JOHN CHANDLER, Ph.D., commencing on Thursday,
7 October 24, 2024, at 8:15 a.m.;
8     That prior to being deposed, the witness was
9 duly sworn by me to testify to the truth;
10    That the reading and signing of the deposition
11 by the witness have been expressly reserved;
12    That I foregoing pages of this deposition
13 constitute a complete, true, and accurate transcription
14 of my stenotype notes of the testimony of said witness
15 to the best of my ability.
16    I further certify that I am not a relative or
17 employee of counsel of any of the parties, nor a
18 relative or employee of the parties involved in said
19 action, nor a person financially interested in the
20 action.
21    IN WITNESS WHEREOF, I have set my hand in my
22 office in the County of Gallatin, State of Montana, this
23 25th day of October, 2024.
24
25
        EMILY K. NILES, RMR, CRR, CCR #782

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

1  JAMES S. RENARD, ESQ.
2  james.renard@nortonrosefulbright.com
3          October 25, 2024
4  RE:   State Of Texas Et Al  v. Google LLC
5    10/24/2024, John Chandler (#6918917)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com.
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 296

1  State Of Texas Et Al  v. Google LLC
2  John Chandler (#6918917)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, John Chandler, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  John Chandler          Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 295

1  State Of Texas Et Al  v. Google LLC
2  John Chandler (#6918917)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  John Chandler          Date
25

75 (Pages 294 - 296)

293

```
 1                    CERTIFICATE OF REPORTER

 2   STATE OF MONTANA     )
                          :
 3   COUNTY OF GALLATIN   )

 4            I, Emily K. Niles, Registered Merit Reporter,

 5   do hereby certify:  That I reported the deposition of

 6   DR. JOHN CHANDLER, Ph.D., commencing on Thursday,

 7   October 24, 2024, at 8:15 a.m.;

 8            That prior to being deposed, the witness was

 9   duly sworn by me to testify to the truth;

10            That the reading and signing of the deposition

11   by the witness have been expressly reserved;

12            That I foregoing pages of this deposition

13   constitute a complete, true, and accurate transcription

14   of my stenotype notes of the testimony of said witness

15   to the best of my ability.

16            I further certify that I am not a relative or

17   employee of counsel of any of the parties, nor a

18   relative or employee of the parties involved in said

19   action, nor a person financially interested in the

20   action.

21            IN WITNESS WHEREOF, I have set my hand in my

22   office in the County of Gallatin, State of Montana, this

23   25th day of October, 2024.

24

25
           _____
           EMILY K. NILES, RMR, CRR, CCR #782
```