# EXHIBIT 31
# [FILED UNDER SEAL]

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF TEXAS

3                      SHERMAN DIVISION

4                          --oOo--

5       THE STATE OF TEXAS, et al.,

6                  Plaintiffs,

        vs.                              Case No.

7                                        4:20-cv-00957-SDJ

        GOOGLE LLC,

8

                   Defendant.

9

        _____/

10

11

12

13       HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

14

15

16

17       VIDEOTAPED DEPOSITION OF ZUBAIR SHAFIQ, Ph.D.

18              SAN FRANCISCO, CALIFORNIA

19                  OCTOBER 9, 2024

20

21

22

23      Reported by:

24      Anrae Wimberley, CSR No. 7778

25      Job No.  6920792

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 2

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF TEXAS
3              SHERMAN DIVISION
4                 --oOo--
5   THE STATE OF TEXAS, et al.,
6         Plaintiffs,
    vs.              Case No.
7                4:20-cv-00957-SDJ
    GOOGLE LLC,
8
         Defendant.
9
   _____/
10
11
12
13  HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
14
15      Transcript of video-recorded deposition
16  of ZUBAIR SHAFIQ, Ph.D., taken at Norton Rose
17  Fulbright US LLP, 555 California Street, Suite 3300,
18  San Francisco, California 94104 and via Zoom
19  videoconference, beginning at 9:55 a.m. and ending
20  at 7:01 p.m. on Wednesday, October 9, 2024, before
21  Anrae Wimberley, Certified Shorthand Reporter
22  No. 7778.
23
24
25
```

Page 3

```
1   APPEARANCES:
2   Counsel for Plaintiff State of Texas:
3       THE LANIER LAW FIRM, PLLC
4       BY:  ROBERT ARTHUR, ESQ.
5       JONATHAN WILKERSON, ESQ. (VIA ZOOM)
6       10940 West Sam Houston Parkway North
7       Suite 100
8       Houston, Texas 77064
9       (713) 659-5200
10      arthur@lanierlawfirm.com
11  - and -
12      NORTON ROSE FULBRIGHT US LLP
13      BY:  M. MILES ROBINSON, ESQ.
14      1301 McKinney, Suite 5100
15      Houston, Texas 77010-3095
16      (713) 651-5151
17      m.miles.robinson@nortonrosefulbright.com
18      Counsel for Texas, Idaho, Louisiana
19      (The Lanier Law Firm only),
20      Mississippi, North Dakota,
21      South Carolina, and South Dakota
22  - and -
23
24
25
```

Page 4

```
1   STATE OF TEXAS
2   OFFICE OF THE ATTORNEY GENERAL
3   BY:  BAO CUONG PHAM, ESQ. (VIA ZOOM)
4   P.O. Box 12548
5   Austin, Texas 78711-2548
6   (512) 936-1674
7   cuong.pham@oag.texas.gov
8
9   COUNSEL FOR GOOGLE LLC:
10      FRESHFIELDS BRUCKHAUS DERINGER US LLP
11      BY:  GAYLE R. KLEIN, ESQ.
12      MORGAN MARMARO, ESQ.
13      JEANETTE BAYOUMI, ESQ. (VIA ZOOM)
14      175 Greenwich Street, 51st Floor
15      3 World Trade Center
16      New York, New York 10007
17      (212) 230-4645
18      gayle.klein@freshfields.com
19      morgan.marmaro@freshfields.com
20      jeanette.bayoumi@freshfields.com
21
22  ALSO PRESENT:
23      KEIGO PAINTER, Videographer
24      VERITEXT LEGAL SOLUTIONS
25                 --oOo--
```

Page 5

```
1              I N D E X
2   EXAMINATION BY:              PAGE
3   Ms. Klein              10
4   Mr. Robinson              278
5   Ms. Klein              284
6
7                 --oOo--
8
9           E X H I B I T S
10  EXHIBIT      DESCRIPTION      PAGE
11  Exhibit 1   Fourth Amended Complaint;   15
                300 pages
12
    Exhibit 2   Curriculum Vitae of Zubair   17
13              Shafiq, Ph.D.; 17 pages
14  Exhibit 3   Rebuttal Expert Report of   37
                Professor Zubair Shafiq
15              dated 9/9/2024; 87 pages
16  Exhibit 4   U.C. Davis Step Plus System   45
                - Table 3; 1 page
17
    Exhibit 5   Paper titled "Tracking,   86
18              Profiling, and Ad Targeting
                in the Alexa Echo Smart
19              Speaker Ecosystem,"
                authored by Dr. Shafiq; 15
20              pages
21  Exhibit 6   Paper titled "CanaryTrap:   87
                Detecting Data Misuse by
22              Third-Party Apps on Online
                Social Networks," authored
23              by Dr. Shafiq; 19 pages
24
25
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 6

1          E X H I B I T S  (Cont'd)
2   EXHIBIT        DESCRIPTION            PAGE
3   Exhibit 7   Call for papers available     93
               on the Internet by the
4              Proceedings on Privacy
               Enhancing Technology
5              Symposium; 10 pages
6   Exhibit 8   Call For Papers, ACM IMC     100
               2023; 7 pages
7
    Exhibit 9   Copy of publicly available    104
8              version of declaration
               submitted by Professor
9              Shafiq in support of
               Plaintiff's Motion for
10             Class Certification in the
               Bernadine Griffith versus
11             TikTok and Bytedance case;
               83 pages
12
    Exhibit 10   Declaration of Glenn         144
13              Berntson; 11 pages
14  Exhibit 11   Court order in Griffith v.   170
               TikTok, Inc.; 11 pages
15
    Exhibit 12   Screenshot from My Ad        209
16              Center; 2 pages
17  Exhibit 13   Printout titled "Ads that    215
               respect your privacy"; 21
18             pages
19             --oOo--
20
21
22
23
24
25

Page 7

1   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
2       PAGE   LINE
3        25     5
4        25     15
5        26     16
6        30     12
7        41     20
8        43     8
9        43     17
10       43     25
11       50     1
12       50     17
13       103    15
14       106    5
15       107    11
16       107    21
17       108    5
18       108    10
19       109    22
20       110    9
21       110    23
22       111    17
23       113    18
24       129    8
25       197    25

Page 8

1        WEDNESDAY, OCTOBER 9, 2024;
2        SAN FRANCISCO, CALIFORNIA;
3            9:55 A.M.
4            - - -
5       THE VIDEOGRAPHER:  Good morning.  We're going
6   on the record at 9:55 a.m. on October 9th, 2024.
7   Please note that the microphones are sensitive and
8   may pick up whispering and private conversations.
9   Please mute your phone at this time.  Audio and
10  video recording will continue to take place unless
11  all parties agree to go off the record.
12       This is Media Unit 1 of the video-recorded
13  deposition of Dr. Zubair Shafiq taken by counsel for
14  defendants in the matter of State of Texas vs.
15  Google, LLC, filed in the United States District
16  Court, Southern District of New York [sic], Case No.
17  1:21-md-03010-PKC [sic] and following cases.  The
18  location of the deposition is 555 California Street,
19  Suite 3300, San Francisco California 94104.
20       My name is Keigo Painter, representing
21  Veritext.  I'm the videographer.  The court reporter
22  is Anrae Wimberley from the firm Veritext.  I'm not
23  related to any party in this action, nor financially
24  interested in the outcome.
25       If there are any objections to proceeding,

Page 9

1   please state them at the time of your appearance.
2   Counsel and all present, including remotely, will
3   now state their appearances and affiliations for the
4   record, beginning with the noticing attorney.
5       MS. KLEIN:  This is Gayle Klein on behalf of
6   the defendant with Freshfields US LLP.
7       And I believe the case caption that you
8   read was from the Southern District of New York, and
9   the case is actually pending in the Eastern District
10  of Texas.  So we'll get you the right caption on a
11  break.
12      MR. ROBINSON:  Miles Robinson for the plaintiff
13  states from Norton Rose Fulbright.
14      MR. ARTHUR:  Robert Arthur for the plaintiff
15  from The Lanier Law Firm.
16      MS. MARMARO:  Morgan Marmaro for the defendants
17  from Freshfields.
18      THE VIDEOGRAPHER:  Will the court reporter
19  please swear in the witness and then counsel may
20  proceed.
21          ZUBAIR SHAFIQ, PH.D.,
22  sworn in personally as a witness by the Certified
23      Shorthand Reporter, testified as follows:
24  //
25  //

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10

1    EXAMINATION
2  BY MS. KLEIN:
3    Q.  Good morning, Dr. Shafiq.  How are you
4  today?
5    A.  Morning.
6    Q.  Am I saying your name correctly?
7    A.  Yes.
8    Q.  Could you please state your name for the
9  record?
10   A.  Can I answer?
11   Q.  Yes.
12   A.  My name is Zubair Shafiq, Z-u-b-a-i-r,
13  S-h-a-f-i-q.
14   Q.  Thank you, Dr. Shafiq.
15       And could you please state your address?
16   A.  My address, office or home address?
17   Q.  Office.
18   A.  Office address is 3043 Kemper Hall, Davis,
19  California.
20   Q.  My name is Gayle Klein and I represent the
21  defendant in this action.
22       Do you understand that?
23   A.  Yes.
24   Q.  And have you given your deposition before?
25   A.  Yes.

Page 11

1    Q.  How many times have you been deposed?
2    A.  I've been deposed about five times.
3    Q.  Have you ever testified at a trial?
4    A.  No.
5    Q.  Have you ever testified in court at any
6  hearing?
7    A.  Yes.
8    Q.  How many times have you testified in a
9  court hearing?
10   A.  One time.
11   Q.  Before we get started today, I just want
12  to go over some ground rules.  Even though you've
13  been deposed, I want to make sure we're clear with
14  our agreements on the record.
15       Is that okay?
16   A.  Yes.
17   Q.  Okay.  You've been sworn to tell the
18  truth.
19       You understand that?
20   A.  Yes.
21   Q.  And you're testifying today as if you're
22  in front of a judge or a jury; correct?
23   A.  Yes.
24   Q.  And you understand that even though
25  there's a videographer here, there's a court

Page 12

1  reporter who's taking down everything you say;
2  correct?
3    A.  Yes.
4    Q.  Therefore, we'll need a verbal answer from
5  you.
6       Is that okay?
7    A.  Yes.
8    Q.  Okay.  And because the court reporter is
9  taking down everything we say, I will endeavor to
10  let you finish your answer before I start my next
11  question.
12       And if you could please afford me the
13  courtesy of letting me finish my question before you
14  answer, so that we don't drive the court reporter
15  crazy.
16       Is that okay?
17   A.  Yes.
18   Q.  If you don't understand a question that I
19  ask, will you ask me to repeat it or rephrase it?
20   A.  Will do.
21   Q.  Okay.  Therefore, is it fair for me to --
22  is it fair for the judge and the jury to understand
23  that you have understood my question if you don't
24  ask me to repeat it or rephrase it?
25   A.  Sounds reasonable.

Page 13

1    Q.  Okay.  Is there any reason you cannot
2  testify truthfully today?
3    A.  No.
4    Q.  This is not a marathon, so if you need to
5  take a break at any time, just let me know and we
6  can take a break.  I'll just ask that you answer the
7  pending question, if there is one, before we break.
8       Is that acceptable?
9    A.  Sounds good.
10   Q.  Okay.  You understand that we're here
11  today because 17 states and commonwealths have sued
12  Google over its advertising technology; correct?
13   A.  Yes.
14   Q.  And this case does not relate to other
15  Google products, such as Search or Play; right?
16   A.  Yes.
17   Q.  You describe your -- you've been retained
18  by the states as an expert witness to provide
19  testimony; correct?
20   A.  Yes.
21   Q.  And your assignment was to opine as to
22  whether privacy is a legitimate justification for
23  Google's conduct at issue; is that correct?
24   A.  Yes.
25   Q.  Do you know what the specific conduct at

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 14

1    issue is?
2        A.  I describe that extensively in my report.
3    Do you want me to summarize it from the report for
4    you or just give you high-level summary?
5        Q.  Well, I guess my question is, where did
6    you get the conduct that you believe is at issue?
7        MR. ROBINSON:  Professor Shafiq, I'm going to
8    instruct you to answer to the extent that you do not
9    reveal communications with counsel.  But you may --
10   you may answer to the extent that it does not cover
11   those subjects.
12       THE WITNESS:  I was given an assignment in this
13   case by counsel to offer rebuttal opinions to the
14   opinions that were offered in the expert reports of
15   Google's experts.
16       (Reporter seeks clarification.)
17       THE WITNESS:  Rebuttal opinions.
18       Can you please repeat where I ended?  I
19   lost my train of thought.
20       (Record read by reporter as follows:
21       "Answer:  I was given an assignment in
22       this case by counsel to offer rebuttal
23       opinions to the opinions that were offered
24       in the expert reports of Google's
25       experts.")

Page 15

1        THE WITNESS:  And Google's experts in their
2    reports offer certain opinions that get to the issue
3    of whether or not privacy is a legitimate
4    justification for certain conduct, and that was the
5    scope of my assignment.  I think that's a high-level
6    way to put it.
7        MS. KLEIN:  Could you mark . . .
8        (Deposition Exhibit 1 was marked.)
9    BY MS. KLEIN:
10       Q.  Dr. Shafiq, the court reporter has put in
11   front of you what's been marked as Shafiq Exhibit 1,
12   which is the Fourth Amended Complaint in this
13   action.
14       Do you see that?
15       (Witness reviews document.)
16       A.  Yes.
17       Q.  And is Shafiq Exhibit 1, the Fourth
18   Amended Complaint, one of the documents that you
19   reviewed in connection with offering the opinions
20   reflected in your report?
21       A.  Yes.
22       Q.  And Shafiq Exhibit 1, the Fourth Amended
23   Complaint, delineates Google's conduct at issue;
24   correct?
25       A.  I've read the complaint.  The complaint

Page 16

1    discusses a number of different issues, including
2    some of the issues that I address in my report.
3        Q.  But when you talk about you have to
4    address Google's conduct at issue in this case, the
5    conduct at issue is reflected in Shafiq Exhibit 1,
6    correct, the Fourth Amended Complaint?
7        A.  Yes.  There is overlap between the conduct
8    that is described in the complaint, the opinions
9    that are offered by Google's experts, and the
10   opinions that I respond to in my report.
11       Q.  You graduated with a Ph.D. in computer
12   science from Michigan State University in 2014; is
13   that correct?
14       A.  Yes.
15       Q.  And then you took a job as an assistant
16   professor of computer science at the University of
17   Iowa in 2014?
18       A.  Yes.
19       Q.  And you were there until 2020?
20       A.  Yes.
21       Q.  And then you took a job at the University
22   of California, Davis?
23       A.  Yes.
24       Q.  Where you are an associate professor?
25       A.  Yes.

Page 17

1        (Deposition Exhibit 2 was marked.)
2    BY MS. KLEIN:
3        Q.  Dr. Shafiq, the court reporter has put in
4    front of you what's been marked as Shafiq Exhibit 2.
5        Is this a true and correct copy of your
6    curriculum vitae?
7        (Witness reviews document.)
8        A.  Yes.
9        Q.  And you put together your CV; correct?
10       A.  Yes.
11       Q.  And your CV reflects that your research
12   interests are web privacy, Internet measurement,
13   Internet security and computer networks; correct?
14       A.  Yes.
15       Q.  You are not an expert in consumer
16   behavior; is that correct?
17       A.  As part of my research in security and
18   privacy, we conduct research into how users of
19   various tools and services use those products as it
20   pertains to security and privacy of those products.
21       So in that sense, my research does entail
22   not just technical work, but gets to the issue of
23   building more secure, more private tools.  It also
24   addresses the use of those tools by consumers and
25   other stakeholders.

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 18

1    MS. KLEIN: Objection as nonresponsive and move
2 to strike.
3 BY MS. KLEIN:
4    Q.  My question to you, sir, was, are you an
5 expert in consumer behavior?
6    MR. ROBINSON: Objection; form.
7    THE WITNESS: Subject to what I described to
8 you earlier, that my research does touch on how
9 consumers use security and privacy features in
10 various products, the core emphasis of my research
11 is not consumer behavior. Is that what you called
12 it? Yes.
13 BY MS. KLEIN:
14    Q.  Yes.
15    So you agree with me then, sir, you are
16 not an expert in consumer behavior; correct?
17    MR. ROBINSON: Objection; form.
18    THE WITNESS: Subject to what I just mentioned,
19 if you put that aside, I am not an expert in
20 consumer behavior.
21 BY MS. KLEIN:
22    Q.  And with respect to your work putting
23 together your opinions in this case, you did not do
24 a survey of consumers; correct?
25    A.  I did not conduct a survey for the

Page 19

1 purposes of my report in this case.
2    Q.  And you did not speak with or do any
3 research specifically on consumers, specifically, in
4 putting together your report? I'm going to strike
5 that. That was a bad question.
6    You did not do any specific research
7 related to consumer behavior when putting together
8 your opinions with respect to this report?
9    MR. ROBINSON: Objection; form.
10    THE WITNESS: I would not agree with that.
11 BY MS. KLEIN:
12    Q.  You do not agree with that.
13    Which consumers did you contact with
14 respect to your report in this case?
15    A.  Like I said earlier, I did not conduct a
16 survey for the purposes of my report.
17    Q.  You're not an expert in linguistics
18 either, are you?
19    MR. ROBINSON: Objection; form.
20    THE WITNESS: Similar to my answer to the
21 previous question, I have published research papers
22 in conferences on computational linguistics, so my
23 research is interdisciplinary. So I have some
24 expertise --
25    (Reporter seeks clarification.)

Page 20

1    THE WITNESS: So I published in peer-reviewed
2 research and conferences where research related to
3 linguistics is published.
4    So if you want to put that aside, and
5 similar to my answer to your previous question, the
6 core expertise that I have is not linguistics,
7 per se.
8 BY MS. KLEIN:
9    Q.  You reference computational linguistics.
10 What is that?
11    A.  Computational linguistics is simply
12 linguistics -- the study of the field of linguistics
13 or issues surrounding the field of linguistics using
14 computational tools.
15    Q.  Such as?
16    A.  I will give you a very simple example to
17 start off. One of the common methodologies that
18 is -- that is used in linguistics is to count words.
19 So I've published papers where we have done studies
20 where we have counted the user for different terms
21 and phases in various documents.
22    We've done, like, much, much more advanced
23 analysis, where this is a simple example to get you
24 started.
25    Q.  You're not an expert in the meaning of

Page 21

1 words, are you?
2    MR. ROBINSON: Objection; form.
3    THE WITNESS: Can you clarify "meaning of
4 words"?
5 BY MS. KLEIN:
6    Q.  Sure.
7    Are you an expert in the meaning of
8 everyday words?
9    MR. ROBINSON: Objection; form.
10    THE WITNESS: I apologize, I'm just, like,
11 failing to comprehend, like, what are you exactly
12 trying to ask me?
13    I mean, my job is to write words, to read
14 papers. I mean, it seems like such an elementary
15 thing, that to be an academic scientist you need to
16 be able to understand and read words, not just in
17 lay context, but also from a scientific standpoint.
18 BY MS. KLEIN:
19    Q.  To the extent you have an understanding of
20 scientific words, you're not here offering an
21 opinion on everyday regular words, are you?
22    MR. ROBINSON: Objection; form.
23    THE WITNESS: In various parts of my report, I
24 describe meaning of various terms. I assess that
25 from a scientific standpoint, as it would be

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 22

1  understood, by example, for -- by a computer science
2  expert in the field of computer science or by
3  consumers, because in my area of research, a lot of
4  our research deals with consumer privacy.
5       So it is important to understand and
6  investigate words as they would be perceived by
7  consumers. So I touch on some of those issues in my
8  report as well.
9  BY MS. KLEIN:
10     Q.  Are you an expert in organizational
11  psychology?
12     A.  No.
13     Q.  Are you an expert in industrial
14  organization?
15     MR. ROBINSON:  Objection; form.
16     THE WITNESS:  No.
17  BY MS. KLEIN:
18     Q.  Are you an expert in auction design?
19     A.  No.
20     Q.  Are you an economist?
21     A.  No.
22     Q.  Are you an expert in economic theory?
23     A.  No.
24     Q.  Are you a mind reader?
25     MR. ROBINSON:  Objection; form.

Page 23

1       THE WITNESS:  Is that a serious question?
2  BY MS. KLEIN:
3     Q.  It is a serious question, sir.
4       Are you a mind reader?
5     MR. ROBINSON:  Same objection.
6     THE WITNESS:  No.
7  BY MS. KLEIN:
8     Q.  I want to focus for a moment on the work
9  that you have done for U.C. Davis since you -- I
10  want to -- sorry, I want to focus on the expert work
11  that you've done since you joined U.C. Davis in
12  2020, which is page 16 of your CV.
13      Can you turn with me to page 16 of Shafiq
14  Exhibit 2?
15     A.  So not the academic papers?
16     Q.  No.  I want to focus on your expert
17  testimony for now.
18      Is the listing of cases on page 16 of
19  Exhibit 2, your CV, a full list of your expert
20  testimony and reports in the last 10 years?
21     A.  I believe so.
22     Q.  There's nothing to add to it, correct,
23  since you've issued your report?
24     A.  I honestly don't remember off the top of
25  my head right now, but I think this is fairly up to

Page 24

1  date.
2     Q.  You issued your report in this action on
3  September 9th, 2024; correct?
4     A.  Yes.
5     Q.  Has anyone hired you in the last month to
6  be an expert?
7     A.  Can I ask a question to counsel?
8     Q.  That's a "yes" or "no" question, so that
9  wouldn't cause you to reveal --
10     MR. ROBINSON:  To the extent you can answer it
11  a simple "yes" or "no," without divulging any
12  information that would be covered by any protective
13  orders or that is covered by protective orders, I
14  would instruct you not to answer, but you can answer
15  yes or no.
16     THE WITNESS:  I'm hesitating because I've
17  signed an NDA.
18  BY MS. KLEIN:
19     Q.  My question to you is not about what.
20      I'm just asking have you been engaged to
21  provide expert testimony since September 9th, 2024
22  by anyone else?
23     A.  Without revealing any information about
24  the contents of those matters, the nature of those
25  matters, the answer is yes.

Page 25

1     Q.  And in how many different -- how many
2  different engagements are there beyond what's
3  reflected in your CV on page 16?
4     A.  One.
5     Q.  And without divulging the nature of that
6  engagement, have you been engaged to testify against
7  Google in that matter?
8     MR. ROBINSON:  Dr. Shafiq, I'm going to
9  instruct you not to answer on the basis of your
10  protective orders and signed NDAs.
11     THE WITNESS:  I've signed an NDA as part of
12  that engagement and I believe I cannot reveal
13  parties or any nature -- any information about the
14  nature of that case.
15  BY MS. KLEIN:
16     Q.  It relates to a lawsuit?  I'm not going to
17  ask any further than that.
18     MR. ROBINSON:  Same instruction not to answer
19  on the basis of protective orders and NDAs, the
20  non-disclosure agreements that you have signed.
21  BY MS. KLEIN:
22     Q.  Go ahead.
23     A.  Can you please rephrase the question?
24     Q.  I'm just -- I'm going to just make the
25  record that I believe that to the extent that you've

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 26

1  been engaged to testify against Google, it goes to
2  your bias as a witness, and so I'm likely going to
3  move to compel to the extent you believe that you
4  cannot respond to that question.
5      MR. ROBINSON:  And I'll just make our position
6  clear that counsel is perfectly fine to ask the
7  expert about his assignment and opinions in this
8  matter, but regarding any other outside potential
9  opinions or consultancies, that there are external
10  protective orders and NDAs that apply here that
11  would bind the expert.
12  BY MS. KLEIN:
13      Q.  Are you refusing to answer my question,
14  sir?
15      A.  Can you please repeat your question?
16      Q.  Yes.
17         Is the additional engagement in which
18  you've been retained since September 9, 2024 adverse
19  to Google?
20      MR. ROBINSON:  Same instruction not to answer
21  on the same basis.
22      THE WITNESS:  At the instruction of counsel,
23  I'm not going to answer the question.
24  BY MS. KLEIN:
25      Q.  Now, your expert testimony and reports in

Page 27

1  the past 10 years, you have a number of cases
2  listed.
3         Do you see that on page 16 of your CV?
4      A.  Yes.
5      Q.  There are 16 of them; is that correct?
6      A.  Yes.
7      Q.  And you have been engaged in all 16 of
8  those matters since you became an associate
9  professor at U.C. Davis; correct?
10      A.  Yes.
11      Q.  So although it says in the past 10 years,
12  really, it's within the last four years; correct?
13      A.  Yes.
14      Q.  And at least five of those cases are
15  adverse to Google; right?
16      A.  Yes.
17      Q.  And one of those cases is against Meta?
18      A.  Can you point me to the case, which one?
19      Q.  In re Meta Pixel Healthcare Litigation,
20  22-cv-03580.
21      A.  That's correct.
22      Q.  And one of those matters is against
23  TikTok; correct?
24      A.  Yes.
25      Q.  And in all 16 of these matters, you've

Page 28

1  been retained by the plaintiff?
2      A.  Yes.
3      Q.  And five of these matters are against
4  Google?
5      A.  Your count is correct.
6      Q.  You don't like Big Tech very much, do you?
7      MR. ROBINSON:  Objection; form.
8      THE WITNESS:  I would not agree with that.
9  BY MS. KLEIN:
10      Q.  Why not?
11      A.  I do not agree with that statement, that I
12  do not like what you're calling Big Tech.
13      Q.  Your hourly rate in this engagement is
14  $750?
15      A.  Yes.
16      Q.  In other cases, you've charged $500 an
17  hour; correct?
18      A.  The rate that I have charged has changed
19  recently.
20      Q.  From $500 an hour to $750 an hour?
21      A.  That's correct.
22      Q.  When did it change?
23      A.  Earlier this year.
24      Q.  When?
25      A.  Sitting here today, I cannot recall from

Page 29

1  memory.
2      Q.  Why did you raise your rate by a full
3  third this year?
4      A.  I discussed at a high level with my
5  colleagues who were being engaged in similar
6  engagements and I was offered advice to increase the
7  rate.
8      Q.  How many hours have you spent on this
9  engagement?
10      A.  I don't recall it perfectly from memory.
11      Q.  Are you invoicing monthly?
12      A.  Yes.
13      Q.  How much money have you invoiced the
14  plaintiffs in this case?
15      A.  Sitting here today, I do not perfectly
16  recall from memory.
17      Q.  Let's have an estimate.  How much?
18      A.  If I have to guess, will be around -- my
19  work in this case is around -- about hundred hours.
20      Q.  So that's about $75,000 to date?
21      A.  Should be in that ballpark.
22      Q.  Does that include the time you spent
23  preparing for your deposition?
24      A.  I mean, we are in the deposition right
25  now, so I have not issued an invoice for this work

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 30

1 that is happening right now.
2     Q.  And your report says you use an outside
3 consulting firm to assist you; correct?
4     A.  That is correct.
5     Q.  And their name is Keystone Analytics?
6     A.  I'm not sure if the full name says
7 "Analytics," but it is Keystone.
8     Q.  I'm sorry.  You're correct.  Keystone
9 Strategy.  Is that correct?
10     A.  I've heard that name, and I think another
11 name I've seen is called Keystone AI.
12     Q.  How did you find Keystone?
13     MR. ROBINSON:  Going to instruct you not to
14 answer to the extent it would reveal communications
15 with counsel in this case.
16     MS. KLEIN:  I'm sorry, but that's not an
17 appropriate privilege question.  I asked him how did
18 he find Keystone.
19     MR. ROBINSON:  The basis is in the Court's
20 expert stipulation, Section 5.1, regarding
21 communications between counsel and testifying
22 expert -- testifying expert and any consultant and
23 staff.  That's the basis of the objection,
24 instruction.
25     MS. KLEIN:  I did not ask him any

Page 31

1 communication.  I just said how did you find
2 Keystone.
3     MR. ROBINSON:  That potentially and likely
4 implicates those protected communications.
5     MS. KLEIN:  The fact of how he found them is
6 not a communication.
7     MR. ROBINSON:  Stand by the objection and
8 instruction on the basis of the expert stipulation,
9 Section 5.1.
10 BY MS. KLEIN:
11     Q.  Did you know of Keystone Strategy or
12 Keystone AI before you were retained in this action
13 on -- in March of 2024?
14     A.  No.
15     Q.  When Keystone was introduced to you, what
16 did you do, if anything, to understand what their
17 expertise is that could help you?
18     MR. ROBINSON:  Objection; form.
19     THE WITNESS:  I interviewed them.
20 BY MS. KLEIN:
21     Q.  Who did you interview at Keystone?
22     A.  I interviewed a number of people at
23 Keystone.
24     Q.  Who?
25     A.  One of the person, that person's name is

Page 32

1 Anna.
2     Q.  What's her last name?
3     A.  That's her first name.
4     Q.  What is her last name?
5     A.  I can't recall from memory.  I think I
6 know it, but I don't want to give you wrong answer.
7     Q.  Who else at Keystone did you interview?
8     A.  Another person I interviewed, that
9 person's name is James.
10     Q.  Do you know James' last name?
11     A.  Same issue, because I don't use last names
12 in my day-to-day communications, I do not remember
13 exactly what his last name is.
14     Q.  Did you interview anybody else before --
15 at Keystone before deciding to use them in this
16 engagement?
17     A.  There was one other person, but I cannot
18 recall that person's name right now.
19     Q.  And what does Anna do, what is her
20 expertise?
21     A.  Broadly speaking, she has a Ph.D. in a
22 STEM field.
23     (Reporter seeks clarification.)
24     A.  STEM, S-T-E-M, all caps.
25     Q.  Do you know which field?

Page 33

1     A.  I'm forgetting the exact topic, but we
2 discussed that to some extent.
3     Q.  Is Anna actually working on this
4 engagement?
5     MR. ROBINSON:  You may answer.
6     THE WITNESS:  Anna has conducted some work
7 under my guidance.
8 BY MS. KLEIN:
9     Q.  Okay.  What has Anna done under your
10 guidance?
11     A.  For example, Anna has conducted some
12 searches.
13     Q.  Of what?
14     A.  Of documents.
15     Q.  What documents?
16     A.  There were a number of -- a large number
17 of documents produced in discovery, and one of the
18 ways I wanted to get help from the team from
19 Keystone was to conduct searches to identify
20 documents that may be relevant to my assignments in
21 this case.
22     Q.  How much time has Anna spent searching for
23 documents?
24     MR. ROBINSON:  Professor Shafiq, on the basis
25 of the expert stipulation, to the extent you know

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 34

1  about the total hours spent by staff members in
2  connection with your opinion, you may -- you may
3  answer, but I'll instruct you not to answer
4  regarding more granular questions such as this.
5      But if you know about the total hours
6  staff members have spent, you may answer.
7      THE WITNESS: Can you please rephrase your
8  question?
9  BY MS. KLEIN:
10     Q.  I said how much time has Anna spent
11  searching documents in this case, if you know?
12     MR. ROBINSON: Same instruction regarding if
13  you know about total hours spent by staff, you may
14  answer, but otherwise I will instruct you not to
15  answer regarding more granular questions.
16     THE WITNESS: I don't know.
17  BY MS. KLEIN:
18     Q.  How much time has Keystone spent working
19  on this engagement under your direction?
20     A.  I don't know.
21     Q.  No clue?
22     A.  Sitting here today, I do not know.
23     Q.  A couple of hours?
24     A.  It's probably more than a couple of hours.
25     Q.  Fifty hours?

Page 35

1      A.  I will have to ask them.
2      Q.  You have no clue as you sit here how much
3  time they've spent working on this case?
4      MR. ROBINSON: Objection; form.
5      THE WITNESS: Like I said earlier, it is more
6  than, as you were asking, a couple of hours.
7  BY MS. KLEIN:
8      Q.  But you don't know if it was a month's
9  worth of work or a day's worth of work?
10     MR. ROBINSON: Objection; form.
11     THE WITNESS: I don't want to give unreliable
12  answer. I will have to ask them.
13  BY MS. KLEIN:
14     Q.  Well, I'm trying to get a sense of how
15  much time Keystone has spent, and your counsel is
16  saying that you're limited to the number of hours.
17     So as you sit here today, can you please
18  estimate the number of hours that Keystone has
19  spent?
20     MR. ROBINSON: Objection; form.
21     THE WITNESS: I will have to wildly speculate
22  and I don't want to do that.
23  BY MS. KLEIN:
24     Q.  I'm asking you to do that.
25     MR. ROBINSON: Objection; form.

