# EXHIBIT 38
# [FILED UNDER SEAL]

Page 1

1            IN THE UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF TEXAS

2                   SHERMAN DIVISION

3

4

5      *********************************

6      THE STATE OF TEXAS, et al.,

7                    Plaintiffs

8      vs.              CA NO. 4:20-cv-00957-sdj

9      GOOGLE LLC,

10                   Defendant

11     *********************************

12

13

14            VIDEOTAPED DEPOSITION OF:

15             PARAG PATHAK, PH.D.

16          VERITEXT LEGAL SOLUTIONS

17              101 Arch Street

18           Boston, Massachusetts

19      October 14, 2024       9:04 a.m.

20

21

22           Darlene M. Coppola

23         Registered Merit Reporter

24         Certified Realtime Reporter

            Job No. CS6919048

Page 2

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing the Plaintiff: |
| 3 | NORTON ROSE FULBRIGHT |
| 4 | 1550 Lamar Street |
| 5 | Suite 2000 |
| 6 | Houston, TX 77010 |
| 7 | BY: ABRAHAM CHANG, ESQUIRE |
| 8 | MARISA MADARAS, ESQUIRE |
| 9 | T 713.651.5151 |
| 10 | E Abraham.chang@nortonrosefulbright.com |
| 11 | Marisa.madaras@nortonrosefulbright.com |
| 12 | -and- |
| 13 | THE LANIER LAW FIRM PLLC |
| 14 | 10940 West Sam Houston Parkway |
| 15 | Suite 100 |
| 16 | Houston, TX 77064 |
| 17 | BY: ALEX ABSTON, ESQUIRE |
| 18 | JULIAN COKIC, ESQUIRE (Via Zoom) |
| 19 | T 713.659.5200 |
| 20 | E alex.abston@lanierlawfirm.com |
| 21 | julian.cokic@lawnierlawfirm.com |
| 22 | |
| 23 | (Continued on next page) |
| 24 | |

Page 3

| | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | Repesenting Office of the Texas Attorney |
| 3 | General: |
| 4 | (Via Zoom) |
| 5 | OFFICE OF THE TEXAS ATTORNEY GENERAL |
| 6 | 300 West 15th Street |
| 7 | Austin, TX 78701 |
| 8 | BY: BRIAN KELLEHER RICHTER, ESQUIRE |
| 9 | TREVOR YOUNG, ESQUIRE |
| 10 | COLE PRITCHETT, ESQUIRE |
| 11 | JONATHAN JAFFE, ESQUIRE |
| 12 | T 512.463.1265 |
| 13 | E brian.richter@oag.texas.gov |
| 14 | trevor.young@oag.texas.gov |
| 15 | cole.pritchett@oag.texas.gov |
| 16 | Representing the Defendant: |
| 17 | FRESHFIELDS |
| 18 | Three World Trade Center |
| 19 | New York, NY 10007 |
| 20 | BY: JAN RYBNICEK, ESQUIRE |
| 21 | XIAOXI TU, ESQUIRE |
| 22 | T 646.863.1627 |
| 23 | E jan.rybnicek@freshfields.com |
| 24 | xiaoxitu@freshfields.com |

Page 4

| | |
|---|---|
| 1 | Also Present: |
| 2 | Shawn Budd, Videographer |

Page 5

| | |
|---|---|
| 1 | INDEX |
| 2 | EXAMINATION |
| 3 | Witness Name                                    Page |
| 4 | PARAG PATHAK, PH.D. |
| 5 | Direct By Mr. Rybnicek ............................ 7 |
| 6 | Cross By Mr. Chang ................................ 310 |
| 7 | |
| 8 | EXHIBITS |

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Dr. Pathak's Report dated June 7, 2024 | 8 |
| Exhibit 2 | Dr. Pathak's Rebuttal Report dated September 9, 2024 | 8 |
| Exhibit 3 | Pathak typos document | 69 |
| Exhibit 4 | JAMA Health Forum Article, "Weighted Lottery to Equitably Allocate Scarce Supply of COVID-19 Monoclonal Antibody" | 283 |
| Exhibit 5 | Wall Street Journal Article, "Q and A, How an Economist Unlocked Hidden Truths About School Choice" | 300 |

Page 6

```
 1         P R O C E E D I N G
 2
 3         (Commencing at 9:04 a.m.)
 4
 5         THE VIDEOGRAPHER:  We are on the
 6  record.  This is the videographer speaking,
 7  Shawn Budd, with Veritext Legal Solutions.
 8  Today's date is October 14, 2024, and the time
 9  is 9:04 a.m.  We are here in Boston,
10  Massachusetts, to take the video deposition of
11  Professor Parag Pathak, in the matter of State
12  of Texas versus Google LLC.
13         Would counsel please introduce
14  themselves for the record.
15         MR. CHANG:  Abraham Chang and
16  Marisa Madaras on behalf of the State of
17  Texas.  With me in the room, I have Alex
18  Abston, The Lanier Law Firm.  With us on Zoom
19  with the State of Texas, I have Trevor Young,
20  Cole Pritchett, Jonathan Jaffe, Julian Cokic,
21  and Brian Richter.
22         MR. RYBNICEK:  Jan Rybnicek and
23  Xiaoxi Tu with Freshfields on behalf of
24  Google.
```

Page 7

```
 1         THE VIDEOGRAPHER:  Okay.  Will
 2  the court reporter please swear in the
 3  witness.
 4
 5         PARAG PATHAK, PH.D.,
 6  a witness called for examination by
 7  counsel for the Plaintiff, having been
 8  satisfactorily identified by the production of
 9  his driver's license and being first duly
10  sworn by the Notary Public, was examined and
11  testified as follows:
12
13         THE STENOGRAPHER:  Thank you.
14  You may proceed.
15
16         DIRECT EXAMINATION
17  BY MR. RYBNICEK:
18     Q.   Good morning, Professor Pathak.  Can
19  you please state and spell your name for the
20  record.
21     A.   Sure.  My name is Parag Pathak.  The
22  first name is spelled P-a-r-a-g.  Last name is
23  spelled P-a-t-h-a-k.
24     Q.   Thank you.  My name is Jan Rybnicek.
```

Page 8

```
 1  I'm counsel for Google, along with my
 2  colleague, Xiaoxi Tu.  You've been sworn in
 3  just now.  You understand you're under oath
 4  and must testify completely and truthfully?
 5     A.   Yes, I do.
 6     Q.   Is there anything preventing you from
 7  testifying completely and truthfully today?
 8     A.   There is not.
 9     Q.   Great.  I'd like to pass you two
10  documents.  The first is your June 7, 2024
11  expert report.
12         MR. RYBNICEK:  We'll mark that
13  Exhibit 1.
14
15         (Exhibit No. 1 marked for
16  identification.)
17
18         MR. RYBNICEK:  And the second
19  document, we'll mark Exhibit 2, and it is
20  dated September 9, 2024, and it is your
21  rebuttal report in this matter.
22
23         (Exhibit No. 2 marked for
24  identification.)
```

Page 9

```
 1
 2  BY MR. RYBNICEK:
 3     Q.   Do you recognize these documents?
 4     A.   I do.
 5     Q.   And they're your reports?
 6     A.   Yes.
 7     Q.   Do you have any opinions in this case
 8  other than those that you've expressed in your
 9  two reports here?
10     A.   I do not.
11     Q.   And so your opening and rebuttal
12  reports contain all of your opinions in this
13  case; is that correct?
14     A.   Yes, that's correct.
15     Q.   Have you done any further analysis
16  since submitting your reports?
17     A.   I have not, but I did find some typos
18  in my reports.  So I want to offer you those.
19  I don't know if that counts as analysis, but I
20  have a document with three typos.
21     Q.   Okay.  Thank you.
22         So aside from the typos that you've
23  just provided me, is there anything you'd like
24  to change in either of your reports?
```

3 (Pages 6 - 9)

Page 10

1    A.  No, there is not.
2    Q.  Is there anything you would like to
3  add to either of your reports?
4    A.  No, there is not.
5    Q.  Is it fair to say that your reports --
6  in your reports, you offer your opinion on
7  whether Google's conduct is efficient?
8    A.  Yes, I do.
9    Q.  And you don't provide any opinions on
10  whether Google's conduct was anticompetitive,
11  correct.
12            MR. CHANG:  Objection.  Form.
13    A.  My assignment was to look at Google's
14  incentives to -- within the context of the
15  markets at hand from the lens of market
16  design, and the field of market design begins
17  by diagnosing market failures.  And one
18  symptom of market failure involves the
19  obstruction of efficiency.  So in my review of
20  the record, my analysis of market design
21  issues overlaps with issues related to
22  competition.
23  BY MR. RYBNICEK:
24    Q.  Did you reach any independent

Page 11

1  conclusions about whether Google's conduct was
2  anticompetitive?
3            MR. CHANG:  Objection.  Form.
4    A.  There are parts of my report, as my
5  assignment was to look at market design as
6  aspects of Google's conduct here, that touch
7  upon those issues.
8  BY MR. RYBNICEK:
9    Q.  In your report, you indicate that you
10  rely on Professor Gans' report for his
11  determination on whether conduct was
12  anticompetitive; is that correct?
13    A.  That is correct.  And I also, in the
14  course of reviewing the market design aspects
15  of the matter here, I've looked at the effects
16  of Google's conduct on competition.
17        The way I teach my undergraduate class
18  in market design is I start by saying why
19  would you need to design a market?  And, you
20  know, the first couple of slides talk about
21  the existence and presence of market power and
22  absence of efficiency as primary reasons to
23  think about designing markets.  So there's
24  overlap.

Page 12

1    Q.  Can a market be inefficient but still
2  competitive?
3    A.  So that's a very high-level question,
4  so let me answer it with that in mind.
5        When I teach my Ph.D. course in
6  microeconomics, we introduce a definition of
7  competitive markets, which involves the
8  agents, the demand side, maximizing some
9  objective, maximizing the utility; supply
10  side, seeking some objective, like maximizing
11  their profits and prices, which clear markets
12  set demand equal to supply.  And one of the
13  first results that we establish -- I did this
14  two weeks ago actually -- is what's called a
15  first welfare theorem of microeconomics, which
16  states that a competitive market is pareto
17  efficient.  So many people think of that
18  formal result as the crowning achievement of
19  microeconomic theory, at least up to the
20  1950s.
21        So with those definitions, I would say
22  a competitive price equilibrium is efficient,
23  or efficient as defined as what we would
24  typically do, pareto efficiency in economics.

Page 13

1    Q.  I appreciate that.  I think I asked a
2  slightly different question, which is to say,
3  can you have an inefficient market that is
4  still competitive?
5    A.  So the second welfare theorem states
6  that if we have an efficient allocation, then
7  it comes about as a result of competition.  So
8  it's a converse of the result that I just
9  stated for you.  So, you know, defining
10  competition as I've defined it, what we would
11  say in economics is a price equilibrium where
12  we have, you know, agents who are price takers
13  who are maximizing their objectives, I would
14  say that competitive markets are efficient.
15        Now, this is such a high-level
16  question, so there are settings where we have
17  to think about environments where we don't
18  have perfect competition as I would define it.
19        So one thing that I focus on a lot in
20  my own research as a market design scholar are
21  markets where we don't have prices, and so an
22  example of that would be a market where we're
23  assigning objects to individuals.  And you can
24  have an outcome that is efficient that is not

4 (Pages 10 - 13)

Page 14

1  a consequence of competition as defined using
2  while raising equilibrium like in the David
3  Kreps or Mas-Colell, Whinston, and Green
4  textbooks that I cite in my report.
5      So there's other mechanisms that lead
6  to efficient outcomes beyond competitive
7  mechanisms. I'll give you a specific example
8  maybe to clarify.
9      So let's say we are trying to assign
10 dormitories to MIT students. Okay. MIT
11 students do not pay a price for dorms, right,
12 so it's a market where there's no price. So
13 we don't have the opportunity to define price
14 equilibrium or competitive equilibrium.
15     But an allocation that works as
16 follows, let's just ask whoever is first in
17 line, What's your preferred dorm? You get to
18 pick. Maybe we do it based on seniority. And
19 then we go to the next person in line and ask
20 them, "Which dorm do you like the most?" so on
21 and so forth.
22     That's a particular priority
23 mechanism. That's not a competitive
24 mechanism, but in that specific context, that

Page 15

1  mechanism generates an outcome that is
2  efficient.
3      Q.  Okay. That's all very helpful.
4      You've touched or said a couple of
5  times or referenced a couple of times the idea
6  of price equilibrium. What do you mean by
7  that?
8      A.  Price equilibrium, as defined in
9  economics as I teach my undergraduates and my
10 Ph.D. students, has two essential ingredients.
11 The first is that there are agents who are
12 maximizing their objectives. We would call
13 that the -- for consumers, their utility
14 maximization problem. What's essential is
15 that agents are price takers, so their
16 decisions to choose a consumption bundle, if
17 it's an exchange economy setting, let's say,
18 are taking prices as given. So given what the
19 price schedule is, they make a decision that
20 achieves their goal, which is to maximize
21 utility. So that's the first ingredient.
22     The second ingredient is the prices
23 are such that the market's clear. So the
24 price is going to be set such that demand is

Page 16

1  equal to supply. So those are the two
2  essential ingredients of competitive
3  equilibrium or price equilibrium. I'm using
4  those terms synonymously.
5      Q.  I believe you also referenced perfect
6  competition earlier.
7      A.  (Witness nodding.)
8      Q.  Can you explain that?
9      A.  Perfect competition is the way
10 economists describe agents being price takers.
11 So their ability to influence the price is
12 negligible. So the technical definition of
13 perfect competition usually involves some kind
14 of limit in an informal model. For instance,
15 if we have a large number of consumers,
16 sometimes people even model this as a
17 continuum of consumers.
18     So let's say we have a line from zero
19 to one and we have a consumer at each value
20 numerical between zero and one. So in
21 principle, that's an infinite number of
22 consumers because there's an infinite number
23 of numbers between zero and one. And perfect
24 competition in that setting means consumers

Page 17

1  taking the price, when they take their action,
2  they don't need to consider the behavior of
3  other agents to figure out what's their best
4  action. It's only sufficient to think about
5  what the price is.
6      Q.  Is it fair to say perfect competition
7  is when price equals marginal cost?
8      A.  Yes, that would be a definition of
9  perfect competition on the firm side. So the
10 way that that reflects what I just talked
11 about is, when a firm is seeking to maximize
12 their objectives, we would say they solve the
13 profit maximization problem. So that is
14 maximizing their total revenue minus costs.
15 And in a model of perfect competition, they
16 take the price as given from the market. So
17 if we observe the firm's profit maximization
18 problem, they would choose a quantity such
19 that we differentiate that profit maximization
20 problem. And the conclusion of that would be
21 price is equal to marginal cost.
22     Q.  And how often does that happen in the
23 market?
24     A.  Perfect competition?

5 (Pages 14 - 17)

Page 18

1 Q. Correct.
2 A. I haven't done a study across
3 industries of that. The way I like to think
4 about these types of models is they're
5 benchmark situations. So if you think about
6 does a firm have the ability to exercise power
7 over price -- there's a debate, in fact, in
8 academic economics right now about your very
9 question, and I don't think it's, you know,
10 very easy to answer your question with any
11 degree of precision.
12     So, you know, that debate broadly
13 speaks to certain industries and looks at
14 specific actions of agents in particular
15 industries to describe whether the model of
16 perfect competition is a good approximation or
17 if other models are good approximations.
18     Another way people have looked at
19 this, which I'm not a big fan of, is trying to
20 calculate a markup.
21     So markup is defined as price minus
22 marginal cost divided by price and using that
23 as an index of how competitive the industries
24 are. So we know from economics -- what I

Page 19

1 teach my undergraduates is inverse elasticity
2 rule or the Lerner rule.
3     And the Lerner rule is solving the
4 profit maximization problem that we just
5 talked about in the case where a firm's choice
6 of quantity does take into consideration what
7 the price would be. So that's an example of a
8 firm that's not a price taker but is aware of
9 how their quantity choice influences what the
10 level of demand will be.
11     And if you work through the profit
12 maximization problem, you can construct a
13 Lerner index. So that's the price minus
14 marginal cost divided by price. And
15 economists -- and this is currently again an
16 active debate -- attempt to try to measure
17 what the Lerner index is across industries.
18 And that's a challenging exercise because it
19 requires you have a precise measure of costs,
20 and it requires you to think about that this profit
21 maximization problem is sufficient to capture
22 the incentives of the firms.
23 BY MR. RYBNICEK:
24     Q. And is it accurate to say that if a

Page 20

1 firm is not pricing at marginal cost, it has
2 some market power?
3     A. It's -- again, this is such a
4 high-level question that we'd have to get into
5 some specific context. So in a -- the
6 stylized Econ 101 representation of firm
7 behavior, we would be ignoring things like
8 fixed costs; we would be ignoring things like
9 adjustment costs in general. The stylized
10 model where folks might make such a claim
11 ignores dynamics.
12     So it's hard for me to give a precise
13 answer without more specific context. It
14 would depend on institutional features of the
15 setting.
16     Q. And in what situations would a firm
17 not have market power if they're pricing above
18 marginal cost?
19     A. If we think about a firm that has
20 fixed costs and is in a competitive industry
21 and is needing to price in a way to cover
22 their fixed costs, so that would be one type
23 of example. So there's, you know, a continuum
24 of firms.

Page 21

1     We think of models in economics like
2 this where to enter, you pay some fixed cost.
3 And once you enter, you're in a marketplace
4 where there are many other competitors and
5 your price doesn't simply reflect your
6 marginal -- your static marginal cost. So
7 situations where there's dynamics would
8 generate examples like that.
9     Q. Are markets in which a firm is pricing
10 above marginal cost anticompetitive?
11         MR. CHANG: Objection. Form.
12     A. I think we have to be much more
13 specific about --
14 BY MR. RYBNICEK:
15     Q. Sure --
16     A. -- what the markets are in hand. So I
17 can't answer that without more specifics.
18     Q. Is having market power -- strike that.
19     If a firm has market power, does that
20 necessarily mean a market is
21 anticompetitive?
22         MR. CHANG: Objection. Form.
23 BY MR. RYBNICEK:
24     Q. Actually, I'll take that back, and

6 (Pages 18 - 21)

Page 22

1  I'll say, if a firm has market power, does
2  that necessarily mean a market is not
3  competitive?
4      A.   This is such a high-level question.
5  To be more specific, is there a -- I think I
6  need more context to answer that question.
7      Q.   What context would you need?
8      A.   So market power involves -- one
9  definition of market power is power over
10  price.  Another definition is the power to
11  exclude competitors.  So actually, could you
12  restate the question?
13     Q.   Sure.
14     A.   Make sure I'm answering it.
15     Q.   If a firm has market power, meaning
16  power over price --
17     A.   Okay.
18     Q.   -- does that necessarily mean a market
19  is not competitive?
20     A.   One example that doesn't fit that
21  model is a firm that has increasing returns to
22  scale technologies.  So you could imagine a
23  firm that has power over price, but the
24  technology, the production function of the

Page 23

1  firm satisfies the -- a mathematical property
2  that we call increasing returns to scale.  And
3  so that firm could have power over price and
4  satisfy the conditions that you just raised.
5      Q.   So simply having power over price is
6  not determinative of whether a market is
7  competitive, correct?
8          MR. CHANG:  Objection.  Form.
9      A.   I mean, it's a symptom of whether a
10 market is competitive or not.  But as an
11 absolute rule, to study whether the outcome is
12 competitive or not, one would need a lot more
13 detail, the circumstances of the market, what
14 the production technologies are, other
15 institutional factors.
16 BY MR. RYBNICEK:
17     Q.   But market power is a market failure;
18 is that correct?
19     A.   In the standard, simple, plain vanilla
20 model, what we would say is, if a firm in that
21 model has power over price, the way we teach
22 our undergraduates is that generates what's
23 called a deadweight loss.  So the usual
24 diagram that we teach in undergraduate

Page 24

1  economics has demand equaling supply.  And if
2  you look at the area under the demand curve up
3  to the supply curve, that's a measure of
4  consumer and producer surplus.
5          When you have a monopolist or a firm
6  with power over price in that model, then we
7  have a restriction of quantity because the
8  monopolist is wary of how their price-setting
9  behavior affects demands because they're not
10 taking prices as given.  And we have a point
11 where prices are higher than the competitive
12 level and quantity is lower, so that generates
13 deadweight loss, so reduction in both consumer
14 surplus and consumer surplus, and that would
15 be a textbook definition of market failure.
16     Q.   Okay.  So I think this might get us
17 back to where I started, which is, if market
18 power is a market failure, that is a market
19 inefficiency, correct?
20     A.   As a general proposition in the
21 stylized models of economics, I would agree
22 with that, yes.
23     Q.   Okay.  And it's also possible that you
24 could have a market in which you have market

Page 25

1  power, which in your market design field is a
2  market inefficiency, but it is still
3  competitive, correct?
4      A.   There are cases where that can occur,
5  yes.
6      Q.   Great.  Thank you.
7          So I think I may have already asked
8  this, but just to be sure, you rely on
9  Professor Gans' opinion for whether Google's
10 conduct was anticompetitive, right?
11     A.   I rely on his opinion, but I also
12 looked at the conduct myself.  And as we
13 discussed, one of the first things a design
14 economist looks at is is there a need for
15 design here, and so we look for symptoms of
16 problems.  And in my review of those symptoms,
17 I saw examples of Google's conduct that got in
18 the way of the principles of market design,
19 like efficiency, and so that overlaps with
20 some of Gans' analysis.
21     Q.   And did you rely on anyone other than
22 Professor Gans for conclusions about Google's
23 conduct being anticompetitive?
24     A.   No.

7 (Pages 22 - 25)

Page 26

1  Q.  Okay.  And how do you determine if
2  conduct is anticompetitive?
3  A.  So as a market design economist, your
4  starting point is looking at what are the
5  valuable principles in a design market.  So,
6  you know, a very lucid explanation of those
7  principles is in Al Roth's textbook "Who Gets
8  What and Why," where he talks about, you know,
9  the need to maximize surplus or the gains from
10  trade.  He talks about congestion or the
11  timing of transactions as getting in the way
12  of good outcomes.  He talks about transparency
13  or safety, as he calls it.
14        And so with that lens, I'm looking at
15  Google's conduct here.  And so the kind of
16  precise legal dimensions of anticompetitive
17  conduct is not what I was assigned to look at,
18  but when I see, you know, Google signing an
19  agreement, say, with Facebook on header
20  bidding and exchange bidding, the Facebook
21  audience network deal that I talk about in my
22  opening report, which ultimately results in
23  Facebook exiting the display market, I see
24  that as a lost opportunity for gains from

Page 27

1  trade because header bidding, had it been more
2  successful, could have allowed more matches to
3  form in the market.  And the particular
4  Facebook audience network deal eventually led
5  to the exit of a competitor, and so that is,
6  you know, bad for market design principles.
7  Q.  So you said that is bad for market
8  design principles.
9  A.  (Witness nodding.)
10  Q.  How do you know it's bad from a
11  competition perspective?
12  A.  Well, one measure of competition is
13  the number of firms that are competing.  So
14  when Facebook is no longer competing, there's
15  one fewer firm competing, so that would be bad
16  for competition.
17  Q.  So it's your opinion that competition
18  is harmed if one firm is taken out of the
19  market?
20  A.  In this -- I'm talking about the
21  specific example.
22        So within the context of this specific
23  example, you know, generally, as an economist,
24  we think of these two extremes.  You asked me

Page 28

1  earlier about perfect competition, right?  So
2  that's envisaged as a model where we have
3  many, many firms competing against each other,
4  and that's where we can harness the forces of
5  competition to generate efficient outcomes.
6  And so as we move away from that, it's a
7  direction that's moving towards less
8  competition.
9        Again, this is as a general model --
10  principle.
11  Q.  You mentioned earlier that what you
12  observed in the record is fewer gains from
13  trade than you would expect in an absence on
14  Google's conduct.
15        What do -- what does gains from trade
16  have to do with competition?
17  A.  Well, when we talk about the effects
18  of competition, back to our discussion of the
19  first welfare theorem, we say that competition
20  generates an efficient outcome, and in an
21  efficient outcome, we are maximizing the gains
22  from trade.  So competition supports the
23  maximization of the gains from trade.
24  Q.  I think this does take us back to

Page 29

1  another line of questions we had, which is
2  there -- or is it your opinion that in
3  competitive markets there cannot be additional
4  gains from trade?
5        MR. CHANG:  Objection.  Form.
6  A.  This is a little bit circular, so I --
7  to answer this question, I need to have a
8  specific competitive model in mind.  So why
9  don't I start with a model that we teach our
10  undergraduates and Ph.D. students, what I
11  teach at MIT every year.
12        If I define the competitive model as
13  it's done in the textbooks, you know, Kreps,
14  Mas-Colell, Whinston, and Green, or even Hal
15  Varian's textbook, which is, you know, the
16  chief economist at Google, a competitive
17  outcome is maximizing the gains from trade.
18  BY MR. RYBNICEK:
19  Q.  I think I had a slightly different
20  question which is is it your opinion that in a
21  market that is competitive, it is not possible
22  to increase the efficiency and achieve
23  additional gains from trade?
24  A.  It depends on the circumstances at

8 (Pages 26 - 29)

Page 30

1  hand.  So again, back to static versus dynamic
2  models, are we talking about what's in the
3  textbook, or are we talking about particular
4  markets at hand?  So let me give you an
5  example.
6         Let's say we have a dynamic model, two
7  periods.  Okay.  So Period 1, full
8  competition.  Period 2, we can make an
9  investment.  Some firms can make an
10  investment to decrease their costs.  In Period 2, we can
11  have additional gains from trade.  So when you
12  talk about maximizing the gains from trade, is
13  it with respect to Period 1, or is it respect
14  to the aggregate gains from trade across both
15  periods?
16        The answer to these questions in the
17  abstract, right, this is why I'm going back to
18  the textbooks.  They're very high-level
19  questions.  To give you a more precise answer,
20  we'd have to talk about very specific
21  setting.
22    Q.  Can you give me an example of a
23  competitive market?
24    A.  You know, one example people sometimes

Page 31

1  talk about is the market for housekeeping
2  services.  There are many participants.
3  There's many people who are, you know, able
4  to, say, clean your house.  Any given
5  housecleaner's ability to set price is
6  affected in large part by market-level
7  conditions.  So the person who helps our
8  family cannot charge way too high a price
9  because I have the opportunity to hire someone
10  else.  And there's a price, so there's, you
11  know, not nonprice issue that we talked about
12  a second ago.
13        So what I would say -- again, these
14  are models, right -- so I would say the
15  lessons from the competitive model, I think,
16  are the right place to start to think about
17  housekeeping services at least, say, in
18  Greater Boston.
19    Q.  And because the housekeeping market is
20  competitive, does that mean that it cannot
21  become more efficient?
22    A.  No.  Again, list -- I think I've kind
23  of given you the example of a static versus
24  dynamic view of this.

Page 32

1         So let's imagine in this specific
2  context my housekeeper has access to a
3  technology, to, like, a new vacuum cleaner
4  that can reduce the amount of time it takes to
5  complete her job.  So that technology would
6  allow her and other folks who have access to
7  that technology to maybe get the job done more
8  quickly.  So that's an example.
9    Q.  Okay.  That's helpful.  This is what I
10  was trying to clear up is whether or not a
11  competitive market could become more efficient
12  or if it -- if maximum efficiency is identical
13  to perfect competition.
14    A.  Is there a question there?
15    Q.  Would -- in your housekeeper example,
16  if one housekeeper gained a new piece of
17  technology to allow them to do their work more
18  productively, is that competitive -- quote,
19  competitive?
20        MR. CHANG:  Objection.  Form.
21    A.  If one housekeeper had the option to
22  get that technology and there's no ability any
23  other housekeeper in that market could also
24  access that technology, is that the context of

Page 33

1  your question?
2  BY MR. RYBNICEK:
3    Q.  Not necessarily that every housekeeper
4  could get it.  There are resource constraints,
5  right?  So my example is one housekeeper is
6  able to obtain, either through ingenuity or
7  resources, additional technology.
8    A.  Yes.
9    Q.  Does that make the market less
10  competitive?
11        MR. CHANG:  Objection to form.
12    A.  I wouldn't say that the market is less
13  competitive because, you know, one of the kind
14  of grounding principles of competitive theory
15  in economics is that agents have choices that
16  they get to make independently.
17        I mean, if you think about one of the
18  godfathers of competitive theory, Milton
19  Friedman, right, the title of his book is
20  "Free to Choose," right?  So if a housekeeper
21  is free to choose a technology, whatever
22  vacuum cleaner system she or he wishes, then
23  that's their prerogative.
24        And that is the beauty of competitive

9 (Pages 30 - 33)

Page 34

1  markets, that a housekeeper making
2  uncoordinated choices, unconstrained choices
3  can lead to efficient outcomes.  That, you
4  know, is the essence of Adam Smith's
5  hypothesis in economics.
6  BY MR. RYBNICEK:
7      Q.  And if other competing housekeepers
8  are also able to obtain that technology, it
9  would be your opinion that the market would be
10  more efficient; is that fair?
11          MR. CHANG:  Objection.  Form.
12      A.  What -- if we're in a competitive
13  environment where agents are able to act in
14  their own best interests, then we're back to
15  the competitive model.  So they can make that
16  choice -- free unconstrained choice.  That's
17  the essence of the competitive model.
18  BY MR. RYBNICEK:
19      Q.  I think earlier you -- I asked you how
20  you identify if conduct is anticompetitive,
21  and I believe you pointed to the -- your
22  principles of market design; is that right?
23      A.  That was my assignment, to bring a
24  market design lens to look at Google's

Page 35

1  conducts and the incentives underlying
2  Google's conducts.  And in the course of doing
3  that assignment, I observed certain conduct
4  that, you know, was bad for the market, had
5  bad -- you know, bad for competition.
6      Q.  And that is because the conduct made
7  markets less thick and less safe and more
8  congested; is that your opinion?
9      A.  That's the market design framework
10  that I bring to my assignment here, yes.
11      Q.  And how does thickness relate to
12  competition?
13      A.  So the market design principle of
14  thickness is trying to ensure that we have
15  enough participants, buyers and sellers
16  together, in a market to maximize the gains
17  from trade.  So if we don't, for instance, if
18  a market is segmented such that only certain
19  participants can transact in certain venues,
20  then we will not have maximized the gains from
21  trade, and that is an outcome that's
22  inefficient.
23      Q.  The outcome is inefficient, but it may
24  still occur in a competitive marketplace,

Page 36

1  correct?
2      A.  No.  The outcome is inefficient, I
3  said, because we have separate venues.  I'm
4  going to make sure I -- I'm not sure about --
5  maybe you could restate the question.  I want
6  to make sure I'm answering your question.
7      Q.  I'm trying to understand how thickness
8  relates to competition.  Does a lack of
9  thickness mean there is no competition?
10      A.  A lack of thickness gets in the way of
11  competitive outcomes is how I would state it.
12  So imagine we had a -- let's go back to the
13  housekeeping market, right?  So that in Boston
14  is a market where there is many people who
15  need housecleaning services and there are many
16  providers, and they can interact with each
17  other and find beneficial matches.
18      Now, imagine that that market were
19  segmented in a way that certain housekeepers,
20  for whatever reason, are not able to access
21  certain homes.
22      So take a particular geographic area
23  of Boston and suppose certain housekeepers are
24  prohibited from being able to clean houses in

Page 37

1  Newton, Massachusetts, where I live, right?
2  They can only clean houses in downtown Boston,
3  where we are right now.  Then we have gotten
4  in the way -- even though they're able to
5  clean houses in downtown Boston, we've gotten
6  in the way of those housekeepers in downtown
7  Boston from finding potentially beneficial
8  matches and therefore maximizing surplus by
9  not letting them clean houses in the adjacent
10  town.
11      Q.  Is that true even though, in your
12  example, in downtown Boston, there are a
13  separate set of competitors who are competing
14  for housekeeping services?
15      A.  Yes, because there could be more
16  beneficial matches.  Like, in my -- the
17  specific example, you know, there could be
18  someone like our household who would like not
19  only cleaning services but also someone to
20  assist our family -- both myself and my wife
21  work.  We have two young kids -- with cleaning
22  services as well as cooking services.  Okay?
23  And I am originally from Nepal, and there are
24  many housekeepers in Greater Boston who are

10 (Pages 34 - 37)

Page 38

1  from Nepal, and it would be lovely to have
2  someone else who will cook Nepalese food at
3  our house.
4        So we are fortunate that there's
5  someone from downtown Boston who is able to
6  come to the suburbs and assist our household.
7  And had that person been prohibited from
8  coming to the suburbs, we have missed on the
9  opportunity of -- from gains from trade
10  because there's not that many Nepalese
11  housekeepers in who live in Newton,
12  Massachusetts.
13       Q.  So the relevant market would be
14  Nepalese housekeepers who live in Newton?
15       A.  I'm just giving you an example here of
16  why having segmentation of markets can get in
17  the way of efficiency.  To answer your
18  question about thickness, right, so allowing
19  people to be able to transact in the most
20  unconstrained way so that we can find matches
21  is good for market outcomes.
22       Q.  Again, I think we're talking past each
23  other a little bit because I'm not asking
24  about efficiency.  I'm asking about

Page 39

1  competition.
2       A.  Uh-huh.
3       Q.  And I think we talked earlier about
4  how they're not exactly the same thing, right?
5       A.  (Witness nodding.)
6       Q.  You don't disagree with that now, do
7  you?
8       A.  Competition is not the same thing as
9  efficiency.  Competition is a way that actors
10  in a market interact.  Efficiency is a
11  property of the allocation, yeah.
12       Q.  Right.  And so you can have a
13  competitive market that is maybe not as
14  efficient as you would like, correct?
15       A.  Well, in my example of the
16  housekeeper, I wouldn't say a prohibition on
17  the housekeeper going across town lines is
18  unconstrained competition.  Their choices have
19  been constrained.  So if you were to ask them,
20  What is the decision that you would take that
21  maximizes your utility? the housekeeper would
22  say, I would really like to work with this
23  Nepalese family.  And if we have a rule that
24  says you're not allowed to go into the other

