# EXHIBIT 40
# [FILED UNDER SEAL]

HIGHLY CONFIDENTIAL

Page 1

1                  UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF TEXAS

3                        SHERMAN DIVISION

4      ------------------------------------x

5      THE STATE OF TEXAS, et al.,

6                         Plaintiffs,      Case No.

7           vs.                            4:20-cv-00957-SDJ

8      GOOGLE, LLC,

9                         Defendant.

10     ------------------------------------x

11

12                    ** HIGHLY CONFIDENTIAL **

13         VIDEOTAPED DEPOSITION OF CYNTHIA RUDIN

14                    (Taken by Defendant)

15                   Durham, North Carolina

16                  Wednesday, October 9, 2024

17

18

19

20

21     Reported by Andrea L. Kingsley, RPR

22

23

24

25

HIGHLY CONFIDENTIAL

Page 2

1    A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFF STATE OF TEXAS:
4        Marc B. Collier, Esquire
         Talbot Hansum, Esquire
5        NORTON ROSE FULBRIGHT US LLP
         98 San Jacinto Boulevard
6        Suite 1100
         Austin, Texas 78701-4255
7        (512) 536-4549
         marc.collier@nortonrosefulbright.com
8        talbot.hansum@nortonrosefulbright.com
9            -and-
10       Erik Janitens, Esquire (Via Zoom)
         NORTON ROSE FULBRIGHT US LLP
11       1550 Lamar Street
         Suite 2000
12       Houston, Texas 77010
         (713) 651-3629
13       erik.janitens@nortonrosefulbright.com
14
15           -and-
16       Alex Abston, Esquire (Via Zoom)
         Zeke DeRose, III, Esquire (Via Zoom)
17       Melonie DeRose, Esquire (Via Zoom)
         THE LANIER LAW FIRM
18       10940 West Sam Houston Parkway North
         Suite 100
19       Houston, Texas 77064
         (713) 659-5200
20       alex.abston@lanierlawfirm.com
         zeke.derose@lanierlawfirm.com
21       melonie.derose@lanierlawfirm.com
22
23
24
25

Page 4

1        VIDEOTAPED DEPOSITION OF CYNTHIA
2    RUDIN, a witness called on behalf of the
3    Plaintiff pursuant to the Federal Rules of
4    Civil Procedure, before Andrea L. Kingsley,
5    Notary Public in and for the State of North
6    Carolina, at Veritext Legal Solutions, 811
7    Ninth Street, Suite 260, Durham, North
8    Carolina, on Wednesday, October 9, 2024,
9    commencing at 9:11 a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    A P P E A R A N C E S (Continued):
2
3    ON BEHALF OF DEFENDANT, GOOGLE, INC.:
4        James K. Hunsberger, Esquire
         Chandler R. Gordon, Esquire
5        Sandhya Taneja, Esquire
         Maryanne Magnier, Esquire (Via Zoom)
6        AXINN, VELTROP & HARKRIDER LLP
         1901 L Street NW
7        Washington, DC 20036
         (202) 469-3561
8        jhunsberger@axinn.com
         cgordon@axinn.com
9        staneja@axinn.com
         mmagnier@axinn.com
10
11           -and-
12       Russell M. Steinthal, Esquire
         Andrew Freeborn, Esquire (Via Zoom)
13       AXINN, VELTROP & HARKRIDER LLP
         114 West 47th Street
14       New York, New York 10036
         (212) 728-2207
15       rsteinthal@axinn.com
         afreeborn@axinn.com
16
17
18   ALSO PRESENT:
19
     WILLIAM SHIEBER, Assistant Attorney General
20   Office of the Attorney General of Texas (Via Zoom)
21   JONATHAN JAFFE, Founding Owner,
     Its-Your-Internet (Via Zoom)
22
     MATT WALTERS, Videographer
23
24
25

Page 5

1        INDEX OF EXAMINATIONS
2                                PAGE
3    By Mr. Hunsberger              7
4
5        INDEX OF EXHIBITS
6                                PAGE
7
     Rudin Exhibit 1, Expert Rebuttal Report    10
8    of Cynthia Rudin, 09-09-2024
9    Rudin Exhibit 2, Curriculum vitae          19
10   Rudin Exhibit 3, Bates                    142
     GOOG-AT-MDL-004555192
11
     Rudin Exhibit 4, Bates                    153
12   GOOG-AT-MDL-B-0024514119
13   Rudin Exhibit 5, E-mail chain, Bates      161
     GOOG-AT-MDL-B-002096117
14
     Exhibit 6, Opening Expert Report of       179
15   Jacob Hochstetler dated June 7, 2024
16   Rudin Exhibit 7, Bates                    209
     GOOG-DOJ-13470118
17
     Rudin Exhibit 8, Bates                    211
18   GOOG-AT-MDL-007375273
19   Rudin Exhibit 9, Expert Report of         223
     Professor Paul Milgrom dated July 30,
20   2024
21
22
23
24
25

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

P R O C E E D I N G S

1    THE VIDEOGRAPHER:  We are now on

2   record.  Today's date is October 9, 2024, and

3   the time 9:11 a.m.

4        This is the video deposition of

5   Cynthia Rudin.

6        Will counsel please introduce

7   yourselves, those in the room.

8        MR. HUNSBERGER:  James Hunsberger

9   from Axinn, Veltrop & Harkrider for Google.  I

10  have my colleagues Russell Steinthal, Sandya

11  Taneja and Chandler Gordon, also from Axinn,

12  Veltrop & Harkrider for Google.

13       MR. COLLIER:  You want in the room

14  first, then you will do Zoom?

15       In the room you have Mark

16  Collier and Talbot Hansum from Norton Rose

17  Fulbright.

18       Via Zoom from The Lanier Law Firm

19  we have Zeke DeRose, Alex Abston, and Jonathan

20  Jaffe.

21       MR. HUNSBERGER:  From Axinn,

22  Veltrop & Harkrider also for Google we have

23  Maryanne Magnier on Zoom.

24              ---

Page 7

1        CYNTHIA RUDIN, being duly sworn,

2    was examined and testified as follows:

3   EXAMINATION BY

4   MR. HUNSBERGER:

5    Q.  Professor Rudin, nice to meet you

6   earlier.

7        Can you please state your name for the

8   record.

9    A.  Cynthia Rudin.

10   Q.  Can you spell it for the court reporter,

11  please.

12   A.  C-Y-N-T-H-I-A, R-U-D-I-N.

13   Q.  You are aware that you are being deposed

14  in Texas, et al., v. Google, LLC, taking place in

15  federal court in the Eastern District of Texas;

16  correct?

17   A.  Yes.

18   Q.  When I say "this matter" or "this case"

19  today I will be referring to the State of Texas

20  v. Google matter in which you have submitted an

21  expert report and are being deposed today.

22       Do you understand that?

23   A.  Yes.

24   Q.  When I say "Texas" or "Attorneys

25  General" today, I will be referring to the State of

Page 8

1   Texas or Attorneys General that are bringing this

2   case on behalf of several plaintiff states in this

3   matter.

4        Do you understand that?

5    A.  Yes.

6    Q.  When I refer generally to the

7   "plaintiffs" today, I will be referring to the state

8   plaintiffs in this matter.

9        Do you understand that?

10   A.  Yes.

11   Q.  Do you understand that you are

12  testifying today under oath?

13   A.  Yes.

14   Q.  Do you understand that you are required

15  to tell the truth?

16   A.  Yes.

17   Q.  Is there anything that would prevent you

18  from giving truthful answers to my questions today?

19   A.  No.

20   Q.  You're not experiencing any unusual

21  stress or physical or mental condition?

22   A.  No.

23   Q.  And you're not on any medication or

24  under the influence of any substances; correct?

25   A.  Correct.

Page 9

1    Q.  The court reporter here will transcribe

2   everything we say and, as we discussed before we

3   went on the record, a lot of complex technical

4   subject matter that we will covering today, so it's

5   very important that we try to talk slowly.  It's

6   important that we wait for each other to finish

7   asking or answering a question before the other

8   begins talking.

9        Do you understand?

10   A.  Yes.

11   Q.  Because we have a court reporter here

12  transcribing what we say, it's important to give

13  oral responses to my questions, so please try to

14  avoid head nods or "uh-huhs."

15       Do you understand?

16   A.  Yes.

17   Q.  If you don't understand a question that

18  I ask, please feel free to ask me to rephrase it or

19  repeat the question.

20       Does that make sense?

21   A.  Yes.

22   Q.  If you answer my question, I'm going to

23  assume you understood it.

24       Does that make sense?

25   A.  Yes.

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1    Q.   If you need a break, please let me know
2    and I will try to find a good stopping point in my
3    questions.  I will just ask that you please answer
4    the question that is pending before we take a break.
5         Does that sound good?
6    A.   Yes.
7         MR. COLLIER:  Mr. Hunsberger,
8    before we go on, minor thing.  I may from time
9    to time have to stand.  I had spinal surgery,
10   and I have so stand.  But I will keep the
11   microphone on.  I'm not asking to stop.  But
12   if I stand, that's all that is the doctor;
13   I have to stand every hour.
14        MR. HUNSBERGER:  I understand,
15   Counselor.
16        MR. COLLIER:  Same to you.  If I
17   stand, it's not to do with you.  It's doctor's
18   orders.  Old-man back.
19   BY MR. HUNSBERGER:
20   Q.   Professor Rudin, I'm handing you what
21   has been marked for the record Rudin Exhibit 1.
22        (Rudin Exhibit 1, Expert Rebuttal
23        Report of Cynthia Rudin, 09-09-2024, marked
24        for identification, as of this date.)
25   BY MR. HUNSBERGER:

Page 11

1    Q.   This is a copy of the rebuttal report
2    you served in this matter on September 9, 2024;
3    correct?
4    A.   Correct.
5    Q.   Please keep this by you for reference
6    throughout our conversation today.  We will be
7    referring back to it a number of times.
8         This report represents your opinions in
9    this matter; correct?
10   A.   Correct.
11   Q.   You did not serve an errata for your
12   report; correct?
13   A.   Correct.
14   Q.   Sitting here today, is there anything in
15   your report that you do not believe is correct or
16   that you would not be willing to testify to under
17   oath?
18   A.   No.
19   Q.   You are not offering any opinions in
20   this case other than those described in your
21   rebuttal report; correct?
22   A.   Correct.
23   Q.   You are only offering rebuttal opinions
24   in this case; is that correct?
25   A.   Correct.

Page 12

1    Q.   You are offering rebuttal opinions only
2    in response to certain opinions from Google's
3    experts; namely, Professor Milgrom, Professor
4    Wiggins and Professor Ghose; correct?
5    A.   No.
6    Q.   Which other plaintiffs' experts are you
7    rebutting?
8    A.   So I'm responding to Milgrom, Wiggins,
9    Ghose and Baye.
10   Q.   Other than those four experts, you are
11   not offering any other rebuttal opinions; correct?
12   A.   My assignment was to rebut those
13   reports.
14   Q.   And you do not intend to offer any
15   affirmative opinions in this case; correct?
16        MR. COLLIER:  Objection.  Vague.
17   A.   What is an affirmative opinion?
18   Q.   In other words, you do not intend to
19   offer any opinions during plaintiffs' case-in-chief?
20   A.   I'm sorry.  I don't understand the
21   question.
22        MR. COLLIER:  Counsel, I might be
23   able to help you move along.  "Case-in-chief,"
24   that's a legal term.  I will stipulate she's
25   here as a rebuttal expert witness, if that

Page 13

1    helps you.
2    BY MR. HUNSBERGER:
3    Q.   My question is whether you're offering
4    any affirmative opinions as part of plaintiffs' main
5    case in this case matter.
6    A.   I'm sorry --
7         MR. COLLIER:  I will object to
8    form.
9    A.   I don't understand the terminology.
10        MR. HUNSBERGER:  Counsel, we'll
11   move on on the basis of your representation
12   she's only serving as a rebuttal witness in
13   this matter.
14        MR. COLLIER:  That is my
15   representation, Counsel.  Your phrase
16   "affirmative opinions," even I am confused as
17   to what you are trying to say.  She has
18   affirmative opinions.
19   BY MR. HUNSBERGER:
20   Q.   Are you offering any opinions in this
21   matter that are not responsive to one of the four
22   Google experts that we just discussed?
23        MR. COLLIER:  Objection to the
24   form.
25        Go ahead.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1    A.    My opinions are in this report.
2    Q.    And your opinions are limited only to
3  opinions that respond to Professors Milgrom, Ghose,
4  Baye and Wiggins; correct?
5          MR. COLLIER:  Objection to the
6      form.
7          You can answer.
8    A.    The opinions are in this report.
9    Q.    I'm asking you to confirm whether the
10 opinions you are providing are limited only to
11 opinions that respond to those four plaintiffs'
12 experts.
13         MR. COLLIER:  Objection to the
14     form.  Asked and answered.
15         Go ahead.
16   A.    The opinions in this report do respond
17 to those reports.  There may be things in here
18 that, you know, respond to various Google exhibits
19 or so on, but the opinions are in the report.
20   Q.    The only opinions that you are offering
21 in this case are those described in your report;
22 correct?
23   A.    Correct.
24   Q.    At a high level, you were asked to
25 evaluate certain opinions discussed in the expert

Page 15

1  reports submitted on behalf of Google; correct?
2    A.    Correct.
3    Q.    And your opinion is based on your
4  expertise in machine learning?
5          MR. COLLIER:  Objection to the
6      form.
7    A.    Machine learning, statistics, data
8  mining, yes.
9    Q.    You do not offer opinions in this matter
10 in any other expert capacity; correct?
11         MR. COLLIER:  Objection to the
12     form.
13   A.    Can you expand on that question?
14   Q.    You testified that you are offering
15 opinions as an expert in machine learning,
16 statistics and data mining; is that correct?
17   A.    That's correct.
18   Q.    Are you offering expert opinions in any
19 other discipline?
20   A.    I mean, my expertise covers a pretty
21 decent range of fields, so I don't want to limit
22 myself to, you know, just these things.  I'm very
23 good at optimization, for instance, and so on.  I
24 think my opinions cover my range of expertise.
25   Q.    You are not offering opinions in this

Page 16

1  matter as an economics expert; correct?
2    A.    Correct.
3    Q.    You are not offering opinions in this
4  matter as an expert in advertising technology;
5  correct?
6          MR. COLLIER:  Objection to the
7      form.
8    A.    I'm an expert in machine learning, which
9  is relevant to advertising technology.
10   Q.    It's relevant to advertising technology,
11 but you do not claim expertise in advertising
12 technology; correct?
13         MR. COLLIER:  Objection to the
14     form.
15         You can answer.
16   A.    I'm an expert in machine learning, which
17 is relevant to advertising technology.
18   Q.    If we look at paragraph 7 of your
19 report, Exhibit 1, you state here that, "My core
20 expertise is in machine learning, statistics,
21 optimization and data science.
22         Do you see that?
23   A.    Yes.
24   Q.    You do not list that you have expertise
25 in display advertising technology; correct?

Page 17

1    A.    In this paragraph I do not list that I'm
2  an expert in display advertising.  My expertise is
3  relevant to display advertising.
4    Q.    But you do not claim to be an expert in
5  advertising technology; correct?
6          MR. COLLIER:  Objection to the
7      form.
8          Go ahead.
9    A.    Machine learning is relevant to
10 advertising technology as well as statistics,
11 optimization and data science.
12   Q.    But you have never worked in the
13 advertising technology industry; correct?
14   A.    I'm not sure what you mean by "worked in
15 advertising technology."  I certainly worked with
16 data that's relevant to advertising technology,
17 so...
18   Q.    Have you ever worked for a company that
19 provides advertising technology products?
20   A.    Have I ever worked for a company that --
21 I don't believe I've worked for a company that
22 provides advertising technology.
23   Q.    You have a graduate degree in applied
24 and computational mathematics; is that correct?
25   A.    Yes.

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

1    Q.   Did you have any particular
2  specialization when you worked on that degree?
3    A.   My specialization in graduate school is
4  machine learning.
5    Q.   As we've discussed, you consider
6  yourself an expert in machine learning?
7    A.   Yes.
8    Q.   On what basis do you consider yourself
9  an expert in machine learning?
10       MR. COLLIER:  Objection to the
11  form.
12    A.   My expertise is based on my 20-some
13  years of experience, numerous awards, numerous
14  keynotes at top conferences, numerous papers and
15  top machine-learning venues, all with the other
16  things listed in my CV.
17    Q.   Are you an expert in antitrust
18  economics?
19    A.   No.
20    Q.   Are you an expert on antitrust law?
21    A.   No.
22    Q.   Are you an expert in auction theory?
23    A.   I'm not an expert in auction theory.
24    Q.   Do you have any academic degrees in any
25  other fields besides computer science and applied

1  mathematics?
2    A.   Yes.
3    Q.   What are your other degrees?
4    A.   I have academic degrees in mathematical
5  physics, music theory, applied computational
6  mathematics.
7    Q.   Are you an expert in the field of market
8  design?
9    A.   Not an expert in market design.
10       (Rudin Exhibit 2, Curriculum vitae,
11    marked for identification, as of this date.)
12  BY MR. HUNSBERGER:
13    Q.   I'm going to hand you another exhibit.
14  This exhibit has been marked as Rudin Exhibit 2.  I
15  represent to you this is the CV attached to your
16  rebuttal report.
17       If we look at page 2, which is -- it is
18  labeled page 2 on the front, but it's the very first
19  page.  Under "Employment History" it lists that you
20  are a National Science Foundation, or NSF,
21  Postdoctoral Research Fellow at New York University
22  from 2004 to 2007; correct?
23    A.   Correct.
24    Q.   You were an associate research scientist
25  at Columbia University in their Center for

1  Computational Learning Systems from 2007 to 2009;
2  correct?
3    A.   Correct.
4    Q.   And you were an assistant professor of
5  statistics at Massachusetts Institute of Technology
6  from 2009 to 2013; correct?
7    A.   Correct.
8    Q.   You were then an associate professor of
9  statistics also at MIT from 2013 to 2016?
10    A.   Correct.
11    Q.   And you were an associate professor at
12  Duke University from 2016 to 2019; correct?
13    A.   Correct.
14    Q.   Going back to your areas of expertise,
15  have you published any peer-reviewed work in
16  antitrust law?
17    A.   No.
18    Q.   Have you published any peer-reviewed
19  work in antitrust economics?
20    A.   No.
21    Q.   Have you published any peer-reviewed
22  work in auction theory?
23    A.   No.
24    Q.   Have you published any peer-reviewed
25  work in market design?

1    A.   No.
2    Q.   In your tenure as an academic have you
3  taught any courses on display advertising
4  technology?
5    A.   I've taught courses that are relevant to
6  display advertising.
7    Q.   What courses were those?
8    A.   Machine learning and statistics.
9    Q.   What was the extent of your coverage of
10  display advertising technology in those courses?
11    A.   I covered machine learning and
12  statistics that are relevant skills for people who
13  want to work in display advertising.  I may have
14  used datasets from advertising as part of the
15  homework assignments for my courses.
16    Q.   You may have used datasets or you did
17  use datasets?
18    A.   Well, a lot of my homework problems use
19  datasets, and sometimes students get to choose
20  their datasets and sometimes we assign datasets.
21  But there are some datasets that are relevant to
22  display advertising that students would have used
23  in their homework assignments.
24    Q.   Were any of your classes for those
25  courses specifically focused on display advertising

HIGHLY CONFIDENTIAL

Page 22

1  technology?
2      A.   My classes were relevant to the
3  technology used in display advertising.
4      Q.   Did you specifically discuss during
5  those classes display advertising technology?
6      A.   I discussed in those classes topics
7  relevant to display advertising.
8      Q.   But you did not discuss display
9  advertising technology specifically; correct?
10         MR. COLLIER:  Objection to the
11  form.
12         You can answer.
13     A.   I'm not sure exactly what you mean, in
14  the sense that I have already answered that the
15  tools that I provide -- that I teach students are
16  relevant to display advertising.
17     Q.   If I understand correctly, you're saying
18  the tools you teach in those courses can be applied
19  to the display advertising technology industry; is
20  that correct?
21     A.   That's correct.
22     Q.   But you did not specifically discuss
23  display advertising technology in the context of
24  those courses; correct?
25     A.   As I mentioned, we have datasets that

Page 23

1  are based on display advertising, so I may have
2  said things relevant to or trying to predict X --
3  or Y from X, and those X and those Y come from
4  display advertising.
5      Q.   What percentage of those courses do you
6  think you were talking about datasets from the
7  display advertising technology industry?
8      A.   I'm not sure.  I'm not sure.  I mean, it
9  could be that students chose to do -- we have
10  projects in my classes, and students may have
11  chosen to use display advertising datasets.  I
12  teach hundreds of students, so it might be that
13  every year a student chose to do a project with a
14  display advertising dataset; I'm not sure.
15     Q.   How many students out of the hundreds
16  that you have taught use datasets from display
17  advertising technology, in your estimation?
18     A.   I don't know because I don't grade the
19  assignments.
20     Q.   Do you have an approximate estimate?
21     A.   Nope.
22     Q.   If I ask you if these courses involved
23  any other industry other than display advertising
24  technology in which machine learning might be
25  relevant, would your answer be substantially the

Page 24

1  same?
2      A.   My answer would probably be similar,
3  yes.
4      Q.   Have you taught any courses about
5  antitrust during the course of your academic tenure?
6      A.   No.
7      Q.   Have you taught any courses about
8  economics in the course of your academic tenure?
9      A.   Some of the work that I -- some of the
10  things I do overlap with economics.
11     Q.   In what way?
12     A.   Well, a lot of my work involves
13  observational causal inference, and I mention that
14  every year.
15     Q.   Have you taught any courses about
16  auction theory?
17     A.   No.
18     Q.   Before completing the report in this
19  case, have you applied machine learning to the
20  display advertising technology industry?
21         MR. COLLIER:  Objection to the
22  form.
23     A.   I've created -- I've even helped create
24  datasets involved in advertising, so -- sorry.  Can
25  you be more specific?

Page 25

1      Q.   Have you ever used machine learning --
2  your machine-learning expertise in the display
3  advertising technology industry before this case?
4      A.   I've used and developed datasets that
5  involved advertising.  I have not worked in -- you
6  know, for a -- for a technology -- company that
7  does display advertising.
8      Q.   What were those datasets that involved
9  advertising?
10     A.   Well, there are probably multiple
11  datasets we've used that involve advertising.  The
12  one that I developed was a survey, and it involved
13  recommendations when you're driving your vehicle
14  for a coffee shop or restaurant or something like
15  that.
16     Q.   In what context did you prepare that
17  report?  Was it prepared as part of your academic
18  work or on behalf of a company?
19     A.   So that work was funded by a company,
20  but it was purely academic work.  And it was
21  published.
22     Q.   Which company funded that work?
23     A.   Ford.
24     Q.   Professor Rudin, moving on from your
25  background to any areas in which you testified or

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1  have done expert work before, I would just like to
2  understand some of your background in the litigation
3  context.
4        Have you ever been deposed before?
5     A.  Yes.
6     Q.  In what case were you deposed?
7           MR. COLLIER:  I don't know what
8     this case is.  You can tell him the case, but
9     if there's a protective order that governs
10    that case, I'm going to instruct you to follow
11    whatever the court's order is and not disclose
12    details.
13           I think Mr. Hunsberger will tell
14    you he's not asking for anything confidential.
15    He is asking for a general description.  But I
16    want you to follow all court orders about
17    describing that testimony.
18  BY MR. HUNSBERGER:
19    Q.  Correct.  I'm not asking you to share
20  any information that's subject to protective order.
21  If I ask a question and there is information that
22  would be responsive to my question but you're not
23  going to disclose because of a protective, just say
24  that for the record so we're clear.
25        So in what case were you previously

Page 27

1  deposed?
2     A.  Stanford v. Flores.
3     Q.  Again, without disclosing any
4  information that's subject to a protective order,
5  what was your assignment in that case?
6           MR. COLLIER:  I will just caution
7     you to be general, given I'm sure there's a
8     protective order.
9     A.  That case involved criminal justice.
10    Q.  Which party were you deposed on behalf
11  of?
12    A.  I probably should stop here, because I
13  don't know what's covered under the protective
14  order.
15    Q.  Did you testify at trial in that case?
16    A.  That case never went to trial.
17    Q.  Have you ever testified at a trial in
18  any other case?
19    A.  No.
20    Q.  Have you ever offered a written
21  declaration in any other legal proceeding?
22    A.  No.
23    Q.  Have you ever prepared an expert report
24  in any other legal proceeding?
25    A.  Just the one mentioned above.

Page 28

1     Q.  Did that case, Flores v. Stanford, did
2  that case involve display advertising technology?
3     A.  No.
4     Q.  Have you ever served as a consulting
5  expert before?
6           MR. COLLIER:  I will let you answer
7     that question.  You can say yes or no.
8     Counsel, I'm sure you're not trying
9     to invade any expert consulting privileges,
10    but I'm not going to allow you to do it.
11        You can answer yes or no if you
12    have ever been a consultant.
13    A.  I've been a consultant before.
14           MR. HUNSBERGER:  Counsel, your
15    position is that you're claiming -- plaintiff
16    states are claiming privilege over prior
17    consulting work that she may have done for
18    other clients; is that your position?
19           MR. COLLIER:  You can ask about
20    other clients to the extent it doesn't cause
21    her to violate any protective orders or
22    anything.
23        But what you cannot do is invade
24    any consulting expert privilege held by any of
25    the states in this matter.  So if you want to

Page 29

1  carve that out of your question, that's fine.
2     I'm not -- if she's consulted with
3  Ford, generally speaking you can ask about
4  that.  But you're not going to ask if she's
5  been a consultant for Norton Rose Fulbright or
6  the State of Texas or any of that unless and
7  until she has issued a report or become a
8  testifying expert.  Or can you ask her about
9  it.  I will instruct her not to answer.
10           MR. HUNSBERGER:  Just to be clear,
11    Counsel, your position is that if Professor
12    Rudin has consulted the -- any of the
13    plaintiff states in any other prior matter,
14    you are claiming privilege on behalf of any of
15    those plaintiff states?
16           MR. COLLIER:  Correct.  When you
17    say "prior matter," particularly including any
18    ongoing matters.
19  BY MR. HUNSBERGER:
20    Q.  Other than any work on behalf of any of
21  the plaintiff states in this matter, have you ever
22  served as a consulting expert in any other matter?
23           MR. COLLIER:  Dr. Rudin, here he's
24    saying consulting expert as opposed to a
25    consultant, as if you were hired by Ford on a

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1  business thing.
2      So based on his question about
3  consulting expert, I instruct you not to waive
4  any consulting privileges for Texas, any other
5  states, or, frankly, any other matter you have
6  been engaged as a consulting expert but have
7  not submitted an expert report, I will say
8  yet.
9      That said, you can answer freely
10 about Ford or any other consulting work you've
11 done generally.
12     With that said, you are free to
13 answer.  If you need me to repeat the
14 instructions.
15     MR. HUNSBERGER:  Counsel, I feel
16 like you're putting words in the witness's
17 mouth, which I don't --
18     MR. COLLIER:  No.  I'm giving --
19     MR. HUNSBERGER:  -- I object to.
20     You can give an instruction, but it
21 was a pretty long instruction, so I'm just
22 going to object to that.
23     MR. COLLIER:  You can object all
24 you want.  And I will repeat the instruction
25 if I need to, Counsel.

Page 31

1      You're not going to waive --
2      MR. HUNSBERGER:  I'm not asking her
3  to --
4      MR. COLLIER:  Mr. Hunsberger --
5      MR. HUNSBERGER:  My question was
6  other than any work on behalf of any of the
7  plaintiff states in this matter, have you ever
8  served as a consulting expert in any other
9  matter.
10     MR. COLLIER:  Counsel, I am warning
11 you, if she has been engaged by -- I will say
12 IBM on an ongoing matter and as their
13 consultant, you're not allowed to waive IBM's
14 consulting privilege.
15     MR. HUNSBERGER:  And you're not
16 entitled to object on IBM's behalf.
17     MR. COLLIER:  I'm representing the
18 witness.  I'm entitled to keep you from having
19 her violate a court order or a protective
20 order.
21     MR. HUNSBERGER:  I have made clear
22 I am not asking her to violate a protective
23 order.  I've made clear I'm not asking her to
24 violate any privileges.
25     Let me ask the question again.

