# EXHIBIT 42
# [FILED UNDER SEAL]

HIGHLY CONFIDENTIAL

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
 2                  SHERMAN DIVISION
 3    THE STATE OF TEXAS, et     )
      al.,                       )
 4                               )
          Plaintiffs,            )
 5                               )
      v.                         )
 6                               ) CASE NO.
      GOOGLE, LLC,               ) 4:20-CV-00957-
 7                               ) SDJ
          Defendant.             )
 8                               )
                                 )
 9                               )
                                 )
10                               )
                                 )
11    _____
12
13
14        VIDEOTAPED DEPOSITION OF:
15        ANIL BUNTWAL SOMAYAJI, PHD
16        Taken on behalf of the Defendant
17        October 30, 2024
18
19
          "MARKED HIGHLY CONFIDENTIAL"
20
21
22
23
24
25    Job No. CS6919006
```

HIGHLY CONFIDENTIAL

Page 2

1 APPEARANCES:
2 For the Plaintiff:
3    PETER M. HILLEGAS, ESQ.
     NORTON ROSE FULBRIGHT US LLP
4    San Jacinto Boulevard, Suite 1100
     Austin, Texas 78701-4255
5    (512) 474-5201
     Peter.hillegas@nortonrosefulbright.com
6
     JIAN (JOHN) WU, Ph.D., ESQ.
7    NORTON ROSE FULBRIGHT US LLP
     1045 W. Fulton Market, Suite 1200
8    Chicago, Illinois 60607
     (312) 964-7800
9    Jian.wu@nortonrosefulbright.com
10
     JONATHAN WILKERSON, ESQ.
11   THE LANIER LAW FIRM
     10940 West Sam Houston Parkway North
12   Suite 100
     Houston, Texas 77064
13   (713) 659-5200
     Jonathan.wilkerson@lanierlawfirm.com
14
15 For the Defendant Google:
16   RUSSELL STEINTHAL, ESQ. (Via Zoom)
     AXINN, VELTROP & HARKRIDER LLP
17   114 West 47th Street
     New York, New York 10036
18   (212) 728-2234
     Rsteinthal@axinn.com
19
     JAMES K. HUNSBERGER, ESQ.
20   AXINN, VELTROP & HARKRIDER LLP
     1901 L Street NW
21   Washington, DC 20036
     (202) 469-3561
22   Jhunsberger@axinn.com
23
        (APPEARANCES CONTINUE)
24
25

Page 3

1      DARPAN R. SINGH, ESQ.
       AXINN, VELTROP & HARKRIDER LLP
2      55 Second Street
       San Francisco, CA 94105
3      Dsingh@axinn.com
4
    Also Present:
5
       (All counsel on Zoom will be
6   supplemented at a later date by reporter, if
    requested.)
7
8   COURT REPORTER:
9      JENNIFER HAYNIE (License No. 403)
       Cell:  615.429.6588
10     E-mail:  jennifercourtreporter@gmail.com
11
12  VIDEOGRAPHER:
13     STEPHANIE FREEMAN
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                    I N D E X
2   Examinations                        Page
3   BY MR. STEINTHAL                       7
4
5                  E X H I B I T S
6   No.       Description            Page
7   1   September 9, 2024 Report        10
8   2   Dr. Milgrom's report           103
9   3   Diagram                        184
10  4   Dr. Hochstetler's report       228
11  5   Footnote 24 (NOT ATTACHED HERETO)    297
12  6   CL136667341 (NOT ATTACHED HERETO     305
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1      The videotaped deposition of
2   ANIL BUNTWAL SOMAYAJI, PHD, taken on behalf of
3   the Defendant, on the 30th day of October, 2024,
4   commencing at 9:35 a.m., in the offices of One
5   Vantage Way, Nashville, Tennessee, for all
6   purposes under the Federal Rules of Civil
7   Procedure.
8      The formalities as to notice, caption,
9   certificate, et cetera, are waived.  All
10  objections, except as to the form of the
11  questions, are reserved to the hearing.
12     It is agreed that Jennifer Haynie, being
13  a Notary Public and Court Reporter for the State
14  of Tennessee, may swear the witness, and that
15  the reading and signing of the completed
16  deposition by the witness are reserved.
17
18                    * * *
19
20
21
22
23
24
25

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1    THE VIDEOGRAPHER:  Good morning.  We
2  are going on the record at 9:35 a.m. on
3  October 30th, 2024.  Please note that the
4  microphones are sensitive and may pick up
5  whispering and private conversations.  Please
6  mute your phones at this time.  Audio and video
7  recording will continue to take place unless all
8  parties agree to go off the record.
9    This is Media Unit One of the
10  video-recorded deposition of Anil Somayaji taken
11  by counsel for the defendants in the matter of
12  the State of Texas versus Google LLC, filed in
13  the United States District Court for the Eastern
14  District of Texas, Sherman Division.  Civil
15  action Number 420 CV 00957 SDJ.
16    The location of this deposition is
17  the Veritext office at 1 Vantage Way, Nashville,
18  Tennessee.  I'm Stephanie Freeman, the
19  videographer representing the Veritext.  The
20  court reporter is Jennifer Haynie, also
21  representing Veritext.
22    Counsel, please state your
23  appearance for the record, followed by the
24  swearing in of the witness from the court
25  reporter.

Page 7

1    MR. STEINTHAL:  Russell Steinthal
2  Axinn Veltrop & Harkrider LLP for Google --
3  defendant Google LLC.
4    MR. HUNSBERGER:  Axinn Veltrop &
5  Harkrider for the defendant Google LLC.
6    MS. SINGH:  Darpan Singh for Axinn
7  Veltrop & Harkrider for defendant Google LLC.
8    MR. HILLEGAS:  Peter Hillegas of
9  Norton Rose Fulbright representing the State of
10  Texas.  With me are my co-counsels Jiang Wu also
11  of Norton Rose Fulbright and Jonathan Wilkerson
12  of the Lanier Law Firm.
13
14    ANIL BUNTWAL SOMAYAJI, PHD,
15    Having been sworn to tell the truth,
16    the whole truth and nothing but the
        truth, testified as follows:
17
18    DIRECT EXAMINATION
19  BY MR. STEINTHAL:
20  Q.   Good morning, Professor.  Can you please
21  state your name for the record?
22  A.   My full legal name is Anil Somayaji.
23  Q.   And can you your last name for the court
24  reporter?
25  A.   S-O-M-A-Y-A-J-I.

Page 8

1  Q.   Thank you.  And you are aware that this
2  deposition is being taken in Texas.  Google LLC,
3  a civil action pending in the U.S. District
4  Court for the Eastern District of Texas?
5  A.   Yes.
6  Q.   So if I say this matter or this action
7  today, I'm referring to that case, the case in
8  which you submitted a report, okay?
9  A.   Yes.
10  Q.   And you understand you're testifying
11  under oath today?
12  A.   Yes.
13  Q.   Which mean you're require to tell the
14  truth?
15  A.   Yes.
16  Q.   Is there anything that would prevent you
17  from giving truthful answers to my questions
18  today?
19  A.   No.
20  Q.   You're not experiencing any unusual
21  stress or physical or mental condition?
22  A.   No.
23  Q.   Are you on any medication or under the
24  influence of any substances that would impact
25  your ability to respond truthfully and

Page 9

1  accurately today?
2  A.   No.
3  Q.   Okay.  The court reporter will transcribe
4  everything we say.  I will therefore try to wait
5  until you're done answering a question before I
6  ask the next one, and I'd ask that you do the
7  same while I'm asking a question.  Does that
8  make sense?
9  A.   Yes.
10  Q.   Okay.  To allow the reporter to take an
11  accurate record, it's important to give oral
12  answers to questions, so no head nods or
13  uh-huhs.  Just try to be clear orally for the
14  record.  Does that make sense?
15  A.   Yes.
16  Q.   If you don't understand any of my
17  questions, please feel free to ask me to
18  rephrase or repeat the question.  If you do
19  answer my -- well --
20  A.   Okay.
21  Q.   Yeah.  And if you do answer my question,
22  I'm going to assume you understood it; does that
23  make sense?
24  A.   Yes.
25  Q.   Okay.  If you need a break at any point,

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1 just let me know, and I'll try to find a good
2 stopping point. My only request is that
3 we finish -- you answer the questions pending
4 before we take a break; does that make sense?
5 A.    Okay.
6 Q.    Otherwise, we'll aim for a break about
7 every hour or so, but I'm sure the lawyers will
8 keep an eye on that for me.
9       Okay. Can I have the report?
10      (Exhibit Number 1 was marked.)
11 BY MR. STEINTHAL:
12 Q.    So I'm handing you --
13 A.    This is a copy of my report I have a copy
14 here.
15 Q.    Yeah. As long as there's no writing in
16 it, there's --
17 A.    There's no marks.
18 Q.    That's fine if you want to look at that
19 one because I think we actually have to hand you
20 this one that has a sticker on it because she's
21 going to keep it, unless you want that.
22      So I'm handing you a copy of the report
23 that we're marking the record as Somayaji
24 Exhibit Number 1. This is copy of the report
25 that you served in the matter on September 9th,

Page 11

1 2024. Just stick a sticker on the front of
2 that.
3       I assume you recognize this?
4 A.    I do.
5 Q.    This is a copy of the report you served
6 on September 9th, 2024?
7 A.    It is.
8 Q.    So you keep a copy -- you have a copy
9 there for reference during the matter.
10      This report contains all your opinions in
11 this matter, correct?
12 A.    Yes.
13 Q.    And just for the avoidance of doubt,
14 although this is marked a rebuttal report, you
15 did not submit an opening report in this case,
16 correct?
17 A.    I did not.
18 Q.    So this is the only one you submitted?
19 A.    Yes.
20 Q.    And did you submit any errata to your
21 report; is that correct?
22 A.    I have not served an errata; however, I
23 do have a couple of small corrections.
24 Q.    Okay. That was my next question was
25 going be: Sitting here today, is there anything

Page 12

1 in your report that you do not believe is
2 correct or you would not be willing to testify
3 to under oath?
4 A.    There are two corrections I would like to
5 enter.
6 Q.    Sure.
7 A.    One is at the end of my CV, it mentions
8 my expert testimony in Epic Games versus Google
9 and Epic Games versus Apple. I did not do a
10 deposition in either case. I did reports and I
11 did trial testimony.
12 Q.    Strike the word deposition from those,
13 okay.
14 A.    Thank you. The other is that in the --
15 in the materials considered, there's not a full
16 listing of the 11 source code snap shots, and
17 those should all be included in the materials
18 considered.
19 Q.    And if that were corrected, it would list
20 all the ones we made available to you?
21 A.    Exactly.
22 Q.    Okay. Thank you.
23      So with those -- that was a correction to
24 appendix B, materials considered, correct?
25 A.    Yes. Considered, yes.

Page 13

1 Q.    Not relied upon. Okay.
2      So with those corrections, is there
3 anything else in your report that you do not
4 believe is correct or you would not be willing
5 to testify to under oath?
6 A.    No.
7 Q.    And you are not -- and you're not
8 offering any opinions in the case other those
9 that are described in the report we've just been
10 discussing?
11 A.    I am not.
12 Q.    Thank you. Okay. So you -- you have a
13 BS in mathematics at MIT; is that correct?
14 A.    Yes, I do.
15 Q.    And yours is a Ph.D. in computer science
16 from the University of New Mexico; is that
17 correct?
18 A.    Yes.
19 Q.    Aside from your BS in mathematics and
20 your Ph.D. in computer science, do you do any
21 other academic degrees?
22 A.    I do not.
23 Q.    And according to your report, your
24 opinion in this case is based on your experience
25 in computer science; is that correct?

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1  A.   Yes.
2  Q.   So I want to talk a bit more about your
3  expertise and what you refer to as, quote,
4  "secure distributed systems" or, quote, "complex
5  distributed computer systems."
6       Can you please describe to me the types
7  of the issues that that -- that those areas
8  involve?
9  A.   So my background and what I went to
10 graduate to was to study complex systems --
11 complex adaptive systems and related field of
12 artificial life. Through the course of my -- my
13 Ph.D., I ended up in the area of computer
14 security under the inspiration of trying to
15 build computer immune systems.
16      So my background is very
17 interdisciplinary. My degree is in computer
18 science, but I draw upon information from lots
19 of other fields, so when I look at -- when I say
20 my expertise is in, you know, complex
21 distributed computer systems, it's coming from
22 there, and I've combined that with my experience
23 doing research and computer security and
24 teaching operating systems and distributing
25 operating systems and my other various startup

Page 15

1  work.
2  Q.   So when we're talking about complex
3  distributed systems, is it fair to say that your
4  expertise includes the types of computing
5  infracture that are required to operate those
6  systems and do things like make sure that
7  they're secure, that there's concurrencies
8  handled correctly, there's no unauthorized
9  access. Is -- is that the type of expertise you
10 got?
11 A.   In part, yes.
12 Q.   Okay. And what else would -- what else
13 would you add to that list?
14 A.   So in the context -- so in teaching -- so
15 I teach courses in operating systems, so
16 understanding the low-level -- low-level
17 computer systems operate and get them up to
18 application-level code. And I've taught in the
19 area of distributed operating systems, which is
20 how these systems get connected to support
21 large-scale distributed applications.
22      And so it's in my expertise at the level
23 of understanding how these systems are coded at
24 a low level and how they're architected at a
25 high level. And that's my expertise in the area

Page 16

1  of -- of these systems. It's not my entire
2  expertise.
3  Q.   But that does not intend to the substance
4  of what the systems are designed to do. For
5  example, for the business logic; is that
6  correct?
7       MR. HILLEGAS: Objection; form.
8       THE WITNESS: So the area of complex
9  adaptive systems is a very broad umbrella.
10 Typically, it's thought of as sets of agents or
11 entities or individuals interacting in an
12 environment typically reproducing in some way or
13 growing in some way and adapting to each other
14 and changing their environment.
15      That framework can apply to, you
16 know, certainly computer systems, which I
17 studied the most, but it also applies to living
18 systems, whether you're talking about
19 multicellular organisms or you're talking about
20 ecologies.
21      It also applies to political and
22 economic systems and social systems. It's --
23 it's a -- it's something that tries to capture a
24 slice of a lot of the world. So aspects of that
25 can apply to, like, things like business logic.

Page 17

1  But that is not my area of focus.
2  BY MR. STEINTHAL:
3  Q.   Okay. But if we focus on the moment on
4  the computer -- computer analyzations of this
5  concept of distributed systems, those can apply
6  in a range -- those can be a used in a range of
7  different business areas, correct?
8       MR. HILLEGAS: Objection; form.
9       THE WITNESS: Certainly computer
10 systems can be used to solve all sorts of
11 problem, including a wide variety of business
12 problems.
13 BY MR. STEINTHAL:
14 Q.   To give an example, are you familiar with
15 system known as AlphaFold?
16 A.   Yes.
17 Q.   Okay. Is it -- is it fair to say it's an
18 AI system that predicts the 3D structure of
19 proteins from their amino acid sequences?
20 A.   Yes.
21 Q.   Would -- to the best of your knowledge,
22 would you describe that as a complex distributed
23 computer system?
24 A.   I regard it as a certainly a distributed
25 computer system. It's complex in a more

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1  standard sense in the sense of there's just a
2  lot of code doing a lot of things, but
3  architecturally, it's in some ways kind of
4  simple because it's not interacting with the
5  world in a realtime basis and not dealing with
6  competing parties.  It's just, here's the task,
7  go compute it, give me an answer.  So that's
8  fitting more into the simple model of
9  computations even though it is highly concurrent
10  and there.
11      So complex can, of course, mean a lot of
12  different things.  When I use it in the context
13  of complex adaptive systems, I'm more talking
14  about the adaptive evolving systems.
15  Q.    So with the exception of the Google
16  system that we're goes to discuss today, can you
17  give me another example of a complex distributed
18  system that you've studied?
19  A.    The web in general is something I've
20  spent -- I've spent a lot of time thinking
21  about.  And you know, the Internet -- I tried to
22  take inspiration from the human immune system,
23  which is a complex adaptive system and trying to
24  figure out how we could build artificial
25  versions of it or aspects of that into computer

Page 19

1  systems to give them similar properties.
2  Q.    And going back to the AlphaFold example
3  which is simpler than the complex systems that
4  you were describing, your expertise would be
5  relevant to understanding how it works, how it
6  ensures, you said concurrency, how it ensures
7  that results are correct; is that fair?
8      MR. HILLEGAS:  Objection; form.
9      THE WITNESS:  So my expertise
10  relating to AlphaFold would be, you know,
11  certainly with the underlying computing system
12  and how to run the large jobs that are required
13  to make it work.
14      I also -- I wouldn't say I'm an
15  expert.  I have definite background in biology.
16  I understand the protein folding problem which
17  is problem I've thought about some.  And then
18  also it's an AI system, and I've -- much of my
19  work in computer security has overlapped with
20  AI.  And I have expertise in -- in machine
21  learning, particularly as applied to computer
22  security.
23  BY MR. STEINTHAL:
24  Q.    But the fact that you can understand how
25  a system is architected from a computing

Page 20

1  perspective would not make you an expert in
2  computational biology, would it?
3      MR. HILLEGAS:  Objection; form.
4      THE WITNESS:  Knowing just how the
5  system operates, you know, in terms of the
6  architecture of the code and stuff, certainly
7  would not make me an expert in computational
8  biology.  That is certainly a separate concern.
9      I'm just saying because of my
10  interesting complex practice systems and I was
11  interested in biology and considered
12  computational biology, I -- I've also thought
13  about that other level in that example.
14  BY MR. STEINTHAL:
15  Q.    But in general, if I give a different
16  example, if you were building complex
17  distributed system, you would want to have a --
18  you would be working with subject matter domain
19  experts who understood the domain knowledge that
20  would be paired with your knowledge on the
21  computing side of the -- how to make it work
22  correctly; is that a fair statement?
23  A.    Certainly one -- one of the key feature
24  of being a computer scientist is you're building
25  tools that be can used by lots of other, and you

Page 21

1  want to work with experts in those areas and
2  merge your expertise of the systems with their
3  expertise, and so, yes, you do want domain
4  experts.
5  Q.    Now turning to your opinions in this
6  matter, do offer any opinions that are beyond
7  those that relate directly to your computer
8  science?
9  A.    No.  I do not offer any expert opinions
10  beyond what are covered in my report.  Again,
11  my -- most of the work in my report is based on
12  my understanding of computer systems, but a bit
13  of my perspective is always influenced by the
14  larger frame of complex adaptive systems.
15  Q.    Are you an expert in economics?
16  A.    I am not.
17  Q.    Are you an expert in industrial
18  organization?
19      MR. HILLEGAS:  Objection; form.
20      (Reporter clarification.)
21  BY MR. STEINTHAL:
22  Q.    Are you an expert in industrial
23  organization?
24      MR. HILLEGAS:  Objection; form.
25      THE WITNESS:  I am not an expert in

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1 industrial organization, except to the degree it
2 would over -- overlap some with complex adaptive
3 systems as a general framework.
4 BY MR. STEINTHAL:
5 Q.    You are not an expert in auction theory,
6 are you?
7        MR. HILLEGAS:  Objection; form.
8        THE WITNESS:  Again, I am not except
9 for where it would overlap with the area of
10 complex adaptive systems.
11 BY MR. STEINTHAL:
12 Q.    Could you give me an example of how
13 auction theory would overlap with complex
14 distributive systems?
15 A.    A classic area of study in complex
16 adaptive systems is understanding evolutionary
17 dynamics.  And related to evolutionary dynamics
18 is -- game theory has often been applied, and
19 game theory is also a framework that is applied
20 in economic context.
21        But -- so problems like the prisoner's
22 dilemma and trying to understand how trust
23 develops in a population.  So that is not
24 economics, but that is -- you know, there are
25 some overlap conceptually.

Page 23

1 Q.    Would you say you're an expert in game
2 theory?
3 A.    I'm not an expert in game theory;
4 however, I have written papers which have
5 incorporated game theory into their analysis.
6 Q.    Are your opinions in this case derived
7 from your knowledge or expertise in game theory?
8 A.    Not directly.
9 Q.    Are you an expert in market design?
10        MR. HILLEGAS:  Objection; form.
11        THE WITNESS:  Again I'm not expert
12 in market design except maybe how it would
13 overlap with my general interest in complex
14 adaptive systems.
15 BY MR. STEINTHAL:
16 Q.    Are you an expert in antitrust or
17 competition economics?
18        MR. HILLEGAS:  Objection; form.
19        THE WITNESS:  I at not except where
20 it might overlap with complex adaptive systems.
21 BY MR. STEINTHAL:
22 Q.    And I assume you're not an expert in
23 antitrust law, are you?
24        MR. HILLEGAS:  Objection; form.
25        THE WITNESS:  Definitely not

Page 24

1 antitrust law.
2 BY MR. STEINTHAL:
3 Q.    Are you an expert in marketing?
4        MR. HILLEGAS:  Objection; form.
5        THE WITNESS:  No.
6 BY MR. STEINTHAL:
7 Q.    Are you an expert in advertising?
8        MR. HILLEGAS:  Objection; form.
9        THE WITNESS:  I have expertise in --
10 you know, in the technology underlying online
11 advertising, but I'm not an expert in
12 advertising beyond that.
13 BY MR. STEINTHAL:
14 Q.    And talking about technology, what
15 experience, training, or expertise would you say
16 you have in advertising technology?
17 A.    My experience and expertise relating to
18 the advertising technology is really in the
19 context of advertising technology is a use-case
20 of web technology, for the most part.
21        I mean, it's -- we distribute an ad.  An
22 ad is, you know, a web document that's
23 incorporated into another web document, and so
24 understanding how that process works is -- you
25 don't have to understand web technologies and,

Page 25

1 you know, distributed network technologies.
2 Q.    Is fair to say that that expertise is
3 focused on the technical aspects of how the ad
4 is displayed, how the ad is rendered to the
5 user, things like that?
6        MR. HILLEGAS:  Objection; form.
7        THE WITNESS:  I would say the
8 expertise applies with the full loop of from
9 where an ad would be requested to the ad being
10 sent off to being processed and the ad coming --
11 and -- and coming back.  It wouldn't be
12 necessarily in the algorithms per se that are
13 used to choose the ad because that would get
14 into a, you know, business, you know,
15 domain-specific things.
16        But the whole -- otherwise that loop
17 of how that is fulfilled and -- and then, of
18 course, also modern systems use machine-learning
19 technology in order to make those decisions, and
20 I have similar expertise in machine learning.
21 BY MR. STEINTHAL:
22 Q.    So you would say that you have expertise
23 in the various technologies that underlie how
24 the system works but not necessarily in the
25 business logic of how to operate that business

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1  or why are we doing the things in particular in
2  that business; is that correct?
3         MR. HILLEGAS:  Objection; form.
4         THE WITNESS:  I agree that my
5  expertise in -- is in how the ads would be
6  served and not -- not in the business-logic
7  aspect of the actual decisions.
8  BY MR. STEINTHAL:
9  Q.    And briefly going back to the topics of
10 game theory and auction theory you mentioned
11 earlier, you said you're familiar with those
12 concepts from work you've done in distributed
13 systems; is that correct?
14        MR. HILLEGAS:  Objection; form.
15        THE WITNESS:  One of my -- one my
16 central interests is in understanding what makes
17 systems secure, and related to what makes
18 systems secure, I try to draw upon -- draw upon
19 biology and what makes living systems secure.
20        One thing that makes living systems
21 secure is diversity.  And so I've been trying to
22 understand why is diversity an effective
23 security mechanism.  To understand why diversity
24 is, you know, a useful security mechanism, I've
25 tried to model interactions in a security

Page 27

1  context in a more theoretical way.  Some of the
2  models I've proposed with my students have
3  involved game theory because it's really about,
4  you know, attack, defense.  What's the attack or
5  strategy; what's the defender strategy?
6         So -- and again, this is all related
7  to the larger thing of complex adaptive systems.
8  BY MR. STEINTHAL:
9  Q.    Okay.  Thank you.  And let's talk for a
10 bit about your professional expertise.  I'm
11 sorry.  Your professional experience.
12        Your CV is at the back of your report.  I
13 don't know if you -- feel free to look at it
14 too.  But I've been looking at it.  You
15 obviously know it.  It was your own life.
16 A.    Yes, exactly.  Some of it has been a
17 while.
18 Q.    So starting at the beginning of -- of
19 your professional work, you were a research
20 assistant at the University of New Mexico from
21 1995 to 2002; is that correct?
22 A.    Yes.
23 Q.    And what areas you were researching at
24 the time?
25 A.    Complex adaptive systems as a general

Page 28

1  framework but specifically computer security,
2  you know, building -- trying to build a computer
3  immune system was my dissertation.
4  Q.    And did you take any courses at the time?
5  A.    I was a teaching assistant during my
6  early years.
7  Q.    And did any of the courses that you
8  assisted with relate to economics?
9  A.    No, they did not.
10 Q.    Did any of them relate to advertising
11 technology?
12        MR. HILLEGAS:  Objection; form.
13        THE WITNESS:  The courses I -- ITA
14 did not involve economics.
15 BY MR. STEINTHAL:
16 Q.    Okay.  Thank you.
17        So it's actually not then; it's a year
18 earlier.  You said you teaching assistant.
19 Would that distinct from your role as a research
20 assistant we just mentioned?
21 A.    Yes.
22 Q.    And in that -- in that earlier role, did
23 you teach or facilitate any courses related to
24 economics?
25 A.    I did not.

Page 29

1  Q.    And in that earlier role, did you teach
2  or facilitate any courses related to advertising
3  technology?
4         MR. HILLEGAS:  Objection; form.
5         THE WITNESS:  I did not teach any
6  courses related to economics.
7  BY MR. STEINTHAL:
8  Q.    Okay.  I'm sorry.  The question was:  In
9  that earlier role, did you teach or facilitate
10 any courses related to advertising technology?
11 A.    No, I did not.
12        MR. HILLEGAS:  Objection; form.
13        THE WITNESS:  I did not teach or
14 assist with any courses on advertising
15 technology.
16 BY MR. STEINTHAL:
17 Q.    And then after -- after that, you were a
18 visiting grad student at the artificial
19 intelligence laboratory at MIT from 1996 to
20 1997; is that correct?
21 A.    Yes.
22 Q.    And did you teach any courses in that
23 role?
24 A.    I did not.
25 Q.    Are you relating -- are any of your

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1  opinions today related to artificial Intel
2  against?
3      MR. HILLEGAS: Objection; form.
4      THE WITNESS: My opinions in here do
5  refer to machine-learning models that are used,
6  but I do not discuss their operation.
7  BY MR. STEINTHAL:
8  Q.   Thank you. In 2003 you worked as a
9  consultant for Sandia National Laboratories; is
10  that correct?
11  A.   Yes.
12  Q.   What were your day-to-day
13  responsibilities in that role?
14  A.   During that position, I was taking my
15  dissertation work, which was building a realtime
16  anomaly detection system for Linux that have
17  been developed running on -- on servers and on
18  desktops, and I was porting it to run on a
19  robot.
20  Q.   And then for 2003, 2016, you were a
21  consultant for SkillBridge Training LLC; is that
22  correct?
23  A.   Yes.
24  Q.   How would you describe SkillBridge's
25  business?

Page 31

1      MR. HILLEGAS: Objection; form.
2      THE WITNESS: SkillBridge is a -- I
3  call it corporate training company. They
4  would -- they would have contracts to teach
5  courses to businesses in various areas. So I
6  worked with them as -- as an instructor for
7  hire. Sometimes to teach courses that had been
8  previously developed, and other times to teach
9  courses that I developed.
10  BY MR. STEINTHAL:
11  Q.   And what was the subject matters of those
12  courses?
13      MR. HILLEGAS: Objection; form.
14      THE WITNESS: The courses that I
15  taught that I did not develop were primarily on
16  programming or system administration. The
17  courses that I taught on my own -- that I
18  developed and taught -- I developed and taught
19  courses computer security.
20  BY MR. STEINTHAL:
21  Q.   And did any of those courses that you
22  taught or developed relate to auction theory?
23      MR. HILLEGAS: Objection; form.
24      THE WITNESS: The courses I taught
25  did not relate to auction theory.

Page 32

1  BY MR. STEINTHAL:
2  Q.   Did any of the courses that you taught or
3  developed relate to economics?
4  A.   Those courses did not relate to
5  economics.
6  Q.   And did any of the courses that you
7  taught or developed relate to advertising
8  technology?
9      MR. HILLEGAS: Objection; form.
10      THE WITNESS: Those SkillBridge
11  courses did not relate to advertising
12  technology.
13  BY MR. STEINTHAL:
14  Q.   So moving on, from 2012 to the present
15  you say that you are adviser for Zighra,
16  Z-I-G-H-R-A, Inc., in Ottawa in Ontario County;
17  is that correct?
18  A.   Yes, it is.
19  Q.   And how -- what is Zighra's business?
20  A.   Zighra is a -- is a computer security
21  firm. They offer solutions. I can say
22  specifically what I worked with them is on
23  behavioral biometric technology.
24      So being able to identify people by how
25  they swipe on a phone. That was the patents

Page 33

1  that are in my CV are mostly related to that.
2  And then more recently they're working on the
3  security of GNM -- GNSS systems which is an
4  umbrella-term for GPS and similar satellite --
5  satellite positioning constellations.
6  Q.   Does Zighra do any work relating to
7  advertising technology?
8      MR. HILLEGAS: Objection; form.
9      THE WITNESS: It does not.
10  BY MR. STEINTHAL:
11  Q.   From November 16 to July 2018, you were
12  the chief scientist at Secure Lytix, S-E-C-U-R-E
13  L-Y-T-I-X Inc.; is that correct?
14  A.   Yes.
15  Q.   And what is Secure Lytics's business?
16  A.   Secure Lytics's business was to -- was to
17  create security solutions for enterprise
18  applications.
19  Q.   And what were your responsibilities in
20  that role as chief scientist?
21  A.   I was the lead for developing the
22  prototypes for -- for detecting anomalous
23  behavior in enterprise applications.
24  Q.   Did any Secure Lytics's word relate to
25  advertising technology?

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1      MR. HILLEGAS: Objection; form.
2      THE WITNESS: Its work did not
3  relate to advertising technology.
4  BY MR. STEINTHAL:
5  Q.    From March 2022 to May 2024 you said on
6  your CV that you were a consultant for Allens in
7  Australia; is that correct?
8  A.    Yes.
9  Q.    And Allens is a law firm?
10  A.    It is.
11  Q.    And you served as expert witness in that
12  role; is that correct?
13  A.    I did.
14  Q.    Did you provide any services other than
15  serving as the witness?
16      MR. HILLEGAS: Caution the witness
17  not to disclose any information that is subject
18  to any confidentiality agreements that you may
19  have signed with any other parties, including
20  Allens.
21      THE WITNESS: I just served as an
22  expert witness.
23  BY MR. STEINTHAL:
24  Q.    And without violating any privileges or
25  court orders, can you tell me if any of your

Page 35

1  work for Allens involved cases related to
2  advertising technology?
3      MR. HILLEGAS: Objection; form.
4      THE WITNESS: I can say that the
5  case was about the distribution of mobile
6  applications, and mobile applications do use,
7  you know, advertising.
8  BY MR. STEINTHAL:
9  Q.    Was there only one case you worked on?
10  A.    I worked on two cases. It was Epic Games
11  versus Google and Epic Games versus Apple.
12  Q.    We'll talk about that one. Thank you.
13      Now turning to your experience at
14  Carleton University, you began teaching as an
15  assistant Professor in 2003; is that correct?
16  A.    I did.
17  Q.    And you were assistant Professor until
18  2008?
19  A.    Yes.
20  Q.    After which you were promoted to
21  associate Professor?
