# EXHIBIT 51
# [FILED UNDER SEAL]

HIGHLY CONFIDENTIAL

Page 1

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                      SHERMAN DIVISION
3
      THE STATE OF TEXAS, et    |
4     al.,                      |
                                |   Case No.
5        Plaintiffs,            |   4:20-cv-00957-SD
                                |
6     - against -               |
                                |
7     GOOGLE LLC,               |
                                |
8        Defendant.             |
9
      ********************************************************
10     HIGHLY CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION OF
11                         JOSHUA GANS
12                      OCTOBER 10, 2024
13     ********************************************************
14
             ORAL AND VIDEOTAPED DEPOSITION of JOSHUA GANS,
15     produced as a witness at the instance of the
       Defendant, and duly sworn, was taken in the
16     above-styled and numbered cause on October 10, 2024,
       from 9:00 a.m. to 7:35 p.m., before Mendy A.
17     Schneider, CSR, RPR, in and for the State of Texas,
       recorded by machine shorthand, at the offices of
18     NORTON ROSE FULBRIGHT, 1550 Lamar, Suite 2000,
       Houston, Texas, pursuant to the Federal Rules of Civil
19     Procedure and the provisions stated on the record or
       attached hereto; that the deposition shall be read and
20     signed.
21
22
23
24
25      Job No. CS6922874

HIGHLY CONFIDENTIAL

Page 2

```
1        A P P E A R A N C E S
2
    FOR THE PLAINTIFF:
3
    GERALDINE YOUNG (Real-time)
4   MARISA MADARAS BONAPARTE (Real-time)
    ABRAHAM CHANG (via Real-time)
5   NORTON ROSE FULBRIGHT
    1550 Lamar, Suite 2000
6   Houston, Texas  77010
    Geraldine.young@nortonrosefulbright.com
7
8   RYAN ELLIS (Real-time)
    ZEKE DEROSE (Remote)
9   ALEXANDRA ABSTON, ESQ. (via Real-time)
    THE LANIER LAW FIRM, PC
10  10940 West Sam Houston Parkway North, Suite 100
    Houston, Texas  77064
11  ryan.ellis@lanierlawfirm.com
    Zeke.derose@lanierlawfirm.com
12
13  FOR THE DEFENDANT:
14  ANDREW J. EWALT  (Real-time)
    LAURA ONKEN (Real-time)
15  FRESHFIELDS BRUCKHAUS DERINGER
    700 13th Street, NW, 10th Floor
16  Washington, DC 10005
    202.777.4500
17  andrew.ewalt@freshfields.com
18
    VERONICA M. BOSCO (Real-time)
19  FRESHFIELDS BRUCKHAUS DERINGER
    3 World Trade Center
20  New York, New York 10007
    veronica.bosco@freshfields.com
21
22  MICHAEL DAVIS, ESQ.
    GIBBS & BRUNS LLP
23  1100 Louisiana, Suite 5300
    Houston, Texas  77002
24  mdavis@gibbsbruns.com
25
```

Page 3

```
1        A P P E A R A N C E S (CONTINUED)
2
    ALSO PRESENT:
3   DAN LAPEYROUSE, The Videographer
    TREVOR YOUNG (via Zoom)
4   BRIAN RICHTER (via Zoom)
    JONATHAN JAFFE (Real-time and Zoom)
5   LUKE WOODWARD (via Real-time)
    WILLIAM SHIEBER (via Real-time)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        EXAMINATION INDEX
2   WITNESS:  JOSHUA GANS
3   EXAMINATION                          PAGE
        BY MR. EWALT                      6
4       BY MS. YOUNG                    266
5   FURTHER EXAMINATION
        BY MR. EWALT                    277
6       BY MS. YOUNG                    283
7   SIGNATURE REQUESTED                       286
8   REPORTER'S CERTIFICATION                  287
9        EXHIBIT INDEX
10                  PAGE
    GANS EXHIBIT NO. 1                    6
11     Opening Expert Report
12  GANS EXHIBIT NO. 2                    6
       Rebuttal Report
13
    GANS EXHIBIT NO. 3                    6
14     Errata Sheet
15  GANS EXHIBIT NO. 4                   66
       E-mail
16
    GANS EXHIBIT NO. 5                   90
17     Professor Baye's Report
18  GANS EXHIBIT NO. 6                   93
       Demand Elasticity on AdX Web Publishers
19
    GANS EXHIBIT NO. 7                  112
20     PowerPoint
21  GANS EXHIBIT NO. 8                  138
       Professor Baye's Surrebuttal Report
22
    GANS EXHIBIT NO. 9                  222
23     PowerPoint
24  GANS EXHIBIT NO. 10                 226
       Project Bernanke Quantitative Easing on
25  the Ad Exchange
```

Page 5

```
1        EXHIBIT INDEX (CONTINUED)          PAGE
2   GANS EXHIBIT NO. 11                 235
       Overall Pub Yields with DRS v2
3
    GANS EXHIBIT NO. 12                 238
4      PRD/Strat Review:  Network Health
5   GANS EXHIBIT NO. 13                 241
       E-mail
6
    GANS EXHIBIT NO. 14                 259
7      Declaration of ▮▮▮▮▮▮
8
9   (REPORTER'S NOTE: All quotations from exhibits are
    reflected in the manner in which they were read into
10  the record and do not necessarily denote an exact
    quote from the document.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1    THE VIDEOGRAPHER:  Okay.  We're now on
2  the record.  Today is October 10, 2024.  The time is
3  approximately 9:00 a.m.  This is Video 1 of
4  Joshua Gans.
5    Will reporter please swear in the
6  witness.
7    JOSHUA GANS,
8  having been first duly sworn, testified as follows:
9    E X A M I N A T I O N
10  BY MR. EWALT:
11    Q.  Good morning, Professor Gans.
12    Would you please state and spell your
13  name for the record.
14    A.  Yes.  My name is Joshua Gans, J-O-S-H-U-A
15  G-A-N-S.
16    Q.  I'm handing you what's been marked as
17  Exhibits 1, 2, and 3.
18    (Marked Gans Exhibit Nos. 1 through 3.)
19    Q.  (BY MR. EWALT) Can you take a moment just to
20  look over those.
21    A.  Yes.
22    Q.  Is Exhibit 1 your opening expert report in
23  this case?
24    A.  Yes.
25    Q.  Is Exhibit 2 your rebuttal report in this

Page 7

1  case?
2    A.  Yes.
3    Q.  Is Exhibit 3 an errata sheet to your opening
4  report dated July 24, 2024?
5    A.  Yes.
6    Q.  Do your opening report and rebuttal report
7  contain all of the opinions that you are offering in
8  this case?
9    A.  Yes.
10    MS. YOUNG:  Objection; form.  Sorry.
11    Mr. Gans, let me object before you
12  answer.
13    Q.  (BY MR. EWALT) Do your opening report and
14  rebuttal report contain all of the bases for the
15  opinions that you are offering in this case?
16    A.  Yes.
17    Q.  Apart from what's addressed in the errata,
18  are there any parts of your -- of your opening report
19  or your rebuttal report that you would like to change?
20    A.  There's nothing in my opening report.  There
21  were a couple of things that I did notice in my
22  rebuttal report.
23    I -- I -- I noticed a typo on
24  Paragraph 18, right at the last part of it, where it
25  is said that -- well, he only accounts for AdX

Page 8

1  revenues using the numerator.  The numerator applies a
2  broad definition.
3    You'll notice that the word "numerator"
4  is used twice.  The second one should have been
5  denominator.
6    Q.  Okay.  Thank you.
7    A.  And, also, with respect to Figure 7, I can't
8  remember exactly which page it was but I'll just tell
9  you now.
10    There was -- there was -- there should
11  have been a footnote that explained where Figure 7
12  came from.  I don't have the footnote with me at the
13  moment, but we can supply it.
14    Q.  Great.  And you'll be able to supply the
15  footnote --
16    A.  Yes.
17    Q.  -- later today or before the deposition is
18  up?
19    MS. YOUNG:  Yes.
20    MR. EWALT:  Great.
21    A.  Those are the only ones that I've noticed or
22  that I recall at the moment.
23    Q.  (BY MR. EWALT) All right.  Thank you.
24    When did you start working on this case?
25    A.  I was engaged as an expert in 2021.

Page 9

1    Q.  September 2021.  Does that sound about right?
2    A.  Yeah.  I think it's in my opening report, the
3  exact date.
4    Q.  Yeah.  Paragraph 2 of your opening report?
5    A.  Right, right.  Yeah.  That's -- well, that's
6  the date I was retained, yes.
7    Q.  Did you do any work before you were retained?
8    A.  In preparing a report or in relation to this
9  matter?
10    Q.  In -- did you do any work in relation to this
11  matter before September 2021?
12    A.  I did provide some --
13    MS. YOUNG:  Professor Gans, I'm going to
14  caution you not to disclose any communications you had
15  with counsel in this case because those are not
16  discoverable under the expert stipulation.
17    THE WITNESS:  Okay.
18    Q.  (BY MR. EWALT) I just asked if you did any
19  work --
20    A.  Yes.
21    Q.  -- in the matter prior to September 2021?
22    A.  Yes.
23    Q.  Okay.  When did you start working on this
24  matter?
25    MS. YOUNG:  Objection; form.

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1  Go ahead.
2  A. That would be approximately a year earlier.
3  Q. (BY MR. EWALT) Okay. Approximately how many
4  hours have you worked on this matter from when you
5  started until today?
6  A. It's been a number of years. I don't
7  remember the exact amount but it would be several
8  hundred.
9  Q. And you're getting paid a thousand dollars
10  per hour for your work on the matter?
11  A. For -- yes, for my billable hours.
12  Q. Approximately how much have you been paid in
13  all your work in this matter?
14  A. I don't -- I don't -- I don't know the exact
15  amount because I don't know the hours.
16  Q. More than a million dollars?
17  A. Oh, no, I don't believe so.
18  Q. More than $500,000?
19  A. It's over four years, so I'm not sure
20  exactly.
21  Q. Do you know whether it's more or less than
22  $500,000 --
23  (Speaking simultaneously.)
24  A. I can't tell you what it is.
25  (Discussion off the record.)

Page 11

1  Q. (BY MR. EWALT) Do you know whether it was
2  more or less than $500,000 that you've been paid on
3  this matter since you started work?
4  A. I do not know.
5  Q. What is your best estimate of the amount that
6  you've been paid for your work on this matter since
7  you started?
8  A. Oh, boy. My best estimate, I really need to
9  know the number of hours that I've worked exactly to
10  provide that. So if it was 300 hours, which it could
11  have been, then 300,000.
12  Q. Is 300 -- 300 hours your best estimate of the
13  amount of time you spent on this matter?
14  MS. YOUNG: Objection; form.
15  You may answer.
16  A. I was just giving an example. I really don't
17  have the exact number.
18  Q. (BY MR. EWALT) Have you ever -- excuse me.
19  Strike that.
20  Has a U.S. court ever qualified you as an
21  expert in an antitrust case?
22  MS. YOUNG: Objection; form.
23  A. Yes.
24  Q. (BY MR. EWALT) Okay. Which case?
25  A. There was a case -- I'm now trying to

Page 12

1  remember the parties because it was back -- it was
2  almost back in 2007 or so. And one of the parties was
3  a company called Digene. And I can't remember the
4  other party, which is a shame, because they were my
5  client.
6  Q. The other party was your client?
7  A. Yes.
8  Q. Okay. Apart from that matter in 2007
9  involving Digene, has a U.S. court ever qualified you
10  as an expert witness in an antitrust case?
11  MS. YOUNG: Objection; form.
12  A. So what do you mean by "qualified"?
13  I have -- I've been deposed in antitrust
14  cases.
15  Q. (BY MR. EWALT) Sure.
16  Did you -- I'm referring to you testifying at
17  a trial --
18  A. Oh, at a trial.
19  Q. -- as an expert witness?
20  A. At a trial. No, I have not testified as a --
21  at an actual trial that resulted in -- from a U.S.
22  antitrust case.
23  Q. Okay. Have you been deposed in U.S.
24  antitrust cases prior to this case?
25  A. Yes.

Page 13

1  Q. And one of those was the Digene case?
2  A. One of those was the Digene case.
3  Another one was a case against Meta.
4  Q. When was that case?
5  A. That -- that deposition was last year.
6  Q. In the Digene case, what was the nature of
7  your testimony?
8  A. I'm trying to recall, but I believe -- I
9  believe that it was with respect to a characterization
10  of conduct that violated, and you'll forgive me if --
11  I'm not sure if it was just Section 2 of the Sherman
12  antitrust case. There might have been others as well.
13  Q. Did you reach any conclusions about market
14  definition in that case?
15  A. I would have, but I don't recall the case
16  enough.
17  Q. Okay. What were the nature of your opinions
18  in the Meta case?
19  A. The nature of my opinions in the Meta case
20  was -- it was -- what was the nature of my --
21  MS. YOUNG: And I'll caution you that
22  that case might have been governed by a protective
23  order. So if you have any concerns about violating a
24  protective order --
25  THE WITNESS: Right, right.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1    MS. YOUNG: -- any confidentiality with
2  respect to --
3        THE WITNESS: Right.
4        MS. YOUNG: -- Meta's information --
5  yeah -- let me speak. Yeah. Happy to discuss those,
6  but I want to caution you with respect to that.
7        You may answer now.
8    A.  I -- I've been doing this case for a bit, and
9  I have -- I'm -- I'm -- I'm trying to remember exactly
10 what my report was in the Meta case. It wasn't a very
11 long report on a matter -- on the matter at hand, and
12 I just can't remember what my assignment was for that
13 one.
14   Q.  (BY MR. EWALT)  Fair enough.
15       Switch gears and talk about market definition.
16       What is the purpose of market definition?
17       MS. YOUNG:  Objection; form.
18       Go ahead.
19   A.  It depends on the nature of the claims in an
20 antitrust action.
21   Q.  (BY MR. EWALT)  All right.  In a
22 monopolization case, what is the purpose of market
23 definition?
24   A.  It is to understand the nature of the markets
25 that were directly impacted on -- by the conduct that

Page 15

1  is under investigation.
2    Q.  Is it fair to say that the -- one of the
3  purposes of market definition is to identify in the
4  areas to test whether a particular conduct has
5  competitive effects?
6        MS. YOUNG:  Objection; form.
7    A.  That would be fair.
8    Q.  (BY MR. EWALT)  When you define "markets" in
9  this case, did you examine the Brown Shoe factors?
10   A.  I did.
11   Q.  When you define "markets" in this case, did
12 you use the hypothetical monopolist test?
13   A.  I applied the hypothetical monopolist case --
14 test.
15   Q.  Other than the Brown Shoe factors and the
16 hypothetical monopolist test, did you use any other
17 methods to define -- define markets in this case?
18   A.  No.  Those capture that.
19   Q.  All right.  Let's start with the Brown Shoe
20 factors, then.
21       Would you please turn to Page 127 of
22 Exhibit 1.  I'm sorry, Paragraph 127.
23   A.  I'm going to -- I'm going to unbind this.
24 You've got it in a binder there.
25       MS. YOUNG:  Can I make a suggestion?  We

Page 16

1  have binders, and there are the reports.  It might be
2  easier for him to flip through.
3        MR. EWALT:  That's fine.
4        MS. YOUNG:  And -- and I just --
5        MR. EWALT:  Let's just go off the
6  record.
7        MS. YOUNG:  Yeah.
8        THE VIDEOGRAPHER:  We're now going off
9  the record.  The time is approximately 9:12.
10       (Break from 9:12 a.m. to 9:13 a.m.)
11       THE VIDEOGRAPHER:  Now back on the
12 record.  The time is approximately 9:13.
13   Q.  (BY MR. EWALT)  Professor Gans, do you have in
14 front of you a binder that is a copy of Exhibit 1?
15   A.  Yes.
16   Q.  And is there also a binder in front of you
17 that is a copy of your rebuttal report that is
18 Exhibit 2?
19   A.  Yes.
20   Q.  Okay.  And that's fine if you want to use the
21 binder throughout the course of the day today.  Or
22 either binder that is.
23       Would you please turn to Paragraph 127
24 of your opening report that's Exhibit 1.
25   A.  Yes.

Page 17

1    Q.  Is that the paragraph where you discuss the
2  Brown Shoe factors?
3    A.  Yes, this is a paragraph that I do discuss
4  them in.
5    Q.  Do the Brown Shoe factors come from a U.S.
6  Supreme Court case?
7    A.  Yes.
8    Q.  Do the Brown Shoe factors constitute an
9  economic methodology for defining a relevant market?
10   A.  They -- they constitute a set of criteria
11 that economists would agree is -- are indicative of
12 being a -- a relevant market.
13   Q.  Can you recall reading any articles in
14 peer-reviewed economic journals that discuss the Brown
15 Shoe factors?
16   A.  I have read some.  You know, one that I cite
17 in that paragraph is an article by Jonathan Baker, but
18 there are others that I have read in my career.
19   Q.  And the article by Jonathan Baker is
20 published in the Antitrust Law Journal?
21   A.  Yes.
22   Q.  Are you aware of any articles published in
23 economic journals that discuss the Brown Shoe factors?
24   A.  Well, the Brown Shoe factors are -- come from
25 the legal scholar -- the legal -- the legal precedent.

HIGHLY CONFIDENTIAL

Page 18

1  I don't -- I don't recall any that directly discuss
2  the Brown Shoe factors as a whole.
3      Q.  Have you ever taught an economics class about
4  the Brown Shoe factors?
5          MS. YOUNG:  Objection; form.
6      A.  I have taught economic classes on antitrust
7  and at times have -- have referred to those factors.
8      Q.  (BY MR. EWALT)  Do the Brown Shoe factors help
9  organize qualitative evidence that may be relevant to
10  defining a market?
11          MS. YOUNG:  Objection; form.
12      A.  I think they help organize evidence that
13  would be related to a market.
14      Q.  (BY MR. EWALT)  And do they help organize
15  qualitative evidence?
16      A.  That would include qualitative evidence.
17      Q.  Are the Brown Shoe factors a starting point
18  for market definition?
19          MS. YOUNG:  Objection; form.
20      A.  They are one starting point you could use.
21      Q.  (BY MR. EWALT)  After considering the Brown
22  Shoe factors, should an economist undertake a deeper
23  examination before reaching conclusions about market
24  definition?
25          MS. YOUNG:  Objection; form.

Page 19

1      A.  I think that an economist needs to undertake
2  whatever investigations are necessary to be confident
3  in their conclusion.
4      Q.  (BY MR. EWALT)  Could you be confident in your
5  conclusions relying solely on the Brown Shoe factors
6  in defining a market?
7      A.  It would depend on the case and the nature of
8  the evidence available.
9      Q.  Have you ever defined a market in an
10  antitrust case relying solely on the Brown Shoe
11  factors?
12      A.  I don't believe so.
13      Q.  Can an economist reach reliable conclusions
14  about market definition based solely on consideration
15  of the Brown Shoe factors?
16          MS. YOUNG:  Objection; form.
17      A.  Depending on the case, it may be possible.
18      Q.  (BY MR. EWALT)  In this case, could you have
19  reached reliable conclusions about market definition
20  based solely on consideration of the Brown Shoe
21  factors?
22          MS. YOUNG:  Objection; form.
23      A.  I think as one of the Brown Shoe factors
24  relates to the nature of substitutes available to
25  customers in -- in this industry.  I think I could

Page 20

1  have organized the evidence solely on the Brown Shoe
2  factors.
3      Q.  (BY MR. EWALT)  Are you referring to the price
4  sensitivity factor in Brown Shoe?
5      A.  Yes, I am.
6      Q.  And I just want to make sure I understand
7  what you're saying.
8          Are you saying that the price
9  sensitivity factor standing alone would have been
10  enough for you to reach reliable conclusions about
11  market definition in this case?
12          MS. YOUNG:  Objection; form.
13      A.  I -- I don't tend to think of it in that way.
14      Q.  (BY MR. EWALT)  How do you think about it?
15      A.  What I'm trying to understand is the conduct
16  at issue.  And the firm that was engaging in that
17  conduct.  And what the set of constraints were
18  competitively on the firm in doing that.
19          And I am trying to do so in a way that
20  is economic, to use the literal meaning of the word,
21  in terms of assembling evidence and allowing the court
22  to make determinations on other things that are
23  required to understand the effects of such conduct.
24      Q.  When defining markets in this case, did you
25  examine evidence of unique production facilities?

Page 21

1          MS. YOUNG:  Objection; form.
2      A.  I considered the criteria of unique
3  production facilities.
4      Q.  (BY MR. EWALT)  And how did you consider that
5  criteria?
6      A.  I thought about the nature of this industry
7  and the nature of the product and how production
8  occurs in this industry to work out if consideration
9  of that factor would be of use in defining the market.
10      Q.  And how -- what did you conclude as to
11  whether the factor of unique production facilities
12  would be useful in defining a market in this case?
13      A.  The terminology that the Supreme Court used
14  was of an age that the term "unique production
15  facilities" wasn't particularly helpful in defining
16  industry that is effectively an industry grounded in
17  information technology.
18      Q.  So is it your view that the unique production
19  facilities factor is not helpful in defining a market
20  in this case?
21      A.  I did not find it helpful as a way of -- of
22  sorting and classifying the evidence.
23      Q.  And you did not discuss the factor of unique
24  production facilities in either of your reports,
25  correct?

6 (Pages 18 - 21)

Page 22

1          MS. YOUNG:  Objection; form.
2     A.  I believe I discussed it in my rebuttal
3  report, Exhibit 2.
4     Q.  (BY MR. EWALT)  Yeah.  You may take a look at
5  Paragraph 82.
6     A.  Okay.  Yes.  In Paragraph 82 is the paragraph
7  I discussed it.
8     Q.  And in that paragraph, you discuss that it's
9  not -- not helpful to consideration, correct?
10    A.  That is correct.
11    Q.  Beyond stating an opinion that it's not
12  helpful to consider, did you otherwise discuss unique
13  production facilities in your evaluation of the
14  relevant markets in this case?
15    A.  I did not.  This is where I, in response to
16  Professor Baye, arguing otherwise -- I think arguing
17  otherwise -- I made a response as to what my
18  consideration was that we've just gone through.
19    Q.  When defining markets in this case, did you
20  examine evidence of distinct customers?
21    A.  We have this page of the report open.  I did
22  consider -- I did -- I did consider whether that would
23  be useful, but I -- I -- I -- I didn't classify them
24  in how I wrote my report as a factor.  I didn't find
25  that classification useful relative to the discussion

Page 23

1  I did elsewhere.
2     Q.  When defining markets in this case, did you
3  examine evidence of specialized vendors?
4     A.  I thought about specialized vendors and I --
5  I believe that I discussed it.  And I might be not
6  recalling correctly at some point in my -- my opening
7  report.
8     Q.  Okay.  But you don't recall, as you sit here,
9  where in your opening report you discussed it?
10    A.  Oh, I can probably find it.
11    Q.  If you want to take a minute.
12    A.  Yeah.  If I did that.
13        This is one of those situations where it
14  would be nice to have this digitally.  Where did I...?
15        I may not have listed the -- the -- the
16  vendors in the market participants under that criteria
17  in my opening report.
18        I just can't recall at the moment.
19    Q.  Okay.  So as you sit here, you don't recall
20  whether you discussed specialized vendors as part of
21  defining a market in this case?
22    A.  I did not -- I did not -- I don't -- I don't
23  recall that being a -- a factor that was given any
24  priority in my report.
25    Q.  Do some vendors of publisher ad servers also

Page 24

1  sell other products?
2     A.  Oh, yes.
3     Q.  Can some publisher ad servers for open web
4  display advertising also be used to serve in-app
5  advertising?
6     A.  Yes, they can.
7     Q.  Can some publishers ad servers for open web
8  display advertising also be used to serve video ads?
9     A.  The -- the suppliers of them, yes.
10    Q.  Do some vendors of ad exchanges also sell
11  other products?
12         MS. YOUNG:  Objection; form.
13    A.  Yes.
14    Q.  (BY MR. EWALT)  Can some ad exchanges for
15  transacting open web display advertising also be used
16  to transact in-app advertising?
17    A.  Yes, I believe they can.
18    Q.  Can some ad exchanges for transacting open
19  web display advertising also be used to transact video
20  ads?
21    A.  Depending on the platform, yes.
22    Q.  Do some vendors of ad-buying tools for small
23  advertisers also sell other products?
24    A.  Yes.
25         MS. YOUNG:  Objection; form.

Page 25

1         Oh, let me object first and then you may
2  answer.
3     Q.  (BY MR. EWALT)  Can some ad-buying tools for
4  small advertisers for buying open web display
5  advertising also be used to buy in-app advertising?
6     A.  Yes.
7     Q.  Can some ad-buying tools for small
8  advertisers for buying open web display advertising
9  also be used to buy video ads?
10    A.  I'm not 100 percent sure, but possibly.
11    Q.  Do some vendors of ad-buying tools for large
12  advertisers also sell other products?
13         MS. YOUNG:  Objection; form.
14    A.  Yes.  Yes.
15    Q.  (BY MR. EWALT)  Can some ad-buying tools for
16  large advertisers for buying open web display
17  advertising also be used to buy in-app advertising?
18    A.  Yes.
19    Q.  Can some ad-buying tools for large
20  advertisers for buying open web display advertising
21  also be used to buy video ads?
22    A.  Yes.
23    Q.  And we talked a few minutes ago about how
24  you -- maybe we didn't.  Let me just start over.
25         When defining markets in this case, did

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1  you examine evidence of sensitivity to price changes?
2      A.  Yes.
3      Q.  What evidence of sensitivity to price changes
4  did you examine?
5      A.  There was a lot.  Can you be more specific.
6      Q.  Sure.
7          Would you consider the evidence related
8  to sensitivity of price changes that you considered to
9  be essentially the same evidence that you used in
10  applying the hypothetical monopolist test?
11         MS. YOUNG:  Objection; form.
12      A.  Yes.
13      Q.  (BY MR. EWALT)  And when defining markets in
14  this case, you examined evidence of distinct prices,
15  right?
16      A.  Yes.
17      Q.  How does your analysis of distinct prices
18  inform your conclusions about market definition?
19      A.  Distinct prices allow you to identify
20  products that the people could buy or not buy
21  independent of other products.
22      Q.  How does -- well, let me ask you this:  What
23  do you mean by "distinct prices"?
24      A.  I mean prices that are wholly determined by
25  suppliers into the -- you know, that are chosen by

Page 27

1  suppliers into the relevant market but are not chosen
2  by suppliers outside the relevant market.
3      Q.  I'm not following you there.
4          Prices are always chosen by suppliers,
5  right?
6      A.  They are, but the way I read the distinct
7  prices is to say, if I'm an outside observer and I'm
8  trying to understand who is supplying products that
9  are -- are into a market, if the products that are
10  identified have on them a -- a distinct price -- and
11  by "price" meaning something that a consumer has to
12  pay that supplier if they consume the product and
13  don't have to if they don't consume the product --
14  then that is an indicator that the participants in the
15  market recognize that those are the products that they
16  are selling to the consumer.
17      Q.  So I understand your definition of price.
18  I'm trying to understand your definition of a distinct
19  price.
20         MS. YOUNG:  Is there a question pending?
21      Q.  (BY MR. EWALT)  How do you define a distinct
22  price?
23         How can you -- strike that.
24         How can you tell whether the Brown Shoe factor
25  of distinct pricing is satisfied in a particular case?

Page 28

1      A.  I read it -- and this is just my
2  interpretation as an economist -- as prices in the
3  market -- you're going to like this -- prices in the
4  market not being not distinct.
5          In other words, if you think about the
6  purpose of a definition of -- of market definition,
7  one of the things we're trying to understand is what
8  constrains the firm at issue, the firm -- the conduct
9  in, for instance, their pricing.
10          In order to do that, it is often helpful
11  to have, in the definition of the market, the
12  constraint on pricing be the constraint on the product
13  that is being sold in the market.  And that is
14  distinct from other products that the firm at issue
15  might be selling.
16      Q.  Distinct in what way?
17      A.  Different.  It's -- it's a price for that
18  product.
19      Q.  Let me ask it this way:  When you are
20  assessing whether prices are distinct, do you consider
21  whether prices are charged on the same basis?
22      A.  Well, let's -- probably the easiest thing to
23  do is to look about -- in my report about where I
24  discuss that, because I think it will probably be
25  indicated to you what I meant by it within the context

Page 29

1  of the example in the -- in the case in the report.
2      Q.  Okay.  We can try.
3          So let me direct you to Paragraph 235 of
4  your opening report.
5      A.  Right.  So there I talk about there being --
6  well, in this case a distinct, independent pricing
7  structure.
8          MS. YOUNG:  I don't think there was a
9  question pending.
10         MR. EWALT:  Okay.
11         MS. YOUNG:  Yeah.  So -- yeah.
12      Q.  (BY MR. EWALT)  So in Paragraphs 235 and 236
13  of your opening report, is it fair to say you -- you
14  apply the distinct and independent pricing structure
15  factor to your candidate market for ad-buying tools
16  for small advertisers?
17      A.  Yes.
18      Q.  And you reach the conclusion that ad-buying
19  tools for small advertisers have a distinct and
20  independent pricing structure.
21         Is that fair?
22      A.  Yes.
23      Q.  And from what is that pricing structure
24  distinct?
25      A.  That if you look at Table 3, it describes

8 (Pages 26 - 29)

Page 30

1  various ad-buying tools to small advertisers that are
2  available in the market and describes the means by
3  which the advertisers are -- were effectively paid --
4  or effectively pay -- sorry -- to -- to -- to -- to
5  pay in the sense of the bids that they offer for which
6  a -- a percentage is the price paid to the provider of
7  the -- the ad-buying tool.
8      Q.  Correct.  That's what Table 3 describes.
9      A.  Yeah.
10     Q.  My question to you is:  How can you tell
11 whether those are distinct from something else?
12     A.  I think this is the case where I am not
13 understanding you.
14     Q.  All right.  Let me try again.
15         So the word "distinct" suggests a
16 comparison between two things.
17     A.  Yes.
18     Q.  Would you agree with that?
19     A.  Yes.
20     Q.  And one of the things that's being compared
21 in Paragraphs 235, 236, and Table 3 of your opening
22 report is the pricing model of display ad campaigns
23 and competing ad-buying tools for small advertisers;
24 is that right?
25     A.  Yes.

Page 31

1      Q.  And what are you comparing those pricing
2  models to?
3      A.  Oh, I see.
4          What I -- I'm -- when advertisers use
5  those tools and they commit to a payment for ads, the
6  provider of these tools will take an amount of that
7  bid, contingent on the bid being ultimately accepted
8  as a, for want of a better term, commission.
9          And that is the way in which the buy --
10 buyers of ads pay for the use of those tools in
11 submitting those bids.
12     Q.  And my question was:  How does that
13 commission compare to anything else?
14     MS. YOUNG:  Objection; form.
15         You can answer.
16     THE WITNESS:  Sorry.
17     A.  The commission compares to the commissions of
18 other providers of ad-buying tools.
19     Q.  (BY MR. EWALT)  So you would agree that
20 providers of ad-buying tools, such as ad exchanges,
21 also charge a commission --
22     MS. YOUNG:  Objection; form.
23     Q.  (BY MR. EWALT) -- for their services?
24     A.  The ad exchangers also on the bids that are
25 submitted to them before those bids -- if those bids

Page 32

1  are accepted before they pay out to suppliers, they
2  take out a commission.
3      Q.  So you agree that ad exchanges charge a
4  commission?
5      A.  Ad exchanges charge -- well, the terminology
6  we've used here is, I guess to be consistent, take
7  rate.
8      Q.  Okay.
9      A.  That is a percentage of the transaction
10 revenue for completed transactions.
11     Q.  All right.  I just want to make sure we got a
12 clear record here.
13     A.  Yes.
14     Q.  So is it your opinion that ad exchanges
15 charge a take rate?
16     A.  My opinion is that there's a take rate that
17 accrues to ad exchanges for completed transactions.
18     Q.  Is it your opinion that there is a take rate
19 that accrues to small advertiser buying tools for
20 completed transactions?
21     MS. YOUNG:  Objection; form.
22     A.  There is.
23     Q.  (BY MR. EWALT)  Is it your opinion that there
24 is a take rate that accrues to large advertiser buying
25 tools for completed transactions?

Page 33

1      MS. YOUNG:  Objection; form.
2      A.  It is my understanding that there is, yes.
3      Q.  (BY MR. EWALT)  Can you please explain how you
4  reach a conclusion that there are distinct prices for
5  small advertiser buying tools when a commission
6  accrues to small advertiser buying tools as well as ad
7  exchanges as well as large advertiser buying tools.
8      MS. YOUNG:  Objection; form.
9      A.  Yes.  There -- there are -- those are
10 distinct -- they're distinct prices in the sense that
11 if you were to not use those tools, you would not pay
12 that price.
13         So if you are an advertiser who did not
14 use the small -- or the -- such as something like
15 Google Ads, you would not be paying Google for those
16 ads.
17     Q.  (BY MR. EWALT)  So is your understanding of
18 the distinct pricing factor such that prices are
19 distinct if customers pay for the product?
20     MS. YOUNG:  Objection; form.
21     A.  Prices are distinct in the sense that if they
22 do not consume the product, they do not pay that
23 price.
24     Q.  (BY MR. EWALT)  Can you give me an example of
25 a situation where a customer does not consume the

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1  product but pays the price?
2          MS. YOUNG: Objection; form.
3      A. I'm trying to think of a clean example that
4  doesn't get us far away from this case.
5          Can you repeat the question again?
6  Sorry.
7      Q. (BY MR. EWALT) That's all right. Let's move
8  on. Let's talk about the hypothetical monopolist
9  test.
10     A. Okay. Okay.
11     Q. The hypothetical monopolist test is described
12 in the DOJ and FTC merger guidelines; is that right?
13     A. Yes, they describe it.
14     Q. And the merger guidelines reflect sound
15 economic principles?
16         MS. YOUNG: Objection; form.
17     A. Yes.
18     Q. (BY MR. EWALT) When you applied the
19 hypothetical monopolist test in this case, did you
20 depart from the principles in the merger guidelines?
