# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

The State of Texas, *et al.*,

                    *Plaintiffs*,

     v.

Google LLC,

                    *Defendant*.

Case No. 4:20-cv-00957-SDJ

## GOOGLE LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF ITAMAR SIMONSON

## TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................1

INTRODUCTION....................................................................................................................1

BACKGROUND .......................................................................................................................2

    A. Professor Simonson Is Qualified to Conduct Surveys. .........................................................2

    B. Professor Simonson Surveyed Statistically Robust Panels of Higher-Spend Advertisers, Lower-Spend Advertisers, and Ad Agencies...........................................................................2

    C. Professor Simonson's Surveys Asked Respondents About the Extent to Which They Would Divert Spending from Display Advertising. ................................................................5

LEGAL STANDARD ...............................................................................................................6

ARGUMENT .............................................................................................................................7

    I. PLAINTIFFS' UNDERREPRESENTATION CRITIQUES DO NOT WARRANT EXCLUSION BECAUSE THEY DO NOT RENDER THE SURVEY UNRELIABLE. ........7

    II. THE DISCLOSURE AND OPT-OUT DID NOT RENDER PROFESSOR SIMONSON'S RESULTS UNRELIABLE. ........................................................................11

    III. THE RESULTS OF THE DIVERSION QUESTION ARE RELIABLE.........................14

CONCLUSION ........................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*C. A. May Marine Supply Co. v. Brunswick Corp.*,
    649 F.2d 1049 (5th Cir. 1981) ....................................................................... 13

*Firebirds International, LLC v. Firebird Restaurant Group, LLC*,
    2019 WL 3957846 (N.D. Tex. 2019).......................................................... 6, 14

*FTC v. Fleetcor Techs., Inc.*,
    2022 WL 3350066 (N.D. Ga. Aug. 9, 2022) ..................................................... 9

*Hall Arts Ctr. Off., LLC v. Hanover Ins. Co.*,
    327 F. Supp. 3d 979 (N.D. Tex. 2018) .............................................................. 6

*Hi Ltd. P'ship v. WingHouse of Fla., Inc.*,
    2004 U.S. Dist. LEXIS 30687 (M.D. Fla. Oct. 5, 2004) ................................... 9

*Holiday Inns, Inc. v. Holiday Out in Am.*,
    481 F.2d 445 (5th Cir. 1973) ..................................................................... 6, 13

*Honestech, Inc. v. Sonic Sols.*,
    430 F. App'x 359 (5th Cir. 2011) .............................................................. 6, 14

*In re Motor Fuel Temperature Sales Practices Litig.*,
    2012 WL 13050523 (D. Kan. Feb. 29, 2012) ................................................. 15

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).......................................................................................... 6

*Liberty Mut. Ins. Co. v. Davis*,
    412 F.2d 475 (5th Cir. 1969) ......................................................................... 10

*Luckenbach Texas, Inc. v. Engel*,
    2022 WL 16857410 (W.D. Tex. Oct. 13, 2022) ............................................... 6

*Malletier* v. *Dooney & Bourke, In*c.,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)............................................................... 2

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) ........................................................................... 6

*Moore v. Ashland Chem. Inc.*,
    151 F.3d 269 (5th Cir.1998) ............................................................................ 6

*RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*,
    655 F. Supp. 2d 679 (S.D. Tex. 2009) ................................................................. 7

*Schechner* v. *Whirlpool Corp.*,
    2018 WL 6843305 (E.D. Mich. Oct. 30, 2018) ..................................................... 2

*Scott Fetzer Co. v. House of Vacuums Inc.*,
    381 F.3d 466 (5th Cir. 2004) .................................................................. passim

*Scrum Alliance, Inc. v. Scrum, Inc.*,
    2021 WL 1691136 (E.D. Tex. 2021) ....................................................................... 6

*TCL Commc'n Tech. Holdings, Ltd.* v. *Telefonaktiebolaget LM Ericsson*,
    2018 WL 4488286 (C.D. Cal. Sept. 14, 2018) ....................................................... 2

**Other Authorities**

Commission Opinion at 69, Intuit, Inc., FTC Docket No. 9408 (Jan. 22, 2024) ........................... 13

Federal Judicial Center's Reference Manual on Scientific Evidence ................................... passim

