# EXHIBIT 2

HIGHLY CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF TEXAS

3                     SHERMAN DIVISION

4

5    --------------------------x

                               )

6    THE STATE OF TEXAS,       ) Case No. 4:20-cv-00957

     et al.,                   )

7                              )

                   Plaintiffs, )

8                              )

        v.                     )

9                              )

     GOOGLE, LLC,              )

10                             )

                   Defendant.  )

11                             )

     --------------------------x

12

13               HIGHLY CONFIDENTIAL

14     VIDEOTAPED DEPOSITION OF ITAMAR SIMONSON, PhD

15             SAN FRANCISCO, CALIFORNIA

16             TUESDAY, OCTOBER 29, 2024

17                    9:10 A.M.

18

19

20

21

22

23   Job No. MDLG6920396

24   Reported by: Leslie A. Todd, CSR No. 5129 and RPR

HIGHLY CONFIDENTIAL

                                                        Page 120

1              THE WITNESS:  Not that I recall.

2              MR. ROBINSON:  I'm going to move

3       to tab 5.

4                   (Exhibit No. 5 was marked for

5                   identification.)

6   BY MR. ROBINSON:

7       Q.      Which will be Exhibit 5.  And,

8   Dr. Simonson, do you have Exhibit 5 in front of

9   you?

10      A.      I do.

11      Q.      And do you recognize this document?

12      A.      Yes.

13      Q.      And what is this document?

14      A.      It appears to be a list of topics

15  that I was going to perhaps include in a number

16  of interviews that were conducted well before the

17  questionnaire was developed.  And so it was

18  different topics that could have been discussed

19  in those unstructured qualitative interviews.

20      Q.      And so Exhibit 5 is Appendix D to

21  your July 30th, 2024 report, right?

22      A.      It appears to be, yes.

23      Q.      And it's titled Preliminary

24  Interview Guide, right?

HIGHLY CONFIDENTIAL

Page 121

1           A.      Right.

2           Q.      And this was produced on the same

3    day of your July 30th, 2024 report, right?

4           A.      Right.

5           Q.      Did you write Exhibit 5?

6           A.      I did not write it, but it was kind

7    of a bunch of qualitative, unstructured questions

8    that I and people at Analysis Group came up with.

9           Q.      So if you did not write Appendix D,

10   Analysis Group wrote this Preliminary Interview

11   Guide, then, right?

12          A.      As I said --

13                  MS. KAPLIN:  Object to form.

14                  THE WITNESS:  As I said, it was

15          a bunch of topics or questions that I

16          and a team at Analysis Group came up

17          with, knowing that some of them will

18          actually be mentioned to the few

19          respondents who participated, and others

20          would not.  And some questions that were

21          not listed would have been asked.

22   BY MR. ROBINSON:

23          Q.      Anyone outside of -- besides you or

24   Analysis Group that helped write these -- this

HIGHLY CONFIDENTIAL

                                                Page 122

1     Preliminary Interview Guide?

2          A.      No.

3          Q.      So I'm trying to understand the

4     specific drafting process here for this

5     Preliminary Interview Guide.  And you testified

6     just now that "I and a team at Analysis Group

7     came up with," referring to Appendix D.

8                  And -- so did Analysis Group write

9     this, and then you -- and then you reviewed it

10    to -- did you review it after they --

11                 MS. KAPLIN:  Object to form.

12                 THE WITNESS:  No, we probably

13          had a Zoom meeting, and just wanted to

14          come up with a bunch of topics, knowing

15          the limited purpose of those interviews,

16          primarily to vet the type of respondents

17          that we may end up interviewing if we

18          proceed with working with Advertiser

19          Perceptions.

20                 So that was the main purpose.

21          The questions that appeared here were

22          not designed to be part of any actual

23          interviews.  It was primarily to vet the

24          kind of respondents that we may end up

Page 123

1          interviewing, assuming we conduct the

2          survey with Advertiser Perceptions.

3    BY MR. ROBINSON:

4          Q.      So these questions were never asked

5    to anybody, though -- let me rephrase.

6                  These questions were never used in

7    an interview?

8          A.      No, I'm -- I think maybe I wasn't

9    clear.  Some of these questions were asked of

10   some of the respondents, probably not word for

11   word, but some of them were asked of some of the

12   respondents.  And depending on how that

13   conversation evolved, other questions were asked

14   that do not appear here.

