# EXHIBIT 4

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| The State of Texas, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Google, LLC, <br><br> Defendant. | Case No. 4:20-cv-00957 |

# EXPERT REBUTTAL REPORT OF NANCY MATHIOWETZ, PH.D.

### September 9, 2024

**Nancy A. Mathiowetz, Ph.D.**
**September 9, 2024**

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

46. A review of these "other responses" indicates many of these respondents worked for entities that sell products or services, including law firms, construction, health agencies, and those in education.[98] In part, the selection of "other" by 304 individuals in response to Question S7 points to the lack of understanding the response option "advertiser/marketer" on the part of respondents.

47. The analytic sample is further reduced by the inclusion of a question at the end of the survey that (1) identifies Google as the client for the surveys; (2) identifies to the respondent that the survey is being conducted for litigation purposes; and (3) offers the respondent the opportunity to opt out after they have already completed the survey (that is, to not have their data included for analysis). Specifically, 94 of the Higher-Spend Advertiser Survey respondents, 95 of the Lower-Spend Advertiser Survey respondents, and 71 of the Ad Agency Survey respondents requested to be excluded. These represent 16%, 24%, and 15% (respectively) of those who completed the survey.[99] Never, in more than 30 years of litigation-related research, have I seen an expert disclose the purpose of the survey to respondents or offer respondents the opportunity to opt out once they were aware of the purpose and sponsorship.[100] Accordingly, this technique of disclosing the purpose and permitting opt outs is not generally accepted in the field of survey methodology when conducting surveys for litigation.[101] Applying this technique is not only unheard of but directly impacts the representativeness of Professor Simonson's surveys. I would anticipate that those who chose to opt out differed with respect to either opinions or ad-purchasing behavior related to Google.[102] I note that the higher opt-out rate among Lower-Spend Advertiser Survey respondents would support this theory.

---

[98] See **Exhibit H** for a full listing of the open-ended responses to Question S7 for the Higher-Spend Advertiser and Lower-Spend Advertiser Surveys.

[99] Simonson Report, Appendix Exhibit 1 (p. 513), Appendix Exhibit 37 (p. 555), and Appendix Exhibit 68 (p. 603).

[100] This is consistent with other guidance I have seen related to litigation in the *Pittsburgh Press Club* criteria that "the respondents should be unaware of the purposes of the survey." *See, e.g.,* Becker, p. 482.

[101] Diamond, pp. 410–411.

[102] Similar to concerns with nonresponse error or nonresponse bias, the concern is that those who select to opt-out (in this case) differ from those who chose to remain in the study. Having collected the data from those who chose to opt-out, Professor Simonson had the opportunity to assess the extent to which those who opted out differed from those who remained in the survey. I understand that Professor Simonson did not receive the data from those who opted-out, but that was a deliberate decision. At a minimum, he could have requested analysis by AdPROs concerning the responses by