# EXHIBIT 5

HIGHLY CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF TEXAS

3                 SHERMAN DIVISION

4     THE STATE OF TEXAS, et

5     al.,

6                 Plaintiffs,     Case No.

7        vs.                  4:20-cv-00957-SDJ

8     GOOGLE LLC,

9                 Defendant.

10    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11

12            *** HIGHLY CONFIDENTIAL ***

13            VIDEO DEPOSITION OF

14            NANCY MATHIOWETZ PhD

15

16              October 15, 2024

17             9:07 a.m. Central

18

19       1045 West Fulton Market, Suite 1200

20             Chicago, Illinois

21

22         Stenographically Reported By:

23     Deanna Amore - CRR, RPR, CSR - 084-003999

24     Job No. CS6920652

25

HIGHLY CONFIDENTIAL

Page 53

1    data or studies on understanding of product labels

2    in New York, Florida, or California or product

3    purchasing patterns specific to New York, Florida,

4    or California; right?

5         MS. YOUNG:  Objection to form.

6         THE WITNESS:  I would have cited them if such

7    had existed, but, obviously with respect to the

8    nature of One A Day products, I obviously at that

9    point in time could not find anything that

10    segmented those three states from the rest of the

11    country.

12    BY MS. SESSIONS:

13         Q.   And that -- and such data or information

14    was not necessary for you to render your opinions

15    in the Bayer case; right?

16         A.   There was no a priori hypothesis that

17    consumers in these three states differed from

18    consumers in other states.

19         Q.   And since there was no such a priori

20    hypothesis, you didn't need to cite data sort of

21    testing or exploring that hypothesis?

22         A.   Well, that's a different premise.

23         Q.   Well, that is my question now.

24              So you said -- so I asked you whether data

25    or information on consumers in New York, Florida,

HIGHLY CONFIDENTIAL

Page 70

```
 1      differently by different people affect the validity
 2      of your survey results?
 3          A.   I think in this case -- right -- the key
 4      part of the question is the disclaimer here "Does
 5      not provide additional support for heart health,
 6      immunity, or physical energy."  Those are the
 7      phrases that were at issue in this lawsuit, and so
 8      those are the key issues that you want respondents
 9      to understand.
10          Q.   So is the answer to my question which is
11      "Does the fact that the phrase 'otherwise healthy
12      person' could be interpreted differently by
13      different people affect the validity of your survey
14      results," is the answer to that question, no, it
15      does not affect the validity of your survey
16      results?
17          MS. YOUNG:  Objection.  Form.
18          THE WITNESS:  I do not believe it did.
19      BY MS. SESSIONS:
20          Q.   Let's now go to "additional support."  Is
21      the term "additional support" vague and ambiguous?
22          A.   Certainly, in the pilot test, we saw no
23      evidence of respondents saying that they did not
24      understand that term.
25          Q.   Okay.  So you tested that phrase
```

HIGHLY CONFIDENTIAL

Page 127

1    interviews?

2    BY MS. SESSIONS:

3        Q.    Sure.

4        A.    So could you repeat your question?

5        Q.    Sure.  So I guess we'll go back and I'll

6    first ask you:  Did you specifically test whether

7    survey respondents had the same definition of

8    chronic condition as it's used in Question 4?

9        MS. YOUNG:  Objection.  Form.

10       THE WITNESS:  I can't see -- I'd have to go

11   back and listen to the cognitive interviews again.

12   I don't see in the report that there's mention of

13   interpretation of chronic conditions.

14   BY MS. SESSIONS:

15       Q.    Okay.  And then my next question was

16   whether it would affect the validity -- right -- of

17   your survey if respondents had differing

18   definitions of chronic conditions when they were

19   answering Question 4.

20       MS. YOUNG:  Objection.  Form.

21       THE WITNESS:  You know, the question asks for

22   information such as.  So it's illustrative.  The

23   point is these are questions that have to do with

24   health as opposed to questions that have to do with

25   your age and employment.  So it's a collection of

HIGHLY CONFIDENTIAL

Page 128

1    very different kinds of information.  I don't think

2    if -- for some people, if they think of cancer

3    versus some people think of heart conditions,

4    that's not going to change the validity of this

5    question.

6    BY MS. SESSIONS:

7        Q.   Got it.  Okay.  Right.

8             Because -- and what you were really trying

9    to get at with this question was what people's

10   expectations were about the website sort of given

11   the collection of this type of information.  Is

12   that fair?

