**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

<u>**GOOGLE LLC'S REPLY IN SUPPORT OF ITS**</u>
<u>**MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' DTPA CLAIMS**</u>

## <u>TABLE OF CONTENTS</u>

I.      The States' Response Does Not Establish Article III Standing or Capacity to Sue. ...................................................................................................................... 1

      A.      The States Have Not Demonstrated Injury in Fact. ................................ 1

      B.      The Attorneys General Lack Capacity to Sue in Texas Federal Court. ...................................................................................................... 5

II.     Plaintiffs Have No Evidence of a Deceptive Act in Each State. ........................ 6

      A.      There Is No Evidence of "Auction Manipulation" Violations in Each State........................................................................................................ 6

      B.      Other Courts Reject General Claims for Penalties Without Proof of Harm. ..................................................................................................... 8

III.    The Penalties Sought Are Constitutionally Excessive and Far Exceed Any Award Sustained in Any State. ......................................................................... 10

IV.     No Evidence Shows Google Deceived Users About the Sale of Personal Information. ...................................................................................................... 11

V.      Plaintiffs Raise No Issue of Fact on Their "Equal Footing" Claims. ............... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&R Eng'g & Testing, Inc. v. Scott*,
  72 F.4th 685 (5th Cir. 2023) ....................................................................1, 3, 4

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982).........................................................................................1

*Angell v. GEICO Advantage Ins. Co.*,
  67 F.4th 727 (5th Cir. 2023) ...........................................................................3

*AU Optronics Corp. v. South Carolina*,
  699 F.3d 385 (4th Cir. 2012) .......................................................................3, 4

*Beale v. Biomet, Inc.*,
  492 F. Supp. 2d 1360 (S.D. Fla. 2007) .........................................................13

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996).......................................................................................10

*Cooper Indus. v. Leatherman Tool Grp., Inc.*,
  532 U.S. 424 (2001).......................................................................................10

*D.C. v. JTH Tax LLC*,
  2023 WL 130736 (D.D.C. Jan. 9, 2023) .........................................................3

*In re Debs*,
  158 U.S. 564 (1895).........................................................................................5

*DeWitt County Elec. Coop, Inc. v. Parks*,
  1 S.W.3d 96 (Tex. 1999).................................................................................12

*Doe v. Cutter Biological, a Div. of Miles, Inc.*,
  852 F. Supp. 909 (D. Idaho 1994) .............................................................11, 12

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000).........................................................................................5

*Gray v. White*,
  18 F.4th 463 (5th Cir. 2021) ..........................................................................14

*Harrison v. Jefferson Par. Sch. Bd.*,
  78 F.4th 765 (5th Cir. 2023) ....................................................................1, 2, 4

*Henningsen v. ADT Corp.*,
    161 F.Supp.3d 1161 (S.D. Fla. 2015) ...................................................................15

*Ironworkers Loc. Union No. 68 v. AstraZeneca Pharms. LP*,
    585 F. Supp. 2d 1339 (M.D. Fla. 2008) ...............................................................8, 9

*Isquith v. Middle S. Utilities, Inc.*,
    847 F.2d 186 (5th Cir. 1988) ...............................................................................13

*Marchese v. Dep't of Interior*,
    2004 WL 2297465 (E.D. La. October 12, 2004) ......................................................8

*W. Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*,
    646 F.3d 169 (4th Cir. 2011) .................................................................................4

*Mir v. L-3 Commc'ns Integrated Sys. L.P.*,
    319 F.R.D. 220 (N.D. Tex. 2016) ............................................................................8

*In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*,
    190 So. 3d 829 (Miss. 2015) ...................................................................................9

*Mississippi v. Becerra*,
    727 F. Supp. 3d 559 (S.D. Miss. 2024) ...................................................................2

*Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*,
    647 F.3d 202 (5th Cir. 2011) ..................................................................................2

*Ogden v. Dickinson State Bank*,
    662 S.W.2d 330 (Tex. 1983) .................................................................................12

*Patterson v. McMickle*,
    191 S.W.3d 819 (Tex. App.—Fort Worth 2006, no pet.) .......................................12

*Paxton v. Dettelbach*,
    105 F.4th 708 (5th Cir. 2024) .................................................................................2

*Polsky v. Dish Network Serv., LLC*,
    2015 WL 12732860 (S.D. Tex. Aug. 7, 2015) ......................................................13

*Fla. ex rel. Shevin v. Exxon Corp.*,
    526 F.2d 266 (5th Cir. 1976) ..................................................................................6

