**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| The State of Texas, et al.,<br><br>               Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>               Defendant. | Case No. 4:20-cv-00957-SDJ<br><br>Hon. Sean D. Jordan |

## PLAINTIFF STATES' RESPONSE TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ANTITRUST CLAIMS

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

RESPONSE TO STATEMENT OF ISSUES ....................................................................... 3

BACKGROUND ................................................................................................................... 4

    A.   The Open Web Display Advertising Industry.......................................................... 4

    B.   Google's Monopolization of the Online Open Web Ad Display Industry .................. 8

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

I.    Google's Anticompetitive Acts Are Not Lawful Refusals To Deal................................. 11

    A.   Tying AdX to DFP ................................................................................................ 14

        1.   AdX and DFP are tied ................................................................................ 15

        2.   Tying AdX and DFP is not a lawful refusal to deal ................................... 19

    B.   Dynamic Allocation/Enhanced Dynamic Allocation.................................................. 21

    C.   Line-Item Limits ................................................................................................... 26

    D.   Redacted Data Transfer Files................................................................................ 29

    E.   Unified Pricing Rules............................................................................................ 33

    F.   Google's Overall Conduct .................................................................................... 38

II.   Google's Anticompetitive Conduct Has No Legitimate Business Justification And Is Exclusionary......................................................................................................................... 39

    A.   Dynamic Allocation/Enhanced Dynamic Allocation.................................................. 41

    B.   Dynamic Revenue Share ...................................................................................... 44

    C.   Project Bernanke ................................................................................................. 47

III. Google's Anticompetitive Conduct Harmed Competition In The Ad Exchange Market. ........................................................................................................................................... 50

IV. Google Has A Dangerous Probability Of Achieving Monopoly Power In The Alleged Market For Ad Buying Tools For Large Advertisers. .................................................... 54

V.  Plaintiff States' State Law Antitrust Claims Present Issues Of Fact For Trial For The Same Reasons As Plaintiff States' Federal Claims........................................................... 55

VI. Plaintiff States' State Law Antitrust Claims For Civil Penalties Are Timely. .............. 56

    A.   Dynamic Allocation/Enhanced Dynamic Allocation.................................................. 58

B. Dynamic Revenue Share ................................................................................................ 59

C. DFP/AdX Tie ............................................................................................................... 60

**CONCLUSION** ......................................................................................................................... **60**

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ................................................................. 19

*Alascom, Inc. v. N. Slope Borough, Bd. of Equalization*,
659 P.2d 1175 (Alaska 1983) ................................................................. 56

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*,
137 F. App'x 694 (5th Cir. 2005) ........................................................... 37

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) .................................................................11, 12, 13

*Assoc. Radio Serv. Co. v. Page Airways, Inc.*,
624 F.2d 1342 (5th Cir. 1980) ........................................................ 13, 38

*Barlow v. Pfizer Inc.*,
2013 WL 12171892 (W.D. Tex. Feb. 22, 2013) ...................................... 57

*Bates v. State Bar of Arizona*,
433 U.S. 350 (1977) ............................................................................... 32

*Bell v. Dow Chem. Co.*,
847 F. 2d 1179 (5th Cir. 1988) ...................................................... *passim*

*Bodet v. Charter Commc'ns Inc.*,
2010 WL 5094214 (E.D. La. July 26, 2010) .......................................... 17

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,
176 F. Supp. 3d 606 (W.D. La. 2016) .....................................................11

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) .................................................................. 54

*Burbank v. Compass Bank*,
2016 WL 7665431 (E.D. Tex. Sept. 29, 2016) ...................................... 57

*Chase Mfg., Inc. v. Johns Manville Corp.*,
84 F.4th 1157 (10th Cir. 2023) ....................................................... 12, 28

*CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*,
888 F. Supp. 2d 780 (E.D. La. 2012) ..................................................... 58

*Childs v Haussecker*,
974 S.W.2d 31 (Tex. 1998) .................................................................... 57

*Cites of Anaheim, Riverside, Banning Colton & Azusa v. S. Cal. Edison Co.*,
    1990 WL 209261 (C.D. Cal. Oct. 22, 1990) ........................................................ 41

*City of Fairbanks v. Amoco Chem. Co.*,
    952 P.2d 1173 (Alaska 1998) ........................................................................... 56

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ................................................................................. 13, 38

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
    732 F.2d 480 (5th Cir. 1984) ....................................................................... 54, 55

*Driskill v. Dallas Cowboys Football Club, Inc.*,
    498 F.2d 321 (5th Cir. 1974) ............................................................................ 15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................................... *passim*

*Facebook, Inc. v. Brandtotal Ltd.*,
    2021 WL 2354751 (N.D. Cal. June 9, 2021) ......................................................... 37

*Federal Trade Commission v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986) ................................................................................. 31, 32

*Foddrill v. McManus*,
    2013 WL 6198228 (W.D. Tex. Nov. 26, 2013) ....................................................... 58

*FTC v. Amazon.com, Inc.*,
    2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) ................................................... 35

*Goldwasser v. Ameritech Corp.*,
    222 F.3d 390 (7th Cir. 2000) ............................................................................ 37

*High Tech. Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993) ........................................................................... 40

*Hudson Ry. Co. v. Consol. Rail Corp.*,
    902 F.2d 174 (2d Cir. 1990) ............................................................................ 41

*Hunton Energy Holdings, LLC, v. HL Seawater Holdings, LLC*,
    539 F. Supp. 3d 685 (S.D. Tex. 2021) ............................................................ 57, 58

*Ill. Tool Works, Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ...................................................................................... 13

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
    703 F. Supp. 3d 862 (N.D. Ill. 2023) ............................................................. 14, 36

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*,
429 F. Supp. 2d 752 (E.D. La. 2005) ...................................................................... 32

*In re Google Digit. Advert. Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022) ............................................................ *passim*

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
622 F. Supp. 3d 22 (E.D. Pa. 2022) ........................................................................ 14

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
2011 WL 167259 (D. Minn. Jan. 14, 2011) ...................................................... 50, 51

*Jack v. Evonik Corp.*,
79 F.4th 547 (5th Cir. 2023) ................................................................................... 57

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ................................................................................... 12, 16, 18

*Kemp v. Holder*,
610 F.3d 231 (5th Cir. 2010) .................................................................................. 10

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
762 F.3d 1114 (10th Cir. 2014) .............................................................................. 52

*Lorain J. Co. v. United States*,
342 U.S. 143 (1951) ............................................................................................... 11

*Mahone v. Addicks Util. Dist. of Harris Cnty.*,
836 F.2d 921 (5th Cir. 1988) .................................................................................. 33

*Major Mart, Inc. v. Mitchell Distrib. Co.*,
46 F. Supp. 3d 639 (S.D. Miss. 2014) ............................................... 40, 42, 46, 50

*McGregor v. La. State Univ. Bd. of Supervisors*,
3 F.3d 850 (5th Cir. 1993) ...................................................................................... 58

*MGMTL, L.L.C. v. Strategic Tech. Inst., Inc.*,
2024 WL 3949073 (5th Cir. Aug. 27, 2024) .......................................................... 57

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958) ........................................................................................... 12, 15

*N. Tex. Specialty Physicians v. FTC*,
528 F.3d 346 (5th Cir. 2008) .................................................................................. 32

*N.Y. ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) ...................................................................... 13, 28, 33

*NCAA v. Alston*,
  594 U.S. 69 (2021) ........................................................................ 28, 33, 36

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) .................................................... *passim*

*Ohio v. Am. Exp. Co.*,
  585 U.S. 529 (2018) ...................................................................... 50

*Otter Tail Power Co. v. United States*,
  410 U.S. 366 (1973) ...................................................................... 41

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ...................................................................... 36, 37

*Quintel Tech. Ltd. v. Huawei Techs., Inc.*,
  2017 WL 9286991 (E.D. Tex. Dec. 13, 2017) ............................... 58

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
  2013 WL 5366104 (E.D. Tex. Mar. 14, 2013) ............................... 52

*Sam v. Richard*,
  887 F.3d 710 (5th Cir. 2018) ........................................................ 10

*Serv. & Training, Inc. v. Data Gen. Corp.*,
  963 F.2d 680 (4th Cir. 1992) ........................................................ 19, 20

*Stearns Airport Equip. Co. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999) ........................................................ 40, 41, 47

*Texas v. Durham*,
  860 S.W.2d 63 (Tex. 1993) ............................................................ 56

*Thompson v. 1-800 Contacts, Inc.*,
  2018 WL 2271024 (D. Utah May 17, 2018) ................................... 32

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594 (1953) ...................................................................... 13, 16

*Tucker v. Apple Comput., Inc.*,
  493 F. Supp. 2d 1090 (N.D. Cal. 2006) ........................................ *passim*

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ...................................................... 55

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ...................................................................... 12

*United States v. Google LLC*,
    2024 WL 3647498 (D.D.C. Aug. 5, 2024)............................................................. 1, 20, 25, 37

*United States v. Google LLC*,
    687 F. Supp. 3d 48 (D.D.C. 2023) ................................................................................... 20, 25

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001)........................................................................................ *passim*

*Van Winkle v. Rogers*,
    82 F.4th 370 (5th Cir. 2023)....................................................................................................11

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)................................................................................................... 13, 37

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020)........................................................................................ *passim*

*Welk v. Simpkins*,
    402 F. App'x 15 (5th Cir. 2010) ................................................................................... 58

*Whitt v. Stephens Cnty.*,
    529 F.3d 278 (5th Cir. 2008)....................................................................................................11

**Statutes**

Alaska Stat. Ann. § 09.10.120............................................................................................. 56

Ark. Code Ann. § 4-75-302................................................................................................ 55

Mont. Code Ann. § 27-2-231 ............................................................................................. 56

Mont. Code Ann. § 27-2-211(1)(c)(i) ............................................................................... 56

**Other Authorities**

Charles A. Wright & Arthur R. Miller, 10B Fed. Prac. & Proc. Civ. § 2732.1 (4th ed.) ............... 2

Fed. R. Civ. P. 56(a) ............................................................................................................ 10

Herbert Hovenkamp, *FRAND and Antitrust*,
    105 Cornell L. Rev. 1683 (2020) ................................................................................11, 12, 19

## INTRODUCTION

Google has built an empire that reaches every aspect of the display advertising markets. These markets are composed of publishers that own websites and sell ad space, advertisers who buy ad space, and advertising technology providers that facilitate these transactions. Because the vast majority of open web display sales are conducted via automated software, ad tech providers play a critical role in the vast majority of transactions.

Google exercises market power across the entire ad tech industry. Google has monopolies in the publisher ad server market that helps publishers sell ad space, the market for ad buying tools for small advertisers that helps them buy ad space, and in the market for ad exchanges—where publisher ad servers and ad buying tools come together to complete sales transactions. Google seeks to extend its dominance even further by attempting to monopolize the market for ad buying tools for large advertisers.

Google did not obtain and preserve its market dominance through merit. Google has intentionally and systematically worked to control each aspect of the industry, coercing customers to use Google products, preventing customers from even having the option of working with any of Google's rivals, and harming publishers and advertisers alike. Engaging in just this sort of unlawful, anticompetitive conduct is not a new strategy for Google. Earlier this year, Google was found to have " violated Section 2 of the Sherman Act" by monopolizing the markets for general search services and general text advertising. *United States v. Google LLC*, 2024 WL 3647498, at *4 (D.D.C. Aug. 5, 2024).

Plaintiff States filed this suit to compel Google to release its monopolistic hold and restore competition. Google remarkably claims the antitrust case should not even go to a factfinder. Dkt. 674. That view is mistaken. Although the legal standard for summary judgment is no different for antitrust cases, as a practical matter, antitrust suits "are by their very nature poorly suited for

disposition by summary judgment," which is "frequently denied." Charles A. Wright & Arthur R. Miller, 10B Fed. Prac. & Proc. Civ. § 2732.1 (4th ed.). Google's motion is no different. It asks the Court to resolve as a matter of law highly fact-intensive issues such as whether Google's conduct is anticompetitive, has legitimate business justifications, or is beneficial or harmful in totality.

Many of Google's legal arguments were already rejected either at the motion to dismiss stage in this case or at summary judgment in the parallel proceeding in the Eastern District of Virginia. Google's motion ignores these decisions and provides no reason to reach a different result now. The remainder of Google's arguments address issues that are fact-bound and readily supported by the record, such as the likelihood Google will be able to monopolize the market for ad buying tools for large advertisers.

At the heart of Google's motion is its contention that most of its conduct should be recharacterized as a lawful refusal to deal with rivals. Not only is this a rewrite of the facts, but it also requires a dramatic rewriting of antitrust law. The conduct at issue here does not involve Google's refusal to extend its technology or platform to rivals; it concerns Google's use of its vertical integration and monopoly power to hurt Google's own *customers* and prevent *them* from participating in a robust, free market with viable competitors. Google does this through a variety of anticompetitive means, including by tying its publisher ad server to its ad exchange, giving its ad exchange multiple advantages to buy impressions by not allowing customers using competitor products to bid, manipulating prices (and hiding that from everyone), requiring publishers to set the same price floors on Google's ad exchange as they do on other exchanges, and simply refusing to give publishers basic information like how much advertisers are bidding for their ad space. To be sure, these monopolistic practices—like all monopolistic practices—harm would-be rivals. But

they are nothing like a mere refusal to share the recipe to Google's fairly developed secret sauce with competitors.

Google also claims that its efforts to avoid competition with its rivals have "legitimate business justifications." Google's own internal documents tell a different story. As just one of many examples, employees acknowledged that Google's auction manipulations were "unethical" and "evil." Ex.[1] 95 (GOOG-TEX-00309326) at -327. Drawing inferences in Plaintiff States' favor, a reasonable, jury could easily conclude that "unethical" and "evil" conduct is the polar opposite of "legitimate." Google's motion should be denied.

### RESPONSE TO STATEMENT OF ISSUES

Plaintiff States answer Google's statement of the issues to be decided as follows:

1.      Google is not entitled to partial summary judgment on Counts I and II because Google's conduct with respect to Dynamic Allocation, Enhanced Dynamic Allocation, Line-Item Limits, Redacted Data Transfer Files, and Unified Pricing Rules is anticompetitive and Plaintiff States' claims are not based on Google having any duty to deal with its competitors;

2.      Google is not entitled to summary judgment on Count III because Google coerces customers to use DFP to gain access to AdX, Plaintiff States' claim is not based on Google having any duty to deal, and, even if Plaintiff States' claim was based on a duty to deal, Google's tying still violates Sections I and II of the Sherman Act;

3.      Google is not entitled to summary judgment on Counts I and II because Dynamic Allocation, Enhanced Dynamic Allocation, Dynamic Revenue Share, and Project Bernanke were implemented to inhibit competition and have no legitimate business justifications;

---

[1] "Ex." refers to exhibits attached by Plaintiffs to the Declaration of K. Bhat, filed contemporaneously herewith in support of Plaintiffs' Oppositions to Google's Motions for Summary Judgment.

