**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| THE STATE OF TEXAS, et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>          Defendant. | Civil Action No. 4:20-cv-00957-SDJ |

## PLAINTIFF STATES' RESPONSE TO GOOGLE LLC'S [CORRECTED] STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule CV-56(b), the Plaintiff States hereby respond to Google's Corrected Statement of Undisputed Material Facts, filed on November 22, 2024, Dkt.687-10.

1

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 1 | Display advertisements are visual ads that contain video, image, or text elements to market products or services to Internet users. Ex. 7, ¶ 138; Ex. 146 at 37:14-38:2 ("Q. . . When you're talking about display advertising, what different formats does DCP use? A. Display advertising could be a video. It could be a static ad, meaning it has no movement. It could be what they call native advertising, which doesn't quite look like an ad, but it would show up alongside or in the thread of, say you're reading an article online. All of those things would fall into display."). | Disputed as to the definition and purpose of display advertisements. *See* Davis Ex. 52, Gans Opening Rep. at 28 ¶ 74 n.34 ("The Interactive Advertising Bureau (IAB) recognizes the existence and role of different types of advertising. It defines display ads as a category of online advertising. In particular, it distinguishes display ads from video ads appearing in video players …."); Heinz Ex. 10, Chandler Rebuttal Rep. at 19 ¶ 44(1) ("The IAB's annual Internet Advertising Revenue Report lists its results by format, dividing channels into the following groups: search, display, video, audio, and other."); Ex. 116, J. Farmer (State of Kentucky) Dep. Tr. at 67:15-68:11 (discussing campaigns aimed at human trafficking awareness and elderly scam awareness that utilized display ads and testifying as follows: "Q. Okay.  And what -- these campaigns don't try to get anyone to buy anything, correct? A. Yes.  The purpose of our campaign was, you know, public awareness, not to purchase products, or..."). |
| 2 | Display ads appear across a variety of formats and channels, including websites accessed on your desktop, the mobile web, apps (including apps offered by social media platforms), as well as on connected TVs or related devices. Ex. 7, ¶ 138; Ex. 154 at 49:20-50:6 (██████ ███████████████████████████ █████████████████████████████ ██████████████████). | Disputed as to the inclusion of "apps," social media, and "connected TVs or related devices." *See* Davis Ex. 52, Gans Opening Rep. at 28 ¶ 74 n.34 ("The Interactive Advertising Bureau (IAB) recognizes the existence and role of different types of advertising. It defines display ads as a category of online advertising. In particular, it distinguishes display ads from video ads |

---

[1] In this response, "Davis Ex." refers to the corresponding exhibit attached by Google to the M. Davis Declaration (ECF No. 668-1), filed with Google's Omnibus Motion to Exclude Expert Testimony.  "Google Ex" refers to the corresponding exhibit cited in Google's Corrected Statement of Undisputed Material Facts.

"Ex." refers to exhibits attached by Plaintiffs to the Declaration of K. Bhat, filed contemporaneously herewith in support of Plaintiffs' Oppositions to Google's Motions for Summary Judgment.

"Heinz Ex." refers to the corresponding exhibit attached by Plaintiffs to the Declaration of N. Heinz, filed contemporaneously herewith in support of Plaintiffs' Opposition to Google's Motion to Exclude.

Further, in this Response, Plaintiffs respond to Google's asserted statements and do not concede (and reserve the right to challenge) the contents of all of Google's cited exhibits.

