# EXHIBIT 12
## REDACTED

**In the Matter Of:**

*In Re - Google Digital Advertising*

███████████

*November 03, 2023*

1

```
 1           UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4   IN RE GOOGLE DIGITAL        ) Civil Action No.

 5   ADVERTISING ANTITRUST       ) 1:21-md-03010-PKC

 6   LITIGATION                  )

 7                               )

 8

 9

10

11           ** HIGHLY CONFIDENTIAL **

12   _____

13

14   VIDEO RECORDED EXAMINATION OF

15        ██████████████

16   _____

17              TAKEN ON

18      FRIDAY, NOVEMBER 3, 2023

19

20

21

22
   CERTIFIED STENOGRAPHER:
23   JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
     CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24   CCR-WA (No. 21007264), CSR-CA (No. 14420),
     REALTIME SYSTEMS ADMINISTRATOR
25   JOB NO.:  915335
```

2

1

2

3          VIDEO RECORDED EXAMINATION of

4    ██████████, taken before JESSICA R. WAACK,

5    Registered Professional Reporter, Registered

6    Merit Reporter, Certified Realtime Reporter,

7    Registered Diplomate Reporter, California

8    Certified Realtime Reporter, New Jersey

9    Certified Court Reporter (License No.

10   30XI008238700); Texas Certified Shorthand

11   Reporter (License No. 11958); Washington

12   State Certified Court Reporter (License No.

13   21007264); California Certified Shorthand

14   Reporter (License No. 14420); New York

15   Association Certified Reporter, New York

16   Realtime Court Reporter and Notary Public of

17   Washington, D.C. and the States of New York,

18   Pennsylvania, Delaware, Maryland and

19   Virginia, at MoloLamken, 430 Park Avenue, New

20   York, New York, on Friday, November 3, 2023,

21   commencing at 9:05 a.m. and concluding at

22   5:35 p.m.

23

24

25

3

```
 1        A P P E A R A N C E S

 2

 3   ON BEHALF OF THE WITNESS AND GOOGLE:

 4      FRESHFIELDS BRUCKHAUS DERINGER LLP

 5      BY:  JAN RYBNICEK, ESQ.

 6      BY:  LIJUN ZHANG, ESQ.

 7      BY:  TINNY SONG, ESQ. (Remote)

 8      700 13th Street, NW, 10th floor

 9      Washington, DC  20005-3960

10       PHONE:  202-777-4500

11       EMAIL:  Jan.rybnicek@freshfields.com

12

13   ON BEHALF OF THE MDL PLAINTIFFSíDISCOVERY

14   STEERING COMMITTEE:

15      KELLOGG, HANSEN, TODD, FIGEL &

16      FREDERICK, P.L.L.C.

17      BY:  CHRISTOPHER C. GOODNOW, ESQ.

18      BY:  DANIEL BIRD, ESQ.

19      Sumner Square

20      Washington, DC  20036

21      PHONE:  202-326-7907

22      EMAIL:  Cgoodnow@kellogghansen.com

23

24

25
```

