# EXHIBIT 41

## REDACTED

HIGHLY CONFIDENTIAL

Page 1

1

2                UNITED STATES DISTRICT COURT

3                EASTERN DISTRICT OF TEXAS

4                     SHERMAN DIVISION

5                          -   -   -

6     THE STATE OF TEXAS, et al.,

7                     Plaintiffs,

8     v.                          Civil Action No.

9     GOOGLE LLC,                 4:20-cv-00957-SDJ

10                     Defendant.

11                         -   -   -

12                    April 19, 2024

13           -  HIGHLY CONFIDENTIAL -

14              Remote videotaped deposition

15    of ███████████, conducted from the

16    location of the witness at Freshfields

17    Bruckhaus Deringer LLP, 170 Greenwich

18    Street, New York, New York, commencing at

19    9:00 a.m. EDT, on the above date, before

20    Marie Foley, a Registered Merit Reporter,

21    Certified Realtime Reporter and Notary

22    Public.

23

24

25     Job No. MDLG6663184

HIGHLY CONFIDENTIAL

Page 2

1

2    ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

3

4    NORTON ROSE FULBRIGHT US LLP

5    BY: JOHN McBRIDE, ESQUIRE

6         PETER HILLEGAS, ESQUIRE

7         NORTON ROSE FULBRIGHT US LLP

8         1045 W. Fulton Market

9         Suite 1200

10        Chicago, Illinois   60607

11        PHONE: 312.964.7800

12        EMAIL:

13        john.mcbride@nortonrosefulbright.com

14

15

16   THE LANIER LAW FIRM

17   BY: ZEKE DeROSE, III, ESQUIRE

18        10940 W. Sam Houston Parkway N

19        Suite 100

20        Houston, Texas   77064

21        PHONE: 713.659.5200

22        EMAIL: zeke.derose@lanierlawfirm.com

23        Representing the Plaintiff States of

24        Texas, Idaho, South Dakota and

25        North Dakota

HIGHLY CONFIDENTIAL

Page 3

1

2    A P P E A R A N C E S: (Cont.)

3

4    FRESHFIELDS BRUCKHAUS DERINGER LLP

5    BY: ERIC MAHR, ESQUIRE

6        LIJUN ZHANG, ESQUIRE

7        700 13th Street, NW

8        10th Floor

9        Washington, DC  20005-3960

10        PHONE: 202.777.4400

11        EMAIL: eric.mahr@freshfields.com

12        Representing the Defendant

13

14    ALSO PRESENT VIA ZOOM:

15        ████████████, Google

16        Jonathan D. Jaffe, Norton Rose Fulbright

17        Erik Janitens, Norton Rose Fulbright

18        Cuong Pham, Texas AG Office

19        Ross Svenson, Freshfields

20

21    EXHIBIT TECHNICIAN:

22        Jim Lopez

23

24    VIDEOGRAPHER:

25        Danny Ortega

HIGHLY CONFIDENTIAL

Page 4

- - -

TRANSCRIPT INDEX

                                                    PAGE

APPEARANCES........................ 2 - 4

INDEX OF EXHIBITS.................. 5 - 7

EXAMINATION OF ███████████:

BY:  MR. McBRIDE.................. 10

AFTERNOON SESSION................. 210

EVENING SESSION................... 311

SIGNATURE PAGE.................... 349

ERRATA............................ 350

REPORTER'S CERTIFICATE............ 351

EXHIBITS WITH ORIGINAL TRANSCRIPT


                    - - -

Page 9

```
 1
 2                          -   -   -
 3                  9:13 a.m. EDT
 4                          -   -   -
 5          THE VIDEOGRAPHER:  We are now on
 6     record.  My name is Danny Ortega, and
 7     I am the legal videographer for Golkow
 8     Litigation Services.
 9          Today's date is April 19, 2024,
10     and the time is 9:13 a.m.
11          This video deposition is being
12     held in the matter of the State of
13     Texas versus Google, LLC.
14          Our deponent today is ███████
15     ████████.
16          Counsel, please identify
17     yourselves for the record.
18          MR. McBRIDE:  John McBride on
19     behalf of the State of Texas.  With me
20     also on the call is Peter Hillegas,
21     also on behalf of State of Texas, from
22     Norton Rose Fulbright.
23          MR. MAHR:  Eric Mahr on behalf
24     of Google and the witness.  And with
25     me is my colleague Lijun Zhang.
```

