**FILED UNDER SEAL**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

# GOOGLE LLC'S REPLY IN SUPPORT OF
# ITS OMNIBUS MOTION TO EXCLUDE EXPERT TESTIMONY

**FILED UNDER SEAL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

I.    Overview of Reply .................................................................................................... 1

II.   Reply to Legal Standards ......................................................................................... 1

III.  Dr. Weinberg's Opinions Should Be Excluded. ....................................................... 3

IV.   Mr. Andrien's Opinions are Unsupported and Measure the Wrong Thing. ............ 6

   A.   Mr. Andrien's Opinions That Google Violated the DTPA Are Inadmissible Legal Conclusions. ................................................................................................... 6

   B.   Mr. Andrien's Auction Analysis is Flawed and Unreliable. ............................ 7

   C.   Mr. Andrien Cannot Offer Any Penalty Figure to the Jury, and Certainly Not One Based on *Ipse Dixit* and an Incorrect Legal Standard Created by States' Counsel. ........ 9

V.    Dr. DeRamus' Improper Rebuttal Opinion Also Measures the Wrong Thing. ........... 11

   A.   Plaintiffs Cannot Defend Dr. DeRamus's Civil-Penalty Calculations. ........................ 11

      1.   Dr. DeRamus's Methodologies are Irrelevant and Unreliable. ............................ 11

      2.   Plaintiffs' "No Harm" Penalty Argument Proves Google's Point. ...................... 13

   B.   Dr. DeRamus's Opinions are Inadmissible in Plaintiffs' Case in Chief and Thus Inadmissible at Summary Judgment. .............................................................. 14

VI.   Professor Chandler's Ecosystem Opinions Are Irrelevant and Unsupported. .............. 14

VII.  Dr. Shafiq's Opinions are Improper Rebuttals and Do Not Conform to Rule 702. ....... 16

VIII. Professor Pathak's Opinions Are Irrelevant to Any Issue. ......................................... 18

IX.   Plaintiffs Fail to Demonstrate That Professor Rudin Reliably Applied Her Theory To "Fit" The Facts Of This Case. ................................................................................. 20

X.    Plaintiffs Cannot Overcome the Fundamental Flaws in Professor Somayaji's Opinions that Render them Inadmissible *Ipse Dixit*. ................................................................. 21

XI.   Several of Professor Gans's Opinions Should be Excluded. ....................................... 22

XII.  Conclusion ............................................................................................................. 25

**FILED UNDER SEAL**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alsadi v. Intel Corp.*,
    2019 WL 4849482 (D. Ariz. Sept. 30, 2019)..........................................................................14

*Avance v. Kerr-McGee Chem. LLC*,
    2006 WL 3484246 (E.D. Tex. Nov. 30, 2006) ....................................................................25

*Betzel v. State Farm Lloyds*,
    480 F.3d 704 (5th Cir. 2007) ...........................................................................................17

*Breen v. Ford Motor Co.*,
    2007 WL 4856864 (N.D. Miss. May 30, 2007)................................................................14

*Burleson v. Texas Dep't. Of Criminal Justice*,
    393 F.3d 577 (5th Cir. 2004) .......................................................................................2, 15

*Carlson v. Bioremedi Therapeutic Sys., Inc.*,
    822 F.3d 194 (5th Cir. 2016) .............................................................................................2

*CEATS v. TicketNetwork, Inc.*,
    2018 WL 453732 (E.D. Tex. Jan. 17, 2018)....................................................................17

*Commonwealth v. TAP Pharma. Prods., Inc.*,
    36 A.3d 1197 (Pa. Comm. Ct. 2011) ...............................................................................11

*Cottonwood Enviro. Law Ctr. v. Edwards*,
    2021 WL 5988554 (D. Mont. Dec. 17, 2021)..................................................................11

*Dahlen v. Landis*,
    314 N.W.2d 63 (N.D. 1981) .............................................................................................10

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993)...........................................................................................2, 13, 19

*Diggs v. Citigroup, Inc.*,
    551 Fed. App'x 762 (5th Cir. 2014) ...................................................................................3

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
    732 F.2d 480 (5th Cir. 1984) ...........................................................................................24

*El Aguila Food Prod's, Inc. v. Gruma Corp.*,
    131 Fed. App'x 450 (5th Cir. 2005) ...................................................................................3

**FILED UNDER SEAL**

*General Electric v. Joiner,*
    522 U.S. 136 (1997)..........................................................................8, 9

*Guile v. United States,*
    422 F.3d 221 (5th Cir. 2005) ...................................................................3

*Hathaway v. Bazany,*
    507 F.3d 312 (5th Cir. 2007) ...............................................................9, 22

*Holt Atherton Indus., Inc. v. Heine,*
    835 S.W.2d 80 (Tex. 1992)......................................................................10

*Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.,*
    436 S.W.3d 9 (Tex. App.—Houston [14th Dist.] 2014, no pet.)...........................10

*Johnson & Johnson,*
    292 Cal. Rptr............................................................................................13

*Johnson v. Arkema, Inc.,*
    685 F.3d 452 (5th Cir. 2012) ...................................................................3

*KB Home v. Antares Homes, Ltd.,*
    2007 WL 1893370 (N.D. Tex. June 28, 2007) ..........................................16

*Knight v. Kirby Inland Marine, Inc.,*
    482 F.3d 347 (5th Cir. 2007) ..........................................................3, 7, 12

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999).................................................................................3

*Meaux Surface Prot., Inc. v. Fogelman,*
    607 F.3d 161 (5th Cir. 2010) ..................................................................10

*Moore v. Ashland Chemical, Inc.,*
    151 F.3d 269 (5th Cir. 1998) ...................................................................3

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans
    Archdiocesan Cemeteries,*
    56 F.4th 1026 (5th Cir. 2023) .................................................................24

*Patterson v. McMickle,*
    191 S.W.3d 819 (Tex. App.—Fort Worth 2006, no pet.) ............................15

*In re Pearl Res. LLC,*
    2023 WL 8642303 (Bankr. S.D. Tex. Dec. 13, 2023) ...............................16

*People v. Johnson & Johnson,*
    292 Cal. Rptr. 3d 424 (Cal. Ct. App. 2022) .............................................13

**FILED UNDER SEAL**

*Pipitone v. Biomatrix, Inc.*,
  288 F.3d 239 (5th Cir. 2002) .................................................................................2, 3, 22

*In re Pool Products Distrib. Mkt. Antitrust Litig.*,
  166 F.Supp.3d 654 (E.D. La. 2016) .................................................................................3

*Robinson v. Am. Multi-Cinema, Inc.*,
  2021 WL 2213376 (E.D. La. May 17, 2021) .................................................................7

*Sardis v. Overhead Door Corp.*,
  10 F4th 268 (4th Cir. 2021) .................................................................................2

*SEC v. Ripple Labs, Inc.*,
  2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) ...............................................................11

*Sierra Club v. El Paso Gold Mines, Inc.*,
  2003 WL 25265873 (D. Colo. Feb. 10, 2003) ............................................................11

*United States ex. Rel. Suter v. Nat'l Rehab Partners Inc.*,
  2007 WL 1597943 (D. Idaho June 1, 2007) ................................................................11

*Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*,
  71 F.4th 894 (11th Cir. 2023) .................................................................................14

*United States v. American Express Co.*,
  2014 WL 2879811 (E.D.N.Y. June 24, 2014) ............................................................16

*United States v. Barton*,
  909 F.3d 1323 (11th Cir. 2018) ............................................................................1, 2

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)...............................................................................................24

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008)...............................................................................15

*United States v. Perry*,
  35 F.4th 293 (5th Cir. 2022) ...............................................................................2

