**\*\* FILED UNDER SEAL \*\***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

The State of Texas, et al.,

        Plaintiffs,

v.

Google LLC,

        Defendant.

Case No. 4:20-cv-00957-SDJ

Hon. Sean D. Jordan

**PLAINTIFF STATES' RESPONSE TO GOOGLE LLC'S MOTION
FOR SUMMARY JUDGMENT ON PLAINTIFFS' DTPA CLAIMS**

** FILED UNDER SEAL **

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

RESPONSE TO STATEMENT OF ISSUES ........................................................ 3

BACKGROUND ..................................................................................................... 3

    A.   Google Did Not Disclose How And When It Was Manipulating Auctions, Deceptively Distorting All Auctions It Held Out As Second-Price...................................... 4

        1.   Reserve Price Optimization ("RPO"): Google Used Advertisers' Bid Data Against Them To Set Price Floors, Subverting The Second-Price "Ecosystem." ................. 5

        2.   Dynamic Revenue Share ("DRS"): Google Discounted Its Share To Drive More Auctions To AdX, Changing Second-Price Auctions Into First-Price Auctions. .. 10

        3.   Bernanke: Google Charged Advertisers The Second Price, Paid Publishers Less Than That, And Earmarked The Spread To Subsidize Other Google Bids............ 12

    B.   After Finally Abandoning The Pretense Of A Second-Price Auction In 2019, Google Made New False, Misleading, And Deceptive Statements. ............................................ 14

    C.   Google's Manipulations And Efforts To Obscure Them Prevented Participants From Understanding The Rules Applying To Any AdX Auctions Google Operated............. 16

    D.   Personal Information: Google Broke Its Promises By Selling User Personal Information Through Its Auctions. ......................................................................................... 19

LEGAL STANDARD ......................................................................................... 19

ARGUMENT ....................................................................................................... 20

I.   The States Have Article III Standing And Statutory Capacity To Bring DTPA Claims. ..................................................................................................................... 21

    A.   The States Have *Parens Patriae* Standing To Bring DTPA Claims To Vindicate The Established Quasi-Sovereign Interest In Ensuring The Integrity Of Markets. ............. 21

    B.   The Relief The States Request Would Redress The Injuries Google Inflicted On The States' Economies By Deterring Google's Future Misconduct. .................................... 24

    C.   The States Have Sovereign Standing To Sue Because They Have An Interest In Enforcing Their Laws. ........................................................................................... 28

    D.   Plaintiff States' Attorneys General Have Capacity To Sue In This Court.................... 30

II.   The Court Has And Should Retain Jurisdiction Pursuant To 28 U.S.C. § 1367. .......... 33

III.   Genuine Disputes Of Material Fact Exist For Trial, Precluding Summary Judgment.36

    A.   Google's Own Data Shows Auctions Occurred In Each State. ...................................... 36

** FILED UNDER SEAL **

B.   There Is No Basis In Law Or The Constitution To Limit Statutory Penalties Now. ...... 40

C.   The States' Theories Of Google's Misconduct Are For The Jury ................................. 45

    1.   RPO ................................................................................................................. 45

    2.   DRS ................................................................................................................. 47

    3.   Bernanke .......................................................................................................... 50

    4.   Equal Footing .................................................................................................. 53

    5.   Personal Information ....................................................................................... 55

**IV.  Google Misreads The Requirements Of State Laws And Ignores Tolling Doctrines.... 56**

A.   Google Misinterprets DTPAs, But Even Where They Require "Consumer Transactions," Google Ignores The Consumers Who Are Served The Ads. ................. 56

B.   State Statutes Of Limitations Do Not Bar Any Claims Because Of The Application of Tolling Doctrines. ........................................................................................................ 59

**CONCLUSION** .................................................................................................................... **60**

**\*\* FILED UNDER SEAL \*\***

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) ................................................................................................ *passim*

*Alpine Bank v. Hubbell,*
    555 F.3d 1097 (10th Cir. 2009) ....................................................................................... 54

*AU Optronics Corp. v. South Carolina,*
    699 F.3d 385 (4th Cir. 2012) ........................................................................................... 22

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) ........................................................................................................ 44

*Brown v. Sneed,*
    14 S.W. 248 (Tex. 1890) ................................................................................................. 59

*California v. Texas,*
    593 U.S. 659 (2021) ........................................................................................................ 25

*Carnegie-Mellon Univ. v. Cohill,*
    484 U.S. 343 (1988) ........................................................................................................ 35

*Carr v. Alta Verde Indus., Inc.,*
    931 F.2d 1055 (5th Cir. 1991) .................................................................................... 27, 28

*Cheshire v. Coca-Cola Bottling Affiliated, Inc.,*
    758 F. Supp. 1098 (D.S.C. 1990) ................................................................................... 38

*Connecticut v. Am. Elec. Power Co.,*
    582 F.3d 309 (2d Cir. 2009) ........................................................................................... 23

*Coulter-Owens v. Time Inc.,*
    695 F. App'x 117 (6th Cir. 2017) ................................................................................... 23

*Crutchfield v. Tyson Foods, Inc.,*
    514 S.W.3d 499 (Ark. App. 2017) .................................................................................. 57

*D'Onofrio v. Vacation Publ'ns, Inc.,*
    888 F.3d 197 (5th Cir. 2018) ........................................................................................... 33

*DirecTV, Inc. v. Cantu,*
    No. SA-04-CV-136, 2004 WL 2623932 (W.D. Tex. Sept. 29, 2004) ............................. 41

*Dist. of Columbia v. JTH Tax LLC,*
    No. CV 22-03165, 2023 WL 130736 (D.D.C. Jan. 9, 2023) ........................................... 22

**\*\* FILED UNDER SEAL \*\***

*DJ Coleman, Inc. v. Nufarm Ams., Inc*,
   693 F. Supp. 2d 1055 (D.N.D. 2010) ................................................................ 38

*Durning v. First Bos. Corp.*,
   815 F.2d 1265 (9th Cir. 1987) ......................................................................... 45

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*,
   752 So. 2d 582 (Fla. 2000) .............................................................................. 38

*Fla. ex rel. Shevin v. Exxon Corp.*,
   526 F.2d 266 (5th Cir. 1976) ........................................................................... 30

*Forever Green Athletic Fields, Inc. v. Lasiter Constr., Inc.*,
   384 S.W.3d 540 (Ark. Ct. App. 2011) .............................................................. 58

*Forte v. Wal-Mart Stores, Inc.*,
   780 F.3d 272 (5th Cir. 2015) ........................................................................... 40

*Fox v. Dakkota Integrated Sys., LLC*,
   980 F.3d 1146 (7th Cir. 2020) ......................................................................... 23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ............................................................................. 26, 27, 28

*Georgia v. Penn. R.R. Co.*,
   324 U.S. 439 (1945) ........................................................................................ 22

*Golan v. FreeEats.com, Inc.*,
   930 F.3d 950 (8th Cir. 2019) ........................................................................... 44

*Greenwell v. Davis*,
   180 S.W.3d 287 (Tex. App. 2005) ................................................................... 31

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
   484 U.S. 49 (1987) .......................................................................................... 26

*Harrison v. Jefferson Par. Sch. Bd.*,
   78 F.4th 765 (5th Cir. 2023) ................................................................. 22, 23, 29

*Healy v. Beer Inst.*,
   491 U.S. 324 (1989) ........................................................................................ 39

*Himes v. Brown & Co. Sec. Corp.*,
   518 So. 2d 937 (Fla. 3d Dist. Ct. App.1987) ................................................... 42

*Hood v. AstraZeneca Pharms., LP*,
   744 F. Supp. 2d 590 (N.D. Miss. 2010) .......................................................... 22

**\*\* FILED UNDER SEAL \*\***

*Hudson v. United States*,
    522 U.S. 93 (1997) ........................................................................................................ 40

*Iadanza v. Mather*,
    820 F. Supp. 1371 (D. Utah 1993) ............................................................................... 57

*Illinois v. SDS W. Corp.*,
    640 F. Supp. 2d 1047 (C.D. Ill. 2009) .......................................................................... 22

*In re Hobbs*,
    No. 10-42736, 2012 WL 4434469 (Bankr. E.D. Tex. Sept. 24, 2012) ......................... 41

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) .......................................................................... 54

*In re Mississippi Medicaid Pharm. Average Wholesale Price Litig.*,
    190 So. 3d 829 (Miss. 2015) ........................................................................................ 42

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004) .............................................................................. 58

*In re Soc. Media Adolescent Addiction/Pers. Inj.Prod. Liab. Litig.*,
    2024 WL 4532937 (N.D. Cal. Oct. 15, 2024) .............................................................. 56

*In re TFT-LCD (Flat Panel) Antitrust Litig., No. C*,
    07-01827, 2011 WL 560593 (N.D. Cal. Feb. 15, 2011) ............................................... 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827, 2014 WL 2905131 (N.D. Cal. June 26, 2014) .................................... 38

*In re Vioxx Prods. Liab. Litig., No.*,
    MDL 1657, 2010 WL 11570867 (E.D. La. Mar. 31, 2010) ......................................... 41

*In re Zyprexa Prods. Liab. Litig.*,
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) ................................................................... 41, 42

*Isquith ex rel. Isquith v. Middle S. Utils., Inc.*,
    847 F.2d 186 (5th Cir. 1988) ....................................................................................... 45

*Joseph ex rel. Est. of Joseph v. Bartlett*,
    981 F.3d 319 (5th Cir. 2020) ....................................................................................... 20

*K.D.F. v. Rex*,
    878 S.W.2d 589 (Tex. 1994) ........................................................................................ 31

*Kemp v. Holder*,
    610 F.3d 231 (5th Cir. 2010) ....................................................................................... 19

**\*\* FILED UNDER SEAL \*\***

*Lanier Bus. Prods. v. Graymar Co.*,
    355 F. Supp. 524 (D. Md. 1973) ....................................................... 34

*Latman v. Costa Cruise Lines, N.V.*,
    758 So. 2d 699 (Fla. 3d Dist. Ct. App. 2000) ................................... 51

*Louisiana v. Union Oil Co. of Cal.*,
    458 F.3d 364 (5th Cir. 2006) ........................................................... 32

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................... 24

*Marquis v. Sadeghian*,
    No. 4:19-CV-00626, 2020 WL 6482973 (E.D. Tex. Aug. 11, 2020) ....................................... 34

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) ........................................................ 21, 25, 27

*McLeskey v. Morris Inv.*,
    No. 1:18-CV-02797-JPH-TAB, 2020 WL 3315996 (S.D. Ind. June 18, 2020) ....................... 57

*Media Matters for Am. v. Paxton*,
    No. 24-cv-00147, 2024 WL 1773197 (D.D.C. Apr. 12, 2024) ................................. 32

*Mississippi ex rel. Fitch v. Eli Lilly & Co.*,
    No. 3:21-cv-00674, 2022 WL 18401603 (S.D.Miss. Aug. 29, 2022) ....................... 59

*Mississippi v. Becerra*,
    727 F. Supp. 3d 559 (S.D. Miss. 2024) ........................................... 29

*Murray v. GMAC Mortg. Corp.*,
    434 F.3d 948 (7th Cir. 2006) ........................................................... 44

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ......................................................................... 39

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ........................................................... 33

*Newell Recycling Co. v. E.P.A.*,
    231 F.3d 204 (5th Cir. 2000) ........................................................... 45

*Online Merchants Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021) ........................................................... 38

*Patel v. Facebook, Inc.*,
    932 F.3d 1264 (9th Cir. 2019) ......................................................... 23

**\*\* FILED UNDER SEAL \*\***

*Pelican Ventures, LLC v. Azimut S.p.A.*,
  No. 03-cv-62119, 2004 WL 3142550 (S.D. Fla. July 28, 2004)............................................. 51

*Reed v. Receivable Recovery Servs., LLC*,
  702 F. App'x 239 (5th Cir. 2017) .................................................................................... 53

*Rockwell Int'l Corp. v. M/V Incotrans Spirit*,
  998 F.2d 316 (5th Cir. 1993)................................................................................... 44, 47

*Rodriguez v. Jim O'Neal Distrib., Inc.*,
  2008 WL 11394309 (S.D. Tex. Sept. 11, 2008) ........................................................ 54

*Sam v. Richard*,
  887 F.3d 710 (5th Cir. 2018)................................................................................. 19, 20

*Schexnider v. McDermott Int'l, Inc.*,
  817 F.2d 1159 (5th Cir. 1987) ............................................................................... 32

*Shooshanian v. Wagner*,
  672 P.2d 455 (Alaska 1983) ................................................................................. 39

*Sindermann v. Perry*,
  430 F.2d 939 (5th Cir. 1970) ............................................................................... 20

*Skalla v. Canepari*,
  430 S.W.3d 72 (Ark. 2013) .................................................................................. 57

*Sony BMG Music Ent. v. Tenenbaum*,
  660 F.3d 487 (1st Cir. 2011) ........................................................................... 44, 45

*SPGGC, LLC v. Blumenthal*,
  505 F.3d 183 (2d Cir. 2007) ................................................................................ 38

*St. Louis, I.M. & S. Ry. Co. v. Williams*,
  251 U.S. 63 (1919)................................................................................. 41, 43, 44

*State v. Beach Blvd Auto. Inc.*,
  139 So. 3d 380 (Fla. 1st Dist. Ct. App. 2014)....................................................... 42

*State v. Harrington*,
  407 S.W.2d 467 (Tex. 1996) ............................................................................... 40

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)......................................................................................... 25, 26

*Stonebridge Collection, Inc. v. Carmichael*,
  791 F.3d 811 (8th Cir. 2015) .......................................................................... 57, 58

*Students For Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023) ................................................................................................ 27

*Tenn. Coal, Iron & R.R. Co. v. George*,
233 U.S. 354 (1914) ................................................................................................ 31

*Tershakovec v. Ford Motor Co.*,
546 F. Supp. 3d 1348 (S.D. Fla. 2021) .................................................................. 54

*Tex. State Troopers Ass'n, Inc. v. Abbott*,
No. A-13-CA-974, 2014 WL 12479651 (W.D. Tex. Apr. 16, 2014) ...................... 32

*Texas v. Am. Blastfax, Inc.*,
121 F. Supp. 2d 1085 (W.D. Tex. 2000) ............................................................ 40, 41

*Texas v. Am. Blastfax, Inc.*,
164 F. Supp. 2d 892 (W.D. Tex. 2001) .................................................................. 32

*Texas v. Colony Ridge, Inc.*,
No. CV H-24-00941, 2024 WL 4553111 (S.D. Tex. Oct. 11, 2024) ...................... 32

*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022) .............................................................................. 21, 25

*Texas v. Veterans Support Org.*,
166 F. Supp. 3d 816 (W.D. Tex. 2015) .................................................................. 32

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ................................................................................................ 24

*U.S. Commodity Futures Trading Comm'n v. M25 Invs. Inc.*,
No. 3:09-CV-1831, 2010 WL 769367 (N.D. Tex. Mar. 6, 2010) .......................... 40

*Union No. 68 v. Astrazeneca Pharms. LP*,
585 F. Supp. 2d 1339 (M.D. Fla. 2008) ................................................................ 41

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007) ................................................................................................ 38

*United Mine Workers of Am. v. Gibbs*,
383 U.S. 715 (1966) ................................................................................................ 33

*United States v. Brown Univ.*,
772 F. Supp. 241 (E.D. Pa. 1991) .......................................................................... 34

*United States v. Cent. Adjustment Bureau, Inc.*,
667 F. Supp. 370 (N.D. Tex. 1986) ........................................................................ 26

**\*\* FILED UNDER SEAL \*\***

*United States v. Google LLC*,
   661 F. Supp. 3d 480 (E.D. Va. 2023) ............................................. 33

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)............................................................ 33

*Utah ex rel. Wilkinson v. B & H Auto*,
   701 F. Supp. 201 (D. Utah 1988) .................................................... 23

*Van Winkle v. Rogers*,
   82 F.4th 370 (5th Cir. 2023)............................................................ 20

*Vanderbilt Mortg. & Fin., Inc. v. Cole*,
   740 S.E.2d 562 (W. Va. 2013) ........................................................ 41

*VeroBlue Farms USA Inc. v. Wulf*,
   No. 3:19-cv-00764, 2023 WL 348963 (N.D. Tex. Jan. 20, 2023) ............ 36

*Wade v. Jobe*,
   818 P.2d 1006 (Utah 1991) ............................................................. 56

*Watson Lab'ys, Inc. v. State*,
   241 So. 3d 573 (Miss. 2018)............................................................ 42

*Whitt v. Stephens Cnty.*,
   529 F.3d 278 (5th Cir. 2008)........................................................... 20

*Young Conservatives of Texas Found. v. Smatresk*,
   73 F.4th 304 (5th Cir. 2023)............................................................ 25

*Zomba Enters., Inc. v. Panorama Recs., Inc.*,
   491 F.3d 574 (6th Cir. 2007) .......................................................... 45

**Statutes**

28 U.S.C. § 1367................................................................................ 3, 33, 35

28 U.S.C. § 1407(g) ........................................................................... 34

Alaska Stat. § 45.50.501 ..................................................................... 30

Alaska Stat. § 45.50.551 ..................................................................... 30

Ark. Code Ann. § 4-88-113 ................................................................. 30

Fla. Stat. § 501.203(2)........................................................................ 30

Fla. Stat. § 501.204 ............................................................................ 35

**\*\* FILED UNDER SEAL \*\***

Fla. Stat. § 501.207(1) ........................................................................................ 30

Fla. Stat. § 501.2075 .......................................................................................... 42

Ind. Code § 24-5-0.5-4(c) ................................................................................... 30

Ky. Rev. Stat. Ann. § 367.190 ............................................................................ 30

La. Stat. Ann. § 51:1407 ..................................................................................... 30

Miss. Code Ann. § 75-24-9 ................................................................................. 30

Miss. Code Ann. § 75-24-19 ............................................................................... 30

Mo. Ann. Stat. § 407.100 .................................................................................... 30

Mont. Code Ann. § 30-14-102(6) .................................................................. 30, 39

Mont. Code Ann. § 30-14-103 ............................................................................. 35

Mont. Code Ann. § 30-14-111 ............................................................................. 30

N.D. Cent. Code. § 51-15-04 ............................................................................... 30

Nev. Rev. Stat. § 11.245 ...................................................................................... 60

Nev. Rev. Stat. § 598.0963(3) ............................................................................. 30

P.R. Laws Ann. tit. 10, § 259 .............................................................................. 35

P.R. Laws Ann. tit. 10, § 269 .............................................................................. 30

S.C. Code Ann. § 39-5-50(a) ............................................................................... 30

S.D. Codified Laws § 37-24-23 ........................................................................... 30

Tex. Bus. & Com. Code Ann. § 17.45(8) ............................................................ 30

Tex. Bus. & Com. Code Ann. § 17.47 ................................................................. 30

Tex. Bus. & Com. Code Ann. § 17.49(g) ............................................................ 59

Utah Code Ann. § 13-2-6 ............................................................................... 39, 59

Utah Code Ann. § 13-11-2 ................................................................................... 57

Utah Code Ann. § 13-11-3 ............................................................................. 30, 57

Utah Code Ann. § 13-11-17(1) ............................................................................ 30

x

** FILED UNDER SEAL **

**Other Authorities**

Fed. R. Civ. P. 56(a) ............................................................................................................... 19

Idaho Admin. Code § 04.02.01.020(13) .................................................................................. 58

La. Const. art. XII, § 13 ........................................................................................................... 59

**\*\* FILED UNDER SEAL \*\***

## INTRODUCTION

Google remains the dominant player in advertising technology ("ad tech"), with control over the main sell-side tools through which publishers sell display space, the main buy-side tools through which advertisers buy that space, and the main exchange running the auctions to match them. The rules of Google's auctions—and participants' perceptions of them—shape our modern information economy, dictating many of the ads we all see online. But Google has not lawfully obtained or wielded that immense power. "By Hook or By Crook," Ex. 13 (GOOG-DOJ-AT-01814688) at -688, Google furtively manipulated its ad tech auctions for its own benefit, deflecting the inevitable questions that arose to obscure its own misconduct. Those manipulations functioned cumulatively to mislead the participants of every ad tech auction Google ran. Plaintiff States bring their deceptive and unfair trade practices ("DTPA")[1] claims to protect their marketplaces and citizenries and hold Google to account for its systematic deceptions.

