# EXHIBIT 8
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF TEXAS

3                    SHERMAN DIVISION

4                       --o0o--

5   STATE OF TEXAS, ET AL.,

6

7   Plaintiffs,                    C.A. No.

8   vs.                            4:20-cv-00957 (SDJ)

9   GOOGLE LLC,

10                   Defendant.

11   _____/

12

13                    --  --  --

14           THURSDAY, NOVEMBER 21, 2024

15                    --  --  --

16        Videotaped Deposition of PAUL R. MILGROM,
     Ph.D., held at Freshfields Bruckhaus Deringer,
17   855 Main Street, Suite 300, Redwood City, California,
     beginning at 9:03 a.m., before Sandra Bunch
18   VanderPol, FAPR, RMR, CRR, CSR #3032

19                    --  --  --

20

21

22

23

24

25     Job No. MDLG7014133

HIGHLY CONFIDENTIAL

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3       ALEX ABSTON Esq.
         ZEKE DeROSE, Esq.
 4       Lanier Law Firm
         10940 West Sam Houston Parkway N.
 5       Houston, Texas 77064
         281-748-7693
 6       Alex.abston@lanierlawfirm.com
         Zeke.derose@lanierlawfirm.com
 7
     -and-
 8
         ETHAN GLENN, Esq.
 9       Norton Rose Fulbright US LLP
         98 San Jacinto Boulevard, Suite 1100
10       Austin, Texas 78701-4255
         (512) 536-2437
11       ethan.glenn@nortonrosefulbright.com
12   For the Defendant:
13       ANDREW J. EWALT, Esq.
         ANDREW HENDERSON, Esq.
14       Freshfields Bruckhaus Deringer US LLP
         700 13th Street, NW, 10th Floor
15       Washington, DC 20005-3960
         (202) 777-4500
16       Andrew.ewalt@freshfields.com
         Andrew.Henderson@freshfields.com
17
     -and-
18
         NEELESH NOORTHY, Esq.
19       Axinn, Veltrop & Harkrider LLP
         55 2nd Street
20       San Francisco, California 94105
         (415) 490-2000
21       Nmoorthy@axinn.com
22
23   (Appearances continued on next page.)
24
25
```

HIGHLY CONFIDENTIAL

Page 3

1    REMOTE APPEARANCES:

2              Hatte Van Metre

              Jonathan Jaffe

3              Melanie DeRose

4

     Also Appearing:  Andrzej Skryzpaca (Auctionomics)

5

6    THE VIDEOGRAPHER:  Alejandro Zamora Ruiz

7    THE TECHNOLOGIST:  Lance Hoeppner

8

9                      --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 4

1                          I N D E X

2    Examination by:                              Page

3      MS. ABSTON                                 9

4      MR. EWALT                                  340

5      MS. ABSTON                                 344

6      MR. EWALT                                  346

7                        --o0o--

8                        EXHIBITS

9           DEPOSITION OF PAUL R. MILGROM, Ph.D.

10              THURSDAY, NOVEMBER 21, 2024

11   Exhibit #            Description           Page

12   Exhibit 1    Curriculum Vitae                15

13   Exhibit 2    Dissertation:  The Structure of  35

14                Information in Competitive

15                Bidding

16   Exhibit 3    Appendix B:  List of Material   144

17                Relied On

18   Exhibit 4    Defendant Google LLC's Motion to  152

19                Strike Expert Reports, containing

20                Declaration of Dr. Milgrom

21   Exhibit 5    Prize Lecture, Auction Research   164

22                Evolving:  Theorems and Market

23                Designs

24   Exhibit 6    March 4th, 2024, DOJ deposition   177

25                transcript

HIGHLY CONFIDENTIAL

Page 5

1                          EXHIBITS

2              DEPOSITION OF PAUL R. MILGROM, Ph.D.

3                   THURSDAY, NOVEMBER 21, 2024

4      Exhibit #        Description                  Page

5    Exhibit 7      Expert Report of Paul R. Milgrom  180

6                   dated January 23, 2024, DOJ case,

7                   Bates GOOG-AT-MDL-C-000021794 -

8                   2190

9    Exhibit 8      Email dated 5/13/2019 re "Header  196

10                  bidding & unified pricing rules,"

11                  Bates GOOG-AT-MDL-013301522

12   Exhibit 9      Email dated 6/19/2018 re "Good    197

13                  read:  Self competition of DBM on

14                  Jedi," Bates GOOG-DOJ-11347849

15   Exhibit 10     Declaration of ███████████        198

16   Exhibit 11     Email chain dated 2/24/16 re      199

17                  "Seeking approval for 90/10

18                  Private Auction rev-share for ████

19                  ██████," Bates GOOG-DOJ-05221243 -

20                  246

21   Exhibit 12     Email chain dated 8/11/2017 re    199

22                  "Google Internal," Bates

23                  GOOG-DOJ-14162304 - 307

24   Exhibit 13     Expert Report of Paul R. Milgrom, 236

25                  dated July 30, 2024

HIGHLY CONFIDENTIAL

```
                                            Page 6

 1                        EXHIBITS

 2            DEPOSITION OF PAUL R. MILGROM, Ph.D.

 3                 THURSDAY, NOVEMBER 21, 2024

 4     Exhibit #        Description                    Page

 5    Exhibit 14    "Interview with Paul R. Milgrom," 335

 6                  March 2021

 7    Exhibit 15    Article, "The quest for the       336

 8                  perfect auction"

 9

10

11

12                        --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL

Page 7

1        BE IT REMEMBERED that on Thursday,

2    November 21, 2024, commencing at the hour of

3    9:03 a.m., at the law offices of Freshfields

4    Bruckhaus Deringer, 855 Main Street, Suite 300,

5    Redwood City, California, before me, Sandra Bunch

6    VanderPol, a Certified Shorthand Reporter in and for

7    the State of California, personally appeared,

8                    PAUL R. MILGROM, PH.D.

9        Expert witness herein, who, having been duly

10    sworn, was thereupon examined and interrogated as

11    hereinafter set forth.

12                    --o0o--

13        THE VIDEOGRAPHER:  We are now on the record.

14    My name is Alejandro Zamora Ruiz.  I am the

15    videographer for Golkow.

16        Today's date is November 21st, 2024 -- give

17    me a second.  I've got to start over.  There we go.

18    Sorry about that.

19        We are now on the record.  My name is

20    Alejandro Zamora Ruiz.  I am the videographer for

21    Golkow.  Today's date is November 21st, 2024, and the

22    time is 9:03 a.m. Pacific Time.

23        This video deposition is being held in

24    Freshfields at 855 Main Street, Redwood City,

25    California 94063, in the matter of the State of Texas

HIGHLY CONFIDENTIAL

Page 8

1    et al., vs. Google, Inc. -- or Google LLC, for the

2    United States District Court, Eastern District of --

3    or Eastern District of Texas, Sherman Division.

4              The deponent is Paul Milgrom.

5              Will counsel please identify themselves?

6              MR. EWALT:  Andrew Ewalt, from Freshfields,

7    on behalf of Google.

8              MR. HENDERSON:  Andrew Henderson from

9    Freshfields on behalf of Google.

10             MR. MOORTHY:  Neelesh Moorthy, from Axinn,

11   on behalf of Google.

12             MS. ABSTON:  And I'm Alex Abston.  I'm here

13   on behalf of plaintiffs.

14             MR. DeROSE:  Zeke DeRose on behalf of the

15   plaintiffs, the Lanier Law Firm.

16             MR. GLENN:  Ethan Glenn, Norton Rose

17   Fulbright, on behalf of plaintiff states.

18             THE REPORTER:  Okay.  Raise your right hand,

19   sir.

20             Do you solemnly swear or affirm the

21   testimony you are about to give in this proceeding

22   shall be the truth, the whole truth, and nothing but

23   the truth, so help you God?

24             THE WITNESS:  I do.

25             THE REPORTER:  Thank you.

HIGHLY CONFIDENTIAL

Page 9

```
 1                      EXAMINATION

 2    BY MS. ABSTON:

 3    Q.      Good morning, Dr. Milgrom.

 4    A.      Good morning.

 5    Q.      Could you please state your full name for

 6    the record, sir.

 7    A.      Yes.  My name is Paul Robert Milgrom.

 8    Q.      And you understand that you're under oath

 9    today?

10    A.      Yes, I do.

11    Q.      Okay.  And I intend to use all seven hours

12    that we have today, but I understand that you've been

13    a little bit under the weather.  So if at any point

14    in time, you need to take a break, will you just let

15    me know?

16    A.      Sure.  Will do.

17    Q.      Okay.  Are you well enough --

18    A.      Sorry.

19    Q.      That's okay.  No need to apologize.

20    A.      I had to get it out.

21    Q.      Are you well enough to continue today?

22    A.      I am, yes.

23    Q.      Okay.  Are you under any medications that

24    may impair your ability to answer my questions

25    truthfully today?
```

HIGHLY CONFIDENTIAL

Page 10

1    A.        I don't believe so, no.

2    Q.        Are you on any medications today that may

3    impair your recollection?

4    A.        No.

5    Q.        Okay.  I'll do my best to take frequent

6    breaks, but, again, if you need a break, you tell me,

7    and you tell me how long.  Okay?

8    A.        Uh-huh.

9    Q.        And then you've been deposed before;

10   correct?

11   A.        Yes.

12   Q.        Okay.  So I know you know the rules of the

13   road, but just a quick refresher.

14             At different points in time, there may be

15   some objections that come from Mr. Ewalt.

16             If you need to rephrase the question or you

17   don't understand it, will you please let me know?

18   A.        Okay.

19   Q.        And for clarity of your testimony and the

20   record, you need to give verbal answers to my

21   questions today.

22             Do you understand that?

23   A.        Yes, I do.

24   Q.        Okay.  Then let's get started.

25             To make today a little bit easier and

HIGHLY CONFIDENTIAL

Page 11

1    clearer throughout, I wanted to see if we could agree

2    on some terminology so that we could refer to the

3    same things throughout.

4              Does that sound okay?

5    A.       That sounds fine.

6    Q.       Okay.  Throughout 2024 you have offered

7    opinions and testimony on behalf of Google in what

8    some refer to "the DOJ trial" or "the Department of

9    Justice trial"; is that correct?

10   A.       Yes.

11   Q.       Are you aware of what court that case is

12   located in?

13   A.       Yes.  That was in Virginia.

14   Q.       Okay.  Do you recall the dates of your

15   expert testimony that you provided in that trial

16   brought by the Department of Justice?

17   A.       It was in September, but, no, I don't recall

18   the exact dates.

19   Q.       And you sat for a deposition and testified

20   at trial in this matter; is that correct?

21   A.       In that matter.

22   Q.       In that matter.

23   A.       Yes.

24   Q.       And do you recall the date of your

25   deposition in the DOJ matter?

HIGHLY CONFIDENTIAL

Page 12

1    A.        No, I don't.

2    Q.        So can we agree today that when I refer to

3    phrases like "the DOJ trial" or "the DOJ case," we

4    are referring to the ongoing trial taking place in

5    the Eastern District of Virginia between the

6    Department of Justice and Google pertaining to

7    ad tech?

8    A.        Yes.

9    Q.        And then you're here today, though, to

10   testify on behalf of Google in a different case as an

11   expert witness; right?

12   A.        That's right.

13   Q.        Okay.  Are you aware of what court that this

14   case is located in?

15   A.        Yes.  This is in Texas.

16   Q.        Okay.  Are you aware of how many plaintiffs

17   are bringing this lawsuit against Google?

18   A.        I don't recall the number.

19   Q.        Okay.  Have you reviewed the complaint in

20   preparation for your deposition testimony today?

21   A.        Well, some time ago I reviewed the

22   complaint.

23   Q.        Did you review it after your DOJ trial

24   testimony?

25   A.        I looked at it.  I didn't read it again from

Page 13

1    front to back after the DOJ testimony.

2    Q.       Okay.  Did you look at it before you issued

3    your report in this matter on July 30th, 2024?

4    A.       Yes.

5    Q.       Okay.  And you haven't reviewed it since

6    then?

7    A.       Not front to back.

8    Q.       Okay.  Are you aware of which version of the

9    complaint that you looked at prior to issuing your

10   report on July 30th, 2024?

11   A.       I think -- well, I think so, but I'm not

12   certain.

13   Q.       Okay.  Do you have an idea of what the date

14   of the complaint was that you looked at for your --

15   A.       I'm remembering Version 4.  Is that -- does

16   that sound right?  I'm sorry.  I'm just -- I'm not

17   sure.

18   Q.       Okay.  Okay.  And does your -- the report

19   that you issued here in this matter on July 30th,

20   2024, pertain to all the plaintiffs that are

21   contained within that complaint?

22   A.       Well, the report speaks for itself, but it

23   pertains to all the -- all the allegations in that

24   complaint.

25   Q.       Okay.  And can we agree today that when I

HIGHLY CONFIDENTIAL

Page 14

1   refer to phrases like "this case" or "your July 30th

2   report" or "the EDTX case," we're referring to the

3   upcoming trial taking place in the Eastern District

4   of Texas between various states and Google pertaining

5   to adtech?

6   A.       Yes.

7           MR. EWALT:  Objection to form.

8           You can answer.

9           THE WITNESS:  Yes.

10  BY MS. ABSTON:

11  Q.       Okay.  And you understand when I use the

12  term "Texas," unless I state otherwise, I'm referring

13  to all plaintiffs' states and territories that are

14  listed in the May 2023 Amended Complaint?

15  A.       Okay.  We can understand that.  Sure.

16  Q.       Great.  And then throughout this

17  deposition -- last term -- can we agree that when I

18  refer to "Google," unless otherwise stated, I'm

19  referring to Google as a whole, which would include

20  Alphabet, unless otherwise specified?

21          MR. EWALT:  Objection to form.

22          THE WITNESS:  I understand.

23  BY MS. ABSTON:

24  Q.       Okay.  Then let's get started.

25          What I want to first start off with is your

HIGHLY CONFIDENTIAL

Page 15

1    CV.  And we're going to mark your CV as Exhibit 1,

2    which is M-2 for our exhibit share.

3    A.       Okay.

4                    (Exhibit No. 1 was marked.)

5    BY MS. ABSTON:

6    Q.       Are you aware that a CV was produced with

7    your expert report in this matter?

8    A.       Yes.  It's toward the back of my report.

9    There we go.  Page 452.  Mm-hmm.

10   Q.       Okay.  And I will represent to you that this

11   was attached to your Eastern District of Texas expert

12   report as Appendix A.

13           Does that appear to be correct?

14   A.       That's what it says on its face.

15   Q.       Okay.  And so this was attached to the

16   report that you issued on July 30th, 2024.

17           Does that appear correct?

18   A.       Yes.

19   Q.       Do you have a more recent CV?

20   A.       Do I have a more recent CV?  Yes.

21   Q.       Okay.  And what is the date of the most

22   recent CV?

23   A.       Well, I keep it online, and when things

24   changes, it changes online.  So if we were to print

25   it, it would have today's date, I imagine.

HIGHLY CONFIDENTIAL

Page 16

1          MS. ABSTON:  Okay.  So on a break, what I'd
2    like to do is print that CV so that we can walk
3    through it and mark it.  And I'll ask, Counsel, that
4    if the CV is updated between now and the time of
5    trial, that you could please provide us with those
6    updates.
7    BY MS. ABSTON:
8    Q.       So -- okay.  So we do have a more recent CV,
9    but for the time being, do you believe that the CV
10   issued on July 30th, 2024, is complete and
11   accurate --
12   A.       Yes.
13   Q.       -- at the time it was issued?
14   A.       It was current as of that date, yes.
15   Q.       Okay.  And what -- what updates to your CV
16   can you recall since then?
17   A.       Oh, at least one of the papers that's marked
18   as a working paper has been published and would move
19   from the "Working Paper" section to the "Published
20   Paper" section.
21          I think that might be the only one that I --
22   that I recall offhand.
23          Shall I look for it?
24   Q.       Yes.  We'll go there in just a minute, if
25   that's okay.  But I am going to refer to this as

HIGHLY CONFIDENTIAL

Page 17

```
 1    Exhibit 1 going forward.

 2    A.        Uh-huh.

 3    Q.        So as you currently sit here today, do you

 4    reside in Stanford, California?

 5    A.        I do.

 6    Q.        And do you have any intention of moving in

 7    the near future?

 8    A.        No.

 9              MS. ABSTON:  Okay.  Give me one second.

10    Q.        Okay.  Let's open up your CV.

11    A.        Okay.

12    Q.        And I see you've got your A.B. in

13    mathematics with high honors from the University of

14    Michigan in May 1970; is that correct?

15    A.        That's correct.

16    Q.        I'd like to flip to page -- I think we're

17    going to start on page 452 of Exhibit 1.

18              Do you see that?

19    A.        Of Exhibit 1.  Is this Exhibit 1?

20    Q.        Yes.  This is Exhibit 1.

21    A.        Okay.  Yep.  Okay.

22    Q.        So how did you land on attending the

23    University of Michigan?

24    A.        Well, I grew up in Michigan.  I --

25    University of Michigan was, it seemed to me at the
```

HIGHLY CONFIDENTIAL

Page 18

1    time, the best university in Michigan, and my parents

2    told me I should -- at the time I should go somewhere

3    close to home.  So that was it.

4    Q.        Okay.  And then in 1978, you graduated with

5    an M.S. in statistics from Stanford; is that correct?

6    A.        Yes, that's right.

7    Q.        And what drew you from Michigan to Silicon

8    Valley?

9    A.        Oh, well, it wasn't -- I didn't go from

10   Michigan to Silicon Valley.

11   Q.        Oh, okay.  So what happened after you

12   graduated from Michigan?

13   A.        I graduated from Michigan in 1970, and then

14   I became an actuary.  I worked -- passed a bunch of

15   actuarial exams.  I worked as an actuary for about

16   five years.

17   Q.        Okay.  So from May 1970 to 1975, you worked

18   as an actionary?

19   A.        Actuary.

20   Q.        Actuary.

21   A.        Yes.

22   Q.        And that was -- where did you live during

23   that time period?

24   A.        Most of it in -- well, in the beginning of

25   that time period, in San Francisco, but most of it in

HIGHLY CONFIDENTIAL

Page 19

1    Ohio, in Columbus, Ohio.

2    Q.      Okay.  And then you made your way to

3    Stanford?

4    A.      Yes.

5    Q.      Okay.  And so what was the exact year that

6    you moved -- or that you began your studies at

7    Stanford?

8    A.      1975.

9    Q.      Okay.  So 1975.

10           MS. ABSTON:  I think we need to go off the

11   record for some technology issues, so...

12           THE WITNESS:  All right.

13           THE VIDEOGRAPHER:  The time is 9:13 Pacific

14   Time.  We are going off the record.

15           (Off the record.)

16           THE VIDEOGRAPHER:  The time is 9:16 a.m.

17   Pacific Time.  We are back on the record.

18   BY MS. ABSTON:

19   Q.      Okay, Dr. Milgrom.  I think we left off and

20   we were talking about 1975, you had moved to Stanford

21   and started your studies; is that correct?

22   A.      That's correct.

23   Q.      Okay.  And then in 1970 -- or, well, when

24   did you graduate from Stanford for the first time?

25   A.      Okay.  I got my first degree from Stanford

HIGHLY CONFIDENTIAL

Page 20

1    in 1978.  That's the master's in statistics.

2    Q.        Okay.  And then what did you do after 1978?

3    A.        I was still a student at Stanford.  That was

4    just sort of a marker, which is why I didn't call it

5    graduation.

6    Q.        Okay.

7    A.        That was -- that was -- I earned that

8    en route to earning my Ph.D.

9    Q.        Okay.  And you graduated with your Ph.D. in

10   business in January of 1979; is that correct?

11   A.        Yes, mm-hmm.

12   Q.        And what was the title of your dissertation?

13   A.        "The Role of Information in Competitive

14   Bidding," I think was the title, if I recall

15   correctly.

16   Q.        Okay.  We're going to circle back to that a

17   little bit later.

18             But I want to talk to you a little bit more

19   about your "Employment" section here that is on page

20   452 of Exhibit 1.

21             Do you see that?

22   A.        Yes, I do.

23   Q.        Have you ever worked outside academia?

24   A.        Yes.  This probably should have been marked

25   "Academic Employment."  But, yes, I worked -- from

HIGHLY CONFIDENTIAL

Page 21

1    1970 to 1975, I worked as an actuary.  And then, of

2    course, I had various little jobs while I helped pay

3    my way through college, which I wouldn't normally

4    include here.

5    Q.        Okay.  So we're going to correct that to say

6    "Academic Employment" here.

7    A.        Yes.

8    Q.        So have you had a job outside academia since

9    1975?

10   A.        Since 1975, no, I've been employed entirely

11   as shown here.

12   Q.        Okay.  And it looks like after you received

13   your Ph.D. in California, you moved back to the

14   Central Time Zone; is that correct?

15   A.        Yeah, to -- to Illinois, yes.

16   Q.        Okay.  And what drew you back to Illinois?

17   A.        I was a professor at Northwestern

18   University, or an assistant professor initially at

19   Northwestern University.

20   Q.        And that was in the Kellogg Graduate School

21   of Management?

22   A.        That's correct.

23   Q.        And what classes did you teach during that

24   time?

25   A.        Oh, Introductory Economics.  This was in the

HIGHLY CONFIDENTIAL

Page 22

1    management of -- Managerial Economics and Decision

2    Sciences Group at the -- at the university, and I

3    taught some groups that were related to operations

4    research methods.  I can't quite -- quite remember

5    the course titles.  But linear programming, inventory

6    theory, that sort of thing.

7    Q.        And then in 1982, you became a visiting

8    professor at Yale; is that correct?

9    A.        Yes.

10   Q.        Okay.  And was that a full-time position?

11   A.        Yes.

12   Q.        And what classes did you teach at Yale?

13   A.        Similar classes, although more.  So I also

14   taught Introductory Economics.  I also taught some of

15   these operations research-related classes.  And I

16   taught, to advanced graduate students there, some

17   research classes on the emerging topic then of

18   information economics.

19   Q.        And what prompted you to leave Silicon

20   Valley in the first place, other than your job

21   position at Northwestern?

22   A.        Well, I was a student there.  I wasn't -- I

23   didn't think of myself as being in Silicon Valley in

24   1975.  I was a student at Stanford.  And when you

25   graduate, the -- at the time, what we thought the

HIGHLY CONFIDENTIAL

Page 23

1   most prestigious thing to do with the expectation was

2   that you would seek a job as a university professor.

3   That's what I had trained to do.

4           So I interviewed for jobs as a university

5   professor, and the best offer I had -- as best I can

6   remember, the best offer I had was from Northwestern,

7   or I considered it the best offer, and so I went

8   there.

9   Q.      When you were graduating from the University

10  of Michigan and looking to further your degree, did

11  you evaluate other universities other than Stanford?

12  A.      Yes.

13  Q.      What were the other universities that you

14  considered?

15  A.      Well, I was admitted to both Stanford and

16  Harvard, and I chose Stanford.

17  Q.      And why did you choose Stanford?

18  A.      I had a love for the West Coast.  I wanted

19  to get out there and -- somewhere that wasn't so

20  cold.

21  Q.      Okay.  Understandable.

22  A.      Uh-huh.

23  Q.      Understandable.

24          Okay.  So I want to go back to talking about

25  the 1980s.

HIGHLY CONFIDENTIAL

Page 24

```
 1              So in 1983, you transitioned to a full-time
 2    position at Yale University as the professor of
 3    economics and management; is that correct?
 4    A.       I see that up there now.  Okay.  Can I pull
 5    this closer --
 6    Q.       Sure.
 7    A.       -- see what I'm looking at.
 8              Yes, so it appears that I had accepted their
 9    full-time offer then and began that position in 1983,
10    yes.
11    Q.       Okay.  And then -- and we're continuing to
12    walk through Exhibit 1, which is your CV.  So I think
13    you have that pulled up in front of you now on the
14    screen.
15    A.       Yes.
16    Q.       But I think we're walking through -- let's
17    see, on page 450 -- 453.
18    A.       Yep.
19    Q.       Okay.  And then two years later, in 1985,
20    you became the Williams Brother professor of
21    management studies and professor of economics at
22    Yale; is that correct?
23    A.       Yes.
24    Q.       Okay.  And then -- but you leave Yale in
25    1987; is that right?
```

HIGHLY CONFIDENTIAL

Page 25

1    A.        Yes.  Yep.

2    Q.        And what prompted you to leave Yale?

3    A.        I had an offer from -- I had offers from

4    U.C. Berkeley and from Stanford, and I negotiated

5    with them and with Yale, and decided it was best for

6    me and my family to -- my young family at the time,

7    that it was best for us to live at Stanford.  So I

8    moved to Stanford.

9    Q.        And when you moved -- when you returned to

10   Sanford, you returned as the director at the Stanford

11   Institute of Theoretical Economics?

12   A.        That was two years later, as you see.

13   Q.        Okay.

14   A.        That's sort of a -- they are sort of out of

15   order, perhaps.  I consider that out of order.

16   Q.        Okay.

17   A.        I moved as a professor of economics.

18   Q.        Oh, okay.  So just to clarify it, when you

19   left Yale in 1987, you started at Stanford in what

20   position?

21   A.        As a professor of economics and a professor

22   by courtesy that year at the Graduate School of

23   Business.  Yep.

24   Q.        Okay.  And then you became the director at

25   the Stanford Institute of Theoretical Economics?

HIGHLY CONFIDENTIAL

Page 26

1    A.       Yes.  I was the founding director of that

2    institute.  Uh-huh.

3    Q.       Okay.  And so since 1987, you've worked

4    full-time at Stanford; is that correct?

5    A.       Yes.

6    Q.       And you've resided in the Palo Alto/Stanford

7    area full-time since 1987?

8    A.       Well, I had a couple of visiting positions

9    during that period.  Let's see.  The -- I think --

10   are my visiting positions discussed here?

11   Q.       I believe some of your visiting positions

12   are mentioned throughout, so -- but let's walk

13   through them.

14           Do you recall specific visiting positions --

15   A.       Yeah, I was --

16   Q.       -- that you've held since 19 -- the 1980s?

17   A.       Yes.  Let's see.  I think it was in 2000,

18   Harvard invited me to come spend a year as a Taussig

19   visiting professor of economics at Harvard

20   University, and it was a nice position.  You know,

21   they just -- they paid me just to be there.  I didn't

22   have any responsibilities other than to show up.  So

23   I spent the year at Harvard.

24           And then the next year I got an offer

25   from -- a permanent offer from MIT, and I ended up

HIGHLY CONFIDENTIAL

Page 27

1    going there as a visitor for a year in 2001-2002, and

2    while Stanford was putting together its counteroffer,

3    and managed to draw me back in 2002.

4    Q.        So the two specific visiting professor

5    opportunities that you recall right now is in 2000

6    you were at Harvard, and then in 2001 you were at

7    MIT?

8    A.        That's correct.

9    Q.        And so did you have any responsibilities

10   when you were a visiting professor at MIT in 2001?

11   A.        Yes.  I taught -- well, I was there and I

12   engaged in teaching the research.  I had some

13   teaching there.

14   Q.        Okay.  So is it fair to say between 1980 and

15   1990, you were full-time in academia?

16   A.        Between 1980 and 1990, yes, I was full-time

17   in academia.

18   Q.        Okay.

19   A.        I'm considered full-time still.

20   Q.        And then you've been a professor at a few

21   different departments at Stanford; right?

22   A.        Well, I have these courtesy appointments in

23   other departments at Stanford.

24   Q.        What are those departments?

25   A.        At the Graduate School of Business and in

HIGHLY CONFIDENTIAL

Page 28

1  the engineering school, the Department of Management

2  Science and Engineering.

3  Q.      And are you teaching -- have you taught --

4  strike that.

5          Have you taught every semester since 1987?

6  A.      Well, we're on a quarter system at Stanford.

7  Q.      Okay.

8  A.      And have I taught every quarter?  No.

9  Q.      Are you teaching classes this semester?

10 A.      This quarter.

11 Q.      This quarter.  Are you teaching classes this

12 quarter?

13 A.      In the fall quarter, I am not teaching

14 classes.

15 Q.      Okay.  When was the last quarter that you

16 taught classes?

17 A.      In the spring of last year.

18 Q.      And what class did you teach?

19 A.      It was a class on -- an undergraduate class,

20 Economics 136.  The subject was market design.

21 Q.      And have you taught classes in antitrust?

22 A.      No.

23 Q.      Have you ever taught classes related to the

24 Deceptive Trade Practices Act?

25 A.      No.

HIGHLY CONFIDENTIAL

Page 29

1    Q.        Do you anticipate teaching next semester?

2    A.        Yes.   Next quarter.

3    Q.        Next quarter.   And so your income between

4    1980 and 1990, when you were working in academia,

5    primarily came from your academic appointments or

6    positions; is that correct?

7    A.        Yes.

8    Q.        And I want to flip to your CV.   We're going

9    to hop around a little bit, if that's okay.   But I

10   want to flip to your "Honors, Awards, Prizes,

11   Fellowships, and Grants" section, which I think

12   begins on page 453.

13            Do you see that?

14   A.        Yes.

15   Q.        And when you submitted your report, was this

16   an accurate representation of all grants you had

17   received since 1974?

18   A.        I believe so, yes.

19   Q.        And is this section still accurate?

20   A.        I don't think that there's anything to add

21   to this since -- since -- I think the last new honor

22   was the honorary doctorate at Charles University in

23   the summer of 2024.

24   Q.        Okay.   But specifically pertaining to

25   grants, this section, you believe it is still

HIGHLY CONFIDENTIAL

Page 30

1    accurate?

2    A.        Grants.  Do I have any other grants?  I have

3    no other grants since that period of time.

4    Q.        And does this list include any grant work

5    that you may have supervised throughout the course of

6    your academic career?

7    A.        I'm not sure I understand the question.

8    Q.        Okay.  Have you ever personally received any

9    grants that had a connection to Google?

10   A.        Grants that had a connection to Google, no.

11   Q.        Have any of your academic departments in

12   which you were employed ever received a grant from

13   Google?

14   A.        I wouldn't know.  None that I'm aware of.

15   Q.        Okay.  And has Google ever funded any of the

16   Stanford departments that you're involved in?

17   A.        Funded the departments?  I am not aware of

18   them funding any of the departments, no.

19   Q.        To your knowledge, have they contributed

20   funds towards any of Stanford's departments?

21   A.        To my knowledge, "contributed funds

22   towards," that's too vague for me to understand

23   exactly what that -- what you mean by that.

24   Q.        So you're unaware if Google has ever

25   contributed financially to any of the departments at

HIGHLY CONFIDENTIAL

Page 31

```
 1    Stanford in which you've been involved?

 2              MR. EWALT:  Objection to form.

 3              THE WITNESS:  I am not aware of Google ever

 4    having made a contribution to one of the departments

 5    that I was involved in.  You know, I -- the Graduate

 6    School of Business, I have very little knowledge of

 7    what might be going on over there, so I really

 8    wouldn't know.  I'm close at the economics

 9    department, and I think I would know.  I'm not aware

10    of any grants there.

11    BY MS. ABSTON:

12    Q.       Okay.  And do you have any plans to retire

13    soon?

14    A.       I do not.

15    Q.       Okay.  I want to keep walking through your

16    CV.

17    A.       Uh-huh.

18    Q.       So let's look at your "Publications" section

19    here.

20    A.       Uh-huh.

21    Q.       I believe your "Publications" section starts

22    on page 457 of Exhibit 1.

23              Do you see that?

24    A.       Yes, that appears to be correct.  Uh-huh.

25    Q.       And do you see the top where it says
```

HIGHLY CONFIDENTIAL

Page 32

```
1    "Publications," and then it looks like there's a
2    subheader that says "Articles."
3    A.        Yes.
4    Q.        Do you see that?
5    A.        Uh-huh.
6    Q.        And when you submitted your report, this is
7    an accurate representation of all the articles you
8    had published at that time?
9    A.        I believe so, yes.
10   Q.        Okay.  But we do note that we're going to
11   walk through, hopefully, your most recent CV that may
12   have some adjustments to the "Articles" section?
13   A.        It may.  There has been at least one article
14   that's mentioned as a working paper here that has
15   been published in the meantime.
16   Q.        Okay.  And then if we continue looking
17   through this section here, I think there's a
18   subheader that says, "Books."
19   A.        Uh-huh.
20   Q.        Have you published any books since you
21   issued your report on July 30th, 2024?
22   A.        It sometimes feels like the report was a
23   book.  But, no, these are the books.
24   Q.        Okay.  So looking at page 465 of Exhibit 1,
25   we have two books listed here.
```

HIGHLY CONFIDENTIAL

Page 33

1    A.        Uh-huh.

2    Q.        And then it looks like there's a subheading

3    that says, "Contribution to Books and Proceedings."

4              Do you see that?

5    A.        Yes.  At the same level as "Articles" and

6    "Books" is "Contributions to Books and Proceedings."

7    Q.        Okay.  So were you the sole author of --

8    let's see -- "Discovering Prices:  Auction Design in

9    Markets with Complex Constraints"?

10   A.        Yes.

11   Q.        Okay.  And that book was published in 2017;

12   correct?

13   A.        Yes.

14   Q.        And were you the sole author of "Putting

15   Auction Theory to Work" published in 2004?

16   A.        Yes.

17   Q.        And so let's move -- strike that.

18             We have talked a little bit about the

19   "Contributions to Books and Proceedings" section.

20             Do you see that?

21   A.        I see the subheading, yep.

22   Q.        And this was after you submitted your report

23   on July 30th?

24   A.        To the best of my knowledge, yes.

25   Q.        Okay.  Moving on from that section, I

HIGHLY CONFIDENTIAL

Page 34

1    believe the next section is a subheader called

2    "Patents."

3           Do you see that?

4    A.     I do.

5    Q.     And how many patents have you been

6    associated with throughout your career?

7    A.     I'd have to count them.  Just a moment.

8           There are ten listed here.

9    Q.     Okay.  So when you submitted your report, it

10   was an accurate representation of all ten patents

11   associated with your name?

12   A.     To the best of my knowledge, yes.

13   Q.     Okay.  And this is still an accurate

14   section?

15   A.     Yes.  There's been no new patents.

16   Q.     Okay.  I'm going to come back to that a

17   little bit later, then.

18          The rest of your CV, I believe, includes

19   subheadings like "Others."  And then I want to --

20   let's flip to the subheader called, "Working

21   Papers" --

22   A.     Yes.

23   Q.     -- on page 470.  You said this may be a

24   place we need to make a correction; is that right?

25   A.     Yes.  Let's see.  Well, the -- it looks like

HIGHLY CONFIDENTIAL

Page 35

1    just one.

2    Q.        Okay.  What's the correction?

3    A.        Kenneth Arrow's "Last Theorem," May '24.

4    Well, it's now accepted for publication, possibly

5    published at this point.

6    Q.        Okay.  And then flipping back to the

7    beginning of your CV to the section called, "Honors,

8    Awards, Prizes, Fellowships, and Grants," on page

9    453.

10   A.        Yep.

11   Q.        Let me know when you're there.

12   A.        I'm there.

13   Q.        When you submitted this -- when you

14   submitted your report, this was an accurate

15   representation of all your honors, awards, prizes,

16   and fellowships since 1974; is that correct?

17   A.        Grants and fellowships, yes.  To the best of

18   my knowledge, this was complete and correct.

19   Q.        And this section is still accurate?

20   A.        There's been no changes in that.

21             MS. ABSTON:  Okay.  Okay.  I want to circle

22   back to your dissertation, which we're going to mark

23   as Exhibit 2.

24                    (Exhibit No. 2 was marked.)

25             ///

HIGHLY CONFIDENTIAL

Page 36

```
 1   BY MS. ABSTON:

 2   Q.       And I believe you testified that your

 3   dissertation was presented in 1978; right?

 4   A.       Something like that.

 5            MS. ABSTON:  I would like to mark what is

 6   your dissertation entitled, "The Structure of

 7   Information and Competitive Bidding" as Exhibit 2.

 8            THE WITNESS:  Okay.

 9   BY MS. ABSTON:

10   Q.       Do you recognize this document?

11   A.       It looks familiar, yes.

12   Q.       Okay.  And did you write this document?

13   A.       Yes.

14   Q.       Okay.  Do you know the exact date that you

15   wrote this document?

16   A.       Well, it says -- it's dated on the front of

17   it October 1978.  So it was written in the period

18   preceding that.

19   Q.       Okay.  And how have you defined "competitive

20   bidding"?

21   A.       In this document?

22   Q.       Yes.  How have you confined -- how have you

23   defined "competitive bidding" in this document?

24   A.       Well, I would have to take a look in here

25   and see if it's defined at all.  Do you have a
```

HIGHLY CONFIDENTIAL

Page 37

1    reference in mind in here?

2    Q.        We can just move on.

3              Are the economic principles outlined in your

4    1978 dissertation still applied within auction -- the

5    auction theory field?

6    A.        I haven't reviewed this dissertation in two

7    decades or so, so I don't remember well enough to be

8    able to -- to be able to answer that question.

9    Q.        Okay.  When was the last time that you think

10   that you read through your dissertation?

11   A.        It must be at least 20 years.

12   Q.        Okay.  And have you applied auction theory

13   principles discussed within your 1978 dissertation

14   within your various Google expert reports?

15   A.        Again, I -- I'm not very clear about what is

16   in this dissertation anymore.  I haven't looked at it

17   in decades.  So whether the same principles are

18   applied or not, I would be unable to tell you as I

19   sit here.

20   Q.        Okay.  Have you used the auction theory --

21   or strike that.

22             Have you used the auction theory principles

23   discussed within your 1978 dissertation to form any

24   of your opinions mentioned in your July 30th report?

25   A.        My previous answer still applies.

HIGHLY CONFIDENTIAL

Page 38

1    Q.      How do you believe that the developed study

2    of the properties of two-sided auctions has impacted

3    modern price theories?

4    A.      Oh, goodness.  That's a very broad question.

5    Can we narrow it down a little bit?

6    Q.      Are you able to speak to any sort of

7    development of the study of properties of two-sided

8    auctions and their impacts on modern price theories?

9    A.      Yeah.  I am.

10   Q.      Could you further explain that?

11   A.      Well, in two-sided auctions, the formal

12   modeling of two-sided auctions has helped us come to

13   understand something about how information that is

14   privately held by individuals comes to be reflected

15   in prices.

16           It's told us something about the rates of

17   convergence of small markets, their structure to

18   perfectly -- the theoretical ideal of perfectly

19   competitive markets.

20           It's just given us a window generally on --

21   in traditional price theory before the development of

22   auction theory, people would draw a supply curve and

23   a demand curve and say somehow magically at the point

24   where the supply and demand curve intersect -- I'm

25   sorry, I shouldn't be using my hands here -- okay.

HIGHLY CONFIDENTIAL

Page 39

1    At the point where the supply and demand curve

2    intersect, there's a price and there's a quantity,

3    and somehow that happens.

4              And what auction theory and two-sided

5    auction theory do is they dig down into the process

6    and see how it affects what happens when you're short

7    of competition, how private information affects

8    prices and so on.

9    Q.       Okay.  And did you use the economic

10   principles outlined in your 1978 dissertation within

11   your work with the United States Federal

12   Communications Commission?

13   A.       It actually was very little of what I was

14   doing in my dissertation that was directly relevant

15   to the work for the Federal Communications

16   Commission.  Very little, if anything.

17   Q.       And what aspects did apply, if any, to your

18   work with the Federal Communications Commission?

19   A.       It would have been issues about framing;

20   that is, it would have been issues about the idea

21   that people have private information about what

22   things are worth to them; that they respond to

23   incentives in their behavior.  They are very general,

24   high-level principles.

25   Q.       Let's talk a little bit more about your

HIGHLY CONFIDENTIAL

Page 40

1    agency-related work.  Does that sound okay?

2    A.       Sure.

3    Q.       Have you ever worked for a United States

4    governmental agency?

5    A.       Oh, the agency.  That sense of agency.

6    Pardon me.  I am just confused about that

7    introduction.

8              I worked for -- well, my company,

9    Auctionomics, has worked for the U.S. Federal

10   Communications Commission.

11   Q.       Have you ever personally worked for the U.S.

12   Federal Communications Commission, outside of

13   Auctionomics?

14   A.       I have not been employed by them, and I have

15   not had an individual contract with them.

16   Q.       Okay.  So the FCC contracted with

17   Auctionomics for -- strike that.

18             When did the FCC contract with Auctionomics,

19   your company?

20   A.       For the work on the incentive auction, I

21   believe that started in 2011, as I recall.

22   Q.       Okay.  So did you ever work with the FCC

23   prior to 2011?

24   A.       Well, worked with the FCC but not -- not for

25   the FCC prior to 2011.

Page 41

1    Q.        When was the first time that you worked

2    with -- strike that.

3              When was the first time that you worked with

4    the FCC?

5    A.        I met with them for the first time in 1993,

6    probably.  I think -- yes, 1993.

7    Q.        And what was the subject matter of that

8    meeting?

9    A.        The very first radio spectrum auctions in

10   the United States.

11   Q.        And so that was the first time that you ever

12   had any interaction with the FCC?

13   A.        I believe so, yes.

14   Q.        And how did you originally get connected

15   with them, with the FCC, sir?

16   A.        Well, I had been hired by what was then

17   Pacific Bell to advise them on how auctions should

18   take place for radio spectrum.

19             And -- and they put me in -- I attended

20   together with their chief lobbyist when we went and

21   visited the FCC in Washington to speak about how

22   the -- the auction should be designed.

23   Q.        And when was Auctionomics formed as a

24   company?

25   A.        Oh, what was the first year?  I think it was

HIGHLY CONFIDENTIAL

Page 42

1    around 2010.  I just -- I'm sorry, I don't remember

2    exactly.

3    Q.        Okay.  And so you didn't do any work with

4    the FCC in the 1980s?

5    A.        "Didn't do any work with the FCC in the

6    1980s."  Oh, in the 1980s.  No, I did not.

7    Q.        Okay.  And could you clarify on the record

8    what the dates of your first -- strike that.

9              What were the dates you were first involved

10   with the FCC on the specific project that you were

11   just discussing?

12   A.        I talked about more than one project.  I'm

13   sorry.

14   Q.        That's okay.  For your first ever project

15   with the FCC --

16   A.        First --

17   Q.        -- what was your start date?

18   A.        Okay.  So this is the project that I had

19   with Pacific Bell we're talking about now.  And --

20   let's see.  The relevant legislation passed in July

21   of 1993, and so I was probably -- I'm going to -- I

22   can't guess the exact date, but September 1993 would

23   have been about the first time I spoke to the FCC.

24   Q.        Okay.  And was Pacific Bell your first hire

25   by a commercial company for consulting relating to

HIGHLY CONFIDENTIAL

Page 43

1    auctions?

2    A.        "For consulting relating to auctions."  It

3    may have been.  I don't recall an earlier one.

4    Q.        And what aspects of auction theory did your

5    work with the FCC pertain to in September of 1993?

6    A.        "Aspects of auction theory."  Well, it --

7    the challenge that the FCC had was how to design an

8    auction that would sell -- or a series of auctions,

9    actually; there have been many auctions now -- to

10   sell radio spectrum.

11            When the radio -- the licenses to use radio

12   spectrum -- I mean to be more precise -- when those

13   licenses were interrelated, some as substitutes and

14   some as complements, it was a new subject in auction

15   theory, one that had not been much researched in

16   academia, and they needed new solutions.

17   Q.        And I believe that that work with the FCC

18   resulted in creation of what some deemed the greatest

19   auction in history; is that right?

20   A.        I think that was the William Safire article

21   had that title, "Greatest Auction in History," yes.

22   Q.        And that article was published in the "New

23   York Times"?

24   A.        Yes.

25   Q.        And would you consider your work with the

HIGHLY CONFIDENTIAL

Page 44

1   FCC to be your greatest contribution to auction

2   theory?

3   A.      No.

4   Q.      What would you consider to be your greatest

5   contribution to auction theory?

6   A.      Okay.  I'm -- I'm sorry.  I was answering

7   that with respect to the 1983 work we were speaking

8   of.

9           Actually, I do think that my -- my greatest

10  work in auction theory was an FCC project, the one

11  that began in 2000 -- 2011, the so-called broadcast

12  incentive auction.

13  Q.      And let's walk through a little bit of a

14  timeline so that I can make that sure I follow you.

15  A.      Uh-huh.

16  Q.      The first time that you worked with the FCC

17  was in September of 1993?

18  A.      Yes.

19  Q.      And that was on the radio spectrum project

20  that you've described here --

21  A.      Yes.

22  Q.      -- is that correct?

23  A.      Yep.

24  Q.      When was the next time that you worked with

25  the FCC?

HIGHLY CONFIDENTIAL

Page 45

1    A.        Oh, I've been in contact with them on and

2    off ever since, so I -- I don't think I can highlight

3    dates for you.

4    Q.        So -- but there were various projects in

5    between, let's say, 1995 and the 2011 broadcast

6    incentive auction FCC project?

7    A.        Yeah, the -- the broadcast incentive auction

8    was an FCC project.  It was a project I did for the

9    FCC.

10            And in between, I had become quite friendly

11   with some of the staff at the Federal Communications

12   Commission, and sometimes they would informally call

13   me for advice.  That was sort of noncommercial.  I

14   was -- pro bono work, if you will, where I would give

15   my advice about how to deal with certain issues that

16   the FCC faced.

17   Q.        Okay.  Could you estimate how many times you

18   had formal projects with the FCC in between 1995 and

19   2011?

20   A.        "Formal projects" meaning something that --

21   if it was something where the FCC paid me, the answer

22   is very simple:  zero.  It was nothing that I was

23   paid by the FCC in that period; in fact, at any time

24   before 2011.

25   Q.        Okay.  So between 1995 and 2011, any time

Page 46

1    you heard from the FCC, it was more of an informal,

2    pro bono type of advice question?

3    A.        Yes, or else I was representing somebody

4    else in talking to the FCC.  Yes.

5    Q.        And have -- so let's talk a little bit about

6    your 2011 project.

7    A.        Sure.

8    Q.        When did you first begin that project in

9    2011?

10   A.        In 2011.  Are you asking a date?  Month?  I

11   can't tell you.

12   Q.        What month did you begin your project with

13   the FCC in 2011?

14   A.        I don't recall.

15   Q.        Okay.  And was Auctionomics also involved in

16   this project with the FCC in 2011?

17   A.        By the time I had a contract, it was

18   Auctionomics, yes.

19   Q.        Okay.  So the FCC contracted directly with

20   Auctionomics for that project?

21   A.        Actually, no.  This was complicated.  The

22   FCC -- yeah.  No.  You can ask more questions if

23   you'd like to know.

24   Q.        Why was that -- why was your contractual

25   situation with the FCC complicated at the time?

HIGHLY CONFIDENTIAL

Page 47

1    A.        Well, the FCC -- this was the most difficult

2    auction project in history ever, in any application,

3    and the FCC reached out to me and said, Can you do

4    this?  They said they wanted to hire me, but due to

5    federal contracting regulations, they couldn't just

6    hire me.  They had to -- they had to find a way to

7    hire me.

8            And they asked me how I felt about being a

9    subcontractor to a service-disabled veteran, with

10   whom they could contract directly.  And so they were

11   the midwife, if you will, in an arrangement between

12   me and a -- and a service-disabled veteran-owned

13   company, which was their direct contractor.  And then

14   I was the subcontractor to that company.

15   Q.        And at that time how many employees did

16   Auctionomics have?

17   A.        Auctionomics mostly doesn't have employees.

18   Mostly we work with contractors.  It's project-based.

19   And at that time probably just one, Silvia, my --

20   probably just one.

21   Q.        And who is Silvia?

22   A.        Silvia Console Battilana is the CEO of

23   Auctionomics.

24   Q.        And in 2011, what was your position with

25   Auctionomics?

HIGHLY CONFIDENTIAL

Page 48

1    A.        I was the co-owner.

2    Q.        Okay.  So you received your payment through

3    industry?

4              MR. EWALT:  Objection.  Form.

5              THE WITNESS:  I don't understand the

6    question.

7    BY MS. ABSTON:

8    Q.        Okay.  Do you believe that the auction

9    mechanics for the FCC auction in 2011 are the

10   equivalent to the mechanics used in Google AdX

11   auctions that you evaluated within the EDTX case?

12   A.        Equivalent in what way?  They are very

13   different.  The problems are different.  The auctions

14   are tailored to different problems, and they have

15   many, many differences.

16   Q.        Okay.  Let's continue talking about

17   Auctionomics.

18   A.        Uh-huh.

19   Q.        Prior to the formation of Auctionomics, did

20   you ever have any sort of company that assisted you

21   with your work or that contracted with you?

22   A.        Yes.

23   Q.        What were -- what was the company that

24   preceded Auctionomics?

25   A.        That immediately preceded Auctionomics?

HIGHLY CONFIDENTIAL

Page 49

```
1    That -- that -- again, it's a complex contractual

2    arrangements.  But the company that I owned that

3    immediately preceded Auctionomics was called

4    Xonomic -- Xonomic or Xonomics -- and was the

5    immediately preceding company.

6    Q.      And when was that company formed?

7    A.      Just a couple of years earlier.  I will

8    guess -- I don't remember exactly which year.

9    Q.      Okay.  Would it be 2010 or earlier like

10   2005?

11   A.      No.  You know, if I were guessing, I would

12   probably guess 2009, something like that.

13   Q.      And were there any other employees of that

14   company?

15   A.      Yes.

16   Q.      And who are those employees of --

17   A.      So my partner there was David Salant; and

18   Silvia, who I described already, was -- worked there;

19   and Steven Goldband, I recall, worked there.  That's

20   all I remember at this time.

21   Q.      Okay.  Prior to the formation of this

22   company in 2009, was there a company that preceded

23   that?

24   A.      I had individual arrangements, I think, at

25   that time.  For the period before then, my
```

HIGHLY CONFIDENTIAL

Page 50

```
 1   arrangement was primarily with Charles River
 2   Associates.
 3   Q.        And what is Charles River Associates?
 4   A.        It is an economic consulting firm.
 5   Q.        Do they also do litigation work?
 6   A.        They do.
 7   Q.        Okay.  Did you engage in litigation work
 8   with Charles River Associates?
 9   A.        Yes.
10   Q.        And what year did you join Charles River
11   Associates?
12   A.        I began working with Charles River -- what
13   year would it have been?  So there's, again, a fair
14   amount of guesswork that goes into this.  But I would
15   think that the first year would have been something
16   like 1996 or something about then.
17   Q.        Okay.  So while you were working in
18   academia, you were also engaged in litigation work
19   with Charles Rivers in 1996?
20             MR. EWALT:  Objection to form.
21             THE WITNESS:  I was engaged in occasional
22   projects with Charles -- with Charles River
23   Associates then, yes.
24   BY MS. ABSTON:
25   Q.        Okay.  How many projects would you say you
```

HIGHLY CONFIDENTIAL

Page 51

1    were engaged with him on?

2    A.        Over that whole period of years?

3    Q.        Yes.

4    A.        Hmm.  I don't know.  Maybe four or five over

5    that period.

6    Q.        And were those CRA projects related to this

7    litigation in any way?

8    A.        No.

9    Q.        So you began working with CRA in 1996.  When

10   did you stop working with CRA?

11   A.        About the time I founded Xonomic.

12   Q.        Xonomic.  Okay.

13             So you worked with CRA from approximately

14   1996 to 2009?

15   A.        Something like that, yeah.

16   Q.        And over the course of your work with them,

17   you worked on four to five different types of

18   projects?

19   A.        That's a guess, but something like that.  A

20   small number.

21   Q.        And that -- and that four to five number

22   includes times you were providing economic

23   consultations and litigation-related consultations?

24   A.        Yes.

25   Q.        How many of those CRA projects during that

HIGHLY CONFIDENTIAL

Page 52

1    time period were litigation-related projects?

2    A.        Well, again, these are -- the best I can do

3    is estimate.  Is that what you want, is estimates?

4    Q.        If you had to give your best estimate for

5    how many of your CRA projects between 1996 and 2009

6    were litigation-related, what would it be?

7    A.        Two or three.

8    Q.        And are you currently still the chairman and

9    co-founder of Auctionomics as of today?

10   A.        Yes.

11   Q.        Okay.  And let me pop back one second.

12             Prior to working with Charles River in 1996,

13   were you a part of any sort of company related to

14   economic consulting or litigation consulting?

15   A.        No.

16   Q.        So Charles River was the first time you were

17   involved in any sort of consulting group?

18   A.        Well -- no, actually, that isn't quite

19   right.  I'm sorry, that's a mistake.

20   Q.        Okay.

21   A.        Let's see.  I'm straining my memory here.

22   Q.        I believe in 1996 you were in California, I

23   think.  Let's go back to your CV.

24   A.        Yes, I was in California.  And I'm not sure

25   if Market Design is mentioned here.  It's sort of a

HIGHLY CONFIDENTIAL

Page 53

1    company.

2    Q.        Okay.

3    A.        There's a company called Market Design that

4    I put together in -- around 1995.

5    Q.        Okay.

6    A.        It wasn't really -- didn't have any

7    contracts at all.  It was really just a network of

8    auction consultants, others who had been -- other

9    professors who had been drawn into using economics

10   for auction consulting.  And we figured we had worked

11   out better methods to run some of the kinds of

12   auctions that were used in the world, and this was a

13   network to sort of direct projects among ourselves.

14            So there were a variety of projects that

15   came in through Market Design, Incorporated.  Was it

16   a commercial arrangement?  I don't know.  I mean,

17   maybe legally it was.  But there was no actual money

18   running through Auctionomics -- or through Market

19   Design, Incorporated.

20   Q.        So you received no revenue from Market

21   Design, Incorporated?

22   A.        Nobody received any revenue directly from

23   Market Design, Incorporated.  Well, that's not quite

24   right either.  Very little, I should say.

25   Q.        Okay.  What do you consider to be "very

Page 54

1    little" revenue?

2    A.        You know, I really don't -- I didn't

3    charge a -- bill a single hour through any project of

4    Market Design.  Some people did, and then there was a

5    small amount of profits that were shared.  But I

6    don't remember the numbers.

7    Q.        So who were the other consultants involved

8    in Market Design, Incorporated?

9    A.        Let's see.  Robert Wilson, who I also don't

10   think had any revenue from -- who was a professor at

11   Stanford and another Nobel laureate.

12             John McMillan, who is another professor.

13   Preston McAfee, Peter Cramton, and Lawrence Ausubel.

14   That was the group.

15   Q.        And so some of those auction consultants may

16   have billed or received revenues from Market Design,

17   Incorporated?

18   A.        Yes, I think -- yes.

19   Q.        And did you bill independently during that

20   time period for auction consulting?

21   A.        Did I personally?  Is that "you" as a

22   singular you?

23   Q.        Yes.

24             Did you personally, in 1995, bill for your

25   auction consulting services?

HIGHLY CONFIDENTIAL

Page 55

1    A.        If I had had any then, I would have billed

2    for them personally, yes.

3    Q.        Do you believe that you had auction

4    consulting services projects in 1995?

5    A.        I think I did not in 1995.

6    Q.        When do you think your first time -- was the

7    first time that you ever provided auction consulting

8    services?

9    A.        Separate from the 1993, which we've already

10   talked about?

11   Q.        Uh-huh.  When was the first time you ever

12   provided --

13   A.        Well, the first auction services I provided

14   were to Pacific Bell in 1993.

15   Q.        Okay.  And prior to 1993, you didn't have

16   any commercial projects where you billed

17   independently?

18   A.        No.

19   Q.        Okay.

20   A.        Not that I recall.

21   Q.        And then are you familiar with a company

22   called Efficient Auctions LLC?

23   A.        Yes, I think that's Larry Ausubel's company.

24   Q.        So you didn't -- what role do you have with

25   Efficient Auctions LLC?

HIGHLY CONFIDENTIAL

Page 56

1    A.        If I'm remembering right that that's

2    Lawrence Ausubel's company, then we had sometimes

3    worked together.  They were -- they provided some of

4    the software we used in connection with the

5    broadcasting incentive auction.

6    Q.        Are you familiar with the company -- or

7    strike that.

8              Are you familiar with Perfect Commerce LLC?

9    A.        Yes.

10   Q.        How are you familiar with that company?

11   A.        So Perfect Commerce.  Yeah, that was Marc

12   Porat's company.

13             So in 1999, if I'm right, or thereabouts --

14   maybe it was 1998 -- but around 1998/1999, I was

15   approached.  It was a -- it was a Silicon Valley

16   startup, and I was asked to participate in that.

17             And, you know, I would show up occasionally

18   for them.  I got some shares.  I don't believe I ever

19   received a penny in revenue from them, however.

20   Q.        Did you ever receive any sort of revenue

21   from Efficient Auctions LLC?

22   A.        I didn't work for Efficient Auctions LLC,

23   just worked with them on -- on the broadcasting

24   incentive auction project.

25   Q.        Did you ever work with Auction Technologies

HIGHLY CONFIDENTIAL

Page 57

1    LLC?

2    A.        Yes.  Auction Technologies LLC, that was --

3    right.  Auction Technologies, that's the -- the David

4    Salant company in -- also in the late '90s, and David

5    Salant I worked with.

6             And that was in connection -- I think that

7    was the contracting entity for some auctions that we

8    worked on with Vodafone, which was bidding in

9    auctions around the world.  And I probably received

10   some revenue through that, yes.  I may -- I may have

11   even had an ownership interest in that.  I have

12   forgotten what the arrangements were.

13   Q.        And you said that was founded in the late

14   '90s?

15   A.        Yeah, if I'm recalling correctly which

16   company is which, yes, that would have been founded

17   in the late '90s.

18   Q.        And did you ever realize any income from the

19   shares you were given in Perfect Commerce LLC?

20   A.        I think not.  I think the answer is no.

21   Q.        Does Auctionomics have a board of directors?

22   A.        Yes.

23   Q.        And who comprises the Auctionomics board of

24   directors?

25   A.        Silvia and me.

HIGHLY CONFIDENTIAL

Page 58

1    Q.        Has there ever been any other board of
2    directors?
3    A.        No.
4    Q.        Does Auctionomics have a board of advisors?
5    A.        Yes.
6    Q.        Who comprises the Auctionomics board of
7    advisors?
8    A.        You would have to look on the website for
9    that.  I don't recall offhand.
10   Q.        Do you recall approximately how many people
11   comprise the board of advisors to Auctionomics?
12   A.        I'm not sure if we still have a board of
13   advisors.  We've had a board of advisors over the
14   years, and it would have been a handful of people;
15   four or five, maybe.
16   Q.        So are you currently employed by
17   Auctionomics?
18   A.        No.  I'm a contractor for Auctionomics.
19   Q.        Okay.  And so what would be your official
20   job title at Auctionomics?
21   A.        I'm the chairman.
22   Q.        Has anyone from Google ever been a part of
23   your Auctionomics board of advisors?
24   A.        Anyone from Google?  I don't think so.  I
25   don't think so.

HIGHLY CONFIDENTIAL

Page 59

1    Q.       And there's never been anyone from Google
2    who was a member of Auctionomics' board of directors?
3    A.       The board of directors has been just Silvia
4    and me.  The board of advisors, I don't know.  I'm
5    pretty sure that nobody from Google has ever been on
6    the board of advisors.
7    Q.       And are there multiple teams at
8    Auctionomics?
9    A.       Yeah.  Well, we put together teams on a
10   project basis.  So there's a group of people we work
11   with regularly, and there can be multiple teams.
12   Q.       So you take professional engagements also
13   outside of Auctionomics; is that correct?
14   A.       I have some.  Yes, I have.
15   Q.       Okay.  Are you currently engaged in
16   professional engagements outside of Auctionomics?
17   A.       No.
18   Q.       When was the last time you were engaged in
19   professional engagements outside of Auctionomics?
20   A.       I -- this is hard.  Just a moment.  Let me
21   see.  I'm trying to remember what's in and what's
22   out.
23            So the sometimes smaller engagements, I have
24   taken outside of Auctionomics.  Actually -- actually,
25   I think the last thing that I did would have been --

HIGHLY CONFIDENTIAL

Page 60

```
 1    outside of Auctionomics would have been just a little
 2    pre-Covid -- it would have been pre-Covid, so maybe
 3    2018, just guessing.
 4    Q.      And can you describe that engagement?
 5    A.      Yeah.  That was -- that also involved
 6    Google.  And it was Woods vs. Google, which has
 7    morphed.  It's coming back to life, it appears.  So I
 8    will probably still be engaged in that.
 9    Q.      Okay.  So in this case, are you -- strike
10    that.
11            Typically if you're retained as an expert
12    witness on any case, does your retention go through
13    Auctionomics?
14    A.      These days, yeah.  My supporting team --
15    my -- my supporting team, at least, is from
16    Auctionomics, and I use the Auctionomics staff for
17    billing.  Sometimes the engagement is done
18    separately, sometimes it's done through Auctionomics,
19    depending on what's convenient in the situation.
20    Q.      Is there a reason why Woods vs. Google
21    pre-Covid was done outside of Auctionomics?
22    A.      Yeah, Auctionomics at the time had never
23    engaged in litigation work.  The -- you know, the
24    main business of Auctionomics is designing markets
25    and assisting participants.  And this was outside the
```

HIGHLY CONFIDENTIAL

Page 61

1    kind of activity that Auctionomics was doing at that

2    time.

3    Q.        Okay.  So the first time that Auctionomics

4    ever engaged in litigation consulting was

5    approximately 2018; does that sound right?

6    A.        That wasn't Auction- -- again, I'm saying

7    that was not Auctionomics.  I think this is -- this

8    case -- this may be the first case that Auctionomics

9    has done that's a litigation support case.

10    Q.        And by "this case," you mean the case in the

11    Eastern District of Texas that you're sitting here --

12    A.        Yes.

13    Q.        -- today for?

14            Do you know Auctionomics' total revenue for

15    2023 and 2024?

16    A.        For 2023 -- no, I don't know those numbers.

17    Q.        Do you know Auctionomics' total revenue for

18    2022?

19    A.        No.  I'm sorry, those numbers aren't at the

20    top of my head.  No, I don't have the numbers handy.

21    Q.        So you testified you're a contractor at

22    Auctionomics.  Do you still retain an equity stake in

23    Auctionomics?

24    A.        Yes.

25    Q.        Okay.  And you mentioned the Auctionomics

HIGHLY CONFIDENTIAL

Page 62

```
 1    website.  So if we wanted to find who was a member of
 2    the board of advisors, we would go to the website to
 3    locate those?
 4    A.       Yes.  If we still have a board of advisors,
 5    you would find it on the website.
 6    Q.       Okay.  And on the website, do you also
 7    include staff members or other independent
 8    contractors that are associated with Auctionomics?
 9    A.       I haven't looked at the website in a long
10    time, so I am not entirely sure about that.  I'm not
11    entirely sure about that.
12    Q.       Okay.  And is Auctionomics doing work on the
13    DOJ case?
14    A.       Yes.
15    Q.       Okay.
16    A.       That's -- I'm sorry.  What -- so we're --
17    right.  So -- so that forces a correction in my
18    earlier statement that this -- this matter, in my
19    mind, the -- many of the same -- same readings and
20    same principles apply.
21            So the first case -- the first cases we were
22    engaged in are these cases, including the DOJ case
23    and the Texas case.
24    Q.       Okay.  Has Google ever compensated you for
25    your litigation work by giving you stock?
```

HIGHLY CONFIDENTIAL

Page 63

1    A.       No.

2    Q.       Has Google ever compensated you for any

3    nonlitigation work by giving you stock?

4    A.       No.

5    Q.       Is Auctionomics, to your knowledge,

6    supporting any other experts on this case?

7    A.       No.

8    Q.       Has Auctionomics, to your knowledge,

9    supported any other experts on any other cases?

10   A.       No.

11   Q.       So Auctionomics only provides litigation

12   support to you and when you are retained as an expert

13   witness?

14   A.       Well, no, that's not a principle.  It's just

15   since I -- these cases are our first -- first

16   litigation support cases.

17   Q.       Okay.  And what percentage of your equity

18   stake -- what is your percentage of your equity stake

19   in Auctionomics?

20   A.       50 percent.

21   Q.       I want to talk a little bit about some of

22   the other active clients of Auctionomics.

23   A.       Uh-huh.

24   Q.       So I think it's best to break it down

25   between -- we discussed today the litigation-related

HIGHLY CONFIDENTIAL

Page 64

1    projects with Auctionomics; correct?

2    A.        Uh-huh.

3    Q.        But there are other projects that you

4    describe that Auctionomics is currently engaged in;

5    correct?

6    A.        Auctionomics is currently engaged in other

7    projects.  We only -- I only do one big project at a

8    time, so the -- so mostly this year this is the

9    project we have been working on.

10   Q.        What was last year's big project?

11   A.        The last year's big project was also the

12   Google -- the Google litigation.

13   Q.        Okay.  In 2022, what was your big project?

14   A.        In 2022, I didn't have a -- I didn't have a

15   monster big project; I had a number of smaller

16   projects.  I worked for Ofcom in the UK.  I worked on

17   some bidder support.  I don't recall.  But I didn't

18   have a single big project, I think, in 2022.

19   Q.        Do you know how many active clients

20   Auctionomics has for auction consulting-related work?

21   A.        Prior to this case or right now?  When are

22   we asking?

23   Q.        Do we know how many active clients

24   Auctionomics has for auction consulting-related work

25   at this moment?

HIGHLY CONFIDENTIAL

Page 65

1   A.        Right now we're not doing any -- this is --

2   this is consuming our -- yeah, our --

3   Q.        Okay.  When was the last time that

4   Auctionomics did any sort of auction consulting work?

5   A.        Probably 2021, 2022, right in there.

6   Q.        Okay.  And what -- could you describe the

7   project that Auctionomics was involved in in 2021 or

8   2022?

9   A.        They were related to plans to bid in radio

10  spectrum auctions.

11           And let's see.  I think 2022 may have been

12  the last year of the C-band auction, possibly.  Right

13  around then.  I'm not sure I have the year correct.

14           But we were -- it was a $85 million sale of

15  radio spectrum by a -- satellite companies that --

16  that had previously been licensed as satellite

17  companies that wound up being sold by the Federal

18  Communications Commission.  And we worked for a

19  couple of years on designing and planning that sale

20  till it was -- as a private sale, but was taken over

21  by the government right around then.  I don't

22  remember the exact year.

23  Q.        Okay.

24  A.        But that was our giant project, though, just

25  before.

HIGHLY CONFIDENTIAL

Page 66

1  Q.       Okay.  So in 2021 and 2022, you had that

2  giant project, and then there was a shift, and

3  Auctionomics focused with you on the Google

4  litigation; is that correct?

5  A.       Once the -- yeah, that project was done, we

6  were open to taking another big project, and this

7  became the next giant project.

8  Q.       Okay.  And then prior to some of the

9  clients, or the active clients we're talking about

10 right now, who had been some of Auctionomics' other

11 clients?

12 A.       Well, we, for many years, were a worldwide

13 consultant to Vodaphone, which was bidding in

14 auctions all around the world.

15          We -- I've had several projects, smaller

16 projects for Ofcom, which is the communications

17 regulator in the UK.

18          A project in -- I had a project in -- for

19 bidding, one of our most regular clients, we did --

20 oh, they were also engaged in 2022, was for up for

21 bidding in auctions in Canada.  And that will be --

22 they will be our client again next year for the next

23 big auction in Canada.

24          I've had some work that I've done for -- for

25 the government of Mexico, Australia, on auctions that

Page 67

1    they have run.  Those are some of the other clients.

2    Q.      Okay.  Have you ever had any -- has

3    Auctionom- -- strike that.

4            Has Auctionomics ever had any other

5    technology client?

6    A.      Besides Google, you mean something --

7    somebody besides --

8    Q.      Has Auctionomics ever been retained by any

9    other sort of technology companies outside of Google?

10   A.      Well, you know, I would have thought that

11   you would consider Vodaphone and, you know, maybe

12   Bell Canada and those in the telecom industries as

13   technology clients.  Perhaps you would consider them

14   that way.  I'm not sure what the boundary is of --

15   yeah.

16   Q.      And so since you're the co-founder of

17   Auctionomics --

18   A.      Uh-huh.

19   Q.      -- would you have access to a full client

20   list of all of Auctionomics' clients since its

21   formation?

22   A.      I'd have to dig it up somewhere.  Yeah, I'm

23   sure I could probably just review my email

24   correspondence and find a full list.  But I don't

25   have one.

HIGHLY CONFIDENTIAL

Page 68

1    Q.       How many clients do you think that
2    Auctionomics has had since it was formed in 2011?
3    A.       Oh, maybe ten, something like that.
4    Q.       Okay.  And that goes for every single
5    independent contractor that Auctionomics may engage;
6    is that correct?
7             MR. EWALT:  Objection to form.
8             THE WITNESS:  Yeah, I don't understand that
9    question either.
10   BY MS. ABSTON:
11   Q.       Okay.  So Auctionomics has only had ten
12   clients since 2011?
13   A.       I'm guessing the number, but it's on that
14   order, yeah.
15   Q.       Okay.  But you can't recall specifically
16   what those -- what -- the names of those ten clients
17   at this time?
18   A.       I have named a bunch of them for you --
19   Q.       Okay.
20   A.       -- so I'm not saying I can't remember
21   anything about any of their names.
22   Q.       Okay.
23   A.       I've named the ones that come to mind.
24   Q.       Okay.  And you can't think of any other
25   client that may be related to advertising technology?

HIGHLY CONFIDENTIAL

Page 69

```
 1   A.        Of clients of Auctionomics that relate to
 2   advertising technology.  I think, actually, one of
 3   the projects that I did for OpenX -- OpenX was an ad
 4   exchange, and some of that I did on my own, outside
 5   of Auctionomics.  Now, that -- as we speak that, I
 6   now recall.  And I think one of the projects for them
 7   was done through Auctionomics.
 8   Q.        Okay.  I want to come back to that.
 9             So Auction- --
10             MR. EWALT:  Excuse me, Counsel.  We've been
11   going for an hour.  Is this now a good breaking
12   point?
13             MS. ABSTON:  I think we're almost done.  Can
14   you give me five more minutes more?
15             MR. EWALT:  Sure.
16             MS. ABSTON:  Are you okay to go five more
17   minutes more?
18             THE WITNESS:  I'm fine, sure.
19             MS. ABSTON:  Okay.  We will go whenever you
20   want to.
21   BY MS. ABSTON:
22   Q.        Since 2011, Auctionomics has had ten
23   clients.  But outside of that, you've also taken on
24   consulting roles and clients; is that correct?
25   A.        Yeah, those are where I don't require any
```

HIGHLY CONFIDENTIAL

Page 70

1    support.

2    Q.        And so you -- who have been your clients

3    that you've consulted with since 2011?

4    A.        Well, I think I was done with Yahoo by then.

5    I'm not quite sure.  I had Yahoo as a client for a

6    while.  That might have been finished by then.  I

7    don't recall the exact years.

8              I had OpenX as a client for several years.

9              I had mentioned the litigation support, the

10   one case.  And as I sit here, those are the only

11   three that come to mind.

12   Q.        Okay.  And when did Google become -- strike

13   that.

14             When did Google first become Auctionomics'

15   client?

16   A.        We're talking about this matter now, which

17   is the only time -- sorry.  I didn't mean that to be

18   a question.  I'm just -- I meant that -- I was

19   thinking aloud.

20   Q.        I understand.  Okay.

21   A.        I think that this dates back two or three

22   years, that just shortly after this Texas case was

23   filed.

24   Q.        Okay.  So would you say that Google first

25   became Auctionomics' client in 2021?

HIGHLY CONFIDENTIAL

Page 71

1    A.        Or '02.

2    Q.        And prior to that, Auctionomics didn't have

3    any interaction with Google; is that correct?

4    A.        That's correct.

5    Q.        Okay.  But prior to Auctionomics becoming

6    involved with Google in 2021, you had different

7    periods in which you provided consulting services to

8    Google; is that correct?

9             MR. EWALT:  Objection to form.

10            THE WITNESS:  No, I wouldn't say that's

11   correct, no.

12   BY MS. ABSTON:

13   Q.        You never provided Google with any sort of

14   consulting services prior to 2021?

15   A.        I -- oh, I'm sorry.  That's not correct.

16            In 20- -- going way back.  The time that I

17   provided Google, it was at their IPO, which was,

18   what, 2004, or something like that, way back.  I

19   was -- I was involved in providing consulting

20   services as to the -- they used an auction for an

21   IPO, that auction, and I provided consulting services

22   in connection with that.  And I don't know what

23   counts as consulting services.

24            So just to be complete, the -- I was a

25   visiting scholar -- I don't think that counts as

HIGHLY CONFIDENTIAL

Page 72

1   consulting services -- but anyway, I was a visiting

2   scholar at Google as well.

3   Q.        Well, then let's broaden it.  We will come

4   back to that, actually.  A few more questions, and we

5   will take a break.

6             Does Auctionomics have any clients that are

7   on retainer?

8   A.        No.

9   Q.        Okay.  Does Auctionomics have an active

10  retainer agreement with Google?

11  A.        An active retainer agreement?  I don't think

12  so.  I'm not quite sure what that means.  But I don't

13  think so.

14  Q.        And so for this matter, you have a contract

15  with Auctionomics to assist you with your work

16  pertaining to Google's DOJ trial and the EDTX trial;

17  is that correct?

18  A.        No.

19  Q.        Okay.  What's incorrect about that

20  statement?

21  A.        I have an understanding with Auctionomics

22  that there's no written contract between me and

23  Auctionomics regarding the support.

24            MS. ABSTON:  Okay.  I think we have reached

25  a good breaking point.  We can stop and take a

HIGHLY CONFIDENTIAL

Page 73

1    ten-minute break.  Is that good enough or do we need

2    longer, Doctor?

3                THE WITNESS:  I am okay.

4                THE VIDEOGRAPHER:  The time is 10:22 Pacific

5    Time.  We are going off the record.

6                (Recess taken.)

7                THE VIDEOGRAPHER:  The time is 10:39 a.m.

8    Pacific Time.  We are back on the record.

9    BY MS. ABSTON:

10   Q.       Okay.  Dr. Milgrom, did you speak with

11   counsel over the break?

12   A.       We chatted, yeah.

13   Q.       Okay.  Did you discuss your testimony here

14   today?

15               MR. EWALT:  Objection.  I'm going to

16   instruct you not to answer any questions about

17   discussions with counsel.

18   BY MS. ABSTON:

19   Q.       Are you going to follow your attorney's

20   instruction?

21   A.       I will.

22   Q.       Before you went on a break, we were talking

23   about Auctionomics.

24               Do you recall that?

25   A.       Yep.

HIGHLY CONFIDENTIAL

Page 74

```
 1    Q.       Okay.  Let's talk a little bit more about

 2    Auctionomics and the work specifically in this case,

 3    which I refer to as "the EDTX case."

 4             Does that sound okay?

 5    A.       That's fine, yes.

 6    Q.       Okay.  So you said that Auctionomics is

 7    comprised of independent contractors; is that

 8    correct?

 9             MR. EWALT:  Objection to form.

10             THE WITNESS:  Comprised of -- well, that is

11    the -- we don't have employees that do these.  We

12    bring together teams of people that we commonly work

13    with.

14    BY MS. ABSTON:

15    Q.       Okay.  So you have a team of -- a team from

16    Auctionomics, nonemployees, that have assisted you

17    with your work in this case?

18    A.       Yes.

19    Q.       And who specifically from Auctionomics has

20    assisted you with your work in this case?

21    A.       Well, let's see.  There's Andy Skrzypacz

22    over here, and where is Mitch?  Mitch is in another

23    room, Mitch Watt.  And Hunter Guru and Albert Zuo,

24    and then a team of people.  There's a lot of people

25    who have been involved.
```

HIGHLY CONFIDENTIAL

Page 75

```
 1           Let's see.  A computer team in Canada.  So
 2    we have Kevin Leyton-Brown, we have Neil -- oh, I'm
 3    blanking on names.  There's three people in Canada
 4    who are -- who are coders.  We have Marco Pagnozzi.
 5    We have -- who am I missing?  Oh, a Paulo Somaini,
 6    coming back local.
 7           Those are the names that come to mind.  That
 8    might be complete.  It might -- it's complete to the
 9    best of my memory.
10    Q.      Okay.  So for this case, I think we have
11    listed off -- one, two, three, four -- approximately
12    11 different team members from Auctionomics that may
13    have assisted you?
14    A.      Yes.
15    Q.      Does that sound right?
16    A.      Something like that.  Right.
17    Q.      Do you think that it might be more than
18    that?
19    A.      I think that -- I think there's a chance
20    that's the complete list.
21    Q.      Okay.
22    A.      Ah, wait a minute.  One more.
23    Q.      Okay.
24    A.      Assaf Eilat.
25    Q.      So we will get a count on that.  But I'm
```

HIGHLY CONFIDENTIAL

Page 76

1    going to say it's about 11 to 12?

2    A.      Okay.

3    Q.      If you think that that's right?

4    A.      Yes.

5    Q.      And some of those team members are here in

6    the United States and some are international?

7    A.      Yes.

8    Q.      And so you've got at least three people in

9    Canada; is that correct?

10   A.      Yes.

11   Q.      Are there any other international team

12   members?

13   A.      Marco Pagnozzi is in Italy.  Assaf Eilat is

14   in Israel.

15           Oh, could I be missing -- okay.  I'm sorry.

16   I missed the Spanish guys.

17   Q.      Okay.

18   A.      Asun Mochon is in Madrid.

19   Q.      Okay.

20   A.      Project manager.  Specifically on this case?

21   I think specifically on this case, okay.

22   Q.      Okay.

23   A.      That's my best.  Best recollection.

24   Q.      And does Silvia assist with the work on this

25   case?

HIGHLY CONFIDENTIAL

Page 77

1    A.        Silvia is handling contracting and matters

2    like that.  She's not working on -- didn't assist me

3    with the preparation of my report or testimony.

4    Q.        Okay.  And each of these individuals is an

5    independent contractor who bills Auctionomics one

6    rate, and then Auctionomics bills Google; is that

7    right?

8    A.        I think so.  That's right.

9    Q.        And then when Auctionomics bills Google, do

10   they bill a higher hourly rate?

11             MR. EWALT:  Objection to form.

12             THE WITNESS:  Well, Auctionomics -- they --

13   again, they have complicated billing arrangements.

14   Some of it's fixed price, some of it's hourly.  And

15   the arrangements speak -- there's not a direct

16   pass-through of the costs, I think is what you're

17   asking.  There's not.

18   BY MS. ABSTON:

19   Q.        So I think we might be up to -- maybe closer

20   to 20 team members at Auctionomics who have supported

21   you on this case.

22             Does that sound right?

23             MR. EWALT:  Objection to form.

24             THE WITNESS:  It sounds high.  Is it that

25   many?  I haven't counted -- I haven't counted them.

HIGHLY CONFIDENTIAL

Page 78

1    That sounds, like, high.

2    BY MS. ABSTON:

3    Q.        Between 12 and 20, potentially?

4            MR. EWALT:  Objection to form.

5            MS. ABSTON:  We can go ahead and count them

6    on a break.

7            THE WITNESS:  All right.  We can count them.

8    BY MS. ABSTON:

9    Q.        All right.  So do these individuals bring

10   skills to this case that you do not?

11   A.        Well, computer programming skills is the

12   skills they bring to the case that I -- that they

13   have more than I have.

14   Q.        Okay.  So would that be narrowed to just the

15   three team members that you, I think, noted were the

16   computer team?

17   A.        There's two computer teams, right.

18   Q.        Okay.

19   A.        We have -- as I understand is common in

20   these matters, we each -- each computation is done

21   twice independently by independent groups, and then

22   they compare and reconcile their findings.  So there

23   is -- there's a programming done here and programming

24   done in Canada, and they compare the results of --

25   compare and reconcile differences.

HIGHLY CONFIDENTIAL

Page 79

```
 1    Q.       Okay.  And who are the team members on each
 2    of those two teams?
 3    A.       Hunter has done some of the coding.  Paulo
 4    Somaini has done some of the coding.
 5             I'm not quite sure actually who has -- and
 6    the team in Canada is led by Kevin Leyton-Brown, who
 7    is a professor at the University of British Columbia.
 8    He has three people working with him.
 9             You know, here, I think Paulo Somaini
10    probably leads the computations that are done here.
11    Q.       Okay.
12    A.       And --
13    Q.       And who coordinates -- strike that.
14             Who from Auctionomics is the coordinator
15    between the two computer teams?
16    A.       Oh, we have -- so the project manager is
17    Asun Mochon --
18    Q.       Okay.
19    A.       -- in Madrid.  And she -- I'm sorry.  Am I
20    covering my mic?  Pardon me.
21             Asun conducts the meetings to ensure that
22    everything is coordinated and done time.
23    Q.       Okay.  And are you a part of those meetings?
24    A.       I am a part of many of the meetings.
25    Q.       If you do not join a meeting, do you receive
```

HIGHLY CONFIDENTIAL

Page 80

1    meeting updates?

2          MR. EWALT:  Objection.  Instruct you not to

3    answer about the content of communications with your

4    staff, pursuant to the expert stipulation that we

5    have in this case.

6    BY MS. ABSTON:

7    Q.      Do you ever review the invoices for your

8    Auctionomics team members?

9    A.      I do not.

10   Q.      Who reviews the invoices for your

11   Auctionomics team members?

12   A.      Silvia does that.

13   Q.      Okay.  Are you involved with setting the

14   rates, the hourly rates of your Auctionomics team

15   members for this case?

16   A.      No.  Silvia does that as well.

17   Q.      Okay.  And then I think you mentioned

18   coding.  Do you code?

19   A.      I haven't coded in several years.  I had --

20   I've been trained, but it's not what -- I have no

21   comparative advantage at coding.

22   Q.      When was the last time you coded?

23   A.      It's been several years, as I say.  You

24   know, I've done some little things just for personal

25   reasons just within the last couple of years, but I

HIGHLY CONFIDENTIAL

Page 81

1    haven't done any serious coding in decades.

2    Q.        Are there any other skills outside of

3    computer programming that your Auctionomics team

4    members bring to the table for this case?

5    A.        Well, they bring lots of skills, some of

6    which are -- you know, we all share.  I mean, Andy

7    over here is a professor of economics, and we talked

8    about economic analysis.

9              Mitch, who's here today, Mitch Watt is --

10   well, yeah, I guess he has some extra skills.  He was

11   a speech writer and mathematician and a -- you

12   know -- and is trained in economics.  I was his -- am

13   his Ph.D. advisor.

14             The -- yeah, these are all people that I've

15   worked with for some time, and, yep, they are skilled

16   people.

17   Q.        Okay.  And so when they submit invoices,

18   Silvia is the one who reviews their invoices; is that

19   correct?

20   A.        That's right.

21   Q.        Okay.  Do you have any idea of how many

22   hours your Auctionomics team members have put in for

23   the Eastern District of Texas case?

24   A.        I haven't even looked.

25   Q.        And so you don't sign or approve any of the

HIGHLY CONFIDENTIAL

Page 82

1   contracts related to retaining your Auctionomics team
2   members?
3   A.        Typically not.
4   Q.        Did you review any contracts for your
5   Auctionomics team members related to the Google DOJ
6   trial?
7   A.        I don't think I have, no.
8   Q.        Did you review any contracts relating to
9   your Auctionomics team members for this Google case
10  in the Eastern District of Texas?
11  A.        I don't think so, no.
12  Q.        And so this same team would also assist you
13  if you were retained as an expert witness in another
14  litigation; is that correct?
15            MR. EWALT:  Objection to form.
16            THE WITNESS:  No.
17  BY MS. ABSTON:
18  Q.        Okay.  So your team at Auctionomics will
19  fluctuate based on whatever litigation may retain
20  you?
21  A.        Well, whatever -- remember, we haven't done
22  the whole series of litigation projects, as I just
23  described.  We put together the team -- what the team
24  needs.  And, you know, that's how it works.
25  Q.        Okay.  And so all of these team members

HIGHLY CONFIDENTIAL

Page 83

1    report to you?

2    A.         No.  We have a project manager who, you

3    know, makes sure that the tasks are allocated.  I

4    talk to the project manager.  She coordinates the

5    team and reports to me.  In the typical business

6    sense, no.

7    Q.         Okay.  What about in the nontypical business

8    sense, do they report to you -- strike that.

9              In the nontypical business sense, do your

10   Auctionomics team members report to you?

11             MR. EWALT:  Objection, form.

12             THE WITNESS:  Report in a nontypical

13   business sense.  I talk to all -- everybody who is

14   producing work for me, I question them about it.  I

15   mean, is this what we mean by "nontypical business

16   sense"?

17             I make sure that anything that I'm relying

18   on, that I have -- that I understand completely; and

19   that if I have any questions, that they are answered,

20   and that the work has been checked.

21             If there's calculations that are done or

22   graphs that are prepared or tables that are prepared

23   that need checking, I make sure that that has been

24   done.  And I guess in that sense, they report to me.

25             ///

HIGHLY CONFIDENTIAL

Page 84

BY MS. ABSTON:

1

2    Q.      And could you ballpark what Auctionomics has

3    charged Google thus far for the Eastern District of

4    Texas case?

5    A.      You know, a few million dollars.  Could I

6    ballpark?  A few million dollars, ballpark.

7    Q.      So Auctionomics, to your knowledge, has

8    turned over invoices to Google that have been paid up

9    until this point; is that correct?

10   A.      Auctionomics has invoiced Google.  Is that

11   what you mean by "turned over invoices"?

12   Q.      Yes.

13   A.      Auctionomics has invoiced Google, and some

14   of those invoices have been paid, yes.

15   Q.      But you never saw the invoices that were

16   sent to Google pertaining to the Eastern District of

17   Texas case?

18   A.      I don't -- that's not part of my routine.

19   They go out directly from -- from Auctionomics'

20   support staff to Google.

21   Q.      Okay.  So as a co-owner of Auctionomics,

22   does Auctionomics have a general goal of a percentage

23   markup?

24           MR. EWALT:  Objection.  Form.

25           THE WITNESS:  I don't know what that means.

HIGHLY CONFIDENTIAL

Page 85

1    BY MS. ABSTON:

2    Q.        Does -- does Auctionomics have a markup on

3    the invoices that they send to Google?

4    A.        We earn profits, if that's what you're

5    asking about.  I don't know whether Auctionomics has

6    a markup on the invoices.  I'm sorry.

7    BY MS. ABSTON:

8    Q.        Does Auctionomics pay its independent

9    contractors for work done for the Google litigation?

10   A.        Yes.

11   Q.        Okay.  And when Auctionomics charges Google,

12   Auctionomics gets revenue from the work its

13   independent contractors do; right?

14   A.        Well, we employ independent contractors.

15   The independent contractors help us prepare reports.

16   We pay them.  We bill Google.  There's no direct

17   pass-through.  There's a negotiated price that we

18   charge.

19   Q.        Okay.  But Auctionomics charged Google more

20   than the independent contractors charge Auctionomics;

21   is that correct?

22   A.        You're relating things.  I mean, there's --

23   we have revenues and we have costs, right?  And the

24   revenues exceed the costs, yes.

25   Q.        So, at the time, do you know how much in

HIGHLY CONFIDENTIAL

Page 86

1    total Auctionomics has billed Google for your and

2    your team's time, since you've been retained in the

3    Eastern District of Texas matter?

4    A.      Please repeat the question.

5    Q.      So, at this time, do you know how much in

6    total Auctionomics has billed Google for you and your

7    team's time, since you've been retained in the

8    Eastern District of Texas matter?

9    A.      No.

10   Q.      Do you have a ballpark of how much you --

11   how many hours you have -- strike that.

12           Do you have a ballpark of how many hours you

13   and your team have billed Google for your work in the

14   Eastern District of Texas matter?

15   A.      I could probably ballpark my own hours.  I

16   have no idea how many hours the team has spent.  I

17   haven't looked at those invoices.

18   Q.      What would be the ballpark of the number of

19   hours that you have billed Google for the work in the

20   Eastern District of Texas matter?

21   A.      250 to 300, somewhere in that ballpark.

22   Q.      Do you know how much Auctionomics intends to

23   bill Google --

24           MR. EWALT:  Objection to form.

25           ///

HIGHLY CONFIDENTIAL

Page 87

```
 1    BY MS. ABSTON:
 2    Q.        -- for the Eastern District of Texas matter?
 3    A.        I don't.
 4    Q.        But you said that you've already --
 5    Auctionomics -- well, let's back up.
 6              So you also submit your time to
 7    Auctionomics, and then it's all compiled and sent to
 8    Google; is that correct?
 9    A.        No.
10    Q.        So your time is done separately, invoiced
11    separately from the Auctionomics team?
12    A.        Yes.
13    Q.        So let's walk through that process a little
14    bit.
15              So when you submit your hours to Google,
16    that's you personally, or is that something that
17    Silvia does?
18    A.        No, I -- actually, it's also not me
19    personally.  I have -- Milgrom Consulting is an
20    S corporation.  It's me.  That's my alter-ego, if you
21    will.  I'm just trying to be precise here.
22    Q.        Yes, thank you.  No, thank you.
23    A.        I bill my time through my S corporation,
24    Milgrom Consulting, and I forward that.  And I
25    actually have assistance putting that into the form
```

Page 88

1    of an appropriate invoice form by the S staff at --

2    at Auctionomics, which forwards that along with the

3    Auctionomics invoice to Google.

4    Q.      Okay.  And do you review your invoices

5    before they are sent to Auctionomics and eventually

6    sent to Google?

7    A.      I prepare -- well, I prepare a timesheet,

8    and I review that I'm paid the right amount when my

9    checks arrive.  But when the check arrives, I say,

10   Okay, does this correspond to what I wrote?  And so

11   far it always has.

12   Q.      Okay.

13   A.      But, no, I don't look at -- I have never

14   looked at an invoice that was sent to Google.

15   Q.      Okay.  About how many checks have you gotten

16   from Google in the Eastern District of Texas matter?

17   A.      I think the checks that I have gotten from

18   Google are not separately marked according to what

19   matter they come from.  I get checks monthly.

20   Q.      So when you do your timesheets, do you

21   designate when you're working on the DOJ trial, for

22   example, versus when you're working on the Eastern

23   District of Texas case?

24   A.      My --

25           MR. EWALT:  I'm going to object to that and

HIGHLY CONFIDENTIAL

Page 89

1    instruct you not to answer about the content of your
2    communications and your billing -- on the bills and
3    invoices, as part of the expert stipulation.
4            MS. ABSTON:  Well, okay.
5    BY MS. ABSTON:
6    Q.      When you sit down to work on a Google
7    matter --
8    A.      Yep.
9    Q.      -- do you -- strike that.
10           Okay.  So just to confirm, when you're
11   compiling your timesheets, you're recounting your
12   work on any Google matter that you may have touched
13   during your billable hours; is that correct?
14           MR. EWALT:  Objection to form.
15           THE WITNESS:  "Recounting your work on" --
16   I'm sorry, that --
17           MS. ABSTON:  That's okay.
18   BY MS. ABSTON:
19   Q.      So Google -- you testified, I think, that
20   Google -- they just send you a check.  They don't
21   designate if it was for the DOJ trial or if it was
22   for the Eastern District of Texas case; is that
23   correct?
24           MR. EWALT:  Objection to form.
25           THE WITNESS:  I -- when -- when I receive --

HIGHLY CONFIDENTIAL

Page 90

1   so I receive my money electronically, and I don't see

2   anything except an amount, when that -- when that

3   amount arrives.

4   BY MS. ABSTON:

5   Q.      Okay.  And you've never been given

6   instructions to designate this is for the Eastern

7   District of Texas case versus this is for the DOJ

8   trial?

9   A.      My timesheet says what I'm working on on

10  each line.  Every hour is accounted for differently.

11  Q.      Okay.  And you mentioned you get monthly

12  checks from Google.  How much are those checks?

13          MR. EWALT:  Objection to form.

14          THE WITNESS:  Okay.  So there -- it's -- I

15  get monthly electronic -- actually, I get it from

16  Auctionomics.  They -- Auctionomics forwards that to

17  me.  They -- they send -- I believe they send two

18  invoices to Google, which are paid together, and then

19  I get money from -- from them.  And it varies.  It

20  can vary from -- how much are those checks?  They can

21  be small, they can be large.  It depends on how much

22  work I did that month.

23  BY MS. ABSTON:

24  Q.      Okay.  What would you consider large?

25  A.      What would I consider large?  Well, you

HIGHLY CONFIDENTIAL

Page 91

1    know, if I'm -- if I -- when I went to Virginia and I

2    was there for multiple days, and the largest check

3    was a six-figure check.

4    Q.        And are you the only owner of your S corp?

5    A.        Yes.

6    Q.        Okay.  We will come back to that.

7              And do you recall you testified that you

8    checked the work you relied upon that was performed

9    by Auctionomics team members in this case?

10   A.        I testified about that, yes.

11   Q.        Okay.  And did your Auctionomics team

12   members initiate work independently that you later

13   proofed?

14   A.        That -- there are places where there is

15   judgment to exercise.  Everything that's done is done

16   at my instruction.  You know, it's -- your question

17   as posed is a little bit tricky to answer.

18   Everything that is done is done at my instruction.

19   Q.        But did you proof anything that was done by

20   Auctionomics team members of work they initiated

21   independently -- or strike that.

22             Did you check anything that was done by

23   Auctionomics team members that they independently

24   initiated?

25   A.        Yeah, so the -- at what point does something

HIGHLY CONFIDENTIAL

Page 92

1    become -- so just to be clear about what we're

2    talking about here so there's no misunderstanding

3    between us, you know, I might say, you know, please

4    check the calculations that are done by the professor

5    on the other side of this case.  And exactly how they

6    go about -- and then they come back with the

7    checking, and Then I look at how that's done.

8           And there's quite a lot of judgment

9    exercised on the -- so you could say that's initiated

10   by me or we could quibble about that, about what it

11   means to be "initiated."

12          But I -- the work that's done is done at my

13   direction.  The way it's done, you know, they -- the

14   way it's done, there's -- these are talented people,

15   and then they describe to me how they have done it,

16   and if I'm not satisfied, then I tell them to do it a

17   different way.  Or if they are not sure what to do, I

18   give them more detailed instructions.  But like that.

19   Q.       Are there opinions that were first arrived

20   to by your team members that you later adopted?

21   A.       I don't recall any such.

22   Q.       Okay.  And then all of the opinions in your

23   report are your own; is that correct?

24   A.       They are all my own opinions, yes.

25   Certainly.

HIGHLY CONFIDENTIAL

Page 93

1    Q.        Okay.  And I want to circle back to some

2    previous testimony.

3              So, just to clarify, has Auctionomics ever

4    advised Google on market design?

5    A.        No.

6    Q.        Okay.  ███████████████████████████████████

7    ████████████████████████

8    A.        ████

9    Q.        ████████████████████████████████

10   ████████████████████████████████████

11   A.        ████

12   Q.        ████  █████████████████████████████

13   ████████████████████████████████████████

14   ██████

15              MR. EWALT:  ████████████████████████

16   ████████████████████████████████████

17   ██████████

18   BY MS. ABSTON:

19   Q.        Are you able to answer my question

20   without --

21   A.        Boy, that's a word -- let's see.

22              Yeah, okay.  So I think I can answer this

23   question.

24   Q.        Okay.

25   A.        So go ahead and please repeat it now?

HIGHLY CONFIDENTIAL

Page 94



1    Q. ██████████████████████

2    ███████████████████

3    ██ ████ █████████████

4    ████████████████ ████████

5    █████████████████████████

6    ████████ █████████████

7    █████████████████████

8    ██████████████████ ████

9    ███████████

10   THE WITNESS:  Right.  Okay.  ████████

11   █████████████████████

12   ███████████████████

13   █████████████████████

14   █████████████████████

15   ████████████████████

16   BY MS. ABSTON:

17   Q. ██████████

18   A. █████████████ ████

19   ████████████ ██████

20   █████████

21   Q. ██████

22   A. ██████ █████████

23   ████████████████████

24   ██████████ ████████████

25   ████████

HIGHLY CONFIDENTIAL

Page 95



1    Q.       Okay.  So before Auctionomics was

2    retained -- strike that.

3    ████████████████████████████████

█    ████████████████████████████████

█    ██████████████████████████████████

█    ████████

█    ████████████    ████████████

█    ████████████    ██████████████████

█    ████████████████    ████████████

█    ██████████████████████████████████

█    ██████████████████████████

█    ████████████████    ██████████

13   ███████████████████████████.

14           MS. ABSTON:  Great.

15           THE WITNESS:  ████████████

16   ██████████████████████████████████

17   ████████████

18           MS. ABSTON:  Okay.

19           THE WITNESS:  ████████████

20   ██████████████████████████████

21   ██████████████████████████████

22   ████████████

23   BY MS. ABSTON:

24   Q.      ████████████████████████

25   ████████████████████████████████

Page 96

1     ███████████████████████

2     A.      █████████████████     ███████████

3     █████████

4     Q.      Okay.  And is it the typical process when

5     someone like Google or a client would reach out that

6     you're first consulted and, then an Auctionomics team

7     is compiled according to the needs of the project?

8             MR. EWALT:  Objection to form.

9             THE WITNESS:  By "you," you mean personally?

10    Is that what the "you" there means?

11            MS. ABSTON:  Yes.

12            THE WITNESS:  Me personally.  Most of the

13    time the projects arise -- for Auctionomics arise at

14    Silvia's initiative.  I'm the attraction to many

15    people because of my credentials.  But Silvia will

16    become aware of something or will -- whatever, and

17    say, you know, this is something we can do, and we a

18    have unique -- we have Professor Milgrom; we have a

19    unique team.

20            And so normally, I think most often the

21    initial contacts are through Silvia.

22    BY MS. ABSTON:

23    Q.      Okay.  And have you in your personal

24    capacity ever worked with Google in a nonlitigation

25    consulting matter?

HIGHLY CONFIDENTIAL

Page 97

1    A.        Yes.

2    Q.        Okay.  And have we discussed all of those

3    matters here today thus far?

4    A.        I think we've mentioned briefly that I

5    worked as a visiting research associate or visiting

6    research fellow, or whatever they called me at the

7    time.  I was studying -- that was a matter where I

8    was studying how pricing of cloud services would be

9    done -- and I was studying it for academic

10   purposes -- and asked to be given access, and they

11   made me a visiting research associate so that I would

12   have access to that material.

13   Q.        Okay.  I want to come back and talk about

14   that a little bit later.

15            But you've also mentioned there's -- you

16   provided nonlitigation consulting to Google in

17   relation to their IPO; is that correct?

18   A.        Oh, and the IPO, right.  Absolutely.  Thank

19   you.

20   Q.        Okay.  And so --

21   A.        That's right.

22   Q.        How did you get connected with Google in the

23   first place?

24   A.        Dating back to the IPO?

25   Q.        How did you -- how did you ever begin

HIGHLY CONFIDENTIAL

Page 98

1    consulting with Google?

2    A.        There are a lot of people there who know who

3    I am.  There's a lot of option work that's done

4    there.  If you -- in this case if you read documents,

5    you'll see that some of the things that they work on

6    result from citing my research, my published

7    research.

8            So there are people there who know me.  One

9    is ████████, for example, who has been involved in

10   Google since practically its founding, is a member of

11   the National Academy of Sciences, as am I -- or the

12   American Academy of Arts and Sciences, as am I.  I

13   have forgotten which academy we share.  We both -- so

14   he's one.

15           They have -- yeah, I'm -- I'm known in my

16   field.

17   Q.        So you consulted for the IPO, which I think

18   you testified happened in 2004; is that correct?

19   A.        I think that's right.

20   Q.        Okay.  So --

21   A.        Yeah.

22   Q.        -- you started consulting, though, before it

23   was public in 2004; is that correct?

24   A.        Yeah, right.  It wasn't -- the IPO was how

25   it become a public company, yeah.

HIGHLY CONFIDENTIAL

Page 99

1    Q.       Right.  So what year did you start

2    consulting or having discussions with Google about

3    the IPO?

4    A.       Oh, it was in the six months before the IPO.

5    Q.       Okay.  So prior to, let's say, 20- -- or

6    2003, you never provided any sort of nonlitigation

7    consulting work to Google; is that correct?

8    A.       That's correct.

9    Q.       Okay.  And so let's talk a little bit more

10   about the IPO.

11           I know you just described that many people

12   at Google know who you are.  Was the initial

13   reach-out from Google stemming from some of your

14   professional engagements?

15   A.       Yeah, I -- my understanding is that that was

16   ███████████████████████████████████████ at Google

17   at the time, who advised them to reach out to me.

18   Q.       Okay.  And so they reached out to you in

19   2003.

20   A.       Or '04.

21   Q.       Or 2004.  Okay.

22   A.       Yeah, probably '04, maybe '03, yeah.

23   Q.       And at the time you were working at

24   Stanford?

25   A.       Yes.

HIGHLY CONFIDENTIAL

Page 100

1  Q.        And so once they reached out to you, did you

2  go on Google's campus and conduct meetings with them

3  discussing the pending IPO?

4  A.        I did a couple -- just a couple of meetings,

5  yes.

6  Q.        Okay.  What was the first step after they

7  reached out to you regarding the IPO?

8  A.        There were proposals from investment banks

9  about what to do, and I read those proposals.  There

10 was -- I think that was the first step.

11 Q.        Do you remember who was at your first

12 meeting with Google?

13 A.        I remember when Sergey Brin walked into the

14 room, having just com from a volleyball game and

15 dressed in sweaty clothing amidst a roomful of

16 lawyers and bankers with suits and ties.  It was

17 pretty funny.

18        Yes, I remember some of the -- you know,

19 there was -- it was lawyers and bankers and the

20 founders.  And I think ████████████████████████████

   ██ ████████████████████████████  ████████████.

22 Q.        So your first meeting, you remember meeting

23 Sergey, who -- Sergey Brin is the founder -- one of

24 the founders of Google; is that correct?

25 A.        Yes, I remember that.

HIGHLY CONFIDENTIAL

Page 101

1    Q.        And then Larry Page is also a founder of

2    Google; is that correct?

3    A.        Yeah.

4    Q.        And so on your very first meeting, Larry and

5    Sergey were both present?

6    A.        I remember Sergey for sure.  And I'm a

7    little vague about whether Larry was there.  If he

8    was there, he was quiet.

9    Q.        But Sergey was not quiet in that meeting?

10   A.        Well, the way he walked in, he stood out.

11   Q.        And was he vocal within the meeting

12   regarding the IPO?

13   A.        I don't recall a lot of detailed discussion

14   about the IPO.  I'm sorry, I can't answer that.

15   Q.        And did you know ███████████ before he

16   reached out to you?

17   A.        Yes.

18   Q.        And through what organization was that?

19   A.        Well, he had been -- I guess when I first

20   met him, ████████████████████████████████████████

██   ████████████████████████████████████████

██   ███████████████████    ████████████████████████████

██   ██████████████████████████████████████████████

██   ██████████████████████████████████████

██   █████████████████

HIGHLY CONFIDENTIAL

Page 102

 7    Q.        Okay.  So when you were providing these

 8    consulting services to Google, did you participate in

 9    weekly meetings leading up to the IPO?

10    A.        No.

11    Q.        What type of consulting services did you

12    provide to Google during this time?

13    A.        It -- the -- they already had bankers, you

14    know, and attorneys advising them, and they already

15    had a proposal.  And they were skeptical about the

16    proposal, and so my role was more or less to review

17    the proposal and discuss it with them and the dangers

18    that it had, and whether this was a good idea, and

19    whether there were alternative ways.

20              You know, we talked about all sorts of

21    alternatives.  Google didn't need to raise money at

22    the time.  It was very profitable, kind of

23    cash-flow-positive company.

Page 103

1    ███████████████

     ████████████████████████████████

     ████████████████████████████████████

     █████████████████.  So I was engaged in discussions,

5    but just a couple of meetings.  I'd say maybe three

6    meetings in total.

7    Q.      Okay.  And did you have a direct report when

8    you were providing those consulting services?

9    A.      No.

10   Q.      Okay.  Who did you communicate the most with

11   at Google during that time?

12   A.      ██████████████████████████.

13   Q.      And was Sergey in every single meeting that

14   you ever had, those three meetings relating to the

15   IPO?

16   A.      No.  I remember that that was the first

17   meeting, the big meeting with the bankers.

18   Q.      Okay.  And outside of the meetings, were

19   there any sort of assignments that were given to you

20   or other consulting questions that were emailed to

21   you?

22   A.      It was just execution.  No.  I was really

23   commenting on the -- on the proposals that were in

24   front of them and what their advantages and

25   disadvantages were so that they were confident that

HIGHLY CONFIDENTIAL

Page 104

1    all the angles had been considered.

2    Q.       Okay.  And I believe the two founders of

3    Google both attended Stanford; is that correct?

4    A.       That's my understanding, too, yep.

5    Q.       But you didn't know them when they were

6    students at Stanford?

7    A.       I did not, no.

8    Q.       And they weren't, like, students within any

9    of your classes; is that correct?

10   A.       I had never met them until that meeting.

11   Q.       And do you still keep in touch with ████

12   ████████

13   A.       Not regularly.  I've been -- you know, we're

14   acquaintances.  I was at a birthday party of his last

15   year, a big party that they threw.  Once a year sort

16   of thing.

17   Q.       Okay.  And then you mentioned ██████████,

18   I think; is that correct?

19   A.       Yes.  Yes.

20   Q.       Okay.  And did you frequently interact with

21   him when consulting regarding Google's IPO?

22   A.       No, just that once, actually.

23   Q.       Just that once.  And do you still stay in

24   contact with him in any way?

25   A.       Not directly, no.

HIGHLY CONFIDENTIAL

Page 105

```
 1   Q.        And do you indirectly stay in contact with
 2   ███████████  in any way?
 3   A.        Yeah, there's -- there's -- ████████████  has
 4   █████████████████████████████████████
     █████████████████████████████████████████
     █████████████████████████████████  █████████████
     ████████████████████████████████████████████████
     ████████████████████████████████████, that sort
 9   of thing.
10   Q.        And hopping back for a second.  You said you
11   were asked to review specific aspects of the
12   proposal; is that correct?
13            MR. EWALT:  I'm just going to caution you.
14   We talked about the involvement of lawyers in the IPO
15   process here, and so I'm going to ask that you form
16   questions that do not seek to elicit privileged
17   information.
18   BY MS. ABSTON:
19   Q.        I am in no way seeking to elicit privileged
20   information by asking you anything like that.  So --
21   well, did you sign an NDA for your work related to
22   Google's IPO in 2004?
23   A.        You're asking me to recall what I signed in
24   2004.  You're smiling.  You know I can't recall that.
25   Q.        ████████████████████████████████████████
```

Page 106

1    █████████████████████████████████████

2    A.        █████

3    Q.        █████████████████████████████████

4    █████████████████████████

5    A.        █████████████████████████████████

█    █████████████████████████

█    ███    █████    ███████████████

█    █████████████████████████████████████

█    ██████████████████████████

██    ███    ██████████████████████████████████

██    ██████████████████████████████████

██    ████████████    ███████████████

██    ███    ████████████████████████

██    ██████████████████████████████████████

██    █████████████████████████████████████

██    ██████████████████████████

17   A.        █████████████████████████████████

██    █████████████████████████████████████

██    ██████████

██    ███    █████████████    Okay.

21            And are you still in contact with either of

22   Google's founders?

23   A.        No.

24   Q.        Okay.  Did you ever have any interaction

25   with ███████████

HIGHLY CONFIDENTIAL

Page 107

1    A.         No.

2    Q.         Did you ever have any interaction with any

3    other early Google employees?

4    A.         No. ██████████████████████ that we

5    mentioned. ████████████████

6    Q.         And then how did Google compensate you for

7    your consulting services at the time?

8    A.         At which time?

9    Q.         At this time.  How did Google compensate

10   you?

11   A.         This time, this case?

12   Q.         How did Google compensate you for your

13   consulting services relating to the IPO?

14   A.         Relating to the IPO, it was a fixed price.

15   There was some -- I don't remember the number, but

16   they paid me some amount of money.

17   Q.         And that had no connection to any sort of

18   stock when Google did end up coming public --

19   becoming public?

20   A.         No.

21   Q.   █████████████████████████████████████

██   ████████████████████████████████

23   A.         ████████

24   Q.         Okay.  And without revealing any sort of

25   privileged information, when you consulted with

HIGHLY CONFIDENTIAL

Page 108

1    Google on the IPO, did you make recommendations

2    regarding their auction?

3    A.        Yes.

4    Q.        Okay.  And without revealing any sort of

5    privileged or legal or confidential information, did

6    you -- during your consulting for Google's IPO, did

7    you make recommendations about the structure of their

8    advertising auctions?

9    A.        No.

10   Q.        And do you know how much money was raised in

11   the IPO?

12   A.        Yes.

13   Q.        Okay.  And what -- how much money was raised

14   in the IPO?

15   A.        Well, this was -- it was one of those funny

16   numbers.  There were -- everything was very amusing

17   at that time.  It was about 2.7 billion.  He was EV'd

18   as 2.7 something, dot, dot, dot, was the target for

19   the amount that they wanted to raise.  So about

20   2.7 billion.

21   Q.        Okay.  I want to hop back quickly to just

22   clarifying some of your consulting work that we have

23   talked about today, things outside of your academic

24   employment.

25            So we've been looking at, I think what we

HIGHLY CONFIDENTIAL

Page 109

1    marked as Exhibit 1, your CV.

2    A.        Yep.

3    Q.        Do you use a different CV for nonlitigation

4    work?

5    A.        Yes.

6    Q.        Okay.  And what's different about your

7    nonlitigation CV?

8    A.        It's a subset of this.  That is the -- here

9    there's litigation support, there's patents.  This is

10   not something I would normally put in my academic CV.

11   I added it for purposes of this litigation.

12   Q.        And we talked about a few different

13   litigation consulting groups today, right?

14   A.        Uh-huh.

15   Q.        Right?  We have mentioned CRA.

16   A.        Yep.

17   Q.        And we have discussed Auctionomics.

18             Have you ever been a member of any other

19   sort of litigation consulting groups?

20   A.        Yes.

21   Q.        Okay.

22   A.        Not a member.  I have participated with.

23   Q.        Yes, let's talk about those.

24             So what other litigation consulting groups

25   have you participated in?

Page 110

1    A.        Okay.  So have I participated in any --

2    yeah, okay.  Just -- I will interpret all those terms

3    in the most general way, most inclusive way.

4              So I worked with NERA.  You know NERA.

5    Q.        Okay.  And what does NERA stand for?

6    A.        National Economic Research Associates,

7    something like that.  Known as "NERA."

8              And, again, before Auctionomics did any

9    litigation support, when I did any litigation-related

10   work, it was supported by someone other than

11   Auctionomics.  So NERA supported the -- this

12   Google/Woods case, for example, when I did that.

13             And, actually, as far as litigation goes, I

14   think that's it.  I think that was -- it was Charles

15   River Associates and NERA.  And I think nobody else

16   for litigation support work.

17   Q.        I have to look back, but do you recall the

18   date that you started -- or strike that.

19             And you started with CRA in 1996?

20   A.        I think that -- well, somewhere around

21   there, yes.

22   Q.        Around there.  And so that was for both

23   litigation support and economic --

24   A.        Yeah.

25   Q.        -- consulting?

Page 111

1    A.        Yeah.  We were -- yeah.  Yes.

2    Q.        Okay.

3    A.        It was primarily at that time auction

4    consulting, not litigation work.

5    Q.        Okay.  And we've talked about a lot of

6    Auctionomics' consulting clients today; is that

7    correct?

8    A.        We have talked about some, yeah.

9    Q.        Okay.  In your personal capacity, you've

10   provided consulting services that we briefly

11   discussed today; is that correct?

12   A.        I have, yeah.

13   Q.        Okay.  And those --

14   A.        And especially personal capacity, including

15   Milgrom Consulting.  Yeah.

16   Q.        Including Milgrom Consulting?

17   A.        Yeah.

18   Q.        And you provided, you know, personal

19   consulting services relating to economics and

20   auctions; is that correct?

21   A.        Primarily, yes.

22   Q.        What else have you provided economic -- or

23   what other personal consulting services have you

24   provided?

25   A.        Well, I was saying "primarily" because I

HIGHLY CONFIDENTIAL

Page 112

1    haven't run through the whole list in my head.  But

2    let's see if there's anything besides -- I mean,

3    that's predominantly.

4              I have spoken to people -- so -- are we --

5    can we limit attention to paid services?  Is that

6    what we're talking about, as opposed to --

7    Q.      Well, we can start with paid services.  What

8    other paid personal consulting services have you

9    provided?

10   A.      I think there might not be anything that's

11   paid besides what we have just mentioned.

12   Q.      Okay.

13   A.      Yeah.

14   Q.      Okay.  So you've mentioned -- so today you

15   have mentioned all of the paid economic consulting

16   services that you have provided?

17   A.      Yes.

18            MR. EWALT:  Objection to form.

19            THE WITNESS:  Cash paid is what I'm

20   referring to here.

21            I have a -- okay.  So -- all right.  I will

22   wait for your question.

23   BY MS. ABSTON:

24   Q.      Okay.  So we've been discussing cash paid,

25   but can you further clarify any economic consulting

Page 113

1   services that you've been compensated for in any way?

2   A.       Yes.  Sure.  So, let's see.  There is a

3   company called OneChronos.  I am the chairman of the

4   scientific board for OneChronos, where I have

5   shared -- the compensation in the form of shares.

6   And it is -- OneChronos is a security market, does

7   the securities trading using a new technology, in

8   which I'm especially expert.  It's what uses smart

9   markets, as they call them.

10           Oh, goodness.  I'm blanking right now.

11           So Algorand, which is a cryptocurrency, I

12  was on the scientific advisory board and received

13  algos, which is a kind of cryptocurrency.  I'm

14  basically an equity participant or was an equity

15  participant in Algorand.

16           I'm sure I'm missing something.

17  Q.       What was your first ever economic

18  consultancy job that you had?

19  A.       The -- oh, I was about to say that it was

20  the FCC, but actually that's not right.

21           I had a small task, I guess, when I was at

22  Yale, so that would have been before 1987.  So it had

23  to be earlier.  And it had to do with Alaskan Inuit

24  ownership of something.  Gosh, it's very vague in my

25  recollection.

HIGHLY CONFIDENTIAL

Page 114

1    Q.        And that was for -- that was not related to
2    litigation in any way; that was just purely
3    economic --
4    A.        No, it was related to litigation.
5    Q.        Okay.
6    A.        It was about the economics of the regulation
7    of oil and gas pipelines in Alaska.
8    Q.        Okay.  I think I've seen that on your
9    testimony list.  Hold on one second.
10   A.        I'm struggling to remember the details.
11   Q.        We will get there.
12   A.        I'm an old man.  I've been around for a long
13   time.
14   Q.        We will get there.  We will get there.
15             So I want to talk about only economic
16   consultancy at this point.
17   A.        Yeah.
18   Q.        Do you believe that we have discussed all of
19   your paid economic consultancy jobs that you've ever
20   had?
21             MR. EWALT:  Objection to form.
22             THE WITNESS:  I don't recall any others --
23             MS. ABSTON:  Okay.
24             THE WITNESS:  -- that we have --
25             ///

HIGHLY CONFIDENTIAL

Page 115

BY MS. ABSTON:

Q.      Okay.  But there could be some others?

A.      This is what I recall.  I've been around for
a long time.

Q.      Okay, great.

        Let's talk about your unpaid economic
consulting.  Who would be some of the clients that
may have called you for unpaid economic consulting
advice?

        MR. EWALT:  Objection to form.

        THE WITNESS:  All small -- small business.
I get asked all the time, you know, every few weeks I
get calls -- and sometimes I'll offer a little bit of
advice -- from companies started by former students
or other projects.

BY MS. ABSTON:

Q.      Have you ever consulted pro bono for any
larger companies?

A.      Pro bono for a larger company.  Governments,
but not companies, no.

Q.      Okay.  What governments have you provided --

A.      I've given advice to Australia.  I've given
advice -- I've given advice to the FCC in the US.
I'm friends with those guys.  I've given small
things, you know, individual things at Ofcom and at

HIGHLY CONFIDENTIAL

Page 116

1    the UK.

2            Those are -- I have close connections --

3    I've worked on several occasions for Ofcom in the UK.

4            I think that's pretty much it.

5    Q.      Okay.

6    A.      Those guys, you know, I do something for

7    free for sometimes.

8    Q.      Okay.  And do you currently sit on any

9    boards?

10   A.      No.

11   Q.      Okay.

12   A.      Well, you mean board of directors when you

13   asked that?

14   Q.      Yes.

15   A.      And the answer is no.  And I have already

16   described to you scientific advisory boards, where

17   the answer is yes.

18   Q.      Have you previously been -- sat on any board

19   of directors?

20   A.      I'm sorry.  The Auctionomics board of

21   directors.  That's it.

22   Q.      Okay.  And I want to circle back to some of

23   the previous consulting engagements that you've

24   discussed throughout today, and I think you recount

25   these in your July 30th report.

HIGHLY CONFIDENTIAL

Page 117

```
 1          But I believe earlier today you mentioned
 2   Yahoo; is that correct?
 3   A.       Yes.
 4   Q.       Okay.  And you were compensated for the
 5   commercial advice that you gave to Yahoo; is that
 6   correct?
 7   A.       Yes.
 8   Q.       And then you also gave commercial advice to
 9   OpenX; is that correct?
10   A.       Yes.  Later.
11   Q.       And is there any other commercial advice
12   that you have given to companies that you were
13   compensated for that we have not discussed today?
14   A.       Not that I recall.
15   Q.       Let's talk about Yahoo.  When was the first
16   time that you provided Yahoo -- strike that.
17          When was the first time you were ever in
18   contact with someone from Yahoo?
19   A.       Oh, well, that's hard to know.  The
20   commercial application engaged in the people in their
21   advertising program, it was around -- what am I
22   thinking?  It's 2007, maybe, something like that.  I
23   think 2007, I think is about right.
24   Q.       So I think you stated -- or in your report,
25   from 2007 to 2008, you advised Yahoo.  Does that
```

Page 118

1    sound right?

2    A.        Yeah.  Was it just a year?  Maybe, okay.

3    Q.        Do you think that it could have been longer

4    than a year?

5    A.        Well, it could have been two years or

6    something.  But about -- a short period.

7    Q.        And was that like a formalized agreement to

8    give them commercial advice?

9    A.        I was paid for it, if that's what you mean.

10   I don't remember the contract.  I'm not sure I --

11   Q.        Okay.

12   A.        Yeah.

13   Q.        And that was prior to the formation of

14   Auctionomics; correct?

15   A.        Oh, yeah.  It was even before Google had

16   purchased DoubleClick.

17   Q.        Okay.  And when did Google purchase

18   DoubleClick?

19   A.        Right around -- just after -- right, I

20   think -- actually, they closed in 2007, 2008.  I

21   started working at Yahoo a little bit before Google

22   had -- that was the first thing everybody was talking

23   about.

24   Q.        I was going to ask.

25             So when -- so when is the first time you

Page 119

1   recall hearing about DoubleClick?

2   A.       Then.

3   Q.       So you were at Yahoo in 2007, and you start

4   hearing about DoubleClick.  What was your

5   understanding of DoubleClick's products in 2007?

6   A.       You mean before I joined Yahoo or started

7   working with Yahoo or during?

8   Q.       We will start with, what was your

9   understanding of DoubleClick's products prior to when

10  you joined Yahoo in 2007?

11  A.       To be clear, anybody who was around then saw

12  DoubleClick appearing on ads, you know, that were

13  popping up on our screens.  So I was aware of the

14  name "DoubleClick" even before I started at Yahoo.

15           And then the -- this was a period in which

16  ad exchanges were not yet prominent in the -- in the

17  industry, and Yahoo was thinking about acquiring

18  RealNetworks, which they eventually did, as their ad

19  exchange, to set up an ad exchange, and they were

20  interested in what Google was doing with its

21  acquisition of DoubleClick.

22           And I was hearing about the organization of

23  ad exchanges and the challenges doing it.  There were

24  huge organizational challenges for -- for a legacy

25  organization to even set up an ad exchange, because

HIGHLY CONFIDENTIAL

Page 120

1    it conflicted with -- you know, Yahoo was also at

2    that time the web's largest publisher, and it was --

3    you know, it had a sales force that was worried that

4    they were going to be, you know, cut out by some --

5    this direct method, and the question of what would

6    happen, the relation to guaranteed and nonguaranteed

7    contracts.  All those issues were coming up.

8              I'm sorry.  I'm not sure I'm answering your

9    question.  I think I should stop and listen to your

10   question again.  It was a complicated time, yeah.

11             THE REPORTER:  I need to go off the record.

12             THE VIDEOGRAPHER:  The time is 11:36 a.m.

13   Pacific Time.  We are going off the record.

14             (Recess taken.)

15             THE VIDEOGRAPHER:  The time is 11:52 a.m.

16   Pacific Time.  We are back on the record.

17   BY MS. ABSTON:

18   Q.       Okay.  And Dr. Milgrom, did you speak with

19   your counsel during the break?

20   A.       Yeah, just chitchat.

21   Q.       Okay.  Did you discuss your testimony here

22   today?

23   A.       No.  Well -- no, not really.  No.

24   Q.       Okay.  Did you discuss any aspect of your

25   testimony here today?

Page 121

1          MR. EWALT:  I'm going to instruct Professor

2     Milgrom not to answer questions about the substance

3     of communications with counsel.

4     BY MS. ABSTON:

5     Q.      And you're going to follow your attorney's

6     instruction?

7     A.      I guess so, yeah.

8     Q.      Before the break we were talking about

9     DoubleClick; is that correct?

10    A.      Yes.

11    Q.      Okay.  And we were talking about DoubleClick

12    in the context of your work with Yahoo from 2007 to

13    2008 or 2009 --

14    A.      Yes.

15    Q.      -- is that right?

16    A.      Right.

17    Q.      And so I think we left it discussing some of

18    the things you were hearing about DoubleClick's

19    products when you were at Yahoo in 2007.

20            Does that sound right?

21    A.      Well, sort of, yeah.  We were talking about

22    bid exchanges and Yahoo's effort to create one as

23    well.

24    Q.      And I think you referred to DoubleClick as

25    being ubiquitous at that time.

HIGHLY CONFIDENTIAL

Page 122

1            Does that sound correct?

2            MR. EWALT:  Objection to form.

3            THE WITNESS:  I don't think that was my

4    word.

5    BY MS. ABSTON:

6    Q.      Okay.  Well, would you agree that

7    DoubleClick was ubiquitous at that time?

8    A.      I remember that before I went to work for

9    Yahoo, I -- you know, their names were on ads.  If

10   you paid attention, you could see "Served by

11   Double-Click," or words to that effect, on lots and

12   lots of ads at the time.

13   Q.      Do you think they were -- do you think

14   that -- strike that.

15           Do you think DoubleClick was a market leader

16   at that time?

17           MR. EWALT:  Objection to form.

18           THE WITNESS:  "At that time."  What time are

19   we talking about?

20   BY MS. ABSTON:

21   Q.      Do you think that DoubleClick was a market

22   leader in 2007, when you were at Yahoo?

23           MR. EWALT:  Objection to form.

24           THE WITNESS:  It was certainly what we had

25   talked about at -- at Yahoo.

HIGHLY CONFIDENTIAL

Page 123

1    BY MS. ABSTON:

2    Q.        Okay.

3    A.        They were -- you know, that was a great

4    concern at Yahoo.

5    Q.        Okay.  Was there anyone else in the market

6    that you can recall at that time?

7    A.        They were -- DoubleClick and the impending

8    acquisition by Google were -- were a big topic and,

9    you know, among competitors, it was the biggest

10   topic.

11   Q.        But you can't recall any other members of

12   the market outside of DoubleClick in 2007?

13   A.        "Members of the market."  So, again, there

14   were other firms -- there were lots of other names

15   that were floating around.  But DoubleClick was

16   creating an exchange, we're talking about, and Yahoo

17   wanted to create an exchange.  And those were the

18   exchanges we were talking about.

19   Q.        And was there ever discussion of Yahoo

20   trying to acquire DoubleClick?

21   A.        Discussion of Yahoo wanting to acquire

22   RealNetwork, which was a different exchange.

23   Q.        Okay.  And -- all right.

24             Do you believe that -- that DoubleClick held

25   a monopoly in the market at that time?

HIGHLY CONFIDENTIAL

Page 124

1   A.        I have no information about either the

2   market definition or the market shares at that time.

3   And RealNetworks was certainly a serious competitor

4   for DoubleClick, but I don't know what the shares

5   looked like.

6   Q.        And why was DoubleClick a great concern at

7   Yahoo?

8             MR. EWALT:  Objection to form.

9             THE WITNESS:  There was already, you know,

10  discussion going on about, you know, a transformation

11  in -- in this method of selling remnant ads.

12            Remember that Yahoo was the largest online

13  publisher in the world at that time, and so if you're

14  a publisher, you're very concerned about the way you

15  conduct your sales, and their sales were mostly

16  direct sales, as was true of most publishers.

17            This was an important new way of -- of doing

18  it.  DoubleClick was a leader.  There was already

19  talk about, you know, the live bidding would be

20  coming down the pike.  They were talking about

21  whether that was important or not.

22            It was clear that -- yeah, I mean, I could

23  talk for ages -- for hours about this.  It was -- it

24  was -- there were lots of considerations going on.

25            ///

HIGHLY CONFIDENTIAL

Page 125

BY MS. ABSTON:

1

2    Q.       Okay.  And why did Google want to acquire

3    RealNetwork over DoubleClicks?

4              MR. EWALT:  Objection to form.

5              MS. ABSTON:  I'm sorry.  Strike that.

6    Q.       Why did Yahoo want to acquire RealNetworks

7    over DoubleClick?

8              MR. EWALT:  Objection to form.

9              THE WITNESS:  Yeah, at the time that -- that

10   I was there, this was -- you know, there was no

11   discussion of who they would acquire, that Yahoo was

12   already, you know, making a deal with -- I don't want

13   to recall the exact status of the deal -- was making

14   a deal with RealNetwork, and that was not -- who they

15   should make a deal with and why was not something

16   that was discussed while I was there.

17   BY MS. ABSTON:

18   Q.       Okay.  And have you ever met ████████?

19   A.       No.  Other than -- I take that back.  I met

20   him very briefly for the first time in Virginia a

21   couple months ago.

22   Q.       So I believe you're referencing that you may

23   have met ████████ at the DOJ trial that took place

24   in the fall of 2024?

25   A.       That's right.  Just briefly, yes.

HIGHLY CONFIDENTIAL

Page 126

1   Q.       And was he testifying at the DOJ trial?

2   A.       Yeah, I exactly remember.  Yes.

3   Q.       Okay.

4   A.       After his testimony, yes.

5   Q.       After his testimony, okay.

6            But you've never done any work with ████

7   ████ in any capacity in your career; is that right?

8   A.       That's correct.

9   Q.       And you didn't have any conversations with

10  him pertaining to the DOJ trial or the Eastern

11  District of Texas case?

12  A.       No.  Oh, was I -- sorry.  No.

13  Q.       And did you have any opinions at the time

14  about DoubleClick's business practices in 2007, when

15  you were at Yahoo?

16  A.       No.

17  Q.       Okay.  And then you never met with any

18  DoubleClick executives?

19  A.       No.

20  Q.       Okay.  And so let's -- let's go back to

21  talking more about the commercial advice that you

22  gave to Yahoo.

23  A.       Yep.

24  Q.       How would you define "commercial advice"?

25  A.       Okay.  Well, you're asking -- you asked the

HIGHLY CONFIDENTIAL

Page 127

1    question.  I was going to ask you what you meant by

2    "commercial advice."

3            But the advice that I was giving -- let me

4    try to be helpful here.  The advice that I was giving

5    concerned basically the evolutions that were taking

6    place at that time in Internet display advertising.

7    Q.        Okay.  Was this the first time you had ever

8    given advice relating to Internet display

9    advertising?

10   A.        Commercial advice, yes.

11   Q.        And so what specifically did you advise

12   Yahoo on?

13   A.        Well, actually, you can read about that in

14   my published work.  So you can see I have a paper

15   with Jon Levin, currently the president of Stanford

16   University, which was included in it a lot about what

17   we were doing.

18           The issues were what would happen as

19   targeting became more refined, how much value --

20   extra value would be created by -- by better

21   targeting, what problems might be created by better

22   targeting, what problems would be created internally

23   within Yahoo when it had competition between its

24   sales force and this alternative channel for selling

25   ad slots.  Those things.

HIGHLY CONFIDENTIAL

Page 128

1    Q.       Okay.  And you mentioned Jon Levin.  Did he

2    also give commercial advice to Yahoo during the same

3    time period that you were offering advice?

4    A.       Yeah, we normally traveled together, John

5    and I.  We were working as a team.

6    Q.       Okay.  And who else was on your team when

7    you were working at Yahoo?

8    A.       No one else.  It was -- well, the consulting

9    were Jon and me, just the two of us.

10   Q.       And had you ever worked with Jon before?

11   A.       Yes.

12   Q.       Okay.  In what capacity had you worked with

13   Jon Levin before you worked with him at Yahoo?

14   A.       We had advised -- who were we advising?  It

15   was Comcast, I believe.  This was advise about

16   bidding in a spectrum auction.

17   Q.       And so you would have been giving advice

18   with Jon Levin to Comcast prior to 2007?

19   A.       Yes, I guess so.

20   Q.       And that was auction advice?

21   A.       Yes.

22   Q.       Okay.  And were you compensated for that

23   advice?

24   A.       Yes.

25   Q.       Who did you work with while you were at

HIGHLY CONFIDENTIAL

Page 129

1    Yahoo that was an employee of Yahoo at the time?

2    A.        I'm sorry, I don't remember the names of the

3    people at that time.

4    Q.        But did you have a direct report at Yahoo

5    that you provided with your insight or consulting

6    advice?

7    A.        Yes.  There was somebody who was in charge

8    of trying to develop the -- an ad network -- I'm

9    sorry, an ad exchange.  My confusion here.

10          There was somebody who was trying to develop

11   an ad exchange, bringing over RealNetwork and

12   integrating Yahoo's very ample inventory into that,

13   that helped jump-start that -- that exchange.

14   Q.        And did you continue to advice Yahoo in any

15   capacity after 2008 or 2009?

16   A.        I don't recall doing any additional advise

17   for Yahoo after that.

18   Q.        Okay.  And do you know what came of Yahoo's

19   efforts to develop an advertising exchange?

20   A.        I don't know any detail about what came of

21   the effort, no.

22   Q.        And do you know if Yahoo runs an exchange

23   today?

24   A.        I believe they don't, but I'm not a

25   hundred percent sure.

HIGHLY CONFIDENTIAL

Page 130

1    Q.      Okay.  You also mentioned that you have

2    provided commercial advice occasionally to OpenX; is

3    that correct?

4    A.      Yes.

5    Q.      Okay.  And what is OpenX?

6    A.      Well, at the time I was providing commercial

7    advice, it was an ad exchange.

8    Q.      Okay.  And when did you first start

9    providing OpenX with commercial advice?

10   A.      I believe I've got the dates in my report,

11   and I -- rather than quoting them from memory, I'd

12   prefer to just quote them accurately.

13   Q.      I will represent to you that in your report,

14   you state that you started occasionally advising

15   OpenX in 2009.

16           Does that sound right?

17   A.      Possible.  I just don't recall.

18   Q.      Were there -- go ahead.

19           Was there ever a time that you were giving

20   commercial advice to both Yahoo and OpenX at the same

21   time?

22   A.      No.  That would have been why, probably, I

23   would have left Yahoo.  But most likely, yeah.

24   Q.      Do you remember who approached you from

25   OpenX?

HIGHLY CONFIDENTIAL

Page 131

1    A.        It was Tim Cadogan.

2    Q.        Okay.  And how did he reach out to you?

3    A.        I don't recall exactly how he reached out to

4    me.  Yeah, I don't recall.

5    Q.        And when you say "occasionally advised,"

6    what do you mean by that?

7    A.        Well, they were located not far from Burbank

8    Airport, I remember, and I would go maybe every

9    quarter or every six months for a day.  I would fly

10   down to their offices and discuss whatever issues

11   were on their mind at the time, and I was

12   following -- as the industry developed, there were

13   new challenges constantly being addressed.

14           They were trying also to understand what

15   policies others were doing and why they would be

16   doing it, and they would ask me for advice.

17           And we also spoke about -- I mean, that's --

18   yeah, occasionally advised.  You asked what

19   "occasionally advised" meant.  I answered the

20   "occasionally advised," yes.

21   Q.        Okay.  And you did that, and you

22   occasionally advised OpenX from 2009 until 2017; is

23   that correct?

24   A.        Is that right?  Are those the dates that are

25   in there?  Okay, good.

HIGHLY CONFIDENTIAL

Page 132

1    Q.        Do you think that it was -- do you think
2    that you provided OpenX with advice after 2017?
3    A.        No.  I stopped -- I remember stopping at
4    some point right around there, 2017, 2018.  If I
5    wrote 2017, then that's when it was.
6    Q.        Was there ever a time you were providing
7    OpenX with consulting advice while you were retained
8    as an expert for Google?
9    A.        No.  In fact, I remember that the reason I
10   stopped working at OpenX is I called Tim and said, I
11   really want to study cloud pricing.  I'm going to go
12   do that at Google.  I think it would be inappropriate
13   for me -- he tried to talk me out of it, I recall --
14   inappropriate for me to do both.  So I'm going to
15   leave -- stop advising OpenX.
16   Q.        Okay.  And that was in your advising
17   capacity.  But I want to try to clarify, were you
18   ever retained as an expert witness for Google while
19   you were also providing advice to OpenX?
20   A.        Oh.  Well, I'd have to look at dates.  I
21   don't think so, but, you know, you're asking about
22   history from some time ago, and I'd need to look at
23   dates to be sure.
24   Q.        We'll come back to that.
25             And during the time you were working at

HIGHLY CONFIDENTIAL

Page 133

1    OpenX, I believe that's when you patented some

2    auction design inventions.

3           Does that sound right?

4    A.     Yes, it is right.

5    Q.     Do you recall how many patents you were

6    associated with during your time at OpenX?

7    A.     I think there was only one for OpenX --

8    Q.     Okay.

9    A.     -- I believe.

10   Q.     And did you co-invent with others during

11   this time at OpenX?

12   A.     Oh, I think we called them co-inventions,

13   yes.  It was my idea that we developed, yeah.

14   Q.     Who were your co-inventors?

15   A.     Can we look at the list of whoever is listed

16   on the --

17   Q.     We can go back to your CV if you want to.

18   A.     My CV.  Oh, this is my CV.  That's right.

19   Yes, thank you.

20   Q.     So we're going to go back to Exhibit 1.

21   A.     And where is -- where are these patent

22   things?

23           There we go.  With Steven Cunningham and

24   Marissa Beck.

25   Q.     And after 2017, have you -- strike that.

HIGHLY CONFIDENTIAL

Page 134

```
 1              Since 2017, have you ever provided OpenX
 2      with any additional commercial advice?
 3      A.      No.
 4      Q.      And is the auction design related to the
 5      patent that you had when you were at OpenX still in
 6      use today?
 7      A.      I believe not, no.
 8      Q.      Okay.  And so then you brought up that you
 9      started as a research scholar at Google in 2017; is
10      that correct?
11      A.      Well, I started talking to Google about
12      doing that.  I don't remember exactly -- the year
13      that I started should presumably be in here
14      somewhere.
15      Q.      And so who reached out to you about being a
16      research -- a visiting research scholar at Google?
17      A.      I reached out to them.  I was curious -- I
18      was curious about the operation of the cloud, and I
19      wanted to be able to have access to and study what
20      Google was doing in developing the cloud.  So I
21      reached out to them.
22      Q.      And what prompted your interest in the
23      cloud?
24      A.      Oh, Amazon had tried to hire me, and I
25      learned about the Amazon Cloud then, and I was
```

HIGHLY CONFIDENTIAL

Page 135

1   fascinated.  I thought that was a great idea, and

2   that the pricing issues were extremely complicated

3   for the cloud.  So that's my thing.

4           You know, I've worked on problems that are

5   hard for other people.  That's my comparative

6   advantage.  And -- and I thought, well, you know,

7   Google is right here.  Maybe I can learn about -- you

8   know, I decided not to work with Amazon, but maybe I

9   could find out what I needed to know at Google.

10          And they said, well, we can't give that to

11  an outsider, but we could arrange for you to be a

12  visiting scholar.

13  Q.      Okay.

14  A.      I said okay.

15  Q.      And who did you reach out to at Google about

16  the visiting scholar potential?

17  A.      I don't recall.

18  Q.      And during that one-year time period that

19  you were a visiting research scholar at Google, did

20  you have an office on campus at Google?

21  A.      I don't think it was as much as a year.  I

22  think it was less than a year that I was at -- at

23  Google.  And there was an office made available to me

24  on the Google campus, yes.

25  Q.      Okay.  And did you receive any sort of

HIGHLY CONFIDENTIAL

Page 136

1    compensation for your visiting research scholar

2    position?

3    A.      I did, yeah.

4    Q.      Okay.  And what all did you -- strike that.

5            Did you have to apply to be a visiting

6    research scholar in any way?

7    A.      I -- pardon me.

8            Did I have to apply?  There were forms --

9    there was stuff I had to go through, and I don't

10   recall exactly what the hoops were.

11           I do recall that I had to -- had to attend

12   an orientation, you know, and learn about some of the

13   rules that applied, but I don't remember any detail

14   about that.  Sorry.

15   Q.      So while you were holding this position with

16   Google as a visiting research scholar, you were also

17   still a professor; is that correct?

18   A.      Oh, yeah.  I only went to -- I went to

19   Google about -- Stanford has rules about the limits

20   of outside -- limits my outside activity.  And I

21   can't average more than a day a week.

22           And so I would -- I would go to Google a day

23   a week and -- and, you know, four days a week I was

24   on the Stanford campus.

25   Q.      Okay.  And that -- you went to Google a day

Page 137

1    a week for less than a year?

2    A.      Yeah.

3    Q.      In that role?

4            Okay.  And you received compensation?

5    A.      Yeah.

6    Q.      Was there a formalized contract dictating

7    your compensation?

8    A.      Oh, I'm sure there was.

9    Q.      Okay.  And do you recall anything about your

10   compensation while you were a visiting research

11   professor at Google?

12   A.      Oh, I recall a few details.  We had to --

13   the fact that my health insurance came -- it made me,

14   you know -- my health insurance came through

15   Stanford.  I wasn't supposed to get any -- any equity

16   compensation from Google.  There were, you know, some

17   details.  But I don't recall a lot about it.

18   Q.      Okay.  And so do you still advise -- strike

19   that.

20           Are you still in any way a research scholar

21   with Google at this time?

22   A.      No.

23   Q.      But you still consult different companies in

24   your personal capacity regarding online display

25   advertising industry; is that correct?

HIGHLY CONFIDENTIAL

Page 138

1    A.        At -- right now, the last couple of years,

2    no.  I mean, I'm -- as I say, I have this -- this

3    project has consumed a lot of my time.

4    Q.        And did your compensation include the

5    benefits that are given to Google's employees, like

6    free lunch?

7    A.        Free lunch was -- yes, I had access to the

8    lunchroom.

9    Q.        Okay.  Any other things that you can recall

10   you had access to?

11   A.        For the most part, I didn't take Google

12   benefits because I was a full-time employee at

13   Stanford, and it was Stanford benefits that I had.

14   Q.        And so outside of Yahoo, OpenX and Google,

15   have you advised any other companies on anything

16   relating to online display advertising, other than

17   those that we have discussed today?

18   A.        Not in the modern era.  Yes, I guess the --

19   I guess there was something, yeah.

20   Q.        Okay.  What can you recall?

21   A.        This is before -- even earlier than this

22   stuff.  The -- the online/offline, there was a

23   company in Washington State.

24   Q.        Okay.

25   A.        And I can't quite recall, but it was a very

HIGHLY CONFIDENTIAL

Page 139

```
 1    early innovator in trying to help advertisers
 2    maintain a portfolio of online and offline
 3    advertising to help them more effectively target
 4    customers.  And I helped the -- I advised them.  I
 5    don't remember very much about that.  I just remember
 6    that there was such a project.
 7             Is there anything else?
 8    Q.      I think we can move on.
 9    A.      Okay.  All right.
10    Q.      I want to hear about -- how did you become a
11    testifying expert?
12    A.      How did I become a testifying expert?  Let's
13    see.
14             Well, I think probably the first testimony
15    happened because of CRA.  The -- for personal
16    reasons, my life changed in the early 1990s, and I
17    needed some additional income.  And I made this
18    association with Charles River Associates where I
19    could do some consulting, which I had intended to be,
20    you know, auction-related consulting, and they
21    brought some cases to me, and they said, This seems
22    to fit your expertise.  Would you like to do it?  I
23    think those were my first -- first cases.
24    Q.      And do you typically -- well, let's see --
25    strike that.
```

HIGHLY CONFIDENTIAL

Page 140

```
 1            Were the first cases that Charles River
 2    brought you back in the mid '90s, were you
 3    representing companies?
 4    A.        Representing -- I'm not a lawyer.
 5    Q.        Strike that.
 6            Were the first cases that Charles River
 7    brought you back in the mid '90s, were you retained
 8    by companies to offer your expertise?
 9    A.        Charles River was retained by companies.  I
10    was working with Charles River at the time.
11    Q.        Right.
12    A.        I don't recall exactly that they -- no, I do
13    recall that I would -- that the payments came through
14    Charles River.  I imagine that the entire contract
15    was probably through Charles River, and I was just
16    working for Charles River.
17    Q.        Were you asked to offer opinions by
18    plaintiffs?
19    A.        Sometimes, yes.
20    Q.        Were you asked to offer your expert opinions
21    in the mid '90s by defendants?
22    A.        Well, if we're going to talk about the
23    period in which I was asked to offer each opinion, I
24    would really need to go look at those cases again and
25    see what dates they were.
```

HIGHLY CONFIDENTIAL

Page 141

1          But there's -- I would say, you know, I was

2    asked to offer opinions by both plaintiffs and

3    defendants in general over a period -- over a period

4    of years.

5    Q.       Okay.  We will look into that in just a

6    little bit.

7          But would you consider testifying as an

8    expert witness to be your primary job?

9    A.       No.

10   Q.       At any point in time, has testifying as an

11   expert witness been your primary job?

12   A.       No.

13   Q.       Okay.  At any point in time, has testifying

14   as an expert witness been your primary source of

15   income?

16   A.       Well, I'd say over the last year, these

17   cases generated more income than my Stanford income.

18   Q.       Okay.  And how much of your income comes

19   from being a testifying expert -- or strike that.

20          How much of your income comes from being an

21   expert witness?

22   A.       Okay.  What -- how are we doing the

23   accounting here?  I have -- how much of my income.  I

24   get income from Auctionomics.  I get income from my

25   direct billing.  I get income from Stanford.

HIGHLY CONFIDENTIAL

Page 142

1           What do you want in the numerator, and what

2      do you want in the denominator for these things?

3      What are you asking?

4      Q.      If you had to ballpark a percentage of your

5      income that comes from being an expert witness, what

6      would be that ballpark?

7      A.      Okay.  Well, in terms of direct charges, if

8      I combine the last few years, ██████████████████████,

9      something like that.

10     Q.      Has it ever been higher than that ████████

██     ██████████████?

12     A.      You know, again, no, I think that's probably

13     what the number has been that it would -- the number

14     we're talking about.

15     Q.      From a percentage of time consumed, have you

16     ever spent more time -- strike that.

17             What percentage of your time is consumed

18     with expert witness work?

19     A.      All my consulting work together, I try to

20     limit to an average of 20 percent, which is what my

21     contract with Stanford requires.

22     Q.      And when you say "consulting work," you're

23     talking about economic consulting and -- economic,

24     nonlitigation consulting and litigation consulting?

25     A.      Yeah.

HIGHLY CONFIDENTIAL

Page 143

1    Q.        Okay.

2    A.        That's why I do only one large project at a

3    time.

4    Q.        Okay.  So 20 percent direct, 20 percent

5    Stanford, and then the rest is Auctionomics?

6              MR. EWALT:  Objection to form.

7    BY MS. ABSTON:

8    Q.        Is that what you --

9    A.        Yes.  So if we're talking about the -- yeah,

10   you asked my income.  My income has lots of -- okay.

11   So I have Auctionomics, and then I have -- you know,

12   ██████████████████████████  and I have -- I have --

13   you know, I'm 76 years old.  ████████████████████████

██   ██████████████████████  ██████████████████████████

15   I've got a lot of different sources of income, and

16   breaking it all down would be very hard for me to do.

17   Q.        Okay.  Let's move on.  Let's talk about the

18   first time that you ever testified as an expert for

19   Google.

20   A.        Uh-huh.

21   Q.        Which I believe we have already discussed

22   today, you've had some previous times that you were

23   retained by Google.  But do you recall the first time

24   that you were retained as an expert by Google?

25   A.        Yeah, for a Google case, that was the --

HIGHLY CONFIDENTIAL

Page 144

1    that was the Woods litigation.

2    Q.        Okay.  So -- but were you -- have you ever

3    testified as an expert in any litigation that

4    involved Google prior to that time?

5    A.        Not to my recollection.

6              MS. ABSTON:  Okay.  What I'm going to do is

7    let's pull out what is M-3, which I think we're going

8    to mark as Exhibit 3, maybe?

9              THE REPORTER:  Correct.

10             MS. ABSTON:  Okay.

11                      (Exhibit No. 3 was marked.)

12   BY MS. ABSTON:

13   Q.        And what I'm handing to you is a -- well, we

14   can come back to this, too.  It's Appendix B, a list

15   of your materials relied upon.

16             And do you recognize this document?

17   A.        Yes, it looks like the document that's at

18   the end of my report.

19   Q.        And do you have any reason to dispute that

20   it's not a correct and accurate copy of all the

21   materials that you relied upon --

22   A.        As far as --

23   Q.        -- in forming your opinions in the report?

24   A.        As far as I know, it's a correct and

25   complete list.

HIGHLY CONFIDENTIAL

Page 145

1   Q.      So you now have as Exhibit 1 your Appendix A

2   to your report for your July 30th Eastern District of

3   Texas report.

4   A.      Yes.

5   Q.      And also before you, you have in front of

6   you your Appendix B which is your materials relied

7   upon, which is marked Exhibit 3.

8           MR. EWALT:  Counsel, can we mark Exhibit 3?

9           MS. ABSTON:  And I'd like to mark Exhibit 3,

10  which is your Appendix B of your materials relied --

11  which is your materials relied upon list.

12  BY MS. ABSTON:

13  Q.      So you now have a full copy of the

14  appendices to your July 30th report.

15  A.      All right.

16  Q.      Let's locate your testimonial history list.

17  And I want to -- I think that may be on -- within

18  Exhibit 1.

19          At the very back, starting on page 471.  Do

20  you see that?

21  A.      471.  There we go, yeah.  It lists nine

22  items, yes.

23  Q.      Okay.  And you have a subheading here that

24  says on Exhibit 1, "Expert Reports and Testimony,

25  2000 to Present."

Page 146

1          Do you see that?

2    A.      Yes.

3    Q.      Okay.  And so is this an up-to-date list of

4    all the cases that you've provided, deposition and

5    trial testimony, within over the last 24 years?

6    A.      I hope so.  Let's see.  Just a moment.

7    Q.      Okay.

8    A.      It looks that way.  Just a second.  And is

9    this -- is it up to date?

10          It goes through the date at which I

11   submitted this report, yeah.

12   Q.      Okay.  We will come back to that.

13   A.      Sure.

14   Q.      I want to -- I want to look with you at

15   what's No. 5 on this list.  And this is a case -- can

16   you read what No. 5 says?

17   A.      Oh, yes, right.  There you go.  Yeah.

18   Q.      And does this refresh your recollection as

19   being the first case in which you were ever involved

20   as -- ever involved in that involved Google?

21   A.      It does refresh my memory, yes.

22   Q.      Okay.

23   A.      So there was another case here that is --

24   Q.      Okay.  And are you aware of the date of this

25   case?

HIGHLY CONFIDENTIAL

Page 147

1   A.        No.  If I were, it would be on there.

2   Q.        Okay.  There's a handful of litigations on

3   this list that do not have a date associated with it,

4   but it looks like this No. 5, "Bid for Position vs.

5   Google," falls after a March 2006 entry and prior to

6   a January 2010 entry.

7            Do you see that?

8   A.        I see that, yes.

9   Q.        Okay.  So this "Bid for Position vs. Google"

10  case may have taken place in between March 2006 and

11  January 2010.  Does that appear right?

12  A.        It's possible, yeah.

13  Q.        And who retained you in that matter?

14  A.        I remember the title of this.  I don't

15  remember anything about this case.  I think I was

16  very, very briefly involved.

17            Let's see.  This case, "Bid for Positions,"

18  was about a patent, right?  Let me just try -- I'm

19  racking my brain trying to remember details, so

20  please give me a moment.

21  Q.        And I can ask you some questions, see if

22  some things come back.

23            So this case, it appears, was in the Eastern

24  District of Virginia.  Does that sound correct?

25  A.        That's what it says here, yes.

Page 148

1    Q.        Okay.  Do you recall if you were retained by

2    Google for this?

3    A.        Gosh, I barely remember this case.  But I

4    wasn't -- I'm pretty sure I would remember if I was

5    retained by Bid for Position, and it only leaves two

6    options here.  So I guess probably I was retained by

7    Google.

8    Q.        Is there anything on this, what I'm going to

9    call your testimonial history list here, in

10   Exhibit 1, where you appeared as a fact witness in

11   any way?

12   A.        No.

13   Q.        Okay.  So we know that you were an expert

14   witness for either Bid for Positions or Google in the

15   Eastern District of Virginia --

16   A.        It was not Bid for Position.

17   Q.        Okay.  So you were --

18   A.        Unless by process of elimination.

19   Q.        Okay.  So the first time that you ever were

20   retained by Google was No. 5 on Exhibit 1, "Bid for

21   Position vs. Google" --

22   A.        Yes.

23   Q.        -- in the Eastern District of Virginia.

24   A.        Okay.

25   Q.        And you were retained as an expert witness

Page 149

1    in that matter?

2    A.        That's what my CV says, yes.

3    Q.        Okay.  But you can't recall, as you sit here

4    today, what the subject matter of that case was?

5    A.        No.  It had to do -- you know, I have little

6    snippets of memories, so I can say a little bit about

7    that, if you wish.

8    Q.        Yes.  What do you recall about that case?

9    A.        So this was about the search -- as I recall,

10   search -- at the time search ads were mixed in

11   with -- or could have been mixed in with what are

12   called organic ads, and this had to do with search

13   advertising.

14             And Bid for Position had said instead of

15   listing ads by relevant, they had a patent that said

16   you could list ads according to who paid the most.

17   And a question was -- there was a question related to

18   whether somebody -- apparently Google, from the title

19   here -- was in violation of that patent.

20             And whether what was -- whether the

21   listings -- Google, of course, at the time

22   maintained -- separated its organic listings from the

23   commercial listings and -- you know, and its position

24   was that that's what it was doing, that that wasn't

25   the same thing.  So --

HIGHLY CONFIDENTIAL

Page 150

1   Q.      And so --

2   A.      -- something like that.

3   Q.      -- did you issue an expert report in this

4   matter?

5   A.      I don't recall.  Probably not.  I'm guessing

6   here that not, because I'm pretty sure that if I had,

7   I would remember something about it.

8   Q.      Okay.

9   A.      This looks like something that -- yeah.

10  Q.      And then looking at this same list in

11  Exhibit 1, looking at No. 8, it says "Rick Woods vs.

12  Google."  Is that the case that you have been

13  referring to today as "Woods vs. Google"?

14  A.      Yes.

15  Q.      And what's the subject matter of that case?

16  A.      That was related to search advertising.

17  Q.      Okay.  And I think you previously testified

18  that that may be an ongoing litigation; is that

19  correct?

20  A.      Yes.

21  Q.      And so what is the current status of that

22  litigation?

23  A.      I understand that Rick Woods was replaced

24  by -- this was a class action.  And there was some

25  problem with Rick Woods, and he was replaced by

HIGHLY CONFIDENTIAL

Page 151

1    somebody else.  And -- and that case will go to

2    trial.

3    Q.        Okay.  And did -- what -- what dates were

4    you involved with this matter?

5    A.        Yeah, good question.  So this was -- this

6    has got to be a period that's pre-Covid.  All I can

7    tell you is that this must have been pre-Covid.

8    Q.        And by "pre-Covid," you mean before 2020?

9    A.        Yes, before 2020.  Yes.

10   Q.        And did you issue a report in this case?

11   A.        Yes, I did.

12   Q.        Okay.  ████████████████████████

     ████████████████████████████████████████

     ██   ████    ██████████

15   Q.        Okay.  And did you issue a supplementary

16   report in this matter?

17   A.        I do not recall a supplementary report.

18   Q.        And did you sit for a deposition in this

19   matter?

20   A.        I did.

21   Q.        Okay.  Did you sit for multiple depositions?

22   A.        One.

23   Q.        Okay.

24   A.        One only.

25   Q.        Okay.  I'm going to hand you what I will

Page 152

1    mark as Exhibit 4, I believe.

2                    (Exhibit No. 4 was marked.)

3    BY MS. ABSTON:

4    Q.        In addition to an expert report in this

5    matter, do you recall issuing a declaration?

6                It's M-27.

7                And I'm going to mark your declaration in

8    the Woods vs. Google case as Exhibit 4.

9                THE REPORTER:  We just marked 4.

10               MS. ABSTON:  I mean, that's what it is.

11               MR. EWALT:  Just for the record, it

12   doesn't -- it appears to be more than a declaration.

13               MS. ABSTON:  Yes.  So we will start, just

14   for context, I believe -- I believe this is a motion

15   to strike -- Google's motion to strike expert

16   reports.

17               THE WITNESS:  Okay.

18               MS. ABSTON:  Just for completeness, we have

19   included that.

20   Q.        And your declaration appears to be either

21   Exhibit 16 or 17, so starting about halfway back --

22   there's not page numbers -- you will see a May 31st,

23   2018, declaration of Paul Milgrom.

24               Do you see that?

25   A.        I'm looking for it.

HIGHLY CONFIDENTIAL

Page 153

1    Q.        It's towards -- about three pages from the

2    back.

3    A.        Oh, about three pages from the back?

4    Q.        Uh-huh.

5    A.        Is there --

6              MR. EWALT:  Yeah, I mean, I'll just state

7    for the record here this appears to be a printout of

8    Docket Entry 44- -- or excuse me -- a partial

9    printout of Docket Entry 442 in Case No. 5:11-CV-1263

10   in the Northern District of California, and it

11   appears that it's Docket Entry 442, 442-1, 442-17.

12   So missing a few of the dockets.

13             MS. ABSTON:  Yeah.  I'm happy to represent

14   to counsel that this is just -- we wanted to provide

15   context for what I believe is Exhibit 16, the

16   Declaration of Paul Milgrom dated May 31st, 2018,

17   that's discussed within the attachments to Google's

18   motion to strike the expert report.

19   Q.        But, Dr. Milgrom, do you see your

20   declaration on May 31st, 2018?

21   A.        Is it May 31st?  I see that it's filed

22   later.

23   Q.        Yes, sorry.  Right.

24             On that page, do you see that there's a date

25   on -- under the words "Declaration of Paul Milgrom"?

HIGHLY CONFIDENTIAL

Page 154

1    A.        Yeah, there it is.  May 31, 2008.

2    Q.        And if you flip to the last page, the very

3    last page -- or the second-to-the-last page, is that

4    your signature?

5    A.        It is, yes.  That's my signature.

6    Q.        And so you also -- so in addition to

7    submitting an expert report, you also submitted a

8    declaration for the Woods v. Google  matter; is that

9    correct?

10   A.        It appears to be.  I'm sorry, my memory of

11   this is weak.

12   Q.        That's okay.

13            And do you remember anything else associated

14   with the Woods vs. Google matter, anything that

15   stands out to you?

16   A.        As I have this in front of me, you can see

17   that I talk about their misunderstanding of how

18   second price options work.  That seems to be what the

19   whole document is about.  I'm testifying about how

20   second price options work and how their

21   understanding -- their lack of understanding

22   undermines the work I did.

23   Q.        Okay.  And this case hasn't gone to trial,

24   has it?

25   A.        Not yet.

HIGHLY CONFIDENTIAL

Page 155

1    Q.      Do you know when it's going go to trial?

2    A.      Early next year.  I don't remember the

3    dates.

4    Q.      Have you been asked to testify at that

5    trial?

6    A.      I've been asked, yes.

7    Q.      And do you know if that case is proceeding

8    to trial in the Northern District of California?

9    A.      I believe so, yes.

10   Q.      Okay.  And do you know if that case is going

11   to take place -- or that trial is going to take place

12   in the beginning of 2025?

13   A.      The first quarter of 2025 is my

14   understanding.

15   Q.      Okay.  Are you aware if your opinions have

16   been limited in any way in that matter?

17   A.      I -- I don't know anything about that.  I'm

18   sorry.

19   Q.      Are you aware if any of your opinions that

20   you have offered in that matter have been excluded?

21   A.      I'm not aware of any that have been

22   excluded.

23   Q.      Okay.  We can set that aside.

24           Okay.  So on October 12th, 2020, you were

25   awarded a Nobel Prize; is that correct?

HIGHLY CONFIDENTIAL

Page 156

1    A.        October 12th as well.  That might have been

2    the announcement date.  December 10th, 2020, I was

3    awarded a Nobel Prize.

4    Q.        And what is the full title of the award you

5    received in 2020?

6    A.        Oh, it's Bank of -- it's said in Swedish,

7    which I can't pronounce.  So it's the Bank of Sweden

8    Prize in Memory of Alfred Nobel.

9    Q.        And for what work did you win the 2020 Nobel

10   Prize?

11   A.        Well, the short citation is something like

12   "for improvements to auction theory and inventions of

13   new auction methods."  And I co-own that prize with

14   Professor Robert Wilson.

15   Q.        And I think you've mentioned Professor

16   Robert Wilson before.  He's someone who dates back to

17   your early days at Sanford; is that correct?

18   A.        He was my dissertation advisor, and

19   currently he's the neighbor who lives across the

20   street from me.

21   Q.        Okay.  How much time do you believe went

22   into winning the Nobel Prize?

23   A.        I don't understand what that means.  I

24   didn't put any time into winning the Nobel Prize.

25   Zero.  I just did my work.

HIGHLY CONFIDENTIAL

Page 157

1    Q.        How much time or how many -- strike that.

2              How many years of work do you think went

3    into winning the Nobel Prize?

4    A.        Well, I started working on auctions in

5    graduate school, and, you know -- in, let's say,

6    1976, 1977, and I had worked on them on and off that

7    entire period.  So, you know, 47 years.

8    Q.        Needless to say, decades and decades leading

9    up to your Nobel Prize work?

10   A.        Yep.

11   Q.        And did you write your Nobel Prize

12   submission in its entirety?

13   A.        My Nobel Prize submission?

14             MR. EWALT:  Objection to form.

15             THE WITNESS:  I don't understand what "my

16   Nobel Prize submission" is.

17   BY MS. ABSTON:

18   Q.        Did you write any sort of Nobel Prize

19   submission in any way?

20   A.        Okay.  "Submission" is the word I am

21   struggling with here.  So I'm --

22   Q.        Okay.  Did you --

23   A.        I wrote things for them that I was asked to

24   write.  One was a history.  Yeah, I mean, basically

25   the longest thing I wrote was a history that they

HIGHLY CONFIDENTIAL

Page 158

1    asked for, they asked me to write.

2    Q.        What was the second thing that they asked

3    you to write?

4    A.        What was the second thing they asked me to

5    write?  I'm sorry.  That's -- I'm also blanking on

6    that.  I'm sorry, I don't recall.

7              But the -- the substantive thing, the long

8    thing, was the -- one was -- I guess one of them was

9    related to research and one of them was sort of a

10   biography that was not related to research, but just

11   about my life.

12   Q.        And are those items public?

13   A.        Yeah, the Nobel Prize --

14   Q.        Okay.

15   A.        Probably on the Nobel Prize website.

16   Q.        Both of those documents that you wrote are

17   publicly accessible?

18   A.        They were intended to be, yes.

19   Q.        Okay.  And outside of Professor Wilson, who

20   assisted you with your Nobel Prize work?

21   A.        Well, you know, I wrote a lot of papers, and

22   a lot of them were cited.  So there were -- some of

23   my papers were singly authored, but mostly not.

24              I wrote a lot of different papers with

25   Professor Robert Weber, who was -- who is retired

1  now, was at Northwestern University.  I wrote with

2  Professor Larry Glasten.  I wrote with Professor Ilya

3  Segal.  These are papers I wrote on auctions and

4  market design.

5          And I wrote -- who else did I write with?

6  Professor Larry Ausubel and Professor Peter Crampton.

7          The -- you know, if you go over my CV, just

8  look at the co-authors, and those are the people I

9  wrote with.

10 Q.      There wasn't any sort of company, like

11 Auctionomics, that did anything to contribute to you

12 winning your Nobel Prize?

13 A.      Well, it says in the -- you know, it says

14 "Inventions of New Auction Methods," and, yeah,

15 the -- Kevin Leyton-Brown and Ilya Segal were working

16 with me -- I'm naming individual names because that's

17 how, you know, we usually think about these things.

18         But that work, you know, the work that won

19 me the Nobel Prize -- that also won me an Emmy, by

20 the way.  I now remember that I have to add the Emmy

21 to my CV.  I have an Emmy award for the work on

22 the -- for much the same work.

23         That work was done through Auctionomics, but

24 I'm now naming the individuals who were the key

25 individuals.

HIGHLY CONFIDENTIAL

Page 160

1    Q.       Okay.  So, just to clarify, there were some

2    individuals who may be independent contractors with

3    Auctionomics that did assist you in some of the work

4    that led up to your Nobel Prize?

5    A.       Yeah.

6    Q.       And they also assisted you in some of the

7    work that may have won you an Emmy for --

8    A.       It wasn't actually -- Auctionomics won the

9    Emmy for the work that -- the work on the broadcast

10   incentive option reorganized the whole television

11   industry.  They decided that was a big technical

12   contribution to the television industry and awarded a

13   technical Emmy, as it's called, to Auctionomics for

14   that, which I have a statuette now.

15   Q.       Cool.  Do you recall the year that

16   Auctionomics was awarded an Emmy?

17   A.       It was just a couple months ago.  October

18   2024.  That's why it's not yet on the CV.

19   Q.       Okay.  And for the submission to the Nobel,

20   did you perform all of those calculations yourself?

21   A.       Submission to the Nobel.  You keep talking

22   about "submissions to Nobel."  You know, I don't even

23   find out that I'm nominated.  Their entire process is

24   secret.  I made no submission.  Everything was

25   done -- anything that I submitted was after the prize

HIGHLY CONFIDENTIAL

Page 161

```
 1    was awarded.  So I'm not sure that's what you mean
 2    by -- you know, I didn't apply for a Nobel Prize.
 3    Q.      I think you refer to the first document, the
 4    longest thing that you wrote, was a history; is that
 5    correct?
 6    A.      I wrote a history.  I wrote -- you know, so,
 7    again, I wrote a biographical piece and a piece about
 8    the research.  And I wrote those myself.
 9    Q.      Okay.  For your -- for your piece about the
10    research, did it include any sort of calculations
11    within it?
12    A.      Numerical calculations, no.
13    Q.      Okay.  And did your piece about the research
14    include detailed methodology of how you were coming
15    to your conclusions?
16            MR. EWALT:  Objection to form.
17            THE WITNESS:  Reasonably detailed.  It's
18    less -- it was intended for public consumption, so
19    less detailed than the papers themselves.  But it --
20    more than anything else, it was the thread, it was
21    the themes that I worked on and how they evolved and
22    why those questions were open questions at the time
23    and how I resolved them.  But not in the same level
24    of detail as a research paper.
25            ///
```

HIGHLY CONFIDENTIAL

Page 162

BY MS. ABSTON:

Q.        Was that methodology that you detailed in
your writings --

A.        Okay.  I'm sorry.

Q.        -- dissimilar from what your methodology is
in their July 30th report?

A.        "In their July 30th" -- what --

Q.        In your July 30th report.

MR. EWALT:  Objection to form.

THE WITNESS:  Is it dissimilar?

MS. ABSTON:  Yes.

THE WITNESS:  That is in terms of the level
of detail and the nature of the argumentation,
there's a lot of similarity, I would say.

BY MS. ABSTON:

Q.        Did you have any assumptions that were
within your writing that you sent to those selecting
the Nobel?

A.        Oh, I'm sorry.

Did I have any assumptions in my -- so --
yeah, assumptions are stated, you know, along with
the conclusions that come from them.  So yes.

Q.        Okay.  And how did you confirm your
assumptions were accurate?

A.        So in economic theory, confirming your

HIGHLY CONFIDENTIAL

Page 163

```
 1    assumptions are accurate is -- it's not the same
 2    procedure as -- as here.  Often the point of -- of an
 3    economic -- of a work in economic theory is to
 4    isolate an effect.  And when you're isolating an
 5    effect, you make an assumption that other effects are
 6    absent, and you don't confirm that those are correct
 7    because they are generally not correct.
 8              Rather, I might want to know whether, for
 9    example, that what we call the -- I could -- it's
10    very difficult to go through examples briefly here in
11    this, given the length of time.
12              But whether -- I might assume in economic
13    theory that some market is perfectly competitive and
14    ask what effect taxes would have, even though markets
15    are not generally perfectly competitive, and then
16    adjustments are made after the fact.
17              So we don't -- we don't make assumptions and
18    then confirm them in general published economic
19    theory.  It's a different process.
20    Q.        And were you asked to write a lecture
21    relating to your Nobel?
22    A.        I think I was, actually, now that you
23    mention it.
24              MS. ABSTON:  Okay.  I'm going to mark this,
25    I think, as Exhibit 5.
```

HIGHLY CONFIDENTIAL

Page 164

1          I'm going to hand you what appears to be

2     your prize lecture from December 7th, 2020.

3                         (Exhibit No. 5 was marked.)

4     BY MS. ABSTON:

5     Q.       Can you look at that and see if you

6     recognize that document?

7     A.       Yes, it's called "The Prize Lecture."

8     Q.       And this is different from the piece that

9     you were asked to write about your research; correct?

10    A.       That's all --

11    Q.       And this is Tab M-29.  Sorry.

12    A.       There we go.  Look at that.  This may

13    actually be -- let's see.

14    Q.       You can see here that the title is "Auctions

15    Research Evolving:  Theorems and Market Designs."

16             Do you see that?

17    A.       Yes.  Right.  And you'll notice the

18    asterisked footnote that this isn't exactly the

19    lecture I delivered.  This is the paper that expands

20    on my lecture that I had delivered during the Nobel

21    Prize week.

22    Q.       Okay.  Do you believe this may be the piece

23    you were asked about, to write about your research?

24    A.       Yes, I think this may be the piece that --

25    after I expanded on the lecture, it may be that

HIGHLY CONFIDENTIAL

Page 165

1    piece.

2    Q.        Okay.  And you created this document in its

3    entirety; is that correct?

4    A.        I did, yes.  As it explains at the bottom, I

5    think Andrew Vogt, Martin Bichler, and Gregor Schwarz

6    for comments and suggestions.  I shared a draft with

7    them and got collegial comments.

8              MS. ABSTON:  And I think the reporter wants

9    to make sure we have marked this as Exhibit 5.

10   Q.        And so what aspects of this prize lecture

11   are incorporated into your July 30th Eastern District

12   of Texas report?

13   A.        I would need to reread the entire lecture to

14   do that.  I think this is about everything that I did

15   that led to my prize.  And creating a mapping is not

16   something -- between this and my July report is not

17   something I can do offline in a few moments.

18   Q.        Okay.  But there's aspects of your Nobel

19   Prize lecture that are incorporated into how you form

20   your opinions in your July 30th report here?

21   A.        Yes.  Yes.

22   Q.        Okay.  And when you gave your lecture, I

23   believe you stated in December 2020, did Professor

24   Wilson also give a lecture?

25   A.        Professor Wilson also gave a lecture, yes.

HIGHLY CONFIDENTIAL

Page 166

1    Q.        Okay.  Did you both talk about the same

2    subject matter of winning the Nobel Prize?

3    A.        Well, in that sense, that it was both about

4    winning the Nobel Prize, he talked about his

5    research; I talked about my research.  These are

6    largely about the research that we did.

7              What was in common between us was that we

8    both worked on the 1993/94 US FCC spectrum auctions,

9    and that we worked on some of the same topics.  My

10   early research was an offshoot of his research.  So

11   we would have spoken about different things in his

12   lecture and my lecture.

13   Q.        Did you review his lecture before he gave

14   it?

15   A.        Did I what?

16   Q.        Did you review your lecture before he gave

17   it?

18   A.        No.

19   Q.        Did he review your lecture before you gave

20   it?

21   A.        No.

22             MS. ABSTON:  Okay.  I think we might be at a

23   stopping point for lunch, if we want to go off the

24   record.

25             THE VIDEOGRAPHER:  The time is 12:48 p.m.

HIGHLY CONFIDENTIAL

Page 167

1      Pacific Time.  We are going off the record.

2                (Lunch recess taken at 12:48 p.m.)

3                        --o0o--

HIGHLY CONFIDENTIAL

Page 168

1    AFTERNOON SESSION                                1:36 P.M.

2                        --o0o--

3            THE VIDEOGRAPHER:  The time is 1:36 p.m.

4    Pacific Time.  We are back on the record.

5    BY MS. ABSTON:

6    Q.        Okay, Dr. Milgrom.  Before we took a break,

7    we were talking about 2020, when you won your Nobel

8    Prize.

9            Do you recall that?

10   A.        I do.

11   Q.        And before we got back into things, did you

12   speak with counsel over the lunch break?

13   A.        I spoke just to chat.

14   Q.        And did you talk about the content of your

15   testimony today?

16   A.        No.

17            MR. EWALT:  I'm going to --

18            THE WITNESS:  Sorry.

19   BY MS. ABSTON:

20   Q.        And we're going to try to slow it down so

21   that Sandy doesn't kill us.

22   A.        Okay.  I will slow it down.

23   Q.        I want to talk to you about the additional

24   times that you have been retained by Google to offer

25   your expert testimony.

Page 169

1    A.        Okay.

2    Q.        And so we've mentioned these two already

3    today, but just so that the record is clear, we've

4    looked at Exhibit 1, which has your testimony

5    history, right, and we have talked about one matter

6    at No. 5, which was Bid for Position vs. Google.

7    A.        Yes.

8              MR. EWALT:  Objection to form.

9    BY MS. ABSTON:

10   Q.        Is that correct?

11             MR. EWALT:  Objection to form.

12             THE WITNESS:  Let's take a look at -- where

13   is it?

14   BY MS. ABSTON:

15   Q.        On page 472 of Exhibit 1.

16   A.        I'm looking in the wrong place.

17             Page 472, it's the last page, right?

18   Q.        Yes.

19   A.        Okay.  What are we looking at now?

20   Q.        I believe we have covered testifying

21   today -- scratch -- strike that.

22             During your testimony today, you discussed a

23   case when you were retained by Google that was Bid

24   for Position vs. Google, No. 5 on your --

25   A.        Yep.

HIGHLY CONFIDENTIAL

Page 170

1    Q.        -- list.  Is that correct?

2    A.        Yeah, we have talked about that.

3    Q.        And then the second time you were retained

4    by Google to offer expert testimony was No. 8 on this

5    list, Rick Woods v. Google.

6              Do you see that?

7    A.        Yes.  It was Rick Woods v. Google at that

8    time, yes.

9    Q.        Okay.  And both of those last dates, that we

10   were able to previously discuss some date ranges; is

11   that correct?

12   A.        We have, yes.

13   Q.        Are you able to clarify any -- any more on

14   the potential dates for those matters?

15   A.        No, I haven't looked at them.  Yeah.

16   Q.        So if we look at No. 9 on this list, on

17   Exhibit 1, that appears to be what we have

18   established and agreed upon very early on in your

19   testimony today what we call "the DOJ case."  Does

20   that -- is that correct?

21   A.        Yes.  Yes.

22   Q.        Okay.  So it's United States, et al., vs.

23   Google, and it's -- there's a date of January 2024.

24   Do you see that?

25   A.        Uh-huh.

HIGHLY CONFIDENTIAL

Page 171

1    Q.        Okay.  And for the January 2024 date, was

2    that the date that you were retained by Google?

3    A.        I don't recall.

4    Q.        Okay.  So for this list, when you have dates

5    that appear next to these case captions, is that your

6    retention date?

7    A.        Good question about how I create it.  My

8    recollection of how I created it was searching for

9    invoices.  I haven't done a lot of expert witness

10   testimony, and I wanted to figure out which cases I

11   had testified in, so I did a bunch of searching

12   through invoices.

13            It's possible that that's the first invoice

14   that went out that was related to this case.  So that

15   may be what it's there about.

16   Q.        Well, were -- because you -- okay.  Strike

17   that.

18   A.        So that would correspond to your conjecture.

19   Q.        What's your understanding of the relevant

20   claims at issue in the DOJ trial?

21   A.        They're primarily anti-monopolization

22   claims.

23   Q.        Okay.  And have you reviewed anything

24   related to the DOJ trial since you testified in

25   Virginia?

Page 172

```
 1    A.        Since I testified in Virginia?  No, not
 2    anything specifically.  Let me just make sure that's
 3    true.
 4              I don't believe I have looked at anything
 5    specifically about the DOJ trial, no.
 6    Q.        And have you been keeping up with any news
 7    sources reporting on the DOJ trial?
 8    A.        I have looked at some news sources that
 9    appeared immediately after my testimony.
10    Q.        Okay.  And which news sources was that --
11    did you look at?
12    A.        Oh, these were things that were stuck in
13    front of me.  So I wasn't actually searching for news
14    sources.  There was somebody who had something -- I
15    guess there's a blog or a website, something called
16    "Big Tech on Trial."
17              And then my partner, Silvia, managed to get
18    some interviews that -- well, she's -- does the
19    marketing for Auctionomics, and it showed the
20    interviews.
21    Q.        And to your knowledge, have any of your
22    opinions been excluded in the DOJ trial?
23    A.        To my knowledge, no.
24    Q.        Have -- to your knowledge, have any of your
25    opinions been limited in the DOJ trial?
```

HIGHLY CONFIDENTIAL

Page 173

```
 1   A.        I have not seen anything about that, no.
 2   Q.        Okay.  Were there any motions in limine
 3   relating to your testimony in this DOJ trial?
 4   A.        Any motions what?
 5   Q.        Were there any motions in limine that you
 6   are aware of that were relating to your testimony in
 7   the DOJ trial?
 8   A.        Motions in limine, is that what you said?
 9   Q.        Yes.
10   A.        What's that mean?  I don't know what that
11   means.
12   Q.        Have you reviewed any trial transcripts from
13   the DOJ trial?
14   A.        I have not.  Not subsequent to my testimony.
15   Q.        Prior to your DOJ trial testimony, did you
16   review any trial transcripts?
17   A.        I looked at a little bit.  Yeah.
18   Q.        Do you recall which trial transcripts you
19   reviewed prior to your DOJ trial testimony?
20   A.        Yeah, I think -- gosh, it's -- this is all
21   that was -- it was all crammed together.  But I think
22   I looked at ███████████████████████, who
23   was -- added some detail that I hadn't heard before,
24   and I think I looked at that.  That's all I remember,
25   as I sit here.
```

Page 174

1    Q.      Do you recall which case you began working

2    on first?  Was it the DOJ trial or the Eastern

3    District of Texas case?

4    A.      I think the first complaint I saw was the

5    Texas case.

6    Q.      Okay.  And that's the one that we've

7    established was in 2020 at some point; is that

8    correct?

9           MR. EWALT:  Objection to form.

10          THE WITNESS:  No.  I don't think so.

11   This -- we're talking about this -- this case?

12   BY MS. ABSTON:

13   Q.      Yes.

14          Do you have a date that you believe you

15   first saw the complaint for this case, for the

16   Eastern District of Texas?

17   A.      I don't have a date in mind, but I don't

18   think it was as early as 2020, no.  I don't think so,

19   anyway.

20   Q.      Okay.  I will represent to you that this

21   case was filed in 2020 --

22   A.      Yeah.

23   Q.      -- for the first complaint.  And then I

24   believe, as you discussed earlier today, there were

25   other amended versions of the complaint that you may

HIGHLY CONFIDENTIAL

Page 175

1    have seen; is that correct?

2    A.      Yeah, I remember that.  I think it was the

3    fourth version that I saw, yeah.

4    Q.      So I think you're referencing the Fourth

5    Amended Complaint, which I believe is May 2023.  But

6    we will get into that a little bit later.

7            So -- but are you able to recall when the

8    DOJ complaint was filed?

9    A.      I don't recall.

10   Q.      Okay.  Do you recall which one -- so, strike

11   that.

12           Do you recall which complaint you saw first,

13   as we sit here today?

14   A.      Yeah, I believe that I saw the Texas

15   complaint first.

16   Q.      Okay.  And once you saw the complaint, did

17   you immediately begin working on your report for the

18   Eastern District of Texas case?

19   A.      No.

20   Q.      Okay.  Were you retained and then

21   immediately given the Eastern District of Texas

22   complaint?

23   A.      Well, again, my best recollection -- I mean,

24   I'd be constructing this.  I'm not sure I can give

25   you reliable testimony on the process of how that --

HIGHLY CONFIDENTIAL

Page 176

1    of how that happened.

2    Q.        Okay.  So you're unclear, as you sit here

3    today, on if you were -- when you were given the

4    Eastern District of Texas complaint?

5    A.        I would think that in my best

6    recollection -- and this is partly based on what my

7    ordinary process would be, which I'm going to assume

8    that I followed, since I don't recall exactly.

9            But on what my ordinary process would be is,

10   let's see what this complaint is and see if it's in

11   my -- if it's consistent with my expertise.  Let's

12   make sure it's not creating any conflicts for me.

13   And that I would have looked at that before I ever

14   had a contract.

15           That's my -- that's what I believe I would

16   have done.  That's what I would normally expect

17   myself to do.  And so I'm going to -- and so this

18   isn't exactly a recollection.  But if I was trying to

19   reconstruct what happened, that would be my best

20   reconstruction.

21   Q.        Okay.  And do you recall testifying that you

22   began working on the DOJ matter in January 2023?

23   A.        I think that's when I began testifying in --

24   let's see.  The DOJ matter in January 2023.  Did I

25   testify that?  Again, I'm construct -- dates -- I'm

Page 177

1    having trouble with dates here today.

2    Q.        Do you have any reason to dispute that you

3    began working on the DOJ case in January 2023?

4    A.        Well, I'm -- as I look at Item 9 here, it's

5    got a date of January 2024 on it, which is

6    probably -- probably related to the first billing

7    date, or something.

8            I'm sorry, I -- I don't have --

9    Q.        We can pull it out --

10    A.        -- any reason -- I -- you know, I'm sorry.

11    I can't do this from memory.

12            MS. ABSTON:  Okay.  So let's pull -- let's

13    go ahead and get out M-8, which we're going to mark

14    as Exhibit 6.  Hold on one second.

15                    (Exhibit No. 6 was marked.)

16    BY MS. ABSTON:

17    Q.        Okay.  I am handing you what is marked as

18    Exhibit 6.

19    A.        Sounds right, yeah.

20    Q.        This is your March 4th, 2024, DOJ deposition

21    transcript.

22    A.        Oh, I see.  Okay.  Thank you.

23    Q.        Have you reviewed this previously?

24    A.        My deposition transcript.  Just for

25    accuracy, yes, I have reviewed it immediately after

Page 178

1    the deposition.

2    Q.        Okay.  And if you flip to --

3    A.        This is March 2024.  Okay.

4    Q.        Yes.  So, yeah, to orient us -- and we can

5    walk back a little bit to when you -- I believe --

6    well, strike that.

7            So if we look at page 86, I believe you're

8    asked, "When did you first start working on this

9    matter?" on line 7.

10   A.        Okay.  Hold on.

11   Q.        Let me know when you're there.

12   A.        86, line 7.

13   Q.        Do you see that?

14   A.        Okay.  Yeah, around January 2023, it says.

15   Okay.

16   Q.        Yeah.  And so you answer on line 9, "I think

17   this is around January 2023.  Isn't that when the

18   complaint was filed?  I think about that."

19           Do you see that?

20   A.        Yeah, I see that.

21   Q.        So does this refresh your recollection on

22   when you began working on the DOJ case?

23   A.        It refreshes what I -- yeah, it refreshes

24   what I said, anyway, and I trust my --

25   Q.        Okay.

Page 179

1    A.       Yep.

2    Q.       So in January 2023, we've established the

3    DOJ complaint was filed, and you were retained by

4    Google to offer expert testimony in the DOJ case.

5    A.       Okay.

6    Q.       Is that correct?

7    A.       Yes.

8    Q.       Okay.  And so when you began -- did you

9    begin working on your report immediately in January

10   2023, when you were retained?

11   A.       I don't recall when I began working on my

12   report or how much time I spent at the beginning.  I

13   think probably the first thing we would have done was

14   assemble a team.

15   Q.       Okay.  Do you recall when you assembled a

16   team for the DOJ matter?

17   A.       I don't recall.  But it likely wouldn't have

18   taken long.

19   Q.       And so do you recall when you signed a

20   protective order in relation to the DOJ case?

21   A.       I don't recall.

22   Q.       Okay.  And do you recall when you were given

23   an assignment in the DOJ case?

24   A.       I don't remember dates, no.  Sorry.

25            MS. ABSTON:  Okay.  So let's go ahead and

HIGHLY CONFIDENTIAL

Page 180

1    see if this helps.  We're going to pull out M-6,

2    which we're going to mark as Exhibit 7.

3                        (Exhibit No. 7 was marked.)

4              MS. ABSTON:  So I am going to hand you M-6,

5    which we're going to mark as Exhibit 7.

6    BY MS. ABSTON:

7    Q.        And can you read that first page for me

8    here?

9    A.        This one is for me, and I will get a marking

10   on it?

11   Q.        Yes.

12   A.        And you want me to read what?

13   Q.        I just -- do you recognize that this -- on

14   the first page is your January 23rd, 2024, DOJ expert

15   report?

16   A.        Yes, that's right.  It is.

17   Q.        And can you flip to the back and make sure

18   that it includes all of the related appendices.

19   A.        It looks like it goes all the way to the

20   end.

21   Q.        Okay.  I think the last page should have a

22   Bates number at the bottom right-hand corner that

23   ends in -2190.

24             Do you see that?

25   A.        Yes, I see that.

HIGHLY CONFIDENTIAL

Page 181

1    Q.       Okay.  And so I believe your signature is on

2    the page that ends in the Bates No. -22158.

3    A.       There it is.

4    Q.       Okay.  And you recognize that as your

5    signature?

6    A.       That's one version of my signature, yes.

7    Q.       Okay.  So that -- that should help us a

8    little bit with the timeline here.

9             So you were retained in the DOJ matter in

10   January 2023.

11   A.       Uh-huh.

12   Q.       You issued a report in -- on January 23rd,

13   2024.

14   A.       Okay.

15   Q.       Is that correct?

16   A.       It looks that way.

17   Q.       Okay.  So this was approximately six months

18   before you issued your expert report here in this

19   case?

20            Does that sound correct?

21   A.       Approximately.

22   Q.       Okay.

23   A.       I don't have those dates either.

24   Q.       Okay.  And when was the last time you've

25   seen a copy of your DOJ case expert report that we

Page 182

1    have marked as Exhibit 7?

2              MR. EWALT:  I'm going to object and instruct

3    you not to answer to the extent that it reveals

4    contents of communications with counsel.

5              THE WITNESS:  Okay.

6              MR. EWALT:  To the extent that you can

7    answer without revealing communications, you should

8    answer.

9              THE WITNESS:  Okay.  So there's one sitting

10   on my desk at home.

11             MS. ABSTON:  Okay.

12             THE WITNESS:  I've probably seen it -- at

13   least the cover I've seen every day sitting there.

14             MS. ABSTON:  Okay.  Okay.

15   BY MS. ABSTON:

16   Q.        So fairly recently you've reviewed your

17   expert report issued in the DOJ case?

18   A.        It sits there on my desk at home.  Okay.

19   Yep.

20   Q.        Okay.  Okay.  And did you review your DOJ

21   case report while preparing for this deposition

22   today?

23   A.        No.

24   Q.        And did you review your DOG -- DOJ case

25   report, expert report, while drafting your expert

HIGHLY CONFIDENTIAL

Page 183

1    report in this matter?

2    A.        Yes.

3    Q.        Okay.  And for what purpose did you review

4    your -- what we have marked as Exhibit 7, your DOJ

5    case expert report?

6    A.        Much of the narrative is the same.  The part

7    of what is in this report is an account of what the

8    programs are and what their -- what purposes they

9    serve and -- except where I had -- well, that's why.

10   Q.        Do you recall if you made any changes in

11   between your DOJ report and the report you issued

12   here in this case?

13             MR. EWALT:  Objection to form.

14             THE WITNESS:  There was some change -- the

15   reports are not identical.  Of course there are

16   changes, yeah.

17   BY MS. ABSTON:

18   Q.        Do you recall any changes as you sit here

19   today?

20   A.        Well, essentially all of the allegations

21   are -- are slightly different, and the words that are

22   used in -- in the complaints that I'm responding to

23   are different, and the responses are tailored to the

24   words of the complaint.  So all of that material --

25   the largest changes are all of that material.

HIGHLY CONFIDENTIAL

Page 184

1    Q.       And how much time did you spend preparing

2    your expert report in the DOJ case?

3    A.       Oh, it's so long ago now.

4    Q.       Well, if you -- maybe this will help.  I'm

5    happy to ask a cleaner question.

6    A.       Yeah.

7    Q.       So if you began -- strike that.

8             If you were retained in January of 2023 and

9    you issued your report in January of 2024, how many

10   hours do you estimate that you spent within the span

11   of a little over a year working on your DOJ case

12   expert report?

13   A.       Oh, I'm going to say, you know, 500, 400.  I

14   don't know, something -- probably something in that

15   range.

16   Q.       Okay.

17   A.       I would -- that's an estimate.

18   Q.       Okay.  And did you spend 300 -- or 500 or

19   400 hours preparing for your Eastern District of

20   Texas expert report?

21   A.       No.

22   Q.       How many hours do you think you spent

23   drafting your Eastern District of Texas expert

24   report?

25   A.       Maybe -- so this -- I'm going to -- if I had

HIGHLY CONFIDENTIAL

Page 185

1    to make a very rough estimate, is that okay?  Because

2    all I can do is make a very rough estimate.  Maybe in

3    the neighborhood of 200.

4    Q.      Okay.  So you spent more time preparing your

5    expert report in the DOJ matter than you did in the

6    Eastern District of Texas matter?

7    A.      Much of the material was reused, as you --

8    as you can see when you compare the reports.

9    Q.      Okay.  And what is your standard hourly

10   rate?

11   A.      It's $1,800.

12   Q.      And has that rate changed in between issuing

13   your DOJ expert report and the expert report here in

14   this case?

15   A.      No.

16   Q.      Since you've issued your Eastern District of

17   Texas expert report this year, has your rate changed?

18   A.      No.

19   Q.      Okay.  Do you know how much Google was

20   charged for your time spent preparing your expert

21   report in the DOJ case?

22   A.      At the rate I've just described.  So however

23   many hours I had times that rate would give the

24   answer.

25   Q.      Do you have an estimate of how much?

HIGHLY CONFIDENTIAL

Page 186

1  A.        Well, if it was -- if it was 500 hours, then

2  it would be $900,000, just doing the arithmetic.

3  Q.        And does that include the number of hours

4  that you testified when you were on the stand?

5  A.        Oh, no.  I think -- does it include that?

6  That was -- that was in preparing the report, I think

7  you asked.

8            And then I, you know, was several days in --

9  in Virginia, and I don't recall exactly what the

10 billing was.  But if I was eight hours a day for five

11 days, say it was 40 hours, just to make up a number,

12 roughly.

13 Q.        So by the time you issued your DOJ expert

14 report in January 2024, you had put in about 500

15 hours, which would equate to approximately $900,000;

16 is that correct?

17 A.        That's an estimate, yeah.

18 Q.        Okay.  And then how many hours did your

19 Auctionomics team spend preparing your DOJ report?

20            MR. EWALT:  Objection to form.

21            THE WITNESS:  I've never seen that

22 information.

23 BY MS. ABSTON:

24 Q.        Okay.  Do you -- okay.

25            And was the fee agreement -- strike that.

HIGHLY CONFIDENTIAL

Page 187

1          Was your financial arrangement in the DOJ

2    case different than your financial arrangement here

3    in the Eastern District of Texas case?

4    A.        No.

5    Q.        Okay.

6    A.        Well, I take that back.  Let me -- it's of

7    the same form.  Obviously they are two different

8    agreements, but the form was the same.

9    Q.        Okay.  Are there -- but there are

10   differences in between your DOJ case financial

11   arrangement versus your Eastern District of Texas

12   financial arrangement?

13   A.        They are different documents.  My -- my rate

14   is the same.  The -- and I'm not -- I think the

15   charges that Google may have varied over time.  I

16   don't -- you know, I don't really handle that side of

17   our business; my partner takes care of the business

18   side.  So I don't really have that information.

19   Q.        Okay.  So you're not aware of how much money

20   Auctionomics has received for their team's work on

21   the DOJ report?

22          MR. EWALT:  Objection to form.

23          THE WITNESS:  I'm not aware.  You know, I

24   only have the -- you know, I don't know how much they

25   have received for the DOJ report.

HIGHLY CONFIDENTIAL

Page 188

1    BY MS. ABSTON:

2    Q.      Do you have an estimate?

3    A.      Okay.  We're talking about the DOJ report

4    again --

5    Q.      Yes.

6    A.      -- for the period up till -- I think I

7    estimated some number in the -- in my deposition.  I

8    think it was -- you know, it's some single-digit

9    millions number.  But more than 5 million, less than

10   10 million, somewhere in there.

11   Q.      Okay.  I will get to that a little bit

12   later.

13           Okay.  So we've talked a lot about

14   Auctionomics today, and we've discussed how

15   Auctionomics has assisted you with the matters you've

16   been retained in from Google.

17   A.      Yep.

18   Q.      And this -- the Google cases have been

19   Auctionomics' big project since you've been retained

20   as an expert witness; is that correct?

21   A.      Yes.

22   Q.      Okay.  And so when we're looking at your DOJ

23   case report, did you create your report in the

24   entirety?  Yourself.

25   A.      Yeah, I created it with assistance, as

HIGHLY CONFIDENTIAL

Page 189

1    usual.

2    Q.       Okay.  So no aspect of your DOJ case expert

3    report was given to you?

4    A.       No, no.  I got it -- I directed the -- I

5    either wrote or directed everything that's in there.

6    Q.       Okay.  And who assisted you from

7    Auctionomics on the DOJ case expert report?

8    A.       It's mostly the same group that I described

9    to you.  I think -- let's see.  Eric Tang was there,

10   and I think was not involved in the Texas case, was

11   on the DOJ case.  But other than that, I think the

12   group is the same group of people that I've already

13   listed.

14   Q.       Okay.  And in your report -- I believe it's

15   in paragraph 13, if we want to flip there -- you

16   discuss your DOJ rate of compensation; is that

17   correct?

18   A.       Let's find out.  Where's paragraph -- oh,

19   here it is.  And it continues.

20            Yes.

21   Q.       And in that section you say, "I receive

22   additional compensation based on the profits of

23   Auctionomics, Inc." --

24   A.       Yes.

25   Q.       -- "which has in this matter provided

HIGHLY CONFIDENTIAL

Page 190

1    research support and assisted in the preparation of

2    this report under my direction and supervision."

3              Do you see that?

4    A.        Yep, I do.

5    Q.        Okay.  So as you sit here today, you're not

6    able to give me an estimate of how many hours the

7    Auctionomics team has spent assisting in the

8    preparation of your DOJ expert report?

9    A.        No.  And I actually have never seen those

10   numbers.

11   Q.        So there's portions of your DOJ expert

12   report that you did not write yourself, but you

13   merely directed?

14             MR. EWALT:  Objection to form.

15             THE WITNESS:  I was assisted in -- this is

16   the same -- you know, there are portions of my DOJ

17   report in which the -- in which I was assisted in the

18   writing.

19   BY MS. ABSTON:

20   Q.        Did you submit any erratas to your report

21   after it was submitted on January 23rd, 2024?

22   A.        I don't believe so, no.

23   Q.        Did you submit any other reports in the DOJ

24   case?

25   A.        I don't believe so, no.

HIGHLY CONFIDENTIAL

Page 191

1    Q.       Okay.  Did you submit any other declarations

2    in the DOJ case?

3    A.       No.

4    Q.       Okay.  Did you submit any other sorts of

5    amendments to your report in the DOJ case?

6    A.       I don't believe so, no.

7    Q.       Okay.  Is it fair to say that we've got --

8    Exhibit 7, your DOJ expert report, includes all of

9    your opinions that you offered in the DOJ case?

10   A.       Well, and whatever I said on the stand,

11   whatever I said in deposition, these are -- this is

12   what I prepared in my report.

13   Q.       Okay.  And is it fair to say that everything

14   in Exhibit 7 includes all the bases of your opinions

15   that you offered in the DOJ case?

16   A.       Everything that's in here has the bases.

17            When I was testifying in Virginia, I was

18   also responding to what others have said.  So there

19   may have been some details that differed.

20   Q.       And is it fair to say that everything in

21   Exhibit 7 includes all the materials you relied upon

22   in order to form your opinions that you offered in

23   the DOJ case?

24   A.       That I offered in this report.  Again,

25   the -- what -- when I gave my testimony, I was also

Page 192

1   relying on what I heard at trial.

2   Q.      Did you ever supplement your materials

3   relied upon list prior to the DOJ trial?

4   A.      Prior to the DOJ trial, I did not, no.

5   Q.      Okay.  Did you -- after issuing your report

6   on January 23rd, 2024, did you review any additional

7   materials that you relied upon in order to form your

8   opinions that you testified to at trial?

9   A.      I'm sorry.  That was too fast.  Say it

10  again?

11  Q.      That's okay.

12  A.      Yep.

13  Q.      After issuing your report on January 23rd,

14  2024, did you review any additional materials that

15  you then relied upon in order to form your opinions

16  that you testified to at trial?

17          MR. EWALT:  Objection, form.

18          THE WITNESS:  Documents that were -- yeah,

19  they related to documents that were used in court by

20  witnesses while I was watching -- while I was

21  watching the court.  I included and referred to those

22  in my trial testimony.

23  BY MS. ABSTON:

24  Q.      Okay.  So in between the time that you

25  issued your DOJ report, so January 23rd, 2024, and

HIGHLY CONFIDENTIAL

Page 193

1    the time that you were deposed in the DOJ case, do

2    you recall specifically what type of work you were

3    doing in furtherance of your opinions here in this

4    case?

5    A.        Here in this Texas case?

6    Q.        Uh-huh.

7    A.        What was I doing after I completed my

8    deposition?

9    Q.        Your expert -- well, let me -- let me ask it

10   this way.

11          Are you able to recall what work you

12   performed on your Eastern District of Texas expert

13   report from the time you issued your DOJ case expert

14   report on January 23rd, 2024, until you were deposed

15   in the DOJ case on March 4th, 2024?

16   A.        Well, the next thing that I recall us doing

17   was picking up, again, the Texas complaint.  And

18   whenever we got the Texas reports -- the dates are

19   all confused in my head.

20   Q.        Okay.  That's okay.

21   A.        But whenever I got the Texas reports,

22   reviewing them and arranging my report to respond to

23   the new materials that were coming in.

24   Q.        Okay.  So you don't recall doing any

25   specific Eastern District of Texas work prior to

Page 194

1    receiving the plaintiffs' expert reports?

2    A.        As I sit here, I do not recall anything

3    other than that.

4    Q.        So you spent January 23rd, 2024, until

5    March 4th, 2024, preparing for your DOJ case

6    deposition?

7                MR. EWALT:  Objection.  Form.

8                THE WITNESS:  I spent most of that time

9    doing my academic work, this period.  I wouldn't say

10   that I spent that time preparing.  The English is

11   ambiguous, and I think perhaps you mean that that

12   was -- it was during that time I was doing

13   preparation.  And if that's what you mean, then

14   during that time, I was doing preparation.  But I'm a

15   full-time professor at Stanford University, and

16   during that quarter I was teaching, and I would have

17   spent a great deal of time in the classroom and

18   working with my students.

19   BY MS. ABSTON:

20   Q.        Okay.  And looking back at Exhibit 6, which

21   is your March 4th, 2024, deposition transcript.

22   A.        All right.  You're going to highlight

23   something for me here?

24   Q.        Yes.  We will flip to it.  We've established

25   that you've previously seen this.

HIGHLY CONFIDENTIAL

Page 195

1           Do you recall if you had any errata to this
2     deposition transcript?
3     A.          There were some errata.  I imagine -- this
4     is after the errata?  Is that what this is, or this
5     is before errata?  This document that I'm looking at
6     now.
7     Q.          Did you submit any errata relating to your
8     deposition transcript in the DOJ case?
9     A.          Yes, there were some errata.
10    Q.          Were they substantive changes?
11    A.          I don't recall any substantive changes, no.
12    Q.          Let's look at page -- I believe it starts on
13    page 6.
14    A.          Is this --
15    Q.          Yes.
16    A.          This is the original before any errata, or
17    this is after the errata?  Or what is this that I'm
18    looking at here?
19    Q.          Okay.  We're going to double-check, but I
20    believe this is the original, pre-errata.
21    A.          Okay.
22    Q.          Okay.  Let's turn -- but for this purposes,
23    I'm just going to ask you some quick questions about
24    the deposition exhibit.
25    A.          Okay.

HIGHLY CONFIDENTIAL

Page 196

1    Q.        And so to the extent that anything I ask

2    you, you believe that you may need to see the errata

3    or see the deposition transcript that was issued

4    after your errata, just let me know, and we will put

5    on the record that you can do that.

6              So looking at page 6, do you see how it has

7    a list of the exhibits to this deposition?

8    A.        Page 6?  Oh, this exhibit.  Exhibit -- okay.

9    Emails from dah, dah, dah, dah, dah.  Okay.

10   Q.        Yeah.

11   A.        I see a list, yes.

12   Q.        Okay.  What I want to do now is just run

13   through these exhibits with you.

14             Do you recall testifying to these exhibits?

15   A.        There's an email string and Bates stamp.

16   That doesn't tell me a lot to help me remember, does

17   it?

18   Q.        No, but were you -- do you believe that you

19   were asked questions about these exhibits within your

20   March 4th, 2024, deposition?

21   A.        Quite possibly.  Let's see the exhibits and

22   see if they are familiar.

23   Q.        Okay.  Okay.  Let's first look at -- it's

24   M-9.  We're going to mark this as Exhibit 8.

25                       (Exhibit No. 8 was marked.)

Page 197

1    BY MS. ABSTON:

2    Q.        Do you recognize this document?

3    A.        Let me take a look at the document, please.

4    Q.        And if it helps, I'm not going to ask you

5    any specific questions about the document.  I'm just

6    wanting to know if the document was Exhibit 1 to your

7    deposition in March 4th, 2024 --

8    A.        Well, it's marked as "Exhibit 1."  So I'm

9    going to assume that that's marked correctly.

10   Q.        Okay.  And --

11   A.        It looks roughly, vaguely familiar.

12   Q.        Okay.  And you're referencing the deposition

13   exhibit sticker that's in the bottom right-hand

14   corner; is that correct?

15   A.        Yes, that's correct.

16   Q.        Okay.

17             MS. ABSTON:  I am now going to hand you

18   M-10, which is Exhibit 2 to your March 4th, 2024,

19   deposition.

20   BY MS. ABSTON:

21   Q.        Do you recognize this document?

22             THE REPORTER:  Is that Exhibit 9?

23             MS. ABSTON:  Yes.  We're going to mark this

24   as Exhibit 9.

25                        (Exhibit No. 9 was marked.)

Page 198

1              THE WITNESS:  Okay.  Let's see what it is.

2       BY MS. ABSTON:

3       Q.      Mr. Milgrom, I'm also just going to ask if

4       you recognize this document.

5              And do you --

6       A.      Okay.  Yeah.

7       Q.      Okay.  And you see the exhibit sticker at

8       the bottom right-hand corner?

9       A.      I do see the exhibit sticker, and I see what

10      it's about.  Yep.  Okay.

11      Q.      Okay.

12      A.      Yep.

13             MS. ABSTON:  I am going to hand you now

14      M-12, which we're going to mark as Exhibit 10.

15                          (Exhibit No. 10 was marked.)

16             MS. ABSTON:  Here we go.  I am going to mark

17      this as Exhibit 10.

18      Q.      This was the --

19      A.      You already marked this.  Okay.

20      Q.      Yes.  This is Exhibit 4 to your March 2024

21      DOJ deposition transcript.

22             Do you see that?

23      A.      The ██████████ declaration.

24      Q.      Yes.

25      A.      I remember this one.

Page 199

1    Q.       Okay.

2    A.       Right?

3    Q.       Yes.  And you recognize that this -- you

4    recognize this document?

5    A.       Yep.

6    Q.       Okay.

7    A.       I think so.

8            MS. ABSTON:  We are now going to mark

9    Exhibit 11.  This is M -- where are we here -- M-13.

10   This is the Milgrom 5, so the fifth exhibit to your

11   DOJ deposition.

12                    (Exhibit No. 11 was marked.)

13   BY MS. ABSTON:

14   Q.       Do you recognize this document?

15   A.       It's marked accordingly, and --

16   Q.       And you see the sticker?

17   A.       Yeah, I see the sticker.  That's what I mean

18   by "it's marked accordingly."

19   Q.       Okay.  Great.

20           MS. ABSTON:  And then we are going to look

21   at M-14, which we will mark as Exhibit 12.

22                    (Exhibit No. 12 was marked.)

23           THE WITNESS:  Are these M numbers -- am I

24   supposed to see these M numbers --

25           MS. ABSTON:  No need.  That's just an

Page 200

1    internal.  You are fine on that.

2    Q.       I am going to hand you what we are marking

3    as Exhibit 12.  This is Milgrom 6, so it's the sixth

4    deposition to your DOJ deposition.

5             Do you see that?

6    A.       It's marked that way.  Okay.

7    Q.       Okay.

8    A.       So we have got a bunch of exhibits.  Okay.

9    Q.       So we have got a bunch of exhibits.  So we

10   can actually set those aside for a minute.

11   A.       Okay.  Yeah.

12   Q.       And let's pull back out your transcript.

13   A.       Okay.

14   Q.       Or your -- let's see here.

15   A.       This one?

16   Q.       Your transcript and your DOJ expert report.

17   So it's going to be Exhibit 6 and Exhibit 7.

18   A.       Got 'em.

19   Q.       Okay.  You got those in front of you?

20   A.       Uh-huh.

21   Q.       And so I believe you previously discussed

22   that your hourly billable rate is $1,800; is that

23   correct?

24   A.       That's my hourly billing rate, yes.

25   Q.       And has this rate changed since you issued

HIGHLY CONFIDENTIAL

Page 201

1    your DOJ report on January 23rd, 2024?

2    A.       No.

3    Q.       And what was your rate prior to issuing this

4    report on January 23rd, 2024?

5            MR. EWALT:  Objection.  Form.

6            THE WITNESS:  What history -- how far back

7    do you want me to go in history here?

8            My rate became $1,800 after the Nobel Prize

9    announcement in 2020.

10   BY MS. ABSTON:

11   Q.       In 2020, prior to that announcement, what

12   was your hourly rate?

13   A.       $1,200.

14   Q.       Okay.  And your rates haven't fluctuated

15   since then?

16   A.       Never, no.

17   Q.       Okay.  So at the time you were deposed on

18   March 4th, 2024, in the DOJ matter, you had been

19   working on the DOJ case at that point for a little

20   over a year; is that right?

21   A.       It sounds that way, yeah.

22   Q.       Okay.  Do you recall testifying at your DOJ

23   deposition that at that point you had been paid

24   approximately $900,000 for your work?

25   A.       Okay.  If that's what I said, then that's

HIGHLY CONFIDENTIAL

Page 202

1    what I said.

2    Q.       Okay.  And do you recall testifying at your

3    March 4th, 2024, DOJ deposition that up until that

4    point, Auctionomics had billed Google $8 million for

5    those approximately 14 months?

6    A.       That, again, was a rough estimate --

7    Q.       Okay.

8    A.       -- but I would have estimated something in

9    that range.

10   Q.       And that $8 million number only included the

11   work of the Auctionomics team --

12           MR. EWALT:  Objection to form.

13   BY MS. ABSTON:

14   Q.       -- is that correct?

15           MR. EWALT:  Objection to form.

16           THE WITNESS:  Yeah, it did not -- it

17   included -- it did not include specifically my time,

18   which was billed separately.

19   BY MS. ABSTON:

20   Q.       So the date of your deposition, which was

21   March 4th, 2024, it appears you and Auctionomics had

22   completed at least a year of work resulting in just

23   shy of $9 million worth of payment; would that be

24   correct?

25           MR. EWALT:  Objection.  Form.

Page 203

1          THE WITNESS:  "Just shy" assumes a level of

2     precision that I wouldn't have built into that

3     statement.  But those numbers add up to just shy of

4     $9 million.

5     BY MS. ABSTON:

6     Q.      And do you have an idea of how many hours

7     you worked on the DOJ case after March 4th, 2024,

8     when you were deposed?

9     A.      Well, let's see.  I didn't do much more

10    until I was preparing for testimony, and then I've

11    already told you, you know, a rough guess of how many

12    hours I spent when I was down in Virginia.  You know,

13    I don't know.  So probably the whole thing is going

14    to be in a range of 50 to 100 hours.

15    Q.      So between March 5th, 2024, until you

16    testified at trial in September 2024, probably --

17    A.      Yeah, sounds --

18    Q.      -- how many hours?

19    A.      I'm just guessing.  It's a guess for me.

20    Q.      Okay.

21    A.      This is -- yeah, it would be a guess, but

22    I've made that guess; 50 to a hundred, we'll say.

23    Q.      Okay.  And that's 50 to 100 hours that you

24    personally spent during that time period?

25    A.      Yeah, I would imagine, right.

HIGHLY CONFIDENTIAL

Page 204

1    Q.        Are you aware of how many hours Auctionomics

2    would have billed between March 5th, 2024, and the

3    time you testified at trial in September 2024?

4    A.        I have never seen any of the hourly charges

5    of any of the other members of the Auctionomics team.

6    I don't have any knowledge of that.

7    Q.        But you've received checks from Google for

8    that time period?

9              MR. EWALT:  Objection.  Form.

10             THE WITNESS:  Auctionomics has received

11   checks from Google during that time.

12   BY MS. ABSTON:

13   Q.        Do you have any idea how much money

14   Auctionomics has received for their work that

15   occurred after your deposition in the DOJ matter?

16   A.        No, I don't.  I don't.

17   Q.        Do you have an estimate of how much

18   Auctionomics has received from Google since

19   March 5th, 2024?

20   A.        How much Auctionomics has received.  In all

21   cases added up, is that what you're asking about now,

22   or are we still talking about the DOJ case?  Or

23   what's your question mean?

24   Q.        Do you have an estimate of how much

25   Auctionomics has received from Google since

HIGHLY CONFIDENTIAL

Page 205

1    March 5th, 2024?

2    A.        Since March 2024, payments from Google.  And

3    we're talking about timing of receipts or billing?

4    We're talking about receipts.

5    Q.        I'm happy to say --

6    A.        I don't know what --

7    Q.        Do you have an estimate of how much

8    Auctionomics has billed since March 5th, 2024?

9    A.        In total for all the cases that were -- that

10   involved them, and this includes -- you know, I don't

11   know.  I'm -- I'm going to guess, and I could be

12   quite off on this, but maybe $5 million or something.

13   Q.        Okay.  And as the chair of Auctionomics, are

14   you aware of how much Auctionomics has billed in the

15   DOJ case to date, in total?

16   A.        I'm not.

17   Q.        Okay.

18   A.        As the chair or in any other way, in either

19   function.

20   Q.        And you've testified today that you're a

21   professor at Stanford?

22   A.        I am, yes.

23   Q.        And what is your annual rate of compensation

24   at Stanford?

25   ■■■        ■■■■■■■■■■■■■■■■■■■■

HIGHLY CONFIDENTIAL

Page 206

1    Q.      Okay.  And are you expecting to earn more

2    from your litigation matters in 2024 than you did in

3    2023?

4              MR. EWALT:  Objection to form.

5              THE WITNESS:  I'm expecting -- so this is

6    first person singular?  Is that what you're asking?

7    BY MS. ABSTON:

8    Q.      Are you -- are you personally expecting to

9    earn more from your litigation matter in 2024 than

10   you did in 2023?

11   A.      No.

12   Q.      And if Auctionomics received 8 million, how

13   much more would you expect to earn from that?

14             MR. EWALT:  Objection.  Form.

15             THE WITNESS:  It depends on the -- it

16   depends on how much Auctionomics -- I realize this

17   probably sounds very strange, but this -- you know,

18   I'm a full-time professor.  Silvia runs the business.

19   Basically, once a year I go over accounts with her.

20   So I don't have a close estimate at all of what the

21   earnings will be.  You know, they -- so I don't

22   really have a good idea.

23   BY MS. ABSTON:

24   Q.      Okay.  Let's talk about when you started

25   reviewing the plaintiffs' expert reports here for

Page 207

1    this case in the Eastern District of Texas, okay?

2    A.        Okay.

3    Q.        So the Eastern District of Texas plaintiffs'

4    expert reports were issued on June 7th, 2024.

5              Does that sound familiar?

6    A.        I just don't remember dates.  I'm sorry.

7    Q.        But you did review the plaintiffs' expert

8    reports immediately when they were issued in the

9    Eastern District of Texas case?

10   A.        Oh, sure.  We only had a very limited time

11   to respond.  We -- you know, that was crash time.

12   Q.        Okay.  So what work did you do from

13   June 7th, 2024, when the plaintiffs' expert reports

14   were issued, until the time you issued your report on

15   July 30th, 2024, in that case?

16   A.        I reviewed the plaintiffs' reports, sketched

17   what the -- tried to isolate from them what the

18   claims were, sketched the responses to the claims,

19   specified analyses that needed to be done, asked the

20   team to assemble documents to support, you know, my

21   conclusions or inform my conclusions in case I was --

22   in case my guesses were wrong, which they weren't,

23   and then prepared the report itself.  It was crunch

24   time.

25   Q.        Do you recall who originally reached out to

Page 208

1    you about serving as an expert witness in the Eastern

2    District of Texas matter?

3    A.        Again, I'm pretty sure that the original

4    contact was through Silvia, not through me.  And --

5    and -- yeah.  So, no, it wasn't anybody who reached

6    out to me directly.

7    Q.        Okay.  So you're -- you're not aware if

8    there was an attorney who reached out to you about

9    serving as an expert witness in any sort of Google

10   litigation?

11   A.        So -- I would be guessing.  I think I

12   probably shouldn't guess.

13   Q.        Okay.  Do you recall who reached out to you

14   and retained you to be an expert witness in the

15   Google DOJ trial?

16   A.        No.  As I say, I mean, I think this is all

17   of one piece.  That is the -- I was made aware that

18   there were multiple closely related trials; that it

19   was about -- that they were looking for an expert to

20   comment on auction methods and the auction

21   procedures, and there were various claims being made

22   about them, and in a series of cases.

23   Q.        Okay.  And were you given a budget for your

24   Auctionomics team in any way?

25   A.        There were -- a contract was negotiated that

HIGHLY CONFIDENTIAL

Page 209

1    specified -- yeah, that specified limits on what

2    would be paid.

3    Q.        And what were those limitations?

4    A.        I don't recall.

5    Q.        Okay.  Do you recall when that contract was

6    signed?

7    A.        I think there's one every year.  I think

8    they renegotiate -- Silvia renegotiates this stuff

9    annually.

10   Q.        Okay.  Do you remember -- do you -- do you

11   recall anything else or any other aspects of the

12   contract, as you sit here today?

13   A.        I'm going to -- I think there were sort of

14   three pieces of the money.  There was the payment for

15   my hours, payment for the team, and it turns out in

16   this case that data is so huge that there's a

17   separate payment for data storage and processing.

18   Q.        Okay.

19   A.        That's the kind of detail that I remember.

20   Q.        And are you being compensated in the Eastern

21   District of Texas case based on your performance?

22   A.        No.

23   Q.        Are you being compensated in the Eastern

24   District of Texas case based on any sort of

25   contingency basis?

HIGHLY CONFIDENTIAL

Page 210

1    A.        No.

2    Q.        And are you eligible for any bonuses based

3    on your work in the Eastern District of Texas case?

4    A.        No.

5    Q.        Are any of your Auctionomics support team

6    members eligible for bonuses based on their work in

7    this case?

8    A.        Auctionomics pays bonuses based on the work

9    that the team does, whether it does good work.  It's

10   not contingent on any outcomes in the case.

11   Q.        Okay.  And you have submitted invoices for

12   your work conducted, leading up to the issuance of

13   your July 30th, 2024, Eastern District of Texas

14   report; is that correct?

15   A.        Yes.

16   Q.        Okay.  Do you know how many invoices that

17   you've submitted?

18   A.        They are submitted monthly.  We can count

19   the months and figure it out.  But -- and the -- and,

20   again, I believe that the invoices to Google are

21   combined, that is, the timesheet -- the timesheets

22   specify, at least for my time, I see my own time

23   sheets -- specifies what I was doing in each period.

24   But it's only one -- one invoice.  And it's monthly.

25   Q.        And since issuing your July 30th, 2024,

Page 211

1    Eastern District of Texas expert report, you're
2    unable, as you sit here today, to estimate how many
3    hours that you've spent continuing to work on Eastern
4    District of Texas-only-related review?
5              MR. EWALT:  Objection to form.
6              THE WITNESS:  Yes.  I'm unable to -- I'm
7    unable to make a reasonable estimate.
8    BY MS. ABSTON:
9    Q.        In what year did Auctionomics make the most
10   revenue, to your recollection?
11   A.        That would have been revenue from the --
12   associated with the C-band auction.  And that would
13   have been, you know, just before or maybe the --
14   maybe overlapping the same year as the -- as we began
15   this case.
16             We had a -- yeah, so I'm going to guess
17   2021, 2022, somewhere in there.
18   Q.        Okay.  But that was not on a Google-related
19   matter?
20   A.        No.
21   Q.        Okay.  Or that was related to a
22   Google-related project?
23   A.        No, no, not -- not related.  It was this
24   $85 billion auction for radio spectrum for 5G uses.
25   Q.        Okay.  And so in 2021 or 2022, they may have

HIGHLY CONFIDENTIAL

Page 212

1    had a couple what you deem big projects that they --

2    that Auctionomics was working on during that time?

3    A.        Just as we ended the C -- we began Google --

4    so, you know, they could have -- one could have ended

5    and the other begun in the same year, potentially.

6    I -- I -- I have no shortage of demand for my time,

7    and the one project ended and another began.  It

8    would be not unlikely that they were in the same

9    calendar year.

10    Q.        Okay.  Okay.  So we can set those exhibits

11    aside.  What I want to do is pull back out Exhibit 3,

12    which is your Appendix B to your Eastern District of

13    Texas report.

14    A.        It's here somewhere?

15    Q.        It is here somewhere.

16    A.        5, 7.

17    Q.        I'm going to ask you some questions about

18    the materials you relied upon to form your opinion.

19    A.        Are we talking about the exhibits now?  Is

20    that what we're talking about?

21    Q.        Yeah, it should be towards the beginning.

22    A.        Oh, there's 3.

23    Q.        There we go.

24    A.        Okay.  Here.  Oh, that exhibit.

25    Q.        Got that list in front of you?

HIGHLY CONFIDENTIAL

Page 213

1    A.       Yes.

2    Q.       Okay.  So at the top of this, it says,

3    "Appendix B."  It's your list of materials relied

4    upon.

5    A.       It does.

6    Q.       Okay.  So do you have any changes that you

7    want to make to this Appendix B, as you sit here

8    today?

9    A.       List of materials -- this is the list of

10   materials relied upon for my Texas report, right?  Is

11   that what we're looking at here?

12   Q.       Yes.  This is Appendix B to your July 30th,

13   2024, Eastern District of Texas report.

14   A.       So this is what I relied on for that report;

15   is that -- and so I have no reason to change it.

16   Q.       Okay.  So you've not reviewed any additional

17   materials that you would like to add to this list

18   since issuing your report on July 30th?

19   A.       The report -- this is a list of materials

20   relied on for that report.  Anything that I read

21   after that report, such as materials that came up

22   during the -- during the DOJ trial, won't be here and

23   weren't relied on for that report.

24   Q.       Okay.  Did you -- well, and so let's --

25   let's look at this.  Under section -- there's some

HIGHLY CONFIDENTIAL

Page 214

1    subsections here.  And looking at page 473 at the

2    bottom, we're looking at subsection A, it says,

3    "Complaint and expert reports."

4            Do you see that?

5    A.       Yes.

6    Q.       Well, and before we get there, did you

7    create this reliance list?

8    A.       With the assistance of -- of my team.  They

9    actually assembled it for me.

10   Q.       Okay.  And so --

11   A.       Pulled everything out of all the footnotes

12   and all of the materials that I had used and -- and

13   created this.

14   Q.       Okay.  And did you review it before it was

15   submitted with your report?

16   A.       I reviewed it -- I reviewed my entire

17   report.

18   Q.       Okay.  And if you have any updates to this

19   reliance list prior to trial, we would ask that

20   counsel please provide us with an updated copy of

21   this list.  Can we agree to that?

22   A.       I'm a little confused by this line of

23   questioning.  This is about what I relied on for a

24   report that I submitted last summer.  I don't

25   understand the questions about how what I read after

HIGHLY CONFIDENTIAL

Page 215

1   that could have been relied on for the report I

2   submitted last summer.  I'm a little mixed up by the

3   question.

4   Q.       Okay.  We will keep moving on.

5            So -- but you -- right.  Because you

6   reviewed materials that you considered, but you

7   didn't rely upon in forming your opinions in this

8   report?

9            MR. EWALT:  Objection.  Form.

10           THE WITNESS:  That's not the because.  I

11  mean, the because I -- other things that I -- more

12  materials were shown -- were shown at the -- produced

13  by the DOJ's experts and produced in trial that I

14  have seen since the preparation of this report.

15  BY MS. ABSTON:

16  Q.       Okay.  Well, did you review any of the

17  plaintiffs' expert rebuttal reports that were issued

18  in this case?

19  A.       Yes.

20  Q.       Okay.  Did you review all 11 plaintiffs'

21  expert rebuttal reports that were issued in this case

22  in September?

23  A.       Yeah, well, with a generous definition of

24  reviewed, yes.

25  Q.       Okay.  But this one only contains the

HIGHLY CONFIDENTIAL

Page 216

1    plaintiffs' expert reports that you reviewed in

2    preparation for issuing your July 30th, 2024 report;

3    correct?

4    A.        Yes.  This was issued --

5    Q.        Okay.

6    A.        -- July 30th, 2024, and can't reflect

7    anything that I did after that time.

8    Q.        Okay.  And, again, this list does not

9    include any materials that you may have considered,

10   but you did not rely upon in order to form your

11   opinions in this case?

12   A.        That's true.

13   Q.        Okay.  Have you ever reviewed Google's

14   source code relating to auctions involving digital

15   advertising?

16   A.        I haven't reviewed it, no.

17   Q.        Have you ever reviewed Google's source code

18   relating to auctions involved in AdX?

19   A.        I haven't reviewed any Google source code.

20   Q.        Outside of this litigation, have you --

21   strike that.

22            In other Google litigation matters, have you

23   ever reviewed any source code?

24   A.        I have not, in other litigation, any source

25   code from any -- anyone in litigation.

HIGHLY CONFIDENTIAL

Page 217

1    Q.       Are you aware of anyone from the

2    Auctionomics team has reviewed any source code in

3    preparation -- in preparing your report?

4    A.       I understand that -- that Google has other

5    experts that review source code.

6    Q.       Did you cite to any source code in your

7    July 30th, 2024, report?

8    A.       I don't recall.  I don't think so, but I

9    don't recall.

10   Q.       So did you personally look at any open

11   display web advertising source code in forming your

12   opinions in this case?

13   A.       No.

14   Q.       But you may have had someone assist you in

15   reviewing the open display web advertising source

16   code?

17   A.       Or read reports about it, as described by

18   Google's parties or read emails that described it.

19   But, no, I did not reserve -- I did not personally,

20   as I just said, review the source code.

21   Q.       And do you recall which of Google's experts

22   that you believe you may have read their reports,

23   where it may have included some sort of source code?

24   A.       Yeah, there's -- yes.

25   Q.       Okay.  Do you recall when you read those

Page 218

1    reports?

2    A.        You know, I recall having a telephone

3    conversation and -- and where I questioned one of the

4    people who read source code.

5    Q.        Okay.  And -- and tell me a little bit more

6    about that telephone conversation.  Who was that

7    with?

8    A.        I think Professor Rinard, I believe, is his

9    name.

10   Q.        Okay.  And how long did that conversation

11   last?

12   A.        15 minutes.

13   Q.        Okay.  And was there anyone else on the

14   conversation with you?

15   A.        Anyone else on the conversation, yeah --

16   well, no, I -- there were other people in the room

17   while the conversation that was going on.  Is that

18   what you mean?

19   Q.        Okay.  Yeah, I'm happy to -- that should

20   have been my first question.

21            So did the conversation take place in

22   person?

23   A.        On the telephone.

24   Q.        Okay.  Who else was in the room with you

25   when you had a conversation with Professor Rinard?

Page 219

1   A.        Well, Andy -- Andy Skrzypacz over here --

2   over there was in the room with me.  With Mitch Watt,

3   who is here, was in the room with me.  Some attorneys

4   were in the room with me.

5   Q.        Okay.  Do you recall which attorneys were in

6   the room with you?

7   A.        I'm pretty sure Mr. Ewalt was in the room

8   with me.  But they weren't participants in the

9   conversation.  The conversation was a conversation

10  between me and Professor Rinard that the -- that

11  folks were listening to.

12  Q.        Okay.  And did you request a conversation

13  with Professor Rinard?

14  A.        Did I -- did I request the conversation?  I

15  had asked for information about -- about certain

16  programs, and that conversation was set up for me.

17  Q.        Okay.  And --

18  A.        I didn't --

19  Q.        -- were you shown any source code during

20  that 15-minute conversation?

21  A.        I was not shown the source code.

22  Q.        Okay.  Was any source code discussed during

23  that 15-minute conversation?

24  A.        Yes.

25  Q.        Okay.  Did you take any notes during that

Page 220

1    conversation?

2    A.        I didn't take written notes, no.

3    Q.        Okay.  Did any of your team members take

4    written notes during that conversation?

5    A.        I don't know.

6    Q.        Okay.  Who would know if there were any

7    notes taken during that conversation?

8    A.        I guess anybody who took notes would know

9    that they took notes.  I didn't ask anyone about

10   notes.

11   Q.        Would the handful of Auctionomics team

12   members that you've listed today possibly have taken

13   notes during your conversation with Professor Rinard?

14   A.        It's possible.

15   Q.        Okay.  And did you incorporate any of your

16   conversation with Professor Rinard into your

17   July 30th expert report?

18   A.        No.

19   Q.        When did the conversation take place with

20   Professor Rinard -- or Rinard?

21   A.        However you pronounce his name.  I'm not

22   hundred percent sure.  It was recent, a few days

23   back.

24   Q.        Oh, okay.  So it happened after the issuance

25   of your report?

HIGHLY CONFIDENTIAL

Page 221

1    A.        Yeah, that's what we've been saying.

2    Everything that I relied on in the report is listed.

3    Q.        Okay.  So you chose recently to have a

4    conversation with Professor Rinard to discuss -- I

5    think you said some program; is that correct?

6    A.        To discuss source code related to -- yeah,

7    related to --

8    Q.        But not solely discuss source code.  You

9    discussed other matters as well; is that correct?

10   A.        No, it was all about -- it was all about

11   source code.  I needed to understand the timing of

12   certain programs.

13   Q.        Okay.  And are you aware that you produced

14   additional backup materials with your report on

15   July 30th, 2024?

16   A.        "Additional backup materials," what does

17   that mean?

18   Q.        Are you aware when your report was served,

19   there were additional materials that counsel was

20   required to produce with your report?

21   A.        I don't recall that.

22   Q.        Okay.  I will represent to you that when

23   your report was produced, additional backup materials

24   were produced along with it.

25             Did you have any sort of involvement in the

HIGHLY CONFIDENTIAL

Page 222

1   creation of those backup materials?

2          MR. EWALT:  Objection to form.

3          THE WITNESS:  I don't recall anything about

4   the backup materials, so I don't suppose I had

5   anything to do with them.

6   BY MS. ABSTON:

7   Q.      Okay.  I was going to bring a screenshot

8   today, but it was numerous, probably over like 11,000

9   pages alone just for the file names of all the

10  different materials that were produced with your

11  report.  So I'm not going to get too granular into

12  it, but I just wanted to clarify if you had any sort

13  of estimate of the number of files that were produced

14  in those backup materials.

15  A.      I was not aware of this process as long as

16  I -- as well as I can recall.

17  Q.      And who would have compiled, let's say, the

18  backup data that you relied upon in forming your

19  opinions in this report?

20  A.      Is this about the data?  Are we talking

21  about data or --

22  Q.      Well, we can talk about data and background

23  material.  First I want to ask about data.

24          So who would have compiled the backup data

25  that you relied upon in forming your opinions in this

Page 223

1    report?

2    A.       Okay.  So the backup -- backup data.

3    What's -- what's included in "backup data"?  What

4    does that mean to you?

5    Q.       I'm happy to rephrase it.

6           Who would have compiled any data that you

7    relied upon in forming your opinions in this report?

8    A.       Yeah, so I had two teams of people working

9    on the data files in this work.  Absolutely enormous.

10   These were petabyte data files, and I had two teams

11   of experts that were, you know, creating code, which

12   I understand -- I understand the code was turned

13   over -- maybe that's part of the supplemental

14   materials we're talking about -- and -- and data that

15   was used.

16          So it would have been those numbers that my

17   team, the team in Canada that I mentioned, led by

18   Professor -- the team -- I'm sorry about that.  The

19   team in Canada that I mentioned that was led by

20   Professor Kevin Leyton-Brown, and the team in

21   California, with Paulo Soumani and Hunter Guru and

22   others.

23   Q.       Okay.  So your Auctionomics team assisted in

24   compiling the data that was -- that you relied upon

25   in the report?

HIGHLY CONFIDENTIAL

Page 224

1    A.        The data I relied upon in the report and the

2    data analyses and the tables and so forth.

3    Q.        Are you aware if you produced any Parquet

4    files in this case?

5    A.        I don't know what a "Parquet file" is.

6    Sorry.

7    Q.        Do you know if you produced any open-display

8    web advertising source-code-protected data files in

9    this case?

10   A.        I have already told you, I'm totally

11   unfamiliar with this -- this.  So I don't know.

12   Q.        I just wanted to double-check.  Okay.

13   Moving on.

14            Let's talk about the types of materials that

15   you were given access to when you were forming your

16   opinions.  Okay?

17   A.        Okay.

18   Q.        So do you recall when you first received

19   access to any sort of materials in the Eastern

20   District of Texas case?

21   A.        I do not recall dates, no.

22   Q.        Okay.  Was it earlier than this year?

23   A.        I'm sure it was.

24   Q.        Okay.

25   A.        Yeah.

Page 225

1    Q.        Do you think it was before 2023?

2    A.        You know, I've already told you, I don't

3    know when this was made available.  Yeah.

4    Q.        Okay.  But it's reasonable to assume that

5    you had access to Google adtech materials since

6    you've been retained in the DOJ case; is that

7    correct?

8    A.        Yes.

9    Q.        Okay.  When -- what type of materials --

10   well, strike that.

11            Did you ever request specific types of

12   materials in order to form your opinions in this

13   case?

14   A.        Did I request specific types of materials.

15            Well, there were some questions we had about

16   how programs operated, and some of the expert

17   declarations were answering questions that we had

18   asked to be -- that were not answered in the

19   documents that we had.  And so their expert

20   declarations included things that we requested,

21   answers to questions we had.

22   Q.        Okay.  And when you say "expert

23   declarations," what case are you referring to?

24   A.        I'm -- I'm a little confused about what's

25   turned up where here.  I'm sorry.

HIGHLY CONFIDENTIAL

Page 226

1    Q.       That's okay.

2    A.       But ██████████ declaration, for

3    example, was in the -- yeah, just for example.  Yeah.

4    Q.       Okay.  Okay.  So Google also provided you

5    with access to certain either employee or other

6    witness declarations?

7    A.       Yes.

8    Q.       Okay.  And you're referring to the earlier

9    one that we talked about a little bit earlier today

10   that was in the exhibit to your DOJ deposition

11   transcript; is that correct?

12   A.       It could be.

13   Q.       You don't have to look at it now.  But I

14   think that's the one you referenced to.

15   A.       It's possible.  Right.

16   Q.       Okay.  So do you believe that you had access

17   to all produced materials within this case?

18   A.       I believe that we had access -- yes, that

19   I -- we had access to all the produced material.

20   Q.       And when you say "we," you're referring to

21   your Auctionomics team members having access to all

22   materials produced in this case; is that right?

23   A.       Yes.  The people under my direction, yes.

24   Q.       Okay.  And did you ever yourself look at any

25   of the document productions that were produced by

HIGHLY CONFIDENTIAL

Page 227

1    Google?

2    A.        I looked at individual documents.  There

3    were millions, as you know, of documents produced,

4    and they were all for me presorted into -- into a

5    more useful form.

6    Q.        Okay.  And the sorting that you're

7    referencing, was that done by you giving specific

8    instructions to Auctionomics team members about what

9    kind of documents you were looking for?

10   A.        Sometimes.  But sometimes, you know --

11   sometimes.

12   Q.        Okay.

13   A.        Yeah.

14   Q.        What about the times -- you know what I'm

15   going to ask next.  What about the other times?  Were

16   there other ways -- let me strike that.

17             Outside of you giving specific instructions

18   to Auctionomics team members about what kind of

19   documents you were looking for, did Auctionomics team

20   members independently run searches and send you

21   documents of things that they thought you might need

22   to see?

23             MR. EWALT:  So I'm going to object and

24   instruct you not to answer to the extent that it

25   reveals communications with your staff.  That's

Page 228

1   outside the scope of expert discovery under the
2   expert stipulation.
3              THE WITNESS:  I guess it's all about
4   communications with my staff, so I suppose I can't
5   answer that.
6   BY MS. ABSTON:
7   Q.       Okay.  But, to your knowledge, you believe
8   you had access -- strike that.
9              To your knowledge, you believe that you and
10  your Auctionomics team members that assisted you in
11  this report had access to all produced materials
12  within this case?
13  A.       Yes.
14  Q.       Okay.  Did you conduct any independent
15  outside research for your work on this case?
16  A.       What does "outside research" mean?
17  Q.       Outside of the produced materials that you
18  were given access to.
19  A.       Possibly.  I may have done that.  I remember
20  wondering -- yeah, I think probably so.
21  Q.       What do you remember wondering or
22  researching outside of the materials produced within
23  this case?
24  A.       You know -- well, I remember wondering
25  were -- what might be in industry publications.  I

HIGHLY CONFIDENTIAL

Page 229

1    wasn't sure whether all of that was in the produced

2    documents.  And I wondered whether industry

3    publications had commented on certain things that

4    were supposedly hidden.  It might be -- it might be

5    widely known in the industry.

6           I remember both -- well, you know, there

7    were various searches that I described that might

8    have been conducted in or outside the -- the

9    documents, depending on whether there was anything in

10   the -- the document cache that we had.

11          MR. EWALT:  So we have been going for about

12   an hour now, a little over.  So if we get to a good

13   stopping point soon, that would be a good for a

14   break.

15          MS. ABSTON:  I think I'm at a stopping point

16   right now.  That's great.

17          Do you want to take a ten-minute break?

18          THE WITNESS:  Okay.

19          THE VIDEOGRAPHER:  The time is 2:49 p.m.

20   Pacific Time.  We are going off the record.

21          (Recess taken.)

22          THE VIDEOGRAPHER:  The time is 5:10 p.m. --

23   5:10, sorry about that -- 3:10 p.m. Pacific Time.  We

24   are back on the record.

25          ///

Page 230

1    BY MS. ABSTON:

2    Q.       Okay.  Dr. Milgrom, did you talk to your

3    counsel during the break?

4    A.       Yes.

5    Q.       Okay.  Did you talk about the contents of

6    your testimony?

7             MR. EWALT:  Objection.  I'm going to

8    instruct you not to answer and reveal any contents of

9    the communications with counsel.

10   BY MS. ABSTON:

11   Q.       Okay.  Are you going to follow the

12   instruction of your attorney?

13   A.       I will.

14   Q.       Okay.  So when we left off, we were talking

15   about the Appendix B to your July 30th, 2024, Eastern

16   District of Texas case expert report.

17            Do you recall that?

18   A.       Yes, Appendix B being the list of --

19   Q.       Yes.

20   A.       Where was that?

21   Q.       Appendix B contains the list of materials

22   relied upon.

23   A.       Yeah, this one.  Okay.  Yeah.

24   Q.       Okay.  I want to ask you a few more

25   questions about that.

HIGHLY CONFIDENTIAL

Page 231

1    A.       Okay.

2    Q.       So did you conduct any searches of the

3    materials that were produced in this case?

4    A.       Yes.

5    Q.       Okay.  And what kind of searches did you

6    conduct?

7    A.       "What kind of searches."  Google searches.

8    Q.       Okay.  And so you conducted searches of

9    Google, the website; is that what you're referring

10   to?

11   A.       No, that -- that -- we searched on the

12   document searching for words and searching for

13   whatever, yeah.

14   Q.       Okay.  So you searched through whatever

15   platform contained all the materials that were

16   produced in this case; is that correct?

17   A.       Yes.  My team conducted the searches for me,

18   yes.

19   Q.       Okay.  And do you know how many searches

20   that your team did across that platform?

21   A.       No.

22   Q.       Okay.  Did you yourself conduct any searches

23   of testimony produced in this case?

24   A.       No.

25   Q.       Okay.  Did your team conduct any searches of

Page 232

1    testimony produced in this case?

2    A.        I don't recall my team doing that, no.

3    Q.        Okay.  So did you personally conduct any

4    document searches in looking through the materials

5    produced in this case?

6    A.        No.

7    Q.        Okay.  Okay.  Moving on to look what's --

8    let's look over here at Exhibit 3, going back to your

9    Appendix B that you have in front of you.

10   A.        Yep.

11   Q.        Okay.  And so we've talked about some of the

12   subheaders that are contained on this list, and those

13   subheaders include things like complaint and expert

14   report, deposition transcripts, produced Google

15   documents, produced third-party documents, and then

16   publicly available sources; is that correct?

17   A.        Just a minute.

18             That is correct.  That's the major letter

19   heading, yes, that you have read.

20   Q.        Okay.  And I think we've established that

21   this list contains everything that you relied upon in

22   order to form your opinions in your July 30th report?

23   A.        Yes.

24   Q.        Okay.  Okay.  I want to -- let's flip over

25   to the publicly available sources, which I think is

Page 233

1    going to be on page 479, in the bottom right-hand

2    corner.

3    A.        Uh-huh.

4    Q.        Let me know when you're there.

5    A.        I'm there.

6    Q.        Okay.  So within your report, did you

7    approve all of the citations?

8    A.        Did I approve all of the citations?  Well,

9    I -- there's no separate approval process.  That was

10   part of my review of the materials that -- that I

11   asked my team to create.

12   Q.        Okay.  Did you choose which citations,

13   footnotes went with each sentence in your report?

14   A.        No, I asked -- for each sentence in my

15   report, I asked my team to extract the relevant

16   material and to put in sufficient detail for me to

17   check it.

18   Q.        Okay.  And you checked it or reviewed your

19   report in its entirety and then signed the report;

20   correct?

21   A.        That is right.

22   Q.        Okay.  And did you base your opinions in

23   this report on peer-reviewed literature and sources?

24   A.        In part.

25   Q.        What else did you base your opinions on in

HIGHLY CONFIDENTIAL

Page 234

```
1    this report, outside of peer-reviewed literature and
2    sources?
3    A.        Everything that's listed in this material
4    relied upon.
5    Q.        Okay.  And would you consider blogs to be a
6    preferred source to rely upon in forming your
7    opinions?
8              MR. EWALT:  Objection to form.
9              THE WITNESS:  Not in general.
10   BY MS. ABSTON:
11   Q.        Okay.
12   A.        But they might be sometimes.  It depends on
13   what -- what I'm trying to infer.  If I want to know
14   whether anybody knew that the sun rose and there was
15   a blog that said, Oh, look at the beautiful sunshine,
16   I would consider that evidence.  It really depends on
17   the context.
18   Q.        Okay.  But there are times where certain
19   information rises to the level of meeting
20   peer-reviewed literature as a citation; is that
21   correct?
22             MR. EWALT:  Objection.  Form.
23             THE WITNESS:  Peer-reviewed literature has
24   an advantage over -- over non-peer-reviewed
25   literature in that it has been peer reviewed, and
```

HIGHLY CONFIDENTIAL

Page 235

1    that adds an extra checking step.  You know, what's
2    necessary depends on context.  I'm not going to make
3    a general statement about that.
4    BY MS. ABSTON:
5    Q.        Okay.  And do you actively read any blogs on
6    adtech?
7    A.        I do not.
8    Q.        Do you actively read any blogs in general?
9    A.        I don't.
10   Q.        Okay.  And in forming your opinions in this
11   case, did you read any blogs that you believe shaped
12   your opinions in this case?
13   A.        As I said here, I don't recall what role
14   blogs played.  That's not part of how I categorize
15   the arguments that I made in this report.
16   Q.        Okay.  Have you ever read "Clear-Code" blog
17   before?
18   A.        I'm not sure.
19   Q.        Okay.  Did you look at specifically the
20   underlying material to which every citation was
21   pointing to?
22   A.        Did I look at the -- every citation of --
23   okay.  So a little context, to every citation in the
24   world --
25   Q.        Yes.  In your report, did you specifically

HIGHLY CONFIDENTIAL

Page 236

1  look at the underlying material to which every

2  citation was referring to?

3  A.        I specifically looked at each one, yes.

4  Q.        Okay.  And if there are documents on your

5  materials relied upon list, would it be true that you

6  would have put your eyes on each and every one of

7  these documents?

8  A.        Yes.  It would be, yes.

9            MS. ABSTON:  Okay.  Okay.  Now I want to

10 mark -- we're going to pull out M-1, and we are going

11 to mark this as Exhibit 13.  So just give me one

12 second.

13                          (Exhibit No. 13 was marked.)

14           MS. ABSTON:  I think I have already given it

15 to Sandy, but I am handing you what is going to be

16 marked as Exhibit 13.  It is your July 30th, 2024,

17 expert report that was issued in this case.

18 BY MS. ABSTON:

19 Q.        Do you recognize that document?

20 A.        It appears so, yes.

21 Q.        Okay.  And then if you flip to the back

22 pages, I think you'll locate your signature.  Can you

23 locate that?

24 A.        Wow.

25 Q.        I think it's the very -- the very last page.

HIGHLY CONFIDENTIAL

Page 237

1   A.      The very last page?

2   Q.      It should be near the last page.

3           MR. EWALT:  Just for the record, it looks

4   like Exhibit 13 does not include the appendices to

5   the report.

6           MS. ABSTON:  Yes.  So the appendices have

7   been separated out from the expert report, and those

8   have been marked today as -- Appendix A is marked as

9   Exhibit 1, and Appendix B has been marked as

10  Exhibit 3, and both of those are parts of his

11  July 30th, 2024, report.

12          So if you want to also pull out, in addition

13  to this exhibit, Exhibit 1 and Exhibit 3, which were

14  attached to your July 30th, 2024, report.

15          THE WITNESS:  Yep.  There is Exhibit 3.

16  BY MS. ABSTON:

17  Q.      And just so the record is clear, when you

18  produced your report on July 30th, 2024, your report

19  contained Appendix A, your CV, and Appendix B, your

20  list of materials relied upon.

21  A.      There it is.  I've got them.

22  Q.      Okay.

23  A.      And all this stuff.  All right.  What do I

24  need to have?

25  Q.      Okay.  Just the report in front of you.

HIGHLY CONFIDENTIAL

Page 238

1    We're going to run through some of it.

2    A.        All right.

3    Q.        I believe we have talked about today that

4    Auctionomics assisted you in drafting both your

5    Eastern District of Texas report that we have just

6    marked as Exhibit 13, as well as your DOJ report; is

7    that correct?

8    A.        Yes.  I had assistance from Auctionomics

9    team members.  That's right.

10    Q.        Okay.  As you sit here today, do you have

11    any corrections to your Eastern District of Texas

12    report?

13    A.        Yeah, there was one correction that I would

14    make.

15    Q.        Okay.  Let's -- let's walk through that.

16    And what page is that on?

17    A.        Good question.  Is it on 208?  Is it the

18    number?  Can I find it in the table of contents?  Let

19    me look.  I always look at these things

20    electronically, which makes it harder to find.

21            MR. EWALT:  Theorem 8 is on page 440, if

22    that's what you're looking for.  I'm not sure if

23    that's the one you're looking for.

24            THE WITNESS:  Let's take a look.  440, you

25    say?

Page 239

1              MR. EWALT:  Yes.

2              THE WITNESS:  Let's see if that's the one.

3     Nope, that's not -- oh, that's Theorem 7.  Here is

4     Theorem 8.

5              No, it's got to be in the EDA chapter.

6              MS. ABSTON:  Are you searching for the EDA

7     section?

8              THE WITNESS:  I found the EDA section.

9              MS. ABSTON:  Okay.

10             THE WITNESS:  Yes.  So I'm on page 237.

11             MS. ABSTON:  Let me flip there.  We have got

12    Exhibit 13, your report, looking at page 237.  What

13    paragraph number would you like --

14             THE WITNESS:  I'm going to try not to mess

15    everything up here.  Let me just put these things

16    down.

17             MS. ABSTON:  Okay.

18             THE WITNESS:  It is paragraph 328.

19             MS. ABSTON:  Okay.  So paragraph 328.

20    BY MS. ABSTON:

21    Q.       Okay.  And what would you like to correct in

22    paragraph 328?

23    A.       Let's see.  "If the publishers set the app

24    on the floor price for the AdX auction, ignoring the

25    red contracts and the distribution of values is

HIGHLY CONFIDENTIAL

Page 240

1    regular, then the floor price set by EDA maximizes

2    publisher revenue."

3              I had omitted a condition in this that the

4    distribution of values is assumed to be regular.

5    Q.         Okay.  So I'm going to read -- let me start

6    on the third line of paragraph 328.  And I'm going to

7    read these sections, and I want you to tell me --

8    because we have got a few different numbers in this

9    paragraph --

10   A.         All right.

11   Q.         -- which aspects you want to change, just so

12   the record is clear.

13             So the second sentence of paragraph 328 on

14   line 3 begins "Then," and there's a No. 1, "EDA

15   increases the publisher's expected revenue relative

16   to the pre-EDA allocation procedure."

17             Do you see that?

18   A.         Yes.

19   Q.         Do you have any corrections that you would

20   like to make to that aspect of paragraph 328?

21   A.         No.

22   Q.         And then it reads, "And" -- and there's a

23   No. 2 -- "if publishers set the optimal floor

24   price"...

25             Do you have any changes for that section of

HIGHLY CONFIDENTIAL

Page 241

1    the sentence?

2    A.        No.

3    Q.        And the sentence continues..."for the AdX

4    auction ignoring direct contracts..."

5              And do you have any changes to that

6    phrasing?

7    A.        No.

8    Q.        Okay.  Then there's a comma that says, "The

9    floor set by the EDA maximizes publisher revenue."

10             Do you have any changes to that?

11   A.        The correction is an insertion between the

12   last -- right immediately after the last comma.

13   Q.        Okay.

14   A.        Or immediately before the last comma, I

15   suppose, for punctuation correction.

16   Q.        So it's going to follow the word

17   "contracts"?

18   A.        "Contracts."

19   Q.        And what would you like to insert there?

20   A.        "And the distribution of bitter values is

21   regular."

22             I probably have a footnote citing

23   regularity, attributing it to Roger Myerson's

24   definition of "regularity."

25   Q.        And when did you discover this --

HIGHLY CONFIDENTIAL

Page 242

1     A.        Omission.

2     Q.        -- correction?  Or, yes, if we want to call

3     it an omission.  When did you discover this omission?

4     A.        There's a correct criticism of this

5     conclusion by Professor Weinberg, who notes that I --

6     that my conditions are insufficient for the

7     conclusion, and his -- his criticism on that point is

8     correct.

9     Q.        Okay.  And I believe you're referring to

10    Professor Matt Weinberg's September 9th rebuttal

11    report; is that correct?

12    A.        To his rebuttal report.  I don't have the

13    date in my head, but yeah.

14    Q.        Have you read any deposition testimony that

15    has taken place in this case from any experts?

16    A.        I don't think I have, actually.

17    Q.        Okay.  Have you read any plaintiff expert

18    depositions that have taken place thus far in this

19    case?

20    A.        No.  Actually, I have not.

21    Q.        Okay.  So your -- the criticism you're

22    referring to from Professor Weinberg stems from his

23    rebuttal report?

24    A.        Yes.

25    Q.        Okay.  And do you recall when you reviewed

HIGHLY CONFIDENTIAL

Page 243

1    Professor Weinberg's rebuttal report?

2    A.        I don't recall exactly.

3    Q.        Okay.

4    A.        After -- after it came and before now.

5    Q.        Okay.  And so -- and apologies if I already

6    asked this.  When did you discover this omission?

7    A.        I read it in Professor Weinberg and said,

8    Did I actually do that?  And I thought I had made

9    regularity a standing assumption here.  And I had not

10   made regularity a standing assumption in the previous

11   text, so I put it in where it was required here.

12            So I would -- I would like to put it in

13   where it's required here.

14   Q.        And do you plan to issue a formal errata

15   making this change?

16   A.        I wasn't aware that I could issue a formal

17   errata.  If I could, I would be happy to do so.

18   Q.        Okay.  And have you been asked to issue any

19   supplemental reports in this case?

20   A.        No.

21   Q.        Okay.  And as you sit here today, do you

22   have any other corrections to your report that you'd

23   like to add, other than those that we have walked

24   through today, I think a few on your -- we're going

25   to get an updated CV, and then this one on page 237?

HIGHLY CONFIDENTIAL

Page 244

1    A.        No other corrections.

2    Q.        Okay.  And this report contains all of your

3    opinions that you hold within this case?

4    A.        As of the time when the report was written,

5    yes.

6    Q.        Do you have any new opinions that you plan

7    to offer in trial in this case?

8    A.        Well, I don't know what will be offered in

9    trial.  That's up to the attorneys.  But I have read

10   the rebuttal reports.  I think there are remarks I

11   would like to say about them.

12   Q.        What remarks would you like to say in light

13   of reviewing those plaintiffs' expert rebuttal

14   reports?

15   A.        They are wrong, basically, in summary.

16   Q.        So do you plan to offer new opinions at

17   trial relating to what the plaintiffs' expert

18   rebuttal reports have stated?

19   A.        If this is -- because I've described what I

20   will do.  I don't have plans for what my testimony

21   will be at trial; that I will get questions from the

22   attorneys.

23           I'm prepared -- I'm prepared to comment on

24   the new material that's presented for the first time

25   in the expert rebuttal reports and Professor

HIGHLY CONFIDENTIAL

                                                    Page 245

1    Weinberg's report.  Most of -- most of the whole

2    combination is new.  He has lots of new stuff in his

3    rebuttal report.  And if the defendant's attorneys

4    wish to have me comment on them, I'm prepared -- I'm

5    prepared to do that.

6    Q.       Okay.  And then we've talked previously that

7    you had an interview with Professor Rinard, another

8    defense expert in this case?

9    A.       Yes.  That's right.

10   Q.       And that interview took place prior to you

11   sitting for this deposition today; is that right?

12   A.       It did, yes.

13   Q.       But after the issuance of your July 30th

14   report?

15   A.       Yes.

16   Q.       Okay.  Did you have any sort of interviews

17   with defense experts prior to issuing your July 30th

18   report?

19   A.       Everything that I relied on in the July 30th

20   report is in -- in this -- in this list here.  So

21   there's no interviews or -- just this.

22   Q.       Okay.  But my question was:  Did you have

23   any interviews with defense experts prior to issuing

24   your report?

25   A.       No.

HIGHLY CONFIDENTIAL

Page 246

1    Q.        Okay.  You didn't have any conversations

2    with any other defense experts?

3    A.        No.  I --

4    Q.        Did you review any defense expert reports

5    prior to issuing your report on July 30th?

6    A.        Any defense expert reports, no.

7    Q.        And you didn't see any drafts of any sort of

8    expert reports before you issued your report?

9    A.        I did not.  This is just my report.

10   Q.        Okay.  So let's flip over to -- we were just

11   there.  I think it was on page 392 of your report, if

12   you don't mind.  We're looking at Exhibit 13.

13             And, actually, before we go there, I missed

14   a question.  I need to go back really quick.

15             Does this report -- strike that.

16             Does this July 30th, 2024, report contain

17   all the bases for your opinions in this case?

18   A.        I believe so, yes.

19   Q.        Okay.  Now, looking at page 392, if you will

20   let me know when you're there.

21   A.        I'm here.

22   Q.        And this section is section 15 entitled

23   "Technical Notes."

24             Do you see that?

25   A.        I do.

HIGHLY CONFIDENTIAL

Page 247

```
1    Q.       Okay.  And there's, I believe, a handful of
2    subsections within these pages that contain your
3    technical notes that you use in forming your opinions
4    in this report; is that correct?
5    A.       I'm looking for the -- yes, there are
6    subsections.  Yes.
7    Q.       Okay.  And so subsection 15 of your report
8    contains all the technical notes related to your
9    opinions in this case?
10   A.       It appears so, yes.
11   Q.       Okay.  And then all the bases for your
12   opinions in this section are contained within your
13   report?
14   A.       The bases for opinions in section -- this
15   section contains opinions, does it not?
16   Q.       Okay.
17   A.       I don't think there are any opinions in this
18   section.  Theorems and proofs and such.
19   Q.       Did you personally create all of the
20   theorems related to your opinions in this case?
21   A.       I did.
22   Q.       Did you personally calculate all of the
23   theorems related to your opinions in this case?
24            MR. EWALT:  Objection to form.
25            THE WITNESS:  I don't know what you mean by
```

HIGHLY CONFIDENTIAL

Page 248

1    calculate a theorem.  It is not a phrase that is

2    meaningful to me.

3    BY MS. ABSTON:

4    Q.        Did you personally create all the theorems

5    in subsection 15 for this case?

6    A.        Yes.  All the theorems in subsection 15 I

7    created.  And some of them after discussion with

8    members of my team, to state them in the best

9    possible form.

10   Q.        And did you personally write the proofs for

11   all of your opinions in this case?

12   A.        I personally wrote or reviewed the proofs

13   for all the theorems in this case.

14   Q.        Who else would have written any of the

15   proofs that you relied upon in forming your opinions

16   in this case?

17   A.        Drafts of the proofs would have been created

18   by members of my team, which are the -- who I have

19   listed before.

20             Oh, and one more that I haven't listed

21   before, actually.  Zi Yang Kang, I should add to the

22   list.

23   Q.        That's another Auctionomics team member?

24   A.        Another Auctionomics team member, yes.

25   Q.        And has he assisted -- or she or they --

HIGHLY CONFIDENTIAL

Page 249

1    assisted you in any way in the DOJ case as well or

2    just in the Eastern District of Texas case?

3    A.        No, in the DOJ case as well.

4    Q.        And just to be explicitly clear, which of

5    these proofs did you personally write?

6    A.        Well, I wrote or contributed to writing or

7    checked every -- all of them.  I mean, the -- there

8    is nothing here that is -- that's not my work, in the

9    same sense that I would put my name on work in a

10   research paper.  You know, I sometimes have coauthors

11   or research assistants who help.  Everything here

12   is -- relies on ideas of mine, and I have checked the

13   final versions.

14   Q.        Okay.  I want to flip to the beginning of

15   your report here and ask you some general questions.

16   So --

17   A.        I was wondering if you were going to get

18   into the Greek notations.

19   Q.        Not today.  I mean, maybe, though.  I've got

20   a little bit of time.  Don't tempt me.

21            MR. EWALT:  Something for the jury.

22            MS. ABSTON:  Don't tempt me.

23   Q.        So let's talk a little bit about your

24   methodology here.  You understand that the defendants

25   have designated you as an expert who may testify

Page 250

1    regarding principles of market design and Google's

2    conduct with respect to auction for display ads?

3    A.      Yes.

4    Q.      And you understand that you did not include

5    any specific section entitled "methodology" within

6    your report?

7    A.      I guess that's right.  Okay.

8    Q.      Or did you include any specific sections

9    within your report pertaining to methodology alone?

10   A.      There's no section entitled "methodology."

11   Q.      Okay.  And you understand that plaintiffs

12   are entitled to know about your methodologies that

13   you employed within this case?

14   A.      Absolutely.

15   Q.      And are there any known error rates

16   associated with the methodologies that you used to

17   form your opinions in this case?

18   A.      Error rates associated with the

19   methodologies.  So the -- the -- known error rates

20   associated with the methodology.

21          Well, let me see.  Not here.  Not there.

22          Well, in the empirical work, the empirical

23   work is subject to the usual kinds of errors that are

24   associated with empirical work.  The theoretical

25   work, it is -- it is a matter of pure logic.  So

HIGHLY CONFIDENTIAL

Page 251

1    there's no error between the assumptions and the

2    conclusions, but one can discuss the accuracy of

3    assumptions and whether they represent what's going

4    on.

5            What else?  The simulations -- the

6    simulations rely on the accuracy of the empirical

7    work that underlies them that generates their

8    assumptions.  And I realize that -- I named an error

9    rate in any of those things, but I'm trying to be

10   helpful here in terms of understanding any errors

11   that there might be.  That's how you would assess

12   them.

13   Q.      Okay.  And how have you accounted for any

14   known error rates within the four corners of your

15   report?

16   A.      Well, again, the theoretical work has no

17   error rate, other than mistakes, such as that you

18   saw.  There's no known error rate of that sort.

19           The empirical work, the data sets are so

20   large that sampling error is effectively zero.  There

21   isn't an error rate from sampling.  So the -- and all

22   the theory and statistics about error rates relates

23   to sampling error.

24           The important errors in empirical work on

25   very large data sets is not related to sampling

HIGHLY CONFIDENTIAL

Page 252

1    errors.  It's related to specification errors.  You

2    could say that I was using the wrong model.  There's

3    no known error rate for that.

4              Your experts would have to say, oh, no, he

5    used the wrong model, and that would be the only way

6    to identify errors there.

7              The simulations depend on sample size, and

8    we have spent a lot of money generating large

9    samplings in the simulations.  Those error rates are

10   trivial.  There is essentially -- they are

11   essentially zero as well.

12             And the conclusions followed from the

13   assumptions, the -- any claims of error would have to

14   challenge the assumptions.

15             And, of course, they could also result from

16   programming errors.  If people have access to the

17   codes we used, they can try to replicate.  And if

18   they find errors, they can point those out.  But

19   those are not -- in statistics, we speak of standard

20   errors.

21             My favorite description is between standard

22   errors and nonstandard errors.  Standard errors are

23   basically a result from sampling, and in data sets of

24   this size, that's zero, for all practical purposes.

25             And then we speak of nonstandard errors,

HIGHLY CONFIDENTIAL

Page 253

1    which really mean that somebody has specified

2    something incorrectly, used the wrong model, made a

3    coding error, and there are no standard rates for

4    those things.

5    Q.        Okay.  And did you calculate a numeric error

6    rate?

7    A.        Did I calculate numeric error rates?  I

8    looked at -- as I said, I looked at the -- the only

9    error rates which were calculable were standard error

10   rates, and found them so close to zero that they

11   weren't worth any attention.

12   Q.        Okay.  I think you used the word "trivial."

13   So you say trivial, but you didn't provide a number

14   in your report at all; correct?

15   A.        That's right.  I -- you know, you can work

16   those out.  The -- for example -- yeah, they are

17   trivial.  I think, right.

18   Q.        Okay.  And you said you spent a lot of money

19   sampling the simulations.

20            MR. EWALT:  Objection to form.

21   BY MS. ABSTON:

22   Q.        What would be considered a lot of money?

23   A.        Well, the total -- the total amount of money

24   we spent on data and simulations reached seven

25   figures.  A lot of money.

Page 254

1    Q.       Okay.  Are there any critiques in the

2    display advertising industry regarding the

3    methodology that you used?

4    A.       I'm not aware of such.

5    Q.       How did -- are there any established

6    standards controlling the application of your

7    methodology?

8    A.       Are you asking -- do you have a context for

9    that?  I mean --

10   Q.       In general?  Are there any established

11   standards controlling the application of the

12   methodology that you employ within your report?

13   A.       So the models that I use -- so the method --

14   as I say, the only -- the only real place that there

15   can be errors in -- with a dataset of this size is

16   with modeling assumptions.  And for the most part, my

17   modeling assumptions about the -- about the data are

18   just the same -- are just the same as, for example,

19   Professor Weinberg and others have used.

20           So I haven't investigated alternative models

21   because I -- you know, there seems to be general

22   agreement among the experts as to which models are

23   applicable.

24   Q.       Did you use any controls to verify the

25   accuracy of your conclusions?

HIGHLY CONFIDENTIAL

Page 255

1    A.        Sometimes, yeah.

2    Q.        On -- what controls did you employ to verify

3    the accuracy of your conclusions?

4    A.        Well, for example, in this data -- in this

5    report, Google had issued some new data sets, both

6    for -- both for GAM and for Google ads --

7                (Reporter clarification.)

8                THE WITNESS:  GAM, G-A-M.  That's -- that's

9    the name of the data and Google ads data.

10               And we ran each of our methods using both

11   data sets to make sure that there were no qualitative

12   changes in the conclusions, and, indeed, there were

13   none.  So that is an example of an empirical control.

14               Essentially we're looking for the only kind

15   of errors that matter in this -- in this analysis for

16   nonstandard errors, you know, to control that the --

17   that the coding is done correctly, we did everything

18   twice independently.  And then when there were

19   differences, reconciled the differences.

20               To ensure that the modeling assumptions were

21   reasonable, well, there are lots of ways that one

22   might look at that.  The seminal paper on that is one

23   that I wrote in 2015, when I was -- when I was

24   advising OpenX.

25               And, you know, we -- we adopted that.  We

Page 256

1    adopted the same kind of model that all of the

2    experts use, a so-called independent private values

3    model so that our conclusions could not be attributed

4    to model choice.

5            I was very careful.

6    BY MS. ABSTON:

7    Q.      And did you consider alternative

8    methodologies?

9    A.      Did I consider alternative methodologies?  I

10   thought about alternative methodologies and decided

11   to stay with the industry standards and with the --

12   and with the same models that were used by the

13   plaintiffs' experts so that, again, to protect myself

14   from claims that I had cherry-picked or, you know,

15   that I had picked models to generate particular

16   conclusions.

17   Q.      Okay.  And what other alternative

18   methodologies did you consider?

19   A.      Okay.  You know, you keep calling them

20   methodologies, and I guess perhaps that's for legal

21   reasons, maybe.  I'm trying to describe approaches

22   that one could take to reach, you know, these

23   evaluations.  And the approaches one can take are to

24   use different models.

25           And, you know, I evaluated different models.

HIGHLY CONFIDENTIAL

Page 257

1    For example, the evaluation of the -- of the adverse

2    selection issues in connection with DEA -- with EDA,

3    use a different model from the main model that's used

4    throughout the rest to investigate whether there is

5    any issue of -- of adverse selection in EDA.

6    Q.       Are there any limitations to your

7    methodology that could affect the opinions that

8    you've reached in this case?

9    A.       Well, the limitations, again, have -- would

10   have to do with what I like to call nonstandard

11   errors, for which there are no -- no measurements and

12   which ought to be entirely accessible to the Court

13   and to people with less technical training.

14            The issue is have we made unrealistic

15   assumptions that cause these models or analyses not

16   to correspond to reality.  And we have been careful

17   not to do that and to -- where we do make

18   assumptions, to make them coincide with plaintiffs'

19   assumptions so that we're not subject to that line of

20   criticism.

21   Q.       Okay.  And were the limitations or potential

22   limitations that you just described disclosed within

23   your report?

24            MR. EWALT:  Objection.  Form.

25            THE WITNESS:  I believe they are.  You know,

HIGHLY CONFIDENTIAL

Page 258

1    I discuss, as the other experts do as well, what is

2    the relevant model.  I wouldn't be able to put my

3    finger on it right now, but it's discussed both in my

4    report and in plaintiffs' experts' reports about why

5    they choose the model they choose.

6              And when I state -- and, you know, and where

7    I am using those, one of the reasons I state theorems

8    is that I want to say these are the assumptions that

9    lead to this conclusion.  And if you disagree with

10   this conclusion, you have to disagree with one of the

11   assumptions in the theorem.  It's -- logically

12   follows.

13   BY MS. ABSTON:

14   Q.        Do you know whether your methodology has

15   ever been rejected by a federal court?

16   A.        No.  I'm not aware of it being rejected by

17   any court at any level.

18   Q.        Okay.  And then how did you verify the

19   accuracy of the data you relied upon in your

20   analysis?

21   A.        The data, for the most part, we have no

22   independent sources to rely upon.  The data was

23   generated for -- for GAM and for -- Google Ad

24   Networks were generated by Google.

25              We did have the data generated twice.  There

HIGHLY CONFIDENTIAL

Page 259

1    was data generated in the federal case, and there was

2    data generated again in the Texas case.  And so when

3    we did our analyses for the Texas case, we used the

4    new data in the main report and the -- and verified

5    it with the federal data, which is included in an

6    appendix or an exhibit or something later in the --

7    later in the report to make sure that the conclusions

8    were unchanged, or at least qualitatively unchanged.

9    Q.       Okay.  So there was a difference in the data

10   production between what you received from the DOJ

11   case and what you received here for the Eastern

12   District of Texas case?

13   A.       Yes.

14           MR. EWALT:  Objection to form.

15           THE WITNESS:  There was new data made

16   available in the Texas case.

17   BY MS. ABSTON:

18   Q.       And what was that new data pertaining to?

19   A.       Well, this is both the GAM dataset and the

20   Google Ad Network dataset.  They were selected

21   differently, so to speak.  That is the -- the -- I

22   think the time period from which they were drawn was

23   a different week or different month.  I don't recall

24   exactly what the weeks and months were as I sit here,

25   but it's listed in my report.

HIGHLY CONFIDENTIAL

Page 260

1           And the frequency.  So when the -- Google
2      has a huge number of these impressions that are
3      served, and I think in one case it was a ███████
4      ████████████████████████, and maybe in the other
5      case it was ███████████████████████████.  So
6      that the -- so they were different.
7           And -- but each of them is intended to be --
8      uses what are considered best methods -- assuming
9      Google did it correctly, uses what are considered
10     best methods to derive a random sample of data from a
11     period of time.  They are different periods of time,
12     slightly different selection methods.  We studied
13     both.
14     Q.      Okay.  And when you say "assuming Google did
15     it correctly," you're referring to that Google made
16     the selection of the data to produce to you?
17     A.      Yes.  Google -- Google did the selection.
18     They drew it from their ordinary production --
19     Q.      Okay.
20     A.      -- which I take to be reliable.
21     Q.      And you developed all of this methodology
22     yourself; is that correct?
23     A.      Yes.
24     Q.      Okay.  And we've discussed today that you
25     considered other possible explanations and

HIGHLY CONFIDENTIAL

Page 261

1    conclusions, but you chose to reject those; is that

2    correct?

3    A.       That's too vague and abstract for me to give

4    a yes-or-no answer to.

5    Q.       Did you consider other possible explanations

6    or conclusions --

7    A.       Regarding what?

8    Q.       -- for your methodology in this case?

9             MR. EWALT:  Objection to form.

10            THE WITNESS:  Yeah, that's not a totally

11   meaningful question to me.  I've -- I've done my best

12   to interpret your -- your term "methodology" and to

13   be explicit about what I'm talking about, but the

14   question is going to have to address what I did in

15   order for me to describe what I did.

16   BY MS. ABSTON:

17   Q.       Okay.  Do you prefer we use a different term

18   other than "methodology"?

19   A.       Yeah, I have described each -- each of the

20   components of things I did.  There are -- there are

21   theoretical methods, where logic drives the

22   conclusion, and there is -- where logic drives the

23   conclusion.  If the logic is correct, then it's

24   correct.  There's no error rates.

25            I've described data analyses.  These

HIGHLY CONFIDENTIAL

Page 262

1    datasets are so large that the sampling error rates
2    are essentially zero.  And the -- any error would be
3    involved in specifications.
4           Did I consider alternative specifications,
5    yes.  Although we chose to use the most common
6    specification, which is also the one -- I'm just
7    repeating myself here -- is also the one chosen by
8    plaintiffs' experts.  They chose the common one, and
9    I decided I didn't want to fight over what would be
10   the best specification.  I thought it was reasonable,
11   and so I chose that one as well.
12          Where there -- where there came to be claims
13   about adverse selection that aren't included in the
14   usual -- in the usual -- in the independent private
15   values model, which plaintiffs' experts used as well,
16   then I expanded the model to include the possibility
17   of adverse selection and measured it and found it to
18   be almost nonexistent.
19          So I don't know what else there is to say
20   about -- yes, I was quite careful about deciding how
21   to do these analyses.
22   Q.     And you considered all of the available data
23   when forming your opinions in this case?
24   A.     All the data produced by Google.
25   Q.     Okay.  And you included the data in the

HIGHLY CONFIDENTIAL

Page 263

1    documents that supported your -- your conclusions
2    that could be found within -- strike that.
3            Isn't it true that you included only data in
4    documents that supported your conclusions when making
5    this report?
6    A.      I'm sorry, I don't remember selecting only
7    data in documents -- the data did support our
8    conclusions.  The conclusions that were reached were
9    supported by the data.
10           There wasn't data that I -- if all the data
11   is consistent with my conclusions, it's because all
12   the data is consistent with my conclusions, not
13   because I've done anything underhanded to -- to
14   manipulate the -- or select data.
15   Q.      Can you point me to a single document that
16   you included in your report that was contrary to the
17   conclusions that you reached?
18   A.      No.
19   Q.      Okay.  So there was no set of data that was
20   contrary to your conclusions?
21   A.      We're talking -- are we talking about data
22   value -- you're using these terms in ways that are
23   unfamiliar to me.  "Data" means data.  "Documents"
24   means documents.  There are millions of documents,
25   and I don't know what's in all of the documents.

HIGHLY CONFIDENTIAL

Page 264

1          The -- we were talking about data, and what

2     I understood "data" to mean, what Google had

3     produced, the GAM data and the Google Ad Network

4     data.  And apparently you mean "data" -- you're using

5     that term to mean something different.

6     Q.      How much time did you dedicate to developing

7     your methodology in this case?

8     A.      Okay.  To developing my methodology.

9          As I've described, we approached each piece

10    separately, according to the method that was

11    associated with the piece.  So I cannot separate

12    development of methodology.

13         For example, when people -- if we were

14    looking -- well, should I make examples?  I don't

15    know if -- that would carry us too far, I'm afraid.

16    You can ask about them if you wish.

17         But the methodology was not developed

18    separately from the analysis.  I took a look at

19    each -- each question at issue, decided in connection

20    with thinking about that question what's the best way

21    to think about it, what's the best available

22    evidence, and ran with it.  And I didn't have a

23    separate period of developing methodology.

24    Q.      Okay.  And have there been advancements in

25    the application of your methodology that you have not

HIGHLY CONFIDENTIAL

Page 265

1    incorporated into this report?

2    A.        No.

3    Q.        Do you know for certain?

4    A.        Do I know for certain?  Well, I don't know

5    everything in the world that's been written.

6              I am pretty well connected to the auction

7    literature.  Some people consider me to be the world

8    expert in this area, and -- and I have -- I think

9    that if somebody had done something significant here,

10   I would know about it.  They would probably write to

11   me about it.

12   Q.        And, Dr. Milgrom, you're here today to

13   testify as an expert witness on behalf of Google, and

14   I want to talk to you a little bit more about some of

15   your other expertise that you just referenced.

16   A.        Uh-huh.

17   Q.        For the opinions that you have expressed in

18   your report in this specific case, do you hold

19   yourself out to be an expert in advertising?

20   A.        In advertising generally?  Not in

21   advertising generally, no.

22   Q.        Okay.  For the opinions that you have

23   expressed in your report in this case, are you

24   holding yourself out to be an expert in marketing?

25   A.        In marketing generally, no.

HIGHLY CONFIDENTIAL

Page 266

1    Q.        Are you holding yourself out to be an expert
2    in technology?
3    A.        Well, technology is a very big field.  I
4    have -- I have expertise in some areas about
5    marketing and in some areas about technology.  And if
6    these questions are going to be about generally, with
7    limits -- within limits, I consider myself experts in
8    several of these fields.
9    Q.        For the opinions that you have expressed in
10   your report in this case, are you holding yourself
11   out to be an expert in ad networks?
12   A.        An expert in ad networks specifically?  Not
13   in ad networks specifically, no.
14   Q.        For the opinions that you have expressed in
15   your report in this case, are you holding yourself
16   out to be an expert in technology advertising?
17   A.        I know a lot about advertising technology.
18   There are things that I don't know as well.  I think
19   if someone approached me and asked for expert
20   opinions about advertising technology, I would
21   consider myself qualified.
22   Q.        Are you holding yourself out to be an expert
23   in this case in computer science?
24   A.        I am not.
25   Q.        Okay.  And I want to -- I want to go back.

HIGHLY CONFIDENTIAL

Page 267

1           For the -- I want to go back to the question

2    of -- for the opinions that you have expressed for

3    your report in this case, are you holding yourself

4    out to be an expert in technology advertising?

5           MR. EWALT:  Objection to form.

6           THE WITNESS:  I think you mean "advertising

7    technology."

8    BY MS. ABSTON:

9    Q.      Advertising technology or technology

10   advertising, whatever you prefer.

11          Are you holding yourself out to be an expert

12   in advertising technology or technology advertising

13   in this case?

14   A.      Okay.  So I understand "technology

15   advertising" to mean people who show ads for

16   technology, and I understand "advertising technology"

17   to -- what modifies -- what modifies what changes.

18          I know a lot about advertising technology.

19   And in -- again, if -- if I were approached to -- for

20   a consulting engagement related to advertising

21   technology, I would consider myself to have

22   sufficient expertise to do that.

23   Q.      Okay.  Are you holding yourself out to be an

24   expert in this case on algorithmic design?

25   A.      Algorithmic design.  So there's a field

HIGHLY CONFIDENTIAL

Page 268

1    called algorithmic mechanism design, which
2    Professor Weinberg holds himself out to be an expert
3    in.  Perhaps that's what you're referring to.
4              Algorithmic design is partly about the
5    construction of algorithms in part.  And algorithm
6    mechanism design is about the construction of
7    algorithms taking account of their effect on
8    incentives.
9              And with regard to the latter, I've been
10   keynote speaker at computer science conferences on
11   that subject.  So I think I do have expertise on
12   algorithmic mechanism design.  More broadly, in
13   algorithmic design, I would not claim expertise.
14   Q.        Okay.  And to be clear, I'm not asking you
15   generally about your expertise, but just asking about
16   the opinions you're offering within this report
17   today.  So let's --
18   A.        Oh, I see.  So you want to know whether I'm
19   holding myself out -- I hold myself out to be an
20   expert on the opinions that I express in this report,
21   to have the necessary expertise for every opinion
22   that's listed in this report.
23   Q.        And so for the opinions that you've
24   expressed in your report in this case, are you
25   holding yourself out to be an expert in monopolies?

HIGHLY CONFIDENTIAL

Page 269

1    A.        I don't -- I don't opine in this case about

2    monopolies.  So I'm not using any expertise of that

3    sort.

4    Q.        And for the opinions that you have expressed

5    in your report in this specific case, are you holding

6    yourself out to be an expert in machine learning?

7    A.        I am not, no.

8    Q.        Okay.  And for the opinions that you have

9    expressed in your report in this case, are you

10   holding yourself out to be an expert in antitrust

11   law?

12   A.        I am not.

13   Q.        And for the opinions that you have expressed

14   in your report in this specific case, are you holding

15   yourself out to be an expert in consumer protection

16   law?

17   A.        I am not.

18   Q.        And for the opinions that you have expressed

19   in your report in this specific case, are you holding

20   yourself out to be an expert in deceptive practices?

21   A.        I am not.

22   Q.        And for the opinions that you have expressed

23   in your report in this specific case, are you holding

24   yourself out to be an expert in anticompetitive

25   practices?

HIGHLY CONFIDENTIAL

Page 270

1    A.        An expert in -- I have expertise in

2    anticompetitive practices that is relevant to my

3    opinions in this case.

4    Q.        Okay.  And then are you offering any

5    opinions today regarding the technical operation of

6    Google's products?

7    A.        I am not a hundred percent sure what that

8    means.

9            The -- the economic technology of the

10   operation, I am offering opinions about, yes.

11   Q.        Are you offering opinions about the

12   technical operation of any other adtech products?

13   A.        Other than what?

14   Q.        Outside of -- are you offering -- let me

15   rephrase.

16           Are you offering any opinions about the

17   technical operation of any other adtech products

18   outside of Google's products today?

19   A.        Well, yes, there's -- I am.  I have offered

20   such opinions, yes.

21   Q.        And those opinions are contained within your

22   report?

23   A.        Yes.

24   Q.        Okay.  Okay.  I'm going to clarify some

25   additional terms and concepts that you detail within

Page 271

1    your July 30th, 2024, expert report.

2    A.        Okay.

3    Q.        Is that okay?

4              Okay.   In your field, how is the term

5    "auction" generally defined?

6    A.        Auction -- so just to be clear for the

7    record here, that there are places where the -- where

8    people distinguish auctions in sealed tenders, for

9    example.   That's not typically distinguished in my

10   field or in this industry.   The process that consists

11   of sealed bids or a multistage process can all be

12   auction processes.

13             Auction processes is a resource allocation

14   process in which the bids made by participants

15   determine the allocations and prices.

16   Q.        Okay.   And what is an example of an auction?

17   A.        Well, eBay, Sotheby's are examples of

18   dynamic auctions with multiple stages that take place

19   over time.

20             And the -- this case focuses primarily, or

21   exclusively, on sealed bid auctions, as we call them,

22   which are auction rules in which bidders are

23   presented with the opportunity to bid on a single

24   item, and there are many other kinds of auctions as

25   well.

HIGHLY CONFIDENTIAL

Page 272

1    Q.        In -- do you have a different definition for

2    the term "auction," other than the generally accepted

3    definition that you just gave?

4    A.        Do I have a different definition?  I use

5    words to communicate, and I understand that words

6    mean different things in different contexts.  So

7    sometimes I use the term differently.

8    Q.        In your field, how is the term "fairness"

9    generally defined?

10   A.        Fairness.  So the -- "fairness" is used in

11   economics in fairly narrow senses.  Usually some

12   variation of equal treatment of equals.

13   Q.        In your field, how is the term "efficiency"

14   generally defined?

15   A.        Efficiency -- an allocation is efficient.

16   "Efficient" is an adjective that's used to describe

17   allocations and processes, and it has -- it has

18   slightly different meanings in each application.  But

19   an allocation is efficient if there is no other

20   allocation that makes some people better off and

21   nobody else worse off.

22   Q.        And in your field, does the term

23   "benefitted" generally have a specific definition?

24   A.        Just that --

25   Q.        Strike that.

HIGHLY CONFIDENTIAL

Page 273

1            In your field, does the term "benefitted"

2       have a generally accepted definition?

3       A.      Yes.

4       Q.      And what would be the generally accepted

5       definition of the term "benefitted"?

6       A.      That the person benefits if some measure of

7       their welfare increases.

8       Q.      Okay.  And are you missing any information

9       that you believe you need in order to form your

10      July 30th Eastern District of Texas expert report

11      opinions at trial?

12      A.      The information that I have here is

13      sufficient for the conclusions that I reach here, and

14      there may be additional conclusions that are

15      rebuttals of the -- that rebut the plaintiffs'

16      experts, which may or may not require additional

17      information.

18      Q.      Okay.  And as you sit here today, you've

19      completed all of the work and opinions that you plan

20      to offer at trial in this case?

21            MR. EWALT:  Objection to form.

22            THE WITNESS:  It's a little bit different

23      from what I just said, as I think you know.

24            The things that I offer at trial will be

25      determined by the questions that I'm asked at trial,

HIGHLY CONFIDENTIAL

Page 274

1    and they will likely include opinions about the new

2    claims and the new analyses that have been made by

3    plaintiffs' experts.

4    BY MS. ABSTON:

5    Q.      Let's quickly look at your table of contents

6    in Exhibit 13.  I believe your table of contents

7    starts on page 1.

8    A.      Yes.

9    Q.      And page 1 starts with Section 1, and I

10   think you have -- let me see here.  Oh, yeah, you've

11   got -- let's see, 15 different sections within your

12   report; is that correct?

13   A.      It appears that that's correct, yes.

14   Q.      Okay.  And all of these sections in your

15   report contain all of the opinions you plan on

16   offering in this case?

17           MR. EWALT:  Objection to form.

18           THE WITNESS:  Except as I've previously

19   described in my last answers to your questions.

20   BY MS. ABSTON:

21   Q.      Okay.  All right.  Let's look at your

22   summary of opinions.

23   A.      Okay.

24   Q.      I believe that starts on page 15.

25   A.      Okay.

Page 275

1    Q.      So each of the subsections of your summary

2    of opinions correspond to the opinions and sections

3    within your report; is that correct?

4            MR. EWALT:  Objection to form.

5            THE WITNESS:  Well, certainly at the

6    beginning, that's what -- in Section A, about how

7    Google's program benefitted its customers, I -- those

8    correspond to sections.

9            The criticisms of the plaintiffs' experts

10   are not organized in the same way.

11   BY MS. ABSTON:

12   Q.      Okay.  And just to clarify.  Does this

13   report contain all of the opinions that you have

14   disclosed to date --

15   A.      This is --

16   Q.      -- in this case?

17   A.      This is my disclosure.  I don't

18   understand -- I don't understand the question.

19   Q.      Okay.  So if I wanted to find the bases for

20   each of these opinions in your summary of your

21   opinions, I would review the remainder of the table

22   of contents in your report to locate those; is that

23   correct?

24   A.      That's correct, yes.

25   Q.      Okay.  Okay.  Let's go back to what you've

HIGHLY CONFIDENTIAL

Page 276

1      been doing the last few months.  You can set this
2      aside for a moment.
3              Oh, actually, before we do that, let me --
4      let me look at this here.
5              Okay.  To which of these state expert
6      reports are you offering opinions in response to?
7      A.      Well, let's see.  I mention -- I mention
8      Pathak, Parag Pathak.  I mention Josh Gans.  I
9      mention Matt Weinberg.
10             I think, you know, this is a 500-page report
11     which I've looked at -- that I haven't totally
12     reviewed in the last -- extremely recently, so I
13     think the report speaks for itself.  But certainly it
14     includes Weinberg and Pathak and Gans.
15     Q.      Okay.  When was the last time you reviewed
16     this report?
17     A.      Well, I'm looking at it right now.  I think
18     it's a couple minutes ago, is one answer to that
19     question.
20     Q.      This one doesn't have a spot on your desk
21     next to the DOJ report, does it?
22     A.      It does not, no.
23     Q.      Okay.
24     A.      It's because -- I will comment that's
25     because I look at this one in electronic form.  The

Page 277

1    DOJ report is sort of history, and I have it in paper

2    form, so I can file it away.

3    Q.      Okay.

4    A.      Yeah.

5    Q.      Okay.  So you don't have any changed

6    opinions that -- or strike that.

7           Do you have any opinions that you believe

8    have changed since you've issued your July 30th,

9    2024, report?

10   A.      I don't believe any of my opinions have

11   changed.  My opinions have not changed.  I think it's

12   more than a belief.  My opinions have not changed

13   since this report.

14   Q.      Okay.  Now we are going to step into what

15   you've been doing the last few months.  And let's

16   talk about your trial testimony in the DOJ trial,

17   okay?

18   A.      All right.

19   Q.      Do you recall when you were told that you

20   were going to testify at the DOJ trial?

21   A.      When I was told that I was going to testify?

22   I don't even know, you know, when it was sort of

23   decided.  I did this the entire period planning to

24   testify, and I was never told that I wasn't going to

25   testify, I guess is the -- yeah.

HIGHLY CONFIDENTIAL

Page 278

```
 1    Q.        And how long were you on the stand
 2    testifying at the DOJ trial?
 3    A.        Well, all morning and part of the afternoon
 4    on -- on that Tuesday that I testified.
 5    Q.        Okay.  I believe that -- well, let's back up
 6    a little bit.
 7              When did you first attend the DOJ trial?
 8    A.        I was present -- I don't remember the dates.
 9    I think I was present the previous week.  I certainly
10    heard some testimony the previous week.
11              You will recall that this is the first time
12    I have testified as a witness at trial, and I found
13    it very informative to see the testimony that -- that
14    others made, and it also was informative about what I
15    would be rebutting.
16              And then -- then there was quite a bit of
17    work to do to sculpt my testimony to fit the issues
18    of the case.
19    Q.        Have you ever attended a trial in person?
20    A.        I have not.
21    Q.        Okay.  So this is your first time being in
22    the courthouse.  So you see the -- well, strike that.
23              Did you attend opening statements for the
24    DOJ trial?
25    A.        No.
```

HIGHLY CONFIDENTIAL

Page 279

1    Q.        Okay.

2    A.        I was unfortunately unable to be there.

3    Q.        Did you read a transcript of the opening

4    statements of the DOJ trial presented?

5    A.        Not of the full transcript, no, I did not.

6    Q.        Did you read Google's opening statements

7    that were presented on September 9th in the DOJ

8    trial?

9    A.        I did not.

10   Q.        Okay.  Did you read the plaintiffs' opening

11   statement?

12   A.        I read -- I did look at the plaintiffs'

13   opening statements, and especially, as you can

14   probably tell, their -- what did they call it --

15   their demonstratives, the slides that they presented.

16   Q.        So you reviewed demonstrative slides.

17            Did you review any of the exhibits that were

18   used at the DOJ trial leading up to your testimony?

19   A.        Yes.

20   Q.        Do you recall which exhibits you reviewed?

21   A.        You're hoping I can describe them?  Is that

22   the hope here?  What are we --

23   Q.        How many exhibits did you review leading up

24   to your testimony in the DOJ trial?

25   A.        One thing that I must admit that it took me

HIGHLY CONFIDENTIAL

Page 280

1    some time to become clear on is what's called an

2    exhibit, and what else was placed in front of

3    witnesses that wasn't called an exhibit.  So at this

4    point I'm not sure, since I didn't know the

5    difference when I began the trial, that I can clarify

6    those for you.

7    Q.       But you did review documents -- either they

8    were exhibits or demonstrative, to use legal terms --

9    that were presented to witnesses at the DOJ trial?

10   A.       I did review some, yes.

11   Q.       Okay.  And do you recall which witnesses

12   those documents, exhibits, demonstratives were used

13   with?

14   A.       Oh, boy.  I'm blanking on names right now.

15   Pardon me a moment.

16   Q.       Well, did you --

17   A.       If we had the names of the witnesses in

18   front of me, I could pull them up more easily, yeah.

19   Q.       Did you -- I will ask it this way.

20            Were there selective witnesses that you read

21   their trial testimony for before you testified at the

22   DOJ trial?

23            MR. EWALT:  Objection to form.

24            THE WITNESS:  I would say no.  I think

25   the -- the witnesses that I witnessed, that I

HIGHLY CONFIDENTIAL

Page 281

1    personally witnessed, were the ones that I paid

2    attention to, and I was aware as the -- as their

3    testimony proceeded that there were certain documents

4    of interest to me.

5    BY MS. ABSTON:

6    Q.        And how many days did you attend trial,

7    leading up to your trial testimony?

8    A.        I think I was present for -- this is a guess

9    now, because I don't recall exact dates.  But I was

10   probably present like four days before my own

11   testimony.

12   Q.        Okay.  And did you ever attend trial after

13   you testified?

14   A.        I think not.

15             Just a moment.  Maybe.  It's all a bit of a

16   fog right now.  I'm sorry.

17   Q.        That's okay.  I will represent to you, I

18   believe you testified on September 24th.

19             Does that sound right?

20   A.        A Tuesday, I think.

21   Q.        Okay.

22   A.        And -- and I had wanted to see some

23   testimony, and I think it -- I think it was testimony

24   I had wanted to see after, but maybe not.  I'm sorry,

25   I just do not recall the order.

HIGHLY CONFIDENTIAL

Page 282

1    Q.        Okay.  Did members of your Auctionomics team
2    also attend the DOJ trial with you?
3    A.        Yes.
4    Q.        Okay.  Did members of your Auctionomics team
5    also just generally attend the DOJ trial without you?
6    A.        No.
7    Q.        Okay.  And how many members of the
8    Auctionomics team accompanied you to trial?
9    A.        Four.
10   Q.        And did you assist in creating any
11   demonstratives for your DOJ trial testimony?
12   A.        Yes.
13   Q.        And which demonstratives did you assist in
14   creating?
15   A.        Well, if you've seen the testimony, you will
16   know that a big chunk of my testimony involved
17   criticizing the demonstratives that were presented by
18   the DOJ, claiming to explain how -- claiming to
19   explain how auctions worked, claiming to explain how
20   dynamic allocation worked.
21           And I had rebuttal demonstratives that were
22   created that corrected the errors and misleading
23   claims on those.  And I worked with my team on that
24   to make them simple and understandable for the Court.
25           Those are the ones that leap to mind

HIGHLY CONFIDENTIAL

Page 283

```
 1    immediately, actually.  And then -- let's see.  Oh,
 2    yes, and then the -- there was -- what's his
 3    name's -- Professor Weintraub's demonstrative about
 4    scale, and I had the rebuttal demonstrative that was
 5    a rebuttal demonstratives that were showing how
 6    exaggerated Professor Weinberg's [sic] conclusions
 7    were.  So I remember that.
 8             That's three.  Those are the ones that pop
 9    to mind.
10    Q.       Okay.  And you said "Professor Weinberg,"
11    but did you mean Professor Weintraub?
12    A.       -traub.  Yes, Gabriel Weintraub.  Did I say
13    Weinberg?  I apologize.
14    Q.       That's okay.
15             And which members -- which specific
16    Auctionomics team members attended the DOJ trial with
17    you?
18    A.       Well, Professor Skrzypacz over there;
19    Mitchell Watt, who is in the other room; Hunter Guru,
20    and Logan Mandol.
21    Q.       Okay.  And did you take any notes during the
22    trial?
23    A.       It's not my custom to take notes.  I usually
24    take mental notes.  So the answer is no.
25    Q.       Okay.  Did anyone from Auctionomics take
```

HIGHLY CONFIDENTIAL

Page 284

1    notes during the trial?

2    A.        I believe they did.

3    Q.        Okay.  And did you discuss their notes that

4    they took during the trial?

5    A.        I had discussions with them, which I

6    imagine, since they use notes, were probably informed

7    by those notes.

8    Q.        Okay.  And did you speak with any of the

9    other Google experts while you were attending the

10   trial?

11   A.        Only socially.  I said, hello, nice to see

12   you, all that kind of thing, but --

13   Q.        Did you --

14   A.        Yeah.

15   Q.        -- speak with any of the plaintiffs' DOJ

16   experts while you were attending the trial?

17   A.        Similarly.

18   Q.        Okay.

19   A.        I said hello to Professor Weintraub.  I

20   think only Professor Weintraub.

21   Q.        And have you concluded all of your work

22   relating to the DOJ case?

23   A.        As far as I know, I have.  If I'm asked to

24   do something else, I'd consider it.  But I think I'm

25   finished.  This is -- remember, I don't know the

Page 285

1    process.  My first one.

2              MS. ABSTON:  Understandable.

3              Okay.  I think we have reached a -- do we

4    want to take a quick break for a moment, if that

5    works for everyone?

6              THE WITNESS:  Certainly.

7              THE VIDEOGRAPHER:  The time is 4:16 p.m.

8    Pacific Time.  We are going off the record.

9              (Recess taken.)

10             THE VIDEOGRAPHER:  The time is 4:37 p.m.

11   Pacific Time.  We are back on the record.

12   BY MS. ABSTON:

13   Q.        Okay, Dr. Milgrom.  I know we've had a long

14   day today, but I think we're almost close to the end,

15   so I just want to ask you a few more questions about

16   some of the materials you relied upon in issuing your

17   July 30th, 2024, report.

18             Does that sound okay?

19   A.        Fine with me.

20   Q.        Okay.  And we just took a break.  Did you

21   speak with counsel over the break?

22   A.        Just chitchat.

23   Q.        Okay.  Did you talk about the contents of

24   your testimony today?

25             MR. EWALT:  Objection.  I'm going to

HIGHLY CONFIDENTIAL

Page 286

```
 1    instruct you not to answer questions about the
 2    substance of your conversations with counsel.
 3    BY MS. ABSTON:
 4    Q.      And you're going to follow the instruction
 5    of your attorney?
 6    A.      I will.
 7    Q.      Okay.  So you're welcome to pull out
 8    Exhibit 3 if you want to, talking about your
 9    Appendix B, materials relied upon, but I'm not sure
10    you will need it.  But feel free to do that.
11            We've briefly talked in passing about when
12    you have seen the other Google expert witnesses at
13    the DOJ trial.
14            Do you recall that?
15    A.      I'm sorry.  That was --
16    Q.      Okay.  We --
17    A.      My head just spun.  We have seen the what?
18    Q.      We have talked today in passing about when
19    you've seen other Google expert witnesses at the DOJ
20    trial.
21            Do you recall that?
22    A.      Yes.
23    Q.      Okay.  And --
24    A.      At the DOJ --
25    Q.      And are you aware of all of the other Google
```

HIGHLY CONFIDENTIAL

Page 287

1    expert witnesses that have been retained here for

2    this case?

3    A.      No.

4    Q.      Okay.  Do you -- I want to walk through a

5    few of the names, just to see if you know any of them

6    personally or -- or by reputation?

7            Does that sound okay?

8    A.      Yes.

9    Q.      Okay.  Do you personally know Donna Hoffman?

10   A.      I do not.

11   Q.      Have you ever interacted with Donna Hoffman

12   professionally?

13   A.      No.

14   Q.      Have you -- or do you personally know

15   Douglas Skinner?

16   A.      No.

17   Q.      Have you interacted with Douglas Skinner

18   professionally?

19   A.      No.

20   Q.      Have you reviewed Douglas Skinner's report

21   issued in this case?

22   A.      No.

23   Q.      Okay.  Have you reviewed Donna Hoffman's

24   report issued in this case?

25   A.      No.

HIGHLY CONFIDENTIAL

Page 288

1    Q.      Do you personally know Itamar Simonson?

2    A.      No.

3    Q.      Have you interacted with Itamar Simonson

4    professionally?

5    A.      Well, his name rings a bell, but I can't

6    place who that is.  So I guess not.

7    Q.      Okay.  And did you review Professor

8    Simonson's report issued within this case?

9    A.      No.

10   Q.      Okay.  Do you personally know Martin Rinard?

11   A.      No.

12   Q.      Have you interacted with Martin Rinard

13   professionally?

14   A.      I have had one phone conversation with him,

15   which I've described already.  And professionally,

16   meaning in connection with this case.

17   Q.      Okay.  And have you reviewed Professor

18   Rinard's report in this case?

19   A.      No.

20   Q.      Do you personally know Steven Wiggins?

21   A.      Personally, no.

22   Q.      Okay.  Have you interacted with Steven

23   Wiggins professionally?

24   A.      Steven Wiggins is actually -- I hadn't

25   really -- the name hadn't clicked before.  Possibly.

Page 289

1    I might know Steven Wiggins.

2    Q.      Okay.  Are you talking in a -- -- strike

3    that.

4            Do you possibly know Steven Wiggins

5    personally?

6    A.      I think we may have met like 20 years ago.

7    I mean, I don't -- I think he and I may have met 20

8    years ago, if it's who I'm thinking of.

9    Q.      Okay.  And have you interacted with him in a

10   professional sense?

11   A.      No.

12   Q.      Do you personally know Jason Nye?

13   A.      No.

14   Q.      Okay.  Have you ever interacted with Jason

15   Nye professionally?

16   A.      No.

17   Q.      Do you personally know Michael Baye?

18   A.      I have met Michael Baye, yeah.

19   Q.      Okay.  Have you interacted with Michael Baye

20   professionally?

21   A.      Have I interacted with Michael Baye

22   professionally?  Prior to this case, prior to the DOJ

23   case, we -- there was a planning meeting where I met

24   him.

25   Q.      Okay.  And was that planning meeting

HIGHLY CONFIDENTIAL

Page 290

1    connected to ongoing Google litigation?

2    A.        Well, to the litigation that's taking place

3    now, yes.

4    Q.        Okay.  And about what year did you meet

5    Michael Baye?

6    A.        Well, at the very beginning.  So it was --

7    what year was I -- did I first get involved here?

8    What year did I first get involved here?  I'm sorry,

9    I forgot.  Time is -- I have trouble keeping track of

10   time.

11   Q.        Okay.  We can just establish that you met

12   Michael Baye when you were originally retained for

13   the DOJ case; would that be correct?

14   A.        I think that's probably right.

15   Q.        Okay.  And if you later discover that you

16   were originally retained for the Eastern District of

17   Texas case first, it would be whatever Google case

18   you were retained for is when you met Michael Baye --

19   A.        Yeah, when we were talking about -- yeah,

20   who would do what, yeah.

21   Q.        Okay.  And have you reviewed Michael Baye's

22   report issued in this case?

23   A.        No.

24   Q.        Okay.  And then do you personally know

25   Professor Ghose?

Page 291

1    A.       No.

2    Q.       Okay.  And have you ever interacted with

3    Professor Ghose professionally?

4    A.       No.

5    Q.       Are you aware Professor Ghose has been

6    de-designated as an expert in this case?

7    A.       No.

8    Q.       And you didn't review his report in any way?

9    A.       No.

10   Q.       Okay.  And do you recall Google's experts in

11   the DOJ trial by name?

12   A.       I'm sure if you read their names, I would

13   probably remember some of them.

14   Q.       Okay.  And have you worked on any other

15   cases with any of the experts that Google has

16   retained in this case?

17            MR. EWALT:  Objection to form.

18            THE WITNESS:  That Google has retained in

19   this case.  No.

20   BY MS. ABSTON:

21   Q.       Okay.  And I believe you've testified today

22   that you have reviewed all of the Plaintiff experts'

23   rebuttal reports that were issued on September 9th;

24   is that correct?

25   A.       All of the plaintiffs' experts' rebuttal

HIGHLY CONFIDENTIAL

Page 292

1    reports?  I'm not a hundred percent sure.

2    Q.      Okay.  Do you recall specific plaintiffs'

3    expert rebuttal reports that you reviewed?

4    A.      The one I reviewed most closely was Matt

5    Weinberg's report, yeah.

6    Q.      But you can't recall any others that you --

7    A.      That's where my attention focused, yes.

8    Q.      Okay.  So let's walk through this for a

9    minute.

10           Do you personally know -- I want to ask you

11   about your connections to any plaintiffs' experts in

12   this case.

13           So do you personally know Joshua Gans?

14   A.      He was my student.

15   Q.      Have you interacted with Joshua Gans

16   professionally?

17   A.      Yes.  I directed his Ph.D. dissertation, for

18   starters.

19   Q.      Okay.  And have you reviewed his opening

20   report that was issued in this case?

21   A.      Yes.

22   Q.      And have you reviewed his rebuttal report

23   that was issued in this case?

24   A.      I looked at it, anyway, yes.

25   Q.      Okay.  What are your opinions, as you're

Page 293

1    sitting here today, that you plan to offer at trial

2    in this case relating to Joshua Gans' rebuttal

3    report?

4              MR. EWALT:  Objection to form.

5              THE WITNESS:  Oh, I -- as I have said, I

6    don't have plans to -- to offer an opinion in the

7    case.  As far as -- as far as I understand, it's the

8    attorneys who will tell me which issues to focus on,

9    and then I will carefully develop my opinions with

10   that in mind.

11   BY MS. ABSTON:

12   Q.       Okay.  So any opinions you have relating to

13   Joshua Gans would be a part of your July 30th, 2024,

14   report --

15             MR. EWALT:  Objection to form.

16   BY MS. ABSTON:

17   Q.       -- absent if you're asked questions at

18   trial?

19             MR. EWALT:  Objection to form.

20             THE WITNESS:  No, I didn't say that.  I --

21   you know, his -- his rebuttal report would also

22   contain statements that I would -- that I might

23   respond to at trial.

24   BY MS. ABSTON:

25   Q.       Okay.  And are you able to sit here today

Page 294

1    with specificity and point out which statements

2    contain -- that Joshua Gans' rebuttal report contains

3    that you plan to offer opinions on at trial?

4                MR. EWALT:  Objection to form.

5                THE WITNESS:  There are several problems

6    with that question.  One is that, as I've told you, I

7    don't have plans.  But that I could -- if I tried to

8    turn that into a meaningful question that I would

9    want to respond to, if I had infinite time or

10   something like that -- I can't respond with

11   specificity anyway, so --

12   BY MS. ABSTON:

13   Q.       Okay.  Do you have any opinions, as you sit

14   here today, that have developed about Dr. Gans'

15   rebuttal report?

16   A.       I have preliminary opinions, yes.

17   Q.       Are you able to speak to those?

18   A.       I am not.  They haven't -- gotten anything

19   that I'm prepared to assert as a -- as a professional

20   opinion at this time.

21   Q.       Okay.  Do you personally know John Chandler?

22   A.       No.

23   Q.       Have you ever interacted with John Chandler

24   professionally?

25   A.       No.

Page 295

1    Q.       Have you ever reviewed John Chandler's

2    opening report?

3    A.       I think so.  I don't recall, yeah.

4    Q.       Have you reviewed John Chandler's rebuttal

5    report?

6    A.       I think it crossed my desk, but I don't

7    think I've studied it, no.

8    Q.       Okay.  What are your opinions, sitting here

9    today, that you -- or strike that.

10           Do you have any opinions, as of today, about

11   Dr. Chandler's rebuttal report?

12   A.       As I sit here today, I have no opinions

13   prepared to offer.

14   Q.       Okay.  Circling back to Professor Gans for a

15   second.  What's your opinion of Dr. Gans as an

16   economist?

17   A.       He's a very creative man and well spoken,

18   and he's a good economist.

19   Q.       Do you personally know Nancy Mathiowetz?

20   A.       No.

21   Q.       Have you ever interacted with Nancy

22   Mathiowetz professionally?

23   A.       No.

24   Q.       Have you reviewed Nancy Mathiowetz' rebuttal

25   report?

HIGHLY CONFIDENTIAL

Page 296

1    A.        I don't recall that report.

2    Q.        Okay.  And do you have any opinions

3    developed as of today about Dr. Mathiowetz' rebuttal

4    report?

5    A.        No.

6    Q.        Do you personally know Zubair Shafiq?

7    A.        No.

8    Q.        Have you interacted with Zubair Shafiq

9    professionally?

10   A.        No.

11   Q.        Have you reviewed Zubair Shafiq's rebuttal

12   report issued in this case?

13   A.        I don't recall.

14   Q.        Okay.  Do you have any opinions developed as

15   of today about Professor Shafiq's rebuttal report?

16   A.        No.

17   Q.        Okay.  Do you personally know David DeRamus?

18   A.        No.

19   Q.        Have you interacted with David DeRamus

20   professionally?

21   A.        No.

22   Q.        Have you reviewed David DeRamus's rebuttal

23   report issued in this case?

24   A.        I don't recall his report.

25   Q.        Do you have any opinions developed as of

Page 297

1    today about David DeRamus's rebuttal report?

2    A.        No.

3    Q.        Do you personally know Jeffrey Andrien?

4    A.        No.

5    Q.        Have you interacted with Jeffrey Andrien

6    professionally?

7    A.        No.

8    Q.        Have you reviewed Jeffrey Andrien's opening

9    report?

10   A.        At this point I don't recall.  I'm sure I --

11   I'm sure it crossed my desk, but I don't recall it

12   now.

13   Q.        Have you reviewed Jeffrey Andrien's rebuttal

14   report?

15   A.        Same.  I don't recall it.

16   Q.        Okay.  Do you have any opinions developed as

17   of today regarding Jeffrey Andrien's rebuttal report?

18   A.        No.

19   Q.        Do you personally know Matt Weinberg?

20   A.        No.

21   Q.        Have you interacted with Matt Weinberg

22   professionally?

23   A.        I believe we have met at a conference once,

24   but that would be the limit.

25   Q.        Did you review Matt Weinberg's opening

HIGHLY CONFIDENTIAL

Page 298

1    reports?

2    A.        Yes.

3    Q.        Did you review Matt Weinberg's rebuttal

4    report?

5    A.        Yes.

6    Q.        As you sit here today, do you have opinions

7    developed regarding Professor Weinberg's rebuttal

8    report?

9    A.        Not sufficiently developed to discuss in

10   detail today.

11   Q.        Generally, do you have opinions that you

12   have developed as of today relating to Professor

13   Weinberg's rebuttal report?

14   A.        Some, yes.

15   Q.        Could you further expand on what those

16   opinions are?

17   A.        Yes.  I think Professor Weinberg's rebuttal

18   report is very different from his opening report.

19   His opening report pays -- you know, defines his

20   field of expertise as algorithmic mechanism design,

21   and he defines "algorithmic mechanism design"

22   as attention to -- algorithm design with attention to

23   economic incentives, and his opening report entirely

24   lacks attention to economic incentives.

25            The rebuttal report then attempts to develop

HIGHLY CONFIDENTIAL

Page 299

1    the theory to justify that, this general theory that

2    he has with so-called default participants, and

3    creates a straw man about the -- that there's -- the

4    only alternative to somebody who's totally -- well,

5    who's a default participant, as he defines it, is

6    a -- someone who is fully informed and totally

7    sophisticated, which I think is totally unfounded.

8              And I think that the rebuttal -- the

9    rebuttal report refers repeatedly, 60, 70 times, to,

10   you know, auction -- principles of auction theory,

11   which are never articulated or cited.

12             You know, I really think it's a weak report.

13   Q.        And do you have any other opinions about

14   Professor Weinberg's rebuttal report as you sit here

15   today?

16   A.        Well, he caught one error of mine, as we

17   have noted already, my omission of the regularity

18   condition from -- it was Theorem 2 or whatever the

19   theorem number was.

20             And then I have lots of very specific --

21   very specific responses.

22   Q.        Okay.  And can you recall any additional

23   specific responses as you sit here today?

24   A.        They are not sufficiently developed that I

25   want to put them on the record.  I want to be able to

Page 300

1    develop them precisely and state them precisely for

2    the Court.

3    Q.        Okay.  So we have walked through --

4    A.        A lot.

5    Q.        We have walked through the opinions that you

6    believe you can sufficiently state regarding

7    Professor Weinberg's rebuttal report at this time?

8    A.        As of today, as of right now.  Just the

9    general response to his reports.

10   Q.        Okay.  Are there any additional preliminary

11   opinions that we could walk through that you have

12   about Professor Weinberg's rebuttal report?

13   A.        They are not sufficiently specifically

14   developed that I can articulate them yet.  That's the

15   testimony that this would be.

16   Q.        So we have discussed all that you believe

17   you can articulate at this time?

18   A.        Specifically today, yes.

19   Q.        Okay.  Do you personally know Cynthia Rudin?

20   A.        No.

21   Q.        Have you interacted with Cynthia Rudin

22   professionally?

23   A.        No.

24   Q.        Have you reviewed Cynthia Rudin's rebuttal

25   report?

HIGHLY CONFIDENTIAL

Page 301

1    A.        No.

2    Q.        I think that --

3    A.        Not that I recall, I should say.  Yes.

4    Q.        Okay.

5    A.        I mean, not that I recall, yes.

6    Q.        Do you have any opinions developed, as you

7    sit here today, regarding Cynthia Rudin's rebuttal

8    report?

9    A.        No.

10   Q.        Okay.  Do you personally know Parag Pathak?

11   A.        Yes.

12   Q.        How do you know Parag Pathak?

13   A.        He was a student in the very first -- I

14   co-invented the field of market design.  Professor Al

15   Roth and I taught the very first course in market

16   design in 2000, and Parag Pathak was a student there,

17   or at MIT; I've forgotten which.

18            He came out to Stanford with me, installed a

19   refrigerator in my home.  I don't know if these

20   details are helpful to you.

21            I have known Parag for almost -- about --

22   almost 25 years now.

23   Q.        And so you've interacted with Parag Pathak

24   professionally?

25   A.        Personally, professionally, in many ways,

HIGHLY CONFIDENTIAL

Page 302

```
 1   yes.

 2   Q.        And have you reviewed Parag Pathak's opening

 3   report?

 4   A.        Absolutely.

 5   Q.        Okay.  Have you reviewed his rebuttal

 6   report?

 7   A.        I have looked at it, yes.

 8   Q.        Okay.  Do you have any opinions as of today

 9   that you've developed about Professor Pathak's

10   rebuttal report?

11   A.        Nothing that I am prepared to discuss today.

12   Q.        Is there anything that generally you've

13   formulated as an opinion in response to Professor

14   Pathak's rebuttal report?

15   A.        Not as of today.

16   Q.        Okay.  And what's your opinion of Dr. Pathak

17   as an economist?

18   A.        He's one of the outstanding economists of

19   his generation.

20   Q.        And do you know Jacob Hochstetler?

21   A.        I don't.

22   Q.        Have you interacted with Jacob Hochstetler

23   professionally?

24   A.        No.

25   Q.        Have you reviewed Jacob Hochstetler's
```

HIGHLY CONFIDENTIAL

Page 303

1      opening report?

2      A.        I'm sure I saw it, yes.

3      Q.        Have you reviewed -- yes.  As you sit here

4      today, do you have any additional opinions that

5      you've developed about Jacob Hochstetler's report?

6      A.        No.

7      Q.        Do you personally know Anil Somayaji?

8      A.        No.

9      Q.        Have you interacted with Anil Somayaji

10     professionally?

11     A.        No.

12     Q.        Have you reviewed Anil Somayaji's rebuttal

13     report?

14     A.        No.

15     Q.        Okay.

16     A.        Not that I recall.

17     Q.        Okay.  So as you sit here today, we have

18     established that you have additional opinions that

19     you plan on offering at trial relating to plaintiffs'

20     expert rebuttal reports; is that correct?

21               MR. EWALT:  Objection to form.

22               THE WITNESS:  Yeah, as I said, I'm planning

23     on offering at trial -- you know, I fully intend to

24     comply with what I'm asked to respond to by

25     defendant's attorneys, and I don't have any plans yet

HIGHLY CONFIDENTIAL

Page 304

1    as to what I will offer at trial.  But I certainly

2    have opinions about these matters, and I will develop

3    those opinions fully, as appropriate.

4    BY MS. ABSTON:

5    Q.        Okay.  And you testified that you did not

6    review a handful of rebuttal reports that were issued

7    on September 9th; is that -- is that correct?

8    A.        I don't recall exactly.  I didn't -- I

9    certainly didn't study them in detail.  There was a

10   lot of material coming in, and this is not the only

11   thing I'm doing.  And I was asked to focus on the --

12   on the issues that relate specifically to the -- the

13   questions I was asked, the auction design practices.

14   So I -- anything that appeared off point, I might

15   have glanced at, but then set aside.

16   Q.        Okay.  So when you testify that plaintiffs'

17   expert rebuttal reports were wrong, you were not

18   talking about the reports that you had not reviewed;

19   right?

20            MR. EWALT:  Objection to form.

21            THE WITNESS:  Any report I have not

22   reviewed, I don't have any opinion about.

23   BY MS. ABSTON:

24   Q.        Okay.  Like, for example, since you didn't

25   read the report of Dr. Rudin, you aren't sitting here

HIGHLY CONFIDENTIAL

Page 305

1    testifying today that you believe her report is wrong

2    in any way?

3    A.        I'm not testifying to that -- that now,

4    yeah.

5    Q.        And you're not testifying to any opinions --

6    strike that.

7             You don't plan to offer any opinions

8    relating to Dr. Rudin's rebuttal report at trial?

9             MR. EWALT:  Objection to form.

10            THE WITNESS:  Plan to offer at trial is the

11   same -- the same response that I always give.  Okay?

12   Do I need to spell it out again?

13            MS. ABSTON:  We're good.  Okay.  Let's --

14   let me make sure here.

15   Q.        I want to step back quickly to your general

16   history of testifying.

17   A.        Sure.

18   Q.        So we will flip back to -- I think we marked

19   that as Exhibit 1.

20   A.        Exhibit 1.

21   Q.        Yes.

22   A.        This guy.  "General History of Testimony."

23   Q.        Okay.  And so we established that this is a

24   case that includes all litigation testimony that

25   you've given, I believe since 2000; is that correct?

HIGHLY CONFIDENTIAL

Page 306

1    A.        That's what it says, "2000 to present."

2    Q.        Okay.  And of this list, were there any

3    cases that involved digital advertising outside of

4    those that we have already discussed today?

5    A.        Outside of those we have discussed today.

6    So...

7    Q.        These are --

8    A.        So we are talking about -- we're talking

9    about 5, 6 --

10   Q.        Yes, so --

11   A.        -- 8 and 9 we have discussed.

12   Q.        Well, yes.  And maybe let's do it quickly

13   this way.

14             Looking at your list here --

15   A.        Yep.

16   Q.        -- excluding the Google testimony we've

17   already discussed today, let's walk through this.

18             So No. 1 is Public Utility Commission of

19   Oregon.  Did that -- or what was the subject matter

20   of that case?

21   A.        Nothing related to digital advertising.  Do

22   you want to know more about it?

23   Q.        I think that's sufficient for now.  I might

24   come back to it.

25   A.        Okay.

HIGHLY CONFIDENTIAL

Page 307

```
 1    Q.        On No. 2, the American Arbitration
 2    Association entry, did that pertain to advertising
 3    technology?
 4    A.        No, that's MCG PCS vs. Leap Wireless.  And
 5    no, that was about -- no.
 6    Q.        Did that have any relation to digital
 7    advertising?
 8    A.        None.
 9    Q.        Okay.  No. 3, another American Arbitration
10    Association.
11    A.        That was about acquisition of mineral
12    rights.
13    Q.        Okay.  And so that didn't have anything to
14    do with digital advertising or advertising
15    technology?
16    A.        That's right.
17    Q.        Okay.  No. 4, this appears --
18    A.        Mario Gabelli, that's related to PCS
19    communication.  That's related to bidding and
20    spectrum auctions.
21    Q.        So that had nothing to do with digital
22    advertising or advertising technology?
23    A.        Right.
24    Q.        Okay.  No. 6 --
25    A.        No. 5.
```

Page 308

1    Q.        Oh, I'm sorry.  No. 5 we've already spoken

2    about today.

3    A.        Yeah.

4    Q.        "Bid for Position vs. Google."

5              So No. 6 would be, let's see, Marla

6    Tidenberg -- I'm going to butcher that --

7    A.        Versus BidZ.

8    Q.        Versus BidZ.  Does that have anything to do

9    with digital advertising?

10   A.        It had to do with online auctions but not

11   digital advertising.

12   Q.        Did that have anything to do with

13   advertising technology?

14   A.        No, it did not.

15   Q.        No. 7 is the Alaska Electric Pension Fund

16   case.  Did that have anything to do with digital

17   advertising?

18   A.        It had to do with securities markets, not

19   digital advertising.

20   Q.        And then I think we've established today

21   that there are some entries missing off of this list,

22   as the list concludes with No. 9, which is your DOJ

23   testimony; is that correct?

24            MR. EWALT:  Objection to form.

25            THE WITNESS:  The list includes --

HIGHLY CONFIDENTIAL

Page 309

1    BY MS. ABSTON:

2    Q.      Well, let me ask it like this --

3    A.      The list includes No. 9.  That's correct.

4    Q.      Okay.  Does this case include information

5    about the -- your expertise or expert testimony that

6    you're providing in this case today?

7            MR. EWALT:  Objection to form.

8            THE WITNESS:  Does No. 9 include

9    information?

10   BY MS. ABSTON:

11   Q.      Does the list overall include your testimony

12   that you're offering here today?

13   A.      Yes, what did we end up omitting?  I've

14   forgotten what's omitted already.

15   Q.      So it -- but --

16   A.      Is there something -- I don't recall what

17   was omitted.

18   Q.      If we were to update this list to be an

19   accurate representation of all the testimony that you

20   have been retained in and offered expert opinions on,

21   up to date, it would require us to update this list

22   and include this case caption for today's deposition;

23   is that correct?

24   A.      Oh, if --

25           MR. EWALT:  Objection to form.

                                                        Page 310

1              THE WITNESS:  Expert -- yeah, the expert

2      report was delivered in this period, so it would be

3      added at this point.

4      BY MS. ABSTON:

5      Q.       Okay.  So in theory, we would correct this

6      part of your CV to add --

7      A.       I'm not sure that's a correction.  That's an

8      update.

9      Q.       An update.  An update, okay.

10     A.       Yeah.

11     Q.       So we would update to add this case.

12             Are there any other cases that we would add

13     that was not discussed today that you've currently

14     been retained in as an expert witness?

15             MR. EWALT:  Objection to form.

16             THE WITNESS:  What's that?

17             MR. EWALT:  I'm objecting to form.  And we

18     should -- I should also caution you not to answer, to

19     the extent that your answer would reveal any legal

20     work you're doing in nonpublic matters.

21             THE WITNESS:  Okay.  So to the best of my

22     recollection then, nothing.

23     BY MS. ABSTON:

24     Q.       Okay.  So you've not issued any other expert

25     reports or given any sort of expert testimony that we

HIGHLY CONFIDENTIAL

Page 311

1    would need to add to make this list accurate and

2    complete as of today?

3    A.       Not to the best of my knowledge.

4    Q.       Okay.  And do you intend on -- well, strike

5    that.

6    ████████████████████████████████████

█    ████████████████████████████████

█    ███████  █████████  ███████████

█    ██████████████████████████████████

█    ████████████████████████████████████

█    ███████████████████

█    ███████████  ██████████████████████

█    ███████

█    ██ MS. ABSTON:

15   Q.       Okay.  Are you aware of any other Google

16   litigation pertaining to adtech that are currently

17   ongoing, outside of the Eastern District of Texas

18   case and the DOJ litigation?

19   A.       Well, we've already described -- discussed

20   the Woods, now "Cabrera vs. Google" case.  That's

21   related to adtech litigation.

22   Q.       Okay.  And there's no other cases that

23   you're aware of, as you sit here today, that Google

24   is involved in relating to the adtech space?

25   A.       Yeah, well, I understand that there is

Page 312

1    continuing litigation that Google is involved in.
2    There's a case in New York that Google is involved
3    in.   There's a case -- there are cases in Europe and
4    in Israel that Google is involved in that are related
5    to adtech.
6    Q.      Okay.
7    A.       I'm -- I'm aware of a number of other cases
8    that Google is involved in.
9    Q.       And how did you come to discover those
10   litigations?
11           MR. EWALT:  Objection.  I'm going to
12   instruct you not to answer, to the extent that your
13   answer would reveal communications with counsel.
14           MS. ABSTON:  Strike that.
15   BY MS. ABSTON:
16   Q.       Without revealing any privileged
17   communications, if you're able to, how did you become
18   aware of other Google adtech litigation?
19   A.       Well, one of my -- another one of my former
20   students is a witness in another case, who told me he
21   was a witness in another case.
22   Q.       Okay.  And are you able to disclose who that
23   former student is?
24   A.       I am not, no.
25   Q.       Okay.  And are you able to disclose the

HIGHLY CONFIDENTIAL

Page 313

1    other case that your former student is a part of?

2    A.        It's a case -- the case in Israel.

3    Q.        And you mentioned a case in New York; is

4    that right?

5    A.        Yes.

6    Q.        Okay.  And how did you become aware of that

7    case in the Southern District of New York?

8              MR. EWALT:  Objection.  I'm going to

9    instruct you not to answer, to the extent that your

10   answer would reveal the contents of communication

11   with counsel.

12             THE WITNESS:  No answer.

13   BY MS. ABSTON:

14   Q.        And what's your understanding of the case in

15   New York?

16   A.        I understand that it involves similar issues

17   to these other two cases.

18             MS. ABSTON:  I think if we can take a quick

19   break, we can go off the record.

20             THE VIDEOGRAPHER:  The time is 5:06 p.m.

21   Pacific Time.  We are going off the record.

22             (Recess taken.)

23             THE VIDEOGRAPHER:  The time is 5:27 p.m.

24   Pacific Time.  We are back on the record.

25             ///

HIGHLY CONFIDENTIAL

Page 314

1    BY MS. ABSTON:

2    Q.       Okay.  Dr. Milgrom, did you talk with

3    counsel over the break?

4    A.       Yes.

5    Q.       And did you talk about the substance of your

6    testimony today?

7            MR. EWALT:  I'm going to instruct you not to

8    answer, to the extent your answer would reveal

9    communications with counsel.

10   BY MS. ABSTON:

11   Q.       Okay.  And you're going to follow that

12   instruction?

13   A.       I am.

14   Q.       Okay.  Let's -- let's wrap up with what you

15   have planned for the upcoming Eastern District of

16   Texas case trial.  Okay?  Does that sounds good?

17   A.       Well, I don't know that I have anything

18   planned.

19   Q.       Okay.  Are you aware of the trial date in

20   this case?

21   A.       I have it in my calendar.

22   Q.       Okay.  And you plan on testifying in person

23   at trial here in this case?

24           MR. EWALT:  Objection to form.

25           THE WITNESS:  I expect to be available to

HIGHLY CONFIDENTIAL

Page 315

1    testify in person in trial in this case.

2    BY MS. ABSTON:

3    Q.       Do you think you have anything left to do in

4    this case prior to trial?

5    A.       Yes.

6    Q.       And what is that?

7    A.       I think to work out the response to the

8    rebuttal testimony that was offered in connection

9    with the matters that I was supposed to comment on.

10   Q.       And we've discussed that to the fullest

11   extent that we can today; is that correct?

12   A.       Fullest extent we can today, that's right.

13   Q.       Okay.  Do you plan on submitting any sort of

14   supplementary opinion in this case?

15   A.       I don't -- I'm not aware that that's part of

16   the process.  If it were part of the process, I

17   might.  But I'm not aware of any such thing.

18   Q.       But you're not, like, drafting a report

19   right now in relation to this case?

20   A.       No.

21   Q.       And did you read any court decisions in

22   preparing for your opinions in this case?

23   A.       At the very, very beginning, I was given

24   some things to read basically about antitrust law, to

25   try to learn a little bit about it.

Page 316

1    Q.        Was that case law that you were given or
2    were those recent court decisions?
3    A.        There was a Law Review article.  This was
4    right at the beginning, just to get me, you know,
5    in -- there was a Law Review article and one case
6    that I was given to look at.
7    Q.        Okay.
8    A.        Excuse me.  Pardon me a moment.
9    Q.        Bless you.
10             And did you look at any statutes when
11   drafting your expert report in this case?
12   A.        I did not.
13   Q.        Okay.  And when you were drafting your
14   expert report in this case, did you look at any
15   specific case law, other than what you've previously
16   discussed?
17   A.        Nothing -- nothing other than what I've
18   described.
19   Q.        Okay.  Okay.  Earlier we discussed your time
20   as a visiting research professor at Google; is that
21   correct?
22   A.        I think that title was "visiting research
23   associate."  I think it's in here.
24   Q.        Was your title "visiting research scholar"
25   at Google in 2017?

HIGHLY CONFIDENTIAL

Page 317

1    A.       Let's see if it's in here.  Hopefully it's

2    in here.  Maybe it's not.

3    Q.       I believe it's in your report.

4    A.       Okay.  If it's in my report, it will tell

5    you the year.

6    Q.       I will represent to you on page 11 of your

7    report, paragraph 9, you were a visiting research

8    scholar at Google --

9    A.       Okay.

10   Q.       -- from 2017 to 2018.

11   A.       Thank you.  Very good.  Yes.

12   Q.       And so we discussed your time at Google

13   earlier today.

14            Do you recall that?

15   A.       We have talked about it some then.  Yes, I

16   recall.

17   Q.       Okay.  And you were there approximately 9 to

18   12 months; is that right?

19   A.       Certainly not 12 months.  Probably less than

20   9 months.  If I were guessing, I would guess that it

21   was more like 6 months.

22   Q.       And you testified that while you were a

23   visiting research scholar, you received compensation

24   from Google?

25   A.       I did, yes.

HIGHLY CONFIDENTIAL

Page 318

1          THE WITNESS:  Pardon me.  There is something

2    ringing, and I want to make sure this is all off.  I

3    apologize for that.

4          Okay.  That should stop it.

5    BY MS. ABSTON:

6    Q.      Okay.  And so just to refresh, you testified

7    while you were a visiting research scholar that you

8    received compensation from Google?

9    A.      Yes.

10   Q.      And you received certain benefits while --

11   from Google at that time?

12   A.      Like lunch, yes.  Yes.

13   Q.      And you had an office option at the Google

14   campus for your --

15   A.      Yes.

16   Q.      -- one-day-a-week visit?

17   A.      Yes.

18   Q.      Okay.  And as a part of your visiting

19   scholar position, did you receive a Google email

20   account?

21   A.      I did, yes.

22   Q.      Okay.  And do you recall what that Google

23   email account address was?

24   A.      Yes, I do.

25   Q.      And what was that Google email address?

HIGHLY CONFIDENTIAL

Page 319

1    A.        I believe it was milgrom@google.com.

2    Q.        Okay.  And have you -- and so that email

3    address expired -- or strike that.

4              Did you ever use that email address after

5    you left your position as a visiting research scholar

6    at Google?

7    A.        No.  It was canceled when I left.

8    Q.        Okay.  And then with that access, did you

9    have any -- with that -- strike that.

10             With that email address, did you have access

11   to and use any other Google applications?

12   A.        "Any other Google applications."

13             Well, yes, the same as you would from any

14   email address, except I had access to internal ones

15   because of that, yes.

16   Q.        So what were some of the Google applications

17   that you had access to?

18   A.        You know, Google Docs.  There was some file

19   sharing; I shared files with other people at Google

20   sometimes.  You know, just the standard Google office

21   applications was what I used.  I probably had access

22   to more than that, but that's what I used.

23   Q.        Okay.  Did you have access to Google Drive?

24   A.        I had a Google Drive, yes.

25   Q.        Did you have access to Google Hangouts?

HIGHLY CONFIDENTIAL

Page 320

1    A.        I'm not sure.  I never used Google Hangouts.

2    I might have had access to it.

3    Q.        Did you have access to Google Chat?

4    A.        I imagine, having a Google email account,

5    there would have been access to Google Chat, Google

6    Meet.

7    Q.        How did you typically correspond with other

8    Google employees?

9    A.        Email.

10   Q.        And you used all of these apps during your

11   time as a visiting research scholar?

12              MR. EWALT:  Objection to form.

13              THE WITNESS:  As I said, I've used some of

14   these apps.  That is -- to the extent I used them at

15   all, it was during that time.

16   BY MS. ABSTON:

17   Q.        Okay.  And during that time period, what

18   would you have talked to Google employees about?

19   A.        I was primarily interested -- so the

20   conversations that I initiated were almost entirely

21   about ████████████████████████████████████████████████

██   ██████████████████████████████████████    ███

██   ███████████████████████████████    ██████████

██   █████████████████████████████████████████

██   ████████████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 321

1    ███████████████████

█    ████████████████████████████████  and

3    things that they contacted me about were mostly the

4    same, but a few others.  I also got contacted by

5    others at Google.

6    Q.       Okay.  So when Google employees contacted

7    you and reached out to you, what platform did they

8    use to do so?

9    A.       Email.

10   Q.       Okay.  Did a Google employee ever reach out

11   to you by chat?

12   A.       I don't recall that ever happening.  If it

13   did, it was rare.

14   Q.       Okay.  But it's possible that a Google

15   employee could have reached out to you by chat during

16   your time as a visiting research scholar?

17   A.       It's possible they could have, yeah.

18   Q.       Okay.  And when you said your email address

19   is canceled, do you mean your email address was

20   deleted?

21   A.       I mean, I -- I don't know exactly how the

22   details work.  But I had -- while I was at Google,

23   they gave me a Chromebook, which was a laptop that I

24   could use to access whatever I was accessing at

25   Google.

Page 322



I don't know.

9    Q.        Okay.  And during that time period, would

10   you have talked to Google employees about any sort of

11   auction-related discussion?

12   A.        Yes.

13   Q.        Okay.  And what type of auction discussion

14   would you have had with Google employees during your

15   time as a visiting research scholar?

16   A.        Yeah, so -- I'm having trouble remembering

17   details, but

And we talked

HIGHLY CONFIDENTIAL

Page 323

1    about ██████████████████.

2    ████████████████████████████████████

3    ██████████████████████████████████████

4    ██████████████████████        You know, those sorts

5    of things.

6    Q.        And did you observe Google employees using

7    Google Chat?

8    A.        I don't think so, no.  I mean, when I was

9    with them -- when I met with employees, it was either

10   in person or we communicated by email, or quite often

11   Google Meet.  The -- we'd have meetings, and some

12   people would be participating remotely.

13   Q.        And were you aware of Project Bernanke?

14            MR. EWALT:  Objection to form.

15            THE WITNESS:  When?

16   BY MS. ABSTON:

17   Q.        At any point in time -- strike that.

18            Are you currently aware of Project Bernanke?

19   A.        Uh-huh.

20   Q.        When did you first become aware of Project

21   Bernanke?

22   A.        In connection with these cases.

23   Q.        When did you first -- are you aware of RPO?

24   A.        I am, yeah.

25   Q.        When did you first become aware of RPO?

HIGHLY CONFIDENTIAL

Page 324

1    A.       Oh, as so named in connection with these

2    cases.

3    Q.       Are you aware of DRS?

4    A.       Yes.

5    Q.       When did you first become aware of DRS?

6    A.       In connection with these cases.

7    Q.       And are you aware of -- okay.

8            Were there any other programs that we have

9    not discussed today that you were aware of when you

10   were a visiting -- or -- yeah, a visiting research

11   scholar at Google?

12           MR. EWALT:  Objection to form.

13           THE WITNESS:  There were programs that I was

14   aware of even before I became -- when I was at OpenX,

15   I was aware of EDA and helped OpenX design their own

16   version.

17   BY MS. ABSTON:

18   Q.       Are there additional programs that you were

19   aware of prior to becoming a visiting research

20   scholar at Google?

21   A.       Well, I didn't know RPO by name, but it --

22   you know, at OpenX we also talked about how we could

23   help publishers set more effective floor prices.

24   Q.       And were there Google programs related to

25   their auctions that you were aware of that were not

HIGHLY CONFIDENTIAL

Page 325

1    publicly known?

2    A.        I wouldn't know what was publicly known.

3    That wasn't part of what I paid any attention to at

4    that time.

5    Q.        Okay.  Okay.  You've mentioned in relation

6    to Auctionomics about Silvia today.

7              Do you recall that testimony?

8    A.        Absolutely.  Yeah.

9    Q.        And what is Silvia's full name?

10   A.        Silvia Console Battilana.  Console is

11   C-O-N-S-O-L-E, and Battilana is B-A-T-T-I-L-I-A-N-A

12   [sic].

13   Q.        Silvia is a co-founder of Auctionomics; is

14   that right?

15   A.        Yes.

16   Q.        And so when Auctionomics was founded in

17   2011, it was you and her as the two founders; is that

18   correct?

19   A.        That's right.

20   Q.        And how did you originally meet Silvia?

21   A.        She was -- before she received her Ph.D. --

22   she received her Ph.D. in economics in -- at

23   Stanford, and she had been a student in one of my

24   classes.  And we had worked together on some

25   projects -- not research projects, but projects

HIGHLY CONFIDENTIAL

Page 326

1  related to the economics department at Stanford, and

2  she was incredibly effective.  She was a planner,

3  high energy, got things done, did whatever was needed

4  to make things work.  I thought she was -- would make

5  a great business partner, so I invited her.

6  Q.        Okay.  And what are her current job

7  responsibilities at Auctionomics?

8  A.        She's the CEO.  She -- is that enough, or do

9  you need more?

10  Q.        Well, you mentioned today that she's -- she

11  holds many different job positions, such as managing

12  the invoices for Auctionomics and assembling the

13  teams that are associated with your expert witness

14  retention.  But I'm wondering if there's any other

15  job -- job positions that she currently takes on?

16  A.        We're a -- we're a small company, and I am a

17  full-time professor.  And Silvia runs everything.

18  She does the hiring.  She, you know, negotiates --

19  negotiates salaries.  She negotiates our contracts.

20  She, you know, manages 90 percent of the finances.

21  She -- although we have staff that -- that helps her

22  with that.

23            She's -- she, you know, markets our

24  services.  She makes connections.  She's really good

25  at that.  She spends a lot of time -- she's a member

HIGHLY CONFIDENTIAL

Page 327

1    of the Young Global Leaders and has connections, goes

2    to meetings, keep -- makes connections.  That helps

3    us find business sometimes.  So --

4    Q.      Okay.

5    A.      -- great partner.

6    Q.      And was she always CEO of Auctionomics?

7    A.      Yeah, right from the beginning.  I'm -- I'm

8    a full-time professor.  I needed a partner who

9    could -- this was what the deal was.  I needed a

10   partner who could run the business and take care of

11   everything.  And my name would help bring in

12   business.  And I would work on interesting projects

13   and make some money, and she would run the business.

14   That's --

15   Q.      Okay.

16   A.      -- probably have inferred that from some of

17   the stuff that's gone on here.  Yeah.

18   Q.      Okay.  You -- I'm going to bounce around a

19   little bit to some of your prior testimony today.

20   A.      Uh-huh.

21   Q.      So you previously discussed some of

22   Auctionomics' seven-figure expenses that they've --

23   or that have contributed to the opinions that you're

24   forming in this case.

25           Do you recall that?

Page 328

1              MR. EWALT:  Objection to form.

2              THE WITNESS:  I think you're talking about

3      the data and software stuff.

4      BY MS. ABSTON:

5      Q.       Right.  So for any expenses that you've

6      incurred in forming your opinions in this case, did

7      Google reimburse you for those?

8              MR. EWALT:  Objection to form.

9              THE WITNESS:  We billed Google for them, and

10     they've -- most of them have been -- they are all --

11     everything is reimbursed with a lag.

12     BY MS. ABSTON:

13     Q.       How much of a lag?

14     A.       Well, we typically bill at the end of the

15     month each month for all of our expenses.  And if we

16     manage to get everything out on time, we get paid

17     within, I don't know, six weeks, something like that.

18     Q.       And you previously testified about ▮▮▮

19     ▮▮▮▮▮  Do you recall that testimony?

20     A.       Well, I recall ▮▮▮▮ and I recall that I

21     testified about him.  Is that enough?

22     Q.       Okay.  Yes.

23              Prior to your retention as a Google -- as

24     Google's expert within the DOJ and Eastern District

25     of Texas case, did you ever talk to ▮▮▮▮about any of

HIGHLY CONFIDENTIAL

Page 329

1    the Google conduct at issue?

2              MR. EWALT:  Objection to form.

3              THE WITNESS:  I remember in 2015, I think it

4    was about 2015, having a discussion about some

5    programs.

6    BY MS. ABSTON:

7    Q.       And what prompted that discussion in 2015?

8    A.       Academic conference.  I had presented my

9    paper with Nick Arnosti and Marissa Beck.  That's

10   listed somewhere.  And I was concerned about -- well,

11   possible effect of EDA.  And I recall ████ telling me

12   I had it wrong, that the -- that their -- that the

13   controls they had in place would eliminate that

14   problem, and they didn't think they needed to modify

15   the option design on that account.  And it turns out

16   that's what is confirmed by my own data analysis now.

17   Q.       Were there any other programs that you

18   discussed with ████ at that time?

19   A.       No, that one stood out because I had just

20   written a paper about it.  And -- and the auction

21   design that I had created for OpenX was to mitigate

22   that problem.  And ████ claimed that Google didn't

23   have that problem.  And as I say, as it turns out,

24   that seems to be correct.

25   Q.       Okay.  And that was during the time period

HIGHLY CONFIDENTIAL

Page 330

1    that you were providing commercial advice for

2    OpenX --

3    A.        Yes.

4    Q.        -- in 2015?

5    A.        Uh-huh.

6    Q.        Did you ever speak with ███ regarding any

7    anti -- antitrust concerns related to Google?

8    A.        No, I don't believe I have.

9    Q.        Okay.  Have you ever spoken with ███ prior

10   to your retention as Google's expert witness within

11   the DOJ or Eastern District of Texas matter, about

12   any antitrust concerns specifically related to

13   auctions?

14   A.        I do not recall having any such discussions

15   with ███.

16   Q.        Okay.  And just so the record is clear, what

17   was your concern at the time, in 2015, about EDA?

18   A.        A concern that we call adverse selection.

19   Does that code word mean anything to you?

20   Q.        No.

21   A.        Okay.

22   Q.        Would you further provide any more

23   information about your concerns related to EDA in

24   2015?

25   A.        Yeah.  So it dates -- it dates actually all

HIGHLY CONFIDENTIAL

Page 331

1    the way back to the Yahoo days.  Jon Levin had

2    written about in the -- in our little paper in the

3    American Economic Review about the "happy contract."

4    I don't know if -- whether you've read any of my

5    stuff.

6            But anyway, the possibility that with fine

7    targeting, the -- there might be more valuable

8    impressions and less valuable impressions, and the

9    people who had access to finer targeting would claim

10   the more valuable impressions and harm those who had

11   less information, so it's called adverse selection.

12   The selection of impressions left over for the other

13   group would be adversely selected, from their point

14   of view.  And so that was a logical possibility that

15   could have been true, and that was suggested by

16   economic theory.

17           But it turns out that, in fact, the -- what

18   is mostly going on, the overwhelming -- what's

19   overwhelmingly important is matching, that is,

20   getting the right ads to the right people rather than

21   shifting, you know, better ad -- and there are good

22   reasons for that, too.  If you wanted to go into

23   them, I could tell you something about that.

24   Q.       So you had concern about adverse selection,

25   and █████ disagreed with you at the time?

HIGHLY CONFIDENTIAL

Page 332

```
 1   A.       He told me that -- that Google had looked at
 2   that and found ███████████████████████████████.
 3   Q.       And that was as early as 2009?
 4   A.       '15.
 5   Q.       Okay.  But you started having concerns about
 6   it in 2009?
 7   A.       I started having concerns at Yahoo in 2009.
 8   It might have -- it might have been a problem in
 9   2009.  I'm not sure.  But in 2015, we had written a
10   paper about it and -- about the theory and about how
11   auction design could be modified to mitigate the
12   problem.
13            And ██████told me that Google had looked at it
14   and figured out that █████████████████████
15   Q.       Okay.  And what was the name of the paper in
16   2009 that you published?
17   A.       The 2009 paper?
18   Q.       Uh-huh.
19   A.       It's with -- it's my only paper with Jon
20   Levin, and it's --
21   Q.       Okay.  And it's contained within your CV?
22   A.       It's in my CV.
23   Q.       And then --
24   A.       The 2015 paper is with Nick Arnosti,
25   A-R-N-O-S-T-I, and Marissa Beck.
```

Page 333

1    Q.       Okay.

2    A.       Maybe it's 2016.  I'm not quite sure.  In

3    around there.

4    Q.       Okay.  Dr. Milgrom, do you currently own any

5    Google stock?

6    A.       No.

7    Q.       Have you ever owned any Google stock?

8    A.       No.

9    Q.       Do you know if you have any family members

10   who own Google stock?

11   A.       I don't know if I have any family -- I doubt

12   it.

13   Q.       Have you ever had any family members that

14   have worked for Google?

15   A.       Family members that work for Google.  No, I

16   don't think so.  Nobody close, certainly.

17   Q.       And we've covered today any time that you've

18   worked for Google in a nonlitigation capacity;

19   correct?

20   A.       We have.

21   Q.       Okay.  And then you testified today that

22   you've been to, I believe, at least one of Google's

23   offices; is that correct?

24   A.       That I've been to their offices?  Oh, yeah,

25   well, I've been to several of their offices several

HIGHLY CONFIDENTIAL

Page 334

1    times.

2    Q.        Okay.  And which offices have you been to?

3    A.        I don't remember the building names.

4    There's a bunch of them in Mountain View.

5            I believe the -- the -- I testified as early

6    as -- well, when the IPO was taking place, I was on

7    the Google campus a couple of times for that.

8            When I was present for the -- as a visiting

9    research scholar, or whatever the position was, I was

10   present roughly once a week for that.

11           And there are a couple of other times.  You

12   know, I've been curious about -- oh, and there have

13   been other academic conferences that have happened on

14   the Google campus.  Just like sometimes we have

15   conferences at Stanford, sometimes there are

16   conferences at Google.  I've been on -- on the Google

17   campus once or twice for conferences.  I'm not really

18   quite sure where all those conferences were.

19   Q.        About how many academic conferences have you

20   attended at Google?

21   A.        Well, I just said once -- once or twice for

22   the academic conferences.  Actually, I think only

23   once.  I think the other one that I'm thinking of was

24   not actually on the Google campus.

25           I think once is just the answer to that

HIGHLY CONFIDENTIAL

Page 335

1    question.

2    Q.        Okay.  And do you currently supervise any

3    Ph.D. students who are employed by Google?

4    A.        Ph.D. students employed by Google.

5    Q.        Yes.

6    A.        No.  No, I don't.

7    Q.        And are you aware of any of your Ph.D.

8    students who have gone on to work for Google?

9    A.        There are Ph.D. students from Stanford

10   economics who have gone on to work for Google.  None

11   of them were my direct supervision.  But some of

12   them -- by my students, you mean anybody who has

13   taken a class from me, then possibly.

14   Q.        Okay.  And then I want to step back and talk

15   a little bit more about your Nobel before we get done

16   for the day.

17              So I'm going to hand you what we're going to

18   mark as Exhibit 14, which is -- if you take a moment

19   and review that.  I'm going to hand you this with the

20   sticker.

21   A.        Thank you.

22                    (Exhibit No. 14 was marked.)

23              MS. ABSTON:  It's M-30.  I'm sorry.

24   Q.        Do you recognize this document?

25   A.        Yeah, I guess I do.  When was this?  March

HIGHLY CONFIDENTIAL

Page 336

1    2021.  Yes.  Looks like.

2    Q.      Do you recall giving this interview in March

3    of 2021?

4    A.      Vaguely, yes.

5    Q.      Okay.  Have you reviewed this interview

6    before?

7    A.      Probably.  Yeah.  Probably so.

8    Q.      Do you have any reason to believe that this

9    is not a complete and accurate copy of the interview

10   that was published online in --

11   A.      No.

12   Q.      -- March 2021?

13   A.      It says, "This interview has been edited for

14   length and clarity."  Okay.  So as it says at the

15   very end, the interview has been edited for length

16   and clarity.  So it's been edited from words close to

17   mine here.

18   Q.      Okay.  And at the bottom of that, there's a

19   URL; is that correct?

20   A.      There is indeed.

21           MS. ABSTON:  Okay.  Okay.  And I'm going to

22   now give you what I'm going to mark as Exhibit 15.

23   This is M-42.

24                   (Exhibit No. 15 was marked.)

25           MS. ABSTON:  Take a moment and review that.

HIGHLY CONFIDENTIAL

Page 337

```
 1    Q.       Do you recognize this document?
 2    A.       This looks familiar, yes.
 3    Q.       Okay.  Did you -- have you seen this
 4    document before?
 5    A.       I believe so.  It looks familiar.
 6    Q.       Do you recall the last time that you've seen
 7    this document?
 8    A.       No.
 9    Q.       Okay.  And can you read the title of this
10    document?
11    A.       "The Quest for the Perfect Auction."
12    Q.       Okay.  And it appears at the top right-hand
13    corner, it says, "The Prize in Economic Sciences of
14    2020" --
15    A.       Yes.
16    Q.       -- is that correct?
17    A.       Yes, that's right.
18    Q.       Okay.  And if we flip to the very last page
19    here, it believes -- I believe that this is an
20    article that was written about you and Professor
21    Wilson; is that correct?
22    A.       It sure looks that way.
23    Q.       Okay.  Okay.  And then at the top --
24    flipping back to the first page, at the top left-hand
25    corner, is there some sort of seal or logo on the
```

HIGHLY CONFIDENTIAL

Page 338

1    document?

2    A.        Yes, from the Royal Swedish Academy of

3    Sciences.

4    Q.        And you recognize that seal as meaning that

5    it comes from the Royal Swedish Academy of Sciences?

6    A.        It looks familiar, yes.

7    Q.        Okay.  And do you recall any specific

8    contributions that you may have made to this piece?

9              MR. EWALT:  Objection to form.

10             THE WITNESS:  I don't recall that I made

11   specific contributions to this piece.

12   BY MS. ABSTON:

13   Q.        Okay.  But you may have reviewed it or you

14   recall seeing it?

15   A.        There was a lot happening.  I tell you, it

16   was the busiest time of my life was right after the

17   Nobel Prize.  The phone never stopped ringing.  News

18   interviews.  Potential clients.  Offers.  That was

19   not pleasant.

20   Q.        Well, is there -- is there such a thing as a

21   perfect auction?

22   A.        "Is there such a thing as a perfect

23   auction."

24             Well, this is a -- you know, this is -- I

25   wouldn't have chosen this language, let's just say.

HIGHLY CONFIDENTIAL

Page 339

1    Q.        Okay.  And why would you have not chosen

2    that language?

3    A.        The -- when we design auctions, we have

4    multiple objectives, and sometimes they're in tension

5    with one -- in tension with one another, and

6    there's -- there's no perfect way of resolving the

7    tension.

8              So -- so I'm -- I don't think there's such a

9    thing as -- well, I guess I'm answering your previous

10   question.  I guess I don't think there's such a thing

11   as a perfect auction unless you've -- rather, there's

12   an auction that optimally -- that gives you a good

13   balance of the objectives that matter to you.

14   Q.        Okay.  And then I -- our final stop.

15             You mentioned at the beginning of our time

16   today that you have a CV that you have updated since

17   July 30th, 2024; is that correct?

18   A.        Quite possibly.  It would also -- it would

19   be online, and I could look for it and see if there's

20   a -- but you could also find it.

21             MS. ABSTON:  Okay.  We would like to mark

22   that new CV as an exhibit, or at least ask that

23   counsel provide it to us if it's made available to

24   you.  Okay.  Are we -- are you amenable to that or

25   amenable today --

HIGHLY CONFIDENTIAL

Page 340

```
 1              MR. EWALT:  Not today.
 2              MS. ABSTON:  -- in providing an updated CV?
 3              MR. EWALT:  Not today.
 4              MS. ABSTON:  Okay.  Then I think,
 5     Dr. Milgrom, I want to thank you for your time today.
 6     Thank you for -- I know it was a long day, but I want
 7     to reserve my time for if Google has any questions.
 8     So thank you.
 9              THE WITNESS:  Okay.  All right.
10              MS. ABSTON:  I will pass the witness.
11              MR. EWALT:  All right.  Let's go off the
12     record.
13              THE VIDEOGRAPHER:  The time is 5:59 p.m.
14     Pacific Time.  We are going off the record.
15              (Recess taken.)
16              THE VIDEOGRAPHER:  The time is 6:24 p.m.
17     Pacific Time.  We are back on the record.
18                        EXAMINATION
19     BY MR. EWALT:
20     Q.     Good evening, Professor Milgrom.
21     A.     Hello.
22     Q.     Do you recall being asked questions earlier
23     today about your time as a visiting research scholar
24     at Google?
25     A.     I do, yes.
```

Page 341

1    Q.        While you were a visiting research scholar

2    at Google, did you work on any projects related to

3    display advertising?

4    A.        I did not, no.

5    Q.        Would you please turn to Exhibit 3, which is

6    the list of materials considered in your Texas

7    report.

8    A.        Yes, I have it here.

9    Q.        Do you see on the first page a list of

10   deposition transcripts?

11   A.        Yes.

12   Q.        And do you recall testifying earlier today

13   about deposition transcripts?

14   A.        I've talked -- yes, I talked some about

15   deposition transcripts.  Yes.

16   Q.        Did you review the deposition transcripts

17   listed in Exhibit 3 when you were formulating your

18   opinions in this case?

19   A.        Yeah, they were included in the material

20   that was reviewed.

21   Q.        Do you recall being asked questions about

22   your methodology?

23   A.        I do, yes.

24   Q.        In preparing your report in this case, did

25   you apply the same techniques and rigor that you use

HIGHLY CONFIDENTIAL

Page 342

1    in your academic work?

2    A.        Yes.  I'm actually very proud of writing

3    this at the same level that I write my best academic

4    work.

5    Q.        In preparing your report in this case, did

6    you apply mathematical principles, results, and

7    insights that stem from economical auction theory and

8    game theory literatures?

9    A.        Yes.

10   Q.        In preparing your report in this case, did

11   you apply concepts and principles from the field of

12   market design?

13   A.        Yes.

14   Q.        In preparing your report in this case, did

15   you analyze facts, including documentary evidence and

16   testimony, about the practices at issue in this case?

17   A.        Yes.

18   Q.        Would you please turn to Exhibit 13, which

19   is your report in this case.

20   A.        Sure.

21   Q.        And within Exhibit 13, I'd ask you to take a

22   look at paragraph 328.

23   A.        Paragraph 3- -- 400.  Man.  Do you know what

24   page it's on?

25   Q.        237.

HIGHLY CONFIDENTIAL

Page 343

```
 1    A.        Let's get this off, then.

 2              Oh, you've got it up there, anyway.

 3              Okay.  Got it.

 4    Q.        In paragraph 328 is where you discuss

 5    Theorem 2; is that correct?

 6    A.        Yes.

 7    Q.        And do you recall discussing Theorem 2

 8    earlier today?

 9    A.        I do, yes.

10    Q.        And I believe you testified that you realize

11    that your statement of Theorem 2 in the report should

12    have specified a condition about regularity.

13    A.        Yes.

14    Q.        Do I have that right?

15    A.        Yes.

16    Q.        What is the regularity condition?

17    A.        It's a standard condition in auction theory

18    that implies that a certain function is concave in

19    shape.

20    Q.        Is regularity a common assumption in auction

21    theory?

22    A.        Almost universal, yes.

23    Q.        Did you use Google data to investigate

24    whether the regularity condition is satisfied?

25    A.        Actually, I used Google data to investigate
```

HIGHLY CONFIDENTIAL

Page 344

1    the conclusion of the theorem directly, whether or

2    not the regularity condition applied.  Since one can

3    argue about approximations and assumptions, and

4    really it's the conclusions that matter.

5    Q.        And do the updates to paragraph 328 that you

6    testified about earlier today cause you to change any

7    of the conclusions in your report?

8    A.        No, neither the updates nor the data causes

9    me to change the conclusion.  This floor price does,

10   within practical -- for all practical purposes,

11   maximize publisher revenue.

12            MR. EWALT:  Thank you, Professor Milgrom.  I

13   will pass the witness.

14            MS. ABSTON:  Three minutes.  Can we go off

15   the record?

16            THE VIDEOGRAPHER:  The time is 6:28 p.m.

17   Pacific Time.  We are going off the record.

18            (Recess taken.)

19            THE VIDEOGRAPHER:  The time is 6:35 p.m.

20   Pacific Time.  We are back on the record.

21                    FURTHER EXAMINATION

22   BY MS. ABSTON:

23   Q.        Dr. Milgrom, I just have a few questions for

24   you.

25   A.        Sure.

Page 345

1    Q.       So you just offered some testimony regarding

2    the insertion that we made to paragraph 328 today.

3             Do you recall that testimony?

4    A.       Yes.

5    Q.       And you stated that the data did not cause

6    you to change your conclusion; is that correct?

7    A.       That was one of the things I said, yeah.

8    Q.       And did you reexamine the data after noting

9    your omission?

10   A.       Yes.

11   Q.       Okay.  And then you testified that Exhibit 3

12   contains all the deposition transcripts that you

13   relied upon in forming your opinions in this case; is

14   that correct?

15   A.       Yes.

16   Q.       And did you personally read all of these

17   deposition transcripts from start to finish?

18   A.       No.

19   Q.       Okay.  Which ones did you read?

20   A.       From start to finish, I didn't read any of

21   them from start to finish.  They were in the database

22   that we -- that I searched.  And when I cite -- and I

23   cite pieces of them when they are relied on in the

24   report.

25   Q.       Okay.  Did you review any deposition

HIGHLY CONFIDENTIAL

Page 346

1    summaries when you were forming your opinions in this

2    report?

3    A.        I don't think so.

4    Q.        Okay.

5    A.        I don't recall reviewing deposition summary.

6    What I recall was -- was searching for -- for certain

7    things, and this is in the database that we searched.

8            MS. ABSTON:  Okay.  Thank you so much for

9    your time today.  We appreciate it.

10           THE WITNESS:  Okay.  You're welcome.

11           MS. ABSTON:  I will pass the witness.

12           MR. EWALT:  One question.

13                    FURTHER EXAMINATION

14   BY MR. EWALT:

15   Q.        Professor Milgrom, did you review at least

16   parts of all of the depositions listed in Exhibit 3,

17   your list of materials relied upon?

18   A.        Yes.

19           MR. EWALT:  Thank you.  No further

20   questions.

21           THE VIDEOGRAPHER:  This concludes today's

22   testimony given by Dr. Paul Milgrom.  Going off the

23   record at 6:37 p.m. Pacific Time.

24           (The deposition was concluded at 6:37 p.m.)

25                    --o0o--

HIGHLY CONFIDENTIAL

Page 347

1          Please be advised I have read the foregoing

2    deposition, and I state there are:

3    (Check one)    _____NO CORRECTIONS

4                   _____CORRECTIONS PER ATTACHED

5

6

7         _____

8          PAUL R. MILGROM, Ph.D.

Page 348

```
 1              DEPONENT'S CHANGES OR CORRECTIONS
 2     Note:  If you are adding to your testimony, print the
 3     exact words you want to add.  If you are deleting
 4     from your testimony, print the exact words you want
 5     to delete.  Specify with "Add" or "Delete" and sign
 6     this form.
 7     DEPOSITION OF:    PAUL R. MILGROM, Ph.D.
 8     CASE:            STATE OF TEXAS, ET AL., VS. GOOGLE
 9     DATE OF DEPOSITION:  NOVEMBER 21, 2024
10     PAGE        LINE     CHANGE/ADD/DELETE
11     _____    _____   _____
12     _____    _____   _____
13     _____    _____   _____
14     _____    _____   _____
15     _____    _____   _____
16     _____    _____   _____
17     _____    _____   _____
18     _____    _____   _____
19     _____    _____   _____
20     _____    _____   _____
21     _____    _____   _____
22     _____    _____   _____
23     _____    _____   _____
24     DEPONENT'S SIGNATURE _____
25     DATE_____
```

Page 349

1                    CERTIFICATE OF REPORTER

2          I, SANDRA BUNCH VANDER POL, a Certified

3    Shorthand Reporter, hereby certify that the witness

4    in the foregoing deposition was by me duly sworn to

5    tell the truth, the whole truth and nothing but the

6    truth in the within-entitled cause;

7          That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time

9    and place therein stated, and that the testimony of

10   the said witness, PAUL R. MILGROM, Ph.D., was

11   thereafter reduced to typewriting (pages 1 - 348), by

12   computer, under my direction and supervision;

13         That before completion of the deposition,

14   review of the transcript was requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed

17   are appended hereto.

18         I further certify that I am not of counsel or

19   attorney for either or any of the parties to the said

20   deposition, nor in any way interested in the event of

21   this cause, and that I am not related to any of the

22   parties thereto.

23   DATED:  November 22, 2024        *Sandra Bunch VanderPol*

24                        _____

                         SANDRA BUNCH VANDER POL, CSR #3032

25

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.