IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |


### GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ANTITRUST CLAIMS

## TABLE OF CONTENTS

I.    The Challenged Conduct Constitutes Lawful Refusals to Deal. ............................................. 2

II.   There Is No Actionable Tying Claim. ...................................................................... 7

  A.   There Is No Coercion. ........................................................................................ 8

    1.   AdX And DFP Are Not "Tied" By Technical Limitations. .............................................. 8

    2.   AdX And DFP Are Not Tied Contractually. ................................................................. 9

  B.   Plaintiffs' Tying Claim Seeks To Force Google To Deal With Rivals. ............................ 10

III.  Plaintiffs Fail To Refute Google's Legitimate Business Justifications. ............................ 11

IV.   Plaintiffs Cannot Demonstrate Net Harm in the Alleged Market for Ad Exchanges. ........ 13

V.    Plaintiffs Attempted Monopolization Claim in the Market for Ad Buying Tools for Large Advertisers Fails for Lack of Evidence. ...................................................................... 14

VI.   The Statute of Limitations Bars Certain State Law Civil Penalty Claims. ........................ 15

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) .................................................... 1

*ASAP Paging Inc. v. Century Tel. Co. of San Marcos, Inc.*, 137 F. App'x 694 (5th Cir. 2005) .... 2

*Assoc. Radio Serv. Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir. 1980)............................. 13

*Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984).......................................... 5

*Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033 (5th Cir. 1981)........................................ 8

*Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157 (10th Cir. 2023) ............................... 3, 4

*Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009) ................. 2, 3, 5

*City of Groton v. Conn. Light & Power*, 662 F.2d 921 (2d Cir. 1981)........................................ 13

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) .................................. 13

*Four Corners Nephrology Assocs. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216

   (10th Cir. 2009) ....................................................................................................................... 5

*In re Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678940 (N.D. Cal. Oct. 30, 2009)............. 8

*In re Apple iPod iTunes Antitrust Litig.*, 796 F. Supp. 2d 1137 (N.D. Cal. 2011) ........................ 4

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)............................................................ 5

*In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022)...................... 1

*In re Suboxone Antitrust Litig.*, 622 F. Supp. 3d 22 (E.D. Pa. 2022). .................................... 13, 14

*Jack v. Evonik Corp.*, 79 F.4th 547 (5th Cir. 2023) ..................................................................... 15

*Liveuniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852 (C.D. Cal. June 4, 2007).................... 5, 6

*Lorain J. Co. v. United States*, 342 U.S. 143 (1951) ..................................................................... 4

*Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518

   (S.D.N.Y. Oct. 10, 2008)........................................................................................................ 15

*New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559

   (S.D.N.Y. 2004) ................................................................................................. 5

*Novell, Inc. v. Microsoft Corp*, 731 F.3d 1074 (10th Cir. 2013) ........................... 2, 3, 4

*O'Dell v. Gen. Motors Corp.*, 122 F. Supp. 2d 721 (E.D. Tex. 2000)......................... 15

*Ohio v. Am. Express*, 585 U.S. 529 (2018) ............................................................... 13

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ...................... 2, 5

*Quintel Tech. Ltd. v. Huawei Tech., Inc.*, 2017 WL 9286991 (E.D. Tex. Dec. 13, 2017) .......... 15

*Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307 (5th Cir. 1976) ................. 9

*Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 888 (5th Cir. 2016) .................. 13

*Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041 (D. Colo. 2011) ............................... 12

*State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469 (7th Cir. 1991)............ 6

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999).................................... 11

*Sw. Bell Tel., L.P. v. Arthur Collins, Inc.*, 454 F. Supp. 2d 600 (N.D. Tex. 2006) ...................... 12

*Thomas v. Price*, 975 F.2d 231 (5th Cir. 1992) ........................................................... 12

*Tucker v. Apple Comput., Inc.*, 493 F. Supp. 2d 1090 (N.D. Cal. 2006) ................................. 3, 4

*United States v. Google LLC*, No. 20-cv-3010 (APM), 2024 WL 3647498

   (D.D.C. Aug. 5, 2024)..................................................................................... 2

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).................................... 8

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398 (2004).................... passim

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)..................................... 3

Plaintiffs' Opposition raises no genuine issue of material fact and summary judgment is warranted on all of Plaintiffs' claims.[1]

