# EXHIBIT 3
# FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                      SHERMAN DIVISION
3   THE STATE OF TEXAS, et      )
    al.,                        )
4                               ) Case No.
            Plaintiffs,    )  4:20-cv-00957-SDJ
5                               )
    vs.                         ) Hon. Sean D. Jordan
6                               )
    GOOGLE LLC,                 )
7                               )
            Defendant.     )
8
                   FRIDAY, AUGUST 30, 2024
9
      HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE
10                      ORDER
                        - - -
11
12          Videotaped deposition of Sundar
13   Pichai, held at the offices of Freshfields
14   Bruckhaus Deringer, 855 Main Street, Redwood
15   City, California, commencing at 10:04 a.m.
16   Pacific Time, on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter, Certified Realtime Reporter,
19   Illinois, California & Texas Certified
20   Shorthand Reporter, Missouri, Kansas,
21   Louisiana & New Jersey Certified Court
22   Reporter.
23                        - - -
24
25   Job No. MDLG6786466

PURSUANT TO PROTECTIVE ORDER

Page 2

```
 1            A P P E A R A N C E S :
 2
 3      THE LANIER LAW FIRM, PLLC
        BY:   W. MARK LANIER
 4            wml@lanierlawfirm.com
              ALEX ABSTON
 5            alex.abston@lanierlawfirm.com
              ZEKE DEROSE
 6            zeke.derose@lanierlawfirm.com
              ALEX BROWN            (VIA ZOOM)
 7            alex.brown@lanierlawfirm.com
              MELONIE DEROSE         (VIA ZOOM)
 8            melonie.derose@lanierlawfirm.com
              SARA ABSTON            (VIA ZOOM)
 9            sara.abston@lanierlawfirm.com
        10940 West Sam Houston Parkway North,
10      Suite 100
        Houston, Texas   77064
11      (713) 659-5200
12      and
13      NORTON ROSE FULBRIGHT US LLP
        BY:   MARC B. COLLIER      (VIA ZOOM)
14            marc.collier@nortonrosefulbright.com
              ETHAN GLENN          (VIA ZOOM)
15            ethan.glenn@nortonrosefulbright.com
        98 San Jacinto Boulevard, Suite 1100
16      Austin, Texas  78701-4255
        (512) 474-5201
17      Counsel for Texas, Idaho, Louisiana
        (The Lanier Law Firm only),
18      Mississippi, North Dakota,
        Mississippi, South Carolina, and
19      South Dakota
20
        STATE OF TEXAS
21      OFFICE OF THE ATTORNEY GENERAL
        BY:   BRENT WEBSTER
22            Brent.Webster@oag.texas.gov
              TREVOR YOUNG           (VIA ZOOM)
23            Trevor.Young@oag.texas.gov
        P.O. Box 12548
24      Austin, Texas  78711-2548
        (512) 936-1674
25      Counsel for Plaintiff State of Texas
```

