# EXHIBIT 4
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF TEXAS
2                  SHERMAN DIVISION
3     STATE OF TEXAS, et al,        )
                                    )
4          Plaintiffs,              )   CASE NO.
                                    )   4:20cv00957-SDJ
5     v.                            )
                                    )
6     GOOGLE, LLC,                  )
                                    )
7          Defendant.               )
      _____      )
8
9
10
11                      __ __ __
12              Friday, May 17, 2024
13                      __ __ __
14              HIGHLY CONFIDENTIAL
15        PURSUANT TO PROTECTIVE ORDER
16                      __ __ __
17              Remote Video-Recorded Oral
      Fed. R. Civ. P. 30(b)(6) Deposition of GOOGLE
18    CHAT, BY AND THROUGH ███████████ held at the
      offices of Veritext, 1000 SW Broadway, Suite
19    1660, Portland, Oregon, commencing at
      9:12 a.m. PDT on the above date, before Debra
20    A. Dibble, Fellow of the Academy of
      Professional Reporters, Certified Court
21    Reporter, Registered Diplomate Reporter,
      Certified Realtime Reporter and Notary
22    Public.
                        __ __ __
23
              Job No. MDLG6695561
24              GOLKOW - VERITEXT
          877.370.DEPS | fax 917.591.5672
25              deps@golkow.com

HIGHLY CONFIDENTIAL

Page 2

```
 1      APPEARANCES:
 2          NORTON ROSE FULBRIGHT US LLP
            BY:  ETHAN GLENN, ESQUIRE
 3               ethan.glenn@nortonrosefulbright.com
                 MARC B. COLLIER, ESQUIRE
 4               marc.collier@nortonrosefulbright.com
            98 San Jacinto Boulevard
 5          Austin, Texas 78701-4255
            (512) 536-2437
 6          Counsel for Plaintiff State of Texas
 7
 8          STATE OF TEXAS
            OFFICE OF THE ATTORNEY GENERAL
 9          BY:  OBINNA ILOANI, ESQUIRE (Via Zoom)
                 obinna.iloani@oag.texas.gov
10          300 West 15th Street
            Austin, Texas 78701
11          (512)463-2100
            Counsel for Plaintiff State of Texas
12
13          FRESHFIELDS BRUCKHAUS DERINGER LLP
            BY:  ROBERT MCCALLUM, ESQUIRE
14               rob.mccallum@freshfields.com
                 ROBERT BARTON, ESQUIRE  (via Zoom)
15               robert.barton@freshfields.com
            3 World Trade Center
16          175 Greenwich Street
            New York, New York 10007
17          (212) 277-4000
            Counsel for Google LLC
18
19      ALSO PRESENT:
20          MARA BOUNDY, ESQUIRE
            Google LLC
21
22          JEFF NIEMCZURA, ESQUIRE (via Zoom)
            Google LLC
23
24          LORI AINTABLIAN, ESQUIRE (via Zoom)
            Google LLC
25
```

HIGHLY CONFIDENTIAL

Page 3

1    APPEARANCES:

2    ALSO PRESENT (continued):

3         JONATHAN JAFFE (via Zoom)

4

5    TRIAL TECHNICIAN/VIDEOGRAPHER:

6        DAN LAWLOR

     Golkow - Veritext

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 4

1                          INDEX

2

3       APPEARANCES                                    2

4       PROCEEDINGS                                    9

5

6       EXAMINATION OF ███████████:

7            BY MR. COLLIER                           10

8            BY MR. MCCALLUM                         247

9

10      CERTIFICATE                                  255

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 5

1                          DEPOSITION EXHIBITS

2        NUMBER                 DESCRIPTION                PAGE

3        Exhibit 415    ██████████  LinkedIn                12

4                       Profile

5        Exhibit 416    Transcript of Proceedings,          32

6                       In re Google Play Store

7                       Antitrust Litigation

8        Exhibit 417    Docket, USA v. Google               44

9        Exhibit 418    12/2/11 Press Release,              45

10                      Statement of DOJ's Antitrust

11                      Division on its Decision to

12                      Close Its Investigation

13       Exhibit 419    8/9/12 Press Release, Google        47

14                      Will Pay $22.5 Million to

15                      Settle FTC Charges

16       Exhibit 420    1/3/13 Press Release, Google        48

17                      Agrees to Change Its

18                      Business Practices to

19                      Resolve FTC Competition

20                      Concerns

21       Exhibit 421    E-mail(s) re: Press Reports:        53

22                      FTC Investigation & Google

23                      Display, GOOG-DOJ-18360214 -

24                      GOOG-DOJ-18360221

25

HIGHLY CONFIDENTIAL

1    Exhibit 422        Excerpt of Google Privilege        56

2                       Log

3    Exhibit 423        5/16/24 Privilege Log              59

4                       Analysis

5    Exhibit 424        E-mail(s) re: CID to               65

6                       Alphabet Inc.,

7                       GOOG-NE-11319529

8    Exhibit 425        State of Texas Civil               70

9                       Investigative Demand,

10                      GOOG-UT-00000034 -

11                      GOOG-UT-00000072

12   Exhibit 426        E-mail(s) re: [Googlers]           97

13                      Business communications in a

14                      complicated world,

15                      GOOG-DOJ-019569563 -

16                      GOOG-DOJ-019569564

17   Exhibit 427        PowerPoint, You Said What?!,      102

18                      USDOJ-GOOGEX-000253 -

19                      USDOJ-GOOGEX-000304

20   Exhibit 428        8/23/17 Chat History,             127

21                      GOOG-AT-MDL-008029060 -

22                      GOOG-AT-MDL-008029061

23

24

25

HIGHLY CONFIDENTIAL

Page 7

```
 1     Exhibit 429        Internal Document,              143
 2                        Architecture - G Suite in
 3                        Regulated Industries,
 4                        GOOG-DOJ-28387270 -
 5                        GOOG-DOJ-28387342
 6     Exhibit 430        TLC Commitment Tracking         150
 7                        Document, GOOG-DOJ-14815029
 8     Exhibit 431        Google Chat Retention           158
 9                        Policy,
10                        GOOG-AT-MDL-009709520 -
11                        GOOG-AT-MDL-009709521
12     Exhibit 432        Google Chat Retention           176
13                        Policy,
14                        GOOG-AT-MDL-009709508 -
15                        GOOG-AT-MDL-009709509
16     Exhibit 433        Google Chat Retention           186
17                        Policy,
18                        GOOG-AT-MDL-009709522-
19                        GOOG-AT-MDL-009709523
20     Exhibit 434        Google Chat Retention           190
21                        Policy,
22                        GOOG-AT-MDL-009709506 -
23                        GOOG-AT-MDL-009709507
24
25
```

HIGHLY CONFIDENTIAL

Page 8

1    Exhibit 435    Google Chat Retention    190

2                   Policy,

3                   GOOG-AT-MDL-009709518 -

4                   GOOG-AT-MDL-009709519

5    Exhibit 436    2/9/23 Chat History,    209

6                   GOOG-AT-MDL-008548075 -

7                   GOOG-AT-MDL-008548077

8    Exhibit 437    10/12/21 Chat History,    212

9                   GOOG-AT-MDL-B-004073824 -

10                  GOOG-AT-MDL-B-004073826

11   Exhibit 438    Findings of Fact and    222

12                  Conclusions of Law Re Chat

13                  Preservation

14   Exhibit 439    Matrix of Produced Chats by    233

15                  year with notations by

16                  witness

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 18

1    governance team?

2         A.     I have one direct report.

3         Q.     Who is that?

4         A.     His name is ████████████, and

5    he is the information governance technical

6    lead.

7         Q.     And what does he do, just in

8    summary?

9         A.     Yeah.  Given the title, he is

10   the more technical, you know, kind of part of

11   the team.  So he spends his time interfacing

12   with various product and engineering teams.

13        Q.     Is he a lawyer?

14        A.     No.

15        Q.     So the legal decisions, if you

16   will, that information governance makes,

17   that's you, ████████, right?

18        A.     That's me, in collaboration

19   with the other members of the legal

20   department.

21        Q.     Who enforces the chat retention

22   policy within Google?

23        A.     The policy is managed by

24   technology called Vault.

25        Q.     And can you explain to me how

HIGHLY CONFIDENTIAL

Page 19

1     Vault, that technology, enforces the chat

2     retention policy?

3          A.     So we create a retention rule

4     within Vault, and that applies automatically

5     to Chat.

6          Q.     And you can change that rule

7     within Vault, right?

8          A.     Yes, within limits.  That's not

9     unlimited, but, yes, we can control certain

10    aspects of retention behavior.

11         Q.     A moment ago you said it was

12    paralegals and legal specialists who help

13    with litigation holds.  Are legal specialists

14    lawyers or nonlawyers?

15         A.     I don't know the specific

16    background of each of them.

17         Q.     Okay.  Does Vault also have

18    rules regarding the retention of e-mails?

19               MR. MCCALLUM:  Objection,

20         scope.

21         A.     Yes.

22    BY MR. COLLIER:

23         Q.     What about documents?

24               MR. MCCALLUM:  Objection,

25         scope.

HIGHLY CONFIDENTIAL

Page 20

1           A.      In theory, you could apply it

2    to Drive, the application, which is where the

3    majority of our documents are stored.

4    BY MR. COLLIER:

5           Q.      Well, when you say theory, are

6    there Vault rules that apply to Drive?

7                   MR. MCCALLUM:  Objection,

8           scope.

9           A.      Not currently.

10   BY MR. COLLIER:

11          Q.      So on your document retention,

12   stored in Drive, who enforces the retention

13   policy on that?

14                  MR. MCCALLUM:  Objection,

15          scope, and I'll note for the record

16          that there's a protective order in

17          place that limits questioning to chat

18          retention.

19          A.      If there is no retention

20   policy, that means that all items stored in

21   Drive remain on our systems indefinitely.

22   BY MR. COLLIER:

23          Q.      Okay.  Is there a -- so we're

24   going to talk a little bit more about history

25   on and history off for chats, as you may

HIGHLY CONFIDENTIAL

Page 21

1      imagine, later.

2                    But was the decision made to

3      force history on for chats on or about

4      February 8th of 2023?

5              A.      Yes.

6              Q.      Who made that decision?

7              A.      That was another group decision

8      within the legal department.

9              Q.      Who was in the group?

10             A.      It was myself, my director,

11     members of the legal leadership team, to the

12     best of my knowledge.

13             Q.      Okay.  So who was your

14     director?

15             A.      Her name is ████████████.

16             Q.      ████████?

17             A.      ████████.

18             Q.      Who were the members of the

19     legal leadership team that made that

20     decision?

