# EXHIBIT 5

# REDACTED

HIGHLY CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF TEXAS
2                    SHERMAN DIVISION
3      STATE OF TEXAS, et al,        )
                                     )
4           Plaintiffs,              )   CASE NO.
                                     )   4:20cv00957-SDJ
5      v.                            )
                                     )
6      GOOGLE, LLC,                  )
                                     )
7           Defendant.               )
       _____      )
8
9
10
11                    __ __ __
12               Friday, May 17, 2024
13                    __ __ __
14               HIGHLY CONFIDENTIAL
15          PURSUANT TO PROTECTIVE ORDER
16                    __ __ __
17               Remote Video-Recorded Oral
       Fed. R. Civ. P. 30(b)(6) Deposition of GOOGLE
18     CHAT, BY AND THROUGH ███████████ held at the
       offices of Veritext, 1000 SW Broadway, Suite
19     1660, Portland, Oregon, commencing at
       9:12 a.m. PDT on the above date, before Debra
20     A. Dibble, Fellow of the Academy of
       Professional Reporters, Certified Court
21     Reporter, Registered Diplomate Reporter,
       Certified Realtime Reporter and Notary
22     Public.
                      __ __ __
23
               Job No. MDLG6695561
24             GOLKOW - VERITEXT
          877.370.DEPS | fax 917.591.5672
25             deps@golkow.com

HIGHLY CONFIDENTIAL

Page 74

1          Q.      And we'll discuss this later in
2     some more depth, but under your regular
3     rules, you mean, for example, 24 hours,
4     right?
5          A.      Correct.  History off, correct.
6          Q.      History off.
7                  So you mentioned, in response
8     to how these chats were preserved in your
9     response to this CID, a litigation hold.
10                 So to whom did Google send
11    litigation holds, or at least chats, related
12    to the Civil Investigative Demand we've just
13    discussed, or this lawsuit generally?
14                 MR. MCCALLUM:  Objection,
15         scope.
16         A.      Yeah, I don't know.  I don't
17    have any knowledge of that.
18    BY MR. COLLIER:
19         Q.      So it's fair to say -- if you
20    don't have any knowledge of which individuals
21    got litigation holds, you don't have any
22    knowledge of which individuals' chats would
23    have been deleted in the normal
24    24-or-whatever-hour retention, right?
25                 MR. MCCALLUM:  Objection,

HIGHLY CONFIDENTIAL

Page 75

1          scope.

2          A.     Help me understand that

3    question a bit better.  The chat retention

4    policy is operating continuously.

5    BY MR. COLLIER:

6          Q.     Mm-hmm.  So what is the

7    longest, absent a litigation hold, that the

8    chat retention policy will hold a chat?

9          A.     For 18 months.

10         Q.     And after 18 months, it's

11   deleted?

12         A.     Correct.

13         Q.     And in some cases the chat

14   retention policy is far shorter than 18

15   months, right?

16         A.     Correct.

17         Q.     24 hours?

18         A.     24 hours, correct.

19         Q.     And what's the other option?

20         A.     30 days.

21         Q.     30 days under what scenario?

22         A.     In a history on, one-on-one or

23   group chat.

24         Q.     So with history off, it's

25   24 hours, is it not?

HIGHLY CONFIDENTIAL

Page 76

1          A.       Correct.

2          Q.       Okay.  So if you don't know who

3     got litigation holds to change the 24-hour

4     chat retention, is it fair to say you can't

5     tell me whose chats were retained?

6                   MR. MCCALLUM:  Objection,

7          scope.

8          A.       Explain -- can you rephrase

9     your question?

10    BY MR. COLLIER:

11         Q.       Sure.

12                  So let's take Mr. Mohan, just

13    as an example, since you know him.  Or know

14    of him.

15         A.       I don't know him personally.

16         Q.       Okay.  But you know of him?

17         A.       Correct.

18         Q.       So we can use him as a name.

19         A.       Sure.

20         Q.       So if Mr. Mohan sent a chat in

21    2018 or participated in a chat with location

22    history off --

23         A.       It's not location history.

24         Q.       Excuse me.  History off.

25         A.       Chat history off, correct.

HIGHLY CONFIDENTIAL

Page 77

```
 1              Q.      That would be deleted within
 2      24 hours, unless he was under a litigation
 3      hold.
 4              A.      We should --
 5                      MR. MCCALLUM:  Objection to
 6              scope and form.
 7              A.      We should also clarify the
 8      retention behavior of history-off messages,
 9      and this is not just for Google; this is for
10      all Workspace customers who use Google Chat.
11      They are -- those history-off messages are
12      never available to Vault.
13                      So they will -- they will
14      disappear from the user's view after
15      24 hours, but they are never available for
16      retention purposes.
17      BY MR. COLLIER:
18              Q.      Are you saying that if history
19      is off on chat -- so let's take Mr. Mohan's
20      chats -- those are never available to Vault
21      even in the 24-hour retention period?
22              A.      Correct.  And this is the way
23      it works for all Workspace customers.  This
24      is how the product was designed.
25              Q.      By the way, Vault is a Google
```

HIGHLY CONFIDENTIAL

Page 78

1      product, right?

2                A.      That's right.

3                Q.      And Google Chat is a Google

4      product, right?

5                A.      That's right.

6                Q.      So they could be designed any

7      way Google wants them designed, right?

8                A.      I have -- wasn't involved in

9      those products or engineering conversations.

10               Q.      So for a chat to be retained at

11     all by Google, in Google's Vault, it requires

12     location history to be on?

13               A.      Not location history.

14                       MR. MCCALLUM:   Objection to

15               form.

16     BY MR. COLLIER:

17               Q.      Sorry, history.

18               A.      Correct, it has to be sent in a

19     history-on state.

