# EXHIBIT 14

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                     SHERMAN DIVISION

4    THE STATE OF TEXAS, et al., )
                                 )
5            Plaintiffs,         )
                                 )
6    vs.                         )  Case No.
                                 )  4:20-cv-000957-SDJ
7    GOOGLE LLC,                 )
                                 )
8            Defendant.          )

9

10

11      **********************************************

12            VIDEOTAPED ORAL DEPOSITION OF

13                 JACOB HOCHSTETLER

14                 DECEMBER 16, 2024

15    HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

16      **********************************************

17

18        On the 16th day of December, 2024, at 9:10 a.m.,

19    the videotaped oral deposition of the above-named

20    witness was taken at the instance of the Defendant,

21    Google LLC, before Michelle L. Munroe, Certified

22    Shorthand Reporter in and for the State of Texas, at

23    Norton Rose Fulbright US LLP, 2200 Ross Avenue, Suite

24    3600, Dallas, Texas, pursuant to Notice and the

25    agreement hereinafter set forth.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 20

1          There's a lot of variables with that,

2     mostly to do with latency and the vehicles moving;

3     is it quicker to process it there or shuffle that up

4     to the cloud, process it, and send it back down.  So

5     there was statistics involved in that.

6          Q.   I'm sorry, maybe I'm missing the point.

7               Can you explain how statistics -- maybe we

8     should back up.

9               What is your definition of "statistics"?

10         A.   My definition would be looking at large

11    data and then gathering calculations and results

12    from that large data.  You can either do it through

13    sampling.  You can do it through -- there's

14    different models.  You can run a cloud forest on it

15    to get your KNN clustering.  But it really depends

16    on how the size of your data is and your format you

17    want out.

18              A lot of modern models when you have

19    p-cutoffs, you're going to generate, you know, ten

20    results out, and you're going to pick the top three,

21    for instance.

22              And that's how a lot of, like, a vision

23    system is looking at an apple in a text -- this is

24    an apple.  It has top three answers.  The apple is

25    top one.  Orange and banana could be the next two.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 21

1    But we have a P greater than 05, so we know the

2    apple is the highest hit.

3           Q.   By the way, you said p-cutoff and you used

4    the acronym "P," is that short for probability?

5                     MR. HILLEGAS:  Objection; form.

6           A.   As I recall.  We usually use, like, P less

7    than 05 is, like, the joke standard that something

8    is assured, but my wheelhouse is computer science.

9           Q.   So then what does the "P" stand for?

10          A.   I can't recall.

11          Q.   What does "P less than 05" mean?

12          A.   It means very, very likely.  These two

13   things are -- or multiple things are very

14   correlated.

15          Q.   You said you don't recall what the "P"

16   stands for.

17               Do you recall what the "05" represents?

18                     MR. HILLEGAS:  Objection; form.

19          A.   Not off the top of my head.

20          Q.   Besides recalling that it was a joke, what

21   else can you tell us that you remember about the

22   concept of P being less than -- "P less than 05"

23   meaning something is very likely?

24          A.   Most of what I do is create models in code

25   and then deploy them, so my recollection of Intro to

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 22

1    Statistics is foggy.

2         Q.    We have talked about the classes that you

3    have taken.

4              Do you have any degrees or certifications

5    that are specific to statistical analysis?

6         A.    That would be a math degree.  I don't have

7    a math degree.

8         Q.    You said it would be.  I'm not asking you

9    specifically if you have a math degree.  Some people

10   come out of college, for example, with a degree in

11   statistical analysis.

12             Do you have such a degree?

13        A.    No.

14                  MR. HILLEGAS:  Objection; form.

15        Q.    And then there's also certifications.  I

16   know there's a long list of computer-related --

17   sorry, computing-related certifications listed on

18   your CV.  We're going to look at it in a minute.

19             Do you have any certifications that are

20   specific to statistics?

21                  MR. HILLEGAS:  Objection; form.

22        A.    I'm not aware of any.

23        Q.    Have you ever held yourself out, as in

24   represented yourself as, an expert in statistical

25   analysis?

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 23

1          MR. HILLEGAS:  Objection; form.

2      A.    I have not.

3      Q.    Has anyone ever hired you as an expert to

4   perform statistical analysis?

5          MR. HILLEGAS:  Objection; form.

6      A.    I have been paid in grant money for

7   writing a paper.  I don't know if I would consider

8   that hired in the strictest sense, but I don't want

9   to, you know, limit myself to what that was.

