UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, ET AL. | § | |
| | § | |
| v. | § | CIVIL NO. 4:20-CV-957-SDJ |
| | § | |
| GOOGLE LLC | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this antitrust action, a coalition of States allege that Defendant Google LLC has executed a broad scheme of anticompetitive conduct in display-advertising markets.[1] Display advertising is a form of tailored digital advertising, displayed on websites and mobile applications, that allows advertisers to direct ads to specific web users based on their browsing history and other characteristics. Plaintiff States maintain that Google has monopolized or attempted to monopolize various markets related to online display ads in violation of federal and state antitrust law and that Google's alleged scheme to manipulate display-advertising markets has also violated the States' deceptive-trade-practices laws.

Before the Court is Google's Motion for Dismissal Pursuant to Rule 12(b)(1), in which Google argues that the case should be dismissed in its entirety because the States lack standing. (Dkt. #200).[2] In response, Plaintiff States contend that they

---

[1] The coalition of States includes Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, South Dakota, Utah, and the Commonwealths of Kentucky and Puerto Rico (collectively, "Plaintiff States").

[2] Google likewise filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), which the Court will address in a separate order.

have standing in both their sovereign and parens patriae capacities to redress Google's purported anticompetitive and deceptive conduct. Because the Court finds that Plaintiff States have parens patriae standing, Google's motion will be denied.

The discussion of Google's motion begins with an analysis of the requirements for parens patriae standing as developed over time. After that, the Court describes the relevant display-advertising markets and Plaintiff States' allegations against Google. Finally, the Court evaluates Google's challenge to subject-matter jurisdiction by applying established principles of parens patriae standing to Plaintiff States' claims.

## I. PARENS PATRIAE STANDING

### A. Standing Generally

The Federal Constitution limits the authority of the federal judiciary to "Cases" and "Controversies." U.S. Const. art. III, § 2. "To establish that a suit falls within this limit, a plaintiff must show (1) an injury in fact that (2) is fairly traceable to the conduct complained of and (3) redressable by a favorable judicial decision." *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769 (5th Cir. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). This limitation furthers the aim that the party bringing the claim has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

2

While "States are not normal litigants for the purposes of invoking federal jurisdiction," they may do so in certain circumstances, so long as the requirements of Article III standing are met. *Harrison*, 78 F.4th at 769 (quoting *Massachusetts*, 549 U.S. at 518). "[S]tates have at least four types of interests that, if injured, satisfy standing's first requirement: sovereign, quasi-sovereign, proprietary, or private." *Id.* (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601–02, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) ("*Snapp*")). States may also sue in multiple capacities, "on behalf of themselves or in the interest of their residents in a parens patriae capacity." *Id.* The Court's discussion here focuses on Plaintiff States' assertion that they are suing on behalf of their citizens in a parens patriae capacity.

## B. Parens Patriae

The ability of a State to seek redress before an Article III court as parens patriae—or "parent of the country"—has long been recognized. *Snapp*, 458 U.S. at 600. In this capacity, a State brings suit to "prevent or repair harm to its 'quasi[-]sovereign interests,'" *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), which "consist of a set of interests that the State has in the well-being of its populace," *Snapp*, 458 U.S. at 602; *see also Maryland v. Louisiana*, 451 U.S. 725, 737, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) (explaining that, as parens patriae, the State "act[s] as the representative of its citizens . . . where the injury alleged affects the general population of [the] State in a substantial way").

When a State proceeds in a parens patriae capacity, it "must do more than meet Article III's irreducible minimum; [it] must assert a quasi-sovereign interest apart from the interests of particular private parties." *Id.* (cleaned up). As the

Supreme Court has explained, a "quasi-sovereign interest" is a "judicial construct that does not lend itself to a simple or exact definition." *Snapp*, 458 U.S. at 601. Such interests are not reducible to an "exhaustive formal definition [or] a definitive list." *Id.* at 607. However, it is clear that a State may bring suit as parens patriae to protect two quasi-sovereign interests: (1) "the health and well-being—both physical and economic—of its residents in general,"[3] and (2) "not being discriminatorily denied its rightful status within the federal system." *Id.*

In addition to establishing that a quasi-sovereign interest has been injured, a State must also show that the challenged conduct affects a "sufficiently substantial segment of its population." *Id.* The impact of challenged conduct on a State's population may be measured by considering both the direct and indirect injuries it causes. *Id.*; *Maryland*, 451 U.S. at 736, 739 (finding that the State had parens patriae standing to sue on behalf of consumers even when the challenged tax was not imposed "directly on the ultimate consumers"). "One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as parens patriae is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Snapp*, 458 U.S. at 607.

---

[3] This "general[ity]" requirement ensures that a State is not proceeding on behalf of "particular private parties." *Snapp*, 458 U.S. at 607. Federal courthouse doors remain closed to a State merely proceeding as a "nominal party without a real interest of its own." *Id.* at 600.

### i. Historic Illustrations

Because quasi-sovereign interests cannot be precisely defined, historical precedent plays a crucial role in determining whether parens patriae standing is present. *See Harrison*, 78 F.4th at 769 (explaining that the lack of historical precedent supporting a claim of standing indicates that such standing is absent); *see also Snapp*, 458 U.S. at 602 (explaining that the "vagueness" of what constitutes a quasi-sovereign interest sufficient for standing "can only be filled in by turning to individual cases"). Helpfully, a series of Supreme Court and lower court decisions, dating back over a century, have examined what showing a State must make to establish parens patriae standing premised on injuries to the economic well-being of its residents—the quasi-sovereign interest at issue here.

The Supreme Court first recognized that a parens patriae action could be grounded in a "quasi-sovereign" interest at the turn of the 20th century, in *Louisiana v. Texas*, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900). *Snapp*, 458 U.S. at 602. Louisiana challenged a quarantine imposed by Texas officials, which limited trade between Texas and the port of New Orleans. *Id*. The Court identified Louisiana's interest as that of parens patriae and described that interest "by distinguishing it from the sovereign and proprietary interests of the State." *Id*. Observing that Louisiana had no authority to protect the freedom of interstate commerce, and that its cause of action did not involve the "infringement" of the State's sovereign powers or any "special injury to her property," the Court concluded that Louisiana had properly stated an interest as parens patriae in protecting "her citizens at large" from economic harm due to Texas's quarantine regulations. *Louisiana*, 176 U.S. at 19.

In the following decades several States successfully represented the interests of their citizens in enjoining public nuisances. In the first such case, *Missouri v. Illinois*, the Supreme Court held that Missouri could proceed in federal court as parens patriae to enjoin the discharge of sewage into the Mississippi River in Missouri. 180 U.S. 208, 241, 21 S.Ct. 331, 45 L.Ed. 497 (1901). To reach this conclusion, the Court analogized Missouri to an independent country, explaining that while the case did not involve a sovereign or proprietary interest, parens patriae standing existed because "it must surely be conceded that, if the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them." *Id*. As the Court recognized in *Snapp*, these early public-nuisance cases demonstrated that States' quasi-sovereign interests included those circumstances "in which the injury to the public health and comfort was graphic and direct." 458 U.S. at 604; *see also North Dakota v. Minnesota*, 263 U.S. 365, 44 S.Ct. 138, 68 L.Ed. 342 (1923) (flooding); *New York v. New Jersey*, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921) (water pollution); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (air pollution).

But history also shows that "parens patriae interests extend well beyond the prevention of . . . traditional public nuisances." *Snapp*, 458 U.S. at 605. Relevant here is a line of later cases confirming that a State may also be a proper party to represent the "economic well-being" of its residents. *Id*. For example, in *Pennsylvania v. West Virginia*, Pennsylvania had parens patriae standing to represent the interests of its residents in maintaining access to natural gas produced in West Virginia. 262 U.S.

