# EXHIBIT 2
# [FILED UNDER SEAL]

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF TEXAS

3                   SHERMAN DIVISION

4    THE STATE OF TEXAS, et al., )

                                 )

5           Plaintiffs,          )

                                 )

6    vs.                         )  Case No.

                                 )  4:20-cv-000957-SDJ

7    GOOGLE LLC,                 )

                                 )

8           Defendant.           )

9

10

11    *********************************************

12           VIDEOTAPED ORAL DEPOSITION OF

13                JACOB HOCHSTETLER

14                DECEMBER 16, 2024

15    HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

16    *********************************************

17

18        On the 16th day of December, 2024, at 9:10 a.m.,

19    the videotaped oral deposition of the above-named

20    witness was taken at the instance of the Defendant,

21    Google LLC, before Michelle L. Munroe, Certified

22    Shorthand Reporter in and for the State of Texas, at

23    Norton Rose Fulbright US LLP, 2200 Ross Avenue, Suite

24    3600, Dallas, Texas, pursuant to Notice and the

25    agreement hereinafter set forth.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 2

```
 1       A P P E A R A N C E S
 2
     FOR THE PLAINTIFF THE STATE OF TEXAS:
 3
         Jonathan Wilkerson
 4       Alex Abston  (via Zoom)
         THE LANIER LAW FIRM, PLLC
 5       10940 West Sam Houston Parkway North
         Suite 100
 6       Houston, Texas  77064
         jonathan.wilkerson@lanierlawfirm.com
 7
     - and -
 8
         Zeke Derose, II (via Zoom)
 9       THE LANIER LAW FIRM, PLLC
         2829 Townsgate Road
10       Suite 100
         Westlake Village, California  91361
11
     - and -
12
         Peter Hillegas
13       Ethan Glenn
         NORTON ROSE FULBRIGHT US LLP
14       1550 Lamar Street
         Suite 2000
15       Houston, Texas  77010
         peter.hillegas@nortonrosefulbright.com
16
     - and -
17
         Marisa Madaras Bonaparte (via Zoom)
18       NORTON ROSE FULBRIGHT US LLP
         799 9th Street, NW
19       Suite 1000
         Washington, DC  20001
20
     - and -
21
         Cuong Pham  (via Zoom)
22       STATE OF TEXAS
         OFFICE OF THE ATTORNEY GENERAL
23       P.O. Box 12548
         Austin, Texas  78711-2548
24       cuong.pham@oag.texas.gov
25
```

Page 3

```
 1       A P P E A R A N C E S (continued)
 2   FOR THE DEFENDANT GOOGLE LLC:
 3       Ayesha Najam
         Elisa Wulfsberg  (via Zoom)
 4       GIBBS & BRUNS LLP
         1100 Louisiana
 5       Suite 5300
         Houston, Texas  77002
 6       anajam@gibbsbruns.com
 7   - and -
 8       Robert McCallum  (via Zoom)
         Veronica Bosco  (via Zoom)
 9       FRESHFIELDS BRUCKHAUS DERINGER US LLP
         175 Greenwich Street
10       51st Floor
         3 World Trade Center
11       New York, New York  10007
         rob.mccallum@freshfields.com
12
13
     ALSO PRESENT:
14
         Jonathan Jaffe (via Zoom)
15       Anu Reddy  (via Zoom)
         Luis Acevedo, Video Technician
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           I N D E X
     WITNESS                          PAGE
 2
     JACOB HOCHSTETLER
 3
         Examination by Ms. Najam.................  5
 4
         Examination by Mr. Hillegas............. 255
 5
         Further examination by Ms. Najam......... 271
 6
 7   DEPOSITION EXHIBITS          IDENTIFIED
 8   Exhibit 1    October 24, 2024  Supplemental
                  Expert Report...................  8
 9
     Exhibit 2    December 11, 2024 Expert
10                Reply Report.................... 41
11   Exhibit 3    Declaration Jacob Hochstetler... 58
12   Exhibit 4    Spreadsheet..................... 84
13   Exhibit 5    Rebuttal Expert Report of
                  Michal A. Malkiewicz........... 88
14
     Exhibit 6    Excerpt of ▮▮▮▮▮▮▮▮
15                Deposition April 26, 2024..... 144
16   Exhibit 7    Excerpt of ▮▮▮▮▮▮▮▮
                  Deposition April 19, 2024..... 146
17
     Exhibit 8    Google document................ 181
18
     Exhibit 9    Google Workspace Updates
19                Hangouts Chat.................. 205
20   Exhibit 10   Google Workspace Updates
                  Hangouts....................... 208
21
     Exhibit 11   12.8.0222 email from Sundar..... 237
22
     Exhibit 12   November 2021 Presentation - An
23                Optimal Police Patrol Planning
                  Strategy for Smart City Safety.. 256
24
25
```

Page 5

```
 1        P R O C E E D I N G S
 2             THE VIDEOGRAPHER:  We're on the record
 3   for the deposition of Jacob Hochstetler.  The time is
 4   9:10 a.m. on December 16, 2024.
 5             Will counsel state their appearances
 6   for the record.
 7             MS. NAJAM:  Ayesha Najam from Gibbs &
 8   Bruns on behalf of Google.
 9             MR. HILLEGAS:  Peter Hillegas of
10   Norton Rose Fulbright on behalf of State of Texas.
11   With me is co-counsel Ethan Glenn, also of Norton
12   Rose Fulbright, and Jonathan Wilkerson of The Lanier
13   Law Firm.
14             JACOB HOCHSTETLER,
15   having been first duly sworn, testified as follows:
16             EXAMINATION
17   BY MS. NAJAM:
18        Q.  Dr. Hochstetler, we met off the record,
19   but, again, my name is Ayesha Najam.  No one
20   pronounces it right.  You can call me "counsel" if
21   you'd like.  And I represent Google in this matter.
22             You have actually already been deposed in
23   this matter; is that right?
24        A.  That's correct.
25        Q.  Was that deposition in October?
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 6

1  October 1st ring a bell?
2      A.  Yes.  The semester has been a blur, but
3  that sounds about right.
4      Q.  All right.  Well, since you have so
5  recently been deposed, I'm not going to go through
6  the usual list of instructions, but a couple of them
7  I did want to touch on again.
8          First, as a reminder, that you please wait
9  for me to finish my question before you start your
10 answer.  And I will, of course, try to do the same
11 with you.
12         The second is I just wanted to get our
13 understanding on the record that if I ask you a
14 question and, for whatever reason, you didn't
15 understand it, didn't hear it, can we agree that
16 you'll ask me to repeat the question or rephrase it
17 in that event?
18     A.  Yes.
19     Q.  Okay.  And if I ask you a question and you
20 answer it just as I phrased it, can we safely assume
21 you understood my question?
22     A.  Yes.
23     Q.  And the final reminder is, as you will
24 recall from last time, we will be taking breaks.
25 The one thing I ask is there not be a pending

Page 7

1  question at the time, but if at any other point,
2  please let me know and we will definitely take a
3  short break.
4      A.  Sounds great.
5      Q.  All right.  Now I know you have done some
6  work in this case on more than one subject.  But you
7  understand today's deposition has to do with your
8  opinions having to do with Google Chat; is that
9  right?
10     A.  Specifically the chat logs.
11     Q.  Okay.  Thanks for the clarification.
12         Including the reports and declaration that
13 you have provided, whether on chat logs or
14 otherwise, am I right that, grand total, you have
15 provided four reports and one declaration?
16     A.  Yes.
17     Q.  And in terms of which of those relate to
18 chat logs, it's an October report, a December
19 report, and a December declaration; am I right?
20     A.  That's correct.
21     Q.  So I'm first going to hand you what I have
22 marked as Exhibit 1 to your deposition.
23         Can you just confirm for me that that's a
24 copy of your October 2024 report relating to chat
25 logs?

Page 8

1          (Exhibit 1 marked.)
2      A.  (Reviewed document.)  Yes, that's correct.
3      Q.  All right.  So page 3, paragraph 2 under
4  the subtitle Assignment, without reading it into the
5  record, I just want you to confirm that this is an
6  accurate summary of what you were originally asked
7  to do as it relates to chat logs.
8      A.  Yes, this was my original assignment.
9      Q.  Okay.  And we'll get to the other stuff
10 later.  I wanted to clarify one thing.
11         You testified in your last deposition in
12 this case that you were engaged solely by the State
13 of Texas.
14         Is that still -- is that still true?
15     A.  That is correct.
16     Q.  And we're obviously going to get into a
17 lot of weeds later, but big picture, am I right that
18 part of your engagement regarding chat logs was to
19 analyze something that you call in your report the
20 log dataset?
21     A.  Yes, this assignment revolved around the
22 log dataset.
23     Q.  And just to get our definitions together,
24 the log dataset as we're going to use that term
25 today, those are logs of Google Chat metadata that

Page 9

1  Google produced for five particular employees
2  covering a 68-day period, true?
3          MR. HILLEGAS:  Objection; form.
4      A.  That is correct.
5      Q.  And in your report, you refer to something
6  called a log period.
7          Is it that 68 days?
8      A.  Yes, it is.
9      Q.  And just to be clear, that specific period
10 is December 9, 2022, to February 14, 2023; is that
11 right?
12         MR. HILLEGAS:  Objection; form.
13     A.  That is correct.
14     Q.  Okay.  Am I right that you have three
15 degrees in computer science?
16     A.  That is correct.
17     Q.  That's a bachelor's, a master's, and a
18 Ph.D.?
19     A.  Correct.
20     Q.  And I'm not going to go through all these
21 in detail, but am I right that you also have several
22 certifications in the field of computer science?
23     A.  Yes.
24     Q.  I take it you consider yourself to be an
25 expert in that field?

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10

1    A. I am.
2    Q. And prior to this case, am I right that
3 all of the times that you have been engaged by a
4 party as an expert, that they all related to
5 computer science?
6    A. That's correct.
7    Q. And am I right that all the classes that
8 you have taught have also been about computer
9 science?
10    A. In a broad sense, yes. I have also taught
11 several information technology classes, but
12 depending upon a school's curriculum, those could
13 fall in different places. But things like networks
14 and databases aren't what would be considered core
15 computer science classes; they would be more aligned
16 with, like, IT.
17    Q. Okay. And to the average person when they
18 hear "IT," are we at least still talking about the
19 world of computing?
20    A. Yes. Yes. Information technology.
21    Q. And how about the research that you have
22 done, has all your research experience also all
23 related to information technology?
24    MR. HILLEGAS: Objection; form.
25    A. I would say that would be specifically

Page 11

1 computer science but under the big umbrella of
2 information technology.
3    Q. Got it.
4    And then same question about work history:
5 Has all of it related to either information
6 technology or computer science?
7    MR. HILLEGAS: Objection; form.
8    A. I have had other jobs that did not relate
9 to computer science.
10    Q. What were they?
11    A. I was an interrogator in the Army. I also
12 performed counterintelligence duties as a
13 counterintelligence special agent.
14    Later on during the early part of the
15 Global War on Terror, I was in Iraq with a private
16 military company doing security operations.
17    Q. In any of -- well, let's take those one by
18 one.
19    For the work that you did for the -- for
20 government-related counterintelligence, did any of
21 that involve analysis of preservation or deletion of
22 data?
23    MR. HILLEGAS: Objection; form.
24    I'm going to caution the witness not
25 to disclose any information covered by

Page 12

1 confidentiality orders or security clearances.
2    A. I'm going to follow my counsel's advice.
3 I cannot disclose tools, techniques, or procedures.
4    Q. Okay. And I didn't ask you to disclose
5 what you did for anybody, including the government.
6 It was a yes-or-no question. I'm going to ask it
7 again.
8    For any of that work, at any point did
9 your job include determining -- sorry, analyzing the
10 preservation or destruction of data?
11    MR. HILLEGAS: Same caution to the
12 witness that if you feel that a yes-or-no answer
13 covers information covered by a security clearance or
14 confidentiality, you are permitted to not answer.
15    MS. NAJAM: Just to save time, you can
16 just say "same instruction." This may happen again.
17    Q. Can you answer the question? I can wait
18 for you to read the realtime.
19    A. I don't feel comfortable answering that
20 question.
21    Q. Okay. So I'm going to ask the same
22 question for the work you described that was not
23 computer science-related for the private military
24 experience.
25    Are you able to tell me, yes or no,

Page 13

1 whether any of that entailed determining the
2 destruction or preservation of data?
3    A. I am able.
4    MR. HILLEGAS: I have the same
5 objections on there so...
6    Q. What's the answer?
7    A. The answer is "no" for that company.
8    Q. Okay. So sitting here today -- actually
9 let's -- sitting here today, can you point us to
10 any -- can you state for us any experience you have
11 had, whether in the academic field or working wise,
12 with analyzing the preservation or destruction of
13 data?
14    MR. HILLEGAS: Objection; form.
15    A. Yes.
16    Q. What's that?
17    A. I worked at Los Alamos National Labs.
18 This was regarding their supercomputing system
19 Trinity, and I worked on a project for log analysis
20 and anomaly detection.
21    Most of the jobs that ran on the
22 supercomputer -- one of the reasons it was named
23 Trinity was for the nuclear simulations.
24    The preservation of logs for these systems
25 was fairly detailed and intricate, not only from a

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 14

1  technical perspective but there were also legal and
2  regulatory requirements from the Department of
3  Energy.
4      Q.  So help me understand, what kind of logs
5  are we even talking about?
6      A.  So --
7          MR. HILLEGAS:  Objection; form.
8      A.  So Trinity has, as I recall, seven layers
9  of storage, everything from a simple node in the
10  supercomputer and cluster all the way up to
11  long-term month or yearlong campaign storage that
12  would be associated with a specific job or set of
13  jobs.  And all between there would be logs that
14  would have to be collected between systems.
15      Q.  I'm sorry, I'm not following.
16          What was the point of the logs?  To
17  document what?
18      A.  Well, either technical, which would be for
19  debugging purposes, seeing if nodes were healthy, if
20  messages were being transmitted correctly, because
21  this was a large-scale supercomputer, all the way up
22  to campaign storage which would include regulatory
23  requirements for certain jobs that were running on
24  those systems.
25      Q.  Regulatory requirements involving a

Page 15

1  preservation of that data or others?
2          MR. HILLEGAS:  Objection; form.
3      A.  For the preservation.
4      Q.  What were the regulatory requirements?
5          MR. HILLEGAS:  Objection; form.
6      A.  I was not involved in governance, so I
7  can't recall, but there were rules in place because
8  of the nature of the simulations.
9      Q.  Okay.  So when you say you were not
10  involved in governance, your point is you weren't
11  involved in the aspect of trying to comply with
12  whatever rules were in place in terms of what had to
13  be stored?  Am I following right?
14          Let me ask an easier question for you.
15          You said you weren't involved in
16  governance.
17          What does that mean?
18      A.  So normally there's going to be another
19  person, either technician or sometimes even a
20  governance officer, that is in charge of ensuring
21  data is properly stored, retained, we have correct
22  authorization for people that can access it, and
23  that's more of a policies and procedure job.  It's
24  not a -- it's not a technical job.  There's no real
25  technical acumen to it.

Page 16

1      Q.  Okay.  So your point was someone else was
2  in charge of that aspect?
3      A.  Someone else was in charge of the
4  policies.
5      Q.  And ensuring compliance with them?
6          MR. HILLEGAS:  Objection; form.
7      A.  They would run audits to ensure.
8      Q.  Okay.  So besides the work you described
9  at Los Alamos, have you ever had any other work
10  experience where your job entailed determining
11  preservation or destruction of data?
12      A.  At a high level, yes.  There were many
13  times overseas when I would not be a part of the
14  investigating team, but when the FBI was doing a
15  CART analysis to recover forensic data, I would be
16  asked to, hey, don't roll those logs, we need to
17  preserve them, which would either be for email or at
18  the time it was IRC, Internet Relay Chat, because
19  that was used extensively around that time period.
20      Q.  Okay.  But just to put that in laymen's
21  terms, what you describe is you followed other
22  people's instructions about not -- when you said
23  "rolling logs," meaning making sure that certain
24  logs continued to run instead of being recycled; is
25  that accurate?

Page 17

1          MR. HILLEGAS:  Objection; form.
2      A.  Yes.  Rolling logs refers to overwriting
3  the logging system.
4      Q.  Okay.
5      A.  So a log would be there and then it would
6  be overwritten.
7      Q.  Okay.  But to recap your overseas
8  experience that you just described, you just
9  followed other instructions about what data to
10  preserve; is that accurate?
11          MR. HILLEGAS:  Objection; form.
12      A.  That's correct.  I didn't make the rules;
13  I just followed the rules.
14      Q.  Do you have any formal education in
15  statistical analysis or data analytics?
16      A.  Yes.
17      Q.  What is it?
18      A.  I have taken several courses in
19  statistics, Intro to Statistics.
20      Q.  I'm sorry, did you say "Intro to
21  Statistics"?
22      A.  Yes, introduction.
23          Probability models, a specific class in
24  data mining and machine learning.  And then in my
25  dissertation, I used statistics quite a bit.

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 18

1    Q.  Let's go through those.  Your Introduction
2  to Statistics, is that, like, a college-level course
3  we're talking about?
4    A.  Yes, that was an undergraduate course.
5    Q.  And how about probability models, was that
6  also an undergrad course?
7    A.  Also an undergrad course.
8    Q.  What did that course entail?
9    A.  Mostly advanced probability models, which
10  was, at the time, light machine learning combined
11  with linear algebra.
12    Q.  What year was this?
13    A.  2010.
14    Q.  Okay.  And then you said another class
15  that you took was data mining and machine learning.
16      How did that involve statistics?  Explain
17  that to us.
18    A.  So data mining is taking a massive amount
19  of data, finding different features to engineer from
20  it, and then using statistics to build a conclusion
21  from that data.  And this can be, you know, massive
22  things like predicting the weather or simple things
23  like why you should put beer next to the diapers in
24  the grocery store, because most dads buy those when
25  they're going out when they have a newborn kid at

Page 19

1  home.  That's like the standard data mining metaphor
2  joke.
3      But nowadays you're getting a lot deeper
4  because we have AI and large language models.  I
5  never went deep into that; I stayed with data
6  mining, which was a grad class.
7    Q.  A graduate class, you said?
8    A.  Yeah.
9    Q.  Okay.  And then explain to me how your
10  dissertation -- how it -- you said it incorp- -- I
11  don't remember the words you used.
12      You said it -- statistics played a role in
13  it in some way.
14      Can you explain that to us?
15    A.  Yes.  So my dissertation was based upon a
16  model of moving applications from mobile devices, so
17  mostly a vehicle but it could be a small airplane,
18  to edge, which would be a cell tower, a local
19  computing station, and then again moving those apps
20  to a cloud.
21      So there was some statistical models to
22  essentially say what's the efficiency of running
23  this on your mobile, on your iPad, or what's the
24  efficiency of running it on the edge or even moving
25  that data to the cloud.

Page 20

1      There's a lot of variables with that,
2  mostly to do with latency and the vehicles moving;
3  is it quicker to process it there or shuffle that up
4  to the cloud, process it, and send it back down.  So
5  there was statistics involved in that.
6    Q.  I'm sorry, maybe I'm missing the point.
7      Can you explain how statistics -- maybe we
8  should back up.
9      What is your definition of "statistics"?
10    A.  My definition would be looking at large
11  data and then gathering calculations and results
12  from that large data.  You can either do it through
13  sampling.  You can do it through -- there's
14  different models.  You can run a cloud forest on it
15  to get your KNN clustering.  But it really depends
16  on how the size of your data is and your format you
17  want out.
18      A lot of modern models when you have
19  p-cutoffs, you're going to generate, you know, ten
20  results out, and you're going to pick the top three,
21  for instance.
22      And that's how a lot of, like, a vision
23  system is looking at an apple in a text -- this is
24  an apple.  It has top three answers.  The apple is
25  top one.  Orange and banana could be the next two.

Page 21

1  But we have a P greater than 05, so we know the
2  apple is the highest hit.
3    Q.  By the way, you said p-cutoff and you used
4  the acronym "P," is that short for probability?
5      MR. HILLEGAS:  Objection; form.
6    A.  As I recall.  We usually use, like, P less
7  than 05 is like, the joke standard that something
8  is assured, but my wheelhouse is computer science.
9    Q.  So then what does the "P" stand for?
10    A.  I can't recall.
11    Q.  What does "P less than 05" mean?
12    A.  It means very, very likely.  These two
13  things are -- or multiple things are very
14  correlated.
15    Q.  You said you don't recall what the "P"
16  stands for.
17      Do you recall what the "05" represents?
18      MR. HILLEGAS:  Objection; form.
19    A.  Not off the top of my head.
20    Q.  Besides recalling that it was a joke, what
21  else can you tell us that you remember about the
22  concept of P being less than -- "P less than 05"
23  meaning something is very likely?
24    A.  Most of what I do is create models in code
25  and then deploy them, so my recollection of Intro to

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 22

1 Statistics is foggy.
2    Q.  We have talked about the classes that you
3 have taken.
4        Do you have any degrees or certifications
5 that are specific to statistical analysis?
6    A.  That would be a math degree.  I don't have
7 a math degree.
8    Q.  You said it would be.  I'm not asking you
9 specifically if you have a math degree.  Some people
10 come out of college, for example, with a degree in
11 statistical analysis.
12       Do you have such a degree?
13   A.  No.
14       MR. HILLEGAS:  Objection; form.
15   Q.  And then there's also certifications.  I
16 know there's a long list of computer-related --
17 sorry, computing-related certifications listed on
18 your CV.  We're going to look at it in a minute.
19       Do you have any certifications that are
20 specific to statistics?
21       MR. HILLEGAS:  Objection; form.
22   A.  I'm not aware of any.
23   Q.  Have you ever held yourself out, as in
24 represented yourself as, an expert in statistical
25 analysis?

Page 23

1        MR. HILLEGAS:  Objection; form.
2    A.  I have not.
3    Q.  Has anyone ever hired you as an expert to
4 perform statistical analysis?
5        MR. HILLEGAS:  Objection; form.
6    A.  I have been paid in grant money for
7 writing a paper.  I don't know if I would consider
8 that hired in the strictest sense, but I don't want
9 to, you know, limit myself to what that was.
10   Q.  The paper that you ultimately wrote with
11 that grant money, what was it about?
12   A.  It was about smart city planning.  That
13 was a large scale statistical model that placed
14 police patrols and police cars into LA County, and
15 this was based upon 13 years of LA County crime
16 records.  I think it was, like, 30 million crimes or
17 so.
18       At that point, I figured out the severity
19 of the crimes.  Obviously, you know, responding to a
20 murder versus responding to check fraud have
21 different severities.
22       So once I grouped them by severity, I then
23 ran a few KNN clustering to bring them into spots on
24 the streets in LA County where not only would be
25 responsive to crimes for each hour of the day, but

Page 24

1 also using Google Maps, they could plot to the next
2 stop the quickest using the traffic data at that
3 hour.  And this was done Monday through Sunday every
4 hour of the day.
5        But the data was coming out of the
6 government, so the LA County data was really rough.
7 There were crimes reported in Las Vegas.  There were
8 crimes reported in the middle of the ocean.  So I
9 had to clean the dataset up quite a bit to get it to
10 a usable spot.
11   Q.  What year was this paper written?
12   A.  I think 2016.
13   Q.  Do you know whether LA County implemented
14 your suggestions in the paper in terms of placement
15 of police and vehicles?
16   A.  I never talked to LA County about it.  I
17 did talk to Denton County about it, and they were
18 interested in a system similar for foot patrols.
19   Q.  Did Denton County end up hiring you to do
20 that or --
21   A.  No.
22   Q.  Sorry.
23       -- or funding a grant in which you
24 ultimately did that?
25       MR. HILLEGAS:  Objection; form.

Page 25

1    A.  The grant was funded through my
2 university, who then paid me to fly to Australia
3 where I presented it.
4    Q.  Okay.  The university funded grant for
5 smart city planning.
6        Do you know whether your work was ever
7 actually deployed in any city is what I'm trying to
8 figure out.
9    A.  While the system was reproducible, it was
10 very specific to LA County based upon all the
11 massaging and the engineering I had to do of the
12 data.  And I know for certain LA County did not
13 implement that.
14   Q.  Okay.  So besides this smart city planning
15 paper that LA County did not implement, have you
16 ever at any other point been hired to perform a
17 statistical analysis?
18       MR. HILLEGAS:  Objection; form.
19   A.  No.
20   Q.  Have you ever taught a class on the topic
21 of statistical analysis?
22       MR. HILLEGAS:  Objection; form.
23   A.  No.
24   Q.  So I'm not going to re-mark it, I'm just
25 going to hand you a copy of what was marked as

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 26

1  Exhibit 3 to your last deposition in this case.
2       If you wouldn't mind handing the extra
3  copies. Thank you.
4       I ask this only because it has been a
5  couple of months: Is this still an accurate
6  representation of your professional and educational
7  background?
8            MR. HILLEGAS: Objection; form.
9       A.  I believe I have added another class to
10  this. It was in one of my reports.
11      Q.  Are you looking through your stack for the
12  CV that was submitted to the Court in connection
13  with your recent declaration in support of
14  sanctions?
15      A.  Yes.
16      Q.  Okay. Do you remember what the class had
17  to do with?
18            MR. HILLEGAS: For counsel, I'll
19  stipulate that he discussed this at his last
20  deposition, including the class that was added.
21      Q.  Oh, so your counsel's point is the class
22  was added before your last deposition and you talked
23  about it?
24      A.  That's correct.
25      Q.  I don't remember what it was if you

Page 27

1  wouldn't mind reminding me?
2       A.  It's a freshman class over tools and
3  techniques. I based it upon MIT's missing semester,
4  which is essentially a class for all the missing
5  pieces that freshman don't get. MIT has a 10-week
6  core schedule, as I recall. They work on quarters.
7  My university works on 16 weeks, so I had to add
8  such content and stretch it out a bit.
9       Q.  Got it.
10      And, sir, in this CV are we going to
11  find -- because we have covered a couple of the
12  subsets, but are we going to find the word
13  "statistics" anywhere in it?
14            MR. HILLEGAS: Objection; form.
15      A.  (Reviewed document.) Not directly.
16      Q.  Like it won't contain the word, right?
17      A.  Correct.
18      Q.  Okay. I want to switch gears for a bit
19  and talk about a different topic and that is
20  document -- electronic document preservation.
21      Do you have any legal training or
22  education on document preservation in the context of
23  litigation?
24      A.  No, I am not a lawyer.
25      Q.  When you say "I'm not a lawyer," I take it

Page 28

1  you never had a law degree; is that right?
2       A.  That's correct.
3       Q.  You're not licensed to practice law
4  anywhere?
5       A.  I would not know where to begin.
6       Q.  Have you ever attended, like, a training
7  or a seminar that has to do about the duties
8  surrounding preservation of electronic data for
9  litigation?
10      A.  For litigation, no.
11      Q.  How about, like, a training or a seminar
12  more generally about discovery, that is, the
13  discovery phase of civil litigation or
14  investigations?
15      A.  No.
16      Q.  And let me ask more broadly: Can you
17  think of any kind of formal or informal education,
18  like even a seminar, that you have attended touching
19  on the topic of preserving electronic data in the
20  context of litigation or investigations?
21            MR. HILLEGAS: Objection. Hold.
22  Objection; form.
23      A.  In the context of investigations, yes.
24      Q.  What is that?
25      A.  Army training, that would be my 97Bravo --

Page 29

1  or for the court reporter, 97B -- MOS training
2  included forensic collection and handling of data.
3       And since I teach cybersecurity, I have
4  people from the NSA, my friends from FBI come in,
5  and I hold seminars usually once a semester for the
6  computer science, the Cybersecurity Club, and
7  they'll go over demos of forensically recovering
8  data for evidence and investigations.
9            MR. HILLEGAS: And I'll just caution
10  the witness to be aware of his security clearance
11  obligations.
12      Q.  Okay. Let's take them one by one.
13      First, your Army training that you
14  described, 97B MOS training, what year are we
15  talking?
16      A.  1997.
17      Q.  How much training are we talking about in
18  terms of time?
19      A.  I believe that AIT was six months. That
20  sounds right.
21      Q.  Okay. And what did -- from the -- I know
22  it has been quite a while.
23      What can you remember about what that
24  training was geared towards?
25            MR. HILLEGAS: Objection; form.

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 30

1    A.  I can say it was geared towards the
2  preservation of data in accordance with US and NATO
3  laws.  And I think that's all I can go into on that.
4    Q.  Okay.  Can you at least tell us whether
5  that had anything to do with civil litigation,
6  parties suing each other?
7    A.  No.  This had counterintelligence aspects.
8    Q.  Got it.
9      Okay.  And then the second thing you
10  mentioned, that once-a-semester seminar that you put
11  together for cybersecurity, the demos that you
12  talked about, it sounded like they were having to do
13  with recovering data.
14      Is that right?
15    A.  Yes, to forensically preserve it for use
16  in investigations.
17    Q.  And when -- is this seminar still
18  occurring once a semester?
19    A.  Yes.  The agents usually change out.  I
20  started this three years or so ago during summer
21  camps that I conduct with the NSA.  This is the
22  GenCyber program, which is the NSA's way of reaching
23  out to high school students, also middle school, and
24  we would have the FBI come in during that and do a
25  quick presentation, three hours or so, on here is a

Page 31

1  criminal's hard drive, we have busted into their
2  apartment, let's preserve it, let's rip it open and
3  run the tools to preserve it and make images out of
4  it.
5      I don't do the summer camps anymore, but I
6  continue that with the cyber and computer science
7  club when I can.
8    Q.  Stepping outside of, like, government
9  data, okay, I want to think about private parties
10  that are -- you know, companies, people who are not
11  working for the government.
12      Have you ever received any kind of
13  training or education about those folks' duties in
14  the context of preserving documents for litigation
15  or investigations?
16    A.  Yes.
17    Q.  Who -- how?  Sorry.  Explain that.
18    A.  So I work for Fidelity Investments.  We
19  are subject to many regulatory bodies.  FINRA being
20  the main one as a brokerage.  So all the
21  communications we have have to be preserved for a
22  certain amount of time.  I believe it's seven years.
23  I'm not a part of governance, so I don't set those
24  policies, but they -- I'm affected by them.  Things
25  like I can't use Zoom Chat, that's disabled, because

Page 32

1  there's no way to recover that and preserve it.
2      I also have policies at the University of
3  North Texas.  I don't know if you consider that a
4  government body or not.  I mean, technically it is.
5  But we also have policies there and that's Title IX.
6  There's also FERPA regulations.
7      I believe every -- every three years we
8  have to purge student records, so I can't go back
9  and look at a student's homework from three years
10  ago because of privacy protections.
11      But student records, like the actual
12  course grade they got, are preserved, I think,
13  digitally for decades.
14      And I don't know -- I don't know if that's
15  a governance policy or if that's in case a student
16  comes back 10 years later and they want to continue
17  their education.  So I don't know if there's a
18  specific law regarding that, but I know that's a
19  policy at the institution.
20      MS. NAJAM:  Okay.  I'll object as
21  nonresponsive.
22    Q.  So my question was actually about training
23  or education so I'll ask it again.  Not -- I totally
24  appreciate your answer about the experience you have
25  had.

Page 33

1      Have you received any formal training
2  about the duties that private parties, not the
3  government, have to preserve documents in
4  anticipation of litigation or investigations?
5      MR. HILLEGAS:  Objection; form.
6    A.  Yes.
7    Q.  What is that?
8    A.  At Fidelity Investments, we have training
9  every year regarding our duty to preserve and why we
10  have to preserve data because of regulatory bodies.
11    Q.  And, more specifically, Fidelity is
12  subject to FINRA requirements about its document
13  preservation, correct?
14    A.  Yes.  I'm not certain if there's other
15  requirements.  Fidelity is a fairly large
16  international company also through Fidelity
17  International, and I know on -- with Europe, we have
18  got a lot of different rules for preservation of
19  data.
20    Q.  Do you know how the requirements that
21  Fidelity is subject to, whether they are FINRA
22  related or from Europe, how those relate to the
23  rules for companies who are in lawsuits in the
24  United States --
25      MR. HILLEGAS:  Objection; form.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 34

1    Q.  -- or is that something that's outside of
2   your expertise?
3           MR. HILLEGAS:  Objection; form.
4    A.  It's outside.  Any retention is
5   automatically handled.
6    Q.  I'm a little confused by your answer, so
7   I'm going to ask:  When you said "outside," are we
8   agreeing that my original question of comparing what
9   Fidelity is subject to worldwide and with respect to
10  FINRA, how that relates to U.S. companies and U.S.
11  lawsuits, that that is outside your expertise?
12          MR. HILLEGAS:  Objection; form.
13   A.  Correct.  To your question "or is that
14  something outside my expertise," it is outside my
15  expertise.  Retention governance is automatically
16  handled for me.
17       Like I stated earlier, Zoom Chat is
18  disabled.  I can't use it because they couldn't
19  figure out a way to retain it.
20   Q.  When you say "they," you're talking about
21  Fidelity?
22   A.  Yes.  The -- specifically the IT
23  administrators we have for Zoom.
24   Q.  Whereas do you ever use Zoom personally,
25  like not using your Fidelity Zoom account?

Page 35

1           MR. HILLEGAS:  Objection; form.
2    A.  Yes.
3    Q.  So on that version of Zoom where you're
4   signed in personally, you can still use Zoom Chat;
5   is that accurate?
6           MR. HILLEGAS:  Objection; form.
7    A.  That's correct.
8    Q.  Do you happen to know what the retention
9   setting is on when you use Zoom Chat when you're
10  personally signed in?
11          MR. HILLEGAS:  Objection; form.
12   Q.  Let me ask a better question.
13       When you're signed in to Zoom Chat, not
14  using your Fidelity account, do you know for how
15  long those messages are kept, if at all?
16   A.  I can't -- I can count on one hand the
17  number of Zoom Chat messages I have sent.  It's not
18  my preferred way to chat.  I do not know the
19  retention for it on a personal account.
20   Q.  In fact, do you even know whether it is
21  retained?
22   A.  I believe there is a setting on the
23  administrator's side, because at University of North
24  Texas, chat is enabled, and it has to be retained
25  for some stuff as I understand, but for personal

Page 36

1   use, I'm not aware.
2    Q.  What -- so let's back up.
3       Do you use any -- actually, we'll touch on
4   this later.  We'll come back to it.
5       Let me finish -- let's go back to your
6   experience as it pertains to the obligations of
7   companies in the United States.
8       Are you familiar at all with the Federal
9   Rules of Civil Procedure?
10   A.  No.
11   Q.  Are there any states whose Rules of Civil
12  Procedure you are familiar with?
13   A.  No.
14   Q.  Let me ask a broad -- broader question.
15       Do you have any formal training on the
16  process of preserving and producing documents to
17  comply with civil discovery obligations in any
18  jurisdiction?
19   A.  Preserving, producing, civil, no.
20   Q.  Do you consider yourself to be an expert
21  on the ethical or legal rules governing document
22  retention for litigation purposes?
23          MR. HILLEGAS:  Objection; form.
24   A.  No.
25   Q.  Okay.  Now to bring it to chats, do you

Page 37

1   consider yourself an expert on what a company in the
2   United States is required to do in terms of
3   preserving ephemeral messages when it may anticipate
4   a lawsuit?
5           MR. HILLEGAS:  Objection; form.
6    A.  As an engineer, no.  This would be a
7   policy that would be from either data governance or
8   from a legal body inside the company, a lawyer.
9    Q.  So not you?
10   A.  Not me.
11   Q.  Has anyone ever hired you to get your
12  expert advice on document retention practices?
13   A.  And "retention" here, we mean specifically
14  for civil litigation?
15   Q.  We can start there.
16   A.  No.
17   Q.  Now more broadly, has any company, not the
18  government, ever hired you and said,
19  Dr. Hochstetler, we need your expertise on the
20  preservation of electronic data?
21       I'll stop there.
22   A.  Clarifying question:  For civil
23  litigation?
24   Q.  Then let me ask a better question.  Okay.
25       Has any private company ever hired you for

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 38

1  your particular expertise in terms of preserving
2  electronic data to comply with any legal obligation?
3      MR. HILLEGAS: Objection; form.
4      A.  No.
5      Q.  Before this case, have you ever served as
6  an expert, whether consulting or in -- as -- in a
7  testifying capacity, on a company's document
8  retention practices?
9      A.  No.
10     Q.  Before this case, has anyone ever reached
11 out and asked you to determine whether someone
12 failed to preserve relevant evidence for purposes of
13 a lawsuit or investigation?
14     A.  Yes.
15     Q.  When was that?
16     A.  This is December.  September time frame.
17 The State of New Jersey.
18     Q.  You mean this year?
19     A.  Yes.  I'm sorry, this year.
20     Q.  Are you able to tell us what exactly you
21 were engaged to do?
22         MR. HILLEGAS: I'll just object that
23 to the extent that you're covered by confidentiality
24 restrictions, you're permitted to not answer.
25     A.  I think I can answer in a general sense.

Page 39

1      It is a cybersecurity forensic
2  investigation that has a civil litigation component.
3      Q.  I want to make sure you understood the
4  original question.
5      Is your testimony that this recent
6  engagement in connection with New Jersey involves
7  you being asked to determine whether someone failed
8  to preserve relevant evidence for purposes of a
9  lawsuit or investigation?
10     A.  I want to clarify.  They have reached out
11 to me; I have not engaged with them.  So I don't --
12 I want to make that clarification.
13     Q.  Okay.  Let me ask you this:  Is this
14 lawsuit the first time that you're being asked to
15 opine on whether a company adequately retained
16 electronic documents in the context of litigation or
17 investigation?
18     A.  When you say "is this lawsuit," we're
19 talking about ad tech, not the lawsuit I spoke about
20 a second ago.
21     Q.  Correct, this Google ad tech case.  I'm
22 sorry.
23     A.  That is correct.
24     Q.  Dr. Hochstetler, let me just ask you:  Do
25 you think you are qualified to tell a Court whether

Page 40

1  a party to a civil lawsuit adequately preserved
2  documents?
3      MR. HILLEGAS: Objection; form.
4      A.  I can speak about the chat logs and what's
5  missing from them, which was my assignment.
6      MS. NAJAM: Okay.  I'll object as
7  nonresponsive.
8      Q.  Totally understand but I do need to ask it
9  again.
10     Are you qualified to tell a Court whether
11 a party to a civil lawsuit adequately preserved
12 documents?
13         MR. HILLEGAS: Objection; form.
14     A.  I'll reach back to my assignment, which
15 was to analyze the chat log dataset and determine if
16 there were missing chats via analysis.
17     Q.  And you did that analysis, right, sir?
18     A.  That is correct.
19     Q.  You came up with a count of messages that
20 were sent or received in the log period when history
21 was off, right?
22     A.  Correct.
23     Q.  And we're going to get to that number in a
24 minute, but before we get into the numbers, I want
25 to know whether you believe you are qualified as an

Page 41

1  expert to tell the Court in this case whether Google
2  adequately preserved documents.
3         MR. HILLEGAS: Objection; form.
4      A.  My assignment was to analyze the chat log
5  dataset.  It only contained metadata; it did not
6  contain the actual chats themselves.
7      Q.  Okay.  There may be discomfort with the
8  words I'm using, so I'm going to show you that
9  they're your words.
10     I'm going to mark your reply report as
11 Exhibit 2.
12     Would you mind -- I'm sorry, I said reply
13 report.
14     Can you confirm that what I just marked as
15 Exhibit 2 is a copy of your December 2024 report in
16 this case replying to Dr. Malkiewicz?
17         (Exhibit 2 marked.)
18     A.  Mr. Malkiewicz.
19     Q.  Oops, you're right.  Sorry.
20     A.  Yes, this is it.
21     Q.  Go to page 10 with me, please, and
22 paragraph 21.
23     Your first sentence there reads,
24 Mr. Malkiewicz, however, agrees with me that Google
25 has failed to adequately preserve messages.

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 42

1    Did I read that right?
2    A.   That is correct.
3    Q.   Now putting aside whether Mr. Malkiewicz,
4    in fact, agrees with you, you are expressing an
5    opinion, are you not, sir, that Google failed to
6    adequately preserve messages?
7    A.   This is my opinion.
8    Q.   Okay.  So back to my question from a
9    couple of minutes ago:  Are you qualified to opine
10   in this case that Google failed to adequately
11   preserve messages?
12         MR. HILLEGAS:  Objection; form.
13   A.   I'm qualified based upon my analysis of
14   the chat log dataset.
15   Q.   What would have been adequate in your
16   opinion?  Where can we find that?
17         Your opinion is that Google failed to
18   adequately preserve messages, right?
19   A.   That's correct.
20   Q.   Actually, we'll hit that later.  You can
21   put the reply report aside.  We'll come back to
22   that.
23         Have you ever been a litigant, that is, a
24   plaintiff or a defendant in a lawsuit?
25   A.   No.

Page 43

1    Q.   Besides reviewing code for litigants in
2    lawsuits, is this Google ad tech lawsuit your
3    first -- firsthand experience with a lawsuit?
4          MR. HILLEGAS:  Objection; form.
5    A.   Yes.
6    Q.   Okay.  I have a couple more questions,
7    then we can take a break.  We have been almost going
8    an hour.
9          Are you still being paid $500 an hour for
10   your work on this case?
11   A.   That's correct.
12   Q.   And your prior work -- we haven't talked
13   about it today, but big picture, you provided a
14   technical assessments of how Google's ad tech tools
15   work; is that accurate?
16   A.   Yes.
17   Q.   Can we agree that that is different in
18   nature than the work you did on the chats logs?
19         MR. HILLEGAS:  Objection; form.
20   A.   Yes.  The chats log was mostly just
21   getting it to a format I could use in Excel, whereas
22   the previous work was looking at all the different
23   code over time that Google had produced.
24   Q.   In your last deposition in October, you
25   testified that you spent between 100 and 250 hours

Page 44

1    working on this case up until that point.
2          Do you recall that testimony?
3    A.   Yes.
4    Q.   Can you give me a total now of your total
5    time spent on this case?
6    A.   350 hours.
7    Q.   Now, those CSV files containing the
8    metadata from the chat logs, they were produced in
9    late August of this year; is that right?
10   A.   That sounds right --
11   Q.   When did --
12   A.   -- because --
13   Q.   I'm sorry.  Go ahead.
14   A.   I became aware of them in early September.
15   Q.   So regardless of when they were produced,
16   you got the metadata in September?
17   A.   Yes, as I recall.
18   Q.   Is it fair for us to assume that you
19   started your analysis in September?
20   A.   Same day.
21   Q.   And are you -- do you have any basis to --
22   well, let me ask you:  Do you dispute Google's
23   description of the logs as having a purpose of
24   debugging?
25         MR. HILLEGAS:  Objection; form.

Page 45

1    A.   I see no evidence to the contrary.
2    Q.   So are you -- just to be clear, are you
3    planning to opine in this case that the purpose of
4    the logs is to monitor chat preservation practices
5    by employees?
6          MR. HILLEGAS:  Objection; form.
7    A.   No.
8    Q.   Just so we can back up, for -- for a
9    layperson like myself to understand, what does it
10   mean for a log like this to be for debugging
11   purposes?
12   A.   So we'll take the retention setting as an
13   example.  Retention setting wasn't always a feature.
14   You would add this feature to the system, to the
15   distributed chat system, then you would be logging
16   out at each point in the system are data coming in
17   and out.  And we want to make sure that the data is
18   not munged or changed between the parts of the
19   system.
20         So for Retention Setting, for instance,
21   they add the new feature, then they can view the
22   logs and make sure, oh, yeah, retention setting is
23   moving between conversations correctly.
24         There's timing information there too.  So
25   if systems are moving slower than they are expected

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 46

1  to, if messages are being delayed, those debug logs
2  have extra information to give you a hint on what
3  the purpose could be or why there's an issue on the
4  system.  Debugging logs are the bread and butter of
5  IT.
6      Q.  To put it in, like, layperson's terms, is
7  an accurate recap that they exist for folks to make
8  sure on the back end that the -- whatever feature
9  we're talking about here, the chat, that it's
10  running properly?
11     A.  Yeah.
12     Q.  And -- go ahead.
13     A.  There's usually other systems to make sure
14  things are healthy, and those -- that's a big can of
15  worms.  So just nailing it down to, like, what logs
16  do is for debugging.  You usually wouldn't fix
17  production issues with logs.
18     Q.  What's a production issue?
19     A.  Chat is down.
20     Q.  Right.
21     A.  Usually we have other things in place.  We
22  have some sort of telemetry or sampling systems that
23  are going to give us a hint why something is
24  unhealthy.
25          But the logging, just like this

Page 47

1  transcript, we can go back and look and, like, oh,
2  ad tech was two As instead of A-d, you know, and we
3  can immediately fix it in -- not realtime, I guess,
4  is the answer.
5      Q.  Got it.
6          And I neglected to ask you this before:  I
7  saw from your last deposition that you had named a
8  couple of folks who had assisted you in terms of
9  your technical assessment of Google's ad tech stack.
10         Did anyone assist you in your chat logs'
11  analysis?
12         MR. HILLEGAS:  Objection; form.
13         In terms of the expert stipulation,
14  the names and conduct that they conducted are not
15  discoverable but you may the question "yes" or "no."
16         MS. NAJAM:  He answered -- he named
17  people in his last deposition so...
18         MR. HILLEGAS:  He can answer your
19  question "yes" or "no," which is what you asked.  But
20  I'm telling him not to go any farther than that under
21  the terms of the expert stipulation.
22     Q.  Okay.  So my original question was
23  actually not even for names; it was just did anyone
24  assist you.
25         Did anyone assist you?

Page 48

1      A.  Yes.
2      Q.  How many people?
3          MR. HILLEGAS:  Same objection.
4          MS. NAJAM:  What's the objection?
5          MR. HILLEGAS:  The same objection to
6  not go beyond the question.  He can answer your
7  question to the number, but not to disclose the
8  people and the conduct that they were --
9          MS. NAJAM:  So it's not an objection.
10  The instruction is don't name them.  No problem.
11         MR. HILLEGAS:  Yes.
12     Q.  Okay.
13     A.  One.
14     Q.  Okay.  You said one person?
15     A.  That's correct.
16     Q.  Who actually wrote your October 2024
17  report about chat logs?
18     A.  I did.
19     Q.  Okay.  And just to -- same question on the
20  reply:  Did you also write that?
21     A.  Yes.
22     Q.  Did you also write your declaration in
23  between those two reports we'll look at soon?
24     A.  I needed help with lawyer formatting for
25  that, so the formatting is definitely lawyering.  I

Page 49

1  wrote the words.
2      Q.  Okay.  And then the one person who did
3  assist you in your analysis of the chat logs between
4  you and that person, can you give me a percentage
5  of -- in terms of work done?
6          MR. HILLEGAS:  Objection; form.  Under
7  the terms of the expert stipulation, the amount of
8  hours spent on any given project is not discoverable,
9  and we instruct the witness not to answer.
10     Q.  Are you going to take your counsel's
11  advice to not answer my question about the
12  percentage of work that you versus this unknown
13  person did?
14     A.  I honestly can't recall, so I'll take my
15  counsel's advice.
16         MS. NAJAM:  All right.  We have been
17  going an hour.  I'm actually happy to keep going, but
18  then it will be sundown by the time I stop.
19         So should we take a break?
20         THE WITNESS:  Probably.
21         MS. NAJAM:  Okay.
22         THE WITNESS:  And I feel back for her
23  fingers so...
24         THE VIDEOGRAPHER:  Off the record,
25  10:11.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 50

1          (Recess 10:11 a.m. to 10:23 a.m.)
2          THE VIDEOGRAPHER:  We're on the
3     record.  The time is 10:23.
4          Q.  Professor Hochstetler, before we move on,
5     is there anything that you testified about in part
6     one today that you need to change or take back?
7          A.  No.
8          Q.  In terms of your opinions on this case
9     involving chat logs, did counsel for the State --
10    sorry, for the State of Texas provide you with any assumptions
11    that you relied on in forming your opinions?
12         MR. HILLEGAS:  Objection; form,
13    privilege.
14         Do not disclose any communications
15    that you may have had with counsel.  You may answer
16    the question "yes" or "no."
17         A.  No.
18         Q.  Did counsel provide you with any facts or
19    data that you relied on in forming your opinions?
20         MR. HILLEGAS:  Same objection and
21    instruction.
22         A.  Yes.
23         Q.  What were they?
24         A.  Number one, the chat log dataset.
25         Number two would be GOOG-AT-MDL-C, for

Page 51

1     Charlie, -000088212.  And this listed the log fields
2     and the internal descriptions from Google.  There
3     was 255 different types of actions, and a lot of
4     them aren't very descriptive, so Google provided
5     this document for me to figure out what they were.
6          And lastly, I don't know of it offhand but
7     Google produced a document mapping the ID numbers
8     within the chat log dataset to the actual email
9     addresses because the chat log dataset itself just
10    had numbers for the users.
11         Q.  Okay.  So besides providing you
12    documentation that originated with Google, did
13    counsel for Texas provide you with any facts or data
14    that you relied on to form your opinions?
15         MR. HILLEGAS:  Same objection and
16    instruction.
17         A.  No.
18         Q.  Now, in your October 4th report -- it's
19    Exhibit 1 for the record -- you listed on page 45
20    four depositions that you reviewed.
21         A.  I'm there.
22         Q.  It is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23    and Mr. Korula.
24         Did I read that right?
25         A.  That is correct.

Page 52

1          Q.  Now I want you to go to Exhibit 2, which
2     is your December report, on page 26.
3          Am I right that in connection with your
4     reply to Mr. Malkiewicz, you reviewed an additional
5     four depositions?
6          MR. HILLEGAS:  Objection; form.
7          A.  Correct.
8          Q.  That's Mr. Jayaram, ▮▮▮▮▮▮▮▮▮▮
9     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10         A.  That's correct.
11         Q.  Have you reviewed any other deposition
12    testimony to date in term -- that relates to your
13    opinions on the chats?
14         A.  I have reviewed many but I only relied
15    upon these.
16         Q.  Which other ones did you review in
17    connection with your chats-related opinions?
18         A.  I can't recall.
19         Q.  And is one reason you can't recall because
20    it's not listed in either report, that is, the
21    depositions that you reviewed but did not rely on in
22    forming your chats-related opinions?
23         A.  Yes.  When I did searches for -- within
24    the depositions, I was searching specifically for
25    keywords like "chat" or "history."

Page 53

1          Q.  Okay.  So it sounds like you were given
2     access to a database containing depositions and you
3     ran searches within the database; is that right?
4          A.  Yes.
5          Q.  Do you know whether that database was a
6     full universe of depositions in this case or some
7     subset?
8          MR. HILLEGAS:  Objection to form.
9          A.  I believe it to be all depositions.
10         Q.  So you think it included, for example,
11    depositions of the 17 states/territories who are
12    plaintiffs in this case?
13         A.  Yes, because I recall there would be hits
14    for the State of Florida, as I recall, maybe someone
15    from their ad agency.
16         Q.  Okay.  So what -- you said you ran search
17    terms.  You mentioned the word "chats."
18         Were there any other search terms that you
19    used?
20         A.  "History."
21         Q.  Besides "chats" and "history," what other
22    search terms did you use to identify potentially
23    relevant testimony?
24         A.  I think the word "usage."
25         Q.  Any others?

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 54

1    A.  I don't think so.
2    Q.  Did you search for the word "hold" or
3  "holds" as in "litigation holds"?
4    A.  No.
5    Q.  And then how did you determine when you
6  came upon a hit whether this was something you were
7  going to rely upon or not?
8    A.  It depends on which report.  Originally I
9  was using, for my supplemental -- there are so many
10  reports, I'm so sorry.
11    For my supplemental, I was using the
12  depositions as a check against the log data.
13    Q.  Okay.
14    A.  Since all I had was the log data, I felt
15  like I needed a second check to make sure this data
16  was valid.
17    Q.  And when you say "supplemental report,"
18  you're talking about your October 4th report, right?
19    A.  Yes, supplemental.
20    Q.  When you say you're checking it against
21  the log data, you mean to verify that your
22  conclusions from the log data were consistent with
23  testimony?
24    Is that what you're saying?
25    MR. HILLEGAS:  Objection; form.

Page 55

1    A.  I think more basic than that.  One of the
2  first things you need to do when you get big data,
3  there's going to be possibly bad things inside it.
4  I wasn't certain that when the logs were produced, a
5  file was zipped wrong or a CSV got munged.
6    It's so much data, I had to ensure that
7  the numbers I was getting back for sents and
8  receives were in the same magnitude that the Google
9  employees were actually sending and receiving chats.
10    For instance, as a hypothetical, if I
11  looked at the data and it showed someone sending a
12  thousand chats a day Monday through Sunday, that's a
13  red flag.  Something is wrong with that data.
14    So this was my initial review of the
15  dataset to make sure, hey, is this data good, do I
16  need to go back to counsel and inform them something
17  is wrong with the data, give it to me again, you
18  know, simple things like maybe it got zipped wrong.
19    So I relied upon those depositions to sort
20  of align expectations with sends and receives of
21  messages.
22    Q.  In connection with your October report,
23  you only listed four, right?
24    A.  Yes.
25    Q.  But, sir, when you searched the database

Page 56

1  for those terms we just talked about, you didn't
2  just come back with four deponents who talked about
3  how many chats they send, right?
4    A.  That's correct.
5    MR. HILLEGAS:  Objection; form.
6    Q.  I'm sorry?
7    What did you do with the other folks'
8  testimony about the number of chats they sent other
9  than the four you listed in your October report?
10    MR. HILLEGAS:  Objection; form.
11    A.  Many of the depositions that were hits for
12  "chat" or "history," when it got to a question about
13  how many they sent or received per day, they
14  couldn't remember and they couldn't equate that
15  versus their emails.  They didn't know at all.
16    So for that, it wasn't a check on the
17  data.  That told me nothing about how valid the
18  dataset was, so I didn't use those depositions.
19    Q.  What did you do when you came across
20  testimony indicating that a particular employee sent
21  less than your average in your log dataset?
22    Did you consider that?
23    MR. HILLEGAS:  Object to form.
24    A.  Yes.
25    Q.  But you didn't rely on it in forming your

Page 57

1  October opinions.  Fair?
2    MR. HILLEGAS:  Objection; form.
3    A.  No.  In fact, one of the custodians in the
4  log dataset, for whatever reason, sent very few
5  messages.  So -- ▮▮▮▮▮▮▮ is the person.
6    So in particular, that lined up with some
7  of the depositions where they said, I don't use chat
8  much.  So that was valid.
9    If a deposition had come back and said, I
10  use chat a thousand times a day, I would have been
11  more concerned about the dataset I got.
12    Q.  So just to make sure I understood that
13  last question (sic), taking ▮▮▮▮▮▮▮ as an
14  example, you did see deposition testimony from folks
15  at Google who testified they didn't use chat very
16  much.  Fair?
17    A.  That is correct.
18    Q.  Now, I already marked as Exhibit 2 your
19  December report replying to the opinions of
20  Mr. Malkiewicz.
21    And I have not yet marked it, so let me do
22  that now, your declaration.  That is Exhibit 3 to
23  this deposition.  If you wouldn't mind passing the
24  extra copies along.
25    So I notice you're looking at a different

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 58

1 version than what I handed you. Did you bring your
2 own copies of items to today's deposition?
3         (Exhibit 3 marked.)
4    A. I did because I like binders.
5    Q. Are any of them marked or notated at all?
6    A. The only thing I have is for the
7 appendices, I have got page dividers.
8    Q. Are there any -- there's no handwritten
9 notes?
10    A. No. No.
11    Q. All right. Then you are free to use
12 whatever version you want, but just for the record,
13 Exhibit 3, can you confirm it's your declaration
14 from earlier this month in support of the Plaintiff
15 States' motion for spoliation sanctions?
16    A. Yes.
17    Q. All right. So let me ask you this, sir:
18 If we wanted to know all the instances with which
19 you disagree with Mr. Malkiewicz's opinion, are they
20 going to be contained in your declaration plus your
21 December 2024 report?
22    A. The December '24 would be the reply
23 report.
24    Q. Exhibit 2, yes.
25    A. That is correct.

Page 59

1    Q. Okay. And more -- even bigger picture, I
2 want to make sure: Do you have any opinions
3 regarding chats or chat logs that are not already
4 included in your October report, your December
5 declaration, or your December report, that is,
6 Exhibits 1, 2, and 3 to today's deposition?
7         MR. HILLEGAS: Objection; form.
8    A. No. But I would like to reserve future
9 reports if I need to write them.
10    Q. Do you have any reason, sitting here
11 today, to anticipate that you're going to need to
12 disclose a new opinion?
13    A. I'm not certain.
14    Q. Sitting here today as an expert for at
15 least the State of Texas in this case, do you have
16 any opinions on Google -- Google Chats that you
17 haven't already put down in those three first
18 exhibits to your deposition?
19    A. No.
20    Q. Have you ever spoken with Ignatius Grande?
21    A. No.
22    Q. Are you aware that he is also an expert
23 hired by the plaintiffs in this case on the topic of
24 chats?
25    A. Yes.

Page 60

1    Q. Did you review either his declaration in
2 support of sanctions or his expert report served
3 last week?
4    A. I have not.
5    Q. Sir, you use Gmail; is that right?
6    A. I have several Gmail accounts.
7    Q. And, in fact, on your CV, it may not be
8 the one sitting in front of us today, but on some --
9 the version of the CV that was submitted to the
10 Court, your email contact information is a Gmail
11 account, right?
12    A. That's my professional Gmail, yes.
13    Q. Do you use other Google products?
14         MR. HILLEGAS: Objection; form.
15    A. Google Calendar is separate from Gmail now
16 I think. And Google Maps. I use API for Google
17 Maps a bit.
18    Q. Have you ever used Google Chat?
19    A. Yes.
20    Q. Have you ever --
21    A. Well --
22    Q. Go ahead.
23    A. It changed names. So if we're talking
24 about, like, the umbrella that is, quote, Google
25 Chat, yes. I have not used -- I think I used it

Page 61

1 when it was called Hangouts or before that maybe.
2    Q. Okay. Have you ever used Google Chat or
3 Google Hangouts or previous iterations of the
4 instant messaging tool provided by Google in
5 connection with work?
6         MR. HILLEGAS: Objection; form.
7    A. No.
8    Q. You mentioned that at Fidelity, that Zoom
9 Chat has been disabled.
10         At Fidelity, is there an instant messaging
11 application that the company does use?
12    A. Yes.
13    Q. Have -- go ahead.
14    A. I don't believe I can disclose what it is.
15    Q. I'm not asking what it is.
16         Have you ever used it?
17    A. Yes.
18    Q. Are you aware whether those instant
19 messages are subject to the same preservation as
20 emails at that company?
21    A. From the training I have to take, they are
22 subject to the same rules.
23    Q. In terms of preservation?
24    A. In terms of preservation.
25    Q. Is there an option for history to be off?

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 62

1    Let me put it a different way.
2        Is there a way for them to not be retained
3    in the same manner as emails?
4        A.   There are different levels of retention,
5    but there's not an "off" setting.
6        Q.   Okay.  How about at the University of
7    North Texas, is there an instant messaging tool
8    available for employees of the university?
9        A.   Yes.
10       Q.   Have you ever used it?
11       A.   Yes.
12       Q.   Do you know whether those messages are
13   subject to the same preservation practices and
14   policies as UNT emails?
15       A.   I believe they are.  I don't recall
16   specifically.
17       Q.   So you think they are but can you tell us
18   the basis for thinking that?
19       A.   During the training regarding policies,
20   chats are not called out specifically but neither is
21   email.  It's just regarding communication and if
22   it's communication to a student or an employee of
23   the university or external.  That's, like, the three
24   buckets of how it's divided.
25       Q.   But in terms of for how long and the

Page 63

1    extent to which they're preserved, do you know
2    whether it's the exact same for emails and UNT
3    chats?
4        MR. HILLEGAS:  Objection; form.
5        A.   I do not definitively know.
6        Q.   By the way, I meant to ask you:  When
7    using Google Chat, whether it's been called that or
8    its previous names or iterations, do you recall
9    whether the tool has features like video or audio
10   chat available?
11       MR. HILLEGAS:  Objection; form.
12       A.   When I used the Google Chat system, I
13   don't think it had either because this would be 2004
14   maybe.
15       Q.   Since 2004, have you used other companies'
16   instant messaging tools?
17       A.   Yes.
18       Q.   Can we at least agree that nowadays these
19   chat tools contain features like video chat or audio
20   chat?
21       MR. HILLEGAS:  Objection; form.
22       A.   Yes.
23       Q.   In other words, nowadays these chat tools,
24   there's other ways to chat other than typing, like
25   you can initiate a video or phone call using the

Page 64

1    chat tool?
2        A.   Yes.  I'm hesitating and thinking about it
3    because in my brain, it's not a chat tool.  It's
4    Zoom or it's Teams.
5        Q.   Okay.  I will try to use technically
6    appropriate wording.
7        These are applications that now have
8    features such as video or phone chat?
9        A.   Yes.
10       Q.   Okay.  Let's talk about your opinions a
11   little bit more.
12       Let's start by pulling out Exhibit 1,
13   page 5, paragraph 8.
14       A.   Page -- what page?
15       Q.   Page 5, paragraph 8.
16       A.   Oh, page 5.  Sorry, I heard page 1.  I was
17   very confused.  I am there.
18       Q.   All right.  So we may do this in reverse
19   order, but in paragraph 8, you say that it is
20   therefore your opinion that the total number of
21   messages not retained by Google employees subject to
22   a litigation hold was a million and a half or more
23   in 2022 only.
24       Did I read that correctly?
25       A.   That is correct.

Page 65

1        Q.   Okay.  And I know there's another
2    declaration, there's another report, we will get to
3    them.
4        But my first question to you, sir, is
5    whether you stand by that opinion today?
6        A.   Yes.
7        Q.   Are you also offering the opinion that
8    this annual number that you came up with can be
9    applied to other years?
10       A.   I can apply the same formula to other
11   years, but the number of custodians, employees under
12   litigation hold, which is in Exhibit D, has changed
13   over time.  And I only ran the numbers for 2022
14   because the window of time I had in the dataset was
15   only for 2022.
16       Q.   Well, it was also a bit into 2023, right?
17       A.   It was a bit into 2023.
18       Q.   Okay.  But going back to that specific --
19   okay, let me make sure I understand.
20       When you say the formula, are you talking
21   about 20,000 lost messages per employee times number
22   of legal hold custodians?
23       Is that the formula that you're saying you
24   could apply beyond '22?
25       A.   Roughly.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 66

1    Q.  Okay.  But you have not actually tried to
2  do a separate calculation for any other year.  Is
3  that fair to say?
4    A.  Correct.
5    Q.  And is it your opinion that you could use
6  that formula, which is roughly 20,000 messages per
7  employee multiplied by number of folks on hold, that
8  you could use that formula dating back to, say,
9  2000?
10    A.  No, because Google Chat didn't exist then,
11  as I understand.
12    Q.  So for what year are you opining you can
13  take that formula and apply it -- for what years?
14        MR. HILLEGAS:  Objection; form.
15    A.  I believe I only ran the numbers for 2022.
16    Q.  Well, here is what's confusing me.  Go to
17  paragraph 82.  It's on page 43.
18        In your last paragraph in your October
19  report, you write, My analysis leads me to conclude
20  that it is reasonable to assume that the number of
21  messages lost per year, across all employees under
22  the litigation hold, was close to 1.5 million.
23        So my question, sir, is you wrote here
24  "per year," which years?
25    A.  So this is using the average from that

Page 67

1  chat log dataset, which I then applied to 2022
2  because that was the year the chat log's from.  All
3  I had to go on was the chat log dataset.  All I had
4  was those five custodians within that time period.
5        MS. NAJAM:  Object as nonresponsive.
6    Q.  My question is:  In telling the Court that
7  you have estimated the number of messages lost per
8  year, are you confining it to 2022 or are you going
9  to testify that I believe roughly this number was
10  also lost in 2007, 2015, et cetera?
11    A.  I would estimate since 2019, and I believe
12  I go into that in my reply.
13    Q.  What is the basis for using 2019 to 2022
14  as the years that you believe you could apply that
15  formula to?
16    A.  So for 2019, we had a -- the COVID
17  pandemic.  That started in November, as I recall.  I
18  think California shut down in December of that year,
19  so there was massive work from home.
20        Due to work from home, it is likely to
21  increase electronic communications, chat being one
22  of those.
23    Q.  Okay.  We will come back to the work from
24  home aspect of chat usage, but I just want to make
25  sure we're on the same page.

Page 68

1        You're offering the opinion of roughly
2  1.5 (sic) messages lost per year for the time period
3  2019 to 2022.
4        Did I get that right?
5    A.  1.5 million.
6    Q.  But otherwise I got that right?
7        MR. HILLEGAS:  Objection; form.
8    A.  I believe that's correct.
9    Q.  Now let's talk about that roughly
10  20,000-message per employee number.
11        Let's go to your original -- sorry, your
12  October report, Exhibit 1, page 14, Table 2.
13    A.  I am there.
14    Q.  Can you just confirm that in coming up
15  with that roughly $20,000 -- sorry, 20,000-message
16  number that it was based solely on the log dataset
17  for these five employees listed in Table 2?
18    A.  Correct, this constituted the entire
19  dataset.
20    Q.  And to put a finer point on it, to come up
21  with your calculation of roughly 20,000 messages per
22  employee per year, you considered solely the number
23  of messages sent or received by these five with
24  history off during the log period; is that right?
25    A.  Only sent.

Page 69

1    Q.  Only sent.  Got it.
2        And I said "log period," but to put an
3  even finer point on it, to come up with the
4  20,000-message annual number, you considered only
5  messages sent by these five with history off through
6  February 8, 2023, true?
7        MR. HILLEGAS:  Objection; form.
8    A.  So, yes, that's about the time that the
9  automatic retention was put in place and they could
10  no longer turn off history.
11        I believe in deposition, I think, from
12  ██████ there's phasing of that though.  It is my
13  understanding that these first five, the entire
14  dataset were part of that first phase.  I think
15  there were other employees that were part of other
16  phases.
17        And the first date of the dataset, there's
18  time zone issues, so it's, like, one day or the
19  other day, and that's just the time zone issue.
20    Q.  Let me ask you this then.
21        In using these five's logs, when coming up
22  with an average per day messages not retained
23  number, did you use 68 days or some lesser number?
24    A.  No, I used 68.
25    Q.  Okay.  And in your October report -- so if

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 70

1  you need to go there, it's -- I'm looking at
2  page 43, Footnote 106.
3         In coming up with your roughly 1.5 million
4  messages for 2022 number, am I correct that you got
5  that number by taking a letter from Google's counsel
6  from August of '24 that identified several employees
7  who were subject to hold and then filtering it to
8  figure out who you thought was on hold in the year
9  '22?
10     A.  That is correct.
11     Q.  And just to be clear, that letter I'm
12 talking about, I think you pointed to this earlier,
13 that's Exhibit D to your report.
14     A.  That's correct, the Freshfields Bruckhaus
15 Deringer from Robert McCallum.
16     Q.  And, sir, big picture, one of your
17 opinions is you can use the log dataset for 68 days
18 to extrapolate to an entire year, first, for just
19 those five custodians, right?
20         MR. HILLEGAS:  Objection; form.
21     A.  Yes, conservatively.
22     Q.  And you're saying conservatively because
23 that 68-day period contains some holidays, right?
24     A.  Yes, contains holidays.  That was honestly
25 one of the first -- I spoke about making sure the

Page 71

1  data was good before.  And as soon as I was able to
2  ascertain the message counts were probably okay, I
3  then plotted them by day of week, and I started to
4  see patterns of not sending chats on Saturday and
5  Sunday, not the work week.  So that correlated with,
6  okay, this is actually good.  So...
7      Q.  Okay.  But back to my question:  Is there
8  any other basis for you to say that extrapolating
9  from that 68 days to the full 365 for these
10 custodians, is there any other basis for what you
11 say is conservative other than the fact that
12 included a holiday period?
13         MR. HILLEGAS:  Objection; form.
14     A.  I think by averaging the five of them,
15 including ▇▇▇▇ and ▇▇▇▇ balanced out, and I
16 felt it was more conservative by adding those two in
17 because they had low message counts.
18     Q.  You said "adding those two in."
19         They were already part of the original log
20 dataset, right?
21     A.  They were.  But Mr. Malkiewicz made a
22 mistake and thought I had removed them when I was
23 averaging.
24     Q.  Okay.  We'll get to that in a second.  But
25 just to clarify, there was no adding those --

Page 72

1  ▇▇▇▇ and ▇▇▇▇ in, right, they
2  were already part of the log dataset?
3      A.  That's correct.
4      Q.  And your point is that when you took their
5  68-day numbers of messages sent with history off,
6  you think it was conservative to extrapolate for the
7  rest of the year for those five folks, true?
8      A.  Yes.
9      Q.  Did you ever consider excluding one of the
10 custodians who had a significantly higher number of
11 sent messages?
12         MR. HILLEGAS:  Objection to form.
13     A.  So that would be excluding Mr. Sundar
14 Pichai?
15     Q.  ▇▇▇▇?
16     A.  Her usage is the highest but I wouldn't
17 say it's out of bounds.  I felt like I had a good
18 mix in this dataset.  I had low usage.  I had high
19 usage.  I felt the dataset was correct because of
20 the holiday gaps.
21         We saw spikes on January 20th from two --
22 I think two or three of the users, which
23 corresponded directly to real world events.  And I
24 felt the data was good from that.
25         MS. NAJAM:  I'll object as

Page 73

1  nonresponsive.
2      Q.  I'll re-ask my original question.
3         Did you ever excluding -- and I'll name
4  her now -- ▇▇▇▇?
5         MR. HILLEGAS:  Objection; form.
6      A.  No.
7      Q.  ▇▇▇▇ sent over 5,000 messages in
8  the log period, true?
9         If you need help, you can go to page 23,
10 Table 7.
11     A.  (Reviewed document.)  Yes.
12     Q.  That's over 2,000 --
13     A.  I see --
14     Q.  Sorry.
15         And that's over 2,000 more than the next
16 custodian in this log dataset, true?
17     A.  Correct.
18     Q.  Okay.  So back to what we were talking
19 about in terms of taking the numbers for those five
20 and the log period and extending those for the rest
21 of the year for just that group.
22         Your next step is to opine that that
23 20,000 number that you get for the whole year, that
24 that would apply to the remaining over 100 employees
25 on litigation hold in this case; is that right?

19 (Pages 70 - 73)

Veritext Legal Solutions

800-567-8658                                           973-410-4098

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 74

1    A.  That's correct.
2    Q.  And that's how you arrive at the
3  paragraph 8 we read earlier, that the total number
4  of messages not retained by Google employees subject
5  to a litigation hold was 1.5 million or more in
6  2022; is that right?
7    A.  My exact verbiage is what's close to
8  1.5 million.
9    Q.  Okay.  So just to be clear, you arrived at
10  that opinion by using log data for five employees in
11  the dataset to make generalizations about other
12  Google employees?
13        MR. HILLEGAS:  Objection; form.
14    A.  I use the entire dataset that Google
15  produced.
16    Q.  Five folks for 68 days?
17        MR. HILLEGAS:  Objection; form.
18    Q.  Right?
19    A.  Correct, the entire dataset.
20    Q.  To extrapolate the number of sent messages
21  with history off for over a hundred other employees
22  for an entire year, right?
23        MR. HILLEGAS:  Objection; form.
24    A.  Yes, I used the entire dataset that Google
25  produced.

Page 75

1    Q.  And we looked at -- sorry, I forgot to ask
2  you this.
3        To arrive at your roughly $1.5 million
4  (sic) annual number, you ended up taking that --
5    A.  No dollars.
6    Q.  Do I keep saying dollars?
7    A.  The dollar number scares me.
8    Q.  Okay.  I'll start over.
9        In coming up with that roughly 1.5 million
10  message per year number, you actually applied that
11  20,000 per year per employee number by half of the
12  141 custodians in this case; is that right?
13    A.  That is correct.
14        MR. HILLEGAS:  Objection; form.
15    Q.  And am I -- in terms of why you in your
16  October report used that half, is that because you
17  were taking into account that some employees may not
18  still be at the company in 2022?
19        MR. HILLEGAS:  Objection; form.
20    A.  Yes.  My -- additionally my understanding
21  of litigation holds is a layman; my expertise is in
22  computer science.
23        I didn't know if you could come off of
24  litigation hold, so I didn't know if employees
25  would -- you know, if they moved roles within the

Page 76

1  company, if they got promoted -- I hope no one gets
2  demoted.  So I felt I was being conservative in
3  having that number.
4    Q.  And then you decided to remove that
5  conservativism when it came to your December
6  declaration in support of sanctions; is that
7  accurate?
8    A.  Yes.
9        MR. HILLEGAS:  Objection; form.
10    Q.  So let's see what you put in your
11  declaration when the Plaintiff States have asked the
12  Court to sanction Google.
13        That's Exhibit 3, right, sir?
14    A.  Yeah, it's -- I get confused -- yes,
15  Exhibit 3.
16    Q.  Look at the sticker at the bottom.
17    A.  Yeah.
18    Q.  There you go.
19        Sir, when you signed this declaration, did
20  you know it would be filed with the court in support
21  of spoliation sanctions against Google?
22    A.  Yes.
23    Q.  Did you have an understanding as to
24  whether that's a pretty extraordinary request to
25  make of a Court?

Page 77

1        MR. HILLEGAS:  Objection; form.
2    A.  No.
3    Q.  Do you have an understanding one way or
4  the other how often it is that parties to lawsuits
5  ask a Court to sanction the other side for not
6  properly preserving documents?
7        MR. HILLEGAS:  Objection; form.
8    A.  My only visibility into it is reading news
9  articles about it.  I'm not a lawyer.
10    Q.  So before you formed your opinions that
11  are expressed in this declaration, had you read news
12  coverage about Google and its chat preservation?
13    A.  No.
14        MR. HILLEGAS:  Objection; form.
15    Q.  So when you said "news coverage," are you
16  talking about generally, like not specific to
17  Google?
18    A.  Just in general.
19        When I think of spoliation, I think of bad
20  milk, not legal terms.
21        MR. HILLEGAS:  Please allow counsel to
22  finish her statement and then give me a chance to
23  actually object to that question, please.
24        MS. NAJAM:  He's not objecting to your
25  milk.  It's okay.

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 78

1    MR. HILLEGAS:  I'm not objecting to
2 the milk, but I -- I wasn't quite sure where the
3 question was ending on that.
4    THE WITNESS:  We should all object to
5 spoiled milk.
6    MR. HILLEGAS:  That's fair.
7    Q.  Okay.  So let's go to page 4 of your
8 declaration, paragraph 13.  Actually, the part of
9 your statement I want to look at is at the top of
10 page 5 where you say "I conclude."
11    Are you with me?
12    A.  Yes.
13    Q.  I conclude that it is likely that those
14 141 custodians sent approximately 2.8 million Google
15 Chat messages with the Google Chat history setting
16 "off" during 2022.
17    Did I read that right?
18    A.  That is correct.
19    Q.  So that is you dropping that halving,
20 h-a-l-v-i-n-g, that you had done in your December
21 report -- I'm sorry, your October report, right,
22 sir?
23    MR. HILLEGAS:  Objection; form.
24    A.  That is correct.
25    Q.  Did you learn of any new information in

Page 79

1 that intervening time, between your October report
2 and your December declaration, to cause you to
3 conclude that all 141 custodians on hold were, in
4 fact, still at Google in '22 and still on hold?
5    MR. HILLEGAS:  Objection; form.
6    A.  Not specifically, but in the intervening
7 time, Mr. Malkiewicz report was received, and I was
8 expecting to get an actual number for litigants for
9 that time period.
10    And, instead, Mr. Malkiewicz produced a
11 number of 202 employees, which caught me by surprise
12 because that's outside the 188 that Robert McCallum
13 had provided me in the spreadsheet.
14    At that point, I felt I didn't get a
15 correct number from Mr. Malkiewicz, so -- and he
16 didn't put the 188 number in his report either, so I
17 went with 141 custodians.
18    Q.  Okay.  So to recap that, that conservative
19 estimate that we saw in your October report, you're
20 now doubling that by removing that halving you had
21 previously done before, right?
22    MR. HILLEGAS:  Objection; form.
23    A.  That is correct.
24    Q.  What do you mean by "likely"?  Can you put
25 a percentage likelihood on your opinion from your

Page 80

1 December declaration that approximately 2.8 million
2 messages were sent with history off for those 141
3 custodians?
4    MR. HILLEGAS:  Objection; form.
5    A.  I cannot put a percent likelihood.
6    Q.  Is there a margin of error that you can
7 give us?
8    A.  Based upon the log dataset, I analyzed the
9 entirety of it, so the margin of error would be
10 zero.
11    Q.  The margin of error of zero applies to the
12 data that is found in the log dataset, right?
13    MR. HILLEGAS:  Objection; form.
14    A.  That is correct.
15    Q.  So in other words, a margin of error of
16 zero applies, in your view, to the number of
17 messages sent during the 68 days by those five
18 people with history off, right?
19    MR. HILLEGAS:  Objection; form.
20    A.  Yes, and the extrapolation out to the
21 larger number of custodians.
22    Q.  So your opinion is -- I'm sorry, I'm
23 getting confused.
24    When I asked you how likely is it that
25 2.8 million chat messages were sent in 2022 with the

Page 81

1 history off by the custodians in this lawsuit, you
2 said you couldn't put a number on the percentage
3 likelihood.
4    Did I hear you right?
5    A.  Correct.
6    Q.  If you can't tell us what percentage
7 likelihood that fact is true, the fact of
8 2.8 million messages, how are you also saying the
9 margin of error is zero?
10    MR. HILLEGAS:  Objection; form.
11    A.  Because I used the entirety of data that
12 was produced.
13    Q.  So you're assuming that there's no error
14 in taking the log dataset data and extrapolating it
15 across the remaining custodians for the entire year?
16    MR. HILLEGAS:  Objection; form.
17    A.  I have seen no evidence to the contrary.
18 I expected Mr. Malkiewicz to produce evidence to the
19 contrary regarding either message usage, different
20 log dataset, the number of custodians, and that
21 didn't happen.
22    MS. NAJAM:  Okay.  I object as
23 nonresponsive.
24    Q.  In terms of my original question of asking
25 you what is your margin of error in telling this

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 82

1  Court that 2.8 million chats were sent in 2022 with
2  history off by the litigation hold employees, when I
3  asked you if your margin of error was zero -- first
4  of all I'll pause there.
5       Are you with me so far?  I have recapped
6  your testimony properly?
7  A.  Yes.
8  Q.  You get there by assuming -- or, sorry, at
9  least -- you get there by concluding that you can
10  extrapolate.
11       Is that an accurate recap?
12  A.  Because of my conservative evaluation of
13  the dataset, yes.
14  Q.  So back to the question before that about
15  the likelihood, is it more than 50 percent likely
16  that 2.8 million chats were sent by litigation hold
17  custodians with history off in that year?
18       MR. HILLEGAS:  Objection; form.
19  A.  I cannot put a percent number on that
20  verbiage.
21  Q.  Okay.  Let's go with your more
22  conservative original number from your October
23  report.
24       Can you tell us how likely it is that in
25  2022, roughly 1.4 or 1.5 million chats were sent

Page 83

1  with history off by litigation hold employees?
2       MR. HILLEGAS:  Objection; form.
3  A.  Extrapolating from the dataset, more than
4  likely.
5  Q.  So more than 50 percent, but you can't put
6  more of a finer number on it; is that accurate?
7       MR. HILLEGAS:  Objection; form.
8  A.  No, I used all the data available.
9  Q.  When you say "I used all the data
10  available," we're just talking about the log
11  dataset, right?
12  A.  That's correct.
13  Q.  Okay.  So we have gone through that you
14  used all that data.
15       My question is:  Can you give the Court a
16  percentage likelihood that in 2022, 1.5 million
17  messages were sent by employees subject to a
18  litigation hold in this case with history off?
19       MR. HILLEGAS:  Objection; form.
20  A.  I cannot give a specific percentage.
21  Q.  We have talked about a couple numbers.
22  There's a couple of punch line numbers.  I think it
23  may help to show the spreadsheet, so I'm going to
24  mark it as Exhibit 4.
25       Please pass the extra down.

Page 84

1       Can you confirm for us that this is a
2  spreadsheet entitled Send/Receive Calculations that
3  you provided with your December reply report?
4       (Exhibit 4 marked.)
5  A.  Yes.
6  Q.  And, Professor, is the point of this to
7  show that you can reach even higher numbers than
8  $1.5 million -- sorry, I keep doing it --
9  1.5 million chats per year?
10       MR. HILLEGAS:  Objection; form.
11  A.  Correct.  The point was to show more of
12  the reasoning behind why I felt the 1.4 number was
13  conservative.
14  Q.  Okay.  And to arrive at any of these per
15  year totals in the second-to-last column, am I
16  correct that one assumption you have made is that if
17  someone was ever on a litigation hold for this case,
18  they must have sent chat messages in the year '22?
19       MR. HILLEGAS:  Objection; form.
20  Q.  I guess with the exclusion of your lower
21  bound number of 1.4 million?
22       MR. HILLEGAS:  Objection; form.
23  A.  Yes.  And you notice two rows below, that
24  was actually an upper/lower where I removed
25  Dr. Varian.

Page 85

1  Q.  Understood.
2       So did you -- I understand your criticism
3  of Mr. Malkiewicz not determining how many people
4  were actually on hold in '22 and were still there,
5  et cetera.
6       Did you undertake to determine how many of
7  the 141 employees had left Google before 2022?
8       MR. HILLEGAS:  Objection; form.
9  A.  I think I had asked counsel if we could
10  get employee records to make that determination.  I
11  can't remember what the reply was on that.
12  Q.  Did you undertake to determine how many of
13  the 141 had left the Display Ads business, to the
14  extent they were in it to begin with, by that date,
15  2022?
16       MR. HILLEGAS:  Objection; form.
17  A.  Same answer.
18  Q.  Can we at least agree that if someone had
19  left the Display Ads business by 2022 but was using
20  chat that year, that the odds that any particular
21  unpreserved message would have involved Display Ads
22  would be lower for that person?
23       MR. HILLEGAS:  Objection; form.
24  A.  Yes, but I also assumed that someone would
25  replace that person in their role.  Ad tech wasn't

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 86

1   shrinking; ad tech was just growing.
2           MS. NAJAM:  I'll object as
3   nonresponsive to everything past "yes."
4       Q.  Okay.  Can you tell me between 2019 and
5   2023 the number of annual employees in Google's
6   ad tech space?
7           MR. HILLEGAS:  Objection; form.
8       A.  I cannot.  It wasn't part of the dataset.
9       Q.  Okay.  And was it part of your -- any
10  expert engagement in this matter to determine the
11  size in terms of number of employees of Google's
12  Display Ads business?
13          MR. HILLEGAS:  Objection; form.
14      A.  No.
15      Q.  So your assumption that if somebody left
16  the business, they would have been replaced by
17  someone else who would be on legal hold, is that
18  just -- you're going off your gut there?
19          MR. HILLEGAS:  Objection; form.
20      A.  Going off industry expertise and 30 years
21  of doing this.
22      Q.  Do you have any data learned in this case
23  or in the industry to actually opine to the Court
24  that for sure if someone left the Display Ads
25  business before 2022, my numbers are unaffected

Page 87

1   because they would have been switched out by another
2   human?
3           MR. HILLEGAS:  Objection; form.
4       A.  Yes.
5       Q.  Is it just the fact that Display Ads as a
6   business grew over time?
7           MR. HILLEGAS:  Objection; form.
8       Q.  Let's do this a different way.
9           I think I have already asked you:  Do you
10  know the number of employees who were in Google's
11  Display Ads business in any particular year from
12  2019 to 2023?
13          MR. HILLEGAS:  Objection; form.
14      A.  I do not.
15      Q.  Okay.  So a minute ago you talked about
16  how Mr. Malkiewicz had referenced a higher count of
17  employees, and that count you're talking about is
18  202, right?
19      A.  Yes.
20      Q.  Okay.  So let's go to your -- actually,
21  let me show for you Mr. Malkiewicz's report.
22          I'm going to mark that as Exhibit 5.
23          MR. HILLEGAS:  We have been on the
24  record about an hour.
25          MS. NAJAM:  Okay.  This will be quick

Page 88

1   and then we can take a break.
2           (Exhibit 5 marked.)
3       Q.  So if you could go to his paragraph 18,
4   which is on page 9.
5       A.  I am there.
6       Q.  He references there that plaintiffs have
7   received the benefit of 202 custodians agreed across
8   this case.
9           So, Professor, is that your basis for
10  assuming that 202 employees were actually on
11  litigation hold in this case?
12          MR. HILLEGAS:  Objection; form.
13      A.  Yes.  I don't think he references 202 any
14  other time.
15      Q.  Do you know whether there can be a
16  difference between the group of employees whose
17  files a company is collecting versus a group of
18  employees who are subject to a litigation hold in a
19  case?
20          MR. HILLEGAS:  Objection; form.
21      A.  No.
22      Q.  Like, do you know whether you can produce
23  documents in a lawsuit from, you know, person A even
24  if person A was not a part of a litigation hold in
25  that particular case?

Page 89

1           MR. HILLEGAS:  Objection; form.
2       A.  I assume you can because you don't own the
3   records.
4       Q.  Sorry, I did not -- what do you mean by
5   "you don't own the records"?
6       A.  When you use a company resources to chat
7   or communicate, you don't own those.
8       Q.  Got it.  I think we're on the same page.
9           If it turns out that 202 employees were
10  not on litigation hold in this case in 2022 -- and
11  we're looking at your spreadsheet that is
12  Exhibit 4 -- then can we ignore the first two per
13  year counts here, the one that's approximately
14  8 million messages a year and approximately
15  4 million messages a year?
16          MR. HILLEGAS:  Objection; form.
17      A.  So to clarify, paragraph 18, he doesn't
18  mean 202 custodians?
19      Q.  No, I'm just asking if there is a
20  difference between a custodian whose stuff was
21  collected versus custodians who are on litigation
22  hold.  We have talked about that.
23          More specifically, I'm asking you:  If 202
24  is not the right number of folks that were on hold,
25  then can we ignore your top two numbers on your

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 90

1  spreadsheet of per year chats sent with history off?
2          MR. HILLEGAS: Objection; form.
3      A.  Yes.  I base that upon Mr. Malkiewicz's
4  report.  So if his report is wrong, those numbers
5  will be wrong.
6      Q.  Or if you misinterpreted his report and
7  there were not 202 employees subject to hold in this
8  case, then that would mean that the 8 and 4 million
9  should not be looked at?
10     A.  Correct.  I took "custodian" to mean under
11 litigation.
12     Q.  Okay.  Got it.
13     A.  Litigation hold.  I'm sorry.
14     Q.  Okay.  So I had asked you earlier if you
15 could put a percentage likelihood on your
16 calculations of 1.5 million a year or 2.8 million a
17 year.
18         I do want to ask the same question for
19 your estimations of 4 million and 8 million a year.
20         Can you give us a percentage likelihood,
21 assuming that 202 is correct?
22         MR. HILLEGAS:  Objection; form.
23     A.  I can't give a percentage likelihood.
24         MS. NAJAM:  Okay.  This is a good time
25 for a break.

Page 91

1          THE VIDEOGRAPHER:  Off the record,
2  11:25.
3          (Recess 11:25 a.m. to 11:41 a.m.)
4          THE VIDEOGRAPHER:  We're on the
5  record.  The time is 11:41.
6      Q.  Dr. Hochstetler, before our last break, we
7  talked a little bit about how you believed your
8  count of messages sent with history off during the
9  log period was conservative due to the intervening
10 holidays.
11         Do you recall that generally?
12         MR. HILLEGAS:  Objection; form.
13     A.  Yes.
14     Q.  Do you have some expertise, in your view,
15 on employees' patterns of the use of ephemeral
16 messaging, like, over the course of a year?
17         MR. HILLEGAS:  Object to the form.
18     A.  Having worked in industry for almost
19 30 years, people take PTO during the winter holiday.
20 I saw that reflected in the log dataset.
21     Q.  Have you ever studied trends in chat, that
22 is, ephemeral messaging usage, as a part of any
23 research you have done or any training you have had?
24         MR. HILLEGAS:  Objection; form.
25     A.  No.

Page 92

1      Q.  Do you know whether at public companies
2  there's an uptick in communications at end of
3  quarter for certain employees whose jobs relate to
4  reporting, financial reporting?
5          MR. HILLEGAS:  Objection; form.
6      Q.  Just for the record, are you looking for
7  the chart of the five employees in the log dataset?
8      A.  Yes, I am.
9      Q.  So you're free to look at that, but my
10 question is just whether generally whether you know
11 if at public companies, there's an uptick in
12 communication at quarter end for folks whose jobs
13 involve financial reporting?
14         MR. HILLEGAS:  Objection; form.
15     A.  No.
16     Q.  So I take it that's not something you
17 considered in determining whether you can
18 extrapolate from the log dataset to the rest of the
19 year for these folks or others?
20         MR. HILLEGAS:  Objection; form.
21     A.  Correct.
22     Q.  Did you consider the possibility that any
23 particular chat during the holiday time frame is
24 less likely to be business related around the
25 holidays?

Page 93

1          MR. HILLEGAS:  Objection; form.
2      A.  There were only a few chats sent around
3  the holidays at all.
4      Q.  How many chats with history off were sent
5  between, say, 12/21 and January 3rd?
6          Do you have that number handy?
7          MR. HILLEGAS:  Object to form.
8      A.  Maybe 300.
9      Q.  And where can I find that in your report?
10     A.  Figures -- this is the supplemental
11 expert.  Figures --
12     Q.  October?
13     A.  The supplemental.
14         And that would be Figure 5.
15     Q.  What page are you on?
16     A.  Sorry, page 26.
17         So Figure 5, Sundar Pichai sends 10, 20 --
18 maybe that's 30 between 12/21 and January 3rd.  Then
19 in Figure 6, which is ████████, maybe 150 there.
20 ████████ on Figure 7 sends -- the crosshatches are so
21 little, maybe 5.  ████████ sends none.  And then
22 ████████ or ████████ -- I'm honestly -- I'm
23 probably butchering the name -- sends about 150,
24 maybe a little bit more, maybe 170.
25     Q.  Sir, those add up to more than 300, right?

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 94

1    A.  I said around 300 -- maybe 300, around
2    300.
3    Q.  Do you know how many unpreserved chats
4    during the log period were along the lines of "happy
5    holidays" or "what are your plans for the break"?
6        MR. HILLEGAS:  Objection; form.
7    A.  I have no idea because they wouldn't be
8    retained.
9    Q.  But you said --
10    A.  They wouldn't be produced by Google.
11    Q.  But based on your decades of just general
12    work experience, can we at least agree that it's
13    possible that around the holidays, there's a higher
14    percent that chat messages with history off were not
15    even business related?
16        MR. HILLEGAS:  Objection; form.
17    A.  Possible but unlikely.  A good example
18    would be I send a message of "happy holidays" to my
19    reports one time.  I don't do it more than once.
20    That would be one chat.
21    Q.  So your testimony is that when you wish
22    someone "happy holidays" that you work with, that's
23    just going to be one message, no replies, no
24    responses about people's holiday plans, et cetera?
25        MR. HILLEGAS:  Objection; form.

Page 95

1    A.  I can't speak for everyone.  I personally
2    don't get involved in my reports' lives.  I try to
3    give them space.
4    Q.  Okay.  And do you know one way or the
5    other whether your personal experience of not
6    getting involved in your colleagues' lives, whether
7    that was the culture at Google?
8        MR. HILLEGAS:  Objection; form.
9    A.  I have no idea.
10    Q.  Okay.  Just to wrap that up, can we at
11    least agree that it is -- that it is possible that
12    chats sent around the holiday time frame related to
13    non-business matters that are specific to holiday
14    time?
15        MR. HILLEGAS:  Objection; form.
16    Q.  And I said "chats"; I meant chats with
17    history off.
18        MR. HILLEGAS:  Same objection.
19    A.  Yes.
20    Q.  All right.  So let's talk a little bit
21    more about the five custodians in the log dataset.
22        First of all, do you understand that the
23    reason their log data was produced to the states in
24    this ad tech case is solely because those particular
25    logs were among those produced in a different case

Page 96

1    called Play?
2        MR. HILLEGAS:  Objection; form.
3    A.  Yes, I understand those were the only logs
4    available because the rest were destroyed.
5    Q.  When you say "the rest were destroyed,"
6    what are you talking about?
7        MR. HILLEGAS:  Objection; form.
8    A.  Google keeps a rolling log, so those logs
9    are overwritten.
10    Q.  Okay.  And is there anything unusual in
11    your experience about these kinds of debugging logs
12    being rolling?
13        MR. HILLEGAS:  Objection; form.
14    A.  In my professional experience, the 55 days
15    seems low.
16        MS. NAJAM:  Okay.  I'll object as
17    nonresponsive.
18    Q.  Putting down -- putting aside the day
19    count, is there anything unusual in your experience
20    about a private company's debugging logs for instant
21    messages being rolling?
22        MR. HILLEGAS:  Objection; form.
23    A.  As long as we refer to these logs as
24    metadata, because some companies will include
25    communications in the logs also, correct, rolling is

Page 97

1    normal.
2    Q.  And by the way, how many private
3    companies -- you don't have to name them -- do you
4    actually have experience with in terms of metadata
5    logs for ephemeral messaging applications?
6        MR. HILLEGAS:  Objection; form.
7    A.  Four.
8    Q.  And it's those four companies that caused
9    you to opine a minute ago that you thought 55 days
10    was low?
11        MR. HILLEGAS:  Objection; form.
12    A.  The 55 days would be low for debugging
13    logs in general, not specifically for chat logs.
14    Q.  Got it.
15        Okay.  What was the Play case where these
16    logs originally came from, what was that about?
17    A.  As I recall, it was -- it was a lawsuit in
18    California about the Google Play Store with Epic
19    Games.  I think that's correct.
20    Q.  And what is --
21    A.  Sorry.
22    Q.  Sorry to interrupt you.
23        What is the Google Play Store?
24        MR. HILLEGAS:  Objection; form.
25    A.  It's the equivalent of the iOS App Store.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 98

1  It's a store where you can buy and download
2  applications for your mobile device, I think also
3  your computer.  I'm not certain on that.
4      Q.  Did the --
5      A.  It would be for phone or tablet.
6      Q.  Did the Play case, to your understanding,
7  have anything to do with Google's Display Ad
8  business or its ad -- display ad tech?
9      A.  I don't believe it did.
10         MR. HILLEGAS:  Objection; form.
11     Q.  Do you have an opinion on how any one of
12 the five custodians whose data was in the log
13 dataset, how their jobs compare to the remaining 136
14 legal hold employees in this case?
15         MR. HILLEGAS:  Objection; form.
16     A.  Can you clarify where the 136 came from?
17     Q.  I'm taking 141 and subtracting 5.
18     A.  Okay.  So we're not -- for the 2002 (sic)
19 year.
20     Q.  Yes.  '22.  2022.
21     A.  Yeah, sorry, 2022.
22         I understand that they were crossovers and
23 that's how Google was able to produce this dataset
24 consisting of -- solely consisting of these five
25 custodians because there was crossover.

Page 99

1      Q.  And when you say "crossover," you mean
2  these people were custodians from whose files
3  documents were taken in both the Play case and this
4  Google ad tech case, right?
5         That's what you mean by "crossover"?
6         MR. HILLEGAS:  Objection; form.
7      A.  I understand that they are under
8  litigation hold in both.
9      Q.  Okay.  Back to my original question.
10         Do you know how the jobs -- the day-to-day
11 job of any of those five compare to the remaining
12 136?
13         MR. HILLEGAS:  Objection; form.
14     A.  No, I have no info about the 136 outside
15 of their names.
16     Q.  Okay.  Then let's stick to the five.
17         Do you know whether any of those five were
18 directly involved in Google's Display Ads business
19 or its ad tech?
20         MR. HILLEGAS:  Objection; form.
21     A.  No.  My assignment was to analyze the
22 dataset, and this was the five custodians in their
23 entirety.
24     Q.  But you had access to the deposition
25 database in this case to run searches, right?

Page 100

1         MR. HILLEGAS:  Objection; form.
2      A.  Yes.
3      Q.  Did you search those depositions to --
4  with words to try to figure out who these people
5  were, these five, in terms of what their jobs were?
6      A.  It wouldn't affect my opinion so I didn't.
7      Q.  In terms of affecting your opinion, can we
8  agree that someone whose job is actually in the
9  Display Ads business is likely to send more messages
10 on the topic of Display Ads than, say, someone who
11 is not?
12         MR. HILLEGAS:  Objection; form.
13     A.  Yes.
14     Q.  Would the head of gaming, for example,
15 send more or less chat messages about display
16 ad tech than, say, a manager in Display Ads?
17         MR. HILLEGAS:  Objection; form.
18     A.  I think gaming may be a bad example
19 because I think gaming and Display Ads are tied
20 closely together.
21         But a different head of something, head of
22 Gmail -- there's ads in Gmail.
23     Q.  Let me ask --
24     A.  Yeah, can you clarify with a different
25 example?

Page 101

1      Q.  Sure.
2         Won't someone's actual job have an impact
3  on the average number of Display Ads-related chats
4  that person is going to send?
5         MR. HILLEGAS:  Objection; form.
6      A.  Yes.  The domain of their work is going to
7  affect the domain of their messages and
8  communications.
9      Q.  But I do want to revisit what you said a
10 second ago.  You said that gaming and Display Ads
11 are tied closely together.
12         What is your basis for that?
13         MR. HILLEGAS:  Objection; form.
14         MS. NAJAM:  What's the objection?
15         MR. HILLEGAS:  To the extent it
16 mischaracterizes.  I just don't have the realtime.
17         MS. NAJAM:  Oh, it's not working for
18 you?
19         MR. HILLEGAS:  No, no, I just don't
20 see it on there, so to the extent that you didn't
21 repeat the question, I'll lodge it as something.
22     Q.  So you said, I think gaming and Display
23 Ads are tied closely together.
24         Did I read that right from the realtime
25 transcript?

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 102

1    A.  Yes.
2    Q.  What's your basis for that?
3    A.  All the students I have that make free
4  games on the Play Store include ads to make money on
5  them.
6    Q.  Oh, okay.  Do you know -- I mean but --
7  you actually did extensive work to understand Google
8  ad technology that's the subject of this lawsuit,
9  right, sir?
10   A.  On the technology, yes.
11   Q.  Is it your understanding that what is at
12  issue in this lawsuit includes the ads that show up
13  in games?
14       MR. HILLEGAS:  Objection; form.
15   A.  I think DV360 may feed into that, but it
16  depends on what year because the stack changed year
17  by year, so it really depends what year we're
18  talking about.
19   Q.  All right.  To sum it up, it sounds like
20  you are unsure whether the ads that actually pop up
21  in games are even a part of this lawsuit?
22   A.  I don't believe they are.
23   Q.  Okay.  Can you tell us the actual rate of
24  preservation, that is, history on -- and by "rate,"
25  I mean percentage -- for chat messages sent by any

Page 103

1  person whose day-to-day job was in the Display Ads
2  business in 2022?
3    A.  No, I don't know any of these day-to-day
4  jobs.
5    Q.  Okay.  Is it possible that the rate of
6  preservation of chat messages for someone whose
7  day-to-day job did involve Display Ads that year was
8  100 percent?
9        MR. HILLEGAS:  Objection; form.
10   A.  Possible but unlikely.
11   Q.  What makes it unlikely to you?
12   A.  Because as I see from the log dataset,
13  most messages were not retained.
14   Q.  But the log -- back to the log dataset, do
15  you know if any of those five custodians actually
16  had a day-to-day job that involved Google Display
17  Ads?
18       MR. HILLEGAS:  Objection; form.
19   A.  Sundar Pichai is the CEO of Google, and
20  he's included in this log dataset.  I would assume
21  he would have an influence on the Google Display
22  Ads.
23   Q.  Okay.  You assumed he would have an
24  influence on that business because he's the CEO.
25       Did I recap that accurately?

Page 104

1    A.  Yes.
2    Q.  Do you know whether Sundar Pichai in 2022
3  had any direct involvement in the Google Display Ads
4  business?
5        MR. HILLEGAS:  Objection; form.
6    A.  No, it doesn't impact my opinions.
7    Q.  Okay.  So go back to my original question:
8  Can you tell us the rate of preservation of chat
9  messages for any person in the dataset or otherwise
10  whose day-to-day job was in the Display Ads
11  business?
12       MR. HILLEGAS:  Objection; form.
13   A.  No.  The dataset only included these five,
14  and all the information I had about them is their
15  title.
16   Q.  And you could glean from their titles that
17  none of them are Display Ads related, right?
18       MR. HILLEGAS:  Objection; form.
19   Q.  Other than as, as you testified, the CEO who
20  you think would influence the business?
21   A.  I would imagine ███████████████████
███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████
25   Q.  Okay.

Page 105

1    A.  For my analysis, these were the five that
2  were under litigation hold, and that's what I used
3  for my formulas and calculations.
4    Q.  I get that that's the data you had and
5  thus you used it.
6        But my question is whether you can even
7  glean from their titles that any of them had a
8  day-to-day role with Display Ads?
9    A.  Not from the few words of their titles.
10   Q.  So I want to --
11       MS. NAJAM:  Unless the soup patrol
12  sees soup.
13       MR. HILLEGAS:  I do not see soup
14  patrol, so...
15   Q.  I want to make sure I understand
16  everything -- let me ask you a first question.
17       Explain to us everything you did, if
18  anything, to confirm that the log dataset was a
19  representative sample for the remaining custodians
20  for you to extrapolate to the rest of those people
21  for days beyond 68 days.
22   A.  Sure.  So I first -- after we confirmed
23  the ID to name, looked at the titles.  These are
24  mostly directors and above.  Then as I started to
25  map out the sent messages, I saw that ████████ was

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 106

1  very low.  Not only was [redacted] message counts
2  extremely low compared to everyone else, but his
3  messaging was very sporadic.
4       Some weeks, well past the holidays, he
5  would send a few messages.  And by "a few," I mean,
6  like, two.  And that would be it.  And he would be
7  quiet for another week, which is, according to some
8  testimony, fairly atypical.  Then we had [redacted]
9  as you recall, had very high messaging count.
10      So with a outlier on the low side and an
11 outlier on the high side, including this low week,
12 week and a half at the end of December, I felt
13 confident that the numbers coming back were
14 conservative.
15    Q.  And so my question wasn't quite what --
16 about the conservativism.
17      The question is whether -- I want to know
18 everything you did to confirm that this sample was a
19 representative sample of the folks you're
20 extrapolating to, the remaining 136 custodians.
21      MR. HILLEGAS:  Objection; form.
22    A.  I had a lower bound and an upper bound.  I
23 have people that are working in executive positions
24 and people that aren't working in executive
25 positions.  Based upon that, this was a good

Page 107

1  representation of the rest of the custodians.
2    Q.  So you began by saying that these were all
3  mainly directors or above.
4      Did I hear that right?
5      MR. HILLEGAS:  Objection; form.
6    A.  Yes.  I'm honestly not certain within the
7  corporate ladder, so to speak, where [redacted]
8  falls.  I know it's an IC role, but I'm not certain
9  what kind of IC role on what level.
10   Q.  Okay.  But your original point was these
11 are folks with higher level jobs than your average
12 employee; is that accurate?
13   A.  These are not fresh employees or interns.
14 These would be people that are mid-career and above.
15   Q.  Did you do any analysis to compare the
16 percentage of mid-career folks in your sample set
17 versus mid-career and above in the remaining set,
18 the other 136?
19   A.  No.
20   Q.  And then the second thing you listed was
21 you noted that [redacted] was very low.  You said
22 according to some testimony, that was atypical.
23      Did I hear that right?
24   A.  The testimony wasn't that [redacted]
25 count was a low.  I was making a comparison that his

Page 108

1  was low compared to other people based upon their
2  individual testimony.
3       As I recall, no one testified about
4  --
5    Q.  Got it.
6    A.  -- message counts.
7    Q.  Did you determine how many folks in the
8  remaining 136 of the population send just as few
9  messages on average as [redacted]?
10   A.  As I stated earlier on, as part of
11 verifying this dataset, I did do searches to find
12 custodians talking about how many messages they
13 received or sent.  But as I stated earlier, most
14 were answering with a "I do not recall."
15   Q.  And some testified that they use it as
16 infrequently as [redacted], right, sir?
17      MR. HILLEGAS:  Objection; form.
18   A.  Yes.
19   Q.  So my question is:  Did you try to figure
20 out how many [redacted] are there in the remaining
21 136?
22   A.  I took many of the depositions with a
23 grain of salt simply because they said they used
24 chat for non-work purposes, but I found many chats
25 where they did not; they used it for work purposes.

Page 109

1       I did not count the number of [redacted].  I
2  used him as an outlier to offset [redacted] in the
3  dataset.
4    Q.  Okay.  When you say you took many
5  depositions with a grain of salt, the exceptions to
6  that would be the four you relied in your October
7  report and the additional four you added in your
8  rely-on section in the December report, right?
9    A.  As I recall, yes.
10      MR. HILLEGAS:  Objection; form.
11   Q.  Those eight deponents' testimony talking
12 about the frequency of their chat usage, that you're
13 relying on; is that true?
14   A.  As I recall, they produced concrete
15 numbers that I could use to validate this dataset.
16      MS. NAJAM:  Object as nonresponsive.
17   Q.  I just want to make sure I understand how
18 you started in terms of searching with keywords in
19 the database and where you ended with listing eight
20 Google employees' testimony and relying on it.
21   A.  I searched for usage.  And if they didn't
22 have usage, I discounted their testimony because I
23 couldn't use it to validate this dataset.
24   Q.  Wait, I'm sorry.  So the folks that you
25 have listed as deposition testimony that you relied

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 110

1  on, did you independently verify the numbers in
2  terms of chat messages they testified they would
3  send?
4        Were you able to independently verify it
5  somehow?
6            MR. HILLEGAS: Objection --
7  A. No.
8            MR. HILLEGAS: -- form.
9            THE WITNESS: Sorry.
10  A. No, Google destroyed that data for me to
11  verify it.
12            MS. NAJAM: Okay. I'll object as
13  nonresponsive to after "no."
14  Q. You said Google destroyed the data.
15        You're just talking about the fact that
16  these debugging logs are on a rolling basis, right?
17  A. Yes, that log was destroyed.
18  Q. The log is not actually destroyed; it's
19  just -- it shifts to the right as time passes,
20  right, in terms of the metadata preserved?
21            MR. HILLEGAS: Objection; form.
22  A. The data is no longer there; it's
23  overwritten.
24  Q. The metadata?
25  A. Correct.

Page 111

1  Q. Okay. So I'm still not quite following.
2        The depositions that you took with a grain
3  of salt of the people who said they used chat for
4  non-work purposes, explain to me all of your
5  reasoning for taking those with a grain of salt.
6  A. Because then when I searched in reveal, I
7  found chats produced by them that were retained that
8  were substantive work.
9  Q. Who are these people that we're talking
10  about?
11            MR. HILLEGAS: Objection; form.
12  A. I can't recall.
13  Q. Were any of them in your log dataset?
14            MR. HILLEGAS: Objection; form.
15  A. Yes. I direct you to the supplemental
16  report.
17  Q. October?
18  A. Yes. And Figure 10 and 11.
19  Q. Pages, please?
20  A. Oh, I'm sorry, 36 and 37.
21  Q. Okay. So whose testimony -- I'm sorry.
22        Whose testimony was inconsistent with what
23  we're looking at on pages 36 and 37?
24  A. I can't recall.
25  Q. Okay. While we're on this topic, Sundar

Page 112

1  Pichai, he was actually part of your log dataset,
2  right?
3  A. Correct.
4  Q. So one thing you could have done was
5  looked at his metadata for the 68 days and then
6  compared that to his deposition testimony on the
7  topic of chats, right, sir?
8            MR. HILLEGAS: Objection; form.
9  A. Yes.
10  Q. You didn't -- did you review his
11  deposition testimony from this case?
12  A. I don't think I did.
13  Q. Were you provided with his testimony from
14  any case on this topic of his use of chat?
15            MR. HILLEGAS: Objection; form.
16  A. As I recall, yes.
17  Q. What testimony did you review?
18  A. I don't recall.
19  Q. So you can't tell us whether his testimony
20  about his use of Google Chat was consistent or
21  inconsistent with the log dataset that you reviewed?
22  A. It wasn't part of my assignment.
23  Q. So the answer is no, you're not here to
24  tell us whether it was consistent or inconsistent,
25  right?

Page 113

1  A. No.
2  Q. That's not right? Sorry, I may have asked
3  it poorly.
4        Do you -- did you undertake to compare
5  Mr. Pichai's testimony about how he used chat?
6  A. I do not intend to opine on his use of
7  chat in his testimony versus what the chat log
8  dataset shows.
9  Q. Because that's not analysis that you did,
10  correct?
11  A. Correct.
12            MR. HILLEGAS: Objection; form.
13  Q. Back to your process for searching
14  depositions.
15        Did any employee, based on your searches,
16  testify that they sent chats with history off while
17  talking about ad tech or the Display Ads business?
18  A. No.
19  Q. Did you review any testimony where folks
20  were asked whether they complied with litigation
21  holds in this case?
22  A. No.
23  Q. Did you review any testimony about whether
24  folks turned retention to "on" when discussing a
25  topic that related to Display Ads?

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 114

1    A.   I recall several depositions -- maybe
2    ████, maybe ████ -- referring to the
3    February 8th, February 9th cutover where they could
4    no longer turn it off.
5        Q.   Did you review any testimony about --
6    sorry -- any testimony from a Google employee about
7    whether they did or did not turn history on or make
8    sure it was on when discussing Display Ads?
9            MR. HILLEGAS:  Objection; form.
10   A.   No.
11   Q.   Okay.
12   A.   It wouldn't have affected my opinion.
13           MS. NAJAM:  I'll object to that after
14   "no" as nonresponsive.
15   Q.   Let's switch gears.
16       Can you give me a definition of
17   "statistical significance"?
18   A.   Something with P less than 05.
19   Q.   And earlier you were unable to explain
20   what "P less than 05" meant.
21       Did you refresh yourself on the break?
22   Can you explain what that means?
23   A.   It's just not something that I work with.
24   Q.   Statistical significance is not something
25   that you work with?

Page 115

1    A.   P 05.  As I stated earlier, the only time
2    I really work with it is in -- where we have
3    multiple outputs.  So we have an ReLU and those
4    ReLU's have independent probabilities.  I think
5    computer science uses statistics more on the machine
6    learning side.
7    Q.   And that would be a different application
8    of statistics than, for example, what we're doing
9    here, that is, extrapolating data from this log
10   dataset to a larger universe.  Fair?
11   A.   I mean --
12           MR. HILLEGAS:  Objection; form.
13   A.   This is a simple averaging.  I wouldn't
14   even put this in the wheelhouse of statistics.
15   Q.   And the reason you say that is because you
16   took an average sent number of unretained per day
17   and you just multiplied it out?
18   A.   I took the average of who was provided in
19   the dataset and extrapolated that out to the number
20   of custodians, whether that be the 141 or the 202
21   number that Malkiewicz sited, that is correct.
22   Q.   So am I hearing you right to say that for
23   your opinions in this case, you did not think
24   statistical significance plays a role?
25           MR. HILLEGAS:  Objection; form.

Page 116

1    A.   There's no statistics involved because I
2    wasn't sampling.  If I was sampling, if I was
3    getting an end number from a larger dataset, then it
4    would have mattered, and that -- once you get to a
5    bigger end number, this had no sampling.  I was
6    using all the data provided to me.
7    Q.   The data provided to you was a subset of
8    custodians and a subset of days, right?
9    A.   It was the entirety of what was produced
10   by Google.
11   Q.   I'll ask it a different way.
12       Out of the 141 custodians, you only had
13   data for five, right?
14   A.   Correct.  As I understand, the rest were
15   destroyed.
16           MS. NAJAM:  Okay.  And I'll object to
17   that as nonresponsive.
18   Q.   Again, you're referring to the destruction
19   of something.
20       You're just talking about the fact that
21   these metadata logs are retained on a rolling basis,
22   right?
23   A.   They're overwritten, correct.
24   Q.   Okay.  So I'm going to have to ask my
25   question again.

Page 117

1        Out of the 141 custodians that were
2    subject to legal hold, you only had data for five,
3    correct?
4            MR. HILLEGAS:  Objection; form.
5    A.   That was all that was produced.
6    Q.   And out of the 365 days in a year, you
7    only had data for 68 days, correct?
8            MR. HILLEGAS:  Objection; form.
9    A.   Yes.  I want to clarify.  My calculation I
10   used 365.25.
11   Q.   To average the amount -- the length of a
12   year?
13   A.   Yes.
14   Q.   Given a leap year every four years?
15   A.   That's right.
16   Q.   All right.  We're going to use 365 for
17   convenience if that's okay.
18       Now you don't say in either of your
19   reports or your declaration that this is a
20   statistically significant sample set to extrapolate
21   to the rest.
22       I think I'm hearing you today your opinion
23   is that this concept of statistical significance
24   just doesn't matter here; is that right?
25           MR. HILLEGAS:  Objection; form.

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 118

1    A.  Correct.
2    Q.  But if we can do some math real quick.
3        Do you have a calculator handy, like your
4  phone, phone calculator?
5    A.  My phone is not in here.
6    Q.  Good.  You followed your counsel's
7  instruction.
8        MS. NAJAM:  Do y'all mind if I hand
9  him mine or do you want to hand him yours?
10       MR. HILLEGAS:  I do not mind if you
11 hand him your phone.
12   Q.  Okay.  Here you go.
13   A.  An iPhone.
14   Q.  Okay.  Multiplying the number of
15 custodians whose data you had times the number of
16 days that you had that data, that is 5 times 68.
17       Can you confirm for me that's 340?
18   A.  That is correct.
19   Q.  And then multiplying the total number of
20 custodians, assuming for these purposes it's 141,
21 multiplying that by the total number of days in a
22 year of 365, can you confirm for me that you get
23 51,465?
24       That is 141 times 365.
25   A.  I think we want to divide.

Page 119

1    Q.  Well, first I wanted to calculate days
2  times individuals in the log dataset, and then I
3  wanted to do days times custodians in the entire
4  population.
5        So, first, 5 custodians inside what you
6  had, the log dataset, times 68 days, that's 340,
7  right?
8    A.  Correct.
9    Q.  And then 141 custodians times 365 days.
10   A.  Okay.  So not -- so a separate
11 calculation.
12   Q.  Yes.
13   A.  51,000.
14   Q.  51,465?
15   A.  465.
16   Q.  And then if you divide those two numbers,
17 which I think you were jumping ahead, but we're
18 lawyers, we can't do that.
19       340 divided by 51,465.  What percentage do
20 you get?
21   A.  .66.
22   Q.  So in terms of the log dataset, can we
23 agree that it is less than 1 percent of the
24 population dataset that you're extrapolating it to,
25 that is, 141 custodians for an entire year?

Page 120

1        MR. HILLEGAS:  Objection; form.
2    A.  Yes.
3        Do you need your phone back?
4    Q.  Yes.  Thank you.
5        So can you explain, sir -- first of all,
6  is it your opinion that your results, that is, your
7  opinion that 1.5 million chats were sent with
8  history off in a year by the employees on litigation
9  hold or 2.8 million, that that is reliable and
10 trustworthy even if the sample that you had is not
11 statistically significant?
12   A.  I have seen no evidence to the contrary.
13   Q.  So is that a yes?  Should we -- can we
14 assume your results are reliable and trustworthy
15 even if they are not statistically significant?
16       MR. HILLEGAS:  Objection; form.
17   A.  I have seen no evidence to the contrary.
18   Q.  I'm going to ask the question again.
19       Should the Court conclude that your
20 results are reliable and trustworthy even if they're
21 not statistically significant?
22       MR. HILLEGAS:  Objection; form.
23   A.  Statistics isn't involved in this because
24 there wasn't sampling, so my opinion is reliable.
25   Q.  And you believe your opinion is reliable

Page 121

1  even if it represents less than 1 percent of the
2  total data -- sorry, total population of chats sent
3  by all the employees under litigation hold for a
4  year?
5        MR. HILLEGAS:  Objection; form.
6    A.  I have seen no evidence to the contrary.
7    Q.  Can you cite to us any study or industry
8  publication or authority that would support that if
9  your sample set constitutes less than 1 percent of
10 your total population, it's fine to draw conclusions
11 from that less than 1 percent sample set that apply
12 to the rest of the population?
13       MR. HILLEGAS:  Objection; form.
14   A.  This is how most polling is conducted.
15   Q.  Have you done polling before?
16   A.  Yes.
17   Q.  What kind of polling?
18   A.  Political polling.
19   Q.  And how -- tell me, what was your -- what
20 was your statistical basis in terms of making sure
21 that your sample set was going to be reflective of
22 the rest of the population within some confidence
23 interval?
24       MR. HILLEGAS:  Objection; form.
25   A.  It was vendor software.  I didn't write

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 122

1  the vendor software.
2      Q.  So are you able to tell us how you made
3  sure that the folks being called were, in fact,
4  representative of the general population of voters?
5          MR. HILLEGAS:  Objection; form.
6      A.  The demographic software did that.
7      Q.  Okay.  So --
8          MR. HILLEGAS:  Counsel, lunch has
9  appeared outside.
10         MS. NAJAM:  Okay.  Thanks.  I'll wrap
11  this up soon.
12     Q.  I'm sorry.  So where we get off on this
13  political polling, are you telling me that you
14  participated in some political polling where
15  somebody decided that sampling less than 1 percent
16  of the population would be an accurate measure of
17  the remaining population?
18     A.  So if we take 180 million voters in the
19  U.S., what is -- can I borrow your calculator?
20     Q.  Yes.
21     A.  What is our number?  .66, I think, was the
22  number we arrived at times 180 million.  So that
23  leaves 118,000 people that have to be polled to
24  determine an NBC news poll for president or
25  political party.  Most polling is conducted with a

Page 123

1  sample size of 800 to 1,200 as I recall.
2      Q.  What are you recalling this from?  What is
3  your experience with polling?
4          MR. HILLEGAS:  Objection; form.
5      A.  I am not an expert in polling; I'm a
6  layperson.
7      Q.  Okay.  So besides your layperson
8  experience with political polling, can you provide
9  any instances where you were actually, like,
10  professionally involved where -- like in your work
11  or your research or at the university where you were
12  part of a study where less than 1 percent of the
13  population was sampled to draw conclusions about the
14  remaining population?
15         MR. HILLEGAS:  Objection; form.
16     A.  Yes.
17     Q.  What is that?
18     A.  I participated on several projects
19  regarding self-driving vehicles and sampling from
20  sensors there across different fusions would be less
21  than 1 percent.
22     Q.  Sampling for what purpose?
23     A.  Oh, camera, LiDAR, any sort of ultrasonics
24  or GPS.  Sampling happens a lot less than 1 percent
25  there.

Page 124

1      Q.  Are we talking about, like, auditing,
2  like, making sure things are working like they're
3  supposed to?
4          MR. HILLEGAS:  Objection; form.
5      A.  No, those would back-feed and actually
6  drive the slam, which is how vehicles' robots drive.
7      Q.  I'm not following.  Tell me how data was
8  taken from some percentage that was less than
9  1 percent and then extrapolated to be data
10  applicable to the remaining population.
11     A.  So you have a bunch of sensors on a
12  vehicle.  Most of the vehicles that we had that we
13  had set up -- we had 12 cameras.  We then had maybe
14  8 ultrasonics, which are like what you would call
15  parking sensors.  They won't work within, like,
16  6 feet or less.  And we had LiDAR front and back,
17  because it's a dome on top, along with radar, also
18  GPS and IMU unit.
19         Each of those were sampling at less than
20  1 percent to get a picture of the world.  And then
21  they average that over time because sensors are
22  faulty, there's noise in the system.
23         So that less than 1 percent sampling then
24  fuses together to produce a picture of the outside
25  world because we can't just tell a computer "you're

Page 125

1  on the road, you're on the sidewalk"; it has to know
2  that.
3      Q.  Okay.  Besides this example you have given
4  about self-driving vehicle cameras to get a picture
5  of the world for the car to operate, are there any
6  other examples you can give us where less than
7  1 percent was enough?
8      A.  Normally sampling telemetry on high TPS,
9  you're going to look for a .1 to 1 percent sampling
10  rate.
11     Q.  I'm sorry, I don't know what telemetry --
12     A.  Sorry.  Sorry, sorry, sorry.
13         MR. HILLEGAS:  Please let her finish
14  asking her question before you respond.
15     Q.  What is "telemetry" and what is "high
16  TPS"?
17     A.  So telemetry is -- any time we have a
18  request coming in, we can moniker that request.  And
19  I'm trying to think of an analogy and it's not
20  coming to me.
21         You're at a trading desk -- you're at the
22  NASDAQ floor doing trades.  Millions of volumes of
23  trades are coming in.  You can't look at every
24  single one.  You can't -- there's no system that can
25  really handle it.

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 126

1     So, instead, your telemetry system is
2  going to sample usually 1 percent or less and verify
3  are these meeting SLAs, service level agreements,
4  are they timing correctly, do they actually return
5  with proper results, and are they consumable by the
6  end party. So telemetry can sort of trace things
7  down.
8     I am talking at a very high level about
9  this.
10    But you can add more to telemetry to
11 increase or decrease what systems it touched. So
12 you can grab samples from more systems.
13    Q. Okay. I understand.
14    MS. NAJAM: We can break for lunch
15 now.
16    THE VIDEOGRAPHER: Off the record,
17 12:32.
18    (Recess 12:32 p.m. to 1:26 p.m.)
19    THE VIDEOGRAPHER: We're on the
20 record. The time is 1:26.
21    Q. Dr. Hochstetler, before we took our lunch
22 break, you were giving me some examples where a
23 sample sizes were less than 1 percent.
24    Do you recall that generally?
25    A. Yes.

Page 127

1     Q. One that you gave had to do with your
2  involvement with some -- I think you said some
3  software that was used to take political polls; is
4  that right?
5     A. That's correct.
6     Q. Did that software ensure that it was using
7  a random sample or do you not know?
8     MR. HILLEGAS: Objection; form.
9     A. I don't know.
10    Q. Given your -- I think you called it
11 personal experience with polls, the samples that are
12 taken, they endeavor to be random, right?
13    MR. HILLEGAS: Objection; form.
14    A. There's different kinds of random. I
15 think in particular they would segment out a
16 specific part of a demographic, like ages 18 to 35,
17 ages 35 to 45. So I didn't know what demographic
18 was being sampled. I don't believe it was truly
19 rolling the dice random.
20    Q. Whatever the demographic chosen to be
21 analyzed was, within that demographic, the samples
22 would have been random, right?
23    A. Yes.
24    Q. And then I wanted to ask you a little bit
25 more about the example you gave regarding your work

Page 128

1  on autonomous vehicles, self-driving cars?
2     A. Yes.
3     Q. The sensors that were being sampled, were
4  they sampled at random?
5     A. Yes and no. You would have random
6  sampling and it also have steady-state sampling,
7  which would be usually by hertz, so many times a
8  second. But you would correlate those both together
9  to make sure you had an accurate measurement.
10    Q. So the random one with the steady-state
11 one?
12    A. Yes.
13    Q. And, sorry, I meant to ask you this
14 earlier.
15    The work that you were describing, was
16 that in connection with your dissertation?
17    MR. HILLEGAS: Objection; form.
18    Q. The sampling of the sensors for the
19 self-driving vehicles?
20    A. Not really. My dissertation was a level
21 above that. But I was in the lab for self-driving
22 and autonomous vehicles, so I was one of the
23 laboratory scientists, for better term, that would
24 be doing work on those.
25    Q. Did you ever do any work for Waymo?

Page 129

1     A. No.
2     Q. Back to the stuff we're talking about in
3  this case, the log dataset, can we agree that was
4  not a random sample?
5     MR. HILLEGAS: Objection; form.
6     A. I'm not certain if it was.
7     Q. You're not certain one way or the other is
8  your point?
9     A. I am not certain if it was a random
10 dataset.
11    Q. Well, we covered earlier that the reason
12 that log dataset in particular was produced at the
13 plaintiffs in this case is because those five
14 custodians overlapped two different cases.
15    Do you recall that?
16    A. Yes.
17    Q. That's not a random sample, is it?
18    MR. HILLEGAS: Objection; form.
19    A. I had no ability to sample, so it couldn't
20 be a random sample.
21    Q. Okay. So let's talk about the term
22 "sample of convenience," which you addressed in your
23 December report.
24    To recap, am I right that your opinion is
25 the log dataset is not a sample of convenience as

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 130

1  you understand that term?
2      A.  What paragraph am I referring to?
3      Q.  You can go to pages 11 to 12,
4  paragraph 26.
5      A.  I'm there.
6      Q.  Okay.  So I'll repeat my question.
7      Am I hearing you correctly that you don't
8  believe that you were working with a sample of
9  convenience?
10     A.  That is correct.
11     Q.  And then I notice that in Footnote 34,
12  your basis for that is an article about sociology
13  experiments; is that right?
14     A.  Yes.
15     Q.  The article is about when a researcher
16  chooses human subjects based on who he or she could
17  conveniently rope in, right?
18     A.  As I recall, yes.
19     Q.  And is that the sole basis that you don't
20  think you were working with a sample of convenience,
21  that is, you didn't rope conveniently anybody in?
22     A.  That's correct.
23     Q.  Putting aside whether it's Google's or
24  someone else's fault that the log dataset only
25  covers five people, only covers 68 days, can we

Page 131

1  agree that whose fault it is does not change whether
2  a sample is truly representative of the entire
3  population?
4          MR. HILLEGAS:  Objection; form.
5      A.  Correct.
6      Q.  Did you, in connection with your work on
7  this case, look for any surveys or studies about the
8  use of ephemeral messaging amongst tech employees in
9  any time frame?
10         MR. HILLEGAS:  Objection; form.
11     A.  No.
12     Q.  Can you -- are you able to tell us what
13  the formula is for statistics in calculating a
14  Z-score?
15         MR. HILLEGAS:  Objection; form.
16     A.  For Z-test?
17     Q.  Yes.
18     A.  And not G-squared?
19     Q.  No, Z.
20     A.  Not off the top of my head.
21     Q.  Do you know what a Type I error is in
22  statistical hypothesis testing?
23         MR. HILLEGAS:  Objection; form.
24     A.  I vaguely recollect it.
25     Q.  What is it?

Page 132

1      A.  When we have a -- when your Z-test error
2  rate is too high.
3      Q.  Is that the -- is that all you recollect?
4      A.  Yes.
5      Q.  And then can you tell us the relationship
6  between t-scores and p-values?
7          MR. HILLEGAS:  Objection; form.
8      A.  I can't recall.
9      Q.  Can you tell us the difference between the
10  formula for calculating a standard deviation for
11  your sample set versus the formula for calculating
12  the standard deviation for your entire population?
13     A.  If I had the entire population, I could
14  definitely do that.
15     Q.  What is the difference between the
16  formulas used for calculating the standard deviation
17  for your sample set versus your entire population?
18     A.  The formulas are the same; I just don't
19  have the entire population.  It was rolled.  It was
20  destroyed, overwritten.
21     Q.  Can you tell us the formula for
22  calculating a margin of error?
23     A.  Not off the top of my head.
24     Q.  Is it the same or different from your
25  Z-score?

Page 133

1      A.  I think it may be the same.
2      Q.  Let me ask you this:  Did you use any of
3  these concepts or statistical tools to arrive at
4  the -- your ultimate opinion in this case about the
5  number of sent chat messages per year with history
6  off?
7      A.  No.  It was not necessary.
8      Q.  So I want to talk about some of the
9  deposition testimony that you did rely on.
10         Let's go to your October report, which is
11  Exhibit 1, page 23.
12         In Footnote 89, you see that you cite
13  three Google employee transcripts for the
14  proposition that the number of chat messages sent
15  and received by the five custodians in your log
16  dataset isn't uncommonly high and are much lower
17  than other employees on hold?
18         Do you see that?
19     A.  Yes.
20     Q.  And the three employees that you're citing
21  for that proposition are ████, ████, and Korula,
22  correct?
23     A.  Correct.
24     Q.  Sir, are these examples of instances where
25  you ran a search term across a database and then

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 134

1  that's how you located relevant testimony?
2      A.  Yes.
3      Q.  Did you only review the portions of the
4  transcripts where your search terms hit or did you
5  also review other portions?
6      A.  It depends on the testimony.
7      Q.  Okay.  So then let's just take them one by
8  one.  I'm going to start with Korula.  It's the last
9  one you cite.
10          You cite him for saying he maybe sent or
11  received 500 individual messages a day, right?
12      A.  Correct.
13      Q.  Didn't Mr. Korula also testify that this
14  was not a constant number and that it varied
15  depending on his position at the time?
16      A.  That's correct.
17      Q.  But you didn't -- you didn't note that in
18  your report, right?
19      A.  I did not.
20      Q.  And testifying that 500 a day isn't
21  constant, it varies, that is much different, isn't
22  it, than saying this employee sent hundreds of
23  messages a day?
24          MR. HILLEGAS:  Objection; form.
25      A.  That is different.

Page 135

1      Q.  And then a similar question for ██████
2  there.  You cite him for saying that on some days,
3  he has hundreds of chats, right, sir?
4      A.  That's correct.
5      Q.  By the way, did you take that to mean
6  messages as opposed to conversations or groups?
7      A.  Yes.  Many of the employees interchanged
8  them between each other.
9      Q.  Okay.  But ██████ also testified that
10  the average number of chat messages he would send on
11  any given day was highly variable, didn't he?
12          MR. HILLEGAS:  Objection; form.
13      A.  I believe that's correct.
14      Q.  And that, too, is different than saying, I
15  sent hundreds of chats every day.
16          MR. HILLEGAS:  Objection; form.
17      Q.  Right?
18          MR. HILLEGAS:  Object to form.
19      A.  Yes.  And I used that as a basis to
20  validate my data.
21      Q.  But my point, sir, is when an employee
22  says, you know, the number of chats I send on a
23  daily basis is highly variable, highly variable,
24  that is very different from citing an employee to
25  say, I send hundreds a day.  Right?

Page 136

1          MR. HILLEGAS:  Objection; form.
2      A.  As I stated earlier, I was using that as a
3  check to ensure the numbers were good.  If ██████ or
4  ██████ stated they sent a thousand a day and I
5  didn't see that kind of usage in the actual log
6  dataset, I would have known something is wrong.
7  There's a spot there where either my analysis is
8  wrong or the data is wrong.  So I was using them as
9  a check.
10          Now, each one of these five custodians has
11  a variable number.  They are not constantly sending
12  a hundred or 500 per day.  In fact, I don't even
13  think -- even ██████ doesn't get as high as 500 a
14  day.
15          MS. NAJAM:  I'll object as
16  nonresponsive.
17      Q.  To recap ██████, you cite him for
18  saying that on some days, he has hundreds of chats.
19  But you did not mention in your report that he also
20  testified that, well, the average per day is
21  actually highly variable.  Correct?
22          MR. HILLEGAS:  Objection; form.
23      A.  I do not cite that.
24      Q.  Then similar question for ██████,
25  that deponent you cite for saying it -- he could

Page 137

1  have easily sent over a hundred messages per day.
2          Do you see that?
3      A.  Yes.
4      Q.  Didn't ██████ also say that his actual
5  numbers depending on the day, including what the
6  discussion of the day was?
7          MR. HILLEGAS:  Objection; form.
8      A.  Yes.  That was expected.
9      Q.  But that is what he testified, right?
10      A.  That's correct.
11      Q.  So just to be clear, for Footnote 89, the
12  testimony you are citing there showed that there was
13  a wide variation in the daily amount of chat
14  messages sent even for a particular employee, right?
15          MR. HILLEGAS:  Objection; form.
16      A.  Yes, that was expected.
17      Q.  And, in fact, there was also a wide
18  variation in the message volume amongst the five
19  employees and the log dataset, correct?
20      A.  That is correct.
21      Q.  And we talked about your lower and your
22  upper, ██████ sent 244 whereas ██████
23  sent over 5,000 total in the log period, right?
24      A.  That's correct.
25      Q.  Sorry, I don't know why I left out

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 138

1    ██████ at the low end of 36 total, right?
2         MR. HILLEGAS:  Objection; form.
3    A.  That's correct.
4    Q.  Given the wide variation and the number of
5    chats sent by just those five during the log period,
6    can we agree that it's likely there's also wide
7    variation in message volume among the remaining 136
8    custodians?
9         MR. HILLEGAS:  Objection; form.
10   A.  I have seen no evidence to the contrary.
11   Q.  So to remove the negative from the answer,
12   given what you saw amongst the five, is it likely
13   that there's a wide variation in number of chats
14   sent per day among the remaining 136?
15        MR. HILLEGAS:  Objection; form.
16   A.  I have seen no such evidence.
17   Q.  You have seen no evidence of wide
18   variation?
19   A.  Correct.
20   Q.  You have actually not seen the chat
21   metadata logs at all for those remaining 136,
22   correct?
23   A.  That is correct.
24   Q.  So I want to go back to the metadata that
25   you saw.

Page 139

1         There was wide variation in the number of
2    messages those five folks sent per day, right?
3         MR. HILLEGAS:  Objection; form.
4    A.  There was wide variation in the number of
5    messages they testified they sent.
6    Q.  I'm talking about the five custodians in
7    your log dataset.
8    A.  Sorry, I saw the 136.  I thought that's
9    what you were referring to.
10        Yes, there's wide variation in this
11   dataset.
12   Q.  Among the five?
13   A.  That's correct.
14   Q.  Isn't it likely there's also wide
15   variation amongst the remaining 136 whose metadata
16   you don't have?
17        MR. HILLEGAS:  Objection; form.
18   A.  So when you say "wide variation," you are
19   comparing it to the wide variation inside the
20   dataset?
21   Q.  I'm just using the phrase as you used it.
22   You used it in talking about the five within the
23   dataset.
24        So I'm asking:  Can we also expect to see
25   wide variation amongst the remaining 136?

Page 140

1    A.  I have seen no evidence.  All I had was
2    the five and the dataset to go from.  We have highs
3    and lows, which averaged out.
4    Q.  Sir, in this case you are taking an
5    average messages sent per day that you derive from
6    the five and you're extrapolating it for the other
7    136, right?
8    A.  That is correct.
9    Q.  And it is your expert opinion that it's
10   perfectly reasonable to do that, right?
11   A.  That is correct.
12   Q.  So what I'm asking is:  Is it also
13   perfectly reasonable to extrapolate that if there
14   was wide variation in number of messages sent for
15   these five, there's going to be wide variation in
16   the rest of your population, that 136?
17   A.  It's possible but highly unlikely.
18   Q.  What makes you think there's not going to
19   be wide variation, just as wide as you found in the
20   sample set, amongst the remaining 136?
21   A.  For two reasons.  The sample set I
22   currently have that was provided in its entirety
23   already had highs and lows.  So we already saw
24   variation within that.  I would expect that to be
25   representative of the larger dataset.

Page 141

1         Additionally, in Mr. Malkiewicz' response,
2    he provided no evidence to the contrary.
3    Q.  We may be missing each other.  Let's start
4    from the beginning.
5         When you opine that there's a wide
6    variation in message volume amongst the five
7    employees in the log dataset, your point is there's
8    a big gap between ██████ and ██████,
9    right?
10   A.  That's correct.
11   Q.  And even amongst the folks in between
12   there, right?
13   A.  Yes.  And not only from Table 7 the volume
14   but also the average number of days, so the actual
15   activity and usage.
16   Q.  Okay.  But let's just stick to your
17   opinion about wide variation in message volume.
18        When you say "message volume," you mean
19   the number of chats they sent in the log period,
20   right?
21   A.  Yes.  Yes.
22   Q.  Or you can average it per day and it's the
23   same result, right?
24   A.  Correct.
25   Q.  Okay.  Explain to me why we cannot also

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 142

1 assume that there will be wide variation, the way
2 you use it, in message volume amongst the other 136.
3      A.   Variation that will be different than
4 these five?
5      Q.   Just wide variation amongst the 136, not
6 these five.
7      A.   So not compared to these one --
8      Q.   Correct.
9      A.   Yes.
10      Q.   So in your reply report, the December
11 report which is marked as Exhibit 2, let's -- we
12 already looked at the end of your report that you
13 listed some additional depositions of Google's
14 employees.
15           Do you recall that?
16      A.   Yes.
17      Q.   They're listed on page 26 of your reply
18 report.
19      A.   I'm there.
20      Q.   And obviously the first one, ███████,
21 that's not -- that was a -- what was called a
22 30(b)(6) deposition, that is, a deposition on behalf
23 of the company on certain topics; is that right?
24      A.   Yes.
25      Q.   Okay.  So I want to focus on the five you

Page 143

1 have listed below there, like Google employees who
2 were giving their testimony about their personal
3 practices.
4           The only thing you are relying on these
5 five, that is, Jayaram, Korula, ███████, ███████,
6 and ███████ is for the proposition that employees
7 use chat just as much as email, right?
8      A.   Yes.
9      Q.   Okay.  And so if we turn to page 23 of
10 that same report, Footnote 91, you have some pages
11 and lines cited there for each of these depositions.
12           Do you see that?  Footnote 91.
13      A.   Oh, yes.
14      Q.   And is your point that what these folks
15 said on those pages and lines supports your
16 assumption that employees use chat just as much as
17 email?
18      A.   Yes.
19      Q.   Are you sure that is, in fact, what these
20 cited pages and lines say?
21           MR. HILLEGAS:  Objection; form.
22      A.   As I recall.
23      Q.   Okay.  So let's take ███████ as an
24 example.
25           And just to be clear, that is someone

Page 144

1 whose testimony you're citing here in support of the
2 generalization that employees use chats just as much
3 as email, right?
4      A.   Yes.
5      Q.   I'm handing you what I'll mark as
6 Exhibit 6.  It's an excerpt of ████████████
7 deposition.
8           (Exhibit 6 marked.)
9           MS. NAJAM:  Please pass the others
10 down.
11      Q.   And you cite page/line 74:11 to 16, do you
12 see that, in your --
13      A.   Yes.
14      Q.   Sorry.
15           -- in your report?
16      A.   Yes.
17      Q.   Okay.  So I have highlighted that on
18 Exhibit 6 for you.
19           And what she says is she was asked:  On
20 some days do you send more chats than emails?
21           And she says:  It's possible.
22           So, Dr. Hochstetler, is that the testimony
23 you meant to cite here?
24      A.   11 to 16?
25      Q.   Yes.

Page 145

1      A.   Yes.
2      Q.   Okay.  That's just an employee saying I
3 may have sent some more chats than emails on some
4 days, right?
5      A.   That's correct.
6      Q.   Let's look at the next one that you
7 cited -- sorry, not the next one, but you also cited
8 ███████  I'm probably butchering that name.
9           I'm going to mark that as Exhibit 7.
10           Before we look at that, Dr. Hochstetler,
11 saying, well, I may have sent more chats than emails
12 on some days, that is different than an employee
13 saying, I use them equally --
14           MR. HILLEGAS:  Objection; form.
15      Q.   -- right?
16      A.   I took it to mean it's possible.
17      Q.   Okay.  But in your reply report, your
18 opinion is -- I'm reading from paragraph 59,
19 "Despite Google's employees testifying that they
20 used chat at least as often as email," that's --
21 that's what you put in this report, right?
22      A.   That is correct.
23      Q.   So what we just saw with ███████ is
24 all she said is it's possible on some days, right --
25           MR. HILLEGAS:  Objection; form.

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 146

1   Q.  -- which is different?
2   A.  She stated --
3          MR. HILLEGAS:  Same objection.
4   A.  -- it's possible.
5   Q.  So ▮▮▮▮▮ deposition, you are citing
6   at page/lines 79:21 to 80:12.
7        Do you see that in your Footnote?
8   A.  That is correct.
9          (Exhibit 7 marked.)
10  Q.  Okay.  So let's see on Exhibit 7 what
11  those pages and lines say.
12        It starts with the witness saying:  No.
13  What I mean is I haven't counted up the number of
14  types I've sent an email in a day and counted up the
15  number of times I've sent a chat in a day.
16        It doesn't say anything about the
17  magnitude of the count.  All I know -- I don't know
18  whether I use chat more than email is really the
19  answer to your question because I haven't really
20  looked at that.
21        I use email frequently.  I use chat
22  frequently.  I don't know which is more.
23        Did I read that right?
24  A.  That is correct.
25  Q.  So this testimony that you're citing

Page 147

1   actually has an employee saying, you know, I don't
2   know which one I use more, right?
3   A.  Correct.  They followed with:  I use email
4   frequently.  I use chat frequently.  I don't know
5   which is more.
6   Q.  Sir, this is not testimony of equal use of
7   chats and email, is it?
8          MR. HILLEGAS:  Objection; form.
9   A.  I took it to mean approximately equal.
10  Q.  You took ▮▮▮▮ testimony that I
11  just read to mean that this employee uses chat and
12  email equally?
13  A.  Approximately.
14         MR. HILLEGAS:  Objection; form.
15  A.  Approximately equally.
16  Q.  Approximately.
17        Did you take similar liberties with other
18  testimony that you cited for this proposition?
19         MR. HILLEGAS:  Objection; form.
20  A.  I'll read back from the ▮▮▮▮
21  deposition the same lines:  On some days do you send
22  more chats than emails?  It's possible.
23  Q.  Okay.  Besides ▮▮▮▮, which I showed
24  you, and ▮▮▮, which I've showed you, did you also
25  liberally construe other folks' testimony on this

Page 148

1   topic of whether they really use chat as much as
2   email?
3          MR. HILLEGAS:  Objection; form.
4   A.  I wouldn't construct that as liberal use.
5   Q.  Okay.  So the two examples we saw, you
6   think you cited them accurately in support of your
7   proposition here that employees used -- employees
8   used chat just as much as email?
9          MR. HILLEGAS:  Objection; form.
10  A.  Yes.
11  Q.  And I take it the way -- your view of
12  citing deposition testimony in support of an
13  opinion, is that how you approach the rest of your
14  work in this -- as it relates to chat logs?
15         MR. HILLEGAS:  Objection; form.
16  Q.  That was a bad question.  Let me rephrase
17  it.
18        When you went searching through the
19  database to find folks' testimony on their use of
20  Google Chats, are the two examples we just looked
21  at, ▮▮▮▮ and ▮▮▮, are they representative of
22  how you approached that task for other parts of your
23  work?
24         MR. HILLEGAS:  Objection; form.
25  A.  They are representative in the sense that

Page 149

1   I used the same keyword searches to find the same
2   relevant sections of testimony.
3   Q.  Okay.  So one of them -- ▮▮▮ said, I
4   don't know which one I use more.
5        And then you cited him as saying employees
6   used both equally, right?
7   A.  I took to mean that he could not quantify
8   and "used email frequently and I used chat
9   frequently, I don't know which is more" to mean
10  about approximately equal.
11  Q.  Okay.  Understood.
12        Viewing all the deposition testimony that
13  you reviewed, whether you relied on it and put it in
14  your reports or not, are you able to testify under
15  oath that all of the employees subject to a
16  litigation hold in this case had similar chat
17  behavior?
18         MR. HILLEGAS:  Objection; form.
19  A.  No.  The only data I have is from the five
20  custodians in the dataset.
21  Q.  But you said you went searching through
22  database using some search words.
23        So viewing that deposition testimony --
24  all of it, not just what you put in your report --
25  are you able to testify under oath that employees on

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 150

1 a litigation hold in this case had similar chat
2 behavior?
3        MR. HILLEGAS:  Objection; form.
4     A.  Using the sample that Google provided in
5 the log dataset, I can extrapolate that out to the
6 other 136 or the other number of custodians
7 Malkiewicz cites.
8     Q.  So we have seen your extrapolation.  And I
9 understand -- it's a quantitative extrapolation.
10 There's a number on it.  I'm asking about
11 qualitative.
12        You have looked at a bunch of deposition
13 testimony.  Whether cited in your report or not, can
14 you tell us under oath that that entire set of 141
15 custodians, they all had similar chat behavior in
16 the year 2022?
17        MR. HILLEGAS:  Objection; form.
18     A.  No.
19     Q.  Do you have an opinion on how the five in
20 your dataset, how their chat frequency -- so I'm
21 going to call it daily message volume -- compares to
22 any specific one of the remaining 136?
23        MR. HILLEGAS:  Objection; form.
24     A.  Google has not produced any data about any
25 of the other 136.

Page 151

1     Q.  But, sir, you just said that you looked at
2 produced chat messages and you looked at deposition
3 testimony.
4        Am I right so far?
5     A.  That's correct.
6     Q.  Do you have an opinion in this case on how
7 the five in the dataset, their daily message volume,
8 compares to any specific one of the remaining 136
9 employees?
10        MR. HILLEGAS:  Objection; form.
11     A.  No.
12     Q.  Do you have an opinion on how the five in
13 the dataset, how their practices in terms of the
14 retention setting being on or off, compares to any
15 specific one of the remaining 136 employees?
16        MR. HILLEGAS:  Objection; form.
17     A.  I have no data on that.
18     Q.  So no opinion, right?
19        MR. HILLEGAS:  Objection; form.
20     A.  They would have to, after February 8th,
21 have retention forced on.  So any messages after
22 that date, Google implemented the automatic system
23 to move into Vault.
24     Q.  Okay.  So let me rephrase my question.
25        Do you have an opinion on whether --

Page 152

1 sorry, on how the five custodians in the dataset
2 prior to February 8, 2023, how their practices when
3 it comes to the retention setting being off or on
4 compares to any specific one of the remaining 136
5 employees?
6        MR. HILLEGAS:  Objection; form.
7     A.  No.
8     Q.  Are you just -- are you assuming for
9 purposes of this case that, on average, it's going
10 to be the same because -- I believe this is in your
11 words -- there's no evidence to the contrary?
12        MR. HILLEGAS:  Objection; form.
13     A.  Sorry, there was a lot of clauses in that.
14 Let me reread it.
15     Q.  Let me ask a better question.
16        Am I correct that you determined for the
17 five in the dataset, their chat frequency and you
18 determined their history "on" and history "off"
19 settings, and you're assuming that that average for
20 those two things is going to be the same for the
21 rest of the population?
22        MR. HILLEGAS:  Objection; form.
23     A.  It wasn't an assumption.  I looked at the
24 dataset.  I had highs.  I had lows.  I correlated
25 that between weekdays versus weekends, in addition

Page 153

1 with the two-week holiday gap.
2        And from there, I can reasonably assure
3 that because of the difference in the variation in
4 this dataset, it would correspond to the larger
5 population of litigants on hold.
6     Q.  Let's try it this way.  I'm going to take
7 you to your declaration.  It's Exhibit 3.  Page 6,
8 paragraph 21.
9        Are you there?
10     A.  Yes.
11     Q.  You write:  I have seen no evidence that
12 suggests that the five custodians' use of Google
13 Chat messages reflected in the log dataset,
14 specifically the sending and receiving of Google
15 Chat message with the Google Chat history setting
16 "off," is not reflective of the way other Google
17 employees under a litigation hold in this case used
18 Google Chat or the Google Chat history setting.
19        Did I read that correctly?
20     A.  That is correct.
21     Q.  So I want to get rid of the double
22 negative.  It started with "I have seen no evidence"
23 and ended with "it's not reflective."
24        Are you -- isn't it true, sir, you are
25 assuming for purposes of your ultimate opinion that

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 154

1  these five's use of chats, including retention
2  settings, is reflective of the remaining custodians?
3      MR. HILLEGAS: Objection; form.
4      A. I'm not assuming. I have seen no evidence
5  that disputes it.
6      Q. For something to be disputed, somebody
7  first needs to contend it, right?
8      A. I thought that's what --
9      MR. HILLEGAS: Objection; form.
10      A. -- Mr. Malkiewicz did.
11      Q. Is it your opinion -- okay. I'm not
12  asking if there's evidence or not evidence.
13      I'm just asking you: If you take the
14  stand in this case, are you going to get up there
15  and say, It is my expert opinion that these five in
16  the log dataset, that their chat behavior in terms
17  of number of messages sent with history off is, in
18  fact, reflective of the remaining 136, their
19  practices?
20      MR. HILLEGAS: Objection; form.
21      A. My opinion is there's no evidence to the
22  contrary.
23      Q. And because if there is no evidence to the
24  contrary, that's why you feel it's reasonable to
25  extrapolate; is that accurate?

Page 155

1      MR. HILLEGAS: Objection; form.
2      A. Yes. I felt if there was evidence, Google
3  would have produced it.
4      Q. Okay. But, sir, I thought you testified
5  earlier that when you went searching through
6  depositions, you did see individuals say that I
7  don't use chat very much, right?
8      MR. HILLEGAS: Objection; form.
9      A. That's correct.
10      Q. And those are the kinds of deposition
11  testimony that you decided to take with a grain of
12  salt?
13      MR. HILLEGAS: Objection; form.
14      A. Yes.
15      Q. Did you look for any testimony from
16  witnesses who said, I made sure the retention
17  setting was "history on" for anything related to a
18  litigation hold?
19      A. No.
20      Q. Did you look for testimony from witnesses
21  who testified their practice was to have retention
22  on for anything business related?
23      A. Yes.
24      Q. Did you find any?
25      A. No.

Page 156

1      Q. So you don't recall any -- any deponent --
2  any witness in this case testifying that their
3  practice was to make sure retention was on if it was
4  ad tech related?
5      A. No. I searched for the five in the
6  dataset and did not see that.
7      Q. Okay. Let's -- we're off track, but now
8  that we're off track, you're back to talking about
9  the five in the dataset, right?
10      A. Yes.
11      Q. One of those people in that five was
12  Sundar Pichai, right?
13      A. Correct.
14      Q. And I thought you testified earlier that
15  you actually don't remember reviewing his deposition
16  testimony in this case about his practices when it
17  came to retaining chat messages.
18      A. I searched for it; I don't remember
19  getting a hit on it.
20      Q. Okay. So back to where we got off track
21  with Mr. Pichai.
22      Did you look for testimony from any Google
23  employee about their specific practice for chatting
24  on topics that are subject to a litigation hold?
25      A. No.

Page 157

1      Q. Did you see testimony from witnesses who
2  said they mainly used chat for scheduling meetings
3  or chitchat?
4      MR. HILLEGAS: Objection; form.
5      A. Yes.
6      Q. Is that the kind of testimony you took
7  with a grain of salt?
8      MR. HILLEGAS: Objection; form.
9      A. And I believe one employee said they only
10  use it for, essentially, non-work purposes; happy
11  birthdays and things like that.
12      Q. Tell me how the testimony that you saw
13  from Google employees who said they mainly use it
14  for scheduling or happy birthdays, how did that
15  enter your analysis if at all?
16      A. It didn't enter my analysis at all.
17      Q. So in your declaration -- I want to go to
18  a different page, page 5, paragraph 16.
19      You say: I have seen no evidence that
20  suggests that Google employees under a litigation
21  hold would send fewer chats with the Google Chat
22  history setting "off" in any year during the
23  relevant period.
24      A. That is correct.
25      Q. By the way, what is "relevant period"? Is

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 158

1  it 2019 to 2022?
2      A.  I can't recall off the top of my head.
3      Q.  Well, go ahead and review this
4  declaration.
5          You're aware this was filed with the
6  Court, right, in support of the motion seeking
7  sanctions?
8      A.  Yes.
9      Q.  This term that you're trying to figure
10  out, I just -- I don't know if it helps you, but you
11  use the term "relevant period" in paragraphs 16 and
12  17 and 20 and 22 and 23.
13     A.  (Reviewed document.)  It would be the
14  period of the lawsuit.
15     Q.  What's the period of the lawsuit?
16     A.  I cannot recall.
17     Q.  And when you say "period of the lawsuit,"
18  are you talking about your understanding of the time
19  period in which the alleged misconduct occurred or
20  do you mean once the lawsuit was filed?
21     A.  It would have to be when the lawsuit was
22  filed, up and to, I believe it was, March '23 when
23  collection stopped.
24     Q.  Okay.  So best that you are able to tell
25  us today, the relevant period is the filing of this

Page 159

1  lawsuit until March 2023?
2      A.  The first quarter, yes.
3      Q.  Okay.  So where we were was paragraph 16
4  that I had just read to you.
5          My question for you is:  What kind of
6  evidence would there be, Professor Hochstetler, that
7  would suggest that employees under litigation hold
8  would send fewer chats with history off than your
9  sample set, your five custodians during the log
10  period?
11     A.  Any sort of logging, any sort of
12  telemetry, I have yet to see anything produced by
13  Google that would show me that.
14     Q.  Okay.  So in paragraph 16, you're talking
15  about metadata or telemetry?
16     A.  Yes.
17     Q.  Deposition testimony to you, it wouldn't
18  count; is that accurate?
19         MR. HILLEGAS:  Objection; form.
20     A.  I was focused on the log datasets.
21     Q.  So when you say "I have seen no evidence"
22  in paragraph 16, you're excluding from that meaning
23  of evidence deposition testimony, true?
24         MR. HILLEGAS:  Objection; form.
25     A.  I did not include deposition.

Page 160

1      Q.  Okay.  Let me ask you this question:  Does
2  it matter to your opinion whether the log dataset
3  punch line of the number of sent messages with a
4  history off, does it matter whether that data is, in
5  fact, representative of the remaining custodians?
6          MR. HILLEGAS:  Objection; form.
7      A.  Clarify "does it matter."
8      Q.  The opinion that you are planning to offer
9  the Court in terms of the number of sent messages
10  with history off in any given year, for that
11  opinion, does it matter to you as an expert whether
12  your sample was representative of the rest?
13     A.  As stated earlier, by analyzing the
14  entirety of the dataset, I had both highs and lows
15  both sides of outliers.  And taking that,
16  extrapolating it across the time period which
17  included both weekends and the holidays, this
18  provided a conservative estimate, which I have
19  already given.
20     Q.  So what's the answer to my question?
21         Does it matter to your opinion whether or
22  not the log dataset is truly representative of the
23  remaining population in terms of how many sent
24  messages took place with the history off?
25     A.  I have seen no evidence that it's not.

Page 161

1      Q.  That is not my question.
2          I want to know how important it is to your
3  opinion whether, in reality, the remaining 136
4  custodians' chat practices really are similar to
5  what you found amongst the five.
6          MR. HILLEGAS:  Objection; form.
7      A.  The only data I had to work with was the
8  five custodians.  If I have data on the 136 other
9  custodians, I would gladly analyze that and reduce
10  that approximate 1.4 million to an exact hard figure
11  of chats destroyed.
12     Q.  But, sir, the data you keep saying is
13  missing, you're talking about metadata on the
14  debugging logs, right?
15     A.  Yes.  I don't need to care about the
16  contents of the messages.
17     Q.  You had deposition testimony available to
18  you in the form of a searchable database and you
19  reviewed some, right?
20         MR. HILLEGAS:  Objection; form.
21     A.  Yes.
22     Q.  So back to my original question.
23         Does it matter when you tell the Court,
24  hey, I think X number of chat messages were sent
25  with the history off for your litigation hold

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 162

1 employees in whatever year, does it matter to that
2 opinion whether the Court determines that your
3 sample set is truly representative of everybody
4 else?
5         MR. HILLEGAS: Objection; form.
6     A. I have seen no evidence that it is not
7 representative.
8     Q. Assume with me that it's not, would your
9 opinion be the same?
10         MR. HILLEGAS: Objection; form.
11     A. I don't like making assumptions.
12     Q. So I'm asking you as an expert to
13 hypothesize with me. Okay.
14         In my hypothetical world where your log
15 dataset is not representative of the remaining 136
16 custodians in terms of sending a message with
17 history off, then your opinion is not reliable,
18 true?
19         MR. HILLEGAS: Objection; form.
20     A. I believe I have already answered your
21 hypothetical. If I had extra data, I would have
22 analyzed it.
23     Q. No, my hypothetical is not giving you more
24 data. In my hypothetical world, turns out that
25 you're log dataset is not a representative sample

Page 163

1 for the remaining population in terms of sent
2 messages with history off.
3         In my hypothetical world, can the Court
4 still rely on your calculation of the number of sent
5 messages that weren't retained by litigation hold
6 employees in any year?
7         MR. HILLEGAS: Objection; form.
8     A. So in your hypothetical, to clarify, the
9 dataset that Google produced with the five
10 custodians, including the CEO, that is based around
11 the holiday period with low message volume with both
12 highs and low senders as outliers is not
13 representative of the larger dataset of litigants on
14 hold?
15     Q. So so far we're together. Yes, please
16 assume so.
17         Then the question now is: Can the Court
18 still rely on your calculation of chat messages lost
19 by Google per year by the litigation hold employees?
20         MR. HILLEGAS: Objection; form.
21     A. Yes.
22     Q. How is that so if your sample is not
23 representative? Explain that.
24         MR. HILLEGAS: Objection; form.
25     A. My sample is representative.

Page 164

1     Q. Okay. So try to stay with me here. We're
2 in a hypothetical world where that sample is not
3 representative of the number of messages that the
4 remaining custodians sent with history off. It's
5 not representative.
6         In that world, am I right that your
7 opinion would not be reliable?
8         MR. HILLEGAS: Objection; form.
9     Q. Your opinion of the annual number of
10 messages lost for litigation hold custodians.
11         MR. HILLEGAS: Same objection.
12     A. So in this hypothetical, I have been
13 provided new information about the other custodians?
14     Q. We don't need go into the weeds.
15         The hypothetical is your sample
16 population's chat behavior with history off
17 is not representative of the remaining 136.
18         In that world, isn't it true that your
19 calculations of messages lost per year is not
20 reliable?
21         MR. HILLEGAS: Objection; form.
22     A. I don't agree that this is going into the
23 weeds. This is the basis of the extrapolation.
24     Q. Sir, you just extrapolated because you
25 found no evidence to the contrary, right?

Page 165

1         That's what you just said in your
2 declaration?
3     A. That is correct.
4     Q. Okay. So the hypothetical -- I'm trying
5 to figure out -- maybe the answer -- we can approach
6 it this way.
7         You would like the Court to believe your
8 opinion, whether it's 1.4, 1.5, or 1.8, the number
9 of messages not preserved by Google per year.
10         Does it matter to you whether the 136
11 custodians that weren't in your dataset, whether
12 their practices in terms of toggling on or using
13 chat were different than the five in your set?
14         MR. HILLEGAS: Objection; form.
15     A. If I was provided new evidence, I would
16 revise my opinion and issue a new report.
17     Q. Because your current numbers would not be
18 reliable --
19         MR. HILLEGAS: Objection; form.
20     Q. -- right?
21         You would have to modify your opinions is
22 what you're saying?
23     A. With new data, yes.
24     Q. Okay. So one of the things you talked
25 about earlier today was the pandemic and folks

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 166

1  working from home.
2      Did you -- are you assuming that when
3  folks at Google were working from home due to the
4  pandemic, they would have used chat more frequently?
5          MR. HILLEGAS: Objection; form.
6      A.  If they're working from home, yes.
7      Q.  Okay. And I'm not -- this is in your
8  declaration, right? Look at paragraph 17.
9      Again, again, it's framed as: I have seen
10 no evidence that suggests that the number of Google
11 Chat messages sent and received by relevant Google
12 employees under a litigation hold would have been
13 lower in any other years during the relevant period
14 than in 2022.
15     And then in the next paragraph, you talk
16 about the pandemic.
17     Do you see that?
18     A.  That's correct.
19         MR. HILLEGAS: Counsel, I think we
20 have been on the record about an hour, so if you're
21 reaching a stopping point.
22         MS. NAJAM: Yes, I am.
23     Q.  So during the pandemic when people were
24 working from home, isn't that when video meetings
25 and calls started taking off more, like Zoom or

Page 167

1  Microsoft Teams or Google's video conferencing?
2          MR. HILLEGAS: Objection; form.
3      A.  I believe so.
4      Q.  In fact, based on your personal
5  experience, do you recall that that's when video
6  chat started being used more frequently by
7  businesses?
8      A.  I can't opine on all businesses. I
9  personally in both of my full-time jobs used Zoom
10 and other various video chats previously because of
11 the geographic limitations.
12     Q.  Okay. But can we at least agree that
13 based on your experience, Zoom -- I mean, most of us
14 wish we had bought stock in it before the pandemic.
15     Like, these things took off during the
16 pandemic, right?
17         MR. HILLEGAS: Objection; form.
18     A.  I believe so, yes.
19     Q.  Besides your personal experience, do you
20 have any other authority for your opinion that
21 Google employees would have used chat more during
22 the work from home phase of pandemic?
23     A.  No.
24     Q.  When folks are not face-to-face to
25 chitchat about non-business matters, can we agree

Page 168

1  they're more likely to use chat to do that rather
2  than email?
3          MR. HILLEGAS: Objection; form.
4      A.  I'm not certain.
5      Q.  Do you know whether there's a higher
6  likelihood that "history off" chats sent during the
7  work from home phase of pandemic were not business
8  related?
9          MR. HILLEGAS: Objection; form.
10     A.  I have no evidence for that.
11     Q.  Well, what about personal experience, when
12 folks were working from home during the pandemic and
13 they wanted to write to each other non-work related
14 things, were they more likely to use an instant
15 messaging tool or email?
16     A.  For personal communication, at both my
17 businesses I'm not allowed to use either, so I
18 resort to tools like Discord.
19     Q.  What's Discord?
20     A.  Discord is another messaging system.
21     Q.  An instant messaging or...
22     A.  There's instant messaging, group
23 messaging, video, audio, and then streaming.
24     Q.  Okay. And that would be over, for
25 example, email?

Page 169

1          MR. HILLEGAS: Objection; form.
2      Q.  As distinct from email?
3      A.  Yes.
4          MS. NAJAM: We can take a break.
5          THE VIDEOGRAPHER: Off the record,
6  2:27.
7      (Recess 2:27 p.m. to 2:42 p.m.)
8          THE VIDEOGRAPHER: We're on the
9  record. The time is 2:42.
10     Q.  Professor Hochstetler, I want to ask you
11 about some opinions in your original report on page
12 4.
13         MR. HILLEGAS: Are you talking about
14 the supplemental, not the --
15         MS. NAJAM: It's called supplemental.
16 It's the one dated October. Sorry.
17         MR. HILLEGAS: When you say original
18 because he has the first set.
19         MS. NAJAM: I'm sorry. I'm sorry.
20         MR. HILLEGAS: Thank you.
21         MS. NAJAM: Original Chat-related
22 report.
23         MR. HILLEGAS: Appreciate that. Thank
24 you.
25     A.  I am there.

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 170

1    Q.  Paragraph 7(b).  You note there that none
2  of the -- and I'm paraphrasing.  None of the five
3  custodians in your Log Dataset personally toggled
4  the history on despite being instructed to do so
5  when discussing irrelevant topics; is that accurate?
6    A.  That's correct.
7    Q.  Is it correct that based on your review of
8  the metadata, none of these five custodians toggled
9  history off either, right?
10   A.  Correct.
11   Q.  And how many groups involving any of these
12  five was retention already toggled to "on" at the
13  beginning of the log period?
14   A.  I can't recall the exact number.
15   Q.  But there were instances of groups, as you
16  use the term in your report, already having the
17  setting on at the beginning of the log period,
18  right?
19   A.  That's correct.
20   Q.  By the way, we should have made this
21  clarification earlier.
22       A group in the context of Google Chat is
23  just like it sounds, a group of people talking, a
24  group of people who are on the same -- who are
25  conversing.  I'll just leave it at that.

Page 171

1       MR. HILLEGAS:  Objection; form.
2    A.  Yes, it could also be one-on-one DMs.
3    Q.  Sure.  So if I am on -- if I'm messaging
4  just you, that group would be you and me, right?
5    A.  Correct.
6    Q.  And if Peter, you, and I are all messaging
7  each other together simultaneously, that would be a
8  group.  I say simultaneously.  Let me -- let me try
9  to state that more artfully.
10      If I'm sending a message to the two of
11  you, then the group is Peter, you, and me, right?
12   A.  Yes.  And it could be a named group, as I
13  understand, and that would have ███████████████.
14   Q.  And each individual message in terms of
15  the metadata, you saw metadata on various messages
16  that in my example might be exchanged among the
17  group, right?
18       MR. HILLEGAS:  Objection; form.
19   Q.  If I type something to the group Peter and
20  Professor Hochstetler, you call that a message,
21  right?
22   A.  That is correct.
23   Q.  And if in Vault there are several messages
24  within that group that are then saved in Vault, you
25  call that a conversation, right?

Page 172

1    A.  Yes, I believe that's the right
2  terminology.
3    Q.  Okay.  So back to where I was asking
4  about.  Am I correct that in certain Chat
5  conversations that are reflected in the Log Dataset
6  that included these five, there were several
7  instances where someone else in the group, even if
8  not these five, did toggle history on, true?
9    A.  That is correct.
10   Q.  So back to paragraph 7(b), you have a
11  reference there, per Google's documentation, as I
12  understand they were instructed by Google to do if
13  they were subject to a litigation hold and discussed
14  a relevant topic.
15       Do you see where I read that from?
16   A.  Yes.
17   Q.  Before forming the opinions in your
18  October report, did you actually review the actual
19  instructions that were given to folks who were on
20  legal hold in connection with this suit?
21   A.  Yes.
22   Q.  Look at -- you didn't rely on them,
23  though; is that accurate?
24   A.  No.
25   Q.  It's not accurate?  Let me remove the

Page 173

1  double negative.
2       Did you -- you're saying you reviewed the
3  instructions given to employees; is that right?
4    A.  I skimmed them.
5    Q.  You skimmed them.  What parts?
6    A.  The basic instructions.
7    Q.  How many sets of instructions did you look
8  at?
9    A.  Just one.
10   Q.  Let's look at your -- page 43 of this
11  report.  That's where your materials relied on
12  documents from production list start, right?
13   A.  That's correct.
14   Q.  So none of these are actually any
15  litigation holds produced by Google, are they?
16   A.  I don't believe so.  I know the CSVs
17  aren't.
18   Q.  Okay.  If you looked at them, why weren't
19  they listed in Appendix A?  Or, sorry.
20       If you skimmed one, why isn't it listed in
21  Appendix A?
22       MR. HILLEGAS:  Objection; form.
23   A.  I didn't rely upon it.
24   Q.  Okay.  In fact, if you look at page 11 of
25  your report, paragraph 18.  Your second sentence

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 174

1  says, I understand that a litigation hold is an
2  instruction to preserve any records and information
3  that are relevant to an anticipated or ongoing
4  lawsuit.
5          And then you cite an article you read
6  online. Do you see that?
7      A. That's correct.
8      Q. Did your understanding of what a
9  litigation hold is, did that come from this online
10  article?
11      A. As I recall, yes.
12      Q. What do you remember -- the actual
13  litigation hold language that you said you skipped,
14  what did it say?
15      A. I can't recall.
16      Q. That wasn't important to you enough for
17  your opinion to remember what the actual
18  instructions were?
19          MR. HILLEGAS: Objection; form.
20      A. That is correct. It had nothing to do
21  with the dataset.
22      Q. Isn't one of your opinions in this case
23  that Google employees who were on litigation hold
24  failed to follow instructions to keep relevant
25  messages?

Page 175

1      A. I believe the opinion that applied to this
2  is 7(a), which is the vast majority of individual
3  messages sent in the Google Chat included in a Log
4  Dataset were not preserved because they were sent
5  with the Chat retention history setting off,
6  ██████████████.
7          I calculated that more than 87 percent of
8  all messages, at least 18,566 out of a total of
9  around 21,269, were lost during that 68-day period
10  covered by the Log Dataset.
11      Q. So I read your report. You don't need to
12  read 7(a). I'll ask the question again in a clearer
13  form.
14          Is it your opinion in this case that
15  Google employees who were subject to a litigation
16  hold failed to follow their litigation hold
17  instructions on retaining relevant messages?
18          MR. HILLEGAS: Objection; form.
19      Q. Are you -- sorry, it has been over a
20  minute.
21          Are you unable to answer the question?
22          MR. HILLEGAS: Objection; form.
23      A. I don't want to speak to the relevancy
24  because it didn't involve the dataset.
25      Q. You don't want to speak to relevancy of

Page 176

1  unretained messages, that's what you mean outside of
2  the -- I'm sorry, wait a second.
3          Are you able to speak to the relevancy of
4  any unpreserved messages, whether in your Log
5  Dataset or otherwise?
6          MR. HILLEGAS: Objection; form.
7      A. As they are part of the dataset, yes.
8      Q. Okay. Let's take that one by one.
9          Are you saying that relevant messages were
10  not preserved during the log period?
11          MR. HILLEGAS: Objection; form.
12      A. Relevant or pertinent?
13      Q. Let's go backwards a little further.
14          What is your understanding of what people
15  on litigation hold were instructed to retain?
16      A. Any talk or communication that was
17  pertinent to that litigation, whatever that
18  litigation may be.
19      Q. And the word "pertinent," I'm not going to
20  find that in either of your reports or your
21  declaration, am I, sir?
22          MR. HILLEGAS: Objection; form.
23      A. I believe I did use that word.
24      Q. Are you sure you didn't use solely the
25  word "relevant"?

Page 177

1      A. (Reviewed documents.)
2      Q. Let's not waste time on that. I'll ask a
3  new question and it was similar to the one that we
4  got off track.
5          Is it your expert opinion in this case
6  that Google employees didn't abide by litigation
7  hold instructions?
8          MR. HILLEGAS: Objection; form.
9      A. It is my opinion that messages were lost
10  and never made it to Vault.
11          MS. NAJAM: Okay. I'll object as
12  nonresponsive.
13      Q. And I'm using word "relevant" because it's
14  in your reports and your declaration.
15          Do you have an opinion in this case as to
16  whether Google's employees failed to comply with
17  their litigation holds?
18      A. Yes, messages were lost.
19      Q. Messages that pertained to this
20  litigation?
21      A. Messages relevant to the dataset.
22      Q. I'm not talking about the dataset, so
23  let's back up.
24          What is your understanding of the meaning
25  of relevance in the context of a notice saying, hey

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 178

1  people, make sure to retain relevant documents of
2  this litigation?  What does relevant mean?
3        MR. HILLEGAS:  Objection; form.
4     A.  Any communication related to that.
5     Q.  Related to what?
6     A.  To the -- to the litigation.
7     Q.  Is it your expert opinion that employees
8  who received a litigation hold notice in this
9  lawsuit nonetheless failed to make sure history was
10  "on" when sending a message related to this
11  litigation?
12        MR. HILLEGAS:  Objection; form.
13     A.  I wouldn't see that from the dataset
14  because the dataset would actually show that as
15  permanent and Vault would have picked it up and
16  those pertinent messages would have been seen.
17        MS. NAJAM:  Objection; nonresponsive.
18     Q.  Is your answer no, I don't have an expert
19  opinion on that because I lack the data?
20        MR. HILLEGAS:  Objection; form.
21     A.  The dataset didn't include that.
22     Q.  Do you have an expert opinion on whether
23  the litigation hold employees who were told to
24  retain Chat messages that may be relevant, that they
25  just didn't comply with the holds?

Page 179

1        MR. HILLEGAS:  Objection to form.
2     Q.  Or is that outside of your expert opinion
3  on this case?
4        MR. HILLEGAS:  Objection; form.
5     A.  The dataset doesn't show one way or the
6  other because it doesn't include the contents.  It
7  only includes the metadata.
8     Q.  So you don't have an opinion on the issue,
9  true?
10        MR. HILLEGAS:  Objection; form.
11     A.  On the dataset, I have no opinion on that.
12     Q.  I'm not asking about the dataset.  I'm
13  asking about the employees outside of the dataset
14  who received litigation hold notes.  Are you going
15  to show up in court and say they failed to comply
16  with their litigation hold notices?
17        MR. HILLEGAS:  Objection; form.
18     A.  My opinion is regarding the lost messages.
19     Q.  Well, you opinion went beyond that, right,
20  sir?  It went beyond the number of lost messages,
21  right?
22        MR. HILLEGAS:  Objection; form.
23     A.  Yes, because it was February 8th when
24  Google finally implemented the automatic and forced
25  history on for those litigants.

Page 180

1     Q.  We will get to the exact words of yours.
2        MS. NAJAM:  Can we turn realtime off
3  or not have him on one because he's not even
4  listening to my questions.  He's waiting until to ask
5  them.  Then he's reading them on realtime and then
6  20 seconds pass.  It's building in a huge time delay.
7        MR. HILLEGAS:  The witness is entitled
8  to a realtime transcript.
9        MS. NAJAM:  Under what rule?
10        MR. HILLEGAS:  If you want to stop
11  this deposition to take away the witness's realtime,
12  we will leave.
13        MS. NAJAM:  I would not stop the
14  deposition.  My question to you is whether you object
15  to me taking away his realtime iPad.  If you're --
16        MR. HILLEGAS:  I do object to --
17        MS. NAJAM:  If he can't testify, he
18  can't testify without the realtime, we'll leave it.
19        THE WITNESS:  I have a lot of hearing
20  loss from stuff overseas so I rely upon reading.
21        MS. NAJAM:  Sorry.  Because this
22  morning you weren't really looking at it and now it
23  seems like every question so I didn't realize.
24        THE WITNESS:  Sorry, the clauses have
25  gotten longer and longer.

Page 181

1     Q.  Okay.  Let's just look at the litigation
2  holds that were produced in this case.  I'm going to
3  mark Exhibit 8.
4        MS. NAJAM:  Can you hand those down,
5  please.
6        (Exhibit 8 marked.)
7     Q.  Let's look at the page ending in 450.  It
8  references three separate investigations of Google's
9  search and advertising products from some
10  governmental bodies.  Do you see that?  And the
11  coalition of -- sorry, governmental bodies and a
12  coalition of state attorney generals in that first
13  paragraph.
14        Are you with me so far?
15     A.  Yes.
16     Q.  And the last sentence of the second
17  paragraph says, This means you must keep and not
18  delete all relevant information as explained below.
19        Do you see that?
20     A.  That's correct.
21     Q.  Then obviously the details of the
22  instructions have been redacted.  But if you go to
23  the next page 451, it says, Please do not use the
24  following tools or messaging apps to discuss any
25  topics covered by this legal hold.  And the second

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 182

1  one there references Google messages -- sorry,
2  Google messaging apps (such as Chat, Hangouts, Duo).
3      And then it says, If you must do so,
4  please make sure the settings preserve the messages
5  such as switching to "history on" for Chat or
6  Hangouts.
7      Before today had you ever seen this
8  language that is specific in the litigation holds to
9  chats?
10     A.  Not that I recall.
11     Q.  So when forming your opinions in this
12 case, starting in October of this year, were you
13 aware that Google had instructed -- sorry.  I saw
14 you raise your eyebrow so I'll fix it.
15     When forming your opinions in this case
16 relating to chats, were you aware that Google
17 instructed its employees not to use it to discuss
18 matters that were the subject of a litigation hold?
19         MR. HILLEGAS:  Objection; form.
20     A.  I believe I saw that in a deposition.
21     Q.  But you just hadn't seen this particular
22 language in the instruction itself; is that
23 accurate?
24     A.  No.
25     Q.  But I thought I had asked you whether you

Page 183

1  had seen page 451 before and you said no.  Did I
2  mishear you?
3          MR. HILLEGAS:  Objection to form.
4      A.  No, I have not seen this redacted document
5  before.
6      Q.  Okay.  When forming your opinions in this
7  case, were you aware that Google employees were
8  instructed, well, if you have to use Chat to talk
9  about stuff relevant to a lawsuit, toggle the
10 history on?  Did you know that?
11     A.  It didn't influence my opinion because it
12 wasn't part of that dataset.
13         MS. NAJAM:  I'll object as
14 nonresponsive.
15     Q.  When forming your opinions in this
16 lawsuit, were you aware that folks on hold were
17 told, if you have to use Chat, turn the history on
18 if it relates to something relevant to the lawsuit?
19         MR. HILLEGAS:  Objection; form.
20     A.  I was not aware.
21     Q.  And I asked you this earlier and we wasted
22 a lot of time and I used the word opinion, so I'm
23 going to switch a different word out.
24     For your opinions in this case about the
25 number of potentially relevant messages sent with

Page 184

1  "history off" in 2022 or some other year, are you
2  assuming that at least some employees didn't follow
3  the instructions we just looked at --
4          MR. HILLEGAS:  Objection; form.
5      Q.  -- in Exhibit 8?
6          MR. HILLEGAS:  Same objection.
7      A.  And by relevant we mean pertinent
8  messages?
9      Q.  However you define the word in your mind.
10     A.  My opinions are based on the messages lost
11 from the dataset.
12     Q.  So you don't have an assumption built in
13 there that some employees failed to follow these
14 instructions in Exhibit 8?
15         MR. HILLEGAS:  Objection; form.
16     A.  As I recall, no.  Mr. Pichai may have
17 mentioned it in his deposition.
18     Q.  That's the deposition testimony we talked
19 about earlier that you couldn't specifically recall,
20 right?
21     A.  I cannot recall the numbers he said for
22 messages sent per day.
23     Q.  Just so we're on the same page, an opinion
24 along the lines of employees compliance with
25 litigation holds, that's not even in your wheelhouse

Page 185

1  or your expertise; is that accurate, sir?
2          MR. HILLEGAS:  Objection; form.
3      A.  Correct.  My opinion is based on the Log
4  Dataset produced by Google.
5      Q.  Is it possible that for the five
6  custodians whose data was contained in your set, is
7  it possible that zero of their unpreserved Chat
8  messages in that period had anything to do with this
9  lawsuit, right?
10         MR. HILLEGAS:  Objection; form.
11     A.  I have no opinion on that because it
12 wasn't in the Log Dataset produced.
13     Q.  So then let's take them one by one.  Let's
14 start with ████████.  You saw that he was the
15 ████████.
16     Do you recall that?
17     A.  Yes.
18     Q.  What did his job entail during the 68 days
19 in the log period?
20     A.  He was the ████████.
21     Q.  What did his day-to-day job look like?  Do
22 you have any idea?
23     A.  I have never been a ████████
24 ████████
25     Q.  Is that a no, you don't have any idea?

47 (Pages 182 - 185)

Veritext Legal Solutions

800-567-8658                                                      973-410-4098

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 186

1  A. No idea.
2      MR. HILLEGAS: Objection; form.
3  Q. Did his job during the 68 days have
4  anything to do with display advertising?
5  A. I have no idea.
6  Q. Do you have any reason to think that he
7  sent or received any messages relevant to the topic
8  of this ad tech lawsuit in that 68-day period?
9      MR. HILLEGAS: Objection; form.
10  A. It was not contained within the dataset.
11  Q. When you say "it was not contained,"
12  you're talking about the content of messages wasn't
13  in the dataset, right?
14  A. That's correct.
15      MR. HILLEGAS: Objection; form.
16  Q. Did you check to see whether any chats
17  were actually produced that included ████ in
18  that same 68-day period?
19      MR. HILLEGAS: Objection; form.
20  A. I believe I did search to see if any were
21  produced.
22  Q. Were they?
23      MR. HILLEGAS: Object to the form.
24  A. He's not in either of these conversation
25  chains.

Page 187

1  Q. So back to my question of whether any --
2  you saw any chats produced during that log period
3  with ████ on them, is the answer no?
4      MR. HILLEGAS: Objection; form.
5  A. Correct.
6  Q. ████ -- let me ask a different
7  question.
8      Have you actually ever seen a Chat message
9  that was produced in this ad tech lawsuit that
10  included ████?
11      MR. HILLEGAS: Objection; form.
12  A. No.
13  Q. Okay. I'll move to ████
14  ████; is that right? First name
15  ████.
16  A. That's correct.
17  Q. Are you able to tell us what her
18  day-to-day job was during the 68 days?
19  A. No.
20  Q. Are you able to tell us whether it had
21  anything to do with Display Ads?
22  A. No.
23  Q. Do you have any reason to think that she
24  sent or got any messages, Chat messages, in that 68
25  days that had anything to do with the topics of this

Page 188

1  lawsuit?
2      MR. HILLEGAS: Objection; form.
3  A. The message content was not in the
4  dataset.
5  Q. So you don't have any reason to think that
6  she did send or get a Chat message relevant to this
7  suit in that period, true?
8  A. I don't want to say no, because there were
9  pertinent settings in the history for her Chat
10  messages.
11  Q. I'm not following what that meant. Can
12  you explain?
13  A. Well, earlier we talked about they were
14  instructed to turn history on if they were going to
15  receive pertinent messages. And in ████ table,
16  I see permanents.
17      So for the question did she get -- send or
18  get Chat messages relevant to this suit, per this
19  figure, I'll have to say yes.
20  Q. So you -- your opinion is if someone
21  turned their history on, that must have been because
22  they were talking about something related to this ad
23  tech lawsuit?
24      MR. HILLEGAS: Objection; form.
25  A. Not necessarily.

Page 189

1  Q. Can we agree that there's lots of reasons
2  why somebody may have toggled history on?
3      MR. HILLEGAS: Objection; form.
4  A. Yes, and she never toggled history on.
5  Q. You said never toggled history on?
6  A. Correct, none of these did.
7  Q. Did you ever see a produced Chat message
8  including ████ in this lawsuit?
9      MR. HILLEGAS: Objection; form.
10  A. Not that I recall.
11  Q. Have you ever seen a Chat message like --
12  with the content that indicated to you that
13  ████ was ever talking about Display Ads,
14  whether in that 68-day period or otherwise?
15      MR. HILLEGAS: Objection; form.
16  A. No.
17  Q. We'll move on to ████. Do you
18  know what her -- sorry, just for the record she was
19  ████; is that right?
20  A. Yes, that's correct.
21  Q. Any clue what she was doing day-to-day
22  during the 68 days?
23      MR. HILLEGAS: Object to the form.
24  A. No.
25  Q. Do you know whether whatever she was

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1  doing, whether it pertained to ad tech or the
2  Display Ads business?
3        MR. HILLEGAS:  Objection; form.
4        MS. NAJAM:  What is the objection?
5        MR. HILLEGAS:  You continue to raise
6  your voice and to badger the witness and I'm going to
7  continue to making objections until you can speak
8  calmly to him and try not to harass him.
9        MS. NAJAM:  Oh, wow, so first of all,
10 when someone asks you the basis for the objection you
11 just stated, you don't give a speech, but I
12 understand.  I raised my voice because the witness
13 said he had a hearing problem and so I have raised it
14 ever since.
15       MR. HILLEGAS:  You have been doing
16 that since long before the witness mentioned it to
17 you.  You have been using it to badger him to try to
18 make a point.
19       MS. NAJAM:  Okay, very much disagree
20 but we can keep going.  And if your objection is
21 loud, you can just have a running objection and stop
22 ruining my record.
23       MR. HILLEGAS:  I can continue to make
24 the objections as I see fit and continue to do so.
25       MS. NAJAM:  The objections are

1  enumerated in the rules and there's not one for
2  lady's voice too loud.  Like, that's not an
3  objection.
4        MR. HILLEGAS:  There is one for
5  badging the witness.
6        MS. NAJAM:  It is based on the
7  content, not on the level of someone's voice.
8        MR. HILLEGAS:  If you're using the
9  level of your voice and your tone to try to
10 intimidate or harass the witness, it counts.  And I
11 will continue to make an objection on that basis.
12    Q.  Doctor --
13       MR. HILLEGAS:  If you would like me to
14 list that out every single time, I will do so.
15 Otherwise I'll continue to say objection, form.
16       MS. NAJAM:  You can have a running
17 objection to the level of my voice.  And I'm going to
18 again ask you to stop saying objection, form even
19 when there's nothing wrong with the question.
20       MR. HILLEGAS:  And I'll continue to
21 make objections as I see fit.
22    Q.  Dr. Hochstetler, am I intimidating you?
23 That is the question.  Am I intimidating you?
24    A.  This whole process intimidates me.
25    Q.  Am I intimidating you?

1    A.  You are a part of this whole process, so
2  yes.
3    Q.  Okay.  Is there anything I can do to be
4  less intimidating to you?
5    A.  Not at this time.
6    Q.  So ███████████, I think I got on the
7  record that her job was ████████████
8  ███████  Sorry, I forgot whether I asked you
9  whether you know what her day-to-day job was during
10 the 68 days.
11    A.  I don't know.
12    Q.  Do you have any reason to think that she
13 sent or received any messages relevant to the topic
14 of this lawsuit in that 68 days?
15    A.  I'll reference again the history being
16 turned on.  But as we talked about a second ago,
17 that could be for any number of reasons.
18    Q.  Did you happen to see any produced Chat
19 messages where ████████████ was discussing Display
20 Ads or ad tech?
21    A.  Not that I recall.
22    Q.  Did you see any documentation that she
23 █████████████████████████████████████
24 ████████████████████████? Does that
25 ring a bell?

1    A.  No.  I included her because the Exhibit D,
2  the original date before the corrected date had her
3  listed as being under hold in 2021.  So she would
4  have been within the 2022 time period of the
5  dataset.
6    Q.  Got it.  Okay.  Sorry to bore you, but
7  we're going to ask similar questions with the next
8  person in the dataset.  ██████████████████████
9  ██████.
10    Do you recall that?
11    A.  Yes.
12    Q.  And I think you touched on this before but
13 it sounds like you don't know what his actual
14 day-to-day job would have entailed for that period?
15    A.  I assume he's ████, but I would not know
16 what his day to day is.
17    Q.  When you say ██, is that short for
18 ████████ -- I'm sorry, what is ██?
19    A.  So within industry companies you have a
20 path of management where you have reports, people
21 report to you, you're their manager, ████████████
22 ████████████████████████████████████
23 ████████████████████████
24    Q.  Do you know whether during that 68 days,
25 his job had anything to do with ad tech or Display

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 194

1  Ads?
2      A.  I have no idea.
3      Q.  And do you have any reason to think he
4  sent or received any messages relevant to the topics
5  of this lawsuit in that period?
6      A.  I'm going to reference Figure 8 again and
7  he did have history on.  But as before, that could
8  be for any number of reasons.
9      Q.  Did you see any produced Chat
10 conversations where ███████ was discussing
11 something relating to the Display Ad's business or
12 the tech?
13     A.  No.
14     Q.  I'm sorry to go backwards.  I meant to ask
15 you something on ████████████
16         You testified earlier that you decided not
17 to exclude her despite her number of sent messages
18 during the period being a couple thousand above the
19 next person.
20         Do you generally recall that?
21     A.  Yes.
22     Q.  We can go to page 23.
23         And you mentioned later in your deposition
24 that the reason you did not exclude her was because
25 you didn't consider her numbers out of bounds.

Page 195

1          Do you recall testifying to that?
2          MR. HILLEGAS:  Objection; form.
3      A.  Yes.
4      Q.  I just wanted to clarify, did you perform
5  any kind of statistical analysis to decide that,
6  well, her number is not out of bounds enough for me
7  to exclude it?
8      A.  No.
9      Q.  How did you decide that her average number
10 of sent, which is over 100 a day, that that's within
11 bounds enough for me to keep it in my set before
12 extrapolating to the remaining 136?
13         MR. HILLEGAS:  Objection; form.
14     A.  Because I had no visibility to not know
15 that it was out of bounds.
16     Q.  So does that mean you had no reason to
17 exclude it so you left it in; is that accurate?
18     A.  That's correct.
19     Q.  Okay.  So you talked a little bit earlier
20 about ████████████ and some disagreement with
21 Mr. Malkiewicz about whether to exclude him or not.
22 I just wanted to clarify this.  So let's in your
23 report go to page 5, paragraph 7(c).
24     A.  Which report?
25     Q.  Sorry, your October report.

Page 196

1      A.  Supplemental report.
2      Q.  Yes, Exhibit 1.
3      A.  I am there.
4      Q.  The first full sentence on this page
5  reads, Prior to that date, referencing February 8,
6  for each of four of the five individuals, at least
7  92 percent of their sent and received messages were
8  not retained.  Then you have a Footnote.
9          Do you see that?
10     A.  That's correct.
11     Q.  For the 92 percent number, you did exclude
12 ████████████; is that right?
13     A.  That is correct.
14     Q.  And if you include him and count up the
15 whole group's sent messages during the log period,
16 am I correct that the percentage of unpreserved
17 messages is actually 87 percent?
18     A.  I'll have to reference.
19     Q.  Let's go to page 19, paragraph 36, may
20 help.
21     A.  (Reviewed document.)  Yes, 1,856.  That's
22 correct.
23     Q.  So while we're talking about ████████████ --
24 sorry to take you around your report.  Now I'm going
25 to go to page 24, Table 9.  So I want to make sure I

Page 197

1  understand your calculations in your second column
2  and fourth column.
3          For ████████████ you calculated that before
4  retention settings changed on February 8th,
5  65.7 percent of his sent messages were not retained;
6  is that right?
7      A.  Correct.
8      Q.  And then in terms of received, that number
9  is 56.4 percent not retained; is that right?
10     A.  Yes.
11     Q.  Can we agree that those are significantly
12 lower numbers than, say, 92 percent?
13         MR. HILLEGAS:  Objection; form.
14     A.  Yes.  ████████████ was definitely an
15 outlier.  If you compare that to Figure 8, he barely
16 used Chat.
17     Q.  But we're talking about two different
18 things, right?  Right now we're looking at his
19 percentage of retention, 65.7 and 56.4, right?
20     A.  Yes.
21     Q.  And percentage retention, that's a
22 different -- that's going to be a different concept
23 than total number of sent and received, right?
24     A.  Yes, if the history's on or off within
25 those messages.

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 198

1    Q.   So earlier I asked you how many
2    ▉▉▉▉ there were in terms of message volume in the
3    remaining 136, but now you have a similar question.
4    How many ▉▉▉▉▉▉ are there in the
5    remaining 136 when it comes to percentage of Chat
6    messages sent with history "off" versus "on"?
7    A.   I have no information on the 136.  The Log
8    Dataset only included the five.
9    Q.   Fair enough.  We'll move on to our last --
10   our last of the custodians in the Log Dataset.  I
11   think I have already asked you about Mr. Pichai.
12   Sorry, I just don't remember if I did.
13        Do you know his level of involvement in
14   Display Ads or the tech in the 68 days of the log
15   period?
16   A.   I know he's the CEO and that's it.
17   Q.   So you're assuming based on his CEO
18   position that he must have had some involvement?
19   A.   He was under litigation hold and he was
20   one of the five in the dataset.
21   Q.   So I understand what you're saying.  I'm
22   talking about the topics of the -- the potential
23   topics of unpreserved Chat messages.
24        You have put in your report that for
25   Mr. Pichai, 96 percent of his sent messages during

Page 199

1    that period were not preserved.
2        Do you recall that?
3    A.   Yes.
4    Q.   Can you testify with reasonable certainty
5    that even one of those messages had something to do
6    with what this lawsuit is about?
7    A.   I'm not really here to opine on the
8    pertinency of chats.  I'm not a lawyer.  But in
9    searching for his chats, I did use one of his
10   pertinent conversations that were produced by Google
11   to reference that back to the Log Dataset.
12        Initially I was not understanding how the
13   chime renders were working because I was seeing way
14   too many of them in the dataset.  Using these logs I
15   was able to match them back directly and figure out
16   that there's a number of "sents" in the dataset, not
17   just one.
18   Q.   Okay.  And we will talk about I think what
19   you're pointing to, that is what you described as a
20   pertinent conversation.
21        Am I right that you believe it's pertinent
22   because it was produced in this lawsuit?
23   A.   Google produced it so I assumed it was
24   pertinent.
25   Q.   Is that an assumption that you used in

Page 200

1    general for your opinions in this case, that if a
2    document was produced -- I'm sorry, if a Chat
3    conversation was produced, then it was pertinent to
4    this case?
5        MR. HILLEGAS:  Objection; form.
6    A.   Yes.
7    Q.   Back to the sample employees.  I'm sorry.
8    You know who I mean.  The five people whose data is
9    in the Log Dataset.
10       I don't think I asked you this earlier.
11   You testified that they were at least mid career?
12   Did I hear that right?
13   A.   From my understanding of these job titles,
14   these would be mid career employees.
15   Q.   Did you -- do you have any idea what
16   percentage of the remaining 136 are mid career
17   employees or higher?
18       MR. HILLEGAS:  Objection; form.
19   Q.   Is that analysis that you have done?
20   A.   No.
21       MR. HILLEGAS:  Objection; form.
22   A.   What was provided in the list of litigants
23   had no job titles.
24   Q.   In terms of the 141 total custodians, do
25   you have an opinion on what percentage of them used

Page 201

1    Chat mainly for non-business conversation?
2    A.   I have no opinion on that.
3    Q.   Do you have an opinion on what percentage
4    of them had a practice of toggling history on when
5    discussing some topic relevant to this lawsuit?
6    A.   I have no data on that.
7    Q.   There is a -- I'll skip that.
8        Do you know whether -- sorry to toggle
9    back to the five custodians in the dataset.  For
10   those five, did you endeavor to find out whether any
11   of them were part of Chat rooms or spaces that were
12   like affinity-based, that is based on some
13   characteristic or hobby rather than business?  Like
14   a group for runners, for example.
15   A.   No.  The metadata only included ▉▉▉▉▉▉
16   ▉▉▉▉▉▉▉▉▉  No content was inside of it.
17   Q.   Okay.  I want to ask you a few questions
18   about your opinion on how easy or difficult it would
19   have been to make the changes that were made in
20   February of 2023 earlier.
21       Do you generally understand what I'm
22   talking about?
23   A.   Yes.
24   Q.   Okay.  So you opine that the enterprise
25   version of Chat allowed customers to restrict users

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 202

1 from toggling history off at an earlier time frame.
2 I first want to look at your report, page 11,
3 paragraph 18. October report, Exhibit 1.
4     A. Supplemental report. I am there.
5     Q. So in the last sentence that starts on
6 this page you say that the enterprise version
7 allowed customers to restrict from toggling off as
8 early as October 2020. So I'm going to pause there.
9         Has that opinion changed since your
10 October report? Are you going with earlier dates
11 now?
12    A. As I recall, this was the first web
13 archive hit I found for this.
14    Q. And did that web archive hit provide ways
15 for third parties using the Google Chat to
16 individually toggle history on and off for
17 particular users?
18    A. I don't know who would be a third party in
19 this case.
20    Q. I'm sorry. A customer, someone using
21 Google's Chat. Let's back up.
22         When you said the enterprise version, are
23 you talking about the product that Google provides
24 for other companies to use, like in their business?
25    A. Yes.

Page 203

1     Q. Okay. So that's what I meant by third
2 party. Sorry.
3         If I'm a company using Google Chat, is it
4 your opinion that I would have been as early as
5 October 2020 able to selectively pick users who
6 cannot turn history off?
7     A. As I recall, that was an administrator
8 option.
9     Q. And your support for that is this Wayback
10 Machine version of this Google support page in
11 Footnote 37?
12    A. Yes.
13    Q. Do you know as of any point in time
14 whether there were differences between the
15 enterprise version of Chat versus what Google was
16 using internally?
17    A. I have no visibility into the products
18 they were using internally.
19    Q. Okay. Let me ask you this: Sitting here
20 today, if I -- I'm a company, I'm at my law firm and
21 I'm using the enterprise version of Google Chat.
22 Can I as the administrator, can I restrict toggling
23 off history for just some of my employees but not
24 others or do you know the answer to that?
25         MR. HILLEGAS: Objection; form.

Page 204

1     A. I don't know. I never administered the
2 Google work spaces.
3     Q. Well, in your reply report, that is the
4 December report, Exhibit 2, page 10.
5         MS. NAJAM: I have also raised my
6 voice because there has been conversation in the
7 hallway. But I'm going to keep my voice down and if
8 you can't hear me because of the conversation, we'll
9 just pause and go off the record.
10        MR. HILLEGAS: I'll do my best not to
11 object.
12    Q. Paragraph 22, in your third sentence, you
13 say, As far as back as 2013, Google had already
14 created and advertised the required functionality.
15 You can read the rest of the sentence to yourself.
16        Just to clarify, is it your opinion that
17 in 2013, Google already had the capability
18 internally to set the default to "on" and
19 selectively prevent certain employees from turning
20 history to "off"?
21    A. The water is getting a little muddy
22 because I'm not certain that work spaces always
23 included Hangouts because Hangouts was a different
24 product and then it was migrated. So I cannot be
25 certain.

Page 205

1     Q. Okay. And then same question about what
2 you're saying in 2015. The next sentence, you talk
3 about Google advertising administrator's ability to
4 force the history to be on or off. And then look at
5 your last sentence. You say that by 2015, Google
6 had done the work to allow customers to prevent
7 specific employees from turning off Chat history.
8     A. That's correct.
9     Q. Okay. So is it your opinion that what you
10 cite in Footnote 23 shows that customers using
11 Google Chat had that ability, that is, to prevent
12 just certain employees from toggling off?
13    A. As I understand the administration
14 policies, yes.
15    Q. But what you cite here -- I'll just give
16 it to you. Hold on. I'm handing you what I'm
17 marking as Exhibit 9. And this is what -- sorry.
18        Exhibit 9 is what you're citing in
19 Footnote 23, right?
20        (Exhibit 9 marked.)
21    A. Yes.
22    Q. So if we look at page 2 of the exhibit,
23 there is a box there at the bottom. And at the
24 bottom under Chat history, there's a button where
25 the administrator can decide is history going to be

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 206

1  on or is history going to be off.
2      Am I reading this correctly, the same way
3  you read it?
4      A.  That is correct.
5      Q.  And underneath that there's a box that
6  says, Don't allow users to change this setting.  And
7  in this example it has been clicked.
8      Do you see that?
9      A.  That's correct.
10      Q.  But, Professor Hochstetler, where in this
11  policy does it say that the administrator back in
12  2015 can decide on a user-by-user basis whether they
13  can change that setting?
14      A.  The locally applied in the corner.  If
15  it's globally applied, it would be for all users was
16  my understanding.
17      Q.  Where did you get the understanding that
18  the term "locally applied" means the administrator
19  is doing this on a user-by-user basis?
20      A.  It would be local to the user, the local
21  Chat of the user.
22      Q.  Right.  But what is your basis for
23  thinking that?
24      A.  The word "local" means specifically to
25  that, so to that Chat --

Page 207

1      Q.  So --
2      A.  -- as opposed to a global setting across
3  all chats.
4      Q.  So your understanding is that an
5  administrator would have an option like what we're
6  looking at on page 2 for -- let's say, a company has
7  20,000 -- sorry, like a million employees, that
8  there would be a million such boxes, a million such
9  settings locally applied to each individual
10  employee?
11      A.  Normally you would do this with an API or
12  a policy document.  For a smaller businesses, you
13  would be clicking web forms.  But for larger
14  enterprises, there would be a policy document which
15  could be -- OPA pushes them out a lot.  But it's
16  really some sort of RBAC control that policy would
17  push down onto specific users.
18      Q.  Look at the very bottom where the box is
19  checked.  It doesn't say don't allow user to change
20  this setting, does it?
21      A.  Correct.
22      Q.  It says users, right?
23      A.  Yes.
24      Q.  But you're -- you're sticking with the
25  understanding that an administrator was able to --

Page 208

1  locally as in on a user-by-user basis decide whether
2  the user could change the setting from history on to
3  off?
4      A.  That's correct.
5      Q.  Well, let's look at the other one you
6  cited then.  I'm handing you Exhibit 10.
7      (Exhibit 10 marked.)
8      THE WITNESS:  I think we have a
9  five-minute for break.
10      MR. HILLEGAS:  We have been on the
11  record for about an hour.  I don't know where the
12  five-minute warning came from.
13      THE WITNESS:  Oh, just like in five
14  minutes wind it down I guess.
15      MS. NAJAM:  Am I out of time?
16      MR. HILLEGAS:  No.  No.  We have been
17  on the record for about an hour.  He needs a rest
18  room break.
19      Q.  Got it.  Okay.
20      I just handed you what I marked as Exhibit
21  10.  During that back and forth I may have given you
22  the wrong copy.  Give me a second.
23      MR. HILLEGAS:  Is that the 2013
24  version or 2015 version you have there?
25      THE WITNESS:  This is '13.

Page 209

1      Q.  For the record, what I just handed you was
2  a 2013 version that's referenced in Footnote 22.  If
3  you could just confirm that for me.
4      A.  That's correct.
5      Q.  And can you point me to what language in
6  here makes you think that in 2013 the enterprise
7  version administrators could on a user-by-user basis
8  restrict changing retention settings?
9      A.  The first line, which Hangout features are
10  available to which employees.  To me that's a
11  qualifier.
12      Q.  So you read feature to mean -- to include
13  turning off Retention Settings; is that accurate?
14      A.  Yes.  And any other features that would
15  have been released in this time frame.
16      Q.  So an example of a Hangout feature would
17  be video and audio Chat, right?  I think you said
18  that earlier in the deposition.
19      MR. HILLEGAS:  Objection; form.
20      A.  I believe Hangout had that.
21      Q.  And this same post notes that those two
22  features can also be turned off across the
23  organization.
24      Do you see that in the -- sorry, last
25  sentence of the first paragraph?

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 210

1    A.  Yes.  That would be globally flipping a
2  switch.
3    Q.  So is it possible that the first sentence
4  was talking about those kind of features that admins
5  can decide which are available to which employee,
6  features like audio Chat and video Chat?
7    A.  It doesn't specifically say.  The previous
8  sentence says, they chose to limit Hangout Chat
9  messages to be internal only so you can't message
10  people outside your organization.  Set Chat history
11  off to by default and decide which users within the
12  domain can contact each other without sending or
13  accepting formal invitations first.
14    Because I think back then Hangouts was --
15  you had to send a request to someone and then they
16  would accept it.  But if you're using the admin
17  version at this point, you could say, no, we're in
18  the same domain, you don't need to send requests
19  every time you want to Chat with a new person.
20    Q.  Is this 2013 blog post that we're looking
21  at in Exhibit --
22    MR. HILLEGAS:  I think 10.
23    Q.  -- 10, is that your only basis for opining
24  that back in 2013 Google could readily decide -- or
25  sorry, select particular employees who can't turn

Page 211

1  off their retention?
2    A.  As I recall, this is the only document
3  from this time period referencing it.
4    Q.  Besides Exhibits 9 and 10, do you have any
5  other basis to conclude that the enterprise version
6  of Google Chat prior to today had the option for
7  administrators to select searching users and prevent
8  them from changing the history setting from "on" to
9  "off"?
10    A.  Now we have been speaking about Exhibits 9
11  and 10, the product that Google would sell to
12  customers.  By enterprise version, do you mean this
13  version or the version internally to Google?
14    Q.  You used the word "enterprise version" in
15  your report.  And I think we established when you
16  used that phrase, you were talking about the version
17  available to other companies who are using Google's
18  Chat tool.
19    Do you recall that?
20    A.  Yes.
21    Q.  Okay.  So I'll re-ask the question.
22    For the outside -- I'm going to call it
23  the outside version of Chat, besides Exhibit 9 and
24  10, can you point to anything else to show that the
25  outside version allowed admin to selectively pick

Page 212

1  users who couldn't turn history off?
2    A.  No.
3    Q.  And are you disputing ▮▮▮▮▮▮▮▮▮
4  testimony that it took hundreds of hours of work to
5  roll out the change that happened in February of
6  '23?
7    A.  I want to be very precise.  I'm not
8  disputing his testimony.  It is my understanding
9  that the outsider version, for a better term, of
10  Google Chat is based off of the enterprise or
11  internal Google Chat.
12    Q.  I'm sorry.  When you use "enterprise
13  version" in your reports, were you talking about the
14  internal version or the version used by other
15  companies, not Google?
16    A.  As I recall, when I refer to "enterprise,"
17  I'm referring to the internal Google Chat that has
18  changed over time from the original to Hangouts to
19  Chat and then integrated into the outside product
20  Google Workspace.
21    Q.  Are you sure?
22    MR. HILLEGAS:  Objection; form.
23    Q.  Otherwise we can -- look at your October
24  report, page 11.  It's the sentence we already read.
25  It's paragraph 18.  You say, Note that the

Page 213

1  enterprise version of Google Workspace, a collection
2  of productivity and collaboration tools including
3  Google Chat, allowed customers to restrict users,
4  et cetera.
5    A.  So the enterprise version is the internal
6  version that is also a product that Google sells,
7  but you as a small business could sign up for
8  Workspace and have different features, as I
9  understand.  It's not tiered.
10    Q.  Do you have an opinion on whether prior to
11  2023 Google already had the capability for the
12  administrator of the internal version to just turn
13  it on as a default and also selectively pick users
14  who cannot turn it off, "off" being history?
15    MR. HILLEGAS:  Objection; form.
16    A.  No.
17    Q.  And so I had asked you about one thing
18  that ▮▮▮▮▮▮ testified about.  I want to ask you
19  about one more thing and then I promise we'll take a
20  break.
21    Did you read ▮▮▮▮▮▮ testimony that
22  what Google has now done internally with its Chat
23  retention settings as of February 2023 is something
24  that its Workspace customers cannot do?
25    A.  I don't recall that.

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 214

1    Q.  So do you have an expert opinion on
2    whether ███████ is wrong to the extent that's what
3    he testified?
4    A.  No, I have no visibility into their
5    internal systems.
6    MS. NAJAM:  All right.  We can take a
7    break.
8    THE VIDEOGRAPHER:  Off the record,
9    3:49.
10    (Recess 3:49 p.m. to 4:08 p.m.)
11    THE VIDEOGRAPHER:  On the record.  The
12    time is 4:08.
13    Q.  Dr. Hochstetler, before we move on to a
14    different topic, I over the break did go back and I
15    needed to clarify one thing.
16    I want to put the Log Dataset aside
17    and I have a question about general principles of
18    statistics.
19    If the sample is not representative of the
20    population, in other words, there's something
21    different about the sample, can we draw reliable
22    conclusions from the sample to apply to the entire
23    population?
24    A.  So in general not talking about this Log
25    Dataset or this case.

Page 215

1    Q.  Correct.
2    A.  You can with corrections.  You can feature
3    engineer specific hyper fields and that's something
4    you would do in larger data mining systems if you
5    can not get a clean dataset or if your dataset is
6    severely lopsided.  If you have got a lot of false
7    positives or true positives like -- what's a good
8    example.  Cancer detection.
9    So if you have 100,000 scans of chest
10    x-rays, only a few are going to have lung cancer so
11    those aren't representative of the whole.  You can
12    feature engineer ways around that to not only boost
13    those but produce proper data mining techniques to
14    make those significant.
15    Q.  So to recap that in layperson's terms, if
16    your sample is unrepresentative in that it is
17    different from the rest of the population, you can
18    theoretically draw reliable conclusions if you're
19    able to make corrections to correct for the lopsided
20    nature; is that accurate?
21    MR. HILLEGAS:  Objection; form.
22    A.  Yes, that's in a nutshell the basis of
23    data mining.
24    Q.  Okay.  As promised, we are going to switch
25    subjects.  Before the last break -- let's start

Page 216

1    here.  Let's look at your October report, which is
2    Exhibit 1, page 5.
3    A.  Supplemental report.
4    Q.  I'm sorry.  I meant page 35, paragraph 67.
5    In the second sentence you write that your goal was
6    to identify logs corresponding to the produced
7    conversations and determine whether any of them had
8    retention settings toggled "off" at any point.  The
9    latter would indicate that not all messages relevant
10    to this matter were preserved or made available.
11    Did I read that right?
12    A.  Yes.
13    Q.  Okay.  And I believe you testified earlier
14    that you, for purposes of this case, assumed that if
15    a Chat conversation was produced in this lawsuit,
16    then it must be -- I believe you used the word
17    "pertinent" to this lawsuit; is that right?
18    A.  Yes.
19    Q.  Okay.  So let's take the hypothetical
20    example.  Let's say the group is me, yourself, and
21    Mr. Hillegas, who I called Peter earlier and I
22    should not have.  It's disrespectful.
23    Okay.  So the three of us are in a group
24    and let's say a conversation was produced in the
25    lawsuit including the three of us.  For your

Page 217

1    analysis purposes, that would be a pertinent
2    conversation; is that true?
3    MR. HILLEGAS:  Objection; form.
4    A.  Yes.
5    Q.  Okay.  And am I right that you then --
6    sticking with that example.  If within the ███████
7    associated with me, yourself, and Mr. Hillegas, if
8    that ███████ had history "off" and a message was
9    sent, then you have concluded a relevant Chat
10    message wasn't preserved during the log period,
11    true?
12    A.  That Chat message was relevant to the
13    dataset because I could see the "send" and a couple
14    times I was able to see "receives" for that with
15    that history set to "off."
16    Q.  In our example, in our group ID, let's say
17    I sent a message and the history was "off."  Later
18    in that group I sent a message and it was produced
19    in this lawsuit.
20    Did you assume that the history off
21    message was relevant?
22    A.  If the history was off, I'm not certain
23    how it would have been produced by normal means.
24    Q.  So in my example, let's say there's a
25    total of three messages.  Your log data showed that

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 218

1  for messages 1 and 2 history was off.
2       Are you with me so far?
3    A.  Yes.
4    Q.  And then there was a -- the log showed
5  that for message 3 history was on.  That would be in
6  your Log Dataset, right?
7    A.  Correct.
8    Q.  And then message number 3 would be
9  produced in some conversation in this lawsuit.
10      Are you with me so far?
11   A.  Yes.
12   Q.  In that example, did you assume that
13 messages 1 and 2 were pertinent to this lawsuit?
14   A.  No, I didn't make any opinion on them
15 being pertinent.
16   Q.  What was the basis for your understanding
17 that if a conversation was produced in this lawsuit,
18 that means it is pertinent to the lawsuit?
19   A.  I understood that if Google produced it,
20 they had done checks to make sure it was pertinent.
21   Q.  Was that the sole basis of your
22 understanding?  Sorry.
23      My question is:  What is the basis of that
24 assumption, that if Google produced it, it must be
25 pertinent to the issues in the lawsuit?

Page 219

1    A.  Why would they produce documents that
2  aren't pertinent.  My reasoning is why would they
3  produce documents that aren't pertinent.
4    Q.  Before issuing your October report, were
5  you aware of an agreement that documents would be
6  produced in this case solely because they were
7  produced in some other case?
8    A.  Wasn't part of my assignment.
9    Q.  I'm just asking if you were aware of any
10 such agreement.
11   A.  No, it wasn't part of my assignment.
12   Q.  Were you aware that documents -- sorry,
13 Chat conversations were produced in this lawsuit
14 solely because they hit on phrases like "history on"
15 or "history off," whether those had to do with
16 Display Ads or not?
17   A.  Yes.
18   Q.  When did you learn that?
19   A.  I believe the timing may be in between
20 Malkiewicz and writing the declaration.  This is a
21 very compressed time frame so timing is fuzzy.
22   Q.  So you learned that after issuing your
23 October report, true?
24   A.  Yes.  Although I believe I did hit on one
25 message because I use that for timing, Figures 12 --

Page 220

1  sorry, 13 and 14 and I used that for timing.  And it
2  is one of these messages that's a hit with the word
3  "history."  And we talked about it before.  It's the
4  happy birthday message and then they say, why is
5  history on here, and I used that timing to the logs.
6    Q.  My question was a little different.
7       Isn't it true that it was after your
8  October report that you learned that certain
9  documents were produced in this case only because
10 they contained "history on" or "history off" even
11 though they didn't relate to Display Ads?
12      MR. HILLEGAS:  Objection to form.
13   A.  I believe Figure 13 was only produced
14 because of history on.
15   Q.  Do you want me to rephrase my question?
16      I asked you earlier if you were aware of
17 an agreement wherein Google would produce documents
18 in this case solely because they were produced in
19 some other case, and your answer to that is you were
20 not aware, true?
21   A.  Correct.
22   Q.  Were you aware of a certain number of Chat
23 conversations that were produced in this case only
24 because they contained history on, history off, even
25 though they have nothing to do with Display Ads?

Page 221

1       MR. HILLEGAS:  Objection; form.
2    A.  I have no idea about the only, in quotes.
3    Q.  Okay.
4    A.  Figure 13 could be produced only because
5  of that.  I'm not certain.
6    Q.  Understood.  Let's move to your December
7  report, which is Exhibit 2, page 5.
8    A.  This is the reply.
9    Q.  Yes.  In paragraph G that's on that page,
10 that's 9(g), your fourth sentence says, In other
11 words, relevant messages were lots (sic), but not
12 all lost messages were relevant.
13      When I said lots, that's how it's written
14 here but that's a typo, right?
15   A.  Yes.
16   Q.  Okay.  So when you opined back in October
17 that roughly 1.5 million Chat messages by litigation
18 hold employees were lost per year, just to clarify,
19 you're not telling the Court that in your opinion
20 all of them were actually relevant to this lawsuit,
21 correct?
22   A.  Correct.  I have no opinion on the
23 pertinency and have no visibility into the content
24 of those.
25   Q.  And you don't have an expert opinion on

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 222

1 like a specific number or percentage of the, as you
2 say, 1.5 million per year that were, in fact,
3 pertinent to this lawsuit, true?
4     A.  Correct, that wasn't part of my
5 assignment.
6     Q.  Are you assuming it's something more than
7 zero?
8         MR. HILLEGAS:  Objection; form.
9     A.  I don't believe I made any assumptions.
10     Q.  Well, in paragraph G you say, relevant
11 messages were lost, once correcting for the typo,
12 right?
13     A.  They were relevant in the context of the
14 dataset.
15     Q.  Oh, that's what you mean when you say
16 relevant messages were lost?
17     A.  Yes, I believe I stated that earlier.  We
18 made the distinction between relative and pertinent.
19     Q.  Okay.  So there's a few places in your
20 reports where you talk about messages that were not
21 preserved that were relevant.
22         Just to clarify, all those references
23 are -- you mean relevant to your dataset?
24     A.  Correct, that's the only visibility I
25 have.

Page 223

1     Q.  Okay.  So you don't have any opinion on
2 whether any messages that were relevant to this
3 lawsuit were, in fact, unpreserved, whether in the
4 log period or otherwise?
5         MR. HILLEGAS:  Objection; form.
6     A.  And we're not talking about relevant to
7 the dataset, correct?
8     Q.  Correct.
9     A.  Yes.
10     Q.  So just to -- sorry, to take it a little
11 bit further.
12         Do you have an opinion on whether a
13 hypothetical Chat message like "nice tie" is
14 relevant to the lawsuit?
15     A.  I have no opinion on that.
16     Q.  Okay.  But if someone sent such a message
17 and we didn't know the content and it was sent
18 during the log period with history off, then in your
19 analysis that would be relevant to the dataset?
20     A.  Yes.
21     Q.  Got it.  Let's go back to your October
22 report.  Sorry to go back and forth.  I'm going to
23 go to page 42, paragraph 81(b).
24         You say, As a result, the volume of
25 individual messages lost that should have been

Page 224

1 retained was extremely high.
2         Do you see that?
3     A.  Yes.
4     Q.  Can you please explain what you mean by
5 "should have been retained"?
6     A.  As I understand, because these messages
7 had history set to "off," there was no way for any
8 of them to be available to Vault even within the one
9 day, 24-hour period.
10     Q.  What is your expert opinion on why they
11 should have been made available to Vault or do you
12 have one?
13     A.  As I understand, these individuals were
14 under -- these five were under litigation hold.
15     Q.  Was it your understanding that being under
16 litigation hold means never send an off-the-record
17 Chat?
18     A.  Not necessarily.
19     Q.  Okay.  So help me understand why you
20 believe that a Chat sent by someone on hold during
21 the log period, quote, should have been retained.
22     A.  Without the e█████████
23 ████████████ therefore, been
24 available to be picked up by Vault.
25     Q.  When you wrote "should have been

Page 225

1 retained," did you mean would have been retained had
2 the retention settings been different?
3     A.  As I understand how Vault works, even if
4 it was set to 24 hours, they still would not have
5 been available and Vault wouldn't have picked them
6 up.
7     Q.  If that person was on hold and history was
8 on, then Vault would have preserved it, true?
9     A.  Yes, there's varying days.  I believe 30
10 days and then 18 months for group DMs, I believe.
11     Q.  So to answer my question, with history on,
12 if a person was on hold, as you understand the
13 policy, that message would have been preserved,
14 right?
15     A.  Yes.
16     Q.  In other words, it's only the "history
17 off" messages that never made their way into Vault,
18 right?
19     A.  Correct.
20     Q.  Okay.  So, sir, what I'm having trouble
21 with is back to the wording you used in your report,
22 what is the standard that you use when you said a
23 bunch of messages were lost that, quote, should have
24 been retained?  Should have according to what
25 standard?

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 226

1    MR. HILLEGAS: Objection; form.
2    A. I'm not understanding the question about a
3  standard.
4    Q. So when you wrote "should have," should
5  means this is something that a person in my opinion
6  doing the right thing would do.
7      Is that accurate, that's what the word
8  should means?
9    MR. HILLEGAS: Objection; form.
10    A. Yes.
11    Q. So I am asking according to what reasoning
12  should a particular message be sent with history on
13  that didn't happen here?
14    A. I think a particular -- taking into
15  context, this is referring to the change in
16  February 8th when all litigants were forced to have
17  ████████████████████████
18    Q. Okay. Your opinion about individual
19  messages lost, those are messages that were lost
20  before February 8th, right?
21    A. Correct.
22    Q. Sir, are you qualified to tell the Court
23  whether a particular Chat message sent before that
24  date should have had history on versus off?
25    MR. HILLEGAS: Objection; form.

Page 227

1    A. That was not part of my assignment.
2    Q. Is it -- are you qualified to give that
3  opinion?
4    MR. HILLEGAS: Objection; form.
5    A. I am not a lawyer.
6    Q. So you're not qualified to give the
7  opinion?
8    MR. HILLEGAS: Objection; form.
9    A. Of a pertinent message, no.
10    Q. And when you opined that Google has failed
11  to adequately preserve messages -- I'm going to ask
12  a similar question -- what definition of adequate
13  are you using?
14      I'm not plucking that from your October
15  report. It's in your reply report. Do you need to
16  look at it?
17    A. Sure.
18    Q. Exhibit 2, paragraph 21.
19    A. Mr. Malkiewicz, however, agrees with me
20  that Google has failed to adequately preserve
21  messages. In other words, there's no way to
22  preserve or restore messages that were sent while
23  the Chat history was off.
24    Q. So putting aside whether he agrees with
25  you or not, what -- what standard of adequate

Page 228

1  preservation are you using in this opinion?
2    A. My reasoning.
3    Q. Are you drawing on any expertise or
4  standards to find the preservation was not adequate?
5    A. I don't cite to anything here.
6    Q. Sitting here in your deposition, can you
7  cite to any standard, legal standard, industry
8  standard to opine that Google's preservation of Chat
9  messages was inadequate?
10    A. No.
11    Q. Are you even qualified to give that
12  opinion?
13    MR. HILLEGAS: Objection; form.
14    A. I don't have a standard to cite to, so I
15  don't believe I can provide any basis for that
16  beyond what Mr. Malkiewicz stated.
17    Q. And I'm not looking for a basis. I'm
18  asking whether -- do you believe you have the
19  education, training, and experience to give an
20  opinion to the Court in this case about whether
21  Google's Chat preservation practices were adequate?
22    MR. HILLEGAS: Objection; form.
23    A. Based upon industry experience, yes.
24    Q. Tell me all the industry experience that
25  renders you an expert in Chat preservation

Page 229

1  practices.
2    A. So starting off, I spoke about IRC which
3  was through MIRC, M-I-R-C. Those chats had
4  preserved for not only target deconfliction but
5  for -- how do I phrase this without walking
6  across -- for different allied countries to
7  coordinate. Those had to be retained properly by
8  governance.
9      Working later, I have worked with many FBI
10  CART teams on preservation of emails and chats. And
11  I believe I talked about taking yearly training
12  regarding data governance and communication with
13  respect to FINRA and other regulatory bodies.
14    Q. Okay. I hate to revisit stuff we have
15  already covered.
16      The first thing you talked about, IRC,
17  what does that stand for?
18    A. Internet relay Chat.
19    Q. Did you say Internet relay Chat?
20    A. That's correct. This was based on the
21  Chandra protocol which was a late '90s protocol and
22  it was used for both one-to-one communication and
23  also group chats.
24    Q. Okay. I'm not following on what your
25  specific experience was in terms of preserving Chat

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 230

1  messages.
2      A.  I was one of the people responsible for
3  managing and administrating the system to preserve
4  the chats.
5      Q.  But it was governance who came up with the
6  policies on preservation; is that right?
7      A.  Yes.
8      Q.  And you were not a part of governance,
9  were you?
10      A.  Correct.
11      Q.  So you were just carrying out a governance
12  of instructions in terms of preserving whatever Chat
13  messages they said needed to be retained; is that
14  accurate?
15      A.  It's 90 percent accurate.
16      Q.  What's the other 10?
17      A.  We worked as a team.  They always didn't
18  have visibility into all the spaces.  So I would
19  have to coordinate with them and develop specific
20  things for specific networks on retention.
21      Q.  Okay.  And the company was MIRC you said?
22      A.  MIRC is a client.
23      Q.  MIRC was the client for whom --
24      A.  The client application.
25      Q.  I'm not following any of this.  I'm sorry.

Page 231

1  Okay.  We're going to need to walk back.
2      For whom were you -- whose -- whose Chat
3  messages were at issue here?
4      A.  Undisclosed individuals in Southwest Asia.
5      Q.  Who was your employer at the time?
6      A.  My employer at the time was the U.S. Air
7  Force.
8      MR. HILLEGAS:  We're getting into
9  military matters.  I'm going to caution the witness
10  not to disclose anything covered by security
11  clearances or confidentiality.
12      Q.  Okay.  Are you able to tell us whether
13  there were differences between the litigation holds
14  in this matter versus the instructions given in
15  connection with the undisclosed folks in South
16  Asia -- Southeast Asia?
17      A.  There was no restriction on or
18  instructions to not use Chat.
19      Q.  In the MIRC Southeast Asia --
20      A.  Southwest Asia.
21      Q.  -- Southwest Asia.  Okay.  All right.
22  Let's go through the second example.
23      Are you saying CART teams, C-A-R-T?
24      A.  That's correct.
25      Q.  What's a CART team?

Page 232

1      A.  They're a forensic investigation team.
2      Q.  Were you involved in coming up with Chat
3  preservation policies?
4      A.  Each team had their own policies based
5  upon the investigation and the parties involved.
6      Q.  Did you -- were you involved in coming up
7  with any teams' policy of preservation of Chat
8  messages?
9      A.  Yes.
10      Q.  What was your involvement?
11      A.  Technical implementation.  Being in a
12  location we were at, we did not have massive amounts
13  of storage.  Things like shipping us hard drives
14  would take sometimes two months so we had to be
15  specific about what was retained.
16      Q.  And you were involved in coming up with
17  what was going to be retained; is that accurate?
18      A.  I would help inform the decision.
19      Q.  So you were not the decision-maker but you
20  consulted on the topics, accurate?
21      A.  Correct.
22      Q.  Okay.  And the yearly training I think we
23  have covered.  You're talking about the yearly
24  training you receive today -- until today at
25  Fidelity; is that accurate?

Page 233

1      A.  Yes.
2      Q.  Okay.  So I hate to try to recap this
3  again.  But are you saying you are an expert in
4  whether a company is complying with its discovery
5  obligations in litigation with respect to retaining
6  Chat messages?
7      A.  That wasn't part of my assignment.
8      Q.  I'm not asking if you were it was part of
9  your assignment.  I think we have seen some stray
10  references and that's why I'm asking.
11      Would you be qualified to tell this Court
12  in this case that there's something wrong with the
13  way Google preserved or failed to preserve Chat
14  messages under the applicable legal standard?
15      MR. HILLEGAS:  Objection; form.
16      A.  Can you restate the question?
17      Q.  Do you know what legal standards govern a
18  company in litigation in the United States -- or
19  sorry, a company anticipating or in litigation in
20  the U.S.?
21      MR. HILLEGAS:  Objection; form.
22      A.  No, I'm not a lawyer.
23      Q.  Are you qualified to tell this court that
24  Google failed to adequately preserve Chat messages
25  pursuant to whatever applicable standards apply?

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 234

1    MR. HILLEGAS:  Objection; form.
2    A.  It was not part of my assignment.
3    Q.  And I'm not asking you whether someone
4  asked you to do it here.
5    Are you even qualified to do it is my
6  question?
7    MR. HILLEGAS:  Objection; form.
8    A.  It was not part of my assignment.
9    Q.  You won't answer my question whether
10  you're qualified or not?
11    A.  I have an opinion about the dataset which
12  was part of my assignment.
13    MS. NAJAM:  Object to that as
14  nonresponsive, but we can move on.
15    Q.  Let's go to your October report that you
16  call your supplemental report, Exhibit 1, page 35,
17  starting with paragraph 68.
18    Sir, I think you referenced this earlier.
19  But there is one Chat group where it had a
20  conversation produced that included Mr. Pichai where
21  you opined that 300 messages were lost.
22    Did I summarize that accurately?
23    A.  Is this the triple A group?
24    Q.  Are you asking me?
25    A.  You said paragraph 68.  I don't see where

Page 235

1  I say 300.
2    Q.  If you skip to paragraph -- sorry, it's
3  taking me a second.  Paragraph 77.  Do you recall --
4  I'll ask a better question.
5    Do you recall that for a Chat conversation
6  that was produced that spanned December 8 to
7  December 9, 2022, that included Mr. Pichai, you
8  offer the opinion that 86 percent of a total of
9  around 387 messages were sent with history off?
10    A.  That's correct.
11    Q.  And then you opine, Consequently, messages
12  relevant to this litigation were lost due to the
13  toggle of the Retention Setting.
14    Do you see that?
15    A.  Yes.
16    Q.  As you established today, you actually do
17  not have any opinions on whether the unpreserved
18  messages were relevant to this lawsuit, right?
19    A.  Relevant means to the dataset.
20    Q.  I hear that you're saying today.  But in
21  your report you wrote the words relevant to this
22  litigation.
23    Do you see that?
24    A.  Yes, the context is this dataset, the Log
25  Dataset.

Page 236

1    Q.  As I understand your opinions today, you
2  are saying that you are not opining that these
3  unsent -- sorry, unsaved messages, this 86 percent,
4  you're not here telling the Court that they were
5  relevant to this litigation; is that true?
6    A.  That they were pertinent.  I don't know.
7  I think I have one example from that -- from that
8  AAA group which was on the next page.  No, back.
9  Yeah, Figure 11.
10    And as I recall, this is -- yeah, this is
11  from the same III group with the redactions in the
12  middle of it.  So this was a produced Chat that
13  was -- my assumption, if it's produced, it's
14  pertinent.
15    Q.  Okay.  Did you actually go through the
16  Chat and make a determination on whether even one of
17  the produced messages related to ad tech or the
18  display ad's business?
19    A.  No, I did not.
20    Q.  Is it possible that literally none of the
21  messages in that produced conversation had anything
22  to do with the topics of this lawsuit?
23    MR. HILLEGAS:  Objection; form.
24    A.  Possibly but highly unlikely.
25    Q.  Let me hand it to you then.  I'm marking

Page 237

1  that as Exhibit 11.
2    (Exhibit 11 marked.)
3    THE WITNESS:  Do these other ones
4  need --
5    MS. NAJAM:  Just pass them down.
6    THE WITNESS:  They don't need
7  stickers?
8    MS. NAJAM:  No.
9    Q.  So can you just confirm for the record
10  that Exhibit 11 is the produced Chat conversation
11  that you excerpted in Figure 11?
12    A.  Yes.
13    Q.  Can you point us to any message in this
14  produced conversation that has to do with Display
15  Ads or advertising technology?
16    A.  (Reviewed document.)  I didn't see
17  anything related with the word ad tech.
18    Q.  I think we have established this.  But
19  you're familiar with the various Google -- you're
20  familiar with Google's ad tech stack, right?
21    A.  Yes.
22    Q.  You're familiar with its publishers --
23  publisher-facing tools, its advertiser-facing tools,
24  its ad exchange.  I'll pause there.
25    You're familiar with how they work?

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 238

1    A.  Yes.
2    Q.  And so are you familiar with some of the
3   features that are at issue in this lawsuit, like
4   Bernanke or RPO or DRS?  Do these all sound familiar
5   to you?
6    A.  That's correct.
7         MR. HILLEGAS:  Objection; form.
8    Q.  Do you have an understanding what ad tech
9   ad tech is right, sir?
10        MR. HILLEGAS:  Objection; form.
11   A.  Yes.
12   Q.  So putting aside the word ad tech, given
13  what you know based on the other work you have done
14  in this case, did you see any message in here that
15  looks like it might even possibly relate to the
16  display ad's business or to tech?
17        MR. HILLEGAS:  Objection; form.
18   A.  As I understand, Meta is one of the bigger
19  competitors in the ad tech space.
20   Q.  Are you looking -- sorry.
21   A.  That's on 392.
22   Q.  Are you pointing to the reference about
23  Meta having layoffs?
24   A.  That's correct.
25   Q.  Okay.

Page 239

1    A.  And then later -- I don't know their full
2   name.  They say, Worth reading the ranges.  Quite
3   aggressive, we will have 8 percent max in the bottom
4   two categories.  Meta's are between 14.5 and
5   16.5 percent.
6    Q.  Based on what you know, do either of those
7   references have to do with digital advertising?
8    A.  I'm not certain what they're referencing
9   with those percentages.
10   Q.  Got it.
11        And when you said Meta is a competitor in
12  Display Ads, what do you mean?
13   A.  From my first report, as I recall, Meta is
14  a competitor in the space of Facebook, formerly
15  known as Facebook with Display Ads.
16   Q.  A major competitor, right?
17   A.  Yes, and they're part of a, quote, FAANG
18  gang.
19   Q.  What's the FAANG gang?
20   A.  It is Facebook, Apple -- I can't remember
21  what the second A stands for, Netflix, Google.  And
22  that's where aspiring CS grads go to work.
23   Q.  Got it.
24        MR. HILLEGAS:  Amazon.
25        THE WITNESS:  Amazon.  How could I

Page 240

1   forget Amazon.
2    Q.  Switching gears for a second.
3         Professor Hochstetler, do you know one way
4   or the other whether Google produced in this lawsuit
5   all the Chat messages it actually had preserved for
6   these 141 employees for any time period?
7    A.  I have no data one way or the other on
8   that.
9    Q.  Do you understand that when in lawsuits,
10  companies will collect a bunch of information that
11  was preserved and then produce to the other side a
12  subset of that?
13   A.  Yes, I'm aware of -- I'm lightly as not a
14  lawyer aware of the process.
15   Q.  Do you know how many Chat messages Google
16  collected in connection with this lawsuit?
17   A.  I do not.
18   Q.  Do you -- well, for your Log Dataset, did
19  you have the ability to determine how many messages
20  were sent or received during the log period, even if
21  you can't tell the content of those with history
22  off?
23   A.  Yes, for those five individuals.
24   Q.  Okay.  And did you read in
25  Mr. Malkiewicz's report that he looked at the log to

Page 241

1   determine that 12 "history on" messages were sent by
2   the CEO in that December 2022 group that we were
3   just looking at in Exhibit 11 but don't appear in
4   the production?
5    A.  As I recall, yes.
6    Q.  Do you have -- are you disputing that
7   conclusion by Mr. Malkiewicz?
8    A.  No.
9    Q.  So if a "history on" message was retained
10  but not produced, do you have any reason to disagree
11  with that, meaning that the message was preserved by
12  Google, just not produced in the lawsuit because it
13  wasn't pertinent?
14        MR. HILLEGAS:  Objection; form.
15   A.  No, I am not a lawyer.
16   Q.  By the way, you have referenced a Happy
17  Birthday Philipp Chat message.
18        The reason you reference that in your
19  report is because it was a message that was in the
20  same group, is that right, as Exhibit 11.
21        If you're looking for where to go, page 39
22  of your report, Figure 13.
23   A.  Yes.  One of the first things I did after
24  I assembled all the data from the creates and the
25  receives was to figure out where do these space IDs

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 242

1  belong.  I first want to check were there any unique
2  space IDs between the five custodians because that
3  would reinforce the messages sent/receive.  I could
4  track in the dataset, hey, this person sent, I
5  should see receives on the side.
6          At this point in the data analysis I was
7  still unsure why there was so many chime ringers
8  being sent and I wasn't seeing a one-to-one
9  correlation with them.  So at this point I started
10 searching directly for the space IDs in the
11 production.
12         And as I recall, one of the first hits I
13 got was on this Happy Birthday Philipp message,
14 which I was able to correlate directly with time.
15 So I was able to figure out the exact timing.  As I
16 mentioned before, one of the original problems was
17 the time zone.  And the original dataset was not
18 great on time zones, so we want to nail down --
19 ███████ was saying February 8 and I wanted to make
20 sure we were on the exact date with that.
21         So having these messages that were
22 produced, having an actual time zone on the end let
23 me do that.  And that was a relief for me because it
24 was -- the timing was either going to GMT or
25 California time.

Page 243

1          MS. NAJAM:  Appreciate it.  I'm going
2  to object as nonresponsive.  No disrespect intended.
3  I'm going to re-ask my question.
4      Q.  Earlier today you gave some testimony
5  about a Happy Birthday Philipp message.  In
6  Figure 13, first question, is that the message you
7  were testifying about earlier?
8      A.  Yes.
9      Q.  Okay.  Second question:  Was this message
10 in the same group as Exhibit 11; in other words, the
11 same participants are on it?
12     A.  This is the --
13         MR. HILLEGAS:  Objection; form.
14     Q.  -- AAAA, AAA group?
15     A.  Yes.
16     Q.  Okay.  Does wishing someone happy -- is
17 wishing someone happy birthday an email pertinent to
18 any lawsuit?
19     A.  I don't believe so.
20     Q.  And you --
21     A.  But the word "any" in there scares me.
22     Q.  Sure.  Is wishing Philipp happy birthday
23 pertinent to this lawsuit?
24     A.  I would hope not.
25     Q.  But I think as you testified earlier, you

Page 244

1  understand that it was produced here because it has
2  the term "history on" in that second message?
3      A.  That's correct.
4      Q.  Dr. Hochstetler, did you any analysis
5  of the dataset compared to produced Chat
6  conversations to determine whether production rates,
7  that is, the messages that were preserved and
8  produced as a percentage of total messages sent and
9  received during the log period, whether those rates
10 increased for the five custodians once history was
11 forced on?
12         MR. HILLEGAS:  Objection; form.
13     A.  No, that wasn't part of my assignment.
14     Q.  Did you have the information to do that
15 though?
16     A.  So are we -- to clarify, we're saying
17 prior to the log period -- prior to the February 8th
18 date and the log period, were aggregating counts and
19 then doing a comparison after February 8th?
20     Q.  Yes.  In terms of account of messages
21 preserved and produced as a percent of total
22 messages sent/received.
23     A.  No.
24     Q.  But my question was, did you have the
25 information to do that?

Page 245

1          MR. HILLEGAS:  Objection; form.
2      A.  Not in an easy format.  It would -- it
3  would take a lot of crunching.  As you can see
4  from -- well, the exhibit, Figure 11, this
5  conversation includes a lot of messages.  So the
6  production isn't a single Chat message.  It's an
7  entire conversation.  So I would have to -- there
8  would be a lot of steps involved in this to parse it
9  out.
10     Q.  Is the punch line that you -- technically
11 you had the information available but it would
12 require a ton of work to do that kind of analysis?
13         MR. HILLEGAS:  Objection; form.
14     A.  I hate to say work because the computer
15 does the work.  It would take time.
16     Q.  Now, Mr. Malkiewicz, do you recall that in
17 his report he, focusing on the CEO, noted that from
18 the moment that Chat was forced on -- sorry, history
19 was forced on until the end of the production period
20 in this case, that's March 23rd of '23, that Google
21 produced zero Chat messages from Mr. Pichai.  Do you
22 recall that in his report?
23     A.  I believe so.
24     Q.  Are you disputing that?
25     A.  No.

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 246

1    Q.  And did you see that Mr. Malkiewicz did
2   similar analysis for other custodians finding what
3   he called responsiveness rates of their chats after
4   history was forced on ranging from 4 to 15 percent?
5    A.  I recall that.  What paragraph?
6    Q.  I actually don't have it handy.  I'm not
7   going to ask you about any numbers.
8        My question is:  Do you dispute the stats
9   that he has come up with for these other custodians
10  in terms of the responsiveness rates of their chats
11  after history was forced on?
12   A.  No.
13       MS. NAJAM:  Okay.  I don't know if you
14  guys want to take a break.  I have about 30 minutes
15  left, maybe less.
16       MR. HILLEGAS:  We have been on the
17  record for --- closing in on an hour actually.
18       MS. NAJAM:  We're at 50 minutes, less
19  than 50 minutes on so far.  I can power through or we
20  can take a break.
21       MR. HILLEGAS:  I've got you at 54
22  but --
23       MS. NAJAM:  Oh, yeah.
24       MR. HILLEGAS:  -- it seems like a
25  good -- if it's convenient stopping point rather than

Page 247

1   going the extra half hour, I think it makes sense.
2        THE VIDEOGRAPHER:  Off the record at
3   5:02.
4        (Recess 5:02 p.m. to 5:13 p.m.)
5        THE VIDEOGRAPHER:  We're on the
6   record.  The time is 5:13.
7    Q.  Now I would like to ask you about
8   something in your declaration.  It is Exhibit 3.
9   It's going to span from pages 6 to 7, paragraphs 22
10  and 23.
11       Now in these two paragraphs of your
12  declaration you are providing numbers of emails
13  produced in this lawsuit versus Chat conversations
14  produced, correct?
15   A.  Correct.
16   Q.  Sir, were you provided any documentation
17  of the number of Chat conversations or individual
18  Chat messages that were preserved but not produced
19  in this lawsuit?
20       MR. HILLEGAS:  Objection; form.
21   A.  No.
22   Q.  For example, did you see a copy of a
23  declaration from somebody at KPMG on this topic?
24   A.  Not that I recall.
25   Q.  In this lawsuit, do you know whether every

Page 248

1   email in a particular string was produced several
2   times versus just the one if it was a comprehensive
3   string?
4    A.  For emails, no.
5    Q.  Well, aren't you aware that every time
6   somebody replied to an email, that new string was
7   produced anew, a-n-e-w, and then the count of emails
8   produced by Google in this case would not be the
9   count of individual unique email messages?
10       MR. HILLEGAS:  Objection; form.
11   A.  Wouldn't that reply be a new email?
12   Q.  So didn't you do some work in this case to
13  determine the unique email messages sent in this
14  case that were produced?
15   A.  Yes.
16   Q.  So in terms of the raw number of emails
17  produced, 4.2 million, those aren't going to be
18  unique emails, right?
19       MR. HILLEGAS:  Objection; form.
20   A.  There were some that were flagged as exact
21  duplicates and some were flagged as near duplicates
22  which would include those.
23   Q.  Okay.  So let me ask you this question:
24  If I email you and, again, Mr. Hillegas and one of
25  you replies "all," and then the other one also

Page 249

1   replies "all" on top of that -- on top of that.
2        Do you know whether in this lawsuit that
3   counts as one email or three emails when you're
4   opining on this 4.2 million number?
5    A.  So in this hypothetical you email and then
6   someone emails back and then I also email back three
7   times?
8    Q.  Yes.
9    A.  That would be three emails.
10   Q.  Okay.  So just to be clear, 4.2 million
11  that is higher than the number of unique email
12  messages produced in this lawsuit, true?
13   A.  Yes.  There were duplicates.  As I
14  understand, there were different ways that retention
15  happened.  It necessarily wasn't one exact system so
16  there are duplicates of emails that were produced.
17   Q.  Okay.  Let's pull out your reply report
18  from December, Exhibit 2.  Go to page 23, paragraph
19  60.
20       Let's actually look at Footnote 93.  You
21  say that out of the roughly 4.2 million emails
22  produced, some of them lacked date and time
23  metadata; is that right?
24   A.  That's correct.
25   Q.  And then you counted around 7,500 that

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 250

1 were flagged as exact duplicates and then another
2 roughly 1.8 million that were flagged as near
3 duplicates.
4        Did I read that -- did I recap that right?
5    A.   That's correct.
6    Q.   So is it your estimation that less than
7 1.8 million unique email messages were produced in
8 this lawsuit?
9        MR. HILLEGAS:  Objection; form.
10    A.   So 1.8 -- or the 1.761275 rounded up to
11 1.8 were flagged as duplicates and I removed them
12 from the 4.2 million.
13    Q.   So if you start at -- let me make sure
14 we're -- you started at 4.2 million and then you
15 removed the ones lacking date and time metadata,
16 right?
17    A.   Let me correct myself.
18    Q.   Yes.
19    A.   I did not deduplicate these at this point.
20 So my last sentence here, I have not performed any
21 deduplication of the email documents.
22    Q.   Who flagged 7,500-ish as exact duplicates
23 and 1 point million-ish as near duplicates?
24    A.   The system flagged them, as I recall, in
25 Reveal.

Page 251

1    Q.   Okay.  But just taking -- just doing the
2 math, out of the 3.8 million that actually had date
3 and time metadata, if you remove the ones the system
4 flagged as exact or near duplicates, don't you end
5 up with roughly 1.8 million?
6        MR. HILLEGAS:  Objection; form.
7    A.   I don't recall from the 1.8 million that
8 were flagged as near duplicates, I don't think it
9 gave me any confidence on what they were as far as
10 duplicates.
11       But if we take 3.8 million and subtract
12 1.8 million, which let's say -- let's say each of
13 them is a duplicate.  That gives us 900,000 and that
14 would be 2.7 million, if my math is right.
15    Q.   Let me ask a better question.
16       Do you have an expert opinion in this case
17 on the -- sorry.
18       Do you have an opinion in this case on the
19 number of unique email messages that Google produced
20 in this lawsuit?
21    A.   No.
22    Q.   Okay.  Now let's talk about Chat
23 conversations.
24       Any Chat conversation when produced will
25 include several individual Chat messages -- or can

Page 252

1 include several individual Chat messages, right?
2    A.   Correct.
3    Q.   And in this case, are you aware that each
4 individual Chat message is not going to be produced
5 separately?
6    A.   As I understand production is of the
7 conversation.
8    Q.   Which can include several messages?
9    A.   Which can include several messages.
10    Q.   Did you count up the individual Chat
11 messages that Google produced in this suit?
12    A.   No.
13    Q.   Can we agree that it would have been an
14 apples-to-apples comparison to count the number of
15 unique emails produced versus the number of unique
16 Chat messages produced?
17       MR. HILLEGAS:  Objection; form.
18    A.   Yes.
19    Q.   And did you try to do that comparison?
20    A.   I considered it but did not have the time.
21    Q.   Okay.  In your declaration that was
22 submitted to the Court, which we looked at a couple
23 moments ago on paragraph 23 -- I'm sorry, it's
24 paragraph 22 and paragraph 23.
25       Can we agree that it is not an

Page 253

1 apples-to-apples comparison to compare the
2 4.2 million emails produced versus the approximate
3 14 to 15,000 Chat conversations produced?
4        MR. HILLEGAS:  Objection; form.
5    A.   Correct.  Also, with chats there was a lot
6 of missing metadata.  A good percentage of it was
7 missing the date/time group metadata.  And then
8 there was also the same issue with emails where
9 there was the duplicate of ones or exact matches.
10    Q.   Okay.  Now you noted in your declaration
11 in paragraph 23 that you didn't identify a single
12 Chat produced prior to 2010.
13       Do you see that?
14    A.   Yes.
15    Q.   Is it possible that some portion of the
16 over 4,000 conversations that were lacking the
17 date/time metadata that they were prior to 2010?
18       MR. HILLEGAS:  Objection to form.
19    A.   It is possible.
20    Q.   And then I had a question about page 8 of
21 your declaration, paragraph 24, and then there's
22 some figures associated with this.
23       You observe that the year that the most
24 produced Google emails were created/sent is
25 different from the year that the most produced

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 254

1  Google chats were sent/received.
2      A.  Chat conversations.
3      Q.  Okay.  This says chats but you meant
4  conversations?
5      A.  Yeah, based upon the figure above it.
6      Q.  Okay.  Perhaps I'm being obtuse or it's
7  just late in the day.
8          Can you explain to me what the point of
9  that analysis is?
10     A.  This was to show a comparison between the
11 two productions.
12     Q.  But can you explain to us why it matters
13 that the peak years for chats versus emails differs?
14 Are you drawing any additional conclusions from
15 that?
16     A.  I am comparing them together.  I am not
17 drawing any separate conclusions.
18     Q.  Okay.  Finally did you -- I say finally,
19 almost finally.
20         Did you review any Chat preservation
21 practices or policies for any of the plaintiff
22 states or territory?
23     A.  I did not.
24     Q.  Was that not part of your scope of work in
25 this case?

Page 255

1      A.  It was not part of my assignment.
2      Q.  How about Google's disclosures of their
3  Chat preservation policy to the plaintiffs during
4  this lawsuit, was that something you considered?
5      A.  No, it was not part of my assignment.
6          MS. NAJAM:  All right.  On behalf of
7  Google, we would like to designate the deposition
8  highly confidential.  And that means that I have no
9  further questions for you at this time, but I may
10 have follow-up depending on if plaintiffs' counsel
11 has some questions.
12         MR. HILLEGAS:  Let's take a break and
13 then I will prepare my rebuttal and then we'll be
14 able to come back on the record.
15         THE VIDEOGRAPHER:  Off the record,
16 5:26.
17         (Recess 5:26 p.m. to 6:02 p.m.)
18         THE VIDEOGRAPHER:  We're on the
19 record.  The time is 6:02.
20             EXAMINATION
21 BY MR. HILLEGAS:
22     Q.  Dr. Hochstetler, welcome back.
23         As part of the questioning earlier today,
24 you were asked about "P values."
25         Do you recall that, sir?

Page 256

1      A.  I do.
2      Q.  Is it your understanding that a P value
3  measures relevance?
4      A.  No.
5      Q.  You were also asked about your history in
6  statistics.
7          Do you recall that, sir?
8      A.  That's correct.
9      Q.  You talked about a paper that you
10 published about where to place police forces.
11         Do you recall that, sir?
12     A.  Yes.
13     Q.  You presented that paper at a conference,
14 right, sir?
15     A.  That's correct.
16     Q.  And it contains your statistical analysis
17 about where best to place police in Los Angeles; is
18 that correct?
19         MS. NAJAM:  Objection; leading.
20     A.  Specifically LA County, not just Los
21 Angeles.
22         MR. HILLEGAS:  I'm passing the witness
23 a document that we can give the next exhibit number.
24         (Exhibit 12 marked.)
25     Q.  Is Exhibit 12 a copy of the paper that you

Page 257

1  presented?
2      A.  Yes.
3          MR. HILLEGAS:  Counsel, I'm noticing
4  you're putting your hand next to your ear.  Do you
5  want me to speak louder?
6          MS. NAJAM:  Yes, if you don't mind.
7  Also I can read it here.  Don't worry about it.
8          MR. HILLEGAS:  First time someone has
9  ever said that to me but I will try.
10     Q.  In your analysis for this case you used
11 all the metadata available to you, correct?
12     A.  That's correct.
13     Q.  You used all the metadata that was
14 available in the 68-day dataset, correct?
15         MS. NAJAM:  Objection; leading.
16     A.  Yes.
17     Q.  Did you exclude any data from the dataset?
18     A.  I used the dataset in its entirety.
19     Q.  Is it your understanding that metadata
20 from outside the dataset was preserved?
21     A.  Not to my knowledge.
22     Q.  To the best of your knowledge, Google
23 didn't preserve any metadata from prior to the
24 December 9th start of the dataset, correct?
25         MS. NAJAM:  Objection; leading.

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 258

1    A.   No.
2    Q.   Google didn't preserve any metadata from
3    prior to December 9th of 2022, right?
4         MS. NAJAM:  Objection; leading.
5    A.   Not that I'm aware of.
6    Q.   Google didn't preserve any data from --
7    strike that.
8         Google didn't preserve any metadata from
9    2021, correct?
10        MS. NAJAM:  Objection; leading.
11   A.   Not that I'm aware of.
12   Q.   Google didn't preserve any data from --
13   strike that.
14        Google didn't preserve any metadata from
15   2020, correct?
16        MS. NAJAM:  Objection; leading.
17   A.   Not that I'm aware of.
18   Q.   And if I were to ask you for each year
19   going back to the beginning of Google's obligation
20   to start holding data relative to this litigation,
21   you would have the same answer, correct?
22        MS. NAJAM:  Objection; form.
23   Objection; leading.
24   A.   That is correct.
25   Q.   You're not opining on when Google's

Page 259

1    obligation to preserve data started, right?
2    A.   I am not.
3    Q.   In your analysis of the metadata, it
4    covered five custodians, correct?
5         MS. NAJAM:  Objection; leading.
6    A.   Yes.
7    Q.   And those five custodians were custodians
8    in the Epic Play log case, correct?
9    A.   As I understand.
10   Q.   Those five custodians were subject to a
11   litigation hold on the Epic Play log case, correct?
12        MS. NAJAM:  Objection; form.
13   Objection; leading.
14   A.   Yes.
15   Q.   Those five custodians were also custodians
16   in this case, correct?
17        MS. NAJAM:  Objection; leading.
18   A.   Yes.
19   Q.   Those five custodians were subject to a
20   litigation hold in this case, correct?
21        MS. NAJAM:  Objection; form, leading.
22   A.   That's correct.
23   Q.   So the five custodians in the metadata
24   data log that you reviewed were subject to at least
25   two litigation holds, correct?

Page 260

1         MS. NAJAM:  Objection; leading.
2    A.   That I'm aware of.
3    Q.   Were the Chat logs that were produced for
4    those five custodians limited to the Epic Play log
5    case?
6    A.   No.
7    Q.   Were the Chat logs that were produced for
8    the five custodians limited to chats for this case?
9    A.   No.
10   Q.   Did the metadata Chat log for those five
11   custodians reflect all of the Chat usage of those
12   five custodians over the 68-day log period?
13   A.   That I'm aware of.
14   Q.   Now, earlier today you had a discussion
15   over whether the Chat log covered people with -- who
16   were in day-to-day jobs in Display Ads.
17        Do you recall that?
18   A.   Yes.
19   Q.   Did Google produce any metadata for
20   employees with day-to-day jobs in Display Ads?
21        MS. NAJAM:  Objection to form.
22   A.   Not that I'm aware of.
23   Q.   Earlier on in the day there was a
24   discussion over whether you reviewed Mr. Pichai's
25   deposition.

Page 261

1         Do you recall that?
2    A.   Yes.
3    Q.   And you had mentioned to counsel that you
4    did not review the deposition, right?
5    A.   Correct.
6    Q.   That's not correct, right?
7         MS. NAJAM:  Objection; leading.
8    A.   That is not correct.
9    Q.   You actually cite Mr. Pichai's deposition
10   on page 6, Footnote 10 of your declaration, right?
11   A.   I do.
12        MS. NAJAM:  Objection; leading.
13   Q.   Now, opposing counsel had a list of
14   questions for you about the Chat volume of the
15   custodians who were not on the Chat log.
16        Do you recall that?
17   A.   Yes.
18   Q.   And you testified that you couldn't speak
19   to the Chat volume of those 136 custodians, correct?
20   A.   The 141 minus 5, yes.
21   Q.   Why can't you speak to the Chat volume of
22   those 136 custodians?
23   A.   There's no data for it.
24   Q.   There's no data for it because that data
25   wasn't preserved by Google, right?

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 262

1          MS. NAJAM: Objection; leading.
2      A.   That metadata was destroyed.
3      Q.   The average that you took of the metadata
4  that was produced is the best possible estimate of
5  Chat use given what was produced in this case,
6  right?
7          MS. NAJAM: Objection; leading.
8      A.   Yes.
9      Q.   You're not opining on the duration
10  necessary to preserve chats, right?
11          MS. NAJAM: Objection; leading.
12      A.   I am not.
13      Q.   Did Google produce any metadata more
14  representative than the dataset you reviewed?
15          MS. NAJAM: Objection; form.
16      A.   Not that I'm aware of.
17      Q.   And that's because Google didn't produce
18  any other data other than the metadata that you
19  produced -- that you reviewed, correct?
20          MS. NAJAM: Objection; leading.
21      A.   That's correct.
22      Q.   There was a series of questions on
23  litigation holds.
24          Do you recall that?
25      A.   Yes.

Page 263

1      Q.   I would like you to bring back up
2  Exhibit --
3      A.   -- eight.
4      Q.   I appreciate you having the number because
5  I don't.
6      A.   Only one copy has a number.
7      Q.   Thank you.
8          And in Exhibit 8, most of it's redacted,
9  right?
10          MS. NAJAM: Objection; leading.
11      A.   (Reviewed document.) I would say the
12  majority is redacted.
13      Q.   In the questioning, opposing counsel had
14  you read portions of it, correct?
15          MS. NAJAM: Objection; leading.
16      A.   Yes.
17      Q.   One of the portions that opposing counsel
18  had you read was in that first open section, This
19  means you must keep and not delete all relevant
20  information as explained below; is that correct?
21      A.   That's correct.
22      Q.   Immediately following that is a large
23  black box that extends from page Bates number ending
24  in 50 to 51; is that correct?
25      A.   Correct.

Page 264

1      Q.   Do you have any idea what's underneath the
2  black box?
3      A.   No.
4      Q.   Do you know whether Google employees
5  followed the instructions under the black box?
6      A.   I do not.
7      Q.   The next passage that Google -- that
8  opposing counsel had you read discusses asking
9  employees not to -- please do not use the following
10  tools or messaging apps to discuss any topics
11  covered by this legal hold, colon, any third-party
12  tools or messaging apps; or any Google messaging
13  apps (such as Chat, Hangouts, Duo) or Dogfood apps
14  (if you must do so, please make sure the settings
15  preserve the messages, such as switching to "history
16  on" for chats and Hangouts).
17          Do you recall that?
18      A.   Yes.
19      Q.   Did Google employees continue to use chats
20  despite that warning?
21          MS. NAJAM: Objection; form.
22      A.   Yes.
23      Q.   In your review of the metadata and chats
24  in this case, you didn't determine whether any
25  produced Chat is pertinent to this case, right?

Page 265

1      A.   No.
2      Q.   At various points today opposing asked --
3  counsel asked you about whether certain unproduced
4  chats were relevant, right?
5      A.   Yes.
6      Q.   And you were unable to testify as to the
7  content of unproduced chats, right?
8      A.   Correct.
9      Q.   Why couldn't you testify as to the content
10  of the unproduced Chat messages?
11      A.   That data doesn't exist.
12      Q.   That data has been destroyed, right?
13          MS. NAJAM: Objection; form.
14      A.   That's correct.
15      Q.   It existed at one point and it no longer
16  exists now; is that fair?
17          MS. NAJAM: Objection; form.
18  Objection; leading.
19      A.   That's fair to say.
20      Q.   Opposing counsel asked you about two
21  documents from 2013 and 2015 respectively about
22  enterprise software.
23          Do you recall that?
24      A.   Exhibits 9 and 10, yes.
25      Q.   Is it fair to say that in order for Google

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 266

1 to preserve chats for individual employees, it must
2 have been able to do two things: First, it needs to
3 be able to make a distinction on
4 employee-by-employee basis. And second, it needs to
5 prevent employees from turning Chat history "off."
6           MS. NAJAM: Objection; form.
7 Objection; leading.
8     A. Yes.
9     Q. One of these exhibits is from 2013, right?
10     A. Yes, Exhibit 10.
11     Q. In the 2013 exhibit, Google discusses how
12 it has the ability to make changes on a per-employee
13 by per-employee basis, right?
14           MS. NAJAM: Objection; form and
15 leading.
16     A. The exact verbiage is, ability to
17 customize which Hangouts features are available to
18 which employees.
19     Q. And that's making changes on a
20 per-employee basis, right?
21           MS. NAJAM: Objection; form and
22 leading.
23     A. Yes.
24     Q. In 2015 Google had the ability to prevent
25 users from changing the default settings, right?

Page 267

1           MS. NAJAM: Objection; form and
2 leading.
3     A. That is correct.
4     Q. And, in fact, if you go to page 3 --
5           MS. NAJAM: Which exhibit are you on?
6           THE WITNESS: Exhibit 9.
7           MR. HILLEGAS: The 2015 one,
8 Exhibit 9.
9           THE WITNESS: Exhibit 9.
10     Q. Can you read the second and third
11 sentences at the top of the page, please.
12     A. With this new feature, admins can ensure
13 Chat participants cannot change this setting for new
14 conversations. This also means that participants
15 with Hangouts Chat history forced on will not be
16 able to communicate with participants with Chat
17 history forced off.
18     Q. Does that mean that in 2015 Google had the
19 ability to prevent users from turning off Chat
20 history?
21           MS. NAJAM: Objection; form and
22 leading.
23     A. Yes.
24     Q. So as of 2015, Google had both elements
25 necessary to prevent individual employees from

Page 268

1 turning off Chat history; is that correct?
2           MS. NAJAM: Objection; form and
3 leading.
4     A. Yes.
5     Q. Opposing counsel referred to ████████
6 deposition several times, right?
7     A. Yes.
8     Q. I believe she cited to his comments in
9 Mr. Malkiewicz's report stating that Google had put
10 in several hundred hours across a team to develop
11 and roll out the technology to preserve chats for
12 specific employees; is that correct?
13           MS. NAJAM: Objection to form and
14 leading.
15     A. That's correct.
16     Q. Is a couple hundred hours a long time for
17 a company the size of Google to develop and roll out
18 software?
19           MS. NAJAM: Objection to form.
20     A. Not for a company the size of Google.
21     Q. How much real time is a couple hundred
22 hours for a team to develop this sort of software
23 for a company the size of Google?
24           MS. NAJAM: Objection; form.
25     A. I would estimate one sprint.

Page 269

1     Q. How long is a sprint?
2     A. Normally it would be two weeks.
3     Q. Opposing counsel also asked you about
4 apples-to-apples comparisons with -- between emails
5 and chats.
6           Do you recall that?
7     A. Yes.
8     Q. And part of that was that each new email
9 on a chain may be a new document, right?
10     A. Yes.
11     Q. It isn't necessarily true that all of the
12 produced documents started with a single email and
13 built from there, right?
14           MS. NAJAM: Objection; form and
15 leading.
16     A. That's true.
17     Q. Some of the produced emails may have just
18 been the entire chain in one fell swoop, correct?
19           MS. NAJAM: Objection; form and
20 leading.
21     A. That's correct.
22     Q. Taking opposing counsel's apples-to-apples
23 comparison as true, are you still able to use the
24 number of emails as a check for your chats analysis?
25     A. Yes.

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 270

1    Q.  Do you believe that your comparison of
2  chats and emails supports your conclusions?
3    A.  Yes.
4    Q.  Opposing counsel asked you about the
5  spreadsheet that you produced in this case.  Do you
6  recall that?  I'm referring to the one mentioned in
7  202 employees.  I don't know which exhibit it is.  I
8  can hand you my copy if you'd like.
9    A.  I was looking for the exhibit number.
10  Yes.
11    Q.  You produced that spreadsheet as part of
12  your reply report, correct?
13    A.  That's correct.
14    Q.  And if you were to receive new information
15  for the number of people that were subject to a
16  litigation hold, could you update your numbers on
17  the spreadsheet?
18    A.  Yes.
19    Q.  Do you intend to testify about all the
20  opinions that are in your reports, including your
21  supplemental report, your declaration, and your
22  prior report?
23    A.  I do.
24    Q.  Are you qualified to give all the opinions
25  that are in your reports?

Page 271

1        MS. NAJAM:  Objection; form.
2    A.  I am.
3    Q.  Has anything mentioned today changed your
4  opinions that are contained within your supplemental
5  report, declaration or reply report?
6    A.  No.
7        MR. HILLEGAS:  Pass the witness.
8        FURTHER EXAMINATION
9  BY MS. NAJAM:
10    Q.  Let's go in reverse order.
11        On the topic of Exhibit 9, and that is the
12  blog post from 2015, I wanted to clarify a few
13  things first.
14        You testified earlier that you didn't know
15  whether the version of Google Chat that it provides
16  to customers was the same as the one Google was
17  using internally.
18        Is that still the case?
19        MR. HILLEGAS:  Objection; form.
20    A.  I don't believe I saw any testimony in the
21  depositions regarding that.
22    Q.  So you don't know.  In other words, I'm
23  going to use your phrase from earlier.  You don't
24  have any visibility into the version of the software
25  that Google uses internally to compare it to the

Page 272

1  versions provided to customers, true?
2    A.  Correct.  I don't -- I don't know if they
3  eat their own dog food.
4    Q.  Did you say, I don't know if they eat
5  their own dog food?
6    A.  That's correct.
7    Q.  What does that mean?
8    A.  That's an industry phrase for when you
9  produce a product, you use it internally to iron out
10  the issues with it and then you release it as a
11  product.
12    Q.  Do you know in 2015, for example, whether
13  your interpretation of Exhibit 9 that you could on A
14  user-by-user basis have a sticky Retention Setting
15  if that was indeed available in whatever software
16  Google was using internally?
17        MR. HILLEGAS:  Objection; form.
18    A.  This is what I took locally applied to
19  mean.
20    Q.  You're looking at Exhibit 9 in that box,
21  correct?
22    A.  That's correct.
23    Q.  I want to look at the language that you
24  and plaintiffs' counsel looked at on page 3, with
25  this new feature admins can ensure.

Page 273

1        Is there any wording in this blog post
2  that says that admin can select on a user-by-user
3  basis whether a Retention Setting cannot be altered?
4    A.  Yes.
5    Q.  Where is that language?
6    A.  The third sentence.
7    Q.  Of what page?
8    A.  Of that -- the page we're on, page 3.
9  This also means that participants with Hangouts Chat
10  history forced on will not be able to communicate
11  with participant with Chat history forced off.
12        If there is someone forced off and there
13  is someone forced on, that means it's not a global
14  application.  It's selectively applying it.
15    Q.  What you're talking about is selectively
16  applying whether history is on versus off, correct?
17    A.  Forced on, yes.
18    Q.  I'm asking a different question.
19        Does it say anything in here about forcing
20  history on for all participants and then selecting
21  which ones can't change it?
22        MR. HILLEGAS:  Objection; form.
23    A.  It's in the same dialogue box from the
24  screenshot in the blog post.
25    Q.  Is it what you and I covered earlier?

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 274

1    A.  Yes.
2    Q.  You're taking the local reference to mean
3  this is a user-by-user determination?
4    A.  That's correct.
5    Q.  Besides Exhibit 9, am I right that you
6  don't have any other indication that back in 2015
7  Google had the capability to do what it ultimately
8  did in February of 2023?
9        MR. HILLEGAS:  Objection; form.
10   A.  Beyond the document I found, I did not do
11  any searching.
12   Q.  And you testified just now when counsel
13  was asking you to agree with him on certain
14  statements.  You said in your view in terms of the
15  work, the hours that ▇▇▇▇▇ testified it took to
16  make the change, that's a sprint.  That's two weeks
17  in your opinion?
18   A.  Yes.
19   Q.  Is the word "sprint" contained in any of
20  your reports or declarations in this case?
21   A.  No.
22   Q.  It's your opinion that that's a two-week
23  effort.  Is that contained in either of your reports
24  or your declaration in this case?
25   A.  No.  Different companies have different

Page 275

1  lengths of sprints.  It really depends upon the
2  internal team dynamics and how they use the software
3  development life cycle.  But, in general, a sprint
4  is two weeks.
5        MS. NAJAM:  Object as nonresponsive
6  beyond "no."
7    Q.  I just want to clarify for the record.
8  Did you include in either of your reports or your
9  declaration your opinion we just heard that it would
10  have taken Google just two weeks of work to make the
11  change it ultimately did on February 8th?
12       MR. HILLEGAS:  Objection; form.
13   A.  I don't make that claim in my report.
14   Q.  It's a new opinion today, right?
15   A.  Yes.
16   Q.  And just to clarify for the record, before
17  plaintiffs' counsel came in and asked you a bunch of
18  questions -- I don't want the hear the content of
19  any conversations -- did y'all meet for roughly 35
20  minutes?
21       MR. HILLEGAS:  You may give the time
22  but no other information.
23   Q.  It was just a yes or no.
24   A.  Yes.
25       MS. NAJAM:  All right.  Thank you.  I

Page 276

1  have no further questions.
2        MR. HILLEGAS:  No questions from me.
3        THE VIDEOGRAPHER:  Off the record,
4  6:26.
5        (Deposition concluded at 6:26 p.m.)

Page 277

1        DEPOSITION CHANGES
2  WITNESS:  JACOB HOCHSTETLER
3  PAGE NO.  LINE NO.    CHANGE   REASON FOR CHANGE
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  Job No. CS7067190

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 278

```
 1
 2
 3
 4      _____
            (Signature of the Witness)
 5
 6
 7
 8   THE STATE OF _____
 9   COUNTY OF _____
10
11      Subscribed and sworn to before me by the said
12   witness, JACOB HOCHSTETLER, on this the _____
13   day of _____, 2024.
14
15
        _____
16         Notary Public in and for the
           State of _____
17         County of _____
18   My commission expires:  _____
19
20
21
22
23
24
25    Job No. CS7067190
```

Page 280

```
 1   Peter Hillegas
 2   peter.hillegas@nortonrosefulbright.com
 3          December 17, 2024
 4   RE:   State Of Texas, Et Al. v. Google LLC
 5   12/16/2024, Jacob Hochstetler (#7067190)
 6      The above-referenced transcript is available for
 7   review.
 8      Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   (erratas-cs@veritext.com).
16    Return completed errata within 30 days from
17   receipt of testimony.
18    If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25
```

Page 279

```
 1   STATE OF TEXAS  )
 2   COUNTY OF DALLAS )
 3      I, Michelle L. Munroe, Certified Shorthand
 4   Reporter in and for the State of Texas, certify that
 5   the foregoing deposition of JACOB HOCHSTETLER was
 6   reported stenographically by me at the time and place
 7   indicated, said witness having been placed under oath
 8   by me, and that the deposition is a true record of
 9   the testimony given by the witness;
10      That the amount of time used by each party at
11   the deposition is as follows:
        Ms. Najam  -   6 hours, 16 minutes
12      Mr. Hillegas -   17 minutes
13      I further certify that I am neither counsel for
14   nor related to any party in this cause and am not
15   financially interested in its outcome.
16      Given under my hand on this the 17th day
17   of December, 2024.
18
19
20
21     Michelle L Munroe
          Michelle L. Munroe, CSR No. 6011
22        Commission expires 1-31-26
          Firm Registration #571
23        VERITEXT LEGAL SOLUTIONS
          300 Throckmorton Street, Suite 1600
24        Fort Worth, Texas  76102
          817.336.3042  telephone
25
```

71 (Pages 278 - 280)

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[& - 17]**                                                                 Page 1

| & | | | |
|---|---|---|---|
| **&**   3:4 5:7 | 84:8,9 90:16 | 241:3,20 | 198:3,5,7 |

**0**

**000088212**   51:1
**000957**   1:6
**05**   21:1,7,11,17
21:22 114:18
114:20 115:1

**1**

**1**   4:8 7:22 8:1
51:19 59:6
64:12,16 68:12
119:23 121:1,9
121:11 122:15
123:12,21,24
124:9,20,23
125:7,9,9
126:2,23
133:11 196:2
202:3 216:2
218:1,13
234:16 250:23
**1,200**   123:1
**1,856**   196:21
**1-31-26**   279:22
**1.4**   82:25 84:12
84:21 161:10
165:8
**1.5**   66:22 68:2
68:5 70:3 74:5
74:8 75:3,9
82:25 83:16

120:7 165:8
221:17 222:2
**1.761275**
250:10
**1.8**   165:8 250:2
250:7,10,11
251:5,7,12
**10**   4:20 27:5
32:16 41:21
93:17 111:18
204:4 208:6,7
208:21 210:22
210:23 211:4
211:11,24
230:16 261:10
265:24 266:10
**100**   2:5,10
43:25 73:24
103:8 195:10
**100,000**   215:9
**1000**   2:19
**10007**   3:11
**106**   70:2
**10940**   2:5
**10:11**   49:25
50:1
**10:23**   50:1,3
**11**   4:9,21
111:18 130:3
144:24 173:24
202:2 212:24
236:9 237:1,2
237:10,11

243:10 245:4
**1100**   3:4
**118,000**   122:23
**11:25**   91:2,3
**11:41**   91:3,5
**12**   4:22 124:13
130:3 219:25
241:1 256:24
256:25
**12.8.0222**   4:21
**12/16/2024**
280:5
**12/21**   93:5,18
**12548**   2:23
**12:32**   126:17
126:18
**13**   23:15 78:8
208:25 220:1
220:13 221:4
241:22 243:6
**136**   98:13,16
99:12,14
106:20 107:18
108:8,21 138:7
138:14,21
139:8,15,25
140:7,16,20
142:2,5 150:6
150:22,25
151:8,15 152:4
154:18 161:3,8
162:15 164:17
165:10 195:12

200:16 261:19
261:22
**14**   9:10 68:12
220:1 253:3
**14.5**   239:4
**141**   75:12
78:14 79:3,17
80:2 85:7,13
98:17 115:20
116:12 117:1
118:20,24
119:9,25
150:14 200:24
240:6 261:20
**144**   4:15
**146**   4:16
**15**   246:4
**15,000**   253:3
**150**   93:19,23
**1550**   2:14
**16**   1:14 5:4
27:7 144:11,24
157:18 158:11
159:3,14,22
279:11
**16.5**   239:5
**1600**   279:23
**16958**   279:21
**16th**   1:18
**17**   53:11
158:12 166:8
279:12 280:3

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[170 - 271]**

Page 2

**170** 93:24
**175** 3:9
**17th** 279:16
**18** 88:3 89:17
   127:16 173:25
   202:3 212:25
   225:10
**18,566** 175:8
**180** 122:18,22
**181** 4:17
**188** 79:12,16
**19** 4:16 196:19
**1997** 29:16
**1:26** 126:18,20
**1st** 6:1

**2**

**2** 4:9 8:3 41:11
   41:15,17 52:1
   57:18 58:24
   59:6 68:12,17
   142:11 204:4
   205:22 207:6
   218:1,13 221:7
   227:18 249:18
**2,000** 73:12,15
**2.7** 251:14
**2.8** 78:14 80:1
   80:25 81:8
   82:1,16 90:16
   120:9
**20** 93:17
   158:12 180:6

**20,000** 65:21
   66:6 68:10,15
   68:15,21 69:4
   73:23 75:11
   207:7
**2000** 2:14 66:9
**20001** 2:19
**2002** 98:18
**2004** 63:13,15
**2007** 67:10
**2010** 18:13
   253:12,17
**2013** 204:13,17
   208:23 209:2,6
   210:20,24
   265:21 266:9
   266:11
**2015** 67:10
   205:2,5 206:12
   208:24 265:21
   266:24 267:7
   267:18,24
   271:12 272:12
   274:6
**2016** 24:12
**2019** 67:11,13
   67:16 68:3
   86:4 87:12
   158:1 192:24
**202** 79:11
   87:18 88:7,10
   88:13 89:9,18
   89:23 90:7,21
   115:20 270:7

**2020** 202:8
   203:5 258:15
**2021** 4:22
   193:3 258:9
**2022** 9:10
   64:23 65:13,15
   66:15 67:1,8
   67:13 68:3
   70:4 74:6
   75:18 78:16
   80:25 82:1,25
   83:16 85:7,15
   85:19 86:25
   89:10 98:20,21
   103:2 104:2
   150:16 158:1
   166:14 184:1
   193:4 235:7
   241:2 258:3
**2023** 9:10
   65:16,17 69:6
   86:5 87:12
   152:2 159:1
   201:20 213:11
   213:23 274:8
**2024** 1:14,18
   4:8,9,15,16 5:4
   7:24 41:15
   48:16 58:21
   278:13 279:17
   280:3
**205** 4:19
**208** 4:20

**20th** 72:21
**21** 41:22 153:8
   227:18
**21,269** 175:9
**22** 65:24 70:9
   79:4 84:18
   85:4 98:20
   158:12 204:12
   209:2 247:9
   252:24
**2200** 1:23
**23** 73:9 133:11
   143:9 158:12
   158:22 194:22
   205:10,19
   212:6 245:20
   247:10 249:18
   252:23,24
   253:11
**237** 4:21
**23rd** 245:20
**24** 4:8 58:22
   70:6 196:25
   224:9 225:4
   253:21
**244** 137:22
**250** 43:25
**255** 4:4 51:3
**256** 4:23
**26** 4:15 52:2
   93:16 130:4
   142:17
**271** 4:5

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[2829 - 6:26]**                                                    Page 3

| | | | |
|---|---|---|---|
| **2829** 2:9 | **365.25.** 117:10 | **5** | **5:26** 255:16,17 |
| **2:27** 169:6,7 | **37** 111:20,23 | **5** 4:3,13 64:13 | **6** |
| **2:42** 169:7,9 | 203:11 | 64:15,16 78:10 | **6** 4:14 93:19 |
| **3** | **387** 235:9 | 87:22 88:2 | 124:16 142:22 |
| **3** 3:10 4:11 8:3 | **39** 241:21 | 93:14,17,21 | 144:6,8,18 |
| 26:1 57:22 | **392** 238:21 | 98:17 118:16 | 153:7 247:9 |
| 58:3,13 59:6 | **3:49** 214:9,10 | 119:5 157:18 | 261:10 279:11 |
| 76:13,15 153:7 | **3rd** 93:5,18 | 195:23 216:2 | **60** 249:19 |
| 218:5,8 247:8 | **4** | 221:7 261:20 | **6011** 279:21 |
| 267:4 272:24 | **4** 4:12 78:7 | **5,000** 73:7 | **65.7** 197:5,19 |
| 273:8 | 83:24 84:4 | 137:23 | **66** 119:21 |
| **3.8** 251:2,11 | 89:12,15 90:8 | **50** 82:15 83:5 | 122:21 |
| **30** 23:16 86:20 | 90:19 169:12 | 246:18,19 | **67** 216:4 |
| 91:19 93:18 | 246:4 | 263:24 | **68** 9:2,7 69:23 |
| 142:22 225:9 | **4,000** 253:16 | **500** 43:9 | 69:24 70:17,23 |
| 246:14 280:16 | **4.2** 248:17 | 134:11,20 | 71:9 72:5 |
| **300** 93:8,25 | 249:4,10,21 | 136:12,13 | 74:16 80:17 |
| 94:1,1,2 | 250:12,14 | **51** 263:24 | 105:21 112:5 |
| 234:21 235:1 | 253:2 | **51,000** 119:13 | 117:7 118:16 |
| 279:23 | **41** 4:10 | **51,465** 118:23 | 119:6 130:25 |
| **34** 130:11 | **42** 223:23 | 119:14,19 | 175:9 185:18 |
| **340** 118:17 | **43** 66:17 70:2 | **51st** 3:10 | 186:3,8,18 |
| 119:6,19 | 173:10 | **5300** 3:5 | 187:18,24 |
| **35** 127:16,17 | **45** 51:19 | **54** 246:21 | 189:14,22 |
| 216:4 234:16 | 127:17 | **55** 96:14 97:9 | 192:10,14 |
| 275:19 | **450** 181:7 | 97:12 | 193:24 198:14 |
| **350** 44:6 | **451** 181:23 | **56.4** 197:9,19 | 234:17,25 |
| **36** 111:20,23 | 183:1 | **571** 279:22 | 257:14 260:12 |
| 138:1 196:19 | **465** 119:15 | **58** 4:11 | **6:02** 255:17,19 |
| **3600** 1:24 | **4:08** 214:10,12 | **59** 145:18 | **6:26** 276:4,5 |
| **365** 71:9 117:6 | **4:20** 1:6 | **5:02** 247:3,4 | |
| 117:16 118:22 | **4th** 51:18 54:18 | **5:13** 247:4,6 | |
| 118:24 119:9 | | | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[7 - accurate]                                                  Page 4

**7**

**7** 4:16 73:10
93:20 141:13
145:9 146:9,10
170:1 172:10
175:2,12
195:23 247:9
**7,500** 249:25
250:22
**7067190** 280:5
**74:11** 144:11
**76102** 279:24
**77** 235:3
**77002** 3:5
**77010** 2:15
**77064** 2:6
**78711-2548**
2:23
**799** 2:18
**79:21** 146:6

**8**

**8** 4:8,17 64:13
64:15,19 69:6
74:3 89:14
90:8,19 124:14
152:2 181:3,6
184:5,14 194:6
196:5 197:15
235:6 239:3
242:19 253:20
263:8
**800** 123:1

**80:12** 146:6
**81** 223:23
**817.336.3042**
279:24
**82** 66:17
**84** 4:12
**86** 235:8 236:3
**87** 175:7
196:17
**88** 4:13
**89** 133:12
137:11
**8th** 114:3
151:20 179:23
197:4 226:16
226:20 244:17
244:19 275:11

**9**

**9** 4:18 9:10
88:4 196:25
205:17,18,20
211:4,10,23
221:10 235:7
265:24 267:6,8
267:9 271:11
272:13,20
274:5
**90** 230:15
**900,000** 251:13
**90s** 229:21
**91** 143:10,12
**91361** 2:10

**92** 196:7,11
197:12
**93** 249:20
**96** 198:25
**97b** 29:1,14
**97bravo** 28:25
**9:10** 1:18 5:4
**9th** 2:18 114:3
257:24 258:3

**a**

**a.m.** 1:18 5:4
50:1,1 91:3,3
**aaa** 236:8
243:14
**aaaa** 243:14
**abide** 177:6
**ability** 129:19
205:3,11
240:19 266:12
266:16,24
267:19
**able** 12:25 13:3
38:20 71:1
98:23 110:4
122:2 131:12
149:14,25
158:24 176:3
187:17,20
199:15 203:5
207:25 215:19
217:14 231:12
242:14,15
255:14 266:2,3

267:16 269:23
273:10
**above** 1:19
105:24 107:3
107:14,17
128:21 194:18
254:5 280:6
**abston** 2:4
**academic** 13:11
**accept** 210:16
**accepting**
210:13
**access** 15:22
53:2 99:24
**accordance**
30:2
**account** 34:25
35:14,19 60:11
75:17 244:20
**accounts** 60:6
**accuracy** 280:9
**accurate** 8:6
16:25 17:10
26:5 35:5
43:15 46:7
76:7 82:11
83:6 107:12
122:16 128:9
154:25 159:18
170:5 172:23
172:25 182:23
185:1 195:17
209:13 215:20
226:7 230:14

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[accurate - advertising]                                      Page 5

| | | | |
|---|---|---|---|
| 230:15 232:17 | 147:1 156:15 | **addition** | **administrators** |
| 232:20,25 | 172:18 173:14 | 152:25 | 34:23 209:7 |
| **accurately** | 178:14 186:17 | **additional**   52:4 | 211:7 |
| 103:25 148:6 | 187:8 196:17 | 109:7 142:13 | **admins**   210:4 |
| 234:22 | 221:20 235:16 | 254:14 | 267:12 272:25 |
| **acevedo**   3:15 | 236:15 240:5 | **additionally** | **ads**   85:13,19,21 |
| **acknowledg...** | 246:6,17 | 75:20 141:1 | 86:12,24 87:5 |
| 280:12 | 249:20 251:2 | **addressed** | 87:11 99:18 |
| **acronym**   21:4 | 261:9 | 129:22 | 100:9,10,16,19 |
| **actions**   51:3 | **acumen**   15:25 | **addresses**   51:9 | 100:22 101:3 |
| **activity**   141:15 | **ad**   39:19,21 | **adequate**   42:15 | 101:10,23 |
| **actual**   32:11 | 43:2,14 47:2,9 | 227:12,25 | 102:4,12,20 |
| 41:6 51:8 79:8 | 53:15 85:25 | 228:4,21 | 103:1,7,17,22 |
| 101:2 102:23 | 86:1,6 95:24 | **adequately** | 104:3,10,17 |
| 136:5 137:4 | 98:7,8,8 99:4 | 39:15 40:1,11 | 105:8 113:17 |
| 141:14 172:18 | 99:19 100:16 | 41:2,25 42:6 | 113:25 114:8 |
| 174:12,17 | 102:8 113:17 | 42:10,18 | 187:21 189:13 |
| 193:13 242:22 | 156:4 186:8 | 227:11,20 | 190:2 192:20 |
| **actually**   5:22 | 187:9 188:22 | 233:24 | 192:24 194:1 |
| 13:8 25:7 | 190:1 192:20 | **admin**   210:16 | 198:14 219:16 |
| 32:22 36:3 | 192:23 193:25 | 211:25 273:2 | 220:11,25 |
| 42:20 47:23 | 236:17 237:17 | **administered** | 237:15 239:12 |
| 48:16 49:17 | 237:20,24 | 204:1 | 239:15 260:16 |
| 55:9 66:1 71:6 | 238:8,9,12,19 | **administrating** | 260:20 |
| 75:10 77:23 | **ad's**   192:24 | 230:3 | **advanced**   18:9 |
| 78:8 84:24 | 194:11 236:18 | **administration** | **advertised** |
| 85:4 86:23 | 238:16 | 205:13 | 204:14 |
| 87:20 88:10 | **add**   27:7 45:14 | **administrator** | **advertiser** |
| 97:4 100:8 | 45:21 93:25 | 203:7,22 | 237:23 |
| 102:7,20 | 126:10 | 205:25 206:11 | **advertising** |
| 103:15 110:18 | **added**   26:9,20 | 206:18 207:5 | 181:9 186:4 |
| 112:1 123:9 | 26:22 109:7 | 207:25 213:12 | 205:3 237:15 |
| 124:5 126:4 | **adding**   71:16 | **administrator's** | 239:7 |
| 136:21 138:20 | 71:18,25 | 35:23 205:3 | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[advice - anticipation]**                                                                 Page 6

**advice**  12:2
  37:12 49:11,15
**affect**  100:6
  101:7
**affected**  31:24
  114:12
**affecting**  100:7
**affinity**  201:12
**agency**  53:15
**agent**  11:13
**agents**  30:19
**ages**  127:16,17
**aggregating**
  244:18
**aggressive**
  239:3
**ago**  30:20
  32:10 39:20
  42:9 87:15
  97:9 101:10
  192:16 252:23
**agree**  6:15
  43:17 63:18
  85:18 94:12
  95:11 100:8
  119:23 129:3
  131:1 138:6
  164:22 167:12
  167:25 189:1
  197:11 252:13
  252:25 274:13
**agreed**  88:7
**agreeing**  34:8

**agreement**  1:25
  219:5,10
  220:17
**agreements**
  126:3
**agrees**  41:24
  42:4 227:19,24
**ahead**  44:13
  46:12 60:22
  61:13 119:17
  158:3
**ai**  19:4
**air**  231:6
**airplane**  19:17
**ait**  29:19
**al**  1:4 280:4
**alamos**  13:17
  16:9
**alex**  2:4
**algebra**  18:11
**align**  55:20
**aligned**  10:15
**alleged**  158:19
**allied**  229:6
**allotted**  280:19
**allow**  77:21
  205:6 206:6
  207:19
**allowed**  168:17
  201:25 202:7
  211:25 213:3
**altered**  273:3
**amazon**  239:24
  239:25 240:1

**amount**  18:18
  31:22 49:7
  117:11 137:13
  279:10
**amounts**
  232:12
**anajam**  3:6
**analogy**  125:19
**analysis**  11:21
  13:19 16:15
  17:15 22:5,11
  22:25 23:4
  25:17,21 40:16
  40:17 42:13
  44:19 47:11
  49:3 66:19
  105:1 107:15
  113:9 136:7
  157:15,16
  195:5 200:19
  217:1 223:19
  242:6 244:4
  245:12 246:2
  254:9 256:16
  257:10 259:3
  269:24
**analytics**  17:15
**analyze**  8:19
  40:15 41:4
  99:21 161:9
**analyzed**  80:8
  127:21 162:22
**analyzing**  12:9
  13:12 160:13

**anew**  248:7
**angeles**  256:17
  256:21
**annual**  65:8
  69:4 75:4 86:5
  164:9
**anomaly**  13:20
**answer**  6:10,20
  12:12,14,17
  13:6,7 32:24
  34:6 38:24,25
  47:4,18 48:6
  49:9,11 50:15
  85:17 112:23
  138:11 146:19
  160:20 165:5
  175:21 178:18
  187:3 203:24
  220:19 225:11
  234:9 258:21
**answered**
  47:16 162:20
**answering**
  12:19 108:14
**answers**  20:24
**anticipate**  37:3
  59:11
**anticipated**
  174:3
**anticipating**
  233:19
**anticipation**
  33:4

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

anu   3:15
anybody   12:5
  130:21
anymore   31:5
apartment   31:2
api   60:16
  207:11
app   97:25
appear   241:3
appearances
  5:5
appeared   122:9
appendices
  58:7
appendix
  173:19,21
apple   20:23,24
  20:24 21:2
  239:20
apples   252:14
  252:14 253:1,1
  269:4,4,22,22
applicable
  124:10 233:14
  233:25 280:8
application
  61:11 115:7
  230:24 273:14
applications
  19:16 64:7
  97:5 98:2
applied   65:9
  67:1 75:10
  175:1 206:14

206:15,18
207:9 272:18
applies   80:11
  80:16
apply   65:10,24
  66:13 67:14
  73:24 121:11
  214:22 233:25
applying
  273:14,16
appreciate
  32:24 169:23
  243:1 263:4
approach
  148:13 165:5
approached
  148:22
appropriate
  64:6
approximate
  161:10 253:2
approximately
  78:14 80:1
  89:13,14 147:9
  147:13,15,16
  149:10
apps   19:19
  181:24 182:2
  264:10,12,13
  264:13
april   4:15,16
archive   202:13
  202:14

army   11:11
  28:25 29:13
arrive   74:2
  75:3 84:14
  133:3
arrived   74:9
  122:22
artfully   171:9
article   130:12
  130:15 174:5
  174:10
articles   77:9
ascertain   71:2
asia   231:4,16
  231:16,19,20
  231:21
aside   42:3,21
  96:18 130:23
  214:16 227:24
  238:12
asked   8:6 16:16
  38:11 39:7,14
  47:19 76:11
  80:24 82:3
  85:9 87:9
  90:14 113:2,20
  144:19 182:25
  183:21 192:8
  198:1,11
  200:10 213:17
  220:16 234:4
  255:24 256:5
  265:2,3,20
  269:3 270:4

275:17
asking   22:8
  61:15 81:24
  89:19,23
  125:14 139:24
  140:12 150:10
  154:12,13
  162:12 172:3
  179:12,13
  219:9 226:11
  228:18 233:8
  233:10 234:3
  234:24 264:8
  273:18 274:13
asks   190:10
aspect   15:11
  16:2 67:24
aspects   30:7
aspiring   239:22
assembled
  241:24
assessment
  47:9
assessments
  43:14
assignment   8:4
  8:8,21 40:5,14
  41:4 99:21
  112:22 219:8
  219:11 222:5
  227:1 233:7,9
  234:2,8,12
  244:13 255:1,5

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[assist - back]                                                      Page 8

| | | | b |
|---|---|---|---|
| assist  47:10,24 | attached | 257:11,14 | |
| 47:25 49:3 | 280:11 | 266:17 272:15 | b  142:22 170:1 |
| assisted  47:8 | attended  28:6 | 280:6 | 172:10 223:23 |
| associated | 28:18 | avenue  1:23 | bachelor's  9:17 |
| 14:12 217:7 | attorney  2:22 | average  10:17 | back  20:4,8 |
| 253:22 | 181:12 280:13 | 56:21 66:25 | 32:8,16 36:2,4 |
| assume  6:20 | atypical  106:8 | 69:22 101:3 | 36:5 40:14 |
| 44:18 66:20 | 107:22 | 107:11 108:9 | 42:8,21 45:8 |
| 89:2 103:20 | audio  63:9,19 | 115:16,18 | 46:8 47:1 |
| 120:14 142:1 | 168:23 209:17 | 117:11 124:21 | 49:22 50:6 |
| 162:8 163:16 | 210:6 | 135:10 136:20 | 55:7,16 56:2 |
| 193:15 217:20 | auditing  124:1 | 140:5 141:14 | 57:9 65:18 |
| 218:12 | audits  16:7 | 141:22 152:9 | 66:8 67:23 |
| assumed  85:24 | august  44:9 | 152:19 195:9 | 71:7 73:18 |
| 103:23 199:23 | 70:6 | 262:3 | 82:14 99:9 |
| 216:14 | austin  2:23 | averaged  140:3 | 103:14 104:7 |
| assuming  81:13 | australia  25:2 | averaging | 106:13 113:13 |
| 82:8 88:10 | authority  121:8 | 71:14,23 | 120:3 124:5,16 |
| 90:21 118:20 | 167:20 | 115:13 | 129:2 138:24 |
| 152:8,19 | authorization | aware  22:22 | 147:20 156:8 |
| 153:25 154:4 | 15:22 | 29:10 36:1 | 156:20 161:22 |
| 166:2 184:2 | authorized  69:9 | 44:14 59:22 | 172:3,10 |
| 198:17 222:6 | 151:22 179:24 | 61:18 158:5 | 177:23 187:1 |
| assumption | automatically | 182:13,16 | 199:11,15 |
| 84:16 86:15 | 34:5,15 | 183:7,16,20 | 200:7 201:9 |
| 143:16 152:23 | autonomous | 219:5,9,12 | 202:21 204:13 |
| 184:12 199:25 | 128:1,22 | 220:16,20,22 | 206:11 208:21 |
| 218:24 236:13 | available  62:8 | 240:13,14 | 210:14,24 |
| assumptions | 63:10 83:8,10 | 248:5 252:3 | 214:14 221:16 |
| 50:10 162:11 | 96:4 161:17 | 258:5,11,17 | 223:21,22 |
| 222:9 | 209:10 210:5 | 260:2,13,22 | 225:21 231:1 |
| assure  153:2 | 211:17 216:10 | 262:16 | 236:8 249:6,6 |
| assured  21:8 | 224:8,11,24 | ayesha  3:3 5:7 | 255:14,22 |
| | 225:5 245:11 | 5:19 | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[back - blackburn]**                                                    Page 9

258:19 263:1
274:6
**background**
26:7
**backwards**
176:13 194:14
**bad**  55:3 77:19
100:18 148:16
**badger**  190:6
190:17
**badging**  191:5
**balanced**  71:15
**banana**  20:25
**barely**  197:15
**base**  90:3
**based**  19:15
23:15 25:10
27:3 42:13
68:16 80:8
94:11 106:25
108:1 113:15
130:16 163:10
167:4,13 170:7
184:10 185:3
191:6 198:17
201:12,12
212:10 228:23
229:20 232:4
238:13 239:6
254:5
**basic**  55:1
173:6
**basis**  44:21
62:18 67:13

71:8,10 88:9
101:12 102:2
110:16 116:21
121:20 130:12
130:19 135:19
135:23 164:23
190:10 191:11
206:12,19,22
208:1 209:7
210:23 211:5
215:22 218:16
218:21,23
228:15,17
266:4,13,20
272:14 273:3
**bates**  263:23
**beer**  18:23
**began**  107:2
**beginning**
141:4 170:13
170:17 258:19
**behalf**  5:8,10
142:22 255:6
**behavior**
149:17 150:2
150:15 154:16
164:16
**believe**  26:9
29:19 31:22
32:7 35:22
40:25 53:9
61:14 62:15
66:15 67:9,11
67:14 68:8

69:11 98:9
102:22 120:25
127:18 130:8
135:13 152:10
157:9 158:22
162:20 165:7
167:3,18 172:1
173:16 175:1
176:23 182:20
186:20 199:21
209:20 216:13
216:16 219:19
219:24 220:13
222:9,17
224:20 225:9
225:10 228:15
228:18 229:11
243:19 245:23
268:8 270:1
271:20
**believed**  91:7
**bell**  6:1 192:25
**belong**  242:1
**benefit**  88:7
**bernanke**
238:4
**best**  158:24
204:10 256:17
257:22 262:4
**better**  35:12
37:24 128:23
152:15 212:9
235:4 251:15

**beyond**  48:6
65:24 105:21
179:19,20
228:16 274:10
275:6
**big**  8:17 11:1
43:13 46:14
55:2 70:16
141:8
**bigger**  59:1
116:5 238:18
**binders**  58:4
██████████
93:19 185:14
186:17 187:3
187:10
**birthday**  220:4
241:17 242:13
243:5,17,22
**birthdays**
157:11,14
**bit**  17:25 24:9
27:8,18 60:17
64:11 65:16,17
91:7 93:24
95:20 127:24
195:19 223:11
**black**  263:23
264:2,5
██████████  4:14
52:8 143:5,23
145:23 147:20
147:23 148:21

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[blackburn's - camera]                                    Page 10

**████**
144:6
**blog**   210:20
271:12 273:1
273:24
**blur**   6:2
**bodies**   31:19
33:10 181:10
181:11 229:13
**body**   32:4 37:8
**bonaparte**   2:17
**boost**   215:12
**bore**   193:6
**borrow**   122:19
**bosco**   3:8
**bottom**   76:16
205:23,24
207:18 239:3
**bought**   167:14
**bound**   84:21
106:22,22
**bounds**   72:17
194:25 195:6
195:11,15
**box**   2:23
205:23 206:5
207:18 263:23
264:2,5 272:20
273:23
**boxes**   207:8
**████**   71:15
72:1 93:20
104:24 137:22
187:13 189:8

189:13
**████**
188:15
**brain**   64:3
**bread**   46:4
**break**   7:3 43:7
49:19 88:1
90:25 91:6
94:5 114:21
126:14,22
169:4 208:9,18
213:20 214:7
214:14 215:25
246:14,20
255:12
**breaks**   6:24
**bring**   23:23
36:25 58:1
263:1
**broad**   10:10
36:14
**broader**   36:14
**broadly**   28:16
37:17
**brokerage**
31:20
**bruckhaus**   3:9
70:14
**bruns**   3:4 5:8
**buckets**   62:24
**build**   18:20
**building**   180:6
**built**   184:12
269:13

**bunch**   124:11
150:12 225:23
240:10 275:17
**business**   85:13
85:19 86:12,16
86:25 87:6,11
92:24 94:15
95:13 98:8
99:18 100:9
103:2,24 104:4
104:11,20
113:17 155:22
167:25 168:7
190:2 192:24
194:11 201:1
201:13 202:24
213:7 236:18
238:16
**businesses**
167:7,8 168:17
207:12
**busted**   31:1
**butchering**
93:23 145:8
**butter**   46:4
**button**   205:24
**buy**   18:24 98:1

**c**

**c**   2:1 3:1 5:1
50:25 195:23
229:3 231:23
**calculate**   119:1

**calculated**
175:7 197:3
**calculating**
131:13 132:10
132:11,16,22
**calculation**
66:2 68:21
117:9 119:11
163:4,18
**calculations**
20:11 84:2
90:16 105:3
164:19 197:1
**calculator**
118:3,4 122:19
**calendar**   60:15
**california**   2:10
67:18 97:18
242:25
**call**   5:20 8:19
63:25 124:14
150:21 171:20
171:25 211:22
234:16
**called**   9:6 61:1
62:20 63:7
96:1 122:3
127:10 142:21
169:15 216:21
246:3
**calls**   166:25
**calmly**   190:8
**camera**   123:23

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**cameras** 124:13
125:4
**campaign**
14:11,22
**camps** 30:21
31:5
**cancer** 215:8
215:10
**capability**
204:17 213:11
274:7
**capacity** 38:7
**car** 125:5
**care** 161:15
**career** 107:14
107:16,17
200:11,14,16
**carrying**
230:11
**cars** 23:14
128:1
**cart** 16:15
229:10 231:23
231:25
**case** 1:6 7:6
8:12 10:2 26:1
32:15 38:5,10
39:21 41:1,16
42:10 43:10
44:1,5 45:3
50:8 53:6,12
59:15,23 73:25
75:12 83:18
84:17 86:22

88:8,11,19,25
89:10 90:8
95:24,25 97:15
98:6,14 99:3,4
99:25 112:11
112:14 113:21
115:23 129:3
129:13 131:7
133:4 140:4
149:16 150:1
151:6 152:9
153:17 154:14
156:2,16
174:22 175:14
177:5,15 179:3
181:2 182:12
182:15 183:7
183:24 200:1,4
202:19 214:25
216:14 219:6,7
220:9,18,19,23
228:20 233:12
238:14 245:20
248:8,12,14
251:16,18
252:3 254:25
257:10 259:8
259:11,16,20
260:5,8 262:5
264:24,25
270:5 271:18
274:20,24
**cases** 129:14

**categories**
239:4
**caught** 79:11
**cause** 79:2
279:14
**caused** 97:8
**caution** 11:24
12:11 29:9
231:9
**cell** 19:18
**center** 3:10
**ceo** 103:19,24
104:19 163:10
198:16,17
241:2 245:17
**certain** 14:23
16:23 25:12
31:22 33:14
55:4 59:13
92:3 98:3
104:23 107:6,8
129:6,7,9
142:23 168:4
172:4 204:19
204:22,25
205:12 217:22
220:8,22 221:5
239:8 265:3
274:13
**certainty** 199:4
**certifications**
9:22 22:4,15
22:17,19

**certified** 1:21
279:3
**certify** 279:4,13
**cetera** 67:10
85:5 94:24
213:4
**chain** 269:9,18
**chains** 186:25
**chance** 77:22
**chandra**
229:21
**change** 30:19
50:6 131:1
206:6,13
207:19 208:2
212:5 226:15
267:13 273:21
274:16 275:11
277:3,3
**changed** 45:18
60:23 65:12
102:16 197:4
202:9 212:18
271:3
**changes** 201:19
266:12,19
277:1 280:10
**changing** 209:8
211:8 266:25
**characteristic**
201:13
**charge** 15:20
16:2,3

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

| charlie 51:1 | 135:10 137:13 | 211:6,18,23 | chats 36:25 |
|---|---|---|---|
| chart 92:7 | 138:20 143:7 | 212:10,11,17 | 40:16 41:6 |
| chat 4:19 7:8 | 143:16 145:20 | 212:19 213:3 | 43:18,20 52:13 |
| 7:10,13,18,24 | 146:15,18,21 | 213:22 216:15 | 52:17,22 53:17 |
| 8:7,18,25 | 147:4,11 148:1 | 217:9,12 | 53:21 55:9,12 |
| 16:18 31:25 | 148:8,14 149:8 | 219:13 220:22 | 56:3,8 59:3,16 |
| 34:17 35:4,9 | 149:16 150:1 | 221:17 223:13 | 59:24 62:20 |
| 35:13,17,18,24 | 150:15,20 | 224:17,20 | 63:3 71:4 82:1 |
| 40:4,15 41:4 | 151:2 152:17 | 226:23 227:23 | 82:16,25 84:9 |
| 42:14 44:8 | 153:13,15,15 | 228:8,21,25 | 90:1 93:2,4 |
| 45:4,15 46:9 | 153:18,18 | 229:18,19,25 | 94:3 95:12,16 |
| 46:19 47:10 | 154:16 155:7 | 230:12 231:2 | 95:16 101:3 |
| 48:17 49:3 | 156:17 157:2 | 231:18 232:2,7 | 108:24 111:7 |
| 50:9,24 51:8,9 | 157:21 161:4 | 233:6,13,24 | 112:7 113:16 |
| 52:25 56:12 | 161:24 163:18 | 234:19 235:5 | 120:7 121:2 |
| 57:7,10,15 | 164:16 165:13 | 236:12,16 | 135:3,15,22 |
| 59:3 60:18,25 | 166:4,11 167:6 | 237:10 240:5 | 136:18 138:5 |
| 61:2,9 63:7,10 | 167:21 168:1 | 240:15 241:17 | 138:13 141:19 |
| 63:12,19,19,20 | 169:21 170:22 | 244:5 245:6,18 | 144:2,20 145:3 |
| 63:23,24 64:1 | 172:4 175:3,5 | 245:21 247:13 | 145:11 147:7 |
| 64:3,8 66:10 | 178:24 182:2,5 | 247:17,18 | 147:22 148:20 |
| 67:1,2,3,21,24 | 183:8,17 185:7 | 251:22,24,25 | 154:1 157:21 |
| 77:12 78:15,15 | 187:8,24 188:6 | 252:1,4,10,16 | 159:8 161:11 |
| 80:25 84:18 | 188:9,18 189:7 | 253:3,12 254:2 | 167:10 168:6 |
| 85:20 89:6 | 189:11 192:18 | 254:20 255:3 | 182:9,16 |
| 91:21 92:23 | 194:9 197:16 | 260:3,7,10,11 | 186:16 187:2 |
| 94:14,20 97:13 | 198:5,23 200:2 | 260:15 261:14 | 199:8,9 207:3 |
| 100:15 102:25 | 201:1,11,25 | 261:15,19,21 | 229:3,10,23 |
| 103:6 104:8 | 202:15,21 | 262:5 264:13 | 230:4 246:3,10 |
| 108:24 109:12 | 203:3,15,21 | 264:25 265:10 | 253:5 254:1,3 |
| 110:2 111:3 | 205:7,11,24 | 266:5 267:13 | 254:13 260:8 |
| 112:14,20 | 206:21,25 | 267:15,16,19 | 262:10 264:16 |
| 113:5,7,7 | 209:17 210:6,6 | 268:1 271:15 | 264:19,23 |
| 133:5,14 | 210:8,10,19 | 273:9,11 | 265:4,7 266:1 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[chats - coming]                                                      Page 13

268:11 269:5
269:24 270:2
**chatting**  156:23
**check**  23:20
54:12,15 56:16
136:3,9 186:16
242:1 269:24
**checked**  207:19
**checking**  54:20
**checks**  218:20
**chest**  215:9
**chief**  104:21
107:7 193:8
**chime**  199:13
242:7
**chitchat**  157:3
167:25
**chooses**  130:16
**chose**  210:8
**chosen**  127:20
**christopher**
4:16
**cite**  121:7
133:12 134:9
134:10 135:2
136:17,23,25
144:11,23
174:5 205:10
205:15 228:5,7
228:14 261:9
**cited**  143:11,20
145:7,7 147:18
148:6 149:5
150:13 208:6

268:8
**cites**  150:7
**citing**  133:20
135:24 137:12
144:1 146:5,25
148:12 205:18
**city**  4:23 23:12
25:5,7,14
**civil**  28:13 30:5
36:9,11,17,19
37:14,22 39:2
40:1,11
**claim**  275:13
**clarification**
7:11 39:12
170:21
**clarify**  8:10
39:10 71:25
89:17 98:16
100:24 117:9
160:7 163:8
195:4,22
204:16 214:15
221:18 222:22
244:16 271:12
275:7,16
**clarifying**
37:22
**class**  17:23
18:14 19:6,7
25:20 26:9,16
26:20,21 27:2
27:4

**classes**  10:7,11
10:15 22:2
**clauses**  152:13
180:24
**clean**  24:9
215:5
**clear**  9:9 45:2
70:11 74:9
137:11 143:25
249:10
**clearance**
12:13 29:10
**clearances**  12:1
231:11
**clearer**  175:12
**clicked**  206:7
**clicking**  207:13
**client**  230:22
230:23,24
**close**  66:22
74:7
**closely**  100:20
101:11,23
**closing**  246:17
**cloud**  19:20,25
20:4,14
**club**  29:6 31:7
**clue**  189:21
**cluster**  14:10
**clustering**
20:15 23:23
**coalition**
181:11,12

**code**  21:24 43:1
43:23
**collaboration**
213:2
**colleagues**  95:6
**collect**  240:10
**collected**  14:14
89:21 240:16
**collecting**
88:17
**collection**  29:2
158:23 213:1
**college**  18:2
22:10
**colon**  264:11
**column**  84:15
197:1,2
**combined**
18:10
**come**  22:10
29:4 30:24
36:4 42:21
56:2 57:9
67:23 68:20
69:3 75:23
174:9 246:9
255:14
**comes**  32:16
152:3 198:5
**comfortable**
12:19
**coming**  24:5
45:16 68:14
69:21 70:3

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[coming - confining]**                                    Page 14

75:9 106:13
125:18,20,23
232:2,6,16
**comments**
268:8
**commission**
278:18 279:22
**communicate**
89:7 267:16
273:10
**communication**
62:21,22 92:12
168:16 176:16
178:4 229:12
229:22
**communicati...**
31:21 50:14
67:21 92:2
96:25 101:8
**companies**
31:10 33:23
34:10 36:7
63:15 92:1,11
96:24 97:3,8
193:19 202:24
211:17 212:15
240:10 274:25
**company**  11:16
13:7 33:16
37:1,8,17,25
39:15 61:11,20
75:18 76:1
88:17 89:6
142:23 203:3

203:20 207:6
230:21 233:4
233:18,19
268:17,20,23
**company's**
38:7 96:20
**compare**  98:13
99:11 107:15
113:4 197:15
253:1 271:25
**compared**
106:2 108:1
112:6 142:7
244:5
**compares**
150:21 151:8
151:14 152:4
**comparing**
34:8 139:19
254:16
**comparison**
107:25 244:19
252:14,19
253:1 254:10
269:23 270:1
**comparisons**
269:4
**competitor**
239:11,14,16
**competitors**
238:19
**completed**
280:16

**compliance**
16:5 184:24
**complied**
113:20
**comply**  15:11
36:17 38:2
177:16 178:25
179:15
**complying**
233:4
**component**
39:2
**comprehensive**
248:2
**compressed**
219:21
**computer**  9:15
9:22 10:5,8,15
11:1,6,9 12:23
21:8 22:16
29:6 31:6
75:22 98:3
115:5 124:25
245:14
**computing**
10:19 19:19
22:17
**concept**  21:22
117:23 197:22
**concepts**  133:3
**concerned**
57:11
**conclude**  66:19
78:10,13 79:3

120:19 211:5
**concluded**
217:9 276:5
**concluding**
82:9
**conclusion**
18:20 241:7
**conclusions**
54:22 121:10
123:13 214:22
215:18 254:14
254:17 270:2
**concrete**
109:14
**conduct**  30:21
47:14 48:8
**conducted**
47:14 121:14
122:25
**conference**
256:13
**conferencing**
167:1
**confidence**
121:22 251:9
**confident**
106:13
**confidential**
1:15 255:8
**confidentiality**
12:1,14 38:23
231:11
**confining**  67:8

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[confirm - conversations]**                                                    Page 15

**confirm** 7:23
  8:5 41:14
  58:13 68:14
  84:1 105:18
  106:18 118:17
  118:22 209:3
  237:9
**confirmed**
  105:22
**confused** 34:6
  64:17 76:14
  80:23
**confusing**
  66:16
**connection**
  26:12 39:6
  52:3,17 55:22
  61:5 128:16
  131:6 172:20
  231:15 240:16
**consequently**
  235:11
**conservative**
  71:11,16 72:6
  76:2 79:18
  82:12,22 84:13
  91:9 106:14
  160:18
**conservatively**
  70:21,22
**conservativism**
  76:5 106:16
**consider** 9:24
  23:7 32:3

36:20 37:1
  56:22 72:9
  92:22 194:25
**considered**
  10:14 68:22
  69:4 92:17
  252:20 255:4
**consistent**
  54:22 112:20
  112:24
**consisting**
  98:24,24
**constant**
  134:14,21
**constantly**
  136:11
**constituted**
  68:18
**constitutes**
  121:9
**construct** 148:4
**construe**
  147:25
**consulted**
  232:20
**consulting** 38:6
**consumable**
  126:5
**contact** 60:10
  210:12
**contain** 27:16
  41:6 63:19
**contained** 41:5
  58:20 185:6

186:10,11
  220:10,24
  271:4 274:19
  274:23
**containing** 44:7
  53:2
**contains** 70:23
  70:24 256:16
**contend** 154:7
**content** 27:8
  186:12 188:3
  189:12 191:7
  201:16 221:23
  223:17 240:21
  265:7,9 275:18
**contents**
  161:16 179:6
**context** 27:22
  28:20,23 31:14
  39:16 170:22
  177:25 222:13
  226:15 235:24
**continue** 31:6
  32:16 190:5,7
  190:23,24
  191:11,15,20
  264:19
**continued** 3:1
  16:24
**contrary** 45:1
  81:17,19
  120:12,17
  121:6 138:10
  141:2 152:11

154:22,24
  164:25
**contributor**
  193:22,23
**control** 207:16
**convenience**
  117:17 129:22
  129:25 130:9
  130:20
**convenient**
  246:25
**conveniently**
  130:17,21
**conversation**
  171:25 186:24
  199:20 200:3
  201:1 204:6,8
  216:15,24
  217:2 218:9,17
  234:20 235:5
  236:21 237:10
  237:14 245:5,7
  251:24 252:7
**conversations**
  45:23 135:6
  172:5 194:10
  199:10 216:7
  219:13 220:23
  244:6 247:13
  247:17 251:23
  253:3,16 254:2
  254:4 267:14
  275:19

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[conversing - counsel]**                                    Page 16

| | | | |
|---|---|---|---|
| **conversing** | 74:1,19 75:13 | 186:14 187:5 | 273:16 274:4 |
| 170:25 | 78:18,24 79:15 | 187:16 189:6 | **corrected**  193:2 |
| **coordinate** | 79:23 80:14 | 189:20 195:18 | **correcting** |
| 229:7 230:19 | 81:5 83:12 | 196:10,13,16 | 222:11 |
| **copies**  26:3 | 84:11,16 90:10 | 196:22 197:7 | **corrections** |
| 57:24 58:2 | 90:21 92:21 | 205:8 206:4,9 | 215:2,19 |
| 280:14 | 96:25 97:19 | 207:21 208:4 | **correctly**  14:20 |
| **copy**  7:24 | 110:25 112:3 | 209:4 215:1,19 | 45:23 64:24 |
| 25:25 41:15 | 113:10,11 | 218:7 220:21 | 126:4 130:7 |
| 208:22 247:22 | 115:21 116:14 | 221:21,22 | 153:19 206:2 |
| 256:25 263:6 | 116:23 117:3,7 | 222:4,24 223:7 | **correlate**  128:8 |
| 270:8 | 118:1,18 119:8 | 223:8 225:19 | 242:14 |
| **core**  10:14 27:6 | 127:5 130:10 | 226:21 229:20 | **correlated** |
| **corner**  206:14 | 130:22 131:5 | 230:10 231:24 | 21:14 71:5 |
| **corporate** | 133:22,23 | 232:21 235:10 | 152:24 |
| 104:23 107:7 | 134:12,16 | 238:6,24 244:3 | **correlation** |
| 189:19 192:7 | 135:4,13 | 247:14,15 | 242:9 |
| **correct**  5:24 | 136:21 137:10 | 249:24 250:5 | **correspond** |
| 7:20 8:2,15 9:4 | 137:19,20,24 | 250:17 252:2 | 153:4 |
| 9:13,16,19 | 138:3,19,22,23 | 253:5 256:8,15 | **corresponded** |
| 10:6 15:21 | 139:13 140:8 | 256:18 257:11 | 72:23 |
| 17:12 26:24 | 140:11 141:10 | 257:12,14,24 | **corresponding** |
| 27:17 28:2 | 141:24 142:8 | 258:9,15,21,24 | 216:6 |
| 33:13 34:13 | 145:5,22 146:8 | 259:4,8,11,16 | **counsel**  5:5,11 |
| 35:7 39:21,23 | 146:24 147:3 | 259:20,22,25 | 5:20 26:18 |
| 40:18,22 42:2 | 151:5 152:16 | 261:5,6,8,19 | 50:9,15,18 |
| 42:19 43:11 | 153:20 155:9 | 262:19,21 | 51:13 55:16 |
| 48:15 51:25 | 156:13 157:24 | 263:14,20,21 | 70:5 77:21 |
| 52:7,10 56:4 | 165:3 166:18 | 263:24,25 | 85:9 122:8 |
| 57:17 58:25 | 170:6,7,10,19 | 265:8,14 267:3 | 166:19 255:10 |
| 64:25 66:4 | 171:5,22 172:4 | 268:1,12,15 | 257:3 261:3,13 |
| 68:8,18 70:4 | 172:9 173:13 | 269:18,21 | 263:13,17 |
| 70:10,14 72:3 | 174:7,20 | 270:12,13 | 264:8 265:3,20 |
| 72:19 73:17 | 181:20 185:3 | 272:2,6,21,22 | 268:5 269:3 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[counsel - custodians]                                                    Page 17

270:4 272:24
274:12 275:17
279:13 280:14
**counsel's**  12:2
26:21 49:10,15
118:6 269:22
**count**  35:16
40:19 87:16,17
91:8 96:19
106:9 107:25
109:1 146:17
159:18 196:14
248:7,9 252:10
252:14
**counted**  146:13
146:14 249:25
**counterintelli...**
11:12,13,20
30:7
**countries**  229:6
**counts**  71:2,17
89:13 106:1
108:6 191:10
244:18 249:3
**county**  23:14
23:15,24 24:6
24:13,16,17,19
25:10,12,15
256:20 278:9
278:17 279:2
**couple**  6:6 26:5
27:11 42:9
43:6 47:8
83:21,22

194:18 217:13
252:22 268:16
268:21
**course**  6:10
18:2,4,6,7,8
32:12 91:16
**courses**  17:18
**court**  1:1 26:12
29:1 39:25
40:10 41:1
60:10 67:6
76:12,20,25
77:5 82:1
83:15 86:23
120:19 158:6
160:9 161:23
162:2 163:3,17
165:7 179:15
221:19 226:22
228:20 233:11
233:23 236:4
252:22
**coverage**  77:12
77:15
**covered**  11:25
12:13 27:11
38:23 129:11
175:10 181:25
229:15 231:10
232:23 259:4
260:15 264:11
273:25
**covering**  9:2

**covers**  12:13
130:25,25
**covid**  67:16
**create**  21:24
**created**  204:14
253:24
**creates**  241:24
**crime**  23:15
**crimes**  23:16
23:19,25 24:7
24:8
**criminal's**  31:1
**criticism**  85:2
**crosshatches**
93:20
**crossover**
98:25 99:1,5
**crossovers**
98:22
**crunching**
245:3
**cs**  239:22
280:15
**cs7067190**
277:25 278:25
**csr**  279:21
**csv**  44:7 55:5
**csvs**  173:16
**culture**  95:7
**cuong**  2:21
**cuong.pham**
2:24
**current**  165:17

**currently**
140:22
**curriculum**
10:12
**custodian**
73:16 89:20
90:10
**custodians**  57:3
65:11,22 67:4
70:19 71:10
72:10 75:12
78:14 79:3,17
80:3,21 81:1
81:15,20 82:17
88:7 89:18,21
95:21 98:12,25
99:2,22 103:15
105:19 106:20
107:1 108:12
115:20 116:8
116:12 117:1
118:15,20
119:3,5,9,25
129:14 133:15
136:10 138:8
139:6 149:20
150:6,15 152:1
153:12 154:2
159:9 160:5
161:4,8,9
162:16 163:10
164:4,10,13
165:11 170:3,8
185:6 198:10

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[custodians - dataset]**                                      Page 18

| | | | |
|---|---|---|---|
| 200:24 201:9 | **dads** 18:24 | 121:2 124:7,9 | 70:17 71:20 |
| 242:2 244:10 | **daily** 135:23 | 135:20 136:8 | 72:2,18,19 |
| 246:2,9 259:4 | 137:13 150:21 | 149:19 150:24 | 73:16 74:11,14 |
| 259:7,7,10,15 | 151:7 | 151:17 160:4 | 74:19,24 80:8 |
| 259:15,19,23 | **dallas** 1:24 | 161:7,8,12 | 80:12 81:14,20 |
| 260:4,8,11,12 | 279:2 | 162:21,24 | 82:13 83:3,11 |
| 261:15,19,22 | **data** 11:22 | 165:23 178:19 | 86:8 91:20 |
| **customer** | 12:10 13:2,13 | 185:6 200:8 | 92:7,18 95:21 |
| 202:20 | 15:1,21 16:11 | 201:6 215:4,13 | 98:13,23 99:22 |
| **customers** | 16:15 17:9,15 | 215:23 217:25 | 103:12,14,20 |
| 201:25 202:7 | 17:24 18:15,18 | 229:12 240:7 | 104:9,13 |
| 205:6,10 | 18:19,21 19:1 | 241:24 242:6 | 105:18 108:11 |
| 211:12 213:3 | 19:5,25 20:11 | 257:17 258:6 | 109:3,15,23 |
| 213:24 271:16 | 20:12,16 24:2 | 258:12,20 | 111:13 112:1 |
| 272:1 | 24:5,6 25:12 | 259:1,24 | 112:21 113:8 |
| **customize** | 28:8,19 29:2,8 | 261:23,24,24 | 115:10,19 |
| 266:17 | 30:2,13 31:9 | 262:18 265:11 | 116:3 119:2,6 |
| **cutoff** 21:3 | 33:10,19 37:7 | 265:12 | 119:22,24 |
| **cutoffs** 20:19 | 37:20 38:2 | **database** 53:2 | 129:3,10,12,25 |
| **cutover** 114:3 | 45:16,17 50:19 | 53:3,5 55:25 | 130:24 133:16 |
| **cv** 1:6 22:18 | 51:13 54:12,14 | 99:25 109:19 | 136:6 137:19 |
| 26:12 27:10 | 54:15,21,22 | 133:25 148:19 | 139:7,11,20,23 |
| 60:7,9 | 55:2,6,11,13,15 | 149:22 161:18 | 140:2,25 141:7 |
| **cyber** 31:6 | 55:17 56:17 | **databases** | 149:20 150:5 |
| **cybersecurity** | 71:1 72:24 | 10:14 | 150:20 151:7 |
| 29:3,6 30:11 | 74:10 80:12 | **dataset** 8:20,22 | 151:13 152:1 |
| 39:1 | 81:11,14 83:8 | 8:24 24:9 | 152:17,24 |
| **cycle** 275:3 | 83:9,14 86:22 | 40:15 41:5 | 153:4,13 |
| **d** | 95:23 98:12 | 42:14 50:24 | 154:16 156:6,9 |
| | 105:4 110:10 | 51:8,9 55:15 | 160:2,14,22 |
| **d** 4:1 5:1 47:2 | 110:14,22 | 56:18,21 57:4 | 162:15,25 |
| 65:12 70:13 | 115:9 116:6,7 | 57:11 65:14 | 163:9,13 |
| 193:1 | 116:13 117:2,7 | 67:1,3 68:16 | 165:11 170:3 |
| | 118:15,16 | 68:19 69:14,17 | 172:5 174:21 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[dataset - declaration]                                          Page 19

| | | | |
|---|---|---|---|
| 175:4,10,24 | **dating**  66:8 | **days**  9:7 69:23 | 59:5 67:18 |
| 176:5,7 177:21 | **day**  1:18 9:2 | 70:17 71:9 | 76:5 78:20 |
| 177:22 178:13 | 23:25 24:4 | 74:16 80:17 | 79:2 80:1 84:3 |
| 178:14,21 | 44:20 55:12 | 96:14 97:9,12 | 106:12 109:8 |
| 179:5,11,12,13 | 56:13 57:10 | 105:21,21 | 129:23 142:10 |
| 183:12 184:11 | 69:18,19,22 | 112:5 116:8 | 204:4 221:6 |
| 185:4,12 | 70:23 71:3 | 117:6,7 118:16 | 235:6,7 241:2 |
| 186:10,13 | 72:5 96:18 | 118:21 119:1,3 | 249:18 257:24 |
| 188:4 193:5,8 | 99:10,10 103:1 | 119:6,9 130:25 | 258:3 279:17 |
| 198:8,10,20 | 103:1,3,3,7,7 | 135:2 136:18 | 280:3 |
| 199:11,14,16 | 103:16,16 | 141:14 144:20 | **decide**  195:5,9 |
| 200:9 201:9 | 104:10,10 | 145:4,12,24 | 205:25 206:12 |
| 214:16,25 | 105:8,8 115:16 | 147:21 185:18 | 208:1 210:5,11 |
| 215:5,5 217:13 | 134:11,20,23 | 186:3 187:18 | 210:24 |
| 218:6 222:14 | 135:11,15,25 | 187:25 189:22 | **decided**  76:4 |
| 222:23 223:7 | 136:4,12,14,20 | 192:10,14 | 122:15 155:11 |
| 223:19 234:11 | 137:1,5,6 | 193:24 198:14 | 194:16 |
| 235:19,24,25 | 138:14 139:2 | 225:9,10 | **decision**  232:18 |
| 240:18 242:4 | 140:5 141:22 | 280:16 | 232:19 |
| 242:17 244:5 | 146:14,15 | **dc**  2:19 | **declaration** |
| 257:14,17,18 | 175:6,9 184:22 | **debug**  46:1 | 4:11 7:12,15 |
| 257:20,24 | 185:21,21 | **debugging** | 7:19 26:13 |
| 262:14 | 186:8,18 | 14:19 44:24 | 48:22 57:22 |
| **datasets**  159:20 | 187:18,18 | 45:10 46:4,16 | 58:13,20 59:5 |
| **date**  52:12 | 189:14,21,21 | 96:11,20 97:12 | 60:1 65:2 76:6 |
| 69:17 85:14 | 192:9,9 193:14 | 110:16 161:14 | 76:11,19 77:11 |
| 151:22 193:2,2 | 193:14,16,16 | **decades**  32:13 | 78:8 79:2 80:1 |
| 196:5 226:24 | 195:10 224:9 | 94:11 | 117:19 153:7 |
| 242:20 244:18 | 224:22 254:7 | **december**  1:14 | 157:17 158:4 |
| 249:22 250:15 | 257:14 260:12 | 1:18 4:9 5:4 | 165:2 166:8 |
| 251:2 253:7,17 | 260:16,16,20 | 7:18,19 9:10 | 176:21 177:14 |
| **dated**  169:16 | 260:20,23 | 38:16 41:15 | 219:20 247:8 |
| **dates**  202:10 | 278:13 279:16 | 52:2 57:19 | 247:12,23 |
| | | 58:21,22 59:4 | 252:21 253:10 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[declaration - destruction]**                                      Page 20

253:21 261:10
270:21 271:5
274:24 275:9
**declarations**
274:20
**deconfliction**
229:4
**decrease**
126:11
**deduplicate**
250:19
**deduplication**
250:21
**deep**  19:5
**deeper**  19:3
**default**  204:18
210:11 213:13
266:25
**defendant**  1:8
1:20 3:2 42:24
**define**  184:9
**definitely**  7:2
48:25 132:14
197:14
**definition**  20:9
20:10 114:16
227:12
**definitions**  8:23
**definitively**
63:5
**degree**  22:6,7,9
22:10,12 28:1
**degrees**  9:15
22:4

**delay**  180:6
**delayed**  46:1
**delete**  181:18
263:19
**deletion**  11:21
**demographic**
122:6 127:16
127:17,20,21
**demos**  29:7
30:11
**demoted**  76:2
**denton**  24:17
24:19
**department**
14:2
**depending**
10:12 134:15
137:5 255:10
**depends**  20:15
54:8 102:16,17
134:6 275:1
**deploy**  21:25
**deployed**  25:7
**deponent**
136:25 156:1
280:13
**deponents**  56:2
109:11
**deposed**  5:22
6:5
**deposing**
280:13
**deposition**  1:12
1:19 4:7,15,16

5:3,25 7:7,22
8:11 26:1,20
26:22 43:24
47:7,17 52:11
57:9,14,23
58:2 59:6,18
69:11 99:24
109:25 112:6
112:11 133:9
142:22,22
144:7 146:5
147:21 148:12
149:12,23
150:12 151:2
155:10 156:15
159:17,23,25
161:17 180:11
180:14 182:20
184:17,18
194:23 209:18
228:6 255:7
260:25 261:4,9
268:6 276:5
277:1 279:5,8
279:11
**depositions**
51:20 52:5,21
52:24 53:2,6,9
53:11 54:12
55:19 56:11,18
57:7 100:3
108:22 109:5
111:2 113:14
114:1 142:13

143:11 155:6
271:21
**deringer**  3:9
70:15
**derive**  140:5
**derose**  2:8
**describe**  16:21
**described**
12:22 16:8
17:8 29:14
199:19
**describing**
128:15
**description**
44:23
**descriptions**
51:2
**descriptive**
51:4
**designate**  255:7
**desk**  125:21
**despite**  145:19
170:4 194:17
264:20
**destroyed**  96:4
96:5 110:10,14
110:17,18
116:15 132:20
161:11 262:2
265:12
**destruction**
12:10 13:2,12
16:11 116:18

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[detail - display]

detail   9:21
detailed   13:25
details   181:21
detection   13:20
  215:8
determination
  85:10 236:16
  274:3
determine
  38:11 39:7
  40:15 54:5
  85:6,12 86:10
  108:7 122:24
  216:7 240:19
  241:1 244:6
  248:13 264:24
determined
  152:16,18
determines
  162:2
determining
  12:9 13:1
  16:10 85:3
  92:17
develop   230:19
  268:10,17,22
development
  275:3
deviation
  132:10,12,16
device   98:2
devices   19:16
dialogue
  273:23

diapers   18:23
dice   127:19
difference
  88:16 89:20
  132:9,15 153:3
differences
  203:14 231:13
different   10:13
  18:19 20:14
  23:21 27:19
  33:18 43:17,22
  51:3 57:25
  62:1,4 81:19
  87:8 95:25
  100:21,24
  115:7 116:11
  123:20 127:14
  129:14 132:24
  134:21,25
  135:14,24
  142:3 145:12
  146:1 157:18
  165:13 183:23
  187:6 197:17
  197:22,22
  204:23 213:8
  214:14,21
  215:17 220:6
  225:2 229:6
  249:14 253:25
  273:18 274:25
  274:25
differs   254:13

difficult   201:18
digital   239:7
digitally   32:13
direct   104:3
  111:15
directly   27:15
  72:23 99:18
  199:15 242:10
  242:14
director   189:19
  192:7
directors
  105:24 107:3
disabled   31:25
  34:18 61:9
disagree   58:19
  190:19 241:10
disagreement
  195:20
disclose   11:25
  12:3,4 48:7
  50:14 59:12
  61:14 231:10
disclosures
  255:2
discomfort
  41:7
discord   168:18
  168:19,20
discounted
  109:22
discoverable
  47:15 49:8

discovery
  28:12,13 36:17
  233:4
discuss   181:24
  182:17 264:10
discussed   26:19
  172:13
discusses   264:8
  266:11
discussing
  113:24 114:8
  170:5 192:19
  194:10 201:5
discussion
  137:6 260:14
  260:24
display   85:13
  85:19,21 86:12
  86:24 87:5,11
  98:7,8 99:18
  100:9,10,15,16
  100:19 101:3
  101:10,22
  103:1,7,16,21
  104:3,10,17
  105:8 113:17
  113:25 114:8
  186:4 187:21
  189:13 190:2
  192:19 193:25
  194:11 198:14
  219:16 220:11
  220:25 236:18
  237:14 238:16

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[display - earlier]                                                    Page 22

239:12,15
260:16,20
**dispute**  44:22
246:8
**disputed**  154:6
**disputes**  154:5
**disputing**  212:3
212:8 241:6
245:24
**disrespect**
243:2
**disrespectful**
216:22
**dissertation**
17:25 19:10,15
128:16,20
**distinct**  169:2
**distinction**
222:18 266:3
**distributed**
45:15
**district**  1:1,2
**divide**  118:25
119:16
**divided**  62:24
119:19
**dividers**  58:7
**division**  1:3
**dms**  171:2
225:10
██████  191:12
**document**  4:17
8:2 14:17
27:15,20,20,22

33:12 36:21
37:12 38:7
51:5,7 73:11
158:13 183:4
196:21 200:2
207:12,14
211:2 237:16
256:23 263:11
269:9 274:10
**documentation**
51:12 172:11
192:22 247:16
**documents**
31:14 33:3
36:16 39:16
40:2,12 41:2
77:6 88:23
99:3 173:12
177:1 178:1
219:1,3,5,12
220:9,17
250:21 265:21
269:12
**dog**  272:3,5
**dogfood**  264:13
**doing**  11:16
16:14 84:8
86:21 115:8
125:22 128:24
189:21 190:1
190:15 206:19
226:6 244:19
251:1

**dollar**  75:7
**dollars**  75:5,6
**domain**  101:6,7
210:12,18
**dome**  124:17
**double**  153:21
173:1
**doubling**  79:20
**download**  98:1
**dr**  5:18 37:19
39:24 41:16
57:5 71:15
72:1 84:25
91:6 93:21
104:21 105:25
106:1 107:21
107:24 108:4,9
108:16 126:21
138:1 141:8
144:22 145:10
191:22 193:8
197:3,14
214:13 244:4
255:22
**draw**  121:10
123:13 214:21
215:18
**drawing**  228:3
254:14,17
**drive**  31:1
124:6,6
**drives**  232:13
**driving**  123:19
125:4 128:1,19

128:21
**dropping**  78:19
**drs**  238:4
**due**  67:20 91:9
166:3 235:12
**duly**  5:15
**duo**  182:2
264:13
**duplicate**
251:13 253:9
**duplicates**
248:21,21
249:13,16
250:1,3,11,22
250:23 251:4,8
251:10
**duration**  262:9
**duties**  11:12
28:7 31:13
33:2
**duty**  33:9
**dv360**  102:15
**dynamics**
275:2

|       e       |

**e**  2:1,1 3:1,1 4:1
5:1,1 248:7
**ear**  257:4
**earlier**  34:17
58:14 70:12
74:3 90:14
108:10,13
114:19 115:1

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

128:14 129:11
136:2 155:5
156:14 160:13
165:25 170:21
183:21 184:19
188:13 194:16
195:19 198:1
200:10 201:20
202:1,10
209:18 216:13
216:21 220:16
222:17 234:18
243:4,7,25
255:23 260:14
260:23 271:14
271:23 273:25
**early**  11:14
44:14 202:8
203:4
**easier**  15:14
**easily**  137:1
**eastern**  1:2
**easy**  201:18
245:2
**eat**  272:3,4
**economist**
104:22 107:7
193:9
**edge**  19:18,24
**education**
17:14 27:22
28:17 31:13
32:17,23
228:19

**educational**
26:6
**efficiency**
19:22,24
**effort**  274:23
**eight**  109:11,19
263:3
**either**  11:5
14:18 15:19
16:17 20:12
37:7 52:20
60:1 63:13
79:16 81:19
117:18 136:7
168:17 170:9
176:20 186:24
239:6 242:24
274:23 275:8
**electronic**
27:20 28:8,19
37:20 38:2
39:16 67:21
**elements**
267:24
**elisa**  3:3
**else's**  130:24
**email**  4:21
16:17 51:8
60:10 62:21
143:7,17 144:3
145:20 146:14
146:18,21
147:3,7,12
148:2,8 149:8

168:2,15,25
169:2 243:17
248:1,6,9,11,13
248:24 249:3,5
249:6,11 250:7
250:21 251:19
269:8,12
**emails**  56:15
61:20 62:3,14
63:2 144:20
145:3,11
147:22 229:10
247:12 248:4,7
248:16,18
249:3,6,9,16,21
252:15 253:2,8
253:24 254:13
269:4,17,24
270:2
**employee**  56:20
62:22 65:21
66:7 68:10,22
75:11 85:10
107:12 113:15
114:6 133:13
134:22 135:21
135:24 137:14
145:2,12 147:1
147:11 156:23
157:9 207:10
210:5 266:4,4
266:12,13,20
**employees**  9:1
45:5 55:9 62:8

64:21 65:11
66:21 68:17
69:15 70:6
73:24 74:4,10
74:12,21 75:17
75:24 79:11
82:2 83:1,17
85:7 86:5,11
87:10,17 88:10
88:16,18 89:9
90:7 91:15
92:3,7 98:14
107:13 109:20
120:8 121:3
131:8 133:17
133:20 135:7
137:19 141:7
142:14 143:1,6
143:16 144:2
145:19 148:7,7
149:5,15,25
151:9,15 152:5
153:17 157:13
157:20 159:7
162:1 163:6,19
166:12 167:21
173:3 174:23
175:15 177:6
177:16 178:7
178:23 179:13
182:17 183:7
184:2,13,24
200:7,14,17
203:23 204:19

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[employees - exact]                                                    Page 24

205:7,12 207:7
209:10 210:25
221:18 240:6
260:20 264:4,9
264:19 266:1,5
266:18 267:25
268:12 270:7
**employer**  231:5
231:6
**enabled**  35:24
**endeavor**
127:12 201:10
**ended**  75:4
109:19 153:23
**energy**  14:3
**engaged**  8:12
10:3 38:21
39:11
**engagement**
8:18 39:6
86:10
**engineer**  18:19
37:6 215:3,12
**engineering**
25:11
**ensure**  16:7
55:6 127:6
136:3 267:12
272:25
**ensuring**  15:20
16:5
**entail**  18:8
185:18

**entailed**  13:1
16:10 193:14
**enter**  157:15,16
**enterprise**
201:24 202:6
202:22 203:15
203:21 209:6
211:5,12,14
212:10,12,16
213:1,5 265:22
**enterprises**
207:14
**entire**  68:18
69:13 70:18
74:14,19,22,24
81:15 119:3,25
131:2 132:12
132:13,17,19
150:14 214:22
245:7 269:18
**entirety**  80:9
81:11 99:23
116:9 140:22
160:14 257:18
**entitled**  84:2
180:7
**enumerated**
191:1
**ephemeral**  37:3
91:15,22 97:5
131:8 175:6
224:22
**epic**  97:18
259:8,11 260:4

**equal**  147:6,9
149:10
**equally**  145:13
147:12,15
149:6
**equate**  56:14
**equivalent**
97:25
**errata**  280:11
280:13,16
**erratas**  280:15
**error**  80:6,9,11
80:15 81:9,13
81:25 82:3
131:21 132:1
132:22
**essentially**
19:22 27:4
157:10
**established**
211:15 235:16
237:18
**estimate**  67:11
79:19 160:18
262:4 268:25
**estimated**  67:7
**estimation**
250:6
**estimations**
90:19
**et**  1:4 67:10
85:5 94:24
213:4 280:4

**ethan**  2:13 5:11
**ethical**  36:21
**europe**  33:17
33:22
**evaluation**
82:12
**event**  6:17
**events**  72:23
**everybody**
162:3
**evidence**  29:8
38:12 39:8
45:1 81:17,18
120:12,17
121:6 138:10
138:16,17
140:1 141:2
152:11 153:11
153:22 154:4
154:12,12,21
154:23 155:2
157:19 159:6
159:21,23
160:25 162:6
164:25 165:15
166:10 168:10
**exact**  63:2 74:7
161:10 170:14
180:1 242:15
242:20 248:20
249:15 250:1
250:22 251:4
253:9 266:16

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[exactly - explain]                                                Page 25

**exactly** 38:20
**examination**
4:3,4,5 5:16
255:20 271:8
**example** 22:10
45:13 53:10
57:14 94:17
100:14,18,25
115:8 125:3
127:25 143:24
168:25 171:16
201:14 206:7
209:16 215:8
216:20 217:6
217:16,24
218:12 231:22
236:7 247:22
272:12
**examples** 125:6
126:22 133:24
148:5,20
**excel** 43:21
**exceptions**
109:5
**excerpt** 4:14,16
144:6
**excerpted**
237:11
**exchange**
237:24
**exchanged**
171:16
**exclude** 194:17
194:24 195:7

195:17,21
196:11 257:17
**excluding** 72:9
72:13 73:3
159:22
**exclusion** 84:20
**executive**
106:23,24
**exhibit** 4:8,9,11
4:12,13,14,16
4:17,18,20,21
4:22 7:22 8:1
26:1 41:11,15
41:17 51:19
52:1 57:18,22
58:3,13,24
64:12 65:12
68:12 70:13
76:13,15 83:24
84:4 87:22
88:2 89:12
133:11 142:11
144:6,8,18
145:9 146:9,10
153:7 181:3,6
184:5,14 193:1
196:2 202:3
204:4 205:17
205:18,20,22
208:6,7,20
210:21 211:23
216:2 221:7
227:18 234:16
237:1,2,10

241:3,20
243:10 245:4
247:8 249:18
256:23,24,25
263:2,8 266:10
266:11 267:5,6
267:8,9 270:7
270:9 271:11
272:13,20
274:5
**exhibits** 4:7
59:6,18 211:4
211:10 265:24
266:9
**exist** 46:7 66:10
265:11
**existed** 265:15
**exists** 265:16
**expect** 139:24
140:24
**expectations**
55:20
**expected** 45:25
81:18 137:8,16
**expecting** 79:8
**experience**
10:22 12:24
13:10 16:10
17:8 32:24
36:6 43:3
94:12 95:5
96:11,14,19
97:4 123:3,8
127:11 167:5

167:13,19
168:11 228:19
228:23,24
229:25
**experiments**
130:13
**expert** 4:8,9,13
9:25 10:4
22:24 23:3
36:20 37:1,12
38:6 41:1
47:13,21 49:7
59:14,22 60:2
86:10 93:11
123:5 140:9
154:15 160:11
162:12 177:5
178:7,18,22
179:2 214:1
221:25 224:10
228:25 233:3
251:16
**expertise** 34:2
34:11,14,15
37:19 38:1
75:21 86:20
91:14 185:1
228:3
**expires** 278:18
279:22
**explain** 18:16
19:9,14 20:7
31:17 105:17
111:4 114:19

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[explain - felt]                                                    Page 26

114:22 120:5
141:25 163:23
188:12 224:4
254:8,12
**explained**
181:18 263:20
**expressed**
77:11
**expressing** 42:4
**extending**
73:20
**extends** 263:23
**extensive** 102:7
**extensively**
16:19
**extent** 38:23
63:1 85:14
101:15,20
214:2
**external** 62:23
**extra** 26:2 46:2
57:24 83:25
162:21 247:1
**extraordinary**
76:24
**extrapolate**
70:18 72:6
74:20 82:10
92:18 105:20
117:20 140:13
150:5 154:25
**extrapolated**
115:19 124:9
164:24

**extrapolating**
71:8 81:14
83:3 106:20
115:9 119:24
140:6 160:16
195:12
**extrapolation**
80:20 150:8,9
164:23
**extremely**
106:2 224:1
**eyebrow**
182:14

**f**

**faang** 239:17
239:19
**face** 167:24,24
**facebook**
239:14,15,20
**facing** 237:23
237:23
**fact** 35:20 42:4
57:3 60:7
71:11 79:4
81:7,7 87:5
110:15 116:20
122:3 136:12
137:17 143:19
154:18 160:5
167:4 173:24
222:2 223:3
267:4

**facts** 50:18
51:13
**failed** 38:12
39:7 41:25
42:5,10,17
174:24 175:16
177:16 178:9
179:15 184:13
227:10,20
233:13,24
**fails** 280:18
**fair** 44:18 57:1
57:16 66:3
78:6 115:10
198:9 265:16
265:19,25
**fairly** 13:25
33:15 106:8
**fall** 10:13
**falls** 107:8
**false** 215:6
**familiar** 36:8
36:12 237:19
237:20,22,25
238:2,4
**far** 82:5 151:4
163:15 181:14
204:13 218:2
218:10 246:19
251:9
**farther** 47:20
**fault** 130:24
131:1

**faulty** 124:22
**fbi** 16:14 29:4
30:24 229:9
**feature** 45:13
45:14,21 46:8
209:12,16
215:2,12
267:12 272:25
**features** 18:19
63:9,19 64:8
209:9,14,22
210:4,6 213:8
238:3 266:17
**february** 9:10
69:6 114:3,3
151:20 152:2
179:23 196:5
197:4 201:20
212:5 213:23
226:16,20
242:19 244:17
244:19 274:8
275:11
**federal** 36:8
**feed** 102:15
124:5
**feel** 12:12,19
49:22 154:24
**feet** 124:16
**fell** 269:18
**felt** 54:14 71:16
72:17,19,24
76:2 79:14
84:12 106:12

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[felt - floor]                                                          Page 27

155:2
**ferpa** 32:6
**fewer** 157:21
159:8
**fidelity** 31:18
33:8,11,15,16
33:21 34:9,21
34:25 35:14
61:8,10 232:25
**field** 9:22,25
13:11
**fields** 51:1
215:3
**figure** 25:8
34:19 51:5
70:8 93:14,17
93:19,20 100:4
108:19 111:18
158:9 161:10
165:5 188:19
194:6 197:15
199:15 220:13
221:4 236:9
237:11 241:22
241:25 242:15
243:6 245:4
254:5
**figured** 23:18
**figures** 93:10
93:11 219:25
253:22
**file** 55:5
**filed** 76:20
158:5,20,22

**files** 44:7 88:17
99:2
**filing** 158:25
**filtering** 70:7
**final** 6:23
**finally** 179:24
254:18,18,19
**financial** 92:4
92:13
**financially** 279:15
**find** 27:11,12
42:16 93:9
108:11 148:19
149:1 155:24
176:20 201:10
228:4
**finding** 18:19
246:2
**fine** 121:10
**finer** 68:20
69:3 83:6
**fingers** 49:23
**finish** 6:9 36:5
77:22 125:13
**finra** 31:19
33:12,21 34:10
229:13
**firm** 2:4,9 5:13
203:20 279:22
**first** 5:15 6:8
7:21 29:13
39:14 41:23
43:3 55:2

59:17 65:4
69:13,14,17
70:18,25 82:3
89:12 95:22
105:16,22
119:1,5 120:5
142:20 154:7
159:2 169:18
181:12 187:14
190:9 196:4
202:2,12 209:9
209:25 210:3
210:13 229:16
239:13 241:23
242:1,12 243:6
257:8 263:18
266:2 271:13
**firsthand** 43:3
**fit** 190:24
191:21
**five** 9:1 67:4
68:17,23 69:5
69:13 70:19
71:14 72:7
73:19 74:10,16
80:17 92:7
95:21 98:12,24
99:11,16,17,22
100:5 103:15
104:13 105:1
116:13 117:2
129:13 130:25
133:15 136:10
137:18 138:5

138:12 139:2,6
139:12,22
140:2,6,15
141:6 142:4,6
142:25 143:5
149:19 150:19
151:7,12 152:1
152:17 153:12
154:15 156:5,9
156:11 159:9
161:5,8 163:9
165:13 170:2,8
170:12 172:6,8
185:5 196:6
198:8,20 200:8
201:9,10 208:9
208:12,13
224:14 240:23
242:2 244:10
259:4,7,10,15
259:19,23
260:4,8,10,12
**five's** 69:21
154:1
**fix** 46:16 47:3
182:14
**flag** 55:13
**flagged** 248:20
248:21 250:1,2
250:11,22,24
251:4,8
**flipping** 210:1
**floor** 3:10
125:22

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[florida - form]                                                    Page 28

| | | | |
|---|---|---|---|
| **florida** 53:14 | 264:9 | **forget** 240:1 | 80:4,13,19 |
| **fly** 25:2 | **follows** 5:15 | **forgot** 75:1 | 81:10,16 82:18 |
| **focus** 142:25 | 279:11 | 192:8 | 83:2,7,19 |
| **focused** 159:20 | **food** 272:3,5 | **form** 9:3,12 | 84:10,19,22 |
| **focusing** | **foot** 24:18 | 10:24 11:7,23 | 85:8,16,23 |
| 245:17 | **footnote** 70:2 | 13:14 14:7 | 86:7,13,19 |
| **foggy** 22:1 | 130:11 133:12 | 15:2,5 16:6 | 87:3,7,13 |
| **folks** 31:13 | 137:11 143:10 | 17:1,11 21:5 | 88:12,20 89:1 |
| 46:7 47:8 56:7 | 143:12 146:7 | 21:18 22:14,21 | 89:16 90:2,22 |
| 57:14 66:7 | 196:8 203:11 | 23:1,5 24:25 | 91:12,17,24 |
| 72:7 74:16 | 205:10,19 | 25:18,22 26:8 | 92:5,14,20 |
| 89:24 92:12,19 | 209:2 249:20 | 27:14 28:22 | 93:1,7 94:6,16 |
| 106:19 107:11 | 261:10 | 29:25 33:5,25 | 94:25 95:8,15 |
| 107:16 108:7 | **force** 205:4 | 34:3,12 35:1,6 | 96:2,7,13,22 |
| 109:24 113:19 | 231:7 | 35:11 36:23 | 97:6,11,24 |
| 113:24 122:3 | **forced** 151:21 | 37:5 38:3 40:3 | 98:10,15 99:6 |
| 139:2 141:11 | 179:24 226:16 | 40:13 41:3 | 99:13,20 100:1 |
| 143:14 147:25 | 244:11 245:18 | 42:12 43:4,19 | 100:12,17 |
| 148:19 165:25 | 245:19 246:4 | 44:25 45:6 | 101:5,13 |
| 166:3 167:24 | 246:11 267:15 | 47:12 49:6 | 102:14 103:9 |
| 168:12 172:19 | 267:17 273:10 | 50:12 51:14 | 103:18 104:5 |
| 183:16 231:15 | 273:11,12,13 | 52:6 53:8 | 104:12,18 |
| **follow** 12:2 | 273:17 | 54:25 56:5,10 | 106:21 107:5 |
| 174:24 175:16 | **forces** 256:10 | 56:23 57:2 | 108:17 109:10 |
| 184:2,13 | **forcing** 273:19 | 59:7 60:14 | 110:8,21 |
| 255:10 | **foregoing** | 61:6 63:4,11 | 111:11,14 |
| **followed** 16:21 | 279:5 | 63:21 66:14 | 112:8,15 |
| 17:9,13 118:6 | **forensic** 16:15 | 68:7 69:7 | 113:12 114:9 |
| 147:3 264:5 | 29:2 39:1 | 70:20 71:13 | 115:12,25 |
| **following** 14:15 | 232:1 | 72:12 73:5 | 117:4,8,25 |
| 15:13 111:1 | **forensically** | 74:13,17,23 | 120:1,16,22 |
| 124:7 181:24 | 29:7 30:15 | 75:14,19 76:9 | 121:5,13,24 |
| 188:11 229:24 | **forest** 20:14 | 77:1,7,14 | 122:5 123:4,15 |
| 230:25 263:22 | | 78:23 79:5,22 | 124:4 127:8,13 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[form - freshfields.com]                                          Page 29

| | | | |
|---|---|---|---|
| 128:17 129:5 | 182:19 183:3 | 266:14,21 | **found**   80:12 |
| 129:18 131:4 | 183:19 184:4 | 267:1,21 268:2 | 108:24 111:7 |
| 131:10,15,23 | 184:15 185:2 | 268:13,19,24 | 140:19 161:5 |
| 132:7 134:24 | 185:10 186:2,9 | 269:14,19 | 164:25 202:13 |
| 135:12,16,18 | 186:15,19,23 | 271:1,19 | 274:10 |
| 136:1,22 137:7 | 187:4,11 188:2 | 272:17 273:22 | **four**   7:15 51:20 |
| 137:15 138:2,9 | 188:24 189:3,9 | 274:9 275:12 | 52:5 55:23 |
| 138:15 139:3 | 189:15,23 | **formal**   17:14 | 56:2,9 97:7,8 |
| 139:17 143:21 | 190:3 191:15 | 28:17 33:1 | 109:6,7 117:14 |
| 145:14,25 | 191:18 195:2 | 36:15 210:13 | 196:6 |
| 147:8,14,19 | 195:13 197:13 | **format**   20:16 | **fourth**   197:2 |
| 148:3,9,15,24 | 200:5,18,21 | 43:21 245:2 | 221:10 |
| 149:18 150:3 | 203:25 209:19 | **formatting** | **frame**   38:16 |
| 150:17,23 | 212:22 213:15 | 48:24,25 | 92:23 95:12 |
| 151:10,16,19 | 215:21 217:3 | **formed**   77:10 | 131:9 202:1 |
| 152:6,12,22 | 220:12 221:1 | **formerly** | 209:15 219:21 |
| 154:3,9,20 | 222:8 223:5 | 239:14 | **framed**   166:9 |
| 155:1,8,13 | 226:1,9,25 | **forming**   50:11 | **fraud**   23:20 |
| 157:4,8 159:19 | 227:4,8 228:13 | 50:19 52:22 | **free**   58:11 92:9 |
| 159:24 160:6 | 228:22 233:15 | 56:25 172:17 | 102:3 |
| 161:6,18,20 | 233:21 234:1,7 | 182:11,15 | **frequency** |
| 162:5,10,19 | 236:23 238:7 | 183:6,15 | 109:12 150:20 |
| 163:7,20,24 | 238:10,17 | **forms**   207:13 | 152:17 |
| 164:8,21 | 241:14 243:13 | **formula**   65:10 | **frequently** |
| 165:14,19 | 244:12 245:1 | 65:20,23 66:6 | 146:21,22 |
| 166:5 167:2,17 | 245:13 247:20 | 66:8,13 67:15 | 147:4,4 149:8 |
| 168:3,9 169:1 | 248:10,19 | 131:13 132:10 | 149:9 166:4 |
| 171:1,18 | 250:9 251:6 | 132:11,21 | 167:6 |
| 173:22 174:19 | 252:17 253:4 | **formulas**   105:3 | **fresh**   107:13 |
| 175:13,18,22 | 253:18 258:22 | 132:16,18 | **freshfields**   3:9 |
| 176:6,11,22 | 259:12,21 | **fort**   279:24 | 70:14 |
| 177:8 178:3,12 | 260:21 262:15 | **forth**   1:25 | **freshfields.com** |
| 178:20 179:1,4 | 264:21 265:13 | 208:21 223:22 | 3:11 |
| 179:10,17,22 | 265:17 266:6 | | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[freshman - go]**                                                                 Page 30

| | | | |
|---|---|---|---|
| **freshman** 27:2 | **gang** 239:18,19 | 204:21 231:8 | **globally** 206:15 |
| 27:5 | **gap** 141:8 | **gibbs** 3:4 5:7 | 210:1 |
| **friends** 29:4 | 153:1 | **gibbsbruns.c...** | **gmail** 60:5,6,10 |
| **front** 60:8 | **gaps** 72:20 | 3:6 | 60:12,15 |
| 124:16 | **gathering** | **give** 44:4 46:2 | 100:22,22 |
| **fulbright** 1:23 | 20:11 | 46:23 49:4 | **gmt** 242:24 |
| 2:13,18 5:10 | **geared** 29:24 | 55:17 77:22 | **go** 6:5 9:20 |
| 5:12 | 30:1 | 80:7 83:15,20 | 18:1 29:7 30:3 |
| **full** 53:6 71:9 | **gears** 27:18 | 90:20,23 95:3 | 32:8 36:5 |
| 167:9 196:4 | 114:15 240:2 | 114:16 125:6 | 41:21 44:13 |
| 239:1 | **gencyber** 30:22 | 190:11 205:15 | 46:12 47:1,20 |
| **functionality** | **general** 2:22 | 208:22 227:2,6 | 48:6 52:1 |
| 204:14 | 38:25 77:18 | 228:11,19 | 55:16 60:22 |
| **funded** 25:1,4 | 94:11 97:13 | 256:23 270:24 | 61:13 66:16 |
| **funding** 24:23 | 122:4 200:1 | 275:21 | 67:3,12 68:11 |
| **further** 4:5 | 214:17,24 | **given** 49:8 53:1 | 70:1 73:9 |
| 176:13 223:11 | 275:3 | 117:14 125:3 | 76:18 78:7 |
| 255:9 271:8 | **generalization** | 127:10 135:11 | 82:21 87:20 |
| 276:1 279:13 | 144:2 | 138:4,12 | 88:3 104:7 |
| **fuses** 124:24 | **generalizations** | 160:10,19 | 118:12 130:3 |
| **fusions** 123:20 | 74:11 | 172:19 173:3 | 133:10 138:24 |
| **future** 59:8 | **generally** 28:12 | 208:21 231:14 | 140:2 157:17 |
| **fuzzy** 219:21 | 77:16 91:11 | 238:12 262:5 | 158:3 164:14 |
| | 92:10 126:24 | 279:9,16 | 176:13 181:22 |
| **g** | 194:20 201:21 | **gives** 251:13 | 194:14,22 |
| **g** 5:1 78:20 | **generals** | **giving** 126:22 | 195:23 196:19 |
| 131:18 221:9 | 181:12 | 143:2 162:23 | 196:25 204:9 |
| 221:10 222:10 | **generate** 20:19 | **gladly** 161:9 | 214:14 223:21 |
| **games** 97:19 | **geographic** | **glean** 104:16 | 223:22,23 |
| 102:4,13,21 | 167:11 | 105:7 | 231:22 234:15 |
| **gaming** 100:14 | **getting** 19:3 | **glenn** 2:13 5:11 | 236:15 239:22 |
| 100:18,19 | 43:21 55:7 | **global** 11:15 | 241:21 249:18 |
| 101:10,22 | 80:23 95:6 | 207:2 273:13 | 267:4 271:10 |
| 185:15,20,23 | 116:3 156:19 | | |

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[goal - gotten]**                                        Page 31

| | | | |
|---|---|---|---|
| **goal**   216:5 | 227:11 231:1,9 | 102:7 103:16 | 220:17 227:10 |
| **going**   6:5 7:21 | 232:17 242:24 | 103:19,21 | 227:20 233:13 |
| 8:16,24 9:20 | 243:1,3 246:7 | 104:3 109:20 | 233:24 237:19 |
| 11:24 12:2,6 | 247:1,9 248:17 | 110:10,14 | 239:21 240:4 |
| 12:21 15:18 | 252:4 258:19 | 112:20 114:6 | 240:15 241:12 |
| 18:25 20:19,20 | 271:23 | 116:10 133:13 | 245:20 248:8 |
| 22:18 25:24,25 | **good**   55:15 | 143:1 148:20 | 251:19 252:11 |
| 27:10,12 34:7 | 71:1,6 72:17 | 150:4,24 | 253:24 254:1 |
| 40:23 41:8,10 | 72:24 90:24 | 151:22 153:12 | 255:7 257:22 |
| 43:7 46:23 | 94:17 106:25 | 153:14,15,16 | 258:2,6,8,12,14 |
| 49:10,17,17 | 118:6 136:3 | 153:18,18 | 260:19 261:25 |
| 54:7 55:3 | 215:7 246:25 | 155:2 156:22 | 262:13,17 |
| 58:20 59:11 | 253:6 | 157:13,20,21 | 264:4,7,12,19 |
| 65:18 67:8 | **goog**   50:25 | 159:13 163:9 | 265:25 266:11 |
| 83:23 86:18,20 | **google**   1:7,21 | 163:19 165:9 | 266:24 267:18 |
| 87:22 94:23 | 3:2 4:17,18,20 | 166:3,10,11 | 267:24 268:9 |
| 101:4,6 116:24 | 5:8,21 7:8 8:25 | 167:21 170:22 | 268:17,20,23 |
| 117:16 120:18 | 9:1 24:1 39:21 | 172:12 173:15 | 271:15,16,25 |
| 121:21 125:9 | 41:1,24 42:5 | 174:23 175:3 | 272:16 274:7 |
| 126:2 134:8 | 42:10,17 43:2 | 175:15 177:6 | 275:10 280:4 |
| 140:15,18 | 43:23 51:2,4,7 | 179:24 182:1,2 | **google's**   43:14 |
| 145:9 150:21 | 51:12 55:8 | 182:13,16 | 44:22 47:9 |
| 152:9,20 153:6 | 57:15 59:16,16 | 183:7 185:4 | 70:5 86:5,11 |
| 154:14 164:22 | 60:13,15,16,16 | 199:10,23 | 87:10 98:7 |
| 176:19 179:14 | 60:18,24 61:2 | 202:15,23 | 99:18 130:23 |
| 181:2 183:23 | 61:3,4 63:7,12 | 203:3,10,15,21 | 142:13 145:19 |
| 188:14 190:6 | 64:21 66:10 | 204:2,13,17 | 167:1 172:11 |
| 190:20 191:17 | 74:4,12,14,24 | 205:3,5,11 | 177:16 181:8 |
| 193:7 194:6 | 76:12,21 77:12 | 210:24 211:6 | 202:21 211:17 |
| 196:24 197:22 | 77:17 78:14,15 | 211:11,13 | 228:8,21 |
| 202:8,10 204:7 | 79:4 85:7 | 212:10,11,15 | 237:20 255:2 |
| 205:25 206:1 | 94:10 95:7 | 212:17,20 | 258:19,25 |
| 211:22 215:10 | 96:8 97:18,23 | 213:1,3,6,11,22 | **gotten**   180:25 |
| 215:24 223:22 | 98:23 99:4 | 218:19,24 | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[govern - hearing]                                                    Page 32

| | | | |
|---|---|---|---|
| **govern** 233:17 | **greenwich** 3:9 | 106:12 247:1 | **happen** 12:16 |
| **governance** | **grew** 87:6 | **hallway** 204:7 | 35:8 81:21 |
| 15:6,10,16,20 | **grocery** 18:24 | **halving** 78:19 | 192:18 226:13 |
| 31:23 32:15 | **group** 73:21 | 79:20 | **happened** |
| 34:15 37:7 | 88:16,17 | **hand** 7:21 | 212:5 249:15 |
| 229:8,12 230:5 | 168:22 170:22 | 25:25 35:16 | **happens** |
| 230:8,11 | 170:23,24 | 118:8,9,11 | 123:24 |
| **governing** | 171:4,8,11,12 | 181:4 236:25 | **happy** 49:17 |
| 36:21 | 171:17,19,24 | 257:4 270:8 | 94:4,18,22 |
| **government** | 172:7 201:14 | 279:16 | 157:10,14 |
| 11:20 12:5 | 201:16 216:20 | **handed** 58:1 | 220:4 241:16 |
| 24:6 31:8,11 | 216:23 217:6,8 | 208:20 209:1 | 242:13 243:5 |
| 32:4 33:3 | 217:16,18 | **handing** 26:2 | 243:16,17,22 |
| 37:18 | 225:10 229:23 | 144:5 205:16 | **harass** 190:8 |
| **governmental** | 234:19,23 | 208:6 | 191:10 |
| 181:10,11 | 236:8,11 241:2 | **handle** 125:25 | **hard** 31:1 |
| **gps** 123:24 | 241:20 243:10 | **handled** 34:5 | 161:10 232:13 |
| 124:18 | 243:14 253:7 | 34:16 | **hate** 229:14 |
| **grab** 126:12 | **group's** 196:15 | **handling** 29:2 | 233:2 245:14 |
| **grad** 19:6 | **grouped** 23:22 | **handwritten** | **head** 21:19 |
| **grade** 32:12 | **groups** 135:6 | 58:8 | 100:14,21,21 |
| **grads** 239:22 | 170:11,15 | **handy** 93:6 | 131:20 132:23 |
| **graduate** 19:7 | **growing** 86:1 | 118:3 246:6 | 158:2 185:15 |
| **grain** 108:23 | **guess** 47:3 | **hangout** 209:9 | 185:20,23 |
| 109:5 111:2,5 | 84:20 208:14 | 209:16,20 | **healthy** 14:19 |
| 155:11 157:7 | **gut** 86:18 | 210:8 | 46:14 |
| **grand** 7:14 | **guys** 246:14 | **hangouts** 4:19 | **hear** 6:15 10:18 |
| **grande** 59:20 | | 4:20 61:1,3 | 81:4 107:4,23 |
| **grant** 23:6,11 | **h** | 182:2,6 204:23 | 200:12 204:8 |
| 24:23 25:1,4 | | 204:23 210:14 | 235:20 275:18 |
| **great** 7:4 | **h** 78:20 | 212:18 264:13 | **heard** 64:16 |
| 242:18 | █ 108:20 | 264:16 266:17 | 275:9 |
| **greater** 21:1 | 198:1,4 | 267:15 273:9 | **hearing** 115:22 |
| | **half** 64:22 | | 117:22 130:7 |
| | 75:11,16 | | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| 180:19 190:13 | **highs**  140:2,23 | 74:13,17,23 | 114:9 115:12 |
| **held**  22:23 | 152:24 160:14 | 75:14,19 76:9 | 115:25 117:4,8 |
| **help**  14:4 48:24 | 163:12 | 77:1,7,14,21 | 117:25 118:10 |
| 73:9 83:23 | **hillegas**  2:12 | 78:1,6,23 79:5 | 120:1,16,22 |
| 196:20 224:19 | 4:4 5:9,9 9:3 | 79:22 80:4,13 | 121:5,13,24 |
| 232:18 | 9:12 10:24 | 80:19 81:10,16 | 122:5,8 123:4 |
| **helps**  158:10 | 11:7,23 12:11 | 82:18 83:2,7 | 123:15 124:4 |
| **hereinafter** | 13:4,14 14:7 | 83:19 84:10,19 | 125:13 127:8 |
| 1:25 | 15:2,5 16:6 | 84:22 85:8,16 | 127:13 128:17 |
| **hertz**  128:7 | 17:1,11 21:5 | 85:23 86:7,13 | 129:5,18 131:4 |
| **hesitating**  64:2 | 21:18 22:14,21 | 86:19 87:3,7 | 131:10,15,23 |
| **hey**  16:16 | 23:1,5 24:25 | 87:13,23 88:12 | 132:7 134:24 |
| 55:15 161:24 | 25:18,22 26:8 | 88:20 89:1,16 | 135:12,16,18 |
| 177:25 242:4 | 26:18 27:14 | 90:2,22 91:12 | 136:1,22 137:7 |
| **high**  16:12 | 28:21 29:9,25 | 91:17,24 92:5 | 137:15 138:2,9 |
| 30:23 72:18 | 33:5,25 34:3 | 92:14,20 93:1 | 138:15 139:3 |
| 106:9,11 125:8 | 34:12 35:1,6 | 93:7 94:6,16 | 139:17 143:21 |
| 125:15 126:8 | 35:11 36:23 | 94:25 95:8,15 | 145:14,25 |
| 132:2 133:16 | 37:5 38:3,22 | 95:18 96:2,7 | 146:3 147:8,14 |
| 136:13 224:1 | 40:3,13 41:3 | 96:13,22 97:6 | 147:19 148:3,9 |
| **higher**  72:10 | 42:12 43:4,19 | 97:11,24 98:10 | 148:15,24 |
| 84:7 87:16 | 44:25 45:6 | 98:15 99:6,13 | 149:18 150:3 |
| 94:13 107:11 | 47:12,18 48:3 | 99:20 100:1,12 | 150:17,23 |
| 168:5 200:17 | 48:5,11 49:6 | 100:17 101:5 | 151:10,16,19 |
| 249:11 | 50:12,20 51:15 | 101:13,15,19 | 152:6,12,22 |
| **highest**  21:2 | 52:6 53:8 | 102:14 103:9 | 154:3,9,20 |
| 72:16 | 54:25 56:5,10 | 103:18 104:5 | 155:1,8,13 |
| **highlighted** | 56:23 57:2 | 104:12,18 | 157:4,8 159:19 |
| 144:17 | 59:7 60:14 | 105:13 106:21 | 159:24 160:6 |
| **highly**  1:15 | 61:6 63:4,11 | 107:5 108:17 | 161:6,20 162:5 |
| 135:11,23,23 | 63:21 66:14 | 109:10 110:6,8 | 162:10,19 |
| 136:21 140:17 | 68:7 69:7 | 110:21 111:11 | 163:7,20,24 |
| 236:24 255:8 | 70:20 71:13 | 111:14 112:8 | 164:8,11,21 |
| | 72:12 73:5 | 112:15 113:12 | 165:14,19 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[hillegas - hochstetler]                                    Page 34

| | | | |
|---|---|---|---|
| 166:5,19 167:2 | 228:13,22 | 83:18 90:1 | 225:7,11,16 |
| 167:17 168:3,9 | 231:8 233:15 | 91:8 93:4 | 226:12,24 |
| 169:1,13,17,20 | 233:21 234:1,7 | 94:14 95:17 | 227:23 235:9 |
| 169:23 171:1 | 236:23 238:7 | 102:24 113:16 | 240:21 241:1,9 |
| 171:18 173:22 | 238:10,17 | 114:7 120:8 | 244:2,10 |
| 174:19 175:18 | 239:24 241:14 | 133:5 152:18 | 245:18 246:4 |
| 175:22 176:6 | 243:13 244:12 | 152:18 153:15 | 246:11 256:5 |
| 176:11,22 | 245:1,13 | 153:18 154:17 | 264:15 266:5 |
| 177:8 178:3,12 | 246:16,21,24 | 155:17 157:22 | 267:15,17,20 |
| 178:20 179:1,4 | 247:20 248:10 | 159:8 160:4,10 | 268:1 273:10 |
| 179:10,17,22 | 248:19,24 | 160:24 161:25 | 273:11,16,20 |
| 180:7,10,16 | 250:9 251:6 | 162:17 163:2 | **history's** |
| 182:19 183:3 | 252:17 253:4 | 164:4,16 168:6 | 197:24 |
| 183:19 184:4,6 | 253:18 255:12 | 170:4,9 172:8 | **hit** 21:2 42:20 |
| 184:15 185:2 | 255:21 256:22 | 175:5 178:9 | 54:6 134:4 |
| 185:10 186:2,9 | 257:3,8 267:7 | 179:25 182:5 | 156:19 202:13 |
| 186:15,19,23 | 271:7,19 | 183:10,17 | 202:14 219:14 |
| 187:4,11 188:2 | 272:17 273:22 | 184:1 188:9,14 | 219:24 220:2 |
| 188:24 189:3,9 | 274:9 275:12 | 188:21 189:2,4 | **hits** 53:13 |
| 189:15,23 | 275:21 276:2 | 189:5 192:15 | 56:11 242:12 |
| 190:3,5,15,23 | 279:12 280:1 | 194:7 198:6 | **hobby** 201:13 |
| 191:4,8,13,20 | **hint** 46:2,23 | 201:4 202:1,16 | **hochstetler** |
| 195:2,13 | **hired** 23:3,8 | 203:6,23 | 1:13 4:2,11 5:3 |
| 197:13 200:5 | 25:16 37:11,18 | 204:20 205:4,7 | 5:14,18 37:19 |
| 200:18,21 | 37:25 59:23 | 205:24,25 | 39:24 50:4 |
| 203:25 204:10 | **hiring** 24:19 | 206:1 208:2 | 91:6 126:21 |
| 208:10,16,23 | **history** 11:4 | 210:10 211:8 | 144:22 145:10 |
| 209:19 210:22 | 40:20 52:25 | 212:1 213:14 | 159:6 169:10 |
| 212:22 213:15 | 53:20,21 56:12 | 217:8,15,17,20 | 171:20 191:22 |
| 215:21 216:21 | 61:25 68:24 | 217:22 218:1,5 | 206:10 214:13 |
| 217:3,7 220:12 | 69:5,10 72:5 | 219:14,15 | 240:3 244:4 |
| 221:1 222:8 | 74:21 78:15 | 220:3,5,10,10 | 255:22 277:2 |
| 223:5 226:1,9 | 80:2,18 81:1 | 220:14,24,24 | 278:12 279:5 |
| 226:25 227:4,8 | 82:2,17 83:1 | 223:18 224:7 | 280:5 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[hold - implemented]**                                                      Page 35

**hold**  28:21 29:5
54:2 64:22
65:12,22 66:7
66:22 70:7,8
73:25 74:5
75:24 79:3,4
82:2,16 83:1
83:18 84:17
85:4 86:17
88:11,18,24
89:10,22,24
90:7,13 98:14
99:8 105:2
117:2 120:9
121:3 133:17
149:16 150:1
153:5,17
155:18 156:24
157:21 159:7
161:25 163:5
163:14,19
164:10 166:12
172:13,20
174:1,9,13,23
175:16,16
176:15 177:7
178:8,23
179:14,16
181:25 182:18
183:16 193:3
198:19 205:16
221:18 224:14
224:16,20
225:7,12

259:11,20
264:11 270:16
**holding**  258:20
**holds**  54:3,3
75:21 113:21
173:15 177:17
178:25 181:2
182:8 184:25
231:13 259:25
262:23
**holiday**  71:12
72:20 91:19
92:23 94:24
95:12,13 153:1
163:11
**holidays**  70:23
70:24 91:10
92:25 93:3
94:5,13,18,22
106:4 160:17
**home**  19:1
67:19,20,24
166:1,3,6,24
167:22 168:7
168:12
**homework**  32:9
**honestly**  49:14
70:24 93:22
104:24 107:6
**hope**  76:1
243:24
**hour**  23:25
24:3,4 43:8,9
49:17 87:24

166:20 208:11
208:17 224:9
246:17 247:1
**hours**  30:25
43:25 44:6
49:8 212:4
225:4 268:10
268:16,22
274:15 279:11
**houston**  2:5,6
2:15 3:5
**huge**  180:6
**human**  87:2
130:16
**hundred**  74:21
136:12 137:1
268:10,16,21
**hundreds**
134:22 135:3
135:15,25
136:18 212:4
**hyper**  215:3
**hypothesis**
131:22
**hypothesize**
162:13
**hypothetical**
55:10 162:14
162:21,23,24
163:3,8 164:2
164:12,15
165:4 216:19
223:13 249:5

| **i** |
|---|

**ic**  107:8,9
193:15,17,18
193:21
**idea**  94:7 95:9
185:22,25
186:1,5 194:2
200:15 221:2
264:1
**identified**  4:7
70:6
**identify**  53:22
216:6 253:11
**ids**  241:25
242:2,10
**ignatius**  59:20
**ignore**  89:12,25
**ii**  2:8
**iii**  236:11
**images**  31:3
**imagine**  104:21
193:22
**immediately**
47:3 263:22
**impact**  101:2
104:6
**implement**
25:13,15
**implementati...**
232:11
**implemented**
24:13 151:22
179:24

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[important - interchanged]                                        Page 36

**important**
   161:2 174:16
**imu**   124:18
**inadequate**
   228:9
**include**   12:9
   14:22 96:24
   102:4 159:25
   178:21 179:6
   196:14 209:12
   248:22 251:25
   252:1,8,9
   275:8
**included**   29:2
   53:10 59:4
   71:12 103:20
   104:13 160:17
   172:6 175:3
   186:17 187:10
   193:1 198:8
   201:15 204:23
   234:20 235:7
**includes**   102:12
   179:7 245:5
**including**   7:12
   12:5 26:20
   71:15 106:11
   137:5 154:1
   163:10 189:8
   213:2 216:25
   270:20
**inconsistent**
   111:22 112:21
   112:24

**incorp**   19:10
**increase**   67:21
   126:11
**increased**
   244:10
**independent**
   115:4 193:18
**independently**
   110:1,4
**indicate**   216:9
**indicated**
   189:12 279:7
**indicating**
   56:20
**indication**
   274:6
**individual**
   108:2 134:11
   171:14 175:2
   193:22,23
   207:9 223:25
   226:18 247:17
   248:9 251:25
   252:1,4,10
   266:1 267:25
**individually**
   202:16
**individuals**
   119:2 155:6
   196:6 224:13
   231:4 240:23
**industry**   86:20
   86:23 91:18
   121:7 193:19

228:7,23,24
   272:8
**influence**
   103:21,24
   104:20 183:11
**info**   99:14
**inform**   55:16
   232:18
**informal**   28:17
**information**
   10:11,20,23
   11:2,5,25
   12:13 45:24
   46:2 60:10
   78:25 104:14
   164:13 174:2
   181:18 198:7
   240:10 244:14
   244:25 245:11
   263:20 270:14
   275:22
**infrequently**
   108:16
**initial**   55:14
**initially**   199:12
**initiate**   63:25
**inside**   37:8
   55:3 119:5
   139:19 201:16
**instance**   1:20
   20:21 45:20
   55:10
**instances**   58:18
   123:9 133:24

170:15 172:7
**instant**   61:4,10
   61:18 62:7
   63:16 96:20
   168:14,21,22
**institution**
   32:19
**instruct**   49:9
**instructed**
   170:4 172:12
   176:15 182:13
   182:17 183:8
   188:14
**instruction**
   12:16 48:10
   50:21 51:16
   118:7 174:2
   182:22
**instructions**
   6:6 16:22 17:9
   172:19 173:3,6
   173:7 174:18
   174:24 175:17
   177:7 181:22
   184:3,14
   230:12 231:14
   231:18 264:5
**integrated**
   212:19
**intend**   113:6
   270:19
**intended**   243:2
**interchanged**
   135:7

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[interested - jonathan.wilkerson]                                    Page 37

**interested**
  24:18 279:15
**internal**   51:2
  210:9 212:11
  212:14,17
  213:5,12 214:5
  275:2
**internally**
  203:16,18
  204:18 211:13
  213:22 271:17
  271:25 272:9
  272:16
**international**
  33:16,17
**internet**   16:18
  229:18,19
**interns**   107:13
**interpretation**
  272:13
**interrogator**
  11:11
**interrupt**   97:22
**interval**   121:23
**intervening**
  79:1,6 91:9
**intimidate**
  191:10
**intimidates**
  191:24
**intimidating**
  191:22,23,25
  192:4

**intricate**   13:25
**intro**   17:19,20
  21:25
**introduction**
  17:22 18:1
**investigating**
  16:14
**investigation**
  38:13 39:2,9
  39:17 232:1,5
**investigations**
  28:14,20,23
  29:8 30:16
  31:15 33:4
  181:8
**investments**
  31:18 33:8
**invitations**
  210:13
**involve**   11:21
  18:16 92:13
  103:7 175:24
**involved**   15:6
  15:10,11,15
  20:5 85:21
  95:2,6 99:18
  103:16 116:1
  120:23 123:10
  232:2,5,6,16
  245:8
**involvement**
  104:3 127:2
  198:13,18
  232:10

**involves**   39:6
**involving**   14:25
  50:9 170:11
**ios**   97:25
**ipad**   19:23
  180:15
**iphone**   118:13
**iraq**   11:15
**irc**   16:18 229:2
  229:16
**iron**   272:9
**irrelevant**
  170:5
**ish**   250:22,23
**issue**   46:3,18
  69:19 102:12
  165:16 179:8
  231:3 238:3
  253:8
**issues**   46:17
  69:18 218:25
  272:10
**issuing**   219:4
  219:22
**items**   58:2
**iterations**   61:3
  63:8
**ix**   32:5

**j**

**jacob**   1:13 4:2
  4:11 5:3,14
  277:2 278:12
  279:5 280:5

**jaffe**   3:14
**january**   72:21
  93:5,18
**jayaram**   52:8
  143:5
**jeff**   185:14
**jersey**   38:17
  39:6
  ▮▮▮▮   104:24
  187:6,15
**job**   12:9 14:12
  15:23,24 16:10
  99:11 100:8
  101:2 103:1,7
  103:16 104:10
  185:18,21
  186:3 187:18
  192:7,9 193:14
  193:25 200:13
  200:23 277:25
  278:25
**jobs**   11:8 13:21
  14:13,23 92:3
  92:12 98:13
  99:10 100:5
  103:4 107:11
  167:9 260:16
  260:20
**joke**   19:2 21:7
  21:20
**jonathan**   2:3
  3:14 5:12
**jonathan.wil...**
  2:6

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[jumping - lawsuit]**                                                    Page 38

**jumping**
119:17
**jurisdiction**
36:18

**k**

**keep** 49:17 75:6
84:8 161:12
174:24 181:17
190:20 195:11
204:7 263:19
**keeps** 96:8
**kept** 35:15
**keyword** 149:1
**keywords**
52:25 109:18
**kid** 18:25
**kind** 14:4 28:17
31:12 107:9
121:17 136:5
157:6 159:5
195:5 210:4
245:12
**kinds** 96:11
127:14 155:10
**knn** 20:15
23:23
**know** 7:2,5
18:21 20:19
21:1 22:16
23:7,9,19
24:13 25:6,12
28:5 29:21
31:10 32:3,14

32:14,17,18
33:17,20 35:8
35:14,18,20
40:25 47:2
51:6 53:5
55:18 56:15
58:18 62:12
63:1,5 65:1
75:23,24,25
76:20 87:10
88:15,22,23
92:1,10 94:3
95:4 99:10,17
102:6 103:3,15
104:2 106:17
107:8 125:1,11
127:7,9,17
131:21 135:22
137:25 146:17
146:17,22
147:1,2,4
149:4,9 158:10
161:2 168:5
173:16 183:10
189:18,25
192:9,11
193:13,15,24
195:14 198:13
198:16 200:8
201:8 202:18
203:13,24
204:1 208:11
223:17 233:17
236:6 238:13

239:1,6 240:3
240:15 246:13
247:25 249:2
264:4 270:7
271:14,22
272:2,4,12
**knowledge**
257:21,22
**known** 136:6
239:15
**korula** 51:23
133:21 134:8
134:13 143:5
**kpmg** 247:23
███████ 104:22

**l**

**l** 1:21 78:20
279:3,21
**la** 23:14,15,24
24:6,13,16
25:10,12,15
256:20
**lab** 128:21
**laboratory**
128:23
**labs** 13:17
**lack** 178:19
**lacked** 249:22
**lacking** 250:15
253:16
**ladder** 107:7
**lady's** 191:2

**lamar** 2:14
**language** 19:4
174:13 182:8
182:22 209:5
272:23 273:5
**lanier** 2:4,9
5:12
**lanierlawfirm...**
2:6
**large** 14:21
19:4 20:10,12
23:13 33:15
263:22
**larger** 80:21
115:10 116:3
140:25 153:4
163:13 207:13
215:4
**las** 24:7
**lastly** 51:6
**late** 44:9
229:21 254:7
**latency** 20:2
**law** 2:4,9 5:13
28:1,3 32:18
203:20
**laws** 30:3
**lawsuit** 37:4
38:13 39:9,14
39:18,19 40:1
40:11 42:24
43:2,3 81:1
88:23 97:17
102:8,12,21

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| 158:14,15,17 | **lawyers**  119:18 | 137:25 195:17 | 81:3,7 82:15 |
| 158:20,21 | **layers**  14:8 | 246:15 | 83:16 90:15,20 |
| 159:1 174:4 | **layman**  75:21 | **legal**  14:1 | 90:23 168:6 |
| 178:9 183:9,16 | **laymen's**  16:20 | 27:21 36:21 | **likely**  21:12,23 |
| 183:18 185:9 | **layoffs**  238:23 | 37:8 38:2 | 67:20 78:13 |
| 186:8 187:9 | **layperson**  45:9 | 65:22 77:20 | 79:24 80:24 |
| 188:1,23 189:8 | 123:6,7 | 86:17 98:14 | 82:15,24 83:4 |
| 192:14 194:5 | **layperson's** | 117:2 172:20 | 92:24 100:9 |
| 199:6,22 201:5 | 46:6 215:15 | 181:25 228:7 | 138:6,12 |
| 216:15,17,25 | **leading**  256:19 | 233:14,17 | 139:14 168:1 |
| 217:19 218:9 | 257:15,25 | 264:11 279:23 | 168:14 |
| 218:13,17,18 | 258:4,10,16,23 | 280:23 | **limit**  23:9 210:8 |
| 218:25 219:13 | 259:5,13,17,21 | **length**  117:11 | **limitations** |
| 221:20 222:3 | 260:1 261:7,12 | **lengths**  275:1 | 167:11 |
| 223:3,14 | 262:1,7,11,20 | **lesser**  69:23 | **limited**  260:4,8 |
| 235:18 236:22 | 263:10,15 | **letter**  70:5,11 | **line**  83:22 |
| 238:3 240:4,16 | 265:18 266:7 | **level**  16:12 18:2 | 144:11 160:3 |
| 241:12 243:18 | 266:15,22 | 107:9,11 126:3 | 209:9 245:10 |
| 243:23 247:13 | 267:2,22 268:3 | 126:8 128:20 | 277:3 |
| 247:19,25 | 268:14 269:15 | 191:7,9,17 | **linear**  18:11 |
| 249:2,12 250:8 | 269:20 | 198:13 | **lined**  57:6 |
| 251:20 255:4 | **leads**  66:19 | **levels**  62:4 | **lines**  94:4 |
| **lawsuits**  33:23 | **leap**  117:14 | **liberal**  148:4 | 143:11,15,20 |
| 34:11 43:2 | **learn**  78:25 | **liberally** | 146:6,11 |
| 77:4 240:9 | 219:18 | 147:25 | 147:21 184:24 |
| **lawyer**  27:24 | **learned**  86:22 | **liberties**  147:17 | **list**  6:6 22:16 |
| 27:25 37:8 | 219:22 220:8 | **licensed**  28:3 | 173:12 191:14 |
| 48:24 77:9 | **learning**  17:24 | **lidar**  123:23 | 200:22 261:13 |
| 199:8 227:5 | 18:10,15 115:6 | 124:16 | **listed**  22:17 |
| 233:22 240:14 | **leave**  170:25 | **life**  275:3 | 51:1,19 52:20 |
| 241:15 | 180:12,18 | **light**  18:10 | 55:23 56:9 |
| **lawyering** | **leaves**  122:23 | **lightly**  240:13 | 68:17 107:20 |
| 48:25 | **left**  85:7,13,19 | **likelihood** | 109:25 142:13 |
| | 86:15,24 | 79:25 80:5 | 142:17 143:1 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

173:19,20
193:3
**listening**   180:4
**listing**   109:19
**literally**   236:20
**litigant**   42:23
**litigants**   43:1
79:8 153:5
163:13 179:25
200:22 226:16
**litigation**   27:23
28:9,10,13,20
30:5 31:14
33:4 36:22
37:14,23 39:2
39:16 54:3
64:22 65:12
66:22 73:25
74:5 75:21,24
82:2,16 83:1
83:18 84:17
88:11,18,24
89:10,21 90:11
90:13 99:8
105:2 113:20
120:8 121:3
149:16 150:1
153:17 155:18
156:24 157:20
159:7 161:25
163:5,19
164:10 166:12
172:13 173:15
174:1,9,13,23

175:15,16
176:15,17,18
177:6,17,20
178:2,6,8,11,23
179:14,16
181:1 182:8,18
184:25 198:19
221:17 224:14
224:16 231:13
233:5,18,19
235:12,22
236:5 258:20
259:11,20,25
262:23 270:16
**little**   34:6 64:11
91:7 93:21,24
95:20 127:24
176:13 195:19
204:21 220:6
223:10
**lives**   95:2,6
**llc**   1:7,21 3:2
280:4
**llp**   1:23 2:13,18
3:4,9
**local**   19:18
206:20,20,24
274:2
**locally**   206:14
206:18 207:9
208:1 272:18
**located**   134:1
**location**   232:12

**lodge**   101:21
**log**   8:20,22,24
9:6 13:19 17:5
40:15,20 41:4
42:14 43:20
45:10 50:24
51:1,8,9 54:12
54:14,21,22
56:21 57:4
67:1,3 68:16
68:24 69:2
70:17 71:19
72:2 73:8,16
73:20 74:10
80:8,12 81:14
81:20 83:10
91:9,20 92:7
92:18 94:4
95:21,23 96:8
98:12 103:12
103:14,14,20
105:18 110:17
110:18 111:13
112:1,21 113:7
115:9 119:2,6
119:22 129:3
129:12,25
130:24 133:15
136:5 137:19
137:23 138:5
139:7 141:7,19
150:5 153:13
154:16 159:9
159:20 160:2

160:22 162:14
162:25 170:3
170:13,17
172:5 175:3,10
176:4,10 185:3
185:12,19
187:2 196:15
198:7,10,14
199:11 200:9
214:16,24
217:10,25
218:4,6 223:4
223:18 224:21
235:24 240:18
240:20,25
244:9,17,18
259:8,11,24
260:4,10,12,15
261:15
**log's**   67:2
**logging**   17:3
45:15 46:25
159:11
**logs**   7:10,13,18
7:25 8:7,18,25
13:24 14:4,13
14:16 16:16,23
16:24 17:2
40:4 43:18
44:8,23 45:4
45:22 46:1,4
46:15,17 47:10
48:17 49:3
50:9 55:4 59:3

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[logs - make]**                                                           Page 41

69:21 95:25
96:3,8,11,20,23
96:25 97:5,13
97:13,16
110:16 116:21
138:21 148:14
161:14 199:14
216:6 220:5
260:3,7
**long**  14:11
22:16 35:15
62:25 96:23
190:16 268:16
269:1
**longer**  69:10
110:22 114:4
180:25,25
265:15
**look**  22:18 32:9
47:1 48:23
76:16 78:9
92:9 125:9,23
131:7 145:6,10
155:15,20
156:22 166:8
172:22 173:7
173:10,24
181:1,7 185:21
202:2 205:4,22
207:18 208:5
212:23 216:1
227:16 249:20
272:23

**looked**  55:11
75:1 90:9
105:23 112:5
142:12 146:20
148:20 150:12
151:1,2 152:23
173:18 184:3
240:25 252:22
272:24
**looking**  20:10
20:23 26:11
43:22 57:25
70:1 89:11
92:6 111:23
180:22 197:18
207:6 210:20
228:17 238:20
241:3,21 270:9
272:20
**looks**  238:15
■■■  51:22
69:12 142:20
213:18 214:2
242:19 274:15
■■■  212:3
213:21 268:5
**lopsided**  215:6
215:19
**los**  13:17 16:9
256:17,20
**loss**  180:20
**lost**  65:21
66:21 67:7,10
68:2 163:18

164:10,19
175:9 177:9,18
179:18,20
184:10 221:12
221:18 222:11
222:16 223:25
225:23 226:19
226:19 234:21
235:12
**lot**  8:17 19:3
20:1,18,22
33:18 51:3
123:24 152:13
180:19 183:22
207:15 215:6
245:3,5,8
253:5
**lots**  189:1
221:11,13
■■■  52:9
143:6
**loud**  190:21
191:2
**louder**  257:5
**louisiana**  3:4
**low**  71:17
72:18 96:15
97:10,12 106:1
106:2,10,11
107:21,25
108:1 138:1
163:11,12
**lower**  84:20,24
85:22 106:22

133:16 137:21
166:13 197:12
**lows**  140:3,23
152:24 160:14
**luis**  3:15
**lunch**  122:8
126:14,21
**lung**  215:10

**m**

**m**  229:3
**machine**  17:24
18:10,15 115:5
203:10
**madaras**  2:17
**made**  71:21
84:16 122:2
155:16 170:20
177:10 201:19
216:10 222:9
222:18 224:11
225:17
**magnitude**
55:8 146:17
**main**  31:20
**major**  239:16
**majority**  175:2
263:12
**make**  17:12
31:3 39:3,12
45:17,22 46:7
46:13 54:15
55:15 57:12
59:2 65:19

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[make - meant]**                                                      Page 42

| | | | |
|---|---|---|---|
| 67:24 74:11 | 195:21 219:20 | 84:4 88:2 | **mdl**   50:25 |
| 76:25 85:10 | 227:19 228:16 | 142:11 144:8 | **mean**   15:17 |
| 102:3,4 105:15 | 241:7 245:16 | 146:9 181:6 | 21:11 32:4 |
| 109:17 114:7 | 246:1 | 205:20 208:7 | 37:13 38:18 |
| 128:9 156:3 | **malkiewicz's** | 208:20 237:2 | 45:10 54:21 |
| 178:1,9 182:4 | 58:19 87:21 | 256:24 | 79:24 89:4,18 |
| 190:18,23 | 90:3 240:25 | **marking** | 90:8,10 99:1,5 |
| 191:11,21 | 268:9 | 205:17 236:25 | 102:6,25 106:5 |
| 196:25 201:19 | **management** | **massaging** | 115:11 135:5 |
| 215:14,19 | 193:20 | 25:11 | 141:18 145:16 |
| 218:14,20 | **manager** | **massive**   18:18 | 146:13 147:9 |
| 236:16 242:19 | 100:16 193:21 | 18:21 67:19 | 147:11 149:7,9 |
| 250:13 264:14 | **managing** | 232:12 | 158:20 167:13 |
| 266:3,12 | 230:3 | **master's**   9:17 | 176:1 178:2 |
| 274:16 275:10 | **manner**   62:3 | **match**   199:15 | 184:7 195:16 |
| 275:13 | **map**   105:25 | **matches**   253:9 | 200:8 209:12 |
| **maker**   232:19 | **mapping**   51:7 | **materials** | 211:12 222:15 |
| **makes**   103:11 | **maps**   24:1 | 173:11 | 222:23 224:4 |
| 140:18 209:6 | 60:16,17 | **math**   22:6,7,9 | 225:1 239:12 |
| 247:1 | **march**   158:22 | 118:2 251:2,14 | 267:18 272:7 |
| **making**   16:23 | 159:1 245:20 | **matter**   5:21,23 | 272:19 274:2 |
| 70:25 107:25 | **margin**   80:6,9 | 86:10 117:24 | **meaning**   16:23 |
| 121:20 124:2 | 80:11,15 81:9 | 160:2,4,7,11,21 | 21:23 159:22 |
| 162:11 190:7 | 81:25 82:3 | 161:23 162:1 | 177:24 241:11 |
| 266:19 | 132:22 | 165:10 216:10 | **means**   21:12 |
| **malkiewicz** | **marisa**   2:17 | 231:14 | 114:22 181:17 |
| 4:13 41:16,18 | **mark**   25:24 | **mattered**   116:4 | 206:18,24 |
| 41:24 42:3 | 41:10 83:24 | **matters**   95:13 | 217:23 218:18 |
| 52:4 57:20 | 87:22 144:5 | 167:25 182:18 | 224:16 226:5,8 |
| 71:21 79:7,10 | 145:9 181:3 | 231:9 254:12 | 235:19 255:8 |
| 79:15 81:18 | **marked**   7:22 | ▮▮▮▮   239:3 | 263:19 267:14 |
| 85:3 87:16 | 8:1 25:25 | **mccallum**   3:8 | 273:9,13 |
| 115:21 141:1 | 41:14,17 57:18 | 70:15 79:12 | **meant**   63:6 |
| 150:7 154:10 | 57:21 58:3,5 | | 95:16 114:20 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[meant - meta]**                                                      Page 43

| | | | |
|---|---|---|---|
| 128:13 144:23 | 189:11 198:2 | 108:9,12 110:2 | 222:11,16,20 |
| 188:11 194:14 | 210:9 217:8,10 | 133:5,14 | 223:2,25 224:6 |
| 203:1 216:4 | 217:12,17,18 | 134:11,23 | 225:17,23 |
| 254:3 | 217:21 218:5,8 | 135:6,10 137:1 | 226:19,19 |
| **measure** | 219:25 220:4 | 137:14 139:2,5 | 227:11,21,22 |
| 122:16 | 223:13,16 | 140:5,14 151:2 | 228:9 230:1,13 |
| **measurement** | 225:13 226:12 | 151:21 153:13 | 231:3 232:8 |
| 128:9 | 226:23 227:9 | 154:17 156:17 | 233:6,14,24 |
| **measures**  256:3 | 237:13 238:14 | 160:3,9,24 | 234:21 235:9 |
| **meet**  275:19 | 241:9,11,17,19 | 161:16,24 | 235:11,18 |
| **meeting**  126:3 | 242:13 243:5,6 | 163:2,5,18 | 236:3,17,21 |
| **meetings**  157:2 | 243:9 244:2 | 164:3,10,19 | 240:5,15,19 |
| 166:24 | 245:6 252:4 | 165:9 166:11 | 241:1 242:3,21 |
| **mention**  136:19 | **messages**  14:20 | 171:15,23 | 244:7,8,20,22 |
| **mentioned** | 35:15,17 37:3 | 174:25 175:3,8 | 245:5,21 |
| 30:10 53:17 | 40:19 41:25 | 175:17 176:1,4 | 247:18 248:9 |
| 61:8 184:17 | 42:6,11,18 | 176:9 177:9,18 | 248:13 249:12 |
| 190:16 194:23 | 46:1 55:21 | 177:19,21 | 250:7 251:19 |
| 242:16 261:3 | 57:5 61:19 | 178:16,24 | 251:25 252:1,8 |
| 270:6 271:3 | 62:12 64:21 | 179:18,20 | 252:9,11,16 |
| **message**  68:10 | 65:21 66:6,21 | 182:1,4 183:25 | 264:15 265:10 |
| 68:15 69:4 | 67:7 68:2,21 | 184:8,10,22 | **messaging**  61:4 |
| 71:2,17 75:10 | 68:23 69:5,22 | 185:8 186:7,12 | 61:10 62:7 |
| 81:19 85:21 | 70:4 72:5,11 | 187:24,24 | 63:16 91:16,22 |
| 94:18,23 106:1 | 73:7 74:4,20 | 188:10,15,18 | 97:5 106:3,9 |
| 108:6 137:18 | 78:15 80:2,17 | 192:13,19 | 131:8 168:15 |
| 138:7 141:6,17 | 80:25 81:8 | 194:4,17 196:7 | 168:20,21,22 |
| 141:18 142:2 | 83:17 84:18 | 196:15,17 | 168:23 171:3,6 |
| 150:21 151:7 | 89:14,15 91:8 | 197:5,25 198:6 | 181:24 182:2 |
| 153:15 162:16 | 94:14 96:21 | 198:23,25 | 264:10,12,12 |
| 163:11 171:10 | 100:9,15 101:7 | 199:5 210:9 | **met**  5:18 |
| 171:14,20 | 102:25 103:6 | 216:9 217:25 | **meta**  238:18,23 |
| 178:10 187:8 | 103:13 104:9 | 218:1,13 220:2 | 239:11,13 |
| 188:3,6 189:7 | 105:25 106:5 | 221:11,12,17 | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[meta's - muddy]                                                    Page 44

| | | | |
|---|---|---|---|
| **meta's** 239:4 | **military** 11:16 | **minus** 261:20 | 20:14,18 21:24 |
| **metadata** 8:25 | 12:23 231:9 | **minute** 22:18 | **modern** 20:18 |
| 41:5 44:8,16 | **milk** 77:20,25 | 40:24 87:15 | **modify** 165:21 |
| 96:24 97:4 | 78:2,5 | 97:9 175:20 | **moment** 245:18 |
| 110:20,24 | **million** 23:16 | 208:9,12 | **moments** |
| 112:5 116:21 | 64:22 66:22 | **minutes** 42:9 | 252:23 |
| 138:21,24 | 68:5 70:3 74:5 | 208:14 246:14 | **monday** 24:3 |
| 139:15 159:15 | 74:8 75:3,9 | 246:18,19 | 55:12 |
| 161:13 170:8 | 78:14 80:1,25 | 275:20 279:11 | **money** 23:6,11 |
| 171:15,15 | 81:8 82:1,16 | 279:12 | 102:4 |
| 179:7 201:15 | 82:25 83:16 | **mirc** 229:3 | **moniker** |
| 249:23 250:15 | 84:8,9,21 | 230:21,22,23 | 125:18 |
| 251:3 253:6,7 | 89:14,15 90:8 | 231:19 | **monitor** 45:4 |
| 253:17 257:11 | 90:16,16,19,19 | **mischaracteri...** | **month** 14:11 |
| 257:13,19,23 | 120:7,9 122:18 | 101:16 | 58:14 |
| 258:2,8,14 | 122:22 161:10 | **misconduct** | **months** 26:5 |
| 259:3,23 | 207:7,8,8 | 158:19 | 29:19 225:10 |
| 260:10,19 | 221:17 222:2 | **mishear** 183:2 | 232:14 |
| 262:2,3,13,18 | 248:17 249:4 | **misinterpreted** | **morning** |
| 264:23 | 249:10,21 | 90:6 | 180:22 |
| **metaphor** 19:1 | 250:2,7,12,14 | **missing** 20:6 | **mos** 29:1,14 |
| **michal** 4:13 | 250:23 251:2,5 | 27:3,4 40:5,16 | **motion** 58:15 |
| **michelle** 1:21 | 251:7,11,12,14 | 141:3 161:13 | 158:6 |
| 279:3,21 | 253:2 | 253:6,7 | **move** 50:4 |
| **microsoft** | **millions** 125:22 | **mistake** 71:22 | 151:23 187:13 |
| 167:1 | **mind** 26:2 27:1 | **mit** 27:5 | 189:17 198:9 |
| **mid** 107:14,16 | 41:12 57:23 | **mit's** 27:3 | 214:13 221:6 |
| 107:17 200:11 | 118:8,10 184:9 | **mix** 72:18 | 234:14 |
| 200:14,16 | 257:6 | **mobile** 19:16 | **moved** 75:25 |
| **middle** 24:8 | **mine** 118:9 | 19:23 98:2 | **moving** 19:16 |
| 30:23 236:12 | **mining** 17:24 | **model** 19:16 | 19:19,24 20:2 |
| **migrated** | 18:15,18 19:1 | 23:13 | 45:23,25 |
| 204:24 | 19:6 215:4,13 | **models** 17:23 | **muddy** 204:21 |
| | 215:23 | 18:5,9 19:4,21 | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[multiple - non]                                                    Page 45

**multiple**  21:13
115:3
**multiplied**  66:7
115:17
**multiplying**
118:14,19,21
**munged**  45:18
55:5
**munroe**  1:21
279:3,21
**murder**  23:20

**n**

**n**  2:1 3:1 4:1
5:1 78:20
248:7
**nail**  242:18
**nailing**  46:15
**najam**  3:3 4:3,5
5:7,7,17,19
12:15 32:20
40:6 47:16
48:4,9 49:16
49:21 67:5
72:25 77:24
81:22 86:2
87:25 90:24
96:16 101:14
101:17 105:11
109:16 110:12
114:13 116:16
118:8 122:10
126:14 136:15
144:9 166:22

169:4,15,19,21
177:11 178:17
180:2,9,13,17
180:21 181:4
183:13 190:4,9
190:19,25
191:6,16 204:5
208:15 214:6
234:13 237:5,8
243:1 246:13
246:18,23
255:6 256:19
257:6,15,25
258:4,10,16,22
259:5,12,17,21
260:1,21 261:7
261:12 262:1,7
262:11,15,20
263:10,15
264:21 265:13
265:17 266:6
266:14,21
267:1,5,21
268:2,13,19,24
269:14,19
271:1,9 275:5
275:25 279:11
**name**  5:19
48:10 73:3
93:23 97:3
105:23 145:8
187:14 239:2
**named**  1:19
13:22 47:7,16

171:12
**names**  47:14,23
60:23 63:8
99:15
**nasdaq**  125:22
**national**  13:17
**nato**  30:2
**nature**  15:8
43:18 215:20
**nbc**  122:24
**near**  248:21
250:2,23 251:4
251:8
**necessarily**
188:25 224:18
249:15 269:11
**necessary**
133:7 262:10
267:25
**need**  16:16
37:19 40:8
50:6 55:2,16
59:9,11 70:1
73:9 120:3
161:15 164:14
175:11 210:18
227:15 231:1
237:4,6
**needed**  48:24
54:15 214:15
230:13
**needs**  154:7
208:17 266:2,4

**negative**
138:11 153:22
173:1
**neglected**  47:6
**neither**  62:20
279:13
**netflix**  239:21
**networks**  10:13
230:20
**never**  19:5
24:16 28:1
177:10 185:23
189:4,5 204:1
224:16 225:17
**new**  3:11,11
38:17 39:6
45:21 59:12
78:25 164:13
165:15,16,23
177:3 210:19
248:6,11
267:12,13
269:8,9 270:14
272:25 275:14
**newborn**  18:25
**news**  77:8,11
77:15 122:24
**nice**  223:13
**node**  14:9
**nodes**  14:19
**noise**  124:22
**non**  95:13
108:24 111:4
157:10 167:25

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[non - objection]                                                    Page 46

| | | | |
|---|---|---|---|
| 168:13 201:1 | 130:11 177:25 | 133:5,14 | 137:5 165:17 |
| **nonresponsive** | 178:8 | 134:14 135:10 | 184:21 194:25 |
| 32:21 40:7 | **notices** 179:16 | 135:22 136:11 | 197:12 246:7 |
| 67:5 73:1 | **noticing** 257:3 | 138:4,13 139:1 | 247:12 270:16 |
| 81:23 86:3 | **november** 4:22 | 139:4 140:14 | **nutshell** 215:22 |
| 96:17 109:16 | 67:17 | 141:14,19 | **nw** 2:18 |
| 110:13 114:14 | **nowadays** 19:3 | 146:13,15 | |
| 116:17 136:16 | 63:18,23 | 150:6,10 | **o** |
| 177:12 178:17 | **nsa** 29:4 30:21 | 154:17 160:3,9 | |
| 183:14 234:14 | **nsa's** 30:22 | 161:24 163:4 | **o** 5:1 |
| 243:2 275:5 | **nuclear** 13:23 | 164:3,9 165:8 | **oag.texas.gov** |
| **normal** 97:1 | **number** 35:17 | 166:10 170:14 | 2:24 |
| 217:23 | 40:23 48:7 | 179:20 183:25 | **oath** 149:15,25 |
| **normally** 15:18 | 50:24,25 56:8 | 192:17 194:8 | 150:14 279:7 |
| 125:8 207:11 | 64:20 65:8,11 | 194:17 195:6,9 | **object** 32:20 |
| 269:2 | 65:21 66:7,20 | 196:11 197:8 | 38:22 40:6 |
| **north** 2:5 32:3 | 67:7,9 68:10 | 197:23 199:16 | 56:23 67:5 |
| 35:23 62:7 | 68:16,22 69:4 | 218:8 220:22 | 72:25 77:23 |
| **norton** 1:23 | 69:23,23 70:4 | 222:1 247:17 | 78:4 81:22 |
| 2:13,18 5:10 | 70:5 72:10 | 248:16 249:4 | 86:2 91:17 |
| 5:11 | 73:23 74:3,20 | 249:11 251:19 | 93:7 96:16 |
| **nortonroseful...** | 75:4,7,10,11 | 252:14,15 | 109:16 110:12 |
| 2:15 280:2 | 76:3 79:8,11 | 256:23 263:4,6 | 114:13 116:16 |
| **notary** 278:16 | 79:15,16 80:16 | 263:23 269:24 | 135:18 136:15 |
| **notated** 58:5 | 80:21 81:2,20 | 270:9,15 | 177:11 180:14 |
| **note** 134:17 | 82:19,22 83:6 | **numbers** 40:24 | 180:16 183:13 |
| 170:1 212:25 | 84:12,21 86:5 | 51:7,10 55:7 | 186:23 189:23 |
| 280:10 | 86:11 87:10 | 65:13 66:15 | 204:11 234:13 |
| **noted** 107:21 | 89:24 93:6 | 72:5 73:19 | 243:2 275:5 |
| 245:17 253:10 | 101:3 109:1 | 83:21,22 84:7 | **objecting** 77:24 |
| **notes** 58:9 | 115:16,19,21 | 86:25 89:25 | 78:1 |
| 179:14 209:21 | 116:3,5 118:14 | 90:4 106:13 | **objection** 9:3 |
| **notice** 1:24 | 118:15,19,21 | 109:15 110:1 | 9:12 10:24 |
| 57:25 84:23 | 122:21,22 | 119:16 136:3 | 11:7,23 13:14 |
| | | | 14:7 15:2,5 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[objection - objection]                                          Page 47

| | | | |
|---|---|---|---|
| 16:6 17:1,11 | 87:3,7,13 | 137:15 138:2,9 | 187:4,11 188:2 |
| 21:5,18 22:14 | 88:12,20 89:1 | 138:15 139:3 | 188:24 189:3,9 |
| 22:21 23:1,5 | 89:16 90:2,22 | 139:17 143:21 | 189:15 190:3,4 |
| 24:25 25:18,22 | 91:12,24 92:5 | 145:14,25 | 190:10,20,21 |
| 26:8 27:14 | 92:14,20 93:1 | 146:3 147:8,14 | 191:3,11,15,17 |
| 28:21,22 29:25 | 94:6,16,25 | 147:19 148:3,9 | 191:18 195:2 |
| 33:5,25 34:3 | 95:8,15,18 | 148:15,24 | 195:13 197:13 |
| 34:12 35:1,6 | 96:2,7,13,22 | 149:18 150:3 | 200:5,18,21 |
| 35:11 36:23 | 97:6,11,24 | 150:17,23 | 203:25 209:19 |
| 37:5 38:3 40:3 | 98:10,15 99:6 | 151:10,16,19 | 212:22 213:15 |
| 40:13 41:3 | 99:13,20 100:1 | 152:6,12,22 | 215:21 217:3 |
| 42:12 43:4,19 | 100:12,17 | 154:3,9,20 | 220:12 221:1 |
| 44:25 45:6 | 101:5,13,14 | 155:1,8,13 | 222:8 223:5 |
| 47:12 48:3,4,5 | 102:14 103:9 | 157:4,8 159:19 | 226:1,9,25 |
| 48:9 49:6 | 103:18 104:5 | 159:24 160:6 | 227:4,8 228:13 |
| 50:12,20 51:15 | 104:12,18 | 161:6,20 162:5 | 228:22 233:15 |
| 52:6 53:8 | 106:21 107:5 | 162:10,19 | 233:21 234:1,7 |
| 54:25 56:5,10 | 108:17 109:10 | 163:7,20,24 | 236:23 238:7 |
| 57:2 59:7 | 110:6,21 | 164:8,11,21 | 238:10,17 |
| 60:14 61:6 | 111:11,14 | 165:14,19 | 241:14 243:13 |
| 63:4,11,21 | 112:8,15 | 166:5 167:2,17 | 244:12 245:1 |
| 66:14 68:7 | 113:12 114:9 | 168:3,9 169:1 | 245:13 247:20 |
| 69:7 70:20 | 115:12,25 | 171:1,18 | 248:10,19 |
| 71:13 72:12 | 117:4,8,25 | 173:22 174:19 | 250:9 251:6 |
| 73:5 74:13,17 | 120:1,16,22 | 175:18,22 | 252:17 253:4 |
| 74:23 75:14,19 | 121:5,13,24 | 176:6,11,22 | 253:18 256:19 |
| 76:9 77:1,7,14 | 122:5 123:4,15 | 177:8 178:3,12 | 257:15,25 |
| 78:23 79:5,22 | 124:4 127:8,13 | 178:17,20 | 258:4,10,16,22 |
| 80:4,13,19 | 128:17 129:5 | 179:1,4,10,17 | 258:23 259:5 |
| 81:10,16 82:18 | 129:18 131:4 | 179:22 182:19 | 259:12,13,17 |
| 83:2,7,19 | 131:10,15,23 | 183:3,19 184:4 | 259:21 260:1 |
| 84:10,19,22 | 132:7 134:24 | 184:6,15 185:2 | 260:21 261:7 |
| 85:8,16,23 | 135:12,16 | 185:10 186:2,9 | 261:12 262:1,7 |
| 86:7,13,19 | 136:1,22 137:7 | 186:15,19 | 262:11,15,20 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[objection - okay]                                                    Page 48

| | | | |
|---|---|---|---|
| 263:10,15 | 66:18 68:12 | 17:4,7 18:14 | 116:24 117:17 |
| 264:21 265:13 | 69:25 75:16 | 19:9 25:4,14 | 118:12,14 |
| 265:17,18 | 78:21 79:1,19 | 26:16 27:18 | 119:10 122:7 |
| 266:6,7,14,21 | 82:22 93:12 | 29:12,21 30:4 | 122:10 123:7 |
| 267:1,21 268:2 | 109:6 111:17 | 30:9 31:9 | 125:3 126:13 |
| 268:13,19,24 | 133:10 169:16 | 32:20 36:25 | 129:21 130:6 |
| 269:14,19 | 172:18 182:12 | 37:24 39:13 | 134:7 135:9 |
| 271:1,19 | 192:24 195:25 | 40:6 41:7 42:8 | 141:16,25 |
| 272:17 273:22 | 202:3,8,10 | 43:6 47:22 | 142:25 143:9 |
| 274:9 275:12 | 203:5 212:23 | 48:12,14,19 | 143:23 144:17 |
| **objections** 13:5 | 216:1 219:4,23 | 49:2,21 51:11 | 145:2,17 |
| 190:7,24,25 | 220:8 221:16 | 53:1,16 54:13 | 146:10 147:23 |
| 191:21 | 223:21 227:14 | 59:1 61:2 62:6 | 148:5 149:3,11 |
| **obligation** 38:2 | 234:15 | 64:5,10 65:1 | 151:24 154:11 |
| 258:19 259:1 | **odds** 85:20 | 65:18,19 66:1 | 155:4 156:7,20 |
| **obligations** | **offer** 160:8 | 67:23 69:25 | 158:24 159:3 |
| 29:11 36:6,17 | 235:8 | 71:2,6,7,24 | 159:14 160:1 |
| 233:5 | **offering** 65:7 | 73:18 74:9 | 162:13 164:1 |
| **observe** 253:23 | 68:1 | 75:8 77:25 | 165:4,24 166:7 |
| **obtuse** 254:6 | **offhand** 51:6 | 78:7 79:18 | 167:12 168:24 |
| **obviously** 8:16 | **office** 2:22 | 81:22 82:21 | 172:3 173:18 |
| 23:19 142:20 | **officer** 15:20 | 83:13 84:14 | 173:24 176:8 |
| 181:21 | **offset** 109:2 | 86:4,9 87:15 | 177:11 181:1 |
| **occurred** | **oh** 26:21 45:22 | 87:20,25 90:12 | 183:6 187:13 |
| 158:19 | 47:1 64:16 | 90:14,24 95:4 | 190:19 192:3 |
| **occurring** | 101:17 102:6 | 95:10 96:10,16 | 193:6 195:19 |
| 30:18 | 111:20 123:23 | 97:15 98:18 | 199:18 201:17 |
| **ocean** 24:8 | 143:13 190:9 | 99:9,16 102:6 | 201:24 203:1 |
| **october** 4:8 | 208:13 222:15 | 102:23 103:5 | 203:19 205:1,9 |
| 5:25 6:1 7:18 | 246:23 | 103:23 104:7 | 208:19 211:21 |
| 7:24 43:24 | **okay** 6:19 7:11 | 104:25 107:10 | 215:24 216:13 |
| 48:16 51:18 | 8:9 9:14 10:17 | 109:4 110:12 | 216:19,23 |
| 54:18 55:22 | 12:4,21 13:8 | 111:1,21,25 | 217:5 221:3,16 |
| 56:9 57:1 59:4 | 15:9 16:1,8,20 | 114:11 116:16 | 222:19 223:1 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[okay - originated]                                                          Page 49

223:16 224:19
225:20 226:18
229:14,24
230:21 231:1
231:12,21
232:22 233:2
236:15 238:25
240:24 243:9
243:16 246:13
248:23 249:10
249:17 251:1
251:22 252:21
253:10 254:3,6
254:18
**once** 23:22 29:5
30:10,18 94:19
116:4 158:20
222:11 244:10
**ones** 52:16
237:3 250:15
251:3 253:9
273:21
**ongoing** 174:3
**online** 174:6,9
**oops** 41:19
**opa** 207:15
**open** 31:2
263:18
**operate** 125:5
**operations**
11:16
**opine** 39:15
42:9 45:3
73:22 86:23

97:9 113:6
141:5 167:8
199:7 201:24
228:8 235:11
**opined** 221:16
227:10 234:21
**opining** 66:12
210:23 236:2
249:4 258:25
262:9
**opinion** 42:5,7
42:16,17 58:19
59:12 64:20
65:5,7 66:5
68:1 74:10
79:25 80:22
98:11 100:6,7
114:12 117:22
120:6,7,24,25
129:24 133:4
140:9 141:17
145:18 148:13
150:19 151:6
151:12,18,25
153:25 154:11
154:15,21
160:2,8,11,21
161:3 162:2,9
162:17 164:7,9
165:8,16
167:20 174:17
175:1,14 177:5
177:9,15 178:7
178:19,22

179:2,8,11,18
179:19 183:11
183:22 184:23
185:3,11
188:20 200:25
201:2,3,18
202:9 203:4
204:16 205:9
213:10 214:1
218:14 221:19
221:22,25
223:1,12,15
224:10 226:5
226:18 227:3,7
228:1,12,20
234:11 235:8
251:16,18
274:17,22
275:9,14
**opinions** 7:8
50:8,11,19
51:14 52:13,17
52:22 57:1,19
59:2,16 64:10
70:17 77:10
104:6 115:23
165:21 169:11
172:17 174:22
182:11,15
183:6,15,24
184:10 200:1
235:17 236:1
270:20,24
271:4

**opposed** 135:6
207:2
**opposing**
261:13 263:13
263:17 264:8
265:2,20 268:5
269:3,22 270:4
**optimal** 4:23
**option** 61:25
203:8 207:5
211:6
**oral** 1:12,19
**orange** 20:25
**order** 1:15
64:19 265:25
271:10
**orders** 12:1
**organization**
209:23 210:10
**original** 8:8
34:8 39:4
47:22 68:11
71:19 73:2
81:24 82:22
99:9 104:7
107:10 161:22
169:11,17,21
193:2 212:18
242:16,17
**originally** 8:6
54:8 97:16
**originated**
51:12

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[outcome - part]                                                    Page 50

| | | | |
|---|---|---|---|
| **outcome** | **p** | 202:2,6 203:10 | 166:8,15 170:1 |
| 279:15 | | 204:4 205:22 | 172:10 173:25 |
| **outlier** 106:10 | **p** 2:1,1 3:1,1 | 207:6 212:24 | 181:13,17 |
| 106:11 109:2 | 5:1 20:19 21:1 | 216:2,4 221:7 | 195:23 196:19 |
| 197:15 | 21:3,4,6,9,11 | 221:9 223:23 | 202:3 204:12 |
| **outliers** 160:15 | 21:15,22,22 | 234:16 236:8 | 209:25 212:25 |
| 163:12 | 114:18,20 | 241:21 249:18 | 216:4 221:9 |
| **outputs** 115:3 | 115:1 132:6 | 253:20 261:10 | 222:10 223:23 |
| **outside** 31:8 | 255:24 256:2 | 263:23 267:4 | 227:18 234:17 |
| 34:1,4,7,11,14 | **p.m.** 126:18,18 | 267:11 272:24 | 234:25 235:2,3 |
| 34:14 79:12 | 169:7,7 214:10 | 273:7,8,8 | 246:5 249:18 |
| 99:14 122:9 | 214:10 247:4,4 | 277:3 | 252:23,24,24 |
| 124:24 176:1 | 255:17,17 | **pages** 111:19 | 253:11,21 |
| 179:2,13 | 276:5 | 111:23 130:3 | **paragraphs** |
| 210:10 211:22 | **p.o.** 2:23 | 143:10,15,20 | 158:11 247:9 |
| 211:23,25 | **page** 4:1 8:3 | 146:11 247:9 | 247:11 |
| 212:19 257:20 | 41:21 51:19 | **paid** 23:6 25:2 | **paraphrasing** |
| **outsider** 212:9 | 52:2 58:7 | 43:9 | 170:2 |
| **overlapped** | 64:13,14,14,15 | **pandemic** | **parking** 124:15 |
| 129:14 | 64:16,16 66:17 | 67:17 165:25 | **parkway** 2:5 |
| **overseas** 16:13 | 67:25 68:12 | 166:4,16,23 | **parse** 245:8 |
| 17:7 180:20 | 70:2 73:9 78:7 | 167:14,16,22 | **part** 8:18 11:14 |
| **overwriting** | 78:10 88:4 | 168:7,12 | 16:13 31:23 |
| 17:2 | 89:8 93:15,16 | **paper** 23:7,10 | 50:5 69:14,15 |
| **overwritten** | 133:11 142:17 | 24:11,14 25:15 | 71:19 72:2 |
| 17:6 96:9 | 143:9 144:11 | 256:9,13,25 | 78:8 86:8,9 |
| 110:23 116:23 | 146:6 153:7 | **paragraph** 8:3 | 88:24 91:22 |
| 132:20 | 157:18,18 | 41:22 64:13,15 | 102:21 108:10 |
| **own** 58:2 89:2 | 169:11 173:10 | 64:19 66:17,18 | 112:1,22 |
| 89:5,7 232:4 | 173:24 181:7 | 74:3 78:8 88:3 | 123:12 127:16 |
| 272:3,5 | 181:23 183:1 | 89:17 130:2,4 | 176:7 183:12 |
| | 184:23 194:22 | 145:18 153:8 | 192:1 201:11 |
| | 195:23 196:4 | 157:18 159:3 | 219:8,11 222:4 |
| | 196:19,25 | 159:14,22 | 227:1 230:8 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| 233:7,8 234:2 | **party** 10:4 40:1 | 122:23 130:25 | 222:1 244:8 |
| 234:8,12 | 40:11 122:25 | 156:11 166:23 | 253:6 |
| 239:17 244:13 | 126:6 202:18 | 170:23,24 | **percentages** |
| 254:24 255:1,5 | 203:2 264:11 | 176:14 178:1 | 239:9 |
| 255:23 269:8 | 279:10,14 | 193:20 200:8 | **perfectly** |
| 270:11 | **pass** 83:25 | 210:10 230:2 | 140:10,13 |
| **participant** | 144:9 180:6 | 260:15 270:15 | **perform** 23:4 |
| 273:11 | 237:5 271:7 | **people's** 16:22 | 25:16 195:4 |
| **participants** | **passage** 264:7 | 94:24 | **performed** |
| 243:11 267:13 | **passes** 110:19 | **percent** 80:5 | 11:12 250:20 |
| 267:14,16 | **passing** 57:23 | 82:15,19 83:5 | **period** 9:2,6,9 |
| 273:9,20 | 256:22 | 94:14 103:8 | 16:19 40:20 |
| **participated** | **past** 86:3 106:4 | 119:23 121:1,9 | 67:4 68:2,24 |
| 122:14 123:18 | **path** 193:20 | 121:11 122:15 | 69:2 70:23 |
| **particular** 9:1 | **patrol** 4:23 | 123:12,21,24 | 71:12 73:8,20 |
| 38:1 56:20 | 105:11,14 | 124:9,20,23 | 79:9 91:9 94:4 |
| 57:6 85:20 | **patrols** 23:14 | 125:7,9 126:2 | 137:23 138:5 |
| 87:11 88:25 | 24:18 | 126:23 175:7 | 141:19 157:23 |
| 92:23 95:24 | **patterns** 71:4 | 196:7,11,17 | 157:25 158:11 |
| 127:15 129:12 | 91:15 | 197:5,9,12 | 158:14,15,17 |
| 137:14 182:21 | **pause** 82:4 | 198:25 230:15 | 158:19,25 |
| 202:17 210:25 | 202:8 204:9 | 235:8 236:3 | 159:10 160:16 |
| 226:12,14,23 | 237:24 | 239:3,5 244:21 | 163:11 166:13 |
| 248:1 | **peak** 254:13 | 246:4 | 170:13,17 |
| **parties** 30:6 | **pending** 6:25 | **percentage** | 175:9 176:10 |
| 31:9 33:2 77:4 | **people** 15:22 | 49:4,12 79:25 | 185:8,19 186:8 |
| 202:15 232:5 | 22:9 29:4 | 81:2,6 83:16 | 186:18 187:2 |
| **partnerships** | 31:10 47:17 | 83:20 90:15,20 | 188:7 189:14 |
| 104:24 185:15 | 48:2,8 80:18 | 90:23 102:25 | 193:4,14 194:5 |
| 185:20,24 | 85:3 91:19 | 107:16 119:19 | 194:18 196:15 |
| 187:14 | 99:2 100:4 | 124:8 196:16 | 198:15 199:1 |
| **parts** 45:18 | 105:20 106:23 | 197:19,21 | 211:3 217:10 |
| 148:22 173:5 | 106:24 107:14 | 198:5 200:16 | 223:4,18 224:9 |
| | 108:1 111:3,9 | 200:25 201:3 | 224:21 240:6 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[period - plucking]                                                    Page 52

240:20 244:9
244:17,18
245:19 260:12
**permanent**
178:15 224:23
226:17
**permanents**
188:16
**permitted**
12:14 38:24
**person** 10:17
15:19 48:14
49:2,4,13 57:5
85:22,25 88:23
88:24 101:4
103:1 104:9
193:8 194:19
210:19 225:7
225:12 226:5
242:4
**personal** 35:19
35:25 95:5
127:11 143:2
167:4,19
168:11,16
**personally**
34:24 35:4,10
95:1 167:9
170:3
**perspective**
14:1
**pertained**
177:19 190:1

**pertains** 36:6
**pertinency**
199:8 221:23
**pertinent**
176:12,17,19
178:16 184:7
188:9,15
199:10,20,21
199:24 200:3
216:17 217:1
218:13,15,18
218:20,25
219:2,3 222:3
222:18 227:9
236:6,14
241:13 243:17
243:23 264:25
**peter** 2:12 5:9
171:6,11,19
216:21 280:1
**peter.hillegas**
2:15 280:2
**ph.d.** 9:18
**pham** 2:21
**phase** 28:13
69:14 167:22
168:7
**phases** 69:16
**phasing** 69:12
**philipp** 241:17
242:13 243:5
243:22
**phone** 63:25
64:8 98:5

118:4,4,5,11
120:3
**phrase** 139:21
211:16 229:5
271:23 272:8
**phrased** 6:20
**phrases** 219:14
**pichai** 72:14
93:17 103:19
104:2 112:1
156:12,21
184:16 198:11
198:25 234:20
235:7 245:21
**pichai's** 113:5
260:24 261:9
**pick** 20:20
203:5 211:25
213:13
**picked** 178:15
224:24 225:5
**picture** 8:17
43:13 59:1
70:16 124:20
124:24 125:4
**pieces** 27:5
**place** 15:7,12
46:21 69:9
160:24 256:10
256:17 279:6
**placed** 23:13
279:7
**placement**
24:14

**places** 10:13
222:19
**plaintiff** 2:2
42:24 58:14
76:11 254:21
**plaintiffs** 1:5
53:12 59:23
88:6 129:13
255:3,10
272:24 275:17
**planning** 4:23
23:12 25:5,14
45:3 160:8
**plans** 94:5,24
**play** 96:1 97:15
97:18,23 98:6
99:3 102:4
259:8,11 260:4
**played** 19:12
**plays** 115:24
**please** 6:8 7:2
41:21 77:21,23
83:25 111:19
125:13 144:9
163:15 181:5
181:23 182:4
224:4 264:9,14
267:11
**pllc** 2:4,9
**plot** 24:1
**plotted** 71:3
**plucking**
227:14

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[plus - preserve]                                            Page 53

plus   58:20
point   7:1 12:8
  13:9 14:16
  15:10 16:1
  20:6 23:18
  25:16 26:21
  44:1 45:16
  68:20 69:3
  72:4 79:14
  84:6,11 107:10
  129:8 135:21
  141:7 143:14
  166:21 190:18
  203:13 209:5
  210:17 211:24
  216:8 237:13
  242:6,9 246:25
  250:19,23
  254:8 265:15
pointed   70:12
pointing
  199:19 238:22
points   265:2
police   4:23
  23:14,14 24:15
  256:10,17
policies   15:23
  16:4 31:24
  32:2,5 62:14
  62:19 205:14
  230:6 232:3,4
  254:21
policy   32:15,19
  37:7 206:11

  207:12,14,16
  225:13 232:7
  255:3
political   121:18
  122:13,14,25
  123:8 127:3
poll   122:24
polled   122:23
polling   121:14
  121:15,17,18
  122:13,14,25
  123:3,5,8
polls   127:3,11
poorly   113:3
pop   102:20
population
  108:8 119:4,24
  121:2,10,12,22
  122:4,16,17
  123:13,14
  124:10 131:3
  132:12,13,17
  132:19 140:16
  152:21 153:5
  160:23 163:1
  214:20,23
  215:17
population's
  164:16
portion   253:15
portions   134:3
  134:5 263:14
  263:17

position   134:15
  198:18
positions
  106:23,25
positives   215:7
  215:7
possibility
  92:22
possible   94:13
  94:17 95:11
  103:5,10
  140:17 144:21
  145:16,24
  146:4 147:22
  185:5,7 210:3
  236:20 253:15
  253:19 262:4
possibly   55:3
  236:24 238:15
post   209:21
  210:20 271:12
  273:1,24
potential
  198:22
potentially
  53:22 183:25
power   246:19
practice   28:3
  155:21 156:3
  156:23 201:4
practices   37:12
  38:8 45:4
  62:13 143:3
  151:13 152:2

  154:19 156:16
  161:4 165:12
  228:21 229:1
  254:21
precise   212:7
predicting
  18:22
preferred
  35:18
prepare   255:13
present   3:13
presentation
  4:22 30:25
presented   25:3
  256:13 257:1
preservation
  11:21 12:10
  13:2,12,24
  15:1,3 16:11
  27:20,22 28:8
  30:2 33:13,18
  37:20 45:4
  61:19,23,24
  62:13 77:12
  102:24 103:6
  104:8 228:1,4
  228:8,21,25
  229:10 230:6
  232:3,7 254:20
  255:3
preserve   16:17
  17:10 30:15
  31:2,3 32:1
  33:3,9,10

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[preserve - production]                                    Page 54

38:12 39:8
41:25 42:6,11
42:18 174:2
182:4 227:11
227:20,22
230:3 233:13
233:24 257:23
258:2,6,8,12,14
259:1 262:10
264:15 266:1
268:11
**preserved**
31:21 32:12
40:1,11 41:2
63:1 110:20
165:9 175:4
176:10 199:1
216:10 217:10
222:21 225:8
225:13 229:4
233:13 240:5
240:11 241:11
244:7,21
247:18 257:20
261:25
**preserving**
28:19 31:14
36:16,19 37:3
38:1 77:6
229:25 230:12
**president**
122:24
**pretty** 76:24

**prevent** 204:19
205:6,11 211:7
266:5,24
267:19,25
**previous** 43:22
61:3 63:8
210:7
**previously**
79:21 167:10
**principles**
214:17
**prior** 10:2
43:12 152:2
196:5 211:6
213:10 244:17
244:17 253:12
253:17 257:23
258:3 270:22
**privacy** 32:10
**private** 11:15
12:23 31:9
33:2 37:25
96:20 97:2
**privilege** 50:13
**probabilities**
115:4
**probability**
17:23 18:5,9
21:4
**probably** 49:20
71:2 93:23
145:8
**problem** 48:10
190:13

**problems**
242:16
**procedure**
15:23 36:9,12
**procedures**
12:3
**process** 20:3,4
36:16 113:13
191:24 192:1
240:14
**produce** 81:18
88:22 98:23
124:24 215:13
219:1,3 220:17
240:11 260:19
262:13,17
272:9
**produced** 9:1
43:23 44:8,15
51:7 55:4
74:15,25 79:10
81:12 94:10
95:23,25
109:14 111:7
116:9 117:5
129:12 150:24
151:2 155:3
159:12 163:9
173:15 181:2
185:4,12
186:17,21
187:2,9 189:7
192:18 194:9
199:10,22,23

200:2,3 216:6
216:15,24
217:18,23
218:9,17,19,24
219:6,7,13
220:9,13,18,23
221:4 234:20
235:6 236:12
236:13,17,21
237:10,14
240:4 241:10
241:12 242:22
244:1,5,8,21
245:21 247:13
247:14,18
248:1,7,8,14,17
249:12,16,22
250:7 251:19
251:24 252:4
252:11,15,16
253:2,3,12,24
253:25 260:3,7
262:4,5,19
264:25 269:12
269:17 270:5
270:11
**producing**
36:16,19
**product** 187:14
202:23 204:24
211:11 212:19
213:6 272:9,11
**production**
46:17,18

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[production - question]                                    Page 55

173:12 241:4
242:11 244:6
245:6,19 252:6
**productions**
254:11
**productivity**
213:2
**products**  60:13
181:9 203:17
**professional**
26:6 60:12
96:14
**professionally**
123:10
**professor**  50:4
84:6 88:9
159:6 169:10
171:20 206:10
240:3
**program**  30:22
**project**  13:19
49:8
**projects**  123:18
**promise**  213:19
**promised**
215:24
**promoted**  76:1
**pronounces**
5:20
**proper**  126:5
215:13
**properly**  15:21
46:10 77:6
82:6 229:7

**proposition**
133:14,21
143:6 147:18
148:7
**protections**
32:10
**protective**  1:15
**protocol**
229:21,21
**provide**  50:10
50:18 51:13
123:8 202:14
228:15
**provided**  7:13
7:15 43:13
51:4 61:4
79:13 84:3
112:13 115:18
116:6,7 140:22
141:2 150:4
160:18 164:13
165:15 200:22
247:16 272:1
**provides**
202:23 271:15
**providing**
51:11 247:12
**pto**  91:19
**public**  92:1,11
278:16
**publication**
121:8
**published**
256:10

**publisher**
237:23
**publishers**
237:22
**pull**  249:17
**pulling**  64:12
**punch**  83:22
160:3 245:10
**purge**  32:8
**purpose**  44:23
45:3 46:3
123:22
**purposes**  14:19
36:22 38:12
39:8 45:11
108:24,25
111:4 118:20
152:9 153:25
157:10 216:14
217:1
**pursuant**  1:15
1:24 233:25
**push**  207:17
**pushes**  207:15
**put**  16:20 18:23
30:10 42:21
46:6 59:17
62:1 68:20
69:2,9 76:10
79:16,24 80:5
81:2 82:19
83:5 90:15
115:14 145:21
149:13,24

198:24 214:16
268:9
**putting**  42:3
96:18,18
130:23 227:24
238:12 257:4

**q**

**qualified**  39:25
40:10,25 42:9
42:13 226:22
227:2,6 228:11
233:11,23
234:5,10
270:24
**qualifier**
209:11
**qualitative**
150:11
**quantify**  149:7
**quantitative**
150:9
**quarter**  92:3,12
159:2
**quarters**  27:6
**question**  6:9,14
6:16,19,21 7:1
11:4 12:6,17
12:20,22 15:14
32:22 34:8,13
35:12 36:14
37:22,24 39:4
42:8 47:15,19
47:22 48:6,7

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[question - reason]                                                    Page 56

48:19 49:11
50:16 56:12
57:13 65:4
66:23 67:6
71:7 73:2
77:23 78:3
81:24 82:14
83:15 90:18
92:10 99:9
101:21 104:7
105:6,16
106:15,17
108:19 116:25
120:18 125:14
130:6 135:1
136:24 146:19
148:16 151:24
152:15 159:5
160:1,20 161:1
161:22 163:17
175:12,21
177:3 180:14
180:23 187:1,7
188:17 191:19
191:23 198:3
205:1 211:21
214:17 218:23
220:6,15
225:11 226:2
227:12 233:16
234:6,9 235:4
243:3,6,9
244:24 246:8
248:23 251:15

253:20 273:18
**questioning**
  255:23 263:13
**questions**  43:6
  180:4 193:7
  201:17 255:9
  255:11 261:14
  262:22 275:18
  276:1,2
**quick**  30:25
  87:25 118:2
**quicker**  20:3
**quickest**  24:2
**quiet**  106:7
**quite**  17:25
  24:9 29:22
  78:2 106:15
  111:1 239:2
**quote**  60:24
  224:21 225:23
  239:17
**quotes**  221:2

**r**

**r**  2:1 3:1 5:1
  229:3 231:23
**radar**  124:17
**raise**  182:14
  190:5
**raised**  190:12
  190:13 204:5
**ran**  13:21
  23:23 53:3,16
  65:13 66:15

133:25
**random**  127:7
  127:12,14,19
  127:22 128:4,5
  128:10 129:4,9
  129:17,20
**ranges**  239:2
**ranging**  246:4
**rate**  102:23,24
  103:5 104:8
  125:10 132:2
**rates**  244:6,9
  246:3,10
**rather**  168:1
  201:13 246:25
**raw**  248:16
**rays**  215:10
**rbac**  207:16
**reach**  40:14
  84:7
**reached**  38:10
  39:10
**reaching**  30:22
  166:21
**read**  12:18 42:1
  51:24 64:24
  74:3 77:11
  78:17 101:24
  146:23 147:11
  147:20 153:19
  159:4 172:15
  174:5 175:11
  175:12 204:15
  206:3 209:12

212:24 213:21
216:11 240:24
250:4 257:7
263:14,18
264:8 267:10
280:9
**readily**  210:24
**reading**  8:4
  77:8 145:18
  180:5,20 206:2
  239:2
**reads**  41:23
  196:5
**real**  15:24
  72:23 118:2
  268:21
**reality**  161:3
**realize**  180:23
**really**  20:15
  24:6 102:17
  115:2 125:25
  128:20 146:18
  146:19 148:1
  161:4 180:22
  199:7 207:16
  275:1
**realtime**  12:18
  47:3 101:16,24
  180:2,5,8,11,15
  180:18
**reason**  6:14
  52:19 57:4
  59:10 95:23
  115:15 129:11

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[reason - reference]                                            Page 57

186:6 187:23
188:5 192:12
194:3,24
195:16 241:10
241:18 277:3
280:11
**reasonable**
66:20 140:10
140:13 154:24
199:4
**reasonably**
153:2
**reasoning**
84:12 111:5
219:2 226:11
228:2
**reasons**   13:22
140:21 189:1
192:17 194:8
**rebuttal**   4:13
255:13
**recall**   6:24 14:8
15:7 21:6,10
21:15,17 27:6
44:2,17 49:14
52:18,19 53:13
53:14 62:15
63:8 67:17
91:11 97:17
106:9 108:3,14
109:9,14
111:12,24
112:16,18
114:1 123:1

126:24 129:15
130:18 132:8
142:15 143:22
156:1 158:2,16
167:5 170:14
174:11,15
182:10 184:16
184:19,21
185:16 189:10
192:21 193:10
194:20 195:1
199:2 202:12
203:7 211:2,19
212:16 213:25
235:3,5 236:10
239:13 241:5
242:12 245:16
245:22 246:5
247:24 250:24
251:7 255:25
256:7,11
260:17 261:1
261:16 262:24
264:17 265:23
269:6 270:6
**recalling**   21:20
123:2
**recap**   17:7 46:7
79:18 82:11
103:25 129:24
136:17 215:15
233:2 250:4
**recapped**   82:5

**receipt**   280:17
**receive**   84:2
188:15 232:24
242:3 270:14
**received**   31:12
33:1 40:20
56:13 68:23
79:7 88:7
108:13 133:15
134:11 166:11
178:8 179:14
186:7 192:13
194:4 196:7
197:8,23
240:20 244:9
244:22 254:1
**receives**   55:8
55:20 217:14
241:25 242:5
**receiving**   55:9
153:14
**recent**   26:13
39:5
**recently**   6:5
**recess**   50:1
91:3 126:18
169:7 214:10
247:4 255:17
**recollect**
131:24 132:3
**recollection**
21:25
**record**   5:2,6,18
6:13 8:5 49:24

50:3 51:19
58:12 87:24
91:1,5 92:6
126:16,20
166:20 169:5,9
189:18 190:22
192:7 204:9
208:11,17
209:1 214:8,11
224:16 237:9
246:17 247:2,6
255:14,15,19
275:7,16 276:3
279:8
**records**   23:16
32:8,11 85:10
89:3,5 174:2
**recover**   16:15
32:1
**recovering**
29:7 30:13
**recycled**   16:24
**red**   55:13
**redacted**
181:22 183:4
263:8,12
**redactions**
236:11
**reddy**   3:15
**reduce**   161:9
**refer**   9:5 96:23
212:16
**reference**
172:11 192:15

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[reference - remaining]                                        Page 58

194:6 196:18
199:11 238:22
241:18 274:2
**referenced**
87:16 209:2
234:18 241:16
280:6
**references**  88:6
88:13 181:8
182:1 222:22
233:10 239:7
**referencing**
196:5 211:3
239:8
**referred**  268:5
**referring**  114:2
116:18 130:2
139:9 212:17
226:15 270:6
**refers**  17:2
**reflect**  260:11
**reflected**  91:20
153:13 172:5
**reflective**
121:21 153:16
153:23 154:2
154:18
**refresh**  114:21
**regarding**  8:18
13:18 32:18
33:9 59:3
62:19,21 81:19
123:19 127:25
179:18 229:12

271:21
**regardless**
44:15
**registration**
279:22
**regulations**
32:6
**regulatory**  14:2
14:22,25 15:4
31:19 33:10
229:13
**reinforce**  242:3
**relate**  7:17 11:8
33:22 92:3
220:11 238:15
**related**  10:4,23
11:5,20 12:23
22:16,17 33:22
52:17,22 92:24
94:15 95:12
101:3 104:17
113:25 155:17
155:22 156:4
168:8,13
169:21 178:4,5
178:10 188:22
236:17 237:17
279:14
**relates**  8:7
34:10 52:12
148:14 183:18
**relating**  7:24
182:16 194:11

**relationship**
132:5
**relative**  222:18
258:20
**relay**  16:18
229:18,19
**release**  272:10
**released**  209:15
**relevance**
177:25 256:3
**relevancy**
175:23,25
176:3
**relevant**  38:12
39:8 53:23
134:1 149:2
157:23,25
158:11,25
166:11,13
172:14 174:3
174:24 175:17
176:9,12,25
177:13,21
178:1,2,24
181:18 183:9
183:18,25
184:7 186:7
188:6,18
192:13 194:4
201:5 216:9
217:9,12,21
221:11,12,20
222:10,13,16
222:21,23

223:2,6,14,19
235:12,18,19
235:21 236:5
263:19 265:4
**reliable**  120:9
120:14,20,24
120:25 162:17
164:7,20
165:18 214:21
215:18
**relied**  50:11,19
51:14 52:14
55:19 109:6,25
149:13 173:11
**relief**  242:23
**relu**  115:3
**relu's**  115:4
**rely**  52:21 54:7
56:25 109:8
133:9 163:4,18
172:22 173:23
180:20
**relying**  109:13
109:20 143:4
**remaining**
73:24 81:15
98:13 99:11
105:19 106:20
107:17 108:8
108:20 122:17
123:14 124:10
138:7,14,21
139:15,25
140:20 150:22

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[remaining - request]                                            Page 59

151:8,15 152:4
154:2,18 160:5
160:23 161:3
162:15 163:1
164:4,17
195:12 198:3,5
200:16
**remember**
19:11 21:21
26:16,25 29:23
56:14 85:11
156:15,18
174:12,17
198:12 239:20
**reminder** 6:8
6:23
**reminding** 27:1
**remove** 76:4
138:11 172:25
251:3
**removed** 71:22
84:24 250:11
250:15
**removing**
79:20
**renders** 199:13
228:25
**repeat** 6:16
101:21 130:6
**rephrase** 6:16
148:16 151:24
220:15
**replace** 85:25

**replaced** 86:16
**replied** 248:6
**replies** 94:23
248:25 249:1
**reply** 4:10
41:10,12 42:21
48:20 52:4
58:22 67:12
84:3 85:11
142:10,17
145:17 204:3
221:8 227:15
248:11 249:17
270:12 271:5
**replying** 41:16
57:19
**report** 4:8,10
4:13 7:18,19
7:24 8:19 9:5
41:10,13,15
42:21 48:17
51:18 52:2,20
54:8,17,18
55:22 56:9
57:19 58:21,23
59:4,5 60:2
65:2 66:19
68:12 69:25
70:13 75:16
78:21,21 79:1
79:7,16,19
82:23 84:3
87:21 90:4,4,6
93:9 109:7,8

111:16 129:23
133:10 134:18
136:19 142:10
142:11,12,18
143:10 144:15
145:17,21
149:24 150:13
165:16 169:11
169:22 170:16
172:18 173:11
173:25 175:11
193:21 195:23
195:24,25
196:1,24
198:24 202:2,3
202:4,10 204:3
204:4 211:15
212:24 216:1,3
219:4,23 220:8
221:7 223:22
225:21 227:15
227:15 234:15
234:16 235:21
239:13 240:25
241:19,22
245:17,22
249:17 268:9
270:12,21,22
271:5,5 275:13
**reported** 24:7,8
279:6
**reporter** 1:22
29:1 279:4

**reporting** 92:4
92:4,13
**reports** 7:12,15
26:10 48:23
54:10 59:9
94:19 95:2
117:19 149:14
176:20 177:14
193:20 212:13
222:20 270:20
270:25 274:20
274:23 275:8
**represent** 5:21
**representation**
26:6 107:1
**representative**
105:19 106:19
122:4 131:2
140:25 148:21
148:25 160:5
160:12,22
162:3,7,15,25
163:13,23,25
164:3,5,17
214:19 215:11
262:14
**represented**
22:24
**represents**
21:17 121:1
**reproducible**
25:9
**request** 76:24
125:18,18

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[request - right]** Page 60

210:15

**requests**
210:18

**require** 245:12

**required** 37:2
204:14

**requirements**
14:2,23,25
15:4 33:12,15
33:20

**reread** 152:14

**research** 10:21
10:22 91:23
123:11

**researcher**
130:15

**reserve** 59:8

**resort** 168:18

**resources** 89:6

**respect** 34:9
229:13 233:5

**respectively**
265:21

**respond** 125:14

**responding**
23:19,20

**response** 141:1

**responses**
94:24

**responsible**
230:2

**responsive**
23:25

**responsiveness**
246:3,10

**rest** 72:7 73:20
92:18 96:4,5
105:20 107:1
116:14 117:21
121:12,22
140:16 148:13
152:21 160:12
204:15 208:17
215:17

**restate** 233:16

**restore** 227:22

**restrict** 201:25
202:7 203:22
209:8 213:3

**restriction**
231:17

**restrictions**
38:24

**result** 141:23
223:24

**results** 20:11
20:20 120:6,14
120:20 126:5

**retain** 34:19
176:15 178:1
178:24

**retained** 15:21
35:21,24 39:15
62:2 64:21
69:22 74:4
94:8 103:13
111:7 116:21

163:5 196:8
197:5,9 224:1
224:5,21 225:1
225:1,24 229:7
230:13 232:15
232:17 241:9

**retaining**
156:17 175:17
233:5

**retention** 34:4
34:15 35:8,19
36:22 37:12,13
38:8 45:12,13
45:20,22 62:4
69:9 113:24
151:14,21
152:3 154:1
155:16,21
156:3 170:12
175:5 197:4,19
197:21 209:8
209:13 211:1
213:23 216:8
225:2 226:17
230:20 235:13
249:14 272:14
273:3

**return** 126:4
280:13,16

**reveal** 111:6
250:25

**reverse** 64:18
271:10

**review** 52:16
55:14 60:1
112:10,17
113:19,23
114:5 134:3,5
158:3 170:7
172:18 254:20
261:4 264:23
280:7

**reviewed** 8:2
27:15 51:20
52:4,11,14,21
73:11 112:21
149:13 158:13
161:19 173:2
177:1 196:21
237:16 259:24
260:24 262:14
262:19 263:11

**reviewing** 43:1
156:15

**revise** 165:16

**revisit** 101:9
229:14

**revolved** 8:21

**rid** 153:21

**right** 5:20,23
6:3,4 7:5,9,14
7:19 8:3,17
9:11,14,21
10:2,7 15:13
27:16 28:1
29:20 30:14
40:17,21 41:19

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[right - running]**                                                           Page 61

| | | | |
|---|---|---|---|
| 42:1,18 44:9 | 140:7,10 141:9 | 239:16 241:20 | 110:16 116:21 |
| 44:10 46:20 | 141:12,20,23 | 248:18 249:23 | 127:19 |
| 49:16 51:24 | 142:23 143:7 | 250:4,16 | **room** 208:18 |
| 52:3 53:3 | 144:3 145:4,15 | 251:14 252:1 | **rooms** 201:11 |
| 54:18 55:23 | 145:21,24 | 255:6 256:14 | **rope** 130:17,21 |
| 56:3 58:11,17 | 146:23 147:2 | 258:3 259:1 | **rose** 1:23 2:13 |
| 60:5,11 64:18 | 149:6 151:4,18 | 261:4,6,10,25 | 2:18 5:10,12 |
| 65:16 68:4,6 | 154:7 155:7 | 262:6,10 263:9 | **ross** 1:23 |
| 68:24 70:19,23 | 156:9,12 158:6 | 264:25 265:4,7 | **rough** 24:6 |
| 71:20 72:1 | 161:14,19 | 265:12 266:9 | **roughly** 65:25 |
| 73:25 74:6,18 | 164:6,25 | 266:13,20,25 | 66:6 67:9 68:1 |
| 74:22 75:12 | 165:20 166:8 | 268:6 269:9,13 | 68:9,15,21 |
| 76:13 78:17,21 | 167:16 170:9 | 274:5 275:14 | 70:3 75:3,9 |
| 79:21 80:12,18 | 170:18 171:4 | 275:25 | 82:25 221:17 |
| 81:4 83:11 | 171:11,17,21 | **ring** 6:1 192:25 | 249:21 250:2 |
| 87:18 89:24 | 171:25 172:1 | **ringers** 242:7 | 251:5 275:19 |
| 93:25 95:20 | 173:3,12 | **rip** 31:2 | **rounded** |
| 99:4,25 101:24 | 179:19,21 | **road** 2:9 125:1 | 250:10 |
| 102:9,19 | 184:20 185:9 | **rob.mccallum** | **rows** 84:23 |
| 104:17 107:4 | 186:13 187:14 | 3:11 | **rpo** 238:4 |
| 107:23 108:16 | 189:19 196:12 | **robert** 3:8 | **ruining** 190:22 |
| 109:8 110:16 | 197:6,9,18,18 | 70:15 79:12 | **rule** 180:9 |
| 110:19,20 | 197:19,23 | **robots** 124:6 | **rules** 15:7,12 |
| 112:2,7,25 | 199:21 200:12 | **role** 19:12 | 17:12,13 33:18 |
| 113:2 115:22 | 205:19 206:22 | 85:25 105:8 | 33:23 36:9,11 |
| 116:8,13,22 | 207:22 209:17 | 107:8,9 115:24 | 36:21 61:22 |
| 117:15,16,24 | 214:6 216:11 | **roles** 75:25 | 191:1 |
| 119:7 127:4,12 | 216:17 217:5 | **roll** 16:16 | **run** 16:7,24 |
| 127:22 129:24 | 218:6 221:14 | 212:5 268:11 | 20:14 31:3 |
| 130:13,17 | 222:12 225:14 | 268:17 | 99:25 |
| 134:11,18 | 225:18 226:6 | **rolled** 132:19 | **runners** 201:14 |
| 135:3,17,25 | 226:20 230:6 | **rolling** 16:23 | **running** 14:23 |
| 137:9,14,23 | 231:21 235:18 | 17:2 96:8,12 | 19:22,24 46:10 |
| 138:1 139:2 | 237:20 238:9 | 96:21,25 | 190:21 191:16 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[s - second]**                                                    Page 62

| s | | | |
|---|---|---|---|
| **s**  2:1 3:1 5:1 | **sampling**  20:13 | 149:5 161:12 | **score**  131:14 |
| **safely**  6:20 | 46:22 116:2,2 | 165:22 173:2 | 132:25 |
| **safety**  4:23 | 116:5 120:24 | 176:9 177:25 | **scores**  132:6 |
| **salt**  108:23 | 122:15 123:19 | 191:18 198:21 | **screenshot** |
| 109:5 111:3,5 | 123:22,24 | 205:2 231:23 | 273:24 |
| 155:12 157:7 | 124:19,23 | 233:3 235:20 | **sdj**  1:6 |
| **sam**  2:5 | 125:8,9 128:6 | 236:2 242:19 | **search**  53:16,18 |
| **sample**  105:19 | 128:6,18 | 244:16 | 53:22 54:2 |
| 106:18,19 | **sanction**  76:12 | **says**  135:22 | 100:3 133:25 |
| 107:16 117:20 | 77:5 | 144:19,21 | 134:4 149:22 |
| 120:10 121:9 | **sanctions**  26:14 | 174:1 181:17 | 181:9 186:20 |
| 121:11,21 | 58:15 60:2 | 181:23 182:3 | **searchable** |
| 123:1 126:2,23 | 76:6,21 158:7 | 206:6 207:22 | 161:18 |
| 127:7 129:4,17 | **saturday**  71:4 | 210:8 221:10 | **searched**  55:25 |
| 129:19,20,22 | **save**  12:15 | 254:3 273:2 | 109:21 111:6 |
| 129:25 130:8 | **saved**  171:24 | **scale**  14:21 | 156:5,18 |
| 130:20 131:2 | **saw**  47:7 72:21 | 23:13 | **searches**  52:23 |
| 132:11,17 | 79:19 91:20 | **scans**  215:9 | 53:3 99:25 |
| 140:20,21 | 105:25 138:12 | **scares**  75:7 | 108:11 113:15 |
| 150:4 159:9 | 138:25 139:8 | 243:21 | 149:1 |
| 160:12 162:3 | 140:23 145:23 | **schedule**  27:6 | **searching** |
| 162:25 163:22 | 148:5 157:12 | **scheduling** | 52:24 109:18 |
| 163:25 164:2 | 171:15 182:13 | 157:2,14 | 113:13 148:18 |
| 164:15 200:7 | 182:20 185:14 | **school**  30:23,23 | 149:21 155:5 |
| 214:19,21,22 | 187:2 271:20 | **school's**  10:12 | 199:9 211:7 |
| 215:16 | **saying**  54:24 | **science**  9:15,22 | 242:10 274:11 |
| **sampled** | 65:23 70:22 | 10:5,9,15 11:1 | **second**  6:12 |
| 123:13 127:18 | 75:6 81:8 | 11:6,9 12:23 | 30:9 39:20 |
| 128:3,4 | 107:2 134:10 | 21:8 29:6 31:6 | 54:15 71:24 |
| **samples**  126:12 | 134:22 135:2 | 75:22 115:5 | 84:15 101:10 |
| 127:11,21 | 135:14 136:18 | **scientists** | 107:20 128:8 |
| | 136:25 145:2 | 128:23 | 173:25 176:2 |
| | 145:11,13 | **scope**  254:24 | 181:16,25 |
| | 146:12 147:1 | | 192:16 197:1 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[second - sent]**                                            Page 63

| | | | |
|---|---|---|---|
| 208:22 216:5 | 235:23 237:16 | 128:21 | 128:3,18 |
| 231:22 235:3 | 238:14 242:5 | **sell** 211:11 | **sent** 35:17 |
| 239:21 240:2 | 245:3 246:1 | **sells** 213:6 | 40:20 56:8,13 |
| 243:9 244:2 | 247:22 253:13 | **semester** 6:2 | 56:20 57:4 |
| 266:4 267:10 | **seeing** 14:19 | 27:3 29:5 | 68:23,25 69:1 |
| **seconds** 180:6 | 199:13 242:8 | 30:10,18 | 69:5 72:5,11 |
| **section** 109:8 | **seeking** 158:6 | **seminar** 28:7 | 73:7 74:20 |
| 263:18 | **seems** 96:15 | 28:11,18 30:10 | 78:14 80:2,17 |
| **sections** 149:2 | 180:23 246:24 | 30:17 | 80:25 82:1,16 |
| **security** 11:16 | **seen** 81:17 | **seminars** 29:5 | 82:25 83:17 |
| 12:1,13 29:10 | 120:12,17 | **send** 20:4 56:3 | 84:18 90:1 |
| 231:10 | 121:6 138:10 | 84:2 94:18 | 91:8 93:2,4 |
| **see** 45:1 57:14 | 138:16,17,20 | 100:9,15 101:4 | 95:12 102:25 |
| 71:4 73:13 | 140:1 150:8 | 106:5 108:8 | 105:25 108:13 |
| 76:10 101:20 | 153:11,22 | 110:3 135:10 | 113:16 115:16 |
| 103:12 105:13 | 154:4 157:19 | 135:22,25 | 120:7 121:2 |
| 133:12,18 | 159:21 160:25 | 144:20 147:21 | 133:5,14 |
| 136:5 137:2 | 162:6 166:9 | 157:21 159:8 | 134:10,22 |
| 139:24 143:12 | 178:16 182:7 | 188:6,17 | 135:15 136:4 |
| 144:12 146:7 | 182:21 183:1,4 | 210:15,18 | 137:1,14,22,23 |
| 146:10 155:6 | 187:8 189:11 | 217:13 224:16 | 138:5,14 139:2 |
| 156:6 157:1 | 233:9 | **senders** 163:12 | 139:5 140:5,14 |
| 159:12 166:17 | **sees** 105:12 | **sending** 55:9 | 141:19 145:3 |
| 172:15 174:6 | **segment** 127:15 | 55:11 71:4 | 145:11 146:14 |
| 178:13 181:10 | **select** 210:25 | 136:11 153:14 | 146:15 154:17 |
| 181:19 186:16 | 211:7 273:2 | 162:16 171:10 | 160:3,9,23 |
| 186:20 188:16 | **selecting** | 178:10 210:12 | 161:24 163:1,4 |
| 189:7 190:24 | 273:20 | **sends** 55:20 | 164:4 166:11 |
| 191:21 192:18 | **selectively** | 93:17,20,21,23 | 168:6 175:3,4 |
| 192:22 194:9 | 203:5 204:19 | **sense** 10:10 | 183:25 184:22 |
| 196:9 206:8 | 211:25 213:13 | 23:8 38:25 | 186:7 187:24 |
| 209:24 217:13 | 273:14,15 | 148:25 247:1 | 192:13 194:4 |
| 217:14 224:2 | **self** 123:19 | **sensors** 123:20 | 194:17 195:10 |
| 234:25 235:14 | 125:4 128:1,19 | 124:11,15,21 | 196:7,15 197:5 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[sent - similar]**                                                          Page 64

197:23 198:6
198:25 217:9
217:17,18
223:16,17
224:20 226:12
226:23 227:22
235:9 240:20
241:1 242:3,4
242:8 244:8,22
248:13 253:24
254:1 280:14
**sentence**  41:23
173:25 181:16
196:4 202:5
204:12,15
205:2,5 209:25
210:3,8 212:24
216:5 221:10
250:20 273:6
**sentences**
267:11
**sents**  55:7
199:16
**separate**  60:15
66:2 119:10
171:13 181:8
254:17
**separately**
252:5
**september**
38:16 44:14,16
44:19
**series**  262:22

**served**  38:5
60:2
**service**  126:3
**set**  1:25 14:12
31:23 107:16
107:17 117:20
121:9,11,21
124:13 132:11
132:17 140:20
140:21 150:14
159:9 162:3
165:13 169:18
185:6 195:11
204:18 210:10
217:15 224:7
224:22,23
225:4
**sets**  173:7
**setting**  35:9,22
45:12,13,20,22
62:5 78:15
151:14 152:3
153:15,18
155:17 157:22
170:17 175:5
206:6,13 207:2
207:20 208:2
211:8 226:17
235:13 267:13
272:14 273:3
**settings**  152:19
154:2 182:4
188:9 197:4
207:9 209:8,13

213:23 216:8
225:2 264:14
266:25
**seven**  14:8
31:22
**several**  9:21
10:11 17:18
60:6 70:6
114:1 123:18
171:23 172:6
248:1 251:25
252:1,8,9
268:6,10
**severely**  215:6
**severities**  23:21
**severity**  23:18
23:22
**sheet**  280:11
**sherman**  1:3
**shifts**  110:19
**shipping**
232:13
**short**  7:3 21:4
193:17
**shorthand**  1:22
279:3
**show**  41:8
83:23 84:7,11
87:21 102:12
159:13 178:14
179:5,15
211:24 254:10
**showed**  55:11
137:12 147:23

147:24 217:25
218:4
**shows**  113:8
205:10
**shrinking**  86:1
**shuffle**  20:3
**shut**  67:18
**sic**  57:13 68:2
75:4 98:18
221:11
**side**  35:23 77:5
106:10,11
115:6 240:11
242:5
**sides**  160:15
**sidewalk**  125:1
**sign**  213:7
280:12
**signature**  278:4
279:21
**signed**  35:4,10
35:13 76:19
280:19
**significance**
114:17,24
115:24 117:23
**significant**
117:20 120:11
120:15,21
215:14
**significantly**
72:10 197:11
**similar**  24:18
135:1 136:24

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[similar - sounds]                                                      Page 65

| | | | |
|---|---|---|---|
| 147:17 149:16 | 256:11,14 | **solely** 8:12 | 125:12,12 |
| 150:1,15 161:4 | **sited** 115:21 | 68:16,22 95:24 | 128:13 137:25 |
| 177:3 193:7 | **sitting** 13:8,9 | 98:24 176:24 | 139:8 144:14 |
| 198:3 227:12 | 59:10,14 60:8 | 219:6,14 | 145:7 152:1,13 |
| 246:2 | 203:19 228:6 | 220:18 | 169:16,19,19 |
| **simple** 14:9 | **six** 29:19 | **solutions** | 173:19 175:19 |
| 18:22 55:18 | **size** 20:16 | 279:23 280:23 | 176:2 180:21 |
| 115:13 | 86:11 123:1 | **somebody** | 180:24 181:11 |
| **simply** 108:23 | 268:17,20,23 | 86:15 122:15 | 182:1,13 |
| **simulations** | **sizes** 126:23 | 154:6 189:2 | 189:18 192:8 |
| 13:23 15:8 | **skimmed** 173:4 | 247:23 248:6 | 192:23 193:6 |
| **simultaneously** | 173:5,20 | **someone's** | 193:18 194:14 |
| 171:7,8 | **skip** 201:7 | 101:2 191:7 | 195:25 196:24 |
| **single** 125:24 | 235:2 | **soon** 48:23 71:1 | 198:12 200:2,7 |
| 191:14 245:6 | **skipped** 174:13 | 122:11 | 201:8 202:20 |
| 253:11 269:12 | **slam** 124:6 | **sorry** 12:9 | 203:2 205:17 |
| **sir** 27:10 40:17 | **slas** 126:3 | 14:15 17:20 | 207:7 209:24 |
| 42:5 55:25 | **slower** 45:25 | 20:6 22:17 | 210:25 212:12 |
| 58:17 60:5 | **small** 19:17 | 24:22 31:17 | 216:4 218:22 |
| 65:4 66:23 | 213:7 | 38:19 39:22 | 219:12 220:1 |
| 70:16 76:13,19 | **smaller** 207:12 | 41:12,19 44:13 | 223:10,22 |
| 78:22 93:25 | **smart** 4:23 | 50:10 54:10 | 230:25 233:19 |
| 102:9 108:16 | 23:12 25:5,14 | 56:6 64:16 | 235:2 236:3 |
| 112:7 120:5 | **sociology** | 68:11,15 73:14 | 238:20 245:18 |
| 133:24 135:3 | 130:12 | 75:1 78:21 | 251:17 252:23 |
| 135:21 140:4 | **software** | 80:22 82:8 | **sort** 46:22 |
| 147:6 151:1 | 121:25 122:1,6 | 84:8 89:4 | 55:19 123:23 |
| 153:24 155:4 | 127:3,6 265:22 | 90:13 93:16 | 126:6 159:11 |
| 161:12 164:24 | 268:18,22 | 97:21,22 98:21 | 159:11 207:16 |
| 176:21 179:20 | 271:24 272:15 | 109:24 110:9 | 268:22 |
| 185:1 225:20 | 275:2 | 111:20,21 | **sound** 238:4 |
| 226:22 234:18 | **sole** 130:19 | 113:2 114:6 | **sounded** 30:12 |
| 238:9 247:16 | 218:21 | 121:2 122:12 | **sounds** 6:3 7:4 |
| 255:25 256:7 | | 125:11,12,12 | 29:20 44:10 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[sounds - station]                                                    Page 66

53:1 102:19
170:23 193:13
**soup**  105:11,12
105:13
**south**  231:15
**southeast**
231:16,19
**southwest**
231:4,20,21
**space**  86:6 95:3
171:13 201:15
238:19 239:14
241:25 242:2
242:10
**spaces**  201:11
204:2,22
230:18
**span**  247:9
**spanned**  235:6
**speak**  40:4 95:1
107:7 175:23
175:25 176:3
190:7 257:5
261:18,21
**speaking**
211:10
**special**  11:13
**specific**  9:9
14:12 17:23
22:5,20 25:10
32:18 65:18
77:16 83:20
95:13 127:16
150:22 151:8

151:15 152:4
156:23 182:8
205:7 207:17
215:3 222:1
229:25 230:19
230:20 232:15
268:12
**specifically**
7:10 10:25
22:9 33:11
34:22 37:13
52:24 62:16,20
79:6 89:23
97:13 153:14
184:19 206:24
210:7 256:20
**speech**  190:11
**spent**  43:25
44:5 49:8
**spikes**  72:21
**spoiled**  78:5
**spoke**  39:19
70:25 229:2
**spoken**  59:20
**spoliation**
58:15 76:21
77:19
**sporadic**  106:3
**spot**  24:10
136:7
**spots**  23:23
**spreadsheet**
4:12 79:13
83:23 84:2

89:11 90:1
270:5,11,17
**sprint**  268:25
269:1 274:16
274:19 275:3
**sprints**  275:1
**squared**  131:18
**stack**  26:11
47:9 102:16
237:20
**stand**  21:9 65:5
154:14 229:17
**standard**  19:1
21:7 132:10,12
132:16 225:22
225:25 226:3
227:25 228:7,7
228:8,14
233:14
**standards**
228:4 233:17
233:25
**stands**  21:16
239:21
**start**  6:9 37:15
64:12 75:8
134:8 141:3
173:12 185:14
215:25 250:13
257:24 258:20
**started**  30:20
44:19 67:17
71:3 105:24
109:18 153:22

166:25 167:6
242:9 250:14
259:1 269:12
**starting**  182:12
229:2 234:17
**starts**  146:12
202:5
**state**  1:4,22 2:2
2:22 5:5,10
8:12 13:10
38:17 50:9
53:14 59:15
128:6,10 171:9
181:12 278:8
278:16 279:1,4
280:4
**stated**  34:17
108:10,13
115:1 136:2,4
146:2 160:13
190:11 222:17
228:16
**statement**
77:22 78:9
**statements**
274:14
**states**  1:1 33:24
36:7,11 37:2
53:11 58:15
76:11 95:23
233:18 254:22
**stating**  268:9
**station**  19:19

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[statistical - sunday]                                    Page 67

statistical
    17:15 19:21
    22:5,11,24
    23:4,13 25:17
    25:21 114:17
    114:24 115:24
    117:23 121:20
    131:22 133:3
    195:5 256:16
statistically
    117:20 120:11
    120:15,21
statistics  17:19
    17:19,21,25
    18:2,16,20
    19:12 20:5,7,9
    22:1,20 27:13
    115:5,8,14
    116:1 120:23
    131:13 214:18
    256:6
stats  246:8
stay  164:1
stayed  19:5
steady  128:6,10
stenographic...
    279:6
step  73:22
stepping  31:8
steps  245:8
stick  99:16
    141:16
sticker  76:16

stickers  237:7
sticking  207:24
    217:6
sticky  272:14
stipulate  26:19
stipulation
    47:13,21 49:7
stock  167:14
stop  24:2 37:21
    49:18 180:10
    180:13 190:21
    191:18
stopped  158:23
stopping
    166:21 246:25
storage  14:9,11
    14:22 232:13
store  18:24
    97:18,23,25
    98:1 102:4
stored  15:13,21
strategy  4:23
    104:23 189:19
    192:8
stray  233:9
streaming
    168:23
street  2:14,18
    3:9 279:23
streets  23:24
stretch  27:8
strictest  23:8
strike  258:7,13

string  248:1,3,6
student  32:8,11
    32:15 62:22
student's  32:9
students  30:23
    102:3
studied  91:21
studies  131:7
study  121:7
    123:12
stuff  8:9 35:25
    89:20 129:2
    180:20 183:9
    229:14
subject  7:6
    31:19 33:12,21
    34:9 61:19,22
    62:13 64:21
    70:7 74:4
    83:17 88:18
    90:7 102:8
    117:2 149:15
    156:24 172:13
    175:15 182:18
    259:10,19,24
    270:15
subjects  130:16
    215:25
submitted
    26:12 60:9
    252:22
subscribed
    278:11

subset  53:7
    116:7,8 240:12
subsets  27:12
substantive
    111:8
subtitle  8:4
subtract
    251:11
subtracting
    98:17
suggest  159:7
suggestions
    24:14
suggests  153:12
    157:20 166:10
suing  30:6
suit  172:20
    188:7,18
    252:11
suite  1:23 2:5
    2:10,14,19 3:5
    279:23
sum  102:19
summarize
    234:22
summary  8:6
summer  30:20
    31:5
sundar  4:21
    72:13 93:17
    103:19 104:2
    111:25 156:12
sunday  24:3
    55:12 71:5

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[sundown - talking]                                    Page 68

**sundown** 49:18
**supercomputer**
  13:22 14:10,21
**supercomputi...**
  13:18
**supplemental**
  4:8 54:9,11,17
  54:19 93:10,13
  111:15 169:14
  169:15 196:1
  202:4 216:3
  234:16 270:21
  271:4
**support** 26:13
  58:14 60:2
  76:6,20 121:8
  144:1 148:6,12
  158:6 203:9,10
**supports**
  143:15 270:2
**supposed** 124:3
**sure** 16:23 39:3
  45:17,22 46:8
  46:13 54:15
  55:15 57:12
  59:2 65:19
  67:25 70:25
  78:2 86:24
  101:1 105:15
  105:22 109:17
  114:8 121:20
  122:3 124:2
  128:9 143:19
  155:16 156:3

171:3 176:24
178:1,9 182:4
196:25 212:21
218:20 227:17
242:20 243:22
250:13 264:14
**surprise** 79:11
**surrounding**
  28:8
**surveys** 131:7
  ███████ 4:14
  144:6
**switch** 27:18
  114:15 183:23
  210:2 215:24
**switched** 87:1
**switching**
  182:5 240:2
  264:15
**swoop** 269:18
**sworn** 5:15
  278:11
**system** 13:18
  17:3 20:23
  24:18 25:9
  45:14,15,16,19
  46:4 63:12
  124:22 125:24
  126:1 151:22
  168:20 230:3
  249:15 250:24
  251:3
**systems** 13:24
  14:14,24 45:25

46:13,22
126:11,12
214:5 215:4

**t**

**t** 132:6 231:23
**table** 68:12,17
  73:10 141:13
  188:15 196:25
**tablet** 98:5
**take** 7:2 9:24
  11:17 27:25
  29:12 43:7
  45:12 49:10,14
  49:19 50:6
  61:21 66:13
  88:1 91:19
  92:16 122:18
  127:3 134:7
  135:5 143:23
  147:17 148:11
  153:6 154:13
  155:11 169:4
  176:8 180:11
  185:13 196:24
  213:19 214:6
  216:19 223:10
  232:14 245:3
  245:15 246:14
  246:20 251:11
  255:12
**taken** 1:20
  17:18 22:3
  99:3 124:8

127:12 275:10
**talk** 24:17
  27:19 64:10
  68:9 95:20
  129:21 133:8
  166:15 176:16
  183:8 199:18
  205:2 222:20
  251:22
**talked** 22:2
  24:16 26:22
  30:12 43:12
  56:1,2 83:21
  87:15 89:22
  91:7 137:21
  165:24 184:18
  188:13 192:16
  195:19 220:3
  229:11,16
  256:9
**talking** 10:18
  14:5 18:3
  29:15,17 34:20
  39:19 46:9
  54:18 60:23
  65:20 70:12
  73:18 77:16
  83:10 87:17
  96:6 102:18
  108:12 109:11
  110:15 111:9
  113:17 116:20
  124:1 126:8
  129:2 139:6,22

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[talking - testified]                                                    Page 69

156:8 158:18
159:14 161:13
169:13 170:23
177:22 186:12
188:22 189:13
196:23 197:17
198:22 201:22
202:23 210:4
211:16 212:13
214:24 223:6
232:23 273:15
**target**  229:4
**task**  148:22
**taught**  10:8,10
  25:20
**teach**  29:3
**team**  16:14
  230:17 231:25
  232:1,4 268:10
  268:22 275:2
**teams**  64:4
  167:1 229:10
  231:23 232:7
**tech**  39:19,21
  43:2,14 47:2,9
  85:25 86:1,6
  95:24 98:8
  99:4,19 100:16
  113:17 131:8
  156:4 186:8
  187:9 188:23
  190:1 192:20
  192:23 193:25
  194:12 198:14

236:17 237:17
237:20 238:8,9
238:12,16,19
**technical**  14:1
  14:18 15:24,25
  43:14 47:9
  232:11
**technically**
  32:4 64:5
  245:10
**technician**  3:15
  15:19
**techniques**
  12:3 27:3
  215:13
**technology**
  10:11,20,23
  11:2,6 102:8
  102:10 237:15
  268:11
**telemetry**  46:22
  125:8,11,15,17
  126:1,6,10
  159:12,15
**telephone**
  279:24
**tell**  12:25 21:21
  30:4 38:20
  39:25 40:10
  41:1 62:17
  81:6 82:24
  86:4 102:23
  104:8 112:19
  112:24 121:19

122:2 124:7,25
131:12 132:5,9
132:21 150:14
157:12 158:24
161:23 187:17
187:20 226:22
228:24 231:12
233:11,23
240:21
**telling**  47:20
  67:6 81:25
  122:13 221:19
  236:4
**temes**  51:22
  114:2 133:21
  135:1,9 136:3
  136:17
**ten**  20:19
**term**  8:24
  14:11 52:12
  128:23 129:21
  130:1 133:25
  158:9,11
  170:16 206:18
  212:9 244:2
**terminology**
  172:2
**terms**  7:17
  15:12 16:21
  24:14 29:18
  37:2 38:1 46:6
  47:8,13,21
  49:5,7 50:8
  53:17,18,22

56:1 61:23,24
62:25 73:19
75:15 77:20
81:24 86:11
97:4 100:5,7
109:18 110:2
110:20 119:22
121:20 134:4
151:13 154:16
160:9,23
162:16 163:1
164:16 165:12
171:14 197:8
198:2 200:24
215:15 229:25
230:12 244:20
246:10 248:16
274:14
**territories**
  53:11
**territory**
  254:22
**terror**  11:15
**test**  131:16
  132:1
**testified**  5:15
  8:11 43:25
  50:5 57:15
  104:19 108:3
  108:15 110:2
  135:9 136:20
  137:9 139:5
  155:4,21
  156:14 194:16

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[testified - three]**                                             Page 70

| | | | |
|---|---|---|---|
| 200:11 213:18 | 149:2,12,23 | **things**   10:13 | 136:13 140:18 |
| 214:3 216:13 | 150:13 151:3 | 18:22,22 21:13 | 148:6 161:24 |
| 243:25 261:18 | 155:11,15,20 | 21:13 31:24 | 166:19 186:6 |
| 271:14 274:12 | 156:16,22 | 46:14,21 55:2 | 187:23 188:5 |
| 274:15 | 157:1,6,12 | 55:3,18 124:2 | 192:6,12 |
| **testify**   67:9 | 159:17,23 | 126:6 152:20 | 193:12 194:3 |
| 113:16 134:13 | 161:17 184:18 | 157:11 165:24 | 198:11 199:18 |
| 149:14,25 | 212:4,8 213:21 | 167:15 168:14 | 200:10 208:8 |
| 180:17,18 | 243:4 271:20 | 197:18 230:20 | 209:6,17 |
| 199:4 265:6,9 | 279:9 280:9,17 | 232:13 241:23 | 210:14,22 |
| 270:19 | **testing**   131:22 | 266:2 271:13 | 211:15 226:14 |
| **testifying**   38:7 | **texas**   1:2,4,22 | **think**   23:16 | 232:22 233:9 |
| 134:20 145:19 | 1:24 2:2,6,15 | 24:12 28:17 | 234:18 236:7 |
| 156:2 195:1 | 2:22,23 3:5 | 30:3 31:9 | 237:18 243:25 |
| 243:7 | 5:10 8:13 32:3 | 32:12 38:25 | 247:1 251:8 |
| **testimony**   39:5 | 35:24 50:10 | 39:25 53:10,24 | **thinking**   62:18 |
| 44:2 52:12 | 51:13 59:15 | 54:1 55:1 | 64:2 206:23 |
| 53:23 54:23 | 62:7 279:1,4 | 60:16,25 62:17 | **third**   202:15,18 |
| 56:8,20 57:14 | 279:24 280:4 | 63:13 67:18 | 203:1 204:12 |
| 82:6 94:21 | **text**   20:23 | 69:11,14 70:12 | 264:11 267:10 |
| 106:8 107:22 | **thank**   26:3 | 71:14 72:6,22 | 273:6 |
| 107:24 108:2 | 120:4 169:20 | 77:19,19 83:22 | **thought**   70:8 |
| 109:11,20,22 | 169:23 263:7 | 85:9 87:9 | 71:22 97:9 |
| 109:25 111:21 | 275:25 | 88:13 89:8 | 139:8 154:8 |
| 111:22 112:6 | **thanks**   7:11 | 97:19 98:2 | 155:4 156:14 |
| 112:11,13,17 | 122:10 | 100:18,19 | 182:25 |
| 112:19 113:5,7 | **theoretically** | 101:22 102:15 | **thousand**   55:12 |
| 113:19,23 | 215:18 | 104:20 112:12 | 57:10 136:4 |
| 114:5,6 133:9 | **thing**   6:25 8:10 | 115:4,23 | 194:18 |
| 134:1,6 137:12 | 30:9 58:6 | 117:22 118:25 | **three**   9:14 |
| 143:2 144:1,22 | 107:20 112:4 | 119:17 122:21 | 20:20,24 30:20 |
| 146:25 147:6 | 143:4 213:17 | 125:19 127:2 | 30:25 32:7,9 |
| 147:10,18,25 | 213:19 214:15 | 127:10,15 | 59:17 62:23 |
| 148:12,19 | 226:6 229:16 | 130:20 133:1 | 72:22 133:13 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[three - top]**                                                                 Page 71

133:20 181:8
216:23,25
217:25 249:3,6
249:9
**throckmorton**
279:23
**tie**  223:13
**tied**  100:19
101:11,23
**tiered**  213:9
█████  4:16
52:9 143:5
145:8 147:24
148:21 149:3
█████  146:5
147:10
**time**  5:3 6:24
7:1 12:15
16:18,19 18:10
29:18 31:22
38:16 39:14
43:23 44:5
49:18 50:3
65:13,14 67:4
68:2 69:8,18
69:19 79:1,7,9
87:6 88:14
90:24 91:5
92:23 94:19
95:12,14
110:19 115:1
124:21 125:17
126:20 131:9
134:15 158:18

160:16 167:9
169:9 177:2
180:6 183:22
191:14 192:5
193:4 202:1
203:13 208:15
209:15 210:19
211:3 212:18
214:12 219:21
231:5,6 240:6
242:14,17,18
242:22,25
245:15 247:6
248:5 249:22
250:15 251:3
252:20 253:7
253:17 255:9
255:19 257:8
268:16,21
275:21 279:6
279:10 280:18
**timeframe**
280:8
**times**  10:3
16:13 57:10
65:21 118:15
118:16,24
119:2,3,6,9
122:22 128:7
146:15 217:14
248:2 249:7
268:6
**timing**  45:24
126:4 219:19

219:21,25
220:1,5 242:15
242:24
**title**  32:5
104:15
**titles**  104:16
105:7,9,23
200:13,23
**today**  8:25 13:8
13:9 43:13
50:6 59:11,14
60:8 65:5
117:22 158:25
165:25 182:7
203:20 211:6
232:24,24
235:16,20
236:1 243:4
255:23 260:14
265:2 271:3
275:14
**today's**  7:7
58:2 59:6
**together**  8:23
30:11 100:20
101:11,23
124:24 128:8
163:15 171:7
254:16
**toggle**  172:8
183:9 201:8
202:16 235:13
**toggled**  170:3,8
170:12 189:2,4

189:5 216:8
**toggling**  165:12
201:4 202:1,7
203:22 205:12
**told**  56:17
178:23 183:17
**ton**  245:12
**tone**  191:9
**took**  18:15 72:4
90:10 108:22
109:4 111:2
115:16,18
126:21 145:16
147:9,10 149:7
157:6 160:24
167:15 212:4
262:3 272:18
274:15
**tool**  61:4 62:7
63:9 64:1,3
168:15 211:18
**tools**  12:3 27:2
31:3 43:14
63:16,19,23
133:3 168:18
181:24 213:2
237:23,23
264:10,12
**top**  20:20,24,25
21:19 78:9
89:25 124:17
131:20 132:23
158:2 249:1,1
267:11

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[topic - types]**                                                      Page 72

| | | | |
|---|---|---|---|
| **topic** 25:20 | **townsgate** 2:9 | **triple** 234:23 | 188:14 203:6 |
| 27:19 28:19 | **tps** 125:8,16 | **trouble** 225:20 | 210:25 212:1 |
| 59:23 100:10 | **trace** 126:6 | **true** 8:14 9:2 | 213:12,14 |
| 111:25 112:7 | **track** 156:7,8 | 69:6 72:7 73:8 | **turned** 113:24 |
| 112:14 113:25 | 156:20 177:4 | 73:16 81:7 | 188:21 192:16 |
| 148:1 172:14 | 242:4 | 109:13 153:24 | 209:22 |
| 186:7 192:13 | **trade** 3:10 | 159:23 162:18 | **turning** 204:19 |
| 201:5 214:14 | **trades** 125:22 | 164:18 172:8 | 205:7 209:13 |
| 247:23 271:11 | 125:23 | 179:9 188:7 | 266:5 267:19 |
| **topics** 142:23 | **trading** 125:21 | 215:7 217:2,11 | 268:1 |
| 156:24 170:5 | **traffic** 24:2 | 219:23 220:7 | **turns** 89:9 |
| 181:25 187:25 | **training** 27:21 | 220:20 222:3 | 162:24 |
| 194:4 198:22 | 28:6,11,25 | 225:8 236:5 | **two** 20:25 |
| 198:23 232:20 | 29:1,13,14,17 | 249:12 269:11 | 21:12 47:2 |
| 236:22 264:10 | 29:24 31:13 | 269:16,23 | 48:23 50:25 |
| **total** 7:14 44:4 | 32:22 33:1,8 | 272:1 279:8 | 71:16,18 72:21 |
| 44:4 64:20 | 36:15 61:21 | **truly** 127:18 | 72:22 84:23 |
| 74:3 118:19,21 | 62:19 91:23 | 131:2 160:22 | 89:12,25 106:6 |
| 121:2,2,10 | 228:19 229:11 | 162:3 | 119:16 129:14 |
| 137:23 138:1 | 232:22,24 | **trustworthy** | 140:21 148:5 |
| 175:8 197:23 | **transcript** 47:1 | 120:10,14,20 | 148:20 152:20 |
| 200:24 217:25 | 101:25 180:8 | **try** 6:10 64:5 | 153:1 171:10 |
| 235:8 244:8,21 | 280:6,19 | 95:2 100:4 | 197:17 209:21 |
| **totally** 32:23 | **transcripts** | 108:19 153:6 | 232:14 239:4 |
| 40:8 | 133:13 134:4 | 164:1 171:8 | 247:11 254:11 |
| **totals** 84:15 | **transitioned** | 190:8,17 191:9 | 259:25 265:20 |
| **touch** 6:7 36:3 | 192:23 | 233:2 252:19 | 266:2 269:2 |
| **touched** 126:11 | **transmitted** | 257:9 | 274:16,22 |
| 193:12 | 14:20 | **trying** 15:11 | 275:4,10 |
| **touching** 28:18 | **trends** 91:21 | 25:7 125:19 | **type** 131:21 |
| **towards** 29:24 | **tried** 66:1 | 158:9 165:4 | 171:19 |
| 30:1 | **trinity** 13:19,23 | **turn** 69:10 | **types** 51:3 |
| **tower** 19:18 | 14:8 | 114:4,7 143:9 | 146:14 |
| | | 180:2 183:17 | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[typing - usage]                                                    Page 73

**typing**  63:24
**typo**  221:14
  222:11

**u**

**u.s.**  34:10,10
  122:19 231:6
  233:20
**ultimate**  133:4
  153:25
**ultimately**
  23:10 24:24
  274:7 275:11
**ultrasonics**
  123:23 124:14
**umbrella**  11:1
  60:24
**unable**  114:19
  175:21 265:6
**unaffected**
  86:25
**uncommonly**
  133:16
**under**  8:3 11:1
  47:20 49:6
  65:11 66:21
  90:10 99:7
  105:2 121:3
  149:14,25
  150:14 153:17
  157:20 159:7
  166:12 180:9
  193:3 198:19
  205:24 224:14

  224:14,15
  233:14 264:5
  279:7,16
**undergrad**
  18:6,7
**undergraduate**
  18:4
**underneath**
  206:5 264:1
**understand**
  6:15 7:7 14:4
  35:25 40:8
  45:9 65:19
  66:11 85:2
  95:22 96:3
  98:22 99:7
  102:7 105:15
  109:17 116:14
  126:13 130:1
  150:9 171:13
  172:12 174:1
  190:12 197:1
  198:21 201:21
  205:13 213:9
  224:6,13,19
  225:3,12 236:1
  238:18 240:9
  244:1 249:14
  252:6 259:9
**understanding**
  6:13 69:13
  75:20 76:23
  77:3 98:6
  102:11 158:18

  174:8 176:14
  177:24 199:12
  200:13 206:16
  206:17 207:4
  207:25 212:8
  218:16,22
  224:15 226:2
  238:8 256:2
  257:19
**understood**
  6:21 39:3
  57:12 85:1
  149:11 218:19
  221:6
**undertake**  85:6
  85:12 113:4
**undisclosed**
  231:4,15
**unhealthy**
  46:24
**unique**  242:1
  248:9,13,18
  249:11 250:7
  251:19 252:15
  252:15
**unit**  124:18
**united**  1:1
  33:24 36:7
  37:2 233:18
**universe**  53:6
  115:10
**university**  25:2
  25:4 27:7 32:2
  35:23 62:6,8

  62:23 123:11
**unknown**  49:12
**unpreserved**
  85:21 94:3
  176:4 185:7
  196:16 198:23
  223:3 235:17
**unproduced**
  265:3,7,10
**unrepresentat...**
  215:16
**unretained**
  115:16 176:1
**unsaved**  236:3
**unsent**  236:3
**unsure**  102:20
  242:7
**unt**  62:14 63:2
**unusual**  96:10
  96:19
**update**  270:16
**updates**  4:18
  4:20
**upper**  84:24
  106:22 137:22
**uptick**  92:2,11
**usable**  24:10
**usage**  53:24
  67:24 72:16,18
  72:19 81:19
  91:22 109:12
  109:21,22
  136:5 141:15
  260:11

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[use - varians]                                                           Page 74

**use**  8:24 21:6
30:15 31:25
34:18,24 35:4
35:9 36:1,3
43:21 53:22
56:18 57:7,10
57:15 58:11
60:5,13,16
61:11 64:5
66:5,8 69:23
70:17 74:14
89:6 91:15
108:15 109:15
109:23 112:14
112:20 113:6
117:16 131:8
133:2 142:2
143:7,16 144:2
145:13 146:18
146:21,21
147:2,3,4,6
148:1,4,19
149:4 153:12
154:1 155:7
157:10,13
158:11 168:1
168:14,17
170:16 176:23
176:24 181:23
182:17 183:8
183:17 199:9
202:24 212:12
219:25 225:22
231:18 262:5

264:9,19
269:23 271:23
272:9 275:2
**used**  16:19
17:25 19:11
21:3 53:19
60:18,25,25
61:2,16 62:10
63:12,15 69:24
74:24 75:16
81:11 83:8,9
83:14 105:2,5
108:23,25
109:2 111:3
113:5 117:10
127:3 132:16
135:19 139:21
139:22 145:20
148:7,8 149:1
149:6,8,8
153:17 157:2
166:4 167:6,9
167:21 183:22
197:16 199:25
200:25 211:14
211:16 212:14
216:16 220:1,5
225:21 229:22
257:10,13,18
279:10 280:19
**user**  206:12,12
206:19,19,20
206:21 207:19
208:1,1,2

209:7,7 272:14
272:14 273:2,2
274:3,3
**users**  51:10
72:22 201:25
202:17 203:5
206:6,15
207:17,22
210:11 211:7
212:1 213:3,13
266:25 267:19
**uses**  115:5
147:11 271:25
**using**  18:20
24:1,2 34:25
35:14 41:8
54:9,11 63:7
63:25 66:25
67:13 69:21
74:10 85:19
116:6 127:6
136:2,8 139:21
149:22 150:4
165:12 177:13
190:17 191:8
199:14 202:15
202:20 203:3
203:16,18,21
205:10 210:16
211:17 227:13
228:1 271:17
272:16
**usual**  6:6

**usually**  21:6
29:5 30:19
46:13,16,21
126:2 128:7

**v**

**v**  78:20 280:4
**vaguely**  131:24
**valid**  54:16
56:17 57:8
**validate**  109:15
109:23 135:20
**value**  256:2
**values**  132:6
255:24
**variable**  135:11
135:23,23
136:11,21
**variables**  20:1
███████  57:5,13
71:15 72:1
84:25 93:21
104:21 105:25
107:21 108:9
108:16 138:1
141:8 193:8
194:10 195:20
196:12,23
197:3,14
███████  106:1
107:24 108:4
███████  108:20
109:1 198:2,4

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[variation - want]                                                      Page 75

**variation**
137:13,18
138:4,7,13,18
139:1,4,10,15
139:18,19,25
140:14,15,19
140:24 141:6
141:17 142:1,3
142:5 153:3
**varied** 134:14
**varies** 134:21
**various** 167:10
171:15 237:19
265:2
**varying** 225:9
**vast** 175:2
**vault** 151:23
171:23,24
177:10 178:15
224:8,11,24
225:3,5,8,17
**vegas** 24:7
**vehicle** 19:17
124:12 125:4
**vehicles** 20:2
24:15 123:19
124:6,12 128:1
128:19,22
**vendor** 121:25
122:1
**verbiage** 74:7
82:20 266:16
**verify** 54:21
110:1,4,11

126:2 280:9
**verifying**
108:11
**veritext** 279:23
280:14,23
**veritext.com**
280:15
**veronica** 3:8
**version** 35:3
58:1,12 60:9
201:25 202:6
202:22 203:10
203:15,21
208:24,24
209:2,7 210:17
211:5,12,13,13
211:14,16,23
211:25 212:9
212:13,14,14
213:1,5,6,12
271:15,24
**versions** 272:1
**versus** 23:20
49:12 56:15
88:17 89:21
107:17 113:7
132:11,17
152:25 198:6
203:15 226:24
231:14 247:13
248:2 252:15
253:2 254:13
273:16

**video** 3:15 63:9
63:19,25 64:8
166:24 167:1,5
167:10 168:23
209:17 210:6
**videographer**
5:2 49:24 50:2
91:1,4 126:16
126:19 169:5,8
214:8,11 247:2
247:5 255:15
255:18 276:3
**videotaped**
1:12,19
**view** 45:21
80:16 91:14
148:11 274:14
**viewing** 149:12
149:23
**village** 2:10
**visibility** 77:8
195:14 203:17
214:4 221:23
222:24 230:18
271:24
**vision** 20:22
**voice** 190:6,12
191:2,7,9,17
204:6,7
**volume** 137:18
138:7 141:6,13
141:17,18
142:2 150:21
151:7 163:11

198:2 223:24
261:14,19,21
**volumes** 125:22
**voters** 122:4,18
**vp** 104:23
187:13
**vs** 1:6

|   w   |
|-------|

**w** 248:7
**wait** 6:8 12:17
109:24 176:2
**waiting** 180:4
**walk** 231:1
**walking** 229:5
**want** 6:7 8:5
20:17 23:8
27:18 31:9
32:16 39:3,10
39:12 40:24
45:17 52:1
58:12 59:2
67:24 78:9
90:18 101:9
105:10,15
106:17 109:17
117:9 118:9,25
133:8 138:24
142:25 153:21
157:17 161:2
169:10 175:23
175:25 180:10
188:8 196:25
201:17 202:2

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[want - words]**                                                                 Page 76

| | | | |
|---|---|---|---|
| 210:19 212:7 | 227:21 233:13 | 184:25 | 78:4 110:9 |
| 213:18 214:16 | 240:3,7 241:16 | **wide**  137:13,17 | 146:12 156:2 |
| 220:15 242:1 | **wayback**  203:9 | 138:4,6,13,17 | 180:7,19,24 |
| 242:18 246:14 | **waymo**  128:25 | 139:1,4,10,14 | 190:6,12,16 |
| 257:5 272:23 | **ways**  63:24 | 139:18,19,25 | 191:5,10 208:8 |
| 275:7,18 | 202:14 215:12 | 140:14,15,19 | 208:13,25 |
| **wanted**  6:12 | 249:14 | 140:19 141:5 | 231:9 237:3,6 |
| 8:10 58:18 | **weather**  18:22 | 141:17 142:1,5 | 239:25 256:22 |
| 119:1,3 127:24 | **web**  202:12,14 | ▇▇▇▇▇▇▇ | 267:6,9 271:7 |
| 168:13 195:4 | 207:13 | 72:15 73:4,7 | 277:2 278:4,12 |
| 195:22 242:19 | **weeds**  8:17 | 93:22,22 | 279:7,9 280:8 |
| 271:12 | 164:14,23 | 104:22,22 | 280:10,12,18 |
| **war**  11:15 | **week**  27:5 60:3 | 106:8 109:2 | **witness's** |
| **warning** | 71:3,5 106:7 | 136:13 137:22 | 180:11 |
| 208:12 264:20 | 106:11,12 | 141:8 189:17 | **witnesses** |
| **washington** | 153:1 274:22 | 192:6,19 | 155:16,20 |
| 2:19 | **weekdays** | 194:15 | 157:1 |
| **waste**  177:2 | 152:25 | ▇▇▇▇▇▇  51:22 | **word**  27:12,16 |
| **wasted**  183:21 | **weekends** | 114:2 133:21 | 53:17,24 54:2 |
| **water**  204:21 | 152:25 160:17 | 136:4,24 137:4 | 176:19,23,25 |
| **way**  14:10,21 | **weeks**  27:7 | **wilkerson**  2:3 | 177:13 183:22 |
| 19:13 21:3 | 106:4 269:2 | 5:12 | 183:23 184:9 |
| 30:22 32:1 | 274:16 275:4 | **wind**  208:14 | 206:24 211:14 |
| 34:19 35:18 | 275:10 | **window**  65:14 | 216:16 220:2 |
| 62:1,2 63:6 | **welcome** | **winter**  91:19 | 226:7 237:17 |
| 77:3 87:8 95:4 | 255:22 | **wise**  13:11 | 238:12 243:21 |
| 97:2 116:11 | **went**  19:5 | **wish**  94:21 | 274:19 |
| 129:7 135:5 | 79:17 148:18 | 167:14 | **wording**  64:6 |
| 142:1 148:11 | 149:21 155:5 | **wishing**  243:16 | 225:21 273:1 |
| 153:6,16 | 179:19,20 | 243:17,22 | **words**  19:11 |
| 157:25 165:6 | **west**  2:5 | **witness**  1:20 | 41:8,9 49:1 |
| 170:20 179:5 | **westlake**  2:10 | 4:1 11:24 | 63:23 80:15 |
| 199:13 206:2 | **wheelhouse** | 12:12 29:10 | 100:4 105:9 |
| 224:7 225:17 | 21:8 115:14 | 49:9,20,22 | 149:22 152:11 |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

[words - z]                                                      Page 77

| | | | |
|---|---|---|---|
| 180:1 214:20 | 101:17 106:23 | **wrong**   55:5,13 | 85:20 87:11 |
| 221:11 225:16 | 106:24 124:2 | 55:17,18 90:4 | 89:13,14,15 |
| 227:21 235:21 | 130:8,20 166:1 | 90:5 136:6,8,8 | 90:1,16,17,19 |
| 243:10 271:22 | 166:3,6,24 | 191:19 208:22 | 91:16 92:19 |
| **work**   7:6 11:4 | 168:12 199:13 | 214:2 233:12 | 98:19 102:16 |
| 11:19 12:8,22 | 229:9 | **wrote**   23:10 | 102:16,17,17 |
| 16:8,9 25:6 | **works**   27:7 | 48:16 49:1 | 103:7 117:6,12 |
| 27:6 31:18 | 225:3 | 66:23 224:25 | 117:14 118:22 |
| 43:10,12,15,18 | **workspace** | 226:4 235:21 | 119:25 120:8 |
| 43:22 49:5,12 | 4:18,20 212:20 | **wulfsberg**   3:3 | 121:4 133:5 |
| 61:5 67:19,20 | 213:1,8,24 | | 150:16 157:22 |

x

| | | | |
|---|---|---|---|
| 67:23 71:5 | **world**   3:10 | **x**   4:1 161:24 | 160:10 162:1 |
| 94:12,22 101:6 | 10:19 72:23 | 215:10 | 163:6,19 |

y

| | | | |
|---|---|---|---|
| 102:7 108:24 | 124:20,25 | | 164:19 165:9 |
| 108:25 111:4,8 | 125:5 162:14 | **y'all**   118:8 | 182:12 184:1 |
| 114:23,25 | 162:24 163:3 | 275:19 | 221:18 222:2 |
| 115:2 123:10 | 164:2,6,18 | **yeah**   19:8 | 253:23,25 |
| 124:15 127:25 | **worldwide**   34:9 | 45:22 46:11 | 258:18 |
| 128:15,24,25 | **worms**   46:15 | 76:14,17 98:21 | **yearlong**   14:11 |
| 131:6 148:14 | **worry**   257:7 | 100:24 236:9 | **yearly**   229:11 |
| 148:23 157:10 | **worth**   239:2 | 236:10 246:23 | 232:22,23 |
| 161:7 167:22 | 279:24 | 254:5 | **years**   23:15 |
| 168:7,13 204:2 | **wow**   190:9 | **year**   18:12 | 30:20 31:22 |
| 204:22 205:6 | **wrap**   95:10 | 24:11 29:14 | 32:7,9,16 65:9 |
| 212:4 237:25 | 122:10 | 33:9 38:18,19 | 65:11 66:13,24 |
| 238:13 239:22 | **write**   48:20,22 | 44:9 66:2,12 | 67:14 86:20 |
| 245:12,14,15 | 59:9 66:19 | 66:21,24 67:2 | 91:19 117:14 |
| 248:12 254:24 | 121:25 153:11 | 67:8,18 68:2 | 166:13 254:13 |
| 274:15 275:10 | 168:13 216:5 | 68:22 70:8,18 | ▮   136:24 |
| **worked**   13:17 | **writing**   23:7 | 72:7 73:21,23 | **york**   3:11,11 |
| 13:19 91:18 | 219:20 | 74:22 75:10,11 | |

z

| | | | |
|---|---|---|---|
| 229:9 230:17 | **written**   24:11 | 81:15 82:17 | **z**   131:14,16,19 |
| **working**   13:11 | 221:13 | 84:9,15,18 | 132:1,25 |
| 31:11 44:1 | | | |

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

**[zeke - zoom]**                                                    Page 78

**zeke**   2:8
**zero**   80:10,11
   80:16 81:9
   82:3 185:7
   222:7 245:21
**zipped**   55:5,18
**zone**   69:18,19
   242:17,22
**zones**   242:18
**zoom**   2:4,8,17
   2:21 3:3,8,8,14
   3:15 31:25
   34:17,23,24,25
   35:3,4,9,13,17
   61:8 64:4
   166:25 167:9
   167:13

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.