# EXHIBIT 3
# [FILED UNDER SEAL]

HIGHLY CONFIDENTIAL

```
                                             Page 1

 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                      SHERMAN DIVISION

 4

    THE STATE OF TEXAS, et al.,    )

 5                                 )

            Plaintiffs,            )  Case No.

 6   v.                            )  4:20-cv-00957-SDJ

                                   )

 7   GOOGLE LLC,                   )  Hon. Sean D. Jordan

                                   )

 8            Defendant.           )

 9  _____

10                  HIGHLY CONFIDENTIAL

11               PURSUANT TO PROTECTIVE ORDER

12

                  TUESDAY, DECEMBER 17, 2024

13  _____

14

15            Videotaped Deposition of MICHAL A. MALKIEWICZ,

16   taken pursuant to notice and conducted at Freshfields

17   Bruckhaus Deringer US LLP, 175 Greenwich Street, 3 World

18   Trade Center, New York, New York, commencing at 9:09 a.m.,

19   EDT, on the above date, before Jennifer A. Dunn, Registered

20   Merit Reporter, Certified Realtime Reporter, Missouri

21   Certified Court Reporter, and Certified Shorthand Reporter

22   in California, Illinois, and Texas #12050.

23

                           —  —  —

24

25     Job No. MDLG7059658
```

HIGHLY CONFIDENTIAL

```
                                              Page 2

 1               A P P E A R A N C E S
 2
        NORTON ROSE FULBRIGHT US LLP
 3           BY:  MARC B. COLLIER
             marc.collier@nortonrosefulbright.com
 4           BY:  ETHAN GLENN
             ethan.glenn@nortonrosefulbright.com  (via Zoom)
 5           1301 McKinney
             Suite 5100
 6           Houston, Texas  77010-3095
             Tel:  (713) 651-5151
 7      -and-
        NORTON ROSE FULBRIGHT US LLP
 8           BY:  DANIELLA TORREALBA
             daniella.torrealba@nortonrosefulbright.com
 9           799 9th St NW, #1000
             Washington, DC 20001
10           Tel:  (202) 662-0200
        -and-
11        THE LANIER LAW FIRM, PLLC
             BY:  ZEKE DEROSE, III
12           zeke.derose@lanierlawfirm.com
             BY:  ALEX ABSTON (via Zoom)
13           alex.abston@lanierlawfirm.com
             10940 West Sam Houston Parkway North
14           Suite 100
             Houston, Texas  77064
15           Tel:  (713) 659-5200
        -and-
16        THE LANIER LAW FIRM, PLLC
             BY:  RACHEL LANIER  (via Zoom)
17           rachel.lanier@lanierlawfirm.com
             2829 Townsgate Road
18           Suite 100
             Westlake Village, California  91361
19              Counsel for Texas, Idaho, Louisiana
                (The Lanier Law Firm Only),
20              Mississippi, North Dakota, South Carolina and
                South Dakota
21              Counsel for Texas, Idaho, Louisiana
                (The Lanier Law Firm Only),
22              Mississippi, North Dakota, South Carolina and
                South Dakota
23
24
25
```

HIGHLY CONFIDENTIAL

```
                                                    Page  3

  1               A P P E A R A N C E S  (Cont.)

  2

  3        FRESHFIELDS BRUCKHAUS DERINGER US LLP
                  BY:  ROBERT MCCALLUM
  4               rob.mccallum@freshfields.com
                  BY:  VERONICA BOSCO
  5               veronica.bosco@freshfields.com
                  BY:  RYAN HICKS
  6               ryan.hicks@freshfields.com
                  3 World Trade Center
  7               175 Greenwich Street
                  51st Floor
  8               New York, NY  10007
                  Tel:  (212) 854-4957
  9                  Counsel for Google LLC

 10

 11   ALSO PRESENT:

 12   Ignatius Grande - Director, Information Discovery, BRG

 13   Jonathan Jaffe, Consultant - It's Your Internet (via Zoom)

 14   Ayesha Najam - Gibbs Bruns LLP  (via Zoom)

 15   Cuong Pham - State of Texas, Office of the Attorney General
      (via Zoom)

 16

      Anu A. Reddy - Kirkland & Ellis, LLP  (via Zoom)

 17

      VINCE ROSICA - Trial Technician

 18

      DANNY ORTEGA - Videographer

 19

      JONATHAN JUAREZ - Videographer

 20

 21

 22

 23

 24

 25
```

HIGHLY CONFIDENTIAL

Page 4

1                          I N D E X

2

3    MICHAL A. MALKIEWICZ                                PAGE

4        Examination by Mr. Collier                      7

5        Examination by Mr. McCallum                     233

6        Examination by Mr. Collier                      239

7    Certificate of Court Reporter                       247

8    Letter for Signature                                248

9    Witness Signature Page                              249

10   Errata Sheet                                        250

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 5

1                   E X H I B I T S
2
    NUMBER          DESCRIPTION                          PAGE
3
    Exhibit 1       Stopwatch Diagram                    13
4
    Exhibit 2       History Off History On Diagram       18
5
    Exhibit 3       History Off History On in G Suite     18
6                   GOOG-AT-MDL-B-004290164
7   Exhibit 4       E-Mail of Google Chats dated 2/21/2018   20
                    GOOG-AT-MDL-B-004290028 to 0029
8
    Exhibit 5       E-Mail of Google Chats dated 1/18/2019   23
9                   GOOG-AT-MDL-B-004290140 to 0148
10  Exhibit 6       Person A/Person B Demonstrative       49
11  Exhibit 7       Person A/Person B Demonstrative
12  Exhibit 8       E-Mail of Google Chats dated 3/18/2020   65
                    GOOG-AT-MDL-B-004067792 to 7794
13
    Exhibit 9       E-Mail with Google Chats dated 11/19/21   74
14                  GOOG-AT-MDL-B-4439513 to 9515
15  Exhibit 10      E-Mail with Google Chats dated 4/26/22   82
                    GOOG-AT-MDL-B-4584048 to 4049
16
    Exhibit 11      E-Mail with Google Chats dated 2/8/22   89
17                  GOOG-AT-MDL-B-8033073 to 3076
18  Exhibit 12      Spreadsheet                          95
                    GOOG-DOJ-1485029
19
    Exhibit 13      Google Chat Retention Policy         96
20                  GOOG-AT-MDL-009709508 to 9509
21  Exhibit 14      Google Chats                         105
                    Google-DOJ-AT-687430
22
    Exhibit 15      Chat Conversation                    113
23
    Exhibit 16      Curriculum Vitae                     113
24
    Exhibit 17      Non-substantive communications       113
25                  GOOG-AT-MDL-B7884309 to 4325

HIGHLY CONFIDENTIAL

Page 6

1              E X H I B I T S (Cont.)

2

3    NUMBER        DESCRIPTION                            PAGE

4    Exhibit 18    Multiple chat conversations            160
                   GOOG-AT-MDL18279549

5

     Exhibit 19    Figure 1 - #Produced Google Emails     172
6                  by Year

7    Exhibit 20    Figure 2 - #Produced Google Chat       176
                   Conversations by Year

8

     Exhibit 21    "Multi-Sided Businesses:  The          175
9                  Implications of Antitrust and Regulatory
                   Policy" by Michal Malkiewicz and Lucy Duan

10

     Exhibit 22    E-Mail from ████████ to ███  ███
█                  ███████ and Kent Walker sent
                   9/16/2008
12                 Subject:  Re:  Business communications
                   in a complicated world
13                 GOOG-DOJ-29864619 to 4620

14   Exhibit 23    On/Off Demonstrative                   186

15   Exhibit 24    Petabyte Demonstrative                 202

16   Exhibit 25    Figure 4 from Prof. Hochstetler's Report  209

17   Exhibit 26    Apps GBU Weekly Launch Update          218
                   GOOG-DOJ-16741074 to 1081

18

19   Exhibit 27    E-Mail from Lily Lin dated 11/7/2014   218
                   GOOG-NE-07385055 to 5056

20

     Exhibit 28    Footnote 48 of Grande Report           226

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 7

1                    P R O C E E D I N G S

2          (Tuesday, December 17, 2024 at 9:09 a.m. EST)

3                    THE VIDEOGRAPHER:  We are now on the record.

4          My name is Danny Ortega, and I am the legal

5          videographer for Golkow Litigation Services.

6                    Today's date is December 17th, 2024, and the

7          time is 9:09 a.m.

8                    This video deposition is being held at 175

9          Greenwich Street, New York, New York, in the matter of

10         the State of Texas, et al. versus Google, LLC.

11                   The deponent today is Michael Malkiewicz.

12                   All counsel will be noted on the stenographic

13         record.

14                   The court reporter today is Jennifer Dunn and

15         will now swear in the witness.

16                   MICHAL A. MALKIEWICZ,

17    of lawful age, having been first duly sworn to tell the

18    truth, the whole truth and nothing but the truth, deposes

19    and says on behalf of the Plaintiffs, as follows:

20                          EXAMINATION

21    BY MR. COLLIER:

22        Q    Good morning, Mr. Malkiewicz.

23        A    Good morning.

24        Q    When does a company have a duty to begin

25    preserving documents?

HIGHLY CONFIDENTIAL

Page 8

1      A    It's not an area of my expertise.  I have a

2  general understanding from the documents I've reviewed in

3  this case and in preparation for today.

4      Q    Okay.  And you may help me short circuit things

5  with that answer.

6          So you're not an expert in when a company should

7  preserve documents, right?

8      A    That is fair, yes.

9      Q    And you're not an expert in the industry standards

10  on when companies preserve documents, are you?

11      A    I am not.  That's correct.

12      Q    What is your lay person's understanding of when a

13  company should preserve documents?

14      A    What my lay person understanding is that the

15  company should preserve documents around the time where it

16  anticipates litigation or an investigation, but that's

17  really the extent of my understanding.

18      Q    When did Google anticipate an investigation on its

19  ad tech practices?

20      A    I do not know as I sit here.

21      Q    What is your understanding of the day that Google

22  should have began preserving documents?

23          Let me ask it a little cleaner way.

24          We talked in general about companies.  I just want

25  to make sure that includes Google, so let me ask the

HIGHLY CONFIDENTIAL

Page 9

1    question this way.

2         It is your understanding that Google should

3    preserve documents beginning around the time it anticipates

4    litigation or an investigation?

5         A    I mean, again, as a lay person, I'm not an expert

6    in the field, that would sound reasonable.

7         Q    Okay.  And as we sit here today, you just don't

8    know when Google anticipated litigation or an investigation

9    into an ad tech practices?

10                   MR. MCCALLUM:  Object to the form.

11                   THE WITNESS:  That's correct.  I don't know

12           that date or information.

13   BY MR. COLLIER:

14        Q    All right.  Do you have an understanding as to how

15   clear a company should be in its instructions to employees

16   on when to preserve documents?

17                   MR. MCCALLUM:  Object to the form.

18                   THE WITNESS:  Again, only as a lay person.

19           And if you use the word "clear," that sounds reasonable

20           to me, but I don't know any details of what that might

21           actually entail.

22   BY MR. COLLIER:

23        Q    Right.  And just to be clear, you're not a lawyer,

24   right?

25        A    That's correct.  I'm not a lawyer.

HIGHLY CONFIDENTIAL

                                                    Page 10

1          Q     And you've never taken any eDiscovery training?

2          A     I have taken eDiscovery trainings over the year,

3     but I'm not a lawyer and not an expert in the field

4     certainly.

5          Q     In those eDiscovery trainings, did you learn that

6     if there is a possibility a document could be relevant to a

7     litigation or an investigation it should be preserved?

8                     MR. MCCALLUM:  Object to the form.

9                     THE WITNESS:  I would not have recalled a

10          specific instruction like that, but generally that

11          would be consistent with my understanding of what, you

12          know, something like a litigation hold would entail.

13                    But again, as I sit here, I don't have a

14          specific recollection of the actual wording or what

15          the -- just more of the intent of the training.

16    BY MR. COLLIER:

17         Q     Did you say more of the intent?

18         A     Right.  What the intent was of what I was learning

19    as opposed to, you know.

20         Q     Well, the intent was to preserve documents so, in

21    part, no one would accuse you of spoliating documents,

22    right?

23                    MR. MCCALLUM:  Object to the form.

24                    THE WITNESS:  That I just don't know what

25          might be the reason or consequences.

HIGHLY CONFIDENTIAL

Page 11

1    BY MR. COLLIER:

2        Q    And I'm going to ask you a few more questions in

3    this area, sir, and I promise you, I understand you're not

4    an expert in the field, I'm just going to try to understand

5    what as a lay person you understand, so please don't take

6    any offense.  If you don't know the answer or it seems like

7    I'm trying to get you to testify outside your field, I'm

8    not, I'm just exploring what you know as a non-expert, if

9    that's okay.

10       A    That's okay.

11       Q    Have you used Google Chats?

12       A    I do not recall specifically.  I may have, but I

13   don't recall, because of the transition period between

14   Google Hangouts and Google Chat, but that would be the time

15   period that I potentially personally used the Google Chat or

16   Google Hangouts.

17       Q    In what job would you have used Google Chats, if

18   at all?

19       A    Personal capacity --

20       Q    Or are you saying in your personal?

21            Okay.  Apologies.

22            And I interrupted you, so it's a good time for me

23   to remind myself and you.  I know you've given many

24   depositions, but if you'll try to let me finish the question

25   before you answer, and equally important for me, I'll try

HIGHLY CONFIDENTIAL

Page 12

1    not to accidentally cut off your answer.  That's never my

2    intention.

3            Fair?

4    A    Very fair.  Understood.

5    Q    And where were you born?

6    A    In Poland.

7    Q    Okay.  Well, you can probably tell I'm from Texas,

8    and so I speak very slow, and sometimes people think I'm

9    done talking but I'm still finishing my sentence.  I'm not

10   very bright perhaps, but if you'll just make sure I get all

11   the way till the end of my question before you answer; is

12   that fair?

13   A    That's fair.

14   Q    So you're not sure if you've ever used Google

15   Chats or Google Hangout, but you can't swear you haven't; is

16   that fair?

17   A    Well, I'm confident, as I sit here, I've used

18   Google Hangouts.

19   Q    Okay.

20   A    But I'm just not sure if I continued to use it

21   when the total transition to Google Chat, because it would

22   have been around the time of transition, so, you know, now

23   would be more than a decade ago, or about a decade ago.

24   Q    That's fair.

25           I'm assuming in Google Hangouts you never had an

HIGHLY CONFIDENTIAL

Page 13

1    opportunity to try to turn history on or off?

2        A    Frankly, I've never thought about whether that

3    option was even available or not, so I don't know, but I

4    don't recall ever thinking about it.

5        Q    So I'm going to hand you -- and I apologize for

6    the reach I'll be doing all day, Deposition Exhibit 1.

7            And I'll put it on the Elmo.

8            Now, ignoring this squiggly little river looking

9    line, do you see in Deposition Exhibit Number 1 that there

10   are two stopwatches?

11               MR. MCCALLUM:  Objection.  If I could just

12       get a representation from counsel describing the

13       document, because I know that it doesn't have a Bates

14       number printed on it, so it does not appear to be a

15       document produced in the litigation.

16               MR. COLLIER:  This is not a document produced

17       in the litigation.  I'll ask some questions, and then

18       I'm going to tie it to produced documents.

19               MR. MCCALLUM:  Okay.  Are you going to give a

20       rough indication of what it is that document represents

21       given that it hasn't been produced?

22               MR. COLLIER:  Once I ask the witness if he

23       has any understanding of this.

24   BY MR. COLLIER:

25       Q    So, sir, ignoring, again, the squiggle line which

HIGHLY CONFIDENTIAL

Page 14

1    is an artifact of copying, do you see two stopwatches there,

2    or two icons that look like stopwatches, or clocks, or

3    alarms?

4        A    I do now that you characterize them.  At first I

5    had it flipped at a 90-degree angle, and I was wondering

6    what those are.  But, yeah, now that I see, when you

7    oriented it on the screen, I can see that these may look

8    like stopwatches, yes.

9        Q    Or clocks or alarms, right?

10       A    Yeah.  I mean, same answer.  I mean, I --

11       Q    Okay.

12       A    I have not seen those before, but I have no reason

13    to disagree with your characterization here.

14       Q    Well, you've anticipated my next question.

15            Do you have any understanding as to what these

16    clock or alarm icons have to do with turning history on or

17    off?

18                    MR. MCCALLUM:  Object to the form.

19                    THE WITNESS:  I do not.  That's the first

20        time I'm seeing those.

21    BY MR. COLLIER:

22       Q    Okay.  So if I represent to you -- and we're going

23    to show a full page, including a produced page that your

24    counsel will want to see, but if I represent to you that

25    these icons turn history on and off, which icon do you

HIGHLY CONFIDENTIAL

Page 15

1    believe would turn history on for Google Chats?

2                    MR. MCCALLUM:  Object to the form.

3                    THE WITNESS:  It really depends on what

4        potentially the default setting is.

5                    I would be completely speculating and

6        guessing, so I don't know, but if presumably the

7        default history is off, then the -- I guess on the

8        screen, the top one, the one without being crossed,

9        would turn it on would be my guess, but I'm

10       speculating, I don't actually know.

11   BY MR. COLLIER:

12       Q    No, I understand.  We're going to go through it

13   and answer this question, but I just want to make sure.

14           This one is -- the top one -- without the bar

15   going through it is the one that would turn history on, that

16   would be your speculation?

17                    MR. MCCALLUM:  Same objection.

18                    You haven't shown -- made any representations

19       as to what the document is.

20                    THE WITNESS:  That -- that would be my,

21       again, guess.

22                    If the default was off, then presumably

23       clicking on or activating that particular button, I

24       would guess it turns the history on, but I'm not sure,

25       again.

HIGHLY CONFIDENTIAL

```
                                              Page 16

  1    BY MR. COLLIER:

  2         Q    That's fair.

  3              And then again just to round out the -- to round

  4    out the equation.  If the clock without the line is history

  5    on, the clock with the no line would be history off, right?

  6                    MR. MCCALLUM:  Same objection.

  7                    Showing the witness a portion of the document

  8         without context.

  9                    THE WITNESS:  It -- it could be.  So

 10         certainly I'd be -- I would think, at least my --

 11         probably a stronger guess would be that both mean

 12         something different.

 13                    Meaning that if one is on then the other must

 14         be off, but I'm not so certain about which one is on

 15         and which one is off, as I sit here.

 16    BY MR. COLLIER:

 17         Q    Okay.  What does that line going through the clock

 18    indicate to you, if anything?

 19                    MR. MCCALLUM:  Same objection.

 20                    THE WITNESS:  Well, I can only read this line

 21         relative to the picture without the line.

 22                    MR. COLLIER:  Uh-huh.

 23                    THE WITNESS:  Meaning that it's a state

 24         that's opposite to the other state.  That's how I would

 25         read it.
```

HIGHLY CONFIDENTIAL

```
                                              Page 17
  1    BY MR. COLLIER:

  2        Q    And opposite, usually that line means no or off,

  3    right?

  4                 MR. MCCALLUM:  Same objection.

  5                 THE WITNESS:  Relative to the default,

  6         depending on what the default is.

  7    BY MR. COLLIER:

  8        Q    Okay.  Let's assume -- assume that history is

  9    defaulted off, as it was for years at Google, right?

 10        A    That's -- yeah, I mean, I understand your

 11    question.  Okay.

 12        Q    Okay.  Assuming that history was defaulted off,

 13    which switch would you hit with no other information to turn

 14    history on?

 15                 MR. MCCALLUM:  Same objection.

 16                 THE WITNESS:  So, yeah.  So in your -- what

 17         you ask me to assume in a kind of hypothetical, that I

 18         envision would be I'm sitting in front of a tool and

 19         there's a history -- and history's defaulting to off,

 20         my guess would be that the line that the -- I guess the

 21         picture that's below, the one that's with a crossed

 22         line would be the one that's activated, maybe

 23         highlighted in some way, and then in order to turn the

 24         history on, I would probably try to click on the -- the

 25         logo above, the one that you've written history on next
```

HIGHLY CONFIDENTIAL

Page 18

1      to.  That's -- that would be my guess as I sit here for

2      that situation.

3                    MR. COLLIER:  That's fair enough.

4                    I'm now going to show you and hand you

5      Exhibit 2.

6                    MR. MCCALLUM:  This looks to be another

7      unproduced document; is that correct?

8                    MR. COLLIER:  It is.

9                    And, Madam Court Reporter, I have set aside

10     your exhibit stickers.  So I'll just write 2 on here

11     and we'll collect them later.

12  BY MR. COLLIER:

13     Q    Now, have you ever seen a setting that has the

14  clocks as represented in Exhibit 1, but with the words shown

15  in Exhibit 2?

16                   MR. MCCALLUM:  Objection.  Showing the

17     witness a portion of a document without context.

18                   THE WITNESS:  Just as with the previous

19     document, I do not recall seeing a portion of that --

20     it doesn't come to mind.

21  BY MR. COLLIER:

22     Q    Okay.  Now I'm going to hand you Exhibit 3.

23                   Exhibit 3, for the record, is -- sorry, I'm trying

24  to get the Elmo working, Bates Number GOOG-AT-MDL-B-4290164.

25                   In preparing for your testimony today, did you

HIGHLY CONFIDENTIAL

Page 19

1    review this produced document showing how history on and

2    history off was done in G Suite?

3                    MR. MCCALLUM:  Object.  And caution the

4          witness not to disclose the content of any

5          communications with counsel.

6                    THE WITNESS:  If I have reviewed this

7          document, it would have been before I signed my expert

8          report, so before, I guess, November 27th.

9                    I do not have a specific recollection of

10         reviewing the document, so if that Bates stamp number

11         is not on my Materials Considered List, I have not seen

12         it before.

13                   MR. COLLIER:  Fair.

14                   THE WITNESS:  But even if I've seen it, I do

15         not have a recollection of it.

16                   MR. COLLIER:  Fair enough.

17   BY MR. COLLIER:

18         Q    Can you agree with me that, as we look at Exhibit

19   3, it is possible that an employee could get confused by the

20   history on and history off logos and words, right?

21                   MR. MCCALLUM:  Object to the form.

22                   THE WITNESS:  I mean, I'm not sure about the

23         employees.  If you ask me, I mean, it's -- it actually

24         appears to be spelled out, so I'm not sure.

25                   I mean --

HIGHLY CONFIDENTIAL

```
                                                    Page 20

 1    BY MR. COLLIER:

 2         Q    Okay.  Fair enough.

 3              Have you seen, as you've gone through the

 4    documents in this case, various Google employees saying that

 5    the history on and history off setting is confusing to them?

 6         A    I do not recall specifically seeing such documents

 7    in that contents.

 8              If anything comes to mind, I'll mention, but I

 9    thought about it, I cannot recall those instances.

10         Q    Well, let me see if I can help you.  I'm going to

11    hand you Exhibit 4.

12              Exhibit 4 is GOOG-AT-MDL-B-4290028 to 29.  Take

13    your time and look at that, and then I'll ask you about a

14    few statements.

15         A    Okay.  I've reviewed Exhibit 4.

16         Q    Would you agree with me that this appears to be a

17    chat pulled into an e-mail by a Google employee?

18         A    So I don't know for a fact about the document

19    you've given to me.  What I do know that it looks more to me

20    like a production out of the Google Vault system, which when

21    conversations are produced out of the Google Vault system

22    they do tend to appear in a way that's similar to what an

23    e-mail would look like, but that's just the way that Google

24    preserves conversations, that's my understanding.

25         Q    Fair enough.  Let me ask a better question.
```

HIGHLY CONFIDENTIAL

Page 21

1        You can agree with me that this appears to

2   represent a Google Chat conversation in 2018, February of

3   2018?

4        A    That's fair.  So the conversation itself is from

5   2018, and it was maintained for a period of what looks like

6   here 18 months through November 20 of 2020, which means it

7   must have been output into this particular format sometime

8   before that date.

9        Q    Fair enough.

10        And you see at the very top, these are all Google

11   employees, right, do you see their e-mails as Google?

12        A    That would be my understanding that if someone has

13   an @Google.com e-mail address, they're likely, at least at

14   the time the messages are sent, they're a Google employee.

15        I'd agree with that.

16        Q    And I've done some highlighting on the copy I'm

17   showing.  This is my highlighting, and I'll just say, all

18   day here, anything that's highlighted is me, the counsel.

19   Unless I say otherwise, unless I say:  "This was highlighted

20   as produced," just assume any highlighting is just by me to

21   help us keep track.

22        Fair enough?

23        A    Okay.  Thank you.

24        Q    Yeah.  And if you ever have a question, ask.  So

25   no one other than a lawyer would highlight so sloppily, that

HIGHLY CONFIDENTIAL

Page 22

1    may be the giveaway.

2            All right.  Do you see in the very beginning,

3    someone is asking in 2018 what state is the history toggle

4    here?

5        A    I do see that highlight, yes.

6        Q    Okay.  And then there's a series of discussions,

7    and the result here -- and we can go through it line by

8    line, is that the Google employees find the history toggle

9    to be confusing, right, or at least some of them?

10       A    I mean, it does appear general topic of discussion

11   is, yeah, it seems exactly in the sense of like what is the

12   default, right, there's some messages about that.

13           But it's not clear what on and off means to these

14   Googlers based on what the default setting is, and they try

15   to, as I read through it, again, and just, you know, the

16   document says what it says, but my interpretation is that

17   they're trying to figure out which one is which based on

18   what the default state is at the time in 2018.

19       Q    Well, and at least two employees, ███████  and

20   ██████████████, specifically say that they find these

21   settings to be confusing, right?

22       A    That's right.  That's what the -- that particular

23   user says, or Googler says.  Yes, I also find this very

24   confusing.  I agree with that.

25       Q    Okay.  So you didn't know that Googlers, Google

HIGHLY CONFIDENTIAL

Page 23

 1    employees, found the history on/off switch to be confusing

 2    before I showed you this Exhibit 4?

 3                    MR. MCCALLUM:  Object to the form.

 4                    THE WITNESS:  Yeah.  I have not seen this

 5          Exhibit 4, or I have not seen, you know, other similar

 6          documents to the extent they exist, so, I -- yeah, I

 7          have not reviewed this before.

 8                    MR. COLLIER:  Okay.  Fair enough.

 9    BY MR. COLLIER:

10          Q    I'll now hand you what I'm marking as Exhibit 5.

11                And, for the record, that's GOOG-AT-MDL-B-4290140

12    through 0148.  Take a minute and look through this.

13          A    Okay.

14          Q    Okay.  This also appears to be a series of chats

15    among Googlers, and this time in the January 2019 time

16    period, right?

17          A    That appears to be correct, yes.

18          Q    Okay.  You see at the beginning, the very first

19    question by a Googler, ████████ is asking the group:  "Is

20    there any way to prevent the," quote:  Delete messages after

21    24 hours toggle from continuously getting turned back on?

22          A    I see that, yes.

23          Q    What do you understand about the Google system in

24    January of 2019 as to whether or not a Googler can keep the

25    delete messages after 24 hours toggle from getting

HIGHLY CONFIDENTIAL

Page 24

1    continuously turned back on.

2              Is there any way?

3        A    I don't have a specific understanding of the --

4    the mechanics on the back end.  I do understand, and as I've

5    summarized in my expert report, the policy at the time was

6    to offer Googlers' ability to turn history on, but that that

7    setting would reset every 24 hours, so that's my general

8    understanding, but in terms of the -- to get it permanently

9    to history on, I don't -- I don't recall seeing references

10   to that.

11       Q    And that tracks with what whoever ███ is saying

12   at Google, right?  He turns it on, and then it -- I mean,

13   excuse me.  He turns history on, if you're understanding

14   this correctly, and it keeps switching to history off, or as

15   he puts it, delete messages after 24 hours, correct?

16                MR. MCCALLUM:  Object to the form.

17                THE WITNESS:  Right.  So I don't -- I don't

18        know obviously what ████████ meant.  I can see

19        the sentence, and I -- that's one interpretation that I

20        think seems fair to me.

21   BY MR. COLLIER:

22       Q    And if we look at the second page of this document

23   ending in 141, after some conversations, someone at Google

24   named ███ or is that █?  Does that look like ███ to you?

25       A    It does look like ███ because all the letters are

HIGHLY CONFIDENTIAL

Page 25

1    non-capitalized.

2        Q    Right.  He says:  "Another way to look at this is

3    that the state of the conversation is the state of the last

4    message."

5            That's your understanding, right?

6        A    I believe that's my understanding at the time that

7    the new message would assume the state of the previous

8    message.  So the setting would be on a per message basis,

9    but it's rules-based, so it would -- the new message would

10   assume, unless actively changed, the state of the previous

11   message in the conversation.

12       Q    But also -- we'll talk about this more later.  If

13   in the middle of a chat someone's like:  "Hey, this is very

14   important," and tries to turn history on, are you with me?

15           Well, say I'm message number five of the chat.

16   There's four messages, and then in message five, a Googler's

17   like:  "Hey, everything we've talked about is very

18   important, I'm turning history on."

19           Are you with me so far?

20       A    Yes.

21       Q    You do understand that only message five onward

22   would be retained, correct?

23       A    Well, it depends.

24       Q    Depends on what?

25       A    On the other -- who the other members of the

HIGHLY CONFIDENTIAL

Page 26

1    particular chat group are.

2        Q    Okay.  Can you explain?

3        A    So my understanding is depending on the timing of

4    the conversation, other members of the group, for example,

5    may be subject to a litigation hold, for example, and in

6    that case, while the individual users in the group who are

7    not part of litigation hold may be able to switch their

8    toggle on and off, the conversation itself would still be

9    preserved, because at least one member in the group was

10   subject to a litigation hold as an example.

11           So that would be one example of it depends.

12       Q    So is it your understanding that when an employee,

13   we'll just say John Doe, a hypothetical Google employee, has

14   a litigation hold put on him, we'll say just for ease,

15   January 1st, 2020.

16           Are you with me?

17       A    Okay.  January 1st, 2020.  I got it.

18       Q    Does that mean if that employee sends a message on

19   January 2nd, 2020, to another Google employee not on a

20   litigation hold, that that chat is retained?

21               MR. MCCALLUM:  Object to the form.

22               THE WITNESS:  In January 2020, that would

23       only be the case for active switching to history on.

24       So at least one member of the chat has to switch the

25       history to on per my understanding of the policy at

HIGHLY CONFIDENTIAL

Page 27

1      that time.

2    BY MR. COLLIER:

3      Q    So prior to 2023, do we agree that for a message

4    to be retained, history had to be on and one individual had

5    to be subject to a litigation hold in that chat?

6      A    I don't believe the second requirement is

7    necessary.

8           So the -- the -- even for individuals who are not

9    on litigation hold, per policy, some messages at that time

10   with history on would still have been kept, would have been

11   sent to Google Vault and kept for either 30 days or 18

12   months at the time.

13     Q    And which ones were kept for 30 days?

14     A    So 30 day ones would typically be the direct

15   messages.  So the ones that are just between, you know, two

16   individuals.

17          The 18 months would be, you know, for group

18   messages.  There's some exceptions, but the policy I believe

19   is pretty detailed on that point.

20     Q    Okay.  Going back to our Exhibit 5.  So we talked

21   a little bit about the state of the conversation in the last

22   message.

23          And do you see what █ -- ████████ response to

24   learning this information in 2019 is?

25     A    Well, the sentence you pointed me to says that's

HIGHLY CONFIDENTIAL

Page 28

1    completely not obvious.

2         Q     And then he goes on to say what?

3         A     The next message says:  "That will explain why it

4    has seemed broken to me on so many occasions."

5         Q     So was it -- is it fair to say that Exhibit 5

6    shows us more -- at least one other Googler who finds this

7    history on and off and retention confusing?

8                   MR. MCCALLUM:  Object to the form.

9                   THE WITNESS:  I mean, it certainly is another

10        example among the chat -- the preserved chats with

11        Googlers discussing it and clarifying the situation.

12   BY MR. COLLIER:

13        Q     Well, let's turn to the next page.  Page 3, or

14   Bates Number 142.

15        A     I'm there.

16        Q     Now we have a different Googler, █████████ and do

17   you see where he says -- and he says it twice once he

18   updated, do you understand that to be he amended a prior

19   message?

20        A     Yes, that's my understanding.

21        Q     In his updated message, but it was actually the

22   original, that having a preference switch reset without the

23   user touching it is an, all caps, extremely confusing

24   decision.

25        A     I see that, yes.

HIGHLY CONFIDENTIAL

```
                                                    Page 29

 1          Q    Do you have any doubt that ███████ at Google

 2    found the history on off switch resetting to be extremely

 3    confusing?

 4                    MR. MCCALLUM:  Object to the form.

 5                    THE WITNESS:  Yeah.  I do see that this

 6          particular Googler, his conversation maybe goes on a

 7          page and one -- or two messages over to next pages,

 8          particularly concerned about his private chats, or

 9          personal chats, as he calls it, but I would agree that

10          he seems --

11    BY MR. COLLIER:

12          Q    Confused, right?

13          A    At least, yeah, wants to clarify his confusion.  I

14    agree with that.

15          Q    Let's go to the next page.  Bates Number 143.

16                ████ at Google also -- agrees that this is

17    confusing, right?

18          A    That's what ████ says, yes.

19          Q    And then ███████ jumps in and says:  "He also

20    doesn't" -- well, he or she, I don't know -- "also doesn't

21    understand how it actually works."

22                Do you see that?

23          A    I see that sentence, yes.

24          Q    And then he says:  "One interpretation" -- can you

25    read that sentence to me?
```

HIGHLY CONFIDENTIAL

Page 30

1      A    The sentence says:  "One interpretation is that

2   when you turn the switch on, all messages, you can see are

3   saved -- are now saved."

4      Q    Is that interpretation accurate as you understand

5   Google Chats?

6      A    Well, it would depend on the setting of the

7   previous, that was attached to the previous messages.  So it

8   could be true, but it also does not have to be true.

9      Q    That's my understanding also of -- that, if

10  anything, this interpretation's incomplete because you need

11  to know more, right?

12     A    That's fair.

13     Q    And then if we look at the next page, the fifth

14  page, but Bates Number 144.  I didn't highlight it, but I

15  will.

16          Pbense says:  "Another interpretation is that only

17  messages you send," quote:  While that switch is on actually

18  gets saved.

19          Do you see that?

20     A    I do.

21     Q    Is that interpretation correct?

22     A    I believe that interpretation is more complete.

23  I'm trying to think of an exception.

24          I don't believe at the time or ever there was an

25  ability to go back and change the setting on a previous

HIGHLY CONFIDENTIAL

                                                    Page 31

1   message, so in that sense, I mean, I'm not an expert in the

2   area, but as I sit here, based on my review of documents,

3   that seems to be pretty close to -- to correct, if not

4   correct.

5        Q     And then █████████ if that interpretation is the

6   correct one, he says:  "That makes it even more useless."

7              Right?

8        A     That's what he says, yes.

9        Q     And why is that interpretation of how Google Chats

10  retains or doesn't retain messages feel useless to ████████

11                  MR. MCCALLUM:  Object to the form.

12                  MR. COLLIER:  If he says -- I might have put

13        a star by it to help you.

14                  MR. MCCALLUM:  Object to the form.

15                  THE WITNESS:  I see the sentence you put a --

16                  MR. COLLIER:  I withdraw my star.  I withdraw

17        my star comment.

18  BY MR. COLLIER:

19        Q     Star or no star, can you see where ████████ explains

20  why the chat retention policy is useless?

21                  MR. MCCALLUM:  Same objection.

22                  THE WITNESS:  I -- I -- I see the sentence

23        and I -- my interpretation of the sentence, now that

24        I'm seeing it, it would be consistent with I guess my

25        previous answer, which is that here █████ appears to

HIGHLY CONFIDENTIAL

Page 32

```
 1        say that -- I guess, I don't know, maybe -- you'd have
 2        to ask him, but to me personally it implies that he
 3        realizes he cannot change the previous -- whatever he
 4        typed in previously, he cannot change the setting on
 5        that once that message has been sent.
 6               That's my interpretation of it, but I --
 7   BY MR. COLLIER:
 8        Q    So this might come back to our hypothetical, where
 9   let's say ████████, ████████ is that what you call him, or
10   her?
11        A    Yeah.
12        Q    We'll just call him ████████ and we'll call him
13   "him," and if it's her, someone can correct us.
14               But one thing that could happen here for ████████ is
15   he's saying he doesn't realize until after the conversation,
16   so this might be the scenario we discussed earlier, where
17   four messages are sent with the default history off, right,
18   and then on message five, pbense, or someone else, realizes:
19   "Hey, this is important stuff."
20               Correct?
21               MR. MCCALLUM:  Object to the form.
22               THE WITNESS:  I mean, I understand your
23        hypothetical.  I just want to make sure that because
24        the ████████ here seems to be particularly worried about
25        the history on setting, rather than the history off,
```

HIGHLY CONFIDENTIAL

```
                                              Page 33

 1        right?  So it's kind of like the flip.

 2   BY MR. COLLIER:

 3        Q     Okay.  Let's take it history on.

 4             Tell me what █████ is worried about from your

 5   read in a, say, a multi-text -- or excuse me, a multi-chat

 6   scenario?

 7                  MR. MCCALLUM:  Object to the form.

 8                  Calls for speculation.

 9                  THE WITNESS:  Right.  So from the messages

10        we've -- you've highlighted, it appears that █████ is

11        concerned about sometimes typing in into the chat,

12        sending the message, and then realizing he would have

13        preferred the history to have been off, but now he has

14        no choice because he knows this message will be

15        retained.  There's no going back.

16             That's, again, I don't know exact -- I mean,

17        you know, I'm not █████ so I -- but that would be --

18        at least the three highlighted messages, that seems

19        what █████ is talking about.

20             But if █████ says something else, I have no

21        reason to agree or disagree.

22   BY MR. COLLIER:

23        Q     Sure.  But just looking at the sentence █████

24   written, it wasn't that he's concerned that something should

25   be off when it's on.  He says:  "Oftentimes, I don't realize
```

HIGHLY CONFIDENTIAL

Page 34

1    until after the fact the conversation needs to be retained."

2            Right?

3       A    I see that part now, yes.

4       Q    So that would be a signal that at least ███████

5    believes he has sent chats that he wishes he could retain

6    but he didn't at the time know the importance of the chats,

7    right?

8                    MR. MCCALLUM:  Object to the form.

9                    Calls for speculation.

10                   THE WITNESS:  Right.  I mean, I think that

11           would be my interpretation as well of that particular

12           statement.

13   BY MR. COLLIER:

14      Q    Okay.  And then finally on this Exhibit 5, at the

15   bottom of the page -- I'm sorry, I'm trying to line up the

16   Elmo to help you.

17           At the bottom of the page, Bates Number 146, and I

18   just have to do that because there's an unfortunate page

19   break.  There's a new individual, at least new to us,

20   ██████████████.

21           Do you see he or she sent a message?

22      A    I do, yes.

23      Q    And then if you go to the next page -- well, first

24   of all, before I turn the page, do you agree that the

25   message we're about to look at on the next page is from ██████

HIGHLY CONFIDENTIAL

Page 35

1      A    Yes.  I would agree.

2      Q    Sorry.  It's just the way the page is broke.

3           And then he sends a message, and then he sends an

4  updated message.  In the updated message, do you see where

5  he says:  "As it is on mobile, it's hard to know if the icon

6  is history is enabled or deletion is enabled.  I just know

7  there's a stopwatch that's enabled."

8           Do you see that?

9      A    I do.

10     Q    Does that tend to indicate to you that the

11  stopwatch icon might be confusing?

12                MR. MCCALLUM:  Object to the form.

13  BY MR. COLLIER:

14     Q    At least as to the gentleman who wrote this.  I

15  won't ask you as to everyone.

16                MR. MCCALLUM:  Same objection.

17                THE WITNESS:  I mean, it's -- I mean, just to

18          repeat.  It's the first time I'm seeing this document.

19                My impression of this particular message, I

20          mean, it's actually -- it's a clever observation on a

21          UX front that making the windows dark, but, yeah, this

22          whole -- this whole chat we're going through, there's

23          certainly individuals like ███ at Google who are

24          raising their opinions about the toggle and the history

25          on/off, so it seems like a specialized chat on the

HIGHLY CONFIDENTIAL

Page 36

1          topic, and there's certainly individuals who are very,

2          you know, technology knowledgeable, so they -- they --

3          they can point to certain aspects of the toggle on and

4          off, and at least it appears they're speculating as to

5          what's behind it, but that's all I can tell you.

6                   You know, I haven't studied the document or,

7          frankly, I don't really have the expertise to comment

8          on the specifics here of -- definitely not on the state

9          of mind of the individuals, whether they're actually

10         confused or not.

11   BY MR. COLLIER:

12         Q    Well, that may save me a bunch of questions.

13                  Is it -- given the scope of your opinion in this

14   case, is it relevant whether or not Google employees were

15   confused as to how to retain and preserve chats that might

16   be relevant to a litigation?

17                  MR. MCCALLUM:  Object to the form.

18                  THE WITNESS:  Not specifically in the context

19         that we have been discussing.

20                  I -- I cannot see its relevance to the

21         opinions that I've offered in this case.

22   BY MR. COLLIER:

23         Q    And that's fair enough, I'm not necessarily

24   implying that it should be.  I just -- I can do, I promise

25   you, many more pages of this, but if you're going to tell me

HIGHLY CONFIDENTIAL

Page 37

1    it's not relevant to your opinion whether Google employees

2    were confused because you opine on other things, that's

3    fine, but I don't want to misstate it.

4        A    Yeah, I believe that's fair.  I don't have an

5    opinion on the confusion in this case.

6        Q    Have you ever heard the phrase:  "What happens in

7    Vegas"?

8        A    I've heard variations of that phrase, yes.

9        Q    How does the phrase end:  "What happens in Vegas"?

10       A    Stays in Vegas.

11       Q    Yeah.  That's at least the one I've always heard.

12            What do you understand that phrase to kind of

13   mean?

14                MR. MCCALLUM:  Object to the form.

15                THE WITNESS:  I've heard various references

16       to what it may mean.  So spanning from, you know, sort

17       of the -- on the one hand like the secret aspect of

18       what happens here cannot leave this room, to things

19       like, you know, what is allowed to happen here, we're

20       only going to do here but we won't do anywhere else,

21       but it doesn't necessarily -- it's not a secret, per

22       se.  So it -- I've heard it used in a spectrum of sort

23       of explanations, but I'm, yeah, certainly not an expert

24       on, you know, defining the idiomatic and other

25       expressions.

HIGHLY CONFIDENTIAL

Page 38

1    BY MR. COLLIER:

2        Q    Have you heard in the context of the chats

3    retention in this case any references to Vegas?

4        A    Not in the context of what stays -- what happens

5    in Vegas.  I believe I've seen a -- during the chats I have

6    reviewed, so the ones that would be part of my Materials

7    Considered List, I may have seen references to a conference

8    that happens in Vegas, some tech-related conference, but

9    that's what I recall right now, but I don't recall the

10   phrase being used.

11               MR. COLLIER:  Okay.  Well, we've been going

12        almost an hour.  You want to take a break and I'll

13        shift topics?

14               THE WITNESS:  Yes, thank you.

15               MR. COLLIER:  And I didn't say it before, but

16        obviously -- and we'll do this bit, but, you know, any

17        time you need a break, let me know.

18               THE WITNESS:  Thank you.

19               THE VIDEOGRAPHER:  The time right now is

20        10:03 a.m.  We are off the record.

21               (Recess taken at 10:03 a.m.)

22               THE VIDEOGRAPHER:  The time right now is

23        10:21 a.m.  We are back on the record.

24   BY MR. COLLIER:

25        Q    Mr. Malkiewicz, can you go back to Exhibit 5?  And

HIGHLY CONFIDENTIAL

Page 39

1    I'm showing it on the screen.

2              And we had, I think, ended our discussion, or at

3    least stopped on Bates page 147.  I just want to talk to you

4    about a few more concepts in this chat.

5              If you can turn to 147, I believe -- yeah.  This

6    is where we had talked about the gentleman, he had another

7    thing of confusion, but do you remember discussing "I just

8    know there's a stopwatch that's enabled."

9              Do you remember that?

10   A    Yes.  And I see that now as well.

11   Q    Okay.  And then, after that, we have ████ come

12   back in and say:  "TIL, I should stop attempting to keep

13   track of anything useful in 1:1 Chat messages."

14             Do you see that?

15   A    I see that sentence, yeah.

16   Q    What is TIL?

17   A    I'm actually not familiar with that particular

18   acronym.

19   Q    Have you ever heard of TIL as an acronym for

20   "today I learned"?

21   A    I actually have not.

22   Q    Okay.  Would it surprise you if TIL was used by

23   people who don't have gray in their hair and beard like you

24   and I as, "today I learned"?

25             MR. MCCALLUM:  Object to the form.

HIGHLY CONFIDENTIAL

```
                                              Page 40
 1                THE WITNESS:  No.  It would not surprise me.
 2    BY MR. COLLIER:
 3         Q    So what does 1:1 Chat messages mean to you?
 4         A    I would I guess speculate or guess that it's a
 5    one-on-one.
 6         Q    I think you're right.  I think that's a logical.
 7              Do you think it is a good thing or a bad thing for
 8    Google's retention when their employees have decided, based
 9    on the confusion of the settings, that they should stop
10    attempting to keep track of anything useful in their
11    one-on-one Chat messages?
12                MR. MCCALLUM:  Object to the form.
13                THE WITNESS:  I mean, in the context of this
14         particular message, I just cannot tell you what ███
15         actually means.
16              If that's a set of, you know, an ironic or
17         sarcastic comment or not, you'd have to -- I'm not sure
18         if ███ was deposed in this case about this, but I
19         think as a general statement, I don't see an issue, but
20         in the context of what ███ actually means here, I
21         just really could not tell you what that particular
22         individual wanted to convey through that message.
23    BY MR. COLLIER:
24         Q    If the goal of Google in January of 2019 was to
25    retain anything useful in the one-on-one Chat messages,
```

HIGHLY CONFIDENTIAL

```
                                                    Page 41
 1   would  ████████  statement that he should stop attempting to
 2   keep track of those be helpful to having chats retained or
 3   harmful?
 4                   MR. MCCALLUM:  Object to the form.
 5                   THE WITNESS:  In the context of what we're
 6           here trying to guess what  ████████  meant, it just really
 7           depends on what the outcome is of what  ████████  you
 8           know, is trying to say here, right.
 9                   That's -- it just really depends.  I mean,
10           I'd be really guessing as to how it might impact.  I
11           think what you describe in your question as
12           preservation.
13   BY MR. COLLIER:
14       Q    So I just want to be clear.
15           It is irrelevant to your opinions about the number
16   of documents, say, retained in 2019, whether or not Google
17   employees decided to stop attempting to keep track of
18   anything useful in one-on-one Chat messages; is that fair?
19                   MR. MCCALLUM:  Object to the form.
20                   THE WITNESS:  I mean, if we're talking still
21           in the context of this particular conversation that
22           we've been discussing, Exhibit 5, then I would not
23           necessarily agree with that statement.
24   BY MR. COLLIER:
25       Q    So it is relevant to your opinions as to the
```

HIGHLY CONFIDENTIAL

Page 42

1    number of documents retained in 2019, whether Google

2    employees decided to stop attempting to keep track of

3    anything useful in one-on-one Chat messages?

4                MR. MCCALLUM:  Object to the form.

5                THE WITNESS:  Well, it is -- it is relevant

6         to the -- to the information set that I have reviewed

7         in the context of my critiques that I offer in this

8         case, which are that we don't know.  Meaning that like

9         I have seen no evidence to actually analyze, for

10        example, ███████ history, to see if, you know, ███████

11        here, if we really do interpret it, as we suggested

12        that ██████ is frustrated, and we interpret he's

13        messaged in one way, you know, I don't know if ███████

14        moved on to e-mails to preserve his substance

15        communications and if those have been produced.

16               My point is that we just don't know, so

17        that's -- in that sense, it's part of my analysis, but

18        it's not part of the opinions, per se, I didn't analyze

19        individual records of individual Googlers who may or

20        may not have been subject to litigation holds.

21               So I don't -- in that sense, I don't know.  I

22        don't have an opinion, and I certainly cannot read -- I

23        can read the sentence, but I cannot read the intent and

24        the outcome of what -- what the outcome for ██████ was

25        of this message.

HIGHLY CONFIDENTIAL

```
                                              Page 43
 1    BY MR. COLLIER:
 2         Q    Okay.  Turn to the next page, Bates Number 148.
 3              The fifth chat conversation down is now a new
 4    person.
 5              He or she, ████████ that's the best I got for
 6    pronunciation.
 7              Do you see where ████████ said:  "Completely
 8    agree.  This experience is confusing," parens, "I messed up
 9    several times in the beginning."
10              Do you see that?
11                   MR. MCCALLUM:  Objection.  I think you
12         misread the Chat message.  If you want to try it again,
13         Counsel.
14                   MR. COLLIER:  I don't want to misread it, so
15         let me try it again.
16    BY MR. COLLIER:
17         Q    Do you see where Mr. ████████ says:  "Completely
18    agree that this experience is confusing," open parens, "it
19    messed me up several times in the beginning," closed parens,
20    period.
21              Do you see that?
22         A    I do, yes.
23         Q    Do you know who he or she is, ████████
24         A    Not other than from the context of these messages,
25    so maybe not just this one but the --
```

HIGHLY CONFIDENTIAL

Page 44

1    Q    The next one?

2    A    The next one that --

3    Q    Yeah.

4    A    -- I get a rough sense of who he is.

5    Q    The rough sense you've got is based on the fact

6    his next message says: ████████████████████████

████████████████████████████████████████

████████████████████████████████████

9         Do you see that?

10   A    I do.

11   Q    And you know what UX is, right?

12   A    In my understanding, it typically refers to user

13   experience.

14   Q    Yes.  And so it would seem to you that whoever

15   ████████████ is, is someone who's ████████████████████

████████████

17         MR. MCCALLUM:  Object to the form.

18         THE WITNESS:  Well, it appears that he's

19   ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

23   ████████████████████████████████████████████

████████████

25

HIGHLY CONFIDENTIAL

Page 45

1    BY MR. COLLIER:

2        Q    ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

7                    MR. MCCALLUM:  Object to the form.

8                    THE WITNESS:  It really depends on how it's

9        implemented.  If the back end is flexible enough to

10       allow for the UX to force that change, that would be a

11       UX only change.

12                    I just -- I have not reviewed any code

13       related to the chat tool in this case, so I don't know

14       what the opportunity was here for Mr. or Ms. ████████

15   BY MR. COLLIER:

16       Q    Okay.  And when, in context, Mr. ████████ says:

17   ████████████████████████████████████████████████ it's

18   referring to the history on and history off setting, right?

19                    MR. MCCALLUM:  Object to the form.

20                    THE WITNESS:  I mean, I don't know for a

21       fact, but in the context of the conversations we've

22       reviewed, I could see that specifically focused on the

23       toggle on/off button.

24   BY MR. COLLIER:

25       Q    So when did Google, if you know, actually make

HIGHLY CONFIDENTIAL

Page 46

1    sure that the history on history off setting that a user

2    selects would stick?

3                    MR. MCCALLUM:  Object to the form.

4                    THE WITNESS:  I -- I don't believe I know as

5        I sit here.

6    BY MR. COLLIER:

7        Q    Can you give me your understanding of just the

8    overall framework of how a Google Chat would make its way to

9    the Vault, and then ultimately to Google's counsel to be

10   produced, if it was captured.

11              Can you kind of walk me through your understanding

12   of that?

13       A    Well, it would be very nontechnical understanding,

14   because I'm not a technical expert, and it, you know, I

15   stand behind a description or the characterization that I've

16   put into the background section of my expert report in this

17   case.

18              So if that's what you're interested, I'm happy to

19   recite that.

20       Q    Well, you say you're not a technical expert.  Can

21   you help me with what you mean by that?

22       A    I don't have a technical -- technological

23   understanding of how exactly things move.  I have a

24   understanding of the interpretation for the purposes of the

25   context in which I perform my analysis.

HIGHLY CONFIDENTIAL

Page 47

1          You know, like an example of which is what we

2    discussed when you first asked me about, you know, the

3    documents you put in front of me being e-mails versus I have

4    an understanding these are not actually e-mails but the way

5    that the Vault operates, so this is a level at which I feel,

6    you know, comfortable discussing the -- the -- sort of the

7    technical aspects, so to speak, of Google's, you know,

8    electronic communication preservation systems.

9          Q    So does that mean you did -- you have not reviewed

10   the code for Google Chats?

11         A    That's certainly correct.  I have not reviewed any

12   code in this case for Google Chats or any technology

13   products.

14         Q    Okay.  Do you know what programming language

15   Google Chats is written in?

16         A    I may have known at some point, but I don't

17   actually recall as I sit here.

18         Q    Do you -- I think I understand this answer to this

19   question, but I have to ask.

20              Did you review any code in this case for the

21   Google Vault?

22         A    I did not.

23         Q    Do you have any understanding as to what

24   programming language Google Vault is written in?

25         A    I do not know.

HIGHLY CONFIDENTIAL

Page 48

1        Q    Do you know how to program a Go, G-o?

2        A    I'm not an expert, but I've used it in the past

3    for work.

4        Q    As a -- as a user or a programmer?  I'm sorry.

5        A    As a consultant.  In my practice, I often code in

6    what I'll call the level five languages, so including in

7    statistical software, such as SAS data.  I also use and

8    teach Python.

9             I occasionally reference Go as well.  It's a very,

10   you know, straightforward programming language, similar to,

11   in many respects, UC, but I'm not an expert programmer.  I

12   never offer myself as such.  It's more of an inputting into

13   the work that I do professionally.

14       Q    Okay.  By the way, you saw that Jacob Hochstetler

15   wrote some code to do system analysis.  I promise you we're

16   going to talk about his analysis and your thoughts on that.

17            But simply focused on the code Jacob Hochstetler

18   wrote to perform his analysis, did you review and analyze

19   that code?

20       A    I have, yes.

21       Q    And did you -- you didn't put in your expert

22   report that there were any problems with his programming

23   language, as opposed to -- I understand you have problems

24   with his inputs and his conclusions; is that fair?

25       A    I mean, that's fair with just one caveat about the

HIGHLY CONFIDENTIAL

Page 49

1    description of the environment setup for one of his codes,

2    because it's a little more complex in terms of my own

3    attempts at running his code on the datasets that I've been

4    provided, but in terms of my identification of any issues

5    with either of his two codes, I have no -- no critiques of

6    those.

7         Q    Okay.  So I'd like to make sure I understand -- we

8    can discuss a hypothetical.

9              Now, I want you to assume with me, and for your

10   counsel's benefit, this is not a produced document, this is

11   just something we wrote up as a demonstrative.  I will mark

12   it as Exhibit 6.

13             I want you to assume with me a chat between

14   persons A and B, pre-February of 2023.

15             You want to just say January of 2023; does that

16   work?

17        A    Okay.

18        Q    All right.  And history is off for persons A and B

19   who are chatting.

20             Are you with me?

21        A    Yes.

22        Q    And person A says -- and I'll put A by this:  "You

23   know we have a monopoly in ad tech."

24             This is just a hypothetical, and person B, with

25   history off, both of them have history off, says:  "Yes, we

HIGHLY CONFIDENTIAL

```
                                              Page 50

  1    do."

  2             And then person A comes back and turns history on,

  3    and says:  "We have worked hard on our ad tech products.

  4             And person B says:  "Yes, we are the best."

  5             In that hypothetical, how many chats would be

  6    retained for the vault?

  7                  MR. MCCALLUM:  Object to the form.

  8    BY MR. COLLIER:

  9       Q    There's four chat lines.  How many would be

 10    retained for the vault?

 11                  MR. MCCALLUM:  Object to the form.

 12                  THE WITNESS:  So assuming that on the page

 13          you prepared we see four chats, if that's, you know, my

 14          correct interpretation of your drawing here, if these

 15          are any two Google users with the history off on the

 16          top, history on at the bottom, in my current

 17          understanding.

 18                  Again, this is nontechnical expert, is that

 19          the two messages on top would not be sent to the Vault,

 20          they would be sort of kept within the chat tool itself

 21          for 24 hours.

 22                  MR. COLLIER:  Okay.

 23                  THE WITNESS:  And then the two other messages

 24          would be sent to the Vault for preservation as of the

 25          time that you've indicated in January 2023.
```

HIGHLY CONFIDENTIAL

```
                                              Page 51
 1    BY MR. COLLIER:

 2        Q    So I wrote your initials, that you believe the

 3    first one wouldn't go to the Vault, and then the second one,

 4    based on this hypothetical, would, correct?

 5                   MR. MCCALLUM:  Object to the form.

 6                   THE WITNESS:  That's my general

 7          understanding.  I don't know if there would be any

 8          exception here.

 9                   But that, you know, to the extent if my

10          understanding here is consistent also with what I wrote

11          in my report, I stand behind it.

12                   MR. COLLIER:  Sure.

13                   THE WITNESS:  That's also not particularly a

14          subject of my opinions.  It's more of a background

15          understanding of how it works.

16    BY MR. COLLIER:

17        Q    Fair enough.

18             Now, let's, in this hypothetical -- you're not an

19    expert in antitrust in this case, right?  You're not

20    offering any antitrust expert opinions are you?

21        A    I'm certainly not, no.

22        Q    Okay.  But you do know antitrust.

23             You've spoken on antitrust before, right?

24        A    Yes.  I mean, I would consider myself

25    knowledgeable and occasionally also an expert witness in
```

HIGHLY CONFIDENTIAL

Page 52

1    antitrust matters.

2        Q    Okay.  So you don't even have to be an antitrust

3    expert to know in a hypothetical, if a Google employee said:

4    "You know we have a monopoly in ad tech," and the next

5    employee said:  "Yes, we do."  Generally speaking, that

6    would be relevant to the Court, the jury, the plaintiff, and

7    Google, as to antitrust liability in the case, right?

8                    MR. MCCALLUM:  Object to the form.

9                    THE WITNESS:  That, I don't know.  I'm not

10           that kind of an expert.  I'm an economist, so I

11           typically don't deal with like chat histories, so I'm

12           not sure.

13                    I guess it probably would depend on who the

14           individuals are and -- I don't know.  I mean, I

15           certainly have not seen these kinds of messages in my

16           review.

17    BY MR. COLLIER:

18        Q    You do realize as a plaintiff, Plaintiffs would

19    find it relevant that a defendant's employee admitted they

20    have a monopoly in ad tech, right, you can understand that?

21                    MR. MCCALLUM:  Object to the form.

22                    THE WITNESS:  I mean, I just really don't

23           know one way or the other.

24                    It may be, I'm just not an expert in -- in --

25           in documents.

HIGHLY CONFIDENTIAL

```
                                                    Page 53

 1   BY MR. COLLIER:

 2        Q    Well, you don't have to be an expert in documents,

 3   sir, if you know antitrust law.

 4             I just -- it seems to me like you're fighting a

 5   hypothetical that's not a real e-mail.  We can't agree that

 6   it might be relevant to an antitrust trust case in federal

 7   court, a Google employee saying:  "We have a monopoly in ad

 8   tech," and another with exclamation marks, saying:  "Yes, we

 9   do"?

10             MR. MCCALLUM:  Object to the form.

11             Calls for speculation.

12             THE WITNESS:  I apologize if I misspoke.  I'm

13        certainly not an expert in antitrust law.  I'm an

14        expert in antitrust economics, but certainly not law.

15   BY MR. COLLIER:

16        Q    Okay.  I just want -- we may play this tape for

17   the judge or the jury one day, and I just want to make sure

18   I understand that you're telling them, under oath, you don't

19   know whether a Google employee's saying:  "We have a

20   monopoly in ad tech," and another's saying:  "Yes, we do,"

21   with two exclamation marks.  You have no idea whether that

22   could possibly be relevant to an antitrust trust?

23             MR. MACCALLUM:  Object to the form.

24             Calls for speculation and a legal conclusion

25        and a hypothetical.
```

HIGHLY CONFIDENTIAL

```
                                                    Page 54

 1               THE WITNESS:  I really don't know.  I've

 2       never opined on the relevance or do not have expertise

 3       or --

 4               MR. COLLIER:  Okay.

 5               THE WITNESS:  It's not something that I do in

 6       my professional life.

 7  BY MR. COLLIER:

 8       Q    All right.  So whether it's relevant or not in

 9  your opinion, we can agree on, in this hypothetical in

10  Exhibit 6, when something -- when a couple of chats are not

11  sent to the Vault, that means they will not be preserved and

12  given to counsel in the lawsuit, right?

13               MR. MCCALLUM:  Object to the form.

14               THE WITNESS:  In my understanding, if they're

15       not sent to the Vault, then they would not be

16       preserved.  So they would disappear after 24 hours.

17               So that -- that I know, like what are some

18       other mechanisms or what else might happen between

19       counsels, that I cannot answer.

20  BY MR. COLLIER:

21       Q    Okay.  And conversely, you have an understanding

22  that the chat that would -- this hypothetical chat in

23  Exhibit 6 that would go to the Vault would include just the

24  last two chats.

25               "We've worked hard on our ad tech products, and,
```

HIGHLY CONFIDENTIAL

```
                                               Page 55
 1   yes, we are the best."
 2           That's what would be available to counsel, right,
 3   more than 24 hours later?
 4                MR. MCCALLUM:  Object to the form.
 5                THE WITNESS:  I don't know if it will be
 6       available to counsel.  I can tell you that from my
 7       understanding of, you know, the technical aspects of it
 8       that it will be preserved in Google system, so at least
 9       someone at Google, who's a -- who keeps track of the
10       Vault would have access to it for, you know, a
11       specified period of time, but what's available to
12       counsel, I cannot speak to that.
13                MR. COLLIER:  Well, that's fair.  So let me
14       go back and ask about the first part.
15   BY MR. COLLIER:
16       Q    These first two messages in Exhibit 6, just as a
17   technical matter, would not be available to the Google
18   Vault; is that fair, under this hypothetical?
19       A    Under your hypothetical, as of January 2023,
20   that's my understanding, yes.
21       Q    Okay.  All right.
22            I'm going to mark another demonstrative as Exhibit
23   7.
24            Okay.  This hypothetical, I want you to assume
25   it's pre-February 2023.  So we'll say January 2023, okay?
```

HIGHLY CONFIDENTIAL

Page 56

1      A    Okay.

2      Q    Same thing.  A and B with four texts, and I just

3   want to make sure nothing about the content of the text

4   changes any of your answers.

5           If history off is when Google Employee A says:

6   "You know we have a monopoly in ad tech."  In history --

7   excuse me, employee B says:  "Yes."  Exclamation points.

8   "We do."

9           Then Employee A says:  "When's the birthday

10   party?"  Or something, you know, grocery list, anything

11   non-substantive.

12           And the answer is:  "It's at noon."

13           But these are the parts where history was turned

14   on, we would have this not in the Vault, right, these top

15   two would not be in the Vault, but the bottom two messages

16   would, you know:  "When's the birthday party?"

17           "It's at noon."

18           Would have been retained and put in the Vault.

19   Whatever happens to it after the Vault I understand is a

20   different story, but they would be retained and in the

21   Vault, right?

22                MR. MCCALLUM:  And just to clarify.  This is

23       another hypothetical created by counsel, right?

24                MR. COLLIER:  As evidenced by the handwriting

25       and manila folder.

HIGHLY CONFIDENTIAL

Page 57

1              MR. MCCALLUM:  Object to the form.

2              THE WITNESS:  So, I mean, we'd have to -- so

3      I'd have to assume, you know, everything else stays

4      constant about the previous hypothetical.

5              MR. COLLIER:  Okay.

6              THE WITNESS:  The chats we've reviewed so far

7      seem to suggest that, you know, turning history on for

8      personal, I mean, the Googlers, in fact, really wanted

9      to have history off for personal messaging.

10             MR. COLLIER:  Okay.

11             THE WITNESS:  So it's -- you know, I have to

12     navigate the hypothetical versus also what we know

13     about the case, but in terms of just keeping in lanes

14     of your previous hypothetical, and the only adjustment

15     that we're making is replacing the final two of the

16     four messages, then I don't -- I don't believe that I

17     have any other information to think that those would

18     not be preserved in the same exact way as in the

19     previous hypothetical.

20     BY MR. COLLIER:

21     Q    So the birthday party and the noon messages would

22     be sent to the Vault, and they'd be preserved under this

23     hypothetical, right?

24     A    That's my understanding.  With all these caveats,

25     yes.

HIGHLY CONFIDENTIAL

Page 58

```
 1        Q    And then that preserved chat would no longer,
 2   would not have the monopoly in ad tech text, correct?
 3                   MR. MCCALLUM:  Object to the form.
 4                   THE WITNESS:  Bearing some other
 5        circumstance, if the history was off, those messages
 6        would not be sent to Vault, they would disappear after
 7        a 24-hour period.
 8   BY MR. COLLIER:
 9        Q    And then -- so it would be possible then for
10   Google to collect portions of chats, depending on all
11   pre-2023, February 2023, I should say, it's possible, if not
12   likely, that when Google preserves chats, some portions of
13   the chat may not be preserved, depending on the history
14   setting that was applicable for those chats, but then it may
15   come back on and it may go back off again if someone
16   switches it back off, right?
17                   MR. MCCALLUM:  Object to the form.
18                   THE WITNESS:  As a matter of technical
19        possibility, that's certainly possible, but I do point
20        in my report, as well as Professor Hochstetler points
21        to it, too, that it's a relatively rare occurrence.
22             So, for example, for the five individuals,
23        Professor Hochstetler and I actually analyzed, that
24        certainly was not a situation where the toggle was
25        turned on and off during the time period even before
```

HIGHLY CONFIDENTIAL

```
                                            Page 59

    1        February 2023.

    2                 So I think it's technically possible, but

    3        probably unlikely I would say, based on the documents

    4        and data that both Professor Hochstetler and I have

    5        reviewed.

    6    BY MR. COLLIER:

    7        Q    Yeah.  So let's take it in two pieces.

    8                 After February of 2023, the default setting would

    9    be history off for Google employees, correct?

   10                 MR. MCCALLUM:  Object to the form.

   11    BY MR. COLLIER:

   12        Q    Oh, excuse me.  The default setting would be on.

   13    No wonder you looked confused.  Let me start all over.

   14                 I should have done the earlier in time one first,

   15    but now I'm -- now I'm -- now I'm -- now I'm pot committed.

   16                 Do you know what pot committed means?

   17        A    I can infer.

   18        Q    It's a poker term.  Okay.  Here we go.

   19                 Can we agree that after February of 2023, the

   20    default setting for chats would be history on for Google

   21    employees, correct?

   22                 MR. MCCALLUM:  Object to the form.

   23                 THE WITNESS:  That is my understanding.  That

   24        the policy was implemented across all the Googlers,

   25        yes.
```

HIGHLY CONFIDENTIAL

```
                                              Page 60

 1    BY MR. COLLIER:

 2       Q    And the data you've analyzed would show you that

 3    rarely does a Google employee go switch that default

 4    setting, so your assumption, as evidenced by the data, would

 5    be that history is going to be on for the vast majority of

 6    Google employee's chats after February of 2023, because of

 7    the default, right?

 8                MR. MCCALLUM:  Object to the form.

 9                THE WITNESS:  Not -- not necessarily, I would

10        not have as broad of a conclusion.

11                So my conclusion is more limited to the -- to

12        the data for the actual individuals that I have access

13        to, and Professor Hochstetler has analyzed as well, to

14        look whatever there is actually indicia at least for

15        these five that the switching of on and off would

16        likely be the case.

17                But I have not analyzed data for all the

18        Googlers, so I don't know.

19                I have also analyzed the record from

20        deposition testimonies that specifically talked to the

21        patterns of switching history on and off, and those

22        were not indicative of there being a pattern of using

23        the toggle in some sort of a substantial and frequent

24        manner.

25                So those are the two pieces of information I
```

HIGHLY CONFIDENTIAL

Page 61

1        have, so that's the conclusion I can make about those

2        particular individuals.

3    BY MR. COLLIER:

4        Q    Okay.  I -- I must -- I'm not trying to trick you.

5    I think we're in agreement on this, but let me try it -- let

6    me see if I can state it a better way and see if we reach

7    agreement.

8            Would you agree with me, based on the five

9    employees' data as part of the Epic hold, that there is

10   little indicia that, at least those Google employees,

11   switched history on or off very often, they stayed with the

12   default, right?

13       A    Right.  So for those five individuals, it's not

14   just indicia, so for the five individuals, both Professor

15   Hochstetler and I can say with certainly that for the period

16   of the log dataset, they, in fact, did not do that, so we

17   know that for certain.

18       Q    And it -- and it goes both ways, right?

19           When the history was defaulted to off, you don't

20   see a lot of indicia of many turning it on, and when the

21   history is defaulted to on, you don't see a lot of indicia

22   of turning it off, right?

23       A    Well, that is not exactly correct.  It's

24   approximate.

25           So in the dataset of Professor Hochstetler and I

HIGHLY CONFIDENTIAL

Page 62

1    have analyzed, we actually see evidence, even before

2    February of 2023, of other Googlers switching the history

3    on, but it's not the five individuals who do switch the

4    toggle.

5              Now the rate of switching the history on is

6    relatively de minimis as both Professor Hochstetler and I

7    observed, but it is there.

8              So some communications were, in fact, preserved

9    for the five custodians, subject to the -- as you called it,

10   the Epic log, prior to February 2023.

11        Q    Right.  I wasn't trying to get you to say all or

12   none.  That wasn't my intention.

13             I thought I asked the question in a way, but you

14   said -- so let me use your wording and make sure I'm

15   understanding.

16             From your study of the Epic log, you and Professor

17   Hochstetler do agree that the rate of switching history on

18   is relatively de minimis, right?

19                  MR. MCCALLUM:  Object to the form.

20                  THE WITNESS:  Correct.  I'll agree with that,

21        based on the data we've reviewed, yes.

22   BY MR. COLLIER:

23        Q    Okay.  And for the jurors who didn't study

24   economics or Latin or go to law school, de minimis means

25   what?

HIGHLY CONFIDENTIAL

Page 63

1      A      Minimal, but not zero.

2      Q      Less than 5 percent?

3      A      It -- it could be.  It depends on context.

4             Here, the numbers would be on that order of

5      magnitude, yes, that's correct.

6      Q      So just talking rough orders of magnitude.  I'm

7      not asking for specifics, and we'll get more into specifics

8      later.

9             If less than 5 percent of the chats had someone

10     switching history to on prior to February of 2023, that

11     would indicate generally rough numbers, that 95 percent of

12     the chats would have not gone to the Vault and 5 percent-ish

13     or less would have gone to the Vault prior to 2023,

14     February 2023?

15                    MR. MCCALLUM:  Object to the form.

16                    THE WITNESS:  I think the context of the

17         hypothetical and the five custodians in particular

18         during the log period, I would agree with that.

19     BY MR. COLLIER:

20     Q      So there's no way for us to tell the contents, as

21     far as you -- and I know you're not giving a technical

22     expert opinion, but based on what you know, there is no way

23     to know what's in the 95 percent of the chats that didn't go

24     to the Vault prior to February of 2023, is there?

25                    MR. MCCALLUM:  Object to the form.

HIGHLY CONFIDENTIAL

Page 64

1                    THE WITNESS:  So, right.

2                    As I sit here, I'm not aware of any other

3          tool that would look at the ephemeral messages that

4          disappear after 24 hours.

5                    If it exists, I just haven't been made aware

6          of it.

7     BY MR. COLLIER:

8          Q    And you said "ephemeral."  What do you -- can you

9     tell the jury what ephemeral means?

10         A    Within the Google Chat logs, there's a specific

11    reference to ███████████████████████████████

██ ████████████████████████████████

██ ██████████████████████████████████

██ ████████████████████████████████

██ █████████

16         Q    And what I really meant was, ephemeral means it

17    goes away, right, wispy, ghost, goes away?

18                    MR. MCCALLUM:  Object to the form.

19                    THE WITNESS:  Sure.  Whatever the synonyms

20         might be in the Webster dictionary.

21    BY MR. COLLIER:

22         Q    Well, I haven't looked them up, do you have any?

23         A    I do not specifically, no.

24         Q    Ephemeral means nontangible, nonpermanent.  We can

25    agree on that, right?  Nonpermanent because it's the

HIGHLY CONFIDENTIAL

Page 65

1    opposite of what you call permanent, right?

2        A    Right.  That's fair.

3            I mean, I'm not a linguistics expert, but in

4    common parlance, I would say yes.

5        Q    Okay.  I'm able to skip a few documents, so give

6    me just a moment, I promise this is in your best interest.

7            Okay.  I'm going to hand you what I'm marking as

8    Exhibit 8.  It's double-sided printed, so you have to flip

9    it over.  I wasn't sure why we did that.

10           And, for the record, Exhibit 8 is GOOG-AT-MDL-B-

11   4067793 through 94.

12               MR. MCCALLUM:  Is this a complete document?

13           It appears to be missing some of the header that we've

14           seen on prior documents.

15               MR. COLLIER:  Oh, I removed the metadata,

16           which had on the back of the first page.  So let me

17           give you a complete exhibit that was -- I was just

18           trying to not give you the metadata because it didn't

19           matter.

20               Can I have that back and I'm going to give

21           you a complete exhibit?

22               Thank you, Mr. McCallum, for pointing that

23           out.

24               So I hereby give you Exhibit 8 to which would

25           be the Bates Number 4067792 through 94.

HIGHLY CONFIDENTIAL

Page 66

```
 1              And then I have yours.  Sorry for the
 2      confusion.
 3  BY MR. COLLIER:
 4      Q    Tell me when you've had a chance to read that.
 5      A    Okay.
 6      Q    All right.  This appears to be a chat from March
 7  of 2020; is that fair?
 8              Oh, excuse me, March of 2017.
 9      A    I would agree with your first dates, so March of
10  2020, but I think it spans March 17th, maybe through --
11  yeah, it says March 17th of 2020, that would be my --
12      Q    Oh, I --
13      A    -- my interpretation of the timestamps.
14      Q    I think you are correct.  I apologize.
15              Okay.  March of 2020.
16              So do you see here in the very beginning of the
17  chat, an individual -- I'll presume female, although maybe I
18  shouldn't, ██████████, says: ████████████████████████
    ██ ████████████████████████████████████████████
20              Do you see that?
21      A    I see that statement.  Or question, yes.
22      Q    And then her next sentence is:  ████████████████
    ██ ████████████████████████████████  Right?
24      A    I see that question as well, yes.
25      Q    And what do you understand a pub to be in the
```

HIGHLY CONFIDENTIAL

Page 67

1    context of this lawsuit?  Not in the context of an English

2    drinking establishment.

3         A    I'm not sure exactly.  I could guess maybe

4    publications, but that would be a guess, I'm not sure.

5         Q    Are you aware that this antitrust suit involves

6    advertisers and publishers?

7         A    Generally.  So if you're representing that this

8    refers to publishers, I have no reason to disagree, but I

9    don't know.

10        Q    Well, what do you understand this lawsuit to be

11   about?

12        A    It's a very general understanding of -- there are

13   various antitrust and unfair competition, both federal and

14   state-based claims against Google's -- part of Google's

15   business related to advertising technologies.  That's sort

16   of the -- what my general understanding is.

17        Q    In what ways does this relate to Google's business

18   as related to advertising technologies, the case?

19        A    I would speculate.  I mean, I've reviewed the

20   complaint, it's -- early on, so about maybe, you know, a

21   month and a half ago, but I don't have a specific

22   recollection as to the specific, you know, products or

23   issues, that's not something I -- I've studied in this case.

24        Q    Do you know of any competitors to Google in the ad

25   tech space?

HIGHLY CONFIDENTIAL

Page 68

1      A    Not specifically.  I haven't studied that market.

2      Q    Okay.  I want you to assume with me, and I will

3  represent to you that pubs means publishers.

4           Can you do that?

5      A    Yeah.  If you represent it to me, sure, no

6  problem.

7      Q    I'm sure your counsel would be objecting if he

8  thought it meant something else.

9           Okay.  You understand as an antitrust economist

10  that a Google employee talking about ████████████████

██      ██████████ could be relevant to this lawsuit, right?

12              MR. MCCALLUM:  Object to the form.

13              THE WITNESS:  I mean, I see that this

14      particular document has been produced, so, I mean, that

15      would be one inference, but I don't have an independent

16      knowledge, again, of the relevance of documents.

17  BY MR. COLLIER:

18      Q    Okay.  If we look at the second page of this

19  document, 793.

20           Halfway down, ████████████ is now talking about

21  ████████████.

22      A    I'm sorry.

23      Q    If we could also go up to the previous two.  Yeah,

24  there we go.

25           Where she starts talking about more on ██████████

HIGHLY CONFIDENTIAL

Page 69

1    ██████████████████████████.  About a little less than

2    halfway down the page.

3         A    I see that, yes.

4         Q    Okay.  Do you have any understanding of what ██████

5    █ ████████████████████?

6         A    I really don't.  I have no understanding of

7    that --

8         Q    Okay.

9         A    -- lingo, no.

10        Q    Do you have any understanding of what a ████████

11   █ ██████ is?

12        A    It's not a phrase I'm familiar with.  I'm not sure

13   what this is referencing, especially in the context of plat

14   versus off.

15             I -- I cannot even guess, actually.

16        Q    Okay.  So if we turn now to the last page, there's

17   a discussion about ████████████████████████████████████

18   ███████.

19             Do you see all that?  Or do you see that sentence

20   I should say?

21        A    Okay, I see it now.

22        Q    And before that, there's a reference by █████████

23   █ ████████████████████████████.

24             Do you see that?

25        A    Okay.  I see it.

HIGHLY CONFIDENTIAL

Page 70

```
 1        Q    Okay.  After there's some conversation about
 2    ████████████████████, I want you to scroll down to where
 3    ███████████ says:  ██████████████████████████████████
      ███████████████████████████████████████████████████████
      ████████████████████
 6             Do you see that?
 7        A    I do see that sentence, yes.
 8        Q    And then 19 seconds after ████████████ says:  ██████
      ██████████████████████████████████████████████████████████
10    what's his next phrase?
11        A    OMFG.  I think that's the next one.
12        Q    And what does OMFG mean?
13        A    I assume it's oh, my, something, God.  But I don't
14    know -- I don't know ██████████████, so I don't know what he
15    used for F.
16        Q    Okay.  But you -- you -- you know and I know the
17    OMG is:  Oh, my God with an F word as the descriptor, right?
18        A    Most likely.
19        Q    Most likely.  You got a good hunch on what that F
20    word might be?
21                  MR. MCCALLUM:  Object to the form.
22                  THE WITNESS:  I have some guesses.
23    BY MR. COLLIER:
24        Q    Does it resemble the word "fire truck," it begins
25    with an F, ends in UCK, maybe an ING?
```

HIGHLY CONFIDENTIAL

```
                                                    Page 71

  1                MR. MCCALLUM:  Object to the form.

  2                THE WITNESS:  I was certainly hoping for an

  3        ING version.

  4   BY MR. COLLIER:

  5        Q    And then after he says:  "OMFG," five seconds

  6   later, what does he say?

  7        A    "History is on, Jesus."  With lower capital Jesus.

  8        Q    And then he sighs, though he types out sigh.

  9   Right?

 10        A    Right.  49 seconds later, yes.

 11        Q    Yeah.  Thought about it a little while.

 12                Where's the rest of this chat?  Scroll down.

 13   Where's the rest of this chat?

 14                MR. MCCALLUM:  Object to the form.

 15                THE WITNESS:  I don't know if there is

 16        anything after this, so I -- I have -- this is the

 17        first time I'm seeing this chat.

 18   BY MR. COLLIER:

 19        Q    Sure.  I understand.

 20                And you understand,  ███████  , as soon as he

 21   realized history was on, this chat came to a complete halt,

 22   as least as produced, right?

 23                MR. MCCALLUM:  Object to the form.

 24                THE WITNESS:  Based on the document that you

 25        gave me, that certainly appears to be the case, but I
```

HIGHLY CONFIDENTIAL

Page 72

1        don't know.

2    BY MR. COLLIER:

3        Q    Okay.  Do you draw the impression from this

4    exhibit that maybe ████████████ didn't want this

5    conversation about ████████████████████████████████

6    ████████████████████████?

7                    MR. MCCALLUM:  Object to the form.

8                    THE WITNESS:  I'm not sure.  I mean, clearly

9            this document has been produced and the history was on,

10           so you'll have to ask ██████████ specifically.

11                   I'm not sure.

12   BY MR. COLLIER:

13       Q    Does it impact your expert opinion in any way if

14   there is evidence that Google employees, when they knew

15   history was on, ceased chatting and, say, picked up the

16   phone and continued the conversation?

17                   MR. MCCALLUM:  Object to the form.

18                   THE WITNESS:  I mean, I lay it out in my

19           expert report, but in the -- in the context of a

20           conversation like this one, I understand that as of

21           2020, there was a specific policy that guided

22           communications for folks who are on hold.

23                   And while I don't recall ████████████

24           specifically, at least Ms. Pappu, who's also on the

25           chain, would have been part of the litigation hold, so

HIGHLY CONFIDENTIAL

Page 73

1          she would have received specific communications about

2          what kind of Chat messages should be preserved versus

3          shouldn't.  So that's the context in which I analyzed

4          the data more generally.

5                    For this specific communication, I cannot

6          tell you if it continued or not, but it's not

7          inconsistent, in my mind, with the policy since it has

8          been produced.

9    BY MR. COLLIER:

10        Q    Right.  One reason it was produced is because

11   ██████████    didn't know he was chatting with history on,

12   right?

13                  MR. MCCALLUM:  Object to the form.

14                  THE WITNESS:  I -- I cannot tell you that,

15        whether that's the reason.

16   BY MR. COLLIER:

17        Q    Is that a reasonable inference?

18                  MR. MCCALLUM:  Object to the form.

19                  THE WITNESS:  I -- I mean, I assume more so

20        it had to do something with the agreement between the

21        parties in this case as to what documents or chats

22        should be produced, but I -- again, I'm not an expert,

23        I don't actually know exactly what the -- what the

24        process was specifically for production.

25                  MR. COLLIER:  I'm going to hand you what we

HIGHLY CONFIDENTIAL

Page 74

1        are marking Exhibit 9; is that correct?  Is that 8?

2                  THE WITNESS:  I have 8.

3    BY MR. COLLIER:

4        Q    Okay, good.  Exhibit 9.

5             Ask you to review this.  And for the record, it is

6    GOOG-AT-MDL-B-4439513 to 9515.

7        A    Okay.

8        Q    Okay.  Looking at Exhibit 9.  First page.

9             Do you understand on the -- well, first of all, is

10   this a chat from November of 2021, as best you can tell?

11       A    Yes.  All the messages, the original messages are

12   dated November 19th, 2021.

13       Q    And can you see on the first page, the very first

14   message says -- the first substantive message, there's some

15   updated room membership.  Do you see that?

16            You don't understand that to be anyone typing that

17   out, right, that's the system saying somebody joined or

18   dropped, right?

19       A    That's fair.

20       Q    Okay.  The very first substantive message here is

21   from ██████████

22            Do you see that?

23       A    I do.

24       Q    And how does his -- can you read his sentence he

25   wrote there?

HIGHLY CONFIDENTIAL

Page 75

```
 1        A    It says:  ███████████████████████
    ██  ████████████████████████████
 3        Q    So what Chat message is he referring to when he
 4   says -- or she, when he says:  "In comparison"?
 5                    MR. MCCALLUM:  Object to the form.
 6                    THE WITNESS:  Well, based on this document, I
 7        cannot tell.
 8   BY MR. COLLIER:
 9        Q    Right.  It appears from the face of this produced
10   document that there were prior Chat messages that were not
11   retained, right?
12                    MR. MCCALLUM:  Object to the form.
13                    THE WITNESS:  I'm not sure.  I couldn't tell
14        you.
15   BY MR. COLLIER:
16        Q    From context, when the very first substantive
17   message is:  "In comparison," does it lead you to believe
18   that there might be other Chat messages that were not
19   preserved?
20                    MR. MCCALLUM:  Object to the form.
21                    THE WITNESS:  I really don't know one way or
22        the other.  I mean, there's all sorts of possibilities.
23                    I would just speculate.
24   BY MR. COLLIER:
25        Q    Okay.  One possibility is, as we discussed before
```

HIGHLY CONFIDENTIAL

Page 76

1   when we were looking at Exhibit 7 and Exhibit 6

2   hypotheticals, that there were some messages that had

3   history off, and then ███████ November 19th, 2021 message,

4   11:39:42 was the first message that was sent with history

5   turned on.

6           That could happen, right?

7       A    It's technically possible, but I don't know.  I

8   mean, there's -- there's many different possibilities here.

9           I just really don't know.

10      Q    What's the other possibility?

11      A    Well, I mean, this is clearly a group chat, so

12  it's possible that it's connected to, for example, a video

13  conference call, or just the content is actually being

14  spoken on the call, and then some folks are live typing in

15  messages, I mean, the timestamp here is UTC, so that seems

16  like a reasonable time of the day in the U.S., at least.

17          So I just don't know.  I mean, I can speculate,

18  but I really don't know.  I mean, I think you'd have to ask

19  the individuals here what exactly happened.

20      Q    So if we go down to the very -- near the bottom

21  where it says: ████████████████████ -- excuse

22  me -- ████████████████████████

    ███ ████████████████████

24          You know what WRT stands for, right?

25      A    Well, I typically use it to mean with respect to.

HIGHLY CONFIDENTIAL

Page 77

1      Q      Yeah.  Or with regard to, I've used it.

2      A      Or for example, yes.

3      Q      Okay.  So as someone who's given antitrust

4   economic testimony, you're aware that market share is

5   generally an important topic in antitrust cases, right?

6                  MR. MCCALLUM:  Object to the form.

7                  The witness has testified that he didn't

8          study the markets in this case.

9                  MR. COLLIER:  I'll object to the coaching of

10         the witness.

11  BY MR. COLLIER:

12     Q      I'm just asking generally.  Is market share a part

13  of antitrust?

14                 MR. MCCALLUM:  Object to the form.

15                 THE WITNESS:  Typically, my experience, yeah,

16         that's one of the -- one of the concepts that

17         economists study.

18  BY MR. COLLIER:

19     Q      Looking to see basically whether or not someone

20  may have monopoly power, for example, right?

21                 MR. MCCALLUM:  Object to the form.

22                 THE WITNESS:  I mean, that's certainly one

23         context in which market shares are studied, yes.

24  BY MR. COLLIER:

25     Q      Okay.  So now let's continue on in this chat.

HIGHLY CONFIDENTIAL

Page 78

```
 1              On the next page, the top of the next page, which
 2     is Bates Number 514, sent -- an individual named ████████
 3     ████████████████████████████.
 4              It says:  ███████████████████████████████████████
 █     ███████████████████████████████
 6              Do you know to ███ is?
 7        A    I do not, no.
 8        Q    Do you know what ███████████████████ means?
 9        A    I do not.
10        Q    Okay.  So we continue down, and then ████████
11     says -- the question is:  ███████████████████████████████
 █     ████████████████████████████████
13              Do you see that?
14        A    I do see that.
15        Q    And then the very next comment is:  ██████
 █     ██████████████  "Quick aside, do we want history on"?
17        A    I see that, yes.
18        Q    And what was the answer to that question?
19        A    No.
20        Q    No, in all caps, right?
21        A    Yes.  No is capitalized, both letters.
22        Q    Okay.  So after ████████ says:  "No," in all caps,
23     what is the next message by a Google employee?
24        A    That would be from ███████████████.  It says:
25     "History is on.  I suggest everyone leave the room and
```

HIGHLY CONFIDENTIAL

Page 79

1    create a new one with history off.  I am happy to punt

2    everyone out."

3         Q    And then what happened?

4         A    It looks like a -- my copy's a little hard to

5    read, but it looks like a thumbs up emoticon.

6         Q    Right.  And then if we go to the next page, once

7    he got the thumbs up, what did tris say?

8         A    He says:  "Okay.  Booting everyone now."

9         Q    So if ███ was telling the truth, then everyone

10   left this chat room where history was on and he created a

11   new one with history off; is that fair?

12                   MR. MCCALLUM:  Object to the form.

13                   THE WITNESS:  Yeah.  I don't know what

14        happened.  I mean, even if what ███ says is intended

15        truth, I don't -- I have no knowledge of what happened

16        after -- I just don't know.

17   BY MR. COLLIER:

18        Q    Well, one thing this does tell us is that at least

19   some Google employees knew how to wire around a history on

20   chat room, right?

21                   MR. MCCALLUM:  Object to the form.

22                   THE WITNESS:  I apologize.

23                   What was the word that you used in your

24        question?

25                   MR. COLLIER:  Wired around.  They did --

HIGHLY CONFIDENTIAL

```
                                                    Page 80
 1          well, let me ask it this way, because that may be a

 2          phrase that, you know, isn't used elsewhere.

 3     BY MR. COLLIER:

 4          Q    One thing we know from this is when Google

 5     employees, in this particular chat realized history was on,

 6     they came up with a plan to boot everyone out of that room

 7     and open a new chat room with history off, right?

 8                    MR. MCCALLUM:  Object to the form.

 9                    THE WITNESS:  Again, I really do not have

10          like -- certainly not personal knowledge, but even from

11          the context around these documents, I don't -- I don't

12          know -- I cannot tell you one way or the other.

13                    I mean, this is the first time I'm seeing

14          this document, and I don't know if there's anything

15          else in the context of it or if these individuals were

16          deposed and said something else.

17                    I -- as I sit here, I have not reviewed that

18          testimony and I have not seen, you know, their other

19          chats.  I just simply don't know.

20     BY MR. COLLIER:

21          Q    Okay.  But what you do know from this chat, if we

22     can go to the history.

23                    What you do know is ███ told everyone:  "History

24     was on," right?

25          A    Yes.
```

HIGHLY CONFIDENTIAL

```
                                              Page 81
  1        Q    You know that ▇▇▇ suggested everyone leave the
  2   room and create a new room with history off, right?
  3                 MR. MCCALLUM:  Object to the form.
  4                 THE WITNESS:  This sentence says that, yes.
  5   BY MR. COLLIER:
  6        Q    We also know that he got a thumbs up from ▇▇▇▇
  7   right?
  8                 MR. MCCALLUM:  Object to the form.
  9                 THE WITNESS:  Yes.
 10   BY MR. COLLIER:
 11        Q    And after getting a thumbs up from ▇▇▇▇▇▇,
 12   ▇▇▇ said:  "Booting everyone now."
 13        The first part of the plan, right?
 14                 MR. MCCALLUM:  Object to the form.
 15                 THE WITNESS:  Yes.  I see that.
 16   BY MR. COLLIER:
 17        Q    And after ▇▇▇ booted everyone from the chat room
 18   with history on, there is no more chat contained within at
 19   least this Chat message, correct?
 20                 MR. MCCALLUM:  Object to the form.
 21                 THE WITNESS:  Yes, at least on this document,
 22        yes, that's correct.
 23                 COLLIER:  Okay.  Thank you.  You can put that
 24        to the side.
 25                 MR. MCCALLUM:  We've been going just over an
```

HIGHLY CONFIDENTIAL

```
                                                    Page 82
 1        hour, Counsel, so whenever there's a convenient
 2        opportunity for a break.
 3                  MR. COLLIER:  We'll take a break right now.
 4        Sorry, I didn't notice.  Unless you want to keep going.
 5                  THE WITNESS:  I'm happy to take a break.
 6                  MR. COLLIER:  We'll do it.
 7                  THE VIDEOGRAPHER:  The time right now is
 8        11:28 p.m.  We are off the record.
 9                  (Recess taken at 11:28 p.m.)
10                  THE VIDEOGRAPHER:  The time right now is
11        11:52 a.m.  We are back on the record.
12    BY MR. COLLIER:
13        Q    Mr. Malkiewicz, I'm handing you what we are
14    marking as Exhibit 10.  And it is GOOG-AT-MDL-B-4584048 to
15    049.
16             Just let me know when you've taken a look at that.
17        A    Okay.
18        Q    All right.  Would you agree with me that -- is
19    this Exhibit 10?  I'm sorry.
20        A    10, yes.
21        Q    Would you agree with me that Exhibit 10 shows
22    Google employees confused about the effect of history on and
23    history off?
24                  MR. MCCALLUM:  Object to the form.
25                  THE WITNESS:  I'm not sure.  I mean, this
```

HIGHLY CONFIDENTIAL

Page 83

1        appears to be another conversation between people -- or

2        Google employees who are -- seem to be, you know,

3        technically involved in the chat tool.

4                So, certainly, they're discussing updates to

5        it, but I -- that's all I can see from the context of

6        this message.

7    BY MR. COLLIER:

8        Q    All right.  If we look at the bottom of the first

9    page, there's an individual, it's long,

10   ███████████████████████████████████████████████.

11       I know I'm mangling their name, and I apologize to

12   them if they ever read this, but can you see where that

13   person makes his or her first comment in the chat?

14       A    I do see that, yes.

15       Q    So, first, she's quoting a question from ██████

█    ██████, or a comment from ██████████, where █████ says:

17   "Also, a lot of times even after history on, old chats are

18   unavailable."

19                Do you see that?

20       A    I see that.

21       Q    And do you understand the next two -- three

22   sentences to be from ███████████ to be answering that

23   comment or addressing that comment?

24       A    That's what it appears.

25       Q    Okay.  So ██████████ says, in response to --

HIGHLY CONFIDENTIAL

Page 84

1    even after "history on, old chats are unavailable," that's

2    because it retains chat conversation that occur after

3    turning the history on.  It doesn't retain anything from

4    before.

5            Do you see that?

6        A    I do see that.

7        Q    Is -- is that basically saying what we talked

8    about when we did the hypotheticals, Exhibit 6, Exhibit 7,

9    where some chats would not be retained because history was

10   off when they were sent and some chats would be retained

11   because history was turned on?

12               MR. MCCALLUM:  Object to the form.

13               THE WITNESS:  I mean, it's consistent with my

14        understanding and I believe with what we've discussed

15        so far.

16   BY MR. COLLIER:

17       Q    And the next sentence says:  "Ideally, it should

18   retain everything."

19            Do you see that?

20       A    I see the sentence, yes.

21       Q    Do you know as a technical issue whether Google

22   Chats and Google Vault had the ability, technically, to

23   retain all chats, including those that were sent while

24   history was off, after someone turns history on?

25            Or put more plainly, could Google have retained

HIGHLY CONFIDENTIAL

Page 85

1    everything?

2                   MR. MCCALLUM:  Object to the form.

3                   THE WITNESS:  I don't know for a fact.  I can

4        only infer from the policy that's been implemented

5        after February 8th of 2023, which in my understanding

6        for a period of time Google was able to send to Vault

7        all the chats with history on, but I'm -- I have no

8        information or knowledge of what was possible or not in

9        April of 2022.

10   BY MR. COLLIER:

11       Q    Okay.  And when you say Google was able to send to

12   the Vault -- can we go back to the Elmo?

13                  Do you remember Exhibit 7, our hypothetical?  I'm

14   showing it again, where it says -- where we have the chain

15   here, where some chats were history off, some were on.  We

16   agreed history off doesn't go to the Vault, history on

17   would.

18                  The question I want to make sure I'm asking

19   correctly is:  In this scenario, prior to 2023, did Google

20   have the technical ability, when history was turned on "on"

21   this third chat, to collect chats 1 and 2?

22       A    Well, so the hypothetical is a little difficult

23   for me to conceptualize within the policy after 2023.

24                  The reason I say this is because with the policy,

25   the way it was implemented in my understanding after

HIGHLY CONFIDENTIAL

Page 86

1    February of 2023, if that same policy was implemented

2    before, where certain users simply did not have the ability

3    to switch the history to off, then your hypothetical would

4    never be a situation to begin with, right, because certain

5    users would simply, even if they tried, they wouldn't be

6    able to switch the history on.

7            So in that sense, every message would have been

8    retained, but I don't know for a fact that Google had the

9    technical ability to implement its 2023 post-February policy

10   earlier.

11           So that's the best I can -- I can answer that

12   question as I sit here.

13   Q    Did you read the deposition of ███████?

14   A    I have, yes.

15   Q    Did you read where I asked ███████ -- let me --

16   let me back up and start that over again.

17           I'm actually going to put up Exhibit 6.  It's the

18   same thing, just different words on the text, but it's

19   easier to point to.

20           Look at that.

21           Our demonstrative Exhibit 6, if this said:  "March

22   of 2023," so we get past February, or what date in February

23   it was, but, you know, the current world.

24           Is it your understanding that all four of these

25   messages, if sent in March of 2023, would have gone to the

HIGHLY CONFIDENTIAL

Page 87

1    Vault?

2         A    Well, so in my understanding, after February 2023,

3    all of the agreed custodians by the party, as well as all of

4    the other Google employees who were put by Google on

5    litigation holds, whether they're approved or agreed to

6    custodians or not, those individuals would never be in this

7    hypothetical because they had no option to be able to use

8    the chat with the history off setting.  Even if some other

9    Google employees tried to change the chat into off, they

10   wouldn't be able to do it with those individuals.

11            So that's my understanding of how the policy was

12   implemented, given the technical limitations that ▮▮▮▮

13   outlined in the deposition that you took.

14        Q    What do you mean "the technical limitations ▮▮▮

▮▮   ▮▮▮▮ outlined?"  You mean the 100 hours of coding work that

16   they'd have to do?

17                 MR. MCCALLUM:  Object to the form.

18                 THE WITNESS:  Correct.  Implemented the way

19        it was implemented.

20                 So, to make it clear, the change that took --

21        that particular effort did not solve the issue of the

22        pre-February 2023 of solving the issue of ephemeral

23        messages with history off being sent to Vault.  That's

24        my understanding based on the deposition testimony.

25                 Again, as, you know, reading for context

HIGHLY CONFIDENTIAL

Page 88

1          rather than as a technical reading of it.

2     BY MR. COLLIER:

3          Q     So do you recall when I deposed ████████ that

4     Google has had, for years, a version of Google Chat designed

5     for the financial industry?

6                    MR. MCCALLUM:  Object to the form.

7     BY MR. COLLIER:

8          Q     Do you recall this testimony?

9          A     Vaguely.  Not specifically, but I recall some

10    discussion around it.

11         Q     Do you recall that ████████████████████

████    ████████████████████████████████████████████

████    ████████████████████████████████████████

████    ██████████████████████████████

15                    MR. MCCALLUM:  Object to the form.

16                    THE WITNESS:  It sounds familiar, but it's

17         been -- I have not reviewed that section of ████████

18         testimony, but it does not sound surprising to me.

19    BY MR. COLLIER:

20         Q     Do you ever work in the FINRA financial space, in

21    your testimony, in your consulting?

22         A     In my consulting, yes.

23         Q     And are you generally aware that in FINRA, there's

24    some strict obligations to keep documents among companies in

25    that space?

HIGHLY CONFIDENTIAL

Page 89

1       A    I'm not familiar with that part of the industry,

2    no.

3       Q    Are you aware as we sit here of any reason that

4    Google couldn't have used ████████████████████████

     ████████████████████████████████████████████████████

     ████?

7                 MR. MCCALLUM:  Object to the form.

8                 THE WITNESS:  I have no knowledge of one way

9           or the other.  I believe I do know that Google itself

10          is not part of FINRA, so it's not regulated by it, but

11          I don't know if -- what Google could or could not do.

12    BY MR. COLLIER:

13      Q    All right.  I'm handing you what I have marked as

14    Exhibit 42 -- excuse me, Exhibit 11.

15                It will be GOOG-AT-MDL-B-8033073 to 3076.

16      A    Okay.

17      Q    All right.  Looking at the first page of this

18    chat, had you reviewed this chat before today, by the way?

19      A    I had not, no.

20      Q    Okay.  Looking at the very first line by ████████

21    he says:  "30 days seems far too short."  And then:

22    "████████████████████████ is the alias to raise this up

23    to."

24                That doesn't seem like the first message in this

25    chat, does it?  From context, I mean?

HIGHLY CONFIDENTIAL

```
                                                       Page 90
  1        A    I do not know.  I mean, this is, again, output

  2    from Vault, so I'm not sure if there's an additional

  3    document simply split because of the 24-hour period, but on

  4    this document, I'm not even sure where this message was

  5    specifically posted, because it's threaded, so --

  6        Q    Right.

  7        A    It's possible that it's posted to some group, I'm

  8    not sure.

  9        Q    Well, wherever -- I'm sorry.  I don't mean to

 10    interrupt.  If you were done.

 11        A    No.  So for this particular conversation, that's

 12    where it starts.  That's what it appears, given the way the

 13    Vault keeps and outputs the --

 14        Q    Right.  The retained version of this chat starts

 15    with this, but it would appear from context that there's

 16    some exchange that's not present in this document, right?

 17                    MR. MCCALLUM:  Object to the form.

 18    BY MR. COLLIER:

 19        Q    No one just starts a conversation with "30 days

 20    seems far too short" out of the blue, do they?

 21        A    Well, so my comment is that based on this document

 22    alone, one cannot tell whether there isn't another Bates

 23    stamp document with the previous message being sent 24 hours

 24    previously that would be output by vault as a separate

 25    conversation, but the way we're using the word
```

HIGHLY CONFIDENTIAL

Page 91

1    "conversation" here, you could connect it to documents.  So

2    based just on this alone, I don't -- I don't know.

3        Q    And another possibility is just like Exhibit 6,

4    our hypothetical -- and I'll just hold it up, I won't put it

5    on the Elmo.

6            Our hypothetical, there could be some messages

7    that were sent with history off, this being February of

8    2022, that just didn't get retained, right?

9        A    I think it's technically possible, but my point is

10    I just don't know.

11        Q    That's fair.

12            So after ████ says:  "30 days seems far too

13    short," can you scroll down a little bit?

14            And you say -- ████ says:  "When you say 30

15    days is too short, why is that too short for 1-1s?"

16            Do you understand that to be one-on-ones?

17        A    I do.

18        Q    And then someone else jumps in, ████████ and

19    says:  "Because chat is not ephemeral, it remains

20    potentially useful forever."

21            Do you agree that chats can remain potentially

22    useful forever for Google employees?

23                MR. MCCALLUM:  Object to the form.

24                THE WITNESS:  I do not know about Google

25        employees.  I see that -- what that particular Googler

HIGHLY CONFIDENTIAL

Page 92

```
 1        is saying.

 2   BY MR. COLLIER:

 3        Q    Okay.  Do you have any reason to disagree with

 4   ralfharing that at least to him, chats can remain

 5   potentially useful forever?

 6                    MR. MCCALLUM:  Object to the form.

 7                    THE WITNESS:  I personally don't know what

 8          exactly Mr. ███████ is thinking here.  I mean, I've

 9          read through the document, I see there are others who

10          sort of tried to balance and explain pros and cons.

11                    But, again, personally I -- I do not have an

12          opinion in that area.

13   BY MR. COLLIER:

14        Q    And then -- and I know you don't have an opinion

15   in this area, but let me see if you have an opinion on the

16   next chat on this thread that says:  "Plus 100 to this."

17                    What do you understand plus 100 to this to mean in

18   chat, bulletin board type conversations?

19        A    I would really be speculating.  I mean, maybe it's

20   equivalent to thumbs up or something along these lines, but

21   I'm not sure, I'm not familiar with that jargon.

22        Q    Okay.  And then ███████.  I'll say ███████

23   Again, apologies to the employee if he or see ever reads

24   this.

25                    Says:  "At every one of my previous jobs, it has
```

HIGHLY CONFIDENTIAL

Page 93

1    been the case that people, including myself, have

2    searched/gone back multiple months in 1-1 chat histories in

3    order to find key aspects of prior discussions and

4    conversations.  In many cases, the 1-1 chat history is the

5    only summary of something that was discussed in a brief

6    face-to-face conversation, parens, hallways/lunch

7    tables/video chat, et cetera," period.

8                    And then a new paragraph.

9                    "As an example, at PayPal, parens, my previous

10   company, closed parens, all chat history was preserved for

11   three years."

12                   Do you see that?

13      A    I do see that.

14      Q    Do you have any reason to doubt Mr. ▮▮▮▮▮ that he

15   searches, at least in his previous jobs, chat histories

16   going back multiple months to find key aspects of prior

17   discussions and conversations?

18                   MR. MCCALLUM:  Object to the form.

19                   THE WITNESS:  I do not have a specific reason

20       to either argue or support that Googler's opinion.

21   BY MR. COLLIER:

22      Q    Okay.  Do you have any reason to oppose his

23   opinion that in many cases, the one-to-one chat history is

24   the only summary of something that was discussed in a brief

25   face-to-face conversation, parens, hallways, lunch tables,

HIGHLY CONFIDENTIAL

Page 94

1    video chats, et cetera, closed parens?

2                    MR. MACCALLUM:  Object to the form.

3                    THE WITNESS:  Not in any more systematic way

4           than, you know, pointing to other Googler's testimony,

5           who use chat tool differently than this particular

6           Googler.

7                    But I, again, for him specifically, I have no

8           reason to disagree with his usage pattern.

9    BY MR. COLLIER:

10        Q    So is it possible that different Googlers use chat

11   in different ways.  Is that possible?

12        A    It's certainly possible.

13        Q    Some may use chat for more substantive

14   conversations, while some may use it mainly for

15   non-substantive conversations, right?

16        A    That's fair, yes.

17        Q    Do you happen to know if at PayPal all chat

18   history's preserved for three years?

19        A    I do not know specifically, but in the context of

20   what you've described as, you know, there being stricter

21   regulations, companies dealing about financial data, which

22   PayPal would be an example of a payment platform, that

23   wouldn't surprise me necessarily.

24        Q    Okay.  That's it for that document.  Thank you.

25                    I'm going to hand you what we're marking as

HIGHLY CONFIDENTIAL

Page 95

1    Exhibit 12.

2            This is a page with a cover page of metadata --

3    oh, it was produced as a native file, which is why I'm

4    giving you a cover page with metadata that has the Bates

5    numbers.

6            And the Bates numbers begin with GOOG-DOJ-1485029.

7    And this is a spreadsheet.  I'm not going to ask you any

8    questions about it other, than have you seen it.  And it's

9    really hard to read.  Small print.

10           Again, my only question is:  Have you seen it

11   before today.  I'm not going to ask you substantive

12   questions.

13      A    It does not appear -- like I don't have a

14   recollection of seeing it.  So if the only caveat, if it is

15   in my materials relied upon, then I would have at least

16   glanced on it.

17           I do not have any particular recollection of this

18   document.  If it's not on my materials relied upon list, I

19   certainly have not seen it.

20      Q    Okay.  So watch this.  Lawyers can keep their

21   promise.  We're done with that.

22           Are you familiar with the Federal Trade

23   Commission's guidance on Google Chats and whether they

24   should be preserved?

25      A    Not intimately.  More as a background.  I've seen

HIGHLY CONFIDENTIAL

Page 96

1    it, I believe I have it referenced in my report as well, but

2    I'm not an expert on the guidance itself.  I've just

3    generally reviewed the document.

4        Q    Well, to save a lot of time, or maybe I can't save

5    you time, but let's see.

6            Are you aware that the FTC has said that Slack,

7    Google Chats, and other collaborative messaging platforms,

8    have always been and will continue to be subject to document

9    request?

10                   MR. MCCALLUM:  Object to the form.

11                   Can we get a time frame?

12                   THE WITNESS:  I believe I've seen the

13           specific sentence you're reading specifically.  So it

14           does ring a bell.

15                   So I would have been aware of it, at least as

16           I sit here right now, it does.  I would have reviewed

17           that particular sentence.

18    BY MR. COLLIER:

19        Q    Okay.  I'm going to hand you what I've marking as

20    Exhibit 13.  And, for the record, this is

21    GOOG-AT-MDL-B-9709508.

22            And my first question will be, did you review this

23    prior to today, which I believe you said in your materials

24    you have, but I don't want to put words in your mouth.

25        A    Yes, that looks right.  So whenever I see a

HIGHLY CONFIDENTIAL

Page 97

```
 1   document like this, my first thing will be to check whether
 2   I've seen that exact copy of it with a Bates stamp, but --
 3       Q    Fair enough.
 4       A    -- if you represent to me that it is in my
 5   materials, then that is exact copy that I would have
 6   reviewed.
 7            I've certainly reviewed Google Chat retention
 8   policies, more than one.
 9       Q    Well, right.  And the only thing I hesitate on
10   Bates numbers is, sometimes the same document get produced,
11   in this case several times, because there's different
12   litigations in all this.
13            So really what I'll just represent to you is:  My
14   understanding is that this was Google's first official chat
15   policy as testified to by ████████████.
16            Is that your understanding of this chat policy,
17   it's Google's first official chat policy from February --
18   well, it might be from November of 2020?
19                 MR. MCCALLUM:  Object to the form.
20                 THE WITNESS:  Right.  I don't recall as I sit
21       here seeing an earlier policy, and I have no reason to
22       dispute ████████████ characterization of this document.
23   BY MR. COLLIER:
24       Q    All right.  And can you look at the Google's chat
25   retention policy, Exhibit 44 -- well, actually I'll just ask
```

HIGHLY CONFIDENTIAL

Page 98

1    you.

2           Nowhere in Google's first official chat policy did

3    they instruct Google employees to turn history on if they

4    were on a litigation hold, did they?

5      A    It does not appear to use the words you've used,

6    but certainly under the legal hold section, it does describe

7    the quote:  "Your Google chats described below will be

8    preserved automatically.  All retention periods are paused

9    for the purpose of legal holds."

10     Q    Okay.  So it does not instruct the employees to

11   turn on history on, right?

12     A    Correct.  Not in this policy.

13     Q    Okay.  And what this policy does say is that these

14   two items -- and we're looking at the bottom on legal holds,

15   the two bullets, there we go.

16          The exhibit and the screen, if your eyes are old

17   like mine.

18          Two types of information will be preserved

19   automatically.  One-on-one -- excuse me.  On the record,

20   one-on-ones, group DMs and flat rooms.

21          Do you understand that?

22     A    Yes.

23     Q    So certain on the record documents will be

24   retained.  And then threaded room conversations in which

25   you've participated, i.e., sent a message, not just

HIGHLY CONFIDENTIAL

Page 99

1    received.

2         A    Yes.

3         Q    So what is not being preserved automatically is

4    off the record, history off chats, right, under this Google

5    retention policy?

6         A    At least as is stated here, that's -- that would

7    be my interpretation as well.

8         Q    And then if we look at the second bullet, I think

9    we've touched on this a little bit before, but just to bring

10   it home.

11         In the threaded room conversations, it says:

12   "Sent a message, not just received."  And this is part of

13   our discussion earlier, which is the history on or history

14   off has to be communicated in a sent message, right?

15         You can't just turn it on without sending a

16   message?

17         A    Well, so it's a little more than that, right?

18         Q    Okay.

19         A    So this is specific to the threaded rooms.

20         So an example of which we've discussed in, I

21   believe, Exhibit 11.  So that is exactly what gave me a

22   pause with, you know, given that there's an individual in

23   litigation hold, even under this policy, the entirety of the

24   threaded room, according to this policy, would have been

25   kept.  So that's why my caveat.

HIGHLY CONFIDENTIAL

                                                      Page 100

1          But again, I -- I don't have an independent way of

2     verifying technical implementations at Google.

3       Q    Okay.  Let's -- can we turn the Elmo back on?

4          So I want to ask this on a one-on-one, this is

5     Exhibit 6.  Demonstrative.

6          I don't know why the zoom doesn't work.

7          Can we see the 6 now?  That's good enough.

8          When we say in the hypothetical for Exhibit 6, you

9     know, history on, that doesn't just mean that person A went

10    and turned history on.  It had to be turned on in connection

11    with this third message:  "We have worked hard on our ad

12    tech partners."

13         Right?

14      A    That's my understanding.  Because otherwise the

15    message would assume the setting of a previous message.

16      Q    Right.  So if in this hypothetical, history was

17    off, A sends, you know:  "We have a monopoly in ad tech."

18         B sends:  "Yes, we do."

19         Then A is like:  "Oh, that might be important,"

20    and just turns history on but doesn't send a message.

21         Nothing is retained in that scenario, right?

22              MR. MCCALLUM:  Object to the form.

23              THE WITNESS:  That is an interesting question

24       I have not thought of.  I don't actually know whether

25       the log of an empty message would have been sent to the

HIGHLY CONFIDENTIAL

Page 101

1        Vault.  I don't know.

2   BY MR. COLLIER:

3        Q    I'm going to ask you some broad questions.  If you

4   want to see some documents, we can do that too, but I'm

5   going to see if I can save some time.

6             Can you agree with me that from your review of all

7   the documents, both in getting ready for your report, your

8   deposition, and during the deposition today, that it's fair

9   to say Google employees use chat for both substantive and

10  non-substantive business purposes, or substantive business

11  and nonbusiness purposes is probably a better way to put it.

12             MR. MCCALLUM:  Object to the form.

13             THE WITNESS:  That's generally fair.  I mean,

14        I specifically describe it in my report as substantial

15        business, non-substantial business, as well as

16        personal, so those three categories, I mean to describe

17        sort of the spectrum of uses of Google Chat by

18        Googlers.

19             MR. COLLIER:  That's fair.  That's probably a

20        better way than I put it.

21  BY MR. COLLIER:

22        Q    So in your three generalized categories, and I

23  realize they could be subcategorize and all that, but in

24  your three generalized categories, there is substantive

25  business, which could be things like, say, market share and

HIGHLY CONFIDENTIAL

Page 102

1    other chats we've seen in chat before, right?

2        A    Sure.

3        Q    There could be non-substantive business, such as:

4    "Hey, are we getting those new vending machines in?"  It's

5    still business related, but still non-substantive?

6        A    I would agree with that, that would be -- yeah.

7        Q    And then finally, it could be happy birthday.  It

8    could be entirely personal.  Someone talking to someone else

9    about their birthday or who won the kid's softball game?

10       A    Sure, yes.

11       Q    And as we sit here today, you can't tell me or

12   anyone under oath what percentage of chats would fall in

13   each of these three categories, can you?

14       A    That's correct.  I cannot tell you the

15   percentages.

16       Q    We just know that there's chats in all three

17   because we've seen them all, or we've seen examples of all.

18            Sorry, that was a bad question.

19       A    Right.  So we've seen examples of all.

20            We've also -- you have taken depositions of a

21   number of Googlers on the topic, so we've seen their

22   disclosures or intents in how they use the Google Chat tool,

23   so we've seen at least these two sources of information.

24       Q    Okay.  And so for chats sent in conversations with

25   history off, say, prior to February of 2023, to make it

HIGHLY CONFIDENTIAL

```
                                        Page 103
 1    easy, if they were not retained, you can't tell us which
 2    categories the non-retained chats fell in, right, because
 3    they don't exist anymore?
 4         A    That's fair.
 5         Q    Now, we talked about Google employees testifying,
 6    and I'll see if I can shortchange a lot of transcripts on
 7    this.
 8              Would you agree that some Google employees
 9    testified they mainly use chats for non-substantive business
10    communications, and some Google employees have testified
11    that they use chats for substantive business communications?
12         A    Yes.
13         Q    And, of course, there's some Googlers that also,
14    happy birthday, and the things we all do as human beings,
15    right?
16         A    Yes.
17         Q    And it's also possible that within a given chat,
18    and I think we've seen examples of this and we can pull some
19    back up, there might be some substantive business
20    communications and then someone interlaces non-substantive
21    or personal, and then it flips back to substantive.
22              You want to see some examples of that, or do you
23    recall?
24         A    I -- I believe we've seen some examples of that
25    today.  So I cannot think of a document I've seen at the
```

HIGHLY CONFIDENTIAL

Page 104

1    time of my report.  I may have, but I certainly -- I would

2    agree that we've seen some today.

3        Q    Okay.  And that doesn't surprise you, like human

4    beings, talk something substantive, non-substantive,

5    personal, substantive, like human beings bounce around on

6    topics all the time, don't they?

7                    MR. MCCALLUM:  Object to the form.

8                    THE WITNESS:  I wouldn't say that's the

9            reason why I find it not surprising.  There is other

10           reasons, including what I've reviewed as part of this

11           case.

12                    So even the deposition testimony you've

13           referenced, and I've disclosed all the transcripts I've

14           reviewed, those would be consistent generally with your

15           description.

16   BY MR. COLLIER:

17       Q    That's good because it saves me a lot of

18   depositions to put in front of you.

19                    I'm going to hand you an exhibit marked Exhibit

20   14.  It's Google-DOJ-AT-687430.

21                    THE WITNESS:  I believe you gave me two

22           copies of the same document.

23                    MR. COLLIER:  Oh.  Thank you.  Rob, did you

24           get your copy?  Okay.

25                    THE WITNESS:  Okay.  I have looked at the

HIGHLY CONFIDENTIAL

Page 105

1          document.

2     BY MR. COLLIER:

3          Q     A lot of jargon in this document, I admit.

4                If you could look about halfway down, where

5     there's a paragraph that begins:  "I was going to join

6     Rita."  All the way until the end of -- yeah, that

7     paragraph, which ends in the word "experiment."

8          A     Okay.

9          Q     Do you know what a ███████████ is in the

10    context of this case?

11         A     I do not.

12         Q     You only know it from Star Wars?

13         A     And even that, only by reference.

14         Q     Do you know what the reference to ████████

15    ██████ means?

16         A     I do not.

17         Q     Okay.  The last sentence, or the second sentence

18    says:  ███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████

23                Do you have any understanding of what any of that

24    means?

25         A     I have --

HIGHLY CONFIDENTIAL

Page 106

1                    MR. MCCALLUM:  Object to the form.

2                    THE WITNESS:  Sorry.  No understanding.

3                    It's -- yeah, I do not.

4    BY MR. COLLIER:

5         Q    Do you know if any of the plaintiff's claims

6    relate to Google pretending to be second price in publisher

7    reporting?

8         A    I -- I don't know.

9         Q    Okay.  If the Court was to find, or the jury, that

10   this actually was relevant to the plaintiff's claims, this

11   would be, for example, an example of a substantive business

12   communication within a chat, right?

13                   MR. MCCALLUM:  Object to the form.

14                   Can we get counsel's representations that

15        this is a chat?

16                   MR. COLLIER:  I can ask him if it's a chat.

17        That's what my understanding of these carets are that

18        it was threaded, but I'll ask him.

19                   MR. MCCALLUM:  It has a subject line which

20        suggests it's not a chat.

21                   MR. COLLIER:  Well, let me withdraw my

22        question and ask you.

23   BY MR. COLLIER:

24        Q    Do you know if this is a chat?

25        A    It does not appear to be a chat.  It appears to be

HIGHLY CONFIDENTIAL

Page 107

1   an e-mail sent to a group server, which would then be

2   memorialized within a group.

3        Q    The normal e-mails produced by Google, I will

4   represent to you, do not have this stair stepping.  Do you

5   see the right-hand facing carets, which generally means a

6   different person, a different level.

7             Is that indicative of a e-mail sent to a group

8   server which would be memorialized within a group?

9                  MR. MCCALLUM:  Object to the form.

10                 THE WITNESS:  So there's a dual system of

11         preservation for group postings that are initiated

12         through an e-mail exchange server.  That's my

13         understanding of how the e-mail system works.

14              So if there was an e-mail that was -- so in

15         some cases a Googler can, instead of going into a group

16         and typing a message, they can, in fact, send an e-mail

17         from their Google account to a specific e-mail address

18         and that would be saved as an e-mail, as well as with

19         that post to a group, as if someone created that

20         message within a group.

21              And again, that's just my background and

22         understanding of how these -- why these different

23         documents generally look a little different.

24  BY MR. COLLIER:

25       Q    Okay.  I'm going to show you -- I'm going to show

HIGHLY CONFIDENTIAL

Page 108

1    you a different -- okay.  Come back to that.

2            I'm going to hand you what I'm marking as 15; is

3    that right?

4                    THE WITNESS:  The last one I looked at was

5        14.

6                    MR. COLLIER:  Okay.  We'll put a real exhibit

7        sticker on this in a moment.

8    BY MR. COLLIER:

9        Q    I'm not going to ask you any questions about this,

10   except looking at the first page and the format of this,

11   does this appear to be a chat conversation as opposed to the

12   last one you mentioned to me was a e-mail and to the group?

13       A    Yes.  Based on the format, that appears to be some

14   probably thousand Chat messages long conversation.

15       Q    Okay.  Put that to the side.

16            Do you recall how many Google employee depositions

17   where the Google employee said that they used chats for

18   substantive business conversations?

19       A    I do not have a count in mind.

20       Q    More than zero, right?

21       A    Correct.

22       Q    Okay.  And, by the way, have you seen e-mails

23   produced in this case, e-mails, that contain personal

24   messages like happy birthday to each other?

25       A    If I did, I don't recall.

HIGHLY CONFIDENTIAL

Page 109

1    Q    Okay.  Give me just a moment.

2         Okay.  All right.  When were you engaged to be an

3    expert witness in this matter?

4    A    I don't recall the specific date, but it would

5    have been after the date of Professor Hochstetler October

6    report.

7         So after the -- I believe it was early October.

8    Q    The report was early October or your engagement

9    was early October, or both?

10   A    So both.  So my retention was after the

11   disclosure, but I don't recall a specific date, but I was

12   not involved before October.

13   Q    I'm going to hand you what I'm marking as Exhibit

14   16.  I believe it will look familiar to you.

15        Can you tell me what Exhibit 16 is?

16   A    It appears to be a copy of my professional CV as

17   of November of 2024, which I assume it's the copy of my

18   Schedule 1 to the report that I've provided.

19   Q    I believe so.  I think we -- I'm just checking to

20   make sure we actually copied your Schedule 1.

21        And, yes, it is a copy for Schedule 1.

22        So this is your resumé or CV, right?

23   A    Correct.

24   Q    And one of the things you list here is your --

25   starting on page 3, your expert witness testimony and

HIGHLY CONFIDENTIAL

Page 110

1  submissions --

2       A    Yes.

3       Q    -- to this list?

4       A    Yes.

5       Q    And it goes on for pages, and it ends with a

6  deposition in 2014, the last entry, right?

7       A    Correct.

8       Q    Is that because you gave a list of your expert

9  witness testimony submissions for the last 10 years or is

10  that all the witness testimony you've ever given?

11       A    This is a complete listing of witness testimony.

12       Q    Okay.  So when I counted the number of times

13  you've testified or given testimony, I've come up with over

14  40; does that sound right?

15       A    I'll take your word for it.  It sounds about

16  right.

17       Q    Okay.  This list includes every time you've

18  testified or submitted an expert report, even if you didn't

19  testify, or the only times you've testified?

20       A    Yeah.  It includes expert reports that would have

21  been served on the other side and that would have given them

22  an opportunity to at least depose me, but in certain cases,

23  the party might choose not to depose me for some reason, but

24  there would be a disclosure to the other side and the Court.

25       Q    So these 40-odd expert witness testimonies do not

HIGHLY CONFIDENTIAL

Page 111

1    include every time you've been an expert witness, you know,

2    engaged in, say, being a consultant or something for parties

3    in litigation, right?

4        A    That's correct.

5        Q    And I won't ask you any times you've -- to name

6    anyone you've been a consultant for absent litigation, I

7    don't want to violate any of your consulting agreements.

8            I just want to say, what percentage of the times

9    are you engaged -- and it can be approximate, as a

10   consultant, does -- or an expert, does that actually result

11   in an expert witness report or a submission that would have

12   made your CV?

13       A    So I don't have the exact percentage distribution

14   in mind, but with respect to my work since 2014, when I was

15   first asked to serve as an expert witness in litigation,

16   maybe 85, 90 percent of the time would be my -- my guess,

17   over the course of these years.

18       Q    And then the other 10 or 15 percent of the time

19   would be things like you were drafting an expert report and

20   they settled or they decided not to submit your report or

21   something like that; is that right?

22       A    That would be one example.  Just purely consulting

23   work would be another example, where there simply wouldn't

24   be an opportunity to disclose anything to anyone.

25       Q    What part of your practice, since 2014, is that

HIGHLY CONFIDENTIAL

Page 112

1    purely consulting work, where there was never -- you were

2    never going to write an expert report for the Court or the

3    other side?

4         A    My best guess would be about 10 percent of the

5    hours I spend professionally.  So, you know, a few hundred

6    hours a year.

7         Q    So 90 percent of your work since 2014 has been

8    being an expert witness and generating expert witness

9    reports and testifying and that sort of thing, right?

10                  MR. MCCALLUM:  Object to the form.

11                  THE WITNESS:  Well, as part of my main

12        employment, that's correct.

13                  As part of the consulting firms I've been

14        employed by, that's certainly the case.

15   BY MR. COLLIER:

16        Q    Okay.  What -- just so I know what main employment

17   means.

18                  What's your non-main employment?

19        A    So, for example, various, you know, teaching

20   engagements and things of that nature.

21                  But the primary source, meaning, you know,

22   someone -- the type of employment where I spend, say, you

23   know, two, three thousand hours a year, that would be in the

24   context of consulting work.

25        Q    I hope it's not 3,000 hours a year.  That's a lot

HIGHLY CONFIDENTIAL

Page 113

1    of hours.

2        A    Occasionally, it is, but I enjoy what I do, so I

3    don't complain.

4        Q    All right.  We'll do -- this is going to be fast.

5            And then we'll -- do you want to do a fast one and

6    then we'll get some lunch?

7        A    Sure.

8        Q    That will be a good stopping point.

9            In Exhibit 15 -- and you can spend as long as you

10   want looking at it.

11           The only question I have for you -- Exhibit 15 is

12   GOOG-AT-MDL-B7884309 to 4325.

13               MR. MCCALLUM:  Counsel, I think it's

14       Exhibit 16.

15               MR. COLLIER:  Did I -- okay.  16.

16               THE WITNESS:  Actually, 16 was my CV.

17               MR. COLLIER:  So 17.  Okay.  I don't have my

18       stickers.

19               All right.  Exhibit 17.  Oh, yeah, thank you.

20       I'll put the right exhibit on there.

21   BY MR. COLLIER:

22       Q    Again, I told you it would be an easy question.

23           This is just an example of non-substantive

24   personal communications, Halloween photos and stuff, right,

25   that is on an e-mail?

HIGHLY CONFIDENTIAL

Page 114

1      A    It does appear like a communication initiated for

2  an e-mail, whether it's also a group message, what gives me

3  a pause is the -- one of the addresses on the cc, the one

4  that starts with "███████    So, ███████, all auto.

5      Q    Uh-huh.

6      A    Which may suggest that this is also posted.  But

7  generally, I haven't read every single page, but just

8  flipping through, it does appear to be a communication,

9  including through e-mails, that involves personal in nature

10 pictures.

11     Q    So if this e-mail -- you know what, we'll go to

12 lunch.

13              THE VIDEOGRAPHER:  The time right now is

14     12:57 p.m.  We are off the record.

15              (Recess taken at 12:57 p.m.)

16              THE VIDEOGRAPHER:  The time right now is

17     1:55 p.m.  We are back on the record.

18 BY MR. COLLIER:

19     Q    Mr. Malkiewicz, were you able to get some lunch

20 over the break?

21     A    Yes.

22     Q    Okay.  Good.  Are you ready to proceed?

23     A    I am.

24     Q    All right.  We were looking at your resumé, or CV.

25 If you could go back to that, or just have it handy.  You

HIGHLY CONFIDENTIAL

Page 115

1    may not need it to answer these questions.

2            I believe you said earlier today, but I want to

3    make sure now that we're looking at your CV, you've never

4    given any expert testimony on eDiscovery issues, have you?

5        A    That's correct.  Not specific to eDiscovery

6    issues.

7        Q    Or spoliation?

8        A    Not in the context that you're using the word I

9    understand.

10       Q    Well, then, in what context?

11       A    In the context of economics, there's a concept of

12   market spoliation.

13       Q    Okay.

14       A    That sometimes comes up, and I have testified in

15   cases where there are allegations of market spoliation.

16       Q    Thank you for the clarification.

17            So you haven't -- you haven't been engaged as an

18   expert on discovery spoliation, correct?

19       A    Correct.

20       Q    Or the requirements for preservation?

21       A    Correct.

22       Q    And you're not an expert in the Sedona conference,

23   are you?

24       A    Not specifically an expert in the Sedona

25   conference, but the Sedona conference working groups

HIGHLY CONFIDENTIAL

Page 116

1    generally is something I'm generally familiar with and

2    reference -- and have referenced, at least for a good almost

3    a decade in my work.

4            There is different, you know, standards and

5    procedures, occasionally related to discovery, but more so,

6    you know, other topics that the Sedona conference generally

7    covers.

8        Q    Like what would be -- other topics be?

9        A    The ones that I come across most often relate to

10   trade secret protections.  Also, standards for damages types

11   of analyses, in particular, intellectual property.  They

12   have pretty well-developed standards, I believe may be

13   working group 12, that's -- those publications.

14           So generally, it's -- it's, you know, a nonprofit

15   that I'm familiar with and follow their -- their

16   publications.

17       Q    Yeah.  And I had gotten about, they talk about

18   damages types on things, so let me ask a better question.

19           You're not an expert on the Sedona conference

20   principles, even though you can read them and cite them,

21   right?

22       A    Correct.  I use those as a -- similar to the way I

23   use a learned treatise, so to speak, so I don't have an

24   opinion about those.  I use them as a reference material.

25       Q    Okay.  Your hourly rate for this matter is $975?

HIGHLY CONFIDENTIAL

Page 117

1       A    That's correct.  That's what CRA charges my time

2    at.

3       Q    Does that go up for 2025?

4       A    I'm not sure.  I don't know.  I haven't been

5    informed that it would, but it's possible.

6       Q    How many total hours have you worked on this case?

7       A    I don't have a specific number, probably between

8    maybe 80 to 100 would be my best guess.

9       Q    And is that all your time or are you including

10   anyone on your team?

11      A    No, just my time.  I understood you were asking

12   about my work, yeah.

13      Q    Are there others who are helping you?

14      A    Yes.

15      Q    Do you know the total hours that your team has

16   spent on this case?

17      A    I do not.

18      Q    So the Epic log file that we've talked about

19   earlier today, it's talked about in your report, is that an

20   application log or a system log?

21      A    My understanding, it's a system log.

22      Q    What is the difference between an application and

23   a system log?

24      A    I mean, I can only speak to it as a nontechnical

25   expert.  So my general understanding is that it's where the

HIGHLY CONFIDENTIAL

Page 118

```
1   log itself sits and collects the data, so it's -- the log at

2   issue in this case was not part of the Google Chat itself.

3   It was a -- it was a log that was developed to collect

4   information, both on front end and back end for debugging

5   purposes.

6           So it was a -- it was built on top of the existing

7   application.

8       Q    And this -- this log, Google still runs that log

9   today, don't they?

10      A    I am not sure which log Google runs today, whether

11  there are any changes or developments.  I do not have that

12  information.

13      Q    Well, the Epic log had five custodians, right?

14              MR. MCCALLUM:  Object to the form.

15  BY MR. COLLIER:

16      Q    The Epic log that you reviewed had five people

17  tracked in that log, right?

18      A    That's correct, yes.

19      Q    And how many custodians did you say were in this

20  case?

21      A    Well, it depends on the way we define custodians,

22  but a few hundred.

23      Q    Okay.  Did you review Google's log for the few

24  hundred custodians, at least as it existed when you were

25  engaged?
```

HIGHLY CONFIDENTIAL

Page 119

1        A      I did not, no.

2        Q      Why?

3        A      It was not part of my assignment, I guess.  It was

4    not something I was provided.

5        Q      If we viewed Google's log for the custodians in

6    this case, would you agree with me that that would give some

7    information as to whether or not the few hundred custodians

8    in this case switched history on or off, at least to the

9    extent that that log could cover a period prior to

10   February of 2023?

11                   MR. MCCALLUM:  Object to the form.

12                   THE WITNESS:  So, just to be clear.

13                   My understanding is that the five custodians

14        are custodians in this case as well, meaning the -- the

15        underlying litigation that we've read -- the caption

16        being read off at the beginning.

17                   So if you're asking had we had a log about

18        more custodians that are also subject here, would it

19        inform us about those custodians on and off switching

20        history, sure, I mean, it would.

21   BY MR. COLLIER:

22        Q      So when you were engaged, did you make any attempt

23   to figure out the availability of these logs, other than the

24   Epic log?

25                   MR. MCCALLUM:  Well, I'll object on privilege

HIGHLY CONFIDENTIAL

Page 120

```
 1          grounds and caution the witness not to disclose the

 2          content of any attorney-client communications.

 3                    THE WITNESS:  Not specifically, other than

 4          asking for a complete set of logs that Professor

 5          Hochstetler has analyzed, and the custodians that he

 6          made references to, and I understand I was provided

 7          whatever was available, that's my understanding.

 8   BY MR. COLLIER:

 9      Q    Do you have an understanding of whether or not

10   Google still maintains this data debugging log today, not

11   the Epic log, the current version of the log?

12                    MR. MCCALLUM:  Same objection and same

13          instruction to the witness.

14                    THE WITNESS:  I do not know.

15   BY MR. COLLIER:

16      Q    If we had a version of the log that had the other

17   custodian other than this five, would that make it easier

18   for you to figure out, again, pre-2023, February 2023, how

19   each of those custodians either turned on or off their

20   history?

21                    MR. MCCALLUM:  Object to the form.

22                    THE WITNESS:  I'm trying to like read into

23          your question.  I mean, if you're asking had I had the

24          same exact log but for additional custodians?

25                    MR. COLLIER:  Yes.
```

HIGHLY CONFIDENTIAL

Page 121

1              THE WITNESS:  Could I even use the same code

2        I've written or that Professor Hochstetler has written

3        to provide same information about additional

4        custodians, my guess would be yes, but I wouldn't know

5        until I see that particular data.

6    BY MR. COLLIER:

7        Q    And how it's formatted and such; kept, formatted,

8    retained?

9        A    Correct.  Yes.

10       Q    Okay.  When we're trying to determine whether

11   Google employees turn history on or off prior to February of

12   2023, is there any more probative or better information

13   that's available to you, other than the Epic log, which you

14   looked at, and the depositions, which you looked at, is

15   there anything else that exists?

16              MR. MCCALLUM:  Object to the form.

17              THE WITNESS:  The one thing that comes to

18        mind, which I believe we've spoke to some extent

19        indirectly because you've pointed me to a number of

20        exhibits from actual chats that had Bates stamps

21        labeled from, I believe the Virginia litigation.  So

22        that's the kind of set of information that, you know,

23        I've also looked into because that set of information,

24        I understand specifically focused on, you know, sort of

25        history on and off and the terms that I've included in

HIGHLY CONFIDENTIAL

Page 122

1          Schedule 3 to my expert report, but that would be the

2          only additional caveat I would say, that on that

3          particular topic, those documents that I've reviewed

4          may also provide some color.

5     BY MR. COLLIER:

6          Q    And you know, Mr. Hochstetler looked at the

7     Virginia litigation documents, too, right?  Or do you know

8     that?

9          A    Yes.  I mean, there's some included on his

10    materials relied upon list.

11         Q    So what I'm trying to ask, and I'm doing it in a

12    very poor way, so hopefully I'll get luckier when I

13    reformulate this question, is:  You looked at the Epic log,

14    you did some analysis to the Epic log, you looked at

15    deposition testimony in this case as what people self-report

16    on litigation on and off, and we looked at some chats today,

17    and you looked at the ED, the Eastern District of Virginia

18    litigation, right?  Just -- are you with me so far?

19         A    Yes --

20         Q    You've looked at all that?

21         A    -- I'm with you, yes.

22         Q    And Professor Hochstetler has looked at those

23    things, for example, you're aware of that.

24              And what I'm asking is, is there anything else in

25    the universe of information that exists that you think you

HIGHLY CONFIDENTIAL

Page 123

1    should have looked at, or Professor Hochstetler should have

2    looked at, or is it, no, everyone's looked at everything

3    that's available, I just disagree on how you interpret it?

4                    MR. MCCALLUM:  Object to the form.

5                    THE WITNESS:  The one -- the part of one

6           other type, in a set of documents that I've looked at

7           that, you know, you've shown one to me was one of the

8           policies that Google has had, so I looked at a number

9           of those, in particular, in conjunction with the

10          deposition testimony.

11                   So specifically the ones that instructed

12          Googlers to not discuss certain things in chat because

13          there's no way to keep those.

14                   So there'll be a set of documents I have

15          reviewed and cite them in the background section that

16          also informs my interpretation of various factual

17          statements that deponents make.

18                   And when I analyzed the actual chat log, I

19          believe that's not something that Professor

20          Hochstetler, at least at the time of his initial

21          October 4th disclosure has looked at, but that would be

22          the -- as I sit here without, you know, going over my

23          full report, that's -- that's for now what I can think

24          to add it to the categories you've referenced.

25

HIGHLY CONFIDENTIAL

Page 124

1    BY MR. COLLIER:

2        Q    Were you aware that Professor Hochstetler was

3    deposed yesterday?

4        A    I -- I was aware that his deposition was

5    yesterday.  I'm not -- I don't know anything about his

6    testimony though.

7        Q    Okay.  Did you see Professor Hochstetler's reply

8    report in this litigation?

9        A    I -- well, I have read through a report and a

10   declaration that I believe was dated as of last week

11   sometime, so I have looked at a couple of the documents

12   authored by Professor Hochstetler.

13       Q    And have you seen that Professor Hochstetler says

14   he has reviewed the chat retention policy and the litigation

15   holds?

16       A    I just don't recall as I sit here, but if you tell

17   me that that's what it says, I have no reason to believe

18   it's not true.

19       Q    Okay.  So, what I'm trying to get to is, it seems

20   to make -- I'm not trying to put words in your mouth, I'm

21   trying to move on to something else if I'm right, and if I'm

22   not right, I want to find out why.

23           That you and Professor Hochstetler, if you assume

24   he's reviewed the -- just assume he's reviewed the chat

25   retention policy and litigation holds, that you're in

HIGHLY CONFIDENTIAL

Page 125

1    agreement, both of you have reviewed, as far as you know,

2    all the information available to reach whatever conclusions

3    each of you has reached as to history on and off, at least

4    prior to February of 2023; is that fair?

5          And I guess to supplement my question, is there

6    something else that you think you needed to review to reach

7    your opinions.

8    A    Well, so there's certainly no additional

9    information that I needed to review to analyze and provide

10   my opinions of Professor Hochstetler's work.  Whether there

11   is some information that Professor Hochstetler should have,

12   could have, asked for, that's not something that I took upon

13   myself, that was not part of my work in this case.

14          I literally looked at Professor Hochstetler's

15   October 4 disclosure, and I analyzed whether the conclusions

16   he's reached, based on the work that he's disclosed at the

17   time, are reliable to a professional degree of certainty.

18   Q    Right.  I understand your disagreement as to

19   conclusions, but kind of remember when I asked you to look

20   at his programming language and it did what it purported to

21   do.

22          I'm simply saying, do you have any criticisms of

23   Professor Hochstetler, and if you have none because it's

24   outside your scope, that's fine too, but do you have any

25   criticisms of Professor Hochstetler that he should have

HIGHLY CONFIDENTIAL

Page 126

1    reviewed other data?

2        A    I don't know.  I mean, I haven't taken my -- I

3    haven't analyzed that particular question.  I only can tell

4    you that within the context of the data that he has

5    reviewed, my understanding is, I mean, not understanding, my

6    opinion is that he cannot scientifically offer the

7    conclusions he has offered within a reasonable degree of

8    professional certainty.

9        Q    Are you an expert statistician?

10       A    I am, yes.

11       Q    You've testified on statistical measures?

12       A    I have, yes.

13       Q    And did you -- you didn't put in your report any

14   attempts to run confidence intervals or statistical

15   significance on what Professor Hochstetler did, right?

16       A    Correct.  I have not done so.

17       Q    So just to be clear.  You haven't done the

18   mathematics that one would do to determine the statistical

19   significance of Dr. Hostetler' conclusion, correct?

20       A    Right.  It would be inappropriate to do at the

21   level of analysis that Professor Hochstetler has conducted.

22       Q    By the way, what format is the log file in, the

23   Epic log file?

24       A    The specific output that I've reviewed was logged

25   into a CSV filed, or common delimited file.

HIGHLY CONFIDENTIAL

Page 127

1    Q    Right.  You anticipated my next question.  I don't

2    think the court reporter got that exactly right.

3         What does CSV stand for?  If you don't know,

4    that's okay.  I'm not trying to trick you.

5    A    No.  I'm trying to recall actually, because I

6    haven't thought about the actual file extension.  I've done

7    CSV for some time now.

8         I -- I -- we typically refer to in jargon as a

9    common delimited file, but obviously those first letters

10   don't fit into CSV, so.

11   Q    Okay.  But a CSV is a common -- a common

12   electronic file, right?

13   A    It is fairly common, yes.

14   Q    So we talked earlier this morning about -- there

15   was Google Hangouts and then it turned into Google Chats.

16        Do you recall that?

17   A    I recall the general discussion, I mean, in fact,

18   there was another tool even before Google Hangouts, but,

19   yes, I generally recall we discussed it this morning.

20   Q    You've got a good read on me because you already

21   knew what my next question was going to be.

22        What was the tool before Google Hangouts called?

23        Maybe I can help you.  Was it G Talk?

24   A    Yes.  It was a G Talk tool.

25   Q    Are you aware of when G Talk was used at Google

HIGHLY CONFIDENTIAL

Page 128

1   versus, say, Google Hangouts?

2        A    I, to the best of my recollection, G Talk was

3   phased out somewhere towards the end of 2014 and beginning

4   of 2015.  So there was a transition period where both

5   Hangouts and the G Talk were maybe available for a period of

6   time, but my best recollection, that's roughly the time

7   frame.

8        Q    And do you recall what Google used before G Talk?

9        A    I do not recall specifically.  I -- I -- I believe

10  I have like a paragraph or two about the general history in

11  my expert report, but I just don't recall from memory as I

12  sit here.

13       Q    As I've looked at these programs, I don't believe

14  that there's anything about the differences between G Talk,

15  Google Hangouts, and Google Chat, that bear in any way on

16  whether it goes to the Vault or history on or off, is

17  that -- is that consistent with your understanding, or is

18  there something peculiar to any of these programs I should

19  know about?

20       A    I don't know.  I'm the wrong person to ask.  I --

21  I do not know the technical differences going as far back.

22       Q    Well, what about the technical differences, if

23  any, that determined whether the underlying chats or

24  messages were retained, do you know?

25       A    I do not recall.  I didn't focus on those years,

HIGHLY CONFIDENTIAL

Page 129

1   because in Professor Hochstetler's report the focus is more

2   on the 2022 time frame.  So that's what the focus, even of

3   my background and understanding was, so I -- I just don't

4   know and definitely don't recall, but I don't believe I even

5   know.

6        Q    Okay.  Are you aware that there was a web version

7   of Google Chat?

8        A    It sounds familiar, but I'm also not

9   particularly -- do not recall the specifics.

10       Q    Are you aware there was a desktop version of

11  Google Chat?

12       A    If -- if we're talking about a time frame of, you

13  know, roughly 2014 or around that time, I believe I've seen

14  references to it.

15            But again, it wasn't a focus of my work in this

16  case.

17       Q    All right.  I want to just ask a couple more

18  questions on this, I think I know your answers, but I've got

19  to ask to do my job.

20            Are you aware that there was a mobile version of

21  Google chat?

22       A    It does not surprise me, but I don't have a

23  specific recollection of looking at anything about it.

24       Q    Do you have any understanding as to whether the

25  Google employees used the web version, the desktop version,

HIGHLY CONFIDENTIAL

Page 130

1    or the mobile version of Google Chats, or all of them or

2    some of them?

3         A    I do not have a specific understanding.

4         Q    And, I'm sorry.  I have to ask these questions.  I

5    think I know your answers, and I apologize.

6              Can you tell for me any differences between the

7    various versions of Google Chats; web, mobile, desktop?

8         A    I couldn't, you know, speculate.

9         Q    I'll try to consolidate all of these questions

10   into one.  Let's see if it works.

11             Is it fair to say that you don't know the

12   differences between the user interfaces of web, mobile, or

13   the desktop versions of Google Chat?

14        A    Yeah.  That's not something I specifically looked

15   at or analyzed.

16        Q    And -- and the same question, but now asking about

17   time periods.

18             Is it fair to say that you don't know the

19   differences between the Google Chat programs and all of its

20   flavors in different years; such as 2007, 2008, 2013, 2015,

21   2019, 2022, like you couldn't describe for me any of those

22   differences?

23        A    Yes.  Most certainly not going back to this 2007,

24   '13.  I have some background and understanding that I

25   focused in describing in my report as to the -- the way, you

HIGHLY CONFIDENTIAL

Page 131

1  know, Google has used the chat tool and some functionality,

2  as well as the user interface aspects of it, but only to the

3  extent that, you know, the depositions that, for example,

4  you've taken are contemporaneous with these tools, but I

5  haven't independently analyzed the tools themselves, so I

6  couldn't tell you the differences.

7       Q    Okay.  When I looked at your CV, I didn't see that

8  you had published any papers on statistics.

9            Have you published on statistics?

10      A    Not specifically.  I mean, I've presented on

11 statistical concepts.  That is one of the main tools that I

12 use in, especially in like survey research work, but I

13 haven't published specifically in terms of like a

14 peer-reviewed journal.

15      Q    And in your survey work, you're using a SAS-based

16 program to analyze the results and how well they're

17 statistically powered; is that fair?

18      A    It depends.  I mean, SAS is definitely one of the

19 tools I've probably spent most of my career with, in terms

20 of actual hands-on coding, but I've used other tools.  I've

21 used Python and R and SPSS.  So all those other software

22 packages.

23            There's some other specialized tools for, you

24 know, other types of statistical analysis, too, I've used.

25 So, Stata, for example, comes to mind, depending on the

HIGHLY CONFIDENTIAL

Page 132

1    types of standard errors I'm trying to evaluate.  Some tools

2    have built-in modules.

3            So, yeah, it really depends, but SAS was probably,

4    you know, in the course of my, say, 20-some years working

5    with statistical packages, SAS is probably, I'd say half of

6    the time I would use SAS.

7        Q    And SAS, do you recall what it stands for?

8        A    Well, it's the name of the company, too, that

9    actually outputs the software, but I don't think I -- I

10   haven't read about what the acronym stood for originally for

11   a long time, so I would speculate at this point.

12           Like maybe statistical analysis software.  Maybe

13   that's -- that would be my guess.

14       Q    Okay.  And SAS, for the court reporter, is it

15   S-A-S-S or S-A-S?

16       A    Just S-A-S.

17       Q    Okay.  And your SAS program, you can input a CSV

18   file, right?

19       A    You could import a CSV file into SAS, correct.

20       Q    So you could have taken the Epic log and analyzed

21   it in the SAS tool, right, as a mechanical matter?

22       A    Yes.

23       Q    And my using of SAS was a long time ago before I

24   got to be a lawyer, but as I recall, it's pretty quick,

25   right?  You upload the file, you tell it what output you're

HIGHLY CONFIDENTIAL

Page 133

1    looking for, and it comes back to you in seconds basically?

2        A    Sure.  So here we're talking about a dataset of

3    roughly 300-some thousand observations, so, yeah, with the

4    modern computing infrastructure, that would be a matter of

5    seconds, most of the queries, at least.

6        Q    And an observation, when we think about it in

7    statistics, would sometimes be called a N, a little N?

8        A    Sure.  I mean, we can define it however, but,

9    yeah, a little N is familiar.

10       Q    So as we sit here today, under oath, you're not

11   able to tell me whether or not 300,000 observations gives

12   you enough statistical power at a 95 percent confidence

13   level, let's say, to reach conclusions, are you?

14       A    The question, in and of itself, doesn't make

15   particular sense to me.  It depends on conclusions about

16   what, and what is the question?

17       Q    Depends on conclusions about what.  What do you

18   mean "conclusions about what?"  Can you help me?  I'm not

19   trying to ask misleading questions, I'm just not a

20   statistician.

21       A    So statistical significance applies to a

22   hypothesis that one is testing.  So what is the hypothesis

23   that I'm asked to hypothetically test, given the log

24   datasets, so I would need to know that at least as a first

25   step to be able to try to answer the question as to whether

HIGHLY CONFIDENTIAL

Page 134

1    that dataset itself is sufficient to answer the question of

2    statistical significance and whether there will be a

3    meaningful question to ask.

4        Q    So if the question you're trying to answer is

5    whether or not employees turned history on or off with your

6    300,000 observations, that you have not tested to see if the

7    Epic log would give you enough statistical significance to

8    reach that conclusion?

9                MR. MCCALLUM:  Object to the form.

10               THE WITNESS:  I mean, again, I'm trying to

11       guess as to exactly what you're asking, because the

12       question as posed doesn't make a lot of sense to me.

13               Because I believe I'm very clear in my report

14       that with respect to the five employees over a 68-day

15       period, I believe both Professor Hochstetler and I have

16       close to a perfect certainty on the pattern of

17       switching on and off for those five employees in

18       particular with a little of uncertainty caveat that

19       doesn't come from statistics, but comes from deficiency

20       in the log itself.

21               So the set of the -- the non-responds bias,

22       so to speak, but that's -- that's less related to the

23       statistical significance, more to simply the slight

24       deficiency in the log itself because it wasn't designed

25       for that purpose.

HIGHLY CONFIDENTIAL

Page 135

1          So Professor Hochstetler notices that the

2     overlapping log and the messages that were produced in

3     context don't always match exactly.  He also notes that

4     the received messages are being logged into the CSV

5     file, sometimes multiple times, so there's some small

6     uncertainty there, but putting those little

7     uncertainties aside, both Professor Hochstetler and I

8     agree that in the context of 68 days for these five

9     particular custodians, we're both relatively certain

10     about the outcome of our on and off analysis.

11 BY MR. COLLIER:

12     Q    I understand that.  Where you and Professor

13 Hochstetler part ways is his extrapolating from the five

14 employees to a larger group, say, 202 employees, or whatever

15 the custodian amount is, because I know it fluctuates all

16 the time.

17          Isn't that kind of a fair summary?

18     A    That's correct.

19     Q    And by the way, I said 202 employees because I

20 believe you reference that in your report, because Professor

21 Hochstetler had said 141 employees, right?

22     A    Yes.  I believe he started, and he actually cited

23 to a document, that was one of the letters, and I believe

24 that's where he took the number from, that's my

25 understanding.

HIGHLY CONFIDENTIAL

Page 136

1      Q    And then where did you get 202 from?

2      A    I asked counsel whether that is a true number and

3   whether there are other custodians given that now there's

4   more information produced from other litigations, so whether

5   that increased the number of custodians from which data and

6   chats in particular were produced in this case, and I was

7   informed that.

8              MR. MCCALLUM:  I'll just object there and

9         caution the witness not to disclose the substance of

10        any communications that counsel made to you.

11             THE WITNESS:  Well, just that there were

12        more.  There were data produced from our custodians and

13        that added up to 2002, and that's the foundation for

14        the 202 in my report.

15   BY MR. COLLIER:

16     Q    And I want to be careful because I don't want to

17   invade your conversation with counsel, so I'm going to ask

18   this question as precisely as I can, and pause before you

19   answer in case Mr. McCallum thinks I don't get it right,

20   because I'm not trying to -- you believe Professor

21   Hochstetler, when he says 141 employees, was wrong, and it's

22   actually -- and I'll say approximately, approximately 202

23   employees or 202 custodians; is that fair?

24     A    Correct.  Irrespective of the time period for

25   which those individuals were, in fact, custodians.  Meaning,

HIGHLY CONFIDENTIAL

Page 137

1    because there's a, you know, not all of these 141 or 202

2    were custodians as of the time period of the log.  Not to

3    mention the time period which then Professor Hochstetler

4    applies the analysis to.

5        Q    Okay.  With that caveat, Professor Hochstetler

6    points to a document from Google to support his 141.

7            Without telling me any communications with

8    counsel, can you point me to a document or something

9    published in this case that supports 202 custodians?

10       A    So just to make it clear.  I have not seen a

11   document from Google.  I've seen a legal letter from

12   Google's counsel to, I believe, one of your colleagues,

13   maybe even you're an addressee as well.

14           So there's a legal communication that Professor

15   Hochstetler, I believe, cites to.

16       Q    Okay.

17       A    And so my understanding of the 202 also comes from

18   counsel, in particular, you know, attorneys who have drafted

19   that letter that Professor Hochstetler has relied upon.

20       Q    Okay.  I'm trying -- I want to be very careful

21   with your counsel's privilege, that's -- I'm pausing for a

22   moment because it is never my intention to accidentally make

23   you say anything you shouldn't.

24           I think that's all I can ask you on that.

25           What effect does -- okay, economists always make

HIGHLY CONFIDENTIAL

Page 138

1  fun of me, so you're free to laugh, too, when I say this

2  Latin, because I say it Texan.

3              Ceteris paribus, all other things being equal,

4  right, standard economist assumption.  What effect does

5  changing the number of custodians from 141 to 202 do to the

6  underlying conclusion by Professor Hochstetler as to the

7  amount of messages that weren't retained, directionally?

8                      MR. MCCALLUM:  Object to the form.

9                      THE WITNESS:  Well, in my opinion, it

10       compounds the errors that Professor Hochstetler has

11       embedded into his extrapolation analysis.

12  BY MR. COLLIER:

13       Q     Please explain.

14       A     So, I mean, I go at length in my report to discuss

15  specifically, for example, the roles of the five custodians

16  for which the log dataset has been analyzed by Professor

17  Hochstetler.

18              One of the custodians that Professor Hochstetler

19  analyzes is the CEO of Google.  Another custodian is █████

█████████████████████████.  With the titles as such, there

21  is only one individual and has only always been one

22  individual with that title and that role at Google.

23              So by multiplying these -- the histories of those

24  unique individuals, more times, the errors associated with

25  treating those individuals as not unique, compound.

HIGHLY CONFIDENTIAL

Page 139

```
 1        Q    Can you tell me why the histories of those unique
 2   individuals not being treated as unique affect the outcome?
 3   If I'm understanding what you said correctly, and I may not
 4   be.
 5        A    Well, one simple way to think about it is, in
 6   particular in the context of the CEO, because I have looked
 7   at the deposition of Mr. Pichai.  His both role and
 8   communication patterns, and level of involvement in depth
 9   and various types of businesses at Google, are unique
10   because they're attached to a role of a chief executive
11   officer.
12             So if one were to use his particular pattern and
13   assume that it's the same as everybody else at Google who
14   would be relevant, and you do it more times than you did
15   previously, that compounds the error rate for that
16   particular individual.
17             And of the five, ███████████████████████
     ██████████████████████████████████████████████, and as
19   Professor Hochstetler notices, has a unique pattern of
20   communicating.
21             And so, again, using that individual to
22   extrapolate into even more individuals outside of these
23   five, again, compounds the error.  If you multiply it as in
24   Professor Hochstetler analysis by, you know, more times
25   than, say, 141.
```

HIGHLY CONFIDENTIAL

Page 140

1      Q    Are you aware that the Court has ordered in that

2  case that Sundar Pichai be deposed because he had relevant

3  knowledge, was that fact available to you?

4      A    If the -- if the deposition notice was attached to

5  Mr. Pichai's deposition I would have skimmed through it.  I

6  don't recall specifically seeing what Mr. Pichai and what he

7  was noted for, so I don't know.

8      Q    Did you reach a conclusion in your expert report

9  that Mr. Pichai had no relevant chats at any time in the

10 period from wherever it started till today's date?

11     A    Just to be clear, again, I'm hoping that I've been

12 clear all along.

13          I'm offering no opinions as to relevance.  That's

14 not the area of my expertise.

15          I can tell you what the log dataset says, what

16 chats have been retained, what the history of off and on is,

17 what chats that have been retained after February 8th have

18 ultimately been produced in this case.

19          So that's the extent of my both expertise as it

20 applies to this.  I cannot speak to relevance, that's

21 outside of my both role and expertise.

22     Q    Did you reach a conclusion that there were no

23 chats of Mr. Pichai they were not retained?

24     A    In the period after February 8th, that is my

25 understanding.  The data that I've analyzed appears

HIGHLY CONFIDENTIAL

Page 141

consistent with that.

    Q    Are you testifying under oath that -- when you say "in the period after February 8th," you mean 2023?

    A    Correct.

    Q    So now I want to ask you prior to February 8th, 2023.  It's not your opinion that Mr. Pichai -- you're not testifying that Mr. Pichai did not send a chat that has not been retained, is it?  That's a lot of double negatives. Let me ask you a better question.  The double negatives are hard.  I'm going to do that.

         Is it your opinion under oath that Mr. Pichai sent Chat messages prior to 2023, but they were all retained and collected by Vault?

    A    No.  I'm very clear about it, and I have a summary table in my report that in my understanding, and including reviewing the log, the same exact policies we've discussed, the retention policies, apply Mr. Pichai as they did to any other employees, including those on litigation holds, which I understand Mr. Pichai was one of those.

    Q    Right.  While based on that, while we don't know the number, can we agree that Mr. Pichai has been employed at Google at all relevant times, I'll represent that to you.

         Can we agree that Mr. Pichai sent some texts that we disagree as to the -- some chats as we disagree as to the number they were not retained and collected by Vault?

HIGHLY CONFIDENTIAL

Page 142

1              MR. MCCALLUM:  Object to the form.

2              THE WITNESS:  Well, in the context of the log

3        dataset, we, as in -- I can tell, at least I can speak

4        for myself that I do know how many messages Mr. Pichai

5        has sent in the 68-day period, or let's say the period

6        from December 13th to February 8th.

7              So I do know the number that he sent and

8        received that were marked as ephemeral.  I just don't

9        recall the number from the top of my head, but that

10       information is in the log datasets, so we know what the

11       number is.

12  BY MR. COLLIER:

13    Q    Right.  That's why -- I'm trying not to quibble

14  with you, sir, about how many, because I know how many chats

15  were not retained is actually a central disagreement between

16  you and Professor Hochstetler, like you don't agree with his

17  extrapolation from the five to the 202, right?

18    A    Correct.  But not with respect to Mr. Pichai,

19  within the context of the 68-day period; I believe we're

20  pretty much in agreement for that particular period for that

21  particular individual.

22    Q    Right.  But the 68-day period tells you that

23  Sundar Pichai sent chats, right?

24    A    Correct.

25    Q    And we know if Sundar Pichai sent chats prior to

HIGHLY CONFIDENTIAL

Page 143

1    February of 2023 and history was not on, those chats were

2    not retained by Google, right?

3         A    Correct.

4         Q    And that same -- I want to ask that same question

5    about every Google employee that could be involved and have

6    relevant documents, even though I'm not asking what's

7    relevant.

8              We know that the Google employees, who sent chats

9    prior to February of 2023 and the history was not on, it was

10   off, those chats were not retained by Google, right, unless

11   someone went in and specially turned on the switch?

12                     MR. MCCALLUM:  Object to the form.

13                     THE WITNESS:  Correct.  With the caveats that

14       we discussed, but I believe I follow your statement.

15   BY MR. COLLIER:

16        Q    Okay.  So Mr. Hochstetler has reached various

17   opinions about the number of chats that were not retained by

18   Google in this case, and you've seen them, right, he did

19   actually for 2022?

20        A    Right.  I believe 2022 -- initially, I think it

21   was about 1.5 million, if I recall roughly, what Professor

22   Hochstetler has put forward.

23        Q    And I think that number bounces around depending

24   on various assumptions, right?

25              I know you don't believe that there's evidence

HIGHLY CONFIDENTIAL

                                                    Page 144

1    that 1.5 million chats were not retained by Google.

2             Do you have affirmative testimony on how many

3    chats were not retained by Google in 2022?

4        A    I do not.

5        Q    Can you testify under oath how many chats were not

6    retained by Google in 2021, of, we'll say, the custodians in

7    this case?

8                 MR. MCCALLUM:  Object to the form.

9                 THE WITNESS:  Same answer.  I can only speak

10        to the -- to the five custodians for which we do have

11        information for.

12   BY MR. COLLIER:

13       Q    And I'm sorry, I got to ask you one more wrap-up

14   question, even though I know your answer, just so I can get

15   it in the record.

16             You can't testify under oath how many chats were

17   not retained by Google from, we'll say 2007, to the end of

18   2022, because the history was off, correct?

19                MR. MCCALLUM:  Object to the form.

20                THE WITNESS:  Correct.  That's not the

21        analysis I've conducted or have been asked to conduct.

22        And I disagree that the methodology that Professor

23        Hochstetler has put forward can be used for that

24        purpose.

25

HIGHLY CONFIDENTIAL

Page 145

1    BY MR. COLLIER:

2         Q    I understand your disagreement.  I'm trying to

3    figure out if you have an affirmative opinion.

4              Now, we can agree, whatever that number is, you

5    know there were some chats not retained by Google from 2007

6    until the end of 2022, the way the system was set up, right?

7                   MR. MCCALLUM:  Object to the form.

8                   THE WITNESS:  Yes.  In the context of what

9         we've been discussing, yes, I believe we've established

10        that.

11   BY MR. COLLIER:

12        Q    Cub any more specific than there were some, you

13   know, it's not zero?

14        A    Well, I just want to be sure I understand.

15   What -- what is it exactly that you're asking me to admit

16   that it's not zero?

17        Q    The number of chats sent prior to 2023.  So 2022

18   backwards, to 2009.

19             How many chats were sent with history off by

20   custodians in this case that were not retained?

21                   MR. MCCALLUM:  Object to the form.

22                   THE WITNESS:  If you're asking me about any

23        chats, it does appear that the number is greater than

24        zero.

25                   I do not know what the number is, or I do not

HIGHLY CONFIDENTIAL

```
                                              Page 146
 1        have an affirmative opinion as to what the number is.
 2   BY MR. COLLIER:
 3        Q    Okay.  How many chats, if you have an opinion, how
 4   many chats would have to be spoliated before a company
 5   should be punished for not retaining the chats?
 6                  MR. MCCALLUM:  Object to the form.
 7                  THE WITNESS:  I'm not sure I -- could you
 8        explain to me the -- what do you mean by "spoliated,"
 9        because we haven't really used the term in the context
10        of discussion so far, so I just want to make sure I
11        understand.
12   BY MR. COLLIER:
13        Q    Well, I'm not using the economic market
14   spoliation.  I'm saying spoliation, like you can think of in
15   like eggs, you know, after a certain period eggs are no
16   good, they're spoliated, they have to be thrown out.  Maybe
17   that's not the best example, but -- I'll tell you what, let
18   me ask it without using the word "spoliated."
19             How many chats by a Google custodian -- by a
20   company's custodians would a company have to fail to
21   maintain or put in their vault before they should be
22   punished for not doing so?
23                  MR. MCCALLUM:  Object to the form.
24                  THE WITNESS:  I -- I don't know.
25
```

HIGHLY CONFIDENTIAL

Page 147

1    BY MR. COLLIER:

2        Q    That's a legal issue?

3        A    I actually don't even know that.  I don't know.

4             There are regulations, there are precedence, or if

5    it is a legal issue or if it's a fact-finder issue, I

6    actually don't know.

7        Q    Okay.  And you're certainly not issuing an opinion

8    on that particular fact?

9        A    Yes, I'm not.

10       Q    By the way, did you look at Mr. Ignatius Grande's

11   rebuttal expert report in this matter?

12       A    I have seen two, I believe, documents from Mr.

13   Grande last week.  Also, one declaration and one -- I think

14   it was titled an expert report, so I know there were --

15   frankly, I spend more time with Professor Hochstetler's

16   documents, but I have seen Mr. Grande's disclosures.

17       Q    Well, and you're probably anticipating where I'm

18   going.

19            You understand Mr. Grande's a lawyer, right?  Or

20   maybe you don't.  Do you know if he's a lawyer?

21       A    If you're representing me that he is, I would not

22   be surprised.  But, yeah.

23       Q    I'll represent to you he is a lawyer, but more --

24   more to the point.  Given the subject of Mr. Grande's

25   declaration in his expert report on things such as

HIGHLY CONFIDENTIAL

Page 148

1    preservation and industry standards and legal standards on

2    that, is it your intention to provide rebuttal testimony to

3    Mr. Grande's either declaration or his report?

4        A    Not as I sit here.

5        Q    When you read Mr. Grand's declaration or expert

6    report, did you go:  "OMFG, that's wrong"?

7                    MR. MCCALLUM:  Object to the form.

8                    THE WITNESS:  I certainly don't recall having

9        any strong reactions about it and certainly not of that

10       kind, so, no.

11   BY MR. COLLIER:

12       Q    All right.  We're removing the OMFG, because

13   that's now my new favorite acronym.

14            It's fair to say when you read Mr. Grande's

15   declaration or expert report, you didn't say:  "I'm going to

16   rebut any of his conclusions under oath," because he's in a

17   different field than you, right?

18       A    Well, I would characterize it a little

19   differently.

20       Q    Okay.

21       A    I typically don't focus on the field of the

22   person.  I more focus on the actual opinions, so I -- I just

23   did not see relevant material to the opinions that I offer.

24            So I -- that's why I wouldn't be developing reply

25   opinions to that, at least as I sit here, and I wasn't --

HIGHLY CONFIDENTIAL

Page 149

1    certainly asked to do any work on those, so I don't know,

2    but it's more in terms of the content, I have not studied

3    Mr. Grande's background, for example, so I don't know.

4         Q    And that's fair enough on the content.

5              So let me ask my question in a way that hopefully

6    makes you a little more comfortable.

7              As you sit here today at your deposition, you've

8    looked at Mr. Grande's declaration, we'll start with that.

9              And there's nothing in Mr. Grande's declaration

10   you intend to provide sworn testimony to rebut, is there?

11        A    Not as I sit here.

12        Q    Same question as you sit here today at your

13   deposition, you've looked at Mr. Grande's -- it's called a

14   rebuttal expert report.

15             There's nothing in Mr. Grande's rebuttal expert

16   report you intend to provide sworn testimony to rebut, is

17   there?

18                  MR. MCCALLUM:  Object to the form.

19                  THE WITNESS:  Same answer.  Not as I sit

20        here.

21   BY MR. COLLIER:

22        Q    And thank you for being patient.  I know some of

23   these questions are just annoying, but I have to figure out

24   what you're going to say at trial and not.

25             Do you have an opinion as to whether or not a

HIGHLY CONFIDENTIAL

Page 150

1   litigation hold should clearly and unambiguously list the

2   types of materials that are subject to that hold?

3        A    I do not have an opinion about that.

4        Q    Do you have an opinion as to whether a litigation

5   hold should provide clear instructions as to how to handle

6   or preserve materials subject to the hold?

7        A    I do not.

8        Q    Do you have an opinion whether a litigation hold

9   should clearly state any de-structure or deletion of

10  relevant materials should immediately cease?

11       A    Same.  I do not.

12       Q    How long have we been going?  If you don't mind,

13  I'll do a couple more questions and then we'll take a break.

14            You are not issuing any opinion that any of the

15  plaintiffs' litigation holds or document preservation

16  schedules are insufficient, are you?

17       A    Correct.  I offer no opinion on that.

18            MR. COLLIER:  This is probably a good time

19       for a break.

20            THE VIDEOGRAPHER:  The time right now is

21       2:52 p.m.  We are off the record.

22            (Recess taken at 2:52 p.m.)

23            THE VIDEOGRAPHER:  The time right now is

24       3:18 p.m.  We are back on the record.

25

HIGHLY CONFIDENTIAL

Page 151

1    BY MR. COLLIER:

2        Q    Mr. Malkiewicz, can you go back to your CV in this

3    matter?  And I'm looking at page 9, which is your research

4    interests.

5        A    Okay.

6        Q    And you've got a lot of interests here, and I was

7    spending a little time earlier looking at the cases that

8    you've testified in.

9             It looked to me like your research interest would

10   be a fair summary of the things that you've rendered expert

11   opinions on before; is that fair?  You want me to take them

12   one by one?

13       A    No.  I just want to make sure I understand your

14   question, so if you could repeat it.

15       Q    Yeah, let me just ask it in a more straightforward

16   way.

17            Are you an expert in antitrust economics?

18       A    Yes.

19       Q    Are you an expert in applied econometrics and

20   statistics?

21       A    Yes.

22       Q    Are you an expert in corporate finance?

23       A    Yes.

24       Q    Are you an expert in health care and

25   bio/pharmaceutical economics?

HIGHLY CONFIDENTIAL

Page 152

1          A     Yes.

2          Q     Are you an expert in intellectual property and

3     intangible assets valuation?

4          A     Yes.

5          Q     Are you an expert in marketing theory and

6     marketing analytics?

7          A     Yes.

8          Q     Are you an expert in international trade?

9          A     Yes.

10         Q     Are you an expert in labor economics?

11         A     Yes.

12         Q     Are you an expert in law and economics?

13         A     That's more of a professional interest.  I have

14    not offered opinions in that area.  But that's something

15    that comes out of my work before consulting.

16         Q     Got it.

17               And you're not a lawyer, so you don't purport to

18    be an expert in the law, right?

19         A     Correct.

20         Q     But you are an expert in economics?

21         A     Correct.

22         Q     Okay.  I just want to make sure that's where you

23    were headed with that.

24               Are you an expert in the economics of

25    standardization and standard essential patents?

HIGHLY CONFIDENTIAL

Page 153

1        A     Yes.

2        Q     And are you an expert in survey research methods?

3        A     Yes.

4        Q     Is there anything else not in that list that you

5    consider yourself an expert in?

6        A     Not that I can think of.  And just to be clear,

7    there's a lot of overlap between those areas.

8        Q     Sure.

9        A     At least in terms of the expertise I'm typically

10   asked to offer.

11       Q     Okay.  And then in your professional history, is

12   it fair to say that since 2006 you have worked for

13   Consulting Practices?

14       A     Correct.

15       Q     And can you tell me generally in a sentence or two

16   what your work -- and I'm sure as you become vice president,

17   it's changed from when you were just a senior associate, but

18   just very generally, what have you done since 2006 to the

19   present as a consultant?

20       A     Generally, I applied my education and training in

21   economics, finance and statistics, to the applied -- so I

22   applied these sciences in the context of various consulting

23   projects with a particular focus on disputes and

24   investigations.

25       Q     And you haven't worked in any non-consultant

HIGHLY CONFIDENTIAL

Page 154

1    industry, have you?

2        A    With the exception of teaching, and since 2006,

3    that's correct.

4        Q    Okay.  Since 2006, you've either been teaching or

5    a consultant, but you haven't been, say, working at

6    Microsoft or any Fortune 500 company?

7        A    Correct.  So all those engagements would be in a

8    consulting capacity through my primary employment as a

9    consultant.

10       Q    Have you, prior to this litigation, done any

11   consulting for Google?

12       A    I have not, no.

13       Q    What about Google's counsel in this matter?

14       A    I have not, no.

15       Q    Do you know how you came to their attention?

16       A    I do not.

17       Q    And then prior to 2006, you had a couple years of

18   being a research assistant, one to a judge and one to a

19   professor, right?

20       A    Correct.

21       Q    And the -- the Honorable Posner, that was through

22   the school, right?

23       A    So the payment for my work would come through the

24   law school at the University of Chicago, but the appointment

25   was to a joint group that was coordinated by Professor

HIGHLY CONFIDENTIAL

Page 155

1    Posner at the time, in his role at the law school, as well

2    as it was sponsored by him sitting by designation, so he was

3    at the time on the Seventh Circuit Court of Appeals already,

4    but he would sit by designation on a lot of Northern

5    District of Illinois cases, so a lot of the funding came

6    through that work, so a lot of my projects were within the

7    context of him sitting by designation in, particular in

8    cases that involved issues of economics and statistics.

9         Q    It says 2004 to 2004, how many months were you his

10   research assistant?

11        A    That stipend was for about nine months.

12        Q    Okay.  And then your work for Professor Townsend,

13   is that sort of the same thing, in terms of how you got the

14   job and how it was funded?

15        A    So it was a little different.  That actually came

16   out of professor -- sorry, Judge Posner's recommendation, to

17   apply to the National Opinion Research Center, so a lot of

18   that work that I've done with Judge Posner related to

19   professional and economic standards of evidence within

20   district court litigations.

21             And so one of the areas of interest was, in

22   particular, using statistics as inference, and so

23   Professor -- so Judge Posner recommended that I apply to the

24   National Opinion Research Center, which at the time was, and

25   I believe still is, the larger nonpartisan statistical

HIGHLY CONFIDENTIAL

Page 156

1  research organization in the United States, and so I got a

2  position with Professor Townsend, who right now is at MIT, I

3  believe.

4      Q    And did you say one of your interests was, in

5  particular, using statistics as inference?

6      A    Right.  As a -- as a method of inference that

7  would apply to proceedings before district courts

8  specifically.  So that was Professor Posner's -- Judge

9  Posner's interest and that's why he recommended, you know,

10 after my internship or after my position with him and his

11 group, you know, as an extension of that interest, you know,

12 he recommended that I apply to NORC.

13     Q    And the only reason I asked about inference, is

14 the court reporter heard interest, so I wanted to make sure

15 it was statistics of inference.

16     A    Inference, correct.

17     Q    And can you just give me an example of -- well,

18 give me a hypothetical of using statistics as inference that

19 you -- so I'll understand the concept?

20     A    So generally, at the very high level, what Judge

21 Posner was interested in is in a situation where there is

22 incredible, say, first account information or data, came

23 studies of subsamples, whether of data or populations,

24 whether their questioners or objectively collected data can

25 be used with scientific rigor that would, then in his mind,

HIGHLY CONFIDENTIAL

Page 157

1    compare to the rigor of, say, direct witness testimony, for

2    example.

3           And so what does the science of statistic teach

4    versus what is typically available, used.  In his practice,

5    as a judge, that he sees being, you know, offered as

6    evidence in court cases.

7           One of -- so that's not hypothetical, it's an

8    actual.  So one of the main projects I worked on related to

9    contingent evaluation types of analysis, so evaluating using

10   statistical methods, whether diminishing of a well-being of

11   individuals as a result of environmental damage can be put

12   forward in the form of statistical models, as opposed to,

13   you know, just asking people how they feel about certain

14   things following an environmental event.

15       Q    And what does the word "inference" connote in this

16   analysis?

17       A    Well, the way that statisticians typically use it,

18   that means whether a conclusion can be drawn to a population

19   about -- from information that comes out of a sample of --

20   that's smaller than the population itself.

21       Q    And the general answer to that question is:  Yes,

22   right?  I mean, sampling -- that's sampling, right?

23       A    It depends.  That's the whole idea, that there are

24   contexts in which drawing of a reliable sample is possible.

25           There's some cases in which it is not possible.

HIGHLY CONFIDENTIAL

Page 158

1    There are cases in which the sample is drawn correctly.

2    There are cases in which it's not drawn correctly, so it's

3    a -- it's a fact intensive inquiry.

4         Q    What are some cases where the drawing of a

5    reliable sample is not possible?

6         A    I'm not sure.  You'd have to give me like an

7    actual situation.

8         Q    Well, I'm asking you because you said there is

9    context in which the drawing of a reliable sample is

10   possible and there are some cases it is not.

11            I'm just looking for a hypothetical of what would

12   be the case where the drawing of a reliable sample is not

13   possible?

14        A    Well, one example would be when the information or

15   proxy information doesn't exist.  So there has to be a

16   hypothesis about why a given sample is representative, and

17   if determination is made that it isn't representative, that

18   it cannot be used to make statistical determination, if it's

19   determined that, you know, even without being perfect it is

20   reliable enough, given certain indicia, then it may be used,

21   so that's why it's a fact-specific inquiry.

22        Q    Okay.  So I'm supposing reasonable economists

23   would disagree on some of these cases, whether there's

24   enough indicia that an imperfect sample may be used?

25        A    It's possible.  I personally have not seen in my

HIGHLY CONFIDENTIAL

Page 159

1    own experience disagreements at that level.  Typically those

2    are relatively clear-cut, whether a specific type of

3    information can or cannot be used, but I'm a sample of one,

4    so that's just in my experience.

5        Q    Well, for example, in your survey work, haven't

6    you had disagreements with the other survey expert as to

7    whether a population is representative?

8                  MR. MCCALLUM:  Object to the form.

9                  THE WITNESS:  I don't recall the specific

10          situations like that, but I certainly -- it's possible,

11          but you asked me about whether it's technically

12          possible to draw a sample from a given population, and

13          that's a very different question as to whether a given

14          population is, in fact, representative of the question.

15                  So these are two very distinct questions.

16   BY MR. COLLIER:

17       Q    Okay.  So a survey is, by definition, a sample,

18   right, unless you happen to survey every member of the

19   group?

20       A    Yes.  Exactly.  So it's technically -- the

21   limitations are that the maximum is the population, and then

22   it's possible to draw inferences about this population

23   occasionally with using fewer individuals that are in the

24   population.

25       Q    Sometimes you can draw inferences about the survey

HIGHLY CONFIDENTIAL

                                              Page 160

1    population even if you can't prove those with, say, a

2    99 percent confidence interval, right?

3         A    Sure.  I mean, a 99 percent confidence interval is

4    just one of the standards that more scientists typically

5    use.  Social scientists still tend to give a little bit more

6    leeway towards a 95 percent confidence interval.

7         Q    Some folks use 90, don't they?

8         A    With the amount of data available, it's -- there's

9    been a trend, and I know it's been pretty well-recorded,

10   including in professional literature, where with the amount

11   of data available, even in social sciences, the 95 percent

12   confidence interval has becoming a de facto standard.

13             But historically, if you look at the literature

14   from '80s and '90s, you will find 95 percent confidence

15   intervals as well.

16        Q    I've lost my Elmo screen.  Okay.

17             Mark 18.  I'll mark Exhibit 18.  And, for the

18   record, this is GOOG-AT-MDL18279549.  And turn on the Elmo,

19   or if you want to pull it up.  Okay, you've got it.

20             Let's look at the very first text in this matter.

21             First of all, does this appear to be a chat?

22        A    It does.  It appears to be a conversation with

23   multiple chats, correct.

24        Q    And who is apappu?

25        A    She's a Google employee and one of the custodians

HIGHLY CONFIDENTIAL

```
                                              Page 161
 1    in this case.

 2         Q    Do you recognize that name?

 3         A    I do.

 4         Q    And she's been at Google a long time, if you know?

 5         A    I believe so.  I have referenced her in my report,

 6    and I believe I've provided her title as well as the maybe

 7    dates of employment as well.

 8         Q    Okay.  But you know she's a custodian in this

 9    case, right?

10         A    Yes.

11         Q    So look at the first sentence.

12              So ABCs, it turns out Vegas is not Vegas.

13              Let's first -- let me ask you.  What does ABCs

14    mean, if you know?

15         A    I do not know.

16         Q    Okay.  Do you have an understanding what she means

17    when Vegas is not Vegas?

18         A    Not specifically.  I'm not sure.

19         Q    But you got to guess, right?

20              MR. MCCALLUM:  Object to the form.

21    BY MR. COLLIER:

22         Q    Next sentence says:  "Chat, in its infinite

23    wisdom, does not have a history:  "Off option for rooms."

24              "That's right.  Everything kept forever or until

25    garbage collected, which I think for rooms with no activity
```

HIGHLY CONFIDENTIAL

Page 162

1    is 28 days?  Nope.  I lied.  It's forever."

2            Do you see that?

3        A    I see that, yes.

4        Q    Now, does it -- does that refresh your

5    recollection as to perhaps what Google employees mean by

6    Vegas?

7                    MR. MCCALLUM:  Object to the form.

8                    THE WITNESS:  I'm really not sure.  I mean,

9            in the context of this particular message, it's

10           actually difficult for me to read between the lines

11           what exactly this Googler may mean.

12                   I mean, it's -- it seems like it's conveying

13           some sarcasm of some sort, but I'm really not an expert

14           in interpreting chats such as this one.

15   BY MR. COLLIER:

16       Q    So you see where she says -- she's writing this in

17   2019, right?

18       A    Yes.

19       Q    Do you see where she says:  "Chat does not have a

20   history off option for rooms"?

21       A    I see that, yes.

22       Q    Is that true as you understand 2019?

23       A    It appears that that's what Ms. Pappu is saying

24   about this particular -- her particular experience with a

25   room, but I'm not sure what she's referencing by saying

HIGHLY CONFIDENTIAL

Page 163

1    that.  I mean, I'm just not sure.

2        Q    When she says "chat is forever," that doesn't seem

3    right to you, based on what you understand about Google's

4    policies in 2019, does it?

5                    MR. MCCALLUM:  Object to the form.

6                    THE WITNESS:  Right.  I mean, it's really

7        difficult to me to interpret this particular message,

8        including in the context of what you just referenced.

9    BY MR. COLLIER:

10       Q    Well, let's see if her next text helps.

11           "We need to go through a convoluted set of steps

12   to make a history off group chat in old classic hangouts and

13   then use that here.  That's the only way."

14           Do you see that?

15       A    I see that sentence, yes.

16       Q    It's pretty clear that Ms. Pappu is -- is it Pappu

17   or -- Pappu, is -- yeah, Ms. Pappu, Aparna Pappu, is wanting

18   to take this history off on this chat, right?

19                   MR. MCCALLUM:  Object to the form.

20                   THE WITNESS:  Again, I'm not sure.  I see the

21       references to this chat, and I see the sentence that

22       you've read, I just don't know how to interpret it.

23   BY MR. COLLIER:

24       Q    Okay.  And then she says:  "█████ want to do the

25   honors"?

HIGHLY CONFIDENTIAL

Page 164

1            Do you see that?

2      A    I do see that sentence -- that question, yes.

3      Q    And her three chats were on 9/16 at basically 2:42

4  in the afternoon, whenever time zone she's in.

5            Would you agree with that?

6      A    Yes.

7      Q    14:42 means 2:42 p.m.?

8      A    That would be my understanding, yes.

9      Q    Okay.  And then the chat jumps ahead two full

10  weeks, where another gentleman or woman comes in and says:

11  "Promo related reviews done.  Whoo.  Whoo."

12            Does that lead you to infer that the chat was

13  turned off for those two weeks or do you not know?

14                 MR. MCCALLUM:  Object to the form.

15                 THE WITNESS:  I do not know.  I mean,

16        there's -- in one of the previous chats you've showed

17        me, there was a clear indication, as, you know, update

18        language to the chat that indicated that it was being

19        turned off.

20                 In this one, I didn't see it so I -- I really

21        cannot tell what might have happened in between.

22  BY MR. COLLIER:

23      Q    So what we don't know from this document is

24  whether ██████ did the honors of turning chat history off on

25  9/16 until someone came back and turned it on on 9/30,

HIGHLY CONFIDENTIAL

Page 165

1    right, we just don't know?

2                    MR. MCCALLUM:  Object to the form.

3                    THE WITNESS:  Yeah, I cannot tell from just

4        looking at this.

5    BY MR. COLLIER:

6        Q    Is there -- when you say "looking at this," is

7    there any way you know from all the evidence you've reviewed

8    given to you by Google or from other plaintiffs and

9    plaintiff's report, on how we would figure out if there was

10   missing chats between 9/16/2019 and 9/30/2019, on this

11   thread?

12       A    I do not know.

13       Q    Well, and you're not aware of any way we can

14   figure this out, right?

15       A    I am not aware of anybody.

16       Q    Are you aware of Google's DoubleClick acquisition?

17       A    Not specifically.  I mean, I've -- I'm generally

18   aware that Google acquired DoubleClick, but I cannot tell

19   you anything else about it.  I can't even tell you when, as

20   I sit here.

21       Q    Okay,  'do you know what DoubleClick was or, is,

22   or I guess it was, it was acquired?

23       A    Not specifically.

24       Q    Do you know if the DoubleClick acquisition is in

25   any way related to this lawsuit?

HIGHLY CONFIDENTIAL

Page 166

1        A     I do not know.

2        Q     Do you know -- I suspect I know the answer, but I

3    have to ask.

4              Do you know at the time of the DoubleClick

5    acquisition how many DoubleClick employees were integrated

6    into Google?

7        A     I -- I -- I have no idea.

8        Q     If I told you there were over 900, would that

9    surprise you?

10       A     I -- I couldn't tell one way or the other.  If you

11   told me it was five or 9,000, I couldn't tell.

12       Q     So I think I know the answer.

13             You didn't do an assessment to determine whether

14   any of the DoubleClick employees should be put on litigation

15   hold, did you?

16       A     That's correct, I did no assessment at the time.

17       Q     And, in fact, let me just ask it so I can save a

18   bunch of questions.

19             You didn't do any kind of assessment, it wasn't

20   within your scope or role, to determine whether the

21   individuals identified as Google custodians constituted a

22   complete list of people who should be custodians, did you?

23             MR. MCCALLUM:  Object to the form.

24             THE WITNESS:  That's correct.  I did no

25        analysis of custodians or folks on litigation hold,

HIGHLY CONFIDENTIAL

Page 167

1          that's correct.

2     BY MR. COLLIER:

3          Q    Do you know how many Google Chat messages -- and

4     I'll say average or mean, if you want to say mean, if you

5     want to answer in median, that's fine, but I'm going to say

6     mean, on average, a Google employee sends on a daily basis?

7          A    I do not know.

8          Q    Presumably a difference per employee, right?

9          A    Yes, it almost certainly does.

10         Q    Do you have a messaging program at your consulting

11    firm?

12         A    Not specifically a messaging program.  I believe

13    CRA uses mostly Microsoft services in its environment.

14              So Microsoft Teams probably would be the closest

15    to something that would potentially serve as a messaging

16    tool, but there's no separate or like identifiable messaging

17    app that I can -- at least I'm aware of.

18         Q    Do you know what CRA's retention policy is on

19    Microsoft Teams messages?

20         A    I do not know specifically.

21         Q    When you want to go back and search Microsoft

22    Teams messages, do you have any idea how far back you can

23    search?

24         A    I do not know.  It's not something I would

25    typically do.  So I do not know.

HIGHLY CONFIDENTIAL

Page 168

1    Q    Do you know -- and if you don't know since, and
2  I'm thinking you don't know the corollary, but do you know
3  how many Google Chat messages a Google employee receives on
4  a daily basis?

5    A    Yeah.  I do not know.

6    Q    But if Google still has access to a current
7  systemwide back end log, that would be something that you
8  could find out, right?

9    A    If there's data out there that I could analyze, I
10  certainly have the expertise to do it.

11    Q    Right.  You understand, we talked about it before,
12  the Epic log is part of a debugging log that Google keeps,
13  right?

14    A    Or at least kept at that time, yes.

15    Q    It's a snapshot of how the log existed on one day
16  that went back essentially 55 to 60-odd days, depending on
17  how you wanted to define it, right?

18    A    Yes, that's my understanding.

19    Q    And you also have an understanding from ▮▮▮
   ▮▮ ▮▮▮▮▮▮ testimony that every day that log rolled off the
21  oldest day and added the new, right, it was kind of a
22  living, breathing 55 day lookback?

23    A    Sure.  For the debugging log, yes, that's my
24  understanding.

25    Q    Do you have any understanding of whether or not

HIGHLY CONFIDENTIAL

Page 169

1    that log is operational as of today?

2        A    I do not have an understanding, I don't know.

3        Q    If that log existed today, you would be able to

4    figure out the custodians in this case and run an analysis

5    of that log, right, on how many messages the employees sent

6    and received?

7                    MR. MCCALLUM:  Object to the form.

8                    THE WITNESS:  Well, I mean, I wouldn't be

9            figuring out the custodians.  That's, I believe,

10           something, you know, that counsel in this case agrees

11           on, but if I was provided a list and I was provided the

12           data, yes, I could -- I could analyze it in that

13           context.

14   BY MR. COLLIER:

15       Q    Yes.  And you corrected a very bad question, so

16   let me ask the question with your correction, because it was

17   not a good question.

18           If that log existed today and you would be able to

19   take the 202 custodians and run an analysis on that log to

20   determine how many of those -- how many messages each of

21   those employees sent and received, assuming they were still

22   employees at the time of the log?

23                   MR. MCCALLUM:  Object to the form.

24                   THE WITNESS:  With 99 percent confidence, I'm

25           pretty sure I could do it.  I mean, bearing some

HIGHLY CONFIDENTIAL

Page 170

1      unforeseen circumstance, but, yes, that would be well

2      within my expertise.

3  BY MR. COLLIER:

4      Q    So why didn't you do that?

5      A    You know, it's something else I was asked to do.

6  I also don't know whether a log exists or not.  I was

7  specifically retained to analyze the work of Professor

8  Hochstetler in this case, and that's what I've done.  I have

9  not been asked to do anything else.

10      Q    So -- and I don't mean this to sound critically,

11  but is it fair to say your job was to evaluate and/or

12  criticize Professor Hochstetler's methodology but not come

13  up with your own methodology for how many chats were sent,

14  received, retained, or not retained; is that fair?

15      A    I mean, that's fair.  I mean, I described the full

16  extent of my assignment, but it's relatively consistent with

17  what you described.

18      Q    I mean, I know you have criticisms of Professor

19  Hochstetler's methodology, and we'll discuss those.

20           But if you don't have any affirmative testimony as

21  to how many chats were sent, received, retained or not

22  retained, other than in that 60-odd day period as to the

23  five custodians, right?

24      A    Yes.

25      Q    And as you said, you and Mr. Hochstetler basically

HIGHLY CONFIDENTIAL

Page 171

1  have agreement on that number, the five custodian over the

2  60-day period, and you're fundamental disagreement with

3  Professor Hochstetler is extrapolating or inferring from

4  that data and applying it to the other 197 custodians; is

5  that a fair summary?

6      A    Right.  At a high level, I'd say that's a fair

7  summary.

8      Q    And because you didn't calculate your own number,

9  it could be mathematically that Professor Hochstetler's

10  numbers on chats received, chats sent, chats retained, not

11  retained, could be high or be low, we just don't know.

12     A    That's -- that's, yes, exactly my point.  We just

13  don't know.  We cannot know using the methodology proposed

14  by Professor Hochstetler.

15     Q    Do you know how many Google Chat conversations

16  Google has produced in this case?

17     A    Google Chat conversations.  I don't have the

18  exact number in mind, but on the order of thousands or tens

19  of thousands.  I'm not sure.

20     Q    How many e-mails has Google produced to the states

21  in this case, if you know?

22     A    I'm not sure.

23     Q    I believe you mentioned before you had reviewed

24  Mr. Hochstetler's declaration in this case, right?

25     A    I have, yes.

HIGHLY CONFIDENTIAL

Page 172

1          Q     I'm going to hand you what I'm marking as Exhibits

2     19 and 20, all at once, save us some time.

3                Looks like maybe I had the wrong exhibit number.

4                Okay, handing you Exhibits 19 and 20.

5                And, sir, I will represent to you these are

6     Figures 1 and 2 out of Mr. -- Professor Hochstetler's

7     declaration, right?  Sorry, the sticker's not cooperating.

8                So first is Exhibit 19, is the chart he did on

9     produced Google e-mails by year.

10               And you've seen that figure, right, in his

11    declaration?

12         A     It looks familiar.  Again, I've had little time to

13    spend with Dr. Hochstetler declaration, but I --

14         Q     Well --

15         A     I'm familiar.

16         Q     -- and I'm not going to ask you, you've already

17    said you don't know, so now I'm asking just a cleanup

18    question.

19               Professor Hochstetler has produced a figure in his

20    declaration talking about how many Google e-mails were

21    produced by year.  I mean, do you remember at least this bar

22    chart in his declaration?

23               Well, I'll tell you what.  Scratch whether you

24    remember it or not.

25               Looking at Figure 1, which I'll represent to you

HIGHLY CONFIDENTIAL

Page 173

1   is from Mr. Hochstetler's declaration, do you have any

2   reason to agree or disagree with the numbers of produced

3   Google e-mails by year as shown in this chart?

4        A    You're jogging my memory a little bit, but I do

5   recall, I believe I had a quibble with the way that

6   Professor Hochstetler defined the word "e-mails" for the

7   purposes of this chart.

8        Q    Okay.

9        A    Because he had a length -- I believe it was a

10  footnote or a lengthy paragraph speaking to, I want to say

11  the -- the way he wasn't able to run the analysis to

12  de-duplicate the actual e-mails, and we've chatted a little

13  bit today about how various Bates stamps are put on same

14  exact documents, and actually in my work and experience,

15  that's always the case, that's why I'm always very careful

16  about is this the actual document I cited on my materials

17  relied upon list.

18             So my quibble was only with the e-mail definition.

19  So not with the actual mathematics of the numbers here, but

20  with what do we understand to mean the word "e-mail" in the

21  title of the chart.  So that's my recollection.

22             But again, I've looked at the declaration briefly

23  I believe maybe on Wednesday is the first time I saw it, so

24  I don't have like a specific analysis that I've conducted of

25  it.

HIGHLY CONFIDENTIAL

Page 174

1      Q    So, yeah, I guess you've answered the better

2   question I should have asked.

3           You have not done an analysis on how many Google

4   e-mails were produced in this case by year, have you?

5      A    I have not, no.

6      Q    And so Professor Hochstetler's Figure 1 could be

7   right, could be wrong, it's just not within the scope of

8   something that you've reported on, other than you note your

9   quibble about how he defines e-mail; is that fair?

10     A    Well, no.  So just to make it clear.  I -- I have

11  no reason to believe that in terms of -- without de-duping

12  or de-duplicating the e-mails that Professor Hochstetler has

13  made a mistake here and these numbers are incorrect.  So I

14  have no reason to quibble with it based on the information

15  he disclosed.

16          But based on additional information he disclosed,

17  that he wasn't able to remove the duplicates from these

18  counts, that neither him nor I know what the actual number

19  of unique e-mails is, so that's my only comment that I can

20  make.

21     Q    Would you assume that the number of duplicates

22  would, percentagewise, be roughly equivalent through the

23  years?

24               MR. MCCALLUM:  Object to the form.

25               THE WITNESS:  I honestly -- I don't know.

HIGHLY CONFIDENTIAL

Page 175

1    BY MR. COLLIER:

2        Q    Okay.  So now I'm handing you Exhibit 21, which is

3    his Figure 2, where he calculates the produced Google Chat

4    conversations by year.

5            You aren't offering any affirmative testimony on

6    how many Google Chat conversations have occurred by year,

7    are you?

8        A    No.  I do not offer an opinion.

9        Q    And so this -- this Exhibit 21 could be right,

10   wrong, you just don't know, because you haven't done the

11   analysis?

12       A    Right.  So, I mean, my only comment was, again, in

13   the context of -- would be in the context of reading through

14   Professor Hochstetler's, you know, declaration explaining

15   how he came up with the numbers, and I certainly do not have

16   any critique of the mechanics of it because I haven't

17   replicated the count itself, so my impression from reading

18   his declaration was more conceptual that, you know, if one

19   is going to compare chat conversations with e-mails, for

20   example, the question is, you know, is the chat conversation

21   the right comparison or is it a Chat message the right

22   comparison, you know, the e-mail chains are produced the way

23   where, you know, if one e-mail on top is a reply e-mail, the

24   rest of the e-mails will also be potentially produced as

25   separate e-mails.

HIGHLY CONFIDENTIAL

Page 176

1        So what is the right comparison here, I don't

2    believe Dr. -- Professor Hochstetler has disclosed what he

3    believes the right comparison would be.

4        So -- so my impression of the declaration was at

5    that level, but I have no critiques as to the actual

6    numerical counts within these charts.

7    Q    Okay.  Do you -- looking at Figures 1 and 2 --

8    A    I apologize, if I may, but just to make it clear.

9        So the documents I have in front of me.  One is

10   labeled as Exhibit 19 and the other one is Exhibit 21.  So

11   it seems like --

12   Q    Did I skip 20?  I'll ask Madam Court Reporter.

13       So I will remark this, and to save us all a bunch

14   of time, I asked you a series of questions about Figure 2,

15   and I might have called it Exhibit 21.

16       Would any of your answers change if I change the

17   exhibit number to Exhibit 20?

18   A    They would not.

19   Q    Okay.  Then thank you for helping me.  As you can

20   see as the day progresses, my administrative skills

21   deteriorate and I'll probably make more mistakes, so I

22   appreciate that.

23       Do you have -- if you look at Exhibits 19 and 20,

24   you'll see that the amount of Google produced Google e-mails

25   by year peaks in 2019, but the amount of produced Google

HIGHLY CONFIDENTIAL

Page 177

1    Chat conversations peaks in 2022.

2            Do you have any understanding as to why that may

3    be?

4        A    Not specifically.  It would be a speculation on my

5    part.

6        Q    What would be your -- your hypothesis?

7                MR. MCCALLUM:  Object to the form.

8                THE WITNESS:  Again, it's completely

9        speculating.  I mean, there's a diversity in -- among

10       the Googlers who are parts -- who are custodians and

11       are on litigation holds.

12               There's diversity over time in what I'll

13       call, you know, generational change in employees, so

14       some employees may be more comfortable using e-mails

15       versus chats.

16               So, I mean, there's various testable

17       hypotheses.  But again, that's sort of generally my

18       kind of marketing analytics expertise, less so, you

19       know, what actually the answer in this case is, that's

20       not something I've analyzed specifically.

21   BY MR. COLLIER:

22       Q    Well, your nice way of saying generational changes

23   of employees to a guy with a gray beard probably means you

24   would assume an old guy like me might be more likely to send

25   an e-mail than a message; is that directionally what you

HIGHLY CONFIDENTIAL

Page 178

1    think?

2         A    That would be my hypothesis, but it's testable, so

3    we don't know if it's true or not in this case.

4         Q    And conversely, a younger, newer employee, might

5    be -- might, not tested, be more likely to send a message

6    than an e-mail?

7         A    Correct.  An average employee, but, of course,

8    it's -- it's, again, it's a testable hypothesis.

9         Q    And just to be clear, you didn't test that

10   hypothesis as part of your work?

11        A    I did not.

12        Q    I will tell you, there is always an outlier,

13   because if you were to see my wife's mother, my kids'

14   grandmother, she sends a lot of messages; bad memes, bad

15   grandma stuff, but that's the purpose of an outlier, right?

16   You can get most things down to a mean, a median, and some

17   distribution type analysis, right?

18        A    Maybe.  I mean, there's not really a statistical

19   test for outliers, per se.  There may be some rule of

20   thumbs, but there's, you know, there's a bit of a quibble as

21   to what the right approach is for treating outliers and it's

22   context specific.

23        Q    And how far out the outlier is sometimes?

24        A    So it's typically less about how far it is, but

25   the actual underlying reason for why it is out.  Because

HIGHLY CONFIDENTIAL

Page 179

1    it's not about the size of the effect, it's more about the

2    reason for the effect.

3          Q     Okay.  Do you know what Project Bernanke was?

4          A     I'm sorry, project name was?

5          Q     Bernanke.

6          A     I do not --

7          Q     B-e-r-n-a-k-e {sic}.

8          A     I do not know.

9          Q     Well, if I was to ask you questions about whether

10   chats about this Bernanke would have any relevance to the

11   case, that would be outside any opinion you're giving?

12         A     Yes.  I do not know what Project Bernanke is.

13         Q     Are you aware that Google designed, developed, and

14   maintains control over the Google Chat product?

15         A     I mean, I'm not particularly aware of it, but

16   it's -- I mean, the way you describe it sounds not

17   controversial to me.

18         Q     Well, you know that Google can change the

19   retention periods applied to Google Chats, right?

20               Or if you don't know, that's fine.  I shouldn't

21   have assumed you knew.

22         A     I mean, if you're asking me from the technical

23   perspective, I know some changes have been made over time

24   based on ████████ testimony.

25               If you're asking about the sort of control in a

HIGHLY CONFIDENTIAL

Page 180

1   more kind of esoteric legal sense, I don't know, but I

2   assume it's a Google product, and Google develops it

3   internally, whether for others or for itself, so there's

4   certainly some level of control, but I don't know what other

5   legal obligations Google may or may not have related to the

6   tool, that's not within my expertise or my review in this

7   case.

8       Q    And when I said "control," I didn't mean in a

9   legal sense.  I meant in the who updates the code, who

10  supports the product?

11      A    Yes.  I mean, my understanding is that -- well,

12  actually, I don't actually know how their third-party

13  developers that Google subcontracts for the Google tool

14  itself.  I really don't know actually.

15      Q    Okay.

16      A    And I apologize.  If I may comment on, there's

17  like a sun directly going into my eyes.

18              MR. COLLIER:  That's awful.  I didn't notice

19      that.  Let's -- let's go off the record for a moment

20      and get you sorted.

21              THE VIDEOGRAPHER:  The time now is 4:10 p.m.

22      We are off the record.

23              (Recess taken at 4:10 p.m.)

24              THE VIDEOGRAPHER:  The time right now is

25      4:35 p.m.  We're back on the record.

HIGHLY CONFIDENTIAL

Page 181

1  BY MR. COLLIER:

2      Q    All right.  Mr. Malkiewicz, I've placed in front

3  of you an article it appears you co-wrote.

4          Can you identify that article; is that you?

5      A    Yes.  That's the article I co-wrote.

6      Q    And what is the title of that article?

7      A    The title is:  "Multi-Sided businesses:  The

8  Implications of Antitrust and Regulatory Policy."

9      Q    And did you publish any addendums or corrections

10  to that article?

11     A    I did not, no.

12     Q    As we sit here today, do you believe everything

13  you said in that article is accurate, as least as of the

14  date you wrote it, 2014?

15     A    Yes.

16     Q    Oh, I said I placed in front of you.  I should

17  have said I placed in front of you Exhibit 21; is that fair?

18  Is it Exhibit 21 on your copy?

19     A    It is Exhibit 21 on my copy, yes.

20     Q    And where was that article published, or wherever,

21  I say "published," maybe it was on the Internet?

22     A    We used to -- Navigant Consulting had a

23  publication that I believe was called Navigant Economics

24  magazine.  So it would have been part of that publication.

25     Q    And did that Navigant Economics magazine go to the

HIGHLY CONFIDENTIAL

Page 182

1    Navigant clients who used or might use your economics

2    expertise?

3        A    Yes.  At least, I think, I mean, the distribution

4    list probably was much wider than that, but, yes, that

5    certainly -- that group would be part of a distribution

6    list.

7        Q    I'm going to ask just a couple -- I'm done with

8    that, thank you.

9            I'm going to ask just a couple of questions on the

10    Google Chat history settings, some of which I've asked a

11    similar question, but I don't think I've asked this

12    question.

13            Do you agree with me that after a Google Chats

14    retention setting expires, whether or not that chat was sent

15    with history on or off, it will be deleted if the employee

16    is not under a litigation hold at that time?

17                    MR. MCCALLUM:  Object to the form.

18                    THE WITNESS:  I do not know whether

19        litigation holds work retractively for chats that are

20        preserved as part of normal policy for 30 or 18 months.

21        I do not know as I sit here.

22    BY MR. COLLIER:

23        Q    I think my question's a little different than that

24    answer, so maybe I didn't ask it very well, or maybe I

25    didn't understand your answer, but let me try it again with

HIGHLY CONFIDENTIAL

Page 183

1    different wordings.

2              So I want you to assume we have a Google Chat

3    message.

4         A    Okay.

5         Q    And its retention setting period has expired,

6    whether it's 30 days or 18 months.

7              Are you with me so far?

8         A    Okay.

9         Q    Whatever that period is, it has expired before a

10   litigation hold is placed on the employee.  That chat,

11   although originally retained, would not be accessible by

12   Vault, correct?

13        A    If a particular message or conversation is no

14   longer in Vault at the time where a litigation hold is put

15   in place, then, correct, the litigation hold would not

16   capture such a message in Vault.

17        Q    Is the -- assume there's no litigation hold, and

18   assume -- assume that we're talking about a chat that has a

19   24-hour retention period.

20             Are you with me so far?

21        A    Yes.

22        Q    For the 24 hours, is the chat sent to Vault or is

23   it held in the Google Chats until pulled into Vault?

24             MR. MCCALLUM:  Object to the form.

25             THE WITNESS:  My understanding, for -- again,

HIGHLY CONFIDENTIAL

```
                                          Page 184

 1        for the purposes of my background section in my report,

 2        my understanding is it exists only within the

 3        application.

 4   BY MR. COLLIER:

 5        Q    In that case chats, Google Chats?

 6        A    Correct.

 7        Q    So even for chats that have a retention period of

 8   18 months, that 18 months, those chats exist in Google Chats

 9   not in Google Vault?

10             MR. MCCALLUM:  Object to the form.

11   BY MR. COLLIER:

12        Q    If there's no litigation hold?

13             MR. MCCALLUM:  Object to the form.

14             THE WITNESS:  That's not my understanding.

15             I believe based on ███████  testimony,

16        where my understanding comes from, is that after a

17        24-hour period, Vault automatically collects messages

18        that did not have a history off setting.

19             So if the history setting was on, the Vault

20        would collect the information from a particular

21        conversation automatically.

22   BY MR. COLLIER:

23        Q    Okay.  And you talked about if it did not have a

24   history off setting in the last question, so let me ask a

25   different question.
```

HIGHLY CONFIDENTIAL

                                        Page 185

1            If a Google Chat message is sent with history off,
2    it will be deleted within 24 hours, it will be deleted after
3    24 hours, right?
4                    MR. MCCALLUM:  Object to the form.
5                    THE WITNESS:  It won't be saved by default
6        because it would never leave the application and go to
7        Vault, so it just won't be preserved.
8    BY MR. COLLIER:
9        Q    Well, it won't be preserved in the Google Chat
10   either, right?
11       A    Correct.  I mean, it won't be preserved period,
12   yes.
13       Q    Then the reason I say deleted is, it was preserved
14   in this hypothetical for 24 hours, right?
15                   MR. MCCALLUM:  Object to the form.
16                   THE WITNESS:  I'm not an expert in
17       terminology.
18                   My understanding is that it's present for 24
19       hours, at which point -- unless it's being sent to
20       Vault, it disappears.  That's -- that's the words I've
21       seen referenced.
22                   I -- I do not have a particular opinion as to
23       the, you know, delete versus other type of synonyms to
24       the -- that you've been using.  I certainly do not have
25       opinions on that.

HIGHLY CONFIDENTIAL

Page 186

1              MR. COLLIER:  Okay.

2    BY MR. COLLIER:

3        Q    Are we on Exhibit 23?  So I'm handing you what has

4    been marked Exhibit 22.

5             I'll note for the record that this is

6    GOOG-DOJ-29864619.  Also has some other Bates numbers and

7    exhibit numbers from other cases.

8        A    Okay.

9        Q    Have you seen this document before?

10       A    I'm just looking at the Bates stamp.  I don't

11   believe it's on my Materials Considered List.

12            I mean, I may have seen the document in passing,

13   but I don't know specifically.  Certainly, if it's not on my

14   Materials Considered List, I would have not seen it, at

15   least as of the date of my report.

16       Q    Sure.

17       A    That's for certain.

18       Q    Have you heard about something called the Kent

19   Walker memo in 2008?

20       A    Not specifically, no.

21       Q    Well, what does specifically mean in that

22   sentence?  Have you generally heard about the Kent Walker

23   memo?

24       A    Oh, no, sorry.  I don't know who Kent Walker is,

25   and I have not seen references to the memo is what I meant.

HIGHLY CONFIDENTIAL

```
                                            Page 187
  1        Q    Okay.  I wasn't trying to be picky, it just seemed
  2   like maybe you had heard about it in some way.
  3             But none of this rings a bell, Kent Walker 2008
  4   memo, or what you've read, right?
  5        A    Yeah, that's correct.  I was just flipping through
  6   because I see there are two people who signed the e-mail at
  7   the bottom, so I was just making sure there isn't like a
  8   memo attachment here or something.
  9        Q    Right.  But that's a fair -- that's a fair
 10   question.
 11             Do you see at the bottom it says:  "█████████
 12   and Kent Walker"?
 13        A    Yes.  That's what I was referencing.
 14        Q    And you don't know who Kent Walker is?
 15        A    I do not.
 16        Q    Do you know who ████████████ is?
 17        A    I also do not know.
 18        Q    All right.  I'll represent to you that Kent
 19   Walker, at the time, he's still a Google employee, but at
 20   the time in 2008, he was Google's General Counsel, okay.
 21             Now, looking -- you know how you read e-mails, you
 22   got to look at the bottom e-mail first because they're
 23   usually in some sort of reverse chronological order.
 24             I'm going to go to the first paragraph under
 25   Googlers.
```

HIGHLY CONFIDENTIAL

Page 188

1          So first, whether it's ███████ or Kent

2     Walker, do you see it says:  "Wrote"?

3          A     Yes.  I see the standard e-mail reply disclosure,

4     yeah.

5          Q     This looks to be a September 16th, 2008

6     communication, right?

7          A     Yes.

8          Q     And it's labeled:  "Confidential/do not forward,

9     or please do not forward"?

10         A     Yes.

11         Q     It's not labeled:  "Attorney-client privilege"

12    anywhere that you see, is it?

13         A     Not that I can see that language now.

14         Q     In his first sentence, he says -- do you agree

15    with me in the first sentence -- I'm going to say Mr. Walker

16    says, if you want to construe that as Mr. Walker and

17    ███████, that's fine, can we just agree?  I'm going to

18    say "Mr. Walker" because I believe that to be the author.

19         A     Sure.

20         Q     Even though both names appear.

21         A     I have no -- I have no knowledge of the authorship

22    of this document, so whatever you tell me, I have no reason

23    to disagree.

24         Q     Well, it says:  "As you know, Google continues to

25    be in the midst of several significant legal and regulatory

HIGHLY CONFIDENTIAL

Page 189

1    matters, including government review of our deal with Yahoo,
2    various copyright patent and trademark lawsuits, and lots of
3    other claims."
4              Do you see that?
5        A    I do.
6        Q    And do you have an understanding of what the
7    Google deal with Yahoo was?
8        A    No, not specifically.  In 2008, I don't -- I
9    wouldn't recall.
10       Q    Was there any antitrust concerns about Google's
11   deal with Yahoo in 2008?
12               MR. MCCALLUM:  Object to the form.
13               THE WITNESS:  I don't know.
14   BY MR. COLLIER:
15       Q    Okay.  Fair enough.
16             And so in the first sentence, he's talking about:
17   "Google faces legal and regulatory matters."  Right?
18       A    Yes.  I see that.
19       Q    And then the second sentence says:  "Given our
20   continuing commitment to developing revolutionary products
21   and doing disruptive things, we're going to keep facing
22   these kinds of challenges."
23             And by "challenges," do you understand that to
24   mean challenges of the legal and regulatory matters?
25               MR. MCCALLUM:  Object to the form.

HIGHLY CONFIDENTIAL

Page 190

```
 1                 THE WITNESS:  I mean, the only thing I know
 2        about this sentence is the context of the paragraph.
 3        So, I mean, it says what it says.  I have no other
 4        interpretation.
 5   BY MR. COLLIER:
 6        Q    Okay.  Then if we go to the next paragraph.
 7             It says:  "First write carefully and
 8   thoughtfully."
 9             Do you see that?
10        A    I do see that, yes.
11        Q    And then the next sentence, in 2008, Mr. Walker
12   writes:  "We're an e-mail and instant messaging culture."
13             Does it surprise you that a technology company
14   like Google would be an instant messaging culture in 2008?
15                 MR. MCCALLUM:  Object to the form.
16                 THE WITNESS:  I have no basis to be surprised
17        or not surprised.  I mean, I read it as a statement
18        from, yeah, whoever the author is.
19   BY MR. COLLIER:
20        Q    Okay.  So let's go down now to the last full
21   paragraph, and you can read any text you want surrounding
22   this, but do you see where it says:  "To help avoid
23   inadvertent retention of instant messages, we have decided
24   to make," quote:  Off the record the Google corporate
25   default setting for Google Talk.
```

HIGHLY CONFIDENTIAL

Page 191

1          Do you see that?

2      A    I do.

3      Q    Did you know before I provided you Exhibit 23 that

4  2008 was the date that off the record or history off was the

5  Google corporate default setting?

6      A    It's not something I recall specifically, but

7  based on the document you're showing me, if that's true.  I

8  mean, I have no reason to -- I don't know any other set of

9  information about what 2008 might have been like at Google.

10     Q    Okay.  So, all right, I'll do a little drawing

11 here, we'll see how this goes.

12          All right.  Setting aside my horrible chicken

13 scratch, do you agree with me that history on was the

14 corporate default policy for chats prior to 2008?

15               MR. MCCALLUM:  Object to the form.

16               THE WITNESS:  I mean, I don't know one way or

17         the other.  I know what we've discussed and what

18         you've -- the documents you've pointed me to.

19               I haven't engaged in a forensic analysis of

20         all the documents and all the policies going back to

21         2008.

22               I focused on the policies relevant to

23         Professor Hochstetler's time period of analysis, around

24         2022.  So I just don't know.

25

HIGHLY CONFIDENTIAL

Page 192

1    BY MR. COLLIER:

2        Q    Okay.  You do know at some point prior to February

3    of 2023, the default must be history off because it's pretty

4    well-established in your report and everyone else's report,

5    as of February of 2023, history was turned on by default,

6    right?

7        A    Yes, I would agree with that.

8        Q    Okay.  Is it relevant to your opinion, in any way,

9    if Google's General Counsel's motivation for turning the

10   default history off was to avoid documents being produced in

11   litigation?

12               MR. MCCALLUM:  Object to the form.

13               THE WITNESS:  For the purposes of my analysis

14        and the opinions I -- I'm offering in this case, it is

15        not.

16   BY MR. COLLIER:

17       Q    So just to ask a more clean question.

18               If the Court or the jury was to find that Google's

19   General Counsel's intention in 2008 was to turn history off

20   so chats don't show up in lawsuits like this one, that's not

21   in any way relevant to your scope of testimony because your

22   scope of testimony deals essentially with the Epic chat log

23   and extrapolations from that?

24               MR. MCCALLUM:  Object to the form.

25               THE WITNESS:  Well, so the answer to the

HIGHLY CONFIDENTIAL

Page 193

1          first part of your question, taking the representation

2          of what a hypothetical jury or the Court finds, I would

3          agree with that.  I do not offer opinions on that

4          topic.

5                  But the second part of your question, I stand

6          behind specific contents as I outlined if my report and

7          the opinions I have.

8                  So the way you characterize it is a little

9          different than what I've specifically done to rebut

10          Professor Hochstetler's analysis, but those are the

11          bounds in which -- as I continue to sit here today,

12          even though the report was dated November 27th, I have

13          not developed any additional opinions or do not intend

14          to offer any additional opinions.

15    BY MR. COLLIER:

16    Q    That's fair.  I guess a shorthand way, and I mean

17    this with no criticism is, you're focused on analyzing data,

18    and you're not as concerned with people's subjective

19    intentions on why they made any switches or history on or

20    history off; is that fair?

21                  MR. MCCALLUM:  Object to the form.

22                  THE WITNESS:  Certainly not in the context of

23          the time period before the, you know, 2022/2023 time

24          frame.

25                  So going back to 2008, I have -- I do not

HIGHLY CONFIDENTIAL

Page 194

1          provide any opinions, testimony, or given background

2          information about that time period.

3     BY MR. COLLIER:

4          Q    In fact, since you think that it's unreliable to

5     extrapolate from the Epic log, you don't really offer any

6     opinions from 2022 backwards or previous, correct?

7          A    Correct.  I do not offer backward-looking opinions

8     from 2022, that's correct.

9          Q    And you also don't offer any opinions as to any

10    custodians, other than the five that you analyzed, because

11    you think extrapolating from those five as to other

12    custodians would be inappropriate, right?

13         A    I believe that's fairly correct.  I mean,

14    certainly in the context of Professor Hochstetler's

15    analysis.  I have not seen other analysis that have been

16    conducted with these five custodians, so I don't have an

17    opinion on any other sets of analyses, but with respect to

18    Professor Hochstetler's extrapolations, that's certainly

19    true.

20         Q    I'm not aware of any other analysis of the five

21    custodians, are you?

22         A    Exactly, I'm not.  But I also am not privy to a

23    lot that's happening in this case, so I just want to be

24    clear.

25         Q    Oh, I understand.  If there was another witness

HIGHLY CONFIDENTIAL

Page 195

1  that hadn't been brought up today that discussed that,

2  you're just saying "I don't know"?

3      A    That's exactly right.

4      Q    Okay.  And do you have an understanding that --

5  I'll mark this demonstrative, just so we have it.  What

6  number are we, 23?

7          All right.  I'll just mark this as 23 since I'm

8  going to keep pointing to it.

9          Do you have an understanding, even though it

10  wasn't the scope of your report, whether or not from 2008 to

11  20 -- February of 2023 -- no, never mind.  I'll withdraw

12  that question.

13          Do you know whether or not Google employees

14  received a training called Communicate with Care?

15      A    I do not know specifically.

16      Q    Have you -- even outside your work in this case,

17  have you read in the press, or anywhere, Google's policy

18  called Communicate with Care; does that ring any bells?

19      A    Not in the context of policy.  I mean, just

20  communicating with care more in a plain language, I may

21  have, but I don't recall a policy of that name.

22      Q    Okay.  I want to go back to where you testified

23  that I believe there were 202 employees under litigation

24  hold, and Mr. Hochstetler, I believe, said 141.

25          Have you seen a listing of the 202 employees put

HIGHLY CONFIDENTIAL

Page 196

1    under a litigation hold?

2                    MR. MCCALLUM:  Object to the form.

3                    THE WITNESS:  No.  I have not.

4    BY MR. COLLIER:

5        Q    Have you looked at the letter that Mr. Hochstetler

6    relies upon to see whether Google's counsel listed 141

7    custodians, 202 custodians, or any other number, like have

8    you done a count?

9        A    Yes.  I mean, I don't recall specifically how many

10   were on that list.  I mean, certainly more than 141 because

11   Professor Hochstetler has, you know, put a time limit on his

12   count, but I don't recall the specific count.

13       Q    Well, I want to talk a little bit about Professor

14   Hochstetler's put a time limit on his count.

15                    What do you mean by that?

16       A    Well, I mean, we'd have to look at his report

17   exactly, I don't want to speak, because it's Professor

18   Hochstetler's work, but the way I understand it, he looked

19   at certain individuals who were put on hold as a specific

20   date, and he counted 141 individuals that met the criteria

21   he defined, and so there would have been other individuals

22   on that list, but the ones Professor Hochstetler counted,

23   you know, he has a little description in his report that

24   specify -- and I don't disagree with -- given his

25   definition, I don't disagree with the count that it's 141.

HIGHLY CONFIDENTIAL

Page 197

1      Q    And actually, if Professor -- are you like most

2   economists, you like the word "directionally"?

3      A    Sure.

4      Q    Yeah.  Would you agree with me that just pure

5   math, I'm not asking whether you agree with it, but

6   directionally, if Professor Hochstetler uses 202 custodians

7   versus 141, and extrapolates from the five, as you -- as you

8   know that he did, that he would come up with a higher amount

9   of chats that were not retained?

10                  MR. MCCALLUM:  Object to the form.

11                  THE WITNESS:  Right.  So they're caveating

12          with the previous discussion we've had where it

13          compounds the error.

14                  If you're asking me about just

15          mathematically, you know, is two times three more than

16          two times two, yes, that's -- that's sure.  Math works

17          directionally that way.

18   BY MR. COLLIER:

19      Q    I wondered if you were going to work directionally

20   in.

21                  But you believe the Court and the jury, when they

22   look at it, should assume that there were 202 custodians,

23   right?

24                  MR. MCCALLUM:  Object to the form.

25                  THE WITNESS:  Well, I mean, I believe I'm

HIGHLY CONFIDENTIAL

Page 198

1          pretty clear in the expert report that the fundamental

2          issue is comparing the wide population in designing

3          this study around it.

4                    So to the extent one is comparing, say, in

5          this case, production or documents or chats from a

6          given population, then we need to know what the

7          population is.  So what is the number and who are the

8          custodians who produced the documents that -- or chats

9          that Professor Hochstetler is trying to extrapolate

10         into.

11                   And since we don't even know from Professor

12         Hochstetler's report what is the exact population he's

13         trying to extrapolate, that's my first critique in the

14         report, effectively.

15    BY MR. COLLIER:

16         Q    Do you know whether or not Professor Hochstetler

17    discussed that under oath in his deposition yesterday?

18         A    I do not.  I have not seen Professor Hochstetler's

19    testimony.

20         Q    Did you see that there were employees not put on a

21    litigation hold until 2013 -- excuse me, 2023, in that

22    letter of custodians?  Some employees, not all?

23         A    Right.  I mean, you'd have to show me the letter

24    again, but I -- it wouldn't surprise me that some of the

25    dates in the table, especially in the revised column, would

HIGHLY CONFIDENTIAL

Page 199

1    have had dates as late as 2023.

2        Q    Well, I'm glad you mentioned revised column,

3    because I was wondering if you were familiar with that

4    document.

5            What was the revised column, revised take into

6    account, if you know?  There was an original column of

7    litigation hold date, and then as to some custodians, not

8    all, Google changed the date of the litigation hold.

9            Do you know why?

10       A    I do not.  I have no understanding of why.

11       Q    Is -- is Google's explanation of why they changed

12   the litigation hold date relevant to your analysis?

13       A    Not that I can think of as I sit here.  I mean, I

14   rely on that column as the correct column in that sense, but

15   the reason why, I just don't know.

16       Q    Is the date that Google put various custodians on

17   a litigation hold, say, just hypothetically, whether they

18   should have put someone on a hold in 2019 but didn't do it

19   till 2023, is any of that relevant to your analysis in this

20   case?

21       A    It is not.  And certainly not to the opinions that

22   I offer in this case.

23       Q    So -- and I don't mean this in a critical way, I'm

24   just trying to make sure that this isn't anything you're

25   relying on.

HIGHLY CONFIDENTIAL

Page 200

1          So whether Google timely put any particular

2     custodian on a litigation hold, whether they did that

3     timely, that's not relevant to any of your analysis, you

4     just take that date and perform your calculations from it,

5     right?

6                    MR. MCCALLUM:  Object to the form.

7                    THE WITNESS:  That's correct.  I mean, in my

8          analysis, the -- the reason behind the date, they do

9          not matter.  I mean, what matters is the date itself,

10         not the reason for it.

11    BY MR. COLLIER:

12         Q    And when you analyze the -- well, never mind.

13              I'll withdraw.

14              So do you have any sense of how much storage space

15    would be required to retain the Google Chat logs for the

16    custodians in this case, we'll say for year 2022, since

17    you're most familiar with that year?

18         A    I do not, no.

19         Q    Do you have any sense of how much cloud and other

20    storage Google owns?

21         A    So I do not have a sense for any distinctions

22    between -- for internal purposes versus for storage of

23    client information.

24              So as, you know, Google providing service to

25    others, I may have seen references not related to this case

HIGHLY CONFIDENTIAL

Page 201

1    but just as a matter of personal knowledge about something

2    on the order of at least a petabytes, but I could be wrong

3    about this.

4         Q    I've -- I've seen those articles, can you -- can

5    you define that term?

6         A    So --

7         Q    Because I stop at terabytes, to be clear.

8         A    Right.  So, so, so if I have it correct, I also

9    typically don't operate on those scales, but they're

10   effectively the 10 to the power 3 multiples of each other.

11        So, you know, as sort of a megabyte to a gigabyte,

12   you know, so gigabyte is a thousand megabytes, and then a

13   petabyte would be, you know, a thousand, I guess terabytes.

14   Terabytes are a thousand gigabytes.  And exabyte would be a

15   thousand petabytes.  And I think that's where my knowledge

16   of the scales of storage stops.

17        Q    Well, and without getting into any details, it's

18   clear that Google, like Microsoft and maybe Oracle and maybe

19   another company or two, have data storage on a scale that's

20   frankly hard for us lay people to imagine, right?

21             MR. MCCALLUM:  Object to the form.

22             THE WITNESS:  So, I mean, again, I'm

23        certainly not an expert in the area, but my sort of

24        common reading of business press, for example, would

25        suggest that really it would be between Google,

HIGHLY CONFIDENTIAL

Page 202

```
 1        Microsoft, DRS servers, AWS certainly from Amazon.
 2                  Oracle would be one of the companies as well.
 3        IBM actually has a cloud offering as well.
 4                  But, again, I'm not an expert in the field,
 5        just my kind of common knowledge from, you know,
 6        reading business press.
 7   BY MR. COLLIER:
 8        Q    All right.  I'm going to display another
 9   demonstrative here, and it may make your client very happy
10   that I went to Google with my colleague to figure this out.
11                  I'm marking as Exhibit 24, my understanding of a
12   petabyte, just because I can't follow that many zeros.  You
13   know why lawyers went to law school, right?  They can't do
14   math.
15                  Is that the number of zeros in a petabyte, to your
16   understanding?
17                      MR. MCCALLUM:  Object to the form.
18   BY MR. COLLIER:
19        Q    I guess I could write "bytes" at the end, because
20   that's the unit of measurement, I believe.
21                  Do you want to look?  I don't care if you look,
22   I'm not trying to trick you.
23        A    No.  There's a lot of zeros on the screen, so I'm
24   trying to make sure, because, you know, it goes from bytes
25   kilobytes, megabytes, gigabytes, terabytes, and then
```

HIGHLY CONFIDENTIAL

Page 203

1    petabytes.  So I want to make sure we have enough, and it's

2    kind of difficult to do just on the screen.

3         Q    You think there are more zeros?

4         A    But if you represent to me that that's -- is the

5    number of zeros, I have no reason to argue against it.

6         Q    Okay.  But does that look right to you?  I just

7    don't --

8         A    It could be, yeah.

9         Q    Okay.  And a byte basically is a small unit of

10   information, right?

11        A    Of storage, yes.

12        Q    Yeah, information as stored.

13             Can we agree that a petabyte is a lot of storage

14   capacity?

15        A    It's all relative, right, relative to what?  Like

16   my personal laptop?  Sure.  Yes.

17        Q    Can we agree it's a lot of storage capacity

18   compared to, say, what a bakery around the corner might

19   have?

20             Do you know any bakeries with a petabyte of

21   storage?

22        A    I do not, but I also don't know many bakeries in

23   terms of their internal operations.

24        Q    Okay.  Is part of your work here today, you didn't

25   do any analysis as to whether or not Google had the storage

HIGHLY CONFIDENTIAL

Page 204

1    capacity to retain all chats by the 202, or whatever the

2    number is, custodians, say, for 2022?

3        A    Correct.  I have done no such analysis.

4        Q    So you don't know whether it's -- would be a heavy

5    burden or no burden at all, it might be one ten-thousandths

6    of their storage capacity?

7        A    That's correct.  I just don't know.

8        Q    Okay.  By the way, as always, if you need a break,

9    we'll take it.

10           It would be my intention to go this hour and then

11   I might go a little after a break, and then Mr. McCallum,

12   you don't have to tell me now, but I will ask at the break

13   if you intend to do a redirect, and I'll save time.

14           If you know now, that's fine.

15                MR. MCCALLUM:  I'll let you know at the

16       break.

17                MR. COLLIER:  Okay.

18   BY MR. COLLIER:

19       Q    What is your understanding of the case that you

20   mentioned earlier in the Eastern District of Virginia?

21       A    Just a general understanding that it involved

22   antitrust claims and other claims against Google specific to

23   advertising technologies.

24       Q    Okay.  Do you know how similar or different the

25   allegations in that case are versus the allegations in this

HIGHLY CONFIDENTIAL

Page 205

1    case?

2         A     No.  I have not compared the allegations.  I don't

3    know.

4         Q     But you say in your report you're generally aware

5    that Google has produced the documents in this case that

6    were produced in the Eastern District of Virginia; is that

7    right?  If you recall.

8         A     I mean, that's not specifically language I use.  I

9    know that for a period of time as I note in my report,

10   the -- there are various litigations that were consolidated

11   for discovery purposes, at least for a period of time,

12   before they were sent back to their representative

13   jurisdictions.

14            So, for example, the case we're sitting for today

15   has been sent back to the Eastern District of Texas.

16            So I believe that's what I describe in my report.

17   But in terms of the actual differences or similarities of

18   the claims, I do not know what exactly -- how to compare

19   these.

20        Q     Well, that's sort of what I was driving at.

21            If chats were produced out of the Eastern District

22   of Virginia and you don't know the actual differences or

23   similarities of the claims in these two cases, you're

24   certainly not opining that those chats are necessarily

25   relevant to the Eastern District of Texas case, are you?

HIGHLY CONFIDENTIAL

Page 206

1      A    Well, so that is a little different question.  So
2  I certainly have no opinions about the relevance of chats,
3  including in the case we're sitting in for today, so that's
4  point number one.
5           I mean, the other point I believe I made in the
6  report about the production out of Eastern District of
7  Texas -- sorry, out of the Virginia case, that you have
8  mentioned, is the one where I specifically included Schedule
9  3 to my report, which lists the subjects -- the sort of the
10  key words that were used to develop production of Chat
11  messages that were later, I understand, also brought into
12  this case.
13           I have no opinion of the relevance or the merits
14  related content of these messages, so I just don't know.
15      Q    And the document you attached to your report with
16  the search terms, I will represent to you has no Bates
17  number.
18           Where did you get the document that purports to be
19  the search terms by Google in the Eastern District of
20  Virginia?
21      A    So, I created the document.  So just to be clear.
22           I -- in my practice, I use notation of schedules
23  as the work product that I have created.  So you'll notice
24  Schedule 1 is my CV.  Schedule 2 is typically material
25  relied upon list.  Schedule 3 could be another table.

HIGHLY CONFIDENTIAL

Page 207

1           If I reference something as an exhibit and I

2    attach it, that will be a document that was given to me or

3    produced, or that I've identified separately.

4           So schedules are my work product, and then

5    exhibits would be something that is a document that already

6    existed.

7       Q    And the search terms in the Eastern District of

8    Virginia are a schedule, right?

9       A    Correct.  Schedule 3.

10      Q    Which means you created it, right?

11      A    Correct.

12      Q    So where did you look to find the search terms for

13   the Eastern District of Virginia chats?

14      A    I asked counsel.

15      Q    Okay.  So you can't disclose to me anything you've

16   discussed with counsel.

17          So other than your discussions with counsel, do

18   you have any source that would tell us what the search terms

19   were for the Eastern District of Virginia chats?

20      A    I do not.

21      Q    Have you reviewed any of the materials from the

22   Eastern District of Virginia case, such as depositions in

23   that case, or trial transcripts?

24      A    So I don't recall specifically which transcripts

25   were shared under the MDL between the cases.

HIGHLY CONFIDENTIAL

Page 208

1          I do know that some of the documents in my

2   materials relied upon list are Bates stamps that appear to

3   be related to the DOJ action in the Virginia case, but that

4   would be the extent of the documents I have reviewed.

5          Q    In your answer, you talk about shared under the

6   MDL.  What is MDL?

7          A    So that's my short of calling the -- when the

8   litigation was consolidated for, you know, multi-district

9   litigation, I guess, for discovery purposes for a period of

10  time.

11         Q    And was the -- to your understanding, the Eastern

12  District of Virginia case consolidated in the MDL for some

13  period of time?

14                   MR. MCCALLUM:  Object to the form.

15                   THE WITNESS:  That's my understanding.

16  BY MR. COLLIER:

17         Q    Looking at the Epic data, or the Epic log.

18         Do you agree with me that most Google Chat

19  conversations before February of 2023 started with history

20  off because that was the default?

21         A    I don't have a specific number in mind right now

22  of the distribution, so I'm not sure.

23         Q    Well, we know that a majority of the Google --

24  well, let's see if we know.

25         Do you agree with me that under your and Professor

HIGHLY CONFIDENTIAL

Page 209

1    Hochstetler's analysis that the Google Chat conversations

2    you've studied as part of the Epic log generally did not

3    change the default history on or history off setting?

4        A    So I know for a fact that the five custodians did

5    not change the setting during that time.  I also know that

6    other members of specific chats who are not the five

7    custodians have changed the toggle, but I don't have a

8    percentage distribution in mind as I sit here.

9        Q    Well, and when another member of a specific chat

10   changes the toggle, say from history off to history on, as

11   we've discussed earlier today, it still doesn't capture the

12   messages prior to that person changing the toggle to history

13   on and sending a message, right?

14       A    Yeah, that's my understanding, yes.

15       Q    Okay.  I'll do one more quick pretty picture.  It

16   may be a little hard to read, but I think you've read it

17   before.

18            So I'm marking as Exhibit 25, and I'm simply

19   asking you about the Figure 4 in his report.  I know there's

20   some words around it that we didn't remove when we Xeroxed

21   it, but this, I will represent to you, is Figure 4 from Mr.

22   Hostetler' report.

23       A    Okay.

24       Q    Do you recall seeing this?

25       A    Yes.

HIGHLY CONFIDENTIAL

Page 210

1        Q    A hypothetical conversation?

2        A    I do recall Figure 4 in Professor Hochstetler's

3    October 4th report, yes.

4        Q    All right.  And on the left-hand side -- and this

5    is a hypothetical conversation, which as an economist you're

6    good with hypotheticals, right?

7        A    I'm familiar about hypotheticals, but I try to

8    avoid hypotheticals, if possible.

9        Q    What do you three economists on a desert island

10   with a can do when they want food?

11       A    That's the reason why I call myself an applied

12   economist.  I look at data and make determinations.

13       Q    Are you going to finish the joke for the jury or

14   we'll just let it hang?

15       A    I think we'll let it hang.

16       Q    All right.  Okay.

17            Figure 4.  This is a hypothetical conversation.

18            On the left-hand side, it's user A and B.  User A

19   and B., and they're initially having a conversation with

20   chat history off.

21            Do you see that?

22       A    I see that, yes.

23       Q    Okay.  And then after three chats, or three Chat

24   messages, user B turns chat history on, and two more

25   messages are sent.

HIGHLY CONFIDENTIAL

Page 211

1          Do you agree?

2     A     I do see that, yes.

3     Q     And then we go back and now user A turns chat

4     history back off after the fifth message.

5          Do you see that?

6     A     I do.

7     Q     And then finally, user B, not to be deterred,

8     sends a message and turns chat history back on.

9          Do you see that hypothetical?

10    A     Yes, I see that step, yes.

11    Q     So it's pretty clear, for whatever reason, user A

12    wanted the chat history on and user B, for some reason,

13    wanted it -- excuse me.  User A wanted the chat history off

14    and user B wanted the chat history on?

15              MR. MCCALLUM:  Object to the form.

16    BY MR. COLLIER:

17    Q     Do you agree with that?

18    A     I -- I mean, I don't recall Professor Hochstetler

19    giving anything further about this hypothetical, so I don't

20    know that he's given reasons for one way or the other, but

21    other than that, I mean, I see the steps here, yes.

22    Q     All right.  And would you agree with me that if

23    the conversation takes place as shown in Professor

24    Hostetler' Figure 4 with the chat history settings off and

25    on at various times, that the conversation that would be

HIGHLY CONFIDENTIAL

Page 212

1    retained looks as it does to the right of Figure 4.

2              And we can walk through it, if you want.

3                   MR. MCCALLUM:  Object to the form.

4                   THE WITNESS:  I'm just trying to recall for

5         the purposes of this hypothetical whether there was

6         some discussion of a time period or which policy

7         applied, and I just don't recall.

8                   I don't -- because it's not in the two

9         paragraphs here.

10   BY MR. COLLIER:

11        Q    I will ask you to assume that this is prior to

12   February of 2023, because of the ability to turn chat

13   history on and off, and you can see the default is chat

14   history off, as the conversation starts on the left.

15              Does that help you?

16        A    So if you represent to me that, in fact, chat

17   history off, the intended, the intention of Professor

18   Hochstetler was to say:  "This is a default setting,"

19   because it doesn't really say "default" here, right, it just

20   says that at the beginning it's off.

21        Q    Assume that chat history is default off at the

22   very top, where it says:  "Chat history off."

23        A    Okay.

24        Q    So we'll just call this January of 2022, to make

25   it easy.

HIGHLY CONFIDENTIAL

Page 213

1          A      Okay.

2          Q      Just, sir, will you look at the conversation that

3     was retained and tell me if you disagree with Professor

4     Hochstetler's analysis of which chats would be retained

5     under this hypothetical, which Chat messages, I shouldn't

6     say chats, Chat messages?

7                          MR. MCCALLUM:   Object to the form.

8                          THE WITNESS:   Yeah, I'm just trying to be

9          very careful that I don't misspeak.

10    BY MR. COLLIER:

11         Q      Do you want to walk through it?

12         A      There's a lot of, you know, embedded assumptions

13    here, but if I have all the steps that we've discussed in

14    mind and the assumptions, if you're asking, is there a

15    situation in the context of a January 2022 conversation

16    under the existing policy, if there's a possibility of such

17    a conversation being retained in the way outlined in these

18    two sides of the table, I think it's possible.

19         Q      Well, if the chat settings are as the hypothetical

20    by Professor Hochstetler says they are, it's more than

21    possible, it's just a rule-based result, right?

22                         MR. MCCALLUM:   Object to the form.

23                         THE WITNESS:   I mean, it is hypothetical.

24         So --

25         Q      It's a hypothetical, where we're applying the

HIGHLY CONFIDENTIAL

Page 214

1    actual real world Google rules for retention in January of

2    2022?

3          A     Right.  So the -- so it's hypothetically possible.

4                Did it actually happen?  I don't know.

5          Q     If you assume that this was the conversation that

6    took place.  Do you see the heading:  "Conversation that

7    took place" in January of 2022.

8                Do you want to go through it message by message

9    and we'll see if you agree?  Maybe that's easier to take it

10   in a bunch of little bites.

11         A     Maybe it's just the language that's used here

12   because this is a hypothetical conversation that may have

13   taken place.  I don't believe this is an actual conversation

14   that took place in the way I would use the words

15   "conversation that took place."

16         Q     Okay.  Assume --

17         A     Unless this is citing to some conversation.

18         Q     Okay.  Assume the conversation took place as is

19   shown on the left side of Figure 4.  Can you do that?

20               I'm not telling you that this is pulled from a

21   Bates number.  I'm saying assume that this is the

22   conversation.

23         A     Okay.

24         Q     Can we agree on that?

25               And now assume with me that the default, as shown

HIGHLY CONFIDENTIAL

Page 215

1    in the top of the conversation that took place, is when the

2    first tech or the first chat was sent by user A:  "Hi, are

3    you available?"

4             The chat history was off.

5             Do you see that?

6        A    I see that.

7        Q    And it was still off when user B said:  "One sec,

8    in the middle of something."

9             Still with me?

10       A    Yes.

11       Q    And then assume with me that it was still off when

12   user A says:  ███████████████████████████

13            Still are me?

14       A    Yes.

15       Q    Now, based on that chat history being off, can we

16   agree as to those three texts, applying Google's rules for

17   retention, none of those three first chats would have been

18   retained as you understand the system from February --

19   excuse me, January of 2023?

20       A    Yes.  That's my understanding.

21       Q    Okay.  And now let's switch it up, because user B

22   sends the fourth text, which is:  "The meeting earlier was a

23   bit of a mess."

24            Do you see that?

25            But he turned chat history on as part of that

HIGHLY CONFIDENTIAL

Page 216

1   message?

2         A    I see that, yes.

3         Q    And then user A replies:  "Everyone's so

4   political."

5         A    I see it, yes.

6         Q    And because the chat history was on, those two

7   messages are retained as shown in the right-hand column,

8   correct?

9              MR. MCCALLUM:  Object to the form.

10             THE WITNESS:  Correct.  My understanding does

11      what have been sent to the Vault and retained, yes.

12             MR. COLLIER:  Almost done.  I know this is

13      painful.

14  BY MR. COLLIER:

15        Q    Now user A turns chat history back off, and says:

16  ███████████████████████████████████████████████████████████

    █  ██████████████████████████████████████████

18        A    I see that, yes.

19        Q    But because he turned chat history off, that chat

20  will not be retained in the conversation, will it?

21             MR. MCCALLUM:  Object to the form.

22             THE WITNESS:  Yes, correct.  In this -- in

23      this case, yes, that's correct.

24  BY MR. COLLIER:

25        Q    And then finally, user B turns chat history back

HIGHLY CONFIDENTIAL

Page 217

1    on, and types in:  "Yes."

2             And user A says:  "Great.  Have a relaxing Labor

3    Day weekend."

4             And you would agree with Professor Hochstetler

5    that under those circumstances those two chats would be

6    retained also?

7                      MR. MCCALLUM:  Object to the form.

8                      THE WITNESS:  Yes.  I mean, and just to be

9        clear, I mean, I base it less on Professor Hochstetler,

10       more than ████████ testimony that informs my

11       understanding, but, yes.

12   BY MR. COLLIER:

13       Q    So it would be fair to say that just because a

14   conversation may have been retained, it doesn't mean that

15   every chat in that conversation was retained, correct?

16   Every Chat message, I should say.

17       A    I mean, generally, I just don't know.  I mean,

18   hypothetically, that's certainly possible.

19                      MR. COLLIER:  Okay.  Let's take a break.

20                      How are you feeling on redirect?

21                      MR. MCCALLUM:  We'll do a short one, but like

22       something on the order of 10 or 15 minutes max.

23                      THE VIDEOGRAPHER:  The time right now is

24       5:36 p.m.  We are off the record.

25                      (Recess taken at 5:36 p.m.)

HIGHLY CONFIDENTIAL

Page 218

1              THE VIDEOGRAPHER:   The time right now is

2       6 p.m.  We are back on the record.

3  BY MR. COLLIER:

4       Q    Mr. Malkiewicz, I have placed in front of two

5  documents.  Exhibit 26, which is a beginning Bates number of

6  GOOG-DOJ-16741074.

7              And Exhibit 27, GOOG-NE-7385055.

8              Do you see those?

9       A    I do.

10       Q    Can we -- we'll start with -- even though it's a

11  little out of order, we'll start with Exhibit 27, if that's

12  okay.

13              Will you take a look at that and let me know when

14  you've had a chance to look at it?

15       A    Okay.  I've reviewed the document.

16       Q    Okay.  Exhibit 27, would you agree with me,

17  appears to be an e-mail from ███████ to Sundar Pichai, ████

██  ██████████████████████████ at Google.

19              Do you agree with that?

20       A    I do.

21       Q    And it was sent on November 7th, 2014, according

22  to the e-mail?

23       A    Yes, that's what it appears.

24       Q    And who is Sundar Pichai?

25       A    He's the CEO of Google.

HIGHLY CONFIDENTIAL

Page 219

1      Q    Okay.  And in this, ███████████████████

      ████████████████████████████████████████, is

3   giving some sort of update to Sundar Pichai, and others.

4           Right?

5      A    Yes.

6      Q    If you'll turn with me to -- under "Launches,"

7   where it says:  "Hangouts for work."  It will be halfway

8   down the first page.

9      A    Okay, I see it.

10     Q    Do you see that it says:  "As early as Wednesday,

11  November 12th" -- and can we assume that that is

12  November 12th, 2014, from the date this e-mail was sent?

13     A    That would make sense.

14     Q    Okay.  I'll start reading it over now because I

15  interrupted myself.

16          "As early as Wednesday, November 12th, we'll be

17  rolling out two new features for Hangouts for Work-the

18  admin option to force Hangouts chat history in your

19  organization to be off, parens, or on, and introducing

20  Google Apps Vault Support for Hangouts chat.  Blog post in

21  the works."

22          Do you see that?

23     A    I do.

24     Q    The first new feature for Google Hangouts was

25  called the admin option to force Hangouts chat history in

HIGHLY CONFIDENTIAL

Page 220

1    your organization to be off or on.

2         Do you see that?

3    A    I do.

4    Q    Do you remember earlier today, many hours ago, I

5    believe you didn't know whether or not Google had the

6    technical ability to force Google Chats, or in this case,

7    Google Hangouts, to have history on or off?

8    A    I mean, I recall generally our conversations, not

9    specifically.  I believe we chatted about -- or you

10   questioned me about a individual level history on/off,

11   policies and technical implementations.

12        This seems to suggest, you know, as a sort of

13   admin right to comprehensively turn it on or off, to the

14   extent that distinction matters for your question.

15   Q    Okay.  So can you agree with me that if Ms. Lin is

16   telling the CEO of Google the truth, in a few days, in the

17   future, in 2014, they were going to roll out an admin option

18   to force Hangouts chat history to be on or off?

19                 MR. MCCALLUM:  Object to the form.

20                 THE WITNESS:  I apologize.  I missed the

21        question stem of the -- of your question.

22                 MR. COLLIER:  Probably I didn't say it

23        clearly.  So let me try again.

24   BY MR. COLLIER:

25   Q    Do you agree with me that as of November 2014, the

HIGHLY CONFIDENTIAL

Page 221

1    CEO of Google was being informed that they were rolling out

2    the admin option to force Hangouts chat history in your

3    organization to be off, parens, or on.

4                    MR. MCCALLUM:  Object to the form.

5                    THE WITNESS:  That's what it appears from

6        this e-mail.

7    BY MR. COLLIER:

8        Q    And Hangouts, we've discussed, is the -- just the

9    prior versions of Chats, right?

10       A    Yes.  For the purposes of our conversation, yes.

11       Q    Do you have any understanding why Google didn't

12   force Chats history to be on for nine years after this

13   e-mail?

14                   MR. MCCALLUM:  Object to the form.

15                   THE WITNESS:  I do not.

16   BY MR. COLLIER:

17       Q    Okay.  Now if you'll look with me at Exhibit 26,

18   and you can look at whatever you want, but I'm going to just

19   tell you.  I'm just going to ask you about the few

20   paragraphs on Bates number ends in 1077, rolling onto 1078,

21   which is called:  "New Policies for Hangout Chats."

22            I mean, feel free to look at the whole thing.

23       A    Okay.

24       Q    All right.  So let's first go back to the date of

25   the e-mail to orient ourselves.

HIGHLY CONFIDENTIAL

Page 222

```
 1            Is this an e-mail sent by whoever is at
 2    ████████████████████████████?
 3      A    That's the e-mail address the e-mail came from,
 4    yes.
 5      Q    And it was sent on March 9th, 2015, right?
 6      A    Yes.
 7      Q    Okay.  So if we turn to page, the fourth page of
 8    this document ending in Bates Number 16741077, which has a
 9    heading:  "New policy controls for Hangouts chat"?
10      A    Okay.
11      Q    What do you understand from this document about
12    what the new policy controls in the beginning of 2015 were
13    for Hangouts chat?
14               MR. MCCALLUM:  Object to the form.
15               THE WITNESS:  I do not have a specific
16       understanding as of the time period.
17    BY MR. MCCALLUM:
18      Q    Okay.  Can you see with me that in 2015, March of
19    2015, there's a new policy control for Hangouts chat, you
20    can see that, right?
21      A    I see the reference to that here, yes.
22      Q    And then under the description of the new policy
23    controls, it says:  "Admins will now see two new options in
24    the Hangout chat settings in the admin console, allowing
25    them to" -- first bullet -- "require only Hangouts chat to
```

HIGHLY CONFIDENTIAL

Page 223

1    be used," and two:  "Force Hangouts chat history to be on or

2    off."

3              Do you see that?

4        A    I see that, yes.

5        Q    What's your understanding of what it means to set

6    a setting in the admin console?

7        A    I don't have a specific understanding, so I don't

8    want to misspeak.  I could only speculate.

9        Q    Are you aware that generally when there's a

10   program in a company, some people have admin or

11   administrative privileges and can change settings that other

12   users cannot?

13             MR. MCCALLUM:  Object to the form.

14             THE WITNESS:  So, that was my layman's

15        understanding before you showed me this document, but

16        because you showed me this document, I can see that the

17        admin console in the previous version of hangouts did

18        not actually give admin rights the right to disallow

19        users from doing certain things, so that's where my

20        prior was overwritten.

21             MR. COLLIER:  Okay.

22             THE WITNESS:  Yeah.  So that's where my

23        confusion comes in based on this actual document in

24        front of me, but I'm not an expert in that area so I

25        don't know.

HIGHLY CONFIDENTIAL

Page 224

1    BY MR. COLLIER:

2        Q    So the confusion is, it appears that in 2014,

3    admins could not yet require only Hangout chats to be used,

4    right?

5                    MR. MCCALLUM:  Object to the form.

6    BY MR. COLLIER:

7        Q    If this is a 2015 change?

8                    MR. MCCALLUM:  Object to the form.

9                    THE WITNESS:  Right.  So that bullet point, I

10           actually do not know how to interpret it.  I don't know

11           what does it mean:  "Require only Hangouts chat to be

12           used," quote-unquote.

13                    I don't know how to interpret that.

14   BY MR. COLLIER:

15       Q    Well, as opposed to A-I-M, for example, AIM?

16                    MR. MCCALLUM:  Object to the form.

17   BY MR. COLLIER:

18       Q    AOL Instant Chat, right, does that sound

19    reasonable?

20       A    I don't know if third-party tools were allowed at

21    Google at the time to begin with, or if this is relative to

22    something else.  I just really don't know.

23       Q    All right.  Well, let's talk about the second

24    bullet, because I think this one will be clearer.

25                    No later than March of 2015, if you believe this

HIGHLY CONFIDENTIAL

Page 225

1    document, admins could force the Hangouts chat history to be

2    on or off, right?

3                      MR. MCCALLUM:  Object to the form.

4                      THE WITNESS:  That's my reading of this one,

5        yes.

6    BY MR. COLLIER:

7        Q    And then as it continues:  "While admins could

8    previously default all Hangouts chat conversation history to

9    on or off, chat participants could change this on a

10   per-conversation basis."

11                 Do you see that?

12       A    I do.

13       Q    What does that mean to you?

14       A    I can only read off the plain of meaning.  So

15   literally what it says that even with the history defaulting

16   to off, chat participants could change this on a

17   per-conversation basis individually, independent of what the

18   admin setting was to begin with.

19       Q    Okay.  And then the next sentence says:  "With

20   this new feature, admins can ensure chat participants cannot

21   change this setting for new conversations."

22                 Do you see that?

23       A    I do.

24       Q    So if we know the default history for Google

25   Chats, or Google Hangout at the time, was history off, this

HIGHLY CONFIDENTIAL

Page 226

1  would lead you to believe that after March of 2015, chat

2  participants could not change the setting for new

3  conversations; is that right?

4                    MR. MCCALLUM:  Object to the form.

5                    THE WITNESS:  Well, had the admin folks

6        actually enforced that feature, they had the ability to

7        enforce it at organizations that this particular

8        Hangouts was rolled to.

9                    So I -- I haven't read this document in

10       detail, so I don't know if this refers to the

11       third-party deployments or if this is a Google-specific

12       document, I don't know.

13                    Because the previous one we looked at seemed

14       to be directed at the Hangouts for work at other

15       organizations.  I don't know about this one.

16  BY MR. COLLIER:

17       Q    As we sit here today, you don't know whether or

18  not this is talking about Google Hangouts as is delivered to

19  Google customers, or Google Hangouts as is used within

20  Google at the time; is that what you're saying?

21       A    Yes, that's correct.  I just don't know one way or

22  the other.  It's possible it's either.

23                    I just -- I'm not familiar with this document, so

24  I don't know.

25       Q    Okay.  I will hand you Exhibit 28, which does not

HIGHLY CONFIDENTIAL

Page 227

1    have a Bates number, and I will represent to you that this

2    comes from Footnote 48 of Mr. Grande's expert report.

3            At the following link.  I'll put it on the Elmo so

4    everyone can see it.

5            Google workplaces -- excuse me.

6            Google workspace updates new admin policy and

7    compliance controls for Google Hangout chats.

8            Have you seen this figure before?  Did you go to

9    look at it when you saw Mr. Grande's report?

10   A    I don't believe I did.  It doesn't -- I do not

11   recall that -- seeing that particular footnote source, or,

12   in fact, 2024 documentation for Google Hangouts, so I'm not

13   sure.

14   Q    Well, I think the 2024, sir, is the date he says

15   visited.  That's a way of -- I'm sure you've done something

16   before.

17           That's a way of letting people know what version

18   you looked at, but if you look in the hyperlink, I believe

19   you'll see a date of 2013.

20   A    I see it now, yes.

21   Q    Okay.  But if you're not familiar with it, that's

22   fine.

23           Do you know, if this was Exhibit 28, was actually

24   a setting screen on or about 2013 to 2015 for Google admins

25   for Google Hangouts?

HIGHLY CONFIDENTIAL

Page 228

1       A    I do not, no.

2       Q    Do you see here if it is the admin setting, that

3    there's a box -- by the way, I didn't draw these blue

4    arrows.  I know I said I'd tell you whenever I highlighted.

5    I didn't draw these blue arrows.  They are actually in the

6    Google document.

7            Do you see the bottom -- well, we'll start at the

8    top.

9            First, there's an option set for Hangouts chat,

10   Hangouts chat, or Google Talk, or Google Talk only.

11           Do you see that?

12      A    I do.

13      Q    That would lead you to believe that this admin

14   setting would be somewhere in the period at which Google

15   Hangouts was converting to Google Talk, right?

16               MR. MCCALLUM:  Object to the form.

17               THE WITNESS:  That would make sense, yes.

18   BY MR. COLLIER:

19      Q    And do you recall roughly what period that was?  I

20   know we discussed it earlier.

21      A    2013/2014 would ring a bell.

22      Q    Okay.  And I'm not asking you to swear to an exact

23   date, I was just wanting to -- somewhere in the range of

24   2013 to 2014.  Okay.

25           And if we look under:  "Chat History," do you see

HIGHLY CONFIDENTIAL

Page 229

1    there's an option for all new Hangout chat conversations.

2    You can either turn history on or history off, and under

3    this particular setting:  "Don't allow users to change the

4    setting."

5        A    I do see that, yes.

6        Q    Do you have any understanding of what "don't allow

7    users to change the settings" means, from context in the

8    document.

9        A    Just what the plain meaning of it says, and in the

10   context of the -- one of the two previous exhibits we've

11   discussed, the plain meaning to me makes sense.  "Don't

12   allow users to change this setting."

13       Q    And this setting meaning the history is on history

14   is off setting referenced above, right?

15       A    Or Hangout chat conversations, correct.

16       Q    Yep.  Okay.  Almost done.  You can put that away.

17            I want you to imagine with me that there is -- I'm

18   going to call him or her the honest Googler.

19            A Google employee who's -- and that's not to imply

20   Google employees are dishonest, but a Google employee who is

21   doing their best to follow all litigation and preservation

22   requirements.

23            Are you with me so far?

24       A    Okay.

25       Q    Let's pretend -- well, let's hypothesize that this

HIGHLY CONFIDENTIAL

Page 230

1   Google employee received a litigation hold in 2020, and

2   after receiving the litigation hold in 2020, she

3   participated in chat conversations where other participants

4   would occasionally turn history off, even if it was turned

5   back on later.

6        A    Okay.

7        Q    You've looked at the litigation holds in this

8   case.  In fact, I've given you one of them, right?

9        A    Yes.  I don't know that I've reviewed a complete

10  list of litigation hold notices or instructions, but I've

11  certainly reviewed some, the ones that I cite in my report,

12  as well as, you know, the one we discussed already today.

13            MR. MCCALLUM:  Counsel, which one was the

14       litigation hold that you provided?

15            MR. COLLIER:  My stack's buried.  If you want

16       to turn to it and look at it.  It should be in your

17       official stack.

18            THE WITNESS:  So I do see a retention policy

19       that's Exhibit 13 that has a section that speaks to

20       legal holds.

21            Is that the document we're --

22  BY MR. COLLIER:

23       Q    Do you call that a -- do you call that a -- wait.

24  Have you reviewed -- I'm sorry.  That's the retention

25  policy.

HIGHLY CONFIDENTIAL

Page 231

1       Have you reviewed the litigation holds issued by

2   Google to individual employees?  Not the retention policy

3   that applies broadly, but when an employee is put on a

4   litigation hold, have you reviewed those litigation holds?

5       A    I have reviewed documents that, again, I don't

6   know about the legal terminology, but, for example, that

7   would have specific instruction that I've summarized in my

8   report that would talk about, you know, how to use certain

9   communication tools given the litigation hold, or to

10  notarize specific -- or note specific discussions about the

11  content's subject of the litigation hold.

12       I'm not sure if that's what you're referring to,

13  but those were the ones I cited in my report.

14       Q    And of the litigation holds cited in your report,

15  none of those litigation holds instructed an employee how to

16  preserve chats that were sent pre-February of 2023 with

17  history off, did they?

18                MR. MCCALLUM:  Object to the form.

19                THE WITNESS:  I don't recall specific

20       language about that.

21  BY MR. COLLIER:

22       Q    So each of those employees would just have to

23  figure out a way to preserve that if they wanted to, in

24  whatever mechanism they thought best, right?

25                MR. MCCALLUM:  Object to the form.

HIGHLY CONFIDENTIAL

Page 232

1                    THE WITNESS:  I don't know what was the

2          total, you know, extent of communications with

3          litigation hold recipients, so I cannot speak to that,

4          that's not part of my analysis or opinions in this

5          case.

6     BY MR. COLLIER:

7          Q    None of the documents you've reviewed in this

8     case, including the litigation holds, to your memory,

9     instructed a Google employee how to preserve chats that were

10    sent pre-February 2023 with history off, right?

11                   MR. MCCALLUM:  Object to the form.

12                   THE WITNESS:  That's fair.  Limiting to

13         documents I have reviewed, I do not recall, as I sit

14         here, such documents.

15    BY MR. COLLIER:

16         Q    Did you review unredacted or redacted litigation

17    holds in this case?

18         A    I do not recall as I sit here.

19                   MR. COLLIER:  Pass the witness.

20                   MR. MCCALLUM:  Take five minutes.

21                   MR. COLLIER:  Sure.

22                   THE VIDEOGRAPHER:  The time right now is

23         6:24 p.m.  We are off the record.

24                   (Recess taken at 6:24 p.m.)

25                   THE VIDEOGRAPHER:  The time right now is

Page 233

1           6:38 p.m.  We're back on the record.

2                          EXAMINATION

3    BY MR. MCCALLUM:

4           Q     Hello, Mr. Malkiewicz.  Just a couple of follow-up

5    questions that I wanted to ask you.

6                 You submitted an expert report in connection with

7    this case, right?

8           A     Yes.

9           Q     Are there any corrections that you'd like to make

10   to that report?

11          A     Yes.

12          Q     What are those corrections?

13          A     Well, in my review of the report, I noticed that

14   in one of the footnotes, specifically Footnote 151, I

15   inadvertently left out three Bates stamp document citations

16   that refer to the three conversations the footnote cites to

17   within the context of that sentence.

18                I meant to include three documents that are on my

19   Materials Considered List, but I inadvertently excluded them

20   from that Footnote 151.

21          Q     And for Mr. Collier's benefit, I think we can just

22   send you a short e-mail that contains those minor

23   corrections.  Thank you, Mr. Malkiewicz.

24                Earlier today you testified that you are not an

25   expert in antitrust law, but that you have expertise in

HIGHLY CONFIDENTIAL

Page 234

1   antitrust economics.

2           Do you recall that testimony?

3       A    Yes.

4       Q    Have you been asked to give -- have you been asked

5   to opine on any antitrust economics issues in this case?

6       A    No.

7       Q    Outside of your role as an expert, do you have any

8   personal opinions about antitrust economics issues in this

9   case?

10      A    I do not.

11      Q    Earlier today, Mr. Malkiewicz, you testified that

12  you had read Mr. Grande's expert declaration and opinions

13  served last week?

14      A    I have, yes.

15      Q    And having reviewed that material, did it change

16  any of the opinions that you gave in your expert report?

17      A    It did not.

18      Q    When you read Mr. Grande's report, is there

19  anything about the report or the declaration that surprised

20  you?

21              MR. COLLIER:  Objection.  Form.

22              THE WITNESS:  Well, it struck me that what

23      Mr. Grande characterizes as his -- as my opinions that

24      he comments on, are not, in fact, my opinions.

25              I could not identify Mr. Grande's opinions

HIGHLY CONFIDENTIAL

Page 235

1         of -- my actual opinions that I offer in this case.

2     BY MR. MCCALLUM:

3         Q    And when you say you could not identify, what do

4     you mean?

5         A    I've reviewed Mr. Grande's report, and I noted

6     that what appears to -- I just could not identify the

7     contents of the report that specifically spoke to the

8     opinions that I offer in this case.

9         Q    You were asked some questions earlier today about

10    the custodians in the case, and there were a couple of

11    different numbers that we used.  There was 141 and 202 and

12    some other numbers.

13            Do you recall that testimony?

14        A    I do.

15        Q    What's your understanding of the 202 number that

16    was referred to in that testimony earlier today?

17        A    So my understanding is that the documents produced

18    in this case have come from 202 individual Google employees.

19        Q    And do you know if that 202 figure is the same

20    universe as the number of Google employees on litigation

21    holds in this case?

22        A    I don't know.

23        Q    Do you have any understanding of the number of

24    Google employees on litigation hold in connection with this

25    case?

HIGHLY CONFIDENTIAL

Page 236

1        A      I do not.

2        Q      Earlier today you were asked a question by Mr.

3    Collier, and the question was:  "You haven't done the

4    mathematics that one would do to determine the statistical

5    significance of Dr. Hochstetler's conclusion, correct?"

6              Do you recall being asked that question?

7        A      I do.

8        Q      And you answered:  "It would be inappropriate to

9    do that at the level of analysis that Professor Hochstetler

10   has conducted."

11             Do you recall giving that answer?

12       A      I do.

13       Q      Why was that -- why would it have been

14   inappropriate to do that at the level of analysis that

15   Professor Hochstetler as conducted?

16       A      Well, that's because, you know, applying

17   statistical methods to a bias sample, such as the one that

18   Professor Hochstetler used, would not provide a statistic

19   that's meaningful in the context of the population that's

20   particularly being analyzed.

21       Q      Well, sir, without doing that math, how can you

22   opine that a sample size is not statistically significant?

23             MR. COLLIER:  Object to form.

24             THE WITNESS:  Well, again, if the sample is

25       not representative of the population at issue, then any

HIGHLY CONFIDENTIAL

Page 237

1          mathematical calculations of the statistical

2          significance would not provide a meaningful statistic.

3     BY MR. MCCALLUM:

4          Q    You were asked a couple of questions this

5     afternoon about admin controls.

6               Do you recall that -- those questions and those

7     answers?

8          A    I do.

9          Q    Did you ever study the details of admin controls

10    for the version of Hangouts or chats that was being made

11    available to Google's customers?

12         A    I did not.

13         Q    Do you know whether the customer or the external

14    version of those tools tracked the features of the version

15    Google was using internally at any point in time?

16         A    I do not.

17         Q    You were shown some documents this afternoon

18    from -- concerning what was described as an update to Google

19    workspace customers in 2015.

20              Do you recall seeing those documents?

21         A    Just today, yes.

22         Q    Were you speculating about the details of that

23    update when you responded to those questions?

24                   MR. COLLIER:  Objection.  Form.

25                   THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL

Page 238

1   BY MR. MCCALLUM:

2       Q    Do you know whether or how for the customer

3   version of chat or Hangout, an administrator could ever

4   actually go on a user-by-user basis to determine whether

5   they could be prohibited from changing retention to history

6   off?

7       A    I do not know.

8       Q    And just before we finished up a short while ago,

9   you were asked a question by Mr. Collier, and the question

10  was:  "None of the documents you have reviewed in this case,

11  including the litigation holds, to your memory, instructed a

12  Google employee how to preserve chats that were sent

13  pre-February 2023 with history off."

14          Right?  Do you recall being asked that question?

15      A    I recall that, yes.

16      Q    And your answer was:  "That's fair.  Limiting to

17  documents I have reviewed, I do not recall as I sit here

18  such documents."

19          Was that your answer?

20      A    I believe so, yes.

21      Q    And was that answer accurate?

22              MR. COLLIER:  Objection.  Form.

23              THE WITNESS:  No.  I misunderstood the date

24      in the question.

25

HIGHLY CONFIDENTIAL

Page 239

1    BY MR. MCCALLUM:

2        Q    And so -- having now had the question repeated to

3    you, including the 20 -- the pre-February 2023 date, what

4    would be your answer to that question?

5                    MR. COLLIER:  Objection.  Form.

6                    THE WITNESS:  Well, I have seen and cited

7            litigation hold notices from before 2023.  That

8            specifically instructed Googlers receiving such

9            litigation holds as to, you know, specifically how they

10           should go about document preservation, including

11           instructing them not to have conversations of substance

12           related to the litigation hold if they can avoid on the

13           chat tool, but instead, use e-mail or other means that

14           can be preserved, and to the extent that they have to,

15           in fact, use the chat tool, to turn the history on in

16           such instances.

17                   MR. MCCALLUM:  Thank you.  Mr. Malkiewicz, no

18           further questions at this time.

19                       EXAMINATION

20   BY MR. COLLIER:

21       Q    Mr. Malkiewicz, as to the question you just gave a

22   different answer to, to your memory, none of the documents

23   reviewed in this case, including the litigation holds,

24   instructed a Google employee how to preserve chats that were

25   sent pre-February 2023 with history off.

HIGHLY CONFIDENTIAL

Page 240

1          You changed your answer to that question, right?

2     A    Correct.  I misunderstood the date in the original

3     question, so I misspoke.

4     Q    Did you -- I asked you that question right before

5     you took a break to meet with counsel, didn't I?

6     A    I believe so.  Yes.

7     Q    Did you review any litigation holds or anything

8     during that break?

9     A    I did not.

10    Q    So before the break you had one answer, and then

11    after your break with counsel you came back with a different

12    one; is that fair?

13    A    That's correct.  I literally believe -- I believed

14    that I've heard you say before 2020, not 2023, and thus my

15    answer was correct for your question, but with the date

16    2020.

17    Q    Okay.  So, let me just make sure I understand.

18         None of the documents you've reviewed in this

19    case, including the litigation holds, instructed a Google

20    employee how to preserve chats that were sent

21    pre-February 2020 with history off, right?

22              MR. MCCALLUM:  Object to the form.

23              THE WITNESS:  That's correct.  And I stand

24       behind my answer in the context of the year 2020.

25

HIGHLY CONFIDENTIAL

```
                                                Page 241

 1    BY MR. COLLIER:

 2        Q    Okay.  And then you told Google's counsel, if we

 3    change that question to pre-February 2023, you have a

 4    different answer, right?

 5             The answer being:  "Yes, I've seen documents"?

 6        A    I mean, I have not told anything of that kind to

 7    Google's counsel.

 8                  MR. MCCALLUM:  If I can clarify.

 9                  I think we're on the same page, that Mr.

10         Collier's asking about the testimony that you just gave

11         a few moments ago.

12                  MR. COLLIER:  Exactly.  I'm not asking what

13         you talked about with counsel in your room.  I'm

14         saying -- let me ask you a better question.

15    BY MR. COLLIER:

16        Q    So after the break when your counsel asked you the

17    same question, you came back with a different answer because

18    you heard the date 2023, right?

19        A    Correct.  It's purely a matter of a date, yes.

20        Q    Exactly.  So when -- at what date does your answer

21    change as to when you believe the first time a Google

22    employee was instructed how to preserve chats that were sent

23    with history off, what's that date?

24                  MR. MCCALLUM:  Object to the form.

25                  THE WITNESS:  So to the best of my
```

HIGHLY CONFIDENTIAL

Page 242

1      recollection, without, again, reviewing the materials

2      relied upon in my list in detail, as I sit here, I

3      specifically recall those instructions, at least as of

4      2021, maybe 2020, but I'm not confident about 2020.

5   BY MR. COLLIER:

6      Q    Okay.  And are you referring to -- when I say --

7   or when you say there's a document in that 2020/2021 range,

8   are you referring to litigation holds?

9      A    Correct.

10     Q    And you believe they instruct an employee how to

11  preserve because they have an instructions such as, do it on

12  an e-mail and various other things, right?

13     A    That's fair.  I mean, I have detailed quotes from

14  those documents included in my expert report.

15     Q    Early on in response to your counsel's

16  questioning, you said you didn't need to run the mathematics

17  because Professor Hochstetler used a biased sample.

18          Do you recall that?

19     A    Yes, I do.

20     Q    And just so I can link-up what you said in your

21  report with what you said here, is the reason you think

22  Professor Hochstetler used a biased sample because he used a

23  sample of convenience?

24          MR. MCCALLUM:  Object to the form.

25          THE WITNESS:  Well, no.  These are two

HIGHLY CONFIDENTIAL

Page 243

1          separate issues, but they go together.

2                    So in my opinion, this sample that Professor

3          Hochstetler used is a biased sample of convenience.  So

4          it's both a biased sample, but it's also a sample of

5          convenience.

6     BY MR. COLLIER:

7          Q    So let's take it in two pieces.  What makes it a

8     biased sample?

9          A    The fact that it's not representative of the

10    population it is intended to extrapolate onto.

11         Q    And how do you know the five employees are not

12    representative of other Google employees?

13         A    Well, I provide detailed analysis in my report,

14    some of it we've already discussed today, including, for

15    example, the very unique roles of two out of the five

16    individuals.

17                   I go in my report into much more detail about, for

18    example, you know, another custodian out of the five has not

19    been involved in, for example, the ad tech business at all

20    since, my understanding, 2019 or before, so there are other

21    characteristics of those particular individuals that when

22    extrapolating onto 2022, and other years, would make them

23    not representative of the population that Professor

24    Hochstetler has been studying, which is presumably the 141

25    custodians, not to mention the 202 individual employees,

HIGHLY CONFIDENTIAL

Page 244

1   whose documents have been produced as part of this

2   litigation.

3       Q    So I'm clear, when you say it's a biased sample,

4   you're not alleging that Professor Hochstetler was biased,

5   right?

6       A    That's correct.  The bias is related to the

7   sample.  Not to an individual, yes.

8       Q    You're not alleging that Professor Hochstetler

9   used a bias sample because he selected certain individuals

10  over others, are you?

11      A    Not specifically, other than in the context maybe

12  of ███████████ inclusion or exclusion from certain types of

13  analyses, but overall, yes, I mean, that's the other part of

14  critique, which is it's a sample of convenience.

15          It's not a sample that Professor Hochstetler has

16  selected or designed with the population he intended to

17  study in mind.

18      Q    What is a sample of convenience, generally,

19  outside the scope of this case?

20      A    Just generally, it's data that's -- or a sample

21  that's available for individuals with a target population

22  that a researcher has access to for reasons unrelated to the

23  selection process, but simply because the sample is

24  available.

25      Q    Isn't in the economic literature, a sample of

HIGHLY CONFIDENTIAL

Page 245

1    convenience, the convenience part means a sample chosen for

2    the convenience of the researcher?

3        A    Not necessarily.  I mean, its -- its availability

4    is convenient in a sense in like a common use of the term,

5    but it does not -- it does not mean that someone has to

6    actively seek convenience.  It simply is available because

7    it's ready for someone to use.

8        Q    Isn't the textbook kind of statistics 101

9    definition of a sample of convenience, when, say, a

10   university professor wanting to know the attitudes of all

11   undergraduates, merely takes a survey of the students in his

12   class because they're there and then tries to extrapolate

13   the survey of the students in his class, right?

14                   MR. MCCALLUM:  Object to the form.

15                   THE WITNESS:  That could be one example.

16           There are other situations that, you know, the sample

17           may already exist.  Maybe the students already answered

18           the questions, and those answers are available and,

19           thus, the professor does not go and question the

20           students to begin with.

21                   So there are many different situations in

22           which a sample of convenience comes into play.

23   BY MR. COLLIER:

24       Q    But you'd agree with me, sir, that a sample of

25   convenience, as defined in the literature, focuses on the

HIGHLY CONFIDENTIAL

Page 246

1    sample selection by the researcher was for their convenience

2    as opposed to selecting an available representative sample

3    or the complete universe?

4         A    I'll put this way, that's a more fair

5    characterization than the previous one you offered.

6                        MR. COLLIER:  I'll pass the witness.

7                        MR. MCCALLUM:  No further questions.

8                        MR. COLLIER:  All right.  Thank you.

9                        THE VIDEOGRAPHER:  The time right now is

10        6:55 p.m.  We are off the record.

11                        (Deposition concluded at 6:55 p.m.)

12                                  _   _   _

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 247

1                          CERTIFICATE

2         I, Jennifer A. Dunn, Registered Merit Reporter,

3    Certified Realtime Reporter, Certified Shorthand Reporter,

4    and Certified Court Reporter, do hereby certify that prior

5    to the commencement of the examination, Michal

6    Malkiewicz, was duly sworn by me to testify to the truth,

7    the whole truth and nothing but the truth.

8         I DO FURTHER CERTIFY that the foregoing is a verbatim

9    transcript of the testimony as taken stenographically by me

10   at the time, place and on the date hereinbefore set forth.

11        I DO FURTHER CERTIFY that I am neither a relative nor

12   employee nor attorney nor counsel of any of the parties to

13   this action, and that I am neither a relative nor employee

14   of such attorney or counsel, and that I am not financially

15   interested in the action.

16

17

18                    JENNIFER A. DUNN

19                NCRA Registered Merit Reporter

                  NCRA Certified Realtime Reporter

20        California Certified Shorthand Reporter #14461

         Illinois Certified Shorthand Reporter #084.004939

21          Missouri Certified Court Reporter #485

           Texas Certified Shorthand Reporter #12050

22

23

24              Dated:  December 18, 2024

25

HIGHLY CONFIDENTIAL

Page 248

1                    INSTRUCTIONS TO WITNESS

2              Please read your deposition over carefully

3   and make any necessary corrections.  You should state the

4   reason in the appropriate space on the errata sheet for any

5   corrections that are made.

6              After doing so, please sign the errata sheet

7   and date it.  You are signing same subject to the changes

8   you have noted on the errata sheet, which will be attached

9   to your deposition.

10             It is imperative that you return the original

11  errata sheet to the deposing attorney within thirty (30)

12  days of receipt of the deposition transcript by you.

13             If you fail to do so, the deposition

14  transcript may be deemed to be accurate and may be used in

15  court.

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 249

1                ACKNOWLEDGMENT OF DEPONENT

2                I, MICHAL MALKIEWICZ, do hereby certify that

3    I have read the foregoing pages and that the same is a

4    correct transcription of the answers given by me to the

5    questions therein propounded, except for the corrections or

6    changes in form or substance, if any, noted in the attached

7    Errata Sheet.

8    _____

     MICHAL MALKIEWICZ                    Date

9

10

11   (Reported by:  Jennifer A. Dunn, RMR, CRR, CCR & CSR)

12

13

14   Subscribed and sworn to before me this

15    _____ day of _____, 20 _____.

16

17   My commission expires: _____

18   _____

19                    Notary Public

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 250

```
 1                    ERRATA SHEET
 2    WITNESS:  Michal Malkiewicz
 3    IN RE:    The State of Texas v. Google
 4
 5    Upon reading the deposition and before subscribing thereto,
 6    the deponent indicated the following changes should be made:
 7
      PAGE  LINE   CHANGE/REASON
 8
      ____  _____  _____
 9
      ____  _____  _____
10
      ____  _____  _____
11
      ____  _____  _____
12
      ____  _____  _____
13
      ____  _____  _____
14
      ____  _____  _____
15
      ____  _____  _____
16
      ____  _____  _____
17
      ____  _____  _____
18
      ____  _____  _____
19
      ____  _____  _____
20
      ____  _____  _____
21
      ____  _____  _____
22
      ____  _____  _____
23
      ____  _____  _____
24
      _____
25    Witness signature
```

HIGHLY CONFIDENTIAL

**[& - 20]**                                                                                   Page 1

| & |
|---|
| **&**   3:16 249:11 |

| 0 |
|---|
| **0029**   5:7 |
| **004067792**   5:12 |
| **004290028**   5:7 |
| **004290140**   5:9 |
| **004290164**   5:6 |
| **00957**   1:6 |
| **009709508**   5:20 |
| **0148**   5:9 23:12 |
| **049**   82:15 |
| **07385055**   6:19 |
| **084.004939**   247:20 |

| 1 |
|---|
| **1**   5:3 6:5 13:6,9 18:14 85:21 109:18,20,21 172:6,25 174:6 176:7 206:24 |
| **1-1**   93:2,4 |
| **1-1s**   91:15 |
| **1.5**   143:21 144:1 |
| **1/18/2019**   5:8 |
| **10**   5:15 82:14 82:19,20,21 110:9 111:18 112:4 201:10 217:22 |

**100**   2:14,18 87:15 92:16,17 117:8
**1000**   2:9
**10007**   3:8
**101**   245:8
**105**   5:21
**1077**   221:20
**1078**   221:20
**1081**   6:17
**10940**   2:13
**10:03**   38:20,21
**10:21**   38:23
**11**   5:16 89:14 99:21
**11/19/21**   5:13
**11/7/2014**   6:19
**113**   5:22,23,24
**11:28**   82:8,9
**11:39:42**   76:4
**11:52**   82:11
**12**   5:18 95:1 116:13
**12050**   1:22 247:21
**12:57**   114:14 114:15
**12th**   219:11,12 219:16
**13**   5:3,19 96:20 130:24 230:19
**1301**   2:5
**13th**   142:6

**14**   5:21 104:20 108:5
**141**   24:23 135:21 136:21 137:1,6 138:5 139:25 195:24 196:6,10,20,25 197:7 235:11 243:24
**142**   28:14
**143**   29:15
**144**   30:14
**14461**   247:20
**146**   34:17
**147**   39:3,5
**148**   43:2
**1485029**   5:18 95:6
**14:42**   164:7
**15**   5:22 108:2 111:18 113:9 113:11 217:22
**151**   233:14,20
**16**   5:23 109:14 109:15 113:14 113:15,16
**160**   6:4
**16741074**   6:17 218:6
**16741077**   222:8
**16th**   188:5
**17**   1:12 5:24 7:2 113:17,19

**172**   6:5
**175**   1:17 3:7 6:8 7:8
**176**   6:7
**17th**   7:6 66:10 66:11
**18**   5:4,5 6:4 21:6 27:11,17 64:14 160:17 160:17 182:20 183:6 184:8,8 247:24
**186**   6:10,14
**19**   6:5 70:8 172:2,4,8 176:10,23
**197**   171:4
**19th**   74:12 76:3
**1:1**   39:13 40:3
**1:55**   114:17
**1p**   105:21
**1st**   26:15,17

| 2 |
|---|
| **2**   5:4 6:7 18:5 18:10,15 85:21 172:6 175:3 176:7,14 206:24 |
| **2/21/2018**   5:7 |
| **2/8/22**   5:16 |
| **20**   5:7 6:7 21:6 132:4 172:2,4 176:12,17,23 |

HIGHLY CONFIDENTIAL

## [20 - 26]

195:11 239:3
249:15
**20001** 2:9
**2002** 136:13
**2004** 155:9,9
**2006** 153:12,18
154:2,4,17
**2007** 130:20,23
144:17 145:5
**2008** 130:20
186:19 187:3
187:20 188:5
189:8,11
190:11,14
191:4,9,14,21
192:19 193:25
195:10
**2009** 145:18
**2013** 130:20
198:21 227:19
227:24 228:24
**2013/2014**
228:21
**2014** 110:6
111:14,25
112:7 128:3
129:13 181:14
218:21 219:12
220:17,25
224:2 228:24
**2015** 128:4
130:20 222:5
222:12,18,19
224:7,25 226:1

227:24 237:19
**2017** 66:8
**2018** 21:2,3,5
22:3,18
**2019** 23:15,24
27:24 40:24
41:16 42:1
130:21 162:17
162:22 163:4
176:25 199:18
243:20
**202** 2:10 6:15
135:14,19
136:1,14,22,23
137:1,9,17
138:5 142:17
169:19 195:23
195:25 196:7
197:6,22 204:1
235:11,15,18
235:19 243:25
**2020** 21:6
26:15,17,19,22
66:7,10,11,15
72:21 97:18
230:1,2 240:14
240:16,21,24
242:4,4
**2020/2021**
242:7
**2021** 74:10,12
76:3 144:6
242:4

**2022** 85:9 91:8
129:2 130:21
143:19,20
144:3,18 145:6
145:17 177:1
191:24 194:6,8
200:16 204:2
212:24 213:15
214:2,7 243:22
**2022/2023**
193:23
**2023** 27:3
49:14,15 50:25
55:19,25,25
58:11,11 59:1
59:8,19 60:6
62:2,10 63:10
63:13,14,24
85:5,19,23
86:1,9,22,25
87:2,22 88:14
89:6 102:25
119:10 120:18
120:18 121:12
125:4 141:3,6
141:12 143:1,9
145:17 192:3,5
195:11 198:21
199:1,19
208:19 212:12
215:19 231:16
232:10 238:13
239:3,7,25
240:14 241:3

241:18
**2024** 1:12 7:2,6
109:17 227:12
227:14 247:24
**2025** 117:3
**209** 6:16
**21** 6:8 175:2,9
176:10,15
181:17,18,19
**212** 3:8
**218** 6:17,19
**22** 6:10 186:4
**226** 6:20
**23** 5:8 6:14
186:3 191:3
195:6,7
**233** 4:5
**239** 4:6
**24** 6:15 23:21
23:25 24:7,15
50:21 54:16
55:3 58:7 64:4
64:12 90:3,23
183:19,22
184:17 185:2,3
185:14,18
202:11
**247** 4:7
**248** 4:8
**249** 4:9
**25** 6:16 209:18
**250** 4:10
**26** 6:17 218:5
221:17

HIGHLY CONFIDENTIAL

**[27 - 9]**

**27**  6:19 218:7 218:11,16
**27th**  19:8 193:12
**28**  6:20 162:1 226:25 227:23
**2829**  2:17
**29**  20:12
**29864619**  6:13 186:6
**2:52**  150:21,22
**2nd**  26:19

**3**

**3**  1:17 3:6 5:5 18:22,23 19:19 28:13 109:25 122:1 201:10 206:9,25 207:9
**3,000**  112:25
**3/18/2020**  5:12
**30**  27:11,13,14 64:14 89:21 90:19 91:12,14 182:20 183:6 248:11
**300**  133:3
**300,000**  133:11 134:6
**3076**  5:17 89:15
**32557**  247:17
**3:18**  150:24

**4**

**4**  5:7 6:16 20:11,12,15 23:2,5 125:15 209:19,21 210:2,17 211:24 212:1 214:19
**4/26/22**  5:15
**40**  110:14,25
**4049**  5:15
**4067792**  65:25
**4067793**  65:11
**42**  89:14
**4290028**  20:12
**4290140**  23:11
**4290164**  18:24
**4325**  5:25 113:12
**44**  97:25
**4439513**  5:14 74:6
**4584048**  5:15 82:14
**4620**  6:13
**48**  6:20 227:2
**485**  247:21
**49**  5:10 71:10
**4:10**  180:21,23
**4:20**  1:6
**4:35**  180:25
**4th**  123:21 210:3

**5**

**5**  5:8 23:10 27:20 28:5 34:14 38:25 41:22 63:2,9 63:12
**500**  154:6
**5056**  6:19
**5100**  2:5
**514**  78:2
**51st**  3:7
**55**  168:16,22
**5:36**  217:24,25

**6**

**6**  5:10 49:12 54:10,23 55:16 76:1 84:8 86:17,21 91:3 100:5,7,8 218:2
**60**  168:16 170:22 171:2
**65**  5:12
**651-5151**  2:6
**659-5200**  2:15
**662-0200**  2:10
**68**  134:14 135:8 142:5,19 142:22
**687430**  5:21 104:20
**6:24**  232:23,24

**6:38**  233:1
**6:55**  246:10,11

**7**

**7**  4:4 5:11 55:23 76:1 84:8 85:13
**713**  2:6,15
**7385055**  218:7
**74**  5:13
**77010-3095**  2:6
**77064**  2:14
**7794**  5:12
**793**  68:19
**799**  2:9
**7th**  218:21

**8**

**8**  5:12 65:8,10 65:24 74:1,2
**80**  117:8
**8033073**  5:17 89:15
**80s**  160:14
**82**  5:15
**85**  111:16
**854-4957**  3:8
**89**  5:16
**8th**  85:5 140:17 140:24 141:3,5 142:6

**9**

**9**  5:13 74:1,4,8 151:3

HIGHLY CONFIDENTIAL

**[9,000 - additional]**　　　　　　　　　　　　　　　　　　　　　Page 4

| | | | |
|---|---|---|---|
| **9,000**　166:11 | 85:20 86:2,9 | **acronym**　39:18 | 73:23 76:13 |
| **9/16**　164:3,25 | 212:12 220:6 | 39:19 132:10 | 86:17 97:25 |
| **9/16/2008**　6:11 | 226:6 | 148:13 | 100:24 106:10 |
| **9/16/2019** | **able**　26:7 65:5 | **action**　208:3 | 109:20 111:10 |
| 165:10 | 85:6,11 86:6 | 247:13,15 | 113:16 127:5 |
| **9/30**　164:25 | 87:7,10 114:19 | **activated**　17:22 | 132:9 135:22 |
| **9/30/2019** | 133:11,25 | **activating** | 136:22 142:15 |
| 165:10 | 169:3,18 | 15:23 | 143:19 147:3,6 |
| **90**　14:5 111:16 | 173:11 174:17 | **active**　26:23 | 155:15 162:10 |
| 112:7 160:7 | **above**　1:19 | **actively**　25:10 | 173:14 177:19 |
| **900**　166:8 | 17:25 229:14 | 245:6 | 180:12,12,14 |
| **90s**　160:14 | **absent**　111:6 | **activity**　161:25 | 197:1 202:3 |
| **91361**　2:18 | **abston**　2:12 | **actual**　10:14 | 214:4 223:18 |
| **94**　65:11,25 | **access**　55:10 | 44:19 60:12 | 224:10 226:6 |
| **95**　5:18 63:11 | 60:12 168:6 | 121:20 123:18 | 227:23 228:5 |
| 63:23 133:12 | 244:22 | 127:6 131:20 | 238:4 |
| 160:6,11,14 | **accessible** | 148:22 157:8 | **ad**　8:19 9:9 |
| **9509**　5:20 | 183:11 | 158:7 173:12 | 49:23 50:3 |
| **9515**　5:14 74:6 | **accidentally** | 173:16,19 | 52:4,20 53:7 |
| **96**　5:19 | 12:1 137:22 | 174:18 176:5 | 53:20 54:25 |
| **9709508**　96:21 | **account**　107:17 | 178:25 205:17 | 56:6 58:2 |
| **975**　116:25 | 156:22 199:6 | 205:22 214:1 | 67:24 100:11 |
| **99**　160:2,3 | **accurate**　30:4 | 214:13 223:23 | 100:17 243:19 |
| 169:24 | 181:13 238:21 | 235:1 | **add**　123:24 |
| **9:09**　1:18 7:2,7 | 248:14 | **actually**　9:21 | **added**　136:13 |
| **9th**　2:9 222:5 | **accuse**　10:21 | 15:10 19:23 | 168:21 |
| | **acknowledg...** | 28:21 29:21 | **addendums** |
| **a** | 249:1 | 30:17 35:20 | 181:9 |
| **a.m.**　1:18 7:2,7 | **acquired** | 36:9 39:17,21 | **additional**　90:2 |
| 38:20,21,23 | 165:18,22 | 40:15,20 42:9 | 120:24 121:3 |
| 82:11 | **acquisition** | 44:8 45:4,17 | 122:2 125:8 |
| **abcs**　161:12,13 | 165:16,24 | 45:25 47:4,17 | 174:16 193:13 |
| **ability**　24:6 | 166:5 | 58:23 60:14 | 193:14 |
| 30:25 84:22 | | 62:1 69:15 | |

HIGHLY CONFIDENTIAL

**[address - analysis]**                                                                 Page 5

| | | | |
|---|---|---|---|
| **address**  21:13 | **affairs**  219:2 | 203:17 208:18 | 229:3,6,12 |
| 107:17 222:3 | **affect**  139:2 | 208:25 211:1 | **allowed**  37:19 |
| **addressee** | **affirmative** | 211:17,22 | 224:20 |
| 137:13 | 144:2 145:3 | 214:9,24 | **allowing** |
| **addresses** | 146:1 170:20 | 215:16 217:4 | 222:24 |
| 114:3 | 175:5 | 218:16,19 | **allows**  105:18 |
| **addressing** | **afternoon** | 220:15,25 | **amazon**  202:1 |
| 83:23 | 164:4 237:5,17 | 245:24 | **amended**  28:18 |
| **adjustment** | **age**  7:17 | **agreed**  85:16 | **amount**  135:15 |
| 57:14 | **ago**  12:23,23 | 87:3,5 | 138:7 160:8,10 |
| **admin**  219:18 | 67:21 132:23 | **agreement**  61:5 | 176:24,25 |
| 219:25 220:13 | 220:4 238:8 | 61:7 73:20 | 197:8 |
| 220:17 221:2 | 241:11 | 125:1 142:20 | **analyses** |
| 222:24 223:6 | **agree**  19:18 | 171:1 | 116:11 194:17 |
| 223:10,17,18 | 20:16 21:1,15 | **agreements** | 244:13 |
| 225:18 226:5 | 22:24 27:3 | 111:7 | **analysis**  42:17 |
| 227:6 228:2,13 | 29:9,14 33:21 | **agrees**  29:16 | 46:25 48:15,16 |
| 237:5,9 | 34:24 35:1 | 169:10 | 48:18 122:14 |
| **administrative** | 41:23 43:8,18 | **ahead**  164:9 | 126:21 131:24 |
| 176:20 223:11 | 53:5 54:9 | **aim**  224:15 | 132:12 135:10 |
| **administrator** | 59:19 61:8 | **al**  1:4 7:10 | 137:4 138:11 |
| 238:3 | 62:17,20 63:18 | **alarm**  14:16 | 139:24 144:21 |
| **admins**  222:23 | 64:25 66:9 | **alarms**  14:3,9 | 157:9,16 |
| 224:3 225:1,7 | 82:18,21 91:21 | **alex**  2:12 | 166:25 169:4 |
| 225:20 227:24 | 101:6 102:6 | **alex.abston** | 169:19 173:11 |
| **admit**  105:3 | 103:8 104:2 | 2:13 | 173:24 174:3 |
| 145:15 | 119:6 135:8 | **alias**  89:22 | 175:11 178:17 |
| **admitted**  52:19 | 141:21,23 | **allegations** | 191:19,23 |
| **advertisers** | 142:16 145:4 | 115:15 204:25 | 192:13 193:10 |
| 67:6 | 164:5 173:2 | 204:25 205:2 | 194:15,15,20 |
| **advertising** | 182:13 188:14 | **alleging**  244:4 | 199:12,19 |
| 67:15,18 | 188:17 191:13 | 244:8 | 200:3,8 203:25 |
| 204:23 | 192:7 193:3 | **allow**  45:10 | 204:3 209:1 |
| | 197:4,5 203:13 | 88:14 89:5 | 213:4 232:4 |

HIGHLY CONFIDENTIAL

[analysis - appropriate]                                                Page 6

236:9,14
243:13
**analytics**   152:6
177:18
**analyze**   42:9,18
48:18 125:9
131:16 168:9
169:12 170:7
200:12
**analyzed**   58:23
60:2,13,17,19
62:1 73:3
120:5 123:18
125:15 126:3
130:15 131:5
132:20 138:16
140:25 177:20
194:10 236:20
**analyzes**
138:19
**analyzing**
193:17
**angle**   14:5
**annoying**
149:23
**another's**   53:20
**answer**   8:5
11:6,25 12:1
12:11 14:10
15:13 31:25
47:18 54:19
56:12 78:18
86:11 115:1
133:25 134:1,4

136:19 144:9
144:14 149:19
157:21 166:2
166:12 167:5
177:19 182:24
182:25 192:25
208:5 236:11
238:16,19,21
239:4,22 240:1
240:10,15,24
241:4,5,17,20
**answered**
174:1 236:8
245:17
**answering**
83:22
**answers**   56:4
129:18 130:5
176:16 237:7
245:18 249:4
**anticipate**   8:18
**anticipated**   9:8
14:14 127:1
**anticipates**
8:16 9:3
**anticipating**
147:17
**antitrust**   6:9
51:19,20,22,23
52:1,2,7 53:3,6
53:13,14,22
67:5,13 68:9
77:3,5,13
151:17 181:8

189:10 204:22
233:25 234:1,5
234:8
**anu**   3:16
**anybody**
165:15
**anymore**   103:3
**aol**   224:18
**apappu**   160:24
**aparna**   163:17
**apologies**   11:21
92:23
**apologize**   13:5
53:12 66:14
79:22 83:11
130:5 176:8
180:16 220:20
**app**   78:12
167:17
**appeals**   155:3
**appear**   13:14
20:22 22:10
90:15 95:13
98:5 106:25
108:11 114:1,8
145:23 160:21
188:20 208:2
**appears**   19:24
20:16 21:1
23:14,17 31:25
33:10 36:4
44:18 65:13
66:6 71:25
75:9 83:1,24

90:12 106:25
108:13 109:16
140:25 160:22
162:23 181:3
218:17,23
221:5 224:2
235:6
**applicable**
58:14
**application**
117:20,22
118:7 184:3
185:6
**applied**   151:19
153:20,21,22
179:19 210:11
212:7
**applies**   133:21
137:4 140:20
231:3
**apply**   141:17
155:17,23
156:7,12
**applying**   171:4
213:25 215:16
236:16
**appointment**
154:24
**appreciate**
176:22
**approach**
178:21
**appropriate**
248:4

HIGHLY CONFIDENTIAL

**[approved - available]** Page 7

approved 87:5
approximate
61:24 111:9
approximately
136:22,22
apps 6:17
219:20 222:2
april 85:9
area 8:1 11:3
31:2 92:12,15
140:14 152:14
201:23 223:24
areas 153:7
155:21
argue 93:20
203:5
arrows 228:4,5
article 181:3,4
181:5,6,10,13
181:20
articles 201:4
artifact 14:1
aside 18:9
78:16 135:7
191:12
asked 47:2
62:13 86:15
111:15 125:12
125:19 133:23
136:2 144:21
149:1 153:10
156:13 159:11
170:5,9 174:2
176:14 182:10

182:11 207:14
234:4,4 235:9
236:2,6 237:4
238:9,14 240:4
241:16
asking 22:3
23:19 63:7
77:12 85:18
117:11 119:17
120:4,23
122:24 130:16
134:11 143:6
145:15,22
157:13 158:8
172:17 179:22
179:25 197:5
197:14 209:19
213:14 228:22
241:10,12
aspect 37:17
aspects 36:3
47:7 55:7 93:3
93:16 131:2
assessment
166:13,16,19
assets 152:3
assignment
119:3 170:16
assistant
154:18 155:10
associate
153:17
associated
138:24

assume 17:8,8
17:17 21:20
25:7,10 49:9
49:13 55:24
57:3 68:2
70:13 73:19
100:15 109:17
124:23,24
139:13 174:21
177:24 180:2
183:2,17,18,18
197:22 212:11
212:21 214:5
214:16,18,21
214:25 215:11
219:11
assumed
179:21
assuming 12:25
17:12 50:12
169:21
assumption
60:4 138:4
assumptions
143:24 213:12
213:14
attach 207:2
attached 30:7
139:10 140:4
206:15 248:8
249:6
attachment
187:8

attempt 119:22
attempting
39:12 40:10
41:1,17 42:2
attempts 49:3
126:14
attention
154:15
attitudes
245:10
attorney 3:15
120:2 188:11
247:12,14
248:11
attorneys
137:18
author 188:18
190:18
authored
124:12
authorship
188:21
auto 114:4
automatically
98:8,19 99:3
184:17,21
availability
119:23 245:3
available 13:3
55:2,6,11,17
88:12 120:7
121:13 123:3
125:2 128:5
140:3 157:4

HIGHLY CONFIDENTIAL

**[available - beginning]** Page 8

160:8,11 215:3
237:11 244:21
244:24 245:6
245:18 246:2
**average** 167:4
167:6 178:7
**avoid** 190:22
192:10 210:8
239:12
**aware** 64:2,5
67:5 77:4
88:23 89:3
96:6,15 122:23
124:2,4 127:25
129:6,10,20
140:1 165:13
165:15,16,18
167:17 179:13
179:15 194:20
205:4 223:9
**awful** 180:18
**aws** 202:1
**ayesha** 3:14

**b**

**b** 2:3 5:1,6,7,9
5:10,11,12,14
5:15,17 6:1
18:24 20:12
22:19 23:11
32:9 49:14,18
49:24 50:4
56:2,7 65:10
74:6 82:14

83:10 89:15
96:21 100:18
179:7 210:18
210:19,24
211:7,12,14
215:7,21
216:25
**b7884309** 5:25
113:12
**back** 23:21
24:1,4 27:20
30:25 32:8
33:15 38:23,25
39:12 44:20
45:6,9 50:2
55:14 58:15,15
58:16 65:16,20
82:11 85:12
86:16 93:2,16
100:3 103:19
103:21 108:1
114:17,25
118:4 128:21
130:23 133:1
150:24 151:2
164:25 167:21
167:22 168:7
168:16 180:25
191:20 193:25
195:22 205:12
205:15 211:3,4
211:8 216:15
216:25 218:2
221:24 230:5

233:1 240:11
241:17
**background**
46:16 51:14
95:25 107:21
123:15 129:3
130:24 149:3
184:1 194:1
**backward**
194:7
**backwards**
145:18 194:6
**bad** 40:7
102:18 169:15
178:14,14
**bakeries**
203:20,22
**bakery** 203:18
**balance** 92:10
**bar** 15:14
172:21
**base** 217:9
**based** 22:14,17
25:9 31:2 40:8
44:5 51:4 59:3
61:8 62:21
63:22 67:14
71:24 75:6
87:24 90:21
91:2 108:13
125:16 131:15
141:20 163:3
174:14,16
179:24 184:15

191:7 213:21
215:15 223:23
**basically** 77:19
84:7 133:1
164:3 170:25
203:9
**basis** 25:8
167:6 168:4
190:16 225:10
225:17 238:4
**bates** 13:13
18:24 19:10
28:14 29:15
30:14 34:17
39:3 43:2
65:25 78:2
90:22 95:4,6
97:2,10 121:20
173:13 186:6
186:10 206:16
208:2 214:21
218:5 221:20
222:8 227:1
233:15
**bear** 128:15
**beard** 39:23
177:23
**bearing** 58:4
169:25
**becoming**
160:12
**began** 8:22
**beginning** 9:3
22:2 23:18

HIGHLY CONFIDENTIAL

**[beginning - broke]**                                    Page 9

| | | | |
|---|---|---|---|
| 43:9,19 66:16 | 173:5,9,23 | 231:24 241:25 | **born** 12:5 |
| 119:16 128:3 | 174:11 176:2 | **better** 20:25 | **bosco** 3:4 |
| 212:20 218:5 | 181:12,23 | 61:6 101:11,20 | **bottom** 34:15 |
| 222:12 | 184:15 186:11 | 116:18 121:12 | 34:17 50:16 |
| **begins** 70:24 | 188:18 194:13 | 141:9 174:1 | 56:15 76:20 |
| 105:5 | 195:23,24 | 241:14 | 83:8 98:14 |
| **behalf** 7:19 | 197:21,25 | **bias** 134:21 | 187:7,11,22 |
| **beings** 103:14 | 202:20 205:16 | 236:17 244:6,9 | 228:7 |
| 104:4,5 | 206:5 214:13 | **biased** 242:17 | **bounce** 104:5 |
| **believe** 15:1 | 220:5,9 224:25 | 242:22 243:3,4 | **bounces** 143:23 |
| 25:6 27:6,18 | 226:1 227:10 | 243:8 244:3,4 | **bounds** 193:11 |
| 30:22,24 37:4 | 227:18 228:13 | **bid** 105:19 | **box** 228:3 |
| 38:5 39:5 46:4 | 238:20 240:6 | **bill** 6:10 187:11 | **brand** 78:4 |
| 51:2 57:16 | 240:13 241:21 | 187:16 188:1 | **brave** 75:2 |
| 75:17 84:14 | 242:10 | **bio** 151:25 | **break** 34:19 |
| 89:9 96:1,12 | **believed** 240:13 | **birthday** 56:9 | 38:12,17 82:2 |
| 96:23 99:21 | **believes** 34:5 | 56:16 57:21 | 82:3,5 114:20 |
| 103:24 104:21 | 176:3 | 102:7,9 103:14 | 150:13,19 |
| 109:7,14,19 | **bell** 96:14 | 108:24 | 204:8,11,12,16 |
| 115:2 116:12 | 187:3 228:21 | **bit** 27:21 38:16 | 217:19 240:5,8 |
| 121:18,21 | **bells** 195:18 | 91:13 99:9 | 240:10,11 |
| 123:19 124:10 | **benefit** 49:10 | 160:5 173:4,13 | 241:16 |
| 124:17 128:9 | 105:18 233:21 | 178:20 196:13 | **breathing** |
| 128:13 129:4 | ▇▇▇▇ 76:3 | 215:23 | 168:22 |
| 129:13 134:13 | ▇▇▇▇ | **bites** 214:10 | **brg** 3:12 |
| 134:15 135:20 | 74:21 | **blog** 219:20 | **brief** 93:5,24 |
| 135:22,23 | **bernanke** | **blue** 90:20 | **briefly** 173:22 |
| 136:20 137:12 | 179:3,5,10,12 | 228:3,5 | **bright** 12:10 |
| 137:15 142:19 | **best** 43:5 50:4 | **board** 92:18 | **bring** 99:9 |
| 143:14,20,25 | 55:1 65:6 | **boot** 80:6 | **broad** 60:10 |
| 145:9 147:12 | 66:23 74:10 | **booted** 81:17 | 101:3 |
| 155:25 156:3 | 86:11 112:4 | **booting** 79:8 | **broadly** 231:3 |
| 161:5,6 167:12 | 117:8 128:2,6 | 81:12 | **broke** 35:2 |
| 169:9 171:23 | 146:17 229:21 | | |

**[broken - case]**                                    Page 10

**broken** 28:4
**brought** 195:1
  206:11
**browsers** 76:22
  76:23
**bruckhaus**
  1:17 3:3
**bruns** 3:14
**built** 118:6
  132:2
**bullet** 99:8
  222:25 224:9
  224:24
**bulletin** 92:18
**bullets** 98:15
**bunch** 36:12
  166:18 176:13
  214:10
**burden** 204:5,5
**buried** 230:15
**business** 6:12
  67:15,17
  101:10,10,15
  101:15,25
  102:3,5 103:9
  103:11,19
  106:11 108:18
  201:24 202:6
  243:19
**businesses** 6:8
  139:9 181:7
**button** 15:23
  45:23

**byte** 203:9
**bytes** 202:19,24

**c**

**c** 2:1 3:1 7:1
**calculate** 171:8
**calculates**
  175:3
**calculations**
  200:4 237:1
**california** 1:22
  2:18 247:20
**call** 32:9,12,12
  45:5 48:6 65:1
  76:13,14
  177:13 210:11
  212:24 229:18
  230:23,23
**called** 62:9
  88:13 127:22
  133:7 149:13
  176:15 181:23
  186:18 195:14
  195:18 219:25
  221:21
**calling** 208:7
**calls** 29:9 33:8
  34:9 53:11,24
**candidate**
  105:9
**capacity** 11:19
  154:8 203:14
  203:17 204:1,6

**capital** 71:7
**capitalized**
  25:1 78:21
**capitalizing**
  78:4
**caps** 28:23
  78:20,22
**caption** 119:15
**capture** 183:16
  209:11
**captured** 46:10
**care** 151:24
  195:14,18,20
  202:21
**career** 131:19
**careful** 136:16
  137:20 173:15
  213:9
**carefully** 190:7
  248:2
**carets** 106:17
  107:5
**carolina** 2:20
  2:22
**case** 1:5 8:3
  20:4 26:6,23
  36:14,21 37:5
  38:3 40:18
  42:8 45:13
  46:17 47:12,20
  51:19 52:7
  53:6 57:13
  60:16 67:18,23
  71:25 73:21

77:8 93:1
97:11 104:11
105:10 108:23
112:14 117:6
117:16 118:2
118:20 119:6,8
119:14 122:15
125:13 129:16
136:6,19 137:9
140:2,18
143:18 144:7
145:20 158:12
161:1,9 169:4
169:10 170:8
171:16,21,24
173:15 174:4
177:19 178:3
179:11 180:7
184:5 192:14
194:23 195:16
198:5 199:20
199:22 200:16
200:25 204:19
204:25 205:1,5
205:14,25
206:3,7,12
207:22,23
208:3,12
216:23 220:6
230:8 232:5,8
232:17 233:7
234:5,9 235:1
235:8,10,18,21
235:25 238:10

[case - chat]                                                          Page 11

239:23 240:19
244:19
**cases**   77:5 93:4
93:23 107:15
110:22 115:15
151:7 155:5,8
157:6,25 158:1
158:2,4,10,23
186:7 205:23
207:25
**categories**
101:16,22,24
102:13 103:2
123:24
**caution**   19:3
120:1 136:9
**caveat**   48:25
95:14 99:25
122:2 134:18
137:5
**caveating**
197:11
**caveats**   57:24
143:13
**cc**   114:3
**ccr**   249:11
**cease**   150:10
**ceased**   72:15
**center**   1:18 3:6
155:17,24
**central**   142:15
**ceo**   138:19
139:6 218:25
220:16 221:1

**certain**   16:14
36:3 61:17
86:2,4 98:23
110:22 123:12
135:9 146:15
157:13 158:20
186:17 196:19
223:19 231:8
244:9,12
**certainly**   10:4
16:10 28:9
35:23 36:1
37:23 42:22
47:11 51:21
52:15 53:13,14
58:19,24 61:15
71:2,25 77:22
80:10 83:4
94:12 95:19
97:7 98:6
104:1 112:14
125:8 130:23
147:7 148:8,9
149:1 159:10
167:9 168:10
175:15 180:4
182:5 185:24
186:13 193:22
194:14,18
196:10 199:21
201:23 202:1
205:24 206:2
217:18 230:11

**certainty**
125:17 126:8
134:16
**certificate**   4:7
247:1
**certified**   1:20
1:21,21 247:3
247:3,4,19,20
247:20,21,21
**certify**   247:4,8
247:11 249:2
**cetera**   93:7
94:1
**ceteris**   138:3
**chain**   72:25
85:14
**chains**   175:22
**challenges**
189:22,23,24
**chance**   66:4
218:14
**change**   30:25
32:3,4 45:10
45:11 87:9,20
176:16,16
177:13 179:18
209:3,5 223:11
224:7 225:9,16
225:21 226:2
229:3,7,12
234:15 241:3
241:21 250:7
**changed**   25:10
153:17 199:8

199:11 209:7
240:1
**changes**   56:4
118:11 177:22
179:23 209:10
248:7 249:6
250:6
**changing**   138:5
209:12 238:5
██████████
218:18
**characteristics**
243:21
**characterizati...**
14:13 46:15
97:22 246:5
**characterize**
14:4 148:18
193:8
**characterizes**
234:23
**charges**   117:1
**chart**   172:8,22
173:3,7,21
**charts**   176:6
**chat**   5:19,22
6:4,7 11:14,15
12:21 20:17
21:2 25:13,15
26:1,20,24
27:5 28:10
31:20 33:5,11
35:22,25 39:4
39:13 40:3,11

HIGHLY CONFIDENTIAL

**[chat - checking]**                                              Page 12

| | | | |
|---|---|---|---|
| 40:25 41:18 | 131:1 141:7,12 | 238:3 239:13 | 144:1,3,5,16 |
| 42:3 43:3,12 | 160:21 161:22 | 239:15 | 145:5,17,19,23 |
| 45:13 46:8 | 162:19 163:2 | **chats**   5:7,8,12 | 146:3,4,5,19 |
| 49:13 50:9,20 | 163:12,18,21 | 5:13,15,16,21 | 160:23 162:14 |
| 52:11 54:22,22 | 164:9,12,18,24 | 11:11,17 12:15 | 164:3,16 |
| 58:1,13 64:10 | 167:3 168:3 | 15:1 23:14 | 165:10 170:13 |
| 66:6,17 71:12 | 171:15,17 | 28:10 29:8,9 | 170:21 171:10 |
| 71:13,17,21 | 175:3,6,19,20 | 30:5 31:9 34:5 | 171:10,10 |
| 73:2 74:10 | 175:21 177:1 | 34:6 36:15 | 177:15 179:10 |
| 75:3,10,18 | 179:14 182:10 | 38:2,5 41:2 | 179:19 182:13 |
| 76:11 77:25 | 182:14 183:2 | 44:15 47:10,12 | 182:19 183:23 |
| 79:10,20 80:5 | 183:10,18,22 | 47:15 50:5,13 | 184:5,5,7,8,8 |
| 80:7,21 81:17 | 185:1,9 192:22 | 54:10,24 57:6 | 191:14 192:20 |
| 81:18,19 83:3 | 200:15 206:10 | 58:10,12,14 | 197:9 198:5,8 |
| 83:13 84:2 | 208:18 209:1,9 | 59:20 60:6 | 204:1 205:21 |
| 85:21 87:8,9 | 210:20,23,24 | 63:9,12,23 | 205:24 206:2 |
| 88:4 89:18,18 | 211:3,8,12,13 | 73:21 80:19 | 207:13,19 |
| 89:25 90:14 | 211:14,24 | 83:17 84:1,9 | 209:6 210:23 |
| 91:19 92:16,18 | 212:12,13,16 | 84:10,22,23 | 213:4,6 215:17 |
| 93:2,4,7,10,15 | 212:21,22 | 85:7,15,21 | 217:5 220:6 |
| 93:23 94:5,10 | 213:5,6,19 | 88:12 89:4 | 221:9,12,21 |
| 94:13,17 97:7 | 215:2,4,15,25 | 91:21 92:4 | 224:3 225:25 |
| 97:14,16,17,24 | 216:6,15,19,19 | 94:1 95:23 | 227:7 231:16 |
| 98:2 101:9,17 | 216:25 217:15 | 96:7 98:7 99:4 | 232:9 237:10 |
| 102:1,22 | 217:16 219:18 | 102:1,12,16,24 | 238:12 239:24 |
| 103:17 106:12 | 219:20,25 | 103:2,9,11 | 240:20 241:22 |
| 106:15,16,20 | 220:18 221:2 | 108:17 121:20 | **chatted**   173:12 |
| 106:24,25 | 222:9,13,19,24 | 122:16 127:15 | 220:9 |
| 108:11,14 | 222:25 223:1 | 128:23 130:1,7 | **chatting**   49:19 |
| 118:2 123:12 | 224:11,18 | 136:6 140:9,16 | 72:15 73:11 |
| 123:18 124:14 | 225:1,8,9,16,20 | 140:17,23 | **check**   97:1 |
| 124:24 128:15 | 226:1 228:9,10 | 141:24 142:14 | **checking** |
| 129:7,11,21 | 228:25 229:1 | 142:23,25 | 109:19 |
| 130:13,19 | 229:15 230:3 | 143:1,8,10,17 | |

HIGHLY CONFIDENTIAL

**[chicago - collier]**                                                          Page 13

**chicago** 154:24
**chicken** 191:12
**chief** 138:20
  139:10,17
**choice** 33:14
**choose** 110:23
**chosen** 245:1
  ▮▮▮ 69:22
  70:3,8 71:20
  72:4 163:24
  164:24
  ▮▮▮
  91:14
**chronological**
  187:23
**circuit** 8:4
  155:3
**circumstance**
  58:5 170:1
**circumstances**
  217:5
**citations**
  233:15
**cite** 116:20
  123:15 230:11
**cited** 135:22
  173:16 231:13
  231:14 239:6
**cites** 137:15
  233:16
**citing** 214:17
**claims** 67:14
  106:5,10 189:3
  204:22,22

  205:18,23
**clarification**
  115:16
**clarify** 29:13
  56:22 241:8
**clarifying**
  28:11
**class** 245:12,13
**classic** 163:12
**clean** 192:17
**cleaner** 8:23
**cleanup** 172:17
**clear** 9:15,19
  9:23 22:13
  41:14 87:20
  119:12 126:17
  134:13 137:10
  140:11,12
  141:14 150:5
  153:6 159:2
  163:16 164:17
  174:10 176:8
  178:9 194:24
  198:1 201:7,18
  206:21 211:11
  217:9 244:3
**clearer** 224:24
**clearly** 72:8
  76:11 150:1,9
  220:23
**clever** 35:20
**click** 17:24
**clicking** 15:23

**client** 120:2
  188:11 200:23
  202:9
**clients** 182:1
**clock** 14:16
  16:4,5,17
**clocks** 14:2,9
  18:14
**close** 31:3
  134:16
**closed** 43:19
  93:10 94:1
**closest** 167:14
**cloud** 200:19
  202:3
**coaching** 77:9
**code** 44:20,22
  45:12 47:10,12
  47:20 48:5,15
  48:17,19 49:3
  121:1 180:9
**codes** 49:1,5
**coding** 87:15
  131:20
**collaborative**
  96:7
**colleague**
  202:10
**colleagues**
  137:12
**collect** 18:11
  58:10 85:21
  118:3 184:20

**collected**
  141:13,25
  156:24 161:25
**collects** 118:1
  184:17
**collier** 2:3 4:4,6
  7:21 9:13,22
  10:16 11:1
  13:16,22,24
  14:21 15:11
  16:1,16,22
  17:1,7 18:3,8
  18:12,21 19:13
  19:16,17 20:1
  23:8,9 24:21
  27:2 28:12
  29:11 31:12,16
  31:18 32:7
  33:2,22 34:13
  35:13 36:11,22
  38:1,11,15,24
  40:2,23 41:13
  41:24 43:1,14
  43:16 45:1,15
  45:24 46:6
  50:8,22 51:1
  51:12,16 52:17
  53:1,15 54:4,7
  54:20 55:13,15
  56:24 57:5,10
  57:20 58:8
  59:6,11 60:1
  61:3 62:22
  63:19 64:7,21

HIGHLY CONFIDENTIAL

**[collier - communications]**                                      Page 14

| | | | |
|---|---|---|---|
| 65:15 66:3 | 150:18 151:1 | 239:20 241:1 | 78:15 83:13,16 |
| 68:17 70:23 | 159:16 161:21 | 241:12,15 | 83:23,23 90:21 |
| 71:4,18 72:2 | 162:15 163:9 | 242:5 243:6 | 174:19 175:12 |
| 72:12 73:9,16 | 163:23 164:22 | 245:23 246:6,8 | 180:16 |
| 73:25 74:3 | 165:5 167:2 | **collier's** 233:21 | **comments** |
| 75:8,15,24 | 169:14 170:3 | 241:10 | 234:24 |
| 77:9,11,18,24 | 175:1 177:21 | **color** 122:4 | **commercialize** |
| 79:17,25 80:3 | 180:18 181:1 | **column** 198:25 | 216:16 |
| 80:20 81:5,10 | 182:22 184:4 | 199:2,5,6,14,14 | **commission** |
| 81:16,23 82:3 | 184:11,22 | 216:7 | 249:17 |
| 82:6,12 83:7 | 185:8 186:1,2 | **come** 18:20 | **commission's** |
| 84:16 85:10 | 189:14 190:5 | 32:8 39:11 | 95:23 |
| 88:2,7,19 | 190:19 192:1 | 58:15 108:1 | **commitment** |
| 89:12 90:18 | 192:16 193:15 | 110:13 116:9 | 189:20 |
| 92:2,13 93:21 | 194:3 196:4 | 134:19 154:23 | **committed** |
| 94:9 96:18 | 197:18 198:15 | 170:12 197:8 | 59:15,16 |
| 97:23 101:2,19 | 200:11 202:7 | 235:18 | **common** 65:4 |
| 101:21 104:16 | 202:18 204:17 | **comes** 20:8 | 126:25 127:9 |
| 104:23 105:2 | 204:18 208:16 | 50:2 115:14 | 127:11,11,13 |
| 106:4,16,21,23 | 211:16 212:10 | 121:17 131:25 | 201:24 202:5 |
| 107:24 108:6,8 | 213:10 216:12 | 133:1 134:19 | 245:4 |
| 112:15 113:15 | 216:14,24 | 137:17 152:15 | **communicate** |
| 113:17,21 | 217:12,19 | 157:19 164:10 | 195:14,18 |
| 114:18 118:15 | 218:3 220:22 | 184:16 223:23 | **communicated** |
| 119:21 120:8 | 220:24 221:7 | 227:2 245:22 | 99:14 |
| 120:15,25 | 221:16 223:21 | **comfortable** | **communicating** |
| 121:6 122:5 | 224:1,6,14,17 | 47:6 149:6 | 139:20 195:20 |
| 124:1 135:11 | 225:6 226:16 | 177:14 | **communication** |
| 136:15 138:12 | 228:18 230:15 | **commencem...** | 47:8 73:5 |
| 142:12 143:15 | 230:22 231:21 | 247:5 | 106:12 114:1,8 |
| 144:12 145:1 | 232:6,15,19,21 | **commencing** | 137:14 139:8 |
| 145:11 146:2 | 234:21 236:3 | 1:18 | 188:6 231:9 |
| 146:12 147:1 | 236:23 237:24 | **comment** 31:17 | **communicati...** |
| 148:11 149:21 | 238:9,22 239:5 | 36:7 40:17 | 5:24 6:12 19:5 |

Golkow Technologies,
A Veritext Division

HIGHLY CONFIDENTIAL

**[communications - considered]**                    Page 15

| | | | |
|---|---|---|---|
| 42:15 62:8 72:22 73:1 103:10,11,20 113:24 120:2 136:10 137:7 219:2 232:2 **companies** 8:10 8:24 88:24 94:21 202:2 **company** 7:24 8:6,13,15 9:15 93:10 132:8 146:4,20 154:6 190:13 201:19 223:10 **company's** 146:20 **comparable** 75:1 **compare** 157:1 175:19 205:18 **compared** 203:18 205:2 **comparing** 198:2,4 **comparison** 75:1,4,17 175:21,22 176:1,3 **competition** 67:13 **competitors** 67:24 | **complain** 113:3 **complaint** 67:20 **complete** 30:22 65:12,17,21 71:21 110:11 120:4 166:22 230:9 246:3 **completely** 15:5 28:1 43:7 43:17 177:8 **complex** 49:2 **compliance** 227:7 **complicated** 6:12 **compound** 138:25 **compounds** 138:10 139:15 139:23 197:13 **comprehensi...** 220:13 **computing** 133:4 **concept** 115:11 156:19 **concepts** 39:4 77:16 131:11 **conceptual** 175:18 **conceptualize** 85:23 | **concerned** 29:8 33:11,24 193:18 **concerning** 237:18 **concerns** 189:10 **concluded** 246:11 **conclusion** 53:24 60:10,11 61:1 126:19 134:8 138:6 140:8,22 157:18 236:5 **conclusions** 48:24 125:2,15 125:19 126:7 133:13,15,17 133:18 148:16 **conduct** 144:21 **conducted** 1:16 126:21 144:21 173:24 194:16 236:10,15 **conference** 38:7,8 76:13 115:22,25,25 116:6,19 **confidence** 126:14 133:12 160:2,3,6,12,14 169:24 | **confident** 12:17 242:4 **confidential** 1:10 188:8 **confused** 19:19 29:12 36:10,15 37:2 59:13 82:22 **confusing** 20:5 22:9,21,24 23:1 28:7,23 29:3,17 35:11 43:8,18 **confusion** 29:13 37:5 39:7 40:9 66:2 223:23 224:2 **conjunction** 123:9 **connect** 91:1 **connected** 76:12 **connection** 100:10 233:6 235:24 **connote** 157:15 **cons** 92:10 **consequences** 10:25 **consider** 51:24 153:5 **considered** 19:11 38:7 186:11,14 |

HIGHLY CONFIDENTIAL

**[considered - conversations]**                                    Page 16

233:19

**consistent**
10:11 31:24
51:10 84:13
104:14 128:17
141:1 170:16

**console**  222:24
223:6,17

**consolidate**
130:9

**consolidated**
205:10 208:8
208:12

**constant**  57:4

**constituted**
166:21

**construe**
188:16

**consultant**  3:13
48:5 111:2,6
111:10 153:19
153:25 154:5,9

**consulting**
88:21,22 111:7
111:22 112:1
112:13,24
152:15 153:13
153:22 154:8
154:11 167:10
181:22

**cont**  3:1 6:1

**contain**  108:23

**contained**
81:18

**contains**
233:22

**contemporan...**
131:4

**content**  19:4
56:3 69:17
76:13 120:2
149:2,4 206:14

**content's**
231:11

**contents**  20:7
63:20 193:6
235:7

**context**  16:8
18:17 36:18
38:2,4 40:13
40:20 41:5,21
42:7 43:24
45:16,21 46:25
63:3,16 67:1,1
69:13 72:19
73:3 75:16
77:23 80:11,15
83:5 87:25
89:25 90:15
94:19 105:10
112:24 115:8
115:10,11
126:4 135:3,8
139:6 142:2,19
145:8 146:9
153:22 155:7
158:9 162:9
163:8 169:13

175:13,13
178:22 190:2
193:22 194:14
195:19 213:15
229:7,10
233:17 236:19
240:24 244:11

**contexts**  157:24

**contingent**
157:9

**continue**  77:25
78:10 96:8
193:11

**continued**
12:20 72:16
73:6

**continues**
188:24 225:7

**continuing**
189:20

**continuously**
23:21 24:1

**control**  179:14
179:25 180:4,8
222:19

**controls**  222:9
222:12,23
227:7 237:5,9

**controversial**
179:17

**convenience**
242:23 243:3,5
244:14,18
245:1,1,2,6,9

245:22,25
246:1

**convenient**
82:1 245:4

**conversation**
5:22 21:2,4
25:3,11 26:4,8
27:21 29:6
32:15 34:1
41:21 43:3
70:1 72:5,16
72:20 83:1
84:2 90:11,19
90:25 91:1
93:6,25 108:11
108:14 136:17
160:22 175:20
183:13 184:21
210:1,5,17,19
211:23,25
212:14 213:2
213:15,17
214:5,6,12,13
214:15,17,18
214:22 215:1
216:20 217:14
217:15 221:10
225:8,10,17

**conversations**
6:4,7 20:21,24
24:23 45:21
92:18 93:4,17
94:14,15 98:24
99:11 102:24

HIGHLY CONFIDENTIAL

**[conversations - court]**                                          Page 17

| | | | |
|---|---|---|---|
| 108:18 171:15 | **corporate** | 184:6 185:11 | 82:1 113:13 |
| 171:17 175:4,6 | 151:22 190:24 | 187:5 194:6,7 | 136:2,10,17 |
| 175:19 177:1 | 191:5,14 | 194:8,13 | 137:8,12,18 |
| 208:19 209:1 | **correct**  8:11 | 199:14 200:7 | 154:13 169:10 |
| 220:8 225:21 | 9:11,25 18:7 | 201:8 204:3,7 | 187:20 196:6 |
| 226:3 229:1,15 | 23:17 24:15 | 207:9,11 216:8 | 207:14,16,17 |
| 230:3 233:16 | 25:22 30:21 | 216:10,22,23 | 230:13 240:5 |
| 239:11 | 31:3,4,6 32:13 | 217:15 226:21 | 240:11 241:2,7 |
| **conversely** | 32:20 47:11 | 229:15 236:5 | 241:13,16 |
| 54:21 178:4 | 50:14 51:4 | 240:2,13,15,23 | 247:12,14 |
| **converting** | 58:2 59:9,21 | 241:19 242:9 | **counsel's**  49:10 |
| 228:15 | 61:23 62:20 | 244:6 249:4 | 106:14 137:21 |
| **convey**  40:22 | 63:5 66:14 | **corrected**  76:23 | 192:9,19 |
| **conveying** | 74:1 81:19,22 | 169:15 | 242:15 |
| 162:12 | 87:18 98:12 | **correction** | **counsels**  54:19 |
| **convoluted** | 102:14 108:21 | 169:16 | **count**  108:19 |
| 163:11 | 109:23 110:7 | **corrections** | 175:17 196:8 |
| **cooperating** | 111:4 112:12 | 181:9 233:9,12 | 196:12,12,14 |
| 172:7 | 115:5,18,19,21 | 233:23 248:3,5 | 196:25 |
| **coordinated** | 116:22 117:1 | 249:5 | **counted**  110:12 |
| 154:25 | 118:18 121:9 | **correctly**  24:14 | 196:20,22 |
| **copied**  109:20 | 126:16,19 | 85:19 139:3 | **counts**  174:18 |
| **copies**  104:22 | 132:19 135:18 | 158:1,2 | 176:6 |
| **copy**  21:16 | 136:24 141:4 | **costs**  69:23 | **couple**  54:10 |
| 97:2,5 104:24 | 142:18,24 | ▐▐▐▐▐▐  6:11 | 124:11 129:17 |
| 109:16,17,21 | 143:3,13 | 187:11,16 | 150:13 154:17 |
| 181:18,19 | 144:18,20 | 188:1,17 | 182:7,9 233:4 |
| **copy's**  79:4 | 150:17 152:19 | **counsel**  2:19,21 | 235:10 237:4 |
| **copying**  14:1 | 152:21 153:14 | 3:9 7:12 13:12 | **course**  103:13 |
| **copyright** | 154:3,7,20 | 14:24 19:5 | 111:17 132:4 |
| 189:2 | 156:16 160:23 | 21:18 43:13 | 178:7 |
| **corner**  203:18 | 166:16,24 | 46:9 54:12 | **court**  1:1,21 |
| **corollary**  168:2 | 167:1 178:7 | 55:2,6,12 | 4:7 7:14 18:9 |
| | 183:12,15 | 56:23 68:7 | 52:6 53:7 |

[court - date]                                                                    Page 18

| | | | |
|---|---|---|---|
| 106:9 110:24 | **critique** 175:16 | 136:3,5,12,23 | **dakota** 2:20,20 |
| 112:2 127:2 | 198:13 244:14 | 136:25 137:2,9 | 2:22,22 |
| 132:14 140:1 | **critiques** 42:7 | 138:5,15,18 | **damage** 157:11 |
| 155:3,20 | 49:5 176:5 | 144:6,10 | **damages** |
| 156:14 157:6 | **crossed** 15:8 | 145:20 146:20 | 116:10,18 |
| 176:12 192:18 | 17:21 | 160:25 166:21 | **daniella** 2:8 |
| 193:2 197:21 | **crr** 249:11 | 166:22,25 | **daniella.torre...** |
| 247:4,21 | **csr** 249:11 | 169:4,9,19 | 2:8 |
| 248:15 | **csv** 126:25 | 170:23 171:4 | **danny** 3:18 7:4 |
| **courts** 156:7 | 127:3,7,10,11 | 177:10 194:10 | **dark** 35:21 |
| **cover** 95:2,4 | 132:17,19 | 194:12,16,21 | **data** 48:7 59:4 |
| 119:9 | 135:4 | 196:7,7 197:6 | 60:2,4,12,17 |
| **coverage** 78:12 | **cub** 145:12 | 197:22 198:8 | 61:9 62:21 |
| **covers** 116:7 | **culture** 190:12 | 198:22 199:7 | 73:4 94:21 |
| **cra** 117:1 | 190:14 | 199:16 200:16 | 118:1 120:10 |
| 167:13 | **cuong** 3:15 | 204:2 209:4,7 | 121:5 126:1,4 |
| **cra's** 167:18 | **current** 50:16 | 235:10 243:25 | 136:5,12 |
| **create** 79:1 | 86:23 120:11 | **customer** | 140:25 156:22 |
| 81:2 | 168:6 | 237:13 238:2 | 156:23,24 |
| **created** 56:23 | **curriculum** | **customers** | 160:8,11 168:9 |
| 79:10 107:19 | 5:23 | 226:19 237:11 | 169:12 171:4 |
| 206:21,23 | **custodian** | 237:19 | 193:17 201:19 |
| 207:10 | 120:17 135:15 | **cut** 12:1 159:2 | 208:17 210:12 |
| **criteria** 196:20 | 138:19 146:19 | **cv** 1:6 109:16 | 244:20 |
| **critical** 199:23 | 161:8 171:1 | 109:22 111:12 | **dataset** 61:16 |
| **critically** | 200:2 243:18 | 113:16 114:24 | 61:25 133:2 |
| 170:10 | **custodians** 62:9 | 115:3 131:7 | 134:1 138:16 |
| **criticism** | 63:17 87:3,6 | 151:2 206:24 | 140:15 142:3 |
| 193:17 | 118:13,19,21 | | **datasets** 49:3 |
| **criticisms** | 118:24 119:5,7 | **d** | 133:24 142:10 |
| 125:22,25 | 119:13,14,18 | | **date** 1:19 7:6 |
| 170:18 | 119:19 120:5 | **d** 1:7 4:1 7:1 | 9:12 21:8 |
| **criticize** 170:12 | 120:19,24 | 22:20 78:16 | 86:22 109:4,5 |
| | 121:4 135:9 | **daily** 167:6 | 109:11 140:10 |
| | | 168:4 | |

HIGHLY CONFIDENTIAL

**[date - depends]**                                                      Page 19

181:14 186:15
191:4 196:20
199:7,8,12,16
200:4,8,9
219:12 221:24
227:14,19
228:23 238:23
239:3 240:2,15
241:18,19,20
241:23 247:10
248:7 249:8
**dated** 5:7,8,12
5:13,15,16
6:19 74:12
124:10 193:12
247:24
**dates** 66:9
161:7 198:25
199:1
**day** 8:21 13:6
21:18 27:14
53:17 76:16
134:14 142:5
142:19,22
168:15,20,21
168:22 170:22
171:2 176:20
217:3 249:15
**days** 27:11,13
64:14 89:21
90:19 91:12,15
135:8 162:1
168:16 183:6
220:16 248:12

**dbm** 105:18
**dc** 2:9
███ 78:4,6
**de** 62:6,18,24
150:9 160:12
173:12 174:11
174:12
**deal** 52:11
189:1,7,11
**dealing** 94:21
**deals** 192:22
**debugging**
118:4 120:10
168:12,23
**decade** 12:23
12:23 116:3
**december** 1:12
7:2,6 142:6
247:24
**decided** 40:8
41:17 42:2
111:20 190:23
**decision** 28:24
**declaration**
124:10 147:13
147:25 148:3,5
148:15 149:8,9
171:24 172:7
172:11,13,20
172:22 173:1
173:22 175:14
175:18 176:4
234:12,19

**deemed** 248:14
**default** 15:4,7
15:22 17:5,6
22:12,14,18
32:17 59:8,12
59:20 60:3,7
61:12 185:5
190:25 191:5
191:14 192:3,5
192:10 208:20
209:3 212:13
212:18,19,21
214:25 225:8
225:24
**defaulted** 17:9
17:12 61:19,21
**defaulting**
17:19 225:15
**defendant** 1:8
**defendant's**
52:19
**deficiency**
134:19,24
**define** 118:21
133:8 168:17
201:5
**defined** 173:6
196:21 245:25
**defines** 174:9
**defining** 37:24
**definitely** 36:8
129:4 131:18
**definition**
159:17 173:18

196:25 245:9
**degree** 14:5
125:17 126:7
**delete** 23:20,25
24:15 185:23
**deleted** 182:15
185:2,2,13
**deletion** 35:6
150:9
**delimited**
126:25 127:9
**delivered**
226:18
**demand** 66:19
66:23 68:10
105:19
**demonstrative**
5:10,11 6:14
6:15 49:11
55:22 86:21
100:5 195:5
202:9
**depend** 30:6
52:13
**depending** 17:6
26:3 58:10,13
131:25 143:23
168:16
**depends** 15:3
25:23,24 26:11
41:7,9 45:8
63:3 118:21
131:18 132:3
133:15,17

HIGHLY CONFIDENTIAL

**[depends - directly]**                                      Page 20

157:23
**deployments**
226:11
**deponent** 7:11
249:1 250:6
**deponents**
123:17
**depose** 110:22
110:23
**deposed** 40:18
80:16 88:3
124:3 140:2
**deposes** 7:18
**deposing**
248:11
**deposition** 1:15
7:8 13:6,9
60:20 86:13
87:13,24 101:8
101:8 104:12
110:6 122:15
123:10 124:4
139:7 140:4,5
149:7,13
198:17 246:11
248:2,9,12,13
250:5
**depositions**
11:24 102:20
104:18 108:16
121:14 131:3
207:22
**depth** 139:8

**deringer** 1:17
3:3
**derose** 2:11
**describe** 41:11
98:6 101:14,16
130:21 179:16
205:16
**described**
94:20 98:7
170:15,17
237:18
**describing**
13:12 130:25
**description** 5:2
6:3 46:15 49:1
104:15 196:23
222:22
**descriptor**
70:17
**desert** 210:9
**designation**
155:2,4,7
**designed** 88:4
134:24 179:13
244:16
**designing**
198:2
**desktop** 129:10
129:25 130:7
130:13
**detail** 226:10
242:2 243:17
**detailed** 27:19
242:13 243:13

**details** 9:20
201:17 237:9
237:22
**deteriorate**
176:21
**determination**
158:17,18
**determinations**
210:12
**determine**
121:10 126:18
166:13,20
169:20 236:4
238:4
**determined**
128:23 158:19
**deterred** 211:7
**develop** 206:10
**developed**
116:12 118:3
179:13 193:13
**developers**
180:13
**developing**
148:24 189:20
**developments**
118:11
**develops** 180:2
**diagram** 5:3,4
**dictionary**
64:20
**difference**
117:22 167:8

**differences**
128:14,21,22
130:6,12,19,22
131:6 205:17
205:22
**different** 16:12
28:16 56:20
76:8 86:18
94:10,11 97:11
107:6,6,22,23
108:1 116:4
130:20 148:17
155:15 159:13
182:23 183:1
184:25 193:9
204:24 206:1
235:11 239:22
240:11 241:4
241:17 245:21
**differently** 94:5
148:19
**difficult** 85:22
162:10 163:7
203:2
**diminishing**
157:10
**direct** 27:14
157:1
**directed** 226:14
**directionally**
138:7 177:25
197:2,6,17,19
**directly** 180:17

HIGHLY CONFIDENTIAL

**[director - documents]**                                        Page 21

| | | | |
|---|---|---|---|
| **director**  3:12 | **discovery**  3:12 | **display**  202:8 | 24:22 35:18 |
| 219:2 | 115:18 116:5 | **displayed** | 36:6 49:10 |
| **disagree**  14:13 | 205:11 208:9 | 44:23 | 65:12 68:14,19 |
| 33:21 67:8 | **discuss**  49:8 | **dispute**  97:22 | 71:24 72:9 |
| 92:3 94:8 | 123:12 138:14 | **disputes**  153:23 | 75:6,10 80:14 |
| 123:3 141:24 | 170:19 | **disruptive** | 81:21 90:3,4 |
| 141:24 144:22 | **discussed**  32:16 | 189:21 | 90:16,21,23 |
| 158:23 173:2 | 47:2 75:25 | **distinct**  159:15 | 92:9 94:24 |
| 188:23 196:24 | 84:14 93:5,24 | **distinction** | 95:18 96:3,8 |
| 196:25 213:3 | 99:20 127:19 | 220:14 | 97:1,10,22 |
| **disagreement** | 141:16 143:14 | **distinctions** | 103:25 104:22 |
| 125:18 142:15 | 191:17 195:1 | 200:21 | 105:1,3 135:23 |
| 145:2 171:2 | 198:17 207:16 | **distribution** | 137:6,8,11 |
| **disagreements** | 209:11 213:13 | 111:13 178:17 | 150:15 164:23 |
| 159:1,6 | 221:8 228:20 | 182:3,5 208:22 | 173:16 186:9 |
| **disallow**  223:18 | 229:11 230:12 | 209:8 | 186:12 188:22 |
| **disappear** | 243:14 | **district**  1:1,2 | 191:7 199:4 |
| 54:16 58:6 | **discussing** | 122:17 155:5 | 206:15,18,21 |
| 64:4 | 28:11 36:19 | 155:20 156:7 | 207:2,5 218:15 |
| **disappears** | 39:7 41:22 | 204:20 205:6 | 222:8,11 |
| 185:20 | 47:6 83:4 | 205:15,21,25 | 223:15,16,23 |
| **disclose**  19:4 | 145:9 | 206:6,19 207:7 | 225:1 226:9,12 |
| 111:24 120:1 | **discussion** | 207:13,19,22 | 226:23 228:6 |
| 136:9 207:15 | 22:10 39:2 | 208:8,12 | 229:8 230:21 |
| **disclosed** | 69:17 88:10 | **diversity**  177:9 | 233:15 239:10 |
| 104:13 125:16 | 99:13 127:17 | 177:12 | 242:7 |
| 174:15,16 | 146:10 197:12 | **division**  1:3 | **documentation** |
| 176:2 | 212:6 | **dms**  98:20 | 227:12 |
| **disclosure** | **discussions** | **document**  10:6 | **documents** |
| 109:11 110:24 | 22:6 93:3,17 | 13:13,15,16,20 | 7:25 8:2,7,10 |
| 123:21 125:15 | 207:17 231:10 | 15:19 16:7 | 8:13,15,22 9:3 |
| 188:3 | **dishonest** | 18:7,17,19 | 9:16 10:20,21 |
| **disclosures** | 229:20 | 19:1,7,10 | 13:18 20:4,6 |
| 102:22 147:16 | | 20:18 22:16 | 23:6 31:2 |

**[documents - eastern]**                                                                Page 22

41:16 42:1
47:3 52:25
53:2 59:3 65:5
65:14 68:16
73:21 80:11
88:24 91:1
98:23 101:4,7
107:23 122:3,7
123:6,14
124:11 143:6
147:12,16
173:14 176:9
191:18,20
192:10 198:5,8
205:5 208:1,4
218:5 231:5
232:7,13,14
233:18 235:17
237:17,20
238:10,17,18
239:22 240:18
241:5 242:14
244:1
**doe** 26:13
**doing** 13:6
122:11 146:22
189:21 223:19
229:21 236:21
248:6
**doj** 5:18,21
6:13,17 95:6
104:20 186:6
208:3 218:6

**dot** 70:3,3,3
**double** 65:8
141:8,9
**doubleclick**
165:16,18,21
165:24 166:4,5
166:14
**doubt** 29:1
93:14
**dr** 126:19
139:17 172:13
176:2 236:5
244:12
**drafted** 137:18
**drafting** 111:19
▮▮▮▮ 6:10
**draw** 72:3
159:12,22,25
228:3,5
**drawing** 50:14
157:24 158:4,9
158:12 191:10
**drawn** 157:18
158:1,2
**drinking** 67:2
**driving** 205:20
**dropped** 74:18
**drs** 202:1
**dual** 107:10
**duan** 6:9
**duly** 7:17 247:6
**dunn** 1:19 7:14
247:2,18
249:11

**duping** 174:11
**duplicate**
173:12
**duplicates**
174:17,21
**duplicating**
174:12
**duration** 64:14
**duty** 7:24

**e**

**e** 2:1,1 3:1,1 4:1
5:1,7,8,12,13
5:15,16 6:1,10
6:19 7:1,1
20:17,23 21:11
21:13 22:19,20
22:20 32:9,9
42:14 47:3,4
53:5 78:3,3,16
92:22,22 107:1
107:3,7,12,13
107:14,16,17
107:18 108:12
108:22,23
113:25 114:2,4
114:9,11
171:20 172:9
172:20 173:3,6
173:12,18,20
174:4,9,12,19
175:19,22,23
175:23,24,25
176:24 177:14

177:25 178:6
179:7,7 187:6
187:21,22
188:3 190:12
218:17,22
219:12 221:6
221:13,25
222:1,2,3,3
233:22 239:13
242:12
**earlier** 32:16
59:14 86:10
97:21 99:13
115:2 117:19
127:14 151:7
204:20 209:11
215:22 220:4
228:20 233:24
234:11 235:9
235:16 236:2
**early** 67:20
109:7,8,9
219:10,16
242:15
**ease** 26:14
**easier** 86:19
120:17 214:9
**eastern** 1:2
122:17 204:20
205:6,15,21,25
206:6,19 207:7
207:13,19,22
208:11

HIGHLY CONFIDENTIAL

**[easy - ensure]**                                                    Page 23

easy   103:1
    113:22 212:25
**econometrics**
    151:19
**economic**   77:4
    146:13 155:19
    244:25
**economics**
    53:14 62:24
    115:11 151:17
    151:25 152:10
    152:12,20,24
    153:21 155:8
    181:23,25
    182:1 234:1,5
    234:8
**economist**
    52:10 68:9
    138:4,20
    139:18 210:5
    210:12
**economists**
    77:17 137:25
    158:22 197:2
    210:9
    ■   78:15
    122:17
**edge**   75:2
**ediscovery**   10:1
    10:2,5 115:4,5
**edt**   1:19
**education**
    153:20

**effect**   82:22
    137:25 138:4
    179:1,2
**effectively**
    198:14 201:10
**effort**   87:21
**eggs**   146:15,15
**either**   27:11
    49:5 64:12
    93:20 120:19
    148:3 154:4
    185:10 226:22
    229:2
**electronic**   47:8
    127:12
**ellis**   3:16
**elmo**   13:7
    18:24 34:16
    85:12 91:5
    100:3 160:16
    160:18 227:3
**else's**   192:4
**emails**   6:5
**embedded**
    138:11 213:12
**emoticon**   79:5
**employed**
    112:14 141:21
**employee**   19:19
    20:17 21:14
    26:12,13,18,19
    52:3,5,19 53:7
    56:5,7,9 60:3
    68:10 78:23

92:23 108:16
    108:17 143:5
    160:25 167:6,8
    168:3 178:4,7
    182:15 183:10
    187:19 229:19
    229:20 230:1
    231:3,15 232:9
    238:12 239:24
    240:20 241:22
    242:10 247:12
    247:13
**employee's**
    53:19 60:6
**employees**   9:15
    19:23 20:4
    21:11 22:8,19
    23:1 36:14
    37:1 40:8
    41:17 42:2
    59:9,21 61:9
    61:10 72:14
    79:19 80:5
    82:22 83:2
    87:4,9 89:5
    91:22,25 98:3
    98:10 101:9
    103:5,8,10
    121:11 129:25
    134:5,14,17
    135:14,14,19
    135:21 136:21
    136:23 141:18
    143:8 162:5

166:5,14 169:5
    169:21,22
    177:13,14,23
    195:13,23,25
    198:20,22
    229:20 231:2
    231:22 235:18
    235:20,24
    243:11,12,25
**employment**
    112:12,16,18
    112:22 154:8
    161:7
**empty**   100:25
**enabled**   35:6,6
    35:7 39:8
**ended**   39:2
**ends**   70:25
    105:7 110:5
    221:20
**enforce**   226:7
**enforced**   226:6
**engaged**   109:2
    111:2,9 115:17
    118:25 119:22
    191:19
**engagement**
    109:8
**engagements**
    112:20 154:7
**english**   67:1
**enjoy**   113:2
**ensure**   225:20

HIGHLY CONFIDENTIAL

**[entail - excuse]**                                                    Page 24

entail   9:21
  10:12
entirely   44:7
  102:8
entirety   99:23
entry   110:6
environment
  49:1 167:13
environmental
  157:11,14
envision   17:18
ephemeral   64:3
  64:8,9,11,16,24
  87:22 91:19
  142:8
epic   61:9 62:10
  62:16 117:18
  118:13,16
  119:24 120:11
  121:13 122:13
  122:14 126:23
  132:20 134:7
  168:12 192:22
  194:5 208:17
  208:17 209:2
equal   138:3
equally   11:25
equation   16:4
equivalent
  92:20 174:22
errata   4:10
  248:4,6,8,11
  249:7 250:1

error   139:15,23
  197:13
errors   132:1
  138:10,24
esoteric   180:1
especially
  69:13 131:12
  198:25
essential
  152:25
essentially
  168:16 192:22
est   7:2
established
  145:9 192:4
establishment
  67:2
et   1:4 7:10 93:7
  94:1
ethan   2:4
ethan.glenn   2:4
evaluate   132:1
  170:11
evaluating
  157:9
evaluation
  157:9
event   157:14
everybody
  139:13
everyone's
  123:2 216:3
evidence   42:9
  62:1 72:14

  143:25 155:19
  157:6 165:7
evidenced
  56:24 60:4
exabyte   201:14
exact   33:16
  57:18 97:2,5
  111:13 120:24
  141:16 171:18
  173:14 198:12
  228:22
exactly   22:11
  46:23 61:23
  67:3 73:23
  76:19 92:8
  99:21 127:2
  134:11 135:3
  145:15 159:20
  162:11 171:12
  194:22 195:3
  196:17 205:18
  241:12,20
examination
  4:4,5,6 7:20
  233:2 239:19
  247:5
example   26:4,5
  26:10,11 28:10
  42:10 47:1
  58:22 76:12
  77:2,20 93:9
  94:22 99:20
  106:11,11
  111:22,23

  112:19 113:23
  122:23 131:3
  131:25 138:15
  146:17 149:3
  156:17 157:2
  158:14 159:5
  175:20 201:24
  205:14 224:15
  231:6 243:15
  243:18,19
  245:15
examples
  102:17,19
  103:18,22,24
except   105:20
  108:10 249:5
exception
  30:23 51:8
  154:2
exceptions
  27:18
exchange   90:16
  107:12
exclamation
  53:8,21 56:7
excluded
  233:19
exclusion
  244:12
excuse   24:13
  33:5 56:7
  59:12 66:8
  76:21 89:14
  98:19 198:21

HIGHLY CONFIDENTIAL

**[excuse - external]**                                                    Page 25

211:13 215:19
227:5
**executive**
139:10
**exemption**
216:16
**exhibit** 5:3,4,5
5:7,8,10,11,12
5:13,15,16,18
5:19,21,22,23
5:24 6:4,5,7,8
6:10,14,15,16
6:17,19,20
13:6,9 18:5,10
18:14,15,22,23
19:18 20:11,12
20:15 23:2,5
23:10 27:20
28:5 34:14
38:25 41:22
49:12 54:10,23
55:16,22 65:8
65:10,17,21,24
72:4 74:1,4,8
76:1,1 82:14
82:19,21 84:8
84:8 85:13
86:17,21 89:14
89:14 91:3
95:1 96:20
97:25 98:16
99:21 100:5,8
104:19,19
108:6 109:13

109:15 113:9
113:11,14,19
113:20 160:17
172:3,8 175:2
175:9 176:10
176:10,15,17
176:17 181:17
181:18,19
186:3,4,7
191:3 202:11
207:1 209:18
218:5,7,11,16
221:17 226:25
227:23 230:19
**exhibits** 121:20
172:1,4 176:23
207:5 229:10
**exist** 23:6 103:3
158:15 184:8
245:17
**existed** 118:24
168:15 169:3
169:18 207:6
**existing** 118:6
213:16
**exists** 64:5
121:15 122:25
170:6 184:2
**experience** 43:8
43:18 44:13
77:15 159:1,4
162:24 173:14
**experiment**
105:7,22

**expert** 8:6,9 9:5
10:3 11:4,8
19:7 24:5 31:1
37:23 46:14,16
46:20 48:2,11
48:21 50:18
51:19,20,25
52:3,10,24
53:2,13,14
63:22 65:3
72:13,19 73:22
96:2 109:3,25
110:8,18,20,25
111:1,10,11,15
111:19 112:2,8
112:8 115:4,18
115:22,24
116:19 117:25
122:1 126:9
128:11 140:8
147:11,14,25
148:5,15
149:14,15
151:10,17,19
151:22,24
152:2,5,8,10,12
152:18,20,24
153:2,5 159:6
162:13 185:16
198:1 201:23
202:4 223:24
227:2 233:6,25
234:7,12,16
242:14

**expertise** 8:1
36:7 54:2
140:14,19,21
153:9 168:10
170:2 177:18
180:6 182:2
233:25
**expired** 183:5,9
**expires** 182:14
249:17
**explain** 26:2
28:3 92:10
138:13 146:8
**explaining**
175:14
**explains** 31:19
**explanation**
199:11
**explanations**
37:23
**exploring** 11:8
**expressions**
37:25
**extension** 127:6
156:11
**extent** 8:17
23:6 51:9
119:9 121:18
131:3 140:19
170:16 198:4
208:4 220:14
232:2 239:14
**external** 237:13

**[extrapolate - fighting]** Page 26

**extrapolate**
139:22 194:5
198:9,13
243:10 245:12
**extrapolates**
197:7
**extrapolating**
135:13 171:3
194:11 243:22
**extrapolation**
138:11 142:17
**extrapolations**
192:23 194:18
**extremely**
28:23 29:2
**eyes** 98:16
180:17

**f**

**f** 70:15,17,19
70:25
**face** 75:9 93:6,6
93:25,25
**faces** 189:17
**facing** 107:5
189:21
**fact** 20:18 34:1
44:5 45:21
57:8 61:16
62:8 85:3 86:8
107:16 127:17
136:25 140:3
147:5,8 158:3
158:21 159:14

166:17 194:4
209:4 212:16
227:12 230:8
234:24 239:15
243:9
**facto** 160:12
**factual** 123:16
**fail** 146:20
248:13
**fair** 8:8 12:3,4
12:12,13,16,24
16:2 18:3
19:13,16 20:2
20:25 21:4,9
21:22 23:8
24:20 28:5
30:12 36:23
37:4 41:18
48:24,25 51:17
55:13,18 65:2
66:7 74:19
79:11 91:11
94:16 97:3
101:8,13,19
103:4 125:4
130:11,18
131:17 135:17
136:23 148:14
149:4 151:10
151:11 153:12
170:11,14,15
171:5,6 174:9
181:17 187:9,9
189:15 193:16

193:20 217:13
232:12 238:16
240:12 242:13
246:4
**fairly** 127:13
194:13
**fall** 102:12
**familiar** 39:17
69:12 88:13,16
89:1 92:21
95:22 109:14
116:1,15 129:8
133:9 172:12
172:15 199:3
200:17 210:7
226:23 227:21
**far** 25:19 57:6
63:21 84:15
89:21 90:20
91:12 122:18
125:1 128:21
146:10 167:22
178:23,24
183:7,20
229:23
**farms** 69:18
**fast** 113:4,5
**favorite** 148:13
**feature** 219:24
225:20 226:6
**features** 219:17
237:14
**february** 21:2
49:14 55:25

58:11 59:1,8
59:19 60:6
62:2,10 63:10
63:14,24 85:5
86:1,9,22,22
87:2,22 91:7
97:17 102:25
119:10 120:18
121:11 125:4
140:17,24
141:3,5 142:6
143:1,9 192:2
192:5 195:11
208:19 212:12
215:18 231:16
232:10 238:13
239:3,25
240:21 241:3
**federal** 53:6
67:13 95:22
**feel** 31:10 47:5
157:13 221:22
**feeling** 217:20
**feels** 70:3
**fell** 103:2
**female** 66:17
**fewer** 159:23
**field** 9:6 10:3
11:4,7 148:17
148:21 202:4
**fifth** 30:13 43:3
211:4
**fighting** 53:4

HIGHLY CONFIDENTIAL

**[figure - following]**                                        Page 27

**figure**  6:5,7,16
  22:17 119:23
  120:18 145:3
  149:23 165:9
  165:14 169:4
  172:10,19,25
  174:6 175:3
  176:14 202:10
  209:19,21
  210:2,17
  211:24 212:1
  214:19 227:8
  231:23 235:19
**figures**  172:6
  176:7
**figuring**  169:9
**file**  95:3 117:18
  126:22,23,25
  127:6,9,12
  132:18,19,25
  135:5
**filed**  126:25
**final**  57:15
**finally**  34:14
  102:7 211:7
  216:25
**finance**  151:22
  153:21
**financial**  88:5
  88:12,20 94:21
**financially**
  247:14
**find**  22:8,20,23
  52:19 93:3,16

  104:9 106:9
  124:22 160:14
  168:8 192:18
  207:12
**finder**  147:5
**finds**  28:6
  193:2
**fine**  37:3
  125:24 167:5
  179:20 188:17
  204:14 227:22
**finish**  11:24
  210:13
**finished**  238:8
**finishing**  12:9
**finra**  88:13,20
  88:23 89:4,10
**fire**  70:24
**firm**  2:11,16,19
  2:21 167:11
**firms**  112:13
**first**  7:17 14:4
  14:19 23:18
  34:23 35:18
  45:2 47:2 51:3
  55:14,16 59:14
  65:16 66:9
  71:17 74:8,9
  74:13,13,14,20
  75:16 76:4
  80:13 81:13
  83:8,13,15
  89:17,20,24
  96:22 97:1,14

  97:17 98:2
  105:14,19
  108:10 111:15
  127:9 133:24
  156:22 160:20
  160:21 161:11
  161:13 172:8
  173:23 187:22
  187:24 188:1
  188:14,15
  189:16 190:7
  193:1 198:13
  215:2,2,17
  219:8,24
  221:24 222:25
  228:9 241:21
**fit**  127:10
**five**  25:15,16
  25:21 32:18
  48:6 58:22
  60:15 61:8,13
  61:14 62:3,9
  63:17 71:5
  118:13,16
  119:13 120:17
  134:14,17
  135:8,13
  138:15 139:17
  139:23 142:17
  144:10 166:11
  170:23 171:1
  194:10,11,16
  194:20 197:7
  209:4,6 232:20

  243:11,15,18
**fixed**  69:23
**flag**  105:18,20
**flat**  98:20
**flavors**  130:20
**flexible**  45:9
**flip**  33:1 65:8
**flipped**  14:5
**flipping**  114:8
  187:5
**flips**  103:21
**floor**  3:7
**fluctuates**
  135:15
**focus**  128:25
  129:1,2,15
  148:21,22
  153:23
**focused**  45:22
  48:17 121:24
  130:25 191:22
  193:17
**focuses**  245:25
**folder**  56:25
**folks**  72:22
  76:14 160:7
  166:25 226:5
**follow**  116:15
  143:14 202:12
  229:21 233:4
**following**
  157:14 227:3
  250:6

HIGHLY CONFIDENTIAL

**[follows - front]**                                                    Page 28

| | | | |
|---|---|---|---|
| **follows** 7:19 | 53:10,23 54:13 | 166:23 169:7 | **fortune** 154:6 |
| **food** 210:10 | 55:4 57:1 58:3 | 169:23 174:24 | **forward** 143:22 |
| **footnote** 6:20 | 58:17 59:10,22 | 177:7 182:17 | 144:23 157:12 |
| 173:10 227:2 | 60:8 62:19 | 183:24 184:10 | 188:8,9 |
| 227:11 233:14 | 63:15,25 64:18 | 184:13 185:4 | **found** 23:1 |
| 233:16,20 | 68:12 70:21 | 185:15 189:12 | 29:2 |
| **footnotes** | 71:1,14,23 | 189:25 190:15 | **foundation** |
| 233:14 | 72:7,17 73:13 | 191:15 192:12 | 136:13 |
| **force** 45:10 | 73:18 75:5,12 | 192:24 193:21 | **four** 25:16 |
| 219:18,25 | 75:20 77:6,14 | 196:2 197:10 | 32:17 50:9,13 |
| 220:6,18 221:2 | 77:21 79:12,21 | 197:24 200:6 | 56:2 57:16 |
| 221:12 223:1 | 80:8 81:3,8,14 | 201:21 202:17 | 86:24 |
| 225:1 | 81:20 82:24 | 208:14 211:15 | **fourth** 215:22 |
| **foregoing** | 84:12 85:2 | 212:3 213:7,22 | 222:7 |
| 247:8 249:3 | 87:17 88:6,15 | 216:9,21 217:7 | **frame** 96:11 |
| **forensic** 191:19 | 89:7 90:17 | 220:19 221:4 | 128:7 129:2,12 |
| **forever** 91:20 | 91:23 92:6 | 221:14 222:14 | 193:24 |
| 91:22 92:5 | 93:18 94:2 | 223:13 224:5,8 | **framework** |
| 161:24 162:1 | 96:10 97:19 | 224:16 225:3 | 46:8 |
| 163:2 | 100:22 101:12 | 226:4 228:16 | **frankly** 13:2 |
| **form** 9:10,17 | 104:7 106:1,13 | 231:18,25 | 36:7 147:15 |
| 10:8,23 14:18 | 107:9 112:10 | 232:11 234:21 | 201:20 |
| 15:2 19:21 | 118:14 119:11 | 236:23 237:24 | **free** 138:1 |
| 23:3 24:16 | 120:21 121:16 | 238:22 239:5 | 221:22 |
| 26:21 28:8 | 123:4 134:9 | 240:22 241:24 | **frequent** 60:23 |
| 29:4 31:11,14 | 138:8 142:1 | 242:24 245:14 | **freshfields** 1:16 |
| 32:21 33:7 | 143:12 144:8 | 249:6 | 3:3 |
| 34:8 35:12 | 144:19 145:7 | **format** 21:7 | **freshfields.com** |
| 36:17 37:14 | 145:21 146:6 | 108:10,13 | 3:4,5,6 |
| 39:25 40:12 | 146:23 148:7 | 126:22 | **front** 17:18 |
| 41:4,19 42:4 | 149:18 157:12 | **formatted** | 35:21 44:19 |
| 44:17 45:7,19 | 159:8 161:20 | 121:7,7 | 45:5 47:3 |
| 46:3 50:7,11 | 162:7 163:5,19 | **forth** 247:10 | 104:18 118:4 |
| 51:5 52:8,21 | 164:14 165:2 | | 176:9 181:2,16 |

HIGHLY CONFIDENTIAL

**[front - goes]** Page 29

181:17 218:4
223:24
**frustrated**
42:12
**ftc** 96:6
**fulbright** 2:2,7
**full** 14:23
123:23 164:9
170:15 190:20
**fun** 138:1
**functionality**
131:1
**fundamental**
171:2 198:1
**funded** 155:14
**funding** 155:5
**further** 211:19
239:18 246:7
247:8,11
**future** 220:17

**g**

**g** 5:5 7:1 19:2
22:19 48:1
127:23,24,25
128:2,5,8,14
**game** 102:9
**garbage** 161:25
**gbu** 6:17
**gdn** 105:19,21
**general** 3:15
8:2,24 22:10
24:7 40:19
51:6 67:12,16

117:25 127:17
128:10 157:21
187:20 192:9
192:19 204:21
**generalized**
101:22,24
**generally** 10:10
52:5 63:11
67:7 73:4 77:5
77:12 88:23
96:3 101:13
104:14 107:5
107:23 114:7
116:1,1,6,14
127:19 153:15
153:18,20
156:20 165:17
177:17 186:22
205:4 209:2
217:17 220:8
223:9 244:18
244:20
**generating**
112:8
**generational**
177:13,22
**gentleman**
35:14 39:6
164:10
**getting** 23:21
23:25 81:11
101:7 102:4
201:17

**ghost** 64:17
**gibbs** 3:14
**gigabyte**
201:11,12
**gigabytes**
201:14 202:25
**give** 13:19 46:7
65:5,17,18,20
65:24 109:1
119:6 134:7
156:17,18
158:6 160:5
223:18 234:4
**giveaway** 22:1
**given** 11:23
13:21 20:19
36:13 54:12
77:3 87:12
90:12 99:22
103:17 110:10
110:13,21
115:4 133:23
136:3 147:24
158:16,20
159:12,13
165:8 189:19
194:1 196:24
198:6 207:2
211:20 230:8
231:9 249:4
**gives** 114:2
133:11
**giving** 63:21
95:4 179:11

211:19 219:3
236:11
**glad** 199:2
**glanced** 95:16
**glenn** 2:4
**global** 219:2
**go** 15:12 22:7
29:15 30:25
34:23 38:25
48:1,9 51:3
54:23 55:14
58:15 59:18
60:3 62:24
63:23 64:13,13
68:23,24 76:20
79:6 80:22
85:12,16 98:15
114:11,25
117:3 138:14
148:6 151:2
163:11 167:21
180:19 181:25
185:6 187:24
190:6,20
195:22 204:10
204:11 211:3
214:8 221:24
227:8 238:4
239:10 243:1
243:17 245:19
**goal** 40:24
**god** 70:13,17
**goes** 28:2 29:6
61:18 64:17,17

HIGHLY CONFIDENTIAL

**[goes - google]**                                                      Page 30

| | | | |
|---|---|---|---|
| 110:5 128:16 | 229:18 | 29:1,16 30:5 | 127:25 128:1,8 |
| 191:11 202:24 | **golkow** 7:5 | 31:9 35:23 | 128:15,15 |
| **going** 11:2,4 | **good** 7:22,23 | 36:14 37:1 | 129:7,11,21,25 |
| 13:5,18,19 | 11:22 40:7 | 40:24 41:16 | 130:1,7,13,19 |
| 14:22 15:12,15 | 70:19 74:4 | 42:1 45:25 | 131:1 137:6,11 |
| 16:17 18:4,22 | 100:7 104:17 | 46:8 47:10,12 | 138:19,20,22 |
| 20:10 27:20 | 113:8 114:22 | 47:15,21,24 | 139:9,13,18 |
| 33:15 35:22 | 116:2 127:20 | 50:15 52:3,7 | 141:22 143:2,5 |
| 36:25 37:20 | 146:16 150:18 | 53:7,19 55:8,9 | 143:8,10,18 |
| 38:11 48:16 | 169:17 210:6 | 55:17 56:5 | 144:1,3,6,17 |
| 55:22 60:5 | **goog** 5:6,7,9,12 | 58:10,12 59:9 | 145:5 146:19 |
| 65:7,20 73:25 | 5:14,15,17,18 | 59:20 60:3,6 | 154:11 160:25 |
| 81:25 82:4 | 5:20,25 6:4,13 | 61:10 64:10 | 161:4 162:5 |
| 86:17 93:16 | 6:17,19 18:24 | 67:24 68:10 | 165:8,18 166:6 |
| 94:25 95:7,11 | 20:12 23:11 | 72:14 78:23 | 166:21 167:3,6 |
| 96:19 101:3,5 | 65:10 74:6 | 79:19 80:4 | 168:3,3,6,12 |
| 104:19 105:5 | 82:14 89:15 | 82:22 83:2 | 171:15,16,17 |
| 107:15,25,25 | 95:6 96:21 | 84:21,22,25 | 171:20 172:9 |
| 108:2,9 109:13 | 113:12 160:18 | 85:6,11,19 | 172:20 173:3 |
| 112:2 113:4 | 186:6 218:6,7 | 86:8 87:4,4,9 | 174:3 175:3,6 |
| 123:22 127:21 | **google** 1:7 3:9 | 88:4,4,11,12 | 176:24,24,25 |
| 128:21 130:23 | 5:7,8,12,13,15 | 89:4,4,9,11 | 179:13,14,18 |
| 136:17 141:10 | 5:16,19,21,21 | 91:22,24 95:23 | 179:19 180:2,2 |
| 147:18 148:15 | 6:5,7 7:10 8:18 | 96:7 97:7 98:3 | 180:5,13,13 |
| 149:24 150:12 | 8:21,25 9:2,8 | 98:7 99:4 | 182:10,13 |
| 167:5 172:1,16 | 11:11,14,14,15 | 100:2 101:9,17 | 183:2,23 184:5 |
| 175:19 180:17 | 11:16,17 12:14 | 102:22 103:5,8 | 184:8,9 185:1 |
| 182:7,9 187:24 | 12:15,18,21,25 | 103:10 104:20 | 185:9 187:19 |
| 188:15,17 | 15:1 17:9 20:4 | 106:6 107:3,17 | 188:24 189:7 |
| 189:21 191:20 | 20:17,20,21,23 | 108:16,17 | 189:17 190:14 |
| 193:25 195:8 | 21:2,10,11,14 | 118:2,8,10 | 190:24,25 |
| 197:19 202:8 | 22:8,25 23:23 | 120:10 121:11 | 191:5,9 195:13 |
| 210:13 220:17 | 24:12,23 26:13 | 123:8 127:15 | 199:8,16 200:1 |
| 221:18,19 | 26:19 27:11 | 127:15,18,22 | 200:15,20,24 |

HIGHLY CONFIDENTIAL

**[google - halloween]**                                                                 Page 31

| | | | |
|---|---|---|---|
| 201:18,25 | 192:18 195:17 | **grande's** | **guess**  15:7,9,21 |
| 202:10 203:25 | 196:6 199:11 | 147:10,16,19 | 15:24 16:11 |
| 204:22 205:5 | 215:16 237:11 | 147:24 148:3 | 17:20,20 18:1 |
| 206:19 208:18 | 241:2,7 | 148:14 149:3,8 | 19:8 31:24 |
| 208:23 209:1 | **google.com** | 149:9,13,15 | 32:1 40:4,4 |
| 214:1 218:18 | 21:13 24:18 | 227:2,9 234:12 | 41:6 52:13 |
| 218:25 219:20 | 89:22 222:2 | 234:18,25 | 67:3,4 69:15 |
| 219:24 220:5,6 | **google.com.** | 235:5 | 111:16 112:4 |
| 220:7,16 221:1 | 34:20 78:24 | **grandma** | 117:8 119:3 |
| 221:11 224:21 | **googler**  22:23 | 178:15 | 121:4 125:5 |
| 225:24,25 | 23:19,24 28:6 | **grandmother** | 132:13 134:11 |
| 226:11,18,19 | 28:16 29:6 | 178:14 | 161:19 165:22 |
| 226:19,20 | 91:25 94:6 | **gray**  39:23 | 174:1 193:16 |
| 227:5,6,7,12,24 | 107:15 162:11 | 177:23 | 201:13 202:19 |
| 227:25 228:6 | 229:18 | **great**  217:2 | 208:9 |
| 228:10,10,14 | **googler's**  25:16 | **greater**  145:23 | **guesses**  70:22 |
| 228:15 229:19 | 93:20 94:4 | **greenwich**  1:17 | **guessing**  15:6 |
| 229:20,20 | **googlers**  22:14 | 3:7 7:9 | 41:10 |
| 230:1 231:2 | 22:25 23:15 | **grocery**  56:10 | **guidance**  95:23 |
| 232:9 235:18 | 24:6 28:11 | **gross**  69:23 | 96:2 |
| 235:20,24 | 42:19 57:8 | **grounds**  120:1 | **guided**  72:21 |
| 237:15,18 | 59:24 60:18 | **group**  23:19 | **guy**  177:23,24 |
| 238:12 239:24 | 62:2 94:10 | 26:1,4,6,9 | **h** |
| 240:19 241:21 | 101:18 102:21 | 27:17 76:11 | **h**  5:1 6:1 78:3 |
| 243:12 250:3 | 103:13 123:12 | 90:7 98:20 | 83:10 |
| **google's**  40:8 | 177:10 187:25 | 107:1,2,7,8,11 | **hair**  39:23 |
| 46:9 47:7 | 239:8 | 107:15,19,20 | **half**  67:21 |
| 67:14,14,17 | **gotten**  116:17 | 108:12 114:2 | 132:5 |
| 97:14,17,24 | **government** | 116:13 135:14 | **halfway**  68:20 |
| 98:2 118:23 | 189:1 | 154:25 156:11 | 69:2 105:4 |
| 119:5 137:12 | **grand's**  148:5 | 159:19 163:12 | 219:7 |
| 154:13 163:3 | **grande**  3:12 | 182:5 | **halloween** |
| 165:16 187:20 | 6:20 147:13 | **groups**  115:25 | 113:24 |
| 189:10 192:9 | 234:23 | | |

HIGHLY CONFIDENTIAL

**[hallways - history]**                                      Page 32

**hallways** 93:6 93:25
**halt** 71:21
**hand** 13:5 18:4 18:22 20:11 23:10 37:17 65:7 73:25 94:25 96:19 104:19 107:5 108:2 109:13 172:1 210:4,18 216:7 226:25
**handing** 82:13 89:13 172:4 175:2 186:3
**handle** 150:5
**hands** 131:20
**handwriting** 56:24
**handy** 114:25
**hang** 210:14,15
**hangout** 12:15 221:21 222:24 224:3 225:25 227:7 229:1,15 238:3
**hangouts** 11:14 11:16 12:18,25 127:15,18,22 128:1,5,15 163:12 219:7 219:17,18,20 219:24,25 220:7,18 221:2

221:8 222:9,13 222:19,25 223:1,17 224:11 225:1,8 226:8,14,18,19 227:12,25 228:9,10,15 237:10
**happen** 32:14 37:19 54:18 76:6 94:17 159:18 214:4
**happened** 76:19 79:3,14 79:15 164:21
**happening** 194:23
**happens** 37:6,9 37:18 38:4,8 56:19
**happy** 46:18 79:1 82:5 102:7 103:14 108:24 202:9
**hard** 35:5 50:3 54:25 79:4 95:9 100:11 141:10 201:20 209:16
**harmful** 41:3
**harris** 69:23 70:3,8,14 71:20 72:4,10 72:23 73:11

**head** 142:9
**headed** 152:23
**header** 65:13
**heading** 214:6 222:9
**health** 151:24
**heard** 37:6,8,11 37:15,22 38:2 39:19 156:14 186:18,22 187:2 240:14 241:18
**heavy** 204:4
**held** 7:8 183:23
**hello** 233:4
**help** 8:4 20:10 21:21 31:13 34:16 46:21 127:23 133:18 190:22 212:15
**helpful** 41:2
**helping** 117:13 176:19
**helps** 163:10
**hereinbefore** 247:10
**hesitate** 97:9
**hey** 25:13,17 32:19 102:4 ███████ 28:16 29:1
**hi** 215:2
**hicks** 3:5

**high** 69:17 156:20 171:6 171:11
**higher** 66:19 197:8
**highest** 66:23
**highlight** 21:25 22:5 30:14
**highlighted** 17:23 21:18,19 33:10,18 228:4
**highlighting** 21:16,17,20
**highly** 1:10
**historically** 160:13
**histories** 52:11 93:2,15 138:23 139:1
**history** 5:4,4,5 5:5 13:1 14:16 14:25 15:1,7 15:15,24 16:4 16:5 17:8,12 17:14,19,24,25 19:1,2,20,20 20:5,5 22:3,8 23:1 24:6,9,13 24:14 25:14,18 26:23,25 27:4 27:10 28:7 29:2 32:17,25 32:25 33:3,13 35:6,24 42:10

HIGHLY CONFIDENTIAL

**[history - holds]**                                                    Page 33

| | | | |
|---|---|---|---|
| 44:7 45:18,18 | 162:20 163:12 | 62:6,17 109:5 | 173:1 174:6 |
| 46:1,1 49:18 | 163:18 164:24 | 120:5 121:2 | 175:14 191:23 |
| 49:25,25 50:2 | 182:10,15 | 122:6,22 123:1 | 193:10 194:14 |
| 50:15,16 56:5 | 184:18,19,24 | 123:20 124:2 | 194:18 196:14 |
| 56:6,13 57:7,9 | 185:1 191:4,13 | 124:12,13,23 | 196:18 198:12 |
| 58:5,13 59:9 | 192:3,5,10,19 | 125:11,23,25 | 198:18 209:1 |
| 59:20 60:5,21 | 193:19,20 | 126:15,21 | 210:2 213:4 |
| 61:11,19,21 | 208:19 209:3,3 | 134:15 135:1,7 | 236:5 |
| 62:2,5,17 | 209:10,10,12 | 135:13,21 | **hold**   10:12 26:5 |
| 63:10 71:7,21 | 210:20,24 | 136:21 137:3,5 | 26:7,10,14,20 |
| 72:9,15 73:11 | 211:4,8,12,13 | 137:15,19 | 27:5,9 61:9 |
| 76:3,4 78:16 | 211:14,24 | 138:6,10,17,18 | 64:15 72:22,25 |
| 78:25 79:1,10 | 212:13,14,17 | 139:19,24 | 91:4 98:4,6 |
| 79:11,19 80:5 | 212:21,22 | 142:16 143:16 | 99:23 150:1,2 |
| 80:7,22,23 | 215:4,15,25 | 143:22 144:23 | 150:5,6,8 |
| 81:2,18 82:22 | 216:6,15,19,25 | 170:8,25 171:3 | 166:15,25 |
| 82:23 83:17 | 219:18,25 | 171:14 172:13 | 182:16 183:10 |
| 84:1,3,9,11,24 | 220:7,10,18 | 172:19 173:6 | 183:14,15,17 |
| 84:24 85:7,15 | 221:2,12 223:1 | 174:12 176:2 | 184:12 195:24 |
| 85:16,16,20 | 225:1,8,15,24 | 195:24 196:5 | 196:1,19 |
| 86:3,6 87:8,23 | 225:25 228:25 | 196:11,22 | 198:21 199:7,8 |
| 88:14 89:5 | 229:2,2,13,13 | 197:6 198:9,16 | 199:12,17,18 |
| 91:7 93:4,10 | 230:4 231:17 | 211:18 212:18 | 200:2 230:1,2 |
| 93:23 98:3,11 | 232:10 238:5 | 213:20 217:4,9 | 230:10,14 |
| 99:4,13,13 | 238:13 239:15 | 236:9,15,18 | 231:4,9,11 |
| 100:9,10,16,20 | 239:25 240:21 | 242:17,22 | 232:3 235:24 |
| 102:25 119:8 | 241:23 | 243:3,24 244:4 | 239:7,12 |
| 119:20 120:20 | **history's**   17:19 | 244:8,15 | **holds**   42:20 |
| 121:11,25 | 94:18 | **hochstetler's** | 87:5 98:9,14 |
| 125:3 128:10 | **hit**   17:13 | 6:16 124:7 | 124:15,25 |
| 128:16 134:5 | **hochstetler** | 125:10,14 | 141:18 150:15 |
| 140:16 143:1,9 | 48:14,17 58:20 | 129:1 147:15 | 177:11 182:19 |
| 144:18 145:19 | 58:23 59:4 | 170:12,19 | 230:7,20 231:1 |
| 153:11 161:23 | 60:13 61:15,25 | 171:9,24 172:6 | 231:4,14,15 |

**[holds - implemented]**                                      Page 34

232:8,17
235:21 238:11
239:9,23 240:7
240:19 242:8
**home**   99:10
**hon**   1:7
**honest**   229:18
**honestly**
   174:25
**honorable**
   154:21
**honors**   163:25
   164:24
**hope**   112:25
**hopefully**
   122:12 149:5
**hoping**   71:2
   140:11
**horrible**   191:12
**hostetler**
   126:19 209:22
   211:24
**hour**   38:12
   58:7 64:12
   82:1 90:3
   183:19 184:17
   204:10
**hourly**   116:25
**hours**   23:21,25
   24:7,15 50:21
   54:16 55:3
   64:4 87:15
   90:23 112:5,6
   112:23,25

113:1 117:6,15
183:22 185:2,3
185:14,19
220:4
**houston**   2:6,13
   2:14
▮▮▮▮   66:18
68:20
**huh**   16:22
   114:5
**human**   103:14
   104:3,5
**hunch**   70:19
**hundred**   112:5
   118:22,24
   119:7
**hyperlink**
   227:18
**hypotheses**
   177:17
**hypothesis**
   133:22,22
   158:16 177:6
   178:2,8,10
**hypothesize**
   229:25
**hypothetical**
   17:17 26:13
   32:8,23 49:8
   49:24 50:5
   51:4,18 52:3
   53:5,25 54:9
   54:22 55:18,19
   55:24 56:23

57:4,12,14,19
57:23 63:17
85:13,22 86:3
87:7 91:4,6
100:8,16
156:18 157:7
158:11 185:14
193:2 210:1,5
210:17 211:9
211:19 212:5
213:5,19,23,25
214:12
**hypothetically**
   133:23 199:17
   214:3 217:18
**hypotheticals**
   76:2 84:8
   210:6,7,8

**i**

**i.e.**   98:25
**ibm**   202:3
**icon**   14:25 35:5
   35:11
**icons**   14:2,16
   14:25
**idaho**   2:19,21
**idea**   53:21
   157:23 166:7
   167:22
**ideally**   84:17
**identifiable**
   167:16

**identification**
   49:4
**identified**
   166:21 207:3
**identify**   181:4
   234:25 235:3,6
**idiomatic**   37:24
**ignatius**   3:12
   147:10
**ignoring**   13:8
   13:25
**iii**   2:11
**illinois**   1:22
   155:5 247:20
**imagine**   201:20
   229:17
**immediately**
   150:10
**impact**   41:10
   72:13
**imperative**
   248:10
**imperfect**
   158:24
**implement**   86:9
**implementati...**
   44:21
**implementati...**
   100:2 220:11
**implemented**
   45:9 59:24
   85:4,25 86:1
   87:12,18,19

**[implications - infrastructure]**                                      Page 35

**implications**
  6:9 181:8
**implies**  32:2
**imply**  229:19
**implying**  36:24
**import**  132:19
**importance**
  34:6
**important**
  11:25 25:14,18
  32:19 77:5
  100:19
**impression**
  35:19 72:3
  175:17 176:4
**inadvertent**
  190:23
**inadvertently**
  233:15,19
**inappropriate**
  126:20 194:12
  236:8,14
**include**  54:23
  111:1 233:18
**included**
  121:25 122:9
  206:8 242:14
**includes**  8:25
  110:17,20
**including**  14:23
  48:6 84:23
  93:1 104:10
  114:9 117:9
  141:15,18

  160:10 163:8
  189:1 206:3
  232:8 238:11
  239:3,10,23
  240:19 243:14
**inclusion**
  244:12
**incomplete**
  30:10
**inconsistent**
  73:7
**incorrect**
  174:13
**increased**
  136:5
**incredible**
  156:22
**independent**
  68:15 100:1
  225:17
**independently**
  131:5
**indicate**  16:18
  35:10 63:11
**indicated**  50:25
  164:18 250:6
**indication**
  13:20 164:17
**indicative**
  60:22 107:7
**indicia**  60:14
  61:10,14,20,21
  158:20,24

**indirectly**
  121:19
**individual**  26:6
  27:4 34:19
  40:22 42:19,19
  66:17 78:2
  83:9 99:22
  138:21,22
  139:16,21
  142:21 220:10
  231:2 235:18
  243:25 244:7
**individually**
  225:17
**individuals**
  27:8,16 35:23
  36:1,9 52:14
  58:22 60:12
  61:2,13,14
  62:3 76:19
  80:15 87:6,10
  136:25 138:24
  138:25 139:2
  139:22 157:11
  159:23 166:21
  196:19,20,21
  243:16,21
  244:9,21
**industry**  8:9
  78:5,8 88:5,12
  89:1 148:1
  154:1
**infer**  59:17
  85:4 164:12

**inference**  68:15
  73:17 155:22
  156:5,6,13,15
  156:16,18
  157:15
**inferences**
  159:22,25
**inferring**  171:3
**infinite**  161:22
**inform**  119:19
**information**
  3:12 9:12
  17:13 27:24
  42:6 57:17
  60:25 85:8
  98:18 102:23
  118:4,12 119:7
  121:3,12,22,23
  122:25 125:2,9
  125:11 136:4
  142:10 144:11
  156:22 157:19
  158:14,15
  159:3 174:14
  174:16 184:20
  191:9 194:2
  200:23 203:10
  203:12
**informed**  117:5
  136:7 221:1
**informs**  123:16
  217:10
**infrastructure**
  133:4

HIGHLY CONFIDENTIAL

**[ing - issue]** Page 36

**ing** 70:25 71:3
**initial** 123:20
**initially** 143:20
210:19
**initials** 51:2
**initiated**
107:11 114:1
**input** 132:17
**inputs** 48:24
**inputting** 48:12
**inquiry** 158:3
158:21
**installs** 75:2
**instances** 20:9
239:16
**instant** 190:12
190:14,23
224:18
**instruct** 98:3
98:10 242:10
**instructed**
123:11 231:15
232:9 238:11
239:8,24
240:19 241:22
**instructing**
239:11
**instruction**
10:10 120:13
216:17 231:7
**instructions**
9:15 150:5
230:10 242:3
242:11 248:1

**insufficient**
150:16
**intangible**
152:3
**integrated**
166:5
**intellectual**
116:11 152:2
**intend** 149:10
149:16 193:13
204:13
**intended** 79:14
212:17 243:10
244:16
**intensive** 158:3
**intent** 10:15,17
10:18,20 42:23
**intention** 12:2
62:12 137:22
148:2 192:19
204:10 212:17
**intentions**
193:19
**intents** 102:22
**interest** 65:6
151:9 152:13
155:21 156:9
156:11,14
**interested**
46:18 156:21
247:15
**interesting**
100:23

**interests** 151:4
151:6 156:4
**interface** 131:2
**interfaces**
130:12
**interlaces**
103:20
**internal** 200:22
203:23
**internally**
180:3 237:15
**international**
152:8
**internet** 3:13
181:21
**internship**
156:10
**interpret** 42:11
42:12 123:3
163:7,22
224:10,13
**interpretation**
22:16 24:19
29:24 30:1,4
30:16,21,22
31:5,9,23 32:6
34:11 46:24
50:14 66:13
99:7 123:16
190:4
**interpretation's**
30:10
**interpreting**
162:14

**interrupt** 90:10
**interrupted**
11:22 219:15
**interval** 160:2
160:3,6,12
**intervals**
126:14 160:15
**intimately**
95:25
**introducing**
219:19
**invade** 136:17
**investigation**
8:16,18 9:4,8
10:7
**investigations**
153:24
**involved** 83:3
109:12 143:5
155:8 204:21
243:19
**involvement**
139:8
**involves** 67:5
114:9
**ironic** 40:16
**irrelevant**
41:15
**irrespective**
136:24
**ish** 63:12
**island** 210:9
**issue** 40:19
84:21 87:21,22

HIGHLY CONFIDENTIAL

[issue - know]                                                    Page 37

118:2 147:2,5
147:5 198:2
236:25
**issued** 231:1
**issues** 49:4
67:23 115:4,6
155:8 234:5,8
243:1
**issuing** 147:7
150:14
**items** 98:14

**j**

**jacob** 48:14,17
**jaffe** 3:13
███ 83:15,16
83:16
**january** 23:15
23:24 26:15,17
26:19,22 40:24
49:15 50:25
55:19,25
212:24 213:15
214:1,7 215:19
**jargon** 92:21
105:3 127:8
**jedi** 105:9
**jennifer** 1:19
7:14 247:2,18
249:11
**jesus** 71:7,7
**job** 1:25 11:17
129:19 155:14
170:11

**jobs** 92:25
93:15
**jogging** 173:4
**john** 26:13
**join** 105:5
**joined** 74:17
**joint** 154:25
**joke** 210:13
**jonathan** 3:13
3:19
**jordan** 1:7
**journal** 131:14
**juarez** 3:19
**judge** 53:17
154:18 155:16
155:18,23
156:8,20 157:5
**jumps** 29:19
91:18 164:9
**jurisdictions**
205:13
**jurors** 62:23
**jury** 52:6 53:17
64:9 106:9
192:18 193:2
197:21 210:13

**k**

**k** 22:20 179:7
███ 218:18
**keep** 21:21
23:24 39:12
40:10 41:2,17
42:2 82:4

88:24 95:20
123:13 189:21
195:8
**keeping** 57:13
**keeps** 24:14
55:9 90:13
168:12
**kent** 6:11
186:18,22,24
187:3,12,14,18
188:1
**kept** 27:10,11
27:13 50:20
99:25 121:7
161:24 168:14
**key** 93:3,16
206:10
**kid's** 102:9
**kids** 178:13
**kilobytes**
202:25
**kind** 17:17 33:1
37:12 46:11
52:10 73:2
121:22 125:19
135:17 148:10
166:19 168:21
177:18 180:1
202:5 203:2
241:6 245:8
**kinds** 52:15
189:22
**kirkland** 3:16

**knew** 72:14
79:19 127:21
179:21
**know** 8:20 9:8
9:11,20 10:12
10:19,24 11:6
11:8,23 12:22
13:3,13 15:6
15:10 20:18,19
22:15,25 23:5
24:18 27:15,17
29:20 30:11
32:1 33:16,17
34:6 35:5,6
36:2,6 37:16
37:19,24 38:16
38:17 39:8
40:16 41:8
42:8,10,13,13
42:16,21 43:23
44:11 45:13,20
45:25 46:4,14
47:1,2,6,7,14
47:25 48:1,10
49:23 50:13
51:7,9,22 52:3
52:4,9,14,23
53:3,19 54:1
54:17 55:5,7
55:10 56:6,10
56:16 57:3,7
57:11,12 59:16
60:18 61:17
63:21,22,23

HIGHLY CONFIDENTIAL

**[know - lanes]**                                                                 Page 38

64:12 67:9,20
67:22,24 70:14
70:14,14,16,16
71:15 72:1
73:11,23 75:21
76:7,9,17,18,24
78:6,8 79:13
79:16 80:2,4
80:12,14,18,19
80:21,23 81:1
81:6 82:16
83:2,11 84:21
85:3 86:8,23
87:25 89:9,11
90:1 91:2,10
91:24 92:7,14
94:4,17,19,20
99:22 100:6,9
100:17,24
101:1 102:16
105:9,12,14
106:5,8,24
111:1 112:5,16
112:19,21,23
114:11 116:4,6
116:14 117:4
117:15 120:14
121:4,22,24
122:6,7 123:7
123:22 124:5
125:1 126:2
127:3 128:19
128:20,21,24
129:4,5,13,18

130:5,8,11,18
131:1,3,24
132:4 133:24
135:15 137:1
137:18 139:24
140:7 141:20
142:4,7,10,14
142:25 143:8
143:25 144:14
145:5,13,25
146:15,24
147:3,3,6,14,20
149:1,3,22
154:15 156:9
156:11,11
157:5,13
158:19 160:9
161:4,8,14,15
163:22 164:13
164:15,17,23
165:1,7,12,21
165:24 166:1,2
166:2,4,12
167:3,7,18,20
167:24,25
168:1,1,2,2,5
169:2,10 170:5
170:6,18
171:11,13,13
171:15,21
172:17 174:18
174:25 175:10
175:14,18,20
175:22,23

177:13,19
178:3,20 179:3
179:8,12,18,20
179:23 180:1,4
180:12,14
182:18,21
185:23 186:13
186:24 187:14
187:16,17,21
188:24 189:13
190:1 191:3,8
191:16,17,24
192:2 193:23
195:2,13,15
196:11,23
197:8,15 198:6
198:11,16
199:6,9,15
200:24 201:11
201:12,13
202:5,13,24
203:20,22
204:4,7,14,15
204:24 205:3,9
205:18,22
206:14 208:1,8
208:23,24
209:4,5,19
211:20 213:12
214:4 215:12
216:12 217:17
218:13 220:5
220:12 223:25
224:10,10,13

224:20,22
225:24 226:10
226:12,15,17
226:21,24
227:17,23
228:4,20 230:9
230:12 231:6,8
232:1,2 235:19
235:22 236:16
237:13 238:2,7
239:9 243:11
243:18 245:10
245:16
**knowledge**
68:16 79:15
80:10 85:8
89:8 140:3
188:21 201:1
201:15 202:5
**knowledgeable**
36:2 51:25
**known**   47:16
**knows**   33:14

**l**

**l**   22:20 24:24
78:3,16,16
**labeled**   121:21
176:10 188:8
188:11
**labor**   152:10
217:2
**lanes**   57:13

HIGHLY CONFIDENTIAL

**[language - lists]**                                                      Page 39

language   47:14
  47:24 48:10,23
  125:20 164:18
  188:13 195:20
  205:8 214:11
  231:20
languages   48:6
lanier   2:11,16
  2:16,19,21
lanierlawfirm...
  2:12,13,17
laptop   203:16
larger   135:14
  155:25
late   199:1
latin   62:24
  138:2
laugh   138:1
launch   6:17
  222:2
launches   219:6
law   2:11,16,19
  2:21 53:3,13
  53:14 62:24
  152:12,18
  154:24 155:1
  202:13 233:25
lawful   7:17
lawsuit   54:12
  67:1,10 68:11
  72:6 165:25
lawsuits   70:5,9
  189:2 192:20

lawyer   9:23,25
  10:3 21:25
  132:24 147:19
  147:20,23
  152:17
lawyers   95:20
  202:13
lay   8:12,14 9:5
  9:18 11:5
  72:18 201:20
layman's
  223:14
lead   75:17
  164:12 226:1
  228:13
leads   70:5,9
learn   10:5
learned   39:20
  39:24 116:23
learning   10:18
  27:24
leave   37:18
  78:25 81:1
  185:6
leeway   160:6
left   79:10 210:4
  210:18 212:14
  214:19 233:15
legal   7:4 53:24
  98:6,9,14
  137:11,14
  147:2,5 148:1
  180:1,5,9
  188:25 189:17

189:24 230:20
  231:6
length   138:14
  173:9
lengthy   173:10
letter   4:8
  137:11,19
  196:5 198:22
  198:23
letters   24:25
  78:21 127:9
  135:23
letting   227:17
level   47:5 48:6
  107:6 126:21
  133:13 139:8
  156:20 159:1
  171:6 176:5
  180:4 220:10
  236:9,14
liability   52:7
lied   162:1
life   54:6
likely   21:13
  58:12 60:16
  70:18,19
  177:24 178:5
  ■   6:19 218:17
  219:1
limit   196:11,14
limitations
  87:12,14
  159:21

limited   60:11
limiting   232:12
  238:16
  ■   6:19 218:17
  219:1 220:15
line   13:9,25
  16:4,5,17,20,21
  17:2,20,22
  22:7,8 34:15
  89:20 106:19
  250:7
lines   50:9 92:20
  162:10
lingo   69:9
linguistics   65:3
link   227:3
  242:20
list   19:11 38:7
  56:10 95:18
  109:24 110:3,8
  110:17 122:10
  150:1 153:4
  166:22 169:11
  173:17 182:4,6
  186:11,14
  196:10,22
  206:25 208:2
  230:10 233:19
  242:2
listed   196:6
listing   110:11
  195:25
lists   206:9
  219:1

HIGHLY CONFIDENTIAL

**[literally - looked]**                                                      Page 40

| | | | |
|---|---|---|---|
| **literally**  125:14 | 238:11 239:7,9 | 118:3,8,8,10,13 | **look**  14:2,7 |
| 225:15 240:13 | 239:12,23 | 118:16,17,23 | 19:18 20:13,23 |
| **literature** | 240:7,19 242:8 | 119:5,9,17,24 | 23:12 24:22,24 |
| 160:10,13 | 244:2 | 120:10,11,11 | 24:25 25:2 |
| 244:25 245:25 | **litigations** | 120:16,24 | 30:13 34:25 |
| **litigation**  7:5 | 97:12 136:4 | 121:13 122:13 | 60:14 64:3 |
| 8:16 9:4,8 10:7 | 155:20 205:10 | 122:14 123:18 | 68:18 82:16 |
| 10:12 13:15,17 | **little**  8:23 13:8 | 126:22,23 | 83:8 86:20 |
| 26:5,7,10,14,20 | 27:21 49:2 | 132:20 133:23 | 97:24 99:8 |
| 27:5,9 36:16 | 61:10 69:1 | 134:7,20,24 | 105:4 107:23 |
| 42:20 72:25 | 71:11 79:4 | 135:2 137:2 | 109:14 125:19 |
| 87:5 98:4 | 85:22 91:13 | 138:16 140:15 | 147:10 160:13 |
| 99:23 111:3,6 | 99:9,17 107:23 | 141:16 142:2 | 160:20 161:11 |
| 111:15 119:15 | 133:7,9 134:18 | 142:10 168:7 | 176:23 187:22 |
| 121:21 122:7 | 135:6 148:18 | 168:12,12,15 | 196:16 197:22 |
| 122:16,18 | 149:6 151:7 | 168:20,23 | 202:21,21 |
| 124:8,14,25 | 155:15 160:5 | 169:1,3,5,18,19 | 203:6 207:12 |
| 141:18 150:1,4 | 172:12 173:4 | 169:22 170:6 | 210:12 213:2 |
| 150:8,15 | 173:12 182:23 | 192:22 194:5 | 218:13,14 |
| 154:10 166:14 | 191:10 193:8 | 208:17 209:2 | 221:17,18,22 |
| 166:25 177:11 | 196:13,23 | **logged**  126:24 | 227:9,18 |
| 182:16,19 | 204:11 206:1 | 135:4 | 228:25 230:16 |
| 183:10,14,15 | 209:16 214:10 | **logical**  40:6 | **lookback** |
| 183:17 184:12 | 218:11 | **logo**  17:25 | 168:22 |
| 192:11 195:23 | **live**  76:14 | **logos**  19:20 | **looked**  59:13 |
| 196:1 198:21 | **living**  168:22 | **logs**  64:10 | 64:22 104:25 |
| 199:7,8,12,17 | **llc**  1:7 3:9 7:10 | 119:23 120:4 | 108:4 121:14 |
| 200:2 208:8,9 | **llp**  1:17 2:2,7 | 200:15 | 121:14,23 |
| 229:21 230:1,2 | 3:3,14,16 | **long**  83:9 | 122:6,13,14,16 |
| 230:7,10,14 | **log**  61:16 62:10 | 108:14 113:9 | 122:17,20,22 |
| 231:1,4,4,9,11 | 62:16 63:18 | 132:11,23 | 123:1,2,2,6,8 |
| 231:14,15 | 100:25 117:18 | 150:12 161:4 | 123:21 124:11 |
| 232:3,8,16 | 117:20,20,21 | **longer**  58:1 | 125:14 128:13 |
| 235:20,24 | 117:23 118:1,1 | 183:14 | 130:14 131:7 |

HIGHLY CONFIDENTIAL

**[looked - make]**                                            Page 41

139:6 149:8,13
151:9 173:22
196:5,18
226:13 227:18
230:7
**looking**  13:8
33:23 74:8
76:1 77:19
89:17,20 98:14
108:10 113:10
114:24 115:3
129:23 133:1
151:3,7 158:11
165:4,6 172:25
176:7 186:10
187:21 194:7
208:17
**looks**  18:6
20:19 21:5
79:4,5 96:25
172:3,12 188:5
212:1
▇▇▇  86:13,15
87:12,15 88:3
97:15
▇▇▇  88:17
97:22 168:20
179:24 184:15
217:10
**lost**  160:16
**lot**  61:20,21
83:17 96:4
103:6 104:17
105:3 112:25

134:12 141:8
151:6 153:7
155:4,5,6,17
178:14 194:23
202:23 203:13
203:17 213:12
**lots**  189:2
**louisiana**  2:19
2:21
**low**  171:11
**lower**  71:7
**luckier**  122:12
**lucy**  6:9
**lunch**  93:6,25
113:6 114:12
114:19

---
                 **m**
---

**m**  224:15
**maccallum**
53:23 94:2
**machines**  102:4
**madam**  18:9
176:12
**made**  15:18
64:5 111:12
120:6 136:10
158:17 174:13
179:23 193:19
206:5 237:10
248:5 250:6
**magazine**
181:24,25

**magnitude**
63:5,6
**mail**  5:7,8,12
5:13,15,16
6:10,19 20:17
20:23 21:13
53:5 107:1,7
107:12,13,14
107:16,17,18
108:12 113:25
114:2,11
173:18,20
174:9 175:22
175:23,23
177:25 178:6
187:6,22 188:3
190:12 218:17
218:22 219:12
221:6,13,25
222:1,2,3,3
233:22 239:13
242:12
**mails**  21:11
42:14 47:3,4
107:3 108:22
108:23 114:9
171:20 172:9
172:20 173:3,6
173:12 174:4
174:12,19
175:19,24,25
176:24 177:14
187:21

**main**  112:11,16
112:18 131:11
157:8
**maintain**
146:21
**maintained**
21:5
**maintains**
120:10 179:14
**majority**  60:5
208:23
**make**  8:25
12:10 15:13
32:23 45:25
46:8 49:7
53:17 56:3
61:1 62:14
85:18 87:20
102:25 109:20
115:3 119:22
120:17 123:17
124:20 133:14
134:12 137:10
137:22,25
146:10 151:13
152:22 156:14
158:18 163:12
174:10,20
176:8,21
190:24 199:24
202:9,24 203:1
210:12 212:24
219:13 228:17
233:9 240:17

**[make - mccallum]**                                           Page 42

| | | | |
|---|---|---|---|
| 243:22 248:3 | **margins**  69:17 | 233:19 242:1 | 28:8 29:4 |
| **makes**  31:6 | 70:2 72:5 | **math**  197:5,16 | 31:11,14,21 |
| 83:13 88:11 | **mark**  49:11 | 202:14 236:21 | 32:21 33:7 |
| 149:6 229:11 | 55:22 160:17 | **mathematical** | 34:8 35:12,16 |
| 243:7 | 160:17 195:5,7 | 237:1 | 36:17 37:14 |
| **making**  35:21 | **marked**  89:13 | **mathematically** | 39:25 40:12 |
| 44:7 45:4,17 | 104:19 142:8 | 171:9 197:15 | 41:4,19 42:4 |
| 57:15 187:7 | 186:4 | **mathematics** | 43:11 44:17 |
| **malkiewicz** | **market**  68:1 | 126:18 173:19 | 45:7,19 46:3 |
| 1:15 4:3 6:9 | 76:22 77:4,12 | 236:4 242:16 | 50:7,11 51:5 |
| 7:11,16,22 | 77:23 101:25 | **matter**  7:9 | 52:8,21 53:10 |
| 38:25 82:13 | 115:12,15 | 55:17 58:18 | 54:13 55:4 |
| 114:19 151:2 | 146:13 | 65:19 109:3 | 56:22 57:1 |
| 181:2 218:4 | **marketing** | 116:25 132:21 | 58:3,17 59:10 |
| 233:4,23 | 152:5,6 177:18 | 133:4 147:11 | 59:22 60:8 |
| 234:11 239:17 | **markets**  77:8 | 151:3 154:13 | 62:19 63:15,25 |
| 239:21 247:6 | **marking**  23:10 | 160:20 200:9 | 64:18 65:12,22 |
| 249:2,8 250:2 | 65:7 74:1 | 201:1 241:19 | 68:12 70:21 |
| **mangling**  83:11 | 82:14 94:25 | **matters**  52:1 | 71:1,14,23 |
| **manila**  56:25 | 96:19 108:2 | 189:1,17,24 | 72:7,17 73:13 |
| **manner**  60:24 | 109:13 172:1 | 200:9 220:14 | 73:18 75:5,12 |
| ▇▇▇▇ | 202:11 209:18 | ▇▇▇▇  6:10 | 75:20 77:6,14 |
| 218:18 | **marks**  53:8,21 | **max**  217:22 | 77:21 79:12,21 |
| **marc**  2:3 | **match**  135:3 | **maximum** | 80:8 81:3,8,14 |
| **marc.collier** | **material** | 159:21 | 81:20,25 82:24 |
| 2:3 | 116:24 148:23 | **mccallum**  3:3 | 84:12 85:2 |
| **march**  66:6,8,9 | 206:24 234:15 | 4:5 9:10,17 | 87:17 88:6,15 |
| 66:10,11,15 | **materials**  19:11 | 10:8,23 13:11 | 89:7 90:17 |
| 86:21,25 222:5 | 38:6 95:15,18 | 13:19 14:18 | 91:23 92:6 |
| 222:18 224:25 | 96:23 97:5 | 15:2,17 16:6 | 93:18 96:10 |
| 226:1 | 122:10 150:2,6 | 16:19 17:4,15 | 97:19 100:22 |
| **margin**  68:21 | 150:10 173:16 | 18:6,16 19:3 | 101:12 104:7 |
| 69:1,10,23 | 186:11,14 | 19:21 23:3 | 106:1,13,19 |
| | 207:21 208:2 | 24:16 26:21 | 107:9 112:10 |

HIGHLY CONFIDENTIAL

113:13 118:14
119:11,25
120:12,21
121:16 123:4
134:9 136:8,19
138:8 142:1
143:12 144:8
144:19 145:7
145:21 146:6
146:23 148:7
149:18 159:8
161:20 162:7
163:5,19
164:14 165:2
166:23 169:7
169:23 174:24
177:7 182:17
183:24 184:10
184:13 185:4
185:15 189:12
189:25 190:15
191:15 192:12
192:24 193:21
196:2 197:10
197:24 200:6
201:21 202:17
204:11,15
208:14 211:15
212:3 213:7,22
216:9,21 217:7
217:21 220:19
221:4,14
222:14,17
223:13 224:5,8

224:16 225:3
226:4 228:16
230:13 231:18
231:25 232:11
232:20 233:3
235:2 237:3
238:1 239:1,17
240:22 241:8
241:24 242:24
245:14 246:7
**mckinney** 2:5
**mdl** 5:6,7,9,12
5:14,15,17,20
5:25 18:24
20:12 23:11
65:10 74:6
82:14 89:15
96:21 113:12
207:25 208:6,6
208:12
**mdl18279549**
6:4 160:18
**mdlg7059658**
1:25
**mean** 9:5 14:10
14:10 16:11
17:10 19:22,23
19:25 22:10
24:12 26:18
28:9 31:1
32:22 33:16
34:10 35:17,17
35:20 37:13,16
40:3,13 41:9

41:20 45:20
46:21 47:9
48:25 51:24
52:14,22 57:2
57:8 65:3
67:19 68:13,14
70:12 72:8,18
73:19 75:22
76:8,11,15,17
76:18,25 77:22
79:14 80:13
82:25 84:13
87:14,15 89:25
90:1,9 92:8,17
92:19 100:9
101:13,16
117:24 119:20
120:23 122:9
126:2,5 127:17
131:10,18
133:8,18
134:10 138:14
141:3 146:8
157:22 160:3
161:14 162:5,8
162:11,12
163:1,6 164:15
165:17 167:4,4
167:6 169:8,25
170:10,15,15
170:18 172:21
173:20 175:12
177:9,16
178:16,18

179:15,16,22
180:8,11 182:3
185:11 186:12
186:21 189:24
190:1,3,17
191:8,16
193:16 194:13
195:19 196:9
196:10,15,16
197:25 198:23
199:13,23
200:7,9 201:22
205:8 206:5
211:18,21
213:23 217:8,9
217:14,17,17
220:8 221:22
224:11 225:13
235:4 241:6
242:13 244:13
245:3,5
**meaning** 16:13
16:23 42:8
64:13 112:21
119:14 136:25
225:14 229:9
229:11,13
**meaningful**
134:3 236:19
237:2
**means** 17:2
21:6 22:13
40:15,20 54:11
59:16 62:24

HIGHLY CONFIDENTIAL

**[means - michal]** Page 44

| | | | |
|---|---|---|---|
| 64:9,16,24 | **member** 26:9 | 35:3,4,4,19 | 58:5 64:3 73:2 |
| 68:3 69:5 78:8 | 26:24 159:18 | 40:14,22 42:25 | 74:11,11 75:10 |
| 105:15,21,24 | 209:9 | 43:12 44:6 | 75:18 76:2,15 |
| 107:5 112:17 | **members** 25:25 | 74:14,14,20 | 86:25 87:23 |
| 157:18 161:16 | 26:4 209:6 | 75:3,17 76:3,4 | 91:6 108:14,24 |
| 164:7 177:23 | **membership** | 78:23 81:19 | 128:24 135:2,4 |
| 207:10 223:5 | 74:15 | 83:6 86:7 | 138:7 141:12 |
| 229:7 239:13 | **memes** 178:14 | 89:24 90:4,23 | 142:4 167:3,19 |
| 245:1 | **memo** 186:19 | 98:25 99:12,14 | 167:22 168:3 |
| **meant** 24:18 | 186:23,25 | 99:16 100:11 | 169:5,20 |
| 41:6 64:16 | 187:4,8 | 100:15,15,20 | 178:14 184:17 |
| 68:8 180:9 | **memorialized** | 100:25 107:16 | 190:23 206:11 |
| 186:25 233:18 | 107:2,8 | 107:20 114:2 | 206:14 209:12 |
| **measurement** | **memory** 128:11 | 162:9 163:7 | 210:24,25 |
| 202:20 | 173:4 232:8 | 175:21 177:25 | 213:5,6 216:7 |
| **measures** | 238:11 239:22 | 178:5 183:3,13 | **messaging** 57:9 |
| 126:11 | **mention** 20:8 | 183:16 185:1 | 96:7 167:10,12 |
| **mechanical** | 137:3 243:25 | 209:13 211:4,8 | 167:15,16 |
| 132:21 | **mentioned** | 214:8,8 216:1 | 190:12,14 |
| **mechanics** 24:4 | 108:12 171:23 | 217:16 | **messed** 43:8,19 |
| 175:16 | 199:2 204:20 | **messaged** | **met** 196:20 |
| **mechanism** | 206:8 | 42:13 | **metadata** 65:15 |
| 231:24 | **merely** 245:11 | **messages** 21:14 | 65:18 95:2,4 |
| **mechanisms** | **merit** 1:20 | 22:12 23:20,25 | **method** 156:6 |
| 54:18 | 247:2,19 | 24:15 25:16 | **methodology** |
| **media** 78:12 | **merits** 206:13 | 27:9,15,18 | 144:22 170:12 |
| **median** 167:5 | **mess** 215:23 | 29:7 30:2,7,17 | 170:13,19 |
| 178:16 | **message** 25:4,7 | 31:10 32:17 | 171:13 |
| **meet** 240:5 | 25:8,8,9,11,15 | 33:9,18 39:13 | **methods** 153:2 |
| **meeting** 215:22 | 25:16,21 26:18 | 40:3,11,25 | 157:10 236:17 |
| **megabyte** | 27:3,22 28:3 | 41:18 42:3 | **michael** 7:11 |
| 201:11 | 28:19,21 31:1 | 43:24 50:19,23 | **michal** 1:15 4:3 |
| **megabytes** | 32:5,18 33:12 | 52:15 55:16 | 6:9 7:16 247:5 |
| 201:12 202:25 | 33:14 34:21,25 | 56:15 57:16,21 | 249:2,8 250:2 |

HIGHLY CONFIDENTIAL

**[microsoft - needed]**                                                                    Page 45

**microsoft**  75:2
  154:6 167:13
  167:14,19,21
  201:18 202:1
**middle**  25:13
  215:8
**midst**  188:25
**million**  143:21
  144:1
**mind**  18:20
  20:8 36:9 73:7
  108:19 111:14
  121:18 131:25
  150:12 156:25
  171:18 195:11
  200:12 208:21
  209:8 213:14
  244:17
**mine**  98:17
**minimal**  63:1
**minimis**  62:6
  62:18,24
**minor**  233:22
**minute**  23:12
**minutes**  217:22
  232:20
**misleading**
  133:19
**misread**  43:12
  43:14
**missed**  220:20
**missing**  65:13
  165:10

**mississippi**
  2:20,22
**missouri**  1:20
  247:21
**misspeak**  213:9
  223:8
**misspoke**  53:12
  240:3
**misstate**  37:3
**mistake**  174:13
**mistakes**
  176:21
**misunderstood**
  238:23 240:2
**mit**  156:2
**mobile**  35:5
  129:20 130:1,7
  130:12
**models**  157:12
**modern**  133:4
**modules**  132:2
**moment**  65:6
  108:7 109:1
  137:22 180:19
**moments**
  241:11
**monopoly**
  49:23 52:4,20
  53:7,20 56:6
  58:2 77:20
  100:17
**month**  67:21
**months**  21:6
  27:12,17 64:14

  93:2,16 155:9
  155:11 182:20
  183:6 184:8,8
**morning**  7:22
  7:23 127:14,19
**mother**  178:13
**motivation**
  192:9
**mouth**  96:24
  124:20
**move**  46:23
  124:21
**moved**  42:14
**multi**  6:8 33:5
  33:5 181:7
  208:8
**multiple**  6:4
  93:2,16 135:5
  160:23
**multiples**
  201:10
**multiply**
  139:23
**multiplying**
  138:23

**n**

**n**  2:1 3:1 4:1
  7:1 22:20 32:9
  83:10 92:22
  133:7,7,9
  179:7
**najam**  3:14

**name**  7:4 78:5
  83:11 111:5
  132:8 161:2
  179:4 195:21
**named**  24:24
  78:2
**names**  188:20
**national**  155:17
  155:24
**native**  95:3
**nature**  112:20
  114:9
**navigant**
  181:22,23,25
  182:1
**navigate**  57:12
**ncra**  247:19,19
**ne**  6:19 218:7
**near**  76:20
**nearly**  69:17
**necessarily**
  36:23 37:21
  41:23 44:20
  60:9 94:23
  205:24 245:3
**necessary**  27:7
  248:3
**need**  30:10
  38:17 115:1
  133:24 163:11
  198:6 204:8
  215:12 242:16
**needed**  125:6,9

HIGHLY CONFIDENTIAL

**[needs - oath]**                                                                 Page 46

**needs** 34:1
**negatives** 141:8
  141:9
**negligence** 45:2
**neither** 174:18
  247:11,13
**never** 10:1 12:1
  12:25 13:2
  48:12 54:2
  86:4 87:6
  112:1,2 115:3
  137:22 185:6
  195:11 200:12
**new** 1:18,18 3:8
  7:9,9 25:7,9
  34:19,19 43:3
  44:6 45:3 79:1
  79:11 80:7
  81:2 93:8
  102:4 148:13
  168:21 219:17
  219:24 221:21
  222:9,12,19,22
  222:23 225:20
  225:21 226:2
  227:6 229:1
**newer** 178:4
**nice** 177:22
**nine** 155:11
  221:12
**non** 5:24 11:8
  25:1 56:11
  94:15 101:10
  101:15 102:3,5

103:2,9,20
  104:4 112:18
  113:23 134:21
  153:25
**nonbusiness**
  101:11
**nonpartisan**
  155:25
**nonpermanent**
  64:24,25
**nonprofit**
  116:14
**nontangible**
  64:24
**nontechnical**
  46:13 50:18
  117:24
**noon** 56:12,17
  57:21
**nope** 162:1
**norc** 156:12
**normal** 107:3
  182:20
**north** 2:13,20
  2:22
**northern** 155:4
**norton** 2:2,7
**nortonroseful...**
  2:3,4,8
**notarize** 231:10
**notary** 249:19
**notation**
  206:22

**note** 174:8
  186:5 205:9
  231:10
**noted** 7:12
  140:7 235:5
  248:8 249:6
**notes** 135:3
**notice** 1:16
  82:4 140:4
  180:18 206:23
**noticed** 233:13
**notices** 135:1
  139:19 230:10
  239:7
**november** 19:8
  21:6 74:10,12
  76:3 97:18
  109:17 193:12
  218:21 219:11
  219:12,16
  220:25
**number** 5:2 6:3
  13:9,14 18:24
  19:10 25:15
  28:14 29:15
  30:14 34:17
  41:15 42:1
  43:2 65:25
  78:2 102:21
  110:12 117:7
  121:19 123:8
  135:24 136:2,5
  138:5 141:21
  141:25 142:7,9

142:11 143:17
  143:23 145:4
  145:17,23,25
  146:1 171:1,8
  171:18 172:3
  174:18,21
  176:17 195:6
  196:7 198:7
  202:15 203:5
  204:2 206:4,17
  208:21 214:21
  218:5 221:20
  222:8 227:1
  235:15,20,23
**numbers** 63:4
  63:11 95:5,6
  97:10 171:10
  173:2,19
  174:13 175:15
  186:6,7 235:11
  235:12
**numerical**
  176:6
**nw** 2:9
**ny** 3:8

**o**

**o** 7:1 48:1
  83:10 114:4
**oath** 53:18
  102:12 133:10
  141:2,11 144:5
  144:16 148:16
  198:17

HIGHLY CONFIDENTIAL

**[object - oh]**                                                      Page 47

| | | | |
|---|---|---|---|
| **object** 9:10,17 | 101:12 104:7 | 226:4 228:16 | **occurrence** |
| 10:8,23 14:18 | 106:1,13 107:9 | 231:18,25 | 58:21 |
| 15:2 19:3,21 | 112:10 118:14 | 232:11 236:23 | **october** 109:5,7 |
| 23:3 24:16 | 119:11,25 | 240:22 241:24 | 109:8,9,12 |
| 26:21 28:8 | 120:21 121:16 | 242:24 245:14 | 123:21 125:15 |
| 29:4 31:11,14 | 123:4 134:9 | **objecting** 68:7 | 210:3 |
| 32:21 33:7 | 136:8 138:8 | **objection** 13:11 | **odd** 110:25 |
| 34:8 35:12 | 142:1 143:12 | 15:17 16:6,19 | 168:16 170:22 |
| 36:17 37:14 | 144:8,19 145:7 | 17:4,15 18:16 | **offense** 11:6 |
| 39:25 40:12 | 145:21 146:6 | 31:21 35:16 | **offer** 24:6 42:7 |
| 41:4,19 42:4 | 146:23 148:7 | 43:11 120:12 | 48:12 126:6 |
| 44:17 45:7,19 | 149:18 159:8 | 234:21 237:24 | 148:23 150:17 |
| 46:3 50:7,11 | 161:20 162:7 | 238:22 239:5 | 153:10 175:8 |
| 51:5 52:8,21 | 163:5,19 | **objectively** | 193:3,14 194:5 |
| 53:10,23 54:13 | 164:14 165:2 | 156:24 | 194:7,9 199:22 |
| 55:4 57:1 58:3 | 166:23 169:7 | **obligations** | 235:1,8 |
| 58:17 59:10,22 | 169:23 174:24 | 88:24 180:5 | **offered** 36:21 |
| 60:8 62:19 | 177:7 182:17 | **observation** | 126:7 152:14 |
| 63:15,25 64:18 | 183:24 184:10 | 35:20 133:6 | 157:5 246:5 |
| 68:12 70:21 | 184:13 185:4 | **observations** | **offering** 51:20 |
| 71:1,14,23 | 185:15 189:12 | 133:3,11 134:6 | 140:13 175:5 |
| 72:7,17 73:13 | 189:25 190:15 | **observed** 62:7 | 192:14 202:3 |
| 73:18 75:5,12 | 191:15 192:12 | **obvious** 28:1 | **office** 3:15 |
| 75:20 77:6,9 | 192:24 193:21 | **obviously** | **officer** 139:11 |
| 77:14,21 79:12 | 196:2 197:10 | 24:18 38:16 | **official** 97:14 |
| 79:21 80:8 | 197:24 200:6 | 127:9 | 97:17 98:2 |
| 81:3,8,14,20 | 201:21 202:17 | **occasionally** | 230:17 |
| 82:24 84:12 | 208:14 211:15 | 48:9 51:25 | **oftentimes** |
| 85:2 87:17 | 212:3 213:7,22 | 113:2 116:5 | 33:25 |
| 88:6,15 89:7 | 216:9,21 217:7 | 159:23 230:4 | **oh** 59:12 65:15 |
| 90:17 91:23 | 220:19 221:4 | **occasions** 28:4 | 66:8,12 70:13 |
| 92:6 93:18 | 221:14 222:14 | **occur** 84:2 | 70:17 95:3 |
| 94:2 96:10 | 223:13 224:5,8 | **occurred** 175:6 | 100:19 104:23 |
| 97:19 100:22 | 224:16 225:3 | | 113:19 181:16 |

HIGHLY CONFIDENTIAL

**[oh - opinions]**

Page 48

| | | | |
|---|---|---|---|
| 186:24 194:25 | 99:18 100:3 | 195:4,22 203:6 | 116:9 123:11 |
| **okay** 8:4 9:7 | 102:24 104:3 | 203:9,24 204:8 | 196:22 230:11 |
| 11:9,10,21 | 104:24,25 | 204:17,24 | 231:13 |
| 12:7,19 13:19 | 105:8,17 106:9 | 207:15 209:15 | **onward** 25:21 |
| 14:11,22 16:17 | 107:25 108:1,6 | 209:23 210:16 | **open** 43:18 |
| 17:8,11,12 | 108:15,22 | 210:23 212:23 | 80:7 |
| 18:22 20:2,15 | 109:1,2 110:12 | 213:1 214:16 | **operate** 201:9 |
| 21:23 22:6,25 | 110:17 112:16 | 214:18,23 | **operates** 47:5 |
| 23:8,13,14,18 | 113:15,17 | 215:21 217:19 | **operational** |
| 26:2,17 27:20 | 114:22 115:13 | 218:12,15,16 | 169:1 |
| 33:3 34:14 | 116:25 118:23 | 219:1,9,14 | **operations** |
| 38:11 39:11,22 | 121:10 124:7 | 220:15 221:17 | 203:23 |
| 43:2 45:16 | 124:19 127:4 | 221:23 222:7 | **opine** 37:2 |
| 47:14 48:14 | 127:11 129:6 | 222:10,18 | 234:5 236:22 |
| 49:7,17 50:22 | 131:7 132:14 | 223:21 225:19 | **opined** 54:2 |
| 51:22 52:2 | 132:17 137:5 | 226:25 227:21 | **opining** 205:24 |
| 53:16 54:4,21 | 137:16,20,25 | 228:22,24 | **opinion** 36:13 |
| 55:21,24,25 | 143:16 146:3 | 229:16,24 | 37:1,5 42:22 |
| 56:1 57:5,10 | 147:7 148:20 | 230:6 240:17 | 54:9 63:22 |
| 59:18 61:4 | 151:5 152:22 | 241:2 242:6 | 72:13 92:12,14 |
| 62:23 65:5,7 | 153:11 154:4 | **old** 83:17 84:1 | 92:15 93:20,23 |
| 66:5,15 68:2,9 | 155:12 158:22 | 98:16 163:12 | 116:24 126:6 |
| 68:18 69:4,8 | 159:17 160:16 | 177:24 | 138:9 141:6,11 |
| 69:16,21,25 | 160:19 161:8 | **oldest** 168:21 | 145:3 146:1,3 |
| 70:1,16 72:3 | 161:16 163:24 | ██████ 218:18 | 147:7 149:25 |
| 74:4,7,8,20 | 164:9 165:21 | **omfg** 70:11,12 | 150:3,4,8,14,17 |
| 75:25 77:3,25 | 172:4 173:8 | 71:5 148:6,12 | 155:17,24 |
| 78:10,22 79:8 | 175:2 176:7,19 | **omg** 70:17 | 175:8 179:11 |
| 80:21 81:23 | 179:3 180:15 | **once** 13:22 | 185:22 192:8 |
| 82:17 83:25 | 183:4,8 184:23 | 28:17 32:5 | 194:17 206:13 |
| 85:11 89:16,20 | 186:1,8 187:1 | 79:6 172:2 | 243:2 |
| 92:3,22 93:22 | 187:20 189:15 | **ones** 27:13,14 | **opinions** 35:24 |
| 94:24 95:20 | 190:6,20 | 27:15 38:6 | 36:21 41:15,25 |
| 96:19 98:10,13 | 191:10 192:2,8 | 91:16 98:20 | 42:18 51:14,20 |

HIGHLY CONFIDENTIAL

**[opinions - parkway]**                                      Page 49

125:7,10
140:13 143:17
148:22,23,25
151:11 152:14
185:25 192:14
193:3,7,13,14
194:1,6,7,9
199:21 206:2
232:4 234:8,12
234:16,23,24
234:25 235:1,8
**opportunity**
13:1 45:14
82:2 110:22
111:24
**oppose** 93:22
**opposed** 10:19
48:23 108:11
157:12 224:15
246:2
**opposite** 16:24
17:2 65:1
**option** 13:3
87:7 161:23
162:20 219:18
219:25 220:17
221:2 228:9
229:1
**options** 222:23
**oracle** 201:18
202:2
**order** 1:11
17:23 63:4
93:3 171:18

187:23 201:2
217:22 218:11
**ordered** 140:1
**orders** 63:6
**organization**
156:1 219:19
220:1 221:3
**organizations**
226:7,15
**orient** 221:25
**oriented** 14:7
**original** 28:22
74:11 199:6
240:2 248:10
**originally**
132:10 183:11
**ortega** 3:18 7:4
**outcome** 41:7
42:24,24
135:10 139:2
**outlier** 178:12
178:15,23
**outliers** 178:19
178:21
**outlined** 87:13
87:15 193:6
213:17
**output** 21:7
90:1,24 126:24
132:25
**outputs** 90:13
132:9
**outside** 11:7
125:24 139:22

140:21 179:11
195:16 234:7
244:19
**overall** 46:8
244:13
**overlap** 153:7
**overlapping**
135:2
**overwritten**
223:20
**own** 49:2 159:1
170:13 171:8
**owns** 200:20

**p**

**p** 2:1,1 3:1,1
7:1 27:23 32:9
114:4
**p.m.** 82:8,9
114:14,15,17
150:21,22,24
164:7 180:21
180:23,25
217:24,25
218:2 232:23
232:24 233:1
246:10,11
**packages**
131:22 132:5
**page** 4:3,9 5:2
6:3 14:23,23
24:22 28:13,13
29:7,15 30:13
30:14 34:15,17

34:18,23,24,25
35:2 39:3 43:2
50:12 65:16
68:18 69:2,16
74:8,13 78:1,1
79:6 83:9
89:17 95:2,2,4
108:10 109:25
114:7 151:3
219:8 222:7,7
241:9 250:7
**pages** 29:7
36:25 110:5
249:3
**painful** 216:13
**papers** 131:8
**pappu** 72:24
162:23 163:16
163:16,17,17
163:17
**paragraph**
93:8 105:5,7
128:10 173:10
187:24 190:2,6
190:21
**paragraphs**
212:9 221:20
**parens** 43:8,18
43:19 93:6,9
93:10,25 94:1
219:19 221:3
**paribus** 138:3
**parkway** 2:13

HIGHLY CONFIDENTIAL

**[parlance - period]** Page 50

**parlance** 65:4
**part** 10:21 26:7
  34:3 38:6
  42:17,18 44:8
  45:2,3 55:14
  61:9 67:14
  72:6,25 77:12
  81:13 89:1,10
  99:12 104:10
  111:25 112:11
  112:13 118:2
  119:3 123:5
  125:13 135:13
  168:12 177:5
  178:10 181:24
  182:5,20 193:1
  193:5 203:24
  209:2 215:25
  232:4 244:1,13
  245:1
**participants**
  225:9,16,20
  226:2 230:3
**participated**
  98:25 230:3
**particular**
  15:23 21:7
  22:22 26:1
  29:6 34:11
  35:19 39:17
  40:14,21 41:21
  61:2 63:17
  68:14 80:5
  87:21 90:11

  91:25 94:5
  95:17 96:17
  116:11 121:5
  122:3 123:9
  126:3 133:15
  134:18 135:9
  136:6 137:18
  139:6,12,16
  142:20,21
  147:8 153:23
  155:7,22 156:5
  162:9,24,24
  163:7 183:13
  184:20 185:22
  200:1 226:7
  227:11 229:3
  243:21
**particularly**
  29:8 32:24
  51:13 129:9
  179:15 236:20
**parties** 73:21
  111:2 247:12
**partners**
  100:12
**parts** 56:13
  177:10
**party** 56:10,16
  57:21 87:3
  110:23 180:12
  224:20 226:11
**pass** 232:19
  246:6

**passing** 186:12
**past** 48:2 86:22
**patent** 189:2
**patents** 152:25
**patient** 149:22
**pattern** 60:22
  94:8 134:16
  139:12,19
**patterns** 60:21
  139:8
███ 218:17
**pause** 99:22
  114:3 136:18
**paused** 98:8
**pausing** 137:21
**payment** 94:22
  154:23
**paypal** 93:9
  94:17,22
███ 23:19
  24:11,18 29:19
  30:16 31:5,10
  31:19,25 32:9
  32:12,14,18,24
  33:4,10,17,19
  33:20,23 34:4
  39:11 40:14,18
  40:20 41:6,7
  42:10,12,13,24
███ 27:23
  41:1 42:10
**peaks** 176:25
  177:1

**peculiar** 128:18
**peer** 131:14
  ███ 34:20,25
  35:23
**people** 12:8
  39:23 83:1
  93:1 118:16
  122:15 157:13
  166:22 187:6
  201:20 223:10
  227:17
**people's** 193:18
**percent** 63:2,9
  63:11,12,23
  111:16,18
  112:4,7 133:12
  160:2,3,6,11,14
  169:24
**percentage**
  102:12 111:8
  111:13 209:8
**percentages**
  102:15
**percentagewise**
  174:22
**perfect** 134:16
  158:19
**perform** 46:25
  48:18 200:4
**period** 11:13,15
  21:5 23:16
  43:20 55:11
  58:7,25 61:15
  63:18 64:12

Golkow Technologies,
A Veritext Division

HIGHLY CONFIDENTIAL

**[period - policies]**                                          Page 51

| | | | |
|---|---|---|---|
| 85:6 90:3 93:7 | 101:16 102:8 | 141:19,21,23 | **platform** 72:5 |
| 119:9 128:4,5 | 103:21 104:5 | 142:4,18,23,25 | 94:22 |
| 134:15 136:24 | 108:23 113:24 | 218:17,24 | **platforms** 96:7 |
| 137:2,3 140:10 | 114:9 201:1 | 219:3 | **play** 53:16 |
| 140:24 141:3 | 203:16 234:8 | **pichai's** 140:5 | 245:22 |
| 142:5,5,19,20 | **personally** | **picked** 72:15 | **please** 11:5 |
| 142:22 146:15 | 11:15 32:2 | **picky** 187:1 | 138:13 188:9 |
| 170:22 171:2 | 92:7,11 158:25 | **picture** 16:21 | 248:2,6 |
| 183:5,9,19 | **persons** 49:14 | 17:21 209:15 | ■ 24:24,25 |
| 184:7,17 | 49:18 | **pictures** 114:10 | 29:16,18 |
| 185:11 191:23 | **perspective** | **pieces** 59:7 | **pllc** 2:11,16 |
| 193:23 194:2 | 179:23 | 60:25 243:7 | **plus** 92:16,17 |
| 205:9,11 208:9 | **petabyte** 6:15 | **place** 183:15 | **point** 27:19 |
| 208:13 212:6 | 201:13 202:12 | 211:23 214:6,7 | 36:3 42:16 |
| 222:16 228:14 | 202:15 203:13 | 214:13,14,15 | 47:16 58:19 |
| 228:19 | 203:20 | 214:18 215:1 | 86:19 91:9 |
| **periods** 98:8 | **petabytes** | 247:10 | 113:8 132:11 |
| 130:17 179:19 | 201:2,15 203:1 | **placed** 181:2,16 | 137:8 147:24 |
| **permanent** | **pham** 3:15 | 181:17 183:10 | 171:12 185:19 |
| 64:11,13 65:1 | **pharmaceutical** | 218:4 | 192:2 206:4,5 |
| **permanently** | 151:25 | **plain** 195:20 | 224:9 237:15 |
| 24:8 | **phased** 128:3 | 225:14 229:9 | **pointed** 27:25 |
| **person** 5:10,10 | **phone** 72:16 | 229:11 | 121:19 191:18 |
| 5:11,11 8:14 | **photos** 113:24 | **plainly** 84:25 | **pointing** 65:22 |
| 9:5,18 11:5 | **phrase** 37:6,8,9 | **plaintiff** 52:6 | 94:4 195:8 |
| 43:4 49:22,24 | 37:12 38:10 | 52:18 | **points** 56:7 |
| 50:2,4 83:13 | 69:12 70:10 | **plaintiff's** | 58:20 137:6 |
| 100:9 107:6 | 80:2 | 106:5,10 165:9 | **poker** 59:18 |
| 128:20 148:22 | **physician** | **plaintiffs** 1:5 | **poland** 12:6 |
| 209:12 | 139:18 | 7:19 52:18 | **policies** 97:8 |
| **person's** 8:12 | **pi** 24:24 | 150:15 165:8 | 123:8 141:16 |
| **personal** 11:19 | **pichai** 139:7 | **plan** 80:6 81:13 | 141:17 163:4 |
| 11:20 29:9 | 140:2,6,9,23 | **plat** 68:25 69:5 | 191:20,22 |
| 57:8,9 80:10 | 141:6,7,11,17 | 69:13 | 220:11 221:21 |

HIGHLY CONFIDENTIAL

**[policy - preserved]**                                                    Page 52

**policy** 5:19 6:9
  24:5 26:25
  27:9,18 31:20
  44:21 59:24
  72:21 73:7
  85:4,23,24
  86:1,9 87:11
  97:15,16,17,21
  97:25 98:2,12
  98:13 99:5,23
  99:24 124:14
  124:25 167:18
  181:8 182:20
  191:14 195:17
  195:19,21
  212:6 213:16
  216:17 222:9
  222:12,19,22
  227:6 230:18
  230:25 231:2
**political** 216:4
**poor** 122:12
**population**
  157:18,20
  159:7,12,14,21
  159:22,24
  160:1 198:2,6
  198:7,12
  236:19,25
  243:10,23
  244:16,21
**populations**
  156:23

**portion** 16:7
  18:17,19
**portions** 58:10
  58:12
**posed** 134:12
**position** 156:2
  156:10
**posner** 154:21
  155:1,18,23
  156:21
**posner's**
  155:16 156:8,9
**possibilities**
  75:22 76:8
**possibility** 10:6
  58:19 75:25
  76:10 91:3
  213:16
**possible** 19:19
  58:9,11,19
  59:2 76:7,12
  85:8 90:7 91:9
  94:10,11,12
  103:17 117:5
  157:24,25
  158:5,10,13,25
  159:10,12,22
  210:8 213:18
  213:21 214:3
  217:18 226:22
**possibly** 53:22
**post** 86:9
  107:19 219:20

**posted** 90:5,7
  114:6
**postings** 107:11
**pot** 59:15,16
**potentially**
  11:15 15:4
  91:20,21 92:5
  167:15 175:24
**power** 77:20
  133:12 201:10
**powered**
  131:17
**practice** 48:5
  111:25 157:4
  206:22
**practices** 8:19
  9:9 153:13
**pre** 49:14 55:25
  58:11 87:22
  120:18 231:16
  232:10 238:13
  239:3,25
  240:21 241:3
**precedence**
  147:4
**precisely**
  136:18
**preference**
  28:22
**preferred**
  33:13
**preparation**
  8:3

**prepared** 50:13
**preparing**
  18:25
**present** 3:11
  90:16 153:19
  185:18
**presented**
  131:10
**preservation**
  41:12 47:8
  50:24 64:12
  107:11 115:20
  148:1 150:15
  229:21 239:10
**preserve** 8:7,10
  8:13,15 9:3,16
  10:20 36:15
  42:14 150:6
  231:16,23
  232:9 238:12
  239:24 240:20
  241:22 242:11
**preserved** 10:7
  26:9 28:10
  54:11,16 55:8
  57:18,22 58:1
  58:13 62:8
  73:2 75:19
  93:10 94:18
  95:24 98:8,18
  99:3 182:20
  185:7,9,11,13
  239:14

HIGHLY CONFIDENTIAL

**[preserves - professor]**                                                   Page 53

**preserves**
  20:24 58:12
**preserving**
  7:25 8:22
**president**
  153:16
**press**  195:17
  201:24 202:6
**presumably**
  15:6,22 167:8
  243:24
**presume**  66:17
**pretend**  229:25
**pretending**
  105:19 106:6
**pretty**  27:19
  31:3 69:17
  70:3 116:12
  132:24 142:20
  160:9 163:16
  169:25 192:3
  198:1 209:15
  211:11
**prevent**  23:20
**previous**  18:18
  25:7,10 30:7,7
  30:25 31:25
  32:3 57:4,14
  57:19 68:23
  90:23 92:25
  93:9,15 100:15
  164:16 194:6
  197:12 223:17
  226:13 229:10

  246:5
**previously**  32:4
  90:24 139:15
  225:8
**price**  105:14,19
  105:20 106:6
**primary**
  112:21 154:8
**principles**
  116:20
**print**  95:9
**printed**  13:14
  65:8
**prior**  27:3
  28:18 62:10
  63:10,13,24
  65:14 75:10
  85:19 88:14
  89:5 93:3,16
  96:23 102:25
  119:9 121:11
  125:4 141:5,12
  142:25 143:9
  145:17 154:10
  154:17 191:14
  192:2 209:12
  212:11 221:9
  223:20 247:4
**private**  29:8
**privilege**
  119:25 137:21
  188:11
**privileges**
  223:11

**privy**  194:22
**probably**  12:7
  16:11 17:24
  52:13 59:3
  101:11,19
  105:21 108:14
  117:7 131:19
  132:3,5 147:17
  150:18 167:14
  176:21 177:23
  182:4 220:22
**probative**
  121:12
**problem**  68:6
**problems**  48:22
  48:23
**procedures**
  116:5
**proceed**  114:22
**proceedings**
  156:7
**process**  73:24
  244:23
**produced**  6:5,7
  13:15,16,18,21
  14:23 19:1
  20:21 21:20
  42:15 46:10
  49:10 68:14
  71:22 72:9
  73:8,10,22
  75:9 95:3
  97:10 107:3
  108:23 135:2

  136:4,6,12
  140:18 171:16
  171:20 172:9
  172:19,21
  173:2 174:4
  175:3,22,24
  176:24,25
  192:10 198:8
  205:5,6,21
  207:3 235:17
  244:1
**product**  179:14
  180:2,10
  206:23 207:4
**production**
  20:20 73:24
  198:5 206:6,10
**products**  47:13
  50:3 54:25
  67:22 189:20
**prof**  6:16
**professional**
  54:6 109:16
  125:17 126:8
  152:13 153:11
  155:19 160:10
**professionally**
  48:13 112:5
**professor**  58:20
  58:23 59:4
  60:13 61:14,25
  62:6,16 109:5
  120:4 121:2
  122:22 123:1

HIGHLY CONFIDENTIAL

**[professor - pursuant]**                                                Page 54

123:19 124:2,7
124:12,13,23
125:10,11,14
125:23,25
126:15,21
129:1 134:15
135:1,7,12,20
136:20 137:3,5
137:14,19
138:6,10,16,18
139:19,24
142:16 143:21
144:22 147:15
154:19,25
155:12,16,23
156:2,8 170:7
170:12,18
171:3,9,14
172:6,19 173:6
174:6,12
175:14 176:2
191:23 193:10
194:14,18
196:11,13,17
196:22 197:1,6
198:9,11,16,18
208:25 210:2
211:18,23
212:17 213:3
213:20 217:4,9
236:9,15,18
242:17,22
243:2,23 244:4
244:8,15

245:10,19
**program**  44:15
48:1 131:16
132:17 167:10
167:12 223:10
**programmer**
48:4,11
**programming**
47:14,24 48:10
48:22 125:20
**programs**
128:13,18
130:19
**progresses**
176:20
**prohibited**
238:5
**project**  179:3,4
179:12
**projects**  153:23
155:6 157:8
**promise**  11:3
36:24 48:15
65:6 95:21
**promo**  164:11
**pronunciation**
43:6
**property**
116:11 152:2
**proposed**
171:13
**propounded**
249:5

**pros**  92:10
**protections**
116:10
**protective**  1:11
**prove**  160:1
**provide**  121:3
122:4 125:9
148:2 149:10
149:16 150:5
194:1 236:18
237:2 243:13
**provided**  49:4
109:18 119:4
120:6 161:6
169:11,11
191:3 230:14
**providing**
200:24
**proxy**  158:15
**pub**  66:25
105:20
**public**  219:2
249:19
**publication**
181:23,24
**publications**
67:4 116:13,16
**publicizing**
215:12
**publish**  181:9
**published**
131:8,9,13
137:9 181:20
181:21

**publisher**
106:6
**publishers**  67:6
67:8 68:3,11
70:2 72:5
**pubs**  66:23
68:3
**pull**  103:18
160:19
**pulled**  20:17
183:23 214:20
**punished**  146:5
146:22
**punt**  79:1
**pure**  197:4
**purely**  111:22
112:1 241:19
**purport**  152:17
**purported**
125:20
**purports**
206:18
**purpose**  98:9
134:25 144:24
178:15
**purposes**  46:24
101:10,11
118:5 173:7
184:1 192:13
200:22 205:11
208:9 212:5
221:10
**pursuant**  1:11
1:16

HIGHLY CONFIDENTIAL

[put - read]                                                          Page 55

**put**   13:7 26:14
    31:12,15 46:16
    47:3 48:21
    49:22 56:18
    81:23 84:25
    86:17 87:4
    91:4 96:24
    101:11,20
    104:18 108:6
    108:15 113:20
    124:20 126:13
    143:22 144:23
    146:21 157:11
    166:14 173:13
    183:14 195:25
    196:11,14,19
    198:20 199:16
    199:18 200:1
    227:3 229:16
    231:3 246:4
**puts**   24:15
**putting**   135:6
**python**   48:8
    131:21

**q**

**queries**   133:5
**question**   9:1
    11:24 12:11
    14:14 15:13
    17:11 20:25
    21:24 23:19
    41:11 47:19
    62:13 66:21,24

    78:11,18 79:24
    83:15 85:18
    86:12 95:10
    96:22 100:23
    102:18 106:22
    113:11,22
    116:18 120:23
    122:13 125:5
    126:3 127:1,21
    130:16 133:14
    133:16,25
    134:1,3,4,12
    136:18 141:9
    143:4 144:14
    149:5,12
    151:14 157:21
    159:13,14
    164:2 169:15
    169:16,17
    172:18 174:2
    175:20 182:11
    182:12 184:24
    184:25 187:10
    192:17 193:1,5
    195:12 206:1
    220:14,21,21
    236:2,3,6
    238:9,9,14,24
    239:2,4,21
    240:1,3,4,15
    241:3,14,17
    245:19
**question's**
    182:23

**questioned**
    220:10
**questioners**
    156:24
**questioning**
    242:16
**questions**   11:2
    13:17 36:12
    95:8,12 101:3
    108:9 115:1
    129:18 130:4,9
    133:19 149:23
    150:13 159:15
    166:18 176:14
    179:9 182:9
    233:5 235:9
    237:4,6,23
    239:18 245:18
    246:7 249:5
**quibble**   142:13
    173:5,18 174:9
    174:14 178:20
**quick**   78:16
    132:24 209:15
**quote**   23:20
    30:17 98:7
    190:24 224:12
**quotes**   242:13
**quoting**   83:15

**r**

**r**   2:1 3:1 7:1
    22:19,20,20
    76:21 78:3

    83:10 114:4
    131:21 179:7
**rachel**   2:16
**rachel.lanier**
    2:17
**raise**   89:22
**raising**   35:24
    ██████████
    91:18 92:4,8
**range**   228:23
    242:7
**rare**   58:21
**rarely**   60:3
**rate**   62:5,17
    116:25 139:15
**rather**   32:25
    88:1
**reach**   13:6 61:6
    125:2,6 133:13
    134:8 140:8,22
**reached**   125:3
    125:16 143:16
**reactions**   148:9
**read**   16:20,25
    22:15 29:25
    33:5 42:22,23
    42:23 66:4
    74:24 79:5
    83:12 86:13,15
    92:9 95:9
    114:7 116:20
    119:15,16
    120:22 124:9
    127:20 132:10

HIGHLY CONFIDENTIAL

**[read - record]**                                                      Page 56

| | | | |
|---|---|---|---|
| 148:5,14 | 76:9,18 80:9 | **rebut** 148:16 | 242:3,18 |
| 162:10 163:22 | 92:19 95:9 | 149:10,16 | **recalled** 10:9 |
| 187:4,21 | 97:13 132:3 | 193:9 | **receipt** 248:12 |
| 190:17,21 | 146:9 162:8,13 | **rebuttal** 147:11 | **received** 73:1 |
| 195:17 209:16 | 163:6 164:20 | 148:2 149:14 | 99:1,12 135:4 |
| 209:16 225:14 | 178:18 180:14 | 149:15 | 142:8 169:6,21 |
| 226:9 234:12 | 194:5 201:25 | **recall** 11:12,13 | 170:14,21 |
| 234:18 248:2 | 212:19 224:22 | 13:4 18:19 | 171:10 195:14 |
| 249:3 | **realtime** 1:20 | 20:6,9 24:9 | 230:1 |
| **reading** 87:25 | 247:3,19 | 38:9,9 47:17 | **receives** 168:3 |
| 88:1 96:13 | **reason** 10:25 | 72:23 88:3,8,9 | **receiving** 230:2 |
| 175:13,17 | 14:12 33:21 | 88:11 97:20 | 239:8 |
| 201:24 202:6 | 67:8 73:10,15 | 103:23 108:16 | **recess** 38:21 |
| 219:14 225:4 | 85:24 89:3 | 108:25 109:4 | 82:9 114:15 |
| 250:5 | 92:3 93:14,19 | 109:11 124:16 | 150:22 180:23 |
| **reads** 92:23 | 93:22 94:8 | 127:5,16,17,19 | 217:25 232:24 |
| **ready** 101:7 | 97:21 104:9 | 128:8,9,11,25 | **recipients** |
| 114:22 245:7 | 110:23 124:17 | 129:4,9 132:7 | 232:3 |
| **real** 53:5 108:6 | 156:13 173:2 | 132:24 140:6 | **recite** 46:19 |
| 214:1 | 174:11,14 | 142:9 143:21 | **recognize** |
| **realize** 32:15 | 178:25 179:2 | 148:8 159:9 | 161:2 |
| 33:25 52:18 | 185:13 188:22 | 173:5 189:9 | **recollection** |
| 101:23 | 191:8 199:15 | 191:6 195:21 | 10:14 19:9,15 |
| **realized** 71:21 | 200:8,10 203:5 | 196:9,12 205:7 | 67:22 95:14,17 |
| 80:5 | 210:11 211:11 | 207:24 209:24 | 128:2,6 129:23 |
| **realizes** 32:3,18 | 211:12 242:21 | 210:2 211:18 | 162:5 173:21 |
| **realizing** 33:12 | 248:4 250:7 | 212:4,7 220:8 | 242:1 |
| **really** 8:17 15:3 | **reasonable** 9:6 | 227:11 228:19 | **recommendat...** |
| 36:7 40:21 | 9:19 73:17 | 231:19 232:13 | 155:16 |
| 41:6,9,10 | 76:16,21,22 | 232:18 234:2 | **recommended** |
| 42:11 45:8 | 126:7 158:22 | 235:13 236:6 | 155:23 156:9 |
| 52:22 54:1 | 224:19 | 236:11 237:6 | 156:12 |
| 57:8 64:16 | **reasons** 104:10 | 237:20 238:14 | **record** 7:3,13 |
| 69:6 75:21 | 211:20 244:22 | 238:15,17 | 18:23 23:11 |

HIGHLY CONFIDENTIAL

**[record - reply]**                                    Page 57

38:20,23 60:19
65:10 74:5
82:8,11 96:20
98:19,23 99:4
114:14,17
144:15 150:21
150:24 160:18
180:19,22,25
186:5 190:24
191:4 217:24
218:2 232:23
233:1 246:10
**recorded**  160:9
**records**  42:19
89:22
**redacted**
232:16
**reddy**  3:16
**redirect**  204:13
217:20
**refer**  64:11
127:8 233:16
**reference**  48:9
64:11 69:22
105:13,14
116:2,24
135:20 207:1
222:21
**referenced**  96:1
104:13 116:2
123:24 161:5
163:8 185:21
229:14

**references**  24:9
37:15 38:3,7
120:6 129:14
163:21 186:25
200:25
**referencing**
69:13 162:25
187:13
**referred**  235:16
**referring**  45:18
75:3 231:12
242:6,8
**refers**  44:12
67:8 226:10
**reformulate**
122:13
**refresh**  162:4
**regard**  77:1
**registered**  1:19
247:2,19
**regulated**
89:10
**regulations**
94:21 147:4
**regulatory**  6:9
181:8 188:25
189:17,24
**relate**  67:17
106:6 116:9
**related**  38:8
45:13 67:15,18
102:5 116:5
134:22 155:18
157:8 164:11

165:25 180:5
200:25 206:14
208:3 239:12
244:6
**relative**  16:21
17:5 203:15,15
224:21 247:11
247:13
**relatively**  58:21
62:6,18 135:9
159:2 170:16
**relaxing**  217:2
**relevance**
36:20 54:2
68:16 140:13
140:20 179:10
206:2,13
**relevant**  10:6
36:14,16 37:1
41:25 42:5
52:6,19 53:6
53:22 54:8
68:11 106:10
139:14 140:2,9
141:22 143:6,7
148:23 150:10
191:22 192:8
192:21 199:12
199:19 200:3
205:25
**reliable**  125:17
157:24 158:5,9
158:12,20

**relied**  95:15,18
122:10 137:19
173:17 206:25
208:2 242:2
**relies**  196:6
**rely**  199:14
**relying**  199:25
**remain**  91:21
92:4
**remains**  91:19
**remark**  176:13
**remember**  39:7
39:9 85:13
125:19 172:21
172:24 220:4
**remind**  11:23
**remove**  174:17
209:20
**removed**  65:15
**removing**
148:12
**rendered**
151:10
**repeat**  35:18
151:14
**repeated**  239:2
**replacing**  57:15
**replicated**
175:17
**replies**  216:3
**reply**  124:7
148:24 175:23
188:3

HIGHLY CONFIDENTIAL

**[report - retained]**                                                    Page 58

| | | | |
|---|---|---|---|
| **report**  6:16,20 | 235:5,7 242:14 | 243:9,12,23 | **responded** |
| 19:8 24:5 | 242:21 243:13 | 246:2 | 237:23 |
| 46:16 48:22 | 243:17 | **represented** | **responds** |
| 51:11 58:20 | **reported**  174:8 | 18:14 | 134:21 |
| 72:19 96:1 | 249:11 | **representing** | **response**  27:23 |
| 101:7,14 104:1 | **reporter**  1:20 | 67:7 147:21 | 83:25 242:15 |
| 109:6,8,18 | 1:20,21,21 4:7 | **represents** | **rest**  71:12,13 |
| 110:18 111:11 | 7:14 18:9 | 13:20 | 175:24 |
| 111:19,20 | 127:2 132:14 | **request**  96:9 | **result**  22:7 |
| 112:2 117:19 | 156:14 176:12 | **require**  222:25 | 111:10 157:11 |
| 122:1,15 | 247:2,3,3,4,19 | 224:3,11 | 213:21 |
| 123:23 124:8,9 | 247:19,20,20 | **required** | **results**  131:16 |
| 126:13 128:11 | 247:21,21 | 200:15 | **resumé**  109:22 |
| 129:1 130:25 | **reporting** | **requirement** | 114:24 |
| 134:13 135:20 | 105:20 106:7 | 27:6 | **retain**  31:10 |
| 136:14 138:14 | **reports**  110:20 | **requirements** | 34:5 36:15 |
| 140:8 141:15 | 112:9 | 115:20 229:22 | 40:25 84:3,18 |
| 147:11,14,25 | **represent** | **research** | 84:23 200:15 |
| 148:3,6,15 | 14:22,24 21:2 | 131:12 151:3,9 | 204:1 |
| 149:14,16 | 68:3,5 97:4,13 | 153:2 154:18 | **retained**  25:22 |
| 161:5 165:9 | 107:4 141:22 | 155:10,17,24 | 26:20 27:4 |
| 184:1 186:15 | 147:23 172:5 | 156:1 | 33:15 34:1 |
| 192:4,4 193:6 | 172:25 187:18 | **researcher** | 41:2,16 42:1 |
| 193:12 195:10 | 203:4 206:16 | 244:22 245:2 | 50:6,10 56:18 |
| 196:16,23 | 209:21 212:16 | 246:1 | 56:20 75:11 |
| 198:1,12,14 | 227:1 | **resemble**  70:24 | 84:9,10,25 |
| 205:4,9,16 | **representation** | **reset**  24:7 | 86:8 90:14 |
| 206:6,9,15 | 13:12 193:1 | 28:22 | 91:8 98:24 |
| 209:19,22 | **representations** | **resetting**  29:2 | 100:21 103:1,2 |
| 210:3 227:2,9 | 15:18 106:14 | **respect**  76:25 | 121:8 128:24 |
| 230:11 231:8 | **representative** | 111:14 134:14 | 138:7 140:16 |
| 231:13,14 | 158:16,17 | 142:18 194:17 | 140:17,23 |
| 233:6,10,13 | 159:7,14 | **respects**  48:11 | 141:8,12,25 |
| 234:16,18,19 | 205:12 236:25 | | 142:15 143:2 |

**[retained - right]**                                                      Page 59

| | | | |
|---|---|---|---|
| 143:10,17 | 48:18 52:16 | **reviews**   164:11 | 77:20 78:20 |
| 144:1,3,6,17 | 74:5 96:22 | **revised**   198:25 | 79:6,20 80:7 |
| 145:5,20 170:7 | 101:6 118:23 | 199:2,5,5 | 80:24 81:2,7 |
| 170:14,14,21 | 125:6,9 180:6 | **revolutionary** | 81:13 82:3,7 |
| 170:22 171:10 | 189:1 232:16 | 189:20 | 82:10,18 83:8 |
| 171:11 183:11 | 233:13 240:7 | **right**   8:7 9:14 | 86:4 89:13,17 |
| 197:9 212:1 | **reviewed**   8:2 | 9:23,24 10:18 | 90:6,14,16 |
| 213:3,4,17 | 19:6 20:15 | 10:22 14:9 | 91:8 94:15 |
| 215:18 216:7 | 23:7 38:6 42:6 | 16:5 17:3,9 | 96:16,25 97:9 |
| 216:11,20 | 45:12,22 47:9 | 19:20 21:11 | 97:20,24 98:11 |
| 217:6,14,15 | 47:11 57:6 | 22:2,9,12,21,22 | 99:4,14,17 |
| **retaining**   146:5 | 59:5 62:21 | 23:16 24:12,17 | 100:13,16,21 |
| **retains**   31:10 | 67:19 80:17 | 25:2,5 29:12 | 102:1,19 103:2 |
| 84:2 | 88:17 89:18 | 29:17 30:11 | 103:15 106:12 |
| **retention**   5:19 | 96:3,16 97:6,7 | 31:7 32:17 | 107:5 108:3,20 |
| 28:7 31:20 | 104:10,14 | 33:1,9 34:2,7 | 109:2,22 110:6 |
| 38:3 40:8 | 118:16 122:3 | 34:10 38:9,19 | 110:14,16 |
| 89:22 97:7,25 | 123:15 124:14 | 38:22 40:6 | 111:3,21 112:9 |
| 98:8 99:5 | 124:24,24 | 41:8 44:11 | 113:4,19,20,24 |
| 109:10 124:14 | 125:1 126:1,5 | 45:18 49:18 | 114:13,16,24 |
| 124:25 141:17 | 126:24 131:14 | 51:19,23 52:7 | 116:21 118:13 |
| 167:18 179:19 | 165:7 171:23 | 52:20 54:8,12 | 118:17 122:7 |
| 182:14 183:5 | 207:21 208:4 | 55:2,21 56:14 | 122:18 124:21 |
| 183:19 184:7 | 218:15 230:9 | 56:21,23 57:23 | 124:22 125:18 |
| 190:23 214:1 | 230:11,24 | 58:16 60:7 | 126:15,20 |
| 215:17 230:18 | 231:1,4,5 | 61:12,13,18,22 | 127:1,2,12 |
| 230:24 231:2 | 232:7,13 | 62:11,18 64:1 | 129:17 132:18 |
| 238:5 | 234:15 235:5 | 64:17,25 65:1 | 132:21,25 |
| **retractively** | 238:10,17 | 65:2 66:6,23 | 135:21 136:19 |
| 182:19 | 239:23 240:18 | 68:11 70:17 | 138:4 141:20 |
| **return**   248:10 | **reviewing** | 71:9,10,22 | 142:13,17,22 |
| **reverse**   187:23 | 19:10 141:16 | 73:10,12 74:17 | 142:23 143:2 |
| **review**   19:1 | 242:1 | 74:18 75:9,11 | 143:10,18,20 |
| 31:2 47:20 | | 76:6,24 77:5 | 143:24 145:6 |

HIGHLY CONFIDENTIAL

**[right - sarcasm]**

Page 60

| | | | |
|---|---|---|---|
| 147:19 148:12 | 212:19 213:21 | **roles**  138:15 | 169:19 173:11 |
| 148:17 150:20 | 214:3 216:7 | 243:15 | 242:16 |
| 150:23 152:18 | 217:23 218:1 | **roll**  220:17 | **rung**  105:21 |
| 154:19,22 | 219:4 220:13 | **rolled**  168:20 | **running**  49:3 |
| 156:2,6 157:22 | 221:9,24 222:5 | 226:8 | **runs**  118:8,10 |
| 157:22 159:18 | 222:20 223:18 | **rolling**  219:17 | **ryan**  3:5 |
| 160:2 161:9,19 | 224:4,9,18,23 | 221:1,20 | **ryan.hicks**  3:6 |
| 161:24 162:17 | 225:2 226:3 | **room**  37:18 | **s** |
| 163:3,6,18 | 228:15 229:14 | 74:15 78:25 | **s**  2:1 3:1 5:1 6:1 |
| 165:1,14 167:8 | 230:8 231:24 | 79:10,20 80:6 | 7:1 32:9 78:3 |
| 168:8,11,13,17 | 232:10,22,25 | 80:7 81:2,2,17 | 83:10,10 92:22 |
| 168:21 169:5 | 233:7 238:14 | 98:24 99:11,24 | 114:4,4 132:15 |
| 170:23 171:6 | 240:1,4,21 | 162:25 241:13 | 132:15,15,15 |
| 171:24 172:7 | 241:4,18 | **rooms**  98:20 | 132:15,16,16 |
| 172:10 174:7 | 242:12 244:5 | 99:19 161:23 | **sam**  2:13 |
| 175:9,12,21,21 | 245:13 246:8,9 | 161:25 162:20 | **sample**  157:19 |
| 176:1,3 178:15 | **rights**  223:18 | **rose**  2:2,7 | 157:24 158:1,5 |
| 178:17,21 | **rigor**  156:25 | **rosica**  3:17 | 158:9,12,16,24 |
| 179:19 180:24 | 157:1 | **rough**  13:20 | 159:3,12,17 |
| 181:2 185:3,10 | **ring**  96:14 | 44:4,5 63:6,11 | 236:17,22,24 |
| 185:14 187:4,9 | 195:18 228:21 | **roughly**  128:6 | 242:17,22,23 |
| 187:18 188:6 | **rings**  187:3 | 129:13 133:3 | 243:2,3,4,4,8 |
| 189:17 191:10 | **rita**  105:6 | 143:21 174:22 | 244:3,7,9,14,15 |
| 191:12 192:6 | **river**  13:8 | 228:19 | 244:18,20,23 |
| 194:12 195:3,7 | **rmr**  249:11 | **round**  16:3,3 | 244:25 245:1,9 |
| 197:11,23 | **road**  2:17 | **rpo**  215:12 | 245:16,22,24 |
| 198:23 200:5 | **rob**  104:23 | 216:16 | 246:1,2 |
| 201:8,20 202:8 | **rob.mccallum** | **rtb**  105:19 | **sampling** |
| 202:13 203:6 | 3:4 | **rule**  178:19 | 157:22,22 |
| 203:10,15 | **robert**  3:3 | 213:21 | ████  83:16 |
| 205:7 207:8,10 | **role**  138:22 | **rules**  25:9 | 83:16 |
| 208:21 209:13 | 139:7,10 | 214:1 215:16 | **sarcasm**  162:13 |
| 210:4,6,16 | 140:21 155:1 | **run**  105:21 | |
| 211:22 212:1 | 166:20 234:7 | 126:14 169:4 | |

HIGHLY CONFIDENTIAL

**[sarcastic - see]**                                          Page 61

**sarcastic**  40:17
**sas**  48:7 131:15
　　131:18 132:3,5
　　132:6,7,14,17
　　132:19,21,23
**save**  36:12 96:4
　　96:4 101:5
　　166:17 172:2
　　176:13 204:13
**saved**  30:3,3,18
　　107:18 185:5
**saves**  104:17
**saw**  48:14
　　173:23 227:9
**saying**  11:20
　　20:4 24:11
　　32:15 53:7,8
　　53:19,20 74:17
　　84:7 92:1
　　125:22 146:14
　　162:23,25
　　177:22 195:2
　　214:21 226:20
　　241:14
**says**  7:19 22:16
　　22:16,23,23
　　25:2 27:25
　　28:3,17,17
　　29:18,19,24
　　30:1,16 31:6,8
　　31:12 33:20,25
　　35:5 43:17
　　44:6 45:16
　　49:22,25 50:3

50:4 56:5,7,9
66:11,18 70:3
70:8 71:5
74:14 75:1,4,4
76:21 78:4,11
78:22,24 79:8
79:14 81:4
83:16,25 84:17
85:14 89:21
91:12,14,19
92:16,25 99:11
105:18 124:13
124:17 136:21
140:15 155:9
161:22 162:16
162:19 163:2
163:24 164:10
187:11 188:2
188:14,16,24
189:19 190:3,3
190:7,22
212:20,22
213:20 215:12
216:15 217:2
219:7,10
222:23 225:15
225:19 227:14
229:9
**scale**  201:19
**scales**  201:9,16
**scenario**  32:16
　　33:6 85:19
　　100:21

**schedule**  109:18,20,21
　　122:1 206:8,24
　　206:24,25
　　207:8,9
**schedules**
　　150:16 206:22
　　207:4
**scheme**  105:15
**school**  62:24
　　154:22,24
　　155:1 202:13
**science**  157:3
**sciences**  153:22
　　160:11
**scientific**
　　156:25
**scientifically**
　　126:6
**scientists**  160:4
　　160:5
**scope**  36:13
　　125:24 166:20
　　174:7 192:21
　　192:22 195:10
　　244:19
**scratch**  172:23
　　191:13
**screen**  14:7
　　15:8 39:1
　　98:16 160:16
　　202:23 203:2
　　227:24

**scroll**  70:2
　　71:12 91:13
**sdj**  1:6
**se**  37:22 42:18
　　178:19
**sean**  1:7
**search**  167:21
　　167:23 206:16
　　206:19 207:7
　　207:12,18
**searched**  93:2
**searches**  93:15
**sec**  215:7
**second**  24:22
　　27:6 45:3 51:3
　　68:18 99:8
　　105:17,20
　　106:6 189:19
　　193:5 224:23
**seconds**  70:8
　　71:5,10 133:1
　　133:5
**secret**  37:17,21
　　116:10
**section**  46:16
　　88:17 98:6
　　123:15 184:1
　　230:19
**sedona**  115:22
　　115:24,25
　　116:6,19
**see**  13:9 14:1,6
　　14:7,24 20:10
　　21:10,11 22:2

**[see - sense]**                                                    Page 62

22:5 23:18,22
24:18 27:23
28:17,25 29:5
29:22,23 30:2
30:19 31:15,19
31:22 34:3,21
35:4,8 36:20
39:10,14,15
40:19 42:10
43:7,10,17,21
44:9 45:22
50:13 61:6,6
61:20,21 62:1
66:16,20,21,24
68:13 69:3,19
69:19,21,24,25
70:4,6,7,9
74:13,15,22
77:19 78:13,14
78:17 81:15
83:5,12,14,19
83:20 84:5,6
84:19,20 91:25
92:9,15,23
93:12,13 96:5
96:25 100:7
101:4,5 103:6
103:22 105:18
107:5 121:5
124:7 130:10
131:7 134:6
148:23 162:2,3
162:16,19,21
163:10,14,15

163:20,21
164:1,2,20
176:20,24
178:13 187:6
187:11 188:2,3
188:12,13
189:4,18 190:9
190:10,22
191:1,11 196:6
198:20 208:24
210:21,22
211:2,5,9,10,21
212:13 214:6,9
215:5,6,24
216:2,5,18
218:8 219:9,10
219:22 220:2
222:18,20,21
222:23 223:3,4
223:16 225:11
225:22 227:4
227:19,20
228:2,7,11,25
229:5 230:18
**seeing**  14:20
18:19 20:6
24:9 31:24
35:18 71:17
80:13 95:14
97:21 140:6
209:24 227:11
237:20
**seek**  245:6

**seem**  44:14
57:7 83:2
89:24 163:2
**seemed**  28:4
187:1 226:13
**seems**  11:6
22:11 24:20
29:10 31:3
32:24 33:18
35:25 53:4
76:15 89:21
90:20 91:12
124:19 162:12
176:11 220:12
**seen**  14:12
18:13 19:11,14
20:3 23:4,5
38:5,7 42:9
52:15 65:14
80:18 95:8,10
95:19,25 96:12
97:2 102:1,17
102:17,19,21
102:23 103:18
103:24,25
104:2 108:22
124:13 129:13
137:10,11
143:18 147:12
147:16 158:25
172:10 185:21
186:9,12,14,25
194:15 195:25
198:18 200:25

201:4 227:8
239:6 241:5
██████  92:22
93:14
**sees**  157:5
**select**  44:8 45:4
45:17
**selected**  244:9
244:16
**selecting**  246:2
**selection**
244:23 246:1
**selects**  46:2
**self**  122:15
**send**  30:17 85:6
85:11 100:20
107:16 141:7
177:24 178:5
233:22
**sending**  33:12
99:15 209:13
**sends**  26:18
35:3,3 100:17
100:18 167:6
178:14 211:8
215:22
**senior**  153:17
**sense**  22:11
31:1 42:17,21
44:4,5 86:7
133:15 134:12
180:1,9 199:14
200:14,19,21
219:13 228:17

HIGHLY CONFIDENTIAL

**[sense - show]**                                                      Page 63

229:11 245:4
**sent**  6:11 21:14
27:11 32:5,17
34:5,21 50:19
50:24 54:11,15
57:22 58:6
76:4 78:2
84:10,23 86:25
87:23 90:23
91:7 98:25
99:12,14
100:25 102:24
107:1,7 141:11
141:23 142:5,7
142:23,25
143:8 145:17
145:19 169:5
169:21 170:13
170:21 171:10
182:14 183:22
185:1,19
205:12,15
210:25 215:2
216:11 218:21
219:12 222:1,5
231:16 232:10
238:12 239:25
240:20 241:22
**sentence**  12:9
24:19 27:25
29:23,25 30:1
31:15,22,23
33:23 39:15
42:23 45:3

66:22 69:19
70:7 74:24
81:4 84:17,20
96:13,17
105:17,17
153:15 161:11
161:22 163:15
163:21 164:2
186:22 188:14
188:15 189:16
189:19 190:2
190:11 225:19
233:17
**sentences**  83:22
**separate**  90:24
167:16 175:25
243:1
**separately**
207:3
**september**
188:5
**series**  22:6
23:14 176:14
**serve**  111:15
167:15
**served**  110:21
234:13
**server**  107:1,8
107:12
**servers**  202:1
**service**  200:24
**services**  7:5
167:13

**set**  18:9 40:16
42:6 120:4
121:22,23
123:6,14
134:21 145:6
163:11 191:8
223:5 228:9
247:10
**sets**  194:17
**setting**  15:4
18:13 20:5
22:14 24:7
25:8 30:6,25
32:4,25 44:7
45:4,17,18
46:1 58:14
59:8,12,20
60:4 87:8
100:15 182:14
183:5 184:18
184:19,24
190:25 191:5
191:12 209:3,5
212:18 223:6
225:18,21
226:2 227:24
228:2,14 229:3
229:4,12,13,14
**settings**  22:21
40:9 182:10
211:24 213:19
222:24 223:11
229:7

**settled**  111:20
**setup**  49:1
**seventh**  155:3
**several**  43:9,19
97:11 188:25
**shame**  78:5,8
**share**  76:22
77:4,12 101:25
**shared**  207:25
208:5
**shares**  77:23
**sheet**  4:10
248:4,6,8,11
249:7 250:1
██████  78:2,3,3
78:10,22 81:6
81:11
**sherman**  1:3
**shift**  38:13
66:22
**shifting**  68:10
**short**  8:4 89:21
90:20 91:13,15
91:15 208:7
217:21 233:22
238:8
**shortchange**
103:6
**shorthand**  1:21
193:16 247:3
247:20,20,21
**show**  14:23
18:4 60:2
107:25,25

HIGHLY CONFIDENTIAL

**[show - sort]**                                                      Page 64

192:20 198:23
**showed**  23:2
   164:16 223:15
   223:16
**showing**  16:7
   18:16 19:1
   21:17 39:1
   85:14 191:7
**shown**  15:18
   18:14 123:7
   173:3 211:23
   214:19,25
   216:7 237:17
**shows**  28:6
   82:21
**sic**  179:7
**side**  81:24
   108:15 110:21
   110:24 112:3
   210:4,18
   214:19
**sided**  6:8 65:8
   181:7
**sides**  213:18
**sigh**  71:8
**sighs**  71:8
**sign**  248:6
**signal**  34:4
**signature**  4:8,9
   247:17 250:25
**signed**  19:7
   187:6
**significance**
   126:15,19

133:21 134:2,7
   134:23 236:5
   237:2
**significant**
   188:25 236:22
**signing**  248:7
**similar**  20:22
   23:5 48:10
   116:22 182:11
   204:24
**similarities**
   205:17,23
**simple**  139:5
**simply**  48:17
   80:19 86:2,5
   90:3 111:23
   125:22 134:23
   209:18 244:23
   245:6
**single**  114:7
**sir**  11:3 13:25
   53:3 142:14
   172:5 213:2
   227:14 236:21
   245:24
■■■■  66:18
   68:20
**sit**  8:20 9:7
   10:13 12:17
   16:15 18:1
   31:2 46:5
   47:17 64:2
   80:17 86:12
   89:3 96:16

97:20 102:11
   123:22 124:16
   128:12 133:10
   148:4,25 149:7
   149:11,12,19
   155:4 165:20
   181:12 182:21
   193:11 199:13
   209:8 226:17
   232:13,18
   238:17 242:2
**sits**  118:1
**sitting**  17:18
   155:2,7 205:14
   206:3
**situation**  18:2
   28:11 58:24
   66:18 86:4
   156:21 158:7
   213:15
**situations**
   159:10 245:16
   245:21
**size**  179:1
   236:22
**skills**  176:20
**skimmed**  140:5
**skip**  65:5
   176:12
**slack**  96:6
**slight**  134:23
**sloppily**  21:25
**slow**  12:8

**small**  76:21
   95:9 135:5
   203:9
**smaller**  157:20
**snapshot**
   168:15
**social**  160:5,11
**softball**  102:9
**software**  48:7
   131:21 132:9
   132:12
**solve**  87:21
**solving**  87:22
**somebody**
   74:17
**someone's**
   25:13
**soon**  71:20
**sorry**  18:23
   34:15 35:2
   48:4 66:1
   68:22 82:4,19
   90:9 102:18
   106:2 130:4
   144:13 155:16
   172:7 179:4
   186:24 206:7
   230:24
**sort**  37:16,22
   47:6 50:20
   60:23 67:15
   92:10 101:17
   112:9 121:24
   155:13 162:13

HIGHLY CONFIDENTIAL

**[sort - stack's]**                                          Page 65

177:17 179:25
187:23 201:11
201:23 205:20
206:9 219:3
220:12
**sorted**  180:20
**sorts**  75:22
**sound**  9:6
88:18 110:14
170:10 224:18
**sounds**  9:19
88:16 110:15
129:8 179:16
▮▮▮▮▮▮▮▮
83:10,22,25
**source**  112:21
207:18 227:11
**sources**  102:23
**south**  2:20,20
2:22,22
**space**  67:25
88:20,25
200:14 248:4
**spanning**  37:16
**spans**  66:10
**speak**  12:8 47:7
55:12 116:23
117:24 134:22
140:20 142:3
144:9 196:17
232:3
**speaking**  52:5
173:10

**speaks**  230:19
**specialized**
35:25 131:23
**specially**
143:11
**specific**  10:10
10:14 19:9
24:3 64:10
67:21,22 72:21
73:1,5 93:19
96:13 99:19
107:17 109:4
109:11 115:5
117:7 126:24
129:23 130:3
145:12 158:21
159:2,9 173:24
178:22 193:6
196:12,19
204:22 208:21
209:6,9 222:15
223:7 226:11
231:7,10,10,19
**specifically**
11:12 20:6
22:20 36:18
45:22 60:20
64:23 68:1
72:10,24 73:24
88:9 90:5 94:7
94:19 96:13
101:14 115:24
120:3 121:24
123:11 128:9

130:14 131:10
131:13 138:15
140:6 156:8
161:18 165:17
165:23 167:12
167:20 170:7
177:4,20
186:13,20,21
189:8 191:6
193:9 195:15
196:9 205:8
206:8 207:24
220:9 233:14
235:7 239:8,9
242:3 244:11
**specifics**  36:8
63:7,7 129:9
**specified**  55:11
**specify**  196:24
**spectrum**  37:22
101:17
**speculate**  40:4
67:19 75:23
76:17 130:8
132:11 223:8
**speculating**
15:5,10 36:4
92:19 177:9
237:22
**speculation**
15:16 33:8
34:9 53:11,24
177:4

**spelled**  19:24
**spelling**  76:23
**spend**  112:5,22
113:9 147:15
172:13
**spending**  151:7
**spent**  117:16
131:19
▮▮▮▮  114:4
**split**  90:3
**spoke**  121:18
235:7
**spoken**  51:23
76:14
**spoliated**  146:4
146:8,16,18
**spoliating**
10:21
**spoliation**
115:7,12,15,18
146:14,14
**sponsored**
155:2
**spreadsheet**
5:18 95:7
**spss**  131:21
**squiggle**  13:25
**squiggly**  13:8
▮▮▮▮  89:20
91:12
**st**  2:9
**stack**  230:17
**stack's**  230:15

HIGHLY CONFIDENTIAL

**[stair - studies]**                                                                Page 66

stair   107:4
stamp   19:10
  90:23 97:2
  186:10 233:15
stamps   121:20
  173:13 208:2
stand   46:15
  51:11 127:3
  193:5 240:23
standard   132:1
  138:4 152:25
  160:12 188:3
standardization
  152:25
standards   8:9
  116:4,10,12
  148:1,1 155:19
  160:4
stands   76:24
  132:7
star   31:13,16
  31:17,19,19
  105:12
start   59:13
  86:16 149:8
  218:10,11
  219:14 228:7
started   135:22
  140:10 208:19
starting   109:25
starts   68:25
  90:12,14,19
  114:4 212:14

stata   131:25
state   1:4 3:15
  7:10 16:23,24
  22:3,18 25:3,3
  25:7,10 27:21
  36:8 61:6
  67:14 150:9
  248:3 250:3
stated   99:6
statement
  34:12 40:19
  41:1,23 66:21
  143:14 190:17
statements
  20:14 123:17
states   1:1 156:1
  171:20
statistic   157:3
  236:18 237:2
statistical   48:7
  126:11,14,18
  131:11,24
  132:5,12
  133:12,21
  134:2,7,23
  155:25 157:10
  157:12 158:18
  178:18 236:4
  236:17 237:1
statistically
  131:17 236:22
statistician
  126:9 133:20

statisticians
  157:17
statistics   131:8
  131:9 133:7
  134:19 151:20
  153:21 155:8
  155:22 156:5
  156:15,18
  245:8
stayed   61:11
stays   37:10
  38:4 57:3
stem   220:21
stenographic
  7:12
stenographic...
  247:9
step   133:25
  211:10
stepping   107:4
steps   163:11
  211:21 213:13
stick   46:2
sticker   108:7
sticker's   172:7
stickers   18:10
  113:18
sticks   44:8 45:4
  45:17
stipend   155:11
stood   132:10
stop   39:12 40:9
  41:1,17 42:2
  201:7

stopped   39:3
stopping   113:8
stops   201:16
stopwatch   5:3
  35:7,11 39:8
stopwatches
  13:10 14:1,2,8
storage   200:14
  200:20,22
  201:16,19
  203:11,13,17
  203:21,25
  204:6
stored   203:12
story   56:20
straightforward
  48:10 151:15
street   1:17 3:7
  7:9
strict   88:24
stricter   94:20
strong   148:9
stronger   16:11
struck   234:22
structure   150:9
students
  245:11,13,17
  245:20
studied   36:6
  67:23 68:1
  77:23 149:2
  209:2
studies   156:23

**[study - suspect]**                                                Page 67

| | | | |
|---|---|---|---|
| **study**  62:16,23 77:8,17 198:3 237:9 244:17 | **substance** 42:14 136:9 239:11 249:6 | **sundar**  140:2 142:23,25 218:17,24 219:3 | 151:13 152:22 153:8,16 156:14 158:6 160:3 161:18 |
| **studying** 243:24 | **substantial** 60:23 101:14 101:15 | **supplement** 125:5 | 162:8,25 163:1 163:20 168:23 |
| **stuff**  32:19 113:24 178:15 | **substantive** 5:24 56:11 | **supply**  66:19 | 169:25 171:19 171:22 186:16 |
| **subcategorize** 101:23 | 74:14,20 75:16 94:13,15 95:11 | **support**  93:20 137:6 219:20 | 187:7 188:19 197:3,16 |
| **subcontracts** 180:13 | 101:9,10,10,24 102:3,5 103:9 | **supports**  137:9 180:10 | 199:24 202:24 203:1,16 |
| **subject**  6:12 26:5,10 27:5 42:20 51:14 62:9 96:8 106:19 119:18 147:24 150:2,6 231:11 248:7 | 103:11,19,20 103:21 104:4,4 104:5 106:11 108:18 113:23 | **supposing** 158:22 | 208:22 227:13 227:15 231:12 232:21 240:17 |
| | **sufficient**  134:1 | **sure**  8:25 12:10 12:14,20 15:13 15:24 19:22,24 32:23 33:23 40:17 44:7 45:4,17 46:1 49:7 51:12 52:12 53:17 56:3 62:14 64:19 65:9 67:3,4 68:5,7 69:12 71:19 72:8,11 75:13 82:25 85:18 90:2,4,8 92:21 102:2,10 109:20 113:7 115:3 117:4 118:10 119:20 133:2,8 145:14 146:7,10 | **surprise**  39:22 40:1 94:23 104:3 129:22 166:9 190:13 198:24 |
| **subjective** 193:18 | **suggest**  57:7 78:25 114:6 201:25 220:12 | | **surprised** 147:22 190:16 190:17 234:19 |
| **subjects**  206:9 | **suggested** 42:11 81:1 | | **surprising** 88:18 104:9 |
| **submission** 111:11 | **suggests**  106:20 | | **surrounding** 190:21 |
| **submissions** 110:1,9 | **suit**  67:5 | | **survey**  131:12 131:15 153:2 159:5,6,17,18 159:25 245:11 245:13 |
| **submit**  111:20 | **suite**  2:5,14,18 5:5 19:2 | | |
| **submitted** 110:18 233:6 | **summarized** 24:5 231:7 | | |
| **subsamples** 156:23 | **summary**  93:5 93:24 135:17 141:14 151:10 171:5,7 | | **suspect**  166:2 |
| **subscribed** 249:14 | | | |
| **subscribing** 250:5 | **sun**  180:17 | | |

HIGHLY CONFIDENTIAL

**[swear - tell]**                                    Page 68

**swear**   7:15
   12:15 228:22
**switch**   17:13
   23:1 26:7,24
   28:22 29:2
   30:2,17 60:3
   62:3 86:3,6
   143:11 215:21
**switched**   61:11
   119:8
**switches**   58:16
   193:19
**switching**
   24:14 26:23
   60:15,21 62:2
   62:5,17 63:10
   119:19 134:17
**sworn**   7:17
   149:10,16
   247:6 249:14
**synonyms**
   64:19 185:23
**system**   20:20
   20:21 23:23
   48:15 55:8
   74:17 107:10
   107:13 117:20
   117:21,23
   145:6 215:18
**systematic**   94:3
**systems**   47:8
**systemwide**
   168:7

**t**

**t**   5:1 6:1
**table**   141:15
   198:25 206:25
   213:18
**tables**   93:7,25
**take**   11:5 20:12
   23:12 33:3
   38:12 59:7
   82:3,5 110:15
   150:13 151:11
   163:18 169:19
   199:5 200:4
   204:9 214:9
   217:19 218:13
   232:20 243:7
**taken**   1:16 10:1
   10:2 38:21
   82:9,16 102:20
   114:15 126:2
   131:4 132:20
   150:22 180:23
   214:13 217:25
   232:24 247:9
**takes**   211:23
   245:11
**talk**   25:12 39:3
   48:16 104:4
   116:17 127:23
   127:24,25
   128:2,5,8,14
   190:25 196:13
   208:5 224:23

228:10,10,15
   231:8
**talked**   8:24
   25:17 27:20
   39:6 60:20
   84:7 103:5
   117:18,19
   127:14 168:11
   184:23 241:13
**talking**   12:9
   33:19 41:20
   63:6 68:10,20
   68:25 102:8
   129:12 133:2
   172:20 183:18
   189:16 226:18
**tape**   53:16
**target**   244:21
**teach**   48:8
   157:3
**teaching**
   112:19 154:2,4
**team**   117:10,15
**teams**   167:14
   167:19,22
**tech**   8:19 9:9
   38:8 49:23
   50:3 52:4,20
   53:8,20 54:25
   56:6 58:2
   67:25 100:12
   100:17 215:2
   243:19

**technical**   46:14
   46:20,22 47:7
   55:7,17 58:18
   63:21 84:21
   85:20 86:9
   87:12,14 88:1
   100:2 128:21
   128:22 179:22
   220:6,11
**technically**
   59:2 76:7 83:3
   84:22 91:9
   159:11,20
**technician**   3:17
**technological**
   46:22
**technologies**
   67:15,18
   204:23
**technology**
   36:2 47:12
   190:13
**tel**   2:6,10,15
   3:8
**tell**   7:17 12:7
   33:4 36:5,25
   40:14,21 55:6
   63:20 64:9
   66:4 73:6,14
   74:10 75:7,13
   79:18 80:12
   90:22 102:11
   102:14 103:1
   109:15 124:16

HIGHLY CONFIDENTIAL

**[tell - think]**                                                          Page 69

126:3 130:6
131:6 132:25
133:11 139:1
140:15 142:3
146:17 153:15
164:21 165:3
165:18,19
166:10,11
172:23 178:12
188:22 204:12
207:18 213:3
221:19 228:4
**telling**  53:18
79:9 137:7
214:20 220:16
**tells**  142:22
**ten**  204:5
**tend**  20:22
35:10 160:5
**tens**  171:18
**terabytes**  201:7
201:13,14
202:25
**term**  59:18
88:13 146:9
201:5 245:4
**terminology**
185:17 231:6
**terms**  24:8 49:2
49:4 57:13
121:25 131:13
131:19 149:2
153:9 155:13
174:11 203:23

205:17 206:16
206:19 207:7
207:12,18
**test**  133:23
178:9,19
**testable**  177:16
178:2,8
**tested**  134:6
178:5
**testified**  77:7
97:15 103:9,10
110:13,18,19
115:14 126:11
151:8 195:22
233:24 234:11
**testify**  11:7
110:19 144:5
144:16 247:6
**testifying**  103:5
112:9 141:2,7
**testimonies**
60:20 110:25
**testimony**
18:25 77:4
80:18 87:24
88:8,18,21
94:4 104:12
109:25 110:9
110:10,11,13
115:4 122:15
123:10 124:6
144:2 148:2
149:10,16
157:1 168:20

170:20 175:5
179:24 184:15
192:21,22
194:1 198:19
217:10 234:2
235:13,16
241:10 247:9
**testing**  133:22
**texan**  138:2
**texas**  1:2,4,22
2:6,14,19,21
3:15 7:10 12:7
205:15,25
206:7 247:21
250:3
**text**  33:5 56:3
58:2 86:18
160:20 163:10
190:21 215:22
**textbook**  245:8
**texts**  56:2
141:23 215:16
**thank**  21:23
38:14,18 65:22
81:23 94:24
104:23 113:19
115:16 149:22
176:19 182:8
233:23 239:17
246:8
**theory**  152:5
**thereto**  250:5
**thing**  32:14
39:7 40:7,7

56:2 79:18
80:4 86:18
97:1,9 112:9
121:17 155:13
190:1 221:22
**things**  8:4 37:2
37:18 46:23
101:25 103:14
109:24 111:19
112:20 116:18
122:23 123:12
138:3 147:25
151:10 157:14
178:16 189:21
223:19 242:12
**think**  12:8
16:10 24:20
30:23 34:10
39:2 40:6,6,7
40:19 41:11
43:11 47:18
57:17 59:2
61:5 63:16
66:10,14 70:11
76:18 91:9
99:8 103:18,25
109:19 113:13
122:25 123:23
125:6 127:2
129:18 130:5
132:9 133:6
137:24 139:5
143:20,23
146:14 147:13

HIGHLY CONFIDENTIAL

**[think - today]**

Page 70

153:6 161:25
166:12 178:1
182:3,11,23
194:4,11
199:13 201:15
203:3 209:16
210:15 213:18
224:24 227:14
233:21 241:9
242:21
**thinking**   13:4
92:8 168:2
**thinks**   136:19
**third**   85:21
100:11 180:12
224:20 226:11
**thirty**   248:11
**thought**   13:2
20:9 62:13
68:8 71:11
100:24 127:6
231:24
**thoughtfully**
190:8
**thoughts**   48:16
**thousand**
108:14 112:23
133:3 201:12
201:13,14,15
**thousands**
171:18,19
**thousandths**
204:5

**thread**   92:16
165:11
**threaded**   90:5
98:24 99:11,19
99:24 106:18
**three**   33:18
83:21 93:11
94:18 101:16
101:22,24
102:13,16
112:23 164:3
197:15 210:9
210:23,23
215:16,17
233:15,16,18
**thrown**   146:16
**thumbs**   79:5,7
81:6,11 92:20
178:20
**tie**   13:18
**till**   12:11
140:10 199:19
**time**   7:7 8:15
9:3 11:14,22
12:22 14:20
20:13 21:14
22:18 23:15,15
24:5 25:6 27:1
27:9,12 30:24
34:6 35:18
38:17,19,22
50:25 55:11
58:25 59:14
71:17 76:16

80:13 82:7,10
85:6 96:4,5,11
101:5 104:1,6
110:17 111:1
111:16,18
114:13,16
117:1,9,11
123:20 125:17
127:7 128:6,6
129:2,12,13
130:17 132:6
132:11,23
135:16 136:24
137:2,3 140:9
147:15 150:18
150:20,23
151:7 155:1,3
155:24 161:4
164:4 166:4,16
168:14 169:22
172:2,12
173:23 176:14
177:12 179:23
180:21,24
182:16 183:14
187:19,20
191:23 193:23
193:23 194:2
196:11,14
204:13 205:9
205:11 208:10
208:13 209:5
212:6 216:16
217:23 218:1

222:16 224:21
225:25 226:20
232:22,25
237:15 239:18
241:21 246:9
247:10
**timely**   200:1,3
**times**   43:9,19
83:17 97:11
110:12,19
111:5,8 135:5
138:24 139:14
139:24 141:22
197:15,16
211:25
**timestamp**
76:15
**timestamps**
66:13
**timing**   26:3
**title**   138:22
161:6 173:21
181:6,7
**titled**   147:14
**titles**   138:20
**today**   7:11,14
8:3 9:7 18:25
39:20,24 89:18
95:11 96:23
101:8 102:11
103:25 104:2
115:2 117:19
118:9,10
120:10 122:16

HIGHLY CONFIDENTIAL

**[today - trying]**                                                    Page 71

133:10 149:7
149:12 169:1,3
169:18 173:13
181:12 193:11
195:1 203:24
205:14 206:3
209:11 220:4
226:17 230:12
233:24 234:11
235:9,16 236:2
237:21 243:14
**today's**  7:6
140:10
**together**  243:1
**toggle**  22:3,8
23:21,25 26:8
35:24 36:3
45:23 58:24
60:23 62:4
209:7,10,12
**told**  80:23
113:22 166:8
166:11 216:16
241:2,6
■   218:18
**took**  87:13,20
125:12 135:24
214:6,7,14,15
214:18 215:1
240:5
**tool**  17:18
45:13 50:20
64:3 83:3 94:5
102:22 127:18

127:22,24
131:1 132:21
167:16 180:6
180:13 239:13
239:15
**tools**  131:4,5,11
131:19,20,23
132:1 224:20
231:9 237:14
**top**  15:8,14
21:10 50:16,19
56:14 78:1
118:6 142:9
175:23 212:22
215:1 228:8
**topic**  22:10
36:1 77:5
102:21 122:3
193:4
**topics**  38:13
104:6 116:6,8
**torrealba**  2:8
**total**  12:21
117:6,15 232:2
**touched**  99:9
**touching**  28:23
**tough**  70:4
**towards**  128:3
160:6
**townsend**
155:12 156:2
**townsgate**  2:17
**track**  21:21
39:13 40:10

41:2,17 42:2
55:9
**tracked**  118:17
237:14
**tracks**  24:11
**trade**  1:18 3:6
95:22 116:10
152:8
**trademark**
189:2
**training**  10:1
10:15 153:20
195:14
**trainings**  10:2
10:5
**transcript**
247:9 248:12
248:14
**transcription**
249:4
**transcripts**
103:6 104:13
207:23,24
**transition**
11:13 12:21,22
128:4
**treated**  139:2
**treating**  138:25
178:21
**treatise**  116:23
**trend**  160:9
**trial**  3:17
149:24 207:23

**trick**  61:4
127:4 202:22
**tried**  86:5 87:9
92:10
**tries**  25:14
245:12
■   78:24 79:7
79:9,14 80:23
81:1,12,17
**truck**  70:24
**true**  30:8,8
124:18 136:2
162:22 178:3
191:7 194:19
**trust**  53:6,22
**truth**  7:18,18
7:18 79:9,15
220:16 247:6,7
247:7
**try**  11:4,24,25
13:1 17:24
22:14 43:12,15
61:5 130:9
133:25 182:25
210:7 220:23
**trying**  11:7
18:23 22:17
30:23 34:15
41:6,8 61:4
62:11 65:18
120:22 121:10
122:11 124:19
124:20,21
127:4,5 132:1

HIGHLY CONFIDENTIAL

**[trying - understand]**                                          Page 72

133:19 134:4
134:10 136:20
137:20 142:13
145:2 187:1
198:9,13
199:24 202:22
202:24 212:4
213:8
**tuesday**   1:12
7:2
**tuning**   69:11
**tunings**   68:21
69:1
**turn**   13:1 14:25
15:1,9,15
17:13,23 24:6
25:14 28:13
30:2 34:24
39:5 43:2
69:16 89:5
98:3,11 99:15
100:3 121:11
160:18 192:19
212:12 219:6
220:13 222:7
229:2 230:4,16
239:15
**turned**   23:21
24:1 56:13
58:25 76:5
84:11 85:20
100:10,10
120:19 127:15
134:5 143:11

164:13,19,25
192:5 215:25
216:19 230:4
**turning**   14:16
25:18 57:7
61:20,22 84:3
164:24 192:9
**turns**   15:24
24:12,13 50:2
84:24 100:20
161:12 210:24
211:3,8 216:15
216:25
**twice**   28:17
**two**   13:10 14:1
14:2 22:19
27:15 29:7
49:5 50:15,19
50:23 53:21
54:24 55:16
56:15,15 57:15
59:7 60:25
68:23 83:21
98:14,15,18
102:23 104:21
112:23 128:10
147:12 153:15
159:15 164:9
164:13 187:6
197:15,16,16
201:19 205:23
210:24 212:8
213:18 216:6
217:5 218:4

219:17 222:23
223:1 229:10
242:25 243:7
243:15
**type**   92:18
112:22 123:6
159:2 178:17
185:23
**typed**   32:4
**types**   71:8
98:18 116:10
116:18 131:24
132:1 139:9
150:2 157:9
217:1 244:12
**typically**   27:14
44:12 52:11
76:25 77:15
127:8 148:21
153:9 157:4,17
159:1 160:4
167:25 178:24
201:9 206:24
**typing**   33:11
74:16 76:14
107:16

---

**u**

**u**   83:10 92:22
92:22
**u.s.**   76:16
**uc**   48:11
**uck**   70:25

**uh**   16:22 114:5
**ultimately**   46:9
140:18
**unambiguously**
150:1
**unavailable**
83:18 84:1
**uncertainties**
135:7
**uncertainty**
134:18 135:6
**under**   53:18
55:18,19 57:22
98:6 99:4,23
102:12 133:10
141:2,11 144:5
144:16 148:16
182:16 187:24
195:23 196:1
198:17 207:25
208:5,25 213:5
213:16 217:5
219:6 222:22
228:25 229:2
**undergraduates**
245:11
**underlying**
44:20 119:15
128:23 138:6
178:25
**understand**
11:3,4,5 15:12
17:10 23:23
24:4 25:21

HIGHLY CONFIDENTIAL

**[understand - used]**                                    Page 73

28:18 29:21
30:4 32:22
37:12 47:18
48:23 49:7
52:20 53:18
56:19 66:25
67:10 68:9
71:19,20 72:20
74:9,16 83:21
91:16 92:17
98:21 115:9
120:6 121:24
125:18 135:12
141:19 145:2
145:14 146:11
147:19 151:13
156:19 162:22
163:3 168:11
173:20 182:25
189:23 194:25
196:18 206:11
215:18 222:11
240:17
**understanding**
8:2,12,14,17,21
9:2,14 10:11
13:23 14:15
20:24 21:12
24:3,8,13 25:5
25:6 26:3,12
26:25 28:20
30:9 44:12
46:7,11,13,23
46:24 47:4,23

50:17 51:7,10
51:15 54:14,21
55:7,20 57:24
59:23 62:15
67:12,16 69:4
69:6,10 84:14
85:5,25 86:24
87:2,11,24
97:14,16
100:14 105:23
106:2,17
107:13,22
117:21,25
119:13 120:7,9
126:5,5 128:17
129:3,24 130:3
130:24 135:25
137:17 139:3
140:25 141:15
161:16 164:8
168:18,19,24
168:25 169:2
177:2 180:11
183:25 184:2
184:14,16
185:18 189:6
195:4,9 199:10
202:11,16
204:19,21
208:11,15
209:14 215:20
216:10 217:11
221:11 222:16
223:5,7,15

229:6 235:15
235:17,23
243:20
**understood**
12:4 117:11
**unfair**  67:13
**unforeseen**
170:1
**unfortunate**
34:18
**unique**  138:24
138:25 139:1,2
139:9,18,19
174:19 243:15
**unit**  202:20
203:9
**united**  1:1
156:1
**universe**
122:25 235:20
246:3
**university**
154:24 245:10
**unproduced**
18:7
**unquote**  224:12
**unredacted**
232:16
**unrelated**
244:22
**unreliable**
194:4
**update**  6:17
164:17 219:3

237:18,23
**updated**  28:18
28:21 35:4,4
74:15
**updates**  83:4
180:9 227:6
**upload**  132:25
**usage**  94:8
**use**  9:19 12:20
48:7 62:14
76:25 87:7
94:5,10,13,14
98:5 101:9
102:22 103:9
103:11 116:22
116:23,24
121:1 131:12
132:6 139:12
157:17 160:5,7
163:13 182:1
205:8 206:22
214:14 231:8
239:13,15
245:4,7
**used**  11:11,15
11:17 12:14,17
37:22 38:10
39:22 48:2
70:15 77:1
79:23 80:2
89:4 98:5
108:17 127:25
128:8 129:25
131:1,20,21,24

HIGHLY CONFIDENTIAL

**[used - viewed]**                                                        Page 74

144:23 146:9
156:25 157:4
158:18,20,24
159:3 181:22
182:1 206:10
214:11 223:1
224:3,12
226:19 235:11
236:18 242:17
242:22,22
243:3 244:9
248:14
**useful**  39:13
40:10,25 41:18
42:3 91:20,22
92:5
**useless**  31:6,10
31:20
**user**  22:23
28:23 44:12
46:1 48:4
130:12 131:2
210:18,18,24
211:3,7,11,12
211:13,14
215:2,7,12,21
216:3,15,25
217:2 238:4,4
**users**  26:6
44:24 50:15
78:11 86:2,5
223:12,19
229:3,7,12

**uses**  101:17
167:13 197:6
**using**  60:22
78:11 90:25
115:8 131:15
132:23 139:21
146:13,18
155:22 156:5
156:18 157:9
159:23 171:13
177:14 185:24
237:15
**usually**  17:2
187:23
**utc**  76:15
**ux**  35:21 44:6
44:11,19 45:3
45:10,11

**v**

**v**  1:6 78:16
250:3
**vaguely**  88:9
**valuation**  152:3
███████  139:17
███████  244:12
**variations**  37:8
**various**  20:4
37:15 67:13
112:19 123:16
130:7 139:9
143:16,24
153:22 173:13
177:16 189:2

199:16 205:10
211:25 242:12
**vast**  60:5
**vault**  20:20,21
27:11 46:9
47:5,21,24
50:6,10,19,24
51:3 54:11,15
54:23 55:10,18
56:14,15,18,19
56:21 57:22
58:6 63:12,13
63:24 64:13,14
84:22 85:6,12
85:16 87:1,23
90:2,13,24
101:1 128:16
141:13,25
146:21 183:12
183:14,16,22
183:23 184:9
184:17,19
185:7,20
216:11 219:20
**vegas**  37:7,9,10
38:3,5,8
161:12,12,17
161:17 162:6
**vending**  102:4
**verbatim**  247:8
**verifying**  100:2
**veronica**  3:4
**veronica.bosco**
3:5

**version**  71:3
88:4,11 89:4
90:14 120:11
120:16 129:6
129:10,20,25
129:25 130:1
223:17 227:17
237:10,14,14
238:3
**versions**  130:7
130:13 221:9
**versus**  7:10
47:3 57:12
68:25 69:5,14
73:2 128:1
157:4 177:15
185:23 197:7
200:22 204:25
**vice**  153:16
**video**  7:8 76:12
93:7 94:1
**videographer**
3:18,19 7:3,5
38:19,22 82:7
82:10 114:13
114:16 150:20
150:23 180:21
180:24 217:23
218:1 232:22
232:25 246:9
**videotaped**
1:15
**viewed**  119:5

HIGHLY CONFIDENTIAL

[village - weeks]                                                    Page 75

| | | | |
|---|---|---|---|
| **village** 2:18 | 96:24 100:4 | 20:22,23 23:20 | 231:23 246:4 |
| **vince** 3:17 | 101:4 103:22 | 24:2 25:2 35:2 | **ways** 61:18 |
| **violate** 111:7 | 111:7,8 113:5 | 42:13 46:8 | 67:17 94:11 |
| **virginia** 121:21 | 113:10 115:2 | 47:4 48:14 | 135:13 |
| 122:7,17 | 124:22 129:17 | 52:23 57:18 | **we've** 25:17 |
| 204:20 205:6 | 136:16,16 | 61:6 62:13 | 33:10 38:11 |
| 205:22 206:7 | 137:20 141:5 | 63:20,22 70:4 | 41:22 45:21 |
| 206:20 207:8 | 143:4 145:14 | 70:9 72:13 | 54:25 57:6 |
| 207:13,19,22 | 146:10 151:11 | 75:21 80:1,12 | 62:21 65:13 |
| 208:3,12 | 151:13 152:22 | 85:25 87:18 | 81:25 84:14 |
| **visited** 227:15 | 160:19 163:24 | 89:8,18 90:12 | 99:9,20 102:1 |
| **vitae** 5:23 | 167:4,5,21 | 90:25 94:3 | 102:17,17,19 |
| | 173:10 183:2 | 100:1 101:11 | 102:20,21,23 |
| **w** | 188:16 190:21 | 101:20 105:6 | 103:18,24 |
| **w** 83:10,10 | 194:23 195:22 | 108:22 116:22 | 104:2 117:18 |
| **wait** 230:23 | 196:13,17 | 118:21 122:12 | 119:15 121:18 |
| **walk** 46:11 | 202:21 203:1 | 123:13 126:22 | 141:16 145:9,9 |
| 212:2 213:11 | 210:10 212:2 | 128:15 130:25 | 173:12 191:17 |
| **walker** 6:11 | 213:11 214:8 | 135:19 139:5 | 197:12 209:11 |
| 186:19,22,24 | 221:18 223:8 | 145:6 147:10 | 213:13 221:8 |
| 187:3,12,14,19 | 229:17 230:15 | 149:5 151:16 | 229:10 243:14 |
| 188:2,15,16,18 | **wanted** 40:22 | 157:17 163:13 | **web** 129:6,25 |
| 190:11 | 57:8 156:14 | 165:7,13,25 | 130:7,12 |
| **wall** 78:5,8 | 168:17 211:12 | 166:10 173:5 | **webster** 64:20 |
| **want** 8:24 | 211:13,13,14 | 173:11 175:22 | **wednesday** |
| 14:24 15:13 | 231:23 233:5 | 177:22 179:16 | 173:23 219:10 |
| 32:23 37:3 | **wanting** 163:17 | 187:2 191:16 | 219:16 |
| 38:12 39:3 | 228:23 245:10 | 192:8,21 193:8 | **week** 124:10 |
| 41:14 43:12,14 | **wants** 29:13 | 193:16 196:18 | 147:13 234:13 |
| 49:9,13,15 | **wars** 105:12 | 197:17 199:23 | **weekend** 217:3 |
| 53:16,17 55:24 | **washington** 2:9 | 204:8 211:20 | **weekly** 6:17 |
| 56:3 68:2 70:2 | **watch** 95:20 | 213:17 214:14 | **weeks** 164:10 |
| 72:4 78:16 | **way** 8:23 9:1 | 226:21 227:15 | 164:13 |
| 82:4 85:18 | 12:11 17:23 | 227:17 228:3 | |

HIGHLY CONFIDENTIAL

**[wenjiazhu - words]**                                              Page 76

| | | | |
|---|---|---|---|
| ██████ 43:5 | 31:15,22 32:22 | 111:1,11,15 | 225:4 226:5 |
| 43:7,17,23 | 33:9 34:10 | 112:8,8,11 | 228:17 230:18 |
| 44:15 45:14,16 | 35:17 36:18 | 113:16 119:12 | 231:19 232:1 |
| **went** 100:9 | 37:15 38:14,18 | 120:1,3,13,14 | 232:12,19 |
| 143:11 168:16 | 40:1,13 41:5 | 120:22 121:1 | 234:22 236:24 |
| 202:10,13 | 41:20 42:5 | 121:17 123:5 | 237:25 238:23 |
| **west** 2:13 | 44:18 45:8,20 | 134:10 136:9 | 239:6 240:23 |
| **westlake** 2:18 | 46:4 50:12,23 | 136:11 138:9 | 241:25 242:25 |
| **when's** 56:9,16 | 51:6,13,25 | 142:2 143:13 | 245:15 246:6 |
| **whoo** 164:11 | 52:9,22 53:12 | 144:9,20 145:8 | 248:1 250:2,25 |
| 164:11 | 54:1,5,14 55:5 | 145:22 146:7 | **woman** 164:10 |
| **wide** 198:2 | 57:2,6,11 58:4 | 146:24 148:8 | **won** 102:9 |
| **wider** 182:4 | 58:18 59:23 | 149:19 157:1 | **wonder** 59:13 |
| **wife's** 178:13 | 60:9 62:20 | 159:9 162:8 | **wondered** |
| **windows** 35:21 | 63:16 64:1,19 | 163:6,20 | 197:19 |
| **wire** 79:19 | 68:13 70:22 | 164:15 165:3 | **wondering** |
| **wired** 79:25 | 71:2,15,24 | 166:24 169:8 | 14:5 199:3 |
| **wisdom** 161:23 | 72:8,18 73:14 | 169:24 174:25 | **word** 9:19 |
| **wishes** 34:5 | 73:19 74:2 | 177:8 182:18 | 70:17,20,24 |
| **wispy** 64:17 | 75:6,13,21 | 183:25 184:14 | 79:23 90:25 |
| **withdraw** | 77:7,10,15,22 | 185:5,16 | 105:7 110:15 |
| 31:16,16 | 79:13,22 80:9 | 189:13 190:1 | 115:8 146:18 |
| 106:21 195:11 | 81:4,9,15,21 | 190:16 191:16 | 157:15 173:6 |
| 200:13 | 82:5,25 84:13 | 192:13,25 | 173:20 197:2 |
| **witness** 4:9 | 85:3 87:18 | 193:22 194:25 | **wording** 10:14 |
| 7:15 9:11,18 | 88:16 89:8 | 196:3 197:11 | 62:14 |
| 10:9,24 13:22 | 91:24 92:7 | 197:25 200:7 | **wordings** 183:1 |
| 14:19 15:3,20 | 93:19 94:3 | 201:22 208:15 | **words** 18:14 |
| 16:7,9,20,23 | 96:12 97:20 | 212:4 213:8,23 | 19:20 86:18 |
| 17:5,16 18:17 | 100:23 101:13 | 216:10,22 | 96:24 98:5 |
| 18:18 19:4,6 | 104:8,21,25 | 217:8 220:20 | 124:20 185:20 |
| 19:14,22 23:4 | 106:2 107:10 | 221:5,15 | 206:10 209:20 |
| 24:17 26:22 | 108:4 109:3,25 | 222:15 223:14 | 214:14 |
| 28:9 29:5 | 110:9,10,11,25 | 223:22 224:9 | |

**[work - zoom]**                                                    Page 77

**work**  48:3,13
  49:16 87:15
  88:20 100:6
  111:14,23
  112:1,7,24
  116:3 117:12
  125:10,13,16
  129:15 131:12
  131:15 149:1
  152:15 153:16
  154:23 155:6
  155:12,18
  159:5 170:7
  173:14 178:10
  182:19 195:16
  196:18 197:19
  203:24 206:23
  207:4 219:7,17
  226:14
**worked**  50:3
  54:25 100:11
  117:6 153:12
  153:25 157:8
**working**  18:24
  44:6,15,19,23
  115:25 116:13
  132:4 154:5
**workplaces**
  227:5
**works**  29:21
  51:15 107:13
  130:10 197:16
  219:21

**workspace**
  227:6 237:19
**world**  1:17 3:6
  6:12 86:23
  214:1
**worried**  32:24
  33:4
**wrap**  144:13
**write**  18:10
  112:2 190:7
  202:19
**writes**  190:12
**writing**  162:16
**written**  17:25
  33:24 47:15,24
  121:2,2
**wrong**  128:20
  136:21 148:6
  172:3 174:7
  175:10 201:2
**wrote**  35:14
  48:15,18 49:11
  51:2,10 74:25
  181:3,5,14
  188:2
**wrt**  76:22,24
**wwyd**  66:18

**x**

**x**  4:1 5:1 6:1
**xeroxed**  209:20

**y**

**yahoo**  189:1,7
  189:11
**yeah**  14:6,10
  17:10,16 21:24
  22:11 23:4,6
  29:5,13 32:11
  35:21 37:4,11
  37:23 39:5,15
  44:3 59:7
  66:11 68:5,23
  71:11 77:1,15
  79:13 102:6
  105:6 106:3
  110:20 113:19
  116:17 117:12
  130:14 132:3
  133:3,9 147:22
  151:15 163:17
  165:3 168:5
  174:1 187:5
  188:4 190:18
  197:4 203:8,12
  209:14 213:8
  223:22
**year**  6:6,7 10:2
  112:6,23,25
  172:9,21 173:3
  174:4 175:4,6
  176:25 200:16
  200:17 240:24
**years**  17:9 88:4
  93:11 94:18

  110:9 111:17
  128:25 130:20
  132:4 154:17
  174:23 221:12
  243:22
**yep**  229:16
**yesterday**
  124:3,5 198:17
**york**  1:18,18
  3:8 7:9,9
**younger**  178:4

**z**

**zeke**  2:11
**zeke.derose**
  2:12
**zero**  63:1
  108:20 145:13
  145:16,24
**zeros**  202:12,15
  202:23 203:3,5
**zone**  164:4
**zoom**  2:4,12,16
  3:13,14,15,16
  100:6

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.