# EXHIBIT 4
# [FILED UNDER SEAL]

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| The State of Texas, et. al.<br>Plaintiff,<br><br>v.<br><br>Google LLC,<br>Defendant. | Case No. 4:20-CV-957-SDJ |

Expert Reply Report of Jacob Hochstetler

December 11, 2024

_____

Jacob Hochstetler

# Table of Contents

I.    INTRODUCTION ................................................................................................................. 3

    A.    Assignment ............................................................................................................. 3
    B.    Qualifications ......................................................................................................... 3

II.    SUMMARY OF OPINIONS ............................................................................................. 4

III.    MR. MALKIEWICZ MISUNDERSTANDS THE FINDINGS IN MY SUPPLEMENTAL REPORT 5

    A.    Mr. Malkiewicz Misconstrues My Findings Regarding ▮▮▮▮▮ Recoverability ................................ 6
    B.    Mr. Malkiewicz Erroneously Criticizes My Assumptions and Choices for Estimating the Number of Messages Lost ................................................................................ 7
    C.    Mr. Malkiewicz Misunderstands My Description of the Google Chat Retention Setting ........... 9
    D.    Mr. Malkiewicz's Summary of My Opinions Misrepresents Several Aspects of My Analysis ........... 10
    E.    Mr. Malkiewicz Misrepresents Statistical Terms to Criticize My Analysis .......................... 11
    F.    Mr. Malkiewicz Erroneously Dismisses the Reliability and Analytical Value of the Log Dataset ....................................................................................................... 13
    G.    Mr. Malkiewicz Misrepresents My Analysis of Produced Messages and Thereby Misinterprets Factual Statements As Contradictory to My Analysis ..................................... 16
    H.    Mr. Malkiewicz Mischaracterizes Retention Settings and Message Volume Methodology ........ 19
    I.    Mr. Malkiewicz's Unsupported Claim That Lost Messages Did Not Meet Criteria for Production Does Not Invalidate My Conclusions About Systematic Message Loss .................... 21

APPENDIX A: PLOTS ON CHAT AND EMAIL COUNTS PRODUCED ................................... 23

APPENDIX B: MATERIALS RELIED UPON ........................................................................... 25

    Documents from production ............................................................................................. 25
    Expert Reports ............................................................................................................... 25
    Communications ............................................................................................................. 25
    Public sources ................................................................................................................ 25
    Deposition Transcripts .................................................................................................... 26
    Other ............................................................................................................................ 26

APPENDIX C: MATERIALS CONSIDERED ........................................................................... 27

    Documents from production ............................................................................................. 27
    Communications ............................................................................................................. 28
    Public sources ................................................................................................................ 28
    Deposition Transcripts .................................................................................................... 29

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

## I.    INTRODUCTION

### A.    Assignment

1.  I have been retained to provide expert analysis and opinions on behalf of all the Plaintiff States in the lawsuit against Google LLC ("Google") asserting violations by Google of federal and state antitrust laws and violations of other state laws, in connection with Google's conduct in the online display advertising industry and as relates to digital advertising technologies. On June 7, 2024, I submitted an opening report ("Opening Report") that gave technical descriptions of the digital advertising ecosystem, Google's advertising technology stack, and specific technologies and systems used in Google's stack. On September 9, 2024, I submitted a rebuttal report responding to the expert report of Professor Martin Rinard on the topic of my methodology for analyzing source code in my opening report. On October 4, 2024, I submitted a supplemental expert report ("Supplemental Report") analyzing chat log data produced by Google to assess message volume and history retention status and to determine whether produced conversations were affected by lack of message retention. On December 9, 2024, I submitted a Declaration with attached exhibits to the Plaintiff States' Motion for Spoliation Sanctions, wherein I discussed the number of Google Chats that Google failed to preserve.

2.  I have been asked by counsel for the State of Texas, on behalf of all Plaintiff States in this case, to respond to the rebuttal report submitted by Michal A. Malkiewicz ("Malkiewicz Rebuttal Report") on November 26, 2024. To the extent that I do not address a point made by Mr. Malkiewicz, this does not indicate that I agree with his claim.

3.  I am competent to testify to the matters stated in this Report, have personal knowledge of the facts and statements herein, and each of the statements is true and correct.

4.  In preparing this report, I have considered all the documents referenced in this report as well as those listed in Appendices B and C. I have also relied upon my own extensive experience in the field of high-performance computing applications and forensic code analysis. My opinion is based on the documents available to me as of the time of this report, including data, chat logs, and depositions.

5.  I reserve all rights to supplement my report should any additional information be produced in this case. I further reserve my right to use graphics, figures, and/or illustrations at trial to support my conclusions.

### B.    Qualifications

6.  For a description of my qualifications, please see Appendix D of my Opening Report.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

7. During my employment at Los Alamos National Laboratory, my duties included log collection and parsing analysis for high-performance computing applications. I also have extensive experience administrating operational systems in a variety of settings and conducting forensic source code analyses. I am therefore qualified to opine on the chat logs I analyzed in my Supplemental Report and to respond to Mr. Malkiewicz. See Appendix D of my Opening Report for more details on my work experience in these areas.

8. I am being compensated for my time at a rate of $500 per hour. My compensation does not depend on the outcome of this case or on any opinion that I may offer.

## II.    SUMMARY OF OPINIONS

9. Based on my review of Mr. Malkiewicz's report, I believe that Mr. Malkiewicz has misunderstood and misconstrued significant portions of my opinions and expert report.

    a.  Mr. Malkiewicz's assertion that that I contend that Google deleted ▮▮▮▮ is not accurate. As Google itself stated, it does not always log the ▮▮▮▮, and missing ▮▮▮▮ are not recoverable.

    b.  Mr. Malkiewicz erroneously asserts that because some persons received litigation hold notices after the start of 2022, my assertion that 141 Google employees had received litigation holds prior to 2022 is inaccurate. I note that the letter listing those on litigation hold, which Mr. Malkiewicz does not dispute, contains 141 employees who received litigation holds prior to the start of 2022 and 47 who received litigation holds after the start of 2022. Mr. Malkiewicz's further assumptions would result in even more employees that would have been subject to litigation hold.

    c.  Mr. Malkiewicz misunderstands my statements regarding retention settings. While Mr. Malkiewicz claims that I assert that retention settings are on a per conversation basis, rather than per message, Mr. Malkiewicz ignores that when settings are toggled for a conversation, the new settings apply to each new message within that conversation. Mr. Malkiewicz further overstates the difficulty and timeliness for instituting per employee preservation of chats.

    d.  Mr. Malkiewicz erroneously suggests that I independently identified which actions manage the status of retention settings. I relied on Google's documentation for identifying these actoins.

    e.  Mr. Malkiewicz misuses statistical terms to criticize my analysis. Mr. Malkiewicz uses "statistical significance" and "sample of convenience" in ways that are both inappropriate and that conflict with his own cited use cases. Mr. Malkiewicz's conclusory criticism of my

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

conservative assumptions and analysis is further erroneous because despite having access to Google's records and personnel, he is unable to identify any specific errors with respect to turnover assumptions or representativeness.

f.  Mr. Malkiewicz erroneously dismisses the reliability of the dataset, including determining that deposition testimony regarding chat usage was more reliable than the actual chat usage of the custodians, that Google was not necessarily required to preserve chats for those under litigation holds. The dataset, however, is the primary source data regarding chat usage, and is an appropriate basis for my analysis.

g.  Mr. Malkiewicz misrepresents my analysis in a number of ways. First, Mr. Malkiewicz erroneously assumes that I have determined that all chats are relevant. Rather, my conclusion is that "messages relevant to this litigation were lost due to the toggle of the Retention Setting." In other words, relevant messages were lots, but not all lost messages were relevant. Mr. Malkiewicz's further criticisms appear based on speculation and a mischaracterization of my hypothetical example as a description of how Google's system operates.

h.  Mr. Malkiewicz mischaracterizes the design of Google's system and the parameters of my analysis. The dataset indicates when a chat conversation member updated the retention_state for all members, not just when an individual changes the setting themselves. He also erroneously asserts that I excluded ▮▮▮▮▮▮ from my analysis; however, I explicitly address ▮▮▮▮▮▮'s status as an outlier among the five candidates, and Mr. Malkiewicz does not contest that ▮▮▮▮▮ is an outlier.

i.  Mr. Malkiewicz misconstrues the purpose of my report. He assumes that because Google produced few chats, most chats are irrelevant; Mr. Malkiewicz's erroneous assumption is therefore that those under litigation hold may destroy any number of chats with no accountability.

