# EXHIBIT 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                         SHERMAN DIVISION

 3   THE STATE OF TEXAS, et al,        §
                                       §
 4                                     §
                  Plaintiffs,          §
 5                                     §        Case No.:
          vs.                          §        4:20-cv-00957-SDJ
 6                                     §
     GOOGLE, LLC,                      §
 7                                     §
                  Defendant.           §
 8

 9                    DISCOVERY CONFERENCE
                  TRANSCRIPT OF PROCEEDINGS
10           BEFORE THE HONORABLE SEAN D. JORDAN
                 UNITED STATES DISTRICT JUDGE
11
             Thursday, December 14, 2023; 8:04 a.m.
12                      Plano, Texas

13
     APPEARANCES OF COUNSEL:
14   (Continued on page 2.)

15   FOR THE PLAINTIFF STATES:

16   W. Mark Lanier
     THE LANIER LAW FIRM
17   6810 FM 1960 West
     P. O. Box 691448
18   Houston, Texas 77269-1448

19   Jonathan P. Wilkerson
     THE LANIER LAW FIRM
20   6810 Cypress Creek Parkway
     Houston, Texas 77069
21

22        *********************************************

23                   GAYLE WEAR, RPR, CRR
                 Federal Official Court Reporter
24                     7940 Preston Road
                     Plano, Texas 75024
25               gayle_wear@txed.uscourts.gov
```

```
 1    FOR THE PLAINTIFF STATES:
      (Continued from page 1.)
 2
      Zeke DeRose, III
 3    THE LANIER LAW FIRM, PC - Houston
      10940 W. Sam Houston Parkway N.
 4    Suite 100
      Houston, Texas 77064
 5
      Marc B. Collier
 6    FULBRIGHT & JAWORSKI
      600 Congress, Suite 2400
 7    Austin, Texas 78701

 8    James Lloyd
      Trevor Young
 9    STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL
      ANTITRUST DIVISION
10    300 W. 15th Street
      Austin, Texas 78701
11

12    FOR THE DEFENDANT:

13    R. Paul Yetter
      Mollie Bracewell
14    YETTER COLEMAN, LLP - Houston
      811 Main Street, Suite 4100
15    Houston, Texas 77002

16    Eric Mahr
      FRESHFIELDS BRUCKHAUS DERINGER US LLP
17    700 13th Street NW
      Washington, DC 20005
18
      Robert John McCallum
19    FRESHFIELDS BRUCKHAUS DERINGER US LLP
      601 Lexington Avenue
20    New York, New York 10022

21    ALSO PRESENT:

22        Roger P. Alford
          UNIVERSITY OF NOTRE DAME
23        3119 Eck Hall of Law
          Notre Dame, Indiana 46556
24
                          *     *     *
25
```

```
 1   December 14, 2023                              8:04 a.m.

 2                         ---o0o---

 3                    P R O C E E D I N G S

 4                         ---o0o---

 5        THE COURT:  Good morning.  Please be seated.

 6        So we're here on 4:20-cv-957, the State of Texas,

 7   et al versus Google.  We're going to talk about discovery

 8   issues.  And let's go ahead and start, though, with

 9   appearances of counsel.  We can start with the Plaintiff

10   States.

11        MR. LANIER:  Thank you, Your Honor.  Mark Lanier

12   here on behalf of the plaintiffs.  I've got with me Zeke

13   DeRose from my firm.  We have Trevor Young -- Trevor Young,

14   the older -- here on behalf of the State of Texas.  We have

15   Roger Alford here as co-counsel.  We have Jonathan Wilkerson

16   from our firm.  James Lloyd from the State of Texas.  And we

17   have Marc Collier from Norton Rose Fulbright, co-counsel - --

18        THE COURT:  All right.  And I take it as per usual,

19   Mr. Lanier, you'll be making most of the presentation and

20   just identifying members of your team, so to speak, who may

21   cover particular issues.

22        MR. LANIER:  -- yes, Your Honor, if the Court will

23   allow me to.

24        THE COURT:  That's fine.

25        All right.  So for Google, Mr. Yetter?
```

1          MR. YETTER:  Yes, Your Honor.  I'm just going to

2     speak up.  I'm trying to get it on green.

3          On behalf of the defendant Google, Paul Yetter; my

4     colleague Mollie Bracewell; our co-counsel Eric Mahr from

5     Freshfields, and his partner Rob McCallum.

6          Mr. Mahr and I will split I think most of the

7     issues that we expect to be discussed today.

8          THE COURT:  All right.

9          MR. YETTER:  Thank you, Your Honor.

10         THE COURT:  All right.  So thank you, counsel.

11     I'll just remind everyone that we have, as we did at our last

12     hearing, an audio-only feed for the public, for the media,

13     anyone that wanted to tune into this hearing.

14         As you all know, we're here based on an order that

15     I issued a few weeks ago after our initial conference that

16     asked the parties to file status reports, essentially, on

17     where you are on discovery, and then issues in discovery, and

18     setting a hearing to talk about that.

19         I think the parties will note, just as an

20     administrative matter, that the Court has entered the

21     proposed orders that came from the parties, the

22     confidentiality orders, discovery procedure order, expert

23     discovery order.  They've all been entered.

24         Before we close out today, do remind me I want to

25     confer with the parties on where we stand on the record on

```
1    remand.  And I know we -- that you all had made a filing on
2    that.  You have a joint stipulation that, as I had indicated
3    to you, I do plan to sign.  The challenge is the most
4    efficient way to get those documents into the record, and we
5    can talk about that.  I assume the parties have been working
6    on putting that together, but I don't know if you've run into
7    any issues with regard to the Court's proposal on the most
8    efficient way to get that into the record.  But we'll talk
9    about that today.
10          So let me just give you the agenda I have and see
11   if you all have anything in particular to add to it.  Before
12   we get into some of the very specific, a little bit more
13   granular, discovery issues, I would like each side to talk a
14   bit about where you see discovery at this point in this case,
15   where we stand, and also how you see it going forward.
16          So that second part has to do with scheduling
17   issues, obviously, because the vision of how discovery is
18   going to go forward has a lot to do with what kind of a
19   schedule we think we can put in place.
20          We will talk about two overarching issues that are
21   referenced in your status reports and that are appropriate
22   for conversation today.  The first is the proposal of the
23   appointment of a special master, potentially, or
24   alternatively having a magistrate judge overseeing certain
25   aspects of discovery or maybe a number of aspects of
```

```
 1   discovery.  So that's one overarching issue I do want to

 2   discuss today with both sides.

 3           And the second is the notion of coordination of

 4   discovery.  This has also been raised.  This has to do with

 5   the MDL matter as well as the matter of the Eastern District

 6   of Virginia, and I would like to talk a bit about the

 7   parties' views on the possibilities of coordination.

 8           I'll state the obvious at the outset, which is the

 9   purpose of coordination is obviously in terms of efficiency

10   so we're not duplicating discovery where it can be avoided.

11   My real questions are going to be what kind of opportunities

12   are there at the moment given where the E.D.V.A. case is,

13   given where the MDL case is.

14           So what I want to do at the outset is have each

15   side kind of talk generally about where you think we are in

16   discovery, where you -- how you envision it going forward,

17   and with the schedule for this case in mind.  And then we'll

18   talk about those overarching issues.  And then, finally, I

19   think we can have some discussion on some of the specific

20   discovery, if you will, disputes or concerns that each side

21   has raised.

22           So let me start with you, Mr. Lanier.  And I know

23   at the risk of redundancy, I have a status report from both

24   of you that kind of talks about this, but I did put some page

25   limits on that, and I think there may be more to say.  And
```

```
 1    let me emphasize that I think for both sides, I'm not saying

 2    that you haven't been, but I want both sides' most realistic

 3    views of where you are and where this can go on discovery.

 4              MR. LANIER:  Certainly, Your Honor.  May it please

 5    the Court.  That's fair.  I approached the podium because the

 6    microphone seems to work better for the court reporter, and I

 7    don't mean to distance myself from you.  But as I approach

 8    it, I see the box of tissues, and I don't know if that means

 9    I'm supposed to start sweating now or if I'm supposed start

10    crying, but my hope is not to need them for either reason.

