**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| *Defendant.* | § | |

---

**DEFENDANT GOOGLE LLC'S SUPPLEMENTAL BRIEF REGARDING
*STANDARD OIL CO. V. ARIZONA***

---

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

ARGUMENT .................................................................................................................... 1

I.    *Standard Oil's* analysis does not apply to this case. ............................................ 2

II.   Whether states have Seventh Amendment rights is an open question in the Fifth Circuit. ................................................................................................................. 4

III.  Contrary to *Standard Oil's* holding, the Seventh Amendment does not protect sovereign state governments. ................................................................................ 5

   A.   *Standard Oil* improperly conducted the "legal nature" test. ......................... 6

   B.   The Ninth Circuit drew the wrong conclusion from its scant evidence of English common law practices. ................................................................... 9

   C.   *Standard Oil* improperly downplayed the abundant evidence of the original meaning of the Seventh Amendment. ........................................................ 11

   D.   *Standard Oil's* analysis of the states' "dual role" is not the proper mode of constitutional analysis for the Seventh Amendment. ............................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*In re Abbott*,
   117 F.4th 729 (5th Cir. 2024) .................................................................................4, 9

*Austin v. Shalala*,
   994 F.2d 1170 (5th Cir. 1993) ....................................................................................5

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*,
   494 U.S. 558 (1990) ...................................................................................................6

*Ciraci v. J.M. Smucker Co.*,
   62 F.4th 278 (6th Cir. 2023) .....................................................................................12

*Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*,
   412 U.S. 94 (1973) ...................................................................................................13

*E.E.O.C. v. Corry Jamestown Corp.*,
   719 F.2d 1219 (3d Cir. 1983)....................................................................................10

*Gannett Co., Inc. v. DePasquale*,
   443 U.S. 368 (1979)...................................................................................................14

*INS v. Chadha*,
   462 U.S. 919 (1983)......................................................................................................6

*King v. Cotton*,
   Eng. Rep. 729  (1751) .................................................................................................9

*King v. Marsh*,
   Eng. Rep. 842 (1751) ..................................................................................................9

*Lewis v. United States*,
   385 U.S. 206 (1966)...................................................................................................12

*Manhattan Cmty. Access Corp. v. Halleck*,
   587 U.S. 802 (2019)...................................................................................................12

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996).....................................................................................................9

*Melancon v. McKeithen*,
   345 F.Supp. 1025 (E.D. La. 1972) ............................................................................14

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ...............................................................................................10, 15

*Notzon v. City of Laredo*,
    2018 WL 3428603 (S.D. Tex. July 16, 2018) ...........................................................14

*In re Oil Spill by the Oil Rig Deepwater Horizon*,
    98 F. Supp. 3d 872 (E.D. La. 2015) ...........................................................................5

*Pizza Hut L.L.C. v. Pandya*,
    79 F.4th 535 (5th Cir. 2023) ......................................................................................1

*Printz v. United States*,
    521 U.S. 898 (1997) ...................................................................................................6

*Sec. & Exch. Comm'n v. Jarkesy*,
    603 U.S. 109 (2024) ........................................................................................*passim*

*Singer v. United States*,
    380 U.S. 24 (1965) ...................................................................................................14

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) .................................................................................................14

*Standard Oil Co. of California v. Arizona*,
    738 F.2d 1021 (9th Cir. 1984) .........................................................................*passim*

*Tull v. United States*,
    481 U.S. 412 (1987) ........................................................................................*passim*

*United States v. ERR, LLC*,
    35 F.4th 405 (5th Cir. 2022) ......................................................................................5

*United States v. Griffin*,
    14 F.2d 326 (W.D. Va. 1926) ..................................................................................12

*Walker v. Sauvinet*,
    92 U.S. 90 (1975) ....................................................................................................14

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) .................................................................................................13

*Wooster v. Plymouth*,
    62 N.H. 193 (1882) ...........................................................................................12, 13

**Statutes**

15 U.S.C. § 15c ...............................................................................................................3

iv

Alaska Stat. § 45.50.578(b)....................................................................................4

Idaho Code Ann. § 48-108(1) ...............................................................................4

Tex. Bus. & Com. Code § 15.20(a) ......................................................................4

