**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

The State of Texas, et al.,

               Plaintiffs,

v.

Google LLC,

               Defendant.

Case No. 4:20-cv-00957-SDJ

Hon. Sean D. Jordan

## PLAINTIFF STATES' SUPPLEMENTAL BRIEF IN OPPOSITION TO GOOGLE'S MOTION TO STRIKE THE JURY DEMAND

# TABLE OF CONTENTS

**LEGAL STANDARD** ................................................................................................. **1**

    A.   Which Questions Are State Law, And Which Are Federal? ............................. 1

    B.   What Is The Test For Intertwined Or Incidental Claims Or Remedies? ......................... 3

**STATE LAW ANALYSIS** ........................................................................................ **5**

    A.   Texas ...................................................................................................... 6

        1.   Antitrust ..................................................................................... 6

        2.   DTPA ........................................................................................ 11

    C.   Alaska .................................................................................................... 16

        1.   Antitrust ..................................................................................... 16

        2.   AUTPCPA ................................................................................. 18

    D.   Arkansas ................................................................................................ 22

        1.   Antitrust ..................................................................................... 22

        2.   DTPA ........................................................................................ 25

    E.   Florida ................................................................................................... 28

        1.   Antitrust ..................................................................................... 28

        2.   FDUTPA .................................................................................... 30

    F.   Idaho ...................................................................................................... 33

        1.   Antitrust ..................................................................................... 33

        2.   ICPA ......................................................................................... 35

    G.   Indiana .................................................................................................. 38

        1.   Antitrust ..................................................................................... 38

        2.   DCSA ........................................................................................ 39

    H.   Kentucky ............................................................................................... 42

        1.   Antitrust ..................................................................................... 42

        2.   KCPA ....................................................................................... 46

    I.   Louisiana ............................................................................................... 49

        1.   Antitrust ..................................................................................... 49

        2.   LUTPA ..................................................................................... 51

J.  Mississippi .................................................................................................... 54

    1.  Antitrust ................................................................................................ 54

    2.  CPA ....................................................................................................... 56

K.  Missouri ...................................................................................................... 60

    1.  Antitrust ................................................................................................ 60

    2.  MMPA ................................................................................................... 61

L.  Montana ...................................................................................................... 64

    1.  Antitrust ................................................................................................ 64

    2.  MUTPA ................................................................................................. 66

M.  Nevada ......................................................................................................... 69

    1.  Antitrust ................................................................................................ 69

    2.  NDTPA .................................................................................................. 72

N.  North Dakota .............................................................................................. 76

    1.  Antitrust ................................................................................................ 76

    2.  NDUSAP ............................................................................................... 78

O.  Puerto Rico ................................................................................................. 81

    1.  Antitrust ................................................................................................ 81

    2.  PRAA's DTP Prohibition ..................................................................... 84

P.  South Carolina ............................................................................................ 87

    1.  Antitrust and Consumer Protection ...................................................... 87

Q.  South Dakota .............................................................................................. 89

    1.  Antitrust ................................................................................................ 89

    2.  DTPA .................................................................................................... 92

R.  Utah ............................................................................................................. 94

    1.  Antitrust ................................................................................................ 94

    2.  UCSPA .................................................................................................. 97

**CONCLUSION** .................................................................................................. **99**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ag Acceptance Corp. v. Glinz,*
684 N.W.2d 632 (N.D. 2004) ...............................................................77

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.,*
135 F.3d 740 (11th Cir. 1998) ..............................................................28

*Am. Nat'l Univ. of Ky., Inc. v. Commonwealth ex rel. Beshear,*
No. 2018-CA-000610-MR, 2019 WL 2479608 (Ky. App. June 14, 2019)............................48

*Arnold v. Microsoft Corp.,*
No. 2000-CA-002144-MR, 2001 WL 1835377 (Ky. Ct. App. Nov. 21, 2001)
(unpublished) ..............................................................43, 44

*Assam Drug Co. v. Miller Brewing Co.,*
798 F.2d 311 (8th Cir. 1986) ...............................................................90

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983).............................................................................7

*Atcheson v. Everitt*, 1 Cowper 382, 98 Eng. Rep. 1142 (K. B. 1776) ....................................45, 48

*Bank of Am. v. Boone Nat'l Bank,*
No. 2004-CA-002422-MR, 2006 WL 504999 (Ky. Ct. App. Mar. 3, 2006)...........................44

*Beacon Theatres, Inc. v. Westover,*
359 U.S. 500 (1959)
.......................... 3, 9, 14, 17, 21, 24, 29, 35, 37, 39-40, 46, 48, 51, 53, 56, 58, 63, 66, 68, 72, 75

*Commonwealth. ex rel. Beshear v. ABAC Pest Control, Inc.,*
621 S.W.2d 705 (Ky. Ct. App. 1981) ...................................................48

*Betsinger v. D.R. Horton, Inc.,*
126 Nev. 162 (2010) ...........................................................................73

*Boulware v. State of Nev., Dep't of Hum. Res.,*
960 F.2d 793 (9th Cir. 1992) ...............................................................70

*Butler Motors, Inc. v. Benosky,*
181 N.E.3d 304 (Ind. Ct. App. 2021)....................................................39

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry,*
494 U.S. 558 (1990).........................................................................4, 10

iii

*Cheshire v. Coca Cola Bottling Affiliated, Inc.*,
  758 F. Supp. 1098 (D.S.C. 1990).........................................................................88

*Citizens Nat'l Bank of Grant Cnty. v. First Nat. Bank in Marion*,
  331 N.E.2d 471 (Ind. 1975) .................................................................................39

*Conway v. CitiMortgage, Inc.*,
  438 S.W.3d 410 (Mo. 2014) .................................................................................62

*Craig & Bishop, Inc. v. Piles*,
  No. 2004-CA-001883-MR, 2005 WL 3078860 (Ky. Ct. App. Nov. 18, 2005)......47

*Curtis v. Loether*,
  415 U.S. 189 (1974)..........................................................................................3, 12

*Dairy Queen, Inc. v. Wood*,
  369 U.S. 469 (1962)
  ......3, 9, 14, 17, 21, 24, 27, 29, 32, 35, 37, 39, 40, 46, 48, 51, 53, 56, 58, 60, 63, 66, 68, 72, 75

*Dep't of Revenue v. Printing House*,
  644 So. 2d 498 (Fla. 1994)............................................................................29, 32

*Feltner v. Columbia Pictures Television, Inc.*,
  523 U.S. 340 (1998)...................................................................................2, 16, 76

*State ex rel. Fitch v. Yazaki N. Am., Inc.*,
  294 So. 3d 1178 (Miss. 2020)..............................................................................59

*Flovac, Inc. v. Airvac, Inc.*,
  84 F. Supp. 3d 95 (D.P.R. 2015).........................................................................82

*Grenada Lumber Co. v. State ex rel. Att'y Gen.*,
  54 So. 8 (Miss. 1911).........................................................................................56

*HPC Biologicals, Inc. v. UnitedHealthcare of La., Inc.*,
  194 So. 3d 784 (La. Ct. App. 2016).....................................................................50

*Lebow v. American Trans Air, Inc.*,
  86 F.3d 661 (7th Cir. 1996)
  ............................................12, 13, 19, 26, 31, 36, 40, 47, 52, 58, 62, 67, 74, 79, 85, 93, 98

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).............................................................................................23

*Marco Island Cable, Inc. v. Comcast Cablevision of the S., Inc.*,
  No. 2:04-CV-26-FTM-29DNF, 2006 WL 1814333 (M.D. Fla. July 3, 2006) ........31

*In re Mem'l Hermann Hosp. Sys.*,
464 S.W.3d 686 (Tex. 2015) ................................................................ 7

*Mendell v. Golden-Farley of Hopkinsville, Inc.*,
573 S.W.2d 346 (Ky. App. 1978) ........................................................ 43

*In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*,
190 So. 3d 829 (Miss. 2015) .............................................................. 57

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
235 F. Supp. 2d 1269 (M.D. Fla. 2002) ............................................ 31

*Nat'l Soc.'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) ............................................................................ 23

*State ex rel. Nixon v. Telco Directory Pub.*,
863 S.W.2d 596 (Mo. 1993) .............................................................. 64

*Nw. Airlines, Inc. v. Transp. Workers Union of Am.*,
451 U.S. 77 (1981) .............................................................................. 23

*Odom v. Lee*,
999 P.2d 755 (Alaska 2000) ............................................................... 17

*Osterman v. Sears, Roebuck & Co.*,
80 P.3d 435 (Mont. 2003) .................................................................. 67

*Ostermeier v. Prime Props. Invs. Inc.*,
589 S.W.3d 1 (Mo. Ct. App. 2019) .................................................... 63

*Pleasant v. McDaniel*,
550 S.W.3d 8 (Ark. Ct. App. 2018) .................................................. 26

*Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*,
332 F.3d 6 (1st Cir. 2003) .................................................................. 82

*S.E.C. v. Bradt*,
No. 93-cv-8521, 1995 WL 215220 (S.D. Fla. Mar. 7, 1995) ............. 29

*S.E.C. v. Jarkesy*,
603 U.S. 109 (2024)
... 5, 8, 12-14, 17, 19-20, 24, 26, 31, 32, 34, 36-37, 40, 47-48, 51-53, 56, 58, 62-63, 66-68, 71, 74-75, 78-80, 83, 85-86, 91, 93-94, 96, 98-99

*Saintignon v. State*,
749 N.E.2d 1134 (Ind. 2001) ............................................................ 42

*Simler v. Conner*,
    372 U.S. 221 (1963)...................................................................1, 3

*Smith v. Baldwin*,
    611 S.W.2d 611 (Tex. 1980)....................................................................11

*Smith v. Video Lottery Consultants, Inc.*,
    858 P.2d 11 (Mont. 1993).....................................................................65

*Standard Oil Co. of Cal. v. Arizona*,
    738 F.2d 1021 (9th Cir. 1984) .................................................................8

*Hood ex rel. State v. BASF Corp.*,
    No. 56863, 2006 WL 3083 78 (Miss. Ch. Jan. 17, 2006).....................................56

*State v. Bill Garland Trucking*,
    No. 91-2375, 1991 WL 290692 (Tex. Dist. Ct. Feb. 20, 1991).............................9

*State v. Kirsch*,
    268 N.W. 473 (N.D. 1936) ...................................................................81

*State v. Se. Tex. Chapter of Nat'l Elec. Contractor's Ass'n*,
    358 S.W.2d 711 (Tex. Civ. App. 1962) .....................................................9

*State v. W. Cap. Corp.*,
    290 N.W.2d 467 (S.D. 1980) ...............................................................94

*State v. Walgreen Co.*,
    250 So. 3d 465 (Miss. 2018)...............................................................60

*North Dakota ex rel. Stenehjem v. Spa D'Athena, LLC*,
    Case No. 08-2018-cv-00306 (N.D. D. Ct. Apr. 11, 2016) ..................................81

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981).........................................................................7

*Tull v. United States*,
    481 U.S. 412 (1987)
    ....1, 2-5, 8, 10, 12-21, 24-27, 29, 31-37, 40-41, 45-49, 51-56, 58-59, 62-69, 71-75, 78-81, 83-
    87, 91-93, 95-99

*U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*,
    No. 14-22739-Civ, 2017 WL 2875427 (S.D. Fla. May 15)...................................29

*United States v. ERR, LLC*,
    35 F.4th 405 (5th Cir. 2022) ...................................................1, 2, 4, 12, 13, 60

*Vader v. Fleetwood Enters., Inc.*,
    201 P.3d 139 (Mont. 2009) ........................................................................66

*Vogt Power Int'l, Inc. v. Lab. Dep't of Workplace Standards*,
    588 S.W.3d 169 (Ky. Ct. App. 2019) ........................................................48

*Watson Lab'ys, Inc. v. State*,
    241 So. 3d 573 (Miss. 2018) ..........................................................58, 59, 60

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*,
    777 S.E.2d 176 (S.C. 2015) ..................................................................89, 90

**Statutes**

10 L.P.R.A. §259(a) ........................................................15, 21, 82, 83, 85

10 L.P.R.A. §259(b) ..................................................................................82

10 L.P.R.A. §259(i) ........................................................82, 83, 84, 85, 86, 87

10 L.P.R.A. §269 ..........................................................83, 84, 85, 86, 87

9 U.S.C. §4 ..................................................................................................22

33 U.S.C. §1319 ..........................................................................................10

33 U.S.C. §1319(b) ..........................................................................10, 21, 82

33 U.S.C. §1319(d) ..............................................................................10, 14

33 U.S.C. §2702(a) ....................................................................................12

Alaska Restraint of Trade Act, Alaska Stat. Ann. §45.50.562 *et seq.* ...........16

Alaska Stat. Ann. §45.50.471 ....................................................................19

Alaska Stat. Ann. §45.50.471(a) ..........................................................19, 22

Alaska Stat. Ann. §45.50.471(b) ..........................................................19, 22

Alaska Stat. Ann. §45.50.501 ..............................................................19, 21

Alaska Stat. Ann. §45.50.501(a) ................................................................20

Alaska Stat. Ann. §45.50.501(b) ................................................................20

Alaska Stat. Ann. §45.50.531 ....................................................................19

Alaska Stat. Ann. §45.50.531(a) ................................................................20

Alaska Stat. Ann. §45.50.535 .................................................................................19

Alaska Stat. Ann. §45.50.537 .................................................................................19

Alaska Stat. Ann. §45.50.551 .................................................................................19

Alaska Stat. Ann. §45.50.551(a) .............................................................................21

Alaska Stat. Ann. §45.50.551(b) ................................................................20, 21, 22

Alaska Stat. Ann. §45.50.578(a) .............................................................................17

Alaska Stat. Ann. §45.50.578(b) .......................................................................17, 18

Alaska Stat. Ann. §45.50.580(a) .......................................................................17, 18

Alaska Stat. Ann. §45.50.580(b) .......................................................................17, 18

Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. Ann.
    §45.50.471 *et seq.* .........................................................................................19

Ark. Code Ann. §4-75-202 .....................................................................................23

Ark. Code Ann. §4-75-212(a) .................................................................................25

Ark. Code Ann. §4-75-212(a)(4) .............................................................................24

Ark. Code Ann. §§ 4-75-212(a)(4) and 4-75-315(a)(4)..........................................24

Ark. Code Ann. §4-75-301 *et seq.* ........................................................................23

Ark. Code Ann. §4-75-315(a)(4) .............................................................................24

Ark. Code Ann. §4-88-107 .....................................................................................25

Ark. Code Ann. §4-88-107(a)(10) ...........................................................................27

Ark. Code Ann. §4-88-108 .....................................................................................25

Ark. Code Ann. §4-88-108(a)(1) .............................................................................27

Ark. Code Ann. §4-88-108(a)(2) .............................................................................27

Ark. Code Ann. §4-88-113 .....................................................................................26

Ark. Code Ann. §4-88-113(a) .................................................................................28

Ark. Code Ann. §4-88-113(a)(1) .............................................................................27

Ark. Code Ann. §4-88-113(a)(2) ........................................................................26, 27

Ark. Code Ann. § 4-88-113(a)(3) ...................................................................26, 27

Ark. Code Ann. §4-88-113(f) ..............................................................................28

Ark. Code Ann. §4-88-116 ...................................................................................28

Ark. Code Ann. §7-75-315(a) ...............................................................................25

Arkansas Code sections 4-75-212 and -315..........................................................24

Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §4-88-101 *et seq.* .............25

Arkansas Unfair Practices Act, Ark. Code Ann. §4-75-201 *et seq.*................................23

Deceptive Trade Practices Act................................................................................6

Fla. Stat. Ann. §501.202 ......................................................................................31

Fla. Stat. Ann. §501.204 ..........................................................................30, 31, 33

Fla. Stat. Ann. §501.207 ......................................................................................31

Fla. Stat. Ann. §501.207(1)(b) .............................................................................32

Fla. Stat. Ann. §501.207(1)(c) .............................................................................32

Fla. Stat. Ann. §501.211 ......................................................................................31

Fla. Stat. Ann. §501.2075 ..........................................................................31, 32, 33

Fla. Stat. Ann. §542.21 ..............................................................................29, 30

Fla. Stat. Ann. §542.21(1).....................................................................................29

Fla. Stat. Ann. §542.22 ......................................................................................30

Fla. Stat. Ann. §542.23 ..............................................................................29, 30

Fla. Stat. Ann. §542.32 ......................................................................................28

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §501.201 *et seq.*....................30

Idaho Code Ann. §48-108(1) ......................................................................34, 35

Idaho Code Ann. §48-108(1)(d) ....................................................................34, 35

Idaho Code Ann. §48-108(2) ................................................................................35

Idaho Code Ann. §48-114.....................................................................................34

Idaho Code Ann. §48-603 .................................................................................................36

Idaho Code Ann. §48-603(5) ...........................................................................................36

Idaho Code Ann. §48-603(7) ...........................................................................................36

Idaho Code Ann. §48-603(9) ...........................................................................................36

Idaho Code Ann. §48-603(17) .........................................................................................36

Idaho Code Ann. §48-603C ..............................................................................................36

Idaho Code Ann. §48-606 .................................................................................................36

Idaho Code Ann. §48-606(1) ...........................................................................................37

Idaho Code Ann. §48-606(1)(a) .......................................................................................37

Idaho Code Ann. §48-606(1)(e) ..................................................................................37, 38

Idaho Code Ann. §48-606(5) ...........................................................................................37

Idaho Code Ann. §48-607 ...........................................................................................36, 37

Idaho Code Ann. §606(1)(b) ............................................................................................37

Idaho Code §48-102(3) .....................................................................................................34

Idaho Code §48-108 ..........................................................................................................34

Idaho Code §48-112 ..........................................................................................................34

Idaho Competition Act, Idaho Code Ann. §48-105 .........................................................34

Idaho Consumer Protection Act, Idaho Code Ann. §48-601 *et seq.* .............................36

Ind. Code Ann. §24-1-2-1 ................................................................................................38

Ind. Code Ann. §24-1-2-2 ................................................................................................38

Ind. Code Ann. §24-1-2-5(a) (2021) ...............................................................................39

Ind. Code Ann. §24-5-0.5-3 .............................................................................................40

Ind. Code Ann. §24-5-0.5-3(a) .........................................................................39, 40, 41, 42

Ind. Code Ann. §24-5-0.5-4(c) ..............................................................................40, 41, 42

Ind. Code Ann. §24-5-0.5-4(f) .........................................................................................41

Ind. Code Ann. §24-5-0.5-4(g) ....................................................................40, 41, 42

Ind. Code Ann. §24-5-0.5-8 ...............................................................................41, 42

Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §367.110 *et seq.*...................................47

Ky. Rev. Stat. Ann. §367.170(1) ...............................................................................47

Ky. Rev. Stat. Ann. §367.175 ...................................................................43, 44, 46

Ky. Rev. Stat. Ann. §367.175(1) ..............................................................................43

Ky. Rev. Stat. Ann. §367.175(2) ..............................................................................43

Ky. Rev. Stat. Ann. §367.190 ...........................................................................47, 49

Ky. Rev. Stat. Ann. §367.200 ..................................................................................48

Ky. Rev. Stat. Ann. §367.990 ..................................................................................48

Ky. Rev. Stat. Ann. §367.990(1) ..............................................................................49

Ky. Rev. Stat. Ann. §367.990(2) ...............................................................47, 48, 49, 50

Ky. Rev. Stat. Ann. §367.990(8) ...........................................................................44, 45, 46

Ky. Rev. Stat. Ann. §416.031 .................................................................................44

La. Rev. Stat. Ann. §51:122(A) ...............................................................................50

La. Rev. Stat. Ann. §51:122(B) .......................................................................50, 51, 52

La. Rev. Stat. Ann. §51:123 ...........................................................................50, 51, 52

La. Rev. Stat. Ann. §51:128 ...............................................................................50, 51

La. Rev. Stat. Ann. §51:138 ...................................................................................51

La. Rev. Stat. Ann. §51:1405(A) ..............................................................................52

La. Rev. Stat. Ann. §51:1407(A) .......................................................................52, 53, 54

La. Rev. Stat. Ann. §51:1407(B) ...................................................................52, 53, 54, 55

La. Rev. Stat. Ann. §51:1407(E) ..............................................................................53

La. Rev. Stat. Ann. §51:1408(A)(5) ....................................................................52, 53

La. Rev. Stat. Ann. §51:1408(B) ..............................................................................53

La. Rev. Stat. Ann. §51:1409 ................................................................................52

La. Rev. Stat. Ann. §51:1416 ................................................................................54

Miss. Code Ann. §75-21-1 ............................................................................55, 56

Miss. Code Ann. §75-21-7 ............................................................................56, 57

Miss. Code Ann. §75-21-9 ............................................................................56, 57

Miss. Code Ann. §75-24-5 ......................................................................58, 59, 74

Miss. Code Ann. §75-24-5(1) ..............................................................................57

Miss. Code Ann. §75-24-9 ..........................................................................57, 58, 59, 60

Miss. Code Ann. §75-24-11 ....................................................................57, 58, 59

Miss. Code Ann. §75-24-15 ..................................................................................57

Miss. Code Ann. §75-24-19(1)(a) .........................................................................59

Miss. Code Ann. §75-24-19(1)(b) ......................................................57, 58, 59, 60, 61

Miss. Code Ann. §75-24-23 ..................................................................................57

Mo. Ann. Stat. §407.020.1 ..................................................................................62

Mo. Ann. Stat. §407.100.1 ......................................................................62, 63, 64

Mo. Ann. Stat. §407.100.2 ..................................................................................64

Mo. Ann. Stat. §407.100.4 ............................................................................62, 63

Mo. Ann. Stat. §407.100.6 ......................................................................62, 63, 64

Mo. Ann. Stat. §407.130 ......................................................................................62

Mo. Ann. Stat. §407.140 ......................................................................................62

Mo. Ann. Stat. §416.031 ......................................................................................63

Mo. Ann. Stat. §416.031.1 ..................................................................................61

Mo. Ann. Stat. §416.031.2 ..................................................................................61

Mo. Ann. Stat. §416.051.3 ............................................................................62, 64

Mo. Ann. Stat. §416.071.1 ..................................................................................61

Mo. Ann. Stat. §416.121 ................................................................................................62

Mo. Ann. Stat. §416.141 ................................................................................................61

Mont. Code Ann. §30-14-103 ........................................................................................67

Mont. Code Ann. §30-14-111 ........................................................................................69

Mont. Code Ann. §30-14-111(4) ..............................................................................67, 68

Mont. Code Ann. §30-14-131 ...................................................................................67, 68

Mont. Code Ann. §30-14-142(1) ...................................................................................68

Mont. Code Ann. §30-14-142(2) ...........................................................................67, 68, 69

Mont. Code Ann. §§30-14-205(1), (2)(b), (2)(c), (2)(g) .............................................65

Mont. Code Ann. §30-14-222(1) .............................................................................65, 66

Mont. Code Ann. §30-14-224 ........................................................................................66

Mont. Code Ann. §30-14-224(2) .........................................................................65, 66, 67

Mont. Code Ann. §30-14-226(1) ....................................................................................65

N.D. Cent. Code §51-08.1-02 ........................................................................................77

N.D. Cent. Code §51-08.1-07 ..............................................................................77, 78, 79

N.D. Cent. Code §51-08.1-11 ........................................................................................78

N.D. Cent. Code §51-15-02 ...........................................................................................79

N.D. Cent. Code §51-15-07 ....................................................................................80, 81

N.D. Cent. Code §51-15-11 ....................................................................................80, 81

Nev. Rev. Stat. Ann. §228.332 ......................................................................................74

Nev. Rev. Stat. Ann. §§598.0915–.0925 .......................................................................73

Nev. Rev. Stat. Ann. §598.0915(5) ...............................................................................73

Nev. Rev. Stat. Ann. §598.0915(7) ...............................................................................73

Nev. Rev. Stat. Ann. §598.0915(9) ...............................................................................73

Nev. Rev. Stat. Ann. §598.0953(1)...........................................................................72, 76

Nev. Rev. Stat. Ann. §598.0963 ................................................................73

Nev. Rev. Stat. Ann. §598.0963(3).....................................................74, 75

Nev. Rev. Stat. Ann. §598.0975(1)(a) ......................................................74

Nev. Rev. Stat. Ann. §598.0999(2).........................................73, 74, 75, 76

Nev. Rev. Stat. Ann. §598A.050 ...............................................................70

Nev. Rev. Stat. Ann. §598A.060 ...............................................................70

Nev. Rev. Stat. Ann. §598A.070(1)(c) ......................................................72

