# EXHIBIT 2

# A HISTORY
# OF ENGLISH LAW

### BY

### Sir WILLIAM HOLDSWORTH

K.C., D.C.L., Hon. LL.D.

VINERIAN PROFESSOR OF ENGLISH LAW IN THE UNIVERSITY OF OXFORD; FELLOW
OF ALL SOULS COLLEGE, OXFORD; HON. FELLOW OF ST. JOHN'S COLLEGE,
OXFORD; FOREIGN ASSOCIATE OF THE ROYAL BELGIAN ACADEMY;
FELLOW OF THE BRITISH ACADEMY; BENCHER OF LINCOLN'S INN

### VOLUME XII



*To say truth, although it is not necessary for counsel to know what
the history of a point is, but to know how it now stands resolved, yet it is a
wonderful accomplishment, and, without it, a lawyer cannot be accounted
learned in the law.*
                                                    ROGER NORTH



## METHUEN & CO. LTD. LONDON

*36 Essex Street, Strand, W.C. 2*

Case 4:20-cv-00957-SDJ     Document 835-2     Filed 04/04/25     Page 3 of 47 PageID #: 60423

said by Lord Lyndhurst to be "a perfect master of the philosophy of law,"[1] set out to produce an edition of Ballow's treatise accompanied by the authorities which Ballow had omitted to cite.   But the period between 1737 when Ballow's book appeared and 1793 when the first edition of Fonblanque's book appeared, was a period during which the principles and rules of equity were rapidly developing into a fixed and systematic form. Fonblanque, therefore, soon found that he must do more than merely supply authorities and references.   He found himself bound both to add to his author's text and to correct it :

In some instances, what the Author had stated as a principle, the Editor found, with reference to more modern decisions, scarcely sustainable as a general rule ; and in other cases he found, that what the Author had stated as a mere precedent, had, from its frequent adoption, become the doctrine of the Court.[2]

It was unfortunate that Fonblanque did not adopt the plan which first suggested itself to his mind, and recast Ballow's book.   Out of respect for Ballow he rejected this plan, retained Ballow's text, and added a commentary which in length and elaboration very considerably exceeded in bulk the text commented on.   The form of a book constructed on these lines was, as Fonblanque admitted, inconvenient.   But the commentary was learned and accurate ; there was no other up-to-date text-book on equity ; and so it is not surprising that it reached a fifth edition in 1820.[3]

This account of the literature of equity shows us that, as compared with the literature of the common law,[4] and even as compared with the literature of those parts of English law which fell within the sphere of the civilian's practice,[5] it was meagre. By far the most important part of the literature of equity is contained in the reports ;  and this shows us that it was the Chancellors and the Masters of the Rolls who were the creators of modern equity, even more exclusively than the judges of the common law courts were the creators of the common law. Of the work of these Chancellors and Masters of the Rolls down to the accession of Lord Hardwicke I must now speak.

### The Chancellors and Masters of the Rolls (1700-1737)

The list of Lord Chancellors or Lord Keepers, Masters of the Rolls, and Commissioners who were appointed during a vacancy

---

[1] D.N.B.                                         [2] Preface to the 2nd ed.
[3] The dates of the publication of these five editions are 1793, 1799, 1805, 1812, and 1820.
[4] Below 331-431.                         [5] Below 606-646.

of the office of Chancellor, will be found at the foot of this page.[1] In this section I shall say something of the careers of the Chancellors and Masters of the Rolls, and of the contributions which they made to equitable doctrines.

I have already given some account of Lord Keeper Wright.[2] We have seen that he was not a strong judge, and that during his tenure of office business got into arrear. On the other hand it is fair to him to remember that many of the principles and rules of equity were still nebulous, and that some of his decisions did contribute to their settlement. Thus in the case of *Hopton v. Dryden* [3] he gave a decision as to the executor's right of retainer which has been followed in modern times.[4] In the case of *Ward v. Lant* [5] he gave effect to the principle that if a contract or a conveyance has been made for an illegal purpose, the person bound can set it aside, if nothing has been done in fulfilment of that purpose—a principle recognized by Lord Hardwicke, who regarded this decision of Wright's as a material authority.[6] In *Lord Cornwallis's Case* [7] he asserted the principle that, if a general power is actually exercised, the property appointed is assets for the payment of the appointor's debts. He was sometimes assisted by the judges ; [8] and it is said that only one of his decisions was reversed by the House of Lords.[9] In fact, he was a sound common lawyer, and did his best to make himself a competent equity lawyer. He was not wholly unsuccessful. But though some of his decisions helped to settle important principles of equity, there is no doubt that he was the weakest of all the Lord Chancellors and Keepers of

---

[1]

| Chancellors or Keepers | Masters of the Rolls |
|---|---|
| Wright 1700-1705. | Trevor 1693-1717. |
| Cowper 1705-1710. | Jekyll 1717-1738. |
| Trevor ⎫ | |
| Tracy ⎬ Commissioners 1710. | |
| Scrope ⎭ | For the Masters of the |
| Harcourt 1710-1714. | Rolls during Hard- |
| Cowper 1714-1718. | wicke's Chancellorship |
| Tracey ⎫ | see below 245-246. |
| Pratt ⎬ Commissioners 1718. | |
| Montague ⎭ | |
| Macclesfield 1718-1725. | |
| Jekyll ⎫ | |
| Gilbert ⎬ Commissioners 1725. | |
| Raymond ⎭ | |
| King 1725-1733. | |
| Talbot 1733-1737. | |

[2] Vol. vi 538.
[4] *Re* Compton (1885) 30 C.D. at p. 22.
[5] (1701) Prec. Ch. 182 ; below 549.
[6] Birch v. Blagrave (1755) Ambler at p. 266.
[8] See e.g. Needham v. Smith (1704) 2 Vern. 463.
[9] Campbell, Chancellors iv 245 ; Earl of Huntingdon v. Countess of Huntingdon (1702) 2 Vern. 437.
[8] (1701) Prec. Ch. 179.
[7] (1704) 2 Free. 279.

this period, and that his contribution to the foundation of equitable doctrine is far more slight than theirs.

In 1705 Wright was succeeded by William Cowper who, first as Lord Keeper and then as Lord Chancellor, held the Great Seal from that date till 1710, and again from 1714 to 1718.[1]

William Cowper, the son of Sir William Cowper, is said to have been born at Hertford Castle in 1664.[2]  On March 8, 1681-1682, he became a member of the Middle Temple.  He was called to the bar May 25, 1688.  His father had been a Whig politician, and the son followed his father's political creed. When William of Orange landed on November 5, 1688, he set out with a small band of volunteers, and joined the Prince at Wallingford.[3]  He soon acquired a good practice on the Home circuit, and also at Westminster, where he practised both in the common law courts and in the court of Chancery.  In 1694 he became King's counsel, and was appointed recorder of Colchester.  In 1695 he and his father were elected members for Hertford.  In Parliament he soon got the reputation of being one of the best speakers in the House.  He assisted in the prosecution of the persons implicated in the assassination plot in 1695-1696, and spoke in favour of the attainder of Sir John Fenwick.  His skill as an advocate and as an orator was so great that the House of Lords, on the trial of Lord Mohun, asked that he should sum up the evidence instead of Hawles the solicitor-general.[4]  By this time he had become one of the leaders of the Whig party ; and, when the Cowper family lost its influence at Hertford, owing to the unfounded charge made against his brother Spencer Cowper of having murdered the quakeress Sarah Stout,[5] a seat was found for him at Beeralston. In 1704 he presented to the House of Commons a sound but unsuccessful argument in favour of the decision of the House of Lords in the case of *Ashby v. White ;* and his defence of Lord Halifax, who was prosecuted by order of the House of Commons for failure to comply with his statutory duties as auditor of the exchequer, brought upon him the censure of a House in which the Tories were in the majority.

But the tide was turning in favour of the Whigs who supported the war, and their strength in the House of Commons

[1] D.N.B. ; Foss, Judges viii 18-28 ; Campbell, Lives of the Chancellors iv 257-420.

[2] Campbell, op. cit. iv 259, states this as a fact ; but in the D.N.B. it is said that the place and date of his birth are unknown.

[3] See Campbell, op. cit. iv 264-265, for an extract from his journal of this campaign which he sent to his wife.

[4] Foss, Judges viii 20.

[5] For an account of this episode see Campbell, op. cit. iv 275-282 ; see also 13 S.T. 1190 ; and for the subsequent appeal of murder brought by the relations of Sarah Stout see 12 Mod. 372.

was increased after the general election of 1705. Cowper had become the leader of that party ; a change in the Chancellorship was needed ; and, since existing law officers were unequal to the post, the duchess of Marlborough and Godolphin persuaded Anne to entrust the Great Seal to Cowper. He was made Lord Keeper, October 11, 1705. On November 9, 1706, he was raised to the peerage, and, after the passing of the Act of Union with Scotland on May 4, 1707, he was made the first Lord Chancellor of Great Britain—an honour he well deserved since, as one of the commissioners for the union with Scotland, he had taken a leading part in negotiating the treaty for the Union. As a leader of the Whig party he showed wise statesmanship when he resisted the attempt of Marlborough to obtain the office of commander-in-chief for life, and when he resisted the proposal to impeach Sacheverell. But his party resolved to take the suicidal step of impeaching Sacheverell, and so Cowper presided at the trial and voted for his condemnation. On the defeat of the Whigs which followed, Cowper resigned with the rest of his colleagues, in spite of Harley's efforts to induce him to remain in office.[1] For the rest of the reign he was in opposition. He took a prominent part in opposing some of the clauses of the treaty of Utrecht, and later the Schism Act.[2] On the death of Anne he regained office. He was one of the Lords Justices nominated by George I under the Regency Act ; and, on the arrival of George I, he was again made Lord Chancellor. He materially helped his party by his memorandum to the King entitled " An Impartial History of Parties," which was a clever statement of the Whig case, from which the moral was drawn that the only safe course for the new dynasty to pursue was to make the Whig party predominant, by giving to it its sole confidence.[3]

George I followed Cowper's advice. In fact, in the first years of the reign, he was the King's chief adviser. He supported the impeachments of the late Queen's ministers ; and he advised the measures which were taken to suppress speedily the rebellion of 1715.[4] He presided with dignity and impartiality at the trial of the rebel lords, and at Oxford's impeachment. He supported the Riot Act,[5] and the Septennial Act.[6] The former Act gave the government a much-needed power to deal with disorderly assemblies,[7] and the latter added greatly to its stability.[8] In 1718 he supported the Mutiny Act which

[1] Campbell, op. cit. iv 324-328.    [2] 12 Anne St. 2 c. 7 ; vol. x 47, 50.
[3] Printed by Lord Campbell, op. cit. iv 421-429 ; vol. x 51-52 ; Lady Cowper translated this document into French, and the translation was submitted by Bernstorff to the King, Campbell, op. cit. iv 348.
[4] See his letter to the King, ibid 355-357.    [5] 1 George I St. 2 c. 5.
[6] Ibid c. 38.    [7] Vol. viii 328-329 ; vol. x 63.    [8] Vol. x 63-64.

established a standing army of sixteen thousand men [1]—a measure which was necessary as a protection not only against foreign enemies, but also, on account of the defective state of the police, against internal disorder.[2] Cowper resigned in 1718. His resignation was probably due partly to the disputes between the King and his son, in which Cowper was thought to have been too partial to the son—his wife held a post in the Princess of Wales' household and he opposed a bill which would have made the Prince financially dependent on the King; [3] and partly to the intrigues of his colleagues. He lived till 1723, and during that time he showed his statesmanlike qualities by the part which he took in the debates in the House of Lords. It is true he showed less tolerance than some of his fellow Whigs when he opposed the repeal of the Test and Corporation Acts, which imposed disabilities on the Protestant dissenters and Roman Catholics. But he voted for the repeal of the Schism Act; [4] and he opposed Walpole's bill for raising additional revenue by taxing the estates of Roman Catholics and nonjurors.[5] He opposed the peerage bill; [6] and he opposed the bill enabling the South Sea Company to increase its capital, which gave the opportunity for the orgy of speculation and dishonesty usually known as the South Sea Bubble.[7] On the question of the bill of pains and penalties against Atterbury, he took the opposite view to that which he had taken on the bill for Fenwick's attainder, and urged the government either to impeach him or to take ordinary criminal proceedings.[8] He died October 10, 1723.

There can be no doubt as to Cowper's ability as a Whig statesman. He served his party well; and it would have been better if they had allowed themselves to be guided more often by his advice. He was an eloquent and persuasive speaker; and both as a statesman and as a judge he was strictly honourable. At a time when party strife ran high, he gave impartial and conscientious advice as to appointments to the benches of the common law courts [9] and to the benches of the justices of the peace.[10] His enemies tried to fasten upon him the imputation of immorality; but whatever cause he may have given

[1] 5 George I c. 5.         [2] Vol. x 144.
[3] For Cowper's Latin letter of advice to the King on this matter see Campbell, op. cit. iv 387-389.
[4] 5 George I c. 4.         [5] Campbell, op. cit. iv 404-405.
[6] Vol. x 65-66.         [7] Vol. viii 212-213; vol. x 66-67.
[8] For his speech in Fenwick's case see Campbell, op. cit. iv 272-274; for his speech in Atterbury's case see ibid iv 402-404.
[9] The advice which he gave to George I is printed by ibid 349 *note ;* the only recommendation which was coloured by political reasons was the recommendation not to reappoint Lord Trevor C.J.
[10] See his letter to the King on this subject defending himself against the charge of using his powers to appoint justices improperly, ibid iv 373-377.

for this imputation in his youth,[1] he gave none after his marriage. He was married twice, and both marriages were happy.

As a judge of the court of Chancery he won universal approval. He abolished the pernicious custom of receiving new year's gifts from the bar and the officials of his court [2]—a course which the chiefs of the common law courts much disliked and refused to follow.[3] He did not, it is true, abandon the almost equally pernicious practice of taking money for the sale of offices in his court.[4] But that was a practice which was pursued both in the Chancery and the common law courts ; [5] and, if the manner in which Macclesfield exploited it had not secured its abolition,[6] it might have lasted in the court of Chancery as long as it lasted in the courts of common law.

Since Cowper had had a practice both in the common law courts and in the court of Chancery, he was well versed in the law and practice of his court ; and he had acquired some definite and historically correct, though somewhat conservative, views as to the relations between law and equity. He was unwilling to allow equity to interfere unduly with the general principles of the common law ; [7] and his decision not to grant an injunction to prevent a plaintiff, who had brought five unsuccessful actions of ejectment from bringing further actions, because at common law a plaintiff could bring as many actions of ejectment as he pleased, was reversed by the House of Lords.[8] He was occasionally also a little too conservative in refusing to admit necessary and logical developments of equitable principle. His decision that property could not be given to the separate use of a married woman, unless it was given to a trustee

---

[1] Nothing is proved against him ; and the whole story of his youthful immorality may well be merely a reflection of the absurd charges made by Swift and Mrs. Manley, see D.N.B. ; Swift insinuated in the *Examiner* (nos. 17 and 22) that he was guilty of bigamy ; this " was retailed as a matter of common notoriety by Voltaire, with the substantial addition that Cowper was the author of a treatise in favour of polygamy," ibid.

