# **EXHIBIT 3**

NATURAL LAW AND
ENLIGHTENMENT CLASSICS

# *Principles of Equity*

Henry Home, Lord Kames

*The Third Edition*

Edited and with an Introduction by
Michael Lobban

*Major Works of Henry Home, Lord Kames*

LIBERTY FUND
*Indianapolis*

This book is published by Liberty Fund, Inc., a foundation established to encourage study of the ideal of a society of free and responsible individuals.

The cuneiform inscription that serves as our logo and as the design motif for our endpapers is the earliest-known written appearance of the word "freedom" (*amagi*), or "liberty." It is taken from a clay document written about 2300 B.C. in the Sumerian city-state of Lagash.

Introduction, editorial apparatus, and index © 2014 by Liberty Fund, Inc.

All rights reserved

Printed in the United States of America

c  10  9  8  7  6  5  4  3  2  1
p  10  9  8  7  6  5  4  3  2  1

Frontispiece and cover (detail): Portrait of Henry Home, Lord Kames, by David Martin. Reproduced with permission of the National Galleries of Scotland.

*Library of Congress Cataloging-in-Publication Data*

Kames, Henry Home, Lord, 1696–1782.
Principles of equity/Lord Henry Home Kames; edited and with an Introduction by Michael Lobban.—Third Edition.
pages   cm.—(Natural law and enlightenment classics) (Major Works of Henry Home, Lord Kames) Includes bibliographical references and index.
isbn 978-0-86597-615-3 (hardback)—isbn 978-0-86597-616-0 (paperback)
1. Equity—Great Britain.   I. Lobban, Michael.   II. Title.
kd674.k36 2014
346.41'004—dc23                                                                 2013020012

liberty fund, inc.
8335 Allison Pointe Trail, Suite 300
Indianapolis, Indiana 46250-1684

# CONTENTS

| | |
|---|---|
| Editor's Introduction | ix |
| A Note on Legal Sources and Citations | xxvii |
| List of Abbreviations | xxxiii |
| Preliminary Discourse (from the second edition of *Principles of Equity*) | xxxv |

*Principles of Equity,* The Third Edition

| | |
|---|---|
| Letter to Lord Mansfield | 3 |
| Preface to the Second Edition | 5 |
| Preface to the Present [Third] Edition | 7 |
| Table of Contents (Third Edition) | 9 |
| Explanation of Some Scotch Law Terms Used in This Work | 15 |
| Principles of Equity (Third Edition) | |
|    Volume 1 | 17 |
|    Volume 2 | 243 |
| Original Index (index to the 1778 edition) | 435 |
| Principles Founded on in This Work | 451 |
| Major Variant Readings between the First, Second, and Third Editions | 453 |

Table of Contents of the First Edition (1760) 467

Table of Contents of the Second Edition (1767) 475

Appendix: Extracts from the First and Second Editions 485

Letter from Kames to Robert Dundas of Arniston,
Lord President of the Court of Session, Including a Paper
Entitled "Jurisdiction of the Court of Session as a Court
of Equity" 537

Glossary 543

Bibliography 565

Index 571

Case 4:20-cv-00957-SDJ    Document 835-3    Filed 04/04/25    Page 6 of 11 PageID #: 60473

62                    BOOK I, PART I, CHAPTER I

of the Earl, the obligation was to be void." Upon the death of the Earl of Peterborough, which happened about five years after the date of the bond, an action was brought in the court of session against the Lord Mordaunt, now Earl of Peterborough, for payment; and the court, upon authority of the case immediately foregoing, unanimously judged, that the bond should only subsist for the sum actually borrowed, with the interest.* <86>

## SECTION IV

*A man moved to act unknowingly against his interest, by fraud, deceit, or other artificial means.*

It is thought, that a court of common law, seldom interposes in any of the cases that come under the section immediately foregoing; and the reason is, that whether a man be led against his own interest by a violent temptation or by extortion, there is still left to him in appearance a free choice. But with respect to the matters that belong to the present section, a man is led blindly against his own interest, and has no choice. This species of wrong, therefore, being more flagrant, is not neglected by courts of common law. It is accordingly laid down as a general rule in the English law, "That without the express provision of any act of parliament, all deceitful practices in defrauding another of his known right, by means of some artful device, contrary <87> to the plain rules of common honesty, are condemned by the common law, and punished according to the heinousness of the offence."† Thus the causing an illiterate person to execute a deed to his prejudice, by reading it to him in words different from those in the deed, is a fraud, which a court of common law will redress, by setting the deed aside. The same where a woman is deceived to subscribe a warrant of attorney for confessing a judgment,[1] understanding the writing to be of a different import.‡

---

\* July 13, 1745, Dr William Abercromby contra Earl of Peterborough [M 4894 and 16429; from Falconer, and Sir James Ferguson of Kilkerran].

