# **EXHIBIT 4**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, ET AL. | § § § | |
| PLAINTIFFS, | § § | CIVIL ACTION NO. 4:20-CV-00957-SDJ |
| VS. | § § | |
| GOOGLE LLC, | § § | |
| DEFENDANT. | § § § § | JURY TRIAL DEMANDED |

## THE PLAINTIFF STATES' SEVENTH AMENDED RESPONSES & OBJECTIONS TO GOOGLE LLC's FIRST SET OF INTERROGATORIES

The Offices of the Attorney General for the states of Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, Puerto Rico, South Carolina, South Dakota, and Utah (collectively, the "Plaintiff States") hereby make the following amended response to Google LLC's First Set of Interrogatories (the "Interrogatories") under Federal Rule of Civil Procedure 33 ("Federal Rules") and any applicable local rules.

- SC:  South Carolina Department of Parks, Recreation, and Tourism; University of South Carolina

- SD:  South Dakota Department of Human Services; South Dakota Department of Education; South Dakota State University; University of South Dakota.

- UT:  Southern Utah University and the Utah Office of Tourism.

> **Response:** The Plaintiff States object to these interrogatories to the extent they seek to compel a legal conclusion. Plaintiff States also object to the extent that these interrogatories are duplicative of Rule 45 subpoenas that have already been sent to the entities listed and thus requesting the same information from the Plaintiff States is unduly burdensome and disproportional to the needs of the case. Finally, the Plaintiff States object to this interrogatory as containing discrete sub-parts such that it should constitute multiple interrogatories in considering the interrogatory limit imposed by the Court in this case. ECF No. 194 at 6 ("This limit on the number of interrogatories includes discrete sub-parts …."). Subject to and without waiving the foregoing objection, Plaintiff States respond that they do not have possession, custody, or control over any documents or personnel that belong to the institutions listed in these interrogatories for their respective state, and do not know who within those organizations would have possession, custody, or control of this information.
>
> - The Office of the Attorney General of Kentucky remains willing to meet and confer with Google to facilitate discovery with state agencies of the Commonwealth, including those identified in this Interrogatory.

**INTERROGATORY NO. 26:** For each category of monetary relief (including where applicable restitution, disgorgement, civil penalties, civil fines, or damages) that You seek in this Action, provide a computation of the amount of each category of monetary relief sought for each count.

> **Response:** The Plaintiff States objects to this interrogatory as premature given the status of the case and the fact that discovery is ongoing, including review of documents only recently or not yet produced by Google, and to the extent it seeks to compel Plaintiff States to marshal all of their evidence in advance of trial. The Plaintiff States further object to this interrogatory to the extent it requires review of documents and data that Google has failed to produce in a timely manner. The Plaintiff States also object on the basis that this request calls for the premature disclosure of expert opinions. Expert disclosures will be made within the time prescribed by the Court's Scheduling Order. Subject to and without waiving the foregoing objection, Plaintiff States respond:

Civil Penalties for consumer claims:[1]

Reserve Price Optimization ("RPO"): The use of RPO was a violation each auction during which time RPO was deceptively or unfairly misrepresented or omitted and/or each time it operated to cause an advertiser to pay more for an impression than they otherwise would have in the absence of RPO. Based on the allegations set forth in Paragraphs 527 – 538 of the Fourth Amended Complaint, the total number of violations equals the total number of auctions during which time RPO was deceptively or unfairly misrepresented or omitted and/or the total number of impressions that RPO affected from when publishers were opted into RPO in 2015 until Google switched to a first price auction in 2019. During this period, advertisers were deceived into bidding into what they believed was a second price auction while RPO ensured they did not receive the benefits of a second price auction, and/or paid more for impressions than they otherwise would have without RPO. The total number of violations is expected to be approximately 20% to 100% of all impressions transacted between the date RPO was launched and the date that Google switched to a first price auction, subject to any additional data to be discovered or produced.

Bernanke: As alleged in Paragraphs 297 - 317 and 549 – 562 of the Fourth Amended Complaint, the use of Bernanke and its iterations was a violation each auction during which time Bernanke was deceptively or unfairly misrepresented or omitted and/or each time it was used to overcharge advertisers or underpay publishers. The total number of violations against advertisers equals the number of impressions that Bernanke lowered the second highest bid from Google Ads while charging an advertiser based off the full amount of that bid. This caused advertisers to pay into a pool for Google that was used to win more on Google's platform. The total violations against web publishers equals the number of impressions in which Bernanke paid publishers based off a decreased bid amount after Bernanke dropped or lowered the second highest bid from Google Ads. In sum, two violations occurred for each transaction that Bernanke operated to drop or lower a bid from Google Ads.

