IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:20-cv-00957-SDJ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |

**GOOGLE LLC'S SUPPLEMENTAL BRIEF ADDRESSING THE VIRGINIA DECISION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

   I.    THE VIRGINIA DECISION IS INTERLOCUTORY AND HAS NO PRECLUSIVE EFFECT. ............................................................................................................................. 2

   II.   THE VIRGINIA DECISION IS IRRELEVANT TO MANY OF GOOGLE'S ANTITRUST SUMMARY JUDGMENT ARGUMENTS IN THIS CASE. ............................ 5

   III.  THE VIRGINIA DECISION IS NOT PERSUASIVE. .................................................... 6

      A.   The Virginia Decision Is Inconsistent with How the Fifth Circuit Analyzes Allegedly Anticompetitive Conduct. ......................................................................................... 6

      B.   The Virginia Decision Did Not Properly Assess Competitive Effects on the Ad Exchange Market. ................................................................................................... 9

      C.   The Virginia Decision Erred in Declining To Apply the Supreme Court's Holdings in *Trinko* .................................................................................................................... 11

      D.   The Virginia Decision Misapplied Tying Law. .......................................................... 18

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ...................................................................... 12

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,
    592 F.3d 991 (9th Cir. 2010) ......................................................................... 7

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*,
    137 F. App'x 694 (5th Cir. 2005) ................................................................. 12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ....................................................................................... 13

*Authenticom, Inc. v. CDK Glob., LLC*,
    874 F.3d 1019 (7th Cir. 2017) ...................................................................... 18

*Baros v. Texas Mexican Ry. Co.*,
    400 F.3d 228 (5th Cir. 2005) ......................................................................... 2

*Bayou Bottling, Inc. v. Dr Pepper Co.*,
    725 F.2d 300 (5th Cir. 1984) ....................................................................... 10

*Bradberry v. Jefferson Cnty.*,
    732 F.3d 540 (5th Cir. 2013) ......................................................................... 3

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023) ..................................................................... 14

*Christy Sports, LLC v. Deer Valley Resort Co.*,
    555 F.3d 1188 (10th Cir. 2009) ..................................................................... 12

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) .......................................................................................... 3

*Contango Operators, Inc. v. United States*,
    965 F. Supp. 2d 791 (S.D. Tex. 2013) ........................................................... 4

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024) ....................................................................... 12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ................................................................................. 16, 17

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .................................................................. 12, 13

*Hacienda Records, L.P. v. Ramos*,
    718 F. App'x 223 (5th Cir. 2018) .......................................................... 3

*In re Braniff Airways, Inc.*,
    783 F.2d 1283 (5th Cir. 1986) .............................................................. 4

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)................................................................... 13

*In re Microsoft Corp. Antitrust Litig.*,
    355 F.3d 322 (4th Cir. 2004) ............................................................... 4

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*,
    166 F. Supp. 3d 654 (E.D. La. 2016)................................................... 10

*In re Swate*,
    99 F.3d 1282 (5th Cir. 1996) ............................................................... 3

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    2016 WL 748089 (E.D.N.Y. Jan. 7, 2016) ......................................... 5

*Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*,
    744 F.2d 118 (D.C. Cir. 1984) ............................................................ 4

*Jones v. Halliburton Co.*,
    791 F. Supp. 2d 567 (S.D. Tex. 2011) ................................................ 4

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951).................................................................... 14, 16

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) ....................................................... 15

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ............................................................ 16

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
    670 F. Supp. 1313 (D. Md. 1986) ....................................................... 20

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
    651 F.2d 76 (2d Cir. 1981).................................................................. 10

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ................................................. 7, 12, 14

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018)........................................................................ 9, 10

*Oksanen v. Page Memorial Hosp.*,
945 F.2d 696 (4th Cir. 1991) .......................................................................... 7

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*,
920 F. Supp. 455 (S.D.N.Y. 1996) ................................................................. 20

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ................................................................................. 11, 16

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979) ......................................................................................... 3

*Phillips v. City of Dallas*,
781 F.3d 772 (5th Cir. 2015) ........................................................................... 3

*Response of Carolina, Inc. v. Leasco Response, Inc.*,
537 F.2d 1307 (5th Cir. 1976) ......................................................................... 3

*Seidenstein v. Nat'l Med. Enters.*,
769 F.2d 1100 (5th Cir. 1985) ....................................................................... 19

*Stearns Airport Equip. Co. v. FMC Corp.*,
170 F.3d 518 (5th Cir. 1999) ................................................................... 7, 8, 9

*Tire Sales Corp. v. Cities Serv. Oil Co.*,
637 F.2d 467 (7th Cir. 1980) ......................................................................... 20

*TQ Delta, LLC v. CommScope Holding Co.*,
657 F. Supp. 3d 892 (E.D. Tex. 2023) ............................................................ 3

*United Farmers Agents Ass'n v. Farmers Ins. Exch.*,
89 F.3d 233 (5th Cir. 1996) ........................................................................... 19

*United States v. Google LLC*,
2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ......................................... *passim*

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) ................................................................... 13

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ....................................................................... 8, 9

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ............................................................................... *passim*

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) .................................................................. 16, 18

*W. Gulf Marine Ass'n v. ILA Deep Sea Loc. 24*,
    751 F.2d 721 (5th Cir. 1985) ....................................................................... 4

*Whitehurst v. Showtime Networks, Inc.*,
    2009 WL 3052663 (E.D. Tex. Sept. 22, 2009) ............................................. 13

**Rules**

Fed. R. Civ. P. 60(b)(5) ..................................................................................... 4

**Other Authorities**

11 Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR
    APPLICATION (5th ed. 2024)........................................................................... 17

