**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

|  |  |
|---|---|
| The State of Texas, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> Google LLC, <br><br>     Defendant. | Case No. 4:20-cv-00957-SDJ <br><br> Hon. Sean D. Jordan |

**<u>PLAINTIFF STATES' SUPPLEMENTAL BRIEF ON THE EASTERN DISTRICT OF VIRGINIA RULING</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.    The Order Confirms Google's Monopoly Power. ................................................ 2

    A.    Publisher Side ........................................................................................ 2

    B.    Ad Exchange ........................................................................................... 3

    C.    Advertiser Side ....................................................................................... 4

    D.    Other Market Definition Issues. ............................................................ 6

II.   The Order Confirms Google's Anticompetitive Conduct. ................................... 6

    A.    Google's Acquisitions ........................................................................... 7

    B.    The AdX-DFP Tie .................................................................................. 7

    C.    Google's Other Anticompetitive Conduct ............................................ 9

    D.    Differences from This Case ................................................................. 11

III.  The Order Refutes Google's Refusal-to-Deal Argument .................................. 12

IV.   The Order Supports Plaintiff States' Motion for an Adverse Inference. ............ 14

CONCLUSION ..................................................................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)..................................................................................13

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023) .........................................................12, 13

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024) ...........................................................13, 14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)..................................................................................12

*In re Google Digital Advertising Antitrust Litig.*,
    5:20-cv-3556, 2021 WL 7083558 (N.D. Cal. Jan. 15, 2021) ....................6

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
    714 F.2d 1384 (5th Cir. 1983) ...................................................................6

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021)....................................................................................14

*Serv. & Training, Inc. v. Data Gen. Corp.*,
    963 F.2d 680 (4th Cir. 1992) .....................................................................7

*United States v. Google LLC*,
    No. 1:23-cv-00108 (E.D. Va. Apr. 17, 2025), ECF No. 1410 ......................1–4, 6, 7, 9, 10, 15

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................................13

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ...................................................................12

**Other Authorities**

Greg Andrews, *Unfazed by Losing Antitrust Suits, Alphabet Makes Kent Walker First US GC to Break $30M Pay Barrier*, Corporate Counsel (Apr. 28, 2025), https://www.law.com/corpcounsel/2025/04/28/unfazed-by-losing-antitrust-suits-alphabet-makes-kent-walker-first-us-gc-to-break-30m-pay-barrier/?slreturn=20250509165847 ......................................................16

## INTRODUCTION

Google has tried three recent antitrust cases to verdict, losing all three. When it filed for summary judgment last year, only two cases had been decided, and Google could argue that "Judge Brinkema did not write on any of the issues raised in Google's motion for summary judgment and her Order asserts no conclusions about whether, as a matter of law, Google's conduct was a lawful refusal to deal." Dkt. 736 at 1. Now, Judge Brinkema has written on *all* the major issues raised in Google's summary judgment motion, decisively rejecting them on near-identical claims.

The most recent case in the Eastern District of Virginia was filed *after* this case survived a motion to dismiss, addresses the same ad tech ecosystem, and employs largely the same antitrust theories. Google insisted on a bench trial before Judge Brinkema, got just that, and put on its best case. After carefully considering the evidence, the court found by a preponderance of the evidence that "Google is liable under Sections 1 and 2 of the Sherman Act." Mem. Op. 115, *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. Apr. 17, 2025), ECF No. 1410 ("Order"). Perhaps Google will withdraw its summary judgment motion in this case, premised as it is on the dubious ground that there is *no dispute of fact* over whether Google violated the antitrust laws. If it does not, this Court should feel highly confident in denying summary judgment.

Judge Brinkema rejected Google's key arguments decisively. The court adopted the United States' market definition for publisher ad servers and ad exchanges and found that Google has monopoly power in both markets. Order at 41–84. It found that Google tied its publisher ad server, Doubleclick for Publishers (DFP), to AdX, its ad exchange. *Id.* at 85–98. And it found that Google entrenched its monopoly position through First Look, Last Look, Dynamic Revenue Share, and Unified Pricing Rules. *Id.* at 98–101. Judge Brinkema dedicated several pages to Google's argument that its challenged conduct is a protected refusal to deal, rejecting that argument because Google was dealing with its customers (not rivals), and did not refuse to deal but rather conditioned

its dealings to harm competition. *Id.* at 101–04. None of Google's proffered procompetitive justifications persuaded Judge Brinkema, *id.* at 104–12, and many the court found to be outright pretext. The court chastised Google for its Chats spoliation and fake privilege practices, which it determined "may well be sanctionable"; but, given the liability finding on other grounds, the court decided it need not adopt an adverse inference or otherwise sanction Google. *Id.* at 112–14.

