# EXHIBIT A

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2025

Lyle W. Cayce
Clerk

No. 24-60223

_____

AT&T, Incorporated,

*Petitioner,*

*versus*

Federal Communications Commission; United States of America,

*Respondents.*

_____

Petition for Review of the Federal Communications Commission
Agency No. 24-40

_____

Before Haynes, Duncan, and Wilson, *Circuit Judges.*[*]

Stuart Kyle Duncan, *Circuit Judge*:

AT&T seeks review of a Federal Communications Commission forfeiture order. In an internal proceeding, the Commission found that AT&T violated section 222 of the Telecommunications Act by mishandling customer data and fined the company $57 million. AT&T's petition argues, among other things, that the in-house adjudication violated the Constitution

_____

[*] Judge Haynes concurs in the judgment only.

by denying it an Article III decisionmaker and a jury trial. Guided by *SEC v. Jarkesy*, 603 U.S. 109 (2024), we agree with AT&T.

Accordingly, we grant the petition and vacate the forfeiture order.

# I

## A

We first outline section 222 of the Telecommunications Act and then explain the Commission's procedures for enforcing it.

### 1

Under section 222, telecommunications carriers must protect the confidentiality of "customer proprietary network information" ("CPNI"). 47 U.S.C. § 222(a). CPNI is defined as "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." *Id.* § 222(h)(1)(A).

Section 222 further provides that carriers "[e]xcept as required by law or with the approval of the customer . . . shall only use, disclose, or permit access to individually identifiable [CPNI] in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service . . . ." *Id.* § 222(c)(1). Commission regulations flesh out these responsibilities. Carriers "must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI," 47 C.F.R. § 64.2010(a), and they may use or disclose CPNI only with customers' "opt-in approval." *Id.* § 64.2007(b).

No. 24-60223

**2**

The Commission assesses forfeiture penalties for violations of the Act, including violations of section 222. 47 U.S.C. § 503(b)(3)(A). The Commission adjudicates alleged violations in two ways: either by assigning a case to an administrative law judge ("ALJ") or by investigating and adjudicating the case itself. *Ibid.* The choice is entirely up to the Commission. *Ibid.*[1] Unsurprisingly perhaps, the Commission typically opts to investigate and adjudicate violations itself, as it did here. That process works as follows.

First, upon receiving information about a potential violation, the Commission's Enforcement Bureau opens an investigation into a carrier. The Bureau can gather information through letters of inquiry sent to the carrier, which may include interrogatories and requests for production. *Enforcement Primer*, FEDERAL COMMUNICATIONS COMMISSION, https://perma.cc/FMQ2-ZH7C. It may also compel documents and testimony through administrative subpoenas. *Ibid.* If the Bureau suspects a violation has occurred, it issues a charging document to the carrier called a Notice of Apparent Liability for Forfeiture ("NAL"). 47 U.S.C. § 503(b)(4)(A). An NAL advises the carrier how it violated the law and proposes a penalty.

To assess the amount of a penalty, the Commission "shall take into account the nature, circumstances, extent, and gravity of the violation and,

_____

[1] Section 503(b)(3)(A) provides in full:

At the discretion of the Commission, a forfeiture penalty may be determined against a person under this subsection after notice and an opportunity for a hearing before the Commission or an administrative judge therefore in accordance with section 554 of Title 5. Any person against whom a forfeiture penalty is determined under this paragraph may obtain review thereof pursuant to section 402(a) of this title.

with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." *Id.* § 503(b)(2)(E). Any penalty "shall not exceed $100,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act . . . ." *Id.* § 503(b)(2)(B).

Once the Commission issues an NAL, the carrier may respond in writing to explain why it should incur no penalty. *Id.* § 503(b)(4)(C). After considering this response, the Commission decides whether to affirm the NAL. If it affirms, the Commission issues a forfeiture order. The written response is the only way a carrier can oppose a NAL. That is, a carrier receives neither a hearing nor a trial before it incurs a Commission forfeiture order and accompanying penalty. *See AT&T Corp. v. FCC*, 323 F.3d 1081, 1083 (D.C. Cir. 2003) (alleged violators can challenge NAL in writing only).

