UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, ET AL. | § | |
| | § | |
| v. | § | CIVIL NO. 4:20-CV-957-SDJ |
| | § | |
| GOOGLE LLC | § | |

## **MEMORANDUM OPINION AND ORDER**

In this antitrust action, a coalition of States[1] allege that Defendant Google LLC has engaged in a broad scheme of anticompetitive conduct, violating the Sherman Act and each State's antitrust and deceptive-trade-practice ("DTPA") laws. The States primarily seek injunctive relief and civil penalties against Google. *See* (Fourth Amended Complaint ("FAC") ¶¶ 598–758). Google has filed a Motion to Strike Plaintiffs' Jury Demand for All Claims and Civil Penalties. (Dkt. #690).[2]

Google challenges the States' right to a jury trial on two issues: (1) Google's alleged liability for violating the States' antitrust and DTPA laws; and (2) the quantum of civil penalties owed, if any, should Google be found liable. The States maintain that under the Seventh Amendment they have the right to a jury trial on these issues.

Google's motion will be granted in part and denied in part, based on the following holdings:

---

[1] The coalition of States includes Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, South Dakota, Utah, and the Commonwealths of Kentucky and Puerto Rico.

[2] For clarity, all docket-citation pincites in this Opinion are to the corresponding CM/ECF pagination at the top of page, not to the parties' pagination (bottom of the page).

- The States do not have a right to a jury trial on their federal-antitrust claims.
- The States have the right to a jury trial on Google's alleged liability for violating the following States' antitrust laws: Texas, Alaska, Florida, Kentucky, Louisiana, Mississippi, Montana, Nevada, North Dakota, South Carolina, South Dakota, and Utah. The States do not have the right to a jury trial on Google's alleged liability for violating the following States' antitrust laws: Arkansas, Idaho, Indiana, Missouri, and Puerto Rico.
- The States have the right to a jury trial on Google's alleged liability for violating the following States' DTPA laws: Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, and Utah. The States do not have the right to a jury trial on Google's alleged liability for violating the following States' DTPA laws: Puerto Rico and South Dakota.
- The States do not have the right to a jury trial on the quantum of civil penalties owed, if any, should Google be found liable.

The discussion of Google's motion proceeds in three parts. First, the Court describes the framework for analyzing the right to a jury trial under the Seventh Amendment. Second, after reviewing the States' allegations, the Court evaluates whether the Seventh Amendment mandates that Google's alleged liability for violating the States' antitrust and DTPA laws must be tried before a jury. Third, the Court addresses whether a jury must calculate the quantum of civil penalties, if any are awarded.

TABLE OF CONTENTS

I. THE SEVENTH AMENDMENT RIGHT TO TRIAL BY JURY .............................................. 4

   A. A Right of Surpassing Importance ........................................................................... 4

   B. The Scope of the Seventh Amendment ................................................................... 6

   C. Mixed Relief: *Beacon Theatres*, *Dairy Queen*, and *Ross* ........................................ 8

   D. Current Seventh Amendment Framework: *Tull* and *Jarkesy* ............................... 15

II. FACTUAL BACKGROUND ......................................................................................... 19

III. DISCUSSION .......................................................................................................... 22

   A. The States' Jury-Trial Demand .............................................................................. 22

   B. Google's Arguments Against the States' Right to Jury Trial ................................. 24

      1. The States are not excluded from the Seventh Amendment. ........................... 25

      2. The States' civil-penalty claims are not sufficiently incidental to or intertwined with equitable claims to abrogate their jury-trial right. ................................. 31

         i. *Terry* and *Gwaltney* do not support Google's theory. .................................... 36

         ii. Google's remaining authorities are inapposite. ........................................... 38

      3. Google's request that the Court decline supplemental jurisdiction. ............... 49

   C. The State-Law Antitrust Claims ............................................................................ 51

      1. Five States are not entitled to a jury trial on their state-antitrust claims seeking civil penalties. .................................................................................. 52

      2. Twelve States are entitled to a jury trial on their state-antitrust claims seeking civil penalties. .................................................................................. 54

         i. Google concedes that three States' state-antitrust claims receive a jury trial under *Tull* and *Jarkesy*. .................................................................... 57

         ii. The remaining nine Antitrust Majority States are similarly entitled to a jury trial on Google's liability for alleged state-antitrust violations. ......... 58

   D. The States' DTPA Claims ....................................................................................... 88

      1. Two States are not entitled to a jury trial on their DTPA claims seeking civil penalties. .................................................................................................. 88

      2. Fifteen States are entitled to a jury trial on their DTPA claims seeking civil penalties. .................................................................................................. 90

         i. *Tull*'s first prong ....................................................................................... 90

         ii. Google's arguments on *Tull*'s first prong .................................................. 91

         iii. *Tull*'s second prong ................................................................................... 95

   E. Quantum of Civil Penalties .................................................................................. 137

IV. CONCLUSION ....................................................................................................... 140

## I. THE SEVENTH AMENDMENT RIGHT TO TRIAL BY JURY

### A. A Right of Surpassing Importance

The Seventh Amendment to the Constitution provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved[.]" U.S. CONST. amend. VII. To the Framers, the Seventh Amendment guaranteed a right of surpassing importance. They considered it a vital "bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting). Thomas Jefferson regarded the right as "the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." 3 *The Writings of Thomas Jefferson* 71 (H. Washington ed. 1861). To Patrick Henry, trial by jury was "the best appendage of freedom." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 324 (Jonathan Elliot ed. 1896). The Framers' devotion to the right to trial by jury echoed Blackstone—their primary source on the common law—who viewed the right as "the glory of the English law," and "the most transcendent privilege which any subject can enjoy." 3 WILLIAM BLACKSTONE, COMMENTARIES *379.

The abrogation of the right to trial by jury was one of the American colonists' principal grievances against the British Crown, specifically included among the indictments of George III in the Declaration of Independence. *See* THE DECLARATION OF INDEPENDENCE para. 20 (U.S. 1776) ("For depriving us in many cases, of the benefits of Trial by Jury[.]"). Every one of the thirteen original States guaranteed the

4

right to trial by jury—many in worshipful terms[3]—making the right "probably the only one universally secured by the first American state constitutions." Leonard W. Levy, *Legacy of Suppression: Freedom of Speech and Press in Early American History* 281 (1960).

Despite this history, however, the civil jury right was not initially included in the Constitution, and its omission proved a stumbling block for ratification. Indeed, arguably the objection to the proposed Constitution that gained the most currency, "well-nigh preventing its ratification," was its failure to guarantee the right to trial by jury in civil cases. 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1763 (5th ed. 1891); *see also United States v. ERR, LLC*, 35 F.4th 405, 409 (5th Cir. 2022) ("The omission generated fierce criticism from the Anti-Federalists."). In the face of such criticism, and in ratifying the Constitution, seven of the original thirteen States did so with the strong recommendation that it be promptly amended to include a Bill of Rights. Six of those seven States urged a specific guarantee of the right to trial by jury in civil cases.[4] That was accomplished when, with no recorded debate, the Seventh Amendment was ratified.

The Supreme Court early on reaffirmed the historic significance of the right to trial by jury. *See, e.g.*, *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446, 7 L.Ed. 732 (1830) (Story, J.) ("The trial by jury is justly dear to the American people. It has always been

---

[3] *See, e.g.*, VA. CONST. art. I, § 11 ("[The] trial by jury is preferable to any other, and ought to be held sacred.").

[4] *See* 2 *The Debate on the Constitution* 538 (Bernard Bailyn ed. 1993) (ratification resolution of New York), 549 (Massachusetts), 551 (New Hampshire), 555 (Maryland), 560 (Virginia), 567 (North Carolina).

an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy."). And over time, the Court has consistently confirmed that this right is "'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care.'" *SEC v. Jarkesy*, 603 U.S. 109, 121, 144 S.Ct. 2117, 219 L.Ed.2d 650 (2024) (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935)); *see also Jacob v. City of New York*, 315 U.S. 752, 752–53, 62 S.Ct. 854, 86 L.Ed. 1166 (1942) ("A right so fundamental and sacred to the citizen . . . should be jealously guarded by the courts.").

## B. The Scope of the Seventh Amendment

The Seventh Amendment preserves the right to jury trial in "suits at common law." Justice Story elaborated on what the Framers intended by the phrase "at common law": They meant "not merely suits which the *common* law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Parsons*, 28 U.S. (3 Pet.) at 447. The Seventh Amendment therefore applies not only to "common-law forms of action," but also to "causes of action created by congressional enactment." *Tull v. United States*, 481 U.S. 412, 417, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (citation omitted); *see also Parsons*, 28 U.S. (3 Pet.) at 447 (noting that the Seventh Amendment "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume"). Because a jury trial is

required for "actions that are analogous to suits at common law," the relevant inquiry is whether a given action is more like the actions that would have been tried in courts of law or courts of equity. *Tull*, 481 U.S. at 417 (citation modified).

Whether a cause of action is one that would have been tried in courts of law is a matter of federal law. *Simler v. Conner*, 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963). To make this determination, the Supreme Court has adopted a two-step approach. First, courts "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Tull*, 481 U.S. at 417. Second, courts "examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* at 417–18. Because "some causes of action sound in both law and equity," the Supreme Court has "concluded that the remedy is the more important consideration." *Jarkesy*, 603 U.S. at 123 (citation modified) (quoting *Tull*, 481 U.S. at 421); *see also ERR*, 35 F.4th at 411 ("The second factor is 'more important.'") (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)).[5]

---

[5] As the Fifth Circuit has noted, the Supreme Court "has also asked whether the particular 'trial decision' must be decided by the jury to preserve the jury-trial right." *ERR*, 35 F.4th at 411 n.4 (first citing *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708, 718–21, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999); then citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) ("If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791.")). For this inquiry, the Court has looked "principally to history," but when history has not "provide[d] a 'clear answer,'" it has considered "precedent and functional considerations." *Id.* (quoting *Monterey*, 526 U.S. at 718). Neither Google nor the States addressed this issue, likely because there is no dispute that "juries resolve complex issues" like those raised in this litigation "all the time." *Id.*

Money damages are the prototypical legal remedy;[6] injunctions, the prototypical equitable remedy.[7] Some remedies may also be classified as legal for one type of claim and equitable for another.[8] What matters is whether the remedy is "designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Jarkesy*, 603 U.S. at 123 (quoting *Tull*, 481 U.S. at 422). Indeed, when "a civil sanction . . . cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes," it "is punishment." *Id.* (quoting *Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (quotation omitted)). Relevant here, the Supreme Court has concluded that "civil penalties are a type of remedy at common law that could only be enforced in courts of law." *Id.* (citation modified). The Seventh Amendment therefore applies to determining liability for civil-penalty remedies.

## C. Mixed Relief: *Beacon Theatres*, *Dairy Queen*, and *Ross*

In a series of decisions around the 1960s, the Supreme Court addressed how the Seventh Amendment applies in cases with mixed issues of law and equity. Broadly speaking, the Court found that the merger of legal and equitable claims in 1938 for federal lawsuits reduced the need for issues to be tried in equity because

---

[6] *Jarkesy*, 603 U.S. at 123 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)).

[7] *See In re Abbott*, 117 F.4th 729, 740 (5th Cir. 2024) ("[A]n 'injunction is an inherently equitable remedy.'" (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002))).

[8] *See, e.g.*, *ERR*, 35 F.4th at 412–13 (explaining that "restitution can sound in either law or equity"). Here, it is undisputed that the civil-penalty claims asserted by the States do not seek a restitution remedy.

adequate remedies were available before a single court that could hear both.[9] As a consequence, when a legal claim is joined with an equitable claim, the right to jury trial on the legal claim is preserved and encompasses all issues common to both claims. *Tull*, 481 U.S. at 425. In other words, "[t]he right cannot be abridged by characterizing the legal claim as incidental to the equitable relief sought." *Id.* (citation modified).

The first of these cases—*Beacon Theatres, Inc. v. Westover*—involved a dispute between California movie-theater chains. 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). In relevant part, Beacon Theatres notified Fox West Coast Theatres that it considered Fox's contracts with movie distributors, which gave Fox the exclusive right to show first-run movies in the San Bernardino area, to violate antitrust laws. *Beacon Theatres,* 359 U.S. at 502. Fox sued in response, seeking a declaration that its contracts did not violate antitrust laws and an injunction to prevent Beacon from suing for antitrust violations. *Id.* at 502–03. Beacon, however, brought its antitrust allegations through counterclaims, seeking treble damages. *Id.* at 503. As a result, both types of claims were present: Fox's sounding in equity (injunctive relief); Beacon's sounding in law (money damages). *See id.*

The Supreme Court held that where legal and equitable claims are brought in one action, and where there are factual issues common to both the legal and equitable

---

[9] When the Federal Rules of Civil Procedure were adopted in 1938, they provided for "only one action—a 'civil action'—in which all claims may be joined and all remedies are available." *Ross v. Bernhard*, 396 U.S. 531, 539, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *see also* FED. R. CIV. P. 1, 2, 18.

causes of action, a court cannot—absent exceptional circumstances—deprive a litigant of the right to a jury trial by trying the equitable claim first. *Id.* at 510–11. In the Court's view, the Seventh Amendment's guarantee constrained the trial court's discretion as to the order of trying issues: "Since the right to jury trial is a constitutional one . . . while no similar requirement protects trials by the court, that discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." *Id.* at 510 (footnote omitted).[10]

Applying these principles, the *Beacon Theatres* Court understood that trying Fox's equitable claims first would mean that Beacon would not have received a jury trial on its antitrust claim for issues of fact common to both claims. As a result, the antitrust claims would be tried in part by the judge and in part by the jury. The Court

---

[10] Prior to the merger of law and equity, courts of equity sometimes enjoined legal claims to protect the rights of the plaintiff in equity. A plaintiff who requested an injunction might suffer irreparable harm if the injunction could not be considered until after legal claims were first resolved. Thus, equitable claims were frequently heard before legal claims. *See id.* at 507 ("[C]ourts of equity . . . were, in some cases, allowed to enjoin subsequent legal actions between the same parties involving the same controversy . . . because the subsequent legal action . . . might not protect the right of the equity plaintiff to a fair and orderly adjudication of the controversy.") (citation omitted).

The Court made clear in *Beacon Theatres*, however, that the merger of legal and equitable causes of action in the same lawsuit ended the need to resolve all equitable issues before proceeding to legal ones: "Inadequacy of remedy and irreparable harm are practical terms . . . . As such their existence today must be determined, not by precedents decided under discarded procedures, but in the light of the remedies now made available by the Declaratory Judgment Act and the Federal Rules." *Id.* (footnote omitted). The Court recognized that, rather than requiring courts to adjudicate equitable causes of action first at the expense of the jury trial right, the advent of the Federal Rules of Civil Procedure permitted legal and equitable causes of action to be tried together, so equitable issues needing immediate relief could be dealt with on a temporary basis pending a jury trial on the legal issues. *See id.* at 508. Thus, collateral estoppel would now work in the other direction—the jury's findings on the issues of fact common to both the equitable and legal claims would bind the judge in the equitable action.

found this result impermissible: "Since the issue of violation of the antitrust laws often turns on the reasonableness of a restraint on trade in the light of all the facts, it is particularly undesirable to have some of the relevant considerations tried by one fact finder and some by another." *Id.* at 508 n.10 (citation omitted). The Court also understood that trying all the issues to a jury in the first instance would help produce a coherent determination based on all underlying factual issues.

Three years later, the Court reaffirmed its *Beacon Theatres* holding in *Dairy Queen, Inc. v. Wood*, a case involving the breach of a franchise contract and trademark infringement. 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Dairy Queen's complaint sought an accounting, as well as injunctive relief preventing Wood from using Dairy Queen's trademark and franchise and from collecting money from Dairy Queen stores within its territory. *Dairy Queen*, 369 U.S. at 475. Reversing the lower courts on whether Dairy Queen had the right to a jury trial, the Supreme Court rejected the view that the issues raised were either "purely equitable" or that the legal issues were "'incidental' to equitable issues." *Id.* at 470 (citation omitted). The Court noted that the district court's characterization of legal issues as "incidental" did not affect the right to a jury trial on legal issues: "It would make no difference if the equitable cause clearly outweighed the legal cause so that the basic issue of the case taken as a whole is equitable. As long as any legal cause is involved the jury rights it creates control." *Id.* at 473 n.8 (quoting *Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.*, 294 F.2d 486, 491 (5th Cir. 1961)).

In a third decision, *Ross v. Bernhard*, the Court found that the merger of legal and equitable claims under the Federal Rules of Civil Procedure also supported a jury-trial right in a shareholder's derivative action, which, pre-merger, had sounded in equity. 396 U.S. 531, 539, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). In *Ross*, shareholders of the Lehman Corporation brought a derivative action against Lehman's directors and brokers, contending that they illegally controlled the corporation and used this control to exact excessive brokerage fees. 396 U.S. at 531–32. The court of appeals had ruled that a derivative action was entirely equitable in nature.[11] Citing *Beacon Theatres* and *Dairy Queen*, the Supreme Court reversed, holding that "[t]he heart of the action is the corporate claim. If it presents a legal issue, one entitling the corporation to a jury trial under the Seventh Amendment, the right to a jury is not forfeited merely because the stockholder's right to sue must first be adjudicated as an equitable issue triable to the court." *Id.* at 539.

Taken together, the Supreme Court's Seventh Amendment jurisprudence in *Beacon Theatres*, *Dairy Queen*, and *Ross*, demonstrates that when the courts were merged and no practical impediment remained to trying legal issues first, the Court broadened the jury-trial right and preserved the principle that equity will not decide issues with an adequate legal remedy. As *Tull* puts it, when a legal claim is joined with an equitable claim, "the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as incidental to the equitable relief sought."

---

[11] *See Ross v. Bernhard*, 403 F.2d 909, 912 (2d Cir. 1968), *rev'd*, 396 U.S. at 543.

12

481 U.S. at 425 (citation omitted). The same is true for separate, intertwined claims: If one claim requires a jury trial, then "a jury trial is required on the overlapping issues to preserve the Seventh Amendment right." *ERR*, 35 F.4th at 414 (citations omitted).

*       *       *

In a decision issued today, the Supreme Court emphasized the continuing importance of the *Beacon Theatres* line of cases when courts evaluate the right to a jury trial in matters involving legal and equitable claims. In *Perttu v. Richards*, No. 21-1324 (June 18, 2025) (slip op.), a case concerning claims made under the Prison Litigation Reform Act of 1995 ("PLRA"), the Court considered whether a party has a right to a jury trial on the issue of exhaustion of remedies when that dispute is intertwined with the merits of the underlying PLRA suit. *Perttu*, slip op. at 1–2. The Court concluded that "the usual practice of the federal courts in cases of intertwinement is to send common issues to the jury," and that the exhaustion issues raised in *Perttu* were intertwined with the merits of the plaintiff's PLRA case. *Id.* at 11–12, 17. And because "nothing in the PLRA suggests Congress intended to depart from [the usual] practice" for PLRA cases, the Court held that "parties are entitled to a jury on PLRA exhaustion when that issue is intertwined with the merits of a claim protected by the Seventh Amendment." *Id.* at 17.

To reach these conclusions, the Court looked to *Beacon Theatres* and *Dairy Queen* as a "prominent line of cases" involving "suits that contain both legal and equitable claims." *Id.* at 8. The Court's analysis of these cases began with its

understanding of *Beacon Theatres*' holding: "Ordinarily, judges resolve equitable claims and juries resolve legal claims. But in *Beacon Theatres* . . . we held that judges may not resolve equitable claims first if doing so could prevent legal claims from getting to the jury." *Id.* at 8. As described in *Perttu*, the "consequence" of this principle was clear in *Beacon Theatres*: "Because resolving the equitable claims could 'prevent a full jury trial' on the legal claims, the legal claims needed to be resolved by a jury first." *Id.* at 9 (quoting *Beacon Theatres*, 359 U.S. at 505, 508).

And when factual disputes concerning both legal and equitable claims are intertwined, the Court confirmed, *Beacon Theatres* also clarified that the "usual practice in [such] cases of intertwinement is to send the question to the jury." *Id.* at 8 n.2 (citing *Beacon Theatres*, 359 U. S. at 510–11); *see also id.* at 12 (recognizing that *Beacon Theatres* establishes a "general prudential rule" (quoting *Parklane Hosiery*, 439 U.S. at 334)). The *Perttu* Court then pointed to *Dairy Queen*, a case involving both legal and equitable claims that "depended on 'common' 'factual issues related to the question of whether there [had] been a breach of contract.'" *Id.* at 9 (alteration in original) (quoting *Dairy Queen*, 369 U.S. at 479). "For that reason, the consequence was again clear: '[T]he district judge erred in refusing to grant petitioner's demand for a trial by jury.'" *Id.* (alteration in original) (quoting *Dairy Queen*, 369 U.S. at 479).

The Court understands *Perttu* to reaffirm the approach to intertwinement described herein that is premised on the guidance of the *Beacon Theatres* line of cases. This Court will also adhere to the Supreme Court's admonition in *Perttu* that, as

14

"confirm[ed]" in "later cases," "*Beacon Theatres* should be read 'expansively,' applying to any claim triable by a jury even 'in a suit in which the basic relief sought is equitable.'" *Id.* (quoting 9 Wright & Miller's Federal Practice & Procedure § 2302.1 (4th ed. 2020)).

## D. Current Seventh Amendment Framework: *Tull* and *Jarkesy*

In the modern era, the Supreme Court has built on its prior Seventh Amendment jurisprudence, further clarifying the scope of the jury-trial right. In particular, the Court's decisions in *Tull* and *Jarkesy* provide substantial guidance for lower courts and a framework for applying the Seventh Amendment. While the Court has already touched on these decisions briefly herein, *supra* Part I.B., closer examination of each case is warranted. The Court begins with *Tull*.

In *Tull*, the Government sued a real-estate developer for dumping fill on three wetland properties in violation of the Clean Water Act (the "CWA"). 481 U.S. at 414. Under separate provisions of the CWA, the Government sought both injunctive relief and civil penalties. *Id.* at 414–15. But because most of the properties had been sold when the complaint was filed, injunctive relief was largely unavailable and the Court's analysis therefore focused on the requested civil penalties—amounting to nearly $23 million. *Id.* at 415.

The Supreme Court held that "the Seventh Amendment required that [the developer]" receive a jury trial "to determine his liability, but that the trial court and not the jury should determine the amount of penalty, if any." *Id.* at 427. To reach this conclusion, the Court considered both the relevant Eighteenth-Century analogs and

the Government's requested relief. The Court determined that the closest analog for recovering "civil penalties under statutory provisions" was historically "viewed as [a] type of action in debt requiring trial by jury." *Id.* at 418–19. The Court's analysis, however, focused on the remedy, which was categorized as "more important than finding a precisely analogous common-law cause of action." *Id.* at 421 (citation modified).

Two inquiries were relevant to the remedy analysis. First, the Court considered whether the penalty sought to punish and deter or to restore the status quo. *Id.* at 422. It found that the statute intended to punish because the civil penalties were not tied to "profits gained from violations of the statute"; rather, the statute "simply impose[d] a maximum penalty of $10,000 per day of violation." *Id.* And the relevant statutory factors for determining the penalty amount sounded in retribution and future deterrence. *Id.* at 422–23.

Second, the Court evaluated the Government's position that the penalty was incidental to or intertwined with injunctive relief. *Id.* at 424–25. In rejecting the Government's theory, the Court highlighted three flaws. *Id.* at 424. First, a court of equity could not enforce civil penalties; it could only "award monetary restitution as an adjunct to injunctive relief[.]" *Id.* Second, the nearly $23 million requested in civil penalties could hardly "be considered incidental to the modest equitable relief sought." *Id.* at 424–25. Third, the Government could seek equitable remedies in addition to or independent of legal relief, as these remedies were authorized in "separate and distinct statutory provision[s]." *Id.* at 425. And because the right to a

jury trial on a legal claim remains intact when "joined with an equitable claim," the Court concluded that the developer had "a constitutional right to a jury trial to determine his liability on the legal claims." *Id.* As to the quantum of civil penalties, however, the Court held "that a determination of a civil penalty is not an essential function of a jury trial, and that the Seventh Amendment does not require a jury trial for that purpose in a civil action." *Id.* at 427.

In *Jarkesy*, the Court applied this framework to an SEC action seeking civil penalties for alleged securities fraud. 603 U.S. at 115. The relevant statutory provisions targeted "the same basic behavior: misrepresenting or concealing material facts." *Id.* at 116. Although the Court noted that the lower court had analogized the civil penalties to actions in debt, *id.* at 119, the Court stressed that the remedy here was "all but dispositive," *id.* at 123.

To the extent the historical analogs mattered in the outcome, the Court found that the similarities between common-law fraud—a legal claim—and securities fraud were instructive, even though the claims were not "identical." *Id.* at 126. Indeed, the Court recognized that "federal securities fraud is narrower" in some respects and "broader" in others. *Id.* Still, the Court concluded that "the close relationship between federal securities fraud and common law fraud confirm[ed] that this action [wa]s 'legal in nature.'" *Id.* (quoting *Granfinanciera*, 492 U.S. at 53).

Turning to the requested remedy—civil penalties—the *Jarkesy* Court once more examined the same markers discussed in *Tull*. The civil penalties at issue in *Jarkesy*, like those in *Tull*, were designed to deter and punish because (1) they could

17

reach "up to $725,000 per violation," even without a showing of investor harm; (2) the tiered system for those penalties depended "on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied"; and (3) the SEC need not "return any money" collected through these penalties "to victims." *Id.* at 118, 124. Overall, the Court concluded that "the civil penalties in this case are designed to punish and deter, not to compensate" and were thus "a type of remedy at common law that could only be enforced in courts of law." *Id.* at 125. (quotation omitted). Based on these conclusions, the Court held that the *Jarkesy* defendants were entitled to a jury trial. *Id.* at 140.

*       *       *

The following governing principles emerge from *Beacon Theatres*, *Dairy Queen*, *Perttu*, *Ross*, *Tull*, and *Jarkesy*:

**Eighteenth-Century Analogs**

- While analogizing to a similar Eighteenth-Century claim is relevant to the Seventh Amendment analysis, the remedy is far more important. *Tull*, 481 U.S. at 421; *Jarkesy*, 603 U.S. at 123.
- A civil penalty is similar to a "type of action in debt requiring trial by jury." *Tull*, 481 U.S. at 418–19.
- Federal securities fraud, although broader and narrower than common-law fraud, is analogous enough to support a finding that both types of fraud claims are legal in nature. *Jarkesy*, 603 U.S. at 126.
- Historical analogs need not be identical to be instructive. *Id.*

**Requested Remedies**

- Civil penalties are legal in nature when they seek to punish and deter instead of to restore the status quo. *Tull*, 481 U.S. at 422. Punishment and deterrence are forward looking; restoration, by contrast, focuses on righting past wrongs.

- A penalty seeks to punish when it has the following characteristics: (1) the penalty amount is not tied to profits from the alleged violations or to restitution; (2) the relevant statutory factors seek to deter unwanted behavior, potentially by increasing the penalty based on culpability; (3) the collected penalty need not be returned to the actual victims of the violation; and (4) no consumer harm needs to be shown to prevail. *Id.* at 422–23; *Jarkesy*, 603 U.S. at 118, 124–25.

**Amount of Civil Penalties**

- The determination of the quantum of civil penalties does not require a jury trial. *Tull*, 481 U.S. at 427.

**Legal Claims Joined with Equitable Claims**

- When a legal claim is joined with an equitable claim, the claimant retains their right to a jury trial on the "liability on the legal claims." *Id.* at 425.

- Seeking both injunctive relief and civil penalties does not negate the right to a jury trial on the civil penalties when one or more of the following are true: (1) the civil penalties do not operate as merely "monetary restitution as an adjunct to injunctive relief"; (2) the requested civil penalties are too high to "be considered incidental"; or (3) the statutory scheme allows the Government to receive legal relief independent from equitable relief. *Id.* at 424–25.

## II. FACTUAL BACKGROUND

The States challenge Google's "alleged monopolization and suppression of competition in online display advertising—essentially, the marketplace for the placement of digital display ads on websites and mobile apps." *In re Digit. Advert. Antitrust Litig.*, 555 F.Supp.3d 1372, 1373 (J.P.M.L. 2021). Display advertising is a form of tailored digital advertising, displayed on websites and mobile applications, that allows advertisers to direct ads to specific web users based on their browsing history and other characteristics. The market for digital advertising is comprised of publishers and advertisers. Publishers—like the New York Post or Fox News—sell

19

available digital advertising space on their platforms. Advertisers—like Proctor & Gamble or Walmart—bid on this advertising space.

Digital-advertising transactions are facilitated through ad servers, ad exchanges, and ad-buying tools. On the seller side, publishers use ad servers to manage and sell their web-display inventory by specifying where advertisers can purchase that inventory, the minimum prices that publishers will accept for it, and so on. On the buyer side, advertisers use ad-buying tools to purchase publisher inventory—the space on websites where ads are shown. These ad-buying tools let advertisers specify how much they are willing to pay for inventory and the audiences that they want their ads to reach. Situated in the middle of these transactions are ad exchanges that connect advertisers' buying tools and publishers' ad servers. The ad exchanges conduct real-time auctions in which advertisers bid on publisher inventory through ad-buying tools.

Google has products in all three spaces of this market: it offers an ad-server product—DoubleClick for Publishers; an ad-exchange product—DoubleClick Ad Exchange; and ad-buying tools for both small advertisers and large advertisers. The below figure shows a rendering of the digital-advertising market, including Google's products. *See* (FAC ¶ 14).

*Figure 2: Exchanges transact with publishers and advertisers through ad servers and buying tools*



The States assert two principal theories of harm from Google's alleged misconduct in the display-advertising market. First, the States bring federal- and state-antitrust claims, alleging the following violations:

(1) Google has violated Section II of the Sherman Act, 15 U.S.C. § 2, by willfully acquiring or maintaining a monopoly in the market for ad servers, ad exchanges, and ad buying tools through anticompetitive conduct. (FAC ¶¶ 598–601).

(2) Google has monopoly power, or in the alternative, a dangerous probability of acquiring monopoly power in the market for ad exchanges and ad buying tools. According to the States, Google also has willfully, knowingly, and with specific intent, attempted to monopolize the market for ad exchanges and the market for ad buying tools. (FAC ¶¶ 602–06).

(3) Google has violated Sections I and II of the Sherman Act by tying its ad exchange and ad server together to coerce publishers to use both products. (FAC ¶¶ 607–13).

(4) Google entered an agreement with Facebook that violated Section I of the Sherman Act because it restrains trade and harms competition. (FAC ¶¶ 614–16).

(5) Google has violated various state-law antitrust statutes. (FAC ¶¶ 617–73).

