UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| The State of Texas, et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>     Defendant. | Case No. 4:20-cv-00957-SDJ<br><br>Hon. Sean D. Jordan |

**JOINT FINAL PRE-TRIAL ORDER**

## TABLE OF CONTENTS

A.    Counsel for the Parties ....................................................................................................1

   1.    Counsel for Plaintiffs ...............................................................................................1

   2.    Counsel for Defendant .............................................................................................9

B.    Statement of Jurisdiction ...............................................................................................10

   1.    Plaintiffs' Statement ..............................................................................................10

   2.    Defendant's Statement ...........................................................................................10

C.    Nature of the Action .......................................................................................................11

   1.    Plaintiffs' Statement ..............................................................................................11

   2.    Defendant's Statement ...........................................................................................11

D.    Contentions of the Parties ..............................................................................................13

   1.    Plaintiffs' Contentions ...........................................................................................13

E.    Stipulations and Uncontested Facts ...............................................................................21

F.    Contested Issues of Fact and Law .................................................................................24

   1.    Plaintiffs' Position .................................................................................................24

   2.    Google's Position ...................................................................................................25

G.    Pending Motions .............................................................................................................32

H.    Probable Length of Trial ................................................................................................32

   Plaintiffs States: ............................................................................................................32

   Defendant Google: ........................................................................................................33

I.    Trial Management Procedures ........................................................................................36

   1.    Procedures Agreed Upon by the Parties ................................................................36

J.    Witness Lists ..................................................................................................................55

K.    Deposition Designations ................................................................................................55

L.    Exhibit Lists ...................................................................................................................55

M.    Certifications ..................................................................................................................55

A. **Counsel for the Parties**

1. **Counsel for Plaintiffs**

**THE LANIER LAW FIRM, PLLC**

W. Mark Lanier
Mark.Lanier@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.Derose@LanierLawFirm.com
Jonathan P. Wilkerson
Jonathan.Wilkerson@LanierLawFirm.com
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
(713) 659-5200

*Counsel for Texas, Idaho, Louisiana, Mississippi, North Dakota, Indiana, South Carolina, and South Dakota*

**KELLER POSTMAN LLC**

Ashley Keller
ack@kellerpostman.com
Kiran N. Bhat
kiran.bhat@kellerpostman.com
2333 Ponce De Leon Boulevard
Suite R-240
Coral Gables, Florida 33134
(833) 633-0118

Zina Bash (Bar No. 24067505)
zina.bash@kellerpostman.com
111 Congress Avenue, Suite 500
Austin, TX 78701
(512) 690-0990

Noah S. Heinz
noah.heinz@kellerpostman.com
1101 Connecticut Ave., N.W., Suite 1100
Washington, DC 20036
(202) 918-1123

*Counsel for Texas, Idaho, Mississippi, North Dakota, Indiana, South Carolina, and South Dakota*

**NORTON ROSE FULBRIGHT US LLP**

Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

Marc Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

James S. Renard
james.renard@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
Telephone: (214) 855-8000

John W. McBride (*pro hac vice*)
john.mcbride@nortonrosefulbright.com
1045 W. Fulton Market, Ste. 1200
Chicago, Illinois 60607
Tel. (312) 964-7744

*Counsel for Texas*


FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

Brent Webster, First Assistant Attorney General of Texas
Brent.Webster@oag.texas.gov

STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

FOR PLAINTIFF STATE OF ALASKA:

TREG TAYLOR
ATTORNEY GENERAL

Jeff Pickett
Senior Assistant Attorney General, Special Litigation Section
jeff.pickett@alaska.gov


FOR PLAINTIFF STATE OF ARKANSAS:

TIM GRIFFIN
ATTORNEY GENERAL

AMANDA J. WENTZ
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
(501) 682-1178
Amanda.Wentz@ArkansasAG.gov


FOR PLAINTIFF STATE OF FLORIDA:

JAMES UTHMEIER, Attorney General

ANDREW BUTLER, Assistant Attorney General *(pro hac vice)*
FL Bar No. 123507
Andrew.butler@myfloridalegal.com

COLIN FRASER, Senior Assistant Attorney General *(pro hac vice)*
FL Bar No. 104741
Colin.fraser@myfloridalegal.com

LEE ISTRAIL, Assistant Attorney General *(pro hac vice)*
FL Bar No. 119216
Lee.istrail@myfloridalegal.com


LIZABETH A. BRADY, Director, Antitrust Division

R. SCOTT PALMER, Special Counsel and Chief of Complex Enforcement
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Phone: 850-414-3300

FOR PLAINTIFF STATE OF IDAHO:

RAÚL R. LABRADOR
Attorney General

John K. Olson, Deputy Attorney General

Consumer Protection Division Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone: (208) 334-2424
john.olson@ag.idaho.gov

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General

Jesse J. Moore
Deputy Attorney General – Consumer Litigation
302 W. Washington St.
IGCS - 5th Floor
Indianapolis, IN 46204-2770
Phone: (317) 234-1479
Fax: (317) 232-7979
Email: jesse.moore@atg.in.gov

FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:

RUSSELL COLEMAN
Attorney General

Christian J. Lewis, Commissioner of the Office of Consumer Protection
christian.lewis@ky.gov
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
philip.heleringer@ky.gov

4

Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
jonathan.farmer@ky.gov
Office of the Attorney General
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Tel: 502-696-5300

FOR PLAINTIFF STATE OF LOUISIANA:

Liz Murrill, Attorney General
Michael Dupree, Assistant Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
(225) 326-6400
voelkerp@ag.louisiana.gov

James R. Dugan, II (*pro hac vice*)
The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
PH:   (504) 648-0180
FX:   (504) 649-0181
EM:    jdugan@dugan-lawfirm.com

James Williams
CHEHARDY SHERMAN WILLIAM, LLP
Galleria Boulevard, Suite 1100
Metairie, LA 70001
PH:   (504) 833-5600
FX:   (504) 833-8080
EM:    jmw@chehardy.com

FOR PLAINTIFF STATE OF MISSISSIPPI:

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

Garrett S. Mascagni
Special Assistant Attorney General
Consumer Protection Division
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39205
Telephone: 601-359-4223
Fax: 601-359-4231
Garrett.Mascagni@ago.ms.gov

FOR PLAINTIFF STATE OF MISSOURI:

ANDREW BAILEY
Attorney General

Michael Schwalbert
Michael.Schwalbert@ago.mo.gov
Missouri Attorney General's Office
815 Olive St.
Suite 200
St. Louis, MO 63101
Tel: 314-340-7888

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Montana Attorney General

Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894
Anna.Schneider@mt.gov

Charles J. Cooper
ccooper@cooperkirk.com
David H. Thompson
dthompson@cooperkirk.com
Brian W. Barnes
bbarnes@cooperkirk.com
Harold S. Reeves

hreeves@cooperkirk.com
COOPER & KIRK PLLC
1523 New Hampshire Avenue, NW
Washington DC 20036
Phone: (202) 220-9620
Fax: (202) 220-9601

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General
ERNEST D. FIGUEROA
Consumer Advocate

Michelle C. Badorine, Senior Deputy Attorney General
MNewman@ag.nv.gov
Lucas J. Tucker (NV Bar No. 10252) Senior Deputy Attorney General
LTucker@ag.nv.gov
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701 Tel: (775) 684-1100

FOR PLAINTIFF STATE OF NORTH DAKOTA:

STATE OF NORTH DAKOTA
Drew H. Wrigley
Attorney General

Elin S. Alm, ND ID 05924
Assistant Attorneys General
Consumer Protection & Antitrust Division
Office of Attorney General of North Dakota
1720 Burlington Drive, Suite C, Bismarck, ND 58503-7736
(701) 328-5570
(701) 328-5568 (fax)
ealm@nd.gov

FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:

Domingo Emanuelli-Hernández Attorney General
Thaizza Rodríguez Pagán Assistant Attorney General PR Bar No. 17177
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192 Tel: (787) 721-2900, ext. 1201, 1204

trodriguez@justicia.pr.gov

Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111

FOR PLAINTIFF STATE OF SOUTH CAROLINA:

ALAN WILSON
Attorney General

Mary Frances Jowers
Assistant Deputy Attorney General
W. Jeffrey Young
Chief Deputy Attorney General
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, South Carolina 29211-1549 Phone: 803-734-5855
Email: mjowers@scag.gov

Charlie Condon
Charlie Condon Law Firm, LLC 880 Johnnie Dodds Blvd, Suite 1 Mount Pleasant, SC 29464
Phone: 843-884-8146
Email: charlie@charliecondon.com

James R. Dugan, II (*pro hac vice*) The Dugan Law Firm
365 Canal Street
One Canal Place, Suite 1000 New Orleans, LA 70130 Phone: (504) 648-0180
Email: jdugan@dugan-lawfirm.com

FOR PLAINTIFF STATE OF SOUTH DAKOTA:

MARTY JACKLEY
Attorney General

Jonathan Van Patten
Assistant Attorney General
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD 57501

Tel: 605-773-3215
jonathan.vanpatten@state.sd.us

FOR PLAINTIFF STATE OF UTAH:

Derek E. Brown
Utah Attorney General

 Matthew Michaloski
Marie W.L. Martin
Assistant Attorney General
160 East 300 South, 5th Floor
P.O. Box 140811
Salt Lake City, UT 84114
mmichaloski@agutah.gov
Telephone: (801) 440-9825


### 2.  Counsel for Defendant

Kathy D. Patrick (KPatrick@gibbsbruns.com)
Robin C. Gibbs (RGibbs@gibbsbruns.com)
Ayesha Najam (ANajam@gibbsbruns.com)
Charles M. Rosson (CRosson@gibbsbruns.com)
Denise L. Drake (DDrake@gibbsbruns.com)
Caitlin A. Halpern (CHalpern@gibbsbruns.com)
Michael R. Davis (MDavis@gibbsbruns.com)
Michael D. Doman (MDoman@gibbsbruns.com)
Elisa J. Wulfsberg  (EWulfsberg@gibbsbruns.com)
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002

Eric Mahr (*pro hac vice*) (eric.mahr@freshfields.com)
Andrew Ewalt (*pro hac vice*) (andrew.ewalt@freshfields.com)
Sara Salem (sara.salem@freshfields.com)
**FRESHFIELDS US LLP**
700 13th Street, NW, 10th Floor
Washington, DC 20005

Justina K. Sessions (justina.sessions@freshfields.com)
**FRESHFIELDS US LLP**
855 Main Street
Redwood City, CA 94063

### B. **Statement of Jurisdiction**

#### 1. **Plaintiffs' Statement**

The Court has jurisdiction over this action, in which the Plaintiff States assert violations of federal antitrust law, under Sections 1, 2, and 4 of the Sherman Act, 15 U.S.C. §§ 1–2 & 4; Sections 16 of the Clayton Act, 15 U.S.C. § 26; and under 28 U.S.C. §§ 1331, 1337, and 1407, and seek equitable remedies.  The Plaintiff States also assert violations of state antitrust and consumer protection laws and seek civil penalties under those state laws.  All claims under federal and state law are based upon a common nucleus of operative facts.  This Court has jurisdiction over the non-federal claims under 28 U.S.C. § 1367(a), as well as under principles of pendent jurisdiction.  The Court has personal jurisdiction over Defendant Google (which Google has not challenged and has, thus, waived).