Page 36

1      THE WITNESS: If I have to speculate, it is
2  probably more than 50 hours.
3  BY MS. KLEIN:
4      Q.  Can you speculate and give me a ballpark
5  as to the total number of hours, please, spent?
6      MR. ROBINSON: Objection to form.
7      THE WITNESS: I cannot do that.
8  BY MS. KLEIN:
9      Q.  Besides doing some searches for documents,
10  what else has Keystone done to assist you?
11     A.  They have also helped me with the
12  formatting of my report.
13     Q.  Did they write any of your report?
14     MR. ROBINSON: Objection; form.
15     THE WITNESS: The team at Keystone, they
16  compiled certain appendices as part of my report
17  under my direction. So they have written those
18  parts of the report.
19  BY MS. KLEIN:
20     Q.  They wrote the appendices?
21     A.  They have written some of the appendices.
22     Q.  What about the body of the report, did
23  they write any of the body of the report?
24     MR. ROBINSON: Objection; form.
25     THE WITNESS: I got some feedback from them

Page 37

1  when I drafted various sections of the report. For
2  example --
3      MR. ROBINSON: Professor Shafiq, I'll ask
4  you -- instruct you not to reveal any content of any
5  communications, including specifically what feedback
6  you received, on the basis of the expert
7  stipulation.
8  BY MS. KLEIN:
9      Q.  My question to you, sir, was, did they
10  write any of the body of the report?
11     A.  No.
12     Q.  Now --
13     MS. KLEIN: You guys want the report? You guys
14  want the report?
15     MR. ROBINSON: Sure. You went to the trouble
16  of printing it, so . . .
17     (Deposition Exhibit 3 was marked.)
18  BY MS. KLEIN:
19     Q.  Professor Shafiq, the court reporter has
20  put in front of you what's been marked as Shafiq
21  Exhibit 3.
22     Is this a true and correct copy of your
23  report in this case dated September 9, 2024?
24     (Witness reviews document.)
25     A.  It looks like it.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 38

1    Q.   And unfortunately the report doesn't have
2  page numbers on it.  But I will represent to you
3  that through paragraph 85, which concludes the
4  body -- what I would call the body of the report, is
5  38 pages.
6         And, actually, you can see in the index on
7  page 2 of the report that that is correct.
8         Do you see that?
9    A.   Yes.
10   Q.   How much of the hundred hours that you've
11 worked on this engagement did you spend writing the
12 body of the report?
13   MR. ROBINSON:  Going to instruct the witness
14 not to answer questions that would violate the
15 expert stipulation regarding specific hour
16 allocations of time spent.
17        You may answer questions globally about
18 how much time you spent on this matter.
19   MS. KLEIN:  I believe that the -- it goes to
20 the allocations not of his time but him and the
21 consultants.
22   MR. ROBINSON:  Well, you've asked him already
23 about -- the total allocation of his time and the
24 consultants', and that's the extent to which you may
25 answer -- ask questions under the expert

Page 39

1  stipulation.
2  BY MS. KLEIN:
3    Q.   Are you refusing to answer my question?
4    A.   As I understand counsel's instruction, I
5  can only tell you about, as I've already done, give
6  you a ballpark estimate of the number of hours I
7  have spent in this case.
8         But counsel has instructed me to not to
9  answer more substantial -- more substantive
10 questions about allocation of time to -- for
11 specific assignments in this case.
12   Q.   Did you do any document searches on your
13 own, sir?
14   A.   Yes.
15   Q.   On what system?
16   A.   We use multiple systems.
17   Q.   Did you do any searching of the documents
18 that Google produced in this action on your own?
19   A.   Yes.
20   Q.   Okay.  Did you consider any other
21 consulting teams to provide support to you than
22 Keystone?
23   A.   No.
24   Q.   Going back to page 16 of your curriculum
25 vitae --

Page 40

1    A.   Can I close Exhibit --
2    Q.   Yes, for now.  Keep it nearby, though.
3  We'll come back to it.  Exhibit 2, I'm going back
4  to, your CV.
5    A.   Yes.
6    Q.   I apologize if I asked this question
7  before, but you were engaged by the plaintiffs in
8  all 16 of these expert testimony reports in the past
9  four years; correct?
10   A.   That's correct.
11   Q.   In the first case listed, it's Calhoun
12 versus Google.
13        Do you see that?
14   A.   Yes.
15   Q.   How much were you paid for your testimony
16 in the Calhoun versus Google case?
17   A.   Sitting here today, I do not recall from
18 memory.  That was many years ago.
19   Q.   Well, the case is a -- do you see on the
20 left it says 4:20-cv-05146?
21   A.   Yes.
22   Q.   So this means that the case was filed in
23 2020; correct?
24   A.   Is that a question?
25   Q.   Yes, that the -- you said it was many

Page 41

1  years ago.  It wasn't many years ago.  You've given
2  your testimony in the last four years in that case;
3  right?
4    A.   Yes.
5    Q.   Okay.  So you can't remember how much
6  money you were paid to testify against Google in
7  that case?
8    A.   No.
9    Q.   Was it more than $5,000?
10   A.   I think so.
11   Q.   Was it more than $10,000?
12   A.   I think so.
13   Q.   Was it more than $20,000?
14   A.   It's hard for to, beyond that, give you
15 a more granular answer without checking my records.
16   Q.   What about the second case you listed,
17 In re Google RTB Consumer Privacy Litigation?
18        Do you see that?
19   A.   Yes.
20   Q.   How much money have you been paid to date
21 in the In re Google RTB Consumer Privacy Litigation
22 case?
23   MR. ROBINSON:  Professor Shafiq, I'm going to
24 instruct you not to answer.  We've already gone
25 already beyond the expert stipulation here.  You may

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 42

1  answer questions about your total compensation in
2  this matter, but counsel is not entitled to ask
3  questions about compensation in matters that are not
4  this one at issue.
5      So on that basis, I'm going to instruct
6  you not to answer.
7      MS. KLEIN:  Which section are you saying
8  that . . .
9      MR. ROBINSON:  Yes, I'm looking at
10 Section 5.1.5, page 8.  The second full sentence
11 says, "Notwithstanding this provision, any party may
12 inquire into a testifying expert's compensation in
13 this matter."
14     And that's why I've allowed questions
15 about compensation in this matter.  But I'm
16 instructing the witness not to answer about
17 compensation in outside matters.
18     MS. KLEIN:  Well, this doesn't preclude him
19 from testifying about compensation in other matters,
20 and it goes specifically to this witness' bias
21 because he's testified against Google in four other
22 matters in the last four years and we are entitled
23 to understand how much he's been paid to testify
24 against Google.
25     MR. ROBINSON:  Section 5.1 -- or Section 5 is

Page 43

1  titled "Expert Materials Not Requiring Disclosure."
2  This is all under that not requiring disclosure.
3  There's nothing in this expert stipulation that
4  allows you to ask questions about compensation in
5  outside matters.
6      MS. KLEIN:  I disagree with that.
7  BY MS. KLEIN:
8      Q.  Sir, are you refusing to answer how much
9  you've been paid to testify in the last four years
10 in In re Google RTB Consumer Privacy Litigation?
11     MR. ROBINSON:  Same instruction not to answer
12 on the same basis.
13 BY MS. KLEIN:
14     Q.  Are you refusing to answer my question?
15     A.  At the instruction of counsel, I'm not
16 going to answer the question.
17     Q.  And are you going to refuse to answer, at
18 the instruction of counsel, how much money you've
19 been paid to testify in the Doe versus Google case?
20     MR. ROBINSON:  Same instruction on the same
21 basis.
22     THE WITNESS:  I'm going to follow counsel's
23 instruction.
24 BY MS. KLEIN:
25     Q.  And I'm going to ask how much you've been

Page 44

1  paid to testify in State of -- State of Texas versus
2  Google, 22-01-88230, in the District Court, Victoria
3  County, Texas?
4      MR. ROBINSON:  Same instruction, same basis in
5  the parties' expert stipulation.
6  BY MS. KLEIN:
7      Q.  Are you refusing to answer my question?
8      A.  At the instruction of counsel, I'm not
9  going to answer the question.
10     Q.  Sir, you're aware -- well, how much do you
11 make as a associate professor at U.C. Davis?
12     A.  I will have to check my pay stubs.  This
13 is not something I check every day.
14     Q.  You're aware that U.C. Davis has a Step
15 Plus system, where it compensates its professors
16 based on a particular system, pay scale?
17     A.  That's correct.
18     Q.  Where are you in that pay scale?
19     A.  I recently got promoted, so I don't
20 remember exactly which step I'm at, but . . .
21     Q.  Where were you before, do you remember?
22     A.  I've been recently -- I don't know if it
23 is official yet, but I've been promoted to some step
24 in the professor section of that scale.  But I don't
25 know exactly which step in the professor section of

Page 45

1  that scale I've been promoted to.
2      Q.  You've been promoted from associate
3  professor to professor?
4      A.  This -- actually, I got to know about this
5  last night, yes.
6      Q.  Congratulations.
7      So currently you are being compensated
8  until today on the associate professor scale?
9      A.  That's correct.
10     Q.  Do you know if you are being compensated
11 at the top of the associate professor scale?
12     A.  Yes.
13     Q.  The top of the associate professor scale
14 has an annual salary of $149,500.
15     Does that sound right to you?
16     A.  Are you representing to me or are you
17 going to show me this document?
18     Q.  I will show it to you if it doesn't sound
19 right to you.
20     A.  I know that there are multiple scales for
21 different types of professors at the University of
22 California system.  So I would not know if you are
23 reading from the right salary scale document.
24     (Deposition Exhibit 4 was marked.)
25 BY MS. KLEIN:

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 46

1    Q.  Professor Shafiq, I have put in front of
2  you what's been marked as Exhibit Shafiq 4.
3         Is this a true and correct copy of the
4  U.C. Davis Step Plus system academic pay scale?
5    A.  Seems to be.
6    Q.  Okay.  Where on the pay scale do you fall?
7    A.  I can't remember exactly, but I'm probably
8  associate professor 5 or 5.5.
9    Q.  So you make either 146,000 or $149,500
10  through your teaching at the University of
11  California, Davis?
12    A.  That's not correct.
13    Q.  What's not correct about that statement?
14    A.  I don't know the exact number, but I
15  generally know that I'm paid more than this.
16    Q.  How much are you paid?
17    A.  I don't remember exactly, but it is more
18  than this.
19    Q.  Is it more or less than $200,000?
20    A.  I think it is probably more than $200,000.
21    Q.  Is it more or less than $250,000?
22    A.  That I cannot recall perfectly from
23  memory.
24    Q.  Well, do you agree with me that you've
25  made more money in the last year testifying against

Page 47

1  Google than you have from the University of
2  California, Davis?
3    MR. ROBINSON:  Objection; form.
4    THE WITNESS:  I'm not sure.
5  BY MS. KLEIN:
6    Q.  It's possible?
7    MR. ROBINSON:  Same objection.
8    THE WITNESS:  I'm not sure.
9  BY MS. KLEIN:
10    Q.  Why aren't you sure?
11    A.  I will have to look at my records to be
12  able to reliably answer your question.
13    Q.  You've made more money testifying as an
14  expert over the course of the last year, regardless
15  of whether it was Google, than you have from your
16  salary at the University of California, Davis;
17  correct?
18    MR. ROBINSON:  Objection; form.
19    THE WITNESS:  I don't know exactly but it's
20  probably in the same ballpark.
21  BY MS. KLEIN:
22    Q.  You recently offered an opinion in the
23  TikTok case on September 20th; right?
24    A.  I -- are you going to show me a document
25  or just --

Page 48

1    Q.  I'm just asking generally.
2         You issued an opinion in the TikTok case
3  on September 20th, it's public; right?
4    MR. ROBINSON:  You may answer the question.
5    THE WITNESS:  The reason I'm hesitating to
6  answer the question is I've signed a confidentiality
7  order in that case.
8  BY MS. KLEIN:
9    Q.  I'm just asking whether you issued an
10  opinion and it's been attached to a public document.
11         Are you going to make me show you the
12  opinion -- or the opinion before you'll testify that
13  you actually issued an opinion on September 20th?
14    A.  I have issued a report --
15    Q.  Okay.
16    A.  -- in that case.
17    Q.  On September 20th?
18    A.  That, I don't recall.
19    Q.  Okay.  In fact, you've issued two reports
20  in the last several months in the TikTok case;
21  right?
22    MR. ROBINSON:  To the extent those are publicly
23  filed documents, they would not conflict with your
24  prior confidentiality obligations.  You may answer.
25    THE WITNESS:  Yes.

Page 49

1  BY MS. KLEIN:
2    Q.  And your work in the TikTok case included
3  doing testing on source code in certain TikTok
4  systems; right?
5    MR. ROBINSON:  Same instruction.  If you know
6  those are publicly filed documents that don't
7  include redactions or anything else that implicate
8  your confidentiality agreements, you may answer.
9    THE WITNESS:  I believe my work in that case
10  deals with confidential information that is
11  protected by the court order that I've -- protective
12  order that I've signed in that case.
13  BY MS. KLEIN:
14    Q.  You agree with me that you've spent at
15  least a hundred hours on each of your reports that
16  you've issued in the TikTok case?
17    MR. ROBINSON:  Objection; form.
18    THE WITNESS:  I would not agree with that.
19  BY MS. KLEIN:
20    Q.  No?  How much time did you spend on the
21  TikTok reports?
22    MR. ROBINSON:  Same objection.
23    THE WITNESS:  Sitting here today, I do not
24  recall from memory.  I'll have to check my records
25  to be able to reliably answer your question.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 50

1  BY MS. KLEIN:
2      Q.  It's safe to assume that if your reports
3  in TikTok are as robust or even more than your
4  report in this case, you made about the same amount
5  of money, at least on those two reports?
6      MR. ROBINSON:  On the basis of the expert
7  stipulation, there's no requirement for the expert
8  to disclose outside compensation or time efforts on
9  outside matters, other than the one at hand.
10         On that basis, I'll instruct the witness
11 not to answer the question.
12 BY MS. KLEIN:
13     Q.  Are you refusing to answer my question?
14     A.  I'm going to follow the instruction of
15 counsel and on the instruction of counsel, I'm not
16 going to answer your question.
17     Q.  Given the fact that you have issued three
18 expert reports against Big Tech since March of 2024,
19 when you were retained in this case, don't you agree
20 with me that you're making more money testifying as
21 an expert than you are as a professor at U.C. Davis?
22     MR. ROBINSON:  Same objection.
23        Same instruction not to answer on the
24 basis of the parties' expert stipulation.
25 BY MS. KLEIN:

Page 51

1      Q.  Are you refusing to answer my question,
2  sir?
3      A.  At the instruction of counsel, I'm not
4  going to answer your question.
5      Q.  I'd like to turn back to your report,
6  please.  It's Exhibit Shafiq 3.
7         The -- paragraph 5 says the list of
8  documents and materials you considered and relied on
9  are cited in line throughout this rebuttal report
10 and the lists are also provided in appendices A and
11 B.
12        Do you see that?
13     A.  Yes.
14     Q.  Appendices A and B are the appendices that
15 Keystone strategy put together for you?
16     A.  Keystone team helped me in compiling
17 appendices A and B.
18     Q.  And you reviewed everything -- well, is
19 there anything that you wanted to review that was
20 not available to you?
21     MR. ROBINSON:  Objection; form.
22     THE WITNESS:  No.
23 BY MS. KLEIN:
24     Q.  Did you ask to look at source code in this
25 action, sir?

Page 52

1      A.  No.
2      Q.  Didn't think it was necessary?
3      MR. ROBINSON:  Objection; form.
4      THE WITNESS:  For the assignments that were
5  given to me by counsel, it was not necessary for me
6  to review source code.
7  BY MS. KLEIN:
8      Q.  Did you ask to view Google's advertising
9  technology systems?  Did you ask for access to the
10 systems themselves?
11     A.  Can you clarify "view" or "access," like
12 what kind of access or viewing are you referring to?
13     Q.  Did you try to buy an ad as part of your
14 work or simulate buying an ad?
15     MR. ROBINSON:  Objection; form.
16     THE WITNESS:  As you probably -- as you may
17 probably know from my CV, my research is at the
18 intersection of online advertising and privacy.  As
19 part of my scholarship, I'm aware of public-facing
20 tools that Google provides for advertising.
21        So I am familiar with the tools that
22 Google provides and anyone can sign up as a
23 publisher or as an advertiser.
24 BY MS. KLEIN:
25     Q.  Right.  And my question to you, sir, was,

Page 53

1  as part of your work generating and issuing the
2  Shafiq report, Exhibit 3, did you actually sign up
3  and try to buy or sell an ad as a publisher or an
4  advertiser in this case?
5      MR. ROBINSON:  Objection; form.
6      THE WITNESS:  For the purposes of the
7  assignments that I address in this report, I did not
8  buy an ad on Google.
9  BY MS. KLEIN:
10     Q.  Or sign up as a publisher and try to sell
11 an ad?
12     MR. ROBINSON:  Objection; form.
13     THE WITNESS:  For the purposes of the
14 assignment that I address in this report, I did not
15 sign up as a publisher to sell ads.
16 BY MS. KLEIN:
17     Q.  And for the purposes of this report, you
18 did not request access to the auction system?
19     MR. ROBINSON:  Objection; form.
20     THE WITNESS:  Can you please clarify what you
21 mean by "auction system"?
22 BY MS. KLEIN:
23     Q.  Well, there's a technology at issue in
24 this case related to an online auction; correct?
25     A.  Broadly speaking, yes.  But are you

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 54

1  referring to a very specific auction system at
2  Google?
3      Q.  I'm referencing to any of the products at
4  issue in this case.
5          Did you request access to any of the
6  online advertising products at issue in this case as
7  part of your work in generating your report,
8  Exhibit 3?
9      MR. ROBINSON:  Objection; form.
10     THE WITNESS:  As part of my work in this case,
11  that I describe in my report, I did not ask for
12  access to Google's advertising systems.  I will note
13  that throughout my report, I describe documentation
14  and research that other people have done, including
15  myself, into various parts of the auction.
16  BY MS. KLEIN:
17     Q.  As part of your work in generating the
18  report, did you access any -- well, strike that.
19         As part of your work in generating this
20  report, did you review any of the ad tech
21  algorithms?
22     MR. ROBINSON:  Objection; form.
23     THE WITNESS:  Can you clarify what you mean by
24  "ad tech algorithms"?
25  BY MS. KLEIN:

Page 55

1      Q.  Google's algorithms are at issue in this
2  case; correct?
3      A.  Are you referring to a specific algorithm?
4      Q.  The ones used in the ad tech tools.
5      MR. ROBINSON:  Objection; form.
6  BY MS. KLEIN:
7      Q.  Any of them.
8          Did you look at any of Google's
9  algorithms?
10     MR. ROBINSON:  Same objection.
11     THE WITNESS:  Similar to my answer to the
12  previous question, in my report I address various
13  issues, using public documentation internal
14  discovery that relates to the algorithms that are
15  used by Google in its advertising systems.
16  BY MS. KLEIN:
17     Q.  And you reference RTB, or real-time
18  bidding, in your report; correct?
19     A.  That's one of the Google products that I
20  address in my report.
21     Q.  And you recognize that RTB uses
22  algorithms?
23     A.  It's like saying everyone breathes air.
24  Any computing system uses an algorithm.
25     Q.  And you didn't specifically look at the

Page 56

1  RTB algorithms or source code; correct?  You relied
2  on Dr. Hochstetler's work in that regard?
3      MR. ROBINSON:  Objection; form.
4      THE WITNESS:  Similar to my answer to your
5  previous question, in my report I am citing
6  documents from discovery, public documents, as well
7  as peer-reviewed research, to describe my opinions
8  as it relates to the what you are calling algorithms
9  that are used in real-time bidding.
10  BY MS. KLEIN:
11     Q.  You didn't look at them yourself, you
12  relied on other people's research --
13     MR. ROBINSON:  Objection --
14  BY MS. KLEIN:
15     Q.  -- and documents that describe them?
16     MR. ROBINSON:  Objection; form.
17     THE WITNESS:  I, for example, relied on
18  Google's own documentation of real-time bidding that
19  describes how real-time bidding works.
20  BY MS. KLEIN:
21     Q.  Right.  You didn't actually look at the
22  underlying data that would support or refute that
23  documentation?
24     MR. ROBINSON:  Objection; form.
25     THE WITNESS:  Can you clarify what you mean by

Page 57

1  "underlying data"?
2  BY MS. KLEIN:
3      Q.  You relied on documents describing
4  algorithms rather than looking at the algorithm
5  itself?
6      A.  I don't know if you're again asking me
7  narrowly about source code, but if your question is
8  did I look at RTB source code, the answer to that
9  question is I did not look at RTB source code
10  because I did not have access to it.
11     Q.  Did you ask for it?
12     A.  No.
13     Q.  You're aware that Dr. Hochstetler is an
14  expert in this case; correct?
15     A.  Yes.
16     Q.  And you're aware that Dr. Hochstetler
17  looked at source code?
18     A.  It is my general understanding that
19  Dr. Hochstetler looked at the source code.
20     Q.  Did you look at the source code for
21  AdSense?
22     A.  No.
23     Q.  Did you look at the source code for AdMob?
24     A.  No.
25     Q.  Did you look at the source code for GAM,

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 58

1  G-a-m, in connection with your work in this case?
2      (Witness reviews document.)
3      A.  I'm looking at my report to make sure that
4  I reliably answer your question because . . .
5      I want to correct my answer to your
6  previous question.
7      Q.  Okay.
8      A.  You asked me about Google AdMob.  In one
9  section of my report, I describe a peer-reviewed
10  research that looked into AdMob code, so I describe
11  that in my report.
12      Q.  You describe peer-reviewed research, but
13  you, yourself, did not look at AdMob source code in
14  connection with this engagement; correct?
15      MR. ROBINSON:  Objection; form.
16      THE WITNESS:  I remember reading the paper, and
17  that paper included an excerpt of source code
18  related to AdMob, or AdMob code.
19  BY MS. KLEIN:
20      Q.  Do you know when the AdMob code from that
21  paper existed, meaning the time frame?
22      A.  That paper was published in the year 2021,
23  so I assume the code sample that they provide in the
24  paper is -- was collected either in year 2021 or
25  earlier.

Page 59

1      Q.  And you agree with me that source code is
2  changed and updated all the time?
3      MR. ROBINSON:  Objection; form.
4      THE WITNESS:  It depends.
5  BY MS. KLEIN:
6      Q.  Do you agree with me that the AdMob code
7  is likely different today than it was in 2020 or
8  2021?
9      A.  I cannot reliably answer your question
10  without conducting an inquiry into that matter.
11      Q.  You have to look at the code to know if
12  it's the same today as it was as is reflected in the
13  paper that you cited; correct?
14      A.  You've asked me a precise question and to
15  answer that precise question about specific snippet
16  of code, I will need to look at the code to be able
17  to answer your question.
18      Q.  And you do not know -- you didn't look at
19  the current source code for AdMob with respect to
20  your report?
21      A.  That's correct.
22      Q.  So you don't know if the code reflected in
23  the paper that you cited in your report is correct
24  or not as of today?
25      MR. ROBINSON:  Objection; form.

Page 60

1      THE WITNESS:  I cannot reliably answer your
2  question because it may be.
3  BY MS. KLEIN:
4      Q.  It may be correct, but it may be
5  incorrect?
6      A.  Is there a question?
7      Q.  Yes.
8      You said you don't know -- my question to
9  you was whether the code reflected in the
10  paper -- strike that.
11      The question is, the code reflected in the
12  paper you cited could be current and it could be out
13  of date; right?
14      MR. ROBINSON:  Objection; form.
15      THE WITNESS:  I don't believe I used those
16  words.
17  BY MS. KLEIN:
18      Q.  What words would you use?
19      A.  I believe the words I used was it may be
20  correct.
21      Q.  And it may be incorrect?
22      A.  I will have to look at the code.
23      Q.  Going to paragraph 8 of your report, you
24  lead -- you lead a research lab at the University of
25  California, Davis; correct?

Page 61

1      A.  Yes.
2      Q.  And you describe your research lab in
3  paragraph 8 of your report as being "focused on
4  online privacy, security, and safety."
5      Do you see that?
6      A.  Yes.
7      Q.  And you describe your lab's research aims
8  as to "uncover personal data collection, sharing,
9  and usage in the online advertising ecosystem."
10      Do you see that?
11      A.  Yes.
12      Q.  So the purpose of your research is to
13  discover how personal data is collected, shared, and
14  used by Big Tech; correct?
15      A.  My lab's research aims to cover personal
16  data collection, sharing, and usage in the online
17  advertising ecosystem.
18      Q.  Is it a conflict of interest -- strike
19  that.
20      Would it be a conflict of interest for you
21  to be retained by Google in a matter?
22      MR. ROBINSON:  Objection; form.
23      THE WITNESS:  Can you clarify what you mean by
24  "conflict of interest"?
25  BY MS. KLEIN:

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 62

1    Q.   Sure.
2         Given what your lab's research aim is, if
3    Google wanted to hire you, would you take the
4    engagement?
5    MR. ROBINSON:  Objection; form.
6    THE WITNESS:  It depends.
7    BY MS. KLEIN:
8    Q.   On what?
9    A.   On the engagement.
10   Q.   In paragraph 10, you state that your
11   research lab is "building new device instrumentation
12   systems and measurement methods to investigate
13   personal data collection, sharing, and usage in the
14   web, mobile, and Internet-of-Things ecosystems."
15        Did I read that correctly?
16   A.   I believe so.
17   Q.   And so when you say on your CV that one of
18   your research interests is on web privacy, it's
19   about the technical aspects of that privacy;
20   correct?
21   A.   Our research deals with technical aspects
22   of privacy.
23   Q.   You basically do research on how privacy
24   controls work in the software programs themselves;
25   correct?

Page 63

1    MR. ROBINSON:  Objection; form.
2    THE WITNESS:  That's one of the things that we
3    study in our lab.
4    BY MS. KLEIN:
5    Q.   What else do you study in your lab on
6    privacy controls?
7    A.   We, for example, investigate how they
8    look.
9    Q.   What else?
10   A.   We investigate whether and how they work.
11   Q.   And when you're -- when you come to an
12   opinion about something, you submit a research paper
13   for publication; correct?  The end goal of your
14   research lab is to submit publications for peer
15   review; correct?
16   A.   One of the goals of our research labs is
17   to publish papers in peer-reviewed conference and
18   journals.
19   Q.   And when you do that, the papers that you
20   submit include a methodology section; correct?
21   A.   It depends on the nature of the paper that
22   we write.
23   Q.   If it's peer-reviewed, do you?
24   A.   There exist peer-reviewed research papers
25   that do not include a methodology section, because

Page 64

1    they may not be building a methodology.
2    Q.   In your report, which is Shafiq Exhibit 3,
3    there is no methodology section; correct?
4    A.   Do you want me to look in the report?
5    Q.   I would like to know, is there a
6    methodology section in your report?
7    MR. ROBINSON:  Counsel, after this line of
8    questioning, can we take our first break?
9    MS. KLEIN:  Sure, sure.
10        (Witness reviews document.)
11   THE WITNESS:  In my report, there is no
12   specific section that is entitled methodology, but
13   number of documents, including peer-reviewed
14   research papers that I've cited, they have described
15   the methodology that they've used in those
16   citations.
17   BY MS. KLEIN:
18   Q.   Your methodology in preparing your
19   opinions in this case is reading documents and
20   applying your interpretation of them; correct?
21   MR. ROBINSON:  Objection; form.
22   THE WITNESS:  My work in this case is to
23   analyze documents that have been produced in
24   discovery, documents that are publicly available,
25   documents that are in other publicly available

Page 65

1    reports, as well as peer-reviewed research, and
2    provide an expert opinion, where my expert opinion
3    is grounded in those facts, including, for example,
4    scientific research that I considered.
5    BY MS. KLEIN:
6    Q.   Did you use any of the instrumentation
7    systems in your lab to measure personal data
8    collection and sharing in connection with preparing
9    your report?
10   A.   Can you please rephrase your question?
11   Q.   Sure.
12        Your lab has device instruments and
13   measurement capabilities that it's developed;
14   correct?
15   A.   Yes.
16   Q.   When you were analyzing and coming up with
17   your opinions in this report, did you use any of
18   those device instruments or measurement
19   capabilities?
20   A.   My work in the case has included
21   conducting investigation of various Google
22   advertising products and systems.  And to understand
23   and explore how they work, I have familiarized
24   myself with how they work using web browser
25   instrumentation systems.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 66

1    Q.  My question to you, sir, was, when you
2   were analyzing and coming up with your opinions in
3   this report, did you use any of the device
4   instruments or measurement capabilities that you've
5   developed in your lab?  Yes or no.
6         (Witness reviews document.)
7    A.  I looked at Google's documentation of
8   various Google products and services.  And as I was
9   trying to understand how those products and services
10  worked, I did a general exploration that I think
11  included doing an analysis of certain Google
12  advertising products and services using web browser
13  instrumentation tools, such as the ones developed in
14  our lab.
15   MS. KLEIN:  Objection; nonresponsive and move
16  to strike.
17  BY MS. KLEIN:
18   Q.  Sir, I'm asking you, did you use the --
19  I'm not asking if you looked on a web browser.
20       I'm asking if you used the device
21  instruments or measurement capabilities that your
22  research lab has developed to measure any data in
23  coming up with your opinions in this report?
24   A.  I think what is probably causing confusion
25  at your end is you're probably not realizing that

Page 67

1   the instrument that we use in our lab to study
2   personal data collection, sharing, and usage is the
3   web browser.  The browser is the instrument.
4    Q.  Did you collect any data yourself in
5   developing your opinions in this report?
6    A.  Like I told you, I conducted a preliminary
7   investigation when I was given assignments by
8   counsel at the start of the case.  I considered
9   Google's documentation.  I was reading research
10  papers, which were describing in more detail how
11  various Google products and systems work.
12       And just as part of, like, reading those
13  papers just to better understand how the systems
14  actually work, if I recall correctly from my memory,
15  I probably did look at -- I used a browser
16  instrument, as you're calling it, to study Google's
17  advertising products and systems.
18   Q.  Where is that reflected in your materials
19  relied upon or considered in your report?
20   A.  Those would be the papers that describe in
21  detail.  It is a common practice that I do when I'm
22  reading research papers or documents that you want
23  to confirm that what some part of the paper is
24  showing, you can actually -- if you can quickly
25  reproduce that, you want to see that.

Page 68

1        So this is my general practice as I read
2   research papers, so I remember doing that.  I don't
3   exactly remember how many tests I did or what
4   exactly did I look at, but if I can go back to my
5   records, I probably have that information.
6    Q.  What browser instrument did you use?
7    A.  I used a Chrome web browser.  It has an
8   instrumentation mode which is called developer
9   tools.
10   Q.  Anything else?  Any other device
11  instrumentation for measurement that you used?
12   A.  Sitting here today, I cannot recall all
13  the instruments I may have used, but I think as I
14  was reading those papers, they were discussing how
15  certain data collection sharing happens in web, so
16  my guess is I used web browsers.  I cannot recall if
17  I only used Chrome or if I used other browsers as
18  well.
19   Q.  And your use of these browses is not
20  reflected anywhere in your report, Exhibit 3;
21  correct?
22   MR. ROBINSON:  Objection; form.
23   THE WITNESS:  Like I said, when -- it is
24  standard practice that I believe a lot of scientists
25  follow that when they read a research paper or

Page 69

1   documentation, you look at it, you . . .
2        In our field, for example, unlike the
3   field of microbiology, where you're reading a paper
4   that is, let's say, discussing some specimen that is
5   very hard to access and you can only analyze it in a
6   lab, the one thing that I really like about my line
7   of research is you can fire up a web browser and you
8   can very quickly look at the thing that you are
9   trying to study.
10       So this is common practice that I follow
11  that when I read a research paper and the research
12  paper is describing something that I can quickly
13  confirm, I do that all the time.
14       And nothing that I saw in the analysis
15  that I did to confirm what those papers were
16  describing contradicted my understanding of Google's
17  products and services from other documents that I
18  considered and relied upon in this report.
19  BY MS. KLEIN:
20   Q.  Last question before we take a break,
21  Professor Shafiq, the issue is I'm here to test and
22  understand what you reviewed and relied upon in
23  developing your opinions, and your alleged use of
24  these browsers is not reflected anywhere in
25  Shafiq -- in your report, which is Shafiq Exhibit 3;

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 70

1    correct?
2        MR. ROBINSON:  Objection; form.
3    BY MS. KLEIN:
4        Q.  You did not list that you used these
5    browsers in your report; correct?
6        MR. ROBINSON:  Objection; form.
7        THE WITNESS:  I think you were asking me a
8    general question.
9    BY MS. KLEIN:
10       Q.  No, sir.
11       A.  I was telling you --
12       Q.  My question to you was, was the use of
13   browsers reflected anywhere in your report.  And you
14   did not write it in there; correct?
15       MR. ROBINSON:  Same objection.
16       THE WITNESS:  I was telling you about my
17   process of reading and understanding documentation
18   and research papers, and as part of that, because
19   the nature of my work is such that you can very
20   quickly confirm what a research paper describes.
21       So I was simply describing that I did use
22   browser instruments to verify what I was reading in
23   documentation or research papers.  I eventually
24   relied upon -- I considered and relied upon those
25   research papers and documents that are cited in my

Page 71

1    report.
2        MS. KLEIN:  We can take a break now.
3        THE VIDEOGRAPHER:  We're going off the record.
4    Time is 11:21.
5        (Recess taken.)
6        THE VIDEOGRAPHER:  We're back on the record.
7    Time is 11:39.
8    BY MS. KLEIN:
9        Q.  Dr. Shafiq, I forget to ask, do you prefer
10   Doctor or Professor?
11       A.  Either is fine.  I am a doctor and a
12   professor.
13       Q.  Understood.  Dr. Shafiq, we're back on the
14   record after a short break.
15       Is there anything you want to change or
16   clarify about your testimony?
17       A.  No.
18       Q.  Okay.  I previously asked you about the
19   work that Keystone was doing.
20       I forgot to ask, are you compensated at
21   all based upon the number of hours that they put in?
22   For example, do you get a percentage of what
23   Keystone is paid?
24       A.  No.
25       Q.  Okay.  And have you used consultants or

Page 72

1    research staff to help you with respect to expert
2    testimony and reports in other cases?
3        MR. ROBINSON:  You may answer a simple yes or
4    no to that, otherwise would implicate your signed
5    protective orders and NDAs.
6    BY MS. KLEIN:
7        Q.  Only looking for a "yes" or "no."
8        A.  Yes.
9        Q.  Okay.  And when do you decide when you
10   need extra support?
11       MR. ROBINSON:  To the extent you can answer
12   that question without revealing communications with
13   attorneys or supporting staff, you may answer.
14       THE WITNESS:  Generally speaking, it depends on
15   the nature of assignment, the nature of the work
16   that needs to be done in that case.
17       THE REPORTER:  There's someone from the Lanier
18   firm that's come into the zoom.  Just announcing.
19       (Whereupon, Mr. Wilkerson, Esq. joined the
20       proceedings via zoom.)
21       MS. KLEIN:  Thank you.
22   BY MS. KLEIN:
23       Q.  Before the break, we were talking about
24   the systems that you build in your research lab.
25       Do you recall that?

Page 73

1        A.  Yes.
2        Q.  Okay.  And the systems that you build in
3    your research lab are built to track and measure
4    personal data sharing and usage; correct?
5        A.  I just want to use my own words, which is
6    that we build systems and measurement methods to
7    investigate personal data collection, sharing and
8    usage in the web --
9        (Reporter seeks clarification.)
10       A.  -- data collection, sharing and usage in
11   the web, mobile and Internet of Things ecosystems.
12       Q.  So you build device instrumentation
13   systems and measurement methods that track it;
14   correct?
15       A.  Can you repeat the last thing that you
16   said?  I am not getting it.
17       Q.  You build systems to track and measure
18   personal data sharing and usage; correct?
19       MR. ROBINSON:  Objection; form.
20       THE WITNESS:  We study it.  I don't like the
21   word "track" because the word "track" has a very
22   specific technical meaning in our line of research.
23   BY MS. KLEIN:
24       Q.  Okay.  And what does "track" mean in your
25   line of research?

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 74

1    A.  The word "track" or "tracking" that is
2    used in our line of research deals with the ability
3    of a tracker to link information or data of a person
4    on and across different websites, apps and products
5    that they would use.
6        Q.  Is it your testimony that your lab does
7    not build systems to track data?
8        MR. ROBINSON:  Objection; form.
9        THE WITNESS:  I just want to use a precise term
10   because the word "track" has a specific meaning.  I
11   know there are some research papers who use the term
12   "tracking," "the trackers."  I don't like it because
13   it conflates the technical meaning of the word
14   "tracking" with a lay understanding of the word
15   "track."
16   BY MS. KLEIN:
17       Q.  I understand that, sir.  I'm just trying
18   to understand what your research lab does.
19           And I'm asking you, does your research lab
20   build systems to track and measure personal data
21   sharing and usage, yes or no?
22       A.  If you ignore that scientific meaning of
23   the word "track" or "tracking," as I have explained
24   it to you earlier, in a lay sense, yes.
25       Q.  Thank you.

Page 75

1        In 2023 you won best paper at the ACM
2    Internet Measurement Conference for your research on
3    designing a method to study tracking, profiling and
4    ad targeting in the Amazon Alexa ecosystem; correct?
5        A.  Yes.
6        Q.  What is the ACM Internet Measurement
7    Conference?
8        A.  ACM is the umbrella body for computing
9    professionals.  Just like I'm sure lawyers have
10   professional organizations, computer scientists have
11   a professional organization called ACM.  This is the
12   flagship professional organization of computer
13   science professionals, and this professional
14   organization organizes academic conferences.
15       And this particular conference called ACM
16   Internet Measurement Conference is a conference that
17   is dedicated to advancing the science and practice
18   of Internet measurement.
19       Q.  And the science and practice of Internet
20   measurement is one of your expertises; correct?
21       A.  Yes.
22       Q.  But in developing your report, you did not
23   employ the science and practice of Internet
24   measurement; correct?
25       MR. ROBINSON:  Objection; form.

Page 76

1        THE WITNESS:  I would --
2    BY MS. KLEIN:
3        Q.  You can answer.
4        A.  Can you please rephrase that question?
5        Q.  Yes.
6            In developing your report, you did not
7    employ the science and practice of Internet
8    measurement; correct?
9        MR. ROBINSON:  Objection; form.
10       THE WITNESS:  In my report I cite a number of
11   papers, peer-reviewed research papers, that employ
12   what computer scientists would call Internet
13   measurement techniques.
14   BY MS. KLEIN:
15       Q.  Right.
16           But you did not employ those Internet
17   measurement techniques on the Google products at
18   issue in this case for purposes of your report;
19   correct?
20       A.  I relied on research papers who applied
21   those methods.  I'm relying on those peer-reviewed
22   research papers.  I did not see the need, at least
23   for the purposes of my assignment in the case, to
24   rely on anything else.
25       Q.  So you agree with me that you did not

Page 77

1    employ the science and practice of Internet
2    measurement on Google's products yourself in
3    developing your report; correct?
4        MR. ROBINSON:  Objection; form.
5    BY MS. KLEIN:
6        Q.  Yes or no?
7        A.  My answer is the same as before, I'm
8    relying on other research papers who are using
9    Internet measurement methods.
10       Q.  Sir, we're going to be here all day if you
11   can't answer my questions.
12           My question to you is, did you employ,
13   yourself, the science and practice of Internet
14   measurement on Google's products in developing your
15   report?
16       MR. ROBINSON:  Objection; form.
17       THE WITNESS:  Like we discussed earlier, when I
18   was reading some of those papers, I could quickly
19   check using various instruments to confirm whether
20   or not what the papers were reporting was correct.
21   And nothing that I saw in my analysis using Internet
22   measurement methods and systems contradicted what
23   those papers were describing.  And hence I'm relying
24   on those peer-reviewed research papers that I'm
25   citing in my report.