Page 40

1  town, then that is a rule that gets in the way
2  of competition, and, as a result the outcome,
3  you know, of that arrangement is going to be
4  inefficient.
5       Q.  That's interesting.  From whose
6  perspective do you evaluate competition?
7       A.  The usual way that we think about
8  competition is the -- how the agents in the
9  model interact.  So in this specific
10  situation, we would be looking at the demand
11  side.  So that would be people, let's say,
12  like me or others who need housekeeping
13  services, and the supply side, which are
14  people who are able to offer those services.
15  So those are the agents that we would be
16  thinking about in terms of defining what
17  competition means there.
18       Q.  But in terms of evaluating if a market
19  is competitive, do you agree that the
20  principle stakeholder is the consumer that you
21  would look at?
22       A.  Not necessarily.
23       Q.  When you -- when you evaluate whether
24  a conduct is anticompetitive, you do not focus

Page 41

1  on the consumer?
2          MR. CHANG:  Objection.  Form.
3       A.  In the abstract.  I mean, what we
4  teach our undergraduates is we have monopoly
5  and we have monopsony, right, which is looking
6  at workers and price setting of workers,
7  right?  So that's on the supply side.
8          And when you have the exercise of
9  market power, power over price, as an example,
10  on the supply side, then that would be another
11  way to say the outcomes are inefficient.
12  BY MR. RYBNICEK:
13       Q.  Sure.  Putting monopsony aside, okay,
14  looking at monopoly --
15       A.  Okay.
16       Q.  -- and competitive effects from
17  monopoly --
18       A.  Uh-huh.
19       Q.  -- do you disagree that the principle
20  source at which you look for the effect of the
21  conduct is the consumer?
22       A.  Well, as a market design economist,
23  I'm looking at both producer and consumer
24  surplus.  So even in the case of monopoly,

11 (Pages 38 - 41)

Page 42

1  monopolists have deadweight loss, and that
2  constrains both producer and consumer surplus.
3      Q.   And so a consumer could be better off,
4  but a producer could be harmed, and that could
5  be bad for competition, in your view?
6      A.   In principle, in the abstract, yes.
7      Q.   If a consumer's prices are going down,
8  is that likely a sign a market is competitive?
9      A.   Not necessarily.
10     Q.   If output is increasing, is that an
11 indication that market is competitive?
12     A.   Not necessarily.  I mean, the great
13 example of oil cartels, right, that's an
14 example where there's coordinated price
15 setting.  So the cartel members have power
16 over price.
17         There are periods in history where the
18 total amount of oil that's being produced has
19 gone up over time.  I mean, any proper
20 analysis of those kinds of questions needs to
21 do a but-for comparison.  What would prices --
22 what would have output have been but for the
23 conduct at hand?
24         So there are trends, you know.  So

Page 43

1  those trends could be independent of the
2  conduct that one is interested in, costs going
3  down, costs going up, you know, things outside
4  of the market.  So it's very hard to say, you
5  know, blanket statements like that.
6      Q.   Putting aside this "but-for" world,
7  it's your opinion that prices going down are
8  not an indication of a competitive market?
9          MR. CHANG:  Objection.  Form.
10     A.   Prices can go down for many reasons,
11 so that alone is not sufficient to establish
12 that the market is becoming more or less
13 competitive.
14         Like -- let my give you an example.
15 Right.  So let's say we have a market that is
16 anticompetitive, not competitive, a monopoly
17 market, but there is a certain input into that
18 market, like gasoline, and that gasoline is an
19 important input for the product market at
20 hand.  Prices could reflect the changes in the
21 price of gasoline over time, and that
22 sometimes can go up, sometimes can go down.
23         And so, you know, we have to worry
24 about the underlying trends to draw any

Page 44

1  conclusions about time series comparisons like
2  you're describing.
3  BY MR. RYBNICEK:
4      Q.   What incentive would a monopolist have
5  to pass on the gas savings to consumers in
6  that example?
7      A.   So if it's a pure monopolist and
8  again, the textbook example, right, so they
9  would -- the pass-through rate, right, would
10 be very little.  But if we had, you know,
11 something that's not exactly a pure
12 monopolist, there can be situations where
13 there would be partial pass-through of those
14 prices.
15         So again, this is the pure monopolist,
16 a single firm idealized example in our
17 textbooks, you know, is an abstraction, right?
18 So as soon as we have multiple firms pass
19 through, in many economic models is not
20 exactly equal to one.  So if a cost changes
21 the pass-through will not move one for one,
22 but it will move in a fractional way.
23     Q.   So you can't look at price or outputs
24 to determine whether a market is

Page 45

1  competitive --
2      A.   No, no.  Just to clarify, it's not
3  sufficient is what I'm trying to answer to
4  your questions.
5          MR. CHANG:  Professor, let --
6          THE WITNESS:  I'm sorry.
7          MR. CHANG:  -- let our
8  questioner ask his question, then you can
9  answer.  He'll do his best to not cut you off
10 either.
11         THE WITNESS:  I'm sorry.
12 BY MR. RYBNICEK:
13     Q.   No.  That is a helpful clarification.
14 I wasn't suggesting that it was sufficient.
15         My question was are decreasing prices
16 indicative of a competitive market, not
17 dispositive?
18     A.   That would be a -- yeah, I agree with
19 that.  That's a place to start.  But, of
20 course, we'd have to understand the underlying
21 institution and the reasons for why prices are
22 decreasing and do a much more thorough
23 context-specific analysis.
24     Q.   And the same question but with respect

12 (Pages 42 - 45)

Page 46

1  to output. Is increasing output indicative of
2  a competitive market, not necessarily
3  dispositive?
4      A.  Yeah, I would agree with that, with
5  the same caveat that I just gave. We have to
6  look at the underlying reasons for that.
7      Now, there are examples in the
8  economic literature where even that is not 100
9  percent clear-cut where we can have expansions
10  of output even when a firm is price
11  discriminating. In fact, Hal Varian, Google's
12  chief economist, famously wrote about this in
13  the "American Economic Review" in a paper in
14  the 19- -- I think 1986. So that just, I
15  think, is by way of pointing out that we
16  really have to think carefully about the
17  context at hand.
18      Like, you know, I can give you the
19  intuition of what kind of the varying insight
20  is, which is if I am, you know, thinking
21  about -- let's just say I'm -- let me see if I
22  can get this right.
23      Let's say I'm providing milk to
24  schoolchildren, okay, at an elementary school,

Page 47

1  right, and we set up a milk cartel, and I have
2  the ability to charge different prices to
3  elementary schools and to folks at the grocery
4  store. Then it's possible for me to price
5  discriminate in a way that leads to more
6  output. And that is an example of having
7  power over price. So that -- I'm not -- I
8  believe -- I would have to look back, but
9  Varian's '86 article, I think, has an example
10  along those lines.
11      Q.  Are any of the markets in ad tech
12  price discrimination markets?
13      A.  I'm not sure I understand what the
14  word "price discrimination markets" means. So
15  one possible definition of "price
16  discrimination markets" is a market where
17  sellers are able to extract the willingness to
18  pay across heterogeneous consumers in the
19  market. So if you think about a seller that
20  is pricing down its demand curve, then that is
21  a form of price discrimination.
22      So you could think, for instance, of
23  the waterfall that used to be common in
24  display advertising markets as, you know,

Page 48

1  offering prices and seeing who's willing to
2  buy. And if that is too high of a price, the
3  price goes down a little bit and people see
4  who's willing to buy, so on and so forth. So
5  under that description, you could say it is
6  like a price discrimination idea.
7      And another thought that comes to mind
8  for your question is thinking about auction
9  markets.
10      So there's literature that relates
11  pricing in auctions. In fact, Myerson's
12  optimal auction paper that is cited in many of
13  the expert reports here has been reinterpreted
14  by economists Jeremy Bulow and John Roberts in
15  a very famous article in 1989 showing that
16  monopolists' pricing problem is very closely
17  related to Myerson's optimal auction problem.
18  So it really depends on what you mean by
19  "price discrimination markets."
20      Q.  I'd like to go back to this idea of
21  how to identify whether conduct is
22  anticompetitive because I'm still struggling
23  to understand your opinion on that.
24      Do you look at foreclosure to

Page 49

1  determine whether conduct is
2  anticompetitive?
3      A.  If by "foreclosure," you mean the
4  exclusion of competitors, yes.
5      Q.  And did you -- in either of the
6  reports, did you analyze foreclosure?
7      A.  My assignment was to look at market
8  design aspects here. So the example, say, of
9  dynamic allocation where AdX is able to get a
10  look at transactions as preventing other
11  exchanges from being able to compete, so that
12  is excluding competition. So there are parts
13  of my report that touch on these issues.
14      Q.  If dynamic allocation is akin -- if we
15  can go back to your housekeeping example -- to
16  the new vacuum cleaner, right, it was an
17  innovation by Google; is that fair?
18      MR. CHANG: Objection. Form.
19      A.  The idea of real-time pricing was not
20  a Google innovation. I wouldn't call it an
21  innovation to place Google's AdX exchange at
22  the top of a queue without giving publishers
23  choices about whether AdX should be
24  prioritized in the waterfall or not. I don't

13 (Pages 46 - 49)

Page 50

1 know if I would agree with your description of
2 it as an innovation.
3 BY MR. RYBNICEK:
4   Q.  So you disagree that dynamic
5 allocation was an innovation?
6        MR. CHANG:  Objection.  Form.
7   A.  I thought you had asked about whether
8 it was an innovation by Google.
9 BY MR. RYBNICEK:
10   Q.  Who is it an innovation by?
11   A.  Well, by dynamic allocation, there's
12 kind of some essential ingredients.  So one is
13 the use of real-time prices.  So having the
14 signals that sellers get reflect underlying
15 real-time information in the marketplace.  And
16 my understanding is that was not an invention
17 of Google's.  So that's one part of dynamic
18 allocation because AdX is using real-time bid
19 information.
20        The other part of dynamic allocation
21 is the sequencing or the priority orders of
22 folks using, you know, DFP to sell their ads.
23 So that was Google's innovation to -- I
24 wouldn't call it an innovation, but that was

Page 51

1 Google's decision to put AdX at the top of
2 the -- I should say near the top of the
3 waterfall.
4   Q.  And so in your view, where did dynamic
5 allocation come from?  What was the genesis?
6        MR. CHANG:  Objection.  Form.
7   A.  My read of the record is there was
8 interest in the marketplace to have more
9 real-time information about prices.  There was
10 already providers trying to offer that kind of
11 information to publishers.
12        As a publisher, you know, there's a
13 strong incentive to want to have accurate
14 information and not have your slots -- your
15 inventory be sold using, you know, outdated
16 static, you know, line item information,
17 static estimates of CPMs.  So, you know,
18 there's this underlying trend towards that.
19        And now I've lost my thread.  I'm so
20 sorry.  Can you restate your question?
21 BY MR. RYBNICEK:
22   Q.  I was just curious what your
23 understanding is of which firm was the first
24 to use dynamic allocation?

Page 52

1        MR. CHANG:  Objection.  Form.
2   A.  So Google used dynamic allocation, but
3 Google also used that idea as part of, you
4 know, DoubleClick.  DoubleClick had a form of
5 dynamic allocation prior to Google purchasing
6 DoubleClick.  So it dates at least until
7 DoubleClick, but it may even be before then.
8 I don't recall at this moment.
9 BY MR. RYBNICEK:
10   Q.  So DoubleClick created dynamic
11 allocation?
12        MR. CHANG:  Objection.  Form.
13   A.  I just want to be very precise about
14 what we're calling dynamic allocation, right?
15 So there is the sequencing order of sources of
16 demands, let's call it.  And so there's also
17 allowing certain exchanges -- AdX in the case
18 of Google -- to go first or go near the top of
19 the sequencing.  So DoubleClick had a version
20 of that.  Google, you know, had a version of
21 that as well.
22 BY MR. RYBNICEK:
23   Q.  And is it fair to call that an
24 innovation from the waterfall system?

Page 53

1   A.  I wouldn't call it an innovation
2 because in some respects it's taking away
3 publisher's choice because an essential part
4 of Google's version of dynamic allocation is
5 putting AdX near the top of the waterfall, and
6 a true innovation would allow publishers the
7 ability to access real-time bids wherever in
8 the waterfall they wanted to.
9   Q.  Was the waterfall an efficient
10 mechanism?
11        MR. CHANG:  Objection.  Form.
12   A.  The waterfall, I wouldn't call it an
13 efficient allocation mechanism because it's
14 sequential.  So there are sources of demands
15 that might have a higher willingness to pay or
16 might be better matches that could be further
17 down the waterfall that we don't reach.
18 Because of the sequentiality, we end up
19 transacting with a party that's earlier in the
20 waterfall, that has a higher priority in the
21 waterfall, so we miss the potential gains from
22 trade.  So that's bad for publishers, and
23 that's potentially bad for advertisers, in
24 particular, the advertiser who is willing to

14 (Pages 50 - 53)

Page 54

1    pay more but did not get to transact because
2    they were lower down.
3    BY MR. RYBNICEK:
4        Q.    And that existed before Google's
5    acquisition of DoubleClick, correct?
6        A.   The waterfall, correct, yes.
7        Q.   And you said it was an inefficient
8    system, the waterfall.  Was the market
9    competitive at the time?
10           MR. CHANG:  Objection.  Form.
11       A.   I would say we did not maximize the
12   gains from trade because of the waterfall.  So
13   at that time -- I haven't done a deep analysis
14   of other indicia, you know, competition from
15   that time period, but as a market design
16   economist, I would not have structured things
17   that way.  And, in fact, that's why the market
18   evolved and moved towards more simultaneous
19   bidding through things like header bidding.
20           In fact, if we think about the
21   emergence of header bidding, as I discuss in
22   the report, many people in the industry talk
23   about, you know, the desire for market
24   participants to have simultaneous trades with

Page 55

1    real-time information and why Google's use of
2    dynamic allocation or enhanced dynamic
3    allocation precipitated header bidding.
4        So header bidding, I would say, is a
5    more efficient market-clearing system than the
6    waterfall because it's simultaneous rather
7    than sequential.
8    BY MR. RYBNICEK:
9        Q.   That's helpful.  But during the period
10   that the waterfall existed, was the market
11   competitive?
12           MR. CHANG:  Objection.  Form.
13       A.   I don't believe so because Google was
14   able to impose that -- its product, AdX,
15   appears first in the waterfall, excluding
16   competition from other exchanges.  So one
17   measure of whether something is competitive is
18   whether there's a participant in the market
19   who is able to exclude competition.  And so
20   the very nature of dynamic allocation is
21   Google has steered volume to AdX without
22   allowing publishers the choice.  So I wouldn't
23   call that a competitive process.
24   BY MR. RYBNICEK:

Page 56

1        Q.   Sorry.  Maybe I'm not being clear.
2        But prior to Google's acquisition of
3    DoubleClick, when the waterfall existed, was
4    the market competitive?
5            MR. CHANG:  Objection.  Form.
6        A.   Prior -- so this is back to, like,
7    2008, the time period?
8    BY MR. RYBNICEK:
9        Q.   Yes.
10       A.   I'd have to think more about that.
11   You know, that wasn't really my assignment
12   here.  My assignment was to look at Google's
13   conduct.  So you're asking me about a period
14   prior to Google's involvement in this
15   marketplace, so I haven't undertaken a deep
16   study of that issue.
17       Q.   Okay.  But you've testified that
18   waterfall's inefficient.
19       A.   Uh-huh.
20       Q.   And on a number of occasions, you've
21   said inefficiency is an indication of less
22   than competitive -- or a less competitive
23   market --
24       A.   Uh-huh.

Page 57

1        Q.   -- right?
2        A.   Yes.
3        Q.   The waterfall -- prior to Google's
4    acquisition of DoubleClick, the waterfall
5    existed, and you have testified that it was
6    inefficient.
7        Doesn't that mean that it was also not
8    competitive?
9            MR. CHANG:  Objection.  Form.
10       A.   We have to judge what was happening in
11   that very early period relative to what are
12   the other options in the market.
13       So back in 2008, it's my understanding
14   that real-time bidding was not very common,
15   that DoubleClick's version of waterfall was
16   different than Google's version of dynamic
17   allocation.
18       So as soon as we introduced real-time
19   bidding as a new technology, right, you could
20   say, the waterfall, you know, because of its
21   sequential nature, becomes inefficient.
22   There's an alternative.
23       And what I'm not opining on, because
24   it wasn't my assignment, is what the market

15 (Pages 54 - 57)

Page 58

1  looked like before Google's participation
2  with -- you know, when it was just
3  DoubleClick.
4  BY MR. RYBNICEK:
5    Q.  So inefficiency is measured by what is
6  available at the time?
7    A.  I mean, yes.
8       So it would be efficient if none of us
9  had ulcers, right?  But if we go 50 years ago
10 and there were no drugs to treat ulcers, then
11 we would look at 50 years ago and say, Well,
12 there was no drug to treat ulcers.  So if you
13 have an ulcer, that's the outcome.  There's no
14 way to make you better without making someone
15 else worse off, yes.
16      So definitions of efficiency depend on
17 the production possibility set and what
18 technologies exist at the time, yes.
19   Q.  So it would be unfair to criticize a
20 firm for not undertaking steps that aren't yet
21 prevalent in the market?
22         MR. CHANG:  Objection.  Form.
23   A.  Again, at that level of generality,
24 it's hard to answer either way.  So we would

Page 59

1  have to look at the specific context of what
2  steps they took, under what situations, what
3  their intent was, what the effects of the
4  steps were, was it used to suppress
5  competitors and exclude competitors or not to
6  give a proper answer to that question.
7       At this level of abstraction, it's not
8  very easy to.
9    Q.  Do you know all those things that you
10 just mentioned with respect to the waterfall
11 prior to Google's DoubleClick acquisition?
12   A.  Could you restate the question?  I
13 want to make sure I understand.
14   Q.  You were very willing to say that,
15 with respect to the waterfall, it's not
16 necessarily inefficient because that's the
17 technology that existed.
18      Is that fair?
19   A.  Can we be precise about the --
20   Q.  Please.
21   A.  -- timing of what technology existed?
22      So if real-time bidding with live
23 information existed, it were possible to bring
24 together multiple sources of demand at the

Page 60

1  same time, and there is a sequential sales
2  mechanism, it's not just me.  I think Google's
3  experts also think that having simultaneous
4  sales are more efficient.
5       But if the world is such that that
6  technology does not exist, so the only
7  technology that we have is a sequential sales
8  technology, then to judge whether that's
9  efficient or not, the next question I would
10 ask is do the publishers, do the sellers in
11 the market have the ability to set the
12 priority order in a way that suits their
13 objectives to maximize whatever goal they're
14 seeking to?
15      And if the answer to that is yes, then
16 I would ask is there a different choice that
17 the publishers could have made that would have
18 achieved their objectives and they were
19 allowed to take that different choice but
20 chose to prioritize sources of demand in a way
21 that they did, then I would say that that is
22 not a case for saying there's a market
23 failure.
24      So if they have unconstrained choice

Page 61

1  with full information and they settled on
2  selling sequentially when there was no other
3  option, then that is publishers acting in
4  their own best interest.
5    Q.  If a firm competing in the ad tech
6  sector makes an innovation that makes a market
7  more efficient, at least for it, is it your
8  view that that innovation needs to be shared
9  broadly?
10         MR. CHANG:  Objection.  Form.
11   A.  It depends on the context again.
12      So if that innovation is -- the not
13 sharing of that innovation is used to exclude
14 competitors and rivals, then I see a problem
15 with that.  If it's not used in that way, then
16 I would say there's not a problem.
17 BY MR. RYBNICEK:
18   Q.  Is there an obligation for a
19 competitor to help its rival?
20         MR. CHANG:  Objection.  Form.
21   A.  I would say that depends on the
22 context.
23      So if there's a competitor that is
24 raising its rival's costs, for instance, in a

16 (Pages 58 - 61)

Page 62

1   way to exclude competition from the
2   competitor, there's a problem with that, and
3   that can have adverse consequences on the
4   market.
5   BY MR. RYBNICEK:
6       Q.   Sorry.  Going back to the example we
7   were working with, which is one in which a
8   firm makes an innovation and that innovation
9   is a tool it uses to make the market more
10  efficient for itself, is it anticompetitive
11  for that firm not to share that innovation
12  more broadly?
13              MR. CHANG:  Objection.  Form.
14      A.   I believe I answered that question.
15  So it depends on the context.
16          If the firm is not sharing that
17  innovation in an effort to exclude
18  competition, exclude the ability for rivals to
19  compete on the merits, then there's a problem
20  with that.
21  BY MR. RYBNICEK:
22      Q.   But doesn't a competitor always try to
23  exclude its competitors?
24          Strike that.

Page 63

1           Doesn't a firm always try to exclude
2   its competitors?
3       A.   There is kind of competition on the
4   merits, and there is competition that's not on
5   the merits, so excluding competition depending
6   on the specific context at hand.
7           One way I could try to compete with my
8   competitors is by lowering my price, and that
9   is a great thing about competition.  If I'm a
10  firm and I want to outcompete my rival, I
11  would lower my price, and that would attract
12  more demand to my firm compared to my rival,
13  so that is something that we like.
14          Did I answer your question?  I'm
15  sorry.  If I didn't, could you please restate
16  it?
17      Q.   My question was simply, if a firm
18  makes an innovation, is it anticompetitive if
19  it keeps that innovation to itself?
20      A.   If the firm is using that innovation
21  to exclude competitors, it can be
22  anticompetitive.
23          The innovations, the not allowing
24  other folks to access that innovation in an

Page 64

1   effort to exclude competition, to not compete
2   on the merits, then it can be anticompetitive.
3       Q.   So I'm sorry to do this, but going
4   back to our housekeeper example --
5       A.   Okay.
6       Q.   -- I think we talked about how if a
7   housekeeper made an innovation, had some new
8   tool, she wouldn't be required or he wouldn't
9   be required to share that with competitors.
10              MR. CHANG:  Objection.  Form.
11      A.   The housekeeper has the right, because
12  it's in a competitive market here, to not
13  share the new, you know, vacuum cleaner
14  technology or whatever it was that we
15  discussed with their competitors.
16          But if the housekeeper were doing
17  that, if they were a dominant housekeeper, for
18  instance, that was blocking other housekeepers
19  from competing using that technology, then
20  there could be a problem.
21  BY MR. RYBNICEK:
22      Q.   I see.  So --
23              MR. CHANG:  Counsel, I don't
24  mean to interrupt you at all.  Just whenever

Page 65

1   you get to a good stopping point.  We've been
2   going for over an hour now.
3               MR. RYBNICEK:  Oh, that's fair.
4   Just a few more questions, and then we'll wrap
5   this up and take a break.
6   BY MR. RYBNICEK:
7       Q.   So you're -- am I correct in
8   understanding that you're saying a dominant
9   firm has a special obligation to share its
10  innovations with competitors?
11              MR. CHANG:  Objection.  Form.
12      A.   It depends on the context.
13          If it's venting -- if a dominant firm
14  is blocking competition by not sharing its
15  innovation, then it is excluding competition,
16  which is bad for the market.
17  BY MR. RYBNICEK:
18      Q.   And what -- what informs these views
19  that you have about a dominant firm
20  potentially having to share its innovation
21  with its competitors?
22      A.   I'm coming to you with my expertise as
23  an economist.
24      Q.   Okay.  Is this -- is it -- do you

17 (Pages 62 - 65)

Page 66

1  teach in your economics courses that a
2  dominant firm has an obligation to share its
3  innovations with competitors?
4       MR. CHANG: Objection. Form.
5       A.  I don't cover Trinko and these kinds
6  of topics in my --
7
8       (Stenographer clarification.)
9
10      THE WITNESS:  Oh, sorry.
11  Trinko, it's a legal case.
12      A.  I'm an economist, so I don't have the
13  nuances of legal cases like the one that you
14  might have in mind here.  So what I'm
15  interested in is, you know, in my market
16  design classes, figuring out how to make
17  competition work.  And so any actions that get
18  in the way of harnessing competitive forces,
19  including those by dominant firms that take
20  actions to exclude competition, are
21  problematic from the perspective of market
22  design.
23  BY MR. RYBNICEK:
24      Q.  Okay.  I know there's been -- I've got

Page 67

1  two questions.
2       One is you raised Trinko.  So putting
3  aside a scenario in which a firm has been
4  dealing with its competitors, a firm makes a
5  new innovation and has not been sharing that
6  with its competitors.  Do you -- is it still
7  your view that a dominant firm may be required
8  to share that with its competitors; otherwise,
9  their conduct would be anticompetitive?
10      MR. CHANG: Objection. Form.
11      A.  It would depend on the specifics of
12  the situation.  So if the dominant firm's
13  unwillingness to share that innovation is in
14  service of the exclusion of competition, then
15  there's a potential problem.
16  BY MR. RYBNICEK:
17      Q.  So it's intent?
18      MR. CHANG: Objection. Form.
19      A.  Not just intent.  It's also other
20  aspects of the episode at hand.  And this is a
21  very abstract discussion, so it's hard for me
22  to be more precise.  But it's also the effect
23  of the conduct and whether the conduct
24  succeeds in excluding competition or not.

Page 68

1  BY MR. RYBNICEK:
2       Q.  All right.  And then my last question
3  was, because I like this housekeeper example
4  so much, if the housekeeper makes an
5  innovation and his or her rival exits because
6  it is not as efficient, is that
7  anticompetitive?
8       A.  In that example, no, it's not.  That
9  is what Joseph Schumpeter talked about as
10  creative destruction firms innovating.  And
11  that causes entry and exit, and that's, you
12  know, in a dynamic model, why competition
13  leads to productivity improvements.
14      MR. RYBNICEK:  Okay.  I'm happy
15  to take a break now.
16      MR. CHANG:  Sounds good.
17      THE VIDEOGRAPHER:  The time is
18  10:22.  We're off the record 10:22 a.m.
19
20
21  (Recess taken from 10:22 a.m.
22      to 10:42 a.m.)
23
24

Page 69

1       (Exhibit No. 3 marked for
2  identification.)
3
4       THE VIDEOGRAPHER:  We are back
5  on the record.  The time is 10:42.
6  BY MR. RYBNICEK:
7       Q.  Great.  Just two quick things.  One,
8  at the beginning of the deposition,
9  Professor Pathak, you handed me a document
10  with the typos to your -- typos you've
11  identified in your reports.  I'm just going to
12  mark that as Exhibit 3 so we can all keep
13  track of it.
14      Then, second, we just took a break.
15  Did you discuss any substance of your
16  testimony with your counsel?
17      MR. CHANG: Objection.  I'm
18  going to instruct the witness not to answer
19  based on the expert stipulation.
20  BY MR. RYBNICEK:
21      Q.  Are you going to follow your
22  attorney's instruction?
23      A.  Yes.
24      Q.  So do your reports contain any

18 (Pages 66 - 69)

Page 70

1　opinions about Google's market power?  Strike
2　that.
3　　　Do your reports contain any opinions
4　about whether Google has market power?
5　　A.  So in my report, I rely on Professor
6　Joshua Gans' analysis of market power.  But in
7　my role as a market design economist, I looked
8　at aspects of Google's behavior in the markets
9　at hand.  And as a market design economist,
10　one of the starting points is to look at
11　whether the market is inefficient, and a
12　primary reason why outcomes can be inefficient
13　is because of market power.  So some of my
14　analysis overlaps with what Professor Gans
15　did, so I also did some independent analysis
16　of those issues.
17　　Q.  And did you reach conclusions about
18　whether Google has monopoly power, and is that
19　contained in your report?
20　　A.  The specific conclusions about
21　Google's monopoly power are laid out in
22　Professor Gans' reports.  But in my analysis
23　and understanding of the participants'
24　incentives from the perspective of market

Page 71

1　design, I saw that there are several indicia
2　of the presence of market power such as high
3　switching costs, such as barriers to entry,
4　such as network externalities.  Those are all
5　things that I came upon in reaching the
6　opinions in my report.
7　　Q.  I'm sorry.  This should be a very easy
8　question.  Does your report contain an opinion
9　about whether Google has monopoly power?
10　　　MR. CHANG:  Objection.  Form.
11　　　So there's specific reliance in
12　my report that comes from Professor Joshua
13　Gans.  But in my own independent review as a
14　market design economist, my second lecture in
15　my undergraduate market design class, I
16　discuss why, reasons market designers think
17　about the role for design, and my lecture
18　slide talks about the presence of market
19　power.  So my report looks at those issues,
20　and the specific reliance is coming from
21　Professor Gans, but my analysis overlaps, as I
22　just said.
23　BY MR. RYBNICEK:
24　　Q.  I'm just trying to ask a very simple

Page 72

1　question.  Maybe I'll put it this way.  Where
2　in your report is your opinion -- your
3　independent opinion about whether Google has
4　market power or monopoly power?
5　　A.  My assignment was to look at Google's
6　conducts and incentives to undertake several
7　of the conducts that are described in my
8　report.  And had Google not had market power
9　for several of those conducts, I do not
10　believe Google would have been able to
11　implement those conducts in a way to exclude
12　participants from the market.  So it's kind of
13　the premise of my analysis.  Coming at the
14　question from market design lenses, there are
15　problems that have as a root cause Google's
16　market power.
17　　Q.  Can you look at Paragraph 8 of your
18　opening report.
19　　A.  I'm going to do the binder version.
20　Okay?
21　　Q.  That's perfectly fine.
22　　A.  Let me see Paragraph 8 here.
23　　　Okay.
24　　Q.  Can you read the first two sentences.