Page 32

1      MR. COLLIER:  You're going to get
2  the same instruction.  So ask again.
3  BY MR. HUNSBERGER:
4      Q.  Other than --
5      MR. COLLIER:  By the way, I caution
6  you, Counsel, you are asking direct questions
7  about consulting expert work.  So I want you
8  to think before you start keep asking her to
9  violate -- because this is your ethical
10 obligation.
11     Ask your question.
12     I will instruct you.  Don't answer
13 until I either object or let you
14 answer depending on how he phrases the
15 question.
16     MR. HUNSBERGER:  Counsel, to be
17 clear, I'm not asking the witness to violate a
18 protective order.  I'm not asking the witness
19 to violate any confidentiality agreements
20 she's subject to.  I'm not trying to invade
21 any of the plaintiff states' privileges, and
22 I'm not trying to invade any other legitimate
23 privileges.  I want to be very clear on that
24 on the record.
25 BY MR. HUNSBERGER:

Page 33

1      Q.  Other than any work on behalf of the
2  plaintiff states in this matter or the plaintiff
3  states in any other matter, and without revealing
4  any information that's subject to a protective
5  order, and without waiving any privileges, have you
6  served as a consulting expert in any other matter?
7      A.  So I actually can't answer that question
8  because some of the work that I do is under
9  protective order.  So I can't violate the
10 protective order.  And so I can't reveal that
11 information.  If I could reveal it, it would be on
12 my CV.
13     Q.  Understood.
14     MR. HUNSBERGER:  Counsel, that's
15 all I was trying to ask.
16     MR. COLLIER:  You understand I
17 didn't object.  That was a fair question.
18     MR. HUNSBERGER:  We don't need to
19 fight over this.
20 BY MR. HUNSBERGER:
21     Q.  Again, with the same carveouts, so other
22 than any work on behalf plaintiff states in this
23 matter or plaintiff states in any other matter, and
24 without revealing any information that's subject to
25 a protective order, and without waiving any

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1  privileges, did any of your prior work involve the
2  display advertising technology industry?
3      A.  That's a complicated question.  If I
4  understood the question correctly, I believe the
5  answer is no.
6      Q.  Moving on to this case.
7          Who retained you in this case?
8      A.  I was retained by Keystone and the State
9  of Texas.
10     Q.  Keystone is a consulting firm; is that
11 correct?
12     A.  That's correct.
13     Q.  Without revealing the matter or without
14 revealing any privileged information if you're able,
15 have you ever been retained by any of the plaintiff
16 states in any other matter?
17     A.  I'm sorry, I cannot reveal that
18 information.
19     Q.  A simple yes-or-no answer?
20         MR. COLLIER:  I'm going to object
21 to form.
22         MR. HUNSBERGER:  I can try again.
23         MR. COLLIER:  I think she can give
24 you the answer you're looking for, but --
25         MR. HUNSBERGER:  Let me start from

Page 35

1      the top.
2  BY MR. HUNSBERGER:
3      Q.  I'm looking for a yes-or-no answer.
4          Without revealing the matter, without
5  revealing any privileged information, without
6  revealing any information that would be subject to a
7  protective order, have you ever been retained by any
8  of the plaintiff states in any other matter besides
9  this case?
10         MR. COLLIER:  And that I would
11 instruct you not to answer.
12         That is an invasion of her
13 consulting expert privilege.
14         MR. HUNSBERGER:  Instructing her
15 not to answer either yes or no; correct?
16         MR. COLLIER:  It can't be answered
17 yes or no without revealing the existence of
18 any applicable consulting expert engagement.
19 You've asked her, without waiving the
20 privilege, are you a consulting expert
21 anywhere.
22         MR. HUNSBERGER:  I understand the
23 plaintiffs' position.  I will move on.
24 BY MR. HUNSBERGER:
25     Q.  Professor, when were you retained in

Page 36

1  this case?
2      A.  I signed the protective order on
3  July 15, 2021.
4      Q.  When did you first start working on the
5  report that you produced on September 9, 2024 in
6  this matter?
7          MR. COLLIER:  Objection to the
8      form.
9      A.  I started working on this report when I
10 received the assignment to produce a rebuttal of --
11 when I received the documents from -- the expert
12 reports from Google and was assigned to create a
13 rebuttal.
14     Q.  Did you do any work on this matter
15 between July of 2021 and -- when you were retained
16 and when you received plaintiffs' expert -- Google's
17 experts' reports that you would be rebutting?
18     A.  Yes.
19     Q.  When did you start doing that work?
20     A.  I'm not sure.
21     Q.  Was it in 2021?  2022?  Just the
22 approximate year.
23     A.  2021.
24     Q.  On page 5 of your report, paragraph 3,
25 you state that you are compensated for your work on

Page 37

1  this matter at $550 an hour.
2          Is that still accurate?
3      A.  Yes.
4      Q.  Approximately how much time have you
5  spent to date on this case?
6      A.  I'm not sure, but approximately 200
7  hours.
8      Q.  Who is compensating you for your work on
9  this matter?
10     A.  The State of Texas.
11     Q.  In the same paragraph 3 we were just
12 talking about you indicated you were supported by a
13 research team who has provided research support and
14 assistance; is that correct?
15     A.  Yes.
16     Q.  Is that team from the Keystone
17 consulting firm we talked about a moment ago?
18     A.  Yes.  But my team also includes counsel.
19     Q.  Besides Keystone personnel and counsel,
20 any other individuals who supported you in
21 preparation of the report?
22     A.  No.
23     Q.  Other than counsel, how many individuals
24 at Keystone supported you in preparing your report?
25     A.  I think there were five people involved.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    Q.   Do you have an understanding of how many
2    hours they have worked on the matter in aggregate
3    across all five individuals?
4    A.   No. I don't keep track of my team's
5    hours.
6    Q.   Do you receive any portion of the
7    billings generated by your team?
8    A.   No.
9    Q.   So if Keystone bills the State of Texas
10   at some hourly rate per hour, you do not receive
11   some percentage of that as compensation?
12   A.   No.
13   Q.   The only compensation you receive is
14   your 550-per-hour rate for how many hours you work;
15   is that correct?
16   A.   Yes.
17   Q.   Did any of the personnel at Keystone
18   draft any portions of your report?
19           MR. COLLIER: Objection, Counsel.
20   That's in violation of the court's order of
21   December 13, 2023.
22           And I will instruct you not to
23   answer.
24   BY MR. HUNSBERGER:
25   Q.   Did you conduct any interviews in this

Page 39

1    matter in connection with preparing your report?
2    A.   No.
3    Q.   Were there any interviews that you
4    wanted to conduct in this matter but did not get an
5    opportunity to do?
6    A.   No.
7    Q.   What did you do to prepare for your
8    deposition today?
9           MR. COLLIER: Objection.
10          You can generally say. Obviously
11   don't disclose any communications with counsel
12   or your team.
13   A.   I met with counsel, and I read.
14   Q.   And, again, without revealing the
15   content or substance of any communications you may
16   have had with counsel, who did you meet with?
17   Counsel in this room?
18          MR. COLLIER: You can answer that.
19   A.   I met with counsel in this room and
20   remote.
21   Q.   How many times did you meet with
22   counsel?
23          MR. COLLIER: You can answer if you
24   know.
25   A.   I can't remember. Maybe around six.

Page 40

1    That's a ballpark.
2    Q.   Across those approximately six meetings
3    with counsel, how many total hours did you prepare
4    for the deposition?
5           MR. COLLIER: Counsel, I'm going to
6    let her answer that, but I will note you're
7    probably in violation of the court's order
8    5.15 which only allows testimony as to the
9    total hours. For all of her work. I will let
10   her answer this question though.
11          With that said, if you can approximate
12   the total hours you spent in these meetings,
13   you're free to do that?
14   A.   I can't remember.
15   Q.   At the prep sessions was anyone besides
16   the states plaintiffs' counsel present?
17   A.   I don't think so.
18   Q.   Did you review documents in preparation
19   for your deposition?
20   A.   Yes.
21   Q.   Approximately how many documents did you
22   review in preparation for your deposition?
23          MR. COLLIER: You can answer if you
24   know.
25   A.   Maybe five.

Page 41

1    Q.   Without disclosing any communications
2    that you may have had with counsel, did counsel
3    select those materials for you?
4           MR. COLLIER: Objection. Counsel
5    now you're in flagrant violation of paragraph
6    5.1 of the court's order, communications
7    between counsel and my testifying witnesses.
8    This is at least the third time you violated
9    this order.
10          MR. HUNSBERGER: Counsel, I said
11   without disclosing --
12          MR. COLLIER: Did counsel select
13   for you is a communication between counsel and
14   my witness.
15          MR. HUNSBERGER: Again, I was very
16   specific, without disclosing any communication
17   you may have had with counsel. If the
18   instruction is she cannot answer that question
19   without disclosing those, then we can move on.
20          MR. COLLIER: That is my
21   instruction and my firsthand knowledge that
22   she can't answer the question without putting
23   you in violation of the court's order.
24          MR. HUNSBERGER: Counsel, again, to
25   be very clear, I'm not intending to or

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1    attempting to violate the court's order, so we
2    can move on from this question. I was very
3    clear about not disclosing any communication
4    she may have had with counsel.
5         MR. COLLIER: Mr. Hunsberger, I
6    want to be clear. When you ask her "What did
7    you counsel tell you," it doesn't save you
8    when you say "without disclosing
9    communications with your counsel."
10        I don't want to argue with you. I
11   want you to spend your time with the
12   deposition. But I want to make clear your
13   intentions are irrelevant to me when you're
14   violating the order.
15        MR. HUNSBERGER: Counsel, to be
16   clear, I did not ask her to disclose anything
17   that she said to you or you said to her. But,
18   again, we can move on.
19   BY MR. HUNSBERGER:
20   Q.   I would like to direct your attention to
21   paragraph 22 of your report.
22   A.   Okay.
23   Q.   Is this an accurate description of your
24   assignment in this case?
25   A.   So that's a summary of opinions rather

Page 43

1    than a summary of my assignment.
2    Q.   And the summary of your assignment, is
3    that what is in paragraph 2?
4    A.   Yes.
5    Q.   Counsel for the State of Texas provided
6    this assignment to you; is that correct?
7    A.   Yes.
8    Q.   You write in paragraph 22 that you were
9    asked to apply your training and experience to
10   analyze Google's machine learning programs from a
11   statistical and optimization lens. You then list a
12   few of Google's programs.
13        Were there any other Google
14   optimizations you analyzed that you didn't include
15   here?
16   A.   Yes.
17   Q.   What were those optimizations?
18   A.   Well, they're listed throughout my
19   report, but, for instance, throttling is not listed
20   here, but it is relevant to all of these programs.
21   Q.   Do you consider throttling a Google
22   product feature or optimization?
23   A.   I consider it a Google optimization.
24   Q.   At a high level, what did you do to
25   develop your opinions for this assignment?

Page 44

1    A.   This is a rebuttal report, so I read the
2    expert reports that I needed to rebut very
3    carefully, and the exhibits, the depositions, the
4    other materials provided, and used my -- leveraged
5    my machine learning and statistics expertise to
6    form my opinions in order to write this report.
7    Q.   In preparing your rebuttal report you
8    reviewed the expert reports of Professors Milgrom,
9    Ghose, Wiggins and Baye; is that correct?
10   A.   As well as other reports, yes.
11   Q.   Beyond those four professors -- Milgrom,
12   Ghose, Wiggins and Baye -- you did not offer any
13   other rebuttal opinions; correct?
14   A.   As I mentioned earlier, there were
15   information in other reports and other expert
16   reports that are similar to those for instance in
17   Milgrom, Ghose, Wiggins and Baye, and exhibits as
18   well, and I offered opinions that could be relevant
19   to those as well.
20   Q.   But you are not offering any rebuttal
21   opinions against any experts other than Professors
22   Milgrom, Ghose, Wiggins and Baye; correct?
23        MR. COLLIER: Objection to the
24   form.
25   A.   I believe I've already answered that

Page 45

1    question.
2    Q.   Is that a yes?
3         MR. COLLIER: Objection to the
4    form.
5    A.   To the extent that there's overlapping
6    content between expert reports and there's
7    additional information, materials, my rebuttals are
8    relevant to those as well.
9    Q.   But as stated in paragraph 22 and
10   paragraph 2, you are rebutting the expert reports of
11   Professor Milgrom, Professor Ghose, Professor
12   Wiggins, and Professor Baye; correct?
13   A.   I am certainly rebutting -- not
14   information -- content opinions of these reports.
15   Q.   In paragraphs 2 and 22 you don't list
16   any other Google experts that you are responding to;
17   correct?
18   A.   I don't list any -- in this paragraph
19   I'm not listing anything except Milgrom, Ghose,
20   Wiggins and Baye. But as I mentioned, my opinions
21   are relevant to other Google reports that overlap
22   with their opinions of these ones.
23   Q.   But your assignment was limited to a
24   rebuttal of those four experts; correct?
25        MR. COLLIER: Objection to the

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1     form.
2         A.   As I mentioned, the reports tend to
3    overlap in their content and opinions, and so my
4    rebuttals are relevant to additional reports.
5         Q.   I'm just asking a straightforward
6    question, whether the assignment was limited to
7    rebut the four experts that you list in paragraphs 2
8    and 22?
9             MR. COLLIER:  Object to form.
10            Counsel, asked and answered.  I will allow her
11            to answer one more time, because this is
12            harassing.
13                Go ahead.
14            MR. HUNSBERGER:  Counsel, the
15            witness has not answered my question, so I'm
16            just looking for a straightforward answer,
17            which she's a rebuttal witness.  Google has
18            the right to confirm the experts to which she
19            is responding.
20        A.   I'm doing my best to answer your
21    question, which is that the Google reports had
22    somewhat overlapping opinions, and so my rebuttal
23    is relevant to additional reports.
24        Q.   Which other experts are your opinions
25    relevant to?

Page 47

1         A.   Well, there are hundreds and thousands
2    of pages of these reports, so I -- if I want me to,
3    I could go through all the reports and I could
4    pinpoint which opinions are overlapping with these
5    four that my opinions are relevant to.
6         Q.   So if we look at paragraph 22, you refer
7    to several Google product features.
8         A.   Sorry?
9         Q.   Paragraph 22.
10        A.   Paragraph 22.
11        Q.   You refer to several Google product
12    features.
13            You see, for example --
14        A.   Yes.
15        Q.   You see, for example, you list DRS,
16    Project Bernanke, EDA, RPO, shifting from a
17    second-price to first-price auction, Open Bidding,
18    UPR and Alchemist, and you refer to those as,
19    quote-unquote, "auction manipulations"; is that
20    correct?
21        A.   That's correct.
22        Q.   During this deposition today if I use
23    the term "optimizations" or "product features" to
24    describe what you refer to as "Google's auction
25    manipulations," will you understand what I mean?

Page 48

1         A.   Yes.
2         Q.   How did you pick which optimizations to
3    focus on?
4         A.   I picked these programs based on my
5    understanding of the reports that I needed to rebut
6    and chose programs where my machine-learning
7    expertise would be relevant in helping me rebut
8    some of the expert opinions, including the ones
9    that are listed in paragraphs 23 and 24, as well as
10    the rest of that section.
11        Q.   And do you offer opinions on any other
12    Google optimizations that are not listed in
13    paragraph 22, other than throttling, which you
14    mentioned earlier?
15        A.   Everything that I have mentioned is
16    listed in my report.  I could probably go through
17    and, you know, find all the different Google
18    conducts that were mentioned throughout the report
19    if you would like.
20        Q.   You describe machine learning as a
21    branch of artificial intelligence; is that correct?
22        A.   Yes.
23        Q.   Are you offering any opinions today on
24    Google's use of any large language models?
25        A.   No.

Page 49

1         Q.   So you're not offering any opinion today
2    on Google's use of large language models, such as
3    Google's Gemini?
4         A.   No.
5         Q.   How did you go about selecting the
6    materials to cite in your report as what you relied
7    upon?
8             MR. COLLIER:  Objection to the
9             form.
10        A.   Well, my team and I read the -- started
11    with the expert reports of Milgrom, Ghose, Wiggins
12    and Baye, and we read those reports, as well as the
13    exhibits, as well as looking through the database
14    of documents that we had that were relevant to what
15    we were looking for, and chose supporting points --
16    chose documents to cite that were relevant to those
17    points.
18        Q.   You had access to all of the documents
19    produced in this case; is that correct?
20        A.   Yes.
21        Q.   You had access to all of the deposition
22    transcripts in this case; is that correct?
23        A.   Yes.
24        Q.   You also had access to all of the data
25    productions in this case; is that correct?

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1     A.   I didn't use any data in the sense of,
2   like, numerical tables to produce this, except for
3   what was produced in the Google -- the database of
4   all of the reports that -- in other words, I didn't
5   do any code review, if that's what you are asking.
6   But I did review the database of Google documents,
7   if that helps.
8     Q.   You had access to Google's transaction
9   data in this case; is that correct?
10    A.   I had access to a very minimal amount of
11  Google transaction data.
12    Q.   Are there any documents, data or other
13  materials that you relied upon to form your opinions
14  that are not listed or cited in your report?
15    A.   I relied on my knowledge of machine
16  learning and statistics which were gained through
17  many documents through many years.
18    Q.   That's fair.
19         Are there any -- other than that, are
20  there any documents, data or other materials that
21  you relied upon to form your opinions that are not
22  listed or cited in your report?
23    A.   I may have done internet searches to
24  gain knowledge.
25    Q.   Did you rely on those internet searches

Page 51

1   to form your opinions?
2         MR. COLLIER:  Objection to the
3     form.
4         You can answer.
5     A.   I learned things -- I always learn
6   things from internet searches, so I could rely on
7   those, if that's what you are asking.
8     Q.   Any other documents, data or materials
9   produced by a party in this case that you relied on
10  that are not listed in your report?
11    A.   I don't believe so.
12        You mean that are not publicly
13  available, correct.
14    Q.   I was asking simply about --
15  party-produced documents, data or other materials.
16        But I can ask now specifically about are
17  there any other publicly available materials that
18  you relied upon in forming your opinions that are
19  not listed in your report?
20    A.   As I said, I may have done internet
21  searches to find -- to understand something a bit
22  better.  But anything that's cited, we did our best
23  to try to cite things that supported the opinions.
24    Q.   In paragraph 5 of your report you state
25  that you "may, and reserve the right to, review and

Page 52

1   rely on additional documents, including transcripts,
2   and testimony in conducting my work and forming my
3   opinions in this case."
4         Do you see that?
5     A.   Yes.
6     Q.   Have you reviewed any other materials,
7   such as documents or transcripts, since submitting
8   your rebuttal report?
9     A.   No.
10        MR. COLLIER:  Pause just a moment.
11  I was going to object to form.  But it's okay,
12  you've said no.
13        THE WITNESS:  That's fine.
14    Q.   You have not provided any supplemental
15  report other than just this report you submitted on
16  September 9; correct?
17    A.   Correct.
18    Q.   Was there any additional analysis that
19  you wanted to undertake in connection with forming
20  your opinions in this matter but did not do?
21    A.   No.
22    Q.   Were you provided any assumptions that
23  you relied on in forming the opinions in your
24  report?
25    A.   No.

Page 53

1     Q.   Were you provided any facts that you
2   relied on in forming the opinions in your report?
3         MR. COLLIER:  Objection.  Vague.
4     Q.   Were you provided any facts other than
5   documents data and other materials that you relied
6   on in forming your opinions in the report?
7         MR. COLLIER:  Still objection,
8     vague.
9         You can answer if you understand.
10    A.   I don't understand, I'm sorry.  Maybe
11  you could explain what types of facts?  Provided by
12  who?  What you mean.
13        MR. HUNSBERGER:  So, Counsel, again
14    just to be clear, just trying to get the one
15    issue that is permitted under the expert
16    stipulation in this matter.
17    Q.   Were you provided any facts by counsel
18  that you relied on in forming the opinions in your
19  report?
20        MR. COLLIER:  You can answer that
21    question.
22    A.   I'm not allowed to reveal conversations
23  with my counsel.
24        MR. COLLIER:  I can -- I will
25    authorize her to answer that question.  I can

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1    chat with her -- this involves -- she thinks
2    she's going to violate a privilege because I
3    told her not to discuss -- would you like me
4    to tell her that she's allowed to your answer.
5    I don't want to be accused of leading the
6    witness. I want you to get an answer.
7        MR. HUNSBERGER: I appreciate that,
8    Counsel. And we're all trying to be current
9    here with privilege and the stipulation. So
10   yes, can you provide her context.
11       MR. COLLIER: While he's not
12   allowed to ask about our conversations, he is
13   allowed to ask if counsel told you I need you
14   to treat as a fact that Google does X, Y, Z,
15   and then you took what counsel told you as a
16   fact for purposes of your analysis. He wants
17   to know, did you do any of that.
18       A.    Okay. No, I don't take what people say
19   as fact. I read very carefully for myself.
20       Q.    So there was no circumstance, as
21   Mr. Collier alluded to, in which counsel said treat
22   something as a fact and you accepted that fact and
23   you relied upon that as a fact in forming your
24   opinions; is that correct?
25       A.    I would not do that with anyone.

Page 55

1        MR. HUNSBERGER: Counsel, we've
2    been going for an hour. Good time for a
3    break?
4        MR. COLLIER: If it's good for you,
5    it's good for us.
6        THE VIDEOGRAPHER: Going off the
7    record. The time is 10:14 a.m.
8        (Recess taken.)
9        THE VIDEOGRAPHER: Going back on
10   the record. The time is 10:28 a.m.
11   BY MR. HUNSBERGER:
12       Q.    Professor Rudin, when we were talking
13   earlier, we talked about your analysis of various
14   Google programs. And I just want to ask, did you do
15   any analysis of any company's ad tech products or
16   programs for any other company besides Google, any
17   third-party companies?
18       A.    No.
19       Q.    So we've handled some of the
20   preliminaries. I think we're past those, so we will
21   sort of dive into the substance, which I hope will
22   be more interesting for you, and certainly given
23   your area of expertise.
24       Before we begin I want to make sure
25   we're all speaking the same language and get out a

Page 56

1    few definitions to make sure we're all on the same
2    page and things go a little smoother.
3        There are, as you know, many
4    abbreviations, many acronyms, many terms of art in
5    the ad tech industry, and I want to make we're using
6    the terms in a way with a common understanding.
7        When you refer in your report to a
8    "DSP," that refers to a demand-side platform; is
9    that correct?
10       A.    Yes.
11       Q.    What is an example of a DSP in the
12   ad tech industry?
13       A.    Google's demand-side platforms perhaps.
14       Q.    What Google tool or tools do you
15   understand to be a demand platform?
16       A.    I mean, Google's demand side includes
17   Google Ads or -- I could go through and -- I don't
18   have a full list of all the Google demand-side
19   things in here. I list several of them throughout.
20   But you can go to Professor Gans or Professor
21   Weinberg for a more complete list of Google's
22   demand-side platform information.
23       Q.    You mentioned Google Ads as a Google
24   demand-side tool.
25       Does Google have any other demand-side

Page 57

1    tools?
2        A.    Yes.
3        Q.    What are those other demand-side tools?
4        A.    So let's go to -- they list a couple of
5    them. I can't list all of them. I can list a
6    couple.
7        So DB360 -- like I said, this report
8    focuses on kind of overall aspects of the way these
9    things relate to each other, and if you want more
10   specifics about Google's, you know, properties and
11   so on, all of the things Google has, then you are
12   better off looking at the Weinberg or Gans reports
13   or some of the other reports.
14       MR. COLLIER: Counsel, I tried not
15   to interrupt, but there's someone I don't
16   recognize on the Zoom. It's your confidential
17   information --
18       THE VIDEOGRAPHER: It's William
19   Shieber.
20       MR. COLLIER: I want to be careful,
21   since we're discussing --
22       MR. HUNSBERGER: I appreciate it,
23   Counsel.
24       MR. COLLIER: For the court
25   reporter, William Shieber from the Texas

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1  Attorney's General Office has joined on the
2  Zoom.
3       I don't know that other name, A.
4  Freeborn.
5       MR. HUNSBERGER:  That's Andrew
6  Freeborn from Axinn, Veltrop & Harkrider, also
7  on behalf of Google.
8       Thank you, Counsel, for being
9  sensitive to information confidential to me.
10      MR. COLLIER:  I tried to wait until
11  I didn't interrupt you.  I apologize.
12  BY MR. HUNSBERGER:
13      Q.  In Section III of your report, Professor
14  Rudin, you describe a hypothetical auction between
15  buyers and sellers; is that correct?
16      A.  Yes.
17      Q.  If you'll turn to that section,
18  paragraph 54, page 19.
19      A.  Okay.
20      Q.  Subheading A1 in that section has a
21  subheading that reads, "Buyer constructs an ML model
22  in my ML Abstracted Auction."
23       Do you see that?
24      A.  Yes.
25      Q.  When you say "buyer" are you referring

Page 59

1  to advertisers?
2       A.  So this is an abstract auction, so it
3  can be any buyer in any auction.  It's an abstract
4  auction.
5       Q.  When you later apply the learnings from
6  your abstract auction to Google's products, when you
7  use the word "buyer" are you referring to
8  advertisers?
9       A.  Yes.
10      Q.  And you're referring to advertisers and
11  not to DSP tools, or are you using them
12  interchangeably?  I want to make sure we understand
13  the word "buyer" as used in your report.
14      A.  So there's advertisers, and then there's
15  also -- there's also tools that -- bidding tools.
16  So the advertisers can work with the bidding tools
17  to place bids into the auction.
18      Q.  So when you use the term "buyer"
19  throughout your report are you referring to the
20  advertisers?
21      A.  It depends which auction you're talking
22  about.  So if you're referring to, like -- like,
23  later in the report we talk about the internal
24  auction.  Right?  There are individual advertisers.
25  And then if we're talking about kind of the AdX

Page 60

1  auction we might be talking about Google Ads
2  bidding into the AdX auction.
3       Q.  Is it fair to say depending on the
4  context you sometimes use "buyer" to refer to
5  individual advertisers and sometimes you use "buyer"
6  to refer to demand-side tools?
7       A.  Yes.  And sometimes buyer is completely
8  abstract as well, because we have the abstract
9  version.
10      Q.  Understood.
11       So to help make sure that we're clear
12  and on the same page as we're going through
13  different sections of your report, if we could just
14  try to be clear in which way you are using "buyer";
15  whether you are using it to refer to individual
16  advertisers or to refer to demand-side tools or
17  using it in the abstract sense.  I think that would
18  be helpful for the clarity of the record.
19      MR. COLLIER:  Dr. Rudin, you
20  nodded --
21      Q.  You understand what I'm saying?
22      A.  Oh, yes.  I will try to be clear.
23      MR. COLLIER:  I was just reminding
24  you what he told you earlier.  He asked you
25  that question, you nodded, he saw your nod, he

Page 61

1  moved on.  But the court reporter isn't able
2  to take down nods.  You have to say "yes."
3       THE WITNESS:  It wasn't a question.
4       MR. HUNSBERGER:  That's fair.  We
5  can -- Counsel, I appreciate your
6  attentiveness, and I am sure the court
7  reporter does as well.
8  BY MR. HUNSBERGER:
9       Q.  Just wanted to make sure we understood
10  that when we're using the term "buyer" and we're
11  having this conversation, we will be try to be
12  clear -- you will try to be clear and I will try to
13  be clear whether we're referring to a specific
14  individual advertiser, referring to demand-side
15  tools or using it in the abstract sense.
16       Is that fair?
17      A.  I will try my best to be clear.
18      Q.  In subheading A2 on page 21, the
19  subheading reads "Seller constructs an ML model in
20  my ML Abstracted Auction."
21       Do you see that?
22      A.  Yes.
23      Q.  When you say "seller" in the context of
24  your report when you're discussing Google's products
25  in the advertising technology industry, you are

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1  referring to publishers; is that correct?
2      A.   Later in the report I refer to sellers
3  at publishers.
4      Q.   What is an example of a seller in the
5  ad tech industry?
6      A.   An example of a seller might be The New
7  York Times.
8      Q.   In Section A3 of your report on page 22
9  there is a subheading entitled "Auctioneer's Role";
10 is that right?
11     A.   Yes.
12     Q.   Later in your report you apply your
13 abstract model involving an auctioneer to Google's
14 products; is that correct?
15     A.   Yes.
16     Q.   When you refer to an "auctioneer" in the
17 context of Google's products which specific Google
18 tool or tools are you referring to?
19     A.   AdX.
20     Q.   Any other Google tools that you're
21 referring to when you use the term "auctioneer"?
22     A.   There are several Google tools that --
23 they're the same tool, essentially, with different
24 names, and I don't remember all of them off the top
25 of my head.  But it's essentially AdX.  AdX and its

Page 63

1  relatives.  We'll say that.
2      Q.   AdX and its relatives?
3      A.   Um-hmm.
4      Q.   What are AdX's relatives?  I want to
5  make sure I understand what you mean by that.
6      A.   It's AdX, its aliases.  I mean, here I'm
7  talking about an abstract auction, so it can be any
8  auctioneer, but I mostly am talking about AdX.
9      Q.   Are you referring to any other Google
10 tools besides AdX?
11     A.   I think I'm referring mostly to AdX in
12 this report.
13     Q.   So before we dive in a bit more into the
14 details of your report, I would like to take a step
15 back and have a conversation from a bigger picture
16 perspective and talk about some issues in the ad
17 tech industry overall.
18          Based on your review of the materials in
19 this case and your understanding of the advertising
20 technology industry, is it fair to say that, all
21 else equal, publishers generally try to maximize
22 their ad revenue?
23          MR. COLLIER:  Objection to the
24     form.
25     A.   I think publishers can have many goals.