22  A.    Yes.
23  Q.    And are the courses that you taught in
24  that role reflected on your CV?
25  A.    They are.

Page 36

1  Q.    And is that list of courses, to your
2  knowledge, complete?
3  A.    The list of courses is complete. I don't
4  think it -- yeah, it does not have this
5  semester. I am teaching 2406, the fundamentals
6  of web applications. I have around 400 students
7  right now, so...
8  Q.    That's lot of exams to grad.
9  A.    I have 14 TAs.
10  Q.    That helps.
11      Is it fair to say that basis of the
12  courses you have not taught any courses about
13  advertising technology?
14      MR. HILLEGAS: Objection; form.
15      THE WITNESS: I have not any courses
16  about advertising technology.
17  BY MR. STEINTHAL:
18  Q.    Have you taught any courses related to
19  auction theory?
20      MR. HILLEGAS: Objection; form.
21      THE WITNESS: I have not taught any
22  courses on auction theory.
23  BY MR. STEINTHAL:
24  Q.    Have you taught any courses related to
25  economics?

Page 37

1      MR. HILLEGAS: Objection; form.
2      THE WITNESS: I have not taught any
3  courses on economics.
4  BY MR. STEINTHAL:
5  Q.    Okay. So we've discussed a number of
6  your employment since college.
7      Have you held any post-college jobs that
8  not listed in your CV or that we have not
9  previously discussed?
10  A.    No.
11  Q.    So it's -- is it correct that none of
12  your professional experience was working for an
13  ad tech company?
14  A.    Yes.
15  Q.    Have you done any work developing,
16  maintaining, or managing any ad tech products?
17  A.    No.
18  Q.    So that would include an ad server? Is
19  that included in your definition of ad tech
20  products?
21      MR. HILLEGAS: Objection; form.
22      THE WITNESS: I have certainly
23  maintained web servers but not ad servers.
24  BY MR. STEINTHAL:
25  Q.    And have you done any work developing and

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1 maintaining or managing an ad exchange?
2         MR. HILLEGAS: Objection; form.
3         THE WITNESS: I have not done any
4 work related to ad exchanges.
5 BY MR. STEINTHAL:
6 Q.   Have you done any --
7 A.   I have not managed any ad exchanges.
8 Q.   Have you done any software development or
9 software maintenance related to advertising
10 exchanges?
11 A.   No.
12        MR. HILLEGAS: Objection; form.
13 BY MR. STEINTHAL:
14 Q.   Have you developed in whole or in part
15 any ad buying tools?
16        MR. HILLEGAS: Objection; form.
17        THE WITNESS: No.
18 BY MR. STEINTHAL:
19 Q.   Have you developed -- have you helped to
20 maintain in whole or in part any ad buying
21 tools?
22        MR. HILLEGAS: Objection; form.
23        THE WITNESS: No.
24 BY MR. STEINTHAL:
25 Q.   And have you managed any ad buying tools?

Page 39

1         MR. HILLEGAS: Objection; form.
2         THE WITNESS: No.
3 BY MR. STEINTHAL:
4 Q.    In any of your professional roles, were
5 you responsible for placing advertisements or
6 otherwise managing marketing campaigns?
7         MR. HILLEGAS: Objection; form.
8         THE WITNESS: I have not.
9 BY MR. STEINTHAL:
10 Q.   In any of your professional roles, were
11 you responsible for selling advertising space?
12        MR. HILLEGAS: Objection; form.
13        THE WITNESS: I have not.
14 BY MR. STEINTHAL:
15 Q.   In any of your professional roles, were
16 you responsible for the use or operation of any
17 ad tech tools?
18        MR. HILLEGAS: Objection; form.
19        THE WITNESS: I have not been
20 responsible for use or operation of any ad tech
21 tools.
22 BY MR. STEINTHAL:
23 Q.   To best of your knowledge, did any of
24 your employers earn money from the sale of
25 advertising while you were working for them?

Page 40

1 A.   None of my direct employers, I -- I
2 believe, have earned money from advertising;
3 however, I have worked as, you know, consulting,
4 you know, instructor and things, and I would
5 have to ensure if they made money from
6 advertising.
7 Q.   But you were not personally involved in
8 any aspect of the business involved in the
9 selling at advertisements; is that correct?
10        MR. HILLEGAS: Objection; form.
11        THE WITNESS: That is correct.
12 BY MR. STEINTHAL:
13 Q.   Have you ever personally used any of the
14 Google ad tech products at issue in this case?
15 A.   I have not.
16 Q.   Have you ever used any ad tech products
17 that were not made by Google?
18        MR. HILLEGAS: Objection; form.
19        THE WITNESS: I have not.
20 BY MR. STEINTHAL:
21 Q.   Before today have you ever given a
22 deposition?
23 A.   Before today, no.
24 Q.   And I believe you mentioned earlier that
25 you testified at trial in Epic Games v Google

Page 41

1 and Epic Games v Apple; is that correct?
2 A.   Yes.
3 Q.   Have you testified in any other trials
4 besides those two?
5 A.   I have not testified in any other trials.
6 Q.   And referring to those two-cases, Epic
7 Games v Google and Epic Games v Apple, is it
8 correct you testified on behalf of Epic Games?
9 A.   Yes.
10 Q.   And when did that testimony occur?
11 A.   Late May of 2024.
12 Q.   And again without violating any
13 confidentiality or protective orders issued by
14 any court, were the opinions you testified to --
15 strike that.
16        Without violating any confidentiality
17 protective orders entered by any court, can you
18 please tell me the nature of your opinions at a
19 high level in those cases?
20 A.   I don't believe I can disclose those
21 opinions here.
22 Q.   There is confidentiality order that
23 protects the contents of those opinions?
24 A.   Yes. And the -- and -- and the trial --
25 I mean, the decision has not been rendered in

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1  the case.
2  Q.    What was the issue in that case?
3        MR. HILLEGAS:  Objection; form.
4        THE WITNESS:  Well, Epic Games was
5  challenging Apple and Google's model for app
6  distribution where they essentially maintained
7  control of how apps were distributed.
8  BY MR. STEINTHAL:
9  Q.    And you testified in those trials.  Was
10 that testimony public?
11       MR. HILLEGAS:  Objection; form.
12       THE WITNESS:  I believe the -- yeah,
13 I believe the testimony was streamed live over
14 the web.  But I don't know if it was -- you
15 know, I don't know exactly what the rules are
16 regarding what I can say about that -- you know,
17 that testimony.
18 BY MR. STEINTHAL:
19 Q.    Can you tell me whether or not any of the
20 testimony you gave in that case related to
21 advertising technology?
22       MR. HILLEGAS:  Objection; form.
23       THE WITNESS:  I don't think I can
24 talk about the details of the arguments that I
25 made in that case.

Page 43

1  BY MR. STEINTHAL:
2  Q.    Are you relying on any information you
3  gained in the course of that engagement in
4  forming your opinions in this case?
5        MR. HILLEGAS:  Objection; form.
6        Same caution not to disclose
7  confidentiality information, but you can answer
8  yes or no.
9        THE WITNESS:  No.
10 BY MR. STEINTHAL:
11 Q.    Have you ever issued a written report or
12 declaration in a legal proceeding?
13       MR. HILLEGAS:  Objection; form.
14       THE WITNESS:  I have written
15 reports.
16 BY MR. STEINTHAL:
17 Q.    And did you write an expert report in
18 Epic Games v Apple?
19 A.    I did.
20 Q.    Did you write a report in Epic Games v
21 Google?
22 A.    I did.
23 Q.    Have you submitted or filed any expert
24 course in any other litigation besides those two
25 cases and this one?

Page 44

1  A.    I have not.
2  Q.    And just for the record, I'm going to
3  ask, without violate any confidential protective
4  orders, can you summarize for me the nature of
5  the opinions in the expert reports in Epic Games
6  v Apple and Epic Games v Google?
7  A.    I don't believe I'm at liberty to
8  summarize those here.
9  Q.    For how long did you work on Epic Games v
10 Google?
11 A.    The start of that I think was early --
12 early 2023, maybe late -- maybe late 2022.  I'm
13 not sure exactly.  The two -- the two cases were
14 overlapping.
15 Q.    And did -- when -- when approximately did
16 your work conclude or is it ongoing?
17 A.    That work concluded in May 2024.
18 Q.    So is it fair say you worked for
19 approximately two years on those cases?
20       MR. HILLEGAS:  Objection; form.
21       THE WITNESS:  On those two cases,
22 yeah, they were approximately two years, yes.
23 BY MR. STEINTHAL:
24 Q.    Okay.  Do you have any sense of how many
25 total hours you worked on those two cases over

Page 45

1  those two years?
2  A.    I'm not sure of the exact number of
3  hours, but it was a considerable number of
4  hours.
5  Q.    Do you have any estimate of the total
6  compensation you received for your work on those
7  two cases?
8  A.    In total it would probably be -- probably
9  a few hundred thousand, I think.
10 Q.    And is it possible to estimate how much
11 of that was related to the Google matter versus
12 the Apple matter?
13 A.    It was approximately half and half.
14 Q.    To the best of your knowledge, has -- has
15 any court excluded or stricken your testimony in
16 whole or in part?
17 A.    No.
18 Q.    And to the best of your knowledge, has a
19 court ever discussed your expert testimony or
20 proposed your expert testimony in any written
21 decisions or opinions?
22 A.    Not that I know of.  But the cases in
23 which I testified, the decision hasn't been
24 reached yet, so...
25 Q.    Did you have any opinions about Google

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1  prior to work on the Epic v Google case?
2  A.    I have had ongoing interactions with
3  Google as a customer, and -- and I am still a
4  customer with them, so I have had positive
5  opinions with that.  But as terms of an
6  expertise or anything -- oh, I have had -- I
7  have taught courses in which I have covered
8  Google's infracture and distributing operating
9  systems.  I've taught papers on -- that -- that
10  have been published by Google's staff and
11  researches about how their system works, and I
12  basically explain to students how Google
13  developed a lot of key technologies.
14  Q.    Would you say that your general opinions
15  about Google changed in any material way from
16  your work on the Epic v Google case?
17        MR. HILLEGAS:  Objection; form.
18        THE WITNESS:  I would say my -- my
19  overall views haven't changed significantly.
20  BY MR. STEINTHAL:
21  Q.    One last question in this line.
22        Without revealing the parties or the case
23  or the substance of your opinions or any
24  conversation you've had with another attorney,
25  and with the exception of the Apple --

Page 47

1  Apple -- the Epic v Apple and Epic v Google that
2  we discussed earlier, have you done any other
3  work as a consulting or testifying expert
4  witness that involved display advertising
5  technology?
6        MR. HILLEGAS:  Objection; form.
7  BY MR. STEINTHAL:
8  Q.    Besides this case?
9  A.    I have not.
10  Q.    Who retained you in this case?
11  A.    The State of Texas.
12  Q.    And without violating any privilege or
13  disclosing the contents of any conversation with
14  counsel, have you been retained by the State of
15  Texas or any other state in any other litigation
16  matters?
17  A.    I have not.
18  Q.    Approximately when were you retained in
19  this case?
20  A.    Approximately mid June of this year.
21  Q.    And that's approximately when you signed
22  the protective order in this case?
23  A.    Approximately, yes.
24  Q.    If I represented that your signature was
25  dated June 14th, that's approximate?

Page 48

1  A.    That sounds correct.
2  Q.    Were you approached by the State of
3  Texas, or did you approach them about the
4  written engagement?
5  A.    I was approached by the State of Texas.
6  Q.    Through counsel?
7  A.    Yes.
8  Q.    When approximately did you learn that
9  you'd be preparing an expert witness in which
10  case?
11  A.    That -- those were my initial
12  conversations was that I would be doing so.
13  Q.    And when would you say you started to do
14  work on the report that you submitted in this
15  Exhibit 1 in this case?  Also approximately mid
16  June?
17  A.    I began preparation to write a report
18  soon after I started, you know, so I started.
19  Q.    Has your understanding -- strike that.
20        In paragraph five of your report, you
21  state that you're being compensated for your
22  work in this matter at a rate of $600 per hour;
23  is that still correct?
24  A.    It is.
25  Q.    And approximately how many hours would

Page 49

1  you say you spent on this case so far?
2  A.    I spent approximately 200 hours at this
3  point.
4  Q.    Do you know how much you've billed for
5  your work on this matter so far?
6  A.    It would be you know 200 times 600, so...
7  Q.    Okay.  And do you receive 100 percent of
8  your bill time as compensation, or do you share
9  it with any firm or consulting group?
10  A.    100 percent goes to me.
11  Q.    And you bill the State of Texas directly?
12  A.    I do.
13  Q.    Other than counsel for the plaintiffs,
14  did anyone assist you in preparing your report?
15        MR. HILLEGAS:  Objection; form.
16        Caution the witness not to disclose
17  any communications that you may have had with
18  any staff or assistants, but you may answer the
19  question yes or no.
20        THE WITNESS:  Yes.
21  BY MR. STEINTHAL:
22  Q.    And were those individuals affiliated
23  with any organization or company?
24        MR. HILLEGAS:  Same objection.
25        You may answer with a name if you

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1  have it, but do not disclose any of the
2  communications that you may have had.
3       THE WITNESS:  So you're asking what
4  the affiliation was of anyone who --
5  BY MR. STEINTHAL:
6  Q.   Well, you testified that there are
7  individuals other than counsel and plaintiffs
8  who assist you in preparing your report; is that
9  correct?
10      MR. HILLEGAS:  Objection; form.
11      THE WITNESS:  Yes.
12 BY MR. STEINTHAL:
13 Q.   How many potential individuals are there?
14      MR. HILLEGAS:  Objection; form.
15      Again you may disclose the number of
16 individuals, but do not disclose any
17 communications that you had or any work that was
18 done in preparation for your report.
19      THE WITNESS:  Approximately six
20 people.
21 BY MR. STEINTHAL:
22 Q.   Okay.  Without revealing the substance of
23 any conversation you might have had with them,
24 can you please give me their names?
25      MR. HILLEGAS:  Objection; form.

Page 51

1       I'm going to instruct the witness
2  not to answer on the basis that providing a name
3  might provide communications that are covered by
4  the expert stipulation.
5  BY MR. STEINTHAL:
6  Q.   There are six individuals who assisted --
7  approximately individuals who assisted you with
8  your report, correct?
9       MR. HILLEGAS:  Objection; form.
10      THE WITNESS:  Yes.
11 BY MR. STEINTHAL:
12 Q.   To the best of your knowledge, are any of
13 those individuals affiliated with the same -- or
14 two or more of those individuals affiliated with
15 the same company or entity?
16      MR. HILLEGAS:  Objection; form.
17      You may answer the question yes or
18 no.  Don't provide any communications with any
19 individuals.
20      THE WITNESS:  Yes.
21 BY MR. STEINTHAL:
22 Q.   What is that company or entity?
23      MR. HILLEGAS:  Same objection.
24      You may provide the name of the
25 company.

Page 52

1       THE WITNESS:  Keystone Strategies.
2  BY MR. STEINTHAL:
3  Q.   Are all six -- are all of the
4  approximately six people that we're referring to
5  here affiliated with Keystone Strategies?
6       MR. HILLEGAS:  Objection; form.
7       Under the protective stipulation,
8  you may answer the question yes or no, but don't
9  provide any communication or names of the
10 individuals.
11      THE WITNESS:  Yes.
12 BY MR. STEINTHAL:
13 Q.   Without revealing the substance of any of
14 your communications with those individuals, is
15 it your understanding that those six individuals
16 have training or experience in computer science?
17      MR. HILLEGAS:  Objection; form.
18      You may provide a yes or no answer
19 to the question.
20      THE WITNESS:  Yes.
21 BY MR. STEINTHAL:
22 Q.   To the best of your knowledge, are any of
23 those six individuals trained in economics?
24      MR. HILLEGAS:  Same objection.
25      Same caution to the witness.

Page 53

1       THE WITNESS:  I'm not sure.
2  BY MR. STEINTHAL:
3  Q.   Is there a particular person on those six
4  about who you are unsure?
5       MR. HILLEGAS:  Same objection and
6  caution.
7       Instruct the witness not to disclose
8  any names or communications, but if there is --
9  you can answer the question yes or no, you may.
10      THE WITNESS:  No.
11 BY MR. STEINTHAL:
12 Q.   So your uncertainty is general across all
13 six?
14      MR. HILLEGAS:  Same objection, same
15 caution.
16      You may answer yes or no.
17      THE WITNESS:  Yes.
18 BY MR. STEINTHAL:
19 Q.   Did you personally identify these six
20 individuals to work on this case?
21      MR. HILLEGAS:  Objection; form.
22      Same caution.  You can answer yes or
23 no to the extent you understand the question.
24      THE WITNESS:  No.
25 BY MR. STEINTHAL:

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1  Q.    To the best of your knowledge, how were
2  those six individuals selected to work on this
3  case?
4            MR. HILLEGAS:  Objection; form.
5            Instruct the witness not to answer
6  as discloses communications with staff and
7  communication -- and any assistants that he may
8  have.
9  BY MR. STEINTHAL:
10 Q.    To the best of your knowledge, do any six
11 individuals that we're talking about have
12 training or expertise in auction theory?
13           MR. HILLEGAS:  Objection to form,
14 expert stipulations.
15           You can answer yes or no to the
16 extent that you know.
17           THE WITNESS:  I'm not sure.
18 BY MR. STEINTHAL:
19 Q.    Are you familiar with the academic or
20 professional background of the six individuals
21 we're talking about?
22           MR. HILLEGAS:  Same objection, same
23 caution.
24           You may answer yes or no to the
25 extent you know.

Page 55

1            THE WITNESS:  No.
2  BY MR. STEINTHAL:
3  Q.    Other than counsel and the six
4  individuals we've been talking about from
5  Keystone Strategies, did anyone else assist you
6  in the preparation of your report?
7            MR. HILLEGAS:  I'm going to caution
8  the witness not to disclose any communication
9  with either counsel or assistants.  You may
10 answer the question yes or no.
11           THE WITNESS:  No.
12 BY MR. STEINTHAL:
13 Q.    To the best of your knowledge, from
14 approximately June when you started working on
15 this case through the present -- or strike that.
16     To the best of your knowledge and
17 approximately June when you started to work on
18 this case through the date of your report, which
19 is September 9th, 2024, did the six individuals
20 we've been talking about work full-time or
21 substantially full-time in support of your work
22 on this case?
23           MR. HILLEGAS:  Objection; form.
24           Caution you not to disclose any
25 communications you my have had, any drafts you

Page 56

1  may have had.  To the extent that you know the
2  answer, you may respond yes or no.
3            THE WITNESS:  No.
4  BY MR. STEINTHAL:
5  Q.    To the best of your knowledge, how many
6  hours in the aggregate did the six individuals
7  we're talking about work in support of your
8  report?
9            MR. HILLEGAS:  Same objection, same
10 caution.
11           You may answer to the extent that
12 you know how many hours to the -- you know the
13 answer to that question.
14           THE WITNESS:  I don't know.
15 BY MR. STEINTHAL:
16 Q.    Did you receive any compensation based in
17 whole or in part on the amount that Keystone
18 Strategies receives for your support team's work
19 on this case?
20 A.    I do not.
21 Q.    Without revealing the substance of any
22 communications that you may have had with them,
23 did any of six individuals we're discussing
24 draft.
25     Portions of your report?

Page 57

1            MR. HILLEGAS:  Objection; form.
2            Instruct the witness not answer
3  under the expert stipulation covering the drafts
4  of the expert report.
5  BY MR. STEINTHAL:
6  Q.    Without revealing the substance of any
7  drafts of the report, did you draft -- did you
8  write the first draft of this report?
9            MR. HILLEGAS:  Objection; form.
10           You may answer yes or no.
11           THE WITNESS:  Yes.
12 BY MR. STEINTHAL:
13 Q.    Got a few final questions before we take
14 a break, which hopefully we can get done in the
15 next few minutes.
16     What did you do to prepare for this
17 deposition -- strike that.
18     Without revealing the substance of any
19 communication with counsel or your support team,
20 what did you do to prepare for this deposition
21 today?
22           MR. HILLEGAS:  Objection; form.
23           THE WITNESS:  I read my expert
24 reports and a few other expert reports involved
25 in this case.

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1  BY MR. STEINTHAL:
2  Q.    Was one of those reports the report of
3  Professor Milgrom?
4  A.    Yes.
5  Q.    Were any of the other reports that you
6  reviewed in connection with your preparation for
7  this deposition -- sorry. Strike that.
8        Was another of your reports you reviewed
9  in preparation of this deposition that of
10  Professor Jacob Hochstetler?
11  A.    Yes.
12  Q.    And those reports that are identified in
13  appendix A of your report as being materials
14  that you relied upon; is that correct?
15        MR. HILLEGAS: Objection; form.
16        THE WITNESS: Those are two reports
17  I relied upon.
18  BY MR. STEINTHAL:
19  Q.    Other than those two reports, did you
20  review any other expert reports in this case?
21        MR. HILLEGAS: Objection; form.
22        THE WITNESS: I also looked at the
23  report of Professor Rinard.
24  BY MR. STEINTHAL:
25  Q.    Did you meet with -- without revealing

Page 59

1  the substance of any communications, did you
2  meet with counsel to prepare for this
3  deposition?
4        MR. HILLEGAS: Objection; form,
5  privileged.
6        You may answer the question yes or
7  no.
8        THE WITNESS: Yes.
9  BY MR. STEINTHAL:
10  Q.    And approximately how many times did you
11  meet with counsel in preparation for this
12  report? For this deposition? Sorry.
13        MR. HILLEGAS: Objection to form and
14  privilege.
15        (Inaudible) to any communications
16  you may have had with counsel, but to the extent
17  a number is coming to mind, you may provide a
18  number.
19        THE WITNESS: Approximately six
20  times.
21  BY MR. STEINTHAL:
22  Q.    Okay. And just to -- I'm going to repeat
23  the question because I was little unclear in
24  phrasing it last time.
25        Approximately how many times did you meet

Page 60

1  with counsel in preparing for this deposition;
2  is that six?
3        MR. HILLEGAS: Same objection, same
4  caution.
5        THE WITNESS: Yes.
6  BY MR. STEINTHAL:
7  Q.    And to the extent you recall, do you have
8  a sense of the total number of hours involved in
9  those six meetings?
10        MR. HILLEGAS: Objection to form.
11  Under the expert stipulation, the total number
12  of hours that we worked on this case may be
13  disclosed but can not be break down per hour.
14        Thereof instruct the witness not to
15  answer as to any portion of hours prepared for
16  the deposition today.
17  BY MR. STEINTHAL:
18  Q.    Was anyone other than counsel to the
19  plaintiffs and you present during those
20  meetings?
21        MR. HILLEGAS: Objection; form,
22  privileged.
23        You may answer yes or no to the
24  extent that you know.
25        THE WITNESS: No.

Page 61

1  BY MR. STEINTHAL:
2  Q.    Did you select all the documents that you
3  reviewed in preparation for this deposition?
4        MR. HILLEGAS: Objection; form,
5  privilege.
6        You may answer yes or no to the
7  extent that you know.
8        THE WITNESS: Yes.
9  BY MR. STEINTHAL:
10  Q.    And any other documents that you reviewed
11  privy to -- strike that.
12        And are any of the documents that you
13  reviewed in preparation of this deposition other
14  than report of Professor Rinard not listed on
15  appendix A, materials relied upon in this case?
16        MR. HILLEGAS: Objection; form.
17        THE WITNESS: There are no other
18  documents.
19        MR. STEINTHAL: We can take a break.
20  Go off the record.
21        THE VIDEOGRAPHER: We are going off
22  the record at 10:35 a.m.
23        (Off-the-record discussion was held.)
24        THE VIDEOGRAPHER: We're going back
25  on the record at 10:52 a.m.

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1  BY MR. STEINTHAL:
2  Q.   Good morning, Professor.  Just before we
3  go back into questioning, is there anything that
4  having had a few minutes to think that you want
5  to correct from earlier testimony?  Any issues
6  that came to mind?
7  A.   Not at this time.
8  Q.   Okay.  Thanks.  Okay.  So we previously
9  established that Exhibit 1 is your report in
10 this matter; is that correct?
11 A.   Yes.
12 Q.   And approximately when did you start
13 working on drafting this report?
14      MR. HILLEGAS:  I'm just going to
15 caution the witness under the terms of the
16 expert stipulation, you can give a date.  Don't
17 disclose the context of any drafting that you
18 may have done.
19      THE WITNESS:  Report -- work on the
20 report itself as opposed background was in
21 August.
22 BY MR. STEINTHAL:
23 Q.   And when you say background, without
24 revealing the contents of any drafts, can you
25 give me a sense of what you mean by the term

Page 63

1  background?
2       MR. HILLEGAS:  Same objections and
3  cautions to the witness.
4       THE WITNESS:  This report is
5  responding to Dr. -- you know, rebutting
6  Dr. Milgrom's report, and so the drafting
7  began -- the full drafting began after we
8  received Dr. Milgrom's report, but preparation
9  for was before that.
10 BY MR. STEINTHAL:
11 Q.   And during that phase you're describing
12 as preparation, had you begun to formulate the
13 opinions that were eventually included in your
14 report?
15 A.   I -- I had begun under -- trying to
16 understand Google's ad infracture, which was
17 then used to inform the opinion I presented
18 here.
19 Q.   And when you began to understand Google's
20 ad infrastructure, did you have a goal in mind
21 as to the aspect of the infrastructure that you
22 were trying to understand?
23      MR. HILLEGAS:  Objection; form.
24      THE WITNESS:  I was trying to
25 understand how the overall system worked at an

Page 64

1  architectural level and understand how the
2  source code was organized and what -- you know,
3  how -- how -- what functionality was there.
4       That -- that review was before
5  Dr. Milgrom's report was available.
6  BY MR. STEINTHAL:
7  Q.   Were you trying to answer any specific
8  substantive questions at that point?
9       MR. HILLEGAS:  Objection; form.
10      THE WITNESS:  A specific question,
11 no.
12 BY MR. STEINTHAL:
13 Q.   Did -- strike that.
14      If we turn to paragraph two of your
15 report, does that -- that accurately describe
16 your assignment in this case?
17 A.   Paragraph two does.
18 Q.   And without revealing the substance of
19 any communications that you may have had with
20 counsel, has that assignment changed at any
21 point over the course of your engagement?
22      MR. HILLEGAS:  Objection; form.
23      THE WITNESS:  No.
24 BY MR. STEINTHAL:
25 Q.   Again without reveal the substance of any

Page 65

1  communications you might have had with counsel,
2  who provided the assignment to you for this
3  case?
4       MR. HILLEGAS:  Objection; form.
5       THE WITNESS:  I was asked by
6  counsel.
7  BY MR. STEINTHAL:
8  Q.   The opinion -- sorry.  The assignment
9  that you list is to respond to the opinion of
10 Dr. Milgrom that advertisement publishers are
11 able to optimize their behavior in response to
12 modifications that Google enters into the
13 auction programs, correct?
14      MR. HILLEGAS:  Objection; form.
15      THE WITNESS:  It was -- the
16 assignment was to -- you know, was to offer an
17 opinion on the degree to which, you know,
18 advertisement publishers can optimize the
19 behavior response to modifications that Google
20 introduces to its auction programs.
21 BY MR. STEINTHAL:
22 Q.   And without revealing the substance of
23 any communications you may have had with
24 counsel, when counsel gave you this assignment
25 in this case, was it limited to the particular

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1  opinion that's listed in paragraph two or was it
2  more general?
3          MR. HILLEGAS: Objection; form.
4          THE WITNESS: My opinion was to be
5  specific to rebutting Dr. Milgrom's statement.
6  BY MR. STEINTHAL:
7  Q.    And just to be precise, it was to rebut
8  the particular statement of Dr. Milgrom that
9  referenced in paragraph two rather than
10 Dr. Milgrom more generally?
11 A.    It's --
12         MR. HILLEGAS: Objection; form.
13         THE WITNESS: Paragraph two doesn't
14 actually quote Dr. Milgrom. I quote him later
15 in my report. But at a high level this covers
16 the aspect of Dr. Milgrom's report I was
17 responding to.
18 BY MR. STEINTHAL:
19 Q.    And at that high level -- and we'll get
20 into the detail in a little bit -- was counsel
21 responsible for selecting those opinions of
22 Dr. Milgrom that you were responding to?
23 A.    Yes.
24 Q.    Okay. Having received that assignment,
25 what led you to focus on information advantage,

Page 67

1  information and balance as a way of answering
2  the question?
3  A.    What led me is I describe my -- the --
4  the process, you know, what my reasoning mostly
5  in paragraph 19, 20 and 21, how I get to
6  information advantage from that. And so that --
7  it's really about understanding what does it
8  mean to do an experiment and understand the
9  results of it and then thinking about that in
10 the context of my understanding of Google's ad
11 infrastructure.
12 Q.    There might be multiple different ways of
13 responding to Professor Milgrom's opinion
14 regarding the ability of advertisement
15 publishers to optimize; is that correct?
16         MR. HILLEGAS: Objection; form.
17         THE WITNESS: I imagine there's
18 other arguments that could be made.
19 BY MR. STEINTHAL:
20 Q.    And my question was: From among those
21 different arguments or lines of inquiry, what
22 led you to believe that information advantage
23 was a fruitful way of approaching the question?
24 A.    So this gets my background on trying to
25 understand complex systems is that Dr. Milgrom

Page 68

1  is saying that outsiders can -- you know,
2  outsiders of Google can understand what's
3  happening inside of Google by conducting
4  experiments.
5          And I have looked at Google's
6  infrastructure, and I was going, there's a lot
7  going on in there. So -- so then the question
8  was, given all that's going on in there, how
9  much transparency is there of that to outsiders?
10 What information is given to outsiders versus
11 what information is given insiders, because
12 given how complex that system is, the only way
13 outsiders could understand what was going on is
14 if they have full disclosure. And so I could
15 look at the code and go, well, how much is being
16 told? And that's where I started looking.
17 Q.    Is it your understanding that Dr. Milgrom
18 offered an opinion that outsiders can understand
19 what's happening inside of Google algorithms?
20         MR. HILLEGAS: Objection; form.
21         THE WITNESS: I give a summary of my
22 understanding of what Dr. Milgrom said in
23 paragraph 19. I can read this if you --
24 BY MR. STEINTHAL:
25 Q.    My question was more specific.

Page 69

1          Is it your understanding that Dr. Milgrom
2  offered an opinion that outsiders can understand
3  the operation of Google's relevant algorithms?
4          MR. HILLEGAS: Objection; form.
5          THE WITNESS: Specifically what
6  Dr. -- as I understand what Dr. Milgrom was
7  saying was that advertisement publishers
8  regularly conduct experiments in ad markets;
9  those being outside of Google. And that -- and
10 Google offers features to facilitate those
11 experiments, and implied, you know, in what
12 Dr. Milgrom said is that those experiments are
13 sufficient to understand what's happening inside
14 of Google.
15 BY MR. STEINTHAL:
16 Q.    We'll come back to that.
17 A.    Okay.
18 Q.    As part of preparing your report, you
19 reviewed expert report of Professor Milgrom
20 dated July 30th, 2024; is that correct?
21         MR. HILLEGAS: Objection, form.
22         THE WITNESS: I reviewed the expert
23 report of Dr. Milgrom. I do not recall the
24 date.
25 BY MR. STEINTHAL:

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1  Q.    But it was the report that it was
2  submitted in this case pending in Eastern
3  District of Texas?
4  A.    Yes.
5  Q.    Did you review any other reports from
6  Professor Milgrom as part of your work on this
7  case?
8  A.    I only reviewed one report from
9  Dr. Milgrom.
10  Q.    So if I turn to the appendix B of your
11  report on page 32, second half of the page, line
12  17, there's a reference to an expert report of
13  Professor Milgrom dated January 23rd, 2024.  Do
14  you see that?