21         MS. YOUNG: Objection; form.
22     A. I have not evaluated whether -- I know that
23 it is described in the merger guidelines. I have not
24 evaluated whether my approach was different. I do not
25 regard it as such.

Page 35

1      Q. (BY MR. EWALT) Is it fair to say that as far
2  as you -- you know sitting here, you applied the same
3  hypothetical monopolist test that's described in the
4  merger guidelines?
5      A. As far I know.
6      Q. Could you please describe the hypothetical
7  monopolist test?
8      A. Yes, certainly.
9          So the hypothetical monopolist test, at
10 least as I applied it in this case, I begin with the
11 conduct at issue in a particular part of conduct. And
12 the firm that is the supply -- the -- the firm that
13 engages in that conduct.
14         And I considered the product, if that is
15 the case, a single product by which the conduct was
16 related to.
17         And then I ask -- for instance, there
18 are multiple competitive variables, but let's focus on
19 price. And I ask for the firm that's supplying that
20 product what are the constraints on the -- on the --
21 on its pricing of that product.
22         In particular, I ask are there any
23 suppliers of other products that constrain the price
24 for which I look first at products that are, for
25 instance, functionally in the -- doing the same thing

Page 36

1  or products that -- and this is where the Brown Shoe
2  factors and the hypothetical monopolist test come
3  together -- ones that people recognize as being the
4  same sort of product, et cetera.
5          And I say, if the firm in question and
6  the suppliers of those products identified got
7  together and formed a cartel and acted as a
8  monopolist, could they raise the price of that product
9  profitably from a competitive level or not.
10         Now, that already guides you into a
11 consideration of whether the consumers facing that
12 hypothetical monopoly if getting a small but
13 significant but sustained -- sustained for a period of
14 time increase in price -- would -- would choose not to
15 buy that product at all.
16         And one of the reasons, maybe the one
17 that often comes up most in antitrust analysis, is
18 maybe the consumers would -- when they choose not to
19 buy a particular product divert their spending to
20 another sort of product.
21         Consumers can sometimes, when they don't
22 buy a product, divert their spending to other things
23 entirely, but the question is is there another product
24 that's a standout.
25         If the answer is no, then we conclude

Page 37

1  that the firms that have formed the cartel are the
2  ones that define the market.
3          If the answer is yes, that consumers
4  would go to another specific product, we, then, look
5  at the suppliers of those other products, expand that
6  group of suppliers accordingly, and reconduct the
7  hypothetical monopolist test.
8          And we keep on doing so until the answer
9  is no, at which time we've decided -- we've -- we've
10 concluded that this is the market of relevance.
11     Q. Thank you very much for that.
12         If I heard you correctly, does part of
13 the hypothetical monopolist test involve consideration
14 of consumer responses to a small but significant
15 nontransitory increase in price?
16     A. Part of it, yes.
17     Q. And that small but significant nontransitory
18 increase in price is sometimes called a SSNIP?
19     A. Yes.
20     Q. And the DOJ and FTC typically use a SSNIP of
21 5 percent; is that correct?
22         MS. YOUNG: Objection; form.
23     A. The authorities around the world tend to
24 focus on 5 percent as a -- as a benchmark.
25     Q. (BY MR. EWALT) When you applied the

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1 hypothetical monopolist test in this case, did you use
2 a SSNIP of 5 percent?
3     A.  The ability to use a SSNIP of 5 percent or an
4 exact quantitative number and to -- to be resting the
5 analysis on that benchmark would be something done if
6 you had -- well, basically an almost ideal set of data
7 to understand the price elasticity of demand.
8         And, more importantly, the cross price
9 elasticity with respect to other products that was
10 engaged in.
11        Without that data, small but significant
12 is -- is a -- a more -- is -- is -- is a less precise
13 increase in price that could include prices that were
14 significantly higher than a 5 percent increase.
15     Q.  Could a -- could it be significantly lower
16 than a 5 percent price increase?
17     A.  Yes, certainly.
18     Q.  In this case, did you apply the hypothetical
19 monopolist test using a SSNIP of less than 5 percent?
20        MS. YOUNG:  Objection; form.
21     A.  I didn't actually focus on a benchmark of a
22 quantitative one because of the nature of the evidence
23 available.
24        My analysis and application was a
25 consideration of evidence regarding substitutability

Page 39

1 that did not allow a actual calculation of a price
2 elasticity of demand.
3     Q.  (BY MR. EWALT)  So would you agree that it's
4 possible to apply the hypothetical monopolist test
5 without a specific quantitative level ascribed to the
6 small but significant nontransitory increase in price?
7        MS. YOUNG:  Objection; form.
8     A.  Yes.
9        MS. YOUNG:  You may answer.
10     A.  Yes, I do.
11     Q.  (BY MR. EWALT)  Does the hypothetical
12 monopolist test examine consumer substitution?
13     A.  It does.
14     Q.  Is consumer substitution the critical
15 question at the heart of market definition?
16        MS. YOUNG:  Objection; form.
17     A.  Depending on the context, I -- the way I've
18 described it in the past outside of this case is we're
19 looking at demand side substitution and sometimes
20 supply side substitution.
21     Q.  (BY MR. EWALT)  Did you look at supply side
22 substitution in this case?
23     A.  In this case, it was focused on demand side.
24     Q.  Should the hypothetical monopolist test begin
25 with prices at the competitive level and then examine

Page 40

1 consumer substitution in response to a SSNIP above the
2 competitive level?
3     A.  The -- the strictest idealized interpretation
4 of it is that you do that.
5        But you do not necessarily have to --
6 the evidence doesn't necessarily have to identify a
7 competitive pricing level in order to apply the
8 hypothetical monopolist test to whittle down or expand
9 the group of relevant suppliers.
10     Q.  Is fair to say that ideally the hypothetical
11 monopolist test should begin with prices at the
12 competitive level and then examine consumer
13 substitution in response to a SSNIP?
14        MS. YOUNG:  Objection; form.
15     A.  That would be ideal.
16     Q.  (BY MR. EWALT)  Have you ever defined an
17 antitrust market without applying the hypothetical
18 monopolist test?
19     A.  In other jurisdictions, the courts have been
20 comfortable in just thinking about the, you know, more
21 standard to a traditional expert -- economics --
22 economics textbook notion of demand and supply
23 substitution as opposed to analyzing that same
24 evidence and interpreting it through the lens of the
25 hypothetical monopolist test.

Page 41

1     Q.  In a matter pending in a U.S. Court, have you
2 ever defined an antitrust market without applying the
3 hypothetical monopolist test?
4     A.  In recent memory, I -- I don't think I -- I
5 have applied it.
6     Q.  Is it possible to apply the hypothetical
7 monopolist test in a quantitative way in this case?
8        MS. YOUNG:  Objection; form.
9     A.  In the full being able to provide a confident
10 estimate of the price elasticity of demand at any
11 price, that alone something that would be close to the
12 competitive price, there was insufficient data in this
13 case.
14     Q.  (BY MR. EWALT)  So did you perform a
15 quantitative hypothetical monopolist test in this
16 case?
17     A.  I reviewed quantitative evidence to assist me
18 in doing so, but of the nature of actually being able
19 to calculate a robust price elasticity of demand in
20 each of the relevant markets that I considered, I was
21 not able to do that.
22     Q.  When you applied the hypothetical monopolist
23 test in this case, were you examining whether enough
24 consumers would react to a SSNIP so as to make the
25 price increase unprofitable for a hypothetical

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1 monopolist?
2        MS. YOUNG: Objection; form.
3    A. I was analyzing whether the volume of sales
4 would substitute a way in sufficient amount to render
5 a increase in price unprofitable.
6    Q. (BY MR. EWALT) And when you talk about there
7 being a sufficient amount to render an increase in
8 price unprofitable, is that sometimes called marginal
9 substitution?
10        MS. YOUNG: Objection; form.
11    A. I guess it could sometimes be called that,
12 yes.
13    Q. (BY MR. EWALT) And does marginal substitution
14 differ from full substitution?
15    A. What I would describe full substitution as is
16 when you've got an increase in price such that no one
17 consumes the product anymore whereas I guess marginal
18 substitution is where I've got an increase in -- in
19 price and there's an increment of a substitution
20 which, I think we can use interchangeably. How's
21 that?
22    Q. All right. Let me just make sure I got this
23 right.
24        So --
25    A. Let me just clarify.

Page 43

1        The -- the term "marginal" sometimes to
2 an economist means marginal -- you know, the quantum
3 of a derivative in calculus where sometimes it's more
4 useful term for what is being done is incremental.
5    Q. Okay. All right. Just so -- just to make
6 sure we've got the terminology down here, would an
7 examination of full substitution focus on whether
8 customers will stop using the relevant product
9 entirely if faced with a SSNIP?
10    A. Yes.
11    Q. And would an examination of incremental
12 substitution or marginal substitution focus on whether
13 enough customers will reduce usage of the relevant
14 product if faced with a SSNIP?
15        MS. YOUNG: Objection; form.
16    A. Enough customers using -- reducing their
17 consumption by enough.
18    Q. (BY MR. EWALT) Okay. Fair.
19        Should the hypothetical monopolist test
20 examine whether marginal substitution or incremental
21 substitution is sufficient to defeat a SSNIP?
22    A. That is one way you could apply it.
23    Q. Is it appropriate for the hypothetical
24 monopolist test to examine whether full substitution
25 is sufficient to defeat a SSNIP?

Page 44

1    A. Full substitution in this case would be a
2 subset of incremental substitution. In other words,
3 if you -- if it was the case that a SSNIP led to
4 nobody buying a product, that automatically tells you
5 especially if they were -- nobody was buying a product
6 by switching to another identifiable sets of products
7 would automatically tell you that you've drawn them --
8 the definition of the market too narrowly.
9    Q. Is it possible that a candidate relevant
10 market would pass the hypothetical monopolist test if
11 only a full substitution analysis were performed but
12 failed the hypothetical monopolist test if an
13 incremental substitution analysis were performed?
14        MS. YOUNG: Objection; form.
15    A. No, as one is a substitute of the other.
16    Q. (BY MR. EWALT) So I'm going to ask you about
17 that idea a little bit more.
18        As I understand it, if you have a full
19 substitution analysis, you're asking if all customers
20 would stop using the product in response to a SSNIP,
21 right?
22        MS. YOUNG: Objection; form.
23    A. I guess you could do that.
24        I -- I'm -- the only thing I'm
25 struggling to is that I don't think of substitution in

Page 45

1 full substitution terms, usually.
2        That would be a -- that would be sort of
3 a -- a thing that we sometimes describe to our
4 students as -- as possible but not something that
5 comes up in reality.
6    Q. (BY MR. EWALT) And you would agree that the
7 purpose of the hypothetical monopolist test is to
8 investigate incremental substitution?
9    A. It is to investigate the -- the magnitude of
10 that incremental substitution, the -- the -- well, the
11 size of it.
12    Q. Well, the purpose is -- of the hypothetical
13 monopolist test is to investigate whether there would
14 be enough incremental substitution for it to be
15 unprofitable for a hypothetical monopolist to raise
16 prices by a SSNIP?
17    A. That's right.
18    Q. And would you agree that evidence of full
19 substitution would not be sufficient to reach a
20 conclusion about the definition of a relevant market?
21        MS. YOUNG: Objection; form.
22        Sorry. Go ahead.
23    A. If you found that full substitution would
24 occur, then that is not sufficient because it would
25 trigger you expanding the set of suppliers or products

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1    under consideration before you ended up with your
2    market definition.
3        Q.   (BY MR. EWALT)  If you found that full
4    substitution would not occur, would that be sufficient
5    to reach a conclusion about the definition of a
6    relevant market?
7        A.   No.
8        Q.   If you found that full substitution would
9    occur, would that be sufficient to reach a conclusion
10   about the definition of a relevant market?
11       A.   No.
12       Q.   Could you please turn to Paragraph 124 of
13   your rebuttal report, Exhibit 2.
14       A.   Sorry.  Could you say that --
15       Q.   Paragraph 124.
16           And the first sentence of that paragraph
17   reads: "Moreover, because the ad server fee is above
18   competitive levels at present..."
19           And then it continues.
20           Do you see that?
21       A.   Yes.
22       Q.   Which ad server fee are you referring to?
23       A.   I don't recall what those -- paragraph
24   before.
25           I think that might have more

Page 47

1    accurately -- by at -- the ad server fee -- the ad
2    server fee the people are -- the customers are paying,
3    which, of course, are the fees that I used to
4    calculate in the previous paragraph.  I used the
5    plural "fees" there.
6           MS. YOUNG:  Counsel, we've been going
7    for over an hour.  So I just want to flag that for you
8    if you reach a good breaking point.
9           MR. EWALT:  Okay.  Would you like a
10   break?
11          THE WITNESS:  I'm -- I'm happy to have a
12   break at the --
13          MS. YOUNG:  Yeah.  We can do a break
14   every hour.
15          MR. EWALT:  Let's go off -- let's go off
16   the record.
17          THE WITNESS:  Okay.
18          THE VIDEOGRAPHER:  It's now the end of
19   Video 1 of Joshua Gans.  Off the record.  The time is
20   approximately 10:04.
21          (Break from 10:04 a.m. to 10:18 a.m.)
22          THE VIDEOGRAPHER:  We're now back on the
23   record.  Video 2 of Joshua Gans.  The time is 10:18.
24       Q.   (BY MR. EWALT)  Welcome back, Professor Gans.
25           During the break did you discuss the substance

Page 48

1    of your testimony with counsel?
2           MS. YOUNG:  I'm going to object to that
3    question as to getting to the contents of
4    communication with counsel.
5           You can ask him if he had discussions
6    with counsel but cannot ask him the contents of those
7    communications, per the expert stipulation in this
8    case.
9           MR. EWALT:  Let's go off the record.
10          THE VIDEOGRAPHER:  Now going off the
11   record.  The time is approximately 10:19.
12          (Break from 10:19 a.m. to 10:20 a.m.)
13          THE VIDEOGRAPHER:  Back on the record.
14   The time is 10:20.
15       Q.   (BY MR. EWALT)  Professor Gans, during the
16   break, prior to the one-minute break we just took, did
17   you have discussions about this case with counsel?
18          MS. YOUNG:  I'm going to object again as
19   to going to the contents of communications with
20   counsel when you asked about -- about this case.
21          MR. EWALT:  Are you instructing him not
22   to answer?
23          MS. YOUNG:  I am instructing him not to
24   answer as to the contents of communication with
25   counsel.

Page 49

1        Q.   (BY MR. EWALT)  All right.  Let's go back to
2    Paragraph 124 of your rebuttal report.
3           And we were looking at the statement regarding
4    ad server fees above competitive levels.
5        A.   Yes.
6        Q.   And you said that you intended that to mean
7    ad server fees, plural.
8           Do I have that right?
9           MS. YOUNG:  Objection; form.
10          You may go ahead.
11       A.   I'm -- I'm -- I think either could be
12   interpreted depending on how you thought about those
13   fees.
14       Q.   (BY MR. EWALT)  Do your expert reports
15   disclose any basis for your opinion that DFP's ad
16   server fees are presently above competitive levels?
17       A.   As I showed in my opening report, the market
18   for ad servers in open web display advertising is not
19   a competitive market.  So that is the basis for which
20   I claim that ad server fees are not at the competitive
21   levels.
22       Q.   And you've concluded that ad servers are not
23   a competitive market based on your market definition
24   for ad servers; is that correct?
25          MS. YOUNG:  Objection; form.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1    A.  Well, within that market definition, I've
2  concluded that is not a competitive market.
3    Q.  (BY MR. EWALT)  Right.  So if you don't know
4  what the -- let me back up.
5        How can you tell whether a price is at
6  competitive levels?
7    A.  When you have a market that you've concluded
8  is not a competitive market and that market is served
9  by firms that are maximizing profits of some
10  description in the setting of their prices, you can
11  conclude that the prices are not at the competitive
12  level.  Infer from that.
13    Q.  Can you conclude whether prices are at
14  competitive levels independently of the market
15  definition?
16        MS. YOUNG:  Objection; form.
17    A.  There are other ways, if you had sufficient
18  data to be able to do that.
19    Q.  (BY MR. EWALT)  In this case, did you make any
20  attempt to estimate whether ad server fees were at the
21  competitive level independently of the market
22  definition?
23        MS. YOUNG:  Objection; form.
24    A.  I considered alternative ways of gathering
25  evidence regarding the competitiveness of the market.

Page 51

1        And for that particular one, concluded
2  there was insufficient cost side information given
3  by -- available from Google to -- to make that
4  determination.
5    Q.  (BY MR. EWALT)  Independently of the market
6  definition, did you reach any conclusion as to whether
7  Google's ad server fees are presently below, at, or
8  above the competitive level?
9        MS. YOUNG:  Objection; form.
10    A.  The context for the statement in the
11  paragraph that we're considering was a rebuttal of
12  particular claims regarding substitution that
13  Professor Baye made.  And that's the context in which
14  I wrote --
15    Q.  (BY MR. EWALT)  That's fair.  I understand the
16  context.  I'm just trying to get an answer to the
17  question, though.
18    A.  Oh, okay.
19    Q.  Which was, independently of the market
20  definition, did you reach any conclusion as to whether
21  Google's ad server fees are presently below, at, or
22  above the competitive level?
23        MS. YOUNG:  Objection; form.
24    A.  I did not.
25    Q.  (BY MR. EWALT)  Independently of the market

Page 52

1  definition, did you reach any conclusion as to whether
2  Google's ad exchange fees are presently below, at, or
3  above the competitive level?
4        MS. YOUNG:  Objection; form.
5    A.  Because my process involved first defining
6  the markets and then assessing the degree of market
7  power by Google -- of Google in those markets, I guess
8  it was dependent on that.
9    Q.  (BY MR. EWALT)  Independently of the market
10  definition, did you reach any conclusion as to whether
11  Google's ad exchange fees are presently below, at, or
12  above the competitive level?
13        MS. YOUNG:  Objection; form.
14    A.  I did not.
15    Q.  (BY MR. EWALT)  Independently of the market
16  definition, did you reach any conclusion as to whether
17  Google's fees for small advertising buying tools are
18  presently below, at, or above the competitive level?
19        MS. YOUNG:  Objection; form.
20    A.  This is similar to the other question, so I
21  did not.
22    Q.  (BY MR. EWALT)  So apologies, I've got to ask
23  these again for a broader period of time.
24        So let me just ask it again.  Okay?
25        Independently of the market definition, did

Page 53

1  you reach any conclusion as to whether Google's fees
2  for publisher ad servers have at any time been below,
3  at, or above the competitive level?
4        MS. YOUNG:  Objection; form.
5    A.  I did not.
6    Q.  (BY MR. EWALT)  Independently of the market
7  definition, did you reach any conclusions as to
8  whether Google's ad exchange fees have at any time
9  been below, at, or above the competitive level?
10        MS. YOUNG:  Objection; form.
11    A.  I did not reach a conclusion regarding
12  Google's ad exchange fees.
13    Q.  (BY MR. EWALT)  Independently of the market
14  definition, did you reach any conclusions as to
15  whether Google's fees for small advertiser buying
16  tools have at any time been below, at, or above the
17  competitive level?
18        MS. YOUNG:  Objection; form.
19    A.  As with my previous answers in this thread, I
20  did not.
21    Q.  (BY MR. EWALT)  Please turn to Paragraph 158
22  in your opening report.
23    A.  Okay.
24        (Discussion off the record.)
25    A.  158?

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1    Q.  (BY MR. EWALT)  Yes, sir.
2    A.  Okay.
3    Q.  Does Paragraph 158 describe how you applied
4  the hypothetical monopolist test in defining a
5  publisher ad server market?
6         MS. YOUNG:  Objection; form.
7    A.  Let me briefly --
8    Q.  (BY MR. EWALT)  Sure.
9    A.  -- read this.
10         Yes.
11    Q.  Okay.  In the last sentence of Paragraph 158,
12  you wrote:  "It is highly unlikely a 5 percent price
13  increase in the market for publisher ad server used
14  for the sale of open web display advertising would
15  cause the publishing giant to eliminate digital
16  advertising from its content."
17         Do you see that?
18    A.  I see that statement.
19    Q.  Is it fair to say that in Paragraph 158, you
20  examined whether a SSNIP for publisher ad servers
21  would lead The New York Times to completely stop
22  selling digital advertising and rely instead on
23  subscriptions as its sole source of revenue?
24         MS. YOUNG:  Objection; form.
25    A.  Can you repeat that question again?

Page 55

1    Q.  (BY MR. EWALT)  Is it fair to say that in
2  Paragraph 158 you examined whether a SSNIP for
3  publisher ad servers would lead The New York Times to
4  completely stop selling digital advertising and rely
5  instead on subscriptions as its sole source of
6  revenue?
7         MS. YOUNG:  Same objection.
8    A.  That -- that paragraph discusses, you know,
9  one possibility that could arise from that.
10    Q.  (BY MR. EWALT)  Does Paragraph 158 analyze
11  incremental or marginal substitution?
12    A.  That paragraph provides a -- information on
13  the significance of advertising to The New York Times
14  and suggest that it would not forego that entirety of
15  that.
16    Q.  So you would agree that Paragraph 158 does
17  not analyze incremental substitution, correct?
18         MS. YOUNG:  Objection; form.
19    A.  In and of itself doesn't, but if in terms of
20  the consideration of the hypothetical monopolist test
21  in the entire subsection, incremental substitution is
22  considered.
23    Q.  (BY MR. EWALT)  Can you point to other parts
24  of that subsection where incremental substitution is
25  considered.

Page 56

1    A.  Yes.  Paragraph 160.
2    Q.  Okay.  Where in Paragraph 160 do you discuss
3  incremental substitution?
4    A.  Well, I discussed incremental substitution
5  that would be facilitated by building in-house ad
6  serving capabilities, the plain reading of which is
7  that the publishers would then use some of their ad
8  serving through those in-house capabilities.
9    Q.  Where do you describe substitution between
10  in-house ad servers and third-party ad servers?
11    A.  In -- in-house and third-party ad servers?
12    Q.  Not in-house ad servers.  That's what I mean
13  by third-party ad servers.
14    A.  Oh, I see, I see.
15    Q.  So let me ask it again.
16         Where in Paragraph 160 do you discuss
17  incremental substitution between ad servers and
18  in-house ad servers?
19    A.  I don't in that paragraph.
20    Q.  Okay.  Do you discuss incremental
21  substitution in Paragraph 159?
22    A.  Yes.
23    Q.  Where?
24    A.  Throughout.
25    Q.  Could you point to the specific language in

Page 57

1  Paragraph 159 where you discuss incremental
2  substitution?
3    A.  With statements such as "lose significant
4  revenue" or "a large proportion of user base."
5    Q.  Do you connect that incremental substitution
6  to the profitability for the hypothetical monopolist
7  test?
8         MS. YOUNG:  Objection; form.
9    Q.  (BY MR. EWALT)  Let me rephrase.
10         You just pointed to some language in
11  Paragraph 159 that you've characterized as relating to
12  incremental substitution.
13         My question is:  Does that language connect or
14  describe the impact on the profitability of the
15  hypothetical monopolist of that incremental
16  substitution?
17         MS. YOUNG:  Objection; form.
18    A.  I'm sorry.  I'll have to ask you to repeat
19  the question.
20    Q.  (BY MR. EWALT)  Does Paragraph 159 of your
21  opening report describe the impact on the
22  profitability of the hypothetical monopolist from
23  incremental substitution?
24         MS. YOUNG:  Same objection.
25    A.  It -- it describes the components of that

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1 profitability.
2    Q.  (BY MR. EWALT)  Where does it describe
3 profitability in Paragraph 159?
4    A.  I said it described the components of it,
5 the -- which is the amount of sales that would be lost
6 should publishers be considering changing their
7 business model to a subscription model.
8    Q.  Do you reach any conclusion as to whether it
9 would be profitable for publishers to change their
10 business model to a subscription model?
11    A.  I do.
12    Q.  Where?
13    A.  In the components that would be significantly
14 costly and so.
15    Q.  So you don't use the word "profit"?
16    A.  I don't use the word "profit."  I said I
17 looked at the components of profit.
18        MS. YOUNG:  And let him finish his
19 question before you answer.  You talked over each
20 other a little there.
21    Q.  (BY MR. EWALT)  All right, sir, let's talk
22 about ad exchanges.
23        Is the key function of an ad exchange to match
24 buyers and sellers of display advertising?
25        MS. YOUNG:  Objection; form.

Page 59

1    A.  It is to do so using information and bids.
2    Q.  (BY MR. EWALT)  So you agree then that a key
3 function of an ad exchange is to match buyers and
4 sellers of display advertising?
5        MS. YOUNG:  Same objection.
6    A.  It is to find opportunities for matches and
7 to communicate those to the parties.
8    Q.  (BY MR. EWALT)  For each transaction on an ad
9 exchange, is there always exactly one buyer and one
10 seller?
11        MS. YOUNG:  Objection to form.
12    A.  If a transaction is completed?  You mean if a
13 match is found?
14    Q.  (BY MR. EWALT)  (Nodding head.)
15    A.  From the point of view of the ad exchange,
16 yes.
17    Q.  For each transaction on an ad exchange, do
18 the buyer and seller interact simultaneously?
19        MS. YOUNG:  Objection; form.
20    A.  The buyer and seller submit information to
21 the ad exchange.  And the ad exchange considers that
22 information together which from an economist point of
23 view would be simultaneous.
24    Q.  (BY MR. EWALT)  Are there indirect network
25 effects between publishers and advertisers in the

Page 60

1 market for ad exchanges?
2    A.  Yes.
3    Q.  Are ad exchanges two-sided transaction
4 platforms?
5    A.  That is a word that you could use for them.
6    Q.  When you define a market for ad exchanges,
7 did you focus on how publishers would respond to a
8 SSNIP?
9        MS. YOUNG:  Objection; form.
10    A.  I -- I focused on should the amount that the
11 ad exchange is charging publishes in terms of taking
12 revenue from advertisers if that increased what the
13 publisher's substitution options would be.
14    Q.  (BY MR. EWALT)  When you defined a market for
15 ad exchanges, did you consider advertisers' options in
16 response to a SSNIP?
17        MS. YOUNG:  Objection; form.
18    A.  For advertisers, the consideration would
19 be -- would require substitution, would be things that
20 were -- were -- were part of the terms of trade that
21 were not necessarily the take rate of the ad exchange.
22    Q.  (BY MR. EWALT)  So did you not consider
23 advertiser responses to a SSNIP when you were defining
24 a market for ad exchanges?
25    A.  Well --

Page 61

1        MS. YOUNG:  Objection; form.
2        You may answer.
3    A.  Well, in this particular case, the
4 substitution triggers for advertisers would be perhaps
5 what you would regard -- what we would regard as
6 nonprice.
7    Q.  (BY MR. EWALT)  Okay.  I'm just asking what
8 you did.
9    A.  Yeah.
10    Q.  Did you consider advertiser responses to a
11 SSNIP when you were defining a market for ad
12 exchanges?
13        MS. YOUNG:  Same objection.
14    A.  I can't recall whether I looked at that
15 particularly given the way that I -- it's in my mind
16 now, but we could have a look at the report to see.
17    Q.  (BY MR. EWALT)  Well, how do you -- let's
18 not -- let's step back and say -- let me -- let me go
19 back for one second.
20        You said that you could define ad exchanges --
21 you could consider ad exchanges to be a two-sided
22 transaction platform, right?
23    A.  Yes.
24    Q.  Do you consider ad exchanges to be a
25 two-sided transaction platform?

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1    MS. YOUNG: Objection; form.
2    A. The ad exchange itself is performing the
3  function of matching given the information from
4  advertisers and publishers.
5    Q. (BY MR. EWALT) Okay. So, yes or no, do you
6  consider ad exchanges to be two-sided transaction
7  platforms?
8    MS. YOUNG: Objection; form.
9    Go ahead.
10    A. The -- my reason for hesitation in sort of
11  doing that word -- well, let me -- let me put it this
12  way, and maybe this will be easier on us.
13    Can you define what you mean by
14  "two-sided transaction platform"?
15    Q. (BY MR. EWALT) So we've been talking about
16  it. I understand it's a term of art in economics.
17    A. It is?
18    Q. It's -- do you disagree? Do you think it --
19  a two-sided transaction platform is not an economic
20  term?
21    A. I think "two-sided platform" is or --
22  "multi-sided platform" is a term of art in economics.
23    I think "multi-sided matching" is a term
24  of art in -- in economics.
25    I am concerned when you insert the word

Page 63

1  "transaction" into it you are meaning something
2  different --
3    Q. Okay.
4    A. -- than those.
5    Q. That's fair.
6    Are ad exchange -- strike that.
7    Do you consider ad exchanges to be
8  two-sided platforms?
9    MS. YOUNG: Objection; form.
10    A. I do.
11    Q. (BY MR. EWALT) Do you consider ad exchanges
12  to be two-sided platforms that match publishers and
13  advertisers?
14    MS. YOUNG: Objection; form.
15    A. That match publishers and advertisers based
16  on the information submitted to the platform.
17    Q. (BY MR. EWALT) Do you consider ad exchanges
18  to be two-sided platforms that match publishers and
19  advertisers based on information submitted to the
20  platform?
21    MS. YOUNG: Objection; form.
22    A. Yes.
23    Q. (BY MR. EWALT) Okay. So why don't we just
24  take a moment here and you can review your report --
25  both reports and refresh your memory as to whether you

Page 64

1  considered advertiser responses to a SSNIP when you
2  were defining a market for ad exchanges.
3    A. Okay.
4    Okay.
5    Q. Did you consider advertiser responses to a
6  SSNIP when you defined a market for ad exchanges?
7    MS. YOUNG: Objection; form.
8    A. I did not find it necessary to do so because
9  the application of the hypothetical monopolist test in
10  the procedure that I outlined earlier in our
11  discussion stopped prior to having to do that.
12    Q. (BY MR. EWALT) When you defined a market for
13  ad exchanges, did you consider only the responses of
14  publishers to a SSNIP?
15    MS. YOUNG: Objection; form.
16    A. When I was considering the set of suppliers
17  of products, it turned out that the publishers were
18  the ones who had the least substitution possibilities.
19    So that side of the market bound in
20  applying the hypothetical monopolist test, meaning
21  that is all I had to consider to be satisfied with the
22  market's boundaries.
23    Q. (BY MR. EWALT) Would you please turn to
24  Paragraph 149 of your rebuttal report.
25    That paragraph reads: "In connection with my

Page 65

1  HMT for ad exchanges, in Paragraph 103 I describe an
2  HMT test conducted by Google referenced by Professor
3  Milgrom."
4    Do you see that?
5    A. Yes.
6    Q. Would you please turn to Paragraph 103 of
7  your rebuttal report and just take a moment to review
8  Paragraphs 103 and 104.
9    Let me know when you're ready.
10    A. Yes.
11    Q. Do you think that in Paragraph 149 of your
12  rebuttal report you meant to refer to Paragraph 104
13  rather than Paragraph 103?
14    A. Oh, in paragraph -- oh, I'm sorry. I -- I
15  stopped at 104. Just a second.
16    Q. Sure. Sure.
17    So we started with Paragraph 149.
18    A. Yes.
19    Q. And my question to you is: Do you --
20    A. Oh.
21    Q. -- do you think that in Paragraph 149 of your
22  rebuttal report you meant to refer to Paragraph 104
23  rather than Paragraph 103?
24    A. I do.
25    Q. All right. I'm handing you a document that's

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1  been marked as Exhibit 4.
2          (Marked Gans Exhibit No. 4.)
3  Q.   (BY MR. EWALT)  The first page bears Bates No.
4  GOOG-AT-MDL-B-001391461.  It's an e-mail dated
5  September 2, 2015.
6      Do you see that?
7  A.  Yes.
8  Q.  Is Exhibit 4 the document you discuss in
9  Paragraph 104 of your rebuttal report?
10  A.  Yes.
11  Q.  Do you interpret Exhibit 4 as a hypothetical
12  monopolist test conducted by Google?
13          MS. YOUNG:  Objection; form.
14  A.  Exhibit 4 was a test, an analysis provided by
15  Google, but I don't believe that they were conducting
16  a hypothetical monopolist test.
17  Q.   (BY MR. EWALT)  Do you interpret Exhibit 4 as
18  evidence in forming your application of a hypothetical
19  monopolist test?
20  A.  I think it is informing any economist
21  application of the hypothetical monopolist test.
22  ████████████████████████████████████████
   ████████
   ██  ████████████████████████████████
25  Q.  And if you look at the page with Bates number

Page 67

1  ending in 462, do you see a set of bullets near the
2  top of the page?
3  A.  Yes.
4  ██  ████████████████████████████████████████
   ██  ████████████
   ██  ████████████████████████████████████████████
   ██  ████████████████████████
   ██  ████████████████████████████████████
   ██  ████████████████
   ██  ████████████
   ██  ██████████████████████████████████████████
   ██  ██████████████████████████████████████████
   ██  ████████████████████████████
   ██  ██████████████████████████
   ██  ████████████████████████████████████

Page 68

1  Q.   (BY MR. EWALT)  Does that imply that if Google
2  increased its price its profit would go down?
3          MS. YOUNG:  Objection; form.
4  A.  So no.
5  Q.   (BY MR. EWALT)  Why not?
6  A.  This calculation was based on DRS Version 1.
7      And what that did is it maintained
8  Google's take rate on impressions that it predicted
9  would be matched at that take rate and reduced the
10  take rate on impressions that it believed would not be
11  matched on AdX, or AdX, at that -- at that take rate,
12  at the -- at its normal take rate.
13      And so the profit changes are wholly on
14  the increment, which was the additional transactions
15  that were matched as a result of Google's discount.
16  Q.  So you interpret the third bullet point on
17  Page 462 of Exhibit 4 to refer to the profit from only
18  the incremental transactions that occurred because of
19  DRS Version 1?
20  A.  That is what I interpreted -- that's what it
21  is.
22  ████████████████████████████████████████
   ████████████████████████████████████████████

Page 69

1  ████████████████████████████████████████
   ████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████████
   ██████████████████████████████████████████
13  Q.  Okay.  Do some publishers have both web and
14  in-app advertising inventory?