Tex. Disciplinary R. of Prof. Conduct 4.02; ABA Model Rules of Prof'l Conduct R. 4.2 ........... 3

## INTRODUCTION

Professor Itamar Simonson is a leading expert in survey design. He conducted three reliable and relevant surveys that empirically analyzed evidence showing that advertisers and ad agencies often use multiple ad buying tools and shift their ad spend across different ad formats—including social media, display, and video—in response to changes in relative cost. Plaintiffs, having conducted no survey of their own, claim that Prof. Simonson's surveys are unreliable because his samples are unrepresentative, his surveys were not double blind, and he used a purportedly vague term in one question. None of these arguments warrants exclusion.

Plaintiffs' arguments all fail because Plaintiffs do not explain how any of the purported errors they identify could have created any bias or other unreliability in Prof. Simonson's results. With respect to excluded or omitted participants, they ignore that evidence is, in fact, available from many of the excluded advertisers (because they provided discovery directly in this case) and that such evidence is consistent with Prof. Simonson's survey results. This directly refutes Plaintiffs' insinuation of sampling bias. Moreover, Plaintiffs ignore that the methods they criticize are condoned by the very authority that they and their survey expert rely upon, the Federal Judicial Center's Reference Manual on Scientific Evidence ("FJC Manual"), that their own expert has excluded parties from her samples in the past, and that the federal government concludes its litigation surveys with a similar disclosure and opt-out option.

Plaintiffs' critique of Prof. Simonson's use of "small but significant" as vague and confusing to a jury is just as easily dispensed with. Their speculation that survey participants had differing precise interpretations of the term is unsupported and has no bearing on the ultimate reliability of the survey results. And their fear that the jury will interpret the term differently can be dealt with on cross-examination.

## BACKGROUND

### A. Professor Simonson Is Qualified to Conduct Surveys.

Professor Itamar Simonson is the Sebastian S. Kresge Emeritus Professor of Marketing at Stanford University's Graduate School of Business, where he taught for more than 25 years. *See* Ex. 1, Expert Report of Itamar Simonson, Ph.D, July 30, 2024 ("Ex. 1, Simonson Rep.") ¶ 1. Google retained Prof. Simonson to conduct "surveys designed to examine how advertisers at companies and . . . ad agencies . . . approach, manage, and evaluate digital advertising and, in particular, display advertising and programmatic display advertising." *Id.* ¶ 13.

Plaintiffs rightly do not challenge Prof. Simonson's qualifications. He is a well-respected survey expert who has published countless articles, *id.* ¶ 4, won numerous awards for his scholarship, *id.* ¶ 5, taught doctoral courses for 33 years, *id.* ¶ 7, and has been repeatedly qualified as an expert on survey design and implementation by federal courts, *see, e.g.*, *Malletier* v. *Dooney & Bourke, In*c., 525 F. Supp. 2d 558, 626 n.210 (S.D.N.Y. 2007) ("Simonson is eminently qualified to analyze survey techniques"); *Schechner* v. *Whirlpool Corp.,* 2018 WL 6843305, at *9 (E.D. Mich. Oct. 30, 2018) ("Simonson's credentials are impressive, and his qualifications related to consumer research cannot be reasonably challenged."); *TCL Commc'n Tech. Holdings, Ltd.* v. *Telefonaktiebolaget LM Ericsson*, 2018 WL 4488286, at *29 (C.D. Cal. Sept. 14, 2018) (finding Prof. Simonson is "exceptionally well credentialed in survey work"), *rev'd in part, vacated in part on other grounds*, 943 F.3d 1360 (Fed. Cir. 2019).

### B. Professor Simonson Surveyed Statistically Robust Panels of Higher-Spend Advertisers, Lower-Spend Advertisers, and Ad Agencies.