15         Q.      And so you testified that you had

16   a -- "We probably had a Zoom meeting; just wanted

17   to come up with a bunch of topics."

18                 So I'm trying to -- I'm trying to

19   understand that.  You had a video call with

20   Analysis Group, where topics for the Preliminary

21   Guide were talked about.  And then Analysis Group

22   took that and turned those list of topics into

23   Appendix D, right?

24         A.      I don't recall precisely.  It was a

HIGHLY CONFIDENTIAL

Page 124

1    year and a half ago, I think in April of 2023.

2    So I don't recall exactly, but I think what you

3    just described, it's possible that that's the way

4    it went.

5            Q.      When you referred earlier to -- you

6    testified that "Some of these questions were

7    asked of some of the respondents, probably not

8    word for word, but some of them were asked of

9    some of the respondents."

10                   Who were these respondents?

11           A.      Could you repeat it?  Who --

12           Q.      Yeah, who were the respondents that

13   were being asked the questions in Appendix D?

14           A.      In total, there were 14

15   respondents, whose names were provided -- or

16   contact information were provided by AP.

17           Q.      And do you know the names of those

18   14 respondents?

19           A.      I do not.

20           Q.      So is Exhibit 5 a true and correct

21   copy of the Preliminary Interview Guide?

22           A.      As I said, that -- that's what was

23   submitted, but as I explained, different

24   respondents were asked different questions.  So

HIGHLY CONFIDENTIAL

Page 125

1    this was just a list that -- a preliminary list

2    that we came up with, but different respondents

3    were asked different questions.

4            Q.      But you have no reason to believe

5    that Exhibit 5 is an inaccurate copy of Appendix

6    D from your report, right?

7            A.      It is from my report, but I'm -- I

8    know how the process went.  I listened to every

9    single one of those 14 interviews.  And I know

10   that some respondents were asked some of the

11   questions, others were asked completely different

12   questions that were not on this list.

13           Q.      So can you provide me the list of

14   the -- of all the questions that were actually

15   asked to respondents?

16           A.      No.

17           Q.      And why is that?

18           A.      Well, I don't -- I didn't take

19   notes.  There was no need to take notes, given

20   the primary purpose of those preliminary

21   interviews.  And I think that's actually normal

22   practice.

23           Q.      So in light of that, Appendix D is

24   actually an incomplete Preliminary Interview

HIGHLY CONFIDENTIAL

                                                        Page 126

 1    Guide, because it doesn't show what was actually

 2    asked of respondents, right?

 3                    MS. KAPLIN:  Object to form.

 4                    THE WITNESS:  I wouldn't call it

 5            inaccurate.  I'd say for its purpose, it

 6            was accurate.  That was the initial

 7            questions that were on that list.

 8    BY MR. ROBINSON:

 9        Q.      But you'd agree with me that it's

10    incomplete, in the sense that it's missing those

11    questions that were actually asked to

12    respondents, right?

13                    MS. KAPLIN:  Object to form.

14                    THE WITNESS:  In many cases,

15            that is correct.  But there was no need

16            to -- given that I did not rely, or did

17            not intend to rely on answers to any of

18            these questions, there was no need to

19            update that qualitative conversational

20            list.

21                    And that's not -- that's not a

22            general practice.  In fact, you can --

23            it seems that your expert was a big --

24            called Dr. Diamond is the authority.

HIGHLY CONFIDENTIAL

Page 127

```
 1        And if you look at her chapter that's
 2        often cited from 2011, that's
 3        specifically what she says, that,
 4        typically -- she even talks about
 5        pretests.  Typically, they're not
 6        disclosed.
 7               MR. ROBINSON:  Objection as
 8        nonresponsive after "In many cases, that
 9        is correct."
10   BY MR. ROBINSON:
11        Q.     Was it your decision to not retain
12   that complete list of questions that were asked
13   to respondents in the preliminary interview?
14        A.     As I said, there was nothing to
15   retain.  It was not recorded.  I didn't have any
16   record of it.  That was not the purpose of those
17   interviews.  It was primarily to vet the members
18   that -- or respondents that can be provided by
19   AP.
20               MR. ROBINSON:  Objection,
21        nonresponsive.
22   BY MR. ROBINSON:
23        Q.     Was it your decision to not have
24   notes?  Was that your decision to not have notes?
```