13       A.   Well, it's really their expectation with

14   respect to the presence of third-party software.

15       Q.   Right.

16            And so to get information about a

17   respondent's expectations with respect to the

18   presence of third-party software, it is not

19   particularly important that each respondent have

20   the same precise definition of chronic condition?

21       MS. YOUNG:  Objection.  Form.

22       THE WITNESS:  So if you listen to the cognitive

23   interviews, it's clear that people understand this

24   question to be saying this website is going to be

25   asking you about all kinds of health information,

HIGHLY CONFIDENTIAL

Page 138

1     Q.   Okay.  And that's one document produced by

2   Google; is that right?

3     A.   That's correct.

4     Q.   So other than this single document

5   produced by Google, you are not relying on any

6   other materials produced either by Google, the

7   plaintiffs, or any third parties in this case; is

8   that right?

9     MS. YOUNG:  Objection.  Form.

10     THE WITNESS:  There are no other Bates-stamped

11   documents, no.

12   BY MS. SESSIONS:

13     Q.   Okay.  So you are relying, for instance,

14   on expert reports?

15     A.   As I've listed here, yes.

16     Q.   Right.  Okay.

17          So other than expert reports and this

18   single Bates-stamped document produced by Google,

19   are you relying on any other materials produced by

20   Google, the plaintiffs, or third parties in this

21   case?

22     A.   Well, I think we already discussed this

23   morning that I did also review Professor Chandler's

24   rebuttal report and Professor Gans' rebuttal

25   report.

HIGHLY CONFIDENTIAL

Page 147

1    Q.   Okay.  Did you discuss the composition of

2    the AdPRO's panel with any advertising or marketing

3    professionals?

4    A.   No.  But I clearly, from the one Google

5    document that you saw that I cited to, clearly

6    Google themselves have raised questions about the

7    composition of that panel.

8    Q.   Did you -- okay, but other than -- well,

9    strike that.  I'll just ask you that question

10   later.

11        Did you discuss with any advertising or

12   marketing professionals their use of advertiser

13   perception surveys in the conduct of their

14   business?

15   A.   I did not.

16   Q.   Did you do any data collection of your own

17   in this case?

18        And by "of your own," I mean other than

19   reviewing the data provided by Professor Simonson.

20   A.   I did not take an independent, separate

21   data analysis.  I didn't undertake a new survey or

22   other data.

23   Q.   Right.

24        Not only did you -- you didn't undertake a

25   new survey.  You also didn't undertake any

HIGHLY CONFIDENTIAL

Page 148

1    interviews or any data gathering kind of short of a

2    survey; correct?

3        A.    That's correct.  But we certainly did

4    analysis of Professor Simonson's survey data.

5        Q.    Right.  Understood.

6            Okay.  Let's go now to your report.  Let's

7    look at paragraph 9.  So beginning at paragraph 9

8    is a section of your report that summarizes your

9    critiques of Professor Simonson's work; is that

10   right?

11       A.    That's correct.

12       Q.    Okay.  So the first critique that you list

13   here is sampling and methodological flaws?

14       MS. YOUNG:  Objection.  Form.

15       THE WITNESS:  So this is a high-level summary.

16   Of course, the full report goes into the detail

17   that leads to that summary opinion.

18   BY MS. SESSIONS:

19       Q.    All right.  And so, then, in the second

20   bullet, you write "Professor Simonson's samples

21   among his three surveys are not representative of

22   the underlying population"; right?

23            That's one of your critiques of

24   Professor Simonson's work?

25       A.    That's correct.

HIGHLY CONFIDENTIAL

Page 251

1    they exited out, whether it was because they heard

2    it was for litigation.  They are, like, "I don't

3    want to be party to this" or because they heard it

4    was for Google, and they may or not -- may or may

5    not perceive that their answers would be viewed

6    favorably or unfavorably by Google.  Who knows.  We

7    don't know what their motivation is.

8    BY MS. SESSIONS:

9        Q.  So you said -- you said that you've never

10   seen, in a litigation context, an expert disclose

11   the survey and -- the purpose of the survey and

12   offer the opportunity to opt out at the end of the

13   survey; is that right?

14       A.  So as I've already alluded to, best

15   practices are to keep interviewers and respondents

16   blind to the client and that it is for litigation

17   purposes.