*Sidco Prods. Mktg., Inc. v. Gulf Oil Corp.*,
    858 F.2d 1095 (5th Cir. 1988) ..............................................................................14

*Sindell v. Abbott Laboratories*,
    26 Cal. 3d 588 (1980) ...........................................................................................11

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................................. 1

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003) ............................................................................... 10

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) .................................................................... 5

*Timbs v. Indiana,*
    586 U.S. 146 (2019) ............................................................................... 10

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................................. 4

*Utah Div. of Consumer Prot. v. Stevens,*
    398 F. Supp. 3d 1139 (D. Utah 2019) ..................................................... 3

*In re Vioxx Prods. Liab. Litig.,*
    2010 WL 11570867 (E.D. La. 2010) .................................................. 8, 9

*Ward v. Succession of Freeman,*
    854 F.2d 780 (5th Cir. 1988) ................................................................. 15

*Watson Labs., Inc. v. State,*
    241 So. 3d 573 (Miss. 2018) ................................................................... 9

*Utah ex rel. Wilkinson v. B & H Auto,*
    701 F. Supp. 201 (D. Utah 1988) ............................................................ 4

*Ex Parte Young,*
    209 U.S. 123 (1908) ................................................................................. 5

*In re Zyprexa Prods. Liab. Litig.,*
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) ............................................... 8, 9

**Statutes**

28 U.S.C. § 1367 ............................................................................................ 5

Idaho Code § 48-108(4) ................................................................................. 6

Idaho Code § 48-606(2) ................................................................................. 6

Google submits this Reply in support of its Motion for Summary Judgment on Plaintiffs' DTPA Claims (ECF No. 672, hereafter "MSJ").

## I.     The States' Response Does Not Establish Article III Standing or Capacity to Sue.

### A.  The States Have Not Demonstrated Injury in Fact.

The States, who can enforce their own laws in their *own* courts, lack Article III standing to sue on DTPA claims in this *federal* court. Plaintiffs concede that standing to sue in federal court requires an injury in fact to a sovereign or quasi-sovereign interest. Resp. at 21. Whether a state consumer protection statute includes "reliance, injury, damages, or specific victims," Resp. at 34, is irrelevant to whether the States have satisfied "Article III's irreducible minimum" necessary to proceed in federal court. *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769 (5th Cir. 2023). A plaintiff does not "automatically satisfy the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016); *see also A&R Eng'g & Testing, Inc. v. Scott*, 72 F.4th 685, 690 (5th Cir. 2023). As shown below, none of Plaintiffs' claimed harms amounts to an injury in fact to a sovereign or quasi-sovereign interest.

First, the States do not have **sovereign standing**, which requires injury to "the power to create and enforce a legal code." Resp. at 28-29 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)). Plaintiffs admit they have power to enforce their laws in their own courts, so no sovereign interest in law enforcement has been injured. The States' claim that Google's alleged deceptive conduct violated the DTPA and thereby impeded the States' ability to enforce their DTPAs, Resp. at 29, fails. "Someone violating a law does not by itself injure the government in an Article III way." *Harrison*, 78 F.4th at 771. Rather, "a violation of state law does not become an injury until a state *brings an enforcement action* against a violator to bring the

1

violator into compliance with the law, and the violator or another entity *hinders the State from doing so*." *Mississippi v. Becerra*, 727 F. Supp. 3d 559, 580 (S.D. Miss. 2024).[1]

Second, the States do not have **quasi-sovereign standing**. They have failed to meet the "hard-and-fast limits on the parens patriae doctrine": injury to a "quasi-sovereign interest" that is "sufficiently concrete to create an actual controversy between the State and the defendant" and that "affects a sufficiently substantial segment of the State's population." *Harrison*, 78 F.4th at 772. A State must show "a valid quasi-sovereign interest" that "implicate[s] the State's *own* interests in addition to and apart from the interests of particular private parties." *Paxton v. Dettelbach*, 105 F.4th 708, 715 (5th Cir. 2024) (emphasis original). It is not enough for a State to claim "injury to its citizens' health or well being" because citizens are "perfectly capable of suing … themselves." *Id.* Instead, the State must show harm that "*implicates its own interests.*" *Id.* (emphasis original). "Texas," like any other State, "may not merely litigate as a volunteer the personal claims of its citizens." *Id.* at 716. Here, each state DTPA allows consumers to sue for damages if they are injured by deceptive acts. The injuries the States allege to ad buyers, ad sellers, and Google's ad-tech competitors thus are not a quasi-sovereign interest because they are "wholly derivative" of the interests of an identifiable group of citizens. *Harrison*, 78 F.4th at 773.