4.      Google is not entitled to summary judgment on Counts I and II because Plaintiff States have demonstrated competitive harm in the relevant markets with respect to the conduct at issue in Google's motion for summary judgment;

5.      Google is not entitled to summary judgment on Counts I and II with respect to the alleged market for ad exchanges because Plaintiff States have established "net harm" in that alleged market;

6.      Google is not entitled to summary judgment on Count II with respect to the alleged market for ad buying tools for large advertisers because Plaintiff States have demonstrated a dangerous probability of Google achieving monopoly power in that alleged market;

7.      Google is not entitled to summary judgment on Count V for the same reasons it is not entitled to summary judgment as to Plaintiff States' federal claims;

8.      Certain Plaintiff States' claims for civil penalties are not barred by the statutes of limitations.

## BACKGROUND

### A.  The Open Web Display Advertising Industry

The open web display advertising industry is composed of three groups of participants: publishers, advertisers, and providers of ad tech tools that facilitate transactions between publishers and advertisers. Davis Ex. 52[2] (Gans Rep.) ¶41. Publishers are typically website owners that utilize display advertising to monetize their content (*e.g.*, news websites). RSMF ¶4.[3] Advertisers are businesses or individuals that wish to promote their products, services, or brands.

---

[2] In this response, "Davis Ex." refers to the corresponding exhibit attached by Google to the Declaration of Michael Davis.
[3] All references to "RSMF" refer to Plaintiff States' Response to Google's [Corrected] Statement of Undisputed Facts in Support of Google's Motions for Summary Judgment, filed concurrently.

*Id.* ¶58. And ad tech providers are firms that provide software tools that publishers and advertisers use to buy, sell, and transact "impressions" (instances of consumers viewing ads). *Id.* ¶¶6–8.

Publishers create online content to attract consumers to their websites and, alongside that content, display ads. *Id.* ¶3. Publishers sell their ad "inventory" (space on a website or webpage to display ads) to maximize profits. *Id.* ¶3–4. A publisher's total amount of inventory depends on both how many ads a webpage displays and the number of times consumers view it, as a single ad space can be sold to different advertisers at different prices for each individual consumer who visits the page. Davis Ex. 52 ¶21. Publishers also care about ad quality, because low quality ads (*e.g.*, irrelevant, misleading, or fake ads) can negatively impact a consumer's view of the publisher's website and harm the user experience. *Id.* ¶54. That in turn can decrease the likelihood the consumer will return to the website (or reduce the frequency at which they do so) and reduce the publisher's opportunity to monetize their inventory and maximize profits. *Id.* ¶¶50, 54.

Information is at a premium in the open web display advertising market. Advertisers value the ability to place ads in front of consumers who are most likely to purchase their products or services. *Id.* ¶22. Publishers therefore seek to provide information to advertisers to increase the value of their inventory, and they accomplish that by collecting data from consumers when they visit a website (*e.g.*, a user's location, age, gender, whether the user clicks an ad) and providing it to advertisers. *Id.* ¶¶22, 42, 49. Advertisers use that data to target ads to specific users and to track the performance of their advertising campaigns (*e.g.*, who and how many users click an ad, who and how many make a purchase). *Id.* ¶¶42, 49, 58. Information thus powers the industry—the better quality information a publisher has, the greater the value the publisher can demonstrate for their inventory, and the more advertisers are willing to pay for impressions. *Id.* ¶26.

Ad tech tool providers facilitate the buying and selling of impressions. RSMF ¶6. The open web display ad industry is characterized by high transaction volumes, and 90% of ads are purchased through automated software, so ad tech providers are critical to the functioning of the industry. *Id.* ¶¶27, 50. Ad tech tools include:

- Publisher ad servers: Software that helps publishers track, manage, and optimize and sell their inventory, including by setting price floors and other sale parameters;

- Ad exchanges: Software that enables the programmatic trading of impressions by connecting publishers and advertisers and running auctions for impressions;

- Ad buying tools: Software that facilitates the purchase of inventory by advertisers based on ad campaign budgets and goals, and connect advertisers to ad exchanges.

*Id.* ¶¶62, 108; RSMF ¶¶12–15, 18–19, 22.

Selling an impression is a multi-step process that brings together publishers and sellers through ad tech tools. When a consumer visits a publisher's website, it triggers the website to send an ad request to the publisher's ad server. RSMF ¶23. The ad request contains data on the consumer's visit, like the consumer's location, device type, and potentially more depending on what information the publisher collects. Davis Ex. 52 ¶93. Based on the information in the ad request, the publisher ad server uses "inventory routing logic" to determine whether to serve a direct ad (an ad that is part of a deal negotiated directly between a publisher and an advertiser, *id.* ¶100) or request an ad from another demand source (any entity that is interested in buying inventory, including advertisers). *Id.* ¶¶93–94. If there is no direct deal, then the publisher ad server will call an ad exchange and request bids from potential advertisers (to be supplied to the ad exchange via the advertisers' ad buying tools). *Id.* ¶96. The bid request includes details on the identity of the consumer and other parameters, like a floor price identifying the minimum price necessary to win the bid, the ad format, and the website URL. *Id.* A publisher can send ad requests to multiple ad exchanges for the same impression.

The decision processes used by ad servers and exchanges to process and solicit bids after receiving a bid request have evolved over time. In the early days of online display advertising, most used a "Waterfall" process. *Id.* ¶95. In the Waterfall process, potential advertisers via Demand-Side Platforms or ad agencies (demand sources) were called sequentially based on their average historical yield from highest to lowest (or some other ranking by the publisher), and the first called demand source that bid at or above the floor price would win the impression. *Id.* ¶¶95, 107; RSMF ¶49. As a result, demand sources did not compete head to head, and publishers did not maximize their yield because a demand source could win the impression even if it did not have the highest bid simply because it was called earlier in the sequence than another demand source that would have bid more if given the opportunity. Davis Ex. 52 ¶107; RSMF ¶50. Real-time bidding eventually evolved as a solution to this inefficiency. Davis Ex. 52 ¶111.

If there is no direct deal, the ad exchange sends the bid request to demand sources (via Waterfall process or real-time bidding) and they evaluate the request and decide whether to bid and what amount based on their targeting parameters and criteria. *Id.* ¶97. If a demand source chooses to bid, it sends the bid to the ad exchange with the bid value and code allowing the ad to be displayed. *Id.* If the real-time process is used, the ad exchange reviews all bids and runs an auction based on its internal logic and selects a winner. *Id.* The publisher ad server receives the winning bids from any ad exchanges it submitted bid requests to, determines the final winner, and notifies the winning ad exchange. *Id.* ¶98. The winning ad exchange then sends the final price to the winning demand source, and the ad is displayed on the publisher's website to the consumer. *Id.* All of this happens in a fraction of a second. *Id.* ¶111.

**Information flow and decision-logic in the programmatic ad tech ecosystem**



### B. Google's Monopolization of the Online Open Web Ad Display Industry

Google is vertically integrated across every component of the online open web ad display industry. Google has a publisher ad server (DFP), an ad exchange (AdX), ad buying tools for small advertisers (Google Ads, also known as GDN), and ad buying tools for large advertisers (DV360). Davis Ex. 52 ¶63; RSMF ¶¶30, 45–46.

Google has monopoly power—or at least significant market power—in the market for each of its products. Google broke into the industry in 2008 when it acquired DoubleClick, which included DFP and an ad exchange. Davis Ex. 52 ¶66. Since then, Google has used anticompetitive means to cement itself as a monopolist in the markets for publisher ad servers and ad buying tools for small advertisers, and it has significant market power in the market for ad exchanges. *Id.* ¶¶348–406. Google is also threatening to become a monopolist in the market for ad buying tools for large advertisers. *Infra* at Section IV.

Google has achieved and protected its monopoly by utilizing a cornucopia of unlawful practices designed to insulate its products from having to compete on the merits with Google's rivals. For purposes of Google's summary judgment motion, the conduct at issue largely centers

around Google's AdX exchange server. AdX rose to prominence with the advent of real-time bidding in AdX's internal logic (known as Dynamic Allocation) that solved the inefficiencies of the Waterfall method discussed above. Davis Ex. 52 ¶114; RSMF ¶¶51, 53.

Publishers, however, wanted to use options outside of AdX that offered different features, services, or advertiser access, without losing the access to Google's vast number of advertisers who could only transact through AdX. Around 2014, publishers began to experiment with methods to allow exchanges outside of AdX to engage in real-time bidding. RSMF ¶56. This resulted in the rise of Header Bidding. Publishers began putting a script in the header tag of their web pages that allowed participating ad exchanges and other demand-side platforms to submit bids for impressions in an auction run on the publisher's webpage. *Id.* ¶57. These auctions occurred before the impression was sent to the publisher ad server. Davis Ex. 52 ¶115.

Header Bidding allowed publishers to circumvent AdX and offer their inventory to other exchanges. *Id.* ¶116. At the same time, Header Bidding also allowed rival exchanges and demand-side platforms to bid on publisher inventory offered through DFP that had previously only been available through AdX. *Id.* Publishers liked Header Bidding because it gave them greater transparency and control, guaranteed better yield management, and enabled advertisers to access previously unavailable inventory through bypassing ad exchanges. *Id.* ¶119.

Google's anticompetitive conduct predated the rise of Header Bidding, but its efforts intensified as Header Bidding threatened AdX and DFP. Google stifled that competition by implementing practices designed to both force publishers to use AdX and DFP and inhibit them from using a rival ad exchange, publisher ad server, or Header Bidding. Google used technical restrictions to tie DFP to AdX by preventing publishers from accessing AdX's real-time bidding unless they used DFP. *Id.* ¶895. Google later cemented the tie by requiring publishers to buy both

9

AdX and DFP together and refusing to sell them separately. *Id.* Google also used its monopoly power to steer customers' transactions to AdX and away from rivals by:

- Using Dynamic Allocation/Enhanced Dynamic Allocation in DFP to give AdX the opportunity to bid on impressions before any rival exchange submitted a live bid, *and* the opportunity to bid one final time after other exchanges' bids were submitted;

- Restricting publishers' use of "line items" (criteria set by publishers to manage the sale of inventory) in DFP to prevent them from using Header Bidding;

- Removing information from key data fields in DFP so publishers could not evaluate and compare how their inventory was performing on different ad exchanges;

- Imposing Unified Pricing Rules through DFP that required publishers to use uniform price floors across exchanges to decrease publishers' incentives to use rival ad exchanges; and

- Using Dynamic Revenue Share to alter AdX's take rates (the share of a winning bid AdX would receive as payment) to increase the number of completed transactions on AdX without having to compete on the merits, reinforcing AdX's market power and raising barriers to entry.

*Id.*

Google's efforts to avoid competing on the merits worked. Google has reduced overall market efficiency—harming its rivals, publishers, advertisers, and end consumers alike. Davis Ex. 39 (Pathak Rep.) ¶¶18, 19, 20, 51–52, 192.

**LEGAL STANDARD**

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Id.* (quoting *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010)). "To decide if the non-movant has raised a genuine issue, [the court] view[s] all facts and evidence in the light most favorable to him and draw[s] all reasonable inferences in his favor." *Id.*

In addition, Plaintiff States are separately moving for an adverse inference based on Google's spoliation of evidence. If the Court grants the motion, the hurdles Google must overcome for summary judgment become even higher because "[a]n inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Van Winkle v. Rogers*, 82 F.4th 370, 382 (5th Cir. 2023) (quoting *Whitt v. Stephens Cnty.*, 529 F.3d 278, 285 (5th Cir. 2008)) (reversing grant of summary judgment).

## ARGUMENT

### I.   Google's Anticompetitive Acts Are Not Lawful Refusals To Deal.

Google rewrites Plaintiff States' case as accusing the company of breaching a "duty to deal with its competitors." Mot. at 11.  But there is a vast difference in antitrust law between failing to share with rivals hard won, proprietary advantages and *excluding* rivals from the marketplace "by means other than competition on the merits." *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 617 (W.D. La. 2016); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) ("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as [anticompetitive]." (internal quotation marks omitted)).

A reasonable jury can easily conclude that Google's misconduct is in the forbidden zone. "A 'simple refusal to deal' is conduct where one firm 'refuses to deal no matter what.'" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) (quoting Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683, 1697 (2020)). The refusal to deal doctrine recognizes that a firm has a "general right" to "refuse to [deal with] whomever it pleases," but that right is "neither absolute nor exempt from regulation." *Lorain J. Co. v. United States*, 342 U.S. 143, 155 (1951). "[E]xercis[ing]" that right as "a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." *Id.* Thus, a firm's refusal to deal with rivals is insulated from

antitrust liability only "[i]n the absence of any purpose to create or maintain a monopoly." *Aspen Skiing*, 472 U.S. at 602 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).

The refusal to deal doctrine's protection of certain conduct has a limited scope—it "targets only a discrete category of section 2 cases." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013). "It doesn't seek to displace doctrines that address a monopolist's more direct interference with rivals." *Id.*

Google's conduct at issue in its Motion does not concern Google's decisions whether or not to deal with its *rivals* but rather Google's direct restriction of its *customers'* choices to do business with competitors on the merits of their product offerings. The refusal to deal paradigm is therefore inapposite. *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (reversing grant of summary judgment because district court erred by "borrowing a standard from refusal-to-deal-with-rivals caselaw").

Tying is one form of anticompetitive conduct. A tying agreement is a "'conditional refusal[] to deal'—i.e., one firm will refuse to deal with another firm unless 'some condition is met.'" *Viamedia*, 951 F.3d at 453 (quoting Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. at 1697). In other words, "[a] tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)). Notably, tying is a conditional refusal to deal with a *customer*, not a rival.

"[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the *buyer* into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated in part*

*on other grounds*, *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (emphasis added). "By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market." *Id.* at 12–13 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953)).

Ultimately, "[c]onduct that can harm competition may fit into more than one of these court-devised categories" or may not fit precisely into any, because "the 'means of illicit exclusion, like the means of legitimate competition, are myriad.'" *Viamedia*, 951 F.3d at 453 (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 398 (2004)). "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Trinko*, 540 U.S. at 411. Accordingly, in every case, the focus is on whether the "the conduct . . . harm[s] the competitive *process* and thereby harm[s] consumers." *Viamedia*, 951 F.3d at 453 (internal quotation marks omitted). If so, then it is anticompetitive and prohibited by the Sherman Act. *Id.* "[E]vidence of intent is" also "relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive." *Aspen Skiing*, 472 U.S. at 602.

To determine whether Google's conduct is anticompetitive in violation of Section 2, the Court must evaluate Google's actions as a whole. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) (analyzing plaintiff's "claims as if they were five completely separate and unrelated lawsuits" was "improper" because "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"); *Assoc. Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980) (affirming jury verdict for plaintiff even though "no one of the instances of improper conduct, standing alone, would lead to section 2 liability" (footnote

omitted)); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 59–62 (E.D. Pa. 2022) (evaluating whether defendant's "combined actions effectively broke the competitive mechanism in the market").

Google repeatedly suggests that it should be free to design its products as it sees fit, but anticompetitive product design is just as unlawful as any other anticompetitive conduct. *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 n.26 (2d Cir. 2015) ("[P]roduct []design violates § 2 when combined with other conduct and the combined effect is anticompetitive or exclusionary."); *United States v. Microsoft*, 253 F.3d 34, 65–66 (D.C. Cir. 2001) (Microsoft's design of Windows 98 operating system violated § 2 because it, "through something other than competition on the merits, ha[d] the effect of significantly reducing usage of rivals' products"); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 870, 908 (N.D. Ill. 2023) (designing tractors to require specific "software tools and resources" that prevented customers from "perform[ing] their own repairs or hav[ing] a local repair shop perform the repairs" stated claim for § 2 violation).