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| |  appearing in video players …."); Heinz Ex. 10, Chandler Rebuttal Rep. at 19 ¶ 44(1) ("The IAB's annual Internet Advertising Revenue Report lists its results by format, dividing channels into the following groups: search, display, video, audio, and other."); Ex. 117, Deposition of ▮▮▮▮▮▮, 9/28/23 Tr. at 61:16-22 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 118, ▮▮▮▮ Dep. Tr. 193:25-3, 194:9-24 ("Q. In that work, you became familiar with some of the differences between video ads and display ads; is that right? A.  That's correct. ... Q.  Display ads, generally, is a static image; is that right? A. So display ads can be -- can also have videos embedded in them.  In fact, many display ads are so-called rich media ads that also have videos in them that also have very similar characteristics to video ads. The difference here is less about the ad itself, which could -- in both cases have motion or not have motion, or have sound or not have sound, but actually where the ad is placed. So generally speaking, if the ad is placed in a video stream, that is referred to an instream ad.  If it's placed on a page with text and other content, that's generally referred to as a display ad."); Ex. 119, ▮▮▮ Dep. Tr. 47:14-18 ("THE WITNESS: So 'in-stream' refers to ads that are shown within the actual -- are stitched into the actual video content itself. 'Out-stream' refers to what would normally be a display ad that just shows a video ad on the page."); Ex. 120, ▮▮▮ Dep. Tr. 35:20-36:23 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | ████████████████████<br>████████████████████<br>████████████).|
| 3 | Publishers of online digital content designate space for digital ads, called inventory. Ex. 2, ¶ 143 ("On the supply side, there are publishers, like websites with space where ads can be displayed."); Ex. 3, ¶ 21; Ex. 6, ¶ 63; Ex. 7, ¶ 129; Ex. 9, ¶ 21. | Undisputed. |
| 4 | Publishers sell advertising inventory to monetize and fund their content. Ex. 3, ¶ 43; Ex. 7, ¶ 133(a); Ex. 8, ¶ 36; Ex. 9, ¶ 21. | Disputed to the extent that publishers may have other reasons to sell advertising inventory. *See* Dkt. No. 664, Google's Answer to Plaintiff's 4th Amended Complaint, at 123 ¶ 511 ("Google admits that some publishers use revenue generated from selling ad space to, *among other things*, support content development." (emphasis added.)). |
| 5 | Advertisers purchase publisher inventory in order to reach their target audience. Ex. 2, ¶ 143 ("On the demand side, there are advertisers who seek to display their ads to a specific audience."); Ex. 5, ¶ 82; Ex. 6, ¶ 72; Ex. 7, ¶¶ 129, 133(b); Ex. 8, ¶ 36. | Disputed to the extent that advertisers may have other reasons or a "variety of factors" to consider, in addition to reaching their target audience, in purchasing publisher inventory. *See* Dkt. No. 664, Google's Answer to 4th Amended Complaint, at 5 ¶10. ("Google admits that some publishers' inventory can be viewed as distinct and that the value of different ad units can differ and will depend on *a variety of factors* including the audience." (emphasis added)). |
| 6 | Ad tech is software that facilitates the purchasing of digital advertising space by matching publishers with inventory to sell with advertisers with ads to show. Ex. 2, ¶¶ 140, 143; Ex. 3, ¶ 61; Ex. 5, ¶¶ 16, 18, 37; Ex. 7, ¶¶ 128, 150-51; Ex. 15 at 58:21-59:1 (agreeing that a "key function in an ad exchange" is "to match buyers and sellers of display advertising" by "using information and bids"). | Disputed to the extent that ad tech is not a singular type of software or technology but, instead, has many components that serve different functions. *See* Davis, Ex. 29, Chandler Opening Rep. at 35 ¶ 115 ("While ad exchanges are the marketplace where advertisers and publishers come together, and with the help of their ad buying tools and supply side platforms, buy and sell ads, the auction is the central activity through which ads are bought and sold on exchanges."); *id.* ¶ 140 ("This system includes several key components: a publisher inventory management system, a publisher ad server, an |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
|   |   | advertising exchange, an advertiser ad server, and an advertiser buying tool."). |
| 7 | Advertisers and publishers seek to maximize revenue by finding the best match possible for each impression. Ex. 5, ¶ 16; Ex. 8, ¶ 39 ("Improved matching that places higher value ads for each impression can increase both the price paid to publishers and the profits earned by advertisers."). | Disputed to the extent "best match" may be different for publishers and advertisers and to the extent implied that advertisers and publishers only "seek to maximize revenue by finding the best match" where other considerations may exist, including the quality and number of the ads on a site. *See* Davis Ex. 29, Expert Report of John Chandler, at 55 ¶ 195 ("The interests of publishers and advertisers are not generally aligned in a transaction for display advertising space."); *id.* at 92 ¶ 355 ("Publishers were harmed because the auction process often led to publishers showing lower quality ads than ads placed through other auctions."); Davis Ex. 2 at 63, n. 135 ("I use the parenthetical (value-adjusted) to note that publishers may care about more than just the revenue earned (for example due to ad quality, a discount offered, etc."). |
| 8 | When this transaction occurs, a user is shown a display ad, which is referred to as an "impression." Ex. 2, ¶ 31(1); Ex. 9, ¶ 23; Ex. 187 at 139:14-16. | Disputed as imprecise, to the extent stating that the display ad being shown is an "impression." *See* Davis Ex. 29, Expert Report of John Chandler, at 12 ¶ 31(1) ("An impression is the unit of measurement of digital advertising and represents a single instance of a particular ad being shown. One can think of an impression as the viewing of an advertisement.")*; see also* Davis Ex. 2, Expert Report of Matthew Weinberg, at 34 ¶ 63 ("Publishers are...sellers of inventory, which is effectively the 'eyeballs' of their users. Publishers (and third parties) have a range of information about the particular users visiting their page, and each unique visitor can be thought of as its own item for sale. The item for sale is referred to as an impression."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 9 | Publishers selling digital ad space have several options for selling their ad inventory. Ex. 5, ¶¶ 79-81; Ex. 7, ¶ 134. | Disputed. *See* Ex. 121, ███████████████████████████████████████████████████████████████████████████████; Ex. 122, ███████████████████████████████████████████████████; Davis Ex. 53, Gans Rebuttal Rep. at 119-121, 21 ¶ 327 (competitors had difficulty getting publishers to switch servers "due to the high switching costs of going from DFP to another ad server and publisher fear of losing revenue due to the loss of Google demand."). |
| 10 | Publishers can engage in direct deals using bilateral negotiations with an advertiser to set the terms of the deal. Ex. 2, ¶¶ 108, 110; Ex. 5, ¶ 79; Ex. 6, ¶ 69; Ex. 7, ¶ 134 & n.17; Ex. 15 at 74:19-23 ("Q. Can Advertisers reach consumers through Direct Deals with publishers?... A. If they strike a direct deal with the right sort of publisher, yes."); Ex. 26 at -481-82; Ex. 112 at -720 (As of 2010, a "typical large publisher generates upward of 80% of its online advertising revenue from guaranteed ad sales."). | Undisputed, except that publishers can engage in direct deals through potentially other types of negotiations. |
| 11 | Publishers can also use ad tech tools to facilitate direct deals with advertisers (also known as "programmatic guaranteed" or "programmatic direct" deals). Ex. 2, ¶¶ 31(15), 110; Ex. 7, ¶ 134 n.17; Ex. 94 at -918 (design document for Google's programmatic direct offering, which was designed to help both sides of the transaction "save time and money," "reduce waste and increase yield," and "save time/reduce bad debt"). | Undisputed as a general matter, except objection to the lack of relevant time period and that such direct deals can also be known by other names, such as "automated guaranteed." *See* Davis Ex. 29, Chandler Opening Rep. at 35 ¶ 110. |
| 12 | Publishers additionally use ad tech tools to facilitate the sale of publisher inventory that is not sold directly, referred to as "remnant inventory." Ex. 2, ¶¶ 108, 111; Ex. 3, ¶ 104. | Disputed. *See* Ex. 123, GOOG-AT-MDL-019109468 ("Under second price auction, the impact of this 'last look' over DFP remnant is quite obvious in that auction will let bids above remnant LI eCPM win over the remnant LI, paying 1 cent above the remnant LI eCPM.") |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 13 | Publishers of digital content employ a variety of what are known as "sell-side" ad tech tools to manage and sell their inventory. Ex. 2, ¶¶ 152-53; Ex. 6, ¶ 76; Ex. 7, ¶ 135; Ex. 175 at 12:12-15. | Disputed as to the term "variety" and imprecise as to the different sell-side products including publisher ad servers and supply-side platforms ("SSPs"), which are distinct *See* Ex. 124, ███████████████████████████; Ex. 125, C. LaSala Dep. Tr., Aug. 17, 2023, at 482:25-483:8 ("Q. So publishers using Google Ad Manager will mostly only use Google Ad Manager, right? ... A. I think it is most common for a publisher to implement a single ad server, whether it's Google's or someone else. There are small instances where they would do both."); Ex. 126, ████████████████; Ex. 127, ██████████████████. |
| 14 | A publisher ad server is an ad tech tool that helps publishers manage, track, and sell their online digital inventory in an automated manner. Ex. 2, ¶¶ 140, 152, 156-57; Ex. 3, ¶ 62; Ex. 6, ¶ 67; Ex. 8, ¶ 45; Ex. 174 at 203:17-21 (██████████████████████ | Undisputed as a general, but not sole or comprehensive, definition or description of a "publisher ad server." |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
|  | ▇▇). Publishers can use ad servers for functions such as deciding which ad to serve and where the ad should be displayed. Ex. 8, ¶ 45; Ex. 2, ¶ 157. |  |
| 15 | Publishers can also use ad exchanges or supply-side platforms ("SSPs"), another tool which provides real-time auction matching between publishers and advertisers in exchange for a commission, also called a revenue share. Ex. 2, ¶¶ 117, 183; Ex. 3, ¶¶ 45, 109, 183; Ex. 6, ¶ 77. | Disputed to the extent stating that ad exchanges are always interchangeable with SSPs, although they are often used interchangeably. *See* Davis Ex. 29, Expert Report of John Chandler, at 41 ¶ 143 ("In order to scale up and facilitate the transactions between the two sides, a broader set of entities have emerged, which includes supply side platforms (SSPs) which help aggregate advertising inventory, demand side platforms (DSPs) which help aggregate and place advertising inventory, and exchanges which facilitate the exchange between the two sides."); Davis Ex. 52, Gans Opening Rep. at 125 n.425 ("'Ad exchange' and 'SSPs' are often used interchangeably."). |
| 16 | Publishers can also sell their inventory through ad networks. Ex. 2, ¶ 114; Ex. 8, ¶ 45; Ex. 154 at 28:6-23 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇). And publishers can employ ad networks to purchase their remnant inventory in bulk and resell that inventory to advertisers. Ex. 2, ¶ 111; Ex. 3, ¶ 105; Ex. 32 at -924 ("aggregated inventory is sold to advertisers - helped publishers by selling remnant inventory"). | Disputed as to the buy-side and programmatic nature of ad networks and that publishers can employ ad networks to sell, not "purchase," their remnant inventory. *See* Davis Ex. 29, Expert Report of John Chandler, at 35 ¶ 111 ("Indirect sales focus on selling ad inventory through intermediaries, such as ad networks or exchanges, typically for remnant inventory. ... Traditional indirect sales involve ad networks that aggregate inventory from multiple publishers, using less automation and often requiring human negotiation."); *see also id.* at 34 ¶ 107 (categorizing selling via ad networks as non-programmatic). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 17 | Publishers "multi-home," meaning they use more than one ad exchange on the sell-side. Ex. 7, ¶ 65 ("About 45 percent of publishers who use AdX or DFP multi-home by selling inventory across AdX and at least one other exchange"); Ex. 186 at 72:22-73:9 ("It's common for publishers to use multiple exchanges at the same time."). | Disputed as to the extent of the stated multi-homing. *See* Davis Ex. 53, Gans Rebuttal Rep. at 101 ¶ 265 ("Out of those that multi-home, 45% use AdX, and only 2% of publishers multi-home, using multiple non-AdX exchanges.443 Publishers' multi-homing is highly fragmented across other exchanges. For example, less than 10% of publishers multi-home on both AdX and another exchange such as Microsoft, Magnite, PubMatic, OpenX, or Index Exchange."). |
| 18 | Advertisers also employ a variety of what are known as "buy-side" ad tech tools to host, manage, target, and buy ad space for their ads with the goal of getting the best return on their advertising investment ("ROI"). Ex. 2, ¶ 171; Ex. 3, ¶¶ 33, 62; Ex. 5, ¶ 83; Ex. 6, ¶ 74. | Disputed, as Google's cited sources do not support the asserted statement and to the extent the statement conflicts with Plaintiffs' evidence. *See* Davis Ex. 53, Gans Rebuttal Rep. at 62 ¶ 162, 227-230 ¶¶ 530-538 (showing that advertiser multi-homing on buyer tools is rare); Davis Ex. 29, Chandler Opening Rep. at 86 ¶ 318 ("In an exchange, the buy side is seeking to purchase high-quality inventory at the lowest prices possible."); *id.* at 31 ¶ 92 ("Third party testimony further supports differentiation between the various marketing channels. Advertisers seeking to maximize ROI or ROAS will allocate spend across marketing channels, indicating that marketing channels are not 'perfectly interchangeable.'"). |
| 19 | Ad buying tools used by advertisers are referred to as demand side platforms ("DSPs") or ad networks. Ex. 2, ¶ 174; Ex. 3, ¶ 110; Ex. 7, ¶ 128 n.4. These ad buying tools are platforms that advertisers and media buying agencies can use to facilitate purchases of ad inventory from publishers in order to reach target audiences. Ex. 2, ¶ 174; Ex. 32 at -924 (ad buying tools provide "bidding technology to target audiences and optimize across multiple ad exchanges"); Ex. 3, ¶ 110. | Disputed to the extent that other ad buying tools exist outside of DSPs and ad networks and that DSPs do not directly interact with publishers. *See* Davis Ex. 29, Expert Report of John Chandler, at 41 ¶ 143 ("In order to scale up and facilitate the transactions between the two sides, a broader set of entities have emerged, which includes supply side platforms (SSPs) which help aggregate advertising inventory, demand side platforms (DSPs) which help aggregate and place advertising inventory, and exchanges which facilitate the exchange between the two sides."); *id.*. at 50-51 ¶¶ 175, 176 ("The tools they use, such as DSPs …."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 20 | Many advertisers work with media buying agencies (or "advertising agencies") to purchase impressions on their behalf. Ex. 5, ¶ 82; Ex. 192 at 74:25-75:2, 75:9-14, 76:2-9; Ex. 138 at 54:16-19; Ex. 168 at 15:17-16:5. In addition to purchasing impressions on the advertiser's behalf, advertising agencies can assist advertisers with setting campaign goals, developing campaign budgets, selecting ad buying tools, managing advertising purchases, and bidding on the advertiser's behalf. Ex. 3, ¶ 44; Ex. 8, ¶¶ 30, 47; Ex. 138 at 57:11-58:15; Ex. 168 at 15:17-16:5 (███████████ ████████████████████████ ); Ex. 177 at 11:13-25; Ex. 192 at 76:19-77:14 ("Q. What role does an ad agency play for Louisiana's ad campaigns? A. I guess the entirety of the role. They are relied upon and hired for their expertise and knowledge of getting the advertisement out in a manner that is effective[.]"), *id.* at 78:20-23. | Undisputed, except that advertising agencies may still interface with ad buying tools on behalf of advertisers. |
| 21 | Advertisers and advertising agencies multi-home, meaning they use more than one ad buying tool, such as a DSP, on the buy-side. Ex. 8, ¶ 78; Ex. 108 at -666, -670 (2021 survey showing that respondent advertisers and ad agencies used an average of 3.4 DSPs and planned to use 5.9 DSPs the following year); Ex. 163 at 40:18-23 (████████████ ███████████████████████████ ███████████████████████████ ████████████ ) | Disputed. *See* Ex. 128, ████████ ███████████████████████████ ███████████████████████████ ; Ex. 129, ███ ███████████████████████████ █ ███████████████████████████ ███████████████████████████ ███████████████████████████ ██████ ; Davis Ex. 52, Gans Opening Rep. at ¶¶ 398-402; Davis Ex. 53, Gans Rebuttal Rep. at 62 ¶ 162, 227-230 ¶¶ 530-538 (showing that advertiser multi-homing on buyer tools is rare). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 22 | Ad tech tools facilitate "matches" between the buy-side and sell-side, and ad exchanges are two-sided transaction platforms. Ex. 15 at 60:3-5 (agreeing that ad exchanges are two-sided transaction platforms), *id*. at 61:20-62:4 (stating that an "ad exchange itself is performing the function of matching given the information from advertisers and publishers"), *id*. at 63:17-22 (agreeing that ad exchanges are "two-sided platforms that match publishers and advertisers based on information submitted to the platform"). | Undisputed that ad exchanges can be multisided transaction platforms that facilitate matches, but disputed as to other ad tech tools that do not provide that function. *See* Davis Ex. 53, Gans Rebuttal Rep. at 10 ¶ 16 ("Under this accepted definition, only ad exchanges arguably meet the definition of a multisided transaction platform, and I have evaluated the relevant ad exchange market as such."). |
| 23 | Transactions using ad tech tools happen in real time. The process starts when a user visits a publisher's property (like a website or mobile app), which thereby triggers requests to the publishers' ad tech software for an ad to show to the user. That request, in turn, kicks off a process of identifying potential ad candidates and oftentimes involves requesting bids from buying tools, conducting auctions, and ultimately showing an ad to the user. Ex. 2, ¶ 147;Ex. 7, ¶¶ 129-30; Ex. 19, ¶ 7. | Disputed in that not all ad tech tool transactions are considered "real time." *See* Davis Ex. 29, Chandler Opening Rep. at 7 ¶ 23(5) ("There are a number of types of display auctions, including those with one or more of the following characteristics or structures: ... (b) real-time versus one participant having lastlook ..."); *id*. at 16 ¶ 31(15) ("Programmatic Guaranteed is a form of programmatic advertising where ad inventory is reserved in advance at a fixed price. *Unlike real-time bidding*, this approach guarantees ad placements on specific sites or platforms, combining the automation and efficiency of programmatic buying with the assurance of direct deals." (emphasis added)). |
| 24 | Some publishers and industry participants, such as Meta and Amazon, operate "walled gardens," and their publisher inventory is typically only available to advertisers through the use of ad tech tools offered by those walled gardens or by direct deals. Ex. 2, ¶ 31(8); Ex. 3, ¶ 161 . Walled gardens directly select which advertisers may purchase impressions on their platforms. Ex. 3, ¶ 222. | Undisputed as to Meta and Amazon as Walled Garden Publishers that do not serve display advertising. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 25 | The ad tech industry is dynamic, technologically driven, and rapidly evolving with new technological advancements. Ex. 2, ¶¶ 26, 99, 102, 105, 227 (describing the "rapid adoption of programmatic display buying," the "rapidly evolving mobile advertising landscape," and how "[real-time bidding] has grown rapidly"); Ex. 7, ¶¶ 132, 179; Ex. 125 at -002 (███████████████████████ ██████████████████████ ██████████████████████ ████████████████████ ██████████████████████ ██████████████████████ ████████████████); Ex. 171 at 254:15-255:10 (██████████████████████ ████████████████). | Disputed to the extent that this statement suggests Google's conduct at issue in this case as being "advancements." *See* Davis Ex. 38, Pathak Dep. Tr. 49:19-50:2 ("The idea of a real-time pricing was not a Google innovation. I wouldn't call it an innovation to place Google's AdX exchange at the top of a queue without giving publishers choices about whether AdX should be prioritized in the waterfall or not. I don't know if I would agree with your description of it as an innovation."), 53:1-8 ("I wouldn't call [dynamic allocation] an innovation because in some respects it's taking away publisher's choice because an essential part of Google's version of dynamic allocation is putting AdX near the top of a waterfall, and a true innovation would allow publishers the ability to access real-time bids wherever in the waterfall they wanted to."). |
| 26 | Several industry participants, including for example Microsoft and Nexxen, offer an "integrated" ad tech stack of both sell-side and buy-side tools. Ex. 7, ¶¶ 132, 170 ("[C]ompanies like Google and Microsoft (Xandr) offer fully integrated ad tech stacks to serve all sides of the market."); Ex. 179 at 121:12-122:6 (█████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ███████). | Disputed. *See* Heinz Ex. 10, Chandler Rebuttal Rep. at 44-45 ¶ 100 ("aQuantive was a direct competitor of DoubleClick through our respective acquisitions, and we grew our advertiser buying tools business from 5-10% market share to 45% between 2001 and 2008. By 2013, Microsoft had decided to exit this aspect of the ads business, selling the Atlas intellectual property to Facebook."); Davis Ex. 53, Gans Rebuttal Rep. at 121 ¶ 326 (████████████████████ ████████████████████ ████████████████████ ██████████████████████ ████████████████████) (citing and quoting Deposition of |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | ███████████████ ████████████████ ██. |
| 27 | Google's ad tech stack is an end-to-end platform with integrated tools. Ex. 3, ¶ 63; Ex. 7, ¶¶ 170, 276. | Disputed that Google's "ad tech stack" is a single "end-to-end platform with integrated tools" and as to the cited evidence, which does not support Google's asserted statement. *See* Davis Ex. 53, Gans Rebuttal Rep. at 10 ¶ 16 ("Other distinct products or tools, such as ad servers and ad buying tools for small and large advertisers, are not multisided transaction platforms. They do not perform direct transactions between two distinct user groups; rather they serve independent customer groups (i.e., publisher ad servers serve publishers; ad buying tools serve advertisers). They provide multiple services other than facilitate transactions."); Ex. 130, GOOG-NE-13468302 at -305 ("Please note that while we talk externally about how these products work together and our plans to integrate them even further, we have not made any formal statements about merging the products and you should still talk about them as *separate products* when talking directly with clients." (emphasis added)); Ex. 131, GOOG-NE-04597999 (Google diagram showing DFP and AdX as two separate products within Display Ads landscape). |
| 28 | Google's ad tech tools benefit publishers and advertisers (as well as their ad agencies), including by providing access to brand-safe | Disputed as to the broad statement that "Google's ad tech tools benefit publishers and advertisers" as Plaintiffs' evidence shows that |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | inventory, enhancing advertising campaign and delivery performance with user-friendly features, and offering sophisticated protections against ad fraud. Ex. 179 at 61:15-62:13 (███) <br><br> (testifying about deposition Exhibit 3 (Ex. 180)), *id.* at 110:20-111:8 (███) (testifying about deposition Exhibit 3 (Ex. 180)); Ex. 180 at slides 10-11 (███); Ex. 128 at -025-30 (███); Ex. 133 at 54:15-20 (███), Ex. 188 at 115:9-16 (███); Ex. 155 at 37:9-15 (███ | due to Google's conduct, publishers and advertisers were harmed, and also as to the asserted benefits and protections, many of which are not unique to Google products and were not in place for the entire relevant time period of the case. *See* Davis Ex. 52, Gans Opening Rep. at 139-301 (explaining Google conduct and resulting harm to publishers and/or advertisers). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | ███████████████████████<br>██████████████████████<br>████████████ ); Ex. 156 at 173:19-174:12 (█████████<br>███████████████████████<br>███████████████████<br>████████████████████<br>█████████████ ). | |
| 29 | Google Ad Manager ("GAM") includes Google's publisher ad server and ad exchange. Ex. 7, ¶ 18; Ex. 103 at -479-81. | Undisputed that, as a result of Google's conduct, Google Ad Manager ("GAM") includes two distinct products, its publisher ad server DFP and ad exchange AdX. |
| 30 | Google's publisher ad server, formerly called "DoubleClick for Publishers" ("DFP"), and Google's ad exchange, AdX, were acquired by Google in 2008.[2] Ex. 3, ¶¶ 66, 140, 552.<br>[2] Although rebranded in 2018 as GAM, see infra ¶¶ 169-70, for convenience and when referring specifically to Google's ad server or its ad exchange, Google will use DFP and AdX, respectively. | Undisputed, except that when Google acquired DoubleClick, DoubleClick's ad exchange tool was known as DoubleClick Ad Exchange. Google later further developed and renamed to AdX. *See* Davis Ex. 52, Gans Opening Rep. 64 ¶ 180 ("In 2008, Google acquired DoubleClick and its ad exchange tool, formerly known as DoubleClick Ad Exchange and renamed to AdX."). |
| 31 | DV360 and Google Ads are Google buy-side tools. Ex. 3, ¶ 63; Ex. 5, ¶ 86; Ex. 7, ¶ 18; Ex. 8, ¶¶ 83, 87. | Undisputed, except that DV360 and Google Ads are also Google products. |
| 32 | Google offers two types of accounts for publishers using GAM's ad server, DFP: small business and premium (also called GAM360). Ex. 3, ¶ 156, Table 1; Ex. 7, ¶ 292 n.414; Ex. 11, ¶ 120 ("[Google] offers two distinct products: DFP Premium and DFP small business."). | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 33 | GAM360 publishers can utilize additional services, one of which is access to data transfer files that contain event-level data of all ads served to their property. Ex. 22, ¶ 14 ("In January 2024, Google made available to publishers using [GAM360] a modified Bids Data Transfer report file – the Joinable Bids Data Transfer report file ('Joinable BDT File') – that could be joined with other Data Transfer report files containing bid information for requests originating outside of Europe."); Ex. 131 at 132:13-20 ("Q. What's a data transfer report file? A. Ad Manager offers to Ad Manager 360 publishers an option for an additional service that – in which we would provide what we call data transfer files that contain event-level data of all the ads served to their property."). | Disputed to the extent the statement implies that additional services have always been available, as cited sources, for example, show that access to data transfer files only became available in January 2024. |
| 34 | The number of GAM360 publishers is much smaller than the number of GAM small business publishers. Ex. 131 at 132:21-133:12. | Disputed to the extent that the statement and cited deposition testimony (" I  don't have the numbers off the top of my  head.") are imprecise and vague ("much smaller") as to the relevant time period and the number of publishers. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 35 | Publishers using Google's ad server, DFP, may set a "floor price," also known as a "reserve price," for each available impression—meaning a minimum price at which the publisher would be willing to sell an impression. Ex. 5, ¶ 71; Ex. 7, ¶ 142 n.74. | Disputed. *See* Davis Ex. 52, Expert Report of Joshua Gans, 178 ¶ 513-14 (Regarding Google's UPR conduct, "Google is stripping them of control over how their inventory is valued, and their ability to control their floor prices… Google received pushback from publishers regarding the loss of control over their price floor."); Ex. 112, Declaration of Nitish Korula (Engineering Director, Google), Paragraph 10, August 4, 2023 ("Using Dynamic Allocation, DFP established a 'floor price' for AdX bids to beat, based on the highest price of any of the publisher's eligible booked, static remnant line items (which a publisher could configure based on the estimated price of each remnant line item or a fixed price the publisher had negotiated with a particular remnant demand partner). AdX buyers would then submit real-time bids to try to beat this floor."); Davis Ex. 52, Expert Report of Joshua Gans, 253 ¶760 ("Specifically, they note that Bernanke overrode ████████████ floor prices for 68% of the problematic impressions that led to this issue."). |
| 36 | AdX runs auctions to match publishers and advertisers and facilitate the sales of ad impressions. Ex. 2, ¶ 183; Ex. 7, ¶ 18. | Undisputed as to a general description of AdX, except incomplete as the statement omits the roles of other distinct tools and products in the auction. *See* Davis Ex. 29, Chandler Opening Rep. at 53 ¶ 183 ("On advertising exchanges, advertisers place bids via DSPs and publishers make their inventory available for auction via SSPs."). |
| 37 | Publishers can make inventory available to buyers by triggering an ad request to GAM. Ex. 8 ¶ 97. | Disputed to the extent the statement is imprecise and vague as to the relevant time period (GAM only came into existence after Google's alleged tie) and method of triggering an ad request to the ad exchange product within GAM. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **38** | AdX does not return real-time bids to Google's ad server, DFP, or any third-party ad server. Ex. 19, ¶ 16. | Disputed, including as to the relevant time period of the statement and the scope of the AdX and DFP products. *See* Heinz Ex. 19, Hochstetler Opening Rep. at ¶ 81; Ex. 132, GOOG-AT-MDL-019653406 at -418 ("…we can always join DFP + AdX logs"). |
| **39** | AdX charges publishers a revenue share for each transaction. Ex. 3, ¶ 183; Ex. 8, ¶ 105; Ex. 19, ¶ 10. AdX's standard revenue share is 20% of the publishers' total revenue from the sales of the publishers' web and video impressions to buyers using AdX, though publishers can negotiate that amount. Ex. 3, ¶ 811 ("Google documents show that AdX has charged around 20% take rate on average across open auction transactions"); Ex. 8, ¶ 105; Ex. 51 at -227 ("AdX applies a 20% sell-side revshare to all bids in their auction."); Ex. 103 at -514; Ex. 196 at 224:6-11 ("I believe that platform that they're referring to is Google's ad exchange, where it historically has extracted a 20 percent revenue share."). | Disputed as to the term "standard" as imprecise/vague where the revenue share or take rate can vary and as to the lack of a relevant time period. *See* Davis Ex. 2, Weinberg Opening Rep. at 111 ¶ 199 ("Under DRSv2, AdX is allowed to either increase the take rate on a per impression basis or decrease it, as it can be seen from its description. This is one important difference in comparison to DRSv1 where AdX was only allowed to decrease the take rate. AdX decides to increase or decrease the take rate based on the average take rate it applied to that publisher in the billing period. If it is close enough to the contractual requirement of 20%, then AdX sometimes decreases the take rate to win impressions that it would not have won otherwise. If it is much lower than 20% and the top bid is high enough compared to the floor, AdX increases the take rate to recoup the losses it incurred in auctions where it decreased its take rate."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 40 | In AdX auctions, the highest bid net of AdX's revenue share ("net bid") wins the auction, as long as it is above the applicable reserve price. Ex. 7, ¶ 619; Ex. 19, ¶¶ 10-12 & n.1; Ex. 164 at 182:11-13 ("Q. So the net bid is the bid price after Google's revenue share? A. Rev – yes that's correct."). | Disputed. *See* Ex. 133, GOOG-DOJ-14952731 at -731 ("[Launch 106307] gTrade: Project Bernanke" September 24, 2013 ("With this project, we are doing a little quantitative easing on the AdX, a la Bernanke: GDN will take a *negative* revshare to allow advertisers to win even more AdX auctions. The cost from this negative revshare will be balanced by increasing the revshare on other auctions by lowering GDN's second bid (which is used to second-price GDN sometimes"); see also Ex. 134, GOOG-TEX-01266874 at -874 ("Bernanke experiment analysis (THIS IS THE INTERNAL TO GTRADE DOC NOT TO BE SHARED!)" February 12, 2018 ("As part of project Bernanke, we reduce the second bid (and in some cases drop the second bid completely) and create a pool of money, which we then reinvest by increasing the first bid on queries in order to win potentially unmatched queries."). |
| 41 | Prior to 2019, AdX conducted a second-price auction. Ex. 7, ¶ 501; Ex. 19, ¶ 11; Ex. 160 at 176:14-19 ("[P]rior to September 2019, AdX would run a second-price auction."). In a second-price auction, the highest bidder is the winner of the auction, and it pays the higher of (i) the second-highest bid and (ii) the reserve price. Ex. 8, ¶ 60; Ex. 9, ¶ 38 n.55; Ex. 7, ¶ 501; Ex. 17 at 203:21-204:4 ("Is it your understanding that in a second-price auction the highest bidder pays the greater of the reserve price and the second highest bid? A. Yes."); Ex. 19, ¶ 11. If no net bid exceeded the publisher's reserve price, the impression is not matched by AdX, meaning no ad is served by AdX. Ex. 5, ¶ 71; Ex. 19, ¶ 12. | Disputed. *See* Ex. 135, GOOG-NE-13340752 (RPO undermines the whole idea of second price auctions); Ex. 136, GOOG-NE-05308018 at -025, 026 (DBM Japan, noticing the effects of RPO, states that AdX auctions appear to be first price); Ex. 137, GOOG-AT-MDL-B-002088137 at -139 (Bernanke's purpose was to randomly charge first price and make more money for Google). |
| 42 | In a given second-price auction, bidders are incentivized to bid according to their actual values, a property called "truthfulness" in auction parlance. Ex. 6, ¶ 51; Ex. 8, ¶ 61-62. A pricing rule in which the winning bidder pays the lowest amount it could have bid to win the auction, in retrospect, is called "threshold | Disputed, as the term "in retrospect" is vague. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | pricing," and auctions using threshold pricing are truthful. Ex. 8, ¶ 61; Ex. 18 at 259:8-23, 263:25-264:18. | |
| 43 | In 2019, AdX transitioned to a first-price auction. See infra ¶ 80; Ex. 7, ¶ 501; Ex. 13 at 174:20-22 ("Q. Do you know when AdX went to a first-price auction? A. I believe it was in 2019."); Ex. 8, ¶ 491; Ex. 150 at 398:19-22 (Q. Do you know when AdX shifted to the unified first-price auction? A. To my recollection, it was close to September 2019."); Ex. 19, ¶¶ 13, 53. As discussed infra ¶ 81, in a first-price auction, the highest bidder wins and pays a price equal to its bid. Ex. 2, ¶ 128; Ex. 8, ¶ 67; Ex. 19, ¶ 11. | Disputed to the extent that Google's "infra" cites are unclear as to the cited source and Plaintiffs reserve the right to object to the citations. |
| 44 | In a first-price auction, a bidder's optimal strategy may include "shading" their bid to a value below their actual willingness to pay. Ex. 6, ¶ 48 & fig.6; Ex. 19, ¶ 11. Unlike in a second-price auction, the reserve price in a first-price auction determines whether an auction clears, but not the *price* at which the auction clears. Ex. 6, ¶¶ 26 ("In a first-price auction, there are two relevant ranges for the reserve: (1) the highest bid exceeds the reserve, in which case the auction concludes identically as if there were no reserve or (2) the highest bid falls below the reserve, in which case the auction is essentially nullified, and the item stays with the seller."); Ex. 19, ¶ 11. | Disputed as to the second statement because, in a second-price auction, the reserve price does not always determine "the price at which the auction clears." *See* Davis Ex. 2, Weinberg Opening Rep. at 17 ¶ 26 ("In a second-price auction, there are three relevant ranges for the reserve: (1) the second-highest bid exceeds the reserve, where the auction concludes identically as if there were no reserve ...."). |
| 45 | Google Ads, formerly known as AdWords and sometimes referred to as Google Display Network ("GDN"), allows advertisers to create ad campaigns that run across different formats, including search and display ads. Ex. 3, ¶ 64; Ex. 6, ¶ 12.e n.5; Ex. 8, ¶ 87. | Disputed to the extent that the Google Ads product's functionalities changed over time and that GDN refers to the display component of Google Ads, not search. *See* Ex. 138, Google, https://support.google.com/google-ads/answer/2404190?hl%3Den ("While the Search Network can reach people while they search for specific goods or services, the Display Network can help you capture |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | someone's attention earlier in the buying cycle."). |
| 46 | DV360, formerly known as DoubleClick Bid Manager ("DBM"), offers tools that assist advertisers in managing their display advertising campaigns. Ex. 7, App'x III ¶ 6; Ex. 8, ¶ 83. DV360 facilitates purchases of ad inventory across dozens of ad exchanges, including AdX, Index Exchange, OpenX, Rubicon, and others. Ex. 8, ¶ 83 & n.115. | Disputed as to the second statement, Google's at-issue conduct prevented the facilitation of purchases across non-Google ad exchanges. *See* Davis Ex. 29, Expert Report of John Chandler, p. 146, ¶262 ("When combined with (Enhanced) Dynamic Allocation, Projects Bernanke and Global Bernanke enabled AdX to have a higher win rate, which would cause other exchanges to have a lower win rate."). |
| 47 | Bidders bidding into AdX without using either of Google's buying tools are called "Authorized Buyers." Ex. 8, ¶ 273; Ex. 178 at 32:4-7 ("Q. What does 'authorized buyers' mean? A. The third-party buyers on the AdX platform."). | Disputed to the extent it is not a comprehensive definition. *See* Heinz Ex. 19, Hochstetler opening report at 56, ¶ 104 (1) (i) ("Authorized Buyers are ad networks and other platforms that are allowed to buy on behalf of multiple advertisers in AdX using real-time bidding"); *see also* Ex. 139, Google, "Authorized Buyers overview," https://support.google.com/authorizedbuyers/answer/6138000?hl=en. Accessed May 30, 2024. |
| 48 | In the early 2000s, publishers sold their remnant inventory (the ad slots that publishers could not sell via direct negotiations with advertisers) through a process called the "waterfall." Ex. 3, ¶ 95; Ex. 7, ¶ 529; Ex. 15 at 194:6-8 ("Q: Did ad networks purchase display inventory through [a] sequential process known as the Waterfall? A. Yes."). | Disputed as to the stated temporal and implied publisher scope, not all publishers sold remnant inventory through the waterfall and the relevant time period was not limited to the early 2000s. |
| 49 | In the "waterfall," a publisher ranked buyers sequentially and often did so according to its expected revenue based on buyers' historical willingness to pay (or based on fixed prices that had been negotiated with an individual buyer) so that buyers who were expected to pay more were offered impressions earlier. Ex. 2, ¶ 31(19); Ex. 3, ¶¶ 95, 107; Ex. 6, ¶¶ 84 & n.75, 90; Ex. 8, ¶¶ 99-100; Ex. 19, ¶ 17. For example, the first buyer would be offered the | Undisputed as a general, but not comprehensive, description of the "waterfall" model or process. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
|  | opportunity to fill an impression, but if that buyer declined to fill the impression at the set price, the request was then passed to the next buyer on the publisher's list, with this process repeating until the impression was sold or the publisher's list was exhausted (leaving the impression unsold). Ex. 2, ¶ 31(19); Ex. 6, ¶ 85; Ex. 8, ¶ 100. |  |
| 50 | The "waterfall" process was inefficient because it sometimes resulted in an advertiser winning an impression when another advertiser later in the waterfall was willing to pay a higher price, resulting in publishers missing out on increased revenue. Ex. 8, ¶ 267; Ex. 15 at 194:9-12 ("Q. Did the Waterfall lead to publishers missing out on more valuable ad inventory allocation? . . . A. I think that's a reasonable conclusion."); Ex. 139 at 115:3-16 ("I can say that it was Meta's point of view, and it is today, that waterfall generally—we've been fairly public about this—is an inefficient system that does not provide the best value for publishers or advertisers."). | Disputed to the extent the statement lacks temporal context because efficiency is relative to the relevant time period and alternative options. *See* Davis Ex. 38, Pathak Dep. Tr. 57:10-22 ("A. We have to judge what was happening in that very early period relative to what are the other options in the market. So back in 2008, it's my understanding that real-time bidding was not very common, that DoubleClick's version of waterfall was different than Google's version of dynamic allocation. So as soon as we introduced real-time bidding as a new technology, right, you could say, the waterfall, you know, because of its sequential nature, becomes inefficient. There's an alternative."). |
| 51 | In 2009, Google's AdX launched real-time bidding ("RTB"). Ex. 3, ¶ 112; Ex. 38 at -095; Ex. 8, ¶ 102; Ex. 34 at -318. | Disputed as to when RTB was launched, as the cited sources show that AdX announced, not launched, RTB support in 2009. *See* Ex. 140, GOOG-AT-MDL-015261161 at -1162 (Google internally discussing when RTB would be released in July 2010). |
| 52 | RTB enabled ad exchanges like AdX to sell individual impressions in real time, or the moment that a user entered a publisher's webpage. Ex. 2, ¶ 98; Ex. 3, ¶ 111. | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 53 | With RTB, advertisers could submit bids based on a real-time evaluation of the value of that user's view or potential click, which enhanced advertisers' return on investment and campaign performances. Ex. 3, ¶¶ 111, 113; Ex. 8, ¶¶ 273-74. | Disputed to the extent stating that RTB in fact "enhanced advertisers' return on investment and campaign performances," as such enhancement was not guaranteed; instead, the benefits to advertisers included increased CPM rates and CTR performance, which could but was not guaranteed to lead to enhanced ROI. *See* Davis Ex. 52, Gans Opening Rep. at 41 ¶ 113. |
| 54 | Other ad exchanges also incorporated RTB in the 2009–2010 time period. Ex. 3, ¶¶ 112, 567-68; Ex. 8, ¶ 278 & n.542. | Undisputed. |
| 55 | While individual exchanges developed RTB capabilities that enabled them to conduct a real-time auction among their own bidders, there were no available technologies (until header bidding was developed, *see infra* ¶¶ 56-64) that allowed publishers to obtain real-time bids from multiple exchanges simultaneously and run an auction comparing the bids from those multiple exchanges head-to-head. Ex. 8, ¶ 296; *see also* Ex. 15 at 196:6-11 ("Header Bidding enabled -- enabled publishers to solicit real-time bids from multiple exchangers, so enabled that competition."). | Disputed to the extent that the situation continued after header bidding was developed because of Google's conduct and publishers' inability to obtain real-time bids from AdX and other exchanges simultaneously. *See* Davis Ex. 29, Chandler Opening Rep. at 94 ¶ 366 ("With Exchange Bidding, Google impaired rival exchanges' participation with AdX, limited publishers' ability to use header bidding auctions, and impeded performance measurement of header bidding. This inhibited header bidding use, affecting auction outcomes."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 56 | Around 2014, publishers began adopting a new technology called header bidding that allowed them to request real-time bids from multiple ad exchanges and then configure those bids into DFP so that they would compete against the bids from AdX's real-time auction. Ex. 3, ¶ 115; Ex. 8, ¶ 356; Ex. 15 at 196:6-14; Ex. 19, ¶¶ 23-24. | Disputed as to extent of competition against AdX. *See* Ex. 141, GOOG-NE-08116078 at -078 ("Publishers can choose to incorporate multiple demand sources within this header tag, all of which circumvent Google ad Manager with the exception of enabled optimization tools (e.g. EDA). When this circumvention is used, Google loses visibility into the 'bid stream' (bidding prices on a per-competitor basis), which are important data points for our own optimization."). |
| 57 | Traditional header bidding—also called client-side header bidding—works as follows: when a user visits the publisher's site, a code embedded in the publisher's webpage calls participating ad exchanges or other buyers to submit bids for that publisher's inventory, processes the responses, and runs an auction directly on the publisher's webpage. Ex. 3, ¶ 117; Ex. 16 at 119:20-120:4 ("Q. At a high level, publishers implemented header bidding by inserting code into their web - own web pages; is that right? A. Client-side header bidding, yes. Q. And publishers can do this by using package code that is known as wrappers or frameworks from third-party providers? . . . A. That's correct. An example of a header bidding wrapper provider is pre-bid."); Ex. 19, ¶ 23 & n.7; Ex. 127 at -046, -048 (███████████ ████████████████████████████ ████████████████████████ ). | Disputed as to the use of the term "traditional header bidding" and the conflation of different types of header bidding, which do not perform all stated functions on the publisher's webpage. *See* Ex. 142, GOOG-DOJ-AT-01811246 at -271. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 58 | Publishers using Google's ad server, DFP, are able to use header bidding through DFP's preexisting line item functionality, *see infra* ¶ 191, which encodes information about sources of advertising demand. Ex. 8, ¶ 357; Ex. 16 at 140:18-141:4 ("And publishers can, as we talked about earlier, feed the results of the header-bidding auction into DFP as a line item, correct? . . . [A.] That's correct. That's the - the header bidding HP_bid, and all those values that are passing in the line items."); Ex. 19, ¶¶ 21, 24; Ex. 103 at -490 ("Line Items represent campaigns / campaign elements within AdManager."); Ex. 162 at 85:17-86:7 ("Google Ad Manager is and has been for a while a very flexible product such that whenever a publisher started using header bidding it was very natural for them to be able to represent the header bidding demand within Google Ad Manager."). | Disputed as to the lack of a defined time period and where, in some instances, Google's limits on the creation of line items prevented publishers from being able to fully incorporate Header Bidding into their DFP set-up. *See* Ex. 143, GOOG-TEX-00110068 at -072 & -073. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 59 | Header bidding introduced the risk of latency (increased load time of the publisher's website) for advertisers, publishers, and users. Ex. 3, ¶ 118 ("[C]lient-side Header Bidding contributed to latency issues during the initial page load and auction execution. It also required major set-up investments from the publisher."); Ex. 4, ¶ 194; Ex. 16 at 121:20-25 ("Q. Continuing in your report a few paragraphs down, if we jump to paragraph 194, looking at the first sentence of paragraph 194, you state that, quote: Client-side header bidding may affect web page loading latency. Correct? A. Yes, that is in the report."); Ex. 8, ¶¶ 117, 477; Ex. 97 at -944, -946; Ex. 196 at 56:10-16 ("I don't believe that anyone disagrees in the interviews that I reviewed that header bidding introduces some amount of latency."); Ex. 19, ¶ 36 ("Most Header Bidding has traditionally taken place client-side, meaning the page sends out requests to individual ad exchanges and other demand sources, processes the responses, and then runs an auction, all via Javascript code running on the page. This may introduce latency issues and slow the pace at which the webpage or app loads for the user."); Ex. 135 at 141:18-24 (███████████████████████████████ ████████████████████ ████████████████████████████ ████████████████████████████ ██████████████████████ ████████████████); Ex. 170 at 49:12-18 (████████████████████████ ████████████████████████████ ████████████████████████ ████████████). | Disputed. *See* Ex. 144, GOOG-TEX-00121300 at -301 (████████████ ████████████████████ ████); Ex. 145, GOOG-TEX-00120626 at -627 (impact of latency caused by HB was negligible); Ex. 146, GOOG-DOJ-14742888 (combined) (Checkpoint header bidding latency report is not all good for Google); Ex. 147, GOOG-TEX-00120719 at -721 (Google email acknowledging "industry does not seem to care about the latency impact"); Ex. 148, GOOG-TEX-00103022 at -3022; Ex. 149, GOOG-TEX-00971726 at -774 (████████████████████████████████ ████████████████). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 60 | Header bidding also increased the risk of fraud. Ex. 130 at 82:19-83:1 ("Header bidding as a technology was problematic, full of fraud, spam."); Ex. 161 at 75:9-11 ("Similarly, header bidding was commonly associated with more invalid traffic, spam, and fraud, et cetera."); Ex. 97 at -946. | Disputed. *See* Ex. 150, Casale testimony, 9/9/2024 A.M. DOJ Tr. 157:4-9 ("I completely disagree with header bidding being more risky [regarding malware or ad fraud]… It's the same equivalence. Whether we were rendering an ad in the waterfall or whether we were rendering an ad through header bidding, we were rendering an ad on the publisher's website. They're fundamentally equivalent once the ad server renders the ad."); *see* Ex. 151, GOOG-AT-MDL-001941178 at -180 ("Why? Large buyers are trying to build direct relationships. … large agencies trying out header bidding to buy brand-safe, fraud-free inventory"); Ex. 152, GOOG-TEX-00120929 at -932, (indicating pretextual nature: "we'd have to come up with the objective measures for why we believe HB is bad for buy side (e.g. fraud protection, latency)"). |
| 61 | Another problem associated with header bidding was the risk of unauthorized transmission of user data. Ex. 97 at -946. | Disputed. *See* Davis Ex. 32, Shafiq Rebuttal Rep. ¶¶ 34-36 ("Header Bidding does not present any unique privacy concerns as compared to Google's Open Bidding. ... For example, just like Header Bidding, Google's Open Bidding shares user information such as a user's cookie ID, the latitude and longitude of a user's location, and the URL of the page with bidders."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 62 | Header bidding also increased the risk of more significant payment reporting discrepancies for publishers. Ex. 8, ¶¶ 117, 478; Ex. 97 at - 946. | Disputed, as to evidence from publishers who viewed header bidding as beneficial and did not report discrepancies. *See* Ex. 128, ███ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████ |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 63 | Another complication with header bidding was that advertisers might bid against themselves in "self-competition" when they bid through multiple exchanges for the same impression. Ex. 8, ¶ 117; Ex. 99 at -014 (header bidding can cause "bid duplication due to multiple requests for the same inventory"). | Disputed. *See* Davis Ex. 52, Gans Opening Rep. at 216 ¶ 627 ("However, multiple industrial guidelines on Header Bidding suggested that the industry had realized and addressed the problem of duplicated bids. ....Google also recognizes that participating in Header Bidding is in the best interest of its DBM advertisers and that 'self-competition' in Header Bidding is not an issue because 'Header Bidding runs a first price auction amongst all bids – so there can be no self competition. Unless in JEDI, where by design the AdX auction competes with header bid'"); Ex. 153, GOOG-NE-06724126 at -128, -130 ("Q3: why does header bidding lead to increased revenue? While self competition is quoted in the industry as the reason for increase publisher revenue, this is not true. Header Bidding runs a first price auction amongst all bids - so there can be no self competition"); Ex. 154, GOOG-TEX-00109645 at -647 ("… Header Bidding has allowed publishers to facilitate both self competition between demand sources and unique demand on a per impression basis."). |
| 64 | Header bidding has grown in popularity, with adoption rates among publishers ranging between 73.1% and 79.2% from 2018 to 2019. Ex. 121 at -760-61; *see also* Ex. 179 at 118:16-19 (█████████████████ █████████████████████); Ex. 100 at -247. | Disputed as to header bidding's growth outside of 2018 and 2019, which the cited sources do not support, and as to the figures being cited out of context. *See* McCallum Ex. 121, ███████████████████████ ███████████████████████████ ███████████████████████████ ████████████████ |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 65 | In 2016, Google announced a rival solution to header bidding, known then as "Exchange Bidding," to enable publishers to compare bids across exchanges. Ex. 6, ¶ 146; Ex. 8, ¶¶ 473, 476; Ex. 19, ¶ 35. | Disputed to the extent the date is not accurate. *See* Davis Ex. 2, Weinberg Opening Rep. at 83 ¶ 146 ("In 2018, Google released Exchange Bidding, a technology similar to header bidding, after observing the rise of header bidding technology"); Heinz Ex. 19, Hochstetler Opening Rep. at 57 ¶ 104 ("Exchange Bidding ("EB"), also known as Open Bidding ("OB"), was launched in February 2018 and was Google's server-side alternative to Header Bidding."); Ex. 75, Google's First Amended Responses and Objections to Plaintiff's Third Set of Interrogatories, (May 24, 2024) at 11; Ex. 155, GOOG-AT-MDL-B-001290356 at -356 ("Announcing Exchange Bidding Open Beta" on June 8, 2017). |
| 66 | Open Bidding aimed to resolve some of the risks and complications of header bidding. Ex. 8, ¶ 474; Ex. 64 at -337; Ex. 19, ¶ 36. | Disputed. *See* Ex. 156, GOOG-TEX-00116076 at -078 (suggesting that the purpose of Open Bidding (OB) was to get visibility throughout the entire transaction and get the data); Ex. 157, GOOG-DOJ-15006599 at -599 (indicating Google's internal motivations to create only a "slightly better" version of header bidding to benefit Google); Ex. 158, GOOG-TEX-00002258 at -258 (similar as to "slightly better"). |
| 67 | This solution was launched for general availability in April 2018. Ex. 19, ¶ 35; Ex. 8, ¶ 473. It was rebranded as "Open Bidding" in mid-2019. Ex. 19, ¶ 35 n.12. | Disputed to the extent the date is not accurate. *See* Heinz Ex. 19, Hochstetler Opening Rep. at 57 ¶ 104 ("Exchange Bidding ("EB"), also known as Open Bidding ("OB"), was launched in February 2018 and was Google's server-side alternative to Header Bidding."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 68 | Open Bidding enabled third-party ad exchanges to compete with each other and with buyers on AdX in a real-time auction. Ex. 8, ¶ 476; Ex. 185 at 174:4-16 ("But from a demand perspective, there could be multiple different DSPs or ad networks competing into - into open bidding, for example."); Ex. 19, ¶ 35; Ex. 50 at -258 ("Exchange and Network bidding is a product to allow pubs to put all of this demand - other exchanges, DSPs, networks - in competition with each other in real time which should drive auction pressure for pubs and maximize their yield."); Ex. 136 at 203:3-7 (███████████████████ ███████████████████████ ██████████████████████); Ex. 161 at 36:8-12 ("Exchange bidding is the former name for what is now known as open bidding, which is a Google product that allows multiple exchanges to compete for ad inventory."). Open Bidding allows publishers to invite third-party ad exchanges to submit bids with real-time prices. Ex. 19, ¶ 35. | Disputed. *See* Ex. 159, GOOG-DOJ-13899823, at -824 ("Developed to protect AdX revenue (███) and DFP platform from the rise of Header Bidding- an imperfect solution for Publishers...EB was developed as a defensive play to protect Google's AdX business and really the DFP platform from disintermediation by a new ad tech solution called Header Bidding"); Ex. 156, GOOG-TEX-00116076 at -078 (suggesting that the purpose of Open Bidding (OB) was to get visibility throughout the entire transaction and get the data). |
| 69 | Open Bidding does not result in the same latency that header bidding can create. Ex. 8, ¶¶ 120, 474 n.931; Ex. 19, ¶ 36; Ex. 90 at -438 (███████████████████████ ██████████████████████ ████████████), *id.* at -441; Ex. 143 at 234:20-235:9 ("I think just based on the structure compared to client-side header bidding, there was one less call, one less trip to the store. So physics would state that it is less latency."); Ex. 99 at -023 (Open Bidding "minimized latency"). | Disputed. *See* Ex. 160, GOOG-TEX-00623823 at -826 (███████████████ ███████████████████). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 70 | Open Bidding provided publishers with benefits such as streamlined payments. Ex. 8, ¶¶ 120, 474 & n. 931; Ex. 19, ¶ 40; Ex. 90 at -438 ("Easy to set up, view/analyze reports and unified payments" and "[p]rovides integrated reporting and billing for exchange bidding transactions won by 3rd party exchanges"), *id.* at -441. | Disputed. *See*, Ex. 161, GOOG-TEX-00969653 at -707 (chart showing feature comparison of Jedi (or Open Bidding) versus Header Bidding). |
| 71 | Open Bidding also provided greater security. Ex. 96 at -267 ("Open Bidding is designed with security in mind[.] Open Bidding is subject to the same data protections and security of other Google ad products."); Ex. 99 at -023 (Open Bidding had "virtually no setup cost or operational complexity" for publishers, offered "integrated reporting with no discrepancy between what buyers pay and what they bid," and brings "guaranteed net 30 day payments to publishers"). | Disputed, including the cited sources which do not support the asserted statement. Davis Ex. 32, Shafiq Rebuttal Rep. at 14-15 ¶¶ 34-36 ("Header Bidding does not present any unique privacy concerns as compared to Google's Open Bidding. ... For example, just like Header Bidding, Google's Open Bidding shares user information such as a user's cookie ID, the latitude and longitude of a user's location, and the URL of the page with bidders. ... Therefore, I conclude that, in terms of privacy, there is no difference between Header Bidding and Google's Open Bidding."); Ex. 150, Casale Testimony, 9/9/2024 A.M. DOJ Tr. 157:4-9 ("I completely disagree with header bidding being more risky [regarding malware or ad fraud]… It's the same equivalence. Whether we were rendering an ad in the waterfall or whether we were rendering an ad through header bidding, we were rendering an ad on the publisher's website. They're fundamentally equivalent once the ad server renders the ad."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 72 | Open Bidding further provided simpler configuration. Ex. 8, ¶¶ 120, 474; Ex. 90 at -438 ("Increase publisher yield from programmatic demand sources at scale with little to no code changes"). | Disputed.  See Ex. 162, GOOG-DOJ-AT-01027937 at -946 (header bidding wrappers reduced both latency and operational complexity); Ex. 161, GOOG-TEX-00969653 at -707 (chart showing feature comparison of Jedi (or Open Bidding) versus Header Bidding). |