4

1          A P P E A R A N C E S

2

3    ON BEHALF OF THE PUBLISHERS CLASS:

4       KOREIN TILLERY

5       BY:  CAROL O'KEEFE, ESQ.

6       BY:  GEORGE ZELCS, ESQ. (Remote)

7       505 North 7th Street, Suite 3600

8       St. Louis, Missouri  63101

9       PHONE:  314 241 4844

10       EMAIL:  Cokeefe@koreintillery.com

11

12   REMOTELY ON BEHALF OF THE PUBLISHERS

13   CLASS:

14       BOIES, SCHILLER & FLEXNER LLP

15       BY:  MARK MAO, ESQ.

16       44 Montgomery Street, 41st Floor

17       San Francisco, California  94104

18       PHONE:  415-293-6800

19       EMAIL:  Mmao@bsfllp.com

20

21

22

23

24

25

5

1          A P P E A R A N C E S

2

3    ON BEHALF OF SUREFREIGHT GLOBAL LLC, AND

4    HANSON LAW FIRM, PC.:

5        TAUS, CEBULASH & LANDAU, LLP

6        BY:  EVAN ROSIN, ESQ.

7        123 William Street, Suite 1900A

8        New York, New York  10038

9        PHONE:  212-931-0704

10        EMAIL:  Erosin@tcllaw.com

11

12    REMOTELY ON BEHALF OF INFORM AND NEWSPAPER

13    PUBLISHERS:

14        HERMAN JONES LLP

15        BY:  SERINA VASH, ESQ.

16        3424 Peachtree Road NE, Suite 1650

17        Atlanta, Georgia  30326

18        PHONE:  862-250-3930

19        EMAIL:  Svash@hermanjones.com

20

21        A L S O   P R E S E N T

22        ████████        Google

23    DMITRY ZVONKOV, videographer

24

25            --o0o--

6

1        INDEX TO EXAMINATION

2        WITNESS: ████████████

3

4          EXAMINATION              PAGE

5    BY MR. GOODNOW                  12

6    EXAMINATION

7    BY MR. ROSIN                   304

8    BY MS. VASH                    349

9

10           INDEXED PAGES

11                      PAGE

12   ████████████ sworn            12

13   REPORTER CERTIFICATE           369

14   INSTRUCTIONS TO WITNESS        370

15   DECLARATION UNDER PENALTY OF PERJURY   371

16   ERRATA SHEET                   372

17

18          INFORMATION REQUESTED

19           None

20

21     WITNESS INSTRUCTED NOT TO ANSWER

22          Page    Line

23           80      18

24           81      11

25

In Re - Google Digital Advertising

Highly Confidential                                                    November 03, 2023

11

1          ******

2          PROCEEDINGS

3       November 3, 2023, 9:05 a.m.

4          New York, New York

5          ******

6       THE VIDEOGRAPHER:  We are on the

7    record.

8          Today's date is November 3, 2023.

9          The time on the video is

10   9:06 a.m.

11         This is Video 1 in the deposition

12   of ███████ in the -- in re:

13   Google Digital Advertising Antitrust

14   Litigation in the U.S. District Court,

15   Southern District of New York, Case

16   Number 1:21-MD-03010-PKC.

17         This deposition is taking place

18   at 430 Park Avenue, New York, New York.

19         The videographer is Dmitry

20   Zvonkov.  The court reporter is Jessie

21   Waack, both with Lexitas.

22         All appearances will be noted on

23   the stenographic record.

24         Would the reporter please swear

25   in the witness.

In Re - Google Digital Advertising
Highly Confidential                                November 03, 2023

12

1              *****

2         ██████████████ sworn

3    on oath and/or affirmed, called as a

4    witness herein, was examined and testified

5              as follows:

6              *****

7              EXAMINATION

8    BY MR. GOODNOW:

9       Q.   Good morning, ████████████

10      A.   Good morning.

11      Q.   My name is Chris Goodnow.  I'm

12   counsel for ████████████████ who are

13   two plaintiffs in the multidistrict

14   litigation that was just announced.

15           Could you please state and spell

16   your name for the record?

17      A.   My name is ██████████.  The

18   first name is ██████.  I have a middle

19   name that I don't use very often, it's

20   ██████████.  My last name is

21   ██████████.

22      Q.   Thank you.  You recall you were

23   previously deposed by the Department of

24   Justice in October of 2021?

25      A.   I recall being previously deposed

315

1    closer to bid CPM; is that correct?

2        A.    I don't know what this document

3    is or...

4        Q.    Do you see the final bullet under

5    auction dynamic changes?

6        A.    Yes.

7        Q.    And do you see that it says,

8    "███ and ███ may be able to give us a

9    list of buyers they think have been most

10   exposed to RPO and DRS"?

11       A.    I see that.

12       Q.    Can you think of how you might

13   give a list of buyers that were most

14   exposed to RPO or DRS, how that would be

15   something that you could have done or

16   accomplished?

17       A.    I don't know -- I don't know who

18   the author of this document is.

19       Q.    That's -- that's fair.

20       A.    I don't know what they mean by

21   "most exposed to RPO and DRS" in the sense

22   that those were features we launched, they

23   affected the buyers.  It's not that --

24   yeah, I'm not sure quite what this person

25   intended.

316

1      Q.   That's fine.  I'm actually just

2   interested mainly in whether -- okay.

3        Let's ask you this:  Do you -- as

4   we sit here today, do you feel that RPO and

5   DRS caused paid CPM to get closer to bid

6   CPM?

7      A.   I wouldn't describe it like that.

8      Q.   How would you describe it?

9      A.   I think you could say that RPO

10  generally increased at the time, reserve

11  prices as appropriate to increase publisher

12  revenue.