HIGHLY CONFIDENTIAL

Page 10

```
1
2            THE VIDEOGRAPHER:  The court
3      reporter today is Marie Foley and will
4      now swear in the witness.
5            THE STENOGRAPHER:  If I could
6      ask you to raise your right hand,
7      please, sir.
8            Do you swear or affirm the
9      testimony you give will be the truth,
10     the whole truth, and nothing but the
11     truth today?
12           THE WITNESS:  I do.
13           THE STENOGRAPHER:  Thank you.
14                    -   -   -
15  ████████████, the Witness herein,
16     having been first duly sworn by a
17     Notary Public in and of the State of
18     New York, was examined and testified
19     as follows:
20  EXAMINATION BY
21  MR. McBRIDE:
22     Q.    Good morning, ████████████.
23     A.    Good morning.
24     Q.    You've been deposed before,
25  correct?
```

HIGHLY CONFIDENTIAL

Page 33

```
 1
 2      understand that perhaps this ad is behind
 3      schedule, at risk of not meeting the
 4      commitment to serve a million ads in the
 5      month of April, and then there would be
 6      actions that they could take to make it
 7      more likely that that ad could serve.
 8              Or for another example, they
 9      could see hey, for this type of inventory,
10      this is how much money you typically make
11      in the auction.  This is how much money
12      you actually made over the last one week
13      or two weeks.
14         Q.    Does a publisher have access to
15      all the same data that Google has access
16      to regarding any particular auction?
17         A.    Not necessarily.
18         Q.    Can you give me some examples of
19      information that Google would have that a
20      publisher would not?
21         A.    Mostly these are related to user
22      privacy where by and large we do provide
23      the information.  What we might do is
24      remove identifying information for a
25      specific user.
```

HIGHLY CONFIDENTIAL

Page 34

1

2          So what does that mean?  Let's

3    say the user visits a particular, you

4    know, or, like, interacts with a

5    particular publisher's app, right.

6    There's a particular ad slot on that app.

7    We run an auction.  We sell -- return an

8    ad to that -- to that user's device, and

9    then we do this for every user who comes

10   to the app.  The publisher might see for

11   this particular ad slot on this particular

12   app over this particular hour, say, over

13   this particular day, whatever it is, I ran

14   these many auctions; these were the

15   outcomes of the auctions; these were the

16   bids that they received for each of the

17   auctions.  But they might not know which

18   particular set of bids corresponded to

19   which particular user.

20        Q.    I think we're going to get into

21   this in -- in a moment, but is it the case

22   that the publisher sees every bid that was

23   submitted for a particular auction?

24        A.    This has varied over time.  What

25   you describe is currently the case.

HIGHLY CONFIDENTIAL

Page 35

1

2      Q.    When was it not the case?

3      A.    Prior to 2019.  And here I'm

4  speaking in my personal capacity.  But --

5  but I have a reasonably accurate knowledge

6  of this.

7            Prior to 2019, before we

8  migrated to the unified first-price

9  auction, there was a ██████████████

10 ██████████████████████████████████

11 ████████████████████  and so some

12 buyers opted out of having their bids

13 included in the data that would go to

14 publishers.  We made ████████████████

15 ███████████████  as part of a migration

16 to the unified first-price auction, and

17 then in the process of that, we removed

18 that offer.

19      Q.    What was the process for buyers

20 to opt out of inclusion in that file?

21      A.    I am sorry, I'm not aware of the

22 exact details for how they could opt out.

23      Q.    Do you know if many buyers chose

24 to opt out?

25            MR. MAHR:  I'll object on scope.

HIGHLY CONFIDENTIAL

Page 36

```
 1
 2            But you can answer if you're
 3       able in your personal capacity.
 4       A.    I know at least a couple of
 5    buyers did, but I do not know how many.
 6       Q.    Who -- why did Google make a
 7    change to the, I'm sorry, was it the ███
 8    ██████, is that what you called it?
 9       A.    ████████████████████████████████
10       Q.    ████████████████████████████████
11            Why did Google make a change to
12    that █████████████████ for unified
13    first-price auctions?
14       A.    Yeah, first of all, I should
15    clarify that ████████████████████████████
16    ██████████████████████████████████████████
17    ██████████████████████████████████████████
18    ██████████████████████████████████████████
19    ██████████████████████████████████████████
20    ███████████████████████████████████████ at
21    the time of the migration to unified
22    first-price auction.
23            We made several changes to the
24    auction, right, and to, sort of like, how
25    Google Ad Manager worked as a result of
```