*United States v. Williams*,
  343 F.3d 423 (5th Cir. 2003) ............................................................................6, 8

*Verizon Comm'ns., Inc. v., Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)...............................................................................................19

*Viterbo v. Dow Chem. Co.*,
  826 F.2d 420 (5th Cir. 1987) ...............................................................................3

<u>**FILED UNDER SEAL**</u>

*Yates-Williams v. El Nihum*,
    2011 WL 1157378 (S.D. Tex. Mar. 24, 2011).........................................................................3

*YETI Coolers, LLC v. RTIC Coolers, LLC*,
    2017 WL 429210 (W.D. Tex. Jan. 28, 2017) .......................................................................10

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)................................................................................................12

**Other Authorities**

Fed. R. Evid. 401 .......................................................................................................................3, 19

Fed. R. Evid. 402 ..........................................................................................................................15

Fed. R. Evid. 403 ............................................................................................................................9

Fed. R. Evid. 702 ...................................................................................................................*passim*

Fed. R. Civ. P. 26 ..........................................................................................................................18

Fed. R. Evid. 703 ..........................................................................................................................15

Fed. R. Evid. 704 ............................................................................................................................7

**FILED UNDER SEAL**

In further support of its Motion to Exclude Expert Testimony, Google submits this Reply.

## I.    Overview of Reply

The Plaintiff States' Response to Google's Motion to Exclude ("Resp.") rests on false premises. First, it sets up a straw man, falsely claiming Google's motion attacked the credentials of the States' experts, Resp. at 1-5, when in fact the motion challenges the *relevance*, *reliability*, and *admissibility* of each expert's testimony, *see* Google's Motion to Exclude Expert Testimony ("Mot."). Second, it complains that Google pressed the experts to provide truthful, responsive answers to deposition questions. Resp. at 3. A fundamental requirement to admit expert testimony is that it be "helpful," Fed. R. Evid. 702, and expert testimony is not helpful when it is evasive, argumentative, or obstructs the truth. *See* Mot. at 15-16. Ironically, the Response then accuses Google of mischaracterizing the experts' opinions and urges the Court to evaluate their *reports*, instead of their sworn testimony. Resp. at 4. But sworn testimony provides the best indication of what experts seek to offer at trial. Here, that testimony does not meet the standards of admissibility.

Finally, where there is no evidence to support the opinions as given, the Response *revises* them outright, *see infra* § V (defending opinion DeRamus does not offer), § VIII (asserting Pathak has opinions the witness disclaimed), § VI (citing methodology Chandler does not employ), § XI (offering an entirely new declaration and opinions for Gans), or backfills them with even more *ipse dixits* from counsel, *see infra* § VII (asserting material Shafiq failed to disclose was only of "medium" importance), § V (asserting DeRamus's calculations would have been *higher* had he done them correctly). None of this meets the States' burden to show these opinions are admissible.

## II.    Reply to Legal Standards

The Response concedes that the trial court's duty is to conduct a rigorous, gatekeeping examination of the admissibility of expert opinions. Resp. at 4-5; *see also, e.g.*, *United States v.*

**FILED UNDER SEAL**

*Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018) (Supreme Court precedent and Rule 702 compel "district courts to perform the critical gatekeeping function concerning admissibility of expert … evidence.").[1] The importance of this function "cannot be overstated." *Id.* The trial judge "must determine whether the expert testimony is both reliable and relevant," *Burleson v. Texas Dep't. Of Criminal Justice*, 393 F.3d 577, 583-84 (5th Cir. 2004), and must assess whether the expert's reasoning "properly can be applied to the facts at issue," *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 592-93 (1993).

The Response cites *United States v. Perry*, 35 F.4th 293 (5th Cir. 2022), to suggest that "the rejection of expert testimony is the exception rather than the rule," Resp. at 5, but *Perry* also requires the Court to exercise its gatekeeping function, 35 F.4th at 329 ("It is an abuse of discretion for a district court" to fail to conduct a *Daubert* inquiry.) (citing *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016) (reversing for failure to conduct a *Daubert* inquiry)). Nothing in *Perry* allows this Court to set aside its gatekeeping role and admit *inadmissible*, *irrelevant*, and *unreliable* opinions simply because they can be cross-examined. *See* Resp. at 5. Nor may the Court "abandon the gatekeeping function," *Sardis v. Overhead Door Corp.*, 10 F4th 268, 282 (4th Cir. 2021), by leaving the assessment of reliability to the jury. As the Supreme Court emphasized in *Daubert*, cross-examination (and directed verdicts) may be "appropriate safeguards where the basis of scientific testimony *meets the standards of Rule 702*," but they are no substitute for the Court's threshold analysis. 509 U.S. at 592-93.

The citation to *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002), Resp. at 5, also supports Google's motion. *Pipitone* held that "the district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience,

---

[1] Unless otherwise indicated, emphasis is added, citations are omitted, and quotes are cleaned up.

<u>FILED UNDER SEAL</u>

employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 288 F.3d at 244 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Applying these factors, the Court upheld the exclusion of an expert whose opinion was irrelevant because it did not tend to make "any fact more or less probable." *Id.* at 245. In fact, district courts in the Fifth Circuit routinely exclude expert testimony that falls short of the requirements for admission,[2] and the Fifth Circuit regularly upholds those decisions.[3]

### III.    Dr. Weinberg's Opinions Should Be Excluded.

The Response repeats Dr. Weinberg's inadmissible opinions, *see* Resp. at 40-43, but that he has *many* opinions does not provide a basis to admit any of them. What the States must prove is that Google committed deceptive acts. To be relevant to that issue, an expert opinion must make a deceptive act "more or less probable than it would be without the evidence." Fed. R. Evid. 401. None of Dr. Weinberg's opinions do this. The contentions that Google's actions "led to a higher win rate" for its customers, Resp. at 41, or lowered win rates for rival exchanges, *id.*, do not make it more or less probable that a *deceptive* act occurred in any Google auction. *See* Mot. at 18-26. The same is true of the "ecosystem" opinion. An ecosystem is not an act, and opinion evidence on this point is not relevant to show any deceptive *act* by Google.

Google's motion asserted four grounds to exclude Dr. Weinberg's opinions: (i) the law prohibits an expert from testifying that conduct was deceptive, (ii) an expert cannot speculate on what was material with no basis to support the opinion, (iii) an expert cannot speculate about the

---

[2] *See, e.g.*, *Yates-Williams v. El Nihum*, 2011 WL 1157378, at *11-20 (S.D. Tex. Mar. 24, 2011); *In re Pool Products Distrib. Mkt. Antitrust Litig.*, 166 F.Supp.3d 654, 673-78 (E.D. La. 2016).
[3] *See, e.g.*, *Diggs v. Citigroup, Inc.*, 551 Fed. App'x 762, 765 (5th Cir. 2014); *Johnson v. Arkema, Inc.*, 685 F.3d 452, 467-69 (5th Cir. 2012); *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007); *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005); *El Aguila Food Prod's, Inc. v. Gruma Corp.*, 131 Fed. App'x 450, 453 (5th Cir. 2005); *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 279 (5th Cir. 1998); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

**FILED UNDER SEAL**

state of mind of any party, and (iv) his "all auctions" opinion was an unsupported *ipse dixit*. Mot. at 18-32. The Response does not establish these opinions are relevant, reliable, and not prejudicial, so the Court should exclude them under Rules 401, 402, 403, and 702.