From 2010 to 2019, Google touted its auctions to the world as "second-price": the winner pays the second-highest bid (as long as that price exceeds the seller's floor). As both Google and academic literature recognized, this format encouraged bidders to bid their true value, creating efficient outcomes by removing incentives to bid strategically. But behind the scenes, Google was incessantly performing undisclosed "experiments" to degrade this format to increase Google's revenues. When it struck oil with some of these "experiments" and turned them into formal programs, Google started getting questions from confused auction participants about what the rules really were. In response, Google lied, deflected, and randomized the application of its new programs to heighten the confusion and protect its bottom line. Google's manipulations were so

---

[1] Different States use different abbreviations, often variations on DTPA or UDAP. Both sides use "DTPA," to refer to all the state consumer protection laws covered by the complaint.

**\*\* FILED UNDER SEAL \*\***

deeply embedded in its systems that it has claimed during this litigation that unwinding the share of auctions to which each manipulation applied would be nearly impossible.

In 2019, faced with new competition from an emerging technology called header bidding that threatened Google's ad tech empire, the company doubled down. It told the world that it would switch from a second-price auction to a first-price auction and gave the cover story that it was doing so to make things fairer and more transparent so that participants could compete equally for ad impressions. But Google used that switch to consolidate and iterate its deceptions. The entire time, Google sold web users' personal information—their geolocations, internet protocol addresses, and device types—through its ad tech auctions while promising it would never do so.

The auction data Google produced to Plaintiff States recorded the ███ of ad tech auctions Google operated while it systematically concealed when and how it was manipulating the rules for its own benefit. Census data about each State's share of internet users—the people whose attention Google's auctions monetized—suggests that approximately ███ of these auctions took place in the States. Even using more conservative assumptions based on available geographic fields in the auction data, *Google's* expert estimates the number at ███. Yet Google moves for summary judgment on Plaintiff States' DTPA claims, Dkt. 672 ("Mot."), on the farcical premise that there is *no evidence* any auction happened in any of the States at all. Rule 56 requires the Court to view the evidence in the light most favorable to Plaintiff States, drawing all reasonable inferences in their favor. After reviewing the evidence and applying that standard, the Court should reject Google's motion. To a legal and mathematical certainty, Google's position is false.

The Court should also reject Google's meandering hodgepodge of constitutional theories, all centered on the notion that Plaintiff States have no right to challenge Google's DTPA violations in this forum. Google claims that Plaintiff States lack Article III standing to bring these claims and

**\*\* FILED UNDER SEAL \*\***

are violating the Commerce and Due Process Clauses because Plaintiff States make no attempt to prove individualized damages that they have long indicated, Dkt. 366 at 1-2, they have no intention to seek. But Google's arguments rest on its continuing misunderstanding of the nature of this lawsuit. Plaintiff States bring this suit as *parens patriae* to ensure the integrity of the markets that Google distorted through its auction manipulations in violation of the DTPAs. Congress authorized this Court's supplemental jurisdiction over state law consumer protection claims, 28 U.S.C. § 1367. Stripping away Google's misguided construction of this lawsuit as a class action, its constitutional arguments all collapse.

## RESPONSE TO STATEMENT OF ISSUES

This response answers Google's issues presented as follows: (1) Plaintiff States have *parens patriae* standing rooted in their quasi-sovereign interests in ensuring free and fair marketplaces and sovereign standing based on their interests in unimpeded enforcement of their legal codes; (2) Plaintiff States have capacity to sue, as Google conflates authority and venue, two plainly distinct concepts; (3) the Court should retain supplemental jurisdiction over the DTPA claims because they largely rest on the same misconduct giving rise to the federal antitrust claims and creating 18 unique lawsuits would be highly inefficient; (4) there are genuine issues of material fact as to Google's many unfair and deceptive actions; and (5) state law permits Plaintiff States to hold Google accountable for all of its misconduct, not just the portion Google prefers.

## BACKGROUND

The DTPA claims focus on Google's auction manipulations, which fundamentally altered the second-price auctions Google claimed it was conducting. When Google faced threats that these manipulations would be exposed, it took technical and public relations measures to obscure its misconduct. Google never told anyone, and has refused to disclose for this litigation, which specific manipulations applied to which specific auctions. As a result, every auction Google

**\*\* FILED UNDER SEAL \*\***

conducted in the States' markets was an actionable DTPA violation. Even after Google at last retreated from its false representation of conducting second-price auctions, it made still more misrepresentations about its switch to first-price auctions. All the while, Google was selling personal information through its auction platform, despite representing that it never would.

**A.    Google Did Not Disclose How And When It Was Manipulating Auctions, Deceptively Distorting All Auctions It Held Out As Second-Price.**

For years, Google misrepresented to the world that its exchange, AdX, ran second-price auctions. RSMF[2] ¶41. In February 2010, Google's Scott Spencer told a trade publication that "[t]his is the most price efficient auction model, resulting in the most stable, long-term equilibrium price." Ex. 1 (AdExchanger Article). Early internal documents indicated that employees should push the public narrative that Google was building an "open system" that "advertisers and publishers [] want[.]" Ex. 2 (GOOG-AT-MDL-009280415) at -416. The plan was to make the public think that AdX had market-oriented benefits: it would "enable[] ads and ad space to be allocated across the web much more efficiently" by creating a "competitive, open marketplace" that "simplif[ied] the system for buying and selling display ads." Ex. 34 (GOOG-NE-06567486) at -486. Google touted that AdX would "cause an increase in high-quality, innovative display ads, which will make for better, more interesting ads." *Id*. at -489. But internally, Google sought to "update all of the documentation related to 2nd price auctions in AdX to give us freedom to experiment." Ex. 16 (GOOG-NE-13315908) at -909. It wanted to ensure its public communications obscured the experiments without "motivat[ing] bidders to try to learn. . . ." *Id*. at -908.

---

[2] "RSMF" refers to Plaintiff States' Response to Google's [Corrected] Statement of Undisputed Facts in Support of Google's Motions for Summary Judgment, filed concurrently.

** FILED UNDER SEAL **

Even though some of its "experiments" to maximize its revenue had long since become established programs by 2016, Google was still claiming in that year that "AdX runs a second price auction." Ex. 40 (GOOG-DOJ-29803801) at -804. In fact, Google *still* maintains that "AdX ran a second-price auction prior to 2019." Ex. 75 (Google's First Am. Resps. & Objs. to Pls.' 3d Set of Interrogs.) at 27; *see also* RSMF ¶41; McCallum Ex. 19[3] (█████ Decl.) ¶11. Believing Google's misstatements, as late as April 2019, many outsiders perceived AdX as running second-price auctions. They believed that in AdX's second-price auction, "people always knew that the price they were paying was fair." Ex. 6 (GOOG-AT-MDL-017791414).

Google understood that second-price auctions were market-efficient and incentive-compatible: "buyers bid their value in a second-price auction." Ex. 7 (████Dep. Tr.) at 295:6-10. "In the academic literature, kind of it's the textbook example of an incentive-compatible auction where you can prove a mathematical theorem for a bidder . . . the bidder's strategy is to submit a bid that equals their -- their true value -- or their value, how much they are willing to pay for the item under consideration." Ex. 8 (███Dep. Tr.) at 16:15-17:2. By contrast, Google also knew that in a first-price auction, "a bidder needs to think about their bidding strategy" which "depends on . . . your beliefs about how much other people might be bidding." *Id*. at 37:11-23; *see also* Ex. 7 (█████ Dep. Tr.) at 249:25-250:18; RSMF ¶¶42, 44. Simply put, Google knew precisely what it was doing when it began silently adjusting the rules to capture the difference between the "true value" the highest bidder submitted and the second-highest bid.

### 1. Reserve Price Optimization ("RPO"): Google Used Advertisers' Bid Data Against Them To Set Price Floors, Subverting The Second-Price "Ecosystem."

Although Google surreptitiously experimented with RPO in live auctions beginning as early as 2014, *see, e.g.*, RSMF ¶220; Ex. 52 (GOOG-AT-MDL-B-001109245), it fully launched

---

[3] "McCallum Ex." refers to exhibits attached to the Declaration of Robert McCallum. Dkt. 674-3.

** FILED UNDER SEAL **

RPO in March 2015.  Ex. 75 (Google's First Am. Resps. & Objs. to Pls.' 3d Set of Interrogs.) at 12; RSMF ¶219. Under a second-price auction, if multiple bids are above a "reserve price" the seller sets, the winning bidder pays the second-highest bid (or the reserve price, if only one bid is above the floor). RSMF ¶41. With RPO, however, Google decided to "increase reserve price[s] in AdX auction[s] on a per buyer basis if buyers have submitted bids with large discount, that is, a big difference between bid and clearing price." Ex. 15 (GOOG-DOJ-14499842) at -842. In other words, RPO would "increase the price that buyers paid and thereby increas[e] publisher revenue." Ex. 12 (███ MDL Dep. Tr.) at 316:24-317:11; RSMF ¶219. This increased Google's own AdX revenues (a share of publisher revenues) by about ███████ on an annualized basis. Davis Ex. 14[4] (DeRamus Rebuttal Rep.) ¶ 101; Davis Ex. 20 (GOOG-AT-MDL-B-001114919). RPO applied to "about 15% of transactions." Davis Ex. 29 (Chandler Rep.) ¶387 (quoting "Smarter optimizations to support a healthier programmatic market," (May 12, 2016), available at https://blog.google/products/admanager/smarter-optimizations-to-suppor/?hl=zh_TW). However, Google exempted advertisers using Google's bidding tools from RPO, protecting its buy-side revenue and penalizing advertisers who used rival buy-side tools. Ex. 5 (GOOG-DOJ-AT-02319045) at -045 n.1 (Google buy-side tool "bids are exempt").

As early as 2009, Google employees raised concerns about RPO's deceptive and coercive nature: "aren't we just gaming advertisers with 'revenue maximizing floor price' on behalf of publishers (maybe because our revenue aligns with pub's revenue) based on the information (statistics) that are supposed to be hidden from publishers?" Ex. 14 (GOOG-AT-MDL-015241235) at -237. Employees also knew that "publishers view the reserve price as a way of protecting their inventory while selling across multiple channels." Ex. 57 (GOOG-DOJ-14510945) at -946. Given

---

[4] "Davis Ex." refers to exhibits attached to the Declaration of Michael Davis. Dkt. 668-1.

**\*\* FILED UNDER SEAL \*\***

these concerns, employees understood well the risks to "*ecosystem health*" and the fundamental "*trustworthiness of [the] auction itself*" from the introduction of RPO. Ex. 60 (GOOG-DOJ-14544743) at -744 (emphasis added). They knew that a second-price auction was "the gold standard for healthy auction dynamics" and "if [the] exchange isn't trustworthy buyers aren't incentivized to bid true value." *Id*. "[I]f the publisher manufactures a floor price based on your bid to get you to pay more than the second price" then this would "transform the *system* into a 1st price auction where the bidder has a strong incentive to bid *less* than he's willing to pay," which was not "desirable for either side in the long term." Ex. 74 (GOOG-NE-13340735) at -735 (emphasis added); *see also* Davis Ex. 3 (Weinberg Rebuttal Rep.) ¶122. ███████████████████ ████████████████████████████████████████████████████, acknowledged in 2013 that "[w]e have externally stated that we don't believe [in] these types of 'dynamic price floors'" and that another well-meaning fellow employee had sought to "restrict[] non incentive compatible optimizations." Ex. 38 (GOOG-DOJ-15601229) at -230.

Still, Google pressed forward. By 2013, Google employees were "train[ing] machine learning models that can predict how much buyers are willing to pay" to ████████████████ ████████████████████ Ex. 83 (GOOG-DOJ-14008698). Within a year, in a document bearing a stylized "By Hook or By Crook" logo, Google employees proudly characterized RPO— which Google had by then designed only to increase price floors—as a means to "[e]xtract higher yield from buyers to pass on to publishers" and therefore Google. Ex. 13 (GOOG-DOJ-AT-01814688). When Google's RPO team sought internal approval to use bid data that Google collected from advertisers, an employee working on Google's bidding tools expressed grave concerns about how buyer incentives would change under RPO. Ex. 42 (GOOG-DOJ-15631978) at -979 ("[w]e will start incentivizing buyers to reduce bids"; "if I had \*your\* job I would not

launch this"). As RPO's launch date approached, Google also "deliberately chose ████████

████████████████████████████████████████████████████████████

████████" Ex. 5 (GOOG-DOJ-AT-02319045) at -046.

Before initiating RPO, Google had released a "Help Center" article, which stated that "AdExchange may run limited experiments designed to optimize the auction" that included "modifying the min CPM set by the publisher for an impression." McCallum Decl. Ex. 42; Mot. at 40. This was no "disclosure." RSMF ¶220. Google's own employees understood that this article did not inform anyone about RPO's launch, which Google later set out to do "silent[ly]," Ex. 13 (GOOG-DOJ-AT-01814688), with "no external announcement" and the understanding that "when it is noticed externally (likely), we use the non-specific language in the comms doc" and then "pass it on reactively if there are questions." Ex. 19 (GOOG-AT-MDL-014566000); *see also* RSMF ¶219. That is exactly what Google did. In March 2015, around the time Google formally launched RPO, a news outlet published a story suggesting that Google intended to use dynamic price floors. Ex. 20 (Digiday article). A Google spokesperson gave a response in the article itself, *see id.*, but employees recognized internally that "we denied that we were doing [RPO] after the recent leak went out in that Digiday article." Ex. 62 (GOOG-DOJ-13997420) at -421; *see also* RSMF ¶220.

In February 2016, ████████████████████████████, reached out to Google with concerns that Google was "not running a 2nd price auction." Ex. 21 (GOOG-AT-MDL-017664768) at -769. That soon followed with similar concerns from ████████████████, that Google's auctions had become first price. Ex. 22 (GOOG-TEX-00982249) at -251. Buyers noticing unexpected auction results led Google's RPO team into multiple responses. On a technical level, Google considered that it ████████████████████████████████████████████████████ to avoid RPO's discovery. *Id.* at -249; *see also* Ex. 21 (GOOG-AT-MDL-017664768) at -769

**\*\* FILED UNDER SEAL \*\***

(noting Google's ability to "█████████████████████████████████████████

███"). On the reputational front, the inquiries "greatly accelerate[d] the need to talk about [RPO]

externally quickly." Ex. 21 (GOOG-AT-MDL-017664768) at -769. So, Google decided to mislead

██████ into thinking they were impacted by "an experiment/beta" when in fact ██████ had

discovered RPO, which had been in effect formally, if silently, for over a year. Ex. 56 (GOOG-

NE-10976657).