The undisputed facts in this case make clear that Plaintiffs' claims rest on the misguided notion that Google had a duty to deal with its competitors. It did not. Plaintiffs seek to avoid this bedrock principle of antitrust law by asserting that such arguments have already been rejected in the MDL and in the parallel case in the Eastern District of Virginia. Nothing in Judge Castel's opinion denying in part Google's motion to dismiss addresses whether or not, based on the undisputed facts in the case, Google's conduct is a lawful refusal to deal under *Trinko*. Indeed, as Judge Castel noted in denying Google's motion to dismiss, "[e]xperience teaches that cases often look very different when evidence from both sides is considered." *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 359-60 (S.D.N.Y. 2022). Judge Castel was right; when required to come up with facts to support their baseless allegations, Plaintiffs have fallen far short. Likewise, Judge Brinkema did not write on any of the issues raised in Google's motion for summary judgment and her Order asserts no conclusions about whether, as a matter of law, Google's conduct was a lawful refusal to deal. Order, *United States v. Google LLC*, No. 1:23-cv-108 (LMB) (E.D. Va. June 14, 2024), ECF No. 773.

Plaintiffs also attempt to escape the refusal to deal doctrine by recasting Google's conduct as an improper restriction on customers as opposed to rivals. But the challenged conduct did not preclude Google's customers from dealing with its rivals, as was the case in *Lorain Journal*, but

---

[1] In an effort to gin up disputes of fact, Plaintiffs dispute 204 of the 257 facts in Google's Statement of Undisputed Material Facts. On summary judgment, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis added). But the genuine issues Plaintiffs raise are not material, and the material issues are not genuine. For example, Plaintiffs dispute that Dynamic Allocation was launched by a product innovation that DoubleClick launched by asserting a "dispute[] as to whether dynamic allocation was an 'innovation' rather than a product feature"—a distinction that is irrelevant to Google's entitlement to summary judgment. SMF ¶ 88 (ECF No. 687-10); RSMF ¶ 88 (ECF No. 712-7).

1

instead involves Google's failure to facilitate the business of its rivals *on its own platform*. Creating such an obligation would require Google to deal with its competitors, which is squarely foreclosed by *Trinko* and its progeny.

Plaintiffs' Opposition as to Google's other arguments fares no better.[2] Plaintiffs fail to point to any genuine dispute of material fact precluding summary judgment as to their tying claim or Google's legitimate business justifications. They fail to muster any evidence to meet the Supreme Court's *American Express* requirement for proving antitrust violations in multi-sided markets by demonstrating "net harm" in the market for ad exchanges or Google's market share in the market for ad buying tools for large advertisers. And they fail to show how tolling doctrines cure the statute-of-limitations problems with various State Plaintiffs' claims for civil penalties.

## I.    The Challenged Conduct Constitutes Lawful Refusals to Deal.

Google's challenged conduct falls within the refusal to deal framework under *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398 (2004), and the long line of cases that follow it. *See, e.g.*, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009); *Novell, Inc. v. Microsoft Corp*, 731 F.3d 1074 (10th Cir. 2013); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009); *ASAP Paging Inc. v. Century Tel. Co. of San Marcos, Inc.*, 137 F. App'x 694 (5th Cir. 2005); *United States v. Google LLC*, No. 20-cv-3010 (APM), 2024 WL 3647498 (D.D.C. Aug. 5, 2024). Plaintiffs' only response is semantic, claiming that Google's conduct "does not concern … whether or not to deal with its *rivals* but rather Google's direct restriction of its *customers'* choices to do business with competitors." Opp. 12. Their argument is wrong on the law and mischaracterizes the facts.

---

[2] As Plaintiffs' Opposition does not rebut Google's argument that it is entitled to summary judgment because not all of the conduct had anticompetitive effects or caused anticompetitive effects in all of Plaintiffs' alleged relevant markets, Mot. 43 (Section IV.A.), Google is entitled to summary judgment on these challenged acts in these markets.

With respect to the law, Plaintiffs principally rely on *Novell*, *Tucker v. Apple Comput., Inc.*, 493 F. Supp. 2d 1090 (N.D. Cal. 2006), and *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157 (10th Cir. 2023).[3] Neither *Novell* nor *Tucker* stand for the propositions for which Plaintiffs cite them and *Chase* expressly applies not to *Trinko*'s permissible refusal to deal, but to *Lorain Journal*-type prohibitions on doing business with rivals.

Plaintiffs' reliance on *Novell* and *Tucker* is puzzling. Neither *Novell* nor *Tucker* stand for the proposition that the "refusal to deal doctrine … has no applicability where a monopolist retains its market power by thwarting a customer's ability to effectively choose an alternative provider." Opp. 24, 36. *Novell* counsels that a plaintiff cannot evade the "duty to deal" doctrine, as Plaintiffs seek here, by "trying to recast conduct as an affirmative act of interference with a rival rather than a 'unilateral' refusal to deal." 731 F.3d at 1078. In rejecting plaintiffs' attempt to "toy with the act-omission distinction," then-Judge Gorsuch noted that "[w]hether one chooses to call a monopolist's refusal to deal with a rival an act or omission, interference or withdrawal of assistance, the substance is the same and it must be analyzed under the traditional [refusal to deal] test we have outlined." *Id.* at 1079.