PURSUANT TO PROTECTIVE ORDER

Page 3

```
1        GIBBS & BRUNS LLP
         BY:  KATHY D. PATRICK
2             kpatrick@gibbsbruns.com
         1100 Louisiana, Suite 5300
3        Houston, Texas  77002
         (713) 650-8805
4
5        and
6
         FRESHFIELDS BRUCKHAUS DERINGER US LLP
7        BY:  ERIC MAHR           (VIA ZOOM)
              eric.mahr@freshfields.com
8             SARA SALEM          (VIA ZOOM)
              sara.salem@freshfields.com
9        700 13th Street, NW, 10th Floor
         Washington, DC  20005-3960
10       (202) 777-4500
         Counsel for Google LLC
11
12
    ALSO PRESENT:
13
             LARA KOLLIOS, in-house counsel, Google
14
             JUAN WILSON, Lanier Law Firm
15
             JESSE ALCORTA, Lanier Law Firm
16
             JONATHAN JAFFE, consultant    (VIA ZOOM)
17
18
    V I D E O G R A P H E R :
19       DAN LAWLOR,
         Golkow Litigation Services
20
                        - - -
21
22
23
24
25
```

```
                                           Page 4

 1                     INDEX
 2                                      PAGE
 3    APPEARANCES.................................   2
 4    EXAMINATIONS
 5      BY MR. LANIER..............................   6
 6
 7                   EXHIBITS
 8     No.   Description                        Page
 9    No. 1  Findings of Fact and Conclusions    26
             of Law Re Chat Preservation
10
      No. 2  Google Chat Retention Policy,       36
11           GOOG-AT-MDL-009709520 -
             GOOG-AT-MDL-009709521
12
      No. 3  E-mail(s),                          59
13           GOOG-AT-MDL-B-004073824 -
             GOOG-AT-MDL-B-004073826
14
      No. 4  Transcript of Bench Trial Before    66
15           the Honorable Amit P. Mehta United
             States District Judge
16
      No. 5  "Va. Ad Tech Judge Warns Google     74
17           Over Chat Deletion," Law360
             article
18
      No. 6  Online Platforms and Market Power,  88
19           Part 6:  Examining the Dominance
             of Amazon, Apple, Facebook and
20           Google, Hearing before the
             Subcommittee on Antitrust,
21           Commercial and Administrative Law,
             July 29, 2020
22
      No. 7  "Charting a Different Course,"      103
23           FBIDOJGOOG_01186933 -
             FBIDOJGOOG_01186940
24
25
```

PURSUANT TO PROTECTIVE ORDER

Page 5

```
1    No. 8  E-mail(s),                           108
            GOOG-DOJ-AT-01985187 -
2           GOOG-DOJ-AT-02072860
3    No. 9  "Facebook made an unprecedented       116
            move to partner with ad tech
4           companies - including Amazon - to
            take on Google," printout
5
     No. 10 George Levitte, Applying for          130
6           promotion from L6 to L7,
            GOOG-DOJ-AT-01901774 -
7           GOOG-DOJ-AT-01901780
8    No. 11 E-mail(s),                            136
            GOOG-AT-MDL-015457010 -
9           GOOG-AT-MDL-015457014
10   No. 12 E-mail(s),                            142
            GOOG-NE-05311570 -
11          GOOG-NE-05311571
12   No. 13 E-mail(s),                            144
            GOOG-NE-10493534 -
13          GOOG-NE-10493538
14   No. 14 Mark Lanier handwritten               151
            demonstratives
15
16      (Exhibits attached to the deposition.)
17
18   CERTIFICATE.................................152
19   ACKNOWLEDGMENT OF DEPONENT..................154
20   ERRATA......................................155
21   LAWYER'S NOTES..............................156
22
23
24
25
```

PURSUANT TO PROTECTIVE ORDER

Page 32

1          A.      -- in terms of I have -- I know
2     there is a training.  I've heard of it.  I
3     haven't directly seen it, but --
4          Q.      All right.  Fair.
5                  Is it true that lawyers do this
6     training within Google?  Or the legal team?
7          A.      Again, I'm not fully sure of
8     the specifics of how the training is done,
9     but I would expect the legal team to be
10    involved, but I don't have firsthand
11    knowledge of that.
12         Q.      All right.  And I'll just say
13    you're not sure, but expect so.  But expect
14    involvement of legal.
15                 Is that fair?
16         A.      Yes.
17         Q.      You do know that your personal
18    training that you've had as an employee --
19    even though you're the CEO, you're still on
20    employee.
21                 Right?
22         A.      Correct.
23         Q.      You know that your personal
24    training was done by lawyers.
25                 Right?