21             A.      Yeah, so they involved members

22     of our ARRIS legal organization.  ████████

23     ████████ is one of those directors.  And

24     because of the importance of the decision, I

25     believe our general counsel was involved as

HIGHLY CONFIDENTIAL

Page 22

```
1        well, and our chief legal officer was
2        involved.
3              Q.      What is the name of your chief
4        legal officer?
5              A.      Kent Walker.
6              Q.      Name of your general counsel?
7              A.      ███████████████████.
8              Q.      And can you spell ARRIS on
9        ARRIS leadership organization?
10             A.      Yeah, it's an acronym.  It's
11       A-R-R-I-S.
12             Q.      And what is it an acronym for?
13             A.      It's the Alphabet regulatory
14       investigation --
15                     I'm not going to be able to
16       give you the accurate acronym explanation.
17             Q.      And did you have meetings with
18       this team to determine that you should force
19       history on for chats on or about February of
20       2023?
21             A.      There were ongoing
22       conversations around that time, yes.
23             Q.      Is there ongoing e-mails that
24       discuss this?
25                     MR. MCCALLUM:  Objection,
```

HIGHLY CONFIDENTIAL

Page 23

```
 1              privilege.  The witness can answer,
 2              but I would instruct the witness not
 3              to divulge any details that are the
 4              subject of the attorney-client
 5              privilege.
 6         A.      I'm not -- I don't have a
 7     direct recollection of specific e-mails, but
 8     I'm sure that there were some correspondence.
 9     BY MR. COLLIER:
10         Q.      Is there chats regarding this
11     issue?
12         A.      I don't honestly remember.
13         Q.      Were any nonlawyers involved in
14     the decision to force history on for chats on
15     or about February 2023?
16         A.      I don't have a direct
17     recollection of that.
18         Q.      Was the CEO involved?
19         A.      I believe that he would have
20     had to sign off on the decision, so I believe
21     it was presented to him for his approval.
22         Q.      What about Mr. Mohan?
23         A.      I don't know if he was
24     involved.
25         Q.      Okay.  What is your
```

HIGHLY CONFIDENTIAL

Page 24

1       understanding -- you understand you're here

2       today as a corporate representative of

3       Google?

4               A.      Yes.

5               Q.      What is your understanding of

6       what the Court has ordered you to testify to

7       today?  Or testify about today?

8               A.      In a general sense, it's Chat,

9       the product.  It's retention of those chats,

10      and other related matters around our legal

11      preservation practices and policies.

12              Q.      Fair enough.

13                      What did you do to prepare for

14      your deposition today?

15              A.      We had a couple of meetings

16      with counsel.

17              Q.      Okay.  So you say -- and I'm

18      not asking you discussions with your counsel,

19      to be clear.

20                      When you say we had a couple

21      meetings with counsel, who is we?

22              A.      My -- Robert here, Mara here,

23      and a couple of internal legal teammates.

24              Q.      Okay.  So when you say Robert,

25      you mean Mr. McCallum who is next to you?

HIGHLY CONFIDENTIAL

Page 25

1           A.      Yes.  Yes.

2           Q.      And then other than

3       Mr. McCallum, it was the internal Google

4       legal team members?

5           A.      Yes.

6           Q.      By the way, back to the

7       decision to force history on in 2023, when

8       did -- just when.  When did those

9       conversations begin before the decision was

10      made?

11          A.      Can you be more specific?

12      Which conversations?

13          Q.      Sure.  Well, I'll break it into

14      pieces and see if I can make it easier.

15              You agree with me that history

16      was forced on for chats effective

17      February 8th of 2023, right?

18          A.      Mm-hmm.  Yes.

19          Q.      And you said that was a

20      decision that came out of some meetings with

21      various people, right?

22          A.      Mm-hmm.  (Witness nods.)

23          Q.      When did those meetings begin?

24      When did the conversation begin about forcing

25      on -- forcing history on for chats?

HIGHLY CONFIDENTIAL

Page 26

```
 1          A.      I believe they began several

 2     weeks before the ultimate change was made.

 3          Q.      So if it was February 8,

 4     presumably -- and I'm not asking for a

 5     specific date, but presumably sometime in

 6     January of 2023?

 7          A.      Yeah, I -- that's right.

 8          Q.      All right.  So your -- you said

 9     you had two meetings to prepare for today?

10          A.      Mm-hmm.  (Witness nods.)

11          Q.      Okay.  When was the first

12     meeting?

13          A.      The first meeting was last

14     Wednesday -- oh, sorry.  Sorry, I've been

15     traveling.  So that would be -- I've had a

16     busy schedule.

17               Let me think.  That was last --

18     what is today, Friday?  Okay.  That would be

19     last Friday.

20          Q.      Okay.  Where was that meeting?

21          A.      I did that remotely.  I was at

22     home.

23          Q.      And who was part of that

24     meeting?

25          A.      That was also Mr. McCallum and
```

HIGHLY CONFIDENTIAL

Page 27

```
 1     Ms. Boundy, and our internal legal team.
 2           Q.      How long did that conversation
 3     last?
 4           A.      I believe it was three hours.
 5           Q.      And then when was the next
 6     meeting?
 7           A.      That would have been Wednesday
 8     of this week.
 9           Q.      Okay.
10           A.      I'm sorry, actually, that is --
11     that is incorrect.  Sorry.  I'm mixing up.
12                   That would have been Tuesday of
13     this week.
14           Q.      And where was that meeting?
15           A.      Remotely as well.
16           Q.      And the same group?
17           A.      Correct.
18           Q.      And other than that -- so other
19     than those two meetings, have you met with
20     anyone else to prepare for your testimony
21     today?
22           A.      No.
23           Q.      Did you discuss with your --
24     I've forgotten his name, but your information
25     governance technician?
```

HIGHLY CONFIDENTIAL

Page 59

1           A.      Correct.

2           Q.      So let me ask these questions

3      again.  I want to make sure I'm clear with

4      you.

5                   The materials Google would need

6      to preserve in anticipation of litigation

7      would include e-mails relevant to the subject

8      of the anticipated litigation, right?

9           A.      In general, yes.

10          Q.      And the materials Google would

11     need to preserve in anticipation of

12     litigation would include chats relevant to

13     the subject of the anticipated litigation,

14     right?

15          A.      Yes.

16          Q.      I'm going to hand you what we

17     have marked as Exhibit 423.

18                  (Google/████  Deposition

19          Exhibit 423, 5/16/24 Privilege Log

20          Analysis, was marked for

21          identification.)

22                  MR. COLLIER:  Oh, I'm so sorry.

23          JJJ.  Tab JJJ.

24     BY MR. COLLIER:

25          Q.      And, sir, I'll represent to you

HIGHLY CONFIDENTIAL

Page 60

```
 1     that this is a count we have performed, we as
 2     in the State of Texas, of the number of
 3     documents withheld in anticipation of
 4     litigation.
 5              And I'm not asking you to
 6     confirm these numbers, because I don't --
 7     I'll find out.
 8              Do you know how many documents
 9     have been withheld in this litigation due to
10     the anticipation of litigation?
11              MR. MCCALLUM:  Can I just get a
12         representation from counsel as to how
13         this document was put together and
14         what it purports to represent?
15              MR. COLLIER:  Yes.  And tell me
16         if I get this right.
17              Generally speaking, Counsel, we
18         went through your privilege log.  We
19         put in there as of May 16th, 2024, and
20         we looked at all entries that had
21         "anticipation of litigation" as the
22         basis for the hold.  The phrase, yeah.
23              Is that -- do you understand?
24              MR. MCCALLUM:  I'm happy for
25         you to continue asking questions.
```

HIGHLY CONFIDENTIAL

Page 61

```
 1              MR. COLLIER:  I'm not going to
 2         make him swear to this.  This is our
 3         work product, not his, but I am
 4         entitled to ask him if he knows.
 5    BY MR. COLLIER:
 6         Q.    So, sir, just so I can ask you
 7    if you know, do you know, from -- and I will
 8    also represent to you on this chart, where it
 9    says 1900 and N/A, those are documents that
10    for whatever reason are not dated.
11              MR. COLLIER:  Log entries are
12         not dated?  Okay.
13    BY MR. COLLIER:
14         Q.    With that said, do you know,
15    other than this chart or with this chart or
16    in any way, how many documents Google has
17    withheld from production due to an
18    anticipation of litigation narrative in their
19    privilege log?
20              MR. MCCALLUM:  Objection, scope
21         and form.
22         A.    I do not know.
23    BY MR. COLLIER:
24         Q.    If it is accurate that, when
25    the Court reviews Google's privilege log,
```

Page 71

1           A.      Just the first couple of pages.
2           Q.      And I'm going to presume -- I
3      shouldn't presume anything.
4                   Have you ever reviewed this
5      Civil Investigative Demand?
6           A.      No.
7           Q.      Will you look at the first
8      page, the very first sentence.  The Office of
9      the Attorney General, OAG, quote, paren --
10     parens, quote, OAG, closed quote, closed
11     parens -- is investigating anticompetitive
12     conduct in markets relating to online
13     advertising in Texas and the rest of the
14     United States.
15                  Do you see that?
16          A.      Yes.
17          Q.      Were you generally aware before
18     today that the CID was issued on this topic
19     in 2019?
20          A.      No.
21          Q.      If we can turn to the next page
22     of the document, that would be page 2, under
23     the word "Notice."
24                  Do you see where it says:  Any
25     person who, with intent to avoid, evade or

HIGHLY CONFIDENTIAL

Page 72

1    prevent compliance, in whole or in part, with
2    a CID, removes from any place, conceals,
3    withholds, destroys, mutilates or alters by
4    any other means falsifies any documentary
5    material, or otherwise provides inaccurate
6    information, is guilty of a misdemeanor.
7                    Do you see that?
8                    And then it continues on as to
9    what can happen if you're guilty.
10                   Do you see that?
11        A.      Yes.
12        Q.      You have an understanding, even
13   without this notice, that once Google is put
14   on notice that certain documents are
15   relevant, destroying them could be a problem.
16   Right?
17        A.      That could violate our
18   preservation obligations, right.
19        Q.      So as we sit here today, what
20   actions are you aware of that Google took
21   after receipt of the Civil Investigative
22   Demand to prevent chats from being destroyed?
23        A.      I'm not personally familiar
24   with the specific actions that were taken at
25   this time in this matter.

HIGHLY CONFIDENTIAL

Page 73

1      Q.      What actions did you take, sir,

2    after you started your role at Google to

3    prevent chats responsive to the State of

4    Texas's Civil Investigative Demand from being

5    destroyed?

6      A.      Well, as you mentioned, it's

7    not within my role to get directly involved

8    in individual legal holds, but I can describe

9    generally the process.

10     Q.      Okay.

11     A.      Which would be to issue a hold.

12   And what that means in terms of Vault and

13   Chat is when a hold is in place for an

14   individual custodian, that suspends the

15   retention rules for any application where

16   there is a Vault rule in place.

17     Q.      And so if a litigation hold has

18   not been issued as to an individual, there

19   will be no retention of that individual's

20   chats?

21     A.      They'll continue to be retained

22   in the normal course of business via our

23   regular rules, but there will not be any

24   special treatment as you would see in the

25   legal hold.

HIGHLY CONFIDENTIAL

Page 74

1          Q.      And we'll discuss this later in

2     some more depth, but under your regular

3     rules, you mean, for example, 24 hours,

4     right?

5          A.      Correct.  History off, correct.

6          Q.      History off.

7                  So you mentioned, in response

8     to how these chats were preserved in your

9     response to this CID, a litigation hold.

10                 So to whom did Google send

11    litigation holds, or at least chats, related

12    to the Civil Investigative Demand we've just

13    discussed, or this lawsuit generally?

14                 MR. MCCALLUM:  Objection,

15         scope.

16         A.      Yeah, I don't know.  I don't

17    have any knowledge of that.

18    BY MR. COLLIER:

19         Q.      So it's fair to say -- if you

20    don't have any knowledge of which individuals

21    got litigation holds, you don't have any

22    knowledge of which individuals' chats would

23    have been deleted in the normal

24    24-or-whatever-hour retention, right?

25                 MR. MCCALLUM:  Objection,

HIGHLY CONFIDENTIAL

Page 75

1           scope.

2           A.      Help me understand that

3     question a bit better.   The chat retention

4     policy is operating continuously.

5     BY MR. COLLIER:

6           Q.      Mm-hmm.   So what is the

7     longest, absent a litigation hold, that the

8     chat retention policy will hold a chat?