20               Q.      And therefore -- and if history

21     is on, the state of history is on, then it

22     will be retained with the user for 24 --

23     24 hours, 30 days, or up to 18 months,

24     depending on the certain circumstances?

25               A.      The shortest history-on

HIGHLY CONFIDENTIAL

Page 79

1    retention is 30 days, and then it goes up to

2    18 months for certain types of conversations.

3            Q.      So -- we'll go over some

4    examples today.  When you have a group chat,

5    say you and Mr. Mohan, just to have an

6    example.

7                    And both of your location

8    history -- your histories are off.  Not

9    location history.  Sorry.  Both of your

10   histories are off.

11           A.      Just to be clear, there's one

12   history for a conversation.  So it's not each

13   individual.  It's a conversation history.

14           Q.      That -- thank you, because

15   you've anticipated what I was trying to ask,

16   which is, there's only one switch, on or off,

17   right?

18           A.      For each conversation, correct.

19           Q.      For each conversation.

20                   And if you and Mr. Mohan have a

21   back-and-forth, you know, five messages each

22   direction, with history off, right?

23           A.      Yeah.

24           Q.      Are you with me?

25           A.      Mm-hmm.

HIGHLY CONFIDENTIAL

Page 80

1      Q.      And then you turn on history.
2    Are you with me so far?   On message No. 11 in
3    total.
4      A.      Yep.
5      Q.      It is fair to say that Vault
6    can only capture messages 11 onwards, right?
7      A.      Correct.
8      Q.      Everything prior to that being
9    turned on is gone, even though it's part of
10   the same group chat.
11     A.      That's how the product works,
12   correct.
13     Q.      Okay.  So we've discussed you
14   don't know who received litigation hold
15   notices in this case, so would it be fair to
16   say you don't know whether or not --
17              Well, let me back up.  I want
18   to ask another question about Vault.
19              And is that the way Vault has
20   always operated that, you know, in our
21   scenario, where you and Mr. Mohan send five
22   messages each, and then on message 11, one of
23   you goes, hey, let's turn on history, that
24   Vault never got the first 10 messages from
25   Google Chat?

HIGHLY CONFIDENTIAL

Page 81

1          A.     That's right.

2          Q.     But has it always operated that

3     way?

4          A.     Yes.  For all Workspace

5     customers, not just for Google.  That's the

6     default product behavior for everyone.

7          Q.     You say "default product

8     behavior."  Can that be altered?

9          A.     No.  That's -- sorry.  Default

10    should not have been in that answer.  This is

11    the way history-off messages have always

12    worked, and continue to work today.

13         Q.     Have you ever spoken to any of

14    the engineers who coded Vault?

15         A.     Yes, we work with the product

16    team.

17         Q.     Have you ever asked the Vault

18    engineers, how can we capture the first part

19    of the messages that someone turned history

20    on for?

21              MR. MCCALLUM:  Objection,

22         scope.

23         A.     No, we haven't had that

24    conversation.

25                     *   *   *

HIGHLY CONFIDENTIAL

Page 106

```
 1      have a long-standing chat in your work with a
 2      series of co-workers and friends where you
 3      share sensitive things such as birth
 4      announcements or someone gets a promotion,
 5      right?
 6            A.    Can you show me -- can you
 7      actually show me?
 8            Q.    Absolutely.  We're still on the
 9      same exhibit, down at the bottom of page 19.
10      The question is at line 20 and your answer
11      begins on line 21.
12                  And then I'll show you the one
13      word that goes onto the next page when you're
14      done with that.
15            A.    Yes.  Yeah.
16            Q.    Okay.  Have you had an
17      opportunity to review your prior testimony?
18            A.    Yes.
19            Q.    And does this refresh your
20      recollection that you've had a long-standing
21      group chat with a series of co-workers?
22            A.    Yes.
23            Q.    And in that group chat, you
24      share sensitive things?
25            A.    Yes.
```

HIGHLY CONFIDENTIAL

Page 107

1          Q.      And by long-standing, does this

2     mean years?

3          A.      Yes.

4          Q.      Okay.   And just so I'm clear,

5     we talk about chat and there's -- there's

6     Google Chat, which is a program, right?

7          A.      Mm-hmm.   (Witness nods.)

8          Q.      But chats also include

9     Hangouts, correct?

10          A.      Hangouts was an earlier

11     application that's since been discontinued.

12          Q.      Yes.   I meant to say, over this

13     long period of time, Google's chat platforms

14     have sometimes changed names or changed

15     products, right?

16          A.      Correct.

17          Q.      And so one chat program you're

18     aware of was Google Talk, right?

19                  MR. MCCALLUM:   Objection,

20          scope.

21          A.      Yes, we saw that in some of the

22     prior.

23     BY MR. COLLIER:

24          Q.      And Google Hangouts is another?

25          A.      Correct.

HIGHLY CONFIDENTIAL

Page 108

1          Q.      And can you instant message

2     within Google?

3                    MR. MCCALLUM:   Objection,

4          scope.

5          A.      Tell me more about that.

6     BY MR. COLLIER:

7          Q.      Well, I'm trying to figure out

8     if instant messaging is a separate program

9     from, say, Google Chats today, or is Google

10    Chats the instant messaging program?

11         A.      Google Chats is the instant

12    messaging program, correct.

13         Q.      And there is a -- used to be or

14    still is, perhaps, Gtalk?

15                  MR. MCCALLUM:   Objection,

16         scope.

17         A.      I believe Gtalk referred to

18    Hangouts --

19    BY MR. COLLIER:

20         Q.      Okay.

21         A.      -- at the time.

22         Q.      And Dory?

23                  MR. MCCALLUM:   Objection,

24         beyond the scope.