10     Q.    The paper that you ultimately wrote with

11  that grant money, what was it about?

12     A.    It was about smart city planning.  That

13  was a large scale statistical model that placed

14  police patrols and police cars into LA County, and

15  this was based upon 13 years of LA County crime

16  records.  I think it was, like, 30 million crimes or

17  so.

18          At that point, I figured out the severity

19  of the crimes.  Obviously, you know, responding to a

20  murder versus responding to check fraud have

21  different severities.

22          So once I grouped them by severity, I then

23  ran a few KNN clustering to bring them into spots on

24  the streets in LA County where not only would be

25  responsive to crimes for each hour of the day, but

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 24

1    also using Google Maps, they could plot to the next

2    stop the quickest using the traffic data at that

3    hour.  And this was done Monday through Sunday every

4    hour of the day.

5            But the data was coming out of the

6    government, so the LA County data was really rough.

7    There were crimes reported in Las Vegas.  There were

8    crimes reported in the middle of the ocean.  So I

9    had to clean the dataset up quite a bit to get it to

10   a usable spot.

11       Q.   What year was this paper written?

12       A.   I think 2016.

13       Q.   Do you know whether LA County implemented

14   your suggestions in the paper in terms of placement

15   of police and vehicles?

16       A.   I never talked to LA County about it.  I

17   did talk to Denton County about it, and they were

18   interested in a system similar for foot patrols.

19       Q.   Did Denton County end up hiring you to do

20   that or --

21       A.   No.

22       Q.   Sorry.

23            -- or funding a grant in which you

24   ultimately did that?

25                MR. HILLEGAS:  Objection; form.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 116

1    A.    There's no statistics involved because I

2  wasn't sampling.  If I was sampling, if I was

3  getting an end number from a larger dataset, then it

4  would have mattered, and that -- once you get to a

5  bigger end number, this had no sampling.  I was

6  using all the data provided to me.

7    Q.    The data provided to you was a subset of

8  custodians and a subset of days, right?

9    A.    It was the entirety of what was produced

10  by Google.

11    Q.    I I'll ask it a different way.

12        Out of the 141 custodians, you only had

13  data for five, right?

14    A.    Correct.  As I understand, the rest were

15  destroyed.

16        MS. NAJAM:  Okay.  And I'll object to

17  that as nonresponsive.

18    Q.    Again, you're referring to the destruction

19  of something.

20        You're just talking about the fact that

21  these metadata logs are retained on a rolling basis,

22  right?

23    A.    They're overwritten, correct.

24    Q.    Okay.  So I'm going to have to ask my

25  question again.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 117

1          Out of the 141 custodians that were
2    subject to legal hold, you only had data for five,
3    correct?
4               MR. HILLEGAS:  Objection; form.
5          A.   That was all that was produced.
6          Q.   And out of the 365 days in a year, you
7    only had data for 68 days, correct?
8               MR. HILLEGAS:  Objection; form.
9          A.   Yes.  I want to clarify.  My calculation I
10   used 365.25.
11         Q.   To average the amount -- the length of a
12   year?
13         A.   Yes.
14         Q.   Given a leap year every four years?
15         A.   That's right.
16         Q.   All right.  We're going to use 365 for
17   convenience if that's okay.
18              Now you don't say in either of your
19   reports or your declaration that this is a
20   statistically significant sample set to extrapolate
21   to the rest.
22              I think I'm hearing you today your opinion
23   is that this concept of statistical significance
24   just doesn't matter here; is that right?
25              MR. HILLEGAS:  Objection; form.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 118

1      A.    Correct.

2      Q.    But if we can do some math real quick.

3            Do you have a calculator handy, like your

4      phone, phone calculator?

5      A.    My phone is not in here.

6      Q.    Good.   You followed your counsel's

7      instruction.

8            MS. NAJAM:   Do y'all mind if I hand

9      him mine or do you want to hand him yours?

10           MR. HILLEGAS:   I do not mind if you

11     hand him your phone.

12     Q.    Okay.   Here you go.

13     A.    An iPhone.

14     Q.    Okay.   Multiplying the number of

15     custodians whose data you had times the number of

16     days that you had that data, that is 5 times 68.

17           Can you confirm for me that's 340?

18     A.    That is correct.

19     Q.    And then multiplying the total number of

20     custodians, assuming for these purposes it's 141,

21     multiplying that by the total number of days in a

22     year of 365, can you confirm for me that you get

23     51,465?