6

553, 592, 43 S.Ct. 658, 67 L.Ed. 1117 (1923). Along the same lines, and particularly applicable to Plaintiff States' claims here, are the Supreme Court's ensuing decisions in cases implicating the economic interests of a State's populace: *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 65 S.Ct. 716, 86 L.Ed. 1051 (1945), *Standard Oil*, 405 U.S. 251, and *Maryland*, 451 U.S. 725. The Court takes each in turn.

In *Pennsylvania Railroad*, Georgia had parens patriae standing to bring a federal antitrust action against twenty railroad companies for their conspiracy to impose an "arbitrary and noncompetitive" price-fixing scheme for railway transportation of freight to and from Georgia. 324 U.S. at 443, 447. Georgia alleged that the rate-fixing scheme harmed its economy in multiple ways, including by "limit[ing] in a general way the Georgia economy to staple agricultural products, . . . restrict[ing] and curtail[ing] opportunity in manufacturing, shipping and commerce, and . . . prevent[ing] the full and complete utilization of the natural wealth of the State;" and by "frustrat[ing] and counteract[ing] the measures taken by the State to promote a well-rounded agricultural program, encourage manufactur[ing] and shipping, provide full employment, and promote the general progress and welfare of its people." *Id.* at 444.

The Supreme Court explained that the alleged harms to Georgia's economy were as "serious" as the "spread of noxious gas over the land or the deposit of sewage in the streams":

> [The anti-competitive rates] may stifle, impede, or cripple old industries and prevent the establishment of new ones. They may arrest the development of a State or put it at a decided disadvantage in competitive markets. . . . Georgia as a representative of the public is complaining of

> a wrong, which if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected. Georgia's interest is not remote; it is immediate.

*Id.* at 450–51. These alleged injuries were sufficient to establish parens patriae standing.[4]

Similarly, in *Standard Oil*, Hawaii—as parens patriae—brought an antitrust action challenging several oil companies' alleged monopoly in the refined petroleum market, among other things. 405 U.S. at 255. Hawaii alleged that the oil companies' actions had "injured and adversely affected the economy and prosperity of the State" by, *inter alia*, "wrongfully extract[ing]" "revenues of its citizens," "curtailing" "opportunit[ies] in manufacturing, shipping[,] and commerce," and "frustrating" "measures taken by the State to promote the general progress and welfare of its people." *Id.* The Supreme Court did not question Hawaii's ability to proceed as parens patriae to rectify these injuries. Indeed, after noting that Section 16 of the Clayton Act permits "any person" to obtain injunctive relief "against threatened loss or damage by a violation of the antitrust laws," 15 U.S.C. § 26, the Court confirmed that

---

[4] Google argues that the Supreme Court only found that Georgia could sue as parens patriae because it was specifically discriminated against. This is a crabbed and mistaken reading of *Pennsylvania Railroad*. While the Supreme Court noted that the railroad companies discriminated against Georgia by "'prefer[ring]' the ports of other States over the ports of Georgia," the impetus behind the Court's finding of parens patriae standing was the effect of the discriminatory rates—i.e., "injur[y] [to] the economy of Georgia." *Pa. R.R.*, 324 U.S. at 445, 447; *see also id.* at 450–51 ("If the allegations of the bill are taken as true, the economy of Georgia and the welfare of her citizens have seriously suffered as the result of this alleged conspiracy.").

a State suing in its parens patriae capacity qualifies as a "person" under this section. *Standard Oil*, 405 U.S. at 261.

Finally, in *Maryland*, the Supreme Court found that the plaintiff States had parens patriae standing to sue Louisiana for its imposition of a "First-Use Tax," which required natural-gas-pipeline companies—not consumers—to pay a small tax on the gas they imported into Louisiana. 451 U.S. at 731. There, "a great many citizens in each of the plaintiff States [we]re themselves consumers of natural gas," and—while not being directly taxed—were "faced with increased costs aggregating millions of dollars per year." *Id.* at 736–37. The Court explained that a State "may act as the representative of its citizens . . . where the injury alleged affects the general population of a State in a substantial way." *Id.* at 737. The Court concluded that this economic harm—increased costs imposed directly on a particular industry but passed on to consumers—was sufficient to confer parens patriae standing on the States. *Id.* at 739.

### ii. Modern Illustrations

"As the pillars of our national economy have shifted from the concrete to the virtual, so too have the targets of government antitrust actions. Where railroads and oil companies were alleged to be early violators, over the past decades," technology companies have been in the crosshairs of modern antitrust actions. *See New York v. Facebook, Inc.*, 549 F.Supp.3d 6, 13 (D.D.C. 2021). And as the following cases illustrate, courts in recent years have found that States have parens patriae standing to protect their citizens from economic harms caused by monopolistic technology companies just as they did to protect them from railroad and natural-gas barons.

For example, in *New York v. Microsoft Corp.*, the district court considered whether the plaintiff States had parens patriae standing to bring claims against Microsoft under Section 2 of the Sherman Act and state-law antitrust analogues for engaging in "anticompetitive conduct [that] ha[d] significantly hampered competition." 209 F.Supp.2d 132, 150 (D.D.C. 2002) (cleaned up). There, the States established that "[m]illions of citizens of, and hundreds, if not thousands, of enterprises in each of the United States and the District of Columbia utilize[d] PCs running on Microsoft software," the monopolistic technology in dispute, leading to a "significant adverse effect on competition." *Id.* at 151–52 (cleaned up). The district court had little trouble concluding that these injuries were sufficient to convey parens patriae standing. *Id.*

More recently, the Southern District of New York found parens patriae standing when a price fixing scheme in the electronic book ("e-book") market caused prices of e-books to "r[i]se precipitously," injuring the States' consumers and their "general economies." *In re Elec. Books Antitrust Litig.*, 14 F.Supp.3d 525, 531–32 (S.D.N.Y. 2014). There, the States alleged, and later proved, that

> [b]y preventing the competitive pricing of e-books, Defendants have deprived the Plaintiff States and their consumers of the benefits of competition. . . . [A]s a direct and proximate result of the unlawful conduct alleged above, the general economies of the Plaintiff States have sustained injury. . . . Defendants' activities also had and continue to have a substantial effect upon the trade and commerce within each of the Plaintiff States.

*Id.* at 531. The court found these injuries sufficient to establish parens patriae standing.[5]

Likewise, the *Facebook* court held that the plaintiff States had parens patriae standing to bring a claim under Section 2 of the Sherman Act against Facebook for its alleged monopoly in the social-media market. 549 F.Supp.3d at 23. The States alleged that Facebook's monopoly resulted in "millions of Plaintiffs' citizens [experiencing] 'reductions in the quality and variety of privacy options and content available to them' in that market—which is to say that, on the States' theory, millions have experienced a rise in the effective *price* of using Facebook." *Id.* (cleaned up). The *Facebook* States also alleged that "small and medium businesses reliant on 'Social Advertising' have lacked lower-priced and higher-quality alternatives to Facebook, and the States' economies in general have suffered from suppressed innovation and investment in the social-networking space." *Id.* (citation omitted). Despite being a "shade vague," the court concluded that these allegations were sufficient to establish parens patriae standing. *Id.*; *see also id.* ("Here, the State Plaintiffs have . . . alleged that tens, if not hundreds, of millions of their citizens consistently use [Facebook], and that U.S. advertisers paid over $30 billion to access those users in 2019 alone. . . . The Court thus fails to see how, at [the motion to dismiss] stage especially, it could find that Facebook's alleged squelching of competition lacked 'sufficiently severe and generalized' consequences for Plaintiffs' economies." (cleaned up)).

---

[5] Although the courts in both *Microsoft* and *In re Electronic Books* considered standing after trials had occurred and the defendants were found liable, the analyses are still instructive here, as the standing requirements are no different post-trial.

\*  \*  \*

The history of parens patriae standing cases, spanning various decades, industries, and injuries, confirms that a State's ability to proceed as parens patriae on behalf of its residents is well-established, but only when two requirements are met. First, the alleged injury must implicate a quasi-sovereign interest, rather than an injury affecting only particular private parties such that the State is merely a "nominal party." One such quasi-sovereign interest is the economic well-being of a State's citizenry. Second, the injury must affect a substantial segment of the State's population. If these requirements are met, a State may proceed in a parens patriae capacity in federal court.