## III.    MR. MALKIEWICZ MISUNDERSTANDS THE FINDINGS IN MY SUPPLEMENTAL REPORT

10. While Mr. Malkiewicz critiques my calculations regarding Google's production of chats and the number of people subject to litigation hold – Mr. Malkiewicz agrees that my number is conservative with respect to the number of chats Google has failed to preserve and asserts that the number of people subjected to litigation holds is even higher[1] – Mr. Malkiewicz does not challenge any of calculations. Further, Mr.

---

[1] Malkiewicz Report, ¶¶ 10, 18, 20.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

Malkiewicz does not challenge my conclusion that Google did not preserve a significant number of chat messages for persons under litigation hold during the relevant timeframe.

11.  Instead, Mr. Malkiewicz criticizes my use of rounding to approximate the number of chats as 1.5 million (from 1.4 million[2]). Mr. Malkiewicz also asserts that Google's production deficiencies taint the results. Mr. Malkiewicz, however, did not conduct any interviews with Google to support his allegations. I address each of Mr. Malkiewicz's criticisms below.

### A.  Mr. Malkiewicz Misconstrues My Findings Regarding ███████ Recoverability

12.  In Section IV.B of his report, Mr. Malkiewicz mischaracterizes my findings related to the recoverability of the "█████" field in the Log Dataset. Google's counsel was asked whether "missing ██████ existed elsewhere/were recoverable or whether they were permanently missing/unrecoverable" and responded:



> As previously noted, these are internal logs for debugging purposes. The logs operated as intended and ████ values were not logged for all actions, such as actions that are specific to a user but not associated with a specific space. In that scenario, there is no ████ because there is no specific space associated with the action. Additionally, since this log is a debugging log, a "█████" might not have been logged if it was not necessary for debugging purposes. So *there is nothing to recover* and it does not make sense that the data would be available elsewhere.[3]

Relying on Google's counsel's representations, I note that "based on Google's representations, that ██ ████████████████████████████████████████████" and that I therefore used the "██████" field, which was "████████████████████████████████████████████."[4]

13.  Mr. Malkiewicz materially misinterprets my analysis. First, Mr. Malkiewicz disagrees with his own counsel's representation in this case, characterizing my statement as "inaccurate"[5] that "based on Google's representations … if a ██████ field is missing in the Log Dataset, it is unrecoverable…"[6] He points to Google's explanation that "██████" fields may be absent for various operational reasons, including instances where actions are user-specific rather than space-specific, or where the field was deemed unnecessary for debugging purposes.[7] He specifically states that "… 'there are several reasons why a ██████ might be missing for a logged action', including, '[f]or example, ██████ is not logged for actions that are specific to a user, but aren't associated with a specific space.' …Further, because the log is a debugging log, 'a "██████" might not have been logged if it was not necessary for debugging purposes',

---

[2] Hochstetler Supp. Report, ¶ 8, fn 4; *see also* Section III(E), *infra*.
[3] Hochstetler Supp. Report, Exhibit C (emphasis added).
[4] Hochstetler Supp. Report, ¶ 30.
[5] Malkiewicz Report, ¶ 14, fn 26.
[6] Hochstetler Supp. Report, ¶ 30.
[7] Malkiewicz Report, ¶ 14, fn 26.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

meaning that certain ▮▮▮▮ data was never logged in the first instance and 'it does not make sense that the data would be available elsewhere.'"

14. Next, Mr. Malkiewicz invents a conclusion, stating that "Prof. Hochstetler's contention that Google deleted data when that data were not logged in the first place is misleading."[8] As noted in my Supplemental Report, however, I merely restated *Google's* representation "there is nothing to recover" when a ▮▮▮▮ field was missing. Mr. Malkiewicz does not contest that the ▮▮▮▮ was not logged in every event and does not contest that there is no way to recover the missing fields in the Log Dataset.

### B.    Mr. Malkiewicz Erroneously Criticizes My Assumptions and Choices for Estimating the Number of Messages Lost

15. In Section IV.C of his report, Mr. Malkiewicz criticizes the assumptions that I used to estimate the number of Chat messages that were not retained by Google each year. Mr. Malkiewicz claims that my statement that "by the beginning of 2022, 141 Google employees had been placed on litigation hold" is "not accurate as written."[9] While Mr. Malkiewicz asserts that "many [of the employees] were placed on hold after Prof. Hochstetler's arbitrary cut-off at the beginning of 2022," Mr. Malkiewicz fails to either provide any specific numbers or timeline to support his criticism - information he could have readily obtained from Google – or determine how many employees were under hold at any given time. I discuss these materials in detail below.

16. Figure 1 shows the number of custodians placed on litigation hold each year, while Figure 2 shows the cumulative number of custodians placed on litigation hold.[10]

---

[8] Malkiewicz Report, ¶ 14, fn 26.
[9] Malkiewicz Report, ¶ 20; *see* Hochstetler Supp. Report, ¶ 8, fn 4.
[10] Letter from R. McCallum, August 29, 2024, attached as Exhibit D in Hochstetler Supp. Report.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

**Figure 1: Number of Custodians Placed on Litigation Hold by Year**



**Figure 2: Cumulative Count of Custodians Placed on Litigation Hold by Year**



17. As shown in Figures 1 and 2, there were 141 custodians who received litigation hold notices between 2019 and 2021, with an additional 47 added between 2022 and 2024. Thus, Mr. Malkiewicz's complaint appears to be that my number was conservative, and that the number of employees subject to litigation holds and preservation requirements is <u>even higher</u> than my estimate.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

18. Mr. Malkiewicz further supports that my use of custodians as the number of employees subject to litigation hold is conservative by highlighting Google's representation that an unknown number of additional employees were given litigation hold notices to preserve their documents.[11] If, as Mr. Malkiewicz asserts, the number of employees subject to litigation hold is higher than my estimate, Google failed to retain an even larger number of chats messages.

19. Mr. Malkiewicz further critiques my choice of an "arbitrary cut-off at the beginning of 2022" used for calculating the estimated number of messages lost in a given year prior to the change of the Retention Setting default.[12] This criticism misses a crucial point: the 68-day Log Dataset ran from December 9, 2022 through February 14, 2023, during which time 6 additional employees were placed on litigation hold. Far from being arbitrary, my decision to use the number from the start of 2022 deliberately produced a more conservative estimate of the number of chats that Google would have been required to retain for 2022. Had I included these additional employees, the estimated number of lost messages would have been even higher.