11              Your Honor, I went through everything as you did

12    getting ready for the hearing.  And I truly believe my

13    overarching view is that we've got to be careful not to

14    allow -- I don't want to be pejorative and use smoke and

15    mirrors, but not allow things to appear to be difficult

16    obstacles or unworkable such that they would propel a trial

17    to some unknown date into the future.  Because I do believe

18    that the details of what are in dispute right now, when you

19    dig down into them, or if a special master or magistrate digs

20    down into them, I think that it cuts through a lot of the

21    confusion that may exist about a lot of these issues and

22    gives certainty --

23              THE COURT:  I just want to stop you for one moment

24    and just ask you and say in your remarks -- and I know you

25    want to talk about what may be perceived as disputes or not,
```

```
1    but a couple of things I wanted you to make sure to address,
2    and I'm confident you would anyway, is just the very
3    practical aspect of timeline for completing certain -- so,
4    for example, in your status report, you talked about how many
5    depositions you need to take.  We've seen from Google how
6    much depositions they think they need to take.
7            As a practical matter, I think it makes sense in
8    this case, as in most cases, that you've gone through and
9    completed written discovery and document production, at least
10   as much as you can, before you start taking depositions, for
11   I think obvious reasons.
12           So part of this for both sides is sort of, looking
13   forward, there are the dispute issues, but then just looking
14   forward and saying, look, I think we can complete this piece
15   of discovery around this time frame and then this piece of
16   discovery around X time frame, Y time frame, Z time frame,
17   and then depositions, and including given the number of
18   depositions you anticipate being taken.
19           So I assume you were going to address that, but I
20   just want to make sure that that's part of what you talk
21   about.
22           MR. LANIER:  Okay, Your Honor, and I will make
23   certain that I do.
24           As I prepped for this, I was doing it with the idea
25   of what path forward do I believe that I should be advocating
```

1    to you.  And you know that path includes a rigorous schedule

2    where this is treated as -- by the parties, this is treated

3    as the priority that we believe it to be.  And so we do

4    appreciate you giving us this hearing.  We would appreciate

5    the idea, and I think the path ahead should include, monthly

6    status hearings in front of you, if possible.

7              We do believe that if you give us a discovery

8    master, whether magistrate or special master, that we should

9    probably be having every other week pre-calendared meetings

10   with that special master.  I think the discovery master will

11   help all involved.  I think it will help Google with some of

12   their complaints.  I think it will help us.  I think a

13   special master can give daily attention to this, which,

14   candidly, may be necessary except for Christmas day.

15             I think that 90 percent of the issues that we've

16   had have been resolved before a hearing.  Even some of the

17   issues today have been resolved as of yesterday because we

18   have the hearing.  And the same I believe would be true if we

19   had a special master.  Once we get a rhythm with the special

20   master, it will help resolve issues.  And you've got

21   incredibly seasoned litigators representing Google and,

22   hopefully, seasoned litigators representing Texas and the

23   other States and Puerto Rico.  And so we ought to be able to

24   do that.

25             The privilege log is also going to take a good bit

1   of work to sort through.  We've been assured by the lawyers

2   here in your last hearing that the 500,000 entries that are

3   on the privilege log have been personally scanned by these

4   law firms so that there will be a different assurance of

5   their quality than has been experienced in other Google

6   litigations.  And I appreciate the integrity with which they

7   have said that.  But it will still need to be tested and

8   probed and watched.

9           So I think that our overall needs are ones that

10  make sense as we work through the schedule and the issues.

11  We are going to need fact discovery, obviously.  We had

12  requested February 14th for fact discovery, seeking to take

13  about 30 depositions.  Obviously, if we think we wind up

14  needing more, we would ask for more, but we would have to

15  have a showing of good cause.

16          Those depositions that we want to take are not only

17  fact depositions of the underlying facts, but we're also

18  going to need to do some discovery on the document issues

19  themselves.  So, for example, in the *Epic* trial that Judge

20  Donato just finished, the instructions given to the jury

21  included a permissive inference where Judge Donato said,

22  quote, You have seen communications or "You have seen that

23  Google chat communications were deleted with the intent to

24  prevent their use in litigation.  You may infer that the

25  deleted chat messages contained evidence that would have been

1    unfavorable to Google in this case," close quote.

2         I was not present for those discovery fights.  I

3    don't know if Judge Donato had a thorough record in front of

4    him.  I've never been in front of Judge Donato.  I have no

5    reason to think he's not an imminently qualified jurist who

6    speaks clearly based upon good things, good evidence.  But I

7    know if I've got this case in front of you, I do not want to

8    take it up to the Fifth Circuit with some permissive

9    inference, for example, without having the underlying

10   discovery done that proves the inference.  And so we're going

11   to need discovery also on matters beyond simply the

12   underlying facts of the case.  But we think we can get that

13   done with 30.

14         You had previously given us 45 interrogatories and

15   30 contention interrogatories; we think those numbers are

16   fine.  The request for admissions, not counting

17   authentication, of 45, fine.  We do believe we can coordinate

18   with the MDL, but not on their timeline.  We believe the

19   coordination needs to be on our timeline.

20         And so we think we should be having full discovery.

21   We think the DTPA issues should be discovered.  We don't

22   believe -- even though I'm sure Google would like to file a

23   motion to dismiss, we don't believe that it will bear fruit.

24   And there will be a motion for summary judgment, I have no

25   doubt.  But to the extent they want to do that, we do not

1    think it should uphold discovery on those issues.

2            So when you put all of that together, where do we

3    stand on fact discovery?  We wanted it to end February 14th,

4    because we've hired the massive international conglomerate

5    firm Norton Rose Fulbright to assist in this regard.  We

6    wanted that fact discovery to end February 14th.

7    Realistically, because you put that to me just now in your

8    prefatory comments and I believe, in candor to the tribunal,

9    we may need an extra month to do that, it may need to be

10   March 14th.  But if I had asked for that, then I would be

11   negotiating from there, so I asked for February 14th.  And

12   I'm just being candid with you.  I think we might need an

13   extra month to get those 30 depositions done because Google

14   will be asking for their depositions as well.

15           THE COURT:  Right.

16           MR. LANIER:  And so we can double track if we need

17   to.  Heavens, we could triple track.  But I think

18   realistically, especially as we're looking through the

19   holiday period right now, you've got to add an extra month

20   onto that.  And that doesn't change the fact that we will

21   have to be incredibly diligent, and it will be a

22   back-breaking pace.  But I think that these firms are able to

23   do that.  I think we've got the stable of lawyers that we

24   need to do that.  And if we are not successful in that

25   regard, you have the power of the calendar, and nobody else,

1    and you can always say, "Lanier, you did not follow through,"

2    and you can alter as you see fit.

3         So expert discovery is a little bit easier I think

4    in our case.  The expert reports for Google, they're due in

5    front of the DOJ December 22nd in the Eastern District case.

6    Those expert reports are going to be very similar to ours;

7    they do not have the additional state allegations of DTPA and

8    things like that.  But as the Court's well aware, our case

9    has been pending a lot longer.  And Google has certainly been

10   aware of the need for this area of expertise for years now,

11   and I suspect that they will have no trouble getting that

12   expert discovery done within two and a half months or so.  We

13   can get our reports done.  We've known about this for years

14   and years as well, and so we're able to do that.

15        I've looked carefully at the schedule.  It looks to

16   me like there may need to be an extra month added to the

17   Court's time to deliberate on motions.  I am aware of this

18   Court's reputation for dealing with those matters in very

19   careful, excruciating personal-attention ways.  And so I

20   think we may have shorted the Court.  All to say that I think

21   we're more realistically looking at probably a late-October

22   trial date if we make those types of adjustments for 2024.

23        Your Honor, to add to where you set the agenda,

24   I've kind of inverted the order.  I went to how we go forward

25   before I looked at the discovery issues.  Here's my thought

1    on the discovery issues, and then I'll cover the last two

2    things you said.

3            From the plaintiffs' perspective, I've got five

4    basic discovery issues the way I've categorized them at this

5    point.  For Google, I've got seven.  And I won't respond to

6    Google's unless the -- until they assert them because maybe

7    I've got theirs wrong.  But for my issues, for the

8    plaintiffs' issues, number one, I want to do discovery, and

9    we need to get discovery, on the destroyed chats and the

10   instant messages, what I'm calling the Google-chat inference

11   discovery.

12           Number two, we believe there is still missing

13   information, missing documents, that the DOJ has not gotten

14   as well, and we think that these documents are ones that we

15   need.

16           Specifically, I put it as number 3, in my law firm

17   as an example, we have attachments to emails.  Mr. DeRose

18   sent me an email at 12:56 this morning detailing some

19   additional stuff for the hearing today; it was an attachment.

20   What Google typically does is they put an internal link

21   rather than an attachment.  So we've got 50,000 documents

22   that have been produced with these internal links, and you

23   can't go and pull up the document that's being referred

24   because we don't have the database to use for that internal

25   link.  That database is stored, we understand, on a massive

1    central database.

2         And we have asked for those links, i.e., the

3    attachments, the referenced documents.  We've been told that

4    that's too burdensome, and those have not been produced to

5    us.  And that is an issue that we need to deal with.  So

6    that's issue number three, linked documents.

7         My fourth issue deals with data source codes.

8    Emails can say one thing, but data and source codes can't

9    alter reality, they are what they are.  And so we want the

10   data source codes.  The -- Google has got certain

11   "dashboards," I think is the term they use, that deal with

12   these codes so that you can see at a dashboard glance how

13   fast the car is running without monitoring it inside the

14   engine, for example.  We need those.  We don't have those.

15   We need all of the source codes.  This is the code to give us

16   the information that we're going to need to prove adequately,

17   and sustain on appeal adequately, what we believe we can

18   prove already with documents.  So we need the data source

19   codes.

20        Number five.  The DOJ alerted us in the last

21   several days that they have provided or will provide a letter

22   to Google citing deficiencies in production.  It's uncertain

23   whether or not Google has even searched this global database

24   that I referenced earlier where these links are.  And the

25   DOJ's letter, while we've been made aware of it, we've not

1    been given a copy of it.  Obviously, those deficiencies, if

2    they exist, cited by the DOJ, are also deficiencies in our

3    case.  And so we're going to need to get that as well.

4         Those are the main discovery issues that we've got

5    that I would alert you to right now.  We think discovery can

6    be done.  We think it can be done timely.  We think it needs

7    oversight on a basis that, candidly, if we could get you to

8    move the rest of your docket over to Judge Mazzant and we had

9    you 24/7, we would just be golden.  But recognizing --

10        THE COURT:  He's a bit busy.

11        MR. LANIER:  Yeah.  Recognizing that, he would --

12   that's impractical, that's not happening.  So we believe that

13   it would be helpful to get a special master.  A special

14   master should be able to help streamline.  A special master

15   should be able to make sure that the privilege log is either

16   in place or is done in a way where you've got the issues in

17   front of you for your purposes.

18        You know, we tried to internally discern who would