**Other Authorities**

Alexander Hamilton, *Federalist No. 84*..............................................................12

Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) .......................7, 12, 13, 14

Elliot Debates..........................................................................................................13

Fed. R. Civ. P. 39(c) ...............................................................................................1

F. Pollock & F. Maitland, *The History of English Law* (2d ed. 1898 reprinted 1952) ...............................................................................................10

James Madison, *Amendments to the Constitution* (June 8, 1789)...................12, 13

Julia A. Dahlberg, *States As Litigants in Federal Court: Whether the Seventh Amendment Right to Jury Trial Applies to the States*, 37 Hastings L.J. 637 (1986).................................................................................................................7

Patrick Devlin, *Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment*, 80 Colum. L. Rev. 43 (1980) .........................................8

William Blackstone, *Commentaries on the Laws of England* (1877)....................13

Defendant Google LLC files this supplemental brief to address the Court's questions about *Standard Oil Co. of California v. Arizona*, 738 F.2d 1021 (9th Cir. 1984), posed during the hearing on Google's Motion to Strike Plaintiffs' Jury Demand (ECF 690). *See* Mar. 12, 2025 Hrg. Tr. at 36–38, 64.

## ARGUMENT

Because Google has challenged the Plaintiff States' right to a jury, the States "bear[] the burden of showing [they are] entitled to a jury" under the Seventh Amendment. *Pizza Hut L.L.C. v. Pandya*, 79 F.4th 535, 541 (5th Cir. 2023). *Standard Oil* does not help them meet it.

*Standard Oil* is inapplicable to, and distinguishable from, this case. The Ninth Circuit viewed the jury right issue through a different lens: that case involved "clearly legal claims" for treble damages; here, the Plaintiff States pursue sweeping claims for equitable injunctions and penalties. The Plaintiff States also assert claims that only a sovereign may assert and—unlike in *Standard Oil*—assert no causes of action that an individual could pursue alone. These distinctions must drive the Court's constitutional analysis in this case.

*Standard Oil* also incorrectly holds that the Seventh Amendment, on its own terms, grants sovereign state governments a right to a jury trial equal to individuals. Neither the Supreme Court nor the Fifth Circuit Court of Appeals has decided this exact question. This Court must decide this question here because if the States have no jury rights under the Seventh Amendment, they may not obtain a jury for any of their claims over Google's objection. *See* Fed. R. Civ. P. 39(c) (actions "not triable of right by a jury" require the "parties' consent" to try any issue to the jury). Put simply, this Court must address *two* constitutional questions: 1) whether the States have any right to a jury trial at all, and 2) even if so, whether the claims asserted here are legal under *Tull* and *Jarkesy*. As shown below, the Ninth Circuit's "legal nature" test—applied without the benefit of later-decided

1

and controlling cases like *Tull* and *Jarkesy*—improperly shoehorned the question whether the Seventh Amendment applies *at all* into the test for whether a *particular claim* is legal in nature.

A complete analysis of the historical evidence shows that the Seventh Amendment did *not* cover sovereign states when it was ratified in 1791. Dozens of primary sources and contemporary writings reveal that the Seventh Amendment was understood uniformly to protect individuals against the government—not the other way around. English evidence supports this conclusion: English cases show a lack of any competent evidence that English sovereigns had jury rights in 1791. Small wonder, then, that the Ninth Circuit's reasoning has never been followed by the Fifth Circuit, where a sovereign state's jury trial right remains an open question.

The Court should hold that sovereign states do not have rights under the Seventh Amendment, and so the Plaintiff States cannot try any of their claims to a jury.

## I.    *Standard Oil's* analysis does not apply to this case.

Setting aside, for a moment, the threshold constitutional question, *Standard Oil* is not on point here. The ruling hinged on several unique characteristics, including the legal nature of the claims for treble damages and the fact that those states sought damages for themselves and in a truly representative capacity.

The Ninth Circuit proceeded from the premise that the action was legal: "Antitrust suits for treble damages are clearly legal actions." *Standard Oil*, 738 F.2d at 1027. Not so here. The Plaintiff States have abandoned any claim for damages. *See* ECF 381 at 2. And the penalty relief Plaintiffs seek—across 17 different state antitrust statutory schemes and 17 more DTPA schemes—is either purely equitable or so intertwined with equity that no Seventh Amendment right could attach. *See*

Google's Motion to Strike Jury Demand (ECF 690) and Google's to-be-filed Supplemental Briefing (*see* ECF 825).[1] That distinction sets *Standard Oil* on a fundamentally different track.