Nev. Rev. Stat. Ann. §598A.070(4)...........................................................72

Nev. Rev. Stat. Ann. §598A.070(c)(2) ......................................................70

Nev. Rev. Stat. Ann. §598A.170 .........................................................70, 71, 72, 73

Nev. Rev. Stat. Ann. §598A.250 ...............................................................71

Nev. Rev. Stat. Ann. §598A.260 ...............................................................71

Nevada Decepive Trade Practices Act, Nev. Rev. Stat. Ann. §598.0903, *et seq.* .........................73

Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §598A.010, *et seq.* ............................70

North Dakota Uniform State Antitrust Act, N.D. Cent. Code §51-08.1-01 *et seq.* .......................77

North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code §51-15-01 *et seq.* ........79

Puerto Rico Antitrust Act, 10 L.P.R.A. §259 *et seq.* ................................82

S.C. Code Ann. §39-5-20...........................................................................88

S.C. Code Ann. §39-5-20(a) ................................................................88, 89

S.C. Code Ann. §39-5-50....................................................................88, 89

S.C. Code Ann. §39-5-110(a) ..........................................................88, 89, 90

S.C. Code Ann. §39-5-110(c) ............................................................88, 89

S.D. Codified Laws §1-11-6.3 ...................................................................91

S.D. Codified Laws §37-1-3.1 ...................................................................90

S.D. Codified Laws §37-1-3.2 ...................................................................90

S.D. Codified Laws §37-1-14.2 ...................................................................91, 92

S.D. Codified Laws §37-1-20 ..........................................................................91

S.D. Codified Laws §37-1-22 ..........................................................................90

S.D. Codified Laws §37-1-31 ..........................................................................91

S.D. Codified Laws §37-24-6 ...............................................................93, 94, 95

S.D. Codified Laws §37-24-6(1) .....................................................................93

S.D. Codified Laws §37-24-23 .............................................................93, 94, 95

S.D. Codified Laws §37-24-27 .............................................................93, 94, 95

S.D. Codified Laws §37-24-29 .................................................................93, 94

South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq.* ............................88

Tex. Bus. & Com. Code §15.04 ..........................................................................7

Tex. Bus. & Com. Code §15.05 ..........................................................................7

Tex. Bus. & Com. Code §15.05(a)-(b) ................................................................7

Tex. Bus. & Com. Code §15.20 ..........................................................................9

Tex. Bus. & Com. Code §15.20(a) ..................................................7, 8, 10, 11

Tex. Bus. & Com. Code §15.20(b) .....................................................7, 8, 10

Tex. Bus. & Com. Code §17.46 ...................................................................11, 13

Tex. Bus. & Com. Code §17.47 ........................................................................13

Tex. Bus. & Com. Code §17.47(a) ....................................................................13

Tex. Bus. & Com. Code §17.47(c) ...............................................13, 14, 15, 16

Tex. Bus. & Com. Code §17.47(d) ....................................................................14

Tex. Bus. & Com. Code §17.47(e) ...............................................................15, 16

Tex. Bus. & Com. Code §17.47(g) ...............................................................14, 16

Tex. Bus. & Com. Code §17.50 ........................................................................13

Utah Antitrust Act, Utah Code Ann. §76-10-3101, *et seq.* .........................................95

Utah Code Ann. §13-11-4..............................................................................97

Utah Code Ann. §13-11-17(1)....................................................................97, 99

Utah Code Ann. §13-11-17(2)(b)...................................................................98

Utah Code Ann. §13-11-17(4)(b)...................................................................98

Utah Code Ann. §13-11-17(6)...................................................................97, 98

Utah Code Ann. §13-11-17(6)(a)...................................................................99

Utah Code Ann. §13-11-117..........................................................................99

Utah Code Ann. §76-10-3104(1)....................................................................95

Utah Code Ann. §76-10-3108....................................................................96, 97

Utah Code Ann. §76-10-3118..........................................................................96

Utah Code §76-10-3114(2).............................................................................96

Utah Consumer Sales Practices Act, Utah Code Ann. §13-11-1 *et seq.*.........98

**Other Authorities**

21 Cong. Rec. 2456 (1890)..............................................................................7

Alisson Reppy, *The Action of Debt – At Common Law, Under Modern Codes, Practice Acts and Rules of Civil Procedure*, 4 N.Y.L. SCH. L. REV. 1 (1958) .......................13

Edward Coke, CASE OF THE MONOPOLIES, *Darcy v. Allein*, 11 Co Rep 84 (1602) .....................43

*Fine*, BLACK'S LAW DICTIONARY (12th ed. 2024).........................................................9

H.B. 21, 66 Leg., Gen. Sess. (Utah 2025)..................................................................95

Puerto Rico Regulation on Fair Competition No. 2648 (Proscribing Unfair Methods and Practices of Competition and Enumerating Acts Which Constitute Unfair Methods of Competition), http://app.estado.gobierno.pr/ReglamentosOnLine/Reglamentos/2648ING.pdf..............83, 86

4 WILLIAM BLACKSTONE, COMMENTARIES....................................................................44

William Letwin, *The English Common Law Concerning Monopolies*, 21 U. Chi. L. Rev. 355 (1954) ............................................................................................7

The Court ordered supplemental briefing on multiple questions related to the jury trial right.  Plaintiff States answer as follows.

## LEGAL STANDARD

### A.    Which Questions Are State Law, And Which Are Federal?

To assist the Court in making sense of the state law analysis below, Plaintiff States offer a breakdown on which issues are controlled by federal law, which by state law, and the interaction between the two sources of law.

*Seventh Amendment: Federal*.  As prior briefing and the hearing made clear, both sides agree that federal law controls the question of whether the Seventh Amendment applies.

*Characterization of a claim as legal or equitable: Federal.*  State law determines the contents and substance of each claim and remedy.  But whether the claim is properly "characterize[ed] . . . as legal or equitable" "must be made by recourse to federal law."  *Simler v. Conner*, 372 U.S. 221, 222 (1963).  The federal-law characterization proceeds by "compar[ing] the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity" to find whether the *better* analogy is an 18th-century action at law or instead one in equity.  *Tull v. United States*, 481 U.S. 412, 417 (1987).

*Characterization of a remedy as legal or equitable: Federal*.  Though less frequently litigated, the same is true for remedies.  Certain remedies—for example, restitution—were available under certain circumstances in equity and under others at law.  The proper federal law inquiry for such remedies is to analogize to the most specifically similar form of the remedy.  The Fifth Circuit commended that approach for the remedy of restitution, endorsing an "analy[sis of] restitution's historical development from the pre-Founding era to the merger of law and equity" to discern the attributes *in the 18th century* of "restitution *in equity*" from "restitution *at law*."  *United States v. ERR, LLC*, 35 F.4th 405, 413–14 (5th Cir. 2022).

1

*Whether the quantum of civil penalties goes to a jury: a federal law presumption that can be overcome.* As Plaintiff States explained in more detail at oral argument, a long line of Supreme Court cases, culminating in *Feltner v. Columbia Pictures Television, Inc.*, have held that the amount of a monetary award is presumptively decided by a jury. 523 U.S. 340, 355 (1998). *Tull* deviated from that presumption, but only because the sovereign authority that crafted the cause of action *expressly* required that judges—not juries—determine the amount. *Tull*, 481 U.S. at 425–26. Plaintiff States have argued that *Tull*'s deviation was "dicta," *Feltner*, 523 U.S. at 354 n.8.[1]

If the Court rejects that argument, at minimum *Tull* did not purport to overturn (let alone discuss) the well-established line of precedent *Feltner* referenced. The Court must therefore apply a rule that harmonizes *Tull* with the traditional, still-binding precedent that typically empowers juries to decide both liability *and* the price of that liability. The best approach is to treat the calculation of monetary amounts by a jury as the default federal rule, but one that can be overcome by an express textual delegation by the sovereign that created the cause of action giving the calculation to a judge. Because the relevant sovereigns here are States, federal law looks to the laws of the States. It is still an application of federal law in the same way that federal law controls the characterization of the remedy as legal or equitable. *ERR*, 35 F.4th at 413–14. Federal law determines *how* to classify a given remedy, but where state law creates the cause of action, state law defines *what* remedy is available. In other words, state-law inputs inform the federal-law analysis, and it is still federal law that supplies the test for determining the division of labor between judges and juries.

---

[1] The state-by-state analysis is not relevant if the Court accepts this argument, and so the state-by-state discussion below assumes, without conceding, that the Court has rejected it.

**B.    What Is The Test For Intertwined Or Incidental Claims Or Remedies?**

The words "intertwined" or "incidental" are relevant to legally distinct concepts, which must be kept separate.  First, the facts and issues in a particular action may be *intertwined*.  Where that is true—for example, as in *Beacon Theatres, Inc. v. Westover*, in which the parties sought damages and equitable relief that hinged on the same facts associated with the same antitrust claims—the jury trial must go first.  359 U.S. 500, 508-09 (1959).  "The holding in *Beacon Theatres* was that where both legal and equitable issues are presented in a single case," the jury must decide shared issues, and this "holding, of course, applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not."  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472–73 (1962); *see also Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974) ("[I]f a legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact.  The right cannot be abridged by characterizing the legal claim as 'incidental' to the equitable relief sought.").  Plaintiffs have argued that this principle *does* apply in this case, such that if any issue is triable to the jury, factually overlapping issues also need to be presented to the jury.

Second, courts have noted that a "court in equity was empowered to provide monetary awards that were incidental to or intertwined with injunctive relief," and the parties dispute the significance of that observation.  *See Tull*, 481 U.S. at 424.  This inquiry is best understood as a component of the federal-law "characterization" of a remedy as legal or equitable under *Simler*.  The test is historical—like all other aspects of Seventh Amendment jurisprudence—rather than an invitation for a court to use intuition when deciding whether the monetary relief is sufficiently "incidental" or "intertwined with" the requested equitable relief to constitute an equitable remedy.  The relevant inquiry, therefore, is: could a court of equity have awarded this money in 1791 as an incidental part of his power to issue an injunction?  If the answer was "no," labelling the requested

money "incidental" or "intertwined" with the injunction does Google no good. Those words in the Supreme Court opinions describing the specific, narrow category of cases where a court of equity could award money even though that relief was usually reserved to courts of law. They are not freestanding invitations to sidestep the original understanding of the jury-trial right based on modern notions of what counts as sufficiently "incidental" or "intertwined."

Precedent confirms this historical approach. The Fifth Circuit, for example, noted that restitution is not always equitable. *See ERR, LLC*, 35 F.4th at 413–14. Historical analysis might show that a specific form of restitution was chiefly incidental to an injunction, and, under that circumstance, restitution incidental to an injunction *today* might be most analogous to that *historical* remedy. That form of restitution may be for the court to award. The Supreme Court has warned against taking this reasoning too far, explaining that even when a given hyper-specific monetary remedy was "available *only* in courts of equity," and that hyper-specific remedy is most analogous to a modern remedy, courts *still* should usually find monetary remedies to be legal because the Seventh Amendment turns on "the *general types of relief* provided by courts of law and equity." *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 571, n.8 (1990) (emphases added).

The Supreme Court's discussion in *Tull* of the "three flaws" in the government's argument there is instructive on how this analysis should proceed. *Tull*, 481 U.S. at 424. "First," the Court pointed out the lack of any historically analogous remedy to civil-penalties-incidental-to-injunctive-relief: "while a court in equity may award monetary *restitution* as an adjunct to injunctive relief, it may not enforce *civil penalties*." *Id.* (emphases added). The same is true here. Thus, even if—as Plaintiff States dispute—the remedies here *could* be characterized as "civil penalties incidental to injunctive relief," the most analogous *historical* counterpart would remain

civil penalties, and civil penalties in the 18th century "could only be enforced in courts of law." *S.E.C. v. Jarkesy*, 603 U.S. 109, 123 (2024) (quoting *Tull*, 481 U.S. at 422).

Turning to the nature of the relief sought, the Supreme Court pointed to two factors. It questioned whether the civil penalties were actually incidental in that action in particular, since "petitioner had already sold most of the properties at issue" and the penalties could reach "$22 million," which "hardly can be considered incidental." *Tull*, 481 U.S. at 424–25. The same is true here, since at least some of the culpable conduct has ended or changed, so the injunctive relief will be about restoring *future* competition, while the civil penalties will be partially to punish *past* misconduct. Last, the Court examined the statute, noting that "the Government was free to seek an equitable remedy in addition to, or independent of, legal relief" and "each kind of relief is separably authorized in a separate and distinct statutory provision." *Id.* at 425. Certainly, where injunctive relief could be *sought* separate and independent from equitable relief, this principle applies. Plaintiff States also believe that where a State could *recover* civil penalties without injunctive relief, the penalties are necessarily not incidental, even if both must be sought initially. Indeed, it makes no sense to say that a monetary award is being given incidental to a requested injunction that has been *denied*. Only where the recovery of civil penalties *requires* the award of injunctive relief can the civil penalties be deemed "incidental." And even then, of course, the other two "flaws" would defeat Google's argument.

## STATE LAW ANALYSIS

| State Antitrust | | | | | | |
|---|---|---|---|---|---|---|
| | More analogous to a legal claim? | Intertwined with legal claims? | Seeks civil penalties? | Jury decides civil penalties *amount*? | Can *win* penalties without winning injunction? | Can *seek* penalties without seeking injunction? |
| AK | **Yes** | **Yes** | **Yes** | **Yes** | **Yes** | **Yes** |
| AR | **Yes** | **Yes** | **Yes** | **Yes** | **Yes** | **Yes** |
| FL | **Yes** | **Yes** | **Yes** | **Yes** | **Yes** | **Yes** |
| ID | **Yes** | **Yes** | **Yes** | **Yes** | **Yes** | **Yes** |

| | | | | | | |
|---|---|---|---|---|---|---|
| IN | Yes | Yes | No | N/A | N/A | N/A |
| KY | Yes | Yes | Yes | Advisory jury | Yes | Yes |
| LA | Yes | Yes | Yes | Yes | Yes | Yes |
| MS | Yes | Yes | Yes | Yes | Yes | Yes |
| MO | Yes | Yes | No | N/A | N/A | N/A |
| MT | Yes | Yes | Yes | Yes | Yes | Yes |
| NV | Yes | Yes | Yes | Yes | Yes | Yes |
| ND | Yes | Yes | Yes | Yes | Yes | Yes |
| PR | Yes | Yes | Yes | Yes | Yes | Yes |
| SC | Yes | Yes | Yes | No | Yes | Yes |
| SD | Yes | Yes | Yes | Advisory jury | Yes | Yes |
| TX | Yes | Yes | Yes | Yes | Yes | Yes |
| UT | Yes | Yes | Yes | Yes | Yes | Yes |

| Deceptive Trade Practices Act (Or Equivalent) | | | | | | |
|---|---|---|---|---|---|---|
| | More analogous to a legal claim? | Intertwined with legal claims? | Seeks civil penalties? | Jury decides civil penalties *amount*? | Can *win* penalties without winning injunction? | Can *seek* penalties without seeking injunction? |
| AK | Yes | Yes | Yes | Yes | Yes | No |
| AR | Yes | Yes | Yes | Advisory jury | Yes | Yes |
| FL | Yes | Yes | Yes | Yes | Yes | Yes |
| ID | Yes | Yes | Yes | Yes | Yes | Yes |
| IN | Yes | Yes | Yes | Advisory jury | Yes | No |
| KY | Yes | Yes | Yes | Yes | Yes | No |
| LA | Yes | Yes | Yes | Advisory jury | Yes | No |
| MS | Yes | Yes | Yes | Advisory jury | Yes | No |
| MO | Yes | Yes | Yes | Advisory jury | Yes | Yes |
| MT | Yes | Yes | Yes | Advisory jury | Yes | No |
| NV | Yes | Yes | Yes | Yes | Yes | Yes |
| ND | Yes | Yes | Yes | Advisory jury | Yes | Yes |
| PR | Yes | Yes | Yes | Yes | Yes | Yes |
| SC | Yes | Yes | Yes | No | Yes | Yes |
| SD | Yes | Yes | Yes | Advisory jury | Yes | No |
| TX | Yes | Yes | Yes | Yes | Yes | No |
| UT | Yes | Yes | Yes | Yes | Yes | Yes |

**A. Texas**

**1. Antitrust**

**a. Legal or equitable**

Texas's antitrust law is more analogous to legal than to equitable claims.  Texas law prohibits "[e]very contract, combination, or conspiracy in restraint of trade or commerce" as well as "to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or

commerce." Tex. Bus. & Com. Code §15.05(a)-(b).  The attorney general may file suits "to collect a civil fine" or may bring a suit "for injunctive relief," or both, which each turn upon proof of a violation of section 15.05.  *Id.* §15.20(a)-(b).  Texas antitrust law is to be "construed in harmony with federal" antitrust law.  *Id.* §15.04; *see also In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 708 (Tex. 2015).  Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)."  Dkt. 674 at 50; *see also* Dkt. 224 at 27.  Federal law thus sheds light on whether Texas antitrust claims are legal or equitable.

It is particularly clear that federal antitrust law is legal rather than equitable because "[t]he congressmen who drafted and passed the Sherman Antitrust Law thought they were merely declaring illegal offenses that the common law had always prohibited."  William Letwin, *The English Common Law Concerning Monopolies*, 21 U. Chi. L. Rev. 355, 355 (1954).  "Congress assumed the courts would refer to the *existing law* of monopolies and restraints on trade."  *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 643 n.15 (1981) (emphasis added) (citing English cases and Letwin, *supra*).  Indeed, according to its drafters, the Sherman Act "does not announce a new principle of law, but applies old and well recognized principles of the common law to the complicated jurisdiction of our State and Federal Government."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 531 (1983) (quoting 21 Cong. Rec. 2456 (1890)).  So closely related are antitrust claims to the common law that "the substantive content of the Sherman Act draws meaning from its common-law antecedents."  *Id.* at 532.  Because Texas law is construed in harmony with federal law, the analogy between Texas antitrust claims and common law claims is similarly close.

By contrast, no case has held or suggested that federal or Texas antitrust claims are equitable.  Google has not proposed any historical analog to a Texas antitrust claim that could be

brought in equity.  Plaintiff States are aware of none.  The identity of the Plaintiff States as enforcers makes no difference to the analysis.  *See, e.g.*, *Standard Oil Co. of Cal. v. Arizona*, 738 F.2d 1021, 1027–28 (9th Cir. 1984).  Because the analogy to a legal claim is stronger than the analogy to an equitable claim, Texas antitrust actions are legal for Seventh Amendment purposes.

### b.  Remedies at issue

Texas seeks injunctive relief and civil penalties.  Fourth Am. Compl. ¶¶759-60 ("FAC").[2] Texas seeks multiple forms of equitable relief, including disgorgement and an injunction under Texas Business & Commerce Code section 15.20(b).  There is no jury trial right for equitable relief.  Texas also seeks civil fines under Texas Business & Commerce Code section 15.20(a).  That section provides that "person adjudged to have violated any of these prohibitions shall pay a fine to the state."  *Id.*

Civil penalties like these are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish (not restore the status quo).  "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'"  *Jarkesy*, 603 U.S. at 123 (quoting *Tull*, 481 U.S. at 422).  Though there are not statutory criteria here, the escalating maximum based on the "assets or market capitalization" is unmistakably linked to deterrence and ability to pay, and has nothing to do with restoring the status quo.  It is punishment through-and-through.  Here, just as in *Jarkesy*, Texas is authorized to exact penalties from the defendant's general assets, with no requirement to identify particular funds, deliver the amounts to particular victims, or calibrate the amount to unwind conduct.  The award is paid "to the state," not any victim.  That makes civil penalties crucially like remedies that only courts of law could supply in the 18th century.

---

[2] Texas (and other states) also seek attorney fees, costs, and so forth, but those remedies would be addressed only after trial, and so are not briefed here.

Attempting to dodge the relevant analysis, Google may argue that this provision provides for a criminal-like fine rather than a civil penalty. But the Supreme Court's test turns on determining, in a *civil* case, whether relief is legal or equitable. Analogizing to criminal law is a category error (and one constitutional amendment off). Regardless, there is no relevant distinction between a "civil fine" and a "civil penalty," and the terms appear to be used interchangeably. *Compare Fine*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("pecuniary criminal punishment or **civil penalty** payable to the public treasury") *with Civil Penalty*, *id.* ("a **fine** assessed for a violation of a statute or regulation") (emphases added); *see also State v. Bill Garland Trucking*, No. 91-2375, 1991 WL 290692, at *1 (Tex. Dist. Ct. Feb. 20, 1991) ("$3,000[] shall be paid by Defendant Homer "Jack" Nikirk to the State of Texas as **penalties** pursuant to the Tex. Bus. & Com[]. Code, §15.20.") (emphasis added); *State v. Se. Tex. Chapter of Nat'l Elec. Contractor's Ass'n*, 358 S.W.2d 711, 713 (Tex. Civ. App. 1962) (Texas "may seek **civil penalties** for violations of state anti-trust laws") (emphasis added). That interchangeability makes sense, because the purpose of criminal fines is to punish the wrongdoer and deter future violations. Those are legal, not equitable, purposes. Whatever its label under state law, a monetary exaction paid by a defendant in a civil case upon proof of a violation simply *is* a civil penalty for Seventh Amendment purposes.

### c. *Intertwinement*

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined. Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide whether such a violation has occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply. First, *Tull* explained that there is no historical analog for awarding civil penalties incidental to injunctive relief: "while a court in equity may award monetary restitution as an adjunct to injunctive relief, it may not enforce

9

civil penalties." *Tull*, 481 U.S. at 424.  There, as here, without any *historical* analog in equity for awarding civil penalties, the best analogy is legal.  That reasoning is reinforced by *Terry*'s admonition that what matters is "the general types of relief provided by courts of law and equity." 494 U.S. at 571, n.8.  Civil penalties as a "general type[] of relief" was unavailable in equity.

Second, *Tull* examined the case before the Court.  There, the penalty was not incidental because "the Government was aware when it filed suit that relief would be limited primarily to civil penalties, since petitioner had already sold most of the properties at issue" and "[a] potential penalty of $22 million hardly can be considered incidental to the modest equitable relief sought in this case."  481 U.S. at 424–25.  Here, much of the conduct for which civil penalties are being sought is in the past, and the amount sought is $30 million.  The injunctive relief is still quite substantial (and more substantial than in *Tull*), but the penalties are significant on their own.

Third, *Tull* looked to the statutory authority at issue.  There, "the Government was free to seek an equitable remedy in addition to, or independent of, legal relief.  Section 1319 does not intertwine equitable relief with the imposition of civil penalties.  Instead each kind of relief is separably authorized in a separate and distinct statutory provision.  Subsection (b), providing injunctive relief, is independent of subsection (d), which provides only for civil penalties."  *Id.* at 425.  The same is true here.  Civil penalties (Tex. Bus. & Com. Code §15.20(a)) and injunctive relief (*id.* §15.20(b)) are separately codified.  Texas could seek one or both.

A jury must resolve all the legal issues first, which includes all intertwined factual issues (intertwinement with DTPA claims is addressed below).  After its verdict, the Court may then decide what other equitable relief should be awarded.  The Court may also have an advisory jury.

### d.  Penalties calculation

Texas law does not specify whether the Court or the jury decides the amount of civil antitrust penalties.  It now simply provides that the defendant "shall pay a fine to the state in an

amount not to exceed . . . $30 million." Tex. Bus. & Com. Code §15.20(a). The federal default rule should therefore control, which Plaintiff States submit is a jury determination. The Court may also have the jury calculate advisory penalties amount even if it disagrees.

### 2. DTPA

#### a. Legal or equitable

For Seventh Amendment purposes, the DTPA claims in Texas are more analogous to actions at law than to actions in equity. Texas alleges that Google violated multiple provisions of Texas Business & Commerce Code section 17.46, including subsection 17.46(a) ("False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful") as well as subsections (b)(5), (7), (9), (12), (24). FAC ¶677. Texas law is clear that the "DTPA does not represent a codification of the common law," *Smith v. Baldwin*, 611 S.W.2d 611, 616 (Tex. 1980). This issue often arises in cases construing it broadly, rather than narrowly. In that context, courts in Texas (and in other States) often hold that the DTPA is meant to cover more than the common law and should not be construed in accordance with the restrictive elements of common law fraud. For the avoidance of doubt, Plaintiff States' arguments here do not suggest that the elements of DTPA violations should be construed to match common law requirements. But to say that the DTPA is *broader* than the common law is not to say that it is *anything like* an equitable claim. It is even farther from the forms of action in equity than those at common law. The question, as always, is discerning the *better* analogy. Under the approach required by *Tull*, *Jarkesy*, and other cases, a claim need not be very similar to a common law claim for that claim to be the closest analogy. Rather, they must simply be somewhat better than the closest equitable analogy. Three examples illustrate the point:

First, consider a civil rights claim for housing discrimination. *See Curtis v. Loether*, 415 U.S. 189 (1974). Eighteenth Century England did not have these. Yet, the Supreme Court held

that such a claim "sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Id.* at 195.