[2] Campbell, op. cit. iv 296-299 ; the second Lady Cowper related in her diary (cited ibid iv 299-300) how " the Earl of Nottingham, when Chancellor, used to receive these gifts standing by a table, and at the same time he took the money to lay it upon the table, he used to cry out, ' Oh Tyrant Cuthtom (for he lisped) My Lord forbid the bringing them.' "

[3] Ibid iv 300 *note ;* D.N.B

[4] It appears from the evidence given on Macclesfield's impeachment that he received £ 500 for a mastership in Chancery, Foss, Judges, viii 22 ; below 205-206.

[5] Vol. i 259 and App. XXX, 422 n. 5, 425, 439.

[6] Ibid 440 ; below 206.

[7] " The Court of Chancery cannot controul the maxims of the common law because of general inconveniences," Earl of Bath v. Sherwin (1710) 10 Mod. at p. 1 ; below 209, 234.

[8] Vol. vii 17 ; 4 Bro. P.C. 373 ; Cowper said, " it is a known maxim of the common law, that a man may try his title as often as he pleases in an ejectment. Now for this court to determine that one, two, three, or more unsuccessful trials by ejectment shall be peremptory, *quid aliud* than to assume a legislative power, and alter the maxims of the common law ? "

for her, was not followed.[1]  Another of his decisions on the question whether a gift to an executor rebuts the presumption that he is entitled to the undisposed of surplus, was reversed by the House of Lords, which put a different construction on the will ;[2] but it is arguable that Cowper's construction and therefore his decision were the sounder.  In one of his decisions, which was reversed by his successor, he neglected to observe the distinction, which in another case he had stated quite clearly,[3] between the construction of an executory trust created by marriage articles, where the intent of the parties is obvious, and an executory trust created by will, where it is not obvious.[4]  But in very many cases he showed much ability in his analysis of complicated facts, in his statement of the legal difficulties to which these facts gave rise, and in his application of the correct principles to the solution of those difficulties. His decisions in these cases are a very considerable contribution to the formation of the doctrines of equity.  Let us look at one or two instances.

The case of *Humberston v. Humberston* introduced a rule which is sometimes known as the " cyprès " doctrine.[5]  It was a case of a devise to trustees on trust to convey land to the male issue of Mathew Humberston for an indefinite succession of life estates.  It is obvious that this trust offended against the rule that all attempts to create a perpetual freehold were invalid because they created a perpetuity.[6]  But it was an executory trust ; and therefore Cowper did what he could to carry out the testator's intention by giving life estates to the sons in being, and estates tail to their unborn sons.[7]  This doctrine was later adopted by the courts of law and extended to direct devises of land ; but only under the strict conditions laid down in the case of *Monypenny v. Dering* [8]—conditions which do not apply where

---

[1] Harvey v. Harvey (1710) 1 P. Wms. 125 ; below 231, 275.
[2] Lady Granville v. Duchess of Beaufort (1709) 1 P. Wms. 114 ;  3 Bro. P.C. 37—as the note to Peere Williams' report says, " the case made to the House of Lords by the appellant considers the devise of the use of the plate to the executrix for life as an *exception* out of the general gift of it to the son, and therefore not such a legacy as should exclude her from the residue " ;  but it appears also that some of the Lords thought that this exclusion could operate if the executor were guilty of fraud—a view which the later cases have negatived, below 209, 212, 279.
[3] Sweetapple v. Bindon (1705) 2 Vern. 536.
[4] Baile v. Coleman (1711) 2 Vern. 670, 1 P. Wms. 142.
[5] (1716) 1 P. Wms. 332 ;  vol. vii 211 ;  Williams, Real Property (22nd ed.) 421-422.
[6] Vol. vii 209-210.
[7] " Tho' an attempt to make a perpetuity for several lives be vain, yet so far as is consistent with the rules of law, it ought to be complied with ; and therefore let all the sons of these several Humberstons that are already born, take estates for their lives ; but where the limitation is to the first son unborn, then the limitation to such unborn son shall be in tail male," 1 P. Wms. at p. 333.
[8] (1847) 16 M. & W. 418 ;  (1852) 2 D.G.M. & G. 145.

the doctrine is applied, not to a direct devise, but to an executory trust.[1]   In the case of *Watts v. Ball* Cowper laid down the principle that, as equitable estates ought to be governed by the same rules as legal estates, the husband was entitled to curtesy out of an equitable estate.[2]   We have seen that this reasoning was not applied to give the wife dower ;[3] but in the case of *Burridge v. Bradyl* Cowper held that a legacy given to a wife in consideration of a release by her of her claim to dower, was payable before other legacies.[4]   Other decisions helped to establish the rule that, if a father purchases land in his son's name, there is a presumption against a resulting trust for the father, and in favour of an advancement for the son ;[5] the rule as to the power of the court to set aside catching bargains with remainder men ;[6] the rule as to reconversion, if persons entitled under a trust for conversion become absolutely entitled ;[7] the rule that a portion debt to a wife is satisfied by the receipt by her of a share of her husband's estate, on his death intestate, which is of equal or greater value.[8]   In the case of *Bucknal v. Roiston*[9] Cowper recognized the proprietary character of the right of the c.q. trust, and therefore gave him a right to follow the trust property, and assert his claim to it in preference to the claims of the trustees' other creditors.   In the case of *Squib v. Wyn* he recognized the husband's right to take on his wife's death her choses in action ;[10] and in the case of *Onions v. Tyrer* he established a doctrine concerning the revocation of wills, which is sometimes known as the doctrine of dependent relative revocation.[11]

These few instances show that Cowper made considerable contributions to the formation of our modern system of equity, and that his reputation as a very able Chancellor and a learned lawyer is justified.   That reputation is vouched for not only by opinions expressed by many different writers,[12] but also by

---

[1] See *re* Richardson [1904] 1 Ch. at p. 344, *per* Buckley J. ; *re* Mortimer [1905] 2 Ch. at p. 512, *per* Vaughan Williams L.J.
[2] (1708) 1 P. Wms. 108.                         [3] Vol. iii 196-197.
[4] (1710) 1 P. Wms. 127.
[5] Lamplugh v. Lamplugh (1709) 1 P. Wms. 111.
[6] Twisleton v. Griffith (1716) 1 P. Wms. 310 ; below 235, 274-275.
[7] Seeley v. Jago (1717) 1 P. Wms. 389—"equity," he said, " like nature will do nothing in vain."
[8] Blandy v. Widmore (1716) 1 P. Wms. 324 ; below 269.
[9] (1709) Prec. Ch. 285 ; below 273.
[10] (1717) 1 P. Wms. 378.
[11] (1716) 1 P. Wms. 343 ; the principle, as stated by Hannen J. in the case of Dancer v. Crabb (1873) 3 P. & D. at pp. 104-105 is this : " if the testator's act can be interpreted thus : ' Whatever else I may do, I intend to cancel this as my will from this time forth,' the will is revoked ; but if his meaning is, ' As I have made a fresh will my old one may now be destroyed,' the old will is not revoked if the new one be not in fact made."
[12] See Campbell, op. cit. iv 415-419 for some of these appreciations.

Harley's anxiety to retain him as Chancellor after the defeat of the Whigs,[1] and by his successor's testimony to his abilities.[2]

Cowper's successor in 1710 was Sir Simon Harcourt.[3] Harcourt's family had come to England with William the Conqueror, and, from the twelfth century, had resided at Stanton Harcourt in Oxfordshire. Simon, the son of Sir Philip Harcourt, was born in 1660 or 1661. He was educated at a private school at Shilton near Burford kept by a Mr. Birch, and Robert Harley, the future Lord Treasurer and earl of Oxford, and Trevor, the future Chief Justice of the Common Pleas, were his school fellows.[4] From there he went to Pembroke College, Oxford, and took his B.A. degree in 1678. He was called to the bar by the Inner Temple, November 25, 1683. He succeeded to the family estates (which were in an embarrassed condition) in 1688; and in 1690 he was elected a member of Parliament in the Tory interest for the borough of Abingdon, of which town he had been the recorder since 1683. He soon made his influence felt in the House of Commons. He made a powerful speech in opposition to the bill attainting Fenwick, and he was the principal manager of the impeachment of Somers. His services to his party were rewarded by his appointment to the office of solicitor-general in 1702. He supported the occasional conformity bill in 1703, and took the side of the House of Commons in the disputes which arose out of the case of *Ashby v. White*. He was one of the commissioners for the union with Scotland; and we have seen that it was his skill in drafting the Act which ensured its easy passage through Parliament.[5] Harcourt became attorney-general in 1707; but, on Harley's dismissal in 1708, he resigned his office. In the new Parliament of 1708 he was again returned for Abingdon, but was unseated on petition. He was shortly afterwards returned for Cardigan; but, during the short time that he was without a seat, he was able to appear for Sacheverell, and to make on his behalf one of the best speeches he ever made in the whole course of his career.

On the defeat of the Whigs, and on the failure of Harley's attempt to induce Cowper to remain in office,[6] or to induce Parker, the Chief Justice of the King's Bench, to accept the Great Seal,[7] he was made Lord Keeper, October 19, 1710. As Lord Keeper he took a prominent part in the negotiations for the treaty of Utrecht. In 1711 he was raised to the peerage,

[1] Above 196.
[2] In the case of Bale v. Coleman (1711) 2 Eq. Cas. Ab. at p. 311 Harcourt L.K., though he reversed his decision, testified his " great respect for his predecessor."
[3] D.N.B.; Foss, Judges viii 33·41; Campbell, Lives of the Chancellors iv 430·500.
[4] D.N.B.    [5] Vol. x 41.    [6] Above 196.    [7] Below 204.

and on April 7, 1713, he was made Lord Chancellor. On the death of Queen Anne he was reappointed Lord Chancellor by the Lords Justices; but on September 21, 1714, he was dismissed by the King. At the beginning of the new reign Harcourt played the part of a consistent but prudent Tory. In conjunction with Walpole, he helped to defeat the impeachment of Oxford, and helped to get a qualified pardon for Bolingbroke. At the end of his life he very wisely made his peace with the government.[1] He was created a viscount in 1721, in 1722 he was readmitted to the Privy Council, and he acted as one of the Lords Justices during the King's absences from England in 1723, 1725, and 1727. He died in 1727.

Harcourt was an able statesman and a competent lawyer, but he cannot be called either a great statesman or a great lawyer. As a statesman he was an able champion of a losing cause; but he was sufficiently prudent to avoid impeachment when his opponents came into power; and, at the end of his career, he was sufficiently wise to see that the cause which he had championed in his youth was hopeless. As a lawyer he was competent, and as an orator and an advocate he was sometimes brilliant. When, as in his defence of Sacheverell, he got a chance to state and justify his political creed, he won praise from audiences who had listened to Bolingbroke. His speech on this occasion, wrote a contemporary, "was universally applauded by enemies as well as friends, and his reputation as a speaker is fixed for ever."[2] He was the friend and patron of many of the best-known literary men of the day. Pope finished the fifth volume of his translation of Homer in Harcourt's home at Stanton-Harcourt, and he wrote a dedicatory poem for an edition of Pope's works.[3]

As Lord Chancellor he left no deep mark on the history of equity. His best-known decision, which was affirmed by the House of Lords, was his decision in the case of *Pye v. Gorge*,[4] that trustees to preserve contingent remainders, who join in their destruction, are guilty of a breach of trust—a rule, he said, "so very plain and reasonable that if there was no precedent in this case, he would make one." The case of *Brown*

[1] As Campbell, op. cit. iv 489, points out, Harcourt's conduct throughout was honourable; on the one hand, "he never betrayed any confidence that had been reposed in him, and he was always pleased to do a good turn for an old Jacobite friend"; on the other hand, "notwithstanding strong solicitations and temptations, he ever after remained true to the new engagements into which he had entered "— thus he refused to have anything to do with Atterbury's plot "though united to the bishop by the closest ties of private friendship."
[2] D.N.B., citing Smalridge's account of the trial; Speaker Onslow in his note to Burnet, History of My Own Time v 441 (cited D.N.B.), said that Harcourt "had the greatest skill and power of speech of any man I ever knew in a public assembly."
[3] Printed by Campbell, op. cit. iv 485.
[4] (1710) 1 P. Wms. 128; 7 Bro. P.C. 221; below 212.

*v. Litton* [1] helped to elucidate the law as to constructive trusts ; and we have seen that, in the case of *Bale v. Coleman*, he corrected a misapplication made by his predecessor of the rules of interpretation to be applied to an executory trust.[2] Other decisions contain useful applications of the doctrines of satisfaction,[3] conversion,[4] and the marshalling of assets.[5] In the case of *Car v. Countess of Burlington* [6] he laid down the principle that specialty and simple contract debts are payable *pari passu* out of equitable assets. In the case of *Broderick v. Broderick* [7] he gave relief against a devisee under a will defectively executed, who, by representing it to have been properly executed, had got a release from the heir for a small payment ; and in the case of *Jenner v. Harper* [8] he held that a devise to a charity by a nuncupative will was, since the passing of the Statute of Frauds, not valid as an appointment under the Act of Elizabeth, which had made these appointments to charities valid.[9] One of his decisions is an important authority as to the liability of co-executors and co-trustees, who had joined in a receipt for money, when the money had been in fact received by one of them and not by the other.[10] In the case of *Tucker v. Wilson* [11] the House of Lords reversed one of his decisions, and established the important principle that a mortgagee of stock has an implied power of sale, and need not take proceedings for foreclosure.[12] Lastly, in *Dones' Case* [13] he laid down the rule that, since Scotland was out of the jurisdiction of the court, a writ of *ne exeat regno* lies, notwithstanding the Act of Union, to prevent a defendant going thither. These decisions make a contribution, but no great contribution, to equitable doctrine. Lord Brougham came to a just conclusion as to Harcourt's position in the history of equity when he said : [14] "Lord Keeper Harcourt, though a respectable lawyer, is certainly not to be ranked with the Parkers, the Finches, and the Hardwickes."

Of Finch, Lord Nottingham, "the father of modern equity," I have already spoken,[15] and of Hardwicke I shall speak later in this chapter.[16] At this point I must say something of Parker, Lord Macclesfield, who succeeded Cowper in 1718.

[1] (1711) 1 P. Wms. 140 ; below 272.
[2] (1711) 1 P. Wms. 142 ; above 201 n. 2.
[3] Copley v. Copley (1711) 1 P. Wms. 147 ; below 269.
[4] Lingen v. Sowray (1711) 1 P. Wms. 172 ; below 270, 324.
[5] Herne v. Meyrick (1712) 1 P. Wms. 201 ; below 280.
[6] (1713) 1 P. Wms. 228.        [7] Ibid 239.        [8] (1714) 1 P. Wms. 247.
[9] 43 Elizabeth c. 4 ; vol. vii 398-399 ; 1 P. Wms. at p. 249 ; below 271.
[10] Churchill v. Hobson (1713) 1 P. Wms. 241 ; below 273.
[11] (1714) 1 P. Wms. 261 ; 5 Bro. P.C. 193.
[12] See Dverges v. Sandeman Clark and Co. [1902] 1 Ch. at p. 589, *per* Vaughan-Williams L.J.
[13] (1714) 1 P. Wms. 263 ; cp. Hunter v. Maccray (1736) Cas. t. Talbot 196.
[14] Jones v. Scott (1830) 1 Russ. and M. at p. 269.
[15] Vol. vi 539-548.        [16] Below 237 seqq.