† [M. Bacon,] New abridgement of the law, vol. 2 [1736,] p. 594.

1. By executing a warrant of attorney, a debtor authorized an attorney named by his creditor to confess an action of debt on his behalf and to suffer a legal judgment to be entered against him.

‡ 1. Sid. 431 [*Roy* v. *Parris* (1669), reprinted in *The English Reports,* vol. 82, p. 1200].

In selling a house, it being a lie to affirm that the rent is £30, instead of £20, by which the purchaser is moved to give a greater price than the house is worth; this loss will be repaired by a court of common law, though the purchaser, by being more circumspect, might have prevented the loss.

In general, every covenant procured by fraud will be set aside in a court of common law. But with regard to covenants or agreements disregarded at common law, there can be no relief but in a court of e- <88> quity. Thus a policy of insurance was set aside upon fraud by a bill in chancery.*

We next proceed to enquire, whether every deceitful practice to impose upon others comes under common law.² Fraud consists in my persuading a man who has confidence in me, to do an act as for his own interest, which I know will have the contrary effect. But in whatever manner a man may be deceived or misled, yet if he was not deceived by relying upon the friendship and integrity of another, it is not a fraud. Fraud therefore implies treachery, without which no artifice nor double dealing can be termed *fraud* in a proper sense. But there are double-fac'd circumstances without number, and other artful means, calculated to deceive, which do not involve any degree of treachery. Where a man is deceived by such artifice, it must in some measure be his own fault; and bystanders are more apt to make him the object of their ridicule than of their sorrow: for which reason, frauds of this inferior nature have been overlooked by common law. But as every attempt to <89> deceive another to his prejudice is criminal in conscience, it is the duty of a court of equity to repress such deceit, by awarding reparation to the person who suffers. Utility pleads for reparation as well as equity; for if law were not attentive to repress deceit in its bud, corruption would gain ground, and even the grossest frauds would become too stubborn for law. It is this species of deceit, excluding treachery, that Lord Coke probably had in his eye,† when he lays down the following doctrine, That all covins, frauds, and deceits, for which there is no remedy at common law, are and were always redressed in the court of chancery.

---

* 2. Vernon 206 [*Whittingham* v. *Thornburgh* (1690), reprinted in *The English Reports,* vol. 23, p. 734].

2. For the treatment of fraud in the first edition, see Appendix, p. 501, Extract [1st: 100–1].

† 4 Inst. 84 [Coke, 4 *Institutes,* p. 84].

It is mentioned above, that a covenant procured by fraud will be set aside in a court of common law; and I now give instances where a covenant procured by deceit that amounts not to fraud, is set aside in a court of equity. A man having failed in his trade, compounded with his creditors at so much per pound, to be paid at a time certain. Some of the creditors refusing to fulfil the agreement, a bill <90> was brought by the bankrupt to compel a specific performance. But it appearing that he had underhand agreed with some of his creditors to pay their whole debts, in order that they might draw in the rest to a composition,[3] the court would not decree the agreement, but dismissed the bill.* A purchase made by a merchant in the course of commerce will be effectual, however soon his bankruptcy follow, provided it was his intention by continuing in trade to pay the price. But if he had bankruptcy in view, and no prospect to pay the price, the bargain, brought about by a palpable cheat, will be reduced in a court of equity, and the subject be restored to the vender. The only thorny point is, to detect the *animus*[4] of the purchaser to defraud the vender. In the case of Joseph Cave,† the presumptive fraud was confined to three days before the *cessio bonorum*;[5] but in that case Cave the purchaser was in good credit, till he demanded a meeting of his creditors in order to surrender his effects to them.[6] Other circumstances may concur with in- <91> solvency to enlarge that period. Gilbert Barclay merchant in Cromarty was in labouring circumstances, and owed much more than he was worth, when he made a purchase of salmon from Mackay of Bighouse; and before delivery several of his creditors proceeded to

---

3. Composition: the acceptance of a smaller sum in payment of a larger sum, usually by the creditors of a bankrupt.

 * 2. Vernon 71. Child contra Danbridge [1688; reprinted in *The English Reports,* vol. 23, p. 655].