Dynamic Revenue Sharing ("DRS"): The use of DRS was a violation each auction during which time DRS was deceptively or unfairly misrepresented or omitted and/or each time it increased its take rate above 20% on any transaction for an ad impression. As alleged in Paragraphs 318 – 330 and 539 – 548 of the Fourth Amended Complaint, Google deceived publishers into opting into DRSv2 by promising increased yield then surreptitiously implemented DRSv2. Publishers were led to believe that DRS would only lower Google's revenue share, but DRSv2 served to increase Google's revenue share on certain impressions. A violation occurred for each auction during which time DRS was deceptively or unfairly misrepresented or omitted and/or each transaction in which DRS increased

---

[1] All Plaintiff States seek civil penalties for violations of their state law consumer protection statutes.

68

60483

Google's revenue share causing web publishers to receive less yield for their inventory under DRSv2 than they would have received under DRSv1.

Header Bidding: As alleged in Paragraphs 563 – 571 of the Fourth Amended Complaint, Google misrepresented to publishers that header bidding would be harmful to them and result in increased latency. This led to publishers to forego header bidding to their detriment. A violation occurred each time a publisher did not use header bidding and received a reduced yield for their inventory as a result of failing to implement header bidding based off Google's misrepresentations.

Equal Footing: As alleged in Paragraphs 586 – 587 of the Fourth Amended Complaint, Google falsely represented that all participants in the unified auction compete equally for each impression. After this statement Google still changed the outcome of auctions with the use of Bernanke and some bidders such as Facebook held an advantage over other bidders. Each time an advertiser bid into AdX where Facebook was also a bidder after the NBA with Google was executed, a violation occurred. Further, each time a bidder submitted a bid into the unified auction where Bernanke operated to either overcharge advertisers or underpay publishers, a violation occurred.

Sale of Personal Data: As alleged in Paragraphs 572 – 585 of the Fourth Amended Complaint, Google falsely represented that it does not sell users' personal information. Google leverages the personal information of millions of people for profit in its online advertising business. With respect to each auction involving DFP or AdX, each disclosure of user's information within each auction is a separate violation.

Civil Penalties for antitrust claims:[2]

Tying:  Google Ads maintains exclusive access to hundreds of thousands of small advertisers seeking to purchase publisher inventory. Google leveraged that exclusive demand to coerce publishers to adopt and license its ad server product. Google denies publishers direct access to its AdX product and does not allow third-party ad servers to access AdX.  This conduct began in 2009 and continues today, in violation of state and federal antitrust law.

Dynamic Allocation:  Using its monopoly power in the market for ad servers, Google blocked publishers from receiving a live bid from rival exchanges more than one exchange at a time through Dynamic Allocation. Dynamic Allocation reduced publishers yield and provided little to no procompetitive benefit to publishers. This anticompetitive conduct occurred between 2010 and 2019, in violation of state and federal antitrust law.

---

[2] The Plaintiff States Alaska, Arkansas, Florida, Idaho, Kentucky, Louisiana, Mississippi, Montana, Nevada, North Dakota, Puerto Rico, South Carolina, South Dakota, Texas, and Utah seek civil penalties for violations of their state antitrust statutes. Subject to how the Court determines what constitutes a violation, Kentucky reserves the right to seek a per day penalty as set out in KRS 367.990(8).

Dynamic Revenue Sharing:   Google altered its revenue share to ensure it could transact an impression after receiving and reviewing bids. This advantage harmed competition amongst exchanges, particularly competition on exchange fees. Google's conduct related to DRS occurred between 2014 and 2019, in violation of state and federal antitrust laws.

Bernanke:  Using its market power in the markets for small ad buying tools and in ad exchanges, Google acted to change the outcome of auctions after they occurred. Google dropped the second-highest bid from the AdX auction when the two highest bids were above the floor and submitted from Google Ads advertisers. Project Bernanke overcharged advertisers because Google did not pass through the benefit derived from dropping the second-highest bid. Bernanke caused further harm to advertisers, because their (inflated) bids were routed to less relevant publisher inventory to help AdX beat out rival exchanges. Google's variations on Project Bernanke hurt publishers also. By pooling funds away from publishers to manipulate and inflate the bids of advertisers using Google Ads, Bernanke caused publishers to be underpaid. Project Bernanke manipulated auctions, ensuring that Google Ads would beat out any rivals who might outbid Google and win the auction in AdX. This conduct began in 2013 and continues today, in violation of state and federal antitrust laws.