18A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE (3d ed.) (Apr. 2025 Update) ........... 4

## <u>INTRODUCTION</u>

Google LLC ("Google") has moved for summary judgment on all of Plaintiffs' federal and state antitrust claims.  *See* ECF Nos. 674 ("MSJ") (opening brief), 711 (opposition), 736 (reply). Since then, the U.S. District Court for the Eastern District of Virginia issued a decision in a case brought by the U.S. Department of Justice ("DOJ") and several states challenging certain Google conduct in the ad tech industry under federal antitrust law.  *See United States v. Google LLC*, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ("Virginia Op.").  The Virginia court concluded that DOJ failed to prove that Google monopolized a market for advertiser buying tools and failed to prove that the acquisitions of DoubleClick and Admeld were anticompetitive, *id.* at *23-25, *36-37, while also finding Google liable for tying and monopolization of other markets, *id.* at *48.  A few days later, this Court directed the parties to submit supplemental briefs addressing the implications of the Virginia court's decision for this case.  ECF No. 843.

The Court may wonder whether the Virginia decision should influence its consideration of the pending summary judgment motions (or any other matters before it).  It should not.  The Virginia decision has no bearing on Google's motion for summary judgment on Plaintiffs' DTPA claims.  Nor should it dictate the Court's consideration of Google's motion for summary judgment on the antitrust claims, as it is neither preclusive nor persuasive.

The Virginia decision has no preclusive effect because it is not a final judgment and will not become final until after the Virginia court issues a separate decision on remedies, following a trial scheduled to begin on September 22, 2025.  Google intends to appeal the Virginia decision to the Fourth Circuit after a final judgment is entered.  *See infra* Part I.

Regardless, this Court should not give any weight to the Virginia decision when it considers summary judgment (or any other matters).  The Virginia decision addressed only some of the conduct that Plaintiffs have challenged here, without touching many of Google's arguments for

1

summary judgment.  *See infra* Part II.  Where the Virginia decision speaks to summary judgment issues in this case, it makes significant legal (and factual) errors, leaving its reasoning unpersuasive.  For example, (1) the Virginia court's legal analysis departed from Fifth Circuit law; (2) it did not properly apply Supreme Court precedent involving two-sided transaction platforms when considering competitive effects on the two-sided market for ad exchanges; (3) it misinterpreted other Supreme Court precedent that should have foreclosed liability; and (4) it misapplied tying principles.  *See infra* Part III.

It is not the task of *this* Court to decide whether the decision of its co-equal court is correct; that is the task, ultimately, of the Fourth Circuit or the Supreme Court.  As always, this Court has the discretion to control its own docket.  Any unique non-antitrust issues may be resolved by the Court regardless of the proceedings in Virginia.  When the Court chooses to consider Google's summary judgment motion on the antitrust claims, it should do so independently and reject the Virginia court's reasoning where it is mistaken.  Should the antitrust claims survive summary judgment, or if further discussion would assist the Court, Google would welcome the opportunity to appear for a status conference.

## <u>ARGUMENT</u>

## I.    THE VIRGINIA DECISION IS INTERLOCUTORY AND HAS NO PRECLUSIVE EFFECT.

The doctrine of offensive, nonmutual collateral estoppel does not preclude Google from presenting *any* of its defenses here—not even those related to issues discussed in the Virginia decision.  As a threshold matter, the Fifth Circuit requires that a final judgment be entered before one court's findings may preclude relitigation of the same issues in another court.  *See Baros v. Texas Mexican Ry. Co.*, 400 F.3d 228, 233 (5th Cir. 2005) ("[W]e have treated finality and the concomitant availability of judicial review as an essential predicate to issue preclusion."); *see also*

*Hacienda Records, L.P. v. Ramos*, 718 Fed. App'x 223, 229-30 (5th Cir. 2018) (summarizing that the Fifth Circuit "has consistently followed the strict approach to finality, linking the availability of appeal for the prior decision with finality for collateral-estoppel purposes"). And while the Virginia decision addresses liability on the issues in that case, that court has not entered a final judgment. In fact, a final judgment will not be issued for at least several months, as a trial on remedies will not begin in Virginia until September 22, 2025. *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.) ("EDVA"), ECF No. 1428.[1]

A final judgment may mark the end of the Virginia case in the district court, but it would be only the beginning of the collateral estoppel analysis. Like any party asserting collateral estoppel, Plaintiffs would be required to show that: "(1) the issue at stake is *identical* to the one involved in the prior action, (2) the issue was actually litigated, and (3) the issue was necessary to support judgment in the prior action." *In re Swate*, 99 F.3d 1282, 1289 (5th Cir. 1996) (emphasis added). In addition, because Plaintiffs were not parties in the Virginia case, they could seek only "offensive nonmutual collateral estoppel," *Phillips v. City of Dallas*, 781 F.3d 772, 782 (5th Cir. 2015), which requires the Court to consider "a fourth factor, namely, whether there are any special circumstances that make it unfair to apply the doctrine," *Bradberry v. Jefferson Cnty.*, 732 F.3d 540, 548 (5th Cir. 2013); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (concluding that, if "the application of offensive estoppel would be unfair to a defendant, a trial

---

[1] In a bifurcated trial with separate liability and remedies phases, there is no final judgment until remedies have been decided. *See Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1321 (5th Cir. 1976) ("[W]e recognize that a finding of 'liability' in phase I of a bifurcated trial is interlocutory."), *abrogated on other grounds by Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977); *see also TQ Delta, LLC v. CommScope Holding Co.*, 657 F. Supp. 3d 892, 903 (E.D. Tex. 2023) ("An order that establishes liability but leaves open the question of damages or other remedies . . . [is] not final for purposes of preclusion.").

judge should not allow the use of offensive collateral estoppel").[2]

Application of these factors would require careful review of each of the Virginia court's findings, a "detailed, difficult, and potentially dangerous" task, particularly in a complex antitrust case. *See Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984). In an analogous situation, the Fourth Circuit reversed a district court's interpretation that was "too broad to assure fairness in the application of the doctrine" to hundreds of separate findings and instructed that court to "take care to limit application to facts that were necessary to the judgment *actually affirmed* by" the court of appeals. *See In re Microsoft Corp. Antitrust Litig.,* 355 F.3d 322, 327-28 (4th Cir. 2004). This Court would need to scrutinize the Virginia court's opinion rigorously before any of its findings could ever be given collateral estoppel effect.