To be sure, courts do occasionally disagree on the law, even as applied to indistinguishable facts. This Court has an independent duty to rule in *this* case based on the record here. But a finding by a preponderance of the evidence by a respected federal judge should induce, at minimum, a strong reluctance to find no dispute of material fact. Either Judge Brinkema is not a reasonable factfinder, or this case should be decided by a trial.

## ARGUMENT

The Order's factual findings about largely the same misconduct show, at a minimum, that a reasonable jury could find the same facts—and therefore that there is a material dispute of fact precluding summary judgment. The Order's legal holdings align with Plaintiff States' arguments.

## I. The Order Confirms Google's Monopoly Power.

Judge Brinkema found for the United States on market definition (which Google has not challenged here) and monopoly power for the publisher-side and ad exchange claims. And while Judge Brinkema rejected the United States' advertiser-side market, Plaintiff States allege different advertiser-side markets that are amply supported by the record in this case.

### A. Publisher Side

The Order found that "publisher ad servers for open-web display advertising constitute a distinct relevant product market," Order at 43–50, and that Google has monopoly power in that market, *id.* at 71–76. There are "significant barriers to entry and expansion" in that market. *Id.* at 74. There is a "lack of meaningful alternatives to DFP." *Id.* at 75. "Google has acted in accordance

with its dominant market position," for example by "degrad[ing] some DFP features, such as by removing publishers' ability to set a higher price floor on AdX as part of its Unified Pricing Rules update"—and in doing so "Google was not concerned about whether publishers would switch." *Id.* at 75–76. Internal studies show that Google could profitably require "a 10% to 20% increase in DFP fees." *Id.* at 76.

## B. Ad Exchange

The Order also found that "ad exchanges for open-web display advertising constitute a distinct relevant product market." *Id.* at 50. Even assuming this market *was* two-sided, "in analyzing whether Google has monopoly power" the court carefully considered "both sides" of the market. *Id.* at 64. The Order identified three bases for concluding that Google has monopoly power in that market. *Id.* at 53, 76–84. First, "[d]irect pricing evidence" of durable supracompetitive prices, second, "limitations on AdX and adjacent products' functionality," and third, "high market share." *Id.* at 84.

First, through AdX, Google has taken an incredible "20% take rate for well over a decade," and that is "*direct* evidence that Google has possessed monopoly power in the open-web display ad exchange market." *Id.* at 77 (emphasis added). Other ad exchanges "charged closer to 10%," but even still "Google has refused to negotiate AdX's take rate." *Id.* Judge Brinkema found that "publishers and advertisers [had] very little choice but to keep using" AdX. *Id.* at 78. Two separate "internal Google stud[ies]" showed that decreasing AdX's take rate would reduce profits, while having a limited effect on retention, suggesting monopoly power. *Id.* Internal analyses by Google showed that ad exchange "margins" were going "way down" because the "technology" was "commoditized to a large extent"—except for AdX's margins, which remained at 20%. *Id.* at 79. Google employees described the take rate as "irrationally high rent." *Id.* (quoting PTX612 at -035).

Second, the Order identified another "direct sign of monopoly power" in how "Google has used market power in adjacent segments of the tech ecosystem." *Id.* at 80. On the "buy-side," Google "limited AdWords' exchange bidding to AdX," boosting AdX at the expense of "advertiser customers." *Id.* Google made AdX indispensable by making "AdX the only ad exchange" with demand from AdWords, "a large and unique demand source." *Id.* (quoting Tr. Sept. 16 PM 128:21–129:5). On the "sell-side" "Google limited AdX to send real-time bids only to DFP." *Id.* at 81. "Once DFP had obtained near-total market share, Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX." *Id.* In short, "Google could set its terms of dealing with its customers," on both sides unilaterally, a telltale sign that "Google had monopoly power." *Id.*

Third, Google's "high and durable market share" reinforced the Order's monopoly power finding. *Id.* at 82. The Court credited the view that "AdX was the exchange for 63% to 71% of the worldwide open-web display transactions among the ad exchanges that produced data" and "handled between 54% and 65% of the market's total transactions." *Id.* at 82. "AdX's share of the worldwide ad exchange market was roughly nine times larger than the share held by Google's next-largest competitor, which had only 6% of the market." *Id.* "[N]umerous industry participants testified that AdX had the dominant position in the ad exchange market." *Id.* The market share percentage accepted by the court is *higher* than the AdX market share opinion given by Professor Gans that Google challenged in its *Daubert* motion here, *see* Dkt. 668 at 131–35, demonstrating Plaintiff States' point that "Professor Gans . . . calculated market share using extremely conservative assumptions." Dkt. 707 at 15.