Two paths exist for a carrier to seek review of forfeiture orders.

On the first path, a carrier fails to timely pay the penalty, which becomes a debt to the United States. 47 U.S.C. § 504(a). The Commission refers the debt to the United States Attorney General (DOJ) for a collection action in federal district court. *Ibid.* If DOJ pursues the action, the carrier is entitled to a trial *de novo* (we refer to this as a "section 504 trial"). At trial, however, the carrier may challenge only the order's factual basis, not its legal validity. *See United States v. Stevens*, 691 F.3d 620, 622 (5th Cir. 2012) (in section 504(a) action, district court was "limited to considering the factual basis for the agency action" but not petitioner's "legal arguments").

On the second path, a carrier timely pays the penalty and seeks review in the appropriate court of appeals. *See AT&T Corp.*, 323 F.3d at 1084; *see also Stevens*, 691 F.3d at 623 (noting "the courts of appeals['] . . . exclusive jurisdiction . . . to determine the validity of final FCC forfeiture orders")

(quoting 28 U.S.C. § 2342(1)) (cleaned up); *see also* 47 U.S.C. § 402(a). The carrier may challenge the order's legal validity but, by choosing this path, forgoes a jury trial. *See AT&T Corp.*, 323 F.3d at 1084.

**B**

Next, we sketch this case's factual and procedural background.

**1**

AT&T provides its customers with voice, text, and data services. To make and receive calls and to transmit data, customers' phones periodically "register," or "check in," with nearby signal towers. Because AT&T knows where these towers are, it can calculate the approximate location of its customers' phones. AT&T uses this location information to maintain network function and to provide services to customers.

At issue here is AT&T's former location-based services program, which it discontinued March 2019. Location-based services give users up-to-date information about their surroundings, such as maps and traffic information. They also include services from providers like Life Alert and AAA, which depend upon customers' locations.

While nothing is wrong in principle with providing location-based services, the Commission took issue with how AT&T protected its customers' location data. To implement location-based services, AT&T contracted with "location aggregators," who collected customers' location data. The aggregators, in turn, sold this data to service providers like Life Alert or AAA.

Before allowing those sales, however, AT&T would review a service provider's "use case," where the provider described why it needed the location data and how it obtained customers' opt-in consent to use the data. (That the providers—as opposed to AT&T—obtained users' consent would

be important in the Commission's section 222 analysis.) AT&T's program also required providers to obtain and document customer consent for every location request.

While AT&T reviewed the providers' consent records daily, it did not verify customer consent before providing access to location data. AT&T also required aggregators to monitor providers and to comply with various security requirements, such as vulnerability scanning and encryption. At the same time, AT&T could cut off access to customer location information at any time.

Beginning in May 2018, several news articles reported problems with AT&T's (and other carriers') location-based services programs. Put simply, it became clear that some service providers were misusing or failing to protect customer location data.[2] After learning about this, AT&T promptly terminated those providers' access to the data. And by March 2019, AT&T stopped providing location data to all aggregators for use by any location-based service provider.

**2**

In May 2018, prompted by such news reports, the Commission's Enforcement Bureau began investigating AT&T and eventually sent the company a letter of inquiry seeking information about its location-based services program. AT&T complied with the investigation.

---

[2] One example was Securus Technologies, which provided location services to law enforcement and correctional facilities. Securus allegedly allowed officers to access customer location data without a customer's consent, so long as officers uploaded a document (like a warrant) authorizing the location request. The problem was that Securus did not verify whether uploaded documents actually authorized the request.