Second, the States maintain that Google's conduct in the display-advertising market was deceptive and violated the States' DTPA laws. (FAC ¶¶ 526–97, 674–758). In particular, the States assert that Google deceived publishers and

advertisers about its use of programs designed to benefit Google at their expense, failed to properly disclose these programs, and misrepresented that it runs a transparent marketplace where participants compete on equal footing. (FAC ¶¶ 526–97).

The States' requested relief varies by claim. For example, as to the States' claims under the Sherman Act, the States seek only equitable relief—an injunction. *See* (Dkt. #835 at 84) ("Here, the States admit that their federal antitrust claims seek wholly equitable relief."). For their state-antitrust and DTPA claims, most States purport to seek a combination of equitable relief and civil penalties, including Alaska, Arkansas, Florida, Idaho, Kentucky, Louisiana, Mississippi, Montana, Nevada, North Dakota, Puerto Rico, South Carolina, South Dakota, Texas, and Utah. The remaining States seek only equitable relief for one of the state claims, including Missouri (only equitable relief under state-antitrust claims) and Indiana (same). A summary of each State's requested relief can be found in Appendix 1.[12]

### III. DISCUSSION

#### A. The States' Jury-Trial Demand

The States assert claims under federal-antitrust, state-antitrust, and state-DTPA laws. They have demanded a jury trial on "all issues properly triable to a jury." (FAC ¶ 778). Invoking Federal Rule of Civil Procedure 39(a)(2), Google timely moved

---

[12] The Court includes at the end of this Opinion and Order two Appendices. Appendix 1 has a chart detailing the specific equitable and legal remedies requested by each State. Appendix 2 includes the pertinent language from the substantive and remedial portions of each State's antitrust and DTPA statutes.

to strike the States' jury demand, contending that there are no such issues. (Dkt. #690 at 9).

The Supreme Court has explained that "before inquiring into the applicability of the Seventh Amendment," courts should first ascertain whether a construction of the statute(s) at issue answers the jury-trial-right question. *Perttu*, slip op. at 5. Accordingly, looking first to the relevant antitrust and DTPA statutes in this case, neither party points to any statutory language requiring a jury trial. Quite the opposite: Google notes that the relevant antitrust statutes "do not expressly delineate the judge/jury role, nor does state caselaw." (Dkt. #835 at 36). And for the DTPA claims, both sides are silent. The Court thus turns to the Seventh Amendment inquiry concerning the disputed right to jury trial on the States' claims.

As discussed above, the Seventh Amendment mandates that legal remedies be decided by a jury, while equitable remedies be decided by the judge. *See supra* Part I.D. For most States, their state-law claims implicate both legal and equitable remedies. Accordingly, the parties' dispute turns primarily on whether the States' legal claims are sufficiently incidental to or intertwined with their equitable claims to abrogate their right to a jury trial.

To begin with, the States have no right to a jury trial on their federal-antitrust claims because they seek only equitable relief. *In re Abbott*, 117 F.4th 729, 739 (5th Cir. 2024) (noting that "the Seventh Amendment does not apply" to "suits seeking only injunctive relief" (quoting *Monterey*, 526 U.S. at 719)). By contrast, most of the States enjoy the right to a jury trial on their state-antitrust and DTPA claims.

23

And to preserve that right, a jury must decide any overlapping issues among the federal and state claims when both legal and equitable claims are asserted. *ERR*, 35 F.4th at 414. Only then may the Court rule on the injunctive relief requested for the States' federal-antitrust claims (counts I–IV), as well as injunctive relief and other equitable remedies asserted under the state-law claims.

The following discussion proceeds in four stages. The Court first examines the principal arguments underlying Google's position that no State has the right to a jury trial on its claims. After that, the Court examines each State's right to a jury trial on its various claims, beginning with the state-antitrust claims, turning next to the DTPA claims, and concluding with the quantum of civil penalties.

The Court's analysis involves some issues controlled by federal law, some by state law, and some that involve the interaction of both. That said, neither party disputes that federal law governs whether the Seventh Amendment applies. In evaluating over thirty state-antitrust and DTPA statutes, the Court recognizes that state law determines the content and substance of each claim and remedy, but whether a claim is properly characterized as legal or equitable "must be made by recourse to federal law." *Simler*, 372 U.S. at 222.

## B. Google's Arguments Against the States' Right to Jury Trial

Google makes three overarching arguments against the States' right to jury trial on all claims and issues in this case. First, Google contends that, as sovereigns, the States are not protected by the Seventh Amendment. Second, even if the States are otherwise protected by the Amendment, Google maintains that the States have

no right to a jury trial on any of the claims asserted in this case. Third, even if a few States may have a right to a jury trial on certain claims, Google argues that a Texas jury should not be burdened with trying those claims and the Court should instead decline to exercise jurisdiction under 28 U.S.C. § 1367. The Court considers each argument in turn.

### 1. The States are not excluded from the Seventh Amendment.

Google argues that the right to jury trial has no application here because the sovereign States are not protected by the Seventh Amendment. The argument is premised on two contentions. First, that the Amendment is designed to protect individual citizens, not governments. Second, applying *Tull*'s analysis, Google maintains that the most apt historical analog to the States' suit would be "comparable damages suits brought by the English Crown in 1791[, which] would have been heard by a judge, not a jury." (Dkt. #690 at 17) (footnote omitted).

The States counter with two primary points.[13] First, the States contend that the plaintiff's identity is irrelevant when evaluating historical analogs. (Dkt. #753 at 10). According to the States, neither case that Google cites in support of this argument includes any discussion about the plaintiff's identity. (Dkt. #753 at 10) (first citing *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 565, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990); then citing *Jarkesy*, 603 U.S. at 121). Second, the historical analog Google proposes—an enforcement

---

[13] The States also argue that Google waived this argument during the Court's hearing on Google's motion. (Dkt. #753 at 10). The Court disagrees. Nothing in Google's counsel's oral argument expressly or intentionally waived any of Google's contentions concerning the jury trial issues before the Court.

action for damages to redress "personal wrongs" against a sovereign—is inapt because it focuses on (1) damages rather than civil penalties; and (2) harm to a sovereign rather than harm to private citizens. (Dkt. #753 at 11).

The Court concludes that the States' right to jury trial is guaranteed by the Seventh Amendment. As always, we begin with the text. The Seventh Amendment's text speaks of "Suits," not parties, U.S. CONST. amend. VII, and "require[s] a jury trial on the merits in those *actions* that are analogous to 'Suits at common law.'" *Tull*, 481 U.S. at 417 (emphasis added); *see also Colgrove v. Battin*, 413 U.S. 149, 152, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973) (explaining that the Seventh Amendment "defines the kind of cases for which jury trial is preserved"); *United States v. Sprague*, 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931) (stating that the Constitution's "words and phrases were used in their normal and ordinary [sense] as distinguished from technical meaning"). Nothing in the Amendment's text suggests that its protection turns on the identity of a litigant, or that it excludes States or other government entities.

For its part, Google offers no case to support the proposition that courts must consider a party's identity when determining whether the Seventh Amendment guarantees a jury trial. Neither in *Tull* nor in any other case has the Supreme Court held that whether a party is an individual or a government entity is relevant to the Seventh Amendment inquiry. And as the States correctly note, (Dkt. #753 at 10), both cases Google references point to the "action," not the parties. *See Terry*, 494 U.S. at 565 (quoting *Tull*, 481 U.S. at 417); *Jarkesy*, 603 U.S. at 121. In this regard, it is

notable that the *Jarkesy* Court did not consider the identity of the sovereign as a party when reaching its decisions on the right to jury trial. *See* 603 U.S. at 124–26. Instead, *Jarkesy* focused on whether similar actions were triable at common law. Fifth Circuit precedent and other persuasive authority align with this approach, recognizing that where the United States brings a cause of action, the usual Seventh Amendment rules apply. *See Austin v. Shalala*, 994 F.2d 1170, 1175 (5th Cir. 1993) (explaining that "where the United States brings the action, the right to trial by jury is determined in the same manner as if the suit were between private parties"); *see also Damsky v. Zavatt*, 289 F.2d 46, 51 (2d Cir. 1961) (Friendly, J.) ("[T]he right to jury trial exists in actions by the United States where it would in a similar action between private parties."); 9 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2314 (4th ed. 2023) ("Actions brought by or on behalf of the United States . . . carry the same jury trial right as any other civil action."). The Court is unaware of any precedent to the contrary.

Google also offers no reason why the States should be treated differently than the federal government in this regard. Nor does Google reference any decision holding that the States have no right to jury trial under the Seventh Amendment.[14] To the

---

[14] The Court notes that the Fifth Circuit has not squarely decided this issue. In *Abbott*, the Fifth Circuit observed that "there is . . . a question of whether the Seventh Amendment's jury trial right extends to state litigants . . . or just to individuals." 117 F.4th at 734 n.7. (citation modified). In that case, the United States sued Texas after the State had installed a floating barrier in the Rio Grande near the border with Mexico. *Id*. at 732. Texas invoked its right to trial by jury in a motion that was denied by the district court, leading to a mandamus proceeding in the Fifth Circuit. *Id*. Because the United States did not contest Texas's assertion that it enjoyed a Seventh Amendment right to jury trial, the Fifth Circuit did not address the issue. *Id*. at 734 n.7. Applying *Tull*, the Fifth Circuit concluded that, because the United States sought purely equitable claims and remedies, Texas satisfied

contrary, in the context of antitrust claims and otherwise, courts have consistently recognized that the States enjoy a right to jury trial under the Amendment. *See, e.g.*, *Standard Oil Co. of Cal. v. Arizona*, 738 F.2d 1021, 1032 (9th Cir. 1984) (holding that States had a right to jury trial for federal-antitrust claims); *United States v. New Mexico*, 642 F.2d 397, 402 (10th Cir. 1981) (holding that the State of New Mexico enjoyed a right to jury trial in a tax dispute with the federal government); *In re Oil Spill by the Oil Rig Deepwater Horizon*, 98 F.Supp.3d 872, 874–83 (E.D. La. 2015) (holding that the State of Alabama was entitled to a jury trial for claims made under the Oil Pollution Act of 1990).[15]

---

"neither the cause-of-action stage, nor the remedy stage of the *Tull* analysis," and therefore had failed to establish a right to jury trial. *Id*. at 741.

In dicta, however, the *Abbott* court suggested that, had the United States sought civil penalties against Texas, a jury trial would have been required. *See id*. at 739 n.12 ("If the United States were to request civil penalties, *Tull* and *Jarkesy* would require that the district court provide Texas the jury trial it seeks.").

[15] Of course, when a plaintiff sues a sovereign, no jury trial is guaranteed. But that result is premised on the law of sovereign immunity, not because of the Seventh Amendment. As a sovereign, the United States "is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). The States also enjoy sovereign immunity against suit. *See, e.g.*, *Sullivan v. Tex. A&M Univ. Sys.*, 986 F.3d 593, 595 (5th Cir. 2021) (citing *Hans v. Louisiana*, 134 U.S. 1, 13, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Thus, "if Congress waives the Government's immunity from suit, . . . the plaintiff has a right to a trial by jury only where that right is one of the terms of the Government's consent to be sued." *Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981) (citation modified).

And when, for example, "Congress has waived the sovereign immunity of the United States, it has almost always conditioned that waiver upon a plaintiff's relinquishing any claim to a jury trial." *Id*. at 161. This principle is woven into the fabric of American law, just as it was for centuries before that in England. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 715–16, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("The generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity."); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (recognizing that sovereign immunity plays a "vital role . . . in our federal system");

The States' right to jury trial in this case is underscored by the fact that they are acting in a parens patriae capacity. The parens patriae doctrine permits a State to sue on behalf of its citizens as a guardian of the well-being of its populace. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982); *Texas v. Google LLC*, 764 F.Supp.3d 500, 505–06 (E.D. Tex. 2025). In analogous situations, the Supreme Court and other courts have held that the right to jury trial on legal issues is unaffected by whether that suit is brought by someone acting in a representative capacity. *See, e.g., Ross*, 396 U.S. at 538–39 (holding that a corporation's right to jury trial in a shareholders' derivative action is not forfeited merely because its shareholders are pursuing the claim for the corporation); *EEOC v. Corry Jamestown Corp.*, 719 F.2d 1219, 1225 (3d Cir. 1983) (holding that when the EEOC brings suit on behalf of a victim of age discrimination, it is entitled to a jury trial). Affording the States a jury trial under these circumstances recognizes and protects their individual citizens' rights under the Seventh Amendment.

Turning to Google's purported historical analog—"comparable damages suits brought by the English Crown in 1791," (Dkt. #690 at 17)—the Court notes that it is untethered to precedent and premised instead on a declaration expressing the opinion of Professor John G.H. Hudson. (Dkt. #690-1). The proposed analog is inapt. Indeed, there is a fundamental disconnect between Professor Hudson's analysis of actions by

---

*Standard Oil*, 738 F.2d at 1027 n.9 ("Just because individuals may not be entitled to jury trials against the government, it does not follow that the government is not entitled to jury trials against individuals.").

the British Crown in the Eighteenth Century and the States pursuing claims on behalf of their citizens in a parens patriae capacity. Professor Hudson describes actions the Crown could pursue, including a "suit for recovering money or other chattels" for wrongs done to the Crown, or an action for "intrusion and debt," with an "intrusion" involving a "trespass committed on the lands of the crown," and a debt suit involving "any contract for monies due to the king, or for any forfeiture due to the crown upon breach of a penal statute." (Dkt. #690-1 at 5). Professor Hudson's examples concern the Crown pursuing legal action to vindicate sovereign or proprietary interests, such as its right to maintain the king's lands free of trespass and to collect monies due to the Crown. But when, as here, a State files suit in its parens patriae capacity, it "act[s] as the representative of its citizens" to address an injury that "affects the general population of [the] State in a substantial way." *Maryland v. Louisiana*, 451 U.S. 725, 737, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). Such an action is different in kind from a suit brought by the British Crown for "'satisfaction in damages for any personal wrong' against the monarch." (Dkt. #690-1 at 5). For this reason, Professor Hudson's analysis misses the mark.

Finally, Google's position cannot be reconciled with *Tull*. The States seek civil penalties under their antitrust and DTPA statutes. As the Supreme Court has made clear, "[a]ctions by the Government to recover civil penalties under statutory provisions . . . historically have been viewed as one type of action in debt requiring trial by jury." *Tull*, 481 U.S. at 418–19. Google has not explained why this principle is inapplicable to the state-law claims at issue here, nor is the Court aware of any

authority supporting Google's theory. Accordingly, the Court concludes that the States' sovereign status is irrelevant to the jury-trial inquiry. Therefore, the Court applies the *Tull/Jarkesy* framework, which focuses on the nature of the action rather than the identity of the litigant.

### 2. The States' civil-penalty claims are not sufficiently incidental to or intertwined with equitable claims to abrogate their jury-trial right.

Google also argues that, even if the States' right to jury trial is protected by the Seventh Amendment, the civil-penalties claims asserted under their state-antitrust and DTPA statutes are sufficiently intertwined with or incidental to claims for equitable relief that the right to jury trial is negated. According to Google, when civil-penalties claims are authorized as part of the same statutory provision that authorizes a claim for injunctive relief, the penalties claims are incidental to or intertwined with the equitable claim for injunctive relief and cannot support a right to jury trial. The Court disagrees.

To begin with, recall the Supreme Court's Seventh Amendment jurisprudence in *Beacon Theatres* and *Dairy Queen*. *See supra* Part I.C. In *Beacon Theatres*, the Supreme Court held that where legal and equitable claims are brought in one action, and when there are factual issues common to both the legal and equitable causes of action, a court cannot, absent exceptional circumstances, deprive a litigant of his right to a jury trial by trying the equitable claim first. 359 U.S. at 510–11. In the Court's subsequent *Dairy Queen* decision, it reaffirmed the principles of *Beacon Theatres*. Rejecting the lower court's view that the legal issues raised there were "'incidental' to equitable issues," *Dairy Queen*, 369 U.S. at 470 (citation modified), the

Court noted that the district court's characterization of legal issues as "incidental" was irrelevant to the right to a jury trial on those issues. "It would make no difference," stated the Court, "if the equitable cause clearly outweighed the legal cause so that the basic issue of the case taken as a whole is equitable." *Id.* at 473 n.8 (quoting *Thermo-Stitch*, 294 F.2d at 491). "As long as any legal cause is involved the jury rights it creates control." *Id.* Applying these principles leads to one conclusion: Issues common to each State's claims for civil penalties and injunctive relief must be tried to a jury.

*Tull* is also instructive here. In that case, the Government argued that, even if the civil penalties it sought under the CWA were deemed to be legal remedies, a jury trial was not required because "[a] court in equity was empowered to provide monetary awards that were incidental to or intertwined with injunctive relief." *Tull*, 481 U.S. at 424. The Supreme Court enumerated three "flaws" with this argument.

For the first flaw, the Court pointed out that "while a court in equity may award monetary restitution as an adjunct to injunctive relief, it may not enforce civil penalties." *Id.* The directive is clear: Civil penalties are not "incidental" to injunctive relief, much less "intertwined" with such relief. This directive aligns with *Tull*'s historical conclusion, echoed by *Jarkesy*, that civil penalties are "a type of remedy at common law that could only be enforced in courts of law." *Jarkesy*, 603 U.S. at 123 (quoting *Tull*, 481 U.S. at 422). The same flaw dooms Google's argument here: *Tull* forecloses Google's suggestion that its potential liability for civil penalties could somehow be adjudicated by a court in equity when joined with equitable claims.

32

The second flaw identified in *Tull* concerned the nature of the relief sought. The *Tull* Court questioned whether the civil penalties at issue in that case could be characterized as incidental when the petitioner "had already sold most of the properties at issue" and the penalties could reach "$22 million," an amount that the Court concluded could "hardly . . . be considered incidental." 481 U.S. at 424–25. This flaw is also present here. As described below, *see infra* Parts III.C., III.D., the potential penalties associated with the States' antitrust and DTPA claims are significant, and cannot reasonably be construed as merely incidental to injunctive relief.

Finally, the *Tull* Court identified a third flaw related to the remedy provisions of the CWA, which allowed the Government to "seek an equitable remedy in addition to, or independent of, legal relief" because "each kind of relief is separably authorized in a separate and distinct statutory provision." *Id.* at 425 (noting that the remedy for injunctive relief is authorized in subsection 1319(b) of the CWA, while civil penalties are provided for in subsection 1319(d) of the Act). The Court then pointed to its earlier decision in *Curtis v. Loether*,[16] stating that when "a legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as 'incidental' to the equitable relief sought." *Tull*, 481 U.S. at 425 (quoting *Curtis*, 415 U.S. at 196 n.11).

---

[16] 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).

Notably, the quoted portion of *Curtis* anchors the right to jury trial for mixed legal and equitable claims in the Court's prior decisions in *Beacon Theatres* and *Dairy Queen*. *See* 415 U.S. at 196 n.11. But even more to the point, *Curtis* involved a claim under Title VIII—the fair housing provision of the Civil Rights Act of 1968—which authorizes both legal remedies (actual and punitive damages) and injunctive relief *in the same provision*, now codified at 42 U.S.C. § 3613(c)(1). Still, *Tull* pointed to *Curtis* as an example of a statute that *separately* allows for legal remedies and equitable remedies.

Google overreads *Tull* (among other cases) to *require* that a legal remedy appear in a separate provision of a statute from equitable remedies to maintain the right to a jury trial. According to Google, whenever a legal remedy appears in the same statutory provision as an equitable remedy, the legal remedy is necessarily intertwined with or incidental to the equitable remedy, negating the right to trial by jury. Not so. If that were the lesson of *Tull*, the decision would have retreated from *Curtis*, rather than embracing and relying upon it in describing the "third flaw" in the Government's argument. *See* 481 U.S. at 425.

More broadly, Google's suggestion that the jury-trial right is frequently abrogated when legal claims are statutorily joined with equitable ones is wrong. Indeed, it is rare in American jurisprudence that a claim for a legal remedy, traditionally decided by a jury, must give way because of that claim's deep and intertwined connections with an equitable claim and remedy. The cases Google relies on only confirm this point.

34

At most, Google's cited precedents show that, in certain circumstances, none of which applies here, the award of monetary relief—typically a legal remedy—*may* be an equitable remedy. The list is short, generally including only the following scenarios: (1) when monetary awards "are restitutionary, such as in 'action[s] for disgorgement of improper profits,'" *Terry*, 494 U.S. at 570 (quoting *Tull*, 481 U.S. at 424), or when such awards are determined to be part of a proceeding in equity, such as trust actions and ERISA cases; and (2) when "a monetary award is incidental to or intertwined with injunctive relief, it may be equitable," *id.* at 571 (citation modified) (quoting *Tull*, 481 U.S. at 424).

Neither scenario applies here. On their face, the civil penalties requested by the States are punitive in nature, not restitutionary. Google does not contend otherwise. Likewise, the civil-penalty remedies at issue in this case cannot be characterized as forming part of a proceeding in equity, such as a trust action or similar statutory remedy, e.g., an ERISA matter. Nor are the civil-penalty claims asserted by the States so bound together with or otherwise integral to an equitable remedy as to abrogate the right to jury trial. As Google's authorities demonstrate, such "incidental" or "intertwined" claims are rare, and typically involve a circumstance in which a monetary award is joined to a specific-performance remedy and necessary to afford complete relief. And, as the Supreme Court has made clear, even when legal claims are incidental to equitable claims, "[a]s long as any legal cause is involved the jury rights it creates control." *Dairy Queen*, 369 U.S. at 473 n.8 (citation omitted).

### i. *Terry* and *Gwaltney* do not support Google's theory.

Start with *Terry*, a decision referenced throughout Google's briefing. In that case, a group of truck drivers sued their union for backpay, claiming that the union breached its duty of fair representation. 494 U.S. at 561. The truck drivers were required to prove two things: (1) their employer "breach[ed] the collective-bargaining agreement" and (2) the union breached its duty of fair representation. *Id.* at 569. The Court explained that the collective-bargaining-agreement issue was analogous to a breach-of-contract claim (legal) and that the fair-representation issue was analogous to a trust action (equitable). *See id.* at 565–70.

The *Terry* Court held there was a right to a jury. *Id.* As to the nature-of-the-action factor, the Court concluded that it was "in equipoise" because the action "encompasse[d] both equitable and legal issues." *Id.* at 570. As to the nature-of-the-remedy factor, the Court concluded that "the remedy of backpay sought in this duty of fair representation action is legal in nature." *Id.* at 573. With one factor neutral and one supporting a jury right, the Court held that the employees were "entitled to a jury trial on all issues presented in their suit." *Id.*

A brief review of some of the union's rejected arguments is instructive. For the nature-of-the-action factor, the union argued that the truck drivers' fair-representation action was "comparable to an action by a trust beneficiary against a trustee for breach of fiduciary duty"—an action traditionally "within the exclusive jurisdiction of courts of equity." *Id.* at 567. On the nature-of-the-remedy factor, the union argued that no jury trial was merited because the truck drivers sought backpay under Title VII—a purely equitable remedy. *See id.* at 572 ("The Court has never held

that a plaintiff seeking backpay under Title VII has a right to a jury trial."). To be sure, the Court assumed without deciding that a Title VII plaintiff seeking backpay alone would have no right to a jury trial. But it observed that this result was required only because "Congress specifically characterized backpay under Title VII as a form of 'equitable relief.'" *Id.* (quoting 42 U.S.C. § 2000e-5(g)). In addition, the Court had determined that backpay sought from an employer under Title VII would generally be a restitution remedy. *Id.* at 572 (citing *Curtis*, 415 U.S. at 197). Notably, the union never asserted any "incidental to or intertwined with" argument, as Google does. Nor do the union's actual arguments apply to the question of whether the States are entitled to a jury trial on their state-antitrust and DTPA claims.

Google's reliance on *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), is similarly misplaced. *Gwaltney* didn't concern the Seventh Amendment. Rather, it addressed a jurisdictional question: whether the so-called "citizen suit" provision of the CWA conferred federal jurisdiction over wholly past statutory violations. *Id.* at 52. For context, Congress created citizen-suit provisions to provide a supplemental means of enforcing federal law. *Id.* at 60–61. The Supreme Court concluded that because the CWA's citizen-suit provision authorized civil penalties in the same subsection as injunctive relief— unlike the provisions of the CWA that separately authorized the government to pursue civil penalties and injunctive relief—there was a jurisdictional connection between injunctive relief and civil penalties for citizen suits. *Id.* at 58. Thus, the Court determined that citizens, unlike the government, could seek civil penalties under the

CWA only in a suit brought to enjoin or otherwise abate an ongoing violation, not for wholly past violations. *Id.* at 58–61.

In Google's view, *Gwaltney* also suggests that when a civil-penalty claim is authorized in the same provision as injunctive relief, the two claims are inextricably intertwined for Seventh Amendment purposes, negating any jury-trial right for those penalties. But *Gwaltney* reaches no such conclusion. Contrary to Google's suggestion, *Gwaltney* did not address how the *jurisdictional* "connection" between civil penalties and injunctive relief in citizen suits affects either party's entitlement to a jury determination on legal claims. *Gwaltney* therefore does not alter the applicable *Tull*/*Jarkesy* framework.[17]

### ii. Google's remaining authorities are inapposite.

Google also relies on a series of circuit court cases for the broad proposition that claims for monetary relief are regularly transformed into equitable claims because they are "intertwined with equitable relief." (Dkt. #835 n.46). But a review of those authorities shows the opposite: legal claims for monetary relief—claims that do not implicate a restitution remedy—are only rendered equitable in limited circumstances.

---

[17] To the extent that other district courts reached a different conclusion, this Court respectfully disagrees with their analysis of *Tull*, related Supreme Court cases, and the Seventh Amendment. *See Paolino v. JF Realty*, No. 12-039, 2013 WL 12320080 (D.R.I. Aug. 8, 2013); *Sanchez v. Esso Standard Oil De P.R., Inc.*, No. 08-2151, 2010 WL 3087485 (D.P.R. Aug. 5, 2010).

*Borst*

For example, in *Borst v. Chevron Corp.*, a case cited throughout Google's supplemental briefing, the Fifth Circuit held that claims for wrongly withheld ERISA benefits were analogous to "breach of fiduciary duty" claims because ERISA plaintiffs "seek restitution of money allegedly wrongly held by the defendants." 36 F.3d 1308, 1324 (5th Cir. 1994). The *Borst* court further explained that "ERISA law is closely analogous to the law of trusts, an area within the exclusive jurisdiction of the courts of equity." *Id.* (citing *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also id.* ("We have held, as have the majority of the other circuits, that ERISA claims do not entitle a plaintiff to a jury trial."). The court went on to conclude that the plaintiffs' request for the distribution of surplus assets was not a legal claim, but rather a claim that was "analogous to an action for disgorgement of improper profits" and therefore sought "restitution of money allegedly wrongly held by the defendants." *Id.*

Thus, *Borst* involved traditional equitable claims for restitution and disgorgement, and the affirmation that ERISA claims are closely analogous to common-law trust actions—an area exclusive to equity. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (explaining that "at common law, the courts of equity had exclusive jurisdiction over virtually all actions by beneficiaries for breach of trust"). Because this case does not involve ERISA claims or a trust action, *Borst* appears to have no application.

*Adams*

Similarly, Google points the Court to *Adams v. Cyprus Amax Mins. Co.*, another ERISA case concerning whether the plaintiffs, who sought to recover enhanced severance-plan benefits, had a right to a jury trial. 149 F.3d 1156 (10th Cir. 1998). In that case, the Tenth Circuit followed the lead of several other circuits in holding that there was no right to a jury trial for claims under the ERISA provision at issue, 29 U.S.C. § 1132(a)(1)(B). *See id.* at 1162. The plaintiffs asserted claims for breach of fiduciary duty and for violation of ERISA procedures and the terms of a severance plan. *Id.* at 1158. Their specific claim under Section 1132(a)(1)(B) sought monetary benefits and enforcement of their rights under the terms of an "Enhanced Severance Plan." *Id.*

The *Adams* court held that there was no right to jury trial on this claim. The court started with ERISA's text, which, with limited exceptions, provides that "the assets of an employee welfare benefit plan authorized under ERISA must be held in trust to be managed and controlled under the authority and discretion of a named fiduciary(ies)." *Id.* at 1160 (citing 29 U.S.C. §§ 1102, 1103). "Not surprisingly then, courts consistently have characterized ERISA actions, including § 1132(a)(1)(B) actions, akin to common law trust actions and thus governed by common law trust principles." *Id.* at 1160–61 (collecting cases, including *Borst*).

Nonetheless, the *Adams* plaintiffs argued that their claims "fit squarely" within *Terry* because they sought only money damages. *Id.* at 1161. Rejecting this argument, the Tenth Circuit explained that the plaintiffs "overlook[ed]" the fact that

40

they were not entitled to the money benefits they requested "unless and until a court exercises its equitable powers to declare Plaintiffs eligible beneficiaries of the plan and thus order Defendants, as fiduciaries, to pay benefits." *Id.* The court went on to note that the eligibility determination was "the root issue in [the] case," and "[a]bsent a favorable ruling (i.e., equitable relief) on that issue, Plaintiffs have no claim for money damages." *Id.* at 1162. "Consequently, their claim for monetary relief is *inextricably intertwined with equitable relief*." *Id.* (emphasis added). Thus, *Adams* provides an example of monetary relief that is "inextricably intertwined" with equitable relief: without *first obtaining* equitable relief (the determination of eligibility under the plan) the plaintiffs could not receive the monetary relief requested. *See id.* at 1161–62. No such issue is implicated here because no state DTPA or antitrust statute requires the States to *obtain an injunction* to qualify for civil penalties. *See* Appendix 2.

Two other points from the *Adams* court merit discussion. In addition to finding that the money benefits sought by the plaintiffs were "inextricably intertwined" with equitable relief, the court further concluded that the plaintiffs lacked the right to a jury trial because "the recovery of benefits is better characterized as equitable/ restitutionary versus legal/compensatory relief." *Id.* at 1162. The Tenth Circuit further concluded that because the plaintiffs' claim to recover benefits under an ERISA plan was also "analogous to an action to enforce a trust," the court's construction of their requested remedy was consistent with "the delineation of beneficiaries' remedies under trust law." *Id.* (citing RESTATEMENT (SECOND) OF

TRUSTS §§ 197–198 (1959)). And applicable trust law states "a beneficiary's remedy against a trustee is exclusively equitable unless the trustee has an immediate and unconditional duty to pay the beneficiaries." *Id.* In *Adams*, the plaintiffs could not claim that they were unconditionally and immediately entitled to benefits under the severance plan when "the resolution of their claims for monetary relief turn[ed] on a determination of their eligibility under the plan." *Id.* For this additional reason, the remedy sought under 29 U.S.C. § 1132(a)(1)(B) was equitable, and there was no right to a jury trial. *Id.*

In short, the *Adams* decision also rested on determinations that the requested relief sounded in restitution—a traditional equitable remedy—and that the claim to recover benefits under an ERISA plan is analogous to an action to enforce a trust—an equitable action. Of course, this antitrust and DTPA action has nothing to do with ERISA, the civil penalties here are indisputably not for restitution, and there is no legitimate analogy to a trust action here.