Google has not disputed the Court's jurisdiction other than its past arguments in its Motion to Dismiss under Rule 12(b)(1) (Dkt. No. 200).  The Court denied that motion, finding that the States plead parens patriae standing and subject matter jurisdiction for all of their claims.  Dkt. No. 788.  There are no pending or outstanding jurisdictional disputes.

#### 2. **Defendant's Statement**

Google has raised jurisdictional disputes, including the States' standing and capacity to sue, in its Motions for Summary Judgment on the States' DTPA claims and the States' Antitrust Claims (ECF 672 and 674). In the DTPA motion, Google also urged the Court to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. While the Court denied Google's Rule 12(b)(1) motion and found the States had adequately pleaded parens patriae standing and subject matter jurisdiction for all of their claims (ECF 788), the Court expressly noted that its ruling was limited to that "stage" of the litigation (i.e., the motion to dismiss stage), *id.* at 28, 40, 41, and 44, and the Court has not ruled on the renewed or new subject matter

jurisdiction objections Google lodged in the pending summary judgment motions. Google agrees there is no dispute as to personal jurisdiction.

### C.  <u>Nature of the Action</u>

#### 1.  Plaintiffs' Statement

The seventeen Plaintiff States,[1] led by the State of Texas, bring two sets of causes of action: (a) federal and state antitrust claims and (b) claims under each State's deceptive trade practices acts ("DTPA").  The States' claims arise from over a decade of ongoing monopolistic, anti-competitive, and deceptive acts by Google through which Google has built and maintained its dominance across multiple markets in the digital advertising technology ("ad tech") industry.  Google's conduct has harmed competition and market participants, including publishers, advertisers, and users.  Based on the extent of Google's conduct shown in Google's own data and documents, the States seek up to approximately $50 billion in DTPA civil penalties against Google, or even higher pending the factfinder's determination.  The States also seek civil penalties and equitable remedies pursuant to their antitrust claims.  The parties have agreed to, and the Court approved, deferral of the equitable remedies portion of the case until after trial on liability and penalties.[2]

#### 2.  Defendant's Statement

Plaintiff States, acting in their *parens patriae* capacities, allege that Google violated federal and state antitrust laws. Specifically, the States contend Google monopolized or attempted to monopolize four different alleged relevant markets: publisher ad servers, ad exchanges, buying

---

[1] Because the "Nature of the Action" is for the Court, Plaintiffs identify as seventeen Plaintiff States here.  In the next section of the "Contentions," which is for the jury, Plaintiffs identify as sixteen Plaintiff States based on the Court's recent ruling on Plaintiffs' jury demand.

[2] The States object to the portions of Google's Statement below that purport to characterize the States' claims.

tools for small advertisers, and buying tools for large advertisers. The States also claim Google unlawfully tied its publisher ad server, Doubleclick for Publisher (DFP), to its ad exchange, AdX. Google disputes that there are four relevant markets, as the States allege. Instead, the States' claims must be evaluated against the commercial and market reality that advertising is inherently a two-sided market, so competitive harm can only be shown by evidence that addresses both sides of the advertising transactions. It "cannot be accurately assessed by looking at only one side of the platform in isolation,"[3] as the States have done by limiting these markets to "advertiser only" or "publisher only" markets. Google also disputes it ties DFP to AdX. Finally, Google contends there were legitimate pro-competitive justifications for Google's conduct.

Plaintiff States also allege that Google violated certain state deceptive trade practice (DTPA) statutes by (i) failing to disclose certain product changes or optimizations, specifically Dynamic Revenue Sharing ("DRS"), Reserve Price Optimization ("RPO"), and Bernanke, (ii) misrepresenting that by switching to a first price auction, Google would create a more fair and transparent market for everyone, where bids would be compared equally on a net basis; and (iii) stating that "we don't sell your personal information" when, according to plaintiffs, Google's ad tech sells what Plaintiffs contend is personal information.

Google disputes the States' claims in their entirety. It denies that the States can proceed, as they seek to do here, without proof of individualized harm to specific advertisers or publishers, because concrete harm and "injury in fact" are required to prove standing and, independently, to establish the constitutionality and proportionality of the "more than $50 billion" in penalties the States seek. Awarding penalties of this magnitude, in the absence of any proof of individualized

---

[3] This portion of the Statement of the Case is drawn from the Supreme Court's decision in *Ohio v American Express Co.*

harm, would violate Due Process and the Excessive Fines Clauses of the Constitution, even assuming the statutes permitted this, which they do not. Google's products did not harm or deceive advertisers and publishers; instead, Google helped them, because advertisers won more ads and publishers sold more ad space, for more revenue, through the use of Google's products and algorithms. Google also denies that it sells personal information. No personally identifying information is shared with third parties (let alone sold to anyone) by Google's ad tech products.

Google further asserts that some or all of the States claims are time-barred or subject to specific defenses provided in the relevant antitrust and DTPA statutes.

### D. Contentions of the Parties

The parties set forth below a summary of their contentions for trial. By reciting them here, the parties do not agree with or adopt their opponent's summaries and contentions and reserve all objections. The parties likewise do not waive any relief sought or arguments made in any pending motion and opposition or related briefing, including, specifically the briefing related to: Google's Motion to Dismiss under Rule 12(b)(6), each side's motions *in limine*, Google's motions for summary judgment, and Google's *Daubert* motions.

#### 1. Plaintiffs' Contentions

There are sixteen Plaintiffs in this trial.  They are: the State of Texas, the State of Alaska; the State of Arkansas; the State of Florida; the State of Idaho; the State of Indiana; the Commonwealth of Kentucky; the State of Louisiana; the State of Mississippi; the State of Missouri; the State of Montana; the State of Nevada; the State of North Dakota; the State of South Carolina; the State of South Dakota; and the State of Utah.

There is only one Defendant in this case—Google LLC.  The States have sued Google to protect each of their residents' economic well-being.[4]

To help you follow the evidence, I will now give you a brief summary of the positions of the parties in this case.

The States are asking you, the jury, to decide two types of claims in this case.  Before we discuss those two types of claims, we will discuss briefly the industry at issue in this case.  All of the States' claims relate to the display advertising industry and Google's products and business in that industry.  Display advertising refers to the digital advertisements or ads that appear on websites, like the websites of local newspapers or USA Today.  Websites are owned by publishers, who sell the ad space on their websites.  Advertisers buy that ad space to display their ads to people visiting and viewing the websites.  Publishers and advertisers use sophisticated tools to sell and buy those ads through auctions.  Each auction lasts a fraction of a second, and there are billions of auctions and ads sold and bought every day.  Specifically, publishers use tools called "ad servers" to sell their ad space.  Advertisers use tools called "ad buying tools" to purchase that ad space.  Situated in the middle of these tools are "ad exchanges" that conduct the auctions and that connect advertisers' buying tools and publishers' ad servers.  Google owns each of these types of tools.  Google owns and controls a publisher ad server, Google owns and controls an ad exchange, and Google owns and controls advertiser buying tools.

As I mentioned, the States are asserting two types of claims in this case.

The States' first type of claims are what I will generally refer to as antitrust claims.  The antitrust laws are meant to promote competition between businesses. Competition between businesses generally benefits and is good for consumers.  The antitrust laws make it illegal to

---

[4] Google objects to this sentence, which omits to inform the jury that this is the States' *claim*, as opposed to a statement by the Court (who will presumably be reading these to the jury).

engage in "anti-competitive" conduct that is bad for competition.  The States claim that Google has intentionally engaged in several forms of illegal, anti-competitive conduct, through Google's ownership and control of each of the tools necessary to buy and sell display ads.  The States claim that Google has stripped its customers of free choice and that Google forces publishers to purchase Google tools and services they otherwise would not purchase, or would purchase elsewhere.  The States also claim that Google has changed auction rules and programs to unfairly advantage Google and to obtain a monopoly in the markets associated with Google's tools.  The States claim that Google's conduct has hurt competition and its own customers, publishers and advertisers, in each of those markets.  The States claim that Google's so-called justifications for its conduct are pretextual or made up to try to excuse Google's harmful conduct.  Google's conduct has allowed Google to maintain high fees, limit customer choice, coerce customers to use Google products, and unfairly exclude competitors, among other harm to customers and competition.  The States are asking you to find that, through this conduct, Google violated the antitrust laws at issue in this case.

The States' second type of claims are what I will generally refer to as deceptive and unfair trade practices claims.  The deceptive and unfair trade practices laws of each State generally forbid businesses from deceiving or misleading consumers or engaging in any other unfair or otherwise unlawful trade practices.  The States claim that, as part of Google's illegal scheme to become a monopolist, Google deceived its own customers, publishers, and advertisers in multiple ways.  The States claim that, through secret or misleading programs with names like Bernanke, DRS, and RPO, Google deceived its own customers about how Google ran its ad auctions, about auction prices, and about the fees collected from customers and paid to Google.

Specifically, the States claim that Google secretly introduced an auction manipulation program called Reserve Price Optimization or RPO in live auctions. The States claim that Google tested RPO in live ad auctions for many months without telling anyone. RPO worked by collecting advertisers' data from past ad auctions to figure out how much they were willing to pay for ads. Then, RPO would raise the starting price, called a price floor, for ads—higher than what the publisher originally set but just below the highest bid it expected. The States claim that this made the auction unfair. Advertisers ended up paying more than they would have in a normal auction.

The States also claim that Google secretly introduced a manipulation to their auctions called Dynamic Revenue Sharing or DRS. Google introduced several versions of DRS. In the first version of DRS, the States claim that Google would secretly lower its 20% commission from ad sales to help win more ad placements. With the second version of DRS, Google would sometimes take more or less than 20%, depending on what helped it win more ad spots and based on information that only Google had. The States claim that Google never told others about the first version of DRS or that it had changed from the first to the second version of DRS.

The States also claim that Google secretly introduced another manipulation to ad auctions called Project Bernanke, to help Google win more ad auctions on Google's ad exchange. First, the States claim that Google secretly lowered the second-highest bid, which made the auction price cheaper, but Google still charged the advertiser the higher price as if it hadn't lowered the second-highest bid. The States claim the extra money was saved in a pool. Second, the States claim that Google secretly used that saved money to raise bids on other auctions, helping Google win even more ad spots. The States contend that Google then secretly introduced a new version of the Bernanke manipulation program called "Global Bernanke." With Global Bernanke, Google took money from ad auctions and put it into a big shared or "global" pool. In the previous version of

Bernanke, the pool of money stayed connected to each individual publisher. But with Global Bernanke, the States claim that a publisher could lose money and not get anything back, because the money was used across many different publishers.

The States claim that Google's deceptive and unfair acts were designed to and did benefit Google, while harming Google's own customers who paid more for ads, who were paid less for ad space, and who lost the basic ability to make informed decisions for themselves. The States are asking you to find that Google violated each States' deceptive and unfair trade practices laws.

You are not being asked to determine any remedies in this case. If you find that Google violated one or more state laws prohibiting anticompetitive conduct or deceptive or unfair trade practices, I will determine in a later proceeding what remedies should be awarded. However, you will be asked to determine the number of violations Google committed as to each law and each category of conduct.[5] This determination will assist me in deciding whether, and in what amount, to award civil penalties.