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 78

1  BY MS. KLEIN:
2      Q.  What data did you collect?
3      MR. ROBINSON:  Objection; form.
4      THE WITNESS:  Can I point you to specific parts
5  of my report?  Because I am relying on research
6  papers --
7  BY MS. KLEIN:
8      Q.  Sir, I'm asking you what data you
9  collected, not what the research papers collected.
10 I want to know what data you collected.
11         The answer is none, isn't it?  You
12 collected no data in creating your opinions in this
13 report; right?
14     MR. ROBINSON:  Objection; form.
15 BY MS. KLEIN:
16     Q.  You did not collect any data; correct?
17     MR. ROBINSON:  Same objection.
18     THE WITNESS:  Can you please rephrase that
19 question?  You have asked me a number of questions
20 back to back.
21 BY MS. KLEIN:
22     Q.  Of course.
23     A.  I've lost context.
24     Q.  You agree with me that you personally did
25 not collect any data to measure in connection with

Page 79

1  this report?
2      MR. ROBINSON:  Objection; form.
3      THE WITNESS:  Subject to the thing that I
4  explained earlier, where I confirmed peer-reviewed
5  research that I cited in parts of my report, other
6  than that, yes, I did not collect data that I relied
7  upon in the report.
8  BY MS. KLEIN:
9      Q.  And you did not measure any data that you
10 relied upon in your report; correct?
11     MR. ROBINSON:  Objection; form.
12     THE WITNESS:  Like I said, I'm relying on
13 peer-reviewed research, which has conducted
14 large-scale measurements.
15 BY MS. KLEIN:
16     Q.  And that means you, yourself, did not
17 measure any data in creating your report; correct?
18     MR. ROBINSON:  Objection; form.
19     THE WITNESS:  Other than the earlier answer
20 that I gave you where I confirmed some of the
21 measurements that were reported in those papers, if
22 you put that aside, other than that, I did not
23 collect my own data.
24 BY MS. KLEIN:
25     Q.  And you did not measure your own data?

Page 80

1      MR. ROBINSON:  Objection; form.
2      THE WITNESS:  Other than that analysis that I
3  described earlier, I did not measure my own data.
4  BY MS. KLEIN:
5      Q.  If you did not collect your own data, how
6  can you say you measured your own data?  You're
7  saying other than the analysis I described earlier,
8  I did not measure my own data.  But you also said
9  you didn't collect your own data.
10         Isn't it true you did not measure any data
11 yourself?
12     MR. ROBINSON:  Objection; form.
13     THE WITNESS:  I would not agree with that.
14 BY MS. KLEIN:
15     Q.  Why not?
16     A.  Like I said earlier, I was reviewing
17 documentation and research papers, and a lot of
18 those papers are describing scientific analysis of
19 large-scale data that they have collected about
20 various online advertising products and services,
21 including Google's products and services.
22         As I was reading those papers -- and,
23 again, I read those papers as part of my regular job
24 as a researcher.  I also confirmed some of the
25 analysis that was presented in the papers by testing

Page 81

1  some of the data that was presented in that -- in
2  those research papers.
3          But nothing that I saw in my analysis,
4  measurement or testing contradicted what was
5  presented in those papers.
6      Q.  Okay.  Where in your report does it say
7  that you conducted your own analysis, measurement or
8  testing?  Please point me to the paragraph.
9      A.  I think I was asking you a question in the
10 context of did you -- I think the first question
11 was, did you use browser instruments to analyze any
12 Google advertising products.
13         And I was telling you as part of my report
14 I'm citing a number of research papers who are
15 studying at a large scale --
16     MS. KLEIN:  Objection, non --
17     THE WITNESS:  -- Google's --
18 BY MS. KLEIN:
19     Q.  Go ahead.  Sorry.
20     THE WITNESS:  Court reporter, can you please
21 repeat where I was?
22     MS. KLEIN:  I was going to object as
23 nonresponsive and move to strike and ask my question
24 again.
25 BY MS. KLEIN:

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 82

1    Q.  Where in your report does it say you
2  conducted any analysis on measurement or testing?
3  Please cite me to the paragraph.
4       (Witness reviews document.)
5    A.  So other than those research papers and
6  the discussion we had surrounding them, I did not
7  collect my own data.
8    Q.  My question to you, sir --
9    MS. KLEIN:  Objection; nonresponsive and move
10 to strike --
11 BY MS. KLEIN:
12   Q.  -- is where in your report does it say you
13 conducted any analysis on measurement or testing?
14 It's true your report does not say that you
15 conducted any analysis on measurement or testing; is
16 that right?
17   MR. ROBINSON:  Objection; form.
18   THE WITNESS:  I'm relying on peer-reviewed
19 research which conducts large-scale measurements,
20 and I'm relying on the conclusions of those
21 peer-reviewed research papers.
22 BY MS. KLEIN:
23   Q.  That's right.
24   A.  And, like I said, when I did read those
25 papers, I did also test and confirm some of the

Page 83

1  results that were presented in those papers.
2    Q.  But you did not say that in your report;
3  correct?  Yes or no?
4    A.  I did not feel the need to because nothing
5  I saw in my own analysis contradicted what was
6  presented in those peer-reviewed research papers.
7    Q.  And therefore you're not relying on your
8  own analysis, you're only relying on the research
9  papers; correct?
10   MR. ROBINSON:  Objection; form.
11   THE WITNESS:  I'm relying on scientific
12 research papers.
13 BY MS. KLEIN:
14   Q.  Those papers that you're relying on are
15 not based on any data or documents that were
16 produced in this case, though; right?
17   A.  Those research papers -- and we can talk
18 about them in more detail -- they rely on data that
19 is publicly available.  Your experts can access it,
20 they can analyze it and reproduce the findings of
21 those papers.
22   Q.  Are you sure about that?
23   A.  I actually teach one of those papers in my
24 graduate course, so I'm very sure about that.
25   Q.  And therefore those papers that you're

Page 84

1  relying on are not based on any of the highly
2  confidential information that was produced in this
3  case; correct?
4    A.  In that part of paper -- in that part of
5  my report, I'm discussing Google's data collection
6  on the web.  And to undertake that investigation,
7  you do not need to rely on any confidential
8  information.
9    Q.  That wasn't my question, sir.  And you
10 really need to answer -- listen to my questions
11 because you keep answering with what you want to
12 answer, and it's going to make this go longer.
13      And if you can't answer my questions, I'm
14 going to ask for more time if I have to go over
15 seven hours.
16   MS. KLEIN:  So I'm going to object as
17 nonresponsive and move to strike and ask you to
18 listen to my question carefully, sir.
19 BY MS. KLEIN:
20   Q.  My question to you was that the papers
21 that you are relying on in your report are not based
22 on any of the highly confidential information that
23 was produced in this case; correct?
24   A.  Yes, those papers rely on publicly
25 available data that those papers have made available

Page 85

1  that anyone can review and reproduce the results.
2    MS. KLEIN:  Objection; nonresponsive and move
3  to strike.
4  BY MS. KLEIN:
5    Q.  And therefore those papers do not rely on
6  any highly confidential information that was
7  produced in this case; correct?
8    MR. ROBINSON:  Objection; form.
9    THE WITNESS:  I think it is reasonable to
10 assume that those research papers -- because those
11 researchers are not privy to confidential
12 information in this case, that they are probably not
13 relying on highly confidential information in this
14 case.
15 BY MS. KLEIN:
16   Q.  Nor were they based on any Google source
17 code; right?
18   MR. ROBINSON:  Objection; form.
19 BY MS. KLEIN:
20   Q.  That's made available in this case.
21   A.  Google has a lot of source code.  Can you
22 please more precisely ask your question?
23   Q.  I'll come back to it.
24   MS. KLEIN:  Court reporter, Rae, can you please
25 provide him with Exhibit 5?

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 86

1        (Deposition Exhibit 5 was marked.)
2    BY MS. KLEIN:
3        Q.   Professor Shafiq, I've put in front of you
4    Exhibit 5.
5        Is this a true and correct copy of the
6    paper that you wrote for the ACM conference called
7    "Tracking, Profiling, and Ad Targeting in the Alexa
8    Eco Smart Speaker System" -- I'm sorry, "Echo Smart
9    Speaker System"?
10       A.   I believe so.
11       Q.   And this is what you scientists would call
12   a peer-reviewed paper?
13       A.   This paper has been published in ACM
14   conference after peer review.
15       Q.   And if you turn with me to page 3 of your
16   paper, you discuss the auditing framework.
17       Do you see that?
18       A.   Which section or . .
19       Q.   "Auditing Framework" on page 3.
20       A.   Yes.
21       Q.   And in this section you describe the
22   methodology that you use to measure data collection,
23   usage and sharing of interaction data by Amazon and
24   third-party skills.
25       Do you see that?

Page 87

1        A.   I can see those sentences.
2        Q.   I was going to ask you, in layperson
3    terms, what were you researching with respect to
4    Exhibit 5?
5        MR. ROBINSON:  Professor Shafiq, I'll instruct
6    you that if you need to review part of this to
7    understand the context of this, feel free to do so.
8        MS. KLEIN:  I will tell you, Professor Shafiq,
9    that this is the paper you authored that you tout as
10   winning best paper.  So I would assume you
11   understood in layperson's terms what you were
12   researching without having to spend ten minutes
13   reading it.  But if you need to, go ahead.
14       THE WITNESS:  Can you please rephrase your
15   question?
16   BY MS. KLEIN:
17       Q.   Yes.
18       In layperson terms, what were you
19   researching with respect to Exhibit 5?
20       A.   At a high level, we were studying
21   tracking, profiling and ad targeting in the Alexa
22   Echo smart speaker ecosystem.
23       Q.   And . . .
24       (Deposition Exhibit 6 was marked.)
25       THE WITNESS:  Can I put Exhibit 5 away?

Page 88

1    BY MS. KLEIN:
2        Q.   I think you should keep it in front of you
3    for just a minute, but let's look at Exhibit 6 for
4    now.  The court reporter has put in front of you
5    what's been marked as Exhibit 6.
6        Is this a true and correct copy of a paper
7    you co-authored entitled "CanaryTrap:  Detecting
8    Data Misuse by Third-Party Apps on Online Social
9    Networks" that was published by the Proceedings on
10   Privacy Enhancing Techniques in 2020?
11       (Witness reviews document.)
12       A.   It looks --
13       Q.   What is the Proceedings on Privacy
14   Enhancing Technologies?
15       A.   Just like Internet Measurement Conference,
16   this is another conference for computer privacy
17   research.
18       Q.   It's very well-known?
19       A.   Yes.  This is one of the flagship privacy
20   focused conference and publications in our field.
21       Q.   So the ACM and the Proceedings on Privacy
22   Technologies Enhancing Technologies are both
23   flagship conferences?
24       A.   Well, the other conference -- there are
25   two conferences that are both considered -- they're

Page 89

1    competing for who -- which one is the flagship.  But
2    in privacy, this conference is the main flagship
3    conference focused on privacy research.
4        Q.   And in layperson's terms, what were you
5    trying to achieve with your research reflected in
6    Shafiq Exhibit 6, the CanaryTrap article?
7        A.   At a high level -- actually, let me give
8    you some context.  So one of the research emphasis
9    in our lab was that we wanted to study data misuse
10   by third-party apps, more broadly speaking.
11       And this is happening in the aftermath of
12   Cambridge Analytica.  So there were a lot of
13   concerns whether or not third-party apps in social
14   networks, the data they collect is potentially
15   misused.
16       And there was a lot of evidence of it.
17   After some data breach happens, something comes to
18   light, but there was a lack of scientific methods
19   using which researchers could independently
20   detect -- or audit is another term that we like to
21   use -- such incidents.
22       And in this particular paper, we developed
23   a methodology that we called CanaryTrap, which
24   allowed us to independently detect data misuse by
25   third-party apps in social networks.  And I believe

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 90

1  the social network we studied in this paper was
2  Facebook.
3      Q.  And the methodology you employed is
4  described in paragraph 3.1 called "Design"?
5      A.  Because this is a kind of peer-reviewed
6  research where we are building a new methodology,
7  hence we have a section describing the new
8  methodology that we have built.
9      Q.  So that's a "yes," the methodology you
10  employed is described in paragraph 3.1 called
11  "Design"; correct?
12      A.  It's described in greater detail in
13  Section 3 of this paper.
14      Q.  That's a "yes," that's the methodology,
15  Section 3 -- methodology section?
16      A.  Section 3 is describing the system -- the
17  new system that we developed.  The system is called
18  CanaryTrap.
19          And then there are various subsections in
20  Section 3.  In 3.1, because this methodology did not
21  exist before we published this paper, we are
22  describing the design.  In Section 3.2, we are
23  describing how did we go about implementing the
24  methodology that we designed.
25          And then in Section 3.3 we are describing

Page 91

1  how did we go about actually deploying it on
2  Facebook.
3      Q.  In Section 2.2 you talk about detecting
4  data leakage.
5          Do you see that?
6      A.  This is a section of the paper that deals
7  with related work.
8          (Reporter seeks clarification.)
9      A.  Yes.  And one of the lines of research we
10  are describing here focuses on detecting data
11  leakage.
12      Q.  And data leakage you note, for -- about --
13  the second point, it says, "Second, prior work has
14  focused on detecting data leakage in web browsers
15  through cookies, contact forms, or e-mails."
16          Do you see that?
17      A.  I just want to refresh my memory on the
18  citations here.
19          (Witness reviews document.)
20      A.  Yes, can you please repeat the question?
21  I've refreshed my memory about this part of the
22  paper.
23      Q.  Yes.
24          I just wanted to point you to the part
25  where it says, "Second, prior work has focused on

Page 92

1  detecting data leakage in web browsers through
2  cooks, contact forms, or e-mails."
3          Do you see that?
4      A.  Yes.
5      Q.  And it says, "For example, Starov et al.
6  [72] showed that more than 8% of websites leak
7  users' PII to online trackers through contact
8  forms."
9          Do you see that?
10      A.  Yes.
11      Q.  And PII is personal identifying
12  information?
13      A.  Yes.
14      Q.  Do you study website leakage?
15      A.  In our research, we study data collection
16  or what is -- what can also be, broadly speaking,
17  called data leakage on websites, including a number
18  of papers that I've cited in my report.
19      Q.  Did you undertake any study regarding data
20  leakage yourself with respect to the opinions in
21  your report?
22      A.  Like I said, I am citing a number of
23  research papers who conduct that study, including I
24  looked at the references by one of the co-authors
25  that are cited here.  I also cite them in my report.

Page 93

1      Q.  But you didn't undertake any independent
2  study of data leakage; correct?
3      A.  I did not conduct my own study for the
4  purposes of my report because I am relying on
5  several peer-reviewed research papers that are doing
6  that study large-scale and they -- and I'm relying
7  on their conclusions.
8      Q.  What is data leakage in layman's terms?
9      A.  In layman terms, data leakage essentially
10  refers to sharing of data.
11      Q.  What does that mean?
12      A.  If you recall when we are discussing the
13  work that my lab does, at a high level it focuses on
14  data collection, sharing, and usage.  So I think you
15  can think of leakage, broadly speaking, to fall into
16  the bucket of sharing.
17      Q.  Unintentional sharing?
18          (Reporter seeks clarification.)
19      A.  It depends on the specific context.
20          (Deposition Exhibit 7 was marked.)
21  BY MS. KLEIN:
22      Q.  Professor Shafiq, I have put in front of
23  you what's been marked as Exhibit 7 which is, I will
24  represent to you, the call for papers available on
25  the Internet by the Proceedings on Privacy Enhancing

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 94

1  Technology Symposium.
2       Do you see that?
3       A.  Yes.
4       Q.  And every year, the Proceedings on Privacy
5  Enhancing Technology Symposium puts out a call for
6  papers in which it tells researchers like yourself
7  what is required of a paper to be submitted; is that
8  right?  Let me scratch that.
9       Do you know what a call for papers is?
10      A.  Yes.
11      Q.  What is a call for papers?
12      A.  The goal for call for papers is typically
13  to define the scope of research papers that are
14  being solicited at that conference or journal.
15      Q.  And so this is the call for papers that
16  Proceedings on Privacy Enhancing Technologies has
17  put out for this year; correct?
18      A.  I think I wrote this, so yes.
19      Q.  Oh, you wrote it.  Very good.
20      Are you the president of the Proceedings
21  on Privacy Enhancing Technology Symposium?
22      A.  There is no designation that is called a
23  president.
24      Q.  Got it.
25      How is it that you came to be the person

Page 95

1  who put out this call for papers, or drafted the
2  call for papers?
3       A.  I'm the editor in chief.
4       Q.  Of the -- of the publication?
5       A.  Yes.
6       Q.  I would like to direct your attention to
7  page 3 of 10 where it talks about clarification of
8  expectations.
9       Do you see that?
10      A.  Yes.
11      Q.  Who decided on what the clarification of
12  expectations would be this year?  Was that you, as
13  the editor in chief?
14      A.  So there is more context to it because
15  this is -- there is a lot of background that went
16  into writing the paragraph the way it is written.
17      Do you want me to give you some overview?
18      Q.  Sure.
19      A.  So I was also the editor in chief of this
20  proceeding the previous year.  And the editors who
21  were before me -- and this is a common issue that we
22  were dealing with in our research -- in our
23  conferences, we were getting a number of submissions
24  that were very theoretical in nature, to put it in
25  lay terms.

Page 96

1       And in this conference, we wanted to
2  encourage publications of more applied privacy
3  research, rather than more theoretical privacy
4  research.
5       (Reporter seeks clarification.)
6       A.  Hence we put in this paragraph to
7  discourage authors who were writing more theoretical
8  privacy research, to consider submitting their
9  papers to other venues.
10      Q.  And the clarification of expectations
11  reads, "This year we introduced a new requirement
12  that submissions must contribute to real privacy
13  applications that run in real systems.  Consistent
14  with this focus, we expect that submissions should
15  not need to rely on proofs as a primary contribution
16  and thus proofs would usually appear in the Appendix
17  rather than in the main body."
18      Did I read that correctly?
19      A.  Yes.
20      Q.  The clarification also requires that "a
21  substantial portion of each submission would instead
22  be focused on work that is more traditionally
23  considered practical or applied work (e.g.,
24  real-world use cases, real-world measurements,
25  evaluations on real-world data, application

Page 97

1  development, integration with a real-world
2  application, system design and evaluation, etc.)"
3       Did I read that correctly?
4       A.  Yes.
5       Q.  And then the clarification goes on to say,
6  "This focus is necessary due to an increasing number
7  of submissions that make primary contributions that
8  are highly theoretical in nature (e.g., to
9  theoretical cryptography and primitives or related
10  areas) for which PoPETs is not well-equipped to
11  review and provide high quality feedback."
12      Do you see that?
13      A.  Yes.
14      Q.  And so the reason that you're asking for
15  more practical or applied work is because it's hard
16  for PoPETs to actually peer review the information;
17  right?
18      A.  So given the context that I gave you
19  previously, we have a number of program committee
20  members on our board who do theoretical research,
21  but we don't have enough of them.
22      Hence we are trying to -- so we -- there
23  was a long debate about this at the last board
24  meeting.  We -- one option we considered was to
25  increase the number of reviewers who conduct more

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 98

1  theoretical research so we can beef up and
2  essentially provide reviews to all the papers who
3  are theoretical in nature that get submitted to the
4  conference.
5       The other option we considered was that we
6  tweak the scope of the conference to be more applied
7  to essentially signal to authors that, hey, if
8  you're doing very theoretical research, don't submit
9  to this conference; submit to other venues which --
10  other venues that have a greater number of program
11  committee members who do theoretical privacy
12  research.
13      Q.  And therefore, you're seeking papers that
14  deal with real world measurements and evaluation of
15  real world data; right?
16      MR. ROBINSON:  Objection; form.
17      THE WITNESS:  In that part of this paragraph,
18  we are giving a number of examples of the kind of
19  things we want to encourage, and those are two of
20  the several things that we provide examples of in
21  this paragraph.
22  BY MS. KLEIN:
23      Q.  Because those are capable of peer review
24  in ways that theoretical research is not?
25      MR. ROBINSON:  Objection; form.

Page 99

1       THE WITNESS:  I would not put it that way.
2  BY MS. KLEIN:
3       Q.  Those are the kinds of cases -- those are
4  the kinds of articles that are -- lend themselves
5  more to peer review?
6       MR. ROBINSON:  Objection; form.
7       THE WITNESS:  I would not agree with that.
8  BY MS. KLEIN:
9       Q.  Do you agree with that -- do you agree
10  with me that articles that contain real world
11  measurements and evaluate real world data are
12  susceptible to peer review?
13      MR. ROBINSON:  Objection; form.
14      THE WITNESS:  Susceptible, can you clarify what
15  you mean by that?  That is throwing me off.
16  BY MS. KLEIN:
17      Q.  Capable of peer review?
18      MR. ROBINSON:  Same objection.
19      THE WITNESS:  All research is capable of being
20  peer-reviewed.
21  BY MS. KLEIN:
22      Q.  It's your opinion that there is no
23  research that's not capable of peer review?
24      A.  Let's go back to the context of this
25  paragraph.  Proceeding of privacy enhancing

Page 100

1  technology symposium.  We have, in the past,
2  peer-reviewed and published a number of theoretical
3  privacy papers as well.  They are capable of being
4  peer-reviewed.
5       Q.  It's just that the flagship organization
6  is not well equipped to review and provide high
7  quality feedback to theoretical papers?
8       MR. ROBINSON:  Objection; form.
9       THE WITNESS:  I think I gave you the context
10  that we were receiving more submissions than we had
11  number of program committee members who had that
12  expertise.
13  BY MS. KLEIN:
14      Q.  Well, you didn't write that in Exhibit 7,
15  which you said you authored; right?
16      A.  Yes.  I wrote this paragraph.  All of
17  those discussions are part of the board meeting that
18  happened earlier this year.
19          Can I put this aside?
20      Q.  Yes.
21          (Deposition Exhibit 8 was marked.)
22          (Discussion off the record.)
23  BY MS. KLEIN:
24      Q.  Professor Shafiq, I've put in front of you
25  what's been marked as Exhibit Shafiq 8.

Page 101

1          Is this the Call For Papers from ACM IMC
2  2023?
3       A.  Yes, it seems so.
4       Q.  And this is the call for papers that
5  resulted in Exhibit No. 5; correct?
6       A.  What was Exhibit 5?
7       Q.  The tracking, profiling, and ad targeting.
8       A.  Yeah, our research paper was eventually
9  accepted at this conference.
10      Q.  And you see that the first paragraph of
11  Exhibit 8, the call for papers for ACM, says "The
12  Internet Measurement Conference is a highly
13  selective venue for the presentation of
14  measurement-based research data -- research in data
15  communications."
16          Do you see that?
17      A.  Yes.
18      Q.  It says, "As we are in the era of
19  data-driven research, IMC 2023 will focus on
20  improving the standard in the collection, usage and
21  sharing of network measurements for the research
22  community."
23          Do you see that?
24      A.  Yes.
25      Q.  Given that you did not collect or measure

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 102

1  any data with respect to your report, it would not
2  qualify as a publishable paper for ACM, would it,
3  under this call for papers?
4      MR. ROBINSON:  Objection; form.
5      THE WITNESS:  Is your question that whether or
6  not my report can be submitted for peer review at
7  this conference?  Because that's not what typically
8  happens.  People don't submit expert reports.
9  BY MS. KLEIN:
10     Q.  No, I understand that.  I'm just saying
11 based on the methodology you used, it wouldn't even
12 qualify to be submitted for peer review at ACM;
13 correct?
14     A.  I would not agree with that.
15     Q.  No?
16     A.  I would not agree with your statement.
17     Q.  Why not?
18     A.  The papers that I'm citing, the evidence
19 that I'm citing, in fact, many of those papers are
20 published in peer-reviewed venues that are
21 considered highly reputable, include co-authors of
22 papers that are published regularly in these and
23 other conferences.
24     So I'm not relying on some made-up data.
25 The data is coming from the kind of conferences that

Page 103

1  we are discussing, and they have been peer-reviewed.
2      Q.  Is ProPublica considered a reliable source
3  in research communities?
4      MR. ROBINSON:  Objection; form.
5      THE WITNESS:  ProPublica is commonly cited in
6  my experience by research papers who are pointing
7  to, for example, a case study of some journalism
8  that is relevant to topic of research.
9  BY MS. KLEIN:
10     Q.  Is ProPublica reliable -- considered a
11 reliable source for source code and other reporting
12 on changes to technical systems?
13     A.  It depends what we are trying to -- what
14 is the context in which someone is relying on it.
15     Q.  In TikTok -- in the TikTok case we talked
16 about earlier, you were asked to opine how TikTok
17 collected and used various data; correct?
18     MR. ROBINSON:  Instruct you not to answer on
19 the basis of the protective orders that you have
20 signed in that case.
21     THE WITNESS:  At the instruction of counsel and
22 the confidentiality agreement that I have signed in
23 that case, I'm not going to answer the question.
24 BY MS. KLEIN:
25     Q.  Okay.  Well, I'm going to give you a

Page 104

1  public -- a publicly available version of the
2  document and then we can talk about it.  Okay?
3      (Discussion off the record.)
4      (Deposition Exhibit 9 was marked.)
5      (Witness reviews document.)
6      MR. ROBINSON:  Now, Professor Shafiq, I'll just
7  go ahead and say that you may answer questions about
8  this previous report that counsel for Google is
9  representing to be a public document.
10     To the extent that any facts or opinions
11 in this, you relied on in creation of your opinions
12 in this case, and otherwise, if they do not relate
13 to something that you relied on in your opinions in
14 this matter, I'm going to instruct you not to
15 answer.
16     MS. KLEIN:  I'm sorry, if you're going to do
17 that, I'm going to move to compel, because I'm
18 allowed to test the different methodologies that he
19 has and the different methodologies that he uses.
20     And if you're going to say I can't use a
21 publicly available document to test his
22 methodologies, we're going to have a big fat
23 problem.
24     MR. ROBINSON:  Well, we can see -- we can say
25 the direction that your questions go, but I'm

Page 105

1  relying on the expert stipulation and Rule 26 here
2  regarding to what you can and can't discover
3  regarding expert disclosures and qualifications.
4      MS. KLEIN:  I completely disagree with that and
5  we may have to get the Special Master on the phone.
6      MR. ROBINSON:  That's fine, that's fine.
7  BY MS. KLEIN:
8      Q.  Professor Shafiq, we've put in front of
9  you what's been marked as Shafiq Exhibit 9.
10     Is this a true and correct copy of the
11 publicly available version of a declaration you
12 submitted in support of Plaintiff's Motion for Class
13 Certification in the Bernadine Griffith versus
14 TikTok and Bytedance case?
15     A.  Do you want me to look at the report?
16     Q.  I want to know if it's a true and correct
17 copy of a redacted version of the report you
18 submitted in that case.
19     (Witness reviews document.)
20     A.  The document that you have put in front of
21 me is -- there's a lot of redactions.  I don't know
22 if this is the true and correct copy.
23     Q.  You don't know if this is what you
24 submitted in the TikTok case?
25     A.  I submitted a report in the TikTok case.

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 106

1    Q.  And you can't tell me this is that report?
2    A.  Because this is not what I wrote.  This is
3  heavily redacted, so I don't know if this has been
4  modified in any way.
5    Q.  Okay.  I'm sure they'll be happy to know
6  that in that case.
7        Professor Shafiq, in the TikTok case, you
8  were asked to opine with respect to how TikTok
9  collected and used various data; right?
10    MR. ROBINSON:  If you relied on any facts or
11  assumptions in this report to make up the basis of
12  your opinions in this case, you may answer.
13  Otherwise, I'll instruct you not to answer on the
14  basis of this case's expert stipulation.
15    MS. KLEIN:  What paragraph of this case's
16  expert stipulation?
17    MR. ROBINSON:  Yeah, I do not see any category
18  under Section 4, expert materials to be disclosed,
19  that would apply to the details of an expert's prior
20  expert opinions in an unrelated case in an
21  assignment that has nothing to do with this case.
22    MS. KLEIN:  It's called impeachment, my friend.
23    MR. ROBINSON:  I'll stand by my instruction.
24    MS. KLEIN:  Court reporter, if you would mark
25  that in the transcript.

Page 107

1  BY MS. KLEIN:
2    Q.  Professor Shafiq, in the TikTok case, were
3  you asked to opine with respect to how TikTok
4  collected and used various data?
5    MR. ROBINSON:  Same instruction not to answer
6  on the same basis and the party's expert
7  stipulation.
8  BY MS. KLEIN:
9    Q.  Are you refusing to answer my question?
10    A.  Can you please rephrase your question?
11    Q.  Yes, sir.
12        Professor Shafiq, in the TikTok case, were
13  you asked to opine on how TikTok collected and used
14  various data?
15    MR. ROBINSON:  Same instruction not to answer
16  on the same basis.
17  BY MS. KLEIN:
18    Q.  Are you refusing to answer my question?
19    A.  At the instruction of counsel, I'm not
20  going to answer your question.
21    Q.  In the TikTok case, as is reflected in
22  paragraph 11 of Shafiq Exhibit 9, did you do public
23  testing of websites?
24    MR. ROBINSON:  Same instruction not to answer
25  on the same basis, unless a question implicates

Page 108

1  facts that you relied on in the creation of your
2  opinions in this matter.
3    THE WITNESS:  At the instruction of counsel,
4  I'm not going to answer your question.
5  BY MS. KLEIN:
6    Q.  In the TikTok case, did you collect data?
7    MR. ROBINSON:  Same instruction, same basis.
8    THE WITNESS:  At the instruction of counsel,
9  I'm not going to answer your question.
10  BY MS. KLEIN:
11    Q.  In the TikTok case, did you develop a
12  methodology to test for variability in collection of
13  data browsers from different websites?
14    MR. ROBINSON:  Same instruction on the same
15  basis.
16    THE WITNESS:  At the instruction of counsel,
17  I'm not going to answer your question.
18  BY MS. KLEIN:
19    Q.  Can you read the first sentence of
20  paragraph 11 of your report, please?
21    MR. ROBINSON:  You can read it.
22    THE WITNESS:  I just want to caution that I
23  don't know if this is the report that I submitted
24  because this is not -- this seems to have these
25  redactions.

Page 109

1  BY MS. KLEIN:
2    Q.  Right, I get it.  You don't want to answer
3  my questions.
4        Can you please read the first sentence of
5  paragraph 11, sir?
6    A.  (Witness complies.)
7        "Based on my public testing of websites
8  using TikTok Pixel, including riteaid.com, I
9  conclude that TikTok Pixel automatically collects
10  the following seven categories of data for all
11  events, including the default 'Page View' event."
12        (Reporter seeks clarification.)
13    Q.  Thank you, sir.
14        Did you write that sentence?
15    A.  Can I complete the sentence?  Because the
16  sentence is not completed.
17    Q.  Sure.
18    A.  (a) Timestamp; (b) IP Address; (c) User
19  Agent; (d) Cookies, (e) URL; (f) in quotes 'Event
20  information'; and (g) in quotes 'Content
21  Information.'"  Full stop.
22    Q.  Is the sentence you just read into the
23  record something that you wrote, sir?
24    MR. ROBINSON:  Same instruction not to answer
25  on the same basis.

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 110

1    THE WITNESS:  At the instruction of counsel,
2    I'm not going to answer your question.
3    BY MS. KLEIN:
4        Q.  Can you please read the first sentence of
5    paragraph 12 into the record?
6        A.  "I further developed a methodology to test
7    for any variability in TikTok Pixel's data
8    collection across different websites."
9        Q.  Did you -- is this a true and correct
10   sentence of something you wrote in the TikTok
11   opinion?
12       MR. ROBINSON:  Same instruction not to answer
13   on the same basis, the parties' expert stipulation.
14       THE WITNESS:  At the instruction of counsel,
15   I'm not going to answer your question.
16   BY MS. KLEIN:
17       Q.  Are you going to answer any questions I
18   ask today, sir, about your expert opinions that you
19   submitted in the TikTok case?
20       MR. ROBINSON:  Objection; form.
21       THE WITNESS:  I think I answered some of your
22   questions.
23   BY MS. KLEIN:
24       Q.  Will you answer any questions I ask about
25   the substance of Shafiq Exhibit 9 or any of the

Page 111

1    other expert opinions you've proffered in the TikTok
2    case?
3        MR. ROBINSON:  Professor Shafiq, I'll go ahead
4    and instruct you that on the basis of the parties'
5    expert stipulation, that you may read publicly
6    available portions of expert reports, but any
7    further substance into opinions and assignments that
8    are outside the scope of your expert assignment and
9    unrelated matters, I'll instruct you not to answer.
10   BY MS. KLEIN:
11       Q.  Are you going to follow your counsel's
12   instructions?
13       A.  I'm going to follow my counsel's
14   instruction and not answer your questions about the
15   substance report or meaning of my work in an
16   unrelated manner.
17       Q.  Any unrelated matter, not just TikTok,
18   because I have several other matters to discuss with
19   you about your methodologies today.
20           Is that correct, you're refusing to
21   testify about your publicly available opinions in
22   any other unrelated matter?
23       MR. ROBINSON:  Same instruction on the same
24   basis.
25       THE WITNESS:  Counsel has instructed me to not

Page 112

1    answer questions about this document.
2    BY MS. KLEIN:
3        Q.  Professor Shafiq, what is your schedule
4    like for the rest of the month?
5        A.  I'm actually attending the 2014 edition of
6    this conference at the end of the month.  Other than
7    that, I'm generally available.
8        Q.  And what about early November?
9        A.  This conference is last week of October or
10   first week of November, overlapping.
11       Q.  Where is it being held?
12       A.  It's in Madrid.
13       Q.  Very nice.
14       MR. ARTHUR:  Would it be a good time for us to
15   take a break?
16       MS. KLEIN:  I'll take a break just after I make
17   a record, which is I have probably a couple hours'
18   worth of questions that I was going to ask about his
19   methodologies in other cases.  And so to the extent
20   that you're not going to allow him to answer, the
21   reason I asked for his schedule is I'm going to move
22   to compel and we will be back here.  And, in fact,
23   I'm going to probably ask that he be required to
24   travel to New York since I took the time out of my
25   schedule to come all the way to San Francisco.  And

Page 113

1    if he won't come to New York, I'm happy to go to
2    Texas, where I also have family and where you guys
3    are located.
4           But this is ridiculous and I object and we
5    will be moving to compel.
6        MR. ROBINSON:  We are standing on the basis of
7    the parties' agreed expert stipulation that
8    everyone's been working under.  It is not our issue
9    that you prepared materials that were in violation
10   of the expert stipulation and we will stand on that
11   instruction and objection to those lines of
12   questions.
13       MR. ARTHUR:  We've noted your objection.
14       MS. KLEIN:  Let's take a break.
15       THE VIDEOGRAPHER:  We're going off the record.
16   Time is 12:36.
17       (Recess taken.)
18       THE VIDEOGRAPHER:  We're going back on the
19   record.  Time is 12:59.
20       MR. ROBINSON:  I'd like to briefly revise
21   plaintiff states' position regarding questions into
22   the expert's prior publicly available opinions or
23   reports in that we are going to allow questions
24   about this on a question-by-question basis.
25           And I will be periodically reminding the

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 114

1  witness that in answering these questions, he will
2  be bound by previous confidentiality orders he has
3  signed in these other cases and also privilege
4  protections between him and other entities that bind
5  him in these previous matters.
6        But we will otherwise allow questions on
7  this -- on these subjects.
8        MS. KLEIN:  Thank you.  And I will just say as
9  we are going question by question, to the extent
10 that there are objections about asking about
11 testimony in other matters, just to remind you all
12 that you -- the plaintiff states have requested
13 expert reports from the MDL and the EDDA and that
14 you can expect that to the extent that you seek to
15 limit questioning on a certain basis that there will
16 be discussion about whether it impacts questions
17 related to those kinds of reports to the extent you
18 seek to question witnesses about them.
19       So thank you very much for the
20 consideration.
21 BY MS. KLEIN:
22    Q.  And we'll go back to Shafiq Exhibit 9,
23 Professor Shafiq.
24       Do you have Exhibit 9 in front of you?
25    A.  Yes.

Page 115

1    Q.  Previously when I asked you about -- oh,
2  by the way, I meant to ask you, Professor Shafiq,
3  after a break is there anything you want to clarify
4  or change about your testimony?
5    A.  No.
6    Q.  Okay.  Previously you testified that you
7  did not know if Shafiq Exhibit 9 was a true and
8  correct copy of a redacted version of your report.
9       Do you recall that?
10   A.  Yes.
11   Q.  Okay.  If you look on page 2 of Exhibit 9,
12 is that your signature?
13   A.  Yes.
14   Q.  And were you asked to opine with respect
15 to how TikTok collected and used various data in the
16 case entitled Bernadine Griffith versus TikTok, Inc.
17 and Bytedance, Inc.?
18      MR. ROBINSON:  And, Professor Shafiq, I'd like
19 you to answer the question to the best of your
20 ability, keeping in mind any confidentiality and
21 applicable privileges in this case.
22      THE WITNESS:  Can you please rephrase the
23 question?
24 BY MS. KLEIN:
25   Q.  Yes.