Page 73

1　　A.  "I have spoken to Professor Gans
2　regarding his analysis of the relevant
3　markets, market power, and anticompetitive
4　effects.  I rely on Professor Gans' findings
5　on market power and market definitions."
6　　Q.  Is this a true statement?
7　　A.  Yes.
8　　Q.  And it remains accurate?
9　　A.  Yes.
10　　Q.  Are you relying on any other opinions
11　for your conclusion about market power and
12　market definition?
13　　A.  As I said, the methodological approach
14　of market design economics is to diagnose
15　market failures, and I did an independent
16　review of reasons for market failure in
17　this -- in the relevant markets.  And, you
18　know, I think we could say I do not solely
19　rely on Professor Gans' findings on market
20　power.
21　　Q.  Point me to where in your report you
22　conduct a market definition exercise.
23　　A.  I was talking about market power.
24　　Q.  The sentence you just read says

19 (Pages 70 - 73)

Page 74

1    "market power and market definition,"
2    correct?
3        A.  The second sentence here, yes.  Yes.
4        Q.  And you --
5        A.  So I don't -- I don't do a separate
6    analysis of market definition in my report.
7        Q.  Okay.  And so you completely rely on
8    Professor Gans for that?
9        A.  Yes.
10       Q.  And you use his markets for your
11   report?
12       A.  That's correct.  I use his analysis of
13   the markets that he's defined.  I reviewed
14   them.  I discussed them with him.  But I rely
15   on him for market definition.
16       Q.  And now can you point me to where in
17   your report you conclude that Google has
18   monopoly power?
19       A.  When I describe some of the incentives
20   underlying Google's conducts, it's my view
21   that had Google not had market power, it could
22   not have undertaken conducts -- for instance,
23   I have a whole section in my report that's
24   called restricting publisher choice.  Let me

Page 75

1    tell you what section that is.
2            Section 10, "Google's control over
3    publisher inventory arising from tie [sic]
4    enabled Google to consistently act against the
5    interests of its publisher customers."
6            So I believe that if Google did not
7    have market power, it could not have
8    undertaken the actions that are described in
9    that section.  The next section also talks
10   about Google taking away choice from
11   publishers.  So that section is also relevant.
12       Q.  So your analysis is an effects-based
13   analysis.  You find an effect, and you're,
14   from that, concluding there's market power; is
15   that fair?
16       A.  Let me make sure I understand the
17   question.
18           So, I mean, my -- what I don't
19   understand in the question is what the word
20   "effects-based analysis" means.  I'm looking
21   at Google's actions, actions that are against
22   the interests of its publishers in both those
23   two sections, and I'm looking at how Google
24   described those actions in the documents that

Page 76

1    I cite in my report, and I'm also looking at
2    the effects of those actions.
3        Q.  Okay.  Do you conclude in your report
4    that Google had monopoly power?
5        A.  So, you know, specific reliance of my
6    report on Professor Gans is that he is
7    expressing the opinions about market power,
8    but my assignment here was to look at things
9    from this market design perspective that
10   overlaps considerably with the questions of
11   market power.  So that -- that's how I've come
12   at this.
13       Q.  Do you conclude in your report that
14   Google has monopoly power?
15       A.  It's --
16           MR. CHANG:  Objection.  Form.
17       A.  It's my opinion that Google would not
18   have been able to do the conducts that I
19   describe in my report had it not had monopoly
20   power.
21   BY MR. RYBNICEK:
22       Q.  So your conclusion about whether
23   Google has monopoly power is based on your
24   understanding that they engaged in the

Page 77

1    conduct; is that accurate?
2            MR. CHANG:  Objection.  Form.
3        A.  That they engaged in the conduct, and
4    the conduct was used to exclude competition
5    and the effects of the conduct.
6    BY MR. RYBNICEK:
7        Q.  Okay.  And so we'll park the effects.
8            But you didn't calculate market
9    shares, correct?
10       A.  That's right.  That's not in my
11   report.  That's in, I believe, Professor Gans'
12   report.
13       Q.  And you didn't analyze switching
14   costs, did you?
15       A.  I do talk about in my report the
16   deposition of Arnaud Creput, the CEO of
17   Equativ AdServer, who expressed that ███████
18   ██████████████████████    So that's
19   the sense in which my analysis overlaps with
20   these topics, Professor Gans also analyzes.
21       Q.  Did you analyze switching costs with
22   respect to Professor Gans' candidate ad
23   exchange market?
24       A.  I mean, there are parts of my report

20 (Pages 74 - 77)

Page 78

1  that touch upon that topic. For instance, in
2  my report, I talk about the tie between DFP
3  and AdX and how that led participants to face
4  high switching costs of leaving AdX. So I
5  think, in my report, I talk about the
6  representative from Vox Media -- I believe his
7  name is Ryan Pauley -- and his account of why
8  ████████████████████████████████████████
9  ████████████████████████
10       So again, I touch upon these issues in
11  my report, but Professor Gans has his own
12  analysis of these topics.
13       Q.  Without Professor Gans' analysis,
14  would you -- well, strike that.
15       You said on a couple of occasions that
16  your analysis overlaps with Professor Gans
17  with respect to anticompetitive effects and
18  market power. What do you mean by "overlaps"?
19       A.  Well, one way to think about it is our
20  starting points. So Professor Gans is doing a
21  traditional competition policy analysis of
22  defining markets, talking about Brown Shoe
23  factors, doing the snip test, the hypothetical
24  monopolist test, and so on. I don't that that

Page 79

1  in my report.
2       My report's starting place is from
3  market design where in market design, market
4  design economists diagnose market failures and
5  study how the structure of -- or the design
6  rules, more precisely, generate market
7  failures. And so there's overlap there
8  because, as I said, one of the starting
9  places, one of the main reasons why we have
10  market failures involves market power and
11  anticompetitive conduct. But my analysis is,
12  you know, starting from a different place than
13  Professor Gans, where he's doing the more
14  traditional antitrust economics analysis.
15       Q.  I guess the thing I'm struggling with
16  is you say very clearly in your report you
17  rely on Professor Gans for market power and
18  market definition as well as anticompetitive
19  effects -- conclusions. But now you're
20  telling me that you have your own opinions; is
21  that true?
22       MR. CHANG: Objection. Form.
23       A.  Many of the issues underlying Google's
24  conduct as a market design economist speak to

Page 80

1  market power and the effects of Google's
2  conduct on competition. So I have my own
3  independent opinions on that that I describe
4  in my report.
5  BY MR. RYBNICEK:
6       Q.  So if Professor Gans hadn't issued his
7  report, you would have the same conclusions
8  about market power, market definition, and
9  anticompetitive effects?
10       MR. CHANG: Objection. Form.
11       A.  So let me think through that
12  hypothetical here.
13       So if Professor Gans had not
14  introduced his report -- I rely on him for
15  market definition. So in my analysis here, I
16  wasn't asked to do a market definition
17  analysis.
18       For market power -- so let's imagine
19  we had a market definition from somewhere
20  else. Then for market power, I have several
21  parts of my report talking about Google's
22  incentives to steer activity to the AdX
23  exchange, which, as I've said, I don't believe
24  a firm would be able to do successfully had it

Page 81

1  not had market power.
2       So what I don't have in my report is
3  the traditional competition policy analysis of
4  market power that Gans undertakes. But I
5  reviewed what Professor Gans did in his
6  report, and I found no reason to disagree with
7  his approach.
8  BY MR. RYBNICEK:
9       Q.  Let me -- I apologize. But we keep
10  talking about market power and monopoly power,
11  and I just want to be precise.
12       What do you understand monopoly power
13  to mean?
14       A.  Monopoly power, the way I think about
15  it is it's substantial market power, so the
16  power over price, the ability to exclude
17  competition. So in the, you know -- when we
18  talk about monopoly in my class, which I
19  literally taught this last week, you know, we
20  work with models which are abstractions. So
21  the monopoly case is a single-firm case, and
22  that's why we think of monopolists as, you
23  know, substantial market power.
24       Q.  And do you use the phrase "monopoly

21 (Pages 78 - 81)

Page 82

1  power" in your report?
2      A.  I don't remember off the top of my
3  head.
4      Q.  There's no section in which you say, I
5  conclude that Google has monopoly power; is
6  that fair?
7      A.  I'm just looking at my section
8  headings here.  One section heading is "Google
9  took away choice from publishers."  So usually
10  in competitive markets, the participants in
11  the markets have unfettered choices.  So the
12  headers are consistent with that statement
13  that you made.  I'd have to look at my report
14  very closely to see if there's a sentence that
15  says what you said.
16      Q.  You don't know, sitting here today,
17  whether or not you concluded explicitly that
18  Google has monopoly power?
19          MR. CHANG:  Objection.  Form.
20      A.  My assignment was to look at Google's
21  incentives in the display advertising markets
22  here, and I think you're asking me about a
23  very particular sentence in the report.  So I
24  can't give you a precise answer about a

Page 83

1  particular sentence of, you know, a
2  100-plus-page report, but my view is Google is
3  not able to do a lot of the conducts that I
4  described here had it not had substantial
5  market power or monopoly power.
6  BY MR. RYBNICEK:
7      Q.  I appreciate that.  I understand your
8  testimony is that the conduct wouldn't have
9  been possible without Google having monopoly
10  power.  I'm trying to understand whether or
11  not you concluded explicitly that Google has
12  monopoly power in your report and disclose
13  that.
14      A.  Let me take a look at the sections.
15  Just give me one second.
16      Q.  Was it your assignment to conclude
17  whether -- to analyze whether Google has
18  monopoly power and to reach a conclusion?
19      A.  The way that I -- well, let's take a
20  look at my assignment, and then I can explain
21  to you why Google's substantial market power
22  and its conduct are relevant for that
23  conclusion.
24          So my assignment here in Paragraph 2

Page 84

1  is that "I was asked to apply my expertise in
2  market design to analyze the incentives
3  motivating Google's conduct at issue in this
4  case.  Using market design principles, I
5  compare Google's conduct with efficient
6  functioning markets.
7          "I've also been asked to apply my
8  market design expertise to identify the nature
9  of remedies that would restore competition.  I
10  do not provide conclusions about whether
11  Google's conduct is anticompetitive, but I
12  have been instructed to accept certain
13  conclusions in this regard provided by
14  Professor Joshua Gans, another expert retained
15  by plaintiff states."
16          So the reason why there's overlap is
17  my assignment was to apply my market design
18  expertise to analyze the incentives motivating
19  Google's conduct and the market design
20  toolbox.
21          I think I've said this a couple of
22  times today already.  In my undergraduate
23  class at MIT, when I teach market design, I
24  start off by talking about why markets need to

Page 85

1  be designed and why there are issues.  And the
2  two leading cases are, first, there is market
3  power.  The second is we have a missing price.
4          So when I'm looking at this from a
5  market design lens, I am looking at why is it
6  that Google restricted choice?  Why is it that
7  publishers did not have options?  If we had a
8  competitive market, if the market were not
9  monopolist, then competitors -- I'm sorry --
10  publishers could switch the products that
11  they're using freely, but they did not, and
12  that is why Google was able to restrict choice
13  to steer volume to its exchange.
14          So that's the sense in which my market
15  design analysis overlaps with Professor Joshua
16  Gans.  But my assignment is this market design
17  framework.  It's not the traditional
18  competition economist framework.
19      Q.  Okay.  I think this helps.
20          So as you read in Paragraph 8, your
21  assignment was not to make findings on
22  Google's -- strike that.
23          As you read in Paragraph 8, your
24  assignment was not to make conclusions about

22 (Pages 82 - 85)

Page 86

1    anticompetitive effects, correct?
2            MR. CHANG: Objection. Form.
3            MR. RYBNICEK: Sorry. I read
4    the wrong paragraph, didn't I?
5    BY MR. RYBNICEK:
6        Q. Paragraph 2. As you read in
7    Paragraph 2, your assignment was not to reach
8    conclusions about whether Google's conduct was
9    anticompetitive, correct?
10       A. Yes, Paragraph 2, the sentence here
11   says, "I do not provide conclusions about
12   whether Google's conduct is not
13   anticompetitive." But the way I think about
14   this is this is the premise of the market
15   design exercise. So if we had completely
16   competitive markets, as I teach my
17   undergraduates, we would say, Well, is there a
18   case for market design here? If markets were
19   functioning as the ideal that we aspire to,
20   the principles that I outline in my report,
21   then what is the case for the designer?
22       So my assignment was not to give these
23   conclusions about whether Google's conduct is
24   anticompetitive, but that's kind of the

Page 87

1    building block of my study of the incentives
2    motivating Google's conduct.
3        Q. And is it fair to say that your
4    assignment was also not to conclude whether or
5    not Google has monopoly power?
6            MR. CHANG: Objection. Form.
7        A. My assignment is stated in this
8    paragraph, but I give you the same answer I
9    just gave a second ago, that the starting
10   point of a market design analysis is to ask is
11   the market functioning according to the
12   competitive ideal? And in the course of my
13   analysis, I, of course, looked at whether the
14   participants in this market have market power
15   and whether some of the conducts are
16   anticompetitive. But, you know, my report is
17   not providing, as I say here, conclusions on
18   those two topics, but it's part of my
19   analysis.
20   BY MR. RYBNICEK:
21       Q. So is it fair to say you're opining on
22   whether Google's conduct is -- strike that.
23       Are you opining that Google's conduct
24   is anticompetitive because it does not follow

Page 88

1    your market design principles?
2            MR. CHANG: Objection. Form.
3        A. What I'm -- I mean, I -- could you ask
4    the question one more time. I want to make
5    sure I understand the language precisely.
6    BY MR. RYBNICEK:
7        Q. Are you opining that Google's conduct
8    is anticompetitive because it doesn't follow
9    the market design principles you articulate in
10   your report?
11           MR. CHANG: Same objection.
12   Form.
13       A. My report is opining that Google has
14   this strong conflict of incentives that
15   motivates many of the conducts that have led
16   to adverse effects on competition in the
17   markets here.
18   BY MR. RYBNICEK:
19       Q. Is it your opinion that Google's
20   conduct is anticompetitive because they don't
21   follow the design -- market design principles
22   you articulate in your report?
23           MR. CHANG: Objection. Form.
24       A. My task here was to apply the market

Page 89

1    design principles to look at Google's
2    incentives and why would Google have an
3    incentive to restrict publisher choice if it's
4    representing the interests of publishers. I
5    would have thought that Google would want to
6    expand choice and do what's in the best
7    interest for publishers.
8        So they were not able to -- they were
9    able to get away with -- they were able to
10   take actions, as I describe in my report, that
11   are against publisher interest because they
12   had market power. And as my report describes,
13   the effects of those restrictions of choice
14   were to obstruct the outcomes from being
15   competitive.
16       Q. Okay. But you, sitting here today,
17   you can't point to a place in your report
18   where you say Google has market power or
19   monopoly power; is that fair?
20       A. So my section headings here are about
21   Google's harm to competition, Google's taking
22   away of choice, Google's control of various
23   parts of the markets here. I also discuss
24   Google's contractual tie in my report.

23 (Pages 86 - 89)

Page 90

1    So if you're asking me about a
2    specific sentence, I cannot say off the top of
3    my head whether that sentence exists without
4    going through my entire report, and we
5    probably don't want to use our time to do
6    that. But each of these sections that I just
7    described speak very clearly to these issues
8    of market power and anticompetitive conduct.
9        Q.   All right. Appendix A of your report,
10   I think, has your CV.
11       Have you found that?
12       A.   I found it, yes.
13       Q.   Great.
14       Can you provide us an overview of your
15   educational background for the record.
16       A.   Sure. I did my undergraduate degree
17   at Harvard University, where I studied applied
18   mathematics with a minor in economics. I also
19   got a master's degree in applied mathematics
20   the same year. I stayed on to do a Ph.D. in
21   business economics, and I graduated in 2007.
22   And my main Ph.D. advisor was Professor Alvin
23   Roth. So that's my education line there.
24       Q.   And what is business economics?

Page 91

1        A.   Business economics is an economics
2    degree that is offered jointly between the
3    faculty of arts and sciences at Harvard and
4    Harvard Business School. So one way to think
5    about this program is it's an economics Ph.D.,
6    so we had to take the entire requirements for
7    economics Ph.D.s, and we also had to take
8    several additional courses taught at Harvard
9    Business School.
10       And our advisor -- one of our advisors
11   had to be joint between -- had to have an
12   affiliation with Harvard Business School. So
13   Alvin Roth, who is my main Ph.D. advisor,
14   fulfilled that role.
15       Q.   Got it.
16       You spent a lot of time in Boston, it
17   appears.
18       A.   I have spent a majority of my life
19   here now, yes.
20       Q.   You don't have a degree in marketing,
21   though, right?
22       A.   I do not have a degree in marketing.
23       Q.   And you don't have a degree in
24   advertising, correct?

Page 92

1        A.   That's correct, yes.
2        Q.   Your specialty is market design; is
3    that fair?
4        A.   That's correct, yes.
5        Q.   And your mentor, Alvin Roth,
6    characterized market design as economic
7    engineering. I think that's what you've
8    quoted in your report. Is that accurate?
9        A.   Yeah, I believe Professor Roth has
10   described it that way. He has a famous
11   article from 2002 that's called "The Economist
12   as Engineer," and he wrote that article the
13   year I took his class actually, so that's the
14   lens that he's put on the field.
15       Q.   Do you agree that's an apt
16   characterization?
17       A.   "The Economist as Engineer" I think
18   is, at a high level, a nice way of describing
19   market design. So, yeah, I agree with that.
20   I've heard other people describe it, you know,
21   less nicely as "The economist as plumber." So
22   I think that might be more appropriate in some
23   circumstances than "engineer."
24       Q.   And so you're an economic engineer or

Page 93

1    an economic plumber, depending on how you
2    think about it?
3        A.   That is, I think, the guiding
4    principles of market design economics, yeah.
5        That manifesto that Roth wrote in
6    2002, I think, has guided a lot of the folks
7    who work in this area. So, for instance, I
8    founded the National Bureau of Economic
9    Research's working group on market design. So
10   that's a professional meeting of about 50 or
11   so scholars who work on market design. We're
12   going to meet this Friday at Stanford.
13       And if you look at the mission
14   statement of that group -- I believe I cite
15   that in my report -- we focus on particular
16   market-clearing institutions across a variety
17   of domains and engineer them, ask whether
18   they're working well and how maybe they can be
19   engineered to work better.
20       Q.   What's an example of a recent example
21   of where the group did that?
22       A.   So it's the -- it's members of the
23   group who work on these issues. But one
24   example that I've spent a lot of time working

24 (Pages 90 - 93)

Page 94

1  on is the way that graduates of U.S. military
2  academy, which is sometimes called West Point
3  and the ROTC program, the Reserve Officer
4  Training Corps program, fulfill their active
5  duty service obligation.
6       So that's an example of a matching
7  market where, as a cadet who is graduating
8  from West Point, at the conclusion of your
9  four years, you have to go through branch
10  assignment.  Essentially, you get to go to
11  college at a highly subsidized rate in
12  exchange for committing to serve in the
13  military for a certain number of years.  So
14  that's called the ADSO requirement, A-D-S-O.
15       And cadets are asked to submit a
16  ranking of branches that they're interested
17  in, like artillery or cyber or quartermaster.
18  And the military has criteria that they use to
19  rate cadets, what's called the order of merit
20  list.  So that includes your grades at West
21  Point, as well as your leadership
22  capabilities, as well as your physical
23  fitness.  And then they run a centralized
24  market-clearing procedure to assign cadets to

Page 95

1  their first positions.  So that's something
2  I've worked on and written about.  So that --
3  that's one example, yeah.
4  BY MR. RYBNICEK:
5       Q.  But your main profession is teaching;
6  is that right?
7       A.  It's a good question.  I'm a
8  professor, and as part of my requirements as a
9  professor, I teach classes.  I supervise
10  doctoral dissertations, and I conduct
11  research, and I also run a research lab at MIT
12  called Blueprint Labs.  That's a research lab
13  that's focused on market design applications
14  to public policy.
15       Q.  Do you only teach in the economics
16  department?
17       A.  Currently, I teach in the economics
18  department undergraduates and graduate
19  students.  I have had the opportunity to teach
20  in business schools in the past.
21       Q.  And what types of classes are you
22  currently teaching?
23       A.  This fall, I'm teaching two classes.
24  One is the very first course that

Page 96

1  Ph.D. students take at MIT, students who are
2  getting a Ph.D. in economics, in information
3  technology, in data science and finance on
4  microeconomic theory.  So that's one class.
5       The other class is an undergraduate
6  elective course on market design.  That's a
7  class that's taught in the economics
8  department, but it also counts for credit for
9  students who major in Course 6, which is MIT
10  lingo for computer science.
11       So we have a tradition at MIT of
12  labeling our courses only in terms of numbers.
13  So we have a joint degree program that's
14  called 614, so 6 is computer science; 14 is
15  economics.  And the market design class is a
16  kind of capstone class for students interested
17  in economics and computer science issues, so
18  I'm currently teaching that class as well.
19       Q.  And does the economics program have
20  kind of specialties, like finance and others?
21       A.  Yes.  The economics program -- let me
22  take that question at several levels.
23       So when you do your Ph.D., our
24  Ph.D. students specialize in certain

Page 97

1  subfields, like finance or market design or
2  behavioral economics.  The undergraduate
3  courses that we offer reflect many of those
4  topics as well.  So there's specialization
5  that way.
6       You don't get a degree, though, that
7  says, I have a Ph.D. in economics with a focus
8  on market design, with the one exception of --
9  well, maybe there's a few exceptions.  Finance
10  Ph.D.s are a distinct Ph.D.  Information
11  technology is a distinct Ph.D.  And the --
12  Institute for Data and Social Sciences have
13  their own distinct Ph.D.
14       Q.  Does market design kind of fall into
15  its own bucket or focus, or does it fall under
16  a broader heading?
17       A.  Market design is, I think -- I mean --
18  let me pause for a second.
19       So I guess the answer to that is yes
20  to both.  So we have a minor in market design,
21  so we have students who list market design as
22  their primary area of interest.  So this fall,
23  I have a Ph.D. student who is looking for a
24  job, and his primary field of interest is

25 (Pages 94 - 97)

1    market design. But market design is a
2    cross-cutting field. It's a field that
3    overlaps with other areas of economics.
4        So the example I gave you a second ago
5    about the military job placement, you could
6    say it sounds more like a labor economics
7    topic. The lectures that I teach on auction
8    markets are maybe more closely related to
9    topics in industrial orGansization. So that's
10   one of the nice things about the field of
11   market design. I think why Roth describes it
12   as an engineering field, it's really a
13   solutions-oriented discipline. It's very
14   applied.
15       So the market designer comes to a
16   problem with the entire toolbox of economics,
17   theoretical work, empirical work, experimental
18   work. Sometimes they conduct their own lab
19   experiments even. And the aspiration is to
20   try to improve the functioning of specific
21   markets. So there's a range of different
22   areas that we cross.
23       Q.  That's not -- obviously not a
24   mechanical engineering or a chemical -- it's

1    like a social engineering field, right?
2        A.  I don't know about the word "social
3    engineering." I think that word has a lot of
4    connotations that may not be positive
5    connotations.
6        Another description, if you don't like
7    the economist as engineering description, is
8    what the economists call the field of market
9    design, which is a theory of an intelligently
10   designed invisible hand.
11       So one thing that we're trying to do
12   is -- in market design economics is harness
13   the forces of competition. But realizing that
14   the rules of the game are designed by folks,
15   you know, either inside the system or outside
16   of the system, and we want to ensure that
17   those rules are designed in a way that leads
18   to beneficial outcomes for participants.
19       Q.  Have you ever taught a class in
20   antitrust economics?
21       A.  Years ago -- I'm sorry. A lecture or
22   a class?
23       Q.  A class. A course.
24       A.  A course in antitrust economics, no, I

1    have not.
2        Q.  And I assume none of your
3    Ph.D. students -- well, strike that.
4        Your CV also lists that you -- or that
5    you were a weekly visitor at something called
6    the Microsoft Research New England?
7        A.  That's correct, yes.
8        Q.  From 2015 to 2016?
9        A.  (Witness nodding.)
10       Q.  What is -- what is Microsoft Research
11   New England?
12       A.  Microsoft Research New England is a
13   research laboratory that's two buildings down
14   from our economics department that hosts
15   academic visitors, and they do basic research
16   on a range of topics.
17       Q.  Is it affiliated with MIT?
18       A.  No, it's not.
19       Q.  And is it, as the name suggests,
20   affiliated with Microsoft?
21       A.  It is, yes.
22       Q.  And so did you receive any
23   compensation from Microsoft for that
24   position?

1    A.  I believe I did. I don't know the
2    exact details of it.
3        Q.  Do you recall what you researched
4    while you were in this position?
5        A.  Yes. So I was a weekly visitor. They
6    have a weekly visitor program. And to the
7    best of my recollection, there was a seminar
8    there once a week, and they have a group
9    that's interested in economics in computer
10   science. So I was working on topics on
11   matching markets. I was doing that the same
12   year I was a visiting professor at Harvard
13   University.
14       So if memory serves, on Fridays, maybe
15   every week or every other week, I would go to
16   Microsoft Research for the seminar. And I
17   think I also spoke in the seminar. So that
18   environment involves a mix of academics or
19   folks who have one foot in academia and one
20   foot in industry talking about basic research.
21       So my research has always, you know,
22   in -- that time period was 2015. Probably
23   what I was working on at that point was
24   matching systems for public school children to

26 (Pages 98 - 101)

Page 102

1   get into different high schools in big cities.
2   Actually, that's exactly what I talked about.
3   I remember it now.
4          So I gave a research seminar in that
5   workshop that was specifically about how you
6   can use the fact that there's rationing of
7   school seats to measure what is the
8   consequence of getting assigned one of your
9   choices.
10      Q.  Have you done any other work for
11  Microsoft?
12      A.  I have not.
13      Q.  Have you done any work for any firm in
14  the ad tech sector?
15      A.  I have not.
16      Q.  We talked about that you don't have a
17  degree in marketing or advertising, but have
18  you ever done any work in marketing or
19  advertising?
20      A.  I have not, no.
21      Q.  So you don't have any experience with
22  advertising or marketing?
23          MR. CHANG:  Objection.  Form.
24      A.  Personal experience --

Page 103

1   BY MR. RYBNICEK:
2       Q.  Correct.
3       A.  -- in terms of working in a firm that
4   is selling ads or buying ads?  No, I have not.
5       Q.  And do you have any experience with
6   digital advertising specifically?
7       A.  As a participant in those markets, I
8   have not bought or sold digital ads.  But if
9   your question is about knowledge of this
10  market, I've spent a lot of time reviewing
11  and -- reviewing documents about this market
12  in the record.
13          I also teach a class in my
14  undergraduate class -- in fact, this was about
15  two weeks ago -- about advertising and the
16  pricing of advertising, specific auction
17  mechanisms in my undergraduate class.
18      Q.  Would you consider yourself -- would
19  you consider yourself an expert in ad tech?
20      A.  If by "expert" you mean someone who
21  knows more than the average person, yes.
22      Q.  More than industry participants?
23          MR. CHANG:  Objection.  Form.
24      A.  Industry participants is a large group

Page 104

1   of individuals.
2          I have my expertise in market design,
3   and I've applied that lens to a study of the
4   record.  And, you know, part of what I'm able
5   to review that certain industry participants
6   are not able to see are information between
7   participants in this market that were not made
8   public to some of the participants.  So there
9   are certainly aspects of this industry that
10  I'm aware of and I've had the opportunity to
11  study that many industry participants have
12  not.
13  BY MR. RYBNICEK:
14      Q.  Have you ever talked to anybody who is
15  in the ad tech business?
16      A.  In preparation for -- of this report
17  or in general?
18          I did not -- I didn't feel the need to
19  in preparing this report because I had access
20  to a tremendous amount of information, and my
21  report is talking, you know, to specific
22  conducts at specific points in time.  And the
23  information that I had access to is
24  information that's coming, you know, from

Page 105

1   testimony and depositions, so that has a lot
2   of advantages over just talking to someone
3   because those depositions take place under
4   oath and, you know, people are truthful.
5       Q.  We talked about this.  You haven't
6   taught an antitrust economics course, and, of
7   course, you hold yourself out as an expert in
8   market design.
9          But do you also hold yourself out as
10  an expert in antitrust economics?
11      A.  If by "expert" you mean someone who
12  knows more than the average person, certainly.
13      Q.  Do you have -- do you know more than
14  someone who teaches antitrust economics for a
15  living?
16      A.  Again, there's a wide range of folks
17  who teach antitrust economics for a living.
18          I'll tell you that my very first job
19  out of college, after I finished my applied
20  mathematics degree, was as an intern at the
21  Economic Analysis Group of the Department of
22  Justice, so in 2002.  So I have studied and
23  paid attention to issues of competition policy
24  for more than 20 years.

27 (Pages 102 - 105)

Page 106

1    So while I have not taught a specific
2    course -- in fact, at MIT, we don't have the
3    bandwidth to teach an economics course solely
4    on antitrust economics.  There are
5    undergraduate courses on industrial
6    orGansization and regulation which touch upon
7    those issues.  I have a lot of knowledge about
8    this area, I believe.
9        Q.  Have you ever been retained to provide
10   your opinion on -- related to antitrust
11   economics?
12       MR. CHANG:  I'm going to
13   instruct the witness to respond to that
14   question to the extent he can -- to the extent
15   that he has been disclosed as a testifying
16   expert.  I don't want to run afoul of anything
17   else that's going on right now.
18       Is that fair?
19       MR. RYBNICEK:  I don't
20   understand the issue.
21       MR. CHANG:  If he is working for
22   some other entity and has not been --
23       MR. RYBNICEK:  I don't need to
24   know the entity.  I'm just asking if he's been

Page 107

1    retained.  It could be on an anonymous basis.
2    I'm just asking if he's been retained in the
3    capacity of providing his expertise on
4    antitrust economics.
5        MR. CHANG:  You can respond to
6    the extent you've been retained as a
7    testifying expert.
8        A.  The answer is yes.  I think we have an
9    example in the report of a deposition that
10   I've submitted in a prior matter.
11   BY MR. RYBNICEK:
12       Q.  This is the Iowa --
13       A.  Yes, that's right, the Iowa pension
14   fund case.
15       Q.  And you submitted a report or you
16   served -- sorry.
17       You submitted a report in that
18   matter?
19       A.  That is correct.
20       Q.  And did you testify at trial?
21       A.  That case did not go to trial.
22       Q.  Were you deposed?
23       A.  Yes.
24       Q.  And what -- what were the issues in

Page 108

1    that case?
2        A.  I can tell you at a high level.  I
3    don't want to violate any protective rules
4    that I've signed.
5        Q.  No, nor am I asking you to.
6        A.  Okay.  That was a case about market
7    design issues in the securities lending
8    market.
9        Q.  Okay.  And did you provide an opinion
10   on damages or the merits?
11       A.  I did both.
12       Q.  And do you know if there was ever an
13   attempt to exclude your testimony -- excuse
14   me -- exclude your report?
15       A.  In that matter, I do not believe there
16   was.
17       Q.  Okay.  So in your report -- in
18   Paragraph 35 in your opening report, you talk
19   about your experience working in market
20   design, and you provide three examples, one of
21   which I think we've already discussed.
22       Do you see that?
23       A.  So could you repeat the paragraph
24   number.

Page 109

1        Q.  35.
2        A.  35.  Okay.  Uh-huh.  Let me just read
3    this.  Sorry.
4        (Witness reviews document.)
5        Great.  Yes.  Okay.  Yes.
6        Q.  And so what are the three markets or
7    areas in which you've worked on -- worked with
8    respect to market design?
9        MR. CHANG:  Objection.  Form.
10       A.  The paragraph describes work I've done
11   studying centralized mechanisms for assigning
12   students to schools.  So I've done a lot of
13   work on that topic and have been involved in
14   practical designs across a number of American
15   cities.  And I have written many research
16   papers about various aspects of that system
17   and systems like that.
18       The second example are cadets to
19   military posts.  So that's what we've talked
20   about with the West Point and ROTC example.
21   So that's another place where I've been
22   actively involved in the design.  The West
23   Point uses a system that myself and my
24   colleague Sonmez proposed.

28 (Pages 106 - 109)

Page 110

1    And then the last example here is
2  research that I've taken studying the process
3  by which medical residents get assigned their
4  first internship. That's called the National
5  Residency Matching Program. I have not been
6  involved directly in the design of that
7  system, but I have researched aspects of the
8  algorithm that's used in that system.
9  BY MR. RYBNICEK:
10    Q.   And in that -- in Paragraph 35, you
11  say, "I've spent most of my career researching
12  and designing matching marketplaces to produce
13  efficient and other desirable outcomes."
14    What do you mean when you say
15  "marketplace" in that context?
16    A.   What I mean by a matching marketplace
17  is that there are two sides. So in the
18  example of students in schools, there's the
19  side of students, and there's the side of
20  schools. And this is a setting where there's
21  no price, so we have to clear the market
22  without the usual instruments that we have in
23  economics of, you know, setting demand equal
24  to supply using the price. So that's a

Page 111

1  marketplace.
2    The other two examples, cadets to
3  military posts also have that property that
4  there is -- there are cadets, and then there
5  are jobs. So you can think of that as there's
6  the demand, and then there's the supply, and
7  the marketplace is a way to clear that market
8  to match up the demand and the supply.
9    The medical residents example also
10  fits into that category.
11    Q.   And so are these the three areas that
12  you've -- why do you point -- highlight these
13  three areas? These are the three areas that
14  you've most been involved in?
15    A.   The area I've been most involved in is
16  the student-to-school matching problem.
17  That's something I've been working on since my
18  Ph.D. days, so I've studied this issue for 20
19  years, many different aspects of this issue.
20    The reason I mention that example is
21  not only that I've worked on this for so long,
22  but it's a real-life example of institutions
23  that I have helped to design. So it's not
24  only theoretical, but it's also very

Page 112

1  practical. And the same consideration applies
2  to the cadet branch assignment setting.
3    And so the medical resident matching
4  program is another real-life institution that
5  you might have had a friend get their first
6  residency position through this kind of
7  system. So these are just really salient
8  examples.
9    The rest of the paragraph, I should
10  mention, talks about methodological work I've
11  also done. And so together with Sonmez, one
12  of the things that we've studied is ways to
13  measure the extent to which different
14  mechanisms encourage straightforward behavior
15  by participants. And so that is a paper that
16  actually spans several other applications of
17  market design reasoning, including matching
18  markets as well as auction markets.
19    Q.   You said you spent most of your time
20  working on student assignments in schools. Is
21  it fair to say more than half of your papers
22  are on that topic probably?
23    A.   I could take a look at that. I don't
24  know. Is it half? Roughly. I'll accept

Page 113

1  that.
2    Q.   Roughly?
3    A.   Yeah.
4    Q.   Is this for public schools?
5    A.   The -- yeah, the settings I focused on
6  are public schools in big cities.
7    Q.   Washington, D.C.?
8    A.   Washington, D.C., in 2012. There's a
9  program there that was called My School DC
10  that involves children in Washington trying to
11  get into public schools in Washington, and
12  they used a centralized clearinghouse that I
13  was fortunate to be part of the design team
14  for that project.
15    Q.   And so when -- taking Washington,
16  D.C., as an example, when a family is seeking
17  to get an assignment for a school, do they
18  have an alternative besides the system that
19  the school system has set up?
20    A.   The family -- it's a public school, so
21  an alternative is always to not go to public
22  school.
23    Q.   Do most people have that
24  alternative?

29 (Pages 110 - 113)

Page 114

1    A.  I haven't studied that very closely,
2 but my impression is that not going to public
3 school involves paying tuition that many
4 families cannot do.
5    Q.  But if you want to participate in
6 public school in D.C., you have to use this
7 matching system that the D.C. school system
8 has; is that right?
9    A.  You know, so I was heavily involved in
10 that system back in 2012.  And sadly,
11 Washington, D.C., is one of the sites that no
12 longer returns my phone calls.  So I could
13 speak to the system back in 2012.  I don't
14 know what the current rules are right now.
15    So the systems are often used for the
16 primary entry point of schools, kindergarten,
17 middle school, sixth grade, high school, ninth
18 grade.  So if I am joining school in the
19 middle of a year or if I'm joining school in a
20 nontransition grade, like third grade, there's
21 other ways to access schools.
22    Q.  But there are multiple auctions or
23 multiple marketplaces; is that fair?
24    A.  Yeah, I think that takes place through

Page 115

1 the district policy.  What -- how you get
2 assigned a school is a prerogative of the
3 district.  So they are the sole designer or
4 orGansizer of that market.
5    Q.  They're like a monopolist?
6    A.  I mean, it's a tricky word to use in
7 this context because it's a public good.  So
8 we usually think of education in economics as
9 a public good.  And so why are schools
10 publicly provided?  Because of a number of
11 reasons, but I wouldn't use the word
12 "monopolist" there.
13    Q.  You don't disagree that it's the only
14 option?
15    A.  Unless you want to, you know, either
16 move to another city or send your kid to
17 private school if you live in Washington, D.C.
18    Q.  So there's not competition for
19 improving the marketplace; is that fair to
20 say?
21    A.  Well, in economics, we talk about
22 competition through what's called Tiebout.
23 Charles Tiebout was a contemporary of Milton
24 Friedman, and his idea was, even in local

Page 116

1 public goods provision, like other settings
2 where we have, you know, firefighters or
3 police that are provided by local governments,
4 there is the option to move.  So Tiebout's
5 main idea was competitive pressure can exist
6 in these kinds of setting by -- people call it
7 voting with your feet.
8    So if the D.C. system is really
9 functioning poorly, then they might lose
10 enrollment.  And I haven't look at D.C., I
11 mentioned, in a long time, but in many big
12 city school districts, they are experiencing
13 very substantial declines in enrollment of
14 students.  And so that is going to create
15 pressure on the district to try to do things
16 to retain enrollment, like, for instance,
17 offering pre-K.  So that's a competitive
18 response that's coming from the threat of
19 exit.
20    Q.  But I guess, going back to my original
21 question, there's no other marketplace that
22 you could turn to for -- to attend D.C.
23 schools, public schools?
24    MR. CHANG:  Objection.  Form.