Page 64

1  I think they want to have high-quality ads and not
2  just maximize short-term revenue.  I think they
3  want to maximize long-term revenue.  They want to
4  maintain their reputation.  So I don't think I
5  would agree with the suggestion that all they're
6  trying to do is maximize short-term revenue.
7      Q.   I was not attempting to suggest only
8  maximizing short-term revenue, so let me try asking
9  the question again.
10          Is it fair to say that if you hold
11 quality and reputation constant, publishers
12 generally try to maximize their ad revenue?
13     A.   So maximizing your ad revenue could be
14 short term, could be long term, and those are tied
15 into the things you try to keep constant, so it's
16 not possible to separate these things out.
17     Q.   So if we're talking about a given piece
18 of publisher inventory, if the publisher has the
19 ability to receive $4 for that piece of inventory or
20 the opportunity to receive $5 for that piece of
21 inventory -- the same inventory, same level of
22 quality -- the publisher would generally prefer to
23 receive the $5 over $4; is that fair?
24     A.   So again you are excluding the rest of
25 the context around this particular auction.  So it

Page 65

1  may be that the audience is not the right target
2  audience and they don't want -- it could be that
3  there's a long-term reputation damage from doing
4  this.
5          So I just -- I don't really want to
6  agree to these hypotheticals without the rest of
7  the context.
8      Q.   So the rest of the context is the same
9  advertiser, the same user, the same ad, the same ad
10 quality.  The only difference is does the publisher
11 receive $4 for that inventory or does the publisher
12 receive $5 for that inventory.
13          MR. COLLIER:  Objection.
14          Go ahead.
15     A.   It's hard to isolate these very narrow
16 circumstances when there's a much broader set of
17 things the publisher might want to consider.
18     Q.   What else would the publisher want to
19 consider?
20     A.   The publisher might want to consider the
21 long-term reputation of -- you know, the publisher
22 wants to keep the -- certain types of ads to keep
23 the value of their property.  The publisher might
24 want to consider who the target -- who the target
25 audience would be for these ads.  The publisher

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1 might want to consider -- there's many things the
2 publisher might want to consider that is not listed
3 in the context there.
4    Q.   So you refer to long-term reputation and
5 target audience as two other considerations that
6 publishers may want to take into account.
7       In my question, again, I'm assuming the
8 same advertiser, the same user, the same ad, and the
9 same quality of the ad.
10       So in that context, would the publisher
11 rather have the $4 for that same piece of inventory
12 for the same ad, the same user, with the same
13 quality, or would it rather have the $4 [sic]?
14       MR. COLLIER:  Objection to the
15    form.
16    A.   Again -- let's say that that
17 publisher -- you're not giving me the full context.
18 So there could be a context in which that would not
19 be true.
20    Q.   What is that context in which that could
21 be true?
22       MR. COLLIER:  Objection to the
23    form.
24    A.   So let's say that the publisher is
25 unhappy with the auctioneer's rules and doesn't

Page 67

1 particularly want to accept bids from that
2 auctioneer because the auctioneer is not providing
3 it with some information.  So perhaps they would
4 prefer not to have that particular ad sold by that
5 auctioneer and might prefer to have that ad sold
6 for a different price by a different auctioneer
7 even if it's lower.
8    Q.   If we look at paragraph 62 of your
9 report, the third sentence of the paragraph, last
10 sentence, reads, "To maximize their revenue,
11 they" -- meaning publishers -- "want to set the
12 floor price as close as possible to what the buyer
13 who values the auction item most is willing to pay."
14       Do you see that?
15    A.   Yes.
16    Q.   Fair to say that one goal of publishers
17 is to maximize their revenue?
18    A.   One goal of publishers is to maximize
19 their revenue.
20    Q.   On the other side of the ad tech
21 industry, fair to say that advertisers want to
22 maximize their return on their advertising spend?
23    A.   One goal of advertisers would be to,
24 yeah, maximize their return on their advertising
25 spend.

Page 68

1    Q.   And to help advertisers and publishers
2 achieve their goals in the ad tech industry, both
3 advertisers and publishers can in some instances
4 turn to ad tech intermediaries; correct?
5       MR. COLLIER:  Objection to the
6    form.
7       Go ahead.
8    A.   Correct.
9    Q.   On the buy side of the ad tech industry,
10 buy-side tools help advertisers buy opportunities to
11 display their advertisements to users; is that
12 correct?
13    A.   Could you just repeat the question?
14    Q.   On the buy side of the ad tech industry,
15 buy-side tools help advertisers buy opportunities to
16 display their advertisements to users; is that
17 correct?
18    A.   Yes.
19    Q.   If we look at paragraph 54 of your
20 report, the second sentence there refers to buyers,
21 quote, "are unwilling to bid above their valuation
22 and would like to bid as low as possible."
23       MR. COLLIER:  Objection to the
24    form.
25    Q.   Do you see that, Professor Rudin?

Page 69

1    A.   Yes.
2    Q.   So all else equal, advertisers would
3 prefer to buy advertising opportunities for a lower
4 cost than a higher cost; is that correct?
5    A.   Generally, yes.
6    Q.   Would you agree that, all else equal,
7 publishers would prefer to sell their ad slots
8 rather than see those ad slots go unsold?
9    A.   Not necessarily.  There's reputational
10 issues, as I mentioned.
11    Q.   If we hold quality and reputation
12 constant, publishers would prefer to sell their ad
13 slots rather than see those ad slots go unsold;
14 correct?
15       MR. COLLIER:  Objection to the
16    form.
17    A.   Again, I have answered this earlier that
18 there could be an issue that the publisher has with
19 the auctioneer and would perhaps want to work with
20 a different auctioneer that maybe will give them
21 some additional data or additional benefit.  So it
22 really depends on the context.
23    Q.   As we discussed a moment ago, Google Ads
24 is Google's bidding tool; correct?
25    A.   Correct.  It's one of Google's bidding

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1  tools.
2     Q.   And AdX is Google's ad exchange, as we
3  talked about earlier?
4     A.   Yes.
5     Q.   On a very basic level, Google Ads only
6  earns revenue when its advertisers clear
7  transactions; correct?
8        MR. COLLIER:  Objection to the
9     form.
10    A.   I'm not an expert in exactly when Google
11 earns, you know -- the only earned money when this
12 happens, I'm not expert on that.  But I do know I
13 read a lot of documents that say that when there
14 are transaction Google Ads gets to keep some of it.
15    Q.   And you're not aware of any instances in
16 which Google Ads makes money when it doesn't clear a
17 transaction; correct?
18    A.   I'm not representing Google here, so I
19 can't tell you what Google Ads' deals are with
20 other people.
21    Q.   But based on the extensive record in
22 this case -- you have had access to millions of
23 documents and data and deposition testimony in this
24 case -- you haven't seen anything in the record that
25 indicates Google Ads earns revenue when

Page 71

1  transactions do not clear; correct?
2     A.   I've not seen anything that says that,
3  but that doesn't mean Google Ads doesn't have some
4  additional complication that I haven't seen.
5     Q.   When publisher inventory is sold using
6  Google Ads, is it your understanding that publishers
7  receive a percentage of the revenue for that
8  inventory?
9     A.   Yes.
10    Q.   So when transactions clear on Google
11 Ads, that leads to a monetary benefit for publishers
12 as well as Google; correct?
13    A.   Not necessarily because that's Google
14 Ads, that's an internal option and you'd have to go
15 to AdX.
16    Q.   And AdX, like Google Ads, only makes
17 money when transactions clear on the exchange;
18 correct?
19    A.   Sorry, could you repeat the question?
20    Q.   Like Google Ads, AdX only makes money
21 when transactions clear on the exchange; correct?
22    A.   Like I said, I don't know exactly all
23 the complications of when Google's things make
24 money, but I've seen evidence that when
25 transactions clear AdX does take part of that

Page 72

1  clearing price.
2        MR. HUNSBERGER:  Sorry, can we go
3     off the record for a minute.
4        THE VIDEOGRAPHER:  Going off the
5     record.  The time is 10:52 a.m.
6        (Recess taken.)
7        THE VIDEOGRAPHER:  Going back on
8     the record.  The time is 11:07 a.m.
9        MR. COLLIER:  Counsel, just to note
10    for the record, Alex Abston had to drop off
11    the Zoom, but Eric Janitens from Norton Rose
12    Fulbright and Melonie DeRose from The Lanier
13    Law Firm, both of course covered by the
14    protective order, have joined.
15 BY MR. HUNSBERGER:
16    Q.   Before we had our technical issue with
17 the realtime transcript we were talking about
18 Google's ad exchange called AdX.
19        Do you recall that?
20    A.   Yes.
21    Q.   When transactions clear on AdX, is it
22 your understanding that publishers receive a
23 percentage of the revenue from that transaction?
24    A.   Yes.
25    Q.   Is it your understanding that AdX also

Page 73

1  receives a percentage of the revenue from that
2  transaction?
3     A.   Yes.
4     Q.   So when transactions clear on AdX, both
5  publishers and Google receive revenue; correct?
6     A.   Yes.
7     Q.   As we discussed a few minutes ago before
8  our technical issue, both advertisers and publishers
9  can use ad tech intermediaries; correct?
10    A.   Yes.
11    Q.   And those can include buying tools for
12 advertisers; correct?
13    A.   Yes.
14    Q.   And publisher ad servers or ad exchanges
15 for publishers; correct?
16    A.   Yes.
17    Q.   And based on your understanding of the
18 ad tech industry from materials you've reviewed in
19 this case, there are multiple buying tools that
20 advertisers can use; correct?
21    A.   Yes.
22    Q.   And there are multiple ad servers and ad
23 exchanges that publishers can use; correct?
24    A.   I don't know the answer to that
25 question.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1    Q.   Are you aware if there are other ad
2    exchanges other than AdX?
3    A.   There are other ad exchanges.
4    Q.   Buying tools for advertisers and
5    ad exchanges for publishers, the firms that offer
6    those functionalities compete on a number of
7    dimensions; is that fair?
8    A.   The word "compete" has a technical
9    definition that - you know, I'm not an expert in
10   competition law, whatever.  So I can't -- I don't
11   really want to weigh into that.
12   Q.   Fair to say that ad exchanges and buying
13   tools have various characteristics that they use to
14   market their products to advertisers and publishers?
15   A.   I don't know how they market their
16   products.
17   Q.   In selecting an ad tool, ad buying tool,
18   fair to say that buyers consider price as one
19   dimension of the product?
20        MR. COLLIER:  Object.  Form.
21   A.   Again, I'm not an expert on what
22   advertisers consider when they're choosing buying
23   tools.
24   Q.   Is it fair to say that publishers
25   consider price as one dimension of their product

Page 75

1    choice?
2         MR. COLLIER:  Object.  Form.
3         Go ahead.
4    A.   Again, I'm not an expert on what
5    publishers choose in terms of their choice of
6    tools.  Price I would assume would be one
7    dimension, but there are many others.
8    Q.   What are those other dimensions?
9    A.   Well, an important one is the switching
10   cost.
11   Q.   What do you understand "switching cost"
12   to mean?
13   A.   The cost to switch who your tool is.
14   Q.   You mentioned earlier that you are not
15   an expert in economics.
16        Are you offering an opinion on switching
17   costs from a computer science perspective?
18   A.   No.  You asked me what are the other
19   things publishers might consider, and I'm telling
20   you what I found in documents, and I'm just
21   repeating those things.
22   Q.   Do you offer any opinion in this case on
23   switching costs?
24        MR. COLLIER:  Object.  Form.
25        Go ahead.

Page 76

1    A.   I would refer to some of the other
2    experts' reports for that information.
3    Q.   You don't have any discussion in your
4    report about switching costs; correct?
5    A.   I have maybe one or two sentences on
6    switching.
7    Q.   But not switching costs; correct?
8    A.   Well, it's relevant to switching costs.
9    Right?
10   Q.   Do you offer any opinion specifically on
11   switching costs in your report?
12   A.   As I said, there's a couple of sentences
13   in my report where switching costs are relevant to
14   the opinions.
15   Q.   In your report you indicate that both
16   publishers and advertisers and ad tech
17   intermediaries may use machine-learning models to
18   optimize their strategy; is that correct?
19   A.   Yes.
20   Q.   In your summary of opinions, going back
21   to paragraph 25 of your report, you offer the
22   opinion that, quote, "due to Google's auction
23   manipulations, sellers and buyers would not be able
24   to experiment to arrive at optimal strategies" for
25   the reasons that you list here; is that correct?

Page 77

1    A.   It says "at least the following
2    reasons."
3    Q.   For Google's supposed auction
4    manipulations to be the cause of customers'
5    inability to experiment to arrive at optimal
6    strategies the customers must have been able to do
7    the experiments to arrive at optimal strategies but
8    for Google's auctions; correct?
9         MR. COLLIER:  Object.  Form.
10   A.   That's a confusing question.  Can you
11   try saying it again?
12   Q.   Is it your opinion that Google's
13   supposed auction manipulations are the cause of
14   customers' inability to experiment to arrive at
15   optimal strategies?
16   A.   I believe many of the Google conducts
17   lead to experimentation being -- leading -- sorry,
18   give me one second.  I'm going to read what it says
19   here.
20        Yeah, due to Google's auction
21   manipulations, sellers and buyers would not be able
22   to experiment to arrive at optimal strategies, and
23   I gave several reasons, many reasons throughout
24   this report.
25   Q.   So is it your opinion that Google's

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1  conduct is the cause of customers' inability to
2  experiment to arrive at optimal strategies?
3      A.  Yes, Google's conducts are the reasons,
4  are reasons why sellers and buyers are not able to
5  experiment to arrive at optimal strategies.
6      Q.  Do you have any evidence that prior to
7  the conduct by Google that you described in your
8  report, sellers and buyers could experiment to
9  arrive at optimal strategies?
10          MR. COLLIER:  Object.  Form.
11          You can answer.
12     A.  I have evidence that certain Google --
13  before certain Google conducts it was much easier
14  to conduct experiments that were much more
15  effective in finding optimal strategies.
16     Q.  Could you point me to the evidence in
17  your report?
18          MR. COLLIER:  Objection.  Form.
19          Go ahead.
20     A.  There's a lot of -- there's a lot of
21  evidence throughout my report on this.  I will give
22  an example.
23          Maybe the decoupling of the different
24  data files, for instance, would prevent sellers
25  from, you know, receiving information that they

Page 79

1  would need to effectively conduct experiments.
2          Would you like me to give more examples?
3      Q.  We can start with that example.  We may
4  come back to other examples.
5          Is it your opinion that prior to the
6  decoupling of the different data files that
7  Google -- strike that.  Let me start again.
8          Is it your opinion that prior to the
9  decoupling of the different data files buyers and
10  sellers were able to conduct experiments to arrive
11  at optimal strategies?
12     A.  No.  Because this happened in 2019, and
13  there were many Google conducts before that that
14  led to the compromise of the experiments.
15     Q.  Do you have any evidence that prior to
16  any of the conduct described in your report that
17  sellers and buyers were able to experiment to arrive
18  at optimal strategies?
19     A.  Can you explain your question in more
20  detail?  I know that Google's conduct made
21  experiments much more difficult to conduct to come
22  up with optimal strategies.
23     Q.  What I'm trying to understand is you
24  describe Google's conduct, in your opinion, made it
25  more difficult to come up with optimal strategies.

Page 80

1  And I'm trying to understand the relative baseline
2  against which you're comparing what was more
3  difficult or easier.
4          So what I'm asking is if you have any
5  evidence that prior to the conduct that you analyze
6  in your report sellers and buyers were able to
7  experiment to arrive at optimal strategies.
8          MR. COLLIER:  Object.  Form.
9      A.  My report talks about the conducts that
10  make experiments more difficult.  I don't opine on
11  anything that happened outside of, you know, like,
12  way before any of these conducts.
13     Q.  In your report do you cite any evidence
14  that advertisers or publishers were actually using
15  machine-learning models to optimize their ad
16  strategies prior to Google's conduct?
17     A.  Sorry.  Could you repeat the question?
18     Q.  In your report do you cite any evidence
19  that advertisers or publishers were using
20  machine-learning models to optimize their ad
21  strategies prior to the conduct you analyze?
22     A.  Let's go through my report and try to
23  answer the question.  So I can go through the
24  report and try to find if there are any citations
25  to machine learning in ad tech before the conduct

Page 81

1  started.
2          (Witness reviews document.)
3  BY MR. HUNSBERGER:
4      Q.  Professor Rudin, have you identified
5  anything --
6          MR. COLLIER:  Counsel, she's
7  still -- you asked, "In your report do you
8  cite."
9          She's still reviewing her report.
10         MR. HUNSBERGER:  We can move on
11  from this question.
12         MR. COLLIER:  You're withdrawing
13  the question?
14         MR. HUNSBERGER:  I'm going to
15  approach it in a different way, because we
16  don't have time --
17         MR. COLLIER:  I'm not being
18  critical.  I am just saying your literal
19  question was "In your report do you cite."  So
20  she gets to review her report.
21         MR. HUNSBERGER:  We can move on and
22  ask the question a different way.
23  BY MR. HUNSBERGER:
24     Q.  You testified earlier, Professor Rudin,
25  that you don't opine on anything that happened

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1  outside of way before any of these conducts; do you
2  recall that?
3      A.   Right, I don't discuss anything that
4  happened way before any of these conducts.
5      Q.   Do you offer any opinions that
6  advertisers or publishers were using
7  machine-learning models to optimize their ad
8  strategies prior to Google's conduct in this case?
9          MR. COLLIER: Object. Form.
10     A.   The report doesn't contain any opinions
11 on what other entities were doing, if that's what
12 you are asking.
13         I know that machine learning has been
14 within the advertising world since its inception,
15 if that's what you are asking.
16     Q.   My question is whether you offer any
17 opinions that prior to Google's conduct that you
18 analyze in your report advertisers or publishers
19 were using machine-learning models to optimize their
20 ad strategies?
21     A.   So as I mentioned, machine learning and
22 advertising have been together since the inception
23 of advertising, so I -- you know, that's my answer.
24     Q.   But do you offer that as an opinion in
25 your report?

Page 83

1          MR. COLLIER: Object. Form.
2          Go ahead.
3      A.   So my report covers specifically
4  conducts of Google that are mentioned in the
5  report.
6      Q.   And you do not include any opinion that
7  publishers and advertisers were using
8  machine-learning models prior to Google's conduct;
9  correct?
10         MR. COLLIER: Object. Form.
11     A.   Can you be more specific about what
12 you're looking for here?
13     Q.   So you state that Google's supposed
14 auction manipulations that you analyze caused
15 customers to be unable to experiment to arrive at
16 optimal strategies.
17         And so what I'm asking for is did you
18 analyze the world without Google's conduct to
19 determine whether publishers or advertisers were
20 using machine-learning models prior to Google's
21 conduct to optimize their strategies.
22     A.   Machine learning and advertising have
23 gone hand in hand since the beginning. So, you
24 know, machine learning is used in sort of -- for
25 many different purposes, and I've listed a lot of

Page 84

1  them in my report.  I explain many reasons why
2  Google's conducts make it very, very difficult to
3  optimize strategies.
4      Q.   Did you review any documents produced in
5  this case stating that an advertiser used machine
6  learning to optimize its strategies?
7      A.   There were many documents showing that
8  Google used machine learning to optimize its
9  strategies.
10     Q.   My question was did you review any
11 documents produced in this case stating an
12 advertiser used machine learning to optimize its
13 strategy?
14     A.   Possibly, but there are thousands and
15 thousands of documents.  We can look through some
16 of them if you like.
17     Q.   But you can't think of any right now;
18 correct?
19     A.   There were documents I recall that might
20 be good answers to your questions, but I'm not sure
21 if I recall them well enough to want to declare
22 that as yes, I remember this.  So I'm not really
23 sure how to answer the question.
24     Q.   What is the earliest in time of the
25 Google conduct that you analyzed that you contend

Page 85

1  interfered with the ability for buyers and sellers
2  to experiment to find optimal strategies?
3      A.   Well, the notable Google program
4  launches, which would give you a better sense of
5  timeline, would include conduct starting from 2013.
6      Q.   Did you offer any opinions that prior to
7  2013 advertisers and publishers in the ad tech
8  industries were using machine-learning models to
9  optimize their ad strategies?
10         MR. COLLIER: Objection. Asked and
11 answered.
12         Go ahead.
13     A.   As I mentioned, machine learning is very
14 common in the advertising industry, so would I
15 assume lots of people would be using machine
16 learning in all different respects.
17     Q.   I understand, Professor Rudin. Part of
18 the purpose of an expert deposition is understanding
19 what you are offering opinions on and what you're
20 not offering opinions on.  And what I'm trying to
21 understand is do you offer opinions anywhere in your
22 report that prior to 2013 advertisers and publishers
23 in the ad tech industry were using machine-learning
24 models to optimize their ad strategies?
25         MR. COLLIER: Object. Form.

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1    Go ahead.
2    A.   My report doesn't address, like I said,
3  things way before the conduct started.  So that
4  topic wouldn't be in my report.
5    Q.   In this case, did you attempt to build a
6  machine-learning model applied to the ad tech
7  industry?
8    A.   I have the hypothetical model in
9  Section III.
10   Q.   Other than the hypothetical model in
11 Section III, did you attempt to build a
12 machine-learning model applied to the advertising
13 technology industry in this case?
14   A.   What is your definition of "model"?
15   Q.   Did you attempt to build a model that
16 could do the machine learning that you are
17 describing in your report applied to the data in
18 this case?
19        MR. COLLIER:  Object.  Form.
20   A.   What data are you referring to?
21   Q.   So in this case there have been massive
22 productions of detailed auction data.  There's been
23 log-level data, ████████ impressions from Google,
24 and similar large productions from third-party
25 ad tech companies such as ███████████████

Page 87

1  ██████ and several others.
2        Did you attempt, in connection with this
3  case, to build a machine-learning model that
4  analyzed that data?
5    A.   I had sufficient information to
6  construct my opinions in my report, so I didn't
7  need to create machine-learning models from that
8  data.
9    Q.   You are offering opinions in this case
10 about what publishers and advertisers can and cannot
11 do with their data when it comes to machine
12 learning, and you have access to massive datasets in
13 this case, and you decided not to build the model?
14        MR. COLLIER:  Object.  Form.
15   A.   Is that a question?
16   Q.   Yes.
17   A.   It's not clear to me what model I would
18 build that would give me any more information to
19 make my opinions stronger than the ones that are
20 already in this report.
21   Q.   Fair to say you did not use any of the
22 log-level impression data produced in this case to
23 build an empirical model; correct?
24   A.   I had sufficient information to
25 construct my report, and so I did not need to build

Page 88

1  any machine-learning models from any data --
2  log-level data to construct my opinions.
3    Q.   Did you estimate the amount of time and
4  money that it would cost to build such a model?
5        MR. COLLIER:  Object.  Form.
6    A.   No, because I had sufficient information
7  to construct the opinions in my report.
8    Q.   Is it fair to say that at various points
9  in your report you state or suggest that Google has
10 an information advantage over individual advertisers
11 and publishers that use Google's products?
12   A.   Yes.
13   Q.   For almost any advertiser or publishers
14 that uses one of the ad tech intermediaries that we
15 talked about, those intermediaries would also have
16 an information advantage; correct?
17        MR. COLLIER:  Object.  Form.
18   A.   Are you specifically discussing -- are
19 you specifically discussing Google's
20 intermediaries?
21   Q.   I'm talking about other intermediaries
22 other than Google.
23        So we talked about the fact that there
24 are other ad exchanges, there are other buy-side
25 tools.

Page 89

1        It's true that for any of those buy-side
2  tools or ad exchanges they will have an advantage
3  over individual publishers and advertisers; correct?
4        MR. COLLIER:  Object.  Form.
5    A.   I don't have information -- I don't
6  opine on what other intermediaries' data access is.
7  Other than Google.
8    Q.   Other than Google?
9    A.   Other than Google.
10   Q.   You have no opinions in this case on any
11 third-party ad tech tools; is that correct?
12   A.   Not quite.  So there's -- it's very
13 clear that Google has more -- access to more data
14 than anyone.  Including, you know, others, just
15 simply because of its massive scale and access to
16 data.
17   Q.   If you didn't analyze third-party
18 ad tech tools, how can you offer the opinion that
19 Google has more access to data than anyone?
20   A.   Because I understand from all of the
21 documents that I have read that Google's scale is
22 absolutely enormous.
23        Let's go to the data section in the
24 report and just talk about the data.
25   Q.   So my question is whether you did any

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1  comparative analysis.
2          Did you compare the amount of data that
3  Google has --
4          MR. COLLIER:  Counsel, I'm not sure
5  she was done answering.
6          Were you done answering?
7          THE WITNESS:  Not yet.
8          MR. COLLIER:  I would ask that you
9  let her finish.
10         MR. HUNSBERGER:  Counsel, I want to
11  make sure we're not filibustering and wasting
12  time.
13  BY MR. HUNSBERGER:
14     Q.   But if you have more to say, I certainly
15  did not mean to cut you off.
16     A.   I'm not filibustering.  I am doing my
17  best to answer your questions.
18         So if we look at the data section --
19     Q.   Which paragraph?
20     A.   I'm looking at Section IV.  And it has,
21  yo know, the list of data from past auctions.
22  Well, Google has conducted an enormous amount of
23  auctions, internal and AdX auctions.  It has data
24  from third-party cookies.  It's an enormous amount
25  of data.  And data from the O&O properties, which

Page 91

1  is also an enormous amount of data that no one else
2  has access to that level of data.
3          Sorry, go ahead with your question.
4     Q.   Thank you, Professor.
5          So my question is in reaching the
6  conclusion that you just said that that no one has access
7  to that amount of data, did you do a comparative
8  analysis of the amount of data that Google has
9  compared to the amount of data that other companies
10  have in the ad tech industry?
11     A.   I've seen many documents that state that
12  Google has much, much more data than anyone else.
13     Q.   But you did not do any empirical
14  analysis of the amount of data that Google has
15  compared to other companies in the ad tech industry;
16  correct?
17     A.   Empirical analysis meaning I would
18  actually have to see that data and have giant
19  tables of what the data is?
20     Q.   Correct.
21     A.   That's not something that I did.
22     Q.   Taking a step back, in other contexts
23  outside of ad tech, if you use an intermediary --
24  say, for example, if you use a real estate agent to
25  help you buy a home -- you expect that intermediary

Page 92

1  to have more and better information than you;
2  correct?
3          MR. COLLIER:  Object.  Form.
4     A.   It depends.  With real estate it's not
5  really clear anymore that that's true.
6     Q.   But you wouldn't hire a real estate
7  agent unless that real estate agent had more and
8  better information than you; correct?
9     A.   I think you have to hire a real estate
10  agent, don't you?  I'm not really sure.  I'm not an
11  expert in real estate.
12     Q.   Based on the materials you've reviewed
13  in this case and your understanding of the ad tech
14  industry, is it your understanding that advertisers
15  expect Google Ads has more information than the
16  individual advertiser?
17         MR. COLLIER:  Object.  Form.
18     A.   I expect Google Ads has more information
19  than the individual advertiser.
20     Q.   Is your understanding that advertisers
21  understand that to be the case too?
22         MR. COLLIER:  Object.  Form.
23     A.   I believe advertisers understand that to
24  be the case.
25     Q.   So advertisers come to Google Ads to

Page 93

1  help them achieve their goals that we talked about
2  earlier, and advertisers expect Google Ads to use
3  the information that Google Ads has to achieve the
4  advertisers' goals; correct?
5     A.   I'm not an advertiser, and I can't tell
6  you what advertisers expect.
7     Q.   Did you interview any advertisers in
8  connection with this case to form your opinions?
9     A.   No.
10     Q.   Did you review documents produced by any
11  advertisers in this case to form your opinions?
12     A.   I reviewed many Google internal
13  documents.  Some of them may have had things from
14  advertisers in them.
15     Q.   Did you review any documents produced by
16  the advertisers themselves, not produced by Google?
17         MR. COLLIER:  Object.  Form.
18     A.   I did not review information outside of
19  the case produced by advertisers, no.
20     Q.   Did you review any produced materials in
21  this case by advertisers?
22         MR. COLLIER:  Object.  Form.
23         You can answer.
24     A.   I don't recall any.
25     Q.   Is it your opinion that Google Ads has

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1    an information advantage over individual
2    advertisers?
3         MR. COLLIER: Object. Form.
4    A.   Yes, Google Ads has an information
5    advantage over individual advertisers.
6    Q.   If Google Ads uses that information to
7    win more impressions for the advertiser, you would
8    expect the advertiser to not try to stop that from
9    happening; correct?
10        MR. COLLIER: Object. Form.
11   A.   That one requires a level of context
12   that -- you know, the question is how much did they
13   pay for the pay? Would they have wanted to pay
14   less?
15        There's a level of context there that I
16   don't think that question has in it, so I can't
17   really answer it.
18        MR. HUNSBERGER: Counsel and
19   Professor, I'm at a good breaking point or we
20   can keep going. It's up to you. It's been
21   about an hour since we went back on the
22   record.
23        THE WITNESS: I've run out.
24        MR. COLLIER: That's fair.
25        Do you want to break for lunch,

Page 95

1    Counsel? We're kind of at your -- we will do
2    whatever. Do you want to break for lunch?
3         MR. HUNSBERGER: Why don't we go
4    off the record.
5         THE VIDEOGRAPHER: Going off the
6    record. The time is 11:45 a.m.
7         (Recess taken.)
8         THE VIDEOGRAPHER: Going back on
9    record. The time is 11:58 a.m.
10   BY MR. HUNSBERGER:
11   Q.   Professor Rudin, welcome back.
12        Talking again about some of the
13   abstraction models that you discuss in your report,
14   is it fair to say you designed machine-learning
15   abstracted options to illustrate how various Google
16   optimizations operate?
17        MR. COLLIER: Object. Form.
18   A.   Yes.
19   Q.   You also note that you have a set of
20   givens and adjust those givens to determine whether
21   it's possible to construct effective
22   machine-learning models; is that correct?
23   A.   I don't understand the question because
24   it doesn't say anything about givens, I don't
25   think, in the report anywhere.

Page 96

1    Q.   If we look at paragraph 51 of your
2    report.
3    A.   Okay.
4    Q.   It says, "I am going to start building
5    my ML Abstracted Auction on a set of postulates or
6    givens."
7         That's the "givens" I referred to in the
8    question.
9    A.   Oh, thank you.
10   Q.   So I can repeat the question, if that
11   would be helpful.
12   A.   What page are you on again?
13   Q.   Paragraph 51, page 19.
14   A.   Sure.
15   Q.   Here in paragraph 51 you note that you
16   have a set of givens, and you adjust them to
17   determine whether it would be possible to construct
18   effective machine-learning models; is that correct?
19   A.   Yes. It says, "I am going to start
20   building my ML Abstracted Auction on a set of
21   postulates" -- I'm just reading paragraph 51 on
22   page 19. I'm sorry.
23   Q.   One given in your report is that buyers
24   and sellers will use machine-learning models;
25   correct?