15  A.    Yes, I do.
16  Q.    You did not review that report?
17  A.    No, I did not.
18  Q.    Did you otherwise consider that report?
19  A.    These are all on the reports that are
20  listed and materials that I considered, so it
21  was considered in the sense of things that I
22  searched through potentially but not things that
23  I relied upon.
24  Q.    I see.  So you -- you may have run tech
25  searches otherwise that could have pulled up

Page 71

1  material from this report, but you did not read
2  it cover to cover?
3  A.    Exactly.
4  Q.    To your recollection, did any of the
5  searches that you ran lead you to material in
6  this report that you did, in fact, review
7  portions of this report from January 2024?
8        MR. HILLEGAS:  Objection; form.
9        THE WITNESS:  Not that I recall.
10  BY MR. STEINTHAL:
11  Q.    Okay.  And by contrast, when you say that
12  you did review the report of Professor Milgrom
13  in this case, you mean to testify that you did
14  read it linearly; is that correct?
15        MR. HILLEGAS:  Objection; form.
16        THE WITNESS:  I did.
17  BY MR. STEINTHAL:
18  Q.    And did you read it in its entirety?
19  A.    I did read it.
20  Q.    In its entirety?
21  A.    I -- I read certain -- I read the
22  portions that I focused on regarding the
23  experiments in detail.  The other parts -- the
24  majority of the report which was about
25  economics, I looked at it, but I didn't read it

Page 72

1  in depth.
2  Q.    But you read it sufficiently to have an
3  understanding that -- of its context that you
4  were going to respond to; is that correct?
5        MR. HILLEGAS:  Objection; form.
6        THE WITNESS:  I wasn't responding to
7  those portions of the report, so...
8  BY MR. STEINTHAL:
9  Q.    But just to be clear, the portions -- the
10  opinions you were responding to, you believe you
11  read it adequately to have a sufficient
12  understanding of the report to respond?
13  A.    Yes.
14  Q.    You also -- so returning to back to
15  paragraph three of your report, you say that you
16  considered the report of Dr. Rinard, and I
17  believe you also said you -- you testified
18  earlier that you reviewed it in preparation of
19  this deposition; is that correct?
20        MR. HILLEGAS:  Objection; form.
21        THE WITNESS:  I did consider it in
22  for writing my report and I did review it
23  before.
24  BY MR. STEINTHAL:
25  Q.    And did you read that report from -- in a

Page 73

1  linear fashion?
2        MR. HILLEGAS:  Objection; form.
3        THE WITNESS:  I looked through the
4  report.  You know, linear is not typically how I
5  would approach this sort of problem.
6  BY MR. STEINTHAL:
7  Q.    Ask the question a little differently.
8        You had distinguished between Professor
9  Milgrom's report, which you read the relevant
10  portions of, and Professor Milgrom's earlier
11  report and the others in appendix B, which were
12  part of reports that you searched.
13        Would you put Professor Rinard's report
14  in the first category that you read or in the
15  second category that you just merely searched
16  through?
17        MR. HILLEGAS:  Objection; form.
18        THE WITNESS:  For the deposition
19  preparation, I put it in the category that I
20  read.
21  BY MR. STEINTHAL:
22  Q.    Okay.  But when you were preparing the
23  report, did you read it or just search it?
24  A.    That was more search.
25  Q.    Did you -- as part of your work in

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1  forming this report -- in formulating your
2  report, did you form any opinions as of
3  substance of Professor Rinard's opinions?
4       MR. HILLEGAS:  Objection; form.
5       THE WITNESS:  I did not offer any
6  expert opinions regarding Professor Rinard's
7  report.
8  BY MR. STEINTHAL:
9  Q.    And, in fact, Professor Milgrom is the
10  only expert you're purporting to respond to in
11  this case; is that correct?
12  A.    Yes.
13       MR. HILLEGAS:  Objection; form.
14       THE WITNESS:  Yes.
15  BY MR. STEINTHAL:
16  Q.    So thinking more generally about the
17  materials that you reviewed or searched through
18  in preparation for your report and forming your
19  opinions and drafting the report, did you select
20  the materials that you reviewed in that context?
21       MR. HILLEGAS:  Objection; form.
22       THE WITNESS:  Yes.
23  BY MR. STEINTHAL:
24  Q.    And you were responsible for determining
25  which documents you wanted to read in their

Page 75

1  entirety versus those you just wanted to search
2  through?
3  A.    Yes.
4  Q.    Without revealing the substance of any
5  communications, did anyone other than you select
6  materials for you to review in preparation for
7  your report?
8       MR. HILLEGAS:  Objection; form.
9       And caution the witness not to
10  disclose any communications or names, but you
11  may answer the question yes or no to the extent
12  that you know.
13       THE WITNESS:  No.
14  BY MR. STEINTHAL:
15  Q.    So to the extent that you reviewed
16  documents produced by Google, you selected them?
17       MR. HILLEGAS:  Objection; form.
18       THE WITNESS:  I chose the documents
19  that I reviewed.
20  BY MR. STEINTHAL:
21  Q.    And the same is true for deposition
22  transcripts?
23       MR. HILLEGAS:  Objection; form.
24       THE WITNESS:  Yes.
25  BY MR. STEINTHAL:

Page 76

1  Q.    Do you recall reviewing deposition
2  transcripts --
3  A.    Oh.
4  Q.    Sorry.
5  A.    Oh, I don't recall relying much on
6  deposition transcripts, but I would refer to my
7  report to see which ones were actually ones I
8  relied upon.
9  Q.    If there are none, does that indicate you
10  didn't review any of the substance?
11  A.    Yes.
12       MR. HILLEGAS:  Objection; form, but
13  answered.
14  BY MR. STEINTHAL:
15  Q.    Are there any materials or documents that
16  you relied upon to form the opinions in your
17  report that are not listed or cited in appendix
18  A to your report?
19  A.    No.  Well, except for the errata that we
20  have.
21  Q.    I thought the errata --
22  A.    Sorry.  That was about the considered,
23  not relied.
24  Q.    Just to clarify the record again, are
25  there any documents or other materials that you

Page 77

1  relied upon to form the opinions in your report
2  that are not listed or cited in appendix A?
3  A.    No.
4       MR. HILLEGAS:  Objection; form.
5       THE WITNESS:  No.
6  BY MR. STEINTHAL:
7  Q.    And that would include any deposition or
8  trial testimony?
9       MR. HILLEGAS:  Objection; form.
10       THE WITNESS:  Correct.
11  BY MR. STEINTHAL:
12  Q.    Okay.  In paragraph four of your report,
13  you state that your opinions were based on in
14  part, quote, "the materials briefed to me by
15  counsel."  What materials are those?
16  A.    In this context, my -- my understanding
17  of the materials, when I said briefed, it's just
18  saying that were made available to me.  So it's
19  referring to the corpus of documents that are
20  private that are in the materials considered.
21  Q.    I see.  And to your knowledge, there are
22  no such materials that are not listed in
23  appendix B with the caveats -- the corrections
24  we already made?
25       MR. HILLEGAS:  Objection; form.

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1    THE WITNESS:  Yes.
2  BY MR. STEINTHAL:
3  Q.    Were there any materials that you wanted
4  to review in this case but were unable to for
5  some reason?
6    MR. HILLEGAS:  Objection; form.
7    THE WITNESS:  The materials I had
8  available to me were sufficient to draw the
9  conclusions that I did.
10  BY MR. STEINTHAL:
11  Q.    So turn to paragraph four or, I guess,
12  staying in paragraph four -- that's the last one
13  we looked at -- you say that your opinion was
14  based -- is based on my review of the source
15  code and documents available to me at the time
16  this report was published.  Do you see that?
17    MR. HILLEGAS:  Objection; form.
18    THE WITNESS:  Yes.
19  BY MR. STEINTHAL:
20  Q.    And with respect to the documents you had
21  available to you, you had access to all the
22  third-party documents produced in this case; is
23  that correct?
24    MR. HILLEGAS:  Objection; form.
25    THE WITNESS:  To the best of my

Page 79

1  knowledge, yes.
2  BY MR. STEINTHAL:
3  Q.    And to the best of your knowledge, you
4  had access to all of the deposition transcripts
5  in this case; is that correct?
6    MR. HILLEGAS:  Objection; form.
7    THE WITNESS:  To the best of my
8  knowledge, yes.
9  BY MR. STEINTHAL:
10  Q.    To the best of your knowledge, did you
11  also have access to all the third-party data
12  production in this case?
13    MR. HILLEGAS:  Objection; form.
14    THE WITNESS:  To the best of my
15  knowledge, yes.
16  BY MR. STEINTHAL:
17  Q.    But did you not rely on any documents
18  produced by anyone other than Google in this
19  case; is that correct?
20  A.    I relied on the documents produced by
21  Google and some public sources that as I cite
22  them.
23  Q.    But none of the documents that were
24  produced in this case pursuant to subpoenas by
25  third parties other than Google are documents

Page 80

1  relied on this case; is that correct?
2    MR. HILLEGAS:  Objection; form.
3    THE WITNESS:  Not to my knowledge.
4  BY MR. STEINTHAL:
5  Q.    And you did not rely on any deposition
6  transcripts in preparing your opinions; is that
7  correct?
8    MR. HILLEGAS:  Objection; form.
9    THE WITNESS:  No.
10  BY MR. STEINTHAL:
11  Q.    And is that because you did not believe
12  that those deposition transcripts provided
13  information that was relevant to your analysis?
14    MR. HILLEGAS:  Objection; form.
15    THE WITNESS:  The information that I
16  relied upon was sufficient to reach the
17  questions that I did.  There was lots more
18  information.  Some of that could have been
19  useful, but none of it should have contradicted
20  anything that I relied upon.
21  BY MR. STEINTHAL:
22  Q.    How do you know that none of the --
23  strike that.
24    What, if any, work did you do to
25  determine whether any of the materials that were

Page 81

1  available to you but that you did not rely upon
2  would not have contradicted the opinions in your
3  report?
4  A.    My opinions were about the source code
5  fundamentally with the documents supporting it,
6  and so I looked at the source code, and so I
7  got, in a sense, ground truth from that, and so
8  much of the other information was -- was about
9  it but not the code.
10  Q.    Okay.  Did you review or consider any
11  quantitative data as part of your work in this
12  case?
13    MR. HILLEGAS:  Objection; form.
14    THE WITNESS:  I did not.
15  BY MR. STEINTHAL:
16  Q.    And again that's because did you not
17  believe that they were relevant to forming the
18  opinions that you have in your report?
19    MR. HILLEGAS:  Objection; form.
20    THE WITNESS:  I didn't believe they
21  were necessary in order to form the opinions I
22  had in this report.
23  BY MR. STEINTHAL:
24  Q.    So as we discussed, as part of your
25  analysis of this case, you reviewed Google

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1  source code; is that correct?
2  A.    Yes.
3  Q.    How would you describe what you were
4  hoping to accomplish when you started that
5  review?
6  A.    When I started my review, before I had my
7  specific assignment, I was just trying to
8  understand the architecture of the system and
9  how -- how things fit together.  When you start
10  with a large code base, there's a lot of just
11  trying to figure out which direction is up.  It
12  can be very confusing, so just getting familiar
13  with the key structures of it and how it was
14  organized took some time.
15  Q.    And sorry, is that end of your answer?
16  A.    I'm -- I'm not sure if that responded to
17  your question completely, but...
18  Q.    In your last response, you refer to the
19  time before you had your specific assignment.
20  What is that point when you had your specific
21  assignment approximately?
22         MR. HILLEGAS:  Objection; form.
23         Not disclose -- caution the witness
24  not to disclose any communications that you had
25  with counsel.

Page 83

1         THE WITNESS:  Early on.
2  BY MR. STEINTHAL:
3  Q.    And at that point and subsequent to it,
4  what were you hoping to accomplish with your
5  review of Google source code?
6         MR. HILLEGAS:  Objection; form.
7         THE WITNESS:  My goal was to
8  understand the degree of information balance or
9  imbalance between first-party and third-party
10  participants in the Google ad ecosystem.
11  BY MR. STEINTHAL:
12  Q.    About how long would you say you spent
13  reviewing Google's source code in this matter?
14         MR. HILLEGAS:  Objection; form.  In
15  terms of the expert stipulation, I caution the
16  witness on the form that the number of hours
17  spent is not in the source code, and it's not
18  discoverable, and I'll instruct him not to
19  answer the question.
20  BY MR. STEINTHAL:
21  Q.    Was your review of Google source code, in
22  your mind, sufficient to achieve the goals you
23  set out to do when you began that review?
24         MR. HILLEGAS:  Objection; form.
25         THE WITNESS:  Yes.

Page 84

1  BY MR. STEINTHAL:
2  Q.    And is it fair to say that your opinions
3  in this case are limited to the operation of
4  Google's source code?
5         MR. HILLEGAS:  Objection; form.
6         THE WITNESS:  My opinions in this
7  case are about my understanding of the -- of the
8  software system as embodied, you know, in that
9  code.  So operations -- I'm not sure exactly how
10  to apply the term operation.
11  BY MR. STEINTHAL:
12  Q.    You testified that you're -- strike that.
13         You said earlier that you were not
14  concerned that third-party documents or
15  testimony would contradict your opinions because
16  your opinions were primarily about the nature of
17  Google systems; is that correct?
18         MR. HILLEGAS:  Objection; form.
19         THE WITNESS:  I was trying to
20  understand the systems by understanding the
21  code.  And so documents supported my
22  understanding of the code, and so once I
23  understood what was going on, I could draw
24  conclusions.  Other documents could have told me
25  additional things about the code, but I had

Page 85

1  achieved sufficient understanding of the code.
2  BY MR. STEINTHAL:
3  Q.    And the conclusions that you drew, were
4  they related exclusively to Google's systems at
5  issue?
6         MR. HILLEGAS:  Objection; form.
7         THE WITNESS:  I cannot say whether
8  the conclusions I drew might have further, you
9  know, utility or implications in other context.
10  I can just say what I observed.
11  BY MR. STEINTHAL:
12  Q.    But your testimony in this case is
13  limited to, as you just said, what you observed
14  through your review of the code and relevant
15  documents about Google systems?
16  A.    Yes.
17         MR. HILLEGAS:  Objection; form.
18  BY MR. STEINTHAL:
19  Q.    We talked earlier about how distributed
20  complex systems involve the interaction of
21  multiple parties with -- with systems; do you
22  recall that?
23  A.    Yes.
24  Q.    And some of the parties who interact with
25  Google's systems at issue in this case are

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1 publishers and advertisers; is that correct?
2 A.    Yes.
3 Q.    And also bidding tools or other ad tech
4 products that they may use; is that correct?
5 A.    Those other tools would interface with it
6 ████████████████████████████████████████████
███.
8 Q.    Correct.  So the question I was asking
9 was:  If we were trying to identify the
10 different participants or stakeholders who
11 interact with Google systems, that might include
12 advertisers, publishers, and also the software
13 systems, the provider software systems, that
14 those advertisers might use; is that correct?
15         MR. HILLEGAS:  Objection; form.
16         THE WITNESS:  That was a list of the
17 parties that could be interacting through the
18 system. ████████████████████████████████████
████████████████████████████████████████████
21 BY MR. STEINTHAL:
22 Q.    But if you're trying -- but you
23 identified that one of the -- one of the
24 characters for the complex system that you
25 analyzed in your work is that it has to deal

Page 87

1 with and interact with multiple different, sort
2 of, outside influences and parties; is that
3 correct?
4         MR. HILLEGAS:  Objection; form.
5         THE WITNESS:  Yes.
6 BY MR. STEINTHAL:
7 Q.    And in fact, that's why we had a little
8 discussion earlier about whether AlphaFold
9 qualified or not.  You said it was mostly
10 self-contained, and so therefore it was less
11 complex than the systems that you were talking
12 about; is that correct?
13         MR. HILLEGAS:  Objection; form.
14         THE WITNESS:  Yes.
15 BY MR. STEINTHAL:
16 Q.    So my question is:  If we were trying to
17 identify the many various parties and systems
18 that interact with Google system to make it as
19 complex as you say it is, those would include
20 not just advertisers and publishers but also
21 other software tools that advertisers might use;
22 is that correct?
23         MR. HILLEGAS:  Objection; form.
24         THE WITNESS:  Those other tools
25 might interact with a system, but they aren't, I

Page 88

1 would say, fundamental to making the system what
2 it is in terms of being a complex system.
3 BY MR. STEINTHAL:
4 Q.    Did you as part of your work on this case
5 analyze any software systems that interact with
6 Google system other than Google system itself?
7 A.    My review was limited to the source code,
8 the Google source code.
9 Q.    So you did not review the source code
10 with any non-Google ad tech tools in this case,
11 correct?
12         MR. HILLEGAS:  Objection; form.
13         THE WITNESS:  I did not review
14 source code from any other source in this case.
15 BY MR. STEINTHAL:
16 Q.    And looking back before your work on this
17 case, have you ever, to your knowledge, examined
18 the source code of any ad tech provider other
19 than Google?
20         MR. HILLEGAS:  Objection; form.
21         THE WITNESS:  I have not.
22 BY MR. STEINTHAL:
23 Q.    In the context of this case, did you do
24 any work to understand how any non-Google ad
25 tech tools operate?

Page 89

1         MR. HILLEGAS:  Objection; form.
2         THE WITNESS:  I did not.
3 BY MR. STEINTHAL:
4 Q.    And do you recall ever having done that
5 analysis in any context other than this case?
6         MR. HILLEGAS:  Objection; form.
7         THE WITNESS:  I have not -- I have
8 not analyzed advertising system code outside the
9 context of this case previously.
10 BY MR. STEINTHAL:
11 Q.    Have you done any work to understand how
12 advertising technology systems operate other
13 than through their view source code?  So one
14 might -- you might have studied how a
15 third-party system worked through some mechanism
16 other than source code.  What I'm trying to
17 understand is, are you limiting your testimony?
18         MR. HILLEGAS:  Objection; form.
19         THE WITNESS:  I have to studied web
20 applications, web ecosystems, and as part of
21 that, I've studied interactions with different
22 parties inside the context of a web page.
23         There is a paper I have on content
24 provider conflict on the modern web, and part of
25 that was understanding how other parties

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1 including advertisers would interact in the
2 context of a web page and how their code could
3 come into conflict, where they could potentially
4 spy on each other or modify each other's
5 behavior inside of a web page.
6        So I have thought about the
7 technology and the interactions in -- in that
8 sort of context. I don't -- but that is
9 separate from this case.
10 BY MR. STEINTHAL:
11 Q.    Have you done any analysis of how
12 advertisers can use buying tools to automate or
13 improve their bidding strategies in ad auctions?
14        MR. HILLEGAS: Objection; form.
15        THE WITNESS: No.
16 BY MR. STEINTHAL:
17 Q.    You have analyzed how publishers can use
18 ad tech tools to automatic or improve their ad
19 sales?
20        MR. HILLEGAS: Objection; form.
21        THE WITNESS: I have not analyzed
22 how advertise -- sorry.
23        I have not analyzed systems other
24 than Google's with relation to advertising
25 technology.

Page 91

1 BY MR. STEINTHAL:
2 Q.    Okay.
3 A.    Beyond -- beyond the general web
4 technology that are lines on this.
5 Q.    Are you familiar with what the term
6 publisher means in the context of this case?
7 A.    Yes.
8 Q.    It means company or entity that shows
9 advertisements on its Web page; is that correct?
10 Fair definition?
11        MR. HILLEGAS: Objection; form.
12        THE WITNESS: On its web pages
13 online.
14 BY MR. STEINTHAL:
15 Q.    Or mobile applications or other
16 properties?
17 A.    Yes.
18        MR. HILLEGAS: Objection; form.
19 BY MR. STEINTHAL:
20 Q.    Have you analyzed how publishers can use
21 ad tech tools to automate their ad sales?
22        MR. HILLEGAS: Objection; form.
23        THE WITNESS: I have not analyzed
24 such automation systems directly.
25 BY MR. STEINTHAL:

Page 92

1 Q.    Have you analyzed how publishers might
2 use ad tech tools to serve ads on their web
3 pages or other mobile properties or other
4 properties?
5        MR. HILLEGAS: Objection; form.
6        THE WITNESS: I have not analyzed
7 the tools themselves, but in the context of
8 looking at Google source code, I have, you know,
9 thought about their ability to optimize systems.
10 BY MR. STEINTHAL:
11 Q.    Did you speak with any advertisers or
12 publishers or their employees in the course of
13 developing your opinions in this case?
14        MR. HILLEGAS: Objection; form.
15        THE WITNESS: I have not.
16 BY MR. STEINTHAL:
17 Q.    Did you speak with or interview anyone
18 who is knowledgeable about the operation or
19 development of ad tech tools as part of your
20 work in preparing for this case?
21        MR. HILLEGAS: Objection; form.
22        THE WITNESS: I did not interview
23 anyone who is knowledgeable about the operation
24 or development of ad tech tools as part of my
25 work in preparing for this case.

Page 93

1 BY MR. STEINTHAL:
2 Q.    Did you conduct any interviews as part of
3 your work in preparation of this case?
4 A.    I did not conduct any interviews as part
5 of preparation for this case.
6 Q.    Without revealing the content of any
7 conversations that you may have had, have you
8 discussed this case or any of your opinions with
9 any of the plaintiff's other experts in this
10 case?
11 A.    No.
12 Q.    In paragraph four of your report, you say
13 that you, quote, "reserve the right to
14 supplement my report should any additional
15 information be produced in this case as well to
16 create and use graphics, figure, and other
17 materials at trial to support my conclusions."
18        Do you see that?
19        MR. HILLEGAS: Objection; form.
20        THE WITNESS: I do see that sentence
21 in my report.
22 BY MR. STEINTHAL:
23 Q.    Have you reviewed any other materials
24 since submitting your rebuttal report that you
25 had not previously reviewed while drafting it?

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1  A.   I looked at Dr. Rinard's report that I
2  hadn't looked at in detail previously.  I ran
3  through that but other than that, no.
4  Q.   And that did not lead you to change any
5  opinions you had in your report?
6  A.   It did not.
7  Q.   Was there any additional analysis that
8  you hoped to take -- to undertake in this matter
9  that you did not do?
10       MR. HILLEGAS:  Objection; form.
11       THE WITNESS:  My analysis that I
12  conducted was sufficient for the conclusions
13  that I reached.
14  BY MR. STEINTHAL:
15  Q.   Without revealing -- strike that.
16       Did counsel provide any assumptions to
17  you that you relied upon in forming the opinions
18  in your report?
19       MR. HILLEGAS:  Objection; form.
20       Caution the witness not to disclose
21  any communications that you may have had with
22  counsel, but you may answer the question yes or
23  no.
24       THE WITNESS:  No.
25  BY MR. STEINTHAL:

Page 95

1  Q.   Did counsel provide you any facts that
2  you relied upon in forming the opinions in your
3  report?
4       MR. HILLEGAS:  Same objection, same
5  caution.
6       You may answer the question yes or
7  no.
8       THE WITNESS:  No.
9  BY MR. STEINTHAL:
10  Q.   So we discussed earlier that your
11  report -- opinions in this case are exclusively
12  responsive to those of Professor Milgrom; is
13  that correct?
14       MR. HILLEGAS:  Objection; form.
15       THE WITNESS:  My report is a
16  rebuttal to a -- you know, to a point that
17  Dr. Milgrom states.  I can't say whether that's
18  of use elsewhere in the case.
19  BY MR. STEINTHAL:
20  Q.   Is your intent to respond to any opinions
21  offered by anyone other than Professor Milgrom?
22       MR. HILLEGAS:  Objection; form.
23       THE WITNESS:  It is not my intent.
24  BY MR. STEINTHAL:
25  Q.   And you understand that Professor

Page 96

1  Milgrom's opinions were offered in his capacity
2  as an expert in market design; is that correct?
3       MR. HILLEGAS:  Objection; form.
4       THE WITNESS:  I can't speak to
5  Dr. Milgrom's precise expertise.  I see -- I
6  understand that he is an expert in economics.
7  BY MR. STEINTHAL:
8  Q.   Okay.  And as you previously testified,
9  you are not an expert in economics, auction
10  theory, or market design; is that correct?
11       MR. HILLEGAS:  Objection; form.
12       THE WITNESS:  I am not an expert in
13  those areas.  I have expertise relating to the
14  technology underlying, you know, online
15  advertising systems.
16  BY MR. STEINTHAL:
17  Q.   Without revealing the substance of any
18  communications or conversations that you may have
19  had, did you discuss Dr. Milgrom's opinions or
20  your understanding of them with anyone who is
21  trained or expert in economics, auction theory,
22  or market design?
23       MR. HILLEGAS:  Objection; form,
24  privilege.
25       I'm going to instruct the witness

Page 97

1  not to answer to the extent that any of those
2  communications may have been with counsel, but
3  to the extent that you had communications
4  outside of counsel and you know the answer to
5  question, you may answer yes or no.
6       THE WITNESS:  To my knowledge, no.
7  BY MR. STEINTHAL:
8  Q.   And again without revealing the substance
9  any of conversations you may have had, have you
10  discussed your response to Dr. Milgrom with
11  anyone other than counsel who is trained in
12  economics, auction theory, or market design?
13       MR. HILLEGAS:  Same objections,
14  caution when speaking with the witness including
15  any of the staff that you may have had.
16       But you may answer yes or no outside
17  of that.
18       THE WITNESS:  To the best of my
19  knowledge, no.
20  BY MR. STEINTHAL:
21  Q.   Do you believe the insight or views of
22  someone trained in the same discipline as
23  Professor Milgrom would have aided you in
24  responding to his opinions?
25       MR. HILLEGAS:  Objection; form.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1    THE WITNESS: I do not believe that
2 expertise in economics -- consulting with
3 someone with expertise in economics would have
4 directly assisted with the formation of my
5 opinion.
6 BY MR. STEINTHAL:
7    Q.    Okay. So, Professor, I'd like to get a
8 list of the places in your report where you
9 identify opinions that Professor Milgrom made,
10 you are responding to. So I'm going to go the
11 paragraph I have in my list one at a time that
12 you listed in your report, and then I'll ask if
13 I missed any.
14    There are eight on my list, so as you
15 flip through the report, if you notice any that
16 I'm skipping, you can either tell me then or you
17 can tell me at the end, but I'm going to go in
18 order.
19    So starting with paragraph two of your
20 report, is this one of the opinions of Professor
21 Milgrom's that you are responding to?
22    A.    This a -- this is a summary of the
23 opinion that I'm to respond to.
24    Q.    But the opinion that's summarized as that
25 advertisers and publishers are able to optimize

Page 99

1 their behavior, et cetera, is a summary of
2 Dr. Milgrom's opinion that you're responding to?
3    A.    The able part is, I think, an assumption
4 in Dr. Milgrom's report. He says that they do
5 and that they're successful which implies that
6 they are able, but my critique goes to their
7 ability to do this well.
8    Q.    Now turn to page -- to paragraph --
9 sorry, not page -- paragraph 13 of your report.
10    Is that also similarly a description or
11 paraphrase of an opinion of Dr. Milgrom's that
12 you're responding to in your report?
13    A.    Again this is -- this is extracting a bit
14 of an assumption that's there in Dr. Milgrom's
15 report that's necessary for the statements that
16 are made as I explained further.
17    Q.    But that assumption is one of the things
18 that you're responding to in your opinions?
19    A.    Exactly.
20    Q.    So the next one I have on my list is
21 paragraph 18 of your report. Is that also a
22 paragraph that describes opinions or assumptions
23 of Professor Milgrom to which you're responding
24 in your report?
25    A.    There's a sentence here early on that --

Page 100

1 that gives a summary as a -- as part of an
2 outline of the rest of my report.
3    Q.    And the next paragraph I think we
4 discussed earlier, paragraph 19, is a summary of
5 Professor Milgrom's opinions, correct?
6        MR. HILLEGAS: Objection; form.
7        THE WITNESS: This paragraph,
8 paragraph 19, is a summary of the portion of
9 Dr. Milgrom's opinions that I'm responding to.
10 BY MR. STEINTHAL:
11    Q.    And is paragraph 20 also a paragraph that
12 describes or references opinions or assumptions
13 of Professor Milgrom that you're responding to
14 your report?
15    A.    Paragraph 20 does reference Dr. Milgrom's
16 opinion.
17    Q.    Any particular opinions in paragraph 20
18 are among the things you're responding to in
19 your report?
20    A.    Paragraph 20 is where I start to explain
21 my approach to responding to Dr. Milgrom's --
22 selected Dr. Milgrom opinion.
23    Q.    And paragraph 21, is that also a section
24 where you describe an opinion of Dr. Milgrom and
25 begin to explore your response to it?

Page 101

1        MR. HILLEGAS: Objection; form.
2        THE WITNESS: In paragraph 21 I -- I
3 give an interpretation of Dr. Milgrom's opinion
4 and then respond to it.
5 BY MR. STEINTHAL:
6    Q.    Moving ahead to paragraph 24, is that
7 also a place where you describe some of
8 Professor Milgrom's opinions or assumptions to
9 which you are responsive in your report?
10        MR. HILLEGAS: Objection; form.
11        THE WITNESS: In paragraph 24 in the
12 first sentence, I have a -- in the first
13 sentence, I have an -- again a summary of
14 portions of Dr. Milgrom's report that I am
15 responding to.
16 BY MR. STEINTHAL:
17    Q.    And the last one on my list is final
18 paragraph of the report, paragraph 43. Is that
19 also -- I'm sorry. That's not the last
20 paragraph in your report.
21    Paragraph 43 -- is that also a paragraph
22 that describes opinions or assumptions of
23 Dr. Milgrom's to which you are responding in
24 your report?
25        MR. HILLEGAS: Objection; form.

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1      THE WITNESS: 43 does reference and
2  summarize portions of Dr. Milgrom's report.
3  BY MR. STEINTHAL:
4  Q.    Are there any other portions of -- strike
5  that.
6      Are any places in your report where you
7  identify additional opinions of Dr. Milgrom to
8  which you respond that we have not yet
9  discussed?
10      MR. HILLEGAS: Objection; form.
11      Caution the witness that you may
12  take whatever time you need to review the report
13  to form an answer.
14      THE WITNESS: Is there a listing of
15  the paragraphs that you have that you're
16  referencing.
17  BY MR. STEINTHAL:
18  Q.    I can read them to you again. I had
19  referenced paragraphs 2, 13.
20  A.    Did you -- what about section titles?
21  Q.    You want to add it to the list. I can
22  add it to the list.
23  A.    I was just saying title of section 3 is
24  and, yeah, paragraph 18 with and 19, yeah, so --
25  so there we have 20 and 21.

Page 103

1      So the previously mentioned paragraphs
2  are the ones where I explicitly refer to
3  Dr. Milgrom, but implicitly, my entire report is
4  referencing what Dr. Milgrom says.
5      (Exhibit Number 2 was marked.)
6  BY MR. STEINTHAL:
7  Q.    Okay. So let's look at those paragraphs
8  in -- in more detail. To look at that I'm going
9  to hand you a document that's been marked
10  Somayaji Exhibit 2, which is the expert report
11  of Professor Milgrom dated July 30th, 2024.
12  A.    Okay.
13      MR. STEINTHAL: I probably have more
14  copies. You may have your own copy. It's not a
15  surprising exhibit.
16      THE WITNESS: Thank you.
17      MR. HILLEGAS: This is a big
18  exhibit.
19      THE WITNESS: Yeah.
20      MR. HILLEGAS: And while you're
21  taking a moment, I saw the food. We've been
22  about an hour. I don't know how big your next
23  module is.
24      MR. STEINTHAL: Try to get through
25  one more little section here if we can.