15      You can put that aside.
16  A.  Are we done with this?  Okay.
17          MS. YOUNG:  Objection; form.
18  Q.   (BY MR. EWALT)  Let me -- let me ask the
19  question again.
20          MR. EWALT:  And you can object again.
21          MS. YOUNG:  Yeah.
22  Q.   (BY MR. EWALT)  Do some publishers have both
23  web and in-app advertising inventory?
24          MS. YOUNG:  Same objection.
25  A.  Yes.

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1    Q.  (BY MR. EWALT)  Can a publisher use the same
2    ad exchange to transact both web and in-app inventory?
3    A.  They could use the same provider.
4    Q.  Did you investigate whether in response to a
5    SSNIP for web impressions publishers would be able to
6    shift enough users from websites to apps to make it
7    unprofitable for a hypothetical monopolist of ad
8    exchanges to raise prices on web impressions?
9         MS. YOUNG:  Objection; form.
10   A.  To -- your question is with respect to an
11   increase in ad exchange prices for open web display
12   ads, the take rate on that.
13        Would publishers use some means to -- to
14   move customers to their app advertising to -- or set
15   up an app?
16   Q.  (BY MR. EWALT)  And the question is:  Did you
17   investigate that?
18   A.  I did that consider that, yes.
19   Q.  Did you express an opinion in either of your
20   reports about whether, in response to a SSNIP for web
21   impressions, publishers would be able to shift enough
22   users from websites to apps to make it unprofitable
23   for a hypothetical monopolist of ad exchanges to raise
24   prices for web impressions?
25        MS. YOUNG:  Objection; form.

Page 71

1    A.  I don't recall whether I did.
2    Q.  (BY MR. EWALT)  Would you please turn to
3    Page 221 of your rebuttal report.
4         MS. YOUNG:  Paragraph or page?
5         MR. EWALT:  Page 221.
6    A.  Did you say paragraph?
7    Q.  (BY MR. EWALT)  Page.  Sorry.
8    A.  Oh, sorry.
9

Page 72

13   Q.  Did you investigate -- strike that.
14        In your reports do you express an
15   opinion whether, in response to a SSNIP, publishers
16   would switch to selling enough of their inventory
17   directly without using an ad exchange to make it
18   unprofitable for a hypothetical monopolist if ad
19   exchange is to raise prices?
20        MS. YOUNG:  Objection; form.
21        Go ahead.
22   A.  I do consider that.
23   Q.  (BY MR. EWALT)  My question, sir, was:  In
24   your reports, do you express an opinion whether, in
25   response to a SSNIP, publishers would switch to

Page 73

1    selling enough of their inventory directly without
2    using an ad exchange to make it unprofitable for a
3    hypothetical monopolist of ad exchanges to raise
4    prices?
5         MS. YOUNG:  Same objection.
6    A.  I do express an opinion.
7    Q.  (BY MR. EWALT)  Where?
8    A.  Could you repeat the question again because I
9    just want to make sure I have it?
10   Q.  Absolutely.
11        In your reports, do you express an
12   opinion, whether in response to a SSNIP, publishers
13   would switch to selling enough of their inventory
14   directly without using an ad exchange to make it
15   unprofitable for a hypothetical monopolist of ad
16   exchanges to raise prices?
17        MS. YOUNG:  Same objection.
18   A.  Right at the moment I can't find the sort of
19   explicit crisp statement, although the look from
20   paragraph -- at pages 69 to 75 of my opening report,
21   as simple evidences as to the lack of
22   substitutability.
23   Q.  (BY MR. EWALT)  All right.  Let's switch gears
24   again to advertiser buying tools.
25        At a high level, do advertisers try to have

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1  their advertisements shown to consumers who might buy
2  their products?
3      A.  Yes, for the majority of advertisers.
4      Q.  Can advertisers reach consumers using display
5  advertising on the open web?
6      A.  They can.
7      Q.  Can advertisers reach consumers using
8  advertiser -- advertising on social media websites
9  like Instagram and TikTok?
10     A.  They can.
11     Q.  Can advertisers reach consumers using
12  advertising on retail websites like Amazon and
13  Walmart?
14     A.  Depending on whether their products are
15  available in those platforms, yes.
16     Q.  Can advertisers reach consumers using
17  advertising in mobile apps?
18     A.  It is possible.
19     Q.  Can Advertisers reach consumers through
20  Direct Deals with publishers?
21         MS. YOUNG:  Objection; form.
22     A.  If they strike a direct deal with the right
23  sort of publisher, yes.
24     Q.  (BY MR. EWALT)  Can advertisers reach
25  consumers using advertising in streaming services or

Page 75

1  connected TV?
2      A.  They -- if advertise -- advertisements are
3  placed on those channels, yes.
4      Q.  Can advertisers reach consumers by
5  advertising in podcasts?
6      A.  Yes, so long as the consumers are -- are
7  listening to the ads in the podcast.
8      Q.  Can advertisers reach consumers by
9  advertising via e-mail?
10     A.  It is possible for them to do so.
11     Q.  Can advertisers reach consumers using search
12  advertising?
13     A.  It is possible for them to do so.
14     Q.  Can advertisers reach consumers by
15  advertising on broadcasts or cable TV?
16     A.  It is possible for them to do so.
17     Q.  Can advertisers reach consumers by
18  advertising on radio?
19     A.  It is possible for -- for them to reach --
20  for advertisers to reach consumers via radio.
21     Q.  Can advertisers reach consumers by
22  advertising in newspapers and magazines?
23     A.  Yes, they can reach some consumers that way.
24     Q.  Can advertisers reach consumers by
25  advertising with billboards?

Page 76

1      A.  Yes, they can.
2      Q.  Do advertisers have other ways of reaching
3  consumers that I haven't asked you about?
4          MS. YOUNG:  Objection; form.
5      A.  Yes.
6      Q.  (BY MR. EWALT)  Is fair to say that
7  advertisers have a lot of options to reach consumers?
8          MS. YOUNG:  Objection; form.
9      A.  There are a lot of channels, distinct
10  channels by which advertisers can reach consumers.
11     Q.  (BY MR. EWALT)  If advertisers find that
12  display advertising on the open web is not performing
13  as well relative to other options, can they shift
14  their spending away from open web display advertising
15  and towards other options?
16         MS. YOUNG:  Objection; form.
17     A.  Are you -- are you asking me if they're
18  allowed to do so?
19     Q.  (BY MR. EWALT)  I'm -- I'll just ask the
20  question again.
21         If advertisers find that display advertising
22  on the open web is not performing as well relative to
23  other options, can they shift their advertising
24  spending away from open web display advertising and
25  towards other options?

Page 77

1          MS. YOUNG:  Same objection.
2      A.  They could shift that spending to any
3  activity that they so chose.
4      Q.  (BY MR. EWALT)  Would you please turn to
5  Paragraph 225 of your opening report.
6          All right.  That paragraph reads:  "The
7  characteristics of ad-buying tools for small
8  advertisers for buying open web display advertising
9  include connecting with exchanges and sellers of ad
10  inventory, optimizing demographic and cross device
11  targeting, managing advertising campaigns and
12  remarketing campaigns, collecting data on campaign's
13  performance, et cetera."
14         Do you see that?
15     A.  Yes.
16     Q.  Does that sentence identify the main
17  characteristics of ad-buying tools for small
18  advertisers?
19     A.  Yes, pretty much.
20     Q.  Do DSPs connect with exchangers and sellers
21  of ad inventory?
22         MS. YOUNG:  Objection; form.
23     A.  DSPs?
24     Q.  (BY MR. EWALT)  Yes.
25     A.  You mean demand side?

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1    Q.   How about this:  Do large advertiser buying
2   tools connect with exchanges and sellers about
3   inventory?
4    A.   Yes.
5    Q.   Do large advertiser buying tools optimize
6   demographic and cross device targeting?
7    A.   Yes.
8    Q.   Do large advertiser buying tools manage
9   advertising campaigns and remarketing campaigns?
10    A.   Yes.
11    Q.   Do large advertiser buying tools collect data
12   on campaign's performance?
13    A.   I believe so.
14    Q.   Would you please turn to Paragraphs 233 and
15   234 of your opening report?
16    A.   Yes.
17    Q.   Would you agree that a conversation with
18   Professor Chandler is the only basis for your opinion
19   that there is industry or public recognition of a
20   market for ad-buying tools for small advertisers?
21        MS. YOUNG:  Objection; form.
22    A.   It is the -- it is -- for industry
23   recognition, yes, it is my basis.
24    Q.   (BY MR. EWALT)  And your only basis?
25        MS. YOUNG:  Objection; form.

Page 79

1    A.   It's the only basis that I cited in the
2   report.
3    Q.   (BY MR. EWALT)  And that conversation with
4   Professor Chandler took place on June 4, 2024?
5    A.   Yes.
6    Q.   That was three days before your report was
7   finalized?
8    A.   Yes.
9    Q.   How long did the conversation with Professor
10   Chandler last?
11    A.   I don't recall.
12    Q.   Was it more than an hour?
13    A.   I don't recall the exact time.  Probably not
14   much more if it was that.
15    Q.   What's your best estimate of how long it
16   took?
17    A.   Maybe an hour.
18    Q.   Who was present for the conversation?
19    A.   Oh, I don't remember.
20    Q.   Was it just you and Professor Chandler?
21    A.   I don't believe so, but I can't remember who
22   else was there.
23    Q.   Were any members of your support team from
24   Keystone present?
25        MS. YOUNG:  So I'm going to instruct you

Page 80

1   not to answer this question.  This is going to
2   contents of communications between the testifying
3   expert and staff.
4        MR. EWALT:  I just asked who was
5   present.  I didn't ask what the content of the
6   communication was.
7        MS. YOUNG:  You may answer who was
8   present if you recall, but not --
9    A.   I don't recall.  I don't recall who was
10   present.
11    Q.   (BY MR. EWALT)  Do you recall whether any
12   lawyers were present?
13    A.   I do not recall.
14    Q.   Do you recall what topics you discussed?
15    A.   I -- I recall some of them, yeah.  Yes,
16   there's -- there are ones that we discussed.  My
17   recollection is contained in the ones that I relied
18   upon in the report.
19    Q.   Okay.  What did Professor Chandler say about
20   industry participants' views concerning a market for
21   ad-buying tools for small advertisers?
22    A.   He said that small advertisers were defined
23   by having a relatively small amount of monthly
24   advertising, and that one reason they are a distinct
25   market is that they have too little advertising

Page 81

1   expenditure to access some of the more sophisticated
2   products that are available that may have different
3   substantive degrees of -- of pricing for -- to
4   advertisers for the use of those products.
5    Q.   Was -- was any record made of the
6   conversation between you and Professor Chandler?
7    A.   In my -- I -- I had a set of questions that I
8   wanted to ask him.  And I --
9        MS. YOUNG:  I'm going to instruct -- so
10   just to be clear, right?  And I want to follow the
11   expert stip, and the expert stip forecloses the
12   disclosure discovery of notes and drafts of testifying
13   experts unless he relied upon them so...
14        MR. EWALT:  He did rely on them.  He
15   cited them here.
16        MS. YOUNG:  Yeah.  And he said that
17   everything he relied upon is stated in his report.  So
18   I just want to caution the witness with that.
19        And I'm allowing you to ask the
20   questions, but I just want to make clear that there is
21   a line that the parties have agreed to draw here.
22        So you're not allowed to discover the
23   contents of any communications between counsel --
24        (Speaking simultaneously.)
25        MS. YOUNG:  Yes.

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1    MR. EWALT:  Yeah.
2    MS. YOUNG:  Go ahead.
3    Q.  (BY MR. EWALT)  Okay.  So the question is:
4    Was a record made of the conversation?
5    A.  No.
6    Q.  Okay.  But you wrote up questions before the
7    conversation to ask Professor Chandler.
8    Is that fair?
9    A.  I had a -- a list of questions.  I cannot
10   recall that if I -- where I wrote them.  It may have
11   been somewhere, but more likely than not it was on my
12   little white board ahead of the conversation.
13   Q.  You probably erased your white board since
14   then?
15   A.  Yeah, I have a white board that sits right in
16   front of my computer screen where I -- it works on
17   Zoom.  It's a good thing.  You should get it.  Well,
18   it's -- I find it useful.
19   And that's where often I write stuff.
20   And then I use the stuff and whatever I
21   was going to use it, off it goes.
22   That's my --
23   Q.  All right.
24   A.  -- process.
25   Q.  Okay.  Well, let's -- can you please turn to

Page 83

1    Page 81 in your opening report.  Page 81.
2    A.  Yep.
3    Q.  You're there.  Great.
4    Let's take a look at Paragraph 237.  It
5    begins:  "A small increase in the price of ad-buying
6    tools for small advertisers for buying open web
7    display advertising above competitive levels would not
8    result in significant substitution by small
9    advertisers for other products.  In response to an
10   increase in price, small advertisers would have four
11   options."
12   Do you see that?
13   A.  Yes.
14   Q.  So when using the hypothetical monopolist
15   test to define your market for ad-buying tools for
16   small advertisers, were you focused on how small
17   advertisers would respond to a SSNIP?
18   A.  Yes.
19   Q.  Both large advertisers and small advertisers
20   use the tools that you refer to as ad-buying tools for
21   small advertisers.
22   Is that fair?
23   MS. YOUNG:  Objection; form.
24   A.  Yes.
25   Q.  (BY MR. EWALT)  Did you analyze how large

Page 84

1    advertisers would respond to a SSNIP for ad-buying
2    tools for small advertisers?
3    A.  I may not have explicitly done so, but some
4    of the factors of substitution that I considered are
5    common to both.
6    Q.  You know that large advertisers account for a
7    large portion of the total spending on ad-buying tools
8    for small advertisers, right?
9    MS. YOUNG:  Objection; form.
10   A.  They account for a reasonable proportion,
11   yes.
12   Q.  (BY MR. EWALT)  Reasonably large proportion?
13   MS. YOUNG:  Objection; form.
14   A.  I can't --
15   MS. YOUNG:  Go ahead.
16   A.  I can't remember the exact proportion.
17   Q.  (BY MR. EWALT)  Please turn to Page 92 of your
18   opening report.
19   Does Figure 8 show a slide from a Google
20   presentation about large and small advertisers using
21   different ad-buying tools?
22   A.  Yes.
23   Q.  In the top left corner of the slide, do you
24   see where it says:  "Google ads customers and
25   revenue"?

Page 85

1    A.  Yes.
2    Q.  Are large advertisers sometimes called head
3    advertisers?
4    A.  Yes.
5    ███████████████████████████
6    ██  █████████████████████████
7    ██  ███████
8    ██  ██████████████
9    ██  ████████████████████████████
10   ██  █████████████████████████████
11   █  ████████████████
12   Q.  How do you know that?
13   A.  Well, that's what that -- that says.
14   Q.  Well, it says "Google Ads" in the top left
15   corner.  It says:  "Google Ads customers and revenue."
16   A.  Well, I -- I -- I look at the -- the side
17   there which has Google Ads being used, but also these
18   other different ad products being used as well.
19   So it's -- it's -- that -- that's what I
20   interpreted that revenue as, but I see what -- I see
21   that it might have another interpretation.
22   █  ████████████████████████
23   █  ████████████████████
24   █  ████████████████████████████

HIGHLY CONFIDENTIAL

Page 86

4    Q.  (BY MR. EWALT)  And do large advertisers use

5  both Google Ads and DV360?

6    A.  Yes.

7         MS. YOUNG:  Objection; form.

8         Sorry.  Just speak over you.  Go ahead.

9    A.  Yes.

10    Q.  (BY MR. EWALT)  If a firm providing ad-buying

11  tools for small advertisers were thinking about

12  raising prices, would it have to consider potential

13  responses from both small advertisers and large

14  advertisers?

15         MS. YOUNG:  Objection; form.

16    A.  It would -- it would have to consider them,

17  yes.

18    Q.  (BY MR. EWALT)  Responses from large

19  advertisers would have a big impact on the provider of

20  ad-buying tools for small advertisers because large

21  advertisers represent a big part of the total spending

22  on ad-buying tools for small advertisers.

23      Do you agree with that?

24         MS. YOUNG:  Objection; form.

25    A.  I think this is what this says, that large

Page 87

1  advertisers place a lot of value on the advertisers

2  that solely go through Google Ads.

3    Q.  (BY MR. EWALT)  Right.  But I'm not asking

4  about this slide right now.

5    A.  Oh, I'm sorry.

6    Q.  My question is about the responses, whether

7  the responses from large advertisers would have a big

8  impact -- strike that.

9        The responses from large advertisers to

10  a price increase would have a big impact on the

11  profitability of the provider of ad-buying tools for

12  small advertisers, right?

13         MS. YOUNG:  Objection; form.

14    A.  If those large advertisers were subject to

15  a -- a 5 percent -- you know, a significant increase

16  in price.  The profitability of that increase in price

17  would have to take into account the large advertising

18  response.

19    Q.  (BY MR. EWALT)  Did you analyze whether large

20  advertisers would shift enough spending from ad-buying

21  tools for small advertisers to ad-buying tools for

22  large advertisers to make it unprofitable for a

23  hypothetical monopolist of ad-buying tools for small

24  advertisers to impose a SSNIP?

25         MS. YOUNG:  Objection; form.

Page 88

1    A.  I didn't engage in that analysis, but I

2  believe that other experts have.

3         MS. YOUNG:  Counsel, we've been going

4  for over an hour.  When you reach a good stopping

5  point on this line of questioning, I suggest a break.

6         MR. EWALT:  Okay.

7    Q.  (BY MR. EWALT)  Did you examine the prices

8  charged by any non-Google ad-buying tools for small

9  advertisers?

10    A.  I examined -- I didn't examine the -- I can't

11  recall if I examined the prices for those.

12         MR. EWALT:  Okay.  We can go off the

13  record.

14         THE VIDEOGRAPHER:  This is now the end

15  of Video 2 of Joshua Gans.  We're off the record at

16  11:23.

17        (Break from 11:23 a.m. to 11:38 a.m.)

18         THE VIDEOGRAPHER:  Now back on the

19  record.  Video 3 of Joshua Gans.  The time is

20  approximately 11:38.

21    Q.  (BY MR. EWALT)  Welcome back, Professor Gans.

22      During the break, did you discuss the

23  substance of this case with counsel?

24         MS. YOUNG:  Again, I'm going to object

25  to this line of questioning as to going into the

Page 89

1  contents of communications with counsel.

2        You can ask him if he had discussions

3  with counsel but not about the contents.  So I'm going

4  to instruct the witness not to answer the question.

5         MR. EWALT:  Okay.  Based on that

6  instruction, we'll continue on another line of

7  questioning.

8    Q.  (BY MR. EWALT)  So, Professor Gans, does

9  Criteo offer an ad-buying tool for small advertisers?

10    A.  You'll forgive me that sometimes the --

11    Q.  Of course.

12    A.  -- exhibit is few and far between.

13    Q.  How about Paragraph 229 of your opening

14  report?

15    A.  Yes.  Just these names.

16        Yes.

17    Q.  Does Criteo offer an ad-buying tool for small

18  advertisers?

19    A.  Yes.

20    Q.  Did you examine the price charged by Criteo

21  ad-buying tools for small advertisers?

22    A.  I did not look at the prices Criteo charged

23  over time for small -- for tools for small

24  advertisers.

25    Q.  Did you look at the prices that any firms

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1  other than Google charge, for small advertiser
2  ad-buying tools?
3     A.  I cannot recall if I saw or thought about any
4  particular price that was charged by the competitors,
5  the other providers in the ad-buying tools for small
6  advertiser market.
7        (Marked Gans Exhibit No. 5.)
8     Q.  (BY MR. EWALT)  I'm handing you what's been
9  marked as Exhibit 5, which is Professor Baye's report.
10    A.  All right.
11    Q.  And ask you to turn to Page 603, Page 603.
12       (Discussion off the record.)
13    Q.  (BY MR. EWALT)  It's towards the end.  Not
14 quite all the way to the end.
15    A.  Yes.  Just a second here.
16       Right.
17    Q.  (BY MR. EWALT)  You there?
18    A.  Yes.
19    Q.  All right.  And Figure 5 on Page 604 of
20 Professor Baye's report shows the price of several
21 advertising buying tools over time.
22       Do you agree with that?
23    A.  Just a sec.  Let me refresh my memory on this
24 chart.
25       MS. YOUNG:  Did you say Page 604?

Page 91

1        MR. EWALT:  603.
2        MS. YOUNG:  603.
3        Objection; form.
4     A.  Okay.  Do you want to ask your question
5  again?
6     Q.  (BY MR. EWALT)  Yes, I do.
7        Do you agree that Figure 5, on Page 603 of
8  Professor Baye's report, shows the prices of several
9  advertiser buying tools over time?
10       MS. YOUNG:  Objection; form.
11       Go ahead.
12    A.  It's a measure of their per customer revenue.
13    Q.  (BY MR. EWALT)  And that's one measure of
14 price?
15    A.  Yes.
16    Q.  Professor Baye's Figure 5 shows the price of
17 Criteo's ad-buying tool for small advertisers in light
18 blue.
19       Do you see that?
20    A.  Yes.
21

Page 92

1
2     Q.  (BY MR. EWALT)  Do you have any reason to
3  doubt the accuracy of Figure 5?
4        MS. YOUNG:  Objection; form.
5     A.  I cannot recall investigating it closely.  So
6  I wouldn't want to warrant its accuracy or otherwise
7  at this stage.
8     Q.  (BY MR. EWALT)  But you don't have any reason
9  to think it's inaccurate, do you?
10       MS. YOUNG:  Objection; form.
11    A.  I -- I haven't investigated its -- its
12 accuracy.
13
14
15
16
17    Q.  Is it fair to say that you don't know what a
18 competitive price would be for ad-buying tools for
19 small advertisers?
20       MS. YOUNG:  Objection; form.
21    A.  I did not conduct an analysis of the -- what
22 the competitive benchmark price would be.
23    Q.  (BY MR. EWALT)  Without knowing the
24 competitive benchmark, can an economist perform a
25 hypothetical monopolist test?

Page 93

1        MS. YOUNG:  Objection; form.
2     A.  Yes, they can.
3     Q.  (BY MR. EWALT)  All right.  Would you please
4  turn to paragraph -- you can put away -- put aside
5  Professor Baye's report.
6        And I'll ask you to please turn to
7  Paragraph 170 of your rebuttal report.
8     A.  Yes.
9     Q.  Paragraph 170 begins:  "Google conducted
10 another HMT experiment in 2018."
11       Do you see that?
12    A.  Yes.
13       (Marked Gans Exhibit No. 6.)
14    Q.  (BY MR. EWALT)  So I'm handing you what's been
15 marked as Exhibit 10.  It's a document bearing -- oh,
16 excuse me.  I'm sorry.
17       I'm handing you what's been marked as
18 Exhibit 6.  It's a document with the first page
19 bearing Bates No. GOOG-NE-04732984.  It's titled
20 "Demand Elasticity on AdX Web Publishers," and it's
21 dated May 9, 2018.
22       Do you see that?
23    A.  Yes.
24    Q.  Is Exhibit 6 the HMT experiment that you
25 referenced in Paragraph 170 of your rebuttal report?

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1    A.  Yes.
2
7    Q.  And that's a part of the experiment that you
8    were discussing in Paragraph 170 of your rebuttal
9    report.
10          Is that fair?
11   A.  Yes.
12
25   Q.  But it would not be itself an application of

Page 95

1    the hypothetical monopolist test; is that correct?
2    A.  Well, this --
3          MS. YOUNG:  Objection; form.
4          I -- sorry.  Go ahead.
5    A.  Well, this document was from Google's
6    perspective not designed to apply the hypothetical
7    monopolist test.
8          It was -- when I used it, it was
9    information that I used to inform how an economist in
10   this case would look at a hypothetical monopolist
11   test.
12
21

Page 96

22   Q.  Right.
23   A.  And you could therefore calculate what --
24   that the elasticity of demand was such that just
25   looking at the buy side alone would not find -- you

Page 97

1    would find it profitable to increase prices.
2    Q.  But this analysis of profit looks at the buy
3    plus sell side, correct?
4    A.  Well, that calculation in that executive
5    summary does, yes.
6    Q.  And then did you do any calculation beyond
7    what appears within Exhibit 6 to assess the
8    profitability for Google Ads standing alone of this
9    price change?
10         MS. YOUNG:  Objection; form.
11   A.  I didn't -- I didn't report that number in
12   this -- in -- in my report.
13   Q.  (BY MR. EWALT)  Okay.  You can put that aside.
14         I want to talk about something else now,
15   monopoly power.  Hopefully this order is seeming
16   familiar to you?
17   A.  Yeah.
18   Q.  Okay.
19   A.  Good.
20         (Speaking simultaneously.)
21   Q.  (BY MR. EWALT)  Can a firm obtain monopoly
22   power without engaging in legal antitrust conduct?
23   A.  Can they --
24         MS. YOUNG:  Sorry.  Objection; form.
25   A.  Can they, yes.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1    Q.  (BY MR. EWALT)  A firm obtain monopoly power
2  by offering high quality products that its competitors
3  can't match?
4        MS. YOUNG:  Objection; form.
5    A.  It is possible that firms can do that.
6    Q.  (BY MR. EWALT)  Can a firm obtain monopoly
7  power by holding unique proprietary technology?
8        MS. YOUNG:  Objection; form.
9    A.  It -- it can do that, yes.
10    Q.  (BY MR. EWALT)  Does DFP have unique product
11  features as compared to other publisher ad servers?
12        MS. YOUNG:  Objection; form.
13    A.  It -- it may have -- it may have some
14  distinctive product differentiation with other
15  publishers' ad servers.
16    Q.  (BY MR. EWALT)  Do those unique features for
17  DFP make it a relatively high quality publisher ad
18  server?
19        MS. YOUNG:  Objection; form.
20    A.  I -- I do not know if that's the case.
21    Q.  (BY MR. EWALT)  Does AdX have unique product
22  features as compared to other ad exchanges?
23        MS. YOUNG:  Objection; form.
24    A.  I -- I am not aware of any specific features
25  that are necessarily unique to Google.

Page 99

1    Q.  (BY MR. EWALT)  Does Google Ads have unique
2  product features as compared to other ad-buying tools
3  for small advertisers?
4    A.  Yes.
5        MS. YOUNG:  Objection; form.
6        Go ahead.
7    A.  Yes.
8    Q.  (BY MR. EWALT)  Do these unique features make
9  Google Ads a relatively high quality ad-buying tool
10  for small advertisers?
11        MS. YOUNG:  Objection; form.
12    A.  Those features mean that compared to other
13  ad-buying tools for small advertisers there are
14  distinctive features whereby advertisers can derive
15  value from Google relative to those others.
16    Q.  (BY MR. EWALT)  In your reports, have you
17  expressed the opinion that Google has monopoly power
18  in the market for ad-buying tools for large
19  advertisers?
20    A.  I have not.
21    Q.  In your reports, have you expressed the
22  opinion that Google has a dangerous probability of
23  achieving monopoly power in the market for ad-buying
24  tools for large advertisers?
25    A.  I have not.

Page 100

1    Q.  In your opinion, does Google have monopoly
2  power in the market for ad exchanges?
3        MS. YOUNG:  Objection; form.
4    A.  In my opinion, it does have monopoly power in
5  the market for ad exchanges for open web display
6  advertising.
7    Q.  (BY MR. EWALT)  When did Google obtain
8  monopoly power in the market for ad exchanges that
9  transact open web display advertising?
10    A.  I did not engage in a analysis of the -- of
11  the timing of that.  I was interested in the state of
12  the market part and then after the conduct that was
13  investigated.
14    Q.  During which periods of time has Google had
15  monopoly power in the market for ad exchanges
16  transacting open web display advertising?
17    A.  It has had that -- it has that degree of
18  market power -- monopoly power most certainly.
19        As I said, I didn't examine at times
20  other than were relevant for this case, but certainly
21  has it -- sorry -- certainly has it over the last
22  significant period of time.
23        I haven't got any dates that I pinned
24  down for this thing.
25    Q.  So you don't -- you haven't pinned down any

Page 101

1  dates for when Google had monopoly power in the market
2  for ad exchanges transacting open web display
3  advertising?
4        MS. YOUNG:  Objection; form.
5    A.  The actual pending the date, which was in
6  some sort of transition even if that were a possible
7  thing, was not something I analyzed.
8    Q.  (BY MR. EWALT)  In your opinion, does Google
9  have monopoly power in the market for publisher ad
10  servers?
11    A.  Yes.
12    Q.  When did Google obtain monopoly power in the
13  market for publisher ad servers?
14    A.  I do --
15        MS. YOUNG:  Objection; form.
16        Sorry.  Go ahead.
17    A.  I do not know exactly when it did obtain that
18  power.  But it certainly achieved that power by 2022
19  and then at the time of writing my report.
20    Q.  (BY MR. EWALT)  How did Google obtain monopoly
21  power in the market for publisher ad servers?
22    A.  I didn't analyze all of the sources of how it
23  obtained that monopoly power.  But one of the things
24  that enhanced its monopoly power in the market for ad
25  serving -- servers was its own conduct.

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1    Q.  Which conduct in particular do you have in
2  mind?
3    A.  I would -- I would say the -- the conduct
4  most salient for that was the conduct that I call the
5  tying conduct of Google.
6    Q.  Okay.  In your opinion, does Google have
7  monopoly power in the market for ad-buying tools for
8  small advertisers?
9        MS. YOUNG:  Objection; form.
10   A.  Yes.
11   Q.  (BY MR. EWALT)  When did Google obtain
12  monopoly power in the market for ad-buying tools for
13  small advertisers?
14   A.  I don't identify a -- a particular date or
15  investigate a particular date for that.
16        But it's as soon as it launched its
17  products for display advertising, it put in the basis
18  that was significant in generating its monopoly
19  position in that market.
20   Q.  Is it your view that Google ads has had
21  monopoly power in the market for ad-buying tools for
22  small advertisers from the very moment it launched
23  ad-buying tool for small advertisers --
24   A.  It --
25   Q.  -- for open web display advertising?

Page 103

1    A.  It is my view that it launched it with a
2  basis of how it launched it that would be a
3  significant factor in its -- in the monopoly power
4  that I observed during my investigation.
5    Q.  I'm just trying to make sure I understand
6  this correctly, though.
7        Did -- is it your view that from the
8  very moment that Google Ads became available for
9  advertisers to buy open web display advertising that
10  Google had monopoly power in the market for ad-buying
11  tools for small advertisers buying open web display
12  advertising?
13   A.  In my report I discuss the basis for Google's
14  monopoly power in the market for small -- for
15  ad-buying tools for small advertisers.
16        And at around Page 143, I discussed how
17  in 2008 Google automatically enrolled Google Ads
18  search advertisers into buying display advertising via
19  the same tool, which created a large base for
20  advertisers using Google Ads to purchase display
21  advertising.
22        So that's the basis.
23   Q.  That was the basis for entering the market,
24  correct?
25   A.  And also the basis for the monopoly power

Page 104

1  that I observed Google having in that market.
2    Q.  And so it's your view that they had monopoly
3  power in the market from the moment they entered?
4    A.  No.  My view is that they had the basis to
5  attain the monopoly power that they had -- that I
6  investigated at the time that they entered.
7    Q.  So they had the ability to obtain monopoly
8  power as of the moment they entered but they did not
9  actually maintain -- obtain monopoly power.
10        Is that your testimony?
11        MS. YOUNG:  Objection; form.
12   A.  I -- I did not investigate whether they had
13  monopoly power at that point or not.  I just don't
14  have an opinion on it.
15   Q.  (BY MR. EWALT)  Do you have an opinion as to
16  when Google obtained monopoly power in the market for
17  ad-buying tools for small advertisers?
18        MS. YOUNG:  Objection; form.
19        Go ahead.
20   A.  No, but it was prior to -- prior to 2000 --
21  when it started engaging in behavior that started to
22  tie its -- the -- own advertising -- own ad server
23  platform to its own ad exchange.
24   Q.  (BY MR. EWALT)  Okay.  Is a firm's market
25  share relevant to a conclusion about whether the firm

Page 105

1  has monopoly power?
2        MS. YOUNG:  Objection; form.
3    A.  Yes, it can be relevant.
4    Q.  (BY MR. EWALT)  Does market share refer to the
5  proportion of total sales or output in a market that
6  is accounted for by a particular firm?
7    A.  That is one way of constructing market share.
8    Q.  Can a high market share be an indicator of
9  monopoly power?
10   A.  A high market share can be an indicator that
11  the firm has monopoly power.
12   Q.  What do you consider to be a high market
13  share?
14        MS. YOUNG:  Objection; form.
15   A.  I don't have any precise threshold as it --
16  as monopoly power depends on other factors as well
17  and -- that interact with market share in interpreting
18  whether someone has market power.
19   Q.  (BY MR. EWALT)  Is it possible for a firm with
20  a high market share not to have monopoly power?
21        MS. YOUNG:  Objection; form.
22   A.  If I were to answer this situation in the
23  context of models and markets sometimes the way
24  economists model them, it is possible.
25        But if I were considering the way in

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1  which we normally assemble evidence for a -- for an
2  antitrust action, that would interact with the
3  definition of the market itself.
4        So it's a little bit tricky.
5        Q.  (BY MR. EWALT)  Okay.  Well, let me ask you as
6  an economist.
7        As an economist, is it possible for a firm
8  with a high market share not to have monopoly power?
9        MS. YOUNG:  Objection; form.
10        Go ahead.
11        A.  Yes, it's possible.
12        Q.  (BY MR. EWALT)  Can a firm with low market
13  share have monopoly power?
14        A.  Yes, it is possible.
15        Q.  How can that happen?
16        A.  Again, it depends on the market context.
17        But, remember, the definition of
18  monopoly power is, for instance, to be able to
19  increase price without losing -- above competitive
20  levels without losing a -- a significant number of
21  customers.