Prof. Simonson was asked to examine the factors that advertisers and ad agencies consider when allocating their spending, the ways they may react to "changing display advertising costs," their use of ad buying tools, the ways they assess performance, and other

issues. Ex. 1, Simonson Rep. ¶ 13. Prof. Simonson defined the relevant "universe" for his surveys, taking into account the "two potentially significant distinctions [among respondents]: the size of the advertising budget and the difference between an advertiser and an advertising agency." *Id.* ¶ 21. As a result, he developed three surveys: one for higher-spend advertisers (with over $500,000 annual ad spend), one for lower-spend advertisers (under $500,000 annually), and one for ad agencies. *Id.* ¶¶ 18, 42, 116, 125. Prof. Simonson hired Advertiser Perceptions ("AP"), a "leading" third-party market research firm, to recruit representative samples of advertisers and agencies. Ex. 1, Simonson Rep. ¶ 30. Prof. Simonson did his diligence, including by conducting pre-survey interviews, *see* Ex. 2, Simonson Tr. 122:3-19, to ensure that AP used a reliable process to recruit respondents. *See* Ex. 1, Simonson Rep. ¶ 33 & n.35; *see also* Ex. 3 (Simonson's EDVA Transcript) at 73:4-15. Google, and many third parties in the industry who provided discovery in this case, subscribe to AP market intelligence. *See, e.g.*, Pubmatic, The State of Omnichannel Wrapper: US Market Landscape Study (2020)[1]; Ex. 7 (███████████████████ ███████████████████████████████████); Ex. 8 (███████████████████████████████ ███████████████████).

At the direction of Google's counsel, Prof. Simonson instructed AP not to invite companies or state or federal agencies that are parties to, are identified in initial disclosures in, or have received subpoenas in connection with this litigation or related litigation—the "No Contact List," Ex. 1, Simonson Rep. ¶ 34, App. I—to comply with ethical prohibitions against contacting represented parties, *see, e.g.*, Tex. Disciplinary R. of Prof. Conduct 4.02; ABA Model Rules of Prof'l Conduct R. 4.2. The No Contact List included 580 advertisers, publishers, ad

---

[1] Available at https://pubmatic.com/wp-content/uploads/2020/11/PubMatic-Omnichannel-Header-Bidding.pdf.

tech providers, and state and federal agencies, Ex. 1, Simonson Rep. App. I—many of which would not have been qualified to respond to Prof. Simonson's survey. After complying with the no-contact directive, AP invited **11,162** potential participants from higher-spend advertisers, lower-spend advertisers, and ad agencies to complete the surveys. Ex. 1, Simonson Rep., at Exhibits 1, 37, 68.

During the surveys, "respondents were 'blind' to the purpose of the survey and the identity of its sponsor." Ex. 1, Simonson Rep. ¶¶ 27, 79; *see also* Ex. 5, Mathiowetz Tr. 251:18-25. Even so, to avoid bias, Prof. Simonson took care not to single out Google or any other company in the questions. Ex. 1, Simonson Rep. ¶¶ 27, 81. Once they completed the survey, respondents were informed that Google sponsored the survey and were given the option to exclude their results. *Id.* ¶¶ 79-81. Respondents could not go back and change their responses, however, *id.* ¶ 27 n.22, ¶ 59 n.55.

Prof. Simonson considered whether the opt out would bias his results, and concluded that it would not, because "there is no reason to expect the respondents who chose [to opt out] . . . to be different in any systematic way or in any way that pertains to the surveys' conclusions from other respondents," particularly because "respondents were asked to describe their advertising practices and considerations, and they were not asked to evaluate any particular company." *Id.* ¶ 81. Prof. Simonson also cited research that identifying the survey sponsor has no meaningful effect on survey responses. *Id.* ¶ 81 n.86. Ninety-four higher-spend respondents (16%), 95 lower-spend respondents (24%), and 71 ad agency respondents (15%) asked to exclude their responses. Ex. 1, Simonson Rep. at Exhibits 1, 37, 68.

Plaintiffs do not challenge the surveys' sample sizes or the statistical significance of the results: Each of Prof. Simonson's surveys had hundreds of responses, which allowed for

appropriately narrow confidence intervals. Ex. 1, Simonson Rep., at Exhibit 1 at n.43, Exhibits 37, 68. The final samples included very large advertisers, including a substantial proportion who spend more than $15 million on advertising per year. Ex. 1, Simonson Rep. ¶ 33 n.36. Plaintiffs did not conduct their own survey, and their expert, Prof. Mathiowetz, did not undertake any interviews or data collection. Ex. 5, Mathiowetz Tr. 147:16-25; 148:1-5.