Page 128

1    A.    No, it never came up.  No decision
2  was made about taking notes or not taking notes.
3  It was just, let's have a conversation with the
4  kind of respondents that may be provided by AP.
5    Q.    Did Analysis Group keep any notes
6  of the preliminary interviews?
7    A.    Not to my knowledge.
8    Q.    Was that your decision?
9    A.    No, there was no decision.  I think
10  you're -- how should I say, you're assuming that
11  there was a decision.  Okay, let's keep notes,
12  let's not keep notes.  That never came up.
13         Given the specific purpose of the
14  survey, to learn about potential respondents
15  that -- and to see whether they're even
16  knowledgeable about advertising as practiced by
17  their organizations.  There was no issue of
18  retaining notes regarding questions that I was
19  not going to ask.
20    Q.    Would you say that Analysis Group
21  is under your control about -- the staff that
22  helped you, were they under your control?
23    A.    Yes, to a significant degree.
24    Q.    And no one at Analysis Group asked

HIGHLY CONFIDENTIAL

Page 172

1              I just gave you one example from the

2              likelihood of confusion survey, an area

3              in which I published a chapter about

4              what I call demand effects in likelihood

5              of confusion surveys.

6                      So I think I know quite a bit.

7              Does it mean that I can always detect

8              biases?  Probably not.

9    BY MR. ROBINSON:

10         Q.      Would you agree with me that survey

11   questions should be clear and unambiguous?

12         A.      I think the answer is generally,

13   yes.

14         Q.      And survey respondents should

15   understand the survey's concepts the same way,

16   right?

17         A.      Not necessarily.  It -- it really

18   depends.  I mean, again, here you do have some

19   principles?  I'm happy to explain that to you, if

20   you want me to elaborate.

21         Q.      But you would agree that -- that

22   survey questions should be interpreted

23   consistently so -- to improve comparability,

24   right?

HIGHLY CONFIDENTIAL

Page 173

1      A.       It really depends on the context.

2  I think what you want to do is to ask meaningful

3  questions that respondents could interpret for

4  themselves, and answer accordingly.

5           If you want a precise number, like

6  elasticity, which I didn't look for in this

7  survey, there it's a different matter.  You may

8  need to have some specific quantities and hope

9  that respondents can give meaningful answers.

10           But in many cases, it's best to use

11  qualitative, relative terms, and let respondents

12  interpret them as they naturally do, based on

13  their experience.  As long as you're using plain

14  English terms, as opposed to inventing terms that

15  respondents are unfamiliar with.

16      Q.       So it's totally fine in a survey

17  for survey respondents to interpret survey

18  questions completely differently, then?

19      A.       No, that misrepresents what --

20      Q.       So they should be -- they should be

21  interpreted consistently, then, right?

22      A.       The words "should be interpreted

23  consistently" -- for example, if you see the word

24  small, if some people think about small as big,

HIGHLY CONFIDENTIAL

Page 174

```
 1    that's a problem.  But if everyone knows what the
 2    word "small" or what the word "significant"
 3    means, then that would be fine, as long as you're
 4    not trying to estimate a precise number, such as
 5    elasticity.
 6           Q.      So it sounds like it's an
 7    assumption you're making that respondents --
 8    survey respondents are going to interpret certain
 9    words the same way, then, in that case, right?
10                  MS. KAPLIN:  Object to form.
11                  THE WITNESS:  Yes.  In fact, I
12          published an article back in 2008 in the
13          Journal of Consumer Psychology, in which
14          I presented the following conclusion:
15          That respondents have difficulty
16          evaluating in questions absolute values.
17          And absolute values would be something
18          like, let's say, plus 8 percent, or
19          $179.  These are absolute numbers.
20                  And I said, they have trouble
21          with that.  And that difficulty, I
22          called it absolute value challenged.
23          That generates systematic errors and
24          biases that many people, based on my
```

HIGHLY CONFIDENTIAL

Page 175

1      meta-analysis and literature review,

2      many people interpreted as showing that

3      people are irrational.

4              And I said, when people are

5      absolute value challenged, it's much

6      better to use qualitative, relative

7      terms.  And then you get much more

8      meaningful answers.

9      Q.      In some cases, is an unbiased

10  survey impossible, given constraints on sample

11  size?

12      A.      Is an unbiased survey impossible

13  because --

14      Q.      Based on constraints on the sample

15  size?

16      A.      It's possible.  I gave you earlier

17  this over $1,000 cigars.  And if you could find

18  only 20 respondents like that, or 15, that's --

19  that's not enough to draw any statistically

20  meaningful conclusions.