18       Q.  So you would agree that the respondents

19   were blind to the client and the purposes of the

20   survey until the end of the survey; right?

21       A.  They were.

22       Q.  Okay.  So when they were giving their

23   substantive answers, they were blind to the client

24   and the purpose of the survey; right?

25       A.  That's correct.

PRIVILEGED & CONFIDENTIAL

**ERRATA SHEET FOR THE TRANSCRIPT OF NANCY MATHIOWETZ**

Case Name: *THE STATE OF TEXAS, et al. vs. GOOGLE LLC*, 4:20-cv-00957-SDJ

Dep. Date:   October 15, 2024

Deponent:   N, Mathiowetz

| Page | Line | Original Language | Corrections | Reason for Correction |
|---|---|---|---|---|
| 16 | 15 | "…that there was xinterest in the development of new…" | "…that there was <u>an</u> interest in the development of new products…" | Transcription error |
| 21 | 25 | "So the demand side is—serve the…" | "So the demand side <u>platform</u> serves the…" | Transcription error |
| 22 | 10 | "So Google Ad DV360…" | "So Google Ad<u>,</u> DV 360…" | Transcription error |
| 24 | 19 | "…or is this just at what happened at trial?" | "…or is this just what happened at trial?" | Transcription error |
| 29 | 12 | "…Navarro, McCall and check Photography versus…" | "Navarro, McCall, and <u>Navarro</u> Photography versus…" | Transcription error |
| 33 | 14-15 | "…Joint Sports claimants do do an establishment survey,…" | "…Joint Sports claimants do do an establishment survey,.…" | Transcription error |
| 39 | 23 | "It looks similar to." | "It looks similar to <u>it</u>." | Transcription error |
| 81 | 7 | "..cost validated…" | "…cross validated…" | Transcription error |
| 83 | 8 | "systems follow…" | "systems file…" | Transcription error |
| 123 | 21 | "instances." | "questions." | Transcription error |
| 147 | 20 | "I did <u>not</u> take an independent…" | "I did <u>undertake</u> an independent…" | Transcription error |
| 151 | 5 | "one produced." | "no one produced." | Transcription error |
| 155 | 16-16 | "So with respect to the ambiguous language, but certainly there are other…" | "So <u>not</u> with respect to the ambiguous language, but certainly there are other…" | Transcription error |
| 169 | 21-22 | "…the for example,…" | "…for example,…" | Transcription error |

PRIVILEGED & CONFIDENTIAL

| 220 | 10-12 | "…among the 500 entities, was his company one of the companies…" | "…among the 500 entities, was this company one of the companies…" | Transcription error |
| 233 | 23-24 | "…Adtech and publishers…" | "…Adtech publishers" | Transcription error |
| 246 | 23-24 | "who is just taking…" | "who has just taken…" | Transcription error |
| 247 | 19 | "advertisers was" | "advertisers were" | Grammar; Transcription error |
| 286 | 8 | "…apply. Whether you're doing…" | "…apply whether you're doing…" | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons, therefore.

Date:  October 28, 2024                    Signature: _____

**HIGHLY CONFIDENTIAL**
**ATTORNEY ERRATA SHEET FOR THE TRANSCRIPT OF ITAMAR SIMONSON**

Case Name:     State of Texas et al., v. Google LLC

Dep. Date:     October 15, 2024

Deponent:     Nancy Mathiowetz

| Page | Line | Corrections | Reason for Correction |
|------|------|-------------|----------------------|
| 17 | 23 | of the litigation work → of your litigation work | Transcription error |
| 24 | 20-21 | I'll, first of all, just ask → First, I'll just ask | Transcription error |
| 30 | 12 | that Navarro case → the Navarro case | Transcription error |
| 36 | 1 | You were critiquing → You weren't critiquing | Transcription error |
| 83 | 17 | So you – right – believe → So – right – you believe | Transcription error |
| 144 | 11-12 | is that correct? → is that right? | Transcription error |
| 217 | 22 | and 6 of the largest global → and the 6 largest global | Transcription error |
| 238 | 2 | Exhibit 6 → Exhibit 7 | Referred to incorrect exhibit |
| 238 | 8 | Exhibit 6 → Exhibit 7 | Referred to incorrect exhibit |
| 267 | 14 | missing the question → misreading the question | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefore.


Date:   11/15/24                    Signature: */s/ Justina Sessions*

                                             Justina Sessions