The States' theory that they have a quasi-sovereign interest in securing "honest marketplaces" by "protecting against an ad tech monopolist's manipulation of the auction rules," Resp. at 22, also fails. Standing is assessed "claim-by-claim." MSJ at 6; *see also Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) ("[A] plaintiff who has been subject to injurious conduct of one kind does not possess by virtue of that injury the necessary

---

[1] The States' arguments about convenience or cost, *see* Resp. at 29, cannot confer sovereign standing where none exists. In any event, the States do not lack resources: they have retained three law firms here on a contingent-fee basis.

stake in litigating conduct of another kind, although similar."). Standing to bring *antitrust* claims challenging a "monopolist's manipulation" of "marketplaces" therefore does not establish standing to bring *DTPA* claims alleging misstatements or omissions of material information. *See Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 735 (5th Cir. 2023). Moreover, lack of "honesty" in a marketplace is not a cognizable injury. To support Article III standing, an alleged harm "must have a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," such as "monetary harms." *A&R Eng'g*, 72 F.4th at 690. An asserted interest in "enforcing consumer protection laws, both to protect individual consumers and to protect an honest marketplace" is too "abstract, generalized, and indirect" to establish standing. *Utah Div. of Consumer Prot. v. Stevens*, 398 F. Supp. 3d 1139, 1142 (D. Utah 2019).

All of the cases Plaintiffs cite as the "weight of authority," Resp. at 22, are from outside the Fifth Circuit and involve inquiry into the real party in interest for purposes of analyzing *diversity jurisdiction*, not standing. None of these cases authorizes a State to sue as a volunteer for private citizens or finds Article III standing where the State's *own independent interests* are not implicated. *See, e.g.*, *D.C. v. JTH Tax LLC*, 2023 WL 130736, at *3-4 (D.D.C. Jan. 9, 2023) (states had a quasi-sovereign interest in suit filed to "seek redress of its *own* injuries"). Moreover, no interest in the "economic well-being of citizens" can be shown here. *Id.* at *3. The States chose to waive all damages related to their citizens' "economic well-being" and instead seek penalties that (if awarded) will be paid only to the States' own treasuries. *See* ECF 366. An attempt to enrich a state's coffers without evidence of injury to the state itself is not a quasi-sovereign interest that confers standing.

The cases Plaintiffs cite also make plain that the DTPA claims belong in state courts, not in this federal court. *See AU Optronics Corp. v. South Carolina*, 699 F.3d 385, 393 (4th Cir. 2012)

(state possesses "a quasi-sovereign interest in the right to enforce its own consumer protection laws *in its own courts*"); *id.* at 394 (recognizing state's "quasi-sovereign interest in enforcing—*in state court*—its laws with respect to price-fixing conspiracies"); *see also W. Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011) (remanding to avoid "trampling on the sovereign dignity of the State and inappropriately transforming what is essentially a West Virginia matter into a federal case").

The throwaway theories tucked in a footnote fare no better. *See* Resp. at 23 n.9. There is no evidence of "increased costs to consumers" caused by Google's alleged conduct, and the Court should reject Plaintiffs' invitation to "presume" otherwise. *Id.* Injury in fact must be "actual or imminent, not conjectural or hypothetical," *A&R*, 72 F.4th at 690, and at the summary judgment stage, must be proven, not merely alleged.[2] Likewise, there is no evidence that "Google's ad tech auctions amounted to sales of consumer data." *See* § IV, *infra*. The States also offer no evidence to show how an interest in consumer privacy could amount to a quasi-sovereign interest that exists "apart from" and is not "wholly derivative" of the interests of private parties consisting of internet users. *Detelbach*, 104 F.4th 715; *Harrison*, 78 F.4th at 773.

Plaintiffs' argument that they "can establish standing without meeting all the normal standards for redressability" because they are entitled to "special solicitude," Resp. at 25, also misses the mark. "[S]pecial solicitude" has not "played a meaningful role" in the Supreme Court's decisions and "has no basis in [its] jurisprudence" apart from a single decision, so "lower courts should just leave that idea on the shelf." *United States v. Texas*, 599 U.S. 670, 688–89 (2023) (Gorsuch, J., concurring). Regardless, even Plaintiffs concede that some redressability test applies:

---

[2] The sole case Plaintiffs cite addressed the adequacy of a complaint at the *dismissal* stage. *Utah ex rel. Wilkinson v. B & H Auto*, 701 F. Supp. 201, 204-05 (D. Utah 1988).

at a minimum, they must show a "possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Resp. at 25. (citing *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022)). Here, there is no "decision" for Google to "reconsider." The algorithms the States attack ended at least a year *before* Plaintiffs filed suit, when the transition to a first-price auction made them obsolete and incapable of recurring. *See* MSJ at 12-16.