Google made the same attempt to characterize its anticompetitive conduct as lawful refusals to deal in its motion to dismiss in the MDL and in its summary judgment motion in the parallel case proceeding in the Eastern District of Virginia. It was correctly rebuffed each time. *See* Pls.' Opp. to Google Mot. for Summ. J. at 21–28, *United States v. Google*, No. 23-cv-108 (E.D. Va. Aug. 6, 2024), Dkt. 1127; Order, *United States v. Google*, No. 23-cv-108 (E.D. Va. June 14, 2024), Dkt. 773. The Court should do the same here.

## A.  Tying AdX to DFP

Google ties DFP and AdX by refusing to allow publishers to access real-time bidding in AdX unless they purchase DFP. Google does this through both technological restrictions that

prevent using real-time bidding with AdX unless the publisher has DFP and by simply refusing to sell such service separately from DFP.

### 1. AdX and DFP are tied

"Tying is conduct in which a firm will 'sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product.'" *Viamedia*, 951 F.3d at 468 (quoting *N. Pac. Ry.*, 356 U.S. at 5–6). A tying claim has multiple elements, but Google disputes only one: whether Google "coerces or forces the customer to buy [DFP] in order to obtain [AdX]." Mot. at 30 (alterations in original) (quotation marks omitted). Coercion is generally a "triable issue[] of fact not subject to proper adjudication by summary judgment." *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974).

Google's coercion is obvious, as Google has used technical and contractual restrictions to force publishers to purchase DFP if they wish to access AdX real-time bidding. Beginning in 2009, Google implemented technical limitations that prevented publishers using competitors' publisher ad servers from selling to AdX in real-time auctions. Davis Ex. 52 ¶¶424–33. Google did not need to impose these limitations, *id.* ¶¶435–43, but did so in order to "lock in" publishers to using DFP in order to access AdX's real-time bidding, *id.* ¶441.

Google later tied AdX and DFP together contractually. Originally, Google would enter into separate contracts with publishers for AdX and DFP—one contract for AdX, and another for DFP. Davis Ex. 52 ¶446; RSMF ¶179. Beginning in June 2016, Google began offering only a single, "unified" contract for what Google called "Google Ad Manager" that included both AdX and DFP. Davis Ex. 52 ¶446; RSMF ¶182; Ex. 96 (GOOG-TEX-00725911) at -911–12. Simultaneously, Google refused to enter into new contracts for only AdX, even if a publisher did not want to use DFP. Davis Ex. 52 ¶446.; Davis Ex. 53 (Gans Rebuttal Rep.) ¶¶296–97, 299; Ex. 96 (GOOG-TEX-00725911) at -912; *see, e.g.*, Ex. 97 (GOOG-AT-MDL-019588187) at -188 (requiring publisher to

sign unified contract even though the publisher "only uses AdX, and doesn't want to use DFP"). Google also terminated the AdX-only contracts for publishers who refused to sign the unified contract. Davis Ex. 53 ¶287; RSMF ¶183; Ex. 109 (GOOG-AT-MDL-B-003186306) at -307 (Google ███████████████████████████████████████). Google did all of this to force customers to buy DFP to access AdX's real-time bidding, reduce competition from Header Bidding, and further Google's ad server monopoly with AdX. Davis Ex. 52 ¶¶447–48.

Google's technical and contractual restrictions are coercive. The "technological limitation[s]" Google imposed "coerced" publishers into using DFP in order to access AdX's real-time bidding. *Tucker v. Apple Comput., Inc.*, 493 F. Supp. 2d 1090, 1097 (N.D. Cal. 2006). And Google's refusal to allow publishers to fully access AdX without purchasing DFP is "explicit . . . evidence" of coercion. *Viamedia*, 951 F.3d at 470 (finding sufficient evidence of coercion where there was testimony that "if a[] [customer] wants to get access to a [ad sales platform], it has to hire [the defendant] as its ad sales representative"); *Jefferson Par.*, 466 U.S. at 12–13 ("By conditioning his sale of one commodity on the purchase of another, a seller coerces the . . . buyer[]." (quoting *Times-Picayune*, 345 U.S. at 605)).

Google's arguments that publishers are not forced to purchase DFP as a condition of using AdX are little more than sleight of hand. Google first contends that "publishers are free to take either AdX or DFP by itself" because publishers that do not buy DFP and AdX can use AdX Direct—an alternative product that uses AdX tags. Mot. at 31 (alterations and internal quotation marks omitted); *id.* at 32 (discussing the availability of "AdX Direct"). But Google does not dispute that publishers cannot access *real-time* AdX bidding without buying DFP.[4] *See* RSMF

---

[4] Google claims (Mot. at 31n.13) it "does not provide real-time AdX bids to any ad server" but its own documents prove otherwise. *See, e.g.*, Ex. 98 (GOOG-TEX-00119553) at -553 ("One of the

¶176; Ex. 91 (GOOG-DOJ-27799214) at -215–17 (summarizing how ████████ ████████ including ████████); Ex. 108, ████████ ████████. Live bidding is the core feature of AdX that drives market demand such that publishers themselves consider AdX foreclosed if they do not purchase DFP. Davis Ex. 53 ¶¶301–6; RSMF ¶¶173–74; Ex. 98 (GOOG-TEX-00119553) at -553 ("One of the core values of DRX has been the real time nature of AdX."); Ex. 108 ████████ ████████. Google itself acknowledges that AdX Direct is no substitute for AdX, ████████ ████████, *See, e.g.*, Ex. 91 (GOOG-DOJ-27799214) at -917 (████████ ████████); *id.* at -216, -219–20 (████████ ████████); *id.* at -216, -221 (████████ ██ ████████ ████████). Thus, without access to AdX's live bidding, publishers effectively do not have access to AdX.[5] That Google may allow publishers to access a lesser version of AdX that lacks its key feature confirms, rather than rebuts, the coercive conduct. *See Bodet v. Charter Commc'ns Inc.*, 2010 WL 5094214, at *7 (E.D. La. July 26, 2010) ("actual coercion" alleged where defendant would sell customers cable service but not "premium cable" service unless plaintiffs also "rent[ed]" a set-top box).

---

core values of DRX has been the real time nature of AdX."); Ex. 94 (GOOG-DOJ-14762797) at -800 (describing how AdX "compete[s] in real time").
[5] For this same reason, Google is correct to acknowledge that AdX is the tying product. *See* Mot. at 31 n.13.

Google next asserts that its "contracts do not force publishers to *use* both DFP and AdX." Mot. at 32 (emphasis added); *see also id.* at 31 (discussing the number of "DFP publishers" that "use other ad exchanges to the exclusion of AdX"). Whether publishers are forced to *use* DFP or AdX after purchasing them does not affect whether publishers are coerced to *purchase* both. "[A] seller coerces" a buyer "[b]y conditioning his sale of one commodity on the purchase of another"— precisely what Google does to publishers with AdX and DFP. *Jefferson Par.*, 466 U.S. at 12–13. Market data confirms Google forced publishers to buy DFP to access AdX real-time bidding, as DFP's market share increased from less than 50% of the market for publisher ad servers before Google's acquisition to today having nearly 100%. Davis Ex. 52 ¶¶450–51. Google's gesture towards use is no defense to what it coerces its customers to *buy*.

At the motion to dismiss stage, Judge Castel rejected Google's argument and held that Google coerced publishers into buying DFP in order to use AdX. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 369 (S.D.N.Y. 2022) (rejecting Google's argument "that there is no plausible claim of actual coercion"). And the district court in the parallel proceeding denied Google's summary judgment motion as to the same conduct underlying the tying claim at issue here. *See* Pls.' Opp. to Google Mot. for Summ. J. at 24–25, *United States v. Google*, No. 23-cv-108 (E.D. Va. Aug. 6, 2024), Dkt. 1127; Order, *United States v. Google*, No. 23-cv-108 (E.D. Va. June 14, 2024), Dkt. 773. Google provides no basis to reach a different result here.

Altogether, the evidence is clear that Google coerces publishers to purchase DFP as a condition of obtaining real-time bidding in AdX.[6] At the very least, resolving all factual issues and

---

[6] Google also states (Mot. 32 n.14) that its "tie" is supposedly a "unilateral act" so applying "Section 1 is inappropriate," but Google's contracts that require purchase of both AdX and DFP are by definition tying agreements that fall under Section 1. *See Kodak*, 504 U.S. at 479.

taking all inferences in Plaintiff States' favor, this is a disputed issue of material fact that compels denial of summary judgment.

### 2.    Tying AdX and DFP is not a lawful refusal to deal

Google tries to avoid the tying framework altogether by recharacterizing its misconduct as a lawful refusal to deal. Google claims that Plaintiff States supposedly "seek[] to force Google to deal with its competitors in the way Plaintiffs deem appropriate." Mot. at 33. Google's characterization has no basis in fact or law.

Refusals to deal and tying are distinct. "A 'simple refusal to deal' is conduct where one firm 'refuses to deal no matter what,' whereas '[t]ying . . . [is a] common example[]' of [a] 'conditional refusal[] to deal'—*i.e.*, one firm will refuse to deal with another firm unless 'some condition is met.'" *Viamedia*, 951 F.3d at 453 (quoting Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. at 1697).

Google's conduct with respect to AdX and DFP is a classic tie. Google is not refusing to provide AdX to publishers "no matter what." Through technological and contractual limitations, Google compels publishers to purchase DFP as a condition of using AdX. Google's "sale of" AdX "to third parties on condition that they buy" DFP "is not" a "unilateral refusal to deal" but a "tie." *Kodak*, 504 U.S. at 463 & n.8.

Even if Google's tying conduct could be properly characterized as being based upon a refusal to deal (and it cannot), that still would not support summary judgment. *Viamedia*, 951 F.3d at 472 ("[A] tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary."). The cases cited by Google do not hold otherwise. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016) (plaintiff lacked "evidence of an implied condition embedded in the sale of the tying product"); *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 686 (4th Cir. 1992) (plaintiffs had no evidence defendant

19

"would sell MV/ADEX only on the condition that the buyer also purchase[ ] a different (or tied) product" (alteration in original) (internal quotation marks omitted)).

In a last ditch effort, Google claims (Mot. at 33–34) that Plaintiff States' sought-after remedy somehow morphs its tying claim into a refusal to deal. But whether conduct is anticompetitive in violation of the Sherman Act is based upon the facts—not a party's requested remedy. Even then, Plaintiff States have only requested that the Court order appropriate relief to restore competitive conditions and not to take any particular action like what Google suggests. Fourth Am. Compl. ¶759, *In re: Google Dig. Advert. Antitrust Litig.*, No. 1:21-md-03010 (S.D.N.Y. May 5, 2023), Dkt. No. 541. As stipulated by the parties and pursuant to the Court's bifurcation order, the Court will determine the appropriate relief on a fully developed record after Google is found liable and "issues related to equitable remedies" cannot be raised at summary judgment. Dkt. No. 610 at 2; *see Viamedia*, 951 F.3d at 480 (rejecting summary judgment argument based "on the challenge of remedying [defendant's] conduct" because it "puts the cart before the horse" and need only be addressed if the defendant "is found liable").The sole case Google relies upon addressed "the challenges the court would face in administering a remedy" only *after* the court held a nine-week bench trial. *Google*, 2024 WL 3647498, at *3, *131. That same court in fact *denied* summary judgment regarding the same conduct. *United States v. Google LLC*, 687 F. Supp. 3d 48, 85 (D.D.C. 2023).

In any event, restoring competitive conditions and rectifying Google's misconduct regarding the tie between AdX and DFP does not require mandating Google deal with its competitors. *First*, the tie is imposed on Google's *customers* (publishers), not competitors. *Second*, to remove the tie, the Court need only order Google to "disaggregate what it sells to customers" (*i.e.*, sell AdX and DFP separately), which Google acknowledges is a proper remedy for a tying

agreement. Mot. at 34 (quoting Areeda & Hovenkamp, ¶1700j1). The questions Google theorizes the Court would have to address (*id.* at 33) are therefore a straw man that have no bearing on summary judgment.

Once again, Judge Castel rejected the substance of Google's argument that Google's tying of AdX and DFP could be construed as a refusal to deal. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 369 (rejecting Google's characterization of the tie as "an assertion that Google should be required to give competing ad servers access to AdX live bids"). The district court in the parallel proceeding rejected Google's argument at summary judgment as well. *See* Pls.' Opp. to Google Mot. for Summ. J. at 24–25, *United States v. Google*, No. 23-cv-108 (E.D. Va. Aug. 6, 2024), Dkt. 1127; Order, *United States v. Google*, No. 23-cv-108 (E.D. Va. June 14, 2024), Dkt. 773. Resolving all factual issues and taking all inferences in Plaintiff States' favor, the Court should reach the same result here.

### B.  Dynamic Allocation/Enhanced Dynamic Allocation

Google used Dynamic Allocation and Enhanced Dynamic Allocation (part of the logic in the DFP publisher ad server) to steer transactions to AdX through market manipulation—not competitive merit—and harm Google's own customers. These anticompetitive policies are not lawful refusals to deal with rivals.

Dynamic Allocation was originally implemented as part of the logic in the DFP publisher ad server to run a real-time auction that avoided the potential inefficiency of the Waterfall process. Davis Ex. 52 ¶¶553–58. Google, however, used Dynamic Allocation to stifle competition among ad exchanges in two primary ways. *First*, Dynamic Allocation gave AdX a right of first refusal to publishers' non-guaranteed inventory. *Id.* ¶568; RSMF ¶¶ 91, 95. Dynamic Allocation did so by allowing AdX to bid first for an impression by comparing AdX's bid against historical average prices from other exchanges (not live bids) before offering the impression to other ad exchanges.

*Id.* Dynamic Allocation therefore allowed AdX to win impressions without giving any other ad exchange an opportunity to bid.

This practice harmed publishers in multiple ways. It prevented other ad exchanges that may have bid more than AdX from bidding at all—causing publishers to receive lower bid prices and lose money. *Id.* ¶¶569, 572–75; RSMF ¶90. Further, if a publisher ranked AdX lower in its Waterfall hierarchy, Dynamic Allocation overrode the publisher's choice by calling AdX first instead of using the publisher's ranking. Davis Ex. 52 ¶570.

Dynamic Allocation also harmed competition amongst ad exchanges. AdX was able to win publisher impressions without competing on the merits because other ad exchanges had no opportunity to submit competing bids. Google's own employees acknowledged that this conduct did not "allow sources of demand to compete fairly." *Id.* ¶588. Further, absent Dynamic Allocation giving AdX a right of first refusal by default, ad exchanges would have had to negotiate with publishers for such a right and exchanges would have competed against one another in this respect. *Id.* ¶582.

Enhanced Dynamic Allocation harms publishers and competition in the same manner, as it simply extended the right of first refusal from Dynamic Allocation to direct deals. *Id.* ¶¶628–30; RSMF ¶100. AdX is the only ad exchange that has this opportunity unconditionally. Davis Ex. 2 (Weinberg Rep.) ¶140.