| 73 | Publishers can, and do, use Open Bidding in combination with header bidding. Ex. 6, ¶ 146; Ex. 8, ¶ 120; Ex. 133 at 127:10-13 (███████ ██████████); Ex. 175 at 18:2-7 (████████ █████████████); Ex. 193 at 66:14-19 (████████ █████████████). | Disputed to the extent that Google actively discouraged the use of header bidding in combination with Open Bidding, including informing publishers of purported risks of header bidding, restricting use of line items, and redacting key publisher data fields.  See Davis Ex. 52, Gans Opening Rep. at  218-237 ¶¶ 634-701. |
| 74 | Google invested significant resources in the Open Bidding product as it determined that Open Bidding provided value for Google's publisher customers. Ex. 19, ¶ 41; Ex. 113 at -793-94, -805 (████████ █████████████). | Disputed.  See Ex. 163, Levitte (Google) Deposition Tr. 53:7-13 (affirming that he wrote that Google's "[header bidding] alternative" is "more favorable to Google . . . as defence against [the] long-term threat posed by [header bidding]."); Ex. 147, GOOG-TEX-00120719 at -721 (████████ █████████████); Ex. 164, GOOG-TEX-00000478 at -480 (describing as "the holy grail......[sic]the impact of [Exchange Bidding] on the reduction of [header bidding]"). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 75 | By 2019, publishers had a multitude of pathways through which they could sell their inventory: direct deals, real-time bidding on ad exchanges, header bidding, and Open Bidding. Ex. 19, ¶¶ 8, 11-12, 23-24, 35-37. | Disputed, Google's conduct actively worked to prevent publisher bidding on non-Google ad exchanges and the use of header bidding. *See* Davis Ex. 52, Gans Opening Rep. at 158-237 ¶¶ 458-701 |
| 76 | The various auction formats (e.g., first-price auctions versus second-price auctions) through which the same publisher inventory could be sold created inefficiencies for an "auction of auctions" in which bids from different exchanges could compete against each other. Ex. 8, ¶ 121 ("Heterogenity in the auction formats used by exchanges during this period complicated the implementation of header bidding and Open Bidding, both of which combine the results of auctions on different exchanges that may use different auction rules to sell the same impressions. One unfortunate result of this 'auction of auctions' process is that the bidder with the highest bid did not necessarily win the impression."); Ex. 81 at -260-65 (2019 Google presentation depicting multiple ways the complex bidding landscape produced inefficient outcomes). | Disputed, as to header bidding which generally led to a more competitive auction and benefits for publishers and advertisers. *See* Ex. 128, ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ |
| 77 | For example, GAM operated a multi-stage auction process, with an initial second-price auction among Google Ads, DV360, and Authorized Buyers ("the AdX auction") and a subsequent first-price auction that included the AdX winner and buyers participating in the Open Bidding auction. Ex. 19, ¶ 37. The winner from the second-price AdX auction would compete against Open Bidders based on the AdX winning price (which was typically | Disputed to the extent that the statement does not reflect the cited source and asserts matters not in the cited source and to the extent the statement does not provide a relevant time period and makes general unsupported statements ("typically"). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | lower than the highest bid due to the second-price format). *Id.*, ¶¶ 11, 37. | |
| 78 | This process was inefficient and could result in a situation where the final auction winner might not be the bidder with the highest bid for an impression. Ex. 8, ¶ 121 ("One unfortunate result of this 'auction of auctions' process is that the bidder with the highest bid did not necessarily win the impression."). This scenario would occur if, for example, the winning bid from a first-price Open Bidding bidder was lower than the AdX winner's bid but higher than the AdX winning price (which was the higher of the second-highest AdX bid and the AdX reserve price). Ex. 81 at -263 (illustrating this scenario); Ex. 55 at -912 ("This two-stage auction does not guarantee the highest bid to win the auction."). | Disputed, as to header bidding which generally led to a more competitive auction and benefits for publishers and advertisers. *See* Ex. 128, ▮▮▮▮▮▮▮▮▮▮▮ |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 79 | The complexity of the multi-stage, multi-auction system also posed difficulties for advertisers and publishers. Advertisers "struggle[d] to optimize when bidding across different channels due to lack of symmetry" because "different auction rules and different floor prices can apply for the same impression." Ex. 55 at -915. ████████████ ████████████████████████ ██████████████████████ ████████████████████ ███████████████████ ██████████████████ Ex. 69 at -974-75. In sum, the environment was "[n]ot efficient or sustainable." *Id.* at -975. | Disputed to the extent that Google's statement omits key context as to how Google used inefficiencies to advantage AdX over other exchanges and held off on moving to a unified first price auction because it was able to implement a last look advantage over third-party exchanges, until Google had developed an alternative way to retain its advantage. *See* Ex. 165, GOOG-DOJ-AT-00292252 at -261 (█████████████████████████ ███████████████████████ ████████████████████████ ████████████████████ █████████); Ex. 166, GOOG-DOJ-AT-00573309 at -310, ("Web publishers on the other hand have started using header bidding which allows them to pit AdX against 3PEs in a 1P auction. This put AdX at a huge disadvantage sine the clearing price from its 2P auction i.e., AdX runner up bid is compared to the 1P bids from 3PEs .So AdX could lose to a 3PE bid even if AdX highest bid was actually higher. To remove this disadvantage 'last look' was implemented which allowed AdX to look at the highest 3PE bid and bid 1c."); Ex. 167, GOOG-AT-MDL-001977826, at -833 (█████████ ████████████████████████ ███████████████████████ █████████████████ ██████). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 80 | In 2019, AdX transitioned to a unified first-price auction ("UFPA"), which created a single-stage unified auction in which all participants—including AdX bidders (Google Ads, DV360, and third-party Authorized Buyers), header bidders, remnant line items, and non-Google exchanges using Open Bidding—compete based on their bids, net of any fees. Ex. 7, ¶ 501; Ex. 8, ¶¶ 122, 491; Ex. 19, ¶¶ 53, 55. | Disputed as to Google's characterization of the auction and competition on participant bids, where participant bids are subject to the unified price floor required by Google. *See* Ex. 102, GOOG-AT-MDL-008964888 at -888 ("The unified pricing rules will only allow a single floor to be set across all exchanges… They will not be able to set exchange specific floors, since there will be a single unified floor"); Ex. 168, GOOG-DOJ-AT-00569648 at -649 ("We could keep all the current floor-pricing options and move to first-price auction and this would have achieved most of what we desperately need to fix our ecosystem. However, Adx team wanted to use this migration as an opportunity to significantly limit the ability of publishers to set floor-prices per buyers (which is a good goal to have"); Ex. 169, GOOG-NE-10660658 at -658 (Google acknowledges that it could just move "to a 1st Price auction, but we'd need to remove some floor control to achieve the primary objective -- if not, pubs could set different floors for AdX, EB, HB, etc, which we're looking to move away from."). |
| 81 | In the UFPA, the highest bidder wins and pays a price equal to its bid. Ex. 8, ¶¶ 122, 491; Ex. 19, ¶ 55. The reserve price is not set by the bid of any bidder in the auction. Ex. 55 at -913 ("No competing offers will set the price paid by another buyer, and the highest offer will win the auction (This mean[s] that we are removing 'last look' for AdX)."); Ex. 6, ¶ 161 n.234 ("Last Look advantage was removed in 2019 during the implementation of Unified Pricing Rules and AdX's switch to the first-price auction format."). | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 82 | The switch to UFPA brought GAM in line with other ad exchanges, most of which had already begun shifting to first-price auctions. Ex. 162 at 96:8-97:1. | Disputed, other ad exchanges had first price auctions, but not UFPA. *See* Ex. 170, GOOG-NE-13603380 at -380 (Google addresses whether UFPA (UPR) will prevent DBM from buying from other exchanges. ██████ ████████████████████████████ ██████); Ex. 168, GOOG-DOJ-AT-00569648 at -649 ("We could keep all the current floor-pricing options and move to first-price auction and this would have achieved most of what we desperately need to fix our ecosystem. However, Adx team wanted to use this migration as an opportunity to significantly limit the ability of publishers to set floor-prices per buyers (which is a good goal to have"); Ex. 169, GOOG-NE-10660658 at -658 (Google acknowledges that it could just move "to a 1st Price auction, but we'd need to remove some floor control to achieve the primary objective -- if not, pubs could set different floors for AdX, EB, HB, etc, which we're looking to move away from."). |
| 83 | Today, most ad exchanges are first-price auctions. Ex. 68 at -364 ("Industry standard / simplicity - most other auctions are partially or completely 1P"). | Undisputed as to the general proposition that ad exchanges have adopted first-price auctions. |
| 84 | Plaintiffs allege four distinct web display advertising markets: publisher ad servers, ad exchanges, ad buying tools for small advertisers, and ad buying tools for large advertisers. Fourth Am. Compl. ¶ 92, *In re Google Digit. Advert. Antitrust Litig.*, No. 1:21-md-3010-PKC (S.D.N.Y. May 5, 2023), ECF No. 541 (hereinafter "FAC"). Plaintiffs allege that ad servers for web display inventory ("publisher ad servers") in the United States constitute a relevant antitrust product market. FAC ¶ 93. As alleged, ad servers are used by publishers to manage and sell their web display ad inventory through direct and indirect sales channels. *Id.* | Undisputed as to what is alleged in Plaintiffs' live complaint and that Plaintiffs allege and have defined through their expert four distinct and relevant product markets in the relevant geographic market of the United States: (1) the market for publisher ad servers used for the sale of open web display advertising inventory, (2) the market for ad exchanges for transacting indirect open web display advertising, (3) the market for ad buying tools for small advertisers for buying open web display advertising space and, (4) the market for ad buying tools for large advertisers. *See* Davis Ex. 53, Gans Rebuttal Rep. 6-7 ¶ 7. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 85 | Plaintiffs allege that ad exchanges for web display inventory ("ad exchanges") in the United States constitute a relevant antitrust product market. FAC ¶ 128. As alleged, ad exchanges are real time auction marketplaces that match publishers' web display impressions with bids from purchasers. *Id.* | Undisputed as to what is alleged in Plaintiffs' live complaint. |
| 86 | Plaintiffs allege that web display buying tools for small advertisers ("ad buying tools for small advertisers") in the United States constitute a relevant antitrust market. FAC ¶ 163. As alleged, these tools provide a web interface for advertisers to use to effectuate bidding on and purchasing open web display inventory across exchanges and networks. *Id.* | Undisputed as to what is alleged in Plaintiffs' live complaint. |
| 87 | Plaintiffs allege that web display buying tools for large advertisers ("ad buying tools for large advertisers") in the United States constitute a relevant antitrust market. FAC ¶ 196. As alleged, these tools provide an interface for large advertisers or their trading desks and ad agencies to bid on and purchase open web display ad inventory on exchanges and networks. *Id.* | Undisputed as to what is alleged in Plaintiffs' live complaint. |
| 88 | Dynamic Allocation ("DA") was a product innovation that DoubleClick launched in 2007, before Google acquired the company in 2008. Ex. 3, ¶ 552; Ex. 4, ¶¶ 14, 131; Ex. 6, ¶ 104 n.110 ("[DA] was introduced by DoubleClick prior to Google's purchase of the company. DoubleClick documentation from that time points to 2007 as the introduction of [DA]."); Ex. 15 at 193:5-20; Ex. 31 ("2008—Dynamic Allocation . . . pre doubleclick acquisition."); Ex. 25 at 11; Ex. 114 at -247-48. | Disputed as to whether dynamic allocation was an "innovation" rather than a product feature. *See* Davis Ex. 52, Gans Opening Report at 192 ¶ 552; Ex. 171, GOOG-AT-MDL-016988772 at -783-84 (companies "such as PubMatic" were already facilitating real-time bidding). |
| 89 | When DA launched, ad exchanges were not competing against each other in real time. Ex. 15 at 194:22-25. | Disputed. *See* Ex. 171, GOOG-AT-MDL-016988772 at -783-84 (companies "such as PubMatic" were already facilitating real-time bidding before implementation of DA). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 90 | DA addressed a "natural shortcoming of the waterfall format" to ensure publishers received the highest possible expected yield for their inventory. Ex. 6, ¶ 104; *see also* Ex. 3, ¶¶ 553, 555-57; Ex. 7, ¶ 529; Ex. 8, ¶ 261; Ex. 11, ¶ 350 ("DA . . . improved the allocation of publishers impressions."); Ex. 47 at -151. | Disputed. *See* Davis Ex. 2, Weinberg Opening Rep. at 62 ¶112 ("That is, the primary arguments supporting Dynamic Allocation with only static line items as potentially leading to higher revenue for publishers do not at all apply when line items are live."); Davis Ex. 52, Gans Opening Rep. at ¶ 570 ("DA enabled Google to override the Waterfall hierarchy that often resulted in AdX ranking lower than other exchanges."); Ex. 172, GOOG-DOJ-14875108 at -108 (███████ ████████████████████████████ ██████████████████████████████ ████████████████████████████ ███████████████████████); Ex. 173, GOOG-NE-11797719 at -724 (███████ ████████████████████████████ ██████████████████████████████ ██████████████████). |
| 91 | Following its acquisition of DoubleClick, Google redesigned the AdX exchange to further increase the benefits of online display advertising auctions for publishers and advertisers by incorporating real-time bidding, which Google launched in 2009. Ex. 8, ¶¶ 273-74; Ex. 34 at -318-19; Ex. 3, ¶ 114 ("Google enabled real-time bidding on its ad-serving tech through a feature that was part of its DoubleClick acquisition."). | Disputed as to benefits for publishers and advertisers in general, as the cited evidence shows that Google incorporated real-time bidding for Google's AdX advertisers only, meaning that advertisers overall did not receive benefits. *See* Ex. 173, GOOG-NE-11797719 at -724 (███████ ████████████████████████████ ██████████████████████████ ████████). |
| 92 | Google publicized DA when it launched the re-designed AdX in 2009. Ex. 25 at 11. | Disputed, the cited source does not show that Google "publicized" DA and to what extent. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 93 | DA with real-time bidding benefitted publishers by allowing publishers to get real-time bids from AdX and allocated each ad impression offered for sale based on who was expected to pay the most for it. Ex. 3, ¶ 114 ("This feature, called Dynamic Allocation, allowed AdX to submit real-time bids for inventory sold on DFP"); Ex. 7, ¶ 528; Ex. 8, ¶¶ 261, 273-74, 279; Ex. 19, ¶ 18; Ex. 47 at -162. | Disputed, as DA with real time bidding advantaged Google by giving AdX a first look and a last look at inventory, which Google acknowledged ███████████ *See* Ex. 174, GOOG-TEX-00122345 at -349 (███████████); Ex. 175, GOOG-NE-06727162 at -162 (███████████ ███████████████████████). |
| 94 | DA provided a way for publishers to determine whether there were buyers bidding through AdX that were willing to pay a higher price for a particular ad impression than the highest static price that the publisher expected to receive from any other participant in the waterfall. Ex. 16 at 103:11-18; Ex. 19, ¶ 18; Ex. 158 at 369:17-371:5. | Disputed, as the cited evidence shows only that AdX would pay a higher price for a given ad impression than the highest static price of remnant demand in the waterfall and other evidence shows that publishers frequently ranked AdX lower in the waterfall. *See* Ex. 172, GOOG-DOJ-14875108 at -108 (███████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████). |
| 95 | Through DA, Google's publisher ad server, DFP, established a reserve price for AdX bidders to beat based on the highest price that the publisher expected to receive from other buyers. Ex. 3, ¶ 558; Ex. 19, ¶ 18. AdX bidders could then submit real-time bids to try to beat this floor. Ex. 3, ¶ 558; Ex. 19, ¶ 18. Plaintiffs refer to this first step in the DA process—AdX assessing the impression to see if any AdX buyers were willing to pay more than the highest amount the publisher expected to receive from other bidders—as "right of first refusal." Ex. 3, ¶ 548. | Disputed. *See* Davis Ex. 52, Gans Opening Rep. at 191 ¶ 548, 194-95 ¶ 558 ("AdX was afforded a right of first refusal on publisher's non-guaranteed inventory. This meant that AdX was offered the opportunity to submit a live bid on each impression; if AdX did not win the impression, only then was it offered to third-party exchanges in the Waterfall. ... DA, both as first implemented by DoubleClick and later by Google's DFP, shared the highest net CPM value determined by the Waterfall process with AdX as a price floor to beat. AdX buyers then bid in real-time for the impression, and if an AdX buyer could clear the price floor, the buyer would win the impression over the demand source selected by the Waterfall process."); Ex. 171, GOOG-AT-MDL-016988772 at -783-784 (companies "such as |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | PubMatic" were already facilitating real-time bidding before implementation of DA). |
| 96 | These impressions were available first to eligible guaranteed line items, which are higher priority line items used for campaigns for which the publisher and advertiser had a direct deal. Ex. 4, ¶ 59; Ex. 6, ¶ 104.a; Ex. 8, ¶ 98; Ex. 19, ¶ 20. Assuming that no guaranteed line items were eligible for the impression, if an AdX bidder bid higher than the reserve price (which reflected the price of the best eligible remnant line item), the AdX bidder's ad would be served. Ex. 3, ¶¶ 558, 562; Ex. 8, ¶ 108; Ex. 19, ¶ 20. Otherwise, the best eligible remnant line item won. Ex. 3, ¶ 563; Ex. 8, ¶ 108; Ex. 19, ¶ 20. If no AdX buyer bid higher than the auction reserve price, the ad impression would be filled (if at all) by another buyer in the waterfall, and DA would have no impact on the sale. Ex. 3, ¶ 563; Ex. 47 at -159; Ex. 6, ¶ 109; Ex. 7, ¶ 529; Ex. 8, ¶¶ 108, 269. | Undisputed as to a general description of DA but disputed that "DA would have no impact." *See* Davis Ex. 52, Gans Opening Rep. at 197 ¶ 569 ("DA allowed AdX, and only AdX, to compete in real-time against all non-guaranteed inventory ..."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 97 | As a result of DA, publishers earned increased revenue. Ex. 15 at 194:17-21 ("Q. Did Dynamic Allocation help publishers make more money than they could make under the Waterfall? . . . A. I believe that they did help some publishers make more money than they could under the Waterfall."). | Disputed, as even the cited evidence indicates that DA increased revenue for only "some publishers," not all publishers, *see* Davis Ex. 51, Gans Dep. Tr. 194:17-21, and does not indicate that publishers were necessarily getting the highest price that all advertising demand sources might pay. *See* Ex. 173, GOOG-NE-11797719 at -724 (███████████ ██████████████████████ ██████████████████████ ███████████); Davis Ex. 2, Weinberg Opening Rep. at 81-82, ¶144 ("The cream-skimming effect reduces the value of direct deals with publishers in the long run from the perspective of advertisers. Hence, it potentially leads to a negative impact on the publisher revenue in the long run."). |
| 98 | ███████████████████ Ex. 48 at -499 (██████████ ██████████████████████ ████████). | Disputed. *See* Davis Ex. 2, Weinberg Opening Rep. at 81-82, ¶144 ("The cream-skimming effect reduces the value of direct deals with publishers in the long run from the perspective of advertisers. Hence, it potentially leads to a negative impact on the publisher revenue in the long run."). |
| 99 | Google launched Enhanced Dynamic Allocation ("EDA") on March 3, 2014, and publicly announced the launch through its Help Center, stating that its "ad servers now optimize the distribution of Ad Exchange and AdSense impressions throughout goal-based line item delivery, without compromising reservation goals." Ex. 25 at 11; see also Ex. 16 at 216:10-217:3; Ex. 19, ¶ 31; Ex. 60 at -161, -163; Ex. 202 at 4. | Undisputed, except incomplete in its description of the Help Center announcement which is only a paragraph with three sentences. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **100** | EDA enabled line items representing AdX and other exchanges to compete simultaneously with line items representing guaranteed demand (i.e., direct deals). Ex. 16 at 216:10-217:3; Ex. 19, ¶ 31; Ex. 60 at -161. Or in other words, it allowed AdX and other exchanges to transact impressions that otherwise would have been allocated to direct deals if doing so would generate more revenue for the publisher. Ex. 19, ¶ 30-31. | Disputed as to the generation of "more revenue for the publisher" because some publishers suffered harm because of EDA in the form of reduced click-through rates because of low-quality demand. *See* Ex. 176, GOOG-TEX-00107284 at -498 (█████ ████████████████████████ █████████████████████████████ ████████████████████████████ ██████████). |
| **101** | EDA also allowed remnant line items (such as header bidding line items) to compete for inventory that previously would have been allocated to guaranteed line items. Ex. 19, ¶ 31. | Undisputed, except cited source does not reference header bidding. |
| **102** | EDA still ensured that publishers met their obligations with respect to delivery of direct deals. Ex. 16 at 218:6-17; Ex. 19, ¶¶ 31-33; Ex. 60 at -161. | Disputed. EDA did not ensure that publishers met their obligations with respect to delivery of direct deals; instead, publishers expressed to Google their concerns about ████████ ████. *See* Ex. 177, █████ ███████████████████████████ ██████████████████████████████ █████████████████████████████ ██████████████████████████████ █████████████████████████████ █████████████████████████████ ████████. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 103 | EDA increased publisher revenue. Ex. 6, ¶ 141 ("As Enhanced Dynamic Allocation runs live auctions for every impression, it will likely create a revenue increase for the publishers in the short run."). | Disputed. The cited evidence states that revenue increases were likely only in the short run, but EDA "potentially leads to a negative impact on the publisher revenue in the long run." Davis Ex. 2, Weinberg Opening Rep. (Ex. 6) at 79 ¶ 141, 81-82 ¶ 144. Also, disputed to the extent that it ignores that some publishers suffered harm because of EDA in the form of reduced click-through rates because of low-quality demand. *See* Ex. 176, GOOG-TEX-00107284 at -498 (notes on "EDA impact on CTR opt" indicate that "███████ complained their CTR dropped," ███ and "this was meaningful for ████ b/c they sell on a CPC basis."). |
| 104 | ██████████ Ex. 71 at -483 (████████ ███████████████████████ ████████ ); Ex. 60 at -164 (████████ ██████████████████████████ █████████). ██████████████████████████ ████ Ex. 75 at -759 (██████████ ████████████████████████ █████████). | Disputed. ███████████████████████ ██████████████████████████ ██████████████████████████ ██████████ Ex. 178, GOOG-NE-13196814 at -845. The purported revenue increase estimated by Google in Ex. 75 are based on numbers from "premium publishers," because "Google is less accurate for SB publishers, in particular." *See* Google Ex. 75, GOOG-DOJ-13208758 at -759; *see also* Google Ex. 60, GOOG-DOJ-06885161 at -161 (███████████████████████ █████████████). |
| 105 | A publisher could configure DFP to have AdX compete at a static price, such that it would not compete with a real-time bid via DA. Ex. 19, ¶ 22. | Disputed. *See* Ex. 179, GOOG-AT-MDL-019508860 at -866 ("Google does not provide a 'toggle' control within the Ad Manager interface to turn off Enhanced Dynamic Allocation. However, publishers are able to effectively disable Enhanced Dynamic Allocation using the 'workaround' method.... This method is not officially promoted or endorsed by Google, but is technically possible."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 106 | DA could be used to put real-time bids from AdX in competition with remnant line items, including those which reflected header bidding bids. Ex. 19, ¶¶ 26-27. | Undisputed. |
| 107 | Because AdX was called after the call to ad exchanges that participated in header bidding, AdX had what Plaintiffs characterize as a "last look" at ad inventory. Ex. 2, ¶ 133; Ex. 3, ¶ 548; Ex. 15 at 196:22-197:8; Ex. 16 at 134:14-135:14; Ex. 19, ¶ 29. "Last look" was not a design choice by Google, but rather a result of the interaction between header bidding and DA. Ex. 19, ¶ 29; Ex. 15 at 197:9-15 ("Q. Was Last Look a product feature that Google designed? . . . A. No, Last Look was a -- a -- a constraint that arose out of the way Dynamic Allocation was set up and Google's choices with regard to which exchange got the Last Look."). Without header bidding, there would be no "last look." Ex. 15 at 197:24-198:4 ("Q. If there had been no Header Bidding, could there have been a Last Look? A. I think in terms of the competitive consequences of Last Look, it wouldn't have been an issue if there had been no Header Bidding."). | Disputed, last look was intentional and a choice by Google. *See* Ex. 180, GOOG-DOJ-14024199 at -201-203 ("Exchange Bidding SSPs may win more impressions, but publisher payout will be substantially the same. ... Example ... AdX highest bid - $5 ... AdX second bid- $2 ... SSP - 4$ ... Result: AdX wins at $4.01 ... **We position this as an improvement on how Dynamic Allocation works** ... Please do not communicate proactively to publishers...") (emphasis in original); Ex. 181, GOOG-TEX-00094890 at -890 (showing that under EBDA, bidders had a "last look" along side AdX.); Ex. 180, GOOG-DOJ-14024199 at -200 (positioning last look as a result of how DA is run; also noting that the initial design of EBDA worked almost like HB did when used in DFP); Ex. 166, GOOG-DOJ-AT-00573309 at -310 ("Web publishers on the other hand have started using header bidding which allows them to pit AdX against 3PEs in a 1P auction. This put AdX at a huge disadvantage since the clearing price from its 2P auction i.e., AdX runner up bid is compared to the 1P bids from 3PEs.So AdX could lose to a 3PE bid even if AdX highest bid was actually higher. To remove this disadvantage 'last look' was implemented which allowed AdX to look at the highest 3PE bid[.]"); Ex. 165, GOOG-DOJ-AT-00292252 at -258 (noting AdX competed through last look). |
| 108 | As part of the transition to a Unified First Price Auction in 2019, described supra ¶¶ 80-81, Google removed what Plaintiffs refer to as AdX's "last look." Ex. 8, ¶¶ 122, 491. | Undisputed as to the effective removal of last look from EDA. Heinz Ex. 19, Hochstetler Opening Rep. at 83 ¶ 156. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 109 | Prior to 2013, and the adoption of Project Bernanke, Google Ads submitted two bids on behalf of its advertisers in each AdX auction, with those bids equal to the two highest values for the impression among its advertisers, adjusted for Google Ads' revenue share. Ex. 8, ¶ 126.a; Ex. 165 at 176:8-16 (███████ ██████). | Disputed that this statement is always true. *See* Ex. 182, GOOG-AT-MDL-B-003716241 (GDN submits 2 bids, for the most part but not always). |
| 110 | Project Bernanke, launched in 2013, was a Google Ads bid optimization that operated before the top two bids from Google Ads advertisers were submitted to AdX. Ex. 6, ¶ 234 ("Under Project Bernanke . . . GDN manipulated advertisers' bids before sending them to AdX."); Ex. 80 at -175 (████ ███████████████████ ███████████████████ ███████████████████ ██████████); Ex. 152 at 41:9-11 (███████████████████ ████████ ). | Disputed. *See* Ex. 61, GOOG-DOJ-14161943 (Publishers, particularly small ones, may see losses above 10%); Ex. 183, GOOG-AT-MDL-B-002514119 █████████ ███████████████████ ███████████████████ ████████████); Ex. 184, GOOG-AT-MDL-B-002514153 at -154 ███████████████; Davis Ex. 53, Gans Rebuttal Rep. at 149 ¶397 ("It should be noted how striking the self-imposed Google constraint of 'maintaining a fixed revenue share' is."). |
| 111 | Project Bernanke was designed to help Google Ads' customers win more impressions. Ex. 3, ¶ 738 ("Google developed Bernanke so that GDN could clear more impressions on AdX[.]"); Ex. 4, ¶ 218 ("Project Bernanke is an internal Google program within Google Ads designed to adjust advertiser bids to increase the numbers of auctions won by Google Ads[.]"); Ex. 15 at 219:13-18, 219:24-220:5; Ex. 16 at 182:8-13; Ex. 8, ¶ 138. | Disputed. *See* Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers); Ex. 137, GOOG-AT-MDL-B-002088137 at -139 (Bernanke "[paid] extra to the publisher and let the advertiser win" on a random set of queries). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 112 | Under Project Bernanke, Google Ads ran an internal auction to determine its top two bids from Google Ads advertisers. Ex. 3, ¶ 727.  Ex. 3, ¶¶ 727-28. | Disputed, including as to ▮▮▮▮ ▮▮▮▮▮▮▮ *See* Ex. 185, GOOG-AT-MDL-001386659 at -666 ("GDN is the only buyer submitting two bids to AdX." "Raise first bid to maintain 14% margin per web property" "Can increase first bid 2x-3x if dropping second bid!"); Ex. 186, GOOG-AT-MDL-B-002760309 ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮). |
| 113 | ▮▮▮▮▮▮▮ e ▮▮▮▮▮▮▮ Ex. 3, ¶¶ 728, 738; Ex. 8, ¶¶ 138-39. | Disputed. *See* Ex. 187, GOOG-TEX-00309958 at -971 (Using an optimization to fill impressions that would have otherwise remained unfilled "can result in *less* revenue for the publisher, because we don't take into account the opportunity cost from serving unfilled impressions elsewhere"). |
| 114 | ▮▮▮▮▮▮▮ | Undisputed |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 115 | Project Bernanke enabled Google Ads to submit these optimized bids into the AdX auction by allowing Google Ads to vary the margin (revenue share) it could take on a per-impression basis—i.e., decreasing the Google Ads margin on impressions it expected to be in higher demand and increasing its margin on other impressions—while holding the aggregate Google Ads margin constant. Ex. 3, ¶ 722; Ex. 8, ¶¶ 138-39. By constraining Bernanke to maintain Google Ads' same overall fee across impressions, Google Ads assured that the savings from increasing its margin in some auctions (when it paid a lower price in less competitive auctions) equaled the impact of lowering its margin in others (when it increased its top bid to win more competitive auctions), such that the two margin adjustments balanced out and Google Ads did not increase its overall fee. Ex. 6, ¶ 233; Ex. 165 at 195:22-196:13, 204:6-18, 204:20-205:12, 210:15-211:5. | Disputed. *See* Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers). |
| 116 | Project Bernanke increased Google Ads advertisers' win rate in the AdX auction without charging advertisers more than they would have paid to win the auction absent Project Bernanke. Ex. 37 at -856 (███████████ ███████████████████████ ███████████████████████ ████████████ ); Ex. 93 at -155 ( ███████████████████████ ███████████████████████ ████████ ), id. at -156 ( ███ ███████████████████ ); Ex. 152 at 38:8-16 ( ███████████████████████ ███████████████████████ ███████████████████ ██████ ). | Disputed. *See* Ex. 61, GOOG-DOJ-14161943 (Publishers, particularly small ones, may see losses ██████ ); Ex. 184, GOOG-AT-MDL-B-002514153 at -154 (██████████ █████████ ); Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **117** | In the instances when Project Bernanke enabled Google Ads to win because it increased the top bid that Google Ads submitted into the AdX auction, it did so to help the Ads bid submitted to AdX auction, it charged advertisers their first price but ████████ ████████████████████████ ██████████████); Ex. 83 at -424 (same). But Project Bernanke did not allow Google Ads to charge the advertiser more than its original bid (i.e., it did not charge the amount of the increased bid); instead, Google Ads would take a negative expected margin in order to enable the advertiser to win the impression. Ex. 4, ¶ 222 ("[W]hen Google Ads bids were not high enough to win an auction, Bernanke could inflate advertiser bids to win the auction while only charging the advertisers the lower cost of their original bid."); Ex. 165 at 205:16-210:13. | Disputed. *See* Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **118** | In the instances when Project Bernanke enabled Google Ads to win at a lower AdX clearing price because it decreased the second bid that Google Ads submitted into the AdX auction (i.e., when Google Ads would have second-priced itself in the AdX auction), the winning advertiser was charged the original value of the second highest Google Ads bid. Ex. 3, ¶ 741 (explaining in this scenario "the GDN advertiser pays the original second price"). The winning advertiser was charged this value not because of Project Bernanke but because a winning Google Ads advertiser had, both prior to and with Project Bernanke, been charged "███████████████████ ███████████████████████████ ███████████████████████████ ███████████" Ex. 24, ¶ 6 (emphasis added); Ex. 93 at -157 (█████ ███████████████████████████ ███████████████████████████ ██████████████████████); Ex. 152 at 45:5-16 (███████████ ███████████████████████ ███████████████████████████ ██████████████████ ██████). | Disputed. *See* Ex. 137, GOOG-AT-MDL-B-002088137 at -139 (Bernanke could cause advertisers to pay first price). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 119 | ██████████████████████████████████████████████████████████████ . Ex. 3, ¶ 728; Ex. 57 at -359; Ex. 16 at 183:7-17 ("Q. With Project Bernanke, you describe in your report ██████████████████████ ██████████████████████████████ █████████████████████ ); Ex. 80 at -176 (██████████████████ ██████████████████████████████ ██████████████████████ ). | Disputed. *See* Ex. 188, GOOG-DOJ-14882535 (GDN won ████ of matched desktop queries and ████ of mobile queries in 2015); Ex. 189, GOOG-DOJ-AT-00511017 at -017, 018 (Opted in AdX buyers can receive bid information about the other bids in auctions they participated in); Ex. 190, GOOG-DOJ-15603182 at -185 (GDN bids were not available). |
| 120 | ██████████████████████████████ ████████████████████████████████s ████████ . Ex. 57 at 359. | Disputed. *See* Ex. 189, GOOG-DOJ-AT-00511017 at -017, 018 (Opted in AdX buyers can receive bid information about the other bids in auctions they participated in); Ex. 190, GOOG-DOJ-15603182 at -185 (GDN bids were not available); Ex. 132, GOOG-AT-MDL-019653406 at -416 (Google ran ████ GDN experiments per quarter); Davis Ex. 41, Rudin Rebuttal Rep. ¶¶ 110-117 ("Google had distinct data advantages compared to individual buyers and sellers, which benefited its ML models for valuations, predictions of competitors' bids, and floor optimization."). |
| 121 | Project Bernanke did not change the rules by which AdX declared the winner and the clearing price in a given auction. The highest bid (whether or not it was a Google Ads bid effectively increased by Project Bernanke) still won the auction, and the clearing price was still the higher of the effective reserve price and the second-highest bid (whether or not it was a Google Ads bid effectively increased or decreased by Project Bernanke). Ex. 57 at 360-61; Ex. 152 at 41:9-11 (██████████ ██████████████████████████ ██████████████████ ). | Disputed. S*ee* Ex. 137, GOOG-AT-MDL-B-002088137 at -139 (Bernanke could cause advertisers to pay first price). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 122 | Project Bernanke expanded output by helping Google Ads advertisers buy more impressions that, without Project Bernanke, would not have been sold at all due to high publisher reserve prices. Ex. 3, ¶ 738 ("Google developed Bernanke so that GDN could clear more . . . impressions that GDN would otherwise have lost due to high publisher floor prices."); Ex. 8, ¶ 138; Ex. 15 at 221:7-11 ("[Q.] [D]oes Bernanke expand the output of transactions? . . . A. Yes"); Ex. 17 at 135:24-136:4 ("Q. Under Project Bernanke Google expanded the number of auction wins in AdX by allowing Google Ads buyers to purchase otherwise unsold impressions; correct? . . . A. It did that, but a lot more, yes."). | Disputed. *See* Ex. 191, GOOG-NE-11902954 at -966 ("First AdX bid is between 1-4x GDN first bid = helps GDN overcome floors and reserve prices, and beat out AdX Buyers"); Ex. 61, GOOG-DOJ-14161943 (Publishers, particularly small ones, may see losses ██████); Ex. 184, GOOG-AT-MDL-B-002514153 at -154 ███████████████████████; Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers). |
| 123 | ███████████████████████████ ███████████████████████ ██████████████████ Ex. 80 at -175. | Disputed as to the impact prior and after the implementation of Project Bernanke and the omission of legitimate reasons why publishers may have set high publisher reserve prices. *See* Davis Ex. 52, Gans Opening Rep. 248 ¶ 739 ("However, if clearing previously high floors was the only impact of Bernanke, I would expect to see increased transactions in AdX for GDN and little change for other AdX buyers. However, the main impact of the program is that GDN transactions increase while other AdX buyer matches decrease after launch."). |
| 124 | ██████████████████████ █████████████████████ █████████████████████████ █████████████████████████ ████████████████████████ ██████████ *See* Ex. 80 at -177. | Disputed. S*ee* Ex. 186, GOOG-AT-MDL-B-002760309 ████████████████ ████████████████████████ ███████████████████████ ████████████████████████ ██████████████████████████); Ex. 61, GOOG-DOJ-14161943 (Publishers, particularly small ones, may see losses ████). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 125 | Project Bernanke benefited advertisers and publishers. Ex. 15 at 226:17-20; Ex. 107 at -569, -573. ██████████ ██████████████████ ██████████████ ██████████████ ████████████ Ex. 93 at -167; *see also* Ex. 15 at 230:17-231:9. | Disputed. *See* Ex. 61, GOOG-DOJ-14161943 (Publishers, particularly small ones, may see losses ██████); Ex. 104, GOOG-AT-MDL-004555192 at -194,195 (Bernanke causes net payers and net takers among the buyers); Ex. 183, GOOG-AT-MDL-B-002514119 ("██████████ ████████████ ██████████████ ██████████████████ . |
| 126 | ██████████████ ██████████████ ██████████████ Ex. 15 at 224:21-226:20; Ex. 107 at -573 (██████████ ██████████████). | Disputed. *See* Ex. 191, GOOG-NE-11902954 at -966 ("First AdX bid is between 1-4x GDN first bid = helps GDN overcome floors and reserve prices, and beat out AdX Buyers"); Ex. 61, GOOG-DOJ-14161943 (Publishers, particularly small ones, may see losses ████ ██); Ex. 184, GOOG-AT-MDL-B-002514153 at -154 ██████████ ██████████████████); Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers). |
| 127 | By helping advertisers win more impressions, Project Bernanke increased advertiser click and conversion volume as well. Ex. 87 at -787 (██████████████ ██████████████ ████████████ ██████████████ ██████████████). | Disputed. *See* Ex. 191, GOOG-NE-11902954 at -966 ("First AdX bid is between 1-4x GDN first bid = helps GDN overcome floors and reserve prices, and beat out AdX Buyers"); Ex. 61, GOOG-DOJ-14161943 (Publishers, particularly small ones, may see losses ████ ██); Ex. 184, GOOG-AT-MDL-B-002514153 at -154 (██████████████ ██████████████); Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 128 | Project Bernanke benefited GAM publishers by increasing match rates and revenue. Ex. 15 at 230:17-232:11; Ex. 93 at -161; Ex. 87 at -787; Ex. 151 at 115:15-25 (███████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████ ); Ex. 151 at 291:13-21 ████████████████████████ ██████ ). | Disputed. *See* Ex. 61, GOOG-DOJ-14161943 (Publishers, particularly small ones, may see losses ███████ ); Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers); Ex. 183, GOOG-AT-MDL-B-002514119 (██ ███████████████████████████ ███████████████████████████ █████████████ ). |
| 129 | Google launched another version of Bernanke in August 2015, called Global Bernanke. Ex. 8, ¶ 140. | Undisputed. |
| 130 | Global Bernanke varied from Project Bernanke algorithmically, and increased the value of impressions won by Google Ads advertisers further by allowing the revenue share collected by Google Ads to vary across different publisher inventory. Ex. 3, ¶ 724 (███████████████████████████ ███████████████████████████ ███████ ); Ex. 8, ¶¶ 126.c, 140; Ex. 91 at -938 (███████████████████████████ ████████████████████████ ); Ex. 92 at -894 (███████████████████████████ ███████████████████████████ ████ ). Global Bernanke also varied in that it performed the same optimization but targeted an average revenue share across all publishers, whereas the earlier version of Bernanke varied the Google Ads revenue share with the aim of maintaining the same average revenue share for each publisher. Ex. 8, ¶¶ 126.c, 140. | Disputed. *See* Ex. 104, GOOG-AT-MDL-004555192 at -194 (Bernanke causes net payers and net takers among the buyers). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 131 | In 2016, Google changed how winning advertisers in Google Ads were charged for impressions by adopting a "threshold payment rule." Ex. 8, ¶ 143; Ex. 18 at 259:8-23. A threshold payment rule charges the winner the minimum bid necessary, in retrospect, to have won the auction. Ex. 18 at 259:8-23 ("[A] threshold payment rule refers to the fact that a bidder is paying their minimum bid to win[.]"). Because it does not depend on the value of the winning bidder's bid, it is "bidder truthful," such that a bidder's optimal strategy is to bid according to its actual value. Ex. 8, ¶¶ 61-62, 143; *see also* Ex. 18 at 263:25-264:18, 270:12-271:8. | Undisputed to the extent consistent with Google's representations in its summary judgment motion that it only applied to autobidding advertisers. |
| 132 | Specifically, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Ex. 106 at -209. ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ *Id.* | Disputed. *See* Ex. 192, GOOG-DOJ-AT-02467209 (▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮). |
| 133 | ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Ex. 106; *see also* Ex. 20, ¶ 2. ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 20, ¶ 3. | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 134 | From those dates forward, with the threshold payment rule in place, an advertiser would optimally bid its true value. Ex. 8, ¶ 143 ("[C]harging a winning advertiser its threshold price—that is, an amount equal to the lowest value it could have reported while still winning the impression," resulted in "a bidder-truthful process for Google Ads advertisers"); Ex. 12, ¶ 239 n.348 ("During periods where Project Global Bernanke used threshold payments, both Sophisticated and Default Advertisers would best-respond by bidding truthfully (because the auction is actually truthful)."); Ex. 18 at 263:25-264:18 ("As I stated in my opening report and is also commonly known within auction theory, in an auction that uses threshold payments, advertisers are not better off bid shading. . . . [I]n an auction with threshold payments, advertisers are best off bidding truthfully, that's correct."), id. at 270:12-271:8 ("[W]hen Global Bernanke used threshold payments, it is in [Google Ads'] advertisers' best interest to bid their true value."). | Disputed to the extent that the terms "the threshold payment rule" and "true value" are ambiguous and not defined as used in this statement. |
| 135 | Other ad buying tools, such as ███████ ████, also applied "multipliers" to bids submitted by their tools' advertisers in order to optimize the bid the ad buying tool submitted into the ad exchange auction. Ex. 137 at 114:25-116:19 (███████████████████ ████████████████████████ ████████████████████████ ███████████████████ ██████████████████████ ████████████████████ ████████████████████████ ███████████████████████ ████████████████████████ ██████████████████████ ███████████████████████ ████████████████████████ ███████████████████████ ███████████████████████ ████████████████████). | Disputed. *See* Ex. 193, GOOG-DOJ-14162335 ("the fact that AdX gets last look over AppNexus...AdX gets to pay high and win whenever AppNexus is present with a high CPM, and can pay low when AppNexus bids low. AppNexus in contrast can't reliably save money on queries where AdX bids low, because it doesn't know AdX bids."); Davis Ex. 41, Rudin Rebuttal Rep. ¶¶ 110-117 ("Google had distinct data advantages compared to individual buyers and sellers, which benefited its ML models for valuations, predictions of competitors' bids, and floor optimization."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| |  | |
| 136 | Other ad buying tools, such as ███████ ██████████████, also varied its margin on a per-impression basis. Ex. 124 at -287 (███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████); Ex. 140 at 45:25-47:13 (██████████████████ ███████████████████████ ███████████████████████ █████████████████████ ███████████████████), id. at 52:13-54:8. | Disputed. *See* Ex. 193, GOOG-DOJ-14162335 ("the fact that AdX gets last look over AppNexus.... AdX gets to pay high and win whenever AppNexus is present with a high CPM, and can pay low when AppNexus bids low. AppNexus in contrast can't reliably save money on queries where AdX bids low, because it doesn't know AdX bids."); Davis Ex. 41, Rudin Rebuttal Rep. ¶¶ 110-117 ("Google had distinct data advantages compared to individual buyers and sellers, which benefited its ML models for valuations, predictions of competitors' bids, and floor optimization."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 137 | In September 2019, when AdX completed its transition to a Unified First Price Auction, Project Bernanke was replaced by a new bid optimization program compatible with a first-price auction format, and the new program is called Alchemist. Ex. 8, ¶¶ 126(d), 144; Ex. 3, ¶ 732; Ex. 24, ¶ 22. | Undisputed. |
| 138 | The "switch[] to a first-price auction" rendered the "mechanics of old Project Bernanke obsolete." Ex. 6, ¶ 264; see also Ex. 3, ¶ 732 (The "first price (1P) auction" "required a change to Beranke."). In a first-price auction, "dropping [Google Ads'] second highest bid [would] not impact the auction at all." Ex. 6, ¶ 264. | Undisputed |
| 139 | Alchemist was designed to make bidders' "participation in AdX's first-price auction truthful." Ex. 6, ¶ 266; Ex. 18 at 273:2-14 ("[A]ll of the periods that Alchemist was active, GDN bidders would have best responded by bidding their true value into the Alchemist."). ███████████████████ ███████████████████ ████████ Ex. 8, ¶¶ 67, 144. ███████████████████ ███████████████████ ███████████████████ ██████ Ex. 24, ¶ 22; Ex. 8, ¶ 144. | Disputed. See Ex. 194, GOOG-AT-MDL-015924793 (███████████ ███████████████████ ███████████████████ ███████████████ ); Ex. 195, GOOG-AT-MDL-019045181 (███████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ ████████ ). |
| 140 | Alchemist used a threshold pricing rule from its inception. Ex. 6, ¶ 266 (acknowledging Alchemist's "bid optimizer for [Google Ads] users that makes their participation in AdX's first-price auction truthful"); Ex. 18 at 272:21-273:14 ("Q. . . . Alchemist used a threshold pricing, not a first price payment rule, right? A. Yes, that is correct."). | Disputed. See Ex. 194, GOOG-AT-MDL-015924793 (███████████ ███████████████████ ███████████████████ ███████████████ ); Ex. 195, GOOG-AT-MDL-019045181 (███████████ ███████████████████ ████████ |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | ████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>█████████████). |
| **141** | Dynamic Revenue Share (also known as "Dynamic Revenue Sharing" or "DRS") was a Google sell-side auction optimization introduced in late August 2015 and implemented in Google's AdX. Ex. 7, ¶ 619; Ex. 19, ¶ 43; Ex. 116 at -530. | Disputed as misleading. *See* Ex. 84, GOOG-DOJ-14265301 at -301-302 (DRS experiments started in June, 2014 and a "silent launch" was planned in September, 2014; "[s]ince the beginning of June we've been running a Dynamic Rev Share (DRS) experiment for AdX";  discussing "agreement" to "do this as a silent launch since there is no direct pub or buyer visible impact," and "asking for approval to go ahead" with DRS); Ex. 196, GOOG-TEX-00156142 at -143 (2014 Google notes referring to DRS as "secret sauce" about which "buyers / pubs" would not be aware, and while they "could notice it, [] we have mechanisms in place to prevent that it can be manipulated"); Ex. 197, GOOG-AT-MDL-013305855 at 867 (June 22, 2015, DRS ramped up to 5% of publishers and buyers). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 142 | DRS was designed to increase the frequency of auctions that ended with a winning bidder by dynamically adjusting the AdX revenue share on a per-impression basis. Ex. 7, ¶ 620; Ex. 17 at 188:17-20 ("Q. At a high level could you summarize for me your understanding of how DRS functions? A. So DRS is a program where Google adjusts its take rate for different auctions."); Ex. 49 at -484; Ex. 89 at -321 (███████████████████████████ ████████████████████████ ████████████████ ); Ex. 85 at -357; Ex. 166 at 273:7-24 (███████████████████████████ ███████████████████████ ████████████████████████ ███████████████████ ). | Disputed. *See* Ex. 198, GOOG-DOJ-15820805 at -807 (Publisher investigation found DRS could decrease publisher revenue); Ex. 106, GOOG-TEX-00831660 (Some DRS variants can result in lower publisher revenue); Ex. 199, GOOG-AT-MDL-019306356 at -359 n. 6 ("Right now, we will behind the scenes take less of a share to make more money for us and for the publishers."). |
| 143 | Prior to DRS, in certain circumstances, even if the AdX winning bidder was willing to pay more than the reserve price, the auction would fail and a transaction would not occur. Ex. 7, ¶ 619. This would happen if the winning bidder's "net bid"—the bid minus AdX's revenue share—fell below the publisher's reserve price. Bids that met this criteria were referred to as being in the "dynamic region." Ex. 76 at -356; Ex. 7, ¶¶ 619, 620; Ex. 72 at -954. | Undisputed. |
| 144 | When first introduced (DRS v1), DRS allowed AdX to reduce its revenue share when doing so brought a bidder's net bid to a level above the applicable reserve price, to allow the bidder to win the auction. Ex. 7, ¶¶ 621; Ex. 19, ¶¶ 43, 46-47; Ex. 89 at -321. | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 145 | DRS v1 enabled Google to reduce AdX's revenue share if the winning bid for an impression fell in the dynamic region, in order to cause the transaction to clear on AdX. Ex. 19, ¶¶ 46-47; Ex. 16 at 194:13-195:1 ("Q. . . . [I]f DRS reduced the AdX revenue share such that the bid would meet the floor price, the publisher would get that floor price as a revenue, correct? . . . [A.] Yes, because the first version only lowered AdX's revenue share, never raising it. If a bid is above the floor but the 20 percent AdX revenue would cause it to fall below that floor, it was in that dynamic range, where DRS v.1 could be applied."); Ex. 53 at -543; Ex. 72 at -954 ("Definition of DRS v1: Lower revenue share when a bid would otherwise be lost due to reserve price"); Ex. 85 at -357. In other words, DRS allowed AdX to charge less than its 20% revenue share on a particular impression, in order to permit a bid to clear when it was above the publisher floor, but not high enough above the floor that it would clear after AdX charged its fee. Ex. 6, ¶¶ 189, 191 (DRS v1 allowed AdX to "decrease[] its take rate to be lower than 20%," so that it would "return[] a successful bid to the ad server and win[] the impression"); Ex. 116 at -530 (▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 164 at 46:12-46:17 ("Q. And by comparison, dynamic revenue share would be Google changes the 20 percent that it receives to give the publisher 80 percent or more; is that accurate? A. Yes. During one transaction that can happen if we enable dynamic rev share."). | Disputed. *See* Ex. 200, GOOG-NE-03616222 ("pub could raise the floor and still win" "if this is a problem, DRS will be throttled by seller" "Prevent buyers from taking advantage of dynamic rev shares" "since reserve prices are visible, buyers could observe auctions clearing even when their post-revshare bid is below the reserve price, and then attempt to lower their bid" "if this is a problem, lower rev shares can be throttled per buyer, or we can change what reserve price we reveal"). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 146 | If an auction clears at a price lower than the reserve price applied, and AdX still pays the publisher at least its designated minimum CPM, that result is only possible through a reduction in AdX's revenue share (i.e., because of DRS v1). Ex. 18 at 202:11-203:15 ("In the event that the auction closes at a price lower than the reserve price applied and sellers are paid at least their min CPM, I agree that can only happen by adjusting Google's revenue share."). | Undisputed. |
| 147 | Weeks prior to launching DRS v1, on August 4, 2015, Google amended an AdX Help Center article to explain: The Ad Exchange auction closing price is determined as the greater of the second-highest net bid in the Ad Exchange auction or the reserve price applied to that impression. In some cases, the auction may close at a price lower than the reserve price applied, due to auction optimizations. Sellers are paid the Ad Exchange closing price, net of Google's revenue share, but will receive, subject to the terms governing their use of Ad Exchange, no less than the min CPM applied to the auction. Ex. 43; see also Ex. 21, ¶ 3. | Disputed. *See* Ex. 201, GOOG-DOJ-14712739 (Help Center article not announced internally or externally); Ex. 93, GOOG-DOJ-15435125 (Some publishers have never heard of DRS). |
| 148 | A second iteration of DRS (DRS v2) subsequently enabled AdX to both reduce its revenue share when a winning bid was in the dynamic region, and correspondingly to increase its revenue share on subsequent impressions where the winning bid was well in excess of the reserve price. Ex. 8, ¶¶ 439-40; Ex. 76 at -355-56. DRS v2 was launched in December 2016. Ex. 10 at Updated Opening Report Exhibit 5 (reflecting 12/1/2016 "Period Start" for DRS v2); Ex. 19, ¶ 48; Ex. 39 at -759, -761. | Disputed. *See* Ex. 202, GOOG-DOJ-15426012 at -012, -016 (Google running DRS V2 in February, 2016 with no notice). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 149 | DRSv2 enabled Google to offset revenue share reductions, while keeping the average overall revenue share closer to 20% (or the publisher's contractually agreed revenue share) without ever exceeding that contractually agreed share over the publisher's billing period. Ex. 19, ¶ 48; Ex. 74 at -875 (█████████████████████). Allowing AdX to both decrease and increase its revenue share enabled Google to operationalize DRS on a greater number of impressions. Ex. 76 at -355 ("by implementing DRS V2, we can apply a less tight throttling probability for DRS V2 compared to DRS V1"). | Disputed. *See* Ex. 203, GOOG-DOJ-13221355 ("Compared to DRS V1, we get considerable more profit (at least 53% profit lift with a conservative estimate). Finally, we note that by implementing DRS V2, we can apply a less tight  throttling probability for DRS V2 compared to DRS V1, and therefore we can get much more  revenue (>55% more revenue lift, and > 169% more profit lift)"). |
| 150 | At the same time, DRS v2 ensured that the publisher always received its contracted revenue share (typically 80%) for each billing period. Ex. 53 at -543 (███████████ ████████████████████ ████████████████████ ████████████████████ ████████████████). | Disputed. *See* Ex. 187, GOOG-TEX-00309958 at -971 (DRS "can result in *less* revenue for the publisher, because we don't take into account the opportunity cost from serving unfilled impressions elsewhere"). |
| 151 | Google announced DRS v2 (under a different name) before it was launched and allowed publishers to opt out of the program. Ex. 1, ¶ 39; Ex. 6, ¶ 197. | Disputed. *See* Ex. 55, ████ Dep. Tr. at 260:7-10 (Q. Certainly you weren't disclosing implementation details to advertisers, though, agreed? A. Not all implementation, yes); Ex. 55, ████ Dep. Tr. at 344:19-345: 3 ("THE WITNESS: You know, we're designing these features primarily for our sell-side clients for the team that I'm on. And, no, I don't think all of the details of the features are something that you'd want to disclose to advertisers, every detail of how it works."); Ex. 204, GOOG-DOJ-AT-02424328 at -330-331 (DRS activated by default); Ex. 93, GOOG-DOJ-15435125 (Some publishers have never heard of DRS). |