13        And DRS -- and so RPO, in some

14  instance, could increase CPMs.  But DRS

15  allowed transactions to occur that would

16  not have otherwise occurred.  And so it's

17  not so much, like, prices going up, more

18  like prices going down.

19      Q.   With respect to RPO or with

20  respect to DRS?

21      A.   I think DRS is more like lowering

22  a price.

23      Q.   And RPO?

24      A.   RPO, one could say, is intended

25  to increase the price that buyers paid and

317

1    thereby increasing publisher revenue.

2         Q.   How did RPO increase prices that

3    buyers paid?

4         A.   Because the clearing price of an

5    auction could be determined by the reserve

6    price.  In cases where auctions would

7    otherwise clear at very low prices --

8    excuse me, setting a higher reserve price

9    might increase the clearing price of such

10   an auction, and then thereby increase the

11   publishers' revenue.

12        Q.   Okay.  And with reserve price

13   optimization, was that Google increasing

14   the reserve price?

15        MR. RYBNICEK:  Objection to form.

16        THE WITNESS:  Meaning it was --

17   BY MR. ROSIN:

18        Q.   Who increased the reserve price,

19   is what I'm asking, in RPO?

20        A.   There was an algorithm that

21   determined -- the algorithm was developed

22   by Google --

23        Q.   Okay.

24        A.   -- employees, and the algorithm

25   predicted reserve prices.

318

1      Q.   Okay.  Thank you.  Let's look at

2    another exhibit.

3         MR. ROSIN:  How am I doing on

4      time?  I want to make sure Serina has

5      some time.

6         Okay.  We'll mark this

7      Exhibit 22, I believe.

8         (Whereupon, Exhibit 22 is marked

9         for identification.)

10   BY MR. ROSIN:

11     Q.   This is GOOG-ADTCH-00028891 and

12   ending GOOG-ADTCH-00028902.

13        Now, this appears to be an email

14   chain; is that correct?

15     A.   It does appear to have an email

16   chain.

17     Q.   And do you see on the first page

18   here, you appear to be CC'd in that email?

19     A.   Yes.

20     Q.   Okay.  I'm going to give you some

21   time to review this, because this is kind

22   of a complicated one.  So maybe just take a

23   moment to look it over.

24     A.   Okay.  Thank you.

25        (Pause for reading/reviewing.)

322

1    BY MR. ROSIN:

2        Q.   No, I understand that.  If you

3    were hypothetically --

4        A.   Sure --

5        Q.   -- and --

6        A.   -- but having never worked as a

7    buyer or building tools for buyers, my

8    modeling of buyers is somewhat imperfect,

9    my mental model of a buyer.

10            But I will also note that it

11    looks like in this thread that this

12    advertiser, ████████████████

13    ████████████████████████████

14    ██████████████████████████

15        Q.   Okay.

16            MR. ROSIN:  I'd like to -- I'd

17        like to strike that as nonresponsive.

18            MR. RYBNICEK:  Objection.

19    BY MR. ROSIN:

20        Q.   I'll just try the question one

21    more time.

22            If you were a buyer and Google

23    told you that it was going to use your true

24    value bid, your first price true value bid

25    to generate a new reserve price that was

323

1    going to be closer to that true value bid

2    than publishers' reserve price, would you

3    continue submitting your true value bids

4    into the auction?

5            MR. RYBNICEK:  Objection to form.

6            THE WITNESS:  It would depend

7        on -- with the same caveat about not

8        having been a buyer, not having

9        products for buyers, et cetera.

10            It would depend on how Google was

11        using that information, what their

12        pricing mechanism was, if it's instead

13        of publishers, it depends on what the

14        publisher pricing mechanism is and so

15        forth, right.

16   BY MR. ROSIN:

17        Q.   Did RPO raise prices of ad

18   impressions?

19        A.   Yes.

20        Q.   Did RPO raise prices of ad

21   impressions by setting a new reserve price

22   that was closer to the top bid true value

23   bid than the publishers's reserve price?

24        A.   Not necessarily.  Sometimes the

25   publishers were setting higher reserve

324

1    prices than what RPO would calculate.

2        Q.   RPO lowered reserve prices?

3        A.   No.  What I mean is that

4    sometimes the publishers' prices were very

5    high and RPO had no effect.