HIGHLY CONFIDENTIAL

Page 37

1
2  that migration, including a change from a
3  second-price auction to a first-price
4  auction.
5          As part of those changes, we
6  wanted to provide publishers more
7  visibility into the full set of bids that
8  they got, but we also had to balance that
9  against some other constraints such as
10 privacy and legal constraints.
11 Q.    What -- well, let's start what
12 legal constraints?
13          MR. MAHR:  I'll just caution the
14          witness not to reveal in his answer
15          any communications with counsel about
16          legal advice.
17          THE WITNESS:  Thank you, Eric.
18 A.    I was just going to say that as
19 I understood those constraints, like,
20 those were all in conversation with our
21 product counsel.
22 Q.    Well, I guess can you -- I'm not
23 interested in the conversation you had
24 with your counsel.  I'm interested in the
25 changes that were made.

HIGHLY CONFIDENTIAL

Page 38

```
 1
 2        A.    So, the changes that were made
 3   involved ████████████████████████████████████
 4   ███████████████████████████████████████████████
 5   ███████████████████████████████████████████████
 6   ███████████████████████████████████████████████
 7   ███████████████████████████████████████████████
 8   ███████████████████████████████████████████████
 9   ███████████████████████████████████████████████
10   ███████████████████████████████████████████████
11        Q.    How did publishers react to
12   changes to that ██████████████████████████████?
13        A.    I think a few publishers
14   expressed some concerns, but I think the
15   vast majority of publishers did not.
16        MR. McBRIDE:  If we could pull
17   up GOOG-DOJ-29427368.
18        (The above mentioned exhibit was
19   published.)
20        MR. McBRIDE:  And if we could
21   skip to the first -- past the metadata
22   sheet.
23        (Exhibit 152, email chain ending
24   9/11/2019, Bates GOOG-AT-MDL-29427358-
25   374, was marked for identification, as
```

HIGHLY CONFIDENTIAL

Page 39

```
 1
 2        of this date.)
 3   BY MR. McBRIDE:
 4        Q.      So, ██████████, this is an email
 5   from you sent September 11th, 2019, and
 6   you're sending it to ██████████ and the
 7   subject is:  Re: Privacy Chat.
 8              Do you see that?
 9        A.     I do.
10        Q.     Who's ██████████?
11        A.     I believe he was in our sales
12   team, but I'm not actually sure what his
13   role was.
14        Q.     So, due to the nature of --
15   of -- this is an email thread, so I think
16   it may be -- it may be easiest for us to
17   start at the bottom and work our way up.
18   So if we could do that and jump to --
19   apologies.  Let me get this document -- so
20   if we jump down to the page that ends in
21   370, and there is in the lower half of the
22   page where it says:  On Wednesday
23   September 11th, 2019 at 11:23 a.m. ██████
24   ██████████ wrote.
25              Do you see that?
```

HIGHLY CONFIDENTIAL

Page 45

```
 1
 2    misleading and not necessarily a very
 3    careful choice by ████████████ while
 4    writing this email.
 5            But as I understand the concern
 6    around user privacy was essentially
 7    revealing which particular users were
 8    associated with which bids from which
 9    advertisers because that could convey some
10    information about the user which -- which
11    might be sensitive in some fashion.
12        Q.    Also in the parenthetical we
13    see -- well, maybe I'll just read -- read
14    the full sentence again:  We had a call
15    with ██████ yesterday, where they
16    ████████████████████████████████████
17    ███████ - and then in parentheses -
18    ████████████████████████████████████
19    ████████████████████████████████████
20            I want to unpack that a little
21    bit.
22    ████████████████████████████████████
23    ███████████████████ that we were discussing
24    a little bit earlier?
25        A.    It is.
```

HIGHLY CONFIDENTIAL

Page 46



1
2   Q.    And this reference to ▇▇▇▇▇▇
3   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
4   ▇▇▇▇▇▇▇▇▇▇▇ what is that referring
5   to?
6   A.    This refers to ▇▇▇▇▇▇▇▇▇
7
8
9
10
11
12
13
14
15
16
17
18
19
20   A.
21
22
23
24
25   Q.

HIGHLY CONFIDENTIAL

Page 47

18   with the move to the unified first-price

19   auction.

20        Q.    You see then the last full

21   sentence: ▮▮▮▮▮▮ also made claims about us

22   being anti-competitive with this change.