Turning to the first ground, namely, his attempts to testify to **legal conclusions**, the States concede that "an opinion that a certain set of facts satisfies a legal definition can be an improper legal conclusion," but suggest they can cure this by reframing the questions they ask at trial. Resp. at 43-44. Not so. The question is whether Dr. Weinberg seeks to offer inadmissible opinions on the ultimate issue, namely, that Google "misled" advertisers, gave disclosures that were "insufficient," was "exceptionally misleading," or was "deceptive." Mot. at 20, n.20 (listing conclusory opinions offered on ultimate issues). These opinions are not only unhelpful to the jury, Fed. R. Evid. 702(a), they are impermissible legal conclusions. Whether something is deceptive is a legal term of art that only the Court (not any expert) can define. Here, the issue is even more problematic: Dr. Weinberg is not a lawyer and read none of the relevant statutes, so he has no idea how the laws of the 17 Plaintiff States define what is "deceptive," raising the prospect that this evidence (if admitted) would affirmatively mislead the jury.

As to the second ground, his attempt to testify to **materiality**, the States offer nothing other than the bare assertion that his opinions are "factual" because he links his opinions to "auction theory." Resp. at 48. This avoids the point. Materiality is a legal term of art. *See* Mot. at 22. It is also an issue determined from the perspective of a reasonable consumer, *see* Mot. at 22-23, a topic about which Dr. Weinberg has no relevant expertise. He is an auction theorist, *see* Resp. at 48, an academic who has "definitely not worked in ad publishing" and has "never worked on ad buying." *See* Mot. Ex. 1 (Weinberg Depo. Tr.) 44:2-3, 44:24-25. Neither has he interviewed a single digital

**FILED UNDER SEAL**

advertiser or publisher. *Id.* at 87:25-88:8. The States' Response fails to demonstrate any reliable basis for Dr. Weinberg's speculative opinions about materiality.

The third ground concerns his prohibited attempt to testify to the **states of mind** of Google or participants in its auctions. Unable to refute the black-letter law holding that opinions on intent and state of mind are *not* admissible, *see* Mot. at 25, the States assert that "Normal people in everyday conversation talk about other people's intent or beliefs without actually claiming to be a mind reader." Resp. at 49. Normal people also relay hearsay in everyday conversation, but that does not make it admissible. Expert testimony that evaluates state of mind is within the province of the jury and is entirely improper. *See* Mot. at I(F). All such opinions must be excluded.

The States' defenses of the "**all auctions**" opinion confirms its speculative nature, lacking the reasonable support Rule 702 requires. As revised in the States' Response, Dr. Weinberg's theory is that (1) "any participants who suspected the auction rules deviated from a sealed second-price auction would change their behavior in all auctions because they would have no way of knowing which auction would be affected by Google's conduct," and (2) "even if participants do not know about Google's conduct, their choices … are based on prior experience and the rules as they understand them." Resp. at 50. This recitation proves the point: Dr. Weinberg is speculating about what Google's customers understood and what they might have done differently in a "but for" world. But Dr. Weinberg admits he has no factual basis for these speculations: he interviewed no ad buyers or ad sellers, has never worked in the industry, and has no evidence any advertiser joined the ecosystem because of the alleged deception. Mot. at 27. Making matters worse, while Dr. Weinberg contends that it was Google's use of the Reserve Price Optimization (RPO), Dynamic Revenue Sharing (DRS), and Bernanke algorithms that allegedly made the ecosystem "deceptive," he performed no study to determine in which auctions these algorithms ran. Having

<u>**FILED UNDER SEAL**</u>

quantified *nothing*, he has no reliable basis to claim that "every single auction" was affected, regardless of whether the algorithms ran or not. The Fifth Circuit and courts within it exclude such impermissible, unfounded speculation. Mot. at 29 n.22. The Court should do the same here.

Dr. Weinberg's second "all auctions" assertion fares no better. This claim is based on just two anecdotes he cites ███████████████. *See* Resp. at 53. But the Response fails to show how these two anecdotes—out of ███████ of auctions—constitute a sufficient basis to support his conclusion that all auctions were affected. The States cite no case allowing an expert to extrapolate from just two anecdotes to draw an otherwise unsupported conclusion about a general trend. An observation of "some" is never sufficient to support a conclusion of "all." *See* Mot. at 30-31.

To salvage Dr. Weinberg's inadmissible opinions, the States argue that Google's objection goes to the weight or credibility of the evidence. *See* Resp. at 54-55. But an opinion cannot have any weight unless it is first shown to be admissible because it is reliable, relevant, and helpful. Dr. Weinberg's opinions do not meet these standards. The Court should exclude them entirely.

**IV.    Mr. Andrien's Opinions are Unsupported and Measure the Wrong Thing.**

Google moved to exclude business and litigation consultant Jeffrey Andrien because his opinions are irrelevant, unhelpful, unreliable, and unduly prejudicial. Mot. at 33-34. Each ground remains a basis for excluding Mr. Andrien's opinions.

Experts cannot offer civil penalty figures to the jury. *See id.* at 48-49. Mr. Andrien's entire penalty opinion should be excluded on that basis alone. The remaining arguments address other reasons why *all* of Mr. Andrien's opinions must be excluded.

**A. Mr. Andrien's Opinions That Google Violated the DTPA Are Inadmissible Legal Conclusions.**

Mr. Andrien's conclusion that each of the ██████ of AdX auctions within his data set violated the States' DTPAs is an inadmissible legal opinion. *See United States v. Williams*, 343

**FILED UNDER SEAL**

F.3d 423, 435 (5th Cir. 2003) (Rule 704(a) "prohibits any witness, expert or lay, from testifying to a legal conclusion."). The States protest that Mr. Andrien merely assumed liability and then performed calculations like many damages experts do, *see, e.g.*, Resp. at 67, but his report and testimony give the game away. Mr. Andrien is no mere quantum expert. He opines that because Google conducted ███████ of auctions, it violated state law ██████ of times—declaring each auction a violation of law. *See*, *e.g.*, Mot. Ex. 8 (Andrien Depo. Tr.) at 162:5-6 ("*I know auctions were manipulated and therefore violations*."); *id.* at 36:15-37:5 ("So I do intend to offer opinions on the number of violations."); Mot. Ex. 9 (Andrien Rpt.) ¶11(d) (purporting to count DTPA "violations"). The claim that Mr. Andrien is merely "leveraging his expertise to help the jury" by offering a "factual" opinion that happens to "embrace" an "ultimate issue, Resp. at 65-67, violates Rule 704. In fact, the Rule prohibits exactly what Mr. Andrien seeks to do; namely, to "tell the [factfinder] what result to reach." *Robinson v. Am. Multi-Cinema, Inc.*, 2021 WL 2213376, at *3 (E.D. La. May 17, 2021). No witness can testify that a defendant violated the DTPA even once— much less ██████ of times. *See id.* Mr. Andrien is no exception.

## B.  Mr. Andrien's Auction Analysis is Flawed and Unreliable.

To start, Mr. Andrien counts the wrong thing. While claiming to count statutory *violations*, Mr. Andrien actually counts AdX *auctions*—all of them, regardless of whether they involved an allegedly deceptive algorithm. *See* Mot. at 37. He makes no effort to determine how many of the total auctions he counted included an allegedly deceptive act—even though that is the central fact the States must prove under their DTPAs. The States admit such information was available, Resp. at 59 n.22 (citing evidence that "RPO applied to ██████ of AdX auctions and ████ for DRS"), but Andrien disregards it, dooming his "all auctions" opinion. *See* Mot. at 9 (citing *Knight*, 482 F.3d at 355 (reliability applies to "all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion")). Mr. Andrien's

**FILED UNDER SEAL**

false and unsupported premise that *all* auctions are a proxy for a deceptive act, Resp. at 60, lacks any evidence to show it is *reliable*, particularly when: (i) the States admit Mr. Andrien disregarded all evidence to the contrary, and (ii) Dr. Weinberg (the expert Mr. Andrien purports to rely on for his "all auctions" inference) lacks any evidence to support that conclusion. *See* Mot. at 25-26 (explaining that Dr. Weinberg does not know how many transactions were affected by RPO, DRS, or Bernanke and cannot identify even *one* sale of an ad impression that was affected by them).