Given the burgeoning possibility of blowback, in May 2016, Google stated in a blog post

that "[o]ptimized pricing in the Open Auction uses historical data to automate the post-auction

analysis and updating of floor prices." McCallum Decl. Ex. 46 at 3. This was no "disclosure"

either. RSMF ¶¶221-23. Ahead of the post's release, Google employees working on RPO discussed

that they would "obscure the comms language to remove sensitive stuff." Ex. 23 (GOOG-AT-

MDL-015109254) at -254. Another Google employee, who worked on RPO, bragged *after* the

blog post that Google had posted it reactively after RPO "started getting noticed"; that he had

"worked on a way to announce [RPO] to customers as 'optimized pricing'"; and that because of

that announcement, Google could "continue to develop [RPO] despite the sensitivity (and

occasional irrational views) of pub customers." Ex. 25 (GOOG-DOJ-14736445) at -445; RSMF

¶223. Even as late as 2017, Google employees knew that auction participants ██████████

████████████████████████████████████████████████████████████████████

████████████████ Ex. 36 (GOOG-DOJ-15022588) at -588. They acknowledged the point of

RPO was not to "optimize" anything but to "exploit the gap between the winning bid and the

transaction price by inserting a (higher) reserve price between the two thereby inducing the winner

to spen[d] more." Ex. 4 (GOOG-NE-13229114) at -114. By June 2019, an internal presentation

about Google's decision to abandon the pretense of a second-price auction bluntly admitted that

**\*\* FILED UNDER SEAL \*\***

although "AdX (*historically*) runs a second price auction," RPO was "set[ting] the minimum price just below what the highest bidder is willing to pay" and that "[w]e're not really running a full second price auction" in order to "make money." Ex. 27 (GOOG-AT-MDL-019203202) at -204-05.

### 2. Dynamic Revenue Share ("DRS"): Google Discounted Its Share To Drive More Auctions To AdX, Changing Second-Price Auctions Into First-Price Auctions.

Google again deviated from the second-price auction format when it secretly launched a program called Dynamic Revenue Share ("DRS") in August 2015, Ex. 75 (Google's First Am. Resps. & Objs. to Pls.' 3d Set of Interrogs.) at 12, which it had quietly been using in experiments since at least 2014. *See, e.g.*, Ex. 84 (GOOG-DOJ-14265301); RSMF ¶141. The initial version of DRS, DRSv1, discounted Google's otherwise static share of revenue on AdX to ensure that auctions which would not have otherwise cleared on AdX did. Ex. 80 (GOOG-NE-06864639) at -643; RSMF ¶143. To do this, Google looked at the distribution of bids after the auction had ended to see if discounting its share would allow the transaction to clear. As one Google employee explained, ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████ Ex. 86 (GOOG-AT-MDL-B-002097533) at -533.

Google shared revenue from AdX transactions by keeping 20 percent and sending 80 percent to the publisher. Ex. 29 (GOOG-AT-MDL-001004706) at -742; RSMF ¶39. Say a publisher set a reserve price of $10 for an AdX auction. Because that reserve price represents only the publisher's 80 percent revenue share, the winning bid must exceed $12.50 ($10/0.8) for Google to receive its share. Davis Ex. 2 (Weinberg Rep.) ¶192. Therefore, before DRS, if the high bid was anywhere in the "dynamic region" between $10 and $12.50, AdX would not clear the transaction. *Id*. ¶194. But DRSv1 enabled Google to discount its share retroactively so that AdX would clear

** FILED UNDER SEAL **

the transaction anyway at the high bid of $11, reducing Google's revenue share from $2.50 to $1 (or from 20 percent to 9.1 percent). *Id.*; RSMF ¶144. As a Google employee acknowledged, early versions of DRS "ma[de] the auction untruthful as we determine the revshare after seeing the buyers' bids and use the winner's bid price itself (first-pricing) when the bid is in the dynamic region. This could incentivize buyers to bid strategically instead of truthfully. . . ." Ex. 26 (GOOG-NE-13226622) at -622. But Google did not care because, by 2016, DRS was increasing Google's revenues by about ███████ on an annualized basis. Davis Ex. 14 ¶101; Davis Ex. 20.

Google only heightened the deception when it updated DRSv1 to DRSv2, which it fully launched in December 2016. Ex. 75 (Google's First Amended Responses and Objections to Plaintiffs' Third Set of Interrogatories) at 12; RSMF ¶148. The idea behind DRSv2 was for Google to make back programmatically the $1.50 it lost in the DRSv1 example above. Ex. 30 (GOOG-NE-13207241) at -245 ("In v2 . . . [the] objective [is] to keep average adx margin at 20% over queries."); RSMF ¶149. Like DRSv1, DRSv2 discounted Google's revenue share at times to help clear transactions on AdX that otherwise would not have cleared. RSMF ¶148. But with DRSv2, Google also tracked the debts that certain advertisers—tellingly, only those that did not use Google's buying tools—purportedly owed Google because their winning bid was below the reserve price that Google had discounted. Ex. 32 (GOOG-TEX-00831090) at -091 ("(DRS) is applied to AdX RTB but not Adwords or DBM."); *see also* Davis Ex. 2 ¶¶198.d.ii, 203. This meant that when DRSv2 was in effect, Google charged the advertiser, bidding $11 in our example above, $11 right away, but *also* added a "debt" of $1.50, for a total charge of $12.50—more than the advertiser was ever willing to pay. Davis Ex. 2 ¶¶203, 204.a.

Google's own expert agrees that Google tracked the "debt" that such advertisers owed for getting a "discount." Davis Ex. 44 (Milgrom Rep.) ¶439. He also agrees that on "some impressions

**\*\* FILED UNDER SEAL \*\***

for which the highest bid was above the amount required to win the impression in the absence of DRS, AdX would collect its standard revenue share *plus an additional payment to recoup debts previously accrued by . . . advertisers under DRS v2*." *Id.* ¶440 (emphasis added).  If DRS was disclosed, advertisers would have changed their bidding strategy—the fact that there *were any* bids in the "dynamic" region demonstrates that advertisers used poor strategy, almost certainly because they did not know about DRS. *See* Davis Ex. 3 ¶¶518.a, 525.a, 528.

### 3.  *Bernanke: Google Charged Advertisers The Second Price, Paid Publishers Less Than That, And Earmarked The Spread To Subsidize Other Google Bids.*

Before RPO and DRS, Google had already initiated, in November 2013, an original subversion of the second-price auction: Project Bernanke. Ex. 75 (Google's First Am. Resps. & Objs. to Pls.' 3d Set of Interrogs.) at 12. In the "Pre-Bernanke world," AdX ran "a second price auction." Ex. 33 (GOOG-AT-MDL-003407129) at -131. But Bernanke exploited Google's observation that its buy-side tool, GDN,[5] typically "submits *two bids* into [the] AdX auction . . . and second-prices itself in ███ of its wins[.]" Ex. 28 (GOOG-NE-06839089) at -094; RSMF ¶109. Put differently, when a GDN bidder won an AdX auction, it typically paid a second price set by another GDN bidder. This presented Google with an arbitrage opportunity: "if we only submitted one bid to AdX . . . this would be very good for us." *See* Ex. 35 (GOOG-AT-MDL-001412616) at -619.

So, instead of submitting bids truthfully, Bernanke first *reduced* the smaller Google-controlled bid. Davis Ex. 2 ¶¶233-34; Ex. 28 (GOOG-NE-06839089) at -099; RSMF ¶110. This often reduced the clearing price of the auction, RSMF ¶114, but Google *charged the winning advertiser as if Google had not reduced the smaller bid*, capturing more money from the advertiser than the publisher received. Davis Ex. 2 ¶233; Ex. 28 (GOOG-NE-06839089) at -099. Google then

---

[5] GDN, Google Ads, and Google Adwords are different names for the same buy-side tool.

**\*\* FILED UNDER SEAL \*\***

placed this extra money into a "pool" and used it to perform Former Federal Reserve Chairman Bernanke-style "quantitative easing." Ex. 28 (GOOG-NE-06839089) at -098; *see also* Davis Ex. 2 ¶233. This second part of Bernanke inflated the *highest* Google-controlled bid, which caused GDN to win more auctions, including some with a "high pub[lisher] reserve" that exceeded any bidder's true value. Ex. 28 (GOOG-NE-06839089) at -098. This increased Google's revenues while sacrificing transparency, efficiency, and the basic concept of a true second-price auction. As one employee aptly put it, Google "subsidize[d] queries below third-party price with money we over charge from other queries." Ex. 82 (GOOG-DOJ-15418378).

Google's employees knew Bernanke was deceptive. Emails from July 2013 describe the genesis of Bernanke: the realization that if Google used its buying tool to "stop[] submitting a second price in the AdX bid it would be essentially like we were *gaming our own auction*." Ex. 37 (GOOG-AT-MDL-B-002086688) at -689 (emphasis added). The "biggest worry" with this manipulation was that "second price auctions have various theorems that (non-colluding) actors have optimal strategy to bid their true value" which Bernanke would wreck, requiring a rational, informed advertiser to "bid above the true value." *Id.* at -688. Google's employees realized that Bernanke "doesn't seem to actually work out to a fair deal for the publisher" and would constitute "the implicit unfair transfer of value from one advertiser to another" because Google's newfound "pot of money to use to boost other ads" "might go to another advertiser." *Id.* That didn't matter to Google. What mattered was Bernanke's ███████ in incremental revenue in 2015 alone. Davis Ex. 14 ¶100.

In 2016, Bernanke went "global." RSMF ¶129. Bernanke originally used the "pool" to subsidize other auctions involving the same publisher, but "Global Bernanke" "remove[d] the margin constraint per publisher." Ex. 33 (GOOG-AT-MDL-003407129) at -135. That is, when

** FILED UNDER SEAL **

Google underpaid a publisher (by reducing the second bid), it initially endeavored to repay the publisher by inflating Google-affiliated bids in that publisher's other auctions. "Global Bernanke" only balanced the "pool" and the subsidy *overall*, effectively redistributing from one advertiser to another, but now also from one publisher to another. RSMF ¶130. This "[a]dded another ████." Ex. 33 (GOOG-AT-MDL-003407129) at -135. Illustrating Google's awareness and attention to the company-wide impacts of Bernanke, when the company switched to Global Bernanke, it understood that ████████████████████████████████████████████████ ██████████████████████████████████ Ex. 77 (GOOG-DOJ-15724551) at -551.

Google changed the formula behind Bernanke in February 2017 for advertisers using autobidding by charging them the minimum bid needed to have won the auction. But by Google's own admission, this transition to "threshold payments" only impacted *advertisers* who used autobidding tools and never impacted publishers, who were still harmed. RSMF ¶¶131-34. In other words, from February 2017 to May 2019 when Google switched AdX to a first-price auction, Bernanke preserved a second-price mechanism only from the perspective of advertisers using Google's autobidding tools. Publishers were still impacted by Bernanke's manipulations.

**B.    After Finally Abandoning The Pretense Of A Second-Price Auction In 2019, Google Made New False, Misleading, And Deceptive Statements.**

Google abandoned its second-price auction model in May 2019, substituting a "unified first-price auction." RSMF ¶137. Google claimed that by "switching to a single first price auction," it could "reduce complexity and create a fair and transparent market for everyone." McCallum Ex. 45 (GOOG-AT-MDL-C-000072098) at -099. It also claimed that the switch would allow "[a]ll participants . . . [to] compete equally for each impression on a net basis." RSMF ¶227 (citing Ex. F to Google's 12(b)(6) Motion to Dismiss, Dkt, 224-1). These statements were false and deceptive.

** FILED UNDER SEAL **

The starting point for the 2019 change was the emergence of header bidding, a technology not under Google's control, which enabled competition among exchanges like AdX in a first-price "auction of auction[s] for the impression." Davis Ex. 2 ¶94. Publishers were adopting header bidding rapidly and Google believed by 2017 that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Ex. 39 (GOOG-TEX-00105361) at -385. So, Google constructed a "last look" system in which "the header bidders are called first and a first-price auction is run amongst them" and then the highest header-bidder bid "is sent as a floor to AdX," which then runs a "second-price" AdX auction. Ex. 49 (GOOG-DOJ-AT-01130527) at -532; RSMF ¶79. Publishers understood that this "last look" let Google's buy-side tools see the AdX floor (which, recall, was the highest header bidding bid) *before* bidding, which allowed Google's advertisers to barely exceed it; Google perceived that some publishers responded by inflating bids on other exchanges to raise the winning header bidding bid (and, therefore, the AdX floor). Ex. 49 (GOOG-DOJ-AT-0113057) at -533.

Contrary to Google's representations, the AdX format shift in 2019 was not about making things fair and transparent or providing equal footing, nor did the switch achieve those goals. Instead, the purpose was to provide cover for new deceptive moves to consolidate Google's position and to impair a threatening technology. RSMF ¶79.

Many examples show this motivation. For example, Google used the change to implement "unified pricing rules," which prohibited publishers using AdX from setting different reserves for different exchanges, which reduced the utility of header bidding. Davis Ex. 2 ¶¶162-82; RSMF ¶80. Google also degraded the data available to publishers, preventing them from using the historical completed auction data Google provided to set optimum reserve prices on competing exchanges. Ex. 41 (▉▉▉▉ Dep. Tr.) at 34:20-35:18, 36:6-38:15, 46:2-48:15; *see also* Ex. 79 (GOOG-DOJ-29427368) at -001, 003; RSMF ¶210. These changes led one publisher to tell Google

**\*\* FILED UNDER SEAL \*\***

that ████████████████████. Ex. 65 (GOOG-DOJ-15772422) at -424. There was no legitimate privacy justification for these degradations. *See* Davis Ex. 32 (Shafiq Rebuttal Rep.) ¶¶17-36.

Google also implemented "smart bidding" to replicate the "last look" advantage it was purporting to give up, which used information only in Google's possession. RSMF ¶79; Ex. 43 (GOOG-TEX-00841213) at -225 ("If we knew our competitor's bid exactly, we can simply bid a cent above that"; "But we don't have this information before the auction, so we need to predict competitor's bid"); Davis Ex. 43 (Somayaji Rebuttal Rep.) ¶¶24-42 (analyzing Google's source code and showing that Google's buy-side tools received more data than third-party buyers). Google continued to have a preferential contract it entered on September 28, 2018, with Meta Platforms, Inc. ("Meta"), which gave Meta advantages for its sell-side tool, the Facebook Audience Network, within the AdX auction environment. Ex. 44 (FBDOJGOOG_00478712). These advantages included ████████████████, ████████████████, ████████ ████████████, a guaranteed match rate for Meta, and malware identification for Meta. Davis Decl. 52 (Gans Rep.) ¶874. Finally, as Google itself admits, RSMF ¶¶139-40, a version of Bernanke that it deemed "Alchemist" remained in place after 2019. Google "want[ed] this mechanism to be truthful from buyers' perspective," Ex. 45 (GOOG-AT-MDL-013274837) at -837, but by continuing the program, sought to advantage Google-affiliated buyers at the expense of publishers using the AdX exchange.

### C.    Google's Manipulations And Efforts To Obscure Them Prevented Participants From Understanding The Rules Applying To Any AdX Auctions Google Operated.

In Google's auctions, all is not as it seems. Google told employees internally to push the idea that its efficient auctions would "cause an increase in high-quality, innovative display ads, which will make for better, more interesting ads." Ex. 34 (GOOG-NE-06567486) at -489. Yet

**\*\* FILED UNDER SEAL \*\***

Google's many undisclosed manipulations made it "impossible for auction participants and competing exchanges to understand the rules that governed and applied to auctions run by Google, skewing decision-making and outcomes." Davis Ex. 29 ¶360. Without "accurate, full, and timely disclosure, advertisers and participants [could not] optimize their bidding strategies or engage with the auction effectively." *Id*. ¶347.

Google did not just deceive by manipulating individual auctions; it also deceived by not telling participants *when* or *if* or *how* it was manipulating *any* specific auction it ran. Google programmatically added artificial variance in the form of probabilistic throttling of its manipulations (turning them on and off) and ███████████████████████████████ ███████████████████ Davis Ex. 3 ¶¶97 & n.94, 113. Google also took affirmative steps to *obscure* from specific auction participants when its manipulations applied. For example, when participants detected its schemes, Google responded by randomizing and perturbing the operation of those schemes to stymie detection, and then issued false denials, claiming that its full-fledged revenue-boosting programs were merely experiments. Davis Ex. 3 ¶¶69-70, 130.

The purpose of hiding and attempting to obscure detection of these programs was to preserve the benefits of both Google's claim to a second-price auction (the allure of a "faster, less costly, and more fair" format, Davis Ex. 1 (Weinberg Dep. Tr.) at 119:24-121:5), and the revenue[6] benefits of running some auctions as not second-price. By interspersing its deceptions in an indetectable way, Google deprived auction participants of the ability to react in their own best

---

[6] Certain of Google's deceptions, RPO and Bernanke, were also designed to migrate more transactions to its exchange, AdX. Davis Ex. 41 (Rudin Rebuttal Rep.) ¶241. In doing so, Google gave itself another advantage at the expense of auction participants' understanding of any auction it ran: it provided itself with more data, which it could then use to train the tools that it used to refine its manipulations, creating a cycle of revenue optimization premised on opacity that shut out competitors. *Id*. ¶¶243-45.

**\*\* FILED UNDER SEAL \*\***

interests in *any* auction. Davis Ex. 29 ¶360. Imagine a car salesman who sells a lemon every tenth car to reduce his costs; further suppose that the lemons qualify as such for different reasons (*e.g.,* one has a faulty engine, another has defective brake pads), to make it harder to detect the salesman's tactics. *Eventually,* the community the salesman serves will figure out that something is not right, impacting buyer behavior for *all* cars from that dealer.