*Tucker* involved allegations of tying and monopolization in connection with Apple's redesign of its iTunes software, which allegedly left consumers using iTunes with no choice but to use an iPod. 493 F. Supp. 2d at 1099. In the preliminary opinion Plaintiffs cite, Judge Ware denied Apple's motion to dismiss, concluding that the plaintiff had a viable claim notwithstanding

---

[3] Plaintiffs also repeatedly rely on cherry-picked statements from *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), but only once (and then incorrectly) relate its facts to those here, and only with respect to the tying claim. *See* Opp. 16. This is because the facts supporting *Viamedia*'s refusal-to-deal claim are simply not present here. Google's DFP and AdX products represent the "'prototypical' vertically-integrated firm," *Viamedia*, 951 F.3d at 464; Opp. 8, and even *Viamedia* recognizes that "'the creator of a resort has no obligation under the antitrust laws to allow competitive suppliers of ancillary services on its property'"—the best analogy to the conduct at issue in this case. 951 F.3d at 465 (quoting *Christy Sports*, 555 F.3d at 1193).

the "refusal to deal" doctrine. *Id.* at 1101. But Plaintiffs failed to inform this Court that Judge Ware subsequently reversed course after *Tucker* was consolidated with other cases, *granting summary judgment* for Apple based on the "duty to deal" doctrine. *In re Apple iPod iTunes Antitrust Litig.*, 796 F. Supp. 2d 1137, 1145 & n.6 (N.D. Cal. 2011).

Finally, Plaintiffs' reliance on *Chase* is simply misguided. Opp. 12. *Chase* involved a manufacturer giving its distributor customers an "all-or-nothing choice: stop doing business with [a new competitor] or lose access" to the manufacturer's product. 84 F.4th at 1171-72. On appeal, both parties *agreed*, as did the Tenth Circuit, that the district court erred in applying the duty to deal standard, which applies to "situations *often remedied by monopolists sharing their technology with rivals.*" *Id.* at 1173 (emphasis added). In remanding the case, the court observed that the conduct at issue resembled the exclusionary conduct in *Lorain J. Co. v. United States*, 342 U.S. 143 (1951). *See Chase*, 84 F.4th at 1172. But as explained in Google's opening brief, *Lorain Journal* (and thus *Chase*) are not applicable here. Mot. 36. None of the challenged conduct—Dynamic Allocation/Enhanced Dynamic Allocation, line item caps, data reductions, or Unified Pricing Rules—involve any action by Google which explicitly or implicitly conditions the use of Google's ad tech tools on a customer *not* using the tools of Google's competitors.

For this reason, Plaintiffs' attempt to escape the refusal to deal doctrine by trying to "recast" Google's conduct is unavailing. Opp. 12. Regardless of how the conduct is characterized, there is no genuine dispute that Google's conduct is not the "all-or-nothing" conduct at issue in *Lorain* or *Chase*, but rather Google's refusal to alter its own technology to better integrate with rivals.

- **DA and EDA:** Plaintiffs do not dispute that the gravamen of their complaint is that Google did not configure DFP to "receive real-time bids *from other exchanges*." Ex. 11 (ECF No. 674-14), ¶ 351 (emphasis added); Opp. 25 (Google had the "technological means to stop such interference"). Thus, whether framed as a restriction on Google's customers or a refusal to deal with rivals, the claim is that Google did not alter its technology to integrate

with competitors. Of course, Google's DFP customers remained free to use any ad exchange they pleased, instead of or in addition to AdX. *See infra* Section II.

- **Line Item Limits:** Placing a (high) technological limit on the number of line items *in Google's ad server* does not prevent customers from using rival ad exchanges. As Google noted in its Motion, Mot. 23, even accepting as true that line item limits are a "limit[] on customers," Opp. 26, summary judgment is warranted. Plaintiffs' claim is grounded in the notion that Google should have designed DFP differently—specifically, to enable *more* exchange competitors to compete using line items *within its own ad server*. Opp. 26-27.

- **Redacted Data Transfer Files:** Citing no Section 2 case to establish that Google was required to provide data transfer files in the first instance,[4] Plaintiffs fail to explain why, having chosen to do so, Google was required to provide them in a certain way. Rather, the crux of Plaintiffs' complaint is that Google did not provide information to its customers that "might have" made it easier for Google's rivals to compete. Mot. 25-26.