Page 33

```
 1          A.      That's correct.
 2          Q.      All right.  So at least as far
 3   as you're concerned, the answer would be
 4   true?
 5          A.      That's correct.
 6          Q.      All right.  Now, is it also
 7   true that Google used Chat for purposes
 8   including anything sensitive?
 9          A.      We definitely use Chat for
10   regular communication as part of our ongoing
11   work.
12          Q.      Okay.  But I'm looking beyond
13   just regular communication.  I want to talk
14   about for sensitive communication.
15              You used Chat for sensitive
16   matters, too, didn't you?
17          A.      Are you talking about the
18   company or me personally?
19          Q.      Both.  You can answer it either
20   way you wish.
21          A.      You know, I have primarily used
22   Chat for coordinating meetings, a quick ping
23   to ask someone to follow up on stuff.
24              I definitely understand my
25   obligations regarding litigation holds, so I
```

Page 34

1    don't discuss any matters which are covered
2    by litigation holds or in general any
3    substantive business communications in Chat.
4         Q.    All right.  Now, you're saying
5    you "don't" in a present tense sense.  But if
6    we go back historically, you have.
7                   Haven't you?
8         A.    Sorry.  To be very clear, till
9    about -- we made some changes to our policy
10   in, if I recall, in February of this year.
11        Q.    February of '23, actually, I
12   believe.
13        A.    February of '23, that's
14   correct.
15                And prior to that, you know, I
16   never used Google -- I didn't use Google Chat
17   for substantive business communications, and
18   I definitely didn't use them for anything
19   covered by litigation holds.
20                But post that change, I know
21   all Chats are stored by default, and so, you
22   know, I'm not -- I don't think about it that
23   explicitly because they're always reading.
24        Q.    Well, let's pause and make sure
25   that we're speaking about the same subjects

Page 40

```
 1          A.      My understanding is that the
 2   defaults varied depending on -- for certain
 3   group meeting -- groups in Chats, the default
 4   setting could have been on.  So it depends on
 5   what the default setting was.  But I think
 6   for one-on-one conversations, the default was
 7   off.
 8               And so that's my understanding.
 9   I'm not exactly sure.
10          Q.      Okay.  All right.  So it can be
11   computer or phone.
12               Fair?
13          A.      Ah, that's correct.
14          Q.      And this is one where, prior to
15   February of '23, default mode was to delete
16   at least one-on-ones in 24 hours.
17               MS. PATRICK:  Objection.  Form.
18   QUESTIONS BY MR. LANIER:
19          Q.      Is that right?
20          A.      That's my understanding.
21          Q.      Okay.  Now, I want to go back
22   to did Google use Chat for anything -- let's
23   do better than that.
24               Did Google use Chat for
25   anything sensitive?  You've said that you did
```

PURSUANT TO PROTECTIVE ORDER

Page 41

1  not.

2              Is that correct?

3      A.    I did not use it for

4  substantive business communications in

5  general, and I definitely did not use it for

6  any subject matters which were covered by

7  litigation holds.

8      Q.    Okay.  If you will go back to

9  Exhibit Number 1, and turn to page 5.  I'd

10  like you to look at what's in paragraph 11.

11              "Google employees took the Care

12  training to heart.  In multiple instances,

13  internal communications actively expressed

14  concerns about the possibility of disclosure

15  in litigation and the risks of preserving

16  Chats."

17              And the example given says,

18  "Comment freely, but be aware that this

19  document is not privileged.  For anything

20  sensitive, please move to Chat or a video

21  call."

22              Do you see that?

23      A.    Yes.

24      Q.    So were you aware that Google

25  was using Chat, at least in that sense, for

PURSUANT TO PROTECTIVE ORDER

Page 42

1    anything that was going to be sensitive?

2              Did you know about that?

3         A.    You know, I assume people are

4    using Chat for business communications, yes,

5    and which would include sensitive

6    communications.

7         Q.    "Would include."  Let's put

8    that clarifying language.  "Would include"

9    anything sensitive.

10             Okay.  And then when history is

11   off, these Chats are deleted after 24 hours.

12             Fair?

13        A.    That's correct, unless you are

14   covered by a litigation hold where the

15   expectation is you would have to turn it on

16   so those documents would be retained.