9           A.      For 18 months.

10          Q.      And after 18 months, it's

11    deleted?

12          A.      Correct.

13          Q.      And in some cases the chat

14    retention policy is far shorter than 18

15    months, right?

16          A.      Correct.

17          Q.      24 hours?

18          A.      24 hours, correct.

19          Q.      And what's the other option?

20          A.      30 days.

21          Q.      30 days under what scenario?

22          A.      In a history on, one-on-one or

23    group chat.

24          Q.      So with history off, it's

25    24 hours, is it not?

HIGHLY CONFIDENTIAL

Page 76

1        A.      Correct.

2        Q.      Okay.  So if you don't know who

3    got litigation holds to change the 24-hour

4    chat retention, is it fair to say you can't

5    tell me whose chats were retained?

6                MR. MCCALLUM:  Objection,

7           scope.

8        A.      Explain -- can you rephrase

9    your question?

10   BY MR. COLLIER:

11       Q.      Sure.

12               So let's take Mr. Mohan, just

13   as an example, since you know him.  Or know

14   of him.

15       A.      I don't know him personally.

16       Q.      Okay.  But you know of him?

17       A.      Correct.

18       Q.      So we can use him as a name.

19       A.      Sure.

20       Q.      So if Mr. Mohan sent a chat in

21   2018 or participated in a chat with location

22   history off --

23       A.      It's not location history.

24       Q.      Excuse me.  History off.

25       A.      Chat history off, correct.

Page 77

1          Q.     That would be deleted within

2     24 hours, unless he was under a litigation

3     hold.

4          A.     We should --

5               MR. MCCALLUM:  Objection to

6          scope and form.

7          A.     We should also clarify the

8     retention behavior of history-off messages,

9     and this is not just for Google; this is for

10    all Workspace customers who use Google Chat.

11    They are -- those history-off messages are

12    never available to Vault.

13               So they will -- they will

14    disappear from the user's view after

15    24 hours, but they are never available for

16    retention purposes.

17    BY MR. COLLIER:

18         Q.     Are you saying that if history

19    is off on chat -- so let's take Mr. Mohan's

20    chats -- those are never available to Vault

21    even in the 24-hour retention period?

22         A.     Correct.  And this is the way

23    it works for all Workspace customers.  This

24    is how the product was designed.

25         Q.     By the way, Vault is a Google

HIGHLY CONFIDENTIAL

1      product, right?

2             A.      That's right.

3             Q.      And Google Chat is a Google

4      product, right?

5             A.      That's right.

6             Q.      So they could be designed any

7      way Google wants them designed, right?

8             A.      I have -- wasn't involved in

9      those products or engineering conversations.

10            Q.      So for a chat to be retained at

11     all by Google, in Google's Vault, it requires

12     location history to be on?

13            A.      Not location history.

14                    MR. MCCALLUM:   Objection to

15            form.

16     BY MR. COLLIER:

17            Q.      Sorry, history.

18            A.      Correct, it has to be sent in a

19     history-on state.

20            Q.      And therefore -- and if history

21     is on, the state of history is on, then it

22     will be retained with the user for 24 --

23     24 hours, 30 days, or up to 18 months,

24     depending on the certain circumstances?

25            A.      The shortest history-on

HIGHLY CONFIDENTIAL

Page 79

```
 1    retention is 30 days, and then it goes up to
 2    18 months for certain types of conversations.
 3         Q.    So -- we'll go over some
 4    examples today.  When you have a group chat,
 5    say you and Mr. Mohan, just to have an
 6    example.
 7              And both of your location
 8    history -- your histories are off.  Not
 9    location history.  Sorry.  Both of your
10    histories are off.
11         A.    Just to be clear, there's one
12    history for a conversation.  So it's not each
13    individual.  It's a conversation history.
14         Q.    That -- thank you, because
15    you've anticipated what I was trying to ask,
16    which is, there's only one switch, on or off,
17    right?
18         A.    For each conversation, correct.
19         Q.    For each conversation.
20              And if you and Mr. Mohan have a
21    back-and-forth, you know, five messages each
22    direction, with history off, right?
23         A.    Yeah.
24         Q.    Are you with me?
25         A.    Mm-hmm.
```

HIGHLY CONFIDENTIAL

Page 80

```
 1          Q.      And then you turn on history.
 2     Are you with me so far?  On message No. 11 in
 3     total.
 4          A.      Yep.
 5          Q.      It is fair to say that Vault
 6     can only capture messages 11 onwards, right?
 7          A.      Correct.
 8          Q.      Everything prior to that being
 9     turned on is gone, even though it's part of
10     the same group chat.
11          A.      That's how the product works,
12     correct.
13          Q.      Okay.  So we've discussed you
14     don't know who received litigation hold
15     notices in this case, so would it be fair to
16     say you don't know whether or not --
17                  Well, let me back up.  I want
18     to ask another question about Vault.
19                  And is that the way Vault has
20     always operated that, you know, in our
21     scenario, where you and Mr. Mohan send five
22     messages each, and then on message 11, one of
23     you goes, hey, let's turn on history, that
24     Vault never got the first 10 messages from
25     Google Chat?
```

HIGHLY CONFIDENTIAL

Page 81

1          A.      That's right.

2          Q.      But has it always operated that

3     way?

4          A.      Yes.  For all Workspace

5     customers, not just for Google.  That's the

6     default product behavior for everyone.

7          Q.      You say "default product

8     behavior."  Can that be altered?

9          A.      No.  That's -- sorry.  Default

10    should not have been in that answer.  This is

11    the way history-off messages have always

12    worked, and continue to work today.

13         Q.      Have you ever spoken to any of

14    the engineers who coded Vault?

15         A.      Yes, we work with the product

16    team.

17         Q.      Have you ever asked the Vault

18    engineers, how can we capture the first part

19    of the messages that someone turned history

20    on for?

21              MR. MCCALLUM:  Objection,

22         scope.

23         A.      No, we haven't had that

24    conversation.

25                    *   *   *

HIGHLY CONFIDENTIAL

Page 82

```
 1    BY MR. COLLIER:
 2         Q.    So what is the default -- or
 3    "default" is probably not the right word.
 4              When you say you use Chat, is
 5    it -- just today, when you go back to your
 6    office, or I guess you're remote.  When you
 7    go back to chatting, what is the name of the
 8    program you are using?  Is it Google Chat?
 9         A.    It's Google Chat today.
10         Q.    And you don't use any
11    third-party applications to chat, do you?
12         A.    No, I don't.
13         Q.    You wouldn't use Apple
14    Messenger or anything?
15         A.    No, not at work.
16         Q.    Yes.
17         A.    Yeah.
18         Q.    And does everyone understand to
19    only use Google Chat or Google-approved chat
20    messages to do chatting?
21         A.    I'm not aware of any policy
22    specific to this, but I -- I have never used
23    anything other than that.
24         Q.    Okay.  And Google doesn't use
25    any third-party programs alongside or in lieu
```

HIGHLY CONFIDENTIAL

Page 83

```
 1    of Vault, right?  It uses your Google Vault
 2    program?
 3             A.    Correct.
 4             Q.    Okay.  Back to litigation holds
 5    in this case, which I think you may not know
 6    these answers, but I have to ask you.
 7                   Do you know if litigation holds
 8    in this case were sent at different times or
 9    were they all sent at one time?
10                   MR. MCCALLUM:  Object to the
11          scope.
12             A.    I don't know.
13    BY MR. COLLIER:
14             Q.    So if I was to ask you a series
15    of questions about when various employees got
16    litigation hold notices, you just wouldn't
17    have any knowledge of that?
18             A.    That's correct.
19                   MR. MCCALLUM:  Objection,
20          scope.
21    BY MR. COLLIER:
22             Q.    How would I find out, or how
23    would you find out who has received a
24    litigation notice, a hold notice in this
25    case, that would affect chats?
```

HIGHLY CONFIDENTIAL

```
 1              MR. MCCALLUM:  Objection to
 2         scope.
 3         A.      -- I'm not aware.
 4    BY MR. COLLIER:
 5         Q.     Before I move on, I want to
 6    make sure I have an understanding of Vault
 7    and its implications.
 8                 So today is May 17, 2024,
 9    right?
10         A.     Is it the 16th or the 17th?
11         Q.     I think it's the 17th.
12         A.     Oh, gotcha.
13         Q.     But it's May of 2024, right?
14         A.     Correct.
15         Q.     So I'm going to ask you about
16    what happens today, which is -- you know,
17    I've asked some stuff about before you got
18    here.
19         A.     Yes.
20         Q.     As of today, if an individual
21    employed at Google has been identified and
22    the -- and their history is on, then the
23    chats that they did with history off will
24    never be captured by Vault.
25         A.      That's right.  They're not
```

HIGHLY CONFIDENTIAL

Page 90

1    available to Vault, correct.

2         Q.    And not only are they not

3    available to Vault, they're not available

4    anywhere else in the Google system.

5         A.    Correct.

6         Q.    I mean, if you were under a

7    court order to go get them, you would just

8    have to say, I can't do it?

9         A.    Correct.

10              MR. MCCALLUM:  Objection,

11         scope.

12   BY MR. COLLIER:

13        Q.    And those chats that you

14   couldn't get that were done -- that were had

15   prior to history being turned on, that could

16   include chats that existed at the time

17   history was turned on, we still couldn't get,

18   right?

19        A.    Give me more specifics there.

20        Q.    Sure.  Let's go back to our

21   example where you and Mr. Mohan exchanged 10

22   chats -- chat messages back and forth in the

23   same chat, and then at some point history was

24   turned on.

25        A.    Mm-hmm.

HIGHLY CONFIDENTIAL

1          Q.      The prior 10 chats, assuming

2     they were within the 24-hour-and-whatnot

3     period, the prior 10 chat messages would have

4     existed as of the time history was turned on,

5     correct?

6          A.      Correct.

7          Q.      But those would have still been

8     deleted within 24 hours or whatever the

9     appropriate retention period is, right?

10         A.      That's right.

11         Q.      And there's nothing you can do

12    today to get those back.

13         A.      Correct.

14         Q.      No backup servers, no emergency

15    disaster servers, nothing?

16         A.      No.

17                 MR. MCCALLUM:   Object to the

18         scope.

19    BY MR. COLLIER:

20         Q.      And does Vault know when a

21    litigation hold has been issued as to a

22    certain employee?

23         A.      Yes.

24         Q.      Okay.  So let's just assume,

25    hypothetically, Mr. Mohan was put on a

HIGHLY CONFIDENTIAL

Page 92

1    litigation hold.  We're just going to make

2    the day up for purposes of the demonstrative.

3              He was put on a litigation hold

4    effective January 1st of 2021.

5              Are you with me so far?

6         A.    Mm-hmm.  (Witness nods.)

7         Q.    That would mean there's nothing

8    about -- well, let me ask this:  Does the

9    litigation hold, when it's entered into

10   Vault, auto -- well, you know what, I'll make

11   this after February of 2023 when history was

12   turned on to make this easier for you.  I'm

13   sorry.

14        A.    Okay.

15        Q.    Let me start again.

16             So let's assume March of 2023.

17   If Mr. Mohan gets a litigation hold effective

18   March of 2023, just as a hypothetical, what

19   happens in Vault related to Mr. Mohan and his

20   chats?