25         A.      Dory is an application that we

HIGHLY CONFIDENTIAL

Page 109

```
1    used to host question and answers in live
2    meetings.  So a Dory -- a Dory is a way to
3    submit questions in advance of a meeting,
4    that then the speakers will read from the
5    Dory and then give an answer in the actual
6    Q&A section of a meeting.
7    BY MR. COLLIER:
8         Q.    So it's a specialized program?
9    Is Dory -- let me ask it this way:  Is -- you
10   can also use Dory during meetings, right?
11              MR. MCCALLUM:  Objection,
12        beyond the scope.
13        A.    It was only a one-way
14   communication.  So it's a way for
15   participants in a meeting to submit questions
16   that they would like answers to from the
17   actual speakers in the meeting.
18   BY MR. COLLIER:
19        Q.    Got it.
20              And do you retain Dory
21   questioning?
22              MR. MCCALLUM:  Objection,
23        scope.
24        A.    I believe, for company-wide
25   meetings, those are retained by the team that
```

HIGHLY CONFIDENTIAL

Page 119

1    And my understanding is that's because of the

2    difference in the way that those two

3    communication types are produced.  So

4    individual e-mails will each get produced as

5    a single item.  Chats will come as

6    conversations, which can include many, many

7    messages within a single conversation.  So

8    that is really kind of an apples-to-oranges

9    kind of comparison.

10            Q.      Are you aware that when e-mails

11    are produced, it can often include all of the

12    other e-mails before it, just like what we

13    talked about earlier today when you read it

14    in reverse chronology?

15            A.      Yes, as a thread.  Yeah.

16            Q.      And so e-mail threads are

17    similar to chat conversations, right?

18            A.      In a sense.

19            Q.      How many more chats would

20    Google have produced in this matter if it had

21    forced location history on in 2019?

22                    MR. MCCALLUM:  Object to the

23            form.

24            A.      And definitely not location

25    history.

HIGHLY CONFIDENTIAL

Page 120

```
 1    BY MR. COLLIER:
 2         Q.    I'm sorry, did I -- I'm going
 3    to ask that question again.  Thank you.
 4              How many more chats would
 5    Google have produced in this matter if it had
 6    forced history on in 2019?
 7              MR. MCCALLUM:  Object to the
 8         form.
 9         A.    There's no way of knowing the
10    answer to that.
11    BY MR. COLLIER:
12         Q.    How many chats were --
13    discussing Ad Tech tools were not retained
14    because Google had not forced history on?
15              MR. MCCALLUM:  Object to the
16         form.
17         A.    There's no way of knowing that.
18    BY MR. COLLIER:
19         Q.    Does that make you
20    uncomfortable as the information governance
21    lead?
22         A.    It doesn't, because I rely on
23    the professionalism and the responsibilities
24    of the individual custodians who receive
25    specific instructions at the moment of their
```

HIGHLY CONFIDENTIAL

Page 121

1    hold being issued on how to use chat or not
2    to use chat when it relates to the topic of a
3    matter.   And so that's why I feel confident
4    in their professionalism.
5            Q.      Well, you don't have -- first
6    of all, you've never audited whether or not
7    that professionalism actually has people
8    retain relevant chats, have you?
9                    MR. MCCALLUM:   Object to the
10           form.
11           A.      I haven't personally, no.
12   BY MR. COLLIER:
13           Q.      Has anyone?
14           A.      I don't know if there is a way
15   to do it.
16           Q.      How many employees are there at
17   Google?
18           A.      Today, there's around about
19   180,000, I believe.
20           Q.      How many of those 180,000
21   employees at Google have you had
22   conversations with about making sure they
23   retain chats, if relevant to an ongoing
24   matter?
25           A.      I have not personally had any

HIGHLY CONFIDENTIAL

Page 122

1        conversations with them.  I'm referring to

2        the notice that's issued to all the Google

3        custodians.

4                Q.    But there's a difference, as

5        you discussed with Judge Donato, in chats

6        versus e-mail retention, right?

7                A.    They are two different

8        applications, so, yes, correct, there is a

9        difference.

10               Q.    And to be clear, by default,

11       history is always on for e-mails, right?

12               A.    There is no history setting for

13       e-mails.

14               Q.    It's treated as if history is

15       always on, though, right?

16               A.    They are each retained,

17       correct, according to the retention policy

18       for Gmail.

19               Q.    And that's different than for

20       chats, as we've discussed?

21               A.    Correct.

22               Q.    And an employee has no ability

23       to turn off the retention of e-mails, do

24       they?

25               A.    Correct.

HIGHLY CONFIDENTIAL

Page 136

1          Q.     And Google employees know that

2    the default for their chats is off the

3    record, right?

4          A.     The default is actually on, as

5    we just talked about, as of 2023.

6          Q.     But even if they were under a

7    litigation hold, employees still had the

8    option to turn history off prior to 2023,

9    didn't they?

10         A.     Yes, they had the option on

11   the -- in their discretion, and understanding

12   the instructions they were given as part of

13   the legal hold notice.

14         Q.     And you would assume that

15   Google employees knew that off-the-record

16   chats were not retained, right?

17               MR. MCCALLUM:   Object to the

18         form.

19         A.    I can't speak to the general

20   knowledge of Googlers.

21   BY MR. COLLIER:

22         Q.     Let's go back to Exhibit 416,

23   your testimony before Judge Donato.

24               Ask you to go to page 68.  Look

25   at lines 11 to 13.

HIGHLY CONFIDENTIAL

Page 137

1          A.     Mm-hmm.

2          Q.     And you were asked:  And

3     they -- meaning Google employees -- know that

4     off-the-record chats are not retained, right?