24           That is 141 times 365.

25     A.    I think we want to divide.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 119

1    Q.    Well, first I wanted to calculate days

2    times individuals in the log dataset, and then I

3    wanted to do days times custodians in the entire

4    population.

5            So, first, 5 custodians inside what you

6    had, the log dataset, times 68 days, that's 340,

7    right?

8    A.    Correct.

9    Q.    And then 141 custodians times 365 days.

10   A.    Okay.    So not -- so a separate

11   calculation.

12   Q.    Yes.

13   A.    51,000.

14   Q.    51,465?

15   A.    465.

16   Q.    And then if you divide those two numbers,

17   which I think you were jumping ahead, but we're

18   lawyers, we can't do that.

19           340 divided by 51,465.    What percentage do

20   you get?

21   A.    .66.

22   Q.    So in terms of the log dataset, can we

23   agree that it is less than 1 percent of the

24   population dataset that you're extrapolating it to,

25   that is, 141 custodians for an entire year?

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 120

1               MR. HILLEGAS:  Objection; form.

2       A.    Yes.

3               Do you need your phone back?

4       Q.    Yes.  Thank you.

5               So can you explain, sir -- first of all,

6   is it your opinion that your results, that is, your

7   opinion that 1.5 million chats were sent with

8   history off in a year by the employees on litigation

9   hold or 2.8 million, that that is reliable and

10  trustworthy even if the sample that you had is not

11  statistically significant?

12      A.    I have seen no evidence to the contrary.

13      Q.    So is that a yes?  Should we -- can we

14  assume your results are reliable and trustworthy

15  even if they are not statistically significant?

16              MR. HILLEGAS:  Objection; form.

17      A.    I have seen no evidence to the contrary.

18      Q.    I'm going to ask the question again.

19              Should the Court conclude that your

20  results are reliable and trustworthy even if they're

21  not statistically significant?

22              MR. HILLEGAS:  Objection; form.

23      A.    Statistics isn't involved in this because

24  there wasn't sampling, so my opinion is reliable.

25      Q.    And you believe your opinion is reliable

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1   even if it represents less than 1 percent of the

2   total data -- sorry, total population of chats sent

3   by all the employees under litigation hold for a

4   year?

5              MR. HILLEGAS:  Objection; form.

6        A.   I have seen no evidence to the contrary.

7        Q.   Can you cite to us any study or industry

8   publication or authority that would support that if

9   your sample set constitutes less than 1 percent of

10  your total population, it's fine to draw conclusions

11  from that less than 1 percent sample set that apply

12  to the rest of the population?

13             MR. HILLEGAS:  Objection; form.

14       A.   This is how most polling is conducted.

15       Q.   Have you done polling before?

16       A.   Yes.

17       Q.   What kind of polling?

18       A.   Political polling.

19       Q.   And how -- tell me, what was your -- what

20  was your statistical basis in terms of making sure

21  that your sample set was going to be reflective of

22  the rest of the population within some confidence

23  interval?

24             MR. HILLEGAS:  Objection; form.

25       A.   It was vendor software.  I didn't write

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 122

1    the vendor software.

2         Q.   So are you able to tell us how you made

3    sure that the folks being called were, in fact,

4    representative of the general population of voters?

5              MR. HILLEGAS:   Objection; form.

6         A.   The demographic software did that.

7         Q.   Okay.  So --

8              MR. HILLEGAS:   Counsel, lunch has

9    appeared outside.

10             MS. NAJAM:   Okay.  Thanks.  I'll wrap

11   this up soon.

12        Q.   I'm sorry.  So where we get off on this

13   political polling, are you telling me that you

14   participated in some political polling where

15   somebody decided that sampling less than 1 percent

16   of the population would be an accurate measure of

17   the remaining population?

18        A.   So if we take 180 million voters in the

19   U.S., what is -- can I borrow your calculator?

20        Q.   Yes.

21        A.   What is our number?  .66, I think, was the

22   number we arrived at times 180 million.  So that

23   leaves 118,000 people that have to be polled to

24   determine an NBC news poll for president or

25   political party.  Most polling is conducted with a

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 234

1              MR. HILLEGAS:  Objection; form.

2       A.    It was not part of my assignment.

3       Q.    And I'm not asking you whether someone

4    asked you to do it here.

5              Are you even qualified to do it is my

6    question?

7              MR. HILLEGAS:  Objection; form.

8       A.    It was not part of my assignment.

9       Q.    You won't answer my question whether

10   you're qualified or not?