## II. BACKGROUND

Broadly speaking, this case concerns Google's "alleged monopolization and suppression of competition in online display advertising—essentially, the marketplace for the placement of digital display ads on websites and mobile apps." *In re Digit. Advert. Antitrust Litig.*, 555 F.Supp.3d 1372, 1373 (J.P.M.L. 2021). Like so many aspects of modern life, the internet brought seismic changes to the advertising industry, including the advent of "display advertising"—a form of tailored digital advertising, displayed on websites and mobile applications, that allows advertisers to direct ads to specific web users based on their browsing history and other characteristics. Publishers and advertisers use sophisticated web tools to conduct auctions, each lasting a fraction of a second, to sell ads that are targeted to likely purchasers. In this market, and as described in the current complaint, advertisers use so-called "ad buying tools" to purchase publisher "inventory"—the space on

websites where ads are shown. These ad-buying tools let advertisers specify how much they are willing to pay for inventory and the audiences that they want their ads to reach. On the other side of the transaction, publishers use "ad servers" to manage and sell their web-display inventory by specifying where advertisers can purchase that inventory and the minimum prices that publishers will accept for it, among other functions. Situated in the middle of these transactions are "ad exchanges" that connect advertisers' buying tools and publishers' ad servers. The ad exchanges conduct real-time auctions in which advertisers—through ad-buying tools—bid on publisher inventory. *See* (Fourth Amended Complaint ("FAC") ¶ 42) (chart illustrating the online-display-advertising market).



FIGURE 3: How an exchange transacts with online publishers and advertisers through ad servers and buying tools

Plaintiff States have asserted two main theories of harm for Google's alleged misconduct in the display-advertising market. First, the States brought both federal- and state-antitrust claims, alleging the following violations:

(1) Google has violated Section II of the Sherman Act, 15 U.S.C. § 2, by willfully acquiring or maintaining a monopoly in the market for ad servers, ad exchanges, and ad buying tools through anticompetitive conduct, (FAC ¶¶ 598–601).

(2) Google has monopoly power, or in the alternative, a dangerous probability of acquiring monopoly power in the market for ad exchanges and ad buying tools. According to Plaintiff States, Google also has willfully, knowingly, and with specific intent, attempted to monopolize the market for ad exchanges and the market for ad buying tools, (FAC ¶¶ 602–06).

(3) Google has violated Section I and II of the Sherman Act by tying its ad exchange and ad server together to coerce publishers to use both products, (FAC ¶¶ 607–13).[6]

Second, Plaintiff States also maintain that Google's conduct in the display-advertising market was deceptive and violated the States' deceptive-trade-practices laws. (FAC ¶¶ 526–97, 674–758). In particular, Plaintiff States assert that Google deceived publishers and advertisers about its use of programs designed to benefit Google at their expense, failed to properly disclose these programs, and misrepresented that it runs a transparent marketplace where participants compete on equal footing. (FAC ¶¶ 526–97).

The following description of Google's conduct in display-advertising markets is drawn from the FAC, as the Court must consider its allegations as true to decide this motion.

## A. Web Display Advertising

While Google is primarily known as a search engine, it also boasts a robust digital-advertising business that Plaintiff States claim dwarfs the New York Stock Exchange in the number of transactions it processes daily. (FAC ¶ 5). In this digital marketplace, advertisers sell their digital advertisements, also known as display ads,

---

[6] Plaintiff States maintain that Google's alleged misconduct also violated various state antitrust laws. (FAC ¶¶ 617–73).

to publishers—the platforms that possess online display ad space (akin to digital billboards). These transactions between advertisers and publishers occur on an ad exchange, such as Google's AdX. Unlike advertisements in a newspaper, the digital-advertising market allows advertisers to place targeted ads—also known as "impressions"—based on the unique characteristics of the user.[7] Each time a user visits a website, a publisher sends out a real-time bid request for that impression via an ad server. Advertisers then place their bids using ad-buying tools. The winning bid is determined by the chosen ad exchange based on the auction protocol. The ad is ultimately delivered to the publisher and displayed for that specific consumer. This whole process occurs in a fraction of a second. Because of Google's alleged dominance in these ubiquitous markets, its influence stretches across "millions upon millions of websites of all sizes." (FAC ¶ 70).

There are three major components of the indirect[8] digital-advertising market for web-display advertising: ad exchanges, ad servers, and ad-buying tools. We begin with ad exchanges.

### i. Ad Exchange

Both ad servers and ad-buying tools operate on an ad exchange, a "real-time auction marketplace" that "matc[hes] publishers' web display impressions with bids

---

[7] A "user," also referred to as a "consumer," is an individual who accesses a website and is shown a targeted display ad.

[8] The indirect sale of digital ads occurs through an ad exchange, like AdX, which publishers use to auction off their inventory of display ads. A publisher can alternatively sell ads directly to an advertiser without using a mediator. The focus of this suit is the indirect sale of ads.

from purchasers." (FAC ¶¶ 13, 128).[9] Ad exchanges generate revenue by retaining a percentage of every transaction (a "fee") that takes place on the exchange.

Plaintiff States allege that Google holds a monopoly in the ad-exchange market. According to Plaintiff States, Google's ad exchange hosts a "significant and unique" pool of advertisers—specifically, those who use Google's ad-buying tool for small advertisers—that are only available through its exchange. (FAC ¶ 146) (emphasis omitted). Publishers who do not use Google's exchange cannot access these advertisers and thus experience a "substantial decrease in the number of bids for their inventory, the number of impressions they sell, and the amount of revenue they generate." (FAC ¶¶ 146, 148).

Google allegedly "controls substantially more than half of the United States exchange market." (FAC ¶ 151). Between October 2018 and 2019, its exchange "transacted over 60 percent of all display inventory sold through exchanges in the United States." (FAC ¶ 151). This monopoly power allegedly enables Google to charge higher transaction fees for lower quality services, forces competitors out of the market, and prevents them from re-entering. Plaintiff States allege that Google's similar dominance in the small-advertiser ad-buying-tool market allows Google to preferentially route transactions to its own exchange, further boosting its bottom line at others' expense.

---

[9] Ad exchanges are typically used by large publishers, while small advertisers generally use ad networks, such as Google Display Network, rather than exchanges.

### ii. Ad Servers

An ad server, such as Google's DoubleClick for Publishers ("DFP"), is a database that publishers use to automate decision-making about what ad to display based on the available space, where to place the ad on the webpage, and which user to target. It also helps publishers identify a user via his or her unique user ID, which tells the publisher about the user's preferences.

Plaintiff States claim that Google has a monopoly in the ad-server market in the United States—a fact allegedly openly acknowledged within Google and among market participants. (FAC ¶¶ 115–17). Google's internal documents allegedly show that in 2018, 84 percent of publishers globally and 99 percent of large publishers in the United States used its ad server. (FAC ¶ 114).

Plaintiff States allege that Google is not subject to any "competitive restraints," which is evidenced by its abilities to charge "supracompetitive fees" on its ad server, while providing low-quality services. (FAC ¶ 118). Specifically, Plaintiff States claim that Google's monopoly allows it to charge a five-percent fee on any transaction that is routed to a non-Google ad exchange, impose a ten-percent fee on any transaction that clears from a non-Google ad network, and "degrade" the quality of its ad server. (FAC ¶ 119). All of these actions have allegedly driven competitors from the market and are untethered from typical competitive-market behavior. Google's market power is thus preserved by the high costs associated with switching to a new ad server and the significant barriers to entry for new competitors.