### C. Mr. Malkiewicz Misunderstands My Description of the Google Chat Retention Setting

20. In Section IV.D of his report, Mr. Malkiewicz misunderstands my analysis of Google's retention settings and claims that this analysis is "flawed."[13] He claims that my statement "Retention Settings are applied per conversation"[14] is incorrect and that these settings are instead applied on a "per message basis." This purported distinction misinterprets my analysis. I explain the technology Google Chat uses to retain messages within a conversation in the preceding paragraphs of my Supplement Report.[15] As I noted, individual chat messages taken together constitute a "chat conversation." As such, when the history is toggled within a chat conversation, these settings are applied to each new message sent in that conversation (i.e., on a per message basis), until such time, if any, that the settings may be changed again. I illustrate this principle in Figure 4 in my Supplemental Report.[16] Thus, Mr. Malkiewicz's suggestion that my statements regarding chat message retention settings are incorrect is itself incorrect. In fact, the retention process he describes in his report confirms that he agrees with the analysis and description I provide in my Supplemental Report.[17]

---

[11] Malkiewicz Report, ¶ 20.
[12] Malkiewicz Report, Section IV.E; *see also* Hochstetler Supp. Report, ¶ 8, fn 4.
[13] Malkiewicz Report, ¶ 29.
[14] Malkiewicz Report, ¶ 29; Hochstetler Supp. Report, ¶ 15.
[15] Hochstetler Supp. Report, ¶ 13.
[16] Hochstetler Supp. Report, Fig. 4.
[17] Malkiewicz Report, ¶ 29, fn 54.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

21. Mr. Malkiewicz, however, agrees with me that Google has failed to adequately preserve messages. As my Supplemental Report states, "[W]hile chat history is 'off' for a given conversation, this conversation's messages are never made available to Vault or any other Google system, even within the 24-hour window. In other words, there is no way to preserve or restore messages that were sent while the chat history was "off."[18] Under the guise of critique, Mr. Malkiewicz reinforces my position. While claiming that I omitted what he describes as "an important detail regarding retention rules," Mr. Malkiewicz asserts that "[w]hile [Prof. Hochstetler] states that 'retention rules within Vault were to be suspended if a litigation hold was issued,' he neglects to specify that such a suspension only applies to history on messages"[19] and that "[t]here is no technical method to preserve messages sent in a 'history off' state."[20] In other words, Mr. Malkiewicz agrees that Google fails to preserve all chats in the "history off" state, regardless of whether a litigation hold has been issued.

22. Mr. Malkiewicz, however, attempts to describe the preservation of chats as difficult.[21] While Mr. Malkiewicz cites to ███████'s testimony that creating a setting preventing employees from toggling history off took "hundreds of hours to develop and deploy" in 2023, Google's documentation contradicts ███████'s memory. As far back as 2013, Google had already created and advertised the required functionality, giving Administrators of its "Google Hangouts" product "the ability to customize which Hangouts features are available to which employees," including setting chat history defaults.[22] In 2015, Google advertised administrators' ability to "[f]orce hangouts chat history to be on or off" as well as to "ensure chat participants cannot change this setting for new conversations."[23] In other words, by 2015, Google had already done all the work to allow customers to prevent specific employees from turning off chat history, but Google chose not to implement this feature for itself until 2023.

### D.    Mr. Malkiewicz's Summary of My Opinions Misrepresents Several Aspects of My Analysis

23. Mr. Malkiewicz erroneously suggests that I independently identified which actions manage the status of the Retention Settings. In particular, he states "Prof. Hochstetler starts his analysis by determining the types of actions for which the <retention_state> field is populated and are related to sending and receiving

---

[18] Hochstetler Supp. Report, ¶ 13.
[19] Malkiewicz Report, ¶ 30.
[20] *Id.*
[21] Malkiewicz Report, ¶ 25.
[22] https://workspaceupdates.googleblog.com/2013/11/admin-controls-and-global-address-list.html (last accessed Dec. 11, 2024).
[23] https://workspaceupdates.googleblog.com/2015/04/new-admin-policy-and-compliance.html (last accessed Dec. 11, 2024); GOOG-DOJ-16741074 at 078 ("While admins could previously default all Hangouts chat conversation history to on or off, chat participants could change this on a per-conversation basis. With this new feature, admins can ensure chat participants cannot change this setting for new conversations.").

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

messages... Using the Google documents produced in this case, he identifies that out of these eight actions, two "key actions" he **claims** are associated with the status of the Retention Setting…"[24] This is not my claim; rather, I relied entirely on Google's own documentation for identifying these actions, as detailed in their internal document "List of Log Fields."[25]

### E.    Mr. Malkiewicz Misrepresents Statistical Terms to Criticize My Analysis

24. In Section VI.A of his report, Mr. Malkiewicz challenges the conclusion in my Supplemental Report that "it is reasonable to assume that the number of messages lost per year across all employees under litigation hold was close to 1.5 million."[26] He claims that I "[do] not assert … that the conclusions … from [my] limited sample are statistically significant," and contends that this analysis is based on a sample that is "biased and small, and thus not representative of all the agreed upon custodians subject to a litigation hold at the beginning of 2022."[27] He thus asserts that my conclusions are "not reliable." [28]

25. First, Mr. Malkiewicz asserts that "statistical significance" is important to "ensure the conclusions drawn from data are accurate and trustworthy."[29] He further asserts that I did "not assert, in [my] report, that the conclusions that [I] draw[] from [my] limited sample are statistically significant." [30] According to the reference Mr. Malkiewicz cites, significance levels are important for determining whether hypotheses based on a portion of data are reasonable.[31] In other words, it is used to compare the results of a sample population to a baseline. [32] Mr. Malkiewicz, however, fails to recognize that there is no baseline for comparison, and therefore that the concept of statistical significance is inappropriate.

26. Second, Mr. Malkiewicz misrepresents the definition of a "Sample of Convenience." Mr. Malkiewicz asserts that a "sample of convenience references a sample that is drawn from readily accessible subgroups within a larger population."[33] Notably, a sample of convenience is a sampling technique wherein participants are

---

[24] Malkiewicz Report, ¶ 33.
[25] GOOG-AT-MDL-C-000088212 at '213 (HCI), "List of Log Fields," Google internal document.
[26] Hochstetler Supp. Report, ¶ 82.
[27] Malkiewicz Report, ¶ 40.
[28] Malkiewicz Report, ¶ 40, he also states in Paragraph 42 that "…the sample of convenience used by Prof. Hochstetler here is vulnerable to selection bias and, as a result, is **underinclusive** and thus unrepresentative of the larger population of interest." And in Paragraph 43 that "Prof. Hochstetler relies on a mere five custodians over 68 days to estimate the number of messages allegedly lost by more than 140 custodians per year."
[29] Malkiewicz Report, ¶ 39.
[30] Malkiewicz Report, ¶ 40.
[31] Malkiewicz Report, ¶ 39, fn. 80 (citing David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 284-285 (3rd ed. 2011), (hereafter "2011 Kaye & Freeman") at p. 251; Amy Gallo, "A Refresher on Statistical Significance," Harvard Business Review, 2016, https://hbr.org/2016/02/a-refresheron-statistical-significance.
[32] *Id.*
[33] Malkiewicz Report, ¶ 42.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

chosen <u>based on the convenience of the researcher</u>." [34] Mr. Malkiewicz, however, fundamentally misrepresents both the nature of the data available to me and the circumstances under which it was obtained. The Log Dataset was not created with my convenience in mind, but Google's. My conclusions are based on the entirety of log data that Google chose to produce, not a discretionary sample I selected. What Mr. Malkiewicz attempts to portray as a "biased and small" sample taken only from "readily accessible subgroups" was, in fact, the entirety of the data that Google elected to provide, and I analyzed this full data set. I provided detailed descriptions of the data in the produced sample throughout my Supplemental Report, and I was reasonably conservative in my estimate of total messages lost based on the produced data. [35] Any constraints on the representativeness of the analysis are therefore inherent to the data Google produced, and not a product of any selective analysis on my part. Mr. Malkiewicz further notes that "the Play logs would only 'cover a sliver of time in early 2023.'" [36] Again, this is not due to a selection on my part; rather, I understand it is due to Google's log rotation process. [37] Furthermore, as established in the ███ deposition, logs from other ad technology custodians have been destroyed or otherwise rendered unavailable. [38]