19   be good special masters, and obviously it's whomever you

20   like.  You've got a Magistrate Judge Royal Furgeson does this

21   type of work.  Judge Glen Ashworth.  There are a multitude of

22   people who do.  We're not here to recommend someone.  We're

23   just here to recommend that someone perhaps be appointed.

24        The last point you asked in an overarching issue is

25   coordination of discovery with the MDL and the Eastern

1    District of Virginia, and what opportunities do we have for

2    efficiencies.  I think Google frets that the States have

3    taken a position that we are all for coordination where it

4    helps us, but all against coordination where it hurts us.

5            I don't know -- that certainly hasn't been our

6    deliberate effort.  Our deliberate effort is for coordination

7    where it's efficient and it doesn't foul up our timeline.  We

8    are not for coordination that sows delay into the case.  And

9    so we belief that it's useful for Google and efficient for

10   Google when they produce documents to the DOJ, to produce

11   them to us.  In essence, add us as a cc to the line so they

12   don't have to do it twice.  Ditto for the MDL.  Just make

13   sure what's being produced in one is produced in all.  That's

14   an efficiency issue.

15           When it comes to the depositions however, those are

16   ones that we expect to play in our case.  If they're

17   depositions we expect to play in our case, then we need to

18   attend and we need to have the documents ahead of time.  If

19   the parties want to agree to use a deposition that's been

20   taken in another arena, that's great; otherwise, both sides

21   should be entitled to take their own depositions in this

22   case.

23           We think that coordination can work, and we're all

24   for coordination.  And while we have no role in the DOJ case,

25   I was one of the lead counsel designated by the judge in the

1    MDL case.  I've still got all of the co-counsel up there that

2    represent the plaintiffs, are my friends.  We coordinate by a

3    matter of course.  None of us want to do unnecessary work.

4    We're all for the coordination.  And we think that that can

5    be done, though perhaps it's more usefully done if we've got

6    a special master who can immediately, on a phone call,

7    resolve a dispute that doesn't seem resolvable, but maybe not

8    meriting your attention.

9            So I've tried to cover the agenda that you gave me.

10   I know that there are issues that Google has, but I would

11   rather them preempt those by just walking through them with

12   my responses.  I will cede the microphone absent any

13   questions.

14           THE COURT:  Well, let me follow up with you on a

15   couple of things before I hear from Mr. Yetter or Mr. Mahr.

16           Let me start with the coordination issue and just

17   explore that with you a little bit.  So let's talk about the

18   E.D.V.A. action first.  It's my understanding that that case

19   is positioned such that discovery is effectively completed.

20   You've mentioned there may be deficiencies.  I mean, I've

21   seen an order recently that denied taking additional

22   depositions in this case.  And I see the timeline that you've

23   visited, Mr. Lanier, about when expert reports are due.  And

24   I believe in January, you know, they have a hearing with the

25   district judge I think about where the case is at, I think

1    summary judgment schedule, perhaps something like that.  But

2    it does certainly look to me like from -- for the E.D.V.A.,

3    there's not really any potential for any kind of coordination

4    at this point.  I know there was an order in the past that

5    where there was some coordination.

6           But is it fair to say that there's not really any

7    coordination left in the sense of, you know, depositions or

8    whatever?  I hear your point about if documents are being

9    produced to the DOJ in that case, should they not be produced

10   in this case.  And I suppose that that's certainly

11   coordination related, although not exactly, you know, for me,

12   I think, where we're looking for deficiencies in some aspects

13   of coordination.  But is it fair to say there's not really

14   any available in the E.D.V.A.

15          MR. LANIER:  Yes, Your Honor, save three things.

16   Number one, the documents you spoke of.  Number two, the

17   expert reports you referenced.  And number three has slipped

18   my mind, so let's just stick with the two you raised.

19          THE COURT:  All right.  Right.  And I think those

20   issues are certainly coordination related, meaning given the

21   subject matter of the two cases, and I know Google's going to

22   have a position on this, but what should and should not be

23   produced in this case that's produced in that case.

24          So then let's talk about the MDL coordination.  I

25   will go ahead and confess I'm not as up to speed, I don't

1    feel like, at this moment of exactly where the MDL is

2    situated in terms of possibilities for coordination.  And

3    maybe you can talk a little bit about that.

4              MR. LANIER:  Well, the MDL has still got their

5    depositions schedule to work through and to iron out, and so

6    there is potential for coordination on depositions.  That

7    was, by the way, my third point, if I can retrograde back.

8    There may be some type of coordination by as we get all of

9    the deposition transcripts with the DOJ, it may obviate our

10   need to take depositions if the parties will stipulate that

11   they can be used.  Now, back to the MDL.

12             We will certainly try to coordinate those

13   depositions as best as we can, but their deposition schedule

14   is different than ours, at least different than we hoped for,

15   and so we don't want to be tied to the depositions they

16   choose.  By the same token, to the extent they are the same

17   witness and we have the opportunity to prepare accordingly,

18   we're certainly happy to try to coordinate within that

19   deposition framework.

20             We're not seeking -- the unique thing -- I can't

21   necessarily put Norton Rose in this position, but from my

22   firm's perspective, the unique thing about a plaintiff's firm

23   generally is we're trying to do this as efficiently as we can

24   because we have no purpose in doing needless work.  And so if

25   we can get this thing done by a deposition, you know, if

1    David Boyce is going to take a deposition in the MDL of the

2    same witness I'm going to take the deposition of, there's no

3    point in me going up there and doing the same thing.

4           Now, if I have independent needs, then we will

5    still coordinate as best as we can and I'll say, hey, we've

6    got X number of hours, I need two hours of time, I need three

7    hours of time.  That type of coordination is easily done.  It

8    doesn't really need, I hope, court oversight.  The document

9    end of discovery is useful as well.

10          The last thing I would add, the last facet of this,

11   is in the MDL the States were the lead parties.  Judge Castel

12   really looked to the States to take the initiative.  He would

13   have -- you know, when we come into your court, Bonnie

14   has this little seating chart.  When we went into his court,

15   he had a seating chart and he would determine much of the

16   seating.  And he looked -- he made it clear that we were --

17   so once we left, the MDL structure is -- had to fill a

18   vacuum.  And they've done it.  They've got great lawyers.

19   They'll have no trouble doing it.  But they have no trouble

20   looking to us, I guess is what I'm saying, and letting us

21   help and integrate and work that.  And we pledged to do that.

22   But beyond that, I don't know that there's that much more to

23   be done on coordination with the MDL.

24          THE COURT:  All right.  That's helpful.  Let's --

25   let me talk about the special master issue with you for a

1    moment.  So obviously, I'm well aware of what we may or may

2    not be able to do with a magistrate judge as a potential

3    person who could help with discovery issues.  The first thing

4    is, obviously, this is all under Rule 53.  I know you're all

5    very familiar with Rule 53.  And, first of all, my

6    understanding is this is a special master as, at least as you

7    suggested, who would be involved in handling discovery issues

8    and discovery issues only.

9         MR. LANIER:  Correct, Your Honor.  And that's all

10   the special master would do.  The parties would each pay half

11   of the bill, and the special master's orders would be

12   appealable to you.

13        THE COURT:  Right.  And you know there are various

14   ways that a special master could be appointed.  One is by

15   consent of the parties.  I'm not sure that you have that

16   here.  The Court has authority to appoint a special master,

17   obviously, but the parties need to have the opportunity to be

18   heard on that, et cetera, et cetera.

19        So and I will say that some of the best practices

20   with regard to special masters may be that if a special

21   master were to be appointed, that the parties would -- might

22   come up with either a list of acceptable people or agree upon

23   a special master.  Those are all possibilities.

24        MR. LANIER:  True.

25        THE COURT:  There's also a point that the Court

1    either before or after that puts forward a person to be a

2    special master.  Obviously, we have all of the conflict

3    disqualification aspects of this.  But more importantly, I

4    think if the Court was going to go down that road, we need to

5    look very carefully at how a special master was selected.

6              MR. LANIER:  True.  No dispute on any of that at

7    all, you know.  And we've had some courts where -- I had a

8    RICO case in Philadelphia where the judge had the magistrate

9    judge as a special master.  And Judge Doherty, I had a case

10   in front of her in Lafayette, and she had three special

11   masters.  Judge Polster, up in Ohio, in our opioid case,

12   started out with three special masters and decided he didn't

13   need three, and he scaled it back to two.  And then when

14   Francis McGovern died, he scaled it back to one; and that one

15   special master had the ability to hire people to assist him.

16   I think David Cohen had hired a law professor for assistance,

17   for example.

18              But you've got great flexibility.  It's truly one

19   of those rules, as we understand it, that exists to give you

20   the ability to work the case up as efficiently and

21   responsibly as it can be done.  And we're certainly believing

22   that a special master would be of great assistance to the

23   Court and to the parties.

24              THE COURT:  All right.  Thank you, Mr. Lanier.  I'm

25   sure you'll be back up relatively soon.

1          And so, Mr. Mahr or Mr. Yetter -- so Mr. Mahr,

2     before you even get into your thoughts, if you will, with

3     regard to your thoughts on discovery, where it's been, where

4     we are, I want to ask you a couple of questions that have to

5     do with these two overarching issues of coordination and a

6     special master.  I'm going to start with the special master

7     issue.

8          From Google's status report, to the extent it was

9     addressed, I think you indicated Google is not on the same

10    page as necessarily the Plaintiff States in believing that a

11    special master or a magistrate is needed on discovery issues

12    in this case.  The, Plaintiff States, you know, as Mr. Lanier

13    just confirmed, believed this would be very helpful on

14    discovery.  And so I would like to get your thoughts on that.

15         It does seem to me that there are a lot of benefits

16    in having both regular planned hearings with this Court on a

17    monthly basis and however it is structured, preplanned, you

18    know, regular meetings on discovery issues, whether that's

19    with this Court or whether that's with the magistrate or a

20    special master.

21         So in commenting on the special master issue, and

22    I'm sort of precluding you getting into your initial

23    thoughts, but I would like to get your thoughts and position

24    on the efficiencies, the usefulness of a special master or

25    magistrate judge, and also just wrapped into that, the idea,

1   which as I've just said made some sense to me, of regular

2   meetings both with this Court writ large on the case's

3   progress, and then whether it's this court, a special master

4   or magistrate on discovery issues.

5          MR. MAHR:  Thank you, Your Honor.  And I'll start

6   with the two easy ones.  Our position is, first, whatever

7   makes sense for you as the judge overseeing this, we'll

8   obviously comply with and support as well.

9          The second is I think regular meetings are

10  typically very helpful establishing that cadence and that

11  discipline.

12         But third, as to the special master, his or

13  herself, we don't think that it would be particularly useful

14  for a couple reasons, and one I'll just flag, but the status

15  of the discovery.  I don't think the status of discovery is

16  the place where a special master would be particularly

17  helpful.

18         And the second is I think that the appointment of a

19  special master -- and I'm actually surprised when the

20  original proposal was to have discovery done on February

21  14th.  Everything, when we tried to negotiate with 17

22  different states, it's taken that long to get a special

23  master, I would -- with respect.  I'm sure we can do it

24  faster under your guidance.  But the idea that we can find

25  someone that's not objectionable to either party and that