The *Standard Oil* states didn't just bring different claims—they also sought relief in a different capacity. In *Standard Oil*, those states sued in their proprietary capacities, as class representatives, and as *parens patriae* claiming *damages*. *Standard Oil*, 738 F.2d at 1022, 1027. By contrast, here, the States seek only injunctions and penalties. They seek *nothing* for harm to their own property, *nothing* to compensate individuals for any harm, and *no damages* at all. *See* ECF 381 (clarifying that the States only seek injunctive relief, penalties, and fees). Any penalties they recover will also, by statute, go only to their state treasuries. The Plaintiff States' allegations of *parens patriae* standing thus differ vastly from their *parens patriae* stance in *Standard Oil*, where those states sought treble damages on behalf of individuals. *Cf.* 15 U.S.C. § 15c ("Any attorney general of a State may bring a civil action in the name of such State, *as parens patriae on behalf of natural persons* … to secure monetary relief as provided in this section for injury sustained by such natural persons to their property by reason of any violation of sections 1 to 7 of this title.").[2]

This is not a mere distinction; it makes a fundamental difference. The Ninth Circuit's reasoning that "it would [] be anomalous to deny the states a right to a jury trial" because "[i]ndividual citizens would clearly have the right to jury trial on their individual claims" had superficial appeal in the context of a case seeking damages *on behalf of individuals*. *Standard Oil*,

---

[1] That the States have no right to a jury determination of the amount of penalties was conclusively established in *Tull v. United States*, 481 U.S. 412 (1987). *Tull*, decided after *Standard Oil*, held decisively that: "We therefore hold that a determination of a civil penalty is not an essential function of a jury trial, and that the Seventh Amendment does not require a jury trial for that purpose in a civil action." *Id* at 427.

[2] All emphasis herein is added unless otherwise indicated.

738 F.2d at 1031. The same assumption finds no purchase here, where the claimed basis for the States' *parens patriae* standing rests on allegations of "harm to their general welfare and economies." ECF 381 at 2. No individual could bring that claim. Nor, by statute, could any individual seek civil penalties in this case on his or her own behalf. *See*, *e.g.*, Idaho Code Ann. § 48-108(1) ("[T]he attorney general may bring an action in the name of the state ... To recover civil penalties."); Tex. Bus. & Com. Code § 15.20(a) (same); Alaska Stat. § 45.50.578(b) (same). In fact, the Plaintiff States have repeatedly argued that their claims *differ* from those that could be brought by individuals, *see*, *e.g.*, ECF 260 at 7–12 (arguing that the States are not subject to normal requirements to show injury, damages, timeliness, and more), an argument that fundamentally undermines the "states are just like individuals" approach the Ninth Circuit used.

## II.   Whether states have Seventh Amendment rights is an open question in the Fifth Circuit.

There is no binding precedent establishing that states have Seventh Amendment jury rights equal to individuals. A mere six months ago, the Fifth Circuit recognized—without resolving—the open "question of whether the Seventh Amendment's jury-trial right extends to state litigants like Texas or just to individuals." *In re Abbott*, 117 F.4th 729, 734 n.7 (5th Cir. 2024) (citing *Standard Oil*, 738 F.2d at 1028).[3]

No other case in this Circuit has examined this constitutional interpretation question. There are a few cases that assumed governments had a jury right, jumping straight to the legal/equitable analysis without examining the issue the Court must decide here, namely whether sovereign states are protected by and have a right to a jury trial under the Seventh Amendment at all. For example,

---

[3] In *In re Abbott*, the Fifth Circuit noted that the United States never challenged the Seventh Amendment right of the State of Texas to demand a jury trial, *see* 117 F.4th at n.7 ("Because the United States does not contest this point, we do not address it."), but still held that Texas was *not* entitled to a jury on its particular claim. *Id.* at 741.