Second, consider the wrongful termination claim in *Lebow v. American Trans Air, Inc.*, 86 F.3d 661, 668 (7th Cir. 1996). The court wryly observed: "We can identify no exact eighteenth-century parallel for Lebow's claim that ATA fired him because he was engaged in union-organizing activities. In eighteenth-century England, labor unions were illegal, and employees who engaged in collective bargaining were subject to criminal penalties." *Id.* Clearly, the statutory right did not codify the common law. Yet the court "analogize[d] to a common-law breach of contract action" because "as an implied term of Lebow's employment, ATA could not fire him for engaging in union activities. An unlawful discharge may be viewed as a breach of this implied contract." *Id.*

Third, consider the claim for recoupment in *ERR*. The Oil Pollution Act makes a "responsible party for a vessel" liable for oil spill clean-up costs. 33 U.S.C. §2702(a). The Fifth Circuit held this was close enough to trespass on the case: "The statute first creates a legal duty and then provides a right of action to compensate the injured party for a breach of that duty." *ERR*, 35 F.4th at 412. It was different from an equitable action "to abate a nuisance or to stop a trespass" because the oil was already spilled—the only question was paying for it. *Id.* at 413. *Tull* itself had much the same analysis for a Clean Water Act claim that it analogized to an action in debt.[3]

Here, the DTPA sets forth legal duties, *see* Tex. Bus. & Com. Code §17.46, and provides for remedies for violations of those duties, *see* Tex. Bus. & Com. Code §§17.47, 17.50. This is

---

[3] While this case is analogous to an action in debt, the common law form of "The Action in Debt" encompassed categories that today we would consider civil penalties and fines rather than "a debt." *See* Alisson Reppy, *The Action of Debt – At Common Law, Under Modern Codes, Practice Acts and Rules of Civil Procedure*, 4 N.Y.L. Sch. L. Rev. 1,37 (1958).

analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

Google has proposed no historical analog to a Texas DTPA claim that could be brought in equity. Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, Texas DTPA claims are legal under the Seventh Amendment.

### b.  *Remedies at issue*

Texas seeks injunctive relief and civil penalties. FAC ¶¶759-60.

Texas seeks multiple forms of equitable relief, including disgorgement and an injunction under Tex. Bus. & Com. Code §17.47(a). There is no jury trial right for equitable relief.

Texas also seeks civil penalties under section 17.47(c). That section (and subsection (g) which gives detail) provides that "the consumer protection division may request, and the trier of fact may award, a civil penalty to be paid to the state in an amount of:

> (1) not more than $10,000 per violation; . . . .
> (g) In determining the amount of penalty imposed under Subsection (c), the trier of fact shall consider:
> (1) the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited act or practice;
> (2) the history of previous violations;
> (3) the amount necessary to deter future violations;
> (4) the economic effect on the person against whom the penalty is to be assessed;
> (5) knowledge of the illegality of the act or practice; and
> (6) any other matter that justice may require.

Tex. Bus. & Com. Code §17.47(c)(1), (g).

Civil penalties like these are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish (not restore the status quo). "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Jarkesy*, 603 U.S. at 123 (quoting *Tull*, 81 U.S. at 422). Here, the statutory criteria match those in *Jarkesy*, and are plainly geared toward punishment and deterrence. Here, just as in

*Jarkesy*, Texas is authorized to exact penalties from the defendant's general assets, with no requirement to identify particular funds, deliver the amounts to particular victims, or calibrate the amount to unwind conduct. The award is paid "to the state," not any victim. That makes civil penalties crucially like remedies that only courts of law could supply in the 18th century.

It is illuminating to compare the civil penalties provision with subsection (d):

> (d) The court may make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice.

Tex. Bus. & Com. Code §17.47(d). This section includes classic damages (a legal remedy), but also includes monetary awards that could be equitable—"to restore money or property . . . which may have been acquired by means of any unlawful act or practice." That the civil penalties are separate and in addition to this authority demonstrates even more clearly that they are *not* for the purpose of restoring money for equitable reasons.

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined. Equitable relief and civil penalties both may be awarded upon proof of a violation of the Texas DTPA. The jury therefore must decide whether the DTPA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply, discussed above. The first flaw is analyzed above, but applies here too. The second flaw applies similarly, except that the civil penalty amount *here* is $10,000 *per violation*, resulting in a potential penalty in the billions, which is even harder to characterize as incidental than the $30 million in antitrust penalties.

Third, *Tull* looked to the statutory authority at issue.  Here, Texas law enumerates two civil penalty provisions and an injunctive relief provision separately.   One provision, subsection 17.47(e), authorizes civil penalties against a person "who violates the terms of an injunction under this section," and specifies what "the court shall take into consideration," and that "the district court issuing the injunction shall retain jurisdiction."  Tex. Bus. & Com. Code §17.47(e).  This provision looks much closer to something that is "incidental to injunctive relief," since it is available *only* after an injunction is issued, and from *only* the court that issued the injunction. Texas is not now seeking penalties under this provision.

Instead, Texas seeks penalties under subsection (c), which states: "In addition to the request for a temporary restraining order, or permanent injunction in a proceeding brought under Subsection (a) of this section, the consumer protection division may request, and the trier of fact may award, a civil penalty . . . ."  Tex. Bus. & Com. Code Ann. §17.47(c).  As in *Tull*, the civil penalty and the injunctive relief is codified separately.  Civil penalties are available only if the state *also* "request[s]" equitable relief under subsection (a), but there is no requirement that Texas *prevail* under subsection (a).  Texas could request a temporary restraining order and no other injunctive relief, plus civil penalties; the temporary restraining order could be denied; but still, the civil penalties could be awarded.  The penalties are therefore not incidental to or intertwined with equitable relief, since they could be awarded even if no equitable relief is.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only the DTPA claims and civil penalties, but also antitrust claims.  For example, Google's monopolization (and attempted monopolization) was partly effected through omissions and misleading statements; its unlawful tying arrangement also

15

involved representing that an agreement involves obligations which are prohibited by law. Many of Google's defenses are likely to overlap as well (for example, statute of limitations defenses).

After the jury's verdict, the Court decides what equitable relief should be awarded. The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d. Penalties calculation

Texas law specifically provides that the "trier of fact" (as opposed to the "court") should "determin[e] the amount of penalty imposed" and "the trier of fact may award, a civil penalty." Tex. Bus. & Com. Code §17.47(c), (g). This differs from subsection (e), which places civil penalties for violating injunctions with the court. This case is therefore the opposite of *Tull*, where the sovereign specifically provided that a court—not a jury—decides penalty amounts. The federal default rule from *Feltner* therefore controls, which Plaintiff States submit is a jury determination. The Court may also have the jury calculate an advisory penalties amount even if it disagrees.

## C.   Alaska

### 1.   Antitrust

#### a.   Legal or equitable

Alaska alleges Google violated the Alaska Restraint of Trade Act ("ARTA"), Alaska Stat. Ann. §45.50.562 *et seq.* Google concedes that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50; *see also* Dkt. 224 at 27. Alaska courts agree. *Odom v. Lee*, 999 P.2d 755, 761 (Alaska 2000) ("This court is guided by federal Sherman Act cases in construing the Alaska antitrust law."). The analysis stated above for Texas applies here too.

#### b.   Remedies at issue

Alaska seeks equitable remedies (including injunctive relief) and civil penalties. *See* FAC ¶¶619-621. Alaska seeks multiple forms of equitable relief, as authorized by Alaska Statutes subsections 45.50.580(a) and (b). There is no jury trial right for equitable relief.

Alaska also seeks civil penalties under subsection 45.50.578(b). That subsection authorizes the attorney general to bring "[i]n addition to any other relief available . . . a civil action against a person who violates" the antitrust laws "for a civil penalty of not more than . . . $50,000,000 if the person is not a natural person." *Id.* The statute does not give criteria to follow in imposing civil penalties, but the separate codification of "additional orders or judgments" for traditional equitable purposes in subsection 45.50.580(b) suggests that civil penalties are not subsumed within the equitable remedies in that section. Nothing in the statute suggests that the civil penalty is supposed to restore the status quo, and it would be a peculiar coincidence if it did. The penalty is paid to the state, and taken from the defendant's general assets (not a particular piece of property). Civil penalties like these are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish (not restore the status quo). Google may argue that these penalties are criminal, but criminal penalties are separately authorized, *see* Alaska Stat. Ann. §45.50.578(a), and this argument would not prove the absence of a jury right even if correct.

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined. Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide whether such a violation has occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply. *See* 481 U.S. at 424. The first flaw applies because there is no historical analog to civil-penalties-incidental-to-injunctive-relief, as argued above. The second flaw applies because the civil penalties can target past conduct while injunctive relief is forward looking, and because penalties here are up to $50 million, which "hardly can be considered incidental." *Id.* at 424–25 The third flaw applies because Alaska law authorizes the attorney general to "bring an action to enjoin a violation" of the antitrust laws, which

"may be brought as a sole action or in conjunction with another action that the attorney general is authorized to bring." Alaska Stat. Ann. §45.50.580(a). The next section authorizes the court to "make additional orders or judgments as may be necessary to restore a person in interest any money or property . . ., and as may be necessary to prevent continuing or future violations." *Id.* §45.50.580(b). A fully separate section authorizes the attorney general to bring "[i]n addition to any other relief available . . . a civil action against a person who violates" the antitrust laws "for a civil penalty." *Id.* §45.50.578(b). Alaska was free to seek either without the other, and there is no requirement to win injunctive relief in order to recover civil penalties.

In sum, a jury must resolve all the legal issues first, which includes all intertwined factual issues (intertwinement with AUTPCPA claims is addressed below). After its verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d.  Penalties calculation

Alaska law does not specify whether the judge or jury decides the amount of penalties, but simply states that the "attorney general may bring a civil action . . . for a civil penalty of not more than . . . $50,000,000 if the person is not a natural person." Alaska Stat. Ann. §45.50.578(b). The federal default rule should therefore control, which Plaintiff States submit is a jury determination. The Court may also have the jury calculate advisory penalties amount even if it disagrees.

### 2.  AUTPCPA

### a.  Legal or equitable

Alaska brings claims against Google for violations of the Alaska Unfair Trade Practices and Consumer Protection Act ("AUTPCPA"), Alaska Stat. Ann. §45.50.471 *et seq.*, which for Seventh Amendment purposes are more analogous to actions at law than to actions in equity. Alaska law prohibits "Unfair methods of competition and unfair or deceptive acts or practices in

18

the conduct of trade or commerce."  Alaska Stat. Ann. §45.50.471(a).  It then lists more specific examples that are "include[d]" within than general proscription.  *Id.* §45.50.471(b).  Alaska alleges Google has and continues to "mak[e] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions," *id.* §45.50.471(b)(10), and "engag[e] in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer or a competitor in connection with the sale or advertisement of goods or services," *id.* §45.50.471(b)(11).

The analysis set forth above for the State of Texas applies here too, but even more strongly because the phrase "unfair methods of competition" is broader than, but more similar to, the common law unfair competition claim.  Here, the AUTPCPA sets forth legal duties, *see* Alaska Stat. Ann. §45.50.471, and provides for remedies for violations of those duties, *see id.* §§45.50.501, 45.50.531, 45.50.535, 45.50.537, 45.50.551.  This is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

Google has not proposed any historical analog to an Alaska AUTPCPA claim that could be brought in equity.  Plaintiff States are aware of none.  Because the stronger analogy is to a legal rather than equitable claim, Alaska AUTPCPA actions are legal for Seventh Amendment purposes.

### b.  *Remedies at issue*

Alaska seeks injunctive relief and civil penalties.  FAC ¶¶679-83.

Alaska seeks multiple forms of equitable relief, including disgorgement and an injunction under Alaska Statutes subsections 45.50.501(a) and (b).  There is no jury right for equitable relief.

Alaska also seeks civil penalties under subsection 45.50.551(b).  That subsection provides that "the attorney general, upon petition to the court, may recover, on behalf of the state, a civil penalty of not less than $1,000 and not more than $25,000 for each violation."  Alaska Stat. Ann.

§45.50.551(b).  Civil penalties like these are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish (not restore the status quo).  There are no statutory criteria, but it is clear that the amount is per-violation, with no attempt to place anyone into his former position.  Here, just as in *Jarkesy*, Alaska is authorized to exact penalties from the defendant's general assets, with no requirement to identify particular funds, deliver the amounts to particular victims, or calibrate the amount to unwind conduct.  The attorney general "may recover *on behalf of the state*," not any victim.  *Id.* §45.50.531(a).  That makes civil penalties crucially like remedies that only courts of law could supply in the 18th century.

> Like Texas, Alaska has a separate provision that provides for other equitable relief:

>> (b) The court may make additional orders or judgments that are necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of an act or practice declared to be unlawful by AS 45.50.471.

*Id.* §45.50.501(b).  That the civil penalties are separate and in addition to this authority demonstrates that civil penalties are not for the purpose of restoring money for equitable reasons.

### c.  Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined.  Equitable relief and civil penalties both may be awarded upon proof of an AUTPCPA violation, so the jury must decide how many such violations occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim.  *Tull's* "three flaws" all apply, discussed above.  The first flaw is analyzed above and applies here too.  The second flaw applies similarly, except that the civil penalty amount *here* is up to $25,000 *per violation*, which results in a potential penalty in the billions, which is even more clearly not incidental.  Third, *Tull* looked to the statutory authority at issue.  Here, Alaska law enumerates two civil penalty provisions and an injunctive relief provision

20

separately.  One provision, subsection 45.50.551(a), authorizes civil penalties against any "person who violates the terms of an injunction or restraining order."  *Id.* §45.50.551(a).  "For the purposes of this section, the superior court in a judicial district issuing an injunction retains jurisdiction . . . ."  *Id.* This provision looks much closer to something that is "incidental to injunctive relief," since it is available *only* after an injunction is issued, and from *only* the court that issued the injunction.  Alaska is not seeking penalties under this provision.

Instead, Alaska seeks penalties under subsection (b), which states: "In an action brought under AS 45.50.501, if the court finds that a person is using or has used an act or practice declared unlawful by AS 45.50.471, the attorney general, upon petition to the court, may recover, on behalf of the state, a civil penalty of not less than $1,000 and not more than $25,000 for each violation."  *Id.* §45.50.551(b).  As in *Tull*, the civil penalty and the injunctive relief are codified separately.  Civil penalties are available only "[i]n an action brought under" section 45.50.501, but there is no requirement that Alaska prevail in recovering an injunction from subsection (a), or restitution or disgorgement or other relief under subsection (b).  Alaska could file an action seeking some equitable relief and civil penalties, could fail to recover any equitable relief, and could still recover civil penalties.  The penalties are therefore not incidental to or intertwined with equitable relief, since they could be awarded even if no equitable relief is.

A jury must resolve all the legal issues first, which includes all intertwined factual issues.  Those intertwined legal issues include not only the AUTPCPA claims and civil penalties, but also antitrust claims.  For example, Google's monopolization, attempted monopolization, and tying also constitute unfair methods of competition under subsection 45.50.471(a), were partly effected through "false or misleading statements of fact" and constitute "conduct creating a likelihood . . . of misunderstanding and that misleads . . . a buyer . . . in connection with the sale or advertisement

of goods or services." Alaska Stat. Ann. §§45.50.471(b)(10)-(11).  Many of Google's defenses are likely to overlap as well (for example, statute of limitations defenses).

After the jury's verdict, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d.  Penalties calculation

The AUTPCPA provides that the "attorney general, upon petition to the court, may recover, on behalf of the state, a civil penalty of not less than $1,000 and not more than $25,000 for each violation." Alaska Stat. Ann. §45.50.551(b).  This provision mentions that there must be a "petition to the court," but does not clearly state whether the court or jury would calculate penalties. Petitions are properly made to the court even where a jury tries disputed facts related to the petition. *Cf.* 9 U.S.C. §4 (providing for a "petition" to "any United States district court" to compel arbitration, with any factual dispute to be resolved by "jury").  The federal default rule should therefore control, which Plaintiff States submit is a jury determination.  The Court may also have the jury calculate advisory penalties amount even if it disagrees.

## D.    Arkansas

### 1.  Antitrust

#### a.  Legal or equitable

Arkansas alleges Google violated the Arkansas Unfair Practices Act, Ark. Code Ann. §4-75-201 *et seq.*, Ark. Code Ann. §4-75-301 *et seq.*, and the common law of Arkansas.  FAC ¶623.

The Supreme Court has held federal antitrust claims to be claims at law, similar to the common law.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007); *Nat'l Soc.'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978); *Nw. Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77 (1981).  "From the beginning the Court has treated the Sherman Act as a common-law statute." *Leegin*, 551 U.S. at 899.  "The legislative history [of the Sherman Act]

makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 688. "In antitrust, the federal courts enjoy more flexibility and act more as common-law courts than in other areas governed by federal statute." *Nw. Airlines, Inc.*, 451 U.S. at 98 n.42. It is a clear and long-standing view that antitrust statutes draw from the common law. Claims arising under federal antitrust statutes, then, are necessarily claims at law rather than claims in equity.

Arkansas's antitrust laws, too, are common law claims at law. Despite Google's claims that Arkansas's antitrust statutes do not sufficiently mirror federal law, Dkt. 674 at 50; *see also* Dkt. 224 at 27, this Court has noted that "the Arkansas legislature's stated purpose in enacting the law is to 'safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented.'" Dkt. 788 at n.19 (quoting Ark. Code Ann. §4-75-202). This purpose is the same as that of its counterparts in the antitrust laws of both the federal government and other states, as is the nature of the claims arising from the statute. Just as the Sherman Act was clearly intended to draw from the common-law tradition, so, too is the Arkansas antitrust law. Consequently, the analysis above for Texas applies here as well, and Arkansas incorporates that analysis into its argument.

### b. Remedies at issue

Arkansas seeks equitable remedies and civil penalties. *See* FAC ¶624.

Arkansas seeks multiple forms of equitable relief, as authorized by Arkansas Code sections 4-75-212 and -315. There is no jury trial right for equitable relief, however, Arkansas also seeks civil penalties under sections 4-75-212(a)(4) and 4-75-315(a)(4), which provide that the Arkansas Attorney General may bring an action "[t]o recover civil penalties of up to one thousand dollars ($1,000) per violation of this subchapter." Ark. Code Ann. §§ 4-75-212(a)(4) and 4-75-315(a)(4)

23

(identical).[4]  Civil penalties awarded pursuant to these sections go to the state, not to any victim as restitution. These penalties are intended to punish and deter, not to restore the status quo. Under the guidance of *Tull* and *Jarkesy*, these civil penalties are a legal remedy and are unenforceable by a court in equity.

### c.  Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined.  Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide how many such violations occurred.

Although the *facts and issues* are intertwined, neither *remedy* is incidental to or intertwined with the other.  *Tull's* "three flaws" all apply, as discussed above.  *See* 481 U.S. at 424. The first flaw, a "court in equity . . . may not enforce civil penalties," *id.*, applies because there is no historical analog to civil penalties incidental to injunctive relief, as argued above. The second flaw applies because the civil penalties awarded for violations of Arkansas's antitrust laws are up to $1,000 per violation, which in the present lawsuit may reach into the billions, and they can "hardly be considered incidental" to the equitable relief sought by Arkansas.  *Id.*  Last, *Tull's* third flaw applies because Arkansas law authorizes the attorney general to "bring an action in the name of the state," and lists four separate and independent remedies: declaratory judgment, injunction, actual damages, and civil penalties.  Ark. Code Ann. §§4-75-212(a), 7-75-315(a).  There is no requirement within the statute that a suit seek any particular relief, or that multiple types of relief must be sought together.  Arkansas is free to seek any of the four remedies independently of one other, and thus legal civil penalties and equitable injunctive relief are not intertwined.

---

[4] These subsections have identical wording, but they apply to different violations, with Arkansas Code section 4-75-212(a)(4) applying to subchapter two, covering illegal contracts, noncompetitive practices, and other related conduct, and section 4-75-315(a)(4) applying to subchapter three, covering monopolies, price fixing, and other related conduct.

A jury must resolve all the legal issues first, including intertwined factual issues (intertwinement with DTPA claims is addressed below).  After its verdict, the Court may then proceed to decide what other equitable relief should be awarded.

### d.  Penalties calculation

Arkansas law does not specify whether the judge or jury decides the penalty amount.  The federal default rule should control, and Plaintiff States submit this results in a jury determination.  The Court may also have the jury calculate advisory penalties amount, even if it disagrees.

## 2.  DTPA

### a.  Legal or equitable

Arkansas brings claims against Google for violations of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §4-88-101 *et seq.*, which for Seventh Amendment purposes are more analogous to actions at law than to actions in equity.  Arkansas law prohibits "[d]eceptive and unconscionable trade practices," including various specific practices and a catchall, *id.* §4-88-107, as well as "concealment, suppression, or omission of any material fact," *id.* §4-88-108.  The analysis set forth above for the State of Texas applies here, too.  Arkansas's DTPA claim is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.[5]

Google has proposed no historical analog to an Arkansas DTPA claim that could be brought in equity.  Plaintiff States are aware of none.  Because the analogy to a legal claim is stronger than the analogy to an equitable claim, Arkansas DTPA claims are legal under the Seventh Amendment.

---

[5] Although a claim arising under the Arkansas DTPA is similar to an action in common law fraud for the purposes of categorizing a claim as legal or equitable under the Seventh Amendment, claims arising under the DTPA are distinct from common law fraud, and DTPA claims are not held to the heightened pleading standard of common law fraud.  *See Pleasant v. McDaniel*, 550 S.W.3d 8 (Ark. Ct. App. 2018).

### b. Remedies at issue

Arkansas seeks both equitable remedies—including injunctive relief—and civil penalties. *See* FAC ¶624.  Arkansas seeks multiple forms of equitable relief, as authorized by section 4-88-113.  There is no jury trial right for equitable relief; however, Arkansas also seeks civil penalties under section 4-88-113(a)(3), which provides that the attorney general may seek, and the Court may grant, "penalties to be paid to the state, not to exceed ten thousand dollars ($10,000) per violation, against persons who have violated this chapter."

Civil penalties awarded pursuant to this section are paid to the state, Ark. Code Ann. § 4-88-113(a)(3), and are separate from restitution assessed to make a consumer whole, *id.* § 4-88-113(a)(2).  These penalties are meant to punish and deter, not to restore the status quo. Under *Tull* and *Jarkesy*, these civil penalties are a legal remedy, not an equitable one.

Google may attempt to argue that these penalties are criminal; however, these penalties are provided for in section 4-88-113, entitled "*Civil* enforcement and remedies—Suspension or forfeiture of charter, franchise, etc." (emphasis added).  Further, such an argument would not prove the absence of a jury right even if it were correct.

### c. Intertwinement

The analysis of intertwinement for Arkansas's DTPA claims and remedies is nearly identical to the antitrust analysis.  Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these two remedies are intertwined, but neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim.  *Tull*'s "three flaws" all apply as discussed above in the antitrust analysis.  The analysis of the first flaw is identical to the above analysis.  The second flaw applies similarly, except that the civil penalty amount for Arkansas DTPA violations is up to $10,000 per violation, which results in a potential penalty in the billions.  This is even harder to characterize as "incidental" than the millions sought

in antitrust penalties.  For the third flaw, *Tull* looks to the statutory authority at issue. Here, the remedies that the attorney general is authorized to seek are separate and independent from one another, just as in the antitrust analysis above.  The attorney general may seek, and the court may grant, injunctive relief, restitution and damages, and penalties.  Ark. Code Ann. §§4-88-113(a)(1)–(3).  As in *Tull*, civil penalties and injunctive relief are separate and may be sought independently.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only the DTPA claims and civil penalties, but also antitrust claims.  For example, Google's monopolization, attempted monopolization, and tying also constitute "unconscionable, false or deceptive act[s]" under section 4-88-107(a)(10) and were partly accomplished through "deception, fraud, or false pretense" and "concealment, suppression, or omission" under sections 4-88-108(a)(1), (2).  Many of Google's defenses are likely to overlap as well (for example, statute of limitations defenses).