Thomas Parker,[1] Lord Macclesfield, was the son of an attorney at Leek in Staffordshire.  He was born July 23, 1666, became a student of the Inner Temple, February 14, 1684, and was called to the bar May 24, 1691.[2]  He was a pensioner of Trinity College, Cambridge, but left the university without taking a degree.  His first important case was *R. v. Tutchin*,[3] in which he appeared for the defendant, who was prosecuted for libel.  Tutchin was found guilty.  But judgment was arrested on account of an irregularity in the process for summoning the jury ; and to this result Parker contributed by an able argument.[4] In 1705 he was elected a member of Parliament for Derby in the Whig interest, became one of the Queen's serjeants, and was knighted.  He distinguished himself as one of the managers of Sacheverell's impeachment in 1710, and immediately afterwards, March 13, 1710, he was appointed to succeed Holt as Chief Justice of the King's Bench.  He very wisely refused the Great Seal in 1711.  On the death of the Queen he acted as one of the Lords Justices till the arrival of George I.  He soon became a favourite of the King, who raised him to the peerage in 1716, and granted him a pension of £1,200 a year.  He took the title of baron Parker of Macclesfield, and in 1721 he was raised to the dignity of an earl.  He consolidated his position at court, and earned the enmity of the Prince of Wales, by the opinion which he and the majority of the judges gave in 1718 that the King could control the education and marriages of his grandchildren.[5]  On May 12, 1718, he was created Lord Chancellor, and the King, on that occasion, gave him a present of £14,000 and a pension of £1,200 a year to his son till he became a teller in the Exchequer.  He held the office of Lord Chancellor till his resignation in 1725, and, as we shall see, his judgments make a considerable contribution to the formation of our modern system of equity.

Parker resigned on account of the scandals arising out of the use made by the Masters in Chancery of the suitors' money, and out of the sale of the office of Master.[6]  In November, 1724, a committee of the Privy Council had been appointed to enquire into the manner in which the Masters had dealt with this money.  It was in the hands of the Masters who, during the time that it was in court, enjoyed the interest upon it—a practice which

---

[1] D.N.B.;  Foss, Judges viii 44-52 ;  Campbell, Lives of the Chancellors iv. 501-566.
[2] Campbell, ibid 502-504, emphasizes unduly the humility of his birth, and supposes, without warrant, that he was articled to his father and practised for some years as an attorney at Derby, see Foss, op. cit. viii 45-46, and D.N.B.
[3] (1704) 14 S.T. 1095.                    [4] Ibid at pp. 1173-1176.
[5] 15 S.T. 1195 seqq.;  Parker's opinion is printed at pp. 1222-1223 ; see vol. x 446.
[6] See vol. i 439-440.

then and later prevailed in other government departments.[1] But it appeared from the report of the committeee that the Masters were not content with this interest. They had speculated with the money, with the result that it had been lost; and it further appeared that there was reason to think that the Lord Chancellor was cognizant of, if not actually implicated in, some of these transactions. At the same time a petition had been presented to the House of Commons by the earl of Oxford and Lord Morpeth, complaining that money in court belonging to the estate of the dowager duchess of Montrose, a lunatic in their charge, had not been accounted for. Early in the following year the results of the investigations of the committee of the Privy Council were laid before the House of Commons, which resolved to impeach the Lord Chancellor.[2]

He was charged with taking sums of money for permission to sell the office of Master;[3] with selling vacant Masterships and other offices in his court;[4] with screening the offences of Masters who were in default;[5] with admitting unfit persons to the office of Master;[6] with conniving at the practice that the incoming Master, who had purchased the office, paid the price out of the suitors' money in the hands of the Master from whom he had bought it;[7] with concealing the delinquencies of Dormer, a Master who had absconded leaving a sum of about £25,000 owing to the suitors;[8] with omitting to take any precautions against the fraud or insolvency of the Masters;[9] with borrowing from the Masters some of the suitors' money;[10] and with illegally appointing as guardian of an infant's estate "a creature of his own," who embezzled a large part of the rents and profits thereof.[11] Parker made a very able defence.[12] It was quite clear that he had only followed the example of his predecessors in selling the office of Master; and, as we have seen, saleable offices in the courts of law existed down to the beginning of the

---

[1] Vol. x 507.

[2] The proceedings on the impeachment are printed in 16 S.T. 767-1402; the twenty-one articles of the impeachment are printed ibid at pp. 767-784.

[3] Arts. 1, 3, 4, 5, 6, 9.                [4] Arts. 2, 7, 8, 10.

[5] Arts. 18, 19.                [6] Art. 11.

[7] "That the prices or sums of money agreed to be paid for the purchase of the said offices, and for the admissions thereinto, were satisfied and paid out of the monies and effects of the suitors of the Court deposited in the hands of the respective Masters, surrendering their offices or dying, either by way of retainer of the purchase money in the hands of the Master resigning, or of replacing the money disbursed for such purchase or admission by the succeeding Master, out of the money and effects of the suitors coming into his hands; by which practice the price and value given upon the sale of the said offices . . . were greatly advanced," Art. 12.

[8] Arts. 13, 14, 15, 16, 17.         [9] Art. 18.         [10] Art. 20.

[11] Art. 21; no evidence was offered in support of Arts. 20 and 21, 16 S.T. at p. 1328.

[12] Ibid 1265-1330.

nineteenth century.[1]  Foss has pointed out that the fact that a clause in a bill, which, at the time of the Revolution, proposed to prohibit the sale of a Master's office, was negatived by the Lords, shows that the practice was "in some sort recognized by the Legislature "; [2] and he points out that the fact that

the price paid by the Masters for their places was considered a legitimate part of the profits of the Chancellor, received a curious confirmation in the grant to Lord Macclesfield's immediate successor, Lord King, of a considerable addition to his salary, as a compensation for the loss occasioned by the annihilation of the practice consequent upon this investigation.[3]

On the other hand, it is clear that Parker had considerably raised the price of vacant Masterships, and the fee payable on the purchase and sale of a Master's place.  It was impossible to suppose that he was ignorant of the reason why candidates for vacant Masterships were willing to give higher prices, and why he was able to exact higher commissions on the purchase and sale of a Master's place.  It was impossible to deny that he had tried to screen Dormer, the absconding Master, and to prevent any inquiry into the existing system of dealing with the suitors' money.  Therefore I think that there is no doubt that he was justly condemned.  There is still less doubt that his impeachment and condemnation had the most salutary effects.  We have seen that it stopped the sale of Masterships, and that the Legislature took steps adequately to safeguard the suitors' money.[4]

Parker was condemned to pay a fine of £30,000, which was applied to meet the liabilities of the Masters, and to be imprisoned till it was paid.  George I stood his friend to the last—promising to pay his fine out of the privy purse.  He gave him £1,000 ; but died before any further sum was paid ; and Parker could expect nothing from George II whose enmity he had earned by his opinion in favour of George I's right to control the education and marriages of his grandchildren.  The fine was paid within six weeks, and for the remainder of his life Parker lived in retirement.  He died in 1732.

Parker had many amiable traits in his character.  He was a friend of poor scholars and gave largely in charity ; [5] and he was the patron of learned men.[6]  He was conscious of the fact that many branches of the law stood in need of reform ; and at

---

[1] Vol. i 259 and App. XXX.     [2] Judges viii 51.
[3] Ibid 52.     [4] Vol. i 440.     [5] See 16 S.T. at p. 1118.
[6] See D.N.B. xliii 281-282, citing the evidence of Warburton, Young, and Zachary Pearce ; he helped William Jones, the father of the famous orientalist and scholar, vol. xi 220-221, and Phelps the astronomer ; this refutes Campbell's statement, op. cit. iv 561, that he was indifferent to literature and literary men.

some period between 1721 and 1724 he addressed a letter to the Chief Justice of the King's Bench, urging him to consult with his brethren, and to make suggestions for the amending of old and the enactment of new laws.[1] Unfortunately, he not only allowed his moral sense to be blinded by the vicious system of trafficking in offices which prevailed in the courts and in the government offices, but he exploited that system to the utmost —employing his secretary as agent to get the utmost price,[2] and not considering the dangers which were involved in that exploitation at a time when the mania for speculation had seized all classes. And, when the crash came, he not only made no proposals for the reform of this system, but tried to bolster it up, and to prevent a thorough enquiry. But, whatever judgment we pass on him as a man, there is no doubt that he was a great Chief Justice and a great Chancellor. It is said, indeed, that his fall was not regretted by many members of the bar to whom he had not been over-courteous,[3] and that he showed undue favour to Philip Yorke, the future Lord Hardwicke.[4] But these are very minor failings. As we shall now see, the reports of his decisions show that he was both a great common lawyer and a great equity lawyer.

Two of the most famous cases in which he was concerned as Chief Justice of the King's Bench, were the trial of Dammaree and Purchase,[5] who had raised a riot to destroy all meeting-houses, for the treason of levying war against the King; and the case of *Mitchel v. Reynolds*[6] which is the foundation of the modern law as to contracts in restraint of trade. We have seen that the law laid down in the case of *Dammaree and Purchase*, though a severe application of the constructive extension of the clause of the Act of Edward III as to the levying of war against the King, was a correct, and indeed an inevitable, application of the law laid down by authorities which were binding upon the court; and that Foster, who had attended the trial as a student, had no doubt of the correctness of the decision.[7] Parker's judgment is a very clear statement of the law which

[1] Calendar of Treasury Papers, 1720-1728, 297 ; he said that, in his opinion, the law of executors was the branch of law which stood in most urgent need of reform ; it may be noted that many years later Blackstone was prepared to propose reforms in this branch of the law, L.Q.R. lii 53 ; below 729.

[2] Vol. i 439.

[3] Campbell, op. cit. iv 511-512 ; D.N.B. ; this seems to be borne out by Lord Hardwicke who said, " I knew a judge of great parts and abilities, and of real good nature and humanity at bottom, lose the affections of the Bar, when his fall from his exalted station made him feel the want of them ; chiefly by having sometimes given way to a sharpness of expression upon observing their failures, without allowing himself time to check the first emotion," P. C. Yorke, Life of Lord Hardwicke i 105-106 ; and cp. Speaker Onslow's testimony cited ibid i 87 n. 3.

[4] Below 239 n. 12.        [5] (1710) 15 S.T. 522 ; vol. viii 320.

[6] (1711) 1 P. Wms. 181 ; vol. viii 60-62.        [7] Vol. viii 320.

he was bound to apply;[1] but having applied it, he was instrumental in getting the Queen to pardon both the prisoners.[2] We have seen that the case of *Mitchel v. Reynolds* is an extraordinarily able account of the history of the law as to contracts in restraint of trade, and that it made so skilful an adaptation of the principles of the old law to the new conditions of trade, that the basic principles there laid down are at the root of those modern decisions of the House of Lords in which the modern law is restated.[3] In the case of the *Company of Stationers v. Partridge*[4] he showed that he was hostile to grants by the Crown of printing monopolies, unless the Crown could show that it had some title to the works in which it granted this monopoly. In this case he intimated his opinion that, unless the Crown could show such a title, it could not make a valid grant of the sole right to print almanacks.[5] The case of *Nickson v. Brohan*[6] is a useful illustration of the new doctrine of employer's liability which had been introduced by his predecessor.[7]

It is upon Parker's decisions as Chancellor that his fame is mainly based. He had an accurate acquaintance with the decisions of his predecessors; and his clear and logical statement of the principles which could be deduced from them, gave old principles a new precision, and indicated the correct lines upon which they should be developed. Let us look at one or two illustrations.

In the case of *Cud v. Rutter*[8] which was a case of a contract to convey South Sea stock, he laid down the principle that the court ought not to grant the remedy of specific performance in these or the like cases, in which damages are an adequate remedy.[9] In the case of *Montacute v. Maxwell*[10] he laid down the principle that a statute must not be used as an instrument of fraud;[11] and, in another case, at the suit of the husband, he relieved against a bond given by the husband to the wife's father, in fraud of the agreement made between the parents of the husband and wife as to the sums to be settled by each on their children.[12] He gave this relief to a guilty party because, to refuse relief on the principle *in pari delicto potior est conditio*

---

[1] 15 S.T. at pp. 699-702.
[2] Campbell, op. cit. iv 513; Foss, Judges viii 47.
[3] Vol. viii 60-62.                   [4] (1712) 10 Mod. 105.
[5] 10 Mod. at p. 107; cp. Lord Mansfield's account of this case in the case of Millar v. Taylor (1769) 4 Burr. at pp. 2402-2403; vol. vi 373.
[6] (1712) 10 Mod. 109.          [7] Vol. viii 474-475.
[8] (1719) 1 P. Wms. 570.
[9] " A court of equity ought not to execute any of these contracts, but leave them to law, where the party is to recover damages, and with the money may if he pleases buy the quantity of stock agreed to be transferred to him; for there can be no differences between one man's stock and another's," ibid at p. 571; below 276-277.
[10] (1720) 1 P. Wms. 618.          [11] At p. 620; below 234-235, 272.
[12] Turton v. Benson (1718) 1 P. Wms. 496.

*defendentis*, would facilitate such frauds.[1]  He laid down the principle that for many purposes a child *en ventre sa mere* must be regarded as already born ;[2] and he established the rule that if property is left to X, and on his death without issue to Y, that means, in the case of personalty, that if X leaves no issue at his death, the property goes over, so that such a limitation does not offend the rule against perpetuities ; but that in the case of realty the construction placed on such a limitation is different ; for it gives an estate-tail to the issue, so that the limitation will take effect if, at any distance of time, the issue fails.[3]   In the case of *Farrington v. Knightly*[4] he considered all the cases on the question when a legacy to an executor would bar his claim to the undisposed-of residue ; in the case of *Tipping v. Tipping*[5] he held that *bona parapherna* are only liable to creditors in the last resort ; and in the case of *Maxwell v. Wettenhall*[6] he summarized the rules as to when and from what time interest is payable on legacies.  In the case of *Trott v. Dawson*[7] he decided that a trustee can assert his right to indemnity as against an assignee of his c.q. trust.  In the case of *Powell v. Hankey and Cox*[8] he held that if husband and wife cohabited, and the husband was permitted to receive the income from his wife's separate property, the wife could not, after the husband's death, sue for an account of this money ; and in the case of *Cannel v. Buckle*[9] that a contract between a woman and her intended husband, though void at law, was valid in equity and could be specifically enforced.  The position of the guardians of infants was elucidated in the case of *Duke of Beaufort v. Berty*[10] and the rules as to the persons to whom the custody of lunatics should be committed in *Mr. Justice Dormer's Case*.[11]  The inconveniences of the common law writ of partition were mitigated by the principle that the court of Chancery would not insist upon a physical division, where this would damage the property, but would award a sum of money to produce equality ;[12] and the principle laid down in *The Earl of Bath v. Sherwin*[13] was explained and followed in the case of

[1] Turton v. Benson (1718) 1 P. Wms. at pp. 498-499 ; below 216.
[2] Hewet v. Ireland (1718) 1 P. Wms. 426 ; Burdet v. Hopegood (1718) 1 P. Wms. 486.
[3] Forth v. Chapman (1720) 1 P. Wms. 663 ; cp. Target v. Gaunt (1718) 1 P. Wms. 432 ; Pleydell v. Pleydell (1721) 1 P. Wms. 748.
[4] (1719) 1 P. Wms. 544 ; below 212, 279.
[5] (1721) 1 P. Wms. 729.
[6] (1722) 2 P. Wms. 26.          [7] (1721) 1 P. Wms. 780.
[8] (1722) 2 P. Wms. 82—a decision followed by King L.C. in the case of Thomas v. Bennet (1725) 2 P. Wms. 341 ; cp. Howard v. Digby (1834) 2 Cl. and Fin. 634.
[9] (1724) 2 P. Wms. 247.          [10] (1721) 1 P. Wms. 703 ; below 226 and n. 2.
[11] (1724) 2 P. Wms. 262.
[12] Earl of Clarendon v. Hornby (1718) 1 P. Wms. 446.
[13] (1710) 10 Mod. 1 ; above 198.