4. "Intention."

 † Dict[ionary,] tit[le] (Fraud) [Kames, *Dictionary,* vol. 1, pp. 335–36: Sir John Inglis of Cramond contra Royal Bank, 8 December 1736; M 4937].

5. "Surrender of goods." Using this procedure, "a bankrupt in prison giving up his whole estate to his creditors upon oath, may apply to the Court of Session for liberation." N. Bailey, *An Universal Etymological Dictionary,* 28th ed. (Edinburgh: Neill, 1800).

6. In this case, Joseph Cave, the purchaser from Sir John Inglis, bought barley while insolvent, and within three days of making a *cessio bonorum:* "The Lords found, that the presumptive fraud must be confined to three days before the *cessio bonorum*" (Kames, *Dictionary,* vol. 2, p. 336).

execution[7] against him. A few days after delivery, he made over the salmon to William Forsyth, another merchant of the same town, in part payment of a debt due to Forsyth; who was in the knowledge that Barclay was in labouring circumstances, and that the price of the salmon was not paid. Execution thickened more and more upon him, and he broke in ten days or a fortnight after the salmon were delivered to Forsyth. From these circumstances the court presumed an intention in Barclay to defraud Bighouse: and considering that Forsyth's purchase was not made *bona fide,* they found him liable to pay to Bighouse the value of the salmon.*

Next of other transactions brought about by deceitful means. By a marriage- <92> settlement *A* is tenant for life of certain mills, remainder to his first son in tail.[8] The son, knowing of the settlement, encourages a person, after taking a thirty-years lease of these mills, to lay out a considerable sum in new buildings, and other improvements, intending to take the benefit after his father's death. This is a deceit which justice discountenances; and therefore it was decreed, that the lessee should enjoy for the residue of the term that was current at the father's death.†,[9] The defendant on a treaty of marriage for his daughter with the plaintiff, signed a writing comprising the terms of the agreement. Designing afterward to get loose from the agreement, he ordered his daughter to entice the plaintiff to deliver up the

---

7. "Putting into effect a court order." In Scotland, it also refers to the document which attests that the officer has carried this out.

* Mackay of Bighouse contra William Forsyth merchant in Cromarty, January 20. 1758 [M 4944, from Kames, *Select Decisions,* p. 198].

8. In order to preserve family property, eighteenth-century marriage settlements conferred only a life interest in the property on the husband (who became "tenant for life"). In contrast with estates in "fee simple" (where absolute rights were granted), such estates were granted in "fee tail," with the settlement specifying "remainders in tail," setting out who would obtain the property after the expiry of the life-estate—generally the "heirs of his body." See J. H. Baker, *An Introduction to English Legal History,* 4th ed. (London: Butterworths, 2002), pp. 293–94.

† Abridgement cases in equity, cap. 47. sect. B. par. 10 [1 Eq. Cas. Abr. 356–57, reprinted in *The English Reports,* vol. 21, p. 1099. The reference is to *Hanning* v. *Ferrers* (1712)].

9. Discussing this case, the first edition adds (p. 6): "Here was no actual damage, but only a risk; for the lessee would have enjoyed the full benefit of his lease had the lessor lived thirty years. 2*do,* The part the son acted was fraudulent, and undoubtedly subjected him to make reparation. And 3*tio,* The proper and natural reparation was to secure the lessee against the wrong-doer."