Enhanced Dynamic Allocation:   As alleged in paragraphs 282-296 of the Complaint, Google deployed a new decisioning logic called Enhanced Dynamic Allocation ("EDA") into its DFP ad server that gave its AdX exchange exclusive access to premium publisher inventory. EDA excluded rival ad buying tools and ad exchanges from accessing and winning this valuable inventory. As alleged in paragraphs 366-374 of the Complaint, when Google did allow (beginning in 2016) its DFP product to allow non-Google exchanges to submit live, competitive bids for impressions (so-called "Exchange Bidding"), EDA excluded rival exchanges from accessing this premium inventory because Google charged publishers a 5% tax on any impression sold on non-Google exchange.  This conduct began in 2014 and is ongoing.  The operation of EDA both before and after the advent of Exchange Bidding was and is a violation of state and federal antitrust laws.

Header Bidding Line-Item Caps: As alleged in paragraphs 389-394, Google used its monopoly power in the ad server market to cap the number of "line items" a publisher can set to match a bid received from a header bidding exchange. This harmed competition in the exchange market and hampered publishers' ability to adopt header bidding to increase yield. Google's conduct in denying line item increases to publishers was a violation of state and federal antitrust laws.

Header Bidding Data Redactions: As alleged in paragraphs 387-388, Google redacted key fields that previously allowed publishers the ability to evaluate the performance of header bidding exchanges. Google's redaction of auction data impaired publisher participation in header bidding. Google's conduct in redacting

70

data that publishers were entitled to was and is a violation of state and federal antitrust laws.

<u>Poirot</u>: Google used Poirot to funnel more spend towards AdX, suppress header bidding, and deprive rival exchanges from access to publisher inventory. Google's intentional conduct in suppressing header bidding through the implementation of Poirot was and is a violation of state and federal antitrust laws.

<u>FAN Agreement</u>: Google entered an unlawful agreement with Facebook in 2018 where Facebook agreed to substantially curtail its use of header bidding in return for Google giving Facebook an advantage in display ad auctions. Google's intention conduct in entering into the Network Bidding Agreement to suppress the adoption of header bidding was and is a violation of state and federal antitrust laws.

<u>Unified Pricing Rules</u>:  Google exerts its market power in the ad serving market to suppress competition in the ad exchange market via Unified Pricing Rules ("UPR"). As alleged in paragraphs 451-469, Google knew that publishers set higher price floors for AdX and Google's ad buying tools to improve inventory yield, improve ad quality, and increase competition.  In response, Google forced publishers to set equal floors across all exchanges, thereby depriving publishers of the opportunity to favor demand from rival exchanges.  This conduct began in 2019 and is ongoing, in violation of state and federal antitrust laws. Google's conduct of imposing Unified Pricing Rules on web publishers was and is a violation of state and federal antitrust laws.

**INTERROGATORY NO. 27:** Identify all persons with relevant knowledge concerning Your claims in this Action.

**Response:** The Plaintiff States objects to this interrogatory as overly broad, unduly burdensome, and disproportional to the needs of the case as it places an undue burden on the responding party as it is duplicative of information included as part of the Plaintiff States' Rule 26 disclosures or otherwise not relevant to the facts or claims in this litigation. Further, the Plaintiff States objects to this interrogatory to the extent that it seeks information that is attorney-client or work product privileged. Further, the Plaintiff States object to the extent that they do not have possession, custody, or control over other state agencies' documents or personnel. Subject to and without waiving the foregoing objections, Plaintiff States respond:

- *See* Appendix A of Plaintiff States forthcoming First Amended Initial Disclosures which lists each third party contacted during the investigation by the Plaintiff States.

Dated: May 3, 2024

Respectfully submitted,

*/s/ Ashley Keller*
Ashley Keller
Admitted Pro Hac Vice
ack@kellerpostman.com
Noah Heinz
Noah.Heinz@kellerpostman.com
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
(312) 741-5220
Zina Bash
zina.bash@kellerpostman.com
111 Congress Avenue, Suite 500
Austin, TX 78701
(501) 690-0990
**KELLER POSTMAN LLC**

*/s/ Mark Lanier*
W. Mark Lanier (*lead counsel*)
Texas Bar No. 11934600
Mark.Lanier@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.DeRose@LanierLawFirm.com
10940 W. Sam Houston Parkway N. Suite 100
Houston, Texas 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
**THE LANIER LAW FIRM, P.C.**

*Attorneys for Plaintiff States of Texas, Idaho, Indiana, Louisiana (The Lanier Law Firm only), Mississippi, North Dakota, South Carolina, and South Dakota*