Google intends to appeal the Virginia decision once a final judgment is entered. If this Court were to give the Virginia decision collateral estoppel effect after final judgment or rely on its reasoning, and if the Fourth Circuit later reversed that decision, then this Court's judgment would be subject to challenge. *See* Fed. R. Civ. P. 60(b)(5) (permitting relief from final judgment "based on an earlier judgment that has been reversed or vacated"). To avoid such "later problems," respected commentators advise that "[i]t is useful to postpone the question of preclusion in the second action until the appeal of the first judgment has been decided." 18A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 4433 & n.23 (3d ed.) (Apr. 2025 Update).[3] Google agrees.

---

[2] "The party seeking to assert that an issue was already adjudicated upon bears the burden of proving that contention . . . ." *Jones v. Halliburton Co.*, 791 F. Supp. 2d 567, 590 (S.D. Tex. 2011) (quoting *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1289 (5th Cir. 1986)); *Contango Operators, Inc. v. United States*, 965 F. Supp. 2d 791, 816 (S.D. Tex. 2013) ("In cases concerning offensive collateral estoppel, the party seeking preclusion must also demonstrate that 'no special circumstances exist that would render preclusion inappropriate or unfair.'").

[3] *Cf. W. Gulf Marine Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985) (recognizing that "the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs").

Indeed, that course has been followed in similar circumstances.  *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 2016 WL 748089, at *6, *15 (E.D.N.Y. Jan. 7, 2016) ("defer[ring] a resolution of the [plaintiffs'] motion for collateral estoppel until after the Second Circuit reache[d] a decision in the appeal of the Government Action" and staying case).

## II.    THE VIRGINIA DECISION IS IRRELEVANT TO MANY OF GOOGLE'S ANTITRUST SUMMARY JUDGMENT ARGUMENTS IN THIS CASE.

Google has moved for summary judgment on Plaintiffs' claims related to several instances of conduct that the Virginia decision simply does not address.  For example, Google has demonstrated that it is entitled to summary judgment on claims related to Project Bernanke (MSJ at 40-41, 48), Enhanced Dynamic Allocation (*id.* at 17-22, 37-38), Line Item Limits (*id.* at 22-24, 48), and Redacted Data Transfer Files (*id.* at 24-26, 48) because the undisputed evidence shows that all of those programs were lawful refusals to deal and/or not anticompetitive.[4]  Google also has shown that summary judgment should be entered on claims related to Projects Poirot, Elmo, and Bell because Plaintiffs have no evidence that any of those programs harmed competition in any market, *id.* at 44, and did not claim otherwise in their opposition brief, *see* ECF No. 711.  The Virginia decision says nothing about any of these programs, except Project Poirot, which the Virginia court held was not anticompetitive.  Virginia Op. at *42 n.29.

Separately, Google moved for summary judgment on (1) Arkansas's state antitrust claim; and (2) certain other state-law antitrust claims for civil penalties based on their statutes of limitations.  *See* MSJ at 51-53.  Because the Virginia case did not involve *any* state antitrust claims,

---

[4] Although the Virginia court concluded that some of Google's conduct could not be shielded from liability as lawful refusals to deal, that holding did not purport to apply to the specific facts of Project Bernanke, Enhanced Dynamic Allocation, Line Item Limits, or Redacted Data Transfer Files.  *See* Virginia Op. at *42-44.  Additionally, the court's reasoning should not be extended to those programs for the reasons discussed below in Part III.C.

5

that decision has no bearing on these arguments for summary judgment.[5]

## III.    THE VIRGINIA DECISION IS NOT PERSUASIVE.

There are many reasons why this Court should not find the Virginia decision persuasive. First, in analyzing Google's business justifications for the challenged conduct, the Virginia court used a framework that departs significantly from how Fifth Circuit precedent guides this Court. Second, the Virginia decision misapplied its own framework by failing to follow Supreme Court precedent that requires consideration of both sides of a two-sided transaction platform. Third, the Virginia court erred in declining to apply controlling Supreme Court authority holding that even monopolists may refuse to deal with their rivals. Fourth, the court's tying analysis misunderstood the relevant facts and misapplied a legal principle that is not relevant to the claims here.[6]

### A. The Virginia Decision Is Inconsistent with How the Fifth Circuit Analyzes Allegedly Anticompetitive Conduct.

As discussed in Google's motion, summary judgment should be granted on several parts of Plaintiffs' monopolization claims because the undisputed evidence shows that those programs were not anticompetitive under Fifth Circuit law. *See* MSJ at 8-10, 34-41; *see also Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."). The Virginia decision did not address Enhanced Dynamic Allocation or Project Bernanke. *See supra* Part II. And while the court held that aspects of Dynamic Allocation, including its interaction with Dynamic Revenue Share, were

---

[5] In addition to the state-specific grounds discussed in text, Google also sought summary judgment on all state antitrust claims for the same reasons as the federal antitrust claims. MSJ at 50-51. All of Google's arguments concerning the Virginia decision's treatment of federal antitrust claims apply equally to the state antitrust claims.