## C. Advertiser Side

The United States argued for a different market from Plaintiff States here. They argued "that advertiser ad networks for open-web display advertising constitute a relevant product

4

market." Order at 54. The court rejected this market, noting that ad networks were initially "a single, two-sided platform" and that a market defined as "the advertiser-facing portion of an ad network" was just a "component[] of . . . the Google Content Network." *Id.* at 55. The court did acknowledge that "the closed two-sided ad network has faded from prominence," *id.* at 56, and that millions of advertisers now use AdWords "to purchase open-web display advertising," *id.* at 57. So, there was "some merit" to the United States's argument for a distinct market for advertiser ad networks for open-web display advertising, *id.*—but Judge Brinkema ultimately rejected it because "trial evidence showed that advertisers reallocate resources among different digital advertising channels" and some are "'agnostic' as to particular platforms or channels," instead of being wedded to open-web display ads in particular. *Id.* at 58. The end-result was the United States's failure "to consider ad networks that facilitate buying ads in these alternative channels in their market definition" and a consequent failure of that market definition. *Id.* at 59-60.

Plaintiff States advance a different market definition and supported it with different evidence. Google declined to challenge Plaintiff States' market definition at summary judgment. Dkt. 674 at 6 n.5. Google did challenge Professor Gans's methodology in its *Daubert* motion, but its arguments are completely unrelated to those in the Order. Specifically, Google disputed Professor Gans's SSNIP analysis, claiming that he understated "the potential response of large advertisers" who could "substitute to *large advertiser* buying tools." Dkt. 668 at 127–28. The Order does not support this argument. Google also challenged Professor Gans's *Brown Shoe* analysis, *id.* at 129–31, but, again, none of its arguments match Judge Brinkema's analysis (for example, Google did not argue for a two-sided ad server market, nor that the buy-side tools are agnostic as to open-web display versus other channels). Professor Gans provided substantial

analysis supporting his view limiting the market to open-web display advertising, and Google has not yet challenged that analysis.

In short, the United States's advertiser-side market definition got to trial. Though it did not prevail, the grounds on which it failed have not even been argued in this case and would not apply. Plaintiff States' market definition should also get to trial.

### D. Other Market Definition Issues.

Google sometimes argues that the proper market definition for ad tech is one giant two-sided market but has not actually made that argument in any pending motion. *See* Dkt. 674 at 6, n.5.[1] The Order decisively rejects that argument, which will be relevant when and if Google argues for an all-encompassing two-sided market in this case. *See* Order at 60–67.

In the Eastern District of Virginia, the United States argued for a "worldwide" market, while Google argued for a nationwide market. *Id.* at 67–71. Judge Brinkema accepted the United States's more aggressive position. Here, Plaintiff States have been more conservative, advocating only a nationwide market, which understates Google's dominance. The acceptance of a worldwide market does not detract from the existence of a nationwide market that Google also monopolizes. *See, e.g.*, *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393–94 (5th Cir. 1983) (recognizing that relevant "submarkets" or smaller geographic markets can exist alongside "a larger geographic market").

### II. The Order Confirms Google's Anticompetitive Conduct.

The court found that Google willfully acquired or maintained its monopoly power.

---

[1] Google has also argued for other market definitions, which persuaded one court. *See In re Google Digital Advertising Antitrust Litig.*, 5:20-cv-3556, 2021 WL 7083558, at 6 (N.D. Cal. Jan. 15, 2021).

## A. Google's Acquisitions

The Order first discussed the Admeld and DoubleClick acquisitions. The court found this history relevant but concluded that "Plaintiffs have not shown that Google's acquisitions of DoubleClick and Admeld constituted anticompetitive conduct." *Id.* at 90. Plaintiff States' position exactly matches the Order. *See, e.g.*, Dkt. 707 at 31 ("[N]one of the series of Google's acquisitions has been alleged as anticompetitive conduct in this case," and "Dr. Chandler does not opine that they are anticompetitive. Rather, he provides key industry context for the ad tech landscape in which Google undertook the at-issue conduct, illustrating the industry's perspective on the major players in the ad-tech field.").

## B. The AdX-DFP Tie

Second, the Order found that "the AdX-DFP tie has violated both Section 1 and Section 2 of the Sherman Act." Order at 90–98. There, as here, Google chiefly challenged coercion. The Order found that "the policy and technology restrictions that Google has placed within AdX 'condition[ed] purchase of the tying product [AdX] upon purchase of the tied product [DFP].'" Order at 92 (alterations in original) (quoting *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992)). That is because the "function of an ad exchange is to match publishers with advertisers by facilitating real-time auctions," and "[b]y restricting AdX's submission of real-time bids only to DFP, and by not allowing AdX to provide real-time bids to other publisher ad servers, Google made AdX ineffective at its core function when used by publishers who did not also use DFP." *Id.*