No. 24-60223

In February 2020, the Commission issued AT&T an NAL for willful and repeated violations of section 222 of the Act and section 64.2010 of the Commission's rules. The NAL proposed a $57,265,625 penalty. Responding in writing, AT&T argued that: (1) location information is not subject to the Act because it is not CPNI, and, in any event, AT&T lacked fair notice that location information is CPNI; (2) AT&T acted reasonably; (3) the forfeiture amount was arbitrary and capricious; and (4) the Commission's enforcement regime is unconstitutional under Article III, the Seventh Amendment, and the nondelegation doctrine.

In April 2024, the Commission rejected all of AT&T's arguments and affirmed the proposed $57 million penalty. In short, the Commission decided that: (1) CPNI relates to the "location" of a telecommunications service under § 222(h)(1)(A) because a carrier must be aware of and use the device's location for customers to send and receive calls; (2) that section speaks for itself and thus gave AT&T notice; (3) AT&T acted unreasonably by relying on providers to enforce safeguards against unauthorized access to location information[3]; and (4) AT&T's constitutional arguments failed because (a) the possibility of a section 504 trial satisfied the Seventh Amendment and Article III, and (b) the Commission's ability to choose between enforcement procedures did not implicate the nondelegation doctrine.[4]

The Commission therefore issued a forfeiture order demanding AT&T pay the $57 million penalty within 30 days.

_____

[3] Specifically, the Commission found that AT&T committed 84 continuing violations of the Act and that its failures were willful or repeated.

[4] Two Commissioners dissented from the NAL. One thought CPNI does not include customer location data; but if it did, AT&T lacked notice of that. The other thought the forfeiture amount was unreasonable.

No. 24-60223

AT&T elected to timely pay the penalty and seek review in our court. Before us, the company raises the same arguments it raised before the Commission.

We resolve AT&T's appeal based on its Seventh Amendment and Article III challenges to the Commission's enforcement regime, which we review *de novo*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). So, we need not reach the other issues AT&T raises.[5]

## II

AT&T argues that the Commission's enforcement procedures violate its Seventh Amendment right to a jury trial and its right to adjudication by an Article III court.

Our analysis is governed by *SEC v. Jarkesy*, 603 U.S. 109 (2024). In that case, the Supreme Court ruled that the Seventh Amendment prohibited the SEC from requiring respondents to defend themselves before an agency, rather than a jury, against civil penalties for alleged securities fraud. *Id.* at 140. The Court also ruled that the case did not fall within the "public rights" exception, which would let Congress assign certain matters to an agency instead of an Article III court. *Id.* at 134.

We must determine whether, following *Jarkesy*, the Commission's enforcement regime also violates the Seventh Amendment and Article III.

## A

The Seventh Amendment provides in relevant part:

---

[5] Specifically, those issues are: whether the Commission's discretion to choose between an NAL or ALJ violates the nondelegation doctrine; whether the Commission lacked statutory authority to issue the forfeiture order; and whether the forfeiture order is arbitrary and capricious.

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved[.]

U.S. CONST. amend. VII. The threshold question is whether the Commission's enforcement proceeding qualifies as a "suit at common law." A common law suit is one that is "legal in nature," as opposed to one sounding in the realm of equity or admiralty. *See Jarkesy*, 603 U.S. at 122 (quoting *Granfinanciera, S. A. v. Nordberg*, 492 U.S. 33, 53 (1989)); *see ibid.* ("[T]he Framers used the term 'common law' in the Amendment in contradistinction to equity, and admiralty, and maritime jurisprudence." (quoting *Parsons v. Bedford*, 3 Pet. 433, 446 (1830))).

How do we tell whether a suit is legal in nature? By considering two things: the cause of action and the remedy provided. *Id.* at 123.

**1**

We start with the remedy because it is the "more important" consideration. *Ibid.* (quoting *Granfinanciera*, 492 U.S. at 421).