*Golden*

Google next cites *Golden v. Kelsey–Hayes Co.*, 73 F.3d 648 (6th Cir. 1996). In *Golden*, the Sixth Circuit addressed unlawful modifications to retiree healthcare benefits and held that the Seventh Amendment did not entitle the plaintiffs to a jury trial. *Id.* at 659–63. The plaintiffs, comprised of retired employees and their surviving spouses, claimed that their former employer breached a collective-bargaining agreement by modifying their healthcare-insurance benefits. *Id.* at 651–52. As a result, the plaintiffs sought reinstatement of their benefits under Section 301(a) of

Labor-Management Relations Act. *Id.* (footnote omitted). The plaintiffs also sought monetary damages for the costs incurred during the two months between when the modifications took effect and when the employer was ordered to resume providing the benefits. *Id.* at 660.

The Sixth Circuit concluded that the plaintiffs sought the equitable remedy of specific performance and that the requested monetary damages were incidental to, or intertwined with, the equitable remedies that the plaintiffs demanded. *Id.* at 661 (explaining that because "the monetary award sought by the plaintiffs is 'incidental to and intertwined with' their request for specific performance, we are convinced that the relief they seek is equitable"). For this reason, the Sixth Circuit concluded that the plaintiffs were not entitled to a jury trial. *Id.* at 662.[18] Similar to *Adams*, the

---

[18] The Sixth Circuit's approach in the divided panel opinion in *Golden* is questionable. At least two circuits have taken a different approach under similar circumstances and upheld the Seventh Amendment right to jury trial. *See, e.g.*, *Stewart v. KHD Deutz of Am. Corp.*, 75 F.3d 1522 (11th Cir. 1996); *Senn v. United Dominion Indus.*, 951 F.2d 806 (7th Cir. 1992). In both of these cases, the plaintiffs sought healthcare benefits that were negotiated in collective-bargaining agreements. The plaintiffs therefore sought damages for breach of the agreements and an injunction requiring the employer to provide future benefits. And in both cases, the circuits held that *Tull* and *Terry* required a jury trial on the plaintiffs' monetary-damages claims. In *Senn*, for example, the Seventh Circuit held that the right to a jury trial was intact even though the primary relief sought by the plaintiffs was injunctive relief. The Circuit reasoned that the right to a jury trial is preserved when legal rights are at stake, and those rights cannot be abridged by characterizing the legal claim as incidental to equitable relief. *Senn*, 951 F.2d at 814.

More broadly, the reasoning of *Golden* is also in tension with the Second Circuit's decision in *Brown v. Sandimo Materials*, 250 F.3d 120 (2d Cir. 2001). In that case, the Second Circuit determined that a breach of labor contracts from failing to make pension payments was triable to a jury. The court held that at trial, the plaintiffs would "seek to establish, first, which parties are bound by the relevant [collective bargaining agreements ("CBAs")], and second, that those parties violated the terms of the CBAs." *Id.* at 126. It further held that the right to a jury trial is a basic and fundamental feature of our system of jurisprudence and that plaintiffs' breach-of-contract claim must be presented to a jury, even though the claim also sought equitable relief. *Id.* at 126–27.

monetary relief in *Golden* was predicated on *first* obtaining an equitable remedy—specific performance under a contract. But that is inapposite here because no State needs to obtain an injunction first to receive civil penalties.

*Brock*

Google next points to *Brock v. Superior Care, Inc.*, a case concerning remedies under the Fair Labor Standards Act ("FLSA"). 840 F.2d 1054 (2d Cir. 1988). The FLSA creates two causes of action for the Secretary of Labor to sue on behalf of injured employees. 29 U.S.C. §§ 216(c), 217. Section 216(c) allows the Secretary to sue employers for unpaid minimum wages and overtime compensation, plus an equal amount of liquidated damages. Section 217 allows the Secretary to sue for injunctive relief, which can include an order restraining the withholding of backpay. *See Brock*, 840 F.2d at 1062; *see also Reich v. Tiller Helicopter Servs.*, 8 F.3d 1018, 1030 (5th Cir. 1993).

A party's right to a jury trial when the Secretary brings an action therefore depends on which FLSA section the Secretary invokes. Because suits brought under Section 217 for injunctive relief are considered equitable actions, the *Brock* court found that the defendant had no right to a jury trial.[19] The *Brock* court also concluded that under the FLSA, liquidated damages were unavailable under Section 217. 840 F.2d at 1063–64. As the court explained, if the Secretary seeks to recover

---

[19] As explained in *Brock*, "[s]uits under section 17 for injunctive relief, even though they may result in an order requiring the employer to remit unpaid wages, have been considered equitable in nature; the award of back pay, without liquidated damages, is in the nature of restitution, and the defendant has no right to a jury trial." 840 F.2d at 1063 (citations omitted); *see also Reich*, 8 F.3d at 1031–32 (same).

liquidated damages, he must also request back pay in the complaint. Were the Secretary allowed to recover liquidated damages following a determination of backwage liability under Section 217, employers would be stripped of their right to have a jury establish liability for back pay and for the quantum of any backpay award. *See id.* at 1064. Because liquidated damages cannot exceed any backpay award, the employer would also be stripped of the right to have the jury limit the quantum of liquidated damages. *See id.*; *see also Reich*, 8 F.3d at 1035 (same).

To the extent relevant here, *Brock* stands for the proposition that in the context of FLSA claims, restitutionary claims like the award of backpay under Section 217, when combined with claims for injunctive relief, are generally not entitled to a jury trial. But as the Court has already noted, the civil-penalty remedies authorized under the state-antitrust and DTPA statutes here are punitive in nature. *Brock*, too, has no application to this case.

*Entergy*

Finally, Google suggests that *Entergy Ark., Inc. v. Nebraska*, offers insight into the jury-trial issues here. 358 F.3d 528 (8th Cir. 2004). It doesn't. That case involved an interstate-compact dispute. Nebraska entered into the Central Interstate Low-Level Radioactive Waste Compact, wherein five member States agreed to build a disposal facility for radioactive waste in one of the member States and agreed to create a commission to carry out the program. *Id.* at 532. Nebraska was selected as the disposal site. *Id.* at 533. Going forward, the commission made periodic payments

to Nebraska for licensing the disposal site. *Id.* Nebraska subsequently breached the compact and thwarted attempts to build the waste facility. *Id.*

The commission sued on behalf of the other member States, seeking injunctive relief requiring Nebraska to carry out the compact and to complete the licensing process under court supervision. *Id.* at 539. Although Nebraska was found liable, injunctive relief was deemed impracticable for various reasons, so the lower court instead fashioned a monetary remedy designed to recoup losses incurred in the absence of an injunction. *Id.* at 540, 546.

Relevant here, the Eighth Circuit confirmed that Nebraska was not entitled to a jury trial under the Seventh Amendment. Applying *Tull*'s two-part test, the court began by describing the unique nature and function of interstate compacts in American law. The Compact Clause permits states with "the Consent of Congress . . . [to] enter into an[] Agreement or Compact with another State." U.S. CONST. art. I, § 10, cl. 3. As the *Entergy* court explained, "[a]n interstate compact represents a political compromise between 'constituent elements of the Union,' as opposed to a commercial transaction." 358 F.3d at 542 (quoting *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 40, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994)). The court also recognized that "[a] suit alleging that a state has breached an obligation owed to its sister states under a congressionally approved interstate compact . . . raises delicate questions bearing upon the relationship among separate sovereign polities with respect to matters of both regional and national import." *Id.*

In evaluating the analogs for an interstate compact, the Eighth Circuit rejected Nebraska's suggestion that the issues in the case were similar to an Eighteenth-Century common-law contract action. *Id.* at 544. Instead, the court found that a dispute between the colonies was the better analogy, the resolution of which "was within the province of the king, who normally referred them to a royal commission in the first instance." *Id.* at 543–44 (citation omitted). "A dispute between the colonies was thus not decided by a court and could not be considered a 'common-law cause[] of action ordinarily decided in English law courts[.]'" *Id.* at 543 (quoting *Granfinanciera*, 492 U.S. at 42).

As to the requested remedies, the *Entergy* court concluded that the relief awarded could not be classified as legal in nature. *Id.* at 546. Although the commission had originally requested an injunction that would restructure the agreed-upon licensing process, it also sought compensation for expenditures and losses incurred during the licensing process. *Id.* at 545–46. The Eighth Circuit construed the damages request as intertwined with the request for injunctive relief because the compensatory damages sought were for "losses already incurred in the absence of an injunction." *Id.* at 546. "Such damages are appropriately awarded by a court of equity when a party has not performed within the time required." *Id.* (citation omitted); *see also id.* ("The *Restatement (Second) of Contracts* explains that '[a] claimant who sues for specific performance or an injunction and who is denied that relief, may be awarded damages or restitution in the same proceeding.'" (citation omitted)). The *Entergy* court further noted that the Supreme Court "has awarded monetary damages

without a jury in original actions between states arising from interstate compacts." *Id.* at 546 n.13. (citing *Kansas v. Colorado*, 533 U.S. 1, 4–5, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001)).

Like the other cases referenced by Google, *Entergy* is unhelpful here. *Entergy* is inapposite for multiple reasons, including the unusual substance and procedures associated with interstate-compact litigation, which has no connection to the issues before this Court. Beyond that, the *Entergy* court's conclusion that the commission's request for monetary damages was intertwined with injunctive relief was driven by the unusual—if not sui generis—circumstances of the case. Indeed, the *Entergy* court expressly distinguished the circumstances it confronted with the civil-penalties claim at issue in *Tull*. It observed that "unlike the present case," *Tull* involved damages that were "clearly legal in nature," namely $22 million in civil penalties under the CWA and that "such a punitive remedy would have been available only in a court of law." *Id.* at 546 n.12. The same is true here as to the civil penalties requested under the state-antitrust and DTPA statutes. *Entergy* does not suggest otherwise.

\*     \*     \*

In sum, the circuit cases relied upon by Google are inapposite and unhelpful. This is not an ERISA case, a trust action, or an action involving specific provisions of the FLSA. Nor is it a case in which the relevant monetary relief requested, civil penalties, is intertwined with the equitable remedy of specific performance or properly characterized as restitutionary in nature. Taken together, the hodgepodge of circuit cases Google references refute, rather than support, Google's broad

48

proposition that claims for monetary relief are regularly transformed into equitable claims because they are "intertwined with equitable relief." (Dkt. #835 n.46). Instead, these cases demonstrate that claims implicating traditional legal remedies, such as claims for monetary relief, are rarely rendered equitable in American law, and only under limited circumstances not applicable here.

### 3. Google's request that the Court decline supplemental jurisdiction.

Google argues that most States' statutory regimes intertwine equitable remedies with legal remedies, abrogating the right to a jury trial on the legal remedies. (Dkt. #835). Google concedes, however, that three States' antitrust statutes don't "explicitly intertwine the recovery of civil penalties with the pursuit of injunctive relief" for their state-antitrust claims—Florida, Kentucky, and Mississippi. (Dkt. #835 at 101). Thus, Google impliedly concedes that those three States are entitled to a jury trial on their antitrust civil-penalty claims. Still, Google believes that because these States' state-antitrust claims comprise a small percentage of the state-law claims asserted here, and because—in Google's view—none of the remaining state-law claims is entitled to a jury trial, the Court should "decline supplemental jurisdiction over those marginal claims." (Dkt. #835 at 102).

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256, 133 S.Ct. 1059, 185 L.Ed.2d 72 (2013) (citation modified) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)). A district court has original jurisdiction over claims that arise under federal

law or those that arise between litigants of different states. 28 U.S.C. §§ 1331, 1332. It may also retain jurisdiction over claims that it would not ordinarily have jurisdiction over if those claims are "part of the same case or controversy" as the federal claims. 28 U.S.C. § 1367.

That said, supplemental jurisdiction is "a doctrine of discretion, not of plaintiff's right." *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). A district court "may decline to exercise supplemental jurisdiction . . . if (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). Courts are also instructed to consider the "common law factors of judicial economy, convenience, fairness, and comity." *Brookshire Bros. Holding v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).

Presumably, Google's argument falls under the fourth reason to decline jurisdiction: exceptional circumstances. Regardless, the argument fails under any of the circumstances articulated in Section 1367(c) and under the common-law factors described in *Brookshire*. Because most States are not entitled to a jury trial for their civil penalties, argues Google, the Court should decline to exercise jurisdiction over the three antitrust claims that are so entitled. But Google's argument rests on a flawed premise: The Court holds that most of the States' claims are entitled to a jury

50

trial. *See infra* Parts III.C., III.D. The Court therefore finds no exceptional circumstance, or any other reason, for declining jurisdiction over the state-law claims at issue.

The Court also notes that this complex case has been litigated for years in this Court, including through the completion of voluminous discovery. The *Brookshire* factors, particularly those of judicial economy, convenience, and fairness, weigh heavily in favor of the Court continuing to exercise supplemental jurisdiction over the state-law claims in this case. Given the history of the case and the Court's familiarity with the issues, it will not decline supplemental jurisdiction.

*    *    *

Having considered Google's overarching arguments against the States' right to jury trial, the Court turns to the parties' state- and claim-specific arguments. The Court addresses the state-antitrust claims first, the DTPA claims second, and the quantum of civil penalties third.

## C. The State-Law Antitrust Claims

Out of the seventeen state-antitrust claims, the Court finds that all but five are entitled to a jury trial. The table below summarizes the Court's jury-trial determinations for each State's antitrust claim.

| State | Jury Trial on State Antitrust? |
|---|---|
| Alaska | Yes |
| Arkansas | No |
| Florida | Yes |
| Idaho | No |
| Indiana | No |
| Kentucky | Yes |

| | |
|---|---|
| **Louisiana** | Yes |
| **Mississippi** | Yes |
| **Missouri** | No |
| **Montana** | Yes |
| **Nevada** | Yes |
| **North Dakota** | Yes |
| **Puerto Rico** | No |
| **South Carolina** | Yes |
| **South Dakota** | Yes |
| **Texas** | Yes |
| **Utah** | Yes |

**1. Five States are not entitled to a jury trial on their state-antitrust claims seeking civil penalties.**

At the outset, two States—Indiana and Missouri—seek only an injunction. (Dkt. #834 at 22–23, 55, 77). Because an injunction is the prototypical equitable remedy, neither State is entitled to a jury trial on its state-antitrust claims. *See In re Abbott*, 117 F.4th at 739.

Two more States—Arkansas and Idaho—appear to seek relief in only their parens patriae capacities.[20] (Dkt. #835 at 98–101). Based on their antitrust statutes, neither State may recover civil penalties when acting in a parens patriae capacity. *See* Ark. Code Ann. § 4-75-315(b) (only authorizing restitution, actual damages, and costs when suing as parens patriae); Idaho Code § 48-108(2) (same but only actual damages and costs). Without civil penalties, the remaining relief each State seeks is

---

[20] The States' supplement points to nothing on the record to suggest that Arkansas has ever asserted any standing theory apart from parens patriae. (Dkt. #844 at 7–10). The Court refuses to find otherwise. By its own pleadings, Arkansas seeks relief only as parens patriae. The same is true for Idaho, which ends the inquiry.

equitable, which negates the right to a jury trial for their state-antitrust claims. *See In re Abbott*, 117 F.4th at 739.

Finally, Puerto Rico purports to seek an injunction, other equitable relief, and "civil penalties of up to $5,000 per violation." (FAC ¶ 773). For this relief, Puerto Rico cites two relevant statutes that implicate its antitrust and DTPA claims. After reviewing its statutory framework, however, the Court concludes that Puerto Rico cannot obtain civil penalties under either statute—only injunctive relief.

Puerto Rico invokes two relevant sections of its Antitrust Act: Sections 259 and 269. Section 259(a) proscribes certain anticompetitive conduct. Sections 259(b)–(j) then define an administrative-review process under Puerto Rico's Office of Monopolistic Affairs with certain remedies, including civil penalties "imposed by the Department of Consumer Affairs up to a maximum of five thousand dollars ($5,000)[] for each violation . . . ." 10 P.R. Laws Ann. § 259(i) (citation modified). These remedies are separate from the remedies that Puerto Rico can pursue in a court that is "authorized by Section 269 of this title." *Id.* § 259(b).

Section 269, by contrast, vests Puerto Rico's district courts "with jurisdiction to prevent, prohibit, enjoin and punish violations of this chapter[.]" *Id.* § 269. Because the following paragraph conveys "exclusive jurisdiction" to these courts over criminal proceedings, it appears that jurisdiction for civil actions is non-exclusive. While the Court understands "enjoin" to authorize injunctions, nothing in Section 269's text authorizes civil penalties.

The States point to Section 259(i) as authorizing civil penalties. (Dkt. #834 at 99 (antitrust), 101 (DTPA)). But as the Court already explained, these are *separate* civil penalties that may be assessed by an administrative tribunal after an administrative proceeding. Because Puerto Rico may not request penalties from this Court under its administrative-proceeding statute, and because Puerto Rico points to no other authorization to obtain civil penalties in this title, the Court finds that Puerto Rico cannot seek civil penalties for its state-antitrust or DTPA claims. Puerto Rico may only pursue injunctive relief in this action—the prototypical equitable remedy—and it therefore enjoys no right to a jury trial on those claims. *See In re Abbott*, 117 F.4th at 739.

## 2. Twelve States are entitled to a jury trial on their state-antitrust claims seeking civil penalties.

The remaining twelve States asserting state-antitrust claims, collectively referred to below as the "Antitrust Majority States," seek civil penalties—legal remedies—that are not intertwined with or incidental to any requested equitable relief.[21] The Antitrust Majority States are therefore entitled to a jury trial on these civil-penalty claims. (Dkt. #834 at 22–23).

The Court begins with *Tull*'s first prong. To determine whether a statutory action is more analogous to cases that were tried in courts of law or equity, the Court first compares "the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Tull*, 481 U.S. at 417.

---

[21] These States are Alaska, Florida, Kentucky, Louisiana, Mississippi, Montana, Nevada, North Dakota, South Carolina, South Dakota, Texas, and Utah.

Here, the parties acknowledge that "antitrust claims were actionable at common law and are considered to be legal in nature." (Dkt. #690 at 16) (first citing *Nat'l Soc'y Pro. Eng'rs v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); then citing *Swofford v. B & W, Inc.*, 336 F.2d 406, 414 (5th Cir. 1964)); *see also* (Dkt. #834 at 24). The Court agrees. Indeed, according to its drafters, the Sherman Act "does not announce a new principle of law, but applies old and well recognized principles of the common law to the complicated jurisdiction of our State and Federal Government." *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 531, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (quoting 21 Cong. Rec. 2456 (1890)). So closely related are antitrust claims to the common law that "the substantive content of the Sherman Act draws meaning from its common-law antecedents." *Id.* at 532.

Further, it is undisputed that the state-antitrust statutes invoked by the Antitrust Majority States include language that mirrors the language of the Sherman Act.[22] The closest historical analog for each of these state-antitrust statutes is therefore a common-law antitrust claim, which would have been brought in a court of law. *See supra* Part I.C. And because the States seek civil penalties under their antitrust statutes, these claims can also be analogized to actions in debt. *See Tull*, 481 U.S. at 418–19. Under either analogy, the claims would be heard by a court of law.

---

[22] *See, e.g.*, (Dkt. #834 at 24, 33, 41, 59, 66, 98); (FAC ¶¶ 658–73); Appendix 2.

Google counters that the existence of antitrust claims at common law is insufficient because the better historical analog would be "comparable damages suits brought by the English Crown in 1791[, which] would have been heard by a judge, not a jury." (Dkt. #690 at 17) (citation modified). But the Court has already rejected this analogy as unpersuasive. *See supra* Part III.B.1. The Court therefore concludes that either antitrust claims brought at common law or actions in debt are the most analogous Eighteenth-Century actions, supporting the Antitrust Majority States' right to a jury trial on their state-antitrust claims.

Moving on to *Tull*'s second prong, the Court examines the remedies sought and determines whether they are legal or equitable in nature. 481 U.S. at 417–18. This inquiry is far more important and in *Jarkesy* it was "all but dispositive." 603 U.S. at 123.

The Antitrust Majority States seek a combination of equitable remedies and civil penalties. As noted herein, "[a]ctions by the Government to recover civil penalties under statutory provisions . . . historically have been viewed as one type of action in debt requiring trial by jury." *Tull*, 481 U.S. at 418–19 (citation modified). And as the analysis below explains, *see infra* Parts III.C.2.i., III.C.2.ii., the Antitrust Majority States' civil-penalty claims show the hallmarks of punishment, not restitution.

The Court concludes that the twelve Antitrust Majority States properly seeking civil penalties are entitled to a jury trial on Google's liability for alleged state-antitrust violations.

### i. Google concedes that three States' state-antitrust claims receive a jury trial under *Tull* and *Jarkesy*.

As described above, *supra* Part III.B.3, Google does not contest that, under *Tull* and *Jarkesy*, Florida, Kentucky, and Mississippi are entitled to a jury trial on their state-antitrust claims. These States seek both civil penalties and injunctive relief under their state-antitrust statutes,[23] and the statutory framework for each antitrust claim authorizes injunctive relief and civil penalties in separate provisions. *See* Appendix 2. For example, Section 542.23 of the Florida Antitrust Act ("FAA") provides a right to sue for "injunctive or other equitable relief," while Section 542.23 separately authorizes civil-penalty claims under Section 542.21.

For their part, Florida, Kentucky, and Mississippi concede that they are not entitled to a jury trial on equitable relief. But they argue that they are entitled to a jury trial on Google's liability for civil penalties because such penalties, under each State's antitrust statute, are designed to punish. *See* Appendix 2. For example, Kentucky's statute provides that the State's attorney general may recover "on behalf of the Commonwealth a civil penalty of not more than the greater of five thousand dollars ($5,000) or two hundred dollars ($200) per day for each and every violation of [the statute]." Ky. Rev. Stat. Ann. § 367.990(8). As Kentucky confirms, and as Google does not dispute, the "penalty has nothing to do with restoring the status quo," because "the accrual of the civil penalty is in no way fixed or determined based on the damage caused," and the "penalties go to the Commonwealth." (Dkt. #834 at 61). The

---

[23] *See* (Dkt. #834 at 45, 60, 71); (FAC ¶¶ 626, 639, 648); Appendix 2.

same is true for Florida's and Mississippi's civil-penalty provisions. Fla. Stat. Ann. § 542.21 (capping civil penalties for natural persons and other persons (corporations) at $100,000 and $1,000,000, respectively); Miss. Code Ann. § 75-21-7 (allowing for the recovery of not "more than two thousand dollars ($2,000.00) for every" violation). Because Google does not dispute that these States' civil penalties are punitive in nature, *Tull* and *Jarkesy* mandate that they must be tried to a jury. *See supra* Part I.D.

Finally, Google concedes that Florida's, Kentucky's, and Mississippi's civil-penalty provisions are not incidental to or intertwined with the equitable-relief provisions of these States' antitrust statutes. In short, Google recognizes that Florida's, Kentucky's, and Mississippi's civil-penalty claims are entitled to a jury trial. Google argues, however, that the Court should decline to exercise supplemental jurisdiction over these claims because none of the other States' antitrust claims is entitled to a jury trial. The Court has already rejected this argument, *see supra* Part III.B.3, and thus concludes that Florida, Kentucky, and Mississippi are entitled to a jury trial on whether Google is liable for civil penalties under each State's antitrust law.

### ii. The remaining nine Antitrust Majority States are similarly entitled to a jury trial on Google's liability for alleged state-antitrust violations.

The Court also concludes that the remaining nine Antitrust Majority States are entitled to a jury trial for their state-antitrust claims under the *Tull/Jarkesy* framework. To begin, Google does not dispute that the state-antitrust statute invoked

by each of the Antitrust Majority States includes language that mirrors the language of the Sherman Act.[24] The closest historical analog for each of these state-antitrust statutes is therefore a common-law antitrust claim, which would have been brought in a court of law. *See supra* Part III.C.2. And because the States seek civil penalties under their antitrust statutes, these claims can also be analogized to an action in debt. *See Tull*, 481 U.S. at 418–19.

Each of the nine remaining Antitrust Majority States concedes that they are not entitled to a jury trial on equitable relief. But they argue that they are entitled to a jury trial on Google's liability for civil penalties because such penalties, under each State's antitrust statute, are designed to punish. *See* Appendix 2. Google does not dispute this point, and the statutes at issue are demonstrably punitive. For example, Section 15.20(a) of Texas's antitrust statute authorizes civil fines payable "to the state" in an amount not to exceed $300,000 for individuals, or the following amounts for business entities:

> (A) $3 million, if the lesser of the person's assets or market capitalization is less than $100 million;
>
> (B) $20 million, if the lesser of the person's assets or market capitalization is at least $100 million but less than $500 million; or
>
> (C) $30 million, if the lesser of the person's assets or market capitalization is $500 million or more.

Tex. Bus. & Com. Code Ann. § 15.20(a)(2)(A)–(C).

Like the penalties in *Tull*, the civil penalties authorized under the Texas antitrust statute sound in punishment, not restitution. 481 U.S. at 422. The

---

[24] *See, e.g.*, (Dkt. #834 at 24, 33, 41, 59, 66, 98); (FAC ¶¶ 658–73); Appendix 2.

contemplated penalties are not tied to profits for alleged violations; are paid to the State, not to the victims; and seek to deter behavior by exacting substantial penalties—up to $30 million for large entities. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same). The other eight States' antitrust statutes have civil-penalty provisions that are similarly designed to punish.[25] Because these States' civil-penalty claims are punitive in nature, *Tull* and *Jarkesy* mandate that they must be tried to a jury. *See supra* Part I.D.

Google resists this result. It argues that the remaining nine Antitrust Majority States have no right to a jury trial because their civil-penalty claims are sufficiently intertwined with or incidental to claims of equitable relief that the penalties are effectively equitable. This argument is unpersuasive for the reasons already explained above. *See supra* Part III.B.2. As Google's own authorities demonstrate, claims for monetary relief are treated as equitable remedies only in limited circumstances, such as the following: (1) monetary awards specifically characterized by Congress or the courts as equitable relief, (2) common-law trust actions or statutory actions that are treated like trust litigation, and (3) instances when a monetary award is joined and integral to specific-performance or another equitable remedy. None of these circumstances is present for the requested penalties under the

---

[25] *See* (Dkt. #834 at 34 (Alaska), 66–67 (Louisiana), 81–82 (Montana), 87 (Nevada), 93–94 (North Dakota), 104 (South Carolina), 107–08 (South Dakota), 112 (Utah)); (FAC ¶¶ 621 (Alaska), 645 (Louisiana), 652 (Montana), 655 (Nevada), 657 (North Dakota), 668 (South Carolina), 671 (South Dakota), 673 (Utah)); Appendix 2 (collecting punitive civil-penalty-remedy provisions).

remaining nine Antitrust Majority States' antitrust statutes. This argument therefore fails.

*Texas*

Texas seeks the legal remedy of civil penalties under one statutory section of its Business and Commerce Code and the equitable remedies of disgorgement and an injunction under another. (Dkt. #834 at 25). Section 15.20(a) authorizes civil fines "to the state"; Section 15.20(b) authorizes the equitable remedies. *See* Tex. Bus. & Com. Code Ann. § 15.20(a)–(b). The State of Texas need not seek, much less obtain, an equitable remedy to be awarded civil fines.

Although Google concedes that Texas's antitrust law "authorizes suits for civil penalties and for injunctive relief as separate, standalone actions," it claims that this matters not because the Texas Supreme Court has purportedly held that the antitrust penalties are incidental to injunctive relief. (Dkt. #835 at 94) (citing *Texas v. Standard Oil Co.*, 107 S.W.2d 550 (Tex. 1937)). This argument fails for two reasons. First, Google fails to recognize that, although state law determines the content and substance of each state-law claim and remedy, whether a claim is properly characterized as legal or equitable "must be made by recourse to federal law." *Simler*, 372 U.S. at 222. And under applicable federal law, the equitable remedies sought by Texas do not negate the right to a jury trial on civil penalties. Under Texas's statutory scheme, civil penalties are punitive and substantial, contemplating an award of up to $30 million. *See* Tex. Bus. & Com. Code Ann. § 15.20(a). And the equitable and legal remedies are found in separate, independent provisions of the antitrust statute,

which means Texas could sue for either or both remedies. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for the same deficiencies).

Second, even if Texas law were applicable to whether a statutory-civil-penalties claim is properly characterized as legal or equitable, Google has Texas law wrong. Google's reliance on the *Standard Oil* case, for example, is misplaced because that decision had nothing to do with whether an antitrust-civil-penalties claim should be tried to a jury. The "primary question" addressed by the Texas Supreme Court in *Standard Oil* was whether Texas's civil-antitrust laws violated the Fourteenth Amendment to the Constitution. 107 S.W.2d at 554. After determining that Texas's antitrust laws were constitutionally valid, the court addressed a few ancillary issues.

Google quotes from the court's consideration of the defendants' misjoinder claim. *See id.* at 559–60. In rejecting the misjoinder claim, the court noted that the State had charged the defendants with conspiracy to violate state-antitrust law, which, if proven, would impose responsibility on all defendants. *See id.* As part of the misjoinder discussion, the court observed that the "general object" of the State's antitrust laws is to "effectually suppress monopolies." *Id.* at 560. Continuing on, the court identified injunctive relief as the State's "primary cause of action," describing the recovery of penalties as "incidental." *Id.* Nothing in *Standard Oil* purports to decide the question here: whether civil-penalty claims brought under Texas's antitrust law are entitled to a jury trial because they were brought with claims for injunctive relief.

Google's focus on dicta in *Standard Oil* unrelated to Seventh Amendment issues is puzzling given that the Texas Constitution and Texas precedent make clear that civil-penalty claims authorized by Texas statutes—including antitrust claims—*are* entitled to a jury trial under Texas law. In fact, the framers of the present Texas Constitution "considered [the jury-trial right] so important that they used sweeping and emphatic language to guarantee it not once, but twice. Not only shall '[t]he right of trial by jury . . . remain inviolate,' TEX. CONST. art. I, § 15, it shall apply upon a party's request '[i]n the trial of all causes,' *id.* art. V, § 10." *In re Troy S. Poe Tr.*, 646 S.W.3d 771, 781 (Tex. 2022) (Busby, J., concurring). "The latter provision, in the Judiciary Article of the Texas Constitution, was adopted to require that juries resolve ultimate issues of fact in equitable as well as legal proceedings." *Id.* (citing *Cockrill v. Cox*, 65 Tex. 669, 672 (1886)). Through its state constitution, Texas "has protected the right to a trial by jury in those cases where a jury would have been proper at common law." *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 291 (Tex. 1975) (citations omitted).