### 2. Google's Contentions in Response to the States' Antitrust Contentions[6]

Google disputes the States' antitrust claims. It contends that digital advertising is a broad market that encompasses not only web display ads, but in-game advertising, in-app advertising on

---

[5] Google objects to any statement informing the jury that they will determine the number of DTPA violations on the grounds that the Court has already ruled that it will determine the quantum of penalties. Jury Order ECF 854. Google contends that while proof of *a* violation is required to establish liability under every DTPA statute, proof of multiple (or a specific number) of violations is not an element required to prove liability under any DTPA statute at issue. *See id*. at App. A. Because the number of violations is relevant only to the *quantum* of penalties to be awarded, Google contends that it is a matter for courts (not juries) to decide under applicable law, and the States' proposed sentence misleads the jury regarding the issues they will consider. The States take the position that the jury will decide the number of DTPA violations.

[6] Given the complexity of this case and the length of the States' contentions, Google respectfully submits that its responsive contentions should be read to the jury at the conclusion of each topic. Doing so would enhance the jury's understanding that these are merely each side's *contentions* and mitigate the prejudice from what may otherwise be perceived as a one-sided statement to

your mobile phone, video, and other avenues by which publishers and advertisers reach consumers. Google disputes that it has a monopoly in any of the markets the States allege; instead, Google claims there are many competitors for advertising tools and advertisers' dollars, many competing ad exchanges, and that publishers have broad choices among how they choose to sell ad space.

Google also contends that its actions did not hurt competition; instead, it claims that its products helped publishers make more money and helped advertisers win more of the ad space they wanted, because its products are better than the products offered by its competitors. Google claims the advertising sales resulting from Google's high-quality matches allow publishers to make money and create more free content, without a subscription paywall, while allowing advertisers to place ads in a more efficient and effective way. By helping its publisher and advertiser customers find each other, at fair market prices, Google claims its digital advertising technology helps keep the internet free and open to all. Google also says it has achieved success through innovation, after significant investments of time and money in research and development, not through anti-competitive conduct. Google also says it has competed vigorously and fairly, achieving success through hard work.

Finally, Google contends that it had legitimate—and not anti-competitive—justifications for its conduct: Google claims that its technology and algorithms increased revenues for publishers, increased ad matches for advertisers, allowed auctions to succeed that might otherwise have failed, and improved quality for its customers by reducing fraud, spam, and website latency.

---

which Google has no response. This approach is simple to implement, if the Court divides its discussion of the parties' contentions into the two buckets the States have already proposed, antitrust claims and DTPA claims. Using this approach, the Court can first describe the States' antitrust claims, then inform the jury of Google's response to them, before proceeding on to describe the States' DTPA claims, followed by Google's response, and concluding with the parties' respective positions on remedies.

Google also contends that the algorithms it implemented were product design choices that benefited its customers, which is not illegal, and that it has no obligation to design its products in ways that benefit its competitors, rather than its customers.

### 4. Google's Contentions in Response to the States' DTPA Claims.

Google denies that it violated any deceptive and unfair trade practices laws and is asking you to find that it is not liable for any of the States' claims. Google contends that its auction optimizations—RPO, DRS, and Bernanke—are technological innovations that improved the advertising auction process. Every technology company, Google says, experiments, optimizes and improves its products all the time. And here, Google says, it told its customers that it conducted experiments to improve its products, so no one was deceived about that.

Google says the optimizations the States criticize were innovations implemented to solve auction problems for advertisers or publishers that arose during ad auctions. For example, in most ad auctions, the publisher selling ad space sets a "reserve price," which is the minimum price a bidder must meet to win the auction. Google contends that many publishers did this manually, which was not effective and caused them to lose money. Google claims that it therefore developed reserve price optimization—abbreviated RPO—an algorithm Google created to help publishers set a more accurate reserve price for their ad space, so they didn't sell ad space too cheaply. RPO used information about historic bids to automatically set the reserve price for ad space at a level near where similar ad space had sold in the past. Google says it created this algorithm after extensive study and experimentation. Google also says publishers made more money and sold more inventory as a result of RPO. With respect to the States' claim that Google kept RPO a secret, Google disagrees. Google stated publicly that it ran experiments to optimize its auctions, including experimenting with modifying publishers' reserve prices. In addition, when RPO was fully

19

launched, Google announced it publicly and explained how it worked, so it says no one was deceived by RPO.

Google says Dynamic Revenue Sharing (abbreviated DRS) solved a different problem. Ad space is sold on a commission (called a "take rate"). Sometimes, because of Google's take rate, its customer might not win an ad it wanted to buy. Google claims it developed DRS, another algorithm, so that, if that was going to happen, Google would lower its take rate so the auction would not fail. To even things out, DRS might also increase Google's take rate in other auctions so that, Google claims, over the course of a given month, Google's overall fee was the same, but more auctions succeeded. Google contends this helped advertisers win more ads and publishers make more sales. Google disagrees with the States' claim that DRS was kept a secret. Google claims that it explained publicly that optimizations like DRS might be applied in the auction, and that Google announced DRS publicly, so no one was deceived. Google contends that publishers even had the option to opt out of DRS if they didn't want to use it.

Google Ads was an advertiser buying tool owned by Google. It helped advertisers manage ad campaigns and placed bids for advertising space on their behalf, and advertisers would pay Google Ads a fee. Google contends that Bernanke was a confidential bidding strategy Google Ads implemented to help its advertisers win more ads. Google claims that it worked roughly the same way as DRS, but on the advertiser side. Bernanke sometimes lowered the fee Google Ads charged advertisers to buy ads, so that a bid from Google Ads would be high enough to clear a reserve price. Bernanke then increased the fee Google Ads charged in other transactions, to average out Google Ads' fee over the course of a given month. Google claims this benefitted its advertiser customers, who were able to win auctions they otherwise would have lost, while still paying Google Ads the same percentage fee for its service. Finally, because Bernanke was a bidding

algorithm, Google claims it was proprietary and a trade secret. Google says no bidder ever discloses to the other side of an auction the bidding strategy it intends to use to try to win an auction, so no one was deceived by any failure to disclose the Bernanke bidding strategy.

Google claims each of these algorithms benefited its customers. Publishers made more money and sold more ads. And advertisers were able to buy more of the ad space they wanted to buy. Google therefore claims no one was deceived, and it did not violate any statute.

### 6. Google's Contentions on Remedies.

Your task in this case will be limited to determining whether Google violated the law as the States claim. You should not concern yourself with what, if any remedy, would be appropriate if you find Google violated a law. I will determine that at the end of the trial, guided by your findings on the facts.

At the end of the trial, before you deliberate, I will give you detailed instructions on the law you must follow in reaching your verdict.

### E.  Stipulations and Uncontested Facts

**Stipulations**

1. At all times described in the Plaintiffs' Fourth Amended Complaint, Google has engaged in conduct which constitutes "trade" and "commerce," as defined in § 17.45(6) of the Texas DTPA; and as defined in Idaho Code § 48-602(2) and IDAPA 04.02.01.020.47.  Google Answer (ECF No. 691-1) ¶¶ 675, 692; Plaintiffs' Fourth Amended Complaint ¶¶ 675, 692.

**Uncontested Facts**

1. Google is a limited liability company organized and existing under the laws of the State of Delaware, and it maintains a Mountain View, California business address; it is a technology company that provides numerous internet-related products, including online advertising technologies; and it is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company that is incorporated and existing under the laws of the State of Delaware and that maintains its principal executive offices in Mountain View, California.

2. Publishers of online digital content designate space for digital ads, called inventory.

3. Ad tech has many components that serve multiple functions but generally facilitates the purchasing of digital advertising space by matching publishers with inventory to sell with advertisers with ads to show.

4. Publishers can use publisher ad servers to facilitate their advertising sales, and advertisers can use buying tools to facilitate their advertising purchases.

5. A publisher ad server is generally an ad tech tool that helps publishers manage, track, and sell their online digital inventory in an automated manner. Publishers can use ad servers for functions such as deciding which ad to serve and where the ad should be displayed.

6. Publishers can engage in direct deals using negotiations with an advertiser to set the terms of the deal, as well as potentially other types of negotiations.

7. Since at least 2015, publishers can also use ad tech tools to facilitate direct deals with advertisers (also known as, among other things, "programmatic guaranteed," "programmatic direct" deals, or "automated guaranteed").

8. Ad exchanges facilitate "matches" between the buy-side and sell-side. They are two-sided transaction platforms.

9. Transactions using ad tech tools start when a user visits a publisher's property (like a website or mobile app), which thereby triggers requests to the publisher's ad tech software for an ad to show to the user. That request, in turn, kicks off a process of identifying potential ad candidates and oftentimes involves requesting bids from buying tools, conducting auctions, and ultimately showing an ad to the user.

10. Many advertisers work with media buying agencies (or "advertising agencies") to purchase impressions on their behalf. Advertising agencies can also assist advertisers with setting campaign goals, developing campaign budgets, selecting ad buying tools, managing advertising purchases, and bidding on the advertiser's behalf. Advertising agencies can interface with ad buying tools on behalf of advertisers.

11. Google's publisher ad server, formerly called "DoubleClick for Publishers" ("DFP"), was acquired by Google in 2008, along with DoubleClick Ad Exchange, which Google re-developed and relaunched as "AdX."

12. AdX runs auctions to match publishers and advertisers and facilitate the sales of ad impressions, along with other tools and products.

13. Google's publisher ad server formerly known as DoubleClick for Publishers included a feature known as "Dynamic Allocation."

14. Dynamic Allocation ("DA") was a product feature that DoubleClick launched in 2007, before Google acquired the company in 2008.

15. Google launched Enhanced Dynamic Allocation ("EDA") in March 2014.

16. EDA enabled line items representing AdX and other exchanges to compete simultaneously with line items representing guaranteed demand (i.e., direct deals).

17. EDA also allowed remnant line items to compete for inventory that previously would have been allocated to guaranteed line items.

18. In 2009, Google's AdX announced the launch of real-time bidding ("RTB").

19. With RTB, advertisers could submit bids based on a real-time evaluation of the value of that user's view or potential click.

20. Other ad exchanges also incorporated RTB in the 2009–2010 time period.

21. Around 2014, publishers began adopting a new technology called header bidding that allowed them to request real-time bids from multiple ad exchanges.

22. In or around 2016, Google announced "Exchange Bidding" to enable publishers to receive bids on a single impression from multiple ad exchanges, and compare those bids to determine the winner.

23. Exchange Bidding fully launched in 2018.

24. Exchange Bidding was renamed "Open Bidding" in mid-2019.

25. In 2019, AdX transitioned to a unified first-price auction ("UFPA").

26. In the UFPA, the highest bidder wins and pays a price equal to its bid.

27. Dynamic Revenue Share (also known as "Dynamic Revenue Sharing" or "DRS") was implemented in Google's AdX.

28. Dynamic Revenue Share, or DRSvl, launched on or about August 20, 2015. DRSv2 subsequently launched on or about December 1, 2016. tDRS subsequently launched on or about July 17, 2018.

29. Prior to DRS, in certain circumstances, even if the AdX winning bidder was willing to pay more than the reserve price, the auction would fail and a transaction would not occur. This would happen if the winning bidder's "net bid"—the bid minus AdX's revenue share—fell below the publisher's reserve price. Bids that met this criteria were referred to as being in the "dynamic region."