Page 116

1        Were you asked in this case to opine --
2  not this case -- were you asked in the TikTok case
3  to opine with respect to how TikTok collected and
4  used various data?
5    A.  Without going into any confidential
6  information in that matter, at a high level, that
7  case involves data collection through the use of a
8  specific piece of technology provided by TikTok.
9        And again without going into any
10 confidential information in that case, at a very
11 high level, my opinions in that case delved into
12 whether and how the product at issue in that case
13 collected data.
14   Q.  And used data or just collected data?
15   A.  I can't recall from memory.
16   Q.  And you did public testing of websites;
17 correct?
18   A.  Can you point me to a specific part of my
19 report because --
20   Q.  Yes.
21   A.  -- I'm not sure if it is redacted in the
22 protective order.
23   Q.  Paragraph 11 of your report reflects that
24 you did public testing of websites.  Correct?
25   A.  That's what paragraph 11 states.

Page 117

1    Q.  Did you do public testing of websites?
2    A.  My answer to the question -- I'm
3  hesitating to answer your question because to answer
4  your question, I will have to reveal the assignments
5  or communications that were given to me by counsel
6  in that matter.
7    Q.  Well, but if you look at Shafiq Exhibit 9,
8  which is your report, even though it's redacted, it
9  reflects that you did do public testing of websites.
10      Do you see that?
11   A.  I think I answered your question.  The
12 paragraph states that public testing of websites was
13 done.
14   Q.  Right.
15      You did it; correct?  You're the one who
16 collected the information off the public websites
17 with respect to your report?
18   A.  I cannot answer your question.
19   Q.  Either you or someone at your direction,
20 without talking about who did it.
21      It says, "based on my public testing."  It
22 was public testing done at your direction or
23 someone . . .
24      MR. ROBINSON:  Professor Shafiq, you may answer
25 in a "yes" or "no" format.

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 118

1    THE WITNESS: Okay.
2         Can you please repeat the question?
3    BY MS. KLEIN:
4    Q. Yes.
5         Professor Shafiq, in the TikTok case, did
6    you do public testing of websites?
7    A. Yes.
8    Q. And, Professor Shafiq, pursuant to
9    paragraph 12 of the TikTok declaration, did you
10   develop a methodology to test for variability in
11   TikTok Pixel's data collection across different
12   websites?
13   A. That's what the first sentence of this
14   paragraph states.
15   Q. Right.
16        Did you -- did you develop that
17   methodology? Because you've said you don't know if
18   this is your report, so I'm just trying to figure
19   out what you did. And based on what it says here
20   that's publicly available, it seems that you did,
21   but I just want to confirm.
22        Did you develop a methodology to test for
23   variability in TikTok Pixel's data collection across
24   different websites?
25   A. I was given a specific assignment by

Page 119

1    counsel in that case. And for that specific
2    assignment that I was given by counsel, I had to
3    conduct some testing.
4    Q. And you also developed a methodology to
5    conduct that testing; correct?
6    MR. ROBINSON: You can answer that in a "yes"
7    or "no" format if you can without violating
8    confidentiality obligations or privilege
9    protections.
10   THE WITNESS: My testing develop -- the testing
11   that I conducted followed a methodology.
12   BY MS. KLEIN:
13   Q. And you developed the methodology; right?
14   That's what it says in paragraphs 12 and 13?
15   A. There was a specific assignment that was
16   given to me by counsel in that case.
17   Q. For which --
18   A. And --
19   Q. -- for which you developed a methodology?
20   A. Sorry. I'm lost. Can you please again
21   ask your question?
22   Q. Yes.
23        Sir, with respect to the assignment you
24   received in the TikTok case, you developed a
25   methodology; correct? Yes or no?

Page 120

1    A. I was given an assignment -- various
2    assignments by counsel in that case. And to perform
3    those assignments, I conducted some testing.
4    Q. And did you develop a methodology or you
5    just decided I'm going to test?
6    A. I followed a methodology.
7    Q. Did you develop the methodology?
8    MR. ROBINSON: Same instruction regarding if
9    you can answer that in a "yes" or "no" format.
10   THE WITNESS: I used a methodology.
11   BY MS. KLEIN:
12   Q. Okay. So when it says in paragraph 12, "I
13   further developed a methodology," it's not you that
14   developed it and you were lying in paragraph 12?
15   MR. ROBINSON: Objection; form.
16   BY MS. KLEIN:
17   Q. Right? If you followed a methodology but
18   you didn't develop it, it means you were lying in
19   paragraph 12?
20   MR. ROBINSON: Objection; form.
21   THE WITNESS: Is that a question?
22   BY MS. KLEIN:
23   Q. Yes, it's a question.
24        Were you lying in paragraph 12 when you
25   said you developed a methodology since you've

Page 121

1    testified here that you only used one?
2    MR. ROBINSON: Objection; form.
3    THE WITNESS: I'm not lying in that section of
4    the report.
5    BY MS. KLEIN:
6    Q. Okay. My question to you, sir, is I asked
7    you did you develop a methodology, and you said, "I
8    used a methodology."
9         I'm asking you questions. And I'm going
10   to have to get more time because you're not actually
11   answering my questions, you're just saying what you
12   want to say. You have to answer my questions, and
13   if it's susceptible to "yes" or "no," you have to
14   say "yes" or "no."
15        Do you understand that, sir?
16   A. You are asking me more pointed questions
17   that get to the assignments that were given to me by
18   counsel, the communications we had about --
19   Q. I'm not -- sir, I'm only asking you
20   exactly what's in your report that -- it says,
21   [as read] "I further developed a methodology to test
22   for any variability in TikTok's data collection
23   across different websites."
24        Did you formulate that methodology?
25   A. That's what the sentence says.

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 122

1    Q.  Is it true?  Or were you lying?
2    MR. ROBINSON:  Objection; form.
3    THE WITNESS:  The sentence is true.
4    BY MS. KLEIN:
5    Q.  Okay.  So it's true you developed a
6    methodology in performing the assignment for the
7    TikTok case?
8    A.  I used a methodology that I used to do the
9    assignment that was given to me by counsel in that
10    case.
11    Q.  Why aren't you agreeing with me that you
12    developed one and just keeping saying "used"?  Is
13    there a difference between "developed" and "used"?
14    A.  To be able to answer that question, I need
15    to get into the details of what the assignment was,
16    how I exactly conducted it.
17         I need to get into the nature of the work
18    that I performed in that case that I believe is
19    protected by confidentiality order that I signed,
20    just like I signed a confidentiality order in this
21    case.
22    Q.  But I'm only asking you if Section 12 is
23    true.
24         Did you develop a methodology in this
25    case?

Page 123

1    A.  If you ask me, for example, that there is
2    something written on that piece of paper and you
3    represent to me, like, this is something that you
4    have gathered from the public record and it is true
5    and accurate copy of the redacted report, the
6    sentence says what it says.
7         But if you ask me to expand on the
8    details, the meaning behind that sentence, that is
9    where I am bound by the confidentiality order in
10    that case.
11    Q.  Okay.  Did you develop a methodology for
12    testing data in this case?
13    MR. ROBINSON:  Professor Shafiq, you can answer
14    that in a "yes" or "no" format that likely -- you
15    may answer that in a "yes" or "no" format.
16    THE WITNESS:  By "this case" you mean the --
17    BY MS. KLEIN:
18    Q.  Google.
19    A.  -- this present case or the TikTok case?
20    Q.  The Google case, sir.
21         Did -- let me ask this directly.
22    Professor Shafiq, did you develop a methodology for
23    testing data in this case?
24    A.  No.  In this case, I conducted -- I relied
25    on the testing and the methodology that I cite from

Page 124

1    peer-reviewed research and other sources in my
2    report.
3    Q.  And did you develop a methodology in this
4    case for collecting data?
5    A.  My answer is the same as earlier.
6    Q.  Which is?
7    A.  I relied on peer-reviewed research paper
8    that I'm describing that use the methodology that is
9    acceptable in peer-reviewed research.
10    Q.  And so if you were to describe what your
11    methodology was in creating your report, it would be
12    reviewing and interpreting peer-reviewed papers and
13    Google documents; correct?
14    A.  We can go to my report.  There is a
15    section in my report with -- going back to
16    Exhibit 3.
17         For example, in paragraph 41 of my report,
18    I'm citing a number of research papers that study
19    data collection by Google on various websites, and
20    this is where I'm citing peer-reviewed research.
21    MS. KLEIN:  Objection; nonresponsive and move
22    to strike.
23    BY MS. KLEIN:
24    Q.  Professor Shafiq, what I'd like to know,
25    if you were to describe what your methodology is and

Page 125

1    how you created your report, would it be that you
2    collected and reviewed and interpreted peer-reviewed
3    papers in Google documents?  Is that your
4    methodology, sir?
5    MR. ROBINSON:  Objection; form.
6    THE WITNESS:  To form and offer the opinions
7    that I'm offering in this report, I am relying on
8    peer-reviewed research that has been published and
9    the methodology that they use in turn and publicly
10    available Google documents as well as internal
11    Google documents.
12    BY MS. KLEIN:
13    Q.  Anything else?
14    A.  I believe in some parts of the report, I
15    also describe I'm citing deposition testimony that
16    also gets to the issue of how Google collects data.
17    Q.  You also relied on Professor Hochstetler's
18    report.
19         Do you recall that?
20    A.  I believe I cited Professor Hochstetler's
21    report.
22    Q.  Did you ever talk to him?
23    A.  No.
24    Q.  Did you ever talk to any of the experts?
25    A.  No.

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 126

1    Q.  In looking at your expert report and the
2   depositions that you relied upon, it's on -- not
3   page numbered, but it's on page 39 of your report.
4   So if you go to the end of your -- the body of your
5   report, which is page -- paragraph 85, the page
6   after that starts "Appendix A:  Materials Relied
7   Upon."
8    A.  Yes.
9    Q.  It says, "Declarations, depositions and
10  rog responses."
11       Do you see that?
12   A.  Yes.
13   Q.  And you relied on three -- one declaration
14  and two depositions.
15       Do you see that?
16   A.  Yes.
17   Q.  And the deposition of Glenn Berntson is
18  not on that list.
19       Do you see that?
20   A.  What?
21   Q.  There's a declaration for Glenn Berntson.
22       Do you see that?
23   A.  Yes.
24   Q.  But no deposition for Glenn Berntson;
25  right?

Page 127

1    A.  It does not say "deposition of Glenn
2   Berntson."
3    Q.  And then if you turn the page to
4   "Declarations, transcripts and exhibits," I don't
5   see Glenn Berntson's deposition in that list either;
6   correct?
7    A.  Which page or section are you referring
8   to?
9    Q.  If you look at Appendix B, Materials
10  Considered, the first through fourth pages talk
11  about depositions and exhibits that you considered.
12       And I'm asking, did you consider Glenn
13  Berntson's deposition?  Because it's not listed
14  there either.
15   A.  Which specific deposition are you talking
16  about?
17   Q.  Mr. Berntson, B-e-r-n-s-t-o-n [sic]?
18   A.  Can you give me maybe the Bates number or
19  the date so I can refresh my memory?
20   Q.  His deposition was taken on September 6th,
21  2024.
22   A.  September 6th?
23   Q.  Yes, sir.
24   A.  My report was submitted on September 9th.
25  I imagine by September 9th, I would not have access

Page 128

1   to his deposition because I did not attend his
2   deposition.
3    Q.  So you did not review or consider
4   Mr. Berntson's deposition in connection with your
5   report?
6    A.  Because, as you can tell, it essentially
7   happened at the same time I submitted my report.
8    Q.  Well, it happened three days before and
9   you could have attended, as you just said; correct?
10   A.  I was telling you that I was not at the
11  deposition.  I was not aware of deposition of
12  Mr. Berntson.
13   Q.  That's something you would like to have
14  considered in your report; correct?
15   A.  I don't know the scope and contents of
16  that deposition.
17   Q.  You cite Mr. Berntson's declaration;
18  correct?
19   A.  I cite Mr. Berntson's declaration because
20  a lot of plaintiffs' experts were relying on
21  Mr. Berntson's declaration in offering some opinions
22  that they were offering.  I read the declaration
23  that was in the materials that were available to me.
24       And as I explain later on in my report,
25  that declaration does not provide context about the

Page 129

1   specific issue that I was addressing in my report.
2    Q.  You were retained in March of 2024;
3   correct?
4    A.  That sounds right.
5    Q.  You did not submit an affirmative expert
6   report in June of 2024; correct?
7    A.  That is correct.
8    Q.  Do you know why or why not?
9    MR. ROBINSON:  Instruct you not to answer
10  anything that would reveal communications between
11  yourself and attorneys, counsel in this case.
12   THE WITNESS:  Without revealing communication
13  between myself and counsel in this case, I cannot
14  answer your question.  Hence, at the instruction of
15  counsel, I'm not going to answer your question.
16  BY MS. KLEIN:
17   Q.  How many hours of work had you performed
18  between March and June of 2024?
19   A.  I don't exactly recall.
20   Q.  Were you performing work between March and
21  June of 2024?
22   MR. ROBINSON:  Objection; form.
23   THE WITNESS:  Yes.
24  BY MS. KLEIN:
25   Q.  You note in paragraph 17 of your report --

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 130

1    you with me on paragraph 17? You say, "In their
2    opening reports, plaintiff's experts Dr. Gans and
3    Dr. Pathak opine on Google's decision to redact
4    certain fields in the BDT files."
5        Do you see that?
6        A.  Yes.
7        Q.  You then say that, "Dr. Gans opines that
8    Google's true motivation was to limit publisher's
9    ability to gain insights on competing exchanges and
10   header bidding, and that Google used privacy as a
11   pretext."
12       Do you see that?
13       A.  Yes.
14       Q.  Your opinion is also that Google used
15   privacy as a pretext; correct?
16       A.  I am not offering that opinion. That is
17   Dr. Gans' opinion.
18       Q.  You are not offering an opinion that
19   Google used privacy as a pretext in the BDT
20   programming?
21       A.  I don't think I used those words in my
22   report.
23       Q.  Your report says on page 9, which is right
24   before paragraph 18 --
25       A.  Yes.

Page 131

1        Q.  -- "Contrary to the assertions of Google's
2    experts, Google had no legitimate privacy concern to
3    redact fields in BDT files."
4        Do you see that?
5        A.  Yes.
6        Q.  Isn't that another fancy way of saying
7    that Google used privacy as a pretext?
8        MR. ROBINSON:  Objection; form.
9        THE WITNESS:  Can you clarify what you mean by
10   "fancy way"?
11   BY MS. KLEIN:
12       Q.  Isn't that another way of saying that
13   Google used privacy as a pretext?
14       A.  I would not put it that way. My opinion
15   simply is that Google -- based on all the evidence
16   that I have analyzed that was cited in Google's
17   experts' reports, I did not see any evidence that
18   would provide a legitimate privacy justification for
19   Google's decision to redact fields in BDT files.
20       Q.  You agree with me that there was
21   information that Google expressed privacy concerns
22   when redacting BDT files; correct?
23       A.  In my report I discuss, for example,
24   candid discussions between Google's employees
25   whether -- they were discussing whether or not there

Page 132

1    are privacy concerns.
2        And I describe in that section of my
3    report that even Google's employees seem to indicate
4    that there were no user privacy concerns. And then
5    there was a plan developed to instead do the change
6    and justify it by saying it is necessary to protect
7    user privacy.
8        MS. KLEIN:  Object as nonresponsive and move to
9    strike.
10   BY MS. KLEIN:
11       Q.  Dr. Shafiq, we're going to be here a
12   really long time if you don't answer the question
13   that I ask, okay?
14       A.  I believe I'm answering your question
15   truthfully and comprehensively.
16       Q.  I don't believe you're actually answering
17   the question that I asked, though. So let me ask my
18   question again and then perhaps you can answer it.
19       MR. ROBINSON:  Can we just get to the questions
20   instead of the --
21       MS. KLEIN:  Of course.
22       MR. ROBINSON:  -- back and forth with the
23   witness?
24   BY MS. KLEIN:
25       Q.  Dr. Shafiq, do you agree with me that in

Page 133

1    some of the documents you reviewed, Google expressed
2    privacy concerns related to the BDT files?
3        A.  I reviewed those documents and evaluated
4    and assessed the validity of those statements.
5        Q.  Your opinion of the validity of those
6    statements; correct?
7        A.  Yes. I'm basing my opinion based on
8    number of documents and evidence that I'm citing in
9    my report.
10       Q.  And as we discussed earlier you're not a
11   mind reader; correct?
12       MR. ROBINSON:  Objection; form.
13       THE WITNESS:  I mean, I'm reading candid
14   discussions that are happening between different
15   Google employees.
16   BY MS. KLEIN:
17       Q.  No, sir, my --
18       A.  Can I please complete my answer?
19       Q.  Sure.
20       A.  And unless those documents are lying,
21   Google's employees are lying, I am describing what
22   those documents are describing in plain text.
23       MS. KLEIN:  Objection; nonresponsive and move
24   to strike.
25   BY MS. KLEIN:

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 134

1    Q.   As we discussed earlier, you're not a mind
2  reader; correct?
3      MR. ROBINSON:  Objection; form.
4  BY MS. KLEIN:
5      Q.   You're not a mind reader; correct?
6      A.   I am not a mind reader, that's correct.
7      Q.   And therefore, you don't really know
8  whether or not, when Google expressed in documents
9  that there were privacy concerns, if Google believed
10 it or not --
11     MR. ROBINSON:  Objection --
12 BY MS. KLEIN:
13     Q.   -- you don't know?
14     MR. ROBINSON:  Objection; form.
15     THE WITNESS:  Can you, for example, show me a
16 document that is cited in footnote 45?
17 BY MS. KLEIN:
18     Q.   No, sir.  Unfortunately, I'm asking the
19 questions, and I want an answer to my question.
20     My question to you, sir --
21     MS. KLEIN:  And I'll object as nonresponsive
22 and move to strike.
23 BY MS. KLEIN:
24     Q.   -- because you're not a mind reader, you
25 don't know, when Google expressed privacy concerns

Page 135

1  in the documents that you reviewed, whether Google
2  believed it or not, you just don't know?
3      A.   The reason --
4      MR. ROBINSON:  Objection; form.
5      THE WITNESS:  The reason I want to bring up
6  that document, and this is a document from which I
7  have a couple of screenshots, this is the document
8  where Google employees were expressing that this
9  change cannot be justified based on privacy.
10     And then, in addition to that, I'm looking
11 at the totality of the evidence.
12     MS. KLEIN:  Objection; nonresponsive and move
13 to strike.
14 BY MS. KLEIN:
15     Q.   Sir, yes or no, when Google expresses in
16 documents that you reviewed that there were privacy
17 concerns, you don't know, as you sit here today, as
18 to whether the person who authored that document
19 believed it or not?
20     MR. ROBINSON:  Objection; form.
21     THE WITNESS:  It is context to those documents
22 that you are refusing to consider.
23 BY MS. KLEIN:
24     Q.   I'm not asking context.
25     I'm saying yes or no, you don't know,

Page 136

1  because you're not a mind reader, that when somebody
2  who authored a document expresses that there were
3  privacy concerns, you don't know whether he or she
4  believed it or not; right?
5      MR. ROBINSON:  Objection; form.
6      THE WITNESS:  It is context in those documents
7  that gives me reason to believe, and hence, I opined
8  that even Google's own employees knew that privacy
9  was not -- user privacy was not a concern.
10 BY MS. KLEIN:
11     Q.   And that's based on an expert opinion or
12 your review of documents?
13     A.   Can you please show me this document that
14 is cited in footnote 45?
15     Q.   No, sir, I cannot.  I'm asking you
16 questions and you're supposed to answer my
17 questions, which you're not doing.  So let's go to
18 another question.  And I'm going to mark that one in
19 the record as something else you didn't answer.
20     If you look at the document that you did
21 cite --
22     MR. ROBINSON:  I'd like to state for the record
23 that our position is that the witness adequately
24 answered the question.
25     MS. KLEIN:  Well, I asked him that you didn't

Page 137

1  know, when the author of the document expressed a
2  privacy concern, whether he or she believed it or
3  not, and he wouldn't say yes or no.  So now I'm
4  going to prove that he did not answer the question
5  and we'll move on.
6      MR. ROBINSON:  There's no basis -- there's no
7  reason for us to get into this, but I will say that
8  he pointed --
9      MS. KLEIN:  This is not a proper objection in
10 the Eastern District of Texas.  You can say
11 objection to form or not.
12     MR. ROBINSON:  Neither are your back and forth
13 with the witness.  He provided you the basis for
14 your questions.
15     MS. KLEIN:  You can say objection; form.  You
16 have completely made this deposition -- you and the
17 witness have made this deposition go on much longer
18 and we may seek leave for additional time because
19 you're obstructing the deposition now, sir.  You
20 know that the rules in the Eastern District of Texas
21 are objection; form.
22 BY MS. KLEIN:
23     Q.   Professor Shafiq, on the next page of your
24 report following paragraph 30, do you see where
25 paragraph 30 is in your report?

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 138

1    A.  Yes.
2    Q.  Turn the page to the next page, to
3  Figure 1.
4        Do you see the slide that you have put in
5  your report?
6    A.  Yes.
7    Q.  Figure 1.  It's a page that you decided
8  yourself to put in this report, correct, to cite?
9  Right?
10    A.  That is correct.
11    Q.  And you said -- so if you look at the
12  second bullet point -- well, let's back up.  The
13  slide is titled "1P auction transparency narrative
14  at risk, due to ███████████████████."
15        Do you see that?
16    A.  Yes.
17    Q.  And it said, first bullet point, "We made
18  a promise to provide complete transparency into the
19  unified 1P auction."
20        Do you see that?
21    A.  Yes.
22    Q.  And the next bullet point says, ". . . but
23  have since realized this is incompatible with
24  █████████████████████."
25        Do you see that?

Page 139

1    A.  Yes.
2    Q.  And then two bullet points down, it says,
3  "Today Bid DT can be joined with other DT files
4  (Impressions, Clicks, etc.) which may contain
5  user-identifiable information."
6        Do you see that?
7    A.  Yes.
8    Q.  And joining a Bid DT with other DT files
9  that have user-identifiable information causes a
10  privacy concern, doesn't it, sir?
11    A.  I would not agree with that.
12    Q.  Why not?
13    A.  As I explain later on in my report, even
14  if it was theoretically possible -- and first, there
15  is no evidence, I've looked at those files, that
16  this was possible.
17        But if even it was theoretically possible,
18  the publisher is simply identifying the user on
19  their own website.  The publisher already knows who
20  the user is.  So it is not user's privacy.
21    Q.  If you assume with me, Professor Shafiq,
22  that there's other user-identifiable information
23  besides just who the user is, that's contained in
24  the joinable data transfer files, would you agree
25  with me that it's a privacy concern?

Page 140

1    A.  Can you give me an example of what you
2  mean by "other user-identifiable" --
3    Q.  Any user-identifiable other than who the
4  user is, which is what you said the website already
5  knows.
6    A.  If the website already knows who the user
7  is, it does not matter.  For example -- sorry, can
8  you remind me what your name is?
9    Q.  I'm going to ask you a different question.
10        If the website doesn't know who the user
11  is or if it contains information that the website
12  doesn't already have, don't you agree with me that
13  joining Bid DT files with other DT files that have
14  user-identifiable information is a privacy concern?
15    A.  I'm disagreeing with your assumption that
16  you're asking me to make.  You cannot make that
17  assumption because the user is on the publisher's
18  website.  The publisher already knows who the user
19  is, can identify a user.
20    Q.  What if the user is not signed in?
21    A.  Sure.
22    Q.  Then it's a privacy concern.
23    A.  I would not agree with that, because there
24  is nothing in the bit data transfer files that would
25  reveal account holder information of the user.

Page 141

1    Q.  How do you know that?
2    A.  I've looked at the files.
3    Q.  Not in this case, though, sir; correct?
4    A.  I've looked at the files that are
5  available at the links at the site where Google
6  explains bit data transfer files, what is contained
7  in them.
8    Q.  What could be contained in them, not what
9  is contained in them.
10    A.  I mean, unless Google is lying in those
11  public-facing documents, I would think -- I think my
12  opinion is correct on that basis.
13    Q.  Well, you haven't actually looked at the
14  data, so you haven't confirmed your opinion;
15  correct?
16        MR. ROBINSON:  Objection; form.
17        THE WITNESS:  I've looked at the files and the
18  fields that are contained in those files.
19  BY MS. KLEIN:
20    Q.  In publicly available documents?
21    A.  That I cite in my report, Google
22  provides a list of fields to publishers.
23    Q.  But the list of field of publishers may
24  not have been the list of fields that was available
25  at this point in time, correct, because they're

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 142

1    different dates?
2        A.   As part of my assignment for this specific
3    opinion, I looked at the fields that existed in
4    2000 . . . just one . . . in 2019 and then the
5    changes that Google made and then the subsequent
6    change that Google made in 2024.
7        Q.   Now, the list that you considered includes
8    optional information; right?
9        A.   I will have to look at the document to be
10   able to reliably answer your question.
11       Q.   You don't know, as you sit here today,
12   whether the list included optional information?
13       A.   I will -- to be able to reliably answer
14   your question from memory, I have memorized every
15   single document that I've cited.  I will have to
16   look at the document.
17       Q.   Do you know who authored the document that
18   is Figure 1 in your report?
19       A.   Can you show me that document?  Because it
20   may contain -- I have not memorized who wrote that
21   document.
22       Q.   I don't have it with me.  I'd just like to
23   know if you know who authored it.
24       A.   There were a number of Google employees
25   that were contributing to that document.  I know

Page 143

1    that because the page right after the page that is
2    cited in Figure 2 of my report, it contained a list
3    of comments between different Google employees who
4    were contributing to this presentation.  And I have
5    not memorized their names or if -- how many there
6    were.
7            But that document would contain
8    information about who authored that document.
9        Q.   Now, you understand that ████████████
10   believed that there were privacy concerns; correct?
11       MR. ROBINSON:  Objection; form.
12       THE WITNESS:  That's correct.
13   BY MS. KLEIN:
14       Q.   ████████████ is a Google employee?
15       A.   I believe so.
16       Q.   He was a Google employee in 2019?
17       A.   Sitting here today, I do not recall from
18   memory whether he was a Google employee in 2019, but
19   I believe he was a Google employee at the time he
20   submitted his declaration, which I believe is
21   earlier this year.
22       MS. KLEIN:  Why don't we -- why don't we take a
23   break then.
24       THE VIDEOGRAPHER:  We're going off the record.
25   The time is 1:39.

Page 144

1        (Lunch recess was taken at 1:39 p.m.)
2    AFTERNOON SESSION          2:28 P.M.
3                - - -
4        THE VIDEOGRAPHER:  We're back on the record.
5    The time is 2:28.
6        (Deposition Exhibit 10 was marked.)
7        EXAMINATION RESUMED
8    BY MS. KLEIN:
9        Q.   Okay.  Professor Shafiq, we're back on the
10   record after a lunch break.
11           Is there anything you want to change or
12   clarify about your testimony?
13       A.   No.
14       Q.   Okay.  If you can reach over for Shafiq
15   Exhibit 10.  This is the declaration of ██████
16   ████████
17           And my question to you, is this the
18   declaration of ████████████ that you rely upon in
19   reaching your opinions in this case?
20       A.   I cite the declaration of ████████████.
21   Let me just make sure it is the same one.
22           Is this the same declaration that was
23   submitted Bates numbered GOOG 80 MDLC 000073682 or
24   it's a different one?
25       Q.   It's the same one.

Page 145

1        A.   Okay.
2        Q.   If you take a look at Exhibit 10, the
3    declaration of ████████████, when we were previously
4    discussing him, I asked if he was a Google employee
5    in 2019.
6            Do you see in paragraph 1 where it says,
7    "I have worked for Google for approximately 12
8    years"?
9        A.   Which paragraph are you pointing?
10       Q.   Paragraph 1, sentence 1.
11       A.   Yes.
12       Q.   Does that refresh your recollection that
13   ████████████ was employed by Google in 2019?
14       A.   Yes.
15       Q.   Thank you.
16           We talked before the break about the
17   Figure 1 on page 12 of your report which comes after
18   paragraph 30.  It's on the left side.
19           Do you see that?
20       A.   Yes, I can see that.
21       Q.   And you testified earlier that although
22   you understood that ████████████ believed that
23   privacy was an issue, you said in the document that
24   comprises Figure 1 that there were other employees
25   who were saying that privacy was not a concern to

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 146

1  them.
2      Do you recall that testimony?
3      A.  I believe I discussed -- or described that
4  in that presentation, the employees were discussing
5  how the change needs to be messaged as to protect
6  user privacy, rather than what the change was
7  actually about.
8      Q.  Do you have any particular skill that I or
9  the judge doesn't have that allows you to interpret
10  the document?
11     MR. ROBINSON:  Objection; form.
12     THE WITNESS:  I'm a computer science professor.
13  I'm a scientist.  The topics at hand here deal with
14  technical issues surrounding data and advertising.
15  So I believe I'm relying on my background as a
16  computer scientist to opine on this issue.
17  BY MS. KLEIN:
18     Q.  Right.
19         But being a computer scientist doesn't
20  require -- well, reading a document and seeing what
21  people say about it doesn't require any special
22  skill beyond being able to read; right?
23     A.  It depends on what is in the document.  If
24  the document talks about technical concepts, as for
25  example, this particular document and the

Page 147

1  surrounding documents are, I think if you just pick
2  a person randomly walking on the street and show him
3  this document, I don't think that person will be
4  able to fully understand what that document is
5  talking about.
6      Q.  And that's the only skill, in addition --
7  reading the technical aspects of the document that
8  you had?
9      MR. ROBINSON:  Objection; form.
10     THE WITNESS:  And my background and training
11  and my decades of experience as a computer scientist
12  and then more precisely, for the last decade plus,
13  doing research on online advertising specifically.
14  BY MS. KLEIN:
15     Q.  If you look at paragraph 29 of your report
16  which is on the preceding page to the one you're
17  looking at, you say, "Google's explain" -- I'm sorry
18  -- "Google's unexplained about-face shows that
19  privacy was not a legitimate justification for the
20  redactions to the BDT files."
21         Do you see that?
22     A.  Yes.
23     Q.  Isn't that another way of saying that it's
24  a pretext?
25     MR. ROBINSON:  Objection; form.

Page 148

1      THE WITNESS:  I'd have to think about this, but
2  I did not use the term pretext.  Like I said
3  earlier, Dr. Gans, I believe, used that term.
4  BY MS. KLEIN:
5      Q.  Right.  But isn't saying "not a legitimate
6  justification" the same thing as saying a pretext?
7      A.  I'm hesitating to answer because I want to
8  make sure if there is a legal definition of the word
9  "pretext."  These are not the words I used.  I would
10  want to stick to the words that I used.
11     Q.  But you have a knowledge of -- the
12  understanding of what the word pretext means; right?
13     A.  As a general level, yes.
14     Q.  And it means there's a reason given that's
15  not a legitimate justification; right?
16     A.  I don't know.  I don't want to offer an
17  opinion about a term that may have a specific legal
18  meaning.  I'm simply describing and I stand by my
19  words, which are that my research and analysis of
20  all the evidence that I've looked at shows that
21  privacy was not a legitimate justification.
22     Q.  You don't agree with me that you're saying
23  the same thing as Dr. Gans, just coming from a
24  different angle?
25     MR. ROBINSON:  Objection; form.

Page 149

1      THE WITNESS:  I think I can at least agree that
2  I'm not disagreeing with Dr. Gans.
3  BY MS. KLEIN:
4      Q.  Do you agree with Dr. Gans?
5      A.  Yes.
6      Q.  And your opinion is further support for
7  Dr. Gans' opinion?
8      A.  The context of my opinion here is that
9  Dr. Gans offered an opinion and then Google's expert
10  said something to the effect of, like, Google's
11  conduct, which was the redaction of bit data
12  transfer files was justified by privacy concerns.
13  So in that context is where I'm providing an opinion
14  here.
15     Q.  Your opinion is that same as Dr. Gans,
16  just from a different angle?
17     MR. ROBINSON:  Objection; form.
18     THE WITNESS:  My understanding is that
19  Dr. Gans' opinion is -- and his set of opinions are
20  far beyond what I am opining on in my report.  I'm
21  simply responding to Google experts' response to
22  Dr. Gans' opinion that user privacy was a
23  justification for Google to redact bit data transfer
24  files.
25  BY MS. KLEIN:

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 150

1  Q.  Footnote 40 from paragraph 29 is -- looks
2  like an analogy that you came up with; correct?
3  A.  That's correct.
4  Q.  And the analogy says, "Simply put, the
5  situation is akin to a parent restricting their
6  children from playing in the backyard.  Imagine a
7  parent who tells their children that they must not
8  play in the backyard because it is dangerous.  The
9  children accept this reasoning at face value and
10  adhere to the parent's directive.  However, a week
11  later, the parent suddenly asks the children to play
12  in the backyard without any explanation to
13  previously mentioned danger.  The children are left
14  wondering whether the parent's concerns about the
15  backyard were valid."
16      Is that correct?
17  A.  Yes.
18  Q.  There are reasons why parents would tell
19  their children that the backyard is dangerous and
20  they can't play in it for a day, aren't there?
21  A.  Can you clarify what you mean by parents
22  will tell children or not tell children?  What are
23  the words you used?
24  Q.  Your analogy is a parent tells the
25  children that they can't play in the backyard

Page 151

1  because it's dangerous; right?
2  A.  Yes.
3  Q.  I live in the northeast and Lyme disease
4  is a huge concern.  You understand that; right?
5  A.  Yes.
6  Q.  And therefore, three times a summer, I
7  spray my backyard for ticks with chemicals.
8      Have you ever done that?
9  A.  No.
10  Q.  And the chemicals that I spray my backyard
11  with are poisonous.  So on those days, I will tell
12  children not to play in my backyard because it's
13  dangerous.
14      Do you understand that?
15  A.  I mean, making sense to me.  Sure, go
16  ahead.
17  Q.  So just because later, I would allow
18  children to play in my backyard doesn't mean that
19  what I said earlier is not a legitimate
20  justification; right?
21  A.  But all I'm simply opining in this analogy
22  is Google is treating publishers as children and not
23  giving them justification about why Google reverted
24  its stance.
25  Q.  Not a justification that you agree with,

Page 152

1  but there could be one that Google thought was
2  appropriate; right?
3      MR. ROBINSON:  Objection; form.
4      THE WITNESS:  I -- in this part of my report, I
5  am looking at the reports of Google's experts, as
6  well as M▮▮▮▮▮▮▮declaration, and I've not
7  seen any justification there.  I've looked at the
8  public documents.  I've not seen any evidence in
9  those public documents.
10  BY MS. KLEIN:
11  Q.  Could you change your mind if you saw
12  other justifications?
13  A.  I will have to look at the evidence that
14  you present to me and then analyze it, put it in the
15  context of everything else that exists, and then I
16  will offer an opinion, if counsel asks me to offer
17  an opinion.
18  Q.  Is it possible there could be more than
19  one reason for a product decision?
20  A.  All I am opining on in this section of my
21  report is that nothing that I've seen in evidence
22  that is pointed by Google's experts and ▮▮▮▮▮
23  would justify that change in the name of user
24  privacy.
25  Q.  But it's possible that there could be more

Page 153

1  than one reason for a product decision?
2      MR. ROBINSON:  Objection; form.
3  BY MS. KLEIN:
4  Q.  Right?
5  A.  There could be, yes.
6  Q.  We talked earlier about -- paragraph 33 of
7  your report.  Let's start, actually, with paragraph
8  32 of your report.  You said, paragraph 32, "After
9  Google implemented the redactions, Google's internal
10  correspondence shows that it received complaints
11  from publishers who 'weren't completely convinced
12  with the user privacy protection narrative.'"
13      Did I read that correctly?
14  A.  Yes.
15  Q.  And then you say in paragraph 33, "The
16  lack of justification for Google's BDT file
17  redactions along with cited evidence--including
18  Google's internal reference to its messaging as a
19  'narrative'--indicates that Google's true intention
20  for the BDT file redactions was not to protect user
21  privacy."
22      Did I read that correctly?
23  A.  That's correct.
24  Q.  And so you're inferring that the word
25  "narrative" has a negative connotation; right?