Page 117

1    A.  To attend D.C. public schools, so
2 that's ruling out leaving D.C. or going to a
3 private school, you're saying.  So if I want
4 to access a D.C. public school, I have to go
5 through Washington, D.C., public schools
6 registration process, yes.
7 BY MR. RYBNICEK:
8    Q.  And do you -- sorry.  Not "do you."
9    Do families pay a price to participate
10 in these markets -- marketplaces, at least at
11 the time when you were involved in it?
12    A.  There's several dimensions of the word
13 "pay a price," so let's take those in turn.
14    The first is to register and submit a
15 list of school choices in Washington, D.C.
16 It's my understanding that this is true today,
17 but certainly back when I was involved, you
18 just simply sign up and get an account, and
19 it's free.
20    There's an obligation in most
21 cities -- again, I don't know the details of
22 Washington, D.C. -- that if you are school
23 age, the City has to provide you a seat at
24 school.  So that's kind of the immediate

30 (Pages 114 - 117)

Page 118

1  question of signing up to participate in the
2  market.
3       But there's a second dimension of your
4  question, which could be the decision to live
5  in Washington, D.C., and so in the background
6  you are transacting, you're paying a price via
7  rental markets or through housing markets to
8  reside in Washington, D.C. So there are parts
9  of Washington, D.C., that are not affordable
10  for many families, so they're priced out of
11  those areas.
12       And the way the Washington, D.C.,
13  system used to work, certain areas of
14  Washington, D.C., would give heightened
15  priority to families from certain residences.
16  So implicitly -- this is a second layer of
17  your question -- there is a price that's
18  happening through the housing market.
19       Q.  But there's no price that affects the
20  supply and demand; is that fair?
21            MR. CHANG:  Objection.  Form.
22       A.  I don't know if I agree with that.
23  BY MR. RYBNICEK:
24       Q.  Okay.  In what way do you disagree?

Page 119

1       A.  If we look at a district in
2  Washington, D.C., Dupont Circle, that has
3  schools that are sought after, and if the D.C.
4  system still has what folks call neighborhood
5  priority, what that amounts to is if I'm an
6  applicant from the neighborhood, I get
7  heightened priority for a slot in Dupont
8  Circle.
9       So what dictates the value of that
10  priority in the system -- well, the amount of
11  residents who live in Dupont Circle and if --
12  how are they rationed?  Why doesn't everyone
13  get access to that priority?  Well, they're
14  being rationed through the housing market, the
15  price of rents and price of real estate there.
16  So there is that -- you could call it an
17  implicit price, but, you know, there's a
18  shortage.
19       In this hypothetical example, I'm just
20  assuming the schools in Dupont Circle are
21  sought after.  Then what's going to dictate
22  how supply and demand interact, you know, the
23  housing market?  So that's why I don't agree
24  with what -- the way you characterized it.

Page 120

1       Q.  Maybe I wasn't being clear.  I guess
2  I'm talking about the price for the tool, the
3  marketplace, right?  So --
4       A.  Okay.
5       Q.  -- not the price of the ultimate good
6  that you're seeking.
7       A.  Uh-huh.  Yeah.  So as I said, if you
8  want to access the tool, every resident of
9  Washington, D.C., has -- I think this is true
10  today as well as back in 2012 -- the
11  opportunity to use a tool without paying any
12  price.
13       Q.  Right.
14       A.  Yeah.
15       Q.  There's a hundred thousand more people
16  that come in.  They're not going to charge you
17  more, right?  As the supply comes up or --
18  excuse me -- as the demand goes up, price
19  isn't going to go up, right?
20       A.  To create an account on My Schools
21  DC --
22       Q.  Yes.
23       A.  -- they would be unlikely to do that,
24  I think.

Page 121

1       Q.  Great.
2       Do you have any experience -- so is it
3  fair to say that the marketplaces for cadets
4  on military posts and for medical residents
5  are similar, not priced being markets as to
6  student assignments to schools?
7       A.  I would say the cadet assignment
8  market is not exactly a nonprice market
9  because they have this very interesting
10  feature that, as a cadet, you are able to
11  express a bid.  The bid is not exactly a price
12  in the conventional sense, but what it is is
13  an opportunity to extend your service
14  commitment.
15       So roughly speaking, every cadet who
16  graduates from West Point has to do three
17  years of an active duty service obligation.
18  But the way the military has set up the system
19  is if I am interested in a spot in a highly
20  sought-after branch, like combat arms, for
21  instance, that could be sought after because
22  that's a branch that leads many people to
23  become generals.  Okay?
24       I can indicate in the matching system

31 (Pages 118 - 121)

Page 122

1    a willingness to extend my commitment beyond
2    three years. So I would think that -- of that
3    as a price. In fact, our model of the system
4    in my paper in the "American Economic Review"
5    calls this a price, but really, it's an
6    extension of the term of the contract. So
7    that -- that's where I just put a kind of
8    fine -- fine comb on that particular example.
9    So it's more of a hybrid auction matching
10   system there.
11       Q. Sure. But there is no literal price;
12   you agree to that? I think you said that
13   earlier.
14           MR. CHANG: Objection. Form.
15       A. I don't know what the word "literal
16   price" means. So if you look at my paper on
17   this, we call it a -- a price -- a multiprice
18   cumulative offer algorithm is the algorithm
19   that's used. So the price here is the terms
20   of the trade. So am I getting assigned combat
21   arms for a three-year commitment or a
22   five-year commitment? So that price.
23           In economics, the way we usually think
24   about a price is it involves a marginal rate

Page 123

1    of substitution. So how much am I willing to
2    trade off one thing versus the other? That's
3    proportional to the price. You can think of
4    that analogy as a price. I'm willing to trade
5    off a higher rank choice. I really want to do
6    combat arms, and I'm even willing to do it for
7    two extra years as opposed to my next-best
8    alternative. So I would call that a price.
9    BY MR. RYBNICEK:
10       Q. My question was is there currency
11   exchanged? I'll put it simply that way.
12       A. Okay. Not in that market, no, yeah.
13       Q. Or in the student assignments to
14   schools marketplace or the medical residents
15   to internships marketplace, correct?
16       A. In the medical residents marketplace,
17   the only place where they charge you is -- so
18   I believe, unlike the school examples, when
19   you apply and go through the National Resident
20   Matching System, you have to pay to set up an
21   account. And if you are interested in ranking
22   more than their standard number of choices,
23   you also have to pay an extra amount to do
24   that. So that's currency, yeah.

Page 124

1        Q. There's no competing -- is there just
2    one medical residency matching program
3    nationally?
4        A. In the United States, my understanding
5    is the vast majority of medical residents get
6    their placement through a -- the NRMP, but
7    there's also placements that happen outside of
8    the NRMP. One example of that is what they
9    call the scramble. So every year, there are
10   participants in the NRMP who don't get any of
11   their choices. So this happens every year in
12   Boston. We have match dates typically in
13   March, and if you're someone who doesn't get a
14   placement through that clearinghouse, you get
15   a phone call two days before.
16           I had a friend go through this. It's
17   a really devastating thing because you didn't
18   get any of your choices. None of your choices
19   wanted you. Maybe it's because you didn't
20   rank enough places. And so you go through a
21   distinct process that is outside of the
22   National Resident Matching Program to get a
23   placement. I believe it's on the order of the
24   30,000 participants, about 1,000 participants

Page 125

1    a year go through that system.
2        Q. Is it fair to say that is a much
3    smaller pool of the residents that go through
4    that system?
5        A. That aftermarket scramble system?
6        Q. Yes.
7        A. Yeah, that's right. 1,000 is a
8    fraction of 30,000.
9        Q. So for all intents and purposes, there
10   is a primary marketplace without a competing
11   marketplace?
12           MR. CHANG: Objection. Form.
13       A. Well, this is for the primary
14   residency match. If you go to some specialty
15   matches, they have different rules. So --
16   BY MR. RYBNICEK:
17       Q. Sure.
18       A. -- for the primary residency matching
19   place, a large majority of American medical
20   school graduates receive their first placement
21   through the NRMP, yeah.
22       Q. So it strikes me that the ad tech
23   industry is very different than the three
24   examples you've provided in Paragraph 35. And

32 (Pages 122 - 125)

Page 126

1  is it -- for one, is it the case that ad tech
2  functions based on price and quality?
3         MR. CHANG: Objection. Form.
4     A.  In the markets that I've described,
5  quality is an incredibly important dimension.
6     So everyone would give an arm and a
7  leg to get a placement at Mass. General
8  Hospital down the street here. So that's very
9  important.
10    The same criteria applies for
11 medical -- I'm sorry -- for military branch
12 assignment. You know, as I said a second ago,
13 there are certain branch assignments that are
14 particularly sought after. They are
15 considered higher quality ones, the fast track
16 to become general.
17    And on the school side, quality is
18 paramount. So a lot of my papers actually
19 talk about ways to measure quality, and
20 they -- I've actually worked in several cities
21 on improving the way that quality is measured,
22 including in New York City, where they're --
23 currently, if you go to the New York City
24 website and look at the quality ratings of

Page 127

1  schools, it's our product. It's our lab --
2  Blueprint Labs from MIT's metric for measuring
3  quality.
4     So I disagree with the quality piece
5  of what you brought up.
6     Q.  Sure.
7     A.  In terms of the exchange of currency,
8  these three markets do not involve the
9  exchange of currency.
10    Q.  Have you worked on -- have markets
11 where the price component is a problem been a
12 part of any of your research?
13    A.  Yes. I have worked on other markets
14 that are not listed here but that are on my
15 CV. So one example is the market for real
16 estate agents. I have several papers on
17 conflicts of interest in how real estate
18 agents are paid.
19    I've also done several studies of the
20 housing market. So in housing, there is a
21 price, so that includes studies of foreclosure
22 discounts or studies of rent control.
23    On the finance side, I've done studies
24 of securities lending, which involve prices of

Page 128

1  the right to basically short-sell a stock or a
2  bond.
3     And those are studies that I didn't
4  mention here, but they're on my CV.
5         MR. CHANG: Counsel, before we
6  go any further, whenever you get to a good
7  stopping place, we've been on the record for a
8  little while now.
9         MR. RYBNICEK: Okay. Just maybe
10 one or two questions.
11 BY MR. RYBNICEK:
12    Q.  Is -- but it's fair to say that the
13 three examples you list in Paragraph 35 are
14 your predominant experience -- representing
15 your predominant experience?
16         MR. CHANG: Objection.
17 BY MR. RYBNICEK:
18    Q.  Is that fair?
19         MR. CHANG: Form.
20    A.  It's hard for me really to know what
21 the word "predominant experience" means. So
22 in terms of the cadet branch matching example,
23 I have written more papers on the housing
24 market and more papers on securities lending

Page 129

1  shorting financial instruments than I've
2  written on cadet branch matching markets.
3     On the medical residents topic, I have
4  written two papers on that topic. And so I've
5  done more than two papers on real estate
6  agents. So I've worked on many different
7  markets. So this is just a snapshot of some
8  of the ones that we've listed here in
9  Paragraph 35. So I would disagree with the
10 "predominant" word there.
11 BY MR. RYBNICEK:
12    Q.  Certainly, the work on student
13 assignments to school, I think we talked
14 earlier, that is your predominant research?
15    A.  That's the topic I worked on the most,
16 correct, yes.
17         MR. RYBNICEK: We can take a
18 break.
19         MR. CHANG: Sounds good.
20         THE VIDEOGRAPHER: The time is
21 12:00 p.m. We're off the record.
22
23    (Recess taken from 12:00 p.m.
24     to 12:47 p.m.)

33 (Pages 126 - 129)

Page 130

1          THE VIDEOGRAPHER: We are back
2   on the record. The time is 12:47.
3   BY MR. RYBNICEK:
4       Q. Great. So, Professor, did you discuss
5   the substance of your deposition with counsel
6   during our lunch break?
7          MR. CHANG: I'm going to
8   instruct the witness not to answer consistent
9   with the expert stipulation.
10  BY MR. RYBNICEK:
11      Q. Will you heed your counsel's advice?
12      A. I will, yes.
13      Q. So I want to get back to your market
14  design principles.
15         Can you explain what the market design
16  principles you applied in forming your
17  opinions in this case?
18      A. The principles that I focused on are
19  associated with Professor Alvin Roth's
20  framework that are described in his book "Who
21  Gets What and Why" and his American Economic
22  Association presidential lecture on
23  marketplaces, markets, and market design.

Page 131

1          Roth outlines a set of goals for
2   well-designed marketplaces. One goal is
3   efficiency. Another goal is thickness.
4   Another goal is safety. And another goal is
5   congestion -- eliminating congestion. Those
6   are the key pillars of the framework that I
7   used in my report.
8       Q. So I'm looking at Paragraph 39. And I
9   see in Subbullet 1, thickness; Subbullet 2,
10  safety; and, 3, congestion. I think you also
11  said efficiency?
12      A. Uh-huh.
13      Q. Is that represented in one of those
14  three that you identified explicitly in
15  Paragraph 39, or is it elsewhere?
16      A. Efficiency is elsewhere in the report,
17  not in Paragraph 39.
18         But if we go back to Paragraph 34, I
19  talk about one common consideration is
20  marketplace efficiency.
21      Q. I guess what I'm trying to get at is
22  Paragraph 39 says, "To function properly,
23  markets need to do at least three things," and
24  I take it you're quoting Dr. Roth here. That

Page 132

1   preamble "to function properly," is that kind
2   of longhand for "to be efficient"?
3          MR. CHANG: Objection. Form.
4       A. My view of what Roth is doing in that
5   quote is allowing for other objectives beyond
6   efficiency. So functioning properly could
7   involve things like being fair.
8          The reason I think that is, Roth and I
9   have worked together in some of the projects
10  that I've undertaken assisting school
11  districts with their assignment processes, and
12  efficiency is a consideration, but fairness is
13  a consideration as well as transparency of the
14  rules. So that phrase "to function properly,"
15  "properly" is a catchall for the various
16  objectives stakeholders have in mind.
17      Q. Okay. You've identified efficiency,
18  fairness, transparency.
19         Is there anything else you think is
20  captured in the phrase "to function
21  properly"?
22      A. It's a fairly broad term, "functioning
23  properly." So the usual exercise in market
24  design has as its origins the technical field

Page 133

1   of microeconomics that's called mechanism
2   design, where we analyze a social system as a
3   function that takes certain inputs to an
4   output. And the way that mechanism design
5   theory operates is we examine desirable
6   properties of outcomes, so fairness,
7   efficiency.
8          Neutrality is an example of a
9   condition. Neutrality, you can think of as a
10  form of nondiscrimination. So we can be
11  mathematically rigorous about what that might
12  mean.
13         So if I have two agents who have the
14  same exact characteristics, they should get
15  the same outcome. That would be one possible
16  definition of neutrality that would depend on
17  the setting at hand. But that's a common
18  definition. And this is a branch of economics
19  that's called axiomatic resource allocation,
20  something I've done research on, where we
21  specify these goals. So that's what
22  "functioning properly" means to me.
23         So another goal is what's called equal
24  treatment of equals. Equal treatment of

34 (Pages 130 - 133)

Page 134

1  equals is a philosophical principle that dates
2  to Aristotle actually.  You can think of it as
3  a fairness requirement, but it's very similar
4  to the idea that I just described.  In certain
5  settings, equal treatment of equals means two
6  individuals who are reporting the same
7  information to the function, to a system
8  should get the same exact outcome.
9        And what Roth pioneered among other
10  economists, Shapley as well, is results that
11  say, given these goals for a system, the only
12  mechanism or only function that takes inputs
13  into outputs is, say, a second-price auction
14  or -- I've given you a couple of examples of
15  goals, but there's -- that's by no means
16  exhaustive.
17        So another goal that is often
18  described is what we would call goals related
19  to incentive compatibility.  So that's jargon
20  in economics for we want to ensure
21  participants have the right incentives in the
22  system.
23        So the strongest version of that
24  condition is what we call strategy proofness.

Page 135

1  So that's a term that folks use who study
2  mechanism design, and that is a requirement
3  that no matter what anyone else is doing, you
4  have -- you can do no better than reveal your
5  private information honestly.  So that's a
6  goal that's related to the procedural
7  dimensions of a mechanism that's distinct from
8  the consequences of the mechanism, the
9  outcomes of the mechanism.  So there's a class
10  of goals like that that people have in mind
11  when designing systems.
12        So for instance, when I have been
13  involved with Professor Roth and also
14  independently in designing school assignment
15  mechanisms, one goal for a properly
16  functioning market is strategy proofness.  In
17  fact, when the superintendent of Boston talked
18  about that goal for functioning properly, he
19  articulated a very important rationale for
20  strategy proofness, which is you want to
21  ensure that the system is fair to people who
22  don't understand the rules.
23        So if you don't understand the rules,
24  when you have a strategy proof system, it

Page 136

1  doesn't matter if you're behaving honestly.
2  You're not penalized for that, so you don't
3  have to look at the particular aspects -- this
4  was in the context of the school assignment
5  system here in Boston.  So that's just by way
6  of example of the types of goals that we would
7  say are behind a properly functioning market.
8      Q.  Okay.  You listed quite a few.
9        Fairness, efficiency, transparency,
10  neutrality, equal treatment of equals,
11  incentive, compatibility.
12      A.  (Witness nodding.)
13      Q.  Do markets need to have all of these?
14      A.  They don't need to have all of these.
15  The relevance of these properties depends on
16  the particular setting at hand.  Let me give
17  you an example.
18        So earlier today we talked about
19  allocating dorm rooms to MIT undergraduates,
20  and if I were to impose the requirement of
21  equal treatment of equals, one thing that you
22  realize is that the only way to get to an
23  outcome where two individuals who have the
24  same rankings over dorm rooms get the same

Page 137

1  outcome is by using something that's not
2  deterministic, but it's random.
3        So equal treatment of equals,
4  Aristotle's idea truly is one rationale for
5  ending up with a randomized mechanism, a
6  mechanism that's, you know, in the simplest
7  case, just a pure lottery.
8        And another goal that I haven't talked
9  about but that's also relevant is concept of
10  auditability.  We can verify what the outcomes
11  of the mechanism are.  After the mechanism has
12  been run, we can verify it.  And sometimes
13  people have a view -- and this, of course,
14  depends on the setting -- that when you have a
15  mechanism that's based on the outcome of a
16  lottery, it's challenging to tell an audit
17  whether the mechanism was run as intended
18  because, in the case of dorm assignment, we
19  can implement that mechanism where we draw
20  numbers out of a, you know, urn in front of
21  everybody, or we could do it on a computer and
22  say, You got, you know, your first choice, and
23  you got your last choice.
24        In the latter implementation, it's

35 (Pages 134 - 137)

1  very difficult to verify that the mechanism is
2  determine -- is implemented as promised.  So
3  this is just to show an example of a setting
4  where goals can be in conflict.  So
5  auditability plus equal treatment of equals
6  are conflicting goals.
7     Q.  And so who decides which of these are
8  applicable and when?
9           MR. CHANG:  Objection.  Form.
10    A.  Well, that's this kind of central
11 starting task of a market designer, to look at
12 the existing institution and study what are
13 the reasons -- another economist who works in
14 this field is an economist named Tayfun
15 Somnez, and he's coined the expression what
16 are the root causes for why an existing
17 institution is not successfully realizing some
18 of the goals of stakeholders, and the way he
19 thinks about it complements the Roth
20 framework.  It's the role of the market
21 designer to diagnose the root causes of market
22 failures and understand whether there are
23 changes to design rules that eliminate the
24 root causes of the market failures.

1        So the answer, in general, depends on
2  the specific context that you have in mind,
3  but I can give you an example from the
4  military example.
5  BY MR. RYBNICEK:
6     Q.  That's okay.
7     A.  Okay.
8     Q.  We might come back to it, though.
9        So these are all potential market
10 goals or attributes of a properly functioning
11 market?
12    A.  (Witness nodding.)
13    Q.  Is that right?
14    A.  It's what I have given you is not an
15 exhaustive list.
16    Q.  Fair enough.
17    A.  But they are examples, yes.
18    Q.  And then Roth goes on to say, to
19 function properly -- that's what we've been
20 talking about -- market needs to do at least
21 three things.  And then that's where this list
22 of thickness, safety, and congestion -- or
23 overcoming congestion comes into play.
24        Do you see that?

1     A.  (Witness nodding.)
2     Q.  Do you see that?
3     A.  I do, yes.
4     Q.  And so am I right that those are the
5  market principles, those three things?
6           MR. CHANG:  Objection.  Form.
7           MR. RYBNICEK:  I'm sorry.
8  What's the objection?
9           MR. CHANG:  I think he's stated
10 before that there are other considerations.
11 Maybe I misunderstood your question.
12 BY MR. RYBNICEK:
13    Q.  Well, what we, I thought, were talking
14 about were the characteristics of a properly
15 functioning market or the goals.  Now I'm
16 asking you what are the principles of market
17 design, which I had understood are these three
18 elements of thickness, safety, and overcoming
19 congestion?  Is that the right way to think
20 about it?
21    A.  Maybe I'd draw your attention to the
22 exact sentence here.  It says, "Roth
23 summarizes that to function properly, markets
24 need to at least -- do at least three things."

1        So these are three key pillars, but
2  there are also other ones.  And if you look at
3  Paragraph 40, I discuss, "In my own research,
4  I have found that markets become thick when
5  they encourage participation.  They become
6  safe when participants have transparency and
7  when participants have straightforward
8  incentives."
9        So as we were just discussing, the
10 idea of strategy proofness or straightforward
11 incentives can be seen as a goal in and of
12 itself, or it can be part of the safety
13 characteristic that Roth has under No. 2.  In
14 fact, if you look at the history of how this
15 field of mechanism design developed, it's
16 something that in the 1970s, economists said,
17 Let's try to look at mechanisms where the goal
18 itself is strategy proofness.  So the famous
19 results of economic theorists in the 1970s,
20 which, by the way, I taught to my
21 undergraduates about a month ago, was a
22 characterization of all functions that are
23 strategy proof.
24        And so I would say that could be a

36 (Pages 138 - 141)

Page 142

1  goal in and of itself, strategy proofness.
2  Okay?  So that would be under "function
3  properly."
4      That could also be an attribute that,
5  you know, why -- back to the Boston example,
6  we want a strategy proof system because we
7  want it to be safe for people, you know, who
8  are participating in the system to reveal
9  their private information.
10      Q.  I think I understand, which is the
11  market principles that you have focused on are
12  thickness, safety, congestion, as well as
13  participation, transparency, and
14  straightforward incentives; is that fair?
15      A.  These are the main ones that I focused
16  on in this particular market, yes.
17      Q.  So could you tell me what market
18  thickness means?
19      A.  I have a precise definition in my
20  report here on page 15.  So market thickness
21  is "to bring together a large enough
22  proportion of potential buyers and sellers to
23  produce satisfactory outcomes for both sides
24  of a transaction."

Page 143

1      Q.  And how do you determine how much
2  thickness is sufficient?
3      A.  You'd have to look at a specific
4  context to come to an understanding of this.
5  One example that comes to mind are financial
6  markets.
7      So we tend to see that when we have
8  trading taking place on exchanges where
9  participants are able to come and transact.  A
10  large number -- the assets, like stocks,
11  many -- many, let's say, large-cap stocks
12  involve many buyers and potential sellers
13  transacting at the same time so that there are
14  opportunities for buyers to find many
15  potential sellers and vice versa, many sellers
16  to find potential buyers.
17      If we had an example of a stock that
18  is illiquid or what people in finance
19  sometimes call pink sheet stocks, those are
20  stocks where there are not many potential
21  buyers or potential sellers.  And so in that
22  situation, you would say that's a thin market.
23      Let me give you another example that's
24  maybe closer to what Roth has worked on and he

Page 144

1  talks about in his book.  That is the market
2  for paired kidney exchange.  Okay?  So one of
3  the reasons why the market design framework
4  has been so powerful in economics is because
5  of the work that economists like Al Roth did
6  to try to orGanize the way in which patients
7  who need kidney transplants are able to obtain
8  exchanges.
9      So what's the idea?  Every one of us
10  has two kidneys.  Let's say my wife has
11  end-stage renal failure.  I would like to be
12  able to donate my kidney to her, but I might
13  not be biologically compatible.
14      And let's imagine you're in the same
15  kind of situation.  Your partner needs a
16  kidney.  You can't donate your kidney to your
17  partner.  What if I donated my kidney to your
18  partner and you donated your kidney to my
19  partner?  That's called a pairwise exchange.
20      And one of the things that Roth and
21  several other economists have worked on for
22  about 20 years is how to set up markets for
23  paired exchange in the United States.  And one
24  of the main frictions in that market is that

Page 145

1  the possibility for paired exchanges are
2  limited to regional markets.
3      So there used to be a thing called the
4  New England program for kidney exchange run
5  out of Mass. General Hospital right here.  And
6  wouldn't it be great if we could have the New
7  England program work together with the Toledo,
8  Ohio, program, work together with the WashU
9  St. Louis program and the San Antonio program?
10  And that would be great because the market
11  becomes thicker.  There are many more possible
12  opportunities for patients who need kidneys to
13  find potential matches and donors to find
14  recipients who can receive their orGans.  So
15  it would be better to have a thick market by
16  integrating all of these markets.
17      Q.  That is because a patient in --
18  sorry -- I think you said St. Louis could
19  match with somebody in Boston and could match
20  with somebody in Florida?
21      A.  Exactly right.  But the markets, as
22  they stand today, are regionalized, and so
23  those potential gains from trade don't occur.
24      Q.  So less fragmentation --

37 (Pages 142 - 145)

Page 146

1    A.   Correct.
2    Q.   -- would be better?
3    A.   Yeah, yeah.
4    Q.   And how does this apply in the ad tech
5    sector?
6    A.   So the way thickness is important for
7    the ad tech sector is we want to maximize the
8    opportunities for participants in the market
9    to find matches.  So what that means is a
10   publisher wants to be able to be unencumbered
11   in finding an advertiser who will generate the
12   most surplus from allowing the advertiser to
13   have access to inventory on the publisher's
14   web page, and likewise, the advertiser wants
15   to have the opportunity to find a publisher
16   who is able to, just like in our kidney
17   example, find the publisher, say, the donor
18   who is most likely to have a compatible
19   kidney.  The advertiser here would like to
20   find inventory that is going to best meet
21   their goals as an advertiser.
22   Q.   And so as in the kidney example, does
23   that mean one big exchange would be
24   preferential?

Page 147

1           MR. CHANG:  Objection.  Form.
2    A.   I haven't studied that one close
3    enough to know whether a single exchange is
4    preferable or maybe two or three exchanges.
5           You know, one of the challenges in the
6    kidney market -- and this is where knowing the
7    institutional details is really important --
8    is that in some places in the United States,
9    you can do a paired exchange.  And a paired
10   exchange requires four distinct surgeries, and
11   those surgeries have to take place at the same
12   exact instance.  So that's what the medical
13   ethics community has determined.
14          I can't first take my wife's kidney
15   out of her and give it to your partner because
16   what if you change your mind and do not give
17   your kidney to my wife?  So for that reason,
18   we have this constraint that surgeries have to
19   take place simultaneously.
20          There are a handful of centers in the
21   United States where they can accommodate six
22   simultaneous surgeries.  So one place is
23   Toledo, Ohio, actually that can accommodate
24   six simultaneous surgeries.

Page 148

1           So there are papers in this field that
2    have looked at this issue.  Is it sufficient
3    to just regionalize exchanges, you know, more
4    than they currently are, or do we need to have
5    a fully integrated market?  And my view of
6    that literature is it's not quite settled how
7    far we need to go to a completely unified
8    market.
9           So it depends a little bit on the
10   technological constraints to answer that
11   precisely for the kidney market.
12   Q.   Sorry.  I thought earlier you said it
13   would be better and more -- it would result in
14   thicker markets to consolidate and have less
15   fragmented kidney exchange marketplaces.
16   A.   (Witness nodding.)
17   Q.   Do you agree with that?
18   A.   As a general principle, but there are
19   also costs of doing surgeries, of trans- --
20   you know, flying from Seattle to Miami to do a
21   surgery.  So those benefits need to be weighed
22   against those costs.  And there are papers
23   that try to undertake this exercise using data
24   and, you know, kind of completely -- if

Page 149

1    there's no costs, you know, a very robust
2    intuition is to maximize the possibility of
3    finding a match, having more trading partners
4    on both sides is good.
5           So I'm just bringing up, you know,
6    that two way versus three way as an example of
7    a type of friction you would want to account
8    for.
9    Q.   So your point is that there are also
10   potential downsides or costs associated with
11   achieving greater thickness?
12   A.   As a general matter, we would have to
13   think about those and weigh them against the
14   benefits of being able to find more trading
15   partners.
16          MR. CHANG:  Professor, before we
17   go any further, you've been doing a good job
18   of this, but if you could, please, for the
19   benefit of the court reporter, respond with
20   yeses and nos as best you can.
21          THE WITNESS:  Okay.
22   BY MR. RYBNICEK:
23   Q.   What's the ideal structure of the ad
24   exchange market?

38 (Pages 146 - 149)

Page 150

1    MR. CHANG: Objection. Form.
2    And -- witness may answer.
3    A. Let me start with some attributes of
4 the ideal structure.
5    One attribute is the market should
6 bring together all participants who are
7 interested in transacting ads should aspire to
8 thickness.
9    Another attribute is the market should
10 have the appropriate incentives for
11 participants to act or reveal their private
12 information. So that's this kind of safety
13 dimension.
14    And the congestion dimension is, I
15 think, most closely related to simultaneity of
16 trades. So when Roth talks about congestion,
17 he's really thinking about time as a way to
18 clear the markets rather than price. And when
19 you have simultaneous trading, what happens is
20 we can ensure that the prices reflect the
21 underlying demand and supply patterns in the
22 market, and it's not a consequence of
23 segmentation or what Roth calls early
24 contracting.

Page 151

1    And one of the reasons why
2 centralization is beneficial in certain
3 situations is that it prevents what Roth calls
4 unraveling. So that's the reason why the
5 medical match looms so large in Roth's book,
6 because that underlies the entire framework
7 that Roth is talking about as a key example.
8    So prior to the existence of the
9 matching program, residency programs used to
10 compete on time, and this is -- this happens
11 in many industries. So if you're trying to
12 hire folks to clerk for the Supreme Court, for
13 instance, the time in which you have to agree
14 to commitments to clerk for district courts is
15 unraveled to early on in law school. And when
16 time becomes a factor, people are forced to
17 make decisions without full information.
18    So to go back and make sure I'm
19 answering your question right, so the ideal
20 structure should try to bring together all of
21 the participants so that we can find the gains
22 in trade, make sure those participants have
23 the appropriate incentives to reveal their
24 values and know how to transact in the system,

Page 152

1 and we should do this in a way that's
2 eliminating other factors, like time, as ways
3 to clear the market.
4 BY MR. RYBNICEK:
5    Q. Sure. That's helpful. I guess I'm
6 trying to think through this a little bit more
7 systematically.
8    A. Okay.
9    Q. How would you identify the right
10 structure to achieve thickness, which is one
11 of the principles for market design that
12 you've outlined?
13    A. I would -- to identify thickness, I
14 would ask the question are there potential
15 participants who would be interested in
16 trading or potential matches that might have
17 occurred that did not? And if I saw
18 large-scale evidence of that phenomena, I
19 would say that is a market that's not thick.
20    And we would then ask what could we do
21 to ensure those participants who wanted to
22 trade, whether it's a publisher who's
23 interested in reaching some advertisers that
24 they cannot or vice versa, an advertiser who

Page 153

1 wants to find a publisher that they find
2 particularly valuable, we would see how --
3 whether that's occurring, what are the
4 obstacles to that occurring, and to make the
5 market thick, we would try to combat those
6 obstacles.
7    Q. And putting aside other factors, would
8 you be assured of -- strike that.
9    Putting aside other factors, would you
10 be able to achieve thickness by bringing
11 together everybody in one exchange?
12    A. I would say that bringing more people
13 on to the same exchange would be a step
14 towards thickness. If you did that in a way
15 that was, you know, frictional, if you brought
16 people to an exchange where you charged, you
17 know, certain participants different prices
18 than other participants to participate, then
19 that would create bottlenecks to bringing
20 people together and realizing the gains from
21 trade.
22    So in a completely frictionless
23 environment where everyone comes to the bazaar
24 to trade, that would be a way to achieve

39 (Pages 150 - 153)

Page 154

1  thickness.
2     Q.  And that's kind of what has happened
3  in the school assignment to school marketplace
4  and the cadet marketplace and the -- what was
5  the third example we talked --
6     A.  Medical match.
7     Q.  Medical match.
8        That's one way that they've achieved
9  thickness, right, is by having one centralized
10 marketplace right?
11    A.  I'd say that's the aspiration.  One
12 place on the school side that has not been as
13 successful involves segmentation between
14 different types of public schools.
15       So earlier we talked about My Schools
16 DC [sic].  What was remarkable about My
17 Schools DC in 2012, '13, that time period, is
18 that the traditional public schools and the
19 charter schools in Washington, D.C., came
20 together and participated on the same platform
21 so that if there was a child who was
22 interested in attending a public school or a
23 charter school, they could express that
24 information through the clearinghouse and did

Page 155

1  not have to go through two separate processes
2  and worry about congestion and the timing of
3  the offers from one process versus the other
4  process.
5        And that pattern has been replicated
6  in several other cities that I've worked in,
7  but it has not always worked out that way.  So
8  there are some places where we still have
9  distinct enrollment processes across different
10 types of schools.  And so I don't like that.
11 I think it's a bad idea.  I've written about
12 that because it's getting in the way of
13 thickness.
14    Q.  So is thick -- is achieving greater
15 thickness in conflict with competition?
16       MR. CHANG:  Objection.  Form.
17    A.  No.
18 BY MR. RYBNICEK:
19    Q.  Well, I think we just talked about an
20 example in which having centralized
21 marketplaces, including even a centralized ad
22 exchange, would create the greatest amount of
23 thickness because you'd have all the
24 participants participating in one exchange.