Page 97

1    A.   Correct.
2    Q.   And earlier you defined buyers in the
3    ad tech industry as buy-side tools or advertiser,
4    depending on the context; correct?
5    A.   Either earlier or later, yes.
6    Q.   Earlier in your testimony --
7    A.   Oh, earlier today. Okay.
8    Q.   -- today you defined sellers as
9    publishers in the ad tech industry; correct?
10   A.   Correct.
11   Q.   Did you interview any buyers in the
12   ad tech industry about their use of machine learning
13   models?
14   A.   No. I had sufficient information to
15   construct my report without interviewing additional
16   people.
17   Q.   Did you analyze the percentage of buyers
18   in the ad tech industry that utilized
19   machine-learning models?
20   A.   The word use is confusing, because even
21   if you don't develop the machine-learning algorithm
22   yourself, you may end up using one in another
23   context. So it's hard to answer that question
24   exactly.
25   Q.   Could you explain what you mean by that?

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1      MR. COLLIER: Objection. Form.
2          Go ahead.
3      A.   You know, if you're an advertiser and
4  you choose not to use machine learning to bid,
5  perhaps others will be using machine learning to
6  bid either for you or, you know, against you or
7  something like that.  So you might have machine
8  learning used even by those who don't develop
9  machine-learning algorithms themselves.
10     Q.   Did you evaluate the percentage of
11 buyers in the ad tech industry that develop
12 machine-learning models?
13     A.   I would refer to some of the other
14 reports for kind of, like, the overall view of the
15 industry since I'm not really an expert on that --
16 you know, who does what in the industry.
17     Q.   To your knowledge, did any of the other
18 plaintiffs' experts in this case evaluate the
19 percentage of buyers in the ad tech industry that
20 developed machine-learning models?
21     A.   There are thousands and thousands of
22 pages in those reports, and I don't remember all of
23 them, so I'm not really sure.
24     Q.   Did you interview any sellers in the
25 ad tech industry about their use of machine-learning

Page 99

1  models in the industry?
2      A.   I had sufficient information to
3  construct my report, so I didn't interview any, you
4  know, additional people, including sellers.
5      Q.   Did you analyze the percentage of
6  sellers in the ad tech industry that have
7  machine-learning models?
8      A.   So, again, since I am not an expert in
9  who does what in this industry, I would refer to
10 others, other reports, for that information.
11     Q.   But you agree that machine learning is
12 not the only method to estimate value in the ad tech
13 industry; correct?
14     MR. COLLIER: Objection. Form.
15     A.   I'm not actually sure how you would
16 estimate -- what was the question again?
17     Q.   You agree that machine learning is not
18 the only method to estimate value; correct?
19     MR. COLLIER: Objection. Form.
20     A.   To estimate value?  I'm not sure what
21 "to estimate value" means.  But estimation and
22 prediction in general, machine learning is a very
23 powerful tool for that.
24     Q.   So if we look at paragraph 52 of your
25 report -- I think it's the same page that you're

Page 100

1  on -- in your abstracted auction you say, "For each
2  auction, both the buyers and sellers try to estimate
3  the value of the item being auctioned."
4          Do you see that?
5      A.   Yes.  Here it says "the value of the
6  item," whereas you just said "value," so I got a
7  little confused.
8      Q.   So do you agree that machine learning is
9  not the only method to estimate the value of the
10 item?
11     MR. COLLIER: Objection. Form.
12     A.   You could use very simple statistics to
13 estimate value if you like.  I don't know if that
14 would fall under machine learning.  Some of it
15 does.
16     Q.   Later in your report you continue to
17 describe your methodology in creating this
18 abstraction model, and in your model you analyze how
19 these models apply to Google's optimizations that
20 you analyzed in the case; correct?
21     A.   I tried to.
22     Q.   If we turn just two pages past where you
23 currently are, to paragraphs 58 and 59 of your
24 report.
25     A.   Okay.

Page 101

1      Q.   In paragraph 58 do you see where it says
2  "Variables that the model would use for bids
3  include"?
4      A.   Yes.
5      Q.   And then in paragraph 59 you write
6  "Output from their valuation model."
7          Do you see that, Professor?
8      A.   Yes.
9      Q.   Then you have subparts (a), (b) and (c)
10 of that paragraph.  At the end of subpart (c) you
11 write, "and so on."
12         Do you see that?
13     A.   Yes.
14     Q.   What are variables would an auction
15 participant need to know for their model?
16     A.   I think auction participants would want
17 to know the full context, as much as they could,
18 that would help them value the item.  That could
19 include any background about the item itself, about
20 the bidders and their benefit from getting the
21 item, the -- let's see, what else.  There's ton of
22 stuff here.
23         So I list actually a lot of things on
24 page 20 and 21 that bidders might want to know,
25 including how rare the item is, the price of

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1  similar items from a similar period, whether
2  there's a collector who wants -- I could go on and
3  on all day about different things people would want
4  to know in order to create a valuation for an item.
5      Q.  So you just discussed a number of things
6  that auction participants would want to know?
7      A.  That would help them construct their
8  valuation model.
9      Q.  Do you have an opinion on what they need
10  to know in order to construct their valuation model?
11      MR. COLLIER:  Objection.  Form.
12      A.  I think it depends on the context.
13  That's very context dependent.
14      Q.  Building on our discussion about your
15  abstracted auction, if I understand from our
16  discussion a couple minutes ago, the buyer and
17  seller are each trying to estimate the true value of
18  the auction item; is that correct?
19      A.  They're each trying to create a
20  valuation of the auction item.  They have different
21  motivations in what they're -- they're doing.
22  Right?  One is trying to buy and the other is
23  trying to sell.  But I think that's clear.
24      Q.  When you apply your abstracted auction
25  to the facts of this case, an auction item is an ad

Page 103

1  impression; is that fair?
2      A.  Not in the abstracted auction.  The
3  abstracted auction is completely general.  But
4  later in the report, yeah.
5      Q.  Apologies if I wasn't clear.  I was
6  asking, when you apply your abstracted auction to
7  the facts of the ad tech industry in this case, an
8  auction item is the ad impression; is that correct?
9      A.  Yes.  Later on in the report, yes.
10      Q.  And in your opinion, what types of
11  factors would a buyer consider in estimating the
12  valuation?
13      A.  This is very heavily context dependent.
14  So I've given an example in the abstracted auction
15  section, page 20 and 21.
16      Q.  As you point out, you provided examples
17  of factors that a buyer might consider in your
18  abstracted auction applied in the art auction
19  context?
20      A.  Yes.
21      Q.  I am wondering if you have a similar
22  list of factors that an auction participant might
23  consider in the ad tech auction context.
24      A.  I think we -- I think we listed -- yes,
25  I think we listed some of that in this report.  Let

Page 104

1  me see if I can find it.
2      So I listed several subsections listing
3  data that's useful for prediction in Section IV of
4  the report starting on page 31, including data from
5  past auctions, including bid data from internal
6  auctions and bid data from AdX auctions, data from
7  third-party cookies -- sorry, in Section B,
8  detailed user data, including data from third-party
9  cookies.  And data from Google's O&O properties.
10      So that's some examples of data that
11  would be useful in ad tech options.
12      Q.  In that section of your report that you
13  refer to you're describing data that Google has;
14  correct?
15      A.  Yes.
16      Q.  And you're not describing data that a
17  buyer or seller would use to build its valuation for
18  the ad impression; correct?
19      MR. COLLIER:  Objection.  Form.
20      A.  Well, if they had access to all of that
21  data I think they would probably want to use that
22  data.
23      Q.  But you're not describing data that they
24  do use; correct?
25      A.  They have some data.  Some of this data

Page 105

1  they have.  But not all of it.
2      Q.  Did you interview any advertisers to
3  reach your conclusion that advertisers would want to
4  use this data?
5      A.  This kind of data is very useful for
6  determining valuations and bids.  So I would be
7  absolutely shocked if advertisers wouldn't want to
8  use this data.
9      Q.  But you did not have any conversations
10  with advertisers to reach your conclusion that
11  advertisers would want to use this data; correct?
12      A.  Again, this data is very -- would be
13  very valuable for constructing bids and valuations,
14  so I don't need to talk to any advertisers directly
15  to determine that this data would be valuable to
16  determine that.
17      Q.  So you assume it would be valuable based
18  on your understanding of the industry?
19      A.  Based on my understanding of the
20  industry as well as my understanding of what
21  Google's actually using to do its own predictions.
22      Q.  But there's a difference between what
23  Google is doing to make its predictions as an
24  ad tech tool versus what publishers or advertisers
25  are doing to make their predictions; correct?

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1    A.    Google has much more data than even
2  advertisers or publishers, so Google is doing
3  something different than advertisers and
4  publishers.
5    Q.    And you have not heard from any
6  advertisers or publishers in connection with this
7  case that they want all that data to do their
8  predictions; correct?
9        MR. COLLIER:  Object.  Form.
10    A.    I have read in various Google internal
11  documents that, for example, publishers really want
12  access to more data.  Or that they were hurt when
13  data was removed from their -- from being available
14  to them.
15    Q.    Those Google internal documents are the
16  only source that helped you reach that conclusion?
17        MR. COLLIER:  Objection.  Form.
18    A.    Which conclusion?
19    Q.    That publishers want access to more
20  data.
21    A.    Everybody wants access to more data.
22  Data is valuable.
23    Q.    That's your assumption; correct?
24    A.    That's based on my knowledge, my 20
25  years of knowledge working in this field.

Page 107

1    Q.    Do you have knowledge --
2    A.    Data's the new oil.
3        MR. COLLIER:  Let him ask his
4  complete question.
5    Q.    I don't mind an occasional injection of
6  humor.
7        So do you have knowledge applied to the
8  publishers and advertisers we are talking about in
9  this case that they want access to the data that you
10  are referring to?
11        MR. COLLIER:  Object to form.
12    A.    I've seen Google internal documents that
13  show that -- that states specifically that sellers
14  want access to more data.
15    Q.    Do you have any other evidence in this
16  case other than Google, in terms of documents to
17  support your conclusion that sellers want access to
18  more data?
19    A.    I believe everybody wants access to more
20  data, because the more data you have, the better
21  you can estimate, predict, act.
22    Q.    You believe that based on your
23  experience, but your only cited evidence in your
24  report is Google documents; is that correct?
25        MR. COLLIER:  Objection.  Form.

Page 108

1    A.    I've cited more than Google documents in
2  my report, a lot of it attesting to the value of
3  data.  And even data within the advertising
4  industry.
5    Q.    What other evidence other than Google
6  documents do you cite to support your conclusion
7  that sellers want access to more data?
8    A.    Okay.  Let's go through the report again
9  and try to find all the places I've cited where --
10  so you want documents that I've cited on the value
11  of data outside of Google internal documents;
12  correct?
13    Q.    No, that's not correct.
14    A.    Okay, I'm sorry.
15    Q.    I will just ask the question in a
16  different way.
17        What evidence did you rely on in forming
18  your opinions to reach the conclusion that
19  publishers want access to more data?
20    A.    Other than Google internal documents?
21    Q.    Correct.
22    A.    So I'm not allowed to use Google
23  internal documents.
24        Am I allowed to use Google internal
25  expert reports?

Page 109

1    Q.    You're, in forming your opinions in this
2  case, allowed to use the materials in the record.
3  It's just a simple factual question.
4        Other than internal Google documents,
5  what other evidence did you rely on to form
6  your conclusion that publishers want access to more
7  data?
8    A.    So we have cited a number of academic
9  papers that are published and are freely available
10  that show that machine-learning models are used in
11  the ad tech industry for different purposes.  So
12  the value of that data is clear in those academic
13  papers.  And of course we used a lot of internal
14  Google documents and expert reports.
15    Q.    Looking at paragraph 61 of your report,
16  page 21.  You state that "one buyer may pay more to
17  complete a collection with the 'Last piece in
18  Series A by Frida Kahlo,' which would increase the
19  value of the collection as a whole."
20        Do you see that?
21    A.    Yes.
22    Q.    That suggests that each potential buyer
23  might have a different value for a particular item
24  in an auction; correct?
25    A.    Correct.

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1    Q.   So applying that to the ad tech
2  industry, each potential buyer might have a
3  different value for the ad impression; correct?
4    A.   Correct.
5    Q.   Is it fair to say that impression values
6  are a combination of information known to the buyer
7  and information unknown to the buyer?
8    A.   Yes.
9    Q.   What proportion of the value of a
10 typical impression is known versus unknown?
11       MR. COLLIER: Objection. Form.
12    A.   There's no way I can answer that
13 question because it's auction dependent.  There
14 could be some auctions where the answer is 100 and
15 some where it's zero.
16    Q.   As we talked about earlier, Google
17 produced log-level bid and auction data for billions
18 of impressions in connection with this litigation.
19       Did you analyze that data to determine
20 what information is known versus unknown to
21 advertisers?
22    A.   First, I had sufficient information to
23 construct my report, so I wouldn't have needed to
24 do that kind of analysis.  But even if I had, I
25 would not have had enough information to determine

Page 111

1  that.
2    Q.   Turning to the seller in your abstracted
3  auction, is it fair to say that your seller in the
4  abstracted auction not only knows the potential
5  buyers for any given impression but also estimates
6  the value for each such buyer?
7    A.   I'm sorry.  Are you working in the
8  abstracted auction?
9    Q.   Correct.  I'm looking at paragraph 61.
10    A.   Okay.  This is an abstract case, but in
11 general a seller may have some idea who the
12 potential buyers are or who the potential set of
13 buyers that might have the highest bids are for a
14 given auction.
15    Q.   As you write in paragraph 61, "the
16 seller wants to estimate the value of the auction
17 item as well"; correct?
18    A.   Where are you looking?
19    Q.   The first sentence of paragraph 61.
20    A.   61?  Yeah.  So in paragraph 61 it says,
21 "In my ML Abstracted Auction, the seller wants to
22 estimate the value of the auction item as well.
23 They need to estimate the value for each buyer."
24    Q.   What information would sellers use to
25 estimate the value of the auction item?

Page 112

1    A.   Well, it depends -- again, this is very
2  context dependent, so it depends on the auction.
3  And we went through a bunch of examples earlier,
4  where -- you know, in the abstracted case, we -- I
5  listed -- I listed information about an art
6  auction.  We talked earlier about useful
7  information in -- that the seller might want to use
8  earlier as well, which is in Section IV.  I think
9  it's in other sections as well.
10    Q.   In the ad tech industry what information
11 would sellers use to estimate the value of an ad
12 impression?
13       MR. COLLIER: Objection. Form.
14    A.   So we've listed a number of data sources
15 that sellers could use to estimate values and set
16 floor prices, if that's what you're asking.
17       Do you want to go back to Section IV?
18    Q.   I was just asking in general terms,
19 based on your expertise and the report you submitted
20 in this case, what information sellers use to
21 estimate the value of an ad impression.
22       MR. COLLIER: Objection. Form.
23    A.   Well, again, it's very dependent on the
24 information that the sellers have available to them
25 and what the auction actually is.  So that's why I

Page 113

1  listed all of these things in Section IV of my
2  report.  The sellers wouldn't have access to all
3  that information, but they would use as much as
4  they could, as much as they had.
5    Q.   You understand that many display ad
6  campaigns are targeted to particular users?
7    A.   What do you refer to as a "user" in this
8  case?
9    Q.   For example, the user of a web page to
10 whom a display advertisement is shown.
11    A.   Okay.  And you're asking whether ads are
12 tailored to individual users?
13    Q.   Whether based on your understanding of
14 the ad tech industry display ad campaigns are
15 targeted to particular users.
16       MR. COLLIER: Objection. Form.
17    A.   I think it depends on the display ad
18 campaign, but I think there are campaigns that
19 would target users that have a specific set of
20 properties associated with them.
21       In terms of particular users, I don't
22 know if they know the user by name, but I think
23 certainly there are ad campaigns that are targeted
24 towards particular types of users.
25    Q.   Because the properties of those users

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1  might have a high value to the advertiser; correct?
2          MR. COLLIER: Objection. Form.
3      A.  Correct.
4      Q.  Is it your understanding for those users
5  the auctions to serve advertisements to those users
6  with particular properties might be more competitive
7  auctions?
8          MR. COLLIER: Objection. Form.
9      A.  Not necessarily. Again, we're missing a
10 lot of context here. So it could be that there's
11 only one buyer right now who would value this
12 particular user highly, and so it might not be an
13 auction where there are multiple high bids. I'm
14 not really sure. It really depends on the actual
15 context.
16     Q.  Professor, moving on a little bit from
17 your abstracted model, earlier today we discussed
18 that one goal of a seller in an auction is to
19 maximize their revenue.
20         Do you agree with that?
21     A.  One goal among possibly many.
22     Q.  And to maximize their revenues in a
23 second price auction, sellers need to set the floor
24 price as close as possible to what the buyer who
25 values the auction item most is willing to pay?

Page 115

1      A.  I'm sorry. Can you tell me the context
2  in which you're asking this?
3          You're in the abstracted auction?
4      Q.  You discussed this issue in the
5  abstracted auction, but then you obviously apply
6  your abstracted auction to the ad tech industry.
7      A.  So we go back to the abstracted auction
8  then, and you're asking whether if in the
9  abstracted auction the seller -- I'm sorry, could
10 you ask it again?
11     Q.  So I'm looking here at paragraph 62 of
12 your report.
13     A.  Okay.
14     Q.  The second -- actually, the third
15 sentence.
16     A.  Okay.
17     Q.  My question was: To maximize their
18 revenues in a second price auction, sellers need to
19 set the floor price as close as possible to what the
20 buyer who values the auction item most is willing to
21 pay; correct?
22     A.  Yes, that's true in the abstracted
23 auction. That's exactly what that says, yes.
24     Q.  And that's also true for second price
25 auctions in the ad tech industry; correct?

Page 116

1      A.  In general -- in general, sellers want
2  to set the floor price as close as possible to what
3  the buyer who values the auction item most is
4  willing to pay.
5      Q.  What is your understanding of what a
6  floor price is?
7      A.  It's the minimum amount that the seller
8  is willing to accept.
9          I'm sorry, I should have looked that up.
10 Right?
11     Q.  Again, in your abstracted model
12 discussed in your report, to determine the optimal
13 floor price to maximize revenue you indicate that a
14 seller would use machine learning to estimate the
15 value of the auction item; is that right?
16     A.  Sellers would benefit generally from
17 using machine learning to set their floor prices.
18     Q.  And in your abstracted model in
19 paragraph 63 you don't specify whether the
20 abstracted model is in a first-price or second-price
21 auction; is that correct?
22     A.  I believe I discussed both. It's
23 somewhere in this. Somewhere in this chapter.
24     Q.  Do you understand the terms "floor
25 price" and "reserve price" to refer to the same

Page 117

1  thing?
2          MR. COLLIER: Objection. Form.
3      A.  Yes.
4      Q.  Is it fair to say that the purpose of
5  the machine-learning model as discussed in your
6  abstract model is to generalize the optimal point
7  that is as close as possible to the highest amount
8  that a buyer will pay?
9      A.  To generalize the -- where are you
10 reading from?
11     Q.  I'm not reading.
12     A.  I'm sorry. Could you -- the word
13 "generalize" has a specific meaning to me, and I'm
14 not sure that's your meaning.
15     Q.  The purpose of the machine-learning
16 model as discussed in your abstraction is to
17 generate the optimal point that is as close as
18 possible to the highest amount that a buyer will
19 pay?
20     A.  It's to help them generate that, yes.
21 To help them generate that.
22     Q.  In your hypothetical model another
23 feature is the sellers know who the buyers are; is
24 that correct?
25     A.  They should know some of the buyers,

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1  yes. That would help them a lot, if they knew
2  information about the buyers.
3      Q. And the sellers have data from past
4  auctions; correct?
5      A. In the abstracted auction, yes, they do
6  have data from past auctions.
7      Q. To clarify, how many past auctions were
8  you contemplating in your abstracted model?
9          MR. COLLIER: Objection. Form.
10     A. It could be any number. It could be
11  ranging from one to -- go up as high as you like.
12     Q. Would that be limited just to auctions
13  that the seller has participated in?
14     A. The more auction information they have,
15  the better for them.
16     Q. In your abstracted model here, was the
17  information that sellers had access to limited to
18  auctions that they participated in, or did they also
19  have access to information from auctions that they
20  did not participate in?
21     A. You can take it either way. And if they
22  had data from auctions they did not participate in,
23  they would leverage that information and be able to
24  make better decisions.
25          THE WITNESS: I think it's getting

Page 119

1  to be time for us to take a break perhaps?
2  How close are we? For lunch. How close are
3  we?
4          MR. HUNSBERGER: I can do a couple
5  more questions and then we can break.
6          THE WITNESS: Okay. That sounds
7  good.
8          MR. COLLIER: And we're not trying
9  to interrupt a module.
10         THE WITNESS: I'm sorry. I'm just
11  hearing my stomach.
12         MR. HUNSBERGER: I won't go long.
13  I want to be mindful and professional and
14  courteous.
15         THE WITNESS: You're fine, don't
16  worry.
17  BY MR. HUNSBERGER:
18     Q. In your abstracted model, would the
19  seller also have data from every buyer who has ever
20  participated in an auction?
21     A. The seller could -- the more information
22  the seller has about bids from auctions they
23  participated in or auctions that others have
24  participated in, the more they could use that data
25  to make better decisions.

Page 120

1      Q. But as contemplated in your abstracted
2  model, would they also have data on every buyer who
3  has participated in the auction?
4      A. You could take that either way.
5          MR. HUNSBERGER: Okay. We can take
6  break.
7          THE VIDEOGRAPHER: Going off the
8  record. The time is 12:39 p.m.
9          (Luncheon recess: 12:39 p.m.)

Page 121

1          A F T E R N O O N   S E S S I O N
2          (Time noted: 1:48 p.m.)
3          THE VIDEOGRAPHER: Going back on
4  the record. The time is 1:48 p.m.
5          ---
6          CYNTHIA RUDIN, resumed and testified
7  further as follows:
8  CONTINUED EXAMINATION
9  BY MR. HUNSBERGER:
10     Q. Professor Rudin, welcome back. I'm glad
11  we've been able to sort out these technical
12  difficulties.
13         Before we move on to some new topics, I
14  would like to just circle back to two points we
15  discussed this morning.
16         One relates to your opinion in paragraph
17  25 of your report on page 9. Here and elsewhere in
18  your report you refer to what you describe as
19  "optimal strategies."
20         How do you define optimal strategies for
21  purposes of your report?
22     A. So the optimality of a strategy would
23  need to be defined by the person who wants to
24  create it. So different publishers might have
25  different optimal strategies, advertisers might

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1  have different optimal strategies, and they might
2  define optimality differently.
3      Q.    What might drive those different
4  definitions for different publishers and
5  advertisers?
6      A.    There could be a lot of things that
7  define optimality.  For instance -- let's give some
8  examples.
9          So publishers might want to preserve
10 their reputations.  There might be long-term
11 strategic goals.  Short-term profits.  There could
12 be a lot of different things that could go into
13 the -- the definition of optimality for an
14 individual actor.
15     Q.    You use the phrase "optimal strategies"
16 throughout your report.  Do you have a general
17 definition for purposes of your report that we can
18 use going forward?
19     A.    So I'm using the word "optimal" in the
20 same way we use in machine learning, where
21 "optimal" is defined with respect to the problem.
22 So you define an objective function, and then you
23 define an algorithm to optimize that objective
24 function.  If you can optimize it, then you created
25 an optimal strategy.

Page 123

1      Q.    In the context of what you just
2  described, how do you define the word "optimize"?
3      A.    Yes.  So optimize means try to get
4  closer to an optimal strategy.  And, again, the
5  goals that determine what is optimal are
6  individual.  Different publishers might have
7  different optimal strategies or different
8  definitions of optimality.  The same thing with
9  advertisers.
10     Q.    Again, for purposes of a general
11 definition, when you use the word "optimize" or
12 "optimal" are you referring to optimizing or
13 determining the optimal strategy to achieve certain
14 goals?
15     A.    Yes.  So you have your goals, and you're
16 trying to create a strategy to optimize those
17 goals.
18     Q.    And in defining "optimal strategy" we're
19 using the word "optimize."  I'm just want to make
20 sure we're speaking the same language.
21         So is it fair to say that in optimizing
22 you're trying to achieve a good outcome for whatever
23 that person's goals are?
24     A.    Yes.
25     Q.    Earlier today we talked briefly, because

Page 124

1  we provided for the court reporter what we were
2  referring to as O&O data, owned and operated data,
3  and you referred to Section IV of your report.
4          In Section IV of your report, on page 36
5  there are four paragraphs, paragraphs 121 through
6  124, where you have a subheading titled "Data
7  Advantage from Google's Owned and Operated
8  Properties."
9          Do you see that?
10     A.    Yes.
11     Q.    Are you aware of any examples from the
12 evidence in this case of Google using the
13 owned and operated data that you referred to in
14 these paragraphs to bid on AdX?
15     A.    So Google is able to use its own data
16 however it likes.
17         And I have, you know, the deposition
18 of -- there's all kinds of evidence cited here,
19 including the deposition of ███████████,
20 and -- I think the fact is that Google owns this
21 data.  That's why it's called "owned and operated."
22 And it can use it however it likes.
23     Q.    So you state that Google can use it
24 however it likes.  My question is a little bit
25 different, which is do you have any evidence that

Page 125

1  Google does in fact use this data from
2  owned and operated properties when bidding on AdX?
3      A.    Sorry.  You're asking when Google uses
4  this data?
5      Q.    My question is do you have any evidence
6  that Google does in fact use this data from
7  owned and operated properties when Google Ads bids
8  on AdX?
9      A.    I mean, I've seen lots of internal
10 Google documents referencing these data.  If you
11 want me to pinpoint something other than what's in
12 the report, it would take me a while to go through
13 and find it.
14     Q.    So I'm looking at paragraphs 121 to 124
15 where you discuss Google's owned and operated data,
16 and on my read I don't see any evidence in these
17 paragraphs that Google uses this owned and operated
18 data when Google Ads bids into AdX.
19     A.    So I will just read you, for instance,
20 one of the footnotes from page 37.  "Owned &
21 Operated Ad Creation.  Internal Google document on
22 Ads in Google Owned and Operated properties.  Ad
23 creation for a new campaign type for Google Owned &
24 Operated properties."
25         So you have, you know, Google using its

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1  own data to create ads on its own properties, from
2  what I can tell.
3      Q.   That doesn't say that Google Ads is
4  using data from owned and operated properties to
5  inform the bids that Google Ads makes on AdX;
6  correct?
7          MR. COLLIER: Objection. Form.
8      A.   I'm reading this document differently
9  than you are, because it says "Internal Google
10 document on Ads in Google Owned and Operated
11 properties."
12         So you have Google owned and operated
13 properties creating ads, so, you know, you've got
14 ads created for itself, and so they're going to use
15 owned and operated data.
16         I can't imagine how that would not be
17 the way that this particular footnote should be
18 interpreted. So I'm not sure where you're going
19 with this.
20     Q.   So there is a difference between
21 having -- Google having access to owned and operated
22 data and Google Ads using that owned and operated
23 data to bid on AdX?
24         MR. COLLIER: Objection. Form.
25     Q.   And that's what I'm trying to get at

Page 127

1  here.
2          So the question is, you described
3  various types of owned and operated data that Google
4  has, such as from YouTube, Google Play, Google
5  Search, Google Maps. And my question is whether you
6  have any evidence indicating that Google Ads as a
7  buying tool uses that owned and operated data to bid
8  on AdX?
9      A.   I've seen documents beyond the ones that
10 I just showed -- the one that I just picked out, I
11 just happened to pick it out incidentally because
12 it happened to be on the page I was looking at.
13 And it's basically saying, as far as I can tell,
14 Google's owned and operated properties -- it says
15 "Owned & Operated Ad Creation."
16         And so it's using information to create
17 ads on Google owned and operated properties.
18         Are you telling me -- it seems like
19 you're telling me that those properties, their data
20 is not going into those ads, and I'm not sure I --
21 I'm not sure I could possibly agree with that.
22     Q.   What you're describing is owned and
23 operated properties where Google is displaying ads;
24 correct?
25         MR. COLLIER: Objection. Form.

Page 128

1      A.   This is just the first citation I found
2  that mentions, you know, O&O data and ads. So if
3  you're telling me to interpret this as Google
4  doesn't use its O&O data to inform the data on its
5  O&O properties, I find that hard to believe.
6          I can try and find more references if
7  you like to, you know, O&O data use. But this is a
8  long document, and I could go and try to find it if
9  you like.
10     Q.   Are you aware that Google does not sell
11 ads for its O&O properties on AdX?
12     A.   What Google does is what Google does.
13 I'm not -- you can tell me things, but I'm not
14 going to believe it unless I see it in the
15 documents.
16     Q.   Did you investigate whether Google sells
17 ads for its O&O properties on AdX?
18     A.   I would need a lot more -- I would need
19 to go through some documents to sort of figure that
20 out, but I'm certainly not going to take anyone's
21 word for it.
22     Q.   My question is whether you, in
23 connection with forming your opinions in this
24 report, investigated whether Google sells ads for
25 its O&O properties on AdX.