Page 104

1  BY MR. STEINTHAL:
2  Q.    Okay. Do you recognize this report?
3  A.    I do.
4  Q.    And you relied on it in forming your own
5  report?
6  A.    I relied on portions.
7  Q.    Portions of it. Okay.
8      So now directing you to -- we're going to
9  flip back and forth between the two, so you
10  might want to keep them both handy.
11  A.    Yep.
12  Q.    Directing your opinion to paragraph two
13  of your report, you see -- you say -- you see
14  that it says that you were asked to, quote,
15  "respond to the opinion of Professor Milgrom's
16  expert report that advertisers and publishers
17  are able to optimize their behavior in response
18  to modifications that Google introduces to its
19  auctions and programs"; is that correct?
20  A.    Yes.
21  Q.    And then flip ahead to paragraph 13 of
22  your report, do you see substantially equivalent
23  statement?
24      MR. HILLEGAS: Objection; form.
25      THE WITNESS: Yes.

Page 105

1  BY MR. STEINTHAL:
2  Q.    And those are intended to respond to the
3  same opinion of Professor Milgrom; is that
4  correct?
5      MR. HILLEGAS: Objection; form.
6      THE WITNESS: They are both
7  referencing the same opinion.
8  BY MR. STEINTHAL:
9  Q.    In both of those sentences, you use the
10  phrase, quote, "optimize their behavior."
11      How do you understand that phrase?
12      MR. HILLEGAS: Objection; form.
13      Professor, if you need something to
14  mark it.
15      THE WITNESS: Thank you.
16      So in both of those paragraphs when
17  it talks about, you know, the claims that
18  publishers and advertisers are able to optimize
19  their behavior in response to the changes that
20  Google introduces to its ad option programs
21  really talking about, you know, on page 35, the
22  heading just before paragraph 32, the section
23  says: Plaintiff's experts analyze and
24  underestimate the role of experimentation for
25  optimizing returns.

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1    And from here Dr. Milgrom goes and
2  talks about the importance of experimentation,
3  and my response to this is really about
4  determining the ability of such experimentation
5  to provide accurate incites into the functioning
6  of Google.
7  BY MR. STEINTHAL:
8  Q.    My question was: In your report, in
9  paragraphs 2 and 13, you use the three-word
10  phrase or four-word phrase "to optimize their
11  behavior." My question is: What was your
12  understanding of the phrase optimize their
13  behavior when you wrote those paragraphs?
14       MR. HILLEGAS: Objection; form.
15       THE WITNESS: When I say optimize
16  their behavior, I'm directly referring to how
17  Dr. Milgrom's discussion of -- you know, so in
18  the paragraph 32 talking about advertiser's
19  leverage key performance indicators or
20  advertiser optimization, using by-side tools,
21  using publishers, you know, talking about these
22  parties doing experiments to optimize and so
23  that's the "they," you know.
24  BY MR. STEINTHAL:
25  Q.    But I'm asking more precisely for a

Page 107

1  definition of the word optimize in that context.
2  What does it mean to optimize one's behavior?
3       MR. HILLEGAS: Objection; form.
4       THE WITNESS: When I think of
5  optimization, I -- I inevitably think about --
6  goes back to my understanding of genetic
7  algorithms and fitness landscapes, and so the
8  idea is that you have a space of possibilities,
9  and entities will find themselves in a
10  particular part of the space, and they're going,
11  I would like -- you know, I want to move to
12  higher ground or lower ground.
13       Optimization is typically I want to
14  get to that higher point. How do I get to that
15  higher point? And so the optimization is the
16  process of searching the space of possibilities
17  to find ones that have that better value. And
18  there's all kinds of strategies for searching a
19  space to under -- to gain that understanding.
20       So that's how I think of
21  optimization in general, and when I look at what
22  these various parties are doing, what -- you
23  know, what these tools the advertisers, what
24  publishing are trying to do, they're trying to
25  get that higher point in the space of making

Page 108

1  money, and some -- you know, which is controlled
2  by various parameters that they have.
3       And so how do they optimize that?
4  How do they get better based on their
5  understanding of where they are in the space?
6  BY MR. STEINTHAL:
7  Q.    Okay. So it's fair to say that the
8  concept of optimization involves trying to get
9  to a better outcome of a higher ground or a
10  better -- better place?
11       MR. HILLEGAS: Objection; form.
12       THE WITNESS: Optimization is about
13  finding that higher ground, yes.
14  BY MR. STEINTHAL:
15  Q.    Okay. So when we refer optimizing in
16  later questions, I'm going to use that
17  definition, if that -- if that works for you; is
18  that fair?
19  A.    Yes.
20  Q.    So it's fair to say when you say you're
21  responding to Professor Milgrom's claim that
22  publishers --
23       (Reporter clarification.)
24  Q.    Strike that question. I'll try again.
25       So if I were to substitute that

Page 109

1  definition that we just gave for optimize into
2  paragraph 13 of your report, let's say, is it
3  fair to say that you're trying to respond to
4  Dr. Milgrom's claim that publishers and
5  advertisers are able to seek better outcomes or
6  higher -- or better value in response to their
7  changes -- their changes that Google -- in
8  response to the changes that Google introduces
9  to its ad auction programs; is that a fair
10  paraphrase?
11       MR. HILLEGAS: Objection; form.
12       MR. STEINTHAL: I'll try to rephrase
13  the question in response to the objection.
14  BY MR. STEINTHAL:
15  Q.    In paragraph 13 you were identifying an
16  opinion of Dr. Milgrom's to which your
17  response -- your report is responsive; is that
18  correct?
19  A.    Yes.
20  Q.    Is it fair to say that the substance of
21  that opinion to which you're responding is that
22  publishers and advertisers are able to change
23  their behavior in response to changes that
24  Google introduces to its ad auction programs so
25  as to obtain better value for themselves?

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1    MR. HILLEGAS: Objection; form.
2    THE WITNESS: This gets to heart
3  what optimization means. So it's always
4  possible to optimize a system simply through
5  trial and error. You try different things and
6  you see what happens. And some of them will be
7  better, and some are worse. If you just keep
8  trying enough random things, eventually you
9  might get to a better -- you know, better part
10 of the space.
11    When -- when I understand what
12 Dr. Milgrom is referring to when he talks about
13 optimize, I do not understand that he's talking
14 about a random search where they're just doing
15 trial and error because trial and error is
16 always possible.
17    What my understanding is that they
18 can do, what I would say, effective
19 optimization. They can do experiments which
20 give them insight, and that insight can be built
21 upon to improve performance. And that is
22 specifically not trial and error; it's guided by
23 their understanding of the system.
24    So -- so if we're talking about
25 optimize -- if we're talking optimize in the

Page 111

1  sense of can I just try things and see if it
2  gets better, you know -- you know, then I would
3  say, you know, then tech -- you know, I would
4  say this is -- this is not correct.
5    But my understanding of optimize in
6  the context of Dr. Milgrom is that they'll do
7  experiments to get insight and that would direct
8  it, and in that sense of the word optimize, that
9  is -- that is what, you know, what I'm saying
10 is, what I'm saying is -- I'm saying I don't
11 think they can do that so effectively.
12    MR. HILLEGAS: We've been on the
13 hour for about an hour now.
14    MR. STEINTHAL: Yeah. I have a few
15 more questions, then we can wrap it up.
16 BY MR. STEINTHAL:
17 Q.   I just want to stay on this response for
18 a moment.
19    My question right now is whether you
20 agree with Dr. Milgrom whether this is possible
21 or not possible. I'm trying to understand --
22 get on the record your understanding of the
23 opinion of Dr. Milgrom that you're responding
24 to.
25    So do you think that it is a fair

Page 112

1  statement of what Dr. Milgrom was saying that
2  publishers and advertisers can change their
3  behavior in response to Google's auction changes
4  so as to obtain better value or otherwise better
5  performance for their goals?
6    MR. HILLEGAS: Objection; form.
7    THE WITNESS: My understanding of
8  Dr. Milgrom's opinion is that it's not just
9  that, you know, participants in the ecosystem
10 that can make changes that improve performance.
11 It's that they can make changes in response to
12 the results from specific experiments, and that
13 is what -- you know, that's the opinion I'm
14 responding to, because again, if you look at
15 Dr. Milgrom's report, he's saying -- you know,
16 specifically the title of the section is, you
17 know, underestimate the role of experimentation
18 for optimizing returns. If it's a random space,
19 you know, experiments don't buy you anything.
20 You have to be able to understand the structure.
21 BY MR. STEINTHAL:
22 Q.   But you're responding to Professor
23 Milgrom's claim that experimentation is a useful
24 means by which advertisers and publishers can
25 seek to improve their outcomes?

Page 113

1    MR. HILLEGAS: Objection; form.
2    THE WITNESS: I'm not offering an
3  opinion on whether the real world tools that are
4  used by these parties provide any value or not,
5  you know, in terms of experimentation. I am
6  talking about the information balance, and the
7  information balance is really saying how hard is
8  this problem to do and -- and bounds how well it
9  can be done.
10 BY MR. STEINTHAL:
11 Q.   But you are responding to a claim of
12 Dr. Milgrom that what you contend that
13 Dr. Milgrom that experimentation is a way by
14 which publishers and advertisers can seek to
15 obtain better outcomes for their goals?
16    MR. HILLEGAS: Objection; form.
17    THE WITNESS: So Dr. Milgrom is in
18 turn responding to other experts. And in
19 paragraph 32 Dr. Milgrom is saying, you know --
20 you know, plaintiff and their experts claim that
21 optimization process for publishers and
22 advertisers was compromised because Google did
23 not disclose their secret programs. And
24 plaintiff's expert suggests that this alleged
25 failure to disclose would mislead a typical

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1  advertiser or publisher, keeping it from
2  optimizing its choices effectively.
3          And the rest of Dr. Milgrom's, you
4  know, section is essentially saying that isn't
5  true, and -- and then goes to say what
6  advertisers do in practice.
7          I'm responding to basically saying
8  that they can't be done effectively. I'm saying
9  there are limits on the effectiveness because of
10  the complexity of the system and the lack of
11  transparency about that system.
12  BY MR. STEINTHAL:
13  Q.    But what it means to be effective, the
14  goal they're trying to accomplish through the
15  optimization or what it means is to -- to get to
16  a better outcome for their goals, correct?
17          MR. HILLEGAS:  Objection; form.
18          THE WITNESS:  I can't speak to the
19  economics motivation of the participants in this
20  environment.  You know, what I can speak about
21  is the technical utility of certain options, and
22  so they are -- you know, so this is a discussion
23  about, you know -- you know, previously saying
24  that participants being misled because of lack
25  of transparency.

Page 115

1          Milgrom is saying that lack of
2  transparency is normal, and so -- and -- and
3  there's all these methods to optimize, you know,
4  things, and my report's going, they can try to
5  optimize, but there's an information imbalance
6  in the system which limits their ability to
7  effectively optimize.
8  BY MR. STEINTHAL:
9  Q.    Let me try a concrete example.  Hopefully
10  we can wrap this up for lunch.
11  A.    Sure.
12  Q.    Let's assume a publisher is making $100
13  from selling ad space on their website, and they
14  run some experiments with change in their floor
15  prices or other change in parameters system to
16  try to see if they can get to $110.  Is that an
17  example of optimizing or trying to optimize?
18          MR. HILLEGAS:  Objection; form.
19          THE WITNESS:  That is an example.
20  BY MR. STEINTHAL:
21  Q.    And if they could get successfully get to
22  $110, it wouldn't be any less an optimization
23  mechanism if it was also possible that if they
24  had done something else, they might have gone to
25  $120, correct?

Page 116

1          MR. HILLEGAS:  Objection; form.
2          THE WITNESS:  At the heart of what
3  I'm talking about here when we're talking about
4  optimization is we're talking about the
5  structure of the landscape and the ability of
6  participants to see the landscape under which
7  they are searching.
8          There's a concept from genetic
9  algorithms that landscapes can be deceptive,
10  that they hide information so that when you're
11  searching on the space, you don't know where you
12  are.  You think that, oh, look.  It's all going
13  up.  It's going up.  Well, actually I'm going to
14  cliff, and actually everything is going horrible
15  after this.  So you don't know the structure.
16          If I translate Dr. Milgrom's
17  language really into that context, Dr. -- you
18  know, Dr. Milgrom's responding to saying you
19  can't optimize -- you know, it's like saying,
20  you know, the search for better outcomes is
21  compromised because of the lack of information.
22          Milgrom's saying, there's enough
23  information because they can do experiments.
24  And I'm saying look at structure of the
25  landscape, because the landscape is determined

Page 117

1  by the code.  And I'm saying that landscape is
2  really hard to understand and search because
3  look at how complicated it is.
4  BY MR. STEINTHAL:
5  Q.    Do you think that Professor Milgrom
6  shares that understanding of the word optimize?
7          MR. HILLEGAS:  Objection; form.
8          THE WITNESS:  I cannot speak to what
9  Dr. Milgrom does or does not understand about
10  optimization.  What I can say is that in this
11  argument is an attempt to say that information
12  that's being hidden from participants is not --
13  you know, it does not effect their behavior
14  because they can do -- I mean, implicitly I read
15  this as implicitly do experiments to understand
16  what's going on.  And if you do those
17  experiments and are really good at doing those
18  experiments, they'll understand what's going on.
19  And I'm going, can they understand it?  Let's
20  look at the system.  How hard would it be to
21  understand those experiments, and that's what my
22  report is talking about.
23          MR. STEINTHAL:  This is a good
24  stopping point.  Off the record.
25          THE VIDEOGRAPHER:  We're going off

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1  the record at 12:07 p.m.
2        (Off the record.)
3        THE VIDEOGRAPHER:  We're going back
4  on the record at 1:00 p.m.
5  BY MR. STEINTHAL:
6  Q.    Good afternoon.  Welcome back.  Just to
7  put a couple things on the record as we go back
8  into the testimony, did you discuss the
9  substance of your testimony with Counsel during
10 the break?
11       MR. HILLEGAS:  Objection to the
12 form.  I'll instruct the witness not to answer
13 that question under the expert witness
14 stipulation.
15       MR. STEINTHAL:  So just to be clear,
16 Counsel, you're instructing him not to answer
17 the question on whether or not you discussed the
18 substance of his testimony during the break; is
19 that correct?
20       MR. HILLEGAS:  I think that 5.5
21 (inaudible) covers any communications between
22 the witness and Counsel.
23 BY MR. STEINTHAL:
24 Q.    And I asked you before, and I'll ask you
25 again:  Is there anything that from your

Page 119

1  testimony before that you need to correct or
2  amend?
3  A.    Not at this time.
4  Q.    Okay.  Thank you.  Okay.  Great.
5        So back to the Exhibit 1 of your report.
6  I'm directing your attention to paragraph 18 of
7  your report.
8  A.    Okay.  Give me a second.
9  Q.    The second sentence reads, "First, in
10 Section 3, I discussed -- discussed
11 Dr. Milgrom's expert report explaining how some
12 of his arguments implied that Google does not
13 have a significant information advantage over
14 other participants."  Do you see that?
15 A.    Yes.
16 Q.    Where in Dr. Milgorm's report does he say
17 that anything to the effect of Google does not
18 have a significant information advantage over
19 other participants?
20 A.    So what I say is that it's not that he
21 states that but that he implies it.  So the
22 implication is in -- if you go back to
23 Dr. Milgrom's report.
24       So starting in paragraph 32 of
25 Dr. Milgrom's report, Plaintiff and the experts

Page 120

1  claim that the optimization process for
2  publisher and advertiser was compromised because
3  Google did not disclose the secret programs.
4  And then, I think the paragraph goes on to say,
5  "Things are kept secret."  And then it goes on
6  to say, "In practice, evidence suggests that
7  tech intermediaries, in-house marketing tools,
8  ad agencies, and publishers who rely heavily
9  feedback and experimentation to optimize their
10 performance" and then describes to which they
11 optimize their performance.  And further in 33,
12 saying, Google's tools make such experiments
13 easier for its customers.
14       So this discussion is saying that
15 Dr. Milgrom's offering the evidence of
16 experiments and Google facilitating those
17 experiments to counter, you know, the point, you
18 know, from the plaintiffs that failures to
19 disclose would mislead typical advertiser or
20 publisher, keeping it from optimizing its
21 choices effectively.  And here I'm saying,
22 you -- that I'm discussing that the information
23 talking about paragraph -- how some of its
24 arguments implies that Google does not have a
25 significant information advantage over other

Page 121

1  participants.  In order for the experimentation
2  that Dr. Milgrom describes to respond
3  effectively to the -- to the statements by the,
4  you know, plaintiff's experts, that would mean
5  that those experiments can overcome the
6  information difference.  And I'm going -- that's
7  the impli- -- that's the implied part.
8  Q.    That seems to be very similar to the
9  answer you gave me before the break with respect
10 to Dr. Milgrom's -- what you said was
11 Dr. Milgrom's opinion as to whether they could
12 optimize their behavior.
13       My question was about -- what you state
14 here is that some arguments imply that Google,
15 quote, does not have significant information
16 advantage over other participants.  I didn't
17 hear anything -- was something in your response
18 that you just gave me in paragraph 32 that
19 discusses information advantage?
20       MR. HILLEGAS:  Objection to form.
21       THE WITNESS:  Dr. Milgrom does not
22 directly talk about the information advantage
23 but is responding to a point about information
24 advantage.  So Dr. Milgrom is saying that, you
25 know, the plaintiffs are saying that there's

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1  this information difference and then saying
2  that -- well, first, says that that information
3  difference is normal, there's things that are
4  kept secret. And then goes on to say, there --
5  you know, but -- and these parties all do
6  experiments. And those experiments only make
7  sense as a counter -- as a counter to what's
8  being said, those experiments negate the
9  information advantage.
10       So -- and thus, what my paragraph's
11  saying is that that's a summary of what implied
12  that Google does not have a significant
13  information advantage, because if you don't take
14  that interpretation, the evidence that
15  Dr. Milgrom offered doesn't counter what the
16  plaintiff's expert say.
17  BY MR. STEINTHAL:
18  Q.    So looking at paragraph 32 of
19  Dr. Milgrom's report again, as you point out,
20  he's responding to a quote that he gives --
21  that -- a paraphrase that he gives for
22  plaintiff's statement. Quote, Google did not
23  disclose their secret program.
24       Is that the information advantage that
25  you believe he is denying?

Page 123

1       MR. HILLEGAS: Objection; form.
2       THE WITNESS: Dr. Milgrom further
3  discusses the work in following sentence.
4  Plaintiff's expert suggest that this alleged
5  failure to disclose would mislead a typical
6  advertiser or publisher, keeping it from
7  optimizing its choices effectively.
8  BY MR. STEINTHAL:
9  Q.    But I'm trying to understand the nature
10  of the information advantage that you think that
11  Dr. Milgrom is denying. Is it -- strike that.
12       I'll try again.
13       If I understood your response, you're
14  saying, plaintiffs and their experts assert
15  there was an information advantage?
16  A.    Yes.
17  Q.    And then Dr. Milgrom denied that and you
18  are responding to Dr. Milgrom's denial of the
19  that initial statement; is that correct?
20  A.    Correct.
21  Q.    So I'm focusing on that initial statement
22  to which Dr. Milgrom was responding. The quote
23  here is that Google did not disclose their
24  secret programs. Is that the information
25  advantage that you understood Dr. Milgrom to

Page 124

1  have been denying?
2       MR. HILLEGAS: Objection; form.
3       THE WITNESS: I understand that to
4  be part of the information advantage but not in
5  whole.
6  BY MR. STEINTHAL:
7  Q.    And what is the additional portion of the
8  information advantage that is not listed in the
9  second line in paragraph 32 that you think
10  Dr. Milgrom was responding to?
11  A.    So the statement that Dr. Milgorm's
12  responding to is not just that these things are
13  secrets -- that are secrets that are being kept
14  but that they make -- they would mislead. And
15  so -- so it's both of those together.
16  Q.    So if I understand your last response
17  correctly, you're saying there is an information
18  advantage, the secrets that are being kept. And
19  then there's an implication that he draws from
20  that -- well, that the plaintiff's expert draws
21  from that that would also keep from optimizing
22  effectively, and you think Dr. Milgrom is
23  responsible for both of those things?
24       MR. HILLEGAS: Objection to form.
25       THE WITNESS: Yes.

Page 125

1  BY MR. STEINTHAL:
2  Q.    And so if I, for the moment, put to the
3  side the implication and I just focus on what is
4  the nature of the information advantage at issue
5  here in this sentence, it's the not disclosing
6  their secret programs is what the plaintiff's
7  expert is saying, correct?
8  A.    Dr. Milgrom isn't responding --
9  (indiscernible) his response. He's not
10  responding to any specific thing except to just
11  say those secrets are normal. The counting of
12  the information advantage is through citing
13  experiments that are done by various parties and
14  the fact that they're facilitated by Google, and
15  that is the counter to the information
16  advantage. And so what I'm discussing is, well,
17  let's understand the information advantage by
18  looking at the code of the system to see that
19  difference and then in that light of that, to
20  see, could experiments negate this.
21  Q.    But the secrecy that you're referring to
22  in paragraph 32 is about the nature of Google's
23  systems themselves, correct?
24       MR. HILLEGAS: Objection; form.
25       THE WITNESS: The citation here in

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1  Dr. Milgorm's report is really about -- he's
2  referring to the very specific secret programs
3  that are disclosed in the other reports and
4  discussing what -- what would mislead. The
5  reply in which I'm responding to isn't really
6  responding to that. It's really making a more
7  general statement by implication which is
8  experiments in the Google Ads ecosystem are
9  sufficient to understand what's going on to
10 allow for effective optimization. That's my
11 interpretation and that's the -- that's the
12 implication. And so that is what -- that is the
13 opinion I am responding to, but I'm not
14 responding to the particular secret programs.
15 BY MR. STEINTHAL:
16 Q.    Where in paragraph 21 -- sorry. Strike
17 that.
18        Where in paragraph 32?
19        MR. HILLEGAS: Objection; form.
20 BY MR. STEINTHAL:
21 Q.    I'll try again. We've been talking about
22 paragraph 32 of Professor Milgrom's report,
23 correct?
24 A.    Yes.
25 Q.    Where in this paragraph do you see an

Page 127

1  indication or implication by Dr. Milgrom that
2  publishers or advertisers can understand the
3  internal operations of Google systems?
4        MR. HILLEGAS: Objection; form.
5        THE WITNESS: That's an implication
6  I interpret, and it involves connecting pieces
7  of this paragraph. So first there is citing of
8  the specific work from the plaintiffs. There's
9  the saying, okay, secrecies are normal and then
10 saying, in practice, evidence suggests that
11 Adtech intermediaries, in-house marketing tools,
12 ad agencies, and publishers rely heavily on
13 feedback and experimentation to optimize their
14 performance.
15        So -- and then -- and then
16 Dr. Milgrom concludes in paragraph 34, after
17 describing all this, says, "By ignoring the
18 evidence that publishers and advertisers
19 experiment and optimize their returns from
20 display advertising and the plaintiffs and their
21 experts underestimate the amounts that Google
22 customers can earn from these programs." So --
23 so this is an economic take on this,
24 (indiscernible) of earnings. But my inter- --
25 to be able to earn -- you know, earn properly

Page 128

1  from these, I interpret this as saying that
2  through experimentation, other parties can do
3  sufficient experiments to understand what's
4  happening in order to optimize their bids, in
5  order to optimize their economic performance.
6        And -- so Dr. Milgrom didn't
7  directly address information advantage.
8  Dr. Milgrom instead says, these experiments --
9  these experimentations that happens, you know,
10 the disadvantage there is normal and there's
11 experiments. And it just sort of says there's
12 experiments and implies that those experiments
13 are sufficient to negate any advantage there is.
14        So I am responding to an argument
15 that Dr. Milgrom is making but is making by
16 citing points without actually responding to
17 what was previously said but is clearly in
18 response to that.
19 Q.    But is there any place where, to your
20 knowledge, Dr. Milgrom explicitly says that
21 publishers and the advertisers need to know how
22 Google systems operate internally in order to
23 run experiments?
24        MR. HILLEGAS: Objection; form.
25        THE WITNESS: Dr. Milgrom does not

Page 129

1  talk about the internal structure of Google
2  systems and how they would be able to relate to
3  the ability of market participants to make
4  decisions. That's not -- that's not something
5  he's analyzing. But in the structure of the
6  argument that he has in paragraphs 32 through
7  34, there is this implication about the
8  information balance, which is what I'm
9  responding to.
10 BY MR. STEINTHAL:
11 Q.    If I refer you to the third sentence of
12 paragraph 32, beginning in reality, do you see
13 that?
14 A.    Yes.
15 Q.    Okay. So isn't the implication of that
16 sentence -- strike that.
17        Isn't Dr. Milgrom's point in paragraph 32
18 that even assuming that Google did not disclose
19 the internals of its operation, that that is
20 normal and it does not compromise the publishers
21 ability or the advertiser's ability to
22 experiment. Is that Dr. Milgrom's claim?
23        MR. HILLEGAS: Objection to form.
24        THE WITNESS: What Dr. Milgrom says
25 here, you know, is, quote, that in reality,

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1  processes for setting reserved prices and
2  determining bids and auctions are a truly kept
3  secret to prevent other auction participants
4  from gaining these strategies.  So this is a
5  general statement about auctions, and there is
6  the assumption here that this generalization
7  applies to what is happening inside Google, that
8  this is a conventional auction, where there's
9  individual participants who, you know, have
10  their sources of information, have their bidding
11  strategies, but they're not, you know -- you
12  know, they're sort of a participant in even
13  playing field.
14        When you look at the code and look
15  to see what's actually happening inside of this,
16  it's something much more complex than any
17  conventional auction.  I mean -- and, you know,
18  this -- yeah.  There's just a lot of
19  information, a lot of complexity, and a lot of
20  those are purely inside Google and are not
21  available to outside participants, and those
22  influence the functioning of the system.  My
23  report is talking about that complexity.
24  BY MR. STEINTHAL:
25  Q.    And that information that is only

Page 131

1  available inside of Google and not outside is
2  about the nature of Google systems, correct?
3        MR. HILLEGAS:  Objection; form.
4  BY MR. STEINTHAL:
5  Q.    I'll rephrase.  That information that you
6  suggest is available only inside of Google and
7  not outside is about how Google's auction
8  mechanisms and algorithms function, correct?
9        MR. HILLEGAS:  Objection; form.
10        THE WITNESS:  Google's systems make
11  bidding choices and operate the auction using
12  vast amounts of data, which is coming from --
13  just to point out part of my report, you know,
14  what's the key thing that's happening in these
15  auctions?  A price has to be set for the
16  individual bids -- first of all, bidders have to
17  be selected and the prices have to be selected.
18  Those aren't just by default; those are chosen
19  and set inside Google.
20        Those prices -- there's this -- so
21  we go to page 21 of my report, which is talking
22  about ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████

Page 132

1  ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████  That's
7  what I'm talking about information balance, and
8  that's a lot.
9  BY MR. STEINTHAL:
10  Q.    And I think that gets to my question,
11  which is paragraph 32 is talking about an
12  information advantage that Google allegedly has
13  because it knows more about its own, quote,
14  secret programs and doesn't disclose that to
15  third parties.  And you just seem to have moved
16  to a different question which is whether or not
17  Google has more information about ad
18  impressions, about users, about publishers, et
19  cetera, to allow the better-set prices.
20        Are those the same thing?
21        MR. HILLEGAS:  Objection to form.
22        THE WITNESS:  The experts that
23  Dr. Milgrom is referring to -- or talking about
24  is a particular secret programs, you know, in
25  terms of how the auctions are performed.  The

Page 133

1  response is about, you know -- you know, the
2  participants in the market can conduct
3  experiments to overcome these -- you know, to
4  overcome this information advantage.
5        What I'm doing in my report is
6  stepping back and going, if participants can do
7  experiments, that implies those experiments will
8  tell them enough to understand what's happening
9  about it in order for them to participate
10  effectively and optimize a performance.  What is
11  the nature of the system in which they are
12  trying to -- they're trying to understand --
13  what they're trying to understand to the degree
14  through experiments that they can place more
15  optimized bids.
16        And so my report is not about the
17  secret programs that are originally being
18  discussed.  It's about this larger -- saying,
19  you can do experiments; what are those
20  experiments trying to uncover?  And that
21  requires understanding the totality of the
22  internal advertising systems at Google, which is
23  what I tried to describe and the particular
24  parts that are relevant to this question of
25  information advantage.

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1  BY MR. STEINTHAL:
2  Q.    And one reason you don't respond to the
3  reports of the particular secret programs
4  discussed in paragraph 32 is that Dr. Milgrom
5  agrees with you that the information is not
6  available outside Google, right?
7           MR. HILLEGAS:  Objection to form.
8           THE WITNESS:  Dr. Milgrom mentions
9  that it's normal for auction mechanisms to not
10 be disclosed and that, you know, this is -- you
11 know, this is -- sorry.  It's saying that in
12 reality, ███████████ and auctions are routinely kept
13 
14 secret, preventing other auctions from gaining
15 those strategic choices.  He does say that.  By
16 saying that, he's implying that such secrets do
17 not represent a significant information
18 advantage.  Similarly, citing all these
19 experiments that any information advantage that
20 might remain can be overcome through
21 experiments, which are done routinely.
22           I'm going -- and my response is
23 saying, well, let's look at the system and to
24 see if it's plausible for experiments to give
25 sufficient information about the operation

Page 135

1  system to allow external parties to predict how
2  things are going to work inside.
3  BY MR. STEINTHAL:
4  Q.    Do you think the objective that
5  advertisers and publishers are trying to achieve
6  is understanding how Google systems work?
7           MR. HILLEGAS:  Objection to form.
8           THE WITNESS:  Advertisers and
9  publishers are trying to -- I'd say win the game
10 they're trying to play in.  You know, whether,
11 you know, advertisers are trying to get the most
12 advertising benefit, you help further the
13 product for a buck, publishers are trying to,
14 you know, get as much money as they can.  These
15 are economic issues.  These are outside the
16 scope of my report.  I'm not talking about
17 economic incentives or what they want to do.
18 What I am talking about is not the game that
19 they're playing but the playing field on which
20 they're playing it and the degree to which it's
21 level or not.  And that -- in which they can
22 even see what the playing field look likes.
23 That's what information balance is really
24 saying.  It's not like saying how they play the
25 game; it's on what basis do they play?  And the

Page 136

1  plaintiff's experts were saying, there's stuff
2  there that outsiders don't know about.  I'm just
3  saying -- I'm just expanding an effect on that
4  saying, there's stuff they don't know about by a
5  lot.
6  BY MR. STEINTHAL:
7  Q.    So you allude to whether the playing
8  field was balanced or not?  It's your view that
9  it's imbalanced, correct?
10 A.    My view is an information imbalance.
11 Q.    And information imbalance as you explain
12 in your report, there's some who have
13 information advantage and there's some who have
14 information disadvantage, correct?
15 A.    Yes.
16 Q.    Who has the information advantage in this
17 context -- in this example you're discussing
18 here?  When you say there's significant
19 imbalance, who is the advantage party?
20 A.    The party with the greater advantage is
21 Google over all other parties participating in
22 the system.
23 Q.    So Google has the advantage and everyone
24 else has the disadvantage?
25           MR. HILLEGAS:  Object to form.

Page 137

1           THE WITNESS:  Google has an
2  advantage over all their participants in the ad
3  ecosystem because they have more information.
4  BY MR. STEINTHAL:
5  Q.    And who are those other participants that
6  you are alluding to?
7           MR. HILLEGAS:  Objection; form.
8           THE WITNESS:  The other participants
9  are advertisers, publishers, and third-party
10 exchanges and buy-side and sell-side tools
11 aggregators.