22        Firms with small market shares in
23  something that would be a market from the point of
24  view of an economic analysis can have that ability.
25        Q.  So is it your view that any firm that can

Page 107

1  increase prices above competitive levels without
2  losing a significant number of customers has monopoly
3  power?
4        MS. YOUNG:  Objection; form.
5        A.  That is one way of describing monopoly power,
6  yes.
7        Q.  (BY MR. EWALT)  Would you please turn to
8  Paragraph 303 of your opening report.
9        A.  Yep.
10        Q.  Okay.  And the third sentence of that
11  paragraph reads:  "Evidence of switching costs can be
12  an indication that a firm possesses monopoly power in
13  a given market."
14        Do you see that?
15        A.  I see that sentence.
16        Q.  Can a firm with a 5 percent market share have
17  monopoly power if there are high switching costs?
18        MS. YOUNG:  Objection; form.
19        A.  According to the definition of monopoly power
20  I just gave you, yes.
21        Q.  (BY MR. EWALT)  Okay.  Would you please turn
22  to Paragraph 304 of your opening report later on that
23  page.
24        A.  Yes.
25        Q.  And that paragraph begins:  "A firm that

Page 108

1  controls a product or platform with network effects
2  can possess significant market power."
3        Do you see that?
4        A.  Yes.
5        Q.  If network effects are present in a market,
6  does that mean that every firm in that market has
7  monopoly power?
8        MS. YOUNG:  Objection; form.
9        A.  No.
10        Q.  (BY MR. EWALT)  If network effects are present
11  in a market, does that mean that at least one firm in
12  the market has monopoly power?
13        MS. YOUNG:  Objection; form.
14        A.  No.
15        Q.  (BY MR. EWALT)  If network effects are present
16  in a market, how can you identify which firms in that
17  market have monopoly power?
18        A.  I would examine the market shares and also
19  the technical characteristics of the network effects
20  to make that determination.
21        Q.  Are there network effects in the market for
22  publisher ad servers?
23        MS. YOUNG:  Objection; form.
24        A.  Do you mean in the sense that if more
25  publishers use a particular ad server the other

Page 109

1  publishers using that same ad server get a higher
2  value?
3        Q.  (BY MR. EWALT)  Yeah.  Good -- good point.
4  Let me ask about indirect network effects.
5        A.  Okay.
6        Q.  Are there indirect network effects in the
7  market for publisher ad servers?
8        MS. YOUNG:  Objection; form.
9        A.  There is no particular reason why there would
10  be indirect network effects in the market for
11  publisher ad servers.
12        Q.  (BY MR. EWALT)  Are there indirect network
13  effects in the market for ad-buying tools for small
14  advertisers?
15        MS. YOUNG:  Objection; form.
16        A.  There's no, you know, in principle reason why
17  there would be indirect network effects in the market
18  for provision of ad-buying tools for small
19  advertisers.
20        Q.  (BY MR. EWALT)  All right.  Could you turn to
21  the next page of your opening expert report.
22        And I'll direct your attention to
23  Paragraph 305, which begins:  "Barriers to entry can
24  reflect the existence of market power."
25        Do you see that?

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1    A.  Yes.
2    Q.  If barriers to entering a market are high,
3    does that mean that every firm in that market has
4    monopoly power?
5        MS. YOUNG:  Objection; form.
6    A.  Not necessarily.
7    Q.  (BY MR. EWALT)  If barriers to entry in a
8    market are high, does that mean that at least one firm
9    in that market has monopoly power?
10   A.  Not necessarily.
11   Q.  If barriers to entering a market are high,
12   how can you identify which firms, if any, in that
13   market have monopoly power?
14   A.  I would combine that analysis with other
15   factors that are present in the market.
16   Q.  What other factors would you consider?
17   A.  Do -- if -- well, if there's only -- if the
18   barriers of entry are high and there's only one firm
19   in the market, that -- there are no other factors
20   required for that.
21       If there is an entry of high and there's
22   more than one firm in the market, one would have to
23   look at the nature of the competition between those
24   firms to establish whether one or more had market
25   power.

Page 111

1    Q.  Would you please turn to Page 117 of your
2    opening report.
3        MS. YOUNG:  Page or paragraph?
4        MR. EWALT:  Page.
5    A.  Yes.
6    Q.  (BY MR. EWALT)  Does Figure 9 summarize your
7    analysis of DFP's share in the market for publisher ad
8    servers?
9    A.  Yes, I believe it does.
10   Q.  And you report data for nine different years
11   between 2006 and 2019.
12       Is that fair?
13   A.  Correct.
14   Q.  And there are six different colors for the
15   nine bars in Figure 9, right?
16   A.  Yes.
17   Q.  Each color represents a different way of
18   measuring shares.
19       Is that fair?
20       MS. YOUNG:  Objection; form.
21       Go ahead.
22   A.  Yes.
23

Page 112

1        MS. YOUNG:  Objection; form.
2
3
4
5    Q.  (BY MR. EWALT)  Okay.
6        (Marked Gans Exhibit No. 7.)
7    Q.  (BY MR. EWALT)  Okay.  I'm handing you a
8    document that's been marked as Exhibit 7.  This
9    document has a slip sheet that says "Produced in
10   Native" with Bates No. GOOG-NE-01663183.
11       And I will represent to you that the document
12   or the pages following the first page of the document
13   are the printout of the native file that was produced
14   with that Bates number.
15   A.  Okay.
16   Q.  I want to ask you -- before we dive into that
17   document, ask you to please take a look at
18   Footnote 381 in your opening report.
19   A.  Okay.
20   Q.  It's a long footnote.
21   A.  All right.
22   Q.  About halfway down in that footnote, about
23   halfway through the line, there is a sentence that
24   starts:  "For 2010 to 2011 shares see..."
25       And then a Bates number.

Page 113

1    A.  Yes.
2    Q.  Okay.  Is exhibit --
3        MS. YOUNG:  Wait.  Were you going to
4    give him time to read the whole footnote?  I think
5    that was your --
6        MR. EWALT:  I don't think --
7        MS. YOUNG:  -- prior instruction, yeah.
8        MR. EWALT:  No, I don't think he needs
9    to read it.
10   Q.  (BY MR. EWALT)  If you feel like you do have
11   to -- let me ask the question.  If you feel like you
12   need to read the whole footnote, then that's fine.
13   A.  Okay.
14   Q.  But is Exhibit 7 the document that you relied
15   upon for the 2010 and 2011 shares reported in Figure 9
16   of your opening report?
17       MS. YOUNG:  And you read the footnote if
18   you feel like you need it to answer the question
19   accurately.
20   A.  I believe it is.
21   Q.  (BY MR. EWALT)  Could you please turn to
22   Page No. 34 in Exhibit 7.
23   A.  Yes.
24   Q.  And Page 34 is one of the pages that you cite
25   for the market shares in Figure 9, right?

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL



Page 114

1    A.  Yes.

Page 116

Page 115

10   Q.  Smaller publishers are less likely to use DFP
11   than large publishers, aren't they?
12        MS. YOUNG:  Objection; form.
13   A.  Smaller publishers are less likely to use
14   DFP?  Well, there are small publishers who use DFP.
15   Q.  (BY MR. EWALT)  That question, sir, is
16   small -- do you know whether smaller publishers are
17   less likely to use DFP than large publishers?
18        MS. YOUNG:  Objection; form.
19   A.  At the moment, I don't recall.
20   Q.  (BY MR. EWALT)  Do you have any evidence of
21   DFP's share of a U.S. market in 2010?
22   A.  The 2010 evidence that we have is -- is --
23   is -- comes from this, so I don't -- I don't separate
24   out the U.S. versus other countries that may be part
25   of North America.

Page 117

5    Q.  (BY MR. EWALT)  Well, the PowerPoint is dated
6    May 2011, correct?
7    A.  Yes.
8    Q.  And at the bottom of the slide where it says
9    "sources invite Q4 spend," you see that?
10        MS. YOUNG:  Objection; form.
11   A.  Yes.
12   Q.  (BY MR. EWALT)  And there wasn't Q4 yet in
13   2011, right?
14        MS. YOUNG:  Objection.
15   A.  Sorry.
16   Q.  (BY MR. EWALT)  So at the time this document
17   was created, we hadn't reached Q4 of 2011, right?
18   A.  We're assuming that that Q4 refers to the end
19   of 2011.  That, I'm not sure.  Sometimes firms have
20   different levels that they call Q4, Q1.  Q4.
21        That could well be.
22   Q.  Well, it also -- and, in fact, more likely
23   refers to Q4 2010, correct?
24        MS. YOUNG:  Objection; form.
25   A.  Yes.

HIGHLY CONFIDENTIAL



Page 118

12  Q.  (BY MR. EWALT)  An estimate of the market
13  share in the future because it's a projection, right?
14  A.  Yes.
15  Q.  Other than this slide, have you seen any
16  evidence of DFP's actual share of a U.S. market for
17  publisher ad servers in 2011?
18  A.  I cannot --
19        MS. YOUNG:  Objection; form.
20        You can -- you may answer.
21  A.  I cannot -- I cannot recall, but this --
22  it -- it's -- that's -- this may be the only one.
23  Q.  (BY MR. EWALT)  Does Google charge small per
24  impression fees for the use of DFP?
25        MS. YOUNG:  Objection; form.

Page 119

1  A.  I'm sorry, can you repeat that question?
2  Q.  (BY MR. EWALT)  Yeah.  Let's -- I'll withdraw
3  it, and ask you to please turn to Page 167 of your
4  opening report.
5  A.  Yes.
6  Q.  Okay.  The last sentence of that paragraph
7  reads:  "By contrast, DFP is not only free for small
8  publishers, but the cost to serve per impression for
9  larger publishers is also small."
10        Do you see that?
11  A.  I see that sentence, yes.
12  Q.  So my question is:  Does Google charge small
13  per impression fees for the use of DFP?
14  A.  Yes, you could characterize it as small.
15  Q.  And you've characterized it as small?
16  A.  Yes.
17  Q.  You understand that not all publishers pay
18  for DFP, correct?
19  A.  I do.
20  Q.  DFP is free for small publishers?
21  A.  It's free for publishers who serve a small
22  amount of ads.
23  Q.  Could you please turn to Page 126 of your
24  opening report.
25        MS. YOUNG:  Page 126?

Page 120

1        MR. EWALT:  Yes.
2  Q.  (BY MR. EWALT)  Does Table 5 on Page 126 of
3  your opening report contain your calculations of AdX's
4  share in the ad exchange market for 2018 to 2021?
5        MS. YOUNG:  Objection; form.
6  A.  It does.
7
13  Q.  In your reports, do you provide an estimate
14  of AdX's share of the ad exchange market for any time
15  prior to January 2016?
16  A.  I don't believe so.

Page 121

2  Q.  (BY MR. EWALT)  When you calculated the market
3  shares in Table 5 of your opening report, did you
4  attribute to AdX impressions that are transacted
5  through non-Google exchanges that participated in Open
6  Bidding?
7  A.  Sorry.  Can you ask that question again?
8  A.  Absolutely.
9        When you calculated the market shares in
10  Table 5 of your opening report, did you attribute to
11  AdX impressions transacted through non-Google
12  exchanges that participated in Open Bidding?
13  A.  I do not believe that was -- that -- the --
14  the purpose of the calculations was to work out the
15  market share that could be attributed to AdX.
16  Q.  You would -- you would agree that it would be
17  improper to attribute impressions transacted through
18  exchanges that participated in Open Bidding to AdX?
19        MS. YOUNG:  Objection; form.
20  A.  Depending on the data available and other
21  ways of making inferences of it, it would be -- it
22  would be important to note what that data was.
23  Q.  (BY MR. EWALT)  And if the data allowed you to
24  isolate impressions that were occurring on ad
25  exchanges through Open Bidding, would you agree that

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1  it would be improper to attribute those impressions to
2  AdX --
3        MS. YOUNG: Objection.
4        Q. (BY MR. EWALT) -- for purposes of calculating
5  AdX's market share of an ad exchange market?
6        MS. YOUNG: Objection; form.
7        A. You would have to, whether there was any
8  ambiguity, note what you -- how -- how you're arriving
9  at the calculation.
10       Q. (BY MR. EWALT) If the data allowed you to
11 isolate impressions that were occurring on ad
12 exchanges through Open Bidding without any ambiguity,
13 would you agree that it would be improper to attribute
14 those impressions to AdX?
15       A. That --
16       MS. YOUNG: Objection; form.
17       Sorry. Go ahead.
18       A. Yes, that would not sound like the usual
19 course of analysis.
20       Q. (BY MR. EWALT) When you calculated the market
21 shares in Table 5, did you attribute to AdX
22 impressions where the transaction type field took on a
23 value of EBDA?
24       MS. YOUNG: Objection; form.
25       A. I cannot recall, but we can look at

Page 123

1  discussions of where I did.
2        Q. (BY MR. EWALT) Sure. So let's look at
3  Footnote 428 to Table 5.
4        A. Yes.
5        Q. And about five lines -- or six lines down in
6  Footnote 428, there's a sentence that reads: "The
7  column transaction type is allowed to take values AdX
8  no fill OA or EBDA."
9        Do you see that?
10       A. Yes.
11       Q. When you calculated the market shares in
12 Table 5, did you attribute to AdX impressions --
13 sorry. Strike that.
14       When you calculated the market shares in
15 Table 5, did you attribute to AdX those impressions
16 where transaction -- the transaction type field took
17 on a value of EBDA?
18       MS. YOUNG: Objection; form.
19       A. Yes.
20       Q. (BY MR. EWALT) Do you understand that EBDA
21 stands for Exchange Bidding in Dynamic Allocation?
22       A. I believe that --
23       MS. YOUNG: Objection; form.
24       Go ahead.
25       A. I believe that's correct.

Page 124

1        Q. (BY MR. EWALT) And you understand that EBDA
2  was an early name for Open Bidding?
3        MS. YOUNG: Objection; form.
4        A. That could be the case.
5        Q. (BY MR. EWALT) Should impressions transacted
6  through EBDA be counted in AdX's market share?
7        MS. YOUNG: Objection; form.
8        A. There's a discussion of this in my rebuttal
9  report, I believe.
10       Q. (BY MR. EWALT) Well, that's fine. And we'll
11 have a chance to look at that in a moment.
12       But I'm just asking you without reviewing your
13 report --
14       A. I can't recall.
15       Q. -- should impressions transacted through EBDA
16 be counted in AdX's market share?
17       A. I can't recall whether they should because
18 I -- there was some nuance in what EBDA was.
19       Q. All right. Would you turn to Paragraph 605
20 of your opening report, please.
21       A. Yes.
22       Q. Okay. And the first sentence of that
23 paragraph reads: "By early 2018, Google responded to
24 the competitive threat of Header Bidding circumventing
25 GAM with its own version of Header Bidding implemented

Page 125

1  inside the ad server called Exchange Bidding in
2  Dynamic Allocation, EBDA."
3        Do you see that?
4        A. Yes.
5        Q. And you understand that EBDA evolved into
6  Open Bidding, right?
7        A. Yes.
8        Q. So should impressions transacted through EBDA
9  or Open Bidding exchanges be counted in AdX's market
10 share?
11       MS. YOUNG: Objection; form.
12       A. It would depend on whether those impressions
13 were transacted through AdX.
14       Q. (BY MR. EWALT) By definition, aren't the
15 transactions occurring through EBDA and Open Bidding
16 not taking place on AdX?
17       MS. YOUNG: Objection; form.
18       A. I don't know if that's the case by
19 definition.
20       Q. (BY MR. EWALT) So you don't know one way or
21 the other whether EBDA transactions are occurring on
22 AdX?
23       MS. YOUNG: Objection; form.
24       Go ahead.
25       A. As I said, the -- I can't recall at the

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1  moment but there was some discussion that -- due to
2  Professor Baye's opinions that I elaborated on in my
3  rebuttal report on this issue.
4      Q.  (BY MR. EWALT)  Sure.  So why don't we -- why
5  don't we take a look at Page 192 of your rebuttal
6  report.
7      A.  Page 192?
8      Q.  Yes.
9      A.  Yes.
10     Q.  Okay.  So you -- you seem like you wanted to
11 review this to refresh your memory.  So please take a
12 moment to do that.
13     A.  Okay.  Thank you.
14         Yes.
15     Q.  Okay.  Are the market shares that you
16 reported in Figure 5 of your opening report mistaken?
17         MS. YOUNG:  Objection; form.
18     A.  Are they a mistake?
19     Q.  (BY MR. EWALT)  Yeah.
20     A.  No.
21     Q.  Okay.  Should impressions transacted through
22 Open Bidding exchanges be counted in AdX's market
23 share?
24         MS. YOUNG:  Objection; form.
25     A.  Transactions that are not AdX exchanges

Page 127

1  should not be counted as AdX exchanges.
2      Q.  (BY MR. EWALT)  And Open Bidding impressions
3  are not transacted on AdX exchange, correct?
4          MS. YOUNG:  Objection; form.
5      A.  That's -- I do not know that with respect to
6  the variable EBDA.  I don't -- I recall looking at
7  documentation to do with that during the write --
8  writing of my reports, and that is not my
9  interpretation of that.
10     Q.  Do you know whether EBDA transactions
11 occurred on AdX?
12     A.  My understanding is the ones labeled EBDA in
13 that data set occurred on AdX.
14     Q.  And if the transactions that were labeled
15 EBDA in that data set did not occur on AdX, would the
16 market shares reported in Table 5 of your opening
17 report be wrong?
18         MS. YOUNG:  Objection; form.
19     A.  The market shares that I calculated were a --
20 were -- from my understanding of the documentation
21 market shares that were of transactions that were
22 served through AdX.
23     Q.  (BY MR. EWALT)  I understand that was your
24 understanding.  Now I'm asking you a different
25 question.

Page 128

1      A.  Yes.
2      Q.  My question is about if you -- that
3  understanding is mistaken and if the transactions
4  labeled EBDA did not actually occur in AdX, would the
5  market shares that you reported in Table 5 of your
6  opening report be overstated?
7          MS. YOUNG:  Objection; form.
8      A.  The market shares, to the extent that they
9  included in the -- the calculation included things in
10 the numerator that were from the denominator that were
11 not AdX would overstate it.
12     Q.  (BY MR. EWALT)  So I think the answer to my
13 question is yes, but I want to just make sure.
14         Yes or no?
15     A.  Well, I -- I -- for the purposes of providing
16 an accurate answer to what is, in my mind, a
17 hypothetical, I'm answering it the way I did.
18     Q.  Well, with respect, I don't think you
19 answered the question that I asked.  So I want to ask
20 it again.
21         MS. YOUNG:  I'll move to strike
22 everything before the question because that was not a
23 pending question.
24     Q.  (BY MR. EWALT)  If the transactions labeled in
25 EBDA did not actually occur in AdX, would the market

Page 129

1  shares that you reported in Table 5 of your opening
2  report be overstated?
3          MS. YOUNG:  Objection; form.
4      A.  So long as that was a -- a calculation that
5  is consistent with the way those transactions were
6  treated in the denominator, that is possible.
7          MS. YOUNG:  Counsel, we've been for
8  going over an hour and we haven't taken a lunch break.
9  So when you reach a good stopping point I think for --
10         MR. EWALT:  Okay.  We're almost there.
11         MS. YOUNG:  -- our reporter and
12 everyone's sake.
13         THE WITNESS:  What time is it?
14         Does anyone know the time?
15         MR. EWALT:  It's 12:40.
16         THE WITNESS:  Okay.  In the current time
17 zone it's 12:40?  I don't know what --
18         MR. EWALT:  That's what this says.
19         THE WITNESS:  Okay.  Cool.
20     Q.  (BY MR. EWALT)  Okay.  Let's look at your
21 rebuttal report, Page 192, Figure 24.
22         That figure reproduces a table that Professor
23 Baye included in his report, correct?
24     A.  Yes.
25     Q.  And Row B of that table removes from the

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

**Page 130**

1 numerator of your Table 5 the transactions that were
2 associated with EBDA; is that correct?
3    A.  Yes.
4      MS. YOUNG:  Objection; form.
5      Please let me object first.  Go ahead.
6    Q.  (BY MR. EWALT)  And do you have any reason to
7 doubt that the figures reported in Row B for AdX's
8 market share are correctly calculated if EBDA
9 transactions did not occur on AdX?
10      MS. YOUNG:  Objection; form.
11    A.  I -- I believe those calculations are
12 accurate for that adjustment.
13      MR. EWALT:  Seems like a good time for
14 lunch.
15      Let's go off the record.
16      THE WITNESS:  Okay.
17      THE VIDEOGRAPHER:  This is now the end
18 of Video 3 of Joshua Gans.  Off the record.  The time
19 is 12:41.
20      (Break from 12:41 p.m. to 1:36 p.m.)
21      THE VIDEOGRAPHER:  We're now on the
22 record.  Video 4 of Joshua Gans.  The time is
23 approximately 1:36.
24      MS. YOUNG:  Before Mr. Ewalt continues
25 questioning, we're putting on the record that counsel

**Page 131**

1 for the states provided counsel with Google with
2 language that would be inserted in the missing
3 footnote of Figure 7 of Professor Gans' rebuttal
4 report.
5      Plaintiff States has told Google counsel
6 that we will follow up with an official signed errata
7 noting that addition to Professor Gans' rebuttal
8 report.  And counsel has the opportunity to review and
9 ask Professor Gans any questions about that added
10 footnote at this deposition.
11      MR. EWALT:  Thank you, Ms. Young.
12    Q.  (BY MR. EWALT)  And welcome back, Professor
13 Gans.
14    I think you know my first question,
15    I think I know your first answer.
16    A.  Oh, right.
17    Q.  I'll ask the question.  During the lunch
18 break did you discuss the substance of this case with
19 counsel?
20      MS. YOUNG:  I'm going to instruct the
21 witness, per the expert stipulation in this case, not
22 to disclose the content of communications he, as a
23 testifying expert, had with counsel.
24    Q.  (BY MR. EWALT)  So based on that instruction,
25 I'll move on to my next question.

**Page 132**

1      Professor Gans, would you please return to
2 what we were talking about before the break and ask --
3 direct your attention to Page 192 of your rebuttal
4 report.
5    A.  Okay.  Yes.
6 ████████████████████████
  ███████
  ███████████████████
  ██████████████████████████
  ███████
13    Q.  Great.  Let's -- can you keep open to that
14 page, please, but then also open your opening report
15 to Page 126.
16      MS. YOUNG:  Did you say Page 126?
17      MR. EWALT:  Oh, yes.  I'm sorry.
18 Page 126.
19    A.  Sorry.
20    Q.  (BY MR. EWALT)  Page 126?
21    A.  Page 126, yes.
22    Q.  All right.  Do the calculations underlying
23 Table 5 in your opening report account for the fact
24 that impressions transacted by AdX and other exchanges
25 may be served outside of DFP?

**Page 133**

1      MS. YOUNG:  Objection; form.
2    A.  No.  Well, they -- well, let me -- let me
3 clarify.
4      It was based on transactions through
5 DFP, as I clearly state, although we tested -- we
6 examined other data that gave us confidence there was
7 no significant bias in doing -- using that approach.
8    Q.  (BY MR. EWALT)  Did you discuss in your
9 reports the other data that you examined?
10    A.  The other -- the -- the other data examined,
11 we -- we do -- sorry, let me -- let me try and remind
12 myself -- that was discussed somewhere in these
13 reports.
14    Q.  All right.  If Table 5 had accounted for the
15 fact that some impressions are served outside of DFP,
16 would AdX's share of the ad exchange market be lower
17 than what's reported in Table 5?
18    A.  No.
19      MS. YOUNG:  Objection; form.
20      Go ahead.
21    A.  That was our assessment that it would not be.
22    Q.  (BY MR. EWALT)  All right.  Please turn in
23 your rebuttal report to Page 92.
24    A.  92?
25    Q.  Yes.

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL



Page 134

1    A.  Yes.
2    Q.  Does Figure 10 in your rebuttal report report
3  market shares for AdX and other exchanges for the
4  period April 2019 to May 2020?
5    A.  All right.  Let me just examine.
6         MS. YOUNG:  Objection; form.
7    A.  Can you ask that question again so I just
8  have it?
9    Q.  (BY MR. EWALT)  Does Figure 10 in your
10  rebuttal report report market shares in the ad
11  exchange market and for AdX other exchanges for the
12  period April 2019 to May 2020?
13         MS. YOUNG:  Same objection.
14    A.  Yes, it does, but using Professor Baye's
15  panel.
16

21    Q.  Did the data that you used in Figure 10
22  include information about impressions transacted by
23  any ad exchanges other than the eight ad exchanges
24  identified in Figure 10?
25    A.  I can't -- I can't recall precisely.  I --

Page 135

1  I -- I don't believe it included other ones.
2    Q.  And were there more than eight ad exchanges
3  operating in the United States during the period
4  April 2019 to May 2020?
5         MS. YOUNG:  Objection; form.
6    A.  Yes, there may have been.
7    Q.  (BY MR. EWALT)  In Figure 10, did you do
8  anything to account for the existence of the ad
9  exchanges other than the eight that are specifically
10  mentioned?
11    A.  The -- I'm trying to recall from the data
12  set, although we could, I guess, call that up, is that
13  there was a category of unknown, and it was not clear
14  whether the unknown were other exchanges or, in fact,
15  could be the exchanges that we had clear information
16  on.
17    Q.  But when you were -- when you were preparing
18  Figure 10, is it fair to say that you did not include
19  any of the information about the unknown data in
20  Figure 10?
21         MS. YOUNG:  Objection; form.
22    A.  Yes.  We didn't include it even though there
23  was a possibility that it could increase the AdX
24  market share.
25    Q.  (BY MR. EWALT)  All right.  So in Figure 10,

Page 136

1  you didn't do anything to account for the existence of
2  ad exchanges other than the eight that are
3  specifically mentioned in Figure 10?
4         MS. YOUNG:  Objection; form.
5    A.  I -- I think in our production materials, we
6  say what we -- what we did, and that's what we did.
7    Q.  (BY MR. EWALT)  Well, then, I'm asking you
8  because you -- I have to be honest.  Sometimes your
9  production materials are not as clear as a lawyer like
10  me can understand, so I just want to ask the question
11  about whether when you put together Figure 10 you did
12  anything to account for the existence of ad exchanges
13  other than the eight that are specifically mentioned?
14         MS. YOUNG:  Objection; form.
15    A.  When we were using the data, we considered
16  what we understood -- as I said, the data was coming
17  from Professor Baye's panel, what that data was in
18  order to represent, we thought, a conservative
19  representation of the various market shares in
20  Figure 10.
21    Q.  (BY MR. EWALT)  So do you think that the way
22  that Professor Baye describes Figure 10 in his
23  surrebuttal report is correct?
24    A.  Let's -- can -- can I have his surrebuttal
25  report again -- well, I don't think we've got it yet.

Page 137

1    Q.  Yep.  We'll get there in a moment.
2    A.  Okay.  But I am aware that he discussed this
3  issue in his surrebuttal report.
4

HIGHLY CONFIDENTIAL



Page 138

11    Q.  (BY MR. EWALT)  Now it's time to talk about
12  Professor Baye -- Professor Baye's surrebuttal report.
13         Handing you -- that report has been marked
14  Exhibit 8.
15    A.  Okay.
16         (Marked Gans Exhibit No. 8.)
17    A.  Surrebuttal is one of those fancy Latin names
18  that you lawyers like, right?
19    Q.  (BY MR. EWALT)  I'm not sure if it's Latin.
20    A.  It isn't?
21    Q.  Maybe, "sur" -- I mean, I guess the "sur"
22  part is.  Rebuttal -- I know "rebuttal" is not.
23    A.  Actually, I don't know Latin, so I was just
24  guessing.
25    Q.  Yeah.

Page 139

1          All right.  So you have Professor Baye's
2   surrebuttal report in front of you?
3     A.  Yes.
4     Q.  Have you reviewed Professor Baye's
5   surrebuttal report before?
6     A.  I have.
7     Q.  When was the first time you reviewed it?
8     A.  On October 5, 2024.
9     Q.  How long have you spent reviewing
10  Professor Baye's surrebuttal report?
11    A.  About two or three hours.
12    Q.  Did you review any of the backup materials
13  for the Baye surrebuttal report?
14    A.  No, I didn't have a chance to do that.
15    Q.  Would you please turn to Paragraph 5 of the
16  Baye surrebuttal report?
17    A.  Yes.
18

Page 140

9     Q.  (BY MR. EWALT)  Why not?
10    A.  Well, if you turn over to Page 4 of the
11  surrebuttal report, you'll look at Figure 1, which is
12  a less colorful and less -- less colorful version of
13  Figure 10 of mine, but it includes the other
14  characteristic there, as I mentioned before, because
15  we could not determine from the documentation were
16  there other -- were other ad exchanges or were just
17  things that were failed to be classified for any of
18  the existing exchanges that we had delineated data on.
19         That, we did not include other in our
20  calculation of the market shares at all.  Professor
21  Baye includes other in its entirety in the denominator
22  of all the market shares there.
23    Q.  Is it possible that Professor Baye's
24  interpretation of the data characterized as "other" is
25  correct?

Page 141

1          MS. YOUNG:  Objection; form.
2     A.  As I -- as I -- and I don't think
3   Professor Baye knows what constitutes "other."  It is
4   possible that he could be correct.
5     Q.  (BY MR. EWALT)  Could you please turn to
6   Paragraph 25 of the Baye surrebuttal report.
7          Now, halfway through that paragraph, there's a
8   sentence that reads "Moreover, the numbers that
9   Professor Gans presents in his rebuttal report,
10  Tables 4 and 11 are in some instances miscalculated by
11  an order of magnitude owing to error in his computer
12  code."
13         Do you see that?
14    A.  I see that, yes.
15         MS. YOUNG:  Sorry.  Can you point me --
16  this is Paragraph 25 -- oh, halfway through the
17  paragraph.
18         THE WITNESS:  Tables 4 and 11.
19         MS. YOUNG:  "Moreover."
20         (Speaking simultaneously.)
21         MS. YOUNG:  Sorry to interrupt.
22    Q.  (BY MR. EWALT)  Okay.  And then after that
23  sentence the paragraph continues:  "Among other
24  errors, instead of calculating the average monthly fee
25  per customer, Professor Gans computes the total

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

**Page 142**

1 revenue for each fee type over a nine-year period and
2 divides this by the number of publishers who are
3 associated with the fee type of at any point in that
4 period."
5     Do you see that?
6 A. Yes.
7 Q. Do you agree that description of your
8 computer code?
9     MS. YOUNG: Objection; form.
10 A. I need to remind myself. I'm trying to just
11 remind myself of -- he's calling errors what that he's
12 calling errors in the computer -- I'm trying to remind
13 myself since we switched ad servers, right?
14 Q. (BY MR. EWALT) So you -- let me direct you to
15 your rebuttal report, Page 47.
16 A. Okay.
17 Q. It has Table 11.
18 A. Yes.
19 Q. And Page 213 has -- I'm sorry -- Page 47 has
20 Table 4 --
21 A. Uh-huh.
22 Q. -- and Page 213 has Table 11.
23 A. Okay.
24 Q. And I think they're the same.
25 A. Yes. Let me just...

**Page 143**

1     Okay.
2 Q. Let me ask the question.
3 A. I have -- I have not -- I have not reviewed
4 this particular claim but I -- I don't believe it's
5 accurate.
6 Q. Okay. Why do you think it's inaccurate?
7 A. Because the calculation of these fees --
8 well, I don't know I don't know why he is saying that
9 we did what he claims to. I would have to -- I would
10 have to -- I would have to review his code and
11 review -- and compare it with our code to -- to be
12 able to comment on that.
13 Q. Okay. So it's fair to say, then, that as you
14 sit here today, you don't have a view one way or the
15 other as to whether Baye -- Professor Baye is correct
16 in what he states in Paragraph 25 in his surrebuttal
17 report?
18     MS. YOUNG: Objection; form.
19 A. Oh -- oh, I do have a view. I believe he is
20 likely incorrect, but I haven't had a chance to, since
21 his surrebuttal report and he raises it, check that
22 claim.
23 Q. (BY MR. EWALT) Okay. So without checking his
24 claim, why do you think he's likely wrong?
25 A. Because when we were calculating these fee

**Page 144**

1 types, when I was instructing and then reviewing the
2 outputs, these were the sorts of questions we were
3 paying attention to, or I was paying attention to.
4 Q. Do you ever make a mistake?
5     MS. YOUNG: Objection; form.
6 A. In my life?
7 Q. (BY MR. EWALT) Yeah.
8 A. I've -- I've made errors in my life.
9 Q. Okay. Would you -- you can put that aside.
10     Can you please turn to Page 135 of your
11 opening report.
12     Does the final row of Table 7 on
13 Page 135 of your opening report -- does that row
14 report your estimate of Google Ads' share of the
15 market for ad-buying tools for small advertisers from
16 2018 to 2021?
17     MS. YOUNG: Objection; form.
18 A. Yes.
19 Q. (BY MR. EWALT) Did you calculate Google Ads'
20 share of the market for ad-buying tools for small
21 advertisers for any time before 2018?
22 A. I don't recall. I don't believe so.
23 ████████████████████████
24 ████████████████████████
25 ████████████████

**Page 145**

1 ████████████████████████
2 ████████████████████████
3 ████████████████████████
4 ████████████████████████
5 ████████████████████████
6 ████████████████████████
7 ████████████████████████
8 ████████████████████████
9 ████████████████████████
10 ████████████████████████
11 Q. (BY MR. EWALT) All right. Let's turn to your
12 rebuttal report, Page 9.
13 A. Yes.
14 Q. Does Table 1 provide a summary of your
15 opinions in this case?
16 A. Yes.
17 Q. Does the column titled "Relevant Market"
18 describe each of the markets that you've defined to be
19 relevant markets in this case?
20 A. Yes.
21 Q. Does the column titled "Conduct Affecting the
22 Relevant Market" describe the only conduct that you're
23 opining affected each of the relevant markets that
24 you've defined?