### C. Professor Simonson's Surveys Asked Respondents About the Extent to Which They Would Divert Spending from Display Advertising.

Prof. Simonson asked advertisers and ad agencies questions about their use of various digital advertising types, reliance on ad agencies, reactions to an increase in the cost of display advertising, use of different ad buying tools, and metrics they use to assess performance. Ex. 1, Simonson Rep. ¶ 39. Plaintiffs do not challenge most of these questions. In the one question they do challenge, Prof. Simonson measured whether respondents would divert any of their advertising spending to other ad formats in response to an increase in the cost of display advertising. *See id.* ¶¶ 63-67 (the "Diversion Question"). The Diversion Question instructed respondents to "suppose that . . . the cost of **programmatic display advertising** has **recently increased by a small but significant amount, and will remain elevated for the foreseeable future**[,]" but that the cost of other digital advertising types, like social and search, remained the same. *Id.* ¶ 65. It then asked whether respondents would divert their advertising spending to other ad formats, and to which types of advertising respondents would divert their spend. *Id.*

The results of Prof. Simonson's surveys confirm that advertisers and ad agency employees regularly adjust their spending across various forms of advertising, and between 54% and 61% of respondents would divert spending from "programmatic display advertising" to another format—such as social, search, digital video, direct deals, and Connected TV—in response to a small but significant price increase. Ex. 1, Simonson Rep. ¶ 18 & Fig. 2, Exhibits 15, 58, 81.

## LEGAL STANDARD

Under Federal Rule of Evidence Rule 702 and *Daubert*, a court may admit expert testimony if "(1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Hall Arts Ctr. Off., LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979, 1001 (N.D. Tex. 2018) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). While the burden is on the proponent to make this showing, *id.*, "'the proponent need not prove to the judge that the expert's testimony is correct,'" *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850-51 (5th Cir. 2015) (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.1998)).

Courts commonly admit expert survey evidence, and "a survey need not be perfect to be admitted into evidence." *Honestech, Inc. v. Sonic Sols.*, 430 F. App'x 359, 362 (5th Cir. 2011). In the Fifth Circuit, "the general rule is that 'methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility.'" *Honestech, Inc. v. Sonic Sols.*, 430 F. App'x 359, 361 (5th Cir. 2011) (quoting *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 466, 488 (5th Cir. 2004)). In particular, courts in this Circuit have found that critiques of the survey universe and question phrasing bear on the weight of the survey, not on admissibility. *See Scrum Alliance, Inc. v. Scrum, Inc.*, 2021 WL 1691136, at *3 (E.D. Tex. 2021) (survey universe, screening respondents, and other issues); *Firebirds International, LLC v. Firebird Restaurant Group, LLC*, 2019 WL 3957846, at *2 (N.D. Tex. 2019) (survey universe and question wording); *Honestech, Inc. v. Sonic Sols.*, 430 F. App'x 359, 361 (5th Cir. 2011) (question phrasing); *Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445, 448 (5th Cir. 1973) (format of the question). "[T]he Rules of Evidence favor admission rather than exclusion[,]" *Luckenbach Texas, Inc. v. Engel*, 2022 WL 16857410, at *5 (W.D. Tex. Oct. 13, 2022), and "[o]nly when 'serious flaws in a survey will make any reliance on that survey unreasonable' . . . should the survey be discounted entirely." *RE/MAX*

6

*Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 705 (S.D. Tex. 2009) (quoting *Scott Fetzer Co.*, 381 F.3d at 488).

**ARGUMENT**

None of Plaintiffs' arguments for exclusion hold water. *First*, they claim that Prof. Simonson's sample was unrepresentative. But he confirmed that his samples represented advertisers and ad agencies across spending levels, even after excluding the No Contact List and opt-outs, and Plaintiffs' expert was unable to identify any way in which the excluded populations differed from those who were tested. *Second*, Plaintiffs complain that the surveys were not double blind, even though their expert acknowledges that respondents were blind to the sponsor and purpose of the survey when responding to questions, Ex. 5, Mathiowetz Tr. 251:18-25, similar to the process used by the federal government in litigation surveys. And *third*, Plaintiffs make a last-ditch effort to exclude responses to the Diversion Question, claiming that Prof. Simonson's use of "small but significant" renders it vague and confusing. But "small but significant" is an easy to understand, plain-English term. If Plaintiffs believe its use in a survey may confuse a jury, they can remedy that via cross-examination. Prof. Simonson executed his surveys based on decades of experience and expertise, and Plaintiffs' arguments do not support exclusion.