21      Q.      So you would prefer in a survey --

22  in a survey to give terms that may be subject to

23  different interpretations, rather than give an

24  absolute value in a question, right?

HIGHLY CONFIDENTIAL

Page 246

1              MS. KAPLIN:  Object to form.

2      BY MR. ROBINSON:

3          Q.      That was a yes, right?

4          A.      Yes.

5          Q.      And your survey did not define the

6      small but significant amount in question 5,

7      right?

8          A.      I thought -- I think we already had

9      that discussion.  But it specifically did not

10     define it because these are familiar words, and I

11     wanted respondents to interpret the question

12     meaningfully based on their familiarity with

13     those plain language words.

14         Q.      Is there a numerical definition

15     that you would use to describe this increase in

16     budget?

17             MS. KAPLIN:  Object to form.

18             THE WITNESS:  Increase in what?

19     BY MR. ROBINSON:

20         Q.      Increase in budget.  Is there a

21     numerical definition that you would give to small

22     but significant amount?

23             MS. KAPLIN:  Object to form.

24             THE WITNESS:  Did you say budget

HIGHLY CONFIDENTIAL

Page 247

1       or amount?
2    BY MR. ROBINSON:
3       Q.      Amount increase in budget.
4               MS. KAPLIN:  Object to form.
5    BY MR. ROBINSON:
6       Q.      Is there an absolute value that you
7    would place on a small but significant amount?
8       A.      Where do you see amount of
9    budget -- where are you reading from?
10      Q.      So question 5 says,
11   "Programmatic" -- "The cost of programmatic
12   display advertising has recently increased by a
13   small but significant amount."  Now --
14      A.      Where is the word "budget" that you
15   just mentioned?
16      Q.      Well, forget the word "budget."
17   What absolute numerical value would you give to a
18   small but significant amount?
19               MS. KAPLIN:  Object to form.
20               THE WITNESS:  I would not give
21          any specific number.  And based on what
22          I've taught my students for many years,
23          and research that I've done, respondents
24          would not convert it to a number.  And

HIGHLY CONFIDENTIAL

Page 248

1          maybe that's something that maybe --

2          that will be difficult for

3          Dr. Mathiowetz, who, as I understand

4          from her area of expertise, she's not an

5          expert on judgment and choice.

6                   She -- she may think, and you

7          may think, that people go through this

8          extra step of converting small but

9          significant to a number, and then going

10         on to speculate about their response

11         based on this hypothetical number.

12                   MR. ROBINSON:  Objection.

13         Nonresponsive.

14         Q.    So --

15         A.    Just to complete my answer.

16                   Based on what we know about how

17    consumers answer questions, they are referred to

18    as cognitive misers.  They look for shortcuts.

19    They would not speculate about a number, and then

20    continue to answer questions based on some

21    speculated random number they came up with.  They

22    will just use their familiarity with the words

23    small but significant.

24                   MR. ROBINSON:  Objection.

HIGHLY CONFIDENTIAL

Page 249

1    Nonresponsive.

2        Q.    So the purpose of the undefined

3    term here was to have people interpret the

4    question in different ways?

5            MS. KAPLIN:  Object to form.

6            THE WITNESS:  Nope.  To --

7        whatever small but significant means to

8        them.  That was not meant to be

9        interpreted in any absolute number

10        terms.

11    BY MR. ROBINSON:

12        Q.    So it's open to people's different

13    interpretation of small but significant, right?

14            MS. KAPLIN:  Object to form.

15            THE WITNESS:  They have their

16        understanding of small, it's not large,

17        but significant as opposed to something

18        you would completely ignore.  That's it.

19        These are familiar words.  It's a

20        balanced term.  They would not convert

21        it to this number or that number.  They

22        have no basis, and it will be the

23        opposite of a shortcut.