Plaintiffs' attempts to recharacterize Supreme Court precedent do not save them. The "*Federal* government"—not *State* governments—may face less stringent standing requirements and have greater access to *federal* courts. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 188 (2000). This is unsurprising: the law has long recognized the right of the federal government to "apply to *its own* courts for any proper assistance" in discharging its "powers and duties." *In re Debs*, 158 U.S. 564, 584 (1895). A State has the same "power" to "appear in *its own* courts." *Ex Parte Young*, 209 U.S. 123, 199 (1908). It does not follow, however, that States have the same right to apply to *federal* courts (rather than their own).[3]

### B.  The Attorneys General Lack Capacity to Sue in Texas Federal Court.

Plaintiffs claim that the Attorney General of every State has capacity to sue in this Texas federal court based on their "common law power." Resp. at 30. But in several Plaintiff States, the Attorneys General do not have common law powers at all. *See* MSJ Appx. A. There, statutes provide the only source of authority for actions by the Attorney General. Further, in every State where the Attorney General does have common law powers, the legislature can constrain that

---

[3] Additionally, Section 1367 allows the Court to decline to exercise jurisdiction where a claim raises "novel or complex issues of State law." 28 U.S.C. § 1367. The States' admission that theirs is not a "mine-run" case, Resp. at 35, offers yet another reason the Court should decline jurisdiction over the DTPA claims. *See also* MSJ at 20-22.

power. *See id.* Here, every legislature did so, allowing each Attorney General to pursue DTPA claims only in state court. *See* MSJ at 18; Appx. A.

Even the case Plaintiffs quote recognizes there is "no doubt that the legislature may deprive the attorney general of specific powers," and he "may exercise all such authority as the public interest requires" only "in the absence of such legislative action." *Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268 (5th Cir. 1976). The States' legislatures authorized the Attorneys General to bring DTPA actions only in the courts of their home states. *See* MSJ Appx. A. When a legislature intends to authorize its Attorney General to sue in foreign or federal courts, it knows how to do so. *Compare, e.g.*, Idaho Code § 48-606(2) (A DPTA action "may be brought *in the district court of the county* …."), *with* Idaho Code § 48-108(4) ("The attorney general may proceed under any antitrust laws *in the federal courts* ….").[4]

## II.    Plaintiffs Have No Evidence of a Deceptive Act in Each State.

Each State's DTPA requires proof that a deceptive act or practice occurred in the State, *see* MSJ Appx. B ("Transactional Nexus); MSJ at 23-29, permitting an award of penalties *only* upon proof of a violation *in that State*. The Response offers no evidence that auction algorithms the States attack were used in each State and no evidence of a deceptive act in each State. This failure of proof is independently fatal to the DTPA claims.

### A.  There Is No Evidence of "Auction Manipulation" Violations in Each State.

Plaintiffs admit that proof of a DTPA violation requires an act in a specific State that was deceptive. *See* Resp. at 36. Neither the assertion that conduct was "nationwide" nor the assumption

---

[4] Plaintiffs' concern about whether the States would retain authority to prosecute a suit filed in state court and removed to federal court, Resp. at 31, is not at issue here. Provisions that limit an Attorney General's authority to *file* suit do not implicate the power to act if a properly filed state court action is *removed* to a federal court.

that there "must have been" some in-state impact is *evidence* of such a violation. *See* MSJ at 26. The States' Response confirms Google's point. It begins: "Google's Own Data Shows *Auctions* Occurred in Each State." Resp. at 36. Auctions, in themselves, are not deceptive. As the Response concedes, the allegedly deceptive algorithms *did not influence all auctions*. *Id.* at n.7.

The Response does not cite a single document or line of testimony from any State witness showing that even *one* of the allegedly deceptive algorithms (or "manipulations") was used in an auction in their State. The Response offers *no* evidence of the number of "manipulations" in each State, no State-specific nexus, and no evidence that an individual ad buyer, ad seller, or consumer in any given State was deceived (or even capable of being deceived) by Google's actions.[5]

Plaintiffs' experts also provide no evidence of violations within each state. Their penalty expert, Mr. Andrien, counted only "the number of *auctions* in each State," Resp. at 37; *see also* RSUF ¶ 256, not the number of times any alleged deception or "auction manipulation" occurred in each State, Resp. at 37 n.16 (auction count only).[6] Mr. Andrien's penalty calculations do not change based on the number of violations, MSJ at 29, Ex. 10 ¶ 20, showing he has not measured or quantified "violations" at all.[7]

The States admit that Mr. Andrien does not allocate penalties among them based on the number of violations, but rather based on "internet users" in each State. Resp. at 37. Household

---

[5] Plaintiffs' RSUF confirms not a single state has *any* evidence of a deceptive act *in* their State. *See, e.g.,* ¶ 240 (Arkansas: "the harm is a harm nationwide … and we have *no reason to believe* that the harm to Arkansans is any different"); *see also* ¶¶ 240-254 (same).