*Second*, Dynamic Allocation gave AdX a "last look" where, after bidding was completed, AdX had the final opportunity to bid over the clearing price. Davis Ex. 52 ¶¶589–90, 594, 598; RSMF ¶¶91, 107. Because other ad exchanges did not have this additional opportunity to bid, Dynamic Allocation again gave AdX a special advantage having *nothing* to do with Google's

22

superior, merits-based product offerings. *Id.* ¶¶602–4, 607–8. Google simply ensured AdX would win impressions without having to actually compete to do so. *Id.*

Dynamic Allocation and Enhanced Dynamic Allocation thus harmed the competitive process by giving AdX the ability to avoid competition from other ad exchanges. AdX could either take an impression for itself without allowing other ad exchanges to bid live (with the right of first refusal), or wait for other exchanges to bid and then bid over the clearing price without giving other exchanges a chance to respond (with last look). In either scenario, AdX was able to complete transactions even though it may be neither the highest bidder (if other exchanges had been able to bid), nor the publisher's preferred demand source. AdX won such impressions simply by not allowing other ad exchanges to compete.

Such anticompetitive conduct falls in the heartland of the Sherman Act. The D.C. Circuit's en banc opinion in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), is illustrative. There, Microsoft was found liable for violating Section 2 because it monopolized the browser and operating system markets. Microsoft had designed the Windows operating system to "prevent[] [computer manufacturers] from pre-installing other browsers and deter[] consumers from using them." *Id.* at 64. The D.C. Circuit affirmed that Microsoft's conduct—such as removing Microsoft's browser from the "Add/Remove Programs utility" and "commingl[ing] browsing and non-browsing code" that would "cripple" the operating system if deleted—was anticompetitive because it, "through something other than competition on the merits, ha[d] the effect of significantly reducing usage of rivals' products and hence protecting [Microsoft's] own operating system monopoly." *Id.* at 65–67.

Like the conduct at issue in *Microsoft*, Dynamic Allocation and Enhanced Dynamic Allocation allow AdX to win more transactions "through something other than competition on the

merits" because AdX can win without submitting the highest live bid and even when publishers have other demand sources ranked higher. *Id.* at 65. The effect is to "significantly reduc[e] usage of rivals'" ad exchange platforms, harming publishers by decreasing their yield and ignoring their preferences. *Id.* If Google wishes to have a right of first refusal or last look advantage, then it should negotiate those advantages on the free market as opposed to mandating them by fiat.

Judge Castel thus came to the correct conclusion when he denied Google's motion to dismiss Plaintiff States' claims regarding these same issues and held that "Dynamic Allocation was anticompetitive in the ad exchange market" because it "had the effect of controlling prices and excluding competition in the ad-exchange market." *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 385; *id.* at 386 (concluding Enhanced Dynamic Allocation "caused injury to competition in the ad-exchange market").

Google contends (Mot. at 20) that this conduct is categorically lawful because it's a refusal to deal and Plaintiff States' claim rests on Google having "a duty to extend its Dynamic Allocation and Enhanced Dynamic Allocation features to rival exchanges." Google is incorrect. A "refusal to deal is conduct where one firm refuses to deal no matter what" with a rival. *Viamedia*, 951 F.3d at 453 (internal quotation marks omitted). Google applies Dynamic Allocation and Enhanced Dynamic Allocation to its own *customers'* ad transactions—overriding *their* preferences and preventing *them* from being served by other ad exchanges. These practices are not a refusal to deal "no matter what" with Google's *rivals*. The refusal to deal doctrine Google relies upon has no applicability where a monopolist retains its market power by thwarting a customer's ability to effectively choose an alternative provider. *Novell*, 731 F.3d at 1076; *see Tucker*, 493 F. Supp. 2d at 1099 (allegations that Apple designed iPod products to be incompatible with music and video files sold by competitors could not "be construed as a refusal to deal"). Were it otherwise, almost

every Section 2 case could be recast as a lawful "refusal to deal," since all Section 2 claims ultimately involve a dominant player "refusing" to allow customers to "deal" with would-be rivals.

Google also asserts that "Plaintiffs' claim closely mirrors the unsuccessful claim" related to Google's search advertising in *United States v. Google LLC*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024). Not so. There, the plaintiffs alleged that "Google ha[d] intentionally slow-rolled the development and launch of various features for Microsoft Ads that Google ha[d] fully integrated into . . . Google Ads." *Id.* at *129. Thus, the plaintiffs there *were* arguing that Google had a duty to affirmatively act and extend Google's services to a competitor (Microsoft). Here, Plaintiff States' claim is that Google must *stop* impairing its *customers'* ability to use competing ad exchanges. Further, the court in that case denied summary judgment regarding the same conduct and only decided the claim lacked merit after a nine-week trial. *Google*, 687 F. Supp. 3d at 85.

Google next contends that it did not affirmatively change Dynamic Allocation after Google acquired DoubleClick to create the right of first refusal or last look advantages.[7] Mot. at 19. Even assuming that is correct, Google deployed Dynamic Allocation anticompetitively despite having the technological means to stop such interference. Davis Ex. 52 ¶¶578–83; RSMF ¶107. Whether Google modified Dynamic Allocation to make it more anticompetitive is irrelevant to whether it "harm[s] the competitive *process* and thereby harm[s] consumers." *Viamedia*, 951 F.3d at 453. (internal quotation marks omitted).

---

[7] Google is incorrect that the claims "relating to Dynamic Allocation . . . and Enhanced Dynamic Allocation . . . have morphed" from the Complaint. Mot. at 17. Plaintiff States have consistently argued that these practices are anticompetitive. *See, e.g.*, *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 384–85 (summarizing allegations); Fourth Am. Compl. ¶271, *In re: Google Digit. Advert. Antitrust Litig.*, No. 1:21-md-03010 (S.D.N.Y. May 5, 2023), Dkt. No. 541 ("Dynamic Allocation marked an end to DFP ad server order-routing impartiality. . . . [as] Google used the dominance it held with its DFP ad server to impart a substantial new unearned and anticompetitive advantage to its own AdX exchange: a right of first refusal.").

Finally, Google raises a host of questions the Court would supposedly have to address when designing remedies. That "puts the cart before the horse," as, per the Court's bifurcation order, remedies need not be considered until after trial when the Court has a fully developed record and certainly not at summary judgment. *Viamedia*, 951 F.3d at 480; Dkt. No. 610 at 2. Google's questions are also red herrings because, again, Google need only stop interfering with its customers' ability to use competing ad exchanges through Dynamic Allocation and Enhanced Dynamic Allocation to end this particular anticompetitive conduct.

Google previously tried to paint Dynamic Allocation and Enhanced Dynamic Allocation as harmless conduct in its summary judgment motion in the Eastern District of Virginia, and the court rightly denied summary judgment. *See* Pls.' Opp. to Google Mot. for Summ. J. at 26, *United States v. Google LLC*, No. 23-cv-108 (E.D. Va. Aug. 6, 2024), Dkt. 1127; Order, *United States v. Google LLC*, No. 23-cv-108 (E.D. Va. June 14, 2024), Dkt. 773. Resolving all factual disputes and taking all inferences in Plaintiff States' favor, the Court should do the same here.

### C. Line-Item Limits

Google's limit on the number of line items publishers can use through its DFP publisher ad server are anticompetitive limits on customers, not lawful refusals to deal with rivals. Line items are ad server settings used by publishers to specify details relevant to displaying an ad to website visitors, like the space available for the ad and details about what kind of ad can be shown. Davis Ex. 52 ¶638; RSMF ¶¶185, 191. Line items are also necessary to use Header Bidding, as they translate the values from a Header Bidding auction into values recognizable by the ad server. Davis Ex. 52 ¶638; RSMF ¶¶58, 191.

Publishers use line items to customize their ad servers to best serve their inventory, as well as enable Header Bidding. Davis Ex. 52 ¶¶634, 640. Header Bidding requires the use of a significant number of line items. *Id.* ¶¶640–62.

Google enforces limits on line items to inhibit Header Bidding from competing with AdX. RSMF ¶188. Google restricts publishers to 61,000 line items. Davis Ex. 52. ¶¶641–43. This line-item limit restricts publishers ability to use Header Bidding and, as a result, limits Header Bidding's ability to compete with AdX. *Id.* ¶¶659, 661. One Google employee expressly acknowledged that line-item limits were ███████████████████████████████████ to ██████ Header Bidding.[8] *Id.* ¶674; *see also* Davis Ex. 53 ¶369.

More importantly, line-item limits also harm publishers. Reducing the number of allowed line items restricts publisher's ability to set and control pricing. Davis Ex. 52 ¶¶663, 665–66. They also reduce publishers' ability to control their inventory, strategize, and use Header Bidding to diversify their demand sources. *Id.* ¶¶664, 667–70, 672–73.

Line-item limits are not some superior innovation or service; Google enforces them to "harm the competitive process" by restricting publishers' ability to work with AdX's rival ad exchanges through Header Bidding. *Microsoft*, 253 F.3d at 58 (emphasis omitted). Similar to the conduct at issue in *Microsoft*, Google uses line-item limits to "reduc[e] usage of rivals' products" based on "something other than competition on the merits" and "deter[]" publishers from using other ad exchanges. *Id.* at 65–66.

Google tries to twist Plaintiff States' challenge to Google's line-item limits as somehow trying to impose a duty to "facilitate[] header bidding" and "the business of its competitors." Mot. at 23. But, as explained above, Google's imposition of line-item limits affirmatively inhibits

---

[8] Google acknowledges that this evidence must be "accept[ed] . . . as true for purposes of summary judgment" but nevertheless claims that Google imposed line-item limits to decrease "infrastructure costs." Mot. at 23. This is pretextual as explained above. Google grants exceptions to the limits and any technical costs from increased line items are minimal. Davis Ex. 53 ¶¶367–68, 370. In any event, whether there is a "procompetitive justification" for Google's conduct is "a factual issue properly resolved by the jury." *Viamedia*, 951 F.3d at 457.

publishers from using Header Bidding—thereby reducing AdX's competition. Google's decision to make it harder for publishers to work with its rivals is plainly anticompetitive and does not rely on imposing any duty on Google to work with rivals; Google merely needs to stop restricting its customers' freedom of choice in the marketplace. *Tucker*, 493 F. Supp. 2d at 1099 ("actively modifying" iPod to "not support" alternative formats and "using technological restrictions to prevent consumers" from playing music and videos purchased from competitors could not "be construed as a refusal to deal"); *see also Chase Mfg.*, 84 F.4th at 1173 ("[A] refusal-to-deal framework applies to narrow situations often remedied by monopolists sharing their technology with *rivals*." (emphasis added)). The fact that Google accomplished its interference by redesigning one of its products also does not insulate it from antitrust liability. *See NCAA v. Alston*, 594 U.S. 69, 101 (2021) ("[A] party can[not] relabel a restraint as a product feature and declare it immune from [antitrust] scrutiny." (internal quotation marks omitted)); *Actavis*, 787 F.3d at 654 & n.26 ("[P]roduct redesign violates § 2 when combined with other conduct and the combined effect is anticompetitive or exclusionary."); *Microsoft*, 253 F.3d at 65–67 (Microsoft's design of Windows 98 to take Internet Explorer "out of the Add/Remove Programs utility" and "commingling of code" violated Section 2).

Finally, Google returns (Mot. at 24) to its favorite straw man regarding supposedly "'thorny' questions about technical feasibility and feature development." Yet again, the question of remediation is not appropriate at summary judgment. *Viamedia*, 951 F.3d at 480. Regardless, because Google is actively restricting publishers' ability to work with Google's rivals by imposing line-item limits, removing those limits is an available, administrable remedy to improve competition.

### D. Redacted Data Transfer Files

Google's redaction of information from AdX Data Transfer files is not a lawful refusal to deal but an anticompetitive practice designed to insulate AdX from competition by withholding information *publishers* need to compare AdX with competing ad exchanges. Auction information, like bid amounts and how winning bids are determined, is critical for publishers to understand how an auction operates. Davis Ex. 52 ¶680. Publishers use this information to set reserve prices and monitor financial performance across ad exchanges. *Id.* Without it, publishers are unable to verify an auction's operations, compare performance across ad exchanges, and value their ad inventory. *Id.* If Ford made it impossible for drivers to gauge the performance of GM trucks, no court would excuse the practice on the ground that Ford has no obligation to deal with GM.

Google provides publishers nine different types of Data Transfer files that contain information on important details related to things like requests, impressions, and bids. *Id.* ¶681. This includes information regarding bids from AdX and other ad exchanges that participate in Open Bidding. *Id.* Data Transfer files do not, however, contain bids that come through Header Bidding auctions. *Id.* ¶681. Header Bidding auction data is collected in separate Bid Data Transfer files. *Id.* ¶682; RSMF ¶209.

Both Data Transfer and Bid Data Transfer files include a "KeyPart" field. Davis Ex. 52 ¶682. Before 2019, the KeyPart value in both files was the same, so publishers could use the KeyPart field to link impressions across both types of files and compare bids and outcomes between Header Bidding and other ad exchanges like AdX. *Id.* ¶¶682–83. This enabled publishers to learn how much a particular advertiser paid for the publisher's inventory when bidding through an exchange. *Id.* ¶684. Thus, publishers could compare their yields for similar inventory across ad exchanges and channels like Header Bidding. *Id.* Google knew that publishers used this information to ███████████████████████████████████████████████ by

████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 99 (GOOG-AT-MDL-006231727) at -729.

In 2019, displeased that customers were using information to shop their business, Google changed how the KeyPart field was generated such that the KeyPart values in Data Transfer files were different from the values in the same field for Bid Data Transfer files. Davis Ex. 52 ¶683. As a result, publishers could no longer match the files and compare bid results between AdX and Header Bidding. *Id.* ¶¶683–84.

At the same time, Google also truncated 20 other data fields, seven of which were necessary for publishers to compare yields across channels. *Id.* ¶685. These fields provided information about the advertiser that would show if the bid won, the ID of the yield partner who placed the bid, and the names of the yield groups that matched to allow the bid. *Id.* By removing these fields, Google hid relevant identifying information about auction winners from publishers. *Id.* Google also truncated fields that provided timestamps of the impression down to the second and microsecond, such that they now only provided the hour of the impression—causing a significant loss of information for publishers and further impairing any attempt to match Data Transfer and Bid Data Transfer files. *Id.* ¶686. Finally, Google rounded the field for the bid price to the nearest $0.10, resulting in a loss of important information about bid pricing. *Id.*

Altogether, these modifications to Data Transfer files significantly decreased the information available to publishers and harmed competition among ad exchanges and with Header Bidding. Losing this information made it impossible for publishers to compare performance across channels. *Id.* ¶695; RSMF ¶213. It also had a number of other harmful impacts on competition: publishers could no longer run experiments necessary to understand bid performance, analyze

Google Ads bids, measure the value of their first-party data and audience, and build value from their inventory. Davis Ex. 52 ¶696. Publishers also could no longer use bidding data to detect if their ad tech providers were complying with revenue sharing agreements. *Id.*

Google's modifications insulated AdX from competition. Publishers' loss of information reduced publishers' incentives to consider rivals by making it difficult for rivals to demonstrate value to publishers. *Id.* ¶¶697, 700. Google *intended* its modifications to harm publishers and reduce competition by depriving publishers of critical information. *Id.* ¶¶691, 698–701; Ex. 100 (GOOG-AT-MDL-B-004016318) at -320 (███████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████). Publishers got the message too, deducing that Google was ███████████ Header Bidding. Davis Ex. 52 ¶699.