| 152 | In June 2016, Google again amended the Help Center article describing the AdX rules. As of June 14, 2016, the Help Center article included the DRS v1 language and the following disclosures as to bidders and bidding: DoubleClick Ad Exchange determines the winner based on the highest net bid submitted. Note that the net bid reflects any adjustments Ad Exchange may, at its discretion, have made to the bid submitted by the buyer for the purpose of optimizing the auction. Regardless of whether any adjustments are made, the winning buyer will never be charged more than the bid it submits. … To optimize the auction, Google may choose to close an auction at a price lower than the reserve price that would otherwise have been applied. In such cases, the winning buyer may pay a price below the reserve and therefore receive a discount on its bid. A buyer that has received discount(s) on its bid(s) may face **higher reserve prices in subsequent transactions to offset such discount(s)**. Ex. 44 (emphasis added); see also Ex. 21, ¶ 4. The Help Center article also supplemented its disclosures as to sellers and reserve prices:  Subject to the terms governing their use of Ad Exchange, sellers are paid the Ad Exchange closing price, net of Google's revenue share, but will receive no less than the min CPM they specified for the auction. Unless the 'per-query revenue share' setting is enabled by a Seller, auction optimizations may result in an auction closing at a price lower than the reserve price that would otherwise have been applied. Because the Seller will always be paid at least its specified min CPM, the Seller may receive more than its contracted revenue share on the transaction. In subsequent transactions, the Seller's revenue share may then be **reduced to offset the prior earnings in excess of the contracted revenue share**, but the Seller will always receive at least its contracted revenue share across all its Ad Exchange transactions in a given month. Ex. 44 (emphasis added). | Disputed. *See* Ex. 93, GOOG-DOJ-15435125 (Some publishers have never heard of DRS). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **153** | The purpose of the June 14, 2016 amendment to the Help Center article was ███████ ██████████████████████ ███████████████████████ Ex. 53 at -547. | Disputed. *See* Ex. 201, GOOG-DOJ-14712739 (Help Center article to be amended due to GDN opt out). |
| **154** | Also in June 2016, Google publicly announced DRS v2 through a Help Center release note, as a "New Ad Exchange control for applying per-query revenue share optimization," further detailing that "[a]s part of our ongoing efforts to provide smarter optimizations and maximize revenue, we may increase or decrease revenue per query." Ex. 40 at -779. That announcement highlighted that publishers that preferred Google to "apply your contracted revenue share on every query" could opt out of DRS v2 in the AdX user interface (UI). Ex. 40 at -779. | Disputed. *See* Ex. 201, GOOG-DOJ-14712739 (Help Center article not announced internally or externally); Ex. 93, GOOG-DOJ-15435125 (Some publishers have never heard of DRS.); Davis Ex. 3, Weinberg Rebuttal at p.22 n. 60 ("The DRSv2 'disclosure' contains a false material statement."); *see also id.* at pp. 77-78 ("The cited DRSv2 disclosure itself contains a *false statement*: 'Regardless of whether any adjustments are made, the winning buyer will never be charged more than the bid it submits.") (citing GOOG-AT-MDL-C-000035252 at -52 and noting "I stated in my Opening Report, and previously, that I find this statement to be false because it does not account for debt. The Milgrom Report does not rebut my claim."). |
| **155** | Google also disclosed DRS v2 in the AdX User Interface itself. The opt-out feature was added through a "toggle" on the "Admin" page, which explained: "When selected, each ad request from this network to Ad Exchange will pay at least contracted revenue share. When not selected, contracted revenue share is applied as an average over a billing period. Selecting this reduces AdX yield." Ex. 35 at -950; Ex. 89 at -323-24. In addition, from June 14 through August 1, 2016 the AdX User Interface featured a "butter bar"—a banner announcement, also called a "feature flag"—explaining to publishers that "You can now control whether or not revenue share is applied per-query for Ad Exchange," complete with links to the above-described release note and the opt-out toggle. Ex. 89 at -323-24; Ex. 35 at -951. | Disputed. *See* Ex. 93, GOOG-DOJ-15435125 (Some publishers have never heard of DRS); Ex. 206, GOOG-DOJ-AT-02422765 at - 769 ("Sales concerns-harm to relationship  if no further detail provided on what switch does"). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **156** | ██████████████████ ██████████████ ████████████ Ex. 89 at -323 (██████████████████ ████████████████). | Disputed. *See* Ex. 93, GOOG-DOJ-15435125 (Some publishers have never heard of DRS); Ex. 207, GOOG-DOJ-15422521 at -522 (internal July 2015 emails in which ████ states "I don't think we will be able to explain it to them in much detail, because I don't think we want to expose how DRS works"); Ex. 67, GOOG-DOJ-14156657 at 658 (document showing publishers were confused and reached out to Google to understand how DRS worked, including asking "what is my contracted revenue share", "why would it be in my advantage to have this fluctuate?", "how can I see the effect if I were to go along with this?" , and "why is this so complex."); Ex. 50, GOOG-NE-04934281 at 283 (May 2016 internal Google document re DRS states "Buy-side: No outreach to buyers is planned, but internal teams will be informed about DRS, and questions can be handled reactively."). |
| **157** | In the third version of DRS—referred to as Truthful DRS ("tDRS")—Google determined whether to reduce its revenue share based on historical bidding data and made that determination prior to receiving live bids from AdX buyers. Ex. 6, ¶ 208; Ex. 19, ¶ 51 & n.14. | Undisputed. |
| **158** | Publishers were given the choice to opt out of DRS v2 and tDRS. Ex. 19, ¶ 50; Ex. 40 at -779; Ex. 89 at -323-24, -326-27. | Disputed. *See* Ex. 93, GOOG-DOJ-15435125 (Some publishers have never heard of DRS); Ex. 206, GOOG-DOJ-AT-02422765 at - 769 (harm to relationship if no further detail provided on what switch does). |
| **159** | In about half of the auctions where DRS applied, the publisher's impression would have gone unsold but for DRS because no other net bid from any bidder exceeded the publisher's reserve price. Ex. 30 (████████ ██████████████ ██████████████ ████████████████ ████████████). | Disputed. *See* Ex. 187, GOOG-TEX-00309958 at -971 (DRS "can result in less revenue for the publisher, because we don't take into account the opportunity cost from serving unfilled impressions elsewhere"). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **160** | Under any version of DRS, as to any particular auction, no advertiser was charged more than its maximum bid, and no seller was paid less than its reserve price. Ex. 6, ¶¶ 231(a)-(b); Ex. 89 at -324 (████████████████████ ████████). | Disputed. *See* Ex. 208, GOOG-NE-06841582 at -584 (Difference between price paid and price charged to customers on one impression recouped in subsequent auctions). |
| **161** | Internally, Google employees believed that under DRSv2, ████████████ ████████████████ Ex. 89 at -324; Ex. 82 at -759 (████████████████ ████████████████████ ████████████████████ ████). | Disputed. *See* Ex. 208, GOOG-NE-06841582 at -584 (Difference between price paid and price charged to customers on one impression recouped in subsequent auctions). |
| **162** | DRS v1 increased both Google and publisher revenues, and benefitted advertisers by enabling efficient transactions to occur. Ex. 15 at 237:8-13; Ex. 85 at -358 (████████ ████████████████); Ex. 89 at -326 (██████████████████ ████████████ ████). | Disputed. *See* Ex. 198, GOOG-DOJ-15820805 at -807 (Publisher investigation found DRS could decrease publisher revenue); Ex. 106, GOOG-TEX-00831660 (Some DRS variants can result in lower publisher revenue); Ex. 209, GOOG-NE-13205235 at -237 (internal Google document re: DRS and RPO and proposal to recover revshare through RPO notes "Stll, since publisher revenue can go down, it is possible for publishers to make more money by opting out of DRS . . ."); Ex. 210, GOOG-DOJ-15446667 (internal emails regarding responding to ████████ inquiries about DRS notes that ████████ has said it has ████████████████████ ████████). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 163 | DRS v2 made publishers more money than they would have received either under DRS v1 or absent DRS. Ex. 78 at -101 and -103 (████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████); Ex. 76 at -355 (████ ████████████████████████████████ ███████████████); Ex. 78 at -101 (████████████████████ ████████████); Ex. 15 at 236:12-14 (same). DRS v2 increased output compared to DRS v1 and these output increases were "welfare enhancing." Ex. 15 at 237:14-23 (acknowledging evidence showed that DRS v2 "increased output" compared to DRS v1). | Disputed. *See* Ex. 198, GOOG-DOJ-15820805 at -807 (Publisher investigation found DRS could decrease publisher revenue); Ex. 106, GOOG-TEX-00831660 (Some DRS variants can result in lower publisher revenue); Ex. 209, GOOG-NE-13205235 (internal Google document re: DRS and RPO and proposal to recover revshare through RPO notes "Stll, since publisher revenue can go down, it is possible for publishers to make more money by opting out of DRS . . ."); Ex. 210, GOOG-DOJ-15446667 (internal emails regarding responding to ████████ inquiries regarding DRS notes that ████████ has ████████████ ████). |
| 164 | tDRS benefitted publishers compared to DRS v2 because tDRS increased match rates and revenue. Ex. 77 at -261 (████████████ ████████████████████████████████ ████████████████████████); Ex. 86 at -595 (████████████████████████████████ ████████████████████ ████████████ ████████). | Disputed. *See* Davis Ex. 39, Expert Report of Parag Pathak, p. 75, ¶204 ("Marketplace efficiency increases when markets are more transparent, encourage participation, and have straightforward incentives. In display advertising, marketplace efficiency leads to greater gains from trade for publishers and advertisers.") ; *Id.* at 72, ¶193.("Google's historical pattern of anticompetitive and deceptive conduct involves using its ad server to benefit its exchange and ad buying tools at the expense of its publisher customers."). |
| 165 | DRS was discontinued in September 2019, when AdX switched to a first-price auction. Ex. 1, ¶ 40; Ex. 6, ¶ 209; Ex. 7, ¶ 622; Ex. 19, ¶ 52; Ex. 89 at -321. | Undisputed that DRS was in place from July 2018 until late 2019, when Google shifted to a first price auction format in AdX. |
| 166 | Under the meaning of 'truthful' as used in auction theory, a "first-price auction is not truthful." Ex. 6, ¶¶ 47-48. | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 167 | Other ad exchanges also offer features that dynamically vary per-impression revenue shares. Ex. 7, ¶ 642; Ex. 8, ¶ 470; Ex. 142 at 63:17-64:2 (█████████████████████████ ████████████████████████████ ████████████████████████████ ███████████████████████████ █████████████████████n ████████████); Ex. 126 at slide 33 (████████████████████████ ███████████). | Disputed. *See* Ex. 193, GOOG-DOJ-14162335 ("My take is that the main culprit is not dynamic revshare, but rather the fact that AdX gets last look over AppNexus...AdX gets to pay high and win whenever AppNexus is present with a high CPM, and can pay low when AppNexus bids low. AppNexus in contrast can't reliably save money on queries where AdX bids low, because it doesn't know AdX bids. This has fundamentally nothing to do with dynamic revshare -- dynamic revshare is just yet another way for AdX to exploit the last look advantage."). |
| 168 | In July 2014, Google announced internally that it was integrating the functionalities of DFP and AdX into one user interface ("UI"), Google Ad Manager ("GAM"). Ex. 56 at -994. | Disputed as to calling DFP and AdX "functionalities" rather than two distinct products. *See* Ex. 211, D. Jean Dep. Tr. 90:16-92:2, May 1, 2024 ("Q. And AdX and GAM, those are separate products, correct? [...] A. I know them as separate technologies. [...] Q. And as we discussed previously, you know them as separate technologies because they serve separate functions, correct? A. In my opinion. Q. And the basis of your opinion is working at Google, correct? A. Working at Google; but most importantly, working in the industry. Q. And what do you mean by you base your opinion in working in the industry? A. The definition of an ad server versus the definition of an ad exchange. I see those as two separate technologies. Q. So just to summarize, in your opinion, AdX and Google Ad Manager are separate technologies based both on your work at Google and also your work outside of Google in the industry, correct? [...] A.: Based on the definition of an ad server and the definition of an ad exchange, they serve different functions. [...] Q. And that is based on your work at Google and in the broader industry outside of Google, correct? A. That is correct."); *see also* Ex. 212, |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | GOOG-AT-MDL-000992438 at -438. "The Google Ad Manager (fka DRX) for Perf" (March 2022) ("Google Ad Manager (internally and formerly known as "DRX") represents the merger of two flagship sell-side products: DoubleClick for Publishers ("DFP") and the Google Ad Exchange ("AdX"). The merger began in September of 2014 and concluded in mid-2018. We have now retired the DoubleClick brand, but internally, the products are still referred to as DFP and AdX."); Ex. 213, GOOG-NE-06586730 at -674 ("Building on a few months of careful planning, we just announced the formation of DRX …, the integration of our AdX and DFP products."); Ex. 130, GOOG-NE-13468302 at -305 ("Please note that while we talk externally about how these products work together and our plans to integrate them even further, we have not made any formal statements about merging the products and you should still talk about them as separate products when talking directly with clients."); Ex. 131, GOOG-NE-04597999 (Google diagram showing DFP and AdX as two separate products within Display Ads landscape). |
| 169 | The integration of DFP and AdX functionalities into what is now referred to as GAM took place over several years. Ex. 117 at -273-76. | Disputed as to calling DFP and AdX "functionalities" rather than two distinct products. *See* Ex. 211, D. Jean Dep. Tr. 90:16-92:2, May 1, 2024 ("Q. And AdX and GAM, those are separate products, correct? […] A. I know them as separate technologies. […] Q. And as we discussed previously, you know them as separate technologies because they serve separate functions, correct? A. In my opinion. Q. And the basis of your opinion is working at Google, correct? A. Working at Google; but most importantly, working in the industry. Q. And what do you mean by you base your opinion in working in the industry? A. The definition of an ad server versus the definition of an ad exchange. I see those as two separate technologies. Q. So just to |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | summarize, in your opinion, AdX and Google Ad Manager are separate technologies based both on your work at Google and also your work outside of Google in the industry, correct? […] A.: Based on the definition of an ad server and the definition of an ad exchange, they serve different functions. […] Q. And that is based on your work at Google and in the broader industry outside of Google, correct? A. That is correct."); *see also* Ex. 212, GOOG-AT-MDL-000992438 at -438. "The Google Ad Manager (fka DRX) for Perf" (March 2022) ("Google Ad Manager (internally and formerly known as "DRX") represents the merger of two flagship sell-side products: DoubleClick for Publishers ("DFP") and the Google Ad Exchange ("AdX"). The merger began in September of 2014 and concluded in mid-2018. We have now retired the DoubleClick brand, but internally, the products are still referred to as DFP and AdX."); Ex. 213, GOOG-NE-06586730 at -674 ("Building on a few months of careful planning, we just announced the formation of DRX …, the integration of our AdX and DFP products."); Ex. 130, GOOG-NE-13468302 at -305 ("Please note that while we talk externally about how these products work together and our plans to integrate them even further, we have not made any formal statements about merging the products and you should still talk about them as separate products when talking directly with clients."); Ex. 131, GOOG-NE-04597999 (Google diagram showing DFP and AdX as two separate products within Display Ads landscape). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 170 | Google publicly announced the unified GAM in June 2018, which replaced the previous "AdX" and "DFP" external branding. Ex. 110 at -090; Ex. 111 at -118. | Disputed to the extent that this suggests the separation of DFP and AdX was purely external prior to combining the two products in GAM. Google still internally referred to the products separately even after combining them in GAM. *See* Ex. 212, GOOG-AT-MDL-000992438 at -438. "The Google Ad Manager (fka DRX) for Perf" (March 2022) ("Google Ad Manager (internally and formerly known as "DRX") represents the merger of two flagship sell-side products: DoubleClick for Publishers ("DFP") and the Google Ad Exchange ("AdX"). The merger began in September of 2014 and concluded in mid-2018. We have now retired the DoubleClick brand, but internally, the products are still referred to as DFP and AdX."). |
| 171 | Google integrated DFP and AdX functionalities into one UI to provide publishers with a single yield optimization offering across ad formats and deal types, making it more efficient for publishers to administer their ad sales. Ex. 115 at -568 (███████████████████████████ ███████████████████████████ ███████████████████████████ ); Ex. 54 at -615 (████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ), id. at -624 (███████████████████████ ███████████████████████████ ██ ). | Disputed as to calling DFP and AdX "functionalities" rather than two distinct products. *See* Ex. 211, D. Jean Dep. Tr. 90:16-92:2, May 1, 2024 ("Q. And AdX and GAM, those are separate products, correct? [...] A. I know them as separate technologies. [...] Q. And as we discussed previously, you know them as separate technologies because they serve separate functions, correct? A. In my opinion. Q. And the basis of your opinion is working at Google, correct? A. Working at Google; but most importantly, working in the industry. Q. And what do you mean by you base your opinion in working in the industry? A. The definition of an ad server versus the definition of an ad exchange. I see those as two separate technologies. Q. So just to summarize, in your opinion, AdX and Google Ad Manager are separate technologies based both on your work at Google and also your work outside of Google in the industry, correct? [...] A.: Based on the definition of an ad server and the definition of an ad exchange, they serve different functions. [...] Q. And that is based on your work at Google and in the broader industry outside of Google, correct? A. That is correct."); *see also* Ex. 212, |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | GOOG-AT-MDL-000992438 at -438. "The Google Ad Manager (fka DRX) for Perf" (March 2022) ("Google Ad Manager (internally and formerly known as "DRX") represents the merger of two flagship sell-side products: DoubleClick for Publishers ("DFP") and the Google Ad Exchange ("AdX"). The merger began in September of 2014 and concluded in mid-2018. We have now retired the DoubleClick brand, but internally, the products are still referred to as DFP and AdX."); Ex. 213, GOOG-NE-06586730 at -732  ("Building on a few months of careful planning, we just announced the formation of DRX …, the integration of our AdX and DFP products."); Ex. 130, GOOG-NE-13468302 at -305 ("Please note that while we talk externally about how these products work together and our plans to integrate them even further, we have not made any formal statements about merging the products and you should still talk about them as separate products when talking directly with clients."); Ex. 131, GOOG-NE-04597999 (Google diagram showing DFP and AdX as two separate products within Display Ads landscape). |
| 172 | Other ad tech providers integrate their ad exchange and ad server functionalities, including because it improves efficiency for publishers and allows for better inventory management. Ex. 3, ¶ 63 n.19 (██████ ██████), id., ¶ 141 (██████ ██████████████ ████████████████████ ████████); Ex. 187 at 111:20-112:4 (██████ ██████████████████████ ████████████████████████████ ████████████████████████ ████████████). | Disputed to the extent this suggests that DFP and AdX are functionalities rather than distinct products, and to the extent this suggests that ad tech providers view ad exchanges and ad servers as "functionalities" rather than distinct products. The cited evidence does not support this classification of ad exchanges and ad servers. *See* Davis Ex. 52, Gans Opening Rep. ¶ 63 n.19 ("With the acquisition of Xandr, Microsoft is now also integrated across several relevant product markets."); Ex. 211, D. Jean Dep. Tr. 90:16-92:2, May 1, 2024 ("Q. And AdX and GAM, those are separate products, correct? […] A. I know them as separate technologies. […] Q. And as we discussed previously, you know them as separate technologies because they serve separate |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | functions, correct? A. In my opinion. Q. And the basis of your opinion is working at Google, correct? A. Working at Google; but most importantly, working in the industry. Q. And what do you mean by you base your opinion in working in the industry? A. The definition of an ad server versus the definition of an ad exchange. I see those as two separate technologies. Q. So just to summarize, in your opinion, AdX and Google Ad Manager are separate technologies based both on your work at Google and also your work outside of Google in the industry, correct? […] A.: Based on the definition of an ad server and the definition of an ad exchange, they serve different functions. […] Q. And that is based on your work at Google and in the broader industry outside of Google, correct? A. That is correct."); Ex. 212, GOOG-AT-MDL-000992438 at -438. "The Google Ad Manager (fka DRX) for Perf" (March 2022) ("Google Ad Manager (internally and formerly known as "DRX") represents the merger of two flagship sell-side products: DoubleClick for Publishers ("DFP") and the Google Ad Exchange ("AdX"). The merger began in September of 2014 and concluded in mid-2018. We have now retired the DoubleClick brand, but internally, the products are still referred to as DFP and AdX."); Ex. 213, GOOG-NE-06586730 at -732 ("Building on a few months of careful planning, we just announced the formation of DRX …, the integration of our AdX and DFP products."); Ex. 130, GOOG-NE-13468302 at -305 ("Please note that while we talk externally about how these products work together and our plans to integrate them even further, we have not made any formal statements about merging the products and you should still talk about them as separate products when talking directly with clients."); Ex. 131, GOOG-NE-04597999 (Google diagram showing DFP and |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | AdX as two separate products within Display Ads landscape). |
| 173 | Publishers who use an ad server other than DFP can access buyers using AdX, including from Google Ads, through AdX Direct. Ex. 3, ¶ 429; Ex. 15 at 163:10-18 (admitting that AdX Direct Tags allow a publisher to request ads from AdX and receive tags from AdX in real time even if the publisher does not use DFP); Ex. 19, ¶¶ 62, 64. | Disputed as to the effectiveness of using AdX Direct tags. *See* Davis Ex. 52, Gans Opening Report at ¶¶ 429-434, 454-455; Ex. 214, |
| 174 | AdX Direct uses pieces of code, also known as "tags," that publishers can place on their websites, allowing them to request an ad from AdX without using DFP. Ex. 19, ¶ 63; Ex. 7, ¶ 456 & n.793. | Disputed as to the effectiveness of using AdX Direct tags. *See* Davis Ex. 52, Gans Opening Report at ¶¶ 429-434, 454-455; Ex. 214, |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | ; Heinz Ex. 19, Hochstetler Opening Rep. at Section V.C and ¶ 127 ("[P]ublishers using AdX tags did not have access to all the features available through DFP and GAM, including DA / EDA and Exchange Bidding."). |
| 175 | Publishers using third-party ad servers have had access to AdX via AdX Direct tags since before Google acquired AdX from DoubleClick in 2008. Ex. 19, ¶ 62. And publishers continue to use AdX Direct today to access AdX through third-party ad servers. Ex. 4, ¶ 127 ("Currently, AdX tags are still in use, and it is still possible for publishers to use AdX with a third-party ad server."); Ex. 15 at 163:19-164:14 (acknowledging AdX Direct has been used since 2014 and can still be used today); Ex. 19, ¶¶ 62, 65. | Disputed as to the effectiveness of using AdX Direct tags. *See* Davis Ex. 52, Gans Opening Report at ¶¶ 429-434, 454-455; Ex. 214, ; *see also* Heinz Ex. 19, Hochstetler |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | Opening Rep. at Section V.C and ¶ 127 ("[P]ublishers using AdX tags did not have access to all the features available through DFP and GAM, including DA / EDA and Exchange Bidding."). |
| 176 | In other words, publishers can and do use AdX without using DFP. Ex. 13 at 278:5-11 ("Q. Can a publisher choose to use AdX without using DFP? A. Yes, it is possible for a publisher to use AdX without using Google Ad Manager."); Ex. 7, ¶ 464; Ex. 19, ¶ 62 | Disputed as misleading. By design, publishers that do not use Google's DFP product cannot receive real-time bids from AdX. If a publisher uses a non-Google ad server, AdX will only submit an ad for an impression in response to a bid request, but it will not disclose the price that it is offering to pay for that impression. *See* Ex. 215, GOOG-AT-MDL-001937115 at -115 ("AdX does not integrate with other ad servers as well as it does with DFP (no dynamic allocation), so AdX does not pass through real-time bids to these other ad servers (instead it passes through a "dumb" flat CPM based on historical averages"); Heinz Ex. 19, Hochstetler Opening Rep. at Section V.C and ¶ 127 ("[P]ublishers using AdX tags did not have access to all the features available through DFP and GAM, including DA / EDA and Exchange Bidding.").<br><br>Also disputed as to the effectiveness of using AdX Direct tags. *See* Davis Ex. 52, Gans Opening Report at ¶¶ 429-434, 454-455; Ex. 214, ████████████████ |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | ███████████████████████ |
| 177 | In addition, publishers using DFP can use exchanges other than AdX. Ex. 19, ¶ 8 ("Publishers that sign up for Google Ad Manager are not forced to use its AdX ad exchange functionality."), *id.*, ¶ 25 ("Google Ad Manager does not and cannot limit how many competing exchanges a publisher can connect to using Header Bidding. A publisher can work with any of the many dozens of competing exchanges. It is common for larger publishers to work with as many as six or seven different exchanges."), *id.*, ¶ 35 ("[Open Bidding] allows third party ad exchanges to compete with line items booked in Ad Manager (including Header Bidding line items) and with Authorized Buyers, DV360, and Google Ads in a real-time auction."), *id.*, ¶ 39 ("Approximately ██ third-party ad exchanges participate in Open Bidding, including ████████████████████ ████████."); Ex. 13 at 278:5-11 ("Q. Can a publisher choose to use DFP without using AdX? A. Yes."); Ex. 4, ¶ 127; Ex. 7, ¶ 463. | Disputed to the extent the statement mischaracterizes the alleged tie in the case. *See* Davis Ex. 53, Gans Rebuttal Rep. ¶ 286 ("in order to access AdX, publishers had to buy DFP"). |
| 178 | In fact, a majority of DFP publishers do not use AdX. Ex. 7, ¶ 463 ("76.6 percent of publishers using DFP do not use AdX"); Ex. 19, ¶ 8. ████████████████ ████████████████████████ Ex. 195 at 3. | Disputed. *See* Ex. 216, GOOG-NE-03609116 at -118 (███████████████████ ████████████████████; Ex. 217, GOOG-TEX-00853578 at -580 ████████ ████████████████████████ ████████████████████. |
| 179 | Initially, AdX and DFP were administered under separate contracts. Ex. 98 at -826, 828. In June 2016, Google began using a Unified | Disputed to the extent that the statement asserts that Google began using the unified contract for only new publishers, where |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | DFP/AdX Contract to onboard new publishers seeking to use either DFP or AdX. Ex. 3, ¶ 446; Ex. 98 at -823. | recontracting applied to existing publishers, *See* Ex. 96, GOOG-TEX-00725911 at 5911-5912 (Google ran a DRX re-contracting campaign where AdX only contracts would no longer be available to new customers. Existing AdX customers were also required to sign unified contracts that included DFP.); Ex. 97, GOOG-AT-MDL-019588187 at -8188 (Publishers were forced to sign these contracts even when they had no interest in DFP.); Ex. 115, ▮▮▮▮▮ Dep. Tr. 76:9-77:4 (Q. Stepping back, a partner didn't have an option to keep their AdX only contract. Is that correct? A. Correct. Q. They did not have an option to not go through the recontracting process? THE WITNESS: Well, they did have an option. They could have chosen not to recontract if they didn't -- if they didn't want to. Q. Their options were limited to either recontracting or no contract at all? A. Those are the two options, yes. Q. Partners or customers of Google were not provided any other choices beyond those two that were just discussed? A. Those are the two choices, yes."); *id.* at 79:11-80:6 ("Q. But it's correct that Google only gave partners two choices. Correct? A. Yes, correct. Q. And those two choices were to recontract, or sign a new contract, or be terminated. Correct? A. That was the decision of the business, yes. Q. And the partners did not have a choice on their participation in this recontracting process? THE WITNESS: We were -- the business made the decision to unify the two -- the -- to unify DFP and AdX, and partners were given a choice to either -- to recontract on the new platform or to no longer use the product."); Ex. 218, GOOG-TEX-00059386 at -386 ("In order to continue using AdX and DFP, you will need to sign a new combined contract that includes terms for both products. This will replace your current individual AdX and DFP contracts."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **180** | On September 19, 2016, Google publicly announced in a Help Center release that "[u]sers with access to both Ad Exchange and DoubleClick for Publishers can now enjoy access to Ad Exchange product features in the DoubleClick for Publishers interface. This streamlines the user workflow and reduces the need to access separate products." Ex. 40 at -774. | Undisputed as to date and content of Help Center release, except Plaintiffs dispute the statements made in the cited underlying document (that the combined offering "streamlines the user workflow and reduces the need to access separate products."). |
| **181** | AdX Direct has been available to and used by publishers both before and after Google offered its unified contract. Ex. 195 at 3 (████████████████████████████ ████████████████████████████ ████████████); see also Ex. 7, ¶ 464 (████████████ ████████████████████████████ ████████████████████ ████████████████████ ████████████████████████ ████████████████). | Disputed as misleading. Google would have ended AdX Direct but for antitrust and PR concerns. *See* Ex. 91, GOOG-DOJ-27799214 at 216, 221 (████████████████████ ████████████████████ ████████████████████████████ ████████████████); Ex. 219, GOOG-NE-04001130 at -131 (There is an ADX-direct product ... but this is being deprecated ...). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 182 | When Google rolled out the unified contract, it informed publishers that while signing the contract would give AdX users access to DFP, they were not obligated to use it. Ex. 11, ¶ 297; Ex. 15 at 176:18-177:12; Ex. 132 at 48:16-49:2 (███████████████████ ███████████████████ ███████████████████ ███████████████). | Disputed as misleading. Google contractually tied DFP to AdX by forcing publishers to sign the GAM contract or risk losing access to Google Ads demand on AdX. *See* Ex. 218, GOOG-TEX-00059386 at -386 ("In order to continue using AdX and DFP, you will need to sign a new combined contract that includes terms for both products. This will replace your current individual AdX and DFP contracts."); Ex. 115, ██████ Dep. Tr. 76:9-77:4 (Q. Stepping back, a partner didn't have an option to keep their AdX only contract. Is that correct? A. Correct. Q. They did not have an option to not go through the recontracting process? THE WITNESS: Well, they did have an option. They could have chosen not to recontract if they didn't -- if they didn't want to. Q. Their options were limited to either recontracting or no contract at all? A. Those are the two options, yes. Q. Partners or customers of Google were not provided any other choices beyond those two that were just discussed? A. Those are the two choices, yes."); *id.* at 79:11-80:6 ("Q. But it's correct that Google only gave partners two choices. Correct? A. Yes, correct. Q. And those two choices were to recontract, or sign a new contract, or be terminated. Correct? A. That was the decision of the business, yes. Q. And the partners did not have a choice on their participation in this recontracting process? THE WITNESS: We were -- the business made the decision to unify the two -- the -- to unify DFP and AdX, and partners were given a choice to either -- to recontract on the new platform or to no longer use the product."); Heinz Ex. 19, Hochstetler Opening Rep. ¶¶ 119-127; Ex. 109, GOOG-AT-MDL-B-003186306 (discussing plans to convert AdX Direct pubs into DFP publishers). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 183 | Google continued to honor existing legacy AdX contracts, which remained active until the contract term was over or the contract was terminated by Google or the partner, or superseded by a Unified DFP/AdX Contract. Ex. 98 at -822; Ex. 194 at 81:12-18 (████████ ███████████████████████████████ ███████████████████████████████ █████████)]. ███████████████████████████████ ██████████████████████ See, e.g., Exs. 36, 58, 118, 119, 120, 122, 123. | Disputed. *See* Ex. 218, GOOG-TEX-00059386 at -386 ("In order to continue using AdX and DFP, you will need to sign a new combined contract that includes terms for both products. This will replace your current individual AdX and DFP contracts."); Ex. 115, ████████ Dep. Tr. 76:9-77:4 (Q. Stepping back, a partner didn't have an option to keep their AdX only contract. Is that correct? A. Correct. Q. They did not have an option to not go through the recontracting process? THE WITNESS: Well, they did have an option. They could have chosen not to recontract if they didn't -- if they didn't want to. Q. Their options were limited to either recontracting or no contract at all? A. Those are the two options, yes. Q. Partners or customers of Google were not provided any other choices beyond those two that were just discussed? A. Those are the two choices, yes."); *id.* at 79:11-80:6 ("Q. But it's correct that Google only gave partners two choices. Correct? A. Yes, correct. Q. And those two choices were to recontract, or sign a new contract, or be terminated. Correct? A. That was the decision of the business, yes. Q. And the partners did not have a choice on their participation in this recontracting process? THE WITNESS: We were -- the business made the decision to unify the two -- the -- to unify DFP and AdX, and partners were given a choice to either -- to recontract on the new platform or to no longer use the product."); Ex. 109, GOOG-AT-MDL-B-003186306 (discussing plans to convert AdX Direct pubs into DFP publishers). |
| 184 | Line items are ad server settings specified by a publisher, which contain details relevant to showing an advertisement, such as the price that would be paid if the line item were selected and details about what kind of ad campaign could be shown. Ex. 3, ¶ 638; Ex. 5, ¶ 81; Ex. 6, ¶ 82; Ex. 7, ¶ 96; Ex. 131 at 92:16-96:21. | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 185 | Line items are the mechanism through which rival exchanges are represented in DFP. Ex. 6, ¶ 83.c; Ex. 5, ¶ 81; Ex. 103 at -491. | Disputed as to characterization of the function of a line item as a DFP mechanism to "represent" rival exhanges. Rivals were not represented in DFP, and pubs used line items to work around that. Davis Ex. 52, Expert Report of Joshua Gans, 219 ¶638 ("In the most basic sense, line items are ad server settings, specified by the publisher, that specify all of the details relevant to showing an ad to website visitors, including the space available for the ad and the details about what kind of ad campaign could be shown.")In additions, line items were controlled and set directly by the publisher using their own specialized knowledge within DFP. Davis Ex. 52, Expert Report of Joshua Gans, 219 ¶639 ("The publisher must specify each line item for the ad server. Thus, if a publisher expects bids to fall between a range of $0.01 and $20.00 and wants line items available in increments of $0.01, the ad server owner needs to setup thousands of individual line items established on the publisher ad server. This was time consuming and required specialized technical knowledge do to.") |
| 186 | The number of "active" line items (meaning the line item is being used to potentially deliver an ad) puts a strain on the ad server, and a publisher can slow or crash infrastructure by using a large number of active line items. Ex. 7, ¶¶ 97, 553; Ex. 65 at -195 ("Limits are necessary in order to protect the health of the product, the performance of our system, and are ultimately for the benefit of all publishers and the performance of their UI"); Ex. 27 at -244, -245; Ex. 79 at -828; Ex. 131 at 92:16-96:21. | Disputed. Davis Ex. 53, Expert Rebuttal Report of Joshua Gans at 141 ¶368 ("There was a process to request line item limit increases, demonstrating the limit was an artificial restriction. As described by ███████, Engineering Director and a Lead of the Google Ad Manager team at Google, DFP could support additional active line items above 61,000 given "it's only compute resources, after all."); Davis Ex. 53, Expert Rebuttal Report of Joshua Gans at 142 ¶370 ("What is at the heart of this is the evidence regarding Google's intent. The analysis in my initial report demonstrated that Google had incentives to cap line items even if it was costless to expand them, which is consistent with the hypothesis that Google's choices were an abuse of its monopoly power.")  *See also* Davis Ex. 52, Gans Opening Rep. at 224- |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | 25 ¶659 ("While pretextual technical reasons were given, its true motives were anticompetitive and technical constraints were negligible."). |
| 187 | Google introduced a limit of 61,000 active line items in late 2013 for its ad server DFP. Ex. 7, ¶ 553; Ex. 65 at -198 (████████████████ ████████████████████ ████████████). | Undisputed. |
| 188 | Line item limits preclude any one publisher from using an excessive number of line items, which would negatively impact the performance of Google's ad server for other publishers. Ex. 79 at -828; Ex. 41 at -304-05 (████████████████████████ ████████████████████ █████); Ex. 131 at 92:16-92:21 ("[The limit is] there to ensure that our systems scale effectively and one publisher doesn't bring down the whole system."). | Disputed. While an excessive number of line items can strain Google's servers, Google began enforcing limits to discourage publishers from using header bidding. *See* Ex. 220, GOOG-DOJ-15127000 at -001-002 (Line Item caps introduce friction into header bidding). |
| 189 | The line item limits were designed to ensure the performance of Google's ad server, protecting the health of the product. Ex. 7, ¶¶ 97, 553 (citing Ex. 65); Ex. 65 at -198; Ex. 27 at -245; Ex. 79 at -828 (noting that "████ ████████████████████ ██████████████████ █████████████); Ex. 131 at 92:16-96:21. ████████████████████ ██████████ Ex. 7, ¶¶ 97, 553 (citing Ex. 65 at -202). | Disputed. Davis Ex. 52, Gans Opening Rep. at 224-25 ¶659 ("While pretextual technical reasons were given, its true motives were anticompetitive and technical constraints were negligible."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 190 | With the advent of header bidding, Google began to see an increase in excessive numbers of active line items, many times more than the system was designed to support. Ex. 7, ¶ 563 ("In 2016 and 2017, Google began to see an increase in the number of publishers exceeding the active line item limit. Sometimes, there were 1,000 times more line items than the system was designed to support."); Ex. 63 at - 882; Ex. 144 at 49:19-51:15. | Disputed. Davis Ex. 53, Gans Rebuttal Rep. at 141 ¶368 ("There was a process to request line item limit increases, demonstrating the limit was an artificial restriction. As described by ▮▮▮▮▮▮▮▮▮, Engineering Director and a Lead of the Google Ad Manager team at Google, DFP could support additional active line items above 61,000 given "it's only compute resources, after all."); Davis Ex. 53, Expert Rebuttal Report of Joshua Gans at 142 ¶370 ("What is at the heart of this is the evidence regarding Google's intent. The analysis in my initial report demonstrated that Google had incentives to cap line items even if it was costless to expand them, which is consistent with the hypothesis that Google's choices were an abuse of its monopoly power."). *See also* Davis Ex. 52, Gans Opening Rep. at 224-25 ¶659 ("While pretextual technical reasons were given, its true motives were anticompetitive and technical constraints were negligible."). |
| 191 | Implementing header bidding with DFP involved creating line items where every price would be associated with a line item. Ex. 7, ¶ 552; Ex. 143 at 204:22-17. And each line item would be targeted at a key value that specified the price. Ex. 7, ¶ 552; Ex. 131 at 92:16-96:21. For example, if a publisher was willing to accept a price between $0.50 and $1.00—the publisher's upper and lower pricing bounds—for an impression, the publisher could implement header bidding by setting up separate line items for every $0.01 increment within that range of prices, totaling 51 separate line items. Ex. 7, ¶ 552. | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 192 | ████████████████ ████████████████ ████████████ ██████ | Disputed. *See* Davis Ex. 53, Expert Rebuttal Report of Joshua Gans at 141 ¶370 ("However, the document used by [Google in Ex. 63] to support his claim also shows that there were only a few publishers with over 61,000 line items, and reducing their line items would only have a limited impact on costs, and that Google could also mitigate any cost increase by adapting its pricing or "not making money on a pub for strategic reason" since it was "not a lot of money."). |
| 193 | When publishers exceeded the line item limit, Google did not charge publishers for the increased infrastructure costs of hosting the additional line items. Ex. 15 at 249:17-23 ("Q. You're aware that Google granted exceptions to the line item cap to some publishers? A. Yes. Q. And did Google charge those publishers additional fees when they granted the exception to the line item cap? A. No."); Ex. 143 at 380:1-381:1 (██████████ ██████████████████████ ██████████████████████ ████████████████████████ ████████████ ██████████████████████ ██████████████████████ ███████████████████ ). | Disputed. *See* Ex. 220, GOOG-DOJ-15127000 at -001-002 (Line Item caps introduce friction into header bidding). |
| 194 | In 2018, Google announced that beginning on January 31, 2019, it would start enforcing the preexisting limits for publishers who were close to or over the line item limit. Ex. 7, ¶ 554; Ex. 101 at -818; Ex. 88 at -380. | Undisputed. |
| 195 | At the time of that announcement, ██ publishers were over the line item limit. Ex. 88 at -380-82. | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 196 | To ensure minimal interruptions to publishers' operations, Google allowed—and granted—certain line item limit exceptions for publishers. Ex. 88 at -380 (Google made clear that "the objective is not to disrupt any of those pubs operations, so the plan is to [sic] flexible on allowing exceptions."); Ex. 144 at 199:2-13 (██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████); Ex. 15 at 249:17-19 ("Q. You're aware that Google granted exceptions to the line item cap to some publishers? A. Yes."); Ex. 143 at 380:1-381:1 (██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████). | Disputed. *See* Davis Ex. 52, Gans Opening Rep. ¶¶ 651-54 ("Google only partially provided publishers with more line items via exceptions. … Google declined many publishers' access to additional line items despite its ability to do so (see Section VII.C.3).") |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **197** | In 2021, Google launched Header Bidding Manager, which provides publishers with tools to manage and optimize their header bidding setups, including by setting up header bidding without having to set up large numbers of line items. Ex. 15 at 253:9-23; Ex. 29 at -134; Ex. 28 at -134, 135. | Disputed to the extent this implies that Header Bidding Manager was a solution to line item limitations or replacement for a signifiant number of publishers. *See* Davis Ex. 52, Expert Report of Joshua Gans at 225 ¶659 ("As part of its settlement with the FCA, Google committed to developing its Header Bidding Manager tool. However, HBM only partly satisfied publishers' needs and ability to expand their Header Bidding strategies."); *Id.* at 225 ¶658 ("HBM adoption was slow as it was available in GAM 360 only842 and remained confidential as only a couple of publishers were progressively enrolled. Moreover, Google tried to keep HBM confidential but was noticed by some bidders.") |
| **198** | Publishers use pricing rules to set reserve (or "floor") prices in auctions occurring on ad exchanges. Ex. 8, ¶ 535; Ex. 19, ¶ 56. | Undisputed. |
| **199** | In 2019, in connection with its move to a UFPA, Google introduced Unified Pricing Rules ("UPR"). Ex. 8, ¶ 535; Ex. 19, ¶¶ 56-57. | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **200** | As discussed, *supra* ¶¶ 41-44, reserve prices function differently in first-price and second-price auctions: in a second-price auction, a reserve price can raise the amount that the winning bidder pays, but in a first-price auction, the winning bidder pays the amount of its bid, regardless of the reserve price. Ex. 19, ¶¶ 11, 58; Ex. 144 at 218:15-219:10 ("[S]ome of the discussions about universal pricing rules is that given the unification of AdManager and [] AdExchange and especially as we were moving to a first price, the different pricing rules for different exchanges really didn't make any sense because if it was used as a way to increase yield in a second price auction, but once you're moving to a first price auction there's really no reason to do it"); Ex. 157 at 633:6-633:13 ("Q. Why did Google create the unified pricing rules? A. As part of our move to a unified first price auction, we wanted to design a new pricing rule structure that would be appropriate for the auction. The nature of how pricing rules work is different in a first price and a second price auction, and so it was an appropriate time for us to think about the design that we wanted for the unified first price auction"). | Disputed. Google knew of the rational reasons why publishers wanted to set higher floors, one of which was independence from Google, and the reason why Google claims if created unified floors is false. *See* Ex. 222, GOOG-NE-11809343 at 9358; (Publishers set high floors to protect them from undesirable ads, for revenue diversity, and independence from Google. "Publishers have been willing to tolerate some revenue loss in exchange for reduced dependence on Google as a whole."); Ex. 168, GOOG-DOJ-AT-00569648 at 9649 ("We could keep all the current floor-pricing options and move to first-price auction and this would have achieved most of what we desperately need to fix our ecosystem. However, Adx team wanted to use this migration as an opportunity to significantly limit the ability of publishers to set floor-prices per buyers (which is a good goal to have"); Ex. 169, GOOG-NE-10660658 at 0658 (Google acknowledges that it could just move "to a 1st Price auction, but we'd need to remove some floor control to achieve the primary objective -- if not, pubs could set different floors for AdX, EB, HB, etc, which we're looking to move away from."); Ex. 89, GOOG-NE-10573952 at 0395 (█████████ ██████████████████████████ ██████████████████████████ ██████████████████████████ ██████████████████████████ ██████████████████████████ ██████████████████████████ ████████████████). The implementation of UPR was unrelated to the first price auctions themselves. With respect to UPR, Google admitted that "Doing this by itself makes it look extremely self serving." *See* Ex. 168, GOOG-DOJ-AT-00569648 at 9648. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 201 | Prior to 2019, publishers were unable to use the Google Ad Manager interface to configure reserve prices for third-party exchanges and buyers participating in Open Bidding and Header Bidding; as a result, they had to separately configure reserve prices on each exchange and network where their inventory was available, which was a time consuming and complicated process. Ex. 8, ¶ 535; Ex. 19, ¶ 56. | Disputed. *See* Davis Ex. 52, Gans Report at 176 ¶ 507 ("publishers had the option of setting uniform floors across all sources of demand for simplicity's sake before UPR. It was straightforward for a publisher to set its price floors across AdX, third party exchanges, and buying tools to the same value."); Ex. 223, GOOG-DOJ-14559099 at 9099 (Google held a partner event where UPR was announced and publishers express concern about ██████████████ ██████████). |
| 202 | Because publishers could set different reserve prices on different exchanges for the same impression, advertisers bidding through a variety of ad buying tools into different channels risked competing with themselves by facing different reserve prices for the same impression. Ex. 19, ¶ 59; Ex. 81 at -250 ("Today, buyers struggle to optimize when bidding across different channels due to lack of symmetry: different auction rules and different floor prices can apply for the same impression."). | Disputed. *See* Ex. 224, GOOG-DOJ-15601956 (██████████████ ████████████████████████████ ████████████); Heinz Ex. 9, Pathak Rebuttal Rep. at 39 ¶ 96 ("Profs. Milgrom and Baye justify UPR as protecting "advertisers from price-fishing." This justification is pretextual because there is no evidence that price-fishing or self-competition is a widespread issue facing advertisers. In addition, even if price-fishing were widespread, it would not be a problem for a publisher ad server to solve."). Advertisers were not competing with themselves. Google's concern was that advertisers were getting lower reserve prices on other exchanges. *See* Ex. 89, GOOG-NE-10573952 at 3953 ("AdX floors are the largest block to adx transactions on eligible inventory"); Ex. 89, GOOG-NE-10573952 at 3952 (██████████████████████████ ████████████████████████████ ████████████████████████ ██████████████████████ ████████████████████████ ██████████████████ ██████████████). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **203** | With UPR, the pricing rules became "unified," meaning that a publisher using GAM could no longer set as part of the bid request different pricing rules based on the identity of the ad exchange or the buying tool used by the advertiser, including setting a lower reserve price on AdX. Ex. 8, ¶ 519; Ex. 19, ¶ 60 & n.16; Ex. 66 at -665 ("Unified Pricing rules will not support the following functionalities that were present in Open Auction pricing rules: Buyer-specific floors: ability to set different floors for different buyers/bidders for a given inventory targeting . . . publishers will still be able to: Set per-advertiser floors in Unified Pricing rules" (emphasis in original)). | Undisputed. |
| **204** | With UPR, publishers can set a single reserve price within the GAM interface that applies uniformly across all participants in the Unified First Price Auction, including AdX buyers, non-Google ad exchanges, and ad networks. Ex. 8, ¶ 519; Ex. 19, ¶ 60; Ex. 55 at -915; Ex. 173 at 19:18-20:5 (██████████████ ████████████████ ███████████); Ex. 149 at 80:6-17 (██████████████ ████████████████ ████████████████ ████████████ ████████████████ ████████████████ ████████████). | Undisputed. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 205 | In this sense, UPR simplified the process of setting price floors for publishers. Ex. 133 at 72:4-72:20 (███████████████████ ████████████████████████ ████████████████████ █████████████████████████ ███████████); Ex. 162 at 252:10-21 ("Q. What were the benefits of UPR, in your view, to publishers, if any? A. Well, the short-term benefit, there were a couple. One was that it provided sort of a single interface where a publisher could go and configure all of their floors and just have it apply in one consistent way. Another was, as I said, the old pricing rules were very clunky, very error-prone. We routinely heard about mistakes that publishers had made or accidents. The old priority system was just hard to manage."). | Disputed. *See* Davis Ex. 52, Gans Opening Rep. at 176 ¶ 507 ("...[P]ublishers had the option of setting uniform floors across all sources of demand for simplicity's sake before UPR. It was straightforward for a publisher to set its price floors across AdX, third party exchanges, and buying tools to the same value.").  Publishers responded negatively to UPR.  *See* Davis Ex. 39, Pathak Opening Rep. at 62 ¶ 168 ("One publisher noted that under the UPR change, Google is ██████████ ████████████████████████████ ████████████████████████████ In addition, ████████████ ████████████████████████████ ████████████████████████████ ███████████████████████ ████████████████████████████ ███████████████████████████).  |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **206** | With UPR, advertisers faced the same reserve prices when bidding across different channels in the Unified First Price Auction. Ex. 8, ¶ 520; Ex. 19, ¶ 60. UPR thus limited the risk of self-competition when buyers bid across different channels and simplified the process of bidding. Ex. 8, ¶ 521. | Disputed. *See* Ex. 224, GOOG-DOJ-15601956 (█████████████████████████████ ██████████████████████████████.); Heinz Ex. 9, Pathak Rebuttal Rep. at 39 ¶ 96 ("Profs. Milgrom and Baye justify UPR as protecting "advertisers from price-fishing." This justification is pretextual because there is no evidence that price-fishing or self-competition is a widespread issue facing advertisers. In addition, even if price-fishing were widespread, it would not be a problem for a publisher ad server to solve."). Advertisers were not competing with themselves. Google's concern was that advertisers were getting lower reserve prices on other exchanges. *See* Ex. 89, GOOG-NE-10573952 at -953 ("AdX floors are the largest block to adx transactions on eligible inventory"); Ex. 89, GOOG-NE-10573952 at -952 (██████████████████████████ ████████████████████████████ ████████████████████████ ████████████████████████ █████████████████████ ██████████████████████████ ██████████████████).|