6            And also it is possible that some

7    publishers -- you know, the -- in the

8    counterfactual without RPO, some publishers

9    would have set some reserve prices

10   themselves rather than via RPO, which would

11   have had a different and potentially even

12   higher impact on -- on reserve prices,

13   which is why I say it depends on the

14   counterfactual.

15           Like what is the -- how exactly

16   is Google using it, what is their pricing

17   mechanism, what is the alternate publisher

18   pricing floor mechanism and algorithm.

19       Q.   Okay.  Sorry to do this, but

20   let's go back to Exhibit 1 again.  Let's go

21   to page 243 this time.  That's Bates number

22   ending in 166.  Let's look at lines 9

23   through 23.

24       A.   Uh-huh.

25       Q.   I'm going to read this.  So the

1    question is, well, a question starting

2    line 6 is:

3              "QUESTION:  How would

4    transitioning to first price level the

5    playing field for all exchanges by removing

6    pricing shenanigans?"

7              This is in reference to something

8    that ███████████ said, and your answer at

9    line 9 is:

10             "ANSWER:  I think one common form

11   of what ████████ describes as pricing

12   shenanigans was exchanges representing

13   themselves as second price exchanges when,

14   in fact, they were operating as first price

15   or effectively first price.  That's an

16   example of misleading auction dynamics that

17   I mentioned before.  That could lead

18   advertisers to overpay."

19             Do you still stand by that

20   statement?

21             MR. RYBNICEK:  If you need to

22        read additional context to understand

23        the context of that answer, you should.

24             THE WITNESS:  I think that I

25        still believe that an exchange that

1    represented sort of a second price

2    when, in fact, it was operating as

3    first price or effectively first price

4    is indeed misleading.

5    BY MR. ROSIN:

6        Q.   Thank you.

7            Do you think that could leave --

8        A.   However.

9        Q.   Sorry.  Go ahead.

10       A.   However, I was going to say, I do

11   not believe that's what AdX was doing.

12       Q.   I'm sorry.  I didn't catch that.

13       A.   I should also note that I don't

14   believe that's what AdX is doing even in

15   this example.

16       Q.   You don't believe that with

17   reserve price optimization or at least more

18   specifically in this example of this past

19   exhibit we were looking at, that they --

20   that the buyer ▇▇▇▇ was mistakenly

21   believing they were bidding into a second

22   price option when, in fact, they were

23   bidding into something that was much closer

24   to a first-price auction?

25       A.   I don't believe that it was

Highly Confidential
November 03, 2023

327

1    operating as first price or effectively

2    first price.

3        Q.   Do you believe that it was

4    operating as closer to first price than

5    second price in that instance?

6        A.   I do not -- closer to first price

7    than second price.

8            Overall in the specific case of

9    ████, I would probably need to analyze

10   their data more.  It's hard from a graph

11   like this to conclude anything because the

12   dots all go together.

13           Overall is it closer to first

14   price than second price?  I don't think one

15   can conclude that from -- this graph that's

16   here.

17       Q.   Let's not -- let's not limit

18   ourselves to the graph.  Let's go back to

19   the last exhibit we were looking at,

20   this -- ending -- the 00028891 exhibit.

21       A.   Yeah.

22       Q.   I think that was 21.

23       A.   Exhibit 22.

24       Q.   Thank you, 22.

25           At 891, really the first -- first

In Re - Google Digital Advertising
Highly Confidential                                              November 03, 2023

369

1          REPORTER CERTIFICATE

2     I, the undersigned, do hereby certify:

3      That ████████████ was by me duly sworn

4    in the within-entitled cause; that said

5    deposition was taken at the time and place

6    herein named; and that the deposition is a

7    true record of the witness's testimony as

8    reported by me, a disinterested person, and

9    thereafter was transcribed.

10     I further certify that I am not

11   interested in the outcome of the said

12   action, nor connected with, nor related to

13   any of the parties in said action, nor to

14   their respective counsel.

15     IN WITNESS WHEREOF, I have hereunto set

16   my hand this 6th day of November, 2023.

17   Signature: __Requested__Waived__Not Requested

18

19

20     _____

21          JESSICA R. WAACK
         Registered Diplomate Reporter
22        Certified Realtime Reporter
       California Certified Realtime Reporter
23        New York Realtime Court Reporter
         New York Association Court Reporter
24        Notary Public, State of New York
       CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
25     CCR-WA (No. 21007264), CSR-CA (No. 14420)