23            Do you see that?

24        A.    I do.

25        Q.    Do you know who ▮▮▮▮▮▮ is?

HIGHLY CONFIDENTIAL

Page 48

```
 1

 2        A.    I believe that refers to ████████

 3  ████████. I'm not sure if ████████ is her full

 4  name or, but she commonly goes by ████████.

 5  She at the time used to work for ████████.

 6        Q.    Other than -- well, with respect

 7  to your changes to the ████████████ are

 8  you aware of any other publishers who made

 9  claims about Google being anti-competitive

10  with -- with the changes to the ████████

11  ████████

12        A.    ████████████ is the most prominent

13  one.  I believe there were a couple of

14  others, but I'm not sure who exactly they

15  are.

16        Q.    Can you remember any of their

17  names?

18        A.    I was just going to say I will

19  also note that here I'm speaking in my

20  personal capacity 'cause I don't -- I

21  haven't seen this document.  I wasn't

22  prepared to discuss this particular

23  document.

24              Sorry, go ahead.

25        Q.    No, my question was just you're
```

HIGHLY CONFIDENTIAL

Page 49

```
 1
 2   saying you didn't review this document in
 3   preparation for your deposition today?
 4        A.    That's right.
 5        Q.    Understood.
 6        A.    Right.  And -- yeah, so, based
 7   on my personal recollection, I think █████
 8   ████████ may have been one of them, but
 9   I -- I'm not completely sure.
10        Q.    Anybody else?
11        A.    I'm sorry, I can't -- I can't
12   even tell you with 50 percent confidence
13   the name of any individual other
14   publisher.
15        Q.    Understood.
16             How about with respect to
17   reserve price optimization, are you aware
18   of any customers saying that the
19   introduction of reserve price optimization
20   was anticompetitive?
21             MR. MAHR:  Objection to scope.
22             But you may answer.
23        A.    I'm speaking in my personal
24   capacity here.
25             I am not aware of any publishers
```

HIGHLY CONFIDENTIAL

Page 50

1

2    who complained about the introduction of

3    reserve price optimization.

4        Q.    I'm sorry, you're not aware of

5    any customers who complained about the

6    introduction of reserve price optimization

7    because it was anticompetitive or

8    complained about it for any reason at all?

9        A.    I'm not aware, I think I said

10   I'm not aware of any publishers who

11   complained about reserve price

12   optimization, and I meant for any reason

13   at all.

14       Q.    How about for Dynamic Revenue

15   Share?

16            MR. MAHR:  Objection; scope.

17       A.    Again here I'm speaking in my

18   personal capacity.

19            I am not aware of any publishers

20   who complained about it.  But I will note

21   that there was a control that publishers

22   could use to decide whether they wanted to

23   have it turned on or off and the vast

24   majority -- there was -- there were some

25   publishers who turned it off, but the vast

HIGHLY CONFIDENTIAL

Page 51

```
1
2    majority of publishers kept it on.
3              So I don't know that those
4    publishers that turned it off had a
5    specific complaint; I'm not aware of any
6    complaints.  But --
7        Q.    Yeah.
8        A.    -- overall, publishers seemed
9    very happy with the feature.
10       Q.    So I want to be clear.
11             For DRS, Dynamic Revenue Share,
12    the ability of a publisher to turn that
13    off only existed with respect to Dynamic
14    Revenue Share version 2, correct?
15       A.    For version 2 and subsequently.
16       Q.    But for Dynamic Revenue Share
17    version 1, publishers did not have the
18    choice to turn Dynamic Revenue Share on or
19    off, correct?
20       A.    That is correct.
21       Q.    If we can go up to the top of
22    this -- of this email, the first page, and
23    I want to zoom in on -- on these -- the
24    two paragraphs here.
25             So, ██████████, this is -- this
```

Page 52

1

2    is your response to the -- the emails in

3    the thread below, and I'll start just by

4    reading aloud this first paragraph:  My

5    answers to the questions are very similar

6    to ███████'s:  [Yes, no, no, marginally].

7    I do think there's a risk they'll move off

8    Ad Manager, but I actually believe that

9    ██████ has been signaling this for some

10   time.  All the times she's been saying

11   "It's unfair that AdX doesn't work with

12   other ad servers in the same way it works

13   with DFP/It's unfair that AdX doesn't

14   contribute demand to prebid" have actually

15   been the reverse of the usual complaint

16   (which has been largely addressed since

17   Exchange Bidding).  This new complaint

18   doesn't make sense unless you want to use

19   a different ad server.