The States now distance themselves from Mr. Andrien's multi-█████-violation calculation, reframing it as an "upper bound." Resp. at 67. But it is no more reliable to declare that Mr. Andrien's "assumption that auctions equal violations sets an upper bound on the number of violations." *Id.* Mr. Andrien has nowhere established the required link between the facts or data considered (the number of auctions) and the conclusion he expresses (that each auction represents a deceptive act or practice violating a DTPA). His *ipse dixit* leap between the two is exactly what *General Electric v. Joiner*, 522 U.S. 136 (1997), forbids. *See* Mot. at 10. Mr. Andrien leaped from what he was provided—(1) a list of auctions, (2) dates on which auction mechanics ran on some but not all of them, and (3) an *unproved* and unsupported assumption that all auctions were "indirectly affected," Resp. at 67—to the opinion that *every auction* violated a DTPA, including those where no algorithm ran. The analytical gap between the data and the conclusion is simply too great. Mr. Andrien cannot bridge it with his *ipse dixit. See Joiner*, 522 U.S. at 146. This opinion must be excluded under Rule 702. *See Williams*, 343 F.3d at 435.

Mr. Andrien's climactic flaw is using data on *internet usage* to conjure conclusions about *AdX auctions* in each state. *See* Mot. at 42-43. He took his count of total auctions and allocated them *not* based on the states in which they occurred but instead based on census data reflecting how many people have internet access. *Id*. Missing from that method is any reliable basis to infer

<u>FILED UNDER SEAL</u>

that consumer internet *access*, which is used for many things and used differently by each person, remotely approximates a measurement of ad auctions in each state, the alleged DTPA violation Mr. Andrien claims to quantify. Put directly, the fact that someone buys a movie in Idaho does not establish a deceptive ad auction occurred in Idaho. And the fact that a lawyer in Texas accessed Westlaw for legal research over the web does not prove an ad auction occurred when she did so. Mr. Andrien performed *no* work to demonstrate the inferred connection was valid or reliable. *Joiner* requires that this *ipse dixit* be excluded. 522 U.S. at 146.

Unable to prove an adequate link between the data and the conclusion drawn, the States appeal to false logic: "No web surfer, no auction." Resp. at 61. This quip does not cure the proof gap. As shown above, a household with the ability to surf the web is not a proxy for an auction. And there is a profound risk of confusion and possible prejudice, Fed. R. Evid. 403, in admitting it. No data or analysis shows online auctions occur in a 1:1 (or any) proportion to the number of household internet users in each state. The Response would have the Court take Mr. Andrien's word that the string of unconnected inferences from auctions → to household internet usage → to deceptive acts generally → to deceptive acts in particular holds true. But he has not demonstrated it. And he has no data to support it. "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

### C. Mr. Andrien Cannot Offer Any Penalty Figure to the Jury, and Certainly Not One Based on *Ipse Dixit* and an Incorrect Legal Standard Created by States' Counsel.

Mr. Andrien's penalty calculation is also inadmissible. The States misframe Google's challenge as a quibble over how to distill conflicting evidence into the form of an economic calculation. Resp. at 63. Not so. Google's motion shows that Mr. Andrien did not apply any reliable economic methodology *at all*. Mot. at 40. He cannot explain—because the field of economics

FILED UNDER SEAL

cannot explain—how a company's *revenue*, divorced from costs, could ever approximate its *incremental profits* from an activity. *Id*. Courts regularly reject revenue as an *incomplete* and overstated calculation of profit and benefits. *See, e.g.*, *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 n.1, 85 (Tex. 1992) (Lost profits "must be predicated on one complete calculation" of "lost *net* profit, not gross profits."); *Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 18 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (same); *Meaux Surface Prot., Inc. v. Fogelman*, 607 F.3d 161, 171 (5th Cir. 2010) (holding that in assessing lost profits, "the proper measure is lost *net* profits"). The States do not come to Mr. Andrien's defense on this point because his analysis departs so far from his field of expertise that it is not defensible. Resp. at 62 (failing to address how revenue could ever be a proxy for incremental benefit).

Worse still, Mr. Andrien's penalty analysis fails to track any of the DTPA statutes. The States offer no support for their inference that an expert can offer the jury a penalty calculation— that is, a recommendation on the quantum of civil penalties, *see, e.g.*, Mot.41—that rests on an admittedly incomplete analysis of controlling statutory factors. The legal standards Mr. Andrien applied (because States' counsel told him to, *see id.* at 35) are both over- and under-inclusive, and he privileged a single factor of "deterrence" over others, ignoring some factors entirely. *See* Resp. at 69. This is the *wrong legal standard*. *E.g.*, *YETI Coolers, LLC v. RTIC Coolers, LLC*, 2017 WL 429210, at *2 (W.D. Tex. Jan. 28, 2017) ("Courts will exclude expert testimony when it relies on an incorrect legal standard."). And the danger of confusing the issues and misleading a jury (if there is a jury), is extreme given that the State statutes are not uniform in directing the factfinder to consider deterrence at all.[4]

---

[4] The States' hodgepodge of state-level legal decisions do not prove otherwise. Resp. at 69-70 n.26. All but two do not involve DTPA penalties. *See, e.g.*, *id.* at 69 (citing *Dahlen v. Landis*, 314 N.W.2d 63, 69 (N.D. 1981) (farm laborer suit for punitive damages arising from personal injuries sustained during a roadside altercation)).

<u>FILED UNDER SEAL</u>

### V.    Dr. DeRamus' Improper Rebuttal Opinion Also Measures the Wrong Thing.

Google set forth many reasons to exclude Dr. DeRamus's arbitrary penalty calculations. Mot. at 47-61. The Response highlights their infirmity and fails to establish their admissibility.

### A.    Plaintiffs Cannot Defend Dr. DeRamus's Civil-Penalty Calculations.

The law prohibits an expert from offering calculations of civil penalties. Mot. at 48-49. The Response cites no cases to refute this. Instead, it offers civil penalty cases where expert testimony was relevant to a question of fact, or that address entirely unrelated questions. *See* Resp. at 75.[5] None of this allows Dr. DeRamus to tell the factfinder what it should award as a penalty.

### 1.    Dr. DeRamus's Methodologies are Irrelevant and Unreliable.

The Response does not dispute that Plaintiffs' DTPA claims regarding DRS, RPO, and Bernanke are **nondisclosure** claims or that Dr. DeRamus measures the total expected benefit from the programs in the aggregate, rather than individually. *See* Mot. at 49-51. Ignoring this, the Response instead asserts Google "would not have rolled the programs out if it had to disclose them." Resp. at 76. This is not a basis to admit Dr. DeRamus's opinion *because that is not his opinion. See* Mot. Ex. 13 (DeRamus Depo. Tr.) at 166:4-9 (admitting such a claim would "go[] beyond the four corners of [his] report"). If Dr. DeRamus did offer that opinion, it would be inadmissible for lack of supporting evidence. Not one of Plaintiffs' experts opines that Google would not have rolled out the programs at issue if it had to disclose them in detail, nor can they,

---

[5] *See Sierra Club v. El Paso Gold Mines, Inc.*, 2003 WL 25265873, at *6-7 (D. Colo. Feb. 10, 2003) (admitting expert opinions on number of violations and EPA's methodology for calculating penalties); *SEC v. Ripple Labs, Inc.*, 2024 WL 3730403, at *8 & n.10 (S.D.N.Y. Aug. 7, 2024) (allowing expert to summarize unlawful contracts, not quantify penalties); *Commonwealth v. TAP Pharma. Prods., Inc.*, 36 A.3d 1197, 1290 (Pa. Comm. Ct. 2011) (in bench trial, court allowed expert to count transactions but "declined to adopt" his penalty calculations.); *see also Cottonwood Enviro. Law Ctr. v. Edwards*, 2021 WL 5988554, at *7 (D. Mont. Dec. 17, 2021) (allowing civil penalties claim to proceed *without* expert evidence); *United States ex. Rel. Suter v. Nat'l Rehab Partners Inc.*, 2007 WL 1597943, at *1 (D. Idaho June 1, 2007) (addressing whether defendants would be prejudiced by a change in plaintiffs' expert analysis).