Indeed, which auctions were lemons was embedded so deeply that when asked to produce simple estimates of the shares of auctions to which its specific manipulations applied, Google objected, insisting that it did not keep any ordinary course records and that creating a "bespoke transaction-level dataset" would create an "immense" burden, which "would entail evaluating trillions of auction transactions across more than a decade" and "might not ultimately be successful." Dkt. 482 at 2; *see also* Ex. 46 (███████ Decl.) ¶8.[7]

So, rather than producing data about individual transactions impacted directly by its deceptions, Google produced data reflecting ██████ of "web display transactions through AdX and Open Bidding involving U.S. users" both directly and indirectly impacted by its misconduct. Ex. 47 (Letter from D. Pearl to M. Mao and W. Noss, May 30, 2023). Google kept this data in a way that ████████████████████████████████████████████████████████ ███████████████████████. Davis Ex. 9 (Andrien Rep.) ¶97, Ex. 4. Using Census data on the share of internet users in each of the States—the ultimate recipients of the ads and the motivation behind the auctions to begin with—Plaintiff States' expert concludes that, during the relevant period, Google ran ██████ auctions in the States while engaging in the RPO, DRS, Bernanke,

_____

[7] Internal Google documents contain rough estimates of the share of auctions with winning bids involving specific manipulations applied. Davis Ex. 9 (Andrien Rep.) ¶99 n.269. In addition, though it was initially unwilling, Google is technically capable of knowing the number of auctions implicating its deceptions. Ex. 46 ██████ Decl. ¶¶6-9.

**\*\* FILED UNDER SEAL \*\***

and equal footing deceptions described above. Even Google's own expert, who parses the same dataset based on Google's more biased assumptions, concedes that there were ████ potential ad tech auctions implicated by Plaintiff States' DTPA allegations. Ex. 85 (Wiggins Rep.) ¶143.

### D. Personal Information: Google Broke Its Promises By Selling User Personal Information Through Its Auctions.

Google's privacy policy represents that "Google does not sell your personal information."[8] But Google does sell its users' personal information. RSMF ¶228. Every time an advertiser makes a "bid request" to the AdX platform, Google displays to the advertiser a plethora of user data. Ex. 48 (GOOG-AT-MDL-013918668) at -678-81. Google acknowledges internally that the "very basics of programmatic ad buy" is "devoted to collecting/storing/analyzing data pertaining to the user" receiving the advertisement. *Id*. at -681. Google agrees that as part of a successful auction, the publisher sends to AdX, and Google provides to advertisers, certain information about users that includes a user's internet protocol address, geolocation, and device information. RSMF ¶228. Members of Congress have expressed concern about this practice of "[h]undreds of potential bidders" receiving and storing this "bidstream" data "to compile exhaustive dossiers" about web users. Ex. 73 (GOOG-DOJ-AT-01933085) at -085.

### LEGAL STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Id*. (quoting *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010)). "To decide if the non-movant has raised a genuine

---

[8] Google Privacy Policy, *available at* https://policies.google.com/privacy?hl=en-US (last visited Dec. 8, 2024).

** FILED UNDER SEAL **

issue, we view all facts and evidence in the light most favorable to him and draw all reasonable inferences in his favor." *Id*. Where constitutional issues are implicated, summary judgment as a "form of disposition is often inappropriate in cases involving issues of far-flung import." *Sindermann v. Perry*, 430 F.2d 939, 943 (5th Cir. 1970), *aff'd*, 408 U.S. 593 (1972). Even where the district court could determine the constitutional question, "that [is] not the district court's job. Rather, the district court properly decline[s] to resolve genuine, material factual disputes—that is the jury's job." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 344 (5th Cir. 2020).

Further, "[a]n inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Van Winkle v. Rogers*, 82 F.4th 370, 382 (5th Cir. 2023) (quoting *Whitt v. Stephens Cnty.*, 529 F.3d 278, 285 (5th Cir. 2008)).

## ARGUMENT

Plaintiff States have Article III standing to bring the DTPA claims. They also each have authority to sue to enforce their DTPAs, as the law of each Plaintiff State provides. Google's insistence that the Court decline supplemental jurisdiction over the DTPA claims is no more than a call to chaos, premised on Google's tactically motivated but unfounded doubts about the administrability of this action. There also exist genuine issues of material fact for trial as to Google's RPO, DRS, Bernanke, equal footing, and personal information deceptions, which a reasonable jury could conclude affected ██████ of auctions, distorting the States' markets. Further, various tolling doctrines apply to extend Google's liability back to the initiation of its first deception, Bernanke, in 2013, irrespective of its attempts to recharacterize those deceptions as impacting only auction participants instead of the internet users within the States. Users, after all, are the ultimate reason for ad tech, as their attention is the *sine qua non* of every auction transaction.

**\*\* FILED UNDER SEAL \*\***

I.    **The States Have Article III Standing And Statutory Capacity To Bring DTPA Claims.**

"Article III of the Constitution restricts the federal judicial power to the resolution of 'Cases' or 'Controversies.'" *Texas v. United States*, 50 F.4th 498, 513 (5th Cir. 2022). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id*. (citation omitted). States may "litigate as *parens patriae* to protect quasi-sovereign interests—*i.e.*, public or governmental interests that concern the state as a whole." *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 n.17 (2007) (citation omitted).

Google seeks summary judgment because Plaintiff States purportedly lack constitutional standing to bring the DTPA claims. Mot. at 5-16. But these arguments rely on Google's confusion about the nature and purpose of the DTPA claims, its conflation of monetary damages owed to a private litigant with the injury to quasi-sovereign and sovereign interests, and its merits arguments about the appropriate quantum of penalties upon a finding of liability. When viewing the DTPA claims as the public enforcement claims they are, rather than as the representative claims on behalf of private litigants that Google wants them to be, Google's misconduct gives rise to an injury-in-fact to Plaintiff States' quasi-sovereign and sovereign interests.

A.    **The States Have *Parens Patriae* Standing To Bring DTPA Claims To Vindicate The Established Quasi-Sovereign Interest In Ensuring The Integrity Of Markets.**

Plaintiff States have *parens patriae* standing based on "a quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). *Parens patriae* standing based on a quasi-sovereign interest requires Plaintiff States to "articulate an interest *apart from* the interests of particular private parties" rather than damages or harms to such parties. *Id*. (emphasis added). Consistent with that requirement, a quasi-sovereign injury must implicate "a sufficiently substantial segment of [the States'] population." *Id*. "One helpful indication in determining

** FILED UNDER SEAL **

whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.*

"History and tradition guide" the analysis of whether a State may properly claim *parens patriae* standing. *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769 (5th Cir. 2023) (citation omitted). One historically established quasi-sovereign interest is protection against acts that "threaten[s] the State's economy." *Id.* at 773 & n.36 (citing *Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 450 (1945)). This quasi-sovereign interest extends to enforcing consumer protection laws to secure honest marketplaces by, here, protecting against an ad tech monopolist's manipulation of the auction rules that impact how virtually all citizens interact with the digital economy.

Applying these principles, the "weight of authority from various Circuits find[s] that states have quasi-sovereign interests in the enforcement of consumer protection laws" to protect the honest operation of markets. *Dist. of Columbia v. JTH Tax LLC*, No. CV 22-03165, 2023 WL 130736, at *4 (D.D.C. Jan. 9, 2023); *accord AU Optronics Corp. v. South Carolina*, 699 F.3d 385, 393-94 (4th Cir. 2012) (states possess a quasi-sovereign interest in pursuing enforcement of consumer protection and antitrust laws); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 07-01827, 2011 WL 560593, at *5 (N.D. Cal. Feb. 15, 2011) ("States have a sovereign interest in the enforcement of their consumer protection and antitrust laws . . . [and] in securing an honest marketplace"); *Illinois v. SDS W. Corp.*, 640 F. Supp. 2d 1047, 1050 (C.D. Ill. 2009) ("securing an honest marketplace" is "a well-established quasi-sovereign interest") (collecting cases); *Hood v. AstraZeneca Pharms.*, *LP*, 744 F. Supp. 2d 590, 596 (N.D. Miss. 2010) ("The fact that another party may benefit from a favorable resolution of this case does not minimize or negate the State's substantial interest" in enforcing its consumer protection statutes.).

** FILED UNDER SEAL **

Against this wall of precedent, Google relies selectively on a single snippet from *Jefferson Parish* that a state asserting a quasi-sovereign interest "must do more than meet Article III's irreducible minimum," but omits the very next clause *in the same sentence* explaining that what this means is that a state "must assert a quasi-sovereign interest 'apart from the interests of particular private parties.'" 78 F.4th at 769 (quoting *Snapp*, 458 U.S. at 607). The omission was necessary, as Google relies on *Jefferson Parish* for exactly the *opposite* proposition: that to have *parens patriae* standing, the States must show that particular citizens suffered Article III injury. Mot. at 8. Given what *Snapp* and its progeny require, the Second Circuit has rejected this very argument:

> Defendants argue that in order for states to sue in their *parens patriae* capacity, the citizens that the states seek to protect must themselves satisfy Article III's core requirements. In so arguing, Defendants attempt to import into *parens patriae* standing the Article III requirements for organizational standing . . . . [But] *Snapp* did not require states suing as *parens patriae* to meet the test for organizational standing. *In fact, it required the opposite, i.e.,* that the individuals with adversely affected interests could not obtain relief via a private suit; that the interest asserted by the state must be *apart from* the interests of the individual citizens on behalf of whom it was suing.

*Connecticut v. Am. Elec. Power Co*., 582 F.3d 309, 338-39 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011) (emphasis added).[9]

---

[9] Even if the States needed to show injury to individual citizens to establish *parens patriae* standing, which they do not, the record contains evidence of such injury. Google's employees admit as just one example of how its manipulations impacted participants that "setting optimized prices on behalf of publishers makes queries more expensive for buyers." Ex. 3 (GOOG-NE-06151351) at -353. Courts presume that businesses pass increased costs to consumers. *See, e.g.*, *Utah ex rel. Wilkinson v. B & H Auto*, 701 F. Supp. 201, 204-05 (D. Utah 1988) ("The situation in which deceptive Supplier A charges innocent intermediate Supplier B an inflated price and B then passes that inflated price to Consumer C is easily foreseeable, and one from which the consumer should be protected."). The States' personal information evidence—that Google's ad tech auctions amounted to sales of consumer data—also support cognizable injury. *See Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1149 (7th Cir. 2020); *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1274 (9th Cir. 2019); *Coulter-Owens v. Time Inc.*, 695 F. App'x 117, 121 (6th Cir. 2017).

** FILED UNDER SEAL **

Here, Google's deceptions undermined the integrity of the States' marketplaces for the delivery of online ads. To be sure, certain individual consumers were harmed by this deceptive conduct, seeing a misplaced ad for the wrong product compared to what would have obtained in a market untainted by Google's mendacity. But the enduring, pervasive, and multipronged nature of Google's deceptions ensured that the *entire* ad tech marketplace was grossly dysfunctional. That is a classic quasi-sovereign injury to the "economic" "health and well-being" to the States' "residents in general" that Article III has authorized federal courts to redress for over a century. *Snapp,* 458 U.S. at 607; *cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021) (finding "reputational harm" a sufficiently concrete constitutional injury). The injury is traceable to Google's actions, as "there is ordinarily little question that the action or inaction has caused [a plaintiff] injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). It is appropriately "apart from" injuries to individual consumers, because it speaks to the integrity of the entire market, not the effect on any individual market participant. *Snapp*, 458 U.S. at 607. That the States do not quantify any one citizen's monetary damages is a reason to find, not reject, *parens patriae* standing.

**B.    The Relief The States Request Would Redress The Injuries Google Inflicted On The States' Economies By Deterring Google's Future Misconduct.**

Google also claims that the injuries Plaintiff States assert are not redressable by the injunctive relief and civil penalties requested because, in Google's view, its misconduct ended in 2019, before Plaintiff States sued. Mot. at 10-16. Put to one side that Google's deceptions lasted long after 2019, *see* Background Section II, *supra,* a factual dispute this Court must construe in the States' favor. The "redressability" prong of standing doctrine does not constitutionally limit the forms of relief that are available to sovereigns to the damages that, on the *merits,* are available to private parties. A civil penalty to deter future wrongdoing, both by Google and by other would-be lawbreakers, more than satisfies the constitutional minimum. Said differently, this action is no less

24

**\*\* FILED UNDER SEAL \*\***

a "case" or "controversy" because Plaintiff States seek statutorily specified penalties as opposed to *quantum meruit*, restitution, or expectation damages.

Typically, "[t]o determine whether an injury is redressable," courts "consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (cleaned up). There is an obviously constitutional relationship between financially punishing Google (the judicial relief requested) for the widespread harm it imposed on the ad tech marketplace (the injury suffered). That the *quantum* of damages (statutory penalties) differs from what a private litigant could recover (*i.e.* lost profits) is a policy choice that Article III does not restrict in any way. That would be true even if Plaintiff States were akin to private litigants. But they "are not normal litigants for the purposes of invoking federal jurisdiction" and may be "entitled to special solicitude" in the Article III analysis if they can show a procedural right to challenge an action that impacts "a quasi-sovereign interest." *Texas*, 50 F.4th at 514 (citing *Massachusetts*, 549 U.S. at 518, 520). When "special solicitude is appropriate, a state can establish standing 'without meeting all the normal standards for redressability and immediacy.' Standing will exist 'if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Id.* (quoting *Massachusetts*, 549 U.S. at 518).

Here, Plaintiff States seek civil penalties and an injunction to deter Google from further deceptive misconduct in running ad tech auctions. Dkt. 366 at 1-2. Under longstanding precedent, even a non-sovereign not entitled to special solicitude may seek injunctive relief, where authorized by statute, to stop potential future misconduct, satisfying Article III's redressability requirement. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998); *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 310 (5th Cir. 2023). Civil penalties designed to penalize past

**\*\* FILED UNDER SEAL \*\***

acts can also support standing by creating deterrence that redresses injury. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 187 (2000) (noting "the principle that civil penalties provide sufficient deterrence to support redressability"); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 63 n.4 (1987) ("Congress knows how to target past violations when it wants to do so."); *United States v. Cent. Adjustment Bureau, Inc.*, 667 F. Supp. 370, 386 (N.D. Tex. 1986), *aff'd as modified,* 823 F.2d 880 (5th Cir. 1987) (awarding civil penalties for past violations).

Google's theory that Plaintiff States lack standing to seek civil penalties for past violations, even when authorized to do so by statute, hinges on its misinterpretation of *Steel Co.*, in which a private organization sued a polluter for past violations of a federal law requiring environmental reporting. 523 U.S. at 86-87. That law created a private right of action which authorized civil penalties payable only to the sovereign. *Id*. at 106. The Supreme Court's ruling that the private organization lacked standing on redressability grounds did not turn on the fact that the penalty was payable to the sovereign as Google says, but rather on the fact that the penalty was *not payable* to the plaintiff. *Id*. at 106 ("[C]ivil penalties authorized by the statute, *see* § 11045(c), might be viewed as a sort of compensation or redress to respondent *if they were payable to respondent*. But they are not." (emphasis added)). "In short, *Steel Co.* held that private plaintiffs, *unlike the Federal Government*, may not sue to assess penalties for wholly past violations." *Friends of the Earth*, 528 U.S. at 188 (emphasis added).

Google attempts to explain this away by conflating its distinct and misguided contention, contra *Snapp*, 458 U.S. at 607, that *parens patriae* standing requires a showing of injury *to* citizens rather than *apart from* them. Mot. at 10 n.6. Google rests this position not on Justice Scalia's controlling majority opinion for the Court in *Steel Co.* but instead on Justice Stevens's concurrence

**\*\* FILED UNDER SEAL \*\***

in judgment. Mot. at 11. But a concurrence in judgment, much like a dissent, "is generally not the best source of legal advice on how to comply with the majority opinion." *Students For Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 230 (2023). Regardless, Justice Stevens put this very idea to bed by later authoring the controlling opinion in *Massachusetts* confirming that the States are "entitled to special solicitude in our standing analysis." 549 U.S. at 520. The Court should reject Google's attempt to reawaken it.

Google similarly overreads *Friends of the Earth*, in which the Supreme Court again assessed a private litigant's standing to seek civil penalties payable to the public fisc. 528 U.S. at 173. This time, recognizing that all civil penalties (even those payable only to the sovereign) have some deterrent effect, the Supreme Court held that private plaintiffs *do* have standing to sue if they allege harms that are ongoing at the time of the suit. *Id.* at 185-88.[10]  In limiting the scope of *Steel Co.*, the Supreme Court was quite careful to *reject* Google's "unvarying, black-letter rule," Mot. at 11, that *public* enforcers lack standing to sue for wholly past violations. *Id.* at 188 ("private plaintiffs, unlike the Federal Government, may not sue to assess penalties for wholly past violations"). That makes sense because such a rule would fatally undermine the "special solicitude" States receive in the Article III context, *Massachusetts*, 549 U.S. at 520. The Court should reject Google's creative misinterpretation of the Supreme Court's precedents.

Even if Google was right on the law, and it is not, it is wrong on the facts. "A plaintiff can prove an ongoing violation at trial . . . by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date *when there is no real likelihood of*

---

[10] Google's reliance on *Carr v. Alta Verde Indus., Inc.*, fares no better, as that case was also about situations in which "*citizens* do not have standing to seek civil penalties for wholly past violations." 931 F.2d 1055, 1058 (5th Cir. 1991) (emphasis added).

** FILED UNDER SEAL **

*repetition.*" *Carr*, 931 F.2d at 1062 (quotation omitted; emphasis added). Here, the evidence at trial will show that Google continues to hold a dominant position across all spheres of ad tech, that it *currently and expressly* reserves the right in the future to run "optimiz[ations]" like those the States allege,[11] and that its employees have continued to perform experiments to identify new sources of profit. *See, e.g.*, Ex. 51 (███ Dep. Tr.) at 90:22-91:19 (confirming that DRS and RPO began as experiments); *id.* at 168:18-169:11 (explaining that "███████████████████████████████ █████████████████████████████"); *see also* RSMF ¶220; Ex. 9 (GOOG-AT-MDL-B-001646464) at -468 ("██████████████████████████████ █████████████████████████████████████"); Ex. 8 (███ Dep. Tr.) at 28:25-29:15 ("it's not so difficult to implement different auction rules"). This evidence of Google's continued ad tech dominance, coupled with its culture of rule manipulation and its recurrent privacy violations, defeats Google's redressability argument. Any other outcome would embolden Google to resume manipulations on the specious ground that public enforcement is somehow unconstitutional unless Google is caught in the act and not a moment later.