- **UPR:** Google does not dispute that UPRs prevent publishers from disadvantaging Google *on its own platform*. Mot. 27. And Plaintiffs do not dispute that UPRs do not apply anywhere other than on Google's own platform. SMF ¶ 207; RSMF ¶ 207 (cited evidence does not create a dispute as to whether UPR applies to publishers using ad servers other than GAM). Plaintiffs fail to acknowledge that Google had no duty to let rival exchanges access GAM in the first place, Mot. 28, and "it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." *linkLine*, 555 U.S. at 450.

Indeed, even if DA/EDA, Line Item Limits, Redacted Data Transfer Files, or UPR were, as Plaintiffs argue, "restrictions" on Google's customers' choice, such conduct is perfectly legal as it, at most, limited customers' ability to do business with rivals *only on Google's own platform*. *See Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) (soft drink distributor could prohibit retail outlet customers from placing rival soft drink products in vending machines owned by the defendant); *see also, e.g.*, *Christy Sports*, 555 F.3d at 1192-97; *Four Corners Nephrology Assocs. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1221-25 (10th Cir. 2009) (Gorsuch, J.); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52-54 (2d Cir. 2007); *Liveuniverse, Inc.*

---

[4] Plaintiffs' argument is based on caselaw addressing Section 1 conspiracies. In contrast, Section 2 cases hold that even an alleged monopolist has no duty to supply pricing information to customers if doing so would benefit its rivals. *See New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 563, 570-72 (S.D.N.Y. 2004) (rejecting Section 2 liability where defendant NYMEX prevented data recipients from sharing pricing data with rivals or using it for competitive purposes).

*v. Myspace, Inc.*, 2007 WL 6865852, at \*11-15 (C.D. Cal. June 4, 2007), *aff'd*, 304 F. App'x 554, 557 (9th Cir. 2008). This is so even if customers would prefer that Google's products work differently. "Monopolists needn't acquiesce to every demand placed upon them by competitors or customers; a monopolist's duties are negative—to refrain from anticompetitive conduct—rather than affirmative—to promote competition." *State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1484 (7th Cir. 1991).

In short, this case is on all fours with *Trinko* in its focus on a company's own technology choices on its own platform, rather than prohibitions on customers doing business with rivals. *Trinko* involved a Section 2 claim brought by customers of Verizon's rivals who wanted the court to compel Verizon to establish better interconnection services with those rivals on Verizon's platform. The complaint alleged "that Verizon denied interconnection services to rivals" in order to "discourage customers from becoming or remaining customers of competitive LECs." 540 U.S. at 404, 407. In affirming the application of the refusal-to-deal framework, the Supreme Court in *Trinko* explained that the relief necessary to address plaintiffs' claim would require the district court to impose "detailed sharing obligations." *Id.* at 415. Noting that the district court was "unlikely to be an effective day-to-day enforcer" of such obligations, the Supreme Court went on to conclude that "Section 2 … seeks merely to prevent *unlawful monopolization*.… [I]t does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Id.* at 415-16.

The *Trinko* Court made clear that the "uncertain virtue of forced sharing" cannot displace the value our antitrust laws place on a firm's ability to choose whether and under what conditions to deal with its rivals. *Id.* at 408. *Trinko* counsels for judicial restraint in the face of requests for unwarranted intrusion into the free market, whether from competitors, customers, or States

claiming to act on their behalf. Indeed, the result in *Trinko* would have been no different had the conduct at issue been framed as a restriction on or interference with Verizon customers' choice to do business with Verizon's rivals. Plaintiffs' claims seek to force Google to open up its own ad tech platform to provide services "not otherwise marketed or available," *id.* at 410, in order to theoretically "yield greater competition," *id.* at 416. This would require Google to permit its rivals to free-ride on its investments and their fruits. *Id.* at 410.

Plaintiffs are wrong that Google "puts the cart before the horse" by raising "thorny questions" concerning remedies. Opp. 26, 28, 33, 37-38. Those "thorny questions" are precisely what guided the Supreme Court in *Trinko* in its evaluation of the plaintiffs' claims in that case (at the motion to dismiss stage, no less). Notably, Plaintiffs here do not (and cannot) dispute the relevance of the questions, nor do they offer any explanation for why this Court need not consider them in ruling on summary judgment. The antitrust laws squarely reject a requirement that Google deal with its competitors, and thus courts have consistently refused to require "forced sharing." *Trinko*, 540 U.S. at 408.