17        Q.    Well, then history wouldn't be

18   off.

19        A.    That's right.

20        Q.    But if history is off, then the

21   Chats are deleted.

22             True?

23        A.    That's correct.

24        Q.    Now, is it also true that

25   Google used Chat to discuss and delete

PURSUANT TO PROTECTIVE ORDER

Page 43

```
 1    substantive business topics, including
 2    antitrust matters?
 3                  MS. PATRICK:  Objection.  Form.
 4                  THE WITNESS:  You know, I
 5          wouldn't be aware of -- when you say
 6          Google used -- Google employees, I
 7          wouldn't know what employees were
 8          doing, and I'm only aware of Chat
 9          conversations I am part of.
10    QUESTIONS BY MR. LANIER:
11          Q.    I would assume when the federal
12    judge issued these findings of fact that are
13    Exhibit Number 1, that you not only would
14    have read them as a CEO but as a board member
15    as well.
16                  Did you -- did you read what
17    the judge said about your company?
18          A.    I was -- I was briefed directly
19    on it, you know, briefed directly on it,
20    and the team made a set of recommendations
21    and implemented a set of recommendations
22    based on the judge's, you know, rulings,
23    which we took very seriously.
24          Q.    Okay.  Well, I understand you
25    were briefed on it, but my question is, did
```

PURSUANT TO PROTECTIVE ORDER

Page 48

```
 1   seriously, but they also have a shareholder

 2   obligation.  They need to make sure that the

 3   company is protected and makes as much money

 4   as it fairly can.

 5              True?

 6       A.     I disagree with this

 7   characterization.  You know, I -- our

 8   obligation as a company is to comply with our

 9   legal obligations.  So I don't -- I don't see

10   this as a tension between that and making

11   money.

12       Q.     But if that's your obligation,

13   when the judge says you didn't comply and

14   says it in strong language and says it was

15   blatant and purposeful, why didn't you hold

16   anybody accountable beyond just having the

17   people who evidently were at fault explain it

18   to you?

19       A.     Our chief legal officer

20   reviewed our practices, and we instituted a

21   set of changes.  We made changes to our Chat

22   retention policy.  We instituted training

23   for -- on -- for our employees on appropriate

24   use and reinforced their obligations.

25              So we conducted training and,
```

PURSUANT TO PROTECTIVE ORDER

Page 49

1    you know, they are -- they are continuing to
2    work on this in an ongoing way.
3         Q.    But you have hundreds of
4    lawyers who have already done something
5    that's blatantly wrong under the law, and
6    you're letting them then fix it without
7    holding them accountable for what they did
8    wrong?
9         A.    To be very clear, through our
10   policies, always instructed employees to
11   comply with litigation holds, right?  So that
12   is the instruction to employees.  And we
13   expect our employees to uphold that -- uphold
14   that obligation.
15        Q.    Huh.
16             So the idea that people should
17   take sensitive matters where documents will
18   not be privileged to Chat is something that
19   you thought was okay?
20        A.    Sorry, could you -- could you
21   repeat the question?
22        Q.    I'm sorry, yeah.  That was not
23   fair.  Let me put it up here so that you see
24   it.
25             So where internal

PURSUANT TO PROTECTIVE ORDER

Page 50

```
1    communications, multiple instances, not once,
2    internal, within Google, communications,
3    actively expressed concerns about possibly
4    being disclosed in litigation and the risks
5    of preserving these Chats, the reply was,
6    "Comment freely, but please be" -- or the
7    example was, "Comment freely, but please be
8    aware, this document is not privileged.  For
9    anything sensitive, please move to Chat."
10                  You approved that?
11        A.    No, that's not consistent
12   with how we want our employees to conduct
13   themselves, if it is covered by litigation
14   hold.
15        Q.    All right.  So if Google, in
16   fact, used Chat to discuss and delete
17   substantive business topics, including
18   antitrust matters, as the judge says, it's
19   not something you approve of?
20        A.    That's correct.
21        Q.    But it is something that
22   apparently happened, according to the
23   findings of the judge.
24              True?
25        A.    Yes, that's my understanding.
```