21        A.    So any chats that are actually

22   on our systems remaining, right, they haven't

23   been removed in the normal course --

24        Q.    All right.

25        A.    -- they would be preserved

HIGHLY CONFIDENTIAL

Page 93

1      indefinitely for the length of the hold.
2            Q.      And to be clear, they haven't
3      been removed in the normal course, that's the
4      24-hour, 1-month up to 18-month period,
5      right?
6            A.      Correct.
7                    But again, that wouldn't
8      include 24 hours because those are
9      history-off messages.
10           Q.      Okay.
11           A.      So Vault wouldn't even have
12     access to them during that 24-hour period.
13           Q.      Can you explain that to me?
14           A.      Sure.   Yeah.
15                   So like we talked about, if
16     history is off and a message is sent, even
17     within that 24-hour period, Vault does not
18     have access to that message.   So if a legal
19     hold is issued 12 hours in, it's not going to
20     be able to retain that message that was sent
21     in the history-off state, because it doesn't
22     have access to that message.
23           Q.      So if -- when Mr. Mohan's
24     hypothetical litigation hold is put into
25     Vault, again, let's just say March 1, 2023,

HIGHLY CONFIDENTIAL

Page 99

1          A.      Yes.

2          Q.      Do you disagree that Google is

3     an e-mail and instant messaging culture?

4          A.      I think Google is a modern

5     technology company.

6          Q.      Right.  And so like all modern

7     technology companies, you use e-mail and

8     instant messaging or Chat, right?

9          A.      That's right.

10                 And then, if we -- if we go to

11    the first sentence in the next paragraph,

12    ██████████ says in 2008:  To avoid

13    inadvertent retention of instant messages, we

14    have decided to make, quote, off the record,

15    end quote, the Google corporate default

16    setting for Google Talk.

17                 Do you see that?

18              MR. MCCALLUM:  Objection,

19         scope.  And can I get a representation

20         as to -- from counsel as to which

21         topic we are on right now?

22              MR. COLLIER:  We are on the

23         deleted chats topic.

24              MR. MCCALLUM:  It reads a lot

25         as though we're on Topic No. 19, which

HIGHLY CONFIDENTIAL

Page 100

1              is the subject in the protective

2              order.

3                      MR. COLLIER:  Okay.  Well,

4              let's see.

5     BY MR. COLLIER:

6              Q.     What is -- do you have an

7     understanding of what Google Talk is?

8              A.     I believe it was one of the

9     predecessors of Google Chat.

10             Q.     Okay.  So it's a chat program?

11             A.     That's my understanding.

12             Q.     All right.  So you still use

13    the phrase "off the record" today in relation

14    to chat programs, right?

15                     MR. MCCALLUM:  Objection,

16             scope.

17             A.     I can't speak for every

18    Googler, but in my personal experience,

19    that's one way that you can describe it.

20    BY MR. COLLIER:

21             Q.     And by "off the record," that

22    is a reference to history being off?

23             A.     Those terms are used

24    synonymously, correct.

25             Q.     And so do you have any

Golkow Technologies,
A Veritext Division

HIGHLY CONFIDENTIAL

Page 101

1    disagreement, or do you have any reason to

2    disagree that as to the Google Chat program,

3    at that time Google Talk, that the Google

4    corporate default setting, since at least

5    2008, has been off the record?

6              MR. MCCALLUM:  Objection to --

7    BY MR. COLLIER:

8         Q.    Until it was changed in 2023.

9              MR. MCCALLUM:  Objection,

10         scope, protective order.

11        A.    Yes, I -- that's my

12    understanding.

13    BY MR. COLLIER:

14        Q.    So for approximately 15 years,

15    the Google corporate default setting for its

16    chat programs has been off the record?

17             MR. MCCALLUM:  Objection,

18         scope, protective order.

19        A.    I don't know the entire history

20    here, but I can speak to my time.  Yes, it

21    was off the record by default when I started.

22    BY MR. COLLIER:

23        Q.    Okay.  Are you familiar with

24    the training Google gives its employees on

25    chat messaging related to communicating with

HIGHLY CONFIDENTIAL

Page 102

```
 1    care?
 2                    MR. MCCALLUM:  Objection,
 3          scope.
 4          A.     Yes, I'm generally familiar
 5    with it.
 6    BY MR. COLLIER:
 7          Q.     And what are Google's
 8    instructions related to communicating with
 9    care on chats?
10                    MR. MCCALLUM:  Objection,
11          scope.
12          A.     I believe it's just a general
13    reminder to be thoughtful about what you send
14    to co-workers via Google Chat.
15    BY MR. COLLIER:
16          Q.     I'm going to hand you what has
17    been marked tab R.  And this will be Exhibit
18    427.
19                    (Google/█████ Deposition
20          Exhibit 427, PowerPoint, You Said
21          What?!, USDOJ-GOOGEX-000253 -
22          USDOJ-GOOGEX-000304, was marked for
23          identification.)
24    BY MR. COLLIER:
25          Q.     And I'll ask, is this the sort
```

HIGHLY CONFIDENTIAL

Page 103

1      of PowerPoint you've seen on the

2      communicating with care, at least as related

3      to chat messages?

4              A.      Yes.

5                      MR. MCCALLUM:  Objection,

6              scope.

7              A.      Yes, it looks the same, or

8      similar.

9      BY MR. COLLIER:

10             Q.      And is the "communicate with

11     care" training refreshed every year?

12                     MR. MCCALLUM:  Objection,

13             scope.

14             A.      I don't actually know what the

15     ongoing maintenance of it is.

16     BY MR. COLLIER:

17             Q.      But you've had it more than

18     once since 2019?

19             A.      I believe I took it when I

20     first joined.  I don't know if I've seen it

21     since then, so I don't actually know what the

22     current cadence is.

23                     MR. COLLIER:  Okay.  All right.

24             Let's take -- it's 11:00.  Let's take

25             a five- or ten-minute break, whatever

HIGHLY CONFIDENTIAL

Page 104

1          you want, and I'll move around some

2          documents.

3                    THE WITNESS:  Okay.

4                    THE VIDEOGRAPHER:  Going off

5          the record.  The time is 11:00.

6                    (Recess taken, 11:00 a.m. to

7          11:08 a.m. PDT)

8                    THE VIDEOGRAPHER:  We are going

9          back on the record.  The time is

10          11:08.

11    BY MR. COLLIER:

12          Q.        ███████, is it fair to define

13    Google Chat as a communications instant

14    messaging tool?

15          A.     Yeah, that sounds right.

16          Q.     And the reason Google offers

17    Google Chat as a tool for its employees is to

18    enhance collaboration and communication among

19    employees?

20          A.     I don't know if they've used

21    that exact words, but that's been my

22    experience, yes.

23          Q.     Okay.  Let's go to Exhibit 416,

24    if that's your transcript.

25                    Okay.  If you want to go, it's

HIGHLY CONFIDENTIAL

Page 119

1     And my understanding is that's because of the

2     difference in the way that those two

3     communication types are produced.  So

4     individual e-mails will each get produced as

5     a single item.  Chats will come as

6     conversations, which can include many, many

7     messages within a single conversation.  So

8     that is really kind of an apples-to-oranges

9     kind of comparison.

10          Q.     Are you aware that when e-mails

11    are produced, it can often include all of the

12    other e-mails before it, just like what we

13    talked about earlier today when you read it

14    in reverse chronology?

15          A.     Yes, as a thread.  Yeah.

16          Q.     And so e-mail threads are

17    similar to chat conversations, right?

18          A.     In a sense.

19          Q.     How many more chats would

20    Google have produced in this matter if it had

21    forced location history on in 2019?

22               MR. MCCALLUM:  Object to the

23          form.

24          A.     And definitely not location

25    history.

Page 120

```
 1     BY MR. COLLIER:
 2          Q.     I'm sorry, did I -- I'm going
 3     to ask that question again.  Thank you.
 4                 How many more chats would
 5     Google have produced in this matter if it had
 6     forced history on in 2019?
 7                 MR. MCCALLUM:  Object to the
 8           form.
 9          A.     There's no way of knowing the
10     answer to that.
11     BY MR. COLLIER:
12          Q.     How many chats were --
13     discussing Ad Tech tools were not retained
14     because Google had not forced history on?
15                 MR. MCCALLUM:  Object to the
16           form.
17          A.     There's no way of knowing that.
18     BY MR. COLLIER:
19          Q.     Does that make you
20     uncomfortable as the information governance
21     lead?
22          A.     It doesn't, because I rely on
23     the professionalism and the responsibilities
24     of the individual custodians who receive
25     specific instructions at the moment of their
```

HIGHLY CONFIDENTIAL

Page 121

1        hold being issued on how to use chat or not

2        to use chat when it relates to the topic of a

3        matter.  And so that's why I feel confident

4        in their professionalism.

5             Q.    Well, you don't have -- first

6        of all, you've never audited whether or not

7        that professionalism actually has people

8        retain relevant chats, have you?

9                  MR. MCCALLUM:  Object to the

10            form.

11            A.    I haven't personally, no.

12       BY MR. COLLIER:

13            Q.    Has anyone?

14            A.    I don't know if there is a way

15       to do it.

16            Q.    How many employees are there at

17       Google?

18            A.    Today, there's around about

19       180,000, I believe.

20            Q.    How many of those 180,000

21       employees at Google have you had

22       conversations with about making sure they

23       retain chats, if relevant to an ongoing

24       matter?

25            A.    I have not personally had any

HIGHLY CONFIDENTIAL

Page 122

```
1        conversations with them.  I'm referring to
2        the notice that's issued to all the Google
3        custodians.
4             Q.    But there's a difference, as
5        you discussed with Judge Donato, in chats
6        versus e-mail retention, right?
7             A.    They are two different
8        applications, so, yes, correct, there is a
9        difference.
10            Q.    And to be clear, by default,
11       history is always on for e-mails, right?
12            A.    There is no history setting for
13       e-mails.
14            Q.    It's treated as if history is
15       always on, though, right?
16            A.    They are each retained,
17       correct, according to the retention policy
18       for Gmail.
19            Q.    And that's different than for
20       chats, as we've discussed?
21            A.    Correct.
22            Q.    And an employee has no ability
23       to turn off the retention of e-mails, do
24       they?
25            A.    Correct.
```

HIGHLY CONFIDENTIAL

Page 123

1          Q.       There's no location switch they
2     can -- excuse me, history switch that they
3     can turn off, is there?
4          A.       Correct.
5          Q.       In fact, as to e-mails, if a
6     custodian is on a litigation hold, they can't
7     adjust the e-mail retention settings at all.
8          A.       Correct.
9          Q.       And even without a litigation
10    hold, e-mails are retained for 18 months,
11    right?
12         A.       Correct.
13         Q.       And an employee can save them
14    forever, or opt out of e-mail destruction,
15    right?
16         A.       They can apply a specific label
17    that accomplishes that, correct.
18         Q.       And you did not make that
19    option available for chats, did you?
20         A.       Again, they're completely
21    different applications, and they're different
22    in our estimation as well in terms of the
23    substantive business value for each of those
24    different types of communications, which is
25    why you see a different policy treatment

HIGHLY CONFIDENTIAL

Page 124

```
1        between e-mails and chats.
2               Q.      Right.
3                      So I just want to make clear
4        that for whatever reason, employees do not
5        have an option to retain a chat forever like
6        they do in e-mails.
7               A.      Well, as I said, the reason is
8        because of the difference in substantive
9        business value of e-mail versus chats.
10              Q.      So that's a yes, for that
11       reason, right?  Employees do not have that
12       option for the reason you just gave?
13              A.      Correct.
14              Q.      But you could give employees
15       that option, couldn't you?
16              A.      Which option specifically?
17              Q.      The option of retaining a chat
18       forever.
19              A.      That's true, that is an option.
20       And that would be contrary to the purpose of
21       the retention policy, which, as a -- on the
22       plain language of the policy, explains that
23       one of our goals is to reduce redundant,
24       obsolete, and trivial information.
25              Q.      And so as to chats -- well,
```

Page 126

1     be preserved, correct?