5                 And what did you answer?

6          A.     I said:  I assume so.

7          Q.     Is that truthful testimony?

8          A.     Yes.

9          Q.     Would you agree with me that

10    information in chats could remain potentially

11    useful forever?

12                MR. MCCALLUM:  Object to the

13          form.

14          A.     I couldn't say if -- I mean,

15    I'd have to look at specific instances to

16    give you that answer.

17    BY MR. COLLIER:

18          Q.     Well, as the information

19    governance lead, you'd agree with me that

20    chats can contain potentially relevant

21    information, either for or against Google, in

22    ongoing litigation, right?

23          A.     In theory, yes.

24          Q.     The change that Google made to

25    force history on in chats in 2023, there was

HIGHLY CONFIDENTIAL

Page 138

1    no technological reason that change could not

2    have been made in, say, 2019, is there?

3              A.      There was a significant

4    internal effort to enable that force history

5    on.

6                      So it was not a trivial matter

7    to make that change.  So hundreds of hours,

8    folks across multiple teams, working to bring

9    that capability.

10                     So -- and just to be clear,

11   that's -- what we have done is a

12   Google-specific change.  So all of the

13   Workspace customers would not be able to do

14   the same thing that it took us hundreds of

15   hours to develop and to deploy.

16             Q.      Okay.  Those hundreds of hours

17   could have been spent in 2019, right?

18             A.      I don't know the answer to

19   that.

20             Q.      Well, the changes were made --

21   the changes were made to Google Chats program

22   to switch history to on, right?

23             A.      Mm-hmm.  (Witness nods.)

24             Q.      Those changes could have been

25   made to Google Chats program in 2019, as best

HIGHLY CONFIDENTIAL

Page 139

1    you know, right?

2         A.    And the reason I can't answer

3    that is because, as we talked about, the

4    product is changing all the time.  So I can't

5    say exactly what the product would have

6    required in 2019 to accomplish the same goal

7    that we were able to in 2023.  So I just

8    can't -- I'm not an engineer, so I can't

9    answer.

10        Q.    Fair enough.

11             So as we sit here today, you

12   don't know of any technological reason that

13   would have prevented history from being

14   turned on in 2019?  You just don't know?

15             MR. MCCALLUM:  Objection,

16        scope.

17        A.    Outside of the massive effort

18   that we undertook internally, correct.

19   BY MR. COLLIER:

20        Q.    Well, but that massive effort

21   of hundreds of hours could have been

22   undertaken in 2019, as far as you know,

23   right?

24        A.    Again, I don't have -- I don't

25   know what it would have taken in a different

HIGHLY CONFIDENTIAL

Page 140

1    time frame, with a version of the product
2    that existed then.
3        Q.    You started with Google in
4    2019, right?
5        A.    Correct.
6        Q.    So, during your tenure at
7    Google, was there any reason that those
8    changes could not have been made prior to
9    2023?
10        A.    I don't know the answer to
11    that, because the specific questions we began
12    asking in anticipation of the change had not
13    been discussed prior.
14        Q.    And the reason Google started,
15    as you say, asking those specific questions,
16    was because of, in January of 2023, you and
17    others had to go testify about chat
18    retention, right?
19            MR. MCCALLUM:  Objection,
20        privileged.  The witness can answer
21        the question, but I caution you not to
22        reveal the contents of any privileged
23        communication.
24        A.    Yes, it was around that same
25    time, correct.

Page 155

1    on a litigation hold, correct?

2        A.    I don't know the full context

3    of these statements.  So I don't know exactly

4    what that means.

5            What -- I mean, blocked on

6    Verizon's response, I don't know how to

7    interpret that.  What is blocked, is my

8    question.

9        Q.    And you think that has

10   something to do with forcing history on?

11       A.    Well, it's not clear to me from

12   this is -- if a request was made, what

13   options were available to the product team at

14   the time.

15       Q.    Do you believe that forcing

16   history on was an option available in 2020

17   when this was written?

18       A.    I don't believe so.  Given that

19   we had specifically investigated and could

20   not do it ourselves.

21       Q.    What about for the version we

22   discussed in 2019, on the so-called

23   FINRA-regulated clients?

24            MR. MCCALLUM:  Objection, scope

25       and form.

HIGHLY CONFIDENTIAL

Page 156

1          A.        So I would distinguish the

2     specifics that were in the FINRA example.

3     That was forcing history on for the entire

4     organization, full stop.

5                    What we implemented was turning

6     history on for a specific subset of the

7     entire employee population.   Only those

8     Googlers on legal hold.

9                    So the capability that we saw

10    in the FINRA example is not the same thing as

11    what we ultimately implemented.

12    BY MR. COLLIER:

13          Q.        It was actually a broader

14    capability, right?   Force it on for everyone?

15                    MR. MCCALLUM:   Objection,

16          scope.

17          A.        No.   The forcing on for

18    everyone is the easier option.   What we did,

19    and why it took us so many hundreds of hours

20    to do, is because it's very -- it's much more

21    difficult to only have that change apply to a

22    subset of all the employee population.

23    BY MR. COLLIER:

24          Q.        So Google could have turned on

25    the history for the entire Google company

HIGHLY CONFIDENTIAL

Page 157

1    when you started in 2019, right?  Not just

2    users on litigation hold, but the entire

3    company?

4         A.    That's right.

5         Q.    Okay.  You mentioned earlier

6    today that you had reviewed a chat retention

7    policy.

8         A.    Yes.

9         Q.    How many chat retention

10    policies has Google had?

11         A.    We have a single policy that

12    has been updated periodically over time.