11      A.    I have an opinion about the dataset which

12   was part of my assignment.

13             MS. NAJAM:  Object to that as

14   nonresponsive, but we can move on.

15      Q.    Let's go to your October report that you

16   call your supplemental report, Exhibit 1, page 35,

17   starting with paragraph 68.

18             Sir, I think you referenced this earlier.

19   But there is one Chat group where it had a

20   conversation produced that included Mr. Pichai where

21   you opined that 300 messages were lost.

22             Did I summarize that accurately?

23      A.    Is this the triple A group?

24      Q.    Are you asking me?

25      A.    You said paragraph 68.  I don't see where

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 235

 1    I say 300.

 2         Q.   If you skip to paragraph -- sorry, it's

 3    taking me a second.  Paragraph 77.  Do you recall --

 4    I'll ask a better question.

 5              Do you recall that for a Chat conversation

 6    that was produced that spanned December 8 to

 7    December 9, 2022, that included Mr. Pichai, you

 8    offer the opinion that 86 percent of a total of

 9    around 387 messages were sent with history off?

10         A.   That's correct.

11         Q.   And then you opine, Consequently, messages

12    relevant to this litigation were lost due to the

13    toggle of the Retention Setting.

14              Do you see that?

15         A.   Yes.

16         Q.   As you established today, you actually do

17    not have any opinions on whether the unpreserved

18    messages were relevant to this lawsuit, right?

19         A.   Relevant means to the dataset.

20         Q.   I hear that you're saying today.  But in

21    your report you wrote the words relevant to this

22    litigation.

23              Do you see that?

24         A.   Yes, the context is this dataset, the Log

25    Dataset.

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 236

1        Q.    As I understand your opinions today, you

2   are saying that you are not opining that these

3   unsent -- sorry, unsaved messages, this 86 percent,

4   you're not here telling the Court that they were

5   relevant to this litigation; is that true?

6        A.    That they were pertinent.  I don't know.

7   I think I have one example from that -- from that

8   AAA group which was on the next page.  No, back.

9   Yeah, Figure 11.

10            And as I recall, this is -- yeah, this is

11   from the same III group with the redactions in the

12   middle of it.  So this was a produced Chat that

13   was -- my assumption, if it's produced, it's

14   pertinent.

15        Q.    Okay.  Did you actually go through the

16   Chat and make a determination on whether even one of

17   the produced messages related to ad tech or the

18   display ad's business?

19        A.    No, I did not.

20        Q.    Is it possible that literally none of the

21   messages in that produced conversation had anything

22   to do with the topics of this lawsuit?

23            MR. HILLEGAS:  Objection; form.

24        A.    Possibly but highly unlikely.

25        Q.    Let me hand it to you then.  I'm marking

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 237

1    that as Exhibit 11.

2                    (Exhibit 11 marked.)

3                    THE WITNESS:  Do these other ones

4    need --

5                    MS. NAJAM:  Just pass them down.

6                    THE WITNESS:  They don't need

7    stickers?

8                    MS. NAJAM:  No.

9        Q.   So can you just confirm for the record

10   that Exhibit 11 is the produced Chat conversation

11   that you excerpted in Figure 11?

12       A.   Yes.

13       Q.   Can you point us to any message in this

14   produced conversation that has to do with Display

15   Ads or advertising technology?

16       A.   (Reviewed document.)  I didn't see

17   anything related with the word ad tech.

18       Q.   I think we have established this.  But

19   you're familiar with the various Google -- you're

20   familiar with Google's ad tech stack, right?

21       A.   Yes.

22       Q.   You're familiar with its publishers --

23   publisher-facing tools, its advertiser-facing tools,

24   its ad exchange.  I'll pause there.

25            You're familiar with how they work?

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 251

1          Q.   Okay.  But just taking -- just doing the

2     math, out of the 3.8 million that actually had date

3     and time metadata, if you remove the ones the system

4     flagged as exact or near duplicates, don't you end

5     up with roughly 1.8 million?

6                    MR. HILLEGAS:  Objection; form.

7          A.   I don't recall from the 1.8 million that

8     were flagged as near duplicates, I don't think it

9     gave me any confidence on what they were as far as

10    duplicates.

11               But if we take 3.8 million and subtract

12    1.8 million, which let's say -- let's say each of

13    them is a duplicate.  That gives us 900,000 and that

14    would be 2.7 million, if my math is right.