### iii. Ad-Buying Tool

Plaintiff States allege that Google possesses monopoly power in the market for ad-buying tools for small advertisers.[10] Advertisers use ad-buying tools to purchase impressions from an ad exchange or ad network. Advertisers can program an ad-buying tool to target specific users based on those users' preferences and characteristics. Plaintiff States claim that Google Ads—one of Google's ad-buying tools—is the dominant ad-buying tool for small advertisers and the "largest buyer on AdX." (FAC ¶ 190). Google Ads "buys about 50 percent of the web display impressions transacted in Google's Exchange, accounting for about 30 percent of all web display impressions transacted across all exchanges in the [U.S.]" (FAC ¶ 190).

All alternatives to Google Ads for small advertisers have allegedly been driven out of the market since 2012. Google Ads also purportedly does not route bids to any non-Google exchanges that may provide cheaper impressions because it has no competitive incentive to do so. Not only are small advertisers divested of any control over their spending, they are also prevented from considering any less-expensive options because of the high switching costs associated with changing buying tools.

---

[10] According to the States, Google has "foreclosed competition in both the market for ad buying tools for small advertisers and the market for ad buying tools for large advertisers." (FAC ¶ 520). However, while Plaintiff States detail Google's conduct in the market for ad-buying tools for small advertisers, they do not expand on their allegation regarding the market for ad-buying tools for large advertisers, other than to say that Google's "exclusionary conduct harmed competition in [both markets]" and that Google's power in the market for ad-buying tools for large advertisers permitted it to "charge supracompetitive fees and lower quality below competitive levels. . . ." *Compare* (FAC ¶¶ 163–95) *with* (FAC ¶¶ 196–214) *and* (FAC ¶¶ 520–25).

## B. Auction Programs

In addition to alleging various antitrust violations, Plaintiff States also allege that Google has engaged in deceptive conduct that has affected "millions of users across billions of impressions," (FAC ¶ 263), and that it has intentionally deceived consumers and foreclosed competition in the markets described above through the actions discussed below.

### i. Tying

Plaintiff States claim that Google unlawfully "tied"[11] its ad server and ad exchange to force publishers to switch platforms. Essentially, Google limited access to bids from advertisers using its ad-buying tool to only publishers that used both Google's ad server and its ad exchange. According to Plaintiff States, "Google's share of the publisher ad server market skyrocketed as a result of this coercion." (FAC ¶ 249). Plaintiff States argue that a competitive market would have discouraged or prevented this behavior.

### ii. Blocking Exchange Competition

Plaintiff States allege that Google foreclosed exchange competition by (1) preventing publishers from "accessing and sharing information about their inventory with non-Google exchanges and buying tools"; (2) implementing Dynamic Allocation to prevent publishers from receiving bids from more than one exchange; and (3) implementing Enhanced Dynamic Allocation ("EDA"). (FAC ¶ 253).

---

[11] Tying is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958).

Prior to Google's launch of its own ad exchange in 2009, Google's ad server allowed publishers to access and share individual user IDs with non-Google exchanges and buying tools. A user ID allowed a publisher to identify a consumer and keep track of the ads that it displayed to him or her. After Google's exchange was launched, its ad server no longer allowed publishers to share user IDs, ostensibly because of privacy concerns. Advertisers using non-Google exchanges were thus unable to identify users going forward, which led them to place lower bids on impressions and ultimately win auctions less frequently. The advertisers using Google's exchange and buying tool, on the other hand, had an information advantage. Plaintiff States claim that this reduced the quality of ads and foreclosed competition.

In 2010, Google introduced Dynamic Allocation, which allegedly gave AdX a right of first refusal not given to any other exchange. Before Dynamic Allocation, Google's ad server—DFP—allowed publishers to sell their impressions through multiple exchanges in accordance with a practice called "waterfalling," where publishers would rank the exchanges in order of preference. When an impression was available, DFP would offer the impression for sale on the exchange that the publisher ranked first. DFP would then move down the line of ranked exchanges until it found an exchange that cleared the impression. Dynamic Allocation altered this process by allowing Google's own ad exchange to view the average historic bids from rival exchanges and win the auction by bidding one cent more than the highest historic bid, effectively ignoring the publisher's exchange rank preferences. Plaintiff States claim that Google did not disclose the details and nature of Dynamic Allocation to

publishers, instead representing that it would "maximize[] [their] revenue." (FAC ¶ 278). In reality, Plaintiff States claim that it foreclosed competition and exacerbated adverse selection.

In 2014, Google introduced EDA, which allegedly foreclosed competition in the markets for exchanges and buying tools for large and small advertisers. Like Dynamic Allocation, EDA was integrated into Google's ad server to give its ad exchange an advantage. It siphoned off a pool of high-value impressions and required advertisers to do business on AdX if they wished to access them. According to Plaintiff States, this foreclosed competition and hurt publishers' yields while selectively keeping the highest-value impressions on AdX, resulting in increased profits for Google. Plaintiff States claim that the extra costs resulting from EDA were ultimately borne by consumers in the form of "higher-priced and lower-quality goods and services." (FAC ¶ 296).

### iii. Auction Manipulation

Plaintiff States claim that Google implemented several programs to exclude competition and manipulate auctions: (1) Project Bernanke; (2) Dynamic Revenue Share ("DRS"); and (3) Reserve Price Optimization ("RPO").

The States allege that Google implemented Project Bernanke to foreclose competition in the markets for ad exchanges and buying tools for small advertisers. To understand the impact of Project Bernanke, some explanation of how auctions work is warranted. In a first-price auction, the "buyer pays the amount of their own winning bid." (FAC ¶ 299). In a second-price auction, the buyer pays the price of the second highest bid, and so on. However, regardless of the auction protocol, the winner

21

of the auction is the advertiser who bid the highest. These types of auctions also allow a seller to set a price floor—the lowest amount that it will accept. If an auction is running as a second-price auction, for example, but the second price is below the price floor, the winner will pay the amount of the price floor.

Project Bernanke switched auctions on AdX from second-price auctions to third-price auctions—a fact which was not disclosed to market participants. However, Google still charged the winner the second highest bid but gave the publisher the earnings for only the third-price bid. The residual funds were put into a pool and later used to inflate other bids and give Google an advantage in its own exchange. Plaintiff States allege that Project Bernanke hurt publishers and advertisers and foreclosed competition in the exchange and ad-buying-tool markets. *See* (FAC ¶ 304) (graph below demonstrating the alleged impact of Project Bernanke).



In 2014, Google launched DRS. DRS adjusted the exchange fee on an "impression-by-impression basis after soliciting bids," enabling AdX to win more often. (FAC ¶ 318). In a "true second-price auction" an impression would only clear a

publisher's price floor if the bid exceeded the price floor after subtracting Google's exchange fee. (FAC ¶ 319). Under DRS, Google's exchange fee was lowered, if necessary, to allow a bid to clear the price floor. For example, Google would decrease its 20-percent exchange fee to five percent so that an AdX bid would prevail when it otherwise would have lost had the 20-percent exchange fee been deducted. According to Plaintiff States, this program "decreased AdX's take rate on some impression[s] to net publishers more," but "increased AdX's take rate . . . on other impressions to wipe out any publisher gains." (FAC ¶ 329). They also allege that DRS "decreased publisher revenues compared to a situation where exchanges could compete effectively by lowering their take rates." (FAC ¶ 329).

In 2015, Google implemented RPO, a program that allegedly allowed AdX to view an advertiser's bids and then adjust the price floor set by the publisher based on the advertiser's historic willingness to pay. Plaintiff States allege that RPO harmed advertisers by forcing them to pay more and harmed publishers by overriding their price floors. And Plaintiff States allege that Google repeatedly and continuously misrepresented the nature and existence of the program and was aware of the competitive harm it caused.

### iv. Header Bidding

Header bidding was an innovation in the digital-advertising market that allowed publishers to solicit live bids from multiple ad exchanges. Publishers would simply insert a specific code into the "header section of their HTML webpage." (FAC ¶ 353). By 2017, about 70 percent of major publishers were using header bidding, leading to increased revenue and competition.