27. Mr. Malkiewicz further criticizes my methodology on multiple grounds, all of which are improper and/or incorrect. First, he claims my calculations are based on an unsupported assumption regarding employee turnover, specifically stating that "Prof. Hochstetler also adjusts his calculation on the unsupported assumption that half of the employees under litigation hold left the company by 2022." [39] However, I included this calculation as a very conservative measure, to account for turnover rates at Google. Had I assumed that all of the employees under litigation hold remained at Google through 2022, the number of deleted messages would have been markedly higher. Notably, while Mr. Malkiewicz challenges this assumption, he fails to suggest that a different number would be more appropriate to use, despite being able to request information on Google's actual employee retention data.

28. Second, Mr. Malkiewicz contends that my conclusions lack reliability because "the five custodians examined may use Chat in ways that systematically differ from the Chat usage of all employees subject to a litigation hold," and that "the Log Period is likely to be too short—68 days does not yield a sample large enough from which to draw conclusions applicable across multiple years…" [40] Mr. Malkiewicz further states that Google's full production "is not representative of the larger population of employees (who are

---

[34] Adam J. McKee, "Convenience Sampling," in FUNDAMENTALS OF SOCIAL STATISTICS; available at https://docmckee.com/oer/statistics/section-2/section-2-2/convenience-sampling/ (last accessed Dec. 11, 2024)

[35] Hochstetler Supp. Report ¶ 82, fn 106.

[36] Malkiewicz Report, ¶ 41.

[37] ███ deposition (May 17, 2024), 224:17-225:17.

[38] Id.

[39] Malkiewicz Report, ¶ 43.

[40] Id.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

subject to a litigation hold."[41] Mr. Malkiewicz provides no evidence and no apparent analysis on his part to support these claims. I note that he could have requested and analyzed additional data from Google to determine if the Chat usage of these five custodians was anomalous. For instance, he could have requested a set of present-day logs from a random sample of a larger group of custodians to analyze differences across custodians. Mr. Malkiewicz has performed no such analysis and resorts to mere conjecture.

29. Mr. Malkiewicz does not contest that the five custodians in the Log Dataset sent a total of approximately 21,269 Google Chat messages during the Log Period.[42] Mr. Malkiewicz does not contest that during the 68 days of the Log Period, approximately 18,566 were lost, covering 87% of the total chats sent, nor that 94.5% of chat conversations had the history setting turned "off" for at least some time during the Log Period.[43] Mr. Malkiewicz does not contest the calculations behind my analysis that Google did not preserve an average of 19,931 messages per employee per year. While Mr. Malkiewicz contests my conservative estimate that half of custodians will have left Google during 2022, he provides no alternative.[44] As Mr. Malkiewicz notes and does not contest, my calculation with the turnover estimate was that approximately 1.4 million chats would have been lost across the custodian group.[45] Without the contested turnover estimate, however, there would be approximately 2.8 million chats missing. Further, Mr. Malkiewicz's assertion that "Plaintiffs have received the benefit of 202 custodians agreed across this case" increases the number of missing chats to approximately 4 million chats annually. Considering my conservative estimations against the unreduced numbers asserted by Mr. Malkiewicz, I believe that my estimate that Google failed to preserve at least 1.4 million, and likely more that 1.5 million chats, remains accurate.

## F.    Mr. Malkiewicz Erroneously Dismisses the Reliability and Analytical Value of the Log Dataset

30. In Section VI.B of his report, Mr. Malkiewicz asserts that Google employees primarily use Google Chat for logistics or personal messaging, citing that, "Neal Mohan, the Chief Executive of YouTube and a Senior Vice President at Google, testified he generally uses Chat for scheduling meetings or checking in on another employee. Another Google employee, ███████ who is ██████████████████████, testified that he and his coworkers "don't use chat for material work discussions" and that Chat is usually used for logistics like meeting organization, following up on tickets, and sometimes HR-related questions." While we agree that the "more reliable source of data" should be used, Mr. Malkiewicz incorrectly asserts that sworn testimony is more reliable than the actual data provided by Google.

---

[41] Malkiewicz Report, ¶ 44.
[42] Malkiewicz Report, ¶¶ 10, 44 (noting only that the "sample" was "unreliable").
[43] Id.
[44] Malkiewicz Report, ¶ 97.
[45] Malkiewicz Report, ¶ 44.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

31. I understand that by "tickets," ▮▮▮▮▮ refers to a process of structuring work tasks often used in software engineering. In enterprise engineering environments, "tickets" constitute fundamental units of work management and documentation. These artifacts serve as comprehensive records of technical discussions, architectural decisions, implementation details and cross-team collaborations. In large-scale engineering projects, tickets typically contain detailed technical specifications, implementation requirements, testing protocols, and documentation of technical decisions. They often include substantive engineering discussions, architectural considerations, and resolution of technical challenges. Furthermore, tickets frequently document critical business decisions, technical trade-offs, and strategic planning considerations that affect product development and deployment.[46]

32. Additionally, I note that per the August 29, 2024, letter from R. McCallum, ▮▮▮▮▮▮ has been designated as a custodian in this action since September 17, 2021.[47] Contrary to ▮▮▮▮▮▮ characterization of chat usage, documentary evidence produced in this matter demonstrates that ▮▮ ▮▮▮▮ engaged in substantive business discussions via Google Chat. Specifically, as shown in Figure 3, ▮▮▮▮▮ participated in a discussion with colleagues regarding a European Union antitrust challenge against Google on March 2, 2023.

**Figure 3: Sample Google Chat conversation**[48]



46 DevDynamics, "JIRA Ticketing System for Software Development Teams," DevDynamics Blog, accessed December 11, 2024, https://devdynamics.ai/blog/jira-ticketing-system-for-software-development-teams/.
47 Letter from R. McCallum, August 29, 2024, see attached as Exhibit D in Hochstetler Supp. Report.
48 GOOG-AT-MDL-014245812. See also linked article at https://www.politico.eu/article/google-eu-antitrust-advertising-technology/, accessed 12/5/2024.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

33. In paragraph 57 of his report, Mr. Malkiewicz claims that I "assume" that Spaces[49] "are used to discuss exclusively work themes," and that I do "not account for the fact that not only are not all Spaces work-related, but that many employees do not even use Spaces."[50] This criticism is unfounded. Mr. Malkiewicz points to no part of my report making this assumption, and in fact, my analysis makes no presumptions about the exclusive work-related nature of Spaces. Furthermore, I reiterate that my definition of Spaces as "conversations focused on a specific theme, e.g. a project or common area of interest" is drawn directly from Google's own public documentation.[51]

34. Mr. Malkiewicz concludes, "In light of this variety of usage patterns, I consider Prof. Hochstetler's characterization of Google Chat as a tool that is 'used internally throughout Google for business-related communication' to be incorrect and misleading."[52] As I discuss above, this conclusion is unfounded and Mr. Malkiewicz's own discussion is misleading as it misrepresents my statements.