```
 1    doesn't have conflicts, get that person up to speed on what
 2    is a very complex case and one that you've already devoted a
 3    lot of time to understanding, that seems to me to be a huge
 4    inefficiency right there.
 5            But even greater inefficiency is, in my experience,
 6    a special master is an invitation to come up with discovery
 7    disputes and take it to the special master because it
 8    lacks -- what you provide in the discovery context is
 9    discipline.  No one wants to come with kind of an, oh, I'll
10    just take a flyer on this one and see if I can get this
11    material because, why not?  It's a special master.  She's not
12    going to be deciding the case.  I'll just give it a try.
13            And the discipline of having to -- Mr. Lanier
14    referred to it, we've got a flurry of discovery responses
15    prior to your last hearing and prior to this hearing.  Even
16    yesterday, we got another email amending one of the
17    responses, because now they're hustling because they have to
18    come in and see you.  And we think that will be the same in
19    the case of discovery going forward, that the discipline you
20    provide is very important.
21            Another in this -- another aspect in this case in
22    particular is it's a very complex case, very complex
23    industry.  These discussions of source code and things like
24    that, they will go to the merits and help you better
25    understand the overall space from a business perspective, a
```

1    market perspective.  And I think that's very useful for you

2    and for the parties to hear how you approach that.

3            Certainly, if certain issues come to you and you

4    think this would be better for a magistrate judge to handle,

5    you can always punt that right down to the magistrate judge,

6    and that makes complete sense for us.  But those are kind of

7    my overarching views.  And maybe if I could segue into where

8    we think discovery is.

9            THE COURT:  Yes.  Yeah, go ahead.  Let's do that.

10            MR. MAHR:  Because, you know, we look at discovery

11    as a number of elements, which it's a lot, but I think it's a

12    little bit more straightforward than the list that Mr. Lanier

13    just gave.  Certainly, depositions have not been reached yet,

14    or at least not many of them have.

15            What has happened to date, and you'll hear this

16    from me a lot, 6 million documents, 200 terabytes of data,

17    and 800 gigabytes of the source code Mr. Lanier was referring

18    to, that's all gone from Google to the States.  We've only

19    had the smallest dribbling of document discovery from the

20    States.  They're fighting -- the state agencies who use

21    AdTech, their AdTech users, are fighting our discovery on

22    sovereign immunity grounds, forcing us to take it up to the

23    Fourth Circuit in different jurisdictions.  So there's a lot

24    to get from the plaintiffs still.

25            But we have provided -- discovery is closed in the

E.D.V.A.  There's always followup and we want a little bit
more of this or that.  But discovery is closed, and we think
the document discovery but for that cleanup that always takes
place.  And we've agreed to go back to the privilege logs --
we, as I said last time, we take these privilege issues
seriously, but no privilege log is going to be perfect, and
we're open to considering challenges to it, working those
things out.  But this document discovery is done for the most
part on our side.  At least that's how we view it.

        We also, we've got -- now, in this case, we have
101 new RFPs from the plaintiffs, and we'll move to -- for a
protective order with respect to some, or maybe be able to
negotiate them down, but that is something that needs to be
done in the next six months.  Whether it results in the
production of more materials, whether we're able to negotiate
our way through it, whether they already have them and we can
point them to them, I don't know yet, but that'll take a bit
of work.

        So you've got the new interrogatories, the
plaintiffs' discovery responses, which are very insufficient
now, and they've been trying to firm them up just in the days
coming -- the days before the hearing, but there is still a
lot way to go, a lot to go on that.  Privilege logs, as
Mr. Lanier said, we have questions on privilege logs.  We
haven't received their privilege logs yet.  And then