4

one district court addressed whether a state plaintiff asserted a legal or equitable claim under the Seventh Amendment. *See In re Oil Spill by the Oil Rig Deepwater Horizon*, 98 F. Supp. 3d 872, 879–83 (E.D. La. 2015). But that court did not analyze—at all—whether the Seventh Amendment protects states. The Fifth Circuit has also suggested that cases brought by the United States government, like those brought by individuals, would need to be legal (not equitable) under *Tull* to be tried to a jury. *See Austin v. Shalala*, 994 F.2d 1170, 1175 (5th Cir. 1993) (citing *Tull*, 481 U.S. at 418–19). But in *Shalala*, it was the individual—not the United States—seeking a jury. *Id.* The *Shalala* Court never examined the separate question: whether the Seventh Amendment guarantees governments (federal or state) the right to a jury trial at all. *See id.* at 1175–78 (affirming district court ruling that a jury was not required to decide public rights). In the *United States v. ERR, LLC* case, invoked by the States at oral argument, *see* Mar. 12, 2025 Hrg. Tr. at 44–49, the federal government was not asserting Seventh Amendment rights—it was *objecting* to ERR's asserted Seventh Amendment rights. 35 F.4th 405, 409 (5th Cir. 2022) ("ERR demanded a jury trial. *The Government moved to strike the demand*.").

### III.   Contrary to Standard Oil's holding, the Seventh Amendment does not protect sovereign state governments.

When this Court considers this open question, it should not adopt *Standard's Oil*'s legally and historically flawed conclusion. First, without the benefit of later Seventh Amendment precedent, the Ninth Circuit improperly grafted part of the threshold constitutional question (whether states have Seventh Amendment rights at all) onto the test for whether the particular *claims* in *Standard Oil* were legal in nature. Second, there is a near-total lack of evidence that the English Crown had any right to a jury trial in 1791, thus no such right was "preserved" by the Seventh Amendment. Third, the Ninth Circuit overlooked the weight of the historical American evidence that the Seventh Amendment was designed to protect individuals, not governments.

Finally, the Ninth Circuit improperly resorted to the proprietary and representative nature of the State's damages claims, untethered to the original meaning of the Seventh Amendment, to find a right to a jury.

### A.    *Standard Oil* improperly conducted the "legal nature" test.

*Standard Oil* conflates two distinct inquiries: the "who" and the "what" of the Seventh Amendment. As framed by the Ninth Circuit, the "sole question" presented in *Standard Oil* was "whether *states* have the right to a jury trial of *legal issues* in antitrust actions in federal court." 738 F.2d at 1022. But whether the Seventh Amendment protects states *at all* is a different question from whether a *particular claim* is legal and so falls under the Seventh Amendment's protections. That first question is one of constitutional interpretation. To answer it, this Court must look to the Constitution's text, structure, and relevant American and English history to determine the Seventh Amendment's original meaning and whether it protected governments. *See*, *e.g.*, *Printz v. United States*, 521 U.S. 898, 905–35 (1997) (interpreting the Constitution through historical practice, writings of the Framers, and structure when there was "no constitutional text speaking to the precise question"); *INS v. Chadha*, 462 U.S. 919, 944–59 (1983) (analyzing text, history, and structure, including writings of the Framers, in interpreting the Constitution).

The second question, by contrast, applies a now well-developed "legal nature" test for whether a claim must be tried by a jury. "The Seventh Amendment extends to a *particular statutory claim* if the claim is 'legal in nature.'" *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 122 (2024); *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 565 (1990) (stating that the jury right turns on "whether a *particular action* will resolve legal rights"). To evaluate this second question—whether a claim is legal—courts must first "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and

6

equity." *Tull*, 481 U.S. at 417. Second, they "examine the remedy sought and determine whether it is legal or equitable in nature," the "more important" of the two steps. *Id.* at 417–18, 421.