After the jury's verdict, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d.  Penalties calculation

The Arkansas DTPA provides that the "circuit court may make such orders or judgments as may be necessary to" (1) prevent prohibited practices (injunctive relief), (2) restore the status quo by restitution or damages, and (3) "assess penalties to be paid to the State."  Ark. Code Ann. §4-88-113(a).  Though the text states that the "court may make such orders . . . necessary to . . . assess penalties," *id.*, which suggests the court should calculate penalties, the phrasing is the same with respect to damages, which are generally calculated by a jury.  However, a specific provision guarantees a "right to a jury trial" for "an action brought under §4-88-113(f)," which is the private right of action.  *Id.* §4-88-116.  Considered together, the specification of subsection (f) rather than the entire section suggests that the court calculates penalties in actions brought by the attorney

27

general under Arkansas law, overcoming the federal presumption.  The Court may have the jury calculate an advisory penalties amount.

### E.     Florida

#### 1.  Antitrust

##### a.  Legal or equitable

Courts are directed to generally construe the Florida Antitrust Act in harmony with federal antitrust law.  *See* Fla. Stat. Ann. §542.32 ("[I]n construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes."); *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law.").  Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)."  Dkt. 674 at 50; *see also* Dkt. 224 at 27.  The analysis above for Texas applies here too.

##### b.  Remedies at issue

Florida seeks both equitable relief and civil penalties. FAC ¶626.

The Florida statute specifically splits the equitable claims from the legal claims.  Section 542.23 provides that "[i]n addition to other remedies provided by this chapter, any person shall be entitled to sue for and have injunctive or other equitable relief in the circuit courts of this state against threatened loss or damage by a violation of this chapter."  There is no jury trial right for equitable relief.

Section 542.21 provides that defendants who violate the Act "shall be subject to a civil penalty of not more than $1 million."  Fla. Stat. Ann. §542.21(1).  In Florida, civil penalties are legal remedies.  *See S.E.C. v. Bradt*, No. 93-8521-CVIGONZALEZ, 1995 WL 215220, at *1 (S.D. Fla. Mar. 7, 1995) (defining civil penalties as "legal remedies"); *U.S. Commodity Futures Trading*

*Comm'n v. S. Tr. Metals, Inc.*, No. 14-22739-Civ, 2017 WL 2875427, at *20 (S.D. Fla. May 15) ("civil monetary penalties are historically a legal remedy"). The Florida Supreme Court, moreover, has held that civil penalties "imposed as a means of punishment" must be "determined by a jury." *Dep't of Revenue v. Printing House*, 644 So. 2d 498, 501 (Fla. 1994).

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined. Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide how many such violations occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply, but the third is dispositive. *See* 481 U.S. at 424. The third flaw applies because Florida law authorizes the attorney general to recover equitable remedies, damages, or civil penalties in separate, independent sections. *See* Fla. Stat. Ann. §542.21 (civil penalties) *id.* §542.22 (damages and *parens patriae*); *id.* §542.23 (equitable remedies). Florida was free to seek either without the other, and there is no requirement to win injunctive relief in order to recover civil penalties. Even so, the first flaw also applies because there is no historical analog to civil-penalties-incidental-to-injunctive-relief, as argued above. Likewise, the second flaw applies because the civil penalties can target past conduct while injunctive relief is forward looking, and because penalties here are up to $1 million for each violation of the antitrust laws, a substantial sum.

In sum, a jury must resolve all the legal issues first, which includes all intertwined factual issues (intertwinement with FDUTPA claims is addressed below). After its verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d. Penalties calculation

The Florida statute at issue does not specify whether the judge or the jury decides the amount of civil penalties. The federal default rule should therefore control, which Plaintiff States submit is a jury determination. The Court may also have the jury calculate advisory penalties.

## 2. FDUTPA

### a. Legal or equitable

Florida brings claims against Google for violating the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. §501.201 *et seq.*, which for Seventh Amendment purposes are more analogous to actions at law than in equity. Florida law prohibits "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. Ann. §501.204. Florida alleges that Google's actions constitute (1) "unfair methods of competition in violation of [FDUTPA]," FAC ¶686, and (2) "unfair or deceptive acts or practices in violation of the [FDUTPA]," FAC ¶687.

The substance of an "[u]nfair methods of competition" claim under FDUTPA is generally construed in harmony with federal antitrust law. *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002) ("FDUTPA is to be construed consistently with antitrust law."), *aff'd*, 364 F.3d 1288 (11th Cir. 2004); *Marco Island Cable, Inc. v. Comcast Cablevision of the S., Inc.*, No. 2:04-CV-26-FTM-29DNF, 2006 WL 1814333, at *6 (M.D. Fla. July 3, 2006) ("both Florida and federal antitrust law are analyzed under the same rules and case law"). As set forth above for the State of Texas, antitrust claims are closely related to common-law antecedents. Because Florida law is construed in harmony with federal law, the analogy between Florida's "unfair method of competition" claim and common law claims is similarly close. Additionally, Florida's claim under the "unfair or deceptive acts or practices" prong of FDUTPA is more analogous to actions at law than to actions in equity. Although FDUTPA is broader than common

law fraud, it is even farther from the forms of action in equity than those at common law, as described above for the State of Texas's DTPA claim.  Indeed, the Florida legislature enacted the FDUTPA to codify common law consumer protection claims—one of the FDUTPA's stated purposes is "[t]o simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices." Fla. Stat. §501.202.  FDUTPA sets forth legal duties, *see* Fla. Stat. Ann. §501.204, and creates remedies for violations of those duties, *see id.* §§501.207, 501.2075, 501.211.  This is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

Google has proposed no historical analog to a FDUTPA claim that could be brought in equity.  Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, FDUTPA claims are legal under the Seventh Amendment.

### b. Remedies at issue

FDUTPA authorizes the State to bring equitable claims for injunctive (and other equitable) relief (including disgorgement), and legal claims for damages, restitution, and civil penalties. In this case, Florida pursues an equitable claim for injunctive relief and a legal claim for civil penalties.  FAC ¶689. The Statute specifically splits out the equitable claims from the legal claims. Section 501.207(1)(b) addresses equitable claims, providing that the enforcing authority may bring "[a]n action to enjoin any person who has violated, is violating, or is otherwise likely to violate" the statute. Section 501.207(1)(c) addresses legal claims for damages, providing that the enforcing authority may bring "[a]n action on behalf of one or more consumers or governmental entities for the actual damages caused by an act of practice in violation of" the statute.  Finally, section 501.2075 addresses legal claims for penalties (which may be recovered in "any action" brought by the Florida Attorney General under FDUTPA) providing that defendants who "willfully" violate

31

the Statute are "liable for a civil penalty of not more than $10,000 for each such violation." Civil penalties like this are legal under *Tull* and *Jarkesy* because their purpose is to punish rather than to restore the status quo. Under Florida law, civil penalties "imposed as a means of punishment" must be "determined by a jury." *Printing House*, 644 So. 2d at 501.

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these two remedies are intertwined. Equitable relief and civil penalties both may be awarded upon proof of a violation of the FDUTPA. The jury therefore must decide whether the FDUTPA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply, discussed above. The first flaw is analyzed above and applies here too. The second flaw applies similarly as the civil penalty amount under FDUTPA is up to $10,000 per violation, which results in a potential penalty in the billions. This can hardly be characterized as incidental. Just as above, the third flaw is dispositive. *Tull* looked to the statutory authority at issue. Here, Florida law authorizes each remedy separately and independently. Each could be sought or awarded independent of the others.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only the FDUTPA claims and civil penalties, but also antitrust claims. Because FDUTPA's unfair methods of competition standard can be satisfied by an antitrust violation that is construed in harmony with federal law, every antitrust violation gives rise to a FDUTPA violation that triggers civil penalties. And so, to resolve the FDUTPA claim, the jury must decide the antitrust claims as well. Beyond that, Google's monopolization, attempted monopolization, and tying also constitute "unfair methods of competition," and were partly

effected through "unfair or deceptive acts or practices." Fla. Stat. Ann. §501.204. Many of Google's defenses are likely to overlap as well (for example, statute of limitations defenses).

After the jury's verdict, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d. Penalties calculation

Florida law does not specify whether the judge or the jury decides the amount of civil penalties. *See* Fla. Stat. Ann. §501.2075. The federal default rule should therefore control, which Plaintiff States submit is a jury determination. The Court may also have the jury calculate advisory penalties amount even if it disagrees.

## F.   Idaho

### 1.   Antitrust

#### a.   Legal or equitable

Idaho alleges Google violated the Idaho Competition Act, Idaho Code Ann. §48-105. FAC ¶¶627-31. Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50; *see also* Dkt. 224 at 27. Idaho law agrees. Idaho Code §48-102(3) ("The provisions of this chapter shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes . . . ."). The analysis stated above for Texas applies here too.

#### b.   Remedies at issue

Idaho seeks equitable remedies (including injunctive relief) and civil penalties. *See* FAC ¶¶631, 764. Idaho seeks multiple forms of equitable relief, as authorized by Idaho Code sections 48-112, 48-108. There is no jury trial right for equitable relief.

Idaho also seeks civil penalties under Idaho Code section 48-108(1)(d). Section 48-108(1) authorizes "an action in the name of the state" as well as various remedies, such as "civil penalties

of up to fifty thousand dollars ($50,000) per violation." *Id.* §§48-108(1) & (1)(d). The statute does not give criteria to follow in imposing civil penalties, but the separate codification of traditional equitable relief and damages makes clear that civil penalties are not subsumed within the equitable remedies in that section. Nothing in the statute suggests that the civil penalty is supposed to restore the status quo. The penalty is paid to the state, *id.* §48-114 and taken from the defendant's general assets (not a particular piece of property). Civil penalties like these are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish (not restore the status quo).

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined. Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide how many such violations occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply. *See* 481 U.S. at 424. The first flaw applies because there is no historical analog to civil-penalties-incidental-to-injunctive-relief, as argued above. The second flaw applies because the civil penalties can target past conduct while injunctive relief is forward looking, and because penalties here are up to $50,000 per violation (billions, here), which "hardly can be considered incidental." *Id.* at 424–25 The third flaw applies because Idaho law authorizes the attorney general to "bring an action in the name of the state," and then lists five separate and independent possible remedies. *See* Idaho Code §48-108(1); *see also id.* §48-108(2). There is no requirement that a suit seek equitable relief any more than that the suit seek damages or civil penalties. Idaho was free to seek either without the other, and there is no requirement to win injunctive relief in order to recover civil penalties.

In sum, a jury must resolve all the legal issues first, which includes all intertwined factual issues (intertwinement with ICPA claims is addressed below). After its verdict, the Court then

decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d.   *Penalties calculation*

Idaho law does not specify whether the judge or jury decides the amount of penalties, but simply states that the "attorney general may bring a civil action . . . [t]o recover civil penalties of up to fifty thousand dollars ($50,000) per violation." Idaho Code Ann. §48-108(1)(d). The federal default rule should therefore control, which Plaintiff States submit is a jury determination. The Court may also have the jury calculate advisory penalties amount even if it disagrees.

## 2.   ICPA

### a.   *Legal or equitable*

Idaho brings claims against Google for violations of the Idaho Consumer Protection Act (ICPA) and its implementing regulations, which for Seventh Amendment purposes are more analogous to actions at law than to actions in equity. Idaho Code Ann. §48-601 *et seq.*, and the Idaho Rules of Consumer Protection (ICPR), IDAPA 04.02.01.000 *et seq.*  Idaho law prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Idaho Code Ann. §48-603. Idaho also alleges violations of more specific statutory prohibitions and regulations. *See* FAC ¶694 (citing Idaho Code Ann. §§48-603(5),(7),(9), (17) and IDAPA 04.02.01.030, which is a rule relating to omissions)

The analysis above for Texas applies here too, but even more strongly because the phrase "unfair methods of competition" is broader than, but more similar to, the common law unfair competition claim. Here, the ICPA sets forth legal duties, *see* Idaho Code Ann. §§48-603, 48-603C, and provides for remedies for violations of those duties, *see id.* §§48-606, 48-607. This is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

Google has proposed no historical analog to an ICPA claim that could be brought in equity. Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, ICPA claims are legal under the Seventh Amendment.

### b. Remedies at issue

Idaho seeks injunctive relief and civil penalties.  FAC ¶764.

Idaho seeks multiple forms of equitable relief, including disgorgement and an injunction under sections 48-606(1)(a)-(b).  There is no jury right for equitable relief.

Idaho also seeks civil penalties under section 48-606(1)(e).  Subsection 48-606(1) authorizes the "attorney general" to "bring an action in the name of the state" and authorizes six remedies, including "civil penalties of up to five thousand dollars ($5,000) per violation."  Idaho Code Ann. §48-606(1)(e).  Civil penalties like these are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish (not restore the status quo).  There are no statutory criteria, but it is clear that the amount is per-violation, with no attempt to place anyone into his former position.  Here, just as in *Jarkesy*, Idaho is authorized to exact penalties from the defendant's general assets, with no requirement to identify particular funds, deliver the amounts to victims, or calibrate the amount to unwind conduct.  The penalties go to the state.  Idaho Code Ann. §48-606(5).  That makes civil penalties like remedies that only courts of law could supply in the 18th century.

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding equitable relief and civil penalties are intertwined.  Both may be awarded upon proof of a violation of the ICPA.  The jury must decide whether the ICPA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim.  *Tull's* "three flaws" all apply, discussed above.  The first flaw is analyzed above and applies here too.  The second flaw applies similarly, except that the

civil penalty amount *here* is up to $5,000 *per violation*, which results in a potential penalty in the billions, which is not incidental. The third flaw applies because Idaho law authorizes the attorney general to "bring an action in the name of the state," and then lists six separate and independent possible remedies. *See* Idaho Code Ann. §48-606(1)(a)-(f); *see also id.* §48-607 (a catchall of other relief, such as attorney's fees and costs). There is no requirement that a suit seek equitable relief any more than that the suit seek damages or civil penalties. Idaho was free to seek either without the other, and there is no requirement to win injunctive relief to recover civil penalties.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only the ICPA claims and civil penalties, but also antitrust claims. For example, Google's monopolization, attempted monopolization, and tying were partly effected through the other ICPA (and regulatory) violations. Many of Google's defenses are likely to overlap as well (for example, statute of limitations defenses).

After the jury's verdict, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d. *Penalties calculation*

Idaho law does not specify whether the judge or jury decides the amount of penalties, but simply states that the "attorney general . . . may bring an action . . . [t]o recover from the alleged violator civil penalties of up to five thousand dollars ($5,000) per violation." Idaho Code Ann. §48-606(1)(e). The federal default rule should control, which Plaintiff States submit is a jury determination. The Court may have the jury calculate an advisory penalties amount if it disagrees.

### G.    Indiana

#### 1.    Antitrust

##### a.    Legal or equitable

"Every scheme, contract, or combination in restraint of trade or commerce, or to create or carry out restrictions in trade or commerce . . . or to limit or reduce the production, or increase or reduce the price of merchandise or any commodity . . . is illegal" in Indiana.  Ind. Code Ann. §24-1-2-1.  So too is "monopoliz[ing] any part of the trade or commerce within [the] state."  *Id.* §24-1-2-2.  Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50; *see* Dkt. 224 at 27; *see also Citizens Nat'l Bank of Grant Cnty. v. First Nat. Bank in Marion*, 331 N.E.2d 471, 478 n.5 (Ind. 1975) (Indiana statute modeled after the Sherman Antitrust Act).  Thus, the analysis stated above for Texas applies here.

##### b.    Remedies at issue

At the time the action was filed, the Attorney General could seek an injunction to stop violations of the State's antitrust law.  *See* Ind. Code Ann. §24-1-2-5(a) (2021).  There is no jury trial right for equitable relief.  At the time this suit was filed, Indiana law did not permit for the recovery of civil penalties by the Attorney General.

##### c.    Intertwinement

Still, the jury should decide Indiana's antitrust claim.  The antitrust claims are intertwined with the Deceptive Consumer Sales Act claims ("DCSA").  Dkt. 753 at 11; 3/12/25 Hr'g Tr. at 47:4–48:2.  And because the DCSA claims seek legal remedies (civil penalties), *Beacon Theatres* and *Dairy Queen* require that a jury decide the intertwined factual issues first.

##### d.    Penalties calculation

Indiana does not seek civil penalties for the antitrust violations.

### 2. *DCSA*

#### a. *Legal or equitable*

For Seventh Amendment purposes, the DCSA claims in Indiana are more analogous to actions at law than to actions in equity. Indiana alleges that Google violated Indiana Code section 24-5-0.5-3(a), which makes it illegal to "commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Indiana's DCSA is not a codification of the common law—it is broader. *Cf. Butler Motors, Inc. v. Benosky*, 181 N.E.3d 304, 311 (Ind. Ct. App. 2021) (discussing the Legislature's broadening of the statute in 2014).

Still, the analysis for Texas above also applies to Indiana because the DCSA sets forth legal duties, *see* Ind. Code Ann. §24-5-0.5-3, and provides for remedies for violations of those duties, *see id.* §§24-5-0.5-4(c)(1), (c)(2), (c)(4), (g). This is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

Google has proposed no historical analog to a DCSA claim that could be brought in equity. Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, DCSA claims are legal under the Seventh Amendment.

#### b. *Remedies at issue*

Indiana seeks equitable relief and civil penalties. FAC ¶702. Indiana seeks multiple forms of equitable relief, including disgorgement and an injunction under subsections 24-5-0.5-4(c)(1) and (2). There is no jury trial right for equitable relief.

Indiana also seeks civil penalties. The law provides that when a defendant violates subsection 24-5-0.5-3(a), the Attorney General "may recover from the person on behalf of the state a civil penalty of a fine not exceeding five thousand dollars ($5,000) per violation." Ind. Code Ann. §24-5-0.5-4(g). Though there are not statutory criteria here, the use of the word fine shows

that the civil penalties are meant to punish wrongdoers and are thus legal in nature. *See Jarkesy*, 603 U.S. at 123–24. The penalty has nothing to do with restoring the status quo. It is punishment through-and-through.

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these three remedies are intertwined. Injunctions, disgorgement, and civil penalties all may be awarded when there is a DCSA violation. The jury therefore must decide whether the DCSA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply, discussed above. The first two flaws are the same as for violations of Texas's DTPA. Third, *Tull* looked to the statutory authority at issue. Indiana law enumerates two civil penalty provisions, an injunctive relief provision, and a disgorgement provision separately. Another provision, Ind. Code Ann. §24-5-0.5-4(f), states that "[a]ny person who violates the terms of an injunction issued under [the DCSA] shall forfeit and pay to the state a civil penalty of not more than fifteen thousand dollars ($15,000) per violation." This provision looks much closer to something that is "incidental to injunctive relief," since it is available *only* after an injunction is issued, and from *only* the court that issued the injunction. Indiana is not now seeking penalties under this provision.

Rather, Indiana seeks penalties under subsection 24-5-0.5-4(g) which provides that when a defendant violates subsection 24-5-0.5-3(a), the Attorney General "may recover from the person on behalf of the state a civil penalty of a fine not exceeding five thousand dollars ($5,000) per violation." It also seeks civil penalties under section 24-5-0.5-8, which provides that "[a] person who commits an incurable deceptive act is subject to a civil penalty of a fine of not more than five hundred dollars ($500) for each violation." As in *Tull*, the civil penalty and the injunctive relief

are codified separately.  Civil penalties are available only if the state *also* seeks equitable relief under subsection 24-5-0.5-4(c)(1) but there is no requirement that Indiana *prevail* under subsection 24-5-0.5-4(c)(1).  Indiana could request an injunction and civil penalties; the injunction request could be denied; but still, the civil penalties could be awarded.  The penalties are therefore not incidental to or intertwined with equitable relief, since they could be awarded even if no equitable relief is.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only DCSA claims and civil penalties, but also antitrust claims for the same reason as set forth for Texas above.  After the jury's verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief).  The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d.  Penalties calculation

The DCSA likely overcomes the federal presumption that the trier of fact decides the quantum of penalties.  Section 24-5-0.5-8 provides that "[a] person who commits an incurable deceptive act is subject to a civil penalty of a fine  of not more than five hundred dollars ($500) for each violation."  It is silent about who decides the amount of that civil penalty.  But another part of the DCSA states that "[i]f *a court* finds any person has knowingly violated" subsection 24-5-0.5-3(a) "the attorney general, in an action pursuant to subsection (c), may recover from the person on behalf of the state a civil penalty of a fine not exceeding five thousand dollars ($5,000) per violation."  Ind. Code Ann. §24-5-0.5-4(g) (emphasis added).

In Indiana, "[w]here statutes address the same subject, they are *in pari materia*, and [Indiana courts] harmonize them if possible."  *Saintignon v. State*, 749 N.E.2d 1134, 1137 (Ind. 2001) (cleaned up).  Here, subsections 24-5-0.5-4(g) and 24-5-0.5-8 both deal with civil penalties under the DCSA.  Thus, the Court should harmonize them if possible.  As subsection 24-5-0.5-

4(g) is the main civil penalties provision, it appears that the legislature has delegated to judges decisions about the proper quantum of damages for DCSA violations. Although another harmonization is possible, Plaintiff States believe this is the best reading of the statutory language.

## H.    Kentucky

### 1.    *Antitrust*

#### a.    *Legal or equitable*

"Every contract, combination in the form of trust and otherwise, or conspiracy, in restraint of trade or commerce in [Kentucky is] unlawful." Ky. Rev. Stat. Ann. §367.175(1). It is also "unlawful for any person or persons to monopolize, attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce in" Kentucky. *Id.* §367.175(2). Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50; *see* Dkt. 224 at 27; *see also Mendell v. Golden-Farley of Hopkinsville, Inc.*, 573 S.W.2d 346, 349 (Ky. App. 1978) (examining claims under Section 367.175 "in light of" the cases interpreting the Sherman Antitrust Act); *Arnold v. Microsoft Corp.*, No. 2000-CA-002144-MR, 2001 WL 1835377, at *3 (Ky. Ct. App. Nov. 21, 2001) (unpublished) (stating "the interpretation of the Sherman Act given by the United States Supreme Court is highly instructive" in interpreting Ky. Rev. Stat. Ann. §367.175 because that statute is "identical to the Sherman Act except that the phrase 'among the several states' was replaced by 'in this Commonwealth.'"). Thus, the analysis above for Texas applies here too.

Additionally, Kentucky's antitrust cause of action is not only substantively similar to Common Law prohibitions on monopolies, but a direct heir of those prohibitions.[6] As such,

---

[6] *See* Edward Coke's CASE OF THE MONOPOLIES, *Darcy v. Allein*, 11 Co Rep 84 (1602), where the Court of Queen's Bench (a court of common law) found that monopolies were void as "against the Common Law" and "in prejudice of the Commonwealth," thereby acknowledging that monopolies

Kentucky's prohibition on monopolistic activities is most similar to English Common Law provisions as they existed in 1791 and is thus entitled to a jury trial pursuant to the 7th Amendment. Whereas cases concerning monopolies were only able to be determined at common law, Kentucky's antitrust claim would clearly have been decided in a common law court in 1791. As such, pursuant to the 7th Amendment, Kentucky is entitled to a jury trial on its antitrust claims.

### b. Remedies at issue

Kentucky seeks equitable relief and civil penalties. FAC ¶639. Kentucky seeks an injunction under Kentucky common law. There is no jury trial right for equitable relief.

Kentucky also seeks civil penalties. Under Kentucky law, "the Attorney General, upon petition to the court, may recover, on behalf of the Commonwealth a civil penalty of not more than the greater of five thousand dollars ($5,000) or two hundred dollars ($200) per day for each and every violation of [Ky. Rev. Stat. Ann. §] 367.175." Ky. Rev. Stat. Ann. §367.990(8). This civil penalty is meant to deter wrongdoing. *See Arnold v. Microsoft Corp.*, No. 2000-CA-002144-MR, 2001 WL 1835377, at *4 (Ky. Ct. App. Nov. 21, 2001) ("Civil money penalties for violations of KRS 367.175 are available, but only on petition of the Attorney General."); *see also Bank of Am. v. Boone Nat'l Bank*, No. 2004-CA-002422-MR, 2006 WL 504999, at *3 & n.8 (Ky. Ct. App. Mar. 3, 2006) (noting a difference between "fines" imposed by and paid to the government and "civil

---

were not merely private wrongs, but public wrongs that affected the whole realm. *Id*. at 86, 88. *See also* Statute of Monopolies of 1623, 21 Jac. 1, c. 3 (stating that monopolies and other restraints of trade were contrary to the common law and that cases concerning them "ought to be, and shall be for ever hereafter examined, heard, tried, and determined, by and according to the common laws of this realm, and not otherwise"). *Id.* at (2).