*Leighton v. Leighton*,[1] where an injunction was granted against bringing further actions of ejectment after two verdicts for the plaintiff. In the case of *Peachy v. Duke of Somerset*[2] he considered the principles upon which equity would relieve against penalties and forfeitures. Lastly, in the case of *De Costa v. Scandret*[3] he laid down the important principle that the contract of insurance is a contract *uberrimae fidei*, so that non-disclosure of a material fact is equivalent to fraud, and entitles the insurers to rescind the contract.

It is clear from these few illustrations that Parker's decisions were rapidly building up the doctrines of equity. From this point of view his fall was a misfortune ; for Chief Justice King, his successor, failed to show the same ability as a Chancellor.

Peter King[4] was the son of a grocer and drysalter of Exeter, and for some years he followed his father's business. But he inherited from his mother, who was a cousin of John Locke, a taste for learning and literature ; and Locke encouraged him in these pursuits. In 1691 he published an *Enquiry into the Constitution of the Primitive Church*, which reached a second edition in 1712-1713, and long remained a standard work on this subject ;[5] and in 1702 he published a *History of the Apostles' Creed*—a learned piece of historical research which won the approval of theologians both abroad and at home.[6] The publication of the former work changed the course of King's life. Locke got his father to allow his son to go to the university of Leyden. He resided there for three years (1691-1694), and, on his return, determined to go to the bar. He became a student of the Middle Temple in 1694, and by the special favour of Treby, C.J., he was called in 1698. His own talents, seconded by the influence of Locke and Treby, C.J., ensured his success. He soon acquired a practice ; and in 1701 he was elected a member of Parliament for the Whig borough of Beeralston. In 1704 he defended in the House of Commons the right of the electors of Aylesbury to bring actions against the returning officer who had refused to receive their votes. He became recorder of London in 1708 ; and his theological learning made him an effective manager in the impeachment of Sacheverell. In 1712 he appeared without fee for Whiston, who had been

[1] (1720) 1 P. Wms. 671.    [2] (1721) 1 Stra. 447.
[3] (1723) 2 P. Wms. 170.
[4] D.N.B.; Foss, Judges viii 132-138 ; Campbell, Chancellors iv 567-647 ; King's Diary printed at the end of vol. ii of Lord King's Life of John Locke, and referred to as Diary.
[5] The writer of the article in the D.N.B. says that this book was not superseded till the publication of Edwin Hatch's Bampton Lectures in 1881.
[6] It was so well thought of abroad that it was translated into Latin ; Campbell, op. cit. iv 574, says that " it is still recommended by bishops to candidates for holy orders."

condemned for heresy at Cambridge, and induced the court of Delegates to reverse the decision.[1]   He also opposed a motion in the House of Commons to impeach Fleetwood, bishop of St. Asaph, for a published sermon, which was thought to reflect upon the government.[2]

By this time King had become a leader of the Whig party. On the accession of George I he was made, on Cowper's recommendation,[3] Chief Justice of the Common Pleas.   His abilities as Chief Justice were recognized by all; and it is clear from his report to the King on the trials of persons implicated in the rebellion of 1715, that he was of a merciful disposition.[4]   Both in civil and in criminal cases he showed all the qualities of a great lawyer;[5] and when he was Chancellor he showed that he had sufficient independence to resist even royal attempts to usurp his patronage.[6]   When Parker resigned in 1725 King was made Speaker of the House of Lords, and, in that capacity, presided at Parker's trial.   After the trial was over he was made Lord Chancellor; the choice was generally approved.   Hervey, who was by no means an admirer of King,[7] said that

he was perhaps the only instance that can be given of a man raised from the most mean and obscure condition to the highest dignity in the state without the malice of one enemy ever pretending to insinuate that the partiality of his friends, in any one step of this rise, had pushed him beyond his merit.   He was made Chancellor as much by the voice of the public as by the hand of power.[8]

But Hervey adds that " that employment proved the vertical point of his glory."[9]   He was not learned in equity.   He did his best to learn; he made himself a competent equity lawyer; and he was continued in his office by George II.   But he never sufficiently mastered what to him was new learning, to be quite at home with either the practice or the doctrines of his court.

That he made himself a competent equity lawyer some of his decisions show.   One of the best known of his decisions is the leading case of *Keech v. Sandford*[10] which decided that if a trustee renews a lease in his own name, even though the lessor

[1] 15 S.T. 703; Campbell, op. cit. iv 588.
[2] Ibid 589-590; Foss, op. cit. viii 135.
[3] Campbell, op. cit. iv 349 *note*; above 197.
[4] Campbell, op. cit. iv 595-598.
[5] Ibid iv 594; Foss, op. cit. viii 135; below 213.
[6] King tells us in his Diary at pp. 47-48 that George II " told me he expected to nominate to all benefices and prebendaries that the Chancellor usually nominated to.   I told him, with great submission, that this was a right belonging to the office annexed to it by Act of Parliament and immemorial usage, and I hoped he would not put things out of their ancient course. . . . I did not give up this point . . . and afterwards, at another time, he told me that I should go on as usual."
[7] Below 213.            [8] Memoirs of the Reign of George II i 285-286.
[9] Ibid 286.                [10] (1726) Cas. t. King 61.

212                    THE EIGHTEENTH CENTURY

has refused to renew in the name of the c.q. trust, he holds the renewed lease as a trustee. In the case of *Mansell v. Mansell*[1] he, together with Raymond, C.J., and Reynolds, C.B., settled that the rule laid down by Lord Keeper Harcourt and the House of Lords,[2] that a trustee to preserve contingent remainders, who joins in destroying them, is guilty of a breach of trust, applies to voluntary settlements as well as to settlements for a valuable consideration. In the cases of *Keylway v. Keylway*[3] and *Holt v. Frederick*[4] he settled important questions of interpretation arising out of the statutes of Distribution; and the latter case is an authority on the question whether a sum of money given by a mother to a child can ever be presumed to be an advancement to the child.[5] In the case of *Coppin v. Coppin*[6] he decided that a will of English land, though made abroad, must be made in accordance with the formalities prescribed by English law. The case of *Croft v. Pyke*[7] asserted the principle that the joint estate of partners was liable in the first place to partnership debts, and the separate estate of each partner was liable in the first place to his separate debts. In the case of *Shepherd v. Beecher*[8] he held that a surety who guarantees the honesty of X, and who, hearing of X's dishonesty, does not put an end to the contract of suretyship, will be liable for X's future acts of dishonesty up to the limits of the guarantee. In the cases of *Milner v. Colmer*[9] and *Brown v. Elton*[10] he enforced the wife's equity to a settlement, but showed that he did not much like the equitable rule because it diminished the husband's legal rights, and because it had proved, in his opinion, to be inconvenient, except in cases where the husband was profligate or extravagant.[11] Later cases have rightly refused to follow his view that if a legacy is given both to an executor and to the next-of-kin, an equal presumption is created in both cases that their legal rights to the residue are barred, and that therefore, it "being exclusion against exclusion, the law must take place, and the executor have the surplus as executor."[12]

---

[1] (1732) 2 P. Wms. 678.               [2] Above 202.
[3] (1726) 2 P. Wms. 344.               [4] Ibid 356.
[5] See Bennet v. Bennet (1879) 10 C.D. at p. 478.
[6] (1725) 2 P. Wms. 291.               [7] (1733) 3 P. Wms. 180.
[8] (1725) 2 P. Wms. 288; cp. Phillips v. Foxall (1872) L.R. 7 Q.B. at p. 679.
[9] (1731) 2 P. Wms. 639.               [10] (1733) 3 P. Wms. 202.
[11] " He thought it extraordinary that this Court should interpose against the husband in cases where the law gives him a title to the wife's personal estate; and doubted, experience had shewn, that such interposition, unless where the husband has appeared to be a profligate or extravagant man, had been the occasion rather of mischief than good," 2 P. Wms. at p. 642; but he admitted that the practice of the court was settled in the contrary sense, 3 P. Wms. at p. 205.
[12] Atty.-Gen. v. Hooker (1725) 2 P. Wms. 338 at p. 340; cp. Andrew v. Clark (1750-1751) 2 Ves. Sen. 162 and Belt's note; another case in which one of his decisions was reversed was Glissen v. Ogden (1731) 2 Atk. at pp. 258-259.

We have seen that he carried through the reforms which deprived the Masters of their control of the suitors' money and vested it in the Accountant-General of the court of Chancery ;[1] and that it was during his Chancellorship that the position of the Master of the Rolls as a deputy judge of the court of Chancery was settled.[2]  He tried without much success to make other reforms in the practice of the court—vested interests were too strong ;[3] and he was sometimes thwarted by Jekyll, M.R.,[4] who was an abler equity lawyer than himself.[5]

Though King added something to equitable doctrine, his consciousness that he was something of an amateur made him very diffident, and therefore very slow ;  and the fact that his decisions were criticised, and sometimes reversed, tended to aggravate these failings.   Hervey said of him that

he had such a diffidence of himself, that he did not dare to do right for fear of doing wrong ;  decrees were always extorted from him ;  and had he been let alone, he would never have given any suitor his due for fear of giving him what was not so.[6]

Hardwicke once said of him that it was common knowledge that he was " as willing to adhere to the common law as any judge that ever sat here."[7]   There was possibly a substratum of truth in the view taken by Hervey and Queen Caroline that his eminence as a pleader made him the less fit to preside in the court of Chancery ;[8]  but there is no doubt that they exaggerated when they insinuated that it had made him a bad Chief Justice of the Common Pleas.   We have seen that Hervey himself admitted that he had deservedly won a great reputation while holding that office.[9]   And his services to the law did not end when he became Chancellor.   As Chancellor he set on foot an enquiry into the fees taken in all the courts ;[10]  and in spite of the opposition of his brethren, he carried the Act which required the records and process of the courts of law to be drawn

[1] Vol. i 440 and n. 4 ;  12 George I cc. 32 and 33.
[2] Vol. i 421 ;  3 George II c. 30 ;  below 221 n. 5.
[3] See Campbell, op. cit. iv 639-640.
[4] Thus in 1725 Jekyll objected to his order that the Usher should be under the same regulations as the Masters, and to his settlement of his fees, Diary 18-19.
[5] Below 219-222.        [6] Memoirs of the Reign of George II i 286.
[7] Le Neve v. Le Neve (1748) 3 Atk. at p. 654.
[8] " His understanding was of that balancing, irresolute kind that gives people just light enough to see difficulties and form doubts, and not enough to surmount the one or remove the other ;  which sort of understanding was of use to him as a pleader though a trouble to him as a judge. . . . The Queen once said of him . . . that ' he was just in the law what he had formerly been in the Gospel—making creeds upon the one without any steady belief, and judgments in the other without any settled opinion ;  but the misfortune,' said she, ' for the public is, that, though they could reject his silly creeds, they are forced often to submit to his silly judgments,' " Memoirs of the Reign of George II i 286-287.
[9] Above 211.        [10] Campbell, op. cit. iv 640.

up in English.[1]   But at the end of his career the burden of work and anxiety undermined his health.[2]   In spite of all his exertions arrears piled up ; and his attempt to cope with them by sitting late was not successful.   Bentham's father [3] said that he often dozed over his cases ; and that they were in effect often settled by the two leaders in the court—Yorke and Talbot.[4] His health gave way entirely, and he resigned November 29, 1733.   He died July 29, 1734.

His successor, Lord Talbot,[5] was born in 1685.   He was the eldest son of William Talbot, who was successively bishop of Oxford, Salisbury, and Durham.   He was a member of Oriel College, and, on taking his degree in 1704, he was elected a fellow of All Souls College.   He was dissuaded from carrying out his original intention of taking orders by Lord Cowper, and, on Cowper's advice, adopted the law as his profession.   He was called to the bar by the Inner Temple in 1711.   He soon acquired a leading practice in the court of Chancery, and became a member of Parliament in 1719.   He was made solicitor-general in 1726 ; and, whilst solicitor-general, he made a very able speech in defence of Walpole's excise scheme.

Yorke and Talbot, the attorney and solicitor-general, were the most eminent barristers of their day, and the leaders of the Chancery bar.   We have seen that, in the latter capacity, they did much to mitigate the evil consequences to the suitors, which followed from the physical incapacity from which Lord Chancellor King suffered in the last years of his chancellorship ; [6] and it was clear that one or other of them would soon be his successor.   The situation was complicated by the death of Lord Raymond, Chief Justice of the King's Bench on March 19,

[1] 4 George II c. 26 ; vol. ii 479 ; vol. xi 603 ; Bl. Comm. iii 322-323.
[2] As early as November 1727 he told the Duke of Newcastle, who had asked him to come back to town, that " my constant and continual application to the business of the Court of Chancery had brought upon me rheumatical and sciatical pains ; and if I had any regard to myself or family, I must for remedy stay three or four days in the country," Diary 53.
[3] It is clear from the letter printed by Cooksey, Sketches of the Lives of Somers and Hardwicke, that it was written by Bentham's father, and not by his more celebrated son, see Cooksey's note at the end of the letter ; the writer of the letter says that he speaks from his own observation, see next note, and Bentham's son was not born till 1748.
[4] " Lord King became so far advanced in years . . . that he often dozed over his causes when upon the bench ;  a circumstance which I myself well remember was the case ;  but it was no prejudice to the suitors ; for Sir Philip Yorke and Mr. Talbot were both men of such good principles and strict integrity, and had always so good an understanding with one another, that, although they were frequently, and almost always, concerned for opposite parties in the same cause, yet the merits of the cause were no sooner fully stated to the court, but they were sensible on which side the right lay ;  and, accordingly, the one or other of these two great men took occasion to state the matter briefly to his Lordship, and instruct the Registrar in what manner to minute the heads of the decree," Cooksey, op. cit. 60.
[5] D.N.B. ;  Foss, Judges viii 169-173 ;  Campbell, Chancellors iv 648-687.
[6] Above n. 4

1733. Yorke had, as attorney-general, a prior claim to the chancellorship ; but, since he was as good a common lawyer as an equity lawyer, he was as well fitted to be Chief Justice of the King's' Bench as Lord Chancellor. On the other hand, Talbot's practice was almost exclusively an equity practice, so that he would not have made a good Chief Justice. The accounts given by Hervey and by Bentham's father [1] of the manner in which the difficulty was settled are substantially similar ; and they are corroborated by the fact that a delay of two terms took place in filling the vacant chief justiceship.[2]  Hervey says : [3]

Upon the corporal death of my Lord Chief Justice Raymond, and the intellectual demise of Lord Chancellor King, these two men, Sir Philip Yorke, and Mr. Talbot, were destined to succeed them ; but the voracious appetite of the law in those days was so keen, that these two morsels without any addition were not enough to satisfy these two cormorant stomachs. Here lay the difficulty : Sir Philip Yorke, being first in rank, had certainly a right to the Chancellor's seals ; but Mr. Talbot, who was an excellent Chancery lawyer and knew nothing of the common law, if he was not Chancellor would be nothing. Yorke, therefore, though fit for both these employments, got the worst, being prevailed upon to accept that of Lord Chief Justice, on the salary being raised from £3,000 to £4,000 a year for life, and £1,000 more paid him out of the Chancellor's salary bv Lord Talbot.[4]  This was a scheme of Sir Robert Walpole's, who, as Homer says of Ulysses, was always fertile in expedients, and thought these two great and able men of too much consequence to lose or disoblige either. Sir Robert communicated this scheme secretly to the Queen. She insinuated it to the King, and the King proposed it to Sir Robert as an act of his own ingenuity and generosity.