writing, and then to marry him. She obey'd; and the defendant stood at the corner of the street to see them go along to be married. The plaintiff was relieved on the point of deceit. A man having agreed to be bound for certain provisions in his son's contract of marriage, upon a promise from the son to discharge the <93> same, which accordingly was done before the marriage: and after the marriage, money having been lent to the son upon the faith of the said provisions in his contract; the discharge was set aside at the instance of the creditors, as being a deceitful contrivance between father and son to entrap them.* In a suit by the indorsee of a note or ticket, the debtor pleaded compensation[10] upon a note for the equivalent sum, granted him by the indorser, bearing the same date with that upon which the process was founded. The court deemed this a deceitful contrivance to furnish the indorser credit; and therefore refused to sustain the compensation.†

*A* having an incumbrance upon an estate, is witness to a subsequent mortgage, but conceals his own incumbrance. For this wrong his incumbrance shall be postponed.‡ To mortgage land as free when there is an incumbrance upon it, is a cheat in the borrower; to which cheat the in- <94> cumbrancer is accessory by countenancing the mortgage, and subscribing it as a witness. The hurt thus done to the lender by putting him off with a lame security, was properly repaired by preferring him before the incumbrancer. The following cases are of the same kind. A man lends his mortgage-deed to the mortgager, to enable him to borrow more money. The mortgagee being thus in combination with the mortgager to deceive the lender, is accessory to the fraud. And the hurt thereby done was properly repaired by postponing his mortgage to the incumbrance which the lender got for his money.§ A counsel having a statute from *A* which he

---

   * Stair, January 21. 1680, Caddel contra Raith [M 4275].
   10. The provision in Scots law whereby mutual debts can be extinguished by setting one off against the other. Under the statute 1592 c. 143 (*APS* iii: 573: c. 61, Compensation Act); this may be pleaded by way of exception or defense before a decree, but not by way of suspension or reduction after a decree.
   † Fountainhall, Forbes, June 11. 1708, Bundy contra Kennedy [M 4907, 4908].
   ‡ 2 Vern[on] 151. Clare contra Earl of Bedford [reprinted in *The English Reports,* vol. 23, p. 703. The case referred to is discussed in the report of the case of *Hunsden* v. *Cheyney*].
   § 2 Vern[on] 726. Peter contra Russel [1716, reprinted in *The English Reports,* vol. 23, p. 1076].

conceals, advises *B* to lend *A* £1000 on a mortgage, and draws the mortgage with a covenant against incumbrances. The statute was postponed to the mortgage.* *A* being about to lend money to *B* on a mortgage, sends to inquire of *D,* who had a prior mortgage, whether he had any incumbrance on *B's* estate. If it be proved that *D* denied he had any incumbrance, <95> his mortgage will be postponed.†,11 An estate being settled by marriage-articles upon the children of the marriage, which estate did not belong to the husband, but to his mother: yet she was compelled in equity to make good the settlement; because she was present when the son declared that the estate was to come to him after her death, and because she was also one of the instrumentary witnesses.‡,12

SECTION V

*What remedy is applied by a court of equity against the wrongs above stated.*

It is proper to be premised, that regulations for preventing harm cannot be other but prohibitory; and consequently cannot afford opportunity for the

---

\* [M. Bacon,] New abridgment of the law, vol. 2 [1736,] p. 598. Draper contra Borlace [1699; the case referred to is reported in 2 Vernon's Chancery Cases 370, reprinted in *The English Reports,* vol. 23, p. 833].

† 2 Vern[on] 554. Ibbotson contra Rhodes [1706, reprinted in *The English Reports,* vol. 23, p. 958].

11. In the discussion of this case in the first edition (p. 8), the comment is added, "A lie being a moral wrong, is sufficient, independent of all connections, to oblige the wrong-doer to repair the prejudice done by it, even where he has no purpose to benefit himself."

‡ 2 Vern[on] 150, Hunsdens contra Cheiney [1690, reprinted in *The English Reports,* vol. 23, p. 703].

12. When this case is discussed in the first edition (p. 8), the following comment is added: "The mother's connection here with the parties-contracters, and the countenance she gave to the contract, made it her duty, without artifice or dissimulation, to speak out the truth. Her artful silence therefore was a wrong, which subjected her to repair the prejudice occasioned by it. The parties could not be restored *in integrum,* because marriage had followed. The only reparation then that could be, was to pay the prejudice upon the wrong-doer, by obliging her to make good the settlement. Such reparation falls heavy on her, because it deprives her of her property. But in all views it is more equitable that the guilty suffer than the innocent."