[6] In focusing on parts of the Virginia decision most closely related to Google's summary judgment motion, this list should not be taken as a complete catalogue of the errors in that decision.

anticompetitive, *see* Virginia Op. at *41-42,[7] that holding depended on legal principles that are

inconsistent with Fifth Circuit law and should not be applied in this case.

In the Fifth Circuit, "[e]xclusionary conduct under section 2 is the creation or maintenance

of monopoly by means other than the competition on the merits." *Stearns Airport Equip. Co. v.*

*FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999). When evaluating whether conduct is "competition

on the merits," the "key factor . . . is the proffered business justification for the act," and courts

may infer that conduct is anticompetitive only if it "has *no rational business purpose* other than

its adverse effects on competitors"—or, put another way, if the conduct "examined without

reference to its effects on competitors . . . is economically irrational." *Id.* at 522-23 (emphasis

added). In short, under Fifth Circuit law, there can be no Section 2 liability if the defendant has a

legitimate business justification for its conduct.[8]

The law is different in other circuits. For instance, in the D.C. Circuit, courts identify

anticompetitive conduct through a multi-step analysis, parts of which allow a defendant to proffer

"a procompetitive justification—a nonpretextual claim that its conduct is indeed a form of

competition on the merits because it involves, for example, greater efficiency or enhanced

---

[7] The Virginia court used the terms "First Look" and "Last Look" to refer to "aspects" of Dynamic Allocation that it found anticompetitive. *See* Virginia Op. at *45-46; *see also* ECF No. 687-10 ("SUMF") ¶¶ 95-96, 107. It also summarily refused to analyze Google's conduct through the lens of product design choices. Virginia Op. at *46. But finding an "aspect" of a product to be anticompetitive is functionally the same as challenging how that product was designed, so the Virginia court should have seriously engaged with cases recognizing that "providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct," even if the change "harms competitors as a result." *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 998-1000 (9th Cir. 2010).

[8] Although the Virginia court failed to apply it, the law in the Fourth Circuit is essentially the same. *See Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991) (requiring proof that defendant had "no valid business reason or concern for efficiency" for its conduct); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.) ("Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect.").

consumer appeal"—for its conduct and then require the plaintiff to "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001). The Virginia court observed that, under the *Microsoft* approach, a defendant may have a legitimate business justification for its conduct "but may still be liable under Section 2 of the Sherman Act" if the plaintiff can prove that the anticompetitive effects of its conduct outweigh the procompetitive effects. Virginia Op. at *35. But that is not the law of the Fifth Circuit. There can be no Section 2 liability in this circuit as long as the defendant has a legitimate business justification for its conduct. *See Stearns*, 170 F.3d at 522-23.

On the record before *this* Court,[9] Dynamic Allocation and Dynamic Revenue Share cannot be anticompetitive under a proper application of Fifth Circuit law. The Virginia court recognized that Dynamic Allocation "increase[d] publishers' revenue substantially," Virginia Op. at *45, and that it also "benefited AdX advertisers," *id.* at *13. Likewise, Dynamic Revenue Share, "helped AdX advertisers win more auctions," *id.* at *16, and "helped create matches for impressions that would not have sold to any advertisers without it," *id.* at *46.[10] These benefits for customers—

---

[9] The Virginia court overlooked undisputed evidence before it that would have undermined its analysis. That evidence is also undisputed here, and this Court must consider it on summary judgment. First, Dynamic Allocation was launched in 2007, before the rise of ad exchanges, SUMF ¶ 88, so it could not have been designed to harm those rivals (as they did not yet exist). Second, the so-called "last look" arose around 2014 from the interaction between header bidding (which was gaining popularity at that time) and Dynamic Allocation. Google did not change DFP or Dynamic Allocation to create "last look"; it arose because of how publishers implemented header bidding in DFP. SUMF ¶ 107. Third, in a second-price auction, the winning bidder always pays less than its bid (which may reflect its willingness to pay) if it bids above a price floor, SUMF ¶¶ 41, 42; this is not an "advantage that Last Look provided to AdX," *cf.* Virginia Op. at *45.

[10] Although the Virginia court dismissed the procompetitive benefits of Dynamic Revenue Share as "pretextual" based on an email, Virginia Op. at *46, that conclusion was inconsistent with the undisputed evidence that this Court must consider on summary judgment. SUMF ¶¶ 141, 159, 162-64.

higher revenue, more auction wins, greater output—make Google's justifications for Dynamic Allocation and Dynamic Revenue Share "obvious:  it was trying to sell its product."  *See Stearns*, 170 F.3d at 524.  Accordingly, Fifth Circuit law treats those programs as "competition on the merits" that cannot support Section 2 liability.  *See* MSJ at 37-40.

### B.  The Virginia Decision Did Not Properly Assess Competitive Effects on the Ad Exchange Market.

Within the framework that the Virginia court borrowed from *Microsoft*, even before considering business justifications, "the plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58-59 (citations omitted).  In markets involving two-sided transaction platforms, a defendant's conduct cannot be found anticompetitive without proof that it causes "net harm," considering impacts on both sides of the platform.  *See Ohio v. American Express Co.*, 585 U.S. 529, 547 (2018) ("*Amex*").  In this case, the undisputed evidence establishes that ad exchanges are two-sided transaction platforms connecting publishers and advertisers.  *See* MSJ at 45-48.  The Virginia court also appreciated that "ad exchanges . . . resemble two-sided transaction platforms" and "evaluate[d] both sides of the ad-exchange market" when it analyzed whether Google had monopoly power in that market, *see* Virginia Op. at *26 (cleaned up), so under *Amex*, the Virginia court should have assessed the impacts of Google's conduct on both publishers and advertisers before reaching any conclusion about whether that conduct harmed competition in a market for ad exchanges.  It did not do so.  *See id.* at *35-36, *41-43.  Instead, it employed a *one-sided* approach, finding that First Look, Dynamic Revenue Share, and Unified Pricing Rules were anticompetitive by focusing exclusively on publishers, without mentioning advertisers at all.[11]  *See id.* at *41-42.