The court also explained why the tie is effective. A "primary source of Google's monopoly power in the ad exchange market is AdWords' uniquely large and diverse array of advertising demand." Order at 96. Publishers who miss out on that demand face considerable costs. As a result of the tie, any publisher who did not use DFP "would be shut out of AdX's core

7

functionality," foregoing AdWords demand.  *Id.* at 93.  The last piece of the puzzle is that "it is not economically feasible for publishers to use multiple publisher ad servers."  *Id.* at 93.  The result is monopoly power:  publishers are desperate for AdWords demand, must purchase DFP to get it, and must use DFP for everything once they have it.  Internal Google documents confirmed this purpose.  *Id.* at 93–94 (citing and quoting documents).  The result is control across the entire ad tech ecosystem:  a "senior Google manager analogized to 'Goldman or Citibank own[ing] the NYSE.'"  *Id.* at 94 (quoting PTX367 at -464).  Publisher customers "felt locked-in."  *Id.* (quoting PTX587 at -794).

Google argued there (and here) that there *is* a way for non-DFP publishers to use AdX, through AdX Direct, but extensive trial testimony contradicted that argument.  As the Order found, "Google offered publishers not using DFP a way to access AdX demand via 'AdX Direct,' but this product was not an 'economically viable substitute to accessing AdX through DFP' because it had rudimentary functionality, did not show the price that AdX was offering, did not provide access to real-time bids, increased latency, and did not permit publishers to place bids from AdX into real-time auctions with bids from other exchanges."  Order at 28 n.16 (citing ten different sources of record evidence).

Notably, the court deemed the technical limitations that linked real-time bidding in AdX to DFP to be sufficient for a tie standing alone—but Plaintiff States have adduced even more evidence.  Plaintiff States explained that Google imposed a "unified contract," making the tie contractually explicit.  Dkt. 711 at 15–18.  That makes the tie even clearer in this case.

Judge Brinkema rejected each of Google's proposed procompetitive justifications for the DFP-AdX tie.  The Order credited record evidence that Google "artificially handicapp[ed] [its] buyside ([AdWords]) to boost [its] sellside (AdX).'"  Order at 106 (alterations in original) (quoting

PTX110 at -009).  Google has not argued in any pending motion that the DFP-AdX tie is procompetitive, *see* Dkt. 674 at 37–41 (arguing procompetitive justifications only for "DA, EDA, DRS, or Project Bernanke"), but this analysis is persuasive when and if Google does so.

### C.  Google's Other Anticompetitive Conduct

Apart from tying, the court identified "a series of anticompetitive policies" that "decreased product quality and harmed competition" that Google accomplished "by exploiting its durable monopoly power."  Order at 98.  Separately, the Court rejected Google's proposed procompetitive justifications for its conduct.  *Id.* at 104–12.

The first is "First Look" (an aspect of Dynamic Allocation) "which required publishers using DFP to offer AdX a first right of refusal for each impression."  *Id.* at 29–33, 99.  This practice enhanced the "tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers."  *Id.*  Judge Brinkema called this "a fundamentally unfair auction process."  *Id.*  Plaintiff States made the same arguments.  *See* Dkt. 711 at 21–22.

None of Google's procompetitive justifications held water.  Order at 107–08.  Judge Brinkema distinguished between "aspects of Dynamic Allocation [that] were anticompetitive" and those that were not.  *Id.* at 108.  First Look was an anticompetitive aspect, and it "resulted in less revenue for publishers, fewer impressions going to the advertisers who were willing to pay the most for them, enhanced AdX market power, and reduced competition in the ad exchange market." *Id.*  This nuanced analysis squarely refutes Google's summary judgment argument that it is Plaintiff States' burden to show that "DA and EDA are anticompetitive in and of themselves," rather than the "'implementation' of DA and EDA."  Dkt. 674 at 17–18.  The Order's findings also refute Google's argument that Dynamic Allocation only ever "benefited publishers," *id.* at 37—at a bare minimum, some evidence suggests otherwise, since Judge Brinkema found by a *preponderance* of the evidence that first look "resulted in less revenue for publishers," Order at 108.

The second anticompetitive conduct considered in the Order is "Last Look" (another aspect of Dynamic Allocation), a "feature which gave AdX the ability to see competing exchanges' bids in an otherwise sealed auction before AdX would bid," and which "harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies." *Id.* at 34–36, 99. Judge Brinkema credited testimony that Last Look "created inefficiencies, reduced publisher revenue, and reduced the amount of impressions non-Google exchanges were able to win." *Id.* (citing Expert Ravi's testimony). Plaintiff States made the same arguments. *See* Dkt. 711 at 22–23.