The Commission's civil penalties "are the prototypical common law remedy." *Ibid.* They are money damages designed to "punish or deter" violators of section 222. *Ibid.* This is evident from the statutory factors, which instruct the Commission to set penalties by reference to "the nature, circumstances, extent, and gravity of the violation" as well as the violator's "degree of culpability." 47 U.S.C. § 503(b)(2)(E). It is also evident from the considerations the Commission used to set AT&T's penalty, such as whether AT&T acted "willfully" and "repeatedly" and whether the violations were "serious." *Cf. Jarkesy*, 603 U.S. at 123 (noting the statutory penalty factors included whether a defendant was a repeat offender and whether its conduct was deliberate).

Moreover, the penalties are not remedial. They are not designed "solely to 'restore the status quo.'" *Ibid.* (quoting *Tull v. United States.*, 481 U.S. 412, 422 (1987)); *see also United States v. Hoffman*, 901, F.3d 523, 560–61 (5th Cir. 2018) ("As opposed to restitution which is remedial, forfeiture is punitive."). Nor are they meant to compensate victims whose location data was compromised. *See* 47 U.S.C. § 504(a) ("The forfeitures provided for in this chapter shall be payable into the Treasury of the United States"); *cf. Jarkesy*, 603 U.S. at 124 (noting SEC was "not obligated to return any money to victims").

So, like the penalties in *Jarkesy*, the civil penalties here are "a type of remedy at common law that could only be enforced in courts of law." *Id.* at 125 (quoting *Tull*, 481 U.S. at 422). That "is all but dispositive" of the Seventh Amendment issue. *Id.* at 123.

### 2

Saying nothing about the remedy, the Commission instead focuses on the second consideration, the nature of the cause of action. It argues that an action to enforce section 222 does not bear a "close relationship" to any common law cause of action and that, as a result, the Seventh Amendment does not apply. We disagree.

As AT&T argues, the section 222 action is analogous to common law negligence.[6] The action punishes carriers for failing to take reasonable measures to protect customers' personal data. *See* 47 C.F.R. § 64.2010(a) ("[Carriers] must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI."). The Commission decided

---

[6] AT&T also argues the action is analogous to common law actions for intrusion upon seclusion and eavesdropping. We need not address that argument.

whether AT&T violated section 222 by repeatedly asking whether the
company had acted reasonably.

For example, the Commission found AT&T unreasonably failed to
protect customer data by relying on aggregators to enforce procedural
safeguards, instead of enforcing the safeguards itself. The Commission also
found AT&T's safeguards to be unreasonable because the company
continued to provide customer location data to aggregators, despite reports
of unauthorized disclosures. And the Commission found AT&T acted
unreasonably by failing to "rectify the systemic vulnerabilities at the heart of
its [] program." In sum, the Commission assessed AT&T's protection of
customer location data entirely in terms of the reasonableness of the
company's actions.

Such analysis is a staple of the common law. "An act or an omission
may be negligent if the actor realizes or should realize that it involves an
unreasonable risk of harm to another through the conduct of the other or a
third person which is intended to cause harm, even though such conduct is
criminal." RESTATEMENT (SECOND) OF TORTS § 302B (2024). This
familiar tort mirrors the Commission's analysis of AT&T's actions:
"[AT&T's] failure to adequately protect CPNI for a protracted amount of
time caused substantial harm by making it possible for malicious actors to
identify the exact locations of AT&T subscribers who belong to law
enforcement, military, government, or other highly sensitive positions—
thereby threatening national security and public safety . . . ." The
Commission's action, then, is analogous to common law negligence.

The Commission responds that section 222 is not analogous to
negligence but instead is a "highly reticulated and technical scheme" for
safeguarding customer data. That is a false choice. The Seventh Amendment
applies to common law suits "whatever may be the peculiar form which they

may assume." *Jarkesy*, 603 U.S. at 122 (quoting *Parsons*, 3 Pet. at 447); *see also Tull*, 481 U.S. at 418–19 ("Actions by the Government to recover civil penalties under statutory provisions therefore historically have been viewed as one type of action in debt requiring trial by jury."). However "technical" section 222 may be, its substance is closely analogous to a negligence action.