The Court finds that *Credit Bureau* is particularly instructive on applicable Texas law. In that case, the Texas Supreme Court considered whether an action to enforce civil penalties under the Texas DTPA is one to which the right to a trial by jury attaches. *Id.* After determining that the DTPA did not answer the question, the court looked to the Texas Constitution and concluded that Texas's Bill of Rights "preserved the right to a trial by jury in a suit for the collection of civil penalties." *Id.*

The court's analysis in *Credit Bureau* invoked familiar principles of federal law on the issue, noting that "[a]t common law, suits for civil penalties were tried as actions for debt, and actions for debt were triable before a jury." *Id.* at 292 (citations omitted). The *Credit Bureau* court went on to examine several federal precedents on the right to jury trial for civil-penalty claims. The court began with *Hepner v. United States*, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909), a case in which "the United States brought suit to recover the penalty provided for the violation of the Alien Immigration Act," and "[t]he court reviewed and cited a number of precedents holding that actions for penalties are recoverable in civil actions and held 'the defendant was, of course, entitled to have a jury summoned in this case.'" *Id.* (quoting *Hepner*, 213 U.S. at 115). The *Credit Bureau* court then pointed to *United States v. Hindman*, 179 F.Supp. 926 (D.N.J. 1960), which "held that the defendants were entitled to a jury in a suit brought against them by the United States for civil penalties for violation of the [FTCA]," a statute the *Credit Bureau* court understood to be "very similar to the Texas [DTPA.]" *Id.* (citing *Hindman*, 179 F.Supp. at 928). Arguably most important, *Credit Bureau* invoked the Supreme Court's decision in *Curtis* for the principle that "[t]he right to a trial by jury is not limited to the precise form of action in which civil penalties were enforceable at common law. The right exists when 'the action involves rights and remedies of the sort typically enforced in an action at law.'" *Id.* (quoting *Curtis*, 415 U.S. at 195).

In sum, the *Credit Bureau* court broadly endorsed the right to jury trials for civil-penalty claims under Texas law. Notably, the case involved a request for civil

penalties for *violating a previously entered DTPA injunction. Id.* at 289–90. Thus, the civil penalties at issue were derived directly from a previous grant of injunctive relief. But the court still found that the defendant "was entitled to a trial by jury to determine whether it committed the violations of the injunction with which it was charged, and if so to determine the amount of civil penalties which should be assessed against it." *Id.* at 293. If Texas law allows for jury trial when civil penalties are sought for violation of a previously entered injunction, *a fortiori* Texas law allows for a jury trial on civil-penalty claims asserted *together with* a claim for injunctive relief, as is the case here.[26] Google's contention otherwise is premised on a misreading of Texas law.

*Alaska*

Alaska asserts that "Google violated the Alaska Restraint of Trade Act ('ARTA'). Alaska Stat. § 45.50.562 *et seq*." (Dkt. #834 at 33). ARTA makes it "unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire with another person to monopolize any part of trade or commerce." Alaska Stat. § 45.50.564. Neither party disputes that this statutory language mirrors the language of the Sherman Act. (Dkt. #834 at 33). The closest historical analog is thus a common-

---

[26] The Court notes that other Texas Supreme Court cases have also recognized the right to jury trial for antitrust cases involving statutory penalties. *See, e.g., Patrizi v. McAninch*, 269 S.W.2d 343, 347 (Tex. 1954) (describing *Ford Motor Co. v. State* as "a suit by the State of Texas to recover statutory penalties and to enjoin violations of the state's antitrust laws" and noting that "while none of the provisions" of the contract at issue violated the antitrust laws, "the petition did charge a course of conduct sufficient to raise a jury question of a violation of such laws") (citing *Ford Motor Co. v. State*, 175 S.W.2d 230 (Tex. 1943)).

law antitrust claim or an action in debt, either of which would have been brought in a court of law. *See supra* Part III.C.2.

Under ARTA, Alaska seeks both "equitable remedies (including injunctive relief) and civil penalties." (Dkt. #834 at 33) (citing (FAC ¶¶ 619–21)). Injunctions are authorized under Section 45.50.580(a), which allows the attorney general to "bring an action to enjoin a violation of [ARTA]," which "may be brought as a sole action or in conjunction with another action that the attorney general is authorized to bring." Alaska Stat. § 45.50.580(a). The next section authorizes other equitable relief, including restitution and the like. *Id.* § 45.50.580(b). Separately, under Section 45.50.578(b), Alaska may, "[i]n addition to any other relief available . . . bring a civil action against a person who violates [any of four specified statutory sections], or an injunction issued under AS 45.50.580, for a civil penalty of not more than (1) $1,000,000 if the person is a natural person; (2) $50,000,000 if the person is not a natural person." *Id.* § 45.50.578(b). Civil penalties are "paid to the state, and taken from the defendant's general assets[.]" (Dkt. #834 at 34).

The States concede that Alaska is not entitled to a jury trial on equitable relief. (Dkt. #834 at 33). But they argue that Alaska is entitled to a jury trial on civil penalties because they are (1) meant to punish, (2) separately authorized from an injunctive action, (3) not focused on restoring the status quo, and are (4) paid to the State. (Dkt. #834 at 34). The Court agrees. Like the penalties in *Tull*, the civil penalties authorized by Section 45.50.578(b) show all the hallmarks of punishment rather than restitution. *See Tull*, 481 U.S. at 422–23 (finding that civil penalties are

legal in nature when they seek to punish and deter rather than restore the status quo). In particular, these penalties (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter unwanted corporate behavior because they could be up to $50 million—fifty times the penalty limit for individuals. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy*, 603 U.S. at 118, 124–25 (same).

Google counters with an odd reading of ARTA. Google points to ARTA's language stating that an action for injunctive relief "may be brought as a sole action or in conjunction with another action that the attorney general is authorized to bring," and compares it to ARTA's section stating that, "in addition to any other relief available," the attorney general "may bring a civil action . . . for a civil penalty." (Dkt. #835 at 88–89) (first citing Alaska Stat. § 45.50.580(a); then citing *id.* § 45.50.578(b)). In Google's view, this framework renders ARTA's civil-penalties provision intertwined with equitable relief such that there is no right to jury trial for a civil-penalties claim. (Dkt. #835 at 88–89).

The Court disagrees. On their face, ARTA's equitable-relief and civil-penalty provisions present cumulative—not intertwined—remedies. The attorney general can file a claim for injunctive or other equitable relief, a claim for civil penalties, or both. Whether an action is brought to pursue some or all of those options falls within the attorney general's discretion. Nothing in ARTA "intertwines" the civil-penalty remedy with equitable relief, and the equitable remedies sought by Alaska do not negate the right to a jury trial on civil penalties.

67

The Supreme Court rejected a similar intertwinement argument in *Tull*. Recall that in *Tull*, the Court considered CWA provisions separately authorizing the federal government to seek injunctive relief and civil penalties. The Court determined that such remedies were not intertwined, explaining that "the Government was free to seek an equitable remedy *in addition to*, or independent of, legal relief. Section 1319 does not intertwine equitable relief with the imposition of civil penalties. Instead, each kind of relief is separably authorized in a separate and distinct statutory provision." *Tull*, 481 U.S. at 425 (emphasis added). There, like here, the statutory regime allowed for equitable remedies to be sought in addition to legal ones. And there, like here, the plaintiff retained its right to a jury trial. Alaska's statutory scheme further supports the jury-trial right for civil-penalty claims because (1) the civil penalties authorized are not for restitution, and (2) civil penalties of up to $50 million are too large to be incidental.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to a jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510. And, as the Supreme Court affirmed in *Dairy Queen*, the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not." 369 U.S. at 473. So even if the Court were to find that the claims for civil penalties were incidental to injunctive relief, the Court's conclusion would remain unchanged.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Alaska's antitrust laws.

*Louisiana*

Louisiana asserts that Google violated two of its antitrust provisions. First, Section 51:123, which mandates that "[n]o person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state." (Dkt. #834 at 66) (citing La. Stat. Ann. § 51:123). Second, Section 51:122(A) declares as illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ." La. Stat. Ann. § 51:122(A). Neither party disputes that this statutory language mirrors the language of the Sherman Act. (Dkt. #834 at 66). The closest historical analog is thus a common-law antitrust claim or an action in debt, either of which would have been brought in a court of law. *See supra* Part III.C.2.

Under its antitrust laws, "Louisiana seeks equitable relief and civil penalties." (Dkt. #834 at 66) (citing (FAC ¶¶ 641, 645)). Under Section 51:128, the attorney general may seek injunctive relief by "institut[ing] proceedings to prevent and restrain violations." La. Stat. Ann. § 51:128. Although the States also claim that Louisiana seeks restitution under this section, (Dkt. #834 at 66), the Court sees no such authorization for that remedy. Louisiana also seeks "fines,"—a civil penalty—in an amount of "not more than five thousand dollars." La. Stat. Ann. §§ 51:122(B),

51:123. The States contend that Section 51:138 authorizes suits for fines without also needing to seek injunctive relief. (Dkt. #834 at 67).

The States concede that Louisiana is not entitled to a jury trial on equitable relief. (Dkt. #834 at 66). But they argue that Louisiana is entitled to a jury trial on civil penalties because they are meant to punish and have "nothing to do with restoring the status quo." (Dkt. #834 at 67). Google counters that, because Louisiana cannot seek penalties or fines unless the attorney general institutes a proceeding seeking an injunction, "[t]he core action is necessarily one for injunctive relief, and civil penalties are contingent on, incidental to, and intertwined with that equitable relief." (Dkt. #835 at 89).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Sections 51:122(B) and 51:123 sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Louisiana's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties along with incarceration. *See id*. at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Louisiana do not negate the right to a jury trial on the State's civil-penalty claims. Louisiana's statutory scheme separately provides for equitable relief and legal relief, and the authorization to seek civil penalties does not require that the State obtain injunctive

70

or other equitable relief.[27] *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for similar deficiencies). Thus, Louisiana may obtain civil penalties without receiving injunctive relief.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Louisiana's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Louisiana's antitrust laws.

*Montana*

Montana asserts that Google violated three of its antitrust provisions. Those provisions make it illegal "to enter an agreement for the purpose of fixing the price or regulating the production of an article of commerce . . . for the purpose of creating or carrying out any restriction in trade, to" (1) "increase or reduce the price of merchandise or commodities;" (2) "prevent competition in the distribution or sale of merchandise or commodities;" or (3) "create a monopoly in the manufacture, sale, or

---

[27] *Compare* La. Stat. Ann. § 51:128 (equitable) *with id.* § 51:123 (legal).

transportation of an article of commerce." Mont. Code Ann. §§ 30-14-205(1), (2)(b), (2)(c), (2)(g). Neither party disputes that this statutory language mirrors the language of the Sherman Act. (Dkt. #834 at 81). The closest historical analog is thus a common-law antitrust claim or an action in debt, either of which would have been brought in a court of law. *See supra* Part III.C.2.

Under its antitrust laws, "Montana seeks equitable relief and civil penalties." (Dkt. #834 at 81) (citing (FAC ¶ 770)). Section 30-14-222(1) provides that Montana "may bring an action to enjoin an act that is in violation of 30-14-205 through 30-14-214 or 30-14-216 through 30-14-218 and for the recovery of damages." Mont. Code Ann. § 30-14-222(1). Separately, under Section 30-14-224(2), Montana seeks civil fines "in an amount not exceeding $25,000." (Dkt. #834 at 81).

The States concede that Montana is not entitled to a jury trial on equitable relief. (Dkt. #834 at 81). But they argue that Montana is entitled to a jury trial on civil penalties because such penalties are meant to punish and have "nothing to do with restoring the status quo." (Dkt. #834 at 82). In response, Google contends that Montana is seeking penalties under Section 30-14-222(a), which may be recovered "in addition to injunctive relief." (Dkt. #835 at 90). Google does not address the separate penalty provision that Montana relies on for its requested civil penalties.

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 30-14-224(2) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. These penalties are not tied to profits for the alleged violation and seek to deter behavior by providing for financial penalties of up to $25,000 per

72

violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Montana do not negate the right to a jury trial on the State's civil-penalty claims. Montana's statutory scheme separately provides for equitable relief and legal relief, and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for similar deficiencies). Thus, Montana may obtain civil penalties without receiving injunctive relief.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Montana's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and intertwinement analysis all support the States' right to a jury trial on Google's alleged violation of Montana's antitrust laws.

*Nevada*

Nevada asserts that Google violated the "Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*," which "broadly prohibits conduct in restraint of trade." (Dkt. #834 at 86) (citation modified). The statute explicitly mandates that its provisions "shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes." Nev. Rev. Stat. § 598A.050. Neither party disputes that this statute mirrors the Sherman Act. (Dkt. #834 at 86). The closest historical analog is therefore a common-law antitrust claim or an action in debt, either of which would have been brought in a court of law. *See supra* Part III.C.2.

Under its antitrust laws, "Nevada seeks all available relief, including injunctive relief and civil penalties." (Dkt. #834 at 87) (citing (FAC ¶ 655)). Although the States' FAC claims to seek "all available relief under the Nevada Unfair Trade Practices Act and common law, including but not limited to disgorgement, injunctions, civil penalties, and its costs and attorney's fees," (FAC ¶ 655) (citation modified), the Court finds that none of the statutes invoked by the States provides for disgorgement. And if Nevada is suggesting that it has such a power at common law, it has failed to provide support for that suggestion. The Court therefore finds that Nevada seeks an injunction, civil penalties, costs, and attorney's fees. Separately, Nevada seeks civil penalties under Section 598A.170, which allows for penalties "in an amount not to exceed 5 percent of the gross income realized by the sale of commodities or services sold by such persons in this state in each year in which

the prohibited activities occurred." Nev. Rev. Stat. § 598A.170. Civil penalties are also authorized by Section 598A.070(1)(c)(2).

The States argue that Nevada is entitled to a jury trial on civil penalties because they are meant to punish and because the amount of the penalties is pegged to an offender's gross income, which "reveals that the civil penalties are designed to maximally deter and punish while remaining cognizant of a company's ability to pay—and not aimed at quantifying the amount of harm done that must be undone." (Dkt. #834 at 87). In addition, Nevada points to Section 598A.250, which states that "[t]he remedies afforded by this chapter are cumulative." Nev. Rev. Stat. § 598A.250. According to the States, this provision shows that the remedies are all independent and need not be brought together.

For Section 598A.070(1)(c)(2), Google contends that because these penalties occur in a list of four remedies—the first and last of which are equitable relief—the "Nevada legislature intended for all enumerated remedies to be equitable in nature." (Dkt. #835 at 91). Google does not address the other penalty section relied upon by Nevada.

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 598A.170 sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. These penalties are paid to the State, not to the victims, and seek to deter behavior by exacting substantial penalties. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy*,

603 U.S. at 118, 124–25 (same). Further, the civil penalties can be substantial, given that they are tied to gross income realized in the State. *See id.*

As to intertwinement, the Court concludes that the equitable remedies sought by Nevada do not negate the right to a jury trial on civil penalties. Nevada's statutory scheme supports this conclusion because it provides for equitable relief and legal relief in two separate statutory provisions, and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief.[28] *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for similar deficiencies). This conclusion is further supported by the fact that Nevada's scheme makes these remedies "cumulative," Nev. Rev. Stat. § 598A.250, allowing Nevada to pursue and obtain equitable relief or civil penalties independently or in combination. Thus, Nevada may obtain civil penalties without receiving injunctive relief.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Nevada's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

---

[28] *Compare* Nev. Rev. Stat. § 598A.070(c)(1) (equitable) *with id.* § 598A.170 (legal).

In sum, the historical analogs, requested remedies, and intertwinement analysis all support the States' right to a jury trial on Google's alleged violation of Nevada's antitrust laws.

*North Dakota*

North Dakota asserts that Google violated the "North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01 *et seq.*," which "broadly prohibits conduct in restraint of trade." (Dkt. #834 at 93). This includes Sections 51-08.1-02 (prohibiting agreements to restrain trade) and 51-08.1-03 (prohibiting monopolization). (Dkt. #834 at 93). Neither side disputes that this statutory language mirrors the language of the Sherman Act. (Dkt. #834 at 93). The closest historical analog is thus a common-law antitrust claim or an action in debt, either of which would have been brought in a court of law. *See supra* Part III.C.2.

Under these laws, North Dakota seeks both equitable relief and civil penalties. (FAC ¶ 772). Section 51-08.1-07 authorizes most of North Dakota's requested relief: "The attorney general . . . may bring an action for appropriate injunctive relief, equitable relief, including disgorgement, and civil penalties in the name of the state for a violation of this chapter. The trier of fact may assess for the benefit of the state a civil penalty of not more than one hundred thousand dollars for each violation of this chapter." N.D. Cent. Code § 51-08.1-07. These remedies, however, are cumulative. *Id.* § 51-08.1-11.

The States concede that North Dakota is not entitled to a jury trial on its equitable-relief claim. (Dkt. #834 at 94). They argue, however, that North Dakota is

entitled to a jury trial on civil penalties because "their purpose is to punish," instead of "undoing the amount of harm done." (Dkt. #834 at 94). In addition, the penalties are not tied directly to any asset used for Google's alleged misconduct, and they are assessed "'for the benefit of the state,' rather than for any specific victim." (Dkt. #834 at 94). Finally, because the remedies are "cumulative," the States contend that all forms of relief may be sought independently. (Dkt. #834 at 94). Google counters that because both the "injunctive relief and civil penalties" fall under a single statutory section, the two remedies are intertwined. (Dkt. #835 at 91). Google does not address the statutory provision confirming that the remedies are cumulative.

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 51-08.1-07 sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. These penalties are not tied to profits for the alleged violation; are paid to the State, not to the victims; and seek to deter behavior by exacting substantial penalties—up to $100,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the Court finds that the equitable remedies sought by North Dakota do not negate the right to a jury trial on civil penalties. Although North Dakota authorizes both injunctive relief and civil penalties in the same statutory provision, its statutory scheme makes all remedies in this section "cumulative." N.D. Cent. Code § 51-08.1-11. Thus, North Dakota is free to pursue equitable relief

or civil penalties, independently or in combination, to address antitrust violations. Likewise, North Dakota may obtain civil penalties without even pursuing, much less obtaining, injunctive relief. Google's "intertwinement" argument cannot be reconciled with the plain text of North Dakota law.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Accordingly, even if the Court were to find that North Dakota's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violation of North Dakota's antitrust laws.

*South Carolina (combined antitrust and DTPA statute)*

The Court finds that South Carolina is entitled to a jury trial on Google's liability for violating its antitrust and DTPA laws.

The States assert that Google violated "[t]he South Carolina Unfair Trade Practices Act (SCUTPA), S.C. Code Ann. § 39-5-10 *et seq.*," which broadly prohibits both "[u]nfair methods of competition" and "unfair or deceptive acts or practices in the conduct of any trade or commerce." (Dkt. #834 at 104). Because SCUTPA

prohibits both anticompetitive conduct (antitrust) and deceptive acts or practices (DTPA), the Court analyzes both sets of claims together.

Beginning with historical analogs, SCUTPA is consistent with the antitrust and DTPA statutes of the other States in this litigation. The appropriate analogs are thus (1) common-law antitrust claims or actions in debt for the state-antitrust violations, *see supra* Part III.C.2; and (2) common-law-fraud actions or actions in debt for the DTPA violations, *see infra* Part III.D.2.i. Both actions would have been brought in a court of law, which favors finding the right to a jury trial as to both claims.

Turning to remedies, "South Carolina seeks civil penalties, (FAC ¶¶ 668(b), 751(b))," as well as "injunctive and other equitable relief, (FAC ¶¶ 668(a), 751(a))." (Dkt. #834 at 104) (citation modified). Under SCUTPA Section 39-5-50, South Carolina may seek injunctive relief and any "other orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss." (Dkt. #834 at 104) (quoting S.C. Code Ann. § 39-5-50). Separately, under Section 39-5-110(a), South Carolina may "'recover on behalf of the State a civil penalty of not exceeding five thousand dollars per violation' for willful violations of section 39-5-20, 'upon petition to the court.'" (Dkt. #834 at 104) (quoting S.C. Code Ann. § 39-5-110(a)).

The States argue that South Carolina is entitled to a jury trial because the legal claim for civil penalties is separately authorized from equitable relief under South Carolina law. (Dkt. #834 at 105). Google counters that, because the award of civil penalties requires the court to find that the offender "has committed a 'willful[]'

violation of its DTPA," and because obtaining that finding requires the attorney general to first bring an injunctive action, its claim for civil penalties is "incidental to and intertwined with its claim for injunctive relief." (Dkt. #835 at 67–68, 92–93) (citation modified).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 39-5-110(a) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. These penalties (1) are not tied to profits for the alleged violation, (2) are "recover[ed] on behalf of the State", and (3) seek to deter behavior by allowing for substantial penalties of up to $5,000 for each violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy*, 603 U.S. at 118, 124–25 (same).

As to intertwinement, the Court concludes that the equitable remedies sought by South Carolina do not abrogate the right to a jury trial on civil penalties. Although Google correctly notes that South Carolina cannot seek civil penalties without also seeking an injunction, it need not obtain an injunction to be awarded civil penalties. Thus, South Carolina's statutory scheme does not present the situation at issue in the *Adams* and *Golden* cases relied upon by Google. In both *Adams* and *Golden*, the plaintiff could not be awarded their requested legal remedy until they *first* obtained an equitable remedy, and therefore the legal remedy was considered to be intertwined with the equitable remedy. *See Adams*, 149 F.3d at 1161–62 (holding that ERISA claimants had no entitlement to the money benefits they requested "unless and until a court exercises its equitable powers to declare Plaintiffs eligible beneficiaries,"

which meant that "their claim for monetary relief [was] inextricably intertwined with equitable relief"); *Golden*, 73 F.3d at 661 (holding, similar to *Adams*, that the monetary relief requested by the plaintiffs was predicated upon *first* obtaining an equitable remedy—specific performance under a contract). Unlike those cases, South Carolina may be awarded civil penalties without an injunction. Under the circumstances, and given South Carolina's statutory scheme, these claims are not intertwined.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Accordingly, even if the Court were to find that South Carolina's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of South Carolina's state-antitrust and DTPA laws.

*South Dakota*

South Dakota asserts that Google violated its antitrust provisions, which prohibit conduct that restrains trade. (Dkt. #834 at 106). More specifically, it claims that Google violated Section 37-1-3.1, which prohibits agreements in restraint of

trade, and Section 37-1-3.2, which prohibits monopolization and attempted monopolization. *See* (Dkt. #834 at 106) (citing S.D. Codified Laws §§ 37-1-3.1, 37-1-3.2). Neither side disputes that this statutory language mirrors the language of the Sherman Act. (Dkt. #834 at 106). The closest historical analog is thus a common-law antitrust claim or an action in debt, either of which would have been brought in a court of law. *See supra* Part III.C.2.

Under its antitrust laws, South Dakota seeks both civil penalties and "injunctive and other equitable relief." (Dkt. #834 at 107) (citing (FAC ¶¶ 670, 775(a))). One statutory provision authorizes all relief sought by South Dakota: "The attorney general . . . may bring an action for appropriate injunctive or other equitable relief and civil penalties in the name of the state for a violation of this chapter. The court may assess for the benefit of the state a civil penalty of not more than fifty thousand dollars for each violation of this chapter." S.D. Codified Laws § 37-1-14.2. In addition, a separate statutory provision makes the remedies "cumulative and not exclusive." *Id.* § 37-1-20.

The States concede that South Dakota is not entitled to a jury trial on equitable relief. (Dkt. #834 at 107). But they argue that South Dakota is entitled to a jury trial on civil penalties because "their purpose is to punish." (Dkt. #834 at 107). Indeed, "South Dakota permits a $50,000-per-violation penalty regardless of the size of the harm done"; the penalties "may be extracted from Google's general corporate assets, regardless of whether any specific asset can be tied back to Google's misconduct"; and the penalties are "'for the benefit of the state,' rather than for any specific victim."

(Dkt. #834 at 107–08) (first citing S.D. Codified Laws § 37-1-31; then citing *id.* § 37-1-14.2). Google counters that, because "South Dakota seeks injunctive relief and civil penalties under the same section of its code," then "there is a connection between injunctive relief and civil penalties, and the two forms of relief are intertwined." (Dkt. #835 at 93) (citation modified).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 37-1-14.2 sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. These penalties are not tied to profits for the alleged violation; are paid to the State, not to the victims; and seek to deter behavior by exacting substantial penalties—up to $50,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the Court finds that South Dakota's decision to seek equitable remedies does not negate its right to a jury trial on civil penalties. Taken together, Sections 37-1-14.2 and 37-1-20 of the South Dakota statute allow the attorney general to pursue one or more of several cumulative remedies for antitrust violations, which include injunctive relief, other equitable relief, and civil penalties. Thus, the statutory language contemplates that the attorney general can elect to pursue some or all of these remedies and need not assert any equitable claim for relief to seek civil penalties, or vice versa. On its face, this scheme does not render a claim for civil penalties intertwined with claims for injunctive or other equitable relief.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Accordingly, even if the Court were to find that South Dakota's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of South Dakota's state-antitrust law.

*Utah*

Utah asserts that Google violated the "Utah Antitrust Act (UAA), Utah Code Ann. § 76-10-3101, *et seq*.," which "broadly prohibits conduct in restraint of trade." (Dkt. #834 at 111). Under the UAA, both agreements to restrain trade along with monopolization or attempted monopolization are prohibited. Utah Code Ann. § 76-10-3104(1)–(2). Neither side disputes that this statutory language mirrors the language of the Sherman Act. (Dkt. #834 at 112). The closest historical analog is thus a common-law antitrust claim or an action in debt, either of which would have been brought in a court of law. *See supra* Part III.C.2.

Under the UAA, Utah seeks both civil penalties and injunctive relief. (Dkt. #834 at 112) (citing (FAC ¶ 673)). The injunctive relief is authorized by Section

76-10-3108(1), which allows the "attorney general" to "bring an action for appropriate injunctive relief, a civil penalty, and damages in the name of the state, any of its political subdivisions or agencies, or as parens patriae on behalf of natural persons in this state, for a violation of this act." Utah Code Ann. § 76-10-3108(1). The next section describes the civil penalties, which may not exceed "more than $100,000 for each violation" for individuals or "more than $500,000 for each violation" for entities. *Id.* § 76-10-3108(2).

The States concede that Utah is not entitled to a jury trial on equitable relief. (Dkt. #834 at 112). But they argue that Utah is entitled to a jury trial on civil penalties "because their purpose is to punish." (Dkt. #834 at 112). These penalties may also be exacted "from Google's general corporate assets, regardless of whether any specific asset ties back to Google's misconduct." (Dkt. #834 at 112). Finally, any recovered penalties are "deposited in the Attorney General Litigation Fund, rather than remitted to victims." (Dkt. #834 at 112) (quotation omitted). Google counters that, because the civil penalties here must be brought "in addition to" injunctive relief, those penalties are "civil penalties" that "are plainly intertwined with injunctive relief under Utah law." (Dkt. #835 at 95) (quotation omitted).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 76-10-3108(2) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. These penalties are not tied to profits for the alleged violation, are paid to the State not to the victims, and seek to deter behavior by exacting substantial penalties—up to $500,000 per violation for business entities.

*See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the Court finds that the equitable remedies sought by Utah do not negate the right to a jury trial on civil penalties. Like South Dakota and other States, Utah's antitrust scheme allows the attorney general to pursue one or more of several cumulative remedies for antitrust violations, including injunctive relief and civil penalties. Thus, Utah's attorney general may elect to pursue some or all of the remedies allowed by the statute. On its face, this scheme does not require the attorney general to seek, much less obtain, injunctive relief to be awarded civil penalties, and Utah's civil-penalties claim is not intertwined with its claims for injunctive or other equitable relief.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Accordingly, even if the Court were to find that Utah's civil-penalties claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Utah's antitrust law.

**D. The States' DTPA Claims**

Out of the seventeen DTPA claims, the Court holds that all but two are entitled to a jury trial. The table below summarizes the Court's jury-trial determinations for each DTPA claim.

| State | Jury Trial on State DTPA? |
|---|---|
| Alaska | Yes |
| Arkansas | Yes |
| Florida | Yes |
| Idaho | Yes |
| Indiana | Yes |
| Kentucky | Yes |
| Louisiana | Yes |
| Mississippi | Yes |
| Missouri | Yes |
| Montana | Yes |
| Nevada | Yes |
| North Dakota | Yes |
| Puerto Rico | No |
| South Carolina | Yes |
| South Dakota | No |
| Texas | Yes |
| Utah | Yes |

**1. Two States are not entitled to a jury trial on their DTPA claims seeking civil penalties.**

At the outset, the Court already concluded that Puerto Rico is not entitled to a jury trial on its DTPA claims because its statutory scheme precludes it from seeking civil penalties from this Court. *See supra* Part III.C.1. This leaves only one other State that is not entitled to a jury trial on their DTPA claims—South Dakota.

South Dakota has requested both equitable relief and civil penalties. (Dkt. #834 at 109). As to the equitable relief, South Dakota claims that it seeks

injunctive relief under Section 37-24-23. *See* (Dkt. #834 at 109) (citing S.D. Codified Laws § 37-24-23). But neither the FAC nor any other filing before the Court has ever suggested that South Dakota seeks injunctive relief under this statute. *See* (FAC ¶ 775) (only requesting injunctive relief for violations of "SDCL §§ 37-1-3.1 *et seq.*"); (Dkt. #381 at 5) (same). And the States' previous submission on remedies to the Court confirms this conclusion.

| South Dakota | Antitrust:<br>- Injunctive relief (Parens Patriae);<br>- Civil penalties and fines (Sovereign, Parens Patriae);<br>- Attorney's fees and costs.<br><br>DTPA:<br>- Civil penalties (Sovereign, Parens Patriae);<br>- Attorneys' fees |
| --- | --- |

(Dkt. #381 at 5). The Court therefore finds that South Dakota seeks only civil penalties and attorney's fees for Google's alleged DTPA violations. But because civil penalties may only be recovered in an action brought under Section 37-24-23, and because South Dakota has failed to seek the injunctive relief required by that Section, it has not properly (or timely) requested *any* remedies for Google's alleged DTPA violations. South Dakota therefore has no right to any trial (let alone a jury trial) for its DTPA claims.

## 2. Fifteen States are entitled to a jury trial on their DTPA claims seeking civil penalties.

The remaining States seek civil penalties—legal remedies—that are not intertwined with or incidental to any requested equitable relief.[29] These States are therefore entitled to a jury trial on their civil-penalty claims. (Dkt. #834 at 22–23).

### i. *Tull*'s first prong

The Court begins with *Tull*'s first prong: determining whether the States' DTPA claims are more analogous to cases that were tried in courts of law or equity by comparing "the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Tull* 481 U.S. at 417. The States point to two historical analogs for their DTPA claims. First, an action in debt, which "was within the jurisdiction of the courts of law." (Dkt. #753 at 5) (quoting *Tull*, 481 U.S. at 418). Second, common-law-fraud claims, like those analogized to by the Court in *Jarkesy*. (Dkt. #753 at 5).