30. When first introduced (DRS v1), DRS allowed AdX to reduce its revenue share when doing so brought a bidder's net bid to a level above the applicable reserve price, to allow the bidder to win the auction.

31. If an auction clears at a price lower than the reserve price applied, and AdX still pays the publisher at least its designated minimum CPM, that result is only possible through a reduction in AdX's revenue share (i.e., because of DRS v1).

32. DRS was in place until late 2019, when Google shifted to a first price auction format in AdX.

33. Line items are ad server settings specified by a publisher, which contain details relevant to showing an advertisement, such as the price that would be paid if the line item were selected and details about what kind of ad campaign could be shown.

34. In late 2013, Google introduced a limit of 61,000 active line items for its ad server DFP.

35. In 2018, Google announced that beginning on January 31, 2019, it would start enforcing the preexisting limits for publishers who were close to or over the line item limit.

36. At the time of that announcement, 35 publishers were over the line item limit.

37. In 2019, in connection with its move to a UFPA, Google introduced Unified Pricing Rules ("UPR").

38. With UPR, the pricing rules became "unified," meaning that a publisher using GAM could no longer set as part of the bid request different pricing rules based on the identity of the ad exchange or the buying tool receiving the bid request.

39. With UPR, publishers can set a single reserve price within the GAM interface that applies uniformly across all participants in the Unified First Price Auction, including AdX buyers, non-Google ad exchanges, and ad networks.

40. The Bid Data Transfer ("BDT") file is one type of data transfer file and contains information about the bids the publisher received on its inventory.

41. Google Ads, formerly known as AdWords, allows advertisers to create ad campaigns that run across different formats, including search and display ads.

42. DV360, formerly known as DoubleClick Bid Manager ("DBM"), offers tools that assist advertisers in managing their display advertising campaigns.

43. Project Bernanke launched in 2013.

44. Google launched another version of Bernanke in August 2015, called Global Bernanke.

45. In 2016 and 2017, Google changed how winning advertisers in Google Ads were charged for impressions by adopting a "threshold payment rule" for advertisers using Google Ads' auto-bidding functions. A threshold payment rule charges the winner the minimum bid necessary, in retrospect, to have won the auction.

46. On May 9, 2016, the new pricing framework was launched for certain advertisers using Google's "conversion optimizer" auto-bidding tool, including those that paid based on a "CPA" (cost-per-conversion/sale) basis or an "ROAS" (return on ad spend/return on investment) basis. On February 10, 2017, the threshold-pricing rule was implemented for the remaining category of auto-bidding advertisers, namely those paying on an "eCPC" (enhanced cost per click) basis.

## F.  Contested Issues of Fact and Law

### 1.  Plaintiffs' Position

The Parties refer the Court to, and hereby incorporate by reference, the factual and legal issues disputed in the following documents in the case and discovery record:

- The Parties' pleadings: Plaintiffs' Fourth Amended Complaint and Google's Answer to Fourth Amended Complaint and Affirmative Defenses;

- The Parties' briefing on and exhibits to Google's Motions for Summary Judgment, including the States' oppositions and Google's reply briefing;

- The Parties' briefing on and exhibits to Google's Motions to Exclude Expert Testimony, including the States' oppositions and Google's reply briefing;

- The Parties' other pending motions, listed in the below section, and related response and reply briefing;

- The Parties' discovery responses; and

- The Parties' Proposed Jury Instructions and Verdict Form, to be filed by the Parties with current deadline of July 24, 2025, as well as the forthcoming Proposed Findings of Fact and Conclusions of Law.

An additional legal issue disputed by the Parties following the Court's Order (Dkt. No. 854) is the scope of the DTPA liability trial vs. the DTPA penalty trial. The States take the position that, pursuant to statutory and case law, the jury must decide the *number* of DTPA violations as it relates to DTPA liability, which is distinct from the Court's determination of the quantum of DTPA civil penalties, which will be based on the jury's determination of DTPA liability.   Because this issue impacts the evidence presented at the jury trial (e.g., which expert witnesses will or will not testify), the Parties plan to separately and immediately raise and brief this issue to the Court.

## 2. Google's Position

Google's disputed issues of fact and law are summarized in its Answer and Defenses to the Fourth Amended Complaint, as well as in the following pending motions:

- Google's Motion to Dismiss under Federal Rule 12(b)(6) (ECF 202)

- Google's Motion for Summary Judgment on Plaintiffs' DTPA Claims (ECF 672);

- Google's Motion for Summary Judgement on Plaintiffs' Antitrust Claims (ECF 674);

- Google's Omnibus Motion to Exclude Expert Testimony (ECF 668);

- Google's Motion to Strike Improper Rebuttal Opinions of Witnesses DeRamus and Somayaji (ECF 613);

- Google's Motion to Strike and/or Exclude testimony from Plaintiffs' Chat-related experts Jacob Hochstetler and Ignatius Grande (ECF 762 & 764);

- Google's Motion to Bifurcate the Liability Finding from Assessment of Penalties (ECF 635);

- Google's Verified Motion for Continuance (ECF 862)

In addition to the issues of fact and law raised in those pleadings and motions, Google specifically disputes the following:[7]

### a.    Scope of Liability Trial

Google disagrees with the States' position that, in addition to determining liability, the jury must also determine the *number* of DTPA or antitrust violations that Google committed. Each statute the States invoke requires proof of a single violation to show liability. None requires proof of *more than one* (or any other number) of violations to establish liability. ECF 835 (Google's Supp. Br. on Mot. to Strike Jury) at App'x A. Instead, the *number* of violations is relevant only to determining the *quantum* of any penalty the Court should apply, *id.* at App. A, an issue the Supreme Court (and this Court) have each ruled the Court alone must decide. *See Tull v. United States*, 481 U.S. 412, 427 (1987); ECF 854.

### b.  Antitrust Claims

Google identifies the following issues of fact and law relevant to Plaintiffs' antitrust claims that remain to be litigated. To the extent any issue of law discussed below is deemed to be an issue of fact, it is incorporated into this section.

1. Whether the antitrust laws require Google to give its competitors the same access to its platforms that Google receives and whether they require Google to take affirmative steps to integrate with its competitors.

2. Whether Plaintiff States have carried their burden of proving that publisher ad servers for web display is a relevant market.

3. Whether Plaintiff States have carried their burden of proving that ad exchanges for web display  is a relevant market.

---

[7] Google objects to the Plaintiffs' citation to the parties' *discovery responses* as a source of contested issues of fact and/or law.

4.   Whether Plaintiff States have carried their burden of proving that ad buying tools for small advertisers and for web display ads is a relevant market.

5.   Whether Plaintiff States have carried their burden of proving that ad buying tools for large advertisers and for web display ads is a relevant market.

6.   If publisher ad servers for indirectly sold open web display ads is a relevant market, whether Plaintiff States have carried their burden of proving that Google has monopoly power in that market.

7.   If ad exchanges for open web display ads is a relevant market, whether Plaintiff States have carried their burden of proving that Google has monopoly power or a dangerous probability of achieving monopoly power in that market.

8.   If open web display ad buying tools for small advertisers is a relevant market, whether Plaintiff States have carried their burden of proving that Google has monopoly power or a dangerous probability of achieving monopoly power in that market.

9.   If open web display ad buying tools for large advertisers is a relevant market, whether Plaintiff States have carried their burden of proving that Google has a dangerous probability of achieving monopoly power in that market.

10.  If publisher ad servers for indirectly sold web display ads is a relevant market, whether Plaintiff States have carried their burden of proving that Google engaged in anticompetitive conduct that harmed competition in the publisher ad server market.

11.  If ad exchanges for open web display ads is a relevant market, whether Plaintiff States have carried their burden of proving that Google engaged in anticompetitive conduct that harmed competition in the ad exchange market.

12.  If open web display ad buying tools for small advertisers is a relevant market, whether Plaintiff States have carried their burden of proving that Google engaged in anticompetitive conduct that harmed competition in that market.

13.  If ad exchanges for open web display ads is a relevant market, whether Google had a specific intent to monopolize the market for ad buying tools for large advertisers.

14.  If open web display ad buying tools for small advertisers is a relevant market, whether Google had a specific intent to monopolize that market.

15.  If open web display ad buying tools for large advertisers is a relevant market, whether Google had a specific intent to monopolize that market.

16.  If open web display ad buying tools for large advertisers is a relevant market, whether Google engaged in anticompetitive conduct in that market.

17.  Whether there was a legitimate business justification for Google's conduct.

27

18. Whether any of Google's ad tech products are two-sided transaction platforms.

19. Whether in any of the markets the States have alleged, they have met their burden to show anticompetitive effects on both sides of the market, as required by *Ohio v. American Express Co.*

20. Whether Plaintiff States have carried their burden of proving that Google's ad server and Google's ad exchange are two separate products.

21. Whether Plaintiff States have carried their burden of proving that Google coerces customers to use its ad server in order to use its ad exchange.

22. Whether Plaintiff States have carried their burden of proving that Google possesses substantial economic power over the ad exchange market.

23. Whether Plaintiffs States have carried their burden of proving that the alleged tie has an anticompetitive effect on the ad server market.

24. Whether Plaintiff States have carried their burden of proving that the alleged tie affects a not insubstantial volume of commerce.

25. Whether Plaintiffs' Supplemental State Law Antitrust Claims fail for the same reasons as Plaintiffs' federal antitrust claims.

26. Whether Alaska's antitrust claims accrued before December 16, 2014.

27. Whether Arkansas', Kentucky's, or Montana's antitrust claims accrued before December 16, 2015.

28. Whether Florida's, Idaho's, Missouri's, Nevada's, North Dakota's, Puerto Rico's, South Dakota's, or Utah's antitrust claims accrued before December 16, 2016.

29. Whether South Carolina's antitrust claims accrued before December 16, 2017.

30. Whether Indiana's antitrust claims accrued before December 16, 2018.

31. Whether Plaintiff States have carried their burden of proving that Google engaged in unlawful conduct through at least one act that took place entirely in Mississippi.

32. Whether the conduct at issue in the antitrust claims injured the health and well-being of the residents of any Plaintiff State.

33. Whether the conduct at issue in the antitrust claims affected a sufficiently substantial portion of any Plaintiff State's population.

**Deceptive Trade Practices Claims**

1. Whether Plaintiffs are required to prove individualized injuries or harm to a specific, individual consumer to confer subject matter jurisdiction over Plaintiffs'

DTPA claims.
   a.   If so, whether Plaintiffs have met that burden.

2.   Whether Plaintiffs have otherwise met their burden to show Article III standing for each of their claims.

3.   Whether Plaintiffs may assert claims for penalties based on allegedly deceptive practices that ended before they filed this suit.

4.   Whether an award of penalties to a State, in the absence of proof of individualized harm to a consumer in that state, violates the Due Process Clause of the Constitution.

5.   Whether an award of penalties to a State, in the absence of proof of individualized harm to a consumer in that state, violates the Excessive Fines Clause of the Constitution.

6.   Whether the States' claim for penalties is redressable if it seeks an award of allegedly "deterrent" penalties for conduct that indisputably ended before the State filed suit.

7.   Whether each Plaintiff must prove deceptive or prohibited conduct by Google within that state to obtain relief under its DTPA statute.
   a.   If so, whether Plaintiffs have met that burden.