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 154

1     A.  I am also looking at the full scope of the
2  document where Google employees discuss whether or
3  not there were actually legitimate privacy concerns.
4  And in the absence of that and then combined with
5  this messaging that I explain here in this part of
6  my report, that's when I am reaching the conclusion
7  the intention was not to protect user privacy.
8         Like we discussed earlier, there might be
9  other reasons, but it is at least not to protect
10 user privacy.
11    MS. KLEIN:  Objection; nonresponsive and move
12 to strike.
13 BY MS. KLEIN:
14    Q.  My question, sir, was you're inferring
15 that the word "narrative," as used in the document,
16 has a negative connotation; correct?
17        You said, "including Google's internal
18 reference to its messaging as a 'narrative.'"  You
19 were inferring that using the term "narrative" has a
20 negative connotation; correct?
21        (Witness reviews document.)
22    A.  Yeah, "narrative" is the term that is used
23 by Google employees in their document that I cite in
24 the previous paragraph.  And you can see here that
25 their -- the Google employee who is describing that

Page 155

1  exchange with publishers is that Google was not able
2  to convince publishers with its user privacy
3  protection narrative.
4     MS. KLEIN:  Objection; nonresponsive and move
5  to strike.
6  BY MS. KLEIN:
7     Q.  My question, sir, is you're inferring that
8  the word "narrative," as used in the document, has a
9  negative connotation; correct?
10    A.  I'm simply using the word that was used by
11 a Google employee.
12    Q.  And you don't know how the Google employee
13 was using that narrative because, as we established,
14 you're not a mind reader; right?
15    MR. ROBINSON:  Objection; form.
16    THE WITNESS:  I am using the word as it was
17 used by Google employee --
18 BY MS. KLEIN:
19    Q.  You don't --
20    A.  -- that they created a narrative.
21    Q.  And you're inferring "narrative" has a
22 negative connotation?
23    A.  Because based on all the evidence, that
24 narrative is not supported by facts.
25    Q.  So your conclusion is the word "narrative"

Page 156

1  was a story that's not supported by facts.
2         Is that your interpretation of the word
3  "narrative" in this context?
4     MR. ROBINSON:  Objection; form.
5     THE WITNESS:  The user privacy narrative was --
6  is not backed up by the evidence that I've seen in
7  this case.
8  BY MS. KLEIN:
9     Q.  Sir, my question to you, and you haven't
10 answered it is, are you inferring that "narrative"
11 has a negative connotation in this context, yes or
12 no?
13    A.  I'm simply trying to -- let me restart.
14    Q.  No, sir, I don't want you to restart.  I
15 want you to answer my question.
16    MR. ROBINSON:  Counsel --
17 BY MS. KLEIN:
18    Q.  Are you inferring --
19    MR. ROBINSON:  -- I think he's attempting to
20 answer the question.
21    MS. KLEIN:  No, he's not.
22        (Cross-talk.)
23    MS. KLEIN:  I'm sorry.  I've asked this --
24        (Cross-talk.)
25    MS. KLEIN:  You can only say objection; form,

Page 157

1  sir.
2     MR. ROBINSON:  Can you let the witness
3  finish --
4     MS. KLEIN:  No, I cannot.
5         (Cross-talk.)
6     MS. KLEIN:  I want him to answer my question.
7     MR. ROBINSON:  Well, you don't know because
8  you're interrupting him.  He may --
9     MS. KLEIN:  I have asked my question four times
10 now and he hasn't answered it.
11    MR. ROBINSON:  Professor Shafiq, please
12 finish --
13    MS. KLEIN:  This is a "yes" or "no" question.
14    MR. ROBINSON:  -- please finish your answer
15 where you were at.
16 BY MS. KLEIN:
17    Q.  Professor Shafiq, this is a "yes" or "no"
18 question.
19        Are you inferring that "narrative" has a
20 negative connotation, yes or no?
21    A.  The context in which that word exists, I
22 describe that the facts do not support the
23 narrative, hence the narrative is false.  In that
24 sense, you could say that I'm using the word
25 "narrative" in a negative sense.

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 158

1    Q.  But the definition of the word "narrative"
2  does not include falsity, so it's an assumption that
3  you're making from reading the documents and
4  inferring intent; correct?
5    MR. ROBINSON:  Objection; form.
6    THE WITNESS:  I'm not making an assumption, I'm
7  objectively evaluating all the facts, and based on
8  the totality of facts, I'm offering the opinion that
9  there was no user privacy justification.  Like we
10  discussed, this is exactly my opinion, that Google
11  had no legitimate privacy concern to redact fields
12  in BDT --
13    (Reporter seeks clarification.)
14    THE WITNESS:  -- privacy concern to redact
15  fields in BDT files.
16    So that's the context in which this
17  statement is happening, so it's not some assumption
18  that I made.  I did a careful analysis of various
19  technical documents, all the evidence that I cite
20  and describe in this part of my report.
21  BY MS. KLEIN:
22    Q.  My question to you --
23    MS. KLEIN:  Objection; nonresponsive and move
24  to strike --
25  BY MS. KLEIN:

Page 159

1    Q.  -- is that the word "narrative" -- the
2  definition of the word "narrative" does not include
3  falsity, as that word is commonly used; right?
4    MR. ROBINSON:  Objection; form.
5    THE WITNESS:  Yeah, it depends on the context
6  in which the word "narrative" is used.  Is it a true
7  narrative or is it a false narrative?
8  BY MS. KLEIN:
9    Q.  Right.  And the document doesn't say "true
10  narrative" or "false narrative," it just says
11  "narrative."  So you're inferring negative intent
12  from your read of the documents; correct?
13    MR. ROBINSON:  Objection; form.
14    THE WITNESS:  The word "narrative" as it is
15  used in paragraph 33 of my report comes with all the
16  context that precedes it in that same paragraph.
17  BY MS. KLEIN:
18    Q.  My question to you, sir --
19    MS. KLEIN:  Objection; nonresponsive and move
20  to strike --
21  BY MS. KLEIN:
22    Q.  -- is that the document doesn't say a
23  "true narrative" or a "false narrative," so you are
24  inferring negative intent from your read of the
25  document; correct?

Page 160

1    MR. ROBINSON:  Objection; form.
2    THE WITNESS:  My use of the word "narrative"
3  here in air quotes is informed by my analysis of all
4  the evidence that I have discussed in that whole
5  section of my report where I have reached the
6  conclusion that user privacy was not a legitimate
7  justification.
8    So in that context, I am essentially
9  reaching the conclusion that the narrative here was
10  a false narrative.
11  BY MS. KLEIN:
12    Q.  And that the person who wrote "narrative"
13  was intending narrative as a false narrative; right?
14    MR. ROBINSON:  Objection; form.
15    THE WITNESS:  These are not the words that I
16  used.
17  BY MS. KLEIN:
18    Q.  No, it's what you're saying he was using,
19  that the use of the term "narrative" in messaging
20  meant that its true intention was something
21  different.
22    So you're saying the use of the word
23  "narrative" meant false narrative.  You're inferring
24  intent; right?
25    A.  Those are not the words that I'm using.

Page 161

1  I'm not opining on that specific thing in this
2  section of my report.
3    Q.  You're not opining on whether "narrative"
4  was meant as true or false; they just used the word?
5    MR. ROBINSON:  Objection; form.
6    THE WITNESS:  "Narrative" and "messaging" is
7  the word that Google employees used.  I am simply
8  providing context to the word that the narrative was
9  a false narrative.
10  BY MS. KLEIN:
11    Q.  How can you provide false --
12    (Reporter seeks clarification.)
13    MS. KLEIN:  That's what he said, yes, that the
14  narrative is a false narrative.
15    THE WITNESS:  Yes, I think so.
16  BY MS. KLEIN:
17    Q.  Did you speak with any Google employees in
18  developing your opinions?
19    A.  No.
20    Q.  Did you speak with the author of the
21  document?
22    A.  No.
23    Q.  Do you know who is the employee that used
24  the word "narrative"?
25    A.  If you can show me that document -- like I

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 162

1  mentioned, the next page of this document seems to
2  contain back and forth between different Google
3  employees and it may contain the names.  I have not
4  memorized their names.
5      Q.  As you sit here today, do you know who it
6  was or did you consider his or her position when you
7  were developing your report?
8      MR. ROBINSON:  Objection; form.
9      THE WITNESS:  I considered the document, which
10  included, I believe, the identities of some, if not
11  all, of the employees who were part of this
12  document.  But I have not memorized their name.
13  BY MS. KLEIN:
14      Q.  Did you undertake an analysis of the
15  position of the person who used the term "narrative"
16  before you wrote your report?
17      MR. ROBINSON:  Objection; form.
18      THE WITNESS:  Sitting here today, I cannot
19  perfectly recall from memory.
20  BY MS. KLEIN:
21      Q.  Do you recall in the document if any of
22  the employees thought there was a security concern?
23      A.  That does not ring a bell.
24      Q.  In paragraph 35 of the report, it goes to
25  your opinion that open bidding is not better than --

Page 163

1  better than -- excuse me.
2          Paragraph 35 goes to your opinion that in
3  terms of privacy open bidding is not better than
4  header bidding.
5          Do you see that?
6      A.  Yeah, that paragraph talks about my
7  opinion that in terms of privacy, open bidding is
8  not better than header bidding.
9      Q.  And you say at the end of paragraph 35
10  that both header bidding and Google's open bidding
11  send bid requests with similar --
12          (Reporter seeks clarification.)
13      Q.  You say at the end of paragraph 35 that
14  both header bidding and Google's open bidding send
15  bid requests with similar data fields to bidders.
16          Do you see that?
17      A.  Yes.
18      Q.  There's no citation to that section.
19          Do you see that?  To that sentence?
20      A.  That sentence does not have a citation.
21      Q.  And as we discussed before, while you
22  reviewed publicly available information, you did not
23  undertake an analysis of bid requests and what
24  header fields -- excuse me, what data fields were
25  sent in them; correct?

Page 164

1      MR. ROBINSON:  Objection; form.
2      THE WITNESS:  I would not agree with that.
3  BY MS. KLEIN:
4      Q.  Did you compare data fields as used in the
5  actual program?
6      A.  Yes.
7      Q.  But you didn't look at Google's programs
8  when you were developing this report, so you're
9  basing it on publicly available documents; correct?
10      A.  So these protocols are what is also called
11  open source protocols.  The description of different
12  fields is publicly available.  This is true for
13  Google's RTB.  This is also true for header bidding.
14          (Reporter seeks clarification.)
15      A.  Header bidding.  And I cite that in early
16  part of this paragraph.
17      Q.  Those are the fields that are available;
18  correct?
19      A.  The document that -- for example, the
20  document that I cite in 56, if my memory serves me
21  correctly, this lists all the fields that are used
22  in Google's RTB, including open bidding.
23      Q.  Those are fields that are available for
24  use in RTB open bidding; correct?
25      A.  The documentation goes into more details

Page 165

1  of which fields are used, which fields are no longer
2  used, so there is more context in that document.
3      Q.  And so while the data fields could be
4  similar, they're not the same; correct?
5      A.  When I did the analysis, I cannot recall
6  what, if any, differences existed.  But if my memory
7  serves me correctly, there was no meaningful
8  difference that was worth pointing out in the
9  context of the opinion of Dr. Ghose.
10      Q.  And how did you do this analysis in
11  particular?
12      A.  I looked at what Dr. Ghose was describing.
13  He was describing, if I remember correctly -- I
14  probably cite this.
15          (Witness reviews document.)
16      A.  Yes.  Yes.
17          So I did this analysis on the -- based on
18  what Dr. Ghose was describing in this part of his
19  report.  He was, I believe, talking about sharing of
20  user identifiers.
21          I did an analysis of the fields that are
22  shared in open bidding, and I, for example, cite the
23  document where Google lists all the fields that are
24  used in open bidding.
25          And I -- as I explain here in this part of

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 166

1  my report that Google shares, for example, user IDs
2  in cookies, the location information of the user,
3  the URL and there are, I think, hundreds of other
4  fields, so I did not list every single one of them.
5       But the conclusion that I reached is they
6  have similar data fields.  So these privacy concerns
7  that Dr. Ghose is trying to suggest that are
8  applicable to header bidding, that's not a unique
9  concern to header bidding.  Google's open bidding
10  is -- suffers from the same potential privacy
11  concerns.
12     Q.  You didn't look at the source code of open
13  bidding to determine how these fields are
14  transmitted; correct?
15     A.  I did not look at the source code for the
16  purposes of my report.
17     Q.  And you did not look at the source code to
18  determine how Google's open bidding data fields are
19  transmitted; correct?
20     A.  I looked at Google's documentation where
21  Google explains in great detail how different data
22  fields -- what they are, how they are transmitted,
23  what is contained in them, how to use them.  All of
24  that information is available in the documentation.
25       You don't need to look at source code.

Page 167

1  Source code will give you the same information that
2  the documentation would give you, unless the
3  documentation is wrong.
4     Q.  And you didn't undertake an analysis to
5  see whether the open bidding documentation was
6  wrong; correct?
7       MR. ROBINSON:  Objection; form.
8       THE WITNESS:  The documentation that I analyzed
9  from Google's public-facing documentation of
10  real-time bidding and open bidding, I assume Google
11  was truthful in its representations.
12  BY MS. KLEIN:
13     Q.  And you didn't undertake an analysis to
14  see whether the header bidding documentation was
15  wrong; correct?
16       MR. ROBINSON:  Objection; form.
17       THE WITNESS:  My answer would be the same here.
18  But the context I just want to provide here is,
19  like, in my research I study real-time bidding.
20  I've written a number of papers about these topics.
21  Nothing that I've seen in these documents
22  contradicts my understanding that I've developed
23  over the past many, many years based on my research
24  and study of real-time bidding, header bidding and
25  so on.

Page 168

1  BY MS. KLEIN:
2     Q.  There's a lawsuit pending against Google
3  relating to real-time bidding and consumer privacy;
4  correct?
5     A.  Can you refresh my memory and point me to
6  the specific [inaudible]?
7     Q.  Sure.
8       You serve as an expert witness in a
9  lawsuit called In re Google RTB Consumer Privacy
10  Litigation, don't you?
11     A.  I do.
12     Q.  Okay.  Is there a reason why you wouldn't
13  just agree with me and you made me say the full name
14  of the case?
15       MR. ROBINSON:  Objection; form.
16       THE WITNESS:  I'm not sure if there are
17  multiple cases against Google surrounding real-time
18  bidding.
19  BY MS. KLEIN:
20     Q.  And you submitted a declaration in support
21  of class certification related to that case, didn't
22  you?
23     A.  I submitted a report in that case.
24     Q.  And there was an opinion issued in that
25  case related to your report in April of this year;

Page 169

1  right?
2     A.  I don't know.
3     Q.  Never read the opinion?
4     A.  I don't know.
5     Q.  Are you aware that the judge said that
6  your opinion was insufficiently developed?
7     A.  I don't know.
8     Q.  You've never read the opinion?
9     A.  No.
10     Q.  Why not?
11     A.  This is not something that I do.  I'm a
12  researcher.  My job is to do technical research as
13  part of my job as a professor, as an academic.  And
14  then I do write expert reports offering technical
15  opinions, but I don't routinely wake up and start
16  reading legal documents and audit is the term I
17  think you used.
18     Q.  Are you aware in the TikTok case that the
19  judge found that your opinions were misleading?
20     A.  What's the question?
21     Q.  I said are you aware in the TikTok case
22  that the judge found that your opinion was
23  misleading?
24     A.  I'm not aware of that.
25     Q.  You don't care.

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 170

1    MR. ROBINSON: Objection; form.
2    THE WITNESS: Can you show me the document?
3    BY MS. KLEIN:
4    Q. Sure.
5    (Deposition Exhibit 11 was marked.)
6    THE WITNESS: Do you want me to read the whole
7    document or . . .
8    BY MS. KLEIN:
9    Q. I can point you to it if you'd like. It's
10   on the second page, the opinion. Next to the part
11   that says star 3, it says, [as read] "Plaintiffs
12   cite to Dr. Shafiq's statement in his rebuttal
13   report that '100 percent of the unmatched rows in
14   (the sample of data collected by the Pixel that he
15   analyzed) contained a hashed e-mail address, hashed
16   phone number, or one of the three types of cookies."
17   Do you see that?
18   A. Yes, I'm reading that paragraph. And then
19   what should I read?
20   Q. The -- at the last sentence of the
21   paragraph, it says, "Thus, saying that 100 percent
22   of unmatched data contains phone numbers, e-mail
23   addresses, or cookies is misleading as to the
24   prevalence of PII given that at most 1.3 percent of
25   the data contains phone numbers or e-mail

Page 171

1    addresses."
2    A. That's what the document says.
3    Q. Right. So the judge found that your
4    opinion was misleading.
5    A. I think you're reading the document wrong.
6    MR. ROBINSON: Professor Shafiq, I just want to
7    remind you that if you want to --
8    MS. KLEIN: I'm going to --
9    MR. ROBINSON: -- review greater portions of
10   the document to understand the context, you may.
11   MS. KLEIN: I'm going to object to the coaching
12   of the witness and not complying with the Eastern
13   District of Texas rules that require you to be
14   limited to saying, "Objection; form."
15   MR. ROBINSON: It's not coaching the witness to
16   get -- to tell him he has the right to review a
17   document he's being shown for the first time.
18   MS. KLEIN: He's been shown a lot of documents
19   for the first time today, sir. You are coaching the
20   witness, and it's inappropriate.
21   MR. ROBINSON: And you've allowed him to review
22   portions of the context of the new document.
23   (Cross-talk.)
24   MR. ROBINSON: This is a common courtesy that
25   is extended. When I deposed Google's fact

Page 172

1    witnesses, I gave them that same right when I put
2    new documents in front of them. It is a --
3    MS. KLEIN: I have not said that he doesn't
4    need to read it. I gave it to him.
5    MR. ROBINSON: Then we agree on that --
6    MS. KLEIN: I gave him plenty of time.
7    MR. ROBINSON: -- and now he's reviewing it.
8    MS. KLEIN: Well, I'm done with my question, so
9    he doesn't need to review it.
10   BY MS. KLEIN:
11   Q. You can put that aside, sir.
12   A. To clarify my answer to your question was,
13   your representation --
14   Q. No, sir.
15   A. -- of that statement was wrong.
16   Q. No, sir.
17   Your next opinion is that -- starts on
18   page 15 of your report in between paragraphs 36 and
19   37. It says, [as read] "Google has a substantial
20   data advantage over its competitors that reinforces
21   through privacy-related justifications."
22   Do you see that?
23   A. Yes.
24   Q. What is your understanding of who Google's
25   competitors are in this case?

Page 173

1    A. For example, one of the things as I
2    understand is alleged in this case is Google offers
3    a product as an ad exchange and there exist other
4    exchanges or exchange products. For example, we
5    were talking about header bidding.
6    Q. Can you name any other competitors?
7    A. So header bidding, for example, can be
8    offered by any number of companies. It's an open
9    standard.
10   Q. Do you have an understanding as to whether
11   Amazon is a competitor of Google's in the
12   advertising technology industry?
13   A. It is my understanding that Amazon offers
14   header bidding, if I remember correctly.
15   Q. So you agree with me that Amazon's a
16   competitor to Google?
17   A. I'm not offering any opinion in this case
18   about who Google is competing with in the context of
19   this specific opinion. I'm talking about Google's
20   data collection and data collection by other
21   companies at large, and I'm simply enumerating, from
22   peer-reviewed research and other data that is
23   available, how does Google's data collection compare
24   to other companies.
25   Q. Do you have an understanding as to who

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 174

1  Google's competitors are in this case, yes or no?
2      A.  I think I gave you an example.
3      Q.  I understand that.  I'm asking -- you said
4  Google has a substantial data advantage over its
5  competitors.
6      A.  Yeah.
7      Q.  And I want to know who are those
8  competitors that you're referring to here, sir?
9      A.  So in the context of the previous example,
10  it would be, for example, any company that offers an
11  ad exchange.  For example, there are companies
12  like -- if I remember correctly, Index Exchange is
13  one company that offers an ad exchange product that
14  you could say is another product similar to Google
15  AdX that could be called competition, not in a legal
16  sense, but --
17          (Reporter seeks clarification.)
18      A.  Called a competitor, but not in a legal
19  sense because I'm not offering any legal opinions
20  about competitors or competition in this matter.
21      Q.  Except you're opining as to Google's data
22  advantage over its competitors.  If you don't know
23  who the competitors are, sir, how can you opine that
24  Google has a data advantage over its competitors?
25      MR. ROBINSON:  Objection; form.

Page 175

1      THE WITNESS:  Google's expert, Dr. Ghose, there
2  in that part of his report, is offering how Google
3  has -- he's describing Google's data collection and
4  then compare it -- compares it to its competitors.
5      So in that context, in the later part of
6  this section, I outline various Google products and
7  services and where applicable, I'm also listing
8  other companies who collect similar data.
9      And then I'm doing a comparison whether or
10  not Google has access to more data than its other
11  competitors.
12  BY MS. KLEIN:
13      Q.  Who are the other competitors, though,
14  sir?  I need to understand, if you have an
15  understanding, as to who the competitors are in this
16  case.
17      A.  Let me give you a precise --
18      MR. ROBINSON:  Objection; form.
19  BY MS. KLEIN:
20      Q.  Names of companies, please.
21      A.  Let me give you a precise example.
22  Paragraph 41, subparagraph C, sub-subparagraph 2,
23  there I am giving an example by comparing Google's
24  data collection as compared to Facebook, Meta, for
25  instance.

Page 176

1      Q.  So you consider Meta a competitor for
2  purposes of your report?
3      A.  Google collects data as a third party on
4  various websites.  Meta also collects data as a
5  third party on different websites.
6      As I explain here in this part of my
7  report, Google collects -- this is a peer-reviewed
8  research that shows that Google collects data from
9  72.33 percent of the websites.  And Google's
10  coverage, in terms of third-party data collection,
11  is 2.7 times more than Meta.
12      Q.  My question to you, sir --
13      MS. KLEIN:  Objection; nonresponsive and move
14  to strike.
15  BY MS. KLEIN:
16      Q.  -- was, do you consider Meta a competitor
17  for purposes of your report?
18      MR. ROBINSON:  Objection; form.
19      THE WITNESS:  In the context of this opinion,
20  Google offers a product using which it collects data
21  as a third party from users on non-Google websites.
22      Facebook also offers a similar product.
23  In the context of this comparison, I am identifying
24  Meta as a potential competitor.  But again, I want
25  to caution, I'm not using the word "competitor" or

Page 177

1  "competition" in a legal sense.
2  BY MS. KLEIN:
3      Q.  You say "potential competitor."
4          Is it a competitor or not for purposes of
5  your report?
6      A.  In the context of this sentence, I'm
7  considering it a competitor.
8      Q.  And in the context of your report, are you
9  considering Amazon, who also collects data on
10  websites, as a competitor to Google?
11      A.  All of these papers, they enumerate the
12  names of all companies that engage in data
13  collection on the web.  It is my understanding that
14  those companies include, but are not limited to,
15  companies like Index Exchange, OpenX, Amazon,
16  Facebook, so on and so forth.
17      Q.  Do you consider any competitors for
18  purposes of your report that don't have an ad
19  exchange?
20      A.  Sitting here today, I do not perfectly
21  recall from memory whether and which of those
22  companies have or not have an ad exchange.  I'll
23  have to consult the documents to be able to more
24  reliably answer your question.
25      Q.  In addition to Meta, Index Exchange,

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 178

1  OpenX, Amazon, and Facebook, is TikTok a competitor?
2      A.  This is not something that I'm opining
3  about in my report.
4      Q.  That TikTok is a competitor or who the
5  competitors are?
6      MR. ROBINSON:  Objection; form.
7      THE WITNESS:  The general question, who the
8  competitors are.  Because that question requires
9  context, would require me to carefully look at the
10  documents that I'm citing.  I did not list here
11  TikTok as a company that is described in these
12  papers.
13  BY MS. KLEIN:
14      Q.  Does TikTok collect data about its users?
15      A.  Yes.
16      Q.  TikTok collects data generally?
17      A.  My response to your question was generally
18  every company collects data.  That's a true
19  statement.
20      (Reporter seeks clarification.)
21      MR. ROBINSON:  Do you agree with that, Zubair?
22  Do you agree with that testimony?
23      THE WITNESS:  Can you please repeat?  Who was
24  reading?
25  BY MS. KLEIN:

Page 179

1      Q.  I was -- I was repeating that you said
2  every company collects data.  That's a true
3  statement.
4          Is that what you just said?
5      A.  Yes.
6      Q.  Dr. Shafiq, your opinion in this section
7  is that Google has a substantial data advantage over
8  its competitors that Google reinforces through
9  privacy-related justifications.
10         Now, my question to you is, if you cannot
11  name who the competitors are, how am I supposed to
12  evaluate whether your statement is true or not?
13      MR. ROBINSON:  Objection; form.
14      THE WITNESS:  I disagree with your
15  representation.  I think I just gave you names of a
16  bunch of Google's competitors.  And if you read
17  these research papers, these papers list all the
18  other companies that are studied who are collecting
19  data from consumers in various ways.
20  BY MS. KLEIN:
21      Q.  And so some of the companies that you
22  consider competitors are competitors in the ad tech
23  space; right?
24      A.  It seems to me that you are going to
25  complete your sentence.

Page 180

1      Q.  No, that was my question.
2          Some of the companies that you consider
3  competitors are competitors in the advertising
4  technology space; correct?
5      A.  Yeah.  I think, for example, we discussed
6  Index Exchange and OpenX.  Those are companies who
7  collect -- who have an ad exchange or had an ad
8  exchange, I'm forgetting, but they also collect data
9  as a third party, just as Google does.
10         And a number of other tech companies also
11  collect data from consumers as a third party.  My
12  opinion in this section of my report simply is that
13  Google collects far more data.
14         Essentially if you go to any website,
15  there is a 70 to 80 percent probability that Google
16  is collecting data from you on that website, and
17  Google's coverage of users' browsing history is far
18  greater than any other company that has been studied
19  in peer-reviewed research.
20      MS. KLEIN:  Objection; nonresponsive and move
21  to strike.
22  BY MS. KLEIN:
23      Q.  My question to you, sir, was, some of the
24  companies that you consider competitors are in the
25  advertising technology space; correct?

Page 181

1      A.  You want me to repeat my answer?  Because
2  I think I answered your question and then added some
3  more context.
4      Q.  You never said yes or no.
5          Are some of the competitors that you
6  listed in the advertising technology space?
7      A.  Can you please rephrase your question?
8      Q.  Yes.
9          Are some of the competitors that you
10  listed, as we were discussing, competitors to Google
11  in the advertising technology space?
12      A.  In this part of my report, I am describing
13  research papers that generally study data collection
14  by tech companies, including Google, and some of
15  those companies, such as OpenX, offer an ad exchange
16  product, which would be a competitor to Google's ad
17  exchange.
18      Q.  And some of the companies may be
19  competitors, but not in the ad exchange world;
20  correct?
21      A.  Yes.
22      Q.  Did you do any independent research to
23  confirm the findings -- I'm sorry, the opin -- the
24  findings of the papers that you cited in this
25  section of your report?

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 182

1    A.  Yes.  These are the papers that I am very
2    familiar with.  I have looked at the underlying data
3    of some of those papers.  This is I think what we
4    were discussing earlier in the report.
5        I teach classes on online tracking and
6    advertising, and as part of that, I've taught these
7    papers and I've conducted or reproduced parts of
8    these papers, so I'm very intimately familiar with.
9        And as you can see, all of these papers,
10   there is broad consensus as to what the results of
11   this study is, that Google is by far the most
12   omnipresent third-party tracker on the web.
13       Q.  Did you look at any data that Google
14   produced in the case in this section of your report?
15       A.  You're talking about Section 4 broadly or
16   you're talking about just paragraph 41?
17       Q.  Paragraph 41.  Did you look at any of
18   Google's data to try to confirm your opinions in
19   paragraph 41?
20       A.  Here I am -- no, here I am relying on
21   peer-reviewed research, as well as other publicly
22   available reports about the market share of Google's
23   products and services.
24       Q.  We talked a little bit earlier about your
25   paper regarding Amazon Alexa.

Page 183

1        Do you recall that?
2        A.  Yes.
3        Q.  Amazon collects data from the Amazon Alexa
4    speakers; correct?
5        A.  Yes.
6        Q.  It also collects data from its website?
7        A.  I've not recently conducted a study of
8    Amazon's website, but based on my general
9    understanding, I think it's fair to assume that
10   Amazon collects some data from users who use
11   Amazon's website, just like Google collects data
12   from users who use Google's website.
13       THE REPORTER:  If we can take a break.
14       MS. KLEIN:  Sure, let's take a break.
15       THE VIDEOGRAPHER:  We're going off the record.
16   The time is 3:18.
17       (Recess taken.)
18       THE VIDEOGRAPHER:  We're back on the record.
19   The time is 3:38.
20       MR. ROBINSON:  At this time, Professor Shafiq
21   would like to make some clarifications to his
22   previous testimony.
23   BY MS. KLEIN:
24       Q.  Dr. Shafiq, we're back on the record after
25   a short break.

Page 184

1        Is there anything you want to clarify
2    about your prior testimony?
3        A.  Yes.
4        Q.  What is that?
5        A.  I just want to clarify that when you were
6    asking me questions about who Google's competitors
7    are, I was not offering a legal opinion about who
8    Google's competitors are.
9        In the part of my report where I'm talking
10   about -- I'm listing various competitors, these are
11   other companies who, for example, in paragraph 40,
12   Subsection C, these are the companies who collect
13   data as a third party, just as Google.
14       And the research papers that I'm citing,
15   they discuss companies, including Google and other
16   companies, such as Facebook, Microsoft, Amazon, and
17   we discussed Index Exchange and OpenExchange that
18   also collect data as a third party from consumers.
19   So I just want to clarify that.
20       Q.  And you decided you wanted to make this
21   clarification after we just took a 10-minute break
22   and you had the opportunity to discuss your
23   testimony with your counsel?
24       A.  Is there a question?
25       Q.  Yes.

Page 185

1        You decided you wanted to make this
2    clarification after we took a 10-minute break and
3    you decided you wanted to -- and you had an
4    opportunity to discuss your prior testimony with
5    your counsel?
6        A.  Yes.
7        Q.  Now, I had asked you previously who you
8    considered Google's competitors to be, as you were
9    using the term throughout Section 4 of your report;
10   correct?
11       A.  I can't remember the exact question that
12   you asked me.  If you could maybe rephrase the
13   question, I'm happy to answer it again.
14       Q.  After you've had the opportunity to
15   discuss your testimony with your counsel and take a
16   10-minute break, are there any competitors who you
17   listed previously that you'd like to remove from the
18   discussion we had before the break?
19       A.  No.  I'm simply here -- I'm going to point
20   out that, for example, paragraph 41C is discussing
21   Google's data collection as a third party.
22       And the peer-reviewed research that I'm
23   citing here is describing other companies that also
24   collect data as a third party.  So the use of the
25   word "competitor" in that context is data collection

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 186

1   as a third party.
2        And those include, like I said earlier,
3   companies like Facebook, Microsoft, Amazon, Index
4   Exchange, OpenExchange.  And I'm sure in the papers
5   they list many more companies that, in that context,
6   also collect data from users as a third party.
7        Q.  Just because a company collects data
8   doesn't mean it actually uses it; correct?
9        MR. ROBINSON:  Objection; form.
10       THE WITNESS:  In theory, it is possible that a
11  company collects data, but does not use it.
12  BY MS. KLEIN:
13       Q.  Does Meta collect first party data?
14       A.  Facebook collects data from Facebook users
15  on Facebook's website.
16       Q.  Well, not just the website; right?  It
17  also has an app?
18       A.  Which app are you referring to?
19       Q.  The Facebook app.
20       A.  Yes.
21       Q.  And Meta also collects data from its other
22  business lines; right?
23       A.  Can you please clarify what you mean by
24  "business lines"?
25       Q.  Sure.

Page 187

1        Does Meta collect data from Instagram?
2        A.  I believe so.
3        Q.  First-party data; correct?
4        A.  Yes.
5        Q.  And Meta collects first-party data from
6   WhatsApp?
7        A.  That, actually, I'm not sure about,
8   because it was my understanding -- again, this is
9   not something that I'm opining on in the report, but
10  my general understanding is that Meta either does
11  not or -- yeah, probably does not collect data from
12  WhatsApp.  I'll have to clarify, check the evidence,
13  but I'm not sure about WhatsApp.
14       Q.  What about Facebook Messenger, does Meta
15  collect data from Facebook Messenger?
16       A.  I believe so.
17       Q.  Does it collect data from Threads?
18       A.  I'm not sure about Threads.
19       Q.  It could or it could not, you just don't
20  know as you sit here?
21       A.  I don't know.
22       Q.  And Amazon has a variety of business lines
23  from which it collects data; correct?
24       MR. ROBINSON:  Objection; form.
25       THE WITNESS:  Can you again give me examples of

Page 188

1   what you mean by business lines, to be more precise?
2   BY MS. KLEIN:
3        Q.  Amazon collects first-party data from its
4   website?
5        A.  Sure, yes.
6        Q.  Amazon collects first-party data from
7   Alexa?
8        A.  Sure.
9        Q.  That's a "yes"?
10       A.  Yes.
11       Q.  Amazon collects data from Whole Foods?
12       A.  I'm not sure about that.
13       Q.  It could, you just don't know?
14       A.  I don't know.
15       Q.  Amazon collects data from Twitch?
16       A.  I'm not sure.
17       Q.  Amazon collects data from its app, the
18  Amazon app?
19       A.  Yep, yes.
20       Q.  And Meta collects data from Instagram,
21  both its app and the website; correct?
22       A.  I'm not sure about the website.  I know
23  they collect data from the app.
24       Q.  And Amazon has a very large cloud service;
25  right?

Page 189

1        A.  Amazon has a service called AWS.
2        Q.  And Amazon collects data from AWS?
3        A.  I'm not sure because I'll have to look
4   at -- I'll have to look at the documentation to be
5   able to reliably answer your question.
6        Q.  Does Amazon collect data from Audible?
7        A.  I'm not sure.
8        Q.  What about Fire?
9        A.  Yes.
10       Q.  Wondery?
11       A.  Sorry, what?
12       Q.  Wondery?
13       A.  Can you spell it?
14       Q.  W-o-n-d-e-r-y.  It's its podcast app.
15       A.  I'm not aware of that.
16       Q.  So if you don't know all of the various
17  business lines from which Amazon collects data, how
18  do you know that Google somehow has an advantage in
19  data over Amazon?
20       A.  In my report, I break down data collection
21  by Google into, as we were discussing, first party,
22  third party.  And then I also briefly mentioned
23  second party.
24       So the most recent discussion that we have
25  had is in the context of first party.  And Google's

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 190

1 first party products, as I describe, list here in my
2 report, they have very large market share.
3      For example, Google Search has 88 percent
4 market share, YouTube has 81 percent market share,
5 and Google Maps has a 72 percent market share.
6 Other companies could also collect data from -- as a
7 first party, as we were discussing.
8      And then I, for example, later on explain
9 data collection as a third party. And that's where
10 I list -- and you can make a more --
11      (Reporter seeks clarification.)
12      A.  A direct one-to-one comparison that
13 Google's data collection, as compared to any of its
14 potential competitors, any other tech company, for
15 that matter, is at least two to three times more
16 Google's coverage in terms of data collection.
17      Q.  But how do you know that if you don't even
18 know the business lines of Amazon that collect data?
19      A.  Because in those research papers that I'm
20 citing there, the methodology that is used -- that
21 was used in those papers, as well is you look at the
22 domain, which is collecting the data, and then you
23 map it to the organization. I have not memorized
24 every single domain and organization.
25      But since Amazon is mentioned in all of

Page 191

1 those papers. So the researchers map the domain,
2 all domains that belong to Amazon through the
3 organization, and do an organization level
4 comparison.
5      And for example, the paper that I cite in
6 41(c)(v), that I remember distinctly does this
7 organization level comparison.
8      Q.  So 41(c)(v) -- well, would you agree with
9 me, Dr. Shafiq, that the adoption of the Internet
10 and apps and data collection has increased over the
11 course of time?
12      MR. ROBINSON:  Objection; form.
13      THE WITNESS:  Can you please break it down
14 because you have several different things in the
15 first part of your statement? Then I will hopefully
16 be able to give agreeable answers to you.
17 BY MS. KLEIN:
18      Q.  Sure. Let's do it this way.
19      The section you just cited, 41(c)(v) on
20 page 18 of your report, is a 2016 report. That data
21 is old and cold, isn't it? And Amazon's footprint
22 looks so different today than it did in 2016; right?
23      MR. ROBINSON:  Objection; form.
24      THE WITNESS:  In that section of my report --
25      (Reporter seeks clarification.)