Page 156

1  If you have one exchange, you inherently don't
2  have competition with other exchanges.
3        Is that a fair observation?
4     A.  I mean, an example that I would point
5  to that's distinct from what you just
6  described is, if you look down the hall here,
7  it says the Boston Stock Exchange, right?  So
8  in the United States, we have several
9  different stock exchanges, ESX, Philadelphia
10 Stock Exchange, and then we have the New York
11 Stock Exchange.  We have NASDAQ.  Now, whether
12 these are exchanges or not, they are places
13 where people can trade, so they're distinct
14 exchanges.
15       And the way that system is structured
16 is we have rules in that marketplace that
17 people call the National Best Bid Offer rules,
18 NBBO rules, that ensure that you're not
19 getting discriminated against by virtue of
20 transacting in the Boston Stock Exchange
21 versus the Philadelphia Stock Exchange.
22       So you could look at that and say it's
23 not a unified market.  It's fragmented.  There
24 are these different venues for which you could

Page 157

1  trade.  But they have designed the market in a
2  way to ensure that we reach some of the market
3  design goals that are -- that are here.
4     Q.  But those are -- those markets are
5  less thick than a single ad exchange market
6  would be?
7     A.  Well, because we have this National
8  Best Bid Offer rules, you can be assured, as a
9  participant, that by transacting in one venue,
10 you're not losing very much.  The offers there
11 have to be competitive with offers on other
12 venues.
13       So it's possible to, you know, have
14 different exchanges with interoperability that
15 allow for the forces of competition to be
16 present.
17    Q.  It's possible.
18       I guess my -- are all the stocks
19 available on all the exchanges?
20    A.  I don't know off the top of my head.
21    Q.  But isn't that a key part of the
22 thickness we're talking about?  The
23 centralized ad exchange we're talking about
24 has all the participants transacting all the

40 (Pages 154 - 157)

Page 158

1    ad impressions.
2        What you're describing is fragmented
3    and has some exchanges with some stocks and
4    other exchanges with other stocks.
5        A.  Uh-huh.
6        Q.  Reading your report, it sounds like
7    that is a less efficient, fragmented, less
8    thick marketplace.
9        A.  It's true that some stocks are traded
10   only on NASDAQ.  Some stocks are only traded
11   on the NYC, but that -- would it be better if
12   everything were integrated in that specific
13   situation?
14       I'm saying because they have these
15   rules, equitable interoperability-type rules,
16   these NBBO rules, the efficiency loss there
17   may not be very large.
18       So as a participant, if I'm interested
19   in buying Tesla stock in -- on BSX versus a
20   different exchange, I'm able to do that
21   without suffering efficiency loss.
22       If I'm interested in a very
23   specialized product, so if the decision is
24   should I buy Tesla versus a different stock or

Page 159

1    something distinct, then I may have to only do
2    that on certain venues.  Like, if I want to
3    buy a stock or a bond, for instance, that's a
4    different venue.
5        So -- yeah, let me stop there.
6        Q.  To achieve optimal thickness, how many
7    ad exchanges should there be?
8            MR. CHANG:  Objection.  Form.
9            Counsel, we're straying into the
10   remedies portion of all of this.  Can I
11   understand how this bears on liability?
12           MR. RYBNICEK:  His opinion is
13   that the market is -- that Google has acted
14   anticompetitively, and he can tell that
15   because the market design is inefficient.  I'm
16   asking what the efficient design is.  I'm not
17   asking him how he would change Google.  I'm
18   asking him how many ad exchanges should there
19   be to achieve his market principle of
20   thickness.
21   BY MR. RYBNICEK:
22       Q.  Do you want me to repeat the question?
23       A.  Sure.
24       Q.  To achieve optimal thickness, how many

Page 160

1    ad exchanges should there be?
2            MR. CHANG:  Objection.  Form.
3    BY MR. RYBNICEK:
4        Q.  You can answer.
5        A.  Can I answer?  Okay.
6        It's something we'd have to think
7    about very carefully because, as I just
8    described, we could have many exchanges that
9    operate with each other in an equitable way
10   where there's nondiscrimination across the
11   exchanges or rules like the rules we see in
12   some financial markets, and that could be one
13   possible structure.  So that would involve
14   multiple exchanges.  Another structure could
15   involve a smaller number of exchanges with
16   interoperability.
17       Q.  So if there's interoperability, you
18   would need fewer exchanges?
19       A.  Not necessarily.
20       Q.  Well, the example you just gave is one
21   structure is -- we could have many exchanges
22   that operate with each other in an equitable
23   way where there's nondiscrimination across
24   exchanges or -- I'm sorry.  I'm reading back

Page 161

1    your last statement.  And then there would be
2    another structure that could involve a smaller
3    number of exchanges with interoperability.
4        So are you describing two scenarios in
5    which you have interoperability, one with a
6    lot of exchanges and one with fewer?
7        A.  Right.  What I'm trying to get at, to
8    answer your question, is to talk about what is
9    the ideal structure.  It's not as simple as
10   saying the number of exchanges.  The other
11   dimensions of how the market is structured are
12   relevant, like interoperability rules, and are
13   we going to impose that each of the exchanges
14   is revealing the same kind of information to
15   participants about the transactions, so on and
16   so forth.  So I can't say should it be one or
17   should it be ten without having more details
18   like that.
19       Q.  But you've determined that Google is
20   acting anticompetitively because -- strike
21   that.
22       Are market -- ad tech markets thick
23   today?
24       A.  I think there are many opportunities

41 (Pages 158 - 161)

Page 162

1  for gains from trade that do not exist during
2  the time period of my report because
3  participants are not able to easily access
4  different sources of demand on the publisher
5  side and advertisers are not easily able to
6  access different publishers because of the
7  fragmentation and other things that I talk
8  about in my report.
9      Q.  So again, I mean, you said the
10  fragmentation.  That would suggest the
11  consolidation would help thickness; is that
12  fair?
13      A.  It depends on how things are
14  consolidated.  So if we have consolidation in
15  which if you use a preferred partner, you get
16  a discount but if you're using a nonpreferred
17  partner, you're charged more, it's not obvious
18  to me that consolidation in and of itself is
19  sufficient to increase thickness.
20      I could consolidate and say either you
21  and I trade or everyone in this room trades,
22  but if everyone in this room is who is not
23  wearing a blue suit is trading, we're going to
24  tax them 50 percent.  Even though that's a

Page 163

1  consolidated market, I don't necessarily think
2  that would be a thick market and a market that
3  would realize the surplus maximization.
4      Q.  Would kind of an ideal thick market,
5  do all the exchanges need to have access to
6  all the demand and supply?
7      A.  In the hypothetical ideal, the market
8  design ideal, it should be possible for
9  participants to find their best matches on
10  both sides.  So those -- that would be the --
11  what I would aspire to, yes.
12      Q.  So matches that are available on AdX
13  should also be available on multiple other ad
14  exchanges?  Is that your view of the market
15  design?
16      MR. CHANG:  Objection.  Form.
17      A.  The participants in the market should
18  be able to make those decisions themselves.
19  So if it turns out there's a venue that the
20  advertisers and the publishers prefer for
21  various reasons, maybe the quality of ads that
22  are transacted in that venue are somehow
23  better or different, then I believe that
24  participants should have the free choices to

Page 164

1  determine their venues.  And ideally, they
2  have full information to make those decisions
3  that reflect their interests in the best
4  possible way.
5  BY MR. RYBNICEK:
6      Q.  So you're not saying that a publisher
7  has to use multiple exchanges; is that fair?
8      A.  Yes.
9      Q.  So it's perfectly fine for a publisher
10  to choose to use AdX and only AdX?
11      MR. CHANG:  Objection.  Form.
12      A.  It depends under the circumstances
13  whether they make that choice.  So if -- you
14  know, as I describe it, it's a Hobson's
15  choice.  It's a choice that's truly not a
16  choice when -- if you are trying to, as a
17  publisher, access demand and the only way you
18  can access Google Ads' demand is by using AdX,
19  it's preventing the publisher from realizing
20  certain matches.  So I would say that's a bad
21  market design.
22  BY MR. RYBNICEK:
23      Q.  Do you know how many advertisers is on
24  Google Ads' multihome?

Page 165

1      A.  Right off the top of my head, no, I
2  don't.
3      Q.  Are you familiar with the concept of
4  multihoming?
5      A.  Yes.
6      Q.  What's the concept of multihoming?
7      A.  Multihoming is when you transact on
8  more than one platform.  Google Ads' demand is
9  exclusive to AdX.
10      Q.  Do advertisers using Google Ads use
11  other buying tools?
12      A.  That's certainly possible.
13      Q.  You don't know?
14      A.  Right off the top of my head, the
15  number who do that, I don't know.
16      Q.  As part of your analysis, you're not
17  aware of whether advertisers use --
18  advertisers using Google Ads also use other
19  buying tools?
20      A.  No, I am aware that that occurs.  What
21  I don't know off the top of my head is the
22  fraction of the market that multihomes.
23      Q.  And if it was -- is your analysis the
24  same if the fraction that multihomes is 5

42 (Pages 162 - 165)

Page 166

1  percent versus 75 percent?
2      A.  The analysis about Google Ads is that
3  Google Ads is exclusive to AdX.  So if I'm an
4  advertiser who wants to be able to find
5  trading partners on AdX, then I'm unable to do
6  that without the Google Ads tool.  So that's
7  bad for market efficiency because we're
8  getting in the way of potential matches
9  forming.
10      Now, the kind of real-world evidence
11  here is difficult to process because the
12  information that advertisers have to make
13  those choices, as I discuss in my report, is
14  confounded by many of the conducts in this
15  case.  So whether I decide to multihome or
16  not, if I'm doing experiments on where am I
17  going to get better matches because of, say,
18  inflation from certain Google conducts,
19  changing bids, et cetera, that information is
20  difficult to process and make informed choices
21  about.
22      Q.  With all due respect, I think the
23  most -- of that answer was not responsive, but
24  I'm going to try again --

Page 167

1      A.  Okay.
2      Q.  -- which is advertisers using Google
3  Ads also use other buying tools; is that your
4  understanding?
5      A.  Yes.
6      Q.  And so they can reach transactions
7  with other exchanges using other buying tools;
8  is that correct?
9      A.  Yes.
10      Q.  And that is a form of market
11  thickness, correct?
12      A.  It depends on the terms in which they
13  can reach those other transactions.  So if I
14  want to reach transactions on AdX, I can't do
15  it on the buying side unless I'm using Google
16  Ads because Google Ads is exclusive to AdX.
17      Q.  But why does -- why do other buying
18  tools need to have access to AdX?
19      A.  The buying tools should be
20  representing the interest of buyers.  So a
21  buying tool should be furthering the
22  opportunity of a buyer to find potential
23  trading partners.  And so a way a buying tool
24  does that is by looking out in the market and

Page 168

1  says, Who's willing to trade with this
2  particular buyer?
3      And so if I use a buying tool, I want
4  to be able to find the best possible matches
5  from that buying tool.  And right now, that
6  buying tool, if it's not Google Ads, is not
7  able to access AdX demand.
8      Q.  But why do you get to dictate who a
9  buying tool transacts with?
10      MR. CHANG:  Objection.  Form.
11      A.  I'm diagnosing the problems with the
12  current structure from the market design lens
13  that I have.  So it would be better for a
14  buying tool to be able to, if it were truly
15  representing the interests of the buyers, look
16  for transactions that are best for those
17  buyers.  And the current structure does not
18  allow those buyers using a non-Google tool to
19  access AdX.
20  BY MR. RYBNICEK:
21      Q.  And the buyers continue to use AdX --
22  excuse me -- Google Ads?
23      A.  Buyers use Google Ads.  That's a true
24  statement.

Page 169

1      Q.  And are you aware of -- well, strike
2  that.
3      Do your students, can they take
4  classes at Harvard?
5      A.  MIT students can take classes at
6  Harvard, yes.
7      Q.  Can they take classes at NYU?
8      A.  As far as I know, yes.
9      Q.  As part of their admission into MIT?
10      A.  I mean, I have students who have come
11  to MIT with several semesters of advanced
12  mathematics classes at NYU.
13      Q.  Let me try it this way.  Can a Harvard
14  student not admitted into MIT take your course
15  at MIT?
16      A.  We have an arrangement with Harvard,
17  and MIT that allows that, yes.
18      Q.  Can every university send their
19  students to your -- to take a class with
20  you?
21      A.  No.
22      Q.  And why is that?
23      A.  They weren't admitted.  There's no
24  arrangement between MIT and the other

43 (Pages 166 - 169)

Page 170

1  universities.
2    Q.  Wouldn't it be a thicker market, so to
3  speak, if all students could take your class?
4    A.  I mean, I'm not a buyer or a seller.
5  I don't see myself as a professor that's
6  selling something.  So, I mean, this is why
7  some of my colleagues write textbooks, because
8  they're able to expand their reach.
9    Q.  But why don't you allow somebody from
10  the University of North Carolina to attend
11  your classes?
12    A.  As actually --
13        MR. CHANG:  Objection.  Form.
14    A.  As a matter of fact, if there's
15  someone who shows up at MIT -- this is
16  happening right now, this fall -- who wants to
17  audit my class, I allow them to sit in my
18  class, and I have several auditors taking my
19  class right now.  I don't even know what
20  university they're from, but it's a way for me
21  to expand my reach and reach those students,
22  which I think is good.
23        Now, I am employed by MIT, so MIT has
24  certain rules about whether those students are

Page 171

1  able to get credit without having to pay
2  tuition and stuff.  But I even give some of
3  those students shadow grades.  If they ask me
4  to write a recommendation letter for them, I
5  also do that because I think that's good for
6  my educational mission as a professor, to
7  teach as many students as possible.
8    Q.  But they don't get a credit; is that
9  true?
10    A.  Yes, as far as I understand.  If
11  you're not registered at MIT for a course, you
12  don't get credit.
13    Q.  Well, that's what I was getting at.
14  Thank you.
15    A.  Okay.
16    Q.  The second principle is safety.  Can
17  you tell me how you apply that principle?
18    A.  Yes.  So the definition of "safety"
19  that I have in my report is the following:
20  "It must be safe.  It must be the case that
21  participants who have been brought together
22  reveal or act on confidential information that
23  they hold in a safe way.  When a good market
24  outcome depends on such disclosure, as it

Page 172

1  often does, the markets must offer
2  participants incentives to reveal some of what
3  they know."
4        So we have safety at several levels in
5  the open web display advertising exchange
6  market as well as the other markets here.  One
7  involves "How should you bid in an auction?"
8  And so in my report, I talk about Google's
9  auction manipulations, making it challenging
10  for participants to know how to bid in an
11  auction because several of those auction
12  manipulations have not been disclosed.
13        For instance, reserve price
14  optimization was in effect for over a year.
15  And in my review of the record, I've seen,
16  say -- Google product manager ███████
17  ████████████████████████████████████████
18  ████████████████████████████.  So if
19  I'm a publisher trying to decide what reserve
20  price I should set, if Google is overriding
21  that choice, I would say that's not an example
22  of a safe environment for the publisher to
23  reveal what reserve price is in their best
24  interest.

Page 173

1        Another example of something that gets
2  in the way of safety is the Bernanke auction
3  manipulation wherein Google is changing the
4  ads submitted by bidders and not disclosing
5  that to market participants.
6        So an advertiser whose bids are being
7  manipulated would potentially behave
8  differently.  They would potentially learn
9  about their different bidding strategies had
10  they known that their bids were being inflated
11  or deflated by Google's system.  So that
12  advertiser would not think of the system as a
13  safe system.
14        The third example is Google's conduct
15  vis-a-vis Dynamic Revenue Share, Version 1,
16  which market participants don't have enough
17  information to figure out whether their bid
18  will be in the region in which Google converts
19  the auction essentially to a first-price
20  format, where the advertiser has to pay their
21  bid.  In that region, the advertiser would
22  change their bid.  And so they don't know that
23  that's occurring, so it's not safe for the
24  advertiser to act on the confidential

44 (Pages 170 - 173)

1  information, in this case, their evaluation
2  for the slot.
3       So those are three places where
4  safety's showing up in my analysis.
5       Q.  I guess, taking the last one first,
6  Dynamic Revenue Share, your concern related to
7  advertisers not knowing how Dynamic Revenue
8  Share adjusted publishers' floors?
9
10      (Stenographer clarification.)
11
12      A.  My understanding of Dynamic Revenue
13  Share is that it's changing the take rates in
14  the auctions.  And by changing the take rates
15  in a way to steer activity to AdX, it creates
16  incentives for advertisers to potentially
17  behave differently.  And Google, as I talk
18  about at length in my report -- and I can pull
19  up some examples of that -- has not disclosed
20  that to advertisers.
21       They also didn't disclose
22  DRS Version 1 to publishers.  So Paragraph
23  188, I talk about -- "For DRS V1, AdX
24  dynamically decreased its take rate to clear

1  more impressions while making sure that its
2  average take rate did not go below 19 percent.
3  However, Google never disclosed this conduct
4  to advertisers or publishers who sell or buy
5  impressions."
6       And there's documents between Google
7  staff ████████████████████████████████
   ████████████████████████████████████████
   ██                                      So that creates an environment that's
11  not safe for participants to behave in.
12  BY MR. RYBNICEK:
13      Q.  And it's your view that advertisers
14  should always know what the publisher-side
15  tool take rate is?
16           MR. CHANG:  Objection.  Form.
17      A.  In a transparent market, advertisers
18  should have information that allows them to
19  bid optimally.  So in the case of DRS, if the
20  take rate is dynamically adjusted in a way
21  that affects the incentives of advertisers,
22  they should be aware of that.  That's a core
23  principle of market design folks who work on
24  designing market clearing rules.

1       Like in the markets that I've been
2  involved in designing, we have information
3  from -- the West Point example.  There are
4  videos upon videos describing exactly how the
5  system works to clear that market.  And that's
6  essential to ensure participants know how to
7  react to the market-clearing rules.
8       So I believe an advertiser should know
9  what rules they're bidding into, yes, what the
10  rules of the auction are.
11  BY MR. RYBNICEK:
12      Q.  When you say "rules of the auction,"
13  that includes the take rate or the revenue
14  share?
15      A.  Correct, yes, because it affects their
16  incentives.  So we want to make it safe for
17  them to act on their confidential information.
18  That is their evaluation for the slot.  But as
19  a revenue share varies -- as a function of
20  what bids are submitted, that affects their
21  optimal response, and advertisers should have
22  the opportunity to best respond with as much
23  information as possible.
24      Q.  Have you done an analysis of the

1  effect of DRS on the ad tech market?
2      A.  I have discussed DRS in my report.  So
3  I can point you to Section B, page 69.
4      Q.  Can you tell me whether it benefited
5  or harmed publishers overall based on your
6  analysis?
7           MR. CHANG:  Objection.  Form.
8      A.  My starting point for that question is
9  the fact that Google did this and did not
10  disclose.  It suggests to me that it benefited
11  Google.  And had advertisers known about DRS,
12  they would potentially have behaved differently.
13  So understanding how they would behave
14  different would be important to understand
15  whether they benefited from this or not.
16       But, you know, if you think about an
17  advertiser whose bid is now cleared on AdX
18  because of DRS, that advertiser might have
19  gotten a better deal elsewhere.  The publisher
20  whose ad is now being sold on AdX, thanks to
21  DRS, might have gotten different terms
22  elsewhere.  So those are the kind of possible
23  things that could occur.
24       That's now DRS v1 plus v2, where

45 (Pages 174 - 177)

Page 178

1 there's this debit mechanism, which makes
2 things even more complicated for participants
3 to understand how the rules work with DRS v1
4 for reducing the take rate.
5      With v2, we're sometimes charging a
6 higher take rate to publishers. So there will
7 be instances where publishers are potentially
8 harmed by the higher take rate. So these are
9 the types of things that can happen.
10 BY MR. RYBNICEK:
11     Q.  You just listed things that could
12 happen, and you identified there being
13 potential scenarios in which parties could or
14 could not be harmed. I asked you a different
15 question, which is have you done an analysis
16 of whether publishers overall are harmed by
17 DRS?
18     A.  The fact that publishers do not have
19 the choice with DRS v1 is in and of itself
20 evidence that they were harmed, that they
21 didn't have the opportunity to turn it on or
22 off with v1.
23     Q.  Even if they made more money?
24     A.  They didn't have the choice. Whether

Page 179

1 they made more money, one would need to know
2 what would have happened to those publishers
3 on other, you know, exchanges, et cetera, and
4 publishers would need to have full information
5 about how DRS versus a world without DRS
6 affects their overall revenue. So they didn't
7 have that choice. They were forced. It
8 wasn't disclosed that DRS 1 was taking place.
9     Q.  Whether they had a choice or not
10 doesn't tell you if they made more money or
11 less money versus the but-for world,
12 correct?
13     A.  Yeah. But your question earlier was
14 about harm. So the fact that they did not
15 have a choice is, you know, I think,
16 preventing them from being able to figure out
17 whether this was good for them, exercising the
18 freedom to choose, which is an important
19 consideration in competitive markets. So it's
20 possible some publishers got some benefit;
21 some publishers on particular auctions got
22 lower benefits.
23     Q.  It's fair to say you don't know how
24 publishers came out overall as a result of

Page 180

1 DRS?
2     A.  I'm not sure that question is kind of
3 the question of my analysis here. My concern
4 with DRS is that publishers were not able to
5 choose that they wanted this feature or not.
6     Q.  That's fine. I appreciate that's not
7 a concern of your analysis.
8     A.  Yeah.
9     Q.  I'm asking if you know. If you don't
10 know, that's fine because it's not part of
11 your analysis. I'm asking do you know if
12 publishers came out better or worse off as a
13 result of DRS?
14     A.  I mean, what I've talked about in my
15 report are examples of publishers expressing
16 confusion about DRS. So whether they're
17 harmed or not, we'd have to look at the
18 evidence for that. And without publishers
19 knowing exactly what DRS is, I would be very
20 skeptical as to what that evidence is.
21      And we'd also need to know what their
22 outside options were. Where else would their
23 inventory potentially have transacted? Would
24 it have been better for them to engage in a

Page 181

1 different type of transaction?
2      Go ahead.
3     Q.  Is it your testimony that you cannot
4 determine whether or not publishers are better
5 or worse off as a result of DRS?
6     A.  What I've looked at is the fact that
7 publishers did not have information about
8 DRS's existence and could not make a choice.
9 My kind of base instinct is publishers are,
10 you know, the folks who should figure out
11 whether they want, you know, DRS or not. They
12 are in the best position to make that
13 decision, not the exchange operator.
14     Q.  I guess I'm still asking the question
15 of -- it sounds like the answer is no, but
16 have you done an analysis to determine whether
17 publishers are better or worse off as a result
18 of DRS?
19        MR. CHANG: Objection. Form.
20     A.  My analysis, using the principles of
21 DRS, the fact that the take rate is
22 dynamically adjusted would show that some
23 publishers might have benefited in some
24 situations and other publishers may not have.

46 (Pages 178 - 181)

Page 182

1    But publishers did not have the information to
2    make the informed choice as to whether they
3    wanted to do this or not.
4    BY MR. RYBNICEK:
5        Q.   So we're getting closer.
6        A.   Okay.
7        Q.   Some benefited.  Some may not have.
8            Overall, do you know if publishers
9    were worse or better off financially as a
10   result of DRS?
11       A.   It's a very difficult -- I mean, I'll
12   go back to what we were talking about a second
13   ago.  What we need to do to answer that
14   question is we need to say, Let's not put
15   Bernanke.  Let's not put a lot of the other
16   conducts here, reserve price optimization, and
17   look at an experiment where there is DRS and
18   there's not DRS, and look at publisher yields
19   in those environments compared to what
20   publishers would have done if there was no
21   DRS.  And so that analysis is not in my report
22   because these conducts are all overlapping,
23   right?  So it's difficult to ascribe a
24   particular publisher's revenue, you know, in a

Page 183

1    particular setting to one specific conduct in
2    an empirical matter.
3            So that's why I retreat back to the
4    theoretical incentive underlying DRS.  And as
5    I said, DRS is steering transactions to AdX.
6    That might have helped some publishers and
7    hurt others.
8        Q.   I'm going to try the same thing with
9    RPO and Bernanke.  And if we can do it faster,
10   that would be great, but we'll get it -- we'll
11   do it however we have to.
12           RPO.  Are publishers better or worse
13   off as a whole as a result of RPO?
14       A.   Publishers set reserve prices for many
15   reasons.  RPO is overriding their ability to
16   set reserve prices and learn from the
17   different reserve prices that they've set.  So
18   RPO is harming publishers from being able to
19   have control over how they want to sell their
20   inventory.
21           In particular, publishers had no
22   information that RPO is taking place, at least
23   in the early year and a half after RPO was
24   launched.  So that is a sign that publishers

Page 184

1    are not able to obey the principles of market
2    design.  They don't have safety in making
3    their choices about reserve prices.
4            On top of that, with both of these
5    conducts, DRS and RPO, Google is throttling
6    these conducts, making it intentionally
7    difficult for publishers to learn how to
8    behave vis-a-vis these conducts.  So with
9    reserve price optimization, I think I would
10   trust a publisher to figure out what's the
11   right reserve price for them, not an exchange
12   who wants to increase the amount of revenue
13   that they can generate.
14           MR. CHANG:  Counsel,
15   understanding you have somewhere you want to
16   go, whenever is a good time, you let me know
17   if we can take a break.
18           MR. RYBNICEK:  We'll try to wrap
19   this up.
20   BY MR. RYBNICEK:
21       Q.   But is it correct to say you have not
22   done a -- you have not quantified where the
23   publishers are financially better or worse off
24   as a result of RPO?

Page 185

1        A.   My analysis is based on the incentives
2    that RPO creates.  And looking at RPO versus
3    not is challenging because of these
4    overlapping conducts.  So to get to an
5    empirical answer like that, I didn't feel the
6    need to do that because of these overlapping
7    conducts.  So that's why I'm talking about the
8    incentives that RPO has placed on publishers
9    and how it's taken away publisher choice to
10   choose a reserve price.
11       Q.   But as a DRS, some publishers could be
12   worse off; some publishers could be better
13   off?  Is that your opinion?
14       A.   In certain auctions, yes.
15       Q.   Bernanke.  Have you quantified whether
16   advertisers are made better or worse off as a
17   result of Bernanke?
18       A.   Bernanke, again, is a conduct that was
19   not disclosed to participants.  So publishers
20   are in the best position to realize -- to
21   determine for themselves whether they want to
22   be the recipient of bids that were manipulated
23   by Bernanke and, likewise, maybe the
24   advertiser side is a better way to describe

47 (Pages 182 - 185)

Page 186

1 that. Bernanke was not disclosed either to
2 publishers or advertisers.
3     So by virtue of the fact that it's not
4 being disclosed to the participants, one
5 wonders why the -- Google is doing these
6 things. If it's supposedly to benefit
7 publishers and advertisers, I would have
8 expected Google to shout that from the
9 rooftops, "We're doing this to help you guys,"
10 but that's not what I see in the record,
11 what's -- any signs of that in the record.
12 ████████████████████
████████████████████████
████████████████████████
████████████████████████
17 And I have the direct quote in my report. So
18 that's where I have to go now, back to the
19 incentive.
20     What Bernanke is doing is manipulating
21 bids so as to drive more traffic to the ad
22 exchange -- AdX exchange. And what that is
23 allowing for is the possibility of mismatch.
24 So there are certain advertisers who, because

Page 187

1 of Bernanke, are getting matched to publishers
2 who would not have been matched otherwise.
3 And that's all in service of increasing
4 revenue on AdX and making -- you know, having
5 these adverse effects for publishers.
6     So in particular instances, to get to
7 the specifics of your question, there can be
8 some publishers who have benefited from
9 Bernanke.
10     Now, Bernanke was a program that was
11 happening on average, so sometimes there was
12 subsidization. Sometimes there was deflation.
13 So I'm not sure that that -- in my review of
14 the record, that has been implemented in a
15 consistent way. So there can be sometimes
16 where you lucked out, sometimes where you did
17 not, and for -- likewise, for advertisers.
18     Q. But you haven't done an analysis to
19 determine whether or not advertisers, as a
20 whole, were better or worse off as a result of
21 Bernanke?
22     A. My analysis is a theoretical analysis,
23 so is that what you're asking about?
24     Q. You haven't quantified?

Page 188

1     A. Well, I'm relying on the incentives
2 that Bernanke placed on market participants,
3 the fact that Bernanke is not disclosed to
4 market participants, and that's the basis for
5 my views about Bernanke.
6     Q. You said this is based on -- your
7 views are based on the fact that Bernanke
8 wasn't disclosed. Is anything that's not
9 disclosed inefficient or anticompetitive?
10     MR. CHANG: Objection. Form.
11     MR. RYBNICEK: Strike that.
12 BY MR. RYBNICEK:
13     Q. Is anything that is not disclosed
14 inefficient?
15     A. As an abstract matter, the extreme
16 case that we had to look at specific
17 context --
18     Q. Any optimization that's not disclosed
19 is inefficient?
20     A. That same answer as previously. We
21 need to talk about what the optimization is.
22 If the optimization is taking traffic and
23 steering it all to AdX versus a different
24 exchange, then that's going to create some

Page 189

1 inefficiency.
2     Q. With all due respect, this is starting
3 to get a little...
4     You said that Bernanke was inefficient
5 because it wasn't disclosed.
6     A. As well as the fact that the
7 incentives of the Bernanke system generate
8 mismatches because it's manipulating the bids
9 that advertisers are submitting, resulting in
10 some advertisers being matched to some
11 publishers who wouldn't have been matched but
12 for the manipulation.
13     Q. But you don't know whether or not that
14 was to their benefit or detriment?
15     MR. CHANG: Objection. Form.
16     A. In some cases, it may have led to a
17 match form that wouldn't have formed. In
18 other cases, it may have led to mismatches.
19 And my view is that publishers and advertisers
20 are in the best position to determine for
21 themselves whether this conduct is good for
22 them or not. And they did not have adequate
23 information to make those decisions because of
24 the fact Bernanke was not disclosed in any

48 (Pages 186 - 189)

Page 190

1  real way.
2  BY MR. RYBNICEK:
3      Q.  Is it your opinion that advertisers
4  don't have a way of identifying their return
5  on investment for their ad purchases?
6      A.  When Google is undertaking many
7  different conducts simultaneously, like
8  Bernanke, like reserve price optimization,
9  like dynamic revenue sharing, and is doing it
10 in a way that involves throttling, which is
11 purposely making it difficult for advertisers
12 to understand the accuracy of the information
13 that advertisers has, is compromised by these
14 conducts.
15     Q.  I'm going to try again.
16     Can advertisers determine whether
17 their return on investment through -- strike
18 that.
19     Is it your opinion that advertisers
20 cannot determine their return on investment
21 when using Google Ads?
22     A.  My opinion is advertisers cannot find
23 an accurate measure of the returns of their
24 bidding strategies as a result of Google's

Page 191

1  conducts and the fact that they are hidden and
2  not described and that they are throttled.  So
3  you can get an estimate, but the question is
4  is it an accurate estimate?
5      Q.  They know how much they're paying for
6  their ads, right?
7      A.  Google's advertisers get charged an
8  amount, so they can observe that.
9      Q.  And they can understand the value of
10 the ads that they've placed, correct?
11     What they don't understand is -- the
12 relevant question is suppose I were to do
13 something different.  What would have
14 happened?  Because a way a firm would try to
15 do that is maybe they would experiment.  They
16 would run an A-B test, right, or maybe they
17 would have someone on their advertiser bidding
18 team say, Well, this is a particular auction
19 format.  If I had shaded my bid one way or the
20 other, this is the amount of revenue that I
21 could expect.  This is an amount of money that
22 I would have to pay.
23     And thanks to Google's auction
24 manipulations, it is not easy for an

Page 192

1  advertiser to get accurate information on
2  their ROI.
3      Q.  Sorry.  You -- I think you changed my
4  question to comparing an advertiser's use of
5  Google Ads to a but-for world that is
6  undefined.
7      I'm asking do Google Ads' advertisers
8  know how much they're paying and what they're
9  getting in return?
10     A.  Google Ads' advertisers know how much
11 they're paying.  That's, you know, billed
12 them, so that is something they get to see.
13     Q.  And what --
14     A.  What they're getting in return -- if
15 I'm advising an advertiser team, the relevant
16 question is should I have done something
17 differently?  And that's where these conducts
18 get in the way of Google advertisers being
19 able to determine what is my optimal strategy,
20 for instance.
21     So as a matter of arithmetic, your
22 question, how much was I charged, yes, there's
23 a bill.  How many people clicked on my ad and
24 how many people eventually bought my product,

Page 193

1  if I'm an advertiser that's selling products,
2  that's an observable question.  But the -- I
3  think the question that most advertisers would
4  have bidding into an exchange is how should I
5  bid into an exchange, and could I have
6  optimized my advertising campaigns in a way to
7  generate a higher return on investment?  And
8  thanks to Google's conducts, that is very
9  difficult for them to figure out.
10     Q.  But in order -- the part of the puzzle
11 that you're saying is missing is what the
12 alternatives are.  But in order -- you still
13 need to know your present ROI, right?  I still
14 can't get the answer from you.
15     A.  Yeah, no, I said, as a matter of
16 arithmetic, of course, you get a bill.  This
17 is how much you paid.  You get your
18 allocation.  This is what you were assigned.
19 Right?  But I'm -- what I'm saying is, as an
20 advertiser, trying to think about what I
21 should do, that's far from sufficient for
22 figuring out what's the best way for me to
23 sell -- advertise my products.
24     MR. RYBNICEK:  Okay.  We can

49 (Pages 190 - 193)

Page 194

1  take a break.
2           MR. CHANG:  Okay.
3           THE VIDEOGRAPHER:  The time is
4  2:05.  We're off the record.
5
6       (Recess taken from 2:05 p.m.
7       to 2:25 p.m.)
8
9           THE VIDEOGRAPHER:  We are back
10 on the record.  The time is 2:25.
11 BY MR. RYBNICEK:
12    Q.  All right.  I think you'll know what
13 my first question is, which is did you discuss
14 the substance of your deposition with your
15 counsel?
16          MR. CHANG:  Consistent with the
17 expert stipulation, I instruct the witness not
18 to answer.
19    A.  I'll follow the advice of counsel.
20 BY MR. RYBNICEK:
21    Q.  Thank you.
22       So I think where we left off was on
23 page 16 now, which discusses or raises the
24 principle of congestion.