Page 129

1      A.   And I told you that I would need to
2  actually go and look at documentation to try to
3  figure out exactly -- if you ask me things like how
4  exactly does Google use all of its data to inform
5  its predictions, I'm going to say, well, I don't
6  know. I mean, this is not information I
7  necessarily have -- it's a very detailed
8  information that I don't necessarily have access to
9  and don't necessarily remember all of the specifics
10 in these thousands and thousands of pages I've
11 read.
12         I do know that Google keeps track of
13 very, very detailed information on individuals for
14 the purpose of advertising. I do know that. I've
15 seen that many times in the Google internal
16 documents.
17     Q.   Other than what you point to here in
18 footnote 66 on page 37, in paragraphs 121 through
19 124 of your report do you cite any other evidence?
20     A.   I believe I do. For instance, there's a
21 footnote about "In an internal communication,
22 Google confirmed the distinct value of 'user
23 intent' information obtained from Search and Chrome
24 activity, noting that 'proactive search query is a
25 strong signal of user intent,' as a user is much

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1  more likely to make a purchase decision after
2  having searched for it."
3       And it says also in another document,
4  internal Google communication on use of search data
5  as a signal for audience targeting.  And it talks
6  about GAIA IDs, which are IDs for users that track
7  them, and there's very detailed information about
8  users with GAIA IDs.
9       There's a lot of data about cookies.
10      I could keep going if you like.
11   Q.   You're referring here about user intent
12  information that's in footnote 71?  That's where you
13  were reading from?
14   A.   Yes.  And 74.  I will keep going if you
15  like.
16   Q.   Do you have any evidence that Google
17  used the data that you cite in footnote 71 or 74 to
18  inform Google Ads bids on AdX?
19   A.   I'm not sure what type of evidence
20  you're looking for other -- it seems almost like I
21  would have to go look at the code to make you happy
22  with evidence.
23      I think these Google internal documents,
24  you know, these ones and the other ones that I have
25  seen, should suffice.

Page 131

1    Q.   Do you agree that there is a difference
2  between collecting and tracking user data and using
3  user data for purposes of informing Google Ads bids
4  on AdX?
5       MR. COLLIER:  Objection.  Form.
6    A.   Yeah, I didn't understand that
7  question --
8    Q.   Put differently, Google can track and
9  collect information about its own owned and operated
10  properties; correct?
11   A.   Google can track information about its
12  owned and operated properties, yes.
13   Q.   But there is a separate question of
14  whether Google uses that information to inform
15  Google Ads bids on AdX; correct?
16       MR. COLLIER:  Object.  Form.
17   A.   So it's very clear to me that Google
18  uses its O&O data to inform bidding and -- I will
19  I've give you another quote.
20       "Specifically, we explore various
21  transfer learning techniques to use knowledges
22  from Google Owned and Operated Products, a/k/a O&O,
23  e.g. Google Search YouTube."
24   Q.   Where are you reading from?
25   A.   Footnote 80.

Page 132

1       MR. COLLIER:  I'm not sure she
2  was -- were you done --
3       THE WITNESS:  No, I wasn't.
4       MR. HUNSBERGER:  I just wanted to
5  make sure where I should be following along.
6    A.   "...to benefit display ads targeting
7  products."
8       So, I mean, like, you can tell me, oh,
9  but it doesn't use O&O, but that disagrees with
10  what I'm reading in this multitude of documents.
11  And this was only a few examples that I happen to
12  have right in front of me.
13   Q.   What you pointed to right there, that
14  doesn't say that Google Ads used O&O data to inform
15  its bids on AdX; correct?
16       MR. COLLIER:  Object.  Form.
17   A.   I think I've answered this question.  I
18  think it's very clear that Google is using its O&O
19  data in many different ways to benefit ads
20  targeting products.  Exactly what it says.
21   Q.   So it would surprise you if you were to
22  learn that Google Ads does not use O&O data to
23  inform its bids on AdX?
24   A.   That would disagree with all of these
25  internal documents that I have read.

Page 133

1    Q.   So that would be a surprising fact to
2  you?
3       MR. COLLIER:  Object.  Form.
4    A.   I've already answered the question.
5    Q.   Would that be a surprising fact to
6  you --
7    A.   It would disagree with what I have read.
8       MR. COLLIER:  Just give me a moment
9  to make my objection to form if I need to.  I
10  don't want to interrupt your answer, but I do
11  want you to pause.  The court reporter can't
12  take us both at once.
13       THE WITNESS:  I'm sorry.
14       MR. COLLIER:  It's okay.
15  BY MR. HUNSBERGER:
16   Q.   Okay.  Professor, I think at this point
17  we'll switch gears a little bit and talk about
18  Section V of your report, I believe it is.  This
19  begins on page 46, paragraph 142.  The heading of
20  the section is "Google's Auction Manipulations
21  Further Limit the Amount of Useful Information That
22  Buyers and Users Have For Machine Learning."
23       One of the optimizations that you
24  discuss in your report is Project Bernanke; is that
25  correct?

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1    A.   Correct.
2    Q.   If we turn to paragraph 156 of your
3  report, in the first sentence there you say, "The
4  amount Bernanke changed bids depended on the ███
5  ████████████████████████████████████████████
6  ████████████████████████████████████████████
7  ███████████████
8         Do you see that?
9    A.   Yes.
10   Q.   So it's your understanding that Bernanke
11  ████████████████████████████████████████████
12  ████████████████████████; correct?
13         MR. COLLIER:  Objection.  Form.
14   A.   Correct.
15   Q.   So it's your opinion that Bernanke did
16  not use information about other bidders' bids in a
17  live auction to compute the multiplier to be applied
18  to the Google Ads bid in that same auction; correct?
19         MR. COLLIER:  Objection.  Form.
20   A.   Sorry, Bernanke did operate on live
21  data, if that's what you're asking.
22   Q.   My question is whether -- did Bernanke
23  use information about other bidders' bids in a live
24  auction to compute the multiplier to be applied to
25  the Google Ads bid in that same auction.

Page 135

1         MR. COLLIER:  Objection.  Form.
2    A.   I believe the answer is no, but I would
3  need to double-check it.
4    Q.   Those multipliers were designed to
5  sometimes increase bids to exceed the predicted bid
6  of other AdX buyers; correct?
7    A.   Correct.
8    Q.   And those multipliers were designed to
9  sometimes decrease bids to only slightly exceed the
10  predicted bid of other AdX buyers; correct?
11   A.   I'm sorry, could you repeat that again?
12   Q.   Yes.
13         And those Bernanke multipliers were
14  designed to sometimes decrease bids to only slightly
15  exceed the predicted bid of other AdX buyers;
16  correct?
17   A.   That can definitely happen, yes.
18   Q.   Under Project Bernanke --
19   A.   Sorry, you said "other AdX bidders";
20  right?  Can you repeat that again?
21   Q.   I did.  Other AdX bidders.
22   A.   Okay, thank you.
23         Go ahead.
24   Q.   Under Project Bernanke Google expanded
25  the number of auction wins in AdX by allowing Google

Page 136

1  Ads buyers to purchase otherwise unsold impressions;
2  correct?
3         MR. COLLIER:  Objection.
4    A.   It did that, but a lot more, yes.
5    Q.   Turning to paragraph 149 of your report,
6  you see that language that I was just reading in the
7  first sentence of paragraph 149.  "Google launched
8  Project Bernanke to expand the number of auction
9  wins in AdX by allowing Google Ads buyers to
10  purchase otherwise unsold impressions."
11        Do you see that language?
12         MR. COLLIER:  Objection.  Form.
13   A.   Yeah, I believe that's the language you
14  just read.
15   Q.   Correct.  I just want to make sure we're
16  all following along at the same paragraph.
17        So Bernanke allowed Google Ads buyers to
18  purchase additional impressions; correct?
19   A.   It did that as well as other things,
20  yes.
21   Q.   Some of those impressions would have
22  otherwise gone unsold?
23   A.   Some of those impressions would have
24  gone unsold in AdX.  They may have gone to another
25  auction where they may have been sold later.  They

Page 137

1  may have gone unsold totally.  Yes.
2    Q.   And Bernanke did this without changing
3  the price that the advertiser had to pay; correct?
4         MR. COLLIER:  Objection.  Form.
5    A.   I'm not sure what you mean exactly, but
6  in terms of the -- did the advertiser know that
7  Bernanke was changing its price -- in other words,
8  would it have paid the same price either knowing or
9  not knowing -- sorry -- the advertiser didn't know
10  that Bernanke was running -- I'm sorry, let me try
11  that again.
12        It's very complicated, because Bernanke
13  did change the prices that advertisers paid,
14  because it -- you know, if an advertiser bid and
15  then the second price was lowered, then -- oh, no,
16  the advertiser would still pay what the original
17  second bid was.
18        So -- yes, so the advertiser would pay
19  whatever that second bid was into the internal
20  Google Ads auction.
21   Q.   Understanding that it's complicated,
22  we'll return to the question, which is:
23        Bernanke did not change the price that
24  the advertiser had to pay; correct?
25         MR. COLLIER:  Objection.  Form.

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1      A.    In the sense that if Bernanke was
2   operating one auction and the bids were the same in
3   the internal Google Ads auction and then the same
4   situation happened again without Bernanke, the same
5   two bids, then the advertiser would pay the same to
6   Google, yes.
7      Q.    In your report, on page 54, paragraph
8   160, the sentence that begins with "Likewise."
9          Do you see that?
10     A.    Yes.
11     Q.    "If Bernanke lowers the clearing price,
12   the seller's model may respond by lowering floor
13   prices in the future."
14         Do you see that language?
15     A.    Yes.
16     Q.    Do you have any empirical evidence to
17   support that statement?
18         MR. COLLIER:  Objection.  Form.
19     A.    This is in an abstract auction, so it is
20   not -- this is an abstract setting.  It's not even
21   pertaining to Google necessarily.
22         Oh, sorry -- I'm sorry -- we're in the
23   other section.  I forgot which section we were in.
24         Let me just step back a second to think.
25         Sorry, are you looking for evidence of a

Page 139

1   particular auction where -- particular set of
2   auctions where some behavior occurred?  Because I
3   could not provide that to you no matter what,
4   because I don't have data -- that kind of very
5   detailed data on who did what when.
6      Q.    So yeah, my question is you seem to
7   be -- correct me if I'm wrong or add any context
8   that you think is appropriate, but you seem to be
9   describing something that may happen.
10         You say "if Bernanke lowers the clearing
11   price, the seller's model may respond by lowering
12   floor prices in the future."
13         So my question is do you have any
14   empirical evidence that the seller's model did
15   respond by lowering floor prices in the future?
16     A.    So you're asking me for something that
17   there's no possible way I would be able to produce
18   because it would require me to actually have
19   knowledge of what an exact seller is doing, and I
20   don't have any kind of data like that.
21     Q.    So you're describing a theory of
22   something that may happen; correct?
23         MR. COLLIER:  Objection.  Form.
24     A.    It uses the word "may."
25     Q.    And it may not happen as well?

Page 140

1      A.    Many things may happen or may not
2   happen.  So yes, it may not happen.
3      Q.    You just said you don't have the data to
4   determine the answer to my question.
5          Do you have any academic research that
6   would support that opinion?
7      A.    I mean, it's a logical conclusion from
8   the situation that I'm describing here, so -- it's
9   kind of a basic calculation.
10     Q.    Did you observe any publisher model that
11   actually did this?
12         MR. COLLIER:  Objection.  Form.
13     A.    So, again, you're asking me for some
14   very specific information about a particular
15   publisher, and I don't have any of that type of
16   data, so there's no way I could possibly answer
17   affirmatively to that question.
18     Q.    You used the word "may" in the sentence
19   to describe something that is logically possible; is
20   that fair?
21         MR. COLLIER:  Objection.  Form.
22     A.    The way we used it here was that they
23   may do this because it makes logical sense that
24   they would.
25     Q.    In the next sentence of the paragraph

Page 141

1   you say, "If the seller lowers floor prices, the
2   model may reduce revenue for seller."
3          Do you see that?
4      A.    Yes.
5      Q.    Do you have any empirical evidence to
6   support that statement?
7          MR. COLLIER:  Objection.  Form.
8      A.    So, again, if you're asking me to talk
9   to a specific publisher and ask what their strategy
10   is, that's not something I would have had access to
11   do or would have done, so I wouldn't be able to
12   answer your question.
13     Q.    And in the documents and data produced
14   in this case did you observe any publisher model
15   that actually lowered floor prices and led to
16   reduced publisher revenue in response to Bernanke?
17         MR. COLLIER:  Objection.  Form.
18     A.    Okay, you're asking for sort of
19   responses to Bernanke, and there were citations
20   here on responses to Bernanke listed in the
21   footnotes throughout this report, and there are a
22   couple of -- ones that would probably answer your
23   question nicely.  I would just need a few minutes
24   to find them.
25         Would you like me to do that?

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1    Q.   I'm aware of the materials you cite in
2  your report, so unless you have anything beyond
3  what's written in your report we can move on.
4    A.   Okay.  I think we can move on.
5    Q.   Ultimately Project Bernanke increased
6  overall publisher revenue; correct?
7         MR. COLLIER:  Objection.  Form.
8    A.   You're asking me about -- okay.  So
9  let's step back a second.
10        So you're asking me about whether this
11  particular program increased -- increased relative
12  to what.  Right?  And so, you know, you've got
13  sellers who are not in good shape either with or
14  without Bernanke.  And so you're saying, well, it's
15  better than this.  But both options are bad, so
16  it's not really like I can say, oh, yeah, it's been
17  super helpful for everybody.  So -- yeah.
18    Q.   Let's turn to a document.
19         (Rudin Exhibit 3, Bates
20         GOOG-AT-MDL-004555192, marked for
21         identification, as of this date.)
22  BY MR. HUNSBERGER:
23    Q.   I'm handing you a copy of an exhibit
24  that has been marked Rudin Exhibit 3.  This is a
25  copy of a document bearing the Bates number

Page 143

1  GOOG-AT-MDL004555192.  This is a document that you
2  cite in footnotes 120 and 185 of your report.
3    A.   Okay.
4         (Witness reviews document.)
5    Q.   Professor, you cite this document in
6  your report.
7         Are you familiar with it?
8    A.   I'm still reading it.  Could you give me
9  a minute?
10    Q.   For your context, I will have questions
11  on page ending in 196.
12    A.   Oh, thank you.  That's helpful.
13         (Witness reviews document.)
14    Q.   Professor, you've had about 10 minutes
15  to review the document.  Are you ready for some
16  questions on page 196?
17    A.   Almost.  I'm sorry.  I'm not a fast
18  reader.
19         MR. COLLIER:  Nor do I believe it's
20  been 10 minutes.
21    Q.   Professor, are you ready to proceed with
22  questions?  It's been about 15 minutes since we
23  introduced the exhibit.
24         MR. COLLIER:  Counsel, I am again
25  going to interject.  You stating facts, it is

Page 144

1  what it is.  You've put -- since you're going
2  to speak on the record, you put a document
3  which is Bates numbered 4,500,000 in the
4  record and act like she's supposed to have
5  memorized this and not be able read it before
6  you ask her questions under oath.
7         So, Dr. Rudin, you read that until
8  you're comfortable you can answer questions
9  under oath about it, but don't take any longer
10  than you need.
11         MR. HUNSBERGER:  I'm certainly not
12  rushing the witness.  I gave her 15 minutes
13  uninterrupted.
14         MR. COLLIER:  First of all, it
15  wasn't uninterrupted.  You decided you would
16  throw down a marker at 10 minutes, as you
17  called it.  So we are now onto the second
18  interruption.  She would probably be done by
19  now if it wasn't for you.
20         Continue, Dr. Rudin.
21         THE WITNESS:  Thank you.
22    A.   Okay.  I might need to look again at
23  this page 196, but I think you can go ahead and ask
24  your question.
25    Q.   Thank you, Professor.

Page 145

1         You cite this document in your report;
2  is that correct?
3    A.   I've read this document several times,
4  and I've cited different parts of it in my report.
5    Q.   So you consider it reliable enough to
6  rely on in your report?
7         MR. COLLIER:  Objection.  Form.
8    A.   The word "rely" is a little bit tricky
9  because this is an internal discussion at Google.
10  So I rely upon the fact the Google employees were
11  talking about these things, but that's about it.
12    Q.   Looking at page 196, the only page of
13  this eight-page document that I plan to ask you
14  about, if we look at bullet point number 5, do you
15  see where it says, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17    A.   Sure.
18    Q.   That quote continues, "▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24         Do you see that quote?
25    A.   I see that quote.

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1    Q.   In the aggregate, Bernanke increased
2    publisher revenue; correct?
3              MR. COLLIER: Objection. Form.
4    A.   So again, you know, you're talking, kind
5    of, there are certain auctions where Bernanke
6    increased publisher revenue and there are other
7    auctions where it decreases publisher revenue. And
8    in fact happens to be the page I'm just sitting on
9    here, talking about Global Bernanke. ████
██████████████████████████████████████
12       So I can't really answer your
13   question -- well, I think I've answered your
14   question actually.
15   Q.   For publishers as a class, so all
16   publishers, in the aggregate Bernanke increased
17   publisher revenue, correct?
18   A.   Again, we don't aggregate all
19   publishers. We talk about some publishers ████
██████████████████████████████. I
21   mean, some things went up, some things went done,
22   but there were some real losers.
23   Q.   And you don't have any evidence that
24   Bernanke decreased publisher revenue in the
25   aggregate; do you?

Page 147

1              MR. COLLIER: Objection. Form.
2    A.   All right. I'm just going to read from
3    my report here.
4              "I understand that the variance created
5    by Bernanke had revenue impacts that were not
6    necessarily easy to predict in advance. For
7    instance, ███████████████████████████
███████████████████████████████████
███████████████████████████
███████████████████████████████
███████████████████████████
███████████████████████████████
███████████████████████████████
█████████████
17   Q.   What you're describing there is
18   referring to specific individual publishers; is that
19   correct?
20   A.   Yes.
21   Q.   Publishers as a class, all publishers in
22   the aggregate experienced increased publisher
23   revenue under Bernanke; correct?
24   A.   I can't agree to that. I can't agree to
25   that kind of summarization, that -- no, I just

Page 148

1    don't believe that's true.
2    Q.   Do you offer any opinion that Bernanke
3    decreased publisher revenue in the aggregate?
4              MR. COLLIER: Objection. Form.
5    A.   I don't agree that it's okay to do that
6    kind of aggregation. So for every Bernanke win,
7    there was another loss, right? Because Bernanke
8    would change the result of an auction. So, you
9    know, I just -- and I've read you paragraphs
10   talking about notable losers of Bernanke. So, you
11   know, I just can't agree with what you said.
12   Q.   So you're referring to specific
13   individual publishers who, in your characterization,
14   were "losers" under Bernanke; correct?
15             MR. COLLIER: Objection. Form.
16   A.   Shall I read it again?
17   Q.   No. It's just a question of what you're
18   describing in your report is specific individual
19   publishers that you describe as "losers" under
20   Bernanke; correct?
21   A.   It was not my description. This was an
22   internal Google document I read from.
23   Q.   But, again, you're referring to specific
24   individual publishers; correct?
25   A.   I pointed out that ████████████████

Page 149

1    ████████████████████████████████████
██████████        So you could talk about
3    individual publishers, but there is many individual
4    publishers who were losers from Bernanke and Global
5    Bernanke.
6    Q.   But you're not offering an opinion that
7    all publishers as a whole faced reduced revenue
8    under Bernanke; correct?
9              MR. COLLIER: Objection. Form.
10   A.   I'm just saying I don't want to
11   characterize all publishers because they're not a
12   monolith.
13   Q.   So you do not offer any opinion on all
14   publishers, correct, because you don't think it's
15   proper?
16             MR. COLLIER: Objection. Form.
17             You both are New York, so you're
18   very fast. Just pause for a second, let me
19   say objection to form, and I know you want to
20   answer.
21             Go ahead.
22             THE WITNESS: Sorry.
23   A.   Okay. I wouldn't even know how to sort
24   of say in the aggregate over individual.
25             So, for example, do I average based on,

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1  you know, the average over all the publishers
2  weighted by the amount of money they gain from the
3  auctions or -- I just don't even know how that
4  aggregation even makes sense.
5       You're saying let me average over
6  companies. Well, how do you do that average?
7  Like, you could weight in 20,000 different ways.
8  So there's not a standard way of aggregating, so
9  I'm not really sure how I can best answer your
10  question other than to say it's not well defined.
11     Q.  So before Bernanke, publishers made a
12  certain amount of revenue. After Bernanke,
13  publishers made a certain amount of revenue.
14      My question is whether you offer any
15  opinion about the amount that publishers as a whole
16  in the aggregate made before Bernanke versus the
17  amount that publishers as a whole made after
18  Bernanke?
19          MR. COLLIER:  Objection. Form.
20     A.  I'm sorry if my answer last time wasn't
21  clear. I will try it again. Which is that it's
22  not clear how you can do that kind of aggregation
23  because you're asking me to aggregate over
24  companies. These are not just numbers. These are
25  companies. So I would have to figure out how to do

Page 151

1  that aggregation. And in statistics there are many
2  different ways to aggregate, and I don't know of
3  one that would actually represent the answer that
4  you're looking for. So I just can't do that kind
5  of aggregation because it's not well defined.
6      Q.  Do you have any reason to believe that
7  this document's statement that Bernanke increases
8  publisher revenue is incorrect?
9          MR. COLLIER:  Objection. Form.
10     A.  So this document is someone's opinion
11  about -- I'm sorry, where is it?
12      Its goal is to increase publisher
13  revenue. This is Google employees talking
14  internally. And so they're talking about a general
15  strategy, and they're saying this is what we --
16  this is what we think should happen, and that's as
17  much as I'm taking from that.
18     Q.  Do you see the language in this same
19  portion of the document on page 196 that refers to
20  "This increases advertiser
21  impression/click/conversion volume"?
22     A.  Where are you reading from?
23     Q.  The same bullet, Number 5.
24     A.  Yeah, I see where it says that. I see
25  where this Google employee is talking about that.

Page 152

1      Q.  Do you have any reason to doubt the
2  statement that Bernanke increases advertiser
3  impression/click/conversion volume?
4     A.  So --
5          MR. COLLIER:  Objection. Form.
6     A.  Thank you. Sorry.
7      The idea with Bernanke is that -- give
8  me a second.
9      Yeah, so the goal is keep more money
10  circulating so that -- this is the idea with
11  Bernanke, that if there's more money circulating
12  into the system, it would increase the volume of
13  wins for Google advertisers.
14          MR. HUNSBERGER:  Professor, we've
15     been going over an hour. I would like to talk
16     about another document, so if it's a good time
17     for you to take a break, I'm happy to take a
18     break.
19          THE WITNESS:  Thank you.
20          THE VIDEOGRAPHER:  We're going off
21     the record. The time is 2:58 p.m.
22          (Recess taken.)
23          THE VIDEOGRAPHER:  Going back on
24     the record. The time is 3:15 p.m.
25  BY MR. HUNSBERGER:

Page 153

1      Q.  Professor Rudin, before the break we
2  were talking about Project Bernanke, and you
3  referred to a document I believe that you cite in
4  your report at footnote 131. I would like to take a
5  look at that exhibit.
6     A.  Okay.
7          (Rudin Exhibit 4, Bates
8     GOOG-AT-MDL-B-0024514119, marked for
9     identification, as of this date.)
10  BY MR. HUNSBERGER:
11     Q.  This is a one-page document bearing the
12  Bates number GOOG-AT-MDL-B-0024514119, marked for
13  the record as Rudin Exhibit 4. Just let me know
14  when you have had a chance to review it, and we can
15  talk about it.
16     A.  Yep, I see it.
17     Q.  So you in footnote 131 quote this
18  portion of the document toward the bottom that
19  starts with the words "A couple."
20     A.  I don't believe that's the footnote I
21  cited.
22     Q.  I'm looking at footnote 131 of your
23  report.
24     A.  But you asked me did you cite that
25  footnote, and I think I cited a different footnote.

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1  But that's fine, I see footnote 131.
2      Q.   Do you see the language you quote in
3  footnote 131 in this document, the sentence that
4  begins ███████████████████████████████████
5  ██████████████████████████████████
6  ██████████████████████ "
7      Do you see that?
8      A.   Yes.
9      Q.   Do you see the last sentence of that
10  same paragraph that begins with the word "Overall"?
11      A.   Yes, I see where it says that.
12      Q.   "Overall, AdX pubs gain over ██████
13  annually."
14      Do you see that?
15      A.   I see where it says that.
16      Q.   Do you have any reason to dispute that
17  overall AdX publishers gained over ████████ as a
18  result of Project Bernanke?
19          MR. COLLIER:  Objection.  Form.
20      A.   First of all, the word "overall," it's
21  not clear how that was computed.
22          Second of all, you're talking about,
23  like, from one thing they did to the next thing,
24  but it's, again, like, they're both sort of bad.
25  They're both sort of bad.  And publishers, you

Page 155

1  know, don't necessarily benefit from this.
2          The things I was quoting are things
3  about publishers losing a lot of money.  So you've
4  got -- you know, you're saying, look, they've
5  improved this much.
6          Well, it's like you've calculated this
7  versus that, but neither of these two things is
8  particularly good.  So, there you go.
9      Q.   So it's your opinion that publishers
10  don't benefit from making ████████ annually more
11  per year?
12          MR. COLLIER:  Objection.  Form.
13      A.   Again, the publishers, because of
14  Bernanke -- first of all, the publishers don't have
15  enough data to detect Bernanke.  And so if you're
16  talking about, like, you know, what would be a good
17  alternative, well, it wouldn't be Google with
18  Bernanke versus Google without Bernanke.  It would
19  be something completely different.
20      Q.   If we are analyzing the impact of
21  Project Bernanke, the relevant comparison is a world
22  with Bernanke and a world without Bernanke; correct?
23      A.   No.  It's a world with Google and
24  without Google.
25      Q.   And you think a world without Google,

Page 156

1  publishers make more money?
2      A.   I think if circumstances were different,
3  publishers would make more money because they could
4  estimate things.
5          And, you know, I talk about -- a lot
6  about sort of variance and how Bernanke changes all
7  the bids so every time there's a new winner,
8  there's potentially a new loser.
9          So you know, you're saying, okay, well,
10  there's some amount of money that was transferred
11  from one place to another.  But, you know, maybe
12  this overall thing doesn't include, sort of, for
13  instance, publishers' long-term goals where they
14  care about the reputation.  Right?  Because
15  Bernanke boosts lower bidders above.  Right?  And
16  maybe publishers want to be able to estimate price
17  floors themselves but Bernanke messes with the
18  signal.  Right?
19          So you're talking about, you know -- and
20  maybe even if these ads were not sold on AdX, maybe
21  they would have been sold on another ad auction and
22  the publishers would have gained that ████████
23  that way.
24          So I just can't agree with the -- you
25  know, the statement that overall blah, blah, blah,

Page 157

1  is true, because I just don't agree with that.
2      Q.   What is your basis for disagreeing?
3          MR. COLLIER:  Objection.  Form.
4          Go ahead.
5      A.   I answered that already.  I gave several
6  reasons.
7      Q.   What is your basis for disagreeing with
8  the statement here?
9          MR. COLLIER:  Objection.  Form.
10      Q.   You can answer.
11          MR. COLLIER:  You can answer.
12      A.   I will try to repeat my answer as best I
13  can.
14          So this overall, I'm not sure how it's
15  computed first of all.  And the publishers, you
16  know, you're -- Google is saying here publishers
17  gain over ████████.  Well, what does that mean?
18  Does that mean, like, you know, that ads that would
19  have been sold on other auctions now are sold on
20  AdX, and so the publisher got ████████ from AdX?
21  So maybe the publisher would have gained more by
22  having other auctioneers serve their impressions.
23          What about the fact that Bernanke
24  changes the winner of the auction so that lower
25  bidders -- all of a sudden these low-quality

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1  advertisers can now serve their ads?  Maybe the
2  publishers wouldn't appreciate that.  So maybe
3  that's not following the publisher's objectives.
4       So I'm not sure that, you know, this
5  number sort of represents the full context of
6  what's going on.
7       Q.   You do cite this document for the
8  proposition in your report in paragraph 157 that
9  ███████████████████████████████████████████████
██  ████████████████████  correct?
11      MR. COLLIER:  Objection.  Form.
12      A.   This document says that, yes.  I mean,
13  there's other documents that say -- I mean, define
14  publisher, whatever I quoted before.
15      So this is one document of many that
16  evaluates Bernanke.  Would you like me to find the
17  others?  Would that help?
18      Q.   That wasn't my question.  I was just
19  saying do you cite this document in footnote 131 to
20  support the statement in paragraph 157 of your
21  report that ████████████████████████████████
22  ███████████████████████████████████?
23      A.   I do cite this to say ████████████████
██  ███████████████████████████████████████████████
██  ██████████████

Page 159

1       Q.   You find that statement to be reliable?
2       A.   These Google people thought it was true.
3  And so, you know, there's a good reason for me to
4  cite that right there.
5       Q.   And these people at Google thought that
6  overall AdX pubs gained over ██████████ annually;
7  correct?
8       A.   Like I said, the word "overall" is kind
9  of loaded because I don't know how they computed
10  it, and I don't know whether this number indicates
11  sort of a -- you're implying that this number means
12  publishers gained ██████████ annually and that's
13  the only thing they cared about, and I don't agree
14  with that.
15      Q.   So you chose to believe one statement in
16  this document that supports your theory and you
17  chose to disbelieve another statement that
18  undermines your theory; correct?
19      A.   No, that's not what I said at all.
20  Let's try again.
21      I'm not sure how the word "overall" is
22  computed in this particular person's calculation,
23  so I don't know what that means.  Whereas in the
24  other place he stated it he says a couple of
25  publishers.  It's like, okay, I know a couple of

Page 160

1  publishers.  That's something I can count on my
2  hand.
3       Second of all, the way that you've asked
4  the question implies that whatever the -- whatever
5  way this number is computed, that this would be the
6  only benefit to publishers, and I -- or, you know,
7  the only impact to publishers, and I would disagree
8  with that, if that's where you're going with this
9  question.
10      Q.   Do you know exactly how the ███████████
██  ██████████ that you cite was calculated?
12      A.   I assume this revenue drop is per
13  publisher, calculated by either the publishers or
14  publishers' -- I assume they're publishers or the
15  publishers' tools are reporting these numbers for
16  particular publishers.  But when you say something
17  like "overall," that implies some kind of average,
18  and I don't know the way that average was computed.
19  Because if you know statistics, you know there are
20  many ways to compute averages.
21      Q.   So you assume this is how the revenue
22  drop was calculated, but you don't know that that's
23  how it was calculated; correct?
24      A.   Well, it says ███████████████████████
██  ████████████████████████████  So I'm going to

Page 161

1  take that at face value.
2       Q.   So you apply one standard of rigor to a
3  piece of evidence that supports your theory, and you
4  apply a different, stricter standard of rigor to
5  evidence that undermines your theory; correct?
6       A.   No, that is not correct.  I'm applying
7  the same standard of rigor.
8       MR. HUNSBERGER:  I would like to
9  discuss another document that you cite in your
10  report.  This one is cited in footnotes 132
11  and 133.
12      (Rudin Exhibit 5, E-mail chain,
13  Bates GOOG-AT-MDL-B-002096117, marked for
14  identification, as of this date.)
15      MR. HUNSBERGER:  This is a document
16  bearing the Bates GOOG-AT-MDL-B-002096117,
17  one-page document, that has been marked Rudin
18  Exhibit 5.
19      I will hand you a copy.
20      MR. COLLIER:  Excuse me, Counsel.
21  Do you have a copy for us?  Oh, sorry, didn't
22  make its way.
23      THE WITNESS:  Okay.
24  BY MR. HUNSBERGER:
25      Q.   As I mentioned, you cite this document

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1 in footnotes 132 and 133 of your report; is that
2 correct?
3    A.  Yes.
4    Q.  The subject line of this document, which
5 appears to be an e-mail, refers to "Global
6 Bernanke."
7      Do you see that?
8    A.  Yes.
9    Q.  Now, in the first-in-time e-mail, so at
10 the bottom of the page, do you see the e-mail dated
11 February 13, 2015 at 11:48 a.m. from a ▮▮▮▮▮
12 ▮▮▮▮?
13    A.  Yes.
14    Q.  And the third paragraph of that e-mail
15 that begins, "Among 500 large pubs"?
16    A.  Um-hmm.
17    Q.  And the document reads, "▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮"
22      Do you see that?
23    A.  Yes.
24    Q.  If we look at page 53 of your report,
25 paragraph 157 --

Page 163

1    A.  Um-hmm.
2    Q.  -- and this is above the line text
3 corresponding with footnote 132, the sentence that
4 begins "After the launch."
5    A.  Sure.
6    Q.  You state, "After the launch of Global
7 Bernanke, Google found that ▮▮▮▮▮▮▮▮
8 ▮▮▮▮"
9      Do you see that language?
10    A.  Um-hmm.
11    Q.  But the document that we just looked at
12 says ▮▮▮▮▮▮▮▮▮▮; correct?
13    A.  Correct.
14    Q.  It does not say ▮▮▮▮▮▮▮▮
15 ▮▮▮▮; correct?
16    A.  I'm not seeing much difference. This is
17 a simulation, and so this is what they're saying is
18 going to happen when they launch this thing.
19    Q.  What's your basis for that?
20      MR. COLLIER: Objection. Form.
21    A.  I'm reading this in context. I read
22 this document and ones around it, and this is
23 how -- they're doing these simulations to figure
24 out what's going to happen. That's why they're
25 doing the simulations.