12 BY MR. STEINTHAL:
13 Q.    And the reason why Google has an
14 advantage over all of those other parties that
15 you just listed is because Google is aware of
16 the details -- the internal details of how its
17 algorithms operate; is that correct?
18           MR. HILLEGAS:  Objection; form.
19           THE WITNESS:  Google's aware of the
20 internal algorithms.  Google is also aware of
21 the inputs to those algorithms which -- which is
22 models of -- well, there's information about
23 particular ad impressions -- ad requests and
24 there's information about advertisers,
25 publishers, and users.  All of these are brought

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

1  to bare in the process of these auctions.  So
2  it's more than just an algorithm thing.  Like,
3  even if you had complete disclosure of the
4  algorithm, if you don't know what the inputs are
5  of the algorithm, you don't know necessarily
6  what it's going to do, but the algorithms are
7  not known and the data is not known.
8  BY MR. STEINTHAL:
9  Q.   I just want to make sure I understand
10  your last response.  I understood you to say
11  that the complete disclosure of the algorithm
12  because you don't know what the inputs are.  To
13  be clear, are you trying to say that you need to
14  know the nature of the inputs or their values?
15  So, for example, I'll give you an example of,
16  like, my question --
21       So which were you trying to answer?
22       MR. HILLEGAS:  Objection; form.
23       THE WITNESS:  So third parties are
24  given -- get a request for supply and ad bid, so
25  this is a BidRequest.  That come in as, you

1  know, the data structure they have, what do I --
2  you know, what price do I set?  In order to set
3  that price effectively, they have to decide, you
4  know -- they may have some value of how much
5  they're willing to pay.  They have to decide how
6  much are -- what are others going to do, right?
7  That's the nature of the auctions; you have to
8  figure out what others might do.
9       What are those others doing?  Most
10  of the others are all the Google internal
11  bidders.  How are those Google internal bidders
12  setting their prices?
17                     if I don't have access to
18  those models, that data, and other things, I
19  don't know what those things are going to
20  output.  So how can I make a guess of what --
21  you know, as an outsider, what I should bid
22  relative to what this giant thing is going to
23  bid.
24  BY MR. STEINTHAL:
25  Q.   Do you believe that a non-Google bidder,

1  say, The Trade Desk -- do you believe they need
2  to know how Google is calculating its bids into
3  the auction to determine what they should bid?
4       MR. HILLEGAS:  Objection; form.
5       THE WITNESS:  In order to -- in
6  order to -- over on average to succeed in
7  auctions, you have to bid well.  The exact
8  nature of bidding effectively is a whole, you
9  know, area of economics.  Dr. Milgrom is an
10  expert in this; that's not my concern.  But
11  certainly, in order to do that bidding well, you
12  have to know the right things.  This is where
13  the complex system -- where if you're going to
14  participate in this, there's things -- how are
15  the other participants in this environment going
16  to act, you know.  If I compare this to an
17  ecosystem -- if I go out there, is there someone
18  who's going to try eating me?  Economic systems
19  are subject to similar kinds of things.  Are
20  they going to get eaten or they going to be able
21  to walk out and walk freely?  That's the game
22  he's always trying to predict.  You have to be
23  able to predict your environment.  I'm saying
24  the environment in which these folks are
25  operating is opaque in the extreme.

1  BY MR. STEINTHAL:
2  Q.   But to make reasonable predictions about
3  how other bidders are going to act, you need to
4  know their internal operations?
5       MR. HILLEGAS:  Objection to form.
6       THE WITNESS:  If I'm going to go
7  outside and I'm worried about -- if I'm worried
8  about something bad happening to me, you know
9  whether a rock's going to fall on my head or a
10  tiger's going to attack me, I have to be able to
11  predict -- I have to be able to make some
12  predictions about the environment.  What is the
13  likelihood of the tiger coming along and eating
14  me and a brick falling on my head?  So I have a
15  model of the world to be able to participate in
16  it.  How good is my model?  How effective is it
17  in this problem?  Depends on the nature of the
18  world in which I'm doing.  Do I have to
19  understand everything about the world?  No.  But
20  I have to be able to model it well enough to be
21  able to understand it to be able to make these
22  choices.
23       And that implies, like, how
24  unpredictable is the environment, how
25  complicated is it.  If I see a very simple

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1   environment -- oh, I can make -- I can make a
2   very simple model and I can predict what's going
3   to happen.  It won't capture everything.  I'll
4   capture enough of it so I can walk outside --
5   well, when I can go outside and when I don't.
6   But these, you know -- but if it's complicated,
7   I can't.
8   BY MR. STEINTHAL:
9       Q.   So I'm going to -- I'm attempting to ask
10  you a question about the tiger, but I'm going to
11  take something a little more concrete here in
12  Nashville.  If I'm going to walk across a busy
13  street, I need to have -- in order to safely, I
14  need to have a model of whether or not I'm going
15  to get hit by a car, right?
16      A.   Exactly.
17          MR. HILLEGAS:  Objection to form.
18  BY MR. STEINTHAL:
19      Q.   And that model might take into account,
20  is there a traffic light there?  Is the traffic
21  light red?  Do I have the walk signal, right?
22      A.   Yes.
23      Q.   It might also take into account, is this
24  a heavily traffic road?  Are there a lot of
25  cars, right?

Page 143

1           MR. HILLEGAS:  Objection; form.
2           THE WITNESS:  So the problem you're
3   describing isn't effective autonomous driving
4   problem or the autonomous walking problem, like
5   how hard is it to model the world so that I can
6   just walk around in it and not be, you know --
7   and be able to avoid obstacles and do things.
8   It seems like there's a lot of, you know, common
9   thing in that we're actually close to solving
10  that with computers, that we can model the world
11  that we can make self-driving cars and stuff.
12  But when you talk to the experts, they go, like,
13  we are very, very far away.  And the reason
14  we're very, very far away is because the world
15  is so complex and weird things happen all the
16  time.  I'm saying that Google's internal
17  environment is complicated, like, you know --
18  not exactly in the real world -- but it's a
19  level of complexity.  There's all this
20  user-publisher interaction that understanding
21  what's going on there is fundamentally hard and
22  because it's fundamentally hard, unless there is
23  complete transparency about it, others won't be
24  able to optimize their behavior inside of it.
25  BY MR. STEINTHAL:

Page 144

1       Q.   So my question's a little different.
2       A.   Okay.
3       Q.   The world is a complicated place
4   (indiscernible) can be very hard and that's --
5   because what I'm trying to do is model what the
6   car next to me is going to do, what the
7   ambulance coming down the street is going to do,
8   what the woman with a child in tow is going
9   to -- in hand is going to do near crosswalk.  In
10  order to understand those things, do I have to
11  understand how the ambulance works?
12          MR. HILLEGAS:  Objection; form.
13          THE WITNESS:  You don't need to
14  understand how the ambulance works, but you
15  still need to be able to predict lots of
16  characteristics about the ambulance.
17  BY MR. STEINTHAL:
18      Q.   I need to predict the likelihood if the
19  ambulance is going to cross my path while I'm
20  trying to cross the street, right?
21      A.   Will the ambulance straight line or will
22  it swerve to try to hit me?
23      Q.   I don't need to the know whether the
24  ambulance is responding to a cardiac arrest
25  or loss of consciousness, right?

Page 145

1           MR. HILLEGAS:  Objection; form.
2           THE WITNESS:  I don't need to know
3   the precise business of the ambulance.
4   BY MR. STEINTHAL:
5       Q.   And I don't know whether it's an internal
6   combustion engine or electric battery-powered
7   engine other than perhaps to change its
8   acceleration rate?
9           MR. HILLEGAS:  Objection to form.
10          THE WITNESS:  Yes.
11  BY MR. STEINTHAL:
12      Q.   So it's possible to interact in this
13  world, even a complex world, with treating other
14  entities as largely black boxes, correct?
15          MR. HILLEGAS:  Objection; form.
16          THE WITNESS:  This is the -- this is
17  the big problem of our day, actually, with
18  autonomous systems.  How much do you have to
19  understand the internal state of these entities
20  that you're interacting with?
21          I would actually argue it's a
22  research question.  Exactly how much you need to
23  understand in order to operate in the world,
24  because we don't know how to build systems that
25  actually can interact in a real world --

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1  effective on the road.
2          What was your question again?
3  I'm --
4  BY MR. STEINTHAL:
5  Q.    Well, my question had been about whether
6  you need to understand the internal operations
7  of the black boxes, but I'll be more concrete
8  with you. Let's put it back to our ad auction
9  context that's in this case.
10 A.    Yes.
11 Q.    It is your opinion that to bid
12 effectively in the AdX auction, a company like
13 The Trade Desk needs to know how Google's
14 internal operations actually function?
15         MR. HILLEGAS: Objection to form.
16         THE WITNESS: So what do we mean by
17 effective? That's where it really comes down to
18 is, is it effective in that they can achieve
19 certain goals? I mean, clearly, companies are
20 successful in running ad campaigns. My reports
21 about the information advantage, do they -- when
22 they participate in this, are they participating
23 at a disadvantage relative to others on an
24 information basis that is -- that potentially
25 could effect how they operate.

Page 147

1  BY MR. STEINTHAL:
2  Q.    If I'm designing an automated bidding
3  system to bid into the AdX auction, so I'm chief
4  engineer at The Trade Desk and I'm trying to
5  build an algorithm to find an effective bid for
6  my advertiser customer, do I need to know what
7  Google is likely to bid against me or how Google
8  calculated amount is likely to bid against me?
9          MR. HILLEGAS: Objection; form.
10         THE WITNESS: So there's -- it
11 doesn't really make sense in this context to
12 talk about the optimal strategy of a particular
13 participant is because there's always -- we
14 aren't talking about a system where no one can
15 ever make any money in Google's ecosystem that
16 everyone else always loses. That's not --
17 that's not what we're talking about. We're
18 talking about a system and what the information
19 advantage is.
20         If we're talking about trading, for
21 example, like a stock market or something, the
22 advantage -- disadvantage is closer to things
23 like what algorithm traders have. You know, if
24 you have information advantage, it means that --
25 say, you can know prices a fraction of a second

Page 148

1  before anyone else. So you can buy the stock
2  quickly and then sell it and basically make a
3  tiny fraction of a cent in profit on this. And
4  if you just keep doing this algorithm
5  high-frequency trading -- if you have a high
6  frequency-trading, you can use a small
7  information advantage to skim money and take
8  money from all the, you know -- all the actors
9  in this market. But they aren't predicting
10 everything, and it's not to say that others
11 can't successfully execute trades. It's that
12 because -- because there's some parties that
13 have information advantage, they can participate
14 in the market in a way that takes away value
15 from other participants.
16 BY MR. STEINTHAL:
17 Q.    And that's because of the nature of how
18 stock exchanges work, where a particular share
19 of stock is -- or block of shares is offered for
20 sale for a certain price and the first person
21 who supplies that offer wins the stock, right?
22         MR. HILLEGAS: Objection to form.
23         THE WITNESS: With high-frequency
24 trading, the nature of the advantage is the time
25 differential. Information advantage, in

Page 149

1  general, is, you know, a very general concept,
2  and if I know more than you, I can make
3  decisions where, over a time, I'm going to able
4  to do better economically than you.
5          And so information here -- I'm not
6  even talking about -- you know, it's not --
7  that's just sort of a general idea, and we can
8  see it in the concrete manifestation of
9  high-frequency trading, kind of the level of the
10 engineer who looks at the speed of light and
11 looks at how the networking and what's the
12 latency between these systems. And I'm saying,
13 there's definitely a difference how that can be
14 leveraged in terms of -- change your economic
15 outcomes. That's also very confusing, but I can
16 tell about that. I'm saying, if you're talking
17 about the speed of light, it's like you have a
18 big advantage in terms of how long you know
19 about things versus others in this metaphor.
20 BY MR. STEINTHAL:
21 Q.    And in that analogy, it matters because
22 there is a first-to-get aspect of stock exchange
23 trading, right? Speed is an advantage?
24         MR. HILLEGAS: Objection to form.
25         THE WITNESS: The speed is an

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL



Page 150

1    advantage because if I know the price earlier, I
2    can then make bids on it accordingly.  But
3    similarly, in Google's system, it's not about
4    knowing it's faster, it's about -- it's about
5    knowing the price before others do and making
6    decisions based on Google knows the price
7    internally because they're being set by their
8    models.
9    BY MR. STEINTHAL:
10   Q.    When you say that "Google knows the
11   prices," I want you to be more precise.  Can you
12   define me what precisely Google and the prices?
13   A.    Advertisers now, for the most part -- not
14   purely but we're talking about -- they place
15   their bids for when they're willing the pay for
16   an ad based on a click.  You know, when an ad is
17   clicked on, that's when they -- you know, that's
18   when they get paid.  That's when they pay.
19       Google

Page 151

1

10

14   Q.    And when you say Google's participating
15   in the auction the others are participating in,
16   the auction is the one run by Google's ad
17   exchange, correct?
18       MR. HILLEGAS:  Objection; form.
19       THE WITNESS:  We're talking about in
20   the                                    , the one
21   that's used, you know, if we're taught the
22   specific components in my report.  I can go
23   through that.
24   BY MR. STEINTHAL:
25   Q.    I'm confused by that answer, Professor.

Page 152

1    You said that -- you referred to an auction in
2    which Google is competing against other bidders;
3    is that correct?
4        MR. HILLEGAS:  Objection; form.
5        THE WITNESS:  So I'd like to refer
6    to my report.
7    BY MR. STEINTHAL:
8    Q.    Sure.
9    A.    Page 11, Figure 1.  This is a high-level
10   model of components of systems, and so we're
11   saying

Page 153

1

12   Q.    So the auction in which Google
13   advertisers indirectly -- strike that.
14       You referred to an auction in which
15   Google competes with non-Google bidders,
16   correct.
17   A.    Yes.
18   Q.    And when you're referring to Google in
19   that concept, you mean the Google buying tools,
20   like Google Ads and Google 360?
21   A.    I'm referring specifically to

39 (Pages 150 - 153)

Page 154

[redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

MR. HILLEGAS: Objection; form.

THE WITNESS: [redacted]

BY MR. STEINTHAL:

Q. [redacted]

MR. HILLEGAS: Objection; form.

THE WITNESS: [redacted]

BY MR. STEINTHAL:

Page 155

Q. [redacted]

MR. HILLEGAS: Objection to form.

THE WITNESS: [redacted]

BY MR. STEINTHAL:

Q. [redacted]

MR. HILLEGAS: Objection to form.

THE WITNESS: [redacted]

BY MR. STEINTHAL:

Q. [redacted]

A. [redacted]

Page 156

[redacted]

Q. [redacted]

MR. HILLEGAS: Objection; form.

THE WITNESS: [redacted]

BY MR. STEINTHAL:

Q. [redacted]

MR. HILLEGAS: Objection; form.

THE WITNESS: [redacted]

BY MR. STEINTHAL:

Q. [redacted]

MR. HILLEGAS: Objection; form.

THE WITNESS: [redacted]

Page 157

BY MR. STEINTHAL:

Q. [redacted]

MR. HILLEGAS: Objection; form.

THE WITNESS: [redacted]



HIGHLY CONFIDENTIAL



Page 158

1  BY MR. STEINTHAL:
2  Q. ████████████████

12 ████████

15        MR. HILLEGAS:  Objection; form.
16        THE WITNESS: ████████████████

Page 160

1 ████████████████

5        MR. HILLEGAS:  Objection; form.
6        THE WITNESS: ████████
7  BY MR. STEINTHAL:
8  Q. ████████████
9  A. ████
10 Q. ████████████

22        MR. HILLEGAS:  Objection; form.
23        THE WITNESS: ████████████

Page 159

1 ████████████

3 ████

16 BY MR. STEINTHAL:
17 Q. ████████████

24 ████

Page 161

1 ████████████

3 BY MR. STEINTHAL:
4  Q. ████
5  A. ████

16 ████

24 Q.    And the value of the ad impression is it
25 could buy advertising, can it not?

Veritext Legal Solutions
800-567-8658                                                        973-410-4098

HIGHLY CONFIDENTIAL

Page 162

1    MR. HILLEGAS:  Objection; form.
2    THE WITNESS:  To Google, the value
3  of an ad impression is the price they'll be
4  paid -- whether someone is going to click on it,
5  the probability is going to be clicked on for
6  this given -- this given publisher and how much
7  they're going to get paid for it.  That's what
8  determines the value for them.
9    The probability -- how much they're
10  going to get paid for the click, they know that.
11  The probability that it's going to clicked on is
12  amazingly complex to calculate because you're
13  literally trying to predict what a person is
14  going to do in a particular context at the point
15  of, you know, reading a particular web page with
16  some particular history, some demographic
17  whatever, just showing them this ad from this
18  particular publ- -- this advertising, are they
19  going to -- are they going to click it or not?
20    That's what determines -- that's how
21  the valuing is to Google and that's what
22  determines what they're willing to pay. █████

Page 163

1  ████████████████████████
2  BY MR. STEINTHAL:
3  Q.    But I didn't ask you about the value of
4  the Google.  I asked you the value of an
5  advertiser.  So isn't the value to be if -- if
6  ████████████████████████████ --
7  A.    Uh-huh.
8  Q.    -- it's bidding on the value its
9  advertisers place on the impression, correct?
10    MR. HILLEGAS:  Objection to form.
11    THE WITNESS:  Third-party bidders
12  get BidRequest as a set of information, and they
13  go, like, based on this, do I want to place a
14  bid?  And -- and they say, Yeah, I want to place
15  for this.  The information we're talking -- the
16  information about, they do but -- strike that.
17  I'm sorry.
18    The information difference in this
19  context is really about the value of the ad, ███
20  ████████████████████████████
21  ████████████████████████████
22  ██ ████████████████████████
23    Because -- so when we say

Page 164

1  what the third-party bidder, do they know the
2  value of this to decide their bid, they have
3  done a less thorough inception of the car.  They
4  don't know much about it to set the price.
5  BY MR. STEINTHAL:
6  Q.    But my question to ask it again is:  The
7  value of the impression is going to differ by
8  advertiser, correct?
9    MR. HILLEGAS:  Objection; form.
10    THE WITNESS:  Different advertisers
11  will place different values on a given ad
12  impression, yes.
13    MR. HILLEGAS:  Been on the record
14  for --
15    MR. STEINTHAL:  I know.  Trying to
16  wrap this up.
17    THE WITNESS:  Wrap up quickly.
18    MR. STEINTHAL:  I'm going to try.
19  BY MR. STEINTHAL:
20  Q.    If the value of the impression depends on
21  the advertiser and ████████████ or the other
22  third-party buyer we're talking about here
23  ████████████████ is the one on behalf of their
24  clients, their advertisers, why do they need to
25  know how Google calculated the bids for its

Page 165

1  advertisers?
2  A.    What third-parties need to know is not
3  the calculation.  They need to know the
4  information that went into that calculation so
5  they can do their own calculation.  That's the
6  information difference.  There's much more
7  information that Google can use to calculate
8  that value than -- than they can in
9  third-parties.  There's much more less
10  information available to third-parties.
11  Q.    So, to be clear, and this will be my last
12  question once I get the answer here.
13  ████████████████████████████████
14  ████████████████████████████████
15  ████████████████████████████████
16  ████████████████████████████████
17  ████████████████████████████████
18  ████████████████████████████████
19  ████████████████████████
20    MR. HILLEGAS:  Objection; form.
21    THE WITNESS:  ███████████████████

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL



Page 166

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15        MR. STEINTHAL: Thanks for bearing
16 with me. It's been a little longer than an
17 hour. We're taking a break. You want to take
18 10, 15 minutes?
19        MR. HILLEGAS: Yes, please.
20        THE VIDEOGRAPHER: We're going off
21 the record at 2:05:00 p.m.
22        (Brief break was observed.)
23        THE VIDEOGRAPHER: We're going back
24 on the record at 2:25 p.m.
25 BY MR. STEINTHAL:

Page 167

1 Q.    Okay. Professor, we spoke earlier about
2 information balance and we can try to explore
3 that a little bit more now. As initial matters
4 to the one same page as terminology, would you
5 describe the information balance as a theory, a
6 state, a concept? What words would you describe
7 it?
8        MR. HILLEGAS: Objection to form.
9        THE WITNESS: So in paragraph 21,
10 when I say, "I explore the assertion by
11 examining the question of information on
12 balance," in this report, I defined it to mean
13 the difference -- to mean that different parties
14 possess different knowledge or amounts of
15 knowledge in the context of any given ad
16 auction.
17 BY MR. STEINTHAL:
18 Q.    I guess I'm asking a little more mundane.
19    If I were to say -- if I were to refer to
20 your theory of information balance -- I don't
21 want to be putting words in your mouth.
22    Is it a theory? Is it a concept of --
23 just, what now would you describe it if I was
24 trying to ask you a question about it?
25        MR. HILLEGAS: Objection to form.

Page 168

1        THE WITNESS: My opinion is not
2 about a general theory of information and
3 balance. It's very specific in the context of
4 an auction which I define here.
5 BY MR. STEINTHAL:
6 Q.    Okay. So does this concept information
7 and balance as you describe it, have any
8 application outside of ad auctions?
9        MR. HILLEGAS: Objection; form.
10        THE WITNESS: The term "information"
11 and "balance," you know, is inherently ambiguous
12 and broad. I'm -- in the context of this, I'm
13 talking about the context of ad auctions.
14 BY MR. STEINTHAL:
15 Q.    So as you just said in paragraph 21, you
16 define information and balance as being a
17 situation in which, quote, different parties
18 possess different knowledge or offer amounts of
19 knowledge in the context of any given ad
20 auction; is that correct?
21        MR. HILLEGAS: Objection; form.
22        THE WITNESS: That appears to be
23 what I said.
24 BY MR. STEINTHAL:
25 Q.    Is that what you meant to say?

Page 169

1 A.    It is.
2 Q.    And you define the parties with, quote,
3 relatively more knowledge or more detailed
4 knowledge as having a sufficient advantage; is
5 that correct?
6        MR. HILLEGAS: Objection to form.
7        THE WITNESS: That is what I say in
8 paragraph 22 in part.
9 BY MR. STEINTHAL:
10 Q.    And conversely, those parties, quote,
11 with relatively less knowledge or less detailed
12 knowledge, quote, they have information
13 disadvantage; is that correct?
14        MR. HILLEGAS: Objection; form.
15        THE WITNESS: That is part of what I
16 say in the rest of paragraph 22.
17 BY MR. STEINTHAL:
18 Q.    Is it meaningful to speak about a
19 particular parties' information advantage or
20 disadvantage by itself, or do you have -- is it
21 in relation to some other party?
22        MR. HILLEGAS: Objection; form.
23        THE WITNESS: The concept of
24 advantage, you know, information advantage or
25 information disadvantage is a relative term with

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

1  respect to another entity.
2  BY MR. STEINTHAL:
3  Q.    And if there is one or more parties with
4  an advantage or disadvantage, that necessarily
5  means there is information imbalance as you use
6  that term, correct?
7        MR. HILLEGAS:  Objection.
8        THE WITNESS:  Yes.
9  BY MR. STEINTHAL:
10 Q.    In your opinion, does the existence of
11 information imbalance have any theoretical
12 consequences or implications?
13       MR. HILLEGAS:  Objection to form.
14       THE WITNESS:  I don't offer an
15 opinion about the theoretical nature of
16 information balance or imbalance here.  It's
17 very much in this context.
18 BY MR. STEINTHAL:
19 Q.    Does it have any -- in your opinion, does
20 the existence of information and imbalance have
21 any practical consequences or implications?
22       MR. HILLEGAS:  Objection; form.
23       THE WITNESS:  I think information
24 imbalance is of particular relevance in the
25 context of this case.  I don't offer an opinion

Page 171

1  outside of that.
2  BY MR. STEINTHAL:
3  Q.    So what I'm trying to understand is
4  whether information and imbalance, as you used
5  that term in your report, just describes a state
6  of certain people, certain parties, having more
7  information than others, or are there
8  consequences that flow from that advantage?
9        MR. HILLEGAS:  Objection; form.
10       THE WITNESS:  My report is about the
11 information imbalance in this particular, you
12 know, Google's auction system.  My report does
13 not go in detail about the consequences of that
14 imbalance.
15 BY MR. STEINTHAL:
16 Q.    So you're not offering any opinions in
17 this case about the consequence of that
18 imbalance?
19       MR. HILLEGAS:  Objection to form.
20       THE WITNESS:  My report is talking
21 about information balance and how it can effect
22 the different parties' ability to understand
23 what's happening and use experiments to
24 understand how the systems behave.  That's the
25 basis of my rebuttal to Dr. Milgrom.

Page 172

1        So I do take a position with respect
2  to how that information balance affects that.
3  BY MR. STEINTHAL:
4  Q.    So there are some implications that you
5  are testifying about?
6        MR. HILLEGAS:  Objection; form.
7        THE WITNESS:  My report describes
8  the information, you know, differences, the
9  advantage and disadvantage and describes it in
10 the context of responding to Dr. Milgorm saying
11 that experiments can be done to -- the
12 implication can be done to negate that
13 information advantage.  So my report is, by
14 responding to that, is saying the experiments
15 are not sufficient.
16 BY MR. STEINTHAL:
17 Q.    Is it inherently undesirable for a party
18 to have a information disadvantage?
19       MR. HILLEGAS:  Objection to form.
20       THE WITNESS:  I don't offer an
21 opinion about the desirability or undesirability
22 of things in this context.
23 BY MR. STEINTHAL:
24 Q.    If there are two parties one with more
25 information and one with less information, is

Page 173

1  the party with less information always worse
2  off?
3        MR. HILLEGAS:  Objection to form.
4        THE WITNESS:  Connecting information
5  advantage or disadvantage to particular concrete
6  economic outcomes is outside the scope of my
7  report.
8  BY MR. STEINTHAL:
9  Q.    The definition that you offered for
10 information balance refers to the context of any
11 given ad auction; is that just because that's
12 the example in this case; or do you believe your
13 opinions are, in fact, specific to the context
14 of the ad auctions?
15       MR. HILLEGAS:  Objection; form.
16       THE WITNESS:  My opinions here are
17 about the code of Google's ad systems and how
18 they work.  So the description of the
19 information advantage or disadvantage is in the
20 context of that code.  I do not offer an opinion
21 on the general nature of that in other systems,
22 ad systems or otherwise.
23 BY MR. STEINTHAL:
24 Q.    So if we change the facts of this case
25 that instead of it being at Google, which

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

1  auctions ads, it was instead about E-Bay, which
2  auctions physical memorabilia and physical
3  objects, everything else is the same, E-Bay had
4  all the same information advantages that Google
5  has and everyone has the same disadvantages that
6  others had (inaudible) -- all that changed
7  instead of auctioning ads, we're auctioning
8  memorabilia, would your opinions still hold?
9        MR. HILLEGAS:  Objection; form.
10       THE WITNESS:  If the -- if my
11  observations were about the code, so if the code
12  was identical, then my conclusions would still
13  hold.  However, I do not see how the code would
14  be identical ███████████████████████  So
16  I don't really see how it would be exactly the
17  same for other auction systems.
18  BY MR. STEINTHAL:
19  Q.    So I take it that if you ask -- if I ask
20  this question about, say, an offline auction for
21  art, you would say it would also be materially
22  different, correct?
23       MR. HILLEGAS:  Objection; form.
24       THE WITNESS:  I would say that the
25  source code of the system I inspected was

Page 175

1  ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
4  I cannot speak about whether the observations I
5  have of that would apply to systems that may or
6  may not be similar in other economic contexts.
7  BY MR. STEINTHAL:
8  Q.    I think I might have asked this question
9  earlier but I'll try it again.
10       What led you to consider information
11  imbalance as a theory for understanding a
12  response to Dr. Milgrom's report?
13  A.    So am I to understand how I -- how did I
14  go from the assignment in paragraph two to the
15  information imbalance I discussed later in my
16  report?
17  Q.    I'm trying to understand what led you to
18  start thinking about information imbalance in
19  this case?
20  A.    So in reading Dr. Milgrom's report and
21  the specific sections on experimentation, so
22  when I first read it, I kind of looked at it and
23  I go, huh, is this right; and I start thinking,
24  if I think it's not right, why is it not right.
25  And so then I take and I try understanding

Page 176

1  what's being said there in terms of doing
2  experiments and in terms of the parts of the
3  auction being kept secret, and in the context of
4  having access to the source code of Google, I
5  then go, experiments about this (indicating);
6  how much can the experiments tell me about this
7  artifact and about how it works; and just at an
8  intuitive level I kind of go, that seems like a
9  challenging thing.  And so then I went let me --
10  so let's see, it could be okay if everyone was
11  getting the same information.  Then I would say,
12  okay, it's a standard auction, everyone gets the
13  same information, everyone can operate on even
14  playing field.  But is that the case?  And so I
15  started looking at how the auction works and
16  seeing, ██████████████████████████████████
█████████████████████████████████████████
19       And so it's really starting with looking
20  at Dr. Milgrom and going, like, what is he
21  saying and trying to understand what that means,
22  and then going, I don't agree with this and
23  trying to understand why I don't agree with it.
24  And when it comes down to why I don't agree with
25  it, it's trying to understand -- I don't think

Page 177

1  these experiments tell you as much and then why
2  don't they tell you as much in the context of
3  the code.  Well, they aren't -- they can't give
4  you any information.
5  Q.    Do you discuss information imbalance in
6  any of your published academic papers?
7        MR. HILLEGAS:  Objection to form.
8        THE WITNESS:  I proposed models of
9  the battles between attackers and defenders,
10  sand part of that model, part of some of the
11  models I've talked about actually with a recent
12  Ph.D. student is about knowledge reviews, and so
13  the idea that a attackers attempt to generate
14  new knowledge in order to, you know, attempt to
15  understand the new knowledge and then defenders
16  attempt to invalidate that knowledge.  So in
17  that context, I have written about information
18  imbalance between attackers and defenders and
19  attackers trying to gain information imbalance
20  advantage and defenders trying to invalidate
21  that information advantage.
22  BY MR. STEINTHAL:
23  Q.    And is that information imbalance similar
24  to the imbalance that you discuss in your
25  report?

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1    MR. HILLEGAS:  Objection; form.
2    THE WITNESS:  I would say the kind
3  of information that we're talking about here is
4  there's so much agreed there complex adaptive
5  systems (as said), but beyond that, they are
6  quite different.
7  BY MR. STEINTHAL:
8  Q.    Because you said earlier that information
9  imbalance described in your report is only
10  applicable in the context of online ad auctions,
11  correct?
12    MR. HILLEGAS:  Objection to form.
13    THE WITNESS:  I'm only offering an
14  opinion on information imbalance in the context
15  of this particular ad auction system.
16  BY MR. STEINTHAL:
17  Q.    Are you aware of any other published
18  papers in the field of computer science
19  discussing information imbalance in the way that
20  it is used in your report?
21    MR. HILLEGAS:  Objection to form.
22    THE WITNESS:  I am not aware of
23  specific papers that discuss information
24  imbalance the way I do, but I have not looked
25  for papers that talk about this.

Page 179

1  BY MR. STEINTHAL:
2  Q.    Did you do a literature review as part of
3  your work in this case?
4    MR. HILLEGAS:  Objection to form.
5    THE WITNESS:  I did not conduct a
6  literature review as part of this.
7  BY MR. STEINTHAL:
8  Q.    If such paper existed, would you want to
9  cite it and bolster your opinion?
10    MR. HILLEGAS:  Objection to form.
11    THE WITNESS:  I did not conduct a
12  literature review, because in the context of
13  support, I was trying to understand a particular
14  artifact and a how its particular dynamics were,
15  and I wasn't claiming that my concepts of
16  information imbalance were original.