25     MS. YOUNG: Objection; form.

HIGHLY CONFIDENTIAL

Page 146

1    A.  Yes.
2    Q.  (BY MR. EWALT)  In either of your reports did
3  you express an opinion about whether any conduct,
4  other than the alleged tying, affected the publisher
5  ad server market?
6    A.  The -- sorry, can you repeat that question
7  again.
8    Q.  In either of your reports did you express an
9  opinion about whether any conduct, other than the
10  alleged tying, affected the publisher ad server
11  market?
12    MS. YOUNG:  Objection; form.
13    A.  Some of the conduct did affect those, but the
14  market for -- that was relevant for competitive harm
15  was only with tying that it was affecting
16  competitive -- impacting on competition in that
17  market.
18    Q.  (BY MR. EWALT)  I see.
19    In either of your reports did you express an
20  opinion about whether any conduct, other than the
21  alleged tying, harmed competition in the publisher ad
22  server market?
23    MS. YOUNG:  Objection; form.
24    A.  I did not.
25    Q.  (BY MR. EWALT)  In either of your reports did

Page 147

1  you express -- did you express an opinion about
2  whether any conduct, other than Bernanke and Global
3  Bernanke harmed competition in the market for
4  ad-buying tools for small advertisers?
5    A.  I did not.
6    MS. YOUNG:  Objection; form.
7    THE WITNESS:  Oh, sorry.
8    MS. YOUNG:  Go ahead.
9    A.  I did not.
10    Q.  (BY MR. EWALT)  In either of your reports did
11  you express an opinion about whether any conduct,
12  other than UPR, harmed competition in the market for
13  ad-buying tools for large advertisers?
14    MS. YOUNG:  Objection; form.
15    A.  I don't believe I did.
16    Q.  (BY MR. EWALT)  In either of your reports did
17  you express an opinion about whether any conduct
18  affected -- strike that.
19    In either of your reports did you -- did --
20  strike it again.
21    In either of your reports did you express an
22  opinion about whether competition in the ad exchange
23  market was harmed by conduct, other than UPR, Dynamic
24  Allocation, Enhanced Dynamic Allocation, line item
25  limitations, data field redactions, Bernanke, Global

Page 148

1  Bernanke, and DRS?
2    A.  I don't --
3    MS. YOUNG:  Objection; form.
4    A.  I didn't.
5    Q.  (BY MR. EWALT)  In either of your reports did
6  you express an opinion that RPO harmed competition in
7  any market?
8    MS. YOUNG:  Objection; form.
9    A.  I did not.
10    Q.  (BY MR. EWALT)  In either of your reports did
11  you express an opinion that exchange bidding harmed
12  competition in any market?
13    MS. YOUNG:  Firm.
14    A.  That exchange bidding itself, I did not.
15    Q.  (BY MR. EWALT)  In either of your reports did
16  you express an opinion that Open Bidding harmed
17  competition in any market?
18    MS. YOUNG:  Objection; form.
19    A.  Open Bidding itself, I did not.
20    ███████████████████████████████████
21    ██████████████████████████████
22    ████████████████████████████
23    ████████████████████
24    ████████.
25    Q.  In either of your reports did you express an

Page 149

1  opinion that Project Poirot harmed competition in any
2  market?
3    MS. YOUNG:  Objection; form.
4    A.  I did not express an opinion.
5    Q.  (BY MR. EWALT)  In either of your reports did
6  you express your opinion in your report that
7  Project Elmo harmed competition in any market?
8    MS. YOUNG:  Objection; form.
9    A.  Project Elmo.  Right.  I did not.
10    Q.  (BY MR. EWALT)  In either of your reports did
11  you express an opinion that Project Bell harmed
12  competition in any market?
13    MS. YOUNG:  Objection; form.
14    A.  I'm forgetting whether Project Bell was also
15  a name for something else, so I can't recall.
16    Q.  (BY MR. EWALT)  Okay.  In either of your
17  reports did you express an opinion that Privacy
18  Sandbox harmed competition in any market?
19    A.  I did not separately evaluate Privacy
20  Sandbox.
21    Q.  Do you see that the middle column of Table 1
22  in your rebuttal report is titled "Google's Estimated
23  Market Share Across the Relevant Time Period"?
24    A.  Yes.
25    Q.  Why do you have "NA" in the row for large

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1  advertiser buying tools market, in that column?
2     A.  Because I didn't attempt to calculation of
3  its market share or try to estimate it through other
4  means.
5

[REDACTED]

Page 151

[REDACTED]

7     Q.  Yeah.  Yeah.  Okay.
8        So let's pick Dynamic Allocation, for
9  example.
10    A.  Yes.
11    Q.  So you're aware that Dynamic Allocation began
12 in 2007?
13    A.  Yes.

[REDACTED]

18    Q.  Do you realize that there wasn't an ad
19 exchange market in 2007?
20    A.  I'm sorry.  Dynamic Allocation -- sorry.
21        You'll -- I -- I didn't listen to your
22 question closely enough.
23    Q.  Okay.  Well, you know, I'm just trying to
24 understand what your position is here.
25    A.  Sorry, because I -- the reason why I just

Page 152

1  didn't -- I -- I -- I didn't listen to your question.
2  I -- I led Google's market share and I didn't think
3  about the dates when I answered your question.
4     Q.  Okay.  Well, but even putting aside whether
5  it was, you know, Google or DoubleClick that owned the
6  exchange --
7     A.  Yes.
8

[REDACTED]

22    Q.  (BY MR. EWALT)  Okay.  And so you understand
23 that Google had an ad exchange in 2008?
24        MS. YOUNG:  Objection; form.
25    A.  Google had acquired DoubleClick and then had

Page 153

1  an ad exchange.  And when it implemented -- when it
2  exchanged in those implementations, that's when the
3  conduct began.
4     Q.  (BY MR. EWALT)  In 2008?
5     A.  I'd have to --
6        MS. YOUNG:  Objection; form.
7     A.  -- report to my -- report to remember the
8  exact dates of these things.
9     Q.  (BY MR. EWALT)  Okay.  Switch gears again
10 here.
11        Did you conclude that some of Google's conduct
12 was anticompetitive?
13    A.  Some of -- the -- of the conduct that I
14 analyzed, I concluded that all of it was
15 anticompetitive.
16    Q.  But you didn't analyze all conduct that
17 Google engaged in, right?
18    A.  Oh, no, that's correct.
19    Q.  Okay.  How did you distinguish -- how do you
20 distinguish anticompetitive conduct from conduct that
21 is not anticompetitive?
22    A.  Well, I didn't reach a conclusion for
23 Google's conduct other than the conduct I analyzed.
24    Q.  Fair.
25        But I'm trying to get a sense of like



39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1  how do you -- how do go about doing this exercise?
2      A.  Yes.
3      Q.  So let me ask again.
4          How do you distinguish anticompetitive
5  conduct from conduct that is not anticompetitive?
6      A.  So once you've identified the conduct at
7  hand, you perform an analysis comparing the outcomes
8  that arose in the market with that conduct because
9  you're analyzing conduct that actually took place.
10         And compare it with what you can
11 understand from an economic perspective using the --
12 sum total and tools of that -- of the discipline, what
13 would have likely happened had that conduct not taken
14 place.  That's the first thing you do.
15         When you're doing that, you then analyze
16 whether the conclusions between what we'll call the
17 factual and the counterfactual, without the conduct,
18 are being driven by the firm in question having market
19 power in a particular market that allowed them to be
20 able to do that conduct and other conditions that gave
21 them the incentive to do that conduct.
22         And that incentive was to give rise to
23 anticompetitive effects at the time of that conduct or
24 ultimately manifesting themselves in the future.
25     Q.  Okay.  So do I have it right that starting

Page 155

1  point for distinguishing anticompetitive conduct from
2  conduct that's not anticompetitive is to define a
3  factual -- factual world and a counterfactual world?
4      A.  Is to -- so to -- is not -- to define as to
5  analyze and using both combination of economic
6  approaches and evidence available to understand what
7  the differences in market outcomes would be in the
8  factual versus the counterfactual with and without
9  that conduct.
10     Q.  So as a first step you need to identify what
11 the counterfactual world is?
12         MS. YOUNG:  Objection; form.
13     A.  I don't know if it's a -- if it's a first
14 step.  It's a -- a -- a -- a necessary step.
15     Q.  (BY MR. EWALT)  It's necessary to identify
16 counterfactual world in order to reach conclusions
17 about whether conduct is anticompetitive?
18         MS. YOUNG:  Objection; form.
19     A.  It is -- no, sometimes there is some degree
20 of uncertainty, so it might not be identifying a
21 single point.  But broadly speaking, yes.
22     Q.  (BY MR. EWALT)  You referred to outcomes.
23     A.  Yes.
24     Q.  And what sorts of outcomes do you compare the
25 actual world to the counterfactual world?

Page 156

1      A.  Those outcomes, depending on the context, can
2  be prices, quantities, investment, innovation, entry,
3  exit, growth.
4      Q.  Okay.  Does a firm offering high quality
5  products harm competitors who can't match the firm's
6  high quality?
7          MS. YOUNG:  Objection; form.
8      A.  If the firm develops a high quality product,
9  that the competitors don't develop, that can harm --
10 that makes it more difficult for those competitors.
11     Q.  (BY MR. EWALT)  Is it anticompetitive for a
12 monopolist to offer high quality products?
13         MS. YOUNG:  Objection; form.
14     A.  Not necessarily.
15     Q.  (BY MR. EWALT)  Does a firm offering low
16 prices harm competitors who have to cut their own
17 prices to compete?
18         MS. YOUNG:  Objection; form.
19     A.  To -- if we call harm, make it more difficult
20 for those competitors to earn a profit, yes.
21     Q.  (BY MR. EWALT)  Is it anticompetitive for a
22 monopolist to offer prices that are low but still
23 above its costs?
24         MS. YOUNG:  Objection; form.
25     A.  Generally speaking not.

Page 157

1      Q.  (BY MR. EWALT)  If Google offers products that
2  help publishers make more money, would that be
3  competition on the merits?
4          MS. YOUNG:  Objection; form.
5      A.  If Google -- yes, the publishers are the
6  customers of -- of Google one of the things they're
7  interested is making money, so if Google assists them
8  in so doing, that -- that is -- I don't know if we
9  would call it competition on the merits.  It's a
10 good -- it's a -- it's a favorable thing for those
11 customers.
12     Q.  (BY MR. EWALT)  If Google offers products that
13 help advertisers win more impressions or achieve a
14 better return on ad spend, would that be competition
15 on the merits?
16         MS. YOUNG:  Objection; form.
17     A.  If there are -- for the return on ad spend,
18 that is in terms of winning impressions, if they're
19 helping them win impressions overall, yes.
20     Q.  (BY MR. EWALT)  Is it legitimate for Google to
21 try to help publishers make more money?
22         MS. YOUNG:  Objection; form.
23     A.  The word "legitimate" is -- seems to be a
24 legal term from an economic perspective.  We consider
25 that many firms operating in a business-to-business

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1  market try to help their customers earn more.
2  Q. (BY MR. EWALT) From an economic perspective,
3  is it legitimate for Google to try to help publishers
4  make more money?
5        MS. YOUNG: Objection; form.
6  A. Again, the -- the term you're saying is
7  "legitimate," which is not -- is not a sort of
8  economics term that we would use.
9        Can it be welfare increasing for -- for
10 Google to offer ways of which publishers can make more
11 money, yes, it can be.
12 Q. (BY MR. EWALT) Is it procompetitive for
13 Google to help publishers make more money?
14       MS. YOUNG: Objection; form.
15 A. It would be the sort of thing we would expect
16 to see arise in a competitive market.
17 Q. (BY MR. EWALT) Would you expect in a
18 competitive market for Google to try to help
19 advertisers win more impressions or achieve a better
20 return on ad spend?
21       MS. YOUNG: Objection; form.
22 A. In a competitive market, depending a little
23 bit on the context, advertising is a little bit of a
24 tricky industry, but yes, it could be -- we would
25 expect to see that when there was competition for

Page 159

1  those advertisers.
2  Q. (BY MR. EWALT) Is it welfare enhancing for
3  Google to try to help advertisers win more impressions
4  or achieve a better return on ad spend?
5        MS. YOUNG: Objection; form.
6  A. Well, advertising is a controversial thing.
7  But, generally speaking, we take advertising as a
8  normal economic product having a competition spur
9  Google to do things that are in an advertiser's
10 interest is potentially welfare enhancing.
11 Q. (BY MR. EWALT) Can conduct harm competitors
12 without that conduct being anticompetitive?
13       MS. YOUNG: Objection; form.
14 A. Yes.
15 Q. (BY MR. EWALT) Would you agree that it's
16 impossible to conclude whether conduct is
17 anticompetitive by looking exclusively at the impact
18 of that conduct on competitors?
19       MS. YOUNG: Objection; form.
20 A. I wouldn't agree with that because it really
21 depends on the context.
22 Q. (BY MR. EWALT) Is it possible for a company
23 that is vertically integrated across multiple markets
24 and has monopoly power in those markets to compete
25 without harming competition?

Page 160

1        MS. YOUNG: Objection; form.
2  A. Is it possible?
3        THE WITNESS: Sorry.
4        MS. YOUNG: Go ahead.
5  A. Is it possible?
6  Q. (BY MR. EWALT) Let me ask it again.
7        Is it possible for a company that is
8  vertically integrated across multiple markets and that
9  has monopoly power in those markets to compete without
10 harming competition?
11       MS. YOUNG: Objection; form.
12 A. Yes.
13 Q. (BY MR. EWALT) Is vertical integration
14 anticompetitive?
15       MS. YOUNG: Objection; form.
16 A. Vertical integration can be anticompetitive,
17 but it can also be not anticompetitive.
18 Q. (BY MR. EWALT) And can vertical integration
19 be procompetitive?
20       MS. YOUNG: Objection; form.
21 A. Vertical integration could be something that
22 we see emerge in competitive markets.
23 Q. (BY MR. EWALT) In your reports, do you offer
24 opinion as whether Google's vertical integration is
25 anticompetitive?

Page 161

1  A. In my report, what I say about Google's
2  vertical integration is that it played a key role in
3  motivating the anticompetitive conduct of Google.
4  Q. And -- but in your reports, do you offer an
5  opinion as to whether Google's vertical integration
6  itself is anticompetitive?
7        MS. YOUNG: Objection; form.
8  A. Its vertical integration was not a conduct
9  that I evaluated.
10 Q. (BY MR. EWALT) All right. Let's switch gears
11 and talk about tying.
12 A. Okay.
13 Q. Does tying involve two separate products?
14       MS. YOUNG: Objection; form.
15 A. Typically, yes.
16 Q. (BY MR. EWALT) And are those products
17 referred to as the "tying product" and the "tied
18 product"?
19 A. Yes. We sometimes try to describe them that
20 way, even though I wish we had different terminology.
21 Q. Safe that one for after the depo.
22       In your tying analysis, did you consider
23 AdX to be the tying product and DFP to be the tied
24 product?
25       Right. Let me help you out here.

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1    A. That's exactly why I --
2    Q. Opening report, Paragraph 414.
3    A. Thank you.
4        Paragraph 414. Sorry.
5    Q. Yes.
6        Second sentence.
7    A. Yes.
8        "Google conditioned the use of AdX (the
9    tying product) with the sale of DFP -- of its DFP ad
10   server (the tied product )."
11   Q. So in your tying analysis, did you consider
12   AdX to be the tying product and DFP to be the tied
13   product?
14   A. I did.
15   Q. Do AdX Direct Tags enable third-party ad
16   servers to call AdX to serve an ad?
17       MS. YOUNG: Objection; form.
18   A. I believe that's what they used to be able to
19   do when they were used.
20   Q. (BY MR. EWALT) Do AdX Direct Tags allow a
21   publisher to request ads from AdX in real time even if
22   the publisher does not use DFP?
23       MS. YOUNG: Objection; form.
24   Q. (BY MR. EWALT) And I can -- you can take a
25   look at Paragraph 429 of your opening report if that's

Page 163

1    helpful.
2    A. Okay.
3    Q. And then I'll ask it again. Let me know when
4    you're ready.
5    A. Thank you very much.
6        Yes. Yes, it could.
7    Q. Let me just ask it so we have a clear record
8    here.
9    A. Uh-huh.
10   Q. Do AdX Direct Tags allow a publisher to
11   request ads from AdX in real time even if the
12   publisher does not use DFP?
13       MS. YOUNG: Objection; form.
14   A. Yes.
15   Q. (BY MR. EWALT) Do AdX Direct Tags allow a
16   publisher to receive tags from AdX if a publisher
17   does not use DFP?
18   A. I believe they do.
19   Q. All right. Could you please turn to Page 157
20   of your report.
21       You see Figure 12 there?
22   A. Yes.
23   Q. And the red dots refer to AdX direct tag,
24   right?
25   A. Yes.

Page 164

1    Q. Have AdX direct tags been in use since at
2    least 2014?
3    A. They have been in use at the data set we --
4    they were listed as being in use in the data set we
5    evaluated.
6    Q. And in use in that data set since at least
7    2014?
8    A. That is correct.
9    Q. Can a publisher still use AdX direct tags
10   today?
11       MS. YOUNG: Objection; form.
12   A. As I understand it, these were legacy things
13   that -- so they may still exist, some publishers that
14   could use them.
15   Q. (BY MR. EWALT) Is it your understanding that
16   AdX sends real-time bids into DFP?
17   A. That is my understanding.
18   Q. What is the basis of that understanding?
19   A. Oh, sorry. AdX sends real-time bids into --
20   AdX is the -- as the DFP allows publishers to offer
21   inventory that is -- can receive real-time bids.
22   Q. Let me -- let me ask that question again. If
23   you don't understand the question, let me know.
24   A. Okay.
25   Q. Is it your understanding that AdX sends

Page 165

1    real-time bids into DFP?
2        MS. YOUNG: Objection; form.
3    A. I'm not quite sure I understand the question.
4    Q. (BY MR. EWALT) What's tripping you up on the
5    question?
6    A. The word "send bids."
7    Q. Okay. We can move on.
8        You analyze tying in your reports.
9        Is that fair?
10   A. I do.
11   Q. And how did Google implement the tie?
12   A. Well, it did several things. I describe it
13   sort of at a high level in part of my report and then
14   more detail later on.
15       But basically the tie between AdX and
16   DFP started -- if I look at -- just so you're on the
17   same page, at Paragraph 416 of my opening report.
18       It started in 2009 when Google imposed
19   some technical limitations preventing publishers from
20   using third-party ad servers to be able to sell into
21   Google's ad exchange in its real-time open options.
22       And then in 2016 it actually made that a
23   contractual tie. That means that publishers who
24   wanted to access demand coming through AdX real-time
25   or otherwise were forced to -- forced -- they were

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

1  forced to sign a DFP/AdX contract. Was the only way
2  they could do so. And that gave -- made it a
3  contractual tie.
4      Q. All right. So if I understand this right,
5  it's your opinion that Google implemented the alleged
6  tie of DFP to AdX through technical limitations
7  beginning in 2019 [verbatim] and contractual
8  provisions beginning in 2016?
9          MS. YOUNG: Objection; form.
10     A. That is correct.
11         MS. YOUNG: And think I you meant 2009.
12  I think you said 2019.
13         MR. EWALT: Thank you very much.
14         MS. YOUNG: Just for the purpose of the
15  record, yeah.
16         MR. EWALT: I'll fix it.
17     Q. (BY MR. EWALT) Is it your opinion that Google
18  implemented the alleged tie of DFP to AdX through
19  technical limitations beginning in 2009 and
20  contractual provisions beginning in 2016?
21     A. Okay. Yes, that is my opinion. It's my
22  understanding.
23     Q. What technical limitations are you referring
24  to?
25     A. Okay. So if we go to -- technical

Page 167

1  limitations I refer to.
2      Q. I'll suggest a paragraph. You tell me if
3  this is the right one.
4      A. 424.
5      Q. I was going to go 435.
6      A. Oh, okay.
7      Q. But you tell me if it's that -- if that's not
8  right.
9      A. Yes. Yes, that's one of the technical
10  limitations.
11     Q. Okay. And were there other technical
12  limitations, other than the one that you refer to in
13  Paragraph 435, through which Google implemented the
14  tie?
15     A. I think not necessarily 2009, but there were
16  other things that emerged that I described earlier
17  regarding how they implemented their GPT tags and
18  other tags that had limitations on them as well.
19     Q. But is it -- is it fair to say that there was
20  not a tie until this technology that you're talking
21  about -- technical limitation, rather, that you're
22  talking about in 2009?
23     A. Yeah. That was --
24         MS. YOUNG: Objection; form.
25         Go ahead.

Page 168

1      A. That was the critical decision point because
2  at that point Google had the evidence that I -- that
3  I -- that I -- I list there the ability to offer
4  third-party ad servers access to real-time bidding.
5      Q. (BY MR. EWALT) And that technology, that
6  technical limitation, is called third-party Dynamic
7  Allocation; is that right?
8      A. Yes. Well, that's -- that wasn't a technical
9  limitation. That was a technical -- that was a -- a
10  technically feasible thing.
11     Q. And it was a limitation because --
12     A. They --
13         (Speaking simultaneously.)
14     Q. (BY MR. EWALT) -- it could do more?
15     A. No, because they didn't actually offer it.
16     Q. Ah, okay. So a technical limitation that
17  effectuated a tie --
18     A. Yes.
19     Q. -- was Google's decision in 2009 not to offer
20  third-party Dynamic Allocation?
21     A. Right. And if they had offered that, there
22  wouldn't be a tie.
23     Q. Okay. So as of 2009, is it your view that
24  Google's refusal to offer third-party Dynamic
25  Allocation as a way to integrate AdX with third-party

Page 169

1  ad servers was anticompetitive?
2          MS. YOUNG: Objection; form.
3      A. That was the -- what I've said is that
4  Google's tying behavior and sort of, as you can see
5  it, ratcheted it up. That consequence of that was
6  anticompetitive.
7      Q. (BY MR. EWALT) Do you think --
8      A. It took them some time to get the full force
9  of it in.
10     Q. When did the full force occur?
11     A. I would say that I would -- if I had to give
12  a date, I would mark that as 2016.
13     Q. Do you think that Google should have offered
14  third-party Dynamic Allocation to allow competing
15  publisher ad servers to receive real-time bids from
16  AdX?
17         MS. YOUNG: Objection; form.
18     A. My opinion is that had Google not had market
19  power through AdX and had not been vertically
20  integrated, that they -- and their ads of a product
21  would have offered third-party Dynamic Allocation.
22     Q. (BY MR. EWALT) And is it your opinion that it
23  was anticompetitive for Google not to build technology
24  that would have allowed competing publisher ad servers
25  to receive real-time bids from AdX?

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

1     MS. YOUNG:  Objection; form.
2     A.  My view is that it is anticompetitive for the
3  reasons that I just said.
4     Q.  (BY MR. EWALT)  Okay.  I just want to -- I
5  think this is a yes-or-no question, but if it's not
6  let me know.
7         Is it your opinion that it was anticompetitive
8  for Google not to build technology that would have
9  allowed competing publisher ad servers to receive
10  real-time bids from AdX?
11     MS. YOUNG:  Objection; form.
12     A.  I think it was anticompetitive for Google to
13  choose to tie its product when it need not have tied
14  its product.
15     Q.  (BY MR. EWALT)  Right.  And -- but I'm trying
16  to understand what you mean by tie, and at least in
17  the 2009 period here.
18     A.  Well, you -- you -- you --
19         MS. YOUNG:  I don't think there's a
20  pending question.
21         THE WITNESS:  Oh, okay.
22         MS. YOUNG:  Let him ask the question and
23  make a clearer record.
24     Q.  (BY MR. EWALT)  What did you want to say?
25     A.  Google had the ability on behalf of its

Page 171

1  publishers to offer on behalf of -- of -- of
2  publishers who were using AdX to offer
3  interruptibility with third-party ad servers.
4         And the question is:  From an economic
5  perspective, what was the decision?
6         And because they had that feasibility
7  and it was effectively costless for them to do so,
8  their decision was a decision to turn that off.
9         So in your framing of it, you are
10  framing it as a decision to turn it on which I was
11  concerned at characterizing that way because it may
12  have implied that there were costs to it from doing
13  so.
14         And that is not my reading of the
15  evidence presented here.
16     Q.  Okay.  If it was costless for Google to offer
17  technology that would have allowed competing publisher
18  ad servers to receive real-time bids from AdX, was --
19  would it have been anticompetitive for Google not to
20  offer such technology?
21     MS. YOUNG:  Objection; form.
22     A.  My analysis is that we cannot know that
23  decision looking at the counterfactual.  But had they
24  not had monopoly power and been vertically integrated,
25  my assessment is they would have offered that

Page 172

1  functionality.
2         Therefore, using the process of
3  analyzing anticompetitive conduct that I outlined to
4  you some time ago, my conclusion is it is
5  anticompetitive -- that the tie was anticompetitive in
6  this regard.
7     Q.  (BY MR. EWALT)  All right.  Now, I -- I
8  appreciate you trying to help me understand here.  I
9  think I do understand and I think you can answer my
10  question with a "yes" or "no."
11     A.  Yes.
12     Q.  So I'm going to try again.
13         MS. YOUNG:  I'm going to move to strike
14  everything that was just said as not a pending
15  question.
16     Q.  (BY MR. EWALT)  If it was costless for Google
17  to offer technology that would have allowed competing
18  publisher ad servers to receive real-time bids from
19  AdX, would it have been anticompetitive for Google not
20  to offer such technology?
21         MS. YOUNG:  Objection; form.
22     A.  Let me put it this way.  Yes, because the
23  only reason they were not offering that technology was
24  because they were trying to enhance their monopoly
25  position in the market for ad servers.

Page 173

1     Q.  (BY MR. EWALT)  If there were costs to Google
2  of offering technology that would have allowed
3  competing publisher ad servers to receive real-time
4  bids from AdX, would it have been anticompetitive for
5  Google not to offer such technology?
6         MS. YOUNG:  Objection; form.
7     A.  It would depend on the magnitude of those
8  costs.
9         If those costs were low, my answer would
10  not change from the costless case.
11         If those costs were extremely high, my
12  answer would be different.
13     Q.  (BY MR. EWALT)  Let's talk about the
14  contractual tie.
15     A.  Okay.
16     Q.  Could you turn to Paragraph 446, please, of
17  your opening report.
18     A.  Okay.
19     Q.  All right.  Is it your opinion that Google
20  contractually required publishers to use DFP in order
21  to access AdX demand?
22     A.  My understanding is that for contracts that
23  were put in place that you and publisher contracts,
24  for instance, that the two products were tied
25  contractually.

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

1    Q.  And I'm trying to understand what you mean by
2  "tied contractually."
3    A.  It meant that if you wanted to access AdX
4  demands, you have to use DFP.
5    Q.  Okay.  So I just want to confirm that it is,
6  in fact, your opinion that Google's contracts required
7  publishers to use DFP in order to obtain access to AdX
8  demand?
9        MS. YOUNG:  Objection; form.
10    A.  My understanding of -- of those contracts --
11  and I will caveat that it is my understanding because
12  I am not a lawyer -- was that that's what they
13  would -- would do.
14        MS. YOUNG:  So we've been going over an
15  hour, so it's just for court reporter's purposes and
16  everyone else's that we break at a good time.
17        MR. EWALT:  Okay.
18    Q.  (BY MR. EWALT)  And I believe you said that
19  Google implemented this contractual tie in June 2016?
20    A.  Yes.
21    Q.  And so there was no contractual tie before
22  June 2016; is that correct?
23        MS. YOUNG:  Objection; form.
24    A.  That is my -- well, that -- that's -- that's
25  my understanding of what a contractual tie was of that

Page 175

1  date.
2    Q.  (BY MR. EWALT)  Is it your opinion that the
3  contractual tie is contained in the unified DFP AdX
4  contract?
5        MS. YOUNG:  Objection; form.
6    A.  I believe that that's where it is.
7    Q.  (BY MR. EWALT)  Have you ever reviewed a
8  unified DFP AdX contract?
9    A.  I have looked at it.  And had a normal
10  reaction to the contract.
11    Q.  You don't cite a unified DFP AdX contract in
12  your reports, do you?
13        MS. YOUNG:  Objection; form.
14    A.  No, I cite other things describing these
15  things.
16    Q.  (BY MR. EWALT)  But it's your testimony that
17  you have, in fact, reviewed such a contract?
18    A.  I believe at some time that I did, but I
19  remember I -- I don't remember it as something I felt
20  I could pass.
21    Q.  Is it fair to say you didn't rely on the
22  terms of the unified DFP AdX contract in forming the
23  opinions in your reports?
24        MS. YOUNG:  Objection; form.
25    A.  I relied on the descriptions of these things

Page 176

1  as listed in the footnotes here.
2    Q.  (BY MR. EWALT)  But you did not rely on the
3  contracts themselves in reaching your opinions about
4  the contractual tie.
5        Is that fair?
6        MS. YOUNG:  Objection; form.
7    A.  I didn't feel it was -- I -- it was not my
8  role to provide a legal analysis of those, which is
9  what you're asking for there.
10    Q.  (BY MR. EWALT)  Could you please turn to
11  Paragraph 297 of your rebuttal report.
12    A.  Yes.
13    Q.  And that paragraph describes a communication
14  from Google to publishers in connection with the move
15  to the unified contract; is that right?
16        MS. YOUNG:  Objection; form.
17    A.  Can you repeat the question?
18    Q.  (BY MR. EWALT)  Does Paragraph 297 of your
19  rebuttal report describe the communication from Google
20  to publishers about the transition to the unified DFP
21  AdX contract?
22    A.  Yes.
23    Q.  I want to direct your attention to the second
24  sentence there -- third sentence, reads:  "The message
25  states to continue using AdX, our partners now need to

Page 177

1  sign a new contract that includes terms for both AdX
2  and DFP.  This contract will give you access to DFP
3  features, but there is no obligation to use them."
4        Do you see that?
5    A.  Yes.
6    Q.  And so you understand that when it was
7  rolling out the unified DFP AdX contract, Google told
8  publishers that they would have no obligation to use
9  DFP; is that right?
10        MS. YOUNG:  Objection; form.
11    A.  I -- I acknowledge that's what it says in my
12  report.
13    Q.  (BY MR. EWALT)  And did you have -- how does
14  the fact that Google told publishers that there was no
15  obligation to use DFP inform your analysis of whether
16  the unified DFP AdX contract actually required
17  publishers to use DFP?
18        MS. YOUNG:  Objection; form.
19    A.  Well, it did require them to sign that -- I
20  don't -- I'm not sure the distinction you're trying
21  to -- to make.
22        MS. YOUNG:  Mr. Ewalt, is this --
23        MR. EWALT:  This is a good time for a
24  break.  Yeah.  Go off the record.
25        THE VIDEOGRAPHER:  Now the end of

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1  Video 4 of Joshua Gans.  Off the record.  The time is
2  2:44.
3       (Break from 2:44 p.m. to 3:00 p.m.)
4       THE VIDEOGRAPHER:  We're now on the
5  record.  Video 5 of Joshua Gans.  The time is
6  approximately 3:00.
7       Q.  (BY MR. EWALT)  Professor Gans, did you
8  discuss the substance of your testimony with counsel
9  during the break?
10       MS. YOUNG:  Same instruction that we've
11  been giving previously, that the expert stipulation in
12  this case prohibits the disclosure of the -- the
13  contents of communication between the testifying
14  expert and counsel.
15       So based on that, I instruct
16  Professor Gans not to disclose the contents of his
17  communications with counsel.
18       MR. EWALT:  Based on that instruction,
19  we will move on.
20       Q.  (BY MR. EWALT)  If Google enabled AdX to send
21  real-time bids to third-party publisher ad servers,
22  would that resolve any competition concerns about
23  Google tying DFP to AdX?
24       MS. YOUNG:  Objection; form.
25       A.  It depends what you mean by "sends real-time

Page 179

1  bids" and if they started allowing that right now the
2  consequences of the previous time would still be with
3  us.
4       Q.  (BY MR. EWALT)  Okay.  If Google had enabled
5  AdX to send real-time bids to third-party publisher ad
6  servers in 2009, would you have any competition
7  concerns related to a tie of DFP to AdX?
8       MS. YOUNG:  Objection; form.
9       A.  I think if we recall from our earlier
10  discussion, it is -- it would -- had they implemented
11  third-party Dynamic Allocation back there in 2009, my
12  analysis of the factual and the counterfactual would
13  have been different.
14       I cannot, without conducting that
15  analysis, tell you whether it would have been the
16  same, but that was -- I would change my -- I would --
17  I would likely change my analysis significantly.
18       Q.  (BY MR. EWALT)  Let's talk about Unified
19  Pricing Rules.  UPR.
20       And I can direct you to Paragraph 476 of your
21  opening report.
22       MS. YOUNG:  Sorry.  Give me one second
23  to get there.  476.
24       Okay.
25       Q.  (BY MR. EWALT)  Before Google implemented UPR,

Page 180

1  could publishers use DFP or Google Ad Manager to set
2  price floors for ad exchanges other than AdX?
3       MS. YOUNG:  Objection; form.
4       A.  They could set price floors for -- they could
5  set price floors for -- sorry.  My...
6       Yes, they could.
7       Q.  (BY MR. EWALT)  And I want to make sure you
8  heard part of the question here, is could they --
9  could they use DFP or Google Ad Manager, so let me
10  start over.
11       A.  Okay.
12       Q.  Before Google implemented UPR, could
13  publishers use DFP or Google Ad Manager to set price
14  floors for ad exchanges other than AdX?
15       MS. YOUNG:  Objection; form.
16       A.  My understanding is that they -- they could
17  by the way that they integrated with Header Bidding.
18       Q.  (BY MR. EWALT)  If publishers could not use
19  DFP or Google Ad Manager to set price floors for ad
20  exchanges other than AdX before UPR, would that affect
21  your analysis of the competitive effects from UPR?