**I.    PLAINTIFFS' UNDERREPRESENTATION CRITIQUES DO NOT WARRANT EXCLUSION BECAUSE THEY DO NOT RENDER THE SURVEY UNRELIABLE.**

Plaintiffs observe that some entities were excluded from the survey sampling population and that AP uses "nonprobability" sampling to constitute its panel, but do nothing to explain why these technical critiques make the survey inadmissible.

Plaintiffs emphasize that "[w]hen a survey's coverage is underinclusive, its 'value depends on *the proportion of the target population that has been excluded* from the sampling frame and *the extent to which the excluded population is likely to respond differently* from the included

7

population.'" Pls.' Mot. at 12 (quoting FJC Man. at 378) (emphasis added); *see also* Pls.' Mot. at 8. Here, the target populations are advertising agencies, higher-spend advertisers, and lower-spend advertisers.[2] It is undisputed that those populations were, in fact surveyed; Plaintiffs take issue with the fact that some individuals from those populations were not. But Plaintiffs' *Daubert* challenge fails because they provide no indication of what "proportion of the target population [was] excluded," Pls.' Mot. at 8-9. and they do not even provide a hypothesis—let alone any evidence—on the extent to which the excluded population, out of millions of potential advertisers or ad agencies, was likely to respond any differently than the included population. Indeed, Plaintiffs' own survey expert acknowledged that a survey that excludes members of the population of interest (at the request of counsel) is not problematic absent an "a priori hypothesis that [the excluded population] differed from [respondents included in the survey universe]." Ex. 5, Mathiowetz Tr. 53:16-18. She applied this very principle in other cases, justifying an exclusion where "[t]here does not appear to be any reason to believe that the opinions of the [population of interest] would differ from the opinions expressed by survey respondents with respect to the substantive questions asked in the survey." Ex. 6 at ¶¶ 9, 22 (Expert Report of Nancy Mathiowetz, PhD at in Gallagher v. Bayer, 14-cv-04601-WHO (N.D. Cal. Dec. 31, 2018). Absent any indication as to whether or how the exclusion systematically biased the survey results, Plaintiffs' criticism fails.

Plaintiffs' criticism of the No Contact List exclusion is worse than abstract; it is contrived. This is not a case where we do not know how individuals on the No Contact List would have

---

[2] Plaintiffs suggest—without authority—that Prof. Simonson's surveys should identify or were designed to identify "the relevant market." Br. at 10. That was not Prof. Simonson's assignment nor was that the objective of any of his surveys, so Plaintiffs' suggestion that Prof. Simonson had to "show that the populations actually represent the markets the surveys purport to represent," *id.*, is incorrect to the extent it is meant to refer to some alleged relevant market.

responded. Many entities on the No Contact List actually provided discovery in this case, and their individual responses can be compared to the survey results to evaluate whether the excluded population would have responded differently. The evidence is indeed consistent with the survey respondents. For example, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ Ex. 10 (████) at 65:12-74:17; *see also* Ex. 9 (██████) at 30:1720-

35:10 (███████████████████████████████████████████████████████

███████████████████████████████████████████); Ex. 12 (██████) at 111:5-118:24

(████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████); Ex.

13 (██████████████) at 63:11-76:1 (████████████████████████████

████████████████████████████████████); Ex. 14 (████) at 101:9-104:14

(████████████████████████████████████████████████████████████); Ex.

11 (████) at 25:19-25:23 (████████████████████████████████████████

████████████████████████████████████████████). Plaintiffs'

rebuttal expert did not bother to examine a single piece of evidence provided by any entity on the

No Contact List.