24    BY MR. ROBINSON:

HIGHLY CONFIDENTIAL

Page 250

1          Q.      Okay.  So I -- I don't understand.
2     Is it -- it's not an absolute amount, so there's
3     not some set term.  But it's also not open for
4     interpretation.  Is that your testimony?
5          A.      Yeah, it is open to -- it's not an
6     issue of interpretation.  The way they -- the
7     meaning to them of small but significant, that's
8     all they need to do.  They're familiar with those
9     words, and that's how they should think about it.
10    And as I said earlier, respondents are good at
11    that.  Even if they don't have specific numbers;
12    whereas, if I gave them an absolute number,
13    8 percent, 15 percent, 2 percent, that's where
14    they would have trouble giving meaningful
15    answers.
16         Q.      Could a respondent convert small
17    but significant to an actual number?
18         A.      As I said, based on what we know
19    about people's judgment and decisionmaking, they
20    would not.
21         Q.      So it's not possible?
22              MS. KAPLIN:  Object to form.
23              THE WITNESS:  Anything is
24         possible.  It's highly unlikely, based

HIGHLY CONFIDENTIAL

Page 251

1          on a great deal of work, including work

2          that gave some people like Herbert Simon

3          back in 1979, I think, and Daniel

4          Kahneman in 2002 -- gave them -- led

5          them to receiving the Nobel Prize in

6          economics.

7      BY MR. ROBINSON:

8          Q.      So some respondents could take

9      small but significant to mean a 5 percent

10     increase, right?

11              MS. KAPLIN:  Object to form.

12     BY MR. ROBINSON:

13         Q.      That's possible, right?

14              MS. KAPLIN:  Object to form.

15              THE WITNESS:  As I said, I'm not

16         going to argue with -- anything is

17         possible, highly unlikely, and that's

18         how you design questions based on your

19         expertise and knowledge of what's highly

20         likely.

21              Does that apply to a hundred

22         percent of the respondents?  Probably

23         not.

24     BY MR. ROBINSON:

HIGHLY CONFIDENTIAL

Page 252

1          Q.        And some survey respondents could

2     take a small but significant increase in price to

3     mean 15 percent, right?  It's possible?

4                    MS. KAPLIN:  Object to form.

5                    THE WITNESS:  I don't know what you

6     mean by possible.  I have no reason whatsoever to

7     believe that anyone would.  If you say, is it

8     possible? yeah, anything is possible.

9     BY MR. ROBINSON:

10         Q.        And some respondents could take a

11    small but significant increase in price to mean

12    25 percent, right?  It's possible?

13                   MS. KAPLIN:  Object to form.

14                   THE WITNESS:  Extremely

15        unlikely.

16    BY MR. ROBINSON:

17         Q.        But you don't know for certain,

18    though, right?

19         A.        I do know, because I'm an expert in

20    asking questions and understanding the manner in

21    which respondents answer such questions.

22         Q.        And you asked respondents after the

23    survey what they took small but significant

24    amount to mean?

**ERRATA SHEET FOR THE TRANSCRIPT OF ITAMAR SIMONSON**

Case Name:     State of Texas et al., v. Google LLC

Dep. Date:     October 29, 2024

Deponent:     Itamar Simonson

| Page | Line | Corrections | Reason for Correction |
|------|------|-------------|----------------------|
| 25 | 48 | Analysis Group → Advertiser Perceptions | Correction |
| 39 | 7 | No, I think they are closely → ~~No,~~ I think they are closely | Transcription error |
| 48 | 6 | may pertains → may pertain~~s~~ | Transcription error |
| 77 | 23 | Probably. I – I mean, it was a → Probably. I, you know, it was a | Transcription error |
| 78 | 23 | a potential → a tangent | Transcription error |
| 83 | 18 | asked now, I kind of → asked now, ~~I~~ kind of | Transcription error |
| 126 | 24 | is the authority → as the authority | Transcription error |
| 140 | 19 | This one? → That one | Transcription error |
| 160 | 1 | wanted to → want | Transcription error |
| 161 | 2 | board → Bortz | Transcription error |
| 162 | 16 | judge's → judges' | Transcription error |
| 172 | 19 | principles? → principles. | Transcription error |
| 185 | 14 | has not shown → has not been shown | Transcription error |
| 189 | 4 | the preliminary interviews that were done early → the preliminary interviews ~~that~~ were done early | Transcription error |
| 192 | 8 | that Dr. Mathiowetz → that when Dr. Mathiowetz | Transcription error |
| 193 | 20-21 | I'm not an expert → I'm not an expert in the QUAID tool | Clarification |
| 240 | 9 | I've have → I have | Transcription error |
| 242 | 8 | just when → just as when | Transcription error |
| 272 | 11 | is → in | Transcription error |
| 284 | 14-15 | wide range of many digital advertising types. → wide range of ~~many~~ digital advertising types. | Transcription error |
| 284 | 21 | the most → they -- most | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefore.


Date:  November 25, 2024

_____

Itamar Simonson, Ph.D.