[6] Google's expert, Dr. Wiggins does not provide the missing proof. *See* Resp. at 37. Dr. Wiggins corrected errors in Mr. Andrien's calculations, which counted auctions, not violations or deception. *See* Resp. Ex. 85 (Wiggins Rpt.) at 69 n.307 (explaining that he excludes from Andrien's figures any "transactions that *could not have been* impacted," which "should not be interpreted as a finding that the remaining transactions were impacted").

[7] The Response does not cite the testimony of the States' purported auction theory expert, Professor Weinberg, leaving unrebutted his admission that he cannot identify "any particular ad impression that I know was impacted." MSJ at 27 (citing Weinberg Tr. at 145:11-146:19).

7

internet usage is obviously not a deceptive act. The count of all auctions, and the allocation based on internet use, is not evidence that *any* deceptive act occurred in *any* State.

The Response attempts to blame Google for the States' failure to bring forth evidence of specific deceptive acts in each state. *See* Resp. at 36. But Google had no obligation to prove "the number of auctions directly affected." *Id.*[8] The States have the burden to show competent evidence refuting Google's motion on three elements: (i) the existence of individual DTPA violations in each State, (ii) how many violations there were in each State, and (iii) whether, as the States claimed, the evidence raises a genuine issue of material fact on their demand for *aggregate* penalties of ~$20 billion, ~$120 billion, or somewhere in between. *See* MSJ at 30-36. The Response offers no such evidence, so summary judgment should be granted.[9]

### B.  Other Courts Reject General Claims for Penalties Without Proof of Harm.

Plaintiffs' attempt to distinguish the decisions in *Zyprexa*, *Ironworkers*, and *Vioxx* as "pharmaceutical mass torts," Resp. at 41, only proves Google's point. In each, the court considered claims under a DTPA statute that, as here, sought "per violation" penalties without proof of specific harm occurring *in* that State. And in each, the court rejected the claim because aggregate proof is not enough to raise a genuine issue of fact to support per-violation penalties under a DTPA.

---

[8] *See Mir v. L-3 Commc'ns Integrated Sys. L.P.*, 319 F.R.D. 220, 227 (N.D. Tex. 2016) (discovery rules impose no duty "to create or prepare a new or previously non-existent document solely for its production"); *Marchese v. Dep't of Interior*, 2004 WL 2297465, at *4 (E.D. La. October 12, 2004) ("Rule 34 does not require a party responding to discovery to create responsive materials.").
[9] The Response suggests that the Court reopen discovery if it finds the States' proof lacking, Resp. at 36 n.15, but does not meet Rule 56(d)'s requirements. It offers no declaration asserting Plaintiffs lacked adequate time for discovery, nor any proof that Google failed to produce relevant data in its possession. To the contrary, it acknowledges that Google produced terabytes of auction-related data and that Mr. Andrien used it in his auction-counting exercise. The suggestion that a spoliation finding based on the failure to retain all Chats of individual employees should relieve Plaintiffs of their burden to show deceptive acts in each State, Resp. at 60, is meritless. The States do not argue that Chats have anything to do with the auction data that was produced or that Chats are relevant to prove violations in each State.

*See In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 459 (E.D.N.Y. 2009) (granting summary judgment because Mississippi failed to offer "*the kind of individualized information relating to each prescription* that is needed to enable the requisite inquiry by the court in imposing discretionary penalties"); *In re Vioxx Prods. Liab. Litig.*, 2010 WL 11570867, at *3, *8 (E.D. La. 2010) (granting summary judgment because "it is *not sufficient* for Plaintiff to generally assert that Merck's misrepresentations led to the prescription of Vioxx. *Each decision by each doctor and each patient was different*."); *Ironworkers Loc. Union No. 68 v. AstraZeneca Pharms. LP,* 585 F. Supp. 2d 1339, 1345-46 (M.D. Fla. 2008) (finding that three state consumer protection statutes required proof of "a causal nexus *between the actionable conduct and the injury sustained*"). The States' "all auctions" theory fails here for the same reasons.