Google offers *no* pro-competitive justification for restricting previously available information. A reasonable jury is certainly entitled not to find market enhancing effects. For example, in *Federal Trade Commission v. Indiana Federation of Dentists*, the Supreme Court addressed a situation where a group of dentists were refusing to provide insurers with dental x-rays so the insurers could evaluate whether the dentists were providing the "least expensive yet adequate treatment" for their patients. 476 U.S. 447, 449 (1986). The Supreme Court held that refusal to provide the x-rays violated Section 1 of the Sherman Act because "withhold[ing] (or mak[ing] more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the market." *Id.* at 461–62. The Court went further and held that withholding such information would violate the Sherman Act "even if the desired information were in fact *completely useless* to the insurers and their patients" because the defendant was "not entitled to

pre-empt the working of the market by deciding for itself that its customers do not need that which they demand." *Id.* at 462 (emphasis added). Other courts have similarly held that withholding or restricting consumers' access to information needed to compare competitors is anticompetitive. *See, e.g.*, *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *4 (D. Utah May 17, 2018) (collecting cases observing that restrictions limiting dissemination of pricing information through advertising "increase the difficulty of discovering the lowest cost seller of acceptable ability," "isolate[s] [advertisers] from competition, and the incentive to price competitively is reduced" (quoting *Bates v. State Bar of Arizona*, 433 U.S. 350, 377 (1977)); *cf. N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 367 (5th Cir. 2008) (practices that "erect[] obstacles to price communications between payors and physicians . . . . ha[ve] anticompetitive effects").

The refusal to deal paradigm is again no defense. Google claims (Mot. at 26) that it has no duty to "provide information to its customers," but it does have an obligation to not obscure and hide pricing and other market information relied upon by publishers to compare Google's services to competitors. *Ind. Fed. of Dentists*, 476 U.S. at 461–62. The lone case cited by Google did not address a situation like this where a firm affirmatively prevents its customers from receiving basic pricing and other information necessary to compare competitors' products. Instead, it concerned a firm's decision to not sell its products (test booklets and answer sheets) directly to certain customers and competitors, and—unlike here—the plaintiffs had "no plausible theory to explain how this conduct [was] anticompetitive." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 429 F. Supp. 2d 752, 758 (E.D. La. 2005).

Fighting the summary judgment standard, Google also suggests (Mot. at 25–26) that its file modifications may not have actually reduced the usage of Header Bidding and notes that some bidders did not provide bid information. But the record shows that Google's conduct significantly

impaired the ability of Header Bidding and rival exchanges to compete. Davis Ex. 52 ¶¶695–701. Because that was Google's *intent,* it can hardly be heard to argue that no reasonable jury could conclude it was successful.   Regardless, Google's actions are anticompetitive and "may be condemned even absent proof that [they] resulted in higher prices" or actually impaired competition. *Ind. Fed. of Dentists*, 476 U.S. at 461–62; *see also Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 939 (5th Cir. 1988) ("Injury to competition is presumed to follow from the conduct proscribed by section 2; therefore, proving an injury to competition is not an element of a monopolization-based antitrust claim.").

Finally, Google again raises questions (Mot. at 26) regarding potential remedies that have no bearing on resolution of its summary judgment motion and are appropriately addressed after the record is fully developed at trial.[9] *See Viamedia*, 951 F.3d at 480. The Court should therefore deny Google's summary judgment motion.

### E.  Unified Pricing Rules

The theme repeats itself. The Unified Pricing Rules Google imposes on publishers harm competition by preventing rival ad exchanges from competing on price with AdX; they are not a refusal to deal. In a competitive market, ad servers will give publishers the option to set reserve prices (also known as price floors, the minimum amount a bid must be to win) that vary by buyer. Davis Ex. 52 ¶466; RSMF ¶¶35, 198. Initially, before Google imposed Unified Pricing Rules

---

[9] Google does not argue that its file modifications should be immune from antitrust scrutiny because they involve product design decisions or are supposedly based on "privacy" concerns. Mot. at 25. Nevertheless, as already explained, "a party can[not] relabel a restraint as a product feature and declare it immune from [antitrust] scrutiny." *NCAA*, 594 U.S. at 101 (internal quotation marks omitted)); *Actavis*, 787 F.3d at 654 & n.26; *Microsoft*, 253 F.3d at 65–67. Google's internal documents show that the modifications were made to stop competition, making any privacy concern pretextual, Ex. 79 (GOOG-DOJ-29427368) at -368-403 (███████████████████████████████████████████); Davis Ex. 52 ¶¶688–94; Ex. 101 (Shafiq Rebuttal Rep.) ¶¶23–4—at most creating a disputed issue of material fact that prevents granting summary judgment. *See Viamedia*, 951 F.3d at 457.

through DFP, buyers could set different price floors across exchanges and ad buying tools. Davis Ex. 52 ¶¶509–13. Being able to set varying price floors was highly valued by publishers as, among other things, it enabled them to control the quality of the ads displayed on their properties because high price floors prevent low quality ads from being displayed. *Id.* ¶¶514–15; Davis Ex. 2 ¶¶165–66, 169; Ex. 92 (GOOG-DOJ-29731245) at -250.

However, in a market without competition, a vertically integrated firm like Google has the incentive to remove the option to set reserve prices to constrain publishers' choices and prevent them from using rival ad servers. Davis Ex. 52 ¶¶471–74.

Google acted on that incentive and implemented Unified Pricing Rules to limit competition among ad exchanges. Unified Pricing Rules prevent publishers from setting per-buyer floors by requiring publishers to set the same price floors across ad exchanges. RSMF ¶¶203–4; Ex. 102 (GOOG-AT-MDL-008964888) at -888; Ex. 89 (GOOG-NE-10573952) at -952. As a result, the same price floor applies to all bids regardless of whether they are submitted on AdX or non-AdX exchanges. Davis Ex. 52 ¶¶476, 479.

Google imposed Unified Pricing Rules because AdX's clearing price was not always competitive with other exchanges' clearing prices. *Id.* ¶481; Ex. 89 (GOOG-NE-10573952) at -953 ("AdX floors are the largest block to adx transactions on eligible inventory."); RSMF ¶200. By mandating uniform price floors across ad exchanges, AdX has one fewer dimension on which to compete with rival exchanges—thereby limiting competition on the merits. Davis Ex. 52 ¶490; *see* Ex. 103 (GOOG-NE-10291781) at -782 (acknowledging that █████████████████████ ███████████████████████████████████).

A reasonable jury can conclude that Unified Pricing Rules were anticompetitive. Take it from Google. Its express goal was to limit publishers' returns for listing inventory on multiple

exchanges and stop Header Bidding from competing with AdX. Davis Ex. 52 ¶¶484–86, 500–2. Google believed that the Rules would result in publishers setting lower price floors, thereby enabling AdX to win more transactions. Ex. 89 (GOOG-NE-10573952) at -952; Ex. 87 (GOOG-DOJ-29453844) at -844.

Unified Pricing Rules achieved Google's anticompetitive aims. The Rules limit publishers' choice and thus competition among ad exchanges, and they harm publishers by forcing them to use lower price floors. Davis Ex. 52 ¶¶490–99; Davis Ex. 53 ¶¶333–334, 341. This not only decreased publishers' revenue but also impaired their ability to protect against displaying low quality ads. Davis Ex. 52 ¶¶509–15, 518–22, 523–25; Davis Ex. 53 ¶¶342–44.

Unified Pricing Rules "harm the competitive process" and "consumers" by decreasing publishers' yields and preventing them from selecting among rival ad exchanges based on different price floor options. *Microsoft*, 253 F.3d at 58 (emphasis omitted). The rules effectively make the price floors set on AdX the "default" floors on all exchanges used by a publisher even if a publisher wishes to use varying price floors across exchanges—thereby "overriding the [publisher's] choice" and "reduc[ing] rivals' usage share." *Id.* at 65. Such conduct is plainly "anticompetitive." *Id.*; *see also FTC v. Amazon.com, Inc.*, 2024 WL 4448815, at *6–7 (W.D. Wash. Sept. 30, 2024) (practices that caused a seller's "price on Amazon's marketplace" to "become[] the price floor market-wide" stated Section 2 claim because they "stifle price competition" (internal quotation marks omitted)).

Google contends (Mot. at 27–28) that Unified Pricing Rules are lawful because it is "entitled to design" its rules "however it likes" and has "no obligation to design [the Rules] to make it easier for rival ad exchanges to compete with AdX." Yet again, Google mischaracterizes the nature of its anticompetitive conduct. Google's adoption of Unified Pricing Rules cannot be considered a refusal to deal because Plaintiff States do not allege that Google is refusing to deal

with anyone through the Unified Pricing Rules. *See Viamedia*, 951 F.3d at 453. Google did not merely select the terms on which it would do business with publishers; it used its monopoly power to set rules that governed publishers' behavior across ad exchanges. Unified Pricing Rules thereby "direct[ly] interfer[e] with" AdX's "rivals," and the "[r]efusal to deal doctrine" does not apply. *Novell*, 731 F.3d at 1076; *Tucker*, 493 F. Supp. 2d at 1099 (conduct related to design of iPod products that restricted interoperability with non-Apple music and video sales platforms could not "be construed as a refusal to deal"). For the same reason, Plaintiff States' claim does not require Google to assist its competitors—it must simply stop preventing *publishers* from working with those competitors. *See Tucker*, 493 F. Supp. 2d at 1099 (allegations that Apple acted anticompetitively by making iPod products not interoperable with music and video files sold by competitors like Microsoft were "not reducible to the single contention that Apple should license Microsoft's DRM").

Google's invocation of the Unified Pricing Rules being a "product feature" of AdX does not render them "immune from [antitrust] scrutiny." *NCAA*, 594 U.S. at 101. The mere fact that Google was able to stifle competition through product design does not alter Google's liability. *See Microsoft*, 253 F.3d at 65; *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d at 870, 908 (product design that required specific software that stopped customers from "perform[ing] their own repairs or hav[ing] a local repair shop perform the repairs" stated Section 2 claim); *Tucker*, 493 F. Supp. 2d at 1096 (rejecting Apple argument that "Plaintiff's theory of liability would require it . . . to change the design of [iPod] products").

Unsurprisingly, none of the cases relied upon by Google involve any conduct similar to that at issue here. None address a situation where a monopolist employs a practice that allows it to dictate the terms on which its customers deal with the monopolist's would-be rivals. *See Pac. Bell*

*Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 442 (2009) (alleged "price squeeze" where defendant "raise[d] the wholesale price of inputs and cut the retail price of the finished good" to "'squeez[e]' the profit margins of any competitors in the retail market"); *Trinko*, 540 U.S. at 407 ("Verizon denied interconnection services to rivals."); *Novell*, 731 F.3d at 1067–69 (Microsoft chose to no longer provide software to rival software developer); *ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694, 698 (5th Cir. 2005) (per curiam) (plaintiff alleged that defendant "rate[d] its customers' calls" as "long distance" instead of local and charged too much as a result); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 399 (7th Cir. 2000) (rejecting "plaintiffs' theory . . . that the duties the 1996 [Telecommunications] Act imposes" on telecommunications service providers "are coterminous with the duty of a monopolist to refrain from exclusionary practices"); *Google*, 2024 WL 3647498, at *129 (Google "slow-rolled the development and launch of various features for Microsoft Ads"); *Facebook, Inc. v. Brandtotal Ltd.*, 2021 WL 2354751, at *15 (N.D. Cal. June 9, 2021) (for California state law claim, plaintiff alleged that Facebook "denied BrandTotal . . . access" to Facebook).

Google's final argument is yet another attempt to transform the question of whether Google's conduct violates Section 2 into resolving what the appropriate remedy is. This is improper and need not be addressed now.[10] *Viamedia*, 951 F.3d at 480. Even if it is, the remedy is again simple: Google may not dictate the terms on which publishers deal with Google's rivals.

---

[10] Google does not argue that summary judgment should be granted because Unified Pricing Rules have a legitimate business justification or procompetitive benefits. Mot. at 26–27. Nevertheless, Google's motivations were expressly anticompetitive because Google intended the Rules to limit publishers' incentives to list inventory on multiple exchanges and stop Header Bidding. Davis Ex. 52 ¶¶484–86, 500–2. So, even if considered, this is a disputed issue of material fact that precludes summary judgment. *See Viamedia*, 951 F.3d at 457.

Once more, Google made the same arguments at the motion to dismiss stage, and Judge Castel rejected them. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 401–2 ("Google's reliance on principles of equal treatment and the absence of an obligation to assist competitors misses the mark" because "Google's adoption of uniform price floors was a targeted anticompetitive measure that used Google's monopoly power to constrain competition between ad exchanges."). The factual record bears out what the complaint alleges, so Google is simply recycling a flawed *legal* argument. And the Eastern District of Virginia rejected those arguments on the facts at the summary judgment stage. *See* Pls.' Opp. to Google Mot. for Summ. J. at 27, *United States v. Google LLC*, No. 23-cv-108 (E.D. Va. Aug. 6, 2024), Dkt. 1127; Order, *United States v. Google LLC*, No. 23-cv-108 (E.D. Va. June 14, 2024), Dkt. 773. The Court should do the same here.

### F. Google's Overall Conduct

For clarity, Plaintiff States have addressed each practice raised in Google's motion separately. But resolving whether Google's practices are anticompetitive requires evaluating the totality of Google's conduct (including that addressed *infra* regarding Dynamic Revenue Share and Project Bernanke). *Cont'l Ore*, 370 U.S. at 698–99; *Assoc. Radio Serv.*, 624 F.2d at 1356.

Evaluating Google's conduct as a whole demonstrates how each of the practices at issue work together to give Google monopoly power and stifle competition—rendering each practice anticompetitive and unlawful. This is true even if the Court accepts Google's (incorrect) portrayal of each individual practice as being a refusal to deal. *Viamedia*, 951 F.3d at 462 (evaluating whether refusal to deal "was part of a larger anticompetitive enterprise" (quoting *Norvell*, 731 F.3d at 1075)).

Google used technical restrictions to tie its publisher ad server DFP to AdX's real-time bidding, increasing Google's market power in the publisher ad server market. Google then

solidified that tie through its contracting practices requiring publishers to buy both AdX and DFP together. Davis Ex. 52 ¶859. Once Google obtained monopoly power in the publisher ad server market, Google used that power to steer transactions to AdX by:

- Using Dynamic Allocation/Enhanced Dynamic Allocation to avoid competing with real-time bids on other ad exchange and increase transactions on AdX;

- Restricting publishers' use of line items to prevent them from using Header Bidding;

- Removing information from key data fields so publishers could not evaluate and compare how their inventory was performing on different ad exchanges and through Header Bidding;

- Imposing Unified Pricing Rules to decrease publishers' incentives to use rival ad exchanges and limit competition through price floors; and

- Manipulating auctions through Project Bernanke and Dynamic Revenue Share to increase the number of completed transactions on AdX without having to compete on the merits, reinforcing AdX's market power and raising barriers to entry.

*Id.* Google's anticompetitive practices succeeded—Google has reduced overall market efficiency and lowered total surplus, harming publishers, advertisers, and end consumers alike. Davis Ex. 39 (Pathak Rep.) ¶¶18, 19, 20, 51–52, 192.

Accordingly, viewing Google's conduct in its totality, Google's conduct "harm[s] the competitive process" and "consumers" and therefore violates the Sherman Act. *Microsoft*, 253 F.3d at 58 (emphasis omitted). At the very least, resolving all factual issues and taking all inferences in Plaintiff States' favor, this is a disputed issue of material fact and summary judgment should be denied.