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 207 | UPR does not apply to publishers using ad servers other than GAM. Ex. 15 at 182:4-8 ("Q. Does UPR have any effect on a publisher that chooses not to use DFP? A. As I understand it, UPR was implemented through DFP, So not directly for other people."). UPR also does not prevent publishers from setting different price floors for different ad exchanges using the tools made available by other ad exchanges. Ex. 19, ¶ 61. | Disputed.  Publishers face the following challenges when considering a move to competitors: 1) AdX is tied to DFP (GAM), so a publisher could not just move to another ad server, (2) Even if they could separate from AdX, the cost of moving to another ad sever would be too high and (3) Google's data gives it a strategic advantage over competitors. *See* Ex. 225, GOOG-DOJ-AT-02304321 at -321 (NewsCorp notes "One of my biggest issues with the current functionality and proposed functionality of GAM is that AdX  is currently tied to DFP functionality leaving me to be forced into using the adserver"; Davis Ex. 52, Gans Opening Rep. at 114 ¶ 348  ("Google's monopoly power is demonstrated through the following factors: a. Google has a large and growing market share; b. High switching costs, which have led to publisher lock-in on the DFP ad server…); Ex. 226, GOOG-NE-13379438 at -439 & -441 (Presentation entitled "Google data for DRX" states that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬). |
| 208 | Google provides GAM360 publishers with the option to subscribe to data transfer files that contain non-aggregated event-level data of all ads served to their websites in order to help publishers understand the performance of their advertising inventory. Ex. 3, ¶¶ 680-81; Ex. 22, ¶ 10; Ex. 131 at 132:13-20 (▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬). Different types of events—such as bids, impressions, and clicks—have separate data transfer files. Ex. 3, ¶¶ 680-81; Ex. 22, ¶ 10. GAM360 publishers can choose to receive some, none, or all of the data transfer files. Ex. 22, ¶ 10. | Disputed as to lack of a specified time frame. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 209 | The Bid Data Transfer ("BDT") file is one type of data transfer file and contains information about the bids the publisher received on its inventory. Ex. 3, ¶ 680; Ex. 22, ¶¶ 10, 11. | Undisputed. |
| 210 | Prior to 2019, Google allowed Authorized Buyers and Open Bidding Buyers to opt out of including their bids in BDT files. Ex. 22, ¶ 11; Ex. 104 at -409 (███████████ ██████████████████████ ██████████████████████ █████████ ); Ex. 102 at -684 (█████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████████████████ ██████████ ); Ex. 15 at 260:13-16 (██████████ ██████████████████████ ████████ ). | Disputed because publishers access data available due to joinability (until removed in 2019), and Google acknowledged the impact of that change was significant. Ex. 227, GOOG-NE-12792275 at -75, -77 (██████ ████████████████████████ ████ ; ██████████████████████████ ████████████████ ); and at -76 (█████████████████████████ ████████████ ). |
| 211 | Because many bidders chose to opt out, the BDT file did not provide publishers with information about the complete set of bids for their inventory. Ex. 22, ¶ 11; Ex. 15 at 260:19-22 (██████████████████ ██████████████████████ ██████ ); Ex. 131 at 147:3-15 (████ ██████████████████████ ██████████████████████ █████ ); Ex. 59 at -294-95 (█████ ██████████████████████ ███████ ). ██████████████████████ | Disputed. *See* response to paragraph 210, *supra*. |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | ████████████████████ Ex. 22, ¶ 11. | |
| 212 | ████████████████ ████ Ex. 59 at -294. | Disputed because ████████████ ████████████████████ ████████████████████ ████████████████████ ██████████, *see* Ex. 228, GOOG-AT-MDL-012771724 at -730. ████████████████████ *See* Ex. 229, GOOG-AT-MDL-B-005209693 at -694. ████████████████ ██████████. *See* Ex. 230, GOOG-AT-MDL-C-000073682 at -90. |
| 213 | In 2019, as part of its migration to a UFPA, discussed supra ¶ 80, and in response to publishers requesting more complete information about the performance of the first price auction, Google opted to provide GAM360 publishers who subscribed to the BDT file with bids submitted by all Authorized Buyers (including Google Ads) and Open Bidding Buyers. Ex. 159 at 36:10-37:10 (████████████████ ████████████████████ ████████████████ ████████████████ ████████████████ ██████); Ex. 102 at -684 (████████████████ ████████████████ ██████████████) | Disputed. Publishers did not request the removal of joinability of BDT files. Many of the publishers responded negatively to the change. *See* Ex. 228, GOOG-AT-MDL-012771724 at 1725-1728 (████████ ████████████████████ ████████████); *See* Ex. 231, GOOG-AT-MDL-016627159 at 7162 (████ ████████████████████ ████████████████████ ██████) The ████████████ referred to relates to Google's claim that the change was made to protect buyers" privacy rights." This reason is pretextual. *See* Ex. 79, GOOG-DOJ-29427368 at 68-0003 (████████████ ████████████████████ |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | ██████████████); Ex. 131 at 136:19-137:13 (████████████ ████████████████ ██████████████ ██████████); Ex. 62 at - 537 (██████████ ████████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████). | ████████████████████ ████████████████████ ████████████████; Davis Ex. 32, Shafiq Rebuttal Rep. at 10 ¶ 23 ("The privacy concern described by Defendant's experts and ██████ that the data could be tied to individual users is unsupported."); Davis Ex. 52, Gans Opening Rep. at 235 ¶ 697 (While explaining how data redactions harmed competition, Gans noted: "Together, these changes meant that publishers lost the ability to compare relative performances of exchanges in Header Bidding and the ability to compare SSPs. This, in turn, limited the ability of rival SSPs to compete with Google by making it difficult for them to demonstrate value to publishers and simultaneously reducing publishers' incentives to consider rival SSP offerings. Overall, these changes made publishers more reliant on Google's ad server, enhancing Google's monopoly power in the ad server market and harming competition in the ad exchange market."); Davis Ex. 39, Pathak Opening Rep. at 55 ¶ 150 ("The redaction of the DT protected AdX against the threat of Header Bidding because it removed publishers' ability to measure Header Bidding results and effectively target users"); Ex. 99, GOOG-AT-MDL-006231727 at 1729 (██████████ ████████████████████ ████████████████████ ██████████████████); Ex. 100, GOOG-AT-MDL-B-004016318 at 6320 ("These changes will reduce the usefulness of the Bid DT for publishers to understand the value of their inventory and inform pricing strategy decisions."); Ex. 79, GOOG-DOJ-29427368 at 68-0001 (████████████ ████████████████). |



| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | ███████████████████████████ ███████. |
| 214 | To provide subscribed publishers with bids submitted by all Authorized Buyers (including Google Ads) and Open Bidding Buyers, Google ███████████████████ ████████████████████ █████████████████████████ █████████████████████r ████ Ex. 104 at -409 (█████████ █████████████████████ ████████████████████); Ex. 22, ¶¶ 12-13; Ex. 102 at -690 (███████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████); Ex. 95 at -885 (███████████████████████ ████████); Ex. 105 at -125 (same). | Disputed. *See* Davis Ex. 32, Shafiq Rebuttal Rep. ¶ 16.a ("I disagree with Defendant's experts Drs. Hoffman, Milgrom, and Baye who opine that Google redacted specific fields from the Bid Data Transfer ("BDT") files due to privacy concerns. Defendant's experts offer no basis to justify the privacy concerns from letting a publisher join Data Transfer ("DT") files for the ad auctions happening on the publisher's own website. Defendant's experts ignore the fact that Google reversed the redaction of the fields without any mitigations to address the purported privacy concerns."). |
| 215 | Specifically, Google was ███████████ ███████████. Ex. 95 at -885; Ex. 22, ¶ 13; Ex. 105 at -125; Ex. 131 at 134:9-135:1 (██████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████). | Disputed as Google's cited evidence only references one specific entity ██████ and no other purported contracts with others and Google's other conduct undermines this statement. *See* Davis Ex. 32, Shafiq Rebuttal Rep. ¶ 16.b ("Contrary to Google's representations to the Federal Trade Commission ("FTC") and Congress '[t]hat data is owned by the customers, publishers and advertisers, and DoubleClick or Google cannot do anything with it,' Google joins user browsing data it collects via DoubleClick from publishers' websites to the personal information of Google account holders collected from Google owned and operated ("O&O") websites and products (e.g., Google Search, YouTube, Maps, Chrome)."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 216 | Google also sought to ████████████ ████████████ ██████ Ex. 102 at -690 (████ ████████████ ████████████ ████████████ ██████████ ████████████ ████████████ ████████████ ██████ ); Ex. 104 at -409 (████████ ████████████ ████████████ ████████████ ████████████ ████████████ ); Ex. 131 at 135:11-136:17 (████████████ ████████ ); Ex. 131 at 140:25-142:19 (████ ████████████ ████████████ ████████████ ████████████ ████████████ ████████████ ████████████ ████████ ████████████ ); Ex. 159 at 44:8-45:11 (████████████ ████████████ ████████████ ████████████ ████████████ ████████ ████████████ ████████████ ). ████████████ Ex. 67 at -071 (████████████ ████████████ | Disputed. *See* Ex. 232, GOOG-NE-07834872 at -880 ████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ Davis Ex. 32, Shafiq Rebuttal Rep. at 10 ¶ 23 ("The privacy concern described by Defendant's experts and ████████'that the data could be tied to individual users is unsupported."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | ██████████████████████████ ██████████████████████ ████████████████ ██████████████████ ████████████████████ ); Ex. 159 at 46:2-46:17 (████ ████████████████████ ████████████████████████ ████████████████████ ████████████████████ ██████████████████ ████████████████████ ██████████████ ████████████████████ ████████████████████ ██████████████████ ). | |
| **217** | To address these concerns, Google removed and/or redacted some information from the BDT files that otherwise could have been used to join data transfer files together. Ex. 22, ¶ 13; Ex. 84 at -615 (██████████████████ ████████████████████ ████████████████████ ████████████████ ). | Disputed that Google removed and redacted fields from the BDT files to address privacy concerns. *See* Davis Ex. 32, Shafiq Rebuttal Rep. ¶ 16.a ("I disagree with Defendant's experts Drs. Hoffman, Milgrom, and Baye who opine that Google redacted specific fields from the Bid Data Transfer ("BDT") files due to privacy concerns. Defendant's experts offer no basis to justify the privacy concerns from letting a publisher join Data Transfer ("DT") files for the ad auctions happening on the publisher's own website. Defendant's experts ignore the fact that Google reversed the redaction of the fields without any mitigations to address the purported privacy concerns."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 218 | In response to publisher feedback, in January of 2024, Google made available to GAM360 publishers two types of files: (1) a modified BDT file also called the "Joinable Bid Data Transfer report file," which could be "joined to other Data Transfer files containing bid information for requests originating outside of Europe" and (2) "non-joinable BDT files," which are the same BDT files that have been available since September 2019. Ex. 22, ¶ 14. | Disputed as to the reason for Google's purported actions.  *See* Davis Ex. 32, Shafiq Rebuttal Rep. ¶¶ 27-29 ("Google released the new version of BDT files in 2024 ... Specifically, Google reverted the two changes from 2019 ... Google internal documents produced in this matter and depositions of Google employees fail to add any further color to the 2024 reversion of the BDT field redactions. When reverting the changes, Google provided no explanation about how it addressed the purported privacy concerns, which Google had used as a justification for these redactions in 2019.  Google's unexplained about-face shows that privacy was not a legitimate justification for the redactions to the BDT files."). |
| 219 | Google launched RPO in 2015. Ex. 3, ¶ 366; Ex. 4, ¶ 289. As explained in Google's May 2016, public-facing blog post, RPO "use[d] historical data" to increase certain reserve prices set by publishers, in hopes of bridging the "more than [] 50% price gap between bid and closing prices in many cases." Ex. 46 at -319; Ex. 6, ¶¶ 274-75; Ex. 1, ¶¶ 30, 31. When AdX ran a second-price auction—in which the high bidder was charged the higher of the second-highest bid or the reserve price—floor-price optimization had an effect because it could determine the price the advertiser pays and the publisher receives. *See* Ex. 8, ¶ 60; Ex. 9, ¶ 38 n.55; Ex. 17 at 203:21-204:4 ("[Q.] . . . Is it your understanding that in a second-price auction the highest bidder pays the greater of the reserve price and the second highest bid? A. Yes."). | Disputed. *See* Ex. 12, Korula Dep. Tr. at 316:24-317:11 ("RPO, one could say, is intended to increase the price that buyers paid and thereby increasing publisher revenue. Q: How did RPO increase prices that buyers paid? A: Because the clearing price of an auction could be determined by the reserve price. In cases where auctions would otherwise clear at very low prices...setting a higher reserve price might increase the clearing [rice of such an auction, and thereby increase the publisher's revenue."); *id.* at 323:17-19 (Q: Did RPO raise prices of ad impressions? A. Yes."); *id.* at 325:24-326:4 ("THE WITNESS" I think that I still believe that an exchange that represented sort of a second price, when, in fact, it was operating as first price or effectively first price is indeed misleading."); Ex. 233, ▮▮▮ Dep. Tr. at 185:4-8 ("A higher reserve price meant a higher price for that query. And whoever was the winner had to pay higher, yes."); Ex. 17, GOOG-DOJ-32321240 at - 241 ("The main sticking point is concern that we are launching another mechanism (RPO) that squeezes money from buyers and gives it to advertisers"); Ex. 234, GOOG-DOJ-32062262 |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | ("There are also projects that are concerned with the redistribution of wealth--dynamic RPO being a prime example"). |
| **220** | As early as August 2014, before RPO's initial rollout, Google's Help Center article about AdX stated that AdX "may run limited experiments designed to optimize the auction" and that such experiments "may include . . . modifying the min CPM set by the publisher for an impression." Ex. 42; Ex. 21, ¶ 2. "Modifying the min CPM set by the publisher" means modifying the reserve price, i.e., the "minimum cost per mille" for a given impression. Ex. 18 at 161:17-25 (Q. "[W]hen we talk about reserve price optimization, the reserve price that is being optimized in that conduct is the min CPM floor, right?" A. "The min CPM floor set by the publisher, yes."). | Disputed to the extent implying or arguing that Google disclosed RPO in August 2014 and that Google only ran "limited experiments." *See* Ex. 235, GOOG-TEX-00079344 (Google denies existence of RPO in response to Digiday article); Ex. 21, GOOG-AT-MDL-017664768 at -771, 772 (Google tries to obscure RPO after clients have observed its effects); Ex. 41, Korula Dep. Tr. Vol. 1 at 129:18-130: 6 (testifying that Google "run[s] many hundreds of experiments in a year"); *id.* at 172:15-24 (████████████████ ████████████); *id.* at 174:10-25 (no reason to doubt that ████ ████████████████████ ████████████); *id.* at 178:9-21 (████████████████████ ████████████); Ex. 9, GOOG-AT-MDL-B-001646464 at 468 ("████████████ ████████████████████ ████████████████████ ████████████); Ex. 58, ████ Dep. Tr. at 198:23-199:17 (Google did not explain that changing floor prices with RPO "may create a situation where a buyer is paying more because the floor price is going up, as is the case for RPO."); Davis Ex. 1, Weinberg Dep. Tr. at 18:5-11 ("Since issuing my opening report, I have reviewed further documents regarding the [] disclosure of RPO by Google. These documents left me to believe that the disclosures by Google regarding RPO were insufficient. I now consider RPO to be concealed for its entire existence since Google's disclosures withheld vital information regarding RPO."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 221 | Google made additional disclosures about RPO in a May 12, 2016 blog post. Ex. 1, ¶ 31 (Google "announce[d] the [RPO] program [in] May 2016 . . . in a blog post under the name 'optimized pricing'"); Ex. 6, ¶ 274 ("Google announced the [RPO] program to its customers under the name 'optimized pricing' on May 12, 2016."). The May 2016 announcement explained that RPO (or "optimized pricing") would "help publishers set price floors . . . that more closely reflect the value of their inventory," to address the "large price gap between what a buyer bids and what they pay." Ex. 46 at -318-19. It further explained that the program "uses historical data to automate" the process of "updating of floor prices," determining optimal floors according to "signals like ad unit and device," as well as "audience-based floors." *Id.* | Disputed. *See* Ex. 54, GOOG-AT-MDL-008051113 (internal May 2016 emails show Google wanted RPO to be "as soft a landing with buyers as possible" and indicate Google knew the blog post would be inadequate such that Google could only respond to post-blog post inquiries using "legally approved message in comms doc" and "everything else is Verbal-only"); Ex. 55, ▮▮▮ Dep. Tr. at 260:7-10 (Q. Certainly you weren't disclosing implementation details to advertisers, though, agreed? A. Not all implementation, yes); Ex. 55, ▮▮▮ Dep. Tr. at 344:19-345: 3 ("THE WITNESS: You know, we're designing these features primarily for our sell-side clients for the team that I'm on. And, no, I don't think all of the details of the features are something that you'd want to disclose to advertisers, every detail of how it works."); Ex. 17, GOOG-DOJ-32321240 at - 241 ("The main sticking point is concern that we are launching another mechanism (RPO) that squeezes money from buyers and gives it to advertisers"); Ex. 234, GOOG-DOJ-32062262 ("There are also projects that are concerned with the redistribution of wealth--dynamic RPO being a prime example"); Ex. 40, GOOG-DOJ-29803801 at -804, 816 (Per buyer floors not disclosed). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **222** | The May 12, 2016 blog post accurately describes RPO. Ex. 6, ¶ 275 ("Internal Google documents suggest that RPO relies on an algorithmic optimization that 'sets optimized reserve prices in AdX auctions' to 'increase the revenue for publishers' via 'modeling effect of various reserve prices' and then 'picking the best one.'"); Ex. 8, ¶ 103 ("Reserve Price Optimization (RPO) (also known as Optimized Pricing) . . . helped publishers set floor prices in the AdX second-price auction by increasing some floor prices in bid requests to buyers when RPO predicted—based on historical data on the distribution of bids—that the higher floor prices would increase publisher revenues."). | Disputed. *See* Ex. 54, GOOG-AT-MDL-008051113 (internal May 2016 emails show Google wanted RPO to be "as soft a landing with buyers as possible" and indicate Google knew the blog post would be inadequate such that Google could only respond to post-blog post inquiries using "legally approved message in comms doc" and "everything else is Verbal-only"); Ex. 55, ▮▮▮ Dep. Tr. at 260:7-10 (Q. Certainly you weren't disclosing implementation details to advertisers, though, agreed? A. Not all implementation, yes); Ex. 55, ▮▮▮ Dep. Tr. at 344:19-345: 3 ("THE WITNESS: You know, we're designing these features primarily for our sell-side clients for the team that I'm on. And, no, I don't think all of the details of the features are something that you'd want to disclose to advertisers, every detail of how it works."); Ex. 17, GOOG-DOJ-32321240 at - 241 ("The main sticking point is concern that we are launching another mechanism (RPO) that squeezes money from buyers and gives it to advertisers"); Ex. 234, GOOG-DOJ-32062262 ("There are also projects that are concerned with the redistribution of wealth--dynamic RPO being a prime example"); Ex. 40, GOOG-DOJ-29803801 at -804, 816 (Per buyer floors not disclosed). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 223 | Google intended for the May 12, 2016 blog post to disclose the functioning of RPO, and after publishing it understood the blog post to have disclosed the functioning of RPO. Ex. 109 at -980, -982 (Google's "plan [was] to announce" RPO in May 2016, through a "[d]etailed blog post"); Ex. 52 (Google "announced new optimizations for DoubleClick Ad Exchange" that included "optimized pricing in the Open Auction (aka RPO)"). | Disputed. *See* Ex. 23, GOOG-AT-MDL-015109254 (March 2016 message from Levitte stating that "[w]e can obscure the comms language [re RPO] to remove sensitive stuff"); Ex. 25, GOOG-DOJ-14736445 (████ promotional email states that when "RPO started getting noticed," he "worked on a way to announce [RPO] to customers as "optimized pricing" so that Google could "continue to develop it despite the sensitivity . . . of pub customers"); Ex. 54, GOOG-AT-MDL-008051113 (internal May 2016 emails show Google wanted RPO to be "as soft a landing with buyers as possible" and indicate Google knew the blog post would be inadequate such that Google could only respond to post-blog post inquiries using "legally approved message in comms doc" and "everything else is Verbal-only"); Ex. 236, GOOG-TEX-00374779 (spreadsheet of pre-announcement RPO comms w specific advertisers showing Google wanted to "highlight how this can encourage publishers to make more money as a positive spin"); Ex. 17, GOOG-DOJ-32321240 at -241 ("The main sticking point is concern that we are launching another mechanism (RPO) that squeezes money from buyers and gives it to advertisers"); Ex. 234, GOOG-DOJ-32062262 ("There are also projects that are concerned with the redistribution of wealth--dynamic RPO being a prime example"); Ex. 40, GOOG-DOJ-29803801 at -804, 816 (Per buyer floors not disclosed). |
| 224 | RPO "was deprecated in 2019 with the switch of AdX to the first-price auction format." Ex. 6, ¶ 274; *see also* Ex. 1, ¶ 31 ("[O]n or about September 25, 2019, Google publicly migrated to a first-price auction format on AdX, thus effectively ending the RPO program."). | Disputed. See Ex. 221, GOOG-AT-MDL-004285638 (Google discussing how to launch ████████████). |
| 225 | No later than August 2014, Google's Help Center article on AdX included the following information: | Disputed. See Ex. 54, GOOG-AT-MDL-008051113 (internal May 2016 emails show Google wanted RPO to be "as soft a landing |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | DoubleClick Ad Exchange determines the winning bidder based on the highest net bid submitted. Such net bid reflects any adjustments Ad Exchange may, at its discretion, have made to the bid submitted by the buyer for the purpose of optimizing the auction. | with buyers as possible" and indicate Google knew the blog post would be inadequate such that Google could only respond to post-blog post inquiries using "legally approved message in comms doc" and "everything else is Verbal-only"); Ex. 55, ███ Dep. Tr. at 260:7-10 (Q. Certainly you weren't disclosing implementation details to advertisers, though, agreed? A. Not all implementation, yes); Ex. 55, ███ Dep. Tr. at 344:19-345: 3 ("THE WITNESS: You know, we're designing these features primarily for our sell-side clients for the team that I'm on. And, no, I don't think all of the details of the features are something that you'd want to disclose to advertisers, every detail of how it works."); Ex. 17, GOOG-DOJ-32321240 at - 241 ("The main sticking point is concern that we are launching another mechanism (RPO) that squeezes money from buyers and gives it to advertisers"); Ex. 234, GOOG-DOJ-32062262 ("There are also projects that are concerned with the redistribution of wealth--dynamic RPO being a prime example"); Ex. 40, GOOG-DOJ-29803801 at -804, 816 (Per buyer floors not disclosed). |
| | Ex. 42; Ex. 21, ¶ 2. | |
| 226 | In 2019, Google first announced the transition to a first-price auction in a blog post with the following graphic: | Undisputed that the graphic appears in the Google-produced document. |
| 227 | Additionally, Google's Help Center article about "Auction Dynamics" in the unified first price auction included the following: | Undisputed that the text appears in the Google-filed document. |
| | How Open Bidding Works (attached as Exhibit F to Google's 12(b)(6) Motion to Dismiss, ECF No. 224-1). | |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 228 | When a user (using any browser, whether Google's or otherwise) visits a website from a personal computer or mobile device, a "cookie" (packet of data) may be stored on that user's browser (with the user's consent). Ex. 169 at 149:20-150:14; Ex. 23, ¶ 2. Some cookies are used—again, with consent—to track a user's web browsing history across multiple websites, which creates a profile of and assigns a unique and anonymous cookie ID number to the browser and enables ad tech to deliver targeted advertising. Ex. 169 at 150:15-21, 152:9-153:1. When that user visits a different website that has ad impressions available for sale, this website's publisher ad server sends a bid request to an ad exchange, which bid request includes the cookie information as well as information about the available impression. Ex. 8, ¶ 273; Ex. 22, ¶ 6. Ad exchanges also facilitate cookie matching, which involves building a mapping between cookie IDs of two parties (commonly the ad exchange and the ad-buying tool), to allow ad buying tools to determine whether the browser with that cookie ID has shown interest in its advertisers' products or services—which, in turn, allows a prospective advertiser to place a value on the impression. Ex. 8, ¶ 48; Ex. 169 at 251:4-252:16. But the advertisers bidding on an impression do not know any personally identifiable information about the internet user who is loading the webpage containing the impression; they instead may know that the user recently visited a sporting goods website or lives in Idaho. Ex. 169 at 150:15-21, 251:4-252:16; Ex. 22, ¶ 5. Google made this information available to advertisers for free, not for a price; the winning advertiser paid a price for an ad, without regard to the amount or quality of the data shared. Ex. 6, ¶¶ 74, 78 (ad buying tools and ad exchanges earn revenue "as a fraction of payments made" by winning advertisers); Ex. 23, ¶¶ 4-7. | Disputed as to the information Google displays to advertisers and that Google "made this information available to advertisers for free." *See* Ex. 48 (GOOG-AT-MDL-013918668) (displaying to the advertiser user data, including device type, internet protocol address, and geolocation.); Ex. 73 (GOOG-DOJ-AT-01933085) (concerns about "[h]undreds of potential bidders" receiving and storing this "bidstream" data "to compile exhaustive dossiers" about web users). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 229 | Google's Privacy Policy defines personal information as "information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account." See Google Privacy Policy effective Dec. 19, 2019 (attached as Exhibit E to Google's 12(b)(6) Motion to Dismiss, ECF No. 224-1). | Disputed as to Google's previous privacy policies and the lack of relevant time period for the statement, where this statement is not accurate for previous privacy policies. See Ex. 237, GOOG-AT-MDL-008929152. |
| 230 | The Privacy Policy further disclosed the following: | Undisputed that the text appears in the Google-filed document. |
| 231 | The Policy also provided a link for the users of Google's services to change their his/her settings to limit the sharing of information. Id. | Disputed as to unspecified time. A link as described was added in August of 2015 and was not present before. See Ex. 238 (https://policies.google.com/privacy/archive/20150630-20150819?hl=en). |
| 232 | Plaintiffs' antitrust claims relating to Reserve Price Optimization (RPO) have been dismissed.[4] Judge Castel found that Plaintiffs failed to plausibly allege competitive harm deriving from RPO in the markets for publisher ad servers, ad buying tools for large and small advertisers, and ad exchanges. In re Google Digit. Advert. Antitrust Litig., 627 F. Supp. 3d 346, 391-93 (S.D.N.Y. 2022). RPO was a process that helped publishers set optimal reserve prices by automating the selection of reserve prices on a dynamic, per-impression basis, based on historical bid data. Ex. 73 at -158; Ex. 61 at -915-16; Ex. 184 at 31:11-16; Ex. 18 at 161:17-25. Plaintiffs' experts do not opine that RPO was anticompetitive. Ex. 15 at 148:5-9, Ex. 11, Table 1. | Disputed as to RPO. See Ex. 17, GOOG-DOJ-32321240 at - 241 ("The main sticking point is concern that we are launching another mechanism (RPO) that squeezes money from buyers and gives it to advertisers"); GOOG-DOJ-32062262 ("There are also projects that are concerned with the redistribution of wealth--dynamic RPO being a prime example"); Davis Ex. 29, Expert Report of John Chandler, p. 93 ¶360 ("RPO, DRSv1, and Bernanke each represented a change to the auction rules…made it impossible for auction participants and competing exchanges to understand the rules that governed and applied to auctions run by Google, skewing decision-making and outcomes."); Davis Ex. 29, Expert Report of John Chandler, p. 96 ¶ 380 ("RPO…originated as [one of their] "yield optimization experiments."…If the experiment successfully increases Google's revenue in a way that outweighs its perceived negative impacts, then Google will "launch" the algorithm so that it is applied to all auctions."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **233** | Plaintiffs' Section 1 claims relating to the Network Bidding Agreement ("NBA") have already been dismissed. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 372-77 (S.D.N.Y. 2022). Plaintiffs' experts do not opine that the NBA was anticompetitive. Ex. 15 at 148:20-24; Ex. 11, Table 1. | Disputed. *See* Davis Ex. 52, Gans Opening Rep. at 13 n.3 ("I also address additional conduct—Project Poirot and Google's Facebook agreement—aimed at limiting the impact of Header Bidding. Collectively, the conduct I have analyzed in this report constitute a pattern of anticompetitive behavior on the part of Google."); *id.* at 291-96 (analyzing the Facebook agreement as one of Google's "additional actions aimed at limiting the impact of Header Bidding that reinforce my economic conclusion that the conduct I have analyzed in detail in this report constituted a pattern of anticompetitive behavior on the part of Google."); ECF No. 327 at 2, 5 ("Nor did the court address whether the NBA violated Section II of the Sherman Act. ... Discovery relating to the NBA agreement is relevant to those [DTPA] claims, as well as the claim made under Section II of the Sherman Act."); Ex. 239, GOOG-TEX-00970722 at -733 (calling Facebook use of HB a "nightmare senario."); Ex. 240, GOOG-NE-04421287 (calling FAN and HB threat a #1 priority); Ex. 241, GOOG-NE-06602063 (PPT pm FAN deal discussion); Ex. 242, GOOG-DOJ-27769247 at -256 (pros and cons of Google partnering with FAN with respect to Header Bidding). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 234 | Plaintiffs' antitrust claims relating to Open Bidding, discussed *supra* ¶¶ 65-74, have already been dismissed. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 393-95. Plaintiffs' experts do not opine that Open Bidding was anticompetitive. Ex. 15 at 148:15-19; Ex. 11, Table 1. | Disputed. *See* Davis Ex. 52, Expert Report of Joshua Gans at 208 ¶ 604. ("Google introduced Exchange Bidding...in response to the competitive threat from Header Bidding. When Google introduced Exchange Bidding, it maintained its Last Look advantage... This enables conduct such as DRS to continue in real time as Google can dynamically adjust AdX take rates to transact impressions it would have otherwise lost. EDA harmed competition in the ad exchange market and reinforced Google's market power in the ad serving market."); *id.* at 164, note 594 ("Open Bidding and Exchange Bidding refer to the same Google ad server product. I use these two terms interchangeably throughout the report.");  Ex. 243, GOOG-TEX-00093279 at -80 and -84. ("[Y]ou mention a critical word, "unfair" -- what the pub considers fair may not be what we consider fair, and may not even lead to their maximum possible revenue."). |
| 235 | Project Bell changed Google Ads' bidding behavior for multi-calling publishers. Ex. 24, ¶¶ 16-21; Ex. 150 at 373:16-374:7. Plaintiffs' experts do not opine that Project Bell was anticompetitive. Ex. 11, Table 1. | Disputed.  *See* Davis Ex. 29, Chandler Opening Rep. at 9 ("... Bell… jeopardized, and detrimentally affected, transparency and fairness of the auctions in which they were employed."). |
| 236 | Project Elmo was an optimized form of budget throttling or management in response to a multicaller. Ex. 8, ¶ 195; Ex. 152 at 226:25-227:7. Plaintiffs' experts do not opine that Project Elmo was anticompetitive. Ex. 15 at 149:5-9; Ex. 11, Table 1. | Disputed. *See* Ex. 244, GOOG-NE-09426318 at -18 ("One additional point…is that [E]lmo is also protecting against header bidding."); Davis Ex. 52, Expert Report of Joshua Gans at 292 ¶865 ("[Projects Poirot and Elmo] are examples of the actions that Google could take to alter the flow of information into markets in ways that were not motivated by the needs of Google consumers (publishers/advertisers) but… made it more difficult for rival exchanges and entrants to compete."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 237 | Project Poirot was an algorithm designed to protect DV360 advertisers from overbidding on exchanges that deviated from second-price auctions. Ex. 24, ¶ 26; Ex. 33 at -376-77; Ex. 153 at 267:9-14. Plaintiffs' experts do not opine that Project Poirot was anticompetitive. Ex. 15 at 148:25-149:4; Ex. 11, Table 1. | Disputed. *See* Ex. 245, GOOG-AT-MDL-001396947 at 47 ("Below is the…Poirot potential impact …a major contribution to our profitability goals!"); Ex. 246, GOOG-AT-MDL-012549335 (███████████████████ ████████████████████████████.."); Ex. 247, GOOG-NE-11275306 at 306 ("███████████ ██████████████████████████ ██████████████████████████ ████) (Note: Tagged "Exclude, not for trial."); Davis Ex. 52, Expert Report of Joshua Gans at 292¶ 865 ("[Projects Poirot and Elmo] are examples of the actions that Google could take to alter the flow of information into markets in ways that were not motivated by the needs of Google consumers (publishers/advertisers) but… made it more difficult for rival exchanges and entrants to compete."); *id.* at at 13 n.3 ("I also address additional conduct—Project Poirot and Google's Facebook agreement—aimed at limiting the impact of Header Bidding. Collectively, the conduct I have analyzed in this report constitute a pattern of anticompetitive behavior on the part of Google."). |
| 238 | In their depositions, however, representatives of each State admitted that they could not identify any instances of in-state conduct or harm resulting from Google's conduct allegedly actionable under their respective deceptive trade practices statutes: | Disputed. *See infra* Plaintiffs' Responses to Paragraphs 239-255. |
| 239 | **Alaska**. Alaska's representative could not identify any in-state publisher, advertiser, or ad tech competitor that was harmed by Google's conduct, and admitted that Alaska did not attempt to locate any. Ex. 176 5/3/2024 at 78:11-22 ("[I]t's not something we looked for."), *id.* at 21:7-11 ("[W]hat became apparent was that the Google conduct that we focused on in the Ad Tech matter was national in scope and, therefore, impacted Alaskans." (emphasis added)), id. at 42:18-22 ("[T]he | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 248, Jeffrey Pickett Deposition at 21:6-16 ("A. So through the course of the information and evidence developed in the coalition's investigation, what became apparent was that the Google conduct that we focused on in the Ad Tech matter was national in scope and, therefore, impacted Alaskans. I believe there's likely to be expert testimony that sort of backs that up. And so that was, you know -- that |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
|   | State of Alaska has not talked to a specific advertiser based in Alaska or specific publisher based in Alaska. As part of our investigation, we have not done that." (emphasis added)). Alaska did not receive any consumer complaints regarding Google's display advertising products. *Id.* at 32:5-7. Alaska's representative admitted there are no facts specific to Alaska that support its state-law claims. *Id.* at 44:24-45:3, 64:15-20. | checked that box to answer, I think, the question that you've asked me."), *id.* at 41:9-42:18 ("Q. Okay. So Alaska is relying on Texas for the harm to Alaska's general welfare and economy. Is that right? A. Yes, in this sense, in this sense. So Google's conduct, its technology is sort of universal, I would say, or that's my understanding, universal in the sense that its products reach all 50 states, territories, you know, obviously around the world as well. But, anyway, with respect to this lawsuit, what concerns Alaska is the fact that tech reaches into Alaska. I think Mr. Gordon testified as to how that tech is harmful to publishers and advertisers. So for the reasons he provided, you know, that would be the factual basis for Alaska's, you know, complaint as well or for its allegation that our general economy has been harmed.  Q. So Alaska doesn't have any Alaska-specific harm in addition to the information that Alaska's relying on from Texas' representative? MR. ENGELBECK: Objection, form. A. Well, Alaska specific. I mean, I think that what -- you know, some of that question I would have to answer by pointing to expert sort of reports that will be coming out. And then, in addition to what the experts are going to talk about, will include, as I understand it, Alaska based -- you know, how Google's tech has intersected with or been used in Alaska. In addition to that, Mr. Gordon, I think, gave fulsome responses to the common facts that we believe also exist -- that also attend Google products in tech that is used by Alaskan publishers and advertisers."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 240 | **Arkansas**. Arkansas' representative admitted that the state has no evidence of any state-specific harm caused by Google. Ex. 147 at 30:6-10 ("[W]e don't have any evidence that the harm to Arkansas citizens is any different than the harm nationally."). Arkansas has also not received any consumer complaints regarding Google's Ad Tech products. *Id.* at 35:18-22. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 249, Chuck Harder Deposition, at 24:22-25:6 ("Q. So -- so it's fair to say that the State of Arkansas joined this lawsuit not knowing one way or the other whether what it's alleging benefits Arkansas consumers or hurts Arkansas consumers; is that right? A. No, we joined the lawsuit -- we joined the lawsuit. The harm -- the harm is a harm nationwide that we believe to be substantial and widespread and we believe that the harm to Arkansans was -- we have no reason to believe that the harm to Arkansans is any different than the national harm to -- national harm."), id at 30:6-19 ("Q. Do you have any evidence about harm to Arkansas's citizens - A. I don't have any -- I don't have any -- we don't have any evidence that the harm to Arkansas citizens is any different than the harm nationally. Q. So -- so is it the State's contention that widespread national harm is the harm to Arkansas citizens? A. We -- no, the -- we do not believe -- we have no reason to believe that Arkansas was -- that the harm to Arkansas was any less or any more than it was nationally at this point. It will not know until discovery is concluded and we have the reports of our experts."). |
| 241 | **Florida**. Florida's designated representative could not name one Florida-based advertiser or publisher who was harmed by Google's alleged conduct. Ex. 134 at 54:21-55:2 ("I don't have a specific one for you today."). | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 250, Andrew Butler Deposition, at 47:20-50:1 ("Q What is the factual basis for Florida's assertion that individual -- that 22 million individuals in the State of Florida suffered irreparable harm as a result of Google's alleged conduct?  A So the factual bases underlying those effects on the nationwide market and then those effects being demonstrated inside of Florida, which could be the subject of expert opinion. Experts quantify and measure harm.  Q You also mentioned that there were certain businesses within the State of Florida who you allege |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
|   |   | experienced irreparable harm as a result of Google's alleged conduct; is that right?  A That's correct.  Q What businesses are you referencing?  A So the Florida Department of State has three and a half million active registrations for businesses. Google's transactional data can demonstrate which of the affected businesses. Those might be in the State. And expert testimony and reports are ongoing.  Q I'm trying to understand. With respect to those three and a half million businesses that are identified by the Florida Department of State, what are the facts underlying Florida's claim that those businesses have suffered irreparable harm because of Google's alleged conduct?  A So the harm to the markets that they participate in is common to all of the Plaintiff States and so that harm, questions surrounding that, I'd refer to the other witness. But there are three and a half million businesses in the State of Florida. Advertising is important to all businesses. The internet is ubiquitous. And the specifics of the harm caused by Google's conduct could be a matter of expert discovery that is ongoing.  Q So you can't point to any specific evidence that advertisers or publishers within the State of Florida were harmed by Google's alleged conduct? MR. PALMER: Objection to form.  MR. ISTRAIL: Objection to form.  A That's not what I said. That evidence, I believe is -- so you take the evidence demonstrating that there's harm in the nationwide market that all of these people are participating in. They're Florida businesses, they're small businesses, they're a peer in the State. They're participating in a market that's been monopolized. They're experiencing the harms just like everyone else in the nationwide market. But those harms are specific to us in Florida because they're our businesses. They're doing business with our citizens. They are our citizens running it, and expert testimony will quantify where and to what |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | extent and how all of these harms occur."); *see id.* at 75:20-76:6 (" Q So the only Florida-specific fact you can identify supporting your claim of irreparable harm under the DTPA is that Floridians participated in the general market; is that right? MR. PALMER: Objection as to form. A I believe the facts underlying the harm specific to Florida is that we have 22 million people participating, with ubiquitous use of internet, three and a half million businesses participating. And I believe that expert testimony can go a long way in elucidating and quantifying this, rather than me pontificating about it."). |
| 242 | **Idaho**. Idaho's representative could not identify any Idaho-specific harm caused by Google's actions with respect to its ad tech products. Ex. 172 at 58:24-59:8, 63:13-25 ("I'm not aware currently of any independent Idaho facts regarding the harm to Idaho individuals or citizens."). | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 251, John Olson Deposition, at 68:1-24 ("Q. (BY MS. CURRAN) And the State of Idaho doesn't have any evidence, as you sit here today, about the population of the citizens of the state of Idaho affected by Google's alleged conduct, correct? MS. SCHULTZ: Object to form.  THE WITNESS: I'm aware that there are just shy of 2 million people in the state of Idaho, and because of the ubiquitous nature of the use of Internet and Internet advertising, a large portion of that group -- of the people in Idaho as well as publishers and advertisers both suffered the harm. Beyond that, I can't identify any unique or separate specific evidence of the alleged harm in Idaho.  Q. (BY MS. CURRAN) But to be clear: Sitting here today, the State of Idaho does not have any specific evidence about the population of the citizens of the state affected by Google's alleged conduct, right?  MS. SCHULTZ: Object to form.  THE WITNESS: Yes. Although that, again, a finer point may be put to that through expert reports and discovery."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **243** | Indiana. Indiana's representative admitted that the state could not identify any Indiana-specific evidence of harm other than what has been alleged by the plaintiff states on a nation-wide basis. Ex. 189 at 113:9-13, 77:23-78:4 ("Q. What is the factual basis for the allegations by the State of Indiana that Google's alleged conducted [sic] harmed publishers in the state of Indiana? A. We believe that the common set of facts which Texas has testified to would apply to Indiana, the same as any other state."). | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 252, Steven Taterka Deposition at 77:23-78:14 (" Q What is the factual basis for the allegations by the State of Indiana that Google's alleged conducted harmed publishers in the state of Indiana? A We believe that the common set of facts which Texas has testified to would apply to Indiana, the same as any other state.  Q As you sit here today, can the State of Indiana name a single advertiser in the State of Indiana that uses Google ad tech products to sell display advertising?  A I can't name a specific advertiser, but I would just reiterate that with discovery still pending and with expert testimony to come, there may be some specific names. In a state of seven million people, there's bound to be some publishers and advertisers here."); *see id.* at 79:12-19 (" Q What about end users? How many end users are there that the State of Indiana contends have been harmed? MR. WILKERSON: Objection. Form.  A I can't possibly come up with a number beyond telling you that there's seven million people in the state and a lot of them have computers, myself included."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 244 | **Kentucky**. Kentucky's representative was unable to identify any harm specific to Kentucky from Google's conduct as alleged in this case. Ex. 141 at 172:6-17 ("Q. . . .I'm asking if you have seen documents from entities in Kentucky showing that they were harmed by Google's conduct. A. . . . There are documents produced in discovery that show national harm, and national harm would obviously include Kentucky."), *id.* at 173:9-25 (referring question of Kentucky-specific harm to Mr. Gordon [Texas's representative] "because he testifies on behalf of all common facts on behalf of Kentucky," but acknowledging that Mr. Gordon did not testify regarding harm specifically to Kentucky residents). The representative also admitted that none of the consumer complaints produced by Kentucky mentioned Google's Ad Tech or related products. Id. at 155:5-16. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 116, Jonathan Farmer Deposition at 39:16-42:25 ("Q. Okay. So let's move to the allegation that Kentucky's general welfare or economy has been harmed. And we've described -- you've described some of the categories of -- of people or entities who have been injured. Do you remember that testimony? A. You're referring to the publishers, advertisers and consumers?  Q. Exactly, yes. How widespread is this impact in the State? A. It's ubiquitous. You know, it impacts a substantial portion of the consumers in Kentucky as well as probably a substantial portion of the advertisers and publishers as well. "); *see id.* at 172:6-17 ("Q. I'm not asking you to speculate about what documents show. I'm asking if you have seen documents from entities in Kentucky showing that they were harmed by Google's conduct. A. Like I say, I've seen national -- I've seen documents -- sorry. There are documents produced in discovery that show national harm, and national harm would obviously include Kentucky. There is no reason that Kentucky somehow wouldn't be applicable to an ad program that Google runs worldwide."). |
| 245 | **Louisiana**. Louisiana's representative was unable to identify any Louisiana-specific harm from Google's alleged conduct, citing only the nationwide harm "testified by Texas on Louisiana's behalf" and unidentified expert reports. Ex. 192 at 37:17-38:3, 39:20-40:1, 64:5-65:15. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 253, Patrick Voelker Deposition, at 31:8-32:19 ("Q. And in proceeding as parens patriae, on whose behalf is the State of Louisiana proceeding? A. Sure, the parens capacity is a constitutional grant of authority by which the attorney general, as the chief legal officer of the State of Louisiana, is empowered to bing -- excuse me, bring and vindicate claims on behalf of Louisiana citizens.  Q. So on whose behalf? A. Would be the citizens of Louisiana. And I think if a particular answer is needed, publishers and advertisers along with the citizens at large.  Q. And have any of these |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
|  |  | groups complained to Louisiana about Google's ad tech/display advertising business? MR. ELLIS: Objection; form.  A. I think the investigation that Texas conducted revealed a series of conduct on the part of Google that, you know, is a national harm. And to the extent that that is -- you know, that that harm applies to Texas, it applies just as equally to the citizens of Louisiana. BY MS. BAYOUMI:  Q. How so?  A. Because the harm, you know, that was determined through the investigation was determined to be anticompetitive and affect negatively the citizens of this nation at whole, and therefore, it applies to Louisiana, as well, the harm.  Q. Did Louisiana do any investigation into - into the alleged harm specific to Louisiana?  A. Louisiana was not part of the multistate investigation. It was made aware of the results of that investigation and the harm that, you know, pervaded throughout the nation on behalf of its citizens. But if Louisiana did any investigation of its own -- it did not -- it was in reference to the investigation that was done by the multistate.");  *id.* at 33:3-22 ("Q. Does Louisiana have any independent factual basis for the allegations it makes in the fourth amended complaint?  A. Louisiana has the harm that was endowed upon its citizens as -- you know, that was a result of the investigation that ensued, the witnesses that were interviewed, the documents gathered. Louisiana will have forthcoming expert reports that will perhaps more specifically quantify that. But yeah, as a result of that investigation, Louisiana has evidence of harm.  Q. And when you refer to ""citizens,"" are you referring to individuals or businesses as well? A. Could be either."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 246 | **Mississippi**. Mississippi's representative testified that Mississippi "cannot identify one specific advertiser or publisher today" that has been harmed by Google's conduct. Ex. 183 at 26:22-27:7. Mississippi was also unable to identify any consumer complaints that related to Google's display advertising technology. *Id.* at 17:7-22. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex, 254, Crystal Secoy Deposition, at 26:9-27:17 ("Q. Okay. So before suit was filed then, Mississippi determined that in-state advertisers and publishers had been harmed by Google's conduct? MS. SCHULTZ: And I'm going to say that - assert a work product privilege there. If you may -- if you can answer without disclosing work product, you may.  A. It's our position that advertisers and publishers in Mississippi would have been impacted by the conduct because it's our understanding that this is a national issue and that it impacts our entire state, consumers, advertisers, publishers, businesses."). |
| 247 | **Missouri**. Missouri's representative could not identify a single in-state advertiser, publisher, or consumer who used Google's Ad Tech products or was affected by the conduct at issue in this lawsuit. Ex. 182 at 33:10-17, 35:19-36:11, 37:17-25. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 255, Michael Schwalbert Deposition at 26:20-27:14 ("Q. Now, the alleged harm to Missouri's general welfare and economy, as it states here, is based on publishers and advertisers experiencing decreased revenue, lower quality and higher prices, right? A. Yes. Q. How widespread is this impact in the state? A. It would be for all, would be for all publishers and advertisers because its conduct on a nationwide scale that affects all of them. Q. And has the state of Missouri, the Attorney General's Office, measured that impact in any way? MR. LUCY: I'm going to object as to work product. So my client can respond to that in a way that would not divulge any protected work product. A. Outside of expert, expert discovery, which is forthcoming, I would not be able to provide a, you know, a defined, defined measure of that, that specific harm either. That would be the subject of expert, the expert discovery."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 248 | **Montana**. Montana's representative admitted that Montana had no state-specific evidence to support the allegations against Google. Ex. 181 at 31:2-8 ("Q. So you're not aware of any Montana-specific evidence that would support the claims in this case? A. The evidence is the same as all of the evidence that the other plaintiffs are alleging that we designated Mr. Gordon [Texas's representative] to testify about, as it was a national scheme."). | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 256, Anna Schneider Deposition at 30:18-32:3 ("Q Okay, but sitting here today, you are not aware of any Montana-specific evidence that would support the claims in this case? MR. BARNES: Object to the form. A As it was a national scheme, it affected Montanans in the same way that it affected all other plaintiffs in this litigation. And it did affect Montana persons, and so that is a specific harm to the State of Montana. Q So you're not aware of any Montana-specific evidence that would support the claims in this case? MR. BARNES: Object to the form. A The evidence is the same as all of the evidence that the other plaintiffs are alleging that we designated Mr. Gordon to testify about, as it was a national scheme. Q So then that evidence is not Montana-specific? A It is Montana-specific in that it was a national scheme, and the nature of the national scheme affects Montana and Montanans. Q Are you aware of any facts that are unique to Montana that support the claims in the complaint? A At this time expert and fact discovery is still ongoing and we will rely on our experts' opinions. Q So at this time you are not aware of any evidence unique to Montana that support the claims in the complaint? A At this time we are relying on the national scheme, as I spoke to earlier, that the harms done on the national scheme to all plaintiffs were also done to Montana. If there are unique harms to Montana that is beyond that, I am going to await our expert and fact discovery to close."). |
| 249 | **Nevada**. Nevada's designated representative could also not articulate any state-specific harm that was suffered by its residents because of Google's actions. Ex. 190 at 201:2-11 ("Q. But sitting here now, you're not aware of any Nevada-specific facts underlying the Fourth Amended Complaint in this case. Correct? A. You know, I'm going [sic] refer to, you know, | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 257, Lucas Tucker Deposition at 51:15-53:17 ("Q. Is it fair to say for any civil penalties sought by the State of Nevada in parens patriae capacity, the State of Nevada has to at least identify some residents of the State of Nevada was harmed by any of the alleged conduct in |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | the common facts as described by Mr. Gordon for the State of Texas, and again, it is a national market and we're not aware of anything that differentiates the harm in Nevada from the harm across the nation."). The state could not identify a single advertiser or publisher who used Google's ad tech products, either. *Id.* at 83:24-84:10, 84:20-85:6 ("I can't tell you specifically a Nevada-based publisher"), *id.* at 91:9-13 ("I cannot identify a specific advertiser located in Nevada."). | this case?  A. I don't believe that we needed to identify specific people in order to assert a parens patriae claim.  Q. How would the State of Nevada know its residents in general were harmed by the conduct alleged in this case when it seeks civil penalties in parens patriae capacity?  MR. HENTHORN: Objection. Form.  A. The multistate investigation, umm, discovered harm across the nation to consumers, to advertisers, to publishers. I'm not aware of any facts that somehow distinguish Nevada consumers, advertisers, and publishers from the general impact across the nation, so I'm not aware of any facts that would have shielded or protected Nevada advertisers or publishers or consumers from the general harm across the nation. Also, Nevada has, as of the 2020 census, more than 3.1 million consumers living here. As of last week, we had more than 446,000 actively registered businesses that had licenses issued by the Secretary of State, and so we look at the national harm, and I'm not aware of any facts that the harm was different here. That would be the basis for our parens patriae claim. And I'll also note that it's a fact that various courts have issued opinions about a government's parens patriae authority. And many of those courts have -- I'm sorry. Many of those opinions have statements to the effect that the raw number of individuals impacted by the conduct is not determinative as to whether a substantial segment of the population was affected. Furthermore, I'm aware of at least three different bankruptcy courts that have found that a state or county has parens patriae authority when fewer than 70 specific individuals were identified as being harmed by the conduct. In fact, even as low as 20 individuals. And so all of those things together give us the basis to assert our parens patriae claim."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 250 | **North Dakota**. North Dakota's representative did not know how many North Dakotans use Google's Ad Tech products and therefore could have been harmed by the challenged conduct. Ex. 129 at 29:14-22 ("Q. Does North Dakota know how many users within the state of North Dakota use Google's ad tech products? A. No. Not at this time, no. I think that's subject to expert discovery. Q. North Dakota, when it filed the lawsuit, did it know how many citizens of the state of North Dakota used Google's ad tech products? A. No."). North Dakota has not received any consumer complaints regarding the Ad Tech products at issue in this lawsuit. Id. at 48:9-15. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 258, Elin Alm Deposition at 30:19-31:15 ("Q. Are you -- are you aware of any investigation that North Dakota conducted in determining how many North Dakota users use Google's ad tech products? A. Again, that's work product, whether we conducted a separate investigation into that. And our investigation is into the entire market, which would include North Dakota users. Q. So is North Dakota's claim in this case that its citizens have been harmed because there is a national market for Google's ad tech products among other ad tech products? A. Yes, Google's legal -- or unlawful conduct affected a national market. Our players in that market are affected just like anybody else in any other state. Q. Okay. What -- what is the market that you're referring to? A. Ad server, ad exchange, and ad tools, advertising tools. Q. So the market is ad tools, ad servers, and what else did you mention? A. Ad exchange. Which, again, is defined in our complaint."). |
| 251 | **Puerto Rico**. Puerto Rico's representative could not identify how many Puerto Rican advertisers or publishers have been affected by the challenged conduct. Ex. 138 at 47:14-48:6. It has received no consumer complaints concerning Google's advertising technology and display advertising. *Id.* at 22:24-23:13. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 259, Guarionex Diaz Martinez Deposition at 37:14-25 ("Q. So Puerto Rico is not relying on any facts that are unique to Puerto Rico to support the claims in the fourth amended complaint; is that correct? A. I wouldn't say it like that because there's harm, you know, and there was an effect in the nationwide market, including Puerto Rico. Q. Well, you testified that you're relying on facts that are common to all of the plaintiff states, including Texas; is that right? A. Yes. Yes."); *id.* at 39:1-17 ("Q. You testified that Puerto Rico is proceeding as parens patriae on behalf of the general welfare and the economy. A. Yeah. Q. Who do you mean when you say "The general welfare and the economy"? MR. BATES: Same objection. THE WITNESS: Just that -- that we are -- what I mean is that we're alleging harm to the |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | general economy and general welfare, yeah. BY MS. BAYOUMI: Q. Are there any specific groups that you mean when you say "general welfare and general economy"? A. Users, consumers in Puerto Rico, advertisers, publishers in Puerto Rico."); *id.* at 45:12-47:21 ("Q. The alleged harm to Puerto Rico's general welfare and economy is based on publishers and advertisers allegedly experiencing decreased revenue, lower quality, and higher prices; is that right?  MR. BATES: Objection to form.  THE WITNESS: I'm sorry, let me clarify the previous question. As long as whatever is the consumer user of the Internet and advertisers, right, the relief Puerto Rico is seeking is injunctive relief, civil penalties and attorney's fees and costs.... Q. Does Puerto Rico have a sense of how widespread this impact is in the state?  A. Nationwide. Q. But it doesn't have -- but Puerto Rico doesn't have an idea of how widespread the impact alleged in the fourth amended complaint is in Puerto Rico? MR. BATES: Objection to form.  THE WITNESS: I mean, besides knowing that the effect of those conducts were nationwide and Puerto Rico is a market within -- and that seeing how the Internet is ubiquitous, it is everywhere in Puerto Rico, we see users of the Internet and advertisers, publishers in that whole of Puerto Rico, yeah. "); *id.* at 53:4-19 ("Q. So Puerto Rico doesn't have an understanding of the types of consumers within Puerto Rico that have been harmed by the alleged conduct; is that right?  A. I mean, potentially, every user of the Internet has been harmed.  Q. And how did you come to that understanding?  A. Again, factual common basis of the investigation, Puerto Rico have designated the testimony of Texas for those purposes.  Q. And so you testified that the types of in-state consumers that might be affected by the alleged conduct could be all Internet users; is that right?  A. Yes."). |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| 252 | **South Carolina**. South Carolina's representative could not identify a single in-state advertiser, publisher, or consumer who was harmed by Google's Ad Tech products. Ex. 148 at 40:9-41:5, 45:16-22, 58:8-16. The representative was also unable to point to any studies or reports regarding instances of in-state harm. Id. at 40:25-41:5, 46:6-12, 59:7-13. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 260, Rebecca Hartner Deposition at 31:19-32:21 ("Q. Does South Carolina contend that publishers and advertisers make up a substantial segment of its population? A. So we allege that the conduct is widespread and statewide. It's our understanding that it affects a significant part of our state based on facts and data produced in this case and ongoing discovery. "); *id.* at 55:14-57:23 ("Q. Yes, sure. So with respect to in-state consumers that have been harmed, which of the following is included: Google users, all internet users, and/or all consumers of goods and services? A. So our understanding is that the harm is widespread, and all the documents and data in this case would support it, and it would be the subject of expert testimony in this case. It's premature for me to answer today.  Q. So if it's premature, you don't have a view, sitting here today, about which of those consumer types are harmed? A. Sitting here today, I know that the factual basis that we'll rely on and the support for our -- our allegations and understanding that it's widespread, and I'll refer you to forthcoming expert testimony.  Q. So setting aside forthcoming expert discovery, what I'm trying to understand, just sitting here today, do you have a view about whether all internet users are affected by the alleged conduct here? A. It's our understanding that the harm is widespread and that might be the case, that the internet users are all affected. I would just, again, refer -- we'll be relying on documents and data produced in this case to support our understanding of the harm, and it will be the subject of expert testimony. "). |
| 253 | **South Dakota**. South Dakota's representative admitted that the state could not name any advertisers or publishers who were harmed by Google's conduct, Ex. 191 at 53:11-19 ("We have not identified any specific ones in South | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 261, Jonathan Van Patten Deposition at 31:5-34:16 ("Q You agree that the alleged harm to South Dakota's general welfare and economy is |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | Dakota"), and that it had not received a single consumer complaint regarding Google's display advertising technology, *id.* at 67:5-9. | based on publishers and advertisers experiencing decreased revenue, lower quality, and higher prices, right?  A Yes. Q And can you describe: How widespread is that impact to the State of South Dakota?  A Well, Google's presence is nationwide. Well, it's worldwide, but it's -- the phenomenon is certainly in this case nationwide and present in South Dakota. So I could see that there were display advertising in various publishers that I looked at. Some had subscription requirements so I didn't go any further, like the Argus Leader. But, like, the TV stations are -- their websites are full of display advertising that is, I believe, through Google.  ... Q Okay. Does South Dakota contend that publishers and advertisers make up a substantial segment of the South Dakota population?  A Define "substantial" for me, please.  Q What does substantial mean to you?  A I would say significant.  Q So does South Dakota contend that publishers and advertisers make up a significant portion of South Dakota's population? A Yes.  Q And why is that?  A Because -- well, now I gotta -- I don't like the question here. Here's the problem: You started with -- you started with publishers and advertisers and then asked if they were part of South Dakota's population. And I don't like that because I think they're part of the injured class whether they are part of South Dakota's population. In other words, I think the state's sovereignty and parens patriae power covers actions within the state's boundaries. So I wouldn't refer to South Dakota -- yes, you could refer to a South Dakota advertiser, but the advertiser doesn't have to be in South Dakota; it has to advertise in South Dakota. Same with the publishers. So I think to the extent when you say the South Dakota population, as I understand it, the economy encompasses those who are acting in South Dakota. And I think that publishers and |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | advertisers are a significant part of that economy."). |
| 254 | **Texas**. Mr. Gordon, the designated representative of Texas, admitted that he could not name one in-state advertiser or publisher that had been harmed by Google's Ad Tech products. Ex. 145 at 34:12-16 ("Q. And can you name any in-state advertisers who have been harmed by the alleged conduct in this case? A. As I sit here today, I cannot name any specific advertisers."), *id*. at 35:1-5 ("Q. And can you name any in-state publishers who were harmed by the alleged conduct in this case? A. I know that our Interrogatory No. 5 identifies harm to publishers. But, as I sit here today, I cannot name any specific Texas publishers."). | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 262, Justin Gordon Deposition at 25:20-26:8 ("Q. Okay. And that says -- the first sentence of that bullet point says, "Google's unlawful conduct has inflicted harm to businesses and individuals in the plaintiff states, to the respective economies of the plaintiff states, and to the general welfare of the plaintiff states," right? A. Yes, that's the first sentence. Q. And how widespread is this impact in the State of Texas? A. What do you mean by "widespread"? Q. How widespread is this -- the harm that's alleged here? A. Well, it affects the entire state, so I would say statewide."); *id.* at 39:7-41:19 ("Q. Okay. So if you can walk me through your understanding, then, of the consumers in the State of Texas who are alleged to have been harmed by Google's conduct. MR. COLLIER: Objection, form. THE WITNESS: I have left the tab, and now I'm reviewing the interrogatory responses. So, for example, on Page 15 of our interrogatory response to No. 5, we have referenced that, "Google conduct has caused and continues to cause harm to small and large businesses in the plaintiff states with follow-on effects to consumers, i.e., plaintiff state citizens. The impacts to the plaintiff states by the following conduct with Google are broad and manifest." Then we describe the harm arising from unlawful tying. THE REPORTER: Unlawful? THE WITNESS: Tying, T-Y-I-N-G. The harm from dynamic allocation, the harm from enhanced dynamic allocation, the harm from dynamic revenue sharing, the harm from reserved price optimization, the harm from Bernanke and its multiple forms, the harm from header bidding submission, the harm from uniform pricing rules. There we conclude that, "Each form of anticompetitive and deceptive conduct |