20             Do you see that?

21        A.    I do.

22        Q.    So, when you say that "██████ has

23   been signaling this for some time" --

24        A.    I'm sorry.  Would it be possible

25   for me to see the questions that are being

HIGHLY CONFIDENTIAL

Page 128

```
 1
 2        just a five minute break?
 3             MR. MAHR:  Good for us.
 4             I'm sure good for Marie.
 5             THE STENOGRAPHER:  Yes, thank
 6        you.
 7             MR. MAHR:  So let's go off the
 8        record.
 9             THE VIDEOGRAPHER:  The time
10        right now is 11:51 a.m.
11             We are off the record.
12             (Recess taken.)
13             THE VIDEOGRAPHER:  The time
14        right now is 12:01 p.m.
15             We are back on the record.
16    BY MR. McBRIDE:
17        Q.    Welcome back, ███  ██████.
18             Turning back to our Exhibit 151.
19             (The above mentioned exhibit was
20        published.)
21    BY MR. McBRIDE:
22        Q.    If we jump to the -- let me just
23    stay on this for one second.
24             So, some examples you gave me of
25    filtering bid responses include if -- if
```

HIGHLY CONFIDENTIAL

Page 129

```
 1
 2    the bid is below the floor, that would be
 3    a reason why a bid response would be
 4    filtered.  Is that correct?
 5         A.    That's correct.
 6               And I think the other example I
 7    gave was it didn't match the protections
 8    that the publisher set up.
 9         Q.    Any other reasons a bid response
10    would be filtered, that you can think of?
11         A.    I think I also gave you the
12    example of the ad was not the right format
13    or the right size publisher requested.
14               Another one is we filter out ads
15    that might be malare or otherwise harmful.
16    We have a number of protections like that
17    we apply.
18         Q.    Would -- I know that Google runs
19    a number of experiments.
20               Are there, to your knowledge, or
21    have there been experiments running in █████
22    ███████████that may have been -- may have
23    resulted in bids being filtered out?
24         A.    If you mean an experiment
25    █████████████ ████ ███████ ██████ ████, I am not
```

HIGHLY CONFIDENTIAL

Page 130

1

2    aware of any such experiment.  But, you

3    know, generally speaking, we run ████

4    ████████ ██ experiments in a year.  It's

5    possible there may have been one, but I am

6    not aware of any such experiment.

7         Q.    I guess, and I think that's a

8    helpful clarification for my question.  So

9    let me try it again.

10            Are you aware of any experiments

11    that would have been running that as a

12   ████████████████████████████████████████

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15        A.    I can think of not a specific

16    example, but the fact that that might have

17    occurred is plausible.

18            For example, let's say we were

19    to rule out, you know, an improvement to

20    our malare detection that way.  That might

21    have started out as an experiment.  In the

22    course of a experiment we might have

23    filtered out some malare that we newly

24    identified that we hadn't identified

25    before.  So the effect of that experiment

HIGHLY CONFIDENTIAL

Page 131

```
 1
 2     might be to result in something's being
 3     filtered out.
 4         Q.    Any other examples you can think
 5     of that might result, experiments that
 6     might result in ads being filtered out?
 7         A.    I mean, again I don't have any
 8     specific example in my mind.  I'm just,
 9     sort of, speculating on the kinds of
10     things that could have occurred.
11             I think we spoke about privacy
12     and consent, right.  There were times
13     where, you know, we probably ran
14     experiments before ruling out some of the
15     new consent requirements.  As those
16     experiments ruled out, there might have
17     been cases where a buyer was not -- did
18     not have the proper consent, meaning the
19     user didn't consent to that buyer of
20     having information or participating in
21     some way.  And so, you know, in the course
22     of the experiment, we realized that that
23     should change, okay.
24             But again, I'm not aware of any
25     specific experiment that we did related to
```

HIGHLY CONFIDENTIAL

Page 171

1
2          A.    I do.
3          Q.    And then there's a paragraph on
4     the following page.
5               And I'll wait for Jim to catch
6     up.
7               (Pause.)
8               So, it says the experiments
9     team -- at the very top it says:  The
10    Experiment team develops the
11    infrastructure and tools that allow
12    Display Ads engineers to run experiments
13    on fractions of live Ad requests, helping
14    them to select and launch the best
15    improvements to achieve their
16    quarter-over-quarter RPM goals.  The
17    Experiments team also provides the
18    experimenters with mechanisms to gradually
19    ramp up/down a feature and red-buttons for
20    controlling the flow of traffic through
21    the Display Ads stacks.
22              Do you see that?
23         A.    I do.
24         Q.    Are you familiar with the
25    Experiments team?