<u>FILED UNDER SEAL</u>

as Plaintiffs' auction expert himself admits that RPO and DRS *were* disclosed. Mot. Ex. 2 (Weinberg Rpt.) ¶¶ 197, 274. The Response's speculation is no basis to admit an analysis relying on opinions that Dr. DeRamus and the States' other experts *do not have*.

The Response admits Dr. DeRamus copied and pasted the "**expected benefit**" estimates he offers wholesale from documents Google produced. Resp. at 77. This is not admissible or reliable. Mot. at 52-53. In fact, Dr. DeRamus was excluded in another case *because he did the same thing*. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292-93 (3d Cir. 2012) (upholding order excluding DeRamus opinion relying on internal company documents because he lacked any basis to show documents were reliable).

The Response likewise supplies no basis for Dr. DeRamus's 10-33% "**probability of detection**" estimate, an opinion that covers a period of more than 20 years. Resp. at 80. As Google explained, the only studies plausibly supporting a probability of detection as low as 10% are those finding 10-15% *annual* probabilities. Mot. at 53-54. Such studies do not "fit" with an analysis that spans 20 years, particularly since Dr. DeRamus does not adjust for time. Plaintiffs respond by pointing to *another* reason those studies do not support a probability-of-detection estimate in this case, Resp. at 80, merely increasing the "analytical gap between the studies on which he relied and his conclusions." *Knight*, 482 F.3d at 355.

Dr. DeRamus's **event study of *Alphabet's* stock price**, offered as a purported basis for an appropriate penalty to assess against *Google*, is unsupported by law or economics. Plaintiffs set up a strawman, rebutting the unmade argument that "event studies are *per se* unreliable." Resp. at 81-82. Google argued that event studies are never countenanced outside the securities fraud context (i.e., outside of cases where the impact on stock price is the very question at issue). Mot. at 54-55. Plaintiffs nevertheless point to securities fraud cases in defending the relevance of event studies.

12

**FILED UNDER SEAL**

*See* Resp. at 85-86. Similarly, in defending Dr. DeRamus's use of a rule of thumb for statistically significant evidence of *causation* as a proxy for the sanction necessary for shareholders to "notice" or "take action," *see* Mot. at 58-59, Plaintiffs cite instances in which that rule of thumb was used as a causation threshold, *see* Resp. at 85, which misses the point entirely. Finally, Plaintiffs admit that Dr. DeRamus's study addresses non-party *Alphabet*'s stock price, not Google's. Google's argument was that (i) such studies are never used in economics to measure optimal sanctions, a point Dr. DeRamus admits, *see* Mot. at 55, and (ii) *this* study measured the effect on *Alphabet*, a non-party whose stock price is irrelevant to how to punish its subsidiary, as to which Dr. DeRamus asserts—without the support of any evidence—that his calculation would have been higher if he focused only on Google. Resp. at 85-86. Whether another methodology would have arrived at a higher or lower result makes no difference to the Rule 702 inquiry, which focuses "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

## 2. Plaintiffs' "No Harm" Penalty Argument Proves Google's Point.

As a matter of law, punitive sanctions like civil penalties must be calculated by reference to the alleged quantum of harm. Mot. at 61. The Response musters not a *single case* from any of the 17 Plaintiff States that admits in evidence a harm-free calculation of civil penalties, punitive damages, or other monetary sanctions. The best the States can do is to cite a case from California, *see* Resp. at 88 (citing *People v. Johnson & Johnson*, 292 Cal. Rptr. 3d 424 (Cal. Ct. App. 2022)), but that case proves *Google's* point. The $302 million penalty the court allowed rested on proof of severe harm caused by misrepresented medical devices including "debilitating, chronic pain" that "destroy[ed] (sometimes permanently) [patients'] sexual, urinary, and defecatory functions." *Johnson & Johnson*, 292 Cal. Rptr. at 472. The States cite no case (because there is none) that would allow imposition of multi-billion-dollar penalties untethered to any proof of actual harm.

FILED UNDER SEAL

Lacking proof of harm (much less a reliably measured quantum of harm), these opinions are irrelevant and unreliable as a matter of law.

**B. Dr. DeRamus's Opinions are Inadmissible in Plaintiffs' Case in Chief and Thus Inadmissible at Summary Judgment.**

Plaintiffs cannot offer Dr. DeRamus's rebuttal opinions in their case in chief or to survive summary judgment. It "should go without saying that as a rebuttal witness, [an expert's] testimony would not be admissible in the plaintiffs' case in chief" at trial, *Breen v. Ford Motor Co.*, 2007 WL 4856864, at *1 (N.D. Miss. May 30, 2007), or at summary judgment, *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 71 F.4th 894, 908 (11th Cir. 2023) ("Travelers cannot rely on potential testimony from Captain Ahlstrom to avoid summary judgment because it only disclosed him as a rebuttal expert."); *see also Alsadi v. Intel Corp.*, 2019 WL 4849482, at *14 (D. Ariz. Sept. 30, 2019) (same). The citations to Dr. DeRamus in the summary judgment opposition should therefore be disregarded and an order entered providing that, if Dr. DeRamus is permitted to testify at all (and he should not be), he may do so only in Plaintiffs' rebuttal case (if any).

**VI.    Professor Chandler's Ecosystem Opinions Are Irrelevant and Unsupported.**

The States' Response does little more than reiterate Dr. Chandler's inadmissible opinions. Repetition does not show admissibility.

Because the States cannot carry their burden to show that Professor Chandler's "fairness" and "transparency" opinions are based on a reliable methodology, the States invent their own standards. Resp. at 34 (arguing he "sets forth the objective, concrete, and verifiable elements of a fair and transparent online auction"). This fails. To be admissible, Dr. Chandler's opinions must be "the product of reliable principles and methods," Fed. R. Evid. 702(c), and Dr. Chandler confirmed his opinions do not meet this standard. In fact, he disclaimed reliance on the industry standards for fairness and transparency that he teaches to university students, Mot. at 64-65, and

**FILED UNDER SEAL**

then invented an undisclosed and obviously inapplicable methodology in the middle of his deposition, *id*. at 67. The Response conjures an argument that the plainly inapplicable "CRISP-DM" methodology supports Dr. Chandler's work, but concedes in the same breath that his reports *do not mention it at all*. Resp. at 35. Dr. Chandler's disregard of the standards he claims apply in his field and his lack of an accepted industry methodology for the opinions he gives make them unreliable. *Burleson*, 393 F.3d at 583–84 (requiring "scientifically valid" methodology) (quoting *Daubert*, 509 U.S. at 592–93).