### C.    The States Have Sovereign Standing To Sue Because They Have An Interest In Enforcing Their Laws.

The States also have sovereign standing. The Supreme Court recognizes that States have at least two sovereign interests they may pursue in federal court. "First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal; second, the demand for recognition from

---

[11] "Ad Manager may run limited experiments designed to optimize the auction. These experiments may include: modifying the standard auction model or mechanics, simulating ad calls and auctions, modifying the CPM price set by the publisher for an impression or otherwise adjusting publisher settings, discounting certain bids submitted by buyers or otherwise modifying the priority of the bids submitted by buyers." *See* https://support.google.com/admanager/answer/152039?hl=en.

** FILED UNDER SEAL **

other sovereigns—most frequently this involves the maintenance and recognition of borders." *Snapp*, 458 U.S. at 601.

Here, Plaintiff States' power to enforce their laws is at issue. Without the ability to bring these consumer protection claims in federal court, Plaintiff States would have to split the claims between state and federal court. That means Plaintiff States would have to invest in eighteen lawsuits—one federal antitrust case and seventeen state-law cases. This would be cost prohibitive, imposing a severe impediment to the States' ability to enforce their laws. In contrast, *Jefferson Parish* turned on the fact that Louisiana "attempt[ed] to invoke federal jurisdiction to enforce mostly state law against a subordinate," and "[n]either history nor tradition supports the use of our Article III judicial power in this way." 78 F.4th at 771. The States invoke federal jurisdiction against a private party operating within their borders to enforce state laws in a manner that, as described in Section I.A above, has significant historical precedent.

Relying further on *Jefferson Parish* and *Mississippi v. Becerra*, 727 F. Supp. 3d 559, 580 (S.D. Miss. 2024), Google contends that the States do not have sovereign standing because they cannot show that their attempts to enforce the law have been impeded. Mot. at 7. But Plaintiff States must and do have authority to enforce their laws, and *Becerra*'s admonition that a "violation of state law does not become an [Article III] injury until . . . the violator . . . hinders the State" from "bring[ing] the violator into compliance with the law" undercuts Google's position on sovereign standing. *Id*. As noted above, Google's DTPA violations were premised largely on an effort to hide and obscure its deceptive programs from the public. Google's attempts to impede the investigative function gives rise to sovereign standing, further distinguishing this case from *Jefferson Parish*. *See* 78 F.4th at 770 (finding no sovereign standing where state was "not hindered from enforcing its laws" against subordinate entity).

**\*\* FILED UNDER SEAL \*\***

### D.    Plaintiff States' Attorneys General Have Capacity To Sue In This Court.

Thwarted by the Constitution, Google next invokes the Federal Rules of Civil Procedure. It claims Rule 17(b)(3) and Texas law work in tandem to revoke attorneys general's "capacity to sue." Mot. at 16-20. This argument reflects deep-seated confusion. The attorneys general are not minor children or defunct corporations—clearly each has the *capacity* to sue. Google does not dispute that the parties here (rather than another governmental organ) can represent each Plaintiff State. More than that, each has a statute specifically authorizing DTPA suits.[12] Parties have not invoked Rule 17(b)(3) in contexts like these because there is no question about the capacity of attorneys general to pursue suits in the public interest:

> [T]he attorneys general of our states have enjoyed a significant degree of autonomy. Their duties and powers typically are not exhaustively defined by either constitution or statute but include all those exercised at common law. There is and has been no doubt that the legislature may deprive the attorney general of specific powers; but in the absence of such legislative action, he typically may exercise all such authority as the public interest requires. And the attorney general has wide discretion in making the determination as to the public interest.

*Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268-69 (5th Cir. 1976). Reflecting this common law power (plus the DTPA-specific authorizing statutes), every Plaintiff State grants its attorney general broad authority to represent the Plaintiff State in civil cases like this one. App'x A (Powers of Attorneys General).

Rather than *capacity* to sue, Google really challenges the *venue*, which should be decided based on rules of venue or personal jurisdiction. That is because even for a state law claim,

---

[12] Alaska Stat. §§ 45.50.501, 45.50.551; Ark. Code Ann. § 4-88-113; Fla. Stat. §§ 501.203(2), 501.207(1); Idaho Code § 48-606(1); Ind. Code § 24-5-0.5-4(c); Ky. Rev. Stat. Ann. § 367.190; La. Stat. Ann. §§ 51:1407(A) and (B); Miss. Code Ann. §§ 75-24-9, 75-24-19; Mo. Ann. Stat. § 407.100; Mont. Code Ann. §§ 30-14-102(2), 30-14-111; Nev. Rev. Stat. § 598.0963(3); N.D. Cent. Code. § 51-15-04; P.R. Laws Ann. tit. 10, § 269; S.C. Code Ann. § 39-5-50(a); S.D. Codified Laws § 37-24-23; Tex. Bus. & Com. Code Ann. §§ 17.45(8), 17.47(a), (c); Utah Code Ann. §§ 13-11-3(3), 13-11-17(1).

**\*\* FILED UNDER SEAL \*\***

"jurisdiction is to be determined by the law of the court's creation, and cannot be defeated by the extraterritorial operation of a statute of another state, even though it created the right of action." *Tenn. Coal, Iron & R.R. Co. v. George*, 233 U.S. 354, 360 (1914). Most[13] statutes Google cites merely *authorize* venue or jurisdiction in state courts. App'x B (Jurisdictional and Venue Provisions). None purport to strip the attorney general of his *capacity* to sue if he files in another court. Google does not (because it cannot) point to a single case in which any court, in Texas or otherwise, interpreted one of the statutes it cites to affect capacity to sue.

Google also suggests that States other than Texas may never sue in Texas courts because Texas law requires express statutory authority, Mot. at 18-19, but that is not the law. Instead, Texas law permits courts in Texas to "recognize the laws of other states with the expectation that those states will extend Texas the same consideration." *Greenwell v. Davis*, 180 S.W.3d 287, 292 (Tex. App. 2005). "Comity is a doctrine grounded in cooperation and mutuality." *K.D.F. v. Rex*, 878 S.W.2d 589, 593 (Tex. 1994). "[U]nder this 'principle of mutual convenience,' Texas will recognize the laws and judicial decisions of other states, expecting that those states will extend Texas the same consideration." *Id.* at 593-94.

A hypothetical demonstrates the unworkability of Google's theory.  Suppose a state had initially filed its suit in *state* court, and Google removed, citing federal question jurisdiction.  Could it really be true that simply moving the case to federal court destroys the state-law claims (because the state lacks "capacity" to bring them in a federal tribunal)? This would threaten to turn procedural questions of venue and capacity into case-ending blockbusters. It also would render the

---

[13] Google concedes that Florida's and Indiana's DTPAs contain no provisions regarding specific venues in which attorneys general may file. Mot. at 18; Mot. App'x A.

**\*\* FILED UNDER SEAL \*\***

removal statute, which is about the *jurisdiction* of a federal court, into a *merits* statute that causes the court to dismiss state-law claims. That is, in short, preposterous.

Not only does Google produce no authority for its reading of Rule 17(b)(3), but it also ignores that federal courts in this State regularly permit suits by Texas's Attorney General seeking to enforce the DTPA alongside a federal claim. *See, e.g.*, *Texas v. Colony Ridge, Inc.*, No. CV H-24-00941, 2024 WL 4553111 (S.D. Tex. Oct. 11, 2024); *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001). Instead, Google points exclusively to cases in which Texas was the *defendant. See Media Matters for Am. v. Paxton*, No. 24-cv-00147, 2024 WL 1773197 (D.D.C. Apr. 12, 2024); *Tex. State Troopers Ass'n, Inc. v. Abbott*, No. A-13-CA-974, 2014 WL 12479651 (W.D. Tex. Apr. 16, 2014). Those cases are irrelevant to Google's argument because they implicate sovereign and official immunity (whether the attorney general was appropriately *sued*) and not the attorney general's *capacity* to sue. What's more, even for private litigants, "plaintiff's choice of forum should rarely be disturbed." *Schexnider v. McDermott Int'l, Inc.*, 817 F.2d 1159, 1163 (5th Cir. 1987).

The other cases on which Google relies fare no better. In *Texas v. Google LLC*, No. 4:22-CV-636 (S.D. Tex.), ECF No. 1-1, at 4, the Texas Attorney General sued in state court, not federal court. Google then tried to remove the case to federal court. But the Southern District of Texas remanded because Texas raised only state law claims and, as every student of federal courts is aware, "a state is not a citizen for purposes of diversity jurisdiction." *Louisiana v. Union Oil Co. of Cal.*, 458 F.3d 364, 366 (5th Cir. 2006) (cleaned up). The same was true in *Texas v. Veterans Support Org.*, 166 F. Supp. 3d 816 (W.D. Tex. 2015), and *Texas v. Eye Level Holdings LLC*, No. 1:11-cv-00178 (W.D. Tex. Mar. 11, 2011).

**\*\* FILED UNDER SEAL \*\***

## II.    The Court Has And Should Retain Jurisdiction Pursuant To 28 U.S.C. § 1367.

This Court has and should exercise jurisdiction to hear Plaintiff States' DTPA claims. This case is about how Google manipulated its ad tech auctions, harming both competition and the States' marketplaces. Plaintiff States seek to remedy these harms through federal antitrust claims, state antitrust claims, and DTPA claims, all arising from the same common set of facts.

Google cannot meaningfully contest the Court's *power* to exercise supplemental jurisdiction over the DTPA claims. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) ("if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole").

So, Google turns to raising discretionary concerns about the novelty and structure of this case, effectively requesting severance and transfer of the DTPA claims to seventeen state courts. Mot. at 20-22. As an initial matter, there is nothing novel or unusual about coalitions of states, or state-federal coalitions, working together to prosecute monopolists in federal court. *See, e.g.*, *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 292 (D.C. Cir. 2023) ("Forty-six states, the District of Columbia, and the Territory of Guam joined in a civil complaint charging Facebook with violating the antitrust laws"); *United States v. Microsoft Corp.*, 253 F.3d 34, 47 (D.C. Cir. 2001) ("the United States and a group of State plaintiffs filed separate (and soon thereafter consolidated) complaints, asserting antitrust violations by Microsoft"); *United States v. Google LLC*, 661 F. Supp. 3d 480, 484 (E.D. Va. 2023) (denying motion to transfer an antitrust action brought by the United States of America and eight states).

Nor is there anything novel or complex about the specific laws on which Plaintiff States rely. *See D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 207 (5th Cir. 2018) (affirming exercise of supplemental jurisdiction where state law claims arguably predominated because state and

**\*\* FILED UNDER SEAL \*\***

federal claims were "intertwined" and state law issues "while numerous, are neither novel nor complex"). Instead of citing cases to the contrary, Google cites two distinguishable cases to preview its misreading, addressed in Section III.B, *infra*, about what proof the DTPAs require. But a sovereign's DTPA enforcement action does not require reliance, injury, damages, or specific victims. App'x C (Requirements of Proof in DTPA Public Enforcement Actions).

Notably, the federal claims in this case are antitrust claims, and Plaintiff States' choice of antitrust fora are entitled to deference, as the Court is aware following the return of this matter to this Court. *Cf.* 28 U.S.C. § 1407(g) ("Nothing in this section [regarding multidistrict litigations] shall apply to any action in which . . . a State is a complainant arising under the antitrust laws"). "[T]he Congressional decision that claimants be given a wide choice of forum in antitrust cases implies that where the choice is within reasonable limits, it should not be disturbed." *Lanier Bus. Prods. v. Graymar Co.*, 355 F. Supp. 524, 528 (D. Md. 1973); *accord United States v. Brown Univ.*, 772 F. Supp. 241, 242 (E.D. Pa. 1991) ("[M]any courts, pointing to the liberal venue requirements for the government bringing an antitrust suit, have held that in such suits, plaintiffs' choice of forum is entitled to heightened respect."). Antitrust matters generally, and this case specifically, seek to address systemic misconduct. That Plaintiff States could have (if only in theory) filed cost-prohibitive separate actions in separate state courts does not provide a meaningful basis to disturb the deference afforded to venue selection in antitrust matters.

Google believes that the DTPA claims predominate because a jury may award significant DTPA penalties. But "DTPA claims" do not "present novel or complex issues," and proof among the federal antitrust, state antitrust, and DTPA claims will be shared, warranting the exercise of supplemental jurisdiction. *Marquis v. Sadeghian*, No. 4:19-CV-00626, 2020 WL 6482973, at \*3 (E.D. Tex. Aug. 11, 2020), *report and recommendation adopted,* No. 4:19-CV-00626, 2020 WL

5669838 (E.D. Tex. Sept. 24, 2020). Beyond that, the requested remedy for the federal antitrust violations is to break Google apart. To the extent a remedy determines which claim "substantially predominates" under 1367, the federal claims have pride of place.

Finally, even if some of the factors under section 1367(c) were met, the Court would have discretion to retain jurisdiction. 28 U.S.C. §1367(c) ("district courts *may* decline to exercise supplemental jurisdiction" (emphasis added)). Here, the factual overlap between the antitrust and DTPA claims is significant. The Court—and a jury—will need to hear complex testimony about Google's ad tech system. Severing the DTPA claims would require other courts to redo essentially all the same factual work more than a dozen times, greatly multiplying costs for the parties and courts. By contrast, only this Court can resolve every claim deriving from the same facts in one proceeding.[14] This is the reason supplemental jurisdiction exists. The "values of judicial economy, convenience, fairness, and comity" counsel in favor of retaining supplemental jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Google is right about one thing: this is no mine-run case. But that does not mean this case cannot be tried. The Court has exercised its discretion under Federal Rule of Civil Procedure 42 to bifurcate the trial. Besides, the Court's pre-trial rulings may narrow the issues further, and the parties will refine their case down to a manageable core for trial. Counsel for both sides are sophisticated and can present a complex case in a way that allows the jury to focus on the factual

---

[14] Some DTPAs contain both unfair competition and deception components. *See, e.g.*, Fla. Stat. § 501.204 (prohibiting both unfair "methods of competition" and "deceptive act acts or practices"); P.R. Laws Ann. tit. 10, § 259, *et seq.* (same); Mont. Code Ann. § 30-14-103 (same). For these States, Google effectively seeks dual prosecution of the *same statutory claim* in multiple fora. And Google's suggestion would also require Plaintiff States to prosecute their state antitrust and DTPA claims, deriving from the same core facts, in separate courts.

**\*\* FILED UNDER SEAL \*\***

disputes and reach a just result. Plaintiff States trust this Court to manage the trial to ensure that occurs.

### III.    Genuine Disputes Of Material Fact Exist For Trial, Precluding Summary Judgment.

### A.  Google's Own Data Shows Auctions Occurred In Each State.

Google hopes to weaponize its refusal to provide or even estimate[15] the number of auctions directly affected by each of its manipulations, a prerequisite to the analysis it now insists was legally required. So, Google twists a factual dispute over how to interpret the internal data it did produce—which shows ███████████████████████████ auctions in the States—into a malign attempt to violate Google's constitutional rights. And Google again conflates the requirement of individualized damages, reliance, and intent central to *private* DTPA rights of action with the showing of deceptive *acts* required in these public enforcement actions. These red herrings aside, the dispute over the data requires a jury resolution.

Plaintiff States' expert, Jeffrey Andrien, analyzed records of Google's ad tech auctions from 2010 to 2024. Andrien first did what experts in similar positions regularly do in assuming the validity of other experts' opinions and liability (issues for the jury to decide) and then parsing Google's available data based on those assumptions. *See, e.g.*, *VeroBlue Farms USA Inc. v. Wulf*, No. 3:19-cv-00764, 2023 WL 348963, at \*8, \*11 (N.D. Tex. Jan. 20, 2023) (finding a damages expert "may rely on hearsay, including other expert reports, in forming his opinions," and therefore denying motion to exclude where damages expert assumed liability). He expressly noted that if the trier of fact disagreed with his assumptions, it could use the data underlying his report to revise his calculations. Davis Ex. 10 ¶126.

---

[15] Plaintiff States analyzed Google's data as they did because of Google's decision. Davis Ex. 10 (Andrien Rebuttal Rep.) ¶¶44-53. Should the Court agree with Google that more data is required, the correct course would not be to grant summary judgment, but to reopen discovery and order Google to produce that data.

** FILED UNDER SEAL **

In producing the auction data on which Andrien relied, Google characterized it as reflecting ███████████████████████ Davis Ex. 10 ¶104; Ex. 47 (Ltr. from D. Pearl to M. Mao & W. Noss, May 30, 2023). Many parties are involved in each ad tech transaction: the publishers, the advertisers, and the users who generate the auction. Because the users generate the query, but Google's data did not list each user's State, Andrien used Census Bureau data on internet use to determine the share of internet users by State. Davis Ex. 9 ¶94. From there, Andrien analyzed the data to count the number of auctions in each State. He counted approximately █████████ *auctions* that Google conducted in the States while Bernanke (the longest-running misconduct) was in effect.[16] Davis Ex. 10 (Exhibit 4, "Monthly Count of Open Auctions Related to Plaintiff States for Bernanke, December 2013 to May 2024"); RSMF ¶256.