## II.    **There Is No Actionable Tying Claim.**

Google's ad exchange, AdX, and its ad server, DFP, are not "tied" together—by technical limitations or contractually. Nothing in Plaintiffs' Opposition changes the undisputed fact that publishers are not "forced" to "purchase" DFP in order to use AdX. In fact, Plaintiffs' Opposition reveals a fundamental problem with Plaintiffs' claim. They acknowledge that AdX, not "real-time bids" from AdX, is the alleged tying product. Opp. 17 n.5. But their argument is that Google "force[s] publishers to purchase DFP if they wish to access AdX real-time bidding." Opp. 15. Having failed to define "real-time bids" from AdX as the tying product, that should be the end of the inquiry. Mot. 31 n.13. But even if it were not, the tying claim cannot survive summary

judgment because there is no genuine issue of material fact that there is no "actual coercion." *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981).

### A.  There Is No Coercion.

#### 1.  AdX And DFP Are Not "Tied" By Technical Limitations.

Plaintiffs' tying claim fails because they do not (and cannot) dispute the fact that a publisher does not need to use DFP to access AdX. SMF ¶¶ 173-176. Plaintiffs' so-called "dispute" is about the "effectiveness" of the access to AdX provided through AdX Direct. RSMF ¶¶ 173-176. But claiming that AdX Direct tags are not as "effective" as accessing AdX through DFP does not change the undisputed fact that DFP and AdX *can* be and *are* used separately. That is, publishers can and do access AdX without using DFP. SMF ¶¶ 173-176.

In fact, as articulated by Plaintiffs, Opp. 16, their claim mirrors the tying claim ultimately dismissed in *In re Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678940, at *5-6 (N.D. Cal. Oct. 30, 2009). There, Apple developed "products that worked optimally with one another," which plaintiffs alleged was an illegal tie because "functionality was impaired when not using the two products together." *Id.* The court granted judgment on the pleadings for Apple because "the increased convenience of using the two products together due to technological compatibility does not constitute anticompetitive conduct" when the products could be used independently from one another. *Id.* (noting this also distinguishes the case from *United States v. Microsoft Corp.*, 253 F.3d 34, 85-86 (D.C. Cir. 2001)).

Plaintiffs' attempt to focus on "real-time bids" from AdX does not save their claim not only because they failed to define "real-time bids" as the relevant product market, but also because they are simply wrong on the facts. AdX does not provide "bids" to any ad server, including DFP. SMF ¶ 38. Its core technological functionality is that, once AdX is called, if an AdX bidder beats

the applicable floor price, that bidder wins and AdX serves the ad (*not* the bid). *Id.* This is exactly

how AdX Direct tags work. Bhat Decl., Ex. 108 (ECF No. 721-22) at 34:5-11 (█████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████). Plaintiffs attempt to

dispute this fact, but the cited evidence does not refute the fact that AdX *does not* provide real-

time *bids* to DFP. SMF ¶ 38; RSMF ¶ 38.

  Moreover, even assuming for the sake of argument that AdX did provide "real-time *bids*"

(not *ads*) to DFP, which it does not, that would not preclude summary judgment. Tying claims

premised upon technological incompatibility with rivals fail unless the incompatibility was

"designed for the purpose of tying the products, rather than to achieve some technologically

beneficial result. Any other conclusion would enmesh the courts in a technical inquiry into the

justifiability of product innovations." *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537

F.2d 1307, 1330 (5th Cir. 1976); *see also infra* Section III (discussing justifications for real-time

bidding and DA). The evidence clearly shows Google's product integration offered a

"technologically beneficial result," SMF ¶¶ 171-172; RSMF ¶¶ 171-172 (not disputing efficiency

benefits of integration), and Plaintiffs have offered no evidence to the contrary. Our antitrust laws

do not preclude Google from introducing a product improvement merely because it does not

provide the same enhanced functionality when used with rival products.

## 2. AdX And DFP Are Not Tied Contractually.

  Plaintiffs' claim that Google contractually tied DFP to AdX also fails. Plaintiffs contend

that it is of no moment that the GAM agreement does not require publishers to "use" DFP because

the operative question is whether publishers have to "purchase" DFP. Opp. 18. Even if that

distinction made a difference, which it does not, Plaintiffs point to no evidence that publishers are

required to "purchase" anything. Nor could they. Publishers only pay for DFP's services if they use DFP, and even then only after a certain volume of impressions have been served. Davis Ex. 52 (ECF No. 668-53), ¶ 155 ("Google's publisher ad server does not charge publishers up to a certain volume of impressions served."). If a publisher does not wish to use DFP, it need not and it is not charged for that decision. It has purchased nothing. Plaintiffs cite no authority for the proposition that such an arrangement constitutes an illegal tie.