PURSUANT TO PROTECTIVE ORDER

Page 51

1      Q.      All right.   And because you
2    don't approve, changes took place.
3            Fair?
4      A.      That's correct.
5            MS. PATRICK:  Mark, we've been
6        going for about an hour, when you're
7        ready.
8            MR. LANIER:  All right, Kathy,
9        hang on one sec.  See if I'm at a good
10       stopping point.
11           I'm at a great stopping point.
12       We're midway through this stop, so we
13       are well on path to about a
14       two-and-a-half-hour depo.
15           MS. PATRICK:  Great.
16           THE WITNESS:  Thank you.
17           MS. PATRICK:  We'll be back in
18       about ten minutes?
19           MR. LANIER:  Whatever works for
20       y'all.
21           VIDEOGRAPHER:  We're going off
22       record.  The time is 11:30.
23        (Off the record at 11:30 a.m.)
24           VIDEOGRAPHER:  We're going back
25       on record.  The time is 11:41.

PURSUANT TO PROTECTIVE ORDER

Page 53

1        Q.      But you did nothing about that

2    until 2023.

3                Also true?

4        A.      You know, I knew employees were

5    required to comply with obligation holds and,

6    you know, I relied on my legal and compliance

7    teams, and they hadn't recommend anything

8    different until 2023.  And when they

9    recommended a set of changes, you know, it

10   made sense to me, and they implemented those

11   changes.

12       Q.      And so no changes were

13   implemented until 2023?

14       A.      That's correct.

15       Q.      But you yourself approved the

16   old policy because you knew it was there, and

17   you had the authority to change it, if

18   nothing else.

19                Right?

20                MS. PATRICK:  Objection.  Form.

21                THE WITNESS:  I didn't

22          approve -- it was the way the company

23          was working when I became CEO.  There

24          was -- you know, again, I rely on our

25          chief legal officer, our legal and

PURSUANT TO PROTECTIVE ORDER

Page 78

1    this document is something -- I mean, I

2    haven't read anything related to it, but

3    based on what you're showing me here, I don't

4    think that's the case.

5          Q.    Yeah.  Tell the jury about the

6    bad language in the 2008 e-mail, because

7    we're going to show the e-mail to the jury.

8    But tell them the language you don't approve

9    of.

10              MS. PATRICK:  Objection.  Form.

11              THE WITNESS:  Can we -- can I

12         see the document, please?

13   QUESTIONS BY MR. LANIER:

14         Q.    No, I don't have it in front of

15   me, and I wanted to see what your memory is.

16         A.    You know, I remember receiving

17   it as an employee, and I've seen the document

18   since then, but this was a document -- at a

19   high level, I would need the document to be

20   more specific.

21         Q.    Okay.  I won't hold you to an

22   exact quote.

23         A.    Yeah.

24         Q.    Go ahead.  At a high level.

25         A.    I'm sorry.

PURSUANT TO PROTECTIVE ORDER

Page 79

1           At a high level, I think the

2   document talks about making sure employees

3   are -- you know, take into account context

4   when they communicate because their

5   conversations could be misconstrued, out of

6   context.

7           It tells that -- it announces a

8   change in policy for Google Chat retention,

9   and it also states that the -- you know,

10  in -- they have an obligation to preserve

11  documents related to litigation holds.

12       Q.    You haven't said anything bad

13  about the document at all.

14           Is there anything you

15  disapproved of in that document, or do you

16  approve that document?

17       A.    You know, I would need to read

18  it a bit more specifically to look at it

19  again.  You know, it's a document from

20  16 years ago now.

21       Q.    That you've looked at recently

22  because you were questioned about it?

23       A.    That's right.  But, you know,

24  there was a lot of documents I looked at.