2          A.     I disagree with that.

3          Q.     Okay.

4          A.     I --

5                 Oh, go ahead.

6          Q.     You can -- I didn't mean to

7     interrupt you.

8          A.     I would just -- the equivalent

9     statement for chats would be custodians don't

10    have to do anything to make sure that

11    history-on messages are preserved.  Because

12    as we've talked about, that's how Vault

13    works.

14         Q.     Okay.  If you could turn to

15    page 55 of your testimony before Judge

16    Donato, lines 11 to 15.

17                Were you asked:  I think you

18    already said in response to the Court's

19    question that Google relies entirely on

20    individual employees to decide which of their

21    one-on-one or group chats will be preserved.

22    Correct?

23                And what did you answer?

24                MR. MCCALLUM:  Objection,

25         scope.

HIGHLY CONFIDENTIAL

Page 127

1          A.     Yes.   I answered "Correct."

2     BY MR. COLLIER:

3          Q.     And that's still the answer

4     today, right?

5          A.     Exactly.   And that's entirely

6     consistent with the explanation I just gave

7     you.

8          Q.     So let's look at tab N.   It

9     will be Exhibit 428.

10              (Google/█████ Deposition

11          Exhibit 428, 8/23/17 Chat History,

12          GOOG-AT-MDL-008029060 -

13          GOOG-AT-MDL-008029061, was marked for

14          identification.)

15     BY MR. COLLIER:

16          Q.     Let me know when you've had a

17     chance to look at that document.

18              [Document review.]

19          A.     Okay.

20     BY MR. COLLIER:

21          Q.     All right.   Have you seen this

22     document before?

23          A.     No.

24          Q.     I'm going to -- who or what is

25     Mull, mull@google.com, the sender of this

HIGHLY CONFIDENTIAL

                                                    Page 133

1       anywhere.

2              Q.      If we could turn to the next

3       page, there's a series of messages of some

4       sort.

5                      Do you see the fourth up from

6       the bottom, there's a person,

7       henrich@google.com.

8                      Do you know who that is?

9              A.      I don't.

10             Q.      Well, here she posted -- posted

11      on August 23rd of 2017:  By default, it

12      starts all new conversations off the record.

13                     Do you see that?

14             A.      Yes.

15             Q.      Is that your understanding of

16      Google Hangouts' default, that all new

17      conversations were off the record?

18             A.      Are you asking me for the

19      product in 2017?

20             Q.      Yes.

21             A.      Based on --

22                     MR. MCCALLUM:  Objection to the

23             scope.

24             A.      Based on what we've reviewed on

25      the previous page, that appears to be what

HIGHLY CONFIDENTIAL

Page 134

1    they're describing.

2    BY MR. COLLIER:

3         Q.    And Google Chats today, does it

4    start all new conversations off the record?

5         A.    No.

6         Q.    When did that change, if you

7    know?

8         A.    That also changed in 2023.

9         Q.    As part of the forcing the

10   history on?

11        A.    Correct.

12        Q.    So prior to 2023, all new

13   conversations in -- all new chats in Hangout

14   Chats or what became known as Google Chats

15   were off the record -- started to default to

16   off the record.

17        A.    Not exactly true.  So there

18   were specific types of conversations in

19   Google Chat -- you'll see references to them

20   as threaded rooms -- that were history on by

21   default.  And that was a specific type of

22   conversation that the product team

23   introduced, and that's just how retention

24   worked for those conversation types.

25        Q.    And let me ask again, then:

HIGHLY CONFIDENTIAL

Page 135

1    Other than in a threaded room, prior to 2023,

2    all new conversations in Hangout Chats or

3    what became as Google Chats were defaulted to

4    be off the record?

5         A.    Right.  The corporate setting

6    was default off; however, like we've talked

7    about, if you had an existing conversation

8    with someone, or a group of people, and the

9    history was turned on, that history setting

10   would stay for that conversation's length

11   unless and until someone turned history off.

12        Q.    Right.

13             And is it fair to say Google

14   Chat remembers your last setting for off the

15   record or not for each new conversation?

16        A.    For each existing conversation,

17   right.

18        Q.    So setting aside Exhibit 428,

19   ███████, you have also left it up to each

20   individual Google employee to determine

21   whether or not to turn history on or off,

22   correct?

23        A.    In the normal course of

24   business, outside of a litigation hold, yes,

25   it is -- employees get to choose.

HIGHLY CONFIDENTIAL

Page 136

1          Q.      And Google employees know that

2     the default for their chats is off the

3     record, right?

4          A.      The default is actually on, as

5     we just talked about, as of 2023.

6          Q.      But even if they were under a

7     litigation hold, employees still had the

8     option to turn history off prior to 2023,

9     didn't they?

10         A.      Yes, they had the option on

11    the -- in their discretion, and understanding

12    the instructions they were given as part of

13    the legal hold notice.

14         Q.      And you would assume that

15    Google employees knew that off-the-record

16    chats were not retained, right?

17              MR. MCCALLUM:   Object to the

18         form.

19         A.      I can't speak to the general

20    knowledge of Googlers.

21    BY MR. COLLIER:

22         Q.      Let's go back to Exhibit 416,

23    your testimony before Judge Donato.

24              Ask you to go to page 68.  Look

25    at lines 11 to 13.

HIGHLY CONFIDENTIAL

```
 1            extra sheets, and this might be the
 2            sheets that you're actually
 3            referencing.  So it was separate from
 4            the document that you handed them.
 5                    MR. COLLIER:  We pulled it, for
 6            your convenience, to be in the front,
 7            and it's also in the complete
 8            document.  That was just really for
 9            you, and him, if you wanted to look at
10            a hard copy.
11                    MR. MCCALLUM:  That's fine.
12                    MR. COLLIER:  And thank you for
13            that, Mr. McCallum, because I didn't
14            want to --
15                    MR. MCCALLUM:  Please carry on.
16                    MR. COLLIER:  Okay.
17       BY MR. COLLIER:
18            Q.    So do you see those Chat
19       settings?
20            A.    Yes.
21            Q.    Does this refresh your
22       recollection that when you started or about
23       when you started in 2019, that these were the
24       Chat settings for classic Hangouts?
25            A.    So looking at the whole
```

HIGHLY CONFIDENTIAL

Page 147

1     document here, so at the top, under the

2     heading Chat - Hangouts Chat, it describes

3     this as testing for our FINRA-regulated

4     customers.

5               So the way I read this -- and

6     again, I've never seen this document before.

7     This predates my time at the company.  To me,

8     this is not the version of chat that would

9     have been made available to Googlers, because

10    Google is not a FINRA-regulated organization.

11              So some of the settings -- and

12    I don't know this for sure -- I'm making

13    deductions as I read -- is that these

14    settings would not have been available to

15    Google as we are not the FINRA-regulated

16    customers that this feature is -- appears to

17    be targeted at.

18         Q.     And that's fair.  What is a

19    G-Suite Specialist CE?

20         A.     I do not know.

21         Q.     What is the Hangouts PM team?

22         A.     I would assume that is the

23    product managers for that product.

24         Q.     And Google has the Hangouts

25    project manager team, right?

HIGHLY CONFIDENTIAL

Page 148

1          A.      Correct.

2          Q.      So when it says This feature

3     can be enabled by your G-Suite Specialist CE

4     and the Hangouts PM team, that would mean

5     that it could have been enabled within

6     Google, by the Google Hangouts PM team,

7     right?

8          A.      I read this as if you are a

9     FINRA-regulated customer, you have a special

10    version of Hangouts, which Google did not

11    have access to.

12                 The way that you would get this

13    enabled is you would reach out to these

14    individuals or these teams that are listed

15    here, and they would do that on your behalf.

16    That's the way I read this.

17         Q.      So when you say Google did not

18    have access --

19                 (Technical comments off the

20         stenographic record.)

21    BY MR. COLLIER:

22         Q.      ████████, you said in your

23    answer:  As I read this, if you were a

24    FINRA-regulated customer, you have special --

25    you have a special version of Hangouts which

Page 149

1      Google did not have access to.

2                    Didn't Google make every

3      version Hangouts?  Isn't it a Google program?

4           A.    So by access, I mean it was not

5      the version that was in effect for Google.

6      So I have no knowledge and I'm not an

7      engineer, and I don't know who was making

8      decisions around that.  I'm saying the

9      version that individual Googlers used in

10     their day-to-day was likely a different

11     version than what is being described here.

12          Q.    And because the version that is

13     being described here in 2019 is available to

14     some customers, do you have an understanding

15     of whether or not Google, as the

16     administrator, could have access to these

17     features if it wanted it?

18                    MR. MCCALLUM:  Object to the

19          form.

20          A.    I don't know the answer to that

21     question.

22     BY MR. COLLIER:

23          Q.    I'll hand you what has been

24     marked as Exhibit 430, which is tab DD,

25     Delta-Delta.

HIGHLY CONFIDENTIAL

Page 153

```
 1        and form.
 2        A.    When you say you, who are you
 3   referring to?
 4   BY MR. COLLIER:
 5        Q.    You as in ███████████████
     ████████████████████████████████████.
 7        A.    Can you -- sorry, can you
 8   repeat?
 9        Q.    Sure.
10              If you were presented this
11   problem today, setting aside it being forced
12   on in 2023, would your solution if Verizon
13   was asking the question, how do we retain
14   direct messages for users under a litigation
15   hold, even if their history is toggled off,
16   would your response be, in substance, you've
17   got to force that history on for all users on
18   the litigation hold?
19              MR. MCCALLUM:  Same objections.
20        A.    That feels like a legal
21   judgment, so that would be for Verizon's
22   counsel to decide, I think.
23   BY MR. COLLIER:
24        Q.    But as a -- that's what Google
25   did in 2023, right?
```

HIGHLY CONFIDENTIAL

Page 154

1          A.      That's the decision that we
2     took for ourselves, correct.
3          Q.      And if Verizon was asking the
4     same thing, that's at least an option for
5     them, correct?
6               MR. MCCALLUM:  Objection, scope
7          and form.
8          A.      I don't read that this way.  I
9     read this as feature requests, right?
10    Customers make all kinds of requests all the
11    time, with -- that has no bearing on what our
12    actual internal capabilities might be.
13              So I read this as a customer
14    asked for something.  I don't know what the
15    response would have been from the Google team
16    at the time.
17    BY MR. COLLIER:
18         Q.      A customer asked to retain
19    direct messages for users under a litigation
20    hold, even if the history was off, right?
21              I mean, as based on this
22    document.
23         A.      Correct.
24         Q.      And the Google notes say that
25    they need to force history on for all users

HIGHLY CONFIDENTIAL

Page 155

1    on a litigation hold, correct?

2         A.    I don't know the full context

3    of these statements.  So I don't know exactly

4    what that means.

5              What -- I mean, blocked on

6    Verizon's response, I don't know how to

7    interpret that.  What is blocked, is my

8    question.

9         Q.    And you think that has

10   something to do with forcing history on?

11        A.    Well, it's not clear to me from

12   this is -- if a request was made, what

13   options were available to the product team at

14   the time.

15        Q.    Do you believe that forcing

16   history on was an option available in 2020

17   when this was written?

18        A.    I don't believe so.  Given that

19   we had specifically investigated and could

20   not do it ourselves.