13         Q.    I asked an imprecise question

14    and you gave me a very precise answer.  How

15    many times has the chat retention policy been

16    amended?

17         A.    So if you actually look at the

18    history of that, that became a stand-alone

19    policy in 2020.  I think we've made around

20    six changes, only one of which was actually

21    substantive.  The other ones were just

22    updating because product changes had been

23    made, but there was no actual change to the

24    retention periods involved.

25         Q.    Understood.  Let's mark as

HIGHLY CONFIDENTIAL

Page 163

1    of rooms.

2                    So what they, at the time, were

3    calling a flat, nonthreaded room, versus a

4    threaded room.  We talked before, threaded

5    rooms were special in that they were history

6    on by default, and you couldn't change that

7    history setting.  Flat rooms operated

8    differently, so we wanted to call that out

9    for folks.

10        Q.    And most Google Chats are

11   nonthreaded?

12        A.    I don't actually know what the

13   distribution is of how folks use the product.

14        Q.    What is the reason for the

15   different retention periods for nonthreaded

16   versus threaded rooms?

17        A.    It was a product decision.

18                    So behind the scenes, via

19   Vault, we have access to some features of

20   some products and not for others.

21                    So what you're seeing here is

22   our attempting to harmonize their attention

23   behavior via the tools that we had available

24   to us.

25        Q.    So there's no substantive legal

HIGHLY CONFIDENTIAL

Page 164

1    reason that you're aware of as to why

2    nonthreaded rooms and threaded rooms have a

3    different retention period or could have;

4    it's based on kind of product design?

5                    MR. MCCALLUM:  Objection,

6            scope, and I'll caution the witness

7            not to reveal any attorney-client

8            communications.

9            A.      Yeah.  In this case this was

10   driven by the product team.  And this was

11   also an artifact of, you know, stages along

12   the pathway from point A to point B, and the

13   product kind of showing its -- showing its

14   immaturity in some places.

15   BY MR. COLLIER:

16           Q.      So the final box talks about

17   previously indefinitely, and then currently

18   18 months.

19                   Can you describe that change

20   that was made in November of 2020?

21           A.      Yeah.  So because the way the

22   Vault rules work, prior to November 18th,

23   there was no Vault retention rule that was

24   operating on Google Chat rooms.  So because

25   there was no rule, all messages would be

HIGHLY CONFIDENTIAL

Page 165

1    retained indefinitely.  The absence of a rule

2    means there is no retention operating.

3              We implemented the change, we

4    implemented the new retention rule in Vault,

5    and starting on this date, Chat messages sent

6    in a threaded room were retained for

7    18 months.

8         Q.    And when you say starting on

9    this date, I want you to assume, we'll say

10   October of 2020.

11             There was a new Google Chat

12   threaded room, October of 2020, that that

13   room would still be retained as of this

14   policy's implementation in November of 2020,

15   right?

16        A.    Mm-hmm.  (Witness nods.)

17        Q.    But with this policy

18   implementation, that room would only be

19   retained 17 more months, 18 months from when

20   it was created, right?

21        A.    Correct.

22        Q.    So that would mean that

23   after -- 18 months after November of 2020,

24   the prior indefinitely saved Google Chats

25   would no longer be available?

HIGHLY CONFIDENTIAL

Page 166

1          A.     I'm actually not sure the
2     answer to that.  Yeah.  Because we talked
3     about before, history -- changing the history
4     setting only applies going forward.  So I
5     can't, with 100% confidence, answer what
6     would have happened to the previous messages
7     that were sent, and might have been sent
8     before the retention rule was implemented.
9          Q.     So on the left-hand side under
10    Previous, there's a box that talks about what
11    happens if message history is off, the
12    default.
13               The next box talks about if
14    message history is on, and then some
15    conditions.
16               But the third just talks about
17    if you're chatting in a new Google Chat room.
18    What is history on or off and how it relates
19    to that third box.
20         A.     Yeah.  So that's because the
21    third box is talking about threaded rooms,
22    which, like we've talked about before, are
23    history on by default, and you can't -- they
24    do not have a history toggle.  So it wouldn't
25    make sense to discuss history changes because

HIGHLY CONFIDENTIAL

Page 167

```
 1        they weren't allowed in threaded rooms.
 2        There just wasn't a toggle.
 3             Q.     But under the policy after
 4        November 2020, that threaded room would last
 5        or be retained 18 months; is that right?
 6             A.     Messages in that threaded room,
 7        correct.
 8             Q.     What if message history was on?
 9             A.     Message history was always on.
10             Q.     So it's still 18 months?
11             A.     Correct.
12             Q.     So back to my question about,
13        say, a threaded room conversation from
14        October of 2020.  You don't know, as we sit
15        here today, whether or not those messages
16        would be retained after 18 months?
17             A.     That's right.  Yeah, that's the
18        gap in my knowledge on exactly how that would
19        operate.
20             Q.     What effect would it have if --
21        if any, as to whether or not somebody was on
22        a litigation hold, as to the Google Chat
23        threaded room retentions?
24             A.     It wouldn't have any effect.
25        Like we talked about, if the hold is in
```

HIGHLY CONFIDENTIAL

Page 168

1    place -- is placed, Vault will preserve

2    anything that is currently on our systems.

3    So that would either apply to indefinite

4    messages, if they were living longer than

5    18 months, and it would apply to any messages

6    that were sent and were still within the

7    18-month period after the retention rule was

8    implemented.

9         Q.    So as to the hole in your

10   knowledge we talked about, where you don't

11   know what happened on the scenario of Google

12   Chat threaded rooms that existed prior to

13   November of 2020 and how long they were held,

14   did you send any warning or any policy update

15   to people that it's possible those threaded

16   room chats might not be retained after

17   18 months after November of 2020?