15         Q.   Let me ask a better question.

16               Do you have an expert opinion in this case

17    on the -- sorry.

18               Do you have an opinion in this case on the

19    number of unique email messages that Google produced

20    in this lawsuit?

21         A.   No.

22         Q.   Okay.  Now let's talk about Chat

23    conversations.

24               Any Chat conversation when produced will

25    include several individual Chat messages -- or can

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 252

1    include several individual Chat messages, right?

2        A.    Correct.

3        Q.    And in this case, are you aware that each

4    individual Chat message is not going to be produced

5    separately?

6        A.    As I understand production is of the

7    conversation.

8        Q.    Which can include several messages?

9        A.    Which can include several messages.

10       Q.    Did you count up the individual Chat

11   messages that Google produced in this suit?

12       A.    No.

13       Q.    Can we agree that it would have been an

14   apples-to-apples comparison to count the number of

15   unique emails produced versus the number of unique

16   Chat messages produced?

17              MR. HILLEGAS:    Objection; form.

18       A.    Yes.

19       Q.    And did you try to do that comparison?

20       A.    I considered it but did not have the time.

21       Q.    Okay.    In your declaration that was

22   submitted to the Court, which we looked at a couple

23   moments ago on paragraph 23 -- I'm sorry, it's

24   paragraph 22 and paragraph 23.

25              Can we agree that it is not an

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 253

1    apples-to-apples comparison to compare the

2    4.2 million emails produced versus the approximate

3    14 to 15,000 Chat conversations produced?

4                    MR. HILLEGAS:  Objection; form.

5        A.    Correct.  Also, with chats there was a lot

6    of missing metadata.  A good percentage of it was

7    missing the date/time group metadata.  And then

8    there was also the same issue with emails where

9    there was the duplicate of ones or exact matches.

10       Q.    Okay.  Now you noted in your declaration

11   in paragraph 23 that you didn't identify a single

12   Chat produced prior to 2010.

13             Do you see that?

14       A.    Yes.

15       Q.    Is it possible that some portion of the

16   over 4,000 conversations that were lacking the

17   date/time metadata that they were prior to 2010?

18                    MR. HILLEGAS:  Objection to form.

19       A.    It is possible.

20       Q.    And then I had a question about page 8 of

21   your declaration, paragraph 24, and then there's

22   some figures associated with this.

23             You observe that the year that the most

24   produced Google emails were created/sent is

25   different from the year that the most produced

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 254

1    Google chats were sent/received.

2         A.    Chat conversations.

3         Q.    Okay.  This says chats but you meant

4    conversations?

5         A.    Yeah, based upon the figure above it.

6         Q.    Okay.  Perhaps I'm being obtuse or it's

7    just late in the day.

8              Can you explain to me what the point of

9    that analysis is?

10        A.    This was to show a comparison between the

11   two productions.

12        Q.    But can you explain to us why it matters

13   that the peak years for chats versus emails differs?

14   Are you drawing any additional conclusions from

15   that?

16        A.    I am comparing them together.  I am not

17   drawing any separate conclusions.

18        Q.    Okay.  Finally did you -- I say finally,

19   almost finally.

20             Did you review any Chat preservation

21   practices or policies for any of the plaintiff

22   states or territory?

23        A.    I did not.

24        Q.    Was that not part of your scope of work in

25   this case?

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 279

```
 1   STATE OF TEXAS    )
 2   COUNTY OF DALLAS )
 3       I, Michelle L. Munroe, Certified Shorthand
 4   Reporter in and for the State of Texas, certify that
 5   the foregoing deposition of JACOB HOCHSTETLER was
 6   reported stenographically by me at the time and place
 7   indicated, said witness having been placed under oath
 8   by me, and that the deposition is a true record of
 9   the testimony given by the witness;
10       That the amount of time used by each party at
11   the deposition is as follows:
         Ms. Najam     -    6 hours, 16 minutes
12       Mr. Hillegas -    17 minutes
13       I further certify that I am neither counsel for
14   nor related to any party in this cause and am not
15   financially interested in its outcome.
16       Given under my hand on this the 17th day
17   of December, 2024.
18
19
20
21                      Michelle L. Munroe, CSR No. 6011
22                      Commission expires 1-31-26
                        Firm Registration #571
23                      VERITEXT LEGAL SOLUTIONS
                        300 Throckmorton Street, Suite 1600
24                      Fort Worth, Texas  76102
                        817.336.3042  telephone
25
```