23

Plaintiff States claim that Google worked to end header bidding because it threatened their position in the market and fostered competition. According to Plaintiff States, Google implemented a variety of initiatives to curtail the use of header bidding, all aimed at "suppress[ing] competition in the exchange market." (FAC ¶ 352).

## C. In-App Display Advertising

Applications ("apps"), such as those found on mobile devices, also display ads. There are two primary programs used by the in-app advertising market: mediation tools and in-app display ad networks. App developers use mediation tools, such as Google's AdMob or Ad Manager for Apps, to sell impressions for in-app advertising space. While mediation tools are not necessary to display in-app ads, they make the process significantly easier and are thus common among apps that display ads from multiple sources. Mediation tools interact with in-app networks[12] to "solicit bids and select winners from multiple demand sources." (FAC ¶ 81). The tool ultimately makes the final decision about which in-app network may purchase the available impressions, "which puts it in a position to distort competition between in-app networks." (FAC ¶ 85). A mediation tool is only useful if it interacts with one or more in-app networks. Thus, the two programs are interdependent, yet separate.

---

[12] An in-app network functions very similarly to an ad network. It acts as an intermediary to buy and sell in-app impressions. Because in-app networks are integrated directly into apps, apps are only able to support a small number of in-app networks, lest the networks interfere with the app's operation.

Plaintiff States argue that Google holds significant market power through both of its mediation tools. In 2019, "at least 50 percent of ad-containing apps . . . used one of Google's mediation tools." (FAC ¶ 228). But Plaintiff States claim that Google's market share is actually closer to 60 percent when apps that display ads from a single demand source are excluded. Google's market power, coupled with the automated decision-making nature of a mediation tool, allows Google to control the in-app inventory for a significant portion of the market. Because mediation tools are integrated into the app itself, switching mediation tools is costly and technologically challenging.

## D. Privacy

Google publicly represents that it "[n]ever sell[s] [its] users' personal information to anyone." (FAC ¶ 572). Plaintiff States allege that this misrepresents Google's practice. In fact, according to Plaintiff States, Google's entire digital-advertising business is premised on "tak[ing] user[s'] personal information, display[ing] it to advertisers, who in turn pay Google for access to that user." (FAC ¶ 578). Using this system, Google allegedly "broker[s] billions of advertisements daily." (FAC ¶ 578).

*        *        *

Plaintiff States allege that Google's misconduct in the display-advertising markets violates Section 1 and Section 2 of the Sherman Act, each Plaintiff States'

antitrust laws, and each Plaintiff States' Deceptive Trade Practices Act.[13] Plaintiff States aver that they have both sovereign standing and parens patriae standing to remedy the economic harms to their economies and residents caused by these alleged violations. Google argues that they have neither, and thus it moves to dismiss the case under Rule 12(b)(1) for lack of standing. The Court, however, agrees with Plaintiff States and concludes that they can maintain their parens patriae action on behalf of their citizens.[14]

### III. LEGAL STANDARD

Federal district courts exercise limited subject-matter jurisdiction. When a specific basis for subject-matter jurisdiction over a claim is absent, a district court has no power to adjudicate the claim. *See Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)) ("A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."). Accordingly, Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for the dismissal of claims based on a "lack of subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1). Google has moved to dismiss Plaintiff States' claims based on lack of subject-matter jurisdiction, thereby invoking Rule 12(b)(1).

---

[13] Although not every law in this case proscribing deceptive conduct is titled "Deceptive Trade Practices Act," the Court will refer to all such laws as "Deceptive Trade Practices Act" or "DTPA."

[14] Because the Court finds that Plaintiff States have parens patriae standing, it need not reach the question of whether they likewise have sovereign standing.

A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction can mount either a facial or a factual challenge. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When, as here, a party makes a Rule 12(b)(1) motion without presenting any evidence, the challenge to subject-matter jurisdiction is facial. *Id.* In assessing such a challenge, the court looks only at the sufficiency of the allegations in the complaint and assumes them to be true. *Id.* "'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice' to establish standing." *Stallworth v. Bryant*, 936 F.3d 224, 230 (5th Cir. 2019) (quoting *Lujan*, 504 U.S. at 561). So long as the Court can "reasonably . . . infer from the plaintiffs' general allegations that they have standing," the complaint stands. *Id.* (cleaned up). The "plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam).

## IV. DISCUSSION

Google argues that Plaintiff States have failed to establish that they have suffered an injury in fact sufficient for standing. Google does not contest, and the Court finds, that the causation and redressability requirements are met. The injury-in-fact requirement, premised on alleged harms to Plaintiff States' quasi-sovereign interests in the economic well-being of their residents, is the focus of the parties' dispute. Recall that a State suing in a parens patriae capacity must show that (1) it has suffered an injury to a quasi-sovereign interest, such as the economic well-being of its residents in general, and (2) a substantial segment of the State's population has been affected by the challenged conduct. *Snapp*, 458 U.S. at 607.

The Court first considers Plaintiff States' federal claims and then turns to their state-law claims. Taking Plaintiff States' allegations as true, as the Court must at the pleading stage, the Court concludes that Plaintiff States have established parens patriae standing for all claims.

## A. Plaintiff States Have Parens Patriae Standing to Bring Their Federal Claims.

### i. The States' allegations are sufficient to support parens patriae standing at this stage of the litigation.

Plaintiff States allege that Google holds a monopoly in the digital-advertising market in violation of federal antitrust laws. According to the States, Google has wielded its monopoly power to its benefit and at the expense of the States' economies and residents. *See supra* Part II. Specifically, the States contend that Google's anticompetitive conduct has resulted in "higher prices, reduced output, lower quality, reduced innovation, the exit of rivals, and foreclosed entry," thereby "adversely and substantially affect[ing] the Plaintiff States' economies, as well as the general welfare in the Plaintiff States." (FAC ¶ 29); *see also* (FAC ¶ 29) ("Google's harm to competition deprives advertisers, publishers, and their consumers of improved quality, greater transparency, greater innovation, increased output, and lower prices. At bottom, Google's illegal conduct has harmed the Plaintiff States' respective economies by depriving the Plaintiff States and the persons within each Plaintiff State of the benefits of competition.").

Courts have held similar allegations sufficient to establish parens patriae standing. *See Microsoft*, 209 F. Supp. 2d at 151-52 ("'[M]illions of citizens of, and hundreds, if not thousands, of enterprises in each of the United States . . . utilize[d]

PCs running on Microsoft software.'") (first alteration in original) (citation omitted). Accepting Plaintiff States' allegations as true, Google's monopolistic and deceptive conduct has injured the economic well-being of their residents and has affected substantial segments of their citizenries. Although the allegations broadly articulate the harms suffered by each States' populace, the States' detailed complaint also identifies specific harms resulting from Google's conduct in display-advertising markets.

For example, the FAC details the various ways Google's purportedly anticompetitive conduct—resulting from its alleged violations of federal law—has harmed publishers, advertisers, and, in turn, consumers. *See, e.g.*, (FAC ¶¶ 502–525). In the exchange market, Google's allegedly anticompetitive actions, such as tying its DFP ad server to its AdX exchange and manipulating auctions through RPO, DRS, and Project Bernanke, have "harmed competition . . . and thereby harmed publishers and advertisers." (FAC ¶ 512); *see also supra* Part II. Google's alleged monopoly allows it to "charge a supracompetitive take rate in the exchange market, which is borne by both publishers and advertisers." (FAC ¶ 513). Plaintiff States also allege that Google's monopoly has led to a decrease in "quality in the exchange market" because "Google has created information asymmetries that exacerbate problems of adverse selection in the exchange market." (FAC ¶ 514). They further assert that Google has hampered competition in the exchange market by, *inter alia*, creating barriers to entry. (FAC ¶ 515). By allegedly stifling competition, Google has harmed publishers, advertisers, and consumers:

> Because of Google's exclusionary conduct, advertisers are significantly less able to identify the user associated with an impression when transacting through a competing exchange with respect to transacting through Google's exchange and are thus forced to transact more on Google's exchange with a higher take rate. And publishers are harmed when more transactions go through Google's exchange, which charges a higher take rate. In a competitive market, publishers and advertisers would benefit from exchanges competing on take rates and quality and from innovation that promotes exchange competition. Competition would lead to lower take rates, benefiting publishers and advertisers. Publishers would retain a greater share of their advertising revenue, permitting them to create more content, higher-quality content, and more subsidized content access. Advertisers would pay less to purchase ad space, permitting them to re-invest those cost savings into providing consumers with higher-quality and lower-priced goods and services. Google's foreclosure of competition in the exchange market has permitted its exchange to charge supracompetitive take rate[s] (approximately 19 to 22 percent on gross transactions) and provide lower quality [products] below competitive levels. Google has consequently reduced output in the exchange market.