35. In paragraph 64 of his report, Mr. Malkiewicz further states, "At various points throughout his report, Prof. Hochstetler opines that Google 'needed to [] preserve[]' or 'should have [] retained' thousands of messages. But those conclusions improperly assume, without basis, that all Googlers ignored the instructions that they were given."[53] This is yet another inaccurate portrayal of my statements, for which Mr. Malkiewicz provides no basis, and the paragraphs Mr. Malkiewicz cites from my Supplemental Report contain no such statements. In fact, Mr. Malkiewicz cites paragraph 18 in my Supplemental Report, in which I clearly state "Google did not enforce automatic preservation of these messages until February 2023. Instead, it was left up to the recipients of the hold to identify relevant conversations and turn chat history "on" during those relevant conversations. The recipients' compliance with the litigation hold was not monitored by Google."[54] Nowhere in my Supplemental Report do I assume or suggest that "all Googlers ignored the instructions that they were given."[55] Rather, I opine that the litigation hold was not monitored or enforced by Google.

36. Mr. Malkiewicz critiques the reliability of the Log Dataset and the custodian composition therein, stating that, "[e]ven Prof. Hochstetler himself admits that there exists 'a wide variation in message volume between

---

[49] In my Supplemental Report, I describe Spaces as "conversations [within Google Chat] focused on a specific theme, e.g., a project or a common area of interest," referencing Google documentation. Hochstetler Supp. Report, ¶ 11; *see also* Google documentation at Google, "Learn about Spaces," Google Chat Help, https://support.google.com/chat/answer/7659784?hl=en-GB.

[50] Malkiewicz Report, ¶ 57.

[51] Google, "Learn about Spaces," Google Chat Help, https://support.google.com/chat/answer/7659784?hl=en-GB. Accessed December 04, 2024.

[52] Malkiewicz Report, ¶ 58.

[53] Malkiewicz Report, ¶ 64.

[54] Hochstetler Supp. Report, ¶ 18.

[55] Malkiewicz Report, ¶ 64.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

the different employees in the Log Dataset.' But rather than consult more reliable evidence in the record, such as sworn testimony and other produced documents reflecting information about these custodians' roles and responsibilities as they relate to the conduct at issue in this case, Prof. Hochstetler stops short. This failure to take into account available and reliable evidence in favor of extrapolating from a small and unreliable dataset infected by selection bias represents a methodologically unsound approach to the stated goals of Prof. Hochstetler's report."[56]

37. I disagree with Mr. Malkiewicz's characterization of the Log Dataset as "unreliable." His assertion effectively questions Google's technical capability to implement and maintain a proper logging system. The Log Dataset constitutes a primary source data set that systematically and automatically captures user activities and system events. In this instance, it faithfully captures message traffic (such as retention setting modifications). Such logging systems are standard practice in enterprise software environments and are specifically designed for reliability, consistency, and accuracy in data capture.[57]

38. The Log Dataset served as an appropriate basis for the analysis presented in my Supplemental Report, particularly in understanding message volumes and user behavior patterns across individual custodians. Notably, Mr. Malkiewicz does not challenge the specific analytical findings presented in Section V.E of my report, which provides a detailed examination of messaging volumes and retention patterns for each custodian. The consistency and systematic nature of the logging system, combined with the comprehensive coverage of user activities, provides a reliable foundation for analyzing communication patterns and user behaviors within Google's messaging platform.

### G.    Mr. Malkiewicz Misrepresents My Analysis of Produced Messages and Thereby Misinterprets Factual Statements As Contradictory to My Analysis

39. In Section VI.C, Mr. Malkiewicz misrepresents my findings when he states, "The logic underpinning Prof. Hochstetler's conclusion is that, because one portion of a conversation dated December 9, 2022, was produced, and because a second Chat conversation with the same < ▮▮▮▮▮ > dated December 29, 2022, was also produced, **then all other chat messages associated with the same < ▮▮▮▮▮ > would be "relevant" to this litigation**" (emphasis added).[58] This fundamentally misrepresents my analysis. I never claimed that every lost message would have been relevant. Rather, my actual conclusion was that "messages relevant to this litigation were lost due to the toggle of the Retention Setting."[59] The distinction is crucial -

---

[56] Malkiewicz Report, ¶ 72.
[57] OWASP Foundation, "Logging Cheat Sheet," OWASP Cheat Sheet Series, accessed December 11, 2024, https://cheatsheetseries.owasp.org/cheatsheets/Logging_Cheat_Sheet.html.
[58] Malkiewicz Report, ¶ 75; *see also* Malkiewicz ¶ 86. "… Prof. Hochstetler's suggestion that all conversations sharing the same <group_ID> must be 'relevant' to a litigation if any one of them was produced."
[59] *See* Hochstetler Supp. Report, Section VII.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

I identified that relevant messages were lost, not that all lost messages were relevant. The fact that hundreds of messages were lost from a conversation thread that Google itself had identified as containing relevant material (as evidenced by their production of portions of it) supports this conclusion.

40. As a concrete example, I analyzed a conversation where one of the participants toggled the Retention Setting "off" - the very chat referenced by Mr. Malkiewicz. This was a Group that included Sundar Pichai, where hundreds of messages were lost during the Log Period due to the toggling. As I discussed in detail in paragraphs 69-77 of my Supplemental Report, my analysis showed that there were two produced conversations from this Group.

41. The first of these conversations[60] was produced in discovery in this matter, while the second[61] was part of a personal conversation produced via Discovery-on-Discovery,[62] showing (as is confirmed by the Log Dataset) that another chat participant toggled the history setting off. As a result, hundreds of messages in this Group were not retained between December 29, 2022, (the date the Retention Setting was toggled "off") and February 8, 2023 (the date the Retention Setting was toggled "on" according to Google's updated retention policy).

42. I concluded that "messages relevant to this litigation were lost due to the toggle of the Retention Setting."[63] I further noted in my conclusion that "for at least one chat produced in this matter, the Retention Setting was toggled off by one of the participants, resulting in hundreds of lost messages for a single conversation that was relevant to this litigation."[64] I did not make the assumption anywhere in my Supplemental Report that *every* message in this chat would have been relevant, as Mr. Malkiewicz claims; rather, I correctly stated that the *conversation* was relevant as it was produced.

43. Mr. Malkiewicz goes on to claim that, since there were messages sent by Mr. Pichai during the time that the Retention Setting was toggled "on," which were not produced in this litigation, "the messages sent by the custodian did not meet the production criteria in this case."[65] Mr. Malkiewicz's assertion does not in any way invalidate my analysis or contradict my conclusions regarding the loss of messages.

---

[60] GOOG-AT-MDL-007412389.
[61] GOOG-AT-MDL-007412395.
[62] "Adversaries have already begun requesting "discovery on discovery," or discovery of the process by which a party produced the requested information." *See* https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1375&context=njtip accessed on Dec 11, 2024.
[63] Hochstetler Supp. Report, ¶ 77.
[64] Hochstetler Supp. Report, ¶ 81.
[65] Malkiewicz Report, ¶ 76.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

44.    Mr. Malkiewicz claims "selection bias,"[66] asserting that I "improperly defined 'relevance' to include documents that were produced in a different litigation, and which were "unrelated to any party's claim or defense."[67] My analysis, however, was to understand the impact of retention setting changes on messages within Google Chat conversations based on the Log Dataset that Google produced.