```
 1    depositions.  And I think the depositions is an important
 2    point.  We're talking about 30 per side.  They have taken
 3    four already in coordination with the DOJ.  They stopped
 4    coordinating with the DOJ because they said they weren't
 5    ready to take those depositions.
 6           And this is kind of another tension here where
 7    they're not ready to take depositions that all the MDL
 8    plaintiffs was ready to take and that all this -- all the DOJ
 9    was ready to take, but they weren't ready because they hadn't
10    gone through the documents.  And now they propose we do 56
11    more in the next two months.  I don't think it's realistic
12    and I think it, actually, at the end, will be less efficient
13    than kind of marching through this in a sensible way.
14           If I can tick through the plaintiffs' issues.  On
15    the chats, I understand it just may be too attractive to see
16    what happened in the Play case and to argue it here, but
17    there are a lot of Google cases.  There's the Play case that
18    just played in front of Judge Donato.  There's also the
19    Search case pending in the District of Columbia in front of
20    Judge Mehta; there was no instruction in that case.  Those
21    issues are in the Play case.  If they find any relevance
22    here, then they'll raise it.
23           THE COURT:  I was going to say this to Mr. Lanier,
24    but I think it likely goes without saying that where a
25    spoliation type of issue -- and I think that sounds like
```

1    that's a spoliation issue and a spoliation instruction, that

2    in any case when that comes up, there may be more discovery.

3    And certainly, in order to get to a point where there's going

4    to be a jury instruction that in any way addresses that kind

5    of issue, that there will have been the discovery that's

6    needed.  Obviously, you'd made a decision about whether or

7    not any such instruction -- you know, this is all very

8    hypothetical.

9          I appreciate the parties bringing to the Court's

10    attention what's happening in other cases and what anybody

11    has done in other cases.  But I do want to make clear that

12    what I'm most concerned with is what's happening in this

13    case, and I'm going to judge the parties' actions in this

14    case.

15          So, you know, anything like that that comes up in

16    discovery, and I think the Court will have and needs to have

17    flexibility in terms of how we deal with discovery issues and

18    potential extensions that you just mentioned, Mr. Mahr.  I

19    mean, right now, I think in the E.D.V.A. there are some

20    things, as they do, that come up maybe at the end of a

21    discovery period that need to be explored as to particular

22    issues, and it seems to me that that's what's happening there

23    and that's what you'd expect.

24          MR. MAHR:  Yes.  That's exactly right.  And with

25    chats, in addition to -- you know, it arose in Play.  It was

 1    not as -- there was no instruction in the Search case.

 2         THE COURT:  Right.

 3         MR. MAHR:  In our case, in the investigation, way

 4    back when the OAG was starting the investigation, we

 5    disclosed the chat retention policy.  So they've known about

 6    this for years.  Now, it's really interesting because of what

 7    Judge Donato said, but they haven't pursued it over the last

 8    couple of years.  So we'll deal with that in the context of

 9    this case as you just suggested.

10         But that -- the second category was missing

11    documents.  Didn't say what those missing documents were,

12    just missing documents.

13         The third was links.  We're negotiating the links

14    issue, 50,000 docs with links.  And the documents they link

15    to will have links, and those links will have links.  I think

16    we're really getting into fishing, upon fishing, upon

17    fishing.  Because in none of these examples of the missing

18    documents -- with the DOJ unknown deficiencies, that they

19    want to raise the same deficiencies that the DOJ raised, even

20    though they don't know what they are -- none of these have

21    yet been tied to any mention of the merits.

22         How in the world is this relevant to how reserve

23    price optimization algorithms run and whether they do what

24    Google said they do or not?  And we're so far away from the

25    case just kind of doing discovery for discovery.  And, wait,

1    the DOJ asked for more.  So we don't know what they asked

2    for, but we want it.  And they're missing documents.  And

3    they can't say what they are and how they're related to the

4    case, but we want them, too.  I think that it's just a

5    proliferation of what we see is already a huge job.  With

6    discovery, with the depositions, and enforcing our written

7    discovery against them, and closing out their written

8    discovery against us, we think that takes until June.  But

9    you put all of their cacophony of issues on top of that, and

10   it really gets complex.

11         The second -- you asked second was coordination.

12   And I think you're right.  The chances for discovery

13   coordination with the E.D.V.A. are almost gone.  There might

14   be a little bit here and there.  I think there is -- and

15   they're dealing with the exact same antitrust claims, so

16   there is an issue of coordination as that -- if that case

17   gets tried before any kind of sensible trial date here, there

18   could be facts established, there could be learning that

19   takes place in that -- takes place in that case that may or

20   may not be applicable in the antitrust claims in this case.

21         That's one reason to kind of stagger.  We're in a

22   very odd situation in the world after the legislation passed

23   that brought us back here, and so we have the same case

24   pending in three different jurisdictions, at least on the

25   antitrust.  They -- kind of trying the two cases on top of

1    each other invites the possibilities of inconsistent

2    judgments and having one appeal, a decision from you, and

3    potentially appeals in the Fifth Circuit, and the same in the

4    Fourth Circuit, and maybe at some point the same in the

5    Second Circuit.  So they're having those kind of reasonably

6    staggered to see what substantive learning.  I think that's

7    all I can think of when you ask for coordination there.

8              The Southern District of New York I think is

9    replete with opportunities for coordination, the same

10   coordination that's been taking place under Judge Castel's

11   fact discovery order.  And that's why we suggest that we

12   continue to follow Judge Castel's June 28th process because

13   we're already -- you know, we've swum halfway across the

14   river and, as Mr. Lanier said, the State Plaintiffs have

15   played a big role in that.

16             Our ability to coordinate documents in depositions

17   with the Southern District of New York is complete.  We could

18   completely coordinate.  Now, of course, there'll be some that

19   certain parties in New York are interested in that the State

20   Plaintiffs aren't, and vice versa.  But for the overlapping

21   depositions, there's no reason we can't continue to do what

22   they did with the four depositions that have already taken

23   place, which is one person -- one deposition per Google or

24   third party.

25             I take a breath to see if you have any questions

1   there, and then I can go to the overarching issues.

2          THE COURT:  Right.  And just on that last point you

3   were making, I heard about from Mr. Lanier a bit about where

4   the deposition process stood in the S.D.N.Y.  And can you

5   comment on that, where that stands?

6          MR. MAHR:  I think it stands pretty close to where

7   we stand here.  There are -- there have been some depositions

8   that have been taken that have overlapped with the DOJ.  As I

9   said, the MDL plaintiffs were able to prepare themselves for

10  a couple more depositions than the States were.  But there's

11  still more to do on both sides in terms of deposition.  And

12  when I say more to do, I view that as opportunities for

13  coordination.

14         THE COURT:  And I take it that's because there's

15  still been production of documents and other things being put

16  in place in the MDL that are preceding the taking of I guess

17  most of the depositions that are anticipated; is that right?

18         MR. MAHR:  I think that's right.  Again, a lot of

19  the -- we think the Google deposition -- the Google document

20  discovery should be done.  I'm sure that all of the

21  plaintiffs disagree with that, but we think we're at least

22  extremely close to that.  So that the Google depositions have

23  been taken and can continue to be taken, and there's no delay

24  in that.

25             I don't know for every third party whether there

1    is -- there are some outstanding items.  But, you know, we're

2    heading into the holidays.  Within six months after that, and

3    that's -- that, to us, is a very reasonable amount of time to

4    take a lot of depositions after cleaning up the discovery,

5    privilege logs, and issues that lay out there.

6            THE COURT:  All right.  And you're right.  My focus

7    is on Google -- I mean, for the MDL and coordination, it

8    principally is Google depositions.  I assume there are some

9    other third parties, et cetera.

10           MR. MAHR:  There are third parties, and there have

11   been no depositions of the States yet.  And as I've said, we

12   have had trouble getting -- the different States are taking

13   different approaches to cooperating with us in getting

14   discovery of state agencies that use AdTech products.  So

15   some have cooperated.  Some have said they would cooperate,

16   and hasn't happened yet.  Some say we don't have anything to

17   do with those third party -- those other agencies.  Some have

18   fought us in the appellate courts over sovereign immunity

19   issues.

20           But about there's a lot to do there to get Google's

21   discovery.  The focus has very much been on Google discovery

22   against it but not for it.  And I will make another point

23   about the one-way coordination.

24           When Judge Castel evaluated the State Plaintiffs'

25   proposal with respect to a coordination order, he rejected it

1    and called it a non-coordination order just for the reasons

2    that we're talking about, which is when it suits them,

3    they'll coordinate.  Any documents, any documents that you

4    give to the DOJ or the MDL, give to us.  No question -- no

5    looking into whether they're relevant or not, whether they

6    have something specifically to do with some of the federal

7    agency advertisers that are seeking damages in that case, or

8    the individual corporate plaintiffs, private plaintiffs in

9    the S.D. -- give it all to us.  But expert reports, before we

10   get to expert discovery, give us a sneak peak at your expert

11   arguments now.  We want all of that.

12          But then when it comes to, you know, whether

13   they'll participate in depositions or deposition scheduling

14   on a consistent basis, they're asking for a schedule from you

15   that will prevent that kind of coordination in that sharing

16   of depositions.

17          The last point I wanted to make, and I think it's

18   an important overarching issue because it does inform both

19   the substance and pace of the discovery particularly on our

20   side, is that Google still has not had the opportunity to

21   file the motion to dismiss on the DTPA claims.  And contrary

22   to some suggestions in their last filing, we're not asking

23   for a stay of discovery to do that.  We're ready to do that

24   concurrent with the discovery that's going on.  Not an easy

25   situation, and I will get to that.

1          But we're not going to come and ask you to stop

2    discovery, because those opportunities for coordination are

3    alive right now with the S.D.N.Y. and the MDL action.  And

4    for us to stay and them to continue would scuttle those

5    opportunities.  So we're not asking for any kind of stay.

6          But we are asking for the opportunity to test the

7    DTPA claims which have been an extraordinarily moving target

8    for the last two, three years now.  And we think as valuable

9    as Judge Castel's motion to dismiss ruling was on the

10    antitrust claims, your addressing the DTPA claims would be

11    equally, if not more, valuable because they are so all over

12    the place.

13          Over the course of four years, the plaintiffs have

14    really yet to -- and I talked about this last time -- they've

15    thrown up six allegedly deceptive acts and they seek to

16    challenge those -- going back to 2010, by the way.  They seek

17    to challenge those acts on behalf of what they say is all of

18    the above, which is advertisers, publishers, AdTech

19    competitors, users, consumers, and the States them self,

20    under at least 17 different state statutes, and that's just

21    DTPA, and professing to seek a mix of relief from damages to

22    restitution to disgorgement and anything else that comes to

23    mind.

24          But they have not still connected the dots between,

25    okay, you're challenging reserve price optimization.  Reserve