Without the benefit of later-in-time Supreme Court cases like *Tull* and *Jarkesy*, the Ninth Circuit improperly conflated the threshold constitutional question about whether states may *invoke* the Seventh Amendment at all with the "legal nature" test for the particular statutory claims. In other words, "the Ninth Circuit purported to apply the historic issue test, but took an unprecedented leap by analyzing whether the *parties* historically had a right to jury trial rather than whether the *issues* historically were tried by juries." *See* Julia A. Dahlberg, *States As Litigants in Federal Court: Whether the Seventh Amendment Right to Jury Trial Applies to the States*, 37 Hastings L.J. 637, 638 (1986) (emphasis in original). Again, the right approach to the "who" question is to ask whether states had any right to a jury at all. Answering the second, "what," question requires evaluating the statutory action, not the plaintiff.[4] To be sure, the identity of the plaintiff may factor into whether a claim would have been heard in courts of law or equity in 1791. But the Ninth Circuit's broader formulation of the question—whether an English sovereign's claims were *ever* tried to a jury in 1791—did not make the states' *antitrust price-fixing claim* any more (or less) legal in nature. As a result of its misplaced inquiry, the Ninth Circuit reached an erroneous conclusion at the end of the "legal nature" test: "that states enjoy a right to jury trial akin to that enjoyed by the English crown in 1791." *Standard Oil*, 738 F.2d at 1028. The test for whether claims are legal in nature cannot, if properly applied, produce such a sweeping conclusion about *who* the Seventh Amendment protects *in the first instance.*

---

[4] Even on its own terms, there is ample reason to doubt the Ninth Circuit's analogy between American states and the English Crown when analyzing the distinction between legal and equitable claims given their different roles in their respective governmental systems, and critically, the limits imposed on American sovereigns by the Bill of Rights.

This flawed approach produced another error: none of the English cases the Ninth Circuit considered were appropriate analogs to complex antitrust claims. The Court cited: a creditor dispute (*The King v. Cotton*) (Ex. 1), a dispute over a deed (*The King v. Marsh*) (Ex. 2), a disagreement over the validity of a lien (*The King v. Humphrey*) (Ex. 3) and a case about the building of a custom home (*Rex v. Peto*) (Ex. 4). *See id.* All four cases involved money or property owned by the Crown itself. None was analogous to the antitrust claims at issue there, much less the claims for injunctions and civil penalties demanded by the Plaintiff States here. More broadly, the Ninth Circuit never grappled with how English courts treated complex cases. There exists abundant evidence that in 1791 complex cases "were being taken in equity simply because they were complicated." Patrick Devlin, *Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment*, 80 Colum. L. Rev. 43, 68 (1980).[5] As a result, *Standard Oil* offers no support for a conclusion that the Plaintiff States' antitrust claims here are legal in nature.

Consistent with Supreme Court precedent, unlike the Ninth Circuit, this Court should independently answer the threshold question: whether states have rights under the Seventh Amendment at all. That requires employing all methods of constitutional interpretation, not just unsupported analogies to eighteenth century English courts. Only if the Seventh Amendment applies to states must the Court analyze the next constitutional question: whether the particular statutory claim the states pursue in this case is legal in nature and thus falls within its ambit.[6]

---

[5] *See also* Patrick Devlin, *Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment*, 80 Colum. L. Rev. 43, 83 (1980) ("I cannot find, so as to include it in the section 'Complex Cases Generally,' any example of a case on restraint of trade. One reason for this—and the reason why there are not more eighteenth-century examples of complexity in other subjects— must undoubtedly be the practice of the common law judges of withdrawing from a jury those questions of fact which they thought a jury would not understand or would not deal with to the satisfaction of the judges."); *see also* ECF 690-1 (Hudson Decl.) ¶ 15 (same).

[6] The Court has requested supplemental, state-specific briefing on this second question, which Google will file. *See* ECF 825.

**B.    The Ninth Circuit drew the wrong conclusion from its scant evidence of English common law practices.**

The Ninth Circuit's biggest error was reasoning that because there are cases "where the crown *brought* suit before a jury," therefore "the crown was *entitled* to [a] jury trial." *Standard Oil*, 738 F.2d at 1028. One does not establish the other. In fact, "research has not revealed one English case adjudicated around 1791 that shows that the Crown demanded, or even had the right to demand, a jury trial." Dahlberg, *supra*, at 650; *see also* ECF 690-1 (Hudson Decl.) ¶ 14 ("[*Anstruther's Reports*] offer no indication that cases brought by the Crown against a private individual for damages would customarily have gone to a jury.").