Additionally, Blackstone in his Commentaries noted that creating a monopoly was a public offense at common law and recognized the validity of the above-mentioned statute. 4 WILLIAM BLACKSTONE, COMMENTARIES *159–60. Furthermore, he also noted that "monopolists are punished with the forfeiture of treble damages and double costs," a remedy only available at common law. *Id.*

remedies in suits between private parties"). The penalty has nothing to do with restoring the status quo. It is punishment.

This is evident for multiple reasons. First, the accrual of the civil penalty is in no way fixed or determined based on the damage caused. Rather, like fines and other civil penalties, it is fixed and determined based on the extent of the illegal activity. Secondly, the civil penalties are not given to all persons who may have been harmed by the defendant's unlawful conduct, but rather, said penalties go to the Commonwealth. Because the damages are not apportioned based on the amount of harm caused, and because the money received in judgment does not go to parties harmed by the unlawful conduct, it is evident that the civil penalty provided for in section 367.990(8) is penal in nature. Thus, it is evident that the remedy and the cause of action were not written in order to "make the parties whole." Instead, the law seeks to punish and deter unlawful activities by instituting civil penalties on those who commit said action—a penalty that in 1791 was characteristically only enforced in courts of Common Law. Additionally, the civil penalty levied for violating the above-mentioned Kentucky statute is substantively similar to the penalty for violating the monopoly statute as described by Blackstone.

Thus, Kentucky's Antitrust claim is clearly within the Supreme Court's holding that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Tull*, 481 U.S. at 422. As such, the Commonwealth is entitled to a jury trial on this claim. Additionally, the Court also held that "[r]emedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity." *Id.* This is in agreement with the Common Law. "Actions for penalties are, to a variety of purposes, considered as civil suits." *Atcheson v. Everitt*, 1 Cowper 382, 98 Eng. Rep. 1142 (K. B. 1776).

### c.  Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined.  Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide how many such violations occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim.  *Tull's* "three flaws" all apply.  For the first and second *Tull* flaws, the analysis is the same as for Texas.  Third, *Tull* looked to the statutory authority at issue.  The legal and equitable claims are not intertwined nor are they incidental to each other.  The Attorney General's right to obtain civil penalties by statute (§367.990(8)) is separate and apart from his authority under Kentucky common law to seek injunctive relief for violations of Kentucky's antitrust statute (§367.175).  Neither source of authority references the other nor limits the circumstances under which the Attorney General may seek relief.  Thus, the claims are wholly independent.  So even Google's counsel must confess that "there is a jury trial right to a trial on liability in the antitrust claims." 11/6/24 Hr'g Tr. at 31:20–21.

A jury must resolve all the legal issues first, which includes all intertwined factual issues (intertwinement with KCPA claims is addressed below).  After their verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief).  The Court may also have an advisory jury resolve issues even if the Court will have the ultimate say on that issue.

### d.  Penalties calculation

Kentucky law provides that "the Attorney General, upon petition *to the court*, may recover, on behalf of the Commonwealth a civil penalty of not more than the greater of five thousand dollars ($5,000) or two hundred dollars ($200) per day for each and every violation of [Ky. Rev. Stat. Ann. §]367.175." Ky. Rev. Stat. Ann. §367.990(8) (emphasis added).  This is the type of decision made by the sovereign that, under *Tull*, displaces the default rule of having juries decide the quantum of

civil penalties.    Thus, Plaintiff States agree with Google that the Court has the ultimate responsibility to set the civil penalty amount for violations of Kentucky's antitrust statute.    Still, the Court can and should exercise its discretion under the Federal Rules of Civil Procedure and enjoy the benefit of an advisory jury verdict on the issue.

### 2.   KCPA

#### a.   Legal or equitable

For Seventh Amendment purposes, claims under the Kentucky Consumer Protection Act ("CPA"), Ky. Rev. Stat. Ann. §367.110 *et seq.*, are more analogous to actions at law than to actions in equity.    Kentucky alleges that Google violated section 367.170(1), which declares "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are" unlawful.    Kentucky's CPA is not a codification of the common law—it is broader.    *Craig & Bishop, Inc. v. Piles*, No. 2004-CA-001883-MR, 2005 WL 3078860, at *4 (Ky. Ct. App. Nov. 18, 2005), *rev'd in part on other grounds*, 247 S.W.3d 897 (Ky. 2008).

Still, the analysis for Texas above also applies to Kentucky because the CPA sets forth legal duties, *see* Ky. Rev. Stat. Ann. §367.170(1), and provides for remedies for violations of those duties, *see id.* §§367.190, 367.990(2).    This is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

Google has not proposed any historical analog to CPA claims that could be brought in equity.    Plaintiff States are aware of none.    Because the analogy to a legal claim is stronger than the analogy to an equitable claim, CPA actions are legal actions for Seventh Amendment purposes.

#### b.   Remedies at issue

Kentucky seeks equitable relief and civil penalties.    FAC ¶710.    Kentucky seeks an injunction.    Ky. Rev. Stat. Ann. §367.190.    There is no jury trial right for equitable relief.

46

Kentucky also seeks civil penalties. "In any action brought under [section] 367.190, if the court finds that a person is willfully using or has willfully used a method, act, or practice declared unlawful by [section] 367.170, the Attorney General, upon petition to the court, may recover, on behalf of the Commonwealth, a civil penalty." *Id.* §367.990(2). These civil penalties are "sanction[s]," *Am. Nat'l Univ. of Ky., Inc. v. Commonwealth ex rel. Beshear*, No. 2018-CA-000610-MR, 2019 WL 2479608, at *6 (Ky. App. June 14, 2019), and are separate from restitution. *See Commonwealth. ex rel. Beshear v. ABAC Pest Control, Inc.*, 621 S.W.2d 705, 706–07 (Ky. Ct. App. 1981) (holding that the Attorney General has authority to seek restitution under KRS 367.200, which is separate from penalties under KRS 367.990); *Vogt Power Int'l, Inc. v. Lab. Dep't of Workplace Standards*, 588 S.W.3d 169, 179 (Ky. Ct. App. 2019). Thus, they are legal in nature. *See Jarkesy*, 603 U.S. at 123–24. The penalty has nothing to do with restoring the status quo. It is punishment. Thus, Kentucky's KCPA claim is clearly within the Supreme Court's holding that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Tull*, 481 U.S. at 422. As such, the Commonwealth is entitled to a jury trial on this claim. The Court also held that "[r]emedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity." *Id.* This is in agreement with the Common Law. "Actions for penalties are, to a variety of purposes, considered as civil suits." *Atcheson v. Everitt*, 1 Cowper 382, 98 Eng. Rep. 1142 (K. B. 1776).

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined. Injunctions and civil penalties both may be awarded when there is a KCPA violation. The jury must decide whether a violation has occurred, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply, discussed above. The first two flaws are the same as for violations of Texas's DTPA. Third, *Tull* looked to the statutory authority at issue. Kentucky law enumerates a civil penalty provision and an injunctive relief provision separately. Another provision, Ky. Rev. Stat. Ann. §367.990(1), states that "[a]ny person who violates the terms of a temporary or permanent injunction issued under [Ky. Rev. Stat. Ann. §367.190] shall forfeit and pay to the Commonwealth a civil penalty of not more than twenty-five thousand dollars ($25,000) per violation." This provision looks much closer to something that is "incidental to injunctive relief," since it is available *only* after an injunction is issued, and from *only* the court that issued the injunction. Kentucky is not seeking penalties under this provision.

Rather, Kentucky seeks penalties under subsection 367.990(2), which provides that "[i]n any action brought under [section] 367.190, if the court finds that a person is willfully using or has willfully used a method, act, or practice declared unlawful by [section] 367.170, the Attorney General, upon petition to the court, may recover, on behalf of the Commonwealth, a civil penalty." As in *Tull*, the civil penalty and the injunctive relief are codified separately. Civil penalties are available only if the Commonwealth *also* seeks equitable relief under section 367.190 but there is no requirement that Kentucky *prevail* under section 367.190. Kentucky could request an injunction and civil penalties; the injunction request could be denied; but still, the civil penalties could be awarded. The penalties are therefore not incidental to or intertwined with equitable relief, since they could be awarded even if no equitable relief is.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only KCPA claims and civil penalties, but also antitrust claims for the same reason as set forth for Texas above. After the jury's verdict, the Court then

48

decides what other equitable relief should be awarded (most notably injunctive relief).  The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d.  Penalties calculation

Kentucky law does not overcome the presumption in favor of a jury determination of the quantum of penalties.  Rather, the statute expressly refers to "the trier of fact" making determinations about civil penalties, as distinct from "the court."  Ky. Rev. Stat. Ann. §367.990(2).

## I.  Louisiana

### 1.  Antitrust

#### a.  Legal or equitable

Louisiana law provides: "No person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state."  La. Rev. Stat. Ann. §51:123.  Furthermore,  "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal."  La. Rev. Stat. Ann. §51:122(A).  Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)."  Dkt. 674 at 50; *see* Dkt. 224 at 27; *see also HPC Biologicals, Inc. v. UnitedHealthcare of La., Inc.*, 194 So. 3d 784, 792–93 (La. Ct. App. 2016) ("federal analysis of the Sherman Act is persuasive" when interpreting the Louisiana Monopolies Act).  Thus, the analysis stated above for Texas applies here too.

#### b.  Remedies at issue

Louisiana seeks equitable relief and civil penalties.  FAC ¶¶641, 645.  Louisiana seeks multiple forms of equitable relief, including restitution and an injunction under Louisiana Revised Statutes section 51:128.  There is no jury trial right for equitable relief.

Louisiana also seeks civil fines.  The law provides that "Whoever violates this Section shall be fined not more than five thousand dollars."  La. Rev. Stat. Ann. §§51:122(B), 51:123.  At first

glance, this looks like a criminal penalty—not a civil penalty. But the statute later clarifies that it is a civil penalty. The Attorney General is authorized to enforce Louisiana's antitrust laws, and "[w]hen the penalty of imprisonment is demanded, the prosecution shall be in accordance with the provisions regulating criminal procedure." *Id.* §51:138. As the statute is silent on the procedure when the Attorney General seeks only monetary relief under sections 51:122(B) and 51:123, those proceedings are civil, and the monetary relief is civil. Though there are not statutory criteria here, the use of the word fine shows that the civil penalties are meant to punish wrongdoers and are thus legal in nature. *See Jarkesy*, 603 U.S. at 123–24. The fine has nothing to do with restoring the status quo. It is punishment through-and-through.

### c. *Intertwinement*

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined. Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide how many such violations occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply. For the first *Tull* flaw, the analysis is the same as for Texas. The same is true of the second *Tull* flaw, except that the penalty amount under Louisiana law may be lower. Third, *Tull* looked to the statutory authority at issue. The legal and equitable claims are not intertwined nor are they incidental to each other. There are separate statutory provisions (§§51:128, 51:138) allowing the Attorney General to sue for injunctive relief and civil penalties respectively. Neither section references the other nor limits the circumstances under which the Attorney General may seek relief. Thus, the claims are wholly independent. So even Google's counsel must confess that "there is a jury trial right to a trial on liability in the antitrust claims." 11/6/24 Hr'g Tr. at 31:20–21.

Thus, a jury must resolve all the legal issues first, which includes all intertwined factual issues (intertwinement with DTPA claims is addressed below). After their verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will ultimately decide them.

### d. Penalties calculation

Louisiana law does not specify whether the Court or the jury decides the amount of civil penalties. It simply provides that the defendant "shall be fined not more than five thousand dollars." La. Rev. Stat. Ann. §§51:122(B), 51:123. The federal default rule should therefore control, which Plaintiff States submit is a jury determination. The Court may also have the jury calculate an advisory penalties amount even if it disagrees.

## 2. LUTPA

### a. Legal or equitable

For Seventh Amendment purposes, the Louisiana Unfair Trade Practices and Consumer Protection law ("LUTPA") claims are more analogous to actions at law than to actions in equity. Louisiana alleges that Google violated Louisiana Revised Statute subsection 51:1405(A), which makes it illegal to engage in "unfair and deceptive acts or practices in the conduct of any trade or commerce." Louisiana, of course, is unique in the United States as it is not a common law jurisdiction; it is a civil law jurisdiction. So LUTPA is not a codification of the common law.

Still, the analysis for Texas above also applies to Louisiana because LUTPA sets forth legal duties, *see* La. Rev. Stat. Ann. §51:1405(A), and provides for remedies for violations of those duties, *see id.* §§51:1407(A), 51:1407(B), 51:1408(A)(5), 51:1409. This is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

51

Google has not proposed any historical analog to LUTPA claims that could be brought in equity. Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, LUTPA actions are legal for Seventh Amendment purposes.

### b. Remedies at issue

Louisiana seeks multiple forms of equitable relief, including an injunction and restitution under subsections 51:1407(A) and 51:1408(A)(5). There is no jury trial right for equitable relief.

Louisiana also seeks civil penalties under subsection 51:1407(B). That section provides that "any person found by the court to have engaged in any method, act, or practice in Louisiana declared to be unlawful under this Chapter . . . with the intent to defraud, the court has the authority to impose a penalty not to exceed five thousand dollars for each violation." Civil penalties like these are legal remedies under *Tull* and *Jarkesy* for the same reasons as set forth above for Texas.

Comparing the civil penalties provision with subsection 51:1408(A)(5) is instructive. That provision provides that the court may enter an order "necessary to compensate any aggrieved person for any property, movable or immovable, corporeal or incorporeal, which may have been acquired from such person by means of any method, act, or practice declared unlawful" including "[r]estitution." La. Rev. Stat. Ann. §51:1408(A)(5). This is a monetary award that is equitable— restoring money lost because of the unfair or deceptive practice. That the civil penalties are separate and in addition to this authority, *see id.* §51:1408(B), shows that they are *not* for the purpose of restoring money for equitable reasons. *See also id.* §51:1407(E) ("An award of restitution under this Chapter has priority over a civil penalty . . . .").

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these three remedies are intertwined. Injunctions, restitution, and civil penalties all may be

awarded when there is a LUTPA violation.  The jury therefore must decide whether LUTPA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim.  *Tull's* "three flaws" all apply, discussed above.  The first two flaws are the same as for violations of Louisiana's antitrust statute.  Third, *Tull* looked to the statutory authority at issue.  Louisiana law enumerates a civil penalty provision, an injunctive relief provision, and a restitution provision separately.  Another provision, La. Rev. Stat. Ann. §51:1416, authorizes civil penalties against a "person who violates the terms of an injunction issued under [section 51:1407(A)]."  This provision looks much closer to something that is "incidental to injunctive relief," since it is available *only* after an injunction is issued, and from *only* the court that issued the injunction.  Louisiana is not now seeking penalties under this provision.

Rather, Louisiana seeks penalties under subsection 51:1407(B) which states: "In addition to the remedies provided herein, the attorney general may request and the court may impose a civil penalty against any person found by the court to have engaged in any method, act, or practice in Louisiana declared to be unlawful under this Chapter."  As in *Tull*, the civil penalty and the injunctive relief are codified separately.  Civil penalties are available only if the State *also* seeks equitable relief under subsection 51:1407(A), but there is no requirement that Louisiana *prevail* under subsection 51:1407(A).  Louisiana could request an injunction and civil penalties; the injunction request could be denied; but still, the civil penalties could be awarded.  The penalties are therefore not incidental to or intertwined with equitable relief, since they could be awarded even if no equitable relief is.

A jury must resolve all the legal issues first, which includes all intertwined factual issues.  Those intertwined legal issues include not only LUTPA claims and civil penalties, but also antitrust

claims for the same reason as set forth for Texas above. After the jury's verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d.  Penalties calculation

LUTPA is clear that "the *court* has the authority to impose a penalty not to exceed five thousand dollars for each violation." La. Rev. Stat. Ann. §51:1407(B) (emphasis added). This is the type of decision made by the sovereign that, under *Tull*, displaces the default rule of having juries decide the quantum of civil penalties. Still, the Court can exercise its discretion under the Federal Rules of Civil Procedure and enjoy the benefit of an advisory jury verdict on the issue.

## J.    Mississippi

### 1.  Antitrust

#### a.  Legal or equitable

Mississippi brings claims against Google for violating Mississippi antitrust law. Miss. Code Ann. §75- 21-1 *et seq.*  Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50; *see also* Dkt. 224 at 27. The analysis stated above for Texas applies here too.

#### b.  Remedies at issue

Mississippi seeks equitable relief and civil penalties. FAC ¶648. Mississippi seeks an injunction under Mississippi Code section 75-21-1. It similarly seeks disgorgement and restitution under Mississippi common law. There is no jury trial right for equitable relief.

Mississippi also seeks civil penalties. Under Mississippi law,

[a]ny person, corporation, partnership, firm or association of persons and the officers and representatives of the corporation or association violating any of the provisions of this chapter shall forfeit not less than one hundred dollars ($100.00) nor more than two thousand dollars ($2,000.00) for every such violation. Each

month in which such person, corporation or association shall violate this chapter shall be a separate violation . . . .

Miss. Code Ann. §75-21-7.[7]  These are legal remedies.  *See Grenada Lumber Co. v. State ex rel. Att'y Gen.*, 54 So. 8, 10 (Miss. 1911) (meant to punish); *Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 3083 78, at * 11 (Miss. Ch. Jan. 17, 2006) (meant to deter); *see also Jarkesy*, 603 U.S. at 123–24 (penalties meant to punish and deter are legal remedies).

### c.  Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined.  Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide how many such violations occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim.  *Tull's* "three flaws" all apply.  For the first *Tull* flaw, the analysis is the same as for Texas.  The same is true of the second *Tull* flaw, except that the penalty amount under Mississippi law may be lower.  Third, *Tull* looked to the statutory authority at issue. The legal and equitable claims are not intertwined nor are they incidental to each other.  There are separate statutory provisions (sections 75-21-1, 75-21-7, and 75-21-9) allowing the Attorney General to obtain injunctive relief and civil penalties respectively.  A suit by the Attorney General seeking an injunction must be filed in the State's Chancery Court.  Miss. Code Ann. §75-21-1. Suits seeking civil penalties, on the other hand, may "be brought in any court of competent jurisdiction."  *Id.* §75-21-7.  There is no statutory text that conditions the receipt of civil penalties on seeking, let alone receiving, an injunction.

---

[7] Mississippi also has an additional penalty of $500 per month that the violation continued.  Miss. Code Ann. §75-21-9.

Thus, a jury must resolve all the legal issues first, which includes all intertwined factual issues (intertwinement with DTPA claims is addressed below). After their verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will ultimately decide them.

### d. Penalties calculation

Mississippi's antitrust statute does not disturb the federal presumption that the jury should decide the amount of penalties. The language of the statutes providing for civil penalties paid to the state mirrors the language providing for damages and civil penalties in the private right of action, both of which authorize suit "in any court of competent jurisdiction" with no distinction between damages or civil penalties. *Compare* Miss. Code Ann. §75-21-9 *with id.* §75-21-7. This suggests that the same entity—the jury—decides both. There is certainly no indication that the Mississippi Legislature wanted a judge alone to decide the quantum of civil penalties. So the jury here should decide how much Google should pay as a civil penalty for violating Mississippi's antitrust statute.

## 2. CPA

### a. Legal or equitable

For Seventh Amendment purposes, claims under the Mississippi Consumer Protection Act ("CPA") are more analogous to actions at law than to actions in equity. Mississippi alleges that Google violated subsection 75-24-5(1), which provides that "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce are prohibited." The CPA is not a codification of the common law—it is broader. *In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 841 (Miss. 2015). Still, the analysis for Texas above also applies to Mississippi because the CPA sets forth legal duties, *see* Miss. Code Ann. §75-24-5(1), and provides for remedies for violations of those duties, *see id.* §§75-24-9, 75-

24-11, 75-24-15, 75-24-19(1)(b), 75-24-23.  This is analogous to an action in debt (as in *Tull*) and a contract action with an "implied term," *Lebow*, 86 F.3d at 668.

Google has not proposed any historical analog to CPA claims that could be brought in equity.  Plaintiff States are aware of none.  Because the analogy to a legal claim is stronger than the analogy to an equitable claim, CPA actions are legal actions for Seventh Amendment purposes.

### b.  Remedies at issue

Mississippi seeks equitable relief and civil penalties.  FAC ¶768.  Mississippi seeks multiple forms of equitable relief, including an injunction and disgorgement/restitution under sections 75-24-9 and 75-24-11.  There is no jury trial right for equitable relief.

Mississippi also seeks civil penalties.  "[I]f the court finds from clear and convincing evidence, that a person knowingly and willfully used any unfair or deceptive trade practice, method or act prohibited by [Miss. Code Ann. §] 75-24-5, the Attorney General, upon petition to the court, may recover on behalf of the state a civil penalty in a sum not to exceed Ten Thousand Dollars ($10,000.00) per violation."  Miss. Code Ann. §75-24-19(1)(b).  Federal law characterizes such penalties as historically legal relief.  *See Watson Lab'ys, Inc. v. State*, 241 So. 3d 573, 593 (Miss. 2018) (CPA civil penalties seek to deter future wrongdoing); *Jarkesy*, 603 U.S. at 123–24 (deterrence is a hallmark of legal relief).  The penalty has nothing to do with restoring the status quo.  It is punishment through-and-through.

### c.  Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these three remedies are intertwined.  Injunctions, disgorgement/restitution, and civil penalties all may be awarded when there is an CPA violation.  The jury therefore must decide whether the CPA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply, discussed above. The first two flaws are the same as for violations of Texas's DTPA statute. Third, *Tull* looked to the statutory authority at issue. Mississippi enumerates an injunctive relief provision, a disgorgement/restitution provision, and a civil penalty provision separately. Miss. Code Ann. §§75-24-9, 75-24-11, 75-24-19(1)(b). Another CPA provision provides that "[a]ny person who violated the terms of an injunction issued under [Miss. Code Ann. §] 75-24-9 shall forfeit and pay to the state a civil penalty in a sum not to exceed Ten Thousand Dollars ($10,000.00) per violation." *Id.* §75-24-19(1)(a). This provision looks much closer to something that is "incidental to injunctive relief," since it is available *only* after an injunction is issued, and *only* from the court that issued the injunction. Mississippi is not seeking penalties under this provision in the matter at hand.

Rather, Mississippi seeks penalties under subsection 75-24-19(1)(b), which states:

> In any action *brought under* Section 75-24-9, if the court finds from clear and convincing evidence, that a person knowingly and willfully used any unfair or deceptive trade practice, method or act prohibited by [Miss. Code Ann. §] 75-24-5, the Attorney General, upon petition to the court, may recover on behalf of the state a civil penalty in a sum not to exceed Ten Thousand Dollars ($10,000.00) per violation.

(emphasis added). As in *Tull*, the civil penalty and the injunctive relief are codified separately. In *Yazaki*, the Supreme Court of Mississippi restated the statutory provision that "[i]f there is no *action* for injunctive relief under 75-24-9, there is no *action* to recover civil penalties under [s]ection 75-24-19." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1184 (Miss. 2020) (emphasis added). But there is no requirement that Mississippi *prevail* under section 75-24-9. Mississippi could request an injunction and civil penalties; the injunction request could be denied; but still, the civil penalties could be awarded. *Watson* is an exact example of when a court denied injunctive relief but still awarded penalties and other monetary remedies, and *Yazaki* did not

overturn this Supreme Court precedent. *Watson*, 241 So. 3d at 594 (affirming chancery court's finding of violations under Miss. Code Ann. §75-24-19(1)(b), ordering Watson to pay penalties, but declining to order an injunction). The penalties are therefore not incidental to or intertwined with equitable relief, since they could be awarded even if no equitable relief is.

In Mississippi, an action for injunctive relief may "be brought in chancery court *or county court*." Miss. Code Ann. §75-24-9 (emphasis added). For instance, in *State v. Walgreen Co.*, the State pursued violations of the CPA in addition to other claims that would not be heard in a court of equity. 250 So. 3d 465 (Miss. 2018). The court held that the Chancery Court could have kept the case as the two claims were intertwined, but found that it also had the discretion to transfer the case to the Circuit Court. *Id.* at 474 ("when the complaint is considered as a whole, the thrust of the State's case clearly is legal in nature, restricting the limited jurisdiction of the chancery"). However, the Mississippi Supreme Court further held that "an application of the State's equitable claims is not enough to limit jurisdiction to the chancery court; not even through the application of Section 75-24-9. We have held that chancery courts maintain 'the discretion to award legal and even punitive damages as long as' their jurisdiction has attached." *Id.*

True, the Attorney General's requests for civil penalties are typically heard by a court of equity in Mississippi state court, but that is because the right to a jury trial in Mississippi is narrower than the Seventh Amendment's jury trial guarantee. Under federal law, when the same factual questions determine both legal and equitable remedies, the right to a jury trial must be preserved. *See Dairy Queen*, 369 U.S. at 479; *ERR*, 35 F.4th at 411 (citations omitted). Through the lens of federal law, Mississippi's statute provides for both equitable and legal relief, and the civil penalties are not incidental to the injunctive relief.