In furtherance of this arrangement Yorke was made Chief Justice of the King's Bench on October 31, 1733, and on November 24 was created a peer with the title of baron Hardwicke. Talbot was made Lord Chancellor on November 29, 1733, and on December 15 was created a peer with the title of baron Talbot of Hensol.[5]  His promotion was celebrated in the Inner Temple by the last of that series of revels for which the Inns of Court had once been famous.[6]  After holding the Great Seal

[1] Cooksey, op. cit. 59.

[2] P. C. Yorke, Life of Lord Hardwicke i 117 ; but cp. Foss, Judges viii 188-189 who discredits the truth of this episode ; but as Mr. Yorke points out, loc. cit., the length of time taken to fill the post of Chief Justice, coupled with the fact that Lord King's resignation was obviously imminent, confirms the story ; and he points out that " from a passing allusion by Lord Hardwicke in a letter to a correspondent a short time afterwards, it may be inferred that he was actually offered the Great Seal and that he declined it."

[3] Memoirs of the Reign of George II i 284-285.

[4] Bentham says that Yorke refused to accept this increase of salary " without its being made permanent to the office of Chief Justice of that Court, by being secured to his successors," Cooksey, op. cit. 59.

[5] It was apparently a part of the arrangement that Hardwicke was to have the senior title, P. C. Yorke, op. cit. i 118 n. 4.

[6] See Wynne, Eunomus iv 104-108 for an account of it ; for earlier revels see vol. iv 267-268 ; above 16.

for only four years he died of inflammation of the lungs on February 14, 1737.

Contemporary opinion is clear that Yorke and Talbot were the two ablest lawyers, the two best judges, and two of the most charming personalities of their day. Hervey says : [1]

Lord Talbot had as clear, separating, distinguishing, subtle, and fine parts as ever man had. Lord Hardwicke's were perhaps less delicate, but no man's were more forcible. No one could make more of a good cause than Lord Hardwicke, and no one so much of a bad one than Lord Talbot. The one had infinite knowledge, the other infinite ingenuity : they were both excellent, but very different ; both amiable in their private characters, as well as eminent in their public capacities ; both good pleaders, as well as upright judges ; and both esteemed by all parties, as much for their temper and integrity as for their knowledge and abilities.

Talbot's decisions show that this appreciation of his abilities was justified—some of them are still landmarks in the history of equity. They show also that equity was rapidly becoming a fixed body of doctrine which supplemented and corrected the law in certain defined ways, and, consequently, that the ground was well prepared for the great work of consolidation effected by his successor Lord Hardwicke.[2] In fact, if Talbot had lived longer, his name, and not that of Hardwicke, would probably have been associated with this penultimate phase in the history of the development of equitable doctrine. A rapid glance at some of his decisions will prove the truth of this proposition.

Talbot pointed out that it was the province of equity to give relief in matters falling within the jurisdiction of the court " though nothing appears which, strictly speaking, may be called illegal." [3] Thus it would relieve against oppression, even though no actual fraud or duress could be proved—" it being the business of this court to relieve against all offences against the law of nature or reason." [4] It was on this ground that he ordered the return of money overpaid in pursuance of an usurious contract, although the payer was *particeps criminis ;* for it cannot be said " in any case of oppression that the party oppressed is *particeps criminis*, since it is that very hardship that he labours under, and which is imposed on him by another, that makes the crime." [5] It was on this ground also that the court gave relief in all cases where undue influence could be proved.

The rule that a mischief is rather to be suffered than a general inconvenience does not at all affect this case ; for it would be a much greater inconvenience to leave men under difficulties and distresses

[1] Memoirs of the Reign of George II i 285.    [2] Below 257 seqq.
[3] Bosanquet v. Dashwood (1734) Cases t. Talbot at p. 40.
[4] Ibid.    [5] Ibid at p. 41 ; below 274-275.

open to all the oppression that other people may please to make them undergo. This is the reason upon which the court relieves against bonds given by young heirs and marriage brocage bonds; and will not suffer any advantage to be taken of the extravagance and want of judgment in the one case, and of the strong bias to obtain what is desired in the other.[1]

On the other hand, Talbot recognized that there were injustices and inconveniences against which equity could give no relief:

Where a particular remedy is given by law, and that remedy bounded and circumscribed by particular rules, it would be very improper for this Court to take it up where the law leaves it, and extend it farther than the law allows.[2]

Thus the liability of a husband to pay his wife's debts ceased at law when the wife died,[3] and equity could do nothing for the creditors, even though the husband had had a large fortune with his wife.[4] Talbot admitted that this was hard on her creditors, but it was a hardship which only the Legislature could remedy.[5]

Just as the principles upon which equity could interfere to prevent injustice, and the limitations upon its power to interfere, were becoming settled, so also were many of the doctrines to which its interference had given rise. The following cases are a few illustrations of this fact. In the case of *Hopkins v. Hopkins*[6] rules were laid down as to when a limitation could be construed to be an executory devise, and when a contingent remainder; [7] and the principle that, in construing an executory devise, every effort must be made to give effect to the intention of a testator was asserted.[8] In the case of *Chapman v. Blissett*[9] the rule was laid down that an equitable contingent remainder would not fail on account of abeyance of the seisin, because the legal estate was in the trustees. In the case of *Glenorchy v. Bosville*[10] the reason for the different way in which executed and executory trusts were construed was explained; and, in the case of *Legg v. Goldwire*,[11] the rules as to when a settlement can be corrected by the marriage articles were stated. The case of

---

[1] Proof v. Hines (1735) Cases t. Talbot at p. 116; below 274, 275.
[2] Heard v. Stanford (1736) Cases t. Talbot at p. 174; below 227, 261-262, 270.
[3] Vol. iii 531.        [4] Heard v. Stanford (1736) Cases t. Talbot 173.
[5] " The case perhaps may be hard, but the law hath made it so, that it may be equal on both sides, as well where the husband is sued during the coverture, for a debt of the wife's, with whom he had no fortune, as where he by her death is discharged from all her debts, notwithstanding any fortune he may have received in marriage with her; so is the law, and the alteration of it is the proper work of the Legislature only," ibid at p. 174.
[6] (1734) Cases t. Talbot 44.          [7] See vol. vii 127.
[8] Cases t. Talbot at pp. 50-51.
[9] (1735) Cases t. Talbot 145 at p. 151; vol. vii at p. 149.
[10] (1733) Cases t. Talbot 3 at p. 19; below 272.
[11] (1736) Cases t. Talbot 20; below 277, 281.

*Lechmere v. Earl of Carlisle* [1] is a leading case on the doctrines of conversion and satisfaction ; and the case of *Streatfield v. Streatfield* [2] on the doctrine of election. The case of *Cookson v. Duke of Somerset* [3] lays down the rule as to the circumstances in which the court would order the specific restitution of a chattel. Previous cases had been somewhat conflicting ; [4] but this case, and the earlier case of *Pusey v. Pusey,* [5] showed that the court would only exercise this jurisdiction in the case of heirlooms or chattels of peculiar rarity. The case of *Stapleton v. Colville* [6] is an authority on the vexed question of the circumstances in which the personal estate is exonerated from its primary liability to pay the debts of a deceased person ; and the case of *Morrice v. Bank of England* [7] on the application of legal and equitable assets in the payment of debts, [8] and on the rights of those creditors, who had got a judgment at common law, and of those who had got a decree in equity. It was settled that, whatever might be the case at law, in equity decrees and judgments stood on an equal footing. [9] Lastly, we have seen that *Barbuit's Case* [10] is a leading case on the privileges of ambassadors and their retinue, and of consuls, and on the interpretation of the statute of 1708, [11] which was passed in consequence of the arrest of the Czar's ambassador.

Of the career of the first of the Masters of the Rolls during this period—John Trevor—I have already spoken. [12] Though he was an unscrupulous politician, brutal in his manners, avaricious, and unprepossessing in appearance, there is no doubt that he was an able lawyer. His decision in the case of *Benson v. Benson* [13] is an early authority on the subject of reconversion. His decision in the case of *Waring v. Danvers* [14] is authority for the proposition that from legal assets executors had the same right of retainer and preference in equity as they had at law ; and that, after an action at law brought by one creditor, the executor could give a preference to another creditor by confessing judgment to him. In an anonymous case he laid

---

[1] (1733) 3 P. Wms. 211 ; S.C. on appeal sub. nom. Lechmere v. Lechmere (1735) Cases t. Talbot 80 ; below 269, 270, 324.
[2] (1736) Cases t. Talbot 176 ; below 270.        [3] (1735) 3 P. Wms. 390.
[4] Above 208 ; below 221 n. 9, 232-233.        [5] (1684) 1 Vern. 273.
[6] (1736) Cases t. Talbot 202.        [7] Ibid 217.
[8] At p. 220 ; below 280.
[9] Cases t. Talbot at p. 223 ; and it was pointed out that the common law rule that the judgment related back to the first day of the term must be disregarded, and the court must look at the exact date in order to see whether the judgment creditor or the decree creditor had the prior right.
[10] (1737) Cases t. Talbot 281 ; vol. x 371-372.
[11] 7 Anne c. 10 ; vol. x 370-371.        [12] Vol. vi 549-550.
[13] (1710) 1 P. Wms. 130.        [14] (1715) 1 P.Wms. 295.

down the rule that a bequest to relations means a bequest to relations capable of taking under the statutes of distribution.[1] Lord Campbell credits him with having been the first to lay down the rule that the marriage of a testator and the birth of a child will revoke his will ;[2] but it would seem that he only followed an earlier decision to this effect, and later referred to it with approval.[3]  In another case he had the courage to differ from a decision of the House of Lords, saying that if the case came again before the House it would decide differently ;[4] but his successors recognized that the decisions of the House could not be treated in this way.[5]

Trevor died in 1717, and his successor as Master of the Rolls was Sir Joseph Jekyll [6]—that

> Odd old Whig
> Who never changed his principles or wig.[7]

He was connected by marriage with two great Chancellors of very different dates—with Somers whose sister he had married, and with Hardwicke who had married his wife's niece.[8] He was born about 1663, and was called to the bar by the Middle Temple in 1687.  From the first he had identified himself with the Whig party, and never wavered in his allegiance during the forty years (1698-1738) that he was a member of the House of Commons.[9]  He became chief justice of Chester in 1697, and a serjeant-at-law in 1700.  In the Aylesbury case he defended the right of the electors to bring actions at law, and he incurred the censure of the House of Commons by appearing in defence of Halifax, when he was prosecuted by order of the House in

---

[1] Anon. (1716) 1 P. Wms. 327.          [2] Chancellors iv 59.

[3] Cook v. Oakley (1715) 1 P. Wms. at p. 304 and note (3) where it is said that the original case was Eyre v. Eyre, which Trevor said was reported to him by Treby C.J. and some eminent civilians ; also it would seem that in 1701 he held that marriage and the birth of a child revoked a will of land ; this case was reversed by Wright L.K. on the facts, ibid ; there was considerable authority for the view that the revocation was presumptive only, so that evidence to rebut the presumption was admissible, see Brady v. Cubit (1778) 1 Dougl. 31 ; but Trevor's view was preferred by the Exchequer Chamber in Marston v. Roe (1838) 8 Ad. and E. 14, see pp. 61-62.

[4] " And it being said by Mr. Pooley that . . . it had been decreed in the House of Lords, that they would not supply the want of a surrender in case of a devise of a copyhold to grandchildren . . . to this the Master of the Rolls answered, that it was his opinion, such a devise of a copy hold, without a surrender, ought to be made good for grandchildren, as well as children ; and if the same case were to come *now* into the House of Lords, it would be so ruled, and that he had, and would so decree it," Watts v. Bullas (1702) 1 P. Wms. at p. 61.

[5] Tudor v. Anson (1754) 1 Ves. Sen., 582 *per* Lord Hardwicke ; Perry v. Whitehead (1801) 6 Ves. at p. 547, *per* Lord Eldon.

[6] D.N.B. ; Foss, Judges viii 127-131.

[7] Pope, Epilogue to the Satires, Dialogue I.

[8] P. C. Yorke, Life of Hardwicke i 69.

[9] He was member for Eye 1698-1714, for Lymington 1714-1722, for Reigate 1722-1738.

220                THE EIGHTEENTH CENTURY

1704. In 1710 he opened the first article on the impeachment of Sacheverell, and was so keen on the prosecution that he tried to prosecute a Welsh clergyman who in a sermon had reflected upon the conduct of the managers.[1]   On the accession of George I he was on the committee of secrecy which was appointed to enquire into the conduct of the late ministry.   His opinion was that there was sufficient evidence to support an impeachment for treason against Bolingbroke, but not against Oxford.   However, Oxford was impeached, and though in June 1717 he was still of opinion that there was not sufficient evidence to impeach for treason, a fortnight later he opened the first article—probably he was aware that it had been arranged that the impeachment was not to be seriously prosecuted.[2]   In 1715 he had assisted the government by taking part in the prosecution of some of the rebels.[3]   He thus deserved his appointment as Master of the Rolls on Trevor's death in 1717.   He held this office till his death in 1738.