---

[11] Even if harm to publishers alone were enough to show competitive harm (and under *Amex* it is not), the Virginia court's findings on that score are based on a fundamental error of law.  To determine whether conduct harmed a publisher, a court should compare (a) how the publisher fared

And while the Virginia court stated that Last Look "harmed . . . advertisers using <u>non-Google</u> ad buying technologies," *id.* at *42 (emphasis added), its analysis left out advertisers using <u>Google</u> ad buying technologies, despite the Supreme Court's holding that courts should consider impacts on the "market . . . as a whole," *Amex*, 585 U.S. at 547.

In finding these programs anticompetitive, the Virginia court emphasized that they "advantag[ed]" or "preference[d]" Google's ad exchange over competing ad exchanges. *See* Virginia Op. at *15, *41, *45. It cited no precedent finding a Section 2 violation based on such "self-preferencing," and Google is aware of none in the Fifth Circuit or elsewhere.[12]  Indeed, the Virginia court itself recognized that "preferenc[ing] its own ad exchange over third-party ad exchanges might have been a permissible design choice" if only Google "did not have monopoly power." *Id.* at *41.  But as discussed below in Part III.C, apart from the narrow *Aspen Skiing*

---

with the conduct in place; to (b) how it would have fared if Google had never implemented the conduct. *Cf. In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 678 (E.D. La. 2016) ("Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation.").  It should not compare the publisher's actual experience to some idealized, more competitive world because the Sherman Act "does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Trinko*, 540 U.S. at 415-16.  But that is exactly what the Virginia court did when it found that Dynamic Allocation "harmed publishers using DFP" because they "were not compensated as much as they would have been for their inventory had Google's AdX demand been required to compete with third-party exchanges (i.e., non-Google exchanges) on a level playing field."  Virginia Op. at *15.

[12] The closest Fifth Circuit case is *Bayou Bottling, Inc. v. Dr Pepper Co.*, 725 F.2d 300 (5th Cir. 1984).  There, the plaintiff (a Pepsi distributor) complained that the defendant (a distributor of Dr Pepper and Coca-Cola) did "not permit retail outlets to place [plaintiff's] products in vending machines and coolers owned by [the defendant], and that [the defendant] provide[d] free maintenance service on machines and coolers owned by businesses if the machines and coolers are stocked only with [the defendant's] products." *Id.* at 302, 304.  The district court entered summary judgment for the defendant on that claim, and the Fifth Circuit affirmed, readily concluding that the challenged practices were "competitive acts" and "not barred by the antitrust laws" because "'[e]ven monopolists must be allowed to do as well as they can with their business.'" *Id.* at 304 (quoting *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 93 (2d Cir. 1981)).

exception (which does not apply here), even a monopolist need not open up its own products to competitors, and when it chooses to do so, it certainly is not required to make those products work as well with its competitors' products as they work with its own.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) ("*Trinko* thus makes clear that if a firm has no antitrust duty to deal with its competitors . . . , it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous.").

### C. The Virginia Decision Erred in Declining To Apply the Supreme Court's Holdings in *Trinko*.

Google's motion for summary judgment explained that, "[f]or the majority of the challenged conduct, Plaintiffs' claims rely on the erroneous premise that Google has some 'duty to deal' with its rivals or a duty to make it easier for those rivals to compete, principally by giving rivals 'equal' or 'comparable' access to Google's products" and that "such notions of 'enforced sharing' are squarely foreclosed by the Supreme Court's decision in *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)."  MSJ at 13; *see also id.* at 13-30, 32-34.  The Virginia court recognized that one of Google's "primary legal defenses" was that its actions "cannot result in antitrust liability under the 'refusal to deal' doctrine articulated by the Supreme Court" in *Trinko* and its progeny.  Virginia Op. at *42.  But after summarizing the leading Supreme Court cases, *id.* at *42-43, the Virginia court concluded that "*Trinko* does not apply to Google's conduct at issue."  *Id.* at *43.  In doing so, the court erred.  None of the bases for its conclusion can survive scrutiny, so the Virginia court's interpretation of *Trinko* (which will be appealed) should be rejected here.

*First*, the Virginia court mistakenly believed that *Trinko* did not apply because *Trinko* involved a "highly regulated industry" and "Google's ad tech products operate in markets where there is no industry-specific 'regulatory structure designed to deter and remedy anticompetitive

harm.'"  *See* Virginia Op. *43.  But after observing that the pertinent regulatory framework did not "modify, impair, or supersede the applicability of any of the antitrust laws," *Trinko* itself focused on "pre-existing antitrust standards" applicable to regulated and unregulated industries alike.  *See Trinko*, 540 U.S. at 406-07; *see also ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694, 698 (5th Cir. 2005) (recognizing that *Trinko* analyzed whether "the complained-of behavior would . . . constitute an antitrust violation in its own right").  And although the Supreme Court noted that the relevant regulatory "regime was an effective steward of the antitrust function," it also highlighted the costs of "antitrust intervention" applicable to all industries and expressly held that "traditional antitrust principles" did not "justify adding the present case to the few existing exceptions from the proposition that there is no duty to aid competitors."  *See Trinko*, 540 U.S. at 411-15.  In other words, *Trinko* determined that a regulatory structure may also deter and remedy anticompetitive harms, but it did not limit to regulated industries the "existing antitrust standards" and "traditional antitrust principles" that support summary judgment here.  MSJ at 13-30, 32-34.[13]