Last Look had no persuasive pro-competitive justifications. It "enabled AdX to win auctions despite offering less than its advertisers were willing to pay," which "reduced publisher revenue." Order at 108. The Order also rejected Google's argument that Last Look must have been procompetitive, because publishers had the option "not to request a bid from AdX." *Id.* at 109. Due to "AdX's monopoly power in the ad exchange market" this option was illusory, since not requesting a bid from AdX "was not financially viable." *Id.*

The third anticompetitive practice is "sell-side Dynamic Revenue Share," Order at 35–36, 100. DRS allowed AdX to vary its take rate to maximize the number of impressions it could win— an option available only to AdX (because of Last Look), but not available to competing exchanges. *Id.* at 100. Plaintiff States provided more robust evidence on DRS (in its different iterations), expanding upon its anticompetitive nature. *See* Dkt. 711 at 44-47.[2]

Judge Brinkema found that "Google's proffered procompetitive justification for sell-side dynamic revenue share was pretextual." Order at 109. Google argued that DRS "helped create matches for impressions that would not have sold" otherwise, *id.*, but the real "primary purpose"

---

[2] Plaintiff States' Deceptive Trade Practices Act claims in particular rely on the unfair and *secret* way DRS distorts AdX auctions, which reinforces DRS's anticompetitive effect. *See* Dkt. 712 at 10–12, 47–50.

was to exploit Last Look more fully. *Id.* One "Google engineer" stated that "AdX gets to pay high and win whenever [a competitor exchange] is present with a high CPM, and can pay low when [the competitor] bids low. [The competitor] in contrast can't reliably save money on queries where AdX bids low, because it doesn't know AdX bids." *Id.* (quoting PTX542 at -335).

A fourth anticompetitive practice is the so-called "Unified Pricing Rules," which "took away publishers' ability to set higher price floors on AdX than on third-party exchanges." Order at 37–39, 100. The court called this an "example of Google exploiting its monopoly power and tying arrangement to restrict its customers' ability to deal with its rivals . . . compounding the harm to customers." *Id.* at 100–01.

The Order rejected Google's procompetitive justifications for Unified Pricing Rules. Some publishers rationally sought to "diversify" by "setting higher price floors" for AdX, and others saw AdX ads as lower-quality in the absence of a high price floor. *Id.* at 110. Google prohibited higher price floors for AdX "*at the request* of the 'Ad[X] team'" which was "strong evidence that Google implemented Unified Pricing Rules to enhance the ADX-DFP tie" rather than to "help[] customers simplify their decision-making, receive better matches, and increase revenue." *Id.* (emphasis added). Also, "Unified Pricing Rules did not stop publishers from setting higher price floors for third-party exchanges than for AdX"—rather, they *only* prevented *lower* price floors on non-AdX exchanges. *Id.* This would make no sense if the goal is simplification.[3]

### D. Differences from This Case

Beyond the conduct Judge Brinkema evaluated, Plaintiff States proffer more. Plaintiff States have argued that the "line item limits" imposed through DFP were anticompetitive, Dkt. 711

---

[3] Based on its advertiser-side market definition finding, the court did "not consider Project Poirot as part of the anticompetitive conduct" because it "occurred within DV360, a Google ad buying tool." Order at 100 n.29. Again, Plaintiff States' position matches the Order in excluding Project Poirot from the anticompetitive conduct. *See, e.g.*, Dkt. 668-54 (Gans Rebuttal Rep.) ¶¶ 11–15.

at 26–28, that Google redacted information from AdX Data Transfer files to sabotage its own customers, *id.* at 29–33, and that Project Bernanke was anticompetitive in that it "helped GDN win more transactions at the expense of rival ad buying tools without improving on price or quality," *id.* at 47–50. The court did not address this conduct, but its analysis is wholly consistent with finding that these too are anticompetitive—it would hardly be surprising to learn that a monopolist acting anticompetitively in five ways is actually doing so in eight.

Plaintiff States also have DTPA claims. In some states, a violation of the antitrust law also counts as a DTPA violation; even where that is not true, the anticompetitive conduct found by Judge Brinkema makes nefarious interpretations of Google's auction manipulations more plausible.

### III. The Order Refutes Google's Refusal-to-Deal Argument

Google's headline argument both here and in the Eastern District of Virginia is that its anticompetitive conduct was *really* protected refusals to deal. *E.g.*, Dkt. 674 at 13–30; Dkt. 736 at 2–7. Plaintiff States explained the flaws in those arguments, *see* Dkt. 711 at 11–38, which the Order strongly supports. *See* Order at 101–04. Judge Brinkema rejected Google's arguments for multiple reasons, all of which apply here.