The Commission also points out that, unlike the securities laws in *Jarkesy*, section 222 does not borrow common law terms like "negligence" or "reasonable care." *Cf. Jarkesy*, 603 U.S. at 125 (noting "Congress deliberately used 'fraud' and other common law terms of art" in the securities laws). That is partially true—the scheme does not use the term "negligence" but does speak of "reasonable measures"—but in any event it is not determinative. Yes, a statute's borrowing common law terms may show its kinship to a common law action. *Cf. ibid.* ("Congress's decision to draw upon common law fraud created an enduring link between federal securities fraud and its common law 'ancestor.'") (cleaned up). The key inquiry, though, is not what terminology the statute uses but whether the statute "target[s] the same basic conduct" as the common law claim. *Ibid.* The answer here is yes: section 222 action targets a carrier's negligence in handling customer data.

Moreover, as *Jarkesy* explained, the statutory action need not be "identical" to a common law analogue. *See id.* at 126 ("That is not to say that federal securities fraud and common law fraud are identical."); *id.* at 135 ("[I]f the action resembles a traditional legal claim, its statutory origins are not dispositive." (citing *Granfinanciera*, 492 U.S. at 52)). All that is needed is a "close relationship," *Jarkesy*, 603 U.S. at 126, and section 222 satisfies that requirement.

To be sure, the relationship between the section 222 action and a common law analogue is not as obvious as it was in *Jarkesy*. But ambiguity on

this second consideration points us back to the "more important" first consideration—remedy. *Jarkesy*, 603 U.S. at 123. As noted, section 222 imposes the archetypal common law remedy of money damages, which is "all but dispositive" of the Seventh Amendment issue. *Ibid.*

## B

The Commission next defends its enforcement proceeding under the "public rights" exception, which, it contends, lets Congress assign the proceeding to an agency rather than a court. We disagree.

### 1

Suits at common law presumptively concern "private rights" and must be adjudicated by Article III courts. *Jarkesy*, 603 U.S. at 127 (citing *Stern v. Marshall*, 564 U.S. 462, 484 (2011)). "The Constitution prohibits Congress from 'withdraw[ing] [such matters] from judicial cognizance.'" *Ibid.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856) (second brackets added)). "Public rights" cases, however, may be channeled to agencies instead of courts. *Ibid.*

This narrow exception to Article III applies only to matters that "historically could have been determined exclusively by [the executive and legislative] branches." *Id.* at 128 (quoting *Stern*, 564 U.S. at 493). While the Supreme Court has not "definitively explained" what divides public from private rights, it has pointed to "historic categories of adjudications" occurring outside Article III. *Id.* at 131, 130. Examples include revenue collection, foreign commerce, immigration, tariffs, tribal relations, public lands, public benefits, and patents. *Id.* at 128–30.[7] That said, the exception

---

[7] *See Murray's Lessee*, 18 How. at 281, 285 (action to compel federal customs collector to pay public funds into Treasury); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 335 (1909) (action to enforce fine on steamship company for disobeying federal

must be handled "with care." *Id.* at 131. "[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Id.* at 132 (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 n.23 (1982)).

**2**

The Commission argues its enforcement action falls within the public rights exception because it involves common carriers. *See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 975 (2005) ("The [Communications] Act regulates telecommunications carriers . . . as common carriers."). Given that common carriers like AT&T are "affected with a public interest," *Munn v. Illinois*, 94 U.S. 113, 130 (1876), the Commission contends Congress could assign adjudication of civil penalties against them to agencies instead of courts. For several reasons, we disagree.