The Court finds that either of the historical analogs proposed by the States— an action in debt or common-law-fraud claims—are appropriate analogs for the States' DTPA claims and therefore such claims would likely have been heard by a court of law. Google offers no equitable analog for the Court to consider. Nor does it rebut *Tull*'s analogizing of civil penalties to an action in debt. And while Google attempts to cast doubt on the analogy to common-law fraud, it misunderstands the inquiry: similarity does not require synonymity. As the Supreme Court noted in

---

[29] These States are Alaska, Arkansas, Florida, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, Texas, and Utah.

*Jarkesy*, even though federal securities fraud was both narrower and broader than common-law fraud, it still served as an apt historical analog. 603 U.S. at 126. So too here. The States' DTPA claims do not mirror common-law fraud. That's fine. What matters is that these types of claims are *similar to* those heard in courts of law for common-law fraud. Because the States' DTPA claims all sound in deception and misrepresentation, common-law fraud can also serve as an appropriate analog.

### ii. Google's arguments on *Tull*'s first prong

Google makes two arguments under *Tull*'s first prong, generally contending that the States' DTPA claims are "purely equitable" and therefore not entitled to a jury trial. (Dkt. #690 at 9–12). The first argument is that, because the States' DTPA laws do not "codify" the common law, and because they create new causes of action with new remedies, they are untethered to any common-law cause of action and therefore have no historical analog. (Dkt. #690 at 11). The second argument is that the States' DTPA laws are modeled on the Federal Trade Commission Act ("FTC Act"). This matters because, in Google's view, courts have consistently held that the Seventh Amendment does not provide a right to jury trial for actions brought under the FTC Act. (Dkt. #690 at 12) (focusing on claims made under 15 U.S.C. § 53(b) of the FTC Act, also known as Section 13(b) claims). The Court takes each argument in turn.

Google begins by observing that the States' DTPA statutes do not "represent a codification of the common law." (Dkt. #690 at 11) (citation modified). Using Texas's DTPA statute as representative, Google goes on to assert that these laws seek to address the "inadequacies of traditional common law remedies" by creating "an

entirely new cause of action, with new and purely equitable remedies for 'deceptive trade practices' not actionable at or unforeseen by the common law." (Dkt. #690 at 11–12) (quoting *Woo v. Great Sw. Acceptance Corp.*, 565 S.W.2d 290, 298 (Tex. Ct. App.—Waco 1978, writ ref'd n.r.e.)). According to Google, "[n]one of this was triable to a jury at common law, so it cannot be tried to a jury here." (Dkt. #690 at 12).

This argument fails at each step. To begin with, the historical analog analysis contemplated by *Tull* and *Jarkesy* focuses on the existence of a similar Eighteenth-Century action and does not require that a modern statutory cause of action codify some existing common-law claim. In *Jarkesy*, for example, the Court's historical-analog analysis found that the similarities between common-law fraud—a legal claim—and securities fraud were instructive, even though the claims were not "identical." 603 U.S. at 126. Indeed, the Court recognized that "federal securities fraud is narrower" in some respects and "broader" in others. *Id.* Still, the Court concluded that "the close relationship between federal securities fraud and common law fraud confirm[ed] that this action [wa]s 'legal in nature.'" *Id.* (quoting *Granfinanciera*, 492 U.S. at 53); *see also AT&T, Inc. v. FCC*, 135 F.4th 230, 238 (5th Cir. 2025) (confirming that the "key inquiry" is "whether the statute targets the same basic conduct as the common-law claim.") (citation modified) (quoting *Jarkesy*, 603 U.S. at 125).

And Google again misreads Texas law—its representative example—by misconstruing the Texas DTPA. For starters, it's odd that Google appears to derive

its understanding of the contours of the Texas DTPA from a few stray sentences in a 1978 opinion of the Waco Court of Appeals, when the Texas Supreme Court has provided more meaningful insight in more recent decisions. Although it's true that the Texas DTPA did not codify the common law, "one of its primary purposes is to provide consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012) (citation modified). Thus, contrary to Google's suggestions, the Texas Supreme Court has recognized the statute's connection with common-law-fraud and breach-of-warranty cases, as well as the fact that the statute is not solely concerned with remedies.

Google's characterization of the Texas DTPA as providing "purely equitable remedies" for deceptive trade practices "not actionable at or unforeseen by the common law," is also wrong. As to remedies, the Texas Supreme Court has repeatedly observed that "DTPA claims generally are also punitive rather than remedial." *PPG Indus. v. JMB/Hous. Ctrs. Partners Ltd.*, 146 S.W.3d 79, 89 (Tex. 2004); *see also Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 439 (Tex. 2023) (same). And the Texas DTPA is not designed to address "novel" or "unforeseen" circumstances, but to create a cause of action that overlaps with certain common-law causes of action, while providing different proof requirements, defenses, and remedies. As the Texas Supreme Court has explained, "it is important to remember that the DTPA overlaps many common-law causes of action, including

breach of contract, warranty, fraud, misrepresentation, and negligence. Frequently, the DTPA is pleaded not because it is the only remedy, but because it is the most favorable remedy." *PPG Indus.*, 146 S.W.3d at 89 (citation modified).

Finally, Google's apparent belief that Texas's DTPA provides only equitable remedies that are not triable to a jury would be news in the Lone Star State, given that Texas has pattern jury instructions for DTPA claims, which have been used for years throughout the State and are cited regularly by Texas courts. *See, e.g.*, Texas Pattern Jury Charges—Question and Instructions on False, Misleading, or Deceptive Act or Practice (DTPA § 17.46(b)) § 102.1 (2022 ed.); *id.* Misrepresented and Unlawful Agreements (DTPA § 17.46(b)(12)) § 102.4.

Put simply, Texas Supreme Court precedent and Texas law more generally refute Google's characterization of the Texas DTPA and confirm that the statute is grounded in and similar to traditional causes of action that involved fraud and misrepresentation. As will be seen, the same reasoning applies as to *Tull*'s first prong for the other States' DTPA laws.

Google's argument that the Seventh Amendment does not provide a right to jury trial for actions brought under the FTCA also misses the mark. Even if Google were correct that the States' DTPA statutes are modeled on the FTCA, that congruence does not negate the States' right to jury trial for their civil-penalty claims. In this regard, and as Google notes, for cases brought under Section 13(b) of FTC Act, the FTC *may seek only equitable relief* and is not entitled to a jury trial. *See, e.g.*, *AMG Cap. Mgmt. v. FTC*, 593 U.S. 67, 75, 141 S.Ct. 1341, 209 L.Ed.2d 361 (2021). By

94

contrast, the right to a jury trial is protected when the Government sues for civil penalties under a different section of the FTC Act. *See, e.g.*, *United States v. Dish Network, L.L.C.*, 754 F.Supp.2d 1002, 1003–04 (C.D. Ill. 2010). That is the case here. To be sure, the States are not entitled to a jury trial for their equitable claims. But they are protected by the Seventh Amendment as to their civil-penalty claims.

Having rejected both of these arguments, the Court concludes that both an action in debt and common-law fraud are appropriate historical analogs for the States' DTPA claims. Because both actions involved legal claims heard by courts of law, the Court finds that the DTPA claims would likely have been heard by courts of law and thus retain the right to a trial by jury.

### iii. *Tull*'s second prong

Turning to *Tull*'s second prong, the States' requested remedies under their DTPA laws align with the remedies requested under the state-antitrust statutes already discussed herein. *See supra* Part III.C.2. For the DTPA claims, the States seek various forms of equitable relief, as well as civil penalties. (FAC ¶¶ 759–76). And for the reasons discussed above, *see supra* Part III.B.2, the civil penalties available under the DTPA statutes are legal in nature and enjoy the right to a jury trial.

Google's only distinct argument against the right to a jury trial under *Tull*'s second prong is that the requested DTPA civil penalties are incidental to or intertwined with the States' requests for equitable relief, rendering them equitable in nature and negating the right to jury trial. *See, e.g.*, (Dkt. #690 at 13); (Dkt. #753 at 9). The Court addresses this argument separately for each State's DTPA statute.

\*        \*        \*

Overall, under the *Tull*/*Jarkesy* framework, the historical analogs for the States' DTPA claims and the punitive nature of the civil penalties they authorize confirm that the States retain a right to jury trial on these claims.

*Texas*

Texas asserts that Google violated "multiple provisions of Texas Business & Commerce Code section 17.46," including the following:

> Subsection 17.46(a): False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful . . . .
>
> Subsection 17.46(b)(5): Representing that services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not have . . . .
>
> Subsection 17.46(b)(7): Representing that services are of a particular standard, quality, or grade, if they are of another . . . .
>
> Subsection 17.46(b)(9): Advertising goods or services with the intent not to sell them as advertised . . . .
>
> Subsection 17.46(b)(12): Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law . . . .
>
> Subsection 17.46(b)(24): Failing to disclose information concerning goods or services which was known at the time of the transaction with the intent to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed . . . .

(Dkt. #834 at 28) (citing (FAC ¶ 677)). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA law, "Texas seeks injunctive relief and civil penalties." (Dkt. #834 at 30) (citing (FAC ¶¶ 759–60)). For the equitable remedies, Texas seeks

"disgorgement and an injunction under Tex. Bus. & Com. Code Ann. § 17.47(a)." (Dkt. #834 at 30). Separately, "Texas also seeks civil penalties under section 17.47(c)," which enables the State to recover penalties of "not more than $10,000 per violation." (Dkt. #834 at 30).

The States concede that Texas is not entitled to a jury trial on any equitable remedies. (Dkt. #834 at 30). But they argue that Texas is entitled to a jury trial on civil penalties "because their purpose is to punish (not restore the status quo)." (Dkt. #834 at 30). These penalties may also be exacted "from the defendant's general assets, with no requirement to identify particular funds, deliver the amounts to particular victims, or calibrate the amount to unwind conduct." (Dkt. #834 at 31) (citation modified). Finally, any recovered penalties are "paid 'to the state,' not any victim." (Dkt. #834 at 31). Google counters that, because the civil penalties here must be brought "in addition to" injunctive relief, these "civil penalties are incidental to and intertwined with injunctive relief." (Dkt. #835 at 54–55) (citation modified).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 17.47(c) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Texas's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $10,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Texas do not negate the right to a jury trial on the State's civil-penalty claims. Texas's statutory scheme separately provides for equitable relief and legal relief,[30] and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for the same three deficiencies). Thus, Texas may obtain civil penalties without receiving injunctive relief.

Moreover, Section 17.47(d)—not Section 17.47(c)—has the structure of an equitable monetary penalty. That Section allows the court to enter "additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice." Tex. Bus. & Com. Code Ann. § 17.47(d). Those penalties are for restitution; the relevant penalties under Section 17.47(c), by contrast, seek to punish and to deter.

Although Google correctly notes that Texas cannot seek civil penalties without also seeking an injunction, it need not obtain an injunction to be awarded civil penalties. Thus, Texas's statutory scheme does not present the situation at issue in the *Adams* and *Golden* cases relied upon by Google. In both *Adams* and *Golden*, the plaintiff could not be awarded their requested legal remedy until they *first* obtained an equitable remedy, and therefore the legal remedy was intertwined with the

---

[30] *Compare* Tex. Bus. & Com. Code Ann. § 17.47(a) (equitable) *with id.* § 17.47(c) (legal).

equitable remedy. *See Adams*, 149 F.3d at 1161–62 (holding that ERISA claimants had no entitlement to the money benefits they requested "unless and until a court exercises its equitable powers to declare Plaintiffs eligible beneficiaries," which meant that "their claim for monetary relief [was] inextricably intertwined with equitable relief"); *Golden*, 73 F.3d at 661 (holding, similar to *Adams*, that the monetary relief requested by the plaintiffs was predicated upon *first* obtaining an equitable remedy—specific performance under a contract). Unlike those cases, Texas may be awarded civil penalties without an injunction. Under the circumstances, and given Texas's statutory scheme, these claims are not intertwined.

This result is also consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Texas's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In short, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Texas's DTPA laws.

*Alaska*

Alaska argues that Google violated the "Alaska Unfair Trade Practices and Consumer Protection Act ('AUTPCPA'), Alaska Stat. § 45.50.471 *et seq.*" (Dkt. #834 at 35). The AUTPCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce." Alaska Stat. § 45.50.471(a). The next section has specific examples of those methods, acts, or practices. *Id.* § 45.50.471(b). Relevant here, Alaska maintains that "Google has and continues to 'mak[e] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions,' *id.* § 45.50.471(b)(10), and 'engag[e] in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer or a competitor in connection with the sale or advertisement of goods or services,' *id.* § 45.50.471(b)(11)." (Dkt. #834 at 36) (alterations in original). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, "Alaska seeks injunctive relief and civil penalties." (Dkt. #834 at 36) (citing (FAC ¶¶ 679–83)). It also seeks other equitable relief under Alaska Stat. § 45.50.501(a)–(b). (Dkt. #834 at 36). Under Section 45.50.501(a), the attorney general may bring an action "to restrain by injunction" any person suspected of engaging in an act or practice that violates the AUTPCPA. It may also seek civil penalties under Section 45.50.551(b), which provides for civil penalties of "not less

than $1,000 and not more than $25,000 for each violation" in an action brought under Section 45.50.501. These civil penalties are recovered "on behalf of the state[.]" *Id.*

The States concede that Alaska is not entitled to a jury trial on equitable relief. (Dkt. #834 at 36). But they argue that Alaska is entitled to a jury trial on civil penalties because they are (1) meant to punish, (2) authorized under a separate statutory section than the equitable relief, (3) not focused on restoring the status quo, and are (4) paid to the State. (Dkt. #834 at 36–38). Google counters that, because the civil penalties must be brought in an action that also seeks injunctive relief, the "civil penalties are 'incidental to' and 'intertwined with' the injunctive relief." (Dkt. #835 at 56) (citation omitted).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 45.50.551(b) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422–23. The penalties authorized by Alaska's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $25,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy*, 603 U.S. at 118, 124–25 (same).

Google is correct that Alaska cannot seek civil penalties without also seeking an injunction. But an injunction need not be entered for Alaska to recover those civil penalties. And like Texas's statutory scheme, Alaska's statutory scheme similarly presents a different situation than the one at issue in the *Adams* and *Golden* cases relied upon by Google. Thus, Alaska's DTPA law allows it to receive a substantial

civil penalty separate from injunctive relief, and without any requirement that injunctive relief be obtained as a prerequisite for a civil penalty to be awarded. Contrary to Google's suggestion, the statute does not render a civil-penalty incidental to or intertwined with equitable relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Alaska's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In short, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Alaska's DTPA laws.

*Arkansas*

Arkansas argues that Google violated "the Arkansas Deceptive Trade Practices Act [('ADTPA')], Ark. Code Ann. § 4-88-101 *et seq*." (Dkt. #834 at 42). The ADTPA prohibits "[d]eceptive and unconscionable trade practices," as well as "concealment, suppression, or omission of any material fact." Ark. Code Ann. §§ 4-88-107, 4-88-108. Section 4-88-107 includes a set of prohibited trade practices. The closest historical

analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.1.

Under its DTPA laws, "Arkansas seeks both equitable remedies—including injunctive relief—and civil penalties." (Dkt. #834 at 43) (citing (FAC ¶ 624)). It also seeks other equitable relief under Ark. Code Ann. § 4-88-113. For example, Section 4-88-113(a)(1) allows for the court to enter an order to "[p]revent the use or employment by such person of any prohibited practices[.]" In addition, Arkansas requests civil penalties under Section 4-88-113(a)(3), which provides for civil penalties "not to exceed ten thousand dollars ($10,000) per violation, against persons who have violated this chapter." (Dkt. #834 at 43). These civil penalties are "to be paid to the state." Ark. Code Ann. § 4-88-113(a)(3).

The States concede that Arkansas is not entitled to a jury trial on its equitable claims. (Dkt. #834 at 43). But they argue that Arkansas is entitled to a jury trial on civil penalties because they are meant to punish, are separate from restitution, and are paid to the State. (Dkt. #834 at 43). Google counters that because the civil penalties fall under the same statutory section that allows for injunctive relief and other equitable remedies, the civil penalties "are intertwined with equitable relief." (Dkt. #835 at 57–58) (citation omitted).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 4-88-113(a)(3) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Arkansas's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3)

seek to deter behavior by providing for financial penalties of up to $10,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy*, 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Arkansas do not negate the right to a jury trial on the State's civil-penalty claims. Arkansas's statutory scheme provides for equitable relief and legal relief in separate subsections of the statute,[31] and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for the same three deficiencies). Thus, although Google correctly notes that both types of relief are in the same statutory section, they are provided in distinct clauses in different subsections of the law, and they need not be brought together. In short, the statute allows Arkansas to seek and obtain civil penalties without receiving injunctive relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not").

---

[31] *Compare* Ark. Code Ann. § 4-88-113(a)(1) (equitable) *with id.* § 4-88-113(a)(3) (legal).

Thus, even if the Court were to find that Arkansas's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In short, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Arkansas's DTPA laws.

*Florida*

Florida argues that Google violated the "Florida Deceptive and Unfair Trade Practices Act ('FDUTPA'), Fla. Stat. Ann. § 501.201 *et seq.*" (Dkt. #834 at 47). The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. Ann. § 501.204. "Florida alleges that Google's actions constitute (1) unfair methods of competition in violation of FDUTPA, (FAC ¶ 686), and (2) unfair or deceptive acts or practices in violation of the FDUTPA, (FAC ¶ 687)." (Dkt. #834 at 47) (citation modified). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, Florida seeks all remedies available under FDUTPA, including damages (Fla. Stat. Ann. § 501.207(1)(c)); disgorgement and restitution (*Id.* § 501.207(4)); injunctive and equitable relief (*Id.* § 501.207(3)); and civil penalties (*Id.* § 501.2075). (Dkt. #834 at 48) (citing (FAC ¶ 689)). Under Section 501.207(1)(b), Florida may bring "[a]n action to enjoin any person who has violated, is violating, or is otherwise likely to violate, this part." Separately, Section 501.2075 authorizes civil

penalties of "not more than $10,000" for each willful use of a "method, act, or practice declared unlawful under [FDUTPA.]" These civil penalties "shall accrue to the state and shall be deposited as received into the General Revenue Fund unallocated." Fla. Stat. Ann. § 501.2075.

Florida argues that it is entitled to a jury trial on civil penalties because they are meant to punish, are authorized under a statutory section separate from the section authorizing equitable relief, and could be substantial. (Dkt. #834 at 48–49). Google counters that, because the civil penalties here are brought in an action for injunctive relief, "the civil penalties are 'incidental to' and 'intertwined with' the injunctive relief.'" (Dkt. #835 at 71) (citation omitted).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 501.2075 sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Florida's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $10,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy*, 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Florida do not negate the right to a jury trial on the State's civil-penalty claims. Florida's statutory scheme separately provides for equitable relief and legal relief,[32] and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable

---

[32] *Compare* Fla. Stat. Ann. § 501.207(1) (equitable) *with id.* § 501.2075 (legal).

relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for the same three deficiencies). Thus, Florida may obtain civil penalties without receiving injunctive relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Florida's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In short, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Florida's DTPA laws.

*Idaho*

Idaho argues that Google violated the "Idaho Consumer Protection Act (ICPA) and its implementing regulations." (Dkt. #834 at 52) (first citing Idaho Code § 48-601 *et seq.*; then citing Idaho Admin Code r. 04.02.01.000 *et seq.*). The ICPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Idaho Code § 48-603. The subsections of Section 48-603 list more specific unfair methods and practices. Of these practices, Idaho asserts that Google violated 48-603(5), (7), (9), and (17), along with Idaho Admin Code

r. 04.02.01.030. (Dkt. #834 at 52). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, Idaho seeks "injunctive relief and civil penalties." (Dkt. #834 at 53). Under Sections 48-606(1)(a)–(f), when the attorney general has reason to believe that any person is engaging, has engaged, or is about to engage in any act or practice declared unlawful by this chapter, the attorney general may bring an action for six distinct types of relief. Idaho Code § 48-606(1). These include declaratory relief, (*id.* § 606(1)(a)); injunctive relief (*id.* § 606(1)(b)); damages, disgorgement, and restitution (*id.* § 606(1)(c)); civil penalties of "up to five thousand dollars ($5,000) per violation" (*id.* § 606(1)(e)); and reasonable costs and fees (*id.* § 606(1)(f)).

The States concede that they are not entitled to a jury trial on equitable relief. (Dkt. #834 at 53). But they argue that Idaho is entitled to a jury trial on civil penalties because "their purpose is to punish (not restore the status quo)"; they don't seek to "place anyone into [their] former position"; and the penalties are exacted "from the defendant's general assets" and "go to the state," not the victims. (Dkt. #834 at 53). Google counters that, because these remedies are within the same subsection, a connection exists "between injunctive relief and civil penalties," supporting "a conclusion that civil penalties may be sought 'only in a suit brought to enjoin or otherwise abate an ongoing violation.'" (Dkt. #835 at 72) (citing *Gwaltney*, 484 U.S. at 58–59).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 48-606(1)(e) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Idaho's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $5,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Idaho do not negate the right to a jury trial on the State's civil-penalty claims. Idaho's statutory scheme allows it to seek equitable relief, legal relief, or both. It also does not require the State to obtain injunctive or other equitable relief before obtaining civil penalties. This flexibility weighs against finding the different types of relief intertwined. And while both types of relief are in the same statutory section, they are presented as distinct clauses in different subsections that need not be brought in tandem. The Court is thus unpersuaded by Google's argument that their statutory proximity renders the civil penalties equitable.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not").

Thus, even if the Court were to find that Idaho's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Idaho's DTPA laws.

*Indiana*

Indiana argues that Google violated "Indiana Code section 24-5-0.5-3(a), which makes it illegal to 'commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction.'" (Dkt. #834 at 56). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, Indiana seeks "equitable relief and civil penalties." (Dkt. #834 at 56) (citing (FAC ¶ 702)). That equitable relief includes "disgorgement and an injunction under subsections 24-5-0.5-4(c)(1) and (2)." (Dkt. #834 at 56). Indiana also seeks civil penalties separately under Subsection 24-5-0.5-4(g): "If a court finds any person has knowingly violated" this subchapter, the attorney general "may recover from the person on behalf of the state a civil penalty of a fine not exceeding five thousand dollars ($5,000) per violation."

Indiana argues that it is entitled to a jury trial on civil penalties because they are "meant to punish wrongdoers and are thus legal in nature" and they have "nothing to do with restoring the status quo." (Dkt. #834 at 57). Google counters that, "[b]ecause Indiana can only seek civil penalties 'in' an action seeking an injunction

via a provision that ties the remedy to that equitable relief, its penalty remedy is 'incidental to' and 'intertwined with' injunctive relief." (Dkt. #835 at 59) (citing *Terry*, 494 U.S. at 571).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Subsection 24-5-0.5-4(g) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Indiana's statutes are not tied to profits for the alleged violation and seek to deter behavior by providing for financial penalties of up to $5,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy*, 603 U.S. at 118, 124–25 (same).

As to intertwinement, Indiana's decision to seek equitable remedies does not negate its right to a jury trial on civil penalties. For example, Indiana's statutory scheme separately provides for equitable relief and legal relief.[33] That said, Google is correct that Indiana cannot seek civil penalties without also seeking an injunction because civil penalties may only be sought "in an action pursuant to subsection (c)." Ind. Code § 24-5-0.5-4(g). But an injunction need not be entered to recover those civil penalties. And, like Texas's statutory scheme, Indiana's statutory scheme does not present the situation at issue in the *Adams* and *Golden* cases relied upon by Google. Thus, Indiana's DTPA law allows it to receive a substantial civil penalty separate from injunctive relief, and without any requirement that injunctive relief be obtained as a prerequisite for a civil penalty to be awarded. Contrary to Google's suggestion,

---

[33] *Compare* Ind. Code § 24-5-0.5-4(c) (equitable) *with id.* § 24-5-0.5-4(g) (legal).

the statute does not render civil penalties authorized under Subsection 24-5-0.5-4(g) incidental to or intertwined with equitable relief.

In this regard, it's notable that incidental civil penalties are found in a different provision of Indiana's DTPA laws—Section 24-5-0.5-4(f)—which allows penalties to be requested only after the terms of an injunction are violated: "Any person who violates the terms of an injunction issued under subsection (c) shall forfeit and pay to the state a civil penalty of not more than fifteen thousand dollars ($15,000) per violation." The civil penalties authorized by Section 24-5-0.5-4(g), by contrast, have no such tie to any equitable relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Indiana's civil-penalty claims under Subsection 24-5-0.5-4(g) were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Indiana's DTPA laws.

*Kentucky*

Kentucky argues that Google violated the "Kentucky Consumer Protection Act ('CPA'), Ky. Rev. Stat. Ann. § 367.110 *et seq.*" (Dkt. #834 at 63). In particular, Kentucky "alleges that Google violated section 367.170(1), which declares that '[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are' unlawful." (Dkt. #834 at 63). The closest historical analogs to such claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, Kentucky seeks both "equitable relief and civil penalties." (Dkt. #834 at 63) (citing (FAC ¶ 710)). It seeks an injunction under Section 367.190, which states that when "the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by KRS 367.170 to be unlawful," they may bring an action for injunctive relief. Ky. Rev. Stat. Ann. § 367.190. Separately, Section 367.990(2) authorizes civil penalties of "not more than two thousand dollars ($2,000) per violation" for actions "brought under KRS 367.190." These penalties are recovered "on behalf of the Commonwealth." *Id.* § 367.990(2).

The States concede that Kentucky is not entitled to a jury trial on equitable relief. (Dkt. #834 at 63). But they argue that Kentucky is entitled to a jury trial on civil penalties because they are "punishment," have "nothing to do with restoring the status quo," and are "separate from restitution." (Dkt. #834 at 64). Google counters that, because the civil penalties here are brought in an action for injunctive relief, the

"request for civil penalties is 'incidental to' and 'intertwined with' injunctive relief." (Dkt. #835 at 60) (quoting *Terry,* 494 U.S. at 571).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 367.990(2) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Kentucky's statutes (1) are not tied to profits for the alleged violation, (2) are recovered on behalf of the Commonwealth and do not appear to flow to the victims, and (3) seek to deter behavior by providing for financial penalties of up to $2,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Kentucky do not negate the right to a jury trial on the State's civil-penalty claims. Kentucky's statutory scheme separately provides for equitable relief and legal relief.[34] Google is correct that Kentucky cannot seek civil penalties without also seeking an injunction because civil penalties may only be sought "in an[] action brought under KRS 367.190." Ky. Rev. Stat. Ann. § 367.990(2). But an injunction need not be entered to recover those civil penalties. And, like Texas's statutory scheme, Kentucky's statutory scheme does not present the situation at issue in the *Adams* and *Golden* cases relied upon by Google. Thus, Kentucky's DTPA law allows it to receive a substantial civil penalty separate from injunctive relief, and without any requirement that injunctive relief be obtained as a prerequisite for a civil penalty to be awarded.

---

[34] *Compare* Ky. Rev. Stat. Ann. § 367.190 (equitable) *with id.* § 367.990(2) (legal).

Contrary to Google's suggestion, the statute does not render a civil-penalty incidental to or intertwined with equitable relief.

And notably, another section within Kentucky's DTPA laws—Section 367.990(1)—shows what incidental penalties look like under Kentucky's statutory scheme. Specifically, penalties under Section 367.990(1) can only be requested when an injunction has been violated: "Any person who violates the terms of a temporary or permanent injunction issued under KRS 367.190 shall forfeit and pay to the Commonwealth a civil penalty of not more than twenty-five thousand dollars ($25,000) per violation." While these penalties are greater than those authorized by Section 369.990(2), they require the violation of equitable relief first—an injunction—for Kentucky to seek them. That the penalties Kentucky seeks under Section 369.990(2) lack such a requirement only further shows that those penalties are not intertwined.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Kentucky's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In short, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Kentucky's DTPA laws.

*Louisiana*

Louisiana argues that Google violated the "Louisiana Unfair Trade Practices and Consumer Protection law ('LUTPA')" by violating Section 51:1405(A), (Dkt. #834 at 68), which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." La. Stat. Ann. § 51:1405(A). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, Louisiana "seeks multiple forms of equitable relief, including an injunction and restitution under subsections 51:1407(A) and 51:1408(A)(5)." (Dkt. #834 at 69). Under Section 51:1407(A), when "the attorney general has reason to believe that any person is using, has used, or is about to use any method, act, or practice declared by [Section] 51:1405 to be unlawful, he may bring an action for injunctive relief in the name of the state against such person to restrain and enjoin the use of such method, act, or practice." La. Stat. Ann. § 51:1407(A). "In addition to" that injunctive relief, Section 51:1407(B) allows the attorney general to seek "a civil penalty . . . not to exceed five thousand dollars for each violation." *Id.* § 51:1407(B).

The States concede that Louisiana is not entitled to a jury trial on equitable relief. (Dkt. #834 at 69). But they argue that Louisiana is entitled to a jury trial on civil penalties "for the same reasons as set forth above for Texas." (Dkt. #834 at 69). Those reasons include that the purpose of such penalties "is to punish (not restore the status quo)" and that the penalties are awarded to the State, not the victims. (Dkt. #834 at 30–31). Google counters that, because the civil penalties here are brought in an action for injunctive relief, the "civil penalties are contingent on, 'incidental to,' and 'intertwined with' that injunctive relief.'" (Dkt. #835 at 89) (citations omitted).

In response, the States point to the civil penalties authorized under Sections 51:1408(A)(5) and 51:1416 as examples of incidental or intertwined penalties. Section 51:1416, for example, allows for civil penalties "of not more than five thousand dollars per violation" for "any person who violates the terms of an injunction issued under [Section] 51:1407[.]" By contrast, the penalties sought under Section 51:1407(B) seek to punish and don't require that an injunction be violated. As a result, the statutory scheme suggests that Louisiana's requested penalties are neither incidental to nor intertwined with injunctive relief. (Dkt. #834 at 69–70). In Google's view, however, the only standalone remedy in this section is injunctive relief under 51:1407, so the civil penalties are necessarily "inextricably intertwined with and dependent upon the injunctive relief under subsection (A)." (Dkt. #835 at 61).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 51:1407(B) sound in punishment, not restitution. *See Tull*,

481 U.S. at 422. The penalties authorized by Louisiana's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $5,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Louisiana do not negate the right to a jury trial on the State's civil-penalty claims. Louisiana's statutory scheme separately provides for equitable relief and legal relief,[35] and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for the same three deficiencies). Thus, Louisiana may obtain civil penalties without receiving injunctive relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Louisiana's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

---

[35] *Compare* La. Stat. Ann. § 51:1407(A) (equitable) *with id.* § 51:1407(B) (legal).