8.   Whether evidence of household internet usage in a state establishes a sufficient nexus to enforce a DTPA statute against Google for conduct in an ad auction, in the absence of proof that one of the parties to the auction was in the state when the auction occurred.
   a.   Whether evidence of household internet usage in a state suffices to prove that any deceptive conduct by Google occurred in an ad auction in a state.

9.   Whether the Court may assess penalties under any States' DTPA statutes without proof of specific harm to an individual consumer in that state as a result of Google's actions.
   a.   If so, whether Plaintiffs have met that burden of proof.

10.   Whether the States' respective Attorneys Generals have authority to pursue their DTPA claims in federal court (as opposed to only in state courts of their home states).

11. Whether any alleged representation or omission by Google was material.

12. Whether, for alleged non-disclosures of material fact, any State must prove Google's alleged non-disclosure actually caused an individual advertiser or publisher's decision to enter into a transaction with Google that the individual advertiser or publisher would otherwise have not entered into.

13. Whether Google had an obligation to disclose to its publisher customers information about the products/services Google sold to advertisers.

14. Whether Google had an obligation to disclose to its advertiser customers information about the products/services Google sold to publishers.

15. Whether evidence of statements to one publisher about equal footing in an auction is sufficient to establish this was a deceptive act or practice as to any other person or any state DTPA statute.

16. Whether, for alleged non-disclosures of material fact in connection with the States' DTPA claims, a fact may be "material" in the sense that it might change the purchasing decisions of consumers, but nevertheless be non-actionable because the fact is of the sort that a reasonable consumer in the industry would not expect to be disclosed.

17. Whether any alleged statements by Google that are alleged to have violated any DTPA were inactionable "puffery."

18. Whether the following states must prove that Google, by virtue of its conduct, intended to mislead a customer into a transaction: Alaska, Louisiana, North Dakota, South Dakota[8], Texas, and Utah.
    a. If so, whether those Plaintiffs have met that burden.

19. Whether the following states must prove that Google willfully committed any allegedly deceptive act: Florida, Kentucky, Mississippi, Montana, Nevada, and South Carolina.
    a. If so, whether those Plaintiffs have met that burden.

---

[8] The Court ruled in its Jury Order that South Dakota failed to properly plead a claim under its DTPA. ECF 854 at 89. As South Dakota has sought reconsideration of this ruling, ECF 856, Google includes South Dakota out of an abundance of caution even though it has stated no claim for relief.

20. Whether the following states' DTPAs exclude commercial transactions and apply solely to transactions with non-commercial consumers: Arkansas, Idaho, Indiana, and Utah.

    a. If so, whether those Plaintiffs have met their burden to prove conduct by Google in transactions with non-commercial consumers.

21. Whether the following states' DTPA claims are time-barred: Alaska, Arkansas, Florida, Idaho, Indiana, Kentucky, Missouri, Montana, Nevada, North Dakota, Puerto Rico, South Dakota, South Carolina, and Utah.

22. Whether RPO, or related disclosures or alleged nondisclosures, was a deceptive (or, where pled and actionable, unfair) trade practice under any of the States' statutes.

23. Whether DRS, or related disclosures or alleged nondisclosures, was a deceptive (or, where pled and actionable, unfair) trade practice under any of the States' statutes.

24. Whether Bernanke was a deceptive (or, where pled and actionable, unfair) trade practice under any of the States' statutes.

25. Whether Google's alleged statements or nondisclosures regarding header bidding were deceptive (or, where pled and actionable, unfair) trade practice under any of the States' statutes.

26. Whether Google's statements that bidders were on "equal footing" in connection its Unified First Price Auction was a deceptive (or, where pled and actionable, unfair) trade practice under any of the States' statutes.

27. Whether Google's statements that bidders were on "equal footing" in connection with its Unified First Price Auction was inactionable puffery.

28. Whether Google's statement in its Privacy Policy that it does not sell users' personal information is a deceptive (or, where pled and actionable, unfair) trade practice under any of the States' statutes.

### G. **Pending Motions**

Plaintiff States' pending motions:

- Plaintiffs' Motion for Spoliation Sanctions (Dkt. No. 693)

- Plaintiffs' Motion to Amend the Order Appointing Special Master (Dkt. No. 808)

- States of Arkansas and Idaho's Motion to Reconsider Grant of Motion to Strike the Jury Trial Right as to Civil Penalties under State Antitrust Laws (Dkt No. 855)

- State of South Dakota's Motion to Reconsider Grant of Motion to Strike the Jury Trial Right on Its DTPA Claims (Dkt. 854) or Alternatively, for Leave to Amend (Dkt. No. 856)

Defendant Google's pending motions:

- Google's Motion to Dismiss under Federal Rule 12(b)(6) (ECF 224)

- Google's Motion for Summary Judgment on Plaintiffs' DTPA Claims (ECF 672);

- Google's Motion for Summary Judgement on Plaintiffs' Antitrust Claims (ECF 674);

- Google's Omnibus Motion to Exclude Expert Testimony (ECF 668);

- Google's Motion to Strike Improper Rebuttal Opinions of Witnesses DeRamus and Somayaji (ECF 613);

- Google's Motion to Strike and/or Exclude testimony from Plaintiffs' Chat-related experts Jacob Hochstetler and Ignatius Grande (ECF 762 & 764);

- Google's Motion to Bifurcate the Liability Finding from Assessment of Penalties (ECF 635);

- Google's Verified Motion for Continuance (ECF 862)

### H. **Probable Length of Trial**

#### **Plaintiffs States:**

For the liability portion of the state antitrust claims and DTPA claims to be determined by a jury, and the federal antitrust claims to be determined by the Court, the Plaintiffs believe, based on six (6) hours of record time each day, this trial will last approximately four (4) weeks. Specifically, the Plaintiffs believe if a jury is picked on Monday, August 11th, then the parties can

be ready to open on Tuesday, August 12th and, at the latest, conclude with closing statements on Friday, September 12th. These dates and trial duration mirror those that the Parties agreed to in e-mail communications with the Court on February 4, 2025, in connection with the past rescheduling of the trial in this case. Plaintiffs would like to note that these dates could be impacted by both the start of local public schools on Monday, August 11th as well as the Labor Day holiday on Monday, September 1st.

For the bench trial of the civil penalties portion, the Plaintiffs believe this trial will last no more than approximately one (1) week. If the jury finds there is liability for the state law claims, Plaintiffs propose continuing straight into this portion of the trial immediately following a verdict, if the timing is convenient for the Court. Alternatively, Plaintiffs propose that the bench trial on penalties be held as soon as practicable and are willing to consider deferring the penalties portion by a reasonable and not an unduly delayed period of time (e.g., 21 or 28 days) after the jury's verdict, at a time that is convenient for the Court. As explained further below, Plaintiffs do not agree to Google's proposal of deferring the trial on penalties until the trial on antitrust equitable remedies. Google's proposal would delay the penalties portion (which does not require further discovery) until after discovery into equitable remedies.

### Defendant Google:

**1.    Expected Length of Trial.**

Google disputes that Plaintiffs have provided a reasonable estimate of the length of the liability trial. Plaintiffs' preliminary witness list identifies up to 70 witnesses that they may call live, and 124 depositions that they may play for the jury (a total of 174 *unique* witnesses). By any measure, this augurs a liability trial that cannot be concluded in four weeks. Taking as true the States' estimate of 6 hours of record time per day, there are 23 trial days in Plaintiffs' proposed

schedule, with 22 days for evidence and a final day of closing argument on September 12, 2025. This equates to 138 hours of trial time to hear testimony from as many as 174 witnesses for the States *alone*, assuming every minute was used for testimony and no other purpose.[9] This equates to less than an hour on average per witness, for direct, cross-, and re-direct examination, with the States using all of the trial time themselves and leaving no time for Google's defense. In addition, while the States posit the case will be argued on September 12, 2025, their proposal fails to allow *any* time for deliberations which may well be quite lengthy in this case: here, the jury will decide claims under 12 different antitrust statutes involving four alleged relevant markets, not to mention 15 different DTPA claims involving as many as seven allegedly deceptive practices for each claim.

All of this, combined with Plaintiffs' refusal to agree to an equal allotment of time (i.e., a chess clock), raises a due process concern. Allotting only 22 trial days for the liability trial (with virtually all of that time consumed by Plaintiffs' case in chief) and mandating closing argument on September 12, 2025 does not afford Google adequate time to present its defense case in chief. Accordingly, if liability is to be tried within 4 weeks, as Plaintiffs assert, Google respectfully requests that the Court mandate an equal allotment of time at trial, maintained and enforced by a chess clock. Plaintiffs have refused to agree to this. But, as Plaintiffs' trial proposal demonstrates, without a chess clock Plaintiffs' bloated witness list may consume all of the trial time the jury is *told* to expect, leaving the jury frustrated when—at the end of four weeks—the Court is forced to extend the trial to afford Google time for its defense.

---

[9] Google believes the States are significantly overestimating the time for the presentation of evidence. Assuming the jury works a 9–5 schedule, with an hour for lunch and two fifteen minute breaks, that equates to 5 to 5.5 hours of evidence per day, again assuming every minute is used for testimony (which it will not be). Using these more realistic numbers, that amounts to somewhere between 110 and 121 hours of evidence time.

### 2. Penalties Trial.

Google disputes that the penalties trial can or should take place immediately after the liability trial, for several reasons. Google also disputes that one week is adequate for this purpose.

First, Plaintiffs propose closing arguments on September 12, 2025. This necessarily means deliberations will occur during the week of September 15, 2025. Depending on their length, an "immediate" and one week long–penalties trial following deliberations would inevitably conflict with the remedies trial set for Virginia on September 22, 2025. Neither Google witnesses nor its trial counsel can be in two courts at once and it would irretrievably prejudice Google to commence a penalties trial here, if liability is found, at the same time a remedies proceeding involving the same conduct is occurring in Virginia.

Second, the Court cannot assess penalties for violations of any statute before it determines whether there is a sufficient basis for the jury's finding of liability, as required by Fed. R. Civ. P. 50. The Rule specifies a minimum of 28 days after the jury's discharge to file motions for judgment as a matter of law and the Court can consider the matter for longer. In addition, as in any bench trial, the Court is entitled to have the benefit of proposed findings of fact and conclusions of law on the claims where it is deciding liability. Receiving these after the jury's verdict will allow the jury's findings to guide the Court's own liability decision, consistent with *Dairy Queen* and *Beacon Theaters,* and will inform its consideration of the evidence at the penalties trial. The Court will also need to consider carefully any issues of redressability and mootness created by the entry of judgment in Virginia. Penalties that have an alleged deterrent purpose are not redressable if, at the time of the award, the conduct sought to be deterred has been rendered impossible due to compliance with another judgment.

Finally, the penalty relief the States seek here is unprecedented. An award of more than $100 billion in penalties, as the States' experts advocate, would be *27 times larger* than the $4.5 billion Clean Water Act statutory penalties assessed in the Deepwater Horizon disaster, an environmental catastrophe in which eleven people were killed and hundreds of miles of coastline were fouled with oil. It also far outstrips the largest awards ever in any of the Plaintiff States. *See* ECF 731-1 (Google's DTPA MSJ Reply, App'x C). Google respectfully submits that a hurried, one week trial is not sufficient time for the Court to consider a matter of this gravity.