Page 192

1      THE WITNESS:  For example, paragraph 41(c), I'm
2 also citing papers that were published recently or
3 that are based on more recent data. For example,
4 the paper in 2022. That's one of the more recent
5 papers that was published in a conference where they
6 do a similar comparison and reach a similar
7 conclusion.
8 BY MS. KLEIN:
9      Q.  And yet we're in 2024 and the way people
10 use the Internet has changed; correct?
11      MR. ROBINSON:  Objection; form.
12      THE WITNESS:  The big picture I want to convey
13 here is that sure, people's Internet usage over time
14 changes.
15      But the picture that emerges from all of
16 this research that spans more than a decade, if you
17 put all of these together, the common theme is what
18 I am describing here in this part of my report, that
19 Google's third-party data collection network is by
20 far the most comprehensive, as compared to any other
21 company on the planet.
22 BY MS. KLEIN:
23      Q.  But as we sit here today, you don't know
24 whether Amazon's data -- as you sit here today, you
25 don't know whether Amazon's third-party data

Page 193

1 collection is bigger than Google's, because you
2 haven't analyzed what Amazon's third-party data
3 network is.
4      MR. ROBINSON:  Objection; form.
5      THE WITNESS:  I would not agree with that.
6 BY MS. KLEIN:
7      Q.  Do you know which companies are in
8 Amazon's third-party data collection today?
9      A.  Yes. They would be listed in the citation
10 that I have in footnotes -- similar to footnotes 87,
11 88, 89, 90. This refers to an open source data
12 collection effort that is publicly available on
13 GitHub. You can type in the name of the company and
14 it will show you names of all the domains that
15 belong to an organization.
16      And if I remember correctly, the -- I've
17 not memorized all the domains that are owned by
18 Amazon, but I remember that Google's third-party
19 data collection market share is -- similarly far
20 exceeds any other company, including Amazon.
21      Q.  The citations in footnotes 87 through 90
22 that you just cited are all on a website called
23 DuckDuckGo; correct?
24      A.  No.
25      Q.  No?

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 194

1    A.  I think you misread.  This is all open
2  source data that is available on GitHub.
3    Q.  And what is the reference to DuckDuckGo?
4    A.  So on GitHub, there are different
5  companies that can put data.  This particular open
6  source effort is -- the tool was developed by
7  DuckDuckGo, where they collect the data.  And all
8  the data that is collected is put on GitHub, anyone
9  can look at it, analyze it.  And the reason I
10  mention that in the context of your question is
11  unlike peer review --
12    Q.  You're going too fast for the reporter.
13    A.  Unlike peer-reviewed research papers,
14  we're scientists, collect data, publish a paper and
15  then after a few years, there is another paper that
16  is published.
17      This particular effort is distinct in that
18  they periodically update the data.  So you can go
19  look at this link, you can see -- traverse the data
20  over time.
21      And this is the reference that I go to
22  because I've looked at the methodology, methodology
23  is sound, similar to what is used in peer-reviewed
24  research, and they also periodically update the
25  data.

Page 195

1    Q.  DuckDuckGo is a competitor to Google;
2  correct?
3    A.  Are you asking me a legal question or a
4  more general technical sense?
5    Q.  I'm asking you, do you consider DuckDuckGo
6  a competitor to Google?
7    A.  Again, clarification question.  Are you
8  asking me a legal question or you want me to offer
9  technical opinion?
10    Q.  I am asking you, sir, do you consider
11  DuckDuckGo a competitor to Google?
12    A.  DuckDuckGo, for example, does not offer an
13  ad exchange.  DuckDuckGo offers a search engine.
14  Google also offers a search engine.
15      So in the context of a search engine, you
16  could argue that -- again, not using the word in a
17  legal sense, that DuckDuckGo has a search engine
18  similar to Google.
19      But DuckDuckGo, for example, does not
20  offer an ad exchange, so in that sense, DuckDuckGo
21  is not competing with Google.
22    Q.  So you believe that DuckDuckGo competes
23  with Google in certain product lines?
24    MR. ROBINSON:  Objection; form.
25    THE WITNESS:  I think the example that I gave

Page 196

1  was Search.
2  BY MS. KLEIN:
3    Q.  Right.
4      My question was, you believe that
5  DuckDuckGo competes with Google in certain product
6  lines; correct?
7    MR. ROBINSON:  Objection; form.
8    THE WITNESS:  The only example I can think of
9  is Search right now.
10  BY MS. KLEIN:
11    Q.  So you believe that DuckDuckGo competes
12  with Google in certain product lines?
13    MR. ROBINSON:  Objection; form.
14    THE WITNESS:  I will rephrase that.  I give you
15  an example that DuckDuckGo competes with Google in
16  search.  I don't know if there exist other product
17  lines.
18  BY MS. KLEIN:
19    Q.  And given that DuckDuckGo is a competitor
20  to Google in search, the reliability of the
21  information is suspect?
22    A.  The data is --
23    MR. ROBINSON:  Objection; form.
24    THE WITNESS:  The data is open source.  You can
25  look at the methodology.  Everything is open source.

Page 197

1  And there is nothing suspect about the methodology
2  of the data because it is fully transparent.
3  Anyone, including any field experts, can go and
4  analyze it and reproduce the results.
5  BY MS. KLEIN:
6    Q.  Have you tried to go in and reproduce the
7  results?
8    A.  Yes.  This is exactly what I was talking
9  about when we discussed earlier that I read some
10  sources, I spot-check them by doing my own testing.
11  This would be one example of that.
12    Q.  Okay.  Well, that's not listed in your
13  report.
14      So if that's something you relied upon,
15  why haven't you listed that in your report?
16    A.  Look, I use a watch to check time.  This
17  is such a basic thing in our scholarship, that if
18  you're looking at data collection from a web
19  browser, you open a website and you see what data
20  collection is happening.
21      So this is something so basic that we
22  teach that it is not worth mentioning, and I've
23  explained to you the context in which I have used
24  those.
25    Q.  How much time did you spend on looking at

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 198

1 DuckDuckGo's collection?
2    MR. ROBINSON:  Objection.  Instruct the witness
3 not to answer on the basis of the expert stipulation
4 regarding time spent on granular matters.
5    THE WITNESS:  At the instruction of counsel,
6 I'm not going to answer your question.
7 BY MS. KLEIN:
8    Q.  It's just like looking at your watch, I
9 suppose.
10    Now, you didn't explain DuckDuckGo's
11 methodology in your report either; correct?
12    A.  The methodology is explained in the
13 footnote that I provide.  If you go to that GitHub
14 repo, they explain the data that is collected.
15    Q.  But they don't explain their methodology
16 for collecting the data?
17    A.  It is on their GitHub repo.  Go to
18 GitHub --
19    (Reporter seeks clarification.)
20    A.  Their GitHub repository or repo.
21    Q.  I want to move now to paragraph 47 of your
22 report.  You write, "To implement this change,
23 Google prompted existing users to opt-in by means of
24 deceptive practices - also called 'dark patterns' -
25 which Google opted new users in by default."

Page 199

1    Did I read that correctly?
2    A.  Yes.
3    Q.  Now, Professor Shafiq, you read all the
4 expert reports in this case; correct?
5    A.  I have not read every single expert report
6 in this case.
7    Q.  You relied on the expert report of Jacob
8 Hochstetler; correct?
9    A.  That is one of the expert reports that
10 I've relied on for a part of my opinion, yes.
11    Q.  Did you read the whole report?
12    A.  I believe I only read the part that was
13 relevant to the opinion that I was offering in my
14 report.
15    Q.  How did you know which part was relevant
16 to the opinion you were offering if you didn't read
17 the whole report?
18    A.  I did searches using keywords.
19    Q.  Okay.  Did you use -- did you keyword
20 search the word "dark patterns" on the expert
21 reports in this case?
22    A.  Sitting here today, I do not recall
23 whether I conducted a search based on that search
24 term.
25    Q.  Are you aware, sir, that you're the first

Page 200

1 expert to utter the word "dark patterns" in this
2 case?
3    A.  I don't know.
4    Q.  You wouldn't be surprised, though, if that
5 were the case; correct?
6    A.  I don't know.
7    Q.  Did you read the complaint?
8    A.  I read the complaint a long -- yes, a
9 while ago.
10    Q.  You agree with me that the word "dark
11 patterns" does not -- is not contained in the
12 complaint?
13    A.  Sitting here today, I cannot recall from
14 memory.
15    Q.  And you agree with me that your statement
16 that Google prompted existing users to opt in by
17 means of deceptive practices is not contained in the
18 complaint; correct?
19    A.  I don't know.  Do you want me to check?
20    Q.  I'm asking if you -- if you agree with me
21 that it is.
22    A.  If I remember correctly, the complaint was
23 like 2, 300 pages long.  I have not memorized it, so
24 I don't know whether the complaint explicitly
25 mentioned the terms "dark patterns" or not.

Page 201

1    Q.  Do you know whether the complaint alleges
2 that Google had deceptive practices to prompt
3 existing users to opt in?
4    A.  I can't recall that.  I have not memorized
5 the complaint.
6    Q.  Turn with me to paragraph 55 of your -- of
7 your report.  In paragraph 55, you say, "After the
8 launch of Narnia2, Google could now build more
9 holistic or unified profiles to target users with
10 better personalized ads."
11    Do you see that?
12    A.  Yes.
13    Q.  Now, you haven't seen any evidence that
14 Google actually used the information to target with
15 personalized ads, have you?
16    MR. ROBINSON:  Objection; form.
17    THE WITNESS:  Can you please rephrase your
18 question?
19 BY MS. KLEIN:
20    Q.  Sure.
21    You're saying that Google could build more
22 holistic or unified profiles, but you don't say that
23 Google does build more holistic or unified profiles;
24 right?
25    A.  This sentence is in the context of the

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 202

1  previous paragraph, where I'm essentially building
2  the timeline of the motivations behind Narnia2. So
3  this was not possible before 2016. And then I'm
4  essentially building the time line that post 2016,
5  post Narnia2, Google could now.
6        And then the answer to your question is
7  yes, Google today does build holistic or unified
8  profile of users based on the data that Google
9  collects from Google owned and operated websites and
10 products as well as non-Google websites.
11    Q.  What is your evidence of that?
12    A.  I cite a lot of documents in my report.
13 Do you want me to . . .
14    Q.  Yes, I would like to know what is your
15 evidence that Google does build holistic and unified
16 profiles to target users with better personalized
17 ads?
18    A.  Let's start off with where we left off,
19 paragraph 55. Right after paragraph 55, you will
20 see that there is Figure 5. Figure 5 is one example
21 that I think nicely visually illustrates the
22 holistic profiles that Google creates by combining
23 data from various products and services.
24        If you look at Figure 5, it explains
25 Google combines the search history data that it

Page 203

1  collects from Google Search, combines it with
2  location history information, combines it with data
3  that it collects as a third party from apps and uses
4  that to target consumers, and in this particular
5  example, for consumers who are in market for
6  minivans.
7     Q.  Your citation to Figure 5 is a
8  footnote 135, a Google internal presentation from
9  December 14, 2016.
10        Do you see that?
11    A.  Yes.
12    Q.  And that is showing that it is possible
13 for Google to build more holistic and unified
14 profiles to target users with ads.
15        I'm asking you, sir, where is your
16 evidence that Google is actually doing this? Not
17 that it's possible, I want to know the evidence that
18 it's doing it.
19    A.  This is consistent with all the other
20 documents that I've cited in my report and other
21 evidence I've looked at.
22        For example, I -- Google has this thing
23 that I think Dr. Hoffman discusses later on that I
24 describe in my section is what is called Web & App
25 Activity.

Page 204

1        (Reporter seeks clarification.)
2     A.  Web & App Activity.
3        That is website or a service that Google
4  has where a Google account holder can see
5  information that Google has collected from various
6  Google products and services, including data that
7  Google collects from, for example, similar to
8  Figure 5, Google Search as well as location data
9  from Google Maps as well as third-party data that
10 Google collects.
11    Q.  I understand, Dr. Shafiq, that you're
12 saying Google collects this data.
13        My question to you is, where is your
14 evidence that Google is using the data to target
15 ads?
16    A.  This is described in that portal, again,
17 Web & App Activity and other things that -- this was
18 discussed much more in depth when Dr. Hoffman
19 describes various -- I'm forgetting the term she
20 uses -- the controls that Google provides to
21 consumers.
22    Q.  Where in your report is the evidence, not
23 that Google could build holistic and unified
24 profiles, but it does? Where in your report is the
25 evidence?

Page 205

1     MR. ROBINSON:  Objection; form.
2        (Witness reviews document.)
3     THE WITNESS:  Let me give you one more example.
4        That example is . . .
5        So I will start noting them down. One of
6  them is footnote 171. Another one is footnote 183.
7  Another one is -- there's a research paper.
8        Another paper is, yes, I believe either
9  footnote 209 or 210, where they look at that exact
10 thing that I describe to you, where Google shows how
11 they collect and combine data from various Google
12 products and services, including data that Google
13 collects from Google owned and operating websites
14 and products, as well as the data that Google
15 collects from non-Google websites and then uses it
16 to identify users' interests, including their
17 demographic information, and then uses it for
18 targeted ads.
19 BY MS. KLEIN:
20    Q.  You agree with me, sir, that Google
21 explains their policies online?
22    MR. ROBINSON:  Objection; form.
23    THE WITNESS:  Can you please clarify which
24 policies are you referring to? Because Google, I'm
25 sure, has a lot of policies.

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 206

1  BY MS. KLEIN:
2      Q.  Sure.
3          For example, on footnote 171, Google Help,
4  it explains, [as read] "Find and control your web
5  activity."
6      A.  Yes.
7      Q.  So Google explains its policies with
8  respect to how it's using data on the web in this
9  document?
10     A.  I will need to look at that document if
11 you can provide it to me because I've not memorized
12 that document.
13     Q.  Well, if you haven't memorized the
14 document, how can you say that it provides evidence
15 of how Google uses information to target ads?
16 Because this doesn't say "target ads" in
17 footnote 71 -- 171.
18     MR. ROBINSON:  Objection; form.
19 BY MS. KLEIN:
20     Q.  So you can remember for part of it but not
21 all of it?
22     A.  Yes, I remember the part of it that is
23 relevant to --
24     (Reporter seeks clarification.)
25     Q.  I'm sorry, sir, you didn't answer my

Page 207

1  question.  If you have -- if you haven't memorized
2  the document, how can you say it provides evidence
3  to support your opinions but you just don't remember
4  it when I cross-examine you --
5      MR. ROBINSON:  Objection.
6  BY MS. KLEIN:
7      Q.  -- on a different part?
8      MR. ROBINSON:  Objection; form.
9      THE WITNESS:  That document describes Web & App
10 Activity, so I know it is -- so the way I would
11 suggest you to think about this, and this is
12 accurate based on all the evidence and analysis that
13 I've done.  The data that Google collects post
14 Narnia2, all of that data gets connected to a
15 Google's -- a user's Google account, what is
16 internally called Gaia ID.
17     So at this website, Google shows users
18 their data that Google collects from various Google
19 products and services, including the data Google
20 collects as a first party, the data Google collects
21 as a second party, and data that Google collects as
22 a third party.
23     And then all of that data is fed into
24 advertising systems where there is a separate page,
25 which I believe now is rebranded to be called My Ad

Page 208

1  Center, where --
2      (Reporter seeks clarification.)
3      THE WITNESS:  Yes.
4      I believe it was called something
5  different.  I recently looked at it.  Google has
6  changed the name and branding of that page -- where
7  Google shows, based on all the information that
8  Google collects from consumers, how Google uses that
9  to infer demographic information, other interests of
10 a consumer that are used to target ads.
11     And Google, in fact, also shows at that
12 place, I think, a subset of ads that Google shows to
13 consumers based on those demographic and other
14 interests and attributes that are inferred by
15 Google.
16     MS. KLEIN:  Object as nonresponsive and move to
17 strike.
18     MR. ROBINSON:  I will note for the record that
19 counsel asked an open-ended question about providing
20 evidence --
21     (Reporter seeks clarification.)
22     MS. KLEIN:  Sir, you really need to stop.
23     (Cross-talk.)
24     MS. KLEIN:  No, you cannot put this on the
25 record, sir.  It's inappropriate.  You're only

Page 209

1  allowed to say, "Objection; form."  I made my
2  objection, and I did not ask you to rule on it.
3      MR. ROBINSON:  Okay.  I see I'm the only one
4  trying to appreciate the court reporter's time
5  without cross-speaking.
6      I would just briefly say that counsel
7  asked an open-ended question and got a open-ended
8  response.
9      (Deposition Exhibit 12 was marked.)
10 BY MS. KLEIN:
11     Q.  Dr. Shafiq, I've put in front of you
12 what's been marked as Shafiq Exhibit 12.
13     Is this a document that you reviewed and
14 considered in your report?
15     A.  I have some clarification questions about
16 this document.  There are some things that I do not
17 understand.
18     Q.  I only asked you, Dr. Shafiq, if this
19 document, Exhibit 12, is a document that you
20 reviewed and considered in rendering your opinions
21 in this case?  Yes or no?
22     A.  I need to know the veracity of this
23 document.  Is this a document that I cited in my
24 report or is this a document that you have created?
25 Can you please tell me whether this is your created

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 210

1  document or if this is a document that I have
2  created?
3      Q.  This is a document, if you look at the
4  bottom left, that's available from the web at
5  https://myadcenter.google.com/personalizationoff.
6  It is publicly available, sir.
7      A.  Can you please answer my question that --
8  whether or not this document was created by you?
9      Q.  No, sir, this document was created by
10  Google and is available on the web.  And as an
11  expert in the industry, I would assume that you
12  would know where Google's representations as to how
13  to control ads would be.
14      Did -- is Exhibit 12 a document you
15  reviewed and considered in rendering the opinions in
16  your report, yes or no?
17      A.  The document that you have put in front of
18  me, this is not a document that is -- I believe I
19  created because if you see at the top right, this is
20  a document that represents what this page looks like
21  inside a person's Google account.
22      I know what my Google account is.  It
23  probably would have said "Z."  Since this is saying
24  "L," I know that this is not the version of the page
25  that I see.

Page 211

1      So I want you to simply be honest and
2  explain to me whether or not this is something that
3  you created from your personal Google account and
4  what, if any, settings you changed to get to this
5  page that you are sending.
6      Q.  Sir, I'm saying this is available on the
7  Internet and --
8      A.  This is not available publicly on the
9  Internet.
10      Q.  No.  All I asked you is, is this a
11  document that you considered when rendering the
12  opinions in your report, yes or no?
13      A.  I do not recognize parts of this document,
14  hence I'm hesitant to answer this question.
15      Q.  So the answer's no, you did not consider
16  this document in rendering the opinions in your
17  report?
18      A.  This is not what I said.
19      MR. ROBINSON:  Objection; form.
20  BY MS. KLEIN:
21      Q.  If you don't recognize the document, how
22  could you have considered it?
23      MR. ROBINSON:  Objection; form.
24      THE WITNESS:  I don't recognize part of the
25  document.  For example, at the top right, where it

Page 212

1  says "L" and then there is a setting for
2  personalized ads that is turned off, so clearly
3  someone went to this page -- not -- it's not a
4  public-facing page -- using their personal Google
5  account, did some actions to create this version of
6  the web page.
7  BY MS. KLEIN:
8      Q.  Sir, have you ever visited
9  https://myadcenter.google.com?
10      A.  Yes.
11      Q.  And when is the last time you accessed
12  that website?
13      A.  I can't perfectly recall from memory, but
14  if I have to guess, probably a couple of weeks ago.
15      Q.  And have you turned off the
16  personalization on your ads?
17      A.  I conduct research on this topic.  I don't
18  remember because I play around with these controls
19  to study their effectiveness.
20      My understanding is that the setting was
21  by default turned on.  I don't believe I have turned
22  it off.
23      Q.  And you haven't recently looked to see
24  what comes up if you turn off the personalization?
25      MR. ROBINSON:  Objection; form.

Page 213

1      THE WITNESS:  Sitting here today, from memory,
2  I do not recall.
3  BY MS. KLEIN:
4      Q.  Do you have any reason to dispute that you
5  can turn off personalization by going to
6  https://myadcenter.google.com [sic]?
7      A.  I'm aware of the setting that exists on
8  this page, where the control purports to allow a
9  user to turn off personalized ads.
10      Q.  And as you see on the left side of the
11  page, it says, [as read] "Control over your info.
12  See what info Google uses to show you ads.  You can
13  turn off anything you don't want used to personalize
14  your ads."
15      Do you see that?
16      A.  Where are you reading from?
17      Q.  On the left side of the page on
18  Exhibit 12, underneath the woman who's sitting back
19  in the chair with her hands behind her head.
20      Do you see it says, "Control over your
21  info"?
22      A.  Yes.  I think this is referring to the
23  Web & App Activity --
24      (Reporter seeks clarification.)
25      A.  -- that we discussed earlier.

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 214

1    Q.  And it says, [as read] "You can turn off
2  anything you don't want used to personalize your
3  ads"; correct?
4    A.  This document states, "You can turn off
5  anything you don't want used to personalize your
6  ads."
7    Q.  Right.
8       You agree that users can turn off anything
9  they don't want used to personalize their ads?
10    MR. ROBINSON:  Objection; form.
11    THE WITNESS:  This is not something that I've
12  investigated as part of my assignment in this case.
13  There is some research out there that casts doubt as
14  to the effectiveness of these controls that even
15  when users exercise them, whether or not that
16  actually makes a difference.
17       But this is not something that I
18  specifically investigated for the purposes of this
19  report, hence I cannot reliably answer your question
20  yes or no.
21  BY MS. KLEIN:
22    Q.  Do you agree with me, Dr. Shafiq, that
23  Google offers controls to users to specifically opt
24  out of the sale of their data through RTB?
25    A.  Can you point me to the control that you

Page 215

1  are referring to?
2    Q.  Paragraph 12 -- or Shafiq Exhibit 12,
3  doesn't this indicate that Google allows users to
4  specifically opt out of the sale of data through
5  RTB?
6    A.  Where does it say that?  I think you're
7  reading from some -- I don't see those words in this
8  page.
9    Q.  It says, [as read] "You can turn off
10  anything you don't want used to personalize your
11  ads."
12    A.  Now you're saying different words.
13    Q.  So just because the words aren't the same
14  you won't agree with me; right?
15    A.  Words matter.  If words are different, the
16  meaning of the words changes.
17    (Deposition Exhibit 13 was marked.)
18  BY MS. KLEIN:
19    Q.  Dr. Shafiq, I've put in front of you
20  what's been marked as Shafiq Exhibit 13.
21       This is a document that was accessed on
22  October 7th, 2024 at 2:22 p.m. from
23  https//safety.google/privacy/adsanddata/ [sic].
24       Do you see that?
25    A.  I have some concerns about the document.

Page 216

1  There is some information that seems to be redacted
2  or has been cut off.
3    Q.  It's just the way my printer worked.
4    A.  But can you tell me what is the
5  information that is not shown on the pages?
6    Q.  There's nothing that's not shown on the
7  pages.  It's just the formatting is not great.
8    A.  But there's clearly some information at
9  the top right that is not complete.
10    Q.  Why don't we just focus less on the
11  document itself.
12       Dr. Shafiq, as part of your development of
13  your opinions in this case, did you go visit
14  https://safety.google/privacy/adsanddata/ [sic]?
15       Did you visit that website as part of your
16  formulation of your opinions?
17    A.  I'm having a hard time understanding this
18  document because I am -- is this all part of the
19  same document?  And how do different pages relate to
20  each other?
21    Q.  I'm asking not about the document, sir.
22       I'm asking, you're aware that Google has a
23  Safety Center online?  You're a privacy research
24  expert.  You are aware that Google has a Safety
25  Center online; right?

Page 217

1       Sir, I'm not talking about the document
2  anymore.  You can put it aside.
3    MR. ROBINSON:  Objection; form.
4  BY MS. KLEIN:
5    Q.  Sir, will you pay attention to me, please?
6    A.  Please give me a second.
7    Q.  I'm not asking about the document anymore.
8  Now you're just taking time on the record.
9    A.  Can you please rephrase the question?
10    Q.  I will reask the question.
11       The question is, did you go -- you are
12  aware that Google maintains on its website a Safety
13  Center; correct?
14    A.  I believe so.
15    Q.  Okay.  And did you go visit the Safety
16  Center as part of formulating your opinions in this
17  report?
18    A.  I will have to take a look at my report.
19  I've not memorized whether this is something that I
20  specifically discussed.
21    Q.  Go for it.
22    (Witness reviews document.)
23    A.  Yes, I believe I cite this --
24    (Reporter seeks clarification.)
25    A.  I believe I cite this document.

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 218

1    Q.  Where did you cite the document in your
2  report?
3    A.  One of the places where I cite this
4  document is 185, where we are -- I'm citing this
5  document in the context of the promise that Google
6  makes to consumers that we never sell your personal
7  information to anyone.
8    Q.  And did you also consider that as part of
9  the Safety Center, Google has an area where you can
10  restrict privacy controls?
11    A.  Like I describe in different parts of my
12  report, Google's privacy controls are riddled with
13  dark patterns.
14      (Reporter seeks clarification.)
15    A.  This is the document that I believe I
16  cite -- yes, that I cite in my report where Google
17  is making some general promises or representations
18  to consumers.
19      For example, I cite that on this link,
20  Google makes a promise -- or Google makes a
21  disclosure to consumers that we never sell your
22  personal information to anyone.
23    MS. KLEIN:  Objection; nonresponsive and move
24  to strike.
25  BY MS. KLEIN:

Page 219

1    Q.  Dr. Shafiq, did you also consider that as
2  part of the Safety Center, Google has an area where
3  you can go and restrict privacy controls, yes or no?
4    A.  Yes.  Those are the controls that I
5  describe in early part of my report, where I explain
6  that those controls are riddled with dark patterns.
7    MS. KLEIN:  Objection; nonresponsive after the
8  word "yes" and move to strike.
9  BY MS. KLEIN:
10    Q.  If you turn with me to page 16 of
11  Exhibit 13, please.
12    A.  Now you want me to look at the exhibit?
13    Q.  Yes, you just said "this document," so I
14  want to turn to page 16 of Exhibit 13.
15    A.  I'm only comfortable talking about the URL
16  because this document is missing a lot of
17  information, including, for example, the exact quote
18  that I provide in my report, and I'm really
19  concerned because I cannot see that quote.  And I
20  know for a fact that quote exists somewhere.
21    Q.  Turn with me to page 16, please, sir.
22  There's your quote, right, sir, "We never sell your
23  personal information to anyone."
24      Do you see that?
25    A.  Yes, I see that quote.

Page 220

1    Q.  And right below it, it says, "Can I turn
2  off personal ads completely?"
3      Do you see that?
4    A.  Yes.
5    Q.  And it says, "Yes.  You can visit My Ad
6  Center to update your preferences or turn off ads
7  personalization."
8      Do you see that?
9    A.  Yes.
10    Q.  Do you agree with me that Google tells
11  consumers and end users that they can turn off
12  personalized ads completely?
13    A.  This is similar to the My Ad Center
14  discussion we had earlier.  This is -- would be a
15  classic example of a case where the disclosure is on
16  page -- at the bottom, roughly, page 16 of 21 of a
17  long document.
18    MS. KLEIN:  Objection; nonresponsive and move
19  to strike.
20  BY MS. KLEIN:
21    Q.  Dr. Shafiq, do you agree with me that
22  Google tells end users that they can turn off
23  personalized ads completely, yes or no?
24      Do you need me to repeat the question?
25    A.  Sure.

Page 221

1    Q.  Do you agree with me that Google tells end
2  users they can turn off personalized ads completely,
3  yes or no?
4    A.  As we are looking at this document, this
5  document states at the bottom, page 16 of 21,
6  there's a question, Can I turn off personalized ads
7  completely?
8      There is a statement that is made here and
9  it points to My Ad Center, which is the control that
10  we talked about earlier.
11    Q.  And if you go back to Exhibit Shafiq 12,
12  there's My Ad Center; correct?  Exhibit 12, the
13  single page.
14    A.  So again, I don't think this is My Ad
15  Center.  This is a specific subpage on My Ad Center.
16    Q.  And do you see on the right of the My Ad
17  Center it says personalized ads and there's a toggle
18  switch, on and off?
19    A.  Yes.
20    Q.  And is there that toggle switch on your
21  personalized ad center when you go visit it, sir, in
22  your Gmail account?
23    A.  I believe so, but it is not off by
24  default.
25    Q.  But you can easily toggle it on and off on

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 222

1  the right-hand side if you like?
2      A.  No, I would not agree with that statement.
3  I explain, for example, in my report that the way
4  privacy controls are set up, it is far easier for
5  consumers to . . .
6          Google uses dark patterns to manipulate
7  users into sharing data, but then it is far more
8  cumbersome for consumers, for example, if we look at
9  the document, the need to scroll all the way down to
10  page 16 of 21, find that link, click on that link,
11  and then after several clicks and scrolls, get to a
12  point where they can turn that setting off.
13      MS. KLEIN:  Objection; nonresponsive and move
14  to strike.
15  BY MS. KLEIN:
16      Q.  My question to you, sir, is, if you are on
17  the page that is Shafiq Exhibit 12, it's easy to
18  toggle the switch on the page on and off; correct?
19  It's a "yes" or "no," with a down click arrow.
20  That's easy for someone to do; right?
21      MR. ROBINSON:  Objection; form.
22  BY MS. KLEIN:
23      Q.  That one action?
24      MR. ROBINSON:  Objection; form.
25      THE WITNESS:  Like I said earlier, finding this

Page 223

1  page is hard for consumers.  Like you showed me in
2  the previous document, it shows you need to scroll
3  all the way down to page 16 of 21 to find the link,
4  and then once a user comes here, that's when you get
5  to this page.
6  BY MS. KLEIN:
7      Q.  When's the last time you visited
8  safety.Google/privacy/adsanddata?
9      A.  Which link are you referring to?  Like
10  this is one of the documents?
11      Q.  I'm not referring to a link.  I'm just
12  referring to a website.
13          When is the last time you visited the
14  Safety Center for Google?
15      A.  Sitting here from memory, I cannot recall.
16      Q.  You didn't bother to do that in developing
17  your opinions in this case?
18      MR. ROBINSON:  Objection; form.
19      THE WITNESS:  I thought we discussed that I
20  looked at that, but I cannot recall exactly when I
21  did that.
22  BY MS. KLEIN:
23      Q.  And you looked at it in paragraph -- in
24  footnote 185 with respect to the representation that
25  you allege that's on page 16.

Page 224

1          If nobody ever gets to this center on page
2  16 that would take them to the Safety Center or the
3  My Ad Center, they would never see the
4  representation that's on page 185 either, would
5  they?  Footnote 185.
6      A.  Yeah, this is where I believe the document
7  that you have printed -- I'm not sure whether it
8  contains everything that you see on the page and
9  how.  So I don't want to speak to the printout that
10  you have presented to me and I've not memorized what
11  that page looks like.
12      Q.  Irrespective of the printout and the page,
13  if the statement "We never sell your information" --
14  excuse me.  Start over.
15          If the statement, "We never sell your
16  personal information to anyone" that you find
17  offensive is on the same page that talks about how
18  you can turn off your ad preferences, if no one ever
19  sees the page of how you can turn off your ad
20  preferences, then no one ever sees the
21  representations that Google doesn't sell your
22  personal information; right?
23      MR. ROBINSON:  Objection; form.
24      THE WITNESS:  I would have to look at that
25  page.  It is my recollection that the representation

Page 225

1  that we do not sell your personal information and
2  variations of this statement appear prominently much
3  higher, either in this page or other page, but I've
4  not memorized.
5  BY MS. KLEIN:
6      Q.  But you agree with me if the statements
7  are together in the Safety Center, then people
8  either see them both or they see none of them;
9  correct?
10      A.  I did not conduct that study about the
11  layout of the page and where they appear side by
12  side or not.
13      Q.  I'm not asking you to conduct a study.
14  I'm asking you to assume that if the statements are
15  next to each other, either people see both
16  statements or they see neither statements; correct?
17          I'm not referring to the document, sir.
18  I'm just asking you to assume with me.  Assume for
19  the purposes of this discussion that those two
20  statements appear next to each other.  One, we never
21  sell your personal information to anyone, and then
22  the instructions on how to turn off personalized
23  ads.
24          If those two appear next to each other,
25  either end users see them both or they don't see

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 226

1 either; correct?
2     MR. ROBINSON: Objection; form.
3     THE WITNESS: It depends how those statements
4 are put together.
5 BY MS. KLEIN:
6     Q. But if they're right next to each other,
7 end users either see them both or they see neither;
8 right?
9     A. Need to see what you mean by they are
10 right next to each other. Does a user have to click
11 to actually see what is the answer to that question
12 or is this something that is just available there?
13     Q. I'm saying they're on a web page right
14 next to each other.
15     A. In the hypothetical that you are
16 presenting to me, if there are two statements where
17 one statement -- two statements in the same
18 paragraph right after each other, then those two
19 statements go together.
20         It is likely that the first statement that
21 a user sees, a user will be likely to see that, and
22 then there's a chance whether or not a user sees the
23 second statement.
24     Q. It's likely that they see both statements
25 if they appear next to each other on a page;

Page 227

1 correct?
2     MR. ROBINSON: Objection; form.
3     THE WITNESS: Partially yes, and the caveat
4 here is user will likely see the first statement and
5 it is possible that user does not go on to see the
6 second statement.
7 BY MS. KLEIN:
8     Q. But it's possible that they do; correct?
9     MR. ROBINSON: Objection; form.
10     THE WITNESS: I don't know.
11         Can we take a break?
12     MS. KLEIN: Sure.
13     THE VIDEOGRAPHER: We're going off the record.
14 The time is 4:38.
15         (Recess taken.)
16     THE VIDEOGRAPHER: We're back on the record.
17 The time is 4:54.
18 BY MS. KLEIN:
19     Q. Dr. Shafiq, we're back on the record after
20 a short break.
21         Is there anything you want to change or
22 clarify about your testimony?
23     A. No.
24     Q. We were talking about privacy controls
25 before the last break.

Page 228

1     Are you aware that Google offers a privacy
2 control specifically geared toward RTB?
3     A. Can you please point me to any -- should I
4 be looking at my report?
5     Q. I was just asking you if you're aware that
6 Google, in fact, offers a privacy control that is
7 specifically geared toward RTB.
8     A. It is my understanding, based on all the
9 evidence that I've looked at, is there is no control
10 that completely stops sharing of data in RTB.
11     Q. That wasn't my question, though.
12         My question to you, sir, was, are you
13 aware that Google offers a privacy control that is
14 specifically geared toward RTB?
15     A. I have not seen such a control.
16     Q. Have you looked?
17     A. I have looked. To the best of my
18 knowledge, there is no control that completely stops
19 real-time bidding.
20     Q. Not stops real-time bidding, but stops
21 sharing of data through real-time bidding.
22     A. Your statement is a little vague, what you
23 mean by data. So we'll need to look at the details
24 to be able to answer your question.
25     Q. Sharing of user data.

Page 229

1     Are you aware that Google offers a control
2 that's geared to stop sharing user data through RTB?
3     A. I've looked at various controls that
4 Google offers. Based on all the evidence that I've
5 seen, testing my analysis, I don't believe there
6 exists currently a control that completely stops
7 sharing of user data in real-time bidding.
8     Q. Well, now, you didn't perform any testing;
9 right?
10     A. I looked at all the evidence, all the
11 documentation, different research papers, the
12 testing that they have done. I have not seen any
13 control that completely stops sharing of user data
14 in real-time bidding.
15     Q. You have not done any testing on the
16 system yourself; correct?
17     A. Which system are we talking about?
18     Q. On real-time bidding, you have not done
19 any testing on Google's systems on real-time bidding
20 yourself?
21     A. I don't have access to Google systems like
22 we discussed.
23     Q. But you have the skill and expertise to
24 conduct that testing if you had access to the
25 system; right?

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 230

1    A.  I have looked at various controls and I
2  have not come across any control that stops
3  transmission of user data in real-time bidding.
4    Q.  That's not my question.  I understand you
5  looked at publicly available information and
6  peer-reviewed publications on the document set in
7  your report.
8       My question to you, sir, is, you have a
9  Ph.D. in computer science and you have a lab, if
10  someone gave you access to Google's system, you have
11  the ability to perform testing to understand whether
12  or not Google has a control that precludes user data
13  from being shared through RTB; right?
14    MR. ROBINSON:  Objection; form.
15    THE WITNESS:  And my answer to your question is
16  that is not possible, because to the best of my
17  knowledge, that control does not exist.
18  BY MS. KLEIN:
19    Q.  But you haven't tested to see if the
20  control exists.  You have the ability to test, see
21  if the control exists; correct?
22    A.  Let me try to explain it in more plain
23  words.
24    Q.  No, sir.
25    A.  Can I please complete my answer?