Page 195

1       Can you explain to me how the market
2  design principle of congestion or overcoming
3  congestion is applied?
4     A.  Congestion is the idea that market
5  participants have enough time to make
6  satisfactory choices when faced with a variety
7  of alternatives.  So when Roth is talking
8  about congestion, he's thinking about time as
9  a way of clearing the market and not price.
10 So let me start with Roth's formulation of
11 congestion.
12       The centralized marketplace that Roth
13 talks about a lot is the medical match, but he
14 also talks about other settings where we see
15 markets where we have things like exploding
16 offers, offers where someone gets to make you
17 an offer ahead of someone else, and, as a
18 participant, you have to decide should I take
19 the offer, or should I wait?
20       And that's -- in several real-life
21 markets, that's what was the genesis of
22 medical match.  Medical residents in the 1920s
23 and '30s were approached by hospital programs
24 and asked, Would you commit to work here? very

Page 196

1  early on in medical school.
2       So typically, four years of medical
3  school.  At the end of your second year, you
4  would have Boston residents who were
5  approached by New York Presbyterian Hospital
6  saying, I'm going to jump the gun.  I'm going
7  to try to get ahead of all of my competitors
8  and get you to transact with me, get you to
9  agree to work for me.
10      And, you know, other places where the
11 timing of transactions is problematic in
12 market design could be things like when we do
13 graduate school admissions.  We have a rule
14 that no student can be pressured to make a
15 decision as to what graduate school they
16 attend before April 15th.  That's an agreement
17 that the American Council on Graduate
18 Education has come to terms with to ensure
19 that participants have enough time and
20 information to make informed choices.
21      And congestion is, in my report, this
22 market design principle.  When I think about
23 the sequential nature of dynamic allocation,
24 AdX is getting this opportunity to transact

Page 197

1  inventory ahead of other potential sources of
2  demand, and that is creating congestion
3  because it's the timing of transactions.
4  They're getting to go quicker.  They're
5  getting to go earlier in the priority
6  ordering.
7     Q.  And so your analysis of congestion is
8  limited to dynamic allocation?
9     A.  Let me look.
10      So enhanced dynamic allocation is also
11 a setting where time is playing a role, you
12 know, time in the sense of the jumping ahead
13 of the rest of the market.
14      The opportunity to -- let's see.  So
15 let me just look at the other conducts just to
16 refresh my memory.
17      (Witness reviews document.)
18      Those are the two main, dynamic
19 allocation and enhanced dynamic allocation.
20    Q.  And maybe say -- explain to me how
21 enhanced dynamic allocation creates more
22 congestion.
23    A.  Enhanced dynamic allocation is giving
24 AdX the opportunity to take inventory away

50 (Pages 194 - 197)

Page 198

1  from directly negotiated deals that publishers
2  may have had with advertisers. So it's like a
3  medical residency program coming early and
4  saying you have to -- you have the opportunity
5  to transact with me when you don't have full
6  information about what your other alternatives
7  would have been and whether that is good for
8  you or not.
9       So there's a close parallel to using
10 time as a way to contract the priority --
11 prioritization in enhanced dynamic allocation
12 is not giving market participants the means to
13 transact their direct inventory in a way that
14 they would like to.
15      Q.  Is enhanced dynamic allocation a
16 feature that publishers can opt in to and out
17 of?
18      A.  It's my understanding that the only
19 way you could opt out of enhanced dynamic
20 allocation is by not participating on AdX. So
21 de facto, it's very hard to opt out of
22 enhanced dynamic allocation.
23      Q.  And what's your understanding --
24 what's the purpose of enhanced dynamic

Page 199

1  allocation?
2       A.  I believe Google is trying to get an
3  opportunity to transact ahead of direct deals
4  for certain advertisers on AdX. So the
5  purpose of EDA, from the perspective of Google
6  AdX, is to have more transactions occur on AdX
7  where they can get a share of the revenue
8  compared to, you know, the alternative that
9  publishers would have for direct deals.
10      Q.  Do you understand that if Google
11 serves an AdX ad through enhanced dynamic
12 allocation, it has a higher value to the
13 publisher than the direct deal?
14      A.  As a matter of the price?
15      Q.  As a matter of the revenue received to
16 the publisher.
17      A.  Right. In enhanced dynamic
18 allocation, the ad would be served via AdX if
19 it were at a price that's higher than the
20 direct deal. But there could be other reasons
21 why advertisers have direct deals having to do
22 with ad quality. So, as I write in my report,
23 the direct deal inventory is often high-value
24 inventory.

Page 200

1       You know, the example in my mind is
2  always the example of a new Marvel movie and a
3  direct deal that, say, "The New York Times"
4  might have with Marvel Studios to take over
5  the entire screen and say, Here is
6  Spider-Man 2. And so there can be many
7  reasons why "The New York Times" would prefer
8  to show that ad over whatever quality ad they
9  would get from AdX.
10      Q.  But you, I think, have said a few
11 times now that you trust publishers to make
12 the decisions that are best for them; is that
13 right?
14      A.  That is my -- my default, yes.
15      Q.  So if EDA was something that
16 publishers could opt in to or out of and they
17 chose to opt in to it, you trust that that
18 must be beneficial to publishers?
19          MR. CHANG:  Objection. Form.
20      A.  I think you're describing, if I've
21 understood your question correctly, a
22 hypothetical world.
23          As I just said, publishers -- and let
24 me just read from my report here on page 65.

Page 201

1  "Publishers did not have the option to
2  selectively turn off EDA for a selection of
3  their premium inventory available through
4  direct deals."
5       Q.  But if publishers were able to turn
6  off EDA, your opinion would be different; is
7  that fair?
8       A.  If publishers had full information
9  about what EDA was and, you know, there's no
10 other ongoing conduct that they have full
11 information about, then Google could offer a
12 choice where there's no friction, so no
13 default effects, no inertia, publishers are
14 fully informed about what EDA is. Then
15 publishers would be in the best position to
16 make that decision whether they want to enable
17 EDA or not.
18      Q.  I just want to make sure we're talking
19 about the same thing.
20          Is it your opinion that publishers
21 don't know about EDA?
22      A.  My opinion, no, is that publishers did
23 not have the option to turn off EDA.
24      Q.  But they are aware of EDA?

51 (Pages 198 - 201)



Page 202

1    A.  I can't speak for every publisher.
2  There could be some publishers who are aware
3  that their direct deals were being sold on
4  AdX.
5    Q.  But you don't know if EDA was known to
6  publishers generally or whether or not it was
7  something done behind the scenes?
8    A.  EDA was a program that Google
9  announced.  Now, the word "behind the scenes"
10  is the difficult part of your question.
11    When we have EDA, you know, we also
12  have these other conducts.  So, you know, as I
13  say in my report, Footnote 210 -- or the
14  sentence surrounding Footnote 210, "Google
15  enrolled all new publishers by default to be
16  set up with EDA turned on and planned to force
17  the remaining publishers that initially opted
18  out to adopt EDA."
19
20
21
22
23
24

Page 203

1    So we're far from the world where
2  publishers have free choice in deciding
3  whether EDA is good for them or not.
4    Q.  Sorry.
5    Is it your opinion that publishers
6  couldn't turn EDA off now?
7    MR. CHANG:  Objection.  Form.
8    A.  What I state in the report -- let me
9  just be very precise.
10    This is on page 65.  "Publishers did
11  not have the option to selectively turn off
12  EDA for a selection of their premium inventory
13  available through direct deals."
14    So if you look at Footnote 211, this
15  is the footnote case that I was mentioning
16  earlier.
17
18
19
20
21
22
23
24    , as the previous footnote shows,

Page 204

1  Google was not very transparent about the
2  option of turning it off.
3
4    Q.  Just looking -- you were just reading
5  from Footnote 212.
6    And so just looking at 210, your
7  Footnote 210, does that suggest that EDA could
8  be turned off?
9    A.  Again, we're talking about as a
10  technical matter to -- Footnote 211 says,
11
12
13
14
15
16
17
18
19
20
21    The next footnote provides even more
22  detail, 212 --
23    Q.  So --
24    A.  Oh, okay.

Page 205

1
2
3    "
4    Do you see that?
5
6
7
8
9
10
11
12
13    Q.  But it could be turned off?
14
15
16
17
18
19    Q.  And today, do publishers know about
20  EDA?
21    MR. CHANG:  Objection.  Form.
22    A.  As in 2024?
23  BY MR. RYBNICEK:
24    Q.  Yes.

52 (Pages 202 - 205)



Page 206

1    A.  I believe some publishers know about
2  EDA.
3    Q.  EDA is available in the public domain,
4  is discussed in the public domain; is that
5  fair?
6       MR. CHANG:  Objection.  Form.
7    A.  I think that's fair.
8  BY MR. RYBNICEK:
9    Q.  Okay.  And do you know of any
10  publishers who want to turn EDA off?
11    A.  There are publishers in the record who
12  were -- got confused about why some of their
13  direct deals were not being served.  So
14  "New York Times," I think, is an example where
15  there are low-quality ads that were being
16  served, and publishers are perplexed by why
17  that's the case.  So there's certainly
18  confusion on the publishers' side about these
19  issues.
20    And so if publishers had full
21  information about how EDA is circumventing
22  their direct deals and leading to
23  cream-skimming effects with direct deal ads,
24  which, you know, I think, in the long run,

Page 207

1  have the effect of undermining the direct deal
2  market, then I believe some publishers would
3  not want to have EDA.
4    But, I mean, the principle here that
5  I'm talking about in my report is publishers
6  should have unencumbered choice to make those
7  decisions.  That's the sign of a
8  well-functioning market.
9  BY MR. RYBNICEK:
10    Q.  So I asked do you know of any
11  publishers who want to turn off EDA, and you
12  didn't identify any.  Is that because you --
13  sitting here today, you can't identify any
14  publishers who wanted to turn off EDA?
15    A.  The turning off of EDA, as we've just
16  been describing, was not an option, right?  So
17  if that's changed right now in 2024, if
18  there's a new set of rules about EDA, which I
19  don't know off the top of my head if that's
20  the case, then the behavior of publishers
21  reflects the fact that EDA was not an option,
22  you know, effectively not an option to turn it
23  off back then.
24    Q.  Are you aware of any publishers

Page 208

1  requesting turning off EDA?
2    A.  Let me check one thing in my reply
3  report.
4       (Witness reviews document.)
5       MR. CHANG:  Professor, your
6  rebuttal report is there.
7       THE WITNESS:  Oh, oh.  Sorry.
8    A.  If we turn to my reply report,
9  Paragraph 85, second sentence states, "This
10  ignores
20  BY MR. RYBNICEK:
21    Q.  So this seems that -- the sentence
22  reads, "

Page 209

1    Do you see that?
2    A.  Yes uh-huh.
3    Q.
5    A.  I mean, the sentence before that says,
6  "

Page 210

1 ████████████████████████
2 ██████████
3    Q.  So you mentioned DA and EDA.  Any
4 other aspects of ad tech that you've analyzed
5 under the reduced congestion element principle
6 of market design?
7    A.  Let me just go back to my list of the
8 conducts.  So my report has -- and one place
9 that touches on the congestion topic involves
10 UPR, unified reserve price, unified pricing
11 rules.  So Professor Milgrom talks about the
12 possibility of postauction discounts as a
13 substitute for UPR, and I don't believe that
14 is an adequate substitute for UPR because it's
15 postauction.  The ones we introduced that were
16 post were back to the timing of transactions.
17       So arguing that postauction discounts
18 are an effective replacement to UPR is
19 something I don't agree with because
20 postauction discounts are -- can be clunky,
21 much like the concern for congestion.
22    Q.  Can you explain to me how -- what you
23 understand UPR to require?
24    A.  UPR is the requirement of publishers

Page 211

1 to set the same reserve price across different
2 demand sources.
3    Q.  And does -- is UPR -- does UPR violate
4 or -- excuse me.  Does UPR violate your market
5 design principles?
6    A.  UPR is taking away choice from
7 publishers to -- let me read exactly what I
8 say about UPR in my report.
9       So back to the opening, on page 10,
10 "Google's unified pricing rules gave
11 preferential treatment to AdX in Google's
12 ad-buying tools to the detriment of
13 publishers.  UPR reduced the ability of
14 publishers to maximize revenue by setting
15 different reserve prices for distinct demand
16 sources and limited their ability to ensure
17 high-quality advertisements.  These
18 restrictions on publisher choice were done to
19 benefit AdX."
20       So did I answer your question, sir?  I
21 want to make sure I answered your question.
22    Q.  What I heard you say is that UPR
23 limited publisher choice and therefore
24 violated your design principles.  But choice

Page 212

1 is not a market design principle we've talked
2 about, I don't think.
3    A.  Choice is inherently linked to
4 efficiency.  If I have a restricted number of
5 choices, I'm not able to do what's most
6 efficient for me as a participant in the
7 market.
8       If we go back to our earlier
9 discussion of the definition of efficiency
10 from microeconomics and the relationship to
11 competitive markets, an agent in a competitive
12 model is maximizing their utility.  They are
13 doing what's best in an unconstrained way.
14 They're only constrained by their budget set.
15       So when we restrict choice, that's
16 core to the inefficiencies that emerge.  A
17 publisher, had they wanted to set the same
18 price floor across different sources of
19 demand, could have, but Google has limited
20 that possibility with UPR.
21    Q.  So in order for a market to be
22 efficient, it has to require -- it has to
23 maximize choice?
24    A.  In this case, that was the previous

Page 213

1 operation.  Publishers had the ability to have
2 separate price floors, and that was taken
3 away.  ████████████████████████
4 ████████████████████████████████
5 ████████████████████████████
6 ██████████████████████████
7 ████████████████████████████████
8 ████████████████████████████████
9 ██████████████
10    Q.  By setting uniform pricing rules,
11 doesn't that embrace the market principle of
12 neutrality?
13    A.  I don't see how.
14    Q.  All exchanges are treated equal.  It
15 also -- does it also embrace --
16    A.  Neutrality, just to clarify, is not
17 the principle that all exchanges are treated
18 equal.  It's that if I'm a participant in a
19 market -- you know, in an explicit example,
20 you and I have the same exact preferences,
21 then we should get the same exact outcome.  It
22 doesn't matter if your name is Parag or if
23 your name is Abe.  If we have the same exact
24 information -- I'm sorry -- same exact

54 (Pages 210 - 213)

Page 214

1   preferences, we should be treated the same.
2           MR. CHANG: Doctor -- sorry.
3   BY MR. RYBNICEK:
4       Q.  Does it embrace --
5           MR. CHANG: One moment.
6       Professor, just take a moment.  Please
7   let the questioner finish his question.  The
8   last question, he did not get a chance to do
9   that.
10          THE WITNESS: So sorry.
11  BY MR. RYBNICEK:
12      Q.  Does it embrace the market principle
13  of equal treatment of equals?
14      A.  I would say it does not because these
15  are not equals.  They are different properties
16  of demands across different demand sources.
17  Some demands may be higher quality; some may
18  be lower quality.
19      So true equal treatment of equals,
20  what's essential is that we have identical
21  agents, and the whole point of publishers
22  wanting the opportunity to have differential
23  reserve prices is that the attributes of
24  demand differ across those different venues.

Page 215

1   So they're inherently not equal sources.
2   There's different distributions that we're
3   drawing from.
4       Q.  Does it -- would you say that it is
5   fair to treat different exchanges with
6   different floors?
7       A.  I think what is fair is for the
8   publisher to have the option to price and set
9   floors in a way that maximizes their
10  interests.  In this particular market, when we
11  talk about fairness we usually think about a
12  formal notion of envy, so is there an
13  advertiser who envies the allocation that
14  another advertiser got?  And the publisher
15  should be able to determine whether the
16  allocation should go to Advertiser A or
17  Advertiser B.
18      So the usual -- I mean, one definition
19  of fairness, formal definition is that there
20  is no envy that's justified.  That's a
21  technical term that's used in the market
22  design literature.
23      So what would that mean?  That would
24  mean there is an advertiser who wished they

Page 216

1   got the slot, and they were willing to pay
2   more for that slot.  And that is in accordance
3   with the person they're transacting with, the
4   publisher.  And so if the publisher decides to
5   have differential reserve prices across
6   different exchanges, it's their discretion to
7   say what truly counts as a justified instance
8   of envy, and so you've taken that away.  So I
9   would not say that is proof fairness under
10  that definition.
11      Q.  And you've said -- we just talked
12  about equal treatment of equals, and I believe
13  you said that different buying tools and
14  different exchanges are not necessarily equal;
15  is that fair?
16      A.  That's correct, yes.
17      Q.  And because they're not equal, is it
18  fair to say that different rules may be
19  appropriate in certain circumstances?
20          MR. CHANG: Objection.  Form.
21      A.  It depends on what the rules are.  So
22  if the -- if we're talking about publisher
23  ad-serving tools, the publisher is -- you
24  know, should be served by those tools and we

Page 217

1   should be maximizing their interests.  So a
2   different rule that I'm fine with is a
3   different way of setting reserve prices across
4   sources of demand.
5       If we're thinking about advertising
6   exchanges as our market, then what I think is
7   good for market design is ensuring that
8   there's interoperability, that we are not
9   discriminating between different sources of
10  demand as the exchange.  Now, the publisher
11  may be willing to do that because it serves
12  their interest, but the exchange is trying to
13  maximize the gains from trade, right, trying
14  to find matches.
15      So discrimination, this is why, you
16  know, our earlier discussion of financial
17  markets, we have these nondiscrimination rules
18  in those settings.
19  BY MR. RYBNICEK:
20      Q.  So is it your opinion that an exchange
21  should interoperate with all buying tools?
22          MR. CHANG: Objection.  Form.
23      A.  It depends.  Is the exchange, are we
24  in a perfectly competitive world, or does the

55 (Pages 214 - 217)

Page 218

1  exchange have monopoly power and is using its
2  decisions about interoperability to exclude
3  competition?
4  BY MR. RYBNICEK:
5      Q.  Let's take -- is an exchange that --
6  in a situation in which there are a dozen
7  exchanges, do each of those exchanges need to
8  interoperate with all buying tools that are
9  available?
10          MR. CHANG:  Objection.  Form.
11     A.  As I understand your question, we're
12 in a situation where we have a competitive
13 exchange market where there are many, many
14 options, 12 options across exchanges, and the
15 decision to interoperate or not is not an
16 exercise of the exclusion of competition.  So
17 in that world, I would say an exchange has the
18 opportunity to decide who they want to
19 interoperate with or not, if it's not
20 excluding competition.
21 BY MR. RYBNICEK:
22     Q.  And do you think that's probably --
23 would that be equally true if there were eight
24 exchanges?

Page 219

1      A.  I don't think you can look at the
2  number of exchanges to see how competitive the
3  industry is.  If you have eight exchanges and
4  one exchange has 99 percent of the volume, I
5  wouldn't call that competitive.
6      Q.  If no exchange had more than 50
7  percent -- or if every exchange -- if no
8  exchange had 50 percent or more and there were
9  eight exchanges?
10     A.  I think these market share measures
11 are, you know, indirect indicia of the
12 presence of market power or not.  So I would
13 also want to look at direct evidence or how
14 competitive the exchanges are before forming a
15 view on that question.
16     Q.  Let me rephrase, then.
17         If no exchange had 50 percent or more
18 market share, there were eight exchanges and
19 no exchange had monopoly power, would the
20 exchanges need to interoperate with every
21 buying tool?
22         MR. CHANG:  Objection.  Form.
23 BY MR. RYBNICEK:
24     Q.  Go ahead.

Page 220

1      A.  Okay.  As I understand your
2  hypothetical, if we have indicia of
3  competitive markets in the exchange market and
4  the decision to interoperate or not is not
5  being used to exclude competition, then I have
6  no problem with that, giving the exchange the
7  opportunity to make that decision.
8      Q.  But you have a different opinion if
9  one -- if an exchange has monopoly power; is
10 that fair?
11     A.  If there's an exchange that has
12 monopoly power and is using the decision to
13 interoperate to exclude competition, I have a
14 problem with that, yes.
15     Q.  And how do you tell if excluding
16 competition is on the merits or not?
17     A.  By reviewing the circumstances of the
18 decision to interoperate or not.
19     Q.  Would you agree that a competitor
20 exiting could be equally indicative of
21 competition on the merits and anticompetitive
22 exclusion?
23     A.  In the abstract, yes, I agree.
24     Q.  What would you look at to determine

Page 221

1  whether exclusion was anticompetitive?
2      A.  I would look at the circumstances
3  surrounding the exclusion, if they were
4  outcompeted by a firm that had superior
5  products versus they were unable to compete
6  because of agreements or what have you, you
7  would have to look at the circumstances of the
8  exit.
9      Q.  But I'm talking about specifically in
10 the context of not being given access to a
11 buying tool.  How would you know if that
12 exclusion was the result of competition on the
13 merits versus anticompetitive exclusion?
14     A.  If -- you know, if the exit were a
15 consequence of, you know, an explicit
16 agreement not to compete with the new entrant,
17 that would be one example of anticompetitive
18 conduct that caused the exit.  So if I had
19 evidence of that, that's one thing I could
20 look at.
21     Q.  Sorry.  I didn't quite understand
22 that.
23         When you say "an explicit agreement
24 not to compete with a new entrant," an

56 (Pages 218 - 221)

Page 222

1    explicit agreement between whom?
2        A.   Between incumbent firms.  And we're
3    talking at an abstract level here still,
4    right?  So if you have two firms that have
5    market power, there's a new entrant.  Those
6    two firms sign an agreement saying "We don't
7    want to interoperate with the new entrant" and
8    then the new entrant exits, I would say that
9    is anticompetitive exit.
10        Q.   We can put to the side horizontal
11    agreements.  But in the situation of a bind --
12    whether or not -- going back to our example
13    we've been working with, with an exchange
14    interoperating with a buying tool --
15        A.   Okay.
16        Q.   -- how do you know whether the
17    exclusivity, let's put it that way, between
18    that buying tool and the exchange is
19    anticompetitive?
20        A.   We'd have to look at the circumstances
21    of that exclusivity.  Did it prevent the
22    buying tool from competing on the merits or
23    not?
24        Q.   Sorry.  I think in the example the --

Page 223

1    the other exchange wouldn't have access to the
2    buying tool that --
3        A.   I think I might have lost the train
4    here.  I'm really sorry.  Could you --
5        Q.   That's fine.  It's getting later in
6    the day.
7             So we're talking about a scenario in
8    which an ad exchange has a -- sorry -- excuse
9    me -- a buying tool bids exclusively into an
10    ad exchange and that buying tool does not bid
11    into a competing ad exchange.  The competing
12    ad exchange -- how do you know if the
13    competing ad exchange had harm due to
14    anticompetitive conduct versus competition on
15    the merits?
16        A.   I would look at whether there was the
17    interest among folks who are using the buying
18    tool to maximize their objectives, say,
19    maximizing their ROI, and whether they had the
20    opportunity to express their willingness to
21    participate on the second exchange, that
22    exchange that exited in your example.  And if
23    they were prevented from being able to
24    exercise that choice because of, say, an

Page 224

1    agreement between the buying tool and the
2    first exchange, that would be exclusionary
3    conduct that resulted in the second exchange
4    exiting.
5        Q.   So it's your opinion that customer
6    preference, an opinion should be followed?
7             MR. CHANG:  Objection.  Form.
8        A.   It's my -- you asked me about
9    competition on the merits.
10    BY MR. RYBNICEK:
11        Q.   Uh-huh.
12        A.   So my opinion is that competition on
13    the merits means that a customer has the
14    opportunity to connect with the exchange that
15    exits.  And when they're prevented from doing
16    that, when they're excluded from doing that,
17    and that results in the competing exchange
18    exiting, that's not competition on the merits.
19        Q.   But I guess what I'm struggling with
20    is the buying tool.  In your opinion, it has
21    to listen to its customers.  If the customers
22    say, "I want you to buy onto another
23    exchange," it is anticompetitive not to listen
24    to your customers; is that accurate?

Page 225

1             MR. CHANG:  Objection.  Form.
2        A.   I am looking at these issues from a
3    market design perspective.  So I would say
4    that the buying tool has got this interest of
5    the buyers, and so I would expect that the
6    buyers would want to be able to maximize their
7    gains from trade.  And a way that buyers would
8    be able to maximize their gains from trade are
9    to be able to compete on multiple exchanges.
10            So the buying tools in the buying tool
11    market should be representing the interests of
12    buyers.  And the fact that they did not do
13    that in your hypothetical is getting in the
14    way of efficient matches forming, and it's
15    preventing competition from having its
16    beneficial effects and leading to the exit of
17    this other index or the other exchange that
18    you have in your hypothetical.
19        Q.   Could a -- could the management of the
20    buying tool have its own reasons for not
21    wanting to bid into that exchange that don't
22    have anything to do with competition such as
23    security or quality or other features that
24    override customer preference?

57 (Pages 222 - 225)

Page 226

1    A.   Yeah.  I mean, in principle, yes,
2  they're going to be balancing what the buying
3  tools thinks its services are for its
4  customers, the advertisers, the benefits
5  versus the costs.  So we would be weighing any
6  perceived concern about negative effects of
7  being on another exchange vis-a-vis safety, if
8  you will, versus the positive effects of being
9  able to find more matches and increase revenue
10  -- the ROI of advertisers.
11    Q.   Are -- is line item capping something
12  you analyzed in the context of congestion or
13  the congestion market principle?
14    A.   Let me take a look at -- if I related
15  line item capping to congestion precisely in
16  my opening report here.
17       (Witness reviews document.)
18       The discussion of line item capping
19  that I have in my opening report is in the
20  section on header bidding.  And my report
21  talks about how line item capping was
22  preventing efficient exchanges, efficient
23  matches from forming through header bidding.
24  It was -- as I say here, "Google would use the

Page 227

1  ad server technology to impede the use of
2  header bidding through line item caps," in
3  page 149.
4       So I see this as not congestion
5  because there's no time dimension here.
6  That's the kind of key principle behind
7  congestion.  There's no prioritization here.
8  This is just I'm getting in the way of header
9  bidding, publishers who want to find other
10  sources of demand to maximize efficiency.
11  BY MR. RYBNICEK:
12    Q.   Well, isn't -- didn't Google implement
13  line item caps in order to ensure the system
14  wasn't overburdened and deteriorated?
15    A.   Not -- that's not consistent with my
16  review of the record.
17    Q.   What was the line item cap that Google
18  imposed?
19    A.   I talk about a specific exchange with
20
21
22
23

Page 228

1
2
3
4
5
6    Q.   Do you know if they rejected the
7  request?
8    A.   Let me take a look here.  In the
9  specific instance of this e-mail
10  correspondence?
11    Q.   Or in any other instance frankly.
12    A.   (Witness reviews document.)
13       Let me take a look at what I wrote
14  here so that -- I do know there were many
15  requests to increase the line item caps, and
16  some of them were rejected; some of them were
17  accepted.
18
19
20
21
22
23
24

Page 229

1
2
3
4
5    Q.   Can a handful of rejections of line
6  item cap waivers affect competition?
7       MR. CHANG:  Objection.  Form.
8
9
10
11
12
13
14
15
16  BY MR. RYBNICEK:
17    Q.   Do you know what percentage of
18  publishers were unable to use header bidding
19  as they desired because of line item caps,
20  Professor?
21    A.   The exact number of publishers that
22  were unable to use header bidding because of
23  line item caps?  This is about how well you
24  can effectively use header bidding line item



58 (Pages 226 - 229)

Page 230

1  caps, get in the way of setting value CPMs at
2  a very granular level.  And, you know, one of
3  the documents in the record is the document
4  from Nitish Korula, who emphasizes it's
5  ███████████████████████████
6  ████████████████████████████
7  ███████████████████████████
8  ████. In fact, that's his
9  expression.  I cite him in my reply report.
10  Q.  But did you undertake an analysis of
11  the percentage of publishers who were affected
12  by line item caps?
13  A.  As I said, that's a challenging, very
14  difficult analysis to do exactly because of
15  ███████████████ that Google engineered
16  and Nitish Korula brought up.
17  I mean, the way I think about this is
18  we have markets that I've been involved in
19  designing where we have, you know, for various
20  reasons, restrictions on the number of things
21  you can rank.
22  So in New York City, when you apply to
23  high school you're only allowed to rank 12
24  choices.  If you look at data and how many

Page 231

1  people are ranking 12 choices, is that
2  informative about how many people are affected
3  by that restriction?  And it's not as simple
4  as looking at how many people are ranking 12
5  because there is a message that's conveyed by
6  the fact that there is a cap.  There's a
7  signal there.  This is the ███████████████
8  that Korula makes.
9  And we've seen in settings the city of
10  Chicago allowed people to rank four items one
11  year, and then they allowed people to rank six
12  items.  If you had looked at the number of
13  people who were at the constraint at four to
14  forecast how many people would rank more than
15  four when you could rank six, then you would
16  have gotten a very inaccurate prediction.  So
17  it's a very challenging exercise to do given
18  that there's a constraint and there's this
19  anchoring involved.  So I did not do a
20  quantitative analysis of that.
21  Q.  Thank you.
22  Is it fair to say that publishers who
23  were only halfway to the line item cap -- only
24  used half the number of line item cap as

Page 232

1  available, they probably were not affected by
2  the line item cap?
3  A.  I mean, there is a microlevel answer
4  to your question, and then there's a
5  macrolevel answer to your question.  So on the
6  micro side, if I am so far from the constraint
7  you would expect that if the constraint were a
8  little bit higher, the anchoring dimensions
9  would be second order.  So I would agree with
10  that, although there are exceptions.
11  And if you look at the Chicago example
12  that I just described, you would see that
13  there is a pretty large-scale behavioral
14  response in the number of things people rank
15  when they changed it from four to six
16  throughout.  So that's on the micro side.
17  On the macro side, if line item caps
18  are being used to make header bidding a less
19  effective product, a less effective
20  innovation, then a publisher who's still not
21  at the cap is affected by Google's actions to
22  try to achieve, as they describe it, the Holy
23  Grail of killing header bidding.
24  Q.  Do you think Google should have made

Page 233

1  it easier for header bidding to operate?
2  A.  If we focus on publisher ad-serving
3  tools, they should have the incentive to
4  maximize the interest of publishers.  And
5  header bidding was an innovation that came
6  outside of Google in reaction to Google's
7  conduct in dynamic allocation.  As Google's
8  own employees state, header bidding was
9  created as a response to dynamic allocation.
10  So we think about the incentives here.
11  Publisher ad-serving tools should want to do
12  what they can to maximize the interest of
13  publishers and publishers want header bidding.
14  Then there's no reason for Google to take
15  actions to try to make header bidding less
16  effective.
17  Q.  But you agree that header bidding is a
18  competitor of Google's, correct?
19  A.  It's an alternative to Google's
20  products, so, yeah, it's competing with
21  Google.
22  Q.  So do we typically in markets want
23  competitors to help each other?
24  MR. CHANG:  Objection.  Form.