Page 164

1    Q.  In your opinion, the word "could"
2 typically means some possibility; correct?
3    A.  Yes.
4    Q.  But it does not mean a certainty;
5 correct?
6    A.  Are you saying that this document is not
7 reliable? I mean, in the sense of you don't
8 believe that the Google simulations are viable?
9      Because it seems to me that what you're
10 asking me to do is try to figure out whether these
11 Google simulations have a -- you know, can measure
12 the -- what's going to happen. And, you know, this
13 is what I have to work from.
14    Q.  All I'm asking is whether the words
15 "could" and "would" in this context have different
16 meanings.
17    A.  In this context, they're saying if we
18 launch this right now, this is what's likely going
19 to happen.
20      And I'm reading both of these, "could"
21 and "would," as this is likely what's going to
22 happen.
23    Q.  Do you cite any evidence in this
24 paragraph that indicates there was actually a ▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

Page 165

1    A.  And these are simulations, so what you
2 are seeing here is, you know, Google doing the best
3 it can to calculate what -- what happens with this
4 program. So I'm taking that at its value.
5    Q.  Professor Rudin, did you conduct any
6 empirical analysis regarding whether Project
7 Bernanke lead to decreased publisher revenues?
8      MR. COLLIER: Objection. Form.
9    A.  I found a lot of internal documents
10 where Google did their own experiments and cited
11 those in their report rather than doing my own
12 experiments on Google data, which, you know, doing
13 that -- doing experiments on that Google data at
14 that point in time would be impossible for me to do
15 at this point in time.
16    Q.  You did not conduct any of your own
17 analysis of Google's data to determine whether
18 Project Bernanke lead to decreased publisher
19 revenues; correct?
20      MR. COLLIER: Objection. Form.
21    A.  I think I already answered that question
22 a second ago.
23    Q.  I didn't get a clean answer, so I want
24 to make sure we're being clear for the record.
25      Did you conduct any of your own analysis

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

1  of Google's data to determine whether Project
2  Bernanke led to decreased publishers' revenue?
3        MR. COLLIER: Objection. Form.
4     A.   So, again, I'm relying on Google's own
5  internal experiments on the effects of things, as
6  well as the other reports, the other expert reports
7  in the case.
8        And trying to conduct experiments from a
9  particular point in time right now is impossible
10 since the world has changed. So there's no way I
11 could have done that.
12    Q.   Do you view Google's own internal
13 experiments on the effects to be reliable?
14    A.   I'm not sure what you're asking me here.
15 I mean, I believe this is the calculations they
16 did, and this is what they shared internally.
17    Q.   Do you view the calculations that they
18 did under their own internal experiments to be
19 reliable?
20    A.   They're the best I have. So I believe
21 that they have done these experiments and that this
22 is what they believe, and I believe these
23 statistics are -- yeah, I believe in the sense that
24 this is actually what they actually got from these
25 simulations.

Page 167

1     Q.   If we turn to paragraph 148 in the
2  "Bernanke" section, you state in this paragraph that
3  publishers and advertisers would not create a model
4  to optimize their strategies with respect to
5  Bernanke; correct?
6     A.   Yes. It's very difficult to optimize
7  while Bernanke is running.
8     Q.   Is it your opinion that the details of
9  Project Bernanke were not disclosed to customers?
10    A.   They weren't sufficiently disclosed,
11 indeed. In fact, this footnote here says -- it is
12 from Milgrom's report -- "While the specific
13 details of Project Bernanke were not communicated
14 to advertisers or publishers." So yes, I believe
15 that.
16    Q.   It's also your opinion that sellers and
17 buyers never knew which queries were being
18 subsidized, which made estimation and response by
19 sellers and buyers more difficult?
20    A.   Yes.
21    Q.   Do I understand correctly your opinion
22 that publishers could not create a model to optimize
23 their strategies with respect to Bernanke in part
24 because sellers cannot optimize floor prices?
25    A.   Yes.

Page 168

1     Q.   If sellers could set floor prices
2  optimally, Bernanke would not be possible since
3  publishers could set the floor just below the
4  highest bid and Bernanke could not drop the second
5  bid to accumulate the pool; correct?
6     A.   Correct.
7        Could you tell me where you're reading
8  from?
9     Q.   I was summarizing a couple of your
10 opinions at 149 and 176.
11    A.   Okay.
12    Q.   Bernanke also weakens the effectiveness
13 of machine learning for both buyers and sellers
14 because Bernanke alters the clearing price of the
15 auction, which is a variable that both buyers and
16 sellers would use in machine-learning models; is
17 that correct?
18    A.   Yes.
19    Q.   Is it your opinion that even if Bernanke
20 was fully disclosed, publishers still could not
21 optimize floor prices?
22    A.   Correct.
23    Q.   Professor Rudin, if we could move on to
24 another optimization that you discuss in your
25 report.

Page 169

1        I would like to discuss the optimization
2  known as reserve price optimization, or the acronym
3  RPO for short.
4        If I refer to "RPO" in this deposition,
5  you will understand that I'm referring to reserve
6  price optimization?
7     A.   Yes.
8     Q.   If we turn to paragraphs 183 and 184 of
9  your report, that's where you begin to discuss RPO?
10    A.   Correct.
11    Q.   You agree that RPO increased publishers'
12 price floors to help them earn more revenue?
13    A.   I agree it increased publishers' price
14 floor. I'm not going to make a comment on overall
15 revenue because, again, we're talking about, you,
16 know publishers' overall objectives, and they may
17 not just be short-term revenue.
18        When I say "short-term," I mean in the
19 auction.
20    Q.   Do you offer any opinion on the effect
21 of RPO on publisher revenue?
22    A.   Yeah. So -- yeah, I do.
23    Q.   What is that opinion?
24    A.   It's all over this thing. There's
25 several opinions. Shall I try to start giving

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

1  some?
2      Q.   I understand you have several opinions
3  in your report on RPO.  I was interested
4  specifically in what your opinions are on the
5  question of whether RPO increased publisher revenue
6  or it decreased publisher revenue.  Any opinion that
7  you have on the impact of RPO on publisher revenue.
8      A.   So let's just -- let's see here.
9          There is something about RPO in here.  I
10  want to talk about the overall kind of point that
11  we shouldn't be considering RPO versus not RPO,
12  again, because that's a narrow comparison that
13  still leaves Google in place with not giving
14  publishers enough information to optimize their own
15  price floors.
16          And so if you want to compare no RPO to
17  RPO, well, this is like saying, well, you know,
18  should you not do machine learning with all this
19  information to estimate your price floor or should
20  you have Google do it.  And the ideal situation is
21  the publisher could do it themselves.  So that's
22  the correct comparison.
23          I can try to find, if you want, more
24  information on RPO that I have in the report.
25      Q.   Is it your opinion that RPO did not have

Page 171

1  any impact on the ability of publishers to optimize?
2          MR. COLLIER:  Object.  Form.
3      A.   So RPO does make it more difficult to do
4  optimization.
5      Q.   If there were no RPO, would publishers
6  be able to optimize?
7      A.   As I mentioned, no, because publishers
8  don't have the data to do that optimization.
9  Google has more data than the publishers.
10      Q.   You indicate that publishers and
11  advertisers could not create a model to optimally
12  respond to RPO; is that correct?
13      A.   I'm sorry.  Could you repeat the
14  question?
15      Q.   You indicate in paragraph 183 that
16  publishers and advertisers could not create a model
17  to optimally respond to RPO; correct?
18      A.   Correct.
19      Q.   You also describe one of the main issues
20  in your abstracted auction with Program R is that
21  the auctioneer sets floor prices for other bidding
22  tools much higher than the sellers' floor prices in
23  cases where it is predicted that the seller
24  inadvertently set them too low; correct?
25      A.   Correct.

Page 172

1      Q.   You then say in paragraph 184, this
2  happens without -- this happens with the sellers'
3  knowledge; correct?
4      A.   I'm sorry?  Could you repeat that?  This
5  happens.
6      Q.   With the sellers' knowledge?
7      A.   With the sellers' knowledge?  I'm sorry,
8  where are you reading?
9      Q.   We can move on.
10          Turning now to how RPO operated, sellers
11  could optimize per-buyer floor prices; correct?
12      A.   There are different points in time.  So,
13  I mean -- sorry, can you say that again?
14      Q.   Under RPO, sellers could optimize
15  per-buyer floor prices; correct?
16      A.   Sorry, I'm getting very confused,
17  because sometimes the sellers don't even know who
18  won the auction.  So how could they possibly
19  optimize per-buyer floor prices?
20      Q.   In your report you state that "Sellers
21  could not optimize per-buyer floor prices well, as
22  they did not have enough data."
23          Do you see that in paragraph 184?
24      A.   Yes.
25      Q.   But it's not your opinion that sellers

Page 173

1  are unable to optimize floor prices at all; correct?
2          MR. COLLIER:  Objection.  Form.
3      A.   They couldn't optimize floor prices
4  well.
5      Q.   But they could optimize floor prices?
6      A.   They could try to improve floor prices.
7  But they wouldn't be able to do a very good job.
8      Q.   Do you have any empirical evidence to
9  indicate publishers would not be able to do a very
10  good job?
11      A.   Yes.  The existence of RPO.
12      Q.   Could you explain what you mean by that
13  statement?
14      A.   As I explained in my report, if the
15  publishers could optimize floor prices well, RPO
16  would not have an effect.
17      Q.   And RPO helped publishers optimize their
18  floor prices; correct?
19          MR. COLLIER:  Objection.  Form.
20      A.   RPO increased floor prices, but it
21  didn't necessarily set them in a way that sellers
22  would want them to be set.
23      Q.   Higher floor prices lead to more
24  publisher revenue; correct?
25          MR. COLLIER:  Objection.  Form.

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

1    A.    Sometimes it does and sometimes it
2  doesn't.  Because if the floor prices get set too
3  high, then there's no auction winner.  And if the
4  floor prices are set for different buyers
5  differently, then you might -- then the floor
6  prices might exclude some buyers that the publisher
7  would -- higher quality buyers.
8    Q.    If RPO is able to improve publisher
9  revenue by, say, 1 to 2 percent, does that mean
10 publishers couldn't do a very good job optimizing
11 floor prices?
12        MR. COLLIER:  Objection.  Form.
13    A.    I couldn't possibly agree with that,
14 because RPO didn't even operate on all the
15 advertisers.  Right?  Google's own advertisers were
16 excluded from RPO.
17        So there's no way I could agree that,
18 oh, well, the publisher gets 1 to 2 percent more
19 money; therefore, the publisher is happier.
20        Like, it's not clear to me that that
21 would be true.
22    Q.    Do you have a sense of the magnitude of
23 increases in publisher floor prices that resulted
24 from RPO?
25    A.    Let's see.  What statistics could I give

1  you that would satisfy this question?
2        I know we have a bunch of statistics
3  about RPO in the report, but I don't know if any of
4  them will satisfy what you're looking for.  I will
5  keep looking.
6        Sorry.  So you're asking for the
7  magnitude at which RPO increased floor prices;
8  right?
9    Q.    Yeah, I can repeat my question.
10        Do you have a sense of the magnitude of
11 increases in publisher floor prices that resulted
12 from RPO?
13    A.    One of the challenges with that is that
14 the auctions are all different scales, so I don't
15 really know how to answer it.
16    Q.    Before you provided an opinion in your
17 report on the impact of RPO, did you investigate
18 this question?
19        MR. COLLIER:  Objection.  Form.
20    A.    It's not clear that investigating this
21 question makes any sense, because the question
22 doesn't make any sense.
23    Q.    Your testimony is that it does not make
24 sense to investigate whether reserve price
25 optimization led to an increase in reserve prices

1  and by what magnitude?
2    A.    It's clear that RPO led to an increase
3  in reserve prices.  The magnitudes would be very
4  different for different auctions, and I wouldn't
5  know how to aggregate all of that.
6    Q.    Did you investigate the magnitude of
7  increases in reserve prices on average across
8  auctions?
9    A.    So again, I don't really know how to
10 compute that average because, again, it's an
11 aggregate, so I'm not really sure whether to do
12 that.  But I'm also not sure that that calculation
13 would necessarily help me form my opinions.
14    Q.    Would it make a difference to your
15 opinion if RPO increased publisher floor prices by
16 0.1 percent or increased publisher floor prices by
17 10 percent?
18    A.    The amount that the floor prices -- the
19 percentage that the floor prices themselves
20 increase is not as relevant as the statistics that
21 are actually in my report.
22    Q.    So your testimony is that the amount
23 that the floor prices themselves increase is not as
24 relevant to your opinion on reserve price
25 optimization; is that correct?

1        MR. COLLIER:  Objection.  Form.
2    A.    I said the statistics in my report were
3  more informative.
4    Q.    So your opinion is that statistics on
5  the amount that floor prices increased under reserve
6  price optimization is not informative; is that
7  correct?
8    A.    That's not what I said.  I said that
9  what's in my report is more informative than
10 knowing how much RPO adjusted the floor price for
11 any particular auction.  Or an average across
12 auctions, however one calculation that average.
13    Q.    Did you calculate such an average?
14    A.    As I mentioned, I had sufficient
15 information to construct the opinions in my report,
16 and creating a calculation that wouldn't -- it
17 wouldn't make my report stronger to have done that
18 particular calculation.
19    Q.    Just going back to how RPO works, RPO
20 set a floor price for the publisher; correct?
21    A.    Yes.
22    Q.    And the publisher was able to increase
23 the floor price above the RPO set floor price;
24 correct?
25    A.    I'm sorry, if RPO is a secret program,

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1  how would the publisher be able to -- they could
2  set the floor price -- I don't understand what you
3  are saying.
4      The publisher doesn't know what RPO is
5  doing. Therefore, there's no way the publisher
6  could have seen the floor price from RPO and then
7  adjusted their floor price above it if the program
8  is hidden. So I don't really understand your
9  question.
10     Q.  The question is if RPO set a price floor
11  of, for example, $1, and the publisher set a manual
12  price floor of, say, $2, nothing in the RPO program
13  prevented the publisher from setting the $2 floor
14  price; correct?
15     A.  So the publisher sets the price first,
16  and RPO doesn't lower the floor price.
17     Q.  RPO does not lower a publisher's floor
18  price; correct?
19     A.  Correct.
20     Q.  So with RPO, Google only increased the
21  publishers' price floors and never set the price
22  floor lower than the publishers' set floor; correct?
23     A.  As far as I know, yes.
24     Q.  Is it your understanding that RPO used
25  historical bid data to adjust publishers' floor

Page 179

1  prices?
2      A.  I believe it did.
3  [redacted]
4  [redacted]
5      A.  I can't remember off the top of my head
6  which Google model used which data. But if you
7  point me to the section in my report, I would be
8  happy to confirm.
9          MR. HUNSBERGER:  We can introduce
10  another exhibit that might help you on this
11  issue.
12          (Exhibit 6, Opening Expert Report
13  of Jacob Hochstetler dated June 7, 2024,
14  marked for identification, as of this date.)
15  BY MR. HUNSBERGER:
16     Q.  So I am handing you what has been marked
17  for the record as Rudin Exhibit 6. This is a copy
18  of the opening expert report submitted by
19  plaintiffs' expert Jacob Hochstetler on June 7,
20  2024.
21      Professor, you cite this report in
22  footnotes 51 and 224 in your report. I will ask you
23  about one specific paragraph in Professor
24  Hochstetler's report at paragraph 292.
25     A.  Okay, I do have a -- I believe the

Page 180

1  information you want is in my report, but I'm happy
2  to go look at this report.
3      Page what?
4      Q.  Paragraph 292 of Professor Hochstetler's
5  report.
6          MR. COLLIER:  Counsel, are you only
7  going to ask about paragraph 292?
8          MR. HUNSBERGER:  That and maybe one
9  other paragraph, depending on where the
10  conversation goes.
11          MR. COLLIER:  I'm trying not to
12  have her, pursuant to my instructions, read
13  the entire document.
14          MR. HUNSBERGER:  Paragraphs 292 and
15  295 are the ones that may be relevant.
16          MR. COLLIER:  Dr. Rudin, you read
17  what you need to read to answer the questions
18  honestly. But I don't believe you have to
19  read this whole report to deal with this, but
20  there might be a section or context you have
21  to look at.
22     A.  Again, I believe the information we're
23  looking for is actually in my report. Oh, well.
24     Q.  If you're able to answer based on your
25  own opinions, without reference to Professor

Page 181

1  Hochstetler's report, we can do that. I can repeat
2  the question, if that would be helpful.
3      A.  Sorry. Sorry. I'm not sure what to do.
4  Maybe I will just read --
5      Q.  292 is the first --
6      A.  292. Okay. Will you give me a minute
7  to look at my report as well?
8      Q.  Yes.
9      A.  Okay. I'll go back to reading here.
10  I'm sorry, what was the other paragraph you wanted
11  me to read?
12     Q.  292 and 295.
13     A.  Okay.
14     Q.  So looking at Professor Hochstetler's
15  report, paragraph 292, do you see the sentence that
16  starts -- at the very first sentence, I apologize.
17  The very first sentence of paragraph 292 states,
18  "More specifically, [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23      Do you see that?
24     A.  Yes.
25     Q.  Do you see at the very top of this

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

1 page 146 the heading that refers to "Second-Price
2 RPO"?
3     A.   Yes.
4     Q.   "Second-price RPO raised auction floors
5 on a per-buyer basis using historical AdX option
6 data"?
7     A.   Yes.
8     Q.   Do you agree with Professor Hochstetler
9 that ███████████████████████████████
██  ██████████████████
11     A.   Yes.  I mean, you also of course want to
12 look at the fact that there's another version right
13 below it that talks about cookies and using
14 additional cookie data as well.  So this is not the
15 only data that's ever used.  I just want to point
16 that out.
17     Q.   We can go to paragraph 295, which the
18 second sentence of 295 reads, "████████████████
██  ████████████████████████████████
██  ████████████████████████████████
██  ███████████████████"
23     Do you see that?
24     A.   Yes.
25     Q.   So do you agree that RPO in both

1 versions was ████████████████████
██  ███?
3     A.   I will say this:  The models were based
4 on the previous day's data.  The whole formation of
5 the problem, the whole setup, everything, is based
6 on every -- things that were created in the past,
7 leveraging Google's long-term knowledge of how to
8 do this.
9     Q.   But under RPO, ████████████████
██  ████████████████████; correct?
11     A.   So, again, yes, Google used the previous
12 day's data to estimate the floor price, as well as
13 its long-term information about how to do this and,
14 you know, the ability to place the cookies on the
15 website, all of that -- you know, I couldn't go in
16 and use yesterday's data to create this model.  It
17 wouldn't be possible without the whole setup.
18     Q.   And you were flipping through your
19 report before when I asked this question.
20     Do you offer any opinion in your report
21 about the number of days of data that RPO is
22 trained on?
23     A.   I think so, but I can't find it.  But
24 one day seems reasonable.
25     Q.   In connection with forming your opinion

1 in this case, did you investigate the number of days
2 of data that RPO is trained on?
3         MR. COLLIER:  Objection.  Form.
4     A.   I did.  I just can't remember it
5 because, again, I read thousands and thousands of
6 pages, and this report alone is -- what -- 90 pages
7 or something.  So I just don't remember off the top
8 of my head.
9     Q.   If we look at paragraph 184 of your
10 report, you state that, in the third sentence,
11 "Google could use the combined DFP-AdX information
12 to leverage all seller and buyer data to optimize
13 floor prices."
14     Do you see that?
15     A.   Yes.
16     Q.   And in the next sentence you claim that
17 this is a "massive amount of valuable data."
18     Do you see that?
19     A.   Yes.
20     Q.   You offer an opinion on the data that
21 Google actually did use to optimize floor prices?
22     A.   I would refer to the report you just
23 handed me for that kind of information, as well as
24 whatever citations I have in my report.
25     Q.   If we turn to paragraph 186 of your

1 report on RPO, you state in paragraph 186, the first
2 sentence, "The key to RPO's success was its secrecy.
3 RPO remained secret for one year after launch (and
4 remained obscured afterwards due to Google's
5 throttling efforts and failure to disclose RPO's
6 precise rules), which had the effect of preventing
7 sellers from undermining it."
8     Do you see that paragraph?
9     A.   Yes.
10     Q.   Is it your opinion that RPO was not
11 disclosed with sufficient detail?
12     A.   Correct.
13     Q.   And in paragraph 184 you say that
14 "Sellers could not optimize per-buyer floor prices
15 well, as they did not have enough data"; correct?
16     A.   Correct.
17     Q.   And in that same paragraph you say that
18 sellers could not get the same amount of data as
19 Google could with DFP and AdX; correct?
20     A.   Correct.
21     Q.   And this data discrepancy between Google
22 and publishers prevented publishers from optimizing
23 their floor prices effectively; is that correct?
24     A.   That's an important reason, yes.
25     Q.   And in paragraph 187 of your report you

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1  say that RPO changed the distribution of winning
2  bids that the publishers observed; correct?
3      A.   Correct.
4      Q.   And RPO changes the distribution of
5  winning bids by increasing the price floors beyond
6  what publishers had set; correct?
7      A.   Yes, for some auctions.
8      Q.   If Google fully disclosed the details of
9  RPO, is it your opinion that Google would still have
10 a data advantage over publishers?
11         MR. COLLIER:  Objection.  Form.
12     A.   Yes.
13     Q.   Because sellers compete with each other
14 and would not want to share their data; correct?
15     A.   That's one reason, but there's a whole
16 lot more data that Google has that publishers don't
17 have.
18     Q.   And because sellers don't have access to
19 data from all auctions in AdX; correct?
20         MR. COLLIER:  Objection.  Form.
21     A.   That's some of the data that publishers
22 don't have, yes.
23     Q.   If I understand correctly, your opinion
24 is that RPO would still increase variance for
25 sellers even if Google had disclosed RPO's rules?

Page 187

1      A.   Yes.  RPO affected some auctions and not
2  others.  It affected some buyers and not others.
3  So yes.
4      Q.   So under the framework that you
5  described in your report, if Google had disclosed
6  all the details of RPO, publishers and advertisers
7  still would not have been able to undermine RPO;
8  correct?
9      A.   I'm sorry, I didn't understand the
10 question.
11     Q.   Under the framework for the opinions
12 that you describe in your report, if Google had
13 disclosed all the details of RPO, would publishers
14 and advertisers have been able to effectively
15 respond to RPO?
16     A.   Are they providing the data as well?  Or
17 just disclosing that the program exists and how it
18 works?
19     Q.   Disclosures.
20         MR. COLLIER:  Objection.  Form.
21         Go ahead.
22     A.   No, because they didn't have the data.
23         THE WITNESS:  Can we take a break
24 at some point?  It doesn't have to be right
25 now.

Page 188

1          MR. HUNSBERGER:  This is actually a
2  good breaking point that we can take break.
3          THE VIDEOGRAPHER:  Going off the
4  record.  The time is 4:21 p.m.
5          (Recess taken.)
6          THE VIDEOGRAPHER:  Going back on
7  the record.  The time is 4:52 p.m.
8  BY MR. HUNSBERGER:
9      Q.   Professor Rudin, I would like to turn
10 our attention to another optimization that you
11 discuss in your report, dynamic revenue share, which
12 you and others abbreviate as "DRS."
13         And if I refer to dynamic revenue share
14 as "DRS," will you understand I mean to refer to the
15 sell-side DRS program?
16     A.   Yes.
17     Q.   At a high level could you summarize for
18 me your understanding of how DRS functions?
19     A.   So DRS is a program where Google adjusts
20 its take rate for different auctions.
21     Q.   If we take a look at your report at
22 paragraph 173, you say that "Google launched
23 sell-side DRS to increase auction wins in AdX when
24 bids from AdX winners would be below the floor
25 price."

Page 189

1          Do you see that language?
2      A.   Yes.
3      Q.   Do you agree that in an auction if all
4  the bids are below the floor price the auction would
5  not clear?
6      A.   The auction would not clear in AdX, yes.
7  It might go to another auctioneer.
8      Q.   And in another auction other than AdX,
9  if all the bids in that auction are below the
10 publisher's floor prices in that auction, the
11 transaction would also not clear; correct?
12     A.   Correct.  If all the bids are below the
13 floor price, the auction typically does not clear.
14     Q.   And in the last sentence of paragraph
15 173 you state that "Sometimes the subsidies are used
16 to permit a bid to clear a floor."
17         Do you see that?
18     A.   Yes.
19     Q.   Do you agree that if a bid clears the
20 price floor, that leads to winning the auction?
21     A.   Yes.
22     Q.   So if Google subsidizes the bids to
23 clear price floors, that benefits the buyer who made
24 the highest bid; correct?
25         MR. COLLIER:  Objection.  Form.