17    If I wanted to describe the history
18  of information imbalance and literature, I would
19  have done a literature imbalance and took these
20  ideas and applied them to this particular
21  system.
22  BY MR. STEINTHAL:
23  Q.    In fact, there's no academic literature
24  cited in your report at all for that reason?
25    MR. HILLEGAS:  Objection; form.

Page 180

1    THE WITNESS:  I do not cite academic
2  literature in my report.
3  BY MR. STEINTHAL:
4  Q.    Have you attended any professional
5  conferences in the field of computer science
6  that discusses information advantage or
7  disadvantage?
8    MR. HILLEGAS:  Objection; form.
9    THE WITNESS:  I've written papers
10  and worked with Ph.D. students on the
11  information dynamic between attackers and
12  defenders, so in that sense, yes.  But more
13  generally, I don't believe so.
14  BY MR. STEINTHAL:
15  Q.    And your opinions in this case are
16  limited to describing the existence and extent
17  of this alleged information imbalance but not to
18  opine on the consequences of that for publishers
19  or advertiser, correct?
20    MR. HILLEGAS:  Object to form.
21    THE WITNESS:  My opinions on
22  information advantage and disadvantage are in
23  the context of rebutting Dr. Milgorm's
24  assertions about experiments being able to allow
25  participants to optimize their bids.  So to that

Page 181

1  extent, I am, you know, the implication of what
2  I'm doing apply to that, but not beyond that.
3  BY MR. STEINTHAL:
4  Q.    But you haven't offered an opinion as to
5  whether or not the information imbalance in this
6  case the fact -- the information imbalance is
7  beneficial for publishers or harmful for
8  publishers?
9    (Clarification by Reporter)
10  Q.    Have you offered an opinion in this case
11  as to whether the information imbalance that you
12  described in your report is beneficial for
13  publishers or harmful for publishers?
14    MR. HILLEGAS:  Objection; form.
15    THE WITNESS:  I have not offered an
16  opinion on advantages or disadvantages per se.
17  BY MR. STEINTHAL:
18  Q.    And that would extent to advantages or
19  disadvantages for advertisers as well, correct?
20    MR. HILLEGAS:  Objection; form.
21    THE WITNESS:  I do not offer an
22  opinion for advertisers -- the advantage for
23  advertisers either.
24  BY MR. STEINTHAL:
25  Q.    Okay.  For the next round of questions

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1  I'm trying to understand this concept a little
2  better, I have a series of hypotheticals and I'm
3  going to try to understand how your notion of
4  information advantage applies there. Just to
5  make sure we're on the same page, some
6  background questions.
7       Do you know what an advertiser buying
8  tools are?
9  A.    Yes.
10  Q.    And what are some examples of buying
11  tools?
12  A.    I believe DV 360.
13  Q.    And what's their principal purpose or
14  function?
15       MR. HILLEGAS:  Objection; form.
16       THE WITNESS:  Advertiser buying
17  tools are simply tools that advertisers use to
18  set bids for buying ads.
19  BY MR. STEINTHAL:
20  Q.    And to essentially be automated bidders
21  to ad auctions, correct?
22  A.    Yes.
23  Q.    And are you familiar with what a
24  publisher ad server is?
25  A.    I'm familiar with the basic term.

Page 183

1  Q.    Are publisher ad servers relevant to
2  advantage buffers in this case?
3       MR. HILLEGAS:  Objection to form.
4       THE WITNESS:  The opinions I offered
5  in this case are really centered around this
6  figure one on page 11, which is about the
7  internal systems, which price and chooses
8  specific ads and serve them out.
9       So I don't have an offered opinion
10  on the tools that input the data to the system,
11  which is what we're talking about by publisher
12  tools and advertiser tools.
13  BY MR. STEINTHAL:
14  Q.    Do you know what an ad exchange is?
15  A.    Yes.
16  Q.    What's an ad exchange?
17  A.    An ad exchange is basically, in the
18  context of this, an auction place for. yeah.
19  Q.    If at any point in these questions, the
20  definition of these terms are unclear, you'll
21  ask for clarification?
22  A.    Yes.
23  Q.    Okay. To make the following questions
24  hopefully a little bit easier, I'm going to hand
25  you a document that's been marked Somayaji

Page 184

1  Exhibit 3, which contains -- just includes a
2  visual of some of the assumptions that I'm going
3  to make hypothetical. Just to be clear, the
4  copy that is marked with a sticker, the reporter
5  is going to take this exhibit, I have plenty of
6  other copies of it, and so if it would be
7  helpful for you to annotate, you know, as we go
8  to different facts. They're available for
9  anyone who wants them. We won't be taking them
10  back in the record. They will just be for
11  scratch paper if you want them.
12  A.    I'll take one.
13  Q.    Sure.
14       MR. STEINTHAL:  If anyone is
15  interested, we have copies. I'll need one.
16  Thanks.
17       (Exhibit Number 3 was marked.)
18  BY MR. STEINTHAL:
19  Q.    So I'm going to describe for you, as we
20  talk in hypotheticals, I want to assume a
21  simplified ad auction. That's simpler than the
22  ones that happened in the real world. Hopefully
23  to better understand the theory underlying this.
24       So as shown here in my simplified ad
25  auction, assume that there's only two

Page 185

1  advertisers for any particular ad, Coke and
2  Pepsi. They can each bid through buying tools A
3  and B. You can imagine that A is 60 and B is
4  The Trade Desk. These are hypothetical abstract
5  bidding tools. Okay. And similarly, they're
6  bidding for ad space on a single website. For
7  simplicity, I called the Dallas Morning News in
8  the State of Texas via Google. It doesn't make
9  a difference who the publishers is. Okay.
10       And then there is a single ad exchange
11  that the Dallas Morning News is selling on, and
12  finally, just for simplicity, let's assume
13  there's a single human user viewing these ads
14  through only one browser. There's just one
15  user. The user is the one that sees the add on
16  the page.
17  A.    Okay.
18  Q.    And none of these examples have anything
19  to do with a particular company like Google or
20  anything. I used Coke and Pepsi just because we
21  understand what soft drinks are, but there's
22  nothing specific to that.
23       Does that make sense?
24  A.    Yes.
25  Q.    Okay. Great. So for my first

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1  hypothetical scenario, let's assume that the ad
2  exchange doesn't receive any information about
3  the user.  It doesn't have a cookie.  It just
4  knows what the Web page is and it sends the
5  exact same information to each of the buying
6  tools A and B.
7       In that scenario, would you say that
8  there's an information imbalance?
9       MR. HILLEGAS:  Objection; form.
10      THE WITNESS:  So if there is no --
11  if the ad exchange is sending the same
12  information to buying tools -- pause.
13      It's a little funny how you've
14  written this diagram because in my mind the
15  tools A and B would have input information in
16  the ad exchange and it would have just processed
17  things there.  Like it's really just loading up
18  a database that the exchange is using as opposed
19  to going back and forth.
20      But if I say that this ad exchange
21  is offering to the agents from buying tool A and
22  B, which have been produced, which make a
23  decision about whether to buy it or not -- if
24  the information provided to both is the same,
25  then the ad exchange is not giving one or the

Page 187

1  other an information advantage.
2  BY MR. STEINTHAL:
3  Q.    I'm going to dig at that a little bit.
4  In your report you talk extensively about the
5  information that is shared by Google ad
6  exchange with both Google buying tools and
7  non-Google buying tools, correct?
8  A.    Yes.
9       MR. HILLEGAS:  Objection to form.
10 BY MR. STEINTHAL:
11 Q.    And the reason, as I understand it, is
12 that as you observe the ad exchange sends
13 BidRequest messages through some network
14 protocol to the different buying tools saying --
15 strike that.
16      Imagine for an example that we ignore the
17 buying tools.  Let's talk about only third-party
18 buying tool for a second.  Okay.  So let's say A
19 and B are each third-party buying tools bidding
20 into Google's exchange.  As I understood in your
21 report, the exchange sends bid requests messages
22 to A and B for each auction so that A and B can
23 decide what they want to bid and return bid
24 responses to the exchange; is that your
25 understanding of the model?

Page 188

1       MR. HILLEGAS:  Objection; form.
2       THE WITNESS:  I think the confusion
3  comes up, it's just in terms of when you say
4  "buying tool," I'm also, in my mind, thinking
5  about the tool that, you know, an advertiser is
6  using in front of them to place this, and so
7  that system is not involved in the realtime
8  decision.  But if -- but the portion of the tool
9  that's involved in the actual decision making,
10 let's assume that, I'll assume that's what the
11 tool is for now, so I'll just repeat...
12 BY MR. STEINTHAL:
13 Q.    Is your answer complete?
14 A.    So my understanding of the model is that
15 the BidRequest would come from the ad exchange
16 to these two tools.  They would evaluate it.
17 Decided if, you know, what price they wanted to
18 set, and that would come back to the ad exchange
19 where it would decide which one was higher.
20 Q.    And so just to review.  If the BidRequest
21 sent to A and B have the exact same information,
22 you would say there is no information imbalance
23 in this case, correct?
24 A.    Created by -- so there's no information
25 imbalance created by the ad exchange.  I

Page 189

1  couldn't speak to the absolute information
2  balance between the parties because maybe they
3  know something else from other channels.
4  Q.    And in your report when you refer to
5  information imbalance in this case, are you
6  referring information imbalance in the absolute
7  sense, or information imbalance caused by a
8  particular actor?
9       MR. HILLEGAS:  Objection; form.
10      THE WITNESS:  I'm talking about the
11 information imbalance caused by the Google tools
12 exchanging information to internal versus
13 external parties.
14 BY MR. STEINTHAL:
15 Q.    Now, for a second scenario dealing with
16 the same facts as the first one except this time
17 the ad exchange does know who the user is, it's
18 able to read a cookie from the browser and it
19 has some sense who the user is, but it does not
20 share that information with either buying tool;
21 it keeps it to itself.
22      So the information in A and B is the
23 same; it just does not include the ad exchange
24 that A and B don't, is there an information
25 imbalance in that case?

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

1    MR. HILLEGAS: Objection; form.
2    THE WITNESS: If I assume the ad
3  exchange is only comparing the values between
4  the buying tools and is otherwise is not making
5  any other decisions, so like A and B are fixed.
6  They're are being chosen from an universe of
7  ones by the ad exchange, they are just -- they
8  are also the only two that are bidding and the ad
9  exchange has additional information that is not
10  being passed on, but the information that is
11  being passed on is the same between the two --
12  then, again, there's no difference in
13  information advantage.
14  BY MR. STEINTHAL:
15  Q.    Third one, so now the ad exchange does
16  share that cookie information with A and with B,
17  but A has seen that cookie before, so A has some
18  concept based on that cookie. B has not. Is
19  there information advantage between A and B in
20  that case?
21    MR. HILLEGAS: Objection; form.
22  BY MR. STEINTHAL:
23  Q.    Sorry. Let me rephrase the ending of
24  that question. Is there information imbalance
25  between A and B in that case?

Page 191

1  A.    So in the absolute sense clearly A has
2  more information than B. But in the context of
3  how -- whether the ad exchange created
4  information imbalance between the parties and
5  you could philosophically say, oh, I exchanged
6  the cookie and so one could make use of it and
7  one couldn't.
8    But in principal, if B could have that
9  same information, then it's, like, you just
10  don't happen to have that information, so we can
11  say the ad exchange didn't create that imbalance
12  because they could have plausibly had
13  information on that cookie, you know,
14  information on that user just as much as A had.
15  Q.    And is it -- are Coke or Pepsi in this
16  example, at an advantage or disadvantage?
17    MR. HILLEGAS: Objection; form.
18    THE WITNESS: So your question is
19  that -- is Coke or Pepsi at at advantage or
20  disadvantage in this scenario?
21  BY MR. STEINTHAL:
22  Q.    Yes. My question is, again, in your
23  report you discuss advertisers being information
24  disadvantages. I'm asking if the advantages in
25  this case here, Coke or Pepsi, are at an

Page 192

1  advantage or disadvantage or neither based on
2  the facts in this scenario?
3    MR. HILLEGAS: Object to form.
4  BY MR. STEINTHAL:
5  Q.    Or you can't know?
6  A.    I'm not sure exactly which -- you
7  described a couple of scenarios. I'm not sure
8  exactly of the specifics of the one you want me
9  to talk about here.
10  Q.    We will try it again and go back and
11  refresh it.
12  A.    Okay.
13  Q.    So in this example, the ad exchange
14  shares a cookie identifier with both buying tool
15  A and buying tool B. Buying tool A is able to
16  use that to look up in its profile database
17  information about the user; B is not.
18    And my question is whether that -- and
19  we've established that that, you said earlier,
20  that in an absolute sense A has an advantage
21  over B, but it wasn't caused by the exchange,
22  correct?
23    MR. HILLEGAS: Objection; form.
24    THE WITNESS: If we assume that both
25  A and B can understand such cookies and have a

Page 193

1  database of it, that is, you know, the exchange
2  can plausible say they have similar utility --
3  similar ability to use the knowledge that has
4  been granted to them, then I would say the ad
5  exchange isn't created information imbalance
6  between them.
7  BY MR. STEINTHAL:
8  Q.    And then my question is -- I move the
9  level of Coke or Pepsi, do they have any -- do
10  either of them have any meaningful information
11  advantage against the other or against buying
12  tools for the exchange?
13    MR. HILLEGAS: Objection to form.
14    THE WITNESS: If Coke knows who the
15  user is and Pepsi doesn't know who the user is,
16  Coke has an advantage.
17  BY MR. HILLEGAS:
18  Q.    So if in Coke the user is buying tool A
19  and in Pepsi the user is buying tool B, you'd
20  say Coke has an advantage because A know the
21  user and B does not?
22    MR. HILLEGAS: Objection to form.
23    THE WITNESS: If Coke knows the
24  user, you know, the buying tool A know the user
25  and the buying tool Pepsi does not know the

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

1  user, then yes.
2  BY MR. STEINTHAL:
3      Q.    Even if B knows the user in the sense
4  that it has the identifier but just no
5  information about the user, same result?
6          MR. HILLEGAS:  Objection; form.
7          THE WITNESS:  If I assume everything
8  else is equal, then I think so.  But I would
9  have to -- but it's -- but I would really have
10  to assume the playing field level in every other
11  way.
12  BY MR. STEINTHAL:
13      Q.    And if I relax the assumption that Coke
14  user is A and Pepsi user is B, and just say,
15  Coke or Pepsi could choose whichever one they
16  want, is Pepsi still at a disadvantage in that
17  scenario?
18          MR. HILLEGAS:  Objection; form.
19          THE WITNESS:  When we talk about the
20  information advantage, it's not talking about
21  information in any specific interaction.  It's
22  normally talking about some sort of systematic,
23  you know, general advantage or, you know,
24  disadvantage.  Some general cap- --- so talking
25  about in the context, if you equalize

Page 195

1  everything, okay, that has a little bit
2  advantage, but when we start generalizing the
3  interactions, it starts losing its meaning,
4  because you are then having to do an economic
5  assessment of who knows more for each party and
6  information advantage or disadvantage is talking
7  about more general properties.
8  BY MR. STEINTHAL:
9      Q.    So I -- you just testified when we talk
10  about information advantage, we're not talking
11  about a specific interaction.  Instead it's more
12  a general advantage.  How does that square up
13  with your report in paragraph 21 when you refer
14  to different parties possessing different
15  knowledge or amounts of knowledge in the context
16  at any given ad auction?
17          MR. HILLEGAS:  Objection; form.
18          THE WITNESS:  Which paragraph again?
19  BY MR. STEINTHAL:
20      Q.    So 21 about four lines down of the
21  paragraph, you're defining information balance
22  it says, quote, which in this report, I define
23  to mean that different parties possess different
24  knowledge or amounts of knowledge in the context
25  of any given ad auction."

Page 196

1          And my question is:  This seems to be
2  defining information imbalance with respect to
3  specific ad auctions and you just testified, if
4  I understood you correctly, that it's not about
5  any specific interaction; it's more a general
6  state?
7      A.    In the simpler scenario, when we talk
8  about everything being even, I can talk about
9  the information advantage, because I can
10  understand what information every party had.
11          When we get into these scenarios, when
12  we start saying, you know, you can choose which
13  exchange, you can do this -- it's like, then,
14  you have to really figure out who knows what in
15  what context, and it's like, it's very hard to
16  say what the overall advantage is because you
17  basically have to an analysis of possible
18  outcomes.  Like you have to do a matrix and say,
19  okay, in this scenario, would I have to measure
20  it in bits or something like that, and it's
21  like, that -- so that's why in the definition
22  here we're talking about -- any given ad auction
23  is talking about in a general pattern.
24      Q.    Okay.  And I'm speaking more generally of
25  this, just looking at this diagram more

Page 197

1  generally, we've spoken about information
2  advantage, has a disadvantage A relative to B or
3  Coke relative to Pepsi.
4          Is it meaningful to also ask about
5  information advantages between -- or
6  horizontally in this example.  So we're talking
7  about information advantage between a buying
8  tool and the exchange or between an advertiser
9  and a buying tool; is that meaningful concept,
10  or do you have to look between peers?
11          MR. HILLEGAS:  Object to form.
12          THE WITNESS:  If I were to map this
13  scenario to the one I'm discussing in the
14  context of Google, I would have to be talking
15  about many different advertisers with the ad
16  exchange choosing which advertiser to permit,
17  you know, to participate, and then also setting
18  the prices for -- for most of the them versus
19  the other ones it does not set prices for.  So
20  it starts looking like a very different picture
21  because the exchange is taking a much more
22  active role.
23  BY MR. STEINTHAL:
24      Q.    And that's your understanding of the
25  facts of this case?

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

Page 198

1    MR. HILLEGAS:  Objection; form.
2    THE WITNESS:  My understanding is
3 the exchange is being much more than just a
4 simple running an auction.
5 BY MR. STEINTHAL:
6 Q.    The description you just gave, though, of
7 what would have to change in the words described
8 in your report is drawn from your understanding
9 of what the facts of this case are, correct?
10 A.    Yes.
11 Q.    Try a different one.  All the same facts
12 previously, the user -- one user, the exchange
13 has a cookie that it draws from the user's
14 browser, it passed it through A and B; A and B
15 both have information about the user.  They've
16 both seen it.  But A has twice as much
17 information has a much more deeper knowledge,
18 sees more transactions than B.
19    Does A have a disadvantage relative to B?
20    MR. HILLEGAS:  Objection to form.
21    THE WITNESS:  When we talk about
22 some parties having differing information about
23 the scenario than other parties, the relevant
24 question is not how much information one party
25 has versus the other party.

Page 199

1    It's really about whether the
2 information is relevant to the decision to be
3 made.  And so in the context here, what, you
4 know, Coke and Pepsi have to figure out is
5 how -- what's the value to them of this
6 particular ad impression, and then based on that
7 value, they can determine what price they're
8 willing pay for it.  That value determination is
9 inherently complicated.  Right.  So it's not
10 just like buying tool may have very little
11 information but it's the right information, and
12 it will say, oh, this is exactly the customer we
13 would want to get things in front of.  They're
14 just about to -- you know, they're thinking
15 about Pepsi but they've been trying to decide
16 whether to go for Coke or Pepsi.  And so we can
17 put this here and we can persuade them to buy
18 Coke, and now Pepsi has lots of information to
19 this user but they can't make this decision.  So
20 all of a sudden, you know, it becomes more
21 valuable to Coke versus Pepsi; but it's that
22 relevance, which is tied to so many factors.
23 BY MR. STEINTHAL:
24 Q.    Okay.  Another example, same facts as the
25 previous hypothetical except that we got the

Page 200

1 publisher, in our case it's Dallas Morning News,
2 has configured the ad exchange to share the
3 cookie identifier only with buying tool B but
4 not buying tool A.
5    In that case is there information
6 advantage between A and B?
7    MR. HILLEGAS:  Objection; form.
8    THE WITNESS:  If I assume all else
9 is equal, buying tool B now can identify the
10 user.  Buying tool A cannot.  That would
11 represent an information advantage for buying
12 tool B.
13 BY MR. STEINTHAL:
14 Q.    Under the assumption that the identifier
15 user is material to the --
16 A.    Yeah, under the assumption that the
17 identifier user is material to make that
18 decision, which is normally the thing in
19 advertising.
20 Q.    And that's true even though in this
21 absolute sense A has more information than B
22 available but it just can't access it, so it's
23 at its disadvantage?
24    MR. HILLEGAS:  Objection; form.
25    THE WITNESS:  So when we talk about

Page 201

1 information advantage, it's not about absolute
2 information.  It's about whether you have the
3 right information.  So if there's an anonymous
4 ad request versus an ad request for a specific
5 user, those are different things.  Oh, this is a
6 user who's never buying anything versus who
7 knows what this is, that's different.
8 BY MR. STEINTHAL:
9 Q.    And A has -- sorry, B has information
10 advantage over A in this scenario, even though
11 it was the publisher and not the ad exchange who
12 made the decision as to who should get the
13 information, correct?
14    MR. HILLEGAS:  Objection; form.
15    THE WITNESS:  The ad exchange is the
16 one controlling the information that's going to
17 these two parties.  So it's the one setting up
18 that information differential.  The basis on
19 which it's doing, yes, okay, there's this
20 publisher who said it could do it, but they're
21 doing it on the -- the ad exchange is the one
22 who is actually acting to make the information
23 difference.
24 BY MR. STEINTHAL:
25 Q.    So you said the exchange caused the

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

1 information advantage regardless of whether it
2 did so of its own -- or at its own initiative or
3 because it was asked by its customer?
4          MR. HILLEGAS:  Objection; form.
5          THE WITNESS:  The ad exchange is the
6 one that is interacting with the buying tools
7 specifically, and it will do actions on behalf
8 of itself or other parties.  But if we're
9 talking about information advantage of A versus
10 B or looking at basically those arrows in the
11 hypothetical scenario.
12 BY MR. STEINTHAL:
13 Q.    I believe you said earlier determining
14 the materiality of what information -- what
15 information material is a complex question,
16 correct?
17 A.    Yes.
18 Q.    Is it reasonable to assume that
19 complexity would increase if I went to two
20 advertisers or a thousand advertisers or ten
21 thousand advertisers?
22 A.    The complexity of the problem is the
23 value for a particular advertiser, what's
24 relevant to them.  The ad exchange question
25 becomes more complicated if he has to choose

Page 203

1 which advertiser to bring in, but the value
2 calculation is separate from that.
3 Q.    I asked that question out of order.  That
4 doesn't make sense so I'm come back to that in a
5 second.
6          MR. HILLEGAS:  We can take a small
7 break.
8          MR. STEINTHAL:  No, it's fine.
9 BY MR. STEINTHAL:
10 Q.    Let's assume in my next hypothetical that
11 the ad exchange share is exactly the same
12 information with A and B, same identifier, and
13 further that A and B have the exact same
14 information in their file about that user, a
15 hypothetical; but the Dallas Morning News, the
16 exchange shares on behalf of the morning news
17 with A but not B, one additional fact that the
18 user has been the subscriber for the Dallas
19 Morning News for the last three years, it's the
20 only information they have available to it.
21          Would you say A has an advantage over
22 B --
23          MR. HILLEGAS:  Objection; form.
24 BY MR. STEINTHAL:
25 Q.    -- in that scenario?

Page 204

1 A.    If we're getting into the weeds about it,
2 it depends on how we're -- so I was talking
3 about information advantage is terms of is this
4 useful information for making this decision.  I
5 don't know whether being a subscriber is useful
6 or not in the context of these advertisers.
7 Q.    Right.  You would need to know more about
8 whether or not that was actually useful to Coke
9 or to Pepsi?
10 A.    Yes.
11 Q.    And that's, of course, why I just asked
12 if that made more sense.  If I, then, assumed
13 that they were not just Coke or Pepsi but there
14 were 10,000 different advertisers, you would
15 have to do more work to figure out whether that
16 piece of information is relevant to any of them
17 to answer the question, right?
18          MR. HILLEGAS:  Objection; form.
19          THE WITNESS:  When you added many
20 advertisers, it changes the nature of the
21 problem, because you could have a scenario where
22 you say everyone is bidding on it and so
23 everyone has to make that decision, but in order
24 for the system to scale, that's impossible.  You
25 have to choose which advertisers are going to

Page 205

1 bid and that choice has to made by the ad
2 exchange, and so that adds in a level of
3 complexity and, frankly, control on the part of
4 the exchange and how the market operates.
5 BY MR. STEINTHAL:
6 Q.    Okay.  Before I go to the next
7 hypothetical, are you familiar with the concept
8 of remarketing or retargeting ads?
9          MR. HILLEGAS:  Objection to form.
10          (Clarification by Reporter)
11          THE WITNESS:  I don't recall the
12 precise definition.
13 BY MR. STEINTHAL:
14 Q.    If I give you a -- if I represent the
15 definition taken from adrole.com is that
16 retargeting is a digital marketing tactic that
17 allows brands served ads tailored potential
18 customers based on the user's prior engagement
19 with the brand; for example, it's often used to
20 target shoppers who have visited a website but
21 left without making a purchase aiming to
22 re-engage the sale.
23          Does that sound like a reasonable
24 definition?
25 A.    I accept that definition.

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

1  Q.    We've all seen this kind of advertising
2  on the Web where you are on a site, you look at
3  some shoes, you don't check out, and all of a
4  sudden, all you see is that pair of shoes?
5        MR. HILLEGAS:  Object to form.
6        THE WITNESS:  I am familiar with,
7  you know, trying to follow around people on the
8  Web.
9  BY MR. STEINTHAL:
10  Q.    So in this hypothetical, rather than
11  introducing new advertisers into my example as
12  Coke and Pepsi, I'm going to instead ask you to
13  assume that Coke has decided to accommodate
14  people like me who like their diet Coke with a
15  home delivery, have a ready stash of diet Coke
16  at home.  Let's assume that it's profitable for
17  Coke to have that so it's wants people to sign
18  up for the service, and the user has been on
19  Coke's website put the subscription into their
20  cart and hasn't checked out.  So Coke puts the
21  user's cookie identifier on a remarketing list
22  to try to serve ads to them coming back and say
23  come back, please, you want your Coke
24  subscription, right.
25        But in the hypothetical, Coke does that

Page 207

1  only on buying tool A.  So basically it
2  configures sends buying tool A a list of cookie
3  identifiers they want to serve the ad for the
4  new subscription to and it doesn't sell it to B.
5        Given those facts, does it seem
6  reasonable to you believe that Coke would be
7  willing to pay more to show an ad to that user
8  who it wants to retarget than some average user?
9        MR. HILLEGAS:  Objection; form.
10        THE WITNESS:  The scenario you're
11  asking is whether Coke is willing to pay more
12  for this, which is an economic analysis, which I
13  think is outside of my area of expertise.
14  BY MR. STEINTHAL:
15  Q.    Let's make that assumption --
16  A.    Okay.
17  Q.    -- for the question.  Knowing that, that
18  with that assumption, and knowing that only A
19  has the list of users who Google is going to pay
20  more for, would you say that A has information
21  advantage over B?
22  A.    So when we're talking about information
23  advantage here, you're talking -- Coke is having
24  business potential with both buying to A and B,
25  and now we're talking about information

Page 208

1  advantage buying tool A over B with respect to
2  the advertiser, so -- so that seems like a --
3  seems like rather different.
4  Q.    So when the ad comes up with the auction
5  and the user uses the website and the Coke
6  identifier comes out in the BidRequest, so in
7  my -- same as all the prior examples, now the ad
8  exchange sends the request to A and B saying
9  that the user identifiers is 1, 2,3; A knows
10  that 1, 2, 3 is on Coke's remarketing list, and
11  so Coke is willing to pay just say $2 for seeing
12  that ad; B does not know that 1, 2, 3 is
13  (inaudible) that Coke is trying to retarget it;
14  and so B says -- B understands that Coke or
15  Pepsi is each willing to bid only $.50 for an
16  average user.
17        My question is:  Does A have an
18  information advantage over B in that scenario?
19        MR. HILLEGAS:  Objection; form.
20        THE WITNESS:  I can say objectively
21  buying tool A has more information about
22  customers, about certain customers, than buying
23  tool B, because it knows there is a list of
24  customers who have, you know, information that
25  they have looked at Coke.

Page 209

1        But I'm just trying to figure out
2  who are we talking about who is having an
3  advantage, because now we're talking about
4  whether the tool has an advantage rather than
5  the advertiser, and I'm -- and does buying tool
6  A -- buying tool A has more information than
7  buying tool B.  The information seems to be
8  relevant to Coke specifically.  So in that
9  context, if everything else was equal, it would
10  seem to be, you know, that A would have an
11  advantage.  But it's -- I'm getting a little
12  lost now on who we're talking about having
13  advantages.
14  BY MR. STEINTHAL:
15  Q.    I think in all of the prior examples
16  we've been talking about principally whether A
17  has an advantage over B and vice versa in
18  (inaudible) buying tools, and I think what this
19  example is designed to illustrate is that here A
20  has more information than B.  It's, in fact,
21  likely to be material.  It's going to -- it will
22  cause it to bid twice as much and, therefore,
23  likely win the auction.  But in this case the
24  information came from the advertiser and not the
25  exchange.

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

1    And my question is:  Is that still
2  information imbalance in the form you're
3  describing in your report?
4  A.    So the notion is that it's coming from
5  the advertiser but it's going directly to tool A
6  and bypassing the exchange?
7  Q.    Correct.
8  A.    So in that scenario, we're talking
9  about -- we're now talking about the whole world
10  as opposed to the information advantage that --
11  the ad exchange itself isn't creating an
12  advantage, but buying tool A does have an
13  information advantage because it just has more
14  relevant information.
15  Q.    So to your earlier -- that caveat that
16  you drew earlier, you were saying that A has an
17  absolute advantage over B, but it's not caused
18  by the exchange?
19  A.    Yes.
20  Q.    You would say it's caused by Coke in that
21  example, correct?
22  A.    I guess the Dallas --
23  Q.    In this case Coke?
24  A.    Coke, right.  Yes.
25  Q.    Okay.

Page 211

1        MR. HILLEGAS:  It's about an hour.
2        THE WITNESS:  How are we doing
3  time-wise?
4        MR. HILLEGAS:  If it's short...
5        MR. HUNSBERGER:  We can go off the
6  record.
7        THE VIDEOGRAPHER:  We're going off
8  the record at 3:24 p.m.
9    (Off-the-record discussion was held.)
10        THE VIDEOGRAPHER:  We're going back
11  on the record at 3:44 p.m.
12  BY MR. STEINTHAL:
13  Q.    Professor, I have one more question on
14  this chart.  You have the chart in front of you.
15  So in this example we're going to again assume
16  that the exchange ads with identifier A and B,
17  and A and B have the same information about the
18  user.  They can infer the same demographics.
19  They have the same sort of inferences that
20  they've drawn.  The only difference in this
21  example is that A has determined that the user
22  is a health food advocate who would never want
23  to buy soda, and B doesn't know that.  B still
24  knows it's a 25-year-old man whatever but it
25  that it doesn't want to buy soda.

Page 212

1        Does A have an information advantage over
2  B?
3        MR. HILLEGAS:  Objection; form.
4        THE WITNESS:  In the scenario as I
5  understand it, all parties have exactly the same
6  information, both A and B, with the only
7  difference being that A has information that the
8  user that is viewing the page, which is
9  requesting the ad, is not interested in soda.
10        That information is relevant,
11  clearly, for Coke versus Pepsi and B doesn't
12  have access to it, so that is information
13  advantage.
14        Now, in terms of -- I'll stop there.
15  BY MR. STEINTHAL:
16  Q.    Okay.  And it's advantage for A over B in
17  this case, not necessarily Coke over Pepsi,
18  correct?