22       MS. YOUNG:  Objection; form.
23       A.  My understanding was that UPR was a
24  restriction on the differential price floors that
25  publishers could set through DFP.  I'm -- if I am to

Page 181

1  understand what you're asking me as a hypothetical,
2  you're saying is if UPR existed before you UPR would
3  UPR have had an -- had a -- an impact.
4       Q.  (BY MR. EWALT)  Yeah.  That's not exactly what
5  I was trying to ask, so it's --
6       A.  Yeah, so --
7       Q.  -- a bad question.
8       A.  Yeah, so I guess I didn't understand your
9  question.
10       Q.  Maybe it was a bad question.
11       Before UPR, how did publishers set
12  differential price floors for ad exchanges?
13       MS. YOUNG:  Objection; form.
14       A.  My understanding and my -- my -- my analysis
15  concentrates on what they could and could not do as
16  opposed to the precise -- necessarily the precise
17  nature in which they engaged in that activity, but I
18  believe that it was through the specification, call it
19  coding or -- or -- or filling in of line items to
20  guide the bidding behavior, that publishers were able
21  to set different price floors for different buyers
22  exchanges and advertising sources.
23       Q.  (BY MR. EWALT)  Did UPR simplify the process
24  of configuring price floors for publishers?
25       MS. YOUNG:  Objection; form.

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1    A. The specific requirement of UPR that
2  restricted that ability did not simplify things for
3  publishers.
4    Q. (BY MR. EWALT) Does UPR have any effect on a
5  publisher that chooses not to use DFP?
6       MS. YOUNG: Objection; form.
7    A. As I understand it, UPR was implemented
8  through DFP, So not directly for other people.
9    Q. (BY MR. EWALT) Does UPR require that the
10  same price floors apply to AdX and other exchanges?
11    A. Well, there were some restrictions on how you
12  could differentiate your price floors between
13  exchanges, as I understood it.
14    Q. Does UPR prevent publishers from setting
15  price floors in Google Ad Manager at advantaged AdX
16  over other ad exchanges?
17       MS. YOUNG: Objection; form.
18    A. I don't think that they did. I -- I -- I
19  believe that the -- I can't recall exactly, but I
20  thought there might be -- I -- I recall an asymmetry
21  with how those price floors -- the UPR rules applied.
22    Q. (BY MR. EWALT) Should Google be required to
23  allow its customers to use Google Ad Manager in a way
24  that disadvantages AdX?
25       MS. YOUNG: Objection; form.

Page 183

1    A. The way that I look at it is the way that I
2  looked at all conduct in this case. This is not a
3  requirements matter but an anticompetitive analysis
4  matter.
5    Q. (BY MR. EWALT) Is it anticompetitive for
6  Google to prevent its customers from using Google Ad
7  Manager in a way that disadvantages AdX?
8       MS. YOUNG: Objection; form.
9    A. Because of Google's market power, yeah. Well
10  the word "disadvantage" is the -- is the interesting
11  one, but because of Google's market power imposing the
12  restrictions that they did was anticompetitive.
13    Q. (BY MR. EWALT) Can you please turn to
14  Paragraph 480 of your opening report.
15    A. Yes.
16    Q. The first sentence there reads: "In this
17  section I analyze Google's intent in imposing UPR on
18  publishers."
19       Do you see that?
20    A. Yes.
21    Q. What methodology did you use to reach
22  conclusions about Google's intent?
23    A. I examined the evidence available.
24    Q. What evidence did you examine?
25    A. Well, the evidence is listed there in my

Page 184

1  discussion throughout that section.
2    Q. Did you consider it an economic methodology
3  to examine Google's intent?
4       MS. YOUNG: Objection; form.
5       Go ahead.
6    A. I -- it is common in antitrust cases for
7  economists to consider documents that were produced
8  either under oath or in context where we believe that
9  they were not guided by -- that they were guided by
10  market prices.
11    Q. (BY MR. EWALT) Is it common for economists to
12  render opinions about a company's intent?
13    A. Yeah --
14       MS. YOUNG: Objection; form.
15       Go ahead.
16    A. Yeah. Yes.
17    Q. (BY MR. EWALT) Do you consider yourself an
18  expert in understanding the intent behind company's
19  actions?
20    A. That is one of the things that I do as an
21  economics -- economics scholar.
22    Q. Have you had any specialized training in
23  understanding the intent behind company's actions?
24    A. Yes.
25    Q. What is that training?

Page 185

1    A. I did my Ph.D. at Stanford University, and
2  part of my specialty was working on the understanding
3  of the operation of organizations, including the
4  actions that they would take and why they might take
5  those actions.
6    Q. And you studied incentives, correct?
7    A. Definitely studied incentives.
8    Q. And that -- the incentives would be what an
9  economist would evaluate in order to understand what
10  was motivating a company, correct?
11       MS. YOUNG: Objection; form.
12    A. That is one of the things.
13       The other things they would understand
14  the constraints that the companies faced, the
15  information or structure of the companies, the
16  communication flows within a company.
17       These are all things that were very much
18  impacted upon me during my Ph.D. studies and then
19  throughout my career.
20    Q. (BY MR. EWALT) And you -- when you were
21  studying at Stanford your advisor was Paul Milgrom?
22    A. Yes.
23    Q. What do you think of Professor Milgrom?
24    A. What do I think of him?
25    Q. Uh-huh.

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1    A.  I -- he is -- he was a terrific supervisor
2  and is a -- has done work that has been inspiring to
3  me as an economist.
4    Q.  Do you consider him an expert in auction
5  design?
6    A.  Yes.
7    Q.  Can you think of anyone with more expertise
8  in auction design than Paul Milgrom?
9        MS. YOUNG:  Objection; form.
10    A.  There are a lot of people with a lot of
11  expertise in auction design.  There are -- depending
12  on the domain, some people have more expertise than
13  Paul Milgrom.  But in -- and in other domains, such as
14  spectrum auctions, very few would have his expertise.
15    Q.  (BY MR. EWALT)  Let's go back to Paragraph 480
16  of your opening report where you talk about how you
17  analyze Google's intent imposing UPR on publishers.
18    A.  Yes.
19    Q.  What do you mean by Google's intent?
20    A.  What I mean is that when Google was thinking
21  about implementing UPR, what were the criteria that
22  they used to justify, as it was a restriction on their
23  own customers, doing that.
24    Q.  What do you mean by what "Google was
25  thinking"?

Page 187

1    A.  Well, obviously Google is made up of a lot of
2  people.  So what were the people inside of Google
3  thinking?
4        What were their expressed reasoning as
5  to why they thought this would be a good policy for
6  them.
7    Q.  Do you need to know every employee's thinking
8  to reach conclusions about a company's intent?
9        MS. YOUNG:  Objection; form.
10    A.  No.  You need to -- you need to know a
11  combination of -- there's a combination of
12  considering, as an economist, the likely intent and
13  then looking at the evidence available to weigh it as
14  to what is the plausibly -- plausible motivation.
15    Q.  (BY MR. EWALT)  In reaching conclusions about
16  a company's intent, do you place greater weight on
17  evidence of the views of employees with
18  decision-making authority than on the views of other
19  employees?
20        MS. YOUNG:  Objection; form.
21    A.  One of the things that is very interesting
22  about how organizations work is that people with
23  decision-making authority are influenced by debates
24  and discussions that others tend to have.
25        And in looking at a company and trying

Page 188

1  to weigh the evidence of their intent, you pay
2  attention to a lot of those -- a lot of those voices.
3    Q.  (BY MR. EWALT)  A lot of which voices?
4    A.  The voices within the company.
5    Q.  The decision-makers or the
6  nondecision-makers?
7    A.  Both.
8    Q.  And my question is:  Which do you place
9  greater weight on, the decision-makers or the
10  nondecision-makers?
11        MS. YOUNG:  Objection; form.
12    A.  All other things being equal, depending on
13  the availability of evidence, I guess you would place
14  more decision weight on -- more -- sorry -- more
15  weight on the decision-makers than the -- not, if that
16  was clear.
17    Q.  (BY MR. EWALT)  In your reports do you express
18  any opinion as to whether UPR harmed competition in
19  the market for publisher ad servers?
20        MS. YOUNG:  Objection; form.
21        You may answer.
22    A.  I do not.
23    Q.  (BY MR. EWALT)  In your reports do you express
24  any opinion about whether UPR harmed competition in
25  the market for small advertiser buying tools?

Page 189

1    A.  I do not.
2    Q.  Can you please turn to Page 180 of your
3  opening report.
4        Do you see that Figure 17 is an excerpt
5  from a Google presentation describing the impact on
6  publishers of the move to a unified first price
7  auction with UPR?
8        MS. YOUNG:  Can you give me one second
9  to catch up.
10        Page 180.
11    A.  Yes.
12    Q.  (BY MR. EWALT)  And the headline of that slide
13  is "Pubs Made More Money."
14        Do you see that?
15    A.  Yes.
16        MS. YOUNG:  Objection; form.
17        Sorry.  Go ahead.
18    Q.  (BY MR. EWALT)  Did publishers make more money
19  after Google moved to a unified first price auction
20  with UPR?
21    A.  I don't think you could draw that conclusion
22  from that assertion.
23    Q.  Have you seen any evidence that publishers
24  made less money as a result of UPR?
25    A.  I see that there's evidence that publishers

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

1  were not happy with UPR being imposed on them from
2  which it is likely the case that it is harming their
3  operations in some way.
4      Q.  But have you seen any evidence about the
5  actual impact on publisher revenues of UPR?
6          MS. YOUNG:  Objection; form.
7      A.  In my rebuttal report I document some of
8  these effects.
9      Q.  (BY MR. EWALT)  Did UPR lower price floors on
10 AdX?
11         MS. YOUNG:  Objection; form.
12     A.  I don't know.
13     Q.  (BY MR. EWALT)  Can you turn to Paragraph 491
14 to 496 of your opening report, please.
15     A.  Okay.
16     Q.  Did UPR lower price floors on AdX?
17     A.  Yes.
18     Q.  Did lower price floors on AdX allow
19 advertisers to pay less for impressions?
20         MS. YOUNG:  Objection; form.
21     A.  Lower price floors on AdX, it's unknown when
22 they are -- whether they are allowed advertiser to pay
23 less because -- I'm sorry.
24         The -- the lower price floors would
25 allow more transactions to be completed.

Page 191

1      Q.  (BY MR. EWALT)  And would the -- the fact that
2  more transactions could be completed benefit
3  advertisers?
4          MS. YOUNG:  Objection; form.
5      A.  More transactions being completed could
6  potentially benefit advertisers.
7      Q.  (BY MR. EWALT)  And would UPR allowing more
8  transactions to be completed also benefit publishers?
9          MS. YOUNG:  Objection; form.
10     A.  That is unlikely given that UPR was -- to the
11 extent that it lowered price floors -- was something
12 that the publishers would have chosen not to do.
13     Q.  (BY MR. EWALT)  Well, you would agree that a
14 publisher could make more revenue by selling more
15 inventory at a lower price than selling less inventory
16 at a higher price?
17         That's a possibility it could work out that
18 way, right?
19         MS. YOUNG:  Objection; form.
20     A.  No, not in this particular case.  You have
21 to -- we're talking about an actual restriction on the
22 publishers.
23         A publisher wants to set a particular
24 price floor.  If UPR lowered price floors, it was
25 because it forced publishers to make different

Page 192

1  decisions than they were previously making.  And
2  that's all it did.
3          And as a result of that, one can infer,
4  as a matter of economics, that the publishers were
5  worse off who -- who found that a binding constraint.
6      Q.  (BY MR. EWALT)  Do you know how many
7  publishers found it a binding constraint?
8      A.  I don't have an exact number.
9      Q.  Have you heard of more than five publishers
10 complaining about UPR?
11         MS. YOUNG:  Objection; form.
12     A.  I document some publishers complaining about
13 UPR that we were able to receive evidence from in --
14 including publishers that complained directly to
15 Google.
16     Q.  (BY MR. EWALT)  How many?
17         MS. YOUNG:  Objection; form.
18     A.  I don't think it matters how many.
19     Q.  (BY MR. EWALT)  Okay.  Have you expressed any
20 opinion about how Dynamic Allocation -- or, strike
21 that.
22         Have you -- have you expressed any opinion
23 about whether Dynamic Allocation harmed competition in
24 any market other than the market for ad exchanges?
25     A.  I have expressed an opinion of how Google's

Page 193

1  implementation of Dynamic Allocation harmed market --
2  harmed the market for ad exchanges, but not other, I
3  did not express opinions with respect to other
4  markets.
5      Q.  Was Dynamic Allocation a feature that
6  DoubleClick launched in 2007?
7      A.  All right.  You're testing --
8      Q.  All right.
9      A.  -- me on--
10     Q.  Opening report --
11         (Speaking simultaneously.)
12     A.  But I'm sure you have --
13     Q.  (BY MR. EWALT)  Opening report Paragraph 552.
14     A.  Thank you.
15         Yes, I agree that in 2007 they had
16 launched a feature they had called Dynamic Allocation.
17     Q.  And so Dynamic Allocation was launched before
18 Google acquired DoubleClick?
19     A.  Well, the feature that they called it was,
20 yes.
21     Q.  When Dynamic Allocation was launched, were ad
22 networks the primary way that advertisers purchased
23 display advertising?
24         MS. YOUNG:  Objection; form.
25     A.  The ad networks was one of them that was

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

1 still Direct Deals as well.
2 Q. (BY MR. EWALT) Did ad networks bid in real
3 time?
4 A. My understanding was that ad networks could
5 not do bid in real time.
6 Q. Did ad networks purchase display inventory
7 through sequential process known as the Waterfall?
8 A. Yes.
9 Q. Did the Waterfall lead to publishers missing
10 out on more valuable ad inventory allocation?
11 MS. YOUNG: Objection; form.
12 A. I think that's a reasonable conclusion.
13 Q. (BY MR. EWALT) Was Dynamic Allocation an
14 improvement over the Waterfall?
15 A. Enabling real-time bidding of that kind was,
16 I believe, a potential improvement over the Waterfall.
17 Q. Did Dynamic Allocation help publishers make
18 more money than they could make under the Waterfall?
19 MS. YOUNG: Objection; form.
20 A. I believe that they did help some publishers
21 make more money than they could under the Waterfall.
22 Q. (BY MR. EWALT) When Dynamic Allocation
23 launched, were ad exchanges competing against each
24 other in real time?
25 A. No, they were not.

Page 195

1 Q. When did ad exchanges start competing against
2 each other in real time?
3 A. I'm not sure that they ever did.
4 Q. Okay. So is it your understanding that ad
5 exchanges do not compete against in each other in real
6 time today?
7 A. I -- sorry. Let me correct.
8 I thought you said "ad networks."
9 Q. Oh.
10 A. Could you repeat that question again?
11 Q. I might have misspoken. I'll --
12 A. No, I just -- no, that's what I heard so...
13 Q. Okay. When did ad exchanges start competing
14 against each other in real time?
15 A. I don't know the precise timing of entry of
16 all of the ad exchanges, so I don't have a date for
17 you for that.
18 Q. Does early 2010 sound about right?
19 A. That does sound about right.
20 Q. Did Google modify Dynamic Allocation once ad
21 exchanges started competing against each other in real
22 time?
23 MS. YOUNG: Objection; form.
24 A. I cannot recall at the moment.
25 Q. (BY MR. EWALT) Is it your view that it -- it

Page 196

1 was anticompetitive for Google to have not modified
2 Dynamic Allocation so that bids from rival non-AdX
3 exchanges could compete in real time against AdX?
4 MS. YOUNG: Objection; form.
5 A. That wasn't my opinion.
6 Q. (BY MR. EWALT) Did Header Bidding allow
7 participating ad exchanges to compete against each
8 other in real time?
9 A. Header Bidding enabled -- enabled publishers
10 to solicit real-time bids from multiple exchangers, so
11 enabled that competition.
12 Q. Did publisher start to experiment with Header
13 Bidding around 2014?
14 A. Yes.
15 MS. YOUNG: Objection; form.
16 Go ahead.
17 A. Yes.
18 Q. (BY MR. EWALT) Did Google modify Dynamic
19 Allocation once publishers started to experiment with
20 Header Bidding?
21 A. Not initially, no.
22 Q. What is your understanding of the term "Last
23 Look"?
24 A. My understanding of the term "Last Look" is
25 that after DFP has received bids from Header Bidding,

Page 197

1 that prior to soliciting those bids, or in this case
2 offers of inventory and floors to -- to AdX, they are
3 able to decide their own bid by for AdX.
4 Q. Did Last Look emerge from the interaction
5 between Dynamic Allocation and Header Bidding?
6 A. Last Look emerged primarily from -- from
7 Dynamic Allocation, but it was a thing that was made
8 apparent competitively through Header Bidding.
9 Q. Was Last Look a product feature that Google
10 designed?
11 MS. YOUNG: Objection; form.
12 A. No, Last Look was a -- a -- a constraint that
13 arose out of the way Dynamic Allocation was set up and
14 Google's choices with regard to which exchange got the
15 Last Look.
16 Q. (BY MR. EWALT) And it was also a consequence
17 of the way that publishers chose to use Header
18 Bidding, correct?
19 MS. YOUNG: Objection; form.
20 A. Publishers only had only a certain set of
21 choices they could engage in because of being forced
22 to -- to utilize an approach such as Header Bidding.
23 And so those things interacted with one another.
24 Q. (BY MR. EWALT) If there had been no Header
25 Bidding, could there have been a Last Look?

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

Page 198

1    MS. YOUNG:  Objection; form.
2    A.  I think in terms of the competitive
3    consequences of Last Look, it wouldn't have been an
4    issue if there had been no Header Bidding.
5    Q.  (BY MR. EWALT)  After publishers started
6    experimenting with Header Bidding, was it
7    anticompetitive for Google not to modify bids --
8    excuse me, let me start over.
9         After publishers started experimenting with
10   Header Bidding, was it anticompetitive for Google not
11   to modify DFP so that bids from rival exchanges could
12   compete in real time against AdX bids?
13        MS. YOUNG:  Objection; form.
14   A.  My analysis was that had ad server market
15   been a competitive market and Google not been
16   integrated into an exchange, that in that scenario, in
17   setting who it was that received -- which exchange
18   received the Last Look, Google would not have
19   necessarily selected its own exchange and may have
20   indeed allowed publishers to selected that exchange.
21   Q.  (BY MR. EWALT)  So is that a way of saying
22   your -- in your counterfactual world Google was not
23   vertically integrated and did not have monopoly power?
24   A.  That's correct.
25   Q.  Why did you pick that as your counterfactual

Page 199

1    world?
2    A.  Well, that is the way to consider these
3    counterfactual worlds is if -- well, there's --
4    there's a couple of ways to it, but the general way to
5    do it is -- for these competitive -- anticompetitive
6    conduct cases is to assure that the firm engaging in
7    the conduct did not have market power in the market
8    for which the conduct was being imposed and then build
9    the analysis on top of that.
10   Q.  Couldn't another counterfactual world be one
11   where the firm existed in the same state yet simply
12   did not engage in the conduct that you're
13   investigating?
14        MS. YOUNG:  Objection; form.
15   A.  That's not the way as I outlined earlier and
16   how I evaluate these things that I conduct my
17   analysis.
18   Q.  (BY MR. EWALT)  Is that -- would it be an
19   inappropriate economic analysis to investigate --
20   strike that.
21        Would it be an inappropriate economic analysis
22   to evaluate whether conduct is anticompetitive by
23   comparing the world with the conduct occurring to a
24   counterfactual world in which the conduct did not
25   occur but no other changes existed?

Page 200

1    MS. YOUNG:  Objection; form.
2    A.  So in evaluating anticompetitive conduct and
3    whether conduct is anticompetitive, the process that I
4    outlined is the way to go.
5         It is also the case that in conducting
6    that analysis, you want to understand potentially what
7    would have occurred in a competitive market.
8         One way of doing so is to consider what
9    effect the conduct was more broadly having on and off,
10   as you just suggested.
11   Q.  (BY MR. EWALT)  So what I'm understanding your
12   analysis to do is to investigate the difference that
13   it makes as to whether Google was vertically
14   integrated and it had monopoly power; is that right?
15   A.  It -- when I'm looking for anticompetitive
16   effect, it's primarily on the monopoly power side.
17        So to -- did Google have monopoly power
18   or not have monopoly power?  It is the counterfactual.
19   Q.  I see.
20   A.  The vertical integration plays a role in that
21   analysis.
22   Q.  Okay.  So if I understand this, then, your
23   counterfactual world is one where Google is vertically
24   integrated but does not have monopoly power and
25   your -- and you compare that world to one in which

Page 201

1    Google is both vertically integrated and has monopoly
2    power?
3    A.  Yes.
4    Q.  And how does that help you evaluate whether
5    particular conduct is anticompetitive?
6    A.  Well, it depends on the conduct.
7         For instance, in a world where Google
8    has no monopoly power, if there is a -- if it would
9    have still engaged in the conduct, one could not say
10   or conclude that the conduct was itself
11   anticompetitive.
12        MR. EWALT:  Let's go off the record and
13   take a --
14        THE VIDEOGRAPHER:  Now going off the
15   record.  The time is approximately 3:38.
16        (Break from 3:38 p.m. to 4:09 p.m.)
17        THE VIDEOGRAPHER:  Back on the record.
18   The time is approximately 4:09.
19   Q.  (BY MR. EWALT)  Professor Gans, when
20   evaluating whether Google's conduct was
21   anticompetitive, did you compare outcomes in the
22   actual world to outcomes in a counterfactual world?
23        MS. YOUNG:  Objection; form.
24   A.  Yes.
25   Q.  (BY MR. EWALT)  In your counterfactual world,

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

1    was Google vertically integrated?
2        A.   In -- in my analysis, depending on the
3    conduct I was looking at because some of that conduct
4    involved market power across -- with two markets, I
5    sometimes had Google vertically integrated and
6    sometimes -- or depending on the -- I think actually I
7    would have to answer this with respect to a specific
8    conduct.
9        Q.   Okay.  When you were evaluating tying, did
10   you use a counterfactual world in which Google was
11   vertically integrated?
12           MS. YOUNG:  Objection; form.
13       A.   Yes.
14       Q.   (BY MR. EWALT)  When you were evaluating UPR,
15   did you use a counterfactual world in which Google was
16   vertically integrated?
17       A.   Both yes, and also considering one where it
18   wasn't.
19       Q.   When you were evaluating Dynamic Allocation,
20   did you consider a counterfactual world in which
21   Google was vertically integrated?
22           MS. YOUNG:  Objection; form.
23       A.   When I was analyzing Google's implementation
24   of Dynamic Allocation, like with the previous one, it
25   was both.

Page 203

1        Q.   (BY MR. EWALT)  And how about enhanced Dynamic
2    Allocation?
3            When you were considering that did you
4    consider --
5        A.   The same answer, yes.
6            MS. YOUNG:  Let him finish his question
7    before you answer.
8        Q.   (BY MR. EWALT)  Did you use the same
9    counterfactual for all of the other conducts, other
10   than tying?
11           MS. YOUNG:  Objection; form.
12       A.   Sorry, let me now work my way through it.
13           For the analysis of Project Bernanke and
14   the analysis of Dynamic Revenue Sharing, I did not --
15   I considered what would happen without Google having
16   market power, monopoly power in the requisite market
17   but not -- but assume they were still vertically
18   integrated.
19       Q.   (BY MR. EWALT)  Did you assume they were not
20   vertically integrated in the counterfactual world?
21           MS. YOUNG:  Objection; form.
22       A.   Not in the -- not for -- I did not need to do
23   that for Dynamic Allocation -- Dynamic -- DRS and for
24   Bernanke.
25       Q.   (BY MR. EWALT)  Okay.  I just need a "yes" or

Page 204

1    "no."
2        A.   Okay.
3        Q.   When you were considering whether Dynamic
4    Allocation and Bernanke --
5        A.   You mean DRS.?
6        Q.   Yes.  Thank you.
7            When you were considering whether
8    Dynamic Revenue Share or Bernanke were
9    anticompetitive, did your -- did you assume that in
10   your counterfactual world Google was vertically
11   integrated?
12           MS. YOUNG:  Objection; form.
13       A.   I -- I assume I -- the analysis would be the
14   same, whether they were vertically integrated or not.
15           So count that as assume they're
16   vertically integrated.
17       Q.   (BY MR. EWALT)  Okay.  When you were
18   evaluating whether Google's conduct was
19   anticompetitive, in your counterfactual world did you
20   assume that Google did not have monopoly power?
21           MS. YOUNG:  Objection; form.
22       A.   Yes, in --
23           MS. YOUNG:  Objection; form.
24           You may answer.
25       A.   Yes, in the market for which the conduct

Page 205

1    originated.
2        Q.   (BY MR. EWALT)  Okay.  And is that answer the
3    same with respect to all of the conduct that you
4    evaluated in your reports?
5        A.   Yes.
6            MS. YOUNG:  Objection; form.
7        A.   Oh.  Yes.
8        Q.   (BY MR. EWALT)  Okay.  In either of your
9    reports did you express an opinion about the overall
10   net effect of UPR considering all the effects on both
11   advertisers and publishers?
12           MS. YOUNG:  Objection; form.
13       A.   No, I only engaged in an analysis of whether
14   it was anticompetitive with respect to the -- the
15   methodology -- the method I've already outlined.
16       Q.   (BY MR. EWALT)  In either of your reports did
17   you express an opinion about the overall net effect of
18   Dynamic Allocation considering all of the effects on
19   both advertisers and publishers?
20           MS. YOUNG:  Objection; form.
21       A.   No.  I didn't analyze a world with or without
22   Dynamic Allocation.  Just a world with or without
23   Google's particular implementation of Dynamic
24   Allocation.
25       Q.   (BY MR. EWALT)  In either of your reports did

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

1  you express an opinion about the overall net effect of
2  Enhanced Dynamic Allocation considering all the
3  effects on both advertisers and publishers?
4       MS. YOUNG:  Objection; form.
5     A.  No, I only considered the effects of Google's
6  implementation of Enhanced Dynamic Allocation compared
7  to a counterfactual where it didn't implement it in
8  that way.
9     Q.  (BY MR. EWALT)  In either of your reports did
10  you express an opinion about the overall net effect of
11  line item capping considering all the effects on both
12  advertisers and publishers?
13       MS. YOUNG:  Objection; form.
14     A.  As before, I considered the impact of line
15  item capping in a world with or without Google having
16  market power in -- in -- in publisher ad servers.
17     Q.  (BY MR. EWALT)  So is it fair to say that you
18  did not express an opinion in your reports about the
19  overall net effect of line item capping considering
20  all the effects on both advertisers and publishers?
21       MS. YOUNG:  Objection; form.
22     A.  My analysis only concerned the impact on the
23  competition in ad exchangers as a result of Google's
24  line item capping, which itself has effects on both
25  advertisers and publishers.

Page 207

1     Q.  (BY MR. EWALT)  In either of your reports, did
2  you express an opinion about the overall net effect of
3  Bernanke considering all the effects on both
4  advertisers and publishers?
5       MS. YOUNG:  Objection; form.
6     A.  I considered the impact of Bernanke on -- on
7  competition -- on -- on competition in the ad server
8  market, and, with respect to that, all of its
9  consequences on -- on customers who interacted with
10  that market.
11     Q.  (BY MR. EWALT)  I'm sorry, did you say that
12  with respect to Bernanke you considered impacts on --
13     A.  Yes.
14     Q.  -- on the ad server market?
15     A.  On the ad exchange market.  If I said "ad
16  server," I meant ad exchange market.  That was
17  Bernanke.
18     Q.  That was Bernanke.
19     A.  I meant the Bernanke on the -- I'm sorry.
20     Q.  Take your time.  Take your time.
21     A.  I meant the market for buy side ad tools for
22  small advertisers.
23     Q.  Okay.
24     A.  And, also, that considered the impact on
25  publishers as well.

Page 208

1     Q.  Is it your opinion -- did you -- do you have
2  an -- strike all that.
3       In your opinion, did Bernanke harm
4  competition in the market for ad exchanges?
5       MS. YOUNG:  Objection; form.
6     A.  My opinion is that it -- yes, it harmed
7  competition in the market for ad exchangers.
8     Q.  (BY MR. EWALT)  Okay.  Have you expressed any
9  opinion in your reports about how enhanced Dynamic
10  Allocation affected competition in any market other
11  than the market for ad exchanges?
12       MS. YOUNG:  Objection; form.
13     A.  That was just a market for ad exchanges.
14     Q.  (BY MR. EWALT)  Does Enhanced Dynamic
15  Allocation allow ad exchanges to compete for
16  impressions that otherwise would be allocated to
17  Direct Deals?
18       MS. YOUNG:  Objection; form.
19     A.  Enhanced Dynamic Allocation allows for
20  additional functionality with respect to programatic
21  advertising, programatic guarantees for -- for -- for
22  publishers.
23       So I -- I think the word "compete" is an
24  odd one.  I would think it allows publishers
25  additional functionality to manage their programatic

Page 209

1  and nonprogramatic advertising.
2     Q.  (BY MR. EWALT)  Is it your opinion that
3  Dynamic -- that Enhanced Dynamic Allocation harms
4  competition in the ad exchange market?
5     A.  No.  I did no analysis for further Enhanced
6  Dynamic Allocation harmed competition in any market.
7       I only examined Google's implementation
8  of Enhanced Dynamic Allocation and whether it harmed
9  competition.
10     Q.  So are you distinguishing between Enhanced
11  Dynamic Allocation and Google's implementation of
12  Enhanced Dynamic Allocation?
13     A.  Oh, I think that is very clear in my report.
14     Q.  Wasn't clear to me.
15       What's the difference between --
16       MS. YOUNG:  And I'm going to --
17     Q.  (BY MR. EWALT)  -- Enhanced Dynamic Allocation
18  and Google's implementation of Enhanced Dynamic
19  Allocation?
20       MS. YOUNG:  I'm going to move to strike
21  everything before the question.
22       Go ahead and answer.
23     A.  Well, this is -- the -- as I have said very
24  clearly in my report, when Google implemented Dynamic
25  Allocation and also as that carried on to Enhanced

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

1  Dynamic Allocation, Google had to make a decision as
2  to who received -- which exchange received First Look
3  or Last Look in the process of implementing that.
4        Its decision was that its own exchange
5  would receive the Last Look advantage.  And that was
6  the particular implementation that I analyzed as to
7  whether -- had Google had a competitive ad server
8  market or faced a competitive ad server market,
9  whether they would have made such a decision.
10  Q.  (BY MR. EWALT)  Was there any implementation
11  of Dynamic Allocation other than the implementation
12  that Google did?
13  A.  Conceptually, of course.
14  Q.  In the real world, because you're evaluating
15  the effects of the actual conduct, right?
16  A.  Yeah.  They had market power.  They had
17  monopoly power.  I'm -- I don't think anyone's
18  surprised that they would do that in their own
19  interest and not believe that there is any other way.
20        However, if you imagine a counterfactual
21  world in which they were just running ad servers in
22  competition with other ad servers, different things
23  would have happened.
24  Q.  So are you disputing -- let me strike that.
25        Am I understanding you correctly that

Page 211

1  you did not evaluate Dynamic Allocation generally?
2        MS. YOUNG:  Objection; form.
3  A.  The existence or not of Dynamic Allocation
4  was not a conduct that I evaluated.
5  Q.  (BY MR. EWALT)  Did you --
6        MS. YOUNG:  Are you finished answering
7  your question?
8        THE WITNESS:  Yes.
9        MS. YOUNG:  Okay.
10  Q.  (BY MR. EWALT)  Did you evaluate the existence
11  of Enhanced Dynamic Allocation?
12  A.  The existence of Dynamic -- of Enhanced
13  Dynamic Allocation or not, or the enhanced part of
14  Dynamic Allocation versus Dynamic Allocation, was not
15  a conduct that I evaluated.
16  Q.  Did you evaluate the existence of UPR?
17  A.  I evaluated the existence of UPR in a world
18  where UPR was not imposed.  That is, as it was prior
19  to the imposing of UPR.
20  Q.  So your answer for UPR was a little bit
21  different than the answer for Enhanced Dynamic
22  Allocation and Dynamic Allocation.
23  A.  It's no different.  If you look in my report,
24  both of them, I'm very clear on the conducts that I am
25  evaluating and looking at.

Page 212

1  Q.  Well, but you just testified that there's a
2  difference between evaluating the conducts and
3  evaluating the implementations of the conducts.
4        MS. YOUNG:  Objection; form.
5  Q.  (BY MR. EWALT)  So I'm really just struggling
6  here with what did you evaluate?
7        MS. YOUNG:  I'm going to -- there's no
8  question pending.  I'm going to move to strike.
9  Q.  (BY MR. EWALT)  Did you evaluate --
10        MR. EWALT:  He's -- the record is clear
11  that -- what I've asked, and the record is very clear
12  what he said.  And he's changing every time I ask a
13  question what he evaluated and what he didn't
14  evaluate.
15        MS. YOUNG:  There's no question pending.
16  I move to strike.
17        There's no question pending.
18        Go ahead.  Ask a question, Counsel.
19  A.  Can you repeat the last question to me.
20  Q.  (BY MR. EWALT)  I'm going to ask a new
21  question.
22        Please identify every type of Google conduct
23  for which you have reached an opinion that such
24  conduct was anticompetitive in any market?
25  A.  Let me, so that I get this right, find the

Page 213

1  most convenient summary in my statements of these
2  things.  And probably the easiest is to go conduct by
3  conduct.
4        Did we want to start with tying?
5  Q.  Please identify every type of conduct Google
6  engaged for which you have reached an opinion that
7  such conduct was anticompetitive in any market.
8  A.  Okay.  Because you're having trouble
9  distinguishing between conduct and projects, I'm going
10  to do this and be very plain about it.
11        First, Google's tying conduct, there was
12  the conduct by which it tied its AdX product to its
13  publisher ad server product in various ways that we've
14  already discussed.
15        Second, UPR.  UPR was a restriction on
16  how publishers could engage in setting differential
17  price floors within the context of Google's ad
18  server -- ad publisher ad server product.  The conduct
19  was the imposition of UPR.  Not having the conduct was
20  not having UPR.
21        With respect to conducts, so that I'm
22  clear, are associated with Dynamic Allocation.
23  Dynamic Allocation itself was a program which allowed
24  for real-time bidding to be done, which was an
25  evolution over the Waterfall.  That is not the conduct

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1  that I evaluate.