For these reasons, the cases that Plaintiffs cite are inapposite. Unlike this case, the surveys

in *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004), *FTC v. Fleetcor Techs.,

Inc.*, 2022 WL 3350066 (N.D. Ga. Aug. 9, 2022), and *Hi Ltd. P'ship v. WingHouse of Fla., Inc.*,

2004 U.S. Dist. LEXIS 30687 (M.D. Fla. Oct. 5, 2004) all omitted *entire categories* of potential

respondents—all potential purchasers of new vacuums, all women, and all past customers,

respectively. Because those groups were likely to have different responses than the surveyed

9

population, "the survey[s] sa[id] nothing about" those portions of the populations of interest. *Scott Fetzer*, 381 F.3d at 487; *see also Fleetcor*, 2022 WL 3350066 at *5 (including past customers was "crucial" because "FleetCor's own company materials and surveys themselves demonstrate that customers left—in droves—because of dissatisfaction"). That is very different from this case, where the No Contact List consisted of *specific* potential respondents due to their potential involvement in the litigation. The only commonality among the excluded entities that Plaintiffs can point to is their size, complaining that "some of the largest and highest-spending advertisers and ad agencies" were excluded.[3] Pls.' Mot. at 10. But Prof. Simonson confirmed that each of his surveys included respondents at every budget level, Ex. 1, Simonson Rep., at Exhibits 6, 42, 73, including 31 respondents with over $200 million in annual ad spend, *see id.* Simonson Rep. at Exhibit 6.

Plaintiffs also separately argue that the court should be "skeptical" of the AP panel, because it is an "opt-in" panel and because one internal email at Google included a stray uninformed negative opinion of AP.[4] Pls.' Mot. at 10. But Plaintiffs' oft-cited FJC Manual agrees with Prof. Simonson that surveys using "nonprobability" panels (i.e., opt-in panels like the one used here) are frequently admitted into evidence because this kind of sampling is "used widely in marketing research and . . . results of these studies are used by major American companies in making

---

[3] Plaintiffs' criticism regarding the No Contact List does not appear to impact the lower-spend advertiser survey.

[4] The relevant Google employees are not survey experts, and this is the only email that Prof. Mathiowetz reviewed. Ex. 5 (Mathiowetz Tr.) at 138:4-11. Prof. Simonson, on the other hand, is an experienced survey expert, conducted diligence on AP, and reviewed the sample and survey results to ensure representativeness. *See* p. 11. Neither Plaintiffs nor their expert have articulated why this one-off email should trump Prof. Simonson's expertise, but plaintiffs are free to cross-examine Prof. Simonson with this document and present the question to the jury. *Liberty Mut. Ins. Co. v. Davis*, 412 F.2d 475, 481-82 (5th Cir. 1969) ("[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.").

decisions of considerable consequence." FJC Man. at 382. Moreover, Prof. Simonson took "special precautions" as recommended by the FJC Manual "to reduce the likelihood of biased samples," Pls.' Mot. at 10 (quoting FJC Man. at 382-83). Professor Simonson thoroughly vetted AP, including by conducting preliminary interviews of the type of respondents that AP could provide. *Id.* ¶ 33 n.35; Ex. 3, EDVA Simonson Tr. at 73:4-15; Ex. 2, Simonson Tr. 122:16. For higher-spend advertisers, Prof. Simonson ensured that there would be sufficiently large sample sizes at different spending levels. *Id.* ¶¶ 30-33 & n.36. He further confirmed that the survey results corroborated the representativeness of his samples, *id.* ¶ 35, and verified that his samples included a statistically relevant number of advertisers above and below the $500,000 spend mark, *id.* ¶ 37 & n.43. There is no basis to exclude Prof. Simonson's opinions based on his use of a non-probability sample.

## II. THE DISCLOSURE AND OPT-OUT DID NOT RENDER PROFESSOR SIMONSON'S RESULTS UNRELIABLE.

Plaintiffs argue that the disclosure and opt-out at the end of the survey rendered the samples unrepresentative and "unblinded" the surveys. Pls.' Mot. at 13. Neither criticism withstands scrutiny.