The lack of proof is not cured by Plaintiffs' claim that Florida's DTPA permits it to sue without proving harm. *See* Resp. at 42. No case permits any State to recover DTPA penalties based on *aggregate* proof with no showing of the number of violations (if any) that occurred in that State. Plaintiffs do not cite a single case permitting a DTPA recovery based on "national" allegations. Instead, they cite two cases in which the Mississippi Supreme Court sustained penalties based on proof of the number of deceptive acts *in Mississippi. See Watson Labs., Inc. v. State*, 241 So. 3d 573, 580-81 (Miss. 2018) (affirming award "based on the number of times Watson published an inflated average wholesale price" in Mississippi); *In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 834, 847 (Miss. 2015) (upholding penalty based on the "number of occasions" fraudulent reports were made to Mississippi Medicaid). This proves Google's point.

### III.     The Penalties Sought Are Constitutionally Excessive and Far Exceed Any Award Sustained in Any State.

The States argue that it is premature to assess whether there is evidence to support the unprecedented tens of billions in penalties they seek. Resp. at 40. In fact, they must come forward now with evidence of deceptive acts in each State to recovery any penalties at all. The States must also adduce evidence now of individual harm in each State, and evidence sufficient to show the penalties they demand are proportionate to that harm. *See* MSJ at 31-36; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (The penalty must be proportional to "civil penalties authorized or imposed in comparable cases."). On both points, however, the Response offers nothing. The unconstitutional excessiveness of this demand warrants summary judgment.

 Penalties are an economic sanction, subject to the strictures of the Excessive Fines and Due Process clauses. *See, e.g.*, *Timbs v. Indiana*, 586 U.S. 146, 151 (2019); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). They require not only proof of individual harm, but also evidence that the penalties demanded are proportional to "sanctions imposed in other cases for comparable misconduct." *Cooper Indus. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 435 (2001). The States offer no such evidence. In fact, no reported case has ever awarded DTPA penalties remotely as large as these. Attached as Appendix C is a spreadsheet compiling the largest reported DTPA penalty awards ever sustained on appeal in each Plaintiff State. In each, DTPA penalties were sustained only on proof of actual violations in that State and were tethered to the number of violations in that State. The largest reported DTPA award in any of these States was $124 million —a tiny fraction of the sum demanded here.

Ignoring this binding law, which requires proof of actual deceptive acts in each State, the Response offers only the demand for penalties based on aggregated, "national" proof, which Plaintiffs urge should be allocated based on each State's share of household internet usage.[10] This echoes the now-discredited "market share" liability theory adopted by the California Supreme Court in *Sindell v. Abbott Laboratories*, 26 Cal. 3d 588 (1980). Since *Sindell* was decided, courts in Texas, Arkansas, Florida, Indiana, Kentucky, Louisiana, Mississippi, Missouri, North Dakota, and South Carolina—all Plaintiffs here—have rejected market share as a basis to allocate liability. *See* Appx. D. Similarly, the Idaho Supreme Court has never "sanctioned the use" of market share liability. *Doe v. Cutter Biological, a Div. of Miles, Inc.*, 852 F. Supp. 909, 913 (D. Idaho 1994). "National" evidence allocated by internet-usage-share raises no genuine issue of fact for trial.

## IV.    No Evidence Shows Google Deceived Users About the Sale of Personal Information.

Plaintiffs' claim that Google violated the DTPAs because it deceived users about whether it "sells" their personal information fails as a matter of law. The evidence is undisputed: Google does not *sell* users' *personal* information; instead, components of Google's ad tech platform may temporarily *share* (not for a price) limited *non-personal* information as part of the auction process.

This is disclosed in the very Policy that Plaintiffs allege is misleading. Plaintiffs' sleight of hand begins by isolating one sentence from Google's Privacy Policy: "Google does not sell your personal information." Here is the entire bullet point[11]:

> • We explain when Google may disclose information in Sharing your information. Google does not sell your personal information. Google also does not "share" your personal information as that term is defined in the California Consumer Privacy Act (CCPA).

---

[10] The bare assertion that "even if the jury concludes that not all auctions were impacted, it will have substantial evidence at trial which would support a calculation of the number of auctions affected," Resp. at 43, raises no issue of fact: the Response cites *no such* evidence.

[11] While Plaintiffs' Fourth Amended Complaint ("FAC") cites to the 2019 version of Google's Privacy Policy, FAC ¶ 579, Plaintiffs now cite to the current version, Resp. at 19, 55-56.