## II. Google's Anticompetitive Conduct Has No Legitimate Business Justification And Is Exclusionary.

Google argues that, notwithstanding the anticompetitive nature of its conduct, certain aspects are not "exclusionary" because they are supposedly driven by "legitimate business

justifications." The evidence, however, establishes that Google's actions are motivated to snuff out competition to the detriment of consumers—not to improve its products or consumer welfare.

Specifically, Google argues (Mot. at 34–46) that it is entitled to summary judgment because supposedly "legitimate business justifications" exist for Dynamic Allocation/Enhanced Dynamic Allocation, Dynamic Revenue Share, and Project Bernanke. "Whether valid business reasons motivated a monopolist's conduct is a question of fact." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993); *Bell v. Dow Chem. Co.*, 847 F. 2d 1179, 1186 (5th Cir. 1988) ("[W]hether the defendant has a legitimate business reason" for its conduct is a "fact determination that may be left to a jury."). If "factual questions exist . . . about the validity and sufficiency of each claimed [business] justification, . . . summary judgment [is] inappropriate." *Kodak*, 504 U.S. at 483. Summary judgment can be granted only "where [the] defendant's business justification is unchallenged." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999).

Google's purported reasons for Dynamic Allocation/Enhanced Dynamic Allocation, Dynamic Revenue Share, and Project Bernanke are "pretextual justifications" for its monopolizing conduct and are insufficient to support summary judgment. *See Major Mart, Inc. v. Mitchell Distrib. Co.*, 46 F. Supp. 3d 639, 661 (S.D. Miss. 2014) ("[P]retextual justifications for predatory conduct will not insulate the defendant from [Section 2] liability."). At the very least, this is a disputed issue of fact that requires denial of summary judgment. *Bell*, 847 F.2d at 1186 ("[T]he district court erred when it held that Bell failed to offer any evidence that Dow's actions were motivated by a monopolizing purpose" because "Bell offered significant evidence undercutting the credibility of the justifications offered by Dow." (internal quotation marks omitted)); *Major Mart*, 46 F. Supp. 3d at 662 (denying summary judgment).

40

Google contends generally (Mot. at 35–36) that a defendant is entitled to summary judgment any time its conduct was designed to "maximize profits." This is self-evidently wrong, as every monopolist's goal is to ultimately maximize profits. Unsurprisingly, "a monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits." *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990); *Cites of Anaheim, Riverside, Banning Colton & Azusa v. S. Cal. Edison Co.*, 1990 WL 209261, at *33 (C.D. Cal. Oct. 22, 1990), *aff'd sub nom. City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373 (9th Cir. 1992) ("A monopolist's interest in extracting and maintaining monopoly profits does not justify anticompetitive conduct." (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973))). Regardless, Google misrepresents the record and ignores countervailing evidence that its actions have no legitimate justification (discussed below).

Finally, Google is incorrect that Plaintiff States must "come forward with evidence to show . . . that Google took any action to prevent its customers from dealing with any of its scores of rivals." Mot. at 36–37. Plaintiff States *have* presented such evidence, but that is not—as Google seems to argue—the only way Google could be liable under Section 2. Because "anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy," *Novell*, 731 F.3d at 1072, courts approach Section 2 on a "case-by-case basis," *Kodak*, 504 U.S. at 467.

### A. Dynamic Allocation/Enhanced Dynamic Allocation

As explained above, *supra* Section I(B), Dynamic Allocation/Enhanced Dynamic Allocation are exclusionary because they enabled AdX to win transactions without competing on the merits with bids from other exchanges. Dynamic Allocation/Enhanced Dynamic Allocation thus reduced competition among ad exchanges. Where a monopolist's conduct "exclude[s] [competitors] from competing on the merits," it is anticompetitive and violates Section 2. *Stearns*, 170 F.3d at 527.

Google argues that Dynamic Allocation/Enhanced Dynamic Allocation have two legitimate business justifications. First, Google claims (Mot. at 37) the programs "benefitted publishers" and that "Google's desire to provide its publisher customers with . . . significant benefits was a legitimate business justification." But these self-serving conclusions ignore conflicting evidence that shows Dynamic Allocation/Enhanced Dynamic Allocation *harmed* publishers, which creates a question of fact that precludes summary judgment.

Dynamic Allocation harmed publishers in multiple ways. *First*, it prevented competitor exchanges that had higher bids than AdX from bidding (resulting in publishers receiving lower bids and losing money). Davis Ex. 52 ¶¶569, 572–75; RSMF ¶¶90, 97. *Second*, for publishers using a Waterfall hierarchy, Dynamic Allocation overrode the publisher's choice if that publisher ranked AdX lower in its hierarchy. Davis Ex. 52 ¶570. *Third*, because Dynamic Allocation overrode publisher choice in the Waterfall hierarchy, it resulted in publishers displaying lower quality ads. Davis Ex. 2 ¶130. *Fourth*, Enhanced Dynamic Allocation in particular resulted in "cream-skimming" where more valuable impressions are transacted through AdX rather than higher-value direct deals—leading to a loss of value for advertisers and, ultimately, publishers' revenue as advertisers are willing to pay less. *Id.* ¶142–44. Altogether, publishers received lower bids and less revenue than they would have absent Google's anticompetitive conduct. *Id.* Enhanced Dynamic Allocation harmed publishers in the same ways for direct deals. Davis Ex. 52 ¶¶589–90, 594, 598, 607–8; *id.* ¶¶628–30 (addressing Enhanced Dynamic Allocation); RSMF ¶¶100, 103. Google's motion wishes this evidence away, but it at the very least establishes that whether there were benefits to publishers is a disputed factual issue. *Bell*, 847 F.2d at 1185; *Major Mart*, 46 F. Supp. 3d at 662.

Second, Google asserts (Mot. at 37–38) that "it was entirely legitimate and rational for Google to choose not to open its proprietary display advertising platform to its rivals so that those rivals could bid against Google" because "Google was justifiably concerned about providing its competitors with direct access to Google's base of publisher customers[.]" But Google provides no evidence to support this supposedly "justifiabl[e] concern[]." The lone document cited is a declaration from a Google employee who says only that "[s]ome at Google were initially concerned." Mot. Ex. 19 ¶41. Google fails to identify who was concerned or what they were concerned about. And a reasonable inference is that whatever those concerns were, they were ultimately resolved given that the unnamed persons were only "initially" concerned.

Regardless, Google mischaracterizes its conduct. As explained above, Dynamic Allocation/Enhanced Dynamic Allocation directly interfered with and prevented publishers from working with rival ad exchanges. Google need not have "opened" its platforms to competitors—it simply needed to *stop* preventing its own customers from transacting with Google's rivals.

In any event, Plaintiff States have presented evidence that Google's supposed business justifications are mere pretext for its anticompetitive objective. For example, Google's own documents reveal that the "last look" feature of Dynamic Allocation helped fight the rise of one of the only forms of competition that threatened Google's stranglehold on the market: Header Bidding. *See* Davis Ex. 52 ¶¶602–4. Header Bidding would have led to "more money" going to publishers due to increased competition in the exchange market. *Id.* ¶¶618–25. Dynamic Allocation/Enhanced Dynamic Allocation helped destroy that competition to the detriment of publishers.

Addressing the same factual issues at the motion to dismiss stage, Judge Castel held that "Dynamic Allocation was anticompetitive in the ad exchange market" because it "had the effect

of controlling prices and excluding competition in the ad-exchange market." *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 385. Google's pretextual justifications for that anticompetitive conduct do not somehow render this exclusionary conduct procompetitive.

## B. Dynamic Revenue Share

Dynamic Revenue Share was one method Google used to manipulate auctions through AdX. Google used Dynamic Revenue Share to adjust the take rate that publishers would pay for completing transactions on AdX to get more matches on its ad tech stack in order to clear the price floor. RSMF ¶¶39, 142, 148. Normally, if a bid is above a publisher's price floor, but falls below when the ad exchange's take rate is included, then the bid (and exchange) cannot win the impression because it is ultimately below the price floor. *Id.* ¶143. Dynamic Revenue Share upended that by adjusting AdX's take rate in these circumstances so that Google would win the transaction. Davis Ex. 52 ¶¶783–86.

Initially, in Dynamic Revenue Share Version 1, Google would only lower (not raise) its take rate to win a transaction—making it effectively a price cut. *Id.* ¶778. But in later versions Google would not only lower its take rate to win transactions, but it would also *raise* the take rate on high demand transactions to recoup the losses incurred when Google lowered the take rate. *Id.* ¶¶715, 776, 779; RSMF ¶¶142–43, 148–49. Google did not disclose Dynamic Revenue Share to publishers, so it occurred secretly—limiting pricing transparency and making it impossible for publishers and rival exchanges to respond. Davis Ex. 52 ¶¶712, 776; RSMF ¶¶141, 147, 151–53.

Google's incentives to use Dynamic Revenue Share were anticompetitive. If Google did not have monopoly power over publishers and was not vertically integrated in the ad exchange market, Google would not have been able and would not have had the motive to implement Dynamic Revenue Share. Davis Ex. 52 ¶781.

Dynamic Revenue Share harmed competition just as Google intended. Through its various versions, Dynamic Revenue Share reduced competition in the ad exchange market by allowing AdX to participate in and win a wide range of auctions, increasing transaction volume and winning transactions it otherwise would have lost. *Id.* ¶¶803–6. This is effectively predatory pricing where a monopolist prices their goods lower than any competitor can in order to drive out competitors who cannot afford to lower their prices in response—except, here, because of the lack of price transparency, Google was able to immediately recoup its losses. *Id.* ¶¶713–15. When combined with Dynamic Allocation/Enhanced Dynamic Allocation, Dynamic Revenue Share is particularly pernicious because it allowed AdX to use real-time bidding against other exchanges' historical averages and adjust its take rate to clear impressions—foreclosing rival exchanges from having the opportunity to bid and clear the same impressions even at higher prices. *Id.* ¶¶807–8. For the same reason, Google's conduct also restricted competition from Header Bidding. *Id.* ¶¶805–6. That this is exclusionary is demonstrated by Google's ability to maintain its take rate despite other ad exchange's decreasing theirs over time. *Id.* ¶¶811–12. One of Google's own employees recognized that Dynamic Revenue Share "can be unethical" and "evil." Ex. 95 (GOOG-TEX-00309326) at -327.

Dynamic Revenue Share also harmed publishers. When combined with the last look advantage from Dynamic Allocation/Enhanced Dynamic Allocation, Dynamic Revenue Share caused publishers to lose revenue in the long run because Google might decrease its take rate by more than the difference between the winning bid and the next highest bid, and then Google would recoup that difference from the publisher. A hypothetical illustrates this problem: the AdX winning bid is 1 cent more than the next highest bid from Header Bidding, but Google has to reduce its take rate by 2 cents to clear the price floor. Later, when bidding for a different impression from the

same publisher, Google increases its take rate by 2 cents to recoup the previous reduction. The net effect is that the publisher is worse off because, had the bid from Header Bidding won, the publisher would have 1 cent more than what it ultimately pays to Google. Davis Ex. 52 ¶¶809–10; RSMF ¶¶142, 150. Publishers were also harmed because Dynamic Revenue Share effectively overrode the price floors they set without their knowledge, creating the risk that they would be served lower quality ads and unable to respond. Davis Ex. 52 ¶845–46.

Dynamic Revenue Share hurt advertisers as well because it misrepresented the nature of the auction. Google represented that its auction was a sealed second-price auction, but Google in fact changed its take rate and charged advertisers more than the second-highest bids in the instances where it was recouping earlier losses. *Id.* ¶851. By hiding the true nature of the auction, advertisers were unable to respond and adjust their bidding strategies. *Id.* ¶¶852–53.

Google claims (Mot. at 38–39) that Dynamic Revenue Share was motivated by legitimate business justifications because it "increased the number of successful transactions between publishers and advertisers," which "delivered benefits to Google's publisher and advertiser customers." But, as explained above, the evidence shows Dynamic Revenue Share was implemented for its anticompetitive effects—it allowed AdX to win impressions not because it outcompeted rival exchanges, but through secret price manipulation. Thus, whether Google has a legitimate business justification is at least a disputed issue of fact that compels denial of summary judgment. *Bell*, 847 F.2d at 1185; *Major Mart*, 46 F. Supp. 3d at 662.

Judge Castel addressed this issue at the motion to dismiss stage and held that Google's use of Dynamic Revenue Share was obviously anticompetitive, as it "permitted AdX to win bids based on price manipulations by Google, as opposed to a superior product or some other legitimate business factor" and thereby "had the effect of advancing or maintaining Google's monopoly in

the ad-exchange market" and "harmed competition in the ad-exchange market." *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 391. Google's price manipulations "manipulated" the market "to the point that the integrity of the decisional process [was] violated." *Stearns*, 170 F.3d at 526 (collecting cases).

### C. Project Bernanke

Project Bernanke, used in Google's ad buying tool GDN, has no purpose but to decrease competition by limiting the amount of information available to rival ad buying tools. Originally, Bernanke manipulated bids so that, if GDN submitted the top two bids, the second bid would be dropped (turning the third-highest bid into the second-highest) so publishers were paid less on that transaction, which Google would make up by overpaying on other transactions for the same publisher. Davis Ex. 52 ¶¶709, 719; RSMF ¶¶109–15. This distorted publishers' impressions and ads delivered in GDN's favor, reducing the quality of matches. Davis Ex. 52 ¶710. At the same time, Google would use those saved funds to win other transactions that GDN would not otherwise win by inflating GDN's bids. *Id.* ¶719; Davis Ex. 29 (Chandler Rep.) ¶357. Bernanke thus helped GDN win more transactions at the expense of rival ad buying tools without improving on price or quality. Davis Ex. 52 ¶¶738–39, 750–54. In the 2015 implementation "Global Bernanke," the true-up was done across publishers so individual publishers were not necessarily trued up. *Id.* ¶¶724, 731.

As a result, some advertisers paid more without knowing it and others paid less. *Id.* ¶¶725, 772; RSMF ¶111. Such price information is critical to competition, and Google inhibited it by distorting the market without informing anyone. Davis Ex. 52 ¶¶725, 733–35. These adjusted bids ensured that rival ad buying tools did not obtain information about the effectiveness of their bids for individual transactions. With less information, rival ad buying tools could not compete effectively and advertisers paid higher prices. *Id.* ¶¶716–17.

Project Bernanke also harmed publishers by reducing the effectiveness of their ability to monetize their inventory. Some were paid less than they otherwise would have been, and all publishers lost the ability to control ad quality on their websites through price floors. *Id.* ¶¶756–67; RSMF ¶¶110, 125. And, because Google did not disclose Bernanke, publishers were not aware of it and could not respond and exert competitive pressure. Davis Ex. 52 ¶771; Davis Ex. 29 (Chandler Rep.) ¶359.