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| | | discussed above caused harm to businesses in each plaintiff state, small, medium, and large, that rely on display advertising. Google's conduct has resulted in higher prices and lower quality products for participants in the ad tech markets and foreclose competition that would bring about non-Google product alternatives. "In turn, the plaintiff states' economies in general have not realized the benefits of competition and instead suffered from stifled innovation and investment in display advertising space." And this is where we get to the portion about consumers. "Furthermore, and as discussed above, Google's unlawful conduct also extracts harm from consumers, i.e., citizens, in the plaintiff states and negatively affected the general welfare. The use of the Internet in the United States and in the plaintiff states is pervasive and almost universally adopted. That means that anyone who uses the Internet, i.e., consumers in the plaintiff states, interacts with display advertising. "Consumers benefit from competent decision in the form of choice and innovation. The cost savings realized by advertisers and publishers could be passed on to consumers, such as lowering subscription fees and removing pay walls. "At the same time, small and large businesses would need to spend less on advertising to generate business. Those savings would benefit consumers because businesses could, in turn, lower the price of their goods and services. Increased commerce drives economic growth in the plaintiff states and improves the general welfare. Google's anticompetitive and deceptive conduct inhibits that progress, growth, and welfare promotion."). |

| 255 | **Utah**. Utah has done no state-specific investigation to determine the harm to Utah residents and relies solely on the multistate investigation. Ex. 167 at 45:2-10, 45:20-46:1 ("The State of Utah has no reason to believe that it is in any way different from harms that are nationwide that result from Google's monopolization in these markets."). Utah has not received consumer complaints from publishers regarding Google's Ad Tech products, and the only advertiser it named as having been harmed is a Utah state agency. *Id.* at 63:11-17, 66:5-17. | Disputed as to the existence of in-state and state-specific conduct or harm. *See* Ex. 263, Marie Martin Deposition at 45:11-50:25 ("Q. So any investigation conducted by the State of Utah into the harms that the State has experienced was -- was done as part of the multistate investigation to Google that occurred before this suit was filed?  A. The State of Utah has been part of the multistate investigation, and thus -- and that is the basis for any investigation that was conducted by Utah.  Q. Did that investigation include an investigation into the harms experienced by the State of Utah specifically?  A. The State of Utah has no reason to believe that it is in any way different from harms that are nationwide that result from Google's monopolization in these markets. ... Q. And my question to you is: What has the State of Utah done to confirm that belief?  A. The State of Utah confirms this belief through being part of the multistate investigation and litigation in this matter.  Q. ... So I wanted to just ask as whether part of the investigation the State of Utah did anything to confirm that -- what and to what extent it was harmed by Google's alleged conduct?  A. To confirm that we are any different from other states, I think -- or from nationwide conduct would be trying to prove a negative. What have we done? We've been part of the multistate investigation. We have citizens who we know were harmed by this conduct, and we have no reason to believe that we're any different from other -- that Utah consumers, advertisers and publishers are any different from other states or from nationwide conduct in this matter.  Q. Can you identify the citizens you just referred to who you know were harmed by this conduct? A. I can identify at least some who were consumers of Google advertising or Google -- I'm sorry, of Google's, who were harmed by the conduct. Now, firstly, all consumers in the state of Utah, all 3.3 million, or at least that part of those who are Internet users, which is greater than 90 percent, would be harmed by |