HIGHLY CONFIDENTIAL

Page 172

1

2         A.    I -- I knew they existed.  I've

3    spoken to some people on that team at some

4    point.  Didn't work very closely with

5    them, but we used their infrastructure.

6         Q.    How did you use their

7    infrastructure?

8         A.    So, for example, if we wanted to

9    run experiments on Google Ad Manager, we

10    would use the infrastructure that they

11    wrote.

12         Q.    And did you run experiments on

13    Google Ad Manager?

14         A.    We did.

15         Q.    Do you have a rough sense of how

16    many?

17         A.    This -- this document below

18

19

20

21

22

23

24

25         Q.    Let me try to unpack that a

HIGHLY CONFIDENTIAL

Page 173

1

2    little bit.

3          When you say ██████████████

4    ██████████████████    were running on

5    Google Ad Manager, do you have a sense of

6    how much -- they were running on live

7    traffic in Google Ad Manager.  Is that

8    right?

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          Q.    As a general matter, when --

25    when -- in your work on the sellside, when

HIGHLY CONFIDENTIAL

Page 174

1

2     you were making changes and rolling out

3     new features for -- for anything you

4     were -- you were designing and

5     implementing, you would run experiments,

6     correct?

7          A.    I will say

8

9

10         Q.    Now, some of the key stats that

11    are -- are listed here, I think it says

12    key stats as of August 2019, the first

13

14

15

16         And I think -- I guess, so,

17    first of all, do you have any reason to

18    doubt that as of August 2019 there were,

19

20

21

22         MR. MAHR:  Objection; form and

23    scope.

24         You can answer.

25         A.    I have no reason to doubt it,

HIGHLY CONFIDENTIAL

Page 175

1

2

3

4

5

6            THE STENOGRAPHER:  I'm sorry, I

7       can't hear that last answer, that last

8       sentence.

9       A.    I think I said I will note that

10

11

12

13

14       Q.    And you say, I think you -- you

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 177



HIGHLY CONFIDENTIAL

Page 178

1

2

3

4

5

6

7          Do you see that?

8     A.    I do.

9     Q.    So is that saying that on

10   average for a given query that you'll --

11

12

13          MR. MAHR:   Objection to form;

14    scope.

15          You can answer.

16    A.    That seems to be what it's

17   saying, yes.

18    Q.    And do you have any reason to --

19   to doubt that that's correct?

20    A.    I have no reason to doubt that.

21

22    Q.    If you ran an experiment and the

23   result of the experiment impacted a

24   publisher's revenue or an advertiser's

25   bid, did Google keep track of that and

HIGHLY CONFIDENTIAL

Page 179

1

2    reimburse the publisher or -- or

3    advertiser for the consequence of the

4    experiment?

5         A.    Generally speaking, I can't

6    speak to practices for advertisers where I

7    didn't conduct experiments on advertisers.

8    That would be more done by buyside

9    products.

10              THE STENOGRAPHER:  I'm sorry, I

11         couldn't hear.

12              "I can't speak to practices for

13         advertisers where..."

14         A.    I didn't work on buyside

15    products.

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 351

```
 1
 2                 C E R T I F I C A T E
 3              I, MARIE FOLEY, Registered Merit
 4   Reporter, Certified Realtime Reporter, and
 5   Notary Public for the State of New York,
 6   do hereby certify that prior to the
 7   commencement of the examination, ███████
 8   █████, was duly remotely sworn by me to
 9   testify to the truth, the whole truth and
10   nothing but the truth.
11        I DO FURTHER CERTIFY that the foregoing
12   is a verbatim transcript of the testimony
13   as taken stenographically by me at the time,
14   place and on the date hereinbefore set forth,
15   to the best of my ability.
16        I DO FURTHER CERTIFY that I am neither
17   a relative nor employee nor attorney nor
18   counsel of any of the parties to this action,
19   and that I am neither a relative nor employee
20   of such attorney or counsel, and that I am
21   not financially interested in the action.
22
     COURT REPORTER
23   Registered Merit Reporter
     Certified Realtime Reporter
24   Notary Public
     Dated: April 22, 2024
25
```