The attempt to save Dr. Chandler's conflict-of-interest opinions suffer the same failing. Mot. at 68-70. Whether Google had a conflict of interest by owning buy-side tools, a sell-side tool, and an exchange (it did not) is not probative of any "fact of consequence," Fed. R. Evid. 402, because no DTPA statute makes a conflict of interest actionable. The bare assertion that a person with a conflict is "more likely to act unfairly or deceptively, and so knowing about the conflict has a tendency to make deception or unfair practices more likely," Resp. at 39, goes nowhere: Dr. Chandler conceded it was no secret that Google operates tools and owns an exchange. It is also fundamental that, in a non-disclosure case, information that is already known cannot be the subject of deception. *See, e.g.*, *Patterson v. McMickle*, 191 S.W.3d 819, 827 (Tex. App.—Fort Worth 2006, no pet.). Finally, this opinion has no relevance to antitrust claims either, which the States admit by failing to argue otherwise. *Compare* Mot. at 70-71 (conflicts of interest are irrelevant to antitrust claim), *with* Resp. at 38-39 (omitting antitrust).

Dr. Chandler's recitation of online articles denigrating Google for acquiring businesses remains inadmissible hearsay. Mot. at 71-73. It is no answer to respond that Rule 703 allows experts to *rely* on hearsay. Resp. at 32. Rule 703 does not allow an expert to "simply transmit that hearsay to the jury," *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008), or "testify as a mere

FILED UNDER SEAL

conduit for others' hearsay," *United States v. American Express Co.*, 2014 WL 2879811, at \*17 (E.D.N.Y. June 24, 2014). The Rule "was not intended to abolish the hearsay rule and to allow a witnesses, under the guise of giving expert testimony, to in effect become the mouthpiece" for inadmissible, out of court statements. *In re Pearl Res. LLC*, 2023 WL 8642303, at \*3 (Bankr. S.D. Tex. Dec. 13, 2023). The States' disclaimer of any antitrust relevance to Dr. Chandler's recitation of Google's acquisitions, Resp. at 33, leaves him with no basis to testify to hearsay articles at all.

Finally, Dr. Chandler's opinions on antitrust substitutability are inadmissible because they apply the wrong standards. Mot. at 73-75. He opines that goods are substitutable only if they are perfectly interchangeable, contradicting binding Fifth Circuit law. *See* Mot. at 74-75. The States ignore this problem by focusing on Dr. Chandler's supposed "expertise," but this does not show that Dr. Chandler applied the correct legal standard. Legal standards are policed by courts, not industry experts, and the Response does nothing to refute the proof that Dr. Chandler used the wrong *legal* standard. Mot. at 73-75. This opinion is irrelevant and should be excluded. *See KB Home v. Antares Homes, Ltd.*, 2007 WL 1893370, at \*9 (N.D. Tex. June 28, 2007) (finding testimony that "relies on an incorrect legal standard would confuse and mislead the jury").

**VII.    Dr. Shafiq's Opinions are Improper Rebuttals and Do Not Conform to Rule 702.**

Plaintiffs' arguments in opposition to Google's motion to exclude the testimony of Dr. Zubair Shafiq fail for at least four reasons. *First*, Plaintiffs concede that Dr. Shafiq, offered as an expert in computer science, fails to use his specific technical and specialized knowledge as is required under Rule 702. *See* Mot. at 79-81. The Response admits he did not perform any practical work, did not rely on any real-world data, and did not follow a scientific methodology. Resp. at 82-84. Pressed about his lack of scientific work, Plaintiffs muster only Dr. Shafiq's vague claim

FILED UNDER SEAL

that he relied on "verification testing," which is not disclosed in his report, and a few peer-reviewed papers that are not tied to the evidence of this case. *See id.*

*Second*, Plaintiffs do not dispute that Dr. Shafiq offers an opinion on Google's subjective intent regarding Google's justifications for the redaction of BDT files. *Id*. at 80-81. No law allows a witness to speculate as to the intent of any party. *See* Mot. at 79-81.

*Third*, Plaintiffs argue that Dr. Shafiq offers rebuttal opinions. Resp. at 88.[6] This forbids their use in Plaintiffs' case in chief or at summary judgment. *See* § V.B, *supra*. Unable to refute this, Plaintiffs urge that his untimely opinions should be allowed under *Betzel v. State Farm Lloyds*, 480 F.3d 704 (5th Cir. 2007), *see* Resp. at 92-93, but the *Betzel* factors weigh in favor of exclusion. The case holds that exclusion is "particularly appropriate where the party has failed to provide an adequate explanation for their failure to identify their expert within the designated timetable." *Betzel*, 480 F.3d at 707. Plaintiffs' claim that they "realized after seeing Google's expert reports that they needed opinions from a privacy expert," Resp. at 93, does not negate that this issue is one on which they bear the burden of proof. And Plaintiffs themselves put privacy at issue in the Fourth Amended Complaint filed on May 5, 2023. *See* ECF No. 541. The remaining *Betzel* factors also weigh against the admissibility of his opinions. Dr. Shafiq's improper rebuttal testimony cannot be "important," since it raises issues that were not presented by any of Google's experts. *See Betzel*, 480 F.3d at 717. Google would also be prejudiced because it has not had a chance to properly respond to the new affirmative opinions. *See id.*[7] Exclusion is the appropriate remedy, *see CEATS*

---

[6] These include opinions on "dark patterns", privacy justifications, and that Google sells user data. As Google's Motion to Strike argued, these are *affirmative* opinions directed to Plaintiffs' case-in-chief. As such, they are (and remain) untimely affirmative opinions.

[7] The Response complains that Google should have included Dr. Shafiq in its September Motion to Strike, ECF No. 613, but Google had not yet taken Dr. Shafiq's deposition.

FILED UNDER SEAL

*v. TicketNetwork, Inc.*, 2018 WL 453732, at *4 (E.D. Tex. Jan. 17, 2018), particularly where Plaintiffs have not presented a "less drastic remedy" to cure this prejudice. *See* Resp. at 93.

*Fourth*, Plaintiffs admit Dr. Shafiq did not properly disclose the materials he relied upon. *See* Resp. at 94. Plaintiffs try to excuse this by again citing *Betzel*'s four-factor test for determining substantial justification or harm, which includes "the importance of the *testimony*" targeted by a motion to strike, *id.* at 92, then claiming that "the importance of his *reliance*" on the undisclosed materials is only "medium," *id.* at 94. But that is not the test. Rule 26(b) requires full disclosure of "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26. Dr. Shafiq did not do so, so striking his opinions is the appropriate remedy.

## VIII.   Professor Pathak's Opinions Are Irrelevant to Any Issue.

Realizing Professor Pathak offers no opinions relevant to their case in chief, Plaintiffs attempt to re-write his report through their Response. Now, the States claim that Professor Pathak has opinions on "market power, anticompetitive conduct, and anticompetitive effects." Resp. at 20. Tellingly, those words appear nowhere in Professor Pathak's assignment, *see* Mot. Ex. 9 (Pathak Rpt.) ¶ 2, or in his summary of opinions. He is plain: "*I do not provide conclusions about whether Google's conduct is anticompetitive*," and he "rel[ies] on Professor Gans's findings on market power and market definition" as well as on "anticompetitive effects." *Id.* ¶¶ 2, 8. Professor Pathak also offers no analysis of what is "deceptive" for DTPA claims, stating only that Google "lowered transparency." *Id.* ¶ 20.[8]

---

[8] During his deposition, Professor Pathak confirmed that he was not offering any new opinions beyond what was included in his report. Mot. Ex. 38 (Pathak Depo. Tr.) at 311:22-24.