Google's own expert, Steven Wiggins, reached a different but still enormous number of auctions held within the States during the relevant period: █████. Ex. 85 (Wiggins Rep.) ¶166; Ex. 53 (Wiggins Dep. Tr.) at 171:19-173:21. That number reflected a series of narrowing assumptions Wiggins made, Ex. 85 (Wiggins Rep.) ¶¶122-65, including about the correctness of Google's legal theories, the billing zip code of at least one advertiser or publisher in one of the States as reflected in Google's data, and Google's views of which transactions could not have been affected by its misconduct. *See also* Ex. 53 (Wiggins Dep. Tr.) at 171:19-173:21. Even assuming

---

[16] In arguing that Andrien "abandons any pretext of calculating the number of violations per state," Mot. at 28, Google misses that Andrien did just that. Andrien determined, for example, that while Bernanke was in effect, there were ████████ auctions in Alaska, ████████ auctions in Arkansas, ████████ auctions in Florida, ████████ auctions in Idaho, ████████ auctions in Indiana, ████████ auctions in Kentucky, ████████ auctions in Louisiana, ████████ auctions in Mississippi, ████████ auctions in Missouri, ████████ auctions in Montana, ████████ auctions in Nevada, ████████ auctions in North Dakota, ████████ auctions in Puerto Rico, ████████ auctions South Carolina, ████████ auctions in South Dakota, ████████ auctions in Texas, and ████████ auctions in Utah. Andrien separately parsed the auction data to count the number of auctions Google held in the times that each separate misconduct (RPO, DRS, Bernanke, and equal footing) were in effect. Davis Ex. 10 (Exhibit 4).

** FILED UNDER SEAL **

Google's expert's numbers, no reasonable jury could ever conclude that *no* auctions took place in any State. Instead, all that remains is a genuine dispute of material fact over *how many*. Google's attempts to evade its own data and the commonsense ubiquity of its ad tech platform, *see, e.g.*, Dkt. 398 at 54:6-55:11, are a reason to deny, not grant the motion.

Google's attempt to conjure a constitutional issue out of its own data showing auctions in the States, Mot. at 23-24, is even more bizarre. *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007) ("The dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake."); *Online Merchants Guild v. Cameron*, 995 F.3d 540, 558-59 (6th Cir. 2021) ("The dormant commerce clause prevents a state from 'projecting its legislation' into another state, . . . but it does not invalidate a state law when some private third-party has done the projecting of its own accord."); S*PGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007) ("[B]ecause consumer protection is a field traditionally subject to state regulation, '[w]e should be particularly hesitant to interfere with the [State's] efforts under the guide of the Commerce Clause.'" (citation omitted)). As an initial matter, Google misreads the laws of several States. To provide just a few examples, the laws of Florida, South Carolina, North Dakota, Utah, Montana, and Alaska all permit DTPA actions against out-of-state actors when its conduct affects the State.[17]

---

[17] *See Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 586 (Fla. 2000) ("Because the Florida market was embraced within this nationwide scheme," defendant "should have been prepared to follow Florida [DTPA]"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2014 WL 2905131, at *3-4 (N.D. Cal. June 26, 2014) (rejecting due process challenge and finding that Florida's DTPA, "by its own terms," applies to acts occurring outside Florida); *Cheshire v. Coca-Cola Bottling Affiliated, Inc.*, 758 F. Supp. 1098, 1102 (D.S.C. 1990) ("South Carolina's [D]TPA is not limited to in-state conduct by its own terms nor does it contain on its face any undue burdens on interstate commerce. . . application of the state [D]TPA does not run afoul of the commerce clause"); *DJ Coleman, Inc. v. Nufarm Ams., Inc*, 693 F. Supp. 2d 1055, 1076-77 (D.N.D. 2010) (North Dakota's DTPA covered farm corporation's purchase of herbicide from a

** FILED UNDER SEAL **

Cases also "must be read with a careful eye to context." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023). Yet Google cites out of context both *National Pork* and *Healy v. Beer Inst.*, 491 U.S. 324 (1989). Google relies primarily on *Healy,* which involved a constitutional challenge to a Connecticut law requiring out-of-state shippers of beer to affirm that the prices of beer sold to Connecticut wholesalers were no higher than the prices of beer sold in Massachusetts, New York, and Rhode Island. 491 U.S. at 326. The Court invalidated this law because the statute had "the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State" but also because "the practical effect of this affirmation law . . . is to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Id*. at 337. *Healy* does not apply here because this case involves public enforcement actions that do not create competing economic regulations. In all events, the Supreme Court in *National Pork* held squarely that no state "may prosecute the citizen of another State for acts committed 'outside [the first State's] jurisdiction' that are *not 'intended to produce [or that do not] produce detrimental effects within it*." 598 U.S. at 375 (alterations in original) (citation omitted) (emphasis added). As its own data reflects, Google's nationwide conduct was intended to, and produced, specific transactions in each of the States.

Nor is Google's "lack of nexus" theory, Mot. at 25-29, persuasive. That Andrien did an analysis applicable to the overall case does not mean, as Google tendentiously assumes, that each

---

manufacturer located in Illinois where manufacturer posted misleading ads on website); Utah Code Ann. § 13-2-6(4)(a)-(b) (making actionable "conduct committed outside the state [which] constitutes an attempt to commit a violation within the state" or conduct when "transactional resources located within the state are used by the offender to directly or indirectly facilitate a violation"); Mont. Code Ann. § 30-14-102(6) (defining "trade or commerce" to mean "the offering for sale, sale, or distribution of any services . . . wherever situated" and that "trade or commerce" "shall include any trade or commerce directly or indirectly affecting the people of this state"); *Shooshanian v. Wagner*, 672 P.2d 455, 465–66 (Alaska 1983) (allowing Alaska DTPA action against New Jersey and Ohio company to proceed where was doing business in Alaska).

**\*\* FILED UNDER SEAL \*\***

Plaintiff State will independently seek the full penalty Andrien recommends. Andrien's opinion is meant as a helpful framework for assessing a penalty that would be sufficient but not greater than necessary to deter Google's misconduct. When the jury agrees with Andrien's estimates of the number of auctions taking place in each State (or, for that matter, Wiggins's estimates), sees the evidence establishing Google's liability as to each State's DTPA, and hears the Court's instructions on the laws of each of the States, the number of violations will be so high that the total possible aggregate penalty will far exceed Andrien's guide anyways. Besides that, the jury will consider other factors, as required by each DTPA.

In truth, Google's nexus argument is another flavor of its demand that Plaintiff States prove damages, reliance, and individualized injuries in this distinguishable public enforcement action. "Enforcement actions do not include a 'reliance' element." *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. M25 Invs. Inc.*, No. 3:09-CV-1831, 2010 WL 769367, at \*2 (N.D. Tex. Mar. 6, 2010). That is no basis for summary judgment.

### B.  There Is No Basis In Law Or The Constitution To Limit Statutory Penalties Now.

All 17 DTPAs impose statutory penalties for deceptive acts. Penalties "differ from punitive damages because statutory penalties have been authorized by the [] Legislature to aid in *law enforcement*." *Forte v. Wal-Mart Stores, Inc.*, 780 F.3d 272, 283 (5th Cir. 2015) (citing *State v. Harrington*, 407 S.W.2d 467, 474 (Tex. 1996)). Deterrence is inherent to civil penalties. *See Hudson v. United States*, 522 U.S. 93, 102 (1997) (noting that "all civil penalties have some deterrent effect"). "The Supreme Court has stated that statutory damages designed to address such 'public wrongs' need not be 'confined or proportioned to [actual] loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury.'" *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1090 (W.D. Tex. 2000) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 65–

**\*\* FILED UNDER SEAL \*\***

66 (1919)). In cases involving a public rather than private plaintiff seeking to impose penalties, the "argument for upholding the . . . minimum damages provision as a means to address a 'public wrong' is even stronger." *Id*. at 1090 n.8.

Civil penalties are also different from punitive damages. Thus, "[w]hile punitive damages are related to and conditioned on actual harm suffered, a civil penalty is conditioned only on a violation of a statute." *Vanderbilt Mortg. & Fin., Inc. v. Cole*, 740 S.E.2d 562, 569 (W. Va. 2013). This means that "[c]ivil penalties are their own separate class of damages, taking on both compensatory and punitive characteristics." *Id.* (citing *DirecTV, Inc. v. Cantu*, No. SA-04-CV-136, 2004 WL 2623932, at \*4 (W.D. Tex. Sept. 29, 2004); *In re Hobbs*, No. 10-42736, 2012 WL 4434469, at \*7 (Bankr. E.D. Tex. Sept. 24, 2012)).

Against the clear distinction between damages and penalties, Google argues that its misconduct was so widespread that proving individualized harm is impossible, that state law requires such proof, and that summary judgment is therefore appropriate. Mot. at 29-31. Google relies for this nonsensical argument on three distinguishable cases involving pharmaceutical mass torts and class actions. *See In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 460 (E.D.N.Y. 2009); *In re Vioxx Prods. Liab. Litig.*, No. MDL 1657, 2010 WL 11570867, at \*8 (E.D. La. Mar. 31, 2010) (permitting Louisiana to proceed under a theory where plaintiff could show a uniform harm); *Ironworkers Loc. Union No. 68 v. Astrazeneca Pharms. LP*, 585 F. Supp. 2d 1339, 1345-46 (M.D. Fla. 2008).

*Ironworkers*, a private action the court dismissed because the plaintiffs could not show proximate causation, best illustrates the diversionary nature of Google's argument. 585 F. Supp. 2d at 1345–46. The portion of *Ironworkers* that Google relies on contains no interpretation of Florida law and is about civil RICO claims, not Florida's DTPA, which permits recovery of civil

** FILED UNDER SEAL **

penalties in "any action" the State brings. Fla. Stat. § 501.2075. Florida courts have expressly held that individualized proof of harm is *not* a prerequisite to recover civil penalties. *See State v. Beach Blvd Auto. Inc.*, 139 So. 3d 380, 394 (Fla. 1st Dist. Ct. App. 2014) (allowing Florida to seek civil penalties after rejecting "flawed" argument that DTPA requires harm to individual consumers); *Himes v. Brown & Co. Sec. Corp.*, 518 So. 2d 937, 938 n.1 (Fla. 3d Dist. Ct. App. 1987) (Florida legislature authorized attorney general to seek civil penalties in "cases where the victims have not suffered actual damages").

*Zyprexa*, which involved claims that a drug company misleadingly promoted an antipsychotic medication, is also inapposite. 671 F. Supp. 2d at 401. There, Mississippi sought statutory penalties on a per-prescription basis, but Mississippi's experts offered substantive liability evidence "contrary to the evidence already analyzed by th[e] court in many Zyprexa summary judgment cases." *Id*. at 457. As such, and because the court therefore "wish[ed] to consider" several medical factors for each patient in a penalties analysis and found this impractical, it erroneously granted summary judgment on Mississippi's DTPA claims. *Id.* at 457–59. By contrast, courts in Mississippi regularly affirm large DTPA penalty awards where the defendant's violations are uniform and are susceptible to counting on a per-violation basis—such as when a drug company "publishe[s] an inflated average wholesale price for a drug." *Watson Lab'ys, Inc. v. State*, 241 So. 3d 573, 581 (Miss. 2018); *see In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 847 (Miss. 2015) (holding that in cases involving "per-violation" penalties under Mississippi's DTPA, the focus is on the "conduct of the person from whom the Government seeks to collect" and not on the actions of others).

Google's violations of the DTPAs here are more akin to publishing an inflated price of a drug—where the documentary and testimonial evidence support a pervasive deception and proof

42

**\*\* FILED UNDER SEAL \*\***

entails counting the number of publications—than they are to the *Zyprexa* situation. Plaintiff States do not allege that Google merely misrepresented the nature of the discrete set of auctions into which it introduced manipulations (a set which it has exclusive knowledge of and yet refuses to identify), as was the case with the prescriptions in *Zyprexa*. Instead, by obscuring *when* and *how* it was manipulating its auctions, Google uniformly misrepresented the nature of *every* auction it ran by misleading the public about what the rules of its auctions were. The jury could reasonably conclude that Google's actions taken as whole made every auction it offered deceptive, and in turn that the number of auctions affecting a State meeting the parameters of that State's DTPA supplies the basis for a penalties award under each DTPA. Because "Legislature[s] may adjust" the amount of statutory penalties as "punishment for the violation of a public law" like these, *Williams*, 251 U.S. at 66 (citation omitted), the Court should reject Google's effort to use *Zyprexa* to convert the scale of its misconduct into a liability waiver.  Even if the jury concludes that not all auctions were impacted, it will have substantial evidence at trial which could support a calculation of the number of auctions affected.  Because there is a dispute of fact about the number of auctions affected by Google's misconduct no matter what level of specificity is required, the jury should decide.

Google's Due Process arguments, Mot. at 31-38, are similarly lacking and are also premature. There is no basis for the Court to cap statutory penalties *before trial* at anything less than the maximum penalty provided for in each DTPA, as the jury must resolve genuine disputes of material fact around subsidiary issues like the number of auctions attributable to Google within the States. In *Rockwell International Corp. v. M/V Incotrans Spirit*, which Google cites for the Court's authority to consider its arguments now, the Fifth Circuit merely affirmed partial summary judgment capping penalties *at the maximum provided for by statute*. 998 F.2d 316, 318 (5th Cir. 1993). Courts typically review penalties awards when they are challenged after verdicts, not at

43

**\*\* FILED UNDER SEAL \*\***

summary judgment. *See, e.g.*, *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 962 (8th Cir. 2019) (finding statutory penalties award "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable" *after* jury made award) (quoting *Williams*, 251 U.S. at 67)).

Google's attempt to have the Court misapply *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), reflects a desire to limit Google's statutory exposure—created through its own misconduct—because it disagrees with the judgments of state legislatures. But courts have long recognized in the class action context that they should not "use procedural devices to undermine laws of which a judge disapproves." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953–54 (7th Cir. 2006). "While a statute remains on the books, . . . it must be enforced rather than subverted." *Id*. at 954. Any consideration of Google's due process theory at this juncture would necessitate premature resolution of constitutional issues that the Court is obliged to avoid. *Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 513 (1st Cir. 2011) (reversing and remanding district court's constitutional limitation on post-trial jury award for violation of doctrine of constitutional avoidance).

In all events, *Williams*, not *Gore*, would largely govern post-verdict review. The Supreme Court has acknowledged that "the power of the State to impose fines and penalties for a violation of its statutory requirements is coeval with government; and the mode in which they shall be enforced, whether at the suit of a private party, or at the suit of the public, and what disposition shall be made of the amounts collected, are merely matters of legislative discretion." *Id*. at 512 (quoting *Williams*, 251 U.S. at 66). "The [due process] concerns regarding fair notice to the parties of the range of possible punitive damage awards present in *Gore are simply not present in a statutory damages case* where the statute itself provides notice of the scope of the potential award." *Id*. at 513 (emphasis added); *see also Zomba Enters., Inc. v. Panorama Recs., Inc.*, 491 F.3d 574,

**\*\* FILED UNDER SEAL \*\***

587 (6th Cir. 2007) ("The Supreme Court has not indicated whether *Gore* and *Campbell* apply to awards of statutory damages. We know of no case invalidating such an award of statutory damages under *Gore* or *Campbell*."). Finally, the Eighth Amendment argument Google previews, Mot. at 31 n.18, is a non-starter. "[I]f the fine does not exceed the limits prescribed by the statute authorizing it, the fine does not violate the Eighth Amendment." *Newell Recycling Co. v. E.P.A.*, 231 F.3d 204, 210 (5th Cir. 2000).

### C.    The States' Theories Of Google's Misconduct Are For The Jury.

The evidence of Google's deliberate and deceptive efforts to taint its own auction ecosystem is legion. *See* Background, *supra*. The evidence for the sufficiency of the purported "disclosures" of these programs, Mot. at 38-56, less so. The context, nature, motivations for, and impacts of purported disclosures are classically fact-intensive matters. "Generally, like materiality, determining whether information has been adequately disclosed is a mixed question of fact and law and, therefore, is a question for a jury." *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 208 (5th Cir. 1988) (citing *Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)). Ignoring this precedent, Google isolates specific misleading statements it made at snapshots in time—often in frantic reaction to possible discovery of its misdeeds—as it continued operating ███████ of deceptive auctions in the background. That was *part of its scheme of deception*. Yet Google moves for summary judgment on it. As the Court should require Google to find out, a reasonable jury will reject its effort to strip evidence of all context. With context, the evidence shows that Google acted well beyond the stretched statutory requirements it seeks to impose. App'x D (DTPA Willfulness and Intent Requirements).

### *1.  RPO*

Google contends that RPO was "anything but a 'secret'" and that it informed the public about RPO by releasing blog posts and Help Center articles which said things in 2014 like Google

** FILED UNDER SEAL **

"run[s] limited experiments" that "modify[] the min CPM set by the publisher," or in 2016 that Google "help[ed] publishers set price floors." Mot. at 40. Seizing on colloquial references to these purported "disclosures" in Weinberg's and Andrien's reports, Mot. at 40, and ignoring those experts' actual opinions and assumptions, Davis Ex. 3 (Weinberg Rebuttal Rep.) ¶68; *id*. Ex. 1 (Weinberg Dep. Tr.) at 14:13-15:11, 18:5-19:8; *id.* Ex. 10 (Andrien Rebuttal Rep.) ¶126; *id*. Ex. 8 (Andrien Dep. Tr.) at 107:5-12, Google contends that the "disclosures" sufficiency is "undisputed."

In fact, Google's documents reflect that its employees understood its "disclosures" as strategic attempts to keep RPO under wraps. RSMF ¶¶219-23. Before initiating RPO, in 2014, Google had released a Help Center article which stated that "AdExchange may run limited experiments designed to optimize the auction" that included "modifying" as opposed to raising "the min CPM set by the publisher." McCallum Decl. Ex. 42; Mot. at 40. But *after* that date, a Google employee explained that the company would implement RPO "silent[ly]," Ex. 13 (GOOG-DOJ-AT-01814688), with "no external announcement." Ex. 19 (GOOG-AT-MDL-014566000). Why, if Google thought it had disclosed RPO in 2014, would a Google employee express such a desire a year later? *See* RSMF ¶220.