### B. Plaintiffs' Tying Claim Seeks To Force Google To Deal With Rivals.

Plaintiffs' expert's proposed remedy for their tying claim would be a "rule requiring non-discriminatory interoperability," which "would require AdX to allow access from third-party ad servers and allow third-party ad servers to receive real-time bids from AdX." Mot. 33 (quoting Ex. 5 (ECF No. 674-8), ¶¶ 221, 226, 229). Allowing rivals access to Google's ad tech platform is quintessential forced dealing, no different in substance than the forced interconnection the Plaintiffs sought in *Trinko*. Plaintiffs do not dispute this, but rather ask the Court to turn a blind eye to it because "'issues related to equitable remedies' cannot be raised at summary judgment." Opp. 20. Of course, Google is not raising an "issue" with any remedy. As in *Trinko*, the de facto socialization and judicial oversight of a company's investments are exactly the sorts of considerations a court must examine in determining if there is liability in the first place. *See Trinko*, 540 U.S. at 415-16.

In attempting to address the "thorny questions" the Court must deal with, Plaintiffs backtrack from their own expert's opinions. They claim that "restoring competitive conditions and rectifying Google's conduct does not require mandating that Google deal with its competitors … the Court need only order Google to 'disaggregate what it sells to customers' (i.e., sell AdX and DFP separately)." Opp. 20. But this just underscores that there is no tie to begin with. Google

doesn't "sell" AdX or DFP; Google makes money only when AdX is *used* to transact an ad or DFP is *used* to serve an ad. SMF ¶ 39 (AdX charges a share of the revenue from impressions it transacts); Ex. 3 (ECF No. 674-6) at Table 1 (DFP has tiered pricing model based on volume of ads served). And Google *already* makes DFP and AdX available separately. SMF ¶¶ 173-177. What Plaintiffs actually seek is for AdX to work with other ad servers the same way that it works with Google's ad server. This is the sort of "forced sharing" that is squarely foreclosed by *Trinko*, 540 U.S. at 407-08.

### III.  Plaintiffs Fail To Refute Google's Legitimate Business Justifications.

Plaintiffs do not dispute that, in the Fifth Circuit, conduct is exclusionary *only* "[i]f the conduct has *no* rational business purpose other than its adverse effects on competitors." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999) (emphasis added). Unable to identify a genuine dispute of fact as to Google's business justifications, Plaintiffs ignore *Stearns* and assert that summary judgment is inappropriate because there might be some *theoretical* dispute as to the *effects* of the conduct.[5] As *Stearns* makes clear, the inquiry begins and ends with the business justification for the conduct—"exclusionary conduct requires some sign that the monopolist engaged in behavior that—examined without reference to its effects on competitors— is *economically irrational*." 170 F.3d at 523 (emphasis added). Because Plaintiffs have not demonstrated there are genuine issues of material fact as to Google' legitimate business justifications, much less that Google had "no rational business purpose" for its conduct, Google is

---

[5] Plaintiffs play fast and loose with their own expert's *opinions* in an attempt to paint a parade of horribles for Google's customers. For example, Plaintiffs claim that DA "result[ed] in publishers receiving lower bids and losing money." Opp. 42. But the expert evidence cited in support of that proposition cites no document showing publishers actually received lower bids *or* lost money. *See, e.g.*, Davis Ex. 52 (ECF No. 668-53), ¶ 575 (concluding only that "[p]ublishers *may* incur losses" and "DA *can* be inconsistent with publisher's real opportunity costs," but citing no evidence this in fact happened (emphases added)).

entitled to summary judgment on Plaintiffs' claims relating to DA/EDA, Dynamic Revenue Share, and Bernanke.

- **DA and EDA**: Google implemented DA and EDA to increase publisher revenue compared to the waterfall. Mot. 37; SMF ¶¶ 50, 98, 104. Plaintiffs do not dispute that increasing publisher revenue is a legitimate business justification. Nor do they create a genuine issue of fact that DA and EDA increased publisher revenue. RSMF ¶ 50 (cited evidence affirms rather than refutes fact), ¶ 98 (expert opinion not based on evidence),[6] ¶ 104 (cited evidence does not create a dispute as to whether EDA increased publisher revenue). While Plaintiffs pay lip service to the argument that Google's justification was pretextual, they fail to create a genuine dispute of fact. Plaintiffs cite to an expert report, which itself does not address Google's business justification for DA or EDA and cites no documents contradicting Google's legitimate justification. *See supra* nn. 5 and 6.