25  But to be -- if you need me to comment

PURSUANT TO PROTECTIVE ORDER

Page 80

1    specifically, I would need to look at the

2    document.

3         Q.    So nothing -- and we can pull

4    the document here after lunch, and I'll show

5    it to you.

6              But there's nothing in the

7    document that you remember being bad?

8         A.    You know, at least as an

9    employee receiving it at that time --

10        Q.    I'm talking about as a CEO

11   who's been looking at it --

12             MS. PATRICK:    Sorry, please let

13        him finish his answers.

14             THE WITNESS:    As an employee,

15        I understood my obligations when I

16        read that document.

17             As a CEO, when I looked at it,

18        you know, I think that I would have

19        been -- I may have worded portions of

20        the document clearly differently.

21        So...

22   QUESTIONS BY MR. LANIER:

23        Q.    So you didn't see it at all the

24   way the judge did, as "a very clever approach

25   to try to hide evidence"?

PURSUANT TO PROTECTIVE ORDER

Page 81

1    A.    I definitely didn't feel that
2    intention at that time as an employee
3    receiving that note.
4    Q.    What about as a CEO looking
5    back?
6    A.    Well, I take between -- as we
7    talked earlier, I definitely -- you know, we
8    take, you know, findings from judges very
9    seriously, and based on that, we undertook a
10   series of actions.  And so, you know, I was
11   focused on that.
12   Q.    Well, my point is, the Walker
13   memo and the Walker e-mail, this clear,
14   smoking gun, that is the same chief legal
15   officer, Kent Walker, that reports to you.
16   Isn't it?
17   A.    That's correct.
18   Q.    That is the same one whose
19   advice you were taking on what the document
20   retention policies would be.
21   Isn't it?
22   A.    That's correct.
23   Q.    That is the one you assigned
24   the responsibility of deciding what it should
25   be, and you went along with it.

PURSUANT TO PROTECTIVE ORDER

Page 82

```
 1                Right?

 2        A.      When I became CEO, there was,

 3   you know, no recommendation, or nothing was

 4   brought to my attention on this matter.

 5   And then in early 2023 when Mr. Walker and

 6   the legal and compliance teams made a series

 7   of recommendations, you know, we went and

 8   implemented those changes.

 9        Q.      And then the write-up of the

10   judge's assessment finishes on the third

11   page.  "Judge Brinkema also expressed concern

12   with the Communicate with Care policy's

13   instruction to copy in-house counsel on

14   e-mails in an attempt to assert privilege

15   where the Department of Justice contends

16   there should be none."

17                Was there really an instruction

18   to copy in-house counsel on e-mails just to

19   add a privilege to the document?

20        A.      You know, I'm not familiar with

21   the specific thing she's referring to, but

22   one of the changes we undertook was to

23   reinforce training on the appropriate use of

24   attorney-client privilege to the -- to the

25   entire company in early 2023.
```

Page 152

```
 1                    CERTIFICATE
 2           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 3   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 4   of the examination, Sundar Pichai, was duly
     sworn by me to testify to the truth, the
 5   whole truth and nothing but the truth.
 6           I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 7   testimony as taken stenographically by and
     before me at the time, place and on the date
 8   hereinbefore set forth, to the best of my
     ability.
 9
             I DO FURTHER CERTIFY that I am
10   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
11   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
12   that I am not financially interested in the
     action.
13
14           Carrie A. Campbell
15
     _____
16   CARRIE A. CAMPBELL,
     NCRA Registered Diplomate Reporter
17   Certified Realtime Reporter
     California Certified Shorthand
18   Reporter #13921
     Missouri Certified Court Reporter #859
19   Illinois Certified Shorthand Reporter
     #084-004229
20   Texas Certified Shorthand Reporter #9328
     Kansas Certified Court Reporter #1715
21   New Jersey Certified Court Reporter
     #30XI00242600
22   Louisiana Certified Court Reporter
     #2021012
23   Notary Public
     Dated:  9/9/24
24
25
```