21        Q.    What about for the version we

22   discussed in 2019, on the so-called

23   FINRA-regulated clients?

24              MR. MCCALLUM:  Objection, scope

25        and form.

HIGHLY CONFIDENTIAL

Page 156

1          A.     So I would distinguish the

2     specifics that were in the FINRA example.

3     That was forcing history on for the entire

4     organization, full stop.

5               What we implemented was turning

6     history on for a specific subset of the

7     entire employee population.  Only those

8     Googlers on legal hold.

9               So the capability that we saw

10    in the FINRA example is not the same thing as

11    what we ultimately implemented.

12    BY MR. COLLIER:

13         Q.     It was actually a broader

14    capability, right?  Force it on for everyone?

15               MR. MCCALLUM:  Objection,

16         scope.

17         A.     No.  The forcing on for

18    everyone is the easier option.  What we did,

19    and why it took us so many hundreds of hours

20    to do, is because it's very -- it's much more

21    difficult to only have that change apply to a

22    subset of all the employee population.

23    BY MR. COLLIER:

24         Q.     So Google could have turned on

25    the history for the entire Google company

Page 157

1    when you started in 2019, right?  Not just

2    users on litigation hold, but the entire

3    company?

4          A.    That's right.

5          Q.    Okay.  You mentioned earlier

6    today that you had reviewed a chat retention

7    policy.

8          A.    Yes.

9          Q.    How many chat retention

10    policies has Google had?

11          A.    We have a single policy that

12    has been updated periodically over time.

13          Q.    I asked an imprecise question

14    and you gave me a very precise answer.  How

15    many times has the chat retention policy been

16    amended?

17          A.    So if you actually look at the

18    history of that, that became a stand-alone

19    policy in 2020.  I think we've made around

20    six changes, only one of which was actually

21    substantive.  The other ones were just

22    updating because product changes had been

23    made, but there was no actual change to the

24    retention periods involved.

25          Q.    Understood.  Let's mark as

HIGHLY CONFIDENTIAL

Page 175

1    of us makes a change.

2         Q.    Let's say you turn it on, but

3    Mr. Mohan, on his next message, turns it off.

4    Then what is retained?

5         A.    Then it's -- whatever messages

6    were sent while history was on will have

7    the -- will actually be retained.

8         Q.    Okay.  So I've read this chat

9    policy a few times now, to myself.  I don't

10   see any references to litigation holds or

11   legal holds in here.

12              Is there any?

13        A.    Let me see.

14              [Document review.]

15        A.    No, there is no mention in this

16   version.

17   BY MR. COLLIER:

18        Q.    And who is lawyer cat?

19        A.    That's just an internal kind of

20   jokey way to refer to members of the legal

21   team.

22        Q.    It's not one particular lawyer;

23   it could be any lawyer surfacing in a

24   conversation?

25        A.    Correct.

HIGHLY CONFIDENTIAL

Page 179

1      earlier today; when it's gone, it's gone,
2      right?
3              A.      Correct.
4              Q.      You said you have a -- you
5      manage a support alias?  Can you tell me what
6      that is?
7              A.      Yeah.  Originally it was
8      recordsretention@google.com, and then we've
9      since updated it to infogov@google.com.  And
10     we just include that in all of our
11     communications so folks know how to reach us
12     if they have a question.
13             Q.      Okay.  And that's where a lot
14     of Googlers have said:  Hey, my chat from X
15     date that's got someone's birthday or
16     something important is gone; can I have it
17     back?  And you essentially respond back with,
18     per our policy, that can't be recovered?
19                     MR. MCCALLUM:  Object to the
20             form.
21     BY MR. COLLIER:
22             Q.      Is that fair?
23             A.      That's fair.
24             Q.      And then, if we look at the
25     bottom of the page, there's now a heading

HIGHLY CONFIDENTIAL

Page 180

1    called Legal Holds.

2              And my question for you here,

3    sir, is -- have you had a chance to look at

4    it?

5        A.    Yes.

6        Q.    Okay.  When it talks about what

7    a legal hold will retain in a threaded room

8    conversation, it says:  Conversations in

9    which you've participated, i.e., sent

10   messages, not just received.

11             Do you see that?

12       A.    Yes.

13       Q.    So if you and Mr. Mohan, back

14   to that example, are having a one-on-one --

15   well, it wouldn't be one-on-one; it would be

16   a threaded room conversation.  Can two people

17   have a threaded room conversation?

18       A.    I believe they can.  There's no

19   limit on the number of participants.  But

20   there wouldn't really be a reason to have a

21   threaded room conversation if it was just the

22   two of you.

23       Q.    Okay.  Let me just make a

24   better example.

25             It's you, your information

HIGHLY CONFIDENTIAL

Page 181

1        governance technician, and Mr. Mohan are

2        having a threaded room conversation, the

3        three of you.

4                    And you and your technician are

5        not under a legal hold.  Are you with me so

6        far?

7            A.       Mm-hmm.

8            Q.       But Mr. Mohan is.  Are you with

9        me?

10           A.       Yep.

11           Q.       Is it fair to say that of that

12       conversation, it would only be retained if

13       Mr. Mohan sent a message, not just received

14       messages from you and your technician, who

15       are not under a legal hold?

16           A.       That's right.

17           Q.       Why wouldn't you retain

18       threaded room conversations in which someone

19       pursuant to a legal hold has received

20       messages?

21           A.       Yeah, this was in --

22       specifically in response to the way that a

23       lot of threaded rooms are used, which are

24       kind of larger communication devices for

25       teams.

HIGHLY CONFIDENTIAL

Page 182

1               So they might add 50 people
2      from an organization and say, hey, everyone,
3      here's the -- you know, here's the schedule
4      for next week.  They don't have any
5      questions.  If only three people out of the
6      50 actually have a -- have questions or have
7      a conversation, this system will not enforce
8      the hold for every single person in that room
9      if they are taking no action whatsoever.
10              Q.    Well, this is in contrast to,
11     say, an e-mail you would send Mr. Mohan,
12     right?  That would be retained forever --
13              A.    Right.
14              Q.    -- if he's under a legal hold.
15              A.    And the difference there is
16     that sending an e-mail is an intentional
17     action to communicate directly with one other
18     person.  A room is just a space where a topic
19     might be discussed.  The fact that you are a
20     member of that room or you were added to that
21     room, does not actually tell you anything
22     about the level of engagement or involvement
23     of the members of that room outside of
24     sending messages.
25              Q.    So to tell the level of

HIGHLY CONFIDENTIAL

Page 183

1       engagement or involvement of the members of

2       the room, you'd have to look at the messages

3       itself, right, to see if there was anything

4       substantive communicated, who it involved,

5       what it involved.

6              A.    It wouldn't be based on the

7       substance; it would be on the activity.

8                    So if Mr. Mohan sent a message,

9       that would immediately -- his hold would

10      apply.

11             Q.    Right.  And I'm asking if

12      Mr. Mohan didn't send a message, and he's the

13      one under the hold, the hold would not apply.

14             A.    Right.  And that's why we've

15      written it as you've participated.  So he

16      would not be considered a participant in that

17      scenario.

18             Q.    Even if hypothetically you had

19      written Mr. Mohan, hey, as a lawyer, I've got

20      all kinds of concerns about Google's behavior

21      in this Ad Tech space.  If he didn't respond,

22      it would not be retained under -- even if

23      he's under a legal hold, it would not -- that

24      chat would not be retained, would it?

25                   MR. MCCALLUM:  Objection, scope

HIGHLY CONFIDENTIAL

Page 184

```
 1        and form.
 2           A.     If he was a member of a
 3     threaded room, and a message was sent and he
 4     never participated, that's correct.
 5  BY MR. COLLIER:
 6           Q.     In Exhibit 432 --
 7               By the way, Google preserves
 8     e-mails sent to a distribution list, doesn't
 9     it?
10           A.     That's right.
11           Q.     In your discussion in
12     Exhibit 432 of legal holds --
13               By the way, did you write
14     Exhibit 432?
15           A.     Yes.  It was my team that
16     produced it, yep.
17           Q.     Well, I mean, you and your
18     technician are your team, or is there others
19     on your team?
20           A.     Yeah.
21           Q.     I didn't mean that in a
22     demeaning way.  I just -- I don't know if
23     "your team" meant there were 50 people you
24     pulled from other places.
25           A.     No, it would be me and my
```

HIGHLY CONFIDENTIAL

Page 185

1    technical lead would create the draft and

2    then -- yeah.

3         Q.    Who approves -- who finally

4    approves these retention policies?

5         A.    For this type of change, which

6    is just a formatting, it would go through my

7    direct leader, my direct manager, and then we

8    would typically publish it at that point.

9              And we've already discussed

10   this, I think, this morning.  For substantive

11   changes, then they might need to go to higher

12   levels of leadership.

13        Q.    Like the CEO?

14             MR. MCCALLUM:  Objection, scope

15        and form.

16        A.    In theory.

17   BY MR. COLLIER:

18        Q.    So under the Legal Holds

19   section, nothing in this section directs

20   users to turn history on if they've been

21   notified they're subject to a legal hold,

22   does it?

23        A.    That's right.

24        Q.    And then it -- and then it's --

25   then the first paragraph says, at the very

HIGHLY CONFIDENTIAL

Page 186

1    last sentence:  Still, don't manually delete

2    any chats relevant to the matter under any

3    circumstances.

4              Does that mean that a user

5    could manually delete a chat while under a

6    legal hold?

7         A.    No.  They -- it actually has no

8    bearing on whether that chat will be

9    preserved.  It's more just a reminder to

10   folks to be mindful.

11        Q.    Okay.  So I'm going to hand

12   you -- let's mark this Exhibit 433, tab G, as

13   in golf.

14              (Google/█████ Deposition

15         Exhibit 433, Google Chat Retention

16         Policy, GOOG-AT-MDL-009709522-

17         GOOG-AT-MDL-009709523, was marked for

18         identification.)

19              [Document review.]

20        A.    Okay.

21   BY MR. COLLIER:

22        Q.    And we can look at the metadata

23   if you'd like, but as you'll recall,

24   Exhibit 432 went until the end of September

25   of 2021, and Exhibit 433 appears to me to be

HIGHLY CONFIDENTIAL

Page 187

1     effective from October of 2021 to December of

2     2021.

3                    Is that correct?

4          A.     That -- yeah, that appears to

5     be right, yep.

6          Q.     Okay.  And my question on

7     Exhibit 433 is simple:  This appears to me to

8     be the first time that your chat retention

9     policy instructed a user to turn history on

10    if they are discussing things relevant to the

11    hold.

12                   Is that true?

13         A.     Can you point me to the

14    specific section you have in mind?

15         Q.     Sure.

16                   Under Legal Holds, the first

17    paragraph, last sentence.

18                   Do you see at the end of that

19    last sentence -- remember we talked before

20    about the sentence "Still, don't manually

21    delete any chats"?

22                   Isn't the phrase "and turn

23    history on if you are discussing anything

24    related to the hold," isn't this the first

25    time that's appeared in the Google Chat

HIGHLY CONFIDENTIAL

Page 188

1    retention policy?

2           A.    Yes, that's right.

3           Q.    So the first time that --

4    telling the user to turn history on if

5    they're discussing anything related to the

6    hold would have been approximately

7    October 1st of 2021?

8                MR. MCCALLUM:   Object to the

9         form.

10          A.    Yeah, that's incorrect, because

11   all the legal hold notices would have

12   included a direct instruction not to use the

13   product if they're discussing a topic related

14   to the matter, or to turn history on if the

15   conversation went in that direction.