18              MR. MCCALLUM:  Objection, scope

19        and form.

20        A.    No.  This was -- this was the

21   communication.  Yeah.

22   BY MR. COLLIER:

23        Q.    This meaning you're pointing to

24   Exhibit 431?

25        A.    The policy itself, correct.

HIGHLY CONFIDENTIAL

Page 169

1          Q.      So if we look at the bottom of

2     this page, page 9709520.

3          A.      (Witness nods.)

4          Q.      I want to ask you about some of

5     the changes that are referenced in here under

6     the heading:  What's already changed and what

7     does the roadmap look like?

8                  In May of 2020, there was a bug

9     fix that caused some group Chat messages, one

10    or more users on classic Hangouts, to be

11    retained indefinitely.

12                 What does that mean?  What was

13    fixed and what was the effect?

14         A.      Yeah.  So that -- as far as I

15    remember, that was an issue that Vault was

16    not operating properly on a subset of chats

17    that had happened in the old tool, so classic

18    Hangouts.

19                 So they were living on beyond

20    the expiration of the retention period.  I

21    think users noticed, and so we worked with

22    the product team to make sure that they were

23    being retained per the policy.

24         Q.      And those that were retained

25    indefinitely, as of May of 2020, that should

HIGHLY CONFIDENTIAL

Page 190

```
 1            1:49 p.m. PDT)
 2                  THE VIDEOGRAPHER:  We are going
 3            back on record.  The time is 1:49.
 4      BY MR. COLLIER:
 5            Q.        ████████, I'm going to hand
 6      you what we'll mark as Exhibit 434, and it's
 7      going to be H, as in Hector.
 8                  (Google/████ Deposition
 9            Exhibit 434, Google Chat Retention
10            Policy, GOOG-AT-MDL-009709506 -
11            GOOG-AT-MDL-009709507, was marked for
12            identification.)
13      BY MR. COLLIER:
14            Q.     Is this the chat policy from
15      December 2021 to May of 2023?
16            A.     Yes.
17            Q.     That was the easiest exhibit
18      all day, because now we'll do the next one,
19      Exhibit 435, tab I as in igloo.
20                  (Google/████ Deposition
21            Exhibit 435, Google Chat Retention
22            Policy, GOOG-AT-MDL-009709518 -
23            GOOG-AT-MDL-009709519, was marked for
24            identification.)
25                  *   *   *
```

HIGHLY CONFIDENTIAL

Page 191

1   BY MR. COLLIER:

2         Q.      And, sir, I'm just asking, is

3   tab I the Google Chat policy from May of 2023

4   to present?

5               And I say the present.  I don't

6   know if one's been issued in the last few

7   months.  I'm not trying to trick you.

8         A.      I don't believe there is a new

9   one.

10        Q.      Okay.

11        A.      So yes, this is still in

12  effect.

13        Q.      And in this current version

14  from May of 2023, if we could look at the

15  first page.

16               Halfway down the first page

17  there's a second note, which I believe is

18  new.  And it says:  Note:  If someone in your

19  conversation is on a legal hold, that

20  conversation's history will typically be set

21  to on automatically, and can't be turned off.

22               Is that a reflection of the

23  February 2023 decision to force on history?

24        A.      Yes.

25        Q.      And it was only forced on for

HIGHLY CONFIDENTIAL

Page 192

1    those on the litigation hold, right?

2         A.    Correct.

3         Q.    And when it says "typically

4    will be set," what are the exceptions?

5         A.    I believe the exceptions here,

6    the reason why it's phrased is typically

7    because we have -- we have different types of

8    holds.  So we have public holds and we have

9    private holds.  So in a private hold, and

10   that's obviously typically employment or

11   investigation matter, you don't necessarily

12   want to indicate to the subject of the

13   private hold that there is a hold in place,

14   right?  They are the subject of, I don't

15   know, could be any -- could be many things.

16   So we wanted to account for the fact that

17   there would be differential behaviors.

18        Q.    Does that mean -- I want to

19   make up an employee because I don't want to

20   put any real employee's name, you know, in

21   any even fake trouble.

22              But Mr. John Doe of Google is

23   under some sort of scrutiny by Google or

24   others, and you don't want him to know that

25   he's on a legal hold.

                                            Page 193

1                 Is that the exception that

2      we're talking about here under this note?

3            A.      Correct.

4                 MR. MCCALLUM:   Objection,

5            beyond the scope.

6            A.      Right.  So we're distinguishing

7      litigation holds, which there is a clear

8      preservation obligation.  It will always be

9      set to on automatically, can't be turned off.

10     We're distinguishing that from private holds

11     where there might be instances where the

12     behavior is different.

13     BY MR. COLLIER:

14           Q.      What about like a government

15     CID?  Can that be a private hold?  Is that

16     always a litigation hold?

17           A.      I can't speak to the specific

18     distinctions in that space.

19           Q.      Okay.  Well, thank you.  I

20     understand that scenario is an exception to

21     why, typically, does not always.

22                 Is there other exceptions?

23           A.      Not that I'm aware of.

24           Q.      Do you know if any individuals

25     at Google are on a litigation hold for this

HIGHLY CONFIDENTIAL

Page 197

1              MR. MCCALLUM:  Object to the
2         form.
3         A.     Right.  So just to be clear,
4    for -- if history is off, 24 hours is the
5    maximum they will be kept, and we don't have
6    access to them at any point.
7    BY MR. COLLIER:
8         Q.     Okay.  Now, if history is on,
9    can Google search or read the contents of any
10   of those retained chats?
11        A.     I believe the answer is not in
12   their native format, but if they are exported
13   to Vault, for example, they might then be in
14   a format that you could actually review.
15        Q.     Okay.  So there would be no
16   way, in like producing documents for
17   discovery, to, even if history is on, look at
18   the contents of any person not under a
19   litigation hold's chats?
20              MR. MCCALLUM:  Objection,
21         scope.
22        A.     Right.
23              So in the normal course of
24   business, there is no ability to look into
25   individual chats that might be exchanged.