(FAC ¶ 517). Plaintiff States further maintain that Google's monopoly in the ad-server market has "allowed it to charge publishers supracompetitive prices," and that Google has "lowered the quality of its ad [server] for publishers below competitive levels." (FAC ¶¶ 506–07). Google has also allegedly "caused competing publisher ad servers to exit the market or significantly scale back their offerings, leaving publishers with little to no choice but to license [Google's ad server]." (FAC ¶ 508). According to Plaintiff States, Google's monopoly has "harmed publishers' customers, i.e., individual consumers," and has led to "less content, lower-quality content, less innovation in content delivery, more paywalls, and higher subscription fees." (FAC ¶ 511).

Plaintiff States go on to describe the harms caused by Google's anticompetitive conduct in the in-app network market and the markets for ad-buying tools for small

advertisers and large advertisers. (FAC ¶¶ 518–25). The described harm alleged in these markets parallels the harms that Google's alleged conduct has inflicted on other display-advertising markets. In general, Plaintiff States contend that Google has foreclosed competition in these markets and has constructed barriers to entry to secure its market power. By impairing competition, the relevant market participants pay higher prices, produce lower-quality content, and decrease their output. In turn, consumers suffer because the increased costs and lower-quality content are passed on to them. *See* (FAC ¶ 525).

Plaintiff States allege that the recited harms to these display-advertising markets are far reaching. According to Plaintiff States, Google's actions affect "millions of users across billions of impressions," (FAC ¶ 263), and Google's influence stretches across "millions upon millions of websites of all sizes," (FAC ¶ 70); *see also* (FAC ¶ 146) (alleging that "[t]he collective pool of advertisers bidding through Google Ads on AdX accounts for at least ~44 billion web display transactions per month in the United States and about 30 percent of monthly transactions across all exchanges in the United States"). Taking the allegations as true, a substantial segment of Plaintiff States' populations have been negatively affected by Google's anticompetitive conduct.

In sum, Plaintiff States' allegations are sufficient to establish parens patriae standing for their federal antitrust claims. The detailed and extensive allegations described herein support an injury to Plaintiff States' quasi-sovereign interests in protecting the economic well-being of their residents and likewise describe negative

effects to substantial segments of their populations. *See, e.g.*, *Facebook*, 549 F.Supp.3d at 23 (finding sufficient plaintiff States' allegations that Facebook's anticompetitive conduct (1) caused "millions of Plaintiffs' citizens [to] experience[] 'reductions in the quality and variety of privacy options and content available to them' in that market," (2) increased prices and reduced quality alternatives, and (3) suppressed innovation and investment); *Maryland*, 451 U.S. at 736–39 (holding that plaintiff States had parens patriae standing to sue for the imposition of a "First-Use Tax" when "a great many citizens" in each of the States, while not being directly taxed, were "faced with increased costs aggregating millions of dollars per year.").

### ii.    Google's arguments against Article III standing are unavailing.

Google argues that Plaintiff States do not have parens patriae standing because (1) they fail to allege a quasi-sovereign interest apart from the interests of particular private parties, and (2) they fail to allege injuries to sufficiently substantial segments of their populations. Specifically, Google contends that Plaintiff States' allegations focus almost entirely on harms to publishers and advertisers and that they only "point to vague allegations of downstream harm to consumers." (Dkt. #277 at 10–11). It further argues that publishers, advertisers, and Plaintiff States' consumers are private parties who can themselves sue to rectify their own injuries and that any economic harms to those groups do not implicate Plaintiff States' own interests.[15] These arguments are unpersuasive.

---

[15] To the extent Google argues that the millions of users allegedly harmed by its anticompetitive conduct can bring suit themselves, the Supreme Court has explained that

To begin, although the FAC details specific harms that Google allegedly caused to publishers and advertisers in display-advertising markets, "[t]his is not a suit in which a State is a mere nominal plaintiff, individual [publishers and advertisers] being the real complainants. This is a suit in which [Plaintiff States] assert[] claims arising out of federal laws and the gravamen of which runs far beyond the claim of damage to individual [publishers or advertisers]." *Pa. R.R.*, 324 U.S. at 452.

In this regard, Google's reliance on *Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017), is misplaced. In *Koster*, the Ninth Circuit held that a group of States lacked parens patriae standing to challenge a California regulation prescribing standards for the conditions under which chickens must be kept for their eggs to be sold in the State. *Id*. at 650. The Court concluded that the States failed to articulate an interest in the litigation apart from the interests of particular private parties—egg farmers. As the court explained, the complaint alleged "the importance of the California market to *egg farmers* in the Plaintiff States," but "contain[ed] no specific allegations about the statewide magnitude of these difficulties or the extent to which they [might] affect more than just an 'identifiable group of individual' egg farmers." *Id*. at 652 (emphasis in original) (quoting *Snapp*, 458 U.S. at 607). The States suggested that a broader impact to their populations was threatened by the regulations because of harmful fluctuation in egg prices. As the court noted, however, this argument had two problems: (1) the Plaintiff States filed suit *before* the

---

"individual consumers cannot be expected to litigate the validity" of a challenged act when the "amounts paid by each consumer are likely to be relatively small," even when the "increased costs aggregat[e] millions of dollars per year." *Maryland*, 451 U.S. at 739.

California regulation took effect, rendering any allegation about future price fluctuations purely speculative; and (2) in one of the proposed scenarios suggested by Plaintiff States' themselves, egg consumers in the Midwest might benefit from California's regulation by enjoying *lower* egg prices. *See id*. at 653–55. Under the circumstances, the court concluded that the States failed to allege anything more than speculative and uncertain effects on egg consumers in their States. *See id*. Because the only negative impact of California's regulation fell on particular private parties— egg farmers—the States failed to show a quasi-sovereign interest to support parens patriae standing. *See id*.

The circumstances of *Koster* are inapposite to those at issue here. Far from describing harms to only discrete groups capable of suing themselves, or hypothetical and uncertain future harms, Plaintiff States allege that Google's anticompetitive conduct has injured their "respective economies by depriving the Plaintiff States and the persons within each Plaintiff State of the benefits of competition." (FAC ¶ 29). The States describe how Google's monopolies in ubiquitous display-advertising markets have injured their economic interests, impeded competition, increased prices, and caused lower-quality and lower-volume product output. While advertisers and publishers may be most directly impacted by Google's alleged wrongs, the purported harms extend beyond those groups and reach the economic well-being of Plaintiff States' residents in general—a quasi-sovereign interest within a State's

prerogative to protect via the federal courts. *See Snapp*, 458 U.S. at 607.[16] This argument thus fails.

Google further contends that Plaintiff States fail to allege harms to substantial segments of their populations or any "widespread economic harm." (Dkt. #277 at 12). In this regard, Google maintains that Plaintiff States improperly rely on allegations of harm felt across the country—not direct harms particular to their residents.