45.    Mr. Malkiewicz claims that "Prof. Hochstetler fails to note, however, that the Log Dataset reflects that an additional 14 messages were sent by Mr. Pichai in this group between February 8, 2023, and February 14, 2023. These messages were retained but not produced because these chat messages did not meet production parameters in this case. This further undermines Prof. Hochstetler's conclusion that other messages in the same group must have been 'relevant to this litigation.'"[68] Mr. Malkiewicz provides no basis for his opinion that the unproduced chat messages did not meet production parameters. Mr. Malkiewicz makes no claim to have reviewed such messages, provides no evidentiary citations, and did not discuss the chats with any Google employees. His assertion is mere conjecture. Further, Mr. Malkiewicz does not support how the fact that not *all* retained messages in a given Group were produced in this litigation would undermine my conclusion that "for at least one chat produced in this matter, the Retention Setting was toggled off by one of the participants, resulting in hundreds of lost messages for a single conversation that was relevant to this litigation,"[69] and his purported analysis does not change my opinion.

46.    Mr. Malkiewicz's own actions directly contradict his criticism regarding methodology transparency. In paragraph 85 and Exhibit 2 of his report, Mr. Malkiewicz conducts an analysis of the Log Dataset to identify specific chats by ██████████. As documented in the note accompanying Exhibit 2, he successfully "ran Prof. Hochstetler's program "process_csvs.go" for ██████████████████ and filtered for backend actions ████████ and ██████████████[70] This execution of my analysis program demonstrates two critical points: first, that Mr. Malkiewicz was able to reproduce my methodology using the provided source code, and second, that he deemed the results sufficiently reliable to include in his own report. These actions fundamentally undermine his earlier assertion that I provided "no detailed description of [my] methodology."[71] Indeed, the very fact that he could successfully implement and utilize my source code for his own analysis serves as compelling evidence of the methodology's clarity and reproducibility.

47.    Mr. Malkiewicz's contention in paragraph 91 that I "seek[] to create the impression that Googlers frequently switch history on and off" is both unsupported and contradicts the explicit findings in my analysis. This

---

[66] Malkiewicz Report, ¶¶ 79-81.
[67] Malkiewicz Report, ¶ 79.
[68] Malkiewicz Report, ¶ 82.
[69] Hochstetler Supp. Report, ¶ 81.
[70] Malkiewicz Report, Exhibit 2 caption.
[71] Malkiewicz Report, ¶ 10.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

mischaracterization is particularly notable as my report demonstrates precisely the opposite conclusion: that retention settings typically remained static, with history predominantly set to "off" prior to the date on which Google changed the default history setting. His assertion that I "conflat[e] 'Groups' and 'produced conversations'" to create this impression is unsupported by any evidence or explanation. Indeed, my analysis carefully distinguishes between these concepts and presents clear empirical findings about the prevalence of disabled message retention.

48. Mr. Malkiewicz's criticism in paragraph 92 regarding my use of a hypothetical example fundamentally misunderstands the purpose and nature of the illustrative example.[72] His assertion that my clearly labeled "hypothetical conversation" is somehow "misleading and speculative" is itself without merit. The example in question was explicitly presented as hypothetical - a standard pedagogical technique used to demonstrate system functionality. Its purpose was not to suggest frequency of occurrence, but rather to illustrate the technical mechanics of how retention settings affect message preservation.

49. Indeed, Mr. Malkiewicz's criticism is particularly misplaced given that my empirical analysis demonstrates the opposite of what he suggests - my findings show that retention setting changes were infrequent, with the most significant finding being that switching retention to "on" was never observed in the dataset prior to February 8, 2023. This is especially notable given that the majority of Groups had retention set to "off" during this period. Mr. Malkiewicz's attempt to characterize a clearly marked illustrative example as "misleading and speculative" ignores both its explicit hypothetical nature and contradicts the actual empirical findings presented in my analysis.

### H.    Mr. Malkiewicz Mischaracterizes Retention Settings and Message Volume Methodology

50. In Section VI.D, Mr. Malkiewicz contests my conclusion that "[n]one of the five individuals represented in the Log Dataset personally changed Retention settings for Group Chats."[73] He argues that this conclusion omits essential context, asserting that "…any other participant in their conversations could have turned history on (i.e., enabled the ███████████ setting) at any time, and this would not register in the logs as an action taken by the user even though it would have affected the user's conversation with the other participant."[74]

51. Mr. Malkiewicz's critique attempts to redirect focus to actions of individuals outside the scope of the provided dataset, which fundamentally mischaracterizes both the system's design and the parameters of my

---

[72] Hochstetler Supp. Report, Fig. 4.
[73] Malkiewicz Report, ¶ 93; Hochstetler Supp. Report, Section V(B).
[74] Malkiewicz Report, ¶ 94.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

analysis. My examination was specifically confined to the five custodians for whom Google provided data, as these were the only individuals whose actions were documented in the dataset made available for review.

52. That said, as detailed in my Supplementary Report, "there are instances in the Log Dataset when ████████████████████ actions in the dataset, indicating that the ████████████ was changed by a different chat participant … the Retention Setting is applied per conversation. Therefore, if another participant changed the Retention Setting for a conversation that includes one of the individuals in the produced data, this change would apply to all participants of the conversation, including that individual…"[75]

53. This system design element is crucial to understanding the significance of my finding that "… for over 90% of the Groups involving each of the five individuals, history was "off" at least for some time during the Log Period…"[76] particularly given that all five individuals were subject to litigation hold for the entirety of the time covered in the Log Dataset. The Log Dataset captures all retention setting changes affecting these individuals' conversations, regardless of who made the change. It records every single retention setting change that affected these individuals' conversations, regardless of who initiated the change.

54. Mr. Malkiewicz further contends that my analysis "relies on unsupported claims."[77] Specifically, he challenges my methodology of "…when estimating the number of messages allegedly lost in a year…" where I "…assume that half of the 141 custodians would leave Google in 2022…"[78] This critique is self-contradictory, as Mr. Malkiewicz himself acknowledges that I needed to "account for the fact that many Google employees left the Display Ads business before the timeframe covered by [my] report."[79] The decision to halve the number of custodians was specifically intended to provide a conservative estimate that accounts for both employee attrition and internal transfers within Google. Notably, while Mr. Malkiewicz challenges this methodological choice, he provides no reason why this assumption is unsuitable, despite presumably having access to Google's employment records – which would establish how many of these employees remained at Google through 2022.

55. Mr. Malkiewicz falsely claims that I "[e]xclude information from ████████, presenting misleading and inflated findings."[80] He further asserts that "[i]f Prof. Hochstetler had used his full sample by including ██
██████, his purported proportion of sent and received messages not retained by all five custodians would

---

[75] Hochstetler Supp. Report, ¶ 41.
[76] Hochstetler Supp. Report, ¶ 64.
[77] Malkiewicz Report, Section VI(D)(ii).
[78] Malkiewicz Report, ¶ 97.
[79] Id.
[80] Malkiewicz Report, ¶ 98.

20

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

have been significantly lower."[81] These claims are demonstrably false and represent a fundamental misinterpretation of the facts documented in my report. For example, I conclude that "there were 9,592 messages sent by the individuals represented in the Log Dataset that were lost and at least 8,974 messages received by these individuals that were lost in just this 68-day period across only <u>five</u> individuals (during a holiday period), resulting in a minimum of 18,566 messages lost (of a total of around 21,269 messages logged)."[82] If I had omitted ███████, the average number of messages lost per employee would have been even higher than my estimate.