```
 1    price optimization is an algorithm designed to increase

 2    publisher revenue, help them fund their websites more.  It

 3    helps publishers.  Are they representing publishers when

 4    they're attacking reserve price optimization?  That doesn't

 5    make any sense.  Are they representing users? Consumers?  Or

 6    advertisers?  And when you get into the parens patriae

 7    issues, if they're just representing advertisers, well,

 8    there's very able classes up in New York who are already

 9    representing the advertisers.

10           And I think the most kind of -- and so they haven't

11    articulated how their case comes together even.  We don't

12    know what we're shooting at yet.  The most salient example of

13    this is that counsel for Texas, from the very first time they

14    appeared before you, has touted this as a case in which they

15    are here parens patriae on behalf of the citizens of Texas.

16           You will recall Mr. Keller back in 2021 said,

17    quote, "Texas is here in parens patriae on behalf of its own

18    citizens for harm that occurred in its own state, and the

19    same is true for the other sovereigns."  And as recently as

20    just on the 20th, when we were here last time, when

21    Mr. Lanier responded to my saying, We don't know who they're

22    representing, he said, quote, "Google complains they don't

23    know the who, what, and how much.  Parens patriae.  Yes, they

24    knew the who.  We claim to represent all of them.  All of

25    them.  All of the above."
```

1          But just last week, we got some long overdue

2    interrogatory responses from the plaintiffs.  And while there

3    are still a lot of questions unanswered, one thing that they

4    did answer is that many States, including remarkably Texas,

5    are no longer seeking to recover as parens patriae.  They

6    gave us this long chart and these interrogatories that says

7    whether they're proceeding as parens or sovereign.  And under

8    Texas, it's sovereign.  So all of the parens patriae

9    discussions we've had for the last two and a half years, gone

10   apparently, unless it changes again.

11          So I think, you know, and they can proceed however

12   they want.  They're perfectly -- they can proceed as a

13   sovereign or parens, or both perhaps, but we need to know.

14   And it seems like the only way we're going to be able to find

15   out is to file a motion to dismiss that kind of -- that

16   forces that kind of discipline on the complaint and on the

17   case.

18          Same thing holds true -- and I won't go through all

19   the examples, but sometimes it's two States are seeking

20   damages, and then it's five, and then four are seeking

21   restitution.  It's a moving target, and we think that a

22   motion to dismiss is the only way to lock this down so that

23   we know what we're litigating.

24          And I think that's a big scheduling consideration.

25   And I don't know -- I've been thinking a lot, we all have,

1    about how to approach a case in which you're seeking to

2    dismiss claims that have been around and amended five times

3    already while you're finishing up discovery.  And the only

4    thing that came -- well, a couple of things came to mind, and

5    you'll, I'm sure, have more ideas.  But one option is to give

6    the plaintiffs yet another shot at filing a coherent

7    complaint on their state DTPA claims, a best and final

8    complaint that does tell us what conduct are you challenging

9    on behalf of what party under what authority and what remedy,

10   and lines those all up; doesn't just throw them all against

11   the wall and allow us -- and force us to figure that out.

12   I'm assuming they can do that quickly.  And however long it

13   takes them to do that, we could have a motion to dismiss in

14   30 days after that.

15          The other option would be just to stick with what

16   we have now, which is kind of this broad complaint as amended

17   by these discovery responses that are trickling in and coming

18   in and changing from week to week --

19          THE COURT:  Can I ask you a quick question on that

20   point, just to be sure if I'm understanding you, because

21   obviously the Fourth Amended Complaint is a lengthy document

22   and that portion of the complaint is rather lengthy.  Are you

23   saying that you're seeing discovery responses -- with regard

24   to what remedies are being sought and what's being asserted

25   in what capacity from various states, are you saying the

1    discovery responses are basically contradicting what's in the

2    Fourth Amended Complaint?  And I want to make sure I'm

3    understanding because you're talking about, hey, maybe they

4    need to file another amended complaint.  And I wanted to see

5    if that's, you know, like you're saying, deficiencies or

6    confusion, or things that you believe are affirmatively

7    contradictory.

8              MR. MAHR:  Not affirmatively contradictory.  Our

9    position is they haven't told us.  And now they're telling us

10   through discovery, and they tell us one thing in the spring

11   and another thing in the summer and another thing in the

12   fall.  And so, you know, for us to move against a particular

13   claim, we have to -- there is a challenging RPO under the

14   Arkansas DTPA, and they're doing that under either statutory

15   parens authority or common law parens authority.  And the

16   requirements for standing under either of those kinds of

17   parens -- but because they never say how they're proceeding

18   under each piece of conduct, we would be kind of having to

19   improve their arguments in order to knock them down.

20             We could do that.  I'm just worried that you're

21   moving to move -- you're moving to challenge a complaint

22   where you have all this discovery that's changing at the same

23   time and it's challenging to figure out how you -- how do you

24   move on a complaint that's essentially been amended.  But I'm

25   not -- there may be contradictions.  I'm not saying there

1    aren't.  But that's not what I'm talking about.

2          So those are the -- I don't know how you want to

3    approach that.  But certainly, the motion to dismiss issue is

4    a challenge.

5          THE COURT:  Well, and I'll give it some thought and

6    I'll hear from Mr. Lanier.  I will tell, you know, both sides

7    I am -- I don't know if it's the right word to say -- I'm a

8    believer in the federal rules or in the motion to dismiss

9    process.  I don't -- as both sides are aware, I don't have

10   standards within this Court that kind of, let me just put it

11   this way, jigger with the process of how motions to dismiss

12   are done.  I know that happens out there.  I don't do that.

13         I believe the process anticipated by the federal

14   rules works.  It doesn't mean that sometimes you have a

15   motion to dismiss that's mooted because somebody got leave to

16   amend a complaint.  Yes, that happens.  But what I find is

17   that the motion to dismiss process candidly works.

18   Sometimes, you know, we grant them when they're merited.  And

19   typically we'll allow re-pleading, but not always, not

20   always.  Sometimes that motion to dismiss is granted and

21   then, you know, you have dismissals with prejudice for claims

22   or lawsuits.

23         So just as a general matter, what I'm saying is I

24   think the motion to dismiss process works as a general

25   matter.  And that means that, you know, many times plaintiffs

1    see that motion to dismiss and they immediately are, you

2    know, trying to get leave to amend their complaint.  And

3    depending where it is in the case, you know, they may get

4    that leave to amend their complaint.  Sometimes you have a

5    motion to dismiss where, you know, things are being dismissed

6    with prejudice.  So what I would say is my general view is we

7    follow the rules.

8              And I will hear from you, Mr. Lanier.  So it may be

9    that the plaintiffs are anticipating asking for leave to file

10   a further amended complaint.

11             Or it may be that, you know, you file your motion

12   to dismiss and we rule on it.  I will also say that as you've

13   noted, Mr. Mahr, I'm not inclined to stay anything while

14   these are pending.  It's going to mean more work for the

15   Court.  It's more work for the parties, but I know both sides

16   are interested in efficiencies here.  And my view is that we

17   can move forward if there's a motion to dismiss and at the

18   same time we're finishing discovery, because after all, a

19   motion to dismiss, as we all know in this room, is about the

20   sufficiency of the pleading itself.  We're not testing the

21   evidence.  We're testing the pleading itself.

22             So I don't see a reason necessarily that we can't

23   be doing both of those.  And my view is, you know, that you

24   can proceed with any motion to dismiss you need to file.  I'm

25   not going to tell you you can't file motions to dismiss about

1    X or Y right now.  If you need to file a motion to dismiss,

2    you can file it.  And I'm happy to discuss it more with the

3    parties if it makes sense because we want this to be

4    efficient.  And if Mr. Lanier or the Plaintiff States today

5    or next week, you know, come forward and say, We want to

6    amend our complaint, obviously a huge factor in that is

7    whether there's an agreement from the parties to have an

8    amended complaint or not; that's a -- particularly when

9    you're at, you know, the third or fourth or fifth amended

10    complaint, even in a case like this.