Tellingly, none of the cases cited by the Ninth Circuit even suggested that the Crown could demand a jury in an action against a citizen. The two pre-1791 cases cited included a mere "reference" and a "mention[]" of a jury. *Standard Oil*, 738 F.2d at 1028. But in both cases the judgment was made by the *court*. In *King v. Cotton*, the case "st[ood] for the judgment *of the court*," and the reference to jury findings appears to refer to an earlier inquisition by the sheriff to account for the debtor's goods—not the dispute before the court involving the Crown. 145 Eng. Rep. 729, 729–30 (1751) (Ex. 1). In *King v. Marsh*, counsel for the Crown mentioned "the jury" writ large—not a jury specific to that case—as a rhetorical tool in arguing why the defendant needed to produce to "the Court on the record" the deed in question. 145 Eng. Rep. 842, 843 (1751) (Ex. 2). Neither case supports that a jury even heard the Crown's claims, much less that the Crown was entitled to demand one.

The other two cases cited are irrelevant in their own right. Both are dated well after 1791 and so cannot establish the "right to a jury trial *as it existed in 1791*." *In re Abbott*, 117 F.4th at 740–41 (emphasis original) (explaining that evidence that a statute allowed common-law courts to grant injunctions in 1854 does not establish right to a jury trial in 1791); *Markman v. Westview*

9

*Instruments, Inc.*, 517 U.S. 370, 376 (1996) ("If the action in question belongs in the law category, we ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right *as it existed in 1791*."); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 35 (2022) ("[W]e must also guard against giving postenactment history more weight than it can rightly bear.").

The Ninth Circuit also invoked, improperly, a secondhand account of the Dark Ages origin of the jury rather than 1791 practices. Seizing on language from a Third Circuit opinion, the Ninth Circuit quoted Pollock and Maitland's *The History of English Law* for the unremarkable proposition that the "Frankish kings" used a form of a jury—in 1066 A.D. *Standard Oil*, 738 F.2d at 1028 (quoting *E.E.O.C. v. Corry Jamestown Corp.,* 719 F.2d 1219, 1224 (3d Cir. 1983)).[7] This historical chestnut has little bearing on jury practice in 1791, nearly 800 years later: the "language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*, not as they existed in the Middle Ages." *Bruen*, 597 U.S. at 39 (emphasis in original and quotation omitted); *see also id.* at 35 ("English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution.").

Moreover, what the Ninth Circuit portrays as an early jury was actually a Frankish *inquisitio* with a different function altogether. 1 F. Pollock & F. Maitland, *The History of English Law* 140 (2d ed. 1898 reprinted 1952) (Ex. 5). The *inquisitio*, or inquest, was useful precisely because it excluded the sovereign—it was used, for example, to declare "what lands, what rights"

---

[7] *Corry* itself has no bearing here because it examined whether the EEOC had a *statutory* right to a jury as a representative of a private party seeking damages, not whether the Seventh Amendment independently guaranteed the federal government jury trial rights. *See Corry*, 719 F.2d at 1221–25. *Standard Oil* rejected any statutory angle for those states' claims. 738 F.2d at 1025.

the sovereign had, to learn about "the misconduct of royal officers," or to "detect those grave crimes which threaten his peace." *Id.* at 141. In fact, on the very same page quoted by the Ninth Circuit, the authors assert that the Frankish inquest allowed the Crown to "administer an *equity* which tempers the rigour of the *law*"—the very opposite of the Ninth Circuit's ultimate conclusion on the legal-equitable distinction.

Ultimately, English history undermines the conclusion that American states have any jury rights. The Ninth Circuit cited to mere crumbs of evidence that the Crown *used* a jury and zero evidence that it had a Seventh Amendment-type right to *demand* one. If any inference can be drawn at all, it is that eighteenth-century English citizens, including those who came to America, would not have viewed the Seventh Amendment as "preserving" any pre-existing understanding that their sovereigns could demand juries at will.

C.    ***Standard Oil* improperly downplayed the abundant evidence of the original meaning of the Seventh Amendment.**

The Ninth Circuit further erred in discounting the ample evidence that by 1791, the jury was broadly understood as a protection for the individual against the government, not as a tool for the government to deploy against an individual.