So a jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only CPA claims and civil penalties, but also antitrust claims for the same reason as set forth for Texas above. After the jury's verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d. Penalties calculation

The CPA provides that civil penalties may be recovered "if *the court* finds from clear and convincing evidence, that a person knowingly and willfully used any unfair or deceptive trade practice." Miss. Code Ann. §75-24-19(1)(b) (emphasis added). This appears to delegate the decision to calculate penalties to the court rather than a jury, which would overcome the federal presumption that juries calculate penalty amounts.

## K.    Missouri

### 1.    Antitrust

#### a.    Legal or equitable

"Every contract, combination or conspiracy in restraint of trade or commerce in [Missouri] is unlawful." Mo. Ann. Stat. §416.031.1. Similarly, "[i]t is unlawful to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce in [Missouri]." *Id.* §416.031.2. Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50; *see* Dkt. 224 at 27; *see also* Mo. Ann. Stat. §416.141 (Missouri's antitrust statutes "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes."). Thus, the analysis stated above for Texas applies here too.

#### b.    Remedies at issue

Missouri's Attorney General seeks an injunction to stop violations of the State's antitrust law. *See* Mo. Ann. Stat. §416.071.1. There is no jury trial right for equitable relief. Missouri law

does not provide for civil penalties absent breach of an injunction. *See id.* §416.051.3. As no such injunction has barred Google's practices to date, Missouri does not seek civil penalties for antitrust violations.

### c.  Intertwinement

The jury should decide Missouri's antitrust claim because it is intertwined with the claims discussed below. *See also* Dkt. 753 at 11; 3/12/25 Hr'g Tr. at 47:4–48:2.

### d.  Penalties calculation

Missouri does not seek civil penalties for Google's antitrust violations.

## 2.  MMPA

### a.  Legal or equitable

For Seventh Amendment purposes, the Missouri Merchandising Practices Act (MMPA) claims in Missouri are more analogous to actions at law than in equity. Missouri alleges that Google violated section 407.020.1, which provides that "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is . . . an unlawful practice." The MMPA is not a codification of the common law—it is broader. *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414 (Mo. 2014) (citation omitted). Still, the analysis for Texas above also applies to Missouri because the MMPA sets forth legal duties, *see* Mo. Ann. Stat. §407.020.1, and provides for remedies for violations of those duties, *see id.* §§407.100.1, 407.100.4, 407.100.6, 407.130, 407.140, 416.121. This is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

Google has proposed no historical analog to MMPA claims that could be brought in equity. Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, MMPA actions are legal actions for Seventh Amendment purposes.

### b.  Remedies at issue

Missouri seeks equitable relief and civil penalties. FAC ¶769. Missouri seeks multiple forms of equitable relief, including an injunction and restitution under subsections 407.100.1, 407.100.4. There is no jury trial right for equitable relief.

Missouri also seeks civil penalties. "The court may award to the state a civil penalty of not more than one thousand dollars per violation" of the MMPA. Mo. Ann. Stat. §407.100.6. The civil penalties are "punitive." *Ostermeier v. Prime Props. Invs. Inc.*, 589 S.W.3d 1, 8 (Mo. Ct. App. 2019). Thus, they are legal in nature. *See Jarkesy*, 603 U.S. at 123–24. The penalty has nothing to do with restoring the status quo. It is punishment through-and-through.

### c.  Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these three remedies are intertwined. Injunctions, restitution, and civil penalties all may be awarded when there is an MMPA violation. The jury therefore must decide whether the MMPA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply, discussed above. The first two flaws are the same as for violations of Texas's DTPA statute. Third, *Tull* looked to the statutory authority at issue. Missouri enumerates a civil penalty provision, an injunctive relief provision, and a restitution provision separately. Mo. Ann. Stat. §§407.100.1, 407.100.4, 407.100.6. Another MMPA provision provides that " [a]ny person who is found to be in contempt of any court order issued to enforce the provisions of [Mo. Ann. Stat. §] 416.031 arising out of any proceeding

brought by the attorney general shall forfeit and pay to the state a civil penalty of not more than twenty thousand dollars." *Id.* §416.051.3. This provision looks much closer to something that is "incidental to injunctive relief," since it is available *only* after an injunction is issued, and from *only* the court that issued the injunction. Missouri is not now seeking penalties under this provision.

Rather, Missouri seeks penalties under subsection 407.100.6, which states that "[t]he court may award to the state a civil penalty of not more than one thousand dollars per [MMPA] violation." As in *Tull*, the civil penalty and the injunctive relief are codified separately. The Missouri Attorney General need not pursue equitable relief to obtain civil penalties There is nothing in subsection 407.100.6 referencing subsection 407.100.1 and vice versa. Contrast that with subsection 407.100.2, which explicitly states that the relief outlined in that subsection may be granted only if the Attorney General is seeking an injunction under subsection 407.100.1. Missouri courts have described suits by the "attorney general for civil fines *or* any injunction." *State ex rel. Nixon v. Telco Directory Pub.*, 863 S.W.2d 596, 599 (Mo. 1993) (emphasis added). The use of the disjunctive "or" shows that the Attorney General may seek only an injunction, only civil penalties, or both. Neither remedy is intertwined or incidental to the other.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only the MMPA claims and civil penalties, but also antitrust claims for the same reason as set forth for Texas above. After the jury's verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d.  Penalties calculation

The MMPA is clear that "[t]he *court* may award to the state a civil penalty of not more than one thousand dollars per violation" of the MMPA. Mo. Ann. Stat. §407.100.6 (emphasis added).

This is the type of decision made by the sovereign that, under *Tull*, displaces the default rule of having juries decide the quantum of civil penalties. Thus, Plaintiff States agree with Google that the Court has the ultimate responsibility to set the civil penalty amount for Missouri. Still, the Court can and should exercise its discretion under the Federal Rules of Civil Procedure and enjoy the benefit of an advisory jury verdict on the issue.

## L.    Montana

### 1.    Antitrust

#### a.    Legal or equitable

Montana law makes it illegal

> (1) to enter an agreement for the purpose of fixing the price or regulating the production of an article of commerce; (2) for the purpose of creating or carrying out any restriction in trade, to . . . increase or reduce the price of merchandise or commodities[ ] prevent competition in the distribution or sale of merchandise or commodities . . . [or] create a monopoly in the manufacture, sale, or transportation of an article of commerce;

Mont. Code Ann. §§30-14-205(1), (2)(b), (2)(c), (2)(g). Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50; *see* Dkt. 224 at 27; *see also Smith v. Video Lottery Consultants, Inc.*, 858 P.2d 11, 13 (Mont. 1993) (Montana "give[s] due weight to the federal courts' interpretation" of federal antitrust laws when interpreting Montana law). Thus, the analysis stated above for Texas applies here too.

#### b.    Remedies at issue

Montana seeks equitable relief and civil penalties. FAC ¶770. Montana seeks an injunction under Mont. Code Ann. §30-14-222(1). There is no jury trial right for equitable relief.

Montana also seeks civil fines. A violator of the antitrust statute "may be subject to a fine in an amount not exceeding $25,000." *Id.* §30-14-224(2). Although the word "fine" is used, the statute later states that they are "civil fines." *Id.* §30-14-226(1). Montana caselaw confirms the

fines are civil in nature.  *See Vader v. Fleetwood Enters., Inc.*, 201 P.3d 139, 148 (Mont. 2009) (a private party may seek relief under Section 30-14-224).  And although there are not statutory criteria here, the use of the word fine shows that the civil penalties are meant to punish wrongdoers and are thus legal in nature.  *See Jarkesy*, 603 U.S. at 123–24.  The fine has nothing to do with restoring the status quo.  It is punishment through-and-through.

### c.  Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these remedies are intertwined.  Equitable relief and civil penalties both may be awarded upon proof of an antitrust violation, so the jury must decide how many such violations occurred.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim.  *Tull's* "three flaws" all apply.  For the first *Tull* flaw, the analysis is the same as for Texas.  The same is true of the second *Tull* flaw, except that the penalty amount under Montana law may be lower.  Third, *Tull* looked to the statutory authority at issue. The legal and equitable claims are not intertwined nor are they incidental to each other.  There are separate statutory provisions (subsections 30-14-222(1) and 30-14-224(2)) allowing the Attorney General to obtain injunctive relief and civil penalties respectively.  Neither section references the other nor limits the circumstances under which the Attorney General may seek relief.  Thus, the claims are wholly independent.  So even Google's counsel must confess that "there is a jury trial right to a trial on liability in the antitrust claims." 11/6/24 Hr'g Tr. at 31:20–21.

Thus, a jury must resolve all the legal issues first, which includes all intertwined factual issues (intertwinement with DTPA claims is addressed below).  After their verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief).  The Court may also have an advisory jury resolve issues even if the Court will ultimately decide them.

### d. Penalties calculation

Montana law does not specify whether the Court or the jury decides the amount of civil penalties.  It simply provides that the defendant "may be subject to a fine in an amount not exceeding $25,000."  Mont. Code Ann. §30-14-224(2).  The federal default rule should therefore control, which Plaintiff States submit is a jury determination.  The Court may also have the jury calculate an advisory penalties amount even if it disagrees.

## 2. MUTPA

### a. Legal or equitable

For Seventh Amendment purposes, claims under the Montana Unfair Trade Practices and Consumer Protection Act of 1973 ("MUTPA") are more analogous to actions at law than to actions in equity.  Montana alleges that Google violated Montana Code section 30-14-103, which makes it illegal to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  The MUTPA is not a codification of the common law.  *Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435, 441 (Mont. 2003).

Still, the analysis for Texas above also applies to Montana because the MUTPA sets forth legal duties, *see* Mont. Code Ann. §30-14-103, and provides for remedies for violations of those duties, *see id.* §§30-14-111(4), 30-14-131, and 30-14-142(2).  This is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.

Google has proposed no historical analog to a MUTPA claim that could be brought in equity.  Plaintiff States are aware of none.  Because the analogy to a legal claim is stronger than the analogy to an equitable claim, MUTPA actions are legal actions under the Seventh Amendment.

### b. *Remedies at issue*

Montana seeks multiple forms of equitable relief, including an injunction and restitution under subsections 30-14-111(4), 30-14-131.  There is no jury trial right for equitable relief.

Montana also seeks civil penalties under subsection 30-14-142(2).  That section provides that "upon petition to the court," the Attorney General "may recover on behalf of the state a civil fine of not more than $10,000 for each violation."  Civil penalties like these are legal remedies under *Tull* and *Jarkesy* for the same reasons as set forth above for Texas.

Comparing the civil penalties provision with section 30-14-131 is instructive.  That provision provides that "[t]he court may enter orders or judgments necessary to restore to a person any money or property, real or personal, that may have been acquired by means of any practice in this part declared to be unlawful."  *Id.*  This is a monetary award that is equitable—restoring money lost because of the unfair or deceptive practice.  That the civil penalties are separate and in addition to this authority shows that they are *not* for the purpose of restoring money for equitable reasons.

### c. *Intertwinement*

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding these three remedies are intertwined.  Injunctions, restitution, and civil penalties all may be awarded when there is a MUTPA violation.  The jury therefore must decide whether the MUTPA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim.  *Tull's* "three flaws" all apply, discussed above.  The first two flaws are the same as for violations of Montana's antitrust statute.  Third, *Tull* looked to the statutory authority at issue.  Montana law enumerates a civil penalty provision, an injunctive relief provision, and a restitution provision separately.  Another provision, Mont. Code Ann. §30-14-142(1), authorizes "a civil fine of not more than $10,000" against "a person who violates the terms

of an injunction or temporary restraining order issued under Section 30-14-111." This provision looks much closer to something that is "incidental to injunctive relief," since it is available *only* after an injunction is issued, and from *only* the court that issued the injunction. Montana is not now seeking penalties under this provision.

Rather, Montana seeks penalties under subsection 30-14-142(2), which states that "upon petition to the court, [the Attorney General] may recover on behalf of the state a civil fine of not more than $10,000 for each [CPA] violation." As in *Tull*, the civil penalty and the injunctive relief are codified separately. Civil penalties are available only if the state *also* seeks equitable relief under section 30-14-111, but there is no requirement that Montana *prevail* under section 30-14-111. Montana could request an injunction and civil penalties; the injunction request could be denied; but still, the civil penalties could be awarded. The penalties are therefore not incidental to or intertwined with equitable relief, since they could be awarded even if no equitable relief is.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only MUTPA claims and civil penalties, but also antitrust claims for the same reason as set forth for Texas above. After the jury's verdict, the Court then decides what other equitable relief should be awarded (most notably injunctive relief). The Court may also have an advisory jury resolve issues even if the Court will decide that issue.

### d.  Penalties calculation

The MUTPA is clear that "if the *court finds* that a person is willfully using or has willfully used a method, act, or practice declared unlawful by [Section] 30-14-103, the [Attorney General], upon petition to *the court*, may recover on behalf of the state a civil fine of not more than $10,000 for each violation." Mont. Code Ann. §30-14-142(2) (emphasis added). This is the type of decision made by the sovereign that, under *Tull*, displaces the default rule of having juries decide the quantum of civil penalties. Thus, Plaintiff States agree with Google that the Court has the

ultimate responsibility to set the civil penalty amount for Montana.  Still, the Court can and should exercise its discretion under the Federal Rules of Civil Procedure and enjoy the benefit of an advisory jury verdict on the issue.

## M.  Nevada

### 1.  *Antitrust*

#### a.  *Legal or equitable*

The Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §598A.010, *et seq.*, broadly prohibits conduct in restraint of trade.  *Id.* §598A.060.  Google has repeatedly conceded that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)."  Dkt. 674 at 50; *see also* Dkt. 224 at 27.  Indeed, Nevada law makes explicit that its antitrust law mirrors federal antitrust law.  Nev. Rev. Stat. Ann. §598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); *see also Boulware v. State of Nev., Dep't of Hum. Res.*, 960 F.2d 793, 800 (9th Cir. 1992) ("The Nevada statute also adopts by reference the case law applicable to the federal antitrust laws[.]").  Furthermore, Nevada law permits, and Nevada thereby seeks, civil penalties for Google's antitrust violations.  *See* FAC ¶655 (listing "civil penalties" in the relief sought for Google's antitrust violations); *see also* Nev. Rev. Stat. Ann. §598A.070(c)(2) (authorizing "[c]ivil penalties" for violations of the Nevada Unfair Trade Practices Act); Nev. Rev. Stat. Ann. §598A.170 (authorizing civil penalties "in an amount not to exceed 5 percent of the gross income realized by the sale of commodities or services sold by such persons in this state in each year in which the prohibited activities occurred").  Thus, the federal-law analysis of the Texas antitrust claim as a legal claim applies equally here, too.  Nevada's antitrust claim is a legal claim.

### b.  Remedies at issue

For Google's violations of its antitrust law, Nevada seeks all available relief, including injunctive relief and civil penalties.  *See* FAC ¶655 (seeking "all available relief under the Nevada Unfair Trade Practices Act and common law, including but not limited to:  disgorgement, injunctions, civil penalties, and its costs and attorney's fees").

Nevada law authorizes civil penalties for antitrust violations in a separate, standalone provision, Nev. Rev. Stat. Ann. §598A.170, and the authorized civil penalties are substantial:  up to "5 percent of the gross income realized . . . by such persons in this state in each year in which the prohibited activities occurred."  And these civil penalties are explicitly "cumulative" on, and therefore separately available from, injunctive and other equitable relief that are also available, Nev. Rev. Stat. Ann. §598A.250.  For injunctive and other equitable relief, there is no jury trial right.

These civil penalties are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish, rather than to restore the status quo ex ante.  Nevada's decision to peg the amount of civil penalties to gross income reveals that the civil penalties are designed to maximally deter and punish while remaining cognizant of a company's ability to pay—and not aimed at quantifying the amount of harm done that must be undone.  Here, just as in *Jarkesy*, Nevada is authorized to exact penalties from the defendant's general assets, with no requirement to identify particular funds in specific accounts tied to Google's misconduct, deliver the amounts to particular victims, or calibrate the amount to unwind Google's misconduct.  "All money obtained as . . . civil penalties for the State of Nevada and its agencies by the Attorney General as a result of enforcement of statutes pertaining to unfair trade practices . . . must be deposited in the Consumer Protection Administrative Account," Nev. Rev. Stat. Ann. §598A.260, rather than returned to any victim. Only courts of law could have awarded these civil penalties in the 18th century.

70

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding civil penalties, on the one hand, and injunctive relief and other equitable relief, on the other hand, are intertwined. Both categories of relief may be awarded upon proof of a violation of Nevada's antitrust laws. Thus, whether Nevada's antitrust laws have been violated must be decided by a jury. This is especially true because, as set forth below, for independent reasons, the jury must decide whether Nevada's DTPA statute has been violated—and the facts and issues to be decided in determining whether Nevada's DTPA statute has been violated are intertwined with the antitrust facts and issues. In Nevada, "[e]vidence that a person has engaged in a deceptive trade practice is prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition." Nev. Rev. Stat. Ann. §598.0953(1).

That is not to say that civil penalties are incidental to or intertwined with equitable relief for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply here, too: (1) there is no historical analog for courts in equity awarding monetary relief in the form of civil penalties incidental to injunctive relief, *Tull*, 481 U.S. at 424; (2) Nevada seeks significant civil penalties of up to 5% of Google's gross income realized from conduct in Nevada for each year at issue; and (3) the provision authorizing civil penalties (§§598A.070(1)(c)(2), 598A.170) is separate from the provision authorizing injunctive and other equitable relief (§§598A.070(1)(c)(1), (4)), such that Nevada was free to seek either without the other, and there is no requirement to win injunctive relief in order to recover civil penalties.

Therefore, a jury must resolve all the legal issues first, which includes all intertwined factual issues. After the jury's verdict, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

71

### d. Penalties calculation

Nevada law does not specify whether the Court or the jury decides the amount of civil penalties under the NUTPA. It simply provides that violators "are civilly liable, at the suit of the Attorney General," for up to 5% of their gross incomes from Nevada. Nev. Rev. Stat. Ann. §598A.170. The federal default rule should control, which Plaintiff States submit is a jury determination. The Court may also have the jury calculate an advisory penalties amount.

## 2. NDTPA

### a. Legal or equitable

For Seventh Amendment purposes, claims under the Nevada Deceptive Trade Practices Act (NDTPA) are more analogous to actions at law than in equity. Nevada alleges that Google violated multiple provisions of the NDTPA, Nev. Rev. Stat. Ann. §598.0903, *et seq.*, including §598.0915(5) ("Knowingly mak[ing] a false representation as to the characteristics . . . of goods or services"), §598.0915(7) ("Represent[ing] that goods or services for sale . . . are of a particular standard, quality or grade . . . if he or she knows or should know that they are of another standard, quality, [or] grade"), and §598.0915(9) ("Advertis[ing] goods or services with intent not to sell . . . them as advertised"). *See* FAC ¶729. Some deceptive trade practices prohibited under the NDTPA have been compared to conduct that would constitute common law fraud as they can "sound in fraud," *Betsinger v. D.R. Horton, Inc.*, 126 Nev. 162, 165 (2010), though "statutory fraud is separate and distinct from common law fraud," *id.* at 166, and need only be proven by a preponderance of the evidence (not clear and convincing evidence like common law fraud), *id.*

The analysis of Texas's DTPA statute as being legal in nature applies here. Like that statute, the NDTPA also sets forth certain legal duties, *see* Nev. Rev. Stat. Ann. §§598.0915–.0925, and provides for remedies for violations of those duties, *see* Nev. Rev. Stat. Ann. §§598.0963, 598.0999(2). In this context, the NDTPA too is analogous to an action in debt (as in *Tull*), a

contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126. By contrast, Google has not proposed any historical analog to an NDTPA claim that could be brought in equity, and Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, NDTPA actions are legal actions for Seventh Amendment purposes.

### b. *Remedies at issue*

For Google's violations of the NDTPA, Nevada seeks both injunctive relief and civil penalties. *See* FAC ¶731. Nevada seeks injunctive relief pursuant to Nev. Rev. Stat. Ann. §598.0963(3), which authorizes the Nevada Attorney General "to obtain a temporary restraining order, a preliminary or permanent injunction, or other appropriate relief, including, without limitation, the recovery of a civil penalty, disgorgement, restitution or the recovery of damages." There is no jury trial right for equitable relief.

Nevada seeks civil penalties pursuant to Nev. Rev. Stat. Ann. §598.0999(2), which authorizes Nevada to "recover a civil penalty not to exceed $15,000 for each violation" "if the court finds that a person has willfully engaged in a deceptive trade practice." These civil penalties are legal remedies, as the Supreme Court made clear in *Tull* and *Jarkesy*. *See* Dkt. 753 at 3–4. Specifically, any civil penalty that Plaintiff State of Nevada recovers under the NDTPA must be deposited in Nevada's Consumer Protection Administrative Account and need not be returned to the victims. *See* Nev. Rev. Stat. Ann. §598.0975(1)(a) ("[C]ivil penalties . . . collected pursuant to the provisions of . . . [NRS §] 598.0999 . . . , [i]n an action brought by the Attorney General, must be deposited in the Consumer Protection Administrative Account pursuant to NRS 228.332."); *see also* Dkt. 672 at 110 n.6 (Google agreeing that the civil penalties "will be paid to State treasuries" instead of being "paid to any allegedly injured party"); Dkt. 832 at 3 ("Any penalties [Plaintiff States] recover will also, by statute, go only to their state treasuries."). This demonstrates that the

civil penalty is punitive and legal, not restitutionary and equitable. *See Jarkesy*, 603 U.S. at 124 (calling the civil penalty "punitive" because it need not be returned to the victims and therefore "by definition does not 'restore the status quo' and can make no pretense of being equitable.").

Furthermore, the purpose of a civil penalty under the NDTPA is to deter and punish, not to make victims whole or to deprive a wrongdoer of ill-gotten gains. For the latter purposes, the NDTPA authorizes Plaintiff State of Nevada to recover restitution and disgorgement. *See* Nev. Rev. Stat. Ann. §598.0963(3) (authorizing the Nevada Attorney General to obtain injunctive relief "or other appropriate relief, including, without limitation, the recovery of a civil penalty, disgorgement, restitution or the recovery of damages."). That the NDPTA authorizes civil penalties in addition to restitution and disgorgement reveals that the civil penalties go beyond restoring the *status quo ex ante* to punishing the wrongdoer and deterring future misconduct.

### c. Intertwinement

Under *Beacon Theaters* and *Dairy Queen*, the facts and issues to be decided in awarding all forms of remedies under the NDTPA are intertwined. Both civil penalties and equitable relief under the NDTPA require violations—and for civil penalties the NDTPA requires a willfulness finding. *See* Nev. Rev. Stat. Ann. §598.0999(2). The jury therefore must decide whether the NDTPA has been violated, and how many times.

However, neither remedy is incidental to or intertwined with the other for purposes of finding an analogous 18th century claim. *Tull's* "three flaws" all apply here, too, discussed above: (1) there is no historical analog for courts in equity awarding monetary relief in the form of civil penalties incidental to injunctive relief, *Tull*, 481 U.S. at 424; (2) Nevada seeks significant civil penalties of up to $15,000 per violation; and (3) the provision authorizing civil penalties (§598.0999(2)) is separate from the provision authorizing injunctive and other equitable relief (§598.0963(3)), such that Nevada was free to seek either without the other, and there is no

requirement to win injunctive relief in order to recover civil penalties. Google has conceded the third point as to the NDTPA. *See* Dkt. 690 at 5 (arguing as to ten of the Plaintiff States, but not as to Plaintiff State of Nevada, that the DTPA statute "permit[s] the sovereign to seek penalties only under provisions that authorize injunctive relief"); *see also id.* at 5 n.3, 7.

A jury must resolve all the legal issues first, which includes all intertwined factual issues. Those intertwined legal issues include not only whether Google's conduct violated the NDTPA, and if so, whether the violations were willful, but also whether Google's conduct violated the NUTPA. As noted above, in Nevada, "[e]vidence that a person has engaged in a deceptive trade practice is prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition." Nev. Rev. Stat. Ann. §598.0953(1). If Google has engaged in a deceptive trade practice in violation of the NDTPA, then it has prima facie violated the NUTPA as well.