He did not cease to be an active member of the House of Commons on his appointment to this office.   He was energetic in exposing the scandals connected with the South Sea Bubble. He proposed and carried the famous Gin Act,[4] which so enraged the people that he was attacked by the mob, and it was necessary to provide a guard for his house.   He was also the author of the Charitable Uses Act of 1736 ; [5] and he proposed an Act, for the benefit of the Quakers, which substituted a lay for an ecclesiastical court as the tribunal before which proceedings for non-payment of tithe were to be instituted.   The latter Act had the support of Walpole and passed the House of Commons,[6] but the opposition of Lords Talbot and Hardwicke,[7] on account of the impracticable nature of its provisions,[8] secured its rejection in the Lords.   He showed his prescience as a statesman when, in 1716, he suggested that the heritable jurisdictions of the Highland chiefs should be abolished.[9]   He was, as Pope said, an old Whig who never deserted his principles—" his principal topics of declamation in the House," says Hervey,[10] " were generally economy and liberty."   Hervey's sketch of

[1] The grand jury threw out the bill, Foss, Judges viii 129.
[2] Campbell, Chancellors iv 369-376, 486-487 ;  above 202.
[3] He was one of the managers on the impeachment of the Earl of Winton, and opened the case against him, 15 S.T. 830 ;  and he appeared for the Crown on the indictment of Francis Francia, ibid 904.
[4] 9 George II c. 23 ;  vol. x 184.          [5] 9 George II c. 36 ;  vol. xi 590-593.
[6] Hervey, Memoirs of the Reign of George II ii 262-263.
[7] Ibid 270-271.
[8] P. C. Yorke, Life of Hardwicke i 149-150;  Hervey's insinuation, op. cit. ii 270-271, that Talbot and Hardwicke acted from the desire to forward the interests of their own profession is obviously wrong.
[9] P. C. Yorke, op. cit. i 590-591.          [10] Op. cit. ii 141.

his character is no doubt biassed and ill-natured, largely it would seem because he had defeated the Court in 1736 on the Marlborough election petition, by a legal argument which the Crown lawyers were unable to answer.[1]  But even he is obliged to admit, that though his old-fashioned prejudices were laughed at, he " spoke with more general weight, though with less particular approbation, than any other single man in that assembly." [2]

He was a very competent lawyer—some thought that he would have been made Lord Chancellor in succession to Cowper ; [3] and he was a better equity lawyer than Lord King, with whom he did not always see eye to eye.[4]  We have seen that it was during Lord King's tenure of office that the dispute arose as to the judicial authority of the Master of the Rolls, which was in effect settled by the argument of his nephew Philip Yorke in favour of that authority.[5]  Such cases as *Turton v. Benson* [6] and *Lechmere v. Lord Carlisle* [7] show that he had a firm grasp of equitable principle.  It is true that some of his decisions were reversed.  But in some of them, e.g. in the case of *Cud v. Rutter*,[8] there is a good deal to be said for the opposite conclusion ; [9] and in others, e.g. in the cases of *Banks v. Sutton*,[10] *Casburne v. Scarfe*,[11] and *Hervey v. Aston*,[12] his judgments show great mastery of principles, a thorough knowledge of the relevant authorities, and a power of lucid exposition.  In the last-named case Lord Hardwicke said that, though he differed from the Master of the Rolls, he had the utmost deference for his judgment.[13]

His old Whig prejudice for economy was illustrated by the bequest in his will of £20,000, after his wife's death, to the sinking fund for the reduction of the national debt—" he might as well," said Lord Mansfield, " have attempted to stop the middle arch of Blackfriars Bridge with his full bottomed wig."  As a matter of fact this bequest did not take effect, because the government consented to the passing of an Act [14] giving up its right to the greater part of this legacy, on the ground that Jekyll had been at great expense in rebuilding the Rolls House and the adjacent premises, under the mistaken impression that

---

[1] Hervey, op. cit ii 138-140.    [2] Ibid 141.
[3] Campbell, Chancellors iv 522.    [4] Above 213.
[5] Vol. i 420-421 ; above 213 ; though there is some evidence that Jekyll had a hand in its composition the better view seems to be that it was the work of Yorke, P. C. Yorke, Life of Hardwicke i 96 n. 1.
[6] (1718) 1 P. Wms. 496.    [7] (1733) 3 P. Wms. 211.
[8] (1719) 1 P. Wms. 570.
[9] Ibid at p. 571 n. 1 it is said that " cases of this kind [contracts to buy stocks or shares] depend so much on their own particular circumstances, that it seems no general rule can be laid down " ;  cp. Colt v. Netterville (1725) 2 P. Wms. 304 where an opposite conclusion was come to in respect of a contract to buy York-Buildings stock.
[10] (1732) 2 P. Wms. 700.    [11] (1737) West t. Hard. 221.
[12] (1737) West t. Hard. 350.    [13] At p. 414.    [14] 20 George II c. 34.

he was able to grant long leases of these premises, with the result that the value of his estate was much diminished.

The developments of equitable doctrine made by these Chancellors and Masters of the Rolls were summed up in Ballow's *Treatise*, which was published in 1737.[1]  That *Treatise* comes at the end of a very distinct epoch in the history of equity —the epoch which stretches from the chancellorship of Nottingham to the beginning of the chancellorship of Hardwicke.  It was an epoch during which the principles and rules of equity were being rapidly developed, and this rapid development continued throughout the eighteenth century, and during the first three decades of the nineteenth century.  Because Ballow's *Treatise* comes at the end of the earlier part of this period of rapid development, we can see in his book both the connection between the later fixed principles and rules of equity and the original bases upon which equitable modifications of and additions to the law rested, and the manner in which these principles and rules were developed from isolated modifications of and additions to the law in particular cases on grounds of fairness and justice. Ballow's acquaintance with all the authorities ancient and modern, and his philosophical turn of mind, which led him to try and reduce to some principle the scattered and often nebulous principles and rules of equity, made him an admirable exponent of this phase of the development of equitable doctrine.

In the first place, he insists at the outset on the philosophical principle upon which equitable interference with the law had from the first been based ; and at many places in his book he tries to base a doctrine of equity on a general principle of acknowledged truth.  But, in the second place, he admits that there are limitations upon the application of these principles, and, consequently, upon the power of equity to interfere with the law, and that the established rules of equity ought to be followed. Thirdly, because the development of a regular and a fixed system of equitable principles and rules was in its initial stage, the rules laid down in some of the cases were then more closely connected with the original wide principle on which equitable interference with the law was based than they were later, with the result that some very loose doctrines are sometimes laid down which were later rejected.  But, fourthly, though in very many cases the settled principles and rules of equity are apparent, some of these principles and rules were then more flexible than they became later in the century, because they were more closely connected with the bases upon which they originally rested. An examination of the manner in which Ballow treats the

[1] Above 191-192.

CHANCELLORS AND MASTERS OF ROLLS (1700–1737)   **223**

principles and rules of equity from these four points of view will give us some idea of the stage which the development of equitable doctrine had reached before the time of Lord Hardwicke.

(1) *Ballow insists at the outset on the philosophical principle upon which equitable interference with the law had from the first been based; and at many places in his book he tries to base a doctrine of equity on a general principle of acknowledged truth.*

We have seen that the author of *The Doctor and the Student* had adopted the views of mediæval thinkers, and had laid it down that mankind was governed primarily by the laws of God or Nature, and only secondarily by the human laws of the State;[1] that he had explained that a human law, though consonant to these higher laws and therefore valid, might, by reason of the general terms in which it was expressed, cause injustice or unfairness in particular cases; and that, following Aristotle,[2] he had based the need for equity upon injustices or unfairnesses so caused.[3] We have seen also that Lord Ellesmere had accepted this principle as the basis of, and the justification for, equitable interferences with the laws;[4] that it was for this reason that the rules of equity necessarily followed and depended upon the law to which they were a supplement, or on which they were a gloss;[5] and that, since their existence and content depended on the question whether any given body of law needed to be thus supplemented or glossed, they were necessarily somewhat disparate, and easily lent themselves to an exposition which took the form of a commentary on certain maxims or principles.[6] Ballow bases the need for a system of equity on these principles. He says:[7]

Equity therefore, as it stands for the whole of natural Justice, is more excellent than any human Institution; neither are positive Laws, even in Matters seemingly indifferent, any further binding, than they are agreeable with the Law of God and Nature. But the Precepts of the natural Law, when enforced by the Laws of Man, are so far from losing any Thing of their former Excellence that they receive an additional Strength and Sanction. Yet as the Rules of the municipal Law are finite, and the Subject of it infinite, there will often fall out Cases, which cannot be determin'd by them; for there can be no finite Rule of an infinite Matter, perfect. So that there will be a Necessity of having Recourse to the natural Principles; that what was

[1] Vol. iv 279-280.
[2] See Vinogradoff, Outlines of Historical Jurisprudence ii 63-65; Aristotle says in the Ethics (cited ibid 64), " The nature of the equitable is the correction of law, inasmuch as law falls short of what is required by the universal terms in which it is expressed. This (deficiency) is the reason why all things cannot be regulated by law, so that decrees are required; that which does not admit of definition must be governed by indefinite rules."
[3] Vol. iv 280.          [4] (1616) 1 Ch. Rep. at p. 6, cited vol. i 453.
[5] Vol. iv 282.          [6] Above 190-191.          [7] A Treatise of Equity 2-3.

wanting to finite, may be supplied out of that which is infinite. And this is what is properly called Equity in Opposition to strict Law; and seems to bear something of the same Proportion to it in the moral, as Art does to Nature in the material World. For as the universal Laws of Matter would in many Instances prove hurtful to Particulars, if Art were not to interpose and direct them aright; so the general Precepts of the municipal Law would oftentimes not be able to attain their End, if Equity did not come in Aid of them. And thus in Chancery every particular Case stands upon its own particular Circumstances; and altho' the Common Law will not decree against the general Rule of Law, yet Chancery doth, so as the Example introduce not a general mischief. Every matter therefore, that happens inconsistent with the Design of the Legislator, or is contrary to natural Justice, may find Relief here. For no Man can be obliged to any Thing contrary to the Law of Nature, and indeed no Man in his Senses can be presumed willing to oblige another to it.

Equity therefore must as a general rule follow the law; and Ballow points out that, if there are no circumstances which make it inequitable that the law should be followed, the Chancellors have always pursued this course.

Where the Intent of the Parties does not specially appear, it is intended to agree with the Rules of Law. And therefore the Chancellors, in Case of an Use, often adjudg'd by Imitation of the Rules of Law, and according to the Nature and Quality of the Land; as in Case of *de possessione fratris*, Borough English, Gavelkind, Lands on the Mother's side etc. . . . So the Widow of the *Cestuy que Trust* of a Copyhold Estate, ought to have her Freebench or Widow's Estate, as well as if the Husband had had the legal Estate in him: And then it may be said, that *Æquitas sequitur legem*. So a Tenant by the Curtesy, shall be decreed of a Trust as well as of a legal Estate.[1]

On the other hand, he claims for equity a freer hand in the development of equitable estates than equity, in the interests of the uniformity of the rules of the law of property, ultimately took.[2] Thus, in conformity with some earlier decisions,[3] he said that an equitable estate tail could be " alien'd without a Recovery by any Manner of Conveyance." [4] We have seen [5] that the law was settled in the opposite way by Lord Hardwicke on the ground that the admission of this principle " would be to confound the rules of property," and " to make a determination in equity contrary to the rules of law." [6] On the other

[1] Op. cit. 62; he points out that in the case of dower equity did not follow the law—" tho' no Manner of Reason can be given for it if it were *res integra* "; as to this see vol. iii 196 and n. 10; vol. vii 148.

[2] " As for a Trust or equitable Interest it is a Creature of their own, and to be govern'd by their Rules," op. cit. 33.

[3] Vol. vii 148 nn. 10, 11, 12.     [4] Op. cit. 33.     [5] Vol. vii 148.

[6] Kirkham v. Smith (1749) Ambler at p. 519; Ballow would not have disapproved as he says, op. cit. 33, " yet some have thought the Method of common Recoveries a very prudent and political Institution, and fit to be follow'd in Equity, that Men may have some Restraint from overturning the Settlements of their Family."

hand, we shall see that this claim that equity could make its own rules for equitable estates was acted upon when, at the end of the century, Lord Thurlow invented the restraint against anticipation.[1]

On the same principle, in cases concerning wills and legacies of personal property, the ecclesiastical law must be followed ; [2] and it was due to this following of the ecclesiastical law " that a Bequest of the same Sum by the Debtor to the Creditor, shall be applied in Satisfaction of the Debt." [3]   Likewise in appropriate cases the maritime law, as applied by the court of Admiralty, must be followed.[4]   But since to use the words of Holt, C.J., " the common law is the over-ruling jurisdiction in this realm," [5] it is and always has been the rules of the common law which have been the principal basis upon which the rules of equity have been built up.   Thus if the rules laid down by the common law courts and the rules laid down by the court of Admiralty conflicted, it was the former rules that the court of Chancery followed.[6]

Just as Ballow is careful to explain the philosophical basis upon which equity rested, so, in several places in his book, he gives a philosophical explanation of the principle or rule of equity which he is expounding.   Thus, at the very beginning of his second Book, he lays down the broad principle, which underlies many applications of the trust concept, that " whoever has the Possession of Goods or Lands, either hath the absolute Property or Estate in them by a sufficient title ; or, so far as this is wanting, is considered as a Trustee for the true Owner." [7]   As an explanation of the favour shown by the

[1] Below 325-326.

[2] Ballow, op. cit. 99-100 ; cp. Hudson v. Hudson (1735) Cases t. Talbot 127 where the court heard an argument from the civilians on the question whether, if administration is granted to two persons and one dies, the right to administer survives.

[3] " And the Canonists, whom our Resolutions have follow'd, have expounded these Wills, as the Civilians did the *Testamenta militaria*, viz., according to the Intent.   And therefore, altho' a Legacy is to be taken as a Gift, yet a Man shall be taken to be just before he is kind.   So that a Bequest of the same Sum by the Debtor to the Creditor, shall be applied in Satisfaction of the Debt," ibid 100 ; Talbot v. Duke of Shrewsbury (1714) Prec. in Ch. 394 ; below 269.

[4] In the case of Allport v. Thomas (1725) Gilb. Rep. at p. 227 Gilbert C.B. said that " though this case was within the mercantile law, yet it being admitted by the answer that the charge was for tackling etc., a court of equity must grant them the redress as a court of Admiralty would, viz., upon the bottom of the ship."

[5] Shermoulin v. Sands (1697) 1 Ld. Raym. at p. 272.

[6] Watkinson v. Bernardiston (1726) 2 P. Wms. 367, where it was held that since at common law ship repairers had no lien on the ship for their charges, they could not assert any claim against the ship in competition with a mortgagee of the ship ; but the note from the Registrar's books would seem to show that the decree in favour of the mortgagee was partly grounded on the fact that the ship repairer had signed receipts for his charges in order to enable the mortgage to be effected.

[7] A Treatise of Equity 52.

court to charitable trusts,[1] he tells us that the King as *parens patriae* was bound specially to care for them, and that he had delegated the care of them to the court of Chancery ;[2] and he gives a similar historical explanation of the modern extent of the court's jurisdiction over infants, idiots and lunatics.[3]   He puts the principles which underlay the protection given by equity to the mortgagor on a very broad ground when he says :[4]

Equity is Part of the Law of *England*, so that it cannot in any Manner of Way be provided by Agreement, in Case of a Mortgage, that the Court of Chancery should not give Relief.   For such an Agreement would be contrary to natural Justice in the Creation of it, and prove a general Mischief ;  because every Lender would by this Method make himself Chancellor in his own Case, and prevent the Judgment of this Court.   Neither shall a man have Interest for his Money, and a collateral Advantage besides for the Loan of it, or clog the Redemption with any By-agreement, since this would be to let in all Manner of Extortion and Usury.

Ballow thus keeps very close to the original and the historic principle upon which equity originally rested, and tries to show that the doctrines of equity which the Chancellors were developing were legitimate deductions from this principle.   In fact, just as the author of *The Doctor and Student* helped to carry over the principles of equity applied by the ecclesiastical Chancellors of the Middle Ages, who were canon lawyers, into the following period, when those principles were applied by Chancellors who were laymen and English lawyers ;[5] so Ballow's treatise helped to carry over the same principles into the period when equity was rapidly becoming a definite system of fixed principles and rules.   But, as we shall now see, the necessity of setting some limitations upon the generality of these principles became more

[1] A Treatise of Equity 80-82.