Many other courts have applied *Trinko* to unregulated industries.  *See, e.g., FTC v. Qualcomm Inc.*, 969 F.3d 974, 993-95 (9th Cir. 2020) (cellular modem chips); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183-84 (9th Cir. 2016) (aircraft repair); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074-78 (10th Cir. 2013) (Gorsuch, J.) (operating systems); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1194-98 (10th Cir. 2009) (ski

---

[13] The Virginia court also cited a recent Fourth Circuit decision recognizing that *Trinko* involved a regulated market.  *See* Virginia Op. at *43 (citing *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 363 (4th Cir. 2024)).  That case declined to apply *Trinko* not because it involved an unregulated industry (regulation was present there, too), but because the facts there (unlike here) fit the *Aspen Skiing* exception to *Trinko*.  *See Duke Energy*, 111 F.4th at 363-65; *see also infra* at pgs. 13-14 (discussing *Aspen Skiing* exception).

resorts); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 53-54 (2d Cir. 2007) (elevators); *Whitehurst v. Showtime Networks, Inc.*, 2009 WL 3052663, at *13 (E.D. Tex. Sept. 22, 2009) (intellectual property). For instance, the U.S. District Court for the District of Columbia recently applied *Trinko* to an unregulated part of Google's business (search engine advertising management tools) and rejected the claim that Google had violated Section 2 by integrating with its own tool and not a rival tool. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 181-84 (D.D.C. 2024); *see also* MSJ at 16-17. Unlike the Virginia decision, all of these cases correctly apply the "traditional antitrust principles" from *Trinko* to unregulated markets, and this Court should do the same here.

*Second*, the Virginia court misapplied the *Aspen Skiing* exception to *Trinko*. Although firms generally have no duty to deal with rivals, the Supreme Court's *Aspen Skiing* decision recognized an "exception[]" that is "at or near the outer boundary of § 2 liability." *See Trinko*, 540 U.S. at 408-09 (discussing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). For that exception to apply, a plaintiff must come forward at least with proof that a defendant: (1) "unilateral[ly] terminat[ed] . . . a voluntary (*and thus presumably profitable*) course of dealing"; and (2) sacrificed "short-term profits to achieve an anticompetitive end." *See Trinko*, 540 U.S. at 409; *Qualcomm Inc.*, 969 F.3d at 993.

The Virginia court only cursorily considered these factors by noting that Google decided (i) to "shut down" a feature that had been offered by Admeld before Google acquired that company and (ii) not to "implement real-time bidding outside of its ad tech infrastructure despite its buy-side team emphasizing the benefits" from doing so. Virginia Op. at *43. But that first example did not involve termination of a course of <u>Google's</u> conduct; rather, Google simply decided not to "incorporate[] some of <u>Admeld's</u> features . . . into AdX" after it acquired the company. *Id.* at *14 (emphasis added). Nor did the court point to any evidence that Google sacrificed profits when it

"shut down" some Admeld features. As to the second example, the Virginia court's focus on "benefits" perceived by the "buy-side team" cannot support a conclusion that Google's overall business sacrificed profits. Plaintiffs' theory presumes that Google limited real-time bidding to benefit the sell side of its ad tech business, and there was no evidence that Google as a whole would have made more money overall if it had opened its technology to rivals.[14] And in any event, there was no evidence that Google had made real-time bids available at one point in time and later terminated that course of dealing. Moreover, even if the *Aspen Skiing* exception applied to these two examples (and it does not), the evidence related to these examples would not establish that the exception applies to Dynamic Allocation, Dynamic Revenue Share, Unified Pricing Rules, or any other of the challenged conduct. *See* MSJ at 15 n.7.

***Third***, the Virginia court distinguished cases like *Trinko* that immunize refusals to deal with competitors from cases like *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), that condemn refusals to deal with customers. In *Lorain Journal*, the Supreme Court held that a newspaper violated Section 2 by "refus[ing] to accept local advertisements" from customers that advertised with a new radio station. *Id.* at 148. The Tenth Circuit reached a similar result when the sole supplier of calcium silicate threatened to cut off its distributor customers if they bought from a new entrant. *See Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1171-73 (10th Cir. 2023). Neither case resembles the facts here: Google has not refused to deal with customers that also use its competitors' tools. To the contrary, although not required to do so, Google

---

[14] *Cf. Novell, Inc.*, 731 F.3d at 1077 ("[E]ven if Microsoft's decision to withdraw the NSEs ultimately made Windows 95 less successful, any losses in that market have to be considered in light of the acknowledged and immediate gains it achieved in the applications arena. Microsoft is an integrated firm with the goal of maximizing overall profits. And viewed overall, there's no evidence that Microsoft took any course other than seeking to maximize the company's net profits in the short as well as long-term.").

facilitates its publisher customers' connections with rival publisher ad servers through AdX Direct, SUMF ¶¶ 173-75, and Google facilitates those customers' connections with rival ad exchanges through the "waterfall," Header Bidding, Open Bidding, and the Unified First Price Auction, *id.* ¶¶ 68, 80-81, 94-96.

As the Virginia court applied it to Google, the distinction between refusing to deal with customers and refusing to deal with rivals is wordplay. Clever counsel could characterize any refusal to deal with rivals as a refusal to deal with customers. For example, *Trinko* itself was a case brought by a *customer* that wanted the defendant to allow rival phone companies to connect to its network. *Trinko*, 540 U.S. at 402. The Supreme Court correctly understood that claim as seeking to require the defendant to deal with its rival, even though it might have been framed instead as the defendant refusing to deal with its customer on terms the customer prefers.