First, none of Google's conduct is a "'simple refusal to deal' with rivals," but rather, at most, "can be conceptualized as a 'conditional refusal[] to deal.'" Order at 103 (alteration in original) (quoting *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020)). "[T]he sale of a tying product to 'third parties' on the 'condition that they buy' a tied product does not fit within the ambit of the refusal to deal exception to antitrust liability." *Id.* (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 n.8 (1992)). There is a difference between the "'refusal-to-deal-with-rivals analysis'" and "anticompetitive restraints that a monopolist places on its *customers*, as opposed to its *competitors*." Order at 101–02 (emphasis added) (quoting *Chase*

*Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023)); *compare* Dkt. 711 at 12. Here, Google "compelled its publisher customers to use DFP if they want to use AdX," "limiting Google's publisher customers' choice of publisher ad server for reasons other than competition on the merits." Order at 103. That (and the other ways Google effected the tie), make this a classic tying case, not a refusal-to-deal. Similarly, other conduct such as First Look and Last Look (aspects of Dynamic Allocation), was not "refusal to deal," but rather abusive ways of dealing with Google's own customers.

Second, the Order observed that unlike *Trinko*, "Google's ad tech business has not operated in a highly regulated industry," Order at 103, but rather in an industry with no regulator that "perform[s] the antitrust function." *Id.* (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004)). That difference warrants greater skepticism. *See id.*; *see also Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 363 (4th Cir. 2024) (same).

Third, "like in *Aspen Skiing* but unlike in *Trinko*, Plaintiffs presented evidence that Google sacrificed 'short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor[s].'" Order at 104 (quoting *Trinko*, 540 U.S. at 409 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 (1985))). The court provided various examples, such as deprecating Admeld's "feature of providing real-time bids to third-party exchanges," and the refusal "to implement real-time bidding outside of its ad tech infrastructure despite its buy-side team emphasizing the benefits that doing so would have for its advertiser customers." *Id.*

More broadly, the Order takes aim at Google's "overarching argument" that its conduct is merely "product design choices," *id.* at 111, which Google has reprised here. Google atomizes

13

and pigeonholes its conduct, classifying everything as "refusal to deal" and insisting that "each challenged practice" must be *independently* "exclusionary." Dkt. 736 at 13. That is not how antitrust law works. *See* Dkt. 711 at 38–39. Rather, "[a]nticompetitive conduct 'comes in many different forms that cannot always be categorized.'" Order at 86 (quoting *Duke Energy*, 111 F.4th at 354). "'[W]hen a court is faced with allegations of a complex or atypical exclusionary campaign,' the 'alleged anticompetitive conduct must be considered as a whole' instead of 'in manufactured subcategories.'" *Id.* (quoting *Duke Energy*, 111 F.4th at 354–55). Judge Brinkema explained how these principles apply here:

> Google's decade-long campaign of exclusionary conduct, however, is not properly characterized as a series of product design choices. As the Fourth Circuit made clear in *Duke Energy*, courts must avoid unduly divvying up a "complex or atypical exclusionary campaign" into "manufactured subcategories" and justify the actions using "specific conduct tests." 111 F.4th at 354–55; *see also* [*Nat'l Collegiate Athletic Ass'n v.*] *Alston,* 594 U.S. [69,] 101 [(2021)] (stating a defendant is not permitted to "relabel a restraint [on trade] as a product feature and declare it immune from" antitrust scrutiny). It would not be accurate to classify the tying of two separate products, or the subsequent decisions that Google made to manipulate auction rules and restrict customer choice in markets in which the firm had monopoly power, as mere choices of product design.

Order at 110 (alteration to *Alston* quote in original).

## IV. The Order Supports Plaintiff States' Motion for an Adverse Inference.

Judge Brinkema, like Judge Mehta, condemned Google's spoliation and abuse of attorney-client privilege: "Google's systemic disregard of the evidentiary rules regarding spoliation of evidence and its misuse of the attorney-client privilege may well be sanctionable." Order at 114. This strongly supports Plaintiff States' motion for sanctions, since the reason the court stayed its hand—namely, a liability finding—is not yet present here. If a jury decides liability, it should be given an adverse inference instruction, and the Court may deny summary judgment on that basis as well. *See* Dkt. 711 at 11; Dkt. 693 (Motion for Spoliation Sanctions) at 1.