First, the Commission's proposal would blow a hole in what is meant to be a narrow exception to Article III. Myriad enterprises might be said to implicate the "public interest."[8] And Congress's power to regulate common carriers is broad. *See Glob. Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45, 48 (2007) ("When Congress enacted the Communications Act of 1934, it granted the FCC broad authority to

---

prohibition on allowing immigration by aliens with contagious diseases); *Ex parte Bakelite Corp.*, 279 U.S. 438, 458 (1929) (assessment of President's tariffs on goods imported by "unfair methods of competition"); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011) (relations with Indian tribes); *Crowell v. Benson*, 285 U.S. 22, 51 & n.13 (1932) (administration of public lands); *ibid.* (public benefits such as veterans benefits and pensions); *United States v. Duell*, 172 U.S. 576, 582–83 (1899) (patent rights).

[8] *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022) (social media activity), *overruled on other grounds by Moody v. NetChoice, L.L.C.*, 603 U.S. 707 (2024); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 611 (1944) (natural gas operations); *Nat'l Union Fire Ins. Co. v. Wanberg*, 260 U.S. 71, 74 (1922) (hail insurance); *New York v. FERC*, 535 U.S. 1, 19 (2002) (electric energy).

No. 24-60223

regulate interstate telephone communications."). If injected into the public rights exception, this combination would empower Congress to bypass Article III adjudication in countless matters. But the Supreme Court has cautioned that the doctrine is a narrow and extra-textual "*exception*" to presumptively mandatory Article III jurisdiction. *Jarkesy*, 603 U.S. at 131.

Second, the common carrier doctrine is deeply rooted in the common law. *See, e.g.*, *NetChoice*, 49 F.4th at 469 ("The common carrier doctrine is a body of common law dating back long before our Founding.").[9] Negligence claims against common carriers have been routinely adjudicated in state and federal courts. *See, e.g.*, *Cole v. Goodwin & Storey*, 19 Wend. 251, 281 (N.Y. Sup. Ct. 1839) (a "coach proprietor's" common carrier status made it strictly liable in tort).[10] In light of that, it would be bizarre to situate a negligence action against carriers within the "historic categories of adjudications" falling *outside* Article III. *Jarkesy*, 603 U.S. at 130.[11]

---

[9] *See* 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4514 (3d ed. 2024) (citing cases placing common carriers' liability within the federal common law because such liability involves significant federal interests); *see also* Robert J. Kaczorowski, *The Common-Law Background of Nineteenth-Century Tort Law*, 51 Ohio State L.J. 1127, 1132 (1990) (explaining that "the common law imposed on persons engaged in a common calling a duty of reasonable care and a standard of professional competence").

[10] *See also New Jersey Steam Nav. Co. v. Merch.'s Bank of Bos.*, 47 U.S. 344 (1848) (steamboat operator liable for losses at sea); *S. Exp. Co. v. Purcell*, 37 Ga. 103 (1867) (railroad for loss of cotton bales); *Duggan v. New Jersey & W. Ferry Co.*, 76 A. 636 (Del. Super. Ct. 1909) (ferry operator for personal injuries); *Goldstein v. Northern Pac. Ry. Co.*, 164 N.D. 602 (1917) (railroad for conversion); *Korner v. Cosgrove*, 108 Ohio St. 484 (1923) (taxicab operator for employee's assault of a passenger); *Callaway v. Hart*, 146 F.2d 103 (5th Cir. 1944) (railroad for negligently leaving doors open) *Andrews v. United Airlines, Inc.*, 24 F.3d 39 (9th Cir. 1994) (airline for luggage falling on passenger).

[11] Nor does it matter that this action is brought by the Government. The Supreme Court "ha[s] never held that 'the presence of the United States as a proper party to the

No. 24-60223

Third, the cases cited by the Commission fail to show that the public rights exception generally applies to common carriers. Some of the cases involved actions far afield from this one, such as public benefits or actions falling within federal admiralty jurisdiction.[12] Those actions arguably fall within the historical categories of non-Article III adjudications listed in *Jarkesy*. *See* 603 U.S. at 130. Whether they do or not, though, they do not involve anything like a negligence action against a common carrier for money damages.