In short, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Louisiana's DTPA laws.

*Mississippi*

Mississippi argues that Google violated Section 75-24-5(1) of the Mississippi Consumer Protection Act ("CPA"), which prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce . . . ." (Dkt. #834 at 73) (quoting Miss. Code Ann. § 75-24-5(1)). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, "Mississippi seeks equitable relief and civil penalties." (Dkt. #834 at 74) (citing (FAC ¶ 768)). Regarding equitable relief, Mississippi seeks "an injunction and disgorgement/restitution under sections 75-24-9 and 75-24-11." (Dkt. #834 at 74). It also seeks civil penalties for these violations under a separate statutory section that allows the attorney general to "recover on behalf of the state a civil penalty in a sum not to exceed Ten Thousand Dollars ($10,000.00) per violation." (Dkt. #834 at 74) (quoting Miss. Code Ann. § 75-24-19(1)(b)).

The States concede that Mississippi has no right to a jury trial on equitable relief. (Dkt. #834 at 74). But they argue that Mississippi is entitled to a jury trial on civil penalties because they are meant to punish, are authorized under a separate statutory section than the equitable relief, and don't focus on restoring the status quo. (Dkt. #834 at 74). Google counters that because the civil penalties here may only be

119

brought in an action for injunctive relief—"[i]n any action brought under section 75-24-9"—"its request for civil penalties is not standalone: instead, it is 'incidental to' and 'intertwined with' injunctive relief." (Dkt. #835 at 62–63) (quoting *Terry*, 494 U.S. at 571).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 75-24-19(1)(b) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Mississippi's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $10,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Mississippi do not negate the right to a jury trial on the State's civil-penalty claims. Mississippi's statutory scheme separately provides for equitable relief and legal relief, and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for the same three deficiencies). And, like Texas's statutory scheme, Mississippi's scheme does not present the situation at issue in the *Adams* and *Golden* cases relied upon by Google; that is to say, there is no requirement that injunctive relief be obtained to be awarded civil penalties. Instead, Mississippi's DTPA law allows it to receive a substantial civil penalty independent of injunctive

relief. Contrary to Google's suggestion, the statute does not render a civil-penalty incidental to or intertwined with equitable relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Mississippi's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Mississippi's DTPA laws.

*Missouri*

Missouri argues that Google violated "the Missouri Merchandising Practices Act (MMPA)." (Dkt. #834 at 78). Under Section 407.020.1, "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is . . . an unlawful practice." Mo. Rev. Stat. § 407.020.1. The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, "Missouri seeks equitable relief and civil penalties." (Dkt. #834 at 79) (citing (FAC ¶ 769)). The equitable remedies include an injunction under Section 407.100.1 and restitution under Section 407.100.4. (Dkt. #834 at 79). The civil penalties are separately authorized under Section 407.100.6 and cannot exceed "more than one thousand dollars per violation." (Dkt. #834 at 79) (quoting Mo. Rev. Stat. § 407.100.6). Any penalty awards are paid to the State.

The States concede that Missouri has no right to a jury trial on equitable relief. (Dkt. #834 at 79). But they argue that Missouri is entitled to a jury trial on civil penalties because they are meant to punish and have "nothing to do with restoring the status quo." (Dkt. #834 at 79). Google counters that, because the "civil penalties are available only if, in the action for injunctive relief, the court finds that the defendant committed violations of the State's DTPA," the "request for civil penalties is 'incidental to' and 'intertwined with' injunctive relief." (Dkt. #835 at 65) (quoting *Terry*, 494 U.S. at 571).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 407.100.6 sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Missouri's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $1,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Missouri do not negate the right to a jury trial on the State's civil-penalty claims. Missouri's statutory scheme supports that conclusion because it allows for the State to recover civil penalties without first obtaining injunctive or other equitable relief. Although the same statutory section authorizes the State's requested legal and equitable relief, these remedies are presented as distinct clauses in different subsections. And, like Texas's statutory scheme, Missouri's scheme does not present the situation at issue in the *Adams* and *Golden* cases relied upon by Google. That is to say, there is no requirement that injunctive relief be obtained to be awarded civil penalties. As a result, each remedy may be awarded independently.

But even if the Court characterized Missouri's civil penalties as incidental or intertwined with the injunctive relief, the outcome would be the same. As the Supreme Court noted in *Tull*—pointing to *Curtis v. Loether*—when "a legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as 'incidental' to the equitable relief sought." *Tull*, 481 U.S. at 425 (quoting *Curtis*, 415 U.S. at 196 n.11). And as the Court stated above, the claims in *Curtis* were *in the same provision* and had to be brought in tandem. *See supra* Part III.B.2. Yet the Court still found that the legal claims there retained the right to jury trial. The same is true here, especially when Missouri's scheme enables legal relief separately from equitable relief.

Moreover, the MMPA has other penalty provisions that, in context, further demonstrate why the relevant provisions here are neither incidental to nor intertwined with equitable relief. For example, Section 416.051.3 allows for a civil penalty "of not more than twenty thousand dollars" if any person "is found to be in contempt of any court order issued to enforce the provisions of section 416.031 . . . ." Mo. Rev. Stat. § 416.051.3. Those penalties, unlike the ones sought by Missouri here, require a court order to be issued and violated to be available. The penalties requested here rely on no such entry of an equitable court order or the violation of it.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Missouri's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

Thus, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Missouri's DTPA laws.

*Montana*

Montana argues that Google violated the "Montana Unfair Trade Practices and Consumer Protection Act of 1973 ('MUTPA')." Specifically, it alleges that Google

"violated Montana Code section 30-14-103, which makes it illegal to engage in '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" (Dkt. #834 at 83) (quoting Mont. Code Ann. § 30-14-103). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, Montana seeks multiple forms of equitable relief, including an injunction and restitution under subsections 30-14-111(4) and 30-14-131. In addition, Montana seeks civil penalties under Section 30-14-142(2), which allows for the recovery of civil fines "of not more than $10,000 for each violation" for actions brought under Section 30-14-111. Mont. Code Ann. § 30-14-142(2). Such fines are recovered "on behalf of the state." *Id.*

The States concede that Montana is not entitled to a jury trial on equitable relief. (Dkt. #834 at 84). But they argue that Montana is entitled to a jury trial on civil penalties "for the same reasons set forth above for Texas." (Dkt. #834 at 84). Those reasons include that the purpose of these penalties "is to punish (not restore the status quo)" and that the penalties are paid to the State, not the victims. (Dkt. #834 at 30–31). Google counters that, because civil penalties must be sought "in an action brought under 30-14-111," "Montana's request for civil penalties is therefore 'incidental to' and 'intertwined with' injunctive relief." (Dkt. #835 at 66–67) (quoting *Terry*, 494 U.S. at 571).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 30-14-142(2) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Montana's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $10,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Montana do not negate the right to a jury trial on the State's civil-penalty claims. Montana's statutory scheme separately provides for equitable relief and legal relief,[36] and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for the same three deficiencies). True, Montana cannot seek civil penalties without also seeking an injunction. But such an injunction need not be entered to recover those civil penalties. Therefore, Montana's legal remedies are neither incidental to nor intertwined with its equitable remedies for the same reasons the Court described herein as to Texas, Missouri, and other States. In sum, Montana may obtain civil penalties without receiving injunctive relief.

The Court also notes that other statutory sections in MUTPA show why the relief authorized by Section 30-14-142(2) is neither incidental to nor intertwined with Montana's requested equitable relief. Section 30-14-131, for example, authorizes the

---

[36] *Compare* Mont. Code Ann. § 30-14-111 (equitable) *with id.* § 30-14-142(2) (legal).

court to "enter orders or judgments necessary to restore to a person any money or property, real or personal, that may have been acquired by means of any practice in this part declared to be unlawful," including "any other order or judgment *required by equity* to carry out the provisions of this part." Mont. Code Ann. §§ 30-14-131(1), (3) (emphasis added). Such a monetary award, which falls in a section authorizing only equitable relief, seeks only to restore the status quo. Or take Section 30-14-142(1)—the subsection directly before the provision Montana seeks penalties under. In that section, a penalty of "not more than $10,000 for each violation" can be imposed on "a person who violates the terms of an injunction or temporary restraining order issued under 30-14-111." *Id.* § 30-14-142(1). And while both Sections 30-141-131 and 30-14-142(1) have the hallmarks of equitable monetary penalties, Section 30-14-142(2) does not.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Montana's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Montana's DTPA laws.

*Nevada*

Nevada argues that Google violated the "Nevada Deceptive Trade Practices Act (NDTPA)." (Dkt. #834 at 89). The FAC alleges five violations of the NDTPA:

> NRS 598.0915(5), a person engages in a deceptive trade practice by representing that services have characteristics, ingredients, uses, benefits, alterations or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he does not have;

> NRS 598.0915(7), a person engages in a deceptive trade practice by representing that services are of a particular standard, quality, or grade, if they are of another standard, quality or grade;

> NRS 598.0915(9), a person engages in a deceptive trade practice by advertising goods or services with the intent not to sell them as advertised;

> NRS 598.092(8), a person engages in a deceptive trade practice by misrepresenting the legal rights, obligations or remedies of a party to a transaction; and

> NRS 598.0923(1)(b), a person engages in a deceptive trade practice by failing to disclose a material fact in connection with the sale of goods or services.

(FAC ¶ 729(a)–(e)). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, Nevada seeks both injunctive relief and civil penalties. (Dkt. #834 at 90) (citing (FAC ¶ 731)). It seeks injunctive relief pursuant to Nev. Rev. Stat. § 598.0963(3), which authorizes the Nevada Attorney General "to obtain a temporary restraining order, a preliminary or permanent injunction, or other

appropriate relief, including, without limitation, the recovery of a civil penalty, disgorgement, restitution or the recovery of damages." (Dkt. #834 at 90). It also seeks civil penalties separately under Section 598.0999(2), "which authorizes Nevada to 'recover a civil penalty not to exceed $15,000 for each violation'" for willful violations. (Dkt. #834 at 90). All recovered penalties "must be deposited in Nevada's Consumer Protection Administrative Account and need not be returned to the victims." (Dkt. #834 at 90) (quoting Nev. Rev. Stat. § 598.0975(1)(a)).

The States concede that Nevada is not entitled to a jury trial on equitable relief. (Dkt. #834 at 90). But they argue that Nevada is entitled to a jury trial on civil penalties because they are "punitive and legal, not restitutionary and equitable." (Dkt. #834 at 91). Google counters that, because "the penalty remedies" sought by Nevada "are *not* standalone remedies, under *Gwaltney* they are intertwined with equitable relief," which Google maintains is confirmed by Nevada's sole claim in this case—an action for "injunctive relief under section 598.0963[.]" (Dkt. #835 at 74). According to Google, the civil remedies Nevada seeks are thus incidental to and intertwined with Nevada's request for injunctive relief. (Dkt. #835 at 74–75).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 598.0999(2) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Nevada's statutes (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $15,000 per

violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Nevada do not negate the right to a jury trial on the State's civil-penalty claims. Nevada's statutory scheme separately provides for equitable relief and legal relief,[37] and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for the same three deficiencies). Thus, Nevada may obtain civil penalties without receiving injunctive relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Nevada's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In short, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Nevada's DTPA laws.

---

[37] *Compare* Nev. Rev. Stat. § 598.0963(3) (equitable) *with id.* § 598.0999(2) (legal).

*North Dakota*

North Dakota argues that Google violated multiple provisions of the "North Dakota Unlawful Sales or Advertising Practices Act (NDUSAP), N.D. Cent. Code § 51-15-01 *et seq.*" (Dkt. #834 at 95). In particular, North Dakota claims that Google (1) "engaged in unlawful practices, in violation of N.D.C.C. § 51-15-02, by using or employing deceptive acts or practices, false pretense, false promise, or misrepresentations in connection with the sale or advertisement of merchandise, including in connection with each of its roles within the ad tech stack," and (2) "engaged in deceptive acts or practices, false pretense, false promise, or misrepresentations with the intent that others rely thereon and is liable for engaging in unlawful practices, pursuant to N.D.C.C. § 51-15-02[.]" (FAC ¶¶ 736–37). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, "North Dakota seeks both injunctive relief and civil penalties." (Dkt. #834 at 95) (citing (FAC ¶ 772(c)–(g)). It requests equitable relief under N.D. Cent. Code § 51-15-07, "which authorizes the North Dakota Attorney General to 'obtain . . . an injunction prohibiting . . . the unlawful practice,' as well as 'to restore to any person in interest any money, or property that may have been acquired by means of any practice in this chapter.'" (Dkt. #834 at 96). Separately, Section 51-15-11 authorizes civil penalties "of not more than five thousand dollars for each violation." N.D. Cent. Code § 51-15-11. These penalties are recovered "for the benefit of the state." *Id.*

The States concede that North Dakota is not entitled to a jury trial on equitable relief. (Dkt. #834 at 96). But they argue that North Dakota is entitled to a jury trial on civil penalties because they are meant to "deter and punish," are authorized under a separate statutory section than the equitable relief, and are not recouped for the benefit of specific victims. (Dkt. #834 at 96). Google counters that, because the civil penalties here are only recoverable "in addition to those remedies otherwise provided by th[e] chapter," and because the action here seeks an injunction under Section 51-15-07, "any civil penalties are 'incidental to' and 'intertwined with' injunctive relief." (Dkt. #835 at 75–76) (quoting *Gwaltney*, 484 U.S. at 59).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 51-15-11 sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by North Dakota's statute (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for financial penalties of up to $5,000 per violation. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by North Dakota do not negate the right to a jury trial on the State's civil-penalty claims. North Dakota's statutory scheme separately provides for equitable relief and legal relief,[38] and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief.

---

[38] *Compare* N.D. Cent. Code § 51-15-07 (equitable) *with id.* § 51-15-11 (legal).

Like Texas's statutory scheme, North Dakota's scheme presents a different situation than the one at issue in the *Adams* and *Golden* cases relied upon by Google. Specifically, North Dakota's DTPA law allows it to receive a substantial civil penalty separate from injunctive relief, and without any requirement that injunctive relief be obtained as a prerequisite for a civil penalty to be awarded. Contrary to Google's suggestion, the statute does not render a civil-penalty incidental to or intertwined with equitable relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that North Dakota's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In sum, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of North Dakota's DTPA laws.

*South Carolina*

As the Court explained above, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of South Carolina's DTPA laws. *See supra* Part III.C.2.

*Utah*

Utah argues that Google violated the "the Utah Consumer Sales Practices Act (UCSPA), Utah Code Ann. § 13-11-1 *et seq.*" (Dkt. #834 at 114). The UCSPA prohibits "[a] deceptive act or practice by a supplier." Utah Code Ann. § 13-11-4; *see also* (FAC ¶ 756). The closest historical analogs to these claims are common-law-fraud actions or actions in debt, which would have been brought in a court of law. *See supra* Part III.C.2.

Under its DTPA laws, "Utah seeks both injunctive relief and civil penalties." (Dkt. #834 at 114) (citing (FAC ¶¶ 758, 776(a)–(c))). Utah's requested equitable relief flows from Utah Code Ann. § 13-11-17(1)(a) (declaratory relief) and from Utah Code Ann. § 13-11-17(1)(b) (injunctive relief). It seeks civil penalties under Section 13-11-17(1)(e), which allows the State to "obtain a fine in an amount [to be] determined after considering the factors in Subsection (6)." The relevant factors are as follows:

> (a) the seriousness, nature, circumstances, extent, and persistence of the conduct constituting the violation;
>
> (b) the harm to other persons resulting either directly or indirectly from the violation;
>
> (c) cooperation by the supplier in an inquiry or investigation conducted by the division concerning the violation;
>
> (d) efforts by the supplier to prevent occurrences of the violation;
>
> (e) efforts by the supplier to mitigate the harm caused by the violation, including a reimbursement made to a consumer injured by the act of the supplier;
>
> (f) the history of previous violations by the supplier;
>
> (g) the need to deter the supplier or other suppliers from committing the violation in the future; and
>
> . . .

(i) other matters as justice may require.

Utah Code Ann. § 13-11-17(6). All civil penalties recovered are "'deposited in the Consumer Protection Education and Training Fund,' Utah Code Ann. § 13-11-17(4)(b), rather than distributed to any specific victims." (Dkt. #834 at 115).

The States concede that Utah is not entitled to a jury trial on equitable relief. (Dkt. #834 at 114). But they argue that Utah is entitled to a jury trial on civil penalties because they are meant "to deter and punish." (Dkt. #834 at 115). Google counters that, because the civil penalties here are provided in the same subsection, their statutory proximity "'suggests a connection between injunctive relief and civil penalties' and 'supports' a conclusion that civil penalties may be sought 'only in a suit brought to enjoin or otherwise abate on ongoing violation.'" (Dkt. #835 at 76) (citing *Gwaltney*, 484 U.S. at 58–59).

The Court agrees with the States. Like the penalties in *Tull*, the civil penalties authorized under Section 13-11-17(1)(d) sound in punishment, not restitution. *See Tull*, 481 U.S. at 422. The penalties authorized by Utah's statutes: (1) are not tied to profits for the alleged violation; (2) are paid to the State, not to the victims; and (3) seek to deter behavior by providing for an uncapped financial penalty based on the violator's level of guilt. *See id.* at 422–23 (reviewing similar factors and finding that the right to a jury trial remained intact); *Jarkesy,* 603 U.S. at 118, 124–25 (same).

As to intertwinement, the equitable remedies sought by Utah do not negate the right to a jury trial on the State's civil-penalty claims. Utah's statutory scheme

135

separately provides for equitable relief and legal relief,[39] and the authorization to seek civil penalties does not require that the State obtain injunctive or other equitable relief. *See Tull*, 481 U.S. at 424–25 (rejecting a similar intertwinement argument for similar deficiencies). Thus, Utah may obtain civil penalties without receiving injunctive relief.

This result is consistent with the Supreme Court's admonition in *Beacon Theatres*: The right to jury trial on a legal claim cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action[.]" 359 U.S. at 510; *see also Dairy Queen*, 369 U.S. at 473 (confirming that the holding of *Beacon Theatres* "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not"). Thus, even if the Court were to find that Utah's civil-penalty claims were incidental to injunctive relief, they would still be subject to a jury trial.

In short, the historical analogs, requested remedies, and lack of intertwinement all support the States' right to a jury trial on Google's alleged violations of Utah's DTPA laws.

---

[39] *Compare* Utah Code Ann. § 13-11-17(1)(b) (equitable) *with id.* § 13-11-17(1)(e) (legal).

**E. Quantum of Civil Penalties**

Having addressed the issue of which States are entitled to a jury trial on Google's liability for civil-penalty claims asserted under the States' state-antitrust and DTPA laws, the Court now considers whether the States also have a Seventh Amendment right to have a jury assess the quantum of damages if Google is found liable on any civil-penalty claim. The Court concludes that *Tull* resolves this issue and requires the Court, rather than a jury, to assess the quantum of civil penalties if Google is found liable on the States' civil-penalty claims.

*Tull* makes clear that the assessment of the quantum of civil penalties does not enjoy the right to a jury trial. The Supreme Court began its analysis of this issue by observing that "[t]he Seventh Amendment is silent on the question whether a jury must determine the remedy in a trial in which it must determine liability." *Tull*, 481 U.S. at 425–26. In the *Tull* Court's view, the answer to the question "must depend on whether the jury must shoulder this responsibility as necessary to preserve the substance of the common-law right of trial by jury." *Id*. at 426 (citation modified). The Court concluded that the answer was "no." *Id*. ("Is a jury role necessary for that purpose? We do not think so."). The Court reasoned that the Seventh Amendment jury-trial right protects "[o]nly those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury" and that "[t]he

assessment of a civil penalty is not one of the 'most fundamental elements.'" *Id*.[40] The Court then underscored the point, stating that "[t]he assessment of civil penalties thus cannot be said to involve the 'substance of a common-law right to a trial by jury,' nor a 'fundamental element of a jury trial.'" *Id*.

Based on these conclusions, the Court held as follows: "We therefore *hold* that a determination of a civil penalty is not an essential function of a jury trial, and that the Seventh Amendment does not require a jury trial for that purpose in a civil action." *Id*. at 427 (emphasis added). This holding has been understood by lower courts across the country to require the court, not the jury, to assess the quantum of damages for civil-penalty claims.[41] The States have not identified any lower court that has reached a different conclusion, and the Court is unaware of any.

The States believe the Court is not bound by this holding of *Tull*. Their primary argument turns on a footnote in *Feltner v. Columbia Pictures Television, Inc.*, in which the Supreme Court states that the portion of *Tull* finding that "Congress could constitutionally authorize trial judges to assess the amount of the civil penalties" was "arguably dicta." 523 U.S. 340, 354 & n.8, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998). The States suggest that this Court should make the next inferential leap—so to

---

[40] *See also id*. (quoting *Galloway v. United States*, 319 U.S. 372, 392, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943) ("[T]he Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements.")).

[41] *See, e.g., PLH Vineyard Sky LLC v. Vt. Pub. Util. Comm'n*, No. 2:23-CV-154, 2024 WL 1072017, at *12 (D. Vt. Mar. 12, 2024) (applying *Tull* to find that there is no right to a jury trial on the quantum of civil penalties); *SEC v. Spartan Sec. Grp.*, No. 8:19-CV-448, 2021 WL 2139053, at *1–2 (M.D. Fla. May 26, 2021) (same); *Nat. Res. Def. Couns. v. Ill. Power Res., LLC*, No. 13-CV-1181, 2017 WL 3037434, at *3 (C.D. Ill. July 18, 2017) (same).

speak—and decide that this portion of *Tull* is, in fact, dicta, and therefore need not be followed. But the problem for lower courts, of course, is that a Supreme Court holding that is "arguably dicta" is also "arguably *not* dicta." Is it the role of a district court to seize on this language from *Feltner* and decline to follow what has been considered binding Supreme Court precedent? That feels a lot like an inferior court straying "out of its lane."

The Court finds the Supreme Court's admonition in *Agostini v. Felton* to be instructive here: "We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls[.]'" 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quotation omitted). Although the circumstances of *Agostini* are not identical to those presented here, the underlying principle applies: It remains the sole prerogative of the Supreme Court to overrule its own past decisions, and lower courts—particularly trial courts—must carefully avoid exceeding their authority in such situations. Unless and until *Tull*'s holding on the right to jury trial for the assessment of the quantum of penalties is overruled or otherwise set aside by the Supreme Court, it remains binding precedent and mandates that the quantum of civil penalties be decided by courts, not juries. *Id.*[42]

---

[42] Because the Court finds that *Tull* precludes the quantum of civil penalties here from being decided by a jury, the Court need not reach, and therefore does not evaluate, whether the Court should strike the jury demand for violating the Excessive Fines Clause. (Dkt. #690 at 9, 22–23). The Court also exercises its discretion to decline to empanel an advisory jury to decide the civil penalties. (Dkt. #753 at 16).

## IV. CONCLUSION

Google's Motion to Strike Plaintiffs' Jury Demand for All Claims and Civil Penalties, (Dkt. #690), is **GRANTED IN PART** and **DENIED IN PART**. It is therefore **ORDERED** that the jury demand for the States' (1) federal-antitrust violations (counts I–IV); (2) state-antitrust violations for Arkansas, Idaho, Indiana, Missouri, and Puerto Rico (counts V.3, V.5, V.6, V.10, V.14); and (3) DTPA violations for Puerto Rico and South Dakota (counts VI.14, VI.16) are **STRICKEN**.

It is further **ORDERED** that the States' jury demands for the quantum of civil penalties owed, if any, for Google's alleged state-antitrust and DTPA claims (counts V, VI) are **STRICKEN.**

Google's motion is otherwise **DENIED.**

**So ORDERED and SIGNED this 18th day of June, 2025.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

# Appendix 1

| State | Relief Requested on Antitrust Claims | Relief Requested on DTPA Claims |
|---|---|---|
| Notation | **E**: Equitable relief | **L**: Legal relief |
| **Alaska** | **E**: injunction, disgorgement, restitution, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, disgorgement, restitution, costs and attorney's fees<br>**L**: civil penalties |
| **Arkansas** | **E**: injunction, disgorgement, costs and attorney's fees<br>**L**: civil penalties | **E**: costs and attorney's fees<br>**L**: civil penalties |
| **Florida** | **E**: injunction, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, disgorgement, restitution, costs and attorney's fees<br>**L**: civil penalties, damages |
| **Idaho** | **E**: injunction, disgorgement, costs and attorney's fees, declaratory relief<br>**L**: civil penalties | **E**: injunction, disgorgement, restitution, costs and attorney's fees, declaratory relief<br>**L**: civil penalties |
| **Indiana** | **E**: injunction, costs and attorney's fees | **E**: disgorgement, restitution, injunction, costs<br>**L**: civil penalties |
| **Kentucky** | **E**: disgorgement, injunction, costs and attorney's fees<br>**L**: civil penalties | **E**: disgorgement, injunction, costs and attorney's fees<br>**L**: civil penalties |
| **Louisiana** | **E**: injunction, restitution, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, restitution, costs and attorney's fees, declaratory relief<br>**L**: civil penalties, damages |
| **Mississippi** | **E**: injunction, restitution, disgorgement, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, restitution, disgorgement, costs and attorney's fees<br>**L**: civil penalties |
| **Missouri** | **E**: injunction | **E**: injunction, restitution, attorney's fees and costs<br>**L**: civil penalties |
| **Montana** | **E**: injunction, costs and attorney's fees, structural relief<br>**L**: civil penalties | **E**: injunction, restitution, costs and attorney's fees<br>**L**: civil penalties |
| **Nevada** | **E**: disgorgement, injunction, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, restitution, costs and attorney's fees<br>**L**: civil penalties |
| **North Dakota** | **E**: injunction, disgorgement, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, attorney's fees<br>**L**: civil penalties |
| **Puerto Rico** | **E**: injunction, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, costs and attorney's fees<br>**L**: civil penalties |
| **South Carolina** | **E**: injunction, costs, attorney's fees<br>**L**: civil penalties | **E**: injunction, costs and attorney's fees<br>**L**: civil penalties |
| **South Dakota** | **E**: injunction, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, attorney's fees<br>**L**: civil penalties |
| **Texas** | **E**: injunction, disgorgement, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, disgorgement, costs and attorney's fees<br>**L**: civil penalties |
| **Utah** | **E**: injunction, disgorgement, costs and attorney's fees<br>**L**: civil penalties | **E**: injunction, declaratory relief, attorney's fees<br>**L**: civil penalties, damages |

# Appendix 2

TABLE OF CONTENTS

Alaska .................................................................................................. 7

   I. Relevant Antitrust Statutes ................................................................ 7

      A. Substantive Provisions ................................................................ 7

      B. Remedial Provisions .................................................................. 7

   II. Relevant DTPA Statutes .................................................................. 7

      A. Substantive Provisions ................................................................ 7

      B. Remedial Provisions .................................................................. 8

ARKANSAS ............................................................................................ 9

   I. Relevant Antitrust Statutes ................................................................ 9

      A. Substantive Provisions ................................................................ 9

      B. Remedial Provisions .................................................................. 9

   II. Relevant DTPA Statutes .................................................................. 10

      A. Substantive Provisions ................................................................ 10

      B. Remedial Provisions .................................................................. 11

FLORIDA .............................................................................................. 12

   I. Relevant Antitrust Statutes ................................................................ 12

      A. Substantive Provisions ................................................................ 12

      B. Remedial Provisions .................................................................. 12

   II. Relevant DTPA Statutes .................................................................. 13

      A. Substantive Provisions ................................................................ 13

      B. Remedial Provisions .................................................................. 13

IDAHO ................................................................................................. 14

   I. Relevant Antitrust Statutes ................................................................ 14

      A. Substantive Provisions ................................................................ 14

B. Remedial Provisions.................................................................. 14

II. Relevant DTPA Statutes .......................................................... 15

   A. Substantive Provisions ......................................................... 15

   B. Remedial Provisions ............................................................. 16

**INDIANA** ......................................................................................... **17**

   I. Relevant DTPA Statutes ........................................................ 17

   A. Substantive Provisions ......................................................... 17

   B. Remedial Provisions ............................................................. 17

**KENTUCKY** ..................................................................................... **18**

   I. Relevant Antitrust Statutes .................................................... 18

   A. Substantive Provisions ......................................................... 18

   B. Remedial Provisions ............................................................. 18

   II. Relevant DTPA Claims ........................................................ 18

   A. Substantive Provisions ......................................................... 18

   B. Remedial Provisions ............................................................. 18

**LOUISIANA** ..................................................................................... **20**

   I. Relevant Antitrust Statutes .................................................... 20

   A. Substantive Provisions ......................................................... 20

   B. Remedial Provisions ............................................................. 20

   II. Relevant DTPA Statutes ....................................................... 21

   A. Substantive Provisions ......................................................... 21

   B. Remedial Provisions ............................................................. 21

**MISSISSIPPI** .................................................................................... **23**

   I. Relevant Antitrust Statutes .................................................... 23

   A. Substantive Provisions ......................................................... 23

B. Remedial Provisions...........................................................................23

II. Relevant DTPA Statutes.....................................................................25

A. Substantive Provisions ......................................................................25

B. Remedial Provisions...........................................................................25

**MISSOURI** ..................................................................................................**27**

I. Relevant DTPA Statutes .....................................................................27

A. Substantive Provisions ......................................................................27

B. Remedial Provisions...........................................................................27

**MONTANA** ..................................................................................................**29**

I. Relevant Antitrust Statutes ................................................................29

A. Substantive Provisions ......................................................................29

B. Remedial Provisions...........................................................................29

II. Relevant DTPA Statutes.....................................................................29

A. Substantive Provisions ......................................................................29

B. Remedial Provisions...........................................................................29

**NEVADA** ......................................................................................................**31**

I. Relevant Antitrust Statues ..................................................................31

A. Substantive Provisions ......................................................................31

B. Remedial Provisions...........................................................................31

II. Relevant DTPA Claims .......................................................................31

A. Substantive Provisions ......................................................................31

B. Remedial Provisions...........................................................................32

**NORTH DAKOTA** ......................................................................................**34**

I. Relevant Antitrust Claims ...................................................................34

A. Substantive Provisions ......................................................................34

B. Remedial Provisions ................................................................................ 34

II. Relevant DTPA Statutes ........................................................................ 34

A. Substantive Provisions ......................................................................... 34

B. Remedial Provisions ............................................................................. 34

**PUERTO RICO** ................................................................................................ 36

I. Relevant Antitrust/DTPA Statutes ......................................................... 36

A. Substantive Provisions ......................................................................... 36

B. Remedial Provisions ............................................................................. 36

**SOUTH CAROLINA** ...................................................................................... 38

I. Relevant Antitrust/DTPA Statutes ......................................................... 38

A. Substantive Provisions ......................................................................... 38

B. Remedial Provisions ............................................................................. 38

**SOUTH DAKOTA** ........................................................................................... 39

I. Relevant Antitrust Statutes ..................................................................... 39

A. Substantive Provisions ......................................................................... 39

B. Remedial Provisions ............................................................................. 39

II. Relevant DTPA Statutes ........................................................................ 39

A. Substantive Provisions ......................................................................... 39

B. Remedial Provisions ............................................................................. 39

**TEXAS** .............................................................................................................. 41

I. Relevant Antitrust Statutes ..................................................................... 41

A. Substantive Provisions ......................................................................... 41

B. Remedial Provisions ............................................................................. 41

II. Relevant DTPA Statutes ........................................................................ 42

A. Substantive Provisions ......................................................................... 42

B. Remedial Provisions ................................................................................ 43

**UTAH** ................................................................................................................ **44**

I. Relevant Antitrust Statutes ................................................................................ 44

A. Substantive Provisions ................................................................................ 44

B. Remedial Provisions ................................................................................ 44

II. Relevant DTPA Statutes ................................................................................ 44

A. Substantive Provisions ................................................................................ 44

B. Remedial Provisions ................................................................................ 45

ALASKA

## I. Relevant Antitrust Statutes

### A. Substantive Provisions

- Alaska Stat. § 45.50.562. Combinations in restraint of trade unlawful: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is unlawful.