For all these reasons, in the interest of judicial efficiency, Google proposes that only one bench trial on remedies take place so the Court can consider—as makes sense—the most effective combination of injunctive and penalty relief (if any) to respond to Google's conduct. This trial should occur *after* the Virginia judgment is entered and after adequate time for remedies discovery, which is necessary to ensure any penalty relief is carefully tailored to a sufficiently supported jury verdict, is not disproportional to the proof of any harm caused, and does not duplicate (and thus punish twice) relief granted in Virginia.

## I.  **Trial Management Procedures**

### 1.  **Procedures Agreed Upon by the Parties**

#### A.  **Bifurcated Liability Trial**

The Court has previously ordered a bifurcated trial of equitable remedies "to address equitable remedies separately from issues of liability and penalties." *See* ECF 610 ("Remedies Order"). The Court has also issued an Order deciding which liability claims shall be tried to the jury and deciding that the determination of the amount (if any) of statutory penalties to be awarded against Google shall be decided solely by the Court, without empaneling an advisory jury. *See* ECF 854 ("Jury Order") at Part E and note 42.

In light of both Orders, subject to certain States' arguments in and the Court's future ruling on the pending motions to reconsider (ECF Nos. 855, 856), the Parties agree that the scheduled August 11, 2025, jury trial be limited solely[10] to determining whether Google is liable for the following claims the Court found to be triable to a jury:

| | State Antitrust Claims | DTPA |
|---|---|---|
| Alaska | X | X |
| Arkansas | | X |
| Florida | X | X |
| Idaho | | X |
| Indiana | | X |
| Kentucky | X | X |
| Louisiana | X | X |
| Mississippi | X | X |
| Missouri | | X |
| Montana | X | X |
| Nevada | X | X |
| N. Dakota | X | X |
| Puerto Rico | | |
| S. Carolina | X | X |
| S. Dakota | X | |
| Utah | X | X |
| Texas | X | X |

*See* Jury Order, ECF 854 at 2. Concurrently with the jury trial currently scheduled for August, the Parties propose that the Court conduct a bench trial of liability on the following claims:

---

[10] Facts and opinions that bear on liability issues to be tried to the jury, even if they may also be related to remedies and penalties, are not included in this limitation and exclusion.

1. Google's liability for the States' federal antitrust claims, giving due regard to any overlapping findings by the jury, *see* Jury Order, ECF 854 at 10-13;

2. The state-law antitrust claims of Arkansas, Idaho, Indiana, Missouri, and Puerto Rico; and

3. The DTPA claims of the Commonwealth of Puerto Rico,[11] and, contingent on the Court's ruling on South Dakota's motion to reconsider (ECF No. 856), the DTPA claims of South Dakota.

**B.  Findings of Fact and Conclusions of Law**

Subject to the Parties' dispute regarding the timing and length of the penalty and equitable remedies bench trial(s) (including whether penalties and equitable remedies would be tried together), and subject to any future ruling by the Court on that issue, the Parties agree to the following schedule for the submission of Proposed Findings of Fact and Conclusions of Law (FOFCOLs) on issues tried to the Court:

1) **Liability FOFCOLs**: Submitted 30 days after the jury renders its verdict in the August liability trial. This timing will implement the mandate in *Dairy Queen* that the Court incorporate the jury's findings on any common issues in its own liability judgment.

2) **Remedy and Penalty FOFCOLs (if necessary)**: Submitted 21 days before any bench trial(s) on remedies and penalties, pending the Court's decision on when to hold such bench trial(s); once the Court decides, the Parties may revisit this proposed timing.

---

[11] Google suggests that any evidence that relates solely to the bench-tried liability claims of Arkansas, Idaho, Indiana, Missouri, and Puerto Rico be received during the trial on a day when the jury is otherwise off, so as to use their time efficiently.

The Parties agree that the July 24, 2025 deadline for Proposed Jury Instructions and Verdict Form in the Court's Scheduling Order (ECF No. 796 at 2) should therefore not apply to the Liability FOFCOLs, which will, with the Court's concurrence, be provided after the jury's verdict.

### C. Demonstratives

The Parties further agree with the Federal Rules' definition of illustrative aids (hereby referred to as "demonstratives") and agree "demonstratives" include any pre-made PowerPoint, presentation, or document that a party intends to use as a demonstrative at trial. This definition is not meant to foreclose upon a party's ability to create a demonstrative live without prior disclosure.

*Marking Demonstratives:* When a document is marked at trial, each party will sticker using the following prefix and numbering system.

| Party | Demonstrative Prefix | Beginning Demonstrative Number |
|---|---|---|
| Plaintiffs | P-DEMO- | P-DEMO-001 |
| Defendant | D-DEMO- | D-DEMO-001 |

*Listing and Tracking Demonstratives:* The parties agree these demonstratives do not need to be pre-listed on the exhibit list. However, the parties will keep a list of all demonstratives marked during trial using the same template format agreed to in the parties' stipulation. Any time the exhibit list is supplemented, the parties must also supply an updated demonstrative list. To the extent a demonstrative was previously used with one witness and properly marked (*i.e.* P-DEMO-001), this demonstrative may be used by either party with any further witnesses without any further disclosure.

*Exchange Format of Demonstratives:* Each party is required to exchange a demonstrative stamped PDF version of any demonstrative that is disclosed. For any demonstratives created live during trial, the parties will work to provide copies of those expediently.

The Parties dispute the procedures through (and circumstances under) which demonstratives will be disclosed, as summarized in the chart in the next section.

### D. Witness Photographs

The parties agree that taking a quick photograph of each witness as they take the stand may be useful in helping the jury to recall testimony when it is called to their attention in closing argument. Similar sized photographs should be printed from the video of any witness who testifies by deposition.

The parties agree to this as long as they are not mandated to use these pictures for any reason.

### E. Conference Procedure to Address Disputes

The Parties propose that any disputes relevant to anticipated argument or evidence on a particular day shall be raised with the Court at the start of that trial day, before the jury is empaneled, or at the close of proceedings if the matter is expected to be addressed in the following morning's session.

The Parties also propose that counsel be required to be present for any such conference 30 minutes before the daily start time for the jury and 30 minutes after the jury recesses for the day to resolve any such issues.

### F. Juror Convenience and Compensation

Given that this is a four week trial, Google would like to discuss with the Court and the States an agreement to create a fund that would increase the daily compensation of jurors from $50 per day to $160 per day. Assuming five and a half hours of testimony per day (9-5, with an hour for lunch and two fifteen minute breaks)—and a total of eight hours at the courthouse per day—this would compensate jurors at the rate of roughly $20 per hour.

To make a long trial more comfortable for the jurors, Google also proposes that the parties agree to provide complimentary snacks, coffee and soft drinks in the jury room, and a catered luncheon each day for jurors, the Court, and its staff.

Jurors would not be informed that either party was contributing to these expenses; rather, they would be informed that these conveniences were being provided by the Court, as a courtesy, in gratitude for their service and in view of the expected length of the trial.

The States agree to this proposal.

### G. Juror Notebooks

To assist the jury, the Parties propose the jury be supplied with juror notebooks that include the following:

- An agreed glossary of terms and definitions, if jointly agreed to by the Parties.
- Notepaper and pen, so the jurors may make notes to assist in their absorption of the evidence.

Plaintiff States (but not Google) further propose the following: The Plaintiffs are open to working with Google to create a *jointly agreed to* glossary of terms to be given to the jury. In the event the parties cannot come to a joint agreement of the definitions of these terms, the Plaintiffs propose that each party submits their final proposal to the Special Master to address any disputes and assist with finalizing any materials. Given that this is a jury trial, the Plaintiffs do not believe it is necessary to follow what was created and/or circulated in the EDVA DOJ Ad Tech bench trial, which was created for a judge, not a lay jury. The Plaintiffs can provide additional briefing related to their proposal if needed.

Google (but not the States) further proposes that:

- Every Monday morning the parties jointly update the jurors' notebooks to include an updated witness tracker that lists the witnesses in the order they have appeared thus far, together with their photographs.

- Jurors should be directed to leave their notebooks in the jury room at the end of each day. The parties will supply the bailiff with updated daily witness trackers to be substituted as the case proceeds.

Google does not consent to have the Special Master rule on any issue related to trial evidence or what jurors may (or may not) be provided.

**H.  The Court's Public and Overflow Logistics Order**

The States propose the following: To ensure that the parties receive a fair trial and that the public and media are given appropriate access to the proceedings, the Plaintiffs respectfully request that the Court issue an Order relating to public and media logistics.

This Order would address the Court's instructions relating to: seating limitations in the primary courtroom; a potential overflow courtroom with a closed circuit audio and/or visual feed; a process for a potential limited livestream/audio-only feed to counsel and/or plaintiffs who may be unable to attend live in the courtroom; the process and point people handling media requests for copies of trial exhibits; the location of the jurors' deliberation and break rooms separate and away from any shared walls with any counsel's war room; and any other necessary security and/or media matters.

The Plaintiffs can provide further briefing on any of the above-mentioned items, including as to the need for livestream and/or audio-visual feed.

Google agrees the Court will need to address these issues and is willing to work with the States and the Court to reach a suitable stipulation. To this list of topics, Google would add the

following: (i) the need to ensure sufficient seating for clients and trial team members, (ii) a process to confer before pleadings or copies of evidence are distributed to members of the media, to ensure that only non-confidential portions or documents are distributed, and (iii) assurances that any live feed provided by the Court as a courtesy cannot be recorded or transcribed by anyone viewing it.

### I. Marking new exhibits and providing hard copy exhibits and demonstratives

To the extent a party offers and marks an exhibit that was not previously included on the exhibit list (i.e. an exhibit used for impeachment, etc.), the offering party will mark the exhibit for identification using the next available unique exhibit number and offer it into evidence in the ordinary course at trial, subject to objection from the opposing parties. The parties reserve their rights to object to the admissibility of these documents as trial exhibits on all other evidentiary grounds.

The parties will meet and confer regarding how many physical copies of direct examination documents and/or direct examination demonstratives the introducing party should provide at trial for the opposing party, the Judge, Court Reporter, and Witness at the time of introduction during trial.

### J. Witness Notice

Counsel must disclose to the other side a list of witnesses who they expect will be called the following week, whether live or by deposition designation, as well as the additional information listed below, via email to counsel, by: **7:00 PM CT** on the Friday prior to the week the witnesses are expected to testify. The disclosure should include:

- The order in which the witnesses are expected to testify;

- A time estimate for the direct testimony of each witness; and

- Whether the witness will be presented live or by deposition.

In return, opposing counsel must disclose time estimates for cross-examination of all live witnesses disclosed by the offering party by: **5:00 PM CT** on the Sunday prior to the week the witnesses are expected to testify.

The parties agree to propose witness time estimates in good faith knowing that these times are solely estimates and subject to change. To the extent any disclosure changes, the parties must disclose changes immediately. Neither party will be subjected to a penalty for not meeting the originally proposed time estimates.

To the extent that any current Google employees are called to testify during the States' case in chief, [12] the parties waive any Fed. R. Evid. 611 objection seeking to limit Google's examination to the scope of the States' examination, so that Google may put on the entirety of the witness's testimony when the witness is called, without the need to recall them in Google's case.