Page 231

1    Q.  No, sir.  I don't want an explanation.  I
2  want an answer to my question.
3       You have the ability, you are a skilled
4  computer scientist, that if someone gave you access
5  to Google's system, you could test and see whether
6  there is an RTB control to turn off the sharing of
7  user data, yes or no?  You have that skill, yes or
8  no?
9    A.  I have not seen such a control.
10    Q.  I'm not asking what you've seen, sir.  I'm
11  telling you -- I'm asking you, if someone gave you
12  access to Google's systems, you have the ability to
13  test to see if the control exists; correct?
14    A.  Can you give me --
15    MR. ROBINSON:  Objection; form.
16    THE WITNESS:  Can you give me more details
17  about which Google system are you talking about?
18  BY MS. KLEIN:
19    Q.  No, sir, I cannot, because you know
20  exactly what I'm talking about and you're trying to
21  avoid answering my question because you know the
22  answer is yes.
23       You are a computer scientist, sir;
24  correct?
25    A.  I am a computer scientist.

Page 232

1    Q.  And you run a research lab; correct?
2    A.  That's correct.
3    Q.  And you run research on systems to
4  understand how data is collected.  Yes?
5    A.  Yes.
6    Q.  And you have the ability, if someone gave
7  you access to Google's systems, to understand how
8  Google scientifically collects data; right?
9    MR. ROBINSON:  Objection; form.
10    THE WITNESS:  I do not understand that
11  question.  Can you please rephrase what you mean by
12  "scientifically collect data"?
13  BY MS. KLEIN:
14    Q.  You have the ability to understand what
15  data Google collects if you just had access to its
16  system; correct?
17    MR. ROBINSON:  Objection; form.
18    THE WITNESS:  I will need to know more about
19  what specific system you're talking about before I
20  give you an answer.
21  BY MS. KLEIN:
22    Q.  How about this, you have opinions
23  throughout your report related to real-time bidding;
24  correct?
25    A.  That's correct.

Page 233

1    Q.  What systems do they run on?
2    A.  This was not part of my assignment.  I
3  believe another expert goes into the details of the
4  exact internal systems which run Google's options,
5  including real-time bidding.
6    Q.  So if you don't know what systems they're
7  on, how is your report at all reliable?
8    MR. ROBINSON:  Objection --
9  BY MS. KLEIN:
10    Q.  If you're saying that they use data on
11  RTB, you don't know what systems RTB is used on?
12    MR. ROBINSON:  Objection; form.
13    THE WITNESS:  I have not memorized everything
14  in this case.  In my report, for the purposes of my
15  report, I was given a specific assignment.  I looked
16  at all the evidence, including Google's public
17  documentation, the controls that Google provides to
18  consumers, and so on.  And the evidence that I cite
19  to support my opinions are sufficient to support
20  those opinions.
21  BY MS. KLEIN:
22    Q.  Right.
23       And my question to you is, if the
24  plaintiffs had come to you and said, we would like
25  you to test to see if RTB has a control that allows

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 234

1    Google to turn off the sharing of user data, you
2    could do that; right?  That wasn't your assignment,
3    but you could do it?
4        MR. ROBINSON:  Objection; form.
5        THE WITNESS:  It is hard for me to answer your
6    hypothetical without knowing more details about
7    which system you are talking about.  If you put
8    me -- in front of me a document that describes some
9    systems, I'm happy to take a look and try to
10   reliably answer your question.
11   BY MS. KLEIN:
12       Q.  Your report cites to AdMob.
13           Do you remember the system called AdMob?
14       A.  Yes.
15       Q.  And AdMob relates to mobile apps; correct?
16       A.  That's correct.
17       Q.  And does RTB run on AdMob?
18       A.  I believe so.  But sitting here today, I
19   do not perfectly recall from memory, but likely,
20   yes.
21       Q.  And therefore, if someone gave you access
22   to source code for AdMob, you could understand
23   whether there was a control that would allow Google
24   to turn off the sharing of user data in that
25   program?

Page 235

1        A.  I mean, whatever hypothetical control and
2    hypothetical system you're talking about, if you
3    show me that document, or the name of that
4    hypothetical control, then I can answer your
5    question.  Otherwise, in this hypothetical world, it
6    is hard for me to answer your questions.
7        MS. KLEIN:  Objection; nonresponsive and move
8    to strike.
9    BY MS. KLEIN:
10       Q.  Sir, I think you understand what I'm
11   saying, and I think you don't want to answer in the
12   affirmative.
13           Because you're a computer scientist and
14   you can look at source code; right?
15       MR. ROBINSON:  Objection to the counsel's
16   testimony before the question.
17   BY MS. KLEIN:
18       Q.  You can look at source code; right?
19       A.  Anyone can look at source code.
20       Q.  Do you read source code and understand it?
21       A.  It depends on what source code we are
22   talking about.
23       Q.  Can you read Google source code?
24       A.  Which Google source code?  It's a very
25   general term that you are stating.

Page 236

1        Q.  You testified earlier that you could read
2    source code.  Now you're backtracking on that?
3        A.  You're going to ask me about some
4    hypothetical system.  In general, computer
5    scientists are trained to understand source code,
6    but in creating of that source code and the analysis
7    that needs to be performed depends on the context of
8    what system we are talking about and so on.
9        Q.  As you sit here today, you haven't looked
10   at AdMob to understand that whether AdMob actually
11   uses real-time bidding; right?  You, yourself, have
12   not looked at AdMob to understand that AdMob uses or
13   doesn't use real-time bidding; right?
14       A.  That was not my answer earlier.  I think
15   my answer was I don't recall 100 percent from
16   memory, but if I remember correctly, Google also has
17   real-time bidding in mobile apps, which I believe is
18   through AdMob.
19       Q.  But you only know that from peer-reviewed
20   publications, not from actually looking at the code;
21   right?
22       A.  I've looked at the documentation that I
23   cite extensively in that section of my report.
24       Q.  But not an actual Google source code
25   that's not available on open source?

Page 237

1        A.  Google's description of what real-time
2    bidding is, how it works, which data field it
3    contains, which controls exist, those are all
4    described in the documents that I cite in my report.
5            Unless Google is lying in those documents.
6    There is no reason to believe.  You don't need
7    anything else to reach the conclusions that I reach
8    in my report.
9        MS. KLEIN:  Objection; nonresponsive and move
10   to strike.
11   BY MS. KLEIN:
12       Q.  You haven't looked at the Google source
13   code for AdMob; correct?
14       A.  That's correct.
15       Q.  You haven't looked at the Google source
16   code for AdSense; correct?
17       A.  That's correct.
18       Q.  You haven't looked at the Google source
19   code for AdManager; correct?
20       A.  That's correct.
21       Q.  So you don't know whether those programs
22   offer the ability to turn off the sharing of user
23   data; correct?  You just don't know?
24       MR. ROBINSON:  Objection; form.
25       THE WITNESS:  Can you please rephrase your

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 238

1  question?
2  BY MS. KLEIN:
3      Q.  You don't know, as you sit here today,
4  whether AdManager offers the ability to turn off the
5  sharing of user data?
6      MR. ROBINSON:  Objection; form.
7      THE WITNESS:  I've looked at the documentation
8  of real-time bidding and I've looked at various
9  controls that it offers and to my understanding,
10 there is no control that exists there that stops
11 real-time bidding, sharing of user data in real-time
12 bidding.
13 BY MS. KLEIN:
14     Q.  You haven't looked at real-time bidding
15 with respect to AdManager, though; right?
16     A.  Real-time bidding with respect to
17 AdManager?  I believe the documents that I cite
18 represent conflagrations or, like, all the data
19 fields that exist.  And they're all available
20 through various Google products, such as Google
21 AdManager.
22     Q.  You haven't done any testing on AdSense;
23 correct?
24     MR. ROBINSON:  Objection; form.
25     THE WITNESS:  That's correct.

Page 239

1  BY MS. KLEIN:
2      Q.  You haven't done any testing on AdSense;
3  correct?
4      MR. ROBINSON:  Same objection.
5  BY MS. KLEIN:
6      Q.  I'm sorry, on AdManager.
7          You haven't done any testing on AdManager;
8  correct?
9      MR. ROBINSON:  Objection; form.
10     THE WITNESS:  That's correct.
11 BY MS. KLEIN:
12     Q.  You haven't done any testing on AdMob?
13     A.  That's correct.
14     Q.  And as a computer scientist, you have the
15 capability to do testing on those programs; right?
16     MR. ROBINSON:  Objection; form.
17     THE WITNESS:  It depends.  The papers that I'm
18 citing, they are conducting testing that would
19 include data collection by, for example, Google
20 AdSense and so forth.  And then the documentation
21 that I cite specifically for real-time bidding.
22     MS. KLEIN:  Objection --
23     THE WITNESS:  That's -- and the documentation
24 that I cite for real-time bidding, I think that's
25 the authoritative source to -- that's an

Page 240

1  authoritative source to look at whether or not some
2  control exists or not.
3      MS. KLEIN:  Objection; nonresponsive and move
4  to strike.
5  BY MS. KLEIN:
6      Q.  The papers that you cited were authored by
7  computer scientists; correct?
8      A.  Are you referring to a specific paper or
9  generally speaking?
10     Q.  You just cited the papers you cited.  And
11 I'm saying the papers that -- the testing that you
12 cited were conducted by computer scientists like
13 yourself; right?
14     A.  The papers that I'm citing, they're
15 generally appearing in venues where computer
16 scientists public research.
17     Q.  If they have the ability to do the testing
18 on Google's products, you have the ability to do
19 that same testing on Google's products if you wanted
20 to; right?
21     A.  Are you referring to a specific test or
22 general testing that I describe in my report?
23     Q.  I'm referencing the papers that you cited
24 in your report where other computer scientists have
25 bothered to do testing on Google's products.

Page 241

1      A.  Like I said, I looked at the papers.  I
2  cite multiple papers that do the testing.
3      Q.  Right.  And --
4      A.  Can I please complete my answer?
5      Q.  No, I'm -- sir, I'm asking if you have the
6  ability, and you are not answering my question and
7  it is a very late day and you haven't answered my
8  questions all day, and I really want you to answer
9  my question.
10         My question is not what papers you cited.
11         My question, sir, is, do you, as a
12 computer scientist, yes or no, have the ability to
13 perform testing on Google's products?  Yes or no?
14     MR. ROBINSON:  Objection to the statements
15 prior to the question.
16     THE WITNESS:  Are you referring to a specific
17 kind of test?  Because like I said earlier when I
18 was reading those papers, I conducted my testing to
19 confirm that the results or findings in those papers
20 were correct.
21         And then I did that, I found that the
22 testing that was reported in those peer-reviewed
23 papers was correct and then I am relying on the
24 consensus opinion across multiple peer-reviewed
25 research papers.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 242

1  BY MS. KLEIN:
2      Q.  Sir, will you have the jury believe that
3  you cannot answer the question of whether you have
4  the ability to perform testing on Google's products
5  generally?  As you sit here today, you can't answer
6  that question?
7      MR. ROBINSON:  Objection; form.
8      THE WITNESS:  I believe I've answered your
9  question multiple times.
10 BY MS. KLEIN:
11     Q.  No, my question to you -- you can't answer
12 my question yes or no.  As you sit here -- tell the
13 jury yes or no.
14         Do you have the ability, the skill set, to
15 perform testing on Google's products?
16     MR. ROBINSON:  Objection; form.
17     THE WITNESS:  Are you generally talking about
18 testing?  I'm trying to more precisely answer your
19 question, which is --
20 BY MS. KLEIN:
21     Q.  It's a general question, sir.
22         Do you, as you sit here today, as a
23 computer scientist, have the ability to perform
24 testing on Google's products?
25     MR. ROBINSON:  Objection; form.

Page 243

1      THE WITNESS:  Yes.  Just as I described earlier
2  that I did the testing to confirm the testing that I
3  cite in my report from peer-reviewed research
4  papers.
5  BY MS. KLEIN:
6      Q.  And as you sit here today, please tell the
7  jury whether you have the skill set to perform more
8  advanced testing on Google's products if you were
9  offered the source code there too.  Yes or no?
10     MR. ROBINSON:  Objection; form.
11     THE WITNESS:  I will need to know more details
12 about the testing, the advanced testing, that you're
13 referring to.
14 BY MS. KLEIN:
15     Q.  As you sit here today, you can't think of
16 a single test you could perform on AdMob if you were
17 offered the source code?
18     A.  I mean, it depends on what exactly is the
19 assignment or the test that we are trying to design.
20     Q.  As you sit here today, could you perform a
21 test to understand whether AdMob has a control to
22 turn off the sharing of user data in RTB if you were
23 offered the source code, yes or no?
24     A.  I will need to look at the source code to
25 be able to answer the question.

Page 244

1      Q.  You don't know if you have the skill set,
2  yes or no?
3      A.  I will need to look at that to be able to
4  answer that question yes or no.
5      Q.  So you don't know is your answer?
6      A.  I don't know.
7      Q.  And it would be the same with any question
8  I ask you about any of Google's products, you don't
9  know if you have the ability to perform testing?
10     A.  If you're asking me --
11     MR. ROBINSON:  Objection; form.
12     THE WITNESS:  -- hypothetical questions about
13 hypothetical systems and hypothetical controls that
14 exist in those systems, I need more details about
15 those hypotheticals to be able to answer your
16 question.
17 BY MS. KLEIN:
18     Q.  All right.
19         As you sit here today, can you please tell
20 the jury whether you have the skill set to evaluate
21 the source code for AdManager to understand whether
22 AdManager has a control that allows the turning off
23 of the sharing of user data in RTB?
24     MR. ROBINSON:  Objection; form.
25     THE WITNESS:  I'm a computer scientist.  I will

Page 245

1  need to look at the source code to be able to answer
2  the question yes or no.
3  BY MS. KLEIN:
4      Q.  So the --
5      A.  Sitting here today, I don't know.
6      Q.  Same with AdSense, as you sit here today,
7  do you have the skill set to evaluate the source
8  code for AdSense to understand whether it has a
9  control that allows the turning off of the sharing
10 of user data in RTB?
11     MR. ROBINSON:  Objection; form.
12     THE WITNESS:  My answer is the same as before.
13 BY MS. KLEIN:
14     Q.  You don't know?
15     A.  I will need to look at that hypothetical
16 control and look at the source code to be able to
17 tell whether or not I can design a test that I can
18 conduct.
19     Q.  So the answer is you don't know?
20     MR. ROBINSON:  Objection; form.
21     THE WITNESS:  Without that additional
22 information, I don't know.
23 BY MS. KLEIN:
24     Q.  Have you performed any investigation or
25 analysis as to how much Google charges for any of

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 246

1  its products?
2      MR. ROBINSON:  Objection; form.
3      THE WITNESS:  I don't believe that was my
4  assignment in this case.  I've not conducted that
5  investigation.
6  BY MS. KLEIN:
7      Q.  Okay.  Have you reviewed any of Google's
8  contracts with publishers?
9      A.  I've looked at a lot of documents.  I
10 cannot, sitting here today from memory, recall if
11 I've looked at contracts, but I don't generally
12 because this is -- I don't read a lot of contracts.
13     Q.  You had access to the database in this
14 case, though; correct?
15     A.  Yes.
16     Q.  And you did not search for contracts with
17 publishers?
18     A.  Sitting here today from memory, I cannot
19 recall whether or not we conducted the searches for
20 specific contracts.
21     Q.  And as you sit here today, have you
22 searched for any contracts that Google has with
23 advertisers?
24     A.  Sitting here today, I do not recall from
25 memory.

Page 247

1      Q.  Do you know what Google charges for any of
2  its ad tech products?
3      MR. ROBINSON:  Objection; form.
4      THE WITNESS:  Generally yes, I am aware of it,
5  but this was not a specific task that I investigated
6  for the purposes of my report.
7  BY MS. KLEIN:
8      Q.  So for purposes of your report you don't
9  know how much Google charges for its products?
10     MR. ROBINSON:  Objection; form.
11     THE WITNESS:  From my general experience as a
12 computer scientist and knowledge of the advertising
13 industry, I understand that Google charges -- Google
14 has different charging models to charge for various
15 products and services.
16         For example, in ad auctions, Google
17 charges a cut of the bid that wins the auction, so
18 that's how Google charges in some of its products.
19 So that's my general understanding.
20 BY MS. KLEIN:
21     Q.  Any other understanding as to how Google
22 charges?
23     A.  Because this was not a specific assignment
24 that I worked on for the purposes of my report in
25 this case, sitting here today I do not recall from

Page 248

1  memory.
2      Q.  Do you have any information as to the
3  pricing models for Google as to what is included in
4  any particular product that you're buying?
5      MR. ROBINSON:  Objection; form.
6      THE WITNESS:  Are you referring to a specific
7  product or any Google product?
8  BY MS. KLEIN:
9      Q.  Any Google product in the advertising
10 technology suite of products.
11     MR. ROBINSON:  Objection; form.
12     THE WITNESS:  For instance, it is my
13 understanding that Google has a free version of
14 Google Analytics and then there is a paid version of
15 Google Analytics.
16         But, again, this is not something that I
17 specifically looked at and prepared for today's
18 deposition, so I don't recall all the variations
19 from memory.
20 BY MS. KLEIN:
21     Q.  Have you looked at any contracts -- strike
22 that.
23         Yeah.  Have you looked at any contracts
24 that Google has with any data brokers?
25     A.  Contracts?  I know that Google works --

Page 249

1  several of Google partners are data -- known data
2  brokers, and I describe that in my report.
3      Q.  But you describe the data brokers in
4  paragraph 78 of your report by citing to third
5  parties; correct?
6      A.  Yes.  In paragraph 78 of my report, I'm
7  describing various Google ad tech partners, and this
8  is what I've also seen independently in my research
9  as well, that Google shares user data with these
10 data brokers.
11     Q.  But you haven't cited a single Google
12 document that indicates that Google shares data with
13 these data brokers; correct?
14     MR. ROBINSON:  Objection; form.
15     THE WITNESS:  I believe I've cited a document.
16 BY MS. KLEIN:
17     Q.  Where is a Google document that states
18 that Google shares information with data brokers?
19     A.  I think the list of ad tech partners,
20 which include known data brokers, they're listed in
21 footnote 191 of my report.
22     Q.  And that is a European document; correct?
23     A.  I've, I believe, looked at a U.S. version
24 of this document since submitting my report.  There
25 is a lot of overlap in the companies that are in the

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 250

1 U.S. list versus the EU list.
2     Q.  But that's not cited in your report, is
3 it?
4     A.  Yes.  These companies that I describe are
5 also, I believe, in the U.S. list.
6     Q.  And do you have knowledge of what the
7 relationship is between Google and data brokers?
8     A.  From a technical standpoint, I have
9 conducted tests as part of my research and
10 scholarship.  I've seen Google share cookie
11 information, IP address, browsing history with data
12 brokers such as Oracle that I've cited in my report.
13     Q.  You haven't personally viewed any
14 agreements between Google and any data broker;
15 correct?
16     A.  I have not personally looked at
17 agreements.
18     Q.  And therefore you don't know -- you don't
19 have any firsthand knowledge as to what information,
20 if any, Google actually shares with the data
21 brokers, do you?
22     MR. ROBINSON:  Objection; form.
23     THE WITNESS:  As part of my research and
24 scholarship, I've seen the data sharing happen in
25 action.

Page 251

1     For example, a lot of my research -- one
2 part of my research specifically deals with sharing
3 of cookie identifiers or what is commonly called
4 cookie syncing.
5     (Reporter seeks clarification.)
6     THE WITNESS:  Cookie syncing.
7     I've published a number of papers on this
8 topic.  I teach about this stuff in the classes that
9 I teach.  It is -- it is shown in all of that
10 research that Google does sharing of user
11 identifiers with a number of data brokers, including
12 the two data brokers that I give examples here.
13     MS. KLEIN:  Objection; nonresponsive and move
14 to strike.
15 BY MS. KLEIN:
16     Q.  My question to you, sir, is firsthand
17 knowledge, not scholarly publications.
18     A.  If you see something in action, would you
19 consider that firsthand knowledge or --
20     Q.  You interrupted me, sir.  You interrupted
21 me, sir, this time.  May I finish my question?
22     A.  Is it a question?
23     Q.  I was working on my question, so I'm going
24 to move to strike my question and I will start it
25 over again.

Page 252

1     My question to you, sir, is, have you
2 actually looked at documents between Google and
3 either of these data brokers in which you have seen
4 information transmitted between the two of them?
5     MR. ROBINSON:  Objection; form.
6     THE WITNESS:  I've conducted my own research as
7 part of my research as an academic.  I've published
8 papers on this very topic.
9     And I believe one of the papers that I've
10 cited also specifically studies -- actually, two of
11 those papers specifically study data sharing between
12 different companies, including Google and different
13 data brokers.
14     And they document -- they have evidence,
15 so I've seen evidence in my own research, I've seen
16 evidence in the papers that I cite that show that
17 Google shares data with known data brokers including
18 user identifiers, IP address and browsing history.
19 BY MS. KLEIN:
20     Q.  You don't cite your own research, do you?
21     A.  The citations that I've provided in my
22 report, they're sufficient to form the opinions in
23 my report.  I could have cited some of my own
24 research as well, but I decided that the citations
25 that I ended up leaning on in my report were

Page 253

1 sufficient to form the basis of my opinions.
2     Q.  Well, you also listed on Appendix A the
3 materials that you relied upon.  And you do not list
4 any of your research, Dr. Shafiq, related to data
5 brokers in Appendix A, do you?
6     A.  The papers that are listed in Subsection A
7 of Appendix A does not include a paper that I have
8 co-authored.
9     Q.  So you did not rely on any of your own
10 papers that you've authored in rendering your
11 report; correct?
12     MR. ROBINSON:  Objection; form.
13     THE WITNESS:  You're asking me a question that
14 goes beyond the scope of my reports.  I was telling
15 you there were papers -- for example, the first
16 paper, "Web Tracking from Users' Perspective," that
17 paper specifically studies data sharing between
18 different companies, and it has a very nice graph
19 that shows how Google data -- Google shares data
20 with different companies.
21     The second paper that I cite, "Online
22 Tracking:  A 1-million-site Measurement and
23 Analysis," that's example of another paper --
24     (Reporter seeks clarification.)
25     THE WITNESS:  "Online Tracking:  A

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 254

1  1-million-site Measurement and Analysis," that's
2  example of another paper that also studies the
3  practice of cookie syncing, including cookie syncing
4  done between Google and other companies, including
5  data brokers.
6      MS. KLEIN:  Objection; nonresponsive and move
7  to strike.
8      BY MS. KLEIN:
9      Q.  My question to you, sir, was not about the
10  documents that are referred to in Appendix A, which
11  we've agreed are not your papers.
12      My question to you was, you did not rely
13  on any of your own papers in rendering the opinions
14  in your report; correct?
15      MR. ROBINSON:  Objection; form.
16      THE WITNESS:  I'm a scholar who conducts
17  research in this space.
18      (Reporter seeks clarification.)
19      THE WITNESS:  I am a scholar, a scientist, who
20  conducts research in this space.  I publish papers
21  that I'm sure you can see on my website.  They are
22  listed in my CV.
23      And the findings of my own papers confirm
24  what is listed -- what is shown in the papers that I
25  do cite, which document the sharing of data that

Page 255

1  Google does with other companies, including known
2  data brokers.
3      BY MS. KLEIN:
4      Q.  Dr. Shafiq, you have been a testifying
5  expert in 16 cases over the course of the last four
6  years; correct?  Yes?
7      A.  Is the count will be my CV?
8      Q.  Yes.
9      A.  Are you representing to me that's an
10  accurate count?
11      Q.  That is correct.
12      We discussed earlier today you've been an
13  expert -- testifying expert -- it's also at the end
14  of your report -- on 16 cases over the course of the
15  last four years.
16      MR. ROBINSON:  One -- my apologies.  One quick
17  technical issue.  I don't know if y'all are seeing
18  this in y'all's real-times.  I'm getting an error
19  message.  Are y'all seeing this on y'all's real-time
20  screens?  It's asking me to remove something from a
21  separate deposition.
22      THE REPORTER:  Do you want me to talk or write?
23  I can't write and talk at the same time.
24      MR. ROBINSON:  Oh, okay.
25      MS. KLEIN:  Just use this one.

Page 256

1      BY MS. KLEIN:
2      Q.  Dr. Shafiq, you've been an expert witness
3  in 16 cases over the course of the last four years;
4  right?
5      A.  That's correct.
6      Q.  And by now you know that when issuing a
7  report as a testifying expert, you are required,
8  under the Federal Rules of Civil Procedure, to list
9  out all of the materials that you relied upon;
10  correct?
11      A.  I believe I listed them in Appendix A of
12  my report.
13      Q.  And there are no papers authored by Zubair
14  Shafiq listed in Appendix A in your report; correct?
15      MR. ROBINSON:  Objection; form.
16      THE WITNESS:  That's correct.
17      BY MS. KLEIN:
18      Q.  And therefore you did not rely on any of
19  the papers that you authored in forming the opinions
20  that are reflected in your report, which is Shafiq
21  Exhibit 3; correct?
22      MR. ROBINSON:  Objection; form.
23      THE WITNESS:  I relied on other papers whose
24  findings confirm -- independently confirm findings
25  of my own research.

Page 257

1      BY MS. KLEIN:
2      Q.  Papers authored by other scientists;
3  correct?
4      A.  Papers authored by other scientists that
5  appeared in peer-reviewed venues.
6      Q.  That's right.
7      You did not rely on any papers that you
8  authored in forming the opinions reflected in
9  Exhibit 3; correct?
10      MR. ROBINSON:  Objection; form.
11      BY MS. KLEIN:
12      Q.  Otherwise they would be reflected in
13  Appendix A and they are not.
14      A.  You're asking me a question that is not
15  something that I specifically opine upon -- that I
16  did not specifically opine about in my report.  If
17  you go beyond the context of my report --
18      Q.  I'm --
19      A.  -- I conduct research in this space, as
20  you know that I've written dozens of papers on this
21  very topic.
22      To answer your question, I was telling you
23  my knowledge.  I am editor-in-chief of Proceeding of
24  Privacy Enhancing Technologies, so I review research
25  on a regular basis.  So I was trying to answer your

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 258

1  question based on my general knowledge and expertise
2  in this field.
3      Q.  And I'm asking you questions based upon
4  what you did in this case.
5          And my question in this case was, you have
6  not personally reviewed any agreements or any
7  documents that indicate that Google has transferred
8  or provided any information to data brokers.  That
9  is all based on speculation from papers that you
10  cite.  You haven't seen any Google documents
11  reflecting same --
12      MR. ROBINSON:  Objection; form.
13  BY MS. KLEIN:
14      Q.  -- that show the actual sharing of any
15  information?
16      MR. ROBINSON:  Same objection.
17      THE WITNESS:  The papers that I -- the papers
18  that I cite document empirically in great detail
19  data sharing between Google and other companies.
20      MS. KLEIN:  Objection; nonresponsive and move
21  to strike.
22  BY MS. KLEIN:
23      Q.  I'm talking about Google documents.
24          When you make a statement that Google is
25  sharing information, have you seen any evidence,

Page 259

1  other than the European document that you cite in
2  the footnote, that demonstrates Google is sharing
3  information with data brokers, yes or no?
4      A.  Other than --
5      MR. ROBINSON:  Objection; form.
6          Professor Shafiq, if you wouldn't mind
7  just pausing so I may get my objections.
8      THE WITNESS:  Can you please rephrase your
9  question?
10  BY MS. KLEIN:
11      Q.  Yes.
12          Have you -- you had access to the database
13  to search for documents; right?
14      A.  That's correct.
15      Q.  And did you search for documents that
16  indicated whether or not Google shared information
17  with data brokers?
18      A.  Sitting here today I cannot recall from
19  memory whether I conducted searches specifically for
20  that, but --
21      Q.  That would have been important to your
22  report; right?
23      A.  Can I please complete my answer?
24      Q.  Yes, of course.
25      A.  Sitting here today I cannot recall from

Page 260

1  memory whether or not I conducted that specific
2  search.  I will need to look at my notes that I was
3  taking as I was preparing that report to be able to
4  answer your question.
5      Q.  Well, certainly if you're opining as a
6  fact that Google sells user data to data brokers,
7  one would assume you would have searched the
8  database to see whether there's any documents in the
9  Google production that would confirm this statement;
10  right?
11      A.  These are all the companies that are
12  listed in this particular link.  These companies are
13  known data brokers that are listed in various data
14  broker registries, which is a lot of peer-reviewed
15  research, including peer-reviewed research that I
16  cite that provide evidence how Google shares data
17  with these data brokers.
18      MS. KLEIN:  Objection; nonresponsive and move
19  to strike.
20  BY MS. KLEIN:
21      Q.  My question to you, sir, is, is your report
22  opines as a fact that Google sells user data to data
23  brokers.
24          Did you search the database to see if
25  there's any documents in the Google production that

Page 261

1  would confirm or deny this opinion?
2      A.  Like I --
3      MR. ROBINSON:  Objection; form.
4      THE WITNESS:  Like I said earlier, sitting here
5  today from memory, I cannot recall.  I will need to
6  look at my notes to be able to answer your question
7  which exact searches me and my team conducted.
8  BY MS. KLEIN:
9      Q.  It would have been important to do,
10  though, if you're stating it as a fact, and you
11  would have wanted to find all the evidence you can
12  to support that fact as an expert; right?
13      A.  The facts -- the citations that I provided
14  here and then throughout my report, they are
15  sufficient to support the opinions that I'm offering
16  in the report.
17      Q.  That's all you have, though; right --
18      MR. ROBINSON:  Objection; form.
19  BY MS. KLEIN:
20      Q.  -- is what's cited in your report;
21  correct?
22      A.  Yes, and I also have knowledge and
23  expertise that I'm relying on that is listed in my
24  CV.
25      Q.  But for factual information, the only

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 262

1  thing you have is what's reflected in your report at
2  191 from Google's documents?
3      MR. ROBINSON:  Objection; form.
4      THE WITNESS:  And if you -- if you pretend that
5  Appendix A does not exist, then sure.
6  BY MS. KLEIN:
7      Q.  I don't pretend that Appendix A does not
8  exist, sir.  I have looked at Appendix A.
9      Can you tell me a single document on
10  Appendix A from the Google production that supports
11  the factual contention that Google sells RTB data to
12  data brokers?
13      (Witness reviews document.)
14      Q.  You were looking at Appendix A.
15      Can you identify for me a single document
16  from the Google production that demonstrates or
17  would support your opinion that Google sells user
18  data to data brokers?
19      A.  I will need to look at those documents.  I
20  have not memorized all of these documents.  So
21  sitting here today from memory, I cannot tell you.
22      MR. ROBINSON:  Counsel, once you finish this
23  line of questioning, can we take a break?
24      THE WITNESS:  I need to -- sorry -- use the
25  restroom.

Page 263

1  BY MS. KLEIN:
2      Q.  Yes, just one -- just one more question
3  and then happy to take a break.
4      Safe to assume that if you had found a
5  document from Google's production that supported the
6  contention in paragraph 78, that you would have
7  cited it in the body of the report; correct?
8      MR. ROBINSON:  Objection; form.
9  BY MS. KLEIN:
10      Q.  Is that correct?
11      MR. ROBINSON:  Same objection.
12      THE WITNESS:  The document that I've cited in
13  that part of my report and other research that I've
14  cited is sufficient to offer the basis -- there
15  could exist other documents that I have cited that
16  could provide additional bases for that exact same
17  fact, but I'm comfortable with the facts that -- the
18  evidence that I've cited.
19      MS. KLEIN:  Objection; nonresponsive and move
20  to strike.
21  BY MS. KLEIN:
22      Q.  There's a lot of Google-produced documents
23  cited in your report, and my question to you, sir,
24  was if there were a Google-produced document that
25  supported the contention in paragraph 78 that

Page 264

1  appears on Appendix A, you would have put it a
2  footnote to paragraph 78; correct?
3      A.  I cannot answer your question from memory.
4  I will need to look at my drafting notes to be able
5  to reliably answer your question.
6      MS. KLEIN:  Well, we'd request a copy of the
7  drafting notes, then, if he's going to say he can't
8  answer my question unless he looks at the notes.
9      Now we can take a break.
10      THE VIDEOGRAPHER:  We're going off the record.
11  Time is 5:36.
12      (Recess taken.)
13      THE VIDEOGRAPHER:  We're back on the record.
14  Time is 5:50.
15  BY MS. KLEIN:
16      Q.  We're back on the record after a short
17  break.
18      Is there anything you'd like to change or
19  clarify about your testimony, Dr. Shafiq?
20      A.  No.
21      Q.  Okay.  In paragraph 62 of your report --
22      THE VIDEOGRAPHER:  Counsel, microphone.
23      THE WITNESS:  Yes.
24  BY MS. KLEIN:
25      Q.  -- you cite to a 2021 paper -- and I'm

Page 265

1  going to mangle these names -- by Tahaei and Vaniea,
2  T-a-h-a-e-i and V-a-n-i-e-a, that purports to
3  document dark patterns used by Google AdMob.
4      Do you see that?
5      A.  That is correct.
6      Q.  Okay.  And the paper relates only to
7  AdMob; correct?
8      A.  I will need to look at the paper because I
9  know that the paper was analyzing a broad range of
10  disclosures and, if I remember correctly, perhaps
11  not even limited to Google.  But the things that I
12  cite here specifically discuss AdMob.
13      Q.  And you don't have any papers that cite
14  AdSense; correct?
15      (Witness reviews document.)
16      A.  Not in this section, that's correct.
17      Q.  And you don't have any papers for this
18  section discussing dark patterns about Ad Exchange;
19  correct?
20      A.  I cite in this paper; but other than this
21  paper, I don't see any other papers I cite.
22      Q.  And in paragraph 82 of your report --
23      A.  Oh, okay.  So we are changing gears?
24      Q.  Yeah, I just want to ask you questions
25  about 82 of your report.

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 266

1 Have you reviewed paragraph 82 of your
2 report?
3 A. Yes. I'm at paragraph 82 of my report.
4 Q. The papers that you cite in paragraph 82
5 of your report are not specific to Google's
6 advertising technology; correct?
7 A. No. You are wrong.
8 Q. How am I wrong?
9 A. These papers that I've cited here, they
10 specifically deal with Google's advertising
11 technology. For example, one of the papers
12 specifically takes the information that Google shows
13 to consumers in terms of the data that Google
14 collects and how Google classifies users into
15 various audiences and the paper kind of builds on
16 that to add information to it and then conduct a
17 user survey, asking users about what do they think.
18 And the takeaway of all of that
19 research -- again, this is all specific to Google's
20 advertising -- is that users are creeped out.
21 (Reporter seeks clarification.)
22 Q. Well, the papers are specific to Internet
23 advertising; correct?
24 A. No. If you show me these papers, I can
25 point you to the specific parts or design of these

Page 267

1 papers that are geared towards Google specifically
2 and the information that Google collects and uses
3 for targeted advertising.
4 Q. The information that Google collects and
5 uses but not necessarily the advertising technology
6 platforms; correct?
7 A. It is related to all the other controls
8 and transparency things that we looked at earlier,
9 and they are all related to the information that
10 Google uses for advertising.
11 Q. And you agree with me, sir, that while
12 some people might find personalized ads creepy or
13 invasive, there are consumers who actually like
14 targeted ads; correct?
15 A. The papers that I cite where they conduct
16 these surveys, the takeaway of that research is --
17 and this is the conclusion that researchers draw
18 there -- that a vast majority -- for example, in one
19 specific paper that I cite, 80 percent of the
20 research participants were uncomfortable with the
21 level of tracking.
22 MS. KLEIN: Objection; nonresponsive and move
23 to strike.
24 BY MS. KLEIN:
25 Q. I wasn't asking you about tracking, sir.