59 (Pages 230 - 233)

Page 234

1    A.  This comes back to are we in a
2  perfectly competitive world where there's
3  competition on the merits, or are we in a
4  world where a dominant firm is taking actions
5  to exclude rivals?  And I think in that case
6  of Google's conduct vis-a-vis header bidding,
7  we're in the latter case because, as you know,
8  Chris LaSala says in ██████████████████



Page 236

1  ████████████████████████████████
2  ████████████████████████████████
3  ██████████████████████
4  ██████████████████ and it's part of
5  this consistent pattern of behavior of Google
6  to try to block header bidding.
7    Q.  So you agree header bidding is an
8  innovation that Google -- or excuse me.
9  Strike that.
10    You agree that open bidding is a new
11  product that Google created?
12    A.  Yes.
13    Q.  And it did that in the wake of header
14  bidding; is that correct?
15    A.  Yes.  It's an alternative, yes.
16    Q.  But what you don't like about the
17  market design is that Google charged for that
18  new product; is that accurate?
19    A.  That's one of the things that I don't
20  like about exchange bidding, that it was
21  created as an alternative to eliminate what
22  publishers wanted, which is, you know, a way
23  to transact their inventory without having to
24  pay that extra fee without being reliant on

Page 235

1  consistent with a concerted effort to try to
2  use whatever means the dominant firm could
3  have at its disposal to not compete on the
4  merits.
5    Competition on the merits in this case
6  would be there is a new way to transact, so we
7  should cut our price to make our products more
8  attractive to participants, or we should offer
9  new services.  And the examples I just gave
10  are not examples of competition on the merits.
11    Q.  You just said we should either cut
12  price or offer new services.  Is open bidding
13  a new service that Google offered in the wake
14  of header bidding?
15    A.  Open bidding is a new alternative.
16  That's correct, yes.
17    Q.  So that is competition on the merits
18  by Google in reaction to header bidding,
19  correct?
20    A.  I wouldn't say it's that simple
21  because open bidding had an additional tax.
22  In fact, I mean, we can just look at Google's
23  own documents on this where Google concedes in
24  ████████████████████████████

Page 237

1  Google's tools.
2    And exchange bidding's extra fee,
3  because Google is a dominant firm, is
4  preventing the competition with header
5  bidding.
6    Q.  And when we say "exchange bidding" and
7  "open bidding," you know that those are the
8  same thing, right?
9    A.  Yeah, yeah.
10    Q.  Okay.
11    A.  Sorry if I changed words.  Yeah.
12    Q.  No, that's fine.
13    I know we've been going just over an
14  hour.  We can take a break in just one second.
15    I was asking you questions about UPR,
16  and we got diverted on this lovely tangent.
17    The last question I wanted to talk
18  about on UPR is why isn't UPR -- why doesn't
19  UPR satisfy your market principle of strategy
20  proofing?
21    A.  Strategy proofing has a very explicit
22  definition, which is, in a mechanism, you want
23  to make it a dominant strategy to reveal your
24  type.  So in the context of an auction, the

Page 238

1  plain vanilla second-price auction is a
2  strategy-proof auction because if your type is
3  your value, it's a dominant strategy, meaning
4  no matter what anyone else submits as their
5  bid, you can do no better than bidding your
6  value.
7      UPR has nothing to do with strategy
8  proofness.
9      Q.  But doesn't having different floors
10  lead to strategic bidding behavior?
11      A.  If I have the plain vanilla model
12  where I have -- you know, UPR was used when
13  the first-price format was put into place.  So
14  the -- you know, we've talked about the first
15  week of my undergraduate class in market
16  design.
17      In the second week of the
18  undergraduate class in market design, I
19  explain why the first-price auction is not a
20  strategy-proof mechanism.  It's not a
21  strategy-proof mechanism because if you bid
22  honestly and you win, your profit is zero
23  because you pay what you bid.  So there's a
24  very robust force as a bidder in a first-price

Page 239

1  auction that you do not want to bid honestly.
2      So we're already in a world where we
3  have a first-price auction which is not
4  strategy proof.  And having different reserve
5  prices is just an extra lever there, but we're
6  so far from a strategy-proof world once we're
7  in a first-price auction that I would not say
8  it's strategy proof either way.  It's a
9  first-price format, so we're already not
10  strategy proof.
11      Q.  Sure.  From -- I get that from the
12  advertiser's side.
13      What about from the publisher's
14  side?
15      A.  So the publisher's choice in a
16  first-price format is setting the reserve
17  price, right, so that's their decision
18  variable.  And they want to do that to
19  maximize their revenue.  And it's only under
20  very, very special assumptions on the
21  distribution of demand across different
22  venues, where setting the same exact reserve
23  price would be the optimal decision.  Those
24  assum- -- those assumptions are very likely to

Page 240

1  be satisfied in practice.
2      So by restricting the publisher from
3  being able to set different reserve prices,
4  you've restricted the publisher from being
5  able to optimize, and you're getting in the
6  way of that optimization decision.  So I
7  wouldn't say that that is strategy proof.
8      I mean, usually, when we take about
9  strategy proofness, we're talking about the
10  bidders going into the auction.  Because what
11  is the strategic problem there?  It's the
12  problem of bidders playing a strategic,
13  multiperson decision problem against other
14  bidders.  Should I outbid you?  Should you
15  outbid me?  So on and so forth.
16      And when a publisher is setting its
17  reserve price, that's what we would say in
18  economics is a decision problem, so there's no
19  strategic dimension to the decision problem.
20  I just have an optimization.
21      So my optimization is maximizing
22  something, right?  And so the way I would
23  think about UPR is I have a maximization
24  problem where I have one control variable,

Page 241

1  which is a single uniform price that's used
2  across different venues, versus a maximization
3  problem, where I have multiple control
4  variables that are used for setting reserve
5  prices across different venues.
6      And what UPR is imposing is a
7  constraint on the variables I can optimize
8  over because I have to make that the same
9  across the different venues.
10      Q.  I think -- so is your -- it's your
11  opinion that UPR -- or strike that.
12      Is it your opinion that setting floors
13  is not a strategic decision by publishers?
14      MR. CHANG:  Objection.  Form.
15      A.  What we need to be very precise about
16  is what we mean by "strategic decision."  So
17  when I talk about a strategic decision, I'm
18  thinking about using the tools of game theory.
19  And so game theory is also known as
20  multiperson decision theory where your
21  strategies depend on the behaviors of other
22  players in the game.
23      So on the advertiser's side, how much
24  I should shade my bid in a first-price auction

61 (Pages 238 - 241)

Page 242

1  will depend on how much I think my opponents
2  are shading their bid in a first-price
3  auction.
4          When you're thinking about the
5  seller's problem, the seller's problem, as in,
6  say, Myerson's "Optimal Auction" paper, is
7  typically seen as a -- you know, we're in the
8  idealized models here, so I should emphasize
9  that, but it's typically seen as just an
10  optimization problem.
11          I have the opportunity to set
12  different reserve prices.  Those can be
13  different for different bidders.  And it's not
14  a multiperson problem because if there's a
15  single seller setting the reserve price in
16  maximizing a single function.  So that's the
17  technical distinction that I'm trying to draw
18  here.
19          Now, if you want to use the word
20  "strategic" as a -- you know, maybe the way
21  that a noneconomist would use the word
22  "strategic," if a bidding -- you know, if
23  you're a publisher and you're thinking about
24  how should I set my reserve price, you likely

Page 243

1  have a strategy team thinking about what's the
2  best way to optimize my goals with my
3  different reserve prices, and there coming up
4  with your -- your strategy.  But the way I
5  would think about that is they're maximizing
6  some objective function for that seller MR.
7  RYBNICEK:
8      Q.  But even after UPR, publishers could
9  accomplish the goals you outline, are you --
10  are what price floors are used for, such as
11  signaling the quality of the advertisement; is
12  that fair?
13      A.  Not -- not as well.  I wouldn't agree
14  with that statement.
15      Q.  Well, I mean, they could still set
16  high floors, right?
17      A.  You're required to do that across all
18  exchanges.
19          So in the record, what we have, as I
20  talk about in my report, is consistent
21  evidence that Google is requiring the floors
22  to be uniform to explicitly take AdX floors
23  and make them lower, because historically, in
24  many instances, the AdX floors were very high.

Page 244

1  And so Google is trying to eliminate that high
2  AdX floor by imposing that floors have to be
3  the same across different sources of demand.
4  So it's overriding publisher choice on how
5  they want to set inventory.
6          It's -- for instance, if different
7  sources of demand have different attributes,
8  we're concerned about sources of demand
9  because we are "The New York Times," and we
10  don't want to have advertisements of, you
11  know, fake Rolex watches being shown to "New
12  York Times" subscribers.  I have the -- I
13  don't have the ability to use my reserve price
14  to distinguish against sources of demand that
15  may be lower quality if I'm required to
16  impose -- it's the same across all sources.
17      Q.  But you can choose just not to
18  interoperate with that demand source, right?
19      A.  That would be an extreme version of
20  that.
21          So you could think of that as I set my
22  reserve to infinity.  So UPR, you could
23  imagine as reserve prices are the same for all
24  sources of demand except for places where it's

Page 245

1  infinity.  Okay.  The previous regime, which
2  allowed for publisher choice, is allowing much
3  more flexibility than those two possible
4  outcomes and is, therefore, getting in the way
5  of publishers realizing their goals.
6      Q.  So if a publisher doesn't want
7  offensive ads, in what scenario would they
8  want it at a high reserve price?
9          For example, if a publisher doesn't
10  want political propaGansda, is your point
11  that, well, maybe they'll take it at a certain
12  price?
13      A.  My point is publisher should have the
14  opportunity to make that decision for
15  themselves and weigh the benefits of having
16  negative political ads on their website
17  relative to the, you know, costs of that on
18  viewers and their reputation and their own
19  interests as a publisher.
20          And if the ad tech tools for
21  publishers are truly reflecting the interest
22  of publishers and are not trying to steer
23  demand to AdX and unwind the high AdX floors,
24  as Google documents describe, I see no reason

62 (Pages 242 - 245)

Page 246

1　to take away that choice for publishers.
2　　　　　MR. RYBNICEK:  I think it's a
3　good place for a break.
4　　　　　THE VIDEOGRAPHER:  The time is
5　3:39.  We're off the record.
6
7　　　　(Recess taken from 3:39 p.m.
8　　　　to 3:52 p.m.)
9
10　　　　　THE VIDEOGRAPHER:  We are back
11　on the record.  The time is 3:52.
12　BY MR. RYBNICEK:
13　　Q.  I want to turn to transparency.
14　　　　Transparency is a market design
15　principle that you implemented as part of your
16　analysis; is that right?
17　　A.  That's correct, yes.
18　　Q.  And can you explain how transparency
19　applies in the context of market design?
20　　A.  Let me start by looking at the precise
21　definition of "transparency" in my report.
22　　　　(Witness reviews document.)
23　　　　So I talk about transparency in
24　Paragraph 40, where I say "Markets become safe

Page 247

1　when participants have transparency about
2　their rules of the market."  And by that, I
3　mean participants understand how the market
4　clears, you know, how demand is matched to
5　supply.  So in the market design toolbox, we
6　emphasize transparency.  Let me give you an
7　example from my own research.
8　　　　When I was involved in setting up the
9　West Point cadet branch assignment system, the
10　reason I was asked to be involved as part of a
11　team was the prior system did not encourage
12　participants to behave honestly.  So when you
13　were asked to rank branches, like combat arms,
14　you were not allowed to express whether you
15　like combat arms with the extended service
16　commitment or with the short-run commitment.
17　　　　The participants, the OEMA office, the
18　Office of Economic and Manpower Analysis at
19　West Point, had not interacted with market
20　design scholars at that time, and they came up
21　with their own protocol.
22　　　　So many of the participants in that
23　system were unclear how to participate, what
24　would be the right strategy, especially in the

Page 248

1　situation where my first choice is combat arms
2　for three years, my second choice is cyber for
3　three years, and my third choice is combat
4　arms for five years.  So what's important
5　about that example is it's not like combat
6　arms dominates everything else, so I will do
7　it for three years, but then if I can't get it
8　for three, I'll do it for five.  There has to
9　be something in between.
10　　　　So if you look at the "Army Times" --
11　that's the newspaper that the Army puts.  They
12　have a website as well -- there is quotes from
13　cadets saying, How do they expect us to behave
14　in such a system where it's not in our
15　interest to reveal our information honestly?
16　They haven't described the rules of the
17　process.  Moreover, we are cadets who might be
18　in combat situations, and we have to trust
19　each other, and here is a system where they
20　are encouraging us to try to sabotage each
21　other in the ROTC system.
22　　　　Actually, the amazing thing about that
23　system before I got involved is they had some
24　concerns about diversity of the ROTC course

Page 249

1　and their job placement.  And they had a
2　set-aside for positions for cadets whose
3　scores were in the bottom half of the
4　distribution, and because the design was
5　poorly constructed, cadets had the opportunity
6　to purposely degrade their score so as to get
7　a better match, what they call tanking.  So if
8　you go online, on the web, you can see endless
9　discussion about tanking, and maybe I should
10　purposefully fail the exam because it's going
11　to allow me to get one of these slots that are
12　reserved for low-performing students.
13　　　　What's very difficult about that is to
14　be able to react to situations where you
15　really need to understand the market rules,
16　you have to form an assessment about what the
17　other cadets are going to do.  Or in our
18　example here, in the auctions, if you're
19　bidding against other advertisers, you have to
20　think very carefully about what are the other
21　bidders going to do, and you want to have the
22　most amount of information to be able to
23　figure out what your optimal strategy is.
24　　　　So what the military now does in

63 (Pages 246 - 249)

Page 250

1    furtherance of transparency is they have a
2    series of videos describing exactly how the
3    mechanism works for cadets.  They even do a
4    simulation for cadets, actually more than one
5    simulation.  In your senior year at West
6    Point, you go through a hypothetical
7    simulation of a cadet branch match-assignment
8    process to make sure people understand the
9    rules of the market, so they do that together
10   with informational videos.
11        And then finally, at the conclusion of
12   the process, they report information that
13   allows participants to verify that the rules
14   were implemented as advertised.  So what they
15   do there and what many transparent market
16   clearinghouses do is provide some summary
17   information that does not violate the privacy
18   of the participants but amounts to things like
19   cutoffs.
20        What did you need to get assigned
21   combat arms?  You needed to have an order of
22   merit list score, say, of 85th percentile.  So
23   as a participant, you can verify ex post.  The
24   reason I didn't get into combat arms is my

Page 251

1    score was less than 85.  And so that's, you
2    know, the example from the military project
3    that I've been involved in.
4         But the same kind of ideas, I think,
5    apply to the issues in this -- in the markets
6    that we're analyzing here.
7         So how do I apply transparency, the
8    market design principle of transparency here?
9    What I would like to see is the bidders have
10   full knowledge of what the auction rules are.
11   Is it a true second-price auction, or is it a
12   30-second price auction?  We have full
13   auditability.  Can I verify ex post why was it
14   that I did not win this impression?  Do I have
15   enough data that's provided to me to figure
16   that out?
17   BY MR. RYBNICEK:
18        Q.  Thank you for that overview.
19        I think you said something along the
20   lines of what I would like to see, and then
21   explained what you would like to see in the ad
22   tech market.  Is what you would like to see
23   the benchmark for, what is competitive?
24        A.  Well, you know, as we talked about,

Page 252

1    when we approach these issues from the market
2    design lens, we have different objectives.  So
3    transparency of an economic system is valuable
4    in and of itself in, my view, so that would be
5    an objective as well.  But transparency is
6    also valuable because it furthers the
7    possibility that market participants are going
8    to be able to understand and best respond to
9    the rules.
10        So back to our definition of what is a
11   competitive market, there's goal-seeking
12   agents on both sides of the market who are
13   able to optimize their objectives, and, you
14   know, the price is what's going to clear that
15   market.  So when you have opaque information
16   about how the market actually clears, it gets
17   very difficult to optimize with respect to
18   those objectives and lead to competitive
19   outcomes.
20        Q.  But is it necessarily the case that a
21   market where there is not maximum
22   transparency, the market is -- lacks
23   competition?
24        MR. CHANG:  Objection.  Form.

Page 253

1    A.  The answer to that question depends on
2    what the definition of "maximum transparency"
3    is.  So as I described in the example of the
4    West Point job assignment, they don't reveal
5    afterwards, after the process is completed,
6    what every cadet's score is.  That's
7    considered private information.
8         If I'm a cadet at West Point, I don't
9    necessarily want to have my friend know what
10   my score was on the physical tasks, how many
11   pull-ups I could do or how many pounds I can
12   bench press.  But what they do reveal is
13   information that's sufficient to verify that
14   the allocation was computed as advertised.  So
15   I think that's very important, to get to
16   efficient outcomes, that you have sufficient
17   information to verify that the protocol, the
18   market-clearing mechanism was implemented as
19   intended.
20   BY MR. RYBNICEK:
21        Q.  But that doesn't require every bid
22   optimization to be disclosed; is that fair?
23        MR. CHANG:  Objection.  Form.
24        A.  Bid optimizations that are taking

64 (Pages 250 - 253)

Page 254

1  place interfere with choices that bidders make
2  in an auction.  So if it turns out that I bid
3  a certain amount into an auction and my value
4  for the item is, let's say, ten and it turns
5  out that I did not win that auction and
6  someone else won that auction who has a lower
7  value than me but was able to win that auction
8  because of a so-called bid optimization --
9  maybe the system inflated their bid to allow
10  them to win -- then I would be very confused
11  about how the auction is working, and I would
12  have concerns that the rules are not as
13  advertised, and it would be very challenging
14  for me to figure out what is my optimal
15  response in such a system.
16  BY MR. RYBNICEK:
17      Q.  Are there some bid optimizations that
18  don't need to be disclosed?
19      A.  In an ideal market design, if there is
20  a bid optimization that is done by an
21  advertiser buying tool, I think it's best if
22  the participants in the advertiser buy side of
23  the market have the opportunity to evaluate
24  whether or not they are actually partaking in

Page 255

1  the bid optimization program and make that
2  choice for themselves.
3      So bid optimization, if it truly is
4  changing the bids that the agent submits into
5  the system, should be disclosed to
6  participants, the workings of how that is
7  taking place.  So, you know, the -- we want to
8  make sure that the agents in the economic
9  system have adequate information to figure out
10  whether they like the optimization or not,
11  whether it's helping them achieve their goals
12  or not, whether it truly is an improvement for
13  them or not.
14      Q.  And advertisers can't do that based on
15  an assessment of whether they're satisfied
16  with the return on investment or not?
17      A.  I don't believe they can do that
18  because the mapping between the decisions they
19  make and what return they get on their
20  investment is compromised by optimizations or
21  other conducts, let's call them, that are
22  layered on top of each other in a way that
23  makes it intransparent for them to figure out
24  what's my best course of action in this

Page 256

1  particular auction.  Should I shade my bid
2  by 50 percent or by 20 percent?
3      If Google is putting Bernanke and
4  inflating and deflating bids at the same time
5  it's adjusting the take rate, at the same time
6  it's throttling, you know, it's periodically
7  making it harder for folks to detect that is
8  occurring, it's not disclosing to bidders that
9  we're doing Bernanke, it's very challenging
10  for a bidder, even if they are able to do
11  controlled experiments, to be able to
12  attribute their performance and display
13  advertising, in purchasing of advertising to
14  the choices that they make because some of
15  those choices are a consequence of things that
16  they're completely unaware of.
17      Q.  But they can evaluate their
18  performance through Google Ads versus other
19  buying tools, correct?
20      A.  They -- you know, I think we've talked
21  about this.  You know, as a matter of
22  arithmetic, you can figure out this is what I
23  was charged.  These are the slots that I got.
24  But what you don't know is why.  Why was I

Page 257

1  assigned this slot?  Why was I charged this
2  amount?  Was there a debt?  Was there a
3  Bernanke pool here?  How do I best respond to
4  that?  How do I figure out what's in my
5  interest as a bidder?  The buy-side tool is
6  supposedly helping me, as a buyer, purchase
7  advertising.  Transparency in those rules and
8  these optimizations furthers the interests of
9  the buyers.
10      Q.  But if an advertiser doesn't like the
11  return on investment its receiving from Google
12  Ads, it could switch to an alternative buying
13  tool where it may perceive it has a higher
14  return on investment; is that fair?
15      A.  They would have that choice to switch,
16  but it's a bit of what I call a Hobson's
17  choice because Google is so dominant that it's
18  not really a true choice for them because they
19  would be sacrificing a lot.
20      Now, of course, the advertiser can
21  judge that trade-off, whether it's worth it or
22  not.  But ideally, they would be able to
23  understand why is it that they got the
24  inventory that they got rather than just, you

65 (Pages 254 - 257)

Page 258

1  know, an abstract here is the number of people
2  who clicked on your ad, or here's how much
3  we're charging.  And when you're designing a
4  market, you know, to make sure people have
5  faith in the institution that you set up, you
6  want to ensure that people have an
7  understanding or the ability to understand
8  what -- you know, is what's dictating the
9  terms of trade.
10   Q.   To the extent an advertiser is not
11  receiving a satisfactory return on investments
12  through Google Ads and determines it can get a
13  higher return on investments through another
14  buying tool, what is preventing it from
15  switching?
16   A.   In that world, if it's a simple
17  comparison of, in Google, I'm getting a
18  hundred bucks, and the other tool, I'm getting
19  200 bucks, then they are able to switch and
20  make that decision.
21   Q.   Is it possible to be too
22  transparent?
23   A.   At this level of abstraction
24  certainly, it's possible that there can be too

Page 259

1  much transparency.
2       So if we go back to my example of the
3  West Point cadet branch assignment process,
4  one potential concern is the information
5  that's revealed during that process will be
6  used for reasons other than that process.  So
7  if it becomes common knowledge, if everyone in
8  the system knows what your order of merit list
9  is, what your score is -- if I know that
10  you're not actually that strong -- maybe
11  you're really good in history -- but the
12  reason why your OML score is high is not
13  because you can't do many push-ups, that could
14  affect what happens to you outside of the
15  initial allocation.
16       So you could get sent to combat arms
17  because your overall OML score is high, but
18  then you end up going to combat arms, and
19  everyone would see, ah, this guy is actually a
20  wimp, and that would affect the quality of
21  your assignment.  So for that reason, they
22  don't reveal that private information to
23  market participants.
24       They reveal just enough -- you know,

Page 260

1  with all of their decision aids and videos
2  about how the process works, they reveal
3  enough to make sure people have trust in the
4  process and can verify that what they got is
5  according to the market-clearing rules.
6       But, you know, some information -- to
7  your question, is it too transparent, they
8  don't reveal everyone's OML score in the
9  system.
10       I can give you another example too.
11  It's a very topical example.
12       Right now in New York City, when you
13  apply to high school, there is a concern that
14  parents have that they want to know their
15  lottery number.  Okay?  So the reason why this
16  came about is that, when you set up your
17  account to rank schools in New York City, your
18  account is associated with a hash code.  Okay?
19  And a parent, who happens to be a computer
20  science professor at Rutgers, figured out that
21  that hash code is a mapping to your lottery
22  number.
23       Okay?  So just one person figured this
24  out, and they then broadcast a message to all

Page 261

1  the participants saying, Hey, by the way, this
2  hash code is related to your lottery number,
3  so you should -- therefore, if you got a bad
4  lottery number, here's how you dehash that
5  hash code.  You should cancel your application
6  and create a new profile and reapply.  You'll
7  get a new draw from the lottery number.  And
8  so that would be a situation where maybe you
9  don't want to give parents the hash code.
10       New York City did not go in that
11  direction actually.  What they're doing this
12  fall -- it's just about to start -- is they
13  are giving families their actual, true lottery
14  number, and they're educating the families
15  that knowing your lottery number should not
16  influence what schools you apply to because
17  the New York City high school assignment
18  system is a strategy-proof system.  So it
19  doesn't matter what anyone else is ranking,
20  you can do no better than ranking your schools
21  honestly.
22       So there are ways to manage
23  transparency, but I've given you some examples
24  where going to full transparency, even getting

66 (Pages 258 - 261)

Page 262

1  your exact lottery number can be good, or
2  maybe you don't want to have the transparency
3  of your scores because they're going to use
4  that to give you a bad assignment later or
5  something that's unrelated to the assignment.
6      Q.  Is it fair to say it's a fact-specific
7  exercise?
8      A.  Yes.  Yes.
9      Q.  Okay.  And we talked at the very
10  beginning how you're relying on Professor Gans
11  for market definition, right?
12      A.  That's correct.
13      Q.  And he defines that Google Ads is in a
14  small advertiser buying tool market; is that
15  right?
16      A.  That's correct.
17      Q.  And does he characterize advertisers
18  using small advertiser buying tools as less
19  sophisticated and needing less or limited
20  functionality?
21      A.  In his report, I think he talks about
22  minimum spend requirements that apply to large
23  advertiser buying tools.  So advertisers who
24  don't have as much ability to spend, if that's

Page 263

1  what you mean by unsophisticated, would not
2  necessarily meet those thresholds and would be
3  consumers in the buying tool market for small
4  advertisers.
5      Q.  What I was asking you was slightly
6  different, which is, is it fair to say that
7  Professor Gans -- that an attribute of a small
8  advertiser buying tool market, in which Google
9  Ads participates, according to Professor Gans,
10  there's less functionality in the buying
11  tool?
12      A.  That would be fair, yes.
13      Q.  So these advertisers are less
14  interested in the bells and whistles, for lack
15  of a better phrase?
16      A.  I don't know if I would say they're
17  less interested.  They're less able to pay for
18  those bells and whistles.  For instance, they
19  can't meet the minimum spend threshold.
20      But I think many of those advertisers
21  wish they had some of the additional
22  functionality.  They just don't have the
23  budget to get there.
24      Q.  It's your opinion that the advertisers

Page 264

1  that use small advertising buying tools in
2  Professor Gans' candidate market don't have
3  the budget to afford a large advertiser buying
4  tool?
5      A.  It's a decision --
6          MR. CHANG:  Objection.  Form.
7          THE WITNESS:  Sorry.
8      A.  The decision to use, you know, a small
9  advertiser buying tool or a large advertiser
10  buying tool depends on many factors.  One of
11  those factors is whether you think you will
12  hit the minimum spend requirement.  And to hit
13  the minimum spend requirement, an advertiser
14  would need to have a certain number of ads
15  that they're purchasing.  And so an advertiser
16  that has a smaller budget -- for whatever
17  reason, that's a choice that the firm is
18  making -- would not meet the minimum spend
19  requirement and, therefore, be more likely to
20  use a tool for small advertisers.
21  BY MR. RYBNICEK:
22      Q.  But you agree that small advertiser
23  buying tools have less functionality?
24      A.  Yes, I agree with that.  Yes.

Page 265

1      Q.  Okay.  But despite the desire for more
2  limited functionality, it's your opinion that
3  they want to have information about all bid
4  optimizations that buying tools implement?
5          MR. CHANG:  Objection.  Form.
6      A.  I think in a market where the buying
7  tools are representing the interests of
8  buyers, there are buyers who would like to
9  know what's happening to their bids when
10  they're making decisions about how much money
11  to allocate to various campaigns.
12  BY MR. RYBNICEK:
13      Q.  Are advertisers using small advertiser
14  buying tools more or less sophisticated than
15  advertisers using large advertiser buying
16  tools?
17          MR. CHANG:  Objection.  Form.
18      A.  It's hard to say a blanket conclusion
19  there.
20      I mean, one example, I have a
21  colleague who uses Google Ads to sell his
22  textbook.  He's a brilliant mind.  He's so
23  brilliant that he writes math -- competition
24  math textbooks based on notes that he prepared

67 (Pages 262 - 265)

Page 266

1  for his daughter.
2      And if you talk to him about auction
3  theory, he knows a lot of information about
4  auction theory, but he doesn't have the skill
5  to bid -- for his books, it's -- if you want
6  to find it, it's called "Hard Math for Middle
7  School." You can by it on Amazon and other
8  sites -- to meet the minimum spend threshold.
9  But I think he's a very sophisticated agent.
10  BY MR. RYBNICEK:
11      Q.  So I think one of the examples of the
12  work you've done in the past was related to
13  the Boston school choice mechanism project.
14      Is that a fair characterization?
15      A.  Yes, that's a fine characterization.
16  Yeah.
17      Q.  Can you -- when did that project take
18  place?
19      A.  I started working with Boston Public
20  Schools dating in 2003.
21      Q.  And can you tell me more about what
22  that project entailed?
23      A.  Sure.
24      Boston Public Schools is a city that

Page 267

1  had for years forced bussing, so the courts
2  ruled that the school district was de facto
3  segregated.  In fact, it's the 50th
4  anniversary of that decision this year, 1974.
5      So they set up a system where they
6  took children from different neighborhoods,
7  and they mandated that they attended schools
8  across town.  Roughly speaking, minority
9  children from Roxbury were bussed into
10  Southie, which was mostly Irish and Italian
11  neighborhoods, and vice versa.  Those families
12  were busted into Roxbury.
13      That system evolved into the 1980s and
14  '90s to take forced bussing and make it
15  voluntary.  So they had set up the
16  infrastructure to bus children throughout the
17  city, and in doing so, they said, Instead of
18  eliminating this system, why don't we offer
19  families the choice of whether they'd like to
20  go to school in different neighborhoods?  So
21  that happened starting in 1989, after the
22  court decree was vacated.
23      And they came up with an allocation
24  system that the literature calls the Boston

Page 268

1  mechanism, so this is when my involvement
2  begins.
3      In the Boston mechanism, it's an
4  example of a system that's not strategy proof.
5  So if I'm submitting my ranking over schools
6  and there's a school that is really popular --
7  so an example in Boston is the Timilty Middle
8  School.  A lot of families want to go there --
9  is it in my interest to rank the Timilty
10  Middle School as my first choice, or should I
11  choose a safe second choice?
12      And the way the algorithm that the
13  city used at the time worked was it was not
14  necessarily in your interest to behave
15  honestly, so it was not a strategy-proof
16  system.
17      So this was pointed out by some other
18  researchers, and my coauthors actually, Tayfun
19  Sonmez and Atilla --
20
21      (Stenographer clarification.)
22
23      THE WITNESS:  Oh, yeah, sorry.
24  These are hard names.  Tayfun, T-a-y-f-u-n,

Page 269

1  Sonmez, S-o-n-m-e-z.  And Atilla, last name
2  starts with an A.
3      A.  And they wrote an article pointing out
4  that this allocation system, which affects
5  tens of thousands of kids in the city of
6  Boston, does not encourage honest behavior.
7      So in 2003, the mayor and the
8  superintendent convened a commission,
9  primarily the superintendent, which brought
10  together economic experts, those two names
11  together, with Alvin Roth and myself, to
12  demonstrate the consequences of not having a
13  system with good incentives.
14      So we issued a report.  I testified in
15  school committee meetings.  And one of the
16  kind of lessons that this -- part of this
17  became my dissertation -- is that when you
18  have a system that does not encourage honest
19  play, a very significant effect of such a
20  system is that there are families who don't
21  understand those rules, and they get hurt by
22  the fact that they don't understand those
23  rules.
24      So unsophisticated families who didn't

68 (Pages 266 - 269)

Page 270

1  get the message you should not apply to the
2  Timilty School might have ranged the Timilty
3  School as their first choice, and as a result
4  of doing that, they lost out on their
5  opportunity to attend their second choice or
6  their third choice.  So in the data in Boston,
7  what we saw is something like 20 percent of
8  elementary school applicants didn't get the
9  memo.  They ranked a school that was quite
10  sought after and ended up unassigned.
11      So my work involved, starting in 2003,
12  advising the district on a strategy-proof
13  alternative that the city eventually adopted
14  in 2005.
15      Q.  And so you would say that the Boston
16  school choice mechanism was not efficient; is
17  that fair?
18      A.  So in that specific context, we have
19  to be very careful about the definition of
20  "efficiency."
21      So if I use the conventional
22  definition from economics of Pareto
23  efficiency, the old system, I would say, was
24  not Pareto efficient.  That is, you could find

Page 271

1  situations where there are two applicants who
2  had gotten assigned their second choices, so I
3  got my second choice, and maybe you got your
4  second choice, and I would rather have your
5  school as my first choice, and you would
6  rather have my school as my -- my first
7  choice.  Those inefficiencies were the result
8  of the fact that the system is not strategy
9  proof.
10      If you had judged whether we could
11  find these mutually beneficial matches from
12  the perspective of the rankings that the
13  participants sent into the system, you would
14  say there are no examples of mutually
15  beneficial trades.
16      So long story short, whether we judged
17  the system as efficient or not requires us to
18  take a view on how is someone going to
19  participate in a system that's not strategy
20  proof?
21      And so if we have some unsophisticated
22  players -- this is the topic of my 2008
23  paper -- in the Boston mechanism, you're going
24  to end up with outcomes that are inefficient.

Page 272

1      Q.  Okay.  I think the conclusion there at
2  the end was that it was not efficient -- or,
3  sorry -- there were inefficiencies associated
4  with the Boston school choice mechanism prior
5  to your involvement?
6      A.  Yeah, that's correct.  Yes, yes, yeah.
7  I just wanted to be very precise about the
8  definition of "efficiency," yes.
9      Q.  Which is why you got involved, right?
10      A.  Well, I was mostly concerned about the
11  incentive issue with the Boston mechanism that
12  I think is one of the dominant considerations
13  in school assignment problems, that when you
14  have a system, like Boston's old system, and
15  you are a participant in the system, if it's
16  not a strategy-proof system, how do I rank
17  schools?
18      So that was a giGanstic issue in the
19  city of Boston because there were some family
20  members who formed parent groups to talk about
21  strategic heuristics.  One group was called
22  the West Zone Parents Group.  They're a Google
23  group that had all of their, you know,
24  heuristics posted online, and that group was

Page 273

1  incredibly sophisticated in how they responded
2  to the system.  But the -- my impression is
3  the vast majority of parents were not members
4  of this West Zone Parents Group.
5      They were concerned that there's this
6  inequity because there's the folks who really
7  understand the rules, and there is folks who
8  don't.  And the folks who understand the rules
9  are able to get, you know, what we would say
10  are strategic errants from the knowledge of
11  the rules.  So that was a concern alongside
12  the efficiency concern.
13      Q.  But it wasn't inefficient because of
14  lack of transparency, right?
15      A.  Well, you had a system that was not
16  strategy proof.  So when you have a system
17  that's not strategy proof, what you need to do
18  is come up with a way to advise participants
19  how they should interact in the system.
20      What the city did not do at that time
21  is provide any information about supply/demand
22  patterns at schools.  Had they advertised to
23  members of the community that the Timilty
24  Middle School, the school I mentioned a second

69 (Pages 270 - 273)

Page 274

1　ago, which is very popular, is incredibly
2　oversubscribed -- so there's 100 slots and a
3　thousand applicants -- then family members
4　would be able to weigh the calculation. Maybe
5　I shouldn't waste my first choice on the
6　Timilty Middle School and choose another
7　school as my first choice.
8　　　　That's one dimension of the system
9　that was not very transparent, you know, how
10　do you participate.
11　　　　Another example in that specific
12　system is the guidance that Boston Public
13　Schools' officials used to give participants
14　in the system. I remember this quote vividly
15　to this day because I found it so shocking.
16　　　　In the school brochure, the advice
17　given to participants was "For a better chance
18　of your 'first choice' school, consider
19　ranking less popular schools." So they are
20　actively encouraging participants to behave in
21　a strategic way to get one of their choices,
22　and that created a tremendous amount of
23　mistrust in the overall system.
24　　Q.　People understood how the allocation

Page 275

1　system worked, right? That was transparent?
2　　A.　The rules were transparent, yes.
3　　Q.　But yet it still led to an inefficient
4　result; is that fair?
5　　A.　That's fair, yes.
6　　Q.　And that wasn't due to any lack of
7　competition, right?
8　　A.　That's correct, yes.
9　　Q.　And so you helped fix the problem; is
10　that right?
11　　A.　Well, one reason I'm working on these
12　topics 20 years later is it's a pretty large
13　problem, so I'm not sure what you mean by
14　"fixed the problem."
15　　　　What I did do, what I did work on is
16　moving the system from Boston to a system that
17　is a strategy-proof system. So now you can
18　give advice to participants on how to behave
19　in the clearinghouse. You should rank your
20　schools honestly. And so for many years,
21　Boston gave that kind of information to
22　participants.
23　　Q.　And did the ranking system change?
24　　A.　If by "ranking system," you mean the

Page 276

1　algorithm that's used to rank choices, that's
2　what changed in 2005. That -- if by the
3　"ranking system," you mean the set of options
4　that people are allowed to rank, that's
5　changed several times since that time period,
6　and I've been involved in those reforms as
7　well.
8　　Q.　And in what way did it change? In
9　what way did the set of options they were
10　allowed to rank change?
11　　A.　So in the early days of the system,
12　back to 2003, the city was partitioned into
13　three different zones, an east zone, a west
14　zone, and a north zone. And applicants for
15　elementary school were only allowed to apply
16　to schools within their zone.
17　　　　Around 2006, they changed the system
18　such that if I happened to live on the
19　boundary of a zone -- let's say I lived right
20　in between the east and west zone, but I
21　happened to be in the east zone. They would
22　allow you to apply to schools that were within
23　a catchment area of your school that's in the
24　other zone. So if I'm in the east zone and

Page 277

1　I'm on the boundary of the east and west, I
2　could apply to the schools on the west zone.
3　　　　They changed the system yet again in a
4　very high profile way in 2012 to a system that
5　was designed by my graduate student at the
6　time -- his name was Pang Xi (phonetic) -- to
7　determine the set of options that you get to
8　apply to based on where you lived. So they
9　eliminated the concept of a zone, and they
10　changed the -- you can call it the choice
11　menu, the set of schools that you get to apply
12　to, to be based on a concept that's known in
13　the city of Boston today as the home-based
14　model.
15　　　　So what they do in the system -- and
16　this is a brain child of my Ph.D. student --
17　is they look at your address so -- in fact,
18　you can go online and do this pretty soon in
19　Boston.
20　　　　You are then given a customized menu
21　of choices in the city of schools that meet
22　certain criteria. So criteria include
23　proximity. They also include a concern for
24　equity. So every applicant in the city of