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

1    A.   Not necessarily.  Because the buyer --
2  if you're talking about, you know, DRSv2, they have
3  to pay it back.  And so this is not necessarily
4  what the advertiser wants and it's not necessarily
5  what the publisher would want.
6    Q.   But you agree that with the subsidy the
7  buyers wins an impression that it would not have won
8  without the subsidy; correct?
9    A.   In AdX, yes.  So if the buyer was given
10  a subsidy they would have to pay back later, they
11  would win that auction, yeah.
12    Q.   But in the auction with a subsidy, the
13  buyers wins an impression that it would not have won
14  without the subsidy; correct?
15    A.   So again, the buyer, yes, would win that
16  auction and would have to pay the subsidy back
17  later in another auction.
18    Q.   Do you also agree that without the
19  subsidy from Google the publisher would not have
20  received anything from Google because the auction
21  would not have cleared?
22    A.   So the publisher would not have had the
23  auction clear in AdX.  The publisher may have had
24  the auction clear the next auctioneer with a
25  different set of buyers bidding differently in a

Page 191

1  different situation, different auction rules,
2  whatever.
3    Q.   So just to be clear for the record,
4  without the subsidy from Google, the publisher would
5  not have received anything from Google resulting
6  from the AdX auction because the AdX auction would
7  not have cleared; is that correct?
8    A.   That's not necessarily correct.  Because
9  if the impression doesn't clear, if the auction
10  doesn't clear in AdX, it might go to another
11  auctioneer, and there be Google bidders into that
12  auction and they might win that auction, so Google
13  might end up giving the publisher something in that
14  way.
15    So it's not real clear that the answer
16  to your question is yes, because there could be
17  circumstances in which Google still pays that
18  publisher, or at least Google advertisers still pay
19  that publisher.
20    Q.   Do you analyze how often that happens in
21  your report?
22    A.   We do -- I do address things related to
23  that.  I'm not sure if I would be able to present
24  you a statistic that's exactly what you're looking
25  for.

Page 192

1    Q.   Professor Rudin, if I understand
2  correctly, you expressed four concerns about DRS.  I
3  would like to review them now and discuss them one
4  by one to make sure I understand each of the
5  concerns.
6    First, by adjusting the AdX revenue
7  share, DRS introduces additional bid variance,
8  making it harder for customers to use the results to
9  build machine-learning models.
10    Is that a fair summary of your concern?
11    MR. COLLIER:  I apologize.  Are you
12  reading from a paragraph you want her to --
13    MR. HUNSBERGER:  I'm just looking
14  at my outline.
15    MR. COLLIER:  My apologies.  We
16  were both looking to go to the paragraph.
17  That's how I understood your question.  My
18  apologies.
19    A.   So what you expressed is a good summary
20  of my point in 4 on page 60.
21    Q.   That's paragraph 177?
22    A.   Starting there, yes.
23    Q.   Your second concern is that DRS can in
24  some cases change the winner of an impression; is
25  that correct?

Page 193

1    A.   Yes.
2    Q.   Your third concern, as I understand it,
3  is that if sellers had known about DRS, they would
4  have responded by raising their floor prices, but
5  without knowledge of when DRS would apply they could
6  not do so; is that correct?
7    A.   Yes, that's definitely a concern.
8    Q.   And fourth, if buyers had known about
9  DRS, they would have shaded some of their bids
10  differently or withheld their bids altogether, but
11  without knowledge of when DRS would apply, they
12  could not do so.
13    Is that a fair summary of your fourth
14  concern?
15    A.   That's a fair summary of my concern.
16  Maybe you can show me where that is if you're
17  looking in here, but that definitely agrees with
18  something I placed in here.
19    Q.   Do you express any other concerns other
20  than those four regarding DRS, its implementation or
21  its effects?
22    A.   There is things about DRS throughout
23  this entire report.
24    Q.   Do they touch on issues other than the
25  four we just discussed?

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

1          MR. COLLIER: Object. Form.
2      A.   I would have to go through the report to
3  figure out if there are any additional concerns.
4  And DRS feeds into all of these things.
5          So when you say is your opinions limited
6  to this, I would say my opinions have everything
7  sort of tied together as well. So it's hard for me
8  to sort of say it's limited to this. That's not --
9  yeah. It's not a good representation.
10     Q.   Is it fair to say that the four concerns
11  I just summarized are the most important concerns
12  you have about DRS?
13     A.   Those are important concerns about DRS.
14     Q.   Are any of your other concerns as
15  important as those four?
16     A.   Well, as I mentioned, DRS feeds into
17  this whole pipeline, this whole snowball that I
18  mentioned. So, you know, it's hard to sort of
19  value which is most important, which is least
20  important.
21          I will just say that, you know, I've
22  mentioned DRS throughout my entire report, so --
23  yeah.
24     Q.   Okay. If we talk for a little bit about
25  variance, is it fair to say increased bid variance

1  can be a consequence of product innovation?
2      A.   I am not an expert in product innovation
3  and what constitutes innovation. That's not part
4  of my expertise, so I think I'll not be able to
5  answer that one.
6      Q.   Any new product innovation would
7  increase the degrees of freedom; correct?
8          MR. COLLIER: Objection. Form.
9      A.   That question doesn't make any sense to
10  me. You can have innovations that don't increase
11  variance. I just can't agree with that.
12     Q.   So, for example, are you aware of the
13  innovation in ad tech known as real-time bidding?
14     A.   Yes.
15     Q.   And real-time bidding often has more
16  variance than a static bidding model; is that
17  correct?
18     A.   I can't weigh any judgment on that one.
19  I would need --
20     Q.   No view on that question?
21     A.   I would have to look at it, and I -- I
22  don't recall my report having anything about
23  that -- about that, you know, whether variance
24  of -- let me interpret the question more narrowly.
25  Right?

1          So the question is would the bids have a
2  larger spread in real-time bidding as they would in
3  header bidding, and I don't know the answer to
4  that, and it's probably scenario dependent.
5      Q.   Do you have any opinion in this case on
6  the benefits of real-time bidding?
7      A.   In general I don't have opinions on the
8  benefits of one type of bidding over another type
9  of bidding, if that's what you're asking.
10     Q.   Okay. We can move on.
11          Turning to the next concern, you have an
12  opinion that DRS can change the winner of an
13  auction; is that correct?
14     A.   Yes.
15     Q.   Can you explain how that would occur?
16     A.   Yes. So if one bidder gets a subsidy,
17  then that might increase their bid and push them
18  over either the highest bidder -- the highest other
19  bidder or the floor.
20     Q.   And assuming that what you described
21  took place, how would that harm the publisher?
22     A.   There's many different ways that it
23  would harm the publisher, as I've listed in my
24  report. I will give you some examples.
25          So maybe the bidder who gets the subsidy

1  is a lower quality advertiser who now wins the bid
2  because they got a subsidy, and so the publisher
3  now has a lower quality advertisement on their
4  site.
5          Also, DRS makes it very -- increases the
6  variance of all the bids because Google is changing
7  the bids away from their valuations, so it makes it
8  harder to do any kind of estimation by buyers or
9  sellers.
10          Those are good examples I think.
11     Q.   Did you investigate, in connection with
12  forming your opinions, whether DRS in fact led to
13  lower quality advertisements being shown on
14  publisher sites?
15     A.   I believe I saw something about that.
16  It's the same effect with Bernanke as well, and
17  this is discussed extensively in other reports, and
18  I can't remember where in my report it's discussed,
19  but it's definitely discussed.
20     Q.   Focusing specifically on the opinions in
21  your report, do you offer any empirical analysis
22  that DRS in fact led to lower quality advertisements
23  being shown on publisher sites?
24          MR. COLLIER: Objection. Form.
25     A.   I have seen documents to that extent. I

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

Page 198

1  just don't know if they're cited anywhere I can
2  reach within a short amount of time.
3     Q.   Did you investigate whether Google Ad
4  Exchange had lower quality buyers than other ad
5  exchanges?
6     A.   I definitely saw documents that state
7  that.  Again, it would take me a few minutes to
8  find those documents.
9        Would you like me to try and do that?
10    Q.   No.
11       Is it your opinion in this case that
12  Google's Ad Exchange has lower quality buyers than
13  other ad exchanges?
14    A.   I've seen documents that state that.
15    Q.   Is it your opinion that that is in fact
16  true?
17    A.   As I mentioned, I've seen internal
18  documents that state that, and it's addressed
19  extensively in other reports.
20    Q.   My question is whether you're offering
21  that as an opinion in this case, that Google's Ad
22  Exchange has lower quality buyers than other ad
23  exchanges?
24    A.   As I said, that's not something
25  addressed necessarily directly in a place where I

Page 199

1  can find it, but it is addressed in other reports
2  that are referenced here (indicating).  And reports
3  that are not referenced here as well.
4     Q.   The last -- the third and fourth
5  concerns that we discussed earlier relate to how
6  advertisers and publishers could have changed their
7  behavior if they had known about DRS; is that fair?
8     A.   Is what fair?
9     Q.   Is that a fair summary, that the third
10  and fourth concerns that we discussed are about how
11  advertisers and publishers could have changed their
12  behavior if they had known about DRS?
13    A.   I believe so, but it was a few minutes
14  ago and I can't remember everything we said a few
15  minutes ago.
16    Q.   And you suggest in your report that if
17  the publisher knew that Google was reducing its
18  revenue share to allow bids to clear floor prices
19  that they otherwise wouldn't clear, the publisher
20  might have further increased its floor price;
21  correct?
22    A.   Correct.
23    Q.   That's because the publisher no longer
24  has to worry about setting the floor price too high
25  if Google will save it by reducing its share of the

Page 200

1  revenue?
2     A.   Yeah, that's a fair description.
3     Q.   Are you familiar with the concept in
4  economics known as moral hazard?
5     A.   Only very vaguely.
6     Q.   If we accept -- if we adopt the
7  definition of moral hazard from Oxford that the lack
8  of incentive to guard against risk where one is
9  protected from its consequences, is it fair to say
10  Google would have created a form of moral hazard by
11  encouraging that behavior by publishers?
12       MR. COLLIER:  Object.  Form.
13    A.   I'm sorry, I'm not familiar enough with
14  this term that I can apply it fluently to new
15  situations.
16    Q.   That's fair.  We can move on.
17       In our case, Google did not apply DRS to
18  every transaction; correct?
19    A.   Correct.
20    Q.   ███████████████████████████
█████████████████████████████████████
23    A.   ██████████
24    Q.   ████████████████████████████████

Page 201

1  ████████████████████
2     A.   ██████████████████████████
███████████████████████████████████
5     Q.   And that's a rational goal for a
6  profit-maximizing company like Google; correct?
7        MR. COLLIER:  Objection.  Form.
8     A.   I'm not going to weigh in on what's
9  rational and not rational.
10    Q.   That's a reasonable thing for a company
11  like Google to do; right?
12       MR. COLLIER:  Objection.  Form.
13    A.   I'm not going to weigh in on what's
14  reasonable and unreasonable.
15    Q.   You don't have a view in this case on
16  whether Google's decisions were reasonable or
17  unreasonable?
18       MR. COLLIER:  Objection.  Form.
19    A.   I'm not going to weigh in on applying
20  the word "reasonable" to various decisions that
21  various entities made.
22    Q.   Including Google?
23    A.   Including Google.
24    Q.   Turning back to ██████████████
████████████████████████████████████

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL



Page 202

5    MR. COLLIER: Objection. Form.

6    A.

16    Q.

21    A.

23    Q.

25    A.

Page 203

8    THE WITNESS: Can we take a break
9    in few minutes?
10    MR. HUNSBERGER: If you would like
11    to take a break, we can take a break.
12    THE VIDEOGRAPHER: Going off the
13    record. The time is 5:16 p.m.
14    (Recess taken.)
15    THE VIDEOGRAPHER: Going back on
16    the record. The time is 5:29 p.m.
17    BY MR. HUNSBERGER:
18    Q.    Professor Rudin, I would like to take a
19    step back and talk a little bit about auctions
20    generally.
21         Is it your understanding that in a
22    second-price auction the highest bidder pays the
23    greater of the reserve price and the second highest
24    bid?
25    A.    Yes.

Page 204

1    Q.    And is it your understanding that
2    despite paying the amount of the second highest bid,
3    the highest bidder still wins the auction; correct?
4    A.    Yes.
5    Q.    I would like to go through a
6    hypothetical in a world without DRS and a world with
7    DRS.
8         So in Scenario 1 let's imagine a
9    scenario where the publisher's reserved price is
10   $10, the highest bid in AdX is $11, the second
11   highest bid is $10.50, and the AdX revenue share is
12   fixed at 20 percent.
13   A.    You seem to think I can do math in my
14   head. Whoa.
15        MR. COLLIER: I don't think he'll
16   object if you have paper and pen.
17   Q.    That's fine. Go ahead. You can write
18   it down if that helps.
19   A.    We're five hours in. I don't know.
20   Q.    Do you want me to repeat the
21   assumptions?
22   A.    You can give me a pencil and paper, but,
23   I mean, I don't know if I'm going to be able to
24   follow all your calculations. I don't know where
25   you're going with them. I'm just warning you.

Page 205

1    Q.    Okay. Do you want paper and pen?
2    A.    Might as well --
3         MR. COLLIER: Would you prefer
4    that, or would you like to have in front of
5    you his question?
6         You'll object to that.
7         MR. HUNSBERGER: If that's the
8    realtime, you can have the realtime in front.
9         MR. COLLIER: I can put in front of
10   you this device where, when he says the
11   question, it gets typed out and you can refer
12   to it.
13        THE WITNESS: We'll do both.
14        MR. COLLIER: Mr. Hunsberger, is
15   that okay? I don't want to do anything you
16   don't approve of.
17        MR. HUNSBERGER: That's okay.
18   A.    But I can't do things like calculate 20
19   percent of random -- whatever number you give me on
20   the fly.
21        MR. STEINTHAL: We kept the numbers
22   close to 10.
23        MR. COLLIER: Russell got in the
24   record now.
25   BY MR. HUNSBERGER:

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

1    Q.   So can I start at the top.
2         Scenario 1 is a scenario where the
3    publisher's reserve price is $10.  The highest bid
4    in AdX is $11.  The second highest bid in AdX is
5    10.50.  And the AdX revenue share is a fixed 20
6    percent.
7    A.   Okay.
8    Q.   Do you agree that with a revenue share
9    of 20 percent, none of the bids would clear the
10   floor price?
11   A.   Sure doesn't look that way.
12   Q.   If we go now to Scenario 2, this is a
13   world where there is DRS in place.  The same facts
14   apply that we just discussed.  The publisher's
15   reserve price is $10, the highest bid in AdX is $11,
16   and the second highest bid in AdX is 10.50.
17   A.   What's the revenue share?
18   Q.   This time AdX dynamically applied a 9.1
19   percent revenue share to the highest bid.
20        With that revenue share, the net bid
21   would be $10 here; correct?
22   A.   You want me to calculate 9.1 percent of
23   something on the fly?  Sorry.  That's beyond my
24   capabilities.
25   Q.   If I represent to you that the revenue

Page 207

1    share of 9.1 percent applied to the second highest
2    bid results in a net bid of $10, can we accept that?
3    A.   Yeah -- I could accept your calculation.
4    That's fine.
5    Q.   So with the $10 bid and the 9.1
6    percent --
7    A.   With a $10 bid?  I'm sorry, I thought it
8    was an $11 bid and then a $10.50 bid?
9    Q.   Let's take a step back.  I may have made
10   an error in my math as well.
11        So the point -- the 9.1 percent revenue
12   share, when that's applied to the highest bid of
13   $11 --
14   A.   I'm sorry.  Why are you applying the
15   revenue share to the top bid if it's a second-price
16   auction?
17   Q.   Let's abandon the math.  I apologize for
18   that painful experience.
19        Is it your opinion that DRS could result
20   in changing the winner of an auction on AdX?
21   A.   Yes.
22   Q.   Could you explain how that happens, in
23   your opinion?
24   A.   So if the revenue share is less, then
25   one of the bids can go up and that bid can become

Page 208

1    the highest.
2    Q.   With dynamic revenue share why does only
3    one of the bids go up?
4         MR. COLLIER:  Objection.  Form.
5    A.   Google determines which bids go up.
6    It's whichever bid is subsidized.
7    Q.   So if Google applies dynamic revenue
8    share to two bids in an auction, it wouldn't
9    necessarily change the identity of the winner;
10   correct?
11   A.   It depends on the auction and what --
12   the way Google applies dynamic revenue share.  So
13   it wouldn't necessarily -- dynamic revenue share
14   wouldn't necessarily change the winner.  It might
15   change the winner.
16   Q.   So returning to your report,
17   paragraph 179.
18        Are you there?
19   A.   Yes.
20   Q.   You say in paragraph 179 that Professor
21   Milgrom does not consider the competing candidate
22   variable in Figure 14.  Is that right?
23   A.   That's right.
24   Q.   And then in footnote 157 you write -- in
25   the second sentence after the citation you write,

Page 209

1    "The percent of those auctions was 39 percent.  (Of
2    these DRS-manipulated auctions, two groups of them -
3    the 'competing candidate' and 'third-party reserve'
4    were cases where DRS changed the winner of the
5    auction so that a lower bidder won over a higher
6    bidder.  The calculation is (1.52 plus 3.25) divided
7    by 12.18 equals .3916.  Milgrom only included the
8    'third-party reserve' but not the 'competing
9    candidate' auctions."
10        Do you see that?
11   A.   Yes.
12        MR. HUNSBERGER:  I would like to
13   introduce another exhibit that we can look at
14   together.  This is a one-page document bearing
15   the Bates label GOOG-DOJ-13470118, and it's
16   been marked as Rudin Exhibit 7.
17        (Rudin Exhibit 7, Bates
18        GOOG-DOJ-13470118, marked for identification,
19        as of this date.)
20   BY MR. HUNSBERGER:
21   Q.   Please take a moment to review.
22   A.   Would you be able to tell me what date
23   this is from?
24   Q.   Professor, do you need the date to
25   answer questions about it?  If so, we can go off the

HIGHLY CONFIDENTIAL

Page 210

1  record.
2      A.   It would be helpful.
3          THE VIDEOGRAPHER:  Going off the
4  record at 5:45 p.m.
5          (Recess taken.)
6          THE VIDEOGRAPHER:  Going back on
7  the record.  The time is 6:02 p.m.
8  BY MR. HUNSBERGER:
9      Q.   So we were talking now about document
10 GOOG-DOJ-13470118 which has been marked as Rudin
11 Exhibit 7.
12         You had asked before we took a quick
13 break the date of this document, and we have
14 confirmed in the metadata for the production, and I
15 will represent to you that the date of creation is
16 March of 2018.
17     A.   Okay.  Thank you.
18         MR. COLLIER:  Counsel, I will make
19 an objection for the record.  I don't believe
20 this is a complete document, as there appears
21 to be a reference to a PLX query and
22 CR/131764233 that are hyperlinked.
23         I'm not interrupting your
24 questioning.  I'm just making my objection for
25 the record.  I don't think this is complete.

Page 211

1      There's no to/from, there's no memo, there's
2  no anything.
3          That said, feel free to ask,
4  subject to my objection.
5          MR. HUNSBERGER:  I understand your
6  objection, Counsel, and we reserve our rights
7  on our position in response to that.
8  BY MR. HUNSBERGER:
9      Q.   Subject to that, do you see on the first
10 bullet at the top of this document refers to
11 ██████████████████
12     A.   Yes.
13     Q.   And it refers to that as ███████████
██  ████████████████████████████?
16     A.   Yes.
17         MR. HUNSBERGER:  If we could turn
18 to another document, and this is a document
19 you said in your report.  This is a document
20 bearing the Bates number
21 GOOG-AT-MDL-007375273.  It's been marked as
22 Rudin Exhibit 8 for the record.
23         (Rudin Exhibit 8, Bates
24 GOOG-AT-MDL-007375273, marked for
25 identification, as of this date.)

Page 212

1  BY MR. HUNSBERGER:
2      Q.   This document you cite in your report in
3  footnotes 157 to 159 for reference.
4          Please take a moment to review it, and
5  we can proceed when you're ready.
6      A.   Okay.
7      Q.   In footnote 157 you state that the
8  competing candidate includes cases where DRS changed
9  the winner of the auction.
10         Do you see that?
11     A.   Yes.
12     Q.   What is the basis for that statement?
13     A.   The basis is exactly what you read; that
14 competing candidate is the price set by the bid
15 submitted by other buyer or the same buyer in the
16 case of GDN, who submits two bids from two
17 different internal buyers.
18     Q.   If the other buyer is in the AdX
19 auction, how could DRS change the winning buyer
20 within that AdX auction?
21     A.   So DRS would give a subsidy to the -- to
22 a lower bidder to cause it to become the highest
23 bidder, and then the competing candidate who would
24 have won now simply determines the price.
25     Q.   So to make sure I understand correctly,

Page 213

1  your testimony is that DRS can change the winning
2  buyer only where DRS applies a subsidy to one bid
3  within AdX but to another bid within AdX?
4      A.   That's not what I said at all.
5      Q.   Could you repeat the circumstances in
6  which if both the buyers are in the AdX auction how
7  could the DRS change the winning buyer within that
8  AdX auction?
9      A.   So if DRS subsidizes the bid, that
10 causes that bid to be higher, and that bidder is
11 now the winner, and the second price is now
12 determined by a competing candidate or whatever
13 these other things are.
14     Q.   Is your understanding that ██████████
██ ████████████████████████████████?
17         MR. COLLIER:  Objection.  Form.
18     A.   ███████████████████████████
██ ████████████████████████████
██ ████████████████████████████
22     Q.   In your example are you assuming that
23 Google did not apply the DRS subsidy to the lower of
24 the two bidders within AdX?
25     A.   No.  That's not what I said.

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1     Q.   If the DRS subsidy applies to both the
2   lower bidder and the higher bidder, how could that
3   result in DRS changing the winning buyer within that
4   auction?
5     A.   Okay.  Let's go abstractly, and you have
6   two bidders that are subsidized at different rates,
7   and that could reverse the order of the bids.
8   That's possible.
9     Q.   Is it your understanding that DRS did
10   subsidize bids at different rates?
11     A.   I don't remember the formulas for DRS.
12   There's several different versions of DRS, so I
13   probably shouldn't weigh in on that one.
14     Q.   Just to make sure I understand your
15   position, the only way to flip the order of the two
16   bids is if the subsidies are applied at different
17   rates; is that right?
18     A.   No.
19     Q.   If the subsidy applied to both bids at
20   the same rate, it wouldn't change the order of the
21   winning and second-place bid; correct?
22     A.   The premise of your question makes no
23   sense to me, because it would be -- just to make
24   sure I understand.  You have two bidders, and you
25   want to raise both of their bids; right?  Because

Page 215

1   they're both being subsidized, I assume.  And then
2   the top bidder pays the second price, which is now
3   higher than it was before.  So if Google did this,
4   they would be charging a higher rate for the second
5   bidder than before?
6     Q.   I don't understand your question, so let
7   me try to phrase this in a different way.
8         There are two bids within the AdX
9   auction, $5 and $4.50.  If both of those -- if those
10   are the two highest bids in AdX and both bids
11   receive the same subsidy from DRS, those would
12   remain the first- and second-highest bids within
13   AdX; correct?
14     A.   Again, I think the premise of what you
15   are suggesting makes no sense.  But if you take the
16   two highest bids and you give them both a subsidy,
17   similar subsidy, so they both go up, then the order
18   wouldn't change.
19         So I'm not sure where you're going with
20   this because the premise of it doesn't make any
21   sense to me.
22     Q.   So if we return to your report,
23   paragraph 172.
24     A.   Sorry, give me a second.  172.  Okay.
25     Q.   Is it your opinion that publishers and

Page 216

1   advertisers could not optimize their strategies
2   because of DRS?
3     A.   That's one of the reasons they couldn't
4   optimize their strategies.
5     Q.   And turning to paragraph 180 of your
6   report, you say that "Accepting Professor Weinberg's
7   view, if the seller knew that AdX was dynamically
8   changing the revenue share, it likely would have
9   responded by changing its floor price."
10         Do you see that?
11     A.   Yes.
12     Q.   Is it your opinion that DRS was not
13   disclosed with sufficient detail?
14     A.   Correct.
15     Q.   And it's your opinion that publishers
16   and advertisers could not optimize their strategies
17   because of DRS in part because AdX has more accurate
18   predictions of buyers' bids than sellers'; correct?
19         MR. COLLIER:  Object.  Form.
20     A.   Well, it's the data but also the
21   disclosure; right?  If you don't know what's going
22   on, it's very, very difficult to figure it out, and
23   it's very difficult to respond to it.
24     Q.   And if you look at paragraph 175 of your
25   report, the first sentence reads, "AdX knows it has

Page 217

1   more accurate predictions than the sellers."
2         Do you see that?
3     A.   Yes.
4     Q.   So that more accurate predictions by
5   AdX, that is part of the reason that publishers and
6   advertisers could not optimize their strategies?
7     A.   It's the way that these predictions are
8   used that makes it difficult for publishers and
9   sellers to optimize their strategies, along with
10   the disclosures and the other things mentioned in
11   the report.
12     Q.   If sellers could set floor prices
13   optimally, DRS would not be possible; correct?
14         MR. COLLIER:  Objection.  Form.
15     A.   Sorry, could you repeat the question
16   again?
17     Q.   I'm looking at paragraph 176 of your
18   report.  "If sellers could set floor prices
19   optimally, DRS would not be possible"; correct?
20     A.   Correct.
21     Q.   Another reason that publishers and
22   advertisers could not optimize their strategies was
23   because DRS increased variance in bids; is that
24   correct?
25     A.   Correct.

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

1    Q.   And assuming that publishers knew
2  exactly how DRS functioned, they would have still
3  had difficulty in predicting where to place their
4  floor for AdX; correct?
5    A.   Sorry -- I'm sorry.  We've been going
6  for a long time.  Try it again.
7    Q.   I understand.
8        Assuming that publishers knew exactly
9  how DRS functioned, they still would have had
10  difficulty in predicting where to place their floor
11  for AdX; correct?
12    A.   When you say knew how DRS functioned, do
13  you mean that DRS wouldn't be throttled?  Like that
14  publishers would know exactly what the pool -- the
15  DRS pool information was and that they had all the
16  data that Google has?
17        I'm a little confused by your question.
18    Q.   I can frame it again.
19        Assuming that publishers had full
20  disclosure from Google about how DRS functioned and
21  when it was in place, they still would have had
22  difficulty in predicting where to place their floors
23  for AdX; correct?
24    A.   So again, it's not really clear what you
25  mean by "disclosure," because in order to place the

Page 219

1  floors optimally they would need to know -- they --
2  it's matter of scale.  If you have the disclosure,
3  then you can figure out, okay, what should I do
4  with this.  Maybe I can optimize a little bit
5  better with this.  If I had more data, then I could
6  optimize better with that.  If I knew when DRS was
7  going to be throttled, then maybe I could use that
8  to do better on my optimization as well.
9    Q.   So let me try to rephrase the question.
10        Assuming that Google disclosed all the
11  details about DRS, how it functioned, to which
12  transactions it applied, and any other relevant
13  details that you think are important to be
14  disclosed, publishers still would have had
15  difficulty in predicting where to set their floors
16  for AdX; correct?
17        MR. COLLIER:  Objection.  Form.
18    A.   Okay.  I will try to give that answer
19  more completely.
20        So every piece of information you give
21  publishers about the circumstance they're in helps
22  them set better floors.  So if you tell them DRS is
23  running, this is how it works, that would help
24  them.  If you tell them additional information,
25  like when it's going to be throttled on and off,

Page 220

1  that would help them as well.  And if you give them
2  more data, then that would help them also set the
3  floors.
4    Q.   So let's set aside the data, because I'm
5  only talking about disclosures for this question.
6        So you say if -- if Google told
7  publishers how DRS is running, how it works, and if
8  you tell them, as you mentioned, when it's going to
9  be throttled on and off, if that information were
10  disclosed by Google to publishers, the publishers
11  still would have difficulty predicting where to
12  place their price floors for AdX; correct?
13        MR. COLLIER:  Objection.  Form.
14    A.   I've already answered that question
15  twice now.
16    Q.   Could you answer it again, please?
17    A.   Sure.  So if DRS was disclosed
18  appropriately, then publishers would be able to
19  optimize better.  If the throttling information was
20  disclosed, exactly when the throttling would occur,
21  when the throttling is off and on, that would help
22  publishers as well.  And if there were more data,
23  that would help publishers as well.
24        And it's difficult to optimize, you
25  know -- well, strike that.  We're good.

Page 221

1    Q.   If DRS was disclosed appropriately in
2  your view, would publishers be able to optimize
3  their prediction of where to set their floor prices
4  for AdX?
5    A.   So as I mentioned, it's a matter of
6  degree.  It's not a yes or no.  It's if you
7  disclose what's going on, publishers can benefit
8  from that information.  Like if you disclose DRS,
9  that would help publishers set the floors.  If you
10  disclose the throttling and when the throttling
11  will occur, that will help publishers set the
12  floors.  And if they had a lot more data like
13  Google has, that would also help them to set
14  floors.
15    Q.   We will turn now to another feature
16  discussed in your report.
17        Starting in paragraph 163 of your report
18  you discuss something you refer to as Google's Last
19  Look program; is that correct?
20    A.   That's not just something I refer to as
21  Google's Last Look program.  Google refers to that
22  program as Last Look.  It's in Google internal
23  slides.
24    Q.   All I'm saying is you in your report
25  refer to it as Google's Last Look; right?

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

1    A.   Me and Google refer to that program as
2  Last Look.
3    Q.   You're familiar with the program that
4  you referred to as the Last Look program?
5    A.   Yes.
6    Q.   ███████████████████████████████
7  ████  ██████████████████████████████
8    A.   I need to go look up the dates.  I agree
9  with those dates.
10   Q.   ███████████████████████████████
11 ████  ████████████████████████████
12 correct?
13   A.   Didn't you just say that?
14   Q.   Are you asking --
15   A.   Sorry, is this question different than
16 the last question?  I must be getting tired.  Maybe
17 we should take a break.
18       MR. COLLIER:  I don't want to be
19   accused of coaching the witness.  She agreed
20   with your statement and you made it sound like
21   a question again.  Whatever --
22   Q.   Let me ask the question again.
23        ████████████████████████████████
24 ██  ████████████████████████████████████
25 ██  █████████████████?