19        MR. HILLEGAS:  Objection; form.
20        THE WITNESS:  In this context, A
21  knows that the user is less valuable to soda
22  advertisers versus B.
23  BY MR. STEINTHAL:
24  Q.    And if I assume that Coke uses tool A and
25  Pepsi uses tool B, would it still be the case

Page 213

1  that Coke and Pepsi are information balance or
2  would that be -- would that change the scenario?
3        MR. HILLEGAS:  Objection; form.
4        THE WITNESS:  So here, like the
5  earlier scenarios, what we're talking about is
6  one party having a bit more information that is
7  relevant to the decision versus other parties,
8  and so as an information advantage is if you
9  have a more -- if -- it's not about more.  It's
10  about the right information for making a better
11  decision versus the other one, and this is what
12  we're talking about in my report in the
13  difference between the two, the internal versus
14  the external bidders.
15  BY MR. STEINTHAL:
16  Q.    Okay.  And now I'm going to sum up the
17  stream of hypotheticals that we just looked at.
18  Is it fair to say information imbalances can
19  arise because of the information that's provided
20  by the exchange to two different buying tools
21  about a given auction that can cause an
22  imbalance?
23        Yeah, sorry, I missed a word.  Let me try
24  to rephrase my question again.
25        Is it fair to say that information

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1  imbalance can arise because of difference in the
2  information that is shared by an exchange with
3  two different participants in the auction?
4  A.    Yes.
5  Q.    And is it fair to say that an information
6  imbalance can arise because persons in the
7  auction have different amounts of their own
8  proprietary information that they're able to
9  access about the auction?
10  A.    The information imbalance can arise if
11  certain parties have access to more relevant
12  proprietary information.
13  Q.    And the same can be true about a
14  difference between information that an
15  advertiser has about the auction such as the fat
16  that Coke thinks that it wants to advertise this
17  user more than Pepsi because of the
18  remarketing-type thing?
19  A.    If one -- if one bidder has information
20  that can be used to determine that a given user
21  is more valuable to that advertiser than to
22  another, that is information that is relevant.
23      In terms of the advantage, again, we're
24  getting into much more complex scenarios with
25  many more parties, so...

Page 215

1  Q.    And as you just said, the advantage can
2  be something that causes the buying tool to want
3  to bid more for an impression, in some cases
4  like the remarketing example?
5      MR. HILLEGAS:  Objection; form.
6      THE WITNESS:  An information
7  advantage allows a bidder to, you know, bid more
8  accurately -- well, sorry.
9      An information advantage -- in my
10  report, I offer a discussion of the information
11  advantage in Google's ad auction.
12      I'm not talking about the
13  consequences of those information advantages.
14  BY MR. STEINTHAL:
15  Q.    Okay.  But sometimes information
16  advantage would lead a bidder to bid more than
17  if it didn't have the additional information,
18  correct?
19      MR. HILLEGAS:  Objection; form.
20      THE WITNESS:  An information
21  advantage could cause higher or lower bids.
22  That's relevance of economics how -- what
23  exactly what to bid.  But what it allows them to
24  do is to make more accurate assessments of value
25  of it.  And so how well you -- how well a party

Page 216

1  can determine a value, they can get an accurate
2  model of what it is they're, you know, bidding
3  on; and that's where having the right
4  information and having information disadvantage
5  matters.
6  BY MR. STEINTHAL:
7  Q.    And sometimes it might even cause an
8  advertiser not to bid at all or cause a bidder
9  not to bid at all?
10      MR. HILLEGAS:  Objection; form.
11      THE WITNESS:  It can cause arbitrary
12  changes in bidding behavior.
13  BY MR. STEINTHAL:
14  Q.    And determining what those arbitrary
15  changes are is a complicated question that's
16  outside of your relevant opinions in this case,
17  correct?
18  A.    Yes.
19  Q.    Okay.  You can thankfully put that aside.
20  I don't have any more questions about Coke and
21  Pepsi?
22      MR. HILLEGAS:  Does that mean you're
23  out of diet Coke questions?
24      MR. STEINTHAL:  When it runs out, I
25  get more.

Page 217

1  BY MR. STEINTHAL:
2  Q.    Perhaps we've been discussing one of your
3  conclusions in your report is that Google has an
4  advantage over other parties' ads in Google; is
5  that correct?
6      MR. HILLEGAS:  Objection; form.
7      THE WITNESS:  My opinion is that
8  Google does have information advantage overall
9  of their participants in its advertising
10  platform.
11  BY MR. STEINTHAL:
12  Q.    And beyond the fact that information
13  advantage exists, do you have an opinion as to
14  whether that advantage allowed Google buying
15  tools to win more auctions for its customers
16  than Google's rivals?
17      MR. HILLEGAS:  Objection; form.
18      THE WITNESS:  I do not offer an
19  opinion on the number of auctions that Google
20  would or would not win.
21  BY MR. STEINTHAL:
22  Q.    Apart from the quantification question of
23  exactly how many, do you offer the opinion that
24  it would allow, in general, it would allow
25  Google's buying tools to win more auctions?

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

1  A.    In my understanding of Google's auction
2  system, every auction that is won is a cost,
3  because when they win an auction, Google has to
4  payout. Google only gets paid unless we're
5  talking about cost per mille, but if we're
6  talking about cost per click, they are only paid
7  when a user clicks on an ad. So winning more
8  auctions is not the key thing. It's winning the
9  right auctions that lead to clicks for which
10  they get pays.
11  Q.    But you testified earlier your opinions
12  don't extend to the consequences of the
13  information advantage other than in the limited
14  context of your response to Professor Milgrom's
15  comment?
16        MR. HILLEGAS:  Objection; form.  Not
17  quite you finished that sentence there, Counsel.
18  It kind of faded off there, so...
19  BY MR. STEINTHAL:
20  Q.    Let me try that again.
21        Are there any consequences of Google's
22  information advantage that you are willing to
23  testify to in this case?
24  A.    I'm willing to testify that that
25  information advantage inhibits the ability of

Page 219

1  other participants to understand the operations
2  inside of Google, whether they do experiments or
3  not, because that information differential makes
4  the internal system so opaque, that without
5  direct access to its internals to be
6  fundamentally difficult for anyone outside, I
7  will say certainly existing tools can bound the
8  behavior and make certain decisions, but
9  overall, they can't know what Google is doing to
10  a significant degree of accuracy.
11  Q.    But you have not offered the opinion that
12  that information advantage leads to more auction
13  wins for Google buying tools and fewer auction
14  wins for non-Google buying tool, correct?
15        MR. HILLEGAS:  Objection; form.
16        THE WITNESS:  I do not offer an
17  opinion on whether it would lead to more or less
18  wins in the auctions. But from my understanding
19  of the functioning of the system, it's not even
20  in Google's best interest to do more or less.
21  It's to do the right ones, and the information
22  that they have means they understand the value
23  of these to a greater degree than outsiders and
24  thus they can win the auctions -- they have a
25  better ability to choose the auctions they

Page 220

1  should win and then to decide how to win them
2  for whatever price they want because they know
3  the value of it --
4  BY MR. STEINTHAL:
5  Q.    But --
6  A.    -- relative to others.
7  Q.    But for whatever set of auctions that
8  Google thinks are the right auctions to win, you
9  have not offered an opinion that it's one or
10  more of those, correct?
11        MR. HILLEGAS:  Objection; form.
12        THE WITNESS:  I do not offer an
13  opinion on which precise auctions Google has won
14  or has not won.
15  BY MR. STEINTHAL:
16  Q.    Or any impact that the Google information
17  advantage has on the auction, it's likely to win
18  auctions, correct?
19        MR. HILLEGAS:  Objection; form.
20        THE WITNESS:  My opinion details
21  with the information at a high level that goes
22  into the decisions to make bids what to
23  calculate the bids in terms of the cost per
24  click to cost per mille, and implicitly part of
25  that is a at least probabilistic determination

Page 221

1  of which ones are going to be won and which ones
2  are not going to win. So that information
3  advantage directly feeds into the operation of
4  the auction.
5        I do not offer an opinion beyond --
6  about the exact economic consequences of the
7  operation of the auction, but it's clearly
8  influencing behavior because it's part of the
9  predicted models that calculate price.
10  BY MR. STEINTHAL:
11  Q.    Do you offer any opinion that Google's
12  information advantage caused advertisers using
13  Google's tools to receive better or worse return
14  on the ad spend?
15        MR. HILLEGAS:  Object to form.
16        THE WITNESS:  In my report, I do not
17  offer an opinion on the precise economic
18  consequences of the information advantage that
19  Google has.
20  BY MR. STEINTHAL:
21  Q.    And you offered your opinion in your
22  report as to whether Google's information
23  advantage or non-Google buying tools converse
24  disadvantage cause that user that are using
25  non-Google tools to have a worse return ad

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

1  spend?
2         MR. HILLEGAS: Objection to form.
3         THE WITNESS: Again, in my report I
4  do not discuss the economic consequences of the
5  information advantage or disadvantages.
6  BY MR. STEINTHAL:
7  Q.    And if we look at publishers, I will ask
8  the same question. Have you offered any opinion
9  that Google's information advantage allows
10 Google's publisher facing tools to earn more
11 revenue than publisher customers than they would
12 earn from non-Google tools?
13        MR. HILLEGAS: Objection; form.
14        THE WITNESS: I do not offer an
15 opinion regarding the publishers in the -- I
16 don't not offer an economic opinion regarding
17 the publishers in Google's ecosystem.
18 BY MR. STEINTHAL:
19 Q.    And have you offered any opinions that
20 Google's information advantage allowed Google to
21 charge more for its Adtech tools than otherwise
22 could?
23        MR. HILLEGAS: Objection; form.
24        THE WITNESS: I do not offer an
25 opinion on what the economic consequences are

1  regarding prices for Google's information
2  advantage.
3  BY MR. STEINTHAL:
4  Q.    Have you offered any opinions that
5  Google's information advantage allowed Google to
6  earn more revenue than it otherwise would have
7  earned?
8         MR. HILLEGAS: Same objection.
9         THE WITNESS: I do not offer any
10 opinion on Google's revenues related to
11 information advantage.
12 BY MR. STEINTHAL:
13 Q.    So, Professor, is it correct, you are not
14 opining on any economic impacts or affects of
15 Google's purported information advantage?
16        MR. HILLEGAS: Objection; form.
17        THE WITNESS: My report discusses
18 information advantage and its relationship to
19 experiments participants in the market might
20 perform to improve their importance. Beyond
21 that, I do not discuss the effect on the
22 economic actors.
23 BY MR. STEINTHAL:
24 Q.    Turning to paragraph 14 of your report,
25 you say, quote, My review of Google's source

1  code and documents indicates that Google
2  maintains an information advantage over all
3  other parties participating in the Google ad
4  ecosystem, whether they be advertisers,
5  publishers, or third-party ad exchanges."
6      Do you see that?
7  A.   Yes.
8         MR. HILLEGAS: Object to form.
9  BY MR. STEINTHAL:
10 Q.    When you refer to, quote, "Google
11 maintains an information advantage" in that
12 paragraph, are you referring to the company as a
13 whole or specific Google to products?
14 A.    I'm referring to the advantage that I
15 observed in the source code that I reviewed.
16 Q.    And that information that you observed,
17 is it information that is maintained by any
18 specific Google tools?
19 A.    The systems that I refer to -- again, the
20 focus of my analysis is, you know, the
21 components on page 11, in figure one. So this
22 portion of the Google infrastructure ████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

1  ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
4  Q.    The analysis you can describe in your
5  report, however, is -- compares the information
6  available to Google's ad buying tools or non-ad
7  buying tools, correct?
8         MR. HILLEGAS: Object to form.
9         THE WITNESS: In my analysis, I'm
10 focused on the entities I can observe in the
11 source code, and ████████████████████████████
██████████████████████████████████████████████
████████████████████████████
14        The tools that publishers and
15 advertisers use are quite far from this, and the
16 affects of them on this would be to put data
17 into databases. So I analyzed this portion but
18 not the tools per se, except for the influence
19 of the behavior of these components.
20 BY MR. STEINTHAL:
21 Q.    Professor, looking at page nine, heading
22 4 in bold print, it says, "Google ad buying
23 tools have access to more granular targeting
24 information than do third-party buyers."
25        Do you see that on page nine of your

HIGHLY CONFIDENTIAL

Page 226

1  report?
2  A.    Sorry, page nine?
3  Q.    Paragraph four.
4  A.    Okay.  Which paragraph again?
5  Q.    Heading in section four, bold print?
6  A.    Oh the heading?
7  Q.    Do you see that?
8  A.    Yes.
9  Q.    So I'll ask the question again.  Is the
10  analysis in your report is focused on the
11  advantages that Google's ad buying tools had
12  over third-party buying tools, correct?
13          MR. HILLEGAS:  Objection; form.
14          THE WITNESS:  So the title of this
15  section, which refers to ad buying tools, is
16  actually referring in the body to specific
17  components, such as in paragraph 26, ███████

Page 227

1  ████████████████
2  ███████████████████
4  BY MR. STEINTHAL:
5  Q.    So despite the fact that your report
6  reflects multiple times, even in just paragraph
7  24, multiple times you refer to a comparison
8  between Google's ad buying tools, the
9  third-party buyers or third-party buying tools.
10      Your position is that your analysis is
11  actually only limited to the ████████████
████████████████████
14          MR. HILLEGAS:  Objection to form.
15          THE WITNESS: ████████████████
16  ███████████████████

Page 228

1  ████████████████████████████████████
3  BY MR. STEINTHAL:
4  Q.    Google ads is an example of a Google
5  buying tool, correct?
6  A.    I want to refer to Dr. Hochstetler's
7  report.
8          MR. STEINTHAL:  We'll get a copy of
9  it.  You can look at it while we're marking it.
10  We'll mark this as Somayaji Exhibit 4.
11          (Exhibit Number 4 was marked.)
12          MR. HILLEGAS:  Is this a full set of
13  all the defendants' source code appendix?
14          MR. STEINTHAL:  I don't think it is
15  not the source code appendix.
16          MR. HILLEGAS:  I see appendix A, B,
17  and not C just to confirm.
18          MR. STEINTHAL:  For the record, this
19  is Dr. Hochstetler's report dated June 7, 2024,
20  excluding appendix C, which is marked "Highly
21  Confidential Source Code."
22          THE WITNESS:  So --
23  BY MR. STEINTHAL:
24  Q.    My question was:  Google ads is an
25  example of Google's buying tools, correct?

Page 229

1  A.    The reason why I was hesitant for naming
2  that, because I'm looking at paragraph 13 from
3  Dr. Hochstetler's report and just talking about
4  the complexity of the terminology, and I'm
5  referring to paragraph 12 and paragraph 13,
6  so...
7  █████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
16  ███████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████
24  Q.    Okay.  There are many references in your
25  report to Google buying tools.  Do you have any

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL



Page 230

1  definition of that term that you want to offer
2  now?
3         MR. HILLEGAS:  Objection; form.
4  BY MR. STEINTHAL:
5  Q.    I'll rephrase.  You use the term "Google
6  buying tools" many times in your report.  How
7  would you define that term?
8  A.    I think in the context of my report I
9  would define the Google ad buying tools as tools
10  that provide inputs, actually ad inventory
11  inputs and rules associated with them ██████
13  Q.    But you did not have the names of any
14  particular tools in mind?
15         MR. HILLEGAS:  Objection; form.
16         THE WITNESS:  I was not thinking of
17  any specific tool.  Again, I was focused on this
18  portion of the code.
19  BY MR. STEINTHAL:
20  Q.    So other than the information advantage
21  that we've just been discussing, in section
22  four, between ██████████████,
23  are there any other information advantages that
24  you are analyzing in your report?
25         MR. HILLEGAS:  Objection; form.

Page 231

1         THE WITNESS:  I talk about the
2  information advantage that ████████████

5  BY MR. STEINTHAL:
6  Q.    ████████
7         MR. HILLEGAS:  Objection; form.
8         THE WITNESS:

16

24  BY MR. STEINTHAL:
25  Q.

Page 232

1

3  A.

6  Q.

8         MR. HILLEGAS:  Objection; form.
9         THE WITNESS:

13  BY MR. STEINTHAL:
14  Q.

18         MR. HILLEGAS:  Objection; form.
19         THE WITNESS:

13 [sic]

18 [sic]

Page 233

1

5  BY MR. STEINTHAL:
6  Q.

9

14         MR. HILLEGAS:  Objection; form.
15         THE WITNESS:

20  BY MR. STEINTHAL:
21  Q.

25         MR. HILLEGAS:  Objection; form.

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

1          THE WITNESS: ▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮
4  BY MR. STEINTHAL:
5  Q.    Are there any other addition aspects of
6  information advantage that you identify in your
7  report?
8          MR. HILLEGAS:  Objection; form.
9          THE WITNESS:  Those are the two
10 aspects of the information advantage.  I cannot
11 say that that was the only advantages, but those
12 are the ones that I described.
13 BY MR. STEINTHAL:
14 Q.    In your report?
15 A.    In my report.
16 Q.    Do you offer any opinions in your report
17 -- well, strike that.
18      Do you offer any opinions in your report
19 as to any information advantages that Google ad
20 managed or Google AdX possess over any other
21 participants?
22          MR. HILLEGAS:  Objection; form.
23          THE WITNESS: ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 235

1  BY MR. STEINTHAL:
2  Q.    ▮▮▮▮
3  A.    ▮▮▮▮▮▮▮▮
5  Q.    ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
10 A.    ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
16 Q.    Let's turn back to paragraph 14 of your
17 report where you write that, quote, This
18 information imbalance between Google and
19 non-Google participants impacts which ads are
20 displayed, where they are shown, and the price
21 that is paid for them."
22      How does such information and imbalance
23 impact which ads are displayed?
24          MR. HILLEGAS:  Objection; form.
25 BY MR. STEINTHAL:

Page 236

1  Q.    How does the information imbalance that
2  you described in your report describe how ads
3  are displayed?
4  A.    What I show is that there is more
5  specific information available to the choosing
6  of ads, and there's a great deal of information
7  in model for choosing those ads.  So your
8  question is -- the specific impact on which ads
9  are chosen, that is outside the scope of my
10 analysis, because again, I'm looking at source
11 code.
12 Q.    So your opinion was that it has some
13 impact but you did not analyze what that impact
14 was?
15          MR. HILLEGAS:  Objection; form.
16          THE WITNESS:  My opinion is that
17 there's information advantage to ▮▮▮▮▮▮▮
▮▮▮▮▮▮.  I do not offer opinion in how that
19 information advantage manifests into specific
20 economic consequences beyond, you know, the
21 challenge of being able to predict outcomes --
22 third-parties being able to predict outcomes
23 through experiments.
24 BY MR. STEINTHAL:
25 Q.    You say information imbalance that you

Page 237

1  describe in your report impacts where "they"
2  meaning "ads" are shown.  Did you analysis the
3  nature of that impact?
4          MR. HILLEGAS:  Objection; form.
5          THE WITNESS:  When I say impact
6  here, I'm talking about in an algorithmic sense,
7  that those are inputs to it, that those
8  decisions are changed because of those inputs;
9  and while in principle, it's possible all
10 additional information models would lead to the
11 system putting the same decisions as it would
12 without those, creating such a system would be
13 an exercise of wasted resources.
14 BY MR. STEINTHAL:
15 Q.    So your opinion is simply that the
16 information Google has, ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮; is that the nature of
19 your opinion?
20          MR. HILLEGAS:  Objection; form.
21          THE WITNESS:  My opinion is that
22 Google has information about publishers,
23 advertisers, users. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL



Page 238

7  BY MR. STEINTHAL:
8  Q.    Okay. But your opinion does not extend
9  to quantifying or describing that impact other
10 than it would have some effect?
11         MR. HILLEGAS: Objection to form.
12         THE WITNESS: I do not offer an
13 opinion on the quantification of that impact.
14 BY MR. STEINTHAL:
15 Q.    Turn to paragraph 20 of your report. I'm
16 sorry, that's the wrong number. Try 23.
17     In paragraph 23 about five lines to the
18 bottom sentence that begins "However," do you
19 see that?
20 A.    Yes.
21 Q.    The sentence says, "However, If it can be
22 shown that different parties have access to
23 different information, and if that information
24 can impact on how auctions are conducted, it
25 would instead be my opinion that there is an

Page 239

1  information imbalance that favors certain
2  parties over others. Such is the case here."
3      Is that a correct statement of your
4  opinion in your report?
5          MR. HILLEGAS: Objection; form.
6          THE WITNESS: That is my opinion in
7  my report. That is what is said in my report.
8  BY MR. STEINTHAL:
9  Q.    Have you, in fact, in your report shown
10 that the different parties have asked for
11 different information and that information can
12 impact on how auctions are conducted?
13         MR. HILLEGAS: Objection; form.
14         THE WITNESS: Could you repeat the
15 question?
16 BY MR. STEINTHAL:
17 Q.    Sure. Rephrase slightly. Paragraph 23
18 states, a conditional, as I read it. You say,
19 "However, If it can be shown that different
20 parties have access to different information,
21 and if that information can impact on how
22 auctions are conducted, it would instead be my
23 opinion that there is an information imbalance
24 that favors certain parties over others. Such
25 is the case here."

Page 240

1      There's two conditionals in that
2  sentence. I'm asking if you have, in fact, in
3  this case shown condition one, different parties
4  asked different information, and condition two
5  that is the information can impact on how
6  auctions are conducted?
7          MR. HILLEGAS: Objection to form.
8          THE WITNESS: So the first part of
9  that sentence different parties have access to
10 different information. My opinion is that is
11 shown by

19

Page 241

1

4

12 BY MR. STEINTHAL:
13 Q.

17         MR. HILLEGAS: Objection to form.
18         THE WITNESS:

23 BY MR. STEINTHAL:
24 Q.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL



Page 242

1
2  A.
3  Q.
4       MR. HILLEGAS:  Objection; form.
5       THE WITNESS:

15  BY MR. STEINTHAL:
16  Q.

20       MR. HILLEGAS:  Objection; form.
21       THE WITNESS:

Page 243

1

9  BY MR. STEINTHAL:
10  Q.

13       MR. HILLEGAS:  Objection; form.
14       THE WITNESS:

25  BY MR. STEINTHAL:

Page 244

1  Q.

3  A.

7  Q.

11       MR. HILLEGAS:  Objection; form.
12       THE WITNESS:

14  BY MR. STEINTHAL:
15  Q.

18       MR. HILLEGAS:  Objection to form.
19       THE WITNESS:

Page 245

1

14

21  BY MR. STEINTHAL:
22  Q.

Veritext Legal Solutions
800-567-8658                                                    973-410-4098

HIGHLY CONFIDENTIAL



Page 246

1    MR. HILLEGAS:  Objection; form.
2    THE WITNESS:

9  BY MR. STEINTHAL:
10  Q.

14    MR. HILLEGAS:  Objection; form.
15    THE WITNESS:

24

Page 247

1

20  BY MR. STEINTHAL:
21  Q.

24    MR. HILLEGAS:  Objection; form.
25    THE WITNESS:

Page 248

1

4  BY MR. STEINTHAL:
5  Q.

7  A.
8  Q.

13    MR. HILLEGAS:  Objection; form.
14    THE WITNESS:

23  BY MR. STEINTHAL:
24  Q.    So do you believe it's not feasible to
25  assess the materiality of alleged information

Page 249

1  advantage that is this complex?
2    MR. HILLEGAS:  Objection to form.
3    THE WITNESS:  It is my opinion it is
4  completely feasible to determine the impact of
5  this, but the impact you would find would not be
6  at a level of looking at particular features and
7  looking at code, but looking at the overall
8  performance of the system in an economic context
9  because that's where the information advantage
10  would manifest in economic decisions, which is
11  outside the scope of my report.
12  BY MR. STEINTHAL:
13  Q.

15

20    MR. HILLEGAS:  Objection to form.
21    THE WITNESS:

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL



Page 250

1 [redacted]

9 BY MR. STEINTHAL:
10 Q.    So I was -- okay.  Finish.
11 A.    [redacted]

17 Q.    Try my last question again.
18 [redacted]

24        MR. HILLEGAS:  Objection to form.
25        THE WITNESS:  [redacted]

Page 251

1 [redacted]

9 BY MR. STEINTHAL:
10 Q.    [redacted]

13 A.    [redacted]

20 Q.    Did you conduct any interviews with
21 advertisers or do any other research or analysis
22 to assess whether advertisers are seeking to
23 understand the internal operation of Google
24 systems?
25 A.    I did not conduct any interviews as part

Page 252

1 of my work here.
2 Q.    Are you aware of any evidence in this
3 case supporting the conclusion that advertisers
4 are interested in the internal operations of
5 Google's systems?
6        MR. HILLEGAS:  Objection to the
7 form.
8        THE WITNESS:  I see from
9 Dr. Milgrom's report his response to the other
10 experts that they are asserting that
11 third-parties are at a disadvantage, and I
12 referred to that.
13 BY MR. STEINTHAL:
14 Q.    Other than paragraph 32 that we discussed
15 earlier, are you aware of any evidence or record
16 in this case suggesting that advertisers are
17 interested in understanding the internal
18 operation of Google's models?
19 A.    I am not aware but I have not looked for
20 such evidence.
21 Q.    So again, referring -- I think we're kind
22 of at an hour but I'm going to try to wrap this
23 up.
24        Referring you back to paragraph 13 of
25 your report, you say that your rebuttal report

Page 253

1 responds to Dr. Milgrom's claims that publishers
2 and advertisers are able to optimize their
3 behavior and the response that Google introduces
4 with add-on programs.
5        If you just testified the information
6 advantage that you are discussing relates to
7 advertisers and not publishers, why is
8 publishers mentioned in paragraph 13?
9        MR. HILLEGAS:  Objection; form.
10        THE WITNESS:  Previously I was
11 talking about the page inventory that's offered
12 in the system is coming from the website that
13 Google has a relationship, those are the ones
14 that it's serving ads to.  That's how the
15 system's setup.  When I talk about publishers,
16 advertiser, optimize, this is talking about
17 those publishers that are being able to --
18 because they set rules and other things to say
19 how should I make sure I maximize my revenue
20 that I get from Google.  How should I setup my
21 system so that I can receive the -- you know, ad
22 inventory, that's publishers conduct experiments
23 to maximize their revenue from Google.  That, in
24 parts, requires them understanding what Google
25 wants them to do, and that system is opaque, and

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL

Page 254

1  that system, in part, has to be opaque, because
2  some scammers try to, you know, manipulate it,
3  but it's also used for the positive
4  participants.
5  BY MR. STEINTHAL:
6  Q.    So again, referring to the information
7  advantage we've been discussing between ▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮r, is it your opinion
9  that information advantage effects advertisers'
10  ability to optimize their behavior and respond
11  to the changes that Google introduces to add-on
12  programs?
13  A.    So the information advantage I'm really
14  talking about is talking about Google over
15  everyone else, and so to understand, we have to
16  think about each of the participants.  We have
17  to know the publishers that are putting their
18  ads up.  We have to think of the first-party
19  advertisers, and then we have to think of the
20  third-party advertisers.  I'm saying all of
21  those participants are at an information
22  disadvantage to Google who's sitting in the
23  middle running these systems and using access to
24  lots of information that none of the other
25  parties have access to.

Page 255

1  Q.    If we were to substitute Google with some
2  other ad exchange, would that not be the same?
3  Would the exchange not always have more
4  information than any addition publisher or
5  advertiser?
6  A.    A classic ad exchange would, you know --
7  the old style would do things in cost per mille,
8  and so the advertisers would come in with a
9  price and then it would just be -- the ad
10  exchange would just compare them and decides who
11  wins and then sends it out; and then presumably,
12  it would send out the request using the same
13  data structure to all participants for them to
14  decide what they do.  This is much like the
15  analogy like you said.
16       What we have with Google is a very
17  different system in which the internal system is
18  doing a lot more work than just comparing cost
19  per mille things, and that's the heart of the
20  information disadvantage all participants are
21  under except for Google.
22  Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 256

1  ▮▮▮▮▮▮▮▮▮
2       MR. HILLEGAS:  Objection; form.
3       THE WITNESS:  ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 257

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  BY MR. STEINTHAL:
8  Q.    I have one last question before you take
9  a break.  You have not analyzed, have you, of
10  the relative benefits to advertisers of using
11  Google's -- the development advantage per costs
12  of using Google's ad buying tools versus other
13  ad buying tools, have you?
14       MR. HILLEGAS:  Objection to form.
15       THE WITNESS:  My analysis in my
16  report is about the source code.  I do not have
17  an analysis of other ad buying systems.
18  BY MR. STEINTHAL:
19  Q.    Or the cost or benefits of advertisers
20  using Google's tools versus not using Google's
21  tools?
22       MR. HILLEGAS:  Objection to form.
23       THE WITNESS:  I wouldn't be doing an
24  economic analysis of such systems.  I have not
25  looked at the source code of such systems.

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL



Page 258

1        MR. STEINTHAL:  Let's take a break.
2        THE VIDEOGRAPHER:  We are going off
3  the record at 4:50 p.m.
4        (Off-the-record discussion was held.)
5        THE VIDEOGRAPHER:  We're on the
6  record at 5:13 p.m.
7  BY MR. STEINTHAL:
8  Q.    Professor, let's talk about the section
9  five of your report.  If I'm understanding that
10 section correctly, your opinion is that Google's
11 buying tools

15 A.    Sorry, which page is section five?  Page
16 20.  Yes.
17 Q.    Paragraph 43.
18 A.

23 Q.

Page 259

1

3  A.

8  Q.

11 A.

18 Q.

20

23 A.

25 Q.

Page 260

1

3  A.

6  Q.

8  A.

9  Q.

13       MR. HILLEGAS:  Objection; form.
14       THE WITNESS:

22 BY MR. STEINTHAL:
23 Q.
24 A.

Page 261

1

8

25 Q.

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL



Page 262

1

3          MR. HILLEGAS:  Objection; form.
4          THE WITNESS:

13  BY MR. STEINTHAL:
14  Q.    I'll ask the question again.

20          MR. HILLEGAS:  Objection; form.
21          THE WITNESS:

Page 263

1

4

11  BY MR. STEINTHAL:
12  Q.

16          MR. HILLEGAS:  Objection; form.
17          THE WITNESS:

Page 264

1

4  BY MR. STEINTHAL:
5  Q.

9  A.
10  Q.

12  A.
13  Q.

15          MR. HILLEGAS:  Objection; form.
16          THE WITNESS:
17  BY MR. STEINTHAL:
18  Q.

20  A.

Page 265

1

9

17  Q.

20          MR. HILLEGAS objection; form.
21          THE WITNESS:

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL



Page 266

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  BY MR. STEINTHAL:
4  Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7       MR. HILLEGAS:  Objection; form.
8       THE WITNESS:  ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
13 BY MR. STEINTHAL:
14 Q.  ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18      MR. HILLEGAS:  Objection; form.
19      THE WITNESS:  ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
23 BY MR. STEINTHAL:
24 Q.  ▮▮▮▮▮▮▮▮▮▮▮▮

Page 267

1  ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
4       MR. HILLEGAS:  Objection to form.
5       THE WITNESS:  ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
16 BY MR. STEINTHAL:
17 Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
20      MR. HILLEGAS:  Objection; form.
21      THE WITNESS:  ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

Page 268

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  BY MR. STEINTHAL:
5  Q.  ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11       MR. HILLEGAS:  Objection; form.
12       THE WITNESS:  ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 BY MR. STEINTHAL:
16 Q.  Move on to something different.  Did you
17 investigate the types or amounts of data that
18 third-party buying tools have available to them?