2       The conduct was when it implemented
3  Dynamic Allocation -- and you can see this in 570 on
4  my opening report -- they overrode any publishers --
5  they -- they made a choice that AdX would have a Last
6  Look, that AdX would have a Last Look in that.
7       And they did the same thing with
8  Enhanced Dynamic Allocation. That was its
9  implementation, and its implementation was the conduct
10 that I analyzed.
11      Just to be clear, if Google did not own
12 AdX, one can imagine that it could integrate with a
13 non-Google exchange.
14      AdX, not owned by Google or any other
15 non-Google exchange, to give that Last Look.
16      And it could have, depending on choices
17 and other competitive positioning, given that choice
18 of who gets the Last Look to the publisher who's the
19 customer of the ad server.
20      Let's continue on.
21      Google engaged in conduct that capped
22 line items in the publisher ad server. The conduct is
23 the cap. Not having the conduct would have no cap.
24      Google redacted data. It redacted data
25 in its ad server products. Had it not -- that was the

Page 215

1  conduct, the redaction. Not -- not redacting would be
2  not doing the conduct.
3       With Bernanke, there were two versions
4  of Bernanke. There was an initial version of Bernanke
5  by which Google lowered the take rate on some -- some
6  advertiser -- some advertiser transactions in order to
7  see them more likely to pass through Google's stack.
8       The second prong of Bernanke was to bank
9  and claw back through higher take rates. It's
10 calculated loss -- and I'm putting that in quotes, I
11 don't know how to say it any other way -- from that.
12      The conduct that I analyzed is the
13 conduct of Google engaging in the high increase in
14 take rate to advertisers as compared to the conduct
15 that just involved the decrease in take rate prong of
16 Bernanke.
17      Similarly, with Dynamic Revenue Sharing
18 also had those two prongs.
19      And the conduct that I investigated was
20 the conduct with the first prong that allowed AdX's
21 take rate to be lower for some transactions as
22 compared to a world with the second prong where AdX --
23 where -- where Google increased the take rate on
24 certain transactions and did so with a view to clawing
25 back the losses on the first prong.

Page 216

1       Those are the conducts I evaluated.
2  Q.  Thank you very much. That was helpful.
3       So let's talk about DA and EDA again.
4  DA first.
5       So in -- if I understand this correctly,
6  you did not investigate whether DA in and of itself
7  harmed competition in the ad exchange market; is that
8  right?
9       MS. YOUNG: Objection; form.
10 A.  That is right. I investigated the
11 implementation of DA that Google chose versus other
12 implementations it might have chosen.
13 Q.  (BY MR. EWALT) And you reached the conclusion
14 that Google harmed competition by implementing DA in
15 such a way that AdX received a Last Look.
16      Is that fair?
17 A.  It -- it did because -- but it was able to
18 favor its own vertically integrated ad exchange via
19 that choice, which had it not had market power in the
20 ad server market, it wouldn't have played out that
21 way.
22 Q.  If Google had implemented Dynamic Allocation
23 in such a way that a different exchange received the
24 Last Look, would that have harmed competition?
25      MS. YOUNG: Objection; form.

Page 217

1  A.  If a different exchange that was not owned by
2  Google had received the Last Look and that was just an
3  independent choice of Google, then that would not have
4  harmed competition.
5  Q.  (BY MR. EWALT) With respect to EDA, I believe
6  you said that you did not reach an opinion that EDA
7  harmed competition on its own.
8       Is that fair?
9  A.  That is correct.
10 Q.  You did reach a conclusion that the way that
11 Google implemented EDA harmed competition; is that
12 right?
13 A.  I did. It was a continuation of the way they
14 had implemented DA.
15 Q.  Is there anything different about the
16 implementation of EDA as compared to the
17 implementation of DA that affected your evaluation as
18 to whether EDA harmed competition?
19      MS. YOUNG: Objection; form.
20 A.  No.
21 Q.  (BY MR. EWALT) Talk about Bernanke next.
22      Am I correct -- well, you -- you talked about
23 there are two prongs for Bernanke, right?
24 A.  Yes.
25 Q.  Did you reach a conclusion as to whether

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

1  Bernanke with both prongs harmed competition?
2      A.  Relative to Bernanke with no Bernanke at all?
3      Q.  Yes.
4      A.  I did not reach a conclusion on that.
5      Q.  With respect to DRS, you also said there were
6  two prongs.
7          Did you reach a conclusion as to whether
8  DRS with two prongs harmed competition relative to a
9  world with no DRS?
10     A.  I --
11         MS. YOUNG:  Objection; form.
12         Go ahead.
13     A.  I did not.
14     Q.  (BY MR. EWALT)  Now, there were actually three
15  versions of DRS.
16         Do you remember that?
17     A.  Yes, there was this final truthful DRS which
18  retains both of the prongs of DRS Version 2.
19     Q.  Did you reach any conclusion as to whether
20  truthful DRS harmed competition?
21     A.  Yes.  Relative to DRS Version 1.
22     Q.  Okay.  Could you turn to Paragraph 738 of
23  your opening report, please?
24         Could you please review that, and let me
25  know when you've finished.

Page 219

1      A.  Yes.
2  ████████████████████████████████
   ████████████████████████████████████
   ███████
   █████████████████████████
   ███████████████████████
7  ████████████████████████████████████████
   ████████████████████████████
   ████████████████████
   ██████████████████████████████████
   █████████████████████
13     Q.  (BY MR. EWALT)  Did Google develop Bernanke so
14  that Google Ads could clear more impressions on AdX,
15  specifically those impressions that Google Ads would
16  have lost due to high publisher floor prices?
17         MS. YOUNG:  Objection; form.
18     A.  Yes, that's what it said it was trying to do.
19     Q.  (BY MR. EWALT)  Did Google develop Bernanke to
20  improve the match rate on AdX?
21     A.  It was trying to improve and increase the
22  number of transactions going through AdX as compared
23  to elsewhere.
24     Q.  Did Google develop Bernanke to help sell
25  impressions that otherwise would not have been sold

Page 220

1  due to high publisher floor prices?
2          MS. YOUNG:  Objection; form.
3      A.  It developed Bernanke to sell impressions
4  that otherwise would have not been sold due to high
5  publisher floor prices on AdX.
6      Q.  (BY MR. EWALT)  Would you please turn to
7  Paragraph 740 to 743 of your opening report.
8      A.  Yes.
9      Q.  And in those paragraphs you describe three
10  scenarios where Bernanke could impact AdX auctions?
11     A.  Yes.
12     Q.  The first scenario is when Google Ads submits
13  the highest and second highest bids into the AdX
14  auction, right?
15     A.  Yes.
16     Q.  In that first scenario, does Bernanke have
17  any effect on rival ad-buying tools?
18     A.  No.
19     Q.  Second scenario is when no buyer submits a
20  bid above the AdX floor price without Bernanke, but
21  Bernanke allows Google Ads to bid above the floor
22  price and win the impression.
23         Is that fair?
24     A.  Yes.
25     Q.  In the second scenario, does Bernanke have

Page 221

1  any effect on rival ad-buying tools?
2      A.  No.
3      Q.  In the second scenario, does Bernanke allow
4  transactions to clear that otherwise would not have
5  cleared?
6      A.  Yes.
7      Q.  In the second scenario, does Bernanke expand
8  the output of transactions?
9          MS. YOUNG:  Objection; form.
10         Go ahead.
11     A.  Yes.
12     Q.  (BY MR. EWALT)  Do publishers and advertisers
13  benefit from Bernanke expanding output in the second
14  scenario?
15         MS. YOUNG:  Objection; form.
16     A.  Well, Google is lowering its price so that
17  they potentially benefit.
18     Q.  (BY MR. EWALT)  The third scenario is when a
19  rival buying tool would have won the impression
20  without Bernanke but Bernanke allows Google Ads to win
21  instead; is that right?
22     A.  That's right.
23     Q.  And this third scenario is the only one where
24  Bernanke could harm rival buying tools.
25         Is that fair?

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL



Page 222

1    A.  That is --
2         MS. YOUNG:  Objection; form.
3         Go ahead.
4    A.  That is correct.
5    Q.  (BY MR. EWALT)  Some of those rival buying
6    tools are buying tools for large advertisers, right?
7         MS. YOUNG:  Objection; form.
8    A.  It's possible.
9    Q.  (BY MR. EWALT)  In your reports, do you
10   express an opinion on how commonly each of the three
11   scenarios occurred?
12        MS. YOUNG:  Objection; form.
13   A.  I do not.
14   Q.  (BY MR. EWALT)  Do you know whether the second
15   scenario is more common than the third scenario?
16        MS. YOUNG:  Objection; form.
17   A.  I do not know the distribution of the
18   scenarios.
19        (Marked Gans Exhibit No. 9.)
20   Q.  (BY MR. EWALT)  I'm handing you a document
21   that's been marked as Exhibit 9.  First page bears
22   Bates No. GOOG-DOJ-AT-02513569.
23        Do you see that?
24   A.  Yes.
25   Q.  I would like to direct your attention to

Page 223

1    Paragraph 746 in your opening report, in particular to
2    Footnote 942.
3    A.  Yes.
4         MS. YOUNG:  You said 942?
5         MR. EWALT:  Yes.
6         MS. YOUNG:  Okay.
7    Q.  (BY MR. EWALT)  Is Exhibit 9 the document you
8    cited in Footnote 942 in your opening report?
9    A.  Yes.
10   Q.  Did you rely on the page with Bates number
11   ending in 573?
12   A.  I believe so.
13   Q.  Would you please turn to that page in
14   Exhibit 6.
15   A.  Yes.
16   Q.  Does Page 573 in Exhibit 6 summarize the
17   results of a simulation of Bernanke that was run in
18   June 2013?
19   A.  Yes.

Page 224

8    Q.  Fair.  Okay.
9         And so can we agree that we'll just call
10   it Bernanke Version 1?  We can refer to that as
11   Bernanke and then we can refer to Global Bernanke
12   separately.
13   A.  Well, it's not Global Bernanke.  It's
14   Bernanke Version 2, and then Global Bernanke was
15   another thing entirely.
16   Q.  And so --
17   A.  There was another -- it was another --
18   Q.  Iteration?
19   A.  Sorry.  Yeah.
20

Page 225

1

HIGHLY CONFIDENTIAL



**Page 226**

9   Q.  Okay.  So it's an increase in economic
10  surplus.
11      And do advertisers receive some of that
12  surplus?
13  A.  Yes.
14  Q.  Do you publishers receive some of that
15  surplus?
16  A.  Yes.
17  Q.  So is fair to say that Bernanke Version 1
18  benefitted both advertisers and publishers?
19      MS. YOUNG:  Objection; form.
20  A.  That would be a fair statement.
21  Q.  (BY MR. EWALT)  All right.  Could you please
22  turn now to Paragraph 750 of your opening report.
23      (Marked Gans Exhibit No. 10.)
24  Q.  (BY MR. EWALT)  Okay.  I'm handing you what's
25  been marked as Exhibit 10.  This is a presentation

**Page 227**

1   that's titled "Project Bernanke Quantitative Easing on
2   the Ad Exchange," and it's dated December 10, 2013.
3   The first page bears Bates No. GOOG-DOJ-28386151.
4       Do you see that?
5   A.  Yes.  It's got a picture.
6   Q.  And directing you to Footnote 947 in your
7   report.
8   A.  Yes.
9   Q.  Is Exhibit 10 the document you cited in
10  Footnote 947?
11  A.  Yes.
12  Q.  And did you rely on the page with Bates
13  number ending in 167?
14  A.  Yes.
15  Q.  Please turn to that page in Exhibit 10.
16  A.  Okay.
17  Q.  Does Page 167 in Exhibit 10 summarize the
18  impact of Bernanke Version 1 as of December 2013?
19  A.  Yes.
20      MS. YOUNG:  Objection; form.

**Page 228**

8   Q.  Do you know which version of Bernanke this --
9   A.  I'll have to remind myself of the -- in this
10  document, I'm sorry, that I don't remember the -- the
11  precise dates off of hand.
12      MS. YOUNG:  Professor Gans, take your
13  time to read the document, if you need it, to answer
14  the question.
24  Q.  (BY MR. EWALT)  Do you know which version of
25  Bernanke was being studied in Exhibit 10?

**Page 229**

1   A.  That's a different question.
2       My understanding, I may be incorrect
3   about it, this was the full version of Bernanke.
4   Q.  Is that different than Version 1?
5   A.  Yes.
6   Q.  How is this -- the full version of Bernanke
7   different than Version 1?
8   A.  The full version of Bernanke kept a -- a
9   count of the discounts that were given in terms of a
10  lower take rate to advertisers -- to -- to -- the
11  discounts that were given in terms of a lower take
12  rate and puts them as a debt in that account, which it
13  was -- which would be clawed back through an increase
14  in the take rate associated with those accounts.
15      So it had both prongs, as we discussed
16  it earlier.
17  Q.  Is it your testimony that Bernanke Version 1
18  did not have both prongs?
19  A.  That's right.  Bernanke Version 1 only had
20  the reduction in the take rate.
21  Q.  Okay.  Now --
22      (Speaking simultaneously.)
23  A.  Or the one in this simulation.
24  Q.  (BY MR. EWALT)  I ask -- well, I ask you this
25  with all due respect.

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

1    Are you aware that prior to Bernanke there was
2  a program called buy-side DRS?
3    A.  Yes.  I see.  Right.
4    Q.  And is buy-side DRS the program that only
5  reduced the margin but did not have a debt account?
6    A.  Right at the moment I have -- I would have to
7  review my report again to remember which version was
8  under which name, which is what I am struggling with
9  right here.
10    Q.  Okay.  So is it possible that Bernanke
11  Version 1 also had a debt account?
12    A.  I would have -- I would -- I would need some
13  time to refresh my memory regarding the exhibits and
14  my report to --
15    Q.  Okay.
16    A.  -- to confirm with certainty.
17    Q.  Okay.  Well, let's turn back to Exhibit 10,
18  Page 167.
19    A.  Yes.
20

Page 231

15    Q.  And that increase in advertiser spending was
16  due to Bernanke allowing more matches between
17  publishers and advertisers increasing output, correct?
18    A.  What you're asking me is about -- potentially
19  about a counterfactual, which was not the
20  counterfactual I analyzed.  It's with and without
21  Bernanke as in these experiments.
22    But with that caveat, yes.

Page 232

3    Q.  So according to your Exhibit 10, did Bernanke
4  benefit both advertisers and publishers?
5    MS. YOUNG:  Objection; form.
6    A.  Well, Bernanke wasn't a conduct I evaluated,
7  as I already mentioned.
8    But in a world with and out -- with and
9  without Bernanke as in those experiments, one effect
10  of it was a short-run effect of increasing the revenue
11  of publishers.
12    Q.  (BY MR. EWALT)  And advertisers?
13    MS. YOUNG:  Objection; form.
14    A.  Potentially of advertisers as well.
15    MR. EWALT:  Let's go off the record.
16    THE VIDEOGRAPHER:  This is now the end
17  of Video 5 of Joshua Gans.  We're off the record.  The
18  time is 4:59.
19    (Break from 4:59 p.m. to 5:18 p.m.)
20    THE VIDEOGRAPHER:  Now back on the
21  record.  Video 6 of Joshua Gans.  The time is
22  approximately 5:18.
23    Q.  (BY MR. EWALT)  Professor Gans, during the
24  break, did you discuss the substance of this case with
25  counsel?

Page 233

1    MS. YOUNG:  Same instruction as before.
2  I direct the witness not to answer pursuant to the
3  expert stipulation entered by the Court in this case.
4    Q.  (BY MR. EWALT)  Based on the instruction not
5  to answer, we will move on.
6    Did DRS Version 1 harm competition in any
7  market?
8    A.  I didn't analyze whether it did harm
9  competition, but my analysis -- yeah.  I didn't
10  analyze whether it did harm competition.
11    Q.  Could you please turn to Paragraph 104 of
12  your rebuttal report.
13    A.  Yes.
14    Q.  And that paragraph begins: "Professor
15  Milgrom, however, provides an illustration of why this
16  approach is not appropriate in this case in his
17  evaluation of one of the conducts investigated in this
18  matter, Sell-Side Dynamic Revenue Sharing, or more
19  specifically DRS v1.  He points to a Google evaluation
20  of the impact of the conduct.

     Recall that I regarded this particular

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

**Page 234**

1  procedure as procompetitive."
2  　Do you see that?
3  A.  Yes.
4  Q.  Was DRS Version 1 procompetitive?
5  A.  In a sense that it --
6  　MS. YOUNG:  Objection; form.
7  　Sorry.  Go ahead and answer.
8  A.  In a sense that it involved Google reducing
9  its take rate only, it -- it -- it could be regarded
10  as -- as procompetitive or welfare enhancing.
11  Q.  (BY MR. EWALT)  Is there any sense in which
12  DRS Version 1 was not welfare enhancing?
13  A.  I do not -- I did not find any sense that it
14  wasn't.
15  Q.  Would you please turn to Paragraph 809 of
16  your opening report.
17  　The first sentence of that paragraph
18  reads --
19  　MS. YOUNG:  Can you give me one second?
20  I'm going to -- it's taking me a little while to flip
21  to it.
22  　Sorry.  Go ahead.
23  Q.  (BY MR. EWALT)  First sentence of
24  Paragraph 809 of your opening report reads:  "The
25  combined effects of Last Look in DRS v2 led to revenue

**Page 235**

1  losses for the publishers for the following reasons."
2  　Do you see that?
3  A.  Yes.
4  Q.  In your reports, do you express any opinion
5  that the combined effect of Last Look in tDRS led to
6  revenue losses for publishers?
7  A.  I cannot whether I analyzed that particular
8  combination in my reports.
9  Q.  Did -- in either of your reports, did you
10  express an opinion as to whether tDRS harmed
11  competition as compared to a world with no DRS?
12  　MS. YOUNG:  Objection; form.
13  A.  I did not.
14  　(Marked Gans Exhibit No. 11.)
15  Q.  (BY MR. EWALT)  I'm handing you what's been
16  marked as Exhibit 11.  It's a document titled "Overall
17  Pub Yields with DRS v2."  First page bears Bates
18  number GOOG-NE-13234466.
19  　Do you see that?
20  A.  Yes.
21  Q.  Would you please turn to Paragraph 805 of
22  your opening report, and actually take a look at
23  Footnote 1030.
24  A.  1030, I -- I -- oh, I see it, sir.  Sorry.
25  　Yes.  1030.

**Page 236**

1  Q.  Does Footnote 1030 cite to Exhibit 11?
2  A.  Yes.
3  Q.  And in particular you cite Page 467 of
4  Exhibit 11; is that correct?
5  A.  Yes.
6  Q.  And please turn to Page 467.
7  A.  Okay.
8  Q.  And that page states that DRS consistently
9  makes publishers more money.
10  　Do you see that?
11  A.  I see that it says that.
12  Q.  And according to Exhibit 11, does DRS
13  Version 2 consistently make publishers more money?
14  A.  As compared to no DRS.
15  Q.  Would you please turn to Page 469 in
16  Exhibit 11?
17  A.  Yes.
18  Q.  You see the top of that page defines
19  publisher revenue as the some of AdX revenue and
20  third-party network revenue?
21  A.  Yes.
22  Q.  And you understand that third-party network
23  revenue refers to rival ad exchanges and ad networks
24  that would compete against AdX through remnant items.
25  A.  Yes.

**Page 237**

1  　MS. YOUNG:  Objection; form.
2  　Sorry.  Go ahead.
3  [REDACTED]
20  Q.  (BY MR. EWALT)  And is an output increase
21  procompetitive?
22  　MS. YOUNG:  Objection; form.
23  A.  Output increases are welfare enhancing.
24  Q.  (BY MR. EWALT)  In either of your reports, did
25  you express an opinion about the overall net effect of

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

1 DRS considering all the effects on both advertisers
2 and publishers?
3          MS. YOUNG:  Objection; form.
4    A.  No, I didn't, because the conduct I evaluated
5 was not that.
6    Q.  (BY MR. EWALT)  All right.  Let's talk about
7 line item capping.
8    A.  Saving the best until last.
9          Okay.  Let's go.
10   Q.  Have you seen evidence that publishers using
11 large numbers of active line items impose costs on
12 Google?
13         MS. YOUNG:  Objection; form.
14   A.  I've seen -- I recall claims made by
15 Professor Baye to that effect.
16         (Marked Gans Exhibit No. 12.)
17   Q.  (BY MR. EWALT)  I'm handing you what's been
18 marked as Exhibit 12.  It's a document titled
19 "PRD/Strat Review:  Network Health."  First page bears
20 Bates No. GOOG-DOJ-06875572.
21         Do you see that?
22   A.  I do.
23   Q.  Would you please turn to Paragraph 370 of
24 your rebuttal report?
25   A.  Of the rebuttal report.

Page 239

1          Oh, good grief.
2          Yeah.
3    Q.  All right.  I want to direct your attention
4 to Footnote 647.
5    A.  Yes.
6    Q.  Is Exhibit 12 the document you cited in
7 Footnote 647 of your rebuttal report?
8    A.  Yes.
9    Q.  Would you please turn to page ending in 686.
10   A.  686?
11   Q.  Maybe 586.
12   A.  Okay.
13   Q.  No, might be 686.
14   A.  I don't -- I don't have 686.
15   Q.  I don't see 686 either.
16         Give me a second here.
17         Yes, would you please turn to the page
18 in Exhibit 12 with Bates number ending in 586?
19   A.  Yes.

Page 240

1    Q.  You understand that Google is referring to
2 additional infrastructure costs associated with line
3 items, right?
4    A.  Oh.
5          MS. YOUNG:  Objection; form.
6    A.  I have to admit, it doesn't plainly say
7 anything on that particular slide.
8          Okay.  Yes.
9    Q.  (BY MR. EWALT)  So do you understand that
10 Google is referring to additional infrastructure costs
11 associated with line items on Page 586 of Exhibit 12?
12         MS. YOUNG:  Objection; form.
13   A.  I do.
14   Q.  (BY MR. EWALT)  Was limiting the number of
15 line items a way for Google to control those costs?
16         MS. YOUNG:  Objection; form.
17   A.  What this says is not allowing every
18 publisher to increase their line items -- or to -- no.
19         Not allowing a situation where every
20 publisher could increase -- would increase its line
21 items would result in costs for Google.  Although that
22 is different from providing the means for some
23 publishers to do so.
24         The increment seemed -- it could be
25 referring to a different calculation.

Page 241

1    Q.  (BY MR. EWALT)  Okay.  You can put that aside.
2          Could you please turn to Paragraph 649 in your
3 opening report?
4    A.  Yes.
5    Q.  One moment, please.
6          (Marked Gans Exhibit No. 13.)
7    A.  Exhibit incoming.
8    Q.  (BY MR. EWALT)  Indeed.
9          I'm handing you what's been marked as
10 Exhibit 13.  This is an e-mail dated October 8, 2018.
11 The first page bears Bates No. GOOG-DOJ-15127000.
12         Do you see that?
13   A.  Yes.
14   Q.  And direct your attention to Footnote 827 of
15 your opening report.
16   A.  Yes.
17   Q.  Is Exhibit 13 a document that's cited in
18 Footnote 827?
19   A.  Yes.
20   Q.  And you've reviewed Exhibit 13 before?
21   A.  Yes.
22   Q.  Do you recognize Exhibit 13 as an e-mail
23 thread among Google employees related to line item
24 capping?
25   A.  Yes.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

**Page 242**

1  Q.  Would you please turn to the page in
2  Exhibit 13 with Bates number ending in 001.
3  A.  Yes.
4  Q.  Towards the bottom of that page, do you see
5  an e-mail from ▮?
6  A.  Yes.
7  Q.  And Mr. ▮ is a senior engineer at
8  Google?
9  A.  I don't recall.
10  Q.  Does that e-mail continue on to the page
11  ending in 002?
12  A.  Yes.
13  Q.  And at the top of the page 002 there's a
14  section titled "Header Bidding Friction."
15  Do you see that?
16  A.  Yes.
17  Q.  Mr. ▮ wrote: "The goal is not to stop
18  Header Bidding.  It is to introduce friction (or
19  costs) that make our programatic offerings more
20  compelling.  The way our system was set up makes it
21  free for pubs to use Header Bidding but costs us
22  serving resources (esp for SB and premium pubs with
23  lower negotiated rates).  This friction is an
24  important part of ensuring that the monetization tools
25  the pub has available are not subsidized by us to our

**Page 243**

1  detriment."
2  Do you see that?
3  A.  Yes.
4  Q.  And returning to the first page of
5  Exhibit 13, there's an e-mail response from Nitish
6  Korula.
7  Do you see that?
8  A.  Yes.
9  Q.  Do you know whether Mr. Korula was another
10  senior engineer at Google?
11  A.  I do not recall.
12  Q.  I would like to direct your attention to
13  Point 4 in Mr. Korula's e-mail.
14  A.  Yes.
15  Q.  And he wrote: "On friction, I think Glenn
16  nailed it.  The goal is not to stop Header Bidding.
17  The way our system was set up makes it free for pubs
18  to use and expand Header Bidding but costs us serving
19  resources and reporting resources and troubleshooting,
20  et cetera.  Even if we can't eliminate it, why should
21  we subsidize publishers doing something suboptimal?
22  That is also bad for users and it introduces more
23  latency, et cetera."
24  Do you see that?
25  A.  Yes.

**Page 244**

1  Q.  And Mr. Korula was agreeing with Mr. ▮
2  that Google's goal with line item caps was not to stop
3  Header Bidding, right?
4  MS. EWALT:  Objection; form.
5  And, Professor Gans, if you need to read
6  the entire e-mail to answer any questions about this
7  multipage e-mail, please do so.
8  MR. EWALT:  All right.  I'll ask the
9  counsel not coach the witness.
10  A.  Okay.  Could you ask the question again.
11  Q.  (BY MR. EWALT)  Was Mr. Korula agreeing with
12  Mr. ▮ that Google's goal with line item caps
13  was not to stop Header Bidding?
14  MS. YOUNG:  Objection; form.
15  A.  I think he was agreeing with him that a way
16  to sell the decision to put in line items caps was
17  to -- was to -- that they didn't want to encourage
18  header -- greater Header Bidding because of the
19  specific costs that Header Bidding imposes on Google.
20  Q.  (BY MR. EWALT)  Google was looking to make
21  sure that it wasn't stuck absorbing as much of the
22  costs of Header Bidding as publishers chose to impose.
23  Is that fair?
24  MS. YOUNG:  Objection; form.
25  A.  Well, I think if you look at this message in

**Page 245**

1  the context of the e-mail thread that was preceding
2  it, I think there was the kind of internal debate and
3  discussion that was going on that we discussed earlier
4  in -- in the day in this thing.
5  And so a plain, out-of-context reading
6  of that particular statement of a goal should not be
7  done.
8  Q.  (BY MR. EWALT)  You shouldn't read the e-mails
9  written by senior Google engineers to reflect their
10  actual intent at the time they wrote it?
11  MS. YOUNG:  Objection; form.
12  A.  Not without taking into account what the
13  earlier e-mail threads may have said with regard to
14  the context.  But even in the plain reading of it, I
15  don't think this makes any difference for any
16  conclusions that I reached.
17  Q.  (BY MR. EWALT)  Okay.  Would you please take a
18  look at Page 140 of your rebuttal report.
19  A.  Yes.
20  MS. YOUNG:  Page 140?
21  MR. EWALT:  Page 140.
22  Q.  (BY MR. EWALT)  All right.  And do you see
23  that there -- that we're in the section dealing with
24  line item capping of your rebuttal report?
25  A.  Yes.

62 (Pages 242 - 245)

Veritext Legal Solutions

800-567-8658                                                      973-410-4098

HIGHLY CONFIDENTIAL

Page 246

1    Q.  I want to direct your attention to
2  Paragraph 370, and specifically to the second to last
3  sentence which appears on Page 142.
4    A.  Yes.
5    Q.  And do you see where you wrote: "What is at
6  the heart of this is the evidence regarding Google's
7  intent"?
8    A.  Yes.
9    Q.  And were you referring to evidence of
10  Google's intent related to line item capping?
11    A.  Yes.
12    Q.  And in Exhibit 13 we saw an internal
13  discussion with Mr. ▇▇▇▇ and Mr. Korula agreeing
14  that Google's goal was not to stop Header Bidding,
15  right?
16    A.  We saw --
17      MS. YOUNG:  Objection; form.
18      Go ahead.
19    A.  That was part of this internal discussion,
20  yes.
21    Q.  (BY MR. EWALT)  Turning back to Paragraph 370,
22  the final sentence reads: "The analysis in my initial
23  report demonstrated that Google had incentives to cap
24  line items, even if it was costless to expand them,
25  which is consistent with the hypothesis that Google's

Page 247

1  choices were an abuse of its monopoly power."
2      Do you see that?
3    A.  Yes.
4    Q.  Was it costless for Google to expand limits
5  on line items?
6    A.  You'll recall that we had an earlier
7  discussion regarding the costs involved in conduct.
8  And I said that if the costs were -- that there were
9  no costs, that makes one conclusion clear.  If there
10  were very significant costs, you reach a different
11  conclusion.
12      When there are only modest costs, it is
13  still the case that you would -- could see the
14  strategy as being an abuse of monopoly power.
15    Q.  How can you tell how much cost -- how
16  significant the costs are that Google would have to
17  absorb before deciding to avoid the costs would not be
18  anticompetitive?
19    A.  So let's look at the context of this entire
20  paragraph that is done here.  Let me read it to you.
21      "So Professors Baye and Milgrom argue
22  that line items were capped because it was costly for
23  Google to expand them.  However, the document used by
24  Professor Baye to support his claim also shows there
25  were only a few publishers with over 61k line items,

Page 248

1  and reducing their line items would have only had a
2  limited impact on costs..."
3      We could review that if you wish.  I
4  think it's one of ours -- ones already we've
5  discussed.
6      "...and that Google could also mitigate
7  any cost increase by adapting its pricing or not
8  making money on a pub for a strategic reason since it
9  was not a lot of money."
10      In other words, Google, to the extent
11  that publishers valued increased line items, didn't
12  have to say no more line items.  What they could say
13  is, This costs us money, here's what you, publisher,
14  are going to have to pay if you wish to have line
15  items.
16      Yet it never offered any publisher that,
17  to my knowledge.
18      "So while Google acknowledged that these
19  were all options to solve this new industry trend, I
20  showed in my opening report that Google regularly
21  denied publishers' request for exemptions to allow
22  increases in line items.
23      "Google's line items -- limits on line
24  items were 'unethical - because it was forcing out
25  competition (no matter the good intentions and the

Page 249

1  reasonable impact on system stability) at the end of
2  the day was forcing them to change their business
3  strategy kicking out HBs, head of bidding."
4      Quoting a statement from discussion with
5  The Washington Post.
6      "I note that even if there were such
7  costs, Google, given its monopoly power and
8  integration, would not have an incentive to make the
9  optimal trade off.  Professor Milgrom, as he
10  consistently does throughout his analysis, fails to
11  consider Google's broad multimarket incentives in
12  making these decisions."
13      And then we quoted the last two ones
14  before.
15      So you'll see there that captures what
16  I've already just described to you.
17    Q.  You're aware that Google granted exceptions
18  to the line item cap to some publishers?
19    A.  Yes.
20    Q.  And did Google charge those publishers
21  additional fees when they granted the exceptions to
22  the line item cap?
23    A.  No.
24    Q.  Was it anticompetitive for Google not to
25  charge more for exemptions from line item limits?

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL

Page 250

1    MS. YOUNG:  Objection; form.
2    A.  In my analysis, I can only analyze the
3  conduct that was actually occurred.
4    The conduct was a simple line item cap
5  without any engagement in strategies that might have
6  mitigated the cost that that was imposing on its own
7  customers.
8    Q.  (BY MR. EWALT)  And is -- in your view, is it
9  anticompetitive because Google chose a strategy of
10  imposing a cap as opposed to the strategy of charging
11  customers for higher usage in line items?
12    A.  I am suggesting that not charging for it is
13  the dog that didn't bark that shows that Google's
14  intent was about limiting the ability to use Header
15  Bidding rather than its own cost management issues.
16    Q.  Would you please turn to Paragraph 675 of
17  your opening report.
18    And the last sentence of that paragraph
19  reads:  "In October 2018, only 2 out of the 18
20  publishers over the limit were granted exceptions."
21    Do you see that?
22    A.  Yes.
23    Q.  So as of 2018, there were 18 publishers that
24  were over the line item limit?
25    A.  That were -- that requested exemptions.  Yes,

Page 251

1  that -- that's my understanding.
2    Q.  So your -- your understanding is that
3  these -- these are only the 18 publishers that
4  requested exemptions?
5    A.  Yes.
6    Q.  All right.  Now, would you please turn back
7  to Exhibit 13.
8    A.  Yeah.
9    Q.  And please, within Exhibit 13, turn to the
10  page ending with 003.
11    A.  Yes.
12    Q.  And there's a heading that reads:  "Move away
13  from Header Bidding towards exchange bidding."
14    Do you see that?
15    A.  Yes.
16    Q.  The second sentence reads:  "There are only
17  18 premium pubs over the current limit, only 2 of
18  which actually have exceptions."
19    Do you see that?
20    A.  Yes.
21    Q.  And that description just refers to 18
22  premium pubs over the current limit without any
23  mention as to whether those are the only publishers
24  who requested exemptions; is that right?
25    MS. YOUNG:  Objection; form.

Page 252

1    A.  Could you ask the question again.
2    Q.  (BY MR. EWALT)  Sure.
3    In that sentence that I just read to you, is
4  there any mention about one way or the other whether
5  these 18 premium pubs requested exemptions over the
6  line item limit?
7    MS. YOUNG:  Same objection.
8    A.  This particular paragraph doesn't speak to
9  the process by which handling of exemptions arose.
10    Q.  (BY MR. EWALT)  Okay.  Do you know whether
11  those 18 publishers all operated in the United States?