Plaintiffs speculate that "there is every reason to believe" that respondents who opted out were those whose responses were adverse to Google. Pls.' Mot. at 13. Their logic does not follow. The surveys did not ask respondents what they thought about Google or its products, or any other question that a non-antitrust expert would understand as having an answer that could be helpful or hurtful to Google. Rather, Plaintiffs assume that respondents would somehow know that saying that they would continue to use display advertising despite a price increase, or that they do not use

multiple ad buying tools, could harm Google, and would therefore choose to opt out. This logical leap is unwarranted and speculation is not a reason to exclude expert testimony.[5]

Plaintiffs also argue that the disclosure at the *end* of the survey "unblinded" the survey and was inconsistent with accepted survey practices,[6] Pls.' Mot. at 4, 13-14, and their expert claims that such a disclosure and opt out is "unheard of," Ex. 4, Mathiowetz Rep. ¶ 47. This just calls into question Prof. Mathiowetz's credibility: The FJC Manual acknowledges that "in some surveys (e.g., some government surveys), disclosure of the survey's sponsor to respondents (and thus to interviewers) is required." FJC Man. at 411. Indeed, Prof. Simonson adopted the federal government's own practice for disclosing the sponsor and purpose of the survey and allowing respondents to opt out. *Compare* Ex. 15 (Novemsky Report, App. D, at 9, Intuit Inc., FTC Docket No. 9408 (filed Feb. 10, 2023)) *with* Ex. 1, Simonson Rep. App. F.2-39, App. G.2-32, App. H.2-41. The FJC Manual accepts that these surveys have probative value, only cautioning that "[s]uch surveys call for an evaluation of the likely biases introduced." FJC Man. at 411.

Prof. Simonson followed the guidance from the FJC Manual by evaluating whether the end-of-survey disclosure would bias his results and concluded it would not. He noted that respondents were not aware when they were answering questions who the sponsor was, and respondents could not subsequently change their answers. Ex. 1, Simonson Rep. ¶¶ 27 n.22,  59

---

[5] Plaintiffs could have tested the effect the opt-outs could have had on the survey results, assuming that all opt-outs had survey answers that were adverse to Google. Plaintiffs did not do so. By contrast, Professor Simonson did conduct this analysis in response to Plaintiffs' criticism and determined that, even if every respondent who had opted out had responded that they do not multihome and that they would not divert their spending in the face of a price increase, all three surveys still show significant multihoming and diversion. Ex. 16 (Sensitivity Analysis Based on Opt Out Respondents).

[6] Plaintiffs also note that Prof. Simonson disclosed the sponsor of the survey during his preliminary interviews, Pls. Mot. at 6, but Prof. Simonson did not rely on the responses in those preliminary interviews in developing his opinions, Ex. 2 (Simonson Tr.) at 126:9-20.

n.55, 79. He observed that the questions did not ask about any particular company, so there is no reason to believe that those who opted out would have favored or disfavored Google in a systematic way, *Id.* ¶¶ 79, 81, and determined there is "no reason to expect the respondents" who opted out "to be different from the other respondents." *Id.* ¶ 81.

Moreover, the FTC has rejected the very same argument before: Intuit, the respondent in an agency enforcement matter, argued that allowing survey respondents to opt out meant that survey participants were "unrepresentative and biased." Commission Opinion at 69, Intuit, Inc., FTC Docket No. 9408 (Jan. 22, 2024). The FTC disagreed:

> The notification regarding the opt-out option and purpose of the survey, which is required by the Privacy Act, 5 U.S.C. § 552a(e)(3), was included at the end of the survey, rather than earlier on, thereby avoiding bias in the responses. . . . Moreover, Respondent has identified no reason to think that those who opted out differed from those who continued to participate in any way that would have affected the survey results. There is certainly no basis for Respondent's suggestion those who opted out were sympathetic to Intuit. It is equally plausible that consumers with positive views of TurboTax were more likely to stay in the survey because they wanted to ensure their answers would help Intuit.

*Id.* Like in the Intuit case, Plaintiffs have provided no data or other evidence demonstrating potential bias, so the same rationale supports the reliability of Prof. Simonson's surveys.

Finally, whether the disclosure biased the results goes to the survey's weight rather than admissibility. *Holiday Inns, Inc. v. Holiday Out In Am.*, 481 F.2d 445, 447 (5th Cir. 1973) ("the format of the questions and the manner of conducting the survey" should be left "for consideration as to the weight of this evidence."); *C. A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1055 n.10 (5th Cir. 1981) (inadequacies regarding "the manner in which [the survey] was taken" go to the "weight of the evidence"). Plaintiffs' expert is welcome to describe to the jury how she would have conducted the survey differently.