SUF ¶ 229. Google's policy also defined "personal information" as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google account." *Id.* The definition was the same in 2019. *See* SUF ¶ 229. The same policy explains how Google uses *non-personally identifying information*:[12]

> We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

And, finally, under "We use data to build better services,"[13] Google is clear:

> • We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

A DTPA claim cannot arise from actions permitted by a contract or disclosure. "It is not a DTPA violation if one party to an agreement fails to inform the other party that it intends to exercise rights that the agreement expressly confers." *DeWitt County Elec. Coop, Inc. v. Parks*, 1 S.W.3d 96, 104 (Tex. 1999); *see also Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 333 (Tex. 1983) (same). The States must produce evidence that: (i) information was not disclosed, (ii) the failure to disclose induced the transaction, and (iii) the customer would not have entered the transaction had the truth been disclosed. *See, e.g.*, *Patterson v. McMickle*, 191 S.W.3d 819, 827 (Tex. App.—Fort Worth 2006, no pet.) (collecting cases). They have not done so.

No reasonable factfinder could determine that these statements were "deceptive." Google's policy both defines "personal information" *and* tells users that, while information that personally

---

[12] https://policies.google.com/privacy?hl=en-US (shortcut via blue hyperlink for "Sharing your information").
[13] https://policies.google.com/privacy?hl=en-US.

identifies the user is *not* shared with advertisers, other *non-personally identifying* information *is* shared with advertisers to personalize ads that the user sees. The same disclosure instructs users on how to disable this setting if they wish.[14] Nor have the States provided evidence from which a reasonable factfinder could conclude that making available anonymized data, such as device type, internet protocol address, and geolocation, in order to solicit bids for an ad is something Google concealed, or amounted to the sale of personally identifiable information.

What Google *sells* are services that match advertisers and publishers' impressions. The Response admits this, arguing that "the winning bidder pays a price for an impression," but errs when it asserts that the bidder "receives the user's personal data along with that impression." Resp. at 55-56. The document Plaintiffs cite refutes this conclusively, stating plainly that what an advertiser receives (and pays for) upon winning an auction is the impression (i.e., delivery to the publisher's site of the URL of the ad image server, so it can display the ad). Resp. Ex. 48 at -680. No evidence supports the inference that Google sells personal information. *Id.* at -678 (showing non-personally identifying information being shared for free, before bids are submitted).

## V.   Plaintiffs Raise No Issue of Fact on Their "Equal Footing" Claims.

Courts do not hesitate to grant summary judgment where disclosure language precludes a finding in favor of a plaintiff's failure-to-disclose theory.[15] This is particularly so in Intent and

---

[14] The tab entitled "Your Privacy Controls" is easily accessible within Google's Privacy Policy: https://policies.google.com/privacy?hl=en-US#infochoices.

[15] *See, e.g.*, *Polsky v. Dish Network Serv., LLC*, 2015 WL 12732860, at *3 (S.D. Tex. Aug. 7, 2015) (granting summary judgment because defendants' "disclaimers would put any reasonable consumer on notice that the [product] had [the] limitations" allegedly undisclosed); *Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1373 (S.D. Fla. 2007) (granting summary judgment where "Plaintiffs' claims of deceptive advertising are belied by the information itself"). Even the securities-fraud case Plaintiffs (oddly) highlight, *see* Resp. at 45, makes the same point: summary judgment should be granted when the disclosure is "obvious," *Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 208 (5th Cir. 1988).

Willfulness States. *See* MSJ at 38-39 & Appx. B. The Fifth Circuit has also rejected the claim (made here) that under Texas's DTPA, a jury must determine whether a disclosure "fairly described" the product at issue. *Sidco Prods. Mktg., Inc. v. Gulf Oil Corp.*, 858 F.2d 1095, 1100 (5th Cir. 1988) (where disclosure provided general notice of the allegedly omitted information, inference of "nefarious motive" was precluded). These cases defeat Plaintiffs' DTPA claims for the alleged nondisclosure of DRS (both DRSv1 and DRSv2) and RPO. Rather than repeat its unrebutted disclosure arguments, Google attaches as Appendix E a chart showing the disclosures that refute Plaintiffs' DRS and RPO claims.

We make two points on Bernanke. First, while Plaintiffs allege Bernanke deceived *both* advertisers and publishers, the Response addresses *only publishers*. *See* Resp. at 52-53. It offers no opposition to Google's motion for partial summary judgment against the alleged deception of *advertisers* after the transition to a threshold-pricing rule. *Compare* MSJ at 46-49, *with* Resp. at 53 (arguing absence of *advertiser* deception is "neither here nor there" because "*publisher clients*" were deceived). Accordingly, the Court should grant summary judgment on the claim that Bernanke deceived *advertisers* after the relevant dates for transitions to threshold-pricing rules. *See Gray v. White*, 18 F.4th 463, 469 (5th Cir. 2021) ("[W]hen a party fails to raise an argument in opposition to a motion for summary judgment, … that argument is waived.").