Judge Castel held that Project Bernanke was anticompetitive when denying Google's motion to dismiss. First, it "caused harm to competition in the ad-server market" by "reward[ing] publishers that granted [Google] a special priority and punish[ing] publishers that did not." *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 388. Second, it was "was anticompetitive as to the market for ad-buying tools used by small advertisers" because it allowed "Google to manipulate ad auctions in order to give an unfair advantage to Google Ads and thereby injure competition among ad-buying tools for small advertisers." *Id.* at 389. Finally, Project Bernanke was "anticompetitive" and "harmed competition in the ad-exchange market by using AdX to selectively transact publishers' higher-value impressions and leaving lower-value impressions for competing exchanges." *Id.*

Google presents two business justifications for Project Bernanke. *First*, Google contends (Mot. at 40) that Project Bernanke "was designed to—and, in fact, did—help Google Ads' advertiser customers 'win more' impressions." But Google ignores the harm advertisers suffered. Plaintiff States' expert Dr. Joshua Gans specifically found that "Bernanke harmed advertisers by overcharging them in low-demand auctions" in order to "create[] a pool of excess advertiser funds that could be used to subsidize GDN bids." Davis Ex. 52 ¶¶772–73. Project Bernanke also "reduc[ed] the quality of matches" on the winning bids. *Id.* ¶710. So even if advertisers won more

impressions, the value of those impressions was lower due to the reduction in quality. Internal documents reveal that Google understandably did not want advertisers to know about Project Bernanke's effect on their bids because it was "borderline fraudulent." *Id.* ¶735.

Further, Project Bernanke harmed non-Google advertisers. In some cases, Project Bernanke "appropriate[s] the impression away from the non-Google advertiser," making the non-Google advertiser "worse off because it no longer wins the impression it would have won without Bernanke." *Id.* ¶743; *see also id.* ¶745. Google's motion looks at only one side of the ledger, extolling Project Bernanke's so-called benefits to some advertisers while ignoring those it harms.

*Second*, Google argues that Project Bernanke "expanded output" by allowing advertisers to buy impressions that otherwise would not have been sold. *Id.* at 40–41. Dr. Gans refuted this claim directly, as he observed that the expert Google relies upon "d[id] not consider . . . whether the [increase in GDN impressions won] increased output across the entire market." Davis Ex. 53 ¶390. Even though *GDN output* may have increased, "the overall market output may be unchanged." *Id.* This distinction is a "potentially . . . substantial effect" of Google's "prediction[] [of] ██████████████████ for non-GDN ad-buying tool providers." *Id.*

Google also ignores the harm publishers suffered. Project Bernanke overrode publishers' high floors on AdX. *Id.* ¶¶738–44. "By raising bid prices from GDN, Bernanke harms publishers by inflating bids of low-quality ads that would not clear the publisher-set price floor," which "harms publishers' reputations [and] can have a significant impact on their revenue stream." *Id.* ¶755. Google also "harmed some publishers that were charged more" as a result of Google switching to Global Bernanke. *Id.* Project Bernanke results in ████████████████ ████████████████████ *Id.* ¶730. Google's internal experiment designed to test the

impact of Project Bernanke showed that ███████████████████████████████

███████████████████████████████████████████████████████████ *Id.* ¶767.

Ultimately, Google's supposed business justifications are pretextual justifications for its real objective for Project Bernanke: to "manipulate auction items in its own interests rather than the interests of its competitors" by "adjusting the bids from advertisers to ensure that rival ad-buying tools did not obtain information . . . that would allow [them] to engage in competitive selection of ad matches across stacks that Google did not own." *See* Davis Ex. 52 ¶716; *id.* ¶736 ("Google's intent for Bernanke was to ensure GDN won more AdX auctions over rival buying tools."). Bernanke was designed to (and did) give Google an "informational advantage," which Google used to "subvert the process of competition." *Id.* ¶717. Project Bernanke succeeded in subverting competition, resulting in GDN winning more AdX auctions than it otherwise would have won on the merits. *See* Ex. 104 (GOOG-AT-MDL-004555192) at -194–95 (Bernanke creates net payers and net takers); Ex. 105 (Lipkovitz Dep. Tr.) at 159:10–14. At the very least, this is a disputed issue of fact and summary judgment cannot be granted. *Bell*, 847 F.2d at 1185; *Major Mart*, 46 F. Supp. 3d at 662.

## III. Google's Anticompetitive Conduct Harmed Competition In The Ad Exchange Market.

Google's argument (Mot. at 42–48) that Plaintiff States have failed to put forward evidence showing certain aspects of Google's conduct harmed competition simply ignores the significant evidence in the record. Anticompetitive effects can be proven through multiple methods, including direct or indirect evidence. *Ohio v. Am. Exp. Co.*, 585 U.S. 529, 542 (2018) (identifying examples of direct evidence "such as reduced output, increased prices, or decreased quality" and indirect evidence, *i.e.*, "proof of market power plus some evidence that the challenged restraint harms competition"). Expert testimony is not required to prove that a defendant's conduct reduced competition. *See Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 2011 WL 167259, at *6 (D.

Minn. Jan. 14, 2011) ("[E]xpertise in antitrust economics are not required to determine that certain actions by a competitor have detrimental effects on its competition." (footnote omitted)).

Assuming Google is correct that the ad exchange market is a two-sided market and that Plaintiff States must show evidence of net harm, such evidence regarding "the net impact of [Google's] conduct on both advertisers and publishers" is abundant. Mot. at 46. Reviewing various sources of data, Plaintiff States' expert Dr. Gans opined that Google has a dominant and growing market share over time—growing from 44.58% in 2018 to 56.83% in 2021 (nearly four times AdX's closest rival). Davis Ex. 52 ¶¶372–76. Alongside its growing market share, AdX has maintained a supracompetitive take rate (*i.e.*, the percentage of a winning bid paid to Google) because of its anticompetitive conduct. *Id.* ¶¶877–86. The costs of that supracompetitive take rate are born by both publishers and advertisers—*i.e.*, both sides of the ad exchange market. *Id.* ¶887. Lower revenue impairs publishers' ability to invest in content and reduces innovation, in turn negatively affecting their content's quality and quantity as well as willingness to generate free, advertiser supported content. *Id.* ¶888. Entry into the publishing market is also reduced. *Id.* Publishers' higher costs are also passed onto advertisers. *Id.* ¶890. Impacts on publishers and advertisers are in turn borne by end users, who receive less relevant or free content from publishers and pay more for advertisers' goods or services. *Id.* ¶¶889–90.

Another expert, Dr. Pathak, concluded that Google's monopolistic conduct reduced total surplus for market participants and reduced overall market efficiency—meaning all sides of the ad exchange market are worse off. Davis Ex. 39 ¶¶19, 20, 51–52, 192. Altogether, this is more than sufficient evidence showing net anticompetitive harms on both sides of the ad exchange market. *See Viamedia*, 951 F.3d at 475–76 (anticompetitive harms include "potentially higher prices, lower output, and reduced innovation" and harms to end consumers like "higher priced and lower quality

services"); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1129 (10th Cir. 2014) (reversing grant of summary judgment for lack of anticompetitive harm where evidence showed defendant "was able to charge supracompetitive prices" and had significant market share); *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 2013 WL 5366104, at *2 (E.D. Tex. Mar. 14, 2013), *report and recommendation adopted*, 2013 WL 12143103 (E.D. Tex. Aug. 19, 2013) (denying summary judgment where plaintiff had evidence defendant "was able to maintain higher pricing premiums, [and] foreclose sales by" competitor).

Google ignores this evidence and instead provides misleading and incomplete excerpts from Dr. Gans's deposition testimony. Google claims Dr. Gans testified that he "did not offer an opinion about the 'net effects' of" Dynamic Allocation/Enhanced Dynamic Allocation, Dynamic Revenue Share, Unified Pricing Rules, Line-Item Limits, and Redacted Bid Data Transfer files. Mot. at 47–48. Not so. Starting with Dynamic Allocation and Enhanced Dynamic Allocation, Google asserts that Dr. Gans "agree[d] he did not express an opinion about the overall net effect . . . on both advertisers and publishers." Mot. at 47 (internal quotation marks omitted). In reality, Dr. Gans testified that he "didn't analyze a world with or without Dynamic Allocation. Just a world with or without Google's particular implementation of Dynamic Allocation." Davis Ex. 51 (Gans Dep.) at 205:16–24; *id.* at 205:25–206:8 (testifying similarly regarding Enhanced Dynamic Allocation). Thus, Dr. Gans was testifying that he did analyze the net effects of the aspects of Dynamic Allocation and Enhanced Dynamic Allocation that were anticompetitive; the only thing he did not analyze was a world where Dynamic Allocation and Enhanced Dynamic Allocation did not exist at all. Dr. Gans testimony was the same regarding Unified Pricing Rules. *Id.* at 205:8–15. He also testified that he evaluated the "effects on both advertisers and publishers" from Line-Item Limits. *Id.* at 206:17–25. For Dynamic Revenue Share, Google claims Dr. Gans was speaking

about Dynamic Revenue Share overall, but he was in fact only speaking about the first version of
Dynamic Revenue Share wherein Google simply lowered its take rate, not the later anticompetitive
iterations. *See id.* at 237:14–19 (discussing exhibit with "DRS Version 2 compared to DRS
Version 1); *id.* at 233:6–10 (Dr. Gans acknowledging he "didn't analyze whether [DRS Version 1]
did harm competition"). And, for Redacted Data Transfer Files, Dr. Gans was asked whether he
"evaluated the effect of data redactions on advertisers" and he responded that although he "wasn't
calculating the incidents of damages" (*i.e.*, specific damages figures) he did calculate "the presence
of [anticompetitive conduct] and . . . the existence of harm to competition." *Id.* at 265:3–12.

Google also asserts that Dr. Gans testified that Project Bernanke "benefitted both
advertisers and publishers" by increasing their revenue. Mot. at 48 (internal quotation marks
omitted). Once again, Google distorts Dr. Gans's actual testimony. When asked if he "express[ed]
an opinion about the overall net effect . . . considering all the effects on both advertisers and
publishers," Dr. Gans stated that he "considered the impact of Bernanke . . . on competition in the
ad server market and, with respect to that, all of its consequences . . . on customers who interacted
with that market"—meaning both advertisers and publishers. Davis Ex. 51 (Gans Dep. Tr.) at
207:1–10; *see also* Davis Ex. 53 ¶¶393–97 (explaining anticompetitive harms to both advertisers
and publishers). The testimony excerpts Google cites only address "Bernanke Version 1," and Dr.
Gans expressly clarified he was "not talking about Bernanke as to its whole implementation."
Davis Ex. 51 (Gans Dep. Tr.) at 224:2–5; *id.* at 226:17–18 (Q: "So is [it] fair to say that Bernanke
Version 1 benefitted both advertisers and publishers?" A: "That would be a fair statement."); *id.* at
227:17–19, 232:3–11 (discussing "Exhibit 10 [that] summarize[s] the impact of Bernanke Version
1").

Resolving all factual issues and taking all inferences in Plaintiff States' favor, they have put forward evidence from which a jury could find anticompetitive harm.

## IV. Google Has A Dangerous Probability Of Achieving Monopoly Power In The Alleged Market For Ad Buying Tools For Large Advertisers.

Google has a dangerous probability of achieving monopoly power in the market for ad buying tools for large advertisers.  Whether a firm has a "dangerous probability of . . . obtaining monopoly power" is "a particularly fact-intensive inquiry." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007) (internal quotation marks omitted). "Dangerous probability is a question of proximity and degree, and the elements of an attempted monopolization claim are frequently interdependent so that proof of one may provide circumstantial evidence or permissible inferences of other elements." *Id.* (internal quotation marks and citations omitted). Courts consider a variety of "factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand." *Id.* "No single factor is dispositive." *Id.*

A market "share of less than [] fifty percent . . . may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984).

Google has a dangerous probability of monopolizing the market for ad buying tools for large advertisers because of its significant market share and anticompetitive conduct. Plaintiff's expert Jeffrey Andrien opines that Google has "an estimated 40% market share as to large advertiser buying tools." Davis Ex. 9 (Andrien Rep.) ¶24. Google also engaged in anticompetitive conduct that harmed the market for ad buying tools for large advertisers. Davis Ex. 53 ¶11. For example, Google acknowledged internally that publishers had ███████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ Davis Ex. 52 ¶501. Google's anticompetitive Unified Pricing Rules were therefore "an opportunity to significantly limit the ability of publishers to set floor-prices per buyers," and decrease publisher revenue. *Id.* Indeed, in one experiment looking at the expected impact of Unified Pricing Rules on the performance of ad buying tools for large advertisers, Google projected that the Rules would significantly increase Google's market share, resulting in a ████████ in impressions won by DBM and an ██ revenue increase. *Id.* ¶502.

Google's assertion (Mot. at 49) that "Plaintiffs have no evidence" on this issue is simply wrong. Google's market share and anticompetitive conduct are more than enough for a jury to conclude that Google has a dangerous probability of monopolizing the market for ad buying tools for large advertisers. *See Domed Stadium Hotel*, 732 F.2d at 491 (acknowledging that "24% market share plus anticompetitive conduct support[s] finding of attempted monopolization" (citing *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1300–01 (9th Cir. 1982)).

Resolving all factual disputes and taking all inferences in Plaintiff States' favor, sufficient evidence exists for a reasonable jury to conclude that Google has a dangerous probability of achieving monopoly power in the market for ad buying tools for large advertisers.

## V. Plaintiff States' State Law Antitrust Claims Present Issues Of Fact For Trial For The Same Reasons As Plaintiff States' Federal Claims.

Plaintiff States agree with Google that, for the issues raised in Google's motion, their antitrust laws generally mirror the relevant federal antitrust laws. Google's motion for summary judgment should therefore be denied with respect to the state antitrust claims for the same reasons it should be denied as to the federal claims.

Regarding Arkansas' state law claims, Google is incorrect that Arkansas law "do[es] not encompass any of the antitrust theories" asserted by Plaintiff States. Mot. at 51. Arkansas law makes "monopoly" "unlawful and against public policy." Ark. Code Ann. § 4-75-302. Google does not dispute its monopolist status, and Arkansas's prohibition of monopolies also prohibits conduct if the "results" are "reasonably calculated to produce" things like price regulation, "driving out competition," and "financially injuring competitors"—all of which Google's conduct does as explained above. *Id.* §§ 4-75-301, 4-75-309, 4-75-310.

## VI. Plaintiff States' State Law Antitrust Claims For Civil Penalties Are Timely.

Google argues that the state law antitrust claims regarding Dynamic Allocation/Enhanced Dynamic Allocation, Dynamic Revenue Share, and AdX/DFP tie are untimely for thirteen States: Alaska, Florida, Idaho, Indiana, Missouri, Montana, Nevada, North Dakota, Puerto Rico, South Carolina, South Dakota, Texas, and Utah. Mot. at 51. These claims are timely for three reasons. *First*, Google misstates the statute of limitations for the Texas, Alaska, and Montana claims. Texas "is not subject to the defense[] of limitations" at all. *Texas v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993). And the limitations period for the Alaska and Montana claims are six[11] and five years,[12] respectively.    The original complaint was filed on December 16, 2020 (Mot. at 52), so the Alaska and Montana state antitrust claims regarding Dynamic Revenue Share and the DFP/AdX tie are timely even accepting Google's arguments that the statutes of limitation began running in 2016.

---

[11] Alaska Stat. Ann. § 09.10.120 (six-year limitations period for actions brought by government); *see City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1180–81 (Alaska 1998) (applying six-year limitations period); *Alascom, Inc. v. N. Slope Borough, Bd. of Equalization*, 659 P.2d 1175, 1179 (Alaska 1983) ("[A] general six-year statute of limitations applies" to claims asserted by a governmental entity "regardless of the nature of the claim.").

[12] The 2-year statute of limitations cited by Google does not apply to "a liability created by statute" for "a penalty," *i.e.*, the claims at issue here. Mont. Code Ann. § 27-2-211(1)(c)(i); *see id.* §§ 30-14-142, 30-14-143 (imposing penalties for violation of unfair competition statute). Thus, a five-year statute of limitations applies. Mont. Code Ann. § 27-2-231.