Google's conduct because that's harm which accrues to the general welfare and economy of the state. Next, as -- as to specific consumers of Google's products, the two consumers who you saw in the deposition previously, Melanie Hall's deposition, were indirect purchasers of Google -- Google's products. Another consumer of Google's products, like if you want to name certain persons, is DCP itself. As you know from looking at -- from watching -- I'm sorry, from deposing Ms. Hall extensively about DCP's purchases, they are also a consumer of Google's products, they are an advertiser. Other advertisers in the state of Utah that I can name are Penna Powers. You want me to talk about publishers?  Q. I was actually focusing on individual citizens, so real persons.  A. The two consumers that were discussed during Melanie Hall's deposition are two specific persons. Additionally, all persons in the state of Utah who have any exposure to the Internet have a harm that's associated with Google's conduct.  Q. What have you done to determine that all users of the Internet in the state of Utah have been -- have had exposure to harm associated with Google's conduct?  A. In order -- so all -- I may have misspoke. All consumers in the state of Utah are harmed by Google's conduct because they are part of the class of persons who are part of the -- they're affected by Google's harms to the general welfare and economy of the state. What have I done? I found information from the US Census Bureau which told us how many Utah consumers there are. They're a percentage that are exposed to the Internet as well as Utah being a part of the multistate investigation and litigation in this matter. ... Q. How widespread is the harm to the State of Utah?  A. It is ubiquitous throughout the state.  Q. And to measure that harm, what have you done?  A. I have determined the number of consumers in the state and the number of businesses in the state, as well as Utah being a part of the multistate investigation and litigation.").

| ¶ | Google's Statement | Plaintiff States' Response[1] |
|---|---|---|
| **256** | Plaintiffs' experts have not attempted to quantify the harm, if any, that resulted from Google's allegedly deceptive conduct. See, e.g., Ex. 18 at 92:4-18, 101:15-102:6; Ex. 1, ¶¶ 116, 118; Ex. 14 at 189:11-16, 189:25-190:8. | Disputed. *See* Davis Ex. 10 (Andrien Rebuttal Exhibit 4, "Monthly Count of Open Auctions Related to Plaintiff States for Bernanke, December 2013 to May 2024") (counting approximately ███████ auctions that Google conducted in the States while Bernanke (the longest-running misconduct) was in effect.). |
| **257** | More than ███ advertisers, more than ███ publishers, and more than ██ Authorized Buyers each participated, respectively, in more than ████████ worth of AdX transactions between 2013 and 2023. See Ex. 197 (Advertisers Revenue Summary), Ex. 199 (Publishers Revenue Summary), Ex. 198 (Authorized Buyers Revenue Summary). | Undisputed, except noting the imprecision of the statement which should refer to ████████ and represents approximate counts. |

Dated: December 9, 2024                    Respectfully submitted,


*/s/ W. Mark Lanier*
W. Mark Lanier
Mark.Lanier@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.DeRose@LanierLawFirm.com
Jonathan P. Wilkerson
Jonathan.Wilkerson@LanierLawFirm.com
10940 W. Sam Houston Pkwy N
Suite 100
Houston, TX 77064
(713) 659-5200
**THE LANIER LAW FIRM, PLLC**

*/s/ Kiran N. Bhat*
Ashley Keller
ack@kellerpostman.com
Kiran N. Bhat
kiran.bhat@kellerpostman.com
2333 Ponce De Leon Boulevard
Suite R-240
Coral Gables, Florida 33134
(833) 633-0118

Zina Bash (Bar No. 24067505)
zina.bash@kellerpostman.com
111 Congress Avenue, Suite 500
Austin, TX 78701
(512) 690-0990

*/s/ Noah S. Heinz*
Noah S. Heinz
noah.heinz@kellerpostman.com
1101 Connecticut Ave., N.W., Suite 1100
Washington, DC 20036
(202) 918-1123
**KELLER POSTMAN LLC**

*Attorneys for Texas, Idaho, Louisiana (The
Lanier Law Firm only), Indiana, North Dakota,
Mississippi, South Carolina, and South Dakota*

*Submitted on behalf of all Plaintiff States*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com

98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General

*/s/ James R. Lloyd*
Brent Webster, First Assistant Attorney General of Texas
Brent.Webster@oag.texas.gov
James R. Lloyd, Deputy Attorney General for Civil Litigation
James.Lloyd@oag.texas.gov

**STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

## CERTIFICATE OF SERVICE

I certify that on December 9, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ Kiran N. Bhat*
Kiran N. Bhat

## CERTIFICATE OF MOTION TO SEAL

I certify that contemporaneously with the filing of this statement, Plaintiff States filed a motion to seal both this document and the attached exhibits.

*/s/ Kiran N. Bhat*
Kiran N. Bhat