FILED UNDER SEAL

The Response all but admits Professor Pathak does *not* opine on the only issues relevant here; namely, whether Google's conduct was anticompetitive or deceptive. *See* Resp. at 19, 22, ("Google argues that 'just because a market does not function well and may be inefficient does not mean it is not competitive'... This is true enough"); *id.* at 25 (admitting Professor Pathak does not opine on what is "deceptive"). Instead, it argues his opinions should be allowed under the "low bar" set by Rule 401, which makes evidence relevant when "it has any tendency to make a fact more or less probable." *Id.* at 20. This assumes the conclusion. Professor Pathak's opinion does not make it "more probable" that a deceptive or anticompetitive act occurred. And the Response does not show that this evidence "fits" the facts, *Daubert*, 509 U.S. at 591, because the opinions discuss the Professor's ideal world, not the elements Plaintiffs must prove at trial.

Plaintiffs' remaining defenses fail to show these opinions are admissible. *First*, Plaintiffs trot out Professor Pathak qualifications, Resp. at 20, which Google did not challenge. *Second*, Plaintiffs incorrectly claim that Google's experts opine on the same topics as Professor Pathak. Resp. at 25. But Professors Milgrom's and Baye's assignments were to analyze Google's auction features, including whether they have legitimate business justifications. They did not opine, as Professor Pathak seeks to do, on the *irrelevant* question of whether the market is optimally designed. *Third*, they claim that Professor Pathak's testimony should be disregarded because his responses were merely "hypothetical." Resp. at 23-24. But Professor Pathak was explaining the basis for the opinions in his report (i.e., asserting that his market design "aspiration" was to have one centrally planned market or that firms have an obligation to share their innovations with competitors). *See* Mot. at 93-94. All of this contradicts settled antitrust law, which favors competition (not central planning) and imposes *no* duty on any competitor to deal with another. *See, e.g.*, *Verizon Comm'ns., Inc. v., Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411

FILED UNDER SEAL

(2004) ("There is no duty to aid competitors."). All of Professor Pathak's analysis rests on his irrelevant "efficient market design" opinion, so his opinions should be excluded in full.

### IX.    Plaintiffs Fail to Demonstrate That Professor Rudin Reliably Applied Her Theory To "Fit" The Facts Of This Case.

Plaintiffs' defense of Professor Rudin establishes that her theoretical opinions do not "fit" the facts of this case, are not reliable, and are not helpful to the jury. Professor Rudin's opinions are about whether *third-party* participants in Google's ad tech auctions—publishers, advertisers, and third-party ad tech tools—are capable of improving their outcomes in response to changes in Google's auction designs. *See* Mot. Ex. 41 (Rudin Rpt.) ¶¶ 22-27. To reliably apply her stated expertise in machine learning to determine the capabilities of participants in Google's auctions, one would expect Professor Rudin to analyze evidence *from those third parties*, but Professor Rudin does none of that, by her own admission. *See* Mot. at nn.78, 81. The Response, tellingly, provides no examples of Dr. Rudin examining relevant third-party evidence (documents, data, or testimony) of their views, needs, or practices regarding using machine learning to optimize. Instead, it: (i) asserts that Professor Rudin offered "extensive evidence," Resp. at 102, but cites none of it; (ii) claims she applied her model "with remarkable detail and substantiation in evidence," but doesn't explain how; and (iii) claims she included "literally hundreds of citations" in her report, *id.* at 101-102, omitting that only one citation is to evidence from auction *participants*. The one third-party document Rudin does cite has nothing to do with that company's use of machine learning or experimentation and does not support Rudin's theory. *See* Mot. Ex. 41 (Rudin Rpt.) n.177. Otherwise, all the evidence cited is from Google documents or generic public documents, not from auction participants. Further, Plaintiffs concede that Professor Rudin conducted no quantitative analysis of the transaction-level data in the record, Mot. at 105 & n.89,

**FILED UNDER SEAL**

and as to qualitative analysis, Plaintiffs cite only a single paragraph of her report, which in turn cites a single, inapposite Google document, Resp. at 104.

Lacking evidence, Professor Rudin is left with only theory. Plaintiffs concede Professor Rudin does not opine on whether "advertisers and publishers actually did not succeed in using experiments," but only whether they "could" use experiments to improve their outcomes. *Id.* This is raw speculation. Her theoretical, unsupported opinions are unreliable and should be excluded.

### X.    Plaintiffs Cannot Overcome the Fundamental Flaws in Professor Somayaji's Opinions that Render them Inadmissible *Ipse Dixit.*

Rather than address the fundamental flaws in Professor Somayaji's opinions on "information imbalance," Mot. at 110-24, Plaintiffs double down on his unreliable, unsupported conclusions, backfilling them with more *ipse dixit*, this time in the form of counsel's argument. None of this satisfies Plaintiffs' burden. Professor Somayaji's opinions should all be excluded.

Plaintiffs' central argument is that Professor Somayaji's opinions should be admitted because he shows that "Google's ad-buying tools have access to far more information than other tools have." Resp. at 109. But Professor Somayaji admitted that "the relevant question is not how much information one party has versus the other party," but "whether the information is relevant to the decision being made." Mot. Ex. 42 (Somayaji Depo. Tr.) at 198:21-199:3. Professor Somayaji conceded he did not even *attempt* to analyze the relevance of the particular data fields he suggests were shared only with Google's buying tools. *See* Mot. at 113-114. Unable to point to anywhere in Professor Somayaji's report where he establishes that the purported additional fields were relevant to auction outcomes for advertisers, Plaintiffs assert that he identified three categories of information that supposedly have "self-evident importance for advertisers"—an opinion never offered by Professor Somayaji. Resp. at 111. Nor did Plaintiffs offer sufficient foundation to admit his opinion that Google's purported advantage impacted "which ads are

<u>FILED UNDER SEAL</u>

displayed." Mot. Ex. 42 (Somayaji Depo. Tr.) at 235:16-236:23. Instead, Plaintiffs fail to identify even one impacted advertiser that was unable to optimize by experimenting, Resp. at 110, and instead assert, without citation, that the "millions (or billions) of auctions everyday" "necessarily entail" an impact. *Id.* at 112. Experts must provide a reasoned basis for their opinions, and attorney *ipse dixit* on top of expert *ipse dixit* will not do. *See Hathaway*, 507 F.3d at 318.

Plaintiffs also claim that Google's alleged "information advantage" makes it "difficult for any non-Google entities to conduct successful, helpful experiments." Resp. at 109. This suffers from the same leap of logic that doomed Professor Somayaji's original analysis: the relevant question is whether "different parties *possess* different knowledge or amounts of knowledge in the context of any given ad auction." Mot. Ex. 43 (Somayaji Rpt.) ¶ 21. The mere fact that *Google shared* more information with its own buying tools does not lead to (or even support) a conclusion that its tools *possess* far more information than others do. To express a reliable opinion on *that* topic would require analyzing the overall information other tools possess, including from sources besides Google. Professor Somayaji admitted that he did not do that analysis, nor *any* analysis of the capabilities or data of *any* non-Google tool. Resp. at 114-15. This incomplete analysis lacks the "intellectual rigor that characterizes the practice of an expert in the relevant field," *Pipitone*, 288 F.3d at 244, and the Response offers nothing to fill the proof gap between the "Google only" data he considered and the *ipse dixit* conclusion he expressed about how Google compared to others *he did not consider or analyze*.

## XI.    Several of Professor Gans's Opinions Should be Excluded.

Google's motion demonstrated that Professor Gans (1) misapplied standard methodologies when attempting to define ad buying tool markets; (2) miscalculated AdX's share of the alleged

**FILED UNDER SEAL**

ad exchange market; and (3) impermissibly opined on Google's motive and intent. Mot. at 124-36. Plaintiffs' brief confirms that all of those flawed opinions should be excluded.