Google's second "disclosure" in a May 2016 blog post, Mot. at 40-41, was even worse. RSMF ¶¶221-23. As an initial matter, Google's own expert concludes that there was no behavioral impact on participants. Ex. 85 (Wiggins Rep.) ¶¶191-206. This makes sense, as the post was not a disclosure but instead a part of Google's diversionary response to outreach from companies which realized that Google's auction ecosystem may be deceptive and called Google on it, only for Google to introduce technical means to obscure further discovery and to lie that RPO was an "experiment." Even without that context, immediately after the blog post, Google's own employees understood that the limited nature of the post was strategic. Ex. 10 (GOOG-AT-MDL-

** FILED UNDER SEAL **

B-004435235) at -245 ("RPO blogpost went live last week, will wait to see how it has been received before deciding on next blogpost with more RPO details"); Ex. 23 (GOOG-AT-MDL-015109254) at -254 ("[w]e can obscure the comms language [about RPO] to remove sensitive stuff"); Ex. 54 (GOOG-AT-MDL-008051113) at -113 (instructing communications personnel to use "legally approved message in comms doc" and "everything else is Verbal-only"); Ex. 25 (GOOG-DOJ-14736445) at -445 (blog post allowed Google to "continue to develop [RPO] despite the sensitivity (and occasional irrational views) of pub customers."); RSMF ¶¶221-22. Like the 2014 Help Center article on which Google relies, years after the announcement, Google employees knew that ███████████████████████████ Ex. 36 (GOOG-DOJ-15022588) at -588. And in all events, Google did not disclose RPO to advertisers because it obviously hurt them. *See* Ex. 55 █████ Dep. Tr.) at 260:7-10; *id*. at 344:19-345:3 ("I don't think all of the details of the features are something that you'd want to disclose to advertisers, every detail of how it works."). A reasonable jury would reject Google's specious claim that it disclosed RPO through two public statements that its own employees recognized as misleading and deceptive.

### 2. DRS

Google next contends that the "undisputed facts show that Google disclosed" DRSv1. Mot. at 42-46. Before implementing DRSv1, Google posted a Help Center article stating that in "some cases, the auction may close at a price lower than the reserve price applied, due to auction optimizations" while "no less than the min CPM applied." Mot. at 42; McCallum Decl. Ex. 43. Matthew Weinberg, Plaintiff States' auction theory expert, understood that the only way an auction could close in this way was if the auctioneer tweaked its take. Mot. at 42; RSMF ¶146. But that does not make the "disclosure"—purposefully broken into pieces, qualified by the language "some cases," and without any coherent specificity—sufficient, as the Help Center article was never

**\*\* FILED UNDER SEAL \*\***

announced and publishers were not aware of DRS. RSMF ¶147. Google's position also distorts Weinberg's actual opinion that the Help Center article was itself misleading because it did not disclose that DRSv1 could make the auction first-price. Davis Ex. 1 (Weinberg Dep. Tr.) at 205:21-206:3 ("So it does not disclose that when a buyer wins with a bid below the price floor that they will pay their bid. That is not disclosed anywhere in this document and there is no way to plausibly conclude that just from the information in this document.")[18]; Davis Ex. 3 (Weinberg Rebuttal Rep.) ¶68 n.60 ("It is my opinion that the DRSv1 'disclosure' prevented advertisers from detecting DRSv1 rather than helping them.").

An employee working on DRSv1 before launch described it as Google's "secret sauce" that "buyers and pubs" would not be aware of. Ex. 66 (GOOG-NE-12737317) at -318. Just weeks before Google's claimed "disclosure," another employee discouraged detailed conversations about DRS with buyers because "I don't think we will want to expose how DRS works." Ex. 24 (GOOG-DOJ-14713056). A Google employee admitted that Google did not disclose DRSv1 to publishers. Ex. 58 (████████ Dep. Tr.) at 135:2-5. Internal documents show the same. Ex. 59 (GOOG-AT-MDL-016926948) at -948 ("DRS v1 was launched with minimal comms"). In addition, as late as July 2016, Google knew that publishers were not aware of DRSv1. Ex. 78 (GOOG-DOJ-14733010) at -010 (████████████████████████████████ ████████████████████████████). Google never disclosed that it was exempting Google's buying tools from DRSv1. Ex. 11 (GOOG-DOJ-14380896) at -896 ("GDN/DBM is opted out of DRS."); Davis Ex. 1 (Weinberg Dep. Tr.) at 278:13-18 ("I do opine

---

[18] Google says that this is immaterial because, conditional on realizing DRSv1 is in place, "no reasonable buyer would expect to pay *less* than its bid," Mot. at 42. But that circularly presupposes the sufficiency of the disclosure. Of course, a buyer misled by Google's diversions would be deceived by DRSv1 when he thinks he is entering a second-price auction and winds up paying his first-price bid.

**\*\* FILED UNDER SEAL \*\***

and believe that GDN and DV360's exemptions from DRS demonstrate preferential treatment. Because those were not disclosed, I consider that to be deceptive."). Moreover, no auction participants could opt out of DRSv1 even if they understood the Help Center article. Ex. 41 (███████ Dep. Tr.) at 51:10-20.

With respect to DRSv2, the "disclosure" on which Google relies was "exceptionally misleading." Davis Ex. 3 (Weinberg Rebuttal) ¶488.i-ii. A bidder who, under DRSv2, bid into the "dynamic region" that triggered Google to lower its revenue share was charged at his willingness to pay. But Google *still* tracked the bidder as owing Google *more*, which it recouped by artificially charging the bidder *more* in future auctions. In other words, Google recouped from these bidders "discounts" it *never actually gave* them. Google, of course, never disclosed this. Instead, it misled buyers by stating that "the winning buyer will never be charged more than the bid it submits" without telling buyers that it would charge them more later to make back a discount Google never paid. The misleading nature of this statement is underscored by the fact that Google spared advertisers who used Google's buying tools from this mistreatment. Google separately submits that it disclosed this deception through an AdX Help Center article in which it stated that a "buyer that has received *discount(s)* on its bid(s) may face higher reserve prices in subsequent transactions to offset such *discounts*," but the advertisers Google was overcharging through DRSv2 never received any discounts at all. McCallum Decl. Ex. 44 (emphasis added); Mot. at 43-44.

Google claims that it also disclosed the details of DRSv2 through a release note and AdX interface changes. Mot. at 44; RSMF ¶¶154-55. But these items did not inform the public of when or how Google was operating DRSv2. *See, e.g.*, Davis Ex. 40 (Rudin Dep. Tr.) at 220:17-23 ("So if DRS was disclosed appropriately, then publishers would be able to optimize better. If the throttling information was disclosed, exactly when the throttling would occur, when the throttling

is off and on, that would help publishers as well. And if there were more data, that would help publishers as well."). Google's documents also reflect the inadequacy, from the publishers' perspective, of these items. Ex. 67 (GOOG-DOJ-14156657) at -658 ("what is my contracted revenue share"; "why would it be in my advantage to have this fluctuate?"; "how can I see the effect if I were to go along with this?"; "why is this so complex."). And these "disclosures" did nothing to inform buyers. Ex. 55 (██████Dep. Tr.) at 260:7-10, 344:19-345:3; Ex. 50 (GOOG-NE-04934281) at -283 ("No outreach to buyers is planned, but internal teams will be informed about DRS, and questions can be handled reactively."). A jury could easily infer that Google's "disclosure" regime with respect to DRSv2 was itself deceptive and misleading.

### 3.  *Bernanke*

Bernanke manipulated bids that Google submitted into its own auctions. As Google admits, it *never* "specifically disclose[d] bid optimization techniques such as Bernanke." Ex. 63 (Letter from J. Sessions dated May 24, 2024) at App'x A p. 8; *see also* Davis Ex. 44 (Milgrom Rep.) ¶174 (noting "the confidential nature of Bernanke"). This deception, coupled with Google's operation of the program for years and its undisclosed impacts on participants, was a third way in which all auction participants were misled every time they approached Google's auction doors.

Google primarily argues for summary judgment on the Bernanke program based on the notion that even though it owns the buy-side tools through which it implemented Bernanke, sell-side tools that permitted publishers to use AdX, and the AdX exchange itself, Google only ever had any obligations to disclose Bernanke to advertisers. Mot. at 49-51. Implicitly then, Google concedes that for nearly four years (from 2013 until February 2017), it deceived advertisers. But Google also does not deny that "Bernanke *affected* the AdX auction." Mot. at 50. It instead must characterize Bernanke as a program which did not "change the rules by which a winner or the clearing price was declared" because the relevant "transaction" for DTPA purposes was not the

** FILED UNDER SEAL **

auction itself.[19] *Id.* All the while, Bernanke operated to pay publishers a lower price than Google charged advertisers on an auction, with Google pocketing the difference and using the proceeds to inflate its own bids in future auctions.

A reasonable jury would disagree with Google's defense for its Bernanke misconduct. The notion that Google viewed itself as multiple siloed and competing companies with no overarching goals is ridiculous. Instead, Google had obligations to all those it interacted with, but also to the integrity of the ad tech environment it dominated on all sides. Google's employees did not respect the so-called "AdX firewall" to the extent it even existed. RSMF ¶119. Before implementing Bernanke, Google employees were thinking about and debating the potential impacts not just for Google's buy-side tool, GDN, but also for AdX. Ex. 64 (GOOG-AT-MDL-B-002087955) at -956 ("███████████████████████████████████████████████████████████████████

████████████████████"). Internal Google documents suggested ███████████████████████

██████████████████████████ Ex. 81 (GOOG-DOJ-28386151) at -161. Correspondingly, Bernanke's buy-side progenitors were careful to argue internally that AdX publishers could in theory increase their revenues from Bernanke because more transactions would clear due to Bernanke's subsidies. Ex. 28 (GOOG-NE-06839089) at -100. Google's decisions to exempt Bernanke from the operations of its sell-side manipulations, RPO and DRS, enabled Bernanke's success and revealed the interactions between the two. Ex. 31 (GOOG-NE-13198969) (raising concern over "[i]nteraction" of Bernanke and DRS at -969; Ex. 17 (GOOG-DOJ-32321240) at -

---

[19] Google's "transactional nexus" argument—that deception can apply to only one set of transactions—is incorrect as a matter of law. *See, e.g.*, *Pelican Ventures, LLC v. Azimut S.p.A.*, No. 03-cv-62119, 2004 WL 3142550, at *12 (S.D. Fla. July 28, 2004) (transactional nexus is "unnecessary" because the "standard is the conduct of the Defendant"); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 704 (Fla. 3d Dist. Ct. App. 2000) (lack of transactional nexus "makes no difference" and is "irrelevant to the underlying analysis").

**\*\* FILED UNDER SEAL \*\***

240 (noting "worrie[s] about Bernanke + DRPO interaction"). The same was true when Google was thinking about implementing Global Bernanke. Ex. 61 (GOOG-DOJ-14161943) at -945 ("Publisher impact analysis"). One Google document expressly noted that ███████████

███████████████████████████████████████████████████████████████████████

█████████████ Ex. 68 (GOOG-AT-MDL-B-005175287) at -296 (emphasis added). Conversely, a Google employee working on sell-side manipulations characterized "the argument that I'm not supposed to use bids submitted" as "ridiculous." Ex. 17 (GOOG-DOJ-32321240) at -241.

███████████████, part of gTrade, a team of "some of the engineers, working on projects, trying to figure out the best way to bid on exchanges on behalf of . . . advertisers," confirmed the absence of any firewall. Ex. 69 (████████ Dep. Tr.) at 49:22-50:2. One of ███████ projects was Bernanke. Ex. 70 (GOOG-AT-MDL-B-002096327). When asked about whether there was a "firewall" between the buy-side and sell-side, ████████ said that the "buy-side team optimizes on behalf of advertisers. Sell side teams work with publishers. *And we interact on occasion to discuss potential impact to advertisers or publishers on launches*." Ex. 69 (████████ Dep. Tr.) at 171:20-172:2 (emphasis added). ████████ recently testified that he was unaware of *any* formal firewall between AdX and the buy-side at any time in his 12 years at Google. Ex. 71 (████████ Trial Tr., *United States v. Google LLC*, Case No. 1:23-cv-108 (E.D. Va. Sept. 17, 2024)) at 17:7-12. Employees who interfaced with publishers were also aware of what Bernanke was and that keeping it secret was important. Ex. 55 (████████ Dep. Tr.) at 350:9-24; Ex. 18 (GOOG-DOJ-15445619) at -620 ("the first rule about Bernanke is that we don't talk about Bernanke"). Put differently, Google knew Bernanke was deceptive to publishers and worked internally to try to address competing concerns between its own buy-side and sell-side teams but chose not to tell the publishers it served about what it was doing. A reasonable jury would conclude that this was deceptive, especially

** FILED UNDER SEAL **

towards publishers, who had no comparable relationship with other buy-side tool operators like they did with Google (which, it bears repeating, *also ran the exchange*). Google cannot claim the benefits of monopoly while disclaiming its obligations.

Google also contends that it changed the formula behind Bernanke in February 2017 as to certain types of advertisers; it approximated their true values by charging them the minimum bid needed to have won the auction. Mot. at 47-48; RSMF ¶131. But that is neither here nor there. Google admits that it never disclosed Bernanke even though it had made a company-wide decision to implement the program in a way that altered participants' incentives on an exchange that it ran. Google engaged in deceptive acts by failing to ever disclose Bernanke to its publisher clients, even though the manipulations "affected the AdX auction." Mot. at 50; *see also* Ex. 55 (████ Dep. Tr.) at 166:7-13 ("I can't remember ever talking about Bernanke with publishers."); *see also* Ex. 72 (████ Dep. Tr.) at 161:9-13 ("I don't believe I've ever used the phrase 'Project Bernanke' in a customer-facing meeting.").

### 4. *Equal Footing*

While deprecating the AdX "second-price auction" format in 2019, Google continued to mislead. A reasonable jury would conclude that Google sought to use the switch from a second-price to a first-price auction as cover to implement changes that would cement its position and enable its continued secretive manipulations to the AdX auction. The goal? Benefit Google while yet again obscuring the true rules for each auction. The results did not place participants on equal footing or create a fair and transparent market and that conclusion holds even taking in the "context of the entire communication." *Reed v. Receivable Recovery Servs., LLC*, 702 F. App'x 239, 240-41 (5th Cir. 2017) (*per curiam*).

In fact, it is Google's argument that its cover story for switching to a first-price auction was mere "puffery" that neglects the "historical context" of the 2019 switch. Mot. at 52. "In

** FILED UNDER SEAL **

determining whether a statement is puffery, the context matters." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009). That is why "puffery or opinion is a question of fact for the jury." *Rodriguez v. Jim O'Neal Distrib., Inc.*, No. H-07-1300, 2008 WL 11394309, at *3 n.3 (S.D. Tex. Sept. 11, 2008), *report and recommendation adopted,* No. CV H-07-1300, 2008 WL 11394373 (S.D. Tex. Sept. 26, 2008) (citations omitted). In other words, "both state and federal courts hold that whether a statement is puffery is a question of fact, save for the unusual case where the answer is so clear it may be decided as a question of law." *Tershakovec v. Ford Motor Co.*, 546 F. Supp. 3d 1348, 1359-60 (S.D. Fla. 2021) (collecting cases), *rev'd in part on other grounds*, 79 F.4th 1299 (11th Cir. 2023).[20]

The "historical context" here is not just the switch from second-price to first-price in isolation, but also header bidding. Portions of Weinberg's opinions that Google does not challenge explain how specific changes Google made to its auction format by introducing new pricing rules can allow Google to increase revenue at the expense of market participants. Davis Ex. 2 ¶¶162-82; *see also* RSMF ¶80. Google began degrading bid data files it sent to publishers so that they would not be able to match bidders in a completed auction to other available data, which stopped publishers from optimizing strategies on other exchanges. RSMF ¶210. Publishers complained. Davis Ex. 52 (Gans Rep.) ¶699. Google received complaints that this was an attempt to kill header bidding. Ex. 65 (GOOG-DOJ-15772422) at -425. The switch also gave Google cover to pretend that it was giving up its "last look" advantage while creating a replacement. Google understood that "last look" allowed its buyers a huge advantage because they would be bidding into an auction

---

[20] Saying that something is transparent is also a factual averment that can be deceptive. *See, e.g., In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 613 (S.D.N.Y. 2017) ("Gasser's statements regarding ITG's 'transparent' approach belied the reality that ITG did not disclose details about Project Omega or the misconduct associated with it. These statements could have given a reasonable investor a false impression about the completeness of ITG's disclosures.").

** FILED UNDER SEAL **

that Google controlled instead of a first-price auction of auctions like header bidding. RSMF ¶79. It expected to lose significant revenue on the buy-side from giving up last look, so it implemented "smart bidding" to replicate the "last look" advantage. *Id*. By continuing to seek to advantage Google-affiliated bidders in the new AdX auction, Google made false its promises that the switch from second-price to first-price auctions was simply about creating a "fair and transparent market" and "compet[ing] equally." It wasn't.

Another way in which Google's equal footing representations were false was that Google continued to have a confidential preferential contract with Meta, which advantaged Meta over other auction participants by providing benefits within the AdX auction environment even under the new first-price auction. And as Google itself admits, RSMF ¶¶139-40, a version of Bernanke that it deemed "Alchemist" remained in place after 2019. Google "want[ed] this mechanism to be truthful from buyers' perspective," Ex. 45 (GOOG-AT-MDL-013274837) at -837, but it cared not a whit about publishers and the transparency of AdX.