- **DRS**: Google introduced DRS to help transactions clear when Google's revenue share precluded an otherwise successful match. SMF ¶ 142. Plaintiffs offer no evidence contradicting this justification for developing any iteration of DRS. Instead, they summarily assert that "Google's incentives to use Dynamic Revenue Share were anticompetitive," Opp. 44, and DRS "was implemented for its anticompetitive effects," Opp. 46. Plaintiffs do not rely on any evidence in the record for these propositions, pointing only to one of their expert reports that also cites no evidence. *See supra* n.6.

- **Bernanke**: Project Bernanke was designed to (and did) help Google Ads customers "win more" impressions. SMF ¶ 111. Plaintiffs do not dispute that. RSMF ¶ 111 (cited evidence does not dispute Google's business justification). Instead, Plaintiffs continue with their misplaced and improper focus on the theoretical effects of the conduct. *See* Opp. 48-50. Plaintiffs cannot create a genuine dispute of fact as to Google's legitimate business justification by relying on Prof. Gans' *opinion* as to Google's "intent," which is inadmissible, *see* ECF No. 668 at 135-136, as only admissible evidence can create a genuine dispute of fact. *See Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992) ("To avoid a summary judgment, the nonmoving party must adduce *admissible* evidence which creates a fact issue" (emphasis added)).

---

[6] *See Sw. Bell Tel., L.P. v. Arthur Collins, Inc.*, 454 F. Supp. 2d 600, 605 (N.D. Tex. 2006) ("An unsupported expert report is hardly enough to create a genuine issue of material fact"); *see also Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1060 (D. Colo. 2011) ("'If summary judgment can be avoided merely by presenting the unsupported opinion of an expert witness, it would be virtually impossible for a court to grant summary judgment'" and citing cases).

## IV.   **Plaintiffs Cannot Demonstrate Net Harm in the Alleged Market for Ad Exchanges.**

To demonstrate anticompetitive effects in the market for ad exchanges, Plaintiffs must prove net harm to *both* publishers and advertisers. Mot. 46-47; *Ohio v. Am. Express*, 585 U.S. 529 (2018). Plaintiffs' argument that such evidence is "abundant," Opp. 51, fails for two reasons.

First, Plaintiffs attempt to side step their own expert's failure to provide an opinion on "net harm" for each challenged conduct by suggesting that Prof. Gans' opinion on Google's take rate suffices. Opp. 51. But Prof. Gans' opinion is that "*[c]ollectively*, *all of Google's conduct* has allowed Google to obtain supracompetitive profits." Davis Ex. 52 (ECF No. 668-53), ¶ 875 (emphasis added).[7] Implicit in Plaintiffs' argument (and as argued elsewhere in their brief) is the suggestion that the Court can evaluate the "totality of Google's conduct" to determine if individual acts had exclusionary effects. Opp. 13-14, 38. Not so.

The Court must first evaluate whether each challenged practice is exclusionary. Mot. 9-10. The cases Plaintiffs cite do not hold otherwise. In *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, the court merely concluded that "the character and effect *of a conspiracy* are not to be judged by dismembering it and viewing its separate parts." 370 U.S. 690, 699 (1962) (emphasis added). Likewise, *Assoc. Radio Serv. Co. v. Page Airways, Inc.* merely held that an aggregation of *business torts* could lead to Section 2 liability. 624 F.2d 1342, 1356 (5th Cir. 1980); *see also Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 888, 892 (5th Cir. 2016) (citing *City of Groton v. Conn. Light & Power*, 662 F.2d 921, 928 (2d Cir. 1981) for the principle that independently lawful acts cannot be cumulatively anticompetitive). Finally, in *In re Suboxone Antitrust Litig.*, the court acknowledged that "when faced with allegations of a broad antitrust

---

[7] Dr. Pathak merely relies on Prof. Gans. *See* Opp. 51; Davis Ex. 39 (ECF No. 668-40), ¶ 8.

scheme, it is still appropriate to consider the individual components of the scheme and whether those components could constitute anticompetitive conduct" and proceeded to "address each element of the alleged scheme to determine whether a genuine issue of material fact exists as to its exclusionary nature." 622 F. Supp. 3d 22, 62-63 (E.D. Pa. 2022).

Second, while Plaintiffs *assert* that Prof. Gans did provide testimony on net effects, they point to none. For example, they dismiss Prof. Gans' testimony that he did not offer opinions on the "net effect" of DA by pointing to his testimony that he only evaluated "a world with or without Google's particular implementation of Dynamic Allocation." Opp. 52 (quoting Davis Ex. 51 (ECF No. 668-52) at 205:16-24). They then assert, without citation, that Prof. Gans testified that "he did analyze the net effects of aspects of Dynamic Allocation and Enhanced Dynamic allocation." Opp. 52. Plaintiffs do not cite any evidence of that opinion, so they have failed to raise a dispute of material fact about the net effects of DA or any other conduct.