16                So this is added here to

17   supplement the previous instruction that had

18   been provided to the custodians all

19   throughout.  Because this is a static page

20   that's available to all Googlers at all

21   times.

22   BY MR. COLLIER:

23          Q.    And you haven't seen the

24   litigation hold notices to people in this

25   case, have you?

HIGHLY CONFIDENTIAL

Page 189

1           A.      No, but I know generally the

2      form that they take.  But I haven't seen the

3      specific ones, correct.

4           Q.      Was Vault capturing whether

5      history was toggled on or off as for any

6      particular user?

7                   MR. MCCALLUM:  Objection,

8           beyond the scope.

9           A.      I don't -- I think they might

10     be able to show that a history change was

11     made.  I don't know if they can show the

12     history state at any particular moment.

13     BY MR. COLLIER:

14          Q.      Do you think it just says

15     history change?  It doesn't say history on,

16     history off?

17          A.      I believe that's correct.

18                  MR. MCCALLUM:  Objection,

19          scope.

20                  MR. COLLIER:  I'm going to take

21          a break just because I'm going to

22          cough.

23                  THE VIDEOGRAPHER:  We're going

24          off the record.  The time is 1:28.

25                  (Recess taken, 1:28 p.m. to

HIGHLY CONFIDENTIAL

Page 202

1      the judge asking you questions, right, at the

2      hearing?

3              A.      (Witness nods.)

4                      MR. MCCALLUM:  Objection,

5              scope.

6              A.      That's right.

7      BY MR. COLLIER:

8              Q.      So the first question on this

9      page from the Court was:  So, basically, you

10     left it up to each individual Google employee

11     to decide about the history?

12                     Do you see that question?

13             A.      Yes.

14             Q.      And your answer was, "Yes."

15             A.      That's right.

16             Q.      And that's right?  At least

17     prior to 2023, correct?

18             A.      And along with the instructions

19     that they received as part of the legal hold

20     notice.

21             Q.      The instructions given to each

22     individual Google employee, right?

23             A.      No, to each individual

24     custodian.  The legal hold notice would

25     include instructions on how to use the

HIGHLY CONFIDENTIAL

Page 203

1     product and how to change their history
2     setting if the relevant topic was -- came up
3     in the conversation.
4          Q.     I confess, I don't understand.
5     We must be talking past each other.
6               So let me just try again.  And
7     it's probably just because it's late in the
8     day for me.
9               The Court asked you:  So,
10    basically, you left it up to each individual
11    Google employee to decide about the history.
12    And you said yes.
13              Is that correct?
14              MR. MCCALLUM:  Objection,
15         scope.
16         A.     Yes, that's right.
17    BY MR. COLLIER:
18         Q.     Are you saying something
19    different today?
20         A.     No, I'm saying the individual
21    action to decide about the history was left
22    up to each employee.  And I'm just adding
23    here, that was informed by the instructions
24    that they were given on how to use the
25    product during the period of time they were

HIGHLY CONFIDENTIAL

Page 204

```
 1    under a legal hold.
 2          Q.    Okay.  And then the question I
 3    tried to ask you a minute ago, and I must not
 4    have asked it very clearly, the Court said:
 5    Okay.  And did anyone ever audit that?  Did
 6    anyone in your department ever audit the
 7    chats to make sure that nothing relevant to
 8    the litigation was getting missed?
 9                And what did you say?
10                MR. MCCALLUM:  Objection,
11          scope, and subject to the protective
12          order under which topic 19 is not in
13          scope for this deposition.
14          A.    Yes.  So I explained what we've
15    already talked about, that we don't have a
16    technical ability to monitor individual
17    conversations, so we wouldn't know what
18    topics they were being -- they were
19    discussing.
20    BY MR. COLLIER:
21          Q.    Okay.  And then the Court --
22    one more question, pretty similar question --
23    said:  All right.  So there was never any
24    check to make sure relevant evidence wasn't
25    being missed?
```

HIGHLY CONFIDENTIAL

Page 205

```
 1                And what was your response?
 2                MR. MCCALLUM:  Objection,
 3          scope, and subject to the protective
 4          order.
 5          A.    Yes, I answered:  No.  We
 6     wouldn't have the ability to do that.
 7     BY MR. COLLIER:
 8          Q.    And that's still true today,
 9     right?
10          A.    Correct.  And as we've talked
11     about, if the history was off, right, those
12     were the only messages you didn't have access
13     to, we would have no visibility into those
14     messages.
15          Q.    Now, have you asked
16     internally -- you mentioned before that there
17     would be some way to tell if the history
18     change -- or the history status had changed
19     but you didn't know if it went from on to off
20     or vice versa; is that fair?
21                MR. MCCALLUM:  Objection,
22          scope.
23          A.    Yeah, that's fair.
24                MR. COLLIER:  And you can take
25          down this exhibit, sir.
```

Page 206

1    BY MR. COLLIER:

2         Q.     Have you asked internally the

3    folks that keep that history status or wrote

4    the code for that as to whether or not it's

5    possible to tell more than just the status

6    changed but what the status was and now is?

7                    MR. MCCALLUM:   Objection,

8         beyond the scope.

9         A.     No, I haven't asked them that.

10   BY MR. COLLIER:

11        Q.     And I believe you told me this

12   morning, but just to be sure, you don't know

13   if every custodian in this matter received a

14   litigation hold, do you?

15        A.     I wasn't involved, so I

16   wouldn't be able to speak to that.

17        Q.     Do you know how many custodians

18   in this case turned history on at any point

19   during the litigation hold?

20                    MR. MCCALLUM:   Objection,

21        beyond the scope.

22        A.     I don't know.

23   BY MR. COLLIER:

24        Q.     Do you know how many custodians

25   turned history off at any point during the

HIGHLY CONFIDENTIAL

Page 207

1      litigation hold?

2                    MR. MCCALLUM:  Objection,

3            beyond the scope and subject to the

4            protective order.

5            A.      I don't know.

6                    MR. COLLIER:  Counsel, I don't

7            understand your scope objections.

8            We're here on retention of chats, and

9            he has testified under oath that

10           history on or off affects that.  So, I

11           mean, I don't really mind you making

12           them, but I don't understand your

13           basis for it.

14                   MR. MCCALLUM:  The basis is

15           that the Court has ordered that topic

16           No. 19 is the subject of a protective

17           order, and Topic No. 19, subpoint (b)

18           is:  The extent to which any document

19           custodian in this case conducted chats

20           with a default history off setting

21           enabled -- and then there's a series

22           of subpoints under that.

23                   So that's the basis of my

24           objection subject to the protective

25           order.

HIGHLY CONFIDENTIAL

Page 216

1          A.      Yeah, that's what it looks
2     like.
3          Q.      So when Google Drive links --
4     like when ███████████, here on October 12,
5     2021, sent some links, and the chat is
6     retained and it's sent to the Vault, is the
7     underlying document retained in the Vault?
8          A.      Yes.  So -- well, it would
9     depend on the ownership of the docs.
10         Q.      Okay.  Can you explain?
11         A.      Yeah.  So a hold is placed on
12    an individual.  And so I don't know the
13    substance of these docs.  I don't know how
14    they were created, who owned them, but that
15    would actually determine the preservation
16    status of those docs, not if they've appeared
17    in the chat somewhere.
18         Q.      Okay.  So let's assume in this
19    scenario, Sundar Pichai was under a
20    litigation hold, and let's assume that Emily
21    Singer, in comms, was not.
22              Can you just assume that?
23    That's just a hypothetical.
24              Are you telling me whether or
25    not these documents would be retained depends

HIGHLY CONFIDENTIAL

Page 217

1      on who is listed as the owner or creator of

2      those documents in the Google Drive?

3                  MR. MCCALLUM:  Objection, scope

4           and form.

5           A.     Yes, it would not be subject

6      solely to the existence in the chat.  The

7      legal holds that apply to Drive use different

8      factors, not just their appearance in a chat

9      conversation.

10     BY MR. COLLIER:

11          Q.     That's -- thank you.  That's

12     what I was trying to get to.

13                 It might be separately

14     retained, due to whoever the owner/custodian

15     is, but when you retain the chat, just

16     because there is a hyperlink to a document in

17     the chat, the hyperlink may get retained as

18     it is in the exhibit we're looking at, but

19     not the underlying document, because that

20     depends upon whoever's the owner/creator of

21     that document and whether they have a

22     litigation hold?

23          A.     That's right.

24          Q.     Do you know if Sundar Pichai

25     has turned off history since you've been at

HIGHLY CONFIDENTIAL

Page 218

1      the company?

2              A.     I --

3                     MR. MCCALLUM:   Objection,

4          scope.

5              A.     I don't know that.

6      BY MR. COLLIER:

7              Q.     Okay.  Do you know if he has

8      been under a litigation hold since you've

9      been at the company?

10                    MR. MCCALLUM:   Objection,

11         scope.

12             A.     I don't know that specifically.

13     BY MR. COLLIER:

14             Q.     Are you aware of the -- you

15     testified in the Epic case, the federal court

16     case we talked about.

17                    Do you recall that?

18             A.     Mm-hmm.

19             Q.     Do you know what overlap there

20     is in the custodians in the Epic or the

21     Google Play Store case that you testified in

22     and in the case we're here about, Texas

23     antitrust case?

24             A.     No, I don't.

25             Q.     In the Epic case, there is

HIGHLY CONFIDENTIAL

Page 219

1    testimony about a system-wide backend log.

2                    Are you familiar with that?

3                    MR. MCCALLUM:  Objection to

4         scope.

5         A.    I'm familiar with logs, yes.

6    BY MR. COLLIER:

7         Q.    And what is, generally

8    speaking, the system-wide backend log as it

9    relates to chats?

10        A.    Are you asking -- tell me more.

11   Be more specific.  What are you asking about?

12        Q.    Okay.  Well, you said you were

13   familiar with, in the Epic case, a

14   system-wide backend log, so I was asking,

15   what is it generally.

16        A.    Yeah, generally, it's a record

17   of different actions that take place within

18   the product at specific points in time, and I

19   think it's typically used for debugging

20   purposes by the technical team that supports

21   the product.

22        Q.    And are you aware that in the

23   Epic case you testified in, a 55-day

24   system-wide backend log was produced?

25        A.    I wasn't involved in producing

HIGHLY CONFIDENTIAL

Page 220

```
 1      it, but that sounds consistent with my
 2      understanding.
 3              Q.     Did you see the log?
 4              A.     No.
 5              Q.     Are system-wide -- you said
 6      system-wide backend logs are typically used
 7      for debugging purposes by the technical team
 8      that supports the product?
 9              A.     That's my understanding of the
10      chat log files.
11              Q.     Did you have any conversations
12      with the technical team that supports the
13      Google Chat product as to whether or not
14      system-wide backend logs exist?
15              A.     No.
16              Q.     As we sit here today, is there
17      just a rolling 55-day system-wide backend log
18      for chats?
19              A.     I believe that's how it works,
20      yes.
21              Q.     If you wanted to get today's
22      rolling 55-day system-wide backend log for
23      chats, like, you know, Sundar Pichai came in
24      your office and said, go get that, where
25      would you go?
```

HIGHLY CONFIDENTIAL

                                                   Page 221

1                    MR. MCCALLUM:  Object to the

2           scope.

3           A.     I would go to the technical --

4    so within the discovery, legal organization,

5    we have a discovery operations team, and they

6    would be the technical experts who could

7    facilitate that request.