HIGHLY CONFIDENTIAL

Page 198

1              Now, if they've been collected
2       as part of a litigation matter, if they're on
3       legal hold, when they're in that format, then
4       you might be able to review them.
5       BY MR. COLLIER:
6              Q.     When they're in the Vault?
7              A.     Right.   Exactly.   When they've
8       been exported by Vault, correct.
9              Q.     Can you run Boolean and other
10      searches on chats within the Vault?
11                   MR. MCCALLUM:   Objection,
12              scope.
13             A.     Yes, Vault allows you to do
14      various forms of keyword searching.
15      BY MR. COLLIER:
16             Q.     Does Google have the technical
17      ability to create separate organizational
18      units that include legal hold recipients and
19      then change the chat retention setting for
20      that organizational unit?
21                   MR. MCCALLUM:   Objection,
22              scope.
23             A.     So there is a technical
24      capability.   However, when we investigated
25      that option, we were told by the technical

HIGHLY CONFIDENTIAL

Page 199

1    experts that that was not advised and not

2    permitted within Google policy.

3    BY MR. COLLIER:

4         Q.    Right.  I'd ask you to look at

5    Exhibit 416, which is your deposition

6    transcript.

7                   MR. COLLIER:  Well, actually,

8              you don't have to look at that.  I can

9              move on.

10   BY MR. COLLIER:

11        Q.    When you say you were advised

12   by technical experts that was not advised and

13   not permitted within Google policy, what does

14   that mean?

15                  MR. MCCALLUM:  Objection,

16             scope.

17        A.    Yes.  So what we learned when

18   we talked to the Google team that manages our

19   domain, so google.com, is an organizational

20   unit, in Workspace parlance, all -- so all of

21   the companies, a single OU, when we -- when

22   we inquired to the relevant technical

23   experts, what would you say if we wanted to

24   create a separate OU, a new one, just for a

25   subset of Google employees, the answer was,

HIGHLY CONFIDENTIAL

Page 200

1    that would be a terrible idea, and we would

2    not support it from an engineering

3    perspective.

4                    So that was the answer that we

5    then used to continue to explore other

6    options.

7    BY MR. COLLIER:

8         Q.    Why was it a terrible idea?

9                    MR. MCCALLUM:    Objection,

10         scope.

11         A.    So basically, an OU is a kind

12    of a membership bucket.    And so you apply

13    policies on the OU basis.    And this is for

14    everything from your badge access to your

15    permissions systems; it's many, many things.

16                    And their advice was that

17    actively managing those permissions, if

18    someone was being transferred between the

19    existing OU and a new OU, would quickly

20    become unmanageable and potentially introduce

21    risks because it would become so technically

22    complex.

23    BY MR. COLLIER:

24         Q.    So your team didn't say you

25    couldn't do it; they just advised against it?

HIGHLY CONFIDENTIAL

Page 201

1        A.        I mean, we take the advice of
2    our engineering and technical experts when
3    we're making decisions.
4        Q.        Did anyone in your department
5    ever audit the chats to make sure nothing
6    relevant to the litigation was being missed?
7                  MR. MCCALLUM:   Objection,
8        beyond the scope.
9        A.        I don't -- I don't know -- tell
10   me what you mean by the word "audit."
11   BY MR. COLLIER:
12       Q.        Well, let's go to page 46 of
13   your deposition and see if that helps us.
14   Because I asked you the same question
15   Judge Donato asked you from the bench, so
16   I'll use his meaning.
17                 If you look at lines -- well,
18   we'll start with line 5 and I'm going to go
19   all the way to line 17.
20                 Just take a look at that, and
21   then I'll ask you some questions.
22                 [Document review.]
23       A.        Okay.
24   BY MR. COLLIER:
25       Q.        All right.  And you remember

HIGHLY CONFIDENTIAL

Page 202

1    the judge asking you questions, right, at the

2    hearing?

3            A.      (Witness nods.)

4                    MR. MCCALLUM:   Objection,

5            scope.

6            A.      That's right.

7    BY MR. COLLIER:

8            Q.      So the first question on this

9    page from the Court was:   So, basically, you

10   left it up to each individual Google employee

11   to decide about the history?

12                   Do you see that question?

13           A.      Yes.

14           Q.      And your answer was, "Yes."

15           A.      That's right.

16           Q.      And that's right?   At least

17   prior to 2023, correct?

18           A.      And along with the instructions

19   that they received as part of the legal hold

20   notice.

21           Q.      The instructions given to each

22   individual Google employee, right?

23           A.      No, to each individual

24   custodian.   The legal hold notice would

25   include instructions on how to use the

HIGHLY CONFIDENTIAL

Page 229

1    might be interested in communicating.

2    BY MR. COLLIER:

3        Q.    Nor does Google.  Right?

4              You can -- Google employees can

5    use Google Chat for business things, right?

6        A.    Correct.

7        Q.    Birth announcements, which are

8    not a Google business thing, right?

9        A.    Correct.

10       Q.    Paragraph 29 on page 9.

11             Now, the first sentence here

12   says:  Google has the technical ability to

13   set Chat history to, quote, on, as the

14   default for all employees who are subject to

15   a legal hold, but it chooses not to, period.

16             Now, that, I believe you'll

17   say, was true until February of 2023, right?

18             MR. MCCALLUM:  Objection to

19        scope.