But a State does not lose its parens patriae standing because the complained-of injuries to its citizens are identical to injuries felt by citizens elsewhere. As the Supreme Court acknowledged in *Standard Oil*, the "United States Government, the

---

[16] Google believes the Fifth Circuit's recent decision in *Harrison* supports its parens patriae arguments. It does not. In *Harrison*, the Fifth Circuit held that Louisiana did not have parens patriae standing to sue Jefferson Parish School Board ("JPSB")—a political unit located within Louisiana—for allegedly discriminatorily disciplining two of its students. 78 F.4th at 768, 772–74. The court explained that unlike the "classic example of suits vindicating sovereign interests [such as] those involving public nuisances and economic interests," Louisiana was "not asserting a separate injury such as being denied its full participation in the federal system, nor d[id] it allege injury to its citizens['] health or economic well-being in a way that also implicates its own interests." *Id.* at 772–73. Instead, Louisiana's interest was "wholly derivative of the interests of JPSB's students." *Id.* at 773. Since Louisiana did not show that it suffered an injury to a quasi-sovereign interest, it could not maintain its suit in federal court.

The *Harrison* court devoted much of its analysis to a State's quasi-sovereign interest in "securing residents from the harmful effects of discrimination." 78 F.4th at 773 (quoting *Snapp*, 458 U.S. at 609). This quasi-sovereign interest is distinct from a State's quasi-sovereign interest in protecting the economic well-being of its residents—the interest Plaintiff States assert—and thus this discussion is largely irrelevant to the Court's analysis here. *See Snapp*, 458 U.S. at 607 ("First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.").

governments of each State, and any individual threatened with injury by an antitrust violation may all sue for injunctive relief against violations of the antitrust laws, and . . . they may theoretically do so *simultaneously* against the *same persons* for the *same violations*." 405 U.S. at 890–91 (emphases added). Thus, the Supreme Court has contemplated the litigation scenario presented here: parallel suits brought by multi-state coalitions, the United States Government, and private parties in various courts, all premised on the same conduct—Google's anticompetitive practices.

More recently, when Microsoft made the same argument asserted by Google here, the court rejected it, concluding that the fact that an injury is shared by the populations of several States does not undermine each affected State's parens patriae standing. As the *Microsoft* court explained, if it agreed with Microsoft's reading of the law, "a state's right to bring suit as *parens patriae* under the Clayton Act would be nullified where the harm sweeps broadly across the states. In such a situation, the individual states would have to rely solely upon the federal government to bring suit to cease the harm." *Microsoft*, 209 F.Supp.2d at 151. "This result runs contrary to the well-established principle that '[s]uits by a State, *parens patriae*, have long been recognized. There is no apparent reason why those suits should be excluded from the purview of the anti-trust acts.'" *Id*. (quoting *Pa. R.R.*, 324 U.S. at 447).

While it is true that a State alleging injury must establish that its own citizens have suffered some harm, there is no authority for Google's proposition that parens patriae standing should be denied where the injury is felt by the citizens of other States. *See Microsoft*, 209 F.Supp.2d at 151. Here, each Plaintiff State has met this

burden by alleging an injury to *its* economy and *its* residents. *See, e.g.*, (FAC ¶ 29) ("Google's illegal conduct has harmed the Plaintiff States' respective economies by depriving the Plaintiff States and the persons within each Plaintiff State of the benefits of competition."); (FAC ¶¶ 617–73) (each State repeating and realleging all previous allegations). This argument therefore also fails.[17]

Finally, Google argues that the Supreme Court has proscribed parens patriae standing based on indirect consumer injury. Google is mistaken. Whether there is an injury in fact does not turn on the directness or indirectness of the injury. Rather, as

---

[17] In support, Google relies on *La. ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872 (5th Cir. 2023) ("*NOAA*"). In that case, the Fifth Circuit considered whether Louisiana had parens patriae standing where it claimed that a rule promulgated by the federal government harmed its shrimping industry. The court found that Louisiana failed to offer enough evidence "particularly substantiating the rule's impact on its shrimping industry or, ergo, 'a sufficiently substantial segment of its population.'" *Id.* at 881 (cleaned up). This case is unhelpful to Google for two reasons.

*First*, the case was before the court on appeal from an order granting summary judgment—not a motion to dismiss like this Court is considering here. The standards for these motions are different. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (cleaned up). "In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations but must set forth by affidavit or other evidence specific facts." *Id.* (cleaned up). Thus, the case is largely inapposite; the stage of litigation matters.

*Second*, and relatedly, the Fifth Circuit did not rule out the possibility that Louisiana could have established an injury to a "sufficiently substantial segment of its population." *NOAA*, 70 F.4th at 881 (cleaned up) (explaining that Louisiana's failure to establish parens patriae standing was due to its "lack of evidence"). Here, Plaintiff States' allegations of harm stem from Google's monopoly in several digital advertising markets. Considering the prevalence of display-advertising markets and their pervasive reach across personal electronic devices used daily by millions of Americans, as alleged by the States in the FAC, the asserted harms in this case, taken as true, impact a "sufficiently substantial segment" of Plaintiff States' populations. Whether Plaintiff States can prove the existence of such harms is a question for another day.

the Supreme Court explained in *Snapp*, the "indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." 458 U.S. at 607; *see also Maryland*, 451 U.S. at 736, 739 (finding parens patriae standing where the challenged tax was indirectly passed on to consumers).[18]

Plaintiff States allege that "Google's harm to competition deprives advertisers, publishers, and ultimately their consumers of improved quality, greater transparency, greater innovation, increased output, and lower prices." (FAC ¶ 502); *see, e.g.*, (FAC ¶ 511) ("Because DFP depresses publishers' inventory yield, publishers offer consumers less content, lower-quality content, less innovation in content delivery, more paywalls, and higher subscription fees."); (FAC ¶ 525) ("The fees advertisers would save on ad buying tools and ad purchases in the absence of Google's anticompetitive conduct would result in reduced costs that advertisers would ultimately pass on to consumers."). "[M]illions of users across billions of impressions"

---

[18] The cases Google references for this argument merely stand for the proposition that a State does not have a cause of action to seek *damages* on behalf of consumers as parens patriae when the consumers have only been indirectly injured by pass-through costs stemming from an antitrust violation. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)). As the Fifth Circuit has acknowledged, this limitation merely bars damages recovery—not injunctive relief, and not the ability to bring suit in the first place. *Cf. In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1167 (5th Cir. 1979) ("[T]he *Illinois Brick* rule has no application to claims for injunctive relief."). Whether a party has a cause of action for a certain type of recovery and whether it has Article III standing are two separate inquiries. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) ("[T]he absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's . . . *power* to adjudicate the case." (cleaned up)). Thus, the indirect-purchaser bar is not a relevant consideration for this motion.

allegedly suffer from these increased costs. (FAC ¶ 263). These allegations, accepted as true, describe injuries to a substantial segment of the population.

The Supreme Court has also instructed that "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as parens patriae is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Snapp*, 458 U.S. at 607. Here, every Plaintiff (except perhaps Arkansas) has enacted antitrust laws mirroring the federal antitrust laws for which it sues.[19] Thus, this consideration counsels in favor of finding that Plaintiff States have parens patriae standing.[20]

*        *        *

---

[19] In its motion to dismiss premised on Rule 12(b)(6), Google acknowledges that except for Arkansas, "each Plaintiff's antitrust law mirrors the relevant federal law." (Dkt. #224 at 32). The Court declines to address the scope of the Arkansas statute here, but notes that the legislature's stated purpose in enacting the law is to "safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented." ARK. CODE ANN. § 4-75-202.