56. In my Supplemental Report, I state that prior to February 2023, "for ***each of the four*** out of five individuals" (referring to the five custodians excluding ███████) "at least 92% of their sent and received messages were not retained."[83] I explicitly address ███████'s status as an outlier among the five custodians, noting that "for ███████ there are only 36 sent messages in the Log Period which is a much lower message volume than other individuals represented in the Log Dataset."[84] In direct contradiction to what appears to be Mr. Malkiewicz's claim, when calculating a blended rate of messages sent and received with retention history toggled "off" across all five custodians (including ███████), the non-retention percentage is even higher: 94% for sent messages and 93% for received messages.[85] This increased rate is precisely due to ███████'s exceptionally low individual message volume.

## I. Mr. Malkiewicz's Unsupported Claim That Lost Messages Did Not Meet Criteria for Production Does Not Invalidate My Conclusions About Systematic Message Loss

57. In Section VI.E of his report, Mr. Malkiewicz states that the "limited number of produced messages compared to the expected total volume underscores the irrelevance of many Chats."[86] He further claims that "the low implied responsiveness rates support the conclusion that Prof. Hochstetler's assumptions about the retention and relevance of messages are overly broad, as the vast majority of messages logged during the analyzed period did not meet the criteria for production."[87] From this, Mr. Malkiewicz concludes that "this further undermines [Prof. Hochstetler's] assumption that the relevant messages were lost due to retention settings."[88]

---

[81] Malkiewicz Report, ¶ 98.
[82] Hochstetler Supp. Report, ¶ 81.b; *see also* Hochstetler Supp. Report, ¶ 82, fn. 106 (calculating that the five employees, including Dr. Varian, averaged 19,931 messages lost per year).
[83] Hochstetler Supp. Report, ¶ 7.c.
[84] Hochstetler Supp. Report, ¶ 27.
[85] send_receive_calculations.xlsx
[86] Malkiewicz Report, ¶ 103.
[87] *Id.*
[88] *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

58. Mr. Malkiewicz's argument fundamentally misses the critical point established in my report: "The vast majority of chat conversations, aggregated across all five individuals in the Log Dataset, were entirely ephemeral,"[89] and consequently, "the volume of individual messages lost that should have been retained, was extremely high."[90] The fact that the subset of messages may not have met production criteria does nothing to invalidate my core findings about systematic message loss. Mr. Malkiewicz's argument suggests that widespread destruction of messages would be acceptable because only a subset is relevant, but there is no way of knowing how large this subset would be since the vast majority of chats were never retained in the first place, as I understand Google was legally obligated to do.

---

[89] Hochstetler Supp. Report, ¶ 81.a.
[90] Hochstetler Supp. Report, ¶ 81.b.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

## APPENDIX A: PLOTS ON CHAT AND EMAIL COUNTS PRODUCED

59. As part of my analysis, I reviewed Google's production of emails in this case. Despite Google employees testifying that they used chat at least as often as email,[91] a review of the respective emails and chats produced in this case supports my conclusion that Google failed to preserve millions of chats, despite their preservation of email for the same custodians.

60. During this litigation, Google has produced approximately 4.2 million emails.[92] Figure 4 shows the quantity of emails sent in each year during from 2000 to 2024.[93]

**Figure 4: Number of Emails produced by Google per Year**



---

[91] *See* N. Jayaram Dep. Tr. at 86:12-22; N. Korula Dep. Tr. at 297:2-19; ▮▮▮▮▮ Dep. Tr. at 74:11-16; ▮▮▮▮▮ Dep. Tr. at 93:17-94:2; ▮▮▮▮▮ Dep. Tr. at 79:21-80:12.

[92] I identified 4,186,133 emails from the produced documents by filtering for documents with email extensions (.eml,.msg, msg, eml, .mht, and email). I used the date-time meta data associated with these documents to identify which year the email document corresponded to.

[93] Out of the 4,186,133 emails produced, 400,524 emails lacked an associated date-time metadata associated. So, in the plot I included only 3,785,609 (~3.8M). Out of the ~3M emails 7,490 were flagged as exact duplicates and 1,761,275 were flagged as near duplicates. This may potentially be due to different emails from the same email thread produced with different bates numbers. I have not performed any deduplication of the email documents.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

61. Google has also produced approximately ~13 thousand Google Chat conversations throughout the litigation period.[94] Those conversations were sent in the following years of the relevant period shown in Figure 5, and I have not identified a single chat produced prior to 2010 based on my review.[95]

**Figure 5: Number of Google Chat Conversations Produced by Year**



62. My review of the Log Dataset, the depositions of Googe employees, and the database of documents produced by google indicates that the year containing the highest number of produced Google emails is different from the year containing the highest number of produced Google chats that were sent or received. This further supports my conclusion that Google failed to preserve millions of chats from designated custodians.

---

[94] The total chats produced were 13,320. To attain this figure, I first identified 14,798k chat conversations from the produced documents by filtering for documents tagged "google chat", "_google_chat_", "gmail chat", or "_gmail_chat_" to identify Google and Gmail Chats or contained "AAAA" or "threaded" in the subject and included as I identified that chats IDs included these in the subject on my review. Additionally, this included 13,334 documents identified by Google as chat conversations (*See* State of Texas v Google LLC_4-20-cv-00957-SDJ_Bates List.xlsx). From this list, I excluded 1,478 documents with image file extensions (.jpg and .png) to remove image attachments which might have included in the filtering criteria, such that I arrived at 13,320 chat conversations. I used the date-time meta data associated with these documents to identify which year the email document corresponded to. End with the eventual figure was 13,320 = (14,798 – 1,478).

[95] Out of the ~13k chat conversations produced, 4,225 chats did not have date-time metadata available. Thus, to generate the plot in Figure 5, included only 9,095 chats in the plot "#Produced Google Chats Conversations by Year" where the total chat conversation counts by year is plotted. Out of the ~9k chats, 61 were flagged as exact duplicates and 335 were flagged as near duplicates. This may potentially be due to different chat conversations from the same chat produced with different Bates numbers. I have not performed any deduplication of the chat conversation documents.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

## APPENDIX B: MATERIALS RELIED UPON

I incorporate by reference all materials relied upon in my Supplemental Expert Report.

### Documents from production

1. GOOG-AT-MDL-007412389, AAAAbOkmVBc-MBI-FLAT:2022-12-08T00:21:21.295727, (2022).

2. GOOG-AT-MDL-007412395, AAAAbOkmVBc-MBI-FLAT:2022-12-29T01:34:27.483071, (2022).

3. GOOG-AT-MDL-014245812, AAAAoGv2qA8-MBI-FLAT:2023-03-01T22:56:24.320463, (2023).

4. GOOG-AT-MDL-C-000088212, List of Log Fields.

### Expert Reports

1. Rebuttal Report of Michal A. Malkiewicz.

2. Supplemental Report of Jacob Hochstetler.

### Communications

3. Letter from Robert J. McCallum, Freshfields Bruckhaus Deringer US LLP, to Zeke DeRose III, The Lanier Law Firm, PC, and Geraldine Young et al., Norton Rose Fulbright US LLP, (August 29, 2024).

### Public sources

1. *Jira ticketing system for software development teams,* DevDynamics (Accessed on December 11, 2024), https://devdynamics.ai/blog/jira-ticketing-system-for-software-development-teams/.

2. Joshua Concannon, *Disclosing Machine Inputs and Outputs: The Vulnerability of Legal Technology in Civil Discovery,* Northwestern Journal of Technology and Intellectual Property 141, (November 2023), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1375&context=njtip.

3. Learn about Spaces, Google Chat Help (last accessed 12/10/2024), https://support.google.com/chat/answer/7659784?hl=en-GB.

4. Admin controls and global address list support for Hangouts, "Google Workspace Updates (last accessed Dec. 11, 2024); https://workspaceupdates.googleblog.com/2013/11/admin-controls-and-global-address-list.html.

5. New admin policy and compliance controls for Google Hangouts chat, "Google Workspace Updates (last accessed Dec. 11, 2024); https://workspaceupdates.googleblog.com/2015/04/new-admin-policy-and-compliance.html.

6. Samuel Stolton, Google's ad money machine faces EU antitrust attack, Politico (March 2, 2023), https://www.politico.eu/article/google-eu-antitrust-advertising-technology/.

7. David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 284-285 (3rd ed. 2011).

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

8. Amy Gallo, "A Refresher on Statistical Significance," Harvard Business Review, 2016, https://hbr.org/2016/02/a-refresheron-statistical-significance.

9. From Practical Law Litigation: https://content.next.westlaw.com/practical-law/document/I0f0a90ed866911ebbea4f0dc9fb69570/Discovery-on-Discovery-Federal?viewType=FullText&transitionType=Default&contextData=(sc.Default) (accessed on, Dec 10, 2024).

10. OWASP Foundation, "Logging Cheat Sheet," OWASP Cheat Sheet Series, accessed December 11, 2024, https://cheatsheetseries.owasp.org/cheatsheets/Logging_Cheat_Sheet.html.

11. https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1375&context=njtip, accessed on Dec 11, 2024.

12. Adam J. McKee, "Convenience Sampling," in Fundamentals of Social Statistics; available at https://docmckee.com/oer/statistics/section-2/section-2-2/convenience-sampling/ (last accessed Dec. 11, 2024).

## Deposition Transcripts

1. Deposition and Exhibits of ▮▮▮▮▮▮▮▮ (May 17, 2024).

2. Deposition and Exhibits of Nirmal Jayaram (April 26, 2024).

3. Deposition and Exhibits of Nitish Korula (April 19, 2024).

4. Deposition and Exhibits of ▮▮▮▮▮▮▮▮▮▮ (April 26, 2024).

5. Deposition and Exhibits of ▮▮▮▮▮▮▮▮▮▮ (April 19, 2024).

6. Deposition and Exhibits of ▮▮▮▮▮▮ (May 2, 2024).

## Other

1. State of Texas v Google LLC_4-20-cv-00957-SDJ_Bates List.xlsx

2. send_receive_calculations.xlsx

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

### APPENDIX C: MATERIALS CONSIDERED

I incorporate by reference the documents considered in my Supplemental Expert Report.

## Documents from production

1. GOOG-AT-MDL-007373729.pdf

2. GOOG-AT-MDL-007412389.pdf

3. GOOG-AT-MDL-007412395.pdf

4. GOOG-AT-MDL-008150322.pdf

5. GOOG-AT-MDL-008358061.pdf

6. GOOG-AT-MDL-008358076.pdf

7. GOOG-AT-MDL-008358088.pdf

8. GOOG-AT-MDL-009709520.pdf

9. GOOG-AT-MDL-012900020.pdf

10. GOOG-AT-MDL-014213973.pdf

11. GOOG-AT-MDL-018586767.pdf

12. GOOG-AT-MDL-018590555.pdf

13. GOOG-AT-MDL-B-004073824.pdf

14. GOOG-AT-MDL-B-004098902.pdf

15. GOOG-AT-MDL-B-004290479.pdf

16. GOOG-AT-MDL-B-005673865.pdf

17. GOOG-AT-MDL-B-005674120.pdf

18. GOOG-AT-MDL-B-005677190.pdf

19. GOOG-AT-MDL-C-000088198.CSV

20. GOOG-AT-MDL-C-000088199.CSV

21. GOOG-AT-MDL-C-000088200.CSV

22. GOOG-AT-MDL-C-000088201.CSV

23. GOOG-AT-MDL-C-000088202.CSV

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

24. GOOG-AT-MDL-C-000088203.CSV

25. GOOG-AT-MDL-C-000088204.CSV

26. GOOG-AT-MDL-C-000088205.CSV

27. GOOG-AT-MDL-C-000088206.CSV

28. GOOG-AT-MDL-C-000088207.CSV

29. GOOG-AT-MDL-C-000088208.CSV

30. GOOG-AT-MDL-C-000088212.pdf

31. GOOG-AT-MDL-C-000088209.CSV

32. GOOG-AT-MDL-C-000088210.CSV

33. GOOG-AT-MDL-C-000088211.CSV

## Communications

1. Exhibit A. Email from Robert McCallum, "RE: Texas v. Google: Play Logs," (August 29, 2024).

2. Exhibit B. Email from Veronica Bosco, "RE: Texas v. Google: Play Logs," (September 23, 2024).

3. Exhibit C. Email from Veronica Bosco, "RE: Texas v. Google: Play Logs," (October 1, 2024).

4. Exhibit D. Letter from Robert McCallum, "Re: State of Texas et al. v. Google LLC, No. 4:20-cv-957-SDJ (E.D. Tex.)," (August 29, 2024).

## Public sources

1. Bensinger, G. (2023, November 14). Alphabet CEO, in Play store trial, acknowledges some materials not retained. *Reuters.* https://www.reuters.com/technology/alphabetceo- play-store-trial-acknowledges-some-materials-not-retained-2023-11-14/. Accessed on September 26, 2024.

2. Google Blog, "The latest on Google Hangouts and the upgrade to Google Chat," (October 15, 2020), https://blog.google/products/workspace/latest-google-hangouts-andupgrade-google-chat/. Accessed on September 25, 2024.

3. Google Blog, "Upgrading from Google Hangouts to Google Chat," (June 27, 2022), https://blog.google/products/workspace/hangouts-to-chat/. Accessed on September 25, 2024.

4. Google Chat Help, "Get started with Google Chat," https://support.google.com/chat/answer/7653601?hl=en&ref_topic=7649316&sjid=156985909929 98824646-EU. Accessed on September 24, 2024.

5. Google Chat Help, "Learn about Spaces," https://support.google.com/chat/answer/7659784?hl=en-GB. Accessed on September 25, 2024.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

6.  Google Support, "Turn chat history on or off for users," Historical web page retrieved via Wayback Machine. https://web.archive.org/web/20201112005112/https://support.google.com/a/answer/7664184. Accessed on September 30, 2024.

7.  Google Workspace, "How to: Turn history on or off in Google Chat," (June 10, 2022), https://www.youtube.com/watch?v=TGzxrWpj1zk. Accessed on September 27, 2024.

8.  Google Workspace, https://workspace.google.com. Accessed on September 30, 2024.

9.  IBM, "Remote Procedure Call", https://www.ibm.com/docs/en/aix/7.3?topic=conceptsremote-procedure-call. Accessed on September 25, 2024.

10. Thomson Reuters, "Glossary: Litigation Hold," https://uk.practicallaw.thomsonreuters.com/9-501-9293?transitionType=Default&contextData=(sc.Default). Accessed on September 25, 2024.

## Deposition Transcripts

1.  Deposition and Exhibits of ███████████ (May 17, 2024).

2.  Deposition and Exhibits of ████████ (April 5, 2024).

3.  Deposition and Exhibits of █████████ (April 12, 2024).

4.  Deposition and Exhibits of Nitish Korula, Vol. I (April 19, 2024).