11           MR. MAHR:  We appreciate that.  And it's just an

12    extraordinarily complex situation we're in with the JPML, and

13    the remand, and discovery going on in the court in the

14    Southern District of New York completely understandably

15    having stayed motions practice on the state law claims.  And

16    we just want to find a way, even if it means doing lot a of

17    things at once, to keep the case moving.  I think you're

18    right that all of our North Stars should be the federal rules

19    of civil procedure because that will get us through.

20           Thank you.

21           THE COURT:  All right.  Mr. Mahr, thank you.

22           Mr. Lanier, I'm going to give you an opportunity to

23    respond but also maybe at the outset to talk about whether or

24    not the plaintiffs are contemplating further amendments to

25    the complaint and, you know -- and also addressing the

1    concerns that Mr. Mahr raised about where the responses to

2    Google's discovery are on behalf of the various States.  And

3    I know there's been recent -- apparently some very recent

4    additional discovery responses.

5         MR. LANIER:  Yes, Your Honor.  On the first issue,

6    the complaint, we have no need to amend the complaint on

7    those issues.  And as long as they're not seeking to stay

8    discovery, they can file all the motions to dismiss with no

9    objection from us.  And I wouldn't ask the Court to abrogate

10   the rules at all.  I think the rules are there for a purpose,

11   they serve a good purpose.  I applaud everything the Court

12   has said.  And they can move to dismiss on the DTPA claims as

13   they've been set out in the complaint.

14        As for the other issues that you wanted me to

15   address, on the state discovery issue -- I'll prioritize that

16   one because you did as well -- the defendants issued 70,

17   seven-zero, Rule 45 subpoenas to a lot of state agencies.  A

18   number of those have complied.  Now, we have authority to

19   speak on behalf of a number of States.  We do not represent

20   all of those States in terms of being their retained legal

21   counsel.

22        Some States have different rules than other States.

23   Some States allow the AG's office, for example, to make

24   determinations about what an agency will or will not produce.

25   Some States do not allow the AG's office to do that, and so

1    you really are at the mercy of the state agency.  It's not

2    anybody we have any control over.  And it's almost like just

3    a third-party subpoena.

4           So when they issue those types of third-party

5    subpoenas, you cannot blame the plaintiffs in this litigation

6    because of someone asserting a legal right they believe

7    they've got in terms of responding to that subpoena.  I would

8    suggest that a special master might see some of this, and the

9    Court might see some of --

10           THE COURT:  Okay.  Do you mind if I ask you a quick

11    question on that, just so I understand the point you just

12    made?  So I'm just going to compare it to the State of Texas

13    for a moment.

14           MR. LANIER:  Yes, sir.

15           THE COURT:  Right.  So you're here as the State of

16    Texas, and the Attorney General's office of the State of

17    Texas certainly represents the state itself and subdivisions

18    of the state; so, for example, we all know the major

19    universities or TDI, et cetera.  Then you have other entities

20    in Texas that aren't necessarily going to be represented by

21    the AG's office -- for example, cities; for example -- we

22    could come up with a number of other entities -- those are

23    the entities that get governmental immunity, they don't get

24    sovereign immunity, they get that derivative immunity.  But I

25    want to make sure I understand your point.  In these other

1    States that you're talking about, is this an issue of we have

2    the AG for each of these States -- if it's South Carolina or

3    Utah or wherever -- where these are subpoenas that are going

4    to entities that are not being represented by the AG counsel

5    for that state?

6              MR. LANIER:  That is correct, Your Honor.

7              THE COURT:  Okay.  Because they are not -- well, I

8    don't want to go into what the Utah constitution or the South

9    Carolina constitution says, but where they are not

10   considered -- I'm using Texas as a comparison -- subdivisions

11   of the States such that the attorney general represents.

12             MR. LANIER:  That is correct, Your Honor.

13             THE COURT:  All right.

14             MR. LANIER:  And if you take Texas then as an

15   example, there are some Texas agencies where the requests

16   have been made, and the response to Google was, you know,

17   What you've asked for here is bombardment and there needs to

18   be a cost-sharing arrangement or a cost-shifting arrangement

19   if you really want all of this.  And when we made that

20   request to Google, Google went radio silent and we've never

21   heard anything from them again as to whether or not they want

22   those documents in light of that.

23             So to just stand up here and to make carefully

24   worded arguments that don't necessarily paint the full

25   picture is not fair, in my opinion, to the parties, it's not

1    fair to the Court.  And I think another example of that is

2    when Mr. Mahr said that the States weren't ready to take

3    depositions because they hadn't gone through the documents

4    yet.  He's referencing two depositions.  He's referencing the

5    Mohan deposition and the deposition of Jonathan Bellock.

6           In those depositions, Google didn't produce the

7    documents in the -- all of the documents timely.  In the

8    Bellock deposition, we got documents the day before the

9    deposition.  And I'm the one who pulled the plug on us

10   participating in that deposition because I'm not going to

11   have Google do a document dump, and I'm not going to let them

12   get away with the idea that they're not giving documents in

13   time for the preparation of the deposition.

14          We knew we were coming back here.  We knew we would

15   have -- we didn't know how long Google would delay our trip

16   back here, but we knew we would be coming back.  And I made

17   the decision.  We are entitled to the documents that they

18   reasonably should have before we take the deposition.  The

19   same is true with the Mohan deposition; over 10,000 documents

20   that were supplied.  Now, those were supplied weeks before,

21   but we still hadn't had time.

22          So for Mr. Mahr to just stand up and say, you know,

23   they want an early discovery cutoff, but they didn't take

24   some of these depos because they hadn't gone through the

25   documents yet, is not fair.

1          Next issue in response.  Mr. Mahr said that they

2     were asking -- we were asking for scheduling that would

3     prevent coordination with the MDL on depositions.  And that's

4     not at all true.  If the MDL wants to participate in the

5     depositions we're taking in this case, we will not object to

6     that at all.  The MDL is welcome to participate in those

7     depositions.  Google, on their own, can cross-notice the

8     deposition in the MDL to assure that they coordinate.

9          All Mr. Mahr has artfully said is that the

10     discovery cutoff in the MDL isn't until June.  And so if the

11     MDL wants to take the depositions past what we would have as

12     a discovery cutoff, then we can't coordinate.  But the

13     coordination will be there for all of our depositions by

14     definition because all of our depositions will be taken

15     before the MDL cutoff; they just have to be cross-noticed by

16     Mr. Mahr.  The MDL will be welcome in our depositions.  We're

17     not seeking to exclude them.  Heavens, they've got some great

18     lawyers.  I would love to have their help in the depos.

19          Next issue.  Mr. Mahr complains because of the

20     parens patriae issue and the way we have narrowed and

21     ferreted that down.  And we have.  We have been very careful.

22          Now, Texas at this point has a policy in the AG's

23     office where they are not pursuing things under parens

24     patriae like this.  And so we've made that adjustment and

25     made that clear, and we have informed them of that.  The

```
 1    States that are asserting parens patriae are Arkansas,

 2    Louisiana, South Dakota, Missouri, Nevada, North Dakota, and,

 3    in addition to those States, the District of Puerto Rico.  We

 4    put that in a chart to clarify any ambiguity.

 5          If Mr. Mahr is upset because we don't have more

 6    States pursuing it under parens patriae as opposed to

 7    sovereign authority, well, we reduced his workload.  Two of

 8    those States, Missouri and Nevada, are pursuing under both

 9    parens patriae and sovereign authority.  We've made that

10    clear.  We have given them an exhibit of which States are

11    claiming damages.

12          Next issue.  Mr. Mahr covered the special master.

13    And in his recitation of reasons it would not be useful to

14    have a special master, his first issue was the status of

15    discovery makes it tough and inefficient to get a special

16    master found and up to speed.  There are great special

17    masters out there that have tailored their life to do this

18    work that would love the opportunity to do this work.  I

19    don't think finding a special master -- if the parties can't

20    find one within a week, shame on us.  And the Court certainly

21    could.  I suspect the Court could in an afternoon.

22          And as for the inefficiency in trying to get a

23    special master up to speed, well, that's some of the beauty

24    of the Christmas holidays, but that's also some of the beauty

25    of what the special master would be looking at.  So, for
```

1    example, the privilege log issue.  The special master needs

2    to be a little aware of what our complaints are and would

3    have to read the complaint; would probably need to read the

4    answer; would probably need to read the, perhaps, Judge

5    Castel's ruling on the motion to dismiss and why he upheld

6    the causes of action we've still got.

7         But once the special master reads that, the special

8    master ought to be able to start digging into the privilege

9    log.  The special master certainly would be able to deal with

10   issues of coordination with the MDL, there's no magic there;

11   the timing involved in a deposition.  Whether or not the

12   States have adequately answered an interrogatory or something

13   like that may be outside the scope, but maybe not.  It

14   depends on how you define it.

15        But the idea that we would not have an efficient

16   process for a special master I find to be wrong.  I think

17   there's plenty of time.  And then don't get a special master

18   because it's an excuse for disputes and taking a flyer.  This

19   is the only case I've litigated with Mr. Mahr.  But I dare

20   say that the Court or Mr. Mahr could ask any number of

21   special masters that have presided over cases where I'm lead

22   counsel -- from the opioids, to Actos, to Pinnacle Hips.

23   James Stanton was the special master in Pinnacle Hips.  David

24   Cohen is a special master in opioids.  And John, whose last

25   name will remain anonymous unless I think of it, was the

1    special master in Actos.  I've never taken a flyer.  That's

2    not the way I practice law.  I don't have time to take

3    flyers.  I don't have energy to take flyers.  And I won't be

4    taking a flyer.

5          So his other reason, this is complex; and if the

6    discovery disputes come in front of you, Judge, they will

7    help you understand the case.  I have no fear of you

8    understanding the case, and you don't need us to have

9    discovery disputes to educate you.  And so I don't find those

10   arguments persuasive myself, and I wanted a chance to

11   respond.  Other than that, I'll shut up and sit down absent

12   any questions.

13         THE COURT:  Well, I think at least one thing the

14   parties do agree on, and it makes sense, is that we have

15   regular meetings with this Court.  And I do tend to think

16   that also along the lines of Mr. Lanier's suggestion, which I

17   didn't hear Mr. Mahr disagree with, whoever it's in front of,

18   even more frequent meetings concerning discovery.

19         And so I think we can work backward from that.  And

20   I do think some of the back and forth we've heard today, I

21   think just both sides would agree, underscores the point that

22   we need to dig into some of these granular discovery issues

23   sooner rather than later.

24         So, you know, I will take under consideration,

25   needless to say, immediately the special master question.

1    And I understood, you know, Mr. Mahr's points to be somewhat

2    as stated by Mr. Lanier, that a concern that having a special

3    master would create disputes and the benefits the Court may

4    have in being involved in some of these granular discussions.

5    You know, on the other hand, you know, those are going to

6    involve a fair amount of time.  So I've got to look at both

7    considerations.

8              I understood Mr. Mahr's point also to be maybe not

9    a special master at this time, but maybe down the road.  So I

10   will look at all that because you all have fleshed out some

11   of the immediate discovery disputes, and we know there'll be

12   more.  So I appreciate all of the argument on that.

13             Mr. Mahr, I want to give you the opportunity, is

14   there anything else you wanted to say about those issues?

15   Because I'm about to move to a discussion of the designated

16   record on remand just to see where we are, if there's

17   anything the parties can tell me.  But if there is anything

18   you would like to say on the issues Mr. Lanier just responded

19   to.

20             MR. MAHR:  Just really quickly.  But I think it

21   does illustrate some of what -- of the complexities we've got

22   going on.  But with respect to the Bellock deposition, we

23   gave them 52 documents the day before the deposition.  When

24   we're talking about having to really buckle down and move

25   fast, you can look at 52 documents the day before a

 1    deposition.

 2              And on this policy change from the office of the

 3    Attorney General, it wasn't in place on November 20th when we

 4    were last here, when Mr. Lanier said he represented all of

 5    the above under parens patriae.  So something's happened in

 6    the last couple of weeks -- don't know what, but I'm glad to

 7    know it now.

 8              But I think, finally, our position all along has

 9    been we have a very thoughtful fact discovery schedule set by

10    Judge Castel that we're halfway through and we think we

11    should complete that.  Then we have a very thoughtful post

12    fact discovery schedule that you set up last time that

13    already has all of the times and already considers both

14    parties' side that we can kick into right after that.

15              And given the complexities and all that's going on

16    as illustrated today, we think sticking to those two already

17    carefully considered orders makes more sense.

18              THE COURT:  All right.  Thank you, Mr. Mahr.

19              All right.  So I wanted to come back and not just

20    forget about this.  I figured the parties may have had

21    questions about how we suggested in getting the designated

22    record on remand entered into our electronic docket.  And I

23    understood -- and, believe me, I thought about it before we

24    sent that off to you -- that this would involve the

25    coordination between the parties.  And then, you know, as is

1    mentioned, we have our -- one of our wonderful people here in

2    our Clerk's office, our Deputy Clerk Leigh Lyon, who I

3    anticipate will coordinate with the parties to, you know,

4    drop documents down from the secure-cloud location.  But that

5    will require coordination, and I didn't know if you all would

6    be able to get that done.

7         There are as I mentioned, as you know, other ways

8    for us to do that; they may not be as efficient as I think

9    I've described to you.

10        MR. LANIER:  Your Honor, I'm pleased to report, and

11   I have asked Mr. Rob to throw something at me if I'm wrong

12   here, but I am pleased to report that we have agreed on the

13   documents that need to be brought over from the Southern

14   District of New York, and we're good to enter those documents

15   identified.  And both parties do agree that if subsequent

16   developments show that something's missing, we will readily

17   agree and quickly supplement.

18        THE COURT:  And, you know, you all, I'm sure, are

19   much better with technology than I am.  I consider myself

20   somewhat of a Luddite, but we talked about a way for the --

21   for these to be organized that I think they could be accessed

22   easier by the Court and anybody else.  You know, I'm thinking

23   of an index for each volume with hyperlinks would I think be

24   extremely helpful.  I assume that's something you all can do.

25        MR. MAHR:  Yes, Your Honor.  I want to take the

1    opportunity to agree with Mr. Lanier, since we haven't agreed

2    to much today, with what he just said.  But also my

3    impression was that it was the Clerk's office is taking it

4    from here after we've reached an agreement.  Hearing what

5    you're saying, we are happy to get together and find a way to

6    make that easy for the Clerk's office, and we'll get started

7    on that as soon as the hearing's over.

8              THE COURT:  Right.  And I will probably just, you

9    know, follow up with you, because this is -- you know, this

10   is just administrative.  This is just -- you all have agreed

11   on the documents.  I think that's great.  This is just the

12   best and most efficient way to get all those documents into

13   our record.  And we were looking for, candidly, some help

14   from you all to get that done quickly, because if we -- just

15   because of the resources we have, having us enter them sort

16   of document by document would just take a lot of time.  And

17   so I will just follow up with you on that, you know, to get

18   that done administratively.

19             But, you know, if you all are able to work together

20   to put those together, get them to our Chief Deputy Clerk,

21   then she can have them entered into the record.  Because we

22   know the documents you want.  We just need to get them into

23   the record.

24             All right.  Is there anything else today?  I mean,

25   the Court is -- obviously, I've got the proposed schedules

```
1    from each side.  I wanted to have this conference on

2    discovery before we made any determination of what the

3    schedule should look like going forward.  I don't think I

4    have anything else that I needed to discuss today.

5              Mr. Lanier, anything else from the Plaintiff

6    States?

7              MR. LANIER:  Nothing from plaintiffs, Your Honor.

8              THE COURT:  All right.  So Mr. Mahr, anything

9    further from Google this morning?

10             MR. MAHR:  Nothing from Google, Your Honor.

11             THE COURT:  All right.  Thank you, counsel.  We'll

12   be following up shortly on this, you know, just tying down

13   the record on remand.  And, otherwise, we'll be in contact

14   with the parties on the schedule and on discovery issues.

15             Thank you.  We'll stand in recess.

16             THE COURT SECURITY OFFICER:  All rise.

17             (Adjourned at 9:33 a.m.)

18                      *    *    *    *    *

19

20

21

22

23

24

25
```

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, Gayle Wear, Federal Official Court Reporter, in

5     and for the United States District Court for the Eastern

6     District of Texas, do hereby certify that pursuant to Section

7     753, Title 28 United States Code, that the foregoing is a

8     true and correct transcript of the stenographically reported

9     proceedings held in the above-entitled matter and that the

10    transcript page format is in conformance with the regulations

11    of the Judicial Conference of the United States.

12

13              Dated 17th day of December 2023.

14

15

16              /s/ Gayle Wear
                GAYLE WEAR, RPR, CRR
17              FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25