First, the Ninth Circuit inappropriately discounted the direct evidence about the Seventh Amendment's drafting and ratification. It considered the fact that James Madison's "early draft of the Seventh Amendment was much less neutral, guaranteeing a right to a jury trial in controversies 'between man and man.'" *Standard Oil*, 738 F.2d at 1029 & n.10. It also "accept[ed] the view" of a historian who stated that the Seventh Amendment was passed with "no substantial alteration in the original Madison draft." *Id.* at 1030. As James Madison himself put it in a 1789 speech about the intentions of his draft: "In suits at common law, between man and man, the trial by jury, as one

of the best securities to the rights of the people, ought to remain inviolate."[8] No part of this history supports the Ninth Circuit's opposite conclusion that the Amendment also protected governments.

Second, the Ninth Circuit failed to address the way the Framers and early Americans viewed the entire Bill of Rights and the Seventh Amendment. "It was universally understood by the founders of our institutions that jury trial, and the other usual provisions of bills of rights, were not grants of rights to the public body politic, but reservations of private rights of the subject, paramount to all governmental authority; and this constitutional principle has never been abandoned." *Wooster v. Plymouth*, 62 N.H. 193, 200 (1882). "The first ten amendments were intended to protect the people from governmental aggressions, and it is, to my mind, *a mere perversion of the purpose and intent of the Seventh Amendment to contend that it gives the government a right to a jury trial in any case*." *United States v. Griffin*, 14 F.2d 326, 326–27 (W.D. Va. 1926); *see also Lewis v. United States*, 385 U.S. 206, 209 (1966) ("The various protections of the Bill of Rights, of course, provide checks … for the protection of the individual.").[9]

Keystone historical documents tell the same tale. Hamilton explained in Federalist No. 84 that "declaration of rights … *must be intended as limitations of the power of the government itself*

---

[8] *Amendments to the Constitution* (June 8, 1789), *Founders Online,* National Archives, available at https://founders.archives.gov/documents/Madison/01-12-02-0126.

[9] More recent pronouncements echo this principle: the Bill of Rights protects individuals *from* the government, not governments from federal judges. *See Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 280 (6th Cir. 2023) ("The first eight provisions of the Bill of Rights offer the most prominent example of constraints on government … these constraints typically *protect citizens from the government*, not from each other.") (citing *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019); *Jarkesy*, 603 U.S. at 141 (Gorsuch, J., concurring) ("The Seventh Amendment's jury-trial right does not work alone. It operates together with Article III and the Due Process Clause of the Fifth Amendment *to limit how the government may go about depriving an individual* of life, liberty, or property."); Dahlberg, *supra* at 654 ("Contrary to the Ninth Circuit's conclusion, English history indicates that trial by jury in 1791 was a protection afforded the individual against arbitrary abuses by the Crown. It was not an instrument for use by the Crown or a protection afforded the Crown against itself.").

… bills of rights are, in their origin, stipulations between kings and their subjects, abridgments of prerogative in favor of privilege, reservations of rights not surrendered to the prince." So too James Madison, who championed his draft of the Bill of Rights as "fortify[ing] the rights of the people *against the encroachments of the government*." *Amendments to the Constitution* (June 8, 1789), *Founders Online,* National Archives. Even Blackstone refers to the jury right in the context of "no freeman" being deprived of rights. 3 *Blackstone Commentaries* 787 (Ex. 6).

The *Wooster* Court assembled over a dozen sources from the late eighteenth century to support this proposition. *Wooster*, 62 N.H. at 200–01 (citing the Elliot Debates, Writings of Madison, Madison Papers, Writings of Gouv. Morris, Sparks Life of Washington, Wirt Life of Henry, Massachusetts Convention of 1788, and more). For example, its dozens of citations to the Elliot Debates (a compilation of state debates between 1787-89) includes descriptions of the jury trial right as one for individuals. *See*, *e.g.,* 2 Ell. Deb. 550 (describing the right to a jury trial "in all cases" as "the boasted birthright of Englishmen and their descendants") (Ex. 7). That the Bill of Rights was understood by the Framers and early Americans to apply to individuals makes sense given their understanding of the English Bill of Rights, which was considered "a statement of the basic rights *of Englishmen*, as well as of the *limitations upon government* that make such rights effective." Bernard Schwartz, *The Bill of Rights: A Documentary History* 40, 43 (1971) (Ex. 8).

American jurisprudence about other amendments largely tracks this near-universal understanding of the Bill of Rights as protective of *individuals*, not governments. States are not treated the same as individuals under the First Amendment. *See Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*, 412 U.S. 94, 139 (1973) (Stewart J., concurring) ("The First Amendment protects the press from governmental interference; it confers no analogous protection on the Government."); *cf. Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207

13

(2015) (government speech does not "normally trigger the First Amendment rules"). Nor do states receive due process protection under the Fifth Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966).[10]

Finally, it's true but irrelevant that a defendant in a federal criminal case has no affirmative constitutional right to *waive* a jury trial in favor of a bench trial. *See Standard Oil*, 738 F.2d at 1028 (citing *Singer v. United States*, 380 U.S. 24 (1965)). Google does not claim a constitutional right to a bench trial. Rather, Google challenges the Plaintiff States' ability to meet their burden to show their jury right under the Seventh Amendment. In any event, *Singer* has no probative force in a civil context. For criminal trials, the default rule is trial by jury, based on a fundamentally different understanding of the role of the jury. *See Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979) ("[B]ecause of the great public interest in jury trials as the preferred mode of fact-finding in criminal cases, a defendant cannot waive a jury trial without the consent of the prosecutor and judge.").

The torrent of American historical evidence—and its stark contrast to the near-total lack of historical evidence that sovereigns of any kind had a jury right, in the Dark Ages or otherwise—demonstrates that the Seventh Amendment does not guarantee a civil jury right to states.

---

[10] The historical lack of incorporation of the entire Bill of Rights against the states further supports the argument that they were not intended to be protected by it. The Honorable Andrew Hanen has held that the Seventh Amendment was *not* incorporated against the States through the Fourteenth Amendment. *See Notzon v. City of Laredo*, 2018 WL 3428603, at *5 (S.D. Tex. July 16, 2018) (citing *Walker v. Sauvinet*, 92 U.S. 90 (1975); *Melancon v. McKeithen*, 345 F.Supp. 1025, 1035 (E.D. La. 1972)). It would be incongruous for the Bill of Rights in 1791—including the Seventh Amendment—to *protect* state governments while at the same time providing *no* protections to individuals against the states in other respects.

**D.** ***Standard Oil's* analysis of the states' "dual role" is not the proper mode of constitutional analysis for the Seventh Amendment.**

Perhaps sensing its shaky ground, the Ninth Circuit also reasoned that the *Standard Oil* plaintiff "states are suing in their proprietary, not sovereign capacities," and that they also proceeded in a representative capacity—like a "representative shareholder in a derivative action." *Standard Oil*, 738 F.2d at 1030, 31.

While this analogy has superficial appeal, it is the wrong tool for a constitutional construction project. "[R]eliance on history to inform the meaning of constitutional text— especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable [than more pragmatic considerations]." *Bruen*, 597 U.S. at 25. Despite their proprietary and representative interests, the states were still *states*. And sovereigns, at law and under the Constitution, are fundamentally different from the individual citizens the Seventh Amendment was designed to protect.

*    *    *

For all the foregoing reasons, *Standard Oil* does not change the fact that the Court, not a jury, must hear this case.

Dated: March 27, 2025

Respectfully submitted,

*/s/ Kathy D. Patrick*
Kathy D. Patrick
State Bar No. 15581400
KPatrick@gibbsbruns.com
Denise Drake
State Bar No. 24092358
DDrake@gibbsbruns.com
Caitlin Halpern
State Bar No. 3454643
CHalpern@gibbsbruns.com
Michael Doman
State Bar No. 24131182
MDoman@gibbsbruns.com
Elisa Wulfsberg
State Bar No. 24125469
EWulfsberg@gibbsbruns.com
Gibbs & Bruns LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel.: (713) 650-8805
Fax: (713) 750-0903

Eric Mahr (*pro hac vice*)
FRESHFIELDS US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4545
Email: eric.mahr@freshfields.com

*Attorneys for Defendant Google LLC*

## CERTIFICATE OF SERVICE

I certify that on March 27, 2025, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ Kathy D. Patrick*

Kathy D. Patrick

16