After the jury's verdict, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d. Penalties calculation

Nevada law could be read to suggest, but does not specify, that the Court decides the amount of civil penalties under the NDTPA. It states that the availability of a civil penalty is conditioned on "the court find[ing] that a person" engaged in a deceptive trade practice "willfully," but on the question of the amount of any civil penalty, it states without identifying the decisionmaker that Nevada "may recover a civil penalty not to exceed $15,000 for each violation." Nev. Rev. Stat. Ann. §598.0999(2). That is not sufficient to override the federal default rule from *Feltner*, and Plaintiff States submit that the federal default of jury determination applies. The Court may also have the jury calculate an advisory penalties amount even if it disagrees.

N.    **North Dakota**

    *1.  Antitrust*

        *a.  Legal or equitable*

The North Dakota Uniform State Antitrust Act, N.D. Cent. Code §51-08.1-01 *et seq.*, broadly prohibits conduct in restraint of trade.  N.D. Cent. Code §51-08.1-02 (prohibiting agreements to restrain trade); 51-08.1-03 (prohibiting monopolization).  Google concedes that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)."  Dkt. 674 at 50; *see also* Dkt. 224 at 27.  And caselaw treats North Dakota's antitrust law as being the same as federal antitrust law.  *See, e.g.*, *Ag Acceptance Corp. v. Glinz*, 684 N.W.2d 632, 639–41 (N.D. 2004) (conducting one analysis of federal antitrust law to resolve both federal and North Dakota antitrust claims).  Like Texas and other Plaintiff States, North Dakota also seeks civil penalties for Google's antitrust violations under its state antitrust law.  *See* FAC ¶772(a) (seeking an order requiring "Google to pay civil penalties"); *see also* N.D. Cent. Code §51-08.1-07 (permitting "an action for appropriate injunctive relief, equitable relief, including disgorgement, and civil penalties," where the civil penalty can be up to "one hundred thousand dollars for each violation").  Thus, the federal-law analysis of the Texas antitrust claim as a legal claim applies equally here, too, and North Dakota's antitrust claim is a legal claim.

        *b.  Remedies at issue*

For Google's violations of its antitrust law, North Dakota seeks civil penalties, *see* FAC ¶772(a), but it is also authorized to seek "appropriate injunctive relief" and "equitable relief, including disgorgement."  N.D. Cent. Code §51-08.1-07; *see also* FAC ¶772(g) (seeking "further relief . . . as provided for by law or equity . . . as the Court deems appropriate and just").

North Dakota law authorizes substantial civil penalties for antitrust violations:  up to "one hundred thousand dollars for each violation."  N.D. Cent. Code §51-08.1-07.  While the same

provision also authorizes "injunctive relief" and "equitable relief, including disgorgement," *id.*, the statutory text is clear that North Dakota's attorney general "may bring an action" for any of the available remedies.  Indeed, in a separate provision, North Dakota law makes the civil penalties "cumulative" on, and therefore separately available from, injunctive and other equitable relief that are also available.  *See* N.D. Cent. Code §51-08.1-11.

For injunctive and other equitable relief, there is no jury trial right, but the civil penalties North Dakota seeks are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish. North Dakota permits a $100,000-per-violation penalty regardless of the size of the harm done, revealing the penalty's purpose of deterring and punishing, rather than undoing the amount of harm done.  Just as in *Jarkesy*, the civil penalties may be extracted from Google's general corporate assets, regardless of whether any specific asset can be tied back to Google's misconduct.  And the penalties are assessed "for the benefit of the state," rather than for any specific victim.  Only courts of law could have awarded these civil penalties before the courts merged.

### c.  Intertwinement

The facts and issues to be decided in assessing civil penalties on Google for its violations of North Dakota's antitrust law are intertwined with the facts and issues for granting any other relief.  Thus, a jury must decide whether North Dakota's antitrust laws have been violated.

North Dakota's claim to civil penalties is not incidental to or intertwined with its claim to equitable relief for the federal-law search for an analogous 18th century claim.  As in *Tull*:  (1) courts in equity cannot assess civil penalties, regardless of whether they are incidental to injunctive relief, *Tull*, 481 U.S. at 424; (2) North Dakota seeks significant civil penalties of up to $100,000 per violation; and (3) while the provision authorizing civil penalties also authorizes injunctive and other equitable relief (§51-08.1-11), the provision is clear that North Dakota may seek one without the other, and win one without the other.

A jury must resolve all the legal issues first, including antitrust liability, civil penalties, and all intertwined factual issues.  If the jury finds for North Dakota, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d.  Penalties calculation

North Dakota law does not specify whether the Court or the jury decides the amount of civil penalties under the NDUSA:  it says that "[t]he trier of fact" may determine the amount.  N.D. Cent. Code §51-08.1-07.  The federal default rule of a jury determination therefore controls; and the Court can always seek an advisory determination by a jury.

## 2.  NDUSAP

### a.  Legal or equitable

Claims under the North Dakota Unlawful Sales or Advertising Practices Act (NDUSAP), N.D. Cent. Code §51-15-01 *et seq.*, are more analogous to actions at law than to actions in equity. North Dakota alleges that Google violated multiple provisions of the NDUSAP, including §51-15-02, which broadly prohibits "[t]he act, use, or employment by any person of any deceptive act or practice."  *Id.*; *see* FAC ¶736.  Like other Plaintiff States' DTPA claims, the NDUSAP claim is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126. Google has proposed no historical analog to an NDUSAP claim that could be brought in equity, and Plaintiff States are aware of none.  Because the analogy to a legal claim is stronger than the analogy to an equitable claim, NDUSAP actions are legal actions under the Seventh Amendment.

### b.  Remedies at issue

For Google's violations of the NDUSAP, North Dakota seeks both injunctive relief and civil penalties.  *See* FAC ¶772(c)-(g).

North Dakota seeks injunctive and other equitable relief pursuant to N.D. Cent. Code §51-15-07, which authorizes the North Dakota Attorney General to "obtain . . . an injunction prohibiting . . . the unlawful practice," as well as "to restore to any person in interest any money, or property that may have been acquired by means of any practice in this chapter." There is no jury trial right for equitable relief.

North Dakota also seeks civil penalties pursuant to N.D. Cent. Code §51-15-11, which authorizes "[t]he court" to "assess for the benefit of the state a civil penalty of not more than five thousand dollars for each violation" "in addition to those remedies otherwise provided."

These civil penalties are legal remedies for the same reasons as in *Tull* and *Jarkesy*, as well as in the analyses above for other Plaintiff States. *See* Dkt. 753 at 3–4. Specifically, any civil penalty that North Dakota recovers under N.D. Cent. Code §51-15-11 is "for the benefit of the state," rather than for specific victims. Google agrees. *See* Dkt. 672 at 110 n.6; Dkt. 832 at 3. This demonstrates that the civil penalty is punitive and legal, not restitutionary and equitable. *See Jarkesy*, 603 U.S. at 124 (calling the civil penalty "punitive" because it need not be returned to the victims and therefore "by definition does not 'restore the status quo' and can make no pretense of being equitable.").

Furthermore, the purpose of a civil penalty under the NDUSAP is to deter and punish. It is not to make victims whole—for that purpose, the NDUSAP separately authorizes equitable restitution and disgorgement. *See* N.D. Cent. Code §51-15-07 (contemplating an order that "restore[s] to any person in interest any [ill-gotten] money, or property"). That the NDUSAP authorizes civil penalties "[i]n addition to" restitution and disgorgement and "any other remedy authorized by this chapter, or by other provisions of law," shows that the specific purpose of the civil penalties is to deter and punish on top of compensating victims.

79

### c.  Intertwinement

The facts and issues to be decided in awarding civil penalties under the NDUSAP are intertwined with the facts and issues for awarding other relief under the NDUSAP.  All forms of relief under the NDUSAP require a violation of the NDUSAP.  The jury therefore must decide whether the NDUSAP has been violated, and how many times.

However, the claim for civil penalties is not incidental to or intertwined with the claim for other forms of relief in the federal-law search for an analogous 18th century claim.  *Tull*'s "three flaws" all apply here, too:  (1) no court in equity could award civil penalties, *Tull*, 481 U.S. at 424; (2) North Dakota seeks significant civil penalties of $5,000 per violation; and (3) the provision authorizing civil penalties (§51-15-11) is separate from the provision authorizing injunctive and other equitable relief (§51-15-07).  Google has conceded the third point as to the NDUSAP.  *See* Dkt. 690 at 5 (arguing as to ten of the Plaintiff States, but not as to North Dakota, that the DTPA statute "permit[s] the sovereign to seek penalties only under provisions that authorize injunctive relief"); *see also id.* at 5 n.3, 7.  Indeed, a party is "entitled to a jury trial if both equitable and legal remedies are afforded by a statute," and "[s]uch is the case here" under the NDUSAP.  *North Dakota ex rel. Stenehjem v. Spa D'Athena, LLC*, No. 08-2018-cv-00306 (N.D. Dist. Ct. Apr. 11, 2016), Dkt. 54.

A jury must decide whether Google violated the NDUSAP, and if so, what the civil penalties are for those violations.  If the jury finds Google liable, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d.  Penalties calculation

North Dakota law states that "[t]he court may assess" the civil penalty under the NDUSAP.  N.D. Cent. Code §51-15-11.  That language might override the federal default rule of juries determining the amount of civil penalties.  *But see State v. Kirsch*, 268 N.W. 473, 476 (N.D. 1936)

(construing a statute that identified the relevant factfinder to be "the court" to mean that the fact is determined by a jury, since "[t]he term court is frequently used in the broad sense of judge and jury," and a different construction might infringe the constitutional right to a civil jury). Of course, in all events, the Court may choose to have a jury calculate an advisory penalties amount.

## O.  Puerto Rico

### 1.  Antitrust

#### a.  Legal or equitable

The Puerto Rico Antitrust Act (PRAA), 10 L.P.R.A. §259 *et seq.*, broadly prohibits "[u]nfair methods of competition." 10 L.P.R.A. §259(a). The PRAA is "coextensive" with the Sherman Act. *Flovac, Inc. v. Airvac, Inc.*, 84 F. Supp. 3d 95, 105 (D.P.R. 2015) (citing *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 16 (1st Cir. 2003)), *aff'd*, 817 F.3d 849 (1st Cir. 2016). Google agrees that the PRAA, as well as other antitrust laws of the Plaintiff States (except Arkansas) "mirror the relevant federal laws." Dkt. 674 at 50; *see also* Dkt. 224 at 27. Like Texas and other Plaintiff States, Puerto Rico, too, seeks civil penalties for Google's antitrust violations under its antitrust law. *See* FAC ¶773(a) (seeking, among other forms of relief, "civil penalties of up to $5,000 per violation"); *see also* 10 L.P.R.A. §259(i) (requiring "a civil penalty up to five thousand dollars ($5,000), for each violation," where a company violates regulations issued pursuant to §259(b) and "it appears that said violation was committed with present or real knowledge of the prohibition, or with reasonable knowledge inferred on the basis of objective circumstances").[8] Thus, the federal-law analysis of the Texas antitrust claim as a legal claim applies equally here, too, and Puerto Rico's antitrust claim is a legal claim.

---

[8] The statutory path to Puerto Rico's claim for civil penalties pursuant to the PRAA is as follows: <u>first</u>, subsection (a) of 10 L.P.R.A. §259 broadly prohibits "[u]nfair methods of competition"; <u>second</u>, subsection (b) authorizes the "the Office of Monopolistic Affairs, through rules and

### b. Remedies at issue

For Google's violations of its antitrust law, Puerto Rico seeks civil penalties as noted above, as well as injunctive and other equitable relief.  *See* FAC ¶773(a) (seeking "injunctive and other equitable relief," as well as "civil penalties of up to $5,000 per violation").

Puerto Rico authorizes substantial, $5,000-per-violation civil penalties on antitrust violators.  10 L.P.R.A. §259(i).  A different statutory provision also authorizes "injunctions," 10 L.P.R.A. §269.

For injunctive and other equitable relief, there is no jury trial right, but the civil penalties Puerto Rico seeks are legal remedies under *Tull* and *Jarkesy*.  They are designed to punish antitrust culprit, which is why Puerto Rico requires for civil penalties not only that the defendant violated the law, but did so "with present or real knowledge," or constructive knowledge.  10 L.P.R.A. §259(i).  As elsewhere, the civil penalties are assessed on Google's general corporate assets, and there is no requirement that penalties collected be traced back to the misconduct being punished. And there is no requirement either to distribute the penalties to the victims.  Only courts of law could have awarded these civil penalties before the courts merged.

---

regulations," to "proscribe specific acts or practices, in a general manner or in any specific line of trade or commerce, in accordance with th[at] standard" in subsection (a); third, one set of such rules and regulations is Puerto Rico Regulation on Fair Competition No. 2648 (Proscribing Unfair Methods and Practices of Competition and Enumerating Acts Which Constitute Unfair Methods of Competition), http://app.estado.gobierno.pr/ReglamentosOnLine/Reglamentos/2648ING.pdf, *see id.* at Article I; fourth, those rules and regulations prohibit, among other unfair methods of competition, "exert[ing] coercion over competitors or their suppliers or manufacturers in order to obtain a competitive benefit," *id.* at Article IV(7); and fifth, subsection (i) imposes a civil penalty of $5,000 on each violation of those rules and regulations with actual or constructive knowledge, 10 L.P.R.A. §259(i) ("with present or real knowledge of the prohibition, or with reasonable knowledge inferred on the basis of objective circumstances").

### c. *Intertwinement*

The facts and issues to be decided in assessing civil penalties on Google for its violations of Puerto Rico's antitrust law are intertwined with the facts and issues for granting any other forms of relief for those violations.  A necessary condition for both forms of relief is a violation of Puerto Rico's antitrust laws—for civil penalties, there is an additional condition of actual or constructive knowledge.  Thus, whether Puerto Rico's antitrust laws have been violated is a jury question.

Puerto Rico's claim to civil penalties is not incidental to or intertwined with its claim to equitable relief.  As in *Tull*:  (1) courts in equity cannot assess civil penalties, regardless of whether they are incidental to injunctive relief, *Tull*, 481 U.S. at 424; (2) Puerto Rico seeks significant, $5,000-per-violation penalties; and (3) the provision authorizing civil penalties (§259(i)) is separate from the provision authorizing injunctive relief (§269).

Accordingly, a jury must resolve all the legal issues first, which includes antitrust liability and whether Google's antitrust violations were knowing, as well as all intertwined factual issues. If the jury finds for Puerto Rico on those issues, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d. *Penalties calculation*

Puerto Rico law states that "the Department of Consumer Affairs shall impose a civil penalty up to five thousand dollars ($5,000), for each violation" if "it appears" that the violations were knowing violations.  10 L.P.R.A. §259(i).  Because that language does not specifically override it, the federal default rule stands: a jury determines the amount of civil penalties.  And as always, the Court can always seek advisory jury determinations in its discretion.

### 2. PRAA's DTP Prohibition

#### a. Legal or equitable

The PRAA, in addition to prohibiting "[u]nfair methods of competition," also broadly prohibits "unfair or deceptive acts or practices in trade or commerce." 10 L.P.R.A. §259(a). Claims alleging deceptive trade practices under the PRAA are more analogous to actions at law than to actions in equity. Indeed, Puerto Rico's prohibition on deceptive trade practices is contained in the same statutory provisions prohibiting antitrust violations, which are legal claims, as set forth above. Furthermore, like other Plaintiff States' DTPA claims, the Puerto Rico's claim of deceptive trade practices is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126. Google has not proposed any historical analog to a deceptive trade practices claim that could be brought in equity, and Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, Puerto Rico's deceptive practices claims against Google are legal actions for Seventh Amendment purposes.

#### b. Remedies at issue

For Google's deceptive trade practices, Puerto Rico seeks both injunctive relief and civil penalties. *See* FAC ¶773(b). Puerto Rico seeks injunctive and other equitable relief pursuant to 10 L.P.R.A. §269, which requires Puerto Rico's Secretary of Justice "to institute proceedings for injunctions" to stop deceptive trade practices, as well as "to obtain such other or further relief as may be appropriate." As always, there is no jury trial right for equitable relief.

Puerto Rico also seeks civil penalties under 10 L.P.R.A. §259(i), which states "the Department of Consumer Affairs shall impose a civil penalty up to five thousand dollars ($5,000),

for each violation in addition to the most appropriate remedies according to the details of the complaint," if the violation "appears" to have been knowing violations of the regulations.[9]

These civil penalties are legal remedies for the same reasons as in *Tull* and *Jarkesy*, as well as in the analyses above for other Plaintiff States.  *See* Dkt. 753 at 3–4.  Google agrees that these civil penalties are for Puerto Rico's treasuries, rather than for disbursement to any specific victims. *See* Dkt. 672 at 110 n.6; Dkt. 832 at 3.  This demonstrates that the civil penalty is punitive and legal, not restitutionary and equitable.  *See Jarkesy*, 603 U.S. at 124 (calling the civil penalty "punitive" because it need not be returned to the victims and therefore "by definition does not 'restore the status quo' and can make no pretense of being equitable").

Indeed, the key purpose of the regulations triggering this civil penalty is deterrence—the regulations note that their "objective" is "guaranteeing the benefits of a free competition to our businessmen and commerce."  Puerto Rico Regulation on Fair Competition No. 2648, Statement of Motives.  That is why Puerto Rico assesses these civil penalties "in addition to" other forms of relief, 10 L.P.R.A. §259(i), including any disgorgement of profits or restitution to victims under 10 L.P.R.A. §269.

### c. Intertwinement

The facts and issues to be decided in awarding civil penalties for Google's deceptive trade practices are intertwined with the facts and issues for awarding other relief, as well as for awarding all forms of relief for Google's unfair methods of competition.  All forms of relief under the PRAA

---

[9] Puerto Rico Regulation on Fair Competition No. 2648 *supra* note 8, prohibits not only unfair methods of competition but also deceptive trade practices, including "us[ing] false representations with the purpose of convincing a prospective client about the advantages he will receive if they engage in commercial transactions," *id.* at Article IV(17), "creating the impression that certain acts will be carried out when there is no intention to perform them," *id.* at Article IV(18), "[u]tilizing practices which are oppressive, dishonest or confusing with the purpose of binding a prospective client," *id.* at Article IV(19), "creat[ing] the impression that a product has certain characteristics which it does not possess," *id.* at Article IV(20), and other unfair or deceptive trade practices

require a violation of the PRAA.  The jury therefore must decide whether the PRAA has been violated, and how many times.

This does not mean that the claim for civil penalties is incidental to or intertwined with the claim for other forms of relief in the federal-law search for an analogous 18th century claim.  *Tull*'s "three flaws" all apply here, too:  (1) no court in equity could award civil penalties, *Tull*, 481 U.S. at 424; (2) Puerto Rico seeks significant civil penalties of $5,000 per violation; and (3) the provision authorizing civil penalties (§259(i)) is separate from the provision authorizing injunctive and other equitable relief (§269).  Google has conceded the third point as to Puerto Rico.  *See* Dkt. 690 at 5 (arguing as to ten of the Plaintiff States, but not as to Puerto Rico, that the DTPA statute "permit[s] the sovereign to seek penalties only under provisions that authorize injunctive relief"); *see also id.* at 5 nn.3, 7.

A jury must decide whether Google violated the PRAA, and if so, what the civil penalties are for those violations.  If the jury finds Google liable, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d.  Penalties calculation

Puerto Rico law states that "the Department of Consumer Affairs" assesses the civil penalty under 10 L.P.R.A. §259(i).  That language does not specifically state that the court determines the amount of civil penalties.  Puerto Rico submits that the federal default rule therefore stands.  A jury should determine the amount of civil penalties, and the Court might decide that the jury's determination of the amount of civil penalties is merely advisory.

P.      **South Carolina**

    *1.  Antitrust and Consumer Protection*

        *a.  Legal or equitable*

    The South Carolina Unfair Trade Practices Act (SCUTPA), S.C. Code Ann. §39-5-10 *et seq.*, broadly prohibits "[u]nfair methods of competition" and also "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. §39-5-20(a). "By the express terms of the statute, [SCUTPA] prohibits both unfair or deceptive acts or practices (consumer protection) *and* anticompetitive conduct (antitrust proscription)." *Cheshire v. Coca Cola Bottling Affiliated, Inc.*, 758 F. Supp. 1098, 1100 (D.S.C. 1990). South Carolina's SCUTPA claims are mixed legal and equitable claims because South Carolina is seeking both legal and equitable relief, as discussed below.

        *b.  Remedies at issue*

    South Carolina seeks civil penalties, *see* FAC ¶¶668(b), 751(b), and it also seeks injunctive and other equitable relief, *see* FAC ¶¶668(a), 751(a). South Carolina Code section 39-5-50 authorizes actions for "temporary restraining order, temporary injunction or permanent injunction," as well as for "orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss." This is an equitable claim. Section 39-5-110(a) authorizes the South Carolina Attorney General to "recover on behalf of the State a civil penalty of not exceeding five thousand dollars per violation" for willful violations of section 39-5-20, "upon petition to the court." This involves legal claims, i.e. whether Google's conduct violated section 39-5-20(a) and whether that conduct was willful under section 39-5-110(c), and a penalty award from the court.

Because the provision authorizing civil penalties is separate from that authorizing injunctive and other equitable relief, South Carolina may recover civil penalties regardless of whether it also obtains equitable relief, and vice versa.

### c.  Intertwinement

The facts and issues to be decided in holding Google liable for the State of South Carolina's legal claims under SCUTPA are intertwined with the facts and issues to be decided in holding Google liable for equitable relief under SCUTPA.  While the equitable relief sought under section 39-5-50 presents no questions for jury involvement, *see id.* ("[t]he courts are authorized to issue orders and injunctions to restrain and prevent violations of this article"), necessary conditions for an award of civil penalties are 1) a violation of section 39-5-20(a) that is 2) willful under section 39-5-110(c).  These are findings of fact to be made by a jury.  *See State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d 176, 196 (S.C. 2015) ("Whether [defendant's] actions and representations to the medical community constituted a violation of SCUTPA was a jury question."); *id.* at 201 ("Further, at the end of trial, the jury was charged with determining several factual issues, each of which was based solely on the provisions of SCUTPA, and the trial judge assessed penalties under [the] SCUTPA framework.").

If the jury answers these questions affirmatively, the case proceeds to a determination of an appropriate penalty by the court.  "[T]he civil penalty award under section 39-5-110(a) is within the discretion of the trial court . . . ."  *Id.* at 203.  The Supreme Court of South Carolina has advised trial courts to apply several factors in making this determination:

> [W]e direct that, prospectively, the following list of non-exclusive factors be used in assessing civil penalties under SCUTPA: (1) the degree of culpability and good or bad faith of the defendant; (2) the duration of the defendant's unlawful conduct; (3) active concealment of information by the defendant; (4) defendant's awareness of the unfair or deceptive nature of their conduct; (5) prior similar conduct by the defendant; (6) the defendant's ability to pay; (7) the deterrence value of the assessed

> penalties; and (8) the actual impact or injury to the public resulting from defendant's unlawful conduct. We further authorize our able trial judges to consider any other factors they deem appropriate under the circumstances. In issuing a ruling, the trial court should make sufficient findings of fact concerning all relevant factors to enable appellate review.

*Id.* at 203 n.31. Under South Carolina law, the penalty award itself is predicated first on legal findings by a jury and then legal and equitable considerations, in the form of these non-exclusive factors, by the trial judge. An advisory jury could certainly assist the court with these findings.

### d. Penalties calculation

South Carolina does not oppose Google's request that the Court decide the amount of civil penalties under the SCUTPA. *See* S.C. Code Ann. §39-5-110(a) (specifying that South Carolina's Attorney General may recover the civil penalty "upon petition to the court").

## Q.    South Dakota

### 1. Antitrust

#### a. Legal or equitable

South Dakota law broadly prohibits conduct in restraint of trade. *See* S.D. Codified Laws §37-1-3.1 (prohibiting agreements in restraint of trade); §37-1-3.2 (prohibiting monopolization and attempted monopolization). Google concedes that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50; *see also* Dkt. 224 at 27. South Dakota is explicit that its antitrust law should be "guide[d]" by "interpretations given by the federal or state courts to comparable antitrust statutes." S.D. Codified Laws §37-1-22; *see also Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 313 (8th Cir. 1986) (noting that the "analysis [of South Dakota's antitrust law] does not differ significantly from that applied to actions brought under the federal antitrust laws"). Like Texas and other Plaintiff States, South Dakota also seeks civil penalties for Google's antitrust violations under its state antitrust law. *See* FAC ¶775(a) (seeking "civil penalties to the State of South Dakota of up to $50,000 per violation for each and every

violation" of its antitrust laws); *see also* S.D. Codified Laws §37-1-14.2 (permitting South Dakota's attorney general to institute an action for civil penalties "for the benefit of the state . . . of not more than fifty thousand dollars for each violation"). Thus, the federal-law analysis of the Texas antitrust claim as a legal claim applies equally here, too, and South Dakota's antitrust claim is a legal claim.

### b.  Remedies at issue

For Google's violations of its antitrust law, South Dakota seeks civil penalties as noted above, *see* FAC ¶775(a), but it also seeks injunctive and other equitable relief, *see* FAC ¶¶670, 775; *see also* S.D. Codified Laws §37-1-14.2 (authorizing South Dakota's attorney general to institute an action for "appropriate injunctive or other equitable relief").

South Dakota law authorizes civil penalties for antitrust violations:  up to "fifty thousand dollars for each violation."  *Id.* §37-1-14.2.  The same provision also authorizes "injunctive relief or other equitable relief," *id.*, but the statutory text is clear that South Dakota's attorney general "may bring an action" for any of the available remedies.  Indeed, in a separate provision, South Dakota law makes the civil penalties "cumulative" and "not exclusive" of, and therefore separately available from, injunctive and other equitable relief.  *See id.* §37-1-20.

For injunctive and other equitable relief, there is no jury trial right, but the civil penalties South Dakota seeks are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish. South Dakota permits a $50,000-per-violation penalty regardless of the size of the harm done, revealing the penalty's purpose of deterring and punishing, rather than undoing the amount of harm done.  Just as in *Jarkesy*, the civil penalties may be extracted from Google's general corporate assets, regardless of whether any specific asset can be tied back to Google's misconduct.  *See* S.D. Codified Laws §37-1-31 (providing that "a civil penalty" under the antitrust law shall be "deposited in the antitrust special revenue fund pursuant to §1-11-6.3").  And the penalties are

assessed "for the benefit of the state," rather than for any specific victim. *Id.* §37-1-14.2.  Only courts of law could have awarded these civil penalties before the courts merged.

### c.  Intertwinement

The facts and issues to be decided in finding Google liable for civil penalties under section 37-1-14.2 are intertwined with the facts and issues for granting any other relief for its antitrust violations.  A necessary condition for both forms of relief is a violation of South Dakota's antitrust laws.  Thus, whether South Dakota's antitrust laws have been violated must be decided by a jury.

South Dakota's claim to civil penalties is not incidental to or intertwined with its claim to equitable relief for the federal-law search for an analogous 18th century claim.   As in *Tull*:  (1) courts in equity cannot assess civil penalties, regardless of whether they are incidental to injunctive relief, *Tull*, 481 U.S. at 424; (2) South Dakota seeks significant civil penalties of up to $50,000 per violation; and (3) while the provision authorizing civil penalties also authorizes injunctive and other equitable relief (§37-1-14.2), the provision is clear that South Dakota may seek one without the other, and win one without the other.

Accordingly, a jury must resolve all the legal issues first, including Google's liability for violating South Dakota's antitrust laws and for civil penalties, as well as all intertwined factual issues.  If the jury finds for South Dakota, the Court may then proceed to decide what other equitable relief should be awarded.

### d.  Penalties calculation

South Dakota law states that "[t]he court may assess" the civil penalty under section 37-1-14.2.  That language overrides the federal default rule of juries determining the amount of civil penalties, but the Court may still choose to have a jury calculate an advisory penalties amount.

## 2. *DTPA*

### a. *Legal or equitable*

Claims under South Dakota's prohibitions against deceptive trade practices, S.D. Codified Laws §37-24-6, are more analogous to actions at law than to actions in equity. South Dakota alleges that Google repeatedly violated that statute, which broadly prohibits the use of any "misrepresentation . . . in connection with the sale or advertisement of any merchandise." *Id.* §37-24-6(1); *see* FAC ¶¶753–54. Like other Plaintiff States' DTPA claims, South Dakota's claims under section 37-24-6 are analogous to actions in debt (as in *Tull*), contract actions with an "implied term," *Lebow*, 86 F.3d at 668, or common law fraud actions, even though they are "broader," *Jarkesy*, 603 U.S. at 126. Google has proposed no historical analog to a South Dakota DTPA claim that could be brought in equity. Plaintiff States are aware of none. Since the analogy to a legal (as opposed to equitable) claim is stronger, South Dakota DTPA claims are legal under the Seventh Amendment.

### b. *Remedies at issue*

For Google's violations of section 37-24-6, South Dakota seeks both equitable relief and civil penalties. *See* FAC ¶775(d)-(g).

South Dakota seeks various forms equitable relief, including injunctive relief and restitution. *See* S.D. Codified Laws §37-24-23 (authorizing "an action in the name of the state" for "temporary or permanent injunction" as well as "reasonable attorney's fees and costs"); *Id.* §37-24-29 (permitting "orders . . . to restore to any person in interest any [ill-gotten] moneys or property," including "the appointment of a receiver" if it appears that the defendant may try to resist that restoration). There is no jury trial right for equitable relief.

South Dakota also seeks civil penalties under section 37-24-27, which authorizes South Dakota's "attorney general, upon petition to the court, [to] recover, on behalf of the state, a civil

penalty of not more than two thousand dollars per violation," in an action under section 37-24-23 that involves intentional violations of the law. These civil penalties are legal remedies. *See* Dkt. 753 at 3–4. Specifically, any civil penalty that South Dakota recovers under section 37-24-27 is "on behalf of the state," rather than for specific victims. Google agrees. *See* Dkt. 672 at 110 n.6; Dkt. 832 at 3. This demonstrates that the civil penalty is punitive and legal, not restitutionary and equitable. *See Jarkesy*, 603 U.S. at 124 (calling the civil penalty "punitive" because it need not be returned to the victims and therefore "by definition does not 'restore the status quo' and can make no pretense of being equitable.").

Furthermore, the purpose of a civil penalty, including under section 37-24-27, is to deter and punish. It is not to make victims whole—for that, South Dakota law provides a separate remedy of restitution, and the appointment of a receiver where necessary, "to restore to any person in interest any moneys or property, real or personal, which the court finds to have been acquired by means of" the deceptive trade practice. S.D. Codified Laws §37-24-29. That takes care of the victims, but South Dakota law goes further and provides for a civil penalty for willful violations to deter and punish knowing misconduct. Accordingly, "it is not necessary that the State show actual damages in order to recover" a civil penalty under section 37-24-27—the point is not to make injured parties whole. *State v. W. Cap. Corp.*, 290 N.W.2d 467, 473 (S.D. 1980).

### c. Intertwinement

The facts and issues to be decided in awarding civil penalties under section 37-24-27 are intertwined with the facts and issues for awarding other relief for deceptive trade practices in violation of South Dakota law. All forms of relief require a violation under section 37-24-6—and civil penalties require a finding that the practice was intentional. The jury therefore must decide whether the Google violated South Dakota's law under section 37-24-6, and how many times.

However, the claim for civil penalties is not incidental to or intertwined with the claim for other forms of relief in the federal-law search for an analogous 18th century claim. *Tull*'s "three flaws" all apply here: (1) no court in equity could award civil penalties, *Tull*, 481 U.S. at 424; (2) South Dakota seeks significant civil penalties of $2,000 per violation; and (3) while the provision authorizing civil penalties (§37-24-27) notes that the civil penalties may be sought in an action seeking injunctive relief (§37-24-23), there is no requirement that South Dakota prevail in winning injunctive relief in order to recover civil penalties.

A jury must decide whether Google violated South Dakota law by engaging in deceptive trade practices prohibited by section 37-24-6, and if so, whether the violations were intentional, triggering civil penalties. If the jury finds Google liable, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d. Penalties calculation

South Dakota law states that the civil penalty under section 37-24-27 may be recovered "upon petition to the court." That language overrides the federal default rule of juries determining the amount of civil penalties, but the Court may have a jury calculate an advisory penalties amount.

## R. Utah

### 1. Antitrust

#### a. Legal or equitable

The Utah Antitrust Act (UAA), Utah Code Ann. §76-10-3101, *et seq.*,[10] broadly prohibits conduct in restraint of trade. Utah Code Ann. §76-10-3104(1) (prohibiting agreements to restrain trade), (2) (prohibiting monopolization and attempted monopolization). Google concedes that "Plaintiffs' state antitrust laws mirror the relevant federal laws (except Arkansas)." Dkt. 674 at 50;

---

[10] Plaintiff State of Utah notes that effective May 7, 2025, sections of the Utah Antitrust Act will be recodified without substantive modification under H.B. 21, 66 Leg., Gen. Sess. (Utah 2025).

*see also* Dkt. 224 at 27.  Interpretation of the UAA is to be "guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."  Utah Code Ann. §76-10-3118.  Utah also seeks civil penalties for Google's antitrust violations under its state antitrust law.  *See* FAC ¶673 (seeking "injunctive relief, civil penalties, disgorgement, attorneys' fees, and costs"); *see also* Utah Code Ann. §76-10-3108(2) (subjecting entities to "a civil penalty of not more than $500,000 for each violation").  Thus, the federal-law analysis of the Texas antitrust claim as a legal claim applies equally here, too, and Utah's antitrust claim is a legal claim.

> ### b.  *Remedies at issue*

For Google's antitrust violations, Utah seeks civil penalties as noted above, *see* FAC ¶673, and equitable remedies like "injunctive relief," *id.*; *see also* Utah Code Ann. §76-10-3108(1) (authorizing the Utah attorney general to "bring an action for appropriate injunctive relief").

Utah law authorizes substantial civil penalties for antitrust violations:  up to "$500,000 for each violation" for companies.  Utah Code Ann. §76-10-3108(2).  While the same statutory provision also authorizes "injunctive relief," *id.* §76-10-3108(1), the statutory text is clear that Utah's attorney general "may bring an action" for any of the available remedies.

For injunctive and other equitable relief, there is no jury trial right, but the civil penalties Utah seeks are legal remedies under *Tull* and *Jarkesy* because their purpose is to punish.  Utah permits a $500,000-per-violation penalty regardless of the size of the harm done, revealing the penalty's purpose of deterring and punishing, rather than restoring the status quo.  Just as in *Jarkesy*, the civil penalties may be extracted from Google's general corporate assets, regardless of whether any specific asset ties back to Google's misconduct.  And the penalties "shall be deposited in the Attorney General Litigation Fund," rather than remitted to victims.  Utah Code §76-10-3114(2).  Only courts of law could have awarded these civil penalties in the 18th century.

### c.  Intertwinement

The facts and issues to be decided in assessing civil penalties on Google for its violations of UAA are intertwined with the facts and issues for granting any other forms of relief for those violations.  A necessary condition for both forms of relief is a violation of the UAA.  Thus, whether Google violated the UAA must be decided by a jury.

Utah's claim to civil penalties under the UAA is not incidental to or intertwined with its claim to equitable relief for the federal-law search for an analogous 18th century claim.  As in *Tull*: (1) courts in equity cannot assess civil penalties, regardless of whether they are incidental to injunctive relief, *Tull*, 481 U.S. at 424; (2) Utah seeks significant civil penalties of up to $500,000 per violation; and (3) while the provision authorizing civil penalties also authorizes injunctive and other equitable relief (§76-10-3108), the provision is clear that Utah may seek one without the other, and win one without the other.

A jury must resolve all the legal issues first, including antitrust liability, civil penalties, and all intertwined factual issues.  If the jury finds for Utah, the Court decides what equitable relief to award (most notably injunctive relief), potentially with the assistance of an advisory jury.

### d.  Penalties calculation

Utah law does not specify whether the Court or the jury decides the amount of civil penalties under the UAA: it simply states that the attorney general "may bring an action for . . . a civil penalty," and that a company that violated the UAA "is subject to" the civil penalty.  Utah Code Ann. §76-10-3108.  The federal default rule of a jury determination therefore controls; and the Court can always seek an advisory determination by a jury.

### 2.  UCSPA

#### a.  Legal or equitable

Claims under the Utah Consumer Sales Practices Act (UCSPA), Utah Code Ann. §13-11-1 *et seq.*, are more analogous to actions at law than to actions in equity.  Utah alleges that Google repeatedly violated the UCSPA, which broadly prohibits "[a] deceptive act or practice by a supplier."  Utah Code Ann. §13-11-4; *see* FAC ¶756.  Like other Plaintiff States' DTPA claims, the UCSPA claim is analogous to an action in debt (as in *Tull*), a contract action with an "implied term," *Lebow*, 86 F.3d at 668, or a common law fraud action, even though it "is broader," *Jarkesy*, 603 U.S. at 126.  Google has proposed no historical analog to a UCSPA claim that could be brought in equity.  Plaintiff States are aware of none. Because the analogy to a legal claim is stronger than the analogy to an equitable claim, UCSPA claims are legal under the Seventh Amendment.

#### b.  Remedies at issue

For Google's violations of UCSPA, Utah seeks both injunctive relief and civil penalties. *See* FAC ¶¶758, 776(a)-(c).  Utah seeks injunctive and other equitable relief pursuant to Utah Code Ann. §13-11-17(1)(a) (authorizing declaratory judgment); Utah Code Ann. §13-11-17(1)(b) (authorizing injunctions).  There is no jury trial right for equitable relief.

Utah also seeks civil penalties pursuant to section 13-11-17(1)(d), which authorizes the Utah Attorney General to "obtain a fine in an amount determined after considering" the factors listed in section 13-11-17(6):

> (a) the seriousness, nature, circumstances, extent, and persistence of the conduct constituting the violation;
> (b) the harm to other persons resulting either directly or indirectly from the violation;
> (c) cooperation by the supplier in an inquiry or investigation conducted by the enforcing authority concerning the violation;
> (d) efforts by the supplier to prevent occurrences of the violation;

(e) efforts by the supplier to mitigate the harm caused by the violation, including a reimbursement made to a consumer injured by the act of the supplier;
(f) the history of previous violations by the supplier;
(g) the need to deter the supplier or other suppliers from committing the violation in the future; and
(h) other matters as justice may require.

These civil penalties are legal remedies for the same reasons as in *Tull* and *Jarkesy*, as well as in the analyses above for other Plaintiff States. *See* Dkt. 753 at 3–4. Specifically, any civil penalty that Utah recovers under UCSPA "shall be deposited in the Consumer Protection Education and Training Fund," Utah Code Ann. §13-11-17(4)(b), rather than distributed to any specific victims. Google agrees. *See* Dkt. 672 at 110 n.6; Dkt. 832 at 3. This demonstrates that the civil penalty is punitive and legal, not restitutionary and equitable. *See Jarkesy*, 603 U.S. at 124 (calling the civil penalty "punitive" because it need not be returned to the victims and therefore "by definition does not 'restore the status quo' and can make no pretense of being equitable.").

Furthermore, the purpose of a civil penalty under the UCSPA is to deter and punish. It is not to make victims whole—for that purpose, the UCSPA authorizes restitution and, in some cases, the appointment of a receiver to facilitate that restitution pursuant to section 13-11-17(2)(b) (authorizing orders to "reimburse consumers found to have been damaged," as well as "appointment of a master or receiver or sequestration of assets" to address any risk that the defendant will "remove, conceal, or dispose of the defendant's property"). Instead, for the determination of the civil penalty, the UCSPA specifically contemplates "the need to deter" future misconduct, as well as, relatedly, the "seriousness, nature, circumstances, extent, and persistence of the conduct constituting the violation." Utah Code Ann. §13-11-17(6).

### c. Intertwinement

The facts and issues to be decided in awarding civil penalties under the UCSPA are intertwined with the facts and issues for awarding other relief under the UCSPA. All forms of

relief under the UCSPA require a violation of the UCSPA. The jury therefore must decide whether the UCSPA has been violated, and how many times.

However, the claim for civil penalties is not incidental to or intertwined with the claim for other forms of relief in the federal-law search for an analogous 18th century claim. *Tull*'s "three flaws" all apply here, too: (1) no court in equity could award civil penalties, *Tull*, 481 U.S. at 424; (2) UCSPA seeks significant civil penalties that reflect "the seriousness, nature, circumstances, extent, and persistence of the conduct constituting the violation," Utah Code Ann. §13-11-17(6)(a); and (3) the sub-section authorizing civil penalties (§13-11-17(1)(d)) is separate from the sub-sections authorizing injunctive and other equitable relief (§13-11-17(1)(a)-(b)). Google has conceded the third point as to the UCSPA. *See* Dkt. 690 at 5 (arguing as to ten of the Plaintiff States, but not as to Utah, that the DTPA statute "permit[s] the sovereign to seek penalties only under provisions that authorize injunctive relief"); *see also id.* at 5 nn.3, 7.

A jury must decide whether Google violated the UCSPA, and if so, what the civil penalties are for those violations. If the jury finds Google liable, the Court may determine appropriate equitable relief, potentially with the benefit of an advisory jury.

### d. Penalties calculation

Utah law does not specify whether the Court or the jury decides the amount of civil penalties under the UCSPA: it simply says that the Utah Attorney General may sue to obtain a fine "in an amount determined after considering" the listed factors. Utah Code Ann. §13-11-17(1)(d). The federal default rule of a jury determination therefore controls.

## CONCLUSION

The Court should deny Google's motion.

DATED: April 4, 2025                        Respectfully submitted,

*/s/ W. Mark Lanier*                        */s/ Ashley Keller*
W. Mark Lanier                              Ashley Keller
Mark.Lanier@LanierLawFirm.com               ack@kellerpostman.com
Alex J. Brown                               Kiran N. Bhat
Alex.Brown@LanierLawFirm.com                kiran.bhat@kellerpostman.com
Zeke DeRose III                             2333 Ponce De Leon Boulevard
Zeke.Derose@LanierLawFirm.com               Suite R-240
Jonathan P. Wilkerson                       Coral Gables, Florida 33134
Jonathan.Wilkerson@LanierLawFirm.com        (833) 633-0118
10940 W. Sam Houston Pkwy N.
Suite 100                                   Zina Bash (Bar No. 24067505)
Houston, TX 77064                           zina.bash@kellerpostman.com
(713) 659-5200                              111 Congress Avenue, Suite 500
                                            Austin, TX 78701
                                            (512) 690-0990

**THE LANIER LAW FIRM, PLLC**               */s/ Noah S. Heinz*
                                            Noah S. Heinz
                                            noah.heinz@kellerpostman.com
                                            1101 Connecticut Ave., N.W., Suite 1100
                                            Washington, DC 20036
                                            (202) 918-1123
                                            **KELLER POSTMAN LLC**

*Counsel for Texas, Idaho, Louisiana (The Lanier*
*Law Firm only), Indiana, Mississippi, North*
*Dakota, South Carolina, and South Dakota*

*Submitted on behalf of all Plaintiff States*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

*/s/ Brent Webster*
Brent Webster, First Assistant Attorney General of Texas
Brent.Webster@oag.texas.gov

**STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
ATTORNEY GENERAL


By: /s/ Jeff Pickett
Jeff Pickett
Senior Assistant Attorney General, Special Litigation Section
jeff.pickett@alaska.gov

*Attorney for Plaintiff State of Alaska*

FOR PLAINTIFF STATE OF ARKANSAS:

TIM GRIFFIN
ATTORNEY GENERAL


By: _____
AMANDA J. WENTZ
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Attorney for Plaintiff State of Arkansas*

FOR PLAINTIFF STATE OF FLORIDA:

JAMES UTHMEIER, Attorney General

/s/ Lee Istrail
LEE ISTRAIL, Assistant Attorney General
FL Bar No. 119216

LIZABETH A. BRADY, Director, Antitrust Division
R. SCOTT PALMER, Special Counsel and Chief of Complex Enforcement
ANDREW BUTLER, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General


Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

FOR PLAINTIFF STATE OF IDAHO:

RAÚL R. LABRADOR
Attorney General

*/s/ John K. Olson*
John K. Olson, Deputy Attorney General

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone:  (208)  334-2424
john.olson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

*/s/ Jesse J. Moore*
Jesse J. Moore
Deputy Attorney General – Consumer Litigation
302 W. Washington St.
IGCS - 5th Floor
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: jesse.moore@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

RUSSELL COLEMAN
Attorney General

*/s/ Philip R. Heleringer*
Christian J. Lewis, Commissioner of the Office of Consumer Protection
christian.lewis@ky.gov
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
philip.heleringer@ky.gov
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
jonathan.farmer@ky.gov
Office of the Attorney General
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300

*Attorneys for Plaintiff Commonwealth of Kentucky*

FOR PLAINTIFF STATE OF LOUISIANA:

By: */s/ Patrick Voelker*
Liz Murrill, Attorney General
Michael Dupree, Assistant Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
(225) 326-6400
voelkerp@ag.louisiana.gov

*s/ James R. Dugan, II*
James R. Dugan, II (*pro hac vice*)
TerriAnne Benedetto (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:   (504) 648-0180
FX:   (504) 649-0181
EM:   jdugan@dugan-lawfirm.com
        tbenedetto@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:   (504) 833-5600
FX:   (504) 833-8080
EM:   jmw@chehardy.com

*Attorneys for Plaintiff State of Louisiana*

FOR PLAINTIFF STATE OF MISSISSIPPI:

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:    */s/ Garrett S. Mascagni*
        Garrett S. Mascagni
        Special Assistant Attorney General
        Consumer Protection Division
        Mississippi Attorney General's Office
        Post Office Box 220
        Jackson, Mississippi 39205
        Telephone: 601-359-4223
        Fax: 601-359-4231
        Garrett.Mascagni@ago.ms.gov

        *Attorney for Plaintiff State of Mississippi*

FOR PLAINTIFF STATE OF MISSOURI:

ANDREW BAILEY
Attorney General

*/s/ Michael Schwalbert*
Michael.Schwalbert@ago.mo.gov
Missouri Attorney General's
Office
815 Olive St.
Suite 200
St. Louis, MO 63101
Tel: 314-340-7888

*Attorneys for Plaintiff State of Missouri*

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Montana Attorney General


*/s/ Anna Schneider*
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894 Anna.Schneider@mt.gov


*/s/ Charles J. Cooper*
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves
hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

*Attorneys for Plaintiff State of Montana*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate


*/s/ Michelle C. Badorine*
Michelle C. Badorine, Senior Deputy
Attorney General
MNewman@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100

*Attorneys for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NORTH DAKOTA:

**STATE OF NORTH DAKOTA**
Drew H. Wrigley
Attorney General


By:    */s/ Elin S. Alm*
       Elin S. Alm, ND ID 05924
       Assistant Attorneys General
       Consumer Protection & Antitrust Division
       Office of Attorney General of North Dakota
       1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
       (701) 328-5570
       (701) 328-5568 (fax)
       ealm@nd.gov

       *Attorneys for Plaintiff State of North Dakota*

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

*/s/ Domingo Emanuelli-Hernández*
Domingo Emanuelli-
Hernández Attorney General
Thaizza Rodríguez Pagán
Assistant Attorney
General PR Bar No.
17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201, 1204
trodriguez@justicia.pr.gov

Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

*Attorneys for Plaintiff Commonwealth of Puerto Rico*

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

ALAN WILSON
Attorney General


/s/ *Mary Frances Jowers*
Mary Frances Jowers
Assistant Deputy Attorney General
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-5855
Email: mjowers@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC
880 Johnnie Dodds Blvd, Suite 1
Mount Pleasant, SC 29464
Phone: 843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
Phone: (504) 648-0180
Email: jdugan@dugan-lawfirm.com


*Attorneys for Plaintiff State of South Carolina*

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

MARTY JACKLEY
Attorney General


*/s/ Jonathan Van Patten*
Jonathan Van Patten
Assistant Attorney General
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: 605-773-3215
jonathan.vanpatten@state.sd.us

*Attorney for Plaintiff State of South Dakota*

FOR PLAINTIFF STATE OF UTAH:

Derek Brown
Attorney General of Utah


*/s/ Matthew Michaloski*
Matthew Michaloski
Assistant Attorney General
Marie W.L. Martin
Deputy Division Director
Utah Office of the Attorney General
160 East 300 South, 5th Floor
P.O. Box 140811
Salt Lake City, UT 84114
mmichaloski@agutah.gov
Telephone: (801) 440-9825

*Attorneys for Plaintiff State of Utah and*
*as counsel for the Utah Division of Consumer Protection*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 4, 2025, this document was filed electronically in compliance with

Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local

Rule CV-5(a)(3)(A).

*/s/ Ashley Keller*
Ashley Keller