[2] " So anciently in this Realm, there were several Things that belonged to the King as *Pater Patriae*, and fell under the Care and Discretion of this Court ;  as Charities, Infants, Ideots, Lunaticks, etc.   Afterwards such of them as were of Profit and Advantage to the King, were remov'd to the Court of Wards, but by the Statute, upon the Dissolution of that Court, came back again to the Chancery," ibid 80 ; in the case of infants modern cases have accepted this explanation of the historical origin of the Chancellor's jurisdiction, though its correctness is improbable, see vol. vi 648 ;  and cp. Hargrave's note to Co. Litt. 128 cited Fonblanque, Treatise (5th ed.) ii. 225-228 ;  Fonblanque, ibid 228-233, supports the generally accepted view stated by Ballow ;  but it is clear that Ballow is wrong in failing to distinguish the jurisdiction over infants from the jurisdiction over lunatics, since the latter jurisdiction is not part of the general jurisdiction of the court of Chancery, but depends upon a special delegation to the Chancellor, vol. i 475 ;  but both in the case of infants and of charities, below 270-271, the jurisdiction of the court may, as Spence says, Equitable Jurisdiction i 592, be regarded as " compounded of the general jurisdiction of the Court of Chancery over trusts, and the prerogative jurisdiction committed to the Chancellor by the sovereign as *parens patriae*, he having in that character a general superintending power over public interests when no other person is intrusted with that power."

[3] Last note.          [4] A Treatise of Equity 87.          [5] Vol. v 268.

CHANCELLORS AND MASTERS OF ROLLS (1700–1737)  227

apparent, as the doctrines of equity became more systematic and more fixed.

(2) *Ballow admits that there are limitations upon the application of these principles, and consequently upon the power of equity to interfere with the law, and that the established rules of equity ought to be followed.*

We have seen that, from the first, it had been admitted that there were limitations on the power of equity to interfere with the law. In the first place, the author of *The Doctor and Student* admitted that, though, as a general rule, equity should intervene if a strict application of the law leads to harsh or unfair dealing, the intervention of equity might, by the terms of the law, be expressly or by implication forbidden.[1] This limitation was expressly admitted by Ballow. " If the Law has determined a Matter with all its Circumstances, Equity cannot intermeddle ; and for the Chancery to relieve against the express Provision of an Act of Parliament, would be the same as to repeal it." [2] In the second place, we have seen that, from the latter part of the sixteenth century onwards, the discretion of the Chancellor to make what decrees he pleased, in order to adjust on ideally equitable principles the rights of the parties, was coming to be limited by the established practice of the court which was recorded in its decisions ; [3] and that the growth of the practice of reporting decisions was giving rise to certain principles and rules which limited still further the Chancellor's discretion.[4] We have seen that Lord Nottingham had laid it down in 1672 that the conscience which should direct the Chancellor was not " *naturalis et interna,*" but " *civilis et politica* and tied to certain measures ; " [5] and that in 1734 Jekyll, M.R., had emphasized the principle that the Chancellor's discretion must be exercised in accordance with established principles.[6] This limitation of the Chancellor's discretion was recognized by Ballow when he said that

altho' in Matters of apparent Equity, as Fraud, or Breach of Trust, Precedents are not necessary ; yet in other Cases, it is dangerous to extend the Authority of this Court further than the Practices of former Times.[7]

In fact, the process which has ended in making equity a systematic body of principles and rules, which are almost as fixed as the principles and rules of the common law, had been rapidly proceeding since the latter part of the seventeenth

[1] Vol. iv 281.
[2] Vol. v 275-276.
[3] A Treatise of Equity 3.
[4] Ibid 276-278 ; vol vi 616-619, 668-669.
[5] Cook v. Fountain (1672) 3 Swanst. at p. 600, cited vol. vi 547.
[6] Cowper v. Cowper (1734) 2 P. Wms. 753-754, cited vol. vi 669.
[7] A Treatise of Equity 3 ; cp. Heard v. Stanford (1736) Cases t. Talbot at p. 174, cited above 217 n. 2.

century. It is true that the application of the principles and rules of equity has never become quite so fixed as the application of the principles and rules of the common law. Equitable remedies always have been and still are discretionary.[1] But it is clear that, as the ground comes to be more thickly covered with precedents, the range of this discretion will become more and more circumscribed. As yet, however, the process is in its initial stages. We shall now see that, when Ballow was writing, the Chancellors had a wider discretion than they had at the end of the century.

(3) *Because the development of a regular and a fixed system of equitable principles and rules was in its initial stage, the rules laid down in some of the cases were then more closely connected with the original wide principle on which equitable interference with the law was based, than they were later, with the result that some very loose doctrines were sometimes laid down which were later rejected.*

We have seen that Lord Nottingham, though he insisted that the conscience which ought to guide the Chancellor was " *civilis et politica* and tied to certain measures," sometimes made use of the original wide principle upon which equitable interference with the law was based. Thus, in order to justify his dissent from the judges in the *Duke of Norfolk's Case*, he said, " I must be saved by my own faith, and must not decree against my own conscience and reason." [2] In 1711 Harcourt, L.C., justified his dissent from a decision of his predecessor Cowper in the same way ; [3] and in 1735 Talbot made use of the same argument to explain his dissent from an earlier decision.[4] In 1755, in a case in which it was alleged that the execution of a power had been procured by misrepresentation, Lord Hardwicke said : " This court is a court of conscience. I shall give my opinion in this case according to my conscience." [5] As I have already pointed out, the fact that many of the cases which came before the court of Chancery depended on complicated

[1] This contrast between the application of legal and equitable remedies was explained and acted upon by Lindley L.J. in *in re* Scott and Alvarez's Contract [1895] 2 Ch. at pp. 612-614 ; cp. Ballow's statement, op. cit. 36, that " altho' a written Agreement being unreasonable, the Court will not carry it into Execution ; yet they will decree, that it be deliver'd to the Person for whose Benefit it was design'd, that he may have an Opportunity to make the most of it at a Trial at Law."

[2] The Duke of Norfolk's Case (1681) 3 Ch. Cases at p. 47, cited vol. vi 546.

[3] " Lord Keeper Harcourt said, that he had a great respect for his predecessor, but that he must determine causes according to his own conscience, and could not agree with Lord Cowper's decree," Bale v. Coleman 2 Eq. Cases Ab. at p. 311.

[4] " As to the case of *Pratt* and *Pratt*, his Lordship declared he had a great regard and deference to the opinion and the judgment thereupon given, but that however he must be guided by his own judgment and conscience," Lutwich v. Lutwich, ibid at p. 448.

[5] Scroggs v. Scroggs, Ambler at p. 814 ; for Hardwicke's view as to the place of conscience in the administration of equity see below 261-263.

states of fact, and on the peculiar circumstances of the parties, and the fact that many of the doctrines of equity were still somewhat nebulous, made it possible for the Chancellors to make the decrees which commended themselves to their sense of what was fair and just.[1]   It is not surprising, therefore, that in this, as in earlier periods in the history of equity, doctrines are laid down in the cases and in Ballow's book, which were based upon a particular Chancellor's view of what was equitable in the circumstances of the particular case ; and that these doctrines, because they were contrary to the principles and rules of equity which ultimately became established, were later rejected.[2] The following instances of these loose doctrines appear in Ballow's book :

Ballow tells us that,

in all contracts purely chargeable, if there appears to be an inequality, altho' there was no Deceit on either Side, and all the Faults of the Things were exposed : Yet if the Damage be considerable, the Bargain ought to be made void.[3]

There was little if any warrant for this doctrine in the decided cases.[4]   In 1741 it was expressly rejected by Lord Hardwicke[5] and in 1787 by Eyre, C.B.[6]   Again, Ballow tells us that,

an Executor or Trustee not being bound to lend etc., if he do lend it is at his Peril ; and if it be by that Means lost, he shall answer the same out of his own Estate, and therefore as he shall bear the Loss, he shall have the Gain.[7]

This is quite contrary to principle,[8] and, in fact, even before Ballow wrote, it had been decided not to be law.[9]   Similarly,

[1] Vol. vi 669-670.

[2] For instances of such cases at an earlier period see vol. v 337 n. 4.

[3] A Treatise of Equity 11.

[4] Fonblanque, A Treatise of Equity (5th ed.) i 127 says, " I have not been able to find a single case in which it has been held, that mere inadequacy of price is a ground for the court to annul an agreement, though executory, if the same appear to have been fairly entered into, and understood by the parties, and capable of being specifically performed ; still less does it appear to have been considered as a ground for rescinding an agreement actually executed " ; the case which comes nearest to it is Herne v. Meeres (1679) cited in note 2 to the case of Heathcote v. Paignon (1787) 2 Bro. C.C. 179 ; but in both these cases there was evidence of fraud or oppression ; for two cases in 1721 in which the fact that an excessive price was promised was made the ground of relief, see below 232-233.

[5] Willis v. Jernegan 2 Atk. at p. 251.

[6] Griffith v. Spratley cited in note 4 to the case of Heathcote v. Paignon (1787) 2 Bro. C.C. 179.

[7] Op. cit. 75 ; his authority was Bromfield v. Wytherley (1718) Prec. in Ch. 505, where the distinction he makes between a solvent and insolvent trustee was drawn.

[8] See Fonblanque, op. cit. ii 186 ; as he points out the principle stated by Ballow was considered and condemned by Lord Thurlow in the case of Newton v. Bennet (1784), 1 Bro. C.C. 359.

[9] Ratcliffe v. Graves (1683) 1 Vern. at p. 197, per North L.K. ; in 1706 Cowper L.K. ruled that, " although a trustee or executor is not empowered or directed to place out at interest ; yet when he makes interest he shall be accountable for it," Lee v. Lee 2 Vern. 548.

230      THE EIGHTEENTH CENTURY

following two early cases,[1] he lays it down that a factor (whom he admits to be a trustee) may retain a profit made by non-payment of customs in a foreign country, which is quite contary to the principles elsewhere laid down by himself,[2] and to the principle laid down in 1726 in the case of *Keech v. Sandford*,[3] as to the duty of a trustee to account for any profit made as a result of the trust relationship.    Ballow tells us that

> in the Performance of a Trust, the Chancery has a Power to alter the Disposition of the Party upon emergent Accidents, which he did not foresee ; and which if he had foreseen, he would in all Probability have settled his Estate otherwise.[4]

Here again there was authority in the earlier cases for this proposition ; [5] but at the end of the century Fonblanque said that it gave " a latitude of construction much beyond what our courts of equity would probably now consider themselves entitled to take." [6]  Ballow states that, though a will proved in the ecclesiastical court cannot be impeached for fraud in the court of Chancery, yet there may be a fraud in obtaining a will which is relievable there.[7]  This was a subject upon which the decisions had been very conflicting.[8]  But later cases have settled that there was no such equity, because, as Fonblanque says, " a will of personal estate may be set aside in the ecclesiastical court, and a will of real estate may be set aside at law." [9]

The decided cases show that it was inevitable that the writer of a text-book on equity at this period should lay down some very vague rules on many matters, and that he should state as grounds for equitable interference principles which were later rejected ; for on many matters the cases were in conflict.  Though some of the cases lay down principles and rules which have been accepted, others are quite inconsistent with these principles and rules ; and others can only be supported by reasons which were not those given by the court which decided them.  These facts were recognized by Talbot when he said, " I think it much better to stick to the known general rules, than to follow any

---

[1] Smith v. Oxenden (1663) 1 Ch. Cases 25 ; Knipe v. Jesson (1666) ibid 76 ; these cases were probably decided mainly on the ground that this retention was permitted by mercantile custom.

[2] " He that takes upon him a Trust, takes it for the Benefit of the Person for whom he is trusted, and not to take any Advantage to himself," op. cit. 76.

[3] Cases t. King 61.      [4] Op. cit. 77.

[5] Nourse v. Yarworth (1674) Rep. t. Finch at p. 159 ; cp. Hyde v. Seymour (1698) 2 Free, at p. 43.

[6] Op. cit. ii 97 ; but the modern cases have recognized a limited power of this kind, see *in re* New [1901] 2 Ch. 534 ; and this power is now given by the Trustee Act 1925 § 57.

[7] Op. cit. 99.       [8] Fonblanque, op. cit. i 69-70.

[9] Ibid 70 ; Bennet v. Wade (1742) 2 Atk. 324 ; Webb v. Claverden (1742) ibid 424 ; Allen v. McPherson (1847) 1 H.L.C. at p. 210, *per* Lord Lyndhurst.

one particular precedent which may be founded on reasons unknown to us : such a proceeding would confound all property." [1]   In fact some of the early decisions of the court of Chancery are like some of the dicta to be found in the Year Books.  They contain the germs of some of the principles and rules which have become fundamental principles and rules of modern equity ; but they contain also principles and rules which have been rejected by later lawyers.[2]   Let us look at one or two instances.

It seems to have been held that, if a parol agreement were made to make a settlement in consideration of marriage, and a marriage took place on the faith of that agreement, the marriage was a sufficient part performance to take the case out of the statute of Frauds, either because it was, in the circumstances, fraudulent to plead the statute, or because the parties had changed their position on the faith of the contract.[3]   This decision was overruled by Hardwicke in 1749.  He held that marriage alone could not be a part performance, since this would be tantamount to a repeal of the statute.[4]   At the beginning of the eighteenth century the idea that, if a woman before her marriage settled her property on herself without the knowledge of her husband, the settlement was not binding because it was a fraud on his marital rights,[5] still persisted ; [6] and in 1710 Cowper thought that if property was given to a married woman for her separate use, and no trustee was appointed, the husband's common law rights were not barred [7]—a view which was negatived in 1725, when it was held that the court would supply the want of a trustee by making the husband a trustee for his wife.[8]

Sometimes decisions were founded on principles of public policy, and even on peculiar conditions arising out of the circumstances of the times.

Many cases show a leaning in favour of the heir, because it was thought expedient that landed estates should be preserved intact and descend as a whole to the eldest son ; and, so far as possible, free from incumbrances.  It was said in 1724 to be

---

[1] Clare v. Clare (1734) Cases t. Talbot at p. 26.
[2] Vol. ii 555-556 ; vol. v 490.
[3] Seaford v. Meale and Leonard (1721) Prec. in Ch. at p. 561.
[4] Taylor v. Beach (1749) 1 Ves. Sen. 297 : cp. McManus v. Cooke (1887) 35 C.D. at p. 391 where this case is cited and approved.
[5] Vol. v 311-314 ; vol. vi 644-645 ; Draper's Case (1677) 2 Free. 29.
[6] Gilbert, Lex Praetoria 280, 344-345 ; Cotton v. King (1726) 2 P. Wms. at p. 360, and see ibid 674, where the settlement was upheld because it was reasonable ; but it was held in 1788 that a settlement by a woman of her own property before marriage would only be upset if she had been guilty of active fraud, Strathmore v. Bowes 2 Bro. C.C. 345 ; below 275, 324.
[7] Harvey v. Harvey 1 P. Wms. 125.    [8] Bennet v. Davis 2 P. Wms. 316.

a standing rule in this court, that when a portion or legacy is to be paid out of an estate and lands, at such a time, or at such an age, then, in favour of the heir at law, if the legatee die before the day, the legacy or portion is sunk and gone ; but it is otherwise if the legacy is to be paid out of personal estate.[1]

It was a rule both of equity and the common law that an heir could only be disinherited by express words ; [2] and in 1729 a construction was put upon marriage articles, which was based partly on the argument that " sons are of a different consideration in equity from daughters, they being to support the name of the family, which daughters do not," and that, " in the general course of marriage settlements daughters are provided for by pecuniary portions and not by land." [3] In 1723 Macclesfield considered it to be a very hard case—almost a want of respect to the Crown—for a peer to disinherit his heir.[4] There was thus authority for Ballow's statement, that the court might refuse to order trustees to make a conveyance " for a political reason, as if it were to enable a nobleman to suffer a recovery and leave the honor bare without estate, or if the party were a notorious spendthrift." [5]

Even more general grounds of public policy sometimes influenced the Chancellor. Thus two decisions were arrived at in 1721 which were based mainly on the peculiar financial conditions prevailing at the time of the bursting of the South Sea Bubble.[6]  In both cases specific performance was refused mainly on this ground ; [7] and in one of them Macclesfield said : [8]

[1] Bateman v. Roach 9 Mod. at p. 106; but Hardwicke denied that equity favoured the heir, and accounted for the rule that legacies charged on land at a future date were not raised if the legatee died before the day of payment, by saying that in such a case equity followed the rule of the common law, but that in cases of personal property it followed the rule of the civil law, Prowse v. Abingdon (1738) 1 Atk. at p. 486.

[2] Shaw v. Bull (1702) 12 Mod. at p. 594, *per* Powell J.; Denn d. Gaskin v. Gaskin (1777) 2 Cowper at p. 661, *per* Lord Mansfield C.J.; cp. 2 Eq. Cases Ab. 321.

[3] Powell v. Price 2 P. Wms. at p. 539.

[4] " But is it not a stronger case, when the King has bestowed an honour on a family, whereby the heir of the honour is *consiliarius natus*, and sits as a judge in the highest court, the house of Lords ?  Surely it is incumbent on the ancestor to leave some provision for the maintenance of the honour, and looks like want of gratitude to the Crown . . . to leave it naked. . . . Therefore more ought to be done in this case for the plaintiff than in a common case," Earl of Suffolk v. Howard (1723) 2 P. Wms. at p. 178 ; and this reasoning was approved by Hardwicke in the case of Leman v. Alie (1753) Ambler at p. 163.

[5] Op. cit. 76 ; Saunders v. Nevil (1701) 1 Eq. Cases Ab. 392-393.

[6] Lewis v. Lord Lechmere 10 Mod. 503 ; Savile v. Savile 1 P. Wms. 745.

[7] In Lewis v. Lord Lechmere the ostensible ground of the decision was that the plaintiff had not given the evidence of his title to Lord Lechmere's counsel within the time limited by the articles ; but he put his insistence on exact time mainly on the fact that the price of South Sea stock, from whence the money for the purchase was to be raised, was varying from day to day.

[8] Savile v. Savile 1 P. Wms. at pp. 746-747.

that according to his apprehension a court of equity ought to take notice under what a general delusion the nation was at the time when this contract was made by Mr. Frederick, when there was thought to be more money in the nation than there really was, which induced people to put imaginary values on estates.

Mr. Frederick was, on this ground, allowed to get out of his contract by forfeiting his deposit—a decision which was quite contrary to established principles.

Only sixty-four years had elapsed between Nottingham's accession to office and the publication of Ballow's book. It is not surprising that decisions should sometimes be conflicting and doctrines either nebulous or unsettled. Rather it is surprising that, within this short period, so many of the principles and rules of equity should have emerged, sometimes in a loose and general, and sometimes in their final, form.

(4) *Though in very many cases the settled principles and rules of equity are apparent, some of these principles and rules are more flexible than they became later in the century, because they are more closely connected with the bases upon which they originally rested.*

I shall deal with the history of the development of the principles and rules of equity in the Second Part of this Book. We shall see that in the year 1737 considerable progress had been made in the development of the leading principles of equity, and in the formation of bodies of equitable doctrine upon such subjects as Trusts, Mortgages, Administration of Assets, Specific Performance of Contracts and other Equitable Remedies, and Evidence. But this process was then still in its initial stages. There were cases in which the bases upon which equitable interferences with the law rested, had been so interpreted that they had given rise to conflicting rules and principles, with the result that some of the principles and rules of equity were more uncertain, and therefore more flexible, than they afterwards became.

Throughout the greater part of the eighteenth century the idea that equity existed to do justice in those cases in which the rules of law would otherwise, by reason of their generality, do injustice, was present to the minds of the Chancellors.[1] At the beginning of the seventeenth century even Coke had admitted that, in cases of this kind, the court of Chancery exercised a useful and a necessary jurisdiction. He said :[2]

In this court of equity the ancient rule is good. Three things are to be judged in court of conscience : covin, accident, and breach of confidence. All covins frauds and deceits, for the which is no remedy by the ordinary course of law. Accident, as when a servant, an obligor, mortgageor etc. is sent to pay the money on the day, and he is robbed etc. remedy is to be had in this court against the forfeiture, and so in

[1] Above 223.        [2] Fourth Instit. 84.

234      THE EIGHTEENTH CENTURY

the like. The third is breach of trust and confidence, whereof you have plentiful authorities in our books.

The principle that the court of Chancery had jurisdiction in cases of fraud trust and accident was repeated by Cowper in 1710,[1] with the explanation that equity could not interfere with the settled principles of the law to remedy general inconveniences, " but only when the observation of a rule is attended with some unusual and particular circumstance which creates a personal and particular inconvenience."[2] As late as 1767 the basic principles upon which the court acted, regarded from the point of view, not of the wrong suffered by the plaintiff, but of the conditions which he must satisfy in order to get relief, were emphasized by Lord Camden. " Nothing," he said,[3] " can call forth this court into activity, but conscience, good faith, and reasonable diligence ; where these are wanting the court is passive, and does nothing." It became less possible and less necessary to make these general statements of first principles as the doctrines of equity became more fixed and more technical. But all through this period and later there was a class of cases in which the court acted very much on its original principles, that is to say it looked very carefully into the facts and the circumstances of the parties, and tried to make the decree which was equitable having regard to those facts and circumstances. This was the class of cases in which some kind of fraud or sharp practice or unconscionable dealing was involved. We have seen that Ballow had said that in matters of apparent equity, such as fraud or breach of trust, precedents were not necessary ;[4] and that in a case where misrepresentation was alleged Hardwicke had said that in cases of this kind he must judge according to his conscience.[5] It is for this reason that we find that in these cases the Chancellors did in fact judge according to their consciences, after a careful examination into all the facts and circumstances of the case before them. Let us glance at one or two instances of the exercise of this wide and flexible jurisdiction.

At the end of the seventeenth century equity had laid it down that it would not permit a statute to be made an instrument of fraud—

[1] Earl of Bath v. Sherwin (1710) 10 Mod. 1.
[2] Ibid ; in this case the Chancellor refused to grant an injunction against the bringing of an action of ejectment after five unsuccessful actions had been brought " for it is a known maxim of the common law, that a man may try his title as often as he pleases in an ejectment " ; but this decision was reversed by the House of Lords, and this reversal helped materially to make the action of ejectment an efficient substitute for the real actions, vol. vii 17.
[3] Smith v. Clay (1767) 3 Bro. C.C. 640 note.
[4] Above 227.                    [5] Above 228.

so if the Son prevails upon the Mother, to get the Father to make a new Will, and make him Executor in her Stead, promising himself to be a Trustee for the Mother ; this will be deemed a Trust for the Wife, on the Point of Fraud, notwithstanding the Statute of Frauds and Perjuries.[1]

The court was always ready to give a remedy for fraud or sharp practice where the parties had no remedy at law.   Thus,

A. agreed for the purchase of timber, and A. and B. both enter into a bond that A. his executors and administrators, should not cut down under such a size.   It comes out that A.'s name was only made use of for B. in the agreement.   B. cuts down timber under size.   There can be no remedy at law against B. upon that bond.   But it is a fraud on the seller, and relievable in equity.[2]

Similarly, the court interfered to prevent acts which it considered unfair or unconscientious, or to give redress for such acts if they had been committed.   Thus it interfered to prevent equitable waste or to give redress if it had been committed, because such waste was an unconscientious use of the legal rights possessed by a tenant for life without impeachment of waste.[3] Though at law an infant was not liable to repay money lent to pay for necessaries, in equity, if the money were spent on necessaries, the lender was subrogated to the rights of the person who supplied the necessaries, and could thus enforce payment ; [4] and Cowper laid it down in another case that " if an infant is old and cunning enough to contrive and carry out a fraud," he ought in equity to make satisfaction for it.[5]   If an agreement had been procured by undue influence not amounting to duress, the court would set it aside ; and it was prepared in some cases to presume the existence of such influence from the relationship of the parties.[6]   On the same principle it would set aside " catching bargains " with heirs and reversioners.[7]

[1] Ballow, op. cit. 57 ; the case to which he is referring is Thynn v. Thynn (1684) 1 Vern, 296 ; see also Devenish v. Baines (1689) Prec. in Ch. 3 ; and for other similar cases of this period see Fonblanque, op. cit. ii 37 ; Gilbert, Lex Praetoria 336.

[2] Butler v. Pendergrass (1720) 2 Eq. Cas. Ab. 481-482—a case decided by the Irish court of Chancery and affirmed by the House of Lords, 4 Bro. P.C. 174.

[3] Vane v. Lord Barnard (1716) 2 Vern. 738 ; " The Court upon filing the bill (and plea and answer put in by Lord Barnard), granted an injunction to stay committing of waste, in pulling down the castle ; and now upon the hearing of the cause, decreed, not only the injunction to continue, but that the castle should be repaired, and put in the same condition as it was in, in August 1714 ; and for that purpose a commission was to issue to ascertain what ought to be repaired, and a master to see it done at the expense and charge of the defendant," ibid at pp. 738-739.

[4] Marlow v. Pitfield (1719) 1 P. Wms. 559.

[5] Watts v. Creswell (1714) 2 Eq. Cas. Ab. 515.

[6] Manners v. Banning (1709) 2 Eq. Cas. Ab. 282.

[7] Berney v. Pitt (1686) 2 Vern. 14 ; Nott v. Johnson (1687) ibid 27 ; Gilbert, Lex Praetoria 291-292, draws a distinction between cases where the heir had a maintenance—there the court would relieve after the father's death " and reduce

And, just as it would give relief in all these cases where fraud and sharp practice were proved, so it refused to enforce a bargain which it considered to be unconscionable. Thus, when an action was brought to get payment for attending auctions in order to enhance the price of goods, the court not only dismissed the action, but refused, in taking the account, to allow this demand to be set off against fair and just demands.[1] It is obvious from these and many other similar cases that equity was not only extending the conception of fraud, but was giving relief in many cases which bordered on fraud. It was for this reason that, as Lord Haldane said, " in Chancery the term ' fraud ' came to be used to describe what fell short of deceit, but imported breach of a duty to which equity had attached its sanction " ; [2] and that the term " fraud," when used in this way, meant " not moral fraud, but breach of the sort of obligation which is enforced by a Court that from the beginning regarded itself as a Court of conscience." [3]

This wide and flexible jurisdiction was being used by the court all through this period to enforce high standards of fairness ; and as yet the court was very free to use it to strike at courses of conduct of which it disapproved, or to adjust the equities arising out of the often complicated states of fact which were brought before it. But it was inevitable that the exercise of this wide and flexible jurisdiction should give rise to definite bodies of equitable doctrine upon certain types of these cases. As yet this process has not gone far ; but some of the cases indicate some of the lines which it will pursue. Thus it is clear that the determination of the court not to allow even a statute to be made an instrument of fraud, will give rise to the equitable rules as to secret trusts ; and that the interference of the court to prevent equitable waste will modify the position of the tenants for life without impeachment of waste.[4] The rules laid down by the court as to the remedies which it will give against fraudulent dealings by infants will add to the law a gloss, which will make this branch of the law complex and uncertain.[5] Its interference to prevent " catching bargains " with heirs and reversioners will make the rules on this point a very distinct branch of equity. Its interference to prevent undue influence

the bargain to the common value of the goods," and cases where he had no maintenance—there the " bargain shall stand, because it is not to supply the luxury and prodigality of the heir, but to keep him from starving, and since the seller would have lost his money in case the heir had died during the life of the father, he ought to have a proportional benefit for such hazard " ; this distinction was lost sight of when the doctrine of equity as to these catching bargains became stereotyped.

[1] Walker v. Gascoigne (1726) 2 Eq. Cas. Ab. 483.
[2] Nocton v. Lord Ashburton [1914] A.C, at p. 953.
[3] Ibid at p. 954.    [4] Vol. vii 278.
[5] See Lord Sumner's judgment in Leslie v. Sheill [1914] 3 K.B. at pp. 613-618.

HARDWICKE AND MODERN SYSTEM OF EQUITY    237

had already added a much-needed supplement to the common law rules as to duress ; and in the distinction which it was drawing between cases where it would and where it would not presume this influence,[1] and between the different considerations which it would apply to deeds and wills alleged to have been obtained by this influence,[2] we can see some of the outlines of the modern law.

This summary of the development of equitable doctrine between 1700 and 1737, shows that the principles and rules of equity had reached a stage at which the condition precedent for their further progress was the accession of an able lawyer to the chancellorship, who should hold his office for a sufficiently long period to make his influence felt. Fortunately for the development of equity this condition was fulfilled. Talbot was succeeded by Hardwicke who, next to Mansfield, was the greatest lawyer of the eighteenth century ; and he held his office for nearly twenty years. We shall now see that it is upon his decisions that many of the modern principles and rules of equity rest.

### Lord Hardwicke and his Contribution to the Formation of the Modern System of Equity

Lord Hardwicke [3] was not only a great lawyer and a great Lord Chancellor, he was also a statesman who exercised much influence upon domestic affairs and upon the foreign policy of the State. But it is in the sphere of domestic affairs, as an exponent and administrator of the law, and as a legislator and a critic of proposed legislation, rather than in the sphere of foreign politics, that he shines as a statesman.[4] The experience

[1] Above 235.

[2] Gilbert, Lex Praetoria 295-296 ; James v. Greaves (1725) 2 P. Wms. 270 ; for this distinction, which is now grounded upon different and sounder reasons than those assigned in this case, see Parfitt v. Lawless (1872) 2 P. and D. at pp. 468-470.

[3] The most exhaustive and much the best life of Hardwicke is " The Life and Correspondence of Lord Hardwicke," by P. C. Yorke ; Harris's Life is useful in so far that it contains summaries from his papers of some of the cases in which he was concerned as law officer, Chief Justice, and Lord Chancellor, and also some of his correspondence ; but otherwise it is verbose and not very illuminating ; Campbell's Life, Chancellors v 1-173, though it contains some interesting material for his life, is, unfortunately, disfigured by many mistakes and misrepresentations ; the best short life is that of Foss, Judges viii 178-197 ; the D.N.B. life is short and quite inadequate.

[4] Lord Chesterfield was his political opponent, but there was something in his statement that " Lord Hardwicke valued himself more on being a great minister of state, which he certainly was not, than upon being a great magistrate, which he certainly was. All his notions were clear, but none of them were great. Good order and domestic details were his proper department : the great and shining parts of government, though not above his parts to conceive, were above his timidity to