Regardless of whether a refusal to deal could be characterized as directed towards rivals or customers, a more substantive distinction between *Trinko* and *Lorain Journal* is that the former involved limiting access to the defendant's own product, while the latter involved interfering with access to competing products. *Trinko*'s holding rests on the foundational insight that forcing a defendant to share its own assets "may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 408. No such concerns arose in *Lorain Journal* because the newspaper was not refusing to allow the radio station to advertise in its pages; it was refusing to sell newspaper advertising to customers that also bought radio advertising. Other courts have correctly appreciated the distinction between a defendant permissibly controlling access to its own product (as Google has done and as in *Trinko*) and impermissibly interfering with access to its competitors' products (as in *Lorain Journal*). *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 34 (D.D.C. 2021) (dismissing claim based on "a focused

15

prohibition on the use of a monopolist's own facilities"), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023).

Focusing on the remedy can clarify on which side of the line particular conduct falls. In *Lorain Journal*, the newspaper's conduct was remedied with a straightforward injunction requiring it to sell advertising as it always had, except without regard to whether a customer also bought radio advertising. *See Lorain Journal,* 342 U.S. at 157. That remedy did not require the newspaper to deal with the radio station; the newspaper only had to stop interfering with the radio station's sales. *Trinko* was not so simple. Because rival phone companies depended on the defendant's network to reach customers, an effective remedy would have required the defendant to open up its own network to competitors and then regulate the terms on which the defendant made access available. Here, Plaintiffs have kept conspicuously mum about how they would remedy any antitrust violation, *see* FAC ¶ 759(c)-(d); Pls.' Amended Advisory Regarding Relief Sought, ECF No. 381 at 2, but their theories imply that they would seek an order governing how Google's publisher ad server connects with competing ad exchanges and/or how Google's ad exchange connects with competing publisher ad servers. Indeed, DOJ has proposed exactly that kind of provision as part of its proposed remedy.[15] Such a remedy would fly in the face of the Supreme Court's reminder that "*Trinko* thus makes clear that if a firm has no antitrust duty to deal with its competitors . . . , it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." *linkLine*, 555 U.S. at 450.

**Fourth**, the Virginia court overread *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), and *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), to support

---

[15] *See* EDVA ECF No. 1430 at 9 ("Plaintiffs propose that Google be required to . . . have AdX bid into non-Google publisher ad servers in the same manner in which it bids into DFP.").

its holding that *Trinko*'s refusal-to-deal framework was "unsuitab[le]" for analyzing the claim that Google tied DFP to AdX.  Virginia Op. at *43.[16]  *Kodak* involved a claim that the defendant tied service for copy machines to replacement parts for those machines.  *Kodak*, 504 U.S. at 459.  While analyzing that claim, the Supreme Court brushed aside one of the defendant's arguments:

> In a footnote, Kodak contends that this practice is only a unilateral refusal to deal, which does not violate the antitrust laws.  Assuming, *arguendo*, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not.

*Id.* at 463 n.8 (citation omitted).  That conclusion made sense in *Kodak* because that case—unlike this one—involved an actual tying arrangement.

Regardless of how a plaintiff styles its claim, "[a] challenged arrangement is not a tie-in unless the alleged foreclosure can be eliminated by instructing the defendant to disaggregate what it sells to its customers . . . rather than by an order to sell something . . . to would-be rivals."  11 Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1700j1 (5th ed. 2024).  The plaintiff in *Kodak* had a real tying claim because it could be remedied by requiring Kodak to sell parts and service separately.  By contrast, Google already makes demand from its AdX ad exchange available through AdX Direct to publishers that prefer to use rival publisher ad servers.  *See infra* Part III.D.  To address Plaintiffs' concerns, Google would have to go further and change *how* AdX is accessible to those rivals.  But as the Supreme Court recognized in *Trinko*, supervising that type of remedy "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited."  540 U.S. at 408.  That type of remedy reveals that Plaintiffs are

---

[16] This portion of the Virginia court's interpretation of *Trinko* applies only to the government's tying claim; it has no bearing on claims related to the other conduct.

really challenging Google's refusal to deal with rivals under the guise of a "tying" claim. *See* MSJ at 32-34; *see also Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017) (vacating injunction in tying case that "essentially forc[ed defendants] to do business with [plaintiff] on terms to which they did not agree" because it was "inconsistent with *Trinko*").

The Virginia court also emphasized that "a tying claim 'does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary,'" Virginia Op. at *43 (quoting *Viamedia*, 951 F.3d at 472), but nothing in *Viamedia* suggests that *Trinko* does not apply to the tying claim at issue here. Instead, *Viamedia* held that a tying claim does not necessarily fail when premised on an <u>unlawful</u> refusal to deal that falls within the *Aspen Skiing* exception to *Trinko*. *See Viamedia, Inc.* 951 F. 3d at 472 ("Viamedia alleged a *prima facie* refusal-to-deal claim. Such potentially illegal conduct cannot justify Comcast's related tying of Interconnect services to ad rep services"). The case did not hold that a tying claim should survive when, as here, the refusal to deal is <u>lawful</u> and the *Aspen Skiing* exception does not apply. *See infra* pgs. 11-16.

### D. The Virginia Decision Misapplied Tying Law.

Google is entitled to summary judgment on Plaintiffs' tying claim—that "Google tied its AdX exchange to its DFP ad server," ECF No. 541 ("FAC") ¶ 608—because Plaintiffs have failed to establish an essential element: actual coercion. *See* MSJ at 30-32. The Virginia court understood that DOJ also "allege[d] that Google tied DFP, its publisher ad server, to AdX, its ad exchange," and it appreciated that such a claim required proof of coercion (what it called "conditioning"). Virginia Op. at *38. But to find that DOJ met its burden, the Virginia court reframed the tying claim and stretched precedent beyond the breaking point. This Court should eschew that approach, evaluate Plaintiffs' claim as pled, and stay true to tying principles. Doing so will show that Google is entitled to summary judgment on the tying claim. *See* MSJ at 30-32.

In the Virginia case, DOJ's claim depended on proof that Google made the tying product (AdX) available only on the condition that publishers also used the tied product (DFP). Virginia Op. at *38. That proof was lacking because, as the Virginia court found, "Google offered publishers not using DFP a way to access AdX demand via 'AdX Direct.'" *Id.* at *12 n.16; *see also* MSJ at 31.[17] With no evidence that Google kept AdX demand from publishers that used rival publisher ad servers, the Virginia court instead mistakenly analyzed the availability of "real-time bids from AdX" (rather than the tying product—the AdX ad exchange) when assessing the coercion element. Virginia Op. at *38-*39.[18] Plaintiffs here try a similar pivot,[19] but such contortions cannot save their claim because, if "real-time bids from AdX" were the tying product, they would have to define a market for "real-time bids from AdX" and show that Google has market power there. *See United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("[M]arket power is a necessary prerequisite to an illegal tie."); *Seidenstein v. Nat'l Med. Enters.*, 769 F.2d 1100, 1106 n.2 (5th Cir. 1985) ("Before market power in the tying market can be determined, the relevant market must first be defined."). They have done neither.

Needing to bridge the gap between its theory and the evidence, the Virginia court relied primarily on a single district court case to conclude that coercion can be established where buyers'

---

[17] The Virginia court dismissed the significance of AdX Direct, Virginia Op. at *12 n.16, but it is undisputed that AdX Direct made demand from AdX advertisers available to publishers that used non-Google publisher ad servers, SUMF ¶¶ 173-76.

[18] The Virginia court further confused matters by asserting without any evidentiary support that Google "restrict[ed] AdX's submission of real-time bids only to DFP." Virginia Op. at *39. But the undisputed evidence shows that Google does *not* make real-time bids from AdX available to DFP. Trial Tr. of Sept. 23, 2024 (AM) at 45:14-17 ("Q. Will AdX return a real-time bid to the third-party ad server? A. It will not but it also doesn't return real-time bids to Google Ad Manager or DFP.") [Nitish Korula (Google)]; *see also* SUMF ¶ 38.

[19] *See* Pls.' Opp MSJ, ECF No. 711 at 15 (arguing that "Google has . . . force[d] publishers to purchase DFP if they wish to access *AdX real-time bidding*" (emphasis added)).

"only viable economic option" to obtain the tying product is to take the tied product as well. Virginia Op. at *39. But that case entered summary judgment for the defendant on the tying claim and did not purport to hold that a tie would be coercive whenever buyers had only one "viable economic option." Rather, it recognized that coercion could be proven only in the narrow circumstance "where [the] defendant has established its pricing policy in such a way that the only viable economic option is to purchase the tying and tied products in a single package." *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1324 (D. Md. 1986) (cleaned up and emphasis added).[20] That standard does not apply here because there is no evidence that Google set the prices for AdX and DFP so as to coerce publishers to use DFP.[21] Apart from those involving "coercive" pricing policies, neither the Virginia court nor Plaintiffs here have identified any case finding coercion where (as here) the defendant made the alleged tying product (AdX) available to customers who did not take the tied product (DFP).

## CONCLUSION

In sum, the Virginia decision is neither binding nor persuasive. When the Court considers Google's motion for summary judgment, it should do so independently and grant summary judgment in Google's favor on all antitrust claims.

---

[20] Other cases discussing economic coercion also limit the concept to situations where the defendant has set prices in a way that practically requires a customer to take the tied product. *See, e.g.*, *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 471 (S.D.N.Y. 1996) (collecting cases and requiring proof that the "pricing structure makes purchase of the tying and tied products together the only viable economic option").

[21] In another case cited by the Virginia court, coercion was shown through evidence of "direct threats of lease cancellations or other repercussions" if customers did not purchase the tied product. *Tire Sales Corp. v. Cities Serv. Oil Co.*, 637 F.2d 467, 472 (7th Cir. 1980). There is no evidence that Google made similar threats.

Dated: May 12, 2025                    Respectfully submitted,

                                       */s/  Eric Mahr*_____
                                       Eric Mahr (*pro hac vice*)
                                       Andrew J. Ewalt (*pro hac vice*)
                                       FRESHFIELDS US LLP
                                       700 13th Street, NW
                                       10th Floor
                                       Washington, DC 20005
                                       Telephone: (202) 777-4545
                                       Email: eric.mahr@freshfields.com

                                       Justina K. Sessions
                                       FRESHFIELDS US LLP
                                       855 Main Street
                                       Redwood City, CA 94063
                                       Telephone: (650) 618-9250
                                       Email: justina.sessions@freshfields.com

                                       Kathy D. Patrick
                                       State Bar No. 15581400
                                       Gibbs & Bruns LLP
                                       1100 Louisiana, Suite 5300
                                       Houston, Texas 77002
                                       Telephone: (713) 650-8805
                                       Fax: (713) 750-0903
                                       Email: KPatrick@gibbsbruns.com

                                       *Attorneys for Google LLC*

## <u>CERTIFICATE OF SERVICE</u>

     I certify that on May 12, 2025, this document was filed electronically in compliance with Local Rule CV-5(a) and served via email on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

<em>/s/  Eric Mahr</em>