The Order's findings specifically contradict what Google has argued to this Court. The DOJ (and various States) brought a motion for sanctions quite close to trial, but Judge Brinkema did not find that delay precluded any remedy. *Compare* Order at 114 *with* Dkt. 757 (Google's Opposition) at 6–8. Google argued that "Plaintiffs fail to show that *any* Google employee deliberately disobeyed the repeated litigation hold instructions" and that there is no "proof that relevant evidence was not preserved." Dkt. 757 at 11. But the Order found otherwise: "[s]ome employees who received litigation holds failed to turn on their chat history despite being instructed to, resulting in their communications being deleted"; "Google employees regularly used this 'off the record' chat functionality for discussions of 'legally sensitive' topics that they did not want to be preserved"; and "Chat deletions occurred when employees discussed substantive topics at issue in this litigation and continued after the federal government began an antitrust investigation into Google's conduct." Order at 113. Since the DOJ's investigation began *after* Texas's, that finding entails that Chat deletions continued after *Plaintiff States* began investigating. Google has argued that its history-off setting was easily "changeable by the user," Dkt. 757 at 2, but the Order found that "the application's user interface made it difficult for employees to turn on chat history for every conversation they had." Order at 113.

Judge Brinkema also called out Google for "misus[ing] the attorney-client privilege." *Id.* Kent Walker—who "oversaw the company's legal team" even marked as privileged "an email ask[ing] his colleagues for reactions to a New York Times article." *Id.* at 113–14. "[E]xecutives and employees routinely labeled emails as attorney-client privileged even though the emails clearly did not involve privileged communications." *Id.* at 114. Despite multiple call-outs from multiple courts, media reports have reported that Google is "unfazed"—rather than firing Kent Walker for encouraging spoliation and fake privilege from the top, Google paid him the most of

any Fortune 500 general counsel for multiple years in a row, culminating in a recent bonus that makes him "the first U.S. legal chief to receive compensation topping $30 million."[4] Clearly, some deterrence is warranted.

## CONCLUSION

For the foregoing reasons, the Court should deny Google's motion for summary judgment and grant Plaintiffs States' motion for sanctions.

---

[4] Ex. A (Greg Andrews, *Unfazed by Losing Antitrust Suits, Alphabet Makes Kent Walker First US GC to Break $30M Pay Barrier*, Corporate Counsel (Apr. 28, 2025), https://www.law.com/corpcounsel/2025/04/28/unfazed-by-losing-antitrust-suits-alphabet-makes-kent-walker-first-us-gc-to-break-30m-pay-barrier/?slreturn=20250509165847).

DATED: May 12, 2025                              Respectfully submitted,

/s/ W. Mark Lanier                               /s/ Ashley Keller
W. Mark Lanier                                   Ashley Keller
Mark.Lanier@LanierLawFirm.com                    ack@kellerpostman.com
Alex J. Brown                                    Kiran N. Bhat
Alex.Brown@LanierLawFirm.com                     kiran.bhat@kellerpostman.com
Zeke DeRose III                                  2333 Ponce De Leon Boulevard
Zeke.Derose@LanierLawFirm.com                    Suite R-240
Jonathan P. Wilkerson                            Coral Gables, Florida 33134
Jonathan.Wilkerson@LanierLawFirm.com             (833) 633-0118
10940 W. Sam Houston Pkwy N.
Suite 100                                        Zina Bash (Bar No. 24067505)
Houston, TX 77064                                zina.bash@kellerpostman.com
(713) 659-5200                                   111 Congress Avenue, Suite 500
                                                 Austin, TX 78701
                                                 (512) 690-0990

**THE LANIER LAW FIRM, PLLC**                    /s/ Noah S. Heinz
                                                 Noah S. Heinz
                                                 noah.heinz@kellerpostman.com
                                                 1101 Connecticut Ave., N.W., Suite 1100
                                                 Washington, DC 20036
                                                 (202) 918-1123
                                                 **KELLER POSTMAN LLC**

*Counsel for Texas, Idaho, Louisiana (The Lanier*
*Law Firm only), Indiana, Mississippi, North*
*Dakota, South Carolina, and South Dakota*

*Submitted on behalf of all Plaintiff States*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

*/s/ Brent Webster*
Brent Webster, First Assistant Attorney General of Texas
Brent.Webster@oag.texas.gov

**STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
ATTORNEY GENERAL


By: /s/ Jeff Pickett
Jeff Pickett
Senior Assistant Attorney General, Special Litigation Section
jeff.pickett@alaska.gov

*Attorney for Plaintiff State of Alaska*

19

FOR PLAINTIFF STATE OF ARKANSAS:

TIM GRIFFIN
ATTORNEY GENERAL


By: _____
AMANDA J. WENTZ
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Attorney for Plaintiff State of Arkansas*

FOR PLAINTIFF STATE OF FLORIDA:

JAMES UTHMEIER, Attorney General

/s/ Lee Istrail
LEE ISTRAIL, Assistant Attorney General
FL Bar No. 119216

LIZABETH A. BRADY, Director, Antitrust Division
R. SCOTT PALMER, Special Counsel and Chief of Complex Enforcement
ANDREW BUTLER, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General


Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

FOR PLAINTIFF STATE OF IDAHO:

RAÚL R. LABRADOR
Attorney General

*/s/ John K. Olson*
John K. Olson, Deputy Attorney General

Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone:  (208)  334-2424
john.olson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

*/s/ Jesse J. Moore*
Jesse J. Moore
Deputy Attorney General – Consumer Litigation
302 W. Washington St.
IGCS - 5th Floor
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: jesse.moore@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

RUSSELL COLEMAN
Attorney General

*/s/ Philip R. Heleringer*
Christian J. Lewis, Division Chief, Office of Consumer and Senior Protection
christian.lewis@ky.gov
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
philip.heleringer@ky.gov
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
jonathan.farmer@ky.gov
Office of the Attorney General
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300

*Attorneys for Plaintiff Commonwealth of Kentucky*

FOR PLAINTIFF STATE OF LOUISIANA:

By: */s/ Patrick Voelker*
Liz Murrill, Attorney General
Michael Dupree, Assistant Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
(225) 326-6400
voelkerp@ag.louisiana.gov

*s/ James R. Dugan, II*
James R. Dugan, II (*pro hac vice*)
TerriAnne Benedetto (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:   (504) 648-0180
FX:   (504) 649-0181
EM:   jdugan@dugan-lawfirm.com
      tbenedetto@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:   (504) 833-5600
FX:   (504) 833-8080
EM:    jmw@chehardy.com

*Attorneys for Plaintiff State of Louisiana*

FOR PLAINTIFF STATE OF MISSISSIPPI:

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By:     _/s/ Garrett S. Mascagni_
        Garrett S. Mascagni
        Special Assistant Attorney General
        Consumer Protection Division
        Mississippi Attorney General's Office
        Post Office Box 220
        Jackson, Mississippi 39205
        Telephone: 601-359-4223
        Fax: 601-359-4231
        Garrett.Mascagni@ago.ms.gov

        _Attorney for Plaintiff State of Mississippi_

FOR PLAINTIFF STATE OF MISSOURI:

ANDREW BAILEY
Attorney General

*/s/ Michael Schwalbert*
Michael.Schwalbert@ago.mo.gov
Missouri Attorney General's
Office
815 Olive St.
Suite 200
St. Louis, MO 63101
Tel: 314-340-7888

*Attorneys for Plaintiff State of Missouri*

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Montana Attorney General


*/s/ Anna Schneider*
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894 Anna.Schneider@mt.gov


*/s/ Charles J. Cooper*
Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves
hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

*Attorneys for Plaintiff State of Montana*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate


*/s/ Michelle C. Badorine*
Michelle C. Badorine, Senior Deputy
Attorney General
MNewman@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252)
Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100

*Attorneys for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NORTH DAKOTA:

> **STATE OF NORTH DAKOTA**
> Drew H. Wrigley
> Attorney General

By:     */s/ Elin S. Alm*
        Elin S. Alm, ND ID 05924
        Assistant Attorneys General
        Consumer Protection & Antitrust Division
        Office of Attorney General of North Dakota
        1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
        (701) 328-5570
        (701) 328-5568 (fax)
        ealm@nd.gov

        *Attorneys for Plaintiff State of North Dakota*

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

*/s/ Domingo Emanuelli-Hernández*
Domingo Emanuelli-
Hernández Attorney General
Thaizza Rodríguez Pagán
Assistant Attorney
General PR Bar No.
17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 1201, 1204
trodriguez@justicia.pr.gov

Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

*Attorneys for Plaintiff Commonwealth of Puerto Rico*

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

ALAN WILSON
Attorney General


/s/ *Mary Frances Jowers*
Mary Frances Jowers
Assistant Deputy Attorney General
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-5855
Email: mjowers@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC
880 Johnnie Dodds Blvd, Suite 1
Mount Pleasant, SC 29464
Phone: 843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
Phone: (504) 648-0180
Email: jdugan@dugan-lawfirm.com


*Attorneys for Plaintiff State of South Carolina*

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

MARTY JACKLEY
Attorney General


*/s/ Jonathan Van Patten*
Jonathan Van Patten
Assistant Attorney General
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel: 605-773-3215
jonathan.vanpatten@state.sd.us

*Attorney for Plaintiff State of South Dakota*

FOR PLAINTIFF STATE OF UTAH:

Derek Brown
Attorney General of Utah


*/s/ Matthew Michaloski*
Matthew Michaloski
Assistant Attorney General
Marie W.L. Martin
Deputy Division Director
Utah Office of the Attorney General
160 East 300 South, 5th Floor
P.O. Box 140811
Salt Lake City, UT 84114
mmichaloski@agutah.gov
Telephone: (801) 440-9825

*Attorneys for Plaintiff State of Utah and*
*as counsel for the Utah Division of Consumer Protection*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 12, 2025, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ Ashley Keller*
Ashley Keller