It is true that federal agencies like the Commission have long had regulatory authority over common carriers, such as when setting rates or granting licenses. *See, e.g.*, *Virginian Ry. Co. v. United States*, 272 U.S. 658 (1926) (discussing the Interstate Commerce Commission's oversight of railroad carriers).[13] But that does not imply, as the Commission seems to think, that any regulatory action concerning common carriers implicates the public rights exception and can therefore be "siphon[ed] . . . away from an Article III court." *Jarkesy*, 603 U.S. at 135.

---

proceeding is . . . sufficient' by itself to trigger the [public rights] exception." *Jarkesy*, 603 U.S. at 135.

[12] *See Scripps-Howard Radio v. FCC*, 316 U.S. 4 (1942) (addressing FCC order granting application for a construction permit and station license); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969) (addressing "fairness doctrine" governing content carriers could broadcast over radio frequency); *Crowell*, 285 U.S. 22 (addressing challenge to the Longshoremen's and Harbor Workers' Compensation Act of 1927).

[13] *See also Burlington N., Inc. v. United States*, 459 U.S. 131, 141 (1982) (discussing Commission's authority to set rates*); Regents of Univ. Sys. of Ga. v. Carroll*, 338 U.S. 586, 598 (1950) (discussing Commission's authority to grant licenses); *Belluso v. Turner Commc'ns Corp.*, 633 F.2d 393, 397 (5th Cir. 1980) (discussing the Commission's authority to sanction licensees).

Not even the first modern administrative agency thought that was so.[14] The Interstate Commerce Commission, while empowered to regulate common carriers and recommend monetary penalties, believed its enforcement actions were subject to the Seventh Amendment and so, necessarily, to Article III adjudication. The agency's 1887 report, issued the year it was created, stated that its power "must be so construed as to harmonize with the seventh amendment to the Federal Constitution, which preserves the right of trial by jury in common-law suits." 1887 INTERSTATE COM. COMM'N ANN. REP. 27; *see also* Richard L. Jolly, *The Administrative State's Jury Problem*, 98 WASH. L. REV. 1187, 1242 (2023) (quoting Report's conclusion that it was "unquestionable that parties can not [*sic*] be deprived of [the jury] right through conferring authority to award reparation upon a tribunal that sits without a jury as assistant"). The Commission takes no account of this history, which is flatly inconsistent with exempting its enforcement action from Article III adjudication.[15]

\* \* \*

Ultimately, "what matters" for Article III purposes "is the substance of the suit, not where it is brought, who brings it, or how it is labeled." *Jarkesy*, 603 U.S. at 135. As explained, this matter involves an action closely

---

[14] *See* LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW 439 (2d ed. 1985). The ICC was the FCC's predecessor.

[15] Consistent with this history is *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 430 (1915), which involved an ICC action targeting a railroad's unreasonable rates. The Supreme Court addressed whether a provision treating the ICC's initial factfinding as a "rebuttable presumption" that could be reconsidered in a later jury trial comported with the Seventh Amendment. *Ibid.* Unlike the Commission's action against AT&T here, the ICC action there (rate setting) had no common law analogue. Even so, the Court assumed the railroad had a jury right in the action and held the provision does not violate the Seventh Amendment because "[i]t cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury." *Ibid.*

analogous to a common law negligence action—and, importantly, one where the Commission seeks "civil penalties, a punitive remedy that [the Supreme Court] ha[s] recognized 'could only be enforced in courts of law.'" *Id.* at 134 (quoting *Tull*, 481 U.S. at 422). Accordingly, the public rights exception does not apply and Article III adjudication is mandatory. *Id.* at 128.

## C

Finally, the Commission argues that, even if the Seventh Amendment and Article III apply, the proceeding here meets their demands.

The Commission points to the possibility of a back-end section 504 trial. Recall that a carrier who fails to timely pay a forfeiture penalty may be sued by DOJ in federal district court. *See* 47 U.S.C. § 504(a). The Commission suggests this would give a carrier everything promised by the Seventh Amendment and Article III. We disagree.

To begin with, by the time DOJ sues (if it does), the Commission would have already adjudged a carrier guilty of violating section 222 and levied fines. This case shows how the process works. The Commission investigated AT&T, issued a charging document (the NAL), and received AT&T's written objections. The Commission then affirmed the NAL by making fact findings, interpreting section 222, and applying that understanding to the facts it had found. This resulted in a forfeiture order concluding AT&T had violated the law and imposing $57 million in penalties. So, in this process, which was completely in-house, the Commission acted as prosecutor, jury, and judge.

Such forfeiture orders, furthermore, are not mere suggestions—to the contrary, they have real-world impacts on carriers. For example, the Commission must consider any history of prior adjudicated offenses in imposing future penalties. *See* 47 U.S.C. § 503(b)(2)(E) ("In determining the amount of such a forfeiture penalty, the Commission or its designee shall take

into account . . . any history of prior offenses . . . .”). Unsurprisingly, they also cause reputational harm to carriers because they can be widely publicized and reported. *See FCC v. Fox Television Stations*, *Inc.*, 567 U.S. 239, 256 (2012) (explaining forfeiture orders’ impact on carriers’ reputations). And consider the risks to a carrier of even getting to the section 504 trial: the carrier must refuse to pay a penalty and wait for DOJ to drag it into court.

In light of this, we reject the Commission’s argument that a section 504 enforcement proceeding satisfies Article III and the Seventh Amendment. The Commission cites no authority supporting the proposition that the constitutional guarantee of a jury trial is honored by a trial occurring after an agency has already found the facts, interpreted the law, adjudged guilt, and levied punishment.

But put all that aside for a moment and consider another glaring problem. In a section 504 trial, a defendant cannot challenge a forfeiture order’s legal conclusions. As our court has explained, in a section 504(a) action, the district court is “limited to considering the factual basis for the agency action” but not petitioner’s “legal arguments.” *Stevens*, 691 F.3d at 622.[16] So, even assuming an after-the-fact jury trial could potentially satisfy the demands of the Constitution, the one provided here amputates the carrier’s ability to challenge the legality of the forfeiture order.

---

[16] The Commission tries to distinguish *Stevens* on the ground that it involved legal challenges to a rule outside of a statutorily imposed deadline, but *Stevens’* reasoning was not limited to such challenges. *See id*. at 623 (“Persons aggrieved by a final FCC forfeiture order must raise legal challenges to the validity of the order in a timely petition for review in the appropriate court of appeals.”). And, contrary to the Commission’s argument, *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1 (2019), does not support a narrow reading of *Stevens*. There, the Supreme Court expressly refused to decide whether the Hobbs Act’s exclusive-review provision affords a prior and adequate opportunity for judicial review of Commission orders interpreting statutory provisions. *Id*. at 8.

True, AT&T could challenge the Commission's legal conclusions by doing what it did in this case—paying the forfeiture and seeking direct appellate review. *See* 47 U.S.C. § 402(a); *see also AT&T Corp.*, 323 F.3d at 1084. But that only underscores the dilemma in which AT&T finds itself. If AT&T wants an Article III court to review the forfeiture order's legality, it has to give up a jury trial. If it wants a jury trial, it has to defy a multi-million dollar penalty, wait for DOJ to sue, and, even then, relinquish its ability to challenge the order's legality.

Either way, AT&T's Seventh Amendment rights have been denied.

## IV

No one denies the Commission's authority to enforce laws requiring telecommunications companies like AT&T to protect sensitive customer data. But the Commission must do so consistent with our Constitution's guarantees of an Article III decisionmaker and a jury trial.

Accordingly, we GRANT AT&T's petition and VACATE the Commission's forfeiture order.