- Alaska Stat. § 45.50.564. Monopolies and attempted monopolies unlawful: It is unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire with another person to monopolize any part of trade or commerce.

### B. Remedial Provisions

- Alaska Stat. § 45.50.580(a). Injunction by attorney general: (a) In addition to any other relief provided by AS 45.50.562–45.50.596, the attorney general may bring an action to enjoin a violation of AS 45.50.562–45.50.596. This action may be brought as a sole action or in conjunction with another action that the attorney general is authorized to bring.

- Alaska Stat. § 45.50.580(b). Injunction by attorney general: (b) The court may make additional orders or judgments as may be necessary to restore to a person in interest any money or property, real or personal, that may have been acquired by an act prohibited by AS 45.50.562–45.50.596, and as may be necessary to prevent continuing or future violations of AS 45.50.562–45.50.596.

- Alaska Stat. § 45.50.578(b). Criminal and civil penalties: (b) In addition to any other relief available, the attorney general may bring a civil action against a person who violates AS 45.50.562, 45.50.564, 45.50.568, or 45.50.570, or an injunction issued under AS 45.50.580, for a civil penalty of not more than

  (1) $1,000,000 if the person is a natural person;

  (2) $50,000,000 if the person is not a natural person.

## II. Relevant DTPA Statutes

## A. Substantive Provisions

- Alaska Stat. § 45.50.471(a). Unlawful acts and practices: (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful.

- Alaska Stat. § 45.50.471(b)(10)–(11). Unlawful acts and practices: (b) The terms "unfair methods of competition" and "unfair or deceptive acts or practices" include the following acts:

  . . .

  (10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

7

(11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer or a competitor in connection with the sale or advertisement of goods or services;

## B. Remedial Provisions

- Alaska Stat. § 45.50.501(a)–(b). Restraining prohibited acts:

  (a) When the attorney general has reason to believe that a person has used, is using, or is about to use an act or practice declared unlawful in AS 45.50.471, and that proceedings would be in the public interest, the attorney general may bring an action in the name of the state against the person to restrain by injunction the use of the act or practice. The action may be brought in the superior court in the judicial district in which the person resides or is doing business or has the person's principal place of business in the state, or, with the consent of the parties, in any other judicial district in the state.

  (b) The court may make additional orders or judgments that are necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of an act or practice declared to be unlawful by AS 45.50.471.

- Alaska Stat. § 45.50.551(b). Civil penalties: (b) In an action brought under AS 45.50.501, if the court finds that a person is using or has used an act or practice declared unlawful by AS 45.50.471, the attorney general, upon petition to the court, may recover, on behalf of the state, a civil penalty of not less than $1,000 and not more than $25,000 for each violation.

8

## ARKANSAS

## I. Relevant Antitrust Statutes

## A. Substantive Provisions

- Ark. Code Ann. § 4-75-301. Definition: As used in this subchapter, unless the context otherwise requires, "monopoly" means any union or combination or consolidation or affiliation of capital, credit, property, assets, trade, customs, skill, or acts of any other valuable thing or possession, by or between persons, firms, or corporations, or association of persons, firms, or corporations, whereby any one (1) of the purposes or objects mentioned in this subchapter is accomplished or sought to be accomplished, or whereby any one (1) or more of the purposes are promoted or attempted to be executed or carried out, or whereby the several results described herein are reasonably calculated to be produced[.]

- Ark. Code Ann. § 4-75-302. Illegality: A monopoly, as defined in § 4-75-301, is declared to be unlawful and against public policy, and any and all persons, firms, corporations, or association of persons engaged therein shall be deemed and adjudged to be guilty of a conspiracy to defraud and shall be subject to the penalties prescribed in this subchapter.

## B. Remedial Provisions

- Ark. Code Ann. § 4-75-315(a). Civil actions and settlements by the Attorney General: (a) In addition to the other remedies provided in this subchapter, whenever the Attorney General has reason to believe that any person is engaging, has engaged, or is about to engage in any act or practice declared unlawful by this subchapter, the Attorney General may bring an action in the name of the state against that person:

  (1) To obtain a declaratory judgment that the act or practice violates the provisions of this subchapter;

  (2) To enjoin any act or practice that violates the provisions of this subchapter by issuance of a temporary restraining order or preliminary or permanent injunction, without bond, upon the giving of appropriate notice;

  (3) To recover on behalf of the state and its agencies actual damages or restitution for loss incurred either directly or indirectly; and

  (4) To recover civil penalties of up to one thousand dollars ($1,000) per violation of this subchapter, or any injunction, judgment, or consent order issued or entered into under the provisions of this subchapter and reasonable expenses, investigative costs, and attorney's fees.

- Ark. Code Ann. § 4-75-315(b). Civil actions and settlements by the Attorney General: (b) The Attorney General also may bring a civil action in the name of

9

the state, as parens patriae on behalf of natural persons residing in this state, to secure monetary relief as provided under this section for injury, directly or indirectly sustained by those persons because of any violation of this subchapter, in accordance with the following provisions:

> (1) The court in which the action is commenced shall award the Attorney General as monetary relief the actual damages sustained or restitution for loss incurred as a result of the violations of this subchapter and the cost of suit, including a reasonable attorney's fee. The court shall exclude from the amount of monetary relief awarded in the action any amount which duplicates amounts that have been awarded for the same injury already or which are allocable to persons who have excluded their claims under subdivision (b)(3)(A) of this section;

## II. Relevant DTPA Statutes

## A. Substantive Provisions

- Ark. Code Ann. § 4-88-107. Deceptive and unconscionable trade practices:
  (a) Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following:

  > (1) Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;

  > (2) Disparaging the goods, services, or business of another by false or misleading representation of fact;

  > (3) Advertising the goods or services with the intent not to sell them as advertised;

  > . . .

  > (10) Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade;

  > . . .

  > (12) Knowingly facilitating, assisting, intermediating, or in any way aiding the operation or continuance of an act or practice that is in violation of this chapter.

  (b) The deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.

- Ark. Code Ann. § 4-88-108. Concealment, suppression, or omission of material facts: (a) When utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, the following is unlawful:

(1) The act, use, or employment by a person of any deception, fraud, or false pretense;

(2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission;

(3) Displaying or causing to be displayed a fictitious or misleading name or telephone number on an Arkansas resident's caller identification service; or

(4) Using a third party to display or cause to be displayed a fictitious or misleading name or telephone number on an Arkansas resident's caller identification service.

(b) Subdivision (a)(3) of this section does not apply to the transmission of a caller identification service by a telecommunications provider that complies with § 23-17-122.

## B. Remedial Provisions

- <u>Ark. Code Ann. § 4-88-113(a)(1). Civil enforcement and remedies–Suspension or forfeiture of charter, franchise, etc.</u>: (a) In any proceeding brought by the Attorney General for civil enforcement of the provisions of this chapter, prohibiting unlawful practices as defined in this chapter, the circuit court may make such orders or judgments as may be necessary to:

    (1) Prevent the use or employment by such person of any prohibited practices;

- <u>Ark. Code Ann. § 4-88-113(a)(3). Civil enforcement and remedies–Suspension or forfeiture of charter, franchise, etc.</u>: (a)(3) Assess penalties to be paid to the state, not to exceed ten thousand dollars ($10,000) per violation, against persons found to have violated this chapter.

## FLORIDA

### I. Relevant Antitrust Statutes

### A. Substantive Provisions

- Fla. Stat. Ann. § 542.19. Monopolization; attempts, combinations, or conspiracies to monopolize: It is unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state.

### B. Remedial Provisions

- Fla. Stat. Ann. § 542.23. Equitable remedies: In addition to other remedies provided by this chapter, any person shall be entitled to sue for and have injunctive or other equitable relief in the circuit courts of this state against threatened loss or damage by a violation of this chapter. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to the plaintiff.

- Fla. Stat. Ann. § 542.21. Penalties for violation: (1) Any natural person who violates any of the provisions of s. 542.18 or s. 542.19 shall be subject to a civil penalty of not more than $100,000. Any other person who violates any of the provisions of s. 542.18 or s. 542.19 shall be subject to a civil penalty of not more than $1 million.

  (2) Any person who knowingly violates any of the provisions of s. 542.18 or s. 542.19, or who knowingly aids in or advises such violation, is guilty of a felony, punishable by a fine not exceeding $1 million if a corporation, or, if any other person, $100,000 or imprisonment not exceeding 3 years, or by both said punishments.

  (3) The commencement of trial seeking civil penalties in any action under this section shall bar any subsequent criminal prosecution against the same person for violation of s. 542.18 or s. 542.19, based upon the same acts. The commencement of trial in a criminal prosecution for violation of s. 542.18 or s. 542.19 shall bar any subsequent action against the same person for recovery of civil penalties under this section based upon the same acts, but shall not bar a subsequent suit for damages or injunctive relief under ss. 542.22 and 542.23.

  (4) No action under this section or s. 542.23 shall be commenced by the Attorney General against any person who, at the time, is a defendant in a suit filed by the United States for violation or alleged violation of the federal antitrust laws involving substantially the same subject matter and seeking substantially the same relief.

## II. Relevant DTPA Statutes

### A. Substantive Provisions

- <u>Fla. Stat. Ann. § 501.204. Unlawful acts and practices</u>: (1) Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

  (2) It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017.

### B. Remedial Provisions

- <u>Fla. Stat. Ann. § 501.207(1). Remedies of enforcing authority</u>: (1) The enforcing authority may bring:

  (a) An action to obtain a declaratory judgment that an act or practice violates this part.

  (b) An action to enjoin any person who has violated, is violating, or is otherwise likely to violate, this part.

  (c) An action on behalf of one or more consumers or governmental entities for the actual damages caused by an act or practice in violation of this part. However, damages are not recoverable under this section against a retailer who has in good faith engaged in the dissemination of claims of a manufacturer or wholesaler without actual knowledge that it violated this part.

- <u>Fla. Stat. Ann. § 501.2075. Civil penalty</u>: Except as provided in s. 501.2077, any person, firm, corporation, association, or entity, or any agent or employee of the foregoing, who is willfully using, or has willfully used, a method, act, or practice declared unlawful under s. 501.204, or who is willfully violating any of the rules of the department adopted under this part, is liable for a civil penalty of not more than $10,000 for each such violation. . . . This civil penalty may be recovered in any action brought under this part by the enforcing authority; or the enforcing authority may terminate any investigation or action upon agreement by the person, firm, corporation, association, or entity, or the agent or employee of the foregoing, to pay a stipulated civil penalty. . . . If civil penalties are assessed in any litigation, the enforcing authority is entitled to reasonable attorney's fees and costs. A civil penalty so collected shall accrue to the state and shall be deposited as received into the General Revenue Fund unallocated.

13

# Idaho

## I. Relevant Antitrust Statutes

## A. Substantive Provisions

- <u>Idaho Code § 48-105. Monopolies</u>: It is unlawful to monopolize, attempt to monopolize, or combine or conspire to monopolize any line of Idaho commerce.

## B. Remedial Provisions

- <u>Idaho Code § 48-112. Additional relief of district court authorized</u>: When the state prevails in any action brought under section 48-108, Idaho Code, the court shall award reasonable costs and attorney's fees to the attorney general. In addition, the court may:

  (1) Make orders or judgments as necessary to prevent the use or employment by a person of any act or practice declared unlawful by this act;

  (2) Make orders or judgments as necessary to compensate persons for damages sustained or to provide for restitution to persons of money, property or other things received from persons in connection with a violation of this chapter;

  (3) Appoint a receiver to oversee assets or order sequestration of assets whenever it appears that the defendant threatens or is about to remove, conceal or dispose of property to the damage of persons to whom restoration would be made under this section and assess the expenses of a master, receiver or escrow agent against the defendant; and

  (4) Grant other appropriate relief.

- <u>Idaho Code § 48-108(2). Civil actions and settlements by the attorney general</u>: (2) The attorney general also may bring a civil action in the name of the state, as parens patriae on behalf of persons residing in this state, to secure monetary relief as provided under this chapter for injury directly or indirectly sustained by those persons because of any violation of section 48-104 or 48-105, Idaho Code, in accordance with the following provisions:

  (a) The district court shall award the attorney general as monetary relief the total damages sustained for violations of section 48-104 or 48-105, Idaho Code, and the cost of suit, including a reasonable attorney's fee. The court shall increase any damage recovery to an amount not in excess of three (3) times the damages sustained if the court finds that the violation at issue constituted a per se violation of section 48-104, Idaho Code, or an intentional violation of section 48-105, Idaho Code. The court shall exclude from the amount of monetary relief awarded in such action any amount which duplicates amounts which have been awarded

14

for the same injury already or which are allocable to persons who have excluded their claims pursuant to subsection (2)(c) of this section.

## II. Relevant DTPA Statutes

## A. Substantive Provisions

- <u>Idaho Code § 48-603 (5), (7), (9), (17). Unfair methods and practices</u>: The following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past, or is:

    . . .

    (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;

    . . .

    (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

    . . .

    (9) Advertising goods or services with intent not to sell them as advertised;

    . . .

    (17) Engaging in any act or practice that is otherwise misleading, false, or deceptive to the consumer;

- <u>Idaho Admin. Code r. 04.02.01.030. General Rule (Rule 30)</u>: It is an unfair and deceptive act or practice for a seller to make any claim or representation concerning goods or services which directly, or by implication, has the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances. An omission of a material or relevant fact shall be treated with the same effect as a false, misleading, or deceptive claim or representation, when such omission, on the basis of what has been stated or implied, would have the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances. With reference to goods or services, this prohibition includes, but is not limited to, factors relating to the cost, construction, durability, reliability, manner or time of performance, safety, strength, condition, life expectancy, ease of operation, problems associated with repair or maintenance, availability, or the benefit to be derived from the use of the goods or services.

**B. Remedial Provisions**

- <u>Idaho Code § 48-606(1)(a–f). Proceedings by attorney general</u>: (1) Whenever the attorney general has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by this chapter to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the state against such person:

   (a) To obtain a declaratory judgment that a method, act or practice violates the provisions of this chapter;

   (b) To enjoin any method, act or practice that violates the provisions of this chapter by issuance of a temporary restraining order or preliminary or permanent injunction, upon the giving of appropriate notice to that person as provided by the Idaho rules of civil procedure;

   (c) To recover on behalf of consumers actual damages or restitution of money, property or other things received from such consumers in connection with a violation of the provisions of this chapter;

   (d) To order specific performance by the violator;

   (e) To recover from the alleged violator civil penalties of up to five thousand dollars ($5,000) per violation for violation of the provisions of this chapter; and

   (f) To recover from the alleged violator reasonable expenses, investigative costs and attorney's fees incurred by the attorney general.

## INDIANA

## I. Relevant DTPA Statutes

### A. Substantive Provisions

- <u>Ind. Code § 24-5-0.5-3(a). Deceptive acts</u>: (a) A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

### B. Remedial Provisions

- <u>Ind. Code § 24-5-0.5-4(c)(1)–(2). Actions and proceedings; damages; injunctions; civil penalties; offers to cure</u>: (c) The attorney general may bring an action to enjoin a deceptive act, including a deceptive act described in section 3(b)(20) of this chapter, notwithstanding subsections (a) and (b). However, the attorney general may seek to enjoin patterns of incurable deceptive acts with respect to consumer transactions in real property. In addition, the court may:

  > (1) issue an injunction;

  > (2) order the supplier to make payment of the money unlawfully received from the aggrieved consumers to be held in escrow for distribution to aggrieved consumers;

- <u>Ind. Code § 24-5-0.5-4(f)–(g). Actions and proceedings; damages; injunctions; civil penalties; offers to cure</u>: (f) Any person who violates the terms of an injunction issued under subsection (c) shall forfeit and pay to the state a civil penalty of not more than fifteen thousand dollars ($15,000) per violation. For the purposes of this section, the court issuing an injunction shall retain jurisdiction, the cause shall be continued, and the attorney general acting in the name of the state may petition for recovery of civil penalties. Whenever the court determines that an injunction issued under subsection (c) has been violated, the court shall award reasonable costs to the state.

  (g) If a court finds any person has knowingly violated section 3 or 10 of this chapter, other than section 3(b)(19), 3(b)(20), or 3(b)(40) of this chapter, the attorney general, in an action pursuant to subsection (c), may recover from the person on behalf of the state a civil penalty of a fine not exceeding five thousand dollars ($5,000) per violation.

KENTUCKY

## I. Relevant Antitrust Statutes

### A. Substantive Provisions

- <u>Ky. Rev. Stat. Ann. § 367.175(1)–(2). Other unlawful acts</u>: (1) Every contract, combination in the form of trust and otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall be unlawful.

  (2) It shall be unlawful for any person or persons to monopolize, attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce in this Commonwealth.

### B. Remedial Provisions

- <u>Ky. Rev. Stat. Ann. § 15.020(1). Chief law officer and adviser; duty to attend to litigation, write opinions, draft writings; communication with Legislative Research Commission; when to appear for Commonwealth; constitutional challenge may be brought in any county</u>: (1) The Attorney General is the chief law officer of the Commonwealth of Kentucky and all of its departments, commissions, agencies, and political subdivisions, and the legal adviser of all state officers, departments, commissions, and agencies, and when requested in writing shall furnish to them his or her written opinion touching any of their official duties, and shall prepare proper drafts of all instruments of writing required for public use, and shall exercise all common law duties and authority pertaining to the office of the Attorney General under the common law, except when modified by statutory enactment.

- <u>Ky. Rev. Stat. Ann. § 367.990(9). Penalties</u>: (9) Any person who shall willfully and intentionally violate any provision of KRS 367.976 to 367.985 shall be guilty of a Class B misdemeanor.

## II. Relevant DTPA Claims

### A. Substantive Provisions

- <u>Ky. Rev. Stat. Ann. § 367.170(1). Unlawful acts</u>: (1) Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

### B. Remedial Provisions

- <u>Ky. Rev. Stat. Ann. § 367.190. Injunction; hearing</u>: (1) Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by KRS 367.170 to be unlawful, and that proceedings would be in the public interest, he may immediately move in the name of the Commonwealth in a Circuit Court for a restraining order or temporary or permanent injunction to prohibit the use of such method, act or practice. The action may be brought in the Circuit Court of the county in which such person resides or has his principal place of business or in the Circuit Court

18

of the county in which the method, act or practice declared by KRS 367.170 to be unlawful has been committed or is about to be committed; or with consent of the parties may be brought in the Franklin Circuit Court.

(2) Upon application of the Attorney General, a restraining order shall be granted whenever it reasonably appears that any person will suffer immediate harm, loss or injury from a method, act or practice prohibited by KRS 367.170. If the defendant moves for the dissolution of a restraining order issued under this section, the court shall hold a hearing within five (5) business days of the date of service of the defendant's motion to dissolve, unless a delay in hearing the cause is requested by, or otherwise caused by the defendant. If such a hearing is not held within five (5) business days, the restraining order will automatically be dissolved.

(3) In order to obtain a temporary or permanent injunction, it shall not be necessary to allege or prove that an adequate remedy at law does not exist. Further, it shall not be necessary to allege or prove that irreparable injury, loss or damage will result if the injunctive relief is denied.

- <u>Ky. Rev. Stat. Ann. § 367.990(1)–(2). Penalties</u>: (1) Any person who violates the terms of a temporary or permanent injunction issued under KRS 367.190 shall forfeit and pay to the Commonwealth a civil penalty of not more than twenty-five thousand dollars ($25,000) per violation. For the purposes of this section, the Circuit Court issuing an injunction shall retain jurisdiction, and the cause shall be continued, and in such cases the Attorney General acting in the name of the Commonwealth may petition for recovery of civil penalties.

  (2) In any action brought under KRS 367.190, if the court finds that a person is willfully using or has willfully used a method, act, or practice declared unlawful by KRS 367.170, the Attorney General, upon petition to the court, may recover, on behalf of the Commonwealth, a civil penalty of not more than two thousand dollars ($2,000) per violation, or where the defendant's conduct is directed at a person aged sixty (60) or older, a civil penalty of not more than ten thousand dollars ($10,000) per violation, if the trier of fact determines that the defendant knew or should have known that the person aged sixty (60) or older is substantially more vulnerable than other members of the public.

## LOUISIANA

## I. Relevant Antitrust Statutes

## A. Substantive Provisions

- <u>La. Stat. Ann. § 51:123. Monopolizing trade or commerce prohibited; penalty</u>: No person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state. Whoever violates this Section shall be fined not more than five thousand dollars, or imprisoned, with or without hard labor, not more than three years, or both.

- <u>La. Stat. Ann. § 51:122(A). Contracts, combinations and conspiracies in restraint of trade illegally; penalty</u>: (A) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal.

## B. Remedial Provisions

- <u>La. Stat. Ann. § 51:128. Injunction at suit of state; petition and citation; temporary relief; process as to parties not joined</u>: The district courts have jurisdiction to prevent and restrain violations of this Part, and the Attorney General or the district attorneys in their respective districts under the direction of the Attorney General or the governor, shall institute proceedings to prevent and restrain violations. Proceedings shall be by way of petition and by citation, setting forth the case and praying that the violations be enjoined, or otherwise prohibited. When the parties complained of have been duly notified of the petition, the court shall proceed, as soon as practicable, to the hearing and determination of the case. Pending such action and before the final decree, the court may at any time issue a temporary restraining order if it is just in the premises. Whenever other parties are required, the court may summon them whether they reside in the parish in which the court is held or not, and the subpoenas may be served in any parish by the sheriff thereof.

- <u>La. Stat. Ann. § 51:122(B). Contracts, combinations and conspiracies in restraint of trade illegally; penalty</u>: Whoever violates this Section shall be fined not more than five thousand dollars, or imprisoned, with or without hard labor, not more than three years, or both.

- <u>La. Stat. Ann. § 51:138. Suits to be instituted by Attorney General or district attorney; prosecutions</u>: All suits for the enforcement of this Part shall be instituted in the district courts by the Attorney General, on his own motion or by direction of the governor, or by the district attorney, acting under instruction of the governor or Attorney General; but when the penalty of imprisonment is demanded, the prosecution shall be in accordance with the provisions regulating criminal procedure.

## II. Relevant DTPA Statutes

### A. Substantive Provisions

- <u>La. Stat. Ann. § 51:1405(A). Unfair acts or practices; interpretation and rulemaking authority</u>: (A) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

### B. Remedial Provisions

- <u>La. Stat. Ann. § 51:1407(A)–(B). Restraining prohibited acts</u>: (A) Whenever the attorney general has reason to believe that any person is using, has used, or is about to use any method, act, or practice declared by R.S. 51:1405 to be unlawful, he may bring an action for injunctive relief in the name of the state against such person to restrain and enjoin the use of such method, act, or practice. The action may be brought in the district court having civil jurisdiction in any parish in which such person resides, or is domiciled or has his principal place of business, or in any parish in which such person did business, or, with consent of the parties, may be brought in the district court of the parish where the state capitol is located. In the event these district courts are not operational due to a declared state of emergency, the action shall be brought in an operating judicial court located closest in geographic distance to the Nineteenth Judicial District Court in the parish of East Baton Rouge. In the event that such person was located outside of the state, but was soliciting in the state by mail, telephone, or any electronic communication, the action may be brought in the district court having civil jurisdiction in the parish in which the contact was made. It being against the public policy of the state of Louisiana to allow a contractual selection of venue or jurisdiction contrary to the provisions of the Louisiana Code of Civil Procedure, no provision of any contract which purports to waive these provisions of venue, or to waive or select venue or jurisdiction in advance of the filing of any civil action, may be enforced against any plaintiff in an action brought in these courts. These courts are authorized to issue temporary restraining orders or preliminary and permanent injunctions to restrain and enjoin violations of this Chapter, and such restraining orders or injunctions shall be issued without bond.

  (B) In addition to the remedies provided herein, the attorney general may request and the court may impose a civil penalty against any person found by the court to have engaged in any method, act, or practice in Louisiana declared to be unlawful under this Chapter. In the event the court finds the method, act, or practice to have been entered into with the intent to defraud, the court has the authority to impose a penalty not to exceed five thousand dollars for each violation.

- <u>La. Stat. Ann. § 51:1408(A)(5). Additional relief</u>: (A) The court may issue such additional orders or render judgments against any party, as may be necessary to compensate any aggrieved person for any property, movable or immovable,

corporeal or incorporeal, which may have been acquired from such person by means of any method, act, or practice declared unlawful by R.S. 51:1405, whichever may be applicable to that party under R.S. 51:1418. Such orders shall include but not be limited to the following:

(5) Restitution.

- <u>La. Stat. Ann. § 51:1416. Civil penalties</u>: In addition to remedies for contempt of court otherwise provided by law, any person who violates the terms of an injunction issued under R.S. 51:1407 or 1408, or an assurance of voluntary compliance as authorized under R.S. 51:1410, may be required to pay to the state treasurer a civil penalty of not more than five thousand dollars per violation. For the purposes of this Section, the district court issuing an injunction shall retain jurisdiction and the attorney general acting in the name of the state may petition for recovery of civil penalties provided in this Section.

## MISSISSIPPI

## I. Relevant Antitrust Statutes

## A. Substantive Provisions

- <u>Miss. Code Ann. § 75-21-3. Additional contracts; trust and combination</u>: Any corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to accomplish the results herein prohibited or without such intent, shall accomplish such results to a degree inimical to public welfare, and shall thus:

    (a) Restrain or attempt to restrain the freedom of trade or production;

    (b) Or shall monopolize or attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business;

    (c) Or shall engross forestall or attempt to engross or forestall any commodity;

    (d) Or shall destroy or attempt to destroy competition in the manufacture or sale of a commodity, by selling or offering the same for sale at a lower price at one place in the state than another or buying or offering to buy a commodity at a higher price at one place in the state than another, differences of freight and other necessary expenses of sale and delivery considered;

    (e) Or shall destroy or attempt to destroy competition by rendering any service or manipulating, handling or storing any commodity for a less price in one locality than in another, the differences in the necessary expenses of carrying on the business considered, shall be deemed and held a trust and combine within the meaning and purpose of this section, and shall be liable to the pains, penalties, fines, forfeitures, judgments, and recoveries denounced against trusts and combines and shall be proceeded against in manner and form herein provided, as in case of other trusts and combines.

    It shall be sufficient to make out a prima facie case of a violation of subdivision (e) of this section to show lower charge for the service therein mentioned in one locality than another, or to show a higher price paid for a commodity in one locality than another, differences of freight and other necessary expenses of operating business considered.

## B. Remedial Provisions

- <u>Miss. Code Ann. § 75-21-1. "Trust or combine" defined; penalties</u>: A trust or combine is a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, when inimical to public welfare and the effect of which would be:

23

(a) To restrain trade;

(b) To limit, increase or reduce the price of a commodity;

(c) To limit, increase or reduce the production or output of a commodity;

(d) To hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity;

(e) To engross or forestall a commodity;

(f) To issue, own or hold the certificate of stock of any trust and combine within the spirit of this chapter knowing it to be such at the time of the issue or the acquisition or holding such certificate; or

(g) To place the control to any extent of business or of the proceeds or earnings thereof, contrary to the spirit and meaning of this chapter, in the power of trustees, by whatever name called; or

(h) To enable or empower any other person than themselves, their proper officers, agents and employees to dictate or control the management of business, contrary to the spirit and meaning of this chapter; or

(i) To unite or pool interest in the importation, manufacture, production, transportation, or price of a commodity, contrary to the spirit and meaning of this chapter.

Any corporation, domestic or foreign, or any partnership, or individual, or other association, or person whatsoever, who are now, or shall hereafter create, enter into, become a member of, or a party to any trust or combine as hereinabove defined shall be deemed and adjudged guilty of a conspiracy to defraud and shall be subject to the penalties hereinafter provided. Any person, association of persons, corporation, or corporations, domestic or foreign, who shall be a party or belong to a trust and combine shall be guilty of crime and upon conviction thereof shall, for a first offense be fined in any sum not less than one hundred dollars ($100.00) nor more than five thousand dollars ($5,000.00) and for a second or subsequent offense not less than two hundred dollars ($200.00) nor more than ten thousand dollars ($10,000.00), and may be enjoined by a final decree of the chancery court, in a suit by the state on the relation of the attorney general, from the further prosecution of or doing of the acts constituting the trust and combine as defined in this chapter.

- <u>Miss. Code Ann. § 11-45-11. State entitled to all remedies</u>: The state shall be entitled to bring all actions and all remedies to which individuals are entitled in a given state of case. It may maintain the action of unlawful entry and detainer in all cases, at its option, for the recovery of land.

- <u>Miss. Code Ann. § 75-21-7. Penalty for violation of chapter</u>: Any person, corporation, partnership, firm or association of persons and the officers and representatives of the corporation or association violating any of the provisions

24

of this chapter shall forfeit not less than one hundred dollars ($100.00) nor more than two thousand dollars ($2,000.00) for every such violation. Each month in which such person, corporation or association shall violate this chapter shall be a separate violation, the forfeiture and penalty in such case to be recovered alone by suit in the name of the state on the relation of the attorney general and by the consent of the attorney general suits may be brought by any district attorney, such suits to be brought in any court of competent jurisdiction.

- <u>Miss. Code Ann. § 75-21-9. Recovery of damages by private persons</u>: Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars ($500.00), by suit in any court of competent jurisdiction. Said suit may be brought against one or more of the parties to the trust or combine and one or more of the officers and representatives of any corporation a party to the same, or one or more of either. Such penalty may be recovered in each instance of injury. All recoveries herein provided for may be sued for in one suit.

## II. Relevant DTPA Statutes

### A. Substantive Provisions

- <u>Miss. Code Ann. § 75-24-5(1). Acts or practices prohibited</u>: (1) Unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce are prohibited. Action may be brought under Section 75-24-5(1) only under the provisions of Section 75-24-9.

### B. Remedial Provisions

- <u>Miss. Code Ann. § 75-24-9. Injunctive relief</u>: Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice prohibited by Section 75-24-5, and that proceedings would be in the public interest, he may bring an action in the name of the state against such person to restrain by temporary or permanent injunction the use of such method, act or practice. The action shall be brought in the chancery or county court of the county in which such person resides or has his principal place of business, or, with consent of the parties, may be brought in the chancery or county court of the county in which the State Capitol is located. The said courts are authorized to issue temporary or permanent injunctions to restrain and prevent violations of this chapter, and such injunctions shall be issued without bond.

- <u>Miss. Code Ann. § 75-24-11. Monies or property acquired by prohibited means</u>: The court may make such additional orders or judgments, including restitution, as may be necessary to restore to any person in interest any monies or property, real or personal, which may have been acquired by means of any practice prohibited by this chapter, including the appointment of a receiver or

25

the revocation of a license or certificate authorizing that person to engage in business in this state, or both.

- <u>Miss. Code Ann. § 75-24-19(1)(b). Civil violations and penalties; jurisdiction</u>:

(1) Civil remedies.

> (b) In any action brought under Section 75-24-9, if the court finds from clear and convincing evidence, that a person knowingly and willfully used any unfair or deceptive trade practice, method or act prohibited by Section 75-24-5, the Attorney General, upon petition to the court, may recover on behalf of the state a civil penalty in a sum not to exceed Ten Thousand Dollars ($10,000.00) per violation. One-half ( ½ ) of said penalty shall be payable to the Office of Consumer Protection to be deposited into the Attorney General's special fund. All monies collected under this section shall be used by the Attorney General for consumer fraud education and investigative and enforcement operations of the Office of Consumer Protection. The other one-half ( ½ ) shall be payable to the General Fund of the State of Mississippi. The Attorney General may also recover, in addition to any other relief that may be provided in this section, investigative costs and a reasonable attorney's fee.

## Missouri

### I. Relevant DTPA Statutes

#### A. Substantive Provisions

- Mo. Rev. Stat. § 407.020.1. Unlawful practices, penalty—exceptions: The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice. The use by any person, in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri of the fact that the attorney general has approved any filing required by this chapter as the approval, sanction or endorsement of any activity, project or action of such person, is declared to be an unlawful practice. Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

#### B. Remedial Provisions

- Mo. Rev. Stat. § 407.100.1. Injunction–temporary restraining orders–receivers–restitution, when–civil penalty–venue–restitution funds payable to injured parties but interest payable to general revenue: Whenever it appears to the attorney general that a person has engaged in, is engaging in, or is about to engage in any method, act, use, practice or solicitation, or any combination thereof, declared to be unlawful by this chapter, the attorney general may seek and obtain, in an action in a circuit court, an injunction prohibiting such person from continuing such methods, acts, uses, practices, or solicitations, or any combination thereof, or engaging therein, or doing anything in furtherance thereof.

- Mo. Rev. Stat. § 407.100.4. Injunction–temporary restraining orders–receivers–restitution, when–civil penalty–venue–restitution funds payable to injured parties but interest payable to general revenue: The court, in its discretion, may enter an order of restitution, payable to the state, as may be necessary to restore to any person who has suffered any ascertainable loss, including, but not limited to, any moneys or property, real or personal, which may have been acquired by means of any method, act, use, practice or solicitation, or any combination thereof, declared to be unlawful by this chapter. It shall be the duty of the attorney general to distribute such funds to those persons injured. Such funds may or may not be interest-bearing accounts, but any interest which accrues to any such account shall be sent at least annually by the attorney general to the director of revenue to be deposited in the state treasury to the credit of the state general revenue fund.

27

- <u>Mo. Rev. Stat. § 407.100.6. Injunction–temporary restraining orders–receivers–restitution, when–civil penalty–venue–restitution funds payable to injured parties but interest payable to general revenue</u>: The court may award to the state a civil penalty of not more than one thousand dollars per violation; except that, if the person who would be liable for such penalty shows, by a preponderance of the evidence, that a violation resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error, no civil penalties shall be imposed.

- <u>Mo. Rev. Stat. § 416.051.3. Penalties–attorney general to prosecute–civil penalty for contempt</u>: Any person who is found to be in contempt of any court order issued to enforce the provisions of section 416.031 arising out of any proceeding brought by the attorney general shall forfeit and pay to the state a civil penalty of not more than twenty thousand dollars. For the purposes of this section, the circuit court issuing any such court order enforcing the provisions of section 416.031 shall retain jurisdiction, and the cause shall be continued, and in such cases the attorney general acting in the name of the state may petition for recovery of civil penalties.

## MONTANA

### I. Relevant Antitrust Statutes

### A. Substantive Provisions

- <u>Mont. Code Ann. § 30-14-205(2)(b), (2)(c), (2)(g). Unlawful restraint of trade</u>: It is unlawful for a person or group of persons, directly or indirectly: (2) for the purpose of creating or carrying out any restriction in trade, to:

    (b) increase or reduce the price of merchandise or commodities;

    (c) prevent competition in the distribution or sale of merchandise or commodities;

    . . .

    (g) create a monopoly in the manufacture, sale, or transportation of an article of commerce;

### B. Remedial Provisions

- <u>Mont. Code Ann. § 30-14-222(1)–(2)(a). Injunctions–damages–production of evidence</u>: (1) A person who is or will be injured or the department may bring an action to enjoin an act that is in violation of 30-14-205 through 30-14-214 or 30-14-216 through 30-14-218 and for the recovery of damages. If the court finds that the defendant is violating or has violated any of the provisions of 30-14-205 through 30-14-214 or 30-14-216 through 30-14-218, the court shall enjoin the defendant. It is not necessary to allege or prove actual damages to the plaintiff.

    (2)(a) In addition to injunctive relief, the plaintiff is entitled to recover from the defendant the greater of three times the amount of actual damages sustained or $1,000.

- <u>Mont. Code Ann. § 30-14-224(2). Penalties</u>: (2) A violation of 30-14-205 is punishable by imprisonment for a period of not more than 5 years, and the offender may be subject to a fine in an amount not exceeding $25,000.

### II. Relevant DTPA Statutes

### A. Substantive Provisions

- <u>Mont. Code Ann. § 30-14-103. Unlawful practices</u>: Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

### B. Remedial Provisions

- <u>Mont. Code Ann. § 30-14-111(4). Department to restrain unlawful acts</u>: (4) A district court is authorized to issue temporary or permanent injunctions or temporary restraining orders to restrain and prevent violations of this part, and an injunction must be issued without bond.

29

- <u>Mont. Code Ann. § 30-14-131. Restoration–court orders</u>: (1) The court may enter orders or judgments necessary to restore to a person any money or property, real or personal, that may have been acquired by means of any practice in this part declared to be unlawful. The court may order the appointment of a receiver or the revocation of a license or certificate authorizing a person to engage in business in this state, or both.

  (2) The court shall award reasonable attorney fees to the prevailing party for bringing a successful action under this part.

  (3) The court may enter any other order or judgment required by equity to carry out the provisions of this part.

- <u>Mont. Code Ann. § 30-14-142(1)–(2). Penalties</u>: (1) In addition to any fine that a person might be subject to under subsection (2), a person who violates the terms of an injunction or temporary restraining order issued under 30-14-111 shall forfeit and pay to the state a civil fine of not more than $10,000 for each violation. For the purposes of this section, the district court issuing an injunction or temporary restraining order retains jurisdiction and the cause must be continued, and in those cases, the department, acting in the name of the state, may petition for recovery of civil penalties.

  (2) In an action brought under 30-14-111, if the court finds that a person is willfully using or has willfully used a method, act, or practice declared unlawful by 30-14-103, the department, upon petition to the court, may recover on behalf of the state a civil fine of not more than $10,000 for each violation. The fine provided for in this subsection is in addition to any liability that a person might be subject to under subsection (1).

NEVADA

## I. Relevant Antitrust Statues

## A. Substantive Provisions

- Nev. Rev. Stat. § 598A.050. Construction of chapter: The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes.

## B. Remedial Provisions

- Nev. Rev. Stat. § 598A.170. Civil penalty in action brought by Attorney General for engaging in prohibited activity: Persons who engage in activities prohibited by this chapter are civilly liable, at the suit of the Attorney General, in an amount not to exceed 5 percent of the gross income realized by the sale of commodities or services sold by such persons in this state in each year in which the prohibited activities occurred.

- Nev. Rev. Stat. § 598A.070(1)(c)(2). Duties of Attorney General and district attorneys:

  (1) The Attorney General shall:

    (c) Institute proceedings on behalf of the State, its agencies, political subdivisions, districts or municipal corporations, or as parens patriae of the persons residing in the State for:

      (2) Civil penalties for violations of the provisions of this chapter.

- Nev. Rev. Stat. § 598A.250. Remedies cumulative: The remedies afforded by this chapter are cumulative.

## II. Relevant DTPA Claims

## A. Substantive Provisions

- Nev. Rev. Stat. § 598.0915(5), (7), (9). "Deceptive trade practice" defined: A person engages in a "deceptive trade practice" if, in the course of his or her business or occupation, he or she:

    (5) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith.

    . . .

    (7) Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model.

    . . .

31

(9) Advertises goods or services with intent not to sell or lease them as advertised.

- Nev. Rev. Stat. § 598.092(8). "Deceptive trade practice" defined: A person engages in a "deceptive trade practice" when in the course of his or her business or occupation he or she:

     (8) Knowingly misrepresents the legal rights, obligations or remedies of a party to a transaction.

- Nev. Rev. Stat. § 598.0923(1)(b). "Deceptive trade practice" defined: (1) A person engages in a "deceptive trade practice" when in the course of his or her business or occupation he or she knowingly:

     (b) Fails to disclose a material fact in connection with the sale or lease of goods or services.

## B. Remedial Provisions

- Nev. Rev. Stat. § 598.0963(3). Additional powers of Attorney General: (3) If the Attorney General has reason to believe that a person has engaged or is engaging in a deceptive trade practice, the Attorney General may bring an action in the name of the State of Nevada against that person to obtain a temporary restraining order, a preliminary or permanent injunction, or other appropriate relief, including, without limitation, the recovery of a civil penalty, disgorgement, restitution or the recovery of damages:

     (a) As parens patriae of the persons residing this State, with respect to damages sustained directly or indirectly by such persons, or, alternatively, if the court finds in its discretion that the interests of justice so require, as a representative of a class or classes consisting of persons residing in this State who have been damaged directly or indirectly; or

     (b) As parens patriae, with respect to direct or indirect damages to the general economy of the State of Nevada or any agency or political subdivision thereof.

- Nev. Rev. Stat. § 598.0999(2). Civil and criminal penalties for violations: (2) Except as otherwise provided in NRS 598.0974, in any action brought pursuant to the provisions of NRS 598.0903 to 598.0999, inclusive, if the court finds that a person has willfully engaged in a deceptive trade practice, the Commissioner, the Director, the district attorney of any county in this State or the Attorney General bringing the action may recover a civil penalty not to exceed $15,000 for each violation. The court in any such action may, in addition to any other relief or reimbursement, award reasonable attorney's fees and costs.

- Nev. Rev. Stat. § 598.0975(1)(a). Deposit and use of money collected pursuant to NRS 598.0903 to 598.0999, inclusive; exception for criminal fines and restitution: (1) Except as otherwise provided in subsection 3 and in subsection

1 of NRS 598.0999, all fees, civil penalties and any other money collected pursuant to the provisions of NRS 598.0903 to 598.0999, inclusive:

(a) In an action brought by the Attorney General, must be deposited in the Consumer Protection Administrative Account pursuant to NRS 228.332.

## NORTH DAKOTA

### I. Relevant Antitrust Claims

### A. Substantive Provisions

- N.D. Cent. Code § 51-08.1-02. Contract, combination, or conspiracy to restrain or monopolize trade: A contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.

- N.D. Cent. Code § 51-08.1-03. Establishment, maintenance, or use of monopoly: The establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful.

### B. Remedial Provisions

- N.D. Cent. Code § 51-08.1-07. Civil penalty and injunctive enforcement by state: The attorney general, or a state's attorney with the permission or at the request of the attorney general, may bring an action for appropriate injunctive relief, equitable relief, including disgorgement, and civil penalties in the name of the state for a violation of this chapter. The trier of fact may assess for the benefit of the state a civil penalty of not more than one hundred thousand dollars for each violation of this chapter.

- N.D. Cent. Code § 51-08.1-11. Remedies cumulative: The remedies provided in this chapter are cumulative.

### II. Relevant DTPA Statutes

### A. Substantive Provisions

- N.D. Cent. Code § 51-15-02. Unlawful practices–Fraud–Misrepresentation—Unconscionable: The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice. The act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice.

### B. Remedial Provisions

- N.D. Cent. Code § 51-15-07. Remedies–Injunction–Other relief–Receiver–Cease and desist orders–Civil penalties–Costs recoverable in adjudicative

34

proceedings: Whenever it appears to the attorney general that a person has engaged in, or is engaging in, any practice declared to be unlawful by this chapter, or by other provisions of law, including chapter 50-22, 51-13, 51-14, 51-16.1, or 51-18, the attorney general may seek and obtain in an action in a district court an injunction prohibiting that person from continuing the unlawful practice or engaging in the unlawful practice or doing any act in furtherance of the unlawful practice after appropriate notice to that person. . . . The court may make an order or judgment as may be necessary to prevent the use or employment by a person of any unlawful practices, or which may be necessary to restore to any person in interest any money, or property that may have been acquired by means of any practice in this chapter, or in other provisions of law, including chapter 50-22, 51-13, 51-14, 51-16.1, or 51-18, declared to be unlawful, including the appointment of a receiver.

. . .

In addition to any other remedy authorized by this chapter, or by other provisions of law, including chapter 50-22, 51-12, 51-13, 51-14, 51-16.1, or 51-18, the attorney general may impose by order and collect a civil penalty against a person found in an adjudicative proceeding to have violated a cease and desist order issued pursuant to this section, in an amount not more than one thousand dollars for each violation. The attorney general may bring an action in district court to recover penalties under this section. A person aggrieved by an order issued under this section may request a hearing before the attorney general if a written request is made within ten days after the receipt of the order. An adjudicative proceeding under this section must be conducted in accordance with chapter 28-32, unless otherwise specifically provided herein. If the attorney general prevails in an adjudicative proceeding pursuant to this section, the attorney general may assess the nonprevailing person for all adjudicative proceeding and hearing costs, including reasonable attorney's fees, investigation fees, costs, and expenses of any investigation and action.

- N.D. Cent. Code § 51-15-11. Civil penalties: The court may assess for the benefit of the state a civil penalty of not more than five thousand dollars for each violation of this chapter or for each violation of chapter 51-12, 51-13, 51-14, or 51-18. The penalty provided in this section is in addition to those remedies otherwise provided by this chapter or by chapter 50-22, 51-12, 51-13, 51-14, 51-16.1, or 51-18.

# PUERTO RICO

## I. Relevant Antitrust/DTPA Statutes

### A. Substantive Provisions

- <u>P.R. Laws Ann. tit. 10. § 259(a). Fair competition</u>: (a) Unfair methods of competition, and unfair or deceptive acts or practices in trade or commerce are hereby declared unlawful.

- <u>P.R. Laws Ann. tit. 10. § 260. Monopolies</u>: Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce in the Commonwealth of Puerto Rico, or in any section thereof, shall be guilty of a misdemeanor.

- <u>P.R. Laws Ann. tit. 31. § 5141. Obligation when damage caused by fault or negligence</u>: A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity.

### B. Remedial Provisions

- <u>P.R. Laws Ann. tit. 10. § 259(b)–(j). Fair competition</u>: (b) Without impairment of the authority to resort to the remedies authorized by § 269 of this title, the Office of Monopolistic Affairs, through rules and regulations adopted as provided in § 272(a)(5) of this title, may proscribe specific acts or practices, in a general manner or in any specific line of trade or commerce, in accordance with the standard provided in subsection (a) of this section.

  . . .

  (c) Without impairment of the power to resort to the remedies authorized by § 269 of this title, the Office of Monopolistic Affairs may file and process administrative complaints in the Department of Consumer Affairs, to prevent, avoid and detain violations of subsection (a) of this section or the regulations approved pursuant to subsection (b) of said section. As soon as the party against whom the complaint has been filed has been properly notified thereof, the Department of Consumer Affairs shall proceed to hold the hearing and solve the case by prescribing the most appropriate remedy, according to the details of the complaint.

  (d) The Office of Monopolistic Affairs or the accused party, when affected by a decision of the Department of Consumer Affairs, shall be entitled to a judicial review at the Court of First Instance of the Commonwealth of Puerto Rico. The petition for review shall be filed with the Court of First Instance within thirty (30) days from the date of notice of such decision.

(e) The petition for review shall be executed by filing an application in the Office of the Court Clerk, in which the grounds supporting the petition for review are set forth. After the petition is filed, the petitioner himself shall notify the other party and the Department of Consumer Affairs. Said Department may request audit within a period of fifteen (15) days from its date of notice.

(f) After the petition for review is established, it shall be the duty of the Department of Consumer Affairs to take a certified copy of the documents on record to the court within a term of ten (10) days from the date of notice of the filing of the petition for review.

(g) The court shall review the decision of the Department of Consumer Affairs on the basis of the administrative record submitted, and only as to the conclusions of law; the findings of fact of the Department of Consumer Affairs shall be conclusive for the court if supported by substantial evidence.

(h) Noncompliance with a final and definite decision issued by the Department of Consumer Affairs in the procedure established herein shall bear, after due notice and hearing, a civil penalty imposed by the Department of Consumer Affairs up to a maximum of five thousand dollars ($5,000). Each separate violation of said decision shall be considered as continuous noncompliance therewith, in which case, each day the decision is not complied with shall be considered as a separate violation.

(i) When any person is found liable of violating the regulations approved pursuant to subsection (b) of this section, and it appears that said violation was committed with present or real knowledge of the prohibition, or with reasonable knowledge inferred on the basis of objective circumstances, the Department of Consumer Affairs shall impose a civil penalty up to five thousand dollars ($5,000), for each violation in addition to the most appropriate remedies according to the details of the complaint, as provided in subsection (c) of this section.

(j) The Office of Monopolistic Affairs may appeal to the Court of First Instance of Puerto Rico requesting that any decision of the Department of Consumer Affairs issued under subsections (h) or (i) of this section be put in effect.

- P.R. Laws Ann. tit. 10. § 269. Jurisdiction and enforcement provisions: The Court of First Instance is hereby vested with jurisdiction to prevent, prohibit, enjoin and punish violations of this chapter, and it shall be the duty of the Secretary of Justice to institute proceedings for injunctions or any other proceeding to prevent, prohibit, enjoin and punish such violations, and to obtain such other or further relief as may be appropriate. . . . [T]he court may make such temporary restraining orders or prohibition as shall be deemed just in the premises.

## SOUTH CAROLINA

### I. Relevant Antitrust/DTPA Statutes

### A. Substantive Provisions

- <u>S.C. Code Ann. § 39-5-20(a). Unfair methods of competition and unfair or deceptive acts or practices unlawful; application of federal act</u>: (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

### B. Remedial Provisions

- <u>S.C. Code Ann. § 39-5-50. Injunction; orders or judgments to restore property</u>: (a) Whenever the Attorney General has reasonable cause to believe that any person is using, has used or is about to use any method, act or practice declared by Section 39-5-20 to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by temporary restraining order, temporary injunction or permanent injunction the use of such method, act or practice. . . . The action may be brought in the court of common pleas in the county in which such person resides, has his principal place of business or conducts or transacts business. The courts are authorized to issue orders and injunctions to restrain and prevent violations of this article, and such orders and injunctions shall be issued without bond. Whenever any permanent injunction is issued by such court in connection with any action which has become final, reasonable costs shall be awarded to the State.

  (b) The court may make such additional orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss by reason of the use or employment of such unlawful method, act or practice, any moneys or property, real or personal, which may have been acquired by means of any practice declared to be unlawful in this article, including the revocation of a license or certificate authorizing that person to engage in business in this State, provided the order declaring the practice to have been unlawful has become final.

- <u>S.C. Code Ann. § 39-5-110(a). Civil penalties for willful violation or violations of injunction</u>: If a court finds that any person is willfully using or has willfully used a method, act or practice declared unlawful by Section 39-5-20, the Attorney General, upon petition to the court, may recover on behalf of the State a civil penalty of not exceeding five thousand dollars per violation.

38

## SOUTH DAKOTA

## I. Relevant Antitrust Statutes

## A. Substantive Provisions

- <u>S.D. Codified Laws § 37-1-3.1.  Combinations in restraint of trade unlawful–
Entities subject to prohibition</u>: A contract, combination, or conspiracy between
two or more persons in restraint of trade or commerce any part of which is
within this state is unlawful.

  A person is any natural person, partnership, limited liability company,
corporation, association, or other legal entity.

- <u>S.D. Codified Laws § 37-1-3.2.  Monopolies and attempts to monopolize
unlawful</u>: The monopolization by any person, or an attempt to monopolize, or
combine, or conspire with any other person or persons, to monopolize any of
the trade or commerce within this state shall be unlawful.

## B. Remedial Provisions

- <u>S.D. Codified Laws § 37-1-14.2. Actions on behalf of state for equitable relief
and civil penalties–Amount of penalty</u>: The attorney general, or a state's
attorney with the permission or at the request of the attorney general, may
bring an action for appropriate injunctive or other equitable relief and civil
penalties in the name of the state for a violation of this chapter. The court may
assess for the benefit of the state a civil penalty of not more than fifty thousand
dollars for each violation of this chapter.

- <u>S.D. Codified Laws § 37-1-20. Remedies cumulative</u>: The remedies provided for
in this chapter shall be construed as cumulative and not exclusive.

## II. Relevant DTPA Statutes

## A. Substantive Provisions

- <u>S.D. Codified Laws § 37-24-6(1). Deceptive act or practice–Violation as
misdemeanor or felony</u>: It is a deceptive act or practice for any person to:

  (1) Knowingly act, use, or employ any deceptive act or practice, fraud,
false pretense, false promises, or misrepresentation or to conceal,
suppress, or omit any material fact in connection with the sale or
advertisement of any merchandise or the solicitation of contributions for
charitable purposes, regardless of whether any person has in fact been
misled, deceived, or damaged thereby;

## B. Remedial Provisions

- <u>S.D. Codified Laws § 37-24-23. Attorney general's action for injunction–
Notice–Attorney fees</u>: If the attorney general has reason to believe that any
person is using, has used, or is about to use any act or practice declared to be
unlawful by § 37-24-6 and that proceedings would be in the public interest, the

39

attorney general may bring an action in the name of the state against the person to restrain by temporary or permanent injunction the use of the act or practice, upon the giving of appropriate notice to that person. The notice shall state generally the relief sought and be served in accordance with § 37-24-16 and at least three days before any hearing in the action. The attorney general, if the prevailing plaintiff, may also recover reasonable attorney's fees and costs.

# TEXAS

## I. Relevant Antitrust Statutes

### A. Substantive Provisions

- <u>Tex. Bus. & Com. Code Ann. § 15.01. Title of act</u>: This Act shall be known and may be cited as the Texas Free Enterprise and Antitrust Act of 1983.

- <u>Tex. Bus. & Com. Code Ann. § 15.05(a)–(b). Unlawful Practices</u>: (a) Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful.

  (b) It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce.

### B. Remedial Provisions

- <u>Tex. Bus. & Com. Code Ann. § 15.20(a)–(b). Civil Suits by the State</u>: (a) Suit to Collect Civil Fine. The attorney general may file suit in district court in Travis County or in any county in the State of Texas in which any of the named defendants resides, does business, or maintains its principal office on behalf of the State of Texas to collect a civil fine from any person, other than a municipal corporation, whom the attorney general believes has violated any of the prohibitions in Subsection (a), (b), or (c) of Section 15.05 of this Act. An individual or other person adjudged to have violated any of these prohibitions shall pay a fine to the state in an amount not to exceed:

  (1) if an individual, $300,000; or

  (2) if any other person:

    (A) $3 million, if the lesser of the person's assets or market capitalization is less than $100 million;

    (B) $20 million, if the lesser of the person's assets or market capitalization is at least $100 million but less than $500 million; or

    (C) $30 million, if the lesser of the person's assets or market capitalization is $500 million or more.

  (b) Suit for Injunctive Relief. The attorney general may file suit against any person, other than a municipal corporation, in district court in Travis County, or in any county in the State of Texas in which any of the named defendants resides, does business, or maintains its principal office on behalf of the State of Texas to enjoin temporarily or permanently any activity or contemplated activity that violates or threatens to violate any of the prohibitions in Section 15.05 of this Act. In any such suit, the court shall apply the same principles as those generally applied by courts of equity in suits for injunctive relief against threatened conduct that would cause injury to business or property. In any

41

such suit in which the state substantially prevails on the merits, the state shall be entitled to recover the cost of suit.

Upon finding a violation of the prohibition against acquiring the stock, share capital, or assets of a person in Subsection (d) of Section 15.05 of this Act, the court shall, upon further finding that no other remedy will eliminate the lessening of competition, order the divestiture or other disposition of the stock, share capital, or assets and shall prescribe a reasonable time, manner, and degree of the divestiture or other disposition.

## II. Relevant DTPA Statutes

## A. Substantive Provisions

- <u>Tex. Bus. & Com. Code Ann. § 17.46(a), (b)(5), (b)(9), (b)(12), (b)(24). Deceptive Trade Practices Unlawful</u>: (a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

  (b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:

  > (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

  > . . .

  > (9) advertising goods or services with intent not to sell them as advertised;

  > . . .

  > (12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

  > . . .

  > (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

## B. Remedial Provisions

- <u>Tex. Bus. & Com. Code Ann. § 17.47(a), (c)–(d). Restraining Orders</u>: (a) Whenever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter, and that proceedings would be in the public interest, the division may bring an action in the name of the state against the person to restrain by temporary restraining order, temporary injunction, or permanent injunction the use of such method, act, or practice.

  Nothing herein shall require the consumer protection division to notify such person that court action is or may be under consideration. Provided, however, the consumer protection division shall, at least seven days prior to instituting such court action, contact such person to inform him in general of the alleged unlawful conduct. Cessation of unlawful conduct after such prior contact shall not render such court action moot under any circumstances, and such injunctive relief shall lie even if such person has ceased such unlawful conduct after such prior contact. Such prior contact shall not be required if, in the opinion of the consumer protection division, there is good cause to believe that such person would evade service of process if prior contact were made or that such person would destroy relevant records if prior contact were made, or that such an emergency exists that immediate and irreparable injury, loss, or damage would occur as a result of such delay in obtaining a temporary restraining order.

  (c) In addition to the request for a temporary restraining order, or permanent injunction in a proceeding brought under Subsection (a) of this section, the consumer protection division may request, and the trier of fact may award, a civil penalty to be paid to the state in an amount of:

    (1) not more than $10,000 per violation; and

    (2) if the act or practice that is the subject of the proceeding was calculated to acquire or deprive money or other property from a consumer who was 65 years of age or older when the act or practice occurred, an additional amount of not more than $250,000.

  (d) The court may make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice. Damages may not include any damages incurred beyond a point two years prior to the institution of the action by the consumer protection division. Orders of the court may also include the appointment of a receiver or a sequestration of assets if a person who has been ordered by a court to make restitution under this section has failed to do so within three months after the order to make restitution has become final and nonappealable.

# UTAH

## I. Relevant Antitrust Statutes

### A. Substantive Provisions

- <u>Utah Code Ann. § 76-10-3104(1)–(2). Illegal anticompetitive activities</u>: (1) Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal.

  (2) It shall be unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce.

### B. Remedial Provisions

- <u>Utah Code Ann. § 76-10-3108(1)–(2). Attorney general may bring action for injunctive relief, damages, and civil penalty</u>: (1) The attorney general may bring an action for appropriate injunctive relief, a civil penalty, and damages in the name of the state, any of its political subdivisions or agencies, or as parens patriae on behalf of natural persons in this state, for a violation of this act. Actions may be brought under this section regardless of whether the plaintiff dealt directly or indirectly with the defendant. This remedy is an additional remedy to any other remedies provided by law. It may not diminish or offset any other remedy.

  (2) Any individual who violates this act is subject to a civil penalty of not more than $100,000 for each violation. Any person, other than an individual, who violates this act is subject to a civil penalty of not more than $500,000 for each violation.

## II. Relevant DTPA Statutes

### A. Substantive Provisions

- <u>Utah Code Ann. § 13-11-4. Deceptive act or practice by supplier</u>: (1) A deceptive act or practice by a supplier in connection with a consumer transaction violates this chapter whether it occurs before, during, or after the transaction.

  (2) Without limiting the scope of Subsection (1), a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:

    (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not;

    (b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not;

    (c) indicates that the subject of a consumer transaction is new, or unused, if it is not, or has been used to an extent that is materially different from the fact;

44

. . .

(e) indicates that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not;

(f) indicates that the subject of a consumer transaction will be supplied in greater quantity than the supplier intends;

(g) indicates that replacement or repair is needed, if it is not;

(h) indicates that a specific price advantage exists, if it does not;

(i) indicates that the supplier has a sponsorship, approval, license, certification, or affiliation the supplier does not have;

## B. Remedial Provisions

- <u>Utah Code Ann. § 13-11-17(1)(a), (b), (d). Actions by enforcing authority</u>: (1) The enforcing authority may bring an action in a court of competent jurisdiction to:

    (a) obtain a declaratory judgment that an act or practice violates this chapter;

    (b) enjoin, in accordance with the principles of equity, a supplier who has violated, is violating, or is otherwise likely to violate this chapter;

    (d) obtain a fine in an amount determined after considering the factors in Subsection (6).

- <u>Utah Code Ann. § 13-11-17(6). Actions by enforcing authority</u>: (6) A fine imposed under Subsection (1)(d) or Subsection (2)(b)(i)(D) shall be determined after considering the following factors:

    (a) the seriousness, nature, circumstances, extent, and persistence of the conduct constituting the violation;

    (b) the harm to other persons resulting either directly or indirectly from the violation;

    (c) cooperation by the supplier in an inquiry or investigation conducted by the enforcing authority concerning the violation;

    (d) efforts by the supplier to prevent occurrences of the violation;

    (e) efforts by the supplier to mitigate the harm caused by the violation, including a reimbursement made to a consumer injured by the act of the supplier;

    (f) the history of previous violations by the supplier;

    (g) the need to deter the supplier or other suppliers from committing the violation in the future; and

    (h) other matters as justice may require.

- <u>Utah Code Ann. § 13-11-17(4)(b). Actions by enforcing authority</u>: (4)(b) All money received through fines imposed under this section shall be deposited in the Consumer Protection Education and Training Fund created by Section 13-2-8.