2. **Procedures Disputed by the Parties**

| Issue | The States' Position | Google's Position |
|---|---|---|
| **Timing of penalties bench trial** | If the jury finds there is liability for DTPA and state law claims, Plaintiffs propose continuing straight into the penalties portion of the trial immediately following a verdict.<br><br>Alternatively, Plaintiffs are willing to consider deferring the penalties portion by a reasonable and not an unduly delayed period of time (e.g., 21 or 28 days) after the jury's verdict, at a time that is convenient for the Court. Plaintiffs do not agree to Google's proposal, which would delay the penalties portion (which does not require further discovery) until after discovery into equitable remedies. | If necessary, the Court should schedule a separate, consolidated bench trial to assess equitable relief and the amount, if any, of penalties to be awarded. This remedies trial should be scheduled, consistent with the Bifurcation Order, for a date after all remedy-related discovery is concluded and after the Court rules on any Rule 50 motions. |

---

[12] Google does not expect that any of its current employees will testify in the States' case in chief (because all Google employees designated as "live" witnesses on the States' preliminary list are outside of Fed. R. Civ P. 45's subpoena range).

| Issue | The States' Position | Google's Position |
|---|---|---|
| **Trial time** | Plaintiffs do not believe that it is reasonable or fair to give Google equal time as Plaintiffs, nor that this case necessitates a chess clock. As the party going first at trial, Plaintiffs must shoulder the burden to educate the jury on complicated Ad Tech background and factual issues, such as industry history and auction mechanics, before shifting into the merits of the case and affirmative liability evidence. As the party going second, Google will not need to spend the same amount of time doing that. Plaintiffs understand that Google proposes a chess clock due to concerns about the jury knowing the time split between the parties (*i.e.* who is using what.). Google's concern, however, does not trump the fact that Plaintiffs must necessarily spend more of their time educating the jury on Ad Tech basis, while Google does not.<br><br>As previously stated at the January 29th, 2025, hearing, Plaintiffs propose meeting with either the Court or the Special Master to further discuss the timing issue. *See* Status Conference, January 29, 2025, statement by W. Mark Lanier, pg. 30 ("…On the timed issue, that's just one that's got to be hammered out if it's going to be fair and right and proper, and we can do that with you directly, we can do that through the special master, however you choose for us to initiate those dialogues with people on what we can do."). | Plaintiffs' proposed schedule contemplates a total of 22 trial days, plus closing argument on September 12, 2025, for a total of 23 days. Assuming, as is typical, that the jury hears five to five-and-a-half hours of evidence per day (based on a 9-5 schedule with an hour for lunch and two fifteen minute breaks), this amounts to a total of 110-121 hours of time, in total, for the presentation of evidence. However, Plaintiffs' preliminary witness list identified up to 70 witnesses that they may call live, and 124 depositions that they may play for the jury (a total of 174 *unique* witnesses). Plaintiffs have affirmatively designated ~66 hours of deposition testimony alone.<br><br>Given the stakes for both parties, and the risk of running out of time during Google's case in chief, Google urges the Court to allocate the trial time *equally*[13] between the parties, by allotting the States 55 hours to present their case and Google 55 hours to present its defense. To ensure the parties adhere to this allocation, Google proposes that the Court's reporter track time used at trial using a chess clock.[14]<br><br>Google suggests that the reporter be asked to track time as follows:<br><br>1. Time spent by counsel during jury argument (e.g., openings, interim arguments, closings) or questioning of witnesses will count against that side; but<br>2. Time spent arguing objections will not count against either side.<br><br>At the end of the day, Google proposes that the reporter reconcile the time count with designated representatives from each side, so the Court will be informed of time used and time remaining for each side. |

---

[13] The court's authority to allocate time equally between the parties at trial is well settled. "In the management of its docket, the court has the inherent right to place reasonable limitations on the time allotted to any given jury trial." *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 520 (5th Cir. 1994); *see also Raynor v. G4S Secure Sols. (USA), Inc.,* 805 Fed. Appx. 170, 177 (4th Cir. 2020); *In re Baldwin,* 700 F.3d 122, 129 (3d Cir. 2012) (collecting cases); *Life Plus Intern. v. Brown,* 317 F.3d 799, 807 (8th Cir. 2003); *Sparshott v. Feld Entm't, Inc.,* 311 F.3d 425, 433 (D.C. Cir. 2002); *Gen. Signal Corp. v. MCI Telecomm. Corp.,* 66 F.3d 1500, 1508 (9th Cir. 1995); *Johnson v. Ashby,* 808 F.2d 676, 678 (8th Cir. 1987); *MCI Comms. v. AT&T,* 708 F.2d 1081 (7th Cir. 1982).

[14] The use of chess clocks to ensure compliance with Court-imposed time limits for the presentation of evidence is common, too. *See e.g.*, *K7 Design Group, Inc. v. Walmart Inc.,* No. 5:21-CV-5069, 2024 WL 756360, at *6 (W.D. Ark. Jan. 26, 2024); *Raynor v. G4S Secure Sols. (USA) Inc.*, 327 F. Supp. 3d 925, 940 (W.D.N.C. 2018), *aff'd,* 805 Fed. Appx. 170 (4th Cir. 2020), *United States v. First Data*, 287 F. Supp. 2d 69, 70 (D.D.C. 2003), *Novey v. Heartland Home Fin., Inc.*, No. 06-CV-00031-MSK-BNB, 2008 WL 687361, at *7 (D. Colo. Mar. 11, 2008); *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-MD-2472 WES, 2019 WL 13257216, at *4 (D.R.I. Dec. 6, 2019).

| Witness List and Live Witnesses at Trial | The parties shall submit to the Court a joint list of all witnesses each party reasonably believes it will or may call to testify at trial in its case-in-chief in accordance with the dates as part of its joint final pretrial order ("JPTO"). For each witness, the witness list shall include the following information: (a) whether the witness is a will call or may call; (b) whether the witness will be presented live and/or by deposition designation. In the event a witness is designated as both "live or deposition designation" then the parties will meet and confer to ascertain a procedure to proceed. The parties will meet and confer regarding when the Plaintiffs shall disclose to the Defendant the witnesses they expect to call the first week of trial.<br><br>*Live Witnesses at Trial*: The Parties have attempted to discuss a subset of witnesses that may be coming to trial live. As described above, the parties will exchange their initial witness lists prior to the filing of the JPTO on July 3rd and incorporate those lists into the filing of the JPTO on July 8th. The parties disagree about adding an additional deadline relating to a trial witness list. Plaintiffs believe an additional deadline will allow the parties to better narrow the list of live witnesses at trial as the parties get more clarification on the scope and specifics of trial. Plaintiffs have proposed a final witness list well before the Court's July 24, 2025, objections deadline.<br><br>To the extent both parties are not able to reach an agreement as to which witnesses will be appearing live at trial, the parties will continue with the designation process and at the time of the exchange of deposition designation objections and counter exchange on July 24th, the parties will submit their differences for the Court to review. Plaintiffs continue to believe that these designation and witness differences are appropriately handled by the Special Master, Google continues to believe that these disagreements | Google disagrees with Plaintiffs' suggestion that they need not comply with the Court-ordered deadline requiring the filing of Witness Lists with this Joint Pretrial Order and, instead, that Plaintiffs should be permitted to identify the witnesses they will actually call on July 24.<br><br>One purpose of requiring parties to exchange meaningful and final witness lists early is to ensure parties have adequate time to prepare for trial and can seek relief if, as has occurred here, witnesses are added to the list who were not disclosed timely.<br><br>The witness list Plaintiffs served on July 3 violates both purposes. It contains 60 witnesses that Plaintiffs "may" call live and another 116 depositions that Plaintiffs "may" play to the jury (though Plaintiffs ultimately designated deposition testimony of ~50 witnesses, totaling 66 hours). Plaintiffs' witness list also includes over 70 witnesses who were not disclosed timely, as required by the Court's scheduling order, imposing on Google the need now to depose several witnesses whose depositions Google did not take in this case.<br><br>Assuming Plaintiffs' witness list appended to this JPTO is similarly open-ended and unhelpful, then Google proposes that Plaintiffs provide a pared down, good faith witness list by **July 21** (as long as they do not <u>add</u> any new witnesses or convert witnesses from "by depo" to "live"). Google proposes that it then have until July 23 to amend its witness list in response.<br><br>Google does not consent to have the Special Master resolve any issues related to trial evidence, including objections to deposition designations. |

| Issue | The States' Position | Google's Position |
|---|---|---|
| | are appropriate for the Court until otherwise ordered. | |
| **Depositions** | As described in the Plaintiffs' June 3, 2025, stipulation proposal:<br><br>**Final Video and/or Transcript**<br><br>The offering party will provide final video files and final clip report(s) or, in the case of non-video, the final transcripts of deposition testimony (including all remaining affirmative, completeness, and counter-designations) to non-offering parties for their review prior to introduction at trial.<br><br>The Parties agree to work in good faith to identify a mutually agreeable format for the exchange of page and line citations for deposition testimony in a manner that permits their respective technical teams to efficiently cut the final videos, including how far in advance the final video files, transcripts, and exhibits must be disclosed prior to trial play. | **Final Deposition Videos/Clip Reports**<br><br>Google proposes that before any party plays a video deposition at trial, they shall provide a copy of the final video clip, including all affirmative designations, optional completeness designations, and counter-designations, together with the corresponding clip report, to the other side *24 hours in advance.* If the deposition was not recorded, the party introducing the deposition testimony will provide a copy of the final clip report to the other side 24 hours in advance.<br><br>Google proposes that any testimony read from a paper transcript shall be read by a lawyer, not an actor, using an even tone throughout, in continuous sequence as it was rendered. |

| Exhibit and Demonstrative disclosure | *Direct Examination Documents:* A party conducting a direct examination must disclose the specific exhibits from its exhibit list and any that it reasonably and in good faith intends to use on direct examination of the witness **by 9:00 PM CT on the day/night prior to their expected use at trial**. The parties are not required to disclose the documents intended to be used on direct examination of a witness who is currently or was formally associated with or employed by an opposing party or designated as hostile. The parties are not required to disclose documents to be used on impeachment or rebuttal (i.e., re-direct). This provision is not intended to conflict with Plaintiffs' proposed stipulation provision governing items that do not need to be listed on the exhibit list.<br><br>Any authenticity objections to the exhibits disclosed for use on direct examination shall be disclosed by **11:00 PM CT** on the day prior to their expected use at trial.<br><br>*Direct Examination Demonstratives:* A party conducting a direct examination of any witness must disclose any demonstratives it intends to use, if that demonstrative has not been previously used by either party, **by 9:00PM CT the day/night before the witness is expected to take the stand**. The parties shall raise any objections to such witness demonstratives with the Court prior to the witness taking the stand.<br><br>*Cross Examination Documents and Demonstratives:* The parties are not required to disclose documents to be used with a witness on cross examination. No party is required to exchange exhibits and demonstratives intended for use on cross-examination. For avoidance of doubt, cross-exhibits and cross-demonstratives need not be disclosed by a party calling any witness who is currently or was formally associated with or employed by an opposing party or designated as hostile. This provision does not relieve the parties of any obligation to | Google proposes that any party intending to use a demonstrative during the examination of any witness shall disclose such demonstrative no later than 24 hours before the demonstrative is to be used.<br><br>Google proposes that any exhibits used during witness examinations be included on the parties' exhibit lists, with the exception of exhibits that are solely for impeachment.<br><br>Google disputes that there should be any exemption from these exchange provisions for cross examination (or any examination of witnesses "employed by a party" or "previously deemed hostile," as the States propose). |

| Issue | The States' Position | Google's Position |
|---|---|---|
| | include such documents on exhibit lists. This provision is not intended to conflict with the Plaintiffs' proposed stipulation provision governing items that do not need to be listed on the exhibit list. | |
| **Opening and Closing Exchange** | Any Opening and Closing PowerPoints, slides (e.g., Google Slides) or other similar presentations must be exchanged **by 7:00 PM CT the night prior to their expected use at trial**. The parties do not need to list any demonstratives that they intend to use at trial on their Exhibit Lists. Furthermore, neither party needs to disclose any other demonstratives prior to use during Openings and Closings.<br><br>The parties exchange objections to Opening and Closing PowerPoints or other presentation materials the morning prior to their expected use at trial by **7:00 AM CT.** | Google disagrees that solely opening/closing slide decks or other "presentations" should be subject to a disclosure requirement while "other" demonstratives are exempt. The parties should either disclose in advance all opening/closing presentations *and* demonstratives they plan to use, or not. |

| Issue | The States' Position | Google's Position |
|---|---|---|
| **Special Master for Disputes and Trial Stipulation** | Plaintiffs' proposed stipulation on trial evidence circulated to Google on June 3, 2025, addresses a proposed conference procedure to address disputes arising from the aforementioned disclosures relating to exhibits, witnesses, disclosures, and demonstratives. To streamline the process, Plaintiffs believe the Court and the parties should incorporate the Special Master in any preliminary trial related objection process.<br><br>Specifically for deposition designations and video plays, Plaintiffs propose that the parties shall meet and confer with the Special Master regarding the format for submission to the Court of deposition designations and objections.<br><br>The parties have also worked since early to mid-May to reach an agreement regarding a trial related stipulation pertaining to deposition designations, witness lists, exhibit lists, and the various objection exchanges aimed at lightening the potential burden the process may have upon the Court. The parties have come to some agreement on the potential stamping procedures relating to the exhibits. However, the parties have not reached an agreement on a number of issues and seek guidance from the Court on how to move forward. Plaintiffs continue to believe the Special Master could be of use on some of the outstanding disputes. | Google does not consent to have the Special Master adjudicate any issue related to the admission or exclusion of evidence at trial. |

51

| **Preliminary Jury Instructions** | Plaintiffs do not believe that this trial requires any sort of preliminary explanatory jury instructions. In the event the Court does believe that a preliminary jury instruction is necessary, the States propose that the Courts approves a joint proposal of these instructions. Plaintiffs also believe that the Court, not an attorney for the parties, should give these instructions to the jury. | At the conference on November 6, 2024, the Court stated that, "before the trial starts, the Court will have to resolve as a matter of law these issues for any such remaining claims so that everybody knows what the proof needs to look like before we get into trial." Tr. 11/6/2024 at 41. Google therefore proposes that the Court use *substantive* preliminary instructions to inform the jury—before they receive evidence—of the legal elements of the claims Plaintiffs must prove in order to prevail. |
| --- | --- | --- |
| | | The giving of ***substantive*** preliminary instructions is supported by a 2014 study conducted by a Blue Ribbon Panel[15] of experienced judges and antitrust trial lawyers. Based on the panel's recommendations, the ABA Antitrust Section's Model Instructions for Juries now recommend that Courts trying antitrust cases deliver preliminary instructions on the law to the jury after they are seated and ***before*** they hear evidence.[16] |
| | | Giving preliminary instructions serves a further purpose here: Plaintiffs have previously argued for an *unequal* allocation of time at trial, claiming they bear the burden to teach the jury the relevant legal concepts. This is flatly wrong: only the Court may instruct the jury on the law.[17] Any such argument by counsel would encroach on the Court's prerogative. Any alleged need to "teach" such concepts to the jury would be avoided by having the Court do this teaching itself, before the jury hears evidence. |
| | | Finally, Google believes preliminary instructions on the law—including the specific elements of each of the claims each State must prove under the relevant statute it invokes—will give jurors an important "frame" within which to view the evidence they will hear; without this frame, they may be at a loss to understand why particular |

| Issue | The States' Position | Google's Position |
|-------|---------------------|-------------------|
|       |                     | evidence is being presented or what it is the parties are trying to prove. |
|       |                     | Google therefore proposes that each side submit proposed preliminary instructions with their other jury instructions on the dates provided in the Scheduling Order. |

---

[15] The Blue Ribbon panel was co-chaired by Joe Goldberg and Harry Reasoner. The judges included Chief Judge Sarah S. Vance (E.D. La.), Judge M. Margaret McKeown (Ninth Circuit), and Judge Vaughn R. Walker (retired N.D. Cal.). The other distinguished members of the panel included Arthur Burke, Mark Gidley, Bob Kaplan, Andy Marovitz, Laddie Montague, Steve Susman, and Heather Tewksbury. The panel began its work in June 2014 and, over five months, expended considerable time reviewing, debating, and revising the instructions provided to it.

[16] The ABA Antitrust Section stated as follows:

> The Blue Ribbon Panel also examined the use of preliminary instructions to the jury before opening statements, particularly in rule of reason cases that will require the jury to understand and apply more difficult legal concepts. The Panel unanimously recommended the use of preliminary instructions before opening statements in order to provide the jury with a legal framework to evaluate the evidence and to focus lawyers' opening statements. However, because preliminary instructions would necessarily be fact-specific, the Handbook does not provide model preliminary instructions. Also, the Blue Ribbon panel, as well as the Antitrust Section, recommends that jurors receive copies of the instructions when they begin deliberations.

[17] It is the sole province of the Court, not counsel, to instruct the jury on the law they must apply in reaching their verdict. *See, e.g.*, *Reitz v. Woods*, 85 F.4th 780, 788 (5th Cir. 2023) (discussing "the court's province"); *Deep Ellum Brewing Co., LLC v. Tex. Alcoholic Beverage Comm'n*, 2016 WL 6747293, at *3 (W.D. Tex. Nov. 14, 2016) (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997)) ("Each courtroom comes equipped with a legal expert ... called a judge.").

| Issue | The States' Position | Google's Position |
|---|---|---|
| **Interim Argument** | Plaintiffs oppose Google's proposal to allow for any interim argument. Plaintiffs' stance has not changed since the January 2025 hearing discussion, that interim argument should not be allowed, but if the Court determines interim argument is permitted, Plaintiffs should be permitted to make the first and last argument to the jury:<br><br> Interim arguments are only fair if there's truly going to be argument, if it's plaintiff, defendant, and a rebuttal. Otherwise, what you've effectively done is supplanted that important role of the plaintiff getting to have the last word necessary for the burden of proof, and have supplemented throughout the duration of a trial sustaining the idea that the defendant gets the last word in such an argument.<br><br>Status Conference, January 29, 2025, statement by W. Mark Lanier, pg. 32. | As previously discussed with the Court, Google proposes that the Court allow each side two hours of interim argument time to be used at their discretion (and subject to the Court's schedule) during the presentation of evidence. Counsel may use their argument budget at their discretion and argument may be made without the need for the other party to respond to it.<br><br>A 2008 study conducted in the Seventh Circuit[18] confirms that interim argument serves several important purposes–particularly in a long trial:<br><br>&bull; It enhanced juror comprehension of the evidence they heard and facilitated their recall of it;<br><br>&bull; It helped to organize and highlight key evidence;<br><br>&bull; It maintains juror engagement and prevents juror fatigue;<br><br>&bull; It increases trial efficiency;<br><br>&bull; It helps jurors "connect the dots" of what they are hearing as long trial proceeds; and,<br><br>&bull; It gives lawyers strategic flexibility to emphasize facts and concepts important to their case, while the evidence is presented, rather than relying on the jury to recall (in the moment) evidence they might have heard four weeks earlier. |

---

[18] Available at https://www.uscourts.gov/file/document/seventh-circuit-bar-assoc-final-report-re-jury-project-2008. The commission's findings regarding interim argument are found on pages 32 to 35.

### J.  **Witness Lists**

Plaintiffs States' Witness List is attached hereto as Exhibit 1.

Defendant Google's Witness List is attached hereto as Exhibit 2.

### K.  **Deposition Designations**

Plaintiffs States' Deposition Designations are attached hereto as Exhibit 3.

Defendant Google's Deposition Designations are attached hereto as Exhibit 4.

### L.  **Exhibit Lists**

Plaintiffs States' Exhibit List is attached hereto as Exhibit 5.

Defendant Google's Exhibit List is attached hereto as Exhibit 6.

### M.  **Certifications**

The undersigned counsel for each of the parties in this action hereby certify and acknowledge the following:

(1)     Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

(2)     Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

(3)     Each exhibit in the List of Exhibits herein:

(a)     is in existence;

(b)     is numbered; and

(c)     has been disclosed and shown to opposing counsel.

DATED: July 11, 2025

/s/ W. Mark Lanier
_____
W. Mark Lanier
Mark.Lanier@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.Derose@LanierLawFirm.com
Jonathan P. Wilkerson
Jonathan.Wilkerson@LanierLawFirm.com
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
(713) 659-5200

**THE LANIER LAW FIRM, PLLC**

Respectfully submitted,

/s/ Ashley Keller
_____
Ashley Keller
ack@kellerpostman.com
Kiran N. Bhat
kiran.bhat@kellerpostman.com
2333 Ponce De Leon Boulevard
Suite R-240
Coral Gables, Florida 33134
(833) 633-0118

Zina Bash (Bar No. 24067505)
zina.bash@kellerpostman.com
111 Congress Avenue, Suite 500
Austin, TX 78701
(512) 690-0990

/s/ Noah S. Heinz
_____
Noah S. Heinz
noah.heinz@kellerpostman.com
1101 Connecticut Ave., N.W., Suite 1100
Washington, DC 20036
(202) 918-1123
**KELLER POSTMAN LLC**

*Counsel for Texas, Idaho, Louisiana (The Lanier Law Firm only), Indiana, Mississippi, North Dakota, South Carolina, and South Dakota*

*Submitted on behalf of all Plaintiff States*

**NORTON ROSE FULBRIGHT US LLP**
Joseph M. Graham, Jr.
joseph.graham@nortonrosefulbright.com
Geraldine Young
geraldine.young@nortonrosefulbright.com
1550 Lamar Street, Suite 2000
Houston, Texas 77010
(713) 651-5151

Marc B. Collier
Marc.Collier@nortonrosefulbright.com
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
(512) 474-5201

*/s/ Kathy D. Patrick*
Kathy D. Patrick
State Bar No. 15581400
KPatrick@gibbsbruns.com
Robin C. Gibbs
State Bar No. 07853000
RGibbs@gibbsbruns.com
Ayesha Najam
State Bar No. 24046507
ANajam@gibbsbruns.com
Charles Rosson
State Bar No. 24074985
CRosson@gibbsbruns.com
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Tel.: (713) 650-8805
Fax: (713) 750-0903

Eric Mahr (*pro hac vice*)
eric.mahr@freshfields.com
**FRESHFIELDS US LLP**
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4545

Justina K. Sessions
justina.sessions@freshfields.com
**FRESHFIELDS US LLP**
855 Main Street
Redwood City, CA 94063

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on July 11, 2025, this document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service, per Local Rule CV-5(a)(3)(A).

*/s/ W. Mark Lanier*
W. Mark Lanier