Page 268

1 I was asking you a general question unrelated to
2 these studies.
3 My question to you is, that while some
4 people might find personalized ads creepy or
5 invasive, you agree with me that there are some
6 consumers who actually like targeted ads; correct?
7 A. It is possible that there could exist
8 users, but, like I said when I'm discussing in
9 this part of my report, peer-reviewed research where
10 researchers have showed to consumers the extent of
11 data collection used and how it is used for
12 personalized advertising, once that full context is
13 made available to consumers, consumers become
14 uncomfortable.
15 So if you don't tell any consumers why
16 they are seeing a particular ad in full detail, then
17 consumers may have certain opinion and this is where
18 I think Dr. Hoffman got it wrong.
19 In privacy research, where privacy
20 researchers do these surveys, they make sure that
21 they tell consumers the full extent of data
22 collection, sharing and use.
23 And once that full context is provided to
24 consumers, the opinion that Dr. Hoffman provided,
25 she would have reached a different opinion and those

Page 269

1 surveys showed that users -- vast majority of them
2 are uncomfortable.
3 MS. KLEIN: Objection; nonresponsive and move
4 to strike after, "It's possible there could exist
5 users."
6 BY MS. KLEIN:
7 Q. Sir, I'm not asking you about what happens
8 to people after they've been exposed to information
9 in the study.
10 I'm asking you, don't you agree with me
11 that there's a spectrum of people out there in the
12 universe, some of whom like targeted ads and some of
13 them don't care and some of them dislike them and
14 it's a spectrum, and you agree with me that those
15 users exist; correct?
16 MR. ROBINSON: Objection; form.
17 THE WITNESS: Your statement is lacking context
18 and all the research that I'm describing in this
19 part of my report.
20 BY MS. KLEIN:
21 Q. I'm not asking --
22 A. For example --
23 Q. -- about -- this is -- we're going to go
24 on forever here, sir, if you don't listen to my
25 question and stop littering it with information that

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 270

1  you want to tie back to your report. I'm not asking
2  about your report. I'm not asking about studies.
3      A.  Can I close my report?
4      Q.  Sure.
5          I'm not asking about your report. I'm not
6  asking about studies. I am asking about facts.
7          And isn't it true that out there in the
8  universe exists a spectrum of consumers, some of
9  whom like targeted ads, some of whom hate targeted
10 ads and there's a variety of people in between and
11 there's a spectrum of people who like to dislike?
12     A.  I would --
13     MR. ROBINSON:  Objection; form.
14     THE WITNESS:  I would not agree with that.
15 BY MS. KLEIN:
16     Q.  Do you agree that there are any consumers
17 who like targeted ads?
18     A.  There could exist consumers who like, but
19 peer-reviewed research has shown that once users are
20 fully made aware of the data collection, usage and
21 sharing and how advertisers use it to profile
22 consumers, then consumers largely, vast majority --
23 for example, in this one particular study, more than
24 80 percent or about 80 percent are uncomfortable.
25 So there could exist 20 percent that have some level

Page 271

1  of comfort, but there exist 80 percent of consumers
2  who are uncomfortable.
3      Q.  They're uncomfortable about the level of
4  data collected, but it doesn't change whether or not
5  they like targeted ads; correct? That wasn't part
6  of the study.
7      A.  Let me give you an example.
8      Q.  I don't want an example, sir. I want to
9  know the study.
10         If you're going to quote the study to me,
11 I want to say that the finding of this study was
12 that consumers were uncomfortable with the level of
13 data collected, not that it changed their opinion
14 about whether or not they liked targeted ads;
15 correct?
16     A.  Do you want me to go to the report?
17 Because I cite studies in my report.
18     Q.  I want to know for those specific studies,
19 sir, that it changed the opinion about their comfort
20 for data collected but not whether or not they liked
21 the targeted ads; right?
22     MR. ROBINSON:  Objection; form.
23     THE WITNESS:  I've not memorized the papers,
24 but the papers that I cite in footnote 208 and 209
25 of my report --

Page 272

1      (Reporter seeks clarification.)
2      THE WITNESS:  -- the papers that I cite in
3  footnotes 208, 209, 210 get to this issue.
4  BY MS. KLEIN:
5      Q.  Right. And in 209 you say, [as read]
6  "One-third of participants who saw our fully
7  featured interface were surprised how trackers were
8  used -- how trackers used their browsing history to
9  infer their interests, and that interests were even
10 inferred in the first place. Even before using our
11 tool, participants were often aware of the existence
12 of online tracking. However, when confronted with
13 detailed descriptions of tracking in their own
14 browsing, they were often surprised by tracking
15 extent and prevalence. Further, participants who
16 saw information about potential inferences reported
17 greater intentions to take privacy-protective
18 actions."
19         Do you see that?
20     A.  I apologize. You lost me. Where are you
21 reading from?
22     Q.  Footnote 209. The inference of the study
23 in paragraph 209 is not that people didn't like
24 targeted ads, it's that they would take greater
25 privacy protections; correct?

Page 273

1      MR. ROBINSON:  Objection; form.
2      THE WITNESS:  I would ask you to pay attention
3  to earlier parts of this paragraph, where, for
4  example, I quote, "the researchers found that
5  consumers perceived behaviorally personalized ads as
6  'creepy' and 'privacy invasive,' and that a majority
7  'were either fully or partially opposed' to
8  personalized ads."
9  BY MS. KLEIN:
10     Q.  That's not the same study, sir. That's
11 paragraph 208. I was looking at study 209.
12         Do you see that?
13     A.  I believe I told you all the footnotes
14 which include this one.
15     Q.  And that's a study from 2012; correct?
16     A.  That paper was published in 2012, that's
17 correct.
18     Q.  Right. And the Internet advertising
19 technology has changed vastly since then, hasn't it?
20     MR. ROBINSON:  Objection; form.
21 BY MS. KLEIN:
22     Q.  Correct?
23     A.  Oh, sorry. What was the question?
24     Q.  Internet advertising technology has
25 changed a lot since then, as has consumer

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 274

1  expectations; correct?
2      MR. ROBINSON: Objection; form.
3      THE WITNESS: I would not agree with that.
4  BY MS. KLEIN:
5      Q. You don't have anything -- strike that.
6      Do you agree with me that end users'
7  relationship with technology has changed since 2012?
8      MR. ROBINSON: Objection; form.
9      THE WITNESS: Can you -- because your question
10  is a very broad question. Can you please add more
11  details into it?
12  BY MS. KLEIN:
13      Q. No, I can't.
14      Can you answer my question?
15      MR. ROBINSON: Same objection.
16      THE WITNESS: Unless you give me more specific
17  details -- this is not something that I studied as
18  part of my assignment in this case, and I cannot,
19  sitting here today from memory, answer your
20  questions.
21  BY MS. KLEIN:
22      Q. Users' understanding of technology has
23  changed since 2012, hasn't it?
24      MR. ROBINSON: Objection; form.
25      THE WITNESS: This is a very, very broad

Page 275

1  question. It is hard for me to answer your very,
2  very broad question as a "yes" or "no."
3  BY MS. KLEIN:
4      Q. You don't know the answer then?
5      MR. ROBINSON: Objection; form.
6      THE WITNESS: This was not the assignment that
7  was given to me by counsel in this specific case.
8  BY MS. KLEIN:
9      Q. Do you agree with me that digital
10  advertising has evolved since 2012?
11      MR. ROBINSON: Objection; form.
12      THE WITNESS: There are things in digital
13  advertising that have remained the same and then
14  there are things that have changed.
15      For example, as I think is documented in
16  these series of papers, over the years, the level of
17  tracking that is done by companies such as Google
18  has increased.
19  BY MS. KLEIN:
20      Q. Do you agree with me that consumers have
21  started to use social media more since 2012?
22      A. I did not specifically study this for the
23  purposes of this report, so I cannot reliably answer
24  your question one way or the other.
25      Q. Do you agree with me that the way that

Page 276

1  consumers are served ads has changed considerably
2  since 2012?
3      MR. ROBINSON: Objection; form.
4      THE WITNESS: There is still, for example,
5  programmatic advertising. That has remained
6  constant. The exact protocol or some detail may
7  have evolved, but generally speaking, the use of
8  cookies and other device identifiers to track
9  consumers, to profile them, to share and sell their
10  data, that was true in 2012, that remains true
11  today.
12      MS. KLEIN: Objection; nonresponsive and move
13  to strike.
14  BY MS. KLEIN:
15      Q. My question to you, sir, was, do you agree
16  that the way consumers are served ads has changed
17  considerably since 2012, yes or no?
18      MR. ROBINSON: Objection; form.
19      THE WITNESS: I would not agree with that
20  statement.
21  BY MS. KLEIN:
22      Q. Do you agree with me, sir, that there have
23  been a variety of privacy regulations that have been
24  implemented since 2012?
25      MR. ROBINSON: Objection; form.

Page 277

1      THE WITNESS: Yes.
2  BY MS. KLEIN:
3      Q. Including privacy regulations in the
4  United States?
5      A. Yes.
6      Q. What is the definition of sell?
7      A. I understand that there is a legal
8  definition, so since I'm not offering any legal
9  opinions in this case, I'm not going to offer a
10  legal definition of sell.
11      But in the field of computer science, the
12  way this term is commonly understood is data is
13  shared and then the other party gets paid.
14      Q. For the use of the data?
15      A. Yeah, the transaction happens that the
16  data is shared and then the other party gets paid.
17      Q. Somebody is buying the data? The use of
18  the data?
19      MR. ROBINSON: Objection; form.
20      THE WITNESS: Can you clarify what you mean by
21  "use of the data"? That's throwing me off.
22  BY MS. KLEIN:
23      Q. Somebody is buying the data to use.
24      A. Yes. As I described in my report, there
25  are data brokers who buy the data and then use it in

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 278

1  a number of ways, including further selling it to
2  other companies.
3      MS. KLEIN:  Thank you, Dr. Shafiq.
4      I'll pass the witness.
5      MR. ROBINSON:  Okay.  If we could just take a
6  brief break.
7      THE VIDEOGRAPHER:  We're off the record.  The
8  time is 6:09.
9      (Recess taken.)
10     THE VIDEOGRAPHER:  We're back on the record.
11 The time is 6:28.
12         EXAMINATION
13 BY MR. ROBINSON:
14     Q.  Now, Professor Shafiq, it's been a long
15 day, so let's keep it to some brief questions for
16 you.
17         So you issued a report on September 9th,
18 2024; correct?
19     A.  That's correct.
20     Q.  And since you issued your September 9th,
21 2024 report, has your -- have your opinions changed
22 since you issued the report?
23     A.  No.
24     Q.  And I want to briefly touch on your
25 report.  Looking at your expert report,

Page 279

1  paragraph 15, you broadly offer three opinions in
2  this case; right?
3      A.  That's correct.
4      MS. KLEIN:  Objection; outside the scope of
5  direct.
6  BY MR. ROBINSON:
7      Q.  And one of those opinions is listed in
8  paragraph 16, Subsection A and reads, [as read] "It
9  is my opinion that there are no unique privacy
10 concerns with header bidding as compared to Google's
11 open bidding and Dr. Ghose fails to identify any
12 unique privacy concerns with header bidding as
13 compared to Google's open bidding."
14         Did I read that correctly?
15     A.  Yes.
16     Q.  And that is -- does that remain your
17 opinion today?
18     MS. KLEIN:  Objection; leading.
19     THE WITNESS:  Yes.
20 BY MR. ROBINSON:
21     Q.  Moving to Subsection B, your second
22 opinion, in about the middle of the paragraph, do
23 you see a sentence that starts with, "It is my
24 opinion that Google has substantial and unique
25 access"?

Page 280

1      Do you see that?
2      A.  Yes.
3      Q.  And finishing out that sentence, "Google
4  has substantial and unique access to data through
5  its O&O websites and products that provides it with
6  a data advantage over competitors."
7      Did I read that correctly?
8      A.  Yes.
9      Q.  And sitting here today has that remained
10 your opinion?
11     MS. KLEIN:  Objection; leading.
12     THE WITNESS:  Yes.
13 BY MR. ROBINSON:
14     Q.  Moving to Subsection C, your third opinion
15 in this case, on the next page directly above
16 paragraph 17, directly above the header titled
17 "Google's Conduct Related to Bid Data Transfer
18 Files," do you see the paragraph directly above
19 that?
20     A.  Yes.
21     Q.  And do you see the sentence that reads,
22 [as read] "Contrary to Google's disclosure
23 statement, Google sells user data billions of times
24 every day in real-time bidding auctions.  Google
25 does not offer any control to users to opt-out of

Page 281

1  the sale of their data in RTB"?
2      Did -- I read that correctly; right?
3      A.  Yes.
4      Q.  And sitting here today does that remain
5  your opinion?
6      MS. KLEIN:  Objection; leading.
7      THE WITNESS:  Yes.
8  BY MR. ROBINSON:
9      Q.  And you're not offering any opinions
10 outside of this report; right?
11     A.  That's correct.
12     Q.  And all the bases of your report that you
13 rely on in your opinions are contained in your
14 report and the appendices to your report; right?
15     MS. KLEIN:  Objection; form.
16     THE WITNESS:  That's correct.
17 BY MR. ROBINSON:
18     Q.  And you used a methodology in reaching
19 these opinions in your report; right?
20     MS. KLEIN:  Objection; leading.
21     THE WITNESS:  Yes.
22 BY MR. ROBINSON:
23     Q.  And we've discussed that methodology here
24 today with Google's counsel; right?
25     A.  Yes.

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 282

1    Q.  And that methodology that you used in
2  reaching those opinions is contained in your report?
3      MS. KLEIN:  Objection; form.
4      THE WITNESS:  Yes.
5  BY MR. ROBINSON:
6    Q.  And have you used this methodology before
7  in reaching opinions?
8      MS. KLEIN:  Objection; leading.
9      THE WITNESS:  Yes.  As I describe in my report,
10  peer-reviewed research, the methodology that is
11  contained therein, that is the methodology that I've
12  used and is used in the materials that I've relied
13  upon, such as peer-reviewed research papers.  This
14  is commonly used in computer science research.
15  BY MR. ROBINSON:
16    Q.  So others in your field use the same
17  methodology?
18      MS. KLEIN:  Objection; leading, form --
19      THE WITNESS:  That's correct.
20      MS. KLEIN:  -- outside the scope of direct.
21      THE WITNESS:  That's correct.
22  BY MR. ROBINSON:
23    Q.  And this methodology that you've used and
24  is in your report is considered reliable in your
25  field of expertise?

Page 283

1      MS. KLEIN:  Objection; form, calls for
2  speculation, lacks foundation, leading --
3      MR. ROBINSON:  Okay.
4      THE WITNESS:  That's correct.
5      MS. KLEIN:  -- has a legal conclusion.
6      MR. ROBINSON:  Counselor, Counselor, you've --
7  this is -- local rules of the Eastern District
8  restrict it to objection; leading.  I would
9  appreciate it if you stuck with that.
10      MS. KLEIN:  I can object to the form too.
11      MR. ROBINSON:  And you can --
12      MS. KLEIN:  And I'm not coaching the witness.
13      MR. ROBINSON:  You can object to the form and
14  to leading, and I would appreciate it if you could
15  hold it there.
16      MS. KLEIN:  I wish you would have done it today
17  too.
18  BY MR. ROBINSON:
19    Q.  Are all the bases that you have used and
20  relied upon in forming your opinions contained in
21  your report?
22      MS. KLEIN:  Objection; form, leading, asked and
23  answered.
24      THE WITNESS:  That's correct.
25      MR. ROBINSON:  Okay, Professor Shafiq, that

Page 284

1  will conclude my questions for today and I'll
2  reserve further questions for -- one second, one
3  second.
4      That will conclude my questions for today
5  and I'll reserve further questions for trial.
6      FURTHER EXAMINATION
7  BY MS. KLEIN:
8    Q.  Professor Shafiq, I just have a couple of
9  questions.
10      So remember earlier today when we were
11  talking and I was asking you lots of questions about
12  your opinions in TikTok and the other cases, your
13  counsel continually instructed you not to answer to
14  the extent that you would have to violate your NDA;
15  correct?
16    A.  I did not answer a subset of questions on
17  the instruction of counsel.
18    Q.  Right, because what you oftentimes do as
19  an expert witness in your chosen field requires an
20  NDA when you get hired, as an expert report [sic];
21  correct?
22      MR. ROBINSON:  Objection to the form and scope
23  of redirect.
24      THE WITNESS:  In that particular case, I've
25  signed a confidentiality order that was, I believe,

Page 285

1  issued by the court and at the instruction of
2  counsel and to comply with that confidentiality
3  order that I've signed in that case, I did not
4  answer a subset of your questions.
5  BY MS. KLEIN:
6    Q.  Correct.  But it doesn't just relate to
7  the TikTok case.
8      You're subject to NDA and confidentiality,
9  for example, with respect to the case that you were
10  hired on after September 9th that we discussed
11  earlier; correct?
12      You discussed that you were engaged on
13  another matter after September 9th and you couldn't
14  talk about it with me because you were subject to an
15  NDA.
16      Do you recall that testimony?
17    A.  I cannot recall.  Maybe we can reread it
18  from the record.
19    Q.  You were in engaged as an expert following
20  issuing your expert report on September 9th in
21  another matter; right?
22    A.  That's correct.
23    Q.  Can you tell me what that matter is?
24      MR. ROBINSON:  Objection; form, scope.
25      And, Professor Shafiq, to the extent that

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 286

1  you can answer the question without violating
2  confidentiality orders, protective orders or
3  privilege information, you may answer.
4      THE WITNESS:  It is my understanding that --
5  let me start again.
6      My work in that case has not been
7  disclosed and I've signed a confidentiality order.
8  BY MS. KLEIN:
9      Q.  And even -- oh, sorry, go ahead.
10     A.  And subject to that, I cannot answer
11  questions about a matter which has not been
12  disclosed without violating the order that I've
13  signed.
14     Q.  Right.  And lots of the kinds of work that
15  you do, given that you're dealing with data for big
16  companies under highly confidential protective
17  orders, you can't talk about what you do with other
18  people; right?
19     MR. ROBINSON:  Objection; form, scope.
20  BY MS. KLEIN:
21     Q.  You can't talk about your expert reports
22  and the methodologies you're employing with other
23  people because you're subject to an NDA and a
24  confidentiality order; right?
25     MR. ROBINSON:  Same objections.

Page 287

1      THE WITNESS:  I can talk about the
2  methodologies that I've used in my report, in the
3  research papers that I've published that I'm relying
4  on and in this particular report.
5  BY MS. KLEIN:
6      Q.  Right, but you -- while you're undergoing
7  the work, for example, you can't talk about it with
8  somebody else at U.C. Davis?
9      MR. ROBINSON:  Objection --
10     THE WITNESS:  Which --
11     MR. ROBINSON:  -- form, scope.
12     THE WITNESS:  Can you clarify which work
13  you're --
14  BY MS. KLEIN:
15     Q.  Sure.
16     A.  -- talking about?
17     Q.  Let's go back to your CV, sir, which is
18  Shafiq Exhibit 2.
19     Second-to-last page of Shafiq Exhibit 2,
20  your expert testimony and reports over the past
21  10 years.
22     Do you see that?
23     MR. ROBINSON:  Objection; form, scope.
24     THE WITNESS:  I'm at the page 16 of my CV.
25  BY MS. KLEIN:

Page 288

1      Q.  Right.
2      You see where you list the 16 reports
3  you've given over the last 10 years?
4      A.  Yes.
5      Q.  Okay.  Tell me about In re Meta Pixel
6  Healthcare Litigation.
7      MR. ROBINSON:  Objection --
8  BY MS. KLEIN:
9      Q.  What's the methodology and what were you
10  looking at in that litigation?
11     MR. ROBINSON:  Objection; form, scope.
12     And then a similar instruction, Professor
13  Shafiq.  To the extent you can answer the question,
14  it does not violate signed non-disclosure
15  agreements, confidentiality orders, protective
16  orders or privilege, you may answer.
17     THE WITNESS:  Can you please rephrase your
18  question?
19  BY MS. KLEIN:
20     Q.  Sure.
21     What's the -- what's the methodology that
22  you employed and the subject matter of that report?
23     A.  Without going into the confidential
24  details of that matter, that case broadly deals with
25  the defendant's collection of personal data from

Page 289

1  consumers.
2      Q.  And tell me about your methodology,
3  please, sir.
4      MR. ROBINSON:  Same objections, same
5  instruction and cautioning regarding non-disclosure
6  agreements, confidentiality orders, protective
7  orders and privilege.
8      THE WITNESS:  Which methodology are you
9  referring to?
10  BY MS. KLEIN:
11     Q.  Your methodology in your report and In re
12  Meta Pixel Healthcare Litigation.  Tell me about it.
13     A.  I issued the report in that case.  If you
14  put the report in front of me, which I believe is
15  subject to protective order -- subject to that
16  protective order, I will attempt to answer your
17  question.
18     Q.  You can't talk about it because it's
19  subject to a protective order and it's not public;
20  right?
21     MR. ROBINSON:  Objection; form, scope.
22     THE WITNESS:  Whether or not I can answer your
23  question about, for example, that matter where that
24  deals with defendant's collection of personal
25  information from consumers depends on the

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 290

1  confidentiality order that I have signed in that
2  case.
3  BY MS. KLEIN:
4      Q.  Can you tell me the methodology you
5  employed in that case today or not?
6      MR. ROBINSON:  Same objections, same
7  instructions regarding prior agreements and
8  privilege.
9      THE WITNESS:  It depends on what broad level
10  you are asking me.  Are you asking me a specific
11  question about a specific methodology or generally
12  speaking?
13  BY MS. KLEIN:
14      Q.  I'm asking you, you testified a few
15  minutes ago that the methodology you employed is
16  customary among other experts in the industry, and
17  I'm here to tell you that you're constrained under
18  your NDA from talking about that methodology with
19  anybody else, so how do you know that it's
20  customary?
21      MR. ROBINSON:  Objection; form, scope.
22      THE WITNESS:  Which methodology are you asking
23  me a question about?
24  BY MS. KLEIN:
25      Q.  I'm asking you about In re Meta.  What's

Page 291

1  the methodology there?
2      MR. ROBINSON:  Same objections --
3  BY MS. KLEIN:
4      Q.  Answer the question, please.
5      MR. ROBINSON:  -- form and scope and same
6  instruction and cautioning regarding prior
7  agreements and privilege.
8  BY MS. KLEIN:
9      Q.  Specifically speaking, tell me the
10  methodology you employed in coming to your
11  conclusions in In re Meta Pixel Healthcare
12  Litigation, sir.
13      MR. ROBINSON:  Same objections, same
14  cautioning.  You may answer the question to the
15  extent you can without violating those agreements
16  and privilege.
17      THE WITNESS:  I have not memorized all the
18  reports that I've written in other cases.  If you
19  ask me generally, I can try to answer your question.
20  But I cannot, from memory, give you any specifics.
21  BY MS. KLEIN:
22      Q.  Well, the specifics are your counsel asked
23  you if your methodology was customary in the
24  industry, but you don't know the specifics and you
25  can't talk about it with anyone, so you really don't

Page 292

1  know whether your methodology is customary or not;
2  correct?
3      MR. ROBINSON:  Objection; asked and answered,
4  form, scope, same cautioning regarding prior
5  agreements.
6      THE WITNESS:  The methodology that I've used
7  for the purposes of my report in this case as well
8  as generally in other cases as well as peer-reviewed
9  research that I do, including the peer-reviewed
10  research that I've cited in my report, uses a
11  standard methodology to study privacy issues in
12  online advertising.
13      I've used the exact same methodology in
14  this case as well as, generally speaking, in other
15  matters.
16  BY MS. KLEIN:
17      Q.  But you can't tell me what those matters
18  are, can you?  And I can't look at those reports to
19  tell?
20      MR. ROBINSON:  Same objections on form and
21  scope, same cautioning regarding previous protective
22  orders and confidentiality agreements and privilege.
23  But you may answer to the extent that you do not
24  violate those.
25      THE WITNESS:  Is there a question on the floor?

Page 293

1  Because I did not hear it as there was a question
2  for me.
3  BY MS. KLEIN:
4      Q.  Yes, sir.
5      You can't tell me which reports you have
6  used the same methodology in, specifically?
7      MR. ROBINSON:  Same objections to form and
8  scope.
9      THE WITNESS:  I have not memorized every report
10  that I've written in other cases.
11  BY MS. KLEIN:
12      Q.  Well, you've got 16 cases written down
13  there.  Tell me which ones you've used this exact
14  same methodology in.
15      MR. ROBINSON:  Same objection; form and scope.
16      And caution the witness he can answer to
17  the extent he can without violating confidentiality
18  orders, non-disclosure agreements or privilege.
19      THE WITNESS:  Subject to the confidentiality
20  orders that I've signed in other matters, my work,
21  generally speaking, not talking about a specific
22  case, talking generally speaking, involves studying
23  data collection in online advertising ecosystem,
24  such as -- and the methodology that is generally
25  used in those matters is described in peer-reviewed

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 294

1  research papers, where you analyze data collection
2  and sharing when a consumer visits a certain
3  website.
4      That's the same general methodology that I
5  have used in all of my work, including peer-reviewed
6  research, as well as my work, generally speaking, in
7  other matters. And it is no different in this case.
8  BY MS. KLEIN:
9      Q. You used a different methodology in a case
10 called John Doe 1, though; right?
11     MR. ROBINSON: Objection; form, scope.
12     To the extent you can answer, you may
13 without violating confidentiality orders, protective
14 orders or privilege.
15     THE WITNESS: I have not memorized all the
16 reports that I've written.
17 BY MS. KLEIN:
18     Q. I'd have to look at the report and show it
19 to the judge and compare to show that you used
20 different methodologies in different cases; right?
21     MR. ROBINSON: Objection; form, scope.
22     THE WITNESS: I cannot answer your general
23 question without more details. If you ask me more
24 specifically, then I can attempt to answer your
25 question.

Page 295

1      But as a general matter, I've told you the
2  methodology that I've used for the kind of
3  assignments where the goal is to study data
4  collection, sharing and usage. As I explained in
5  the start of my report, this is squarely the focus
6  of the research that me and my lab conducts deals
7  with this and the methodology that I've generally
8  used in peer-reviewed research as well as other
9  cases, including this particular case, follows the
10 standard methodology that I've used in peer-reviewed
11 research, that other people have used in
12 peer-reviewed research, including the papers that
13 I've cited in my report.
14 BY MS. KLEIN:
15     Q. You haven't articulated any methodology,
16 sir.
17     Can you please explain what your
18 methodology is?
19     MR. ROBINSON: Objection; form, scope.
20     THE WITNESS: Do you want me to give you an
21 example?
22 BY MS. KLEIN:
23     Q. No.
24     I want to know what was your methodology
25 in this case?

Page 296

1      A. For the assignment, for example, the
2  second assignment, where the goal was to study
3  Google's data collection, for that specific
4  assignment, I relied on peer-reviewed research and
5  the methodology that is used in them, which is to
6  crawl a large number of websites and meticulously
7  count how many websites -- on how many websites data
8  is collected by different companies.
9      I describe that extensively in my report,
10 and that methodology is described in much, much
11 greater detail in the research papers that I cite in
12 my report.
13     Q. Where in your report do you describe that
14 you crawled thousands of sites?
15     A. Do you want me to go back to the report?
16     Q. Yes, sir.
17     (Witness reviews document.)
18     A. The papers that I cite and my summary of
19 those papers in paragraph 41c, all of these
20 papers -- I believe all except one of these papers
21 use the methodology where they crawl various
22 websites.
23     For example, the first citation in 40c1
24 [sic], crawled one million websites and then did the
25 counting and reached the conclusion that Google

Page 297

1  tracks users on 78.07 percent of the top one million
2  websites.
3      Q. You didn't personally crawl these
4  websites; correct?
5      MR. ROBINSON: Objection; form, scope.
6  BY MS. KLEIN:
7      Q. You cited papers that crawled the
8  websites?
9      A. I did not crawl one million websites, but,
10 like I told you earlier, this is the methodology
11 that I have also used when I was reading these
12 papers and citing them in my report.
13     I also analyzed various websites to
14 confirm that the results are indeed what I am seeing
15 in my own testing.
16     Q. Well, sir, you didn't describe that
17 methodology in your report, did you?
18     MR. ROBINSON: Objection; form.
19 BY MS. KLEIN:
20     Q. You never said in your report that you
21 crawled any websites?
22     MR. ROBINSON: Same objection.
23     THE WITNESS: All of these papers that --
24     (Reporter seeks clarification.)
25 BY MS. KLEIN:

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 298

1    Q.  You never said in your report that you
2  crawled any websites; correct?
3        MR. ROBINSON:  Same objection.
4        THE WITNESS:  I did not use those exact words
5  in my report.
6  BY MS. KLEIN:
7    Q.  But you did say in the TikTok report that
8  you crawled websites; right?
9    A.  Can you tell me which . . .
10   Q.  Do you not remember that you crawled
11 websites with respect to your TikTok opinion,
12 really?
13       MR. ROBINSON:  Objection; form.
14       THE WITNESS:  I do not recall.
15 BY MS. KLEIN:
16   Q.  Okay.  Let's go back to the TikTok
17 opinion, sir.  Exhibit 9.  Your declaration,
18 Exhibit 9.  Page 48.
19   A.  Can I take a moment to review?
20   Q.  Sure, take all the time you want, sir.
21   A.  Which page was it?
22   Q.  Page 48.
23       MS. MARMARO:  Page 48?
24       MS. KLEIN:  Page 48, paragraph 82.
25       THE WITNESS:  Yes.

Page 299

1  BY MS. KLEIN:
2    Q.  You see in your -- in your report at
3  page 48, paragraph 82, Exhibit Shafiq 9, you said,
4  [as read] "I crawled six websites included in the
5  second amended complaint using four major web
6  browsers," and then it goes on from there.
7        Do you see that?
8    A.  Paragraph 48?
9    Q.  Page -- paragraph 82?
10   A.  Oh.
11   Q.  Page 48.
12       Do you see here where you said you crawled
13 six websites?
14   A.  Yes.
15   Q.  Your methodology in TikTok was different,
16 wasn't it?
17       MR. ROBINSON:  Objection; form.
18       THE WITNESS:  Without going into the specifics
19 of my assignments in that case, the methodology of
20 analyzing tracking that I've used in peer-reviewed
21 research, that is the same in my research, that is
22 the same, generally speaking, in this report as well
23 as what is used in the research papers that I cite
24 in my report in this case.
25 BY MS. KLEIN:

Page 300

1    Q.  You looked at source code in the TikTok
2  case?
3        MR. ROBINSON:  Same -- object to form and
4  scope.  And similar caution on you may answer the
5  question to the extent it does not violate
6  confidentiality orders, protective orders or
7  privilege.
8        THE WITNESS:  I believe I cannot answer your
9  question about details of source code analysis.
10 BY MS. KLEIN:
11   Q.  I'm not asking your analysis, sir, I'm
12 just asking if you reviewed source code in the
13 TikTok case; correct?
14   A.  No.
15       MR. ROBINSON:  Similar objection to the
16 questions and cautioning on confidentiality order
17 and privilege.
18 BY MS. KLEIN:
19   Q.  There are cases in which you reviewed
20 source code; correct?
21       MR. ROBINSON:  Object to the form and scope and
22 instruct the witness that, to the extent you can
23 answer the question without violating
24 confidentiality orders, protective orders,
25 non-disclosure agreements or privilege, you may

Page 301

1  answer the question.
2        THE WITNESS:  Just like we talked about the
3  source code of Google AdMob that I discuss and the
4  analysis of websites, what happens when the source
5  code a website executes that I describe in my report
6  in this case.
7  BY MS. KLEIN:
8    Q.  Sir, I'm talking --
9    A.  I have similarly --
10   Q.  Go ahead.
11   A.  -- analyzed source code in the same
12 fashion, generally speaking, in other cases as well.
13   Q.  And you analyzed source code in more depth
14 in other cases as well, where you got access to
15 highly confidential source code that's not subject
16 to public disclosure; correct?
17       MR. ROBINSON:  Object to the form.
18 BY MS. KLEIN:
19   Q.  You actually looked at the source code
20 that's not publicly available in other cases?
21       MR. ROBINSON:  Object to the form and scope.
22 And instruct the witness that he may answer to the
23 extent it does not violate non-disclosure
24 agreements, confidentiality orders, protective
25 orders or privilege.

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 302

1    THE WITNESS: Can I answer yes or no?
2    MR. ROBINSON: Yes, if you believe that does
3  not violate your previous protective orders,
4  confidentiality orders or non-disclosure agreements
5  or privilege.
6    THE WITNESS: Subject to the protective orders
7  that I've signed, the only answer I can give you is
8  no.
9  BY MS. KLEIN:
10   Q.  Okay. Let's look at the last page of
11 Exhibit 9.
12   A.  Last page. Yes.
13   Q.  Do you see where it says, [as read] "Slip
14 sheet, Appendix B exists of source code, scripts and
15 data and has been produced by e-mail in native form
16 to defendants"?
17   A.  Yes.
18   MR. ROBINSON: Object to the form and to the
19 scope.
20   THE WITNESS: This is what it states.
21 BY MS. KLEIN:
22   Q.  Right. You reviewed source code that you
23 appended to your report in the TikTok case?
24   MR. ROBINSON: Object to the form, to the
25 scope.

Page 303

1  BY MS. KLEIN:
2    Q.  Correct?
3    A.  No, that's incorrect.
4    Q.  You didn't review what you attached to
5  Exhibit B [sic]?
6    MR. ROBINSON: Object to the form, to the
7  scope.
8    THE WITNESS: This is the source code that I
9  wrote.
10 BY MS. KLEIN:
11   Q.  So you never reviewed source code as part
12 of your expert work in any case?
13   MR. ROBINSON: Object to the form, to the
14 scope.
15     You may answer the question to the extent
16 it does not violate confidentiality orders,
17 non-disclosure agreements, protective orders or
18 privilege.
19   THE WITNESS: Subject to all of those
20 confidentiality orders, my answer to your question,
21 generally speaking, is no.
22 BY MS. KLEIN:
23   Q.  So the last page of Exhibit 9 is source
24 code that you created to do what?
25   MR. ROBINSON: Object to the form, to the

Page 304

1  scope.
2    And you may answer the question to the
3  extent it does not violate confidentiality orders,
4  protective orders, that you have signed and also
5  privilege.
6    THE WITNESS: Sitting here today I do not
7  recall from memory, but if you show it to me, I can
8  try to answer your question.
9  BY MS. KLEIN:
10   Q.  You wrote code to perform work to do work
11 in the TikTok case; right?
12   MR. ROBINSON: Object to the form, to the
13 scope.
14     And you may answer the question to the
15 extent it does not violate confidentiality orders,
16 protective orders or privilege.
17   THE WITNESS: Can you please rephrase that
18 question?
19 BY MS. KLEIN:
20   Q.  You wrote code to perform work in the
21 TikTok case, which you appended as Exhibit B?
22   A.  That's correct --
23   MR. ROBINSON: Same objection and same
24 instruction.
25     You may answer the question if it does not

Page 305

1  violate those orders, agreements or privilege.
2    MS. KLEIN: He already said, "That's correct."
3    THE WITNESS: That's correct.
4  BY MS. KLEIN:
5    Q.  And you agree with me, sir, that you did
6  not write any code to perform any analysis in this
7  case; correct?
8    MR. ROBINSON: Object to the form and to the
9  scope.
10   THE WITNESS: Are you talking about my report
11 in this case or reports in other cases?
12 BY MS. KLEIN:
13   Q.  Your report in this case that we've
14 been -- that is your report should be Exhibit 3.
15     Did you -- you did not write any code to
16 perform the analysis that's contained in Exhibit 3;
17 correct?
18   MR. ROBINSON: Objection to the form and to the
19 scope.
20   THE WITNESS: No, but I reviewed source code
21 that I cite in my report throughout in various
22 footnotes as well as source code that is described
23 in research papers that I cite in my report.
24   MS. KLEIN: Okay. Pass the witness.
25   MR. ROBINSON: Okay. We'll reserve any further

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 306

1  questions for trial.
2      MS. KLEIN:  Thank you, Dr. Shafiq.
3      THE VIDEOGRAPHER:  We're off the record at
4  7:01 p.m.  This concludes today's testimony given by
5  Dr. Zubair Shafiq.  The total number of media units
6  used was eight and will be retained by Veritext.
7      (Whereupon, the proceedings were concluded
8      at 7:01 p.m.)
9      ---oOo---
10
11
12  _____
13      ZUBAIR SHAFIQ, Ph.D.
14
15
16
17
18
19
20
21
22
23
24
25  Job No. CS6920792

Page 307

1      I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12      Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript (X) was ( ) was not requested.
16      I further certify that I am neither
17  financially interested in the action nor a relative
18  or employee of any attorney of any party to this
19  action.
20      IN WITNESS WHEREOF, I have this date
21  subscribed my name.
22  Dated:  October 10, 2024
23
24
25      ANRAE WIMBERLEY, CSR No. 7778

Page 308

1  ROBERT ARTHUR, ESQ.
2  arthur@lanierlawfirm.com
3      October 10, 2024
4  RE:   State of Texas, Et Al. v. Google LLC
5      10/9/2024, Zubair Shafiq (#6920792)
6    The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 309

1  State Of Texas, Et Al. v. Google LLC
2  Zubair Shafiq (#6920792)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Zubair Shafiq          Date
25

78 (Pages 306 - 309)