70 (Pages 274 - 277)

Page 278

1  Boston is allowed to apply to two schools that
2  the City has rated as Tier 1 as well as the
3  two closest schools that the City has rated
4  Tier 2. And they have other considerations
5  that determine the choice set.
6          The underlying algorithm, by the way,
7  that reform that took place in 2005 did not
8  change. This is just an input into the
9  algorithm. So I think that was the most
10 significant change in 2013, the elimination of
11 zones in these customized choice menus.
12     Q. Did the customized choice menus, did
13 the number of schools you could apply to or
14 bid for, I suppose --
15     A. Yes.
16     Q. -- change?
17     A. For elementary school in the old
18 system, depending on whether you were in the
19 east zone or the west zone or the north zone,
20 your typical applicant could apply to about 25
21 to 28 schools. In the new system, the City
22 changed the typical applicant's choice set
23 size to be on the order of, let's say, 12
24 to 15 schools. So for most applicants, the

Page 279

1  number of choices you could apply to
2  decreased.
3      Q. Decreased by roughly half?
4      A. Maybe a little bit less than half,
5  but...
6      Q. Yes. That seems like a bad outcome
7  for parents and families, right?
8      A. We have to judge this relative to the
9  goals of the system. So one of main goals of
10 the system at the time was to have the City
11 pay less for transportation costs.
12         So among large U.S. cities, Boston
13 spends more on per-pupil transportation than
14 any other city. So if I look at the top 100
15 school districts in the United States, Boston
16 spends $2,000-plus per pupil, which is the
17 most of any city. And if you look at the
18 discussion in "The Boston Globe," any Boston
19 resident is aware of challenges with buses
20 arriving on time, dropping kids back home on
21 time.
22         And so the edict that was given by the
23 mayor that led to that reform in 2012 was to
24 have children attend school closer to home so

Page 280

1  the City would have to spend less on
2  transportation costs. And one way the City
3  achieved that was by limiting the number of
4  choices that you could apply to.
5          So in a setting like this, you know,
6  we have competing objectives that we're
7  thinking about. We want to let families
8  exercise choice and do what's good for them.
9  At the same time, the system operator, because
10 this is a public sector resource, is balancing
11 the costs of offering families choice. And
12 here in Boston, it really stands out just how
13 much the City pays on transportation. So that
14 was kind of the mandate that was given by the
15 mayor at the time, Tom Menino, to reform the
16 choice system.
17         So I think of these as distributional
18 changes within an allocation algorithm. So
19 with a public sector resource like schools, we
20 care a lot about equitable distribution of
21 resources. And, you know, the history of
22 bussing in Boston casts a very long -- long
23 and tall shadow. So, you know, my role as the
24 market designer is to not quibble with that

Page 281

1  objective. It's still true that within the
2  system, given the choice sets that parents
3  have, it's very hard to find an instance where
4  we can make two families better off without
5  hurting any other family. Like we said a
6  second ago, it's not the case that you got
7  your second choice and I got my second choice
8  and I want your school as my first choice and
9  vice versa.
10         But if I were to think about a
11 counterfactual world where you could apply to
12 any school in the entire city, then by
13 restricting the set of choice options, you
14 have prevented children from maybe accessing
15 their dream school. But the City came to the
16 decision that they wanted to do that to be
17 able to save on the transportation costs.
18     Q. But families had -- were allowed to --
19 families had fewer choices, and all things
20 equal, we talked about how less choice is an
21 adverse market design feature; is that fair?
22     A. As a general principle, we want to
23 ensure that market participants have many
24 choices. In this specific instance and other

71 (Pages 278 - 281)

Page 282

1    market design instances, we have to weigh the
2    ability to express choices with other factors
3    that determine the performance of the market.
4        Q.  So your point is that you need to look
5    at these things holistically, and a reduction
6    in choice might be justified by other
7    considerations; is that fair?
8        A.  In the specific case of Boston,
9    reducing choice was, you know, the -- kind of
10   the assignment given to the design team, so it
11   was rationalized because of this desire to try
12   to reduce transportation costs in the system.
13   So as a general matter, you know, when we
14   think about designing market-clearing rules,
15   there often are competing objectives, and we
16   have to weigh those objectives.  I agree with
17   that.
18       Q.  We've talked about -- one of the
19   market design principles we've talked about --
20   and I think this is in the context of
21   fairness.  Some of these run together for me,
22   so apologies --
23       A.  Okay.
24       Q.  -- is level playing field, the idea of

Page 283

1    a level playing field.
2        A.  (Witness nodding.)
3        Q.  How does -- is it fair to consider the
4    notion of level playing field within the
5    market design principle of fairness?
6        A.   That's one dimension of fairness,
7    yes.
8            MR. RYBNICEK:  I'm going to
9    mark -- I think this is Exhibit 4.  It's a
10   health forum article titled "Weighted Lottery
11   to Equitably Allocate Scarce Supply of
12   COVID-19 Monoclonal Antibody."
13
14       (Exhibit No. 4 marked for
15   identification.)
16
17   BY MR. RYBNICEK:
18       Q.  Do you -- do you recognize this
19   document?
20       A.  I do, yes.
21       Q.  And you see that your name is amongst
22   the author field; is that right?
23       A.  Yes, I see my name there.
24       Q.  Do you need a minute to familiarize

Page 284

1    yourself, or are you okay?
2        A.  This is a relatively recent article.
3    Let me just review this specific one.
4            Okay.  Yes, great.  This is bringing
5    back memories.  Thank you.
6        Q.  This article describes -- or this
7    paper describes a weighted lottery process for
8    allocating COVID prophylaxis to high-risk
9    individuals, right?
10       A.  That's correct, yes.
11       Q.  And do you recall how that weighted
12   system worked?
13       A.  At a high level, I do, yes.
14       Q.  Can you explain it to me?
15       A.  Sure.  So this paper is describing a
16   partnership that three market designers,
17   myself, Tayfun Sonmez, and another market
18   designer, Utku Ünver, had with a team from the
19   University of Pittsburgh's medical center.
20   And the lead author -- the last author of this
21   article is a doctor named Douglas White, who
22   is a bioethicist and one of the leading
23   experts in the United States on the fair
24   allocation of scarce medical resources.

Page 285

1            And the article is referring to an
2    early period of the COVID-19 pandemic when we
3    did not have sufficient supply of one of the,
4    at the time, most promising treatments for
5    COVID.  They call it mAB or monoclonal
6    antibodies.  And Doug White's team was tasked
7    with figuring out how to distribute the
8    allocation of the units mAb.  I mean, the
9    specific medical names are here for the
10   University of Pittsburgh Medical Center, the
11   35-hospital system in Western Pennsylvania.
12           And what they were interested in is
13   having a system that prioritized a subset of
14   patients who came from disadvantaged areas,
15   and those disadvantaged areas were defined by
16   what's called an area deprivation index, and
17   so it turned out that this specific setting
18   was closely related to work that Sonmez and I
19   had done studying how to design an allocation
20   system for students who are applying to
21   selective high schools in the city of Chicago
22   once the city stopped using race as a factor
23   in admissions and used place instead to
24   determine your property rights to attend

72 (Pages 282 - 285)

Page 286

1  certain schools.
2      So what we did in this system is set
3  up a -- what Professor White used to like to
4  call weighted lottery or what we would call in
5  economics a reserve system, where a portion of
6  units are allocated via lottery where the
7  lottery is weighted in a way to achieve
8  distributional goals.
9      So the specific details on the
10  weighting are described in this paper, and
11  what this paper is specifically about is how
12  well did that system work in achieving the
13  goals?  So it builds on earlier work that we
14  had done with White to look at different ways
15  to accommodate equity considerations and the
16  allocation of scarce medical resources during
17  pandemics.
18      Q.  Thanks for that overview.
19      So is it fair to say that individuals
20  from the disadvantaged communities were
21  weighted in the lottery by being entered in
22  additional times?
23      A.  Now, let me try to remember.  If you'd
24  just give me one second.

Page 287

1      Q.  Sure.  Take your time.
2      A.  How the weighting took place.
3      (Witness reviews document.)
4      I think the way you described it is
5  equivalent to the way that this was actually
6  undertaken.
7      We could think of a lottery, which is
8  everyone has an equal probability of getting
9  assigned that one unit of the monoclonal
10  antibody, or what we could do instead is
11  weight the lottery such that if you're from a
12  region that has an ADI that is sufficiently
13  high -- I think it was 8, 9, and 10 -- then
14  the probability that you have of getting a
15  unit is going to be higher than folks who are
16  not from that area.
17      So that's what we would call a reserve
18  system.  Also, we have a portion of units set
19  aside that are reserved for a particular group
20  of participants in the allocation system, and
21  their prioritization, that is, their odds in
22  this case, because it's a lottery system,
23  differs because they're a member of this
24  reserve group.

Page 288

1      Q.  Got it.
2      And so did the program achieve its
3  goals?
4      A.  So there's many aspects of that
5  question of achieving its goals.  So --
6      Q.  I guess I can simplify it.
7      A.  Okay.
8      Q.  What's it say by "main outcomes"?
9      A.  Okay.  The main outcomes here, and let
10  me read this.  "Proportion of individuals from
11  disadvantaged neighborhoods and black
12  individuals who are allocated and received
13  tixagevimab" --
14
15      (Stenographer clarification.)
16
17      A.  Okay.  Let's just say were allocated
18  and received the monoclonal antibody.  That
19  was the main outcome.
20  BY MR. RYBNICEK:
21      Q.  And so did individuals with -- who
22  were weighted more heavily ultimately receive
23  the therapy at a higher rate?
24      A.  Let's look at results here.  So I'm

Page 289

1  reading from the results.  "A higher
2  proportion of individuals from disadvantaged
3  neighborhoods was allocated the drug in the
4  ADI, the area of deprivation, index-weighted
5  lottery compared with the unweighted lottery."
6      So that's one of the main outcomes
7  that's specified in the study.
8      "The proportion of black individuals
9  allocated the drug was greater in the weighted
10  lottery."
11      Q.  Was there anything anticompetitive
12  about this lottery?
13      MR. CHANG:  Objection.  Form.
14      A.  I don't even know how to process that
15  question.
16      So if I were to think about
17  anticompetitive conduct, this is a pandemic
18  scenario where there is a scarcity of a given
19  quantity.  And so the demand and supply here
20  involved the demand for the drug from
21  patients -- here, 10,834 individuals were
22  eligible for the drug -- and the supply.  The
23  supply was only 450 units.
24      So this is a setting where there's no

73 (Pages 286 - 289)

Page 290

1  price, so defining what is competitive here
2  without a price is a challenging notion.
3       What I can say, however, is that the
4  outcome here -- because if we model this --
5  this is what we've done in other papers -- is
6  one where people have preferences, where they
7  prefer getting the drug versus not getting the
8  drug.  Provided that we're not wasting any
9  units of these monoclonal antibody, there's no
10  way to make someone better off without making
11  someone worse off, so the outcome here would
12  be Pareto efficient.
13  BY MR. RYBNICEK:
14     Q.  And do you think this lottery system
15  was fair?
16            MR. CHANG:  Objection.  Form.
17     A.  My role in this particular problem was
18  implementing the goals of the stakeholder
19  community that Professor White convened.  So
20  this is really an example of the economist as
21  engineer, so I didn't take a position on the
22  objectives of the stakeholders.
23       But given their objectives -- so the
24  way they did this in Pittsburgh was they had a

Page 291

1  community engagement process where they had
2  different members of the community, including
3  doctors, including lawyers, including
4  religious personnel, weighing in on what is an
5  adequate way to allocate monoclonal antibody
6  from the perspective of health equity.
7       I'm not an expert on health equity,
8  but given their goals of trying to prioritize
9  certain disadvantaged neighborhoods, the task
10  then became, as the engineer -- as the
11  economic engineer, what is a way to implement
12  that objective using an allocation mechanism.
13  So when I am asked the question that you've
14  asked about, is this fair or not, I would
15  judge that with respect to the objectives.
16       And so in this system, it's a lottery
17  system.  So if we go back to the definition of
18  fairness as equal treatments of equals, we
19  have two different types of patients here.  We
20  have patients from, you know, high ADI areas
21  and patients from non-ADI areas.  It's a fair
22  lottery.
23       In fact, in this case, we even
24  provided computer code to the University of

Page 292

1  Pittsburgh Medical Center, so I'm certain that
2  the lottery was a fair lottery.  This
3  allocation mechanism satisfies the property
4  that if I'm from a low ADI area, a not
5  disadvantaged neighborhood area, then my
6  probability of getting assigned is the same as
7  another patient from a low ADI area.  So it
8  satisfies the equal treatment of equals
9  property.
10       Furthermore, the second type of
11  individual here is someone from a high ADI
12  area.  And we have two patients from high ADI
13  areas, because it's a fair lottery among that
14  group, we satisfy the equal treatment of
15  equals property.  They would -- they have the
16  same probability of getting assigned.
17       So using that as a definition of
18  fairness, which is what we have written about
19  in other papers, I would say this, given the
20  objective, was a fair procedure.
21  BY MR. RYBNICEK:
22     Q.  And so it was fair because -- in the
23  context of the objectives of those running the
24  lottery; is that fair?

Page 293

1            MR. CHANG:  Objection.  Form.
2     A.  It's fair because the stakeholders
3  came up with the objective, right, through
4  this community engagement process.  And then
5  I've given you a mathematical definition of
6  fairness in this context.  And the allocation
7  system that we designed, in collaboration with
8  Professor White and his team, satisfied that
9  property, this equal treatment of equals
10  property.
11  BY MR. RYBNICEK:
12     Q.  Okay.  So -- but fairness is judged
13  within the context of what the objectives of a
14  particular marketplace is; is that accurate?
15            MR. CHANG:  Objection.  Form.
16     A.  In this specific outcome, in this
17  specific scenario, the notion of fairness that
18  I've proposed to you is this equal treatment
19  of equals idea, this, you know, Aristotelian
20  idea that is relevant in this setting because
21  there's no price, right, so there are aspects
22  of what you're saying that could be right
23  because we've only partitioned the problem
24  into two types of patients, right?  There are

74 (Pages 290 - 293)

Page 294

1    patients from low-income neighborhoods and
2    patients from high-income neighborhoods. So
3    that is a constraint that was given to us as
4    the designer.
5         But once we have that constraint, the
6    definition of fairness is, you know, this
7    philosophical definition of what is truly
8    fair.
9    BY MR. RYBNICEK:
10       Q.   Yes. Okay. I guess -- I think I'm
11   just restating what you said earlier --
12       A.   Okay.
13       Q.   -- which is fairness is judged from
14   the perspective of the objective of a
15   particular program.
16        In this case, the objective of the
17   program was to deliver a scarce supply of
18   monoclonal antibodies at a higher rate to
19   disadvantaged communities.
20       A.   Yeah.
21       Q.   Is that fair?
22            MR. CHANG: Objection. Form.
23       A.   Could you restate the question? I
24   just --

Page 295

1    BY MR. RYBNICEK:
2        Q.   Sure.
3        A.   -- want to make sure I am
4    understanding what you're --
5        Q.   What I had --
6        A.   Okay.
7        Q.   What I had heard you say earlier is
8    that fairness is assessed in the context of
9    the objection -- objective of a particular
10   program --
11       A.   Yeah.
12       Q.   -- marketplace, lottery.
13        In this context, the objective was to
14   deliver therapies to a particular community at
15   a higher rate than other communities, and that
16   led you to conclude that it was fair; is that
17   accurate?
18       A.   I mean, there's some nuance to what
19   you've just said. I just want to be very
20   clear here.
21        So in this problem, we have many
22   outcomes that are efficient because the
23   preferences are I want the drug versus I don't
24   want the drug, right? So using efficiency as

Page 296

1    we would in technical economics, there are
2    many efficient outcomes.
3         Then we turn to fairness. So I have
4    fairness with respect to the way that the
5    stakeholders have defined the problem. I
6    wouldn't call that -- this is what I'm wanting
7    to emphasize. I wouldn't call that the
8    objective. I would say that's more of a
9    constraint.
10        So they said you can only condition
11   delivery of the drug on this one attribute of
12   the patients, where they live. Okay. Now,
13   for instance, they did not say you can
14   condition delivery of the drug on the race of
15   the patient. Okay? There's a debate about
16   whether that is, in fact, legal or
17   appropriate. Okay?
18        So given that constraint, I then
19   appealed to my definition of fairness, which
20   comes from Aristotle and others, and ask, with
21   respect to that constraint, is the allocation
22   mechanism producing a fair outcome?
23       Q.   Okay. Did the participants in this
24   lottery know that some individuals were

Page 297

1    weighted more heavily than others?
2        A.   In my understanding -- well, this
3    specific one in the paper that you sent me,
4    let me just see what we said about that.
5            (Witness reviews document.)
6         I don't remember in this specific
7    instance what the participants were informed
8    about the specific mechanism. The mechanism
9    rules were and prioritization was the result
10   of community engagement, and they were in line
11   with the rules that were discussed by the
12   Commonwealth of Pennsylvania, which had put
13   out public documents on its ethical allocation
14   goals. So that's what we talk about here in
15   this paper.
16        But, you know, this was in the kind of
17   peak of the COVID pandemic, where there was
18   extreme scarcity, so I don't remember, you
19   know, what was -- beyond what's written in
20   this paper about precisely what was relayed to
21   individuals.
22        I do remember one aspect, though, that
23   comes to mind right now, which is we had this
24   visual basic macro in Microsoft Excel that ran

75 (Pages 294 - 297)

Page 298

1  this lottery for the UPMC team that one of my
2  coauthors designed for them.  And what they
3  would do is they would calibrate the cutoff
4  number that you needed to be, so if the
5  patients were given random numbers, and that
6  information was given to the clinicians.
7       So if someone wanted to ask the
8  clinician, Why is it that I did not get the
9  monoclonal antibody? the clinician was
10  equipped to say, The reason you did not get
11  this drug is because your lottery number was
12  not above the lottery number that you would
13  need to get the drug.  So that was a specific
14  request that the team had at UPMC.
15       Q.  But would you agree that it would --
16  it would be deceptive not to tell lottery
17  participants that some were weighted more
18  heavily than others?
19       A.  As a matter of economics, the word
20  "deceptive," I think it's the task of the
21  market designer to tell participants what the
22  allocation scheme is.  So --
23       Q.  So sometimes it's fine not to tell
24  market participants?

Page 299

1       A.  No, no, no.
2            MR. CHANG:  Objection.  Form.
3       A.  I'm sorry.  So maybe I
4  miscommunicated.
5            It's not fine to tell participants,
6  especially in this kind of situation, where at
7  the time -- you know, it's turned out that
8  monoclonal antibodies are not as effective as
9  we thought, by the way.  So this is back in
10  2002 -- 2022.  Many people thought that
11  monoclonal antibody -- antibody infusions
12  were -- you know, in other influenza pandemics
13  have been quite effective, so there was a lot
14  of hope with this particular treatment.
15            And if they are rationing it in a
16  life-or-death situation and the participants
17  who are being rationed are not informed about
18  the rules, I think that is not a good
19  allocation system.
20       Q.  Okay.  You can put that to the side.
21       A.  Okay.
22       Q.  Tab 13.
23            MR. RYBNICEK:  We'll mark this
24  "Wall Street Journal" article as Exhibit 5.

Page 300

1  It's captioned "Q and A, How an Economist
2  Unlocked Hidden Truths About School Choice."
3
4            (Exhibit No. 5 marked for
5  identification.)
6
7  BY MR. RYBNICEK:
8       Q.  I assume this is familiar to you; is
9  that correct?
10       A.  It's definitely been a while since
11  I've seen this, and I look much younger in
12  this picture.
13       Q.  That's the way time works.
14            If you need a minute, feel free to
15  familiarize yourself --
16       A.  Let me take that minute, yes.
17            (Witness reviews document.)
18            Okay.  Great.  I have had a chance to
19  read this.
20       Q.  Is having more choice ever a bad
21  thing?
22            MR. CHANG:  Objection to form.
23       A.  It depends on the context.
24  BY MR. RYBNICEK:

Page 301

1       Q.  But it may?
2       A.  It could be, yes.
3       Q.  On the -- you're already there, I
4  think.  On what's marked page 4, essentially
5  the second to the last page, at the bottom,
6  there's a question posed to you, "Do you think
7  giving people more choices in their education
8  or their children's education is always a good
9  thing?"
10            And your response is "One of the
11  narratives of school choice reform, going all
12  the way back to Milton Friedman, is giving
13  people choice is inherently good.  Now we are
14  starting to see a couple of pretty
15  high-profile scenarios, like the Louisiana
16  voucher system, where --
17
18            (Stenographer clarification.)
19
20  BY MR. RYBNICEK:
21       Q.  -- a couple of pretty high-profile
22  scenarios, like the Louisiana voucher system,
23  where giving people choice actually results in
24  people learning less.

76 (Pages 298 - 301)

Page 302

1    So it's -- I have just a simple
2 question, which is it depends on the context
3 whether more choice or less is beneficial,
4 correct?
5    A.   Yeah, I would agree with that
6 statement.  In this context, we're looking at
7 families expressing a choice to go to a
8 private school, and what we saw was parents
9 who chose to send their kid to a private
10 school ended up having the children do worse
11 on standardized tests, but, of course, those
12 family members may have been opting to go to
13 those private schools for reasons other than
14 standardized tests.
15    So an interesting feature of
16 Louisiana's private school voucher system is
17 that public funds were used to allow children
18 to attend religious schools.  So whether
19 choice is good or bad in this specific context
20 depends on what the objectives are of the
21 participants in the system.  And so what we
22 usually do in economics is we start with a
23 revealed preference idea that people with full
24 information will make choices that are in

Page 303

1 their interest.
2    So even reading this quote today, I
3 think is sufficiently nuanced.  I say here,
4 "We are starting to see a couple of high
5 scenarios where people actually learn less."
6 I'm not saying it's bad for them.  If I get to
7 send my kid to a religious school and I care a
8 lot about sending my kid to Catholic school,
9 you may tell me the performance of my kid on a
10 standardized test one year after attending the
11 school is not necessarily a bad thing, and, in
12 fact, that was the reaction we got from this
13 study.  The State of Louisiana continued to
14 run this program for several years.
15    Q.   Okay.  You can put that to the side.
16    A.   Okay.
17    Q.   How did you prepare for this
18 deposition?
19    A.   To prepare for this deposition, I
20 reread my report and reviewed material that I
21 cited in my report.
22    Q.   And did you meet with any individuals
23 to prepare?
24    A.   Yes.

Page 304

1    Q.   And who did you meet with?
2    A.   I met with counsel, and I met with the
3 team that assisted me in preparing this
4 report.
5    Q.   Anybody else?
6    A.   No.
7    Q.   And how many meetings approximately
8 did you have?
9    A.   My best guess is between five and ten.
10    Q.   And how long were each of those
11 meetings on average?
12    A.   Between 45 minutes to an hour and a
13 half roughly.
14    Q.   And you mentioned you met with your
15 team.  Who is your team?
16    A.   I was assisted by Keystone Consulting
17 in preparing this report.
18    Q.   And how many individuals at Keystone
19 assisted you approximately?
20    A.   A handful of individuals.  You know, I
21 don't know the exact number.
22    Q.   More than five?
23    A.   I think less than five.
24    Q.   When did you first learn about this

Page 305

1 case?
2    A.   Let me tell you exactly when I was
3 retained by looking at my report here.  I
4 think we have listed the dates precisely.  I
5 mean, I can't find it right now.  It's roughly
6 the end of 2021.
7    I'm sorry.  Here, I found it.  I was
8 retained in July of 2021.
9    Q.   And that's when you learned about the
10 case as well?
11    A.   I think I may have read about aspects
12 of this case in the news prior to that date.
13    Q.   Did you talk to anybody about the case
14 before being retained?
15    A.   No.
16    Q.   And when did you start working on your
17 report?
18    A.   Shortly after the date I was retained,
19 a couple of months after July 2021.
20    Q.   So is it fair to say you've been
21 working on your report for over three years?
22 Strike that.
23    Is it fair to say you worked on your
24 report for over three years?

77 (Pages 302 - 305)

Page 306

1    A.  Yeah, that's fair to say.
2    Q.  And how many hours would you
3  approximate that you worked on your report?
4    A.  I don't know exactly but approximately
5  somewhere around the order of maybe 400 hours,
6  3- to 400 hours.
7    Q.  Three to -- okay.
8    And was there any additional time that
9  you worked on this case that you're not
10  counting in the time that you worked on your
11  report?
12    A.  I think that's the total sum of time
13  I've spent studying the issues here.
14    Q.  Did you draft your report?
15    A.  Yes.
16    Q.  How did -- well, what's -- and what is
17  your compensation in this case?
18    A.  I am compensated at the rate of $1,200
19  an hour.
20    Q.  And did you receive any compensation
21  from the work that flowed to your team at
22  Keystone?
23    A.  I did not.
24    Q.  And do you know what your team was

Page 307

1  compensated?
2    A.  I do not know.
3    Q.  You don't know their margin?
4    A.  I don't.
5    Q.  Are you currently working -- we may
6  have covered this, but I'll ask just in case.
7  Are you currently working as an expert in any
8  other case?
9    MR. CHANG:  Objection.  I'm
10  going to instruct the witness not to answer
11  except for the cases where he has been
12  disclosed as a testifying expert.
13    A.  The list of cases where I have been
14  disclosed as a testifying expert are in my
15  report that we talked about, the Iowa case.
16  BY MR. RYBNICEK:
17    Q.  Great.  Did the attorneys assisting
18  you draft any portions of your report?
19    MR. CHANG:  Objection.  I'm
20  going to instruct the witness not to answer
21  per the expert stipulation.
22  BY MR. RYBNICEK:
23    Q.  Appendix B of your opening report
24  lists the materials you relied upon; is that

Page 308

1  right?
2    A.  Appendix B lists the materials that I
3  relied upon and the materials I considered.
4    Q.  Well you're getting ahead of me,
5  Professor.
6    A.  That's just the title.
7    Q.  What is the difference between the
8  materials you relied upon and the materials
9  you considered?
10    A.  The materials that I relied upon are
11  listed as materials that I relied upon in
12  forming my expert opinion.  So these are
13  things that are cited in my report, academic
14  works, public information, documents, and
15  depositions.
16    Q.  And the materials you considered are
17  ones that you reviewed but are not cited?  Is
18  that an accurate description?
19    A.  That is an accurate description.  So
20  these are materials that I had access to, and
21  I looked at many of these in forming my
22  opinion.
23    Q.  So just looking at the -- the
24  appendices aren't numbered.  But on the next

Page 309

1  page, after the heading "Materials
2  Considered," it says you considered all
3  available discovery responses produced within
4  the matter of State of Texas, et al. v.
5  Google, including the parties' initial
6  disclosures, discovery responses, and
7  objections to interrogatories, written
8  responses to plaintiffs' Rule 30(b)(6) notice.
9  You reviewed all of those?
10    A.  I ran queries through these documents,
11  the entire list here.
12    Q.  And you ran queries through these
13  documents.  Do you -- does that mean that you
14  didn't actually read word for word each of
15  these documents, but you searched them?
16    A.  Right.  I focused my attention on
17  parts of these documents that were most
18  relevant do my assignment.
19    Q.  So it's not the case that you reviewed
20  word for word each of the materials listed in
21  the materials considered; is that right?
22    A.  That's a fair description.
23    THE WITNESS:  Abe, can I ask --
24  I have to go to the restroom.  I can hold it

78 (Pages 306 - 309)

Page 310

1  for a couple of minutes, but if it's a natural
2  place to break --
3           MR. RYBNICEK: Let's go off the
4  record. We're going to take a -- can we go
5  off record?
6           MR. CHANG: Yes.
7           THE VIDEOGRAPHER: Time is 5:14.
8  We're off the record.
9
10      (Recess taken from 5:15 p.m.
11      to 5:37 p.m.)
12
13           THE VIDEOGRAPHER: We are back
14  on the record. The time is 5:37.
15           MR. RYBNICEK: Great.
16  Dr. Pathak, I have no further
17  questions. I appreciate your time.
18
19           CROSS-EXAMINATION
20  BY MR. CHANG:
21  Q.  Dr. Pathak, a few questions for you.
22      Do you recall the questions that
23  Google's counsel asked you today regarding
24  your opinions in your opening report?

Page 311

1  A.  Yes.
2  Q.  Was any of your testimony today
3  intended to change the opinions expressed in
4  your opening report?
5  A.  No.
6  Q.  Was any of your testimony today
7  intended to limit the opinions expressed in
8  your opening report?
9  A.  No.
10  Q.  Was any of your testimony today
11  intended to change the opinions expressed in
12  your rebuttal report?
13  A.  No.
14  Q.  Was any of your testimony today
15  intended to limit the opinions expressed in
16  your rebuttal report?
17  A.  No.
18  Q.  Did you have sufficient facts and data
19  to reach your opinions within your two reports
20  in this case?
21  A.  Yes.
22  Q.  Did you offer any new opinions in your
23  reports today?
24  A.  No.

Page 312

1  Q.  You're not offering any new opinions
2  as you sit here today, correct?
3  A.  That is correct.
4  Q.  You understand that today you
5  testified regarding liability?
6  A.  Yes.
7  Q.  Do you understand that the parties
8  will later depose you, if needed, to discuss
9  your remedies-related opinions in your opening
10  and rebuttal reports?
11  A.  Yes, I understand that.
12  Q.  Do you recall Google's counsel asking
13  you about your -- about conclusions and
14  whether you offered them as to Google's
15  alleged conduct?
16  A.  Yes.
17  Q.  Do you recall Google's counsel asking
18  you about whether Google's alleged conduct had
19  anticompetitive effects?
20  A.  Yes.
21  Q.  Do you come to independent conclusions
22  about whether Google's conduct had
23  independent -- had anticompetitive effects?
24  A.  Yes.

Page 313

1  Q.  Do you recall being asked by Google's
2  counsel about the COVID market design exercise
3  that you carried out in Boston?
4  A.  I believe it wasn't in Boston, but I
5  do remember the COVID market design questions.
6  Q.  Sorry. Which city was that?
7  A.  Pittsburgh.
8  Q.  Do you recall being asked by Google's
9  counsel about a COVID market design in
10  Pittsburgh?
11  A.  Yes, I do.
12  Q.  Were there special circumstances that
13  were present in that particular exercise that
14  are not present in the ad tech industry?
15           MR. RYBNICEK: Objection to
16  form.
17  A.  Yes, there were, like a global
18  pandemic.
19           MR. CHANG: Pass the witness.
20           MR. RYBNICEK: We have no
21  further questions.
22           THE VIDEOGRAPHER: The time is
23  5:41. We're off the record.
24           THE STENOGRAPHER: I've got standing

79 (Pages 310 - 313)

Page 314

1    orders for all parties.

2         MR. CHANG:  Yes.  We need a

3    rough as well.

4         MR. RYBNICEK:  Yes.  Thank you.

5

6

7         (Deposition concluded at 5:42 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 315

1              CERTIFICATION

2         I, DARLENE M. COPPOLA, a Notary Public, do hereby

3    certify that PARAG PATHAK, PH.D., after having

4    satisfactorily identifying himself, came before me on

5    the 14th day of October 2024, in Boston,

6    Massachusetts, and was by me duly sworn to testify to

7    the truth and nothing but the truth as to his

8    knowledge touching and concerning the matters in

9    controversy in this cause; that he was thereupon

10   examined upon his oath and said examination reduced to

11   writing by me; and that the statement is a true record

12   of the testimony given by the witness, to the best of

13   my knowledge and ability.

14        I further certify that I am not a relative or

15   employee of counsel/attorney for any of the parties,

16   nor a relative or employee of such parties, nor am I

17   financially interested in the outcome of the action.

18        WITNESS MY HAND THIS 14th day of October, 2024.

19

20

21   DARLENE M. COPPOLA          My commission expires:

22   NOTARY PUBLIC               November 2, 2029

23   REGISTERED MERIT REPORTER

24   CERTIFIED REALTIME REPORTER

---

Page 316

1         IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF TEXAS

3              SHERMAN DIVISION

4

5    ********************************

6    THE STATE OF TEXAS, et al.,

7              Plaintiffs

8    vs.          CA NO. 4:20-cv-00957-sdj

9    GOOGLE LLC,

10             Defendant

11   ********************************

12

13        I, PARAG PATHAK, PH.D., say that I have read

14   the foregoing deposition and hereby declare under

15   penalty of perjury the foregoing is true

16   and correct:  (as prepared)  (as corrected on errata.)

17        Executed this _____ day of _____,

18   2024, at _____, _____.

19

20

21        _____

22        PARAG PATHAK, PH.D.

23

24   Job No. CS6919048

---

Page 317

1              CORRECTION PAGE

2    DEPONENT:  PARAG PATHAK, PH.D.

3    DATE TAKEN: OCTOBER 14, 2024

4    CASE:      STATE OF TEXAS, ET AL. VS. GOOGLE LLC

5    **************************************************

6    PAGE / LINE / SHOULD READ

7    _____/_____/ _____

8    _____/_____/ _____

9    _____/_____/ _____

10   _____/_____/ _____

11   _____/_____/ _____

12   _____/_____/ _____

13   _____/_____/ _____

14   _____/_____/ _____

15   _____/_____/ _____

16   _____/_____/ _____

17   _____/_____/ _____

18   _____/_____/ _____

19   _____/_____/ _____

20   _____/_____/ _____

21   _____/_____/ _____

22   _____/_____/ _____

23   _____/_____/ _____

24   _____/_____/ _____

Job No. CS6919048

---

80 (Pages 314 - 317)

Page 318

1  Abraham Chang, Esq.
2  Abraham.chang@nortonrosefulbright.com
3          Octocber 15, 2024
4  RE:    State Of Texas Et Al v. Google LLC
5    10/14/2024, Parag Pathak (#6919048)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22          Yours,
23          Veritext Legal Solutions
24
25

Veritext Legal Solutions
800-567-8658                                                     973-410-4098