Page 223

1    A.   I believe that's the case.
2    Q.   You state in your report, paragraph 170,
3  the second sentence of paragraph 170, "When Google
4  removed Last Look as part of the move to the
5  first-price auction in AdX."
6        Do you see that language?
7    A.   Yes.
8    Q.   And in paragraph 166 you state, in the
9  first sentence, "The illustration below shows that
10 without a 'Last Look' AdX bidders are forced to
11 predict competitors' bids.  Professor Milgrom points
12 out that this is an extremely difficult prediction
13 problem.  With the benefit of a 'Last Look,'
14 information about competitor bids and floor price
15 are known, so no prediction is needed."
16       Do you see that language?
17   A.   Yes.
18       MR. HUNSBERGER:  If we could turn
19   to Professor Milgrom's report from which you
20   cite this proposition.  We can give you a copy
21   of that.
22       (Rudin Exhibit 9, Expert Report of
23   Professor Paul Milgrom dated July 30, 2024,
24   marked for identification, as of this date.)
25 BY MR. HUNSBERGER:

Page 224

1    Q.   This is a copy of Professor Paul
2  Milgrom's report dated July 30, 2024, and it's been
3  stamped, for the record, as Exhibit 9 to the Rudin
4  deposition.
5    A.   Thanks.
6    Q.   I am going to ask you about paragraph 67
7  of his report.
8    A.   Okay.
9    Q.   Professor Milgrom is one of the experts
10 from Google that you respond to in this case; is
11 that correct?
12   A.   Yes.
13   Q.   And you cite to this paragraph 67 in
14 footnote 143 of your report; is that correct?
15   A.   Yes.
16   Q.   And you cite his statement about
17 two-thirds of the way down of that paragraph that
18 begins with the word "Guessing."
19       "Guessing the identities and bids of
20 others for each different impression is a costly and
21 error-prone activity that can lead to inefficiency
22 when bidders' guesses are wrong."
23       Do you see that language?
24   A.   Yes.
25   Q.   His next sentence reads, "In a

Page 225

1  first-price auction, the winner may be a bidder who
2  does not have the highest value for the impression."
3        Do you see that?
4    A.   Yes.
5    Q.   And on page 58 of Professor Milgrom's
6  report, right about paragraph 67, do you see the
7  heading for that section that says "First-Price
8  Auctions"?
9    A.   Yes.
10   Q.   So Professor Milgrom in this paragraph
11 was talking about first-price auctions when he wrote
12 the statement that you cited; correct?
13       MR. COLLIER:  Object.  Form.
14   A.   I don't believe so.  I think it was a
15 general statement.
16   Q.   So your testimony is that in this
17 paragraph 67 that begins "In a first-price auction"
18 and only talks about first-price auctions in this
19 paragraph, that he's referring to second-price
20 auctions?
21   A.   No.  He's saying that in general
22 guessing the identities and bids of others for each
23 different impression is a costly and error-prone
24 activity that can lead to inefficiency when
25 bidders' guesses are wrong, and that's his general

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

1  information that he's using to talk about a
2  particular disadvantage of first-price auctions.
3      Q.    As we just discussed, Last Look no
4  longer existed once AdX moved to a first-price
5  auction; correct?
6      A.    I'm sorry, we're going the whole day.
7  I'm getting tired. Can you repeat the question
8  again.
9      Q.    As we discussed a moment ago, Last Look
10  no longer existed once AdX moved to a first-price
11  auction; correct?
12      A.    I'm sorry, I believe there may have been
13  a form of Last Look after that.
14      Q.    So if you look at paragraph 170 of your
15  report, do you see the language --
16      A.    Oh --
17      Q.    -- "When Google removed Last Look as
18  part of the move to the first-price auction in AdX"?
19      A.    I'm sorry, could you repeat the
20  question? We've been going for a long time.
21      Q.    Google removed Last Look as part of the
22  move to the first-price auction in AdX; correct?
23      A.    That's what it says here, yes.
24      Q.    And in the first-price auction, bidders
25  have the incentive to submit a bid lower than their

Page 227

1  true value; is that correct?
2          MR. COLLIER: Objection. Form.
3      A.    I'm not going to weigh in on auction
4  theory, but that agrees with what we just read from
5  Professor Milgrom's report.
6      Q.    Do you agree with Professor Milgrom on
7  that point?
8      A.    Like I said, I'm not an expert on
9  auction theory, so -- I mean, it seems reasonable.
10      Q.    Ideally bidders in a first-price auction
11  would want to bid a penny above competitor bids;
12  correct?
13      A.    Correct.
14      Q.    And that's why bidders need to predict
15  competitor bids in a first-price auction; correct?
16      A.    Correct.
17          THE WITNESS: Can we take a break
18      pretty soon? Is that okay? Are we almost
19      done with this?
20          MR. HUNSBERGER: Yes, we can soon,
21      if I can finish a couple more questions. Or
22      we can take a break. By all means.
23          THE WITNESS: Whatever you like.
24  BY MR. HUNSBERGER:
25      Q.    In a second-price auction the optimal

Page 228

1  strategy for buyers is to bid their true value;
2  correct?
3          MR. COLLIER: Objection. Form.
4      A.    In a second-price auction, bidders are
5  incentivized to bid their true value if there's
6  nothing else going on around the auction. Which is
7  the pure single second-price auction.
8      Q.    And because of that, in a second-price
9  auction bidders do not need to predict the bids of
10  their competitors; is that correct?
11      A.    Again, if there's nothing else going on
12  in the second-price auction -- because a lot of
13  Google's auctions there's other things going on
14  that are not disclosed. So in that case, it's
15  really not clear how bidders exactly should bid and
16  whether they should bid truthfully or not.
17      Q.    Regardless of whether Last Look applies
18  in a second-price auction, because of the incentives
19  buyers have in second-price auctions they don't have
20  to predict the bids of other buyers; correct?
21          MR. COLLIER: Objection. Form.
22      A.    Again, I'm not -- to be able to
23  disentangle the second-price auction and Last Look
24  I would need a bit more time than I have today,
25  because then it's not a pure second-price auction

Page 229

1  because you're changing something about the auction
2  that makes it different.
3          MR. HUNSBERGER: Okay. We can take
4      a break, Professor.
5          THE VIDEOGRAPHER: Going on the
6      record. The time is 6:36 p.m.
7          (Recess taken.)
8          THE VIDEOGRAPHER: Going back on
9      the record. The time is 7:15 p.m.
10          MR. COLLIER: Counsel, just a quick
11      logistical issue. It's 7:15. She's not had
12      dinner. I'm not sure, are you intending to
13      use your whole 44 minutes? What is your
14      intention? Because this is very difficult for
15      her.
16          MR. HUNSBERGER: We're happy to
17      take a break for dinner if she would like, but
18      we don't -- we may not have a full 44 minutes,
19      but we may have 30 to 40 minutes. It's up to
20      the witness.
21          MR. COLLIER: I'm going to advise
22      you that -- well -- she may need a break in
23      the middle of the 44 to get something other
24      than these cookies in her.
25          MR. HUNSBERGER: Perfectly

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

1    understandable.
2          MR. COLLIER: I just don't want you
3    to -- Cynthia, are you okay to push through
4    the 44?
5          THE WITNESS: I have no idea.
6    Let's give it a try.
7          MR. HUNSBERGER: Counsel, feel free
8    to take a break. No objection to --
9          MR. COLLIER: I didn't want you to
10   think there was anything tactical about this.
11   It is just it is 7:16 at night, and --
12         MR. HUNSBERGER: It's been a long
13   day. I understand. If you need a break, feel
14   free. I will not object.
15         THE WITNESS: Thank you.
16         MR. COLLIER: You do what you need
17   to do for your body.
18         MR. HUNSBERGER: Agree with that.
19   And I appreciate your patience on some very
20   technical issues today.
21   BY MR. HUNSBERGER:
22     Q.   If we take a step back from the specific
23   optimizations we've been talking about and go back
24   to your discussion of -- in your report of an
25   abstracted auction, in your report you described an

1    abstracted auction and several variations on the
2    auction; is that correct?
3      A.   That's correct.
4      Q.   I would like to walk through an exercise
5    where we look at your abstracted auction and
6    understand how your theories in your report apply to
7    that abstracted auction.
8          If we assume that we have an ad exchange
9    known as "simple exchange." As the name implies, it
10   has a very simple model. All it sends in its bid
11   requests are three features: the domain of the
12   website, the dimensions of the ad slot in pixels,
13   and the time at which the auction will close.
14         Let's further assume that the simple
15   exchange runs a second-price auction.
16         Under those circumstances, is it fair to
17   assume that it is an easier model for buyers and
18   sellers to estimate impression values than either
19   your abstracted auction or the real world?
20     A.   Sorry. So you're asking whether what
21   you just proposed was easier than my abstracted
22   auction or the real world?
23     Q.   Easier for buyers and sellers to
24   estimate impression values in the simple exchange
25   model that I described.

1      A.   I'm trying to compare your model to
2    my model.
3          So my model, it doesn't say what
4    variables are available, and you specified which
5    variables are available, so -- and you haven't
6    specified who has what information. So I'm a
7    little bit -- it's a little bit hard for me to do
8    the comparison.
9      Q.   If we set aside your abstraction model
10   and just compare the simple exchange that I
11   described versus the real world and ad tech auctions
12   today, would it be fair to say that it would be
13   easier for buyers and sellers to estimate
14   impressions in the simple exchange as opposed to the
15   real world?
16     A.   Okay. So could you restate your simple
17   exchange again?
18     Q.   You have an ad exchange known as "simple
19   exchange." As the name implies, it has a very
20   simple model. All it sends in its bid requests are
21   three features: the domain of the website, the
22   dimensions of the ad slot in pixels, and the time at
23   which the auction will close.
24         And the simple exchange runs a
25   second-price auction.

1      A.   Does the simple exchange do all of
2    Google's manipulations as described?
3      Q.   It only does what I just described. It
4    does not.
5      A.   Does it return -- what does -- does it
6    withhold that data? Does it -- do the parties have
7    access to that data? Does it adjust the bids?
8    Does it -- all those things.
9      Q.   In all other respects it's the same as
10   your abstracted model before any auction
11   manipulation.
12     A.   Okay. So this is a -- sorry, I'm still
13   trying to wrap my head around this, given that
14   we've been going for so long.
15         So you've got this abstract auction.
16   There's three variables that are given to every
17   bidder, and the -- it's the same as the abstract
18   auction in every way?
19     Q.   In all other ways.
20     A.   All other ways. And you're asking
21   whether it would be easier for sellers and bidders
22   to construct their strategies; is that correct?
23     Q.   To estimate impression values.
24     A.   To estimate impression values. Okay.
25         What is your definition of "easier"?

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

1    Q.   Under the methodology that you apply in
2  this case and the basis on which you've provided
3  your opinions.
4        MR. COLLIER: Objection. Form.
5    A.   Okay. So, again, in the abstracted
6  auction what do you mean -- do you mean, like, the
7  valuations are more accurate, or do you mean that
8  there's no better strategy?
9        I just don't understand what you mean.
10   Q.   Easier to optimize, under your
11 definition as you describe in your report.
12   A.   So, again, I still don't really
13 understand what you mean by "easier," because, you
14 know, it could mean several different things.
15   Q.   Is your opinion that when a bid request
16 includes more information it is more difficult for
17 buyers and sellers to model and estimate impression
18 values?
19   A.   Okay. So you asked when a bid request
20 includes more information, you're asking if it's
21 more difficult to model and estimate impression
22 values.
23        And the answer is it depends on what
24 kind of information that is, because if you reveal
25 some information that is very telling, right,

Page 235

1  that -- when you provide more information, then it
2  might make it easier to estimate. But if you
3  include a huge amount of information, none of which
4  is particularly relevant, then it might make it
5  harder to estimate.
6    Q.   Under the simple exchange and the
7  assumptions I've described, could you explain what
8  would make it easier for buyers and sellers to
9  estimate impression values and what would make it
10 harder for buyers and sellers to estimate impression
11 values?
12       MR. COLLIER: Object. Form.
13   A.   Okay. If you -- if the buyers and
14 sellers receive information that is closer -- let's
15 say it's highly correlated with the valuation.
16 Then that would make it easier to do that kind of
17 estimation.
18       And if the buyers and sellers receive a
19 lot of information that is not correlated with the
20 valuation, then that would make it difficult for
21 them to do the estimation. Or a small amount of
22 information that is not relevant. Any nonrelevant
23 information or less relevant information could make
24 it more difficult.
25   Q.   I think we're having difficulty with the

Page 236

1  hypothetical, so let me try to take it back to a
2  concrete question related to Google's products.
3        In your opinion, is there any change to
4  Google's products that you could imagine that would
5  increase variance in auction results and still be
6  positive for advertisers and publishers?
7    A.   I think that requires a level of
8  speculation that I'm not sure I am prepared to do
9  at this moment.
10   Q.   But you don't offer an opinion that an
11 increase in variance in auction results is
12 necessarily a bad thing for advertisers or
13 publishers; correct?
14       MR. COLLIER: Objection. Form.
15   A.   So in the case of Google's conduct, the
16 extra variance makes it harder to do the
17 estimation.
18   Q.   And making it harder to do the
19 estimation outweighs any other potential benefits to
20 the publisher or advertiser from the product?
21   A.   I'm not weighing in on the relative
22 merits of, you know, you hurt them one way and you
23 benefit another way. That's not something I can
24 do.
25   Q.   Your opinion is limited to the impact on

Page 237

1  advertisers and publishers from the perspective of
2  their use of machine-learning models to optimize
3  their outcomes; is that correct?
4    A.   What do you mean by "limited"?
5    Q.   So you mentioned that: I'm not weighing
6  in on the relative merits of some harms and some
7  benefits.
8        I'm just trying to understand what you
9  are weighing in on specifically.
10       MR. COLLIER: Objection. Form.
11       MR. HUNSBERGER: I was clarifying
12 in response to the witness's question, so I
13 can repeat.
14       MR. COLLIER: It wasn't a
15 criticism. I just don't think it was a
16 question standing alone.
17       MR. HUNSBERGER: Understood. The
18 witness is asking me a lot of questions, so
19 I'm trying to give her the information she
20 needs.
21       MR. COLLIER: I understand. It
22 wasn't a criticism.
23       I think he's going to ask a
24 question.
25 BY MR. HUNSBERGER:

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

1    Q.   Do you offer any opinions in this case
2    that weigh the impact of Google's conduct on
3    advertisers and publishers from the perspective of
4    machine-learning models to optimize outcomes versus
5    any other considerations?
6           MR. COLLIER:  Objection.  Form.
7    A.   It's very difficult for me to weigh
8    conduct.
9        I'm sorry, that question was worded
10   unclearly.
11   Q.   Do you offer any opinions in this case
12   that weigh the concerns you have identified from a
13   machine-learning perspective?
14          MR. COLLIER:  Objection.  Form.
15          MR. HUNSBERGER:  I wasn't done with
16   my question, Counselor.
17          MR. COLLIER:  Apologies.  I thought
18   you were done.
19   A.   Weigh the concerns -- I just don't
20   understand --
21          MR. COLLIER:  I don't understand.
22   If you weren't done with your question, are
23   you going to finish your question?
24          MR. HUNSBERGER:  You've been
25   talking and she's been talking, so I will wait

Page 239

1    until you're done talking and then I will ask
2    my question.
3           MR. COLLIER:  My talking is
4    objecting.  I'm done objecting.  You may now
5    ask your question, sir.
6    BY MR. HUNSBERGER:
7    Q.   Do you offer any opinions in this case
8    that weigh the concerns you have identified from a
9    machine-learning perspective against any potential
10   benefits that may result from the products that you
11   have analyzed?
12          MR. COLLIER:  I speak again.
13          Object.  Form.
14          You may answer.
15   A.   Maybe it's late in the day, but I'm just
16   not sure what this question means, in terms of what
17   does it mean to weigh one concern against a
18   potential benefit?
19       I mean, I analyzed the conducts in depth
20   in this report, and I've talked about all the
21   problems, you know, many problems with the
22   conducts.  It wasn't my job to, you know, do things
23   that are outside the realm of this report, so I'm
24   really not sure what you are asking.
25          MR. HUNSBERGER:  Okay.  I have some

Page 240

1    final questions, but if you would like to take
2    a break, we are happy to take a break.  I know
3    it has been a long day.
4           THE WITNESS:  No, I'm good.
5           MR. COLLIER:  Doctor, it's up to
6    you.
7        I suspect her answer depends on how
8    many more minutes he has.  But is this three
9    minutes of questions or --
10          MR. HUNSBERGER:  Probably more than
11   three minutes.  Depends on how the questioning
12   and the answers go.
13          THE WITNESS:  We can keep going.
14   That's fine.
15   BY MR. HUNSBERGER:
16   Q.   It's been a long day.  We've talked
17   about a number of issues today.  I wanted to take a
18   few minutes and confirm that I understand the scope
19   of your opinions.
20       In your report you offer opinions on the
21   effects of Google optimizations on publishers' and
22   advertisers' ability to optimize machine learning;
23   is that correct?
24   A.   Yes.
25   Q.   In your report you do not offer any

Page 241

1    opinions on how Google's optimizations may have
2    affected rival ad tech companies; is that correct?
3    A.   That's not true.
4    Q.   Which opinions do you offer on how
5    Google's optimization may have affected rival
6    ad tech companies?
7    A.   There are many opinions on that topic
8    throughout the report.  I could refer you to some
9    of the statistics toward the end of the report if
10   you would like.
11   Q.   So when I refer to "rival ad tech
12   companies" I'm talking about Google's competitors in
13   the provision of ad tech tools.  I'm not talking
14   about publishers or advertisers.  So I want to make
15   sure we're on the same page when it comes to
16   terminology.
17       I can ask the question again for
18   clarity, if that would be helpful.
19   A.   I'm sorry, but I feel like I've already
20   answered your question because, you know, you asked
21   me if I make any opinions about competitors, and I
22   do, and they're in this report.
23   Q.   What are your opinions on the impact of
24   Google's optimizations on rival ad tech companies?
25   A.   So, again, they're in this report,

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

1  throughout the report, but I will focus towards the
2  end of the report if you want to see more details.
3  Near the end of the report somewhere.
4      Q.   Which -- I guess at a high level, what
5  are your opinions in that section of your report?
6      A.   Well, I don't feel comfortable
7  summarizing, but I'm happy to read parts if you
8  like.  Would you like me to find them?
9      Q.   I don't think it's a good use of time to
10  read -- just read sections of your report, but if
11  you have at a high level what your summary of
12  opinions is with respect to competitors?
13      A.   Okay.  Let me see if I can find it
14  quickly.  It's literally throughout the report.  It
15  talks about -- it's literally throughout the
16  report.  There's some useful statistics at the end
17  that pertain to this.  Yeah.
18      Q.   Can you direct me to a paragraph number?
19      A.   Sure.  Just give me a second.
20          Okay.  So it should be in the section
21  starting on page 82.
22      Q.   Looking at page 82, paragraph 241, is
23  that what you're referring to?
24      A.   That's the start of the section I refer
25  to.  Again, there could be throughout the report

Page 243

1  sections to competitors.
2      Q.   So taking a step back, as you've
3  described, your opinion is that due to Google's
4  auction manipulations sellers and buyers would not
5  be able to experiment to arrive at optimal
6  strategies; is that correct?
7      A.   Yes.  Sellers and buyers have a very
8  hard time experimenting.  They would struggle to
9  arrive at optimal strategies due to Google's
10  auction manipulations.
11      Q.   And the term "optimal strategies" is
12  context dependent; is that correct?
13      A.   Yes.
14      Q.   And different advertisers and different
15  publishers might have different definitions of that
16  term?
17      A.   Correct.
18      Q.   And in your report you do not provide a
19  single definition of the term "optimal strategies";
20  is that correct?
21      A.   Importantly, yes.  It's really important
22  that publishers can optimize to their own
23  objectives and advertisers can optimize their own
24  objectives.
25      Q.   In your report you do not analyze

Page 244

1  whether advertisers and publishers were able to
2  arrive at optimal strategies before the introduction
3  of Google's auction manipulations?
4          MR. COLLIER:  Objection.  Form.
5      A.   So again, it's really a matter of the
6  fact that Google's manipulations made it much more
7  difficult to optimize strategies.  So by
8  withholding data, by all of the different conducts,
9  by not disclosing.  All of these things make it
10  more difficult to optimize.
11      Q.   And did you analyze whether advertisers
12  and publishers were able to optimize before Google
13  started the alleged conduct that you analyze in your
14  report?
15          MR. COLLIER:  Objection.  Form.
16      A.   So, again, it's really not a matter of
17  the fact that Google's manipulations made it much
18  more difficult to optimize strategies.  By
19  withholding data, by all of the different conducts,
20  by not disclosing all of these conducts, that makes
21  it more difficult to optimize.
22      Q.   But you did not analyze a world prior to
23  Google's auction manipulations; correct?
24          MR. COLLIER:  Objection.  Form.
25      A.   So, again, it's really not a matter

Page 245

1  of -- it's really -- sorry.
2          The fact is that Google's manipulations
3  made it much more difficult to optimize strategies,
4  by withholding data, by all of the different
5  conducts, by not disclosing the conducts, and it
6  makes it more difficult to optimize.
7      Q.   I apologize.  I don't think that's an
8  answer to my question, so I will try asking in a
9  different way.
10          Did you analyze a -- the ad tech
11  industry and whether publishers and advertisers
12  could optimize before Google started what you
13  referred to as the "auction manipulations"?
14      A.   So as I mentioned, Google's conducts
15  made it much more difficult to optimize strategies
16  because they withheld data.  That makes it more
17  difficult to do machine learning, estimation and
18  prediction.  These conducts increased variance.
19  And the throttling that disguises the conducts.
20  All of these things make it more difficult to
21  optimize.
22      Q.   When you say "more difficult to
23  optimize," what is the baseline against which you're
24  comparing?
25          MR. COLLIER:  Objection.  Form.

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL

Page 246

1    You can answer.
2    A.   Okay.  So for example, without a certain
3  conduct it would be easier to do X, for instance.
4    Q.   Do you analyze a world without that
5  certain conduct in place?
6        MR. COLLIER:  Objection.  Form.
7    A.   So as I mentioned, Google's conducts
8  make it much more difficult to optimize than if
9  those conducts were not present because they
10  withheld data, which makes it difficult to do
11  machine learning.  The conducts increase variance,
12  which makes it more difficult to do prediction.
13  Throttling makes it difficult to detect the
14  conducts and optimize on top of them.  All of these
15  things make it more difficult to perform
16  optimization.
17    Q.   You referred in your answer several
18  times to "more difficult."
19        Do you analyze more difficult relative
20  to what?
21        MR. COLLIER:  Objection.  Form.
22    A.   Okay.  You've already asked me that
23  question like four or five times now.
24    Q.   You haven't answered the question, and
25  it's a very straightforward question, and if you

Page 247

1  answered it we could easily move on.
2    A.   I thought I answered it sufficiently
3  well the first time, as well as the second, third
4  and fourth time.  I can keep answering if you would
5  like.
6        MR. COLLIER:  Dr. Rudin, just try
7  again.  Answer his question again as best you
8  can.
9    A.   If the conducts were not present -- with
10  and without the conducts, it's much more difficult
11  to do the optimization with the conducts, with --
12  when Google withholds data, when they have their
13  conducts, when they throttle their conducts, all of
14  these manipulations make it much more difficult to
15  analyze than if those conducts were not there.
16    Q.   As part of your opinions in this case
17  you have formed a view that advertisers and
18  publishers use machine learning to help estimate
19  bids and floor prices; is that correct?
20    A.   Yes.
21    Q.   Did you interview any advertisers or
22  publishers to confirm that view?
23        MR. COLLIER:  Objection.  Form.
24        You can answer.
25    A.   That answer is everywhere.  It is all

Page 248

1  over the internet.  It's all over all the citations
2  that I give.  It is all over the Google internal
3  documents.  So there's no need for me to interview
4  anyone to find that out.
5    Q.   In forming your opinions in this case
6  did you investigate the types of data that
7  advertisers and publishers use to generate estimates
8  of bids and floor prices?
9        MR. COLLIER:  Objection.  Form.
10    A.   Yes.  And there's a section on that in
11  my report.
12    Q.   In your opinion is part of the problem
13  you describe in your report that publishers and
14  advertisers do not have enough information?
15    A.   They have much less information than
16  Google does.  They cannot compete with Google.
17    Q.   Ultimately is it your opinion that if
18  Google has data that it uses to construct
19  machine-learning models it should share that data
20  with publishers and advertisers?
21        MR. COLLIER:  Objection.  Form.
22    A.   I make no opinion on that.  The question
23  is how they use that data or how they don't use
24  that data.
25    Q.   You have no opinion on whether Google

Page 249

1  should share its data with publishers and
2  advertisers?
3        MR. COLLIER:  Objection.  Form.
4    A.   The question of what Google should do is
5  beyond the scope of my report.  I'm not allowed to
6  say what -- who should be doing what.
7        I have opinions on how Google uses the
8  data that it collects, but I don't have any opinion
9  on who should be doing what.  That requires a
10  policy, and it's beyond the scope of my report.
11    Q.   In providing your opinions did you study
12  how any non-Google ad tech tools operate?
13    A.   Which tools are you referring to
14  specifically?
15    Q.   Ad exchanges offered by non-Google
16  companies or buy-side tools offered by non-Google
17  companies.
18    A.   I cite several public papers in my
19  report that describe how these tools generally
20  operate.
21        Do I have propriety information from any
22  of these tools?  No.
23    Q.   Do you offer any opinion in this case on
24  whether compared to Google those non-Google ad tech
25  tools share more, less or the same amount of data

HIGHLY CONFIDENTIAL

Page 250

1  with publishers and advertisers?
2      A.   In the sense that that would require
3  proprietary information, there's no way I can know
4  that information.
5      Q.   In your report you're not offering
6  any opinion on the commercial effects of sharing
7  data with third-parties outside of Google; correct?
8      A.   I don't know what a "commercial effect"
9  means.
10     Q.   Do you offer any opinions on the privacy
11 implications of sharing that data?
12     A.   I'm not a privacy expert.
13     Q.   Do you offer any opinions on the
14 legality of sharing that data under U.S. or other
15 laws?
16     A.   I'm not a legal expert.
17     Q.   Prior to being retained as an expert
18 witness in this matter, did you have an opinion on
19 Google as a company?
20         MR. COLLIER:  Objection.  Form.
21     A.   Google's not a monolith, so I give many
22 opinions about Google, and none of them are
23 relevant here.
24     Q.   Prior to being retained as an expert
25 witness in this matter what opinions did you hold

Page 251

1  about Google?
2          MR. COLLIER:  Objection.  Form.
3          Counsel, are you asking about her
4      personal opinions?
5          MR. HUNSBERGER:  I'm asking
6      questions that go to bias.
7          MR. COLLIER:  You can answer.  Go
8      ahead.
9      A.   I think Google does some things really
10 well and Google does some things not so well.  It's
11 not a monolith.  Their research division is very
12 good.  I wasn't familiar with the ad tech side of
13 Google before this case.
14         MR. HUNSBERGER:  Professor Rudin,
15     thank you for your time and patience today.
16     It's been a long day, and I appreciate you
17     bearing with us through some very difficult
18     technical subject matter.
19         Your counsel may decide to ask you
20     some questions.  I reserve the remainder of my
21     time to ask any follow-up questions based on
22     that.  But subject to that I have no further
23     questions at this time.
24         And I want to note for the record
25     that Google would like to mark the transcript

Page 252

1  as highly confidential under the protective
2  order.
3          MR. COLLIER:  Dr. Rudin, the States
4      will reserve their questions until the time of
5      trial, which means you're excused.
6          THE VIDEOGRAPHER:  This ends the
7      deposition.  The time is 7:53 p.m.
8      (Deposition concluded at 7:53 p.m.)
9          (Signature reserved)

Page 253

1  STATE OF NORTH CAROLINA
2  WAKE COUNTY
3          REPORTER'S CERTIFICATE
4      I, Andrea L. Kingsley, a Notary Public
5  in and for the State of North Carolina, do hereby
6  certify that there came before me on Wednesday,
7  October 9, 2024, the person hereinbefore named, who
8  was by me duly sworn via Virtual Zoom to testify to
9  the truth and nothing but the truth of his
10 knowledge concerning the matters in controversy in
11 this cause; that the witness was thereupon examined
12 under oath, the examination reduced to typewriting
13 under my direction, and the deposition is a true
14 record of the testimony given by the witness.
15     I further certify that I am neither
16 attorney or counsel for, nor related to or employed
17 by, any attorney or counsel employed by the parties
18 hereto or financially interested in the action.
19     IN WITNESS WHEREOF, I have hereto set
20 my hand this 9th day of October, 2024.
21
22     <%21582.Signature%>
23     Andrea L. Kingsley, Notary Public
24     Notary Public #201903800023
25

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL

Page 254

1  Marc B. Collier, Esquire
2  marc.collier@nortonrosefulbright.com
3            October 10, 2024
4  RE:   The State Of Texas, Et Al. v. Google LLC
5    10/9/2024, Cynthia Rudin (#6918999)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com.
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 256

1  The State Of Texas, Et Al. v. Google LLC
2  Cynthia Rudin (#6918999)
3      ACKNOWLEDGEMENT OF DEPONENT
4   I, Cynthia Rudin, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Cynthia Rudin            Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 255

1  The State Of Texas, Et Al. v. Google LLC
2  Cynthia Rudin (#6918999)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Cynthia Rudin            Date
25

Veritext Legal Solutions

800-567-8658                                                973-410-4098