19      MR. HILLEGAS:  Objection to form.
20 BY MR. STEINTHAL:
21 Q.  And third-party buying tools somebody
22 other than Google?
23 A.  I analyzed the data ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
25 Q.  So you analyzed the data by Google.  Did

Page 269

1 you conduct any analysis of the total amounts of
2 information that is available to them from all
3 sources?
4       MR. HILLEGAS:  Objection; form.
5       THE WITNESS:  I did not conduct any
6 analysis outside the bounds of Google source
7 code and the associate documentation.
8 BY MR. STEINTHAL:
9 Q.  So you have no opinion as to whether or
10 not non-Google buying tools have data that is
11 equivalent to the information that you allege is
12 being fed into Google's machine learning models,
13 did you?
14      MR. HILLEGAS:  Objection; form.
15      THE WITNESS:  In my report, I did
16 not offer an opinion in the information
17 available to third-party tools outside of the
18 data that is given to them ▮▮▮▮▮▮▮.
19 BY MR. STEINTHAL:
20 Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22       MR. HILLEGAS:  Objection; form.
23       THE WITNESS:  ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

68 (Pages 266 - 269)



HIGHLY CONFIDENTIAL

Page 270

1  BY MR. STEINTHAL:
2  Q.
4        MR. HILLEGAS:  Objection; form.
5        THE WITNESS:
10  BY MR. STEINTHAL:
11  Q.    If hypothetically Google provided less
12  information to third parties that they were able
13  to obtain the same information, the missing
14  information from other sources, would Google
15  still have information advantage?
16        MR. HILLEGAS:  Objection; form.
17        THE WITNESS:  Implicitly of your
18  questions are two questions.  One is if the
19  third-parties had access to the same
20  information, could they make up for the
21  information disadvantage that they have, you
22  know, relative to Google.  And the second
23  question, as I understand it, is that's
24  plausible, because it's plausible for
25  third-parties to have such information to get

Page 271

1  the same information that Google has.  It's not
2  a simple matter of having a lot of information.
3  You have to have the right information, and you
4  have to have it -- you have to be able to
5  observe from the right perspective.
6        Google is
9  Third-parties do not, in general, sit where
10  Google does in the Internet.  Google has lots of
11  points of observation.  Most parties don't have
12  anything close to that.  With those, they can
13  get that information, in particular from a
14  particular ad service.  let me be specific.
15

Page 272

1
22  BY MR. STEINTHAL:
23  Q.

Page 273

1
3        MR. HILLEGAS:  Objection; form.
4        THE WITNESS:
7  BY MR. STEINTHAL:
8  Q.
12        MR. HILLEGAS:  Objection; form.
13        THE WITNESS:
20  BY MR. STEINTHAL:
21  Q.    And you also did not offer an opinion as
22  to whether or not those third-parties could
23  obtain equivalent data from other sources other
24  than Google, correct?
25        MR. HILLEGAS:  Objection; form.

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL

Page 274

1    THE WITNESS:  I do not offer an
2  opinion on an ability of third parties to obtain
3  such information.
4  BY MR. STEINTHAL:
5  Q.    Did you attempt to analyze that?
6    MR. HILLEGAS:  Objection; form.
7    THE WITNESS:  My -- I chose to
8  approach the assignment that was given was to
9  respond to the opinion of Dr. Milgrom that
10  advertisers and publishers are able to optimize
11  the behavior response modifications that Google
12  introduced to its auction programs.  I took that
13  question and my interpretation was to look at
14  the information advantage in Google source code.
15  So that's what I analyzed here, and in my
16  opinion, the analysis of that source code is
17  sufficient to address that question.  I'm not
18  saying there aren't other ways to address that
19  question.
20  BY MR. STEINTHAL:
21  Q.    Okay.  So staying on that opinion.  You
22  offered opinions on the case, information
23  imbalance in the information that's provided by
24  Google's ad exchange to its only internal buyers
25  third parties ad buyers, have you -- is that

Page 275

1  correct?
2    MR. HILLEGAS:  Objection; form.
3  BY MR. STEINTHAL:
4  Q.    I'll rephrase.
5    Professor, your opinion on information on
6  imbalance in this case focuses on different
7  information that is made available to Google's
8  ad buying tools by Google's ad exchange and the
9  information that is made available to
10  third-party buyers by Google's ad exchange; is
11  that correct?
12  A.    I agree with that statement to the degree
13  it aligns with the ████████████████████
14  ████████████████████
15  Q.    And I think we might have asked this
16  question earlier, it refers to that information
17  imbalance analysis, are you concerned with the
18  potential imbalance between Google's ad exchange
19  itself and any particular buyer?
20  A.    My analysis is at a level of source code.
21  Not of that of any particular buyer.
22  Q.    As I recall one of the earlier
23  hypotheticals we discussed involved an exchange
24  that new information about the user but did not
25  share it with either of the buying tools in that

Page 276

1  example.  Do you recall that hypothetical?
2  A.    Yes.
3  Q.    Okay.  And in that case, the conclusion
4  was that the exchange had not caused information
5  imbalance between A and B just because it held
6  on to the information itself either, correct?
7    MR. HILLEGAS:  Objection; form.
8    THE WITNESS:  In the context of that
9  hypothetical with only two ad buying tools in an
10  exchange, yes.
11  BY MR. STEINTHAL:
12  Q.    Okay.  So now in the real world, more
13  buyers and Google's ad exchange, my question is
14  if Google's ad exchange has information about ad
15  auctions, about impressions, whatever that is
16  about, that is more than information is
17  available to any particular buying tool bidding
18  into the exchange, my question is, is that the
19  information imbalance that you're describing in
20  your report?
21    MR. HILLEGAS:  Objection; form.
22    THE WITNESS:  As I said, the
23  information imbalance takes multiple forms.  One
24  form of it is that third-parties do not get
25  access to the same information ████

Page 277

1  ████████████████████████████████.
2    But Google as an ad exchange, does
3  much more than the ad exchange in the
4  hypothetical, because it is ████████████
5  ████████████████████████████████
6  ████████████████████████████
7  ████████████████████████████████
8  ████████████████████████████████
9  ████████████████████████████
10  ████████████████████████████████
11  ████████████████████████████████
12  ██████████████████████████████████
13  ██████████████████████████.
14  BY MR. STEINTHAL:
15  Q.    Are you offering an opinion in this case
16  as to the information advantage possessed or as
17  to -- strike that.
18    Are you offering an opinion in this case
19  as to an information advantage that's possessed
20  by Google's ad exchange over non-Google ad
21  buying tools?
22    MR. HILLEGAS:  Objection; form.
23    THE WITNESS:  I'm offering an
24  opinion regarding the information balance and
25  participants in Google's infrastructure ████

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL



Page 278

1  ██████████████ and the degree to which
2  those effect the various buying tools.
3  BY MR. STEINTHAL:
4  Q.  ████████████████████
   ████████████████████████████
7       MR. HILLEGAS:  Objection; form.
8       THE WITNESS:  ████████
   ████████████████████████████
   ████████████████████████████
   ████████████████████
14 BY MR. STEINTHAL:
15 Q.  ████████████████████████
   ████████████████████████████
18 A.  ██████████████████████
   ████████████████████████████
   ████████████████████████
   ████████████████████████
   ████████████████████
   ████████████████████

Page 279

1       ██████████████████████.
2  Q.  ██████████████████████
   ████████████████████████████
4  ████████████████████████████████
6  A.  ████████.
7  Q.  ████████████
9       MR. HILLEGAS:  Objection; form.
10      THE WITNESS:  ███
11 BY MR. STEINTHAL:
12 Q.  ████████████████████████
   ████████████████████████████
16      MR. HILLEGAS:  Objection; form.
17      THE WITNESS:  ████████████
19 BY MR. STEINTHAL:
20 Q.  ████████████████████████
   ████████████████████████████
24      MR. HILLEGAS:  Objection; form.
25      THE WITNESS:  I'm not quite sure

Page 280

1  what you mean by that.
2  BY MR. STEINTHAL:
3  Q.    I'll try it a different way.
4        Ad buying tools can count the number of
5  clicks on the ads that they serve, correct?
6        MR. HILLEGAS:  Objection; form.
7        THE WITNESS:  To be clear, clicks on
8  an ads are recorded by the Java Script running
9  in a browser.  That data then goes back to the
10 sever that served the ad to say what happened to
11 that add, and that data is aggregated, and so
12 it's part of the ad serving infrastructure.
13 It's not part of the ad buying infrastructure.
14 BY MR. STEINTHAL:
15 Q.    Are you aware that ad buying tools can
16 include code in the render creatives to allow
17 them to detect when an ad is clicked upon?
18        MR. HILLEGAS:  Objection; form.
19        THE WITNESS:  I would assume that ad
20 buying tools can select things to say, please
21 tell me when my ad is clicked on.
22 BY MR. STEINTHAL:
23 Q.    And --
24 A.    But the flow of data is a bit different.
25 Q.    Did you investigate whether ad buying

Page 281

1  tools are capable of detecting when their ads
2  are clicked on?
3        MR. HILLEGAS:  Objection; form.
4        THE WITNESS:  I did not investigate
5  the matrix that ad buying tools report to users
6  to them or the sources of those matrix.
7  BY MR. STEINTHAL:
8  Q.    That wasn't my question, but I'll try it
9  a slightly different one.
10 ████████████████████████████████
12 A.  ████████
13 Q.  ████████████████████████████
   ████████████████████████
16      MR. HILLEGAS:  Objection; form.
17      THE WITNESS:  ████████████
   ████████████████████████████
   ████████████████████████████
22 BY MR. STEINTHAL:
23 Q.  ████████████████████████
   ████████████████████████

Veritext Legal Solutions
800-567-8658                                                                    973-410-4098

HIGHLY CONFIDENTIAL



Page 282

1 ▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮
3       MR. HILLEGAS:  Objection to form.
4  BY MR. STEINTHAL:
5  Q.  ▮▮▮▮▮▮▮▮
   ▮▮▮▮▮
7       MR. HILLEGAS:  Objection; form.
8       THE WITNESS:  ▮▮▮▮▮
   ▮▮▮
10 BY MR. STEINTHAL:
11 Q.  ▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮
15      MR. HILLEGAS:  Objection to form.
16      THE WITNESS:  ▮▮▮▮▮
   ▮▮▮▮▮▮▮▮
19 BY MR. STEINTHAL:
20 Q.  ▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮
   ▮▮▮
24 A.  ▮▮▮▮▮▮▮
   ▮▮▮

Page 283

1  Q.  ▮▮▮▮▮▮▮▮
   ▮▮▮▮
3       MR. HILLEGAS:  Objection; form.
4       THE WITNESS:  ▮▮▮▮▮
   ▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮
9  BY MR. STEINTHAL:
10 Q.  ▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮
16      MR. HILLEGAS:  Objection to form.
17      THE WITNESS:  ▮▮▮▮
   ▮▮▮▮▮
19 BY MR. STEINTHAL:
20 Q.  ▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮

Page 284

1  A.  ▮▮▮▮▮▮▮▮▮▮
   ▮▮▮
3  Q.  ▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮
6       MR. HILLEGAS:  Objection; form.
7       THE WITNESS:  ▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮
10 BY MR. STEINTHAL:
11 Q.  ▮▮▮▮▮▮▮▮▮▮▮
13      MR. HILLEGAS:  Objection; form.
14      THE WITNESS:  ▮▮▮▮▮▮
16 BY MR. STEINTHAL:
17 Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮
22      MR. HILLEGAS:  Objection; form.
23      THE WITNESS:  ▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 285

1  ▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮.
4  BY MR. STEINTHAL:
5  Q.    So one last question, I guess.
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11      MR. HILLEGAS:  Objection to form.
12      THE WITNESS:  ▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮
19 Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮
22      MR. HILLEGAS:  Objection to form.
23      MR. STEINTHAL:  ▮▮▮▮▮▮
25 BY MR. STEINTHAL:

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL

Page 286

1  Q.  ████████████████
2        MR. HILLEGAS:  Objection; form.
3        THE WITNESS:  ████████████████
  ████████████████
5  BY MR. STEINTHAL:
6  Q.    Try the question again.
7  ████████████████████████
  ████████████████████████
  ████████████████████████
  ████████████████████████
  ████████████████████████
12        MR. HILLEGAS:  Objection; form.
13        THE WITNESS:  ████████████
  ████████████████████████
  ████████████████████████
  ████████████████████████
  ████████████████████████
18  BY MR. STEINTHAL:
19  Q.  ████████████████████
  ████████████████████████
  ████████████████████████
22        MR. HILLEGAS:  Objection; form.
23        THE WITNESS:  ████████████
  ████████████████
25  BY MR. STEINTHAL:

Page 287

1  Q.  ██████████████████
  ████████████████████████
  ██████████████
5        MR. HILLEGAS:  Objection; form.
6        THE WITNESS:  ████████████
  ████████████████████
9  BY MR. STEINTHAL:
10  Q.  ██████████████████
  ████████████████████████
  ████████████████████████
  ████████████████
15        MR. HILLEGAS:  Objection; form.
16        THE WITNESS:  ████████████
  ████████████████████
  ██████████
20  BY MR. STEINTHAL:
21  Q.  ████████████████
23  A.  ████████████████████
  ████████████

Page 288

1  Q.  ████████████████████
  ████████████████████████
  ████████████████████████
  ████████████████████
7        MR. HILLEGAS:  Objection; form.
8        THE WITNESS:  ████████████████
  ████████████████████████
  ████████████████████████
  ████████████████████████
  ████████████████████████
17  ████████████████████████
  ████████████████████████
21        MR. STEINTHAL:  Why don't we take a
22  few minutes.
23        MR. HILLEGAS:  Taking our last
24  break.
25        THE VIDEOGRAPHER:  We're going off

Page 289

1  the record at 6:02 p.m.
2    (Off-the-record discussion was held.)
3        THE VIDEOGRAPHER:  We're going back
4  on the record at 6:19 p.m.
5  BY MR. STEINTHAL:
6  Q.    Okay.  So we're back on the record, and I
7  just, for the benefit of the reporter and
8  everyone present, identified two exhibits which
9  I'm going to introduce in this round of
10  questioning are subject to the source code
11  protocol under the protective order and
12  designated highly confidential source code.  So
13  when we get to them, I will read descriptions of
14  them into the record for the record, and then
15  take the copies back at the end of the
16  deposition according to the order.  We're not
17  there just quite yet.
18        MR. HILLEGAS:  Well, I'm getting
19  information that the Zoom is muted.
20  BY MR. STEINTHAL:
21  Q.    So, Professor, your analysis of Google's
22  information advantage is based on comparison
23  ████████████████████████████
24        MR. HILLEGAS:  Objection; form.
25        THE WITNESS:  My analysis is based

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL



Page 290

1  on that, in part.
2  BY MR. STEINTHAL:
3  Q.    That is a substantial portion of your
4  analysis ███████████████████████████████
   ████████████████████
6        MR. HILLEGAS:  Objection; form.
7        THE WITNESS:  It is definitely a
8  significant part of my report.
9  BY MR. STEINTHAL:
10 Q.   ████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
15       MR. HILLEGAS:  Objection; form.
16       THE WITNESS:  ██████████████████
   ██████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████
21 BY MR. STEINTHAL:
22 Q.    And you based your conclusion that
23 Google's ad buying tools have an information
24 advantage over non-Google ad buying tools, in
25 part, based on ██████████████████████████

Page 291

1  ████████████████████████████████
2        MR. HILLEGAS:  Objection; form.
3        THE WITNESS:  ██████████████
   ██████████████████████████████████████████
7  BY MR. STEINTHAL:
8  Q.    Is it your opinion that ██████████████
   ████████████████████████████████
   ████████████████████████████████
   ████████████████████████████████
13       MR. HILLEGAS:  Objection; form.
14       THE WITNESS:  Information advantage
15 is not purely based on number but on the
16 relevance.
17 BY MR. STEINTHAL:
18 Q.    Okay.  So in that case, why did you cite
19 ████████████ in paragraph 33 in your report?
20       MR. HILLEGAS:  Objection; form.
21       THE WITNESS:  I mention ████████████
   ████████████████████████████████
   ████████████████████████████████
   ████████████████████████     The

Page 292

████████████████████████████████
████████████████████████████████
████████████████████████████████
4  BY MR. STEINTHAL:
5  Q.    ███████████████████████████████
   ████████████████████████████████
   ████████████████████████
9        MR. HILLEGAS:  Objection; form.
10       THE WITNESS:  █████████████████████
   ████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████
16 BY MR. STEINTHAL:
17 Q.    Direct your attention to footnotes 23 or
18 24 of your report, which is at the bottom of the
19 page we were just looking at here.  Do you see
20 that?
21 A.    Yes.
22 Q.    Are those the two files that you examined
23 to come to the conclusion that is listed in
24 paragraph 33 -- strike that.
25       Are the two files identified in foot

Page 293

1  notes 23 and 24, the files you compared to
2  determine that ████████████████████████
   ████████████████████████████
   ████████████████
6        MR. HILLEGAS:  Objection; form.
7        THE WITNESS:  █████████████████
   ████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
   ██████████████████████████████████
13 BY MR. STEINTHAL:
14 Q.    █████████████████████████████████
   ████████████████████████████████
17 A.    ████
18 Q.    ████████████████████████████
   ████████████████████████████████
22 A.    ██
23 Q.    ████████████████████████████████
   ████████████████████

Veritext Legal Solutions
800-567-8658                                                     973-410-4098

HIGHLY CONFIDENTIAL

Page 294

1  A.

4  Q.

7        MR. HILLEGAS:  Objection; form.
8        THE WITNESS:

15 BY MR. STEINTHAL:
16 Q.
17        MR. HILLEGAS:  Objection; form.
18        THE WITNESS:

21 BY MR. STEINTHAL:
22 Q.

24        MR. HILLEGAS:  Objection; form.
25        THE WITNESS:

Page 295

1

7  BY MR. STEINTHAL:
8  Q.

13        MR. HILLEGAS:  Objection; form.
14        THE WITNESS:

20 BY MR. STEINTHAL:
21 Q.
22 A.

Page 296

1

3  Q.

6        MR. HILLEGAS:  Objection; form.
7        THE WITNESS:

9  BY MR. STEINTHAL:
10 Q.

12        MR. HILLEGAS:  Objection; form.
13        THE WITNESS:

21 BY MR. STEINTHAL:
22 Q.

25        MR. HILLEGAS:  Objection; form.

Page 297

1        THE WITNESS:

3        (Exhibit Number 5 was marked.)
4        "HIGHLY CONFIDENTIAL"
5  BY MR. STEINTHAL:
6  Q.    I am handing you a document that has been
7  marked as Somayaji Exhibit 5, which is a
8  printout of the document that is marked, that is
9  referenced in Footnote 24 of your report.  And
10 for the record, this document is a printout of a
11 file of a source code file that was made
12 available by Google for the plaintiffs'
13 inspection of the name in which is given in full
14 at to note 24 of professor Somayaji's report,
15 which ends                    and the file is
16 designated highly confidential source code under
17 the protective order.
18        MR. HILLEGAS:  I'm going to put an
19 objection on this, on the basis this appears to
20 be                                              .
22        MR. STEINTHAL:  So I will note for
23 the record that we have confirmed that this is,
24 in fact, a copy of it,

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 298

1   ██████████ but the objection is noted.  But we
2   did confirm that this is a printout on the same
3   file that was made available ██████████
    ██.
5   BY MR. STEINTHAL:
6   Q.    Do you recognize this, Professor?
7   A.    This looks familiar.
8   Q.    And as I said, it's a three-page printout
9   containing the file we were just discussing,
10  which you described as ████████████████
    ███████████████████████████
    ██████████
13         MR. HILLEGAS:  Objection; form.
14         THE WITNESS: ██████████████
    ██████████████████████████
    ██████████████████████████
    ██████████████████████████
18  BY MR. STEINTHAL:
19  Q.    But if I represent that this is a
20  printout of the file, the same file path that
21  you have looked at.
22  A.    If you say so.
23  Q. ████████████████████████████
    ████████████████

Page 299

1   ████████████████████████████
    ██████████████
3          MR. HILLEGAS:  Objection to form.
4          THE WITNESS: █████████████
    ████████████████████████████
    ████████████████████████████
    ██████████████████████
9   Q. ██████████████████████████
11         MR. HILLEGAS:  Objection; form.
12         THE WITNESS: █████████████
    ████████████████████████████
    █████████████████
16  BY MR. STEINTHAL:
17  Q. ██████████████████████
19         MR. HILLEGAS:  Objection.
20         THE WITNESS: ████████████
    ████████
22  BY MR. STEINTHAL:
23  Q. ████████████████████████████
    ████████████████████████

Page 300

1   ██████████████████
2          MR. HILLEGAS:  Objection; form.
3          THE WITNESS: █████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████
13  BY MR. STEINTHAL:
14  Q. ████████████████████████████
    ████████████████████████████
    ████████████████████████
    ████████████████████████████
20  A. ███████████████████████████
    ████████████████████████████
    ████████████████████████████
    ████████████████████████

Page 301

1   ████████████████████
2   Q. ████████████████████████
4   A. ████████████████████████████
    ████████████████████████████
    ██████████████████
10  Q. ████████████████████████████
    ████████████████
13  A. ██████
14  Q. ████████████████████████████
    ████████████████████████████
    ████████████████████
19         MR. HILLEGAS:  Objection to form.
20         THE WITNESS: ████
21  BY MR. STEINTHAL:
22  Q. ████████████████████████████
    ██████████████
24  A. ████████████████████████████

Veritext Legal Solutions

800-567-8658                                                   973-410-4098

HIGHLY CONFIDENTIAL

Page 302

2  Q.

6        MR. HILLEGAS:  Objection; form.
7        THE WITNESS:

9  BY MR. STEINTHAL:
10  Q.
11  A.

15  Q.

20        MR. HILLEGAS:  Objection; form.
21        THE WITNESS:

24  BY MR. STEINTHAL:
25  Q.

Page 303

4        MR. HILLEGAS:  Objection; form.
5        THE WITNESS:

8  BY MR. STEINTHAL:
9  Q.

13  A.
14  Q.

19
20  A.
21  Q.

24        MR. HILLEGAS:  Objection; form.
25        THE WITNESS:

Page 304

4  BY MR. STEINTHAL:
5  Q.

10        MR. HILLEGAS:  Objection; form.
11        THE WITNESS:

22

Page 305

3  BY MR. STEINTHAL:
4  Q.

9  A.

17        (Exhibit Number 6 was marked.)
18        (HIGHLY CONFIDENTIAL)
19  BY MR. STEINTHAL:
20  Q.    So I'm going to hand you -- now I'm
21  handing you a document marked Somayaji
22  Exhibit 6.  This is a document --
23  A.    Uh-huh.
24  Q.    I did not mean to tear that.  This is a
25  document that is a change list entry that was

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL



Page 306

1  made available to the plaintiffs for inspection
2  of the source code protocol, and its number is
3  ███████████
4        Are you familiar, Professor, with the
5  concept of a change list?
6  A.    I am.
7  Q.    And did you -- are you aware that certain
8  change lists were made available on the source
9  code machine for inspection?
10  A.    I'm aware that they were made available.
11  Q.    Did you review any Google change list
12  inspections as part of your work on this case?
13  A.    I did not.
14  Q.    Now, one of the things that's shown on
15  the change list entry is generally the specific
16  code that was changed in each affected file
17  which is known as the diff, correct?
18        MR. HILLEGAS:  Objection; form.
19        THE WITNESS:  Yes.
20  BY MR. STEINTHAL:
21  Q.    And in this case, starting on the second
22  page on, we have diffs of various files.
23        Do you see that?
24  A.    I do.
25  Q.    ██████████████████████

Page 307

1  ████████████████████████████

8
9  A.    ██
10  Q.    ██████

14  A.    ██████
15        MR. HILLEGAS:  Objection; form.
16  BY MR. STEINTHAL:
17  Q.    ██████

22
24  A.    ████
25  Q.    ████████████

Page 308

1  ████████████████████████
?
4        MR. HILLEGAS:  Objection; form.
5        THE WITNESS:  ██████████

9  BY MR. STEINTHAL:
10  Q.    ████████████████

14        MR. HILLEGAS:  Objection; form.
15        THE WITNESS:  ██████████

20  BY MR. STEINTHAL:
21  Q.    ████████████████

25  A.    ██

Page 309

1  Q.    ████████████████

4        MR. HILLEGAS:  Objection; form.
5  BY MR. STEINTHAL:
6  Q.    ██████
7  A.    ██
8  Q.    ████████

10        MR. HILLEGAS:  Objection; form.
11        THE WITNESS:  ██████

13  BY MR. STEINTHAL:
14  Q.    ████████████

16  A.    ████
17  Q.    ████████

19        MR. HILLEGAS:  Objection; form.
20        THE WITNESS:  ██████

22  BY MR. STEINTHAL:
23  Q.    ████████

25  A.    ████

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL



Page 310

1  Q.
2  A.
3  Q.

5  A.
6  Q.
7  A.

9  Q.
10  A.
11  Q.
12  A.

17  Q.

21        MR. HILLEGAS:  Objection; form.
22        THE WITNESS:
23  BY MR. STEINTHAL:
24  Q.

Page 311

1

5        MR. HILLEGAS:  Objection; form.
6        THE WITNESS:

16

20  BY MR. STEINTHAL:
21  Q.

23  A.

Page 312

1
2  Q.
3  A.

6  Q.

10  A.
11  Q.

14  A.

25  Q.

Page 313

1

6        Sorry.  I'll try the question again.
7

14        MR. HILLEGAS:  Objection; form.
15        THE WITNESS:

21  BY MR. STEINTHAL:
22  Q.

24        MR. HILLEGAS:  Objection; form.
25        THE WITNESS:

79 (Pages 310 - 313)

HIGHLY CONFIDENTIAL



Page 314

1 ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

10 BY MR. STEINTHAL:
11 Q. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

15 MR. HILLEGAS: Objection; form.
16 THE WITNESS: ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

Page 315

1 ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

3 BY MR. STEINTHAL:
4 Q. ▮▮▮▮▮▮▮▮

▮▮▮▮▮

6 MR. HILLEGAS: Objection; form.
7 THE WITNESS: ▮▮▮▮▮▮

9 BY MR. STEINTHAL:
10 Q. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

16 BY MR. STEINTHAL:
17 Q. You can put that away. I have a few more
18 questions on topics and we can wrap it up.
19 ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

24 MR. HILLEGAS: Objection; form.
25 THE WITNESS: ▮▮▮▮▮▮

Page 316

1 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

4 BY MR. STEINTHAL:
5 Q. And one of the consequences that you
6 suggested in your report was that that
7 information advantage made it more difficult for
8 advertisers and publishers to understand the
9 internal operations of Google's auction
10 mechanisms, correct?
11 MR. HILLEGAS: Objection; form.
12 THE WITNESS: My particular
13 assertion has been about the ability of third
14 parties to conduct experiments in order to gain
15 insight into the functioning of the system.
16 BY MR. STEINTHAL:
17 Q. And if hypothetically they were provided
18 with all the same information ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮, would they have a
20 greater ability to understand and through -- to
21 perform experiments to understand the internal
22 operation of Google's systems?
23 MR. HILLEGAS: Objection; form.
24 THE WITNESS: As I discuss in my
25 report, the information advantage is in two

Page 317

1 parts. Part of it is a difference ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮, but
3 there's also the ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮.

8 BY MR. STEINTHAL:
9 Q. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

13 MR. HILLEGAS: Objection; form.
14 THE WITNESS: ▮▮▮▮▮▮▮▮

17 MR. STEINTHAL: I will designate the
18 transcript as "highly confidential" subject to
19 potentially at last these last portions of
20 source coding portions later, and preserve any
21 time for recross if you have any redirect
22 sessions.
23 MR. HILLEGAS: Why don't we take a
24 break. I have a couple of questions, and then
25 we can probably wrap it up.

80 (Pages 314 - 317)

HIGHLY CONFIDENTIAL

Page 318

1    THE VIDEOGRAPHER: We're going off
2  the record at 7:01.
3    (Brief break was observed.)
4    THE VIDEOGRAPHER: We're going back
5  on the record at 7:12 p.m.
6  BY MR. HILLEGAS:
7  Q.   Welcome back, Dr. Somayaji. Hopefully we
8  will get you off soon. I just have a couple of
9  questions for you.
10    Does your report rebutting Dr. Milgrom
11  contain all of your expert opinions in this
12  case?
13  A.   Yes.
14  Q.   Do you intend to offer at trial all of
15  the opinions that are contained within your
16  report rebutting Dr. Milgrom?
17  A.   Yes.
18    MR. STEINTHAL: Objection to form.
19  BY MR. HILLEGAS:
20  Q.   Does anything that you have been shown
21  today offer any opinions that you tend to offer
22  at trial in this case?
23  A.   No.
24  Q.   Does any of the source code that you were
25  shown today, change any of the opinions that you

Page 319

1  intend to offer at trial in this case?
2  A.   No.
3  Q.   Do any of the hypotheticals posed by
4  Google's counsel today, change any opinions that
5  you tend to offer at trial in this case?
6  A.   No.
7    MR. HILLEGAS: Pass the way.
8    MR. STEINTHAL: No further
9  questions. Just for the record, before we go
10  off the record, as discussed earlier, I am
11  retaining custody of Exhibits 5 and 6,
12  Exhibits 1, 2, 3, 4 are held by the reporter.
13  Thank you, Dr. Somayaji, for your time.
14    THE WITNESS: Thank you.
15    THE VIDEOGRAPHER: That concludes
16  today's testimony. We are going off the record
17  at 7:13.
18
19    FURTHER THIS DEPONENT SAITH NOT.
20
21
22
23
24
25

Page 320

1  REPORTER'S CERTIFICATE
2    I certify that the witness in the
3  foregoing deposition, was by me duly sworn to
4  testify in the within-entitled cause; that the
5  said deposition was taken at the time and place
6  therein named; that the testimony of said
7  witness was reported by me, a Shorthand Reporter
8  and Notary Public of the State of Tennessee
9  authorized to administer oaths and affirmations,
10  and said testimony, pages 8 through 319 was
11  thereafter transcribed into typewriting.
12    I further certify that I am not counsel
13  or attorney for either or any of the parties to
14  said deposition, nor in any way interested in
15  the outcome of the cause named in said
16  deposition.
17    IN WITNESS WHEREOF, I have hereunto
18  set my hand the 31st Day of October, 2024.
19
20
21
22
23
24
    <%13815,Signature%>
25    JENNIFER HAYNIE (License No. 403)

Page 321

Errata Sheet

ANIL BUNTWAL SOMAYAJI, PHD   OCTOBER 30, 2024

Page No./Line No.  Changed from:  Changed to:
--- --- --------------- ----------------
--- --- --------------- ----------------
--- --- --------------- ----------------
--- --- --------------- ----------------
--- --- --------------- ----------------
--- --- --------------- ----------------
--- --- --------------- ----------------
--- --- --------------- ----------------
--- --- --------------- ----------------

Check if you do not wish to make changes.
_____

By signing below, I am confirming that these are
the only clerical corrections made to my
testimony.

_____
Signature

_____
Notary Signature

81 (Pages 318 - 321)