12    A.  I do not know where they operated.
13    Q.  Do you know what percentage of all U.S. ad
14  exchange transactions were accounted for by those 18
15  publishers?
16    A.  I don't know because I don't know the list of
17  those 18 publishers.

Page 253

2    Q.  (BY MR. EWALT)  Do you have any reason to
3  believe that any publisher was prevented from using
4  Header Bidding because of the line item caps?
5    MS. YOUNG:  Objection; form.
6    A.  I don't believe the line item caps was a full
7  prevention of using Header Bidding.  It just made it
8  more difficult to use Header Bidding.
9    Q.  (BY MR. EWALT)  Would you please turn to
10  Paragraph 657 of your opening report.
11    A.  Yes.
12    Q.  And there you talk about Header Bidding
13  Manager.
14    Is that fair?
15    A.  Seems that way.
16    Q.  Did Google rule out Header Bidding Manager in
17  2021?
18    A.  Yes.  Started enrolling publishers into it in
19  20211 is what I know.
20    Q.  And is Header Bidding Manager a tool that
21  allows publishers to set up Header Bidding without
22  having to set up large numbers of line items?
23    A.  I believe that's what it does.
24    Q.  Does the availability of Header Bidding
25  Manager reduce the effects on Header Bidding that you

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL

Page 254

1  found were caused by line item caps?
2         MS. YOUNG: Objection; form.
3      A. Would you ask that question again?
4      Q. (BY MR. EWALT) Does the availability of
5  Header Bidding Manager reduce the effects on Header
6  Bidding that you found were caused by line item caps?
7         MS. YOUNG: Same objection.
8      A. It -- it may do so for some publishers.
9      Q. (BY MR. EWALT) In either of your reports, did
10 you express an opinion about the overall net effect of
11 line item caps considering the effects on both
12 advertisers and publishers?
13        MS. YOUNG: Objection; form.
14     A. Line item caps were a restriction on -- on
15 publishers, and so my analysis was focused on the
16 impact on competitive conditions that faced those --
17 that -- that were in the publisher facing markets.
18     Q. (BY MR. EWALT) And did you consider impacts
19 on advertisers from line item capping?
20     A. I didn't directly consider that.
21     Q. Let's talk about data redactions.
22        Would you please turn to Paragraph 688
23 of your opening report?
24     A. Yes.
25     Q. The first sentence reads: "This section

Page 255

1  explains that Google's true motivation in reducing
2  [verbatim] data for publisher was to remove the
3  ability of publishers to gain insights about their
4  business on competing exchanges through joining the DT
5  files and ultimately to preference its ad exchange by
6  removing publisher's abilities to compare their
7  performance across competing exchanges and Header
8  Bidding."
9         Do you see that?
10     A. Yes, except it was redacting not reducing.
11     Q. Oh, I apologize.
12        MS. YOUNG: Objection; form.
13     Q. (BY MR. EWALT) Can you please point me to the
14 evidence that you relied upon to support your
15 conclusion that Google's true motivation in redacting
16 data was to remove publisher's ability to compare
17 their performance across competing exchanges in Header
18 Bidding?
19     A. Well, it's various things that I list
20 following that paragraph in Paragraph 690 and
21 Paragraph 691.
22        In paragraph -- yeah. 690 and 691,
23 yeah.
24     Q. Okay. So which of the sources there indicate
25 that it was Google's intention -- excuse me. Which of

Page 256

1  the -- let me strike all that.
2         Which sources indicate that it was
3  Google's true motivation in redacting data -- strike
4  that.
5         Late for me too.
6         Which sources indicate that Google's
7  true motivation for redacting data files was to remove
8  publisher's ability to compare their performance
9  across competing exchanges and Header Bidding?
10     A. Well, I think the evidence cited in 690
11 describes those things. Plus, that Google understand
12 that it would lead to objections from publishers in
13 691.
14     Q. I don't see in either of those paragraphs any
15 mention about the objections being related to the
16 comparison of exchanges in Header Bidding.
17        MS. YOUNG: Objection; form.
18     Q. (BY MR. EWALT) Where do you -- where do you
19 see that?
20        MS. YOUNG: Objection; form.
21     A. These were for information the publishers may
22 use in certain ways that would facilitate their
23 ability to understand the performance of their
24 products going through Google's exchange that they
25 would be able to therefore through that increased

Page 257

1  knowledge be able compare more clearly the performance
2  of Google's products in comparison into transactions
3  that went through other exchanges using Header
4  Bidding. By having that understanding, they would be
5  able to engage in Header Bidding more effectively for
6  them.
7      Q. (BY MR. EWALT) I'm sorry. Are you reading
8  from the report somewhere?
9      A. No, I'm telling you.
10     Q. Okay. I was just asking where in your report
11 you have the evidence for this?
12     A. This is -- this is at 690. 690 is the
13 evidence for it.
14     Q. And where in 690 do you quote evidence
15 discussing the comparison of exchanges in Header
16 Bidding?
17     A. If you look here, the exchanges that were
18 made to the data transfer files, there's a discussion
19 of why those redactions occur, and there's a -- trying
20 to prevent the publishers from being able to determine
21 advertisers who are willing to pay for each user's
22 impression.
23        That's a critical input in understanding
24 what the value that Google is potentially bringing to
25 publishers through its ad exchange.

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL

Page 258

1    And these are done down to high
2   gradation levels that allows them to engage in yield
3   optimization.
4       Q.   And so you were just referring to the
5   sentence with the quote that ends with Footnote 881;
6   is that right?
7       A.   That's right.
8       Q.   And the quote there says:  "We want to
9   prevent a publisher to be able to determine these
10  advertisers were willing to pay this much for that
11  user's impression," right?
12      A.   Yes.
13      Q.   And that quote says that Google was -- wanted
14  to prevent a publisher from being able to determine
15  the advertiser's willingness to pay, right?
16      A.   Yes.
17      Q.   It doesn't say anything there about wanting
18  to prevent publishers from comparing exchanges, does
19  it?
20          MS. YOUNG:  Objection; form.
21      A.   Absolutely.  That's how -- that's what
22  they're trying to do in explain -- in comparing
23  exchanges.  You need to understand what the bid prices
24  coming through those exchanges mean for you and to
25  make inferences from them.

Page 259

1          And, in fact, it's just a general
2   approach to any auction theory that you would -- you
3   know, an auction -- sorry, auction participation, that
4   you would engage in such things.
5          So information is required.  Google is
6   redacting that information, and that's why the
7   publishers want that information.
8       Q.   (BY MR. EWALT)  Are you aware that prior to
9   2019, buyers could opt out of allowing Google to share
10  data about their bids with publishers?
11      A.   I -- I'm -- I'm not aware of the specifics of
12  that, but it's possible.
13          (Marked Gans Exhibit No. 14.)
14      Q.   (BY MR. EWALT)  I'm handing you what's been
15  marked as Exhibit 14.  It's the declaration of ████
16  ███████, signed on June 28, 2024.  And the first page
17  bears Bates No. GOOG-AT-MDL-C-000073682.
18          Do you see that?
19      A.   Yes.
20      Q.   Have you seen Exhibit 14 before?
21      A.   I am not sure if I have seen it before.
22      Q.   All right.  Would you --
23      A.   Certainly, it seems to be done after my first
24  report.
25      Q.   Okay.  Could you turn to Paragraph 11 in

Page 260

1   Exhibit 14?
2       A.   Oh, you've given me two.
3       Q.   Oh.
4       A.   Paragraph 11.  I'm sorry.  I'm looking at
5   page.
6          Yes.
7       Q.   Okay.  And the second sentence there says:
8   "Prior to September 2019, Google allowed buyers to opt
9   out of including information about their bids in BDT
10  files."
11          You see that?
12      A.   Yes.
13      Q.   Do you have any reason to doubt that prior to
14  September 2019 Google allowed buyers to opt out of
15  including information about their bids in BDT files?
16      A.   No.
17          MS. YOUNG:  Objection; form.
18      A.   No.
19      Q.   (BY MR. EWALT)  Are you aware that buyer
20  opt-outs limited the amount of bid data that was
21  available to publishers?
22      A.   I would expect that they would.
23      Q.   Are you aware that when Google made the data
24  redactions discussed in your reports they also removed
25  the ability of buyers to opt out of having their bid

Page 261

1   data shared with publishers?
2          MS. YOUNG:  Objection; form.
3       A.   I don't know the circumstances of that.
4       Q.   But did you know that Google removed the
5   opt-out at the same time they made the redactions to
6   the data transfer files?
7          MS. YOUNG:  Objection; form.
8       A.   I can't recall.
9       Q.   (BY MR. EWALT)  Are you aware of whether some
10  publishers considered the 2019 changes to the data
11  transfer files to be an improvement because they
12  received bid data from all buyers?
13          MS. YOUNG:  Objection; form.
14      A.   I'm not specifically aware of what some
15  publishers may have viewed this as.
16      Q.   (BY MR. EWALT)  Is it your opinion that the
17  data redactions were anticompetitive because Google
18  made changes to what data was available in the data
19  transfer files?
20      A.   My opinion is that the redactions part of it
21  that Google made to the extent that it left publishers
22  with -- some publishers with less information is
23  anticompetitive because if the markets were
24  competitive, Google would have not -- either not
25  engaged in those redactions or publishers would have

HIGHLY CONFIDENTIAL

Page 262

1  been able to switch to a provider that provided them
2  the information they needed.
3     Q.  Okay.  Would you please turn to Paragraph 699
4  in your opening report.
5     A.  Yes.
6  [redacted]
20     Q.  Could you turn back to Exhibit 14?
21        I want to direct your attention to
22  Paragraph 17 on Page 9.
23     A.  Yes.
24     Q.  And Paragraph 17 states that as of August 31,
25  2019, the 41 publishers listed below subscribed to

Page 263

1  receive BDT files.
2        Do you see that?
3     A.  Yes.
4     Q.  Do you know what percentage of all U.S. ad
5  exchange transactions were accounted for by those 41
6  publishers?
7        MS. YOUNG:  Objection; form.
8     A.  No.
9        MS. YOUNG:  Go ahead.
10    A.  No.
11    Q.  (BY MR. EWALT)  Do you have any reason to
12  believe that any publisher was prevented or dissuaded
13  from using Header Bidding because of the data transfer
14  files?
15       MS. YOUNG:  Objection; form.
16    A.  My analysis was in terms of how effective
17  they could -- effectively they could use Header
18  Bidding in order to create further exchange
19  competition, not necessarily whether they would
20  curtail the use of Header Bidding or not.
21    Q.  (BY MR. EWALT)  Is it fair to say you did not
22  analyze whether any publisher curtailed its use of
23  Header Bidding because of the data transfer files?
24       MS. YOUNG:  Objection; form.
25    A.  I was not able to -- I did not -- sorry.

Page 264

1        My analysis was on the impact of the
2  data redaction conduct on the ability of Header
3  Bidding to impact on ad exchange composition.
4        The manifestation of which might have
5  been a reduction in the use of Header Bidding or it
6  might not have.
7     Q.  (BY MR. EWALT)  Is it your opinion that the
8  redaction of the data files could have affected
9  competition in the ad exchange market even if it had
10  no impact on publisher usage of Header Bidding?
11       MS. YOUNG:  Objection; form.
12    A.  Yes, because it could have reduced their
13  ability to use Header Bidding effectively.
14    Q.  (BY MR. EWALT)  In either of your reports did
15  you express an opinion about the overall net effect of
16  the data redactions considering the effects on both
17  advertisers and publishers?
18       MS. YOUNG:  Objection; form.
19    A.  It was not necessary given the conduct was on
20  the publisher market.
21    Q.  (BY MR. EWALT)  So is fair to say that you did
22  not evaluate the effects of the data redactions on
23  advertisers?
24    A.  My focus was on, as I said before, whether
25  Google would have engaged in this conduct had they had

Page 265

1  a competitive ad server market.  And my conclusion was
2  that they would not have.
3     Q.  Did you evaluate the effect of data
4  redactions on advertisers?
5     A.  I wasn't --
6        MS. YOUNG:  Objection; form.
7        Go ahead.
8        THE WITNESS:  Sorry.
9     A.  I wasn't calculating the incidents of damage
10  of the anticompetitive conduct, just the presence of
11  it and the harm -- the existence of harm to
12  competition.
13       MR. EWALT:  We can go off the record.
14       THE VIDEOGRAPHER:  This is now the end
15  of Video 6 of Joshua Gans.  We're off the record.  The
16  time is approximately 6:08.
17       (Break from 6:08 p.m. to 7:01 p.m.)
18       THE VIDEOGRAPHER:  Now on the record of
19  Video 7 of Joshua Gans.  The time is approximately
20  7:01.
21    Q.  (BY MR. EWALT)  Professor Gans, during the
22  break did you discuss the substance of this case with
23  counsel?
24       MS. YOUNG:  Same instruction as earlier
25  today.  Pursuant to the expert stipulation entered by

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL

Page 266

1 the court in this case, I instruct the witnesses not
2 to -- witness not to disclose the contents of
3 communications with counsel.
4 Q. (BY MR. EWALT) Based on that instruction, we
5 pass the witness.
6 E X A M I N A T I O N
7 BY MS. YOUNG:
8 Q. Professor Gans, do you recall the questions
9 that Google's counsel asked you today regarding your
10 opinions in your June 7 opening report and
11 corresponding errata?
12 A. Yes.
13 Q. Was any of your testimony today intended to
14 change the opinions expressed in your opening report
15 and corresponding errata?
16 A. No.
17 Q. Was any of your testimony today intended to
18 limit the opinions expressed in your opening report
19 and corresponding errata?
20 A. No.
21 Q. Professor Gans, do you recall the questions
22 that Google's counsel asked you today about your
23 opinions in your September 9, rebuttal report?
24 A. Yes.
25 Q. Aside from the two issues that you noted on

Page 267

1 the record with respect to the term "numerator" used
2 in Paragraph 18 of your rebuttal report and the
3 missing footnote to Figure 7 in your rebuttal report,
4 was any of your testimony today intended to change the
5 opinions expressed in your rebuttal report?
6 A. No.
7 Q. Was any of your testimony today intended to
8 limit the opinions expressed in your rebuttal report?
9 A. No.
10 Q. Professor Gans, do you recall the questions
11 that Google's counsel asked you earlier today about
12 the methodologies that you used in determining the
13 market definitions in your opening report?
14 A. Yes.
15 Q. Do you recall Google's counsel asking you
16 questions regarding the Brown Shoe factors?
17 A. Yes.
18 Q. Do you recall Google's counsel asking you
19 questions regarding the hypothetical monopolist test,
20 otherwise known as HMT?
21 A. Yes.
22 Q. Were the methodologies that you used based on
23 reliable and generally accepted economic principles?
24 A. Yes.
25 Q. Can the methodologies that you used be

Page 268

1 tested?
2 A. Yes.
3 Q. Have the methodologies that you used been the
4 subject of peer review and publication?
5 A. Yes.
6 Q. Are the methodologies that you used generally
7 accepted in the field of economics to define markets?
8 A. Yes.
9 Q. Did you reliably apply the methodologies that
10 you used to form your opinions about the relevant
11 markets in this case?
12 A. Yes.
13 Q. Did you have sufficient facts or data to
14 reach the opinions you did in this case about market
15 definitions?
16 A. Yes.
17 Q. Did you have sufficient facts and data to
18 reach your opinions within your two reports in this
19 case?
20 A. Yes.
21 Q. Did you offer any new methodologies or
22 opinions in your rebuttal report?
23 A. No.
24 Q. Are you offering any new opinions, as you sit
25 here today, subject to your continuing review of the

Page 269

1 Professor Baye surrebuttal report and backup
2 materials?
3 A. No.
4 Q. Professor Gans, do you recall the questioning
5 by Google's counsel regarding the SSNIP, which stands
6 for small but significant nontransitory increase in
7 price?
8 A. Yes.
9 Q. Do you recall the questioning by Google
10 counsel about the SSNIP in the context of the
11 hypothetical monopolist test, or HMT?
12 A. Yes.
13 Q. In conducting -- strike that. I'll start
14 over.
15 Is conducting a quantitative SSNIP test
16 necessary to conduct a reliable HMT to define a
17 relevant market?
18 A. No.
19 Q. Is starting with an identified competitive
20 price level necessary to conducted a reliable HMT to
21 define a relevant market based on economic principles?
22 A. No.
23 Q. Do you recall when Google's counsel asked
24 whether you investigated if publishers could shift
25 enough users from websites to apps in order to make it

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL

Page 270

1  unprofitable for a hypothetical monopolist of ad
2  exchanges in order to raise prices of open web display
3  impressions?
4      A.  Yes.
5      Q.  In your opening report did you investigate
6  the substitutability between selling open web display
7  advertising inventory and selling in-app inventory?
8      A.  Yes.
9      Q.  For example, did you find that publishers who
10 sell primary in-app inventory use different tools than
11 those selling open web display advertising?
12     A.  Yes.
13     Q.  Professor Gans, do you recall being asked
14 about your reliance on a conversation with Professor
15 Chandler with respect to your opinions about distinct
16 product markets from an industry perspective?
17     A.  Distinct product markets?
18     Q.  I can re-ask the question.  It was a long
19 question.
20     A.  I recall a discussion of distinct pricing.
21     Q.  Okay.  Do you recall discussing with Google
22 counsel regarding your conversation with Professor
23 Chandler about ad-buying tools for small advertisers?
24     A.  Yes.
25     Q.  Other than your conversation with Professor

Page 271

1  Chandler, did you review documents that support your
2  contention of industry recognition of ad-buying tools
3  for small advertisers as a distinct product market?
4      A.  Yes.
5      Q.  Did you review any deposition testimony that
6  supports industry recognition of ad-buying tools for
7  small advertisers as a distinct product market?
8      A.  I believe so.
9      Q.  And did that review of documents and
10 deposition testimony also support your contention that
11 there's public recognition of ad-buying tools for
12 small advertisers as a distinct product market?
13     A.  My recollection is it was supportive of that
14 contention.
15     Q.  Did you -- strike that.
16         Other than your conversation with
17 Professor Chandler, did you review documents and
18 deposition testimony that supported your contention
19 that industry -- of industry and public recognition of
20 publisher ad servers as a distinct product market?
21     A.  I did.
22     Q.  Professor Gans, do you recall when Google's
23 counsel asked you about the date on which Google
24 obtained monopoly power in the ad exchange market?
25     A.  Yes.

Page 272

1      Q.  In your opening report do you provide
2  opinions on the timing of Google's monopoly power in
3  the ad exchange market that you define?
4      A.  Yes, I have -- provide opinions on the time.
5      Q.  If we can go to Table 5 of your opening
6  report that follows Paragraph 372.
7      A.  Yes.
8      Q.  Okay.  Does that table -- does that table
9  provide your opinion on the timing of Google's
10 monopoly power in the ad exchange market that you
11 define?
12     A.  It provides opinion on the times that Google
13 had monopoly power.
14
15
16
17
18     Q.  Professor Gans, do you stand by that opinion
19 of market share calculation today?
20     A.  Yes.
21     Q.  If we can go to Paragraph 391 of your opening
22 report.
23     A.  Yes.
24     Q.  Have you read that paragraph?
25     A.  Yes.

Page 273

1      Q.  In that paragraph, do you state that there
2  had been no new entrants or that there have been
3  entrants in the ad exchange market in the last
4  12 years?
5      A.  I state in that paragraph that there's been
6  no new entrants in the last 12 years.
7      Q.  Is it your opinion that Google has had
8  monopoly power in the ad exchange market that you
9  define for multiple years?
10     A.  Yes.
11     Q.  Professor Gans, do you recall when Google's
12 counsel asked you about the date on which Google
13 obtained monopoly power in the publisher ad server
14 market that you define?
15     A.  Yes.
16     Q.  In your opening report, do you provide an
17 opinion on the timing of Google's monopoly power in
18 the publisher ad server market that you define?
19     A.  Yes, I provide an opinion on the times of
20 that monopoly power.
21     Q.  If we can go to Paragraph 353 of your report
22 and look at the Figure 9 that follows that paragraph.
23         Do you see what I am referring to?
24     A.  Yes.
25     Q.  In that Figure 9, do you provide a timeline

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL

**Page 274**

1  for Google's monopoly power in the publisher ad server
2  market that you define spanning 2011 to 2022?
3  A. Yes, I provide information on the times that
4  Google had monopoly power.
5  MR. EWALT: Objection; form.
6  Q. (BY MS. YOUNG) Professor Gans, do you recall
7  when Google's counsel asked you the date on which
8  Google obtained monopoly power in a small advertiser
9  buying tool market that you define?
10  A. Yes.
11  Q. In your opening report, do you provide an
12  opinion on the timing of Google's monopoly power in
13  the small advertiser buying tools market that you
14  define?
15  A. Yes, I provide an opinion on the times.
16  Q. Let's go to Paragraph 395 and look at the
17  figure that follows that paragraph in your opening
18  report.
19  Do you see what I'm referring to?
20  A. Yes.

**Page 275**

1  Q. That's okay. I will strike that question and
2  move on.
3  A. Thank you.
4  Q. Do you recall when Google's counsel asked you
5  whether you reached a conclusion on ad exchange fees
6  being at, above, or below a competitive price?
7  A. Yes.
8  Q. Above competitive price is also referred in
9  economic literature as super competitive price,
10  correct?
11  A. Yes. Yes.
12  Q. Okay. Can your opinions on Google's exchange
13  fee being super competitive be found within your
14  original and rebuttal reports?
15  MR. EWALT: Objection; form.
16  A. Yes.
17  Q. (BY MS. YOUNG) Do your opinions on Google's
18  exchange fee being super competitive -- I'll strike
19  that.
20  Do your original and rebuttal reports contain
21  opinions about Google's exchange fee being super
22  competitive?
23  A. Yes.
24  Q. Let's go to Paragraph 812 of your opening
25  report.

**Page 276**

1  Q. Do you see Paragraph 812?
2  A. Yes.
3  Q. Is that an example of an opinion of yours
4  that Google's exchange fee is super competitive?
5  A. Yes.
6  Q. If you look at Paragraphs 813 and 815 that
7  follow immediately after Paragraph 812 --
8  A. Yes.
9  Q. -- are those also examples of opinions of
10  yours that Google's exchange fee is super competitive?
11  A. Yes.
12  Q. Professor Gans, do you recall when Google's
13  counsel asked you about the contractual tying of AdX
14  and DFP?
15  A. Yes.
16  Q. If we can go to Paragraph 444 of your opening
17  report?
18  A. Yep.
19  Q. In that paragraph, do you opine whether DFP
20  and AdX are two separate products or the same product?
21  A. I state that they're separate products.
22  Q. In Paragraph 446 of your opening report, do
23  you describe the contractual tying of DFP and AdX?
24  A. Yes.
25  Q. Do you stand by that description here today?

**Page 277**

1  A. Yes.
2  Q. In your opening report, do you opine that
3  Google contractually tied DFP and AdX through a
4  unified DRS contract?
5  A. Yes.
6  MS. YOUNG: I'm going to pass the
7  witness at this time and reserve redirect and time at
8  trial.
9  MR. EWALT: Okay. Let's go off the
10  record.
11  THE VIDEOGRAPHER: Now going off the
12  record. The time is 7:18.
13  (Break from 7:18 p.m. to 7:25 p.m.)
14  THE VIDEOGRAPHER: Now back on the
15  record. The time is approximately 7:25.
16  F U R T H E R   E X A M I N A T I O N
17  BY MR. EWALT:
18  Q. Professor Gans, do you recall being asked
19  questions about whether your methodologies for
20  defining relevant markets could be tested?
21  A. Just now, yes.
22  Q. And you answered that your methodologies for
23  testing -- for defining relevant markets could be
24  tested, correct?
25  A. Yes.

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL

Page 278

1    Q.  How would one test the application of the
2  Brown Shoe factors to the definition of a relevant
3  market?
4    A.  Oh, I interpreted testing as you could use
5  those methodologies and apply them with relation to
6  evidence is how I interpreted that question.
7        And you could also take those
8  methodologies and evaluate whether they were suitably
9  applied in the circumstance.
10   Q.  How would you test whether those
11  methodologies were suitably applied?
12   A.  There are various means.  Depending on the
13  context and the way that they were applied, et cetera,
14  it was -- would involve examination of how that the
15  preponderance of the evidence fit together to reach a
16  conclusion.  I -- I'm not quite sure what specific
17  things you would do, just that they can be done that
18  way.
19   Q.  Do you recall being asked questions about
20  whether it was necessary to start with the competitive
21  price when implementing the hypothetical monopolist
22  test?
23   A.  Yes.
24   Q.  And I believe you testified that it is not
25  necessary to start with the competitive price.

Page 279

1        Is that fair?
2    A.  That is correct.
3    Q.  Would you agree that the standard way to
4  implement the hypothetical monopolist test is to begin
5  with the competitive price?
6        MS. YOUNG:  Objection; form.
7    A.  The standard way the hypothetical monopolist
8  test is envisioned and taken is to -- is from the
9  competitive price.
10       However, given circumstances and data --
11  and you'll recall we talked about unions of sets, I
12  think.  It's getting a little late.  You can make
13  inferences regarding the outcome of the hypothetical
14  monopolist test without having a specific benchmark
15  being derived.
16   Q.  (BY MR. EWALT)  Could you please turn to
17  Paragraph 233 of your opening report.
18   A.  Yes.
19   Q.  Do you recall that you were asked by counsel
20  about whether you reviewed documents and deposition
21  testimony about industry or public recognition of a
22  candidate market for ad-buying tools for small
23  advertisers?
24   A.  Yes.
25   Q.  And I believe you testified that you did

Page 280

1  review documents and deposition testimony about those
2  issues; is that right?
3    A.  Yes.
4    Q.  But you did not cite in your opening report
5  or your rebuttal report any of those materials,
6  depositions or documents, in support of your
7  conclusions about the industry or public recognition
8  of a market for advertiser buying tools for small
9  advertisers, correct?
10       MS. YOUNG:  Objection; form.
11   A.  I was asked about were there other things
12  that I reviewed that pertained to those, the -- the
13  public recognition, and were supportive of it, and I
14  said that I did.  But I did not cite those in my
15  report because -- well, I did not, yeah.
16   Q.  (BY MR. EWALT)  And you did not rely on those
17  documents and deposition testimony to support your
18  opinions about industry or public recognition of a
19  market for ad-buying tools for small advertisers,
20  correct?
21       MS. YOUNG:  Objection; form.
22   A.  I -- I -- I didn't separately rely upon them.
23   Q.  (BY MR. EWALT)  You didn't rely on them at
24  all, did you?
25       MS. YOUNG:  Objection; form.

Page 281

1    A.  When I had a discussion with Professor
2  Chandler about this, my impressions of his conclusions
3  were not contradicted by other things that I had said
4  and spoke to that.
5    Q.  (BY MR. EWALT)  Is it your testimony that you
6  relied on documents and depositions to support your
7  conclusions about industry or public recognition of a
8  market for small advertiser buying tools?
9    A.  No, the documents I relied upon are the
10  documents that I listed as being relied upon in
11  this -- these reports.
12   Q.  And you didn't rely on any for purposes of
13  the industry or public recognition of an advertiser
14  buying tool for small advertisers market?
15       MS. YOUNG:  Objection; form.
16   A.  I -- I didn't state -- list those documents
17  as documents I relied upon.
18   Q.  (BY MR. EWALT)  Could you please turn to
19  Paragraph 372 in your opening report and Table 5 that
20  follows?
21   A.  Yes.
22   Q.  Do you recall you were asked questions about
23  whether Table 5 provides your views on monopoly power
24  in the ad exchange market?
25   A.  Yes.

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL

Page 282

1    Q.   Is it your view that AdX had monopoly power
2    in the ad exchange market each year between 2018 and
3    2021?
4    A.   Yes.
5    Q.   In either of your reports, did you express an
6    opinion as to whether AdX has or had monopoly power in
7    any year other than the years 2018 through 2021?
8    A.   Yes.  In my rebuttal report, I also included
9    2022.
10   Q.   Okay.  In your opening report and your
11   rebuttal report, did you express an opinion about
12   whether AdX has monopoly power in the ad exchange
13   market in any years other than 2018 through 2022?
14   A.   I -- I didn't explicitly identify other
15   years.
16   Q.   Could you please turn in your opening report
17   to Paragraph 353 and Figure 9.
18   A.   Yes.
19   Q.   Do you recall you were asked questions about
20   whether Figure 9 provides your views about monopoly
21   power in the market for publisher ad service?
22   A.   Yes.
23   Q.   And I believe that counsel asked you about
24   whether this Figure 9 provided your views about
25   monopoly power in the years 2011 through 2022?

Page 283

1    A.   I thought it was 2010 onwards.
2    Q.   Well, regardless of what your prior testimony
3    was.
4    A.   Oh, okay.
5    Q.   Let me just ask you.
6    A.   Yes.
7    Q.   What years, if any, does Figure 9 indicate
8    that AdX had monopoly power?
9    A.   Figure 9 indicates that it had monopoly power
10   2010, 2011, 2012, 2015, 2017, 2018, and 2019.
11   Q.   Thank you, Professor Gans.
12        MR. EWALT:  I'll pass the witness.
13        MS. YOUNG:  Brief redirect.
14     F U R T H E R   E X A M I N A T I O N
15   BY MS. YOUNG:
16   Q.   Professor Gans, in both your opening and
17   rebuttal reports and your materials relied upon, there
18   are a number of deposition testimonies cited from
19   industry participants, including ad buyers,
20   publishers, and competitors of Google, correct?
21        MR. EWALT:  Object to form.
22   A.   I believe so.
23   Q.   (BY MS. YOUNG)  Yeah.  And there are a number
24   of documents cited in your materials relied upon,
25   correct?

Page 284

1        MR. EWALT:  Object to form.
2    A.   Yes.
3    Q.   (BY MS. YOUNG) And do those materials contain
4    some of the evidence that you relied upon in forming
5    your conclusions in defining market -- markets in this
6    case?
7    A.   I believe they do.
8    Q.   Okay.
9        MS. YOUNG:  Pass the witness.
10        MR. EWALT:  Thank you, Professor Gans.
11   I have no further questions.
12        THE WITNESS:  Thank you.
13        THE VIDEOGRAPHER:  This is now the end
14   of Video 7 of Joshua Gans.  Off the record.  The time
15   is approximately 7:35.
16        (The deposition concluded at 7:35 p.m.)
17
18
19
20
21
22
23
24
25

Page 285

1    WITNESS CORRECTIONS AND SIGNATURE.
2    Please indicate changes on this sheet of paper,
     giving the change, page number, line number and reason
3    for the change.  Please sign each page of changes.
4    PAGE/LINE      CORRECTION      REASON FOR CHANGE
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
         _____
         JOSHUA GANS
24
25   Job No. CS6922874

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL

Page 286

1      S I G N A T U R E   O F   W I T N E S S

2

3      I, JOSHUA GANS, solemnly swear or affirm under the

4   pains and penalties of perjury that the foregoing

5   pages contain a true and correct transcript of the

6   testimony given by me at the time and place stated

7   with the corrections, if any, and the reasons therefor

8   noted on the foregoing correction page(s), and that I

9   am signing this before a Notary Public.

10

11      _____

12      JOSHUA GANS

13

14   STATE OF _____  *

15   COUNTY OF _____  *

16      SUBSCRIBED AND SWORN TO BEFORE ME BY

17   JOSHUA GANS on this, the _____ day of _____, 2024.

18

19      _____

20      Notary Public, State of Texas

21

    My Commission Expires: _____

22

    Job CS 6922874

23

24

25

Page 287

1      IN THE UNITED STATES DISTRICT COURT

       FOR THE EASTERN DISTRICT OF TEXAS

2                SHERMAN DIVISION

3

    THE STATE OF TEXAS, et  |

4   al.,               |

                       | Case No.

5      Plaintiffs,     | 4:20-cv-00957-SD

                       |

6   - against -        |

                       |

7   GOOGLE LLC,        |

                       |

8      Defendant.      |

9   _____

    THE STATE OF _____ :

10  COUNTY OF _____ :

11      I, MENDY A. SCHNEIDER, a Certified Shorthand

12   Reporter in and for the State of Texas, do hereby

13   certify that the facts as stated by me in the caption

14   hereto are true; that the above and foregoing answers

15   of the witness, JOSHUA GANS, to the interrogatories as

16   indicated were made before me by the said witness

17   after being first duly sworn to testify the truth, and

18   same were reduced to typewriting under my direction;

19   that the above and foregoing deposition as set forth

20   in typewriting is a full, true, and correct transcript

21   of the proceedings had at the time of taking of said

22   deposition.

23      I further certify that I am not, in any

24   capacity, a regular employee of the party in whose

25   behalf this deposition is taken, nor in the regular

Page 288

1   employ of this attorney; and I certify that I am not

2   interested in the cause, nor of kin or counsel to

3   either of the parties.

4      That the amount of time used by each party at

5   the deposition is as follows:

6      MS. YOUNG - 00:16:47

7      MR. EWALT - 06:44:32

8

9

       GIVEN UNDER MY HAND AND SEAL OF OFFICE, on

10  this, the 11th of October, 2024.

11

12      _____
       Presiding Signature

       MENDY A. SCHNEIDER, CSR, RPR

13      Certification No.:  7761

       Expiration Date:  1-31-2025

14

15

16

17

18

19

20

21

22

23

24

25

Page 289

1   GERALDINE YOUNG

2   Geraldine.young@nortonrosefulbright.com

3              October 11, 2024

4   RE:   State Of Texas, Et Al. v. Google LLC

5   10/10/2024, Joshua Gans (#6922874)

6      The above-referenced transcript is available for

7   review.

8      Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12      The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  erratas-cs@veritext.com.

16   Return completed errata within 30 days from

17  receipt of testimony.

18   If the witness fails to do so within the time

19  allotted, the transcript may be used as if signed.

20

21

22      Yours,

23      Veritext Legal Solutions

24

25