### III.   THE RESULTS OF THE DIVERSION QUESTION ARE RELIABLE.

Plaintiffs argue that the Court should exclude the responses to the Diversion Question due to its "fatally vague and ambiguous" language, Pls.' Mot. at 15[7], but quibbles with question phrasing "generally speak to 'weight . . . not . . . admissibility.'" *Honestech, Inc. v. Sonic Sols.*, 430 F. App'x 359, 362 (5th Cir. 2011) (quoting *Scott Fetzer*, 381 F.3d at 488); *see also Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, 2019 WL 3957846, at *3 (N.D. Tex. Aug. 21, 2019) ("[T]he manner in which Klein asked questions . . . is not fatal to the survey's admissibility.").

Moreover, Prof. Simonson's use of "small but significant" was intentional, based on years of experience. He sought to "to leave it to the [respondents] to consider their reaction, if any, if (what they consider to be) 'a small but significant' increase in the cost of programmatic display advertising occurred," Ex. 1, Simonson Rep. ¶ 65, using a "balanced" term to avoid predisposing respondents to a particular answer, *id.* at ¶ 65 n.65. Although Plaintiffs' expert apparently would have preferred a precise number, Prof. Simonson chose qualitative words because, in his experience, "people are absolute value challenged" so it is "better to use qualitative, relative terms" to get "more meaningful answers." Ex. 2, Simonson Tr. 175:4-8, 249:2-252:21. This is a valid methodological choice, not a reason for exclusion. He declined to define the term because small and significant "are familiar words" and he "wanted respondents to interpret the question meaningfully based on their familiarity with those plain language words."[8] Ex. 2, Simonson Tr. 246:5-13. And he considered but rejected Plaintiffs' arguments that respondents would assign different numerical meanings to "small but significant," based on his own research that has shown

---

[7] Plaintiffs do not make any arguments challenging the relevance of the diversion question, despite stating that the question is unreliable and irrelevant in a heading. *See* Pls.' Mot. at 14.

[8] Courts agree that lay persons (like survey respondents and jurors) are well-placed to interpret plain-English terms. *See, e.g., United States v. Haines*, 803 F.3d 713, 734 (5th Cir. 2015).

that respondents are "cognitive misers" who "would not speculate about a number" but would instead "use their familiarity with the words small but significant" to respond. *Id.* 248:16-23; *see also id.* 247:20-24.

In any case, there is nothing problematic about Prof. Simonson's use of the term "small but significant." Unlike in *In re Motor Fuel Temperature Sales Practices Litig.*, 2012 WL 13050523 (D. Kan. Feb. 29, 2012), the case cited by Plaintiffs, Pls.' Mot. at 14-15, Plaintiffs surely do not purport to argue that respondents did not know what the Diversion Question was asking (i.e. their conduct if prices increased). Indeed, Plaintiffs' own expert acknowledged that even when a phrase "could be interpreted differently by different people," it does not necessarily "affect the validity of [the] survey results." Ex. 5 Mathiowetz Tr. 70:10-18; *id.* at 127:5-128:5 (testifying potentially different interpretations of a term is "not going to change the validity of this question"). Moreover, while Plaintiffs' argue that "[j]urors will likely assume" that the respondents interpreted the question to be asking about a five-percent price increase, Pls.' Mot. at 15, any confusion can be easily avoided at trial by cross examining Prof. Simonson about whether the survey assigned a percentage to "small but significant." Prof. Simonson's use of "small but significant" does not render his results unreliable or unduly confusing for the jury.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

Dated: December 9, 2024

Respectfully submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 461-8276
Email: justina.sessions@freshfields.com

Eric Mahr (*pro hac vice*)
FRESHFIELDS US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4545
Email: eric.mahr@freshfields.com

Kathy D. Patrick
State Bar No. 15581400
KPatrick@gibbsbruns.com
Gibbs & Bruns LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel: (713) 650-8805
Fax: (713) 750-0903

*Counsel for Defendant Google LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 9, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

<u>/s/ *Justina K. Sessions*</u>

## <u>CERTIFICATE OF MOTION TO SEAL</u>

I certify that contemporaneously with the filing of this Motion, Defendant is filing a motion to seal both this document and the documents attached as exhibits hereto.

<u>/s/ *Justina K. Sessions*</u>