Second, as to publishers—that is, ad space *sellers* in the auction—the Response concedes that Bernanke (i) was a program on "Google Ads" (i.e., "GDN"), a buy-side tool for advertisers, *see* Resp. at 12, and (ii) worked by increasing some and decreasing other "bids" before they were submitted "to AdX," rather than working at the AdX level after bids were received, *id.* at 12-13; *see also* SUF ¶¶ 108, 119. Neither the DTPA, nor any other law, requires the disclosure of buyers' bidding strategies to auction sellers. Nor would a "reasonable consumer" expect such disclosures.

*See* MSJ at  38 & n.21, 52 & n.27. Plaintiffs, in fact, contended in their Complaint that revealing bidding strategies to sellers would be unfair and deceptive. *See* FAC ¶ 334 (advertisers trusted that their maximum bids would "not be used against them" in the auction). And even if Bernanke's adjustments to bids were publisher-facing adjustments to the operation of the AdX auction, or if the fact that publishers were "affected" required that the adjustment of bids by Google be disclosed, Google *did* disclose that AdX had the "discretion" to adjust bids—a fact Plaintiffs' Response wholly ignores. *See* MSJ at 50-51; Appx. E.

Finally, the Response offers no evidence to show that Google's disclosures about the 2019 transition to a unified first price-auction were false or deceptive. *See* MSJ at 51-53. Instead, the Response hypothesizes about Google's allegedly secret motive for this change, Resp. at 53-54, but raises no genuine issue of fact for trial. "Case law clearly holds that a defendant's motive is not a material fact," *Ward v. Succession of Freeman*, 854 F.2d 780, 791 (5th Cir. 1988), and "the law imposes no duty to disclose that motivation," *Henningsen v. ADT Corp.*, 161 F.Supp.3d 1161, 1183 (S.D. Fla. 2015), *aff'd sub nom.*, *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 Fed. App'x 850 (11th Cir. 2016). The failure to offer any proof that Google's actual representation (that there would be no "last look" advantage going forward) was false or deceptive requires summary judgment. This claim is not saved by the assertion (for the first time in the Response) that "smart bidding" somehow "replicate[d]" last look, Resp. at 54-55, because the evidence cited refutes it conclusively. *See id.* (citing RSUF ¶ 79). It is undisputed that what Plaintiffs call "last look" was removed in 2019. RSUF ¶¶ 81, 108. And subjective statements about "fairness" and "equal footing" are statements of opinion and puffery, which are always appropriate for summary judgment. *See* MSJ at 54-55.

Dated: December 23, 2024

Respectfully submitted,

GIBBS & BRUNS LLP

*/s/ Kathy D. Patrick*
Kathy D. Patrick
Texas Bar No. 15581400
KPatrick@gibbsbruns.com
Robin C. Gibbs
Texas Bar No. 07853000
RGibbs@gibbsbruns.com
Caitlin A. Halpern
Texas Bar No. 24116474
CHalpern@gibbsbruns.com
Michael R. Davis
Texas Bar No. 24109793
MDavis@gibbsbruns.com
Connor E. Burwell
Texas Bar No. 24131297
CBurwell@gibbsbruns.com
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805

Eric Mahr (*pro hac vice*)
eric.mahr@freshfields.com
Gayle Klein (*pro hac vice*)
gayle.klein@freshfields.com
Andrew Ewalt (*pro hac vice*)
andrew.ewalt@freshfields.com
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4545

Daniel S. Bitton (*pro hac vice*)
dbitton@axinn.com
AXINN, VELTROP & HARKRIDER LLP
55 Second Street
San Francisco, CA 94105
Telephone: (415) 490-1486

Bradley Justus (*pro hac vice*)
bjustus@axinn.com
James K. Hunsberger (*pro hac vice*)
jhunsberger@axinn.com

16

David R. Pearl (*pro hac vice*)
dpearl@axinn.com
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW Washington, DC 20036
Telephone: (202) 912-4700

ATTORNEYS FOR DEFENDANT GOOGLE LLC

## **CERTIFICATE OF SERVICE**

I certify that on December 23, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and notice was thereby served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ Kathy D. Patrick*
Kathy D. Patrick

17