*Second*, Google does not point to any evidence that shows *Plaintiff States* knew or should have known about the relevant anticompetitive conduct on or before December 16, 2016. Under the discovery rule (which Google accepts as the "relevant accrual standard" (Mot. at 51–52) and which Plaintiff States assume applies for purposes of this Motion), a plaintiff's "mere suspicion" does not trigger accrual. *Barlow v. Pfizer Inc.*, 2013 WL 12171892, at *6-7 (W.D. Tex. Feb. 22, 2013) (quoting *Childs v Haussecker*, 974 S.W.2d 31, 40 (Tex. 1998)). "[T]he question of when the statute [of limitations] begins to run and the discovery rule are questions of fact[.]" *MGMTL, L.L.C. v. Strategic Tech. Inst., Inc.*, 2024 WL 3949073, at *4 (5th Cir. Aug. 27, 2024); *Burbank v. Compass Bank*, 2016 WL 7665431, at *7 (E.D. Tex. Sept. 29, 2016) (denying summary judgment).

Google implies that Plaintiff States should have known about the anticompetitive conduct because Google made certain, incomplete representations to users of Google's ad tech products. (Mot. at 51–52). But those representations did not put Plaintiff States on notice, especially considering not even every publisher knew about Google's misconduct as late as March 2, 2017. *See* Ex. 93 (GOOG-DOJ-15435125) at -125. At best, Google's statements could have raised suspicions with Plaintiff States that are not enough to start the clock. Despite the "public" statements Google references, Google kept quiet about the full extent of that conduct. Because the most relevant "facts [were] not capable of discovery, . . . the claim[s] cannot be time-barred" under the discovery rule. *Jack v. Evonik Corp.*, 79 F.4th 547, 563 n.27 (5th Cir. 2023) (addressing tolling limitations period under Louisiana doctrine equivalent to discovery rule).

*Third*, Google ignores the applicable tolling doctrines. The law in each of the Plaintiff States at issue embrace fraudulent concealment, the continuing violations doctrine, or similar doctrines like equitable tolling to extend the statute of limitations.[13] "[I]nvocation of fraudulent

---

[13] *See* App'x 1 (State Statute of Limitations Tolling Doctrines).

57

concealment estops a defendant from relying on the statute of limitations as an affirmative defense to [a] plaintiff's claims." *Hunton Energy Holdings, LLC, v. HL Seawater Holdings, LLC*, 539 F. Supp. 3d 685, 691 (S.D. Tex. 2021); *see Welk v. Simpkins*, 402 F. App'x 15, 18 (5th Cir. 2010) (fraudulent concealment elements). Fraudulent concealment applies when the plaintiff can show: "(1) the existence of the underlying [claim]; (2) the defendant's knowledge of the [claim]; (3) the defendant's use of deception to conceal the [claim]; and (4) the plaintiff's reasonable reliance on the deception." *Welk v. Simpkins*, 402 F. App'x 15, 18 (5th Cir. 2010). Fraudulent concealment tolls the statute of limitations until "the fraud is discovered or could have been discovered with reasonable diligence," which is "normally an issue of fact." *Quintel Tech. Ltd. v. Huawei Techs., Inc.*, 2017 WL 9286991, at *13 (E.D. Tex. Dec. 13, 2017).

The state laws at issue also embrace the continuing violations doctrine.[14] "[T]he continuing violation doctrine provides that where the last act alleged is part of an ongoing pattern . . . and occurs within the filing period, allegations concerning earlier acts are not time-barred." *Foddrill v. McManus*, 2013 WL 6198228, at *1 (W.D. Tex. Nov. 26, 2013) (quoting *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 866 (5th Cir. 1993)). Questions of fact about whether the defendant's conduct was a continuing violation preclude summary judgment. *See CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, 888 F. Supp. 2d 780, 794 (E.D. La. 2012). Here, the statutes of limitations are tolled by the fraudulent concealment, the continuing violations, or both.

## A. Dynamic Allocation/Enhanced Dynamic Allocation

Google misrepresented and concealed how Dynamic Allocation/Enhanced Dynamic Allocation operated to stifle competition. Google's contention (Mot. at 52) that it generally disclosed that these features existed in 2009 and 2014 does not establish that the statute of

---

[14] *See* App'x 1 (State Statute of Limitations Tolling Doctrines).

limitations began running then because Google failed to disclose how either feature actually worked. Google, for example, acknowledged in 2016—years after the announcement of Enhanced Dynamic Allocation—that publishers were complaining that "[Enhanced Dynamic Allocation] is a black box" and that they had insufficient information to "understand the impact on [their] business." Ex. 90 (GOOG-DOJ-14158284) at -287; *see also* Ex. 88 (GOOG-DOJ-14382034) at -034 (discussing how "publishers . . . don't understand EDA"). Google acknowledged that publishers did not understand Dynamic Allocation either. *See, e.g.*, Ex. 264 (GOOG-ADTCH-00247165) at -170 (recognizing in February 2019 that ████████████████████████████ ████████ and ████████████████████████████████). Taking all factual inferences in Plaintiff States' favor, the claims regarding Dynamic Allocation/Enhanced Dynamic Allocation are timely under both the discovery rule and fraudulent concealment doctrine.

Plaintiff States' claims are also timely under the continuing violations doctrine. Google employed Dynamic Allocation/Enhanced Dynamic Allocation even after the original complaint was filed in December 2020. *See, e.g.*, Ex. 111 (GOOG-AT-MDL-001447559) at -559 (discussing the use of "DA" and "EDA" in December 2020); Ex. 112 (GOOG-AT-MDL-008842393) at -399 (acknowledging Enhanced Dynamic Allocation was used until "at least December 2021"). And Dynamic Allocation, including its "last look" advantage, continued to operate until at least 2019, within even the shortest possible statute of limitations. RSMF ¶108; *see, e.g.*, Ex. 113 (GOOG-DOJ-10924270) at -273 (discussing use of "last look" in January 2019).

## B.  Dynamic Revenue Share

Google affirmatively misrepresented and concealed its practices regarding Dynamic Revenue Share, as explained in Plaintiff States' separate response to Google's motion for summary judgment on Plaintiff States' Deceptive Trade Practices Act claims. *See* Pls.' Resp. to Google's Mot. for Summ. J. on Pls.' DTPA Claims at Section III(C)(2). Thus, while Google may have

generally disclosed that Dynamic Revenue Share existed in June 2016, it failed to disclose how each version actually operated. RSMF ¶¶147–48, 151–56, 158; *see, e.g.*, Ex. 107 (GOOG-AT-MDL-014570102); Ex. 106 (GOOG-TEX-00831660) at -661 (2017 email discussing how Google "would like to avoid going into the details" "about the mechanism" used by Dynamic Revenue Share"); Ex. 107 (GOOG-AT-MDL-014570102) (2018 email explaining there would be "no buyside comms in general" about later version). For the same reasons, the discovery rule and fraudulent concealment apply and Plaintiff States' claims are timely.

The continuing violations doctrine applies too. Google used Dynamic Revenue Share until September 2019—well within even the shortest two-year statute of limitations Google claims applies. RSMF ¶165; Ex. 110 (GOOG-DOJ-AT-01509153) at -153 ("DRS was turned off when we switched to first price" in "September 2019"); Davis Ex. 52 ¶789.

### C. DFP/AdX Tie

Finally, the continuing violations doctrine applies to Google's tying of DFP and AdX. Google fully implemented the contractual tie in the beginning of 2017. Ex. 96 (GOOG-TEX-00725911) at -912–13 ("As of Q1 2017, it is no longer possible to create an AdX account without a DFP account."). And Google continued to offer only contracts that tied AdX with DFP through when the original complaint was filed in 2020 and into the present. *See, e.g.*, Ex. 114 GOOG-DOJ-AT -01128809) at -823, -828 (listing "Unified DFP/AdX Contract" as an offering from September 2020 presentation and observing that "standalone AdX contracts" are not available); Ex. 115 (████ Dep. Tr.) at 301:25–302:5 (Q: "[W]e talked today about unified contracts. . . . [A]s this letter confirms and as documents show, they go through the present. Correct?" A: "Correct."). Thus, Google's tie of DFP and AdX occurred well within the statute of limitations.

## CONCLUSION

For the foregoing reasons, Google's motion should be denied.

DATED: December 9, 2024

Respectfully submitted,

/s/ W. Mark Lanier

W. Mark Lanier
Mark.Lanier@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.Derose@LanierLawFirm.com
Jonathan P. Wilkerson
Jonathan.Wilkerson@LanierLawFirm.com
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
(713) 659-5200


**THE LANIER LAW FIRM, PLLC**

/s/ Ashley Keller

Ashley Keller
ack@kellerpostman.com
Kiran N. Bhat
kiran.bhat@kellerpostman.com
2333 Ponce De Leon Boulevard
Suite R-240
Coral Gables, Florida 33134
(833) 633-0118

Zina Bash (Bar No. 24067505)
zina.bash@kellerpostman.com
111 Congress Avenue, Suite 500
Austin, TX 78701
(512) 690-0990

/s/ Noah S. Heinz

Noah S. Heinz
noah.heinz@kellerpostman.com
1101 Connecticut Ave., N.W., Suite 1100
Washington, DC 20036
(202) 918-1123
**KELLER POSTMAN LLC**


*Counsel for Texas, Idaho, Louisiana (The Lanier Law Firm only), Indiana, Mississippi, North Dakota, South Carolina, and South Dakota*

*Submitted on behalf of all Plaintiff States*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

*/s/ James R. Lloyd*
Brent Webster, First Assistant Attorney General of Texas
Brent.Webster@oag.texas.gov
James R. Lloyd, Deputy Attorney General for Civil Litigation
James.Lloyd@oag.texas.gov

**STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
ATTORNEY GENERAL


By: /s/ Jeff Pickett
Jeff Pickett
Senior Assistant Attorney General, Special Litigation Section
jeff.pickett@alaska.gov

*Attorney for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF ARKANSAS:

TIM GRIFFIN
ATTORNEY GENERAL


By: _____
AMANDA J. WENTZ
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Attorney for Plaintiff State of Arkansas*

FOR PLAINTIFF STATE OF FLORIDA:

ASHLEY MOODY, Attorney General

/s/ Lee Istrail
LEE ISTRAIL, Assistant Attorney General
FL Bar No. 119216

LIZABETH A. BRADY, Director, Antitrust Division
R. SCOTT PALMER, Special Counsel and Chief of Complex Enforcement
ANDREW BUTLER, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General


Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

FOR PLAINTIFF STATE OF IDAHO:

RAÚL R. LABRADOR
Attorney General

*/s/ John K. Olson*
John K. Olson, Deputy Attorney General

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone:   (208)   334-2424
john.olson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

*/s/ Jesse J. Moore*
Jesse J. Moore
Deputy Attorney General – Consumer Litigation
302 W. Washington St.,
IGCS - 5th Floor
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: jesse.moore@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

RUSSELL COLEMAN
Attorney General

*/s/ Philip R. Heleringer*
Christian J. Lewis, Commissioner of the Office of Consumer Protection
christian.lewis@ky.gov
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
philip.heleringer@ky.gov
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
jonathan.farmer@ky.gov
Office of the Attorney General
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300

*Attorneys for Plaintiff Commonwealth of Kentucky*

FOR PLAINTIFF STATE OF LOUISIANA:

By: */s/ Patrick Voelker*
Liz Murrill, Attorney General
Michael Dupree, Assistant Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
(225) 326-6400
voelkerp@ag.louisiana.gov

*s/ James R. Dugan, II*
James R. Dugan, II (*pro hac vice*)
TerriAnne Benedetto (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:  (504) 648-0180
FX:  (504) 649-0181
EM:  jdugan@dugan-lawfirm.com
        tbenedetto@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:  (504) 833-5600
FX:  (504) 833-8080
EM:   jmw@chehardy.com

*Attorneys for Plaintiff State of Louisiana*

FOR PLAINTIFF STATE OF MISSISSIPPI:

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:     */s/ Garrett S. Mascagni*
        Garrett S. Mascagni
        Special Assistant Attorney General
        Consumer Protection Division
        Mississippi Attorney General's Office
        Post Office Box 220
        Jackson, Mississippi 39205
        Telephone: 601-359-3070
        Fax: 601-359-4231
        Garrett.Mascagni@ago.ms.gov

        *Attorney for Plaintiff State of Mississippi*

FOR PLAINTIFF STATE OF MISSOURI:

ANDREW BAILEY
Attorney General

*/s/ Michael Schwalbert*
Michael.Schwalbert@ago.mo.gov
Missouri Attorney General's
Office
815 Olive St.
Suite 200
St. Louis, MO 63101
Tel: 314-340-7888

*Attorneys for Plaintiff State of Missouri*

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Montana Attorney General


*/s/ Anna Schneider*
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894 Anna.Schneider@mt.gov


*/s/ Charles J. Cooper*
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves
hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

*Attorneys for Plaintiff State of Montana*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate


*/s/ Michelle C. Badorine*
Michelle C. Badorine, Senior Deputy
Attorney General
MNewman@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100

*Attorneys for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NORTH DAKOTA:

**STATE OF NORTH DAKOTA**
Drew H. Wrigley
Attorney General


By:    _/s/ Elin S. Alm_
Elin S. Alm, ND ID 05924
Assistant Attorneys General
Consumer Protection & Antitrust Division
Office of Attorney General of North Dakota
1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
(701) 328-5570
(701) 328-5568 (fax)
ealm@nd.gov

_Attorneys for Plaintiff State of North Dakota_

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

*/s/ Domingo Emanuelli-Hernández*

Domingo Emanuelli-
Hernández Attorney General
Thaizza Rodríguez Pagán
Assistant Attorney
General PR Bar No.
17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201, 1204
trodriguez@justicia.pr.gov

Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

*Attorneys for Plaintiff Commonwealth of Puerto Rico*

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

ALAN WILSON
Attorney General

/s/ *Mary Frances Jowers*
Mary Frances Jowers
Assistant Deputy Attorney General
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-5855
Email: mjowers@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC
880 Johnnie Dodds Blvd, Suite 1
Mount Pleasant, SC 29464
Phone: 843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
Phone: (504) 648-0180
Email: jdugan@dugan-lawfirm.com

*Attorneys for Plaintiff State of South Carolina*

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

MARTY JACKLEY
Attorney General


*/s/ Jonathan Van Patten*
Jonathan Van Patten
Assistant Attorney General
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: 605-773-3215
jonathan.vanpatten@state.sd.us

*Attorney for Plaintiff State of South Dakota*

FOR PLAINTIFF STATE OF UTAH:

Sean D. Reyes
Utah Attorney General

*/s/ Matthew Michaloski*
Matthew Michaloski
Marie W.L. Martin
Assistant Attorney General
160 East 300 South, 5th Floor
P.O. Box 140874
Salt Lake City, UT 84114
mmichaloski@agutah.gov
Telephone: (801) 440-9825

*Attorneys for Plaintiff State of Utah and*
*as counsel for the Utah Division of Consumer Protection*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 9, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ Ashley Keller*
Ashley Keller

## <u>CERTIFICATE OF MOTION TO SEAL</u>

I certify that contemporaneously with the filing of this Motion, Plaintiff States filed a motion to seal both this document and the attached exhibits.

*/s/ Ashley Keller*
Ashley Keller