**First**, Professor Gans failed to reliably apply the Hypothetical Monopolist Test ("HMT") and the *Brown Shoe* factors when he tried to define separate markets for ad buying tools for small and large advertisers. Professor Gans's purported HMT analysis is unreliable because it did not evaluate potential substitution by large advertisers. Mot. at 125-128. While recognizing that large advertisers account for at least a "reasonable proportion" of spending on so-called small advertiser buying tools and that providers of small advertiser buying tools would have to take into account how large advertisers would respond to a price increase, Professor Gans admitted that he did not analyze large advertiser responses. Mot. Ex. 51 (Gans Depo. Tr.) at 84:6-11, 87:6-88:2. Plaintiffs try to gloss over this gaping hole in Professor Gans's HMT analysis with quibbles over "the right interpretation of an internal document" and speculation that "large advertisers use Google Ads *to purchase search ads*, not display ads," Resp. at 11-12, but they cannot—and do not even try to—rebut Professor Baye's showing that nearly ███ of indirect *display ad spending* on Google Ads comes from large advertisers, Mot. Ex. 54 (Baye Rpt.) fig. 18 (cited at Mot. at 127). Professor Gans's failure to analyze responses by advertisers accounting for such significant display ad spending eviscerates his HMT analysis.[9]

Professor Gans's *Brown Shoe* opinions suffer from additional flaws. Mot. at 129-31. Plaintiffs concede that "Google is correct" about many of the "overlap[s]" between buying tools for small and large advertisers, yet they maintain that small advertiser buying tools still have a

---

[9] Plaintiffs also claim that two internal Google "experiments" indicate that their alleged markets pass the HMT. Resp. at 10. But the HMT evaluates customers' likely responses to price increases above the competitive level; ████████████████████████████████████████ ████████████████████; and Professor Gans did not identify a competitive benchmark for small advertiser buying tools.

FILED UNDER SEAL

single "peculiar characteristic": they are "easy to use and manage." Resp. at 13. But antitrust markets often include products that are not identical,[10] and Plaintiffs cite no precedent holding that products belong in separate markets when they are as admittedly similar as buying tools for small and large advertisers. Regarding "industry or public recognition," Plaintiffs make no effort to justify Professor Gans's reliance on a conversation that did not even address the views of the industry or the public. Mot. at 129-30. Instead, they assert generally that "other sections" of his report support his opinions, Resp. at 13-14, when the key section discussing "industry or public recognition" consists of only two sentences and relies exclusively on the off-topic conversation, Mot. Ex. 52 (Gans Rpt.) ¶¶ 233-34. Finally, with respect to "distinct prices," Plaintiffs offer only distinctions that Professor Gans never made, Resp. at 14; Mot. at 130-31, and they cannot salvage his market-definition opinions by using their brief to put words in his mouth.

***Second***, Professor Gans miscalculated AdX's market share. *See* Mot. at 131-35. Plaintiffs do not deny that he made these mistakes. Resp. at 18. Neither estimate supports an inference of monopoly power, *see Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984) (requiring market share of "at least fifty percent" for monopolization), but Plaintiffs' defense of these errors is doubly misleading. It omits that Professor Baye (1) was correcting a new and different calculation *from Professor Gans's rebuttal* report (asserting AdX's share was about ██████); and (2) made additional corrections before opining that a better estimate of AdX's market

---

[10] *See, e.g.*, *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("But where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the market."); *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1038 (5th Cir. 2023) (rejecting alleged market for New Orleans cemetery tours because "other New Orleans historical site tours are reasonably interchangeable substitutes for cemetery tours").

FILED UNDER SEAL

share would be ▆▆▆ or less. *See* Mot. Ex. 55 (Baye Sur-Rebuttal Rpt.) ¶¶ 4-8, fig. 1. These are significant errors the Response does not refute. The opinion is unreliable and should be excluded.

Plaintiffs now seek a third bite at the AdX-share apple with a new Gans Declaration. *See* Resp. Ex. 7. That declaration should be stricken as untimely: it offers new AdX market share estimates long after the deadline for Plaintiffs' expert reports. *See Avance v. Kerr-McGee Chem. LLC*, 2006 WL 3484246, at *2, 6-7 (E.D. Tex. Nov. 30, 2006) (striking expert affidavit "attached to the briefing on the parties' motions to exclude" expert opinions). Plaintiffs attempt to shift the blame to Google for supposedly "late" disclosures, Resp. at 15-16, but conveniently omit that Professor Baye pointed out the flaws in Professor Gans's calculations months ago. Mot. Ex. 54 (Baye Rpt.) ¶¶ 320-26; Mot. Ex. 55 (Baye Sur-Rebuttal Rpt.) ¶¶ 4-8. The belated submission of an entirely new opinion underscores one thing: all of the AdX market share estimates contained in Professor Gans's *timely* reports are so unreliable that they must be abandoned. This requires the exclusion of all of the *timely* opinions.

**Third**, Google highlighted how Professor Gans's reports contain numerous improper opinions about Google's motive and intent. Mot. at 135-36. The Response asserts that Professor Gans does not "actually plan[] to opine" about these issues, Resp. at 18, but they explicitly (and impermissibly) rely on his "intent" opinion to oppose summary judgment on Plaintiffs' antitrust claims, Antitrust MSJ Resp. at 50 (citing Mot. Ex. 52 (Gans Rept.) ¶ 736). As a matter of law, an expert may not opine as to any party's intent, Mot. at 14-17, so these opinions must be excluded.

## XII.    Conclusion

For these reasons, and those set forth in Google's opening brief, the Court should exclude, in whole or in part, the proffered expert opinions of Dr. Weinberg, Mr. Andrien, Dr. DeRamus, Professor Chandler, Dr. Shafiq, Dr. Pathak, Professor Rudin, Dr. Somayaji, and Professor Gans.

**FILED UNDER SEAL**

Dated: December 23, 2024

Respectfully submitted,

**GIBBS & BRUNS LLP**

*/s/ Kathy D. Patrick*
Kathy D. Patrick
Texas Bar No. 15581400
KPatrick@gibbsbruns.com
Robin C. Gibbs
Texas Bar No. 07853000
RGibbs@gibbsbruns.com
Charles M. Rosson
Texas Bar No. 24074985
CRosson@gibbsbruns.com
Caitlin A. Halpern
Texas Bar No. 24116474
CHalpern@gibbsbruns.com
Michael R. Davis
Texas Bar No. 24109793
MDavis@gibbsbruns.com
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805

Eric Mahr (*pro hac vice*)
eric.mahr@freshfields.com
Gayle Klein (*pro hac vice*)
gayle.klein@freshfields.com
Andrew Ewalt (*pro hac vice*)
andrew.ewalt@freshfields.com
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4545

Daniel S. Bitton (*pro hac vice*)
dbitton@axinn.com
AXINN, VELTROP & HARKRIDER LLP
55 Second Street
San Francisco, CA 94105
Telephone: (415) 490-1486

Bradley Justus (*pro hac vice*)
bjustus@axinn.com
James K. Hunsberger (*pro hac vice*)

**FILED UNDER SEAL**

jhunsberger@axinn.com
David R. Pearl (*pro hac vice*)
dpearl@axinn.com
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW Washington, DC 20036
Telephone: (202) 912-4700

ATTORNEYS FOR DEFENDANT GOOGLE LLC

## CERTIFICATE OF SEALING

I certify pursuant to Local Rule CV-5(a)(7)(B) that, on December 23, 2024, a motion to seal was filed, separately and immediately before this document was filed under seal.

*/s/ Kathy D. Patrick*
Kathy D. Patrick

## CERTIFICATE OF SERVICE

I certify that on December 23, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and notice was thereby served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A). In addition, this sealed filing will be promptly served by email on counsel of record for all parties.

*/s/ Kathy D. Patrick*
Kathy D. Patrick