### 5. *Personal Information*

Finally, Google complains that it "shared" but did not "sell" user personal information, Mot. at 55-57, during its auction process. In other words, Google claims that it gave user data away to firms that siphoned data from its auctions and that it disclosed it was doing so—even though the whole purpose of the auction is to sell an impression that contains that information. Google's argument is a distinction without a difference that a jury could easily reject. Every time an advertiser makes a "bid request" to the AdX platform, Google displays to the advertiser a plethora of user data, including device type, internet protocol address, and geolocation. Ex. 48 (GOOG-AT-MDL-013918668). Google agrees that as part of a successful AdX auction, the publisher sends to AdX, and Google provides to winning advertisers, that same information. RSMF ¶228. In other words, the winning bidder pays a price for an impression and receives the user's personal data

** FILED UNDER SEAL **

along with that impression. That Google's privacy policies say it "shares" data is irrelevant where, through AdX, Google is selling it to some portion of bidders. To the extent a winning bidder obtains a user's personal information through an AdX auction, a reasonable jury could decide that is a sale.

## IV. Google Misreads The Requirements Of State Laws And Ignores Tolling Doctrines.

### A. Google Misinterprets DTPAs, But Even Where They Require "Consumer Transactions," Google Ignores The Consumers Who Are Served The Ads.

Finally, as it does throughout its motion, Google assumes that Plaintiff States have brought this action on behalf of injured advertisers and publishers suing elsewhere and have failed to identify harms[21] to them. Based on that mistake, Google contends that the only persons affected by its manipulations were advertisers and publishers, neglecting that its deceptions distorted transactions which had the end goal of serving consumers in the States with ███████ online ads. But courts have held that providing online services, even absent monetary consideration, can amount to a "consumer transactions" under DTPAs. *See, e.g.*, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, ___ F. Supp. 3d ___, 2024 WL 4532937, at *40-41 (N.D. Cal. Oct. 15, 2024) (Indiana and Utah law).

Google's reading of the Arkansas, Indiana, Idaho, Utah, and Texas DTPAs is unduly restrictive.[22] To illustrate, Utah's DTPA is a comprehensive statute designed to broadly protect consumers and should be "construed liberally to promote a number of policies." *Wade v. Jobe*, 818 P.2d 1006, 1014 (Utah 1991) (quotation and citation omitted) (later superseded in part by statute). Those policies include "to protect consumers from suppliers who commit deceptive and unconscionable sales practices," as well as "to make state regulation of consumer sales practices

---

[21] In fact, the States *did* identify the harms Google's misconduct caused them. RSMF ¶¶239-55.

[22] Notably, Google also seeks summary judgment only as to certain portions of the DTPA claims of these States on these grounds. Idaho, for example, alleges violations that of provisions that do not require consumer transactions. FAC ¶694(a), (b), (c). So does Texas, FAC ¶677(a), (b).

** FILED UNDER SEAL **

not inconsistent with the policies of the Federal Trade Commission Act relating to consumer protection." Utah Code Ann. § 13-11-2. A "supplier" like Google is subject to Utah's DTPA "whether or not [it] deals directly with the consumer." Utah Code Ann. § 13-11-3(6). "[I]n enacting the Utah [DTPA] the legislature eschewed the language of the model act's definition of 'consumer transaction' in favor of a broader definition." *Iadanza v. Mather*, 820 F. Supp. 1371, 1379-80 (D. Utah 1993). Google collects user personal information from consumers as part of each AdX transaction. Google transfers this data to potential advertisers and is compensated for this data transfer when Google's buying tools win an impression. Further, Google's auction manipulations distort transactions for the ads that are served to consumers in the States. There is no basis for summary judgment based on lack of consumer transactions under Utah's DTPA.

Likewise, Google cites an Indiana Code provision that a "consumer transaction" is one that is "for purposes that are primarily personal . . . or household" to support its argument. Mot. at 58; *see also* Mot. at 58 n.31 (similar Utah code provision). But that is exactly what ad transactions directed towards the States' internet-using populations are. Tellingly, none of Google's cases involve a public enforcement action.[23]

The cases Google cites regarding Arkansas's DTPA show that the statute covers Google's misconduct here. The Eighth Circuit's decision in *Stonebridge Collection, Inc. v. Carmichael*, 791

---

[23] *McLeskey v. Morris Inv.*, No. 1:18-CV-02797-JPH-TAB, 2020 WL 3315996, at *6 (S.D. Ind. June 18, 2020) (Indiana plaintiffs who sued real estate seller wanted "to invest in 'turnkey' rental properties generating immediate income" and therefore were not consumers); *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 821 (8th Cir. 2015) (defendants "did not make any representation to the public" and therefore could not show "consumer-oriented" transactions under Arkansas DTPA); *Crutchfield v. Tyson Foods, Inc.*, 514 S.W.3d 499, 501 (Ark. App. 2017) ("termination of a twenty-five-year poultry-growing arrangement" not a "consumer-oriented" transaction); *Skalla v. Canepari*, 430 S.W.3d 72, 82 (Ark. 2013) (defendant who allegedly breached fiduciary duty to plaintiff by purchasing plaintiff's co-tenants' undivided shares in farmland not liable under Arkansas DTPA because defendant's acts were not consumer oriented).

**\*\* FILED UNDER SEAL \*\***

F.3d 811 (8th Cir. 2015) is most instructive. There, the court explained that Arkansas's DTPA covers deceptive acts if they "impacted consumers in any way." *Id.* at 822. Again, consumers—whose personal data Google incorporated into each sale—were the integral target of each deceptive auction Google ran. The Eighth Circuit's construction of Arkansas's DTPA tracks the state cases that Google cites. In *Forever Green Athletic Fields, Inc. v. Laiser Construction, Inc.*, the court affirmed the dismissal of DTPA claims because "PSS never explain[ed] what the false representations were or what acts Laiser Construction engaged in that violated the [DTPA]." 384 S.W.3d 540, 552 (Ark. Ct. App. 2011). Under Google's mistaken interpretation, that court would have affirmed because the dispute was between two companies. But the court did not affirm on that basis. Rather, it focused on the defective pleading. A transaction between two companies can be consumer-oriented, but in all events, the purpose of the auctions at issue here was to serve consumers ads.

Google's argument on Idaho's DTPA also misses the mark because Google does not read the entire Idaho Code and Idaho Administrative Code. A "consumer" for purposes of Idaho's DTPA is "[a] person who purchases, leases, or rents, or is solicited to purchase, lease, rent or otherwise give consideration for any goods or services." Idaho Admin. Code § 04.02.01.020(13). And a "person" includes "business entities, and any other legal entity." Idaho Code § 48-602(1). Google cites *In re New Motor Vehicles Canadian Exp. Antitrust Litigation*, 350 F. Supp. 2d 160, 183-84 (D. Me. 2004), where plaintiffs were car buyers who sued car companies and two national dealer associations. *Id*. at 167. Their Idaho DTPA claims against the dealer associations failed because the associations "provided services to automobile dealers," not the plaintiffs. *Id*. at 184. The Idaho DTPA claims were *not* dismissed because automobile dealers could never be "consumers" under

**\*\* FILED UNDER SEAL \*\***

that statute. Idaho's claims here are grounded in Google's misconduct towards advertisers, publishers, and consumers viewing the resulting ads.

Finally, Google argues that the Texas DTPA does not cover claims involving the approximately "2,000 advertisers, 1,500 publishers, and 100 authorized buyers [that] participated in more than $500,000 in AdX transactions." Mot. at 59; *see* Tex. Bus. & Com. Code Ann. § 17.49(g) (relating to a "total consideration *by the consumer* of more than $500,000"). But Google again ignores the fact that its deceptive acts affected more than winning advertisers and publishers. Advertisers who placed losing bids were also affected by Google's deception, as were Texans who received the resulting ads. Because of Google's deceptions, the market for delivery of ads to those consumers was distorted and those individuals' personal data were sold through ad tech auctions. Google does not argue that any Texan internet user meets the $500,000 threshold. Even if Google was right on the law, as a factual matter Google would have to prove that both the publisher and advertiser in a transaction participated in more than $500,000 in AdX transactions. It has produced no such evidence. Thus, Texas's DTPA does not limit Texas's recovery here.

**B.    State Statutes Of Limitations Do Not Bar Any Claims Because Of The Application of Tolling Doctrines.**

Finally, as a last resort, Google falls back on statutes of limitations.  Plaintiff States present their own views on the applicable statutes separately.  App'x E (Statutes of Limitations). Some Plaintiff States have no limitations period applicable to DTPA public enforcement actions. *See* La. Const. art. XII, § 13; *Mississippi ex rel. Fitch v. Eli Lilly & Co.*, No. 3:21-cv-00674, 2022 WL 18401603, at \*2 (S.D. Miss. Aug. 29, 2022); *Brown v. Sneed*, 14 S.W. 248, 251 (Tex. 1890); *see also* Mot. App'x B (conceding there are no statutes of limitations in Louisiana, Mississippi, and Texas for public enforcement actions). In two instances, Google gets the applicable statute wrong. Following a 2018 revision, Utah's DTPA has a five-year limitations period. Utah Code Ann. § 13-

**\*\* FILED UNDER SEAL \*\***

2-6(6)(b) ("A civil action filed under this chapter or a chapter listed in Section 13-2-1 shall be commenced no later than five years after the day on which the alleged violation occurs"); § 13-2-1 (listing Chapter 11); § 13-11-4(1) (giving rise to cause of action); § 13-11-7 (authorizing suit). In 2021, the Nevada legislature passed a statute removing the limitations period for the DTPA claims asserted by Nevada. Nev. Rev. Stat. § 11.245.

The facts cited in this response also support application of various tolling doctrines for States in which a statute of limitations does apply. The laws of Alaska, Idaho, Missouri, Montana, Nevada, North Dakota, Puerto Rico, South Carolina, South Dakota, and Utah include a discovery rule, *see* App'x F (Tolling Doctrines for DTPA Claims), tolling the statute of limitations until a plaintiff knew or should have known about the accrual of a cause of action. As Plaintiff States' concurrently filed motion for spoliation sanctions illustrates, Google took pains to hide its misconduct *even after* the commencement of this suit by spoliating evidence. The laws of Alaska, Idaho, Indiana, Kentucky, South Carolina and Utah recognize the continuing violations doctrine, to which Google's unbroken chain of misconduct dating back to 2013 gives rise. App'x F. The laws of Alaska, Florida, Indiana, Montana, South Carolina, and Utah recognize the fraudulent concealment doctrine, about which there is a genuine dispute of material fact given Google's spoliation and the fact that it never disclosed Bernanke after its inception in 2013. *Id.* Finally, Alaska, Indiana, and South Carolina recognize equitable tolling doctrines, which permits tolling under flexible circumstances more than present here about Google's overarching deceptions for more than a decade. *Id.*

## CONCLUSION

The Court should deny Google's motion for summary judgment on Plaintiff States' DTPA claims.

** FILED UNDER SEAL **

DATED: December 9, 2024

Respectfully submitted,

/s/ W. Mark Lanier

W. Mark Lanier
Mark.Lanier@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.Derose@LanierLawFirm.com
Jonathan P. Wilkerson
Jonathan.Wilkerson@LanierLawFirm.com
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
(713) 659-5200

/s/ Kiran N. Bhat

Ashley Keller
ack@kellerpostman.com
Kiran N. Bhat
kiran.bhat@kellerpostman.com
2333 Ponce De Leon Boulevard
Suite R-240
Coral Gables, Florida 33134
(833) 633-0118

Zina Bash (Bar No. 24067505)
zina.bash@kellerpostman.com
111 Congress Avenue, Suite 500
Austin, TX 78701
(512) 690-0990

**THE LANIER LAW FIRM, PLLC**

/s/ Noah S. Heinz

Noah S. Heinz
noah.heinz@kellerpostman.com
1101 Connecticut Ave., N.W., Suite 1100
Washington, DC 20036
(202) 918-1123
**KELLER POSTMAN LLC**

*Counsel for Texas, Idaho, Louisiana (The Lanier Law Firm only), Indiana, Mississippi, North Dakota, South Carolina, and South Dakota*

*Submitted on behalf of all Plaintiff States*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

** FILED UNDER SEAL **

FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

*/s/ James R. Lloyd*
Brent Webster, First Assistant Attorney General of Texas
Brent.Webster@oag.texas.gov
James R. Lloyd, Deputy Attorney General for Civil Litigation
James.Lloyd@oag.texas.gov

**STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
ATTORNEY GENERAL


By: /s/ Jeff Pickett
Jeff Pickett
Senior Assistant Attorney General, Special Litigation Section
jeff.pickett@alaska.gov

*Attorney for Plaintiff State of Alaska*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF ARKANSAS:

TIM GRIFFIN
ATTORNEY GENERAL

By: _____
AMANDA J. WENTZ
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Attorney for Plaintiff State of Arkansas*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF FLORIDA:

ASHLEY MOODY, Attorney General

/s/ Lee Istrail
LEE ISTRAIL, Assistant Attorney General
FL Bar No. 119216

LIZABETH A. BRADY, Director, Antitrust Division
R. SCOTT PALMER, Special Counsel and Chief of Complex Enforcement
ANDREW BUTLER, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General

Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF IDAHO:

RAÚL R. LABRADOR
Attorney General

*/s/ John K. Olson*
John K. Olson, Deputy Attorney General

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone:   (208)   334-2424
john.olson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

** FILED UNDER SEAL **

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

*/s/ Jesse J. Moore*
Jesse J. Moore
Deputy Attorney General – Consumer Litigation
302 W. Washington St.
IGCS - 5th Floor
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: jesse.moore@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

RUSSELL COLEMAN
Attorney General

*/s/ Philip R. Heleringer*
Christian J. Lewis, Commissioner of the Office of Consumer Protection
christian.lewis@ky.gov
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
philip.heleringer@ky.gov
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
jonathan.farmer@ky.gov
Office of the Attorney General
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300

*Attorneys for Plaintiff Commonwealth of Kentucky*

FOR PLAINTIFF STATE OF LOUISIANA:

By: */s/ Patrick Voelker*
Liz Murrill, Attorney General
Michael Dupree, Assistant Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
(225) 326-6400
voelkerp@ag.louisiana.gov

*s/ James R. Dugan, II*
James R. Dugan, II (*pro hac vice*)
TerriAnne Benedetto (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:  (504) 648-0180
FX:  (504) 649-0181
EM:  jdugan@dugan-lawfirm.com
        tbenedetto@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:  (504) 833-5600
FX:  (504) 833-8080
EM:   jmw@chehardy.com

*Attorneys for Plaintiff State of Louisiana*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF MISSISSIPPI:

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:    */s/ Garrett S. Mascagni*
       Garrett S. Mascagni
       Special Assistant Attorney General
       Consumer Protection Division
       Mississippi Attorney General's Office
       Post Office Box 220
       Jackson, Mississippi 39205
       Telephone: 601-359-4223
       Fax: 601-359-4231
       Garrett.Mascagni@ago.ms.gov

       *Attorney for Plaintiff State of Mississippi*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF MISSOURI:

ANDREW BAILEY
Attorney General

*/s/ Michael Schwalbert*
Michael.Schwalbert@ago.mo.gov
Missouri Attorney General's
Office
815 Olive St.
Suite 200
St. Louis, MO 63101
Tel: 314-340-7888

*Attorneys for Plaintiff State of Missouri*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Montana Attorney General


*/s/ Anna Schneider*
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894 Anna.Schneider@mt.gov


*/s/ Charles J. Cooper*
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves
hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

*Attorneys for Plaintiff State of Montana*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate

*/s/ Michelle C. Badorine*

Michelle C. Badorine, Senior Deputy
Attorney General
MNewman@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100

*Attorneys for Plaintiff State of Nevada*

**\*\* FILED UNDER SEAL \*\***


FOR PLAINTIFF STATE OF NORTH DAKOTA:

       **STATE OF NORTH DAKOTA**
       Drew H. Wrigley
       Attorney General


By:     */s/ Elin S. Alm*
       Elin S. Alm, ND ID 05924
       Assistant Attorneys General
       Consumer Protection & Antitrust Division
       Office of Attorney General of North Dakota
       1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
       (701) 328-5570
       (701) 328-5568 (fax)
       ealm@nd.gov

       *Attorneys for Plaintiff State of North Dakota*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

*/s/ Domingo Emanuelli-Hernández*
Domingo Emanuelli-
Hernández Attorney General
Thaizza Rodríguez Pagán
Assistant Attorney
General PR Bar No.
17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201, 1204
trodriguez@justicia.pr.gov

Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

*Attorneys for Plaintiff Commonwealth of Puerto Rico*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

ALAN WILSON
Attorney General

<u>/s/ *Mary Frances Jowers*</u>
Mary Frances Jowers
Assistant Deputy Attorney General
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-5855
Email: mjowers@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC
880 Johnnie Dodds Blvd, Suite 1
Mount Pleasant, SC 29464
Phone: 843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
Phone: (504) 648-0180
Email: jdugan@dugan-lawfirm.com

*Attorneys for Plaintiff State of South Carolina*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

MARTY JACKLEY
Attorney General


*/s/ Jonathan Van Patten*
Jonathan Van Patten
Assistant Attorney General
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: 605-773-3215
jonathan.vanpatten@state.sd.us

*Attorney for Plaintiff State of South Dakota*

**\*\* FILED UNDER SEAL \*\***

FOR PLAINTIFF STATE OF UTAH:

Sean D. Reyes
Utah Attorney General

*/s/ Matthew Michaloski*
Matthew Michaloski
Marie W.L. Martin
Assistant Attorney General
160 East 300 South, 5th Floor
P.O. Box 140811
Salt Lake City, UT 84114
mmichaloski@agutah.gov
Telephone: (801) 440-9825

*Attorneys for Plaintiff State of Utah and*
*as counsel for the Utah Division of Consumer Protection*

**\*\* FILED UNDER SEAL \*\***

## CERTIFICATE OF SERVICE

I certify that on December 9, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ Kiran N. Bhat*
Kiran N. Bhat

## CERTIFICATE OF MOTION TO SEAL

I certify that contemporaneously with the filing of this Motion, Plaintiff States filed a motion to seal both this document and the attached exhibits.

*/s/ Kiran N. Bhat*
Kiran N. Bhat