## V.  **Plaintiffs Attempted Monopolization Claim in the Market for Ad Buying Tools for Large Advertisers Fails for Lack of Evidence.**

Plaintiffs do not dispute that to prevail on their attempted monopolization claim, they must demonstrate that Google had market power in the alleged market for large advertiser buying tools. Mot. 49; Opp. 54. Plaintiffs also do not address (much less) dispute that their expert on monopoly power and anticompetitive effects offers no opinion on Google's market share because he "didn't attempt to calculat[e] it" or "try to estimate it through other means." Ex. 15 (ECF No. 674-18) at 149:21-150:4; Mot. 49-50. Instead, Plaintiffs assert that their claim should survive summary judgment based on an "opinion" on market share offered by their expert on *civil penalties for their DTPA claims*. Opp. 54. But even a cursory review of Plaintiffs' cited evidence reveals that Prof. Andrien offers no such "opinion." In support of his assertion that Google has "an estimated 40% market share," Prof. Andrien cites a *press article* that simply repeats *allegations* from the

Department of Justice's complaint in *Search*. Davis Ex. 9 (ECF No. 668-10), ¶ 24. Absent any evidence of Google's market power in the large advertiser ad buying tools market, Google is entitled to summary judgment on Plaintiffs' attempted monopolization claim. Mot. 50.

**VI.    The Statute of Limitations Bars Certain State Law Civil Penalty Claims.**

There is no dispute Google disclosed DA/EDA, DRS, and the alleged "tie." Mot. 52-53. Plaintiffs cite no authority exempting them from the discovery rule. Pursuant to *Jack v. Evonik Corp.*, the statute of limitations runs "when the reasonable person has actual or constructive knowledge of the facts." 79 F.4th 547, 562 (5th Cir. 2023). "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* In light of the undisputed disclosures Google did make, Plaintiffs were—at a minimum—on constructive notice and their claims are thus barred by their respective statutes of limitation.

Plaintiffs also cannot save their claims by relying on tolling doctrines. A "party asserting fraudulent concealment as an affirmative defense to the statute of limitations has the burden to raise it in response to the summary judgment motion *and to come forward with summary judgment evidence* raising a fact issue with regard to each of the four elements." *Quintel Tech. Ltd. v. Huawei Tech., Inc.*, 2017 WL 9286991, at *12 (E.D. Tex. Dec. 13, 2017). Plaintiffs have put forth no such evidence. Similarly, for the continuing violations doctrine to apply, "the acts committed by a defendant within the limitations period must be more than 'the abatable but unabated inertial consequences of some pre-limitations action.'" *O'Dell v. Gen. Motors Corp.*, 122 F. Supp. 2d 721, 727 (E.D. Tex. 2000). In other words, Plaintiffs would need to demonstrate some "new and independent act that is not merely a reaffirmation of a previous act" and which "inflict[s] new and accumulating injury." *Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008). They have not offered any such evidence.

Dated: December 23, 2024                     Respectfully submitted,

                                            */s/ Eric Mahr*
                                            Eric Mahr (*pro hac vice*)
                                            Andrew Ewalt (*pro hac vice*)
                                            Constance Forkner (*pro hac vice*)
                                            FRESHFIELDS US LLP
                                            700 13th Street, NW
                                            10th Floor
                                            Washington, DC 20005
                                            Telephone: (202) 777-4545
                                            Email: eric.mahr@freshfields.com

                                            Kathy D. Patrick
                                            State Bar No. 15581400
                                            KPatrick@gibbsbruns.com
                                            Gibbs & Bruns LLP
                                            1100 Louisiana, Suite 5300
                                            Houston, Texas 77002
                                            Tel.: (713) 650-8805
                                            Fax: (713) 750-0903

                                            Daniel S. Bitton (*pro hac vice*)
                                            AXINN, VELTROP & HARKRIDER LLP
                                            55 Second Street
                                            San Francisco, CA 94105
                                            (415) 490-1486
                                            dbitton@axinn.com

                                            *Attorneys for Google LLC*

## CERTIFICATE OF SERVICE

I certify that on December 23, 2024, this document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

/s/ *Eric Mahr*

## CERTIFICATE OF MOTION TO SEAL

I certify that contemporaneously with the filing of this Motion, Defendant is filing a motion to seal this document.

/s/ *Eric Mahr*