8    BY MR. COLLIER:

9           Q.     Okay.  And the -- it's your

10   understanding, is it not, that the log shows

11   history on or off events for all of the

12   custodians captured by that log, right?

13          A.     I think that's right.

14          Q.     And when I say history on or

15   off events, that means someone toggling

16   history on to off or off to on, right?

17          A.     That's right.

18          Q.     And the system-wide backend log

19   would contain enough information to show

20   which specific user changed the log to on or

21   off, right?

22          A.     Change a particular setting?

23          Q.     Yes.

24          A.     Right.  That's right.

25          Q.     And the specific date and time?

HIGHLY CONFIDENTIAL

Page 222

1          A.      That's right.

2          Q.      And the specific chat

3     conversation?

4          A.      That's right.

5          Q.      And who is the custodian within

6     Google of this log?  Is it the legal

7     operations team or is there a technical

8     custodian?

9          A.      I actually don't know the

10    answer to that.

11         Q.      Did you ask to look at the

12    system-wide backend log for this case?

13         A.      No.

14         Q.      All right.  I'm going to hand

15    you tab NNN, which we will mark as

16    Exhibit 438.

17                 (Google/█████ Deposition

18         Exhibit 438, Findings of Fact and

19         Conclusions of Law Re Chat

20         Preservation, was marked for

21         identification.)

22    BY MR. COLLIER:

23         Q.      Tell me when you've had a

24    chance to look at it.

25                 [Document review.]

HIGHLY CONFIDENTIAL

Page 227

```
 1            A.     I'm not sure.  I don't know.
 2            Q.     And by jury instructions, you
 3     mean adverse jury instructions that
 4     instructed the jury that the missing chats
 5     could or should be presumed to be unfavorable
 6     to Google?
 7                   MR. MCCALLUM:  Objection,
 8          beyond the scope.
 9            A.     That's my understanding.
10     BY MR. COLLIER:
11            Q.     If we could turn to page 3.
12     I'm just going to -- because the Court walked
13     through some Findings of Fact, in part based
14     on your testimony, I just want to see if you
15     agree with the Court.
16                   If we can go to page 3,
17     paragraph 2 of Findings of Fact.
18                   The Court's second finding of
19     fact is:  Google employees are no strangers
20     to document production and discovery
21     obligations.
22                   Do you agree with that?
23                   MR. MCCALLUM:  Object as beyond
24          the scope.
25            A.     I couldn't speak to Google
```

HIGHLY CONFIDENTIAL

Page 228

1     employees as a single collection.

2     BY MR. COLLIER:

3          Q.     Okay.  Let's go to paragraph 14

4     on page 6.

5                The Court found that, the first

6     sentence:  Google Chat is an essential tool

7     used daily by Google employees.

8                Do you have any reason to

9     disagree with that?

10               MR. MCCALLUM:  Object, scope.

11         A.     In my personal experience,

12    that's correct.

13    BY MR. COLLIER:

14         Q.     Okay.  Paragraph 15.

15               The Court found:  There are no

16    restrictions on the content and topics on

17    Chat, hearing transcript at 47:2-10.  Parens,

18    Chat can be used for, quote, anything under

19    the sun that employees want to communicate,

20    end quote.

21               Is that accurate?

22               MR. MCCALLUM:  Objection,

23        scope.

24         A.     Yes, the product does not

25    restrict you from typing in anything that you

HIGHLY CONFIDENTIAL

Page 229

1    might be interested in communicating.

2    BY MR. COLLIER:

3           Q.    Nor does Google.  Right?

4                You can -- Google employees can

5    use Google Chat for business things, right?

6           A.    Correct.

7           Q.    Birth announcements, which are

8    not a Google business thing, right?

9           A.    Correct.

10          Q.    Paragraph 29 on page 9.

11                Now, the first sentence here

12   says:  Google has the technical ability to

13   set Chat history to, quote, on, as the

14   default for all employees who are subject to

15   a legal hold, but it chooses not to, period.

16                Now, that, I believe you'll

17   say, was true until February of 2023, right?

18                MR. MCCALLUM:  Objection to

19         scope.

20          A.    That's right.

21   BY MR. COLLIER:

22          Q.    Let's go to paragraph 32.

23                The Court found:  Google did

24   not check to see if custodians were actually

25   preserving relevant Chats as directed by the

Page 240

```
 1                    MR. COLLIER:  I'm simply
 2          explaining it for context.  He doesn't
 3          have to swear to it.
 4                    Everything beyond here, I'm
 5          going to ask him if it's accurate.
 6          A.    So what does yes mean?
 7     BY MR. COLLIER:
 8          Q.    Yes means that Google has
 9     withheld documents based on an anticipation
10     of litigation.
11          A.    You mean retained?  Withheld,
12     to me, means that it was held back --
13          Q.    Yes.
14          A.    -- for means of privilege or
15     some other reason.
16          Q.    Correct.  That's withheld.
17          A.    Ahh, okay.
18          Q.    But again, you don't have to
19     swear to that.  I just wanted you to have
20     context.
21          A.    No, I'm just trying to make
22     sure I interpret it correctly.
23          Q.    You're doing great.  Your
24     questions are great.
25                    The next category says the
```

HIGHLY CONFIDENTIAL

Page 241

1      Ad Tech -- and by Ad Tech we mean here the

2      State of Texas Ad Tech, not the DOJ, but I

3      suspect the answer is maybe the same --

4      litigation hold.

5                    Do -- I believe you've

6      testified you don't know when that litigation

7      hold was first entered?

8            A.      Correct.

9            Q.      So assuming that it was first

10     entered in 2020, I've put yes after 2020, but

11     no up until 2019.

12                   But I presume we can agree that

13     there would have been no Ad Tech litigation

14     hold prior to the receipt of the State of

15     Texas CID we looked at earlier, in late 2019.

16           A.      As a general matter, that would

17     make sense to me.

18           Q.      So the nos are probably

19     accurate on this, and the yeses, we just

20     don't know.

21                   MR. MCCALLUM:   Object as beyond

22           the scope.

23           A.      I think that's right.

24     BY MR. COLLIER:

25           Q.      Okay.  And now -- and this is

Page 242

1    where you may have to help me.  Because I --

2    I tried, and Mr. Glenn, who is the brains of

3    the operation here, tried really hard.

4                 We tried to apply the policies

5    as we understood it, and the conditions to

6    see whether or not chats would have been

7    retained.

8                 And just starting with the

9    first one -- and we won't go through all six

10   if you get the gist and you think I'm right,

11   or wrong.

12          A.    Mm-hmm.

13          Q.    In a situation where there was

14   a one-on-one chat, but the history was off,

15   the policy at all times would be they would

16   be purged after 24 hours?

17          A.    Correct.  And they would never

18   be available to Vault.

19          Q.    Hence why, in this row, the

20   answer should always be no as to whether they

21   were retained, because they weren't available

22   to Vault.  Right?

23          A.    Correct.

24          Q.    And that would even be a no in

25   2013.  Right?

HIGHLY CONFIDENTIAL

                                                    Page 243

1          A.     Correct.

2          Q.     Okay.  Could you just scribble

3     no in there?  I wasn't sure when I wrote

4     this.

5          A.     Sorry, where do you want me to

6     scribble?

7          Q.     2013.  I put a dash because I

8     didn't know.

9                 Oh, sorry.  Mr. Glenn's

10    correcting me.  I almost misled you.

11         A.     Yes.

12         Q.     You can't have history off

13    after February of 2023, at least as to the

14    custodians.

15         A.     Right, exactly.

16         Q.     Okay.  So that would be a dash,

17    because we don't know.  It depends on whether

18    someone is the custodian, right?

19         A.     Right.

20         Q.     Okay.  Now, if we look at the

21    next row, in a scenario where we have a group

22    chat with history off, those two are purged

23    after 24 hours.

24         A.     Correct.

25         Q.     And therefore, the nos going

HIGHLY CONFIDENTIAL

Page 244

1    all the way through 2022, and frankly, a

2    little bit into 2023, would be correct, they

3    would be nos.

4             MR. MCCALLUM:  I'll object as

5         to scope as to the 2007 through 2018

6         time frame.

7    BY MR. COLLIER:

8         Q.    I'm sorry, sir.  Was that

9    correct?

10        A.    That was correct, yes.

11        Q.    And I can ask you questions row

12   by row, but now that you understand how I've

13   tried to fill this out, do you want to see if

14   you agree with me on the nos and yeses for

15   every category?

16        A.    Yes.  So the other

17   clarification, slash, edit that needs to be

18   made is for threaded chat rooms.  So history

19   off, that's, again, 24 hours.  So if history

20   is off, it does not matter the type of

21   conversation; it will always be 24 hours, and

22   it's never available to Vault.

23        Q.    Okay.

24        A.    So the final row -- the row --

25   five?  Sorry, Threaded Chat/Rooms:  History

HIGHLY CONFIDENTIAL

Page 245

1    Off.

2         Q.    Should be purged after

3    24 hours, not 180 days?

4         A.    Correct.  History off is always

5    24 hours.

6         Q.    Okay.

7         A.    And that's the same for every

8    customer.  It's not a Google-specific

9    customization.  So history off -- a simpler

10   version of this would say:  History off is

11   equals 24 hours, never available to Vault.

12             The other edit is, for Threaded

13   Chat/Rooms:  History On, the policy is

14   18 months.  So that's 540 days, not --

15   180 days is six months.  So just want to do

16   the math correctly.

17        Q.    It's always the math.  You,

18   sir -- I understand both.  Can you make both

19   corrections just on that sheet?

20        A.    Yeah.

21        Q.    You can see I made one

22   correction, arguably in Google's favor, and

23   one against them.  I'm just even-handed in my

24   inability to --

25        A.    It's not in favor, it's just

HIGHLY CONFIDENTIAL

Page 246

1    how it works.

2         Q.    It's just how it works, you're

3    right.

4         A.    Yep.

5         Q.    Okay.  Sir, with the

6    corrections that you've made on exhibit --

7    what number were we on --

8              439, the one that you've

9    initialed.  And we'll make sure the court

10   reporter gets that one as the exhibit and not

11   the one that's blank.

12             Is this a fair summary of what

13   we've discussed today and what would have

14   been retained and sent to the Vault and what

15   would not have been?

16             MR. MCCALLUM:  Object as to

17        scope and as to form.

18        A.    In terms of accurately

19   representing the product behavior, yes, I

20   think that's correct.

21             MR. COLLIER:  All right.  I'll

22        pass the witness.

23             MR. MCCALLUM:  Take a break.

24             MR. COLLIER:  Okay.

25             THE VIDEOGRAPHER:  We're going

HIGHLY CONFIDENTIAL

Page 255

1            C E R T I F I C A T E

2

3            I, DEBRA A. DIBBLE, RDR, CRR, CRC,

4    Notary Public, do hereby certify:

5            That ██████████, the witness

6    whose deposition is hereinbefore set forth,

7    was duly sworn by me and that such deposition

8    is a true record of the testimony given by

9    such witness;

10            That pursuant to FRCP Rule 30,

11    signature of the witness was not requested by

12    the witness or other party before the

13    conclusion of the deposition;

14            I further certify that I am not

15    related to any of the parties to this action

16    by blood or marriage, and that I am in no

17    way interested in the outcome of this matter.

18            IN WITNESS WHEREOF, I have

19    hereunto set my hand on 18th day of May,

20    2024.

21

22    *Debra A. Dibble*

      Debra A. Dibble TX CSR-10777

23    Fellow of the Academy of Professional

      Reporters

24    Registered Diplomate Reporter

      Certified Realtime Reporter

25    Notary Public 11/17/2027