20       A.    That's right.

21   BY MR. COLLIER:

22       Q.    Let's go to paragraph 32.

23             The Court found:  Google did

24   not check to see if custodians were actually

25   preserving relevant Chats as directed by the

HIGHLY CONFIDENTIAL

Page 230

1     hold notice, and did nothing in the way of

2     auditing or monitoring Chat preservation.

3                    MR. MCCALLUM:  Objection,

4         scope.

5          A.     Is there a question?

6     BY MR. COLLIER:

7          Q.     There is a question.  Under

8     oath, sir, is this finding by the Court true,

9     or not?

10                    MR. MCCALLUM:  Objection to

11        scope.

12         A.     Well, as we've discussed, there

13    is no technical ability to monitor the

14    content of chats to determine relevance in

15    the normal course of business.

16    BY MR. COLLIER:

17         Q.     And then the second sentence

18    says:  There is no evidence establishing that

19    Google did any individualized follow-up on

20    Chat preservation with the hold recipients,

21    including those designated as custodians.

22                    Is that true, sir?

23                    MR. MCCALLUM:  Objection,

24        scope.

25         A.     My thoughts on this are that I

HIGHLY CONFIDENTIAL

Page 231

1    do know that there was follow-up with
2    custodians in a general sense to remind them
3    of their obligations, substance of their hold
4    notice.  I believe that happens twice a year,
5    so...
6              But I -- but if he is
7    specifically saying if there was a
8    Chat-specific follow-up, then yes, I assume
9    that's correct.
10              MR. COLLIER:  Okay.  All right.
11         We can set that to the side.
12              Why don't we take a short
13         break.  I think I'm going to be able
14         to finish in one more questioning
15         session when we come back.
16              MR. MCCALLUM:  Okay.
17              MR. COLLIER:  I just want to
18         organize my last few documents to do
19         this efficiently.
20              MR. MCCALLUM:  Okay.
21              THE VIDEOGRAPHER:  We're going
22         off record.  The time is 2:39.
23              (Recess taken, 2:39 p.m. to
24         2:54 p.m. PDT)
25              THE VIDEOGRAPHER:  We're going

HIGHLY CONFIDENTIAL

Page 232

```
 1            back on the record.  The time is 2:54.
 2       BY MR. COLLIER:
 3            Q.      ██████████, good afternoon.
 4                    Did -- does Google use Google
 5       Chat with its customers?
 6            A.      Yes, you could use Google Chat
 7       internally and externally.
 8            Q.      Do you know if people used
 9       Google Chat or instant messaging to talk to
10       publishers?
11            A.      I don't know.
12            Q.      Advertisers?
13            A.      I don't know.
14            Q.      But it can be used internally
15       and externally, right?
16            A.      That's right.
17            Q.      To your knowledge, does Google
18       routinely use any non-Google Chat programs?
19            A.      Not to my knowledge.
20            Q.      And I think I asked you this
21       before, but I'm not sure I asked it exactly
22       this way, so I'm going to ask you a big, long
23       question because I think I know your answer,
24       but if I need to break it up, I will.
25                    As we sit here today, are you
```

HIGHLY CONFIDENTIAL

Page 255

1               C E R T I F I C A T E

2

3          I, DEBRA A. DIBBLE, RDR, CRR, CRC,

4     Notary Public, do hereby certify:

5          That ███████████, the witness

6     whose deposition is hereinbefore set forth,

7     was duly sworn by me and that such deposition

8     is a true record of the testimony given by

9     such witness;

10          That pursuant to FRCP Rule 30,

11     signature of the witness was not requested by

12     the witness or other party before the

13     conclusion of the deposition;

14          I further certify that I am not

15     related to any of the parties to this action

16     by blood or marriage, and that I am in no

17     way interested in the outcome of this matter.

18          IN WITNESS WHEREOF, I have

19     hereunto set my hand on 18th day of May,

20     2024.

21

22     _Debra A. Dibble_

      Debra A. Dibble TX CSR-10777

23     Fellow of the Academy of Professional

      Reporters

24     Registered Diplomate Reporter

      Certified Realtime Reporter

25     Notary Public 11/17/2027

**ERRATA SHEET FOR THE TRANSCRIPT OF** ███████████ **30(b)(6)**

Case Name: *In re Google Digital Advertising Antitrust Litigation*, 4:20-cv-00957-SDJ

Dep. Date:    May 17, 2024

Deponent:    ████████

| Page | Line | Corrections | Reason for Correction |
|------|------|-------------|----------------------|
| 18 | 23-24 | The phrase "The policy is managed by technology called Vault" should read "The policy is managed by a technology called Vault" | Transcription error |
| 34 | 7-8 | The phrase "a couple of other letters" should read "a couple other letters" | Transcription error |
| 88 | 15-16 | The phrase "anything like that" should read "anything about that" | Transcription error |
| 99 | 10-17 | Lines 10-17 should be recorded as a question by Mr. Collier, not a response by the deponent. | Transcription error |
| 100 | 1-2 | The phrase "subject in the protective order" should read "subject of the protective order" | Transcription error |
| 108-109 | 108:25-109:2 | The phrase "application that we used to host" should read "application that we use to host" | Transcription error |
| 138 | 4 | The phrase "enable that force history" should read "enable that, to force history" | Transcription error |
| 138 | 12-13 | The phrase "all of the Workspace customers" should read "all other Workspace customers" | Transcription error |
| 163 | 22-23 | The phrase "harmonize their attention behavior" should read "harmonize their retention behavior" | Transcription error |
| 231 | 1 | The phrase "there was follow-up" should read "there is follow-up" | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefore.

Date: _____June 14, 2024_____        Signature: ____ */s/* ████████_____