[20] Google filed four supplemental briefs in support of its 12(b)(1) motion, citing additional cases for the Court to consider. (Dkt. #454, #536, #608, #772). The Court finds the cited authorities to be inapt, irrelevant, or unpersuasive. For example, neither *TransUnion LLC v. Ramirez* nor *FDA v. Alliance for Hippocratic Medicine* relate to, discuss, or draw conclusions about state-standing or parens-patriae-standing theories. *TransUnion*, 594 U.S. 413, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021); *All. for Hippocratic Med.*, 602 U.S. 367, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024). And because Google did not file a 12(b)(2) motion, it has waived any arguments that this Court lacks personal jurisdiction over Google, rendering *Google LLC v. State* irrelevant. No. 13-23-00114-CV, 2025 WL 52611 (Tex. App. Corpus Christi-Edinburg Jan. 9, 2025, no pet. h.) (mem. op.). Finally, Google's reliance on *Paxton v. Dettelbach* is misplaced. 105 F.4th 708 (5th Cir. 2024). The Fifth Circuit there found that the interests asserted by Texas were nothing more than the interests of particular citizens who could sue in their own right, 105 F.4th at 715–16, just as the Court found in *Harrison*, 78 F.4th at 773. And for the same reasons *Harrison* is distinguishable from the circumstances of the case at bar, *see supra* note 16, so too is *Dettelbach*.

Plaintiff States' allegations concerning the injuries caused by Google's purported violations of federal antitrust laws are sufficient to establish parens patriae standing, at least at this stage. Taking the allegations in the Fourth Amended Complaint as true, Google's anticompetitive practices have caused "higher prices, reduced output, lower quality, reduced innovation, the exit of rivals, and foreclosed entry," and thereby "adversely and substantially affect[ed] the Plaintiff States' economies, as well as the general welfare in the Plaintiff States." (FAC ¶ 29). As the Supreme Court and other courts have held, these allegations are sufficient.

## B. Plaintiff States Have Parens Patriae Standing to Bring Their State Claims.

Plaintiff States also bring causes of actions for violations of their respective antitrust laws and Deceptive Trade Practices Acts. Google does not contest that these claims are sufficiently related to the federal claims such that the Court's original jurisdiction over the federal claims would convey supplemental jurisdiction over the state claims. *See* 18 U.S.C. § 1367(a). However, supplemental jurisdiction satisfies statutory standing—not constitutional standing. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 351–52, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). And since "a plaintiff must demonstrate [Article III] standing for each claim he seeks to press," Plaintiff States must meet Article III's standing requirements to maintain their state-law claims as well. *Id.* As with the federal claims, Plaintiff States claim parens patriae standing based on their allegations that Google's various violations of state law have injured the economic well-being of their residents. Taking the allegations as true, the Court agrees that Plaintiff States have standing.

40

First, for the same reasons identified above, the Court finds that Plaintiff States have adequately alleged that Google's anticompetitive conduct stemming from its alleged monopolies has injured the economic well-being of their residents such that Plaintiff States can bring their state antitrust claims. These claims are premised on the same conduct and rely on the same harms as the federal antitrust claims. Once more, Plaintiff States allege that Google's anticompetitive conduct has resulted in "higher prices, reduced output, lower quality, reduced innovation, the exit of rivals, and foreclosed entry," thereby "adversely and substantially affect[ing] the Plaintiff States' economies, as well as the general welfare in the Plaintiff States." (FAC ¶ 29). And they allege that these harms are felt by "millions of users across billions of impressions," (FAC ¶ 263), and that Google's influence stretches across "millions upon millions of websites of all sizes," (FAC ¶ 70). These allegations are sufficient to establish parens patriae standing at this stage.

Second, as to the DTPA claims, Plaintiff States allege that Google's deception regarding RPO, DRS, Project Bernanke, header bidding, the purported sale of users' personal information, and the fairness in its auctions has "resulted in billions of deceptive trade practice violations." (FAC ¶ 526). Plaintiff States once again primarily focus on the harms to advertisers and publishers. To list a few examples, they allege that RPO "used [advertiser's bid data] against them to increase the floor price in an auction," resulting in billions of instances of an "advertiser pa[ying] more for an impression than they otherwise would have had they not been misled by Google's misstatements or had RPO been properly disclosed." (FAC ¶ 538). They

further allege that "Google deceived publishers into using DRS under the false pretense that it would only lower Google's exchange fee and net publishers more revenue, while knowing all along that DRS would ultimately only benefit Google by recollecting on the lowered fee." (FAC ¶ 547); *see also* (FAC ¶ 596) (alleging that Google "prevent[ed] publishers from linking bids originating from Google Ads to bids from rivals using header bidding on the same impression," thus "prevent[ing] publishers from effectively tracking competition amongst ad exchanges to make informed decisions about how and where they sell their inventory"). Plaintiff States also assert that Project Bernanke "deceived both publishers and advertisers by converting sealed second price auctions into third price auctions," causing publishers to accept decreased payments and advertisers to unknowingly pay into Google's auction pool. (FAC ¶ 538).

In addition to injuring publishers and advertisers, Plaintiff States allege that Google's DTPA violations have harmed Plaintiff States' economies and consumers.[21] For example, Google allegedly "concealed and misrepresented its programs' true nature and the financial harm Google would subsequently cause to publishers' yield." (FAC ¶ 295). In turn, this harm allegedly passes through the advertisers and publishers and affects consumers:

---

[21] Because the Court determines that the allegations concerning Plaintiff States' economies and consumers are sufficient, the Court need not decide whether the allegations merely concerning the publishers and advertisers would suffice. It does appear, however, that the publishers and advertisers—numbered in the "[h]undreds of thousands," (FAC ¶ 5), including over 600,000 small and medium size businesses, (FAC ¶ 188), and "millions upon millions of websites of all sizes," (FAC ¶ 70)—may well comprise a significant part of Plaintiff States' populations.

> These extra costs are ultimately born not just by publishers and advertisers, but by the millions of Americans who consume online content and purchase goods and services advertised online. Lower inventory yield for publishers means less money devoted to producing quality content and/or higher subscription fees; higher effective rates for advertisers mean higher-priced and lower-quality goods and services for consumers.

(FAC ¶ 296). Plaintiff States further allege that Google's "dece[ptive]," "non-transparent" auction programs—RPO, DRS, and Project Bernanke—"unlawfully excluded competition in the exchange market," (FAC ¶ 297), the exclusion of which allegedly "deprive[d] advertisers, publishers, and their consumers of improved quality, greater transparency, greater innovation, increased output, and lower prices," (FAC ¶ 29). *See also* (FAC ¶ 351) ("[T]he lack of transparency prevents more efficient competition that would drive greater innovation, increase the quality of intermediary services, increase output, and create downward pricing pressure on intermediary fees.").

Finally, Plaintiff States allege that Google has deceived its users—i.e., anyone who "visit[s] Google's own properties" or "visit[s] the websites or mobile apps of publishers and developers who use Google's ad server and mediation tool"—by falsely representing that it does not sell their personal information. (FAC ¶¶ 578, 581). According to Plaintiff States, Google "takes [a] user's personal information, displays it to advertisers, who in turn pay Google money for access to that user. Notwithstanding Google's (mis)representations, Google leverages its users' intimate data and personal information to broker billions of advertisements daily." (FAC ¶ 578).

The Court concludes that these allegations, taken as true, are sufficient to establish parens patriae standing at this stage. Plaintiff States allege that Google's deceptive conduct has stifled competition, increased prices, lowered the quality and quantity of goods and services, and has lured users to trust that Google is protecting their personal information—when, in reality, Google is selling their information. According to Plaintiff States, Google has committed these wrongs billions of times over, harming millions of Americans and the digital-advertising market. These allegations demonstrate that Google's conduct has injured the economic well-being of Plaintiff States' economies and residents and has affected substantial segments of their populations. *See Microsoft*, 209 F.Supp.2d at 151–52 (finding parens patriae standing where "[m]illions of citizens of, and hundreds, if not thousands, of enterprises in each of the United States and the District of Columbia utilize PCs running on Microsoft software"). Thus, the Plaintiff States have parens patriae standing to bring their state-law claims.

## V. CONCLUSION

For the foregoing reasons, the Court holds that Plaintiff States have alleged sufficient facts to establish parens patriae standing for all of their claims. It is therefore **ORDERED** that Google's Motion for Dismissal Pursuant to Rule 12(b)(1), (Dkt. #200), is **DENIED**.